I5VTMIDA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3
                 v.                          18 CR 36 (JPO)
4
    DAVID MIDDENDORF, THOMAS
5   WHITTLE, DAVID BRITT, CYNTHIA
    HOLDER and JEFFREY WADA
6
                 Defendants
7   ------------------------------x

8                                            New York, N.Y.
                                             May 31, 2018
9                                            3:05 p.m.

10  Before:

11                      HON. J. PAUL OETKEN

12                                           District Judge

13

14                          APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    AMANDA K. KRAMER
17  JESSICA GREENWOOD
         Assistant United States Attorneys
18
    PETRILLO KLEIN & BOXER LLP
19       Attorneys for Defendant Middendorf
    NELSON A. BOXER
20  AMY R. LESTER

21  BRUCH HANNA LLP
         Attorneys for Defendant Middendorf
22  GREGORY S. BRUCH

23  CAHILL, GORDON & REINDEL
         Attorneys for Defendant Whittle
24  BRADLEY BONDI
    NOLA HELLER

25

I5VTMIDA

APPEARANCES CONTINUED


ORRICK HERRINGTON & SUTCLIFFE LLP
        Attorneys for Defendant Britt
ROBERT M. STERN
MELINDA L. HAAG
MATTHEW R. SHAHABIAN

THOMPSON HINE LLP
        Attorneys for Defendant Holder
NORMAN A. BLOCH
EMILY J. MATHIEU

BROWN RUDNICK
        Attorneys for Defendant Wada
STEPHEN COOK
SELVIE JASON

I5VTMIDA

1              (In open court, case called)

2          THE COURT:  Good afternoon.  This is an argument that

3     I scheduled on the motions to dismiss the indictment.  The five

4     defendants in this case have moved and filed briefs in various

5     combinations seeking dismissal of Counts One through Five of

6     the indictment in this case, and this is an opportunity to have

7     argument on those motions.

8          I should say that I have about -- we can go until

9     about 4:30, so we have an hour and 20 minutes or so, if you

10    need to take that long.  I should also say that I read the

11    briefs, so I don't need you all to repeat what is in the

12    briefs.

13         What I would like to do is -- if you have divided up

14    the time differently, that's fine.  I know some of the briefing

15    was joint briefing, and that's fine, but I would like to give

16    each of you an opportunity to have at least ten minutes to

17    argue on behalf of your client.  But again, I already read the

18    briefs, so you don't need to repeat what is in the briefs.

19         What I haven't really done is read all the cases.  I

20    sort of started reading the cases, and I plan to read through

21    the briefs again and the cases before I decide the motion, so I

22    don't believe I will be in a position to rule on the motions

23    today.  But if you think about it as I have ten minutes and

24    these are the points I really want the judge to hear and

25    highlight when I'm reading the cases and rereading the briefs,

I5VTMIDA

1    that's really how you should think about it.

2              So I think since the defendants are movants, I would

3    like to started with you.  Have you talked about a particular

4    order?

5              MR. BOXER:  We did, your Honor.  We'll start with the

6    joint brief of Middendorf, Whittle and Britt, and Mr. Shahabian

7    is going to argue that brief for us.

8              THE COURT:  Okay, very well.

9              Mr. Shahabian.

10             MR. SHAHABIAN:  May it please the Court, I'm appearing

11   on behalf of David Britt, arguing the joint motion filed by

12   Mr. Middendorf, Mr. Britt and Mr. Whittle, and joined by

13   Ms. Holder and Mr. Wada.

14             The government's argument fails to recognize what the

15   PCAOB is and what it is not.  What it is, as the Supreme Court

16   explained in *Free Enterprise* is the regulator of first resorts

17   and primary law enforcement authority for the accounting

18   industry that wield the executive power of the United States.

19   But what it is not is an agency of the United States or a part

20   of the formal United States government.

21             And Congress made those choices when it enacted

22   Sarbanes-Oxley in creating the PCAOB, and it made those choices

23   and set up a remedial structure for violation of PCAOB rules.

24   It specified when those rules would be enforced criminally and

25   when they would be enforced civilly.  And for the majority,

I5VTMIDA

including the confidentiality rule at issue in this case,

Congress specified that under Sarbanes-Oxley it would be

enforced through the ample civil and administrative penalties

in the act, including penalties up to $750,000 for an

individual, and facing a lifetime bar from the public

accounting industry.

THE COURT:  That's a PCAOB rule?

MR. SHAHABIAN:  That is in Sarbanes-Oxley.

THE COURT:  When PCAOB issued rules, there are also

PCAOB rules about not disclosing this kind of information, is

that correct?

MR. SHAHABIAN:  That's correct, it's part of the PCAOB

ethics code.  The confidentiality rule is Ethics Code 9.

THE COURT:  So Ethics Code 9, is that something that

is issued in the federal register?

MR. SHAHABIAN:  Yes, it is, your Honor.  And the

federal register cite is in our opening briefing, and it

explains that the statute under which the PCAOB issued the

ethics code.  As we explained in our opening brief, that

statutory provision that instructs the PCAOB to enact the

ethics code, Congress did not add triggering language for that

statute that it would be enforced through criminal penalties as

it did with other parts of Sarbanes-Oxley.  And without that

triggering language, the default penalties are the ample civil

and administrative penalties.  So a violation of PCAOB could be

I5VTMIDA

1    enforced through that civil administration structure.

2            THE COURT:  Let me ask you, before you get into your

3    next point, or maybe it's your first point, to at a high level

4    address the argument which I will also ask the government about

5    why there isn't an inconsistency in the position with respect

6    to Count One, which seems to rest on the idea that there's no

7    conspiracy targeted because the SEC and PCAOB is a private

8    entity versus your argument on the wire fraud counts which

9    seems to emphasize the private nature of the PCAOB.  And as I

10   say, I will ask the government whether there's an alternative

11   charging type problem here or an inconsistency, and about what

12   the possibility of inconsistency in your argument as to these

13   fraud statutes?

14           MR. SHAHABIAN:  There is no inconsistency, your Honor.

15   And the two cases that make that clear are the *Free Enterprise*

16   case and the *Tanner* case.  And so it's important to go back to

17   statutes that are charged for the conspiracy counts and for the

18   wire fraud counts.  So the conspiracy count is a conspiracy to

19   defraud, quote, the United States.

20           And as the Supreme Court explains in *Tanner*, as broad

21   as that statute is, that has to be the restriction on a

22   conspiracy to defraud the United States.  It is what is

23   actually part of the United States government for statutory

24   purposes.  And that's what the Supreme Court acknowledged in

25   *Free Enterprise* when it noted that Congress had made the

I5VTMIDA

1  decision not to make the PCAOB part of the formal United States

2  government.

3          That's why Count One acknowledges this in not charging

4  the object of the conspiracy as defrauding the PCAOB, which is

5  not part of the United States, but instead the SEC, which is an

6  entity of the United States.  So it's that statutory hook that

7  in *Tanner* the Supreme Court says must be present.  It is not

8  sufficient to charge a scheme to defraud an intermediary that

9  may have secondary effects on the formal United States, the

10  fraud must reach the United States.

11          But the wire fraud counts are a totally different

12  question and that's why there is no inconsistency.  So the wire

13  fraud statute, as the Supreme Court explained in *McNally* is not

14  limited to the United States government, it's not limited to

15  any government.  It was designed to protect private people and

16  their property interests.

17          So what the Supreme Court started to do to in *McNally*,

18  and most notably emphasized in *Cleveland*, is said that when the

19  wire fraud statute is used to charge a scheme to deprive a

20  regulatory interest under the wire fraud statute, that does not

21  interfere with what we think of as common law property

22  interests and is not an appropriate subject of a wire fraud

23  prosecution.

24          So there's no inconsistency because the question is

25  different.  For the 371 count, the question is what is part of

I5VTMIDA

1    the United States, and does the indictment allege a conspiracy

2    that actually targeted at reaching and defrauding the United

3    States government.

4            For the wire fraud question, the question is if the

5    indictment charges the interference with an intangible right,

6    is that intangible right a common law private property interest

7    or is it a regulatory interest that is not typically referred

8    to as property.

9            And so that's why even though the PCAOB is not part of

10   the formal United States and cannot be the subject of a

11   conspiracy to defraud the United States, because Congress made

12   that decision in defining the United States.  It still a

13   regulator.  It still exercises the executive power of the

14   United States.  It acts as regulator.

15           So in determining whether an interference with the

16   intangible rights of the PCAOB is a property interest or a

17   regulatory interest, that is what *Cleveland* demands this Court

18   look at to see whether the PCAOB's interest in protecting the

19   integrity of its regulatory scheme is a common law property

20   interest protected by the statute.

21           THE COURT:  I think that's a very strong argument.  I

22   think that the argument is that -- first of all, the PCAOB, the

23   board itself consists of inferior officers of the United

24   States, according to *Free Enterprise*, and those are board

25   members who are exercising governmental power, delegated

I5VTMIDA

1   governmental power.

2        But the strength of that argument, it seems to me,

3   perhaps makes weaker your argument on Section 371 in the sense

4   that the more -- what's happening here is regulatory activity,

5   the more it seems a main part of what they were doing was

6   something that was obviously going to the SEC, they were

7   playing with information that was regulatory information that

8   was essential to the oversight role of a government entity.

9   And so that extent, it brings the PCAOB closer to the SEC, I

10  would think.

11       MR. SHAHABIAN:  So I have a few responses to that

12  point, your Honor, and again I go back to emphasize the key

13  cases.  We think it's *Tanner* as well as *Free Enterprise*.

14       So your Honor noted that the Congress delegated a

15  significant federal function to the PCAOB, even though it has

16  decided not to make it a formal entity of the United States.

17  The government raised that same argument in *Tanner*.  It said

18  what we have here is a private entity that is not part of the

19  United States, but it's been delegated a significant federal

20  function, it uses federal funds, it's supervised by a federal

21  agency.  And the Supreme Court squarely rejected that argument

22  and said it was not sufficient to charge a conspiracy to

23  defraud an entity supervised by the United States government or

24  even an entity delegated a distinctly federal function, as is

25  the case with the PCAOB.

I5VTMIDA

1          The restriction on 371, because it's such a broad

2     statute, as the Supreme Court noted and the Second Circuit

3     noted, it has to be the formal United States as the target.

4     And we don't see the indictment as really taking issue with

5     that point, because it attempts to transform an agreement

6     targeted at the PCAOB into a fraud on the SEC.

7          And this leads me to your second point, your Honor,

8     that isn't it obvious that this is something that would reach

9     the SEC.  That is not at all obvious in what is in the

10    indictment.  The only thing the indictment charges as the

11    agreement that the defendants agreed to to commit the

12    conspiracy is paragraph 91 where it says there was an agreement

13    to misappropriate confidential information from the PCAOB and

14    use it to effect PCAOB inspection outcomes which were

15    transmitted to the SEC and used for its undefined regulatory

16    and enforcement functions.  That never specifies what function

17    of the SEC the defendants agreed to impede.

18          Your Honor mentioned the SEC oversees the PCAOB.  But

19    again, this takes us back to *Tanner.  Tanner* rejected the

20    arguments that federal oversight after an intermediary can

21    constitute a conspiracy to defraud the United States.  It is

22    simply insufficient unless there is a fraud that is targeted

23    and an actual function of the SEC.

24          So then get back to what is the indictment charge.

25    And we don't know.  It doesn't specify.  It lists a bunch of

I5VTMIDA

1    various functions of the SEC, including the oversight function,

2    but it never explains what the defendants agreed to impede.

3           And to come back to *Free Enterprise*, the PCAOB serves

4    an entirely separate role than the SEC.  It's not simply

5    collecting this information, bundling it up and transmitting it

6    to it the SEC who then actually uses it to do things.  *Free*

7    *Enterprise* explains the PCAOB is the primary regulator.  It is

8    the front line entity that entities like KPMG are dealing with.

9    That's why the majority of the indictment is directed at the

10   relation to PCAOB and the defendants in KPMG.  It never

11   explained what the SEC is doing with that at the secondary

12   level.

13          And to be clear, the statute mandates not only that

14   the PCAOB transmits to the reports to SEC, but it should be

15   transmitted to every state regulatory entity and to the public

16   at large.  So by failing to specify what it is that the SEC

17   does with these reports, that the defendants agreed and

18   targeted to impede, as *Tanner* requires, the Second Circuit's

19   decision in *Pirro* makes clear that by not failing to allege the

20   essential elements of the crime that pushed the indictment's

21   allegations, even if true, into criminal conduct, the remedy

22   has to be dismissal of the indictment.

23          THE COURT:  What do you say to the argument that your

24   argument is to some extent there's no conspiracy targeted at

25   the SEC, there has to be a purpose and not just knowledge,

I5VTMIDA

1    because I think the indictment does allege that there was

2    knowledge that the information would go to the SEC, but you say

3    that's not enough.

4         The government responds the cases don't require that

5    it be the sole purpose, it can be a purpose, it can be one of

6    several of purposes, or one of several of purposes is to

7    defraud the SEC.  Do you think that that is not adequately

8    alleged, that it's one of several purposes to give false

9    information that will flow to the SEC?

10        MR. SHAHABIAN:  No, your Honor.  We don't take issue

11   to the basic premise that a conspiracy could have multiple

12   purposes.  But be that as it may, it must still charge it was a

13   purpose to defraud the SEC.

14        So the cases we cite in the brief, including *Goldberg*

15   and *Atkinson* -- *Goldberg* is a First Circuit case and *Atkinson*

16   is from the 11th Circuit -- make clear when you have a multiple

17   conspiracy indictment that charges a conspiracy to defraud the

18   United States, it must be clear that one of the purposes was to

19   defraud the United States and not that there was a secondary

20   effect.

21        So to give your Honor an example of knowledge, the one

22   that the Goldberg case explains is if several defendants agreed

23   to rob a bank and steal money, they know they're not going to

24   report the proceeds of that theft to IRS, but it would be

25   ridiculous to contend that the knowledge that they're not going

I5VTMIDA

1    to report it to the IRS is also a conspiracy to defraud the IRS

2    in the collection of tax revenues.  It must have been actually

3    a purpose of the conspiratorial agreement to accomplish that

4    function.

5           And the Second Circuit's decision in *Rosenblatt* makes

6    this even clearer, that if the government's contention is all

7    they need to do is track the statutory language of the defraud

8    charge in order to charge a 371 count.  The Second Circuit

9    rejected that over 40 years ago in *Rosenblatt*.  They squarely

10   said it is not sufficient to merely say there is a conspiracy

11   to defraud the United States, it must be clear what the

12   essential nature of the fraud was.

13           THE COURT:  This seems a long way from the idea of the

14   bank robbers.  Obviously the bank robbers know they're the

15   going to defraud the IRS, but that's not their purpose.

16   They're not thinking about the IRS when they rob the bank,

17   they're thinking about the money.

18           But here, as alleged, the taking and use of the

19   information about where the next audits will be is directly

20   tied to the function that is the regulatory function of the

21   PCAOB and the SEC, which are interlinked, I would think.

22           MR. SHAHABIAN:  And that's where I disagree.  That

23   interlinking, that the function of the SEC, is not specified in

24   the indictment as part of the agreement of the defendants.

25   That's why I come back to paragraph 91, which is the critical

I5VTMIDA

paragraph, because it's the only paragraph that actually

charges what the agreement was.  It just says that they knew

the inspection reports would be transmitted to the SEC and used

for its undefined regulatory and enforcement functions.

            Now we come back to *Tanner.*  *Tanner* says it is not

sufficient to know that a federal agency is overseeing an

intermediary like the PCAOB, it must be actually targeted at

defrauding the specific function of that agency.  And because

of other paragraphs in the indictment, such as paragraph ten,

state the SEC oversees the PCAOB, it oversees the PCAOB's

inspections process, because paragraph 91 doesn't specify what

function was the agreed-to target, the grand jury may have

relied on those oversight allegation in deciding to indict the

defendant.  If that is the case, they charged a conspiracy that

*Tanner* says does not constitute conspiracy to defraud the

United States.  That's why *Pirro* says when the indictment is

not specific enough to ensure that the actual elements of the

offense are charges, the indictment must be dismissed.

            In addition to the targeted point, I also point out

it's not just there is no agreed-to purpose to defraud the SEC,

the indictment never explains what the fraud on the SEC was.

Fraud is a term of art at law.  It requires the submission of

false statements or a violation of a duty to the United States

government.

            Again, coming back to *Tanner*, the Supreme Court in

I5VTMIDA

*Tanner* didn't reverse the convictions outright.  It remanded to the 11th Circuit to allow reconsideration on one consideration in the indictment, that is the indictment stated the defendants conspired to submit false statements through the intermediary to the federal agency that they had complied with the federal bidding requirements.  And that was the only way the Supreme Court held in that case there could be a conspiracy to defraud the United States.

This indictment never explains what false statement was submitted to the SEC, what duty to the SEC was violated.  And to be clear, because there may have been some confusion in the briefs, we're not arguing it has to be a duty that the defendants owed directly to the PCAOB.  The law is clear that the defendants can use an intermediary to breach the duty the intermediary owes to the SEC, but it doesn't allege that.

THE COURT:  I haven't read the relevant cases on this I don't think yet, but the government says it's not limited, as you suggest, to false statements and breaches of duty.  The cases don't actually limit it to that.

MR. SHAHABIAN:  That is their position, your Honor, and there is no support for that in the case law.  This would be the first case to ever allow a conspiracy to defraud the United States to go forward where there's no allegation of a false statement submitted to the United States and there's no allegation of a breach of a duty to the United States.

I5VTMIDA

1          And given the serious constitutional vagueness issues

2     with this statute, the Second Circuit already noted, we think

3     it would be beyond the pale to allow an indictment to go

4     forward on an undefined novel theory of fraud like that.  And

5     the cases that the government cites for this point, *Ballistrea*

6     and *Nersesian*, don't say there's no need requirement.

7          So for example, in *Nersesian*, it was a structuring

8     case.  There's a duty for a bank, if there's a transaction more

9     than $10,000 in a single day, you have to tell the IRS.  So the

10    defendants structured their transaction to avoid the bank

11    knowing they deposited more than $10,000 in a single day.  So

12    what the Second Circuit said is well, the bank had a duty to

13    the United States government.  You concealed the fact that

14    would have triggered the duty and requirement to report, the

15    bank violated a duty to the United States, that is a fraud on

16    the United States.  There's nothing like that here that shows

17    what duty to the PCAOB owed to the SEC that was breached.

18         THE COURT:  Doesn't the PCAOB have a statutory duty to

19    report truthful information to the SEC?

20         MR. SHAHABIAN:  There is no duty to report a

21    particular kind of information to the SEC, the only duty is to

22    transmit the reports.

23         So the other case that is helpful on this point is the

24    *Murphy* case from the Ninth Circuit.  In that case, undercover

25    agents told the defendants here's some money laundering

I5VTMIDA

proceeds we would like you to deposit in a bank.  They set up a

shell corporation, deposited on the bank, and on the

transaction form listed it came from this shell corporation

this is the amount of the deposit.  And the government charged

them with conspiring to conspire the United States by not

disclosing it was money launder proceeds.  But the Ninth

Circuit held this statute doesn't require you to say exactly

where the money came from, it's not the proceeds of money

laundering, all that is required is to state who deposited and

the amount, they did that, there's no breach of duty.

The only duty here for the PCAOB is to transmit the

inspection reports, whatever they are, whatever they say.  And

there can't be false statements in them.  There's no allegation

of false statements here.  But when it comes to a duty to

disclose information, there has to be a specific duty in order

for a fraud to attach based on the failure to disclose that

information.

So that is why a fraud case requires either a false

statement, to affirmatively submit a lie to the United States

government, or a duty; you are required to do something to the

United States government, you did not do it.  And in the

absence of failing to state what bucket of conduct we're in,

this indictment on its face can't be said to charge a

conspiracy to defraud the United States.

THE COURT:  Do you want to turn to the wire fraud?

I5VTMIDA

1          MR. SHAHABIAN:  Yes, your Honor.  This is squarely

2     governed by the Supreme Court's decision in *Cleveland*, which

3     explains why intangible rights that implicate regulatory

4     interests are not covered by the wire fraud statute.  This is

5     something the Supreme Court has had to reiterate in cases like

6     *McNally*, *Skilling*, *Cleveland*.  The fraud statutes, the generic

7     wire fraud and mail fraud statutes, cannot be used to charge

8     intangible, vague theories of honest services fraud.  They have

9     to be tied to what is considered a common law property

10    interest.  And a regulator's ability to hold information

11    confidential in support of a regulatory mission is not a common

12    law intangible property interest.

13          And the case that we think makes that point clear is

14    the *Hedaithy* case from the Third Circuit, which both sides

15    cite, but we think a careful reading of the case explains why

16    *Cleveland* governs here and why it controls the outcome.  So in

17    that case, *Hedaithy*, the victim was a private company that sold

18    the TOEFL test, administers the TOEFL test and submits reports.

19    And the Third Circuit went through the various factors laid out

20    in *Cleveland* and says this is a private entity pursuing a

21    profit-seeking enterprise, it creates this information and

22    sells it in the marketplace, its ability to do that is based on

23    its trademarks, its assets, its business interests, and it has

24    the ability to sell this authority to other entities.  It has

25    no regulatory authority.  It has no sovereign power to

I5VTMIDA

regulate.  So on all the factors the Supreme Court listed in
*Cleveland*, this is a private property interest, this
confidential information.

          If you run the same analysis in this case, which the
government's brief doesn't even attempt to do, every factor
shows that the PCAOB's regulatory information is a regulatory
interest under the *Cleveland* case.  It has sovereign authority
to regulate in this industry.

          The ethics code that governs the confidentiality of
this information was enacted based on sovereign power that
Congress conferred on the PCAOB to create the ethics code.  It
conducts these inspections not because it's competing in the
market to get people to come and say let's look at your audits
and bless you, is does that because Congress told them to do so
and Congress requires that firms submit to inspections.  And it
can't sell this information for a profit, it can't sell its
authority to conduct inspections, it can't sell its
inspections.  So on every factor that the Supreme Court said
was relevant in *Cleveland*, this information fails to meet an
intangible property interest.

          The government relies on *Carpenter*, but *Carpenter* is a
limited case, as the *Cleveland* opinion explains.  *Cleveland*
says in *Carpenter* we rely on these private property sources of
authority, a corporate law treatise, prior Supreme Court
opinions discussing confidential business information, to

I5VTMIDA

conclude that a business' confidential information is something

that's long been recognized as intangible property.  But there

is no similar authority for confidential regulatory

information.

And I think this point is important:  The government

cannot point to a single opinion post-*Cleveland* upholding the

use of the mail or wire fraud statutes to prosecute the

disclosure of confidential regulatory information.  It's never

been used like this in a way that's been upheld post-*Cleveland*.

And the reasons, as we explained in our clear

statements section, run into the same reasons that the Supreme

Court did not want to expand the wire fraud statute in

*Cleveland*.  Governments have the ability to protect their

confidential information, whether state and local governments,

which the wire fraud statute applies to, or the federal

government.  The federal government has detailed structures

about when disclosures of confidential regulatory information

like classified information and cleared information will be

prosecuted criminally.  And in this case, the PCAOB's

confidential information, Congress made the decision to attach

serious civil and administrative penalties to a breach of that

confidentiality rule.

And what the Supreme Court said in *Cleveland* is in

light of all these other schemes -- in there they were

particularly focused on the state and local clear statement

I5VTMIDA

principle, but of course, as your Honor knows, the clear

statement principles apply to federal regulatory schemes as

well -- in light of these existing scheme, we're not going to

expand the definition of property to cover intangible

regulatory interests absent a clear statement from Congress.

In the nearly 20 years since *Cleveland* there has been

no clear statement from Congress that they would like to revise

the scope of the wire fraud, statute, and we don't think this

Court should be the first to expand the wire fraud statute to

cover this kind of information.

THE COURT:  The government cites cases from the Fourth

Circuit and the First Circuit involving stealing government

information and things like that.  I assume your argument on

those is they're pre-*Cleveland*.

MR. SHAHABIAN:  They're pre-*Cleveland* first and

foremost, but that's not the only argument.  They're both

distinguishable even if they were post-*Cleveland*.  So the

*Fowler* case from the Fourth Circuit is not a wire fraud case,

although it's cited for that in the government's brief.  If you

read the case, they're referring to Section 641, which is a

separate statute which criminalizes any thing of value of the

United States, and the Circuit is split on whether that covers

confidential information, but it's not implicated in this case.

So the *Fowler* case is simply inapposite.

Is the First Circuit case, the name escapes me, but

I5VTMIDA

that case is distinguishable because the defendant never

challenged the idea that confidential regulatory information

can't be property.  And we cited the defendant's brief in our

reply brief where he concedes that it was.  So it wasn't an

issue the First Circuit ever had to consider to decide whether

they actually reversed the conviction of defendant in that

case, it's complete dicta, but as your Honor noted, they are

also pre-*Cleveland*, so if there was any doubt, *Cleveland*

clarified it.

THE COURT:  You read *Carpenter* as limited to

confidential business information, but I think there's this

case -- there's a Second Circuit case, *Grossman* that actually

points out that the word "business" isn't necessarily essential

to the holding.

MR. SHAHABIAN:  So *Grossman* is a case that says

*Carpenter* is not limited to its facts.  So in *Grossman* the

defendant was a law firm, I think they had an associate who had

stolen client information from the law firm.  And he said well,

a law firm, unlike the Wall Street Journal in *Carpenter*,

doesn't publish this information, doesn't make money from

disclosing confidential information, so this is different from

*Carpenter*.

And the Second Circuit very quickly said that's

ridiculous, this is still confidential business information --

and it used the term "confidential business information" -- of

I5VTMIDA

1    the client who entrusted it to the law firm.  It was a property

2    interest.  It didn't disappear when it went to the law firm.

3    And in addition, the law firm had a business interest in

4    protecting the confidentiality of this information.  It needed

5    to protect its reputation, people who trusted it to give it

6    their information, they couldn't get clients.

7         And that's not the case with the PCAOB.  It's not

8    competing to get people to submit to their inspections, they're

9    statutorily required to do so.  So *Grossman* is simply saying

10   *Carpenter* is not limited to exact facts, stealing a newspaper's

11   confidential information, but it is still in the context of

12   private confidential business information, not the regulatory

13   kinds of interest.

14        THE COURT:  Thank you.  I think that answers all the

15   questions I have.  I appreciate that.

16        Ms. Greenwood, I don't know if you want to do your

17   response to this first or if you a preference or do defendants

18   have preference?

19        MS. GREENWOOD:  I'm happy to defer to the Court.

20        MR. BOXER:  We have no preference.

21        MS. GREENWOOD:  I'm happy to save my response to the

22   end.

23        THE COURT:  Why don't we do that.

24        Are you next, Mr. Boxer?

25        MR. BOXER:  I am.

I5VTMIDA

1          THE COURT:  All right.

2          MR. BOXER:  A few points I would like to get across,

3    your Honor.  On behalf of Mr. Middendorf, we move to dismiss

4    Counts Two, Three, Four and Five, wire fraud counts, for

5    different reasons than just discussed with Mr. Shahabian.

6          First, we move pursuant to Rule 12(b).  And that rule

7    permits the Court to dismiss an indictment if it does not

8    allege a crime.  And what we got back from the government in

9    opposition was opposition to our Rule 7 motion.  We satisfied

10   notice pleading, we said all the nouns of verbs in the wire

11   fraud statute, it's premature for Rule 29 motion, it's not a

12   time for summary judgment.  These are almost all direct quotes.

13   They did not, whatsoever, address the legal arguments and legal

14   bases why we think those counts should be dismissed.  And

15   there's one reference where it says see Middendorf brief

16   generally, but the essential argument we make is in a wire

17   fraud, as part of proving a scheme to defraud, you need to

18   prove a material misrepresentation or an omission in breach of

19   a duty to disclose.

20         There are numerous Second Circuit cases about it.

21   There are even Second Circuit cases that are entertaining

22   motions to dismiss in cases where parts of indictments have

23   been dismissed pretrial.  We cite some of them.  There are many

24   of them.  And it is absolutely not alleged against

25   Mr. Middendorf in the indictment.  There's no allegation that

I5VTMIDA

he was aware of the breach of duty at the PCAOB, there's no
allegation that he breached a duty to the PCAOB, and there's no
allegation that Mr. Middendorf made a material
misrepresentation to the PCAOB.  It's just not there.  And
without it, they have not alleged the wire fraud.  An
interested comment at the end of Mr. Shahabian's argument is
what the facts of this case look like is a 641 case, an
embezzlement from the United States, because it charges
embezzlement but it doesn't have the United States as a victim.
And so it tries to fit a wire fraud into a 641 case.

        And once it's a wire fraud, it's a wire fraud.  And
the government is required, in proving the scheme to defraud,
that our client knowingly and intentionally and willfully
either made a material misrepresentation or made an omission in
breach of a duty.  He didn't do that and he wasn't alleged to
do that.  He didn't do that, and they didn't allege that he was
aware of anybody doing that.  And that is a fatal deficiency in
the substantive counts against Mr. Middendorf.

        One argument that the government does make when it
addressed this in one of the other briefs is that a crime of
embezzlement is not complete until the use of the information.
And they cite *Czubinski*, a case I think in the First Circuit,
where the court essentially said that.  The reason why that
argument doesn't apply here is because embezzlement is a
fraudulent appropriation to one own's use.  That's black letter

I5VTMIDA

1    law.

2         So it's true that the crime may not be complete as

3    alleged until someone uses the stolen information, and it's

4    true that they allege that Mr. Middendorf used stolen

5    information, but the use is only relevant to the person who

6    embezzles, who appropriates.  There's no embezzlement when

7    there's just use.  Without the knowledge that there was an

8    omission in breach of a duty or material misrepresentation and

9    just the use, it's not embezzlement.  And that's the situation

10   precisely here.

11        I would just conclude by saying I appreciate the

12   government said they pled nouns and verbs and all the

13   appropriate words.  They actually pled quite a bit, obviously,

14   it's a lengthy and detailed indictment.  But the detail they

15   alleged does not allege a wire fraud against Mr. Middendorf.

16   There's no allegation that he was aware of the breach of a duty

17   by any PCAOB employees, past or present.  There's no allegation

18   that he breached a duty to PCAOB.  There's no allegation that

19   he made misrepresentations.  And without that, they haven't

20   alleged the wire fraud.  And under Rule 12(b), when that

21   happens, the Court should dismiss those counts.

22             THE COURT:  Thank you.

23             MR. BOXER:  Thank you, your Honor.

24             THE COURT:  Thank you very much.

25             Mr. Bondi.

I5VTMIDA

1          MR. BONDI:  Yes, your Honor.

2          May it please the Court, your Honor, we join in the

3    prior arguments and rise specifically to address Count Three of

4    the indictment which appears in our docket entry as 58 and 83.

5          Your Honor, Count Three of the indictment alleges that

6    Mr. Sweet, while in the employment of the PCAOB, took documents

7    from a network drive on the PCAOB, downloaded those documents

8    onto his PCAOB computer, and then took from those documents

9    from his PCAOB computer, put them on a personal hard drive

10   shortly before leaving his employment at the PCAOB, and walked

11   out of the PCAOB.

12         Now the government in their opposition at page 27

13   concedes that this was illicit downloading of the information.

14   Your Honor, for purposes of the government's theory of wire

15   fraud -- which again we dispute and join in the prior

16   arguments, but even if the government is right this is somehow

17   wire fraud, the crime of wire fraud would have taken place at

18   that point in time that Mr. Sweet took the information, put it

19   on a personal hard drive, and walked out of the PCAOB forever.

20         Your Honor, at no point in the indictment, the 53

21   pages of the indictment, does the government allege that the

22   defendants encouraged Mr. Sweet to take this information before

23   he left his employment at the PCAOB, that they asked him do

24   that, that there was some -- that they were part of some scheme

25   to do that, or your Honor, there's not even any allegation that

I5VTMIDA

1    they even knew that he was taking this information prior to

2    leaving the PCAOB.

3          Your Honor, just because later in time he is alleged

4    to have provided that information to others at KPMG does not

5    mean that the wire fraud took place at that point in time.  The

6    wire fraud took place, according to the government's theory of

7    wire fraud, at the point in time that he illicitly downloaded

8    the information from the PCAOB, made it his own property, and

9    walked out of the PCAOB.

10         As prior counsel mentioned, the government cites a

11   First Circuit case, *Czubinski*, as support for the fact that

12   somehow there have to be some use of reporting with this

13   property.  *Czubinski* involved an IRS employee while employed by

14   the IRS accessed private information of other taxpayers, he was

15   browsing information of other taxpayers improperly, and he was

16   employed up until the point of his indictment at the IRS.

17         He doesn't download the information, he doesn't do

18   anything with the information other than browse and look at the

19   information.  And the First Circuit said that's not enough,

20   there has to be some sort of using the information.

21         What's interesting, the First Circuit points out, is

22   one way, one example the court points out in dicta is that you

23   can credit the information.  That's effectively, your Honor,

24   analogous to what Mr. Sweet did when he downloaded the

25   information.  And Mr. Sweet did that at a point in time right

I5VTMIDA

1   before he left his employment at the PCAOB to then join KPMG.

2   At that point in time, under the government theory, the wire

3   fraud is complete, and there's no allegations whatsoever that

4   the defendants were part of that scheme to deprive the PCAOB of

5   that property.  And your Honor, for that reason, Count Three of

6   the indictment should be dismissed.

7           And I will yield to the Court for any questions.

8           THE COURT:  The *Czubinski* case you mentioned, is that

9   an embezzlement case or a fraud case?

10          MR. BONDI:  The government charged wire fraud in

11  *Czubinski*, if I recall correctly, your Honor, and the First

12  Circuit overrule and said there had to be some sort of use of

13  the information.  In other words, he would have to have created

14  some dossiers of the people he was looking at their tax returns

15  for.  Merely browsing the information didn't deprive the IRS of

16  that property.

17          And one example that the government, or excuse me,

18  that the First Circuit points out in *Czubinski* at page 1072 of

19  the opinion is the Court says if he had printed the

20  information, taken notes, created a dossier, at that point in

21  time the crime of wire fraud would have taken place.

22          And your Honor, I submit that if the defendants had

23  nothing to do with any of the information, and Mr. Sweet

24  downloaded this information for his own personal use when he

25  got to KPMG, the government would be charging Mr. Sweet with

I5VTMIDA

1    wire fraud and pointing out the fact that he took the

2    information and illicitly downloaded the information.  It was

3    the illicit downloading of the information that completed the

4    crime of wire fraud, and whatever he did later is irrelevant as

5    a matter of laws.

6          In terms of the use point that the government tries to

7    make issue of, the fact of the matter is nowhere in the

8    indictment do they say that the defendant used the information.

9    While they allege that one of the defendants got the

10   information -- and again, this is after the fact, after the

11   alleged wire fraud would have already taken place as a matter

12   of law, but they don't allege anywhere the defendants

13   themselves used the information.

14         And it's very artful in their wording.  At paragraphs

15   41 and 42 of the indictment, the government uses the phrase

16   "engagement partners."  They talk about Mr. Sweet providing the

17   information to the engagement partners, and on page -- at

18   paragraph 41 they say that gave engagement partners extra time

19   to prepare for the inspection and audits.  They're not even

20   alleging in the indictment that the defendants used the

21   information.  So even under their theory about use, the

22   defendants aren't alleged to have used the information.

23         THE COURT:  Thank you.

24         MR. BONDI:  Thank you, your Honor.

25         MR. SHAHABIAN:  Your Honor, briefly, to clarify,

I5VTMIDA

1    Mr. Bondi is correct, the *Czubinski* case was a wire fraud case,

2    and the key language to emphasize this point that the First

3    Circuit relied on was their intent to use.  That hasn't been

4    shown.  There was in that case.  Here, as Mr. Bondi stated, it

5    was obvious, the government's theory is that Mr. Sweet took the

6    information from the PCAOB.  That was the intent to use.

7              THE COURT:  Thank you.

8              Mr. Bloch.

9              MR. BLOCH:  Your Honor, we rest on our brief as to

10   Counts Four and Five of the indictment and join in the

11   arguments of Mr. Shahabian and Mr. Boxer with respect to Counts

12   One and Two applicable to Ms. Holder.  She's not charged in

13   Count Three, so I'm happy to be silent about that count.

14             THE COURT:  That's fine.  Thank you.

15             MR. COOK:  Likewise, Mr. Wada submits on the papers

16   and arguments made by counsel, but we would like the

17   opportunity to perhaps respond to the government's arguments as

18   necessary.

19             THE COURT:  Very well.

20             MS. GREENWOOD:  If I may have a moment, your Honor.

21             THE COURT:  Sure.

22             (Pause)

23             THE COURT:  Ms. Greenwood.

24             MS. GREENWOOD:  Your Honor, unless you have specific

25   questions to start for me, I would like to spend a few moments

I5VTMIDA

1    on the indictment before responding to each of the defendant's

2    arguments.

3            THE COURT:  Okay.

4            MS. GREENWOOD:  The indictment in this case, which is

5    what we're here today about, charges the defendants with

6    participating in a large-scale, years-long scheme to defraud

7    the SEC using confidential information that was stolen from the

8    PCAOB and disseminated by its current and former employees in

9    breach of their duties of confidentiality and loyalty.

10           Specifically, the indictment details how the

11   defendants, each of whom were high level executives at KPMG or

12   long-time employees of the PCAOB engaged in inspection work,

13   sought out or disclosed information about which KPMG audits

14   would be inspected PCAOB.  This happened in 2015, again in

15   2016, and again in 2017.  As the indictment makes clear, this

16   inspection information was kept highly confidential at the

17   PCAOB so that it would not influence the outcome of PCAOB

18   inspections.

19           We know exactly why the defendants embarked on this

20   scheme, because as the indictment alleges KPMG was facing a

21   crisis.  By at least 2014 it was performing twice as poorly in

22   PCAOB inspections as its competitor firms.  And its performance

23   was not only bad for business, it put KPMG directly in the hot

24   seat with the SEC.

25           So in 2016, as the indictment alleges, as the SEC held

I5VTMIDA

1  top executives of KPMG, including its CEO, the vice chair of

2  audits, and the defendant David Middendorf to a meeting with

3  SEC chief account who told KPMG about the concerns that the SEC

4  had about audit quality issues at KPMG based on its poor

5  performance in PCAOB inspections.

6       KPMG acknowledged those concerns, including issues

7  with a particular financial metric used in auditing financial

8  institutions known as ALLL.  This was a bet-the-company moment

9  for KPMG.  And I can't understate the measures that KPMG

10 underwent in order to address these concerns by the SEC, and

11 also their poor performance of PCAOB inspections, as alleged in

12 the indictment.

13      They began recruiting former PCAOB employees,

14 including cooperating witness Brian Sweet and the defendant

15 Cynthia Holder.  They hired a data analytics firm to help them

16 predict what audits would be inspected by the PCAOB.  They

17 initiated bonuses for clean inspections with the PCAOB.

18      THE COURT:  By the way, the hiring of the data

19 analytics firm, there's nothing illegal or unethical about

20 that, is there?

21      MS. GREENWOOD:  That's correct, your Honor.  These

22 were measures that KPMG attempted to take in a legitimate

23 effort to determine which KPMG audits were going to be

24 inspected, and in order to attempt to, like you say, in a

25 legitimate way anticipate which audits would be inspected by

I5VTMIDA

1    the PCAOB so they could pay extra attention to those particular

2    audits and ensure there was increased audit quality.  The

3    government takes no issue with those steps, but as the

4    indictment alleges, the defendants and their co-conspirators

5    went even further to ensure that their results on the test

6    would be even better than they could do themselves.

7              So as alleged in the indictment, they pressured Brian

8    Sweet to obtain and disclose confidential PCAOB information

9    that would allow them to cheat on the test.  And for example,

10   defendant Holder, through Brian Sweet, was asked to provide

11   confidential information from the PCAOB, which he in fact

12   provided.  Defendant Wada likewise provided confidential PCAOB

13   information that he described as a grocery list.

14             And as the indictment alleges, the plan worked.  KPMG

15   was able to used the stolen PCAOB information to do additional

16   audit work that it otherwise would not have performed, and

17   identified significant issues on audits that it otherwise would

18   not have identified because additional audit work was not

19   allowed to be done at the time that they received the

20   confidential information and performed that audit work.

21             THE COURT:  So it went back and did better audits on

22   the issuers with the heads up about who they, as auditor, were

23   going to be audited.

24             MS. GREENWOOD:  That's correct, your Honor.  There's

25   specific allegations that with respect to -- it's specifically

I5VTMIDA

1    audits that were identified as being on the PCAOB's inspection

2    list, the people who were going to be subject to a pop quiz,

3    that after the time that the --

4            Sorry, your Honor.

5            THE COURT:  No, finish your thought.

6            MS. GREENWOOD:  After the time that the accounting

7    standards would have allowed audit work to be performed, they

8    went back into archived audit files and identified audit

9    issues.

10           THE COURT:  Here's what I was going to ask:  The

11   indictment alleges that that there's two oversight roles of

12   SEC.  One is to look at how the auditors are doing as auditors

13   of the auditors, and the other is to look at issuers and find

14   problems.  So as to the issuers it actually helped.  They got

15   better information as a result of the fraud, right?

16           MS. GREENWOOD:  Certainly, your Honor, with respect to

17   certain issuers I think it can be said that issues were

18   identified that would not have otherwise been.  So with respect

19   to financials of those particular issuers, it may well be that

20   the audit turned out better.

21           I think the SEC's response at trial, when we talked to

22   them about the impact of this, is the fact that one audit was

23   improved for one issuer is really not the goal, it's to ensure

24   that the auditing program at KPMG, and other auditors like

25   KPMG, actually have integrity and actually have quality and can

I5VTMIDA

1    assure that future inspections and future audits of public

2    companies are in fact properly done.  The fact that you receive

3    advanced notice and improve one inspection result does not

4    improve the health of financial industry.  I think that that

5    certainly is going to be plain at trial, and I think it's

6    alleged in the indictment as well.

7           Your Honor, again, not to belabor the point, but as

8    the indictment makes clear, the impact of this fraud, as we

9    were just discussing, was that the PCAOB, which had a statutory

10   duty not only as Mr. Shahabian referenced to report or to issue

11   inspection reports to the SEC, but to issue reports pursuant to

12   15 USC 7214(c)(2) that identify acts or practices that may be

13   in violation of it SOX, SEC rules for PCAOB rules, and report

14   any such act, practice or omission as appropriate to the SEC.

15          In conducting the fraud the way that they did, the

16   defendants prevented the PCAOB from being able to identify

17   issues like the fact that they went in and did audit work

18   outside of the time period that the accounting standards would

19   allow, and that tainted the integrity of the PCAOB inspection

20   results and the process.

21          And make no mistake, your Honor, the indictment

22   alleges in paragraph after paragraph that the defendants knew

23   what they were doing was wrong, and that the information that

24   they were using was information obtained from the PCAOB

25   improperly.  The indictment alleges that the defendants were

I5VTMIDA

 1    told this was information that PCAOB had not disclosed, that it

 2    was information that had been obtained from current employees

 3    of the PCAOB, they created cover stores and lied about why they

 4    were using information, and talked about using burner phones to

 5    destroy documents.  The allegations are very clear with respect

 6    to intent.  So that's why we're here.

 7            Again, before I go quickly through legal arguments,

 8    the defendants engaged in a very clear scheme that falls both

 9    within Section 371 as a scheme to defraud the SEC, and aided

10    and abetted and conspired in a scheme to steal and use

11    confidential information from the PCAOB.

12            I'll start, your Honor, with the arguments made with

13    respect to joint brief, if I may.

14            With respect to first point the defendants focus on in

15    their joint brief with respect to whether or not the indictment

16    alleges a scheme to targeted at the SEC, I think the indictment

17    does just that, your Honor.  As you noted during the

18    defendants' argument, it's not that the scheme has to be a

19    scheme solely with the goal of defrauding the SEC.  As alleged

20    here, it has to be a scheme that at least one purpose of which

21    was to defraud the SEC.

22            THE COURT:  But what about the argument that it was

23    knowledge, it was knowledge versus purpose?  They knew this

24    information would go to the SEC, among a bunch of state

25    regulators and others, but the purpose isn't alleged to be

I5VTMIDA

1    defrauding the SEC as opposed to the PCAOB.

2         MS. GREENWOOD:  To be clear, your Honor, that argument

3    is based solely on reliance on the to wit clause.  And I think

4    the defendants' reliance on that clause is seriously

5    overstated.

6         As an initial matter, a 371 case doesn't even have to

7    include a to wit clause, and the word "knowingly" wouldn't even

8    need to appear in any to wit clause in order to sufficiently

9    state a 371 claim.

10        The to wit clause here is merely a description and

11   summary of the means used.  It's not a fulsome description of

12   the mens rea used or alleged by the government in order to

13   satisfy Section 371.

14        In fact, if you look in context, in paragraphs 90 to

15   92 of the indictment, we do allege willful and knowing

16   participation in a conspiracy.  And then an object of that

17   conspiracy was willfully and knowingly defrauding the SEC.

18   That's our mens rea allegation, your Honor, and frankly, that

19   stands in and of itself with respect to intent.

20        But the factual allegations of the indictment make

21   very clear that not only was defrauding the SEC at least a

22   secondary motive of this scheme, but quite frankly the SEC's

23   pressure and criticism of KPMG appears to have motivated much

24   of what happened.

25        And I will point you to a few specific paragraphs in

I5VTMIDA

1    the indictment.  Paragraph 59 sets out, as I mentioned earlier,

2    the pressures that KPMG was facing by 2014 with respect to the

3    poor performance and inspections by the PCAOB, paragraphs 59

4    and 16, excuse me, your Honor.

5         17 and 18 detail the impact that their poor

6    performance inspections were having on KPMG's bottom line, and

7    the multilevel approach that they adopted to attempt to improve

8    PCAOB inspection results.

9         Paragraph 60, your Honor, describes the February 2016

10   meeting where the SEC brought in KPMG's CEO and defendant

11   Middendorf to discuss audit quality issues based on poor

12   performance in PCAOB inspections, and in particular, ALLL

13   issues.

14        And paragraph 61 discusses additional meetings held

15   after that time all to discuss ALLL issues with defendant Britt

16   as well as others at KPMG.

17        And paragraph 67, your Honor, brings the entire

18   narrative to -- sort of closes the circle on the ALLL

19   narrative.  When the SEC brings in KPMG to talk about PCAOB

20   inspections, they flag ALLL as the cornerstone issue.  And

21   specifically when the defendants use the stolen PCAOB

22   information about inspections, they use it in connection with

23   ALLL and they go back and conduct a stealth rereview, described

24   in paragraph 67, purportedly of all engagements in the ALLL

25   monitoring program, but really only looking at issues with

I5VTMIDA

1    respect to engagements that were on the PCAOB inspection

2    selection list.  So they specifically used this information to

3    address concerns that the SEC had raised directly with KPMG.

4         Based on that, your Honor, the statutory language, the

5    factual investigations all make clear that one of the motives

6    of the scheme at issue was to defraud the SEC with respect to

7    its oversight of the accounting industry, the financials, and

8    its review of PCAOB inspection rules.

9         And I would point, your Honor, to *United States v.*

10   *Gurary* as sort of our counterpoint to the *United States v.*

11   *Tanner* case.  And to be clear, your Honor, the *Tanner* case

12   simply stands for the proposition that federal oversight of a

13   non-government agency by itself does not transform that

14   government agency into -- or sorry, does not transform that

15   non-governmental agency into the United States for purposes of

16   a Section 371 case.

17        It does not address the situation like the one here in

18   which the oversight system itself involves communications that

19   flow up from the non-governmental agency directly to the United

20   States.  In fact, *Tanner* recognizes that where the fraud flows

21   up the chain from the non-governmental entity to the government

22   entity, that can be the basis of a 371 claim.  And that's

23   precisely what is alleged here, your Honor.

24        So *Gurary* is an example -- defendants in that case,

25   although it was not their primary purpose, had as part and

I5VTMIDA

parcel of their scheme to defraud the IRS because they knew
that fictitious invoices that they created and provided to
non-governmental third parties would he reported on their books
and records on which their corporate tax returns would be
based.  In order for the defendants' scheme in *Gurary* to
succeed, the IRS had to be defrauded, and that was sufficient
because it was part and parcel of the scheme they were
conducting here.

          And same is true here, your Honor.  In order for the
defendants' illicit use of PCAOB inspection results to be
effective, in order to reduce the concerns and scrutiny they
were receiving, it had to also defraud the SEC.  Because
otherwise, if the SEC were not convinced, they would continue
to be subject to the same type of scrutiny that they had been
as alleged in the indictment.

          THE COURT:  Do you want to address sort of at a high
level the arguable inconsistency between -- or why there's not
an inconsistency between Count One and the wire fraud counts?
In particular, what you have been arguing is how this was all
tied with the SEC, given the information was inevitably going
to the SEC, but isn't it true that your wire fraud counts rely
on this being essentially information that is not intangible
regulatory type information?

          MS. GREENWOOD:  Sure.  I don't think that the theories
are inconsistent, your Honor.  Under Section 371 we have

I5VTMIDA

1    treated the PCAOB as a matter of the statute and recognized in

2    *Free Enterprise* as a non-governmental entity.  And for

3    statutory purposes, as the Supreme Court recognized and as the

4    parties conceded in *Free Enterprise*, although the PCAOB

5    performs some regulatory function, or primarily a regulatory

6    function, it is a private non-governmental entity.  So for that

7    reason, of course we did not charge that the fraud was -- that

8    the Section 371 fraud was directly on the PCAOB.

9            However, I don't think it's at all inconsistent to say

10   that even a non-government entity that performs a regulatory

11   function can still possess information that is confidential

12   information that is protected by the wire fraud statute.  Those

13   two things are not inconsistent.

14           And if I may, I can pivot to the wire fraud count, if

15   that's helpful, although I do want for a moment to talk about

16   the fraud on the SEC element.

17           THE COURT:  But the reason it's confidential --

18   turning to the wire fraud, the whole reason it's confidential

19   is for a regulatory purpose, not for some business purpose or

20   because it's competing.  You might have PCAOB information that

21   is confidential for business reasons, like it's trying to lease

22   a building somewhere and it's looking at different prices from

23   different landlords or something, and that might be

24   confidential for purely business proprietary reasons.  But this

25   is information that is confidential solely to promote a

I5VTMIDA

1    governmental regulatory purpose.

2             MS. GREENWOOD:  I think, your Honor, when you look at

3    *Cleveland* and the regulatory interests there, the question is

4    not so much the purpose of the information, but looking at the

5    nature of it in terms of it being held by the PCAOB, and

6    ultimately whether we're talking about information or an

7    interest.

8             So the government has not alleged, for example, that

9    the PCAOB's right to decide what inspections it wants to

10   inspect without interference was the right that was interfered

11   with.  We have alleged information, which is an asset at the

12   heart of the PCAOB's work, was stolen.

13            And significantly, your Honor, this is not an issue

14   like in *Cleveland* where the only cost to PCAOB, like the

15   licensing authority in *Cleveland*, was the cost of a stamp and

16   the paper it took to print a license.  This was information

17   that the PCAOB invested time and resources into in order to

18   create, although for regulatory purpose, so it could use that

19   information in order to carry out that purpose.

20            And your Honor, I think, again, I want to point you to

21   the specific paragraph in the indictment, if you look at

22   paragraph 6, it talks about PCAOB inspection selections are

23   based on information that the PCAOB collects from audit firms,

24   and undergoes months of analysis of a variety of factors,

25   including issues with respect to how long it's been since an

I5VTMIDA

1   audit has been inspected, looking at risk factors for

2   particular audit firms.

3           And your Honor, we don't quantity the amounts involved

4   in the indictment.  I can tell that you the government

5   anticipates that the evidence at trial will include testimony

6   from the PCAOB that just with respect to 2017, as an example,

7   it costs the PCAOB in excess success of $500,000 in resources

8   to generate its inspection list.  Over half a million dollars.

9           This is not a case, as I said, like in *Cleveland*,

10  where the only interest infringed upon was Louisiana's ability

11  to issue a license and to print that license on a piece of

12  paper and send it to a recipient.  And also in *Cleveland* the

13  court spends time discussing the fact that although the

14  licensing authority in *Cleveland* was defrauded of its ability

15  to decide based on complete and honest information whether or

16  not to issue a license, it had already received the revenue

17  that it was expecting in order to make that decision.  The fee

18  in order to make the licensing application had been paid.  They

19  were out no money.

20          By contrast, the PCAOB not only expended those upfront

21  costs I mentioned alleged in the indictment, but at trial we

22  would show that in 2017, in order to recreate its inspection

23  lists, and in light of the defendant's fraud, expended in

24  excess of $200,000 over and above in excess of the $500,000 it

25  expended in order to generate the lists in the first place.

I5VTMIDA

1          So I think we are a far cry from a mere regulatory

2     interest here.  We're talking about an asset, information that

3     the PCAOB dedicates its precious resources to developing, that

4     it dedicates staff members' time, hours, to create this

5     inspection selection, granted in furtherance of its statutory

6     regulatory role, but we're not in the realm of *Cleveland* where

7     this is a mere regulatory decision.

8          I would also note, your Honor, Mr. Shahabian when he

9     argued, he pointed out there's not been a single case in which

10    the type of quasi regulatory information here has been deemed

11    protectable under the wire fraud statute.  I would say the

12    opposite is also true.  This is sort of a novel entity, but

13    there are no cases in which a nonprofit has been deprived of

14    its property rights merely or because it was a regulatory or

15    quasi regulatory entity.

16         We're not dealing here with a government agency, we're

17    dealing here with a nonprofit corporation.  And specifically,

18    your Honor, when Congress made the decision to provide certain

19    regulatory powers to the PCAOB, but to nevertheless designate

20    it a non-governmental agency, part of the implication of that

21    was that statutes like the wire fraud statute that apply to

22    nonprofit corporations, of which the PCAOB is, would apply to

23    the PCAOB.

24         So I think the fact that there may be alternative

25    remedies for this type of theft, for example under SOX, is

I5VTMIDA

certainly no bar and is totally consistent with the fact that

there are also separate remedies when and if an entity like the

PCAOB is stolen from and its confidential information is taken.

       If I may, your Honor, I think just to pivot back

briefly to Count One, in addition to alleging a scheme targeted

at the SEC, the indictment does more than enough to allege the

fraud was on the SEC.  The defendants acknowledge that by

alleging an agreement to transmit a false statement to the SEC

or violate a duty to the SEC, either directly or through an

intermediary, that the indictment would allege an offense under

Section 317, provided that the fraudulent act reached the

government, either directly or indirectly, and there was a

false statement or violation of duty to the government.

            THE COURT:  Where do you propose that from?

            MS. GREENWOOD:  That's from the joint reply brief at

page 5, your Honor.

            THE COURT:  Okay.

            MS. GREENWOOD:  This is not a case where we have to

deal with sort of the edges of what is allowed and what isn't

allowed under Section 371, because at a minimum, as alleged in

indictment, we have a situation in which the PCAOB provided

false and misleading information to the SEC in violation of its

statutory duty.

       As I noted, your Honor, the PCAOB has a duty not only

to provide inspection reports to the SEC, but to report

I5VTMIDA

violations of SOX and SEC rules and accounting standards that
it identifies as part of its inspections.

Paragraph one of the indictment discusses the SEC's
role in implementing the enforcement of securities laws under
SOX.

And paragraph four, as I mentioned, talks about PCAOB
inspections, ensuring compliance with those rules and the
accounting standards.  One of those, as I alluded to earlier,
your Honor, is the 45-day rule, which is that after the 45 days
following the close of an audit, the documentation is supposed
to be archived and not supposed to be accessed again, alleged
in paragraph three.

And alleged in paragraph eight, the PCAOB as a general
matter keeps its inspections selections confidential and
doesn't tell auditors about them until the close of the 45-day
period precisely to keep situations like the one in this case
from happening in which auditors game the system by knowing
which audits are subject to inspection before the PCAOB comes
around to inspect.

Paragraphs five and eleven detail the PCAOB's
requirement to report its inspection findings to the SEC.

And paragraph eleven, your Honor, alleges in
sufficient detail that the SEC uses those inspection reports --
and this is key, your Honor -- to carry out its regulatory
oversight and enforcement functions, including to monitor audit

I5VTMIDA

 1    quality, to identify weaknesses in issuer financial statements

 2    that it refers to the division of enforcement and corporate

 3    finance.  That's the alleged fraud.  That is the function of

 4    the SEC that was obstructed in this case.  I don't see how much

 5    more specific the government would have needed to be, but

 6    paragraph eleven squarely alleges the legal function of the SEC

 7    that was obstructed in this case.

 8         If you look at 72, paragraph 72 of the indictment,

 9    your Honor, goes through the issue I discussed with respect to

10    the defendants using this PCAOB inspection information after

11    the time that the audit would have been allowed under that

12    45-day documentation rule to perform new audit work and

13    identify new issues without disclosing the conduct of that

14    audit work to the PCAOB in its work papers.

15         So taken together, your Honor, I think the

16    indictment's not only the statutory allegations but the factual

17    allegations are more than sufficient to allege the 371

18    violation.

19         THE COURT:  Maybe you're getting to this, but I want

20    you to respond to Mr. Boxer's point about the allegations not

21    being sufficient with respect to that his client was aware of a

22    duty to -- breach of a duty at all.

23         MS. GREENWOOD:  Certainly, your Honor.  I would,

24    again, turn us back to the indictment allegations to be very

25    express about what is alleged.

I5VTMIDA

1          So following the -- and we're talking about, your

2     Honor, about the wire fraud counts, Counts Two through Five?

3          THE COURT:  Yes.

4          MS. GREENWOOD:  So I think, your Honor, the indictment

5     does in fact allege that with respect to -- and to be clear,

6     Counts Two through Five charge wire fraud in the context of a

7     scheme, a conspiracy, and also in the wire fraud counts, the

8     defendants are charged with aiding and abetting violations.

9          So I believe there was mention I believe in

10    Mr. Middendorf's argument that he himself did not breach a

11    duty.  That's now how this case has been alleged.  The duty

12    that has been alleged is the breach of duties of

13    confidentiality and loyalty by former and current PCAOB

14    employees who are disclosing information they're not permitted

15    to disclose.

16         And the indictment, in discussing the provision of

17    stolen PCAOB information to the defendants, repeatedly alleges

18    that they -- alleges facts to suggest they understood the

19    information either non-public or had come from the PCAOB.

20          Here's some examples from the indictment, your Honor:

21          With respect to defendant Middendorf, in paragraph 33

22    and 32, it discusses a lunch that he attended, or Middendorf

23    asked Sweet following his start at KPMG and after he left the

24    PCAOB whether a particular issuer would be targeted by PCAOB

25    inspections and were generally what KPMG engagements would be

I5VTMIDA

1    inspected.

2         In paragraph 33 he tells Sweet to remember where his

3    paycheck came from and to be loyal to be KPMG.

4         Paragraph 66 and 67 discuss a conference call in

5    March 2016 where defendants Middendorf, Whittle and Britt agree

6    to conduct stealth rereviews using the stolen PCAOB

7    information, and Middendorf and Whittle on that call discuss

8    the need to keep the 2016 list of inspections secret, and the

9    nature and extent of the rereview secret.

10        Paragraph 83 details a conversation in which Brian

11   Sweet told Middendorf, Britt and Whittle about the 2017 final

12   list, and Middendorf said it was simply too good to pass up.

13        With respect to defendant Whittle, your Honor,

14   paragraph 34 discusses a May 2015 lunch between Sweet and

15   others.  And in the course of that meeting, Whittle asks Sweet

16   for the list of engagements to be inspected by the PCAOB and

17   Whittle tells Sweet that he's most valuable to KPMG at that

18   moment and will soon become less valuable.

19        The following day, May 8, 2015, Sweet emails Whittle a

20   list of inspection selection saying just so you know, it's

21   actually the full list of anticipated inspections, including

22   non-bank.  I appreciate the team's discretion in the nature of

23   not disseminating, to which Whittle responded:  Got it, and

24   understand the sensitivity.  That same day Whittle forwarded

25   the list to Middendorf and said the complete list, obviously

I5VTMIDA

1   very sensitive, we won't be broadcasting this.

2            Some examples with respect to defendant Britt,

3   paragraph 39, Britt emails Sweet asking for the 2015 list, and

4   Sweet responds saying:  Please note there's some sensitivity

5   with these and some of the teams have not been officially

6   notified by the PCAOB, so please use your discretion with this

7   information.

8            Paragraph 68, March 2016, Britt has a conversation

9   with at least two individuals at KPMG about the use of 2016

10  list in which he expresses the need for secrecy, telling a

11  partner that he couldn't tell him the source of the knowledge

12  and telling another partner to keep his mouth shut.

13           Paragraph 69, March 2016, Britt sends an email to

14  engagement partners with a false reason for needing to access

15  audit files.  That was based on access to PCAOB information.

16           These are just some examples with respect to these

17  three defendants.  And I think, given not only their position

18  within KPMG, executives within the department of professional

19  practice and audit group, the particular interactions they had

20  with the SEC, their understanding about the timing of PCAOB

21  disclosures and inspection selections, and on facts as alleged

22  here, as well as others, I made very clear that they understood

23  that the information they were receiving they were not supposed

24  to have, and they weren't supposed to have it because it was

25  obtained in breach of a duty.

I5VTMIDA

1          Turning more broadly, your Honor, to the arguments

2     with respect to Count Three, I believe defendants Middendorf,

3     Whittle and Britt again join in the argument that their

4     obtaining and use of information that Sweet had embezzled while

5     an employee of PCAOB cannot form the basis of the 2015 wire

6     fraud count which alleged in Count Three.

7          I think the argument by the defense ultimately goes

8     too far.  The cases that they discuss with respect to

9     completion of an active embezzlement are primarily -- and the

10    cases I have been able to find, your Honor, are in the context

11    of when does the statutes of limitations for a particular

12    embezzlement stop to run.

13         So the cases say it's not a continuing offense, and

14    that, for example, once you have obtained the information the

15    statute of limitations begins to run and that crime is

16    complete.  However, the cases say nothing about whether you can

17    charge multiple acts of embezzlement and multiple acts of using

18    confidential information in violation of duties based on serial

19    disseminations and serial disclosures of that information.

20         So for example, your Honor, when the indictment

21    alleges that in 2015 Britt -- excuse me, Sweet begins working

22    at KPMG and the defendants Britt, Whittle and Middendorf

23    encourage him and in facts obtain confidential PCAOB

24    information from him, the cases say nothing about whether we

25    can charge that act separately.  So it's the government's

I5VTMIDA

position that the wire fraud alleged with respect to that

conduct in 2015 standing alone is its own crime that could be

alleged separately from whether or not there was a separate

embezzlement or separate wire fraud that happened when Sweet

left the PCAOB.

And further, your Honor, I would note that with

respect to the 2015 allegations, the government does allege

that certain information was provided by Sweet orally, not

based solely on documents, and certainly that use of the

confidential information would not have -- did not happen until

the defendants encouraged Sweet to provide that information.

And also there's information alleged in the 2015 time

period that was obtained after the encouragement by Britt,

Whittle and Middendorf when Sweet then went back to defendant

Holder and obtained additional confidential PCAOB information

while she was still at the PCAOB.

All of those allegations are part of the Count Three,

your Honor, and all of which were presented to the grand jury

in this case.  And again, I think that the defendant's argument

with respect to completion of the embezzlement is sort of

neither here nor there with respect to whether or not the

government has sufficiently alleged this wire fraud in Count

Three.

THE COURT:  What's your response to the argument about

there was no actual statement or omission where there was a

I5VTMIDA

1    duty?

2           MS. GREENWOOD:  Again, your Honor, I think with

3    respect to obtaining -- with respect to Counts Two through

4    Five, your Honor, the crime is obtaining the information in

5    violation of a duty.  So the embezzlement -- for example,

6    obtaining information in violation of a duty is embezzlement,

7    and that can satisfy the obtaining property prong of the wire

8    fraud statute.

9           And again, here, as alleged in the indictment, the

10   defendants, from whom confidential information was obtained,

11   including or in addition to cooperating witness Brian Sweet,

12   owed duties of confidentiality and loyalty to the PCAOB,

13   including a lifetime ban on disclosure of confidential

14   information as former employees of the PCAOB.  So that's the

15   theory that the government is alleging with respect to the

16   embezzlement aspect, misappropriation aspect of Counts Two

17   through Five.

18          I want to look through my notes briefly on the other

19   arguments to make sure I hit everything.

20          (Pause)

21          MS. GREENWOOD:  Unless the Court has specific

22   questions, the government would rest otherwise on its papers

23   and again emphasize that this is a case that I don't think we

24   are dealing with anywhere near the borderline of the edges of

25   371, 1343.  This is a pretty straightforward scheme.  It does

I5VTMIDA

1    involve an entity that is somewhat novel, but the defendants,

2    as alleged, conspired to steal information and use it for an

3    improper purpose.  And those allegations are more than

4    sufficient to state the offenses in the indictment.

5              THE COURT:  Thank you, Ms. Greenwood.

6              Does anyone want to reply briefly?

7              MR. SHAHABIAN:  Yes, your Honor, a few points to make.

8              So actually I would like to start with something that

9    is not in our briefing because I did not know that the

10   government was making that argument until they said it right

11   now.

12             So if I understand Ms. Greenwood's arguments

13   correctly, they're now arguing that for the 371 count, that is

14   a fraud on the United States, that the PCAOB had a duty in its

15   inspection reports to include violations of various regulations

16   and transmit those to the SEC, and that those were not

17   transmitted.  And for that duty, Ms. Greenwood cited to 15 USC

18   7214(c).

19             That is not a duty that 7214(c) creates.  What 7124(c)

20   says -- and it's a different provision than the provision about

21   transmitting inspection reports, which is at 7214(g).  What

22   7241(c)(2) says is the board, quote, if appropriate, should

23   report violations of various accounting rules to the

24   commission.  Other provisions of Subsection C say the board, if

25   appropriate, should engage in its own enforcement actions.

I5VTMIDA

1       And to add a few more citations that are not in the

2   briefing, the implementation of that statute shows there was no

3   duty to include information to is the SEC.  It's solely within

4   the PCAOB's discretion.  So that statute is implemented in

5   PCAOB Rule 4004.  And the notice of proposed rule making for

6   Rule 4004 is at 69 Federal Register 22103, page 22106.  And at

7   that page, the PCAOB says, in going back to the statute, to

8   report any violation, quote, if appropriate, to the commission.

9       The PCAOB said the phrase:  If it determines

10  appropriate in Rule 4004, which implements that statute, is

11  meant to signal that the board will decide which of these acts,

12  practices and omissions would be appropriate to refer to the

13  commission and to the states or other authorities.  In making

14  this determination, depending on the nature of possible

15  violation, the board could conclude that it be appropriate to

16  report information to the commission and not the states or

17  other authorities, and vice versa.

18      So in other words, this statute doesn't the create any

19  duty on the board to include violations in the inspection

20  reports themselves.  To the contrary, this gets back to where

21  we started.  What did Congress do when it created the PCAOB?

22  It created a regulatory entity with the power to enforce

23  violations of its own provisions through civil and

24  administrative remedies.

25      If appropriate, it was, of course, free to refer those

I5VTMIDA

1    violations to the SEC, but it had no duty to do so.  And so any

2    failure to include information in the inspection reports can't

3    be the legal hook for a duty that was violated that creates a

4    conspiracy to defraud the United States.

5              And the Second Circuit made that clear in the *Coplan*

6    case.  And in that case Ernst & Young partners were accused of

7    creating an illegal tax shelter scheme and hiding marketing

8    materials, instructing their employees to take these marking

9    materials back from clients so the IRS doesn't see them.  The

10   Second Circuit vacated the conviction holding there was no duty

11   to turn over those documents, and absent a duty, that can't be

12   the hook for conspiracy to defraud the IRS.  The same is true

13   here.

14             And another point on the 7214 argument, and the reason

15   we didn't address it in our briefing it's not in the

16   indictment.  And again, *Pirro* explains that a motion to dismiss

17   must be adjudicated on what is alleged to be in the indictment,

18   not how the government wishes they would have written the

19   indictment.  And there is, on the face of the indictment, no

20   allegation of a breach of a duty to the SEC, or the submission

21   of a false statement in an inspection report to the SEC.

22             The only language in the indictment is in paragraph 91

23   that says fraudulently affect inspection outcomes.  The Second

24   Circuit made clear you can't just add the word "fraud" to

25   something and have that sufficient to explain what the fraud

I5VTMIDA

is.  It must be a false statement.  It must be the violation of

a duty to disclose.  And absent that allegation, the indictment

doesn't charge a fraud on the SEC.

Staying with the 371 count and turning back to the

purpose point, Ms. Greenwood ran through various allegations in

the indictment, and as your Honor pointed out, some of them

allege things that are perfectly appropriate, such as hiring a

data analytics firm.  She referenced meetings with the SEC to

talk about allowances for loan and lease losses, that's the

ALLL issue.

The indictment never alleges that the scheme to

misappropriate confidential PCAOB information and affect the

outcomes was intended to interfere with any of those functions.

To the contrary, at other points in the indictment, paragraph

18, KPMG set up a monitoring program to resolve its issues

relating to ALLL.  There's no tie at all between these various

functions that are listed in the indictment and the scheme, an

agreement to defraud a specific lawful function of the SEC.

The agreement -- and we're not playing a magic words

game.  Ms. Greenwood suggested the to wit clause is not

necessary.  They didn't allege it throughout the indictment.

We're not saying it had to appear in a specific place.  But the

only place that alleges it is paragraph 91.  That's where they

try to define the agreement, and it simply states

misappropriate confidential information knowing it would affect

I5VTMIDA

1    regulatory and enforcement functions of the SEC, without ever

2    defining what those functions are.

3            And as we jump between things, as your Honor noted

4    that are perfectly appropriate, such as hiring an analytics

5    firm, creating a monitoring program to improve audit quality

6    issues, SEC functions that were not at all impeded by the

7    alleged scheme like the improvement in issuer quality, it's

8    impossible for the defendants looking at this indictment to

9    understand what the crime is, what the line crossed into for

10   criminal conduct that defrauded a specific lawful function of

11   the SEC.  And that's why under *Pirro* the remedy has to be

12   dismissal.

13           Turning to the wire fraud counts, *Free Enterprise*

14   makes clear that the PCAOB is not, as the government suggests,

15   merely a private non-governmental entity.  To the contrary,

16   what the Supreme Court said in *Free Enterprise* is that the

17   PCAOB is, quote, the regulatory of the first resort and the

18   primary law enforcement authority for the accounting industry.

19   It, quote, wields the executive power of the United States.

20           The board members, as your Honor noted, are inferior

21   officers to the United States.  Congress made specific

22   decisions when it created the PCAOB, took it out of the formal

23   United States government, but it gave it a regulatory function.

24   And under *Cleveland*, that is the key here.

25           So then we turn to:  What is the interest that is

I5VTMIDA

alleged to be defrauded?  *McNally*, *Skilling*, *Cleveland* all make

clear there has to be property interest.

          In this case, it's not, as Ms. Greenwood suggested,

simply information.  The alleged right that has been interfered

with is an intangible right to control the dissemination of

information, that is, to protect the confidentiality of the

information.  And *Carpenter* makes clear that that is the kind

of intangible right we're talking about.  It held that the Wall

Street Journal's information was private property because it

said -- and this is at page 26 of the opinion -- quote, the

confidential information was generated from the business, the

business had a right how to decide how to use it prior to

disclosing it to the public.  The Court went on to note that,

going into page 27, exclusivity is an important aspect of

confidential information, and most private property, for that

matter.

          So what *Cleveland* does is it take that language of

intangible right, the right to exclude, the right to control.

And what it says is it may be private property when a private

entity does it for business purpose, when a patent holder

licenses a patent, when a newspaper publishes news, when a

franchiser franchises his business.  But when the government

does it, when the government decides how it's going to control

its intangible right, its right to exclude others from knowing

its confidential information, that ceases to be a private

I5VTMIDA

property right, it's an intangible right, a regulatory right
that is not the subject of a wire fraud prosecution.

Instead, the government turns to the resources
expended by the PCAOB to make the list.  If that argument were
accepted, that the resources expended by the government turn an
intangible right into a private property interest, then
*Cleveland* is meaningless, because the government, of course,
expends resources for everything it does.

The licensing scheme at issue in *Cleveland* required
the expenditure of resources.  The agents of the state had to
process licenses, give out applications, do background checks.
The fact that resources are expended by the government doesn't
mean everything it does suddenly becomes a private property
interest under the wire fraud statute.  If that were the case,
*Cleveland*, *McNally*, all of the cases where the court made clear
the narrow scope of the wire fraud statute, would be
meaningless.

And similarly, the allegation that it cost resources
to redo the list after the scheme was discovered, there's no
allegation that the intent of the scheme to deprive the
confidentiality of the information is intended to force the
victim to spend money to recreate the information when the
embezzlement is discovered, and it is certainly not the theory
that appears in the indictment.

The government also stated in their rebuttal that they

I5VTMIDA

1    have sufficiently alleged that there is false and misleading

2    information in the inspection reports.  Respectfully, your

3    Honor, we reviewed the indictment, it does not state that.  The

4    only thing it states in paragraph 91 is that the information

5    was used to, quote, privately affect PCAOB inspection outcomes.

6    It adds the conclusory label "fraud" onto what happened, but it

7    never explains what was the fraudulent conduct.  Was there a

8    false statement in those inspection reports?  It never quotes

9    from the inspection reports.  Was there a violation of a duty?

10   It doesn't say that.

11            So again, we're back to where we started, which is

12   Congress made choices about how PCAOB would be structured, how

13   violations of its rules would be enforced.  A violation of the

14   confidentiality rule, according to Sarbanes-Oxley, is a civil

15   and administrative matter.  To get around that choice, the

16   indictment has decided to take the generic conspiracy statute

17   and the generic wire fraud statute and apply them in a way that

18   has never been done before.

19            This would be the first case to allow a conspiracy to

20   defraud prosecution to go forward where the fraud on the United

21   States is never defined.  It would be the first case to allow a

22   wire fraud prosecution to go forward post-*Cleveland* based on

23   intangible regulatory information.  It's never been used in any

24   sort of government lead prosecution and upheld post-*Cleveland*.

25            And we would submit, respectfully, that under basic

1   principles of due process, statutory interpretation and what is

2   required to be charged in an indictment, this indictment does

3   not state an offense and must be dismissed.

4            THE COURT:  Thank you.

5            Does anyone else want to reply to something?

6            MR. BOXER:  We do not.  We will rest on our argument

7   and our brief.

8            THE COURT:  Thank you.

9            MR. BONDI:  We'll rest, your Honor.

10            THE COURT:  All right.  Very well.

11            Did you need to respond to anything?

12            MS. GREENWOOD:  Just very, very briefly, your Honor.

13            THE COURT:  Sure.

14            MS. GREENWOOD:  To be clear, the scheme at issue here,

15   your Honor, caused the PCAOB to not be able to speak truthfully

16   to the SEC when it was reporting to the SEC there was a PCAOB

17   inspection.  It caused deception, it caused a misstatement.

18   And that is the heart of our Section 731 claim, your Honor.

19            With respect to just one last point, your Honor, that

20   Mr. Shahabian made with respect to *Cleveland*, this is not a

21   situation where we said because there is some expenditure in

22   some licensing regime that the licensing regime somehow becomes

23   property.  Here it's very clearly tied to the creation of the

24   information, and specifically the PCAOB's expenditure of

25   resources to compile and create information that is the very

I5VTMIDA

```
 1    heart of the business and the work it performs.  Stealing that
 2    information is a crime, your Honor.
 3              Nothing further.
 4              THE COURT:  Thank you.
 5              Thank you very much.  I appreciate the very able
 6    lawyering by all the parties in the case, both in the briefing
 7    and the argument today.
 8              I will mention a couple of other things.  Decision is
 9    reserved as to these motions.  There are a few other motions, I
10    understand.  There's a motion for release of Brady materials
11    which was filed on May 24, there's a motion for a bill of
12    particulars filed on May 25, and then there's a motion to
13    unseal that I received by email with respect to the Brian Sweet
14    case, and I believe I'll be getting responses -- I don't think
15    I have responses to those by the government, but you are
16    planning to respond to those?
17              MS. GREENWOOD:  That's correct, your Honor.
18              THE COURT:  Do you have dates for the responses?
19              MS. GREENWOOD:  Your Honor, we expect at a minimum to
20    reply to the unsealing motion tomorrow, and we would ask to be
21    allowed to put in a letter asking for the time that we need to
22    respond to other two tomorrow as well.
23              THE COURT:  That's fine.  As you know, defendants'
24    motions to compel discovery any other motions related to
25    compelling discovery are extended to June 8.
```

I5VTMIDA

1            All right.  Thank you all very much.  We're adjourned.

2            (Adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25