UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-                                                              18-CR-36 (JPO)

DAVID MIDDENDORF,                                    OPINION AND ORDER
THOMAS WHITTLE,
DAVID BRITT,
CYNTHIA HOLDER, and
JEFFREY WADA,
                                        Defendants.

J. PAUL OETKEN, District Judge:

Defendants David Middendorf, Thomas Whittle, David Britt, Cynthia Holder, and Jeffrey

Wada are charged in a five-count indictment with offenses relating to an alleged scheme to

improve KPMG's performance on inspections conducted by the Public Company Accounting

Oversight Board ("PCAOB") by passing confidential PCAOB information to select KPMG

employees.  (Dkt. No. 1 ("Indictment").)  Before the Court are several motions to dismiss the

Indictment.  For the reasons that follow, the motions are denied.

I.      **Background**

The following factual background is taken from the Indictment, the allegations of which

are assumed true solely for purposes of these motions, as explained in Section II below.

To register securities with the Securities and Exchange Commission ("SEC"), publicly

traded companies must prepare and disclose annual financial statements that have been audited

by registered public accounting firms.  (Indictment ¶ 2.)  The PCAOB, a nonprofit corporation

created by the Sarbanes-Oxley Act of 2002 ("SOX"), conducts inspections of these auditors to

ensure their compliance with SOX, SEC, and PCAOB rules.  (*Id.* ¶ 4.)  SOX requires the

PCAOB to prepare written inspection reports which are then shared with the SEC and, in part,

with the public.  (*Id.* ¶¶ 9, 11.)  The SEC uses the information contained in these inspection reports to carry out its regulatory, oversight, and enforcement responsibilities.  (*Id.* ¶ 11.)

The six largest accounting firms in the United States are subject to the PCAOB's Global Network Firm ("GNF") program.  (*Id.* ¶ 5.)  Every year, for each GNF firm, the PCAOB selects a list of audits for PCAOB review.  (*Id.* ¶ 6.)  These lists are kept "highly confidential," and the PCAOB generally does not inform the auditor which of its accounts will be inspected until after the firm's 45-day window for documenting previously completed work, called the "documentation period," has lapsed.  (*Id.* ¶¶ 3, 8.)  PCAOB Ethics Rule 9 imposes a lifetime prohibition on current or former PCAOB employees sharing confidential PCAOB information—including, in particular, non-public information about which audits have been selected for inspection.  (*Id.* ¶¶ 13−14.)

KPMG LLP ("KPMG") is an accounting firm subject to the PCAOB's GNF program. (*Id.* ¶ 15.)  KPMG fared poorly in its 2013 and 2014 PCAOB inspections, so in 2015 the firm began making a concerted effort to improve its inspection performance.  (*Id.* ¶¶ 16−18.)  The Indictment alleges that in addition to KPMG's various lawful efforts, a handful of KPMG and PCAOB employees orchestrated a scheme to give KPMG access to the PCAOB's confidential list of audits selected for inspection.  (*Id.* ¶¶ 18, 27.)  Defendants are alleged to have participated in that scheme.

There are six relevant players.  Brian Sweet, Defendant Cynthia Holder, and Defendant Jeffrey Wada started out as employees of the PCAOB, assigned to the team tasked with inspecting KPMG.  (*Id.* ¶¶ 21−23.)  Defendants David Middendorf, Thomas Whittle, and David Britt were employees of KPMG and, in various capacities, were responsible for maintaining

audit quality at KPMG.  (*Id.* ¶¶ 19−20, 24−26.)  Both Sweet and Holder left the PCAOB and began employment with KPMG in April and August of 2015, respectively.  (*Id.* ¶¶ 21−22.)

The Indictment alleges that shortly before Sweet's last day of employment with the PCAOB in April 2015, he downloaded and copied various confidential PCAOB documents to a personal hard drive.  (*Id.* ¶ 30.)  Among these documents was a "planning spreadsheet" containing a list of KPMG audits that had been selected for inspection in 2015—most of which had not yet been officially noticed for inspection by the PCAOB.  (*Id.* ¶¶ 7, 30, 34.)  The Indictment alleges that in response to requests from Middendorf, Whittle, and Britt, Sweet shared this 2015 inspection list with Britt and Whittle, who then passed it on to Middendorf.  (*Id.* ¶¶ 32−37.)  The Indictment alleges that throughout 2015, Sweet continued to share confidential information, including risk factors used by the PCAOB in making inspection selections, with Defendants Middendorf, Whittle, and Britt.  (*Id.* ¶¶ 42−46.)

After his separation from the PCAOB, Sweet remained in communication with Holder about helping her find employment at KPMG.  (*Id.* ¶¶ 47−49.)  Holder shared various pieces of confidential PCAOB information with Sweet, including internal deliberations regarding "deficiency comments" and likely inspection selections, which Sweet then shared with Whittle.  (*Id.* ¶ 50.)  KPMG made Holder an offer of employment in July 2015, and prior to leaving the PCAOB Holder, too, copied PCAOB confidential information onto a personal thumb drive.  (*Id.* ¶¶ 55−56.)  On at least one occasion, she emailed one of these copied documents to Sweet.  (*Id.* ¶ 57.)

As Sweet had done with her, Holder remained in contact with another PCAOB employee, Wada, who expressed frustration to Holder about his failure to obtain a promotion at the PCAOB.  (*Id.* ¶¶ 58, 62.)  Between August 2015 and March 2016, Wada provided Holder with

confidential PCAOB information, including a list of KPMG audits that the PCAOB planned to inspect in 2016. (*Id.* ¶¶ 58, 62, 65.) Holder shared this information with Sweet, who in turn shared it with Middendorf, Whittle, and Britt. (*Id.* ¶¶ 66−67.) Middendorf, Whittle, and Britt agreed to initiate "re-reviews" of select audits on the PCAOB's 2016 list and directed Sweet and Holder to conduct the re-reviews. (*Id.* ¶¶ 67−71.) These re-reviews uncovered several problems with audits which, in some instances, prompted KPMG to conduct additional audit work that was not properly documented. (*Id.* ¶ 72.)

Wada continued to share confidential PCAOB information with Holder in 2017. First, in January, Wada disclosed a preliminary list of 2017 inspection selections. (*Id.* ¶ 73.) The information filtered up from Holder to Sweet, Whittle, Britt, and Middendorf. (*Id.* ¶¶ 74−77.) Because the tentatively selected audits were still ongoing, Sweet, Whittle, Britt, and Middendorf agreed to direct extra attention and resources to conducting those audits. (*Id.* ¶¶ 75−78.) Then, in February, Wada relayed the PCAOB's final list of inspection selections, along with the inspections' focus areas, to Holder. (*Id.* ¶¶ 80−81.) Whittle, Britt, and Middendorf—having received the information from Holder via Sweet—made plans to notify KMPG partners whose audits appeared on the inspection list. (*Id.* ¶¶ 82−83.)

The scheme finally unraveled in February 2017, when KPMG's General Counsel opened an investigation into the source of the 2017 inspection information. (*Id.* ¶¶ 84−89.) Wada and Sweet separated from the PCAOB and KPMG, respectively, in March 2017; and Holder, Whittle, Britt, and Middendorf separated from KPMG in April 2017. (*Id.* ¶¶ 21−26.)

The Indictment, which was unsealed on January 22, 2018, charges Defendants Middendorf, Whittle, and Britt with five counts, and Defendants Holder and Wada with four counts. Count One charges all Defendants with conspiracy "to defraud the United States and an

agency thereof, to wit, the SEC," in violation of 18 U.S.C. § 371.  (*Id.* ¶ 90.)  Count Two charges all Defendants with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343.  (*Id.* ¶ 95.) And Counts Three, Four, and Five charge the Defendants with wire fraud in 2015, 2016, and 2017, respectively, in violation of 18 U.S.C. §§ 2, 1343.[1]

All Defendants have moved to dismiss the Indictment.  (Dkt. Nos. 53, 56, 60.)  The Court heard oral argument on the motions on May 31, 2018.

## II.    Legal Standard

On a motion to dismiss an indictment pursuant to Federal Rule of Criminal Procedure 12(b), "the Court accepts the allegations in the indictment as true and may not consider the sufficiency of the evidence."  *United States v. Block*, No. 16 Cr. 595, 2017 WL 1608905, at *2 (S.D.N.Y. Apr. 28, 2017); *see also United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009)). However, because "federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (internal citation omitted) (quoting *Dowling v. United States*, 473 U.S. 207, 213 (1985)).

Rule 7(c) requires that an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  Generally, "an indictment need 'do little more than to track the language of the

---

[1]      Defendants Holder and Wada are not charged in Count Three.  (*Id.* ¶¶ 97, 99, 101.)

statute charged and state the time and place (in approximate terms) of the alleged crime.'"

*United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United States v. Pirro*, 212

F.3d 86, 92 (2d Cir. 2000)).  However, when an indictment charges conspiracy to defraud the

government in violation of § 371, "it is not sufficient that the indictment shall charge the offense

in the same generic terms as" in the statute, and the government must therefore "plead . . . an

agreement with respect to the essential nature of the alleged fraud."  *United States v. Rosenblatt*,

554 F.2d 36, 41–42 (2d Cir. 1977) (footnote omitted) (first quoting *United States v. Cruikshank*,

92 U.S. 542, 544 (1875)).

## III.   Discussion

Defendants argue that the Indictment fails to allege (1) that they have conspired to

defraud the United States government, as charged in Count One, and (2) that they have

committed (or conspired to commit) wire fraud, as charged in Counts Two through Five.  The

Court addresses each in turn.

### A.      Count One: Conspiracy To Defraud the United States

Count One of the Indictment charges Defendants with conspiring to defraud the United

States under the "defraud clause" of 18 U.S.C. § 371.  Pursuant to this clause, it is a crime for

"two or more persons [to] conspire . . . to defraud the United States, or any agency thereof in any

manner or for any purpose" if "one or more of such persons do any act to effect the object of the

conspiracy."  18 U.S.C. § 371.

The meaning of "defraud" under § 371 is more capacious than its definition at common

law or in the federal mail and wire fraud statutes.  *See Dennis v. United States*, 384 U.S. 855, 861

(1966) (citing *Haas v. Henkel*, 216 U.S. 462, 479 (1910)); *United States v. Rosengarten*, 857

F.2d 76, 78 (2d Cir. 1988).  Section 371 reaches beyond "schemes which deprive the government

of money or property" to "any conspiracy for the purpose of impairing, obstructing, or defeating

the lawful function of any department of Government." *United States v. Nersesian*, 824 F.2d

1294, 1313 (2d Cir. 1987) (second quoting *Dennis*, 384 U.S. at 861) (internal quotation marks

omitted).  And, as long as the conspiracy seeks to interfere with a lawful governmental function,

§ 371 criminalizes all acts that accomplish that goal "by deceit, craft, or trickery, or by means

that are dishonest." *Nersesian*, 824 F.2d at 1313 (citing *Hammerschmidt v. United States*, 265

U.S. 182, 188 (1924)).

In the Second Circuit, § 371 conspiracies to defraud the United States' lawful

government functions are often called "*Klein* conspiracies."  *See United States v. Klein*, 247 F.2d

908, 915−16 (2d Cir. 1957); *see also United States v. Coplan*, 703 F.3d 46, 59−61 (2d Cir. 2012)

(discussing the origins of the *Klein* conspiracy).  "[I]n order to prove a *Klein* conspiracy, the

Government must show '(1) that the defendant entered into an agreement (2) to obstruct a lawful

function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in

furtherance of the conspiracy.'"  *Coplan*, 703 F.3d at 61 (brackets omitted) (quoting *United

States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)).  Defendants raise two challenges to Count

One.

First, Defendants argue that the Indictment fails to allege that the purpose of the

conspiracy was to obstruct a lawful function of a government agency.  (Dkt. No. 57 at 11−15.)

As accurately reflected in the Indictment, the PCAOB is not an agency of the United States.  *See*

15 U.S.C. § 7211(b) ("The [PCAOB] shall not be an agency or establishment of the United

States Government . . . ."); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561

U.S. 477, 484 (2010) ("Congress created the [PCAOB] as a private 'nonprofit corporation,' and

Board members and employees are not considered Government 'officer[s] or employee[s]' for

statutory purposes." (alterations in original) (quoting 15 U.S.C. §§ 7211(a), (b))).  Therefore, for

the Indictment to allege a violation of § 371, it must allege that Defendants conspired to defraud

an agency of the United States—in this case, the SEC.

Section § 371 "require[s] a showing of specific intent" to defraud a government agency.

*United States v. Gurary*, 860 F.2d 521, 523 (2d Cir. 1988); *see also Tanner v. United States*, 483

U.S. 107, 130 (1987) ("The conspiracies criminalized by § 371 are defined not only by the nature

of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but

also—and most importantly—by the *target* of the conspiracy.").  That said, "intent to defraud the

United States may be incidental to another primary motivation or purpose."  *Gurary*, 860 F.2d at

525.  In *Gurary*, for example, the Second Circuit considered a scheme to sell fictitious invoices

to companies which would then use those invoices to misreport their taxable income to the IRS.

*Id.* at 523.  In affirming the salesmen's conviction under § 371, the court held that "[a] jury could

reasonably infer . . . that [the] defendants intended to impede or obstruct the IRS from carrying

out its functions" because "[a]t a minimum, [the] defendants knew the fictitious invoices would

be recorded in corporate books and records, records on which corporate tax returns are based."

*Id.* at 525.  As a result, "[i]mpeding the IRS, though not defendants' primary purpose, was part

and parcel of the scheme."  *Id.*

Count One of the Indictment alleges that Defendants conspired to defraud the SEC "by

misappropriating, embezzling, obtaining, sharing, and using confidential information from the

PCAOB in order to fraudulently affect PCAOB inspection outcomes, the results of which the

defendants knew were reported to the SEC and utilized by the SEC to carry out its regulatory and

enforcement functions."  (Indictment ¶ 91.)  Like the defendants in *Gurary* who knew that their

fabricated invoices would be used by customers to report false income to the IRS, Defendants

allegedly knew that their scheme would alter PCAOB inspection results which would then be

reported to the SEC.  Affecting the SEC's regulatory and enforcement functions was "part and parcel" of Defendants' scheme.  *Gurary*, 860 F.2d at 525.

Thus, Count One sufficiently alleges a purpose to defraud the government in violation of § 371.  Whether the government can prove this allegation is a question for the jury.  For now, it is enough that Count One charges a violation of § 371 "with sufficient precision to inform the defendant[s] of the charges [they] must meet and with enough detail that [they] may plead double jeopardy in a future prosecution based on the same set of events."  *Stavroulakis*, 952 F.2d at 693.

Second, Defendants argue that the Indictment fails to allege that they agreed to use "deceitful or dishonest means" to defraud the government.  *Coplan*, 703 F.3d at 61 (quoting *Ballistrea*, 101 F.3d at 832).  (*See also* Dkt. No. 57 at 15−20.)  It is settled law that a scheme may qualify as "deceitful or dishonest" without constituting an independent criminal offense, *see, e.g.*, *Rosengarten*, 857 F.2d at 78−79, and that "[a] method that makes use[] of innocent individuals or businesses to reach and defraud the United States" is within "the scope of § 371," *Tanner*, 483 U.S. at 129.

It is less clear, however, just how far the meaning of "deceitful or dishonest" can stretch. Relying primarily on a line of cases in the Ninth Circuit, Defendants argue that to charge the use of deceitful or dishonest means, "an indictment must allege a fraud . . . in the form of either an affirmative misrepresentation to the government or the breach of a duty owed to the government."  (Dkt. No. 57 at 15−16 (citing *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989); *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993)).)  The government, in contrast, argues that the "Second Circuit has repeatedly rejected the defendants' argument that

. . . the Government must show that the defendant owed a direct duty of disclosure to the relevant government agency."  (Dkt. No. 74 at 17.)

The truth lies somewhere in the middle.  The Government is correct that the Second Circuit has held that a defendant need not breach a *direct* duty in order for his conduct to fall within the ambit of § 371's defraud clause.  But in all of the cases upon which the government relies, the defendants conspired to cause third-party intermediaries to make a false statement or breach a duty to the government.  *See United States v. Shellef*, 507 F.3d 82, 105 (2d Cir. 2007) (defendants misled manufacturers about the taxable status of their transactions, which the manufacturers had a duty to report to the IRS); *Ballistrea*, 101 F.3d at 832 (defendants instructed salesmen to conceal unlawful marketing materials from the FDA); *Gurary*, 860 F.2d at 525 (defendants conspired to sell fake invoices which purchasers used to file false tax returns); *Nersesian*, 824 F.2d at 1313 (defendants' conspiracy prevented banks from making mandatory reports to the IRS).[2]  These cases demonstrate that defendants may be charged with conspiracy to defraud the government via (even innocent) intermediaries.  But they do not answer, one way or the other, the question whether § 371 "fraud" may occur in the absence of *any* misstatement or breach of duty to the government.

For the answer to this question, the Court must move up one level of granularity.  While the Second Circuit has never affirmatively held that "fraud" can occur in the absence of a

---

[2]     Although all parties have, to some extent, cherry-picked choice sentences from these cases, those sentences must be read in context.  Take *Shellef*, for example.  On the one hand, the *Shellef* opinion states that "a defendant need not have a duty to report transactions or pay taxes to be convicted of a conspiracy to defraud the IRS with respect to those reports or payments."  *Shellef*, 507 F.3d at 105.  On the other hand, however, the *Shellef* court explained that "[j]ust as the *Nersesian* defendants could be convicted for misrepresenting the nature of their transactions to a third party who owed an independent duty to the IRS, so can [the defendants here]."  *Id.*

misstatement or breach of duty, both the Supreme Court and the Second Circuit have continually

reaffirmed the holdings of *Hammerschmidt* and *Klein* that § 371 criminalizes conspiracies "to

interfere with or obstruct one of [the government's] lawful governmental functions by deceit,

craft or trickery, or at least by means that are dishonest." *Klein*, 247 F.2d at 916 (quoting

*Hammerschmidt*, 265 U.S. at 188); *see also Tanner*, 483 U.S. at 129 ("[T]he broad language of

§ 371, covering conspiracies to defraud 'in any manner for any purpose,' puts no limits based on

the *method* used to defraud the United States."). Indeed, as the Second Circuit recently

explained in rejecting a statutory challenge to *Klein* conspiracies, "Notwithstanding . . .

infirmities in the history and deployment of the statute," "the *Klein* doctrine derives from and

falls within the scope of the law of the Circuit (itself grounded on long-lived Supreme Court

decisions)." *Coplan*, 703 F.3d at 62. Consequently, challenges to the scope of § 371's defraud

clause "are properly directed to a higher authority."[3] *Id.*

This Court is bound to take the Second Circuit at its word: a conspiracy to defraud the

government includes any scheme "to obstruct, through deceit, trickery, or dishonest means, the

[government's] lawful function." *Ballistrea*, 101 F.3d at 833; *see also United States v.*

*Nersesian*, 824 F.2d at 1313 ("[T]o be held liable under the broad sweep of the fraud prong of §

---

[3]       As noted by the government, Defendants' reliance on *Coplan* to support their
misstatement-or-duty interpretation of § 371 is misplaced. The *Coplan* court reversed a
defendant's conviction for insufficient evidence, holding that the fact that the defendant had
"discourage[d] personnel from leaving . . . marketing materials with clients, in case the IRS
should demand copies of those materials" was insufficiently "deceptive." *Coplan*, 703 F.3d at
64. In so holding, the court noted that "[t]he Government [did] not argue . . . that the IRS ever
requested copies of the promotional materials . . . , or that governing ethical standards required
[the company] to disclose those materials in the absence of such a request." *Id.* This sentence
must be read in the context of the facts adduced at trial, however. "*Coplan* invalidated the
defendants' convictions, not the sufficiency of the indictment." *United States v. Buck*, No. 13
Cr. 282, 2017 WL 4174931, at *6 (S.D.N.Y. Aug. 28, 2017).

371, defendants . . . merely must have agreed to interfere with or to obstruct one of the government's lawful functions.").

The Indictment alleges as much.  Although the Indictment does not allege that Defendants caused the PCAOB to report inaccurate information to the SEC, it does allege that Defendants embezzled confidential PCAOB information with the intent "to fraudulently affect PCAOB inspection outcomes, the results of which the defendants knew were reported to the SEC and utilized by the SEC to carry out its regulatory and enforcement functions."  (Indictment ¶ 91.)  In other words, Defendants conspired to cause the PCAOB's inspection results, although accurate, to paint a rosier picture of the integrity and quality of KPMG audits.  Thus the allegations in Count One are sufficient "to allege a crime within the terms of the applicable statute."  *Aleynikov*, 676 F.3d at 76.

Taking a slightly different tack, Defendants urge this Court to invalidate § 371's defraud clause as unconstitutionally vague or, as a matter of constitutional avoidance, to narrowly interpret it.  (*See* Dkt. No. 57 at 20−25.)  However, "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand," *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988), and "one whose conduct is clearly proscribed by a statute may not successfully challenge it for vagueness," *United States v. Strauss*, 999 F.2d 692, 698 (2d Cir. 1993).

The Court concludes that "even if there might be theoretical doubts" about the scope of the defraud clause at its margins, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010), the illegality of Defendants' alleged conduct in this case is—or at least should have been—clear. As alleged in the Indictment, it was clear to all Defendants that the PCAOB's inspection lists were confidential and that PCAOB employees embezzled them in violation of their ethical

duties.  Furthermore, Defendants are professionals with knowledge of the PCAOB and the oversight function it performs—including its production of reports that are utilized by the SEC in the execution of its regulatory and enforcement functions.  In short, Defendants had fair notice that obtaining and using the PCAOB's confidential inspection lists was a "deceitful or dishonest" scheme "to obstruct a lawful function of the" SEC.  *Coplan*, 703 F.3d at 61.

Accordingly, the motions to dismiss Count One are denied.

**B.    Counts Two Through Five: Wire Fraud and Conspiracy To Commit Wire Fraud**

Counts Three through Five of the Indictment charge the Defendants with wire fraud, which is defined by 18 U.S.C. § 1343 as the use of wire communications in interstate or foreign commerce in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343; *see also* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). Count Two charges the Defendants with conspiracy to commit wire fraud.  *See* 18 U.S.C. § 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

Although one could read "schemes to defraud" and "schemes to obtain money or property" as alternative elements, the Supreme Court clarified in *McNally v. United States* that the statute is "limited in scope to the protection of property rights."  483 U.S. 350, 360 (1987) (discussing 18 U.S.C. § 1341); *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (recognizing that the "mail and wire fraud statutes share the same language in relevant part" and are accordingly subject to the same statutory analysis).  Thus, the elements of wire fraud are: "(1)

a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the

mails [or wires] to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.

2004) (alterations in original) (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.

1996)).

### 1.     Scheme To Defraud "Money or Property"

First, Defendants challenge the sufficiency of the Indictment with respect to the second

element of wire fraud: whether the alleged scheme had "money or property" as its object.  (*See*

Dkt. No. 57 at 26–42.)  The Indictment alleges that Defendants used the wires in a scheme to

defraud the PCAOB by embezzling its "property in the form of valuable confidential information

and documents concerning planned PCAOB inspections."  (Indictment ¶¶ 97, 99, 101.)  The

question, therefore, is whether the PCAOB's confidential inspection information is "property."

The answer lies in the interstices between two Supreme Court cases: *Carpenter v. United States*,

484 U.S. 19 (1987), and *Cleveland v. United States*, 531 U.S. 12 (2000).

*Carpenter* held that intangible "confidential business information" is property for

purposes of the wire fraud statute.  *Carpenter*, 484 U.S. at 25.  At issue in *Carpenter* was a

scheme by a *Wall Street Journal* reporter to leak the contents of upcoming "Heard on the Street"

columns to his associates at a brokerage firm, who would then make trading decisions based on

the column's likely impact on the market.  *Id.* at 23.  The reporter never altered the articles for

purposes of boosting the traders' profits, but he did violate the *Journal*'s confidentiality policy

by disclosing the columns' contents.  *Id.*  In affirming the conviction, the Court unanimously

rejected the defendants' claim that they took no "money or property" from the *Journal*.  *Id.* at 25.

The Court explained that "the object of the scheme was to take the *Journal*'s confidential

business information—the publication schedule and contents of the 'Heard' column—and its

intangible nature does not make it any less 'property' protected by the mail and wire fraud

14

statutes." *Id.* at 25.  Even though the *Journal* suffered no monetary loss, it was "sufficient that the *Journal* has been deprived of its right to exclusive use of the information," because "exclusivity is an important aspect of confidential business information," and "[c]onfidential business information has long been recognized as property." *Id.* at 26−27.

*Cleveland* considered whether lying to the government to obtain a license—in that case, a license to operate a video poker machine—qualifies as a fraudulent scheme to obtain property. The Court concluded that it does not, based on a two-step analysis.  First, it held that "the thing obtained must be property in the hands of the victim," regardless of whether it becomes property in the hands of the thief.  *Cleveland*, 531 U.S. at 15.  And second, the Court held that a license is not property in the hands of the state because "the State's core concern is *regulatory*." *Id.* at 20. Even if a license to operate vests the licensee with a property interest, the ability to confer such an interest is merely a "state police power[]"—not property—in the hands of the government. *Id.* at 21.  The Court was unpersuaded by the government's argument that the defendant "frustrated the State's right to control the issuance, renewal, and revocation" of licenses because "these intangible rights of allocation, exclusion, and control amount to no more and no less than [the state's] sovereign power to regulate." *Id.* at 23.

Neither *Carpenter* nor *Cleveland* directly controls the outcome here.  *Carpenter* held that confidential business information is property, but the PCAOB is not a private "business" like the *Wall Street Journal*.  *Cleveland* held that unissued licenses are not property in the hands of the state, but the PCAOB's inspection lists are not government licenses.  It is, therefore, this Court's task to apply the principles and reasoning—if not the holdings—of *Carpenter* and *Cleveland* to the facts of this case.

15

To begin with, the reasoning of *Carpenter* supports the conclusion that confidential information—whether held by the government, a private entity, or a statutory nonprofit corporation such as the PCAOB—is "property."  *Carpenter* is most fairly read to hold: first, that the wire fraud statute covers all interests that are properly characterized as "property" interests, whether tangible or intangible; and second, that the confidential information of a business is "property."  *Carpenter*, 484 U.S. at 26.  *Carpenter* did not hold that confidential information *must* belong to a private business to qualify as property—that it is a sufficient condition does not imply that it is a necessary condition.  *See United States v. Grossman*, 843 F.2d 78, 86 (2d Cir. 1988) (explaining that while "*Carpenter . . . describes* the confidential information in that case[,] it does not require that *all* confidential information must be of the same nature to be considered 'property'").  Indeed, *Carpenter* held that confidential information may qualify as property even where its embezzlement causes no pecuniary loss to its owner.  *Id.* at 26−27.

Starting from the premise that confidential information can be property, the reasoning of *Cleveland* does not create a carve-out for confidential information which happens to belong to the government.  To be sure, *Cleveland*'s discussion of "regulatory interests," if read in a vacuum, sweeps broadly.  But *Cleveland* cannot be read for the proposition that the government can never be defrauded of property for purposes of the wire fraud statute.  The Court soundly rejected that interpretation of *Cleveland* in *Pasquantino v. United States*, which held that money "legally due" to the government is "property."   544 U.S. 349, 356 (2005).  Nor can *Cleveland* be read for the proposition that property which *facilitates* regulation cannot be "property"; if a thief broke into the IRS and stole every computer, one could not seriously argue that he stole no "property."  And, finally, *Cleveland* cannot be read for the proposition that property *derived from*

the power to regulate is not "property"; the government's right to uncollected excise taxes, for example, is "property" for purposes of the wire fraud statute.  *See Pasquantino*, 544 U.S. at 355.

So what is left is a narrower holding:  *Cleveland* holds that permission to engage in regulated conduct is a regulatory interest in the hands of the government which transmutes into a property interest in the hands of a private party.  And a license is the vehicle through which the government transforms its amorphous power to regulate conduct into a private right to engage in that conduct.  But the government does not hold any "licenses" per se; rather, it holds the power to *issue* licenses, which is a regulatory power.  *See Pasquantino*, 544 U.S. at 357 (explaining that *Cleveland* held that "an unissued video poker license was not 'property,' because the interest in *choosing* particular licensees was 'purely regulatory'" (quoting *Cleveland*, 544 U.S. at 22) (emphasis added)).  To borrow an analogy from physics, what is potential energy in the hands of the government becomes kinetic energy in the hands of a license-holder.

But nothing in *Cleveland* suggests that the PCAOB's inspection lists are at all akin to a license.  In contrast to a license, the PCAOB's confidential information is valuable, intangible property *in the hands of the PCAOB*.  To be sure, the PCAOB's confidential information is valuable because the PCAOB relies on its inspection lists to carry out a regulatory function.  Indeed, as the Supreme Court stated:  "Unlike the self-regulatory organizations [on which the PCAOB was modeled] . . . the [PCAOB] is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry."  *Free Enter. Fund*, 561 U.S. at 485.  Presumably if the PCAOB issued regulatory licenses like those at issue in *Cleveland*, they would not constitute "property" under the wire fraud statute—for precisely the reasons given by the

17

Court in that case.[4]  But even recognizing the PCAOB's status as a regulator, it does not follow

that *Cleveland*'s holding regarding regulatory permits extends to confidential

information—something that exists and has value in the hands of the government.  "The fact that

the victim of the fraud happens to be the government, rather than a private party, does not lessen

the injury."  *Pasquantino v. United States*, 544 U.S. 349, 356 (2005).  Similarly, the fact that

confidential information has regulatory value does not mean that the information is not property

in the hands of the regulator.

So we have two rules in the negative: first, the fact that confidential information is

intangible does not make it not-property, *see Carpenter*, 484 U.S. at 25; and second, the fact that

property is in the hands of the government (or some other regulatory entity) does not make it not-

property, *see Pasquantino*, 544 U.S. at 357.  What is left is to determine whether this particular

confidential information is, affirmatively, property.

The Court concludes that the answer is yes.  The inspection lists were certainly

"'something of value' to the" PCAOB, which invested time and resources into their creation.

*Pasquantino*, 544 U.S. at 355 (quoting *McNally*, 483 U.S. at 358).  And Defendants' alleged

scheme deprived the PCAOB of a "property right in keeping confidential and making exclusive

use" of that information.  *Carpenter*, 484 U.S. at 26.  Like the news at issue in *Carpenter*, the

PCAOB's "confidential information was generated from the [PCAOB]," and as a result "the

[PCAOB] had a right to decide how to use it prior to disclosing it to the public."  *Carpenter*, 484

U.S. at 26.

---

[4]      The government contends that the PCAOB's non-governmental status alone
renders *Cleveland* inapposite.  (Dkt. No. 74 at 33–34.)  That is a hard conclusion to draw, given
the PCAOB's significant regulatory role.  But *Cleveland* is inapplicable for a simpler reason:
This case is not about licenses.

In assessing the nature of the confidential information at issue here, an analogy may be helpful—one that is closer to the facts alleged in this case.  Consider the Uniform Bar Examination, which is administered by a nonprofit corporation, the National Conference of Bar Examiners (or NCBE).  Information regarding the questions on the bar exam is strictly confidential until the date of the exam, and the NCBE presumably maintains tight control over that information.  Suppose an employee of the NCBE, in exchange for $10,000 and in violation of the NCBE's policies, provided someone with the six essay questions on the bar exam scheduled in one month.  This allows that one test-taker to prepare perfect answers to the questions in advance and to unfairly ace the essay exam.  It seems clear that the employee has taken the employer's "property"—in the form of "confidential business information"—within the meaning of the wire fraud statute.  As in *Carpenter*, the untimely misappropriation of the corporation's confidential information, while not necessarily causing any direct economic harm, compromises the corporation's mission, which in the case of the NCBE is to provide a fair and impartial evaluation of bar applicants.  *Cf. United States v. Hedaithy*, 392 F.3d 580, 594–95 (3d Cir. 2004) (holding that TOEFL exam questions are "confidential business information" of the Educational Testing Service and therefore property under the wire fraud statute).

The PCAOB is a nonprofit corporation like the NCBE, and the PCAOB's confidential list of audit inspections is arguably akin to the NCBE's bar exam subjects.  Just as the NCBE (or ETS, or the University of Iowa) relies on the confidentiality of its proprietary information to evaluate students, the PCAOB relies on such confidential information to evaluate auditors.  To read *Cleveland* as extinguishing the *proprietary* status of confidential information whenever it is used in the service of regulation would be to devalue intangible property in the hands of the

government (or private entities performing regulatory functions).  Such a broad reading of *Cleveland* is unwarranted as a matter of interpretation, as well as principle and policy.

### 2.    Sufficiency of the Indictment's Allegations

Defendants also challenge the sufficiency of the Indictment's allegations as to each of their individual conduct.

First, with respect to Counts Three through Five, Defendants Holder, Middendorf, Whittle, and Britt (the "KPMG Defendants") argue: (1) that the alleged scheme to defraud was "complete" by the time they learned the confidential information (*see* Dkt. No. 58 at 1−5; Dkt. No. 59 at 9−10); (2) that they did not themselves breach a duty nor solicit, incentivize, or otherwise aid and abet PCAOB employees to breach their duties of confidentiality (*see* Dkt. No. 54 at 4−8; Dkt. No. 59 at 7−13); and (3) that they did not put the misappropriated information to their own personal "use" (*see* Dkt. No. 54 at 8−10).  In substance, these three challenges all hinge on the "scheme to defraud" element of wire fraud.

The wire fraud statute "reach[es] any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises."  *Carpenter*, 484 U.S. at 27.  "[T]he words 'to defraud' . . . have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'"  *Id.* (quoting *McNally*, 483 U.S. at 358).  Such dishonest means include, but are not limited to, "act[s] of embezzlement, which [are] 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'"  *Id.* (quoting *Grin v. Shine*, 187 U.S. 181, 189 (1902)).  And, as *Carpenter* made clear, "undisclosed misappropriation of [confidential] information, in violation of a fiduciary duty . . . constitutes fraud akin to embezzlement."  *United States v. O'Hagan*, 521 U.S. 642, 654 (1997); *see also United States v. Chestman*, 947 F.2d 551, 571 (2d Cir. 1991) ("A scheme to

misappropriate material nonpublic information in breach of a fiduciary duty of confidentiality may indeed constitute a fraudulent scheme sufficient to sustain a mail fraud conviction.").[5]

The Indictment alleges that Defendants each "participated in a scheme to defraud the PCAOB by misappropriating, embezzling, obtaining, sharing, and using the PCAOB's property in the form of valuable confidential information and documents concerning planned PCAOB inspections." (Indictment ¶¶ 97, 99, 101.) Thus, in contrast to Defendants' contention that the scheme to defraud was "complete" at the moment the relevant PCAOB employee downloaded the inspection information, the Indictment alleges that the Defendants' fraudulent scheme continued as various PCAOB employees shared the embezzled information, in violation of their duties of confidentiality, with KPMG employees. Whether the government can prove that such a scheme to embezzle existed and that Defendants are culpable—either directly or as aiders and abettors—for the fraudulent scheme is a question for trial.[6] *See United States v. Tochelmann*, No. 98 Cr. 1276, 1999 WL 294992, at *2 (S.D.N.Y. May 11, 1999) ("[I]t is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence." (citing *United States v. Williams*, 540 U.S. 36, 54 (1992)). At this stage, it is sufficient that the Indictment "inform[s] the defendant[s] of the charges [they] must meet." *Stavroulakis*, 952 F.2d at 693.

---

[5]      Of course, "[a] breach of fiduciary duty, without more, does not constitute mail fraud" or wire fraud. *United States v. Mittelstaedt*, 31 F.3d 1208, 1219 (2d Cir. 1994). The victim must additionally "be deprived of money or property to convert 'fiduciary delinquencies' into mail fraud." *Id.* (quoting *United States v. Miller,* 997 F.2d 1010, 1020 (2d Cir.1993)).

[6]      The Court does not mean to imply that the government must prove that the scheme was successful. *See United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000) ("[The wire fraud statute] punishes the scheme, not its success." (alterations in original) (quoting *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997)) (internal quotation marks omitted)).

Second, Defendant Wada argues that Count Two, the conspiracy count, fails to provide sufficient notice of the charge to be met.  (*See* Dkt. No. 60 at 8−9).  The Court disagrees.  Count Two alleges the approximate time of the conspiracy, the object of the conspiracy, and the requisite scienter.  (*See* Indictment ¶¶ 93−95.)  Furthermore, Count Two formally realleges the allegations contained in Count One, which provides significant factual detail on each Defendant's role in the alleged conspiracy to commit wire fraud.  (*See* Indictment ¶ 93.)  This is sufficient to meet the pleading standard of Rule 7(c).

Accordingly, the motions to dismiss Counts Two through Five are denied.

## IV.   Conclusion

For the foregoing reasons, Defendants' motions to dismiss the Indictment are DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 53, 56, and 60.

SO ORDERED.

Dated:  July 17, 2018
         New York, New York

_____
          J. PAUL OETKEN
       United States District Judge