```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
              v.                          18 CR 36 (JPO)
 4
     DAVID MIDDENDORF, THOMAS
 5   WHITTLE, DAVID BRITT, CYNTHIA
     HOLDER and JEFFREY WADA
 6
                  Defendants
 7   ------------------------------x

 8                                        New York, N.Y.
                                          August 1, 2018
 9                                        10:35 a.m.

10   Before:

11                    HON. J. PAUL OETKEN

12                                        District Judge

13

14                    APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     AMANDA K. KRAMER
17   REBECCA G. MERMELSTEIN
     JESSICA GREENWOOD
18        Assistant United States Attorneys

19   PETRILLO KLEIN & BOXER, LLP
          Attorneys for Defendant Middendorf
20   NELSON A. BOXER
     AMY R. LESTER
21
     BRUCH HANNA, LLP
22        Attorneys for Defendant Middendorf
     GREGORY S. BRUCH
23
     CAHILL, GORDON & REINDEL
24        Attorneys for Defendant Whittle
     BRADLEY J. BONDI
25   NOLA B. HELLER
```

APPEARANCES CONTINUED


ORRICK HERRINGTON & SUTCLIFFE, LLP
        Attorneys for Defendant Britt
ROBERT M. STERN
MELINDA L. HAAG

SEWARD & KISSEL, LLP
        Attorneys for Defendant Britt
BY: RITA M. GLAVIN

THOMPSON HINE, LLP
        Attorneys for Defendant Holder
NORMAN A. BLOCH
EMILY J. MATHIEU

BROWN RUDNICK
        Attorneys for Defendant Wada
STEPHEN COOK
SELVIE JASON

1          (In open court, case called)

2          THE COURT:  Good morning.

3          We're here for argument on the pending motions in the

4     case.  I thought we would start with the pending motions and

5     then address the scheduling issue raised in counsel's July 23rd

6     letter and with a government response of July 25th about moving

7     the trial.  As you all know the trial is currently scheduled

8     for October 15th of this year, and defendants I believe jointly

9     have requested that it be moved to February 11th, 2019.

10          I think it probably makes sense to first talk about

11     anything anybody wants to highlight on the motions, which are a

12     combination of motions for bill of particulars and Rule 16

13     discovery and *Brady* disclosure primarily of various defendants,

14     various combinations of defendants some of which are

15     overlapping arguments.  So I thought it made sense to talk

16     first about those.  I have read all the parties' submissions

17     and I will start with Mr. Boxer.  And if there is anything you

18     all would like to emphasize or highlight for purposes of

19     argument, you can go do that.

20          MR. BOXER:  Thank you, your Honor.

21          In our motion we are left with the bill of particulars

22     aspects of it.  Our *Brady* request resulted in a letter from the

23     government in early June disclosing various *Brady* material.  So

24     what is on open for us is our bill of particulars.  And the

25     central argument we make, and I think it still has not been

remedied, is that the substantive counts do not articulate

which wire or wires our client is alleged to have used in order

to perpetrate a wire fraud.

        In their opposition brief, the government cites to

many paragraphs of the indictment.  Only one of them is a phone

call that our client allegedly participates in, and they cite

that with respect to Count Four.  With respect to Count Three,

they cite paragraphs that do not include a wire of Mr.

Middendorf.  With respect to Count Five, they did not cite any

paragraphs in the indictment.  I think that is a classic

instance where it is appropriate for the Court to direct that

bill of particulars issue.

        I would also note their indictment does not specify

what representation or admission, breach of duty that

Mr. Middendorf made that supports wire fraud counts.  This has

been a subject of our motion to dismiss and we have written on

it in that context, but a scheme to defraud requires a

misrepresentation.

        THE COURT:  Does it require a misrepresentation?  It

could be an omission.  It could be fraudulent conduct.

        MR. BOXER:  It requires a misrepresentation or an

admission, breach of a duty.  I guess that there could be

fraudulent conduct.  It is not clear to me how that would be

something other than a misrepresentation.  But leaving that

aside, I know there is an allegation.  They cite 18, U.S.C.,

1   Section 2 for aiding and abetting and there is no specificity

2   as to who breached the duty that Mr. Middendorf was aware of or

3   who made a misrepresentation that Mr. Middendorf was aware of

4   that he then aided and abetted in that context.

5          My understanding of what the theory of the case is,

6   leaving aside misrepresentation or whether conduct could be

7   fraudulent, as it is pled is the government's theory is that

8   people like Mr. Sweet breached a duty that they owed to the

9   PCAOB by not keeping confidential certain PCAOB information and

10  then share it.  Under a misappropriation theory without

11  Mr. Sweet -- let's stick with him -- disclosing that breach,

12  that omission is a basis for the fraud charge.  So how

13  Mr. Middendorf fits within that theory is not articulated in

14  the indictment.

15         THE COURT:  Are you talking about conspiracy or just

16  the substantive wire fraud?

17         MR. BOXER:  Well, I will speak to both, but I think it

18  applies to both but I was speaking to the substantive.  Because

19  under conspiracy, the government still needs to prove an

20  intentional agreement with the unlawful objective of fraud by

21  this theory of misappropriation as I understand it.

22         In addition to not specifying the wires, which seems

23  to us like a basic requirement for us to be able to meet the

24  case and be able to plead double jeopardy if we ever needed to.

25  The charges do not with respect to Mr. Middendorf explain

1    whether he made a misrepresentation that led to the fraud,

2    whether he omitted to do something in breach of the duty he had

3    or if the theory is he aided and abetted somebody else doing

4    that.  Whose duty was he aware was being breached and that he

5    then went on and aided and abetted.  We think in order to

6    defend the case, we're entitled to those particulars there.

7              There is no doubt there is a lot of discovery.  I am

8    sure it will come up in part two about the trial date.  We have

9    the emails and documents, but I think the volume of the

10   discovery is what actually makes it particularly important that

11   we just have the very simple understanding what is he charged

12   with.  So that is the basis for our bill of particulars.

13             THE COURT:  Okay.

14             MR. BOXER:  Thank you.

15             THE COURT:  At least as to Mr. Middendorf what the

16   complaint is relatively focused.  I will have you respond to

17   that.  Essentially if the government can respond to --

18   Ms. Kramer you will be responding --

19             MS. KRAMER:  Yes.

20             THE COURT:  -- to why can't you identify the wire

21   transmissions and the misrepresentations or other omissions or

22   whatever that constitute the alleged fraud.

23             MS. KRAMER:  Certainly, your Honor.

24             First, Mr. Boxer's argument in support of his request

25   for specific identification of the wire transmissions in this

1    case rests upon an incorrect premise, which is cited I believe

2    in a footnote of his brief that Mr. Middendorf must have caused

3    a wire to be sent to be guilty of one of the substantive wire

4    fraud counts.  That is not true in connection with a wire fraud

5    scheme.

6          In *United States v. Halloran*, the Second Circuit

7    rearticulated this position that a defendant can be guilty of

8    participating in a scheme to commit wire fraud if the use of

9    the wires would be a reasonably foreseeable consequence of the

10   scheme to the defendant.  That is certainly the case here and

11   that is more than amply pled and more than amply demonstrated

12   by the discovery in this case.

13         THE COURT:  What is it that Mr. Middendorf did that is

14   sufficiently connected to wire transmissions?

15         MS. KRAMER:  In the first instance, your Honor, in

16   response to the argument that it is not clear how David

17   Middendorf fits into the scheme, I would point the Court as an

18   example to paragraphs 32 and 33 of the indictment where

19   Middendorf asks Sweet whether a particular issue would be the

20   target of a PCAOB inspection and more generally which KPMG

21   engagements would be subject to inspection that year.  He goes

22   on to talk to him about where his paycheck comes from and

23   emails are sent and received following that in furtherance of

24   the scheme.

25         For example, in 2016 in connection with the stealth

rereviews of the work papers where the ALLL monitoring program

was used as a pretext to cover up the fact that the defendants,

including Mr. Middendorf, had inside PCAOB information that

they were not supposed to have about the inspection of certain

engagements and an email was sent out by Mr. Britt saying, Here

is what we want to do, we want to do a rereview in connection

with the ALLL monitoring program.  That email contained

numerous false statements.

THE COURT:  But that is not an email from

Mr. Middendorf?

MS. KRAMER:  No, it is not, your Honor, but that is an

email that was, A, foreseeable to Mr. Middendorf, but B, also

caused to be sent by him because it flowed from the

conspiratorial meeting the defendants had where they concocted

this plan to cover up their review of the work papers with the

confidential information that they were illegally using by

saying to all of the engagements in the ALLL monitoring program

were going to come back and look at the work papers to make

sure that everything was done.  That is not at all what the

purpose was.  In fact, they only conducted a rereview of the

engagements on the list and that sending of that email was

specifically discussed in a meeting with Mr. Middendorf.

So that is one example.  I don't mean to suggest that

that is the only one.  But to say that it is totally unclear

how Mr. Middendorf could be found guilty of a substantive wire

1    fraud or how he fits into the fraudulent scheme is belied by

2    the charges and the discovery that has been produced.

3           With respect to the notion that a specific false

4    statement for misrepresentation must be identified, your Honor

5    is correct that fraudulent conduct more generally is

6    sufficient; but also this was a scheme, a fraudulent scheme, in

7    which the defendants defrauded the SEC through implicit and

8    explicit representations and they caused those implicit and

9    explicit representations to be made that KPMG was complying

10   with the PCAOB inspection process and made material omissions

11   by not disclosing that they had advance notice of the

12   inspection or that they had reviewed the work papers in

13   anticipation of the inspection and omitting that the work

14   papers in some cases were affected by this rereview that they

15   had done focusing for a moment on 2016.

16           THE COURT:  So did Mr. Middendorf omit to disclose

17   something where he had a duty to disclose it?  Or are you

18   relying on an omission from a PCAOB employee who had a duty to

19   his or her employer.

20           MS. KRAMER:  Mr. Middendorf did not have to have a

21   duty.  In going through the inspection process, the KPMG

22   employees who participated in this scheme and caused the rest

23   of the KPMG employees who met with PCAOB inspectors, provided

24   all the work papers implicitly misrepresented that they were

25   following PCAOB rules and procedures.  And that is not true.

1    All of this was done as evidenced by the coverup, the stealth

2    rereview, the fact that they had a circle of trust with

3    criminal intent.

4                MR. BOXER:  Briefly, your Honor.

5                THE COURT:  Yes.

6                MR. BOXER:  We take issue with much of what the

7    government just said as far as the evidence and what inferences

8    should be drawn from it.  I don't even think we need to decide

9    whether the wire was reasonably foreseeable and therefore it is

10   the basis for a substantive wire fraud charge against

11   Mr. Middendorf.  The jury instructions and at trial we will

12   have plenty of opportunity to debate that.  For now identify

13   the wire.  If the theory is it only had to be reasonably

14   foreseeable, which wire?

15               THE COURT:  She just identified an email from

16   Mr. Britt.

17               MR. BOXER:  What's that?

18               THE COURT:  She identified a email from Mr. Britt.

19               MR. BOXER:  Right.  So that I believe that is

20   paragraph 67.  They cited that in connection with Count Four.

21   Based on what was said today, I withdraw my request for bill of

22   particulars on Count Four.  But on Count Three what was cited

23   is far from apparent to us and in Count Five nothing was said.

24               THE COURT:  I think she referred to paragraphs 32 and

25   33.

1          MS. KRAMER:  Your Honor, the Britt email is described

2     in paragraph 67, your Honor.

3          THE COURT:  Britt email.

4          MR. BOXER:  So that is the 2016 email and our client

5     is CC'd on the email.  And at a later date we can debate cause

6     and whether that is a basis for wire fraud.  I understand that

7     is for Count Four.  Count Three and Count Five they haven't

8     cited any anything for Count Five.  Under whatever theory they

9     are operating on, simply a notice request at this point I think

10    we're entitled to.

11          Thank you, your Honor.

12          THE COURT:  So you are asking about Count Three and

13    Five?

14          MR. BOXER:  I am asking about Count Three and Five.

15          THE COURT:  Do you want to add something, Ms. Kramer,

16    on Count Three and Five?

17          MR. BOXER:  The answer with respect to Count Four

18    takes care of Count Two as well.  So Count Three and Five.

19          MS. KRAMER:  Your Honor, I am happy to respond to

20    that.  There are numerous emails and phone calls in connection

21    with the 2015 and 2017 wire fraud.  I think it is worth taking

22    a step back for a moment because with respect to 2016, that

23    email from Britt is not of course the only wire transmission

24    the government intends to rely upon at trial and there is a

25    good reason that there is an overarching and long held

1    principle that bill of particulars are disfavored and are

2    required only in rare circumstances where even after receiving

3    discovery and other information the defendants have

4    insufficient notice of what they have been charged with doing.

5          This is not a three-page indictment with statutory

6    allegations and two-line to wit clauses.  It is robust.  The

7    scheme here is contained in a way that some others are not.

8    The defendants, most of them, worked together at KPMG in

9    connection with this scheme.  They know each other.  They sent

10   and received most of the emails in the case, which we have

11   produced -- we have produced all the emails we received.  So it

12   is not as though we are cherrypicking and only giving them some

13   of the emails or some of the phone records we have gotten.

14         They communicated at sort of peaks of activity in

15   connection with each of the years when they got the inspection

16   list, when they were gearing up for the inspections.  It is not

17   a case where they don't have notice of what they have been

18   charged with doing.  Frankly, their factual recitation in all

19   the briefing they have put in demonstrates that point.  It is

20   crystal clear exactly what the defendants have been charged

21   with doing and more notice in the form of a bill of

22   particulars, which constrains the government in ways that are

23   not favored unless absolutely necessary is not warranted here.

24         THE COURT:  So again the overcharging point that I

25   would say as to everyone is bills of particulars are not a

discovery device as other judges have pointed out and to ask
for a identification of every wire transfer in a situation
where it is pretty clear what is being alleged, I think is not
a proper use of a bill of particulars.  You will have wire
transfers for each of the counts.  No one is hiding the ball.

What is alleged here is the government is saying that
this confidential information about which audit inspections
were going to be done was revealed improperly and then it was
hidden that it was being revealed.  In every email that is
about that and is using that is part of the scheme.  I don't
know what is being hidden here.

MR. BOXER:  Your Honor, I am not suggesting anything
is being hidden.  They certainly described the scheme in
detail, but they have charged Mr. Middendorf with the crime of
committing a wire fraud.  An element to that -- a necessary
element is he effecting a wire.  So I am missing the
controversy so to speak.  I am not asking them to summarize
their proof, but I think he is entitled to know which wire is
the basis for the scheme that is in furtherance of the scheme.
So there is no doubt it is a very detailed indictment.  We
received a lot of discovery.  I am not sure of the reluctance
to explicitly point it out to us.  I heard what they said about
Count Four.  It is there.  That is the basis for our request.

THE COURT:  But if emails are turned over to you in
the time frame discussed in Counts Three and Five, for example,

1    are emails that talk about -- I haven't seen the emails

2    myself -- inspection information that was revealed by Mr. Sweet

3    form one of the other defendants that as alleged shouldn't have

4    been revealed because it was a heads up about where the audit

5    inspections were going to be.  That's the answer.

6          MR. BOXER:  I know but it is not there.  Let me give

7    you an example.  So for 2015 they cite one email -- I believe

8    it is in May -- that Mr. Whittle sends to Mr. Middendorf and

9    attaches a list that apparently came from Mr. Sweet.  That's

10   it.  He says, and I am paraphrasing, Here is the list, very

11   sensitive, implies don't say anything about it.  There is no

12   reply.  There is no answer.  It is just a one-way email.  That

13   cannot be the basis for a wire fraud even the way the

14   government described it against Mr. Middendorf because he

15   couldn't have caused that email.  There is no evidence it was

16   foreseeable to him.  It drops out of the sky and lands on his

17   server and that is all we have seen for 2015.

18         THE COURT:  Isn't that an argument for the jury?

19         MR. BOXER:  It will be an argument for the jury for

20   sure, but I think for notice for the principle behind the bill

21   of particulars what is the wire that is the basis for the wire

22   fraud charge against Mr. Middendorf?  So I feel like a little

23   with the government and myself we're not really disagreeing

24   about -- I am not disagreeing about the premises.  It is a lot

25   of detail.  It is just which wire.

1          MS. KRAMER:  Just to focus for a moment on the example

2     raised by Mr. Boxer.  In paragraph 37 of the indictment, Thomas

3     Whittle, the defendant, forwarded the list to David Middendorf,

4     the defendant, and said, "The complete list.  Obviously very

5     sensitive.  We will not be broadcasting this."  That follows

6     what begins in paragraph 32 with Middendorf asking Sweet which

7     KPMG engagements would be subject to inspection.  This is a

8     world in which people communicate by email and cell phone.  It

9     was certainly reasonably foreseeable based on that request that

10    the provision of the list that was precipitated by David

11    Middendorf that the email that follows is a wire transmission

12    that was reasonably foreseeable to him in furtherance of the

13    scheme.

14          The substance of the email itself from Whittle to

15    Middendorf for what it is not said speaks volumes about whether

16    this was expected by Middendorf.  Whittle doesn't say, I have

17    news to share.  We're getting the list.  He just says, "The

18    complete list," obviously something that Middendorf was

19    expecting at that point.  It was not news or a surprise or an

20    unsolicited email.  It was a wire transmission that was at

21    least reasonably foreseeable to him if not caused by him.  So

22    that is one example for 2015.

23          MR. BOXER:  I disagree with basically all of that, but

24    I don't disagree with it for purposes of the motion.  My

25    request is simple tell us which wires they are.  So if that is

1       the government's theory and this May email is the one and it is

2       based on what happened two weeks before, there will be a time

3       and place to argue that; but come out in writing and say the

4       one in paragraph 35 I think Ms. Kramer said is the wire.

5       That's all we're asking.

6               THE COURT:  Understood.

7               Who else would like to argue anything from your

8       motions?

9               MS. HAAG:  Your Honor, just a couple things.  As your

10      clerk requested my name is Melinda Haag.  I am here on behalf

11      of Mr. Britt.

12              Your Honor, despite the volume of discovery, which has

13      been significant in this case, based on our review of the

14      discovery, I and others had this overarching concern which is

15      that the government wasn't looking at its discovery obligations

16      broadly enough or thinking broadly enough about where they

17      should be looking.  Frankly, those are the biggest mistakes in

18      discovery that I have seen not thinking about it broadly enough

19      and not thinking about it from a defense perspective and not

20      thinking about where you should be looking.

21              So one of the things we did in response to that

22      feeling was we asked the government some questions.  For

23      example, is there anybody who reviewed work papers and

24      participated in a rereview of work papers in 2016 and didn't

25      think the changes were significant or didn't think the changes

1    were inconsistent with the accounting rules.

2             THE COURT:  And they gave you names?

3             MS. HAAG:  Yes, they gave us names.  So my concern is

4    that indicated to me they weren't thinking about that as being

5    exculpatory for the defense until we raised it.

6             Another question was is there anybody who had the same

7    information that our clients had or some of the same

8    information that our clients had and they didn't think there

9    was anything wrong with this.  They didn't think there was

10   anything criminal or anything wrong with this.  We got names in

11   response to that as well.

12            Again, it causes me concern that the government isn't

13   thinking about this from the defense perspective, which is what

14   they have to do when thinking about what is exculpatory, what

15   is helpful to the defense, what counters the government's case,

16   and what bolsters the defense case.  So I find it hard to

17   believe that we have asked all the right questions and those

18   are the questions we asked and we got answers to those, but I

19   fear that there are other questions out there that we haven't

20   thought to ask or haven't asked the government.  So that is

21   where we're coming from.

22            With respect to those particular issues, the

23   government did tell us, yes, there are people who participated

24   in the rereview of work papers in 2016 and didn't think changes

25   were substantive and didn't think changes were inconsistent

1    with the accounting rules.  That to me reads on the allegation

2    that our clients engaged in a scheme to impede the function of

3    the PCAOB.  So that is why it bolsters the defense, counters

4    the government's case and it is exculpatory.  So the government

5    did provide us with the names, but, your Honor, we submit that

6    the names are not enough.

7         The standards are articulated in a few cases, one of

8    which the government cited and a couple that we cited.  The

9    standard for what is enough when you are providing that

10   exculpatory information *Stewart* puts it in terms of a essential

11   facts.  You have to provide the essential facts.  The *Rodriguez*

12   case that we cited talks about the fact that disclosures must

13   be sufficiently specific and complete to be useful.

14        THE COURT:  Well, in your reply brief you talk about

15   they have to disclose facts even though you acknowledge that

16   witness statements are not yet required to be disclosed and you

17   seem to suggest that they need to go through and pull facts out

18   of the witness statements and the disclose those parts of the

19   documents that are facts.

20        MS. HAAG:  I think that is what is required to comport

21   with the standard here.  We have the names.  We have no other

22   detail.  Providing us names is an acknowledgment that it is

23   exculpatory.

24        THE COURT:  But that is enough for you to investigate

25   what could be exculpatory I would think.

1              MS. HAAG:  Well, your Honor, we can try to talk to

2     those witnesses.  Witnesses of course don't have any obligation

3     to speak with us.  The government is sitting on this

4     information.  I am guessing, I don't know, the government has

5     interview memos for 13 different people that in our view and

6     the government's view provide exculpatory information for our

7     client.

8              They have given us the names, but what is also

9     exculpatory are the details.  If the names are exculpatory, I

10    submit the details are exculpatory.  If someone is saying,

11    Yeah, I didn't think there was anything wrong with this, then

12    what is it that they knew?  Did they have any conversations

13    with our clients about that?  Did they have conversations with

14    anybody else about it?  What are the details behind somebody

15    saying, I didn't think there was anything wrong with that?

16             Your Honor, there is some discovery that reads on this

17    and this sort of folds into another issue here and it actually

18    folds into the motion for bill of particulars so maybe will put

19    that off to the side.  We believe that the information is

20    exculpatory, the names and the details.  The government seems

21    to agree.  They provided us with the names, but they are

22    holding back information that is in their possession about the

23    details, 13 different people who provided exculpatory

24    information with respect to the defendants.  I didn't think

25    there was anything wrong with this.  I had the same information

1   or at least some of the same information as the defendants and

2   we didn't think that we made any nonsubstantive changes to the

3   work papers that affected the accounting rules or were

4   inconsistent with the accounting rules.  That is incredibly

5   important exculpatory information.  The government has it and

6   they don't want to give it to us.

7           In terms of it being a witness statement, your Honor,

8   the government seems to be withholding it as *Giglio*.  I am

9   guessing these are not actually *Jencks* statements, statements

10  made by the defendants, approved, signed by or transcripts or

11  grand jury transcripts.  I don't know that but I am guessing

12  that is not the form that it is in.  The government is holding

13  it as *Giglio*.  We're not seeking it as *Giglio*.  We wouldn't

14  seek to impeach these people based on this information

15  obviously.  This is information that is exculpatory for the

16  defendants.  I don't think it is right to hold it back as

17  *Giglio*.  If it exists in a memo of interview, the government

18  can provide that or I suppose they can provide a factual

19  summary if there was some reason not to provide the memo

20  itself, but it seems to me this is exculpatory information

21  about 13 people that comes from 13 different people.  That is

22  huge and government is sitting on it and not providing it.

23  That is one thing I did want to highlight.

24          Three more things.  One is that the government

25  indicated in court in connection with the motion to dismiss

that the PCAOB -- that PCAOB costs of creating these lists and

recreating lists was significant and they spoke in terms of

hundreds of thousands of dollars if not more.  We have zero

evidence on that.  That is something the government I believe

intends to prove at trial, the fact of the costs of creating

list and recreating the list.  We have, I believe, zero

evidence to support that.

          THE COURT:  If, for example, the basis for that were

conversations with people and they planned to get the documents

to support it or work on witness testimony in the couple weeks

before trial whenever that is, what would they have to turn

over now?

          MS. HAAG:  Well, the government can and often does

turn over summaries of things like that.  So, for example, if

an AUSA is talking to a witness, and I assume that is what this

is, an AUSA is talking to a PCAOB witness and that witness

says, Hey, here is the cost and here is how we calculated it --

          THE COURT:  Well, then you get it in the 3500; right?

          MS. HAAG:  If there is a *Jencks* statements, but in

that scenario I don't think it is that common to create or

generate a *Jencks* statement.  I don't know that it would come

in that form.  At the moment the government interviews this

witness and learns here is what the cost was, here is how we

did it, in my view and I submit to the Court that is the

information the government intends to introduce at trial and

1    the government is able to provide that to the defense in some

2    form.  It is very common for the government to put that kind of

3    thing in a letter.

4            For example, the government identified those 13 people

5    to us in a letter.  They didn't provide the interview memos,

6    which has its only issues, but they can do that and often do it

7    and it's a common practice.  It's critical information.  They

8    are going to seek to introduce it at trial.  They are sitting

9    on it today and we're asking the Court to provide it to us.

10           If the PCAOB calculated the costs, I also am

11   guessing -- again, I don't know -- there are documents that

12   underlie that calculation.  That is not just a conversation,

13   but that somebody at the PCAOB sat down with pencil and paper

14   in some form and calculated those costs and there are documents

15   that support whatever this person said to the government.  So

16   we're asking for that evidence.

17           Third, the government also made comments during the

18   motion to dismiss hearing that the SEC has certain views on

19   audit quality.  Again, we have no evidence on that at all.

20   That is evidence that we think the government will seek to

21   introduce at trial and we think it is appropriate for the

22   government provide that information to us and the information

23   from the SEC and any documents underlying that.

24           Finally, our request that the government conduct a

25   broader search of the SEC and PCAOB files.  So at this point

what we're asking for from the SEC files are five things:
Policies, etc., that describe the relationship with the PCAOB
which is an element and the government we assume intends to
prove that; the PCAOB inspection reports of KPMG that are
maintained in the SEC, which is also relevant to the issue of
SEC's relationship to PCAOB; third, communications among SEC
personnel or between the SEC and KPMG related to a
February 16th, 2016 meeting that was held at the SEC and that
folks from the KPMG attended; fourth, SEC emails that
essentially contain *Brady* or Rule 16; and fifth, interview
notes with SEC personnel assuming that there are people at the
SEC that interviewed fellow SEC personnel in connection with
this case.

There are indications in this case to us that this was
a joint investigation between DOJ and SEC.  There are six
things I think that indicate that.  First, that the DOJ and SEC
filed their charges on the same day; second, that they filed
those cases against the very same people, and I know the Court
hasn't had the opportunity or I am sure the desire to go
through the discovery but there are a lot of other people that
are sort of in this story if you will and the SEC and DOJ chose
to focus on exactly the same people; third, Mr. Sweet is
cooperating with both the SEC and the DOJ as far as we know;
fourth, the factual narrative in the SEC's filing and the
indictment very closely mirror each other; fifth, the SEC was

1    present during witness interviews; and sixth, there is

2    apparently an agreement between DOJ and the SEC for the SEC not

3    to take notes because it has been represented to us that they

4    didn't and I cannot imagine that the SEC would sit in an

5    interview and not take notes unless there was agreement between

6    the SEC and the DOJ that that is how it would be handled.

7          So there are certainly indications to us that it was a

8    joint investigation and that it is appropriate for the

9    government go to the SEC and ask for certain materials and in

10   particular the materials that we described.  We're not asking

11   DOJ to go into SEC databases that hold evidence and information

12   from all around the country.  As the government indicated, it

13   is very specific, very narrow, very related to this case and we

14   think it is appropriate given the relationship to the SEC and

15   the DOJ in this case for the government to be expected to do

16   that.

17         The *Martoma* case is one we cited to you and the Court

18   there found that there was a joint investigation for these

19   purposes because four things existed in that case:  The

20   agencies conferred about their investigations, which I am

21   guessing that happened here; they jointly conducted interviews,

22   which appears happened here; the SEC provided the government

23   with documents it obtained as part of its investigation, which

24   I am guessing happened here; and they coordinated efforts in

25   conducting depositions, which if you substitute deposition for

1   interview happened here.

2            So it seems to us that it is appropriate there is

3   close enough relationship between DOJ and SEC that the

4   Department of Justice should go to its partner and ask for

5   these specific materials that are relevant to the defense, that

6   bolster the defense, very narrowly tailored.  We're not asking

7   that they go and root through all of SEC's databases and files.

8   Frankly, the government can ask the SEC to assist and so I

9   think it is appropriate to go to the SEC and say, Hey, can you

10  find these things and work with them.  It is not like they need

11  to go into the SEC headquarters and root around.  They can

12  certainly work with their partners at the SEC.  Courts order

13  that all the time.  I know the Court ordered it in the *Gupta*

14  case for them to simply work together.

15           With respect to the PCAOB it is a little less clear,

16  the relationship.  We're asking for four things in that regard.

17  First, policies and memos and things describing the

18  relationship with the SEC, which is of course a critical

19  element here; policies and memos that relate to the

20  confidentiality of the inspection lists; third, any memos

21  summarizing interviews of PCAOB employees.  So it seems to me

22  quite possible that PCAOB personnel interviewed PCAOB employees

23  and that it could be relevant to this case, could be

24  exculpatory, could bolster the defense, and seems to be

25  appropriate for the government to obtain; finally, emails for

1    Mr. Sweet, Ms. Holder, and Mr. Wada.  That would be a very

2    short period of time for each of them.  I think just a couple

3    two, three months for each of them.  The relevant time frame

4    while they were at the PCAOB for each of them is very short so

5    it would be a very narrowly tailored review of their emails.

6    It is not clear to us that any anyone has gone in and looked at

7    all of their emails.  We have gotten a few.  We have not gotten

8    very many and it is not clear to us that is being done.

9            So I think it fair to say it is less clear what the

10   relationship was between the Department of Justice and PCAOB,

11   but there is some indication and we would ask the Court to

12   inquire in some form of the government or ask the government to

13   provide information about the relationship, but what we do see

14   is that the PCAOB clearly produced evidence to the government

15   and there is certainly evidence of discussions between them

16   because as the government has related they have been in

17   discussions about what the costs were to the PCAOB of creating

18   and recreating lists.

19           So we have some indication.  With all candor we don't

20   have as much indication, but we certainly have some.  So I

21   wanted to highlight that was as well.  Those are the things I

22   think are important to highlight from the discovery motions --

23   the motion that we filed.  I am obviously happy to answer the

24   Court's questions.  There are two things from our motion for

25   bill of particulars that I would like to highlight.

1          THE COURT:  Go ahead and do the bill of particulars

2   and then I will have Ms. Kramer respond.

3          MS. HAAG:  We asked for five.  I know the Court has

4   read the papers so I won't belabor all of them, but I wanted to

5   focus on two.  The first is our number one request and that

6   relates to paragraph 72 of the indictment, which alleges that

7   the rereviews conducted in 2016 uncovered significant problems

8   with audits and then the indictment proceeds to give "examples"

9   of that.  It is important to us to know you have given us a

10  couple of examples of things the government thinks exceeded the

11  accounting rules, were inconsistent with the accounting rules,

12  but the indictment speaks in terms of examples.  So we need to

13  know is there anything else.

14          We have been given some work papers.  We have not been

15  given complete set of the work papers.  We're playing a

16  guessing game.  Is there something else?  We have a number of

17  witnesses who have said, We didn't think we violated the

18  accounting rules in anything we did in this rereview.  We have

19  that and then we have the government giving us a couple of

20  examples.  It is important for us to know if there is anything

21  else.  We have to be able to counter that and so we're asking

22  that the government specifically identify what happened in the

23  rereview that you think violated the accounting rules.  We need

24  more than the "examples."

25          The other one I would like to focus on is our number

five.  In paragraph 91 of the indictment, the indictment speaks in terms of the defendant's misappropriating confidential information from the PCAOB.  We assume that the confidential information that is at issue in this case are the three so-called lists from 2015 and 2016 and 2017.  Again, I know Court hasn't had the benefit of reviewing the discovery.

I think it is fair to say that Mr. Sweet provided all kinds of information from the PCAOB throughout his time at KPMG.  I will call it inside baseball.  All kinds of information.  He makes a presentation to KPMG personnel.  There is a long, long email addressed to a whole long list of people at KPMG with all sorts of what I call inside baseball from Mr. Sweet.  There are conversations and information that he provides to other KPMG employees that I will call inside baseball.  We don't know what the government views as the confidential information at issue in this case.  We are operating on the assumption that it is the three lists.  That is what we put in our motion.  The government did not respond to that so we haven't gotten in insight, but we need to know so we can counter what the government's view is of what information that Mr. Sweet provided during his time at KPMG was the confidential information at issue.

With that I will rest.

THE COURT:  Thank you.

Ms. Kramer, would you like to respond?

1          MS. KRAMER:  Yes, your Honor.  Is it okay if I start

2     the order in which Ms. Haag went?

3          THE COURT:  Sure.

4          MS. KRAMER:  The request for the interview memos of

5     the individuals the government identified in its letter in

6     response to the defendant's request is one that is without

7     basis in law, but first I think there are some factual perhaps

8     misunderstandings that need to be corrected.  The government

9     has not acknowledged that the items that were requested by the

10    defendants and that the government provided that that

11    constitutes exculpatory material.  That is I think something

12    Ms. Haag might have said three or four times.

13          That is not an acknowledgment.  They requested that we

14    make the disclosures.  We made them.  I think to turn that into

15    an acknowledgment on our part counters the requests that are

16    often made by defense counsel that even if you don't agree

17    something is exculpatory.  We think it is, please give it to

18    us.  It is not an acknowledgment on our part that that is

19    exculpatory.  The notion that we have to produce interview

20    memos is not supported by the case law.

21          I think some of what is happening here perhaps is the

22    result of different practices in different districts leading to

23    a misconception of how we might make disclosures in this case.

24    So our office takes a generally expansive view of what

25    constitutes 3500 or Jencks Act material.  We are not going to

be producing, as many counsel know sitting here, only those

statements that were signed by a witness or a verbatim

transcript.  We generally produce the interview memos that

agents made or notes that AUSAs take when a witness who is

going to testify is meeting with us and we take notes in those

meetings.  So to say that something needs to be produced now

because it doesn't fit into the narrow definition that defense

counsel is giving to 3500 is inconsistent with our practice and

I think we would be here for a different motion if we took that

position when it came time to produce 3500 in this case because

it would amount to a very thin binder as opposed to the robust

production that we'll be giving.

        The witness statements will be produced when we

produce 3500 material and we're just not required to do it

sooner even to satisfy a *Brady* requirement.  We have given the

essential facts that allow the defendants to use this

information.  The Second Circuit has specifically held in

*Stewart* that the government is not required to make a witness's

statement known to a defendant who is on notice of the

essential facts, which would enable him to call the witness and

take advantage of any exculpatory testimony he might furnish.

        I think one thing was said that is not correct, which

is that the witnesses who said that they didn't think something

was a crime knew the same thing, had the same information as

the defendants is not true.  That is not what the evidence

 1    reflects and I think there is just no basis to order the

 2    production of witness statements at this time.  The government

 3    gave the disclosure and the defendants can use that disclosure.

 4          The questions about evidence that has not been

 5    produced under Rule 16, as your Honor pointed out to the extent

 6    that we intend to prove certain aspects of the case through

 7    witness testimony without underlying documents, we will produce

 8    those witness statements when we produce 3500 material in this

 9    case as we always do.  We are not sitting on documents that are

10    required to be produced under Rule 16 nor would we.

11          In turning to the question of whether the government

12    should be required to go to the SEC and search its files to

13    satisfy both the government's Rule 16 obligations and

14    obligations under *Brady*, the defendant's motion should be

15    denied on that point.  First, there was no joint investigation

16    between the government and the SEC in this case.  We did not

17    make joint charging decisions.  We did not make joint strategic

18    decisions.  We did not coordinate prosecutorial strategy.

19          THE COURT:  I have never dealt with this particular

20    situation, and I know Judge Kaplan has and Judge Rakoff has.  I

21    wonder if you know how they have dealt with.  All I have is

22    representations from the government, and maybe that is what

23    they rely on and the kind of circumstantial data points that

24    are emphasized by Ms. Haag.

25          Do you know how this is done by other judges, how they

1     look into and make the determination of joint versus parallel

2     investigations?

3          MS. KRAMER:  I know that in a case that I personally

4     tried before Judge Preska that she relied on the

5     representations of the parties.  I know that has happened in

6     some of the other cases your Honor is talking about.  There are

7     several other cases like that where judges have made this

8     decision based on representations by the government, including

9     Judge Carter in *United States v. Durante*.  I don't know if that

10    is what Judge Rakoff and Judge Kaplan relied upon, the cases

11    that your Honor is talking about.

12         Judge Kaplan's decision in *Blaczak* is useful.  I don't

13    believe there was a hearing on this so I don't know if he

14    merely relied on representations or something more, but there

15    is a question and some divergence among judges about what is a

16    proper inquiry when attempting to understand whether there was

17    a joint investigation.  Judge Kaplan's reasoning in *Blaczak* is

18    really on point in what your Honor uses in this case.  He

19    looked at whether the parties shared the joint strategic

20    decision-making.  That was in March of 2017.  He denied a

21    similar motion there.  He was persuaded by the fact that the

22    SEC wasn't involved in the government's grand jury

23    presentation, wasn't present at some prosecution interviews,

24    didn't review documents that were gathered only by the

25    prosecution, and did not develop prosecutorial strategy.

1          THE COURT:  Well, do you know the answers to those

2   questions in this case?

3          MS. KRAMER:  Yes.  In this cases, your Honor?

4          THE COURT:  If you can go through those.

5          MS. KRAMER:  Certainly, your Honor.

6          The SEC most certainly was not involved in the

7   government's grand jury presentation and was not privy to any

8   grand jury material.  The SEC did not review documents that

9   were gathered only by the government and did not develop any

10  prosecutorial strategy.  Whether the SEC was not present at

11  some interviews is an open question.  We were trying to recall

12  this and weren't certain.  If not present, it was at a very

13  small number.  But that fact alone shouldn't be dispositive as

14  it wasn't in other cases where the Court actually looked at

15  joint fact-gathering efforts.

16          Even in the case relied upon by the defense*, Martoma*,

17  what Judge Gardephe ordered in that case in granting the motion

18  was extraordinarily limited.  He ordered that the government

19  was obligated to produce communications from the SEC to

20  cooperating witnesses that threatened criminal prosecution for

21  not implicating *Martoma*, the defendant in that case, or that

22  promised nonprosecution agreements for implicating him.

23          Even in *Gupta* Judge Rakoff required the government to

24  review -- first of all, neither *Martoma* or *Gupta* required the

25  government to review SEC material for Rule 16 purposes as the

defense suggested.  But even if *Gupta*, Judge Rakoff required
the government to review for *Brady* only documents that arose
from joint efforts to investigate the facts of the case
together.  Central to the Court's decision was that the
government could easily access the requested materials.

I am not sure where the representation is coming from
that this is a narrow request and that it would be simple for
the government to comply.  On the subject of a *Brady* review, we
could not delegate our review for *Brady* to anyone and certainly
not to the SEC, who I want to unequivocally say is not our
partner in this case.  The U.S. Attorney's Office has
investigated this case with its law enforcement partner, the
United States Postal Inspection Service.  The SEC is a separate
agency.  We have made separate decisions.

None of us know sitting here today what their database
looks like, what they have collected.  We have not been a party
to their thought process about what documents are relevant to
their own determinations.  So if we don't know it, I don't know
how defense counsel could know that this is a limited body of
material to be reviewed.  We certainly could not satisfy our
obligations or stand up here as officers of the court and say
we have complied with an order to review something if we did
not actually lay eyes on it ourselves.

Under either inquiry whether there was joint strategic
decision-making, which is what Judge Kaplan looked at after a

1    well long reasoned opinion or whether there was joint

2    fact-gathering, the defendant's motion should fail in this

3    case.  The fact that witnesses did not have to sit to have the

4    same or similar interview twice because the SEC was permitted

5    to be present when he conducted an interview does not make this

6    a joint investigation and certainly does not make the SEC an

7    arm of the government in this case.  The argument that the

8    PCAOB is is even less compelling.  There was no coordination

9    with the PCAOB.  The fact that we asked the PCAOB for documents

10    and we interviewed witnesses from the PCAOB makes them no more

11    our partner than when we get documents and call witnesses from

12    AT&T and Verizon.  We were not engaged in joint fact-gathering

13    or joint strategic decision-making.

14          Unless your Honor has other questions on this point, I

15    will turn to the bill of particulars request.

16          THE COURT:  Sure.

17          MS. KRAMER:  With respect to Defendant Britt's bill of

18    particular requests, I think that the two points that were

19    principally discussed today were first wanting more than just

20    examples of specific problems with audits.  Defense counsel is

21    correct that specific examples were given; but to be clear, all

22    of the work papers in the government's possession have been

23    produced to defense counsel.  Again, there is no hiding the

24    ball here.  They have from our understanding been engaged in an

25    in depth and thorough review of those work papers -- looking at

them, analyzing them -- and there is nothing more than we need
to add to apprise them of what they are being charged with.

          The fact that I think the statement was made that the
defendants didn't intend to violate a PCAOB rule or accounting
procedure that is evidence that they didn't intend to commit
the crime in this case, that is not the case at all, your
Honor.  That is evidence that they didn't intend to commit a
separate act of wrongdoing.  It is not something that they need
to be specifically apprised of more than they already have of
the examples and they have gotten all the work papers that the
government has.

          With respect to what is the confidential information
that was misappropriated from the PCAOB, defense counsel is
correct there are other examples.  There are other examples in
the indictment.  Beginning on page 17 with paragraph 42, there
is an entire section titled "Sweet shares other confidential
PCAOB information with KPMG personnel in 2015."  So, yes, there
is other confidential PCAOB information that was part of the
crimes that are charged.  That has been apparent since the
indictment was unsealed and that has been apparent from the
discovery as Ms. Haag points out, and nothing more is needed on
that point.  There is ample notice.

          THE COURT:  It is not just the inspection of lists for
the three years?

          MS. KRAMER:  Correct, your Honor.

1          The Second Circuit has made crystal clear that a

2   defendant does not get the whens, wheres and by whoms of a

3   crime, the evidentiary detail to which he is not entitled

4   through a bill of particulars motion.  Well, of course, more

5   detail will be helpful to defendants.  That is not what a bill

6   of particulars is for.  To the extent they want to know what

7   other confidential information was shared from the PCAOB, they

8   have it in all of the discovery.  So this bill of particulars

9   motion should also be rejected, your Honor.

10          THE COURT:  Thank you.

11          Did you want to reply to anything?

12          MS. HAAG:  Just a couple of things, your Honor.

13          With respect to the SEC, the request that the

14   government looked at the SEC or worked with the SEC to gather

15   some evidence and discovery, again in feeds into my concern

16   that the government isn't looking at its obligations broadly

17   enough.  A critical element for the government to prove, and of

18   course that we take great issue with, is what role did the SEC

19   play here.  The defendants are charged with a conspiracy to

20   defraud the SEC, which depends entirely on a relationship

21   between the SEC and the PCAOB.  We have asked:  Are there any

22   policies?  Are there my memos?  Is there anything at the SEC or

23   PCAOB that talks about the relationship between the two of them

24   and what oversight is performed by the SEC?  Does the SEC look

25   at these reports when they come from the PCAOB and analyze them

1   every year?  Does the SEC sit down and meet with the PCAOB?

2   What level of oversight is there?

3          My concern is if this is a critical element for the

4   government to prove, why hasn't the government gone to the SEC

5   and said, Hey, we need to essentially prove the relationship

6   between these two agencies.  So talk to us about that, give us

7   your policies, give us memos, give us documents that read on

8   that issue.  We don't have anything and my concern is the

9   government again is not looking or thinking broadly enough

10  about what evidence it should be gathering.  If there is an

11  absence of it, then it would be good to know that as well from

12  the defense perspective; but if there are policies, procedures,

13  memos, and things like that that describe the relationship, it

14  is information the government is going to try to prove up at

15  trial and it is information we have to address.

16         Also with respect to the PCAOB inspection reports

17  maintained by the SEC, again do these reports come into the SEC

18  and go into revolving file and that is it?  I think that reads

19  on the issue of whether the defendants intended to or

20  committing a conspiracy vis-á-vis the SEC.

21         There was a February 2016 meeting with SEC people and

22  KPMG people.  We received one document that relates to that.

23  It is a summary memo that was prepared for the chair the

24  commission in connection with that meeting.  What we have asked

25  for is there anything else.  Again, I would be surprised if the

government didn't say, Hey, this meeting is important and it is referred to in the indictment.  What communications were there about this meeting at the SEC?  We should gather that.  If the government didn't gather it, fair enough.  But what we believe is appropriate is that the government now go to the SEC in connection with its joint relationship with the SEC and obtain these documents.

Obviously I have no reason to doubt Ms. Kramer with respect to her representations to the Court, but I do think it is appropriate to have an evidentiary hearing on this issue.  If there wasn't a joint investigation, if there wasn't coordination between the SEC and DOJ, how is it that their filings are so similar?  How is it that they chose the exact same people to bring their cases against?  How is it that they agreed that the SEC would not take notes?

The reason that the SEC doesn't take notes I submit is obvious, that the government wouldn't want two different government agencies to create notes or memos of witness interviews so they don't create inconsistent statement.  There is a reason for that and it demonstrates some coordination between those two agencies.  I don't think it is fair to say that the DOJ is not to the SEC in this case just as an AT&T custodian of records is to the Department of Justice.  The relationship between the SEC and DOJ is very different.

It appears to us there were objective signs that they

1   were working together, that it is a joint investigation.  There

2   is nothing wrong with that.  It happens every single day in a

3   case that is in the jurisdiction of the SEC and DOJ.  The only

4   thing that matters is, okay, if you are going to work together

5   to the extent there are materials that are discoverable to

6   criminal defendants, the department should go to its partner

7   and try to obtain those materials for the criminal defendants.

8           With respect to the bill of particulars, again the

9   government has said here is a couple of examples of problems

10  with the changes to the work papers.  Apparently what I am

11  hearing and assuming, and I have to assume in connection with

12  defending Mr. Britt, is that there are other things the

13  government thinks violated the accounting rules.  I have no

14  idea what they are.  The work papers are very hard to read,

15  changes to the work papers are very hard to discern.  If the

16  government is going to walk into this courtroom in front of a

17  jury and say, We gave you examples in the indictment, but here

18  are five other things that happened to those work papers that

19  we think violated the accounting rules and we hadn't figured

20  that out from the work papers, we'll be caught completely

21  flatfooted and unable to respond to those representations by

22  the government and that is what we're trying to avoid.  I think

23  is fair and appropriate for the government to point out to us

24  any changes in the work papers they intend to walk into this

25  courtroom and tell the jury violated the accounting rules and

1  were substantive changes to the work papers.

2          With respect to the confidential information at issue

3  here, fair enough, the three lists and then the government

4  again gives a couple of examples of information that Mr. Sweet

5  provided included in the indictment.  As I said, if you read

6  the discovery, Mr. Sweet is providing all kinds of information

7  inside baseball.  If we can take all that off the table and we

8  don't have to worry about trying to counter it, that's great.

9  If the government will tell us that, that is great and we will

10 not worry about everything else that Mr. Sweet said.

11         In the same way what we don't want is walk into this

12 courtroom and have the government come in and say, Oh, yeah

13 this thing Mr. Sweet said in this email on this date, that is

14 part of this case as well.  This thing he said in this email is

15 part of this case as well.  This thing he said in that meeting

16 at KPMG is part of this cases as well.  We don't want to be

17 caught flatfooted and unprepared to respond to those claims of

18 that these pieces of confidential information are part of this

19 case.

20         That is all we're asking.  Tell us what this case is

21 about.  Tell us what you are going to come in tell the jury is

22 a problem and we'll be ready to respond to it.  Those are two

23 examples of places we will just not be able to respond to it if

24 the government won't give us the details.

25         MS. KRAMER:  Your Honor, may I respond?

1          THE COURT:  Yes.

2          MS. KRAMER:  So I think it is plain that the defendant

3     is not asking here for exculpatory information from the SEC or

4     the PCAOB because they think that actually exists.  What they

5     are asking for is 3500 material and to direct our

6     investigation.  The fact that a certain fact is significant or

7     critical does not mean that the government is required to go

8     out to a third-party and collect documents to produce them to

9     defense counsel.  If there are documents that they think exist

10    that are admissible and evidentiary and are not the subject of

11    a fishing expedition, they can certainly subpoena those

12    documents.

13          On the work paper issue, it is a closed universe.

14    There are the work papers we have received and produced and

15    that is it.  It is our understanding that the defendants are

16    going to get a presentation from KPMG sort of showing the

17    changes in the work papers as KPMG learned they existed.  So to

18    the extent there is lingering confusion about whatever is in

19    the work papers, it certainly seems like they are going to get

20    additional information from KPMG about what changes were made.

21          On the notion of what is the purpose of a bill of

22    particulars, the question is whether there has been sufficient

23    notice.  The fact that it would be great for defense counsel if

24    they could take something off the table in knowing what will be

25    proved at trial is exactly the kind of thing that the bill of

1    particulars is not meant to do.  We're not required to itemize

2    our proof or to walk the defendants through and preview what

3    the case will be and it sounds like more than sufficient notice

4    has been given.

5        THE COURT:  Are there any other counsel that would

6    like to address any other matters in the papers?

7        MR. BLOCH:  Yes, your Honor.  May I speak from here

8    rather than climb over co-counsel?

9        THE COURT:  Yes.  As long as the court reporter and

10   everybody else can hear you.

11       Do you want a microphone?

12       MR. BLOCH:  I don't think it is necessary.

13       Your Honor, we made two points in our papers and I

14   don't want to belabor the arguments there with respect to bill

15   of particulars.  The first had to do with asking the government

16   to identify the unindicted coconspirators.  Their response

17   basically was, We don't want to.  We tried to make a reasoned

18   argument addressed to your discretion, your Honor, about why we

19   need it.  I want to point out a few specific reasons why as a

20   practical matter this is material for the defense.

21       First, we talked about the rereviews that were

22   conducted in 2016.  Is it the government's position that all of

23   the rereviews involved were coconspirators with the indicted

24   defendants?  It affects how we look at the large volume of

25   communications that we received.  We received tens of thousands

1    of emails and texts.  And if can focus in on the ones that are

2    significant and certainly coconspirator communications as

3    identified by the government are important for us to figure

4    out.  It is hard to do without having them identify it.

5            Second, your Honor, Ms. Kramer was very careful in

6    stating that the names of the people that were disclosed to the

7    defense in the June 1 letter were not -- they contained

8    information that we might view as exculpatory but which the

9    government doesn't necessarily agree.  But it doesn't answer

10   the other part of the equation, which is is it the government's

11   view that those people despite their comments or statements

12   that we view as exculpatory that the government also views them

13   as coconspirators with the indicted defendants.

14           Lastly, there are people who are anonymized in the

15   indictment whose names we have obtained in discovery.  Is it

16   the government's position that those are coconspirators of the

17   defendants?  It is important, your Honor, in preparing and in

18   thinking about how the case is going to get tried.  If the

19   government is going to introduce out-of-court statements by

20   coconspirators, then the defense has the right to impeach those

21   out-of-court declarants if they are coconspirators.

22           So it is important to know.  The government hasn't

23   provided the Court with any specific reason why it shouldn't do

24   this and as we have put in our papers it is not uncommon to

25   provide this information especially in a white-collared case

1    like this where there is no danger to any witnesses or

2    identified coconspirators.

3            Second, your Honor, we ask that the government

4    identify the "other duties" the defendants are alleged to have

5    breached either as principal or as aiders and abettors.  Again,

6    we have all been talking both in motion to dismiss the

7    indictment and even today about the duty of confidentiality

8    that has been breached allegedly by PCAOB personnel; but when

9    we talk about other duties, what are we talking about?  We're

10   not asking for the evidence.  We're not asking for a theory.

11   What is the duty?  If I can figure it out, your Honor, I

12   wouldn't be standing here asking the Court to order the

13   government to tell us.  If they are not going to identify

14   another duty that we are focused on the duty of

15   confidentiality, then let's say that and be done with it and

16   move on.  Thank you.

17           THE COURT:  Thank you, Mr. Bloch.

18           Would you like to respond, Ms. Kramer?

19           MS. KRAMER:  Yes, your Honor.  Thank you.

20           So with respect to the concern that defense counsel

21   needs to know sort of for hearsay purposes and evaluating

22   admissibility of statements whether the government intends to

23   offer statements of unindicted coconspirators, the government

24   will give such notice at the time motions in limine are due so

25   it is sufficiently in advance of trial for the parties to work

out and for the Court to decide any hearsay issues that flow
from that.

Aside from the hearsay issues there is nothing about
the defendants' requests that calls for a bill of particulars
on this point.  The fact that it would be useful for the
defense in preparing their case does not mean that they have
insufficient notice right now.  This was a little more
expansive than *Block*, which your Honor presided over; but for
same reasons your Honor denied the motion for a bill of
particulars in *Block* on this point, you should deny one here.

Cases that involve such requests where they are
granted generally involve conspiracies with a large number of
coconspirators over a very long period of time.  Here, this is
as I have said a closed universe where all but one defendant
worked at the same company and in many respects in the same
part of the same company.  They worked together.  The time
period that is alleged is not as short as in *Block*, but the
instances of activity around the receipt of the misappropriated
information and the use of it are very clear.  These defendants
were the ones emailing other individuals in the case, having
phone calls with them, having meetings.

The email that we have talked about already from Britt
about the stealth rereview, the pretextual email, there is a
list of individuals in the to box in that email.  This is not
international money laundering narcotics conspiracy where the

1    defendants simply have no idea who may be an unindicted

2    conspirator, can't identify witnesses.  We will produce witness

3    statements for any unindicted coconspirators at the time we

4    produce 3500 material per Rule 806.  Defendants will have the

5    opportunity to review that material and nothing more is

6    required.

7            With respect to the other duties questions, I think

8    the government will confer and will give notice to defendants

9    if there are any other duties that were violated other than the

10   duty of confidentiality by the PCAOB employees that we intend

11   to proceed on trial.

12           THE COURT:  You are not saying there are not other

13   duties, but you are saying --

14           MS. KRAMER:  I am saying we would like a week to

15   discuss it and we'll give notice to defense counsel.

16           THE COURT:  Fair enough.

17           Does anybody else want to add anything?

18           MR. BLOCH:  Practically, you can have an email with 15

19   people on the specifics.  That doesn't tell us who the

20   government says is a conspirator.  I can have my own views, but

21   there are elements to it.  Without the government telling us,

22   we don't know.  Is it all of them?  Is it three of them?  Is it

23   others at the PCAOB?  We don't know.

24           As I said, your Honor, we're not finished going

25   through the voluminous discovery we already received, but all

1     of the thousands of messages we would like a little help in

2     focusing on what we're supposed to be doing to prepare for

3     trial.

4               THE COURT:  Thank you.

5               Any other counsel want to add anything?

6               I think my questions have been answered by everything

7     we covered.  I am going to reserve decision on the motions for

8     now.  I would like to turn to the scheduling issue.

9               Five-minute break.

10              (Recess)

11              THE COURT:  I have read the parties' letters about the

12    trial date and with the following introduction I would like to

13    again confirm what each defendant's position is and what the

14    government's position is.  The introduction is this:  If I move

15    it, it would have to be I believe to February 11th not to an

16    interim period.  I don't think I can move it to November,

17    December because I am on Part I duty the last week of November,

18    and first week of December, which means I am the emergency

19    on-call judge and cannot schedule trials during those two

20    weeks.  If I moved it, it probably would be to February 11th.

21              That having been said, I am not inclined to move it

22    unless it is really absolutely necessary.  The other thing I

23    would say is it is August 1st and there are two months between

24    now and October 15th.  I am not sure why two and a half months

25    wouldn't be enough for everyone to prepare for trial

1    particularly given that y'all are not lacking in resources in

2    terms of lawyers and legal assistants and things like that I

3    believe as far as I know.

4          Let me hear the position of each of you very briefly.

5    Just anything you would like to highlight.

6          I will start with you, Mr. Boxer, because last time

7    your client was the one who took the position that you would

8    like to have a trial.

9          MR. BOXER:  We did.  In the division of our labor, I

10   was not assigned leave for this topic but I do have some views

11   and let the others speak.  Essentially for us there has been

12   more discovery than predicted in March.  I don't ascribe any

13   fault to the government.  It is not uncommon and nothing

14   purposeful or nothing misleading, but for us there was more

15   discovery than we expected.  I believe it will be helpful to

16   have more time to review it.  I think it will actually lead to

17   a more efficient and concise presentation.  I don't see any

18   prejudice to the government and I don't see anything in their

19   correspondence.  It is the first request.

20         For those reasons we join in the application.

21         THE COURT:  Anyone else?

22         MR. STERN:  Good morning, your Honor.  Rob Stern on

23   behalf of David Britt.

24         I will echo what Mr. Boxer said.  I will not repeat

25   the arguments made in the letter.  We do believe that there has

1   been significantly more discovery.  There have been problems

2   with the discovery that have resulted in delays and the

3   defendants' abilities to access it.  Again, no fault to the

4   government.  The government did not intend those technical

5   delays.  They are what they are.  There also has been

6   significant documents produced since the last status conference

7   which bears on the timing all of which necessitates the move to

8   February in our view.

9          THE COURT:  Thank you.

10          Anyone else?

11          MR. BLOCH:  We join in that request, your Honor.  Also

12   having to do with the experts and the timing and ability to

13   form the opinion and provide disclosure, but the real problem

14   is the quantity of discovery and not just reading it.  We may

15   have people reading it, but you have to do more than just go

16   through it.  It is not a document production.  There has to be

17   some analysis that goes with it.  In a complex case like this

18   two and a half months while it seems like a lot, your Honor,

19   the summer is almost over as far as we're concerned.  So that

20   is the reason for the adjournment request.

21          THE COURT:  Counsel for the government?

22          MS. KRAMER:  Your Honor, as we said in our July 25th,

23   2018 letter, there is still plenty of time.  This is not in the

24   government's view a reason for an adjournment and certainly not

25   of the length that has been requested.  We hear you that you

1    don't have any middle ground that you can settle on if your

2    Part I commitment is immoveable.  It just shouldn't be

3    adjourned four months.  There is just not a basis for it.

4              THE COURT:  I am going to keep the October 15th trial

5    date.  I think two and a half months is enough time.  I think

6    it is a significant amount of time.

7              As I said I reserve decision on the pending motions.

8    I will let you know about those as soon as I can.

9              Anything else y'all need address at this time?

10             MR. STERN:  Your Honor, I would ask you to reconsider

11   in light of there are additional facts I didn't want to belabor

12   the response to the government's letter, but the work-paper

13   issue that we have teed up and the government summarily

14   dismisses is a real, real burden for our ability to be ready by

15   October.  As the government has indicated, we have only

16   received excerpts of the work papers, not the entirety of the

17   work papers.  In reviewing those very voluminous excerpts is

18   not just reviewing normal documents in the way you or I would

19   think about this.  There are dangling loose threads which often

20   have busted cross-references if you will to changes or

21   editions.

22             THE COURT:  What do you mean "busted

23   cross-references"?

24             MR. STERN:  I apologize for the euphemism, but there

25   are references in the work papers of the excerpts that we have

1    to additional work papers that changes that were made that are

2    not included in the excerpts.  Our ability to evaluate whether

3    those changes were significant or material or permissible under

4    the accounting rules may depend on the entirety of the work

5    papers.  And so when our lawyers, clients and experts have been

6    diligently reviewing tens of thousands of pages of work papers,

7    trying to find needles in a haystack in terms of the kinds of

8    changes that the government has referenced with respect to the

9    changes, often what we find is a rabbit trail to an end for

10   which we don't have the additional papers.  As Ms. Kramer

11   alluded earlier this morning, we have gotten to the point where

12   we have requested that KPMG try to walk us through this.

13        THE COURT:  Tell me about that.  I understand there

14   was a reference to something that KPMG is going to be providing

15   or presenting.  What can you tell me about that?

16        MR. STERN:  It is not clear to me exactly what it is.

17   Your Honor what it is designed to do is hopefully designed to

18   obviate the need for the defendants to go to KPMG and say, We

19   need the entirety of these work papers.  The only way we can

20   evaluate the work papers and the only way our experts will be

21   adequately prepared to testify at trial is to have the entirety

22   of the work papers so that we can see every change that was

23   made and the references.

24        As I have said work papers we as lawyers don't really

25   understand.  Maybe you have reference and experience than some

of the lawyers do in terms of the way work papers are compiled,
but it is not the way we think of them the way we see them when
they are finally prepared in a nicely orderly file.  The matter
in the way we have provided them have been as I say random to
say the least.  So our experts, clients, and lawyers have had
to try to literally map out the thread of the changes by
piecing together sometimes proposed changes to the work papers
from emails that reference a work paper whose date has
subsequently changed because the emails says, Can you make this
change to this work paper on this date, and the work paper is
not dated that.

          So the process has been incredibly, incredibly
burdensome and has taken much, much longer than we thought it
would and much longer than even the government anticipates,
which is why in their letter they say that process is sort of
beside the point.  The question of whether the changes were
material or violated the accounting rules as Ms. Kramer said
today is irrelevant to the question of whether the defendants
intended to commit mail or wire fraud.  We submit as you would
expect that it bears directly on our client's intent.  It bears
directly on the question of whether they were coconspirators to
commit mail and wire fraud if they were careful not to violate
the accounting rules.  As you can imagine it will be a central
part of our defense that the changes were intended not to
violate the accounting rules.  So the process of going through

1   these tens of thousands of work papers.

2         Ultimately we may come back to you at some point and

3   ask you to sign a subpoena for the balance of these work papers

4   because we will have no other alternative but to do that at

5   which point in time your Honor is going to be annoyed at us

6   because you are going to say, I have an October trial date and

7   you are now coming to me and asking for a subpoena for another

8   tens or hundreds of thousands of pages of work papers.

9         THE COURT:  If you are seeking the fuller picture, you

10  have gotten what the government has in terms of work papers and

11  you feel you need to complete the picture.

12        Where are you in that process?  What have you gotten?

13        MR. STERN:  So we have gotten the excerpts that the

14  government has.  As the letter from Cahill, Gordon previously

15  indicates, the process of finding experts who are sufficiently

16  equipped and available to review those and work with us has

17  taken much, much longer than anticipated.  We began the process

18  in earnest in late February and we finally retained qualified,

19  competent experts last month.  Because this is not your

20  garden-variety, run-of-the-mill case where any accounting

21  expert will suffice, as you can imagine, and so the process of

22  finding experts has taken much longer as anticipated.  As a

23  consequence of that, those experts are, along with our clients

24  and our lawyers, pretty well into the process of reviewing the

25  excerpts we have but a long way from making their way through

1    the work papers in a way that would enable them to come to

2    court as a testifying expert and testify that the changes were

3    consistent with the accounting standards or professional

4    standards, and that ultimately is where the defendants need to

5    be for purposes of their intent with respect to the crimes that

6    they are charged with.

7            I understand why from the government's perspective all

8    of that is irrelevant; but from the defendants' perspective, it

9    bears directly on the defendants' state of mind and it is

10   directly relevant.  That is why when we say to you we really

11   need additional time, we really need additional time.

12           THE COURT:  How did y'all come up with a February

13   date?  Was that based on conferring with attorney on available

14   times plus and additional time you need, or something else?

15           MR. STERN:  It was a very calculated date that was

16   selected.  It was based on the time that we believe at least on

17   behalf of Mr. Britt we needed.  It took into account the fact

18   that we were going to need this process to go through with the

19   work papers.  It took into account the fact that we were going

20   to have difficulty interviewing, meeting and coordinating with

21   potential witnesses over the Thanksgiving and the Christmas and

22   New Years holidays.  It took into account a myriad of

23   circumstances.  It was not a date that was arbitrarily chosen.

24           Your Honor, I would point out that it is a date that

25   is less than what we initially -- when we first requested a

1    trial date and an adjournment back in March, we suggested

2    April, which was our best estimate at that point in time.  Now,

3    while we recognize we need more time, we recognize that we can

4    put on an efficient and effective case in support of our

5    clients in February of next year.

6              THE COURT:  Did you want to add anything?

7              MR. COOK:  If I could, your Honor, I would to correct

8    what might be a misimpression.

9              Mr. Wada is the only defendant that was not a KPMG

10   employee.  He was an inspection leader at the PCAOB.  Because

11   of that, and I don't know this, but he does not benefit from

12   whatever third-party pair arrangements the other defendants may

13   enjoy.  He is on a very limited budget and we don't have as

14   your Honor mentioned teams of attorneys and legal systems and

15   paralegals we can throw at all this discovery.

16             THE COURT:  Does PCAOB pay for his defense?

17             MR. COOK:  No.  So we have to use our resources very

18   wisely and carefully.  The additional time that we requested

19   would will be well used and be essential for us to adequately

20   review the voluminous discovery in this case and to prepare for

21   trial.

22             THE COURT:  Well, Mr. Stern makes a pretty persuasive

23   case that this is not something that is a matter of convenience

24   but it is something that the defendants need to prepare their

25   defense.  Although, to some extent I believe that the work of

1   preparing for a trial expands to fill whatever time you have, I

2   don't want to prejudice any of the defendants' cases.

3          I will give you a chance to respond, Ms. Kramer, if

4   you want to take one more shot at it.

5          But I want to confirm that each of the defendants

6   would certainly be able to try the case on February 11th, 2019,

7   if I did move it and that there would be no objection to the

8   excluding the time under the Speedy Trial Act to that date.

9          Could I confirm that as each of them?

10          MR. BOXER:  Confirmed, your Honor.

11          MS. HELLER:  Confirmed.

12          MR. STERN:  Confirmed, your Honor.

13          MR. BLOCH:  Confirmed.

14          MR. COOK:  Confirmed as to Mr. Wada.

15          THE COURT:  Do you want to give it one more shot?

16          MS. KRAMER:  Well, your Honor, as Mr. Stern

17   acknowledges and as we put in our letter opposing the

18   adjournment, there is a real question of how relevant the work

19   papers are going to be at trial and in particular I would say

20   these -- I can't remember the term Mr. Stern used -- broken

21   threads where you can't figure out the end, that is obviously

22   something that doesn't allow for them to have the complete

23   picture of the entirety of the work papers for a given

24   inspection; but the government's understanding of how these

25   work papers were gathered and produced was at least in part to

1     reveal changes that were made and that are identifiable.  So

2     the quasi fishing expedition that exists, what may be out there

3     in additional work papers that the government doesn't intend to

4     use and that are sort of broken chains in the link of database

5     of hundreds or thousands of work papers, that doesn't get to

6     the core of the issue even if the extent of the changes both in

7     terms of quality and quantity is an important issue at trial.

8     It seems like this could potentially go on forever.

9          There are tons of work papers for each engagement.

10     There are a lot of audits that were conducted in this case.  It

11     does not go beyond what we have alleged in the indictment as

12     examples of changes.  That is not the core of the case.  To

13     adjourn the trial for four months is for that reason, to pursue

14     something that may or may not lead to anything that is even

15     relevant or admissible -- I am sure this can be something that

16     can be the subject of a motion in limine -- it is just not

17     warranted.

18          THE COURT:  I am going to grant the request for

19     adjournment of the trial date to February 11th, 2019.  It is

20     hard to analyze these issues when I haven't gotten my hands

21     dirty with all the evidence as you have in terms of the detail

22     required.  I know that it is a complex case.  I had set an

23     October date, which is a fairly early trial date given that the

24     case began in the beginning of 2018.  I don't believe that the

25     defendants are requesting an adjournment in bad faith or for

reasons that are not good reasons.  So I am going to grant the

request to adjourn the trial date to February 11th, 2019.  I

believe that you should all assume 100 percent that the trial

will happen on that date and will not be moved again.

As I said, I am reserving on the other matters.

I am going to exclude time under the Speedy Trial Act.

I note that each of the defendants consents to the exclusion of

time.  I find that the ends of justice outweigh the interest of

the public and each of the defendants in a speedy trial for the

reasons essentially we have been discussing, which is the

complexity of the issues in the case, the need for additional

time, for the parties to prepare for trial, and possible

discussion of disposition of the matter.

Is There anything else anyone wants to discuss today?

MR. BOXER:  I did, your Honor.

THE COURT:  Yes.

MR. BOXER:  Your Honor, the defense would like to

schedule some deadlines for various materials in some of the

litigation that was referred to today -- in limine motions,

experts.  We're familiar with the order your Honor entered in

U.S. v. Block and the way it staggered disclosures regarding

experts, expert deadlines with exhibit lists, 3500 material.

We have some thoughts as to what those deadlines should be, but

more importantly we would like to raise the issue and take

guidance from you as how to proceed in setting some of those

```
 1    deadlines.  Since we're all here and we have a trial date, it
 2    would be useful to know when to expect what we'll be receiving.
 3    So I am happy to suggest some times; but if you think there is
 4    a better process, I will be happy to follow that.
 5              THE COURT:  Well, the process I used before was to
 6    have the parties confer, and that is what I did in *Block*, and
 7    they were able to reach agreement.  If you are not able to
 8    reach agreement, I will hear each side's proposal and come up
 9    with something myself.
10              So have you conferred?
11              MR. BOXER:  We have not.
12              THE COURT:  I think you should confer first and see if
13    you can reach agreement.  Obviously you have more time.  If
14    you're not able to reach agreement, you can submit each
15    parties' proposal and I will determine what I think is
16    appropriate.
17              MR. BOXER:  Thank you very much.  We'll do that.
18              THE COURT:  Anything else from anybody?
19              MS. KRAMER:  Not from the government, your Honor.
20              MS. HAAG:  No, your Honor.
21              THE COURT:  Thank you very much.
22                              o0o
23
24
25
```