J2D5mid1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           18 Cr. 0036(JPO)

5    DAVID MIDDENDORF and JEFFREY
     WADA,
6
                Defendants.
7
     ------------------------------x
8

9                                          February 13, 2019
                                           9:35 a.m.
10

11   Before:

12                    HON. J. PAUL OETKEN,

13                                         District Judge
                                           and a jury
14

15                        APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
18        AMANDA K. KRAMER
          JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20   PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant David Middendorf
21   BY:  NELSON A. BOXER
          AMY R. LESTER
22        ALEXANDRA REBECCA CLARK
              – and –
23   BRUCH HANNA LLP
     BY:  GREGORY S. BRUCH
24

25
```

J2D5mid1

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:    STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
                – and –
LATHAM & WATKINS
BY:    JASON MASASHI OHTA


          – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal

J2D5mid1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          So, a couple of issues relating to jurors.  One is the

4     one I raised yesterday evening.  Ms. Dwumah, no. 11, says she

5     has parent teacher conferences that cannot be rescheduled and

6     they're tomorrow -- Thursday -- and she just said that to

7     Mr. Hampton last night at the end of the day.

8          Then, this morning, juror no. 5, Ms. Lestrange, spoke

9     to Mr. Hampton and said she had learned that she only gets paid

10    for five days by her employer and continuing to serve more than

11    a week would be a financial hardship, and mentioned that she

12    has a 94-year-old mother in hospice care and that's part of the

13    reason it is a hardship.

14         So, thoughts?

15         MS. KRAMER:  Your Honor, a question, based in part on

16    my own experience.  Do you have a sense of when the parent

17    teacher conferences are scheduled for on Thursday?  Because if

18    they are in the morning and in the evening, then it seems that

19    perhaps we could adjust the schedule slightly so that she can

20    either not miss all of them or perhaps only has to reschedule

21    some of them.  I mean, it's obviously an inconvenience to

22    reschedule parent teacher conferences.  I have been on the

23    receiving end of that rescheduling as a parent and it happens

24    and they get rescheduled.  They're typically 10-minute

25    conferences.  So, it does seem since we are not sitting Fridays

J2D5mid1

1      that perhaps there is some flexibility there in her schedule to

2      either schedule some or all of them.

3               THE COURT:  Do you think I should bring her out and

4      speak, ask her about that?

5               MR. COOK:  Your Honor, the only thing I was unclear on

6      is whether this was for this week that was an issue or whether

7      it was going to continue in other weeks.

8               THE COURT:  I think it was just this week.  She said

9      "Thursday" and she wasn't exactly clear, but it sounded like --

10     we assumed it was tomorrow.

11              MR. COOK:  Okay.  We would prefer to perhaps bring her

12     out and confirm that perhaps we can rearrange the schedule but

13     make some adjustment to allow her to stay.

14              MR. BOXER:  We agree, your Honor.  And it seemed like

15     Ms. Lestrange has a little more challenging situation, so

16     trying to save this juror is important.

17              THE COURT:  Trying to what?

18              MR. BOXER:  Trying to save this juror is extra

19     important because the second juror you mentioned seemed like it

20     was going to be more difficult situation.

21              MS. KRAMER:  With respect to Ms. Lestrange, your

22     Honor, it does seem perhaps that an intermediate step would be

23     for your Honor to call her employer and find out, indeed, what

24     the circumstances are and how flexible they are.

25              THE COURT:  Yes, and I am happy to do that.  I can

J2D5mid1

1    also do that with Ms. Dwumah's employer.  I don't know if it

2    helps or not, but.

3              So, why don't we call her out, Ms. Dwumah first, call

4    her out, put her in the witness chair, and I will ask her about

5    it.

6              Does that make sense?  Any objection to that?

7              MS. KRAMER:  No, your Honor.

8              MR. COOK:  No, your Honor.

9              MR. BOXER:  No, your Honor.

10             THE COURT:  Ms. Dwumah, no. 11.

11             (Juror present)

12             THE COURT:  Please, be seated.

13             You are juror no. 11, Ms. Dwumah?

14             JUROR:  Yes.

15             THE COURT:  Would you mind pulling the mic closer?

16             I understand you spoke to Mr. Hampton about a

17    scheduling issue and I wanted to follow up with a few questions

18    about that.

19             JUROR:  Sure.

20             THE COURT:  Remind me what you do.  You are a teacher?

21             JUROR:  Yes.

22             THE COURT:  Where do you teach?

23             JUROR:  Transfiguration Catholic School, right around

24    the corner.

25             THE COURT:  Right around the corner down here?

J2D5mid1

1              JUROR:  Yeah.

2              THE COURT:  Could you tell me what it was that the

3    issue was?

4              JUROR:  I have parent teacher conference tomorrow and

5    I have 20 parents that I can't reschedule.

6              THE COURT:  Why can't they reschedule?

7              JUROR:  Because there is no school on Friday.  We have

8    a conference day.

9              THE COURT:  Okay.  What's the time of the conferences?

10             JUROR:  For -- from 8:30 to 1:00.

11             THE COURT:  8:30 to 1:00?

12             JUROR:  Yes.

13             THE COURT:  And is it just tomorrow?

14             JUROR:  Just tomorrow.

15             THE COURT:  Not future weeks?

16             JUROR:  No.

17             THE COURT:  So there is no problem with next week or

18   the following week?

19             JUROR:  No.

20             THE COURT:  Is there any way you could schedule the

21   conferences just for you to Friday, or a Friday?

22             JUROR:  No, I cannot.

23             THE COURT:  Why is that?

24             JUROR:  Because we have -- the parents scheduled ahead

25   of time, they have to take off work, and it is just going to be

J2D5mid1

1   a lot of rescheduling and we have the calendar day for -- the

2   calendar set for the year so every day we have something going

3   on.  I cannot reschedule.

4           THE COURT:  Well, can I talk to your boss about that?

5           JUROR:  Yeah, sure.

6           THE COURT:  Is there a principal?

7           JUROR:  Yes.

8           THE COURT:  Who is that?

9           JUROR:  Emily Eng.

10          THE COURT:  Emily Eng.

11          Do you know her number?  Transfiguration Catholic

12   school?

13          JUROR:  Childhood -- early Childhood.

14          THE COURT:  Do you mind if I call her?

15          JUROR:  Sure.

16          THE COURT:  Are you -- when did you last speak to

17   whoever scheduled the conferences?  Did you talk to someone

18   recently about this?  Because you didn't raise this when I

19   asked if anyone had a scheduling problem.

20          JUROR:  I spoke to my principal yesterday.

21          THE COURT:  And that was Ms. Yang?

22          JUROR:  Eng.  E-N-G.

23          THE COURT:  And what did she say?

24          JUROR:  We spoke about the scheduling and she told me

25   that we cannot reschedule and I am required to be there to

J2D5mid1

1    carry out the conferences.

2              THE COURT:  So there is no one who can cover for you

3    for this?

4              JUROR:  No.

5              THE COURT:  Because you are the teacher?

6              JUROR:  Yes.

7              THE COURT:  How many conferences do you have?

8              JUROR:  20.

9              THE COURT:  20.

10             And they are scheduled --

11             THE COURT:  Every 10 minutes or something?

12             JUROR:  Yes.

13             THE COURT:  You said the timing was when?

14             JUROR:  8:30 to 1:00.

15             THE COURT:  8:30 to 1:00.

16             So, if we took off the morning and we just sat in the

17   morning, as the jury at 2:00, would you be able to make that?

18             JUROR:  Yes.

19             THE COURT:  So, it is 8:30 to 1:00 you cannot make;

20   and Transfiguration Catholic School.

21             Does anybody want to ask any questions?

22             MR. COOK:  No, your Honor.

23             THE COURT:  All right.  Thank you.

24             JUROR:  Thank you.

25             (Juror not present)

J2D5mid1

1          THE COURT:  Any objection to calling out

2     Ms. Lestrange?

3          MS. KRAMER:  No, your Honor.

4          MR. BOXER:  No, your Honor.

5          MR. COOK:  No, your Honor.

6          THE COURT:  Ms. Lestrange, please?

7          (Juror present)

8          THE COURT:  Please, be seated.  Good morning.

9          JUROR:  Good morning.

10         THE COURT:  You are Ms. Lestrange?

11         JUROR:  Yes.

12         THE COURT:  Juror no. 5.

13         I understand that you spoke with my courtroom deputy

14    Mr. Hampton this morning about an issue with your work; is that

15    right?

16         JUROR:  Yes.

17         THE COURT:  Could you repeat what the issue is?

18         JUROR:  Yes.

19         What I spoke with him about was that I confirmed, by

20    yesterday evening, the policies and procedures of my position

21    at work that I'm only going to be paid for five days of jury

22    duty.  So, that's going to result in a financial hardship for

23    me, which means I will be over two and a half weeks without a

24    paycheck and that will present a financial hardship for me.

25         THE COURT:  Remind me what you do for work?

J2D5mid1

1          JUROR:  I'm a nurse.

2          THE COURT:  You are a nurse.

3          RN?

4          JUROR:  Yes.

5          THE COURT:  Who is your employer?

6          JUROR:  Silver Hill Hospital in New Canaan,

7   Connecticut.

8          THE COURT:  You couldn't go with just the -- you know,

9   the jury pay is, I think it is $50; is that enough to cover you

10  for a couple weeks?

11         JUROR:  Well, the thing is with jury pay -- first of

12  all, no.  The answer to the first part of that is no but the

13  second part of that is you are not paid until eight to 10 weeks

14  after conclusion of jury service, so you are looking at maybe

15  June before you are paid for your transportation and I travel

16  two hours to get here, as well.

17         THE COURT:  So you are saying you are not able to go

18  forward?

19         JUROR:  I'm saying that if -- yeah.  Under the

20  circumstances I can't do four weeks.  I could have done a week

21  or two weeks but I didn't know that I was going to be selected

22  as a juror for a four-week trial.  So, I couldn't bring this up

23  the first day because I didn't know what I was going to be

24  selected for.  I didn't bring it up yesterday because I wanted

25  to clarify the policy and procedure through my work.

J2D5mid1

1      THE COURT:  If your work paid for more weeks, would

2   you be able to do it?

3      JUROR:  If I were paid for my time here by my job I

4   would, absolutely would, because I do believe in fulfilling my

5   civic duty.

6      THE COURT:  But if it is only the five days it's a

7   financial hardship?

8      JUROR:  That's correct.

9      THE COURT:  Okay.  Can you tell me who you spoke to?

10  Is it the HR people?

11     JUROR:  It is human resources.

12     THE COURT:  Is there a particular person?

13     JUROR:  Yes, his name would be Rich Juliana.

14     THE COURT:  Do you mind if I speak with him?

15     JUROR:  No, I don't.

16     THE COURT:  You don't happen to know his number, do

17  you?

18     JUROR:  I only know the area code and the exchange.

19  So, it's 203-801.  I'm sorry, I don't know HR, his exact HR

20  extension.

21     THE COURT:  Any other issue?  I think you said also

22  something about your mother in hospice?

23     JUROR:  My mother is elderly and is she is in hospice.

24  She is 93 so she could, you know, be with us for a week or two

25  weeks, or four weeks or five weeks.  It is very difficult to

J2D5mid1

1   say.

2              THE COURT:  So that creates an additional hardship?

3              JUROR:  It could potentially.

4              THE COURT:  But you don't know?

5              JUROR:  Right, no.  No.

6              THE COURT:  So, the issue, the issue you were raising

7   was the fact that you learned you were only being paid five

8   days and that's a problem.

9              JUROR:  Yes.

10             THE COURT:  Any other questions you would like me to

11  ask?

12             MS. KRAMER:  No, your Honor.

13             MR. COOK:  No.

14             MR. BOXER:  No, your Honor.

15             THE COURT:  Thank you.  You may go back.

16             (Juror not present)

17             THE COURT:  I am open to calling either or both of the

18  supervisors.  It sounds like with Ms. Dwumah, if we took

19  tomorrow morning off, that would address the problem with her.

20  I don't know how much a hardship that is on the trial.

21             MS. KRAMER:  Your Honor, we would like you to call

22  both employers and see if we can sit as we are scheduled to sit

23  a full day tomorrow.  We have, after Mr. Bricker, a fairly

24  brief witness, and then we have another witness who -- our next

25  two witnesses have both traveled by plane to be here.  The

J2D5mid1

1    witness who we are calling after our next witness has a lot of

2    personal scheduling constraints and --

3              THE COURT:  Is that also a brief witness?

4              MS. KRAMER:  No.

5              THE COURT:  Is that Mr. Sweet?

6              MS. KRAMER:  No, that's Ms. Rodriguez.  She is from

7    the PCAOB.  But, if we -- there is a lot of difficulty in her

8    life that will result if our schedule deviates.  If it's

9    absolutely necessary, obviously we will do what we need to do

10   but it would be a real problem, so we would request that you

11   call both employers and try to help them understand the

12   importance of jury service and people serving on the trial that

13   they've been selected for.

14             THE COURT:  Okay.

15             Does anybody have an objection to my calling both of

16   them and just (1) confirming what the jurors have said; and (2)

17   seeing if there is any solution here?

18             MR. BOXER:  We have no objection, your Honor.

19             MR. COOK:  No objection.

20             THE COURT:  Okay.  I guess I propose doing that right

21   now.  Okay?  All right.  Thanks.

22             (Recess)

23             THE COURT:  So, good news I think.

24             I spoke first with Mr. Rich Juliana, who is the HR

25   director at Silver Hill Hospital in New Haven, Connecticut.  I

J2D5mid1

1    confirmed that not he, but a manager at the place had said to

2    Ms. Lestrange, oh, I think the policy is five days' payment,

3    that's it.  And I said, well, can you double check the policy?

4    And he pulled it up and read it and said oh, actually, that's

5    wrong.  We pay five days automatically and then we continue to

6    pay indefinitely, minus the amount the Court is giving.  So,

7    basically there is no, the information was just wrong.

8            So, she should be fine.

9            And then I spoke with Emily Eng, the principal of

10   Transfiguration Early Childhood School and she confirmed that

11   she spoke with Ms. Dwumah, who is not a teacher but a teacher's

12   assistant, and she had told her that she really wanted her to

13   be there for conferences, which are in fact, she said 8:30 to

14   12:30 tomorrow.  And I said, well, she's been picked for the

15   jury, is that something she could miss?  And she said,

16   hesitantly, yes.  The teacher -- the main teacher is the one

17   doing the conference and it is nice to have the teacher's

18   assistant there, but it is not necessary.  And I could tell

19   that she wanted -- she was annoyed that Ms. Dwumah was going to

20   be missing this and I explained to her the importance of jury

21   duty and that she had been picked for the jury and I emphasized

22   to her that there should be no negative consequence to her

23   employment.  And I think she understood all of that.  And, in

24   the end she said, it's fine, she'll be able to catch up with

25   the teacher after the conferences and it is not a problem if

J2D5mid1

1    she misses them.  I mean, I shouldn't say -- she didn't say not

2    a problem, she said it was an inconvenience but she understood

3    and that it would be fine if she missed them.

4         So, I suggest maybe just going back to the robing room

5    with the court reporter and that I just, rather than bringing

6    them out where they're embarrassed, that I talk to each of them

7    and we will do it on the record, unless you think I should

8    bring them out.

9         MR. BOXER:  That's fine, your Honor.

10        MS. KRAMER:  That's fine, your Honor.

11        MR. COOK:  That's fine.

12        THE COURT:  Okay.  I will do that now.

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid1

1              (In robing room; Juror Lestrange present)

2         THE COURT:  Hi.

3         JUROR:  My apologies.

4         THE COURT:  No worries.

5         So, we are in the robing room with Ms. Lestrange,

6    juror no. 5, and I followed up, as discussed in the courtroom,

7    by calling Rich Juliana, Director of HR, and he said he had

8    initially thought that it was also being paid for five days

9    under the policy at the hospital, and I said can you double

10   check that and he double checked and said, actually, it is paid

11   five days and then for after the five days it's full pay minus

12   the check you get from the Court.

13        THE JUROR:  Right.

14        THE COURT:  So, he said you would continue being paid

15   and it wouldn't wait until you get the check.

16        A JUROR:  So it is not going to wait until after I

17   have proof that I have been paid from the Court?

18        THE COURT:  Well, he said you need some proof, an

19   invoice or something, but we can give you that.

20        A JUROR:  So my pay won't be interrupted then.  That's

21   what I was worried about, if I had to wait until the middle of

22   May, that would be difficult.

23        THE COURT:  He said your pay wouldn't be interrupted.

24   You should feel free to call him.  Do you have his number?

25        JUROR:  I can get it.  I don't have a piece of paper

J2D5mid1

1    right now.

2              THE COURT:  Yes.  So, he confirmed that it wouldn't be

3    interrupted as long as we give you a voucher or whatever

4    showing that you would be receiving the, I think it is $50 a

5    day and it wouldn't be --

6              JUROR:  I'm sorry for any confusion or delay.

7              THE COURT:  No, that's fine.

8              So, I think they gave you information that wasn't

9    accurate or I might have misinterpreted it or been more literal

10   in understanding it.  I think it was after the fact that I

11   would eventually get, you know.

12             THE COURT:  Yes.

13             So, feel free to call and confirm that but if that's

14   the case, are you okay serving?

15             JUROR:  Yes.

16             THE COURT:  Okay.  Great.  Thank you.

17             JUROR:  Thank you very much.

18             THE COURT:  Thank you.

19             (Juror not present)

20             THE COURT:  Ms. Dwumah.

21             (Juror Dwumah present)

22             THE COURT:  Hello.

23             JUROR:  Hi.

24             THE COURT:  We are in the robing room with Ms. Dwumah,

25   juror no. 11.

J2D5mid1

1          JUROR:  Yes.

2          THE COURT:  So, I did speak with Ms. Eng, the

3   principal of the school.

4          JUROR:  Yes.

5          THE COURT:  I explained to her the situation and she

6   said that she had spoken to you.

7          A JUROR:  Yes.

8          THE COURT:  Is it a teacher's assistant or teacher's

9   aide?

10          JUROR:  Teacher's assistant.

11          THE COURT:  Teacher's assistant.

12          As a teacher's assistant she would like, prefer that

13   you be this for the conferences, but when I explained to her

14   the importance of jury duty.

15          JUROR:  Yeah.

16          THE COURT:  The fact that you had been selected.

17          JUROR:  Yeah.

18          THE COURT:  And I basically said it is inconvenient

19   for everybody to be on jury duty but it is extremely

20   important --

21          JUROR:  Right.

22          THE COURT:  -- is it okay if she served during that

23   time.  And she said it would be fine.

24          JUROR:  Okay.

25          THE COURT:  And you are welcome to speak with her and

J2D5mid1

1  confirm that if you want, but she said it would be fine, at my

2  request.  And I confirmed that there would be no negative

3  effect in terms of your employment or anything.

4             A JUROR:  Okay.

5             THE COURT:  But, you can catch up with the teacher

6  after the conferences and get any notes you need.

7             Is that okay?

8             JUROR:  Yes.

9             THE COURT:  So, in light of that, are you comfortable

10 serving?

11            JUROR:  I am.

12            THE COURT:  Okay.

13            JUROR:  Thank you.

14            THE COURT:  Thanks very much.

15

16

17

18

19

20

21

22

23

24

25

J2D5mid1

```
1              (In open court)

2              MS. KRAMER:  Your Honor, shall I have the witness take

3    the stand?

4              THE COURT:  Yes.  In the mean time, I spoke to both of

5    the jurors and they're both, in light of the information I

6    received, they're both comfortable serving, I don't see a

7    problem.

8              (Witness resumes the stand)

9              THE COURT:  Are we all set for the jury?

10             MS. KRAMER:  Yes, your Honor.

11             THE COURT:  Please, bring them in.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

J2D5MID1                         Bricker - direct

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.

3           THE JURY:  Good morning, Judge.

4           THE COURT:  Is he looking for your note pad?

5           JUROR:  Yes.  Thank you.

6           THE COURT:  It will be one second.

7           (pause)

8           THE DEPUTY CLERK:  Make sure it is yours.

9           JUROR:  Yes.  Thank you.

10          THE COURT:  Going forward, please remember to leave

11   them on your chairs.  Only when you begin deliberating will you

12   take your note pads back to talk about your deliberations.

13          We are continuing with the testimony and, Ms. Kramer,

14   you may proceed.

15          Mr. Bricker is under oath from yesterday, so you may

16   proceed.

17          MS. KRAMER:  Thank you, your Honor.

18    WESLEY RAY BRICKER, resumed

19   DIRECT EXAMINATION  (Continued)

20   BY MS. KRAMER:

21   Q.  Mr. Bricker, are you aware of whether there were ever

22   quarterly meetings between your office, the Office of the Chief

23   Accountant, and personnel from KPMG?

24   A.  Yes.

25   Q.  And approximately how often did they happen?

J2D5MID1                          Bricker - direct

1    A.  Those meetings occurred approximately four times a year or

2    quarterly.

3    Q.  Could you please take a look at what's marked for

4    identification as Government Exhibit 321?  Do you recognize

5    this document?

6    A.  I do.  I recognize it as an e-mail on which I am included.

7    Q.  And when did you receive this e-mail?

8    A.  I received it on March 24th regarding a March 31st meeting.

9    Q.  Did you receive it as part of performing your normal duties

10   at the SEC?

11   A.  I did.

12         MS. KRAMER:  Your Honor, the government offers

13   Government Exhibit 321.

14         MR. BOXER:  No objection.

15         MR. COOK:  No objection.

16         THE COURT:  321 is received in evidence.

17         (Government's Exhibit 321 received in evidence)

18   BY MS. KRAMER:

19   Q.  So, let's look, Mr. Bricker, at the header information on

20   the e-mail.  So, what is the subject line of the e-mail?

21   A.  March 31.

22   Q.  And what is the title of the attachment?

23   A.  KPMG Agenda for Meeting with OCA, March 31.

24   Q.  Who did you receive this e-mail from?

25   A.  Robert Malhotra.

J2D5MID1                         Bricker - direct

1  Q.  Where did he work at the time?

2  A.  At KPMG.  He was a partner at KPMG.

3  Q.  And, do you know what his role was when you received this

4  e-mail?

5  A.  He was a partner assigned to KPMG's national office.

6  Q.  Let's look at the text of the e-mail he sent, and this is

7  addressed to you and someone named Jennifer Minke-Gerard.  Who

8  was she?

9  A.  Jennifer Minke-Gerard reported to me in the Office of the

10  Chief Accountant.  She was, at the time, senior associate chief

11  accountant.

12  Q.  Look in the middle of the first paragraph at the sentence

13  that starts with "Please note," in which Mr. Malhotra told you

14  that Scott Marcello would be joining the meeting.  What did you

15  understand his role to be at the time you received this e-mail?

16  A.  I understood that Scott would be joining to provide an

17  update on KPMG's audit practice and their strategies and goals

18  for 2016.

19  Q.  Let's look at the agenda that was sent to you.  What is the

20  first item on the agenda?

21  A.  KPMG's audit practice, 2016 strategy and goals.

22  Q.  Did you attend this meeting on March 31st, 2016?

23  A.  I did.

24  Q.  Do you recall, generally, what was discussed at the

25  meeting?

J2D5MID1                          Bricker - direct

1    A.  I do.

2    Q.  And, was the subject of KPMG's audit practice 2016 strategy

3    and goals discussed at the meeting?

4    A.  It was.

5    Q.  Do you recall what was said on the subject and who said it?

6    A.  In general terms, what I recall was Scott had a

7    presentation which he used to facilitate the discussion and the

8    discussion included, broadly, their strategy and their goals

9    but including their goals for addressing inspection issues and

10   raising the quality of their audits during 2016, and so he was

11   laying out the strategy and the goals for the practice more

12   generally but including on that topic, particularly given that

13   we had previously talked about inspections.

14   Q.  Do you remember whether or not David Middendorf attended

15   that meeting?

16   A.  I don't believe he did but I don't recall specifically.

17   Q.  If you had learned, as chief accountant of the SEC, that

18   there were problems in the way PCAOB was conducting its

19   inspections, did you have any remedies that you could pursue?

20   A.  Yes.

21        So, if we had known that there were problems with the

22   inspections, we could have incorporated that into our oversight

23   of the PCAOB, as well as our regulation of auditors.  Our

24   oversight of the PCAOB includes oversight of the PCAOB board

25   which includes the selection and retention of PCAOB board

J2D5MID1                         Bricker - direct

1    members, just as an example.

2    Q.  And, have you ever had direct communications with

3    individuals at the PCAOB about matters that came to your

4    attention?

5    A.  Yes.

6    Q.  So, included in your oversight, does that include direct

7    communications?

8    A.  It does include direct communications.

9          For example, I, at the time and continuing, have met

10   with their division director for inspections, their chief of

11   staff, their chair, as well as other board members in direct

12   meetings regarding the PCAOB's performance as well as the

13   performance of auditors who are registered with the PCAOB.

14         MR. BOXER:  Your Honor, objection.  Move to strike the

15   answer after he answered, yes, it does include direct

16   communications.

17         MR. WEDDLE:  Join in that.

18         THE COURT:  Sustained.  Since it was a yes or no

19   question, I am going to direct the jury to disregard everything

20   other than "it does include direct communications."

21   BY MS. KRAMER:

22   Q.  Mr. Bricker, could you give an example of what kinds of

23   direct communications you had with the PCAOB?

24   A.  An example of direct communications with the PCAOB would be

25   meetings with the PCAOB chair, board members, PCAOB's chief of

J2D5MID1                          Bricker - direct

1    staff, as well as the program directors such as the director of

2    registration and inspections at the PCAOB.

3    Q.  I would like to now turn your attention to the events of

4    February 9, 2016.  I asked you questions at the very end of

5    yesterday but I'm just going to go back over a couple of them

6    to reorient you.

7            Did you participate in any meetings that day with

8    personnel from KPMG?

9    A.  I did.

10   Q.  How many meetings did you personally participate in?

11   A.  I participated in one meeting personally.

12   Q.  Who else was in that meeting with you from the SEC?

13   A.  From the SEC, Jim Schnurr, then chief accountant, and the

14   deputy chief accountant for the professional practice group

15   Brian Croteau.

16   Q.  Who was in that meeting from KPMG?

17   A.  From KPMG, Lynn Doughtie, the CEO of KPMG; Scott Marcello

18   head of KPMG's audit practice; and David Middendorf, head of

19   KPMG's national office.

20   Q.  Do you recall what topics were discussed in that meeting?

21   A.  As I recall, it was essentially two; one was meeting them,

22   so it was in the first instance a meeting and introduction, but

23   then the second part of the discussion was a discussion about

24   their focus on their quality of their audit services and the

25   inspection results from the PCAOB, and wanting to emphasize the

J2D5MID1                        Bricker – direct

1   importance to them of increasing quality and addressing the

2   inspection results.

3   Q.   Who addressed those issues on behalf the SEC?

4   A.   Then chief accountant Jim Schnurr.

5   Q.   Do you recall what, if anything, David Middendorf said at

6   that meeting?

7   A.   As I recall, David talked about the focus of the national

8   office on addressing those issues.

9   Q.   In your time at the SEC, have you participated in other

10  similar meetings between the chief accountant and the CEO of

11  one of the four largest accounting firms?

12  A.   I have participated in the meet and greet part of those

13  meetings.  We have meetings with the CEOs of each of the major

14  firms from time to time.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J2ddmid2                          Bricker - direct

1    Q.   And how did the tone of this meeting compare to those other

2    meetings?

3    A.   It was very different.  It was -- it was much more direct,

4    perhaps a bit confrontational, and expressed directly the

5    concerns that we had had.

6    Q.   Do you know whether or not the KPMG personnel you met with

7    that day, Ms. Doughtie, Mr. Marcello and Mr. Middendorf, had

8    any other meetings with the SEC the same day?

9    A.   My understanding is they had a meeting with the

10   Commission's Chair, Chair White, at the time as well as Chief

11   Accountant Jim Schnurr.

12   Q.   How do you know that they had a meeting with Chair White?

13   A.   I walked with Jim Schnurr together with the KPMG personnel

14   up to Chair White's office.  I didn't attend the meeting, but I

15   walked up with the group.

16   Q.   Did you play any role in the planning of the meeting that

17   Chair White held with the same KPMG personnel?

18   A.   I did.  I participated in drafting a briefing memo for

19   Chair White.

20   Q.   What was your understanding of the planned topics for Chair

21   White's meeting?

22   A.   There was a similar element of the meet-and-greet piece,

23   but then, in terms of the briefing memo I participated in, it

24   included the inspection experience that KPMG was having with

25   the PCAOB and highlighted the inspection experience regarding

J2ddmid2                              Bricker - direct

1    banks and the allowance for loan losses.

2    Q.  How did you refer to the meeting between KPMG and Chair

3    White that day?

4              MR. WEDDLE:  Objection, your Honor.

5              THE COURT:  Yes.

6              If you could clarify?

7              MS. KRAMER:  Sure.

8    BY MS. KRAMER:

9    Q.  In preparing for that meeting, was there a nickname for the

10   meeting that you used?

11   A.  There was.  It was a "Come to Jesus" meeting.

12   Q.  Why was that the nickname for the meeting?

13   A.  That was the nickname of the meeting because there were --

14   there were serious concerns regarding the performance -- the

15   inspection, performance, and the responsiveness of the firm.

16   Q.  Did there come a time in 2017 that you received a call from

17   Sven Holmes?

18   A.  There was.

19   Q.  And what role did you understand Sven Holmes to have as of

20   February 2017?

21   A.  At the time, my understanding was that Sven Holmes was the

22   KPMG general counsel.

23             THE COURT:  You just said February 2017.  Did you mean

24   '16?

25             MS. KRAMER:  No.

J2ddmid2                          Bricker - direct

1  BY MS. KRAMER:

2  Q.  So moving now to a year later, 2017, I want to direct your

3  attention to February 2017, and at that time, did you receive a

4  call from Sven Holmes?

5  A.  I did.

6  Q.  And you understood him to be the general counsel of KPMG?

7  A.  I did.

8  Q.  During that call, did he report to you that he had learned

9  that there was an unauthorized receipt of information by KPMG,

10  that the firm was looking into it, and that he would keep you

11  updated?

12  A.  Yes, he did.

13  Q.  Did -- what did you tell him in response?

14  A.  I told him I appreciated the information, but that I would

15  like an update as the firm developed more information.  He

16  shared that the firm would be looking into the circumstance,

17  and so I asked him for an update the following week.  As I

18  recall, the conversation was on a Friday and I asked for an

19  update on Monday of the following week.

20  Q.  Did he in fact give you that update that you asked for?

21  A.  As I recall, yes.

22          MS. KRAMER:  All right.  Mr. Urbanczyk, could you pull

23  what is in evidence as Government Exhibit 5.  And let's turn to

24  page 7, I believe it is.

25  Q.  OK.  So focusing on the second paragraph under -- in the

J2ddmid2                         Bricker - direct

1    middle of the page that begins "In February 2017," as a user of
2    the PCAOB inspection reports, does it matter to you if a firm
3    gets improper advance notice of inspection selections?
4             MR. BOXER:  Objection.
5             MR. WEDDLE:  Objection.
6             THE COURT:  Overruled.
7    A.  It does, because it affects my ability to use the reports
8    and rely on them.
9    Q.  Why does it affect your ability to use the reports and rely
10   on them?
11            MR. WEDDLE:  Objection.
12            THE COURT:  Overruled.
13   A.  It affects my ability to rely on them because I rely on the
14   reports being prepared consistent with the PCAOB's inspection
15   program, and so my ability to use the reports that are prepared
16   on a very different premise is compromised.  And it's hard to
17   judge, you know, is there a usefulness of the information
18   contained in the reports whenever they have been compromised.
19   Q.  Does that advance notice affect your ability to use the
20   reports even if the opinions that were issued by the accounting
21   firm are sound?
22            MR. BOXER:  Objection, your Honor.
23            MR. WEDDLE:  Objection.  We covered all of this
24   yesterday.
25            THE COURT:  Overruled.

J2ddmid2                              Bricker - direct

1    A.   Yes.   My ability to rely on the inspection reports is

2    impacted regardless of whether the audit reports were supported

3    at the time the audit reports were issued.

4    Q.   Why?

5    A.   It impacts it because the process of inspections, and the

6    reporting about that process of inspections, is separate from

7    the underlying audits.   What I'm focused -- what I focus on in

8    this context is oversight of the PCAOB and understanding the

9    nature of the firm's audit quality, and this was a source of

10   insight regarding those issues.   And so when these reports are

11   compromised, then it limits my ability to use the reports in

12   that work.

13   Q.   Are you aware of whether or not the SEC has a pending

14   proceeding against the defendants in this matter?

15   A.   I am.

16   Q.   Do you remember approximately when you first met with the

17   government in connection with this case?

18   A.   As I recall, it was early 2018.

19   Q.   Since that time, have you been actively involved in the

20   SEC's proceedings against the defendants in this case?

21   A.   Since that time, I have been separated off from the SEC's

22   work, which is largely carried out by the Division of

23   Enforcement.

24            MS. KRAMER:   May I have a moment, please, your Honor?

25            THE COURT:   Yes.

J2ddmid2                              Bricker - cross

1              (Pause)

2              MS. KRAMER:  No further questions.

3              THE COURT:  Cross-examination.

4              Mr. Boxer.

5              MR. BOXER:  Thank you, your Honor.

6  CROSS-EXAMINATION

7  BY MR. BOXER:

8  Q.  Good morning, Mr. Bricker.  My name is Nelson Boxer.  I

9  represent Mr. Middendorf.

10              Do you see Mr. Middendorf in court today?

11  A.  I do.

12  Q.  Could you describe him, point him out, where he is?

13  A.  Yes.  In a black suit coat.

14  Q.  Is there a reason why you needed to identify him by this

15  photograph yesterday as opposed to --

16              MS. KRAMER:  Objections.

17  Q.  -- observing him in court?

18              THE COURT:  Sustained.

19  Q.  Do you find it difficult to look at Mr. Middendorf during

20  the course of these proceedings?

21  A.  No, I do not.

22              MS. KRAMER:  Objection.

23              THE COURT:  Overruled.

24  Q.  Was just now the first time you looked at him since you

25  walked into the courtroom yesterday?

J2ddmid2                          Bricker - cross

1           MS. KRAMER:  Objection.  Relevance.

2           THE COURT:  Overruled.

3           You can answer.

4    A.  No.

5    Q.  How many times did you meet with the government to prepare

6    for your testimony today?

7    A.  I don't have a specific -- more than five.  It was probably

8    more than five, yes.

9    Q.  And you went over the answers -- the questions and the

10   answers during those proceedings -- during those meetings?

11   A.  I went through the questions that was --

12   Q.  My question was simply did you go over the questions and

13   the answers during those meetings with the government?

14   A.  We did go through the questions and I provided my answers.

15   Q.  And during your testimony yesterday and today, at times you

16   gave answers to questions that weren't even asked as of yet,

17   right?

18   A.  No.  I thought I was answering the questions.

19   Q.  You on occasions yesterday and again this morning provided

20   details that weren't even yet asked for by the prosecutor in

21   her question, correct?

22   A.  Again, I thought I was answering the questions asked.

23   Q.  You don't think that happened a single time?

24   A.  It may have.  I was -- I was trying to provide responsive

25   answers to the best of my ability.

J2ddmid2                          Bricker - cross

1    Q.  That wasn't my question.

2            My question was on occasions yesterday and today, did

3    you embellish and add details that weren't asked for in the

4    question posed by the prosecutor?

5    A.  Perhaps I did but --

6    Q.  And during the course of your preparation with the

7    government, did they instruct you to look at the jury while you

8    were giving these answers?

9    A.  Not that I recall.

10   Q.  I want to address your testimony about your reliance on the

11   reports, but before I do that, just a couple of quick

12   questions.

13           You mentioned the budget of the PCAOB yesterday.  The

14   PCAOB budget is not funded by the United States, correct?

15   A.  That's correct.

16   Q.  And it is not funded by the SEC, right?

17   A.  That's correct.

18   Q.  It's funded by the public companies who are subject to

19   supervision by the PCAOB, correct?

20   A.  Among other sources.

21   Q.  And your -- the Commission's oversight of that budget is

22   not related to how much money the commission from its budget is

23   contributing to the PCAOB's budget, right?

24   A.  That's correct.

25   Q.  And, in fact, in the most recent approval -- request and

J2ddmid2                              Bricker - cross

1    approval, the budget of the PCAOB has gone down, is that right?

2    A.  It's -- it's fluctuated.  I think in our immediate last

3    request, it went up relative to the prior year.  In the year

4    prior it had gone down.

5    Q.  And their most present request asked for a three/four

6    percent reduction in its budget, correct?

7    A.  No, I think it went up.  There are two numbers.  There is

8    the amount of cash and then there is the budget and expenses,

9    which is on an accrual basis.  So it depends on which number --

10   which number you are referencing.

11   Q.  Let me try it this way.  In certain years, the amount of

12   the PCAOB budget has gone down as opposed to it going up,

13   correct?

14   A.  That's correct.

15   Q.  You were asked some questions yesterday and again this

16   morning about if KPMG has advance notice of the inspections,

17   and I wanted to ask you a few questions about that.

18           What's your understanding of the term "the

19   documentation period" with respect to audits?

20   A.  The documentation period is described in a PCAOB standard

21   which describes how documentation should be assembled and

22   during a specific period of time.

23   Q.  And the advance notice we're speaking -- you were speaking

24   about was during the documentation period, is that correct?

25   A.  It might have been.  I was referring more generally to

J2ddmid2                         Bricker - cross

1     advance notice before the PCAOB had provided notice sort of in

2     the normal course.

3     Q.  OK.  So that's fair.  Let's be more specific.

4           In this case, it's your understanding that there was

5     no advance notice that was acted on while the audit itself was

6     still open, correct?

7     A.  I don't have knowledge of those specific details.

8     Q.  You don't have knowledge about anything with respect to

9     advance notice in this case?

10          MS. KRAMER:  Objection.

11          THE COURT:  You can answer.

12    A.  I have knowledge that there was advance notice, but in

13    terms of the specifics relative to specific audits, I don't

14    have that knowledge.

15    Q.  What about, generally speaking, do you have any knowledge

16    as to the timing of the advance notice to KPMG generally?

17    A.  Generally, I do.

18    Q.  What's your understanding?

19    A.  My understanding is that notice was -- was given to KPMG

20    ahead of the normal process whereby PCAOB would provide notice

21    to the firm to enable the firm to pull together the audit file

22    and alert engagement team personnel so that they could prepare

23    for the inspection.

24    Q.  OK.  So what I heard you just say is that you understand

25    the notice came earlier than it ordinarily would by the PCAOB,

J2ddmid2                         Bricker - cross

1     correct?

2     A.   That's correct.

3     Q.   Do you have any further details as to how much earlier the

4     advance notice was provided in this -- that is at issue in this

5     case?

6     A.   What I'm aware of is that, you know, the list of

7     engagements that the PCAOB intended to provide notice to the

8     firm, that that list was -- was given to KPMG, and so that's

9     sort of my knowledge on this.

10    Q.   OK.   To me that's the same answer you gave to my prior

11    question.

12              MS. KRAMER:   Objection.

13              THE COURT:   Sustained.

14              MR. BOXER:   My apologies.   I will ask it hopefully a

15    little clearer.

16    Q.   Other than your knowledge that notice was given to KPMG

17    sooner than ordinarily given by the PCAOB, do you have any

18    additional knowledge as to the timing of that notice?   Yes or

19    no?

20    A.   I don't believe so.   No.

21    Q.   OK.   So I'm going to ask you some hypothetical questions,

22    the way the prosecutor did, about notice, and I'd like you to

23    assume for these questions that the notice was given after the

24    audit opinion was issued but before the documentation period

25    concluded.   OK?

J2ddmid2                          Bricker - cross

1   A.  OK.

2   Q.  And my first question is what PCAOB guidance specifically

3   applies during that documentation period?  I think you

4   mentioned this but I am asking it again.  What is the guidance

5   that applies during that period?

6   A.  The guidance that applies to that period is the PCAOB's

7   audit standard on documentation, which includes definitions for

8   documentation -- or support for an audit opinion when it is

9   issued, and then the housekeeping or the documentation period

10  after the audit has been issued, that's the housekeeping period

11  that I had testified to.

12  Q.  OK.  And I'd like to show you and counsel, not the jury,

13  what we've marked as Exhibit M-176, please.

14          MR. BOXER:  And if, Mr. O'Connor, you could just

15  generally page through M-176.

16  Q.  Do you recognize that exhibit?

17  A.  I do, as Auditing Standard Number 3.

18          MR. BOXER:  We offer it, your Honor.

19          THE COURT:  M-176.  Any objection?

20          MS. KRAMER:  No objection, your Honor.

21          THE COURT:  M-176 is received.

22          (Defendant's Exhibit M-176 received in evidence)

23  BY MR. BOXER:

24  Q.  I would like to first direct your attention to the second

25  page, number 2, and ask you to read the last sentence, please,

J2ddmid2                          Bricker - cross

1    to the jury, starting with, "Among other things."

2    A.   "Among other things, audit documentation includes records

3    of the planning and the performance of the work, the procedures

4    performed, evidence obtained, and conclusions reached by the

5    auditor."

6    Q.   And the last sentence, please.

7    A.   "Audit document may" -- I'm sorry.  It just went off the

8    screen.

9    Q.   It did.

10            (Pause)

11            It is back.  Thank you.

12   A.   Now we are back.

13            "Audit documentation also may be referred to as work

14   papers or working papers."

15   Q.   You agree with me that there is no reference to

16   housekeeping items in paragraph 2 of AS3, correct?

17   A.   That's correct.

18   Q.   And then if we could turn to paragraph 15 in AS3, and I

19   would ask you if you could, for the jury, read the entirety of

20   paragraph 15?

21   A.   Sure.

22   Q.   Thank you.

23   A.   Paragraph 15.  "Prior to the report release date, the

24   auditor must have completed all necessary auditing procedures

25   and obtained sufficient evidence to support the representations

J2ddmid2                     Bricker - cross

1   in the auditor's report.  A complete and final set of audit

2   documentation should be assembled for retention as of a date

3   not more than 45 days after the report release date

4   (documentation completion date).  If a report is not issued in

5   connection with an engagement, then the documentation

6   completion date should not be more than 45 days from the date

7   that fieldwork was substantially completed.  If the auditor was

8   unable to complete the engagement, then the documentation

9   completion date should not be more than 45 days from the date

10  the engagement ceased."

11  Q.  Assuming that the notice was given within the documentation

12  period, which was earlier than ordinary, and AS3 was fully

13  complied by KPMG, isn't it true that the audit would accurately

14  reflect the quality and work that was done on that audit?

15  A.  I'm sorry.  Could you repeat that question?

16  Q.  If the engagement that came from KPMG had fully complied

17  with AS3, including this paragraph 15, the workpapers would

18  accurately reflect what was done and the quality of the audit,

19  correct?

20  A.  If the firm fully complied with this portion, then I would

21  say they've complied with the documentation standard.

22  Q.  And if they had fully complied with the documentation

23  standard, then the audit work papers would accurately reflect

24  the quality, or lack of quality, of the audit, right?

25  A.  I think that's right.

J2ddmid2                              Bricker - cross

1    Q.  And as you mentioned yesterday, one of the goals of the SEC

2    is to protect shareholders, correct?

3    A.  That's correct.

4    Q.  And so shareholders are protected when audits conducted, an

5    audit opinion is issued by accounting firms, accurately and

6    fairly reflect the work that was done, isn't that right?

7              MS. KRAMER:  Objection.  Vague.

8              THE COURT:  Do you understand the question?

9              THE WITNESS:  I think so.

10             THE COURT:  You can answer if you understand.

11   A.  OK.

12   Q.  It is a yes or no question.

13   A.  I guess -- what I would understand requires a little bit

14   more context, that the audit is a source of investor protection

15   that we do in fact rely on, but it's not -- it's not limited to

16   audits.

17   Q.  I understand.  But the audit aspect of investor protection

18   is well served and served -- leave out the "well" -- if the

19   accounting firm does its audit, issues its opinion, and

20   complies with AS3, correct?

21   A.  It is served by that compliance, absolutely.

22   Q.  OK.  Now, are you aware that one of the audits at KPMG

23   that -- when advance notice was received, actually additional

24   audit work was done during the documentation period?  Are you

25   aware of that fact?

J2ddmid2                          Bricker - cross

1    A.  I have a general understanding of that but not the

2    specifics.

3    Q.  OK.  The public company's name is AMBAC.  Were you aware of

4    that?

5    A.  I was aware of that name.

6    Q.  And what is your general understanding of what happened on

7    the AMBAC audit?

8    A.  So the general understanding is that AMBAC had to file an

9    amendment to one of their filings to include an updated KPMG

10   audit report as well as an updated certification by impact

11   management regarding their internal controls.

12   Q.  And there's an exception to AS3 if the auditor, during the

13   documentation period, learns of audit procedures that weren't

14   done -- weren't performed but need to be done, correct?

15   A.  There is an exception for subsequent discovery of fact by

16   the auditor.

17   Q.  And that's reflected in a standard called AU390, right?

18   A.  I believe that's right.

19   Q.  And in this AMBAC audit, the additional work that was done,

20   as you said, led to the company publishing additional

21   information about its financial statements, correct?

22   A.  So I'm not familiar with sort of the details of how the

23   company reached the conclusion to amend its filing.  I'm just

24   aware that they did.

25   Q.  Would you agree with me that that amended filing provided

J2ddmid2                        Bricker - cross

1    more information to shareholders about the financial statements

2    and status of AMBAC?

3    A.   It provided different information regarding the internal

4    controls and the audit of the internal controls.

5    Q.   So you are familiar with the fact that the additional

6    filing related to KPMG's opinion about AMBAC's internal

7    controls, correct?

8    A.   It was an amendment of a prior filing.

9    Q.   And that amendment provided additional information to the

10   shareholders about AMBAC's internal controls, correct?

11   A.   Additional in the sense that it was an amendment of a

12   previously-issued report.

13   Q.   Correct.  So it went from a certain amount of information

14   to different and additional information provided to AMBAC

15   shareholders, right?

16   A.   That's right.

17   Q.   And didn't that further the interests of AMBAC

18   shareholders?

19   A.   Well --

20   Q.   That is a yes or no -- yes or no question.

21        Yes or no, weren't the AMBAC shareholders better

22   informed as a result of that additional filing?

23   A.   An accurate although later filing is better than not having

24   an earlier accurate filing, yes.

25   Q.   They were better informed, correct?

J2ddmid2                          Bricker - cross

1    A.  After they received accurate information, yes.

2    Q.  Just to finish the topic on AS3, once the documentation

3    period is over, what's the rule at that point?

4    A.  So after the documentation period is over, then the audit

5    file needs to be archived or locked down so that it can be

6    subject to inspection, etc.

7    Q.  And so from that point forward, no one could access the

8    audit work they papers in the audit file, correct?

9    A.  They can be accessed but changes to them are locked down.

10   Q.  Clarification, I appreciate it.

11          So they can be viewed but nobody can change them?

12   A.  That's right, yes.

13   Q.  So from that point on, when the 45-day period ends and the

14   work papers cannot be changed, from that point on nothing

15   impairs the ability of the Commission, or your office within

16   the Commission, to review those audit files, correct?

17          MS. KRAMER:  Objection.  Vague.

18          THE COURT:  You can answer if you understand.

19   A.  In the normal course, we don't look at the underlying

20   files, we count on the PCAOB to do that.

21   Q.  Have you ever looked at an underlying file?

22   A.  Not in my current role.

23   Q.  And as far as the PCAOB looking at the underlying file

24   after the 45 days, whatever they see is, whether they look on

25   the 50th day or the 100th day, it is going to look the same,

J2ddmid2                        Bricker - cross

1    correct?

2    A.   That's right.  It is supposed to look the same.

3    Q.   You were asked some questions about February 2017.  I want

4    to move you forward to January 2018, at the time the charges in

5    this case were publicly announced.

6           The Commissioner of the SEC issued a press release at

7    that time, correct?

8    A.   Chair Clayton issued a statement, yes.

9           MR. BOXER:  I would like to show for the witness and

10   counsel only what was marked as M-171?

11          MS. KRAMER:  Objection, your Honor.

12          MR. BOXER:  To him looking at it?

13          MS. KRAMER:  No.

14   Q.   Do you recognize M-171?

15   A.   I do.

16   Q.   Is that the press release that was issued by Commissioner

17   Clayton?

18   A.   Yes, it is.

19          MR. BOXER:  I offer it, your Honor.

20          MS. KRAMER:  Objection.

21          THE COURT:  What is that?

22          MR. BOXER:  I think it is a party statement.

23          MS. KRAMER:  It is not made by a party to this case,

24   your Honor.

25          MR. BOXER:  I think based on the questions and

J2ddmid2                          Bricker - cross

1    answered of the last day, it certainly has been.

2              THE COURT:  I am going to overrule the objection and

3    allow it, and M-171 is received.

4              (Defendant's Exhibit M-171 received in evidence)

5    BY MR. BOXER:

6    Q.  I want to direct your attention to Commissioner Clayton's

7    statements about reliance on audit reports by KPMG.  The third

8    paragraph, starting on the second sentence, please.

9              If you could read the rest of that paragraph, starting

10   with "Based on."

11   A.  "Based on discussions with the SEC staff, I do not believe

12   that today's actions against these six individuals will

13   adversely affect the ability of SEC registrants to continue to

14   use audit reports issued by KPMG in filings with the Commission

15   or for investors to rely upon those required reports."

16   Q.  Thank you.

17             Yesterday, and as well as today, you testified about

18   various meetings with Mr. Middendorf where the concept of ALL

19   or ALM was discussed, correct?

20   A.  That's correct.

21   Q.  OK.  That was an ongoing issue with KPMG since your tenure

22   as Chief Accountant, correct?

23   A.  That's correct.

24   Q.  An ongoing topic of discussion, right?

25   A.  That's correct.

J2ddmid2                           Bricker - cross

1   Q.  They essentially, from the start of your tenure when you

2   reached out to Mr. Middendorf and he asked for a meeting, you

3   had been discussing that concept with him and others at KPMG,

4   right?

5   A.  Yes.  There were other topics but it included it.

6   Q.  There are a few I want to review with you, but my question

7   is that issue of how KPMG was auditing the allowance -- I think

8   is the appropriate audit speak for that --

9   A.  Yes.

10  Q.  -- how KPMG was auditing the allowance, that was a

11  continual issue that had your attention since you became Chief

12  Accountant, correct?

13  A.  That's correct.

14  Q.  Is it still an open issue as you sit here today?

15  A.  The auditing is an ongoing discussion.  PCAOB has a more

16  general item on its agenda for auditing accounting estimates

17  which is inclusive of the allowance.

18  Q.  You're -- I think you referred to some staff bulletins

19  yesterday, but SAB 102, Staff Accounting Bulletin 102, that is

20  the one that I understand governs this allowance issue, is that

21  right?

22  A.  That is one of the sources of guidance.  There is a

23  Commission interim release as well which is referenced in that

24  FR 28.  So those are the two principal documents.

25  Q.  And those two authorities were discussed with

J2ddmid2                              Bricker - cross

1   Mr. Middendorf and his colleagues at these various meetings you

2   testified about?

3   A.   That's correct.

4   Q.   And they are still under discussion with KPMG regarding how

5   they are auditing the allowance when you meet with them?

6   A.   Not to my knowledge, no.

7   Q.   Did there come a time where you resolved the issue as to

8   how KPMG was auditing the allowance?

9   A.   So as I --

10  Q.   That is just a yes or no.  Did your office become aware

11  that that issue was resolved with KPMG?

12  A.   I became satisfied that SAB 102 didn't require amendment

13  nor did the Commission's guidance require amendment.

14  Q.   I think I wasn't clear in my question so let me try again.

15          The discussions with KPMG about how it was auditing

16  the allowance, those have been ongoing, correct?

17  A.   Those have not continued.

18  Q.   When was the last discussion you had about how KPMG was

19  auditing the allowance with KPMG, if you recall?

20  A.   I don't recall specifically.  It was probably in 2017.

21  Q.   OK.  And so do you recall when in 2017?

22  A.   I don't recall specifically.

23  Q.   So as of 2016 --

24  A.   Yes.

25  Q.   -- when the advance notice, I'll call it, was provided to

J2ddmid2                         Bricker - cross

1   KPMG, you were engaged in discussions with Mr. Middendorf and

2   his colleagues about the -- about how KPMG was auditing the

3   allowance, correct?

4   A.   That's correct.

5   Q.   And there was nothing about that advance notice in 2016

6   that impaired or prevented you or your staff from discussing

7   how KPMG audited the allowance in 2016, correct?

8   A.   Those were sort of two separate issues.  We were talking

9   about the design of their methodology --

10  Q.   And that's exactly my question.  There is nothing about the

11  advance notice that impaired your ability to speak with KPMG

12  about the design of how it was auditing the allowance, correct?

13  It is a yes or no question.

14  A.   I just --

15  Q.   Do you want it back?

16  A.   Those were sort of two separate issues.

17  Q.   I understand.  You are saying it is like apples and

18  oranges.

19  A.   That's right.

20  Q.   OK.  And so I'm just, as a result of that, asking you,

21  isn't it true that the discussions with KPMG about the

22  allowance at the Commission were not impaired or impeded by

23  anything having to do with advance notice of the inspections,

24  correct?

25  A.   Well, our discussion with KPMG included the inspection

J2ddmid2                          Bricker - cross

1   results --

2   Q.   That wasn't my question.

3   A.   Right.

4   Q.   My question is simply about KPMG's methodology to audit the

5   allowance.  My question is, those discussions about KPMG's

6   methodology to audit the allowance were not impaired or impeded

7   in any way by any advance notice of PCAOB inspections, correct?

8   A.   That's correct, yes.

9   Q.   Sorry if I wasn't clear leading up to that.

10  A.   Maybe I wasn't clear.

11  Q.   One little question about these ALL topics.  Do you recall

12  the issue of community banks that were clients of KPMG coming

13  up in any of these meetings?

14  A.   I do recall that --

15  Q.   Please.  Go ahead.

16  A.   I do recall that part of the discussion with Dave and

17  others was that KPMG had, you know, a significant number -- to

18  them, a significant number of community bank clients within

19  their portfolio.

20  Q.   And the issue that Dave and others shared with you about

21  the community banks was included that some of those banks were

22  much smaller than --

23            MS. KRAMER:  Objection.  Hearsay.

24            MR. BOXER:  I'm not offering it for the truth, your

25  Honor.

J2ddmid2                          Bricker - cross

1              THE COURT:  Overruled.

2              MR. BOXER:  Let me try to rephrase it anyway and maybe

3     I can avoid the objection.

4              MS. KRAMER:  Your Honor, may we have a proffer as to

5     what it is being offered for, then?

6              MR. BOXER:  For the witness' state of mind, his

7     understanding as to how KPMG was auditing the allowance.

8              THE COURT:  You said you are going to rephrase?

9              MR. BOXER:  I will.

10    BY MR. BOXER:

11    Q.  Does the -- in your experience in reviewing audits, does

12    the sophistication and depth of the management team at the bank

13    have an impact on the audit of internal controls?

14    A.  Internal controls is designed to be proportionate to the

15    bank's systems and management sophistication.  That's sort of

16    the premise of SAB102.

17    Q.  That is how it is supposed to be, correct?

18    A.  That's correct.

19    Q.  And that same proportionality is supposed to exist for

20    procedures for setting the allowance as well at -- full stop --

21    procedures for setting the allowance, it also applies, correct?

22    A.  The requirement to have a well-supported and consistently

23    determined doesn't vary according to size, but the nature of

24    the bank's information systems and the analysis that a bank

25    might do will vary.  It will vary according to the nature of

J2ddmid2                          Bricker - cross

1   loans that they have, the nature of their information systems,

2   and the nature of management skill in doing that analysis.

3   Q.  And one of the topics that was raised at these meetings

4   with Dave and his colleagues was the fact that the PCAOB was

5   not acknowledging the proportionality and the different level

6   of --

7                MS. KRAMER:  Objection.  Hearsay.

8   Q.  -- procedures and infrastructure that you just described?

9   That was discussed at the meetings that you testified about

10  yesterday, correct?

11               MS. KRAMER:  Objection.  Hearsay.

12               THE COURT:  Overruled.

13  A.  It was, yes.

14  Q.  I think you mentioned yesterday 4004 reports, correct?

15  A.  That is correct.

16  Q.  And maybe, just to remind the jury, just a short definition

17  of what a 4004 report is?

18  A.  So the PCAOB is required to identify, report, and then

19  investigate as part of their statutory requirements.  The form

20  of the report can be in a variety of --

21  Q.  I'm just asking about 4004.

22  A.  So 4004 reports is a particular form of a report that the

23  PCAOB has developed to meet its statutory requirement.

24               MR. BOXER:  And I'd ask if we can show the witness and

25  counsel and your Honor Exhibit M-207.

J2ddmid2                          Bricker - cross

1   Q.  And do you recognize M-207, Mr. Bricker?

2   A.  I recognize it generally as a 4004 report but --

3   Q.  I appreciate you're telling us you are not familiar -- you

4   don't recognize the specific contents of this report, correct?

5   A.  That's correct.

6           MR. BOXER:  We offer it, your Honor.

7           MS. KRAMER:  No objection, your Honor.

8           THE COURT:  M-207 is received.

9           MR. BOXER:  Thank you, your Honor.

10          (Defendant's Exhibit M-207 received in evidence)

11  BY MR. BOXER:

12  Q.  If we can focus on Footnote 1.  It is on the first page.

13          And I ask you to read that, please.

14  A.  Footnote 1:  "In the interest of timeliness, this

15  information is being reported to the Commission before the firm

16  has had an opportunity to respond to a draft report on the

17  inspection.  In the event that the firm's response to the draft

18  inspection report provides information bearing on the accuracy

19  or completeness of the information presented here, this report

20  will be supplemented, and if necessary corrected."

21  Q.  So the PCAOB does not have to wait until it issues its

22  inspection report before it could send over a form 4004 to your

23  office, correct?

24  A.  That's correct.

25  Q.  And you testified quite a bit yesterday about the 2016 KPMG

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2ddmid2                         Bricker - cross

1    inspection and some issuers that had to be replaced as part of

2    that inspection, and you talked about the timing of the report.

3    None of that timing would have prevented the PCAOB from sending

4    over a 4004 report if it had seen something in the inspection

5    that it thought should be sent to your office, correct?

6    A.   That's correct.

7    Q.   I want to just finish up with some of those meetings you

8    described for me yesterday, and I would like to show you what's

9    marked as Government Exhibit 818, not yet in evidence.

10              And do you recognize that exhibit, 818?

11   A.   As an email of which I am included.

12              MR. BOXER:   I offer it, your Honor.

13              MS. KRAMER:   Could we just see the whole thing?   I

14   just don't have it handy.

15              MR. BOXER:   Sure.   Mr. O'Connor, is it one page -- it

16   is two pages, actually.

17              MS. KRAMER:   Thank you.   No objection.

18              THE COURT:   Government's 818 is received in evidence.

19              (Government's Exhibit 818 received in evidence)

20   BY MR. BOXER:

21   Q.   It is an email inviting -- if we can show it to the jury --

22   an email inviting Mr. Middendorf and others from KPMG to a

23   meeting at your office, correct?

24   A.   That's correct.

25   Q.   And it says, "KPMG allowance meeting," correct?

J2ddmid2                              Bricker - cross

1   A.   That's correct.

2   Q.   This is one of the several meetings you're having with

3   Mr. Middendorf and others about the allowance, right?

4   A.   That's correct.

5   Q.   Did you come to learn anything about Mr. Middendorf's

6   experience as an auditor since you've gotten to know him?

7           MS. KRAMER:  Objection.  Relevance.

8           THE COURT:  No.  Overruled.

9           MR. BOXER:  I just need a moment to show the

10  relevance, your Honor.

11  Q.   Do you want me to repeat the question?

12  A.   So I have a general understanding of Dave's background as

13  being, I believe, in the retail space.

14  Q.   OK.  He was -- that answers my question.

15          Now, if you look at the other people invited to the

16  meeting, do you recall who George Hermann is?

17  A.   Yes.  As I recall, at the time George Hermann was KPMG's

18  chief auditor.

19  Q.   And the name below his is Tom Canfarotta.  Do you recall

20  who he is?

21  A.   At the time I believe Tom Canfarotta was in KPMG's national

22  office.

23  Q.   And Mr. Britt, David Britt, do you recall who he is?

24  A.   Similar thing.  As I recall, I think David was in the

25  national office, but he might have been in the national banking

J2ddmid2                              Bricker - cross

1    practice.  I don't recall specifically.

2    Q.  Is it fair to say that Mr. Canfarotta and Mr. Britt were

3    the banking auditor senior officials who were brought to the

4    meeting, at that meeting?

5    A.  Yes, they had a background in banking.

6    Q.  Mr. Middendorf did not have a background in banking,

7    correct?

8    A.  That's --

9    Q.  That was your understanding?

10   A.  Yes, that was my understanding.

11          MR. BOXER:  If we can now turn to Government Exhibit

12   309, which is also not yet in evidence.

13   Q.  It's a two-page document.  Just as the last time,

14   Mr. Bricker, do you recognize it?

15   A.  I do.

16   Q.  And you recognize it as what?

17   A.  First as an email that I'm included on and then an attached

18   agenda.

19          MR. BOXER:  I offer it, your Honor.

20          MS. KRAMER:  No objection.

21          THE COURT:  Government's 309 is received.

22          (Government's Exhibit 309 received in evidence)

23          MS. KRAMER:  Your Honor, could we give these defense

24   exhibit numbers when they are offered by the defense so there

25   is not confusion later?

J2ddmid2                          Bricker - cross

1          MR. BOXER:  Sure.  I thought I announced them but I
2     will make sure.
3          MS. KRAMER:  No, I think --
4          MR. BOXER:  You mean to put a defense exhibit number
5     on it?  Absolutely.
6          THE COURT:  Do you know what the next number would be
7     or the next letter?
8          MR. BOXER:  I don't but somebody else does.
9          MR. WEDDLE:  Your Honor, on the exhibit numbering
10     issue, might I be heard on that at some break?
11          THE COURT:  Yes.
12          MS. KRAMER:  It is just a housekeeping issue since it
13     has a government exhibit sticker but it is being offered by the
14     defense, but we can deal with it later.
15          THE COURT:  OK.
16          MR. BOXER:  Fair point.
17     BY MR. BOXER:
18     Q.  So looking at Government Exhibit 309, this reflects another
19     meeting with KPMG, correct?
20     A.  That's correct.
21     Q.  And if you look at the second page, that is the agenda, the
22     meeting is to take place on March 1, 2016, right?
23     A.  That's correct.
24     Q.  And, again, the first bullet point, "Audit challenges
25     regarding the ALL" is the first topic, right?

J2ddmid2                          Bricker - cross

1   A.   That's correct.

2   Q.   The fourth bullet point, what does that say?

3   A.   "Large versus small company compliance with SOX rules,"

4   referring to the Sarbanes-Oxley Act.

5   Q.   Was that the topic of discussion at that meeting, similar

6   to my questions before about community banks versus large

7   banks?

8   A.   I don't recall specifically but I wouldn't be surprised if

9   that was the issue.

10   Q.   You testified yesterday, I think it also came up today,

11   that in these discussions with KPMG, you gave us a few possible

12   scenarios that could apply, right?

13   A.   That's correct.

14   Q.   Say yes?

15   A.   Yes.

16   Q.   Yes or no.  One was you could propose or recommend to the

17   Commission a change in the rules, right?

18   A.   That is correct.

19   Q.   And you did not come to that conclusion, right?

20   A.   I did not come to that conclusion.

21   Q.   You could issue staff guidance about -- additional staff

22   guidance, I should say, about preparation of the allowance, and

23   you came to the conclusion that you didn't need to do that,

24   right?

25   A.   That is correct.

J2ddmid2                         Bricker - cross

1   Q.  And then on the topic -- well, I think before we get to

2   KPMG, I think you testified you ruled out the possibility that

3   the PCAOB's inspection process was designed differently for

4   KPMG than for everybody else, that is correct?

5   A.  That is correct.

6   Q.  So you are left with KPMG's audit methodology as the only

7   option, right?

8   A.  That's how I thought about it.

9   Q.  Understood.  And you said yesterday you weren't able to

10  rule out, or you didn't reach a definitive conclusion, about

11  KPMG's audit methodology, correct?

12  A.  That is correct.

13  Q.  So it was unresolved, for example, at this point in March

14  of 2016, correct?

15  A.  Unresolved --

16  Q.  From your perspective?

17  A.  From my perspective, yes.

18  Q.  Did you ever provide any guidance to KPMG as to how to

19  specifically resolve this issue?

20  A.  We encouraged them to work with the PCAOB, and then I

21  separately spoke with the PCAOB.

22  Q.  My question was did you or your staff ever provide any

23  guidance to Mr. Middendorf or the other people on, for example,

24  at this meeting as to how they should resolve your issues or

25  their issues with the allowance?  Did you or your office ever

J2ddmid2                          Bricker - cross

1     do that?

2     A.   We did not issue any guidance.

3     Q.   And as you said, you're -- one of your main goals is

4     investor protection, correct?

5     A.   That's the Commission's mission, yes.

6     Q.   Which you work for?

7     A.   Yes.

8     Q.   And KPMG audits a lot of banks; you knew that, right?

9     A.   That's correct.

10    Q.   There are a lot of shareholders of those banks, correct?

11    A.   That's correct.

12    Q.   Some of them are very big banks, corrects?

13    A.   That's correct.

14    Q.   And so throughout this time where KPMG is discussing with

15    you this audit allowance and these challenges, you at no time

16    go back to them -- you, your office, the Chief Accountant --

17    with any specific guidance or instruction as to how they should

18    perform that auditing function, correct?

19    A.   That's correct.

20    Q.   If we could put up Government Exhibit 1.

21         This is one of the inspection reports we reviewed

22    yesterday, correct?

23    A.   That's correct.

24    Q.   I just wanted to go over the dates a little bit.

25         It says "2014 Inspection of KPMG" on the cover, right?

J2ddmid2                          Bricker - cross

1    A.   That's correct.

2    Q.   These questions, my understanding, would apply to any

3    inspection report the jury were to examine as far as the dates,

4    correct?  It hasn't changed, the way that is formated, right?

5    A.   This convention has been consistent, yes.

6    Q.   Convention was the word I was looking for.  Thank you.

7             So "2014 inspection," that means that the PCAOB was in

8    the field inspecting in 2014, correct?

9    A.   That's correct.

10   Q.   And what they were inspecting was the -- generally

11   inspecting was the prior year's, the 2013 activities and

12   entries and debits and credits and things accountants do for

13   the company, correct?

14   A.   That's roughly right.  So, it's 2013 audits, which many of

15   which would have been completed and the audit reports issued in

16   2014, and then the inspection process really kicks in in 2014.

17   So giving allowance for some things in 2013, some things in

18   2014, that's correct.

19   Q.   So for a company that has a year-end fiscal year, 2014

20   inspection is auditing -- is inspecting the activity of the

21   company in the calendar year 2013?

22   A.   That is correct.

23   Q.   And then in this particular instance, the report is issued

24   in October of 2015, correct?

25   A.   That is correct.

J2ddmid2                              Bricker - cross

1    Q.  So the report itself is issued largely two years after the

2    accounting activity that's the subject of the report, is that

3    correct?

4    A.  Well, again, the financial statements for that

5    calendar-year company would be issued in 2014, the early part

6    of 2014.  It would include disclosures that are current as of I

7    think our example yesterday was February 28th.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid3                          Bricker - cross

1  BY MR. BOXER:

2  Q.  That's fine.

3          So, it's a year and eight, nine months after the

4  financial statements are issued, correct?

5  A.  That's correct.

6  Q.  But it is also two years after the underlying sales, costs

7  of goods sold, loans, whatever other financial activity at the

8  company took place?

9  A.  That is correct.  Yes.

10  Q.  If we could turn to page 161?  We talked a little bit

11  yesterday about Part II and the tone at the top, and what

12  appears in Government Exhibit 1 is a tone at the top criticism

13  of KPMG from 2013; is that right?

14          MS. KRAMER:  Objection.  Misstates the testimony.

15          MR. BOXER:  Let me try again.

16          THE COURT:  If you can clarify it.

17  BY MR. BOXER:

18  Q.  What we are looking at now, Part II, that included a

19  criticism of the tone at the top at KPMG, correct?

20  A.  That's correct.

21  Q.  And that criticism related to audits that occurred in 2013,

22  correct?

23  A.  So, it would have related to the firm's tone at the top for

24  the period covered by the inspection.  The inspection -- the

25  audits inspected would have been 2013, but the inspection would

J2D5mid3                          Bricker - cross

1    have included the firm's programs much more generally where

2    there is not such a discrete cutoff.

3    Q.  Okay.

4    A.  So.

5    Q.  Fair enough.

6              The tone at the top of Government Exhibit 1 concerned

7    the inspections completed in 2013, correct?

8    A.  The inspections completed in 2014, correct.

9              THE COURT:  You said 2014, he said 2013.

10             MR. BOXER:  I did.

11             THE WITNESS:  So, no.  This was the inspection report

12   relating to the 2014 inspections.

13             MR. BOXER:  I'm sorry.  I made it more confusing.

14             THE WITNESS:  Okay.

15             MR. BOXER:  Let me try again.

16             THE WITNESS:  Perhaps I have as well.

17   BY MR. BOXER:

18   Q.  That was the point of walking through the dates initially.

19             The audits that were covered by this tone at the top

20   Part II criticism were 2013 audits?

21   A.  That's correct.

22   Q.  Mr. Middendorf became head of the national office in 2014;

23   isn't that right?

24   A.  I don't recall specifically, but.

25   Q.  Do you recall that it was sometime in 2014?

J2D5mid3                         Bricker - cross

```
 1   A.  I met David Middendorf in 2015 so it may have been 2014.  I
 2   don't have a specific knowledge of that.
 3   Q.  Okay.
 4           Other Big Four firms have appeared in Part II and have
 5   received tone at the top criticism other than KPMG in, let's
 6   say, the last five years, right?
 7           MS. KRAMER:  Objection.  Relevance.
 8           THE COURT:  Overruled.
 9           THE WITNESS:  That's correct.
10   BY MR. BOXER:
11   Q.  It is not just KPMG receiving this type of criticism,
12   correct?
13   A.  I think there have been others, yes.
14   Q.  I would now like to turn to a document not in evidence
15   marked Middendorf 246.  What is M-246?
16   A.  M-246 is a strategy document for the accounting group
17   within OCA.
18   Q.  And that's the group that you used to be the deputy in
19   charge of that group, correct?
20   A.  That's correct.
21   Q.  And it's dated summer of 2016?
22   A.  That's correct.
23   Q.  And what does that strategy document generally purport to
24   do?  Without reading from it since it is not in evidence, just
25   a very short description of it.
```

J2D5mid3                         Bricker - cross

1   A.   Sure.  A very short description is it provided guidance for

2   members of the accounting group.

3              MR. BOXER:  We offer it, your Honor.

4              MS. KRAMER:  No objection.

5              THE COURT:  M-246 is received.

6              (Defendant's Exhibit M-246 received in evidence)

7   BY MR. BOXER:

8   Q.   I want to direct your attention to page 4 where it lists

9   the responsibilities of the group.  And, by the way, before we

10  get there, did you oversee and review this strategy document

11  before it was officially released to the group?

12  A.   I believe I did.  Yes.

13  Q.   Makes sense, doesn't it?

14  A.   Yes.

15  Q.   So, looking at responsibility no. 3, can you read that for

16  us?

17  A.   Responsibility no. 3:  Assist in relevant aspects of

18  Commission enforcement actions.

19  Q.   Now I would like to direct your attention to the following

20  year, Exhibit M-206, and do you recognize M-206?

21  A.   I do.

22  Q.   What is M-206?

23  A.   It is a strategy-in-process document for the accounting

24  group.

25  Q.   It is the same document we just looked at but effective

J2D5mid3                          Bricker - cross

1   spring 2017, correct?

2   A.   I think there were additional updates but, yeah, it was the

3   same starting point for the document.

4   Q.   That was a poor question.

5        It is a similar document for the same purpose issued

6   in spring 2017 by the accounting group, correct?

7   A.   That's correct.

8              MR. BOXER:   We offer it, your Honor.

9              THE COURT:   M-206 is received.

10             (Defendant's Exhibit M-206 received in evidence)

11   BY MR. BOXER:

12   Q.   If I can direct your attention to responsibility no. 3 and

13   ask you to read it?

14   A.   Responsibility no. 3:   Responsible for recommending the

15   institution of administrative and disciplinary proceedings

16   relating to the disqualification of accountants to practice

17   before the Commission and supervises the procedures to be

18   followed in the Commission's enforcement activities involving

19   accounting and auditing issues.

20   Q.   So, you added quite a bit of language to responsibility 3

21   between 2016 and 2017, correct?

22   A.   There is a lot of additional language.   This is tracking, I

23   believe, the language for the chief accountant.

24   Q.   And that's additional language that was added in the spring

25   after you received the phone call from Mr. Holmes that the

J2D5mid3                          Bricker - cross

1    government lawyer asked you about earlier today, correct?

2    A.   The timeline may line up with that.

3    Q.   That's simply my question.

4         You received a call from Mr. Holmes in February 2017,

5    correct?

6    A.   That's correct.

7    Q.   And this added language appears in the Spring of 2017,

8    correct?

9    A.   That's correct.

10   Q.   And you would agree with me that February is not spring?

11   A.   That's correct.

12   Q.   If we could put on the screen Government Exhibit 356, which

13   I think is in evidence?

14        That's the statute that permits what I think you

15   called remedial actions yesterday.  Am I correct about that or

16   am I --

17   A.   I don't recall.

18   Q.   I may have the wrong exhibit.

19   A.   I don't recall remedial actions.

20   Q.   What is Government Exhibit 356?

21   A.   It's an excerpt of the United States Code as annotated,

22   specifically for inspections of registered public accounting

23   firms.

24   Q.   You can take that one down, Ms. O'Connor.

25        You mentioned earlier today, I think I got a little

J2D5mid3                         Bricker - cross

1   confused on the citation, but you mentioned something today

2   about an SEC proceeding against, you said, defendants.

3   Correct?

4   A.  I forget what I said, but yes.

5   Q.  What does Section 1-02(e) in SEC words mean?

6   A.  Sure.

7           Rule 1-02(e) addresses, generally speaking, of the

8   disqualification of accountants, to appear or practice before

9   the Commission.

10  Q.  And those are proceedings that the Commission brings for

11  ethical violations among other things, correct?

12  A.  Among other things.

13  Q.  And the Commission has brought such a proceeding against

14  Mr. Middendorf, correct?

15  A.  I believe so.

16  Q.  And no matter what happens in this case, the Commission's

17  proceeding against Mr. Middendorf will go forward, correct?

18  A.  It may.  I'm not part of that case, but.

19  Q.  And the result of a 1-02(e) proceeding is that

20  Mr. Middendorf could be prevented from practicing as an

21  accountant before the Commission, correct?

22  A.  That's correct.

23  Q.  I would like to next turn to a couple more of the, just

24  briefly the 4004 report starting with M-208 and M -- well, we

25  will do them one at a time.

J2D5mid3                          Bricker - cross

1          M-208; is that a PCAOB Rule 4004 report?

2   A.  It is.

3          MR. BOXER:  I offer it, your Honor.

4          THE COURT:  Any objection?

5          MS. KRAMER:  I don't think so, your Honor.  Let me

6   just make sure of the whole document.

7          No objection.

8          THE COURT:  M-208 is received.

9          (Defendant's Exhibit M-208 received in evidence)

10  BY MR. BOXER:

11  Q.  Just focusing you for a moment, Mr. Bricker, on the first

12  paragraph, the report indicates that it is being sent as a

13  result of a KPMG inspection, correct?

14         Withdrawn.  Let me ask a better question.

15         The information that is the basis for this, for M-208,

16  the PCAOB is informing the Commission it received that

17  information during an inspection of KPMG's audit?

18  A.  That's correct.

19  Q.  And the information that's being passed along to the PCAOB

20  is not about KPMG, correct?

21  A.  I believe that's right but I --

22  Q.  It is about the issuer who is referenced as a broker-dealer

23  located in New York, New York, correct?

24  A.  Yes.  Broker-dealers are an additional class to issuers so

25  it's issuers and broker-dealers, but that's correct.

J2D5mid3                          Bricker - cross

1    Q.  Thank you.

2           My point is that this 4004 report and the prior 4004

3    report were examples of the PCAOB sending information to the

4    Commission, to your office, about companies and potential

5    accounting malfeasance by those companies, correct?

6    A.  About potential noncompliance and, so yes, generally, this

7    communicates information about compliance with SEC rules.

8    Q.  And if we look at M-209, is that also a 4004 report?  It is

9    longer.  I don't mean to rush you so take your time in looking

10   at it.

11   A.  Yes.  It seems to be a 4004 report.

12           MR. BOXER:  I offer it, your Honor.

13           MS. KRAMER:  No objection.

14           THE COURT:  What number was that?

15           MR. BOXER:  209.

16           THE COURT:  M-209 received.

17           MR. BOXER:  Thank you.

18           (Defendant's Exhibit M-209 received in evidence)

19   BY MR. BOXER:

20   Q.  This 4004 report is different than the two others we looked

21   at, correct?  As far as the topic?

22   A.  As far as the topic, yes.

23   Q.  And it addresses a topic that is generally referred to as

24   auditor independence.  Is that fair to say?

25   A.  I think I saw that information on the next page.

```
 1   Q.   Yes.  If we look at the second page under A --
 2   A.   That's correct.  Rule 2-01(c) deals with auditor
 3   independence.
 4   Q.   Can you explain to the jury what auditor independence is?
 5   A.   Auditor independence is the framework for evaluating
 6   whether the auditor is independent of the company and its
 7   management, its directors, and so forth.  So, it's the
 8   safeguard so that the auditor really is an objective and
 9   impartial check on what management is doing.
10   Q.   And so, to give my simple example, tell me if I have this
11   right.  An example of auditor independence would be if KPMG
12   audited JP Morgan, which I understand it doesn't so it is an
13   example, and Mr. Middendorf had a mortgage from JP Morgan, he
14   was the auditor.  Does that create an issue of auditor
15   independence?  It may be a very simple one but is that the
16   idea?
17   A.   Maybe, but there is a specific exception for home mortgage
18   so let's say it is a personal loan and then, yes, that would
19   create the issue.
20   Q.   Okay.
21   A.   Home mortgages are dealt with differently.
22   Q.   Understood.
23        So, the 4004 reports that come from the PCAOB --
24   withdrawn.
25        The 4004 reports, the PCAOB learns about that
```

J2D5mid3                          Bricker - cross

1    information during their inspections of the auditing firms like

2    KPMG, correct?

3    A.  That's correct.

4    Q.  And then what it learns in those reports it sends over to

5    your office, correct?

6    A.  As part of its reporting, yes.

7    Q.  And the content of those reports either concern accounting

8    treatment by one of the companies that's being audited or

9    auditor independence, correct?

10   A.  As examples.

11   Q.  The 4004 reports do not cover the quality or the procedures

12   in the audit itself performed by the accounting firm.  That's

13   not what they're for, correct?

14   A.  I think that's generally right.  Yes.

15   Q.  If we can now turn to Government Exhibit 311 which is not

16   in evidence and we will put a defense sticker on it.  It's an

17   e-mail with an attachment and my question, as with all of

18   these, is if you recognize it.

19   A.  I do recognize the e-mail as being an e-mail that I am

20   included on.  I am just looking at the --

21   Q.  Yes.  Please, take your time.  It is a little longer than

22   some of the other ones I have shown you.

23   A.  The attached presentation I am sure I saw at the time but

24   it doesn't trigger an immediate recollection, but.

25   Q.  Okay.

J2D5mid3                          Bricker - cross

1    A.   This generally would be the type of presentation that the

2    Division of Corporation Finance would use in the inspectors',

3    the PCAOB inspectors' training.

4    Q.   And there is an e-mail in the middle that is directed to

5    you and Brian Croteau, correct --

6    A.   That's correct.

7    Q.   -- about the planned training that is reflected in the

8    slide deck, correct?

9    A.   That's correct.  Yes.

10             MR. BOXER:  I offer it, your Honor.

11             MS. KRAMER:  No objection.

12             THE COURT:  Government Exhibit 311 is received.

13             (Government's Exhibit 311 received in evidence)

14   BY MR. BOXER:

15   Q.   If we can start the e-mail from Nili Shah to you and

16   Mr. Croteau and the first paragraph, as you know, that's the

17   training you were just referencing, correct?

18   A.   That's correct.

19   Q.   And this is training of the PCAOB inspectors, right?

20   A.   That's correct.  This is training that the PCAOB puts on

21   for its inspectors and then they invite us to participate.

22   Q.   And it says that the Division of Corporate Finance will

23   have three staff speaking, right?

24   A.   That's correct.

25   Q.   And, still working through the final talking points,

J2D5mid3                         Bricker - cross

1    correct?

2    A.  That's correct.

3    Q.  And on the bottom, very bottom of the e-mail, it says, Let

4    us know if you have any questions or concerns; correct?

5    A.  That's correct.

6    Q.  So, this is what the Division of Corporate Finance is going

7    to be speaking to the PCAOB inspectors about, right?

8    A.  That's correct.

9    Q.  Then, if you turn to the cover page of the slide deck, that

10   is memorializing what we were just discussing, right?  That's

11   the topic?  Correct?

12   A.  That's correct.

13   Q.  And then if we start with page 7 of the slide presentation

14   it addresses the PCAOB/SEC interactions, correct?

15   A.  That's correct.

16        MR. BOXER:  If I may have a moment?

17        (Counsel conferring)

18   BY MR. BOXER:

19   Q.  At the conclusion of the slide deck we go to what is marked

20   on the bottom as 29971, Bates Number.  There are talking points

21   including slide 7 I was just mentioning, correct?

22   A.  It certainly seems to be.

23   Q.  I am going to ask you to read a few of those talking

24   points; and these are things that people from the division of

25   corporate finance will be saying to train the PCAOB inspectors,

J2D5mid3                    Bricker - cross

1   correct?

2   A.  Certainly seems to be.  I don't remember seeing this

3   document, but.

4   Q.  But that's your understanding of what this is?

5   A.  That's correct.  That's correct.

6   Q.  If you turn the page to end of the slide 7 talking points,

7   I would just ask you to read the first bullet point.

8   A.  So, this is from the perspective of Division of

9   corporation --

10  Q.  I am just asking you to read the first bullet point.

11  A.  Okay.

12          Of course, the PCAOB and SEC focus in different areas.

13  You are focused on the auditor, while we are focused on the

14  company and the disclosures they provide.

15          MR. BOXER:  Your Honor, I think there is someone on

16  the lawyer team who could use a short break.

17          THE COURT:  Why don't we take a quick 10-minute

18  bathroom break and we will go until 1:00 when we will break for

19  lunch.  All right?

20          Folks, please leave your note pads on your chairs and

21  go back to the jury room, we will come back in 10 minutes and

22  continue.

23          (Continued on next page)

24

25

J2D5mid3                          Bricker - cross

```
 1                  (Jury not present)

 2                  (recess)

 3              THE COURT:  Another juror issue.

 4              Juror no. 16 stopped Mr. Hampton -- no. 16 is

 5     Ms. King, the one who was late yesterday and, by the way, was

 6     20 minutes late today.  She said to Mr. Hampton, I have been

 7     falling asleep, I don't understand what's going on, and I'm

 8     just going to go along with what everybody else decides.

 9              Discuss.

10              (Counsel conferring)

11              MS. KRAMER:  Your Honor, she obviously has to be

12     removed.  We don't believe she should stay or that she is fit

13     to be a juror given what she said but have some concerns about

14     sending the message to the jury that if you just try hard

15     enough, show up late, whatever, that you will be off the jury.

16              So, perhaps at the end of the day -- I think we should

17     discuss the best procedure.

18              MR. COOK:  I agree with Ms. Kramer, that she should

19     not stay.

20              MR. BOXER:  So do we.

21              THE COURT:  Do you think we should wait and just

22     proceed for now, at least until lunch?

23              MS. KRAMER:  Yes.

24              THE COURT:  Why don't we go forward at least until

25     lunch and we will address how to deal with it.
```

J2D5mid3                              Bricker – cross

1              MR. BOXER:  I have about 15, 20 minutes left.

2              THE COURT:  Okay.  All right.

3              Shall we bring the witness and the jury?

4              MR. WEDDLE:  Your Honor, just because this is an

5    important point.  I noticed on the live feed we left out the

6    word "not."  So the live feed says we think should stay but I

7    think Mr. Cook's intent was to say she should not stay.

8              THE COURT:  Just to clarify for the transcript?  Got

9    it?

10             OFFICIAL REPORTER:  Thank you.  Yes.

11             THE COURT:  Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                MR. BOXER:  May I proceed, your Honor?

3                THE COURT:  You may proceed.

4                MR. BOXER:  Thank you.

5    BY MR. BOXER:

6    Q.  Mr. Bricker, just a few more brief topics of questions that

7    I have.

8                Yesterday we reviewed the summer of 2015 strategy and

9    process document and I would like to show you what's marked as

10   Government Exhibit 350 and 352.  We will start with 350.

11               Is that the strategy document for your office for

12   summer of 2016?

13   A.  Correct; for the accounting group within the office.

14   Q.  Excuse me.  For the accounting group?

15   A.  Yes.

16   Q.  And if we look at 352, that's the accounting group within

17   your office's strategy and process documentation for spring

18   2017, correct?

19   A.  That's correct.

20               MR. BOXER:  We offer both of those, your Honor.

21               THE COURT:  Government Exhibit 350 and 352 are

22   received.

23               (Government's Exhibits 350 and 352 received in

24   evidence)

25   BY MR. BOXER:

J2D5mid3                          Bricker - cross

1   Q.  On Government Exhibit 350, if I could direct your attention

2   to page 162, and at the very top it is addressing the process

3   for the identification of a referral matter, correct?

4   A.  That's correct.

5   Q.  This is the document, by way of reminder, that had that

6   flowchart at the end that I think you testified you created

7   when you were a fellow, it was your idea; is that right?

8   A.  The flowchart came later when I was a fellow, the Court

9   policy is what I worked on but those are different

10  representations of the same thing.

11  Q.  And your thinking was that it was too informal a processes

12  and should be more formalized, correct?

13  A.  The chair at the time wanted much more consistency and so I

14  was directed to carry that out.

15  Q.  Understood.

16  A.  Yes.

17  Q.  So, for the spring of 2016 process, can you read what it

18  says under identification of a referral matter, please?

19  A.  Sure.

20          Identifying a matter as a referral matter, and

21  application of the screening process requires difficult

22  judgments.  The following provides a nonexclusive list of

23  principles that the review team should apply in making those

24  judgments.

25  Q.  And if then you proceed down to the third bullet point, if

1    you could read that to the jury?

2    A.  The goal of the review is to identify potential issuer

3    issues, and therefore the review team should avoid reporting

4    matters that appear to be solely misapplication by the auditor

5    of PCAOB standards.

6    Q.  And the review team that this is addressing is within the

7    accounting group within your office, correct?

8    A.  It's principally the accounting group, that's right, but

9    there were other representatives so that we had a cross

10   disciplinary team.

11   Q.  And it became the defined term, the review team; is that

12   right?

13   A.  That's correct.  That's correct.

14   Q.  This is the instruction to that SEC review team as defined

15   in Government Exhibit 350, right?

16   A.  That's correct.

17   Q.  And if we turn to 352, that's for spring of 2017, and

18   directing your attention to page 152, if you could read first

19   from the -- well, read from the third bullet point, please?

20   A.  The goal of the review is to identify potential issuer

21   issues, and therefore the review team should avoid reporting

22   matters that appear to be solely misapplication by the auditor

23   of PCAOB standards.

24   Q.  Thank you.

25                THE COURT:  Just to clarify for the jury, when you say

J2D5mid3                          Bricker - cross

1   issuers you are talking about the companies that are being

2   audited as opposed to when you say the auditor, KPMG is an

3   example of an auditor; is that right?

4              THE WITNESS:  That's correct, your Honor.

5              THE COURT:  Okay.

6              THE WITNESS:  Issuer, as we talked about yesterday, is

7   the public company that is issued stock and so the reference

8   there to issuer is sort of the issuance of stock.

9              MR. BOXER:  Thank you, your Honor.

10  BY MR. BOXER:

11  Q.  Actually, if you could also read the bullet point above:

12  *The review team should consider*...?

13  A.  The review team should consider reporting matters that the

14  PCAOB describes as a violation of SEC rules or regulations.

15  The team should avoid reporting matters described as violations

16  by the auditor of independence standards, since those matters

17  are otherwise assessed by the professional practice

18  group-independence.

19  Q.  And the first sentence, the PCAOB describes as a violation

20  of SEC rules or regulations; those are the kinds of things that

21  were reflected in the first two Rule 4004 reports we looked at;

22  one, for example, was about a broker-dealer, correct?

23  A.  Those would be just examples of SEC rules.

24  Q.  Thank you.

25              I know you testified right before you finished your

J2D5mid3                     Bricker - cross

1    direct this morning about this so-called come to Jesus meeting.
2    A big issue that was bothering the Commission before that
3    meeting and your staff was the fact that the new chairwoman of
4    KPMG had not quickly, or with appropriate deference, set up a
5    meeting with the senior officers of the Commission.
6             Isn't that right?
7    A.   There was concern that there wasn't communication, they
8    hadn't met.
9    Q.   Her name is Lynn Doughtie, correct?
10   A.   That's correct.
11   Q.   Do you recall when she took her role?
12   A.   I don't recall exactly, no.
13   Q.   Do you know if it was in 2016?
14   A.   No.  I think it was in 2015 but in terms of exact dates, I
15   don't recall.
16   Q.   And the meeting we are speaking of was the second week of
17   February 2016, correct?
18   A.   That's correct.
19   Q.   So it had taken her approximately six, nine months to even
20   have a meeting with the Commissioner of the SEC; is that right?
21   A.   I believe that's right.
22   Q.   And was a second issue at the Commission concerned with the
23   fact that Ms. Doughtie had not previously come from the audit
24   division of KPMG?
25   A.   That may have been the case.

J2D5mid3                          Bricker - cross

1    Q.  Were you aware that she was -- she worked in the advisory

2    practice at KPMG?

3    A.  I was aware of that, yes.

4    Q.  As opposed to working in the audit practice, correct?

5    A.  That's correct, but I believe what she said was that she

6    had worked on audits.

7    Q.  And advisory practice at a firm like KPMG, instead of

8    auditing work papers and financial statements like we have been

9    speaking about, they work on projects to give advice to

10   companies about strategic issues; is that fair to say?

11   A.  That's correct.

12   Q.  And that's where Ms. Doughtie, that's where we she worked,

13   correct?

14   A.  Principally as I recall, yes.

15   Q.  I would like to show you what's marked as Defendant's

16   Exhibit 71 for identification.  It is M-71.  I apologize.  Do

17   you recognize that e-mail?

18   A.  I do.  It is an e-mail that I was included on.

19   Q.  And you have received it?

20   A.  So, I sent the first in the chain January 15th, 2016, and

21   then received a response.

22            MR. BOXER:  I offer it, your Honor; M-71.

23            MS. KRAMER:  No objection.

24            THE COURT:  M-71 received.

25            (Defendant's Exhibit M-71 received in evidence)

J2D5mid3                          Bricker - cross

1    BY MR. BOXER:

2    Q.  It is an e-mail between you and Bob or Robert Malhotra,

3    correct?

4    A.  That's correct.

5    Q.  And Mr. Malhotra worked at KPMG?

6    A.  That's correct.

7    Q.  And did you know him when he was a fellow and you were a

8    fellow at the SEC?

9    A.  I don't believe we overlapped but I did know him in the

10   context of his service at the SEC, yes.

11   Q.  And you write to him -- why don't you read the words that

12   you sent to Mr. Malhotra on January 15th, 2016.

13   A.  Looks like Lynn, Dave, Scott, and John are coming in on the

14   9th of February.

15   Q.  And he writes back what?

16   A.  That is what I heard late last night.  They have time with

17   Schnurr, followed by Chair White.  Sorry it took so long to get

18   this organized.

19   Q.  And that last sentence, that apology, that references the

20   fact that it took so long for Ms. Doughtie to come in for

21   what's been called the come to Jesus meeting; is that right?

22   A.  I believe so, but.

23   Q.  Is it fair to say that was your understanding of what that

24   sentence meant?

25   A.  I think that's right.

J2D5mid3                          Bricker - cross

1   Q.  Now, after this meeting on February 9th, 2016, are you

2   aware of any effort by the Commission, your office, anyone in

3   the Commission to reach out to people at KPMG about any of the

4   specific issues that might have been discussed at that meeting?

5        Do you have any knowledge of that?

6   A.  In terms of follow-up discussions?

7   Q.  Yes.

8   A.  So, one thing I did was to set up quarterly meetings with

9   the KPMG team to stay current on the kinds of accounting issues

10  that they were seeing.

11  Q.  Like how to audit for the allowance, correct?

12  A.  It included a lot of topics.  I don't remember specifically

13  if allowance was included in that agenda, but we had a

14  quarterly cadence to those meetings.

15  Q.  Did Mr. Middendorf attend some of those meetings?

16  A.  I don't recall specifically, I know Scott Marcello did.

17  Robert Malhotra was the primary organizer of those.

18  Q.  And was Scott Marcello Mr. Middendorf's boss at KPMG?

19  A.  That's right.  Yes.

20  Q.  Just a couple other questions.

21       We had the Sarbanes-Oxley statute up on the screen

22  yesterday, I don't want to do that again, but is it fair to say

23  that oversight of independent auditing of public accounting

24  firms, that that statute delegated that responsibility to the

25  PCAOB?

J2D5mid3                           Bricker - cross

1    A.  In part.  The Commission also has --

2    Q.  I appreciate you have testified about oversight.

3    A.  Yes.

4          MS. KRAMER:  Objection, your Honor.  The witness was

5    still answering.

6    BY MR. BOXER:

7    Q.  Fair enough.  Please finish.

8          THE COURT:  Go ahead.

9    A.  In part, the Commission also has rules and regulations for

10   accountants who may be performing audits.

11   Q.  Ethical rules, correct?

12   A.  Rules that include ethics but covers improper professional

13   conduct, for example, in Rule 1-02(e).

14   Q.  So, outside of 1-02(e) and those rules and the supervisory

15   role you described, Sarbanes-Oxley delegated to the PCAOB the

16   review and inspection and oversight of public company auditing

17   firms, correct?

18   A.  That's correct.

19   Q.  I don't know if we went through your background in great

20   detail but you were an auditor yourself, as I understand,

21   correct?

22   A.  I was.

23   Q.  At PwC?

24   A.  That's correct.

25   Q.  And how many years did you do that for?

J2D5mid3                          Bricker - cross

1   A.  I was at PwC from 2000 until 2009 in the audit practice,

2   and then I was also at PwC from 2011 -- 2011 until 2015, again

3   in the audit practice.

4   Q.  And, did you work on any engagement teams for any audits

5   when you were at PwC?

6   A.  I did.  I both led and served on engagement teams.

7   Q.  Just generally, what kind of clients were they?  You don't

8   have to name them.

9   A.  It included banks and financial services clients, among

10  others.

11  Q.  Did any of those engagements that you worked on at PwC get

12  inspected by the PCAOB?

13  A.  They did.

14  Q.  And were there instances where your engagements received

15  comments?

16  A.  They had comments that were resolved.

17  Q.  They received comments?

18  A.  That's correct.

19  Q.  And while you were a partner at -- withdrawn.

20          Were you a partner at PwC?

21  A.  I was.

22  Q.  While you were at PwC, firm-wide, were engagements

23  receiving comments?

24          MS. KRAMER:  Objection to the relevance, your Honor,

25  for two reasons.

J2D5mid3                          Bricker - cross

1          MR. BOXER:  I don't want to speak to it.  I could at

2     the side bar or try another question.

3          THE COURT:  Try another question.

4     BY MR. BOXER:

5     Q.  We looked at a document yesterday that showed the number of

6     comments that KPMG had in a particular inspection year, I

7     believe it was 28 issuers or audits that had comments in

8     Part I.  Do you recall that?

9     A.  I do recall that, yes.

10    Q.  Do you recall during your time at PwC whether PwC had also

11    had a significant number of audits that received comments as

12    well?

13         MS. KRAMER:  Objection.  Relevance.

14         THE COURT:  Overruled.

15    A.  I recall they were higher than the firm desired and there

16    was a push to reduce those comments.

17    Q.  Similar to the way Mr. Middendorf reached out to you to

18    schedule meetings to discuss ALL and tried to resolve the

19    appropriate way for KPMG to be auditing that allowance, right?

20    A.  I don't know how PwC was doing that.  I wasn't in the

21    national office.

22    Q.  When you were at PwC for all the audits that received

23    comments in part 1, did you consider each one of them to be

24    audit failures as an accountant and partner at PwC?

25         MS. KRAMER:  Objection.

J2D5mid3                          Bricker - cross

1              MR. BOXER:  He has testified about audit failures,

2      your Honor.

3              THE COURT:  You can answer.

4              THE WITNESS:  So, I didn't have any in that

5      circumstance but, generally, a deficiency that required more

6      work was a failure.

7      BY MR. BOXER:

8      Q.  So, it's a failure in the sense that it required more work,

9      according to the PCAOB, correct?

10     A.  According to the firm and the experience that I had.

11     Q.  When you say audit failure, you don't mean that the

12     financial statements were materially misstated, right?

13     A.  I didn't have any experience with material misstatements on

14     financial statements.

15     Q.  Okay.  Well, you spoke about audit failure.  I just want to

16     make sure I am understanding what you mean by that.

17             If an audit receives an inspection comment, PCAOB

18     calls that an audit failure, correct?

19     A.  That's correct.

20     Q.  That doesn't mean, if it receives a comment, that the

21     investors can't rely on that issuer's financial statements,

22     right?

23     A.  In that case the auditor has do more work and then, as a

24     result of doing more work, that may identify a financial

25     statement in the statement or a change to an opinion.

J2D5mid3                         Bricker - cross

1    Q.  Let me try it another way, Mr. Bricker.

2            When an audit firm like PwC or KPMG receives notice

3    that one of their audits is going to receive a comment, does

4    that mean that as of that moment they need to withdraw their

5    audit opinion and inform their issuer that shareholders can't

6    rely on their financial statements?

7    A.  Not as of that moment.  No.

8    Q.  And in the vast majority of instances, isn't it true that

9    that moment never occurs where the accounting firm has to

10   withdraw its opinion and the shareholders can no longer rely on

11   the financial statements?  That's a restatement situation,

12   correct?

13   A.  That would be a restatement situation.

14   Q.  And that's rare, correct?

15   A.  It is infrequent, yes.

16            MR. BOXER:  May I have one brief moment, your Honor?

17            THE COURT:  Yes.

18            (Counsel conferring)

19            MR. BOXER:  No further questions.

20            THE COURT:  Okay.

21            MR. BOXER:  Thank you, Mr. Bricker.

22            THE WITNESS:  Thank you.

23            THE COURT:  Cross-examination, Mr. Weddle?

24            MR. WEDDLE:  Thank you, your Honor.

25   CROSS EXAMINATION

J2D5mid3                          Bricker - cross

```
 1  BY MR. WEDDLE:
 2  Q.  Good afternoon, Mr. Bricker.
 3  A.  Good afternoon.
 4  Q.  My name is Justin Weddle, I represent Mr. Wada in this
 5  matter.  I am a binder guy, give me a second.
 6          You were just talking about your time at PwC, I have a
 7  few questions about that topic also.  During your time at
 8  PwC -- well, actually, let me back up.
 9          You said you had two stints at PwC and then the
10  intervening or the successive places where you worked were the
11  SEC; is that right?
12  A.  That's correct.
13  Q.  So you were at PwC, then you were the fellow at the SEC,
14  then back to PwC, then back to the SEC?
15  A.  That's correct.
16  Q.  And you are familiar with the term "revolving door?"
17  A.  I am familiar with that term.
18  Q.  And I guess some people use it in a pejorative sometimes, I
19  am not trying to use it in a pejorative, I am asking about the
20  fact that you had experience in a private firm in private
21  practice, and you have also had experience with the government,
22  right?
23  A.  That's correct.
24  Q.  And that's valuable both to the private firm you worked for
25  and to the government, right?
```

J2D5mid3                          Bricker - cross

1    A.  I believe that's valuable, yeah.

2    Q.  So, I mean, the SEC finds it valuable to have people come

3    to the SEC who have experience working at public accounting

4    firms, right?

5    A.  That's correct.  We have accountants of all types but

6    including private firms.

7    Q.  I am not saying exclusively but it is a valuable experience

8    to have, let's say, right?

9    A.  I agree in my case, certainly.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2ddmid4                    Bricker - cross

1   Q.  And it would also be valuable, if there comes a time for

2   you to leave the SEC again, that you might imagine that private

3   employers would find your experience as the Chief Accountant at

4   the SEC to be valuable to them in providing services to their

5   clients, right?

6   A.  I'm sure that would be the case.

7   Q.  And is it fair to say that as a general matter, for

8   professionals like yourself, they tend to be paid more working

9   for a private firm than they do when they're engaging in public

10  service working for the government?

11  A.  That's generally the case, not the case for professional

12  accounting fellows.  I think the government pays more.

13  Q.  Now, so let's talk a little bit about professional

14  accounting fellows.

15         Is the fact that it is called a fellow, is that

16  different from just coming and joining the staff of the SEC?

17  A.  It's different in the sense that the U.S. government has

18  fellowship programs all across the government, like the White

19  House Fellows Program, other agencies have them, but those

20  are -- those are employees for a specific term of time.  In

21  this case, it is a four-year period.  Individuals can serve

22  shorter but not more than four years.  Most people serve three

23  to two years.

24  Q.  And you served two years?

25  A.  I served two years.

J2ddmid4                          Bricker - cross

1   Q.  And when you went to become a fellow at the SEC for that

2   two-year stint, did you continue to -- or on your departure

3   from PwC, did you have any continuing relationship with PwC as

4   an employment matter, let's say?

5   A.  No.

6   Q.  So it wasn't as if -- it wasn't that you were on loan from

7   PwC, for example?

8   A.  That's correct.  The government ethics rules preclude

9   continuing employment status.  So, in other words, no dual

10  employment.  You can't be employed at a firm and also employed

11  with the government.

12  Q.  So then you went back to PwC, and you were a partner

13  focusing on banking, among other things, right?

14  A.  That's correct.

15  Q.  In any of your time at PwC, did you come to know a PwC

16  accountant named Brian Sweet?

17  A.  No.

18  Q.  Now, you talked about in your job meeting with the CEOs or

19  I guess -- I don't know what the title is, CEO or chair people

20  of the Big Four accounting firms.  Do you recall that?

21  A.  That's correct.

22  Q.  And so the Big Four accounting firms are KPMG, PwC,

23  Deloitte and Ernst & Young, right?

24  A.  That is correct.

25  Q.  And you testified, I think, that the tone was different

J2ddmid4                          Bricker - cross

1   when you met with KPMG's top leadership than with the other

2   people, is that right?

3   A.   That is correct.

4   Q.   When you met with the PwC top leadership, those are people

5   who were your former partners, right?

6   A.   Well, for the first period of time, I was recused and so I

7   didn't participate in any of those meetings.  Then Chief

8   Accountant Jim Schnurr did, but I wasn't part of those

9   meetings.

10  Q.   And you said for the first part of time you were recused.

11  Have you in your position met with the leadership of PwC?

12  A.   Following that recusal period, yes.

13  Q.   And how long was the recusal period?

14  A.   For one year.

15  Q.   And so after the one-year period of time, when you met with

16  PwC leadership, they were your former partners?

17  A.   That's correct.

18  Q.   And when Mr. Schnurr and you -- so let me back up.

19            Mr. Schnurr was the Chief Accountant when you came to

20  the SEC for the second time in 2015, right?

21  A.   That's correct.

22  Q.   So you were one of his deputies?

23  A.   That is correct.

24  Q.   And then after he retired, you ended up taking his job?

25  You became the Chief --

J2ddmid4                         Bricker - cross

1    A.   That is correct.

2    Q.   When you did that, when you became the Chief Accountant,

3    who appointed you?  Was it the Chair or the Commission itself

4    or --

5    A.   The Chair, Chair White.

6    Q.   Not the Commission?

7    A.   It's -- no, Chair White has the administrative

8    responsibilities.  She consulted with the other commissioners,

9    but it was the Chair's determination.

10   Q.   So there is not like a Commission order appointing you as

11   the Chief Accountant?

12   A.   There is a press release but not an underlying order.

13   Q.   And I think in your testimony you said in your job as the

14   Chief Accountant, you report to the Chair?

15   A.   That is correct.

16   Q.   Not the Commission as a whole, the Chair?

17   A.   Administratively to the Chair.  I provide advice and

18   recommendation to the Commission, which is a more inclusive

19   reference to the five commissioners.

20   Q.   The -- I lost my train of thought for a second.

21        So when you met with the leadership of Deloitte, did

22   you do that together with Mr. Schnurr, that is, did you do it

23   at the time that he was the Chief Accountant and you were a

24   deputy?

25   A.   I don't believe I met with the Deloitte CEO until I was --

J2ddmid4                          Bricker - cross

1   until I was serving in the Interim Chief Accountant role.  So

2   in 2016, Jim Schnurr had a bicycling accident, that was in

3   April.  Then I stepped into those dual -- those roles.  I was

4   appointed as the Interim Chief Accountant and then later named

5   as the Chief Accountant.  It was during that period when I met

6   with Deloitte.

7   Q.  Is it your understanding that Mr. Schnurr met with the

8   leadership of Deloitte before you met with them?

9   A.  He may have.  I don't -- I don't know.

10  Q.  He is an alumni of Deloitte, correct?

11  A.  That's correct.

12  Q.  He was an accounting partner at Deloitte?

13  A.  That is correct.

14  Q.  Do you know for how long?

15  A.  I don't know off the top of my head.  It was the majority

16  of his career.

17  Q.  So when he met with people from Deloitte, if they were

18  partners, he might well be meeting with his former partners?

19  A.  That's correct.

20  Q.  You talked about -- I may jump around a bit, so if you will

21  bear with me.

22          You talked about the design of the PCAOB inspection

23  process.  Do you recall that testimony?

24  A.  Yes.

25  Q.  And is the design of the -- and a number of times you

J2ddmid4                          Bricker - cross

1    talked about it is important that it is as designed and things

2    like that, and you talked about certain characteristics of the

3    design, right?

4              And among the characteristics of the design, in your

5    understanding, is the timing in which the accounting firm is

6    notified of the inspection, is that correct?

7    A.   That's correct.

8    Q.   Is the design of the PCAOB inspection process, does that

9    come out of Sarbanes-Oxley, that law that we were looking at?

10   A.   The law isn't prescriptive regarding the particulars of the

11   design.  The law directs the PCAOB to have an inspection

12   program, but it doesn't sort of specify individual

13   characteristics other than need to have it, need to cover

14   firms, and it needs to result in reporting.

15   Q.   There is no other law that sets out the design

16   characteristics that you've talked about as being important to

17   you, is there?

18   A.   Not beyond sort of the PCAOB's, you know, sort of ethics

19   and conduct for individuals who participate in that program,

20   and that is sort of part of its design.  Those are PCAOB rules.

21   Those come to the Commission for approval, and then they get

22   incorporated into the 1934 Act.

23   Q.   OK.  I haven't gotten there yet.

24   A.   OK.

25   Q.   My question was about laws.

J2ddmid4                        Bricker - cross

1    A.  OK.

2    Q.  So when I'm talking about laws, I'm talking about something

3    that Congress votes on and the President signs, and then it is

4    a law of the United States.  Are you with me?

5    A.  I understand.

6    Q.  OK.  So is there anything in any law of the United States

7    that you are aware of that sets out the design characteristics

8    that you've testified are important to you?

9    A.  Not the specific timing of notice, no, I'm not aware of the

10   Sarbanes-Oxley Act dealing with that specific topic.

11   Q.  So, sorry if this is too basic.

12          We talked about Sarbanes-Oxley.  This was a broader

13   question.  Any law -- are you aware of any law that sets out

14   the design characteristics of the PCAOB inspection process that

15   you've testified is important to you?

16          MS. KRAMER:  Asked and answered.  Objection.

17          THE COURT:  Overruled.

18          You can answer.

19   A.  From Congress that sets out for the PCAOB design

20   characteristics of its program, I'm not aware of that.

21   Q.  And so now let's go to the next step.

22          So, we have laws.  I am talking about the law for the

23   time being.  There are also, let's say, important

24   pronouncements that are SEC rules and regulations, right?  They

25   exist in the world?

J2ddmid4                          Bricker - cross

1    A.  They exist.

2    Q.  OK.  And the SEC rules and regulations have a certain

3    method for being promulgated, right?

4    A.  That's correct.

5    Q.  They are not passed on by Congress and the President,

6    right?

7    A.  Congress directs the SEC to do certain things and then the

8    SEC does them.

9    Q.  And when the SEC does those things with a certain level of

10   formality and notice and comment period and all of those

11   things, then they can become a rule or a regulation, right?

12   A.  They are described as rules and regulations but they have

13   the force of law.

14   Q.  That was going to be my next question.

15   A.  OK.

16   Q.  So they have the force of law but they are not passed on

17   by -- they are not enacted by Congress?

18   A.  They are not enacted by Congress.

19   Q.  And is there anything in the SEC's rules and regulations

20   that sets out, or directs, the design -- the particular design

21   characteristics that you've testified are important to you?

22   A.  The design characteristics for the PCAOB, no, those are the

23   PCAOB's design.

24   Q.  OK.  So nothing in the SEC rules and regulations?

25   A.  I have to -- nothing that's sort of presently.  I haven't

J2ddmid4                         Bricker - cross

1   done an exhaustive, you know, sort of search, but nothing that

2   I am presently aware of.

3   Q.   And are the design characteristics that you've testified

4   about as being important to you, were those set out in a formal

5   rule promulgated by the PCAOB and approved by the SEC?

6   A.   Not that I'm -- not -- so there is no document that I'm

7   aware of that sort of lays that out, but the implications of

8   those do make their way into the SEC's rules, for example.  So,

9   for example, the PCAOB's budget, which includes a description

10  of the PCAOB strategic plan, which includes a description of

11  the resources, come to us, make its way through the Commission.

12  The Commission approves an order.  That order is then

13  incorporated into the 1934 Act.  So, there is a bit of, I

14  guess, rule-making design to all of this.  I don't know whether

15  I'm sort of getting at the point that you are getting at, but

16  the Commission's orders have the force of law.

17  Q.   OK.  I don't think that you are getting at the point that

18  I'm getting at.  The point that I'm getting at I think is very

19  basic so that may be the problem that we're having.

20       There is nothing in a PCAOB rule that sets out, for

21  example, how much notice is permitted to be given to an audit

22  firm of an upcoming inspection?  And here my question is only

23  about a rule that's been approved by the SEC.  We'll get to

24  other documents later.

25  A.   Yeah.  I'm not aware of one but --

J2ddmid4                        Bricker - cross

```
 1   Q.  And so then the same question about any other -- I just
 2   can't remember if there are other aspects of the inspection
 3   process design that you testified about as being important to
 4   you.  One of them was of the timing.  If there are any others
 5   that I'm leaving -- that I have left out when I mentioned the
 6   timing that you've testified were important to you, are those
 7   design aspects embodied in, set out in a PCAOB rule that has
 8   been adopted by the SEC and the force is mandatory on the
 9   PCAOB?
10   A.  So I testified regarding, you know, the Board's rules, the
11   PCAOB's rules.  Those rules are fairly comprehensive.  Those
12   are important to me, and they are incorporated into the SEC's
13   rules.
14   Q.  I'm asking about the design characteristics.  Let me do it
15   this way.
16           You testified that the design -- that you have an
17   understanding about how the PCAOB inspection process is
18   designed, right?
19   A.  That is correct.
20   Q.  And you've testified that it's important to you that the
21   process function as designed, that's right?
22   A.  That's correct.
23   Q.  And you've testified that if it didn't function as
24   designed, then that might have some effect on the way you do
25   your job, right?
```

J2ddmid4                        Bricker - cross

A.   That would impact the premise of the inspection reports
that I use in doing my job.

Q.   OK.  So you're saying it would just affect the report,
right?

A.   As one example.  That was one of the examples that I had
given.

Q.   OK.  So -- all right.

          And the report is something that you have testified
you rely on the reports in engaging in various of your
oversight responsibilities in your job, right?

A.   That's correct.

Q.   But those characteristics -- this is my question here.  The
characteristics of the design that are important to you may be
set out in various documents, but they're not set out in a rule
that's been approved by the SEC, right?

A.   I'm not aware of one, but I haven't -- I wouldn't say
that's something that I, you know, have specifically focused
on.

Q.   And we talked about certain, let's say -- I'm going back to
the SEC.  Seconds ago we were talking about the PCAOB and its
rules.  Now I am going to ask you about the SEC again.  We
talked about it before.  We were talking about rules and
regulations.  I am going to ask you about a step down from
rules and regulations.  That is, are there policies and
procedures at the SEC that set out the importance of how much

J2ddmid4                              Bricker - cross

1   time -- the timing of the notification to an audit firm of an

2   upcoming inspection?

3   A.  We haven't prescribed that for the PCAOB as part of our

4   oversight of the PCAOB.

5   Q.  And even in your internal policies and procedures, it's not

6   in those either, right?

7   A.  Because it may vary.  So I'm not -- I'm not aware of a

8   procedures document that sort of specifically addresses that.

9   Q.  When you say "because it may vary," you're saying that the

10  timing of the notice to an audit firm of any particular

11  inspection could vary, right?

12  A.  Well, so what I'm saying is the documentation standards

13  sort of sets out what it is.  If a firm has two weeks to get

14  ready or three weeks to get ready, that may vary.  That's sort

15  of, you know, a much more specific level of procedural aspect

16  for the PCAOB.

17  Q.  So that kind of difference, two weeks, three weeks, four

18  weeks, some number of weeks, is not material in your view?

19  A.  What I'm saying is that's not something that I would get

20  involved with because that's within the PCAOB's division of

21  inspections.

22  Q.  That is not an SEC matter, that is a PCAOB matter?

23  A.  That's correct.

24  Q.  And in your testimony, you used the phrase, I think you

25  said, in describing when the PCAOB gives notice to audit firms,

J2ddmid4                          Bricker - cross

1    you said they give notice with just enough time.  Do you

2    remember that phrase, "just enough time"?

3    A.   I don't remember it specifically but I may have said that.

4    Q.   OK.  But I guess by that phrase, you didn't intend to mean

5    some sort of precision timing such that variations of a few

6    weeks would become material, right?

7    A.   What -- so that phrase and what I'm suggesting is that the

8    PCAOB enables firms to have enough time to sort of pull things

9    together, pull the archived file together, ensure that there

10   are individuals available, and then they carry on with the

11   field work portion of the inspection.

12   Q.   OK.  And so I guess I read to you a portion of your

13   testimony, and I have an advantage because I have a transcript.

14   But you said the PCAOB provides notice -- you didn't say just

15   in time, but you also said after the firm has completed --

16   after the audit has been completed.

17          So once -- I guess once the report is issued, then a

18   variation of a few weeks here or there is not material to you

19   in any way in terms of the notice?

20          MS. KRAMER:  I object to form.

21          THE COURT:  You can answer if you understand it.

22   A.   So I'm not sure I understand that question.

23   Q.   I guess I'm just saying, if the audit has been completed,

24   the amount of notice that the PCAOB gives to an audit firm can

25   vary in a manner that is a PCAOB issue but it is not at all an

J2ddmid4                              Bricker - cross

1    SEC issue?

2              MS. KRAMER:  I object to form.

3              THE COURT:  Overruled.

4    A.  So what I'm saying is this morning we looked at paragraph

5    15, and I read paragraph 15 in terms of the 45-day period for

6    assembling the audit file.  I would assume that firms may need

7    to take advantage of the 45 days to put things together.  And

8    then after things are locked down, after the audit file was

9    locked down, then it's, as I talked -- as I testified this

10   morning, after the file is locked down, then at that point the

11   inspection -- it would be available for inspection.  They would

12   sort of carry on with that process.  They would need enough

13   time to make available the file, make available their

14   personnel, and to carry that out.

15             THE COURT:  It's 1 o'clock.  If you have a couple of

16   more, you can, or we can break for lunch.

17             MR. WEDDLE:  Great, your Honor.  Thank you.

18             THE COURT:  All right, folks.  It is 1 o'clock.  We

19   will break for an hour for lunch.  Please leave your notepads

20   on your chairs.

21             Don't discuss the case.  You are not yet deliberating.

22             We will continue at 2 o'clock.  Have a good lunch.  I

23   will see you at 2 o'clock.

24             (Continued on next page)

25

J2ddmid4                              Bricker - cross

1              (Jury not present)

2              THE COURT:  You can step down.

3              (Witness not present)

4              THE COURT:  You can be seated.

5              Anything we need to talk about before lunch?

6              MR. WEDDLE:  No.

7              MS. KRAMER:  Judge, I think there is a numbering issue

8    with respect to the exhibits that we raised earlier and said we

9    could work out later.

10             THE COURT:  Do we need to have a defendant's exhibit

11   number on the ones that they introduced?

12             MS. KRAMER:  I think we should.  I mean, we marked a

13   number of exhibits that may not on their own be admissible,

14   right, when we want to use them to refresh or something like

15   that, so we may never be offering them.  I think they should

16   have defense exhibit stickers and they are offered and received

17   as defense exhibits.

18             MR. BOXER:  Should we put it over the government

19   exhibit sticker?

20             MS. KRAMER:  I think it depends because there are

21   exhibits that we are going to offer, even.  If the defense

22   offers them, we may offer them as government exhibits.

23             THE COURT:  Then they will be doubly offered.

24             MS. KRAMER:  We could double sticker them, right.

25             MR. BOXER:  We will mark them as just defense

J2ddmid4                         Bricker - cross

1   exhibits, and if the government chooses to mark additionally,

2   that is fine.

3           MS. KRAMER:  And I think to clarify the record for

4   what has already happened, given that some jurors are taking

5   notes and writing down only the government exhibit stickers,

6   for those, even though I know some of them we likely won't

7   offer, we can have both stickers, so that if a juror later

8   wants to see Government Exhibit 311, confusion doesn't ensue.

9   Right?  Because we've covered it.  So we'll keep those with the

10  government sticker and add the defense sticker to those, if we

11  could, and we could put on the record at some later time what

12  the sort of corresponding numbers are.

13          THE COURT:  I think Mr. Weddle wants to say something.

14          MR. WEDDLE:  I disagree with this plan, your Honor.  I

15  think that the purpose of exhibit stickers is to have a unique

16  identifier for a document.  There is no magic to what the

17  unique identifier is.  It could be called court exhibit,

18  government exhibit.  It could be any number of things.  The

19  purpose of it is so that when you read the transcript, you know

20  exactly what somebody is talking about.

21          I think is contrary to that purpose to have two

22  documents with two different unique identifiers on them,

23  because then you have to try to match up person A said this

24  about something and person B said that about something, or --

25  you know, I think the proposal is to have two stickers on a

J2ddmid4                          Bricker - cross

1    document.  And in order for that to give clarity to the record,

2    every time you talk about the document, you would have to say

3    I'm now showing you Government Exhibit 311 which has also been

4    marked Defense Exhibit M-145, and I don't know if it is

5    important.  So, anyway, I think that that is cumbersome and

6    adds confusion to the record.

7              I also don't think that there is evidentiary value,

8    really, to whose sticker is on a document.  The government

9    marks a bunch of documents.  I don't know what purpose they are

10   going to use them for.  If I want to use that document, I

11   normally use their sticker so I don't proliferate unique

12   identifiers on a document.  And it is an accident of the order

13   in which the trial happens whether I'm offering it or they're

14   offering it.

15             So, I think it adds confusion.  I don't think there is

16   a reason for it, and I think the record will be clearer for

17   everyone, including the jury, if a single document has a single

18   identifier.

19             MR. COOK:  Can I just add to Mr. Weddle's response?

20             The other complication would be, for example, on

21   cross-examination, we don't know what documents the government

22   might use in their direct until they're finished with their

23   direct.  So, we won't know until we stand up for

24   cross-examination whether it has already been admitted as a

25   government exhibit or if we have to at that time resticker the

J2ddmid4                           Bricker - cross

document as a defense exhibit.  There is just no reason to do

that.  It complicates the record.  It complicates the court

process.

          MS. MERMELSTEIN:  I think we certainly have done it

the way we propose many times.  To the extent that the defense

thinks the exhibit is going to come through us and then it

doesn't and they want to use it on cross, they can put a

physical sticker on top of the physical copy of the

government's sticker and we can work it out later.

          I think it is wrong to say that there is sort of no

import to the this.  Certainly, we have no objection to the

defense not remarking things that are government exhibits and

just using those once they are in evidence, just as we, too,

may use something once it is in evidence.  But I think that, as

Ms. Kramer said, the government has marked as exhibits in some

cases things that are patently not admissible because we intend

to have a reference number essentially if it is used to refresh

or to impeach.  We've also marked things as exhibits that are

admissible only if they are offered by the government because

they contain, for example, statements by the defendants that

would not be admissible if offered by them.

          I think the effort -- I am not saying it is

intentional, but when you try to offer a government exhibit and

you are the defense and the government objects, it makes it

look to the jury like the government is sort of doing something

J2ddmid4                        Bricker - cross

1     odd, when it is not.  So we don't want to have to do that.  We

2     would like there to be defense exhibits when the defendants are

3     offering things.

4             I also think that there are for other purposes, like

5     on appeal, when you end up trying to see who put in what, it

6     does matter.  It is going to confuse the record when the

7     government exhibits haven't been offered by the government.

8             So, we feel relatively strongly that we should sort of

9     let the defendants mark as defense exhibits those things that

10    they want to offer in the first instance.

11            MR. COOK:  May I add one last point?

12            THE COURT:  Yes.

13            MR. COOK:  In addition to the example I gave of

14    cross-examination, even if I had a physical sticker, a physical

15    document, that doesn't change the electronic version that we

16    have been using throughout the trial.  That creates yet another

17    burden to have to -- I don't even know how that works

18    electronically.

19            THE COURT:  Well, I mean, I will have a stack of

20    exhibits that go back -- physical exhibits that go back with

21    the jury, and I've actually done it both ways.  I have never

22    actually had a disagreement from counsel on this issue.  But I

23    think Ms. Mermelstein is probably right, that as a formal

24    technical matter, if it's the defendant's exhibit, it probably

25    should say a defendant's exhibit number.  It is a little more

J2ddmid4                          Bricker - cross

1   work.  At the end of the day, you know, it might be a stack of

2   defense exhibits versus a stack of government exhibits, and I

3   do believe that -- if all the parties don't agree on this, I

4   think I am going to have a defense exhibit marked as a defense

5   exhibit.

6           So just mark it with the next defense number.  All

7   right --

8           We'll see you at 2.

9           MS. MERMELSTEIN:  Thank you, your Honor.

10          (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid5

1          A F T E R N O O N   S E S S I O N

2                      2:10 p.m.

3          (Trial resumed; jury not present)

4          THE COURT:  Good afternoon.

5          Before we bring the witness back, yet another juror

6  has asked Mr. Hampton to speak with him; juror no. 4,

7  Mr. Rivera.  He said:  *I have a job where I work per diem, four*

8  *weeks will be a financial hardship.*  That's all he said.

9          I guess I wasn't clear enough with these people during

10 voir dire.

11         MS. KRAMER:  Maybe we are not entertaining enough.

12         THE COURT:  I guess.  I don't know.

13         Anyway, I propose that we go ahead for now and think

14 about it.  Is that okay with everybody?

15         MR. COOK:  Yes.

16         MR. BOXER:  Yes, your Honor.

17         MS. KRAMER:  Yes, your Honor.

18         THE COURT:  Will you please bring the witness in and

19 we will bring the jury in?

20         (Continued on next page)

21

22

23

24

25

J2D5mid5                          Bricker - cross

 1                (Jury present)

 2                THE COURT:  Please, be seated.  Good afternoon, folks.

 3                THE JURY:  Good afternoon.

 4                THE COURT:  Welcome back.  We are continuing with

 5        cross-examination by Mr. Weddle.

 6                You may proceed.

 7                MR. WEDDLE:  Thank you, your Honor.

 8         WESLEY RAY BRICKER, resumed.

 9        CROSS EXAMINATION

10        BY MR. WEDDLE:

11        Q.  Sir, you testified on direct examination when the

12        government was asking you questions and also when Mr. Boxer was

13        asking you questions about your view that there were basically

14        three possibilities to explain the inspection results for KPMG.

15                Do you remember that?

16        A.  I do.

17        Q.  And the possibilities, I could be wrong but I think maybe

18        there should be a change in the rule or rules, maybe there was

19        an issue with PCAOB inspection consistency across firms or

20        maybe there was an issue with KPMG?  Is that right?

21        A.  That's right.  The first one was rules for management.

22        Q.  And when you say rules for management, you are talking

23        about rules for the companies?

24        A.  For the companies in preparing their financial statements.

25        Q.  The clients of KPMG, not KPMG, not management of KPMG?

J2D5mid5                         Bricker - cross

1    A.   That's correct.

2    Q.   The clients of KPMG?

3    A.   That's correct, yes.

4    Q.   And that's because the client has its own accountants,

5    right?

6    A.   That's correct.

7    Q.   And the accountants at the client, they apply the same

8    accounting standards that KPMG or whoever the auditor is

9    applies, right?

10   A.   Well, the company is required to prepare its financial

11   statements according to the accounting standards and then the

12   auditor is auditing under the auditing standards and evaluating

13   whether or not the accounting standards have been complied

14   with.

15   Q.   But the accounting standards are the same standards for

16   both the auditor and for the company, it is just that the

17   auditor is doing an independent thing with respect to those?

18   A.   That's correct.

19   Q.   And so, the second possibility that I think you said you

20   ruled out was PCAOB inspection consistency across firms.

21   A.   Uh-huh.

22   Q.   So, to put that in simpler terms, it is sort of a question

23   mark that one might be tempted to ask or a question one might

24   be tempted to ask, well, is there something uneven about how

25   the PCAOB is doing its inspections of KPMG or PwC or Deloitte

J2D5mid5                              Bricker - cross

1   or whoever it may be that accounts for any differences in

2   results?

3   A.  Uh-huh.  That's correct.

4              MR. WEDDLE:  One moment, your Honor?  I just have to

5   find a document here.

6   Q.  Are you aware, sir, that in the beginning of 2017 -- so,

7   are you with me, 2017 -- in late January 2017, the PCAOB

8   created a new group which they referred to as the Bank

9   Inspections Group?

10             Are you aware of that?

11  A.  Very -- very generally.

12  Q.  So, since your awareness is general I take it you are not

13  aware that the PCAOB told KPMG about the creation of this new

14  group on or about January 24th, 2017?

15  A.  I wasn't aware of that.

16  Q.  So, if you would take January 24th, 2017 as a guidepost,

17  when do you think you became aware of the creation of a special

18  Bank Inspections Group?  Before that guidepost or after that

19  guidepost?

20  A.  What I was aware of was that the PCAOB had individuals who

21  focused on the banking industry and so the PCAOB has what it

22  refers to as its own national office.  It's just a general

23  reference to a group of individuals who are available to

24  inspections teams as a resource for addressing judgmental

25  issues, hard issues, and then that group is a resource to

J2D5mid5                              Bricker - cross

1    promote consistency in the way those issues are addressed.  And

2    so, within that group, there are banking specialists.

3              That's what I was aware of and referring to.

4    Q.  So my question was, do you remember I talked about a

5    guidepost?  Do you remember that?

6    A.  Yes.

7    Q.  And the guidepost that I asked you to put into your mind

8    was January 24th, 2017.

9              Do you remember that?

10   A.  Yes.

11   Q.  So, the question that I asked you to answer was did you

12   become aware of the creation of a Bank Inspection Group by the

13   PCAOB before that guidepost or after that guidepost?

14             Do you have the question?

15   A.  I think we are talking about a different group.  My

16   understanding was a national office.  I think you are asking

17   about a different group which I wasn't aware of.

18   Q.  Not aware of it?

19   A.  Not aware of a team of inspectors assigned to solely do

20   banks.  I wasn't aware of that.

21   Q.  Okay, so you are not aware of something, that the PCAOB

22   formed a new group that the PCAOB calls the Banking Inspections

23   Group known as BIG and the group is going to work across all

24   firms instead of having a dedicated banking subset of, for

25   example, the KPMG inspection team?

J2D5mid5                          Bricker - cross

1   A.  That's -- that's not something I was aware of.

2   Q.  Mr. Boxer asked you about meeting with the government to

3   prepare to testify and I think you said it was probably more

4   than five times?

5   A.  I think that's right, yes.

6   Q.  Do you think it was more than 10?

7   A.  I don't know.  Maybe it was 10.  I'm not sure if it was

8   more.

9   Q.  Did you also meet with SEC personnel in preparation for

10  testifying?

11  A.  Not separately, no.

12  Q.  So, when you say not separately, you mean the SEC personnel

13  were sometimes present for your meetings with the prosecutors?

14  A.  That's correct.

15  Q.  Did anyone tell you in your meetings to prepare to testify,

16  that to the extent you can, you should answer with a narrative

17  instead of answering a question that's a yes or no question

18  with a yes or a no?

19  A.  No.

20  Q.  Now, you testified about a number of different ways -- yes,

21  I guess a number of different ways in which you rely on

22  inspection reports in your job at the SEC, right?

23  A.  That's correct.

24  Q.  I think I have gotten them all but if I have forgotten any,

25  I will ask you to add to them, but one of the areas is setting

J2D5mid5                         Bricker - cross

1   the budget for the PCAOB, right?

2   A.   That's correct.

3   Q.   And one of the areas, and Mr. Boxer asked you about the

4   budget and the fact that the funding actually comes from

5   companies, right?

6   A.   The source of the actual cash comes from companies,

7   broker-dealers, registration fees from firms.

8   Q.   So, whatever the amount of monies in the proposed budget,

9   it's a number and an explanation from the PCAOB.  Does it take

10  you longer to look at a higher number than to look at a lower

11  number?

12  A.   So, the Sarbanes-Oxley act sets out the budget process

13  and --

14  Q.   This one is a real yes or no question.

15        Does it take you longer to look at a higher number on

16  a piece of paper than a lower number on a piece of paper?

17  A.   We have to look at the justification.  So, if there is a

18  substantial increase, then -- which would be a higher number

19  then, yes, we have to look at that.

20  Q.   But whatever their number is -- I mean, I take it as part

21  of the budget review process they don't just give you a number

22  without explanation, right?

23  A.   That's correct.

24  Q.   They always, the PCAOB always feels obliged because of the

25  SEC's oversight role to explain the reason for whatever number

J2D5mid5                          Bricker - cross

1    they're proposing, right?

2           MS. KRAMER:  Object to asking this question about what

3    the PCAOB feels.

4           THE COURT:  Sustained.

5    BY MR. WEDDLE:

6    Q.  In your understanding when the PCAOB proposes a budget,

7    they always give an explanation for the particular number

8    they're asking for, right?

9    A.  They support their budget request as the Sarbanes-Oxley Act

10   establishes that their budget request has to be supported and

11   so that guides our work in evaluating their support.

12   Q.  Is there something about your answer that's different from

13   just saying yes?

14          MS. KRAMER:  Objection.  Argumentative.

15          THE COURT:  Sustained.

16   BY MR. WEDDLE:

17   Q.  So, another area that you said you are involved in, in

18   which you rely on inspection reports, is the selection of PCAOB

19   board members; is that right?

20   A.  That's correct.

21   Q.  I think you said that if someone were proposed to be a

22   PCAOB board member you would want to know how they had, what

23   their history was in terms of audit quality that might be in

24   inspection reports, right?

25   A.  That's correct.

J2D5mid5                              Bricker - cross

1   Q.  Do you, personally, look back at the inspection reports to

2   see, to carry out this task?

3   A.  I personally look at the background check materials.  I

4   personally engage with my deputies to understand whether one of

5   the candidates or any of the candidates had been inspected,

6   yes.

7   Q.  So, you don't personally check the inspection reports to

8   determine whether a candidate was inspected or not, somebody

9   else does that?

10  A.  One of my deputies does that, that's correct.

11  Q.  And the report itself doesn't say who the audit partner is,

12  right?

13  A.  That's accessible to us.

14  Q.  So, the question that I had was the report itself doesn't

15  say who the audit partner was, does it?

16  A.  Not the report itself.

17  Q.  Thank you.

18          In fact, the report itself doesn't even say which

19  client of the audit firm had an identified deficiency, does it?

20  A.  The public version doesn't but we -- the PCAOB gives us

21  the, it is called the issuer key which identifies the specific

22  name of the company.

23  Q.  So, the SEC can decode who the companies are?

24  A.  That's correct.

25  Q.  But even in the version, the non-public version that's

J2D5mid5                          Bricker - cross

1   given to the SEC, it doesn't say right in it who the issuer is,

2   right?  Who the company is?

3   A.  No.  It is literally a separate document that comes at the

4   same time.

5   Q.  So, who is it who goes back and checks every candidate to

6   see, first of all, whether an issuer had a comment in a report

7   and whether the candidate was involved in that issuer's audit?

8   A.  It's a combination of my deputy chief accountant for the

9   professional practice group, as well as my chief counsel and

10  the individuals who work wore them.  We might get 60 potential

11  candidates as part of our process so it takes a team of people.

12  Q.  Does the SEC have a spreadsheet somewhere that says who the

13  audit partners are on each of the companies whose audit had a

14  deficiency identified in a report?

15  A.  I'm not sure that we have a spreadsheet.  The engagement

16  partner is accessible publicly through the PCAOB's website and

17  then we have the issuer key and we have the inspection reports.

18  I don't know that we've assembled it into a spreadsheet or not.

19  Q.  Between 2015 and I guess the beginning of 2017, were there

20  any PCAOB board candidates who were KPMG people?

21  A.  No.

22  Q.  I think another area where you said you relied on

23  inspection reports was in making judgments about whether PCAOB

24  rules should be adjusted in some way, right?

25  A.  PCAOB rules as well as our rules more generally, yes.

J2D5mid5                         Bricker - cross

1    Q.   A fourth area where you said you rely on the reports is if

2    there are comments, if the PCAOB gives comments in an audit and

3    the firm that's being -- sorry, I said audit, I meant

4    inspection.

5             If the PCAOB gives comments in an inspection and the

6    firm that is being inspected wants to challenge those comments

7    to a different arbiter, that can be challenged in the SEC,

8    right?

9    A.   That's correct.

10   Q.   So, let's just take a step back.  A comment is different

11   from a writeup in the inspection report, right?

12   A.   Comments are written by the inspection team.  The

13   inspection report is prepared on the basis of all of the

14   inspection team's work which would include comments.

15   Q.   Okay.  Fair enough.

16            So, do you have an understanding that at the PCAOB

17   there is a form for comments?

18   A.   Yes.

19   Q.   And it's a form, it is also a formal documents.  When we

20   are talking about comments in the course of a PCAOB inspection

21   we are not just talking about, *hey, nice tie.*  We are talking

22   about a form that's been filled out by the inspectors?

23   A.   Yes.

24   Q.   And it may be the case, is it your understanding that it

25   may be the case that the comments later make their way into an

J2D5mid5                          Bricker - cross

1   inspection report as a deficiency identified in the inspection
2   report?
3   A.  Yes.
4   Q.  Or some version of the substance of the comment, right?
5   A.  That's correct.
6   Q.  But some comments don't make their way into the report,
7   right?
8   A.  That's correct.
9   Q.  And so, it may that be there are larger number of comments
10  in a particular inspection than there are deficiencies
11  identified in the report, right?
12  A.  That's correct.
13  Q.  And there is a whole dialogue process surrounding the
14  comments, right?
15  A.  That's correct.
16  Q.  So, the inspectors write up a comment and then the firm has
17  an opportunity to respond to that write up, basically disagree,
18  maybe, or try to clarify or say to the PCAOB you shouldn't
19  really be giving us a comment on this because here is an
20  explanation, right?
21  A.  That's correct.
22  Q.  And then the PCAOB may or may not agree with that feedback,
23  right, and there is a mechanism, there is a legal mechanism
24  where if the two sides are kind of at loggerheads with respect
25  to a comment, the firm can ask the SEC to decide the issue.

J2D5mid5                              Bricker - cross

1           Is that right?

2    A.  No.  The interim review is an interim review of the report

3    so the PCAOB's process needs to have been completed, the PCAOB

4    board then approves the issuance of the report, and it is at

5    that point that the firm can seek a review of the particular

6    section within the report that it disagrees with.  That occurs

7    before the report is issued publicly.

8    Q.  Okay.  So, thank you for the clarification.

9           So, it is not at the comment dialogue stage that the

10   firm can seek review from the SEC, it is at the point where

11   whatever comments are getting incorporated in the report, that

12   process has happened and the report has been drafted but not

13   publicly issued?

14   A.  The report has been approved by the Board and then the firm

15   has 30 days to seek interim review.  After the 30 days passes,

16   if the firm hasn't sought interim review, then the report is

17   made available publicly.

18   Q.  So, in the same time period, 2015 through, let's say,

19   February of 2017, did KPMG seek formal review from the SEC with

20   respect to any of the reports?

21   A.  Not that I recall.

22   Q.  And then I think the last --

23           MR. WEDDLE:  I'm sorry, your Honor.  Can I have a

24   moment?

25           THE COURT:  Yes.

J2D5mid5                          Bricker - cross

1          (pause)

2     BY MR. WEDDLE:

3     Q.   Then I think the last area where you said you relied on the

4     reports in doing your work at the SEC was in, with respect to

5     issues of de registration.  Do you remember that discussion?

6     A.   I do remember that.  I think there were other areas that

7     are referred to as using reports, but.

8     Q.   Oh, okay.  Great.

9          So, before we talk about de-registration, can you tell

10    me the other areas I have left out?

11    A.   Yes.  We talked about or I talked about reviewing reports

12    and referring matters to other divisions and offices.  For

13    example, in each of, for example, the issuer A there is a real

14    company behind that and we would know which real company is

15    behind that.  The accounting group, for example, would read

16    through those comments to evaluate whether there is some

17    indication that the company's financial statements might be --

18    there might be a problem with those.  That's just one example.

19    And then we would refer those matters to the Division of

20    Corporation Finance for further resolution.

21         We would also refer all of the items in inspection

22    reports as a potential matter to the Division of Enforcement

23    because those comments represent deficiencies in compliance

24    with PCAOB rules or SEC rules, as just examples.

25    Q.   So let's talk about de-registration.

1          So, de-registration is, if de-registration happens to

2     an accounting firm that is a pretty dramatic event for an

3     accounting firm, right?

4     A.  It is.

5     Q.  Particularly for a Big Four accounting firm, if the SEC

6     deregistered it, most likely that firm would be out of

7     business, right?

8     A.  It would have to focus on non-public companies.  Each firm

9     has audit practices for private companies but it would be a

10    fairly significant event, yes.

11    Q.  And will you agree with me that KPMG has about 20,000

12    employees?

13    A.  That sounds right.

14    Q.  So, will you agree with me that if KPMG were de-registered,

15    probably more than half of those people would be out of work?

16          MS. KRAMER:  Objection, your Honor.

17          THE COURT:  Overruled.

18          You can answer, if you know.

19          THE WITNESS:  I don't know how it would absorb and

20    reallocate its practices.

21    BY MR. WEDDLE:

22    Q.  Sitting here today you can't say whether probably half of

23    KPMG would be out of work if KPMG was de-registered by the SEC?

24          MS. KRAMER:  Objection, your Honor.  Speculation.

25          THE COURT:  Sustained.

J2D5mid5                         Bricker - cross

1   BY MR. WEDDLE:

2   Q.  What percentage of KPMG's work do you think would be --

3   current work would be precluded if the SEC de-registered KPMG?

4           MS. KRAMER:  Same objection, your Honor.

5           THE COURT:  Overruled.

6           THE WITNESS:  I don't know.

7   BY MR. WEDDLE:

8   Q.  Do you think it would be more than half?

9   A.  It could well be.  I just -- I don't know what portion of

10  their practice is devoted to SEC PCAOB work versus their

11  private practice, that is, companies that are not registered

12  with us.  I would only be speculating about a percentage.  I

13  don't know that.

14  Q.  So, it is fair to say, though, that KPMG has not been

15  de-registered, right?

16  A.  It has not been de-registered.

17  Q.  Are there a number of steps in the process of

18  de-registering?

19  A.  There are legal steps to both registering and

20  de-registering, yes.

21  Q.  Has any of the steps toward de-registration been taken at

22  the SEC with respect to KPMG?

23  A.  It wouldn't be within the SEC's process, it's the PCAOB

24  that registers and de-registers firms.

25  Q.  So, that's a PCAOB issue?

J2D5mid5                        Bricker - cross

1    A.  That's a PCAOB activity.

2    Q.  Okay.

3    A.  But, the effect of de-registration has an effect on

4    companies that have been audited by KPMG because if they're

5    de-registered then companies have to get another auditor to do

6    the audit.

7    Q.  So, what you are saying is if KPMG were de-registered, each

8    of its public company clients would have to get a new audit

9    with a new auditor?

10   A.  That's correct.

11   Q.  And correct me if I am wrong, but there are about 600 such

12   clients of KPMG?

13   A.  That may -- that sounds generally right.  I don't know

14   exactly how many they have.

15   Q.  And among the 600 public company clients of KPMG are some

16   of the largest global companies in the world, right?

17   A.  That's correct.

18   Q.  So, would you expect that the de-registration of KPMG might

19   affect the stock price of those large companies?

20            MS. KRAMER:  Objection, your Honor.  Speculation.

21            THE COURT:  Sustained.

22   BY MR. WEDDLE:

23   Q.  Do you have an understanding about whether the stock price

24   of KPMG's clients would be affected by de-registration of KPMG?

25            MS. KRAMER:  Objection, your Honor.  Speculation and

J2D5mid5                              Bricker - cross

1    relevance.

2              THE COURT:  You can answer whether you have an

3    understanding.

4              THE WITNESS:  I'm not an economist to predict the

5    correlation of, you know.

6    BY MR. WEDDLE:

7    Q.  I guess we have been talking about the fact that in

8    addition to public companies, many accounting firms also audit

9    companies that are not or institutions that are not public

10   companies, right?

11   A.  That's correct.

12   Q.  And, even some institution -- there are also institutions

13   that get audits but they may not be performed by a private

14   accounting firm; is that correct?

15   A.  I'm not sure I understand that.

16   Q.  Okay.  Well, let's take an easy example.  The Securities

17   and Exchange Commission is a government agency, right?

18   A.  That's correct.

19   Q.  It manages money, correct?

20   A.  It manages its own resources, yes.

21   Q.  And in doing that it has to follow certain accounting

22   rules, right?

23   A.  It follows governmental accounting standards, yes.

24   Q.  And the SEC also is audited in its application of the

25   applicable accounting standards, right?

J2D5mid5                      Bricker - cross

1    A.  That's correct.

2    Q.  Who audits the SEC?

3    A.  The GAO; the General Accountability Office for the U.S.

4    government.

5    Q.  Are you aware that KPMG audits the Department of Justice?

6    A.  I wasn't aware.

7           MS. KRAMER:  Objection to relevance, your Honor.

8           THE COURT:  Sustained.

9    BY MR. WEDDLE:

10   Q.  Can we display Government Exhibit 354, which I believe is

11   in evidence?  It is the first page.

12          So, you recall this is the SEC's strategic plan for

13   2014 to 2018, right?

14   A.  Yes.

15   Q.  And, I believe on direct you talked about strategic

16   objective 1.1 which is on page 12.  Do you want to look at

17   that?  Do you see that?

18   A.  Yes.

19   Q.  And we don't have to zoom in on this right now, but if you

20   just take a look?  So, that the way this strategy document is

21   laid out, there are a number of strategic objectives, correct?

22   A.  That's correct.

23   Q.  Those are written in red ink, right?

24   A.  That's correct.

25   Q.  Then, to accomplish each strategic objective there are a

J2D5mid5                        Bricker - cross

1    number of bullet points which are denoted initiatives, right?

2    A.  That's correct.

3    Q.  So, if we blow up the heading Initiatives and maybe the

4    first line of the bullet point it says:  Initiatives to

5    accomplish this strategic objective, the SEC plans to implement

6    the following initiatives.

7         Correct?

8    A.  That's correct.

9    Q.  And the second initiative we looked at, we looked at this

10   when you were on direct testimony -- wait.  Am I on the wrong

11   one?  I'm sorry, double-sided pages.

12        The next page, I'm sorry, so probably going eight

13   bullet points into the initiatives and there is one that is

14   called -- can you, Ms. Kramer -- there is one that is called

15   Foster High-quality Audits and we looked at this when you were

16   on direct, right?

17   A.  That's correct.

18   Q.  Will you agree with me that the only mentions of the PCAOB

19   in this entire document are on this page?

20   A.  I don't know it well enough to know one way or the other,

21   to be honest.

22   Q.  Let's look, still, at this document.  I have to find the

23   page -- I apologize, your Honor -- sir, you don't have the

24   document in front of you in a binder but it is about a 50-page

25   document, right?

J2D5mid5                         Bricker - cross

1    A.   As I recall, yes.

2    Q.   And it covers the whole scope of the SEC's work, right?

3    A.   It covers the strategic planning aspects of our mission;

4    that's correct.

5    Q.   And the SEC's oversight of the PCAOB is just one among a

6    number of functions at the SEC, right?

7    A.   That's correct.

8    Q.   So, if we take a look at page 31, and this is at the top of

9    this page 31 of Government Exhibit 354, there is another

10   strategic objective, strategic objective 2.3.

11            Do you see that?

12   A.   I see that.

13   Q.   And that objective is the SEC prosecutes violations of

14   federal securities laws and holds violators accountable through

15   appropriate sanctions and remedies.

16            Do you see that?

17   A.   I do see that.

18   Q.   When that document says "prosecute" it is not talking about

19   a criminal prosecution, right?

20   A.   That's correct.  The SEC doesn't have criminal authority.

21   Q.   Sometimes the SEC cooperates or coordinates with the people

22   in charge of criminal prosecutions but it doesn't, itself, have

23   the ability to bring a criminal case, right?

24   A.   That's correct.

25   Q.   The cases that it brings are what we will call civil cases,

J2D5mid5                          Bricker - cross

1    right?

2    A.   That's correct.

3    Q.   Or administrative cases, right?

4    A.   That's correct.

5    Q.   And those cases are about whether someone -- well, are you

6    familiar with the types of sanctions that are available in the

7    context of an SEC action as distinguished from a criminal

8    action?

9              MS. KRAMER:   Objection.   403 and relevance.

10             THE COURT:   Sustained.

11   BY MR. WEDDLE:

12   Q.   Mr. Boxer asked you about the fact that the SEC has in fact

13   brought an enforcement action against or relating to the same

14   conduct that you are here talking about, right?

15             MS. KRAMER:   Object to this line of questioning, your

16   Honor.

17             May we have a side bar?

18             THE COURT:   Yes.

19             (Continued next page)

20

21

22

23

24

25

J2D5mid5                         Bricker - cross

1        (At side bar)

2            MS. KRAMER:  Your Honor, the punishment that the SEC

3    action may effect on the defendants should be as irrelevant

4    here as any mention of the punishment they face in the criminal

5    case.  The answer to Mr. Boxer's question on this was out

6    before we could raise an objection but it's the same problem

7    which is, essentially, if the defendants intend to argue or

8    suggest through this line of cross-examination that the jury

9    does not have to convict Mr. Middendorf or Mr. Wada because

10   they will face civil penalties and they will be punished enough

11   anyway, that is improper.  And, if not for the purpose of that

12   argument, I don't see the relevance of the testimony.

13           THE COURT:  What is the relevance?

14           MR. WEDDLE:  At least two things I have, just thought

15   of.

16           The first is, when I say I just thought of them I

17   thought of them before but I may remember some more as we are

18   talking.  One is that, is to just elicit the fact that there is

19   a difference between criminal cases and civil cases.  I don't

20   plan to go through the particular punishments that are being

21   sought in this.

22           THE COURT:  But why is that relevant?

23           MR. WEDDLE:  Because this is similar to the whole

24   willfulness instruction argument that the parties have had,

25   your Honor, which is that whatever your Honor's instruction is

J2D5mid5                              Bricker – cross

1    going to be, I hope that it's going to include an instruction

2    that the defendants can't be -- some type of instruction that

3    draws a line between criminal and non-criminal, that is

4    wrongful, perhaps, but non-criminal conduct.  We are just

5    trying to point out that there are differences between civil

6    and criminal actions and that there is a whole range of things.

7            On direct testimony Mr. Bricker went through the

8    statute and there is Section 104 about all the things, I think

9    it is Government Exhibit 356 about all the things that the

10   PCAOB inspections are required to or designed -- sorry -- are

11   listed in the law as things that the PCAOB inspection should

12   identify and that has a whole range of things in it that I

13   submit have very different levels of severity, and to leave

14   that direct testimony uncrossed as if it is the same thing to

15   have the PCAOB looking for a violation of a professional

16   standard as to look for a violation of Sarbanes-Oxley or other

17   laws or SEC rules, those are different things and I think we

18   are entitled to point out that those are different things.

19           There is an additional relevance to the enforcement

20   action which I am happy to talk about now or after.

21           THE COURT:  Yes.  What is that?

22           MR. WEDDLE:  The additional is that I think it goes to

23   bias of the witness.  I think that this witness and other

24   witnesses that we are going to hear in this trial are, in some

25   sense, and people may disagree about the strength of this

J2D5mid5                              Bricker - cross

1    argument, but I think it is fair argument, that they're in some

2    sense on a side in this litigation.

3              THE COURT:  They're on a what.

4              MR. WEDDLE:  On a side.  So, the SEC is not a neutral,

5    the SEC has brought enforcement action, and when the SEC brings

6    an enforcement action that means the Commission itself has

7    voted on the enforcement action, it can't be brought by the

8    Division of Enforcement.

9              So, it is run and investigated by the Division of

10   Enforcement but in order to investigate, the Commission itself

11   has to issue an order authorizing the investigation.  In order

12   to bring the case the SEC issues this order instituting

13   proceedings.  So, the witness' boss has said this is

14   sanctionable behavior and he is here testifying.  I think that

15   that is an area of bias, your Honor.

16             MS. KRAMER:  Your Honor, the fact that the action has

17   been brought is arguably relevant for that purpose.  The fact

18   of the action is already in evidence.  The penalties that may

19   flow from SEC actions have no relevance here and that's the

20   difference.

21             So, the witness has already testified that there is an

22   administrative proceeding.  The specific peoples available

23   should just not be put into evidence.  To the extent that there

24   is any probative value from them, the sort of the argument that

25   flows from them, the inference that flows from them that the

J2D5mid5                      Bricker - cross

remedy in a civil case is just this stuff and not jail, right,

calls to the jurors' minds punishment which is not something

that they should be thinking about in this phase of the

criminal proceeding and is prejudicial.

          MR. BOXER:  May I?

          THE COURT:  Yes.

          MR. BOXER:  First off, I have no intention of making

an argument in summation that Ms. Kramer was concerned about.

          Second, with respect to my cross, I think the door was

opened on the 1-02(e) in the direct examination.  I asked a few

questions about it because I think it goes to Mr. Middendorf's

intent that when he did what they accused him of doing he

understood that it could have an administrative consequence to

him but he didn't think that he could be defrauding the SEC in

the manner that he is charged.  So, I think it is relevant to

show what he could have understood and what he couldn't have

understood.  I don't think it is a big part of our case at all,

I don't plan to make the argument that counsel is concerned

about but they brought it up and I think it helps show that he

views the SEC as dealing with professional practice.

          THE COURT:  As what?

          MR. BOXER:  With dealing with professional practice,

not what he is charged with.

          MS. MERMELSTEIN:  But that's all in evidence now,

right?

J2D5mid5                          Bricker - cross

1            So, to the extent there is any purported bias, we

2       didn't object to that question because we think it is a bad

3       argument but a permissible one.  That's in evidence.  This,

4       about civil penalties, is completely improper, suggests a

5       problematic argument which is it is enough, they're already

6       going to be punished and your Honor has already said during

7       jury selection to jurors who sat on civil juries that there is

8       a difference.  They'll be instructed in the full instructions

9       that civil trials are different, that the government has the

10      burden, that it's much higher and so there is plenty in,

11      anything else is just a 403 problem.

12            THE COURT:  I agree.  I'm going to sustain the

13      objection.

14            MR. WEDDLE:  Your Honor, can I just ask for a quick

15      clarification?

16            I don't think I have elicited from him the fact that

17      Mr. Wada is named in the OIP yet.  Mr. Boxer elicited the fact

18      that Mr. Middendorf was but I would like to cover that.

19            And can I still talk about the bias point, your Honor?

20      I think the last question that I asked him was what are the

21      range of sanctions and I take your Honor's ruling to mean we

22      are not going to talk about the difference between civil and

23      criminal, but can I talk about the fact that the proceeding was

24      instituted by the Commission itself?

25            THE COURT:  Yes, you can do that, and that Mr. Wada is

1    named.

2              MR. WEDDLE:   Thank you.

3              (Continued on next page)

J2D5mid5                          Bricker - cross

J2ddmid6                          Bricker - cross

2            (In open court)

3            MR. WEDDLE:  I forgot precisely where we were.

4            I'm sorry.  Are we ready?

5            Thank you, your Honor.

6   BY MR. WEDDLE:

7   Q.  I think you said you're generally aware that there was an

8   enforcement action brought by the SEC in relation to the

9   conduct that we are going to be talking about in this trial.

10  A.  In relation to specific individuals.

11  Q.  Right.  Right.  Exactly.

12           And Mr. Boxer asked you if his client was one of the

13  individuals.  And I just have the same question, which is are

14  you aware that Mr. Wada was one of the individuals named in

15  that enforcement action?

16  A.  I am aware, yes.

17  Q.  And generally -- let me just back up.

18           SEC administrative actions are not managed day-to-day

19  by the Office of the Chief Accountant, right?

20  A.  They are not.

21  Q.  They are more the responsibility of the Division of

22  Enforcement, right?

23  A.  That's correct.

24  Q.  But are you aware that the Division of Enforcement itself

25  doesn't bring administrative actions; actions are brought by

J2D5mid5                        Bricker - cross

1    means of an order instituting proceedings issued by the

2    Commission itself?

3    A.  Yes, that's correct.

4    Q.  So the five members -- the four or five members of the

5    Commission have to actually vote to bring an administrative

6    action, right?

7    A.  That's correct.

8    Q.  And ultimately those are -- the Commission is ultimately

9    your boss?

10   A.  That's correct.

11             MR. WEDDLE:  May I have a moment?

12             THE COURT:  Sure.

13             (Pause)

14   Q.  Are you also generally aware, sir, that the Commission has

15   brought an administrative action against a person named Brian

16   sweet?

17   A.  Yes.  Yes.  I believe so.

18   Q.  Are you generally aware how Mr. Sweet is handling that

19   administrative action?

20   A.  I am not aware, no.

21             (Pause)

22             MR. WEDDLE:  I apologize, your Honor.

23             (Pause)

24   Q.  Now, you testified, sir, on direct examination about the

25   delay in issuance of some of the KPMG inspection reports; do

J2D5mid5                         Bricker - cross

1   you recall that?

2   A.  I do.

3   Q.  And specifically those reports are the 2016 inspection

4   report of KPMG, which was issued publicly on January 5th, 2019,

5   so just a few weeks ago?

6   A.  That's correct.

7   Q.  That's one of them.  And then the other one is the 2017

8   inspection report for KPMG which was issued publicly on

9   January 24th, 2019, just a few weeks ago, right?

10  A.  That's correct.

11  Q.  And I think you testified that the SEC only finds out about

12  the deficiencies identified in a report when the report is

13  issued.

14  A.  Generally speaking, that's right, yes.

15  Q.  And, of course, there are laws and rules governing what the

16  PCAOB can say publicly about its inspections, right?

17  A.  That's correct.

18  Q.  But the SEC is not public in its dealings with the PCAOB,

19  right?

20  A.  That's correct.

21  Q.  So is it fair to say that if the SEC wanted to know what

22  the inspection showed, it could find out before the inspection

23  report was issued, right?

24  A.  We could meet with the PCAOB.  We could get, you know,

25  information about that.  Nothing really becomes final until it

J2D5mid5                           Bricker - cross

1   is brought for a PCAOB board vote.

2   Q.  Right.  But at any time you could find out exactly the

3   status by just asking?

4   A.  That's right.

5   Q.  And there would be no constraint in the PCAOB telling you

6   the information, right?

7   A.  That's correct.

8   Q.  And you talked about the fact that in the -- let me see, I

9   think it was the 2016 inspection report, that there were some

10  additional audits inspected -- ten additional audits inspected;

11  do you remember that?

12  A.  Yes.

13  Q.  So the SEC could have asked the PCAOB what's happening with

14  additional inspections, whose's being inspected as additional

15  inspections, right?

16  A.  That's correct.  We wouldn't really know until their

17  process is complete, though.

18  Q.  Right.  But you could get whatever information they can --

19  up-to-date information they could give you as up to date as

20  they could give it to you, right?

21  A.  That's correct.

22  Q.  All you have to do is ask?

23  A.  That's correct.

24  Q.  OK.  So let's talk about a couple of these reports.

25            MR. WEDDLE:  Can we take a look at on the screen

J2D5mid5                         Bricker - cross

1  Government Exhibit 2?

2          I'm sorry, 1, 3 and 5.  Can we not put 2 up.

3          I'm sorry, your Honor.  All of my Post-Its are on the

4  wrong document.

5          (Pause)

6          Can we look at Government Exhibit 1?

7  BY MR. WEDDLE:

8  Q.  And let's take a look at -- so this is Government Exhibit

9  1, just to orient you.  It is the 2014 inspection of KPMG,

10  which was a report publicly issued October 15, 2015.  Do you

11  see that?

12  A.  Yes.

13  Q.  And if we could look at page 52 of the document.

14          And I think before we read the document, let me just

15  ask you a question.

16          I think you said that you used the report to gauge

17  audit quality for the firm, right?

18  A.  That's correct.

19  Q.  The report itself -- let's blow up the top paragraph of

20  this.  So in the report itself, it explains some information

21  about reports generally, right?

22  A.  That is correct.

23  Q.  And this one says, at the top, "The inspections are

24  designed to identify deficiencies in audit work and defects or

25  potential defects in the firm's system of quality control

J2D5mid5                          Bricker - cross

1   related to the firm's audits."

2            Do you see that?

3   A.   Yes.

4   Q.   "The focus on deficiencies, defects, and potential defects

5   necessarily carries through to reports on inspections and,

6   accordingly, Board inspection reports are not intended to serve

7   as balanced report cards or overall rating tools."

8            Do you see that?

9   A.   I do.

10  Q.   Will you agree with me that that language appears in every

11  inspection report for KPMG that you have read?

12  A.   I would expect that it does.  The PCAOB generally includes

13  that language.

14  Q.   Do you personally use it as a tool to gauge audit quality.

15  A.   It is one source.  That's why we also meet with the firms,

16  to understand their perspective, to have a more balanced

17  perspective.  But inspection reports is one source of our

18  overall review and assessment of how things are going.

19            This is quite precisely and accurately describing

20  what's contained in here is a summary of the deficiencies.  So

21  it gives us a sense of where the deficiencies are.  It doesn't

22  include a summary of all of the things that they've done

23  correctly, for example.

24  Q.   Nor does the report issued by the PCAOB disclose all of the

25  additional information and meetings and discussions that you

J2D5mid5                          Bricker - cross

1    know as the Chief Accountant take place?

2    A.  That is correct.

3              (Pause)

4              MR. WEDDLE:  I'm sorry, your Honor.  I am just

5    mentally cutting questions.

6              (Pause)

7              May I have a moment to talk with my colleagues, your

8    Honor?

9              THE COURT:  Sure.

10             (Pause)

11   BY MR. WEDDLE:

12   Q.  Sir, in the inspection reports, any of them, they don't say

13   in them how long -- how much notice the firm had that an

14   inspection was coming, do they?

15   A.  No.  Just it describes the design of the inspection program

16   and says that they've looked at 50, not all of the firm's

17   clients, but it's not specific as to the amount of time.

18   Q.  We talked before about, you know, the sort of variation of

19   a few weeks.  The timing is not specifically identified for

20   every issuer; issuer A got notice four weeks before the

21   inspections started and this is what happened?

22   A.  That is correct.

23   Q.  And you don't at the SEC separately get like a chart?  In

24   other words, you talked about sort of the answer key that

25   identifies who -- the names, who the issuers are.  You don't

J2D5mid5                    Bricker - cross

1  get a separate chart that says how many days' notice they have,

2  do you?

3  A.  I don't believe so.

4  Q.  So we were talking earlier about your work at PwC and also

5  your work as a fellow at the SEC.  When you left the SEC job as

6  a fellow and went to PwC, as a partner in PwC, did you keep in

7  touch with any of your former colleagues from the SEC.

8  A.  Generally, socially.  I was subject to the government's

9  ethics rules, which precluded, you know, appearance or practice

10 or really appearance before the Commission during the cooling

11 off period.  So I was subject to that and I followed it very

12 closely.

13 Q.  Right.  But like socially you might go to lunch with a

14 colleague, as long as it wasn't contrary to the cooling off

15 period?

16 A.  That is correct.

17 Q.  And if you went to lunch with a former SEC colleague when

18 you were at PwC, might you talk shop?

19 A.  Not generally because I was very careful about the ethics

20 prohibitions.

21 Q.  You wouldn't talk about accounting generally and things

22 like that?

23 A.  We may have but I was -- I was quite careful to not talk

24 about matters that could come before the SEC or OCA generally.

25 Q.  Right.  And then is it the same now that you are back at

J2D5mid5                          Bricker - cross

1    the SEC; do you from time to time have lunch with former

2    colleagues from the PCAOB socially?

3    A.   Former colleagues of the PCAOB?

4    Q.   Sorry.  I misspoke.  I said "PCAOB."  I meant PwC.

5            Your former colleagues at PwC, do you sometimes

6    socially --

7    A.   I do.

8    Q.   -- get together with them in a social fashion?

9    A.   I do.

10   Q.   And I take it you probably have the same answer.  You're

11   mindful of your discussions with those people and make sure

12   that they stay social --

13   A.   That's right.

14   Q.   -- and personal and aren't in some way transgressing the

15   rules?

16   A.   That is correct.

17   Q.   When you left PwC, you didn't, for example, take tens of

18   thousands of PwC emails with you?

19   A.   When I left PwC, no.

20   Q.   Did you take any documents with you when you left PwC?

21   A.   I recall having some personal accounting texts which I took

22   into the firm and I took out of the firm.

23   Q.   But no -- no matters that you had worked on at PwC,

24   documents you had worked on at PwC to help you with your new

25   job?

J2ddmid6                          Bricker - redirect

1   A.  No.

2               MR. WEDDLE:  I have nothing further, your Honor.

3               THE COURT:  OK.  Any redirect?

4               MS. KRAMER:  Yes.  Briefly, your Honor.

5               THE COURT:  Yes.

6   REDIRECT EXAMINATION

7   BY MS. KRAMER:

8   Q.  Mr. Bricker, earlier today Mr. Boxer asked you a series of

9   questions about whether comments in PCAOB inspections lead to

10  restatements of financials, and you testified that most of the

11  time they don't.

12              Even if comments don't lead to restatements, do those

13  comments matter to the SEC?

14  A.  They do.  They can lead to comment letters and changes in

15  disclosure even if there is not a restatement.

16  Q.  And let's take a look at I believe it is Defense Exhibit

17  M-206.

18              MS. KRAMER:  Mr. Urbanczyk, could you pull that up?

19  Q.  You testified about this document.  Do you recall that?

20  A.  I do.

21  Q.  Who does this strategy and process document give direction

22  to within the SEC?

23  A.  It gives direction to the accounting group, which is a

24  subgroup within all of the Chief Accountant's office.  There is

25  about 50 people in the Chief Accountant's office, about 20

J2ddmid6                        Bricker - redirect

1   people in the accounting group, so it is a subset of the

2   accounting group.

3   Q.  And are there other components within the SEC that focus on

4   the audit issues that come up in inspections?

5   A.  Yes, there are.  So that's the professional practice group.

6   There is roughly ten people in that group.  It has its own

7   deputy in charge of that area.  It has its own process for

8   driving the consistency.  It is a smaller group so they tend to

9   have just meetings so that they achieve consistency that way.

10  Q.  OK.  And you were asked some questions -- thank you,

11  Mr. Urbanczyk -- about whether you had provided guidance to

12  KPMG on how to solve its problems on the allowance issue and

13  inspections.  Do you remember being asked some questions about

14  that?

15  A.  I do.

16  Q.  Are there guidance documents that exist for auditors like

17  KPMG on the allowance issue?

18  A.  There are.  That is the Staff Accounting Bulletin 102,

19  which I testified about.  And so we pointed to that existing

20  guidance just as a starting point for those discussions.  The

21  reason we were having meetings -- among the reasons, we wanted

22  to make sure that there was a common understanding of the

23  guidance that already existed.  So, SAB 102 was the

24  Commission's guidance and FR 28 and among other things.

25  Q.  You just mentioned SAB 102 and FR 28?

J2ddmid6                        Bricker - redirect

A.   Yes.

Q.   So is that guidance that's available to firms like KPMG
and --

A.   It is on our website.  It is available to firms, companies,
the general public to understand it.

Q.   I just want to clarify something on the timing.  You were
asked a lot of questions this afternoon about the timing of the
notice that PCAOB gives to firms likes KPMG of when it is going
to inspect a particular audit.

            When in relation to the end of the 45-day period do
you understand notice to be given generally?

A.   Generally, it's after that 45-day period, because it is the
45-day period where the firm is assembling its final audit file
and then archiving it, locking it down, and then after that the
inspections occur so that there is no misunderstanding about
what the audit file is and what it represents and how it was
documented.

Q.   You were also asked some questions about AS 3, the standard
concerning audit documentation.

            MS. KRAMER:  Mr. Urbanczyk, could you pull up AS 3?
It is Defense Exhibit M-176.

Q.   All right.  You were asked about just one paragraph in this
document.  Let's look at another paragraph.

            So on page 2, next to the number 2 at the top of the
page, could you please read the sentence that begins with the

J2ddmid6                          Bricker - redirect

1    words "Audit documentation."

2    A.   "Audit documentation is the written record of" --

3    Q.   I'm sorry.  There are multiple sentences that begin with

4    "Audit Documentation."  Could you look at the second sentence

5    that begins with "Audit Documentation."

6    A.   Yes.  "Audit documentation also facilitates the planning,

7    performance, and supervision of the engagement, and is the

8    basis for the review of the quality of the work because it

9    provides the reviewer with written documentation of the

10   evidence supporting the auditor's significant conclusions."

11   Q.   So if a firm had improper advance notice of -- that the

12   fact that the PCAOB was going to inspect a particular audit and

13   they got that notice during the 45-day period and made changes

14   to the work papers, even if those changes complied with AS 3,

15   would you be able to rely on the inspection report's assessment

16   about the quality of the audit?

17              MR. BOXER:  Objection.

18              MR. WEDDLE:  Objection.

19              THE COURT:  Overruled.

20   A.   No.

21   Q.   Why not?

22   A.   Because the documentation reflects the auditor's judgments

23   and representations about the work that was performed, and so

24   it's the basis for the PCAOB's review of that work and then

25   summarizing whether the firm generally has a system and a set

J2ddmid6                           Bricker - redirect

1    of tools and methodology to do its work on all of its

2    engagements.

3    Q.  You were asked some questions about an SEC statement that

4    was issued.

5            MS. KRAMER:  Mr. Urbanczyk, could you pull M-171,

6    please.

7    Q.  So let's look at a paragraph that you weren't asked about

8    on cross-examination.

9            Let's look at the first paragraph, Mr. Urbanczyk.

10   Q.  Mr. Bricker, what does this paragraph say?

11   A.  It says:  "Today, the U.S. Department of Justice and the

12   SEC initiated enforcement actions against six former KPMG and

13   PCAOB personnel related to an alleged misappropriation of

14   confidential PCAOB inspection information.  More information

15   relating to the allegations can be found in the orders

16   instituting procedures (Order 1, Order 2) and the accompanying

17   press release."

18   Q.  I think you said "procedures."  Is it "proceedings"?

19   A.  Oh, "proceedings."  "Orders instituting proceedings."

20   Q.  Let's look at the second paragraph.

21           And what does this say?

22   A.  It says:  "The alleged conduct is disturbing, and I support

23   the SEC's enforcement action.  Audited financial statements are

24   at the heart of the SEC's disclosure-based regulatory regime:

25   A company's financial statements provide investors with a

J2ddmid6                              Bricker - redirect

1    wealth of material information, and independent audits give

2    investors confidence that those statements can be trusted.  The

3    PCAOB is a critical part of the oversight of our local,

4    national, and international capital markets, in that it helps

5    to promote high-quality audits of the financial statements of

6    issuers and broker-dealers, upon which investors rely."

7    Q.  Let's look at the paragraph you testified about earlier,

8    which is paragraph 3.  I think you were asked about the

9    sentence that indicates that SEC registrants could continue to

10   use audit reports issued by KPMG going forward.

11        As of the date this statement was issued, what was

12   your understanding about whether the misappropriation of

13   confidential PCAOB inspection information that's discussed in

14   this statement had been uncovered?

15        MR. BOXER:  Objection.

16        THE COURT:  The question was whether --

17        MS. KRAMER:  Yes.

18        THE COURT:  -- it had been uncovered?

19        MS. KRAMER:  Yes.

20   BY MS. KRAMER:

21   Q.  To be clear, as of the date of this statement, did you have

22   an understanding of whether the SEC knew about the

23   misappropriation of confidential information that's the subject

24   of this statement?

25        MR. BOXER:  Objection.

J2ddmid6                         Bricker - recross

1          MR. WEDDLE:  Objection.

2          THE COURT:  Overruled.

3          You may answer.

4    A.  Yes.

5    Q.  And as of the date of this statement, what was your

6    understanding about whether the individuals at KPMG who were

7    involved in this conduct were still employed by KPMG?

8    A.  I understood that they were former KPMG PCAOB personnel.

9    They had then terminated from their prior status with those

10   respective organizations.

11         MS. KRAMER:  May I have a moment, please, your Honor?

12         THE COURT:  Yes.

13         (Pause)

14         MS. KRAMER:  Nothing further, your Honor.

15         THE COURT:  OK.  Anything further?

16   RECROSS-EXAMINATION

17   BY MR. BOXER:

18   Q.  So as you understand it, Mr. Bricker, Mr. Middendorf is no

19   longer employed at KPMG, correct?

20   A.  Yes.

21   Q.  Just two follow-up questions.

22         First regarding AS 3.

23         MR. BOXER:  If we can put up 176 on the screen.

24   Q.  I thought I heard you say that the documentation period

25   included reliance on the judgment of the auditor.  Did I

J2ddmid6                          Bricker - recross

1    mishear you when you said that?

2    A.   I'm sorry.  What was that question?

3    Q.   Ms. Kramer asked you if -- she gave you that long

4    hypothetical and suggested that you couldn't rely -- or asked

5    you a question whether you could rely on the audit work papers

6    and the scenario that she said, and you said you couldn't

7    because they reflect the auditor's judgment, what's included in

8    the work papers.  That's what I thought I heard you testify.

9            Is that your testimony, or would you like to clarify

10   that?

11   A.   Well, the audit documentation reflects the auditor's

12   judgment in written form.  It is written down and recorded.

13   Q.   OK.  Well, if I could -- when you say "judgment" -- well,

14   let me take it in steps.

15           If we could look to paragraph 4 of AS 3.

16           Would you read the second sentence?

17   A.   "Audit documentation should be prepared in sufficient

18   detail to provide a clear understanding of its purpose, source,

19   and the conclusions reached."

20   Q.   In other words, it needs to present all the facts that were

21   considered, correct?

22   A.   That would be an element of it.

23   Q.   And so an audit team couldn't -- if they consider facts

24   one, two, three and four -- my hypothetical -- they couldn't

25   just put facts one and two in the audit work papers, they are

J2ddmid6                         Bricker - recross

1   supposed to consider all -- put in, document all the facts that
2   they considered, one, two, three, and four, in my example,
3   correct.
4   A.  As part of audit documentation, it needs to reflect, you
5   know, the --
6   Q.  Everything they did?
7   A.  It needs to reflect what they did, yes.
8   Q.  And so there is no judgment in the sense that the auditor
9   can say, well, I'll put this in but I won't put that in; even
10  though I considered them both, I decided what I want to do?
11  The rule is very clear, everything you relied on, you need to
12  document and include in the work papers, right?
13  A.  Allowance for the phrase "sufficient detail."  There's --
14  there's --
15  Q.  Is that what you're testifying to, as far as your judgment,
16  that would have meant maybe there is not sufficient detail?  Is
17  that the subject of your judgment testimony?
18          MS. KRAMER:  Objection.  Vague.
19  Q.  Do you understand my question?
20  A.  I don't understand the question.
21  Q.  You testified that with changes to the work papers, it
22  would affect your review because those changes reflect
23  judgment, words to that effect.  Is that what you testified to,
24  or did I misunderstand you?
25  A.  I believe what I was getting at was that audit

J2ddmid6                         Bricker - recross

1  documentation needs to -- needs to reflect the auditor's work.

2  The auditor's work includes judgments.

3  Q.  Thank you.  So they're documenting judgment decisions they

4  made during the audit, correct?

5  A.  That's right.

6  Q.  But the actual act of documenting the audit, there is no

7  judgment, correct?

8  A.  Well, there is some judgment in terms of, you know --

9  Q.  Sufficient detail?

10  A.  That would be an example.

11  Q.  OK.  When you testified earlier about judgment, were you

12  talking about the term "sufficient detail," or were you talking

13  about the judgment that needs to be exercised in certain

14  aspects of the audit?

15  A.  So when I was testifying about the 45-day period --

16  Q.  Right.

17  A.  -- what I was testifying about was professionals have to

18  assemble all of the information into a place, but all of the

19  work needed to have been done, prepared, reviewed, subject to

20  all of the supervision by the time that the audit report was

21  issued.

22  Q.  I understand.  But you used the word "judgment."  The word

23  judgment, would you agree with me, implies that it requires

24  some discretion?  It could be affected.  That's what judgment

25  means.  And that was your word.  And so I'm trying to

J2ddmid6                        Bricker - recross

1   understand what you meant by it.

2              And I think what I'm hearing -- and tell me if I have

3   this wrong -- is that during the audit, oftentimes the

4   accountants exercise judgment in how they conduct their audit,

5   but when they document it in the 45-day period, they are

6   required to document everything they did in sufficient detail?

7   It's clear in AS 3.  Is that correct?

8   A.  Not entirely because the work that the auditor has done

9   needs to be subject to supervision and quality review.  For

10  example, there is an auditing standard on the engagement,

11  quality of reviewer.  All of that needs to be done before the

12  audit report is issued.  So it is not that you can do much work

13  and then document it later, after the opinion has been issued.

14  It wouldn't have been timely supervised and reviewed in that

15  instance.

16  Q.  But I'm asking about you used the word "judgment."  When

17  preparing the work papers and cleaning them up and following AS

18  3, you are required to provide sufficient detail and a clear

19  understanding of what was done, correct?

20             MS. KRAMER:  Your Honor, objection.  Asked and

21  answered.

22             MR. BOXER:  I don't think I have --

23             THE COURT:  I will allow it.

24             Go ahead.

25  A.  The audit -- if the question is should audit documentation

J2ddmid6                            Bricker - recross

1    be prepared in sufficient detail, yes, absolutely.

2    Q.  The question is, is there -- there is no judgment as part

3    of documenting what was done in sufficient detail; isn't that

4    correct?

5    A.  I think audit professionals exercise judgment in everything

6    that they do.

7    Q.  Including gathering the materials that they relied on and

8    the work that they did, that's an exercise of judgment?

9    A.  It's not automatic.

10   Q.  It's what?

11   A.  It's not automatic.  Auditors who have training in audit

12   are doing that.  It is not assigned to administrative staff.

13   Q.  So if I'm an auditor and I did four things to test the

14   allowance, in my judgment, I could only document three of them

15   and I don't have to put the fourth one in, if I did, according

16   to AS 3; is that your testimony?

17              MS. KRAMER:  I object to form, your Honor.

18              THE COURT:  You can answer it, if you understand.

19   A.  I think I understand but I'm not sure.

20   Q.  OK.  I want you to understand.  So, that was my question.

21   Do you think you can answer it or should I try to rephrase it?

22   A.  Let me try to answer it.

23          We talked earlier about subsequent discovery of a

24   fact.

25   Q.  We did.

J2ddmid6                         Bricker - recross

A.   Which is an audit standard.  And so it might be that the

auditor has subsequently discovered that the audit report was

not adequately supported whenever it had been issued.  In that

instance, if fact four in the hypothetical was a significant

thing, it might be covered under that standard, and then you

would have to apply that standard.

Q.   I understand that hypothetical.  So let me refine the

hypothetical a little bit.

          Auditing for the allowance, you do four things -- one,

two, three and four -- to test the allowance, no additional

audit procedures are discovered that need to be done in the

documentation period, does the auditor have the discretion to

only document on the work papers three of the four things he or

she did to test the allowance; is that your testimony?

A.   It does not have that discretion.

Q.   So she would have to put down all four things that she did

to test the allowance in that circumstance, correct?

A.   It would have to --

Q.   In sufficient detail?

A.   You would have to put it down, and it would have to -- if

it is significant to that, it would have to go through the

review, supervision, and the engagement quality review.

Q.   Understood.  Understood.

          One last question or questions about guidance that

Ms. Kramer asked you about.

J2ddmid6                          Bricker - recross

1                This SAB 102, what year does that date back to?

2       A.  I believe it was issued in two thousand -- maybe it was

3       2001, maybe it was 2002, so early 2000s.

4       Q.  So, it is an old standard.  Maybe that is the wrong way to

5       phrase it.  It has been around for a long time?

6       A.  It has been around for a while.

7       Q.  Isn't it true that as part of these meetings you've

8       testified about, that your staff, or you actually, reviewed

9       some of KPMG's guidance to see if it was adequate?

10      A.  KPMG provided excerpts of their tools and their methods,

11      and we offered observations, after having reviewed those

12      observations, to sort of help them think about it.

13      Q.  I think I understand your prior testimony now.  So you

14      consider those tools as opposed to guidance, what you just

15      described?

16      A.  Tools and guidance are interchangeable.

17      Q.  So, for example, KPMG has a manual that it distributes to

18      its junior and senior auditors as to how to conduct audits,

19      correct?

20      A.  Yes.  That would be guidance, and a checklist would be a

21      tool.

22      Q.  Exactly.  They might have professional practice letters

23      that they periodically send out to highlight certain issues

24      that the audit team should be aware of, right?

25      A.  That's correct.

J2ddmid6                         Bricker - recross

1   Q.  They might have formal policies about sampling, for

2   example, correct?

3   A.  That is correct.

4   Q.  So all of that is considered guidance, at least by me.

5            Would you consider that guidance as well?

6            MS. KRAMER:  I object to the testifying, your Honor.

7            MR. BOXER:  I will withdraw that.

8   BY MR. BOXER:

9   Q.  Do you consider that guidance, the type of material as I

10  have just described it?

11  A.  Just generally speaking, yes.

12  Q.  OK.  And it's those types of materials and information that

13  informed these discussions about the allowance that we reviewed

14  together earlier today from KPMG, correct?

15  A.  There were specific excerpts from KPMG's materials.

16           MR. BOXER:  Thank you.

17           I have no further questions, your Honor.

18           THE COURT:  Thank you.

19           Anything further?

20           MR. WEDDLE:  Nothing further.

21           THE COURT:  OK.

22           MS. KRAMER:  Nothing further, your Honor.

23           THE COURT:  All right.  Thank you.  You may step down.

24           Maybe this is a good time for a quick bathroom break.

25  We will take ten minutes, folks.

J2ddmid6

1              Please leave your notepads on your chairs and we will

2      continue in ten minutes.

3              (Witness excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2ddmid6

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Any issues you want to address or should we come back

4      after the break?

5              MS. KRAMER:  No, your Honor.

6              THE COURT:  OK.  We'll see you in ten minutes.

7              MS. MERMELSTEIN:  Your Honor, is it all right if we

8      put the witness on the stand?

9              THE COURT:  Sure.

10             (Recess)

11             (Jury not present)

12             THE COURT:  Everybody ready?

13             MS. MERMELSTEIN:  Yes, your Honor.

14             THE COURT:  Please bring in the jury.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J2ddmid6                          Ren - direct

1           (Jury present)

2           THE COURT:  You may be seated.

3           Welcome backs, folks.

4           Government, you may call your next witness.

5           MS. MERMELSTEIN:  Thank you, your Honor.

6           The government calls Mr. Chris Ren.

7           THE COURT:  All right.

8           Sir, will you please raise your right hand and you

9    will be sworn in.

10   CHUANGANG REN,

11       called as a witness by the government,

12       having been duly sworn, testified as follows:

13           THE CLERK:  Can you please state your full name and

14   spell your last name slowly for the record.

15           THE WITNESS:  First name C-h-u-a-n-g-a-n-g.  Last name

16   R-e-n.

17           THE CLERK:  Thank you.

18           MS. MERMELSTEIN:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MS. MERMELSTEIN:

21   Q.  Good afternoon, Mr. Ren.

22           May I ask you to please briefly describe your

23   educational background for the jury?

24   A.  Sure.  I got my bachelor's degree in China in 1992 and I

25   came to the U.S. and got my master's degree in economics and

J2ddmid6                         Ren - direct

1   master's degrees in computer science in December of 1998.

2   Q.   Where do you currently work?

3   A.   PCAOB.

4   Q.   How long have you worked for the PCAOB?

5   A.   I started in July 2005 as a contractor, and I was converted

6   into a full-time employee in December of 2005.

7   Q.   Can you describe the various positions you have held at the

8   PCAOB since you first began working there?

9   A.   I started as an applications security engineer.  Later I

10  was promoted to senior applications security engineer, and

11  later I was promoted to security architect.

12  Q.   Did you say "security" architect?

13  A.   Yes.

14  Q.   What department within the PCAOB do you work in?

15  A.   It's the Office of Information Technology.

16  Q.   What, if any, electronic devices does the PCAOB provide to

17  its employees?

18  A.   A laptop computer and a mobile device, which is an iPhone.

19  Q.   Does the PCAOB utilize any shared computer network?

20  A.   Yes.  We have a shared computer network and a cloud-based

21  solution.

22  Q.   What is the cloud-based solution called?

23  A.   It's called IIS.

24  Q.   IIS?

25  A.   Yes.

J2ddmid6                              Ren - direct

1    Q.  Does every PCAOB employee have access to all aspects of
2    IIS?
3    A.  No.
4    Q.  I want to turn your attention to approximately April of
5    2017.
6            Did there come a time that you were involved in a
7    search of the content of a laptop used by Jeffrey Wada?
8    A.  Yes.
9    Q.  First, how do you know that the laptop you searched was
10   used and belonged to Jeffrey Wada?
11   A.  There are two aspects.  First, at the PCAOB we have a
12   management system so in the system we have a computer name and
13   a username.  So we have a laptop.  When you open it, I can see
14   the tag and check on the system to see the username.  Then, you
15   know, with the computer files, there is also a user preference.
16   That will be the username.  So that is what we used to
17   identify, you know, the user's laptop computer.
18   Q.  What was the first step you took in conducting a search of
19   Jeffrey Wada's computer?
20   A.  I followed our standard practice for a security
21   investigation.  We first created a forensic disk image from the
22   laptop.  Then we used our office standard practice, because it
23   is encrypted, we performed a decryption with a disk image.
24   Then we imported that forensic disk image into our forensic
25   system, which is called Access Data Enterprise, which is an

J2ddmid6                          Ren - direct

1    enhanced version of FTK, Forensic Toolkit.

2    Q.  Why is it the standard practice to begin a search by

3    creating a forensic disk image?

4    A.  I think the concept in this industry is called forensically

5    sound.  We don't want to make any modification to the original

6    disk, so we only do a read-only operation.  Then you know after

7    the forensic disk image is created, we don't touch that

8    original computer anymore.

9    Q.  In other words, it allows you to search the computer

10   without risking that you will alter any of the data on it?

11   A.  That is correct.

12            MR. OHTA:  Your Honor, leading.

13            THE COURT:  I will allow it.

14            Go ahead.

15   BY MS. MERMELSTEIN:

16   Q.  Let me turn your attention to Government Exhibit 92, for

17   identification.  There is a hardcopy in front of you just by

18   the water, and it is also going to come up on your screen.

19            Do you recognize that?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a screen capture I created for a folder on Mr. Wada's

23   laptop.

24   Q.  Does this accurately reflect the file names of the

25   documents that were in the folder and that you captured on Mr.

J2ddmid6                         Ren - direct

1    Wada's computer?

2    A.  Yes.

3              MS. MERMELSTEIN:  The government offers Government

4    Exhibit 92.

5              MR. OHTA:  No objection, your Honor.

6              THE COURT:  OK.  Government's 92 is received.

7              (Government's Exhibit 92 received in evidence)

8              MS. MERMELSTEIN:  Can we publish that to the jury,

9    please, Mr. Cooney.

10   BY MS. MERMELSTEIN:

11   Q.  Mr. Ren, looking at the top left-hand corner of the screen,

12   where it says "Computer," and then reading across the list of

13   words there, what does this indicate about the location of the

14   file that you copied?

15   A.  So this first, it is the local disk J.  It is a local disk

16   with its name, J.  And every person see this as the C drive

17   when he is operating the computer.

18             Then we have "Users," which is the Windows' user

19   profile folder.  After "Users," we have WadaJ, which lets you

20   know the user account name.  Then we have "My Documents."  So

21   for this portion, the user you see when you open your "My

22   Documents," this way you know its location.

23             Then under "My Documents," there is a folder with its

24   name "Inspections."

25             Then your next folder, there is a folder named "2017."

J2ddmid6                          Ren - direct

1    And in the folder 2017, there is a folder name

2    "PriceWaterhouseCoopers."  Within that folder, there is another

3    folder name, "zero admin."  And then inside that folder there

4    is a folder named "Planning."  And in the folder Planning there

5    is a folder named "Examples from other firms."

6    Q.  So, in other words, these files were all in a folder called

7    "Examples from other firms" which was itself in each of the

8    folders you just read, is that right?

9    A.  That's correct.

10   Q.  Looking at the list of files under "Name," what are we

11   seeing there?

12   A.  Here we have a list of Excel files and Office files.

13   Q.  That were in this folder?

14   A.  Yes.

15   Q.  What is the date created for each of these documents?

16   A.  It is February 1, 2017.

17   Q.  And what does it mean that the date created in this folder

18   is February 1, 2017?

19             MR. OHTA:  Objection.  Foundation.

20             THE COURT:  If you know, you can explain.  You can

21   answer.

22   A.  So this is called a time stamp which is used by the file

23   system, used by the computer to start the time that the file is

24   created.

25   Q.  And does that reflect the time that the file was first

J2ddmid6                          Ren - direct

1   created or the time it was saved to this computer?

2              MR. OHTA:  Objection, your Honor.  Leading.

3              THE COURT:  Overruled.  You can answer.

4   A.   It's the first a file is created.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid7                     Ren - direct

1   BY MS. MERMELSTEIN:

2   Q.  Sorry.  Is the date created here, does that reflect the

3   date that the file was saved to Mr. Wada's computer?

4   A.  Yes.

5   Q.  Or the date that it was created by someone somewhere?

6   A.  Here it is the date that's created on this laptop.

7   Q.  Meaning the date it was saved to this laptop?

8   A.  Yes.

9   Q.  Let me direct your attention to Government Exhibit 93 in

10  front of you, it is a CD.  Do you have it there?

11  A.  Yes.

12  Q.  Do you recognize that?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's a CD with the files I collected from Mr. Wada's laptop

16  computer.

17  Q.  In other words, the files whose names we were just looking

18  at?

19  A.  Yes.

20  Q.  Is that all of the files or is there one that's not on the

21  CD?

22  A.  It's all the files but the first one.

23  Q.  And are the documents on Government Exhibit 93 true and

24  accurate copies of the documents that you copied from the

25  folder we were just looking at from Mr. Wada's computer?

J2D5mid7                          Ren - direct

1   A.   Yes.

2              MS. MERMELSTEIN:   The government offers Government

3   Exhibit 93 and its contents, which are Government's Exhibits 80

4   through 91.

5              THE COURT:   They're received.

6              MR. OHTA:   Your Honor, because the document is

7   incomplete, we would like to add the document that is missing

8   from the CD.

9              MS. MERMELSTEIN:   May we approach, your Honor?

10             THE COURT:   Yes.

11             (Continued next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid7                        Ren - direct

1          (At side bar)

2          MS. MERMELSTEIN:  We don't have the document.  When we

3    produced the contents of the folder to defense counsel, we made

4    explicitly clear in the cover letter that we were not including

5    that document.  Because it is an Ernst & Young document,

6    confidential EY information, it wasn't given to us and so it

7    wasn't relevant, in our view, to the case.  Defense counsel

8    never asked us for it or, to my view, the PCAOB.  I don't think

9    it is incomplete because we don't have it.  If defense counsel

10   wants to get it and offer it we might have no objection, but I

11   think the documents, as they've been marked, are admissible.

12   There is plenty of notice that that is what the government

13   intended to do.

14          THE COURT:  Do you have the other one?

15          MR. OHTA:  No, your Honor.

16          MR. COOK:  It is relevant given the title of the file

17   structure.  It is examples from other firms as to why he was

18   collecting these documents which are not just KPMG material but

19   E&Y as well.

20          MS. MERMELSTEIN:  The reason we have put in the whole

21   file structure is that that put everyone on notice there is

22   another document.  We haven't misled the jury it was only KPMG

23   documents.  And, the title of the file makes clear it is Ernst

24   & Young.

25          So, if they want to argue there is legitimate purpose

J2D5mid7                         Ren - direct

```
1    in collecting documents from other firms, they can do that.  I
2    don't think it precludes the admission of this document.
3              THE COURT:  When you say you don't have the first one,
4    what do you mean by that?
5              MS. MERMELSTEIN:  The government is not in possession
6    of it.
7              THE COURT:  Doesn't have it?  At all.
8              MS. MERMELSTEIN:  At all.  We have never seen it, we
9    don't have it.
10             THE COURT:  So it never came from the PCAOB to the
11   government?
12             MS. MERMELSTEIN:  Correct.  Exactly.
13             MR. OHTA:  Did you look on Mr. Wada's laptop if it was
14   there?
15             MS. MERMELSTEIN:  Hold on one second.
16             (Counsel conferring)
17             MS. MERMELSTEIN:  I'm just confirming.  We don't have
18   Mr. Wada's laptop, the PCAOB has Mr. Wada's laptop.  They
19   located this file, we asked for the KPMG materials.  We have
20   disclosed to the jury that there was an E&Y document.  You can
21   certainly ask them but none of this should be new to the
22   defense and I don't think it is incomplete in a way that
23   renders it inadmissible.
24             THE COURT:  I agree.  I mean, if you want to ask about
25   what the other document is, you can.  If it becomes relevant we
```

J2D5mid7                         Ren - direct

1   can try to -- you can try to offer it but I don't think it

2   makes the rest of this inadmissible.

3            MR. OHTA:  Okay, your Honor.

4            And also, I don't know how long the direct is going to

5   take but it is getting closer than I had thought in terms of

6   expert testimony.

7            MS. MERMELSTEIN:  I have no further questions after

8   these are admitted into evidence, so.

9            THE COURT:  Okay.

10           MR. OHTA:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2D5mid7                          Ren - cross

 1              (In open court)

 2              THE COURT:  So, Government Exhibit 93 and 80 through

 3     91 are admitted into evidence.

 4              (Government's Exhibit 93 received in evidence)

 5              (Government's Exhibits 80 - 91 received in evidence

 6              MS. MERMELSTEIN:  No further questions, your Honor.

 7              THE COURT:  Mr. Ohta?

 8              MR. OHTA:  Thank you, your Honor.

 9     CROSS EXAMINATION

10     BY MR. OHTA:

11     Q.  Good afternoon, Mr. Ren.

12     A.  Hi.

13     Q.  My name is Jason Ohta and I represent Jeffrey Wada in this

14     case.

15              You briefly went through your educational background

16     and I think there is a time period missing that I want to go

17     over with you.  You said you earned your masters in December of

18     1998; is that correct?

19     A.  Yes.

20     Q.  And then you started working at the PCAOB in July of 2005?

21     A.  Yes.

22     Q.  I just want to go through that period between your

23     graduation date and July 2005.

24     A.  Sure.

25     Q.  How were you employed after you graduated?

J2D5mid7                          Ren - cross

1    A.  So, in January of '99, immediately after my graduation, I

2    started working for a company called Reliable Software

3    Technologies, which later changed its named to Cigital, which

4    was later acquired by a public company Synopsis.

5              THE COURT:  You said Cigital, and it was acquired by

6    synopsis?

7              THE WITNESS:  C-I-G-I-T-A-L.

8    A.  It was first called Reliable Software Technologies.

9              So, I started in January of 1999 and I worked there

10   until the, to the October of 2004.  Then I started --

11   Q.  Hold on.  I will ask the questions.  I didn't mean to

12   interrupt you.

13   A.  Sir, I haven't finished.  You know the time?

14   Q.  I will get there.

15              What was your position at Reliable?

16   A.  Research associate.

17              I started as a research associate in the research

18   division, then later I also worked as a security consultant,

19   worked for companies like, you know, Microsoft and Qualcomm as

20   a security consultant.

21   Q.  After that position did you have another job before?

22   A.  Yes.

23   Q.  Please, how were you employed?

24   A.  I went to a company called LECG, I think it is called Legal

25   Expert Consulting Group, which was a public company at the

J2D5mid7                          Ren - cross

1    time.  I joined as a managing consultant to do litigation

2    support work.  Then, in July of 2005, I moved to a company

3    called True North Solutions which is a contractor for the

4    PCAOB.  So, I started at the True North solutions as a

5    contractor and I was converted into full-time employee in

6    December of 2005.

7    Q.  Did you ever do any work for an E-discovery company?

8    A.  LECG, yes.

9    Q.  How long did you have that job for?

10   A.  It's started in October of 2004 to July of 2005.

11   Q.  Thank you.

12        Have you ever testified in a criminal case before?

13   A.  No.

14        MS. MERMELSTEIN:  Objection to relevance, your Honor.

15        THE COURT:  I will allow it.  Go ahead.

16   BY MR. OHTA:

17   Q.  Was that a yes?  I'm sorry.

18   A.  No.

19   Q.  Have you ever been involved in a criminal investigation

20   before?

21        MS. MERMELSTEIN:  Same objection, your Honor.

22        THE COURT:  Overruled.

23   A.  No.

24   Q.  Have you ever had any discussions with federal prosecutors

25   before your involvement in this case?

J2D5mid7                              Ren – cross

1    A.   No.

2    Q.   I think you said your first job was Reliant Software

3    Technology?

4    A.   Reliable.

5    Q.   Reliable.  I'm sorry.

6          Did you receive any formal training in criminal

7    investigative techniques?

8    A.   We received training in computer forensics as part of

9    information security.

10   Q.   How long was your training?

11   A.   I attended training on various occasions in a security

12   conference.

13   Q.   A conference?

14   A.   Security conference, you know you have trainings, yes.

15   Not, you know formal like, you know, year-long training but you

16   know, it computer forensics in training for, like, offered by,

17   you know, security conference.

18   Q.   So what conference?

19   A.   RSA Security.

20   Q.   But it was one conference that you are talking about,

21   correct?

22   A.   Yes.

23   Q.   Did you learn any techniques about evidence collection at

24   that conference?

25   A.   In general, you know.  I work in the information security

J2D5mid7                          Ren - cross

```
 1    field.
 2                 MR. OHTA:  I apologize, your Honor.  Objection.
 3    Non-responsive.
 4                 THE COURT:  Did you learn any techniques about
 5    evidence collection at that conference?
 6                 THE WITNESS:  Yes.
 7    BY MR. OHTA:
 8    Q.   What did you learn?
 9    A.   Some principles about, you know, how to keep computer
10    evidence in tact to make sure it's forensically sound.  And
11    various forensic tools such as FTK.
12    Q.   Did you learn, at that conference, anything about chain of
13    custody?
14    A.   Yes.
15    Q.   What did you learn?
16    A.   It's about, you know, where you transfer evidence, you
17    know, the time and the person you are working with, you need to
18    sign.
19    Q.   How about the preservation of evidence?  Did you learn
20    anything at that conference about the preservation of evidence?
21    A.   Preservation, I think I know it in general.
22    Q.   Just generally?
23    A.   I know it.  I don't need to, you know, to go to a
24    conference to know that I know preservation of evidence.  It is
25    kind of, you know, common sense.
```

J2D5mid7                        Ren - cross

1    Q.   I'm sorry.  What is common sense?

2    A.   To, you know, preserve evidence through technical means to

3    make sure, you know, that evidence will be in tact and it can

4    be, you know, forensically sound in a situation like, you know,

5    this court.

6    Q.   So since it is common sense they didn't teach preserving

7    evidence in a formal way at that conference, correct?

8    A.   They just nominally mention it because your instructor just

9    mentioned like, you know, common sense, you need to keep

10   evidence, you know, in tact.

11   Q.   Do you continue to receive training in forensic or computer

12   forensics at the PCAOB?

13   A.   Computer forensics I think, you know, to a certain degree.

14   We have confidence we know enough already to, you know, manage

15   a case like this.

16   Q.   I will ask the question again.

17            Do you receive any training at the PCAOB in computer

18   forensics?

19   A.   I think, you know, we know enough, we don't really need,

20   you know, continuous training about this type of basic stuff,

21   you know, continuously.

22   Q.   So, Mr. Ren, is the answer no?

23   A.   Continuous forensic training?  No, we don't have, you know,

24   forensic training every year.

25   Q.   Thank you.

J2D5mid7                        Ren - cross

1      Are you familiar with the Information Assurance

2  Certification Review Board?

3  A.   Yes.

4  Q.   Have you ever applied to be a certified computer forensics

5  examiner?

6           MS. MERMELSTEIN:   Objection as to relevance, your

7  Honor.

8           THE COURT:   Overruled.

9           THE WITNESS:   So --

10  BY MR. OHTA:

11  Q.   Have you ever applied to be a certified computer forensic

12  examiner?

13  A.   No.

14  Q.   Have you ever applied to be a certified data recovery

15  professional?

16  A.   No.

17  Q.   Are you familiar with the American society crime lab

18  directors?

19  A.   No.

20  Q.   Have you ever been a member of any organization that

21  involves computer forensics?

22  A.   I was formerly certified information system security

23  professional and I am not really a big fan of certifications so

24  I, actually I'm not -- I got certified more than 10 years ago

25  as a certified information security -- information system

J2D5mid7                          Ren - cross

1  security professional and I'm not a big fan of certification

2  because whether I have a certification actually or not --

3         MR. OHTA:  Objection, your Honor.  Not responsive.

4  Move to strike.

5         THE COURT:  Sustained.

6         THE WITNESS:  So --

7         MR. OHTA:  I'm sorry.

8         THE COURT:  Wait for next question.

9         THE WITNESS:  Okay.

10  BY MR. OHTA:

11  Q.  I'm sorry, your Honor, because we don't have real-time

12  working, I want to ask my last question to you, Mr. Ren.

13  A.  Sure.

14  Q.  Have you ever been a member of any organizations that

15  involve computer forensics?

16  A.  I worked for a company called LECG, as I mentioned, and we

17  did, you know, computer evidence collection as, you know, a

18  routine job.  And that company, you know, didn't ask me for any

19  certification.

20  Q.  I want to talk to you now about, because you just testified

21  about examining Mr. Wada's laptop, correct?

22  A.  Yes.

23  Q.  When did you first come into contact with Mr. Wada's

24  laptop?

25  A.  It was -- first I learned the first contact, I believe it

J2D5mid7                          Ren - cross

1    was in May of 2017.

2    Q.  Who asked you to review the -- to review Mr. Wada's laptop?

3    A.  It was my manager.

4    Q.  What is your manager's name?

5    A.  His name is Mike Carver.

6              THE COURT:  What's his last name?

7              THE WITNESS:  Carver.  C-A-R-V-E-R.

8              THE COURT:  Thank you.

9    BY MR. OHTA:

10   Q.  What did Mr. Carver ask you to do with Mr. Wada's laptop?

11   A.  He asked me to do forensic, you know, work, which means we

12   would follow our normal forensic procedure.  And later I

13   received, you know, a request to search for a list of terms,

14   search terms.

15   Q.  When Mr. Carver gave you Mr. Wada's laptop, did you have to

16   sign a chain of custody form?

17   A.  Yes.

18   Q.  So you said someone other than Mr. Carver asked you to

19   conduct a search or gave you search terms -- I apologize -- to

20   run on Mr. Wada's computer?

21   A.  I received search terms from my manager Mr. Carver.

22   Q.  Did Mr. Carver tell you where he got those search terms

23   from?

24   A.  No.

25   Q.  Were you only asked to run those specific search terms on

J2D5mid7                          Ren - cross

1    Mr. Wada's computer?

2    A.   Yes.

3    Q.   Were you asked to do anything else?

4    A.   No.

5    Q.   What were those search terms that you were asked to run on

6    Mr. Wada's computer?

7    A.   I don't remember all of them in my head right now but I

8    remember they were terms such as KPMG and, you know, GNF.

9    Q.   Were those terms written down or were they told to you

10   orally?

11   A.   Written down.  It's through a request, yeah.

12   Q.   Do you know where that document is, by any chance?

13   A.   It's an e-mail request from my manager.

14   Q.   From Mr. Carver?

15   A.   Yeah.

16   Q.   You also testified that you had a contractor, I believe,

17   create an image of Mr. Wada's laptop?

18   A.   That's what my manager told me.

19   Q.   That's what your manager told you to do?

20   A.   I'm sorry?

21   Q.   That's what your manager told you to do?  Get a forensic

22   copy of Mr. Wada's laptop?

23   A.   He asked me to do a forensic analysis of his laptop and I

24   used our, you know, standard practice to create, you know, a

25   forensic disk image.

J2D5mid7                        Ren - cross

1   Q.  Is your standard practice written down anywhere?

2   A.  Actually, every person, it is in our documentation so this

3   last one --

4               (Reporter clarification; record read)

5   A.  No.

6   Q.  Who was the external contractor that you worked with to

7   take an image of Mr. Wada's laptop?

8   A.  I don't know.

9   Q.  Is that information written down anywhere?

10  A.  I don't know.

11  Q.  How long did this contractor have possession of Mr. Wada's

12  laptop before it was returned to the PCAOB?

13  A.  I don't know.

14  Q.  Ms. O'Connor, can we please put up Government Exhibit 92

15  which has already been admitted into evidence?

16              Mr. Ren, based on your search terms, are these the

17  only documents that came up based on your search?

18  A.  No.  They are not the only ones.

19  Q.  What other documents came up on your search?

20  A.  There are others.  I don't remember exactly but, you know,

21  I just, whatever technology FTK returned, I pulled them

22  together and sent to my manager.

23  Q.  So you put the entire search, based on the search terms

24  that you were given by your manager, you presented him with

25  that information, correct?

J2D5mid7                          Ren - cross

1    A.  I put the search terms in the technology FTK, run as to

2    search for at least the files concerning the search terms.

3    Then the technology FTK returned at least, you know, five

4    names.  I sent that list of five names to my manager.  And --

5    Q.  I'm just curious.  I see the files listed on Government's

6    Exhibits 92.  Who was the one to determine what files were, I

7    guess, hit on your search terms?

8    A.  I don't know who created the search terms.  I put the

9    search term in the technology and the technology returned, you

10   know, these files.

11   Q.  You also briefly testified that you are familiar with

12   PCAOB's IIS system; is that correct?

13   A.  Yes.

14   Q.  That's the Inspections Information System?

15   A.  That's correct.

16   Q.  Can you tell the jury, what is IIS?

17   A.  It's a piece of technology generally called, you know, GRC.

18   It's Governance, Risk, and Control, and it's a cloud-solution

19   offered by Thomson-Reuters.

20             THE COURT:  It is a cloud solution offered by

21   Thomson-Reuters?

22             THE WITNESS:  Yes.

23   BY MR. OHTA:

24   Q.  Would you please put up Defendant's Exhibit 1439 just for

25   the Court and counsel?

J2D5mid7                          Ren - cross

1              Mr. Ren, do you see the document on the screen before

2      you?

3      A.  Yes.

4      Q.  Do you recognize this document?

5      A.  No.

6      Q.  It says PCAOB information --

7              MS. MERMELSTEIN:  Objection, your Honor.  Reading from

8      a document not in evidence that the witness has said he does

9      not recognize.

10             THE COURT:  Sustained.

11     BY MR. OHTA:

12     Q.  Are you aware that the PCAOB publishes manuals regarding

13     the IIS system?

14     A.  I'm not a user of the IIS system.

15     Q.  But you did testify that you are aware of the IIS system?

16     A.  I am aware of the system but I am not a user of the system.

17     Q.  But you are in the IT department of the PCAOB, correct?

18     A.  Yes.

19     Q.  In terms of the IIS system, are you familiar with -- let me

20     step back.

21             On Government Exhibit 92 you testified to the date

22     created and there were a bunch of dates on that document; is

23     that correct?

24     A.  Yes.

25     Q.  On the IIS system if a document is, let's say, for example,

J2D5mid7                        Ren - redirect

1    a document that's contained on Government's Exhibit 92, if that

2    document was with a similar title accessed in IIS, would the

3    IIS system record the time stamp of when that document was

4    accessed in IIS?

5    A.  That I don't know.

6    Q.  Who would know that information?

7    A.  That would be the administrator of the IIS.

8    Q.  Who is that person -- sorry, what is that person's name?

9    A.  I don't know.

10   Q.  Mr. Ren, were you ever asked to search any other laptops in

11   this criminal investigation?

12   A.  No.

13           MR. OHTA:  Your Honor, may I have one minute?

14           THE COURT:  Yes.

15           (Counsel conferring)

16           MR. OHTA:  Thank you, your Honor.  No questions.

17           THE COURT:  Thank you.

18           Anything further?

19           MR. BOXER:  No questions, your Honor.

20           MS. MERMELSTEIN:  Very briefly, your Honor?

21           THE COURT:  Okay.

22   REDIRECT EXAMINATION

23   BY MS. MERMELSTEIN:

24   Q.  Just a few clarifications, Mr. Ren.

25           First of all, the IIS system you said is maintained by

J2D5mid7                          Ren - redirect

1    Thompson-Reuters; is that what you said?

2    A.   Yes.

3    Q.   That's a third-party vendor?

4    A.   Yes.

5    Q.   So not maintained within the PCAOB IT system?

6    A.   That's correct.

7    Q.   Is that why you are not very familiar with it?

8    A.   That's correct.

9    Q.   You said that you sent out Mr. Wada's computer for a

10   forensic image from a third-party vendor and that you also made

11   your own forensic image.  Which one did you do first?

12   A.   It was sent to the outside vendor first.

13   Q.   And what is, again, the purpose of making a forensic image?

14   A.   To make sure it will be forensically sound.

15   Q.   In other words that you have made a copy without altering

16   any of the data on the original, right?

17   A.   That's correct.

18   Q.   So, the laptop that came back to you from the third-party

19   forensic image being made had not been altered, in your

20   understanding?

21           MR. OHTA:  Objection, your Honor.

22           THE COURT:  You can testify to your understanding, if

23   you know.

24           THE WITNESS:  That's correct.

25   BY MS. MERMELSTEIN:

J2D5mid7                        Ren - redirect

1   Q.  Am I right that on cross-examination you described the

2   search you conducted as being relatively basic?

3           MR. OHTA:  Objection, your Honor.

4           THE COURT:  You can answer.

5           THE WITNESS:  Yes.  Basically it is a very basic

6   forensic operation.  Just, you know, basically search terms,

7   puts the terms in the technology, let the technology run, and

8   get the result.

9   BY MS. MERMELSTEIN:

10  Q.  Can you put up Government Exhibit 92 for a moment?

11          Just so it is clear, Government Exhibit 92 is all of

12  the documents that were in this particular folder on Mr. Wada's

13  hard drive, right?

14  A.  That's correct.

15  Q.  It's not all of the documents that hit on search terms,

16  right?

17  A.  That's correct.

18  Q.  You said that you used a tool called FTK to run the search;

19  is that correct?

20  A.  Yes.

21  Q.  That's the same tool that is used, for example, by the FBI,

22  right?

23          MR. OHTA:  Objection, your Honor.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.  It is a widely used tool in the

J2D5mid7                          Rodriguez - direct

1    forensic community.

2              MS. MERMELSTEIN:  Nothing further.

3              THE COURT:  Okay.  Anything else?

4              MR. OHTA:  No questions, your Honor.

5              THE COURT:  Thank you, sir.  You may step down.

6              (witness excused)

7              MS. MERMELSTEIN:  The government calls Stephanie

8    Rodriguez, your Honor.

9              THE COURT:  Okay.

10    STEPHANIE RODRIGUEZ,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MS. MERMELSTEIN:

15   Q.  Good afternoon, Ms. Rodriguez.

16   A.  Hi.

17   Q.  What is your educational background?

18   A.  I graduated from the University of South Florida with my

19   bachelors in accounting on May of 1998, and my masters degree

20   in May of 2002.

21   Q.  What did you do following graduation?

22   A.  I took a position with Arthur Andersen as an intern and

23   thereafter staff, and I was there for a little over a year,

24   upon which I took a position with Ernst & Young and I was there

25   for 10 years.  And then, upon leaving, Ernst & Young I took a

J2D5mid7                              Rodriguez - direct

1    position with PCAOB.

2    Q.   Are Arthur Andersen and Ernst & Young both accounting

3    firms?

4    A.   Yes, they are.

5    Q.   What position do you currently hold at the PCAOB?

6    A.   I'm an associate director.

7    Q.   As associate director, do you have any particular

8    responsibility with respect to the KPMG team?

9    A.   Yes.  I am currently the U.S. team lead for the KPMG

10   inspection team.

11   Q.   Can you describe the other positions that you have held at

12   the PCAOB since the time you joined and up until the time you

13   assumed your present role?

14   A.   Yes.

15            I was an IS-III, Inspection Specialist III when I was

16   hired, and I was at that level I believe two and a half years

17   or so, and then I was promoted to an inspection leader, and I

18   was an inspection leader for three years, until I was promoted

19   to associate director which is my current position.

20   Q.   Let's back up for a second.  What is the PCAOB?

21   A.   The PCAOB, we are regulators for the public accounting

22   firms.

23   Q.   How is the PCAOB created?

24   A.   It was created through the Sarbanes-Oxley Act of 2002.

25   Q.   Is it a government agency?

1  A.  No, we are not.

2  Q.  What kind of entity is it?

3  A.  I don't know that I know the technical term, but we are

4  overseen by a government agency.

5  Q.  What government agency oversees the PCAOB?

6  A.  The SEC.

7  Q.  And, in broad terms, what does it mean that the SEC

8  oversees the PCAOB?

9  A.  The SEC has numerous responsibilities in our oversight.

10  They approve our budget, they approve our standards.  They

11  oversee our inspection process.  They become involved and

12  receive information through enforcement so they oversee all the

13  components within our operations.

14  Q.  What is the PCAOB's mission?

15  A.  The PCAOB's mission is to protect investor interests and

16  through hopefully improving audit quality.

17  Q.  You said that the PCAOB oversees auditors.  What are

18  auditors?

19  A.  Auditors perform audits of companies, both public and

20  private.

21  Q.  What is a public company?

22  A.  A public company is a company whose ownership or their

23  shares are publicly traded on an exchange.

24  Q.  How do public companies report their financial information

25  to their investors and to the investing public?

J2D5mid7                         Rodriguez – direct

A.  They file quarterly financial statements every three months

within the year, and they also file annual financial statements

at their year-end.

Q.  Are they required to make those filings?

A.  Yes, they are.

Q.  When are companies required to make an annual filing?

A.  An annual filing is required to be filed within 60 to 90

days of year-end and that depends on the size of the company.

Q.  What do you mean by year-end?

A.  Whenever their calendar -- if their calendar year-end or

some companies have different year-end depending on what

industry they operate in or what have you, they can all have

different year-ends.

Q.  Is there one year-end that is most common?

A.  Yes; December 31st.

Q.  Are there rules that govern how a company prepares its

financial statements?

A.  Yes, there are.

Q.  Where do those rules come from?

A.  The accounting rules are set forth by FASB.

Q.  Can you give the jury an easy example of what an accounting

rule might be?

A.  Sure.

        For example, there are many accounting rules over

revenue.  So, depending on what kind of business you have

J2D5mid7                          Rodriguez - direct

1    determines when you would recognize your revenue.  So, if you

2    have, like, a grocery store where you buy a item at the cash

3    register and your commitment is done -- your sale is done and

4    you own that grocery item -- you can recognize that revenue

5    then; as opposed to an arrangement where you may have a

6    contract in place, like where you have home-service contracts

7    where you pay one time and then they owe you service throughout

8    the year, that revenue gets recognized over the period of

9    service that they are giving you.

10   Q.  In other words you don't earn it all up front if you have

11   to perform your services over a year?

12   A.  Correct.

13   Q.  Just to be clear, do auditors prepare financial statements

14   for companies?

15   A.  No, they do not.

16   Q.  So, what is their role?

17   A.  Their role is to verify the accuracy of the information

18   within the financial statements.

19   Q.  How do auditors do that?

20   A.  They do that through the audit and they compare those

21   financial statements to the books of the company which they're

22   auditing.

23   Q.  Are you familiar with the term audit procedure?

24   A.  Yes.

25   Q.  What does that mean?

J2D5mid7                        Rodriguez - direct

A.  An audit procedure are the steps or the work that an

auditor will do over a specific account balance.  So, there are

certain steps you to do to verify each of the numbers in the

financial statements and each of those procedures is called an

audit procedure.

Q.  Sticking still with easy examples, can you give us an easy

example of what an audit procedure might be?

A.  Sure.

        For instance, accounts receivable, so that is the

money that a business is owed from people with which it

transacts business transactions with.  What we are required to

do is confirm or verify the existence of those receivables at

year-end so an auditor may send out a confirmation to whoever

owes the money and asks them to confirm an amount is correct

and these are in fact due and the date and age of that have

receivable.

Q.  What is the difference between an accounting rule and an

auditing rule?

A.  So, the accounting rules set forth how numbers should be

recorded within the financial statements and an auditing rule

sets forth the regulations or the procedures that you should

perform to verify those numbers.

Q.  And where do auditing rules come from?

A.  Auditing rules come from the PCAOB.

Q.  When auditors conduct an audit, do they look at every

1    transaction on the company's financial statements?

2    A.  No, they do not.

3    Q.  Why not?

4    A.  It would be impractical to verify every number on the

5    financial statements in all transactions.

6    Q.  So, what do auditors do in that respect?

7    A.  They take a sample of transactions or they sample some of

8    the items within the work.

9    Q.  Now, you said that there are audit rules set by the PCAOB

10   or rules about how to audit.  Can you give us an example of

11   what a PCAOB rule governing auditing might be?

12   A.  Yes.

13        So, when we are talking about accounts receivable

14   where you send confirmations, the auditing rules would tell you

15   that the auditor must maintain control of that process.  So,

16   the auditor should send the confirmation directly and receive

17   the confirmation directly.  That should not be done through

18   client.

19   Q.  Let's take, as an example, a company that has a December

20   31st year-end -- so the most common year-end.  What is the

21   timeline of an audit of that company?

22   A.  So, the planning procedures will begin early during the

23   year that is under audit where there will be a process by which

24   the auditors determine the scope and the risk within the audit

25   and there will be many times testing of internal controls that

1   the company has throughout that period.  And then your interim

2   procedures usually occur around the September-October time

3   frame where they'll perform procedures on the numbers in the

4   financial statements with the year-end procedures happening

5   shortly after the close of the year.

6   Q.  What is an auditor's final work product in that respect?

7   A.  The final deliverable that the auditor would issue is their

8   opinion on the financial statements.

9   Q.  And when does that issue?

10  A.  That is issued at the same time that the financial

11  statements must be issued when they're filing their financial

12  statements.

13  Q.  What do auditors have to complete before they can issue

14  that opinion?

15  A.  Their audit procedures.

16  Q.  How do auditors document their work?

17  A.  They document their work in their audit workpapers.

18  Q.  What is the purpose of a workpaper?

19  A.  The purpose of the workpaper is to serve as evidence for

20  all the work that was done to support the audit.

21  Q.  Are auditors required to maintain workpapers?

22  A.  Yes, they are.

23  Q.  Why?

24  A.  To support the work that you did and its evidence to show

25  that those numbers were in fact tested and audited.

J2D5mid7                          Rodriguez - direct

Q.  How do large audit firms typically maintain the workpapers?

A.  The larger firms typically have electronic systems with
which they maintain their audit workpapers.

Q.  When does an auditor have to complete its workpapers?

A.  So, the audit procedures must be completed before the
financial statements are filed and the audit workpapers must be
assembled and completed within 45 days of that date.

Q.  What is the difference between audit procedures and the
audit workpapers?

A.  So, the procedures are the actual work that the auditor
does in order to verify those numbers on the financial
statements.  The workpapers support that work.  So, the work
must be done, all work must be done prior to issuing the
financials, and then the workpapers must be completed,
assembled and filed within 45 days.

Q.  Can you give the jury an example of the kind of thing that
would be proper for an auditor to do in that 45 days?

A.  Sure.

        So, when you are issuing financial statements there is
often many drafts that you are going through as changes are
being done and the auditors are verifying the numbers in the
financial statements.  Once those financial statements are
filed, they'll take that final version and they'll put all of
the tie out information they had done previously on the drafts
and put it on the final version to put in their workpapers.

J2D5mid7                         Rodriguez - direct

1          THE COURT:  Did you say tie out information?

2          THE WITNESS:  Yes, a tie out.  I'm sorry, I used

3    accounting lingo.

4          THE COURT:  Just for the jury, I want to make sure

5    they understand a term like that.

6          THE WITNESS:  Thank you.

7          A tie out is when you actually have support for a

8    number in the financials so you will maintain a record showing

9    you everything was supported within those documents.  That's

10   what they call a tie out of the financials.

11   BY MS. MERMELSTEIN:

12   Q.  What happens if, say, during that 45 days, an auditor

13   discovers that there was audit work that was necessary and had

14   not been performed before the opinion was issued?

15   A.  There is a standard in place that allows an auditor to do

16   the work if they realize they have an omitted procedure, it is

17   commonly referred to as AU 390.

18   Q.  What, if any requirement is there, that auditor disclose in

19   the work papers that that work was done after the 45 days had

20   begun?

21   A.  So, if the requirements under AU 390 are to evaluate the

22   materiality of that omitted procedure, and if it is determined

23   necessary for the work, they must complete that work and add it

24   to the workpapers, and if new work or procedures are added to

25   workpapers, you document what was added and why it was added.

J2D5mid7                              Rodriguez - direct

1    Q.  So, let's turn back then to the PCAOB.  What kind of
2    auditors are overseen by the PCAOB?
3    A.  Those who audit public companies.
4    Q.  Are there different PCAOB programs for different kinds of
5    auditors?
6    A.  Yes, there are.
7    Q.  What are they?
8    A.  So, the PCAOB inspection program is divided into the GNF
9    Program, which is the Global Network Firm Program; the NAF
10   program which is the Non-Affiliate Firm Program, and our
11   broker-dealer program.
12   Q.  I want to focus on the GNF program throughout your
13   testimony today.  Which auditors are overseen by the PCAOB as
14   part of the GNF program?
15   A.  Those are the auditors that work at the six largest
16   firms -- international farms.
17   Q.  What are the six largest international audit firms?
18   A.  Ernst & Young, Deloitte & Touche KPMG, PwC, Grant Thornton,
19   and BDO.
20   Q.  Are you familiar with the term The Big Four?
21   A.  Yes, I am.
22   Q.  What does that refer to?
23   A.  That refers to the four largest of those firms which are
24   Ernst & Young, KPMG, PwC and Deloitte & Touche.
25   Q.  What is the principal way by which the PCAOB oversees the

J2D5mid7                          Rodriguez - direct

1    GNF firms?

2    A.   Through our inspections program.

3    Q.   And what is an inspection?

4    A.   So, annually we will perform inspection procedures over the

5    firms where we will perform reviews of individual issuer

6    audits, and we will also perform reviews over the quality

7    control system within the firm.

8    Q.   So, what do you mean when you say that you performed

9    inspections of individual issuer audits?

10   A.   We will make a selection of audits that the firm has

11   performed and we will review those audit files.

12   Q.   So you pick specific audits that a firm has performed and

13   you look at those?

14   A.   Yes.

15   Q.   And you also said that you look at a firm's system of

16   quality control?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   All of the firms have controls in place that dictate how

20   they do things in order to ensure audit quality is maintained

21   in their practice.  So, they could have rules, for instance,

22   around independence, and the independence process in making

23   sure that the auditors who work on an issuer are in fact

24   independent of them.  They have rules around how they accept

25   clients and re-evaluate the retention of those clients every

J2D5mid7                          Rodriguez - direct

1    year.  And, they have rules, for instance, over how they

2    evaluate partner performance and assign partners to

3    engagements.

4    Q.  So you are looking at the firm as a whole and also then in

5    a subset of its audits; is that right?

6    A.  That is correct.

7    Q.  Approximately how many audits does the PCAOB typically look

8    at when it inspects a GNF firm?

9    A.  There is not really a set percentage that they look at

10   every year.  It is usually in the mid 50s, mid to low 50s.

11   Q.  With respect to KPMG in particular, do you have a sense of

12   what percentage of KPMG's total audits that is?

13   A.  If I remember correctly, I think it was about 7 percent.

14   Q.  So, let's talk in a little more detail about how the

15   inspection process works and I want to focus, in particular, on

16   the time frame from roughly 2015 to early 2017.

17          Did the PCAOB have a designated team for each GNF

18   firm?

19   A.  Yes, we do.

20   Q.  And were PCAOB inspectors generally assigned to one team or

21   to more than one team?

22   A.  Many inspectors are assigned to one team but there is a

23   component or there are a component of inspectors who work on

24   two teams because they would work on the inspection of one of

25   The Big Four, and then they would also work on the inspection

J2D5mid7                          Rodriguez - direct

1    of Grant and BDO.

2    Q.  Does it ever happen that an inspector from, say, the PwC

3    team is lent to the Deloitte team for a particular project?

4    A.  Yes, it does.

5    Q.  And what are the typical circumstances in which that

6    happens?

7    A.  Typically, that would occur because of the most common

8    reason you see it is because of industry experience.  So, if we

9    are inspecting an issuer that operates in an industry that has

10   specific accounting rules or guidance around them, we would

11   bring people in for that inspection who have had experience

12   either inspecting that industry or auditing in that industry.

13   Q.  And what about with respect to international inspections of

14   a U.S. firm's international affiliate?

15   A.  Do we borrow people for that?

16   Q.  Yes.  Exactly.

17   A.  Yes, we do; primarily because of language resources.  So,

18   if you speak the language in a particular country that we are

19   going to, we will share resources for that, and then also for

20   industry experience.

21   Q.  So, let's start by talking about how inspection planning

22   happens at the GNF-wide level, in other words the umbrella for

23   all of those six firms.

24          Who at the PCAOB sets the inspection approach for the

25   GNF program?

1   A.   Annually, our national office will determine the approach

2   that we are going to take across all of the firms.

3   Q.   And what is the national office?

4   A.   They're a group of individuals within the GNF program who

5   work in what we call the national office, and what they will do

6   is they will be responsible for things that operate across the

7   firms.  So, they will be responsible for things like setting

8   our approach, or if our board is interested in a particular

9   item and we are gathering information, they will facilitate

10  that.  If there is new items that we are looking at in a given

11  year because a new accounting standard was adopted, they will

12  work on projects like that.

13          So, they work on usually items that go across all six

14  firms.

15  Q.   And so, can you explain in a little more detail what you

16  mean when you say that they would decide, for example, if there

17  was a particular accounting issue that they wanted to look at

18  or other issues, what are the kinds of decisions about the

19  approach that come from the national office level?

20  A.   So, the first thing they do, one of the biggest things they

21  do is they determine how many issuers we are going to inspect

22  at every firm.  They also determine within the different

23  categories of issuers that we look at, they will determine how

24  many of each or set or range that we should be looking at on a

25  particular topic.  If there are items that we are going to be

J2D5mid7                         Rodriguez - direct

1  inspecting, like for instance a new accounting standard was

2  adopted, they will determine how many we are going to look at,

3  they will develop the inspection program and tell us what we

4  are going to do exactly.

5          So, they really set the framework for our inspections.

6  Q.  How was that framework, that plan communicated to the

7  individual teams in the GNF program?

8  A.  We receive a planning memo template which has the

9  instructions and then we will also receive numerous e-mail

10 communications that will subsequently follow that with further

11 clarification on each of these areas.

12 Q.  So, let me show you what's been marked for identification

13 as Government Exhibit 224.  There is a binder in front of you

14 next to the water if you prefer hard copy, otherwise things

15 should generally come up on the screen.

16 A.  Okay.

17 Q.  Do you recognize this document?

18 A.  Yes, I do.

19 Q.  What is it?

20 A.  This is the communication of the 2016 GNF planning memo.

21 Q.  Did you receive this 2016 GNF planning memo?

22 A.  Yes, I did.

23 Q.  In your role as a member of the leadership of the KPMG

24 team?

25 A.  Yes, I did.

1            MS. MERMELSTEIN:   Government offers Government Exhibit

2   224.

3            THE COURT:   Government's 224 is received.

4            (Government's Exhibit 224 received in evidence)

5   BY MS. MERMELSTEIN:

6   Q.  Can we publish this to the jury, please, Mr. Cooney?

7            What is the date of this e-mail?

8   A.  November 17th, 2015.

9   Q.  Without reading every single name, sort of what is the

10  general category of people who are receiving this e-mail?

11  A.  This is being sent to, primarily, the inspection team

12  leadership.

13  Q.  Let me interrupt you for one second.

14           Your Honor, I think we have a technology problem with

15  respect to one of the jury screens.

16           THE COURT:   Oh, that one is not working?

17           MS. MERMELSTEIN:   Let me do this since the day is

18  almost over.

19  Q.  So you were saying sort of the general category of people

20  who are recipients of this e-mail?

21  A.  This e-mail goes to the inspection team leadership so

22  included on here are the global team leads, the U.S. team

23  leads, the associate team leads, and the AFCs who are the

24  Affiliate Firm Coordinators.

25  Q.  Now, this document, this e-mail, let's actually go to the

J2D5mid7                          Rodriguez - direct

1    attachment, if we can scroll back, Mr. Cooney?

2              This is the planning memo itself; is that right?

3    A.   That's correct.

4    Q.   You said this for 2016.  Was a similar document used in

5    2015 and 2017?

6    A.   Yes.

7              MS. MERMELSTEIN:  Your Honor, before we start going

8    through the document, this seems like a logical stopping point

9    since we are almost at 5:00.

10             THE COURT:  Okay.  Why don't we break for the day.

11             Was the one in the back not working too?

12             THE JUROR:  Yes.

13             THE COURT:  So, two of them; the front right and the

14   back left weren't working.  We will take a look at those.

15             Folks, we are going to break for the evening.  Please

16   leave your pads on your chairs.  We will start back at 9:30 in

17   the morning and we will have coffee for you in the jury room by

18   9:15.  So, please, try to be here at 9:15 and we will start at

19   9:30.

20             Again, don't discuss the case and we will see you

21   tomorrow morning.

22             Have a good night, everybody.

23             (Continued on next page)

24

25

J2D5mid7                          Rodriguez - direct

1          (Jury not present)

2          THE COURT:  So, we didn't address the juror issue

3    further about, we have two, I guess, Mr. Rivera, no. 4, and

4    Ms. King, no. 16.

5          What do you think?

6          MS. MERMELSTEIN:  Your Honor, we have given it some

7    consideration.  I think with respect to 4 we are optimistic

8    that he learned your Honor was successful in solving juror

9    no. 5's problem and that if you call his employer, maybe we can

10   obviate this issue.  So, we propose we do the same thing and

11   see where that leaves us.

12         With respect to 16, I think there is universal

13   consensus that she is not fit to actually serve as a juror but

14   we are fairly concerned that if she's allowed to leave now we

15   will send a message to the rest of the jury that if they don't

16   feel like coming, they can avoid it by making themselves

17   difficult.  So, we would be inclined to let her sit for a while

18   at least, recognizing that in some unlikely event that we lost

19   all of the other three alternates, she cannot be seated as a

20   juror.  So, we would sort of only have three alternates but she

21   shouldn't be allowed to go yet.

22         MR. BOXER:  I'm not so sure, your Honor.

23         My concern is the influence, negative influence she

24   could bring to the rest of the panel.  I appreciate the point

25   the government makes but I can see it cutting the other way as

J2D5mid7                        Rodriguez - direct

1    well.

2              MR. COOK:  I agree with Mr. Boxer.

3              I think there is a risk as well that she's going to

4    poison or influence the rest of the jurors and she should be

5    let go sooner rather than later.  She is also, clearly, not

6    paying attention to the testimony as well.

7              THE COURT:  Right.  Yes.

8              I think if we know we are going to release her, having

9    her come back tomorrow, maybe we will have to think about how

10   to do it exactly, what I tell her and what I tell, if anything,

11   the other jurors.  It is possible that I let her know that I

12   understand she's having problems following things and perhaps

13   getting here on time so I'm going to let her go and have her

14   leave and then tell the other jurors nothing.

15             In any event, I think I will do that tomorrow, I think

16   it is too late to do it now.

17             Any other thoughts?

18             MS. MERMELSTEIN:  That's fine, your Honor.  I think it

19   should be done in a way so she doesn't have the opportunity to

20   speak to the other jurors after she has been spoken to by your

21   Honor, but that sounds like what you were intending to do.

22             THE COURT:  Agreed.

23             MS. MERMELSTEIN:  Two other small issues from the

24   government.  One is with respect to sealing.

25             We are now -- we have just offered the first exhibit

J2D5mid7                        Rodriguez - direct

1    that I think is in the category of confidential PCAOB

2    information on which the government has moved and so we can

3    certainly maintain things provisionally under seal.  It is not

4    an emergency, so long as things aren't yet public, we but we

5    wanted to flag for your Honor that we are now offering

6    documents into evidence that we would like to keep under seal.

7            THE COURT:  Okay.

8            MS. MERMELSTEIN:  The other issue, I think we have

9    mentioned with respect to talking about scheduling with the

10   other jurors.

11           Ms. Rodriguez has been in New York all week from

12   Florida waiting to testify.  This is how trials are, of course,

13   but she has already sort of made significant accommodations

14   with regard to child care.  And so, we wanted to flag that we

15   really would like to get her off the stand by the end of

16   tomorrow because it is an enormous problem for her to be back

17   here on Tuesday.

18           So, it is hard to know sort of how far the rest of the

19   morning will go and if our jurors will be here on time and how

20   long cross is, but we would propose trying to move at a faster

21   pace either by not taking a full lunch break, taking shorter

22   breaks, sitting a slightly longer day.  And, in the event that

23   that does not work, although Friday is also a problem for

24   Ms. Rodriguez, perhaps sitting just enough hours on Friday to

25   finish her and then sort of calling it a day.

1          I know everything about this is inconvenient for all

2    parties but she has already made such a significant sacrifice

3    that forcing her to be in New York a second week, if it can be

4    at all avoided, I think is something we should try to do.

5          THE COURT:  How much longer do you think you have in

6    direct?

7          MS. MERMELSTEIN:  A fair amount.  I think her direct

8    is probably about three hours.  We have tried to cut some

9    things in an effort to streamline it but she is sort of the

10   PCAOB witness in a PCAOB trial so it is not short.

11         THE COURT:  Okay.  Well, you are not asking me to

12   limit the defendant's cross?

13         MS. MERMELSTEIN:  I'm not.  I mean, I haven't seen

14   what it looks like yet but, no, we are certainly not.  I wanted

15   to flag the issue.  I think we spoke to counsel and thought

16   that given their anticipated length of cross that that wasn't

17   necessarily a problem but it may be the kind of thing where if

18   we only take a half hour for lunch and sit to 5:30 we can get

19   it done as opposed to forcing a person to come back on Tuesday.

20   If we can sort of build in an extra hour or build in extra time

21   Friday morning we don't need to do anything right this minute

22   but we wanted to put it on everyone's radar.

23         THE COURT:  Okay.  Fair enough.

24         I have scheduled all my other cases on Friday and I am

25   sure you have scheduled things on Friday but if we have to do a

1   couple hours on Friday, I am open to it.  And, we may be able

2   to sit a little longer tomorrow.

3          Does anybody else want to say anything about that?

4          MR. BOXER:  My only input is I think Friday runs the

5   risk of a credibility issue with the rest of the jurors.

6          THE COURT:  Credibility of what we promised them you

7   mean?

8          MR. BOXER:  Exactly.

9          MS. MERMELSTEIN:  I think we told them, though, we

10  generally wouldn't sit Fridays but might do it sometimes so I

11  think we are covered.

12         THE COURT:  Yes.  I may need to raise the issue with

13  them and see if someone has a really major problem with it.

14         MR. BOXER:  Right.

15         MR. COOK:  Your Honor, obviously we will be here

16  Friday if we need to be here.  I just know that Mr. Weddle has

17  some child care issues that he planned on not being here on

18  Friday.  He will be here if necessary, but we prefer to go

19  later tomorrow, if that's an option.

20         THE COURT:  Okay.  We will see how that goes and

21  monitor the situation.

22         As to juror no. 4, I think if it is okay in the

23  morning, I will do the same thing that I did with respect to

24  the other jurors which is just talk to him in the robing room

25  with the court reporter present and ask if it is okay with him

1    that I pursue it with his employer and try to get more

2    information.  Or, if you would rather, I can do that first

3    thing in the morning here in the courtroom.

4              MS. MERMELSTEIN:  I think whatever is fastest, your

5    Honor, is fine with the government.

6              THE COURT:  Any problem with doing it in the robing

7    room?

8              MR. BOXER:  No, your Honor.

9              MR. COOK:  No.

10             THE COURT:  Okay.

11             And then finally, we actually have all their cell

12   phone numbers so with respect to juror no. 16, we could call

13   her.  I could call her and just say, you know, your service is

14   done and then that would address the issue of polluting the

15   other jurors if there is some conversation going on and that

16   might be the simplest way to handle it.

17             MR. COOK:  I agree, your Honor.  I think there is a

18   good chance she won't be on time tomorrow.

19             MS. MERMELSTEIN:  That's fine, your Honor.

20             MR. BOXER:  Agreed.

21             THE COURT:  So, we will just call her and tell her

22   that she is excused.

23             And I don't know, do you think I should say anything

24   in particular to the jurors?  Or just not say anything?  They

25   might just assume that she -- on the one hand, they might

1  assume that you can just stop coming in.  On the other hand, I

2  could just say something vague about personal issues.

3          MS. KRAMER:  Your Honor, because she is the last juror

4  and alternate no. 4, perhaps you can say that a fourth

5  alternate was no longer needed or something --

6          THE COURT:  But that highlights that there is three

7  other alternates.

8          MS. MERMELSTEIN:  They don't know they're alternates.

9          MS. KRAMER:  Oh.  Right.  Never mind.  That's not a

10  good solution.

11          MR. WEDDLE:  I would say I was required to dismiss

12  juror no. 16.

13          THE COURT:  And that's it?

14          MR. WEDDLE:  Yes.

15          I mean, I wouldn't attribute it to her reasons because

16  I'm not sure it is her reasons.  I think it is the Court's

17  decision that she is not fit to sit on this jury which may

18  dissuade other people from trying to make up some excuses.

19          MS. MERMELSTEIN:  That's fine with the government,

20  your Honor.

21          THE COURT:  Is that okay?

22          MR. BOXER:  Fine.

23          THE COURT:  I will do that.

24          MR. WEDDLE:  Very briefly, your Honor?

25          THE COURT:  Yes.

J2D5mid7                          Rodriguez – direct

1              MR. WEDDLE:  On the sealing issue.

2              We disagree with the request to seal.  I think that it

3      is one of the issues in the case is the overbreadth of EC 9 and

4      the overbreadth of the PCAOB's written policies about what is

5      confidential.  And, they have a policy that covers, that throws

6      confidentiality over all sorts of things that are not the least

7      bit sensitive.

8              THE COURT:  Could we address this later?  I actually

9      have a sentencing.

10             MR. WEDDLE:  I'm sorry.

11             THE COURT:  But no, that's fine.  For now we can treat

12     it as provisionally sealed, subject to argument about this

13     later.

14             Is that fair?

15             MR. WEDDLE:  That's fine.

16             MS. MERMELSTEIN:  Thank you, your Honor.

17             THE COURT:  Thanks, everybody.  Have a good night.

18             (Adjourned to February 14, 2019, at 9:30 a.m.)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

WESLEY RAY BRICKER

Direct By Ms. Kramer . . . . . . . . . . . . . 212

Cross By Mr. Boxer . . . . . . . . . . . . . 224

Cross By Mr. Weddle  . . . . . . . . . . . . 284

WESLEY RAY BRICKER

Cross By Mr. Weddle  . . . . . . . . . . . . 307

Redirect By Ms. Kramer . . . . . . . . . . . 343

Recross By Mr. Boxer . . . . . . . . . . . . 349

 CHUANGANG REN

Direct By Ms. Mermelstein  . . . . . . . . . 360

Cross By Mr. Ohta  . . . . . . . . . . . . . 372

Redirect By Ms. Mermelstein  . . . . . . . . 385

STEPHANIE RODRIGUEZ

Direct By Ms. Mermelstein  . . . . . . . . . 388

```
1                        GOVERNMENT EXHIBITS

2     Exhibit No.                                Received

3      321   . . . . . . . . . . . . . . . . . . 213

4      818   . . . . . . . . . . . . . . . . . . 246

5      309   . . . . . . . . . . . . . . . . . . 248

6      311   . . . . . . . . . . . . . . . . . . 266

7      350 and 352   . . . . . . . . . . . . . . 271

8      92    . . . . . . . . . . . . . . . . . . 364

9      93    . . . . . . . . . . . . . . . . . . 372

10     80 - 91   . . . . . . . . . . . . . . . . 372

11     224   . . . . . . . . . . . . . . . . . . 404

12                       DEFENDANT EXHIBITS

13    Exhibit No.                                Received

14     M-176   . . . . . . . . . . . . . . . . . 230

15     M-171   . . . . . . . . . . . . . . . . . 238

16     M-207   . . . . . . . . . . . . . . . . . 245

17     M-246   . . . . . . . . . . . . . . . . . 258

18     M-206   . . . . . . . . . . . . . . . . . 259

19     M-208   . . . . . . . . . . . . . . . . . 262

20     M-209   . . . . . . . . . . . . . . . . . 263

21     M-71   . . . . . . . . . . . . . . . . . . 276

22

23

24

25
```