J2edmid1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                18 Cr. 0036(JPO)

5   DAVID MIDDENDORF and JEFFREY
    WADA,
6
               Defendants.
7
    ------------------------------x
8

9                                                February 14, 2019
                                                 9:42 a.m.
10

11  Before:

12                     HON. J. PAUL OETKEN,

13                                               District Judge
                                                 and a jury
14

15                          APPEARANCES

16  GEOFFREY S. BERMAN
         United States Attorney for the
17       Southern District of New York
    BY:  REBECCA G. MERMELSTEIN
18       AMANDA K. KRAMER
         JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20  PETRILLO KLEIN & BOXER LLP
         Attorneys for Defendant David Middendorf
21  BY:  NELSON A. BOXER
         AMY R. LESTER
22       ALEXANDRA REBECCA CLARK
              – and –
23  BRUCH HANNA LLP
    BY:  GREGORY S. BRUCH
24

25

J2edmid1

1                          APPEARANCES CONTINUED

2   BROWN RUDNICK LLP
         Attorneys for Defendant Jeffrey Wada
3   BY:   STEPHEN COOK
         JUSTIN S. WEDDLE
4         SELBIE JASON
              – and –
5   LATHAM & WATKINS
    BY:   JASON MASASHI OHTA
6

7             – also present –

8   Lyeson Daniel, Postal Inspector
    Virginia Faughnan, Postal Inspector
9   Luke Urbanczyk, Government Paralegal
    Nathaniel Cooney, Government Paralegal
10  Kiezia Girard-Lawrence, Postal Inspector
    Stephanie O'Connor, Defendant Middendorf paralegal
11  Sarah Chojecki, Defendant Wada paralegal

12

13                          oOo

14

15

16

17

18

19

20

21

22

23

24

25

J2edmid1

```
 1                (Trial resumed)
 2                (In the robing room present with the Court, law clerk,
 3      deputy clerk and Juror No. 4)
 4                JUROR:  Good morning.
 5                THE COURT:  Good morning.  So we're in the robing
 6      room.
 7                And you are Juror No. 4, Mr. Ferdinand Rivera?
 8                JUROR:  That's correct.
 9                THE COURT:  All right.  I just wanted to follow up
10      because I understand you made a comment to Mr. Hampton about
11      your work situation, and I just wanted to follow up on that.
12                Because you -- remind me where you work?
13                JUROR:  I work for Phelps Memorial Hospital in
14      Tarrytown.
15                THE COURT:  Phelps?
16                JUROR:  It is now under Northwell.
17                THE COURT:  And is it Phelps?
18                JUROR:  It is Phelps Memorial Hospital.
19                THE COURT:  P-h-e-l-p-s?
20                JUROR:  P-h-e-l-p-s.
21                THE COURT:  What do you do for them?
22                JUROR:  I work as admitting department.
23                THE COURT:  Admitting department.
24                JUROR:  But I'm per diem.
25                THE COURT:  What does that mean?
```

J2edmid1

1              JUROR:  Per diem means that I was working almost

2     full-time but they call me.  So, for they to pay me, I need to

3     be scheduled, but I cannot be scheduled because to be scheduled

4     I need to be available.  And if I am in jury duty, they told me

5     I'm not available before-

6              THE COURT:  When did you learn this?

7              JUROR:  I talked to them Friday, I believe.  I talked

8     to them Monday, after -- yes, Monday after -- I told them that

9     I was going for jury duty and that I didn't know if I was going

10    to be selected.  So they told me just keep us informed.

11             THE COURT:  Keep us informed?

12             JUROR:  Yes.

13             THE COURT:  And then you spoke to them on Monday

14    and --

15             JUROR:  Yes.  And they -- I called into to my

16    immediate boss supervisor.  And that's the way it is.  You

17    know, they call me if they need my help and then I have to let

18    them know if I am available.  If I am available, they confirm

19    with all the supervisors -- the front supervisors in the

20    department.  And if they agree for me to go to work, I will

21    replace someone who is absent or something happened, then I am

22    scheduled.

23             THE COURT:  OK.  So you are not scheduled for, for

24    example, next week?

25             JUROR:  No.  I was scheduled only for the 21st.

J2edmid1

1    Usually it is the day before.  But for the 21st, I believe they

2    would -- you know, they would be responsible for it.

3             THE COURT:  So you think they will pay you for the

4    21st?

5             JUROR:  Yes, for the 21st, yes.  They didn't tell me

6    anything about it, yes.

7             THE COURT:  But other than that, you are not

8    scheduled?

9             JUROR:  No, I will not be scheduled.  I will not be

10   called.

11            THE COURT:  OK.  So, as I said when we were selecting

12   the jury, this trial could well go three weeks or four weeks?

13            JUROR:  Mm-hmm.

14            THE COURT:  And we need all the jurors to be here from

15   Monday through Thursday, at least.  So, what would that mean

16   for you?

17            JUROR:  Also is that I live in Ossining.  It is in

18   Westchester.

19            THE COURT:  Ossining?

20            JUROR:  Ossining.  And when I come in and return, it

21   is peak.  So it's -- I don't know how that works if it is 58

22   cents per mile, but I spend almost $35 every day just in

23   transportation to get here.

24            THE COURT:  And do you know what the jury department

25   pays you for?

J2edmid1

1          JUROR:  I know it is 58 cents per mile.  The thing is

2     I don't know if they just use one point to another one or they

3     just go straight to count the miles, or if they use the miles

4     according to the route that I will take.  I mean, if you use --

5     like, for example, if it is only 30 miles, probably that

6     would -- it might cover.  I'm not sure.  I have not really

7     calculated it well.

8          THE COURT:  OK.  Then you get how much per day, did

9     they tell you?

10          JUROR:  It was 50.

11          THE COURT:  50 a day?

12          JUROR:  First week, first two weeks, and then it might

13     go to 60, or something like that.

14          THE CLERK:  I know they got an increase but I know it

15     is $50 per day.

16          THE COURT:  We can find out about the mileage issue.

17     But, you know, basically, the reason I asked all these

18     questions at the beginning when I pick the jury is because I

19     wanted to make sure that once we start, it is very problematic

20     for the jury to lose people.

21          How much of a problem is this for you?

22          JUROR:  Is there -- it is not for sure, for certain

23     that we will be off on Friday?  That's -- because maybe I

24     can -- I can work on Fridays.  That's what I'm trying to say.

25          THE COURT:  OK.  Well, we could get you -- we could --

J2edmid1

1    I could probably assure you, if that is what is necessary,

2    that -- this Friday is the questionable one.  Tomorrow is the

3    questionable one.

4              JUROR:  I know.

5              THE COURT:  But next Friday and the following Friday,

6    I could probably let you off.

7              JUROR:  All right.

8              THE COURT:  The other thing I wanted to suggest is is

9    there anything I could do in terms of talking to your

10   supervisor or talking to anybody at work about the situation?

11             JUROR:  I will talk to them.  The thing is that I --

12   whenever I'm off, maybe Monday, maybe I will be able to go

13   there and talk to them, yes.

14             THE COURT:  Would it help for me to talk to them?

15             JUROR:  Let me find out first specifically what is

16   their thinking.

17             THE COURT:  OK.

18             JUROR:  And then I'll talk to Alex, back to Alex, and

19   we'll see --

20             THE COURT:  Bruce.

21             JUROR:  Bruce, I mean.  I don't know why somebody

22   called you Alex.

23             THE COURT:  He looks like an Alex.

24             JUROR:  All right.  I was worried because the first

25   day that I was coming in, I said, I'm know I'm getting this

J2edmid1

1    money but I'm not going to get paid.  It isn't about the money,

2    it is that I have to be paid every day.  It is almost 30,

3    almost $38 a day.  And I'm not getting any income.  That is my

4    worry.  I know I am going to get the $50.  Probably most of it

5    is refunded but it is at the end.

6              THE COURT:  Yes, that is right.

7              JUROR:  And that worries me a little bit.

8              THE COURT:  OK.  But do you think you will be able to

9    do it for four weeks?

10             JUROR:  I hope so.

11             THE COURT:  If you could work --

12             JUROR:  I know that if I started it out, I have to

13   finish it.  I am aware of it.

14             THE COURT:  So you think you could do it?

15             JUROR:  I could, yeah, I think so.

16             THE COURT:  Let me just say, I am happy to talk to

17   your supervisor.  If there is anything they could do about I

18   don't know if there is any flexibility in terms of, you know,

19   giving you a couple of days of pay, at least say the 21st and

20   any other day, if it would help, I would be happy to call your

21   supervisor and talk to them.

22             JUROR:  I am going to talk to them first.  They have a

23   policy already set up.  I mean, that will not change because I

24   know that I will be paid money.

25             THE COURT:  OK.

J2edmid1

1          JUROR:  So let me talk to them first.

2          THE COURT:  OK.

3          JUROR:  I didn't know it was for four weeks.  I was

4     counting for two weeks.  I know you said it at the beginning.

5     I should have asked to come to the front, to the sidebar, and

6     say it, but I don't know.  I just -- I don't know, I lost my

7     mind.  I should have come forward.

8          THE COURT:  It is OK.  So feel free to ask me again to

9     speak to your supervisor.  We'll find out the information about

10    the mileage issue.

11         How many -- where is it that you live?  In Ossining?

12         JUROR:  Ossining, New York.

13         THE COURT:  And you take the train?

14         JUROR:  Yes.  And it is peak hours.  It is $3 extra,

15    and when I go back it is also as well.

16         THE COURT:  So what do you end up paying to get here?

17         JUROR:  It is 28 plus 5.50.  It is 33.50.

18         THE COURT:  OK.  All right.

19         JUROR:  That's where I worry a little bit.  Just that

20    I will be -- I will get that refunded but it is going to be at

21    the end of the trial.

22         THE COURT:  Yes.

23         THE CLERK:  I'm sorry, Judge.  If I could just

24    interject one second?

25         THE COURT:  Yes.

J2edmid1

1          THE CLERK:  Are you saving your receipts?

2          JUROR:  I'm not saving it but I do have records

3    because I am using my credit card and I have bought them

4    through my phone, which are rail receipts.  For the subway, I

5    don't have the receipt but I do have the credit card which says

6    MTA and the dates.

7          THE CLERK:  OK.

8          THE COURT:  OK.

9          JUROR:  I didn't save them because I thought -- it

10   says it is 58 miles, so they said not to save the receipt

11   unless you were driving.

12         THE COURT:  Oh, OK.

13         JUROR:  That's what they say.

14         THE COURT:  We'll try to find out a little more about

15   that.

16         Try to speak to your supervisors.  You will be off on

17   Monday, of course, because it is Martin Luther King Day.  Will

18   you be able to speak to them then?

19         JUROR:  Yes.

20         THE COURT:  OK.  I'm not sure about this Friday, but I

21   think next Friday you should be able to sign up for work and

22   we'll just kind of go from there, if that is OK.  OK?

23         JUROR:  That makes sense.

24         THE COURT:  OK.

25         JUROR:  OK.  Yes.

J2edmid1

1            (In open court; jury not present)

2            THE COURT:  Good morning.

3            MS. MERMELSTEIN:  Good morning, your Honor.

4            THE COURT:  Two juror-related things.

5            First, with respect to Juror No. 16, Ms. King, after

6    we spoke last night about the idea of just calling her, I

7    realized that she actually had a security card, a court

8    security card, to get access to the jury room, and I was afraid

9    that if we just called her and released her, that we would

10   never see the jury card and that is a security issue.  Instead

11   of doing that, we just waited for her to arrive this morning

12   and Mr. Hampton -- the others were in the jury room, and

13   Mr. Hampton intercepted her before she got to the jury room --

14   she was plainly late -- and just told she was excused from jury

15   service.  Basically that's it.  Took the jury card from her.

16   And she said, Can I say goodbye to the other jurors?  And he

17   said, No.

18          So, she's out.  And so I guess I would just suggest --

19   I guess Mr. Weddle's suggestion is just to say I had to excuse

20   one of the jurors, we're continuing -- I had to excuse Juror

21   No. 16, we're continuing with the trial.

22          With respect to Juror No. 4, Mr. Rivera, I don't know

23   if you saw the feed while I was in the robing room, but there

24   is a transcript of it.  I inquired about his -- the fact that

25   he is paid per diem.  Essentially, I need to get more

J2edmid1

1    information before the mileage reimbursement.  He asked if he

2    could be scheduled to work on Fridays.  I said probably not

3    this Friday but perhaps next Friday.  And essentially he said

4    he thought he could work it out.  So, you will be able to see

5    the transcript, I believe.

6            And the issue of the under-seal documents, I received

7    a couple of letters, one from Mr. Wada's counsel and one from

8    counsel to the PCAOB.

9            Does the jury have to know if it is under seal?  Could

10   we just proceed without that information?

11           MS. MERMELSTEIN:  Yes, your Honor.  We don't propose

12   to inform the jury.  We'll just offer them and then outside

13   their presence we can deal with what's under sealed and what's

14   not.

15           THE COURT:  OK.  So what I propose to do is, because I

16   do want to look into the Lugosch issue a little bit more, we'll

17   just proceed provisionally treating them as under seal and then

18   I will address the issue later, if that is OK.

19           MR. WEDDLE:  No objection.

20           THE COURT:  OK.  Can we bring out the jury?  Starting

21   with the witness and then the jury?

22           MS. MERMELSTEIN:  Your Honor, one quick -- before the

23   jury is in:  Given the uncertainty of the sealing issue, would

24   it be all right with your Honor if we turned off the gallery

25   monitors so things that may end up under seal are not being

J2edmid1

```
 1    broadcast into the gallery?

 2              THE COURT:  Is there a button --

 3              MS. MERMELSTEIN:  I think we have to unplug it.  I

 4    think it is sync'd to the attorneys' ones -- or to the jurors,

 5    rather.

 6              THE COURT:  OK.

 7              MS. MERMELSTEIN:  Or can it can be turned, I suppose.

 8              (Pause)

 9              MR. WEDDLE:  Your Honor, very briefly.  I don't know

10    what the direct testimony looks like, but it may be that we

11    lose our issue if this is the resolution.  Even though it is

12    temporary, it may become permanent.

13              THE CLERK:  The jury is present.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

J2edmid1

1              (Jury present)

2              THE COURT:  You may be seated.

3              Good morning, ladies and gentlemen.

4              JURORS:  Good morning.

5              THE COURT:  I hope you all had a good night.

6              Was there coffee for you this morning?

7              JURORS:  Yes.

8              THE COURT:  Was there enough?

9              JURORS:  Yes.

10             THE COURT:  OK.  Good.  We'll make sure we always have

11   coffee for you.

12             And you'll see I had to excuse Juror No. 16.  She's

13   not going to be on the trial anymore.  No reason you have to be

14   concerned about that.

15             We'll now continue with testimony in the trial.

16             And, Ms. Mermelstein, you may proceed.

17             MS. MERMELSTEIN:  Thank you.

18             Your Honor, could you remind the witness that she is

19   under oath?

20             THE COURT:  Yes.

21             You are still under oath.  You were sworn in

22   yesterday.  You remain under oath.

23             And you may proceed.

24   STEPHANIE RODRIGUEZ,

25        called as a witness by the government,

J2edmid1                          Rodriguez - direct

1          having been duly previously sworn, resumed and

2          testified further as follows:

3   DIRECT EXAMINATION

4   BY MS. MERMELSTEIN:

5   Q.  So I think where we left off, Ms. Rodriguez, last night,

6   you were discussing Government Exhibit 224, in evidence.

7          Could we pull that up for everyone.

8          And can you remind the jury generally what Government

9   Exhibit 224 was?

10  A.  Yes.  This is the email communication sent out to the

11  inspection team members, which is providing us the planning

12  memorandum, which will have the instructions for our

13  inspections in that year.

14  Q.  Let me ask you -- direct your attention to the first

15  sentence of the email, and ask you to read it out loud?

16  A.  "Attached please find the 2016 GNF inspection planning

17  memorandum template.  There are a few items that I'd like to

18  highlight."

19  Q.  And then let me direct your attention to the second bullet

20  point of the email.  Let me ask you to read that.

21  A.  "There will be an inspection focus on going concern and

22  segment reporting in 2016.  There will not be an inspection

23  focus on the statement of cash flows."

24  Q.  Did the GNF-wide planning directives often include

25  direction into particular areas that would be focuses across

J2edmid1                          Rodriguez - direct

1    the GNF program?

2    A.  Yes, they did.

3    Q.  Where did those focus areas come from?

4    A.  You know, there are different reasons for focus areas in

5    any given year.  Sometimes they are our standard sitting group

6    that is interested in adoption of a new principle or a certain

7    area that they find -- you know, there is some feedback that is

8    confusing and they are debating whether to provide additional

9    guidance.  There could be areas where we see historical

10   findings that we're trying to understand the cause of them.

11   There is a number of different reasons that we will develop

12   these focus areas.

13   Q.  Are do these focus areas ever come from outside entities

14   outside the PCAOB?

15   A.  I believe so, yes.  It's my understanding.

16   Q.  Like what?

17   A.  The SEC at times will gather information for them, areas

18   that we know are of interest to them; we will gather

19   information.

20   Q.  Let me direct your attention to the second-to-last bullet

21   point, and let me ask you to read that, please?

22   A.  "There are no significant changes to the issuer selection

23   strategy except you will not be required to select 2 mutual

24   funds.  For the 'random selections,' ORA has incorporated a

25   random number generator directly in the engagement profile.

J2edmid1                         Rodriguez - direct

1    The tool will select directly from the issuer listing in the

2    planning profile based on set criteria."

3    Q.  With respect to the reference to not being required to

4    choose two mutual funds, was it common for the GNF-wide

5    planning to include a directive that a particular number of

6    some kind or the other of issuer be selected?

7    A.  Yes.  They often provide numbers for selection or ranges

8    for selection.

9    Q.  There is a reference here to, quote, random collection

10   selections?

11   A.  Mm-hmm.

12   Q.  What is that in reference to?

13   A.  In every inspection season, there is a certain amount of

14   unpredictability that we like to include in our inspections

15   process, and one of the ways we do that are through random

16   selections.  So what that means is the majority of our

17   selections are risk-based.  So we evaluate different components

18   of an issuer that we think are high risk and we select those.

19   But what we also do is we randomly select from a population a

20   certain number of issuers that are based literally on being a

21   random selection and not a risk profile and we inspect those.

22   Q.  Why does the PCAOB mostly select inspections based on risk?

23   A.  Primarily because those are the riskiest for the firms to

24   inspect, and they have the most risk in the issuer profiles.

25   Q.  Why are some smaller subset of purely random selections

J2edmid1                          Rodriguez - direct

included?

A.   In addition to seeing how audits with risk are handled, we also want to see how audits without risk are handled to get an idea of the total performance of audit quality within the firm. So, looking at an issuer where they maybe wouldn't expect us to look, it has allowed us to introduce unpredictability into our process.

Q.   What is the random number generator?

A.   That is literally a function within the spreadsheet that allows you to randomly select from items.

Q.   Let's jump to page 18 of the attachment, which I think is page 20 of the pdf, Mr. Cooney.

     And directing your attention to the top, "Inspection plans for name of U.S. firm," what is this section of the planning document talking about?

A.   I'm not sure I understand.

Q.   OK.  Is this -- I'm talking about the inspection plan with respect to the U.S. component of the firm.

A.   Yes, it is.

Q.   And let me direct your attention, then, to the section underneath that, titled, "U.S. firm planning considerations effect of prior year Part I inspection findings on current year plan."  What is this session addressing?

A.   So in this section we will summarize what the historical findings in Part I of the report is, and Part I is the public

J2edmid1                          Rodriguez - direct

1    section of our report.  And those issues are issues we will

2    focus on in the upcoming year if we've noticed that there has

3    been historical deficiencies in the area.

4    Q.  OK.  Let's move to page 22 of the document or page 24 in

5    the pdf.  And let me direct your attention to the instruction

6    under "Issue selections and strategy" and ask you to read that

7    paragraph, please.

8    A.  "The engagement team selection process includes an

9    evaluation of information related to the U.S. firm, its issuer

10   clients, and referred engagements.  This information includes,

11   but is not limited to, the Top 30 Program, star referrals,

12   other deliverables from ORA, tips received through the PCAOB

13   center for enforcement, tips, referrals, complaints and other

14   information, firm specific data, past inspection findings

15   (including remediation findings and root cause analysis

16   information), and information included in issuer filings and

17   other publicly available information."

18   Q.  OK.  So let's break down what some of those considerations

19   are.

20           What is the Top 30 program?

21   A.  So, the Top 30 program is where we obtain information on a

22   number of issuers -- actually more than 30 -- because you can

23   be considered top 30 within the firm.  It could be market cap,

24   so the size of the issuer; how big they are, the 30 largest

25   issuers.  It could be in revenue to the firm, so the 30 highest

J2edmid1                          Rodriguez - direct

revenue-producing issuers.  Hours.  There is a number of

metrics we consider.  And we look at that portfolio, and we

evaluate who will be the Top 30 in those.  And we then screen

all of those issuers where we review all of them and go through

a risk evaluation on those to determine which we want to

inspect.

Q.  And if we scroll down to the bottom of the page for a

moment and you look at that chart there, where it says "Top 30

issuers."

A.  Mm-hmm.

Q.  Can you read what it says there with respect to Top 30?

A.  "Select three to five top 30 issuers for inspection.  This

requirement applies to the inspections of the U.S. firms of

Deloitte, Ernst & Young, KPMG and PwC (hereafter referred to

collectively as the Big 4 firms)."

Q.  Again, was it typical for the GNF planning directives to

specify not just that, for example, Top 30 issuers should be

looked at but how many?

A.  Yes.

Q.  Let's go back up to the list of inspection considerations

at the top.

          What is a star referral?

A.  A star referral is a rating system used by ORA.  And what

ORA is, it is one of our offices within the PCAOB, and they

support the inspections process, among other things.  But for

J2edmid1                         Rodriguez - direct

1    inspections, they go through a list of issuers.  They look at

2    all the issuers in the firm, and they evaluate issuers based on

3    risk.  And it may be a certain industry that they determine has

4    risk.  It could be a certain type of transactions that they

5    look at.  They could evaluate issuers and see what's happening

6    at that issuer, is there something specifically there that's

7    risky.  And they will identify a population of issuers for us

8    based on that information, and they rate them using a star

9    system.  So an issuer will receive three, two, or one stars,

10   and those are star referrals.

11   Q.  And is three stars the riskiest or one star the riskiest?

12   A.  Three stars.

13   Q.  Let's go to the bottom of the page, and let me ask you to

14   read the directions with respect to ORA star referrals.

15   A.  "Select all ORA 3-star referrals.  For ORA 2-star referrals

16   it is anticipated that a high percentage of these will be

17   incorporated into the inspection plan (Note:  In the areas

18   selected for inspection and the rationale section of the U.S.

19   firm issuer screening template, separately identify all

20   accounting risks and other risks identified by ORA.  For those

21   accounting risks and other risks not selected for inspection,

22   the rationale should be documented in this section of the

23   screening template.)"

24   Q.  And so, in more plain English, what is this directing with

25   respect to both three-star and two-star referrals?

J2edmid1                          Rodriguez - direct

1    A.  So the first thing they're telling us is if anything

2    receives a three-star referral, that must be inspected.  And

3    for those that receive two star referrals, we must inspect a

4    very high percentage of those.  In addition, when they rate

5    them with stars, they also determine what we will inspect

6    within that issuer.  So they will actually determine the

7    accounting risks or areas we should focus on, and if we're not

8    going to focus on those, we have to document why we're choosing

9    not to use that portion of the referral.

10            THE COURT:  Did you say what ORA stands for, O-R-A?  I

11   missed it.

12            THE WITNESS:  I think it is Office of Risk and

13   Analysis, I think.  It has changed its name since then, but I

14   think that is what it was --

15            THE COURT:  It is part of the PCAOB?

16            THE WITNESS:  Yes, it is.

17            THE COURT:  OK.  Thanks.

18   BY MS. MERMELSTEIN:

19   Q.  Is it also now known as ERA, E-R-A?

20   A.  It is now known as ERA, yes.

21   Q.  Do you remember what that stands for.

22   A.  I think it is Economic and Risk analysis, I think.  I might

23   have that wrong because we use ORA and ERA constantly.  We

24   rarely use the full title.

25   Q.  But the same group?

J2edmid1                          Rodriguez - direct

A.   The same group.  They've combined with a Center of

Economics that we have within the PCAOB but they do the same

thing, yes.

Q.   Let's go back up to that list of considerations at the top.

          What does "firm specific data" mean?

A.   So we obtain a large amount of information from the firm

related to specific issuers.  It could be what industries

they're in, partner information, the information on the

engagement team, who participates on it, quality ratings for a

partner.  We receive a lot of data from them, and so we will

look at that data when we're making these selections.

Q.   Going back up higher in the list, what are the other

deliverables from ORA?

A.   So what they also give us is they give us -- they give us

information on -- industry information, so if there is any

high-risk industries that we should be looking at.  So, during

a time where the oil and gas prices are fluctuating

dramatically, they may indicate oil and gas issuers are at

risk.  Or during the credit crisis, financial service

industries will be at risk, and they will highlight what types

of risks we should be looking at.

Q.   What does "tips received through the PCAOB center for

enforcement tips" mean?

A.   So those are -- what we call tips are people who

anonymously report tips within the PCAOB to us, and they go to

1    our enforcement division.  And they evaluate whether or not

2    they will pursue this.  And then they share it with the

3    inspections group.  And then we need to evaluate whether there

4    is any reason to look at a specific issuer because of things

5    that happened that occurred on an audit or things that are

6    happening at an issuer, and we will evaluate what tips we

7    receive throughout the year.

8    Q.  How about "remediation," what does that refer to?

9    A.  Remediation refers to a process where we issue an

10   inspection report.  The firm has one year to address any

11   findings that are in Part II of the report.  And those findings

12   relate to the quality control deficiencies that we talked about

13   when they -- or when we're looking at the various quality

14   controls throughout the firm and any themes that we've seen.

15   Those go in Part II.  And by statute they have twelve months to

16   remediate those.  So, the firm creates actions that they put in

17   place to address those findings.  And depending on the nature

18   of those actions, if they impact specific issuers, we may look

19   at an issuer to see how effective those actions are.

20   Q.  So, in other words, part of the current year's inspection

21   is to look at problems from the prior year and see if they fit

22   in?

23   A.  And how they are being addressed in the current year.

24   Q.  Then, finally, what is "information included in issuer

25   filings and other publicly available information"?

J2edmid1                         Rodriguez - direct

1   A.  We read the 10-Ks for the issuers, and if there is any

2   information on what's going on in an issuer, whether they have

3   very large transactions or things that are of high risk, or if

4   they've received comment letters from the SEC where there are

5   items that the SEC is looking at, those all factor into our

6   selection process also.

7   Q.  So, stepping back, what is the purpose of having this very

8   detailed level of instruction given as a directive to all of

9   the GNF firms in planning their inspections?

10  A.  In order to have a consistent approach with all the firms,

11  that way every firm is being treated the same, the results are

12  comparable, that larger approach is determined by the national

13  office and given to everyone.

14  Q.  I want to turn now away from the whole data program and

15  towards how a particular inspection team conducts its planning

16  and how it implements these directives.  And so let's use the

17  KPMG team that you lead as an example.

18  A.  OK.

19  Q.  First, when in the calendar year does the KPMG team really

20  begin in earnest to prepare for the inspection season?

21  A.  So there are components of planning happening throughout

22  the year.  So, for instance, those error referrals, we receive

23  those quarterly and we will evaluate them throughout the year,

24  but the vast majority of our planning efforts begin in the late

25  October/November timeframe.

J2edmid1                              Rodriguez - direct

1   Q.  Approximately how many total members are there of the KPMG

2   inspection team in a given year?

3   A.  Somewhere between, just our team, 10 to 15 team members.

4   Q.  Is that for the whole inspection team or the planning

5   process?

6   A.  For the planning process.

7   Q.  And so a subset of the whole team is responsible for

8   planning?

9   A.  That is correct.

10  Q.  What, if any, information does KPMG provide to the PCAOB to

11  permit for this inspection planning?

12  A.  They provide a large amount of issuer data, which is part

13  of what we talked about, firm specific data.  They provide us a

14  large amount of geographic information on each of their

15  issuers.  That includes information on current year and prior

16  year, all team members, executives on the team, audit hours,

17  audit fees, whether there is foreign locations.  It is an

18  extremely large amount of information they're giving us.

19  Q.  And then after the KPMG planning team has gotten that

20  information from KPMG and received all the other kinds of

21  information we were just talking about, how is all that data

22  gathered together?

23  A.  We accumulate that information and put it in what we call

24  an engagement profile.

25  Q.  Is that also known as the GNF Planning Profile?

J2edmid1                          Rodriguez - direct

1    A.  Yes, it is.

2    Q.  What is that?

3    A.  It's a large Excel spreadsheet which has numerous tabs for

4    all of these components where we screen each of these issuers

5    and document our rationale based on all of this information.

6    Q.  Where does that spreadsheet live or reside?

7    A.  It resides within IIS, which is our electronic software

8    where we document our inspections process.

9    Q.  Who has access to the GNF Planning Profile in IIS?

10   A.  At that time it was members of the engagement team current

11   and past and certain members of national office or people

12   throughout the organization, where they deemed it necessary for

13   them to have access.

14   Q.  Would that include someone who was just helping out on one

15   particular KPMG inspection but wasn't part of the KPMG team?

16   A.  They would get a certain amount of access given to them so

17   that way they could document their inspection, yes.

18   Q.  Now, is the information contained in the analysis in the

19   GNF Planning Profile confidential PCAOB information?

20   A.  Yes, it is.

21   Q.  Does the PCAOB have any written confidentiality rules?

22   A.  Within our ethics code we do.

23   Q.  So let me show you what's been marked for identification as

24   Government Exhibit 20.  Do you recognize that?

25   A.  Yes, I do.

J2edmid1                        Rodriguez – direct

1    Q.   What is?

2    A.   The ethics code for the organization.

3              MS. MERMELSTEIN:  The government offers Government

4    Exhibit 20.

5              MR. OHTA:  No objection, your Honor.

6              THE COURT:  Government 20 is received.

7              (Government's Exhibit 20 received in evidence)

8              MS. MERMELSTEIN:  Let's publish that, Mr. Cooney.

9    Q.   And then, Ms. Rodriguez, I would like to direct your

10   attention to EC1.  Can you read the provision covering who is

11   bound by the ethics code.

12   A.   "The provisions of this ethics code apply, according to

13   their terms, to -- present and former board members and staff;

14   the spouse, spousal equivalent, and dependents of board members

15   and staff; and designated contractors and consultants to the

16   board."

17             MS. MERMELSTEIN:  Your Honor, I'm sorry, I think we

18   are having a screen problem again with the screen over here.

19             THE COURT:  OK.

20             MS. MERMELSTEIN:  I will just work without mine for

21   the moment while we work it out so we can keep going.

22             THE COURT:  We have one in the back as well.

23             MS. MERMELSTEIN:  Then I will take a break.

24             (Pause)

25             THE COURT:  Are we OK for now?

J2edmid1                         Rodriguez - direct

1           OK.  Go ahead.

2    BY MS. MERMELSTEIN:

3    Q.  So, again, just so it is clear, does the ethics code apply

4    to PCAOB employees even after they no longer are employed by

5    the PCAOB?

6    A.  Yes, it does.

7    Q.  And then let me direct your attention to EC9, which is on

8    page 18, Mr. Cooney.

9           Could you read the provisions of EC9, please?

10   A.  Yes.  "Unless authorized by the Board, no Board member or

11   staff shall disseminate or otherwise disclose any information

12   obtained in the course and scope of his or her employment, and

13   which has not been released, announced, or otherwise made

14   available publicly.  The provisions of this section shall

15   continue in effect after the termination of employment or Board

16   membership."

17   Q.  During the course of your employment at the PCAOB, have you

18   received training about the confidentiality provisions of the

19   ethics code?

20   A.  Yes, I have.

21   Q.  In what form?

22   A.  I couldn't probably tell you all of them, but annually, at

23   a minimum, we attend our annual training for all inspectors

24   within the division, and there is always an ethics component

25   that discusses the confidentiality of information.  And

J2edmid1                          Rodriguez - direct

1   annually we are required to sign our ethics code agreement.  So

2   there is numerous occasions during the year when this is

3   reminded.

4   Q.  How seriously were these confidentiality provisions treated

5   at the PCAOB?

6   A.  Very seriously.

7               THE COURT:  Overruled.

8   Q.  I want to now direct your attention to what's been marked

9   for identification as Government Exhibit 102.

10              Do you recognize that?

11  A.  I don't see anything.

12  Q.  It takes a moment to come up.

13  A.  Yes, I do.

14  Q.  What is that?

15  A.  This is the planning profile.

16  Q.  For what year?

17  A.  This is 2015.

18              MS. MERMELSTEIN:  The government offers Government

19  Exhibit 102.

20              THE COURT:  Government's 102 is received.

21              (Government's Exhibit 102 received in evidence)

22  BY MS. MERMELSTEIN:

23  Q.  Now, does this -- sorry.  I can have my screen bank.  OK.

24              Does this, Government Exhibit 102, relate to KPMG's

25  global inspections or just to the U.S. component?

J2edmid1                          Rodriguez - direct

A.   The U.S. component.  The components that even impact global

are, if there is a global issuer, the U.S. piece of that global

issuer is what is in here, so it is all the U.S. component.

Q.   And this, you said, was the GNF Planning Profile for KPMG

for 2015.  Was a similar document used in other years?

A.   Yes, it is.

Q.   How large a spreadsheet is this?

A.   It is extremely large.  It is difficult to even open on

your computer.

Q.   OK.  So before we start going through -- we won't go

through it all, but, Mr. Cooney, could I ask you to just click

through each of the tabs so the jury can see generally the

scope of the spreadsheet.

          (Pause)

          OK.  So let's look at just a few of the tabs in closer

detail, and let's start with the tab called "Issuer flag

detail."

          What is an issuer flag?

A.   So, the flags are certain topics that have been identified

that could trigger risk within an issuer.  So what the planning

team does is we go through these flags and determine if we want

to use it to screen an issuer, and then we mark that as yes, an

applicable flag.  And then we determine how much weight we want

to give it, so how important do we think this is in any given

circumstance.

J2edmid1                          Rodriguez - direct

1          So, once we determine if it is applicable, how much

2     weight it should get, this is kind of run against the

3     population issuers, and what it kind of results in is a flag

4     count.  So the higher the flag count, the more risk exists at

5     an issuer.

6     Q.  Are the flags set the same across all of the GNF firms, or

7     can they be different between the different firms?

8     A.  They can be different.  You can customize them for whatever

9     risks you believe are more prevalent at the specific firm you

10    are looking at, the issuer profile you are looking at.  You can

11    customize these on your team.

12    Q.  And you said that the flags are weighted?

13    A.  Yes.

14    Q.  Are those weightings the same across all four firms or can

15    they be different?

16    A.  No, they can be different.

17    Q.  So we're not going to go through every flag but let's just

18    look at a few examples.

19          Looking at the gray bar that looks a little green on

20    this screen, that says "Audit opinion issuer audit," in broad

21    strokes, what kind of flags are covered by that category?

22    A.  So this primarily talks about the opinions that are being

23    issued, are there any restatements that have occurred, or is

24    this the first year we're looking at an issuer, if there are

25    any restatements where this is a first year ICFR opinion, so

J2edmid1                           Rodriguez - direct

1    the first year there is internal controls opinion, is this the

2    first year an issuer is public because it was just an IPO.

3    That looks at these types of issues.

4    Q.  And so let's look at the first one just as an example.  It

5    is under the red number 14.  It says, "Dismissed auditor post

6    opinion."  What does that mean?

7    A.  If the firm changed -- if the issuer changed auditors after

8    the issuance of the opinion.

9    Q.  That is a risk factor?

10   A.  Potential, yes.

11   Q.  Underneath that, in gray, it says, "Yes," and then

12   underneath that it says the number 1.  What does that mean?

13   A.  So that means -- so if you look above it, it says

14   "Threshold operators."  That means if this is yes for an

15   issuer, it is going to have a weighting of 1.

16   Q.  OK.  So let's scroll across and let's go to column AH,

17   under the heading "Firm related date."  It says, "Lead

18   engagement partners industry practice unrelated to issuer's

19   industry."  What does that mean, and why is it a risk factor?

20   A.  So what this means is is if the lead engagement partner, or

21   the partner in terms of the audit, is working in an industry

22   outside their specialization, do we believe that to be a risk.

23   So if you have a partner that primarily does banking, are they

24   looking at software; or if you have a healthcare person, are

25   they in banking.  So it is really considering is that person

J2edmid1                        Rodriguez - direct

1    qualified to do an audit in the industry that they're doing

2    that in.

3    Q.  OK.  Let's keep scrolling across and move all the way to

4    column DM.  And under "PCOB inspection history," it includes a

5    reference to "Part I comment for various timeframes."

6          Generally speaking, what is that referring to?

7    A.  So that's referring to how many Part I comments -- did they

8    have Part I comments in any of these given years.  So if that

9    issuer had a Part I comment or had an unsupported audit opinion

10   in the year, they will be asked for that year.  So, we'll look

11   at how many times that occurred over this course of years we're

12   looking at here.

13   Q.  Looking over just a few columns to column DS, it has

14   information about "ORA star referrals."

15          Is this just the ORA star referral system that you

16   were talking about earlier?

17   A.  Yes, it is.

18   Q.  And let's scroll over a couple of more columns to column

19   DX, which begins a section, "Team specific elements."

20          In broad strokes, what are team specific elements?

21   A.  So these are items specific to that engagement team.  So,

22   did they have changes in senior managers, did they participate

23   in any of those remedial actions, or some of the quality

24   control that the firm has in place, we look at those, and was

25   there a tip received on this engagement; that type of

J2edmid1                          Rodriguez - direct

1  information is in this section.

2  Q.  In that section, in column DY, it says, "Engagement subject

3  to inflight review KPMG."  What does that mean?

4  A.  That means -- what we're looking at there is whether or not

5  this issuer was part of KPMG's inflight review program, which

6  was a reissuance review prior to the issuance of the audit

7  opinion that was reviewed.

8  Q.  If you look under that column, under "Yes," it has the

9  number 2.  How does that -- how does that differ from some of

10  the other weights?

11  A.  So these are saying -- so if you look, you will see that

12  these have 2.  So it is a little bit riskier than a 1 but not

13  as some of our bigger risks, which would be a 3 I believe in

14  this year.

15  Q.  Indeed, I think there is a 3 in column DT --

16  A.  Mm-hmm.

17  Q.  -- under the star referral?

18  A.  Correct.

19  Q.  So different risk factors are given more or less weight?

20  A.  Yes.

21  Q.  Going back to the inflight review, why is that something

22  that is a consideration for whether or not an engagement will

23  be inspected?

24  A.  So, when the firms design remedial actions, or they have

25  these quality controls in place, we want to evaluate how

J2edmid1                          Rodriguez - direct

1    effective those actions are.  So we will often obtain a list of

2    issuers who are subject to these and where this is taking

3    place, and we want to inspect those to see, if this review took

4    place, to help the quality of the audit, when we inspected it,

5    did we have findings, and it helps us to evaluate how effective

6    that review may have been.

7    Q.  Let's scroll over to column EE, it says, "2014 ALLL focus

8    area review."  What is "ALLL"?

9    A.  That is the allowance for loan loss.

10   Q.  What is the allowance for loan loss?

11   A.  So at a bank or a financial services issuer, when you have

12   loans, they have a reserve against those loans, which is the

13   "ALL," which allows for any loans that you ultimately may not

14   collect on, those are adjusted for what they estimate to be

15   collectible in any given period and that reserve is the ALL.

16   Q.  Are you a banking auditor specialist, or do you have

17   specialty in another, in a different field?

18   A.  I am not a banking specialist.  I have industry practice in

19   other fields.

20   Q.  Let's scroll all the way to the end and look at columns EJ,

21   EK, and EL.  What is described generally in this summary

22   section?

23   A.  This is looking at a total flag count for each individual

24   issuer.

25   Q.  And, again, what is the significance of the total flag

J2edmid1                          Rodriguez - direct

1    count?

2    A.   The significance is the higher that number, the higher the

3    flag count, that is an issuer that has the most risk based on

4    our evaluation of these factors.

5    Q.   So now I want to look at the next tab, the "Issuer

6    screening template."  Broadly speaking, what is this?

7    A.   This is where we document our analysis of each of the

8    issuers we screened for potential selection.

9    Q.   Looking at column B, titled, "Selection recommendation,"

10   "Select equals one, neutral equals two, don't select equals 3."

11   What is that referring to?

12   A.   So the team performs the initial review of these issuers in

13   the initial screening, and they will determine based on their

14   review of the issuer whether they recommend it for inspection,

15   whether it could be but it's not necessarily a strong

16   selection, or whether they do not recommend this for selection,

17   and that will be how they show that recommendation with either

18   a 1, 2 or 3.

19   Q.   And then if you look in the column C, "Final selection,"

20   what does that refer to?

21   A.   That refers to whether or not we will ultimately select

22   this issuer for inspection.

23   Q.   And who weighs in on that decision?

24   A.   That would be the ATL on the team, which is the Associate

25   Team Lead, the U.S. Team Lead and the Global Team Lead.

J2edmid1                        Rodriguez - direct

1    Q.  Turning to the next column, "Rationale for selection," what

2    does that generally refer to?

3    A.  So this gathers all of the data that we've looked at

4    throughout this document and any others, and this summarizes

5    why we picked that issuer for inspection.

6    Q.  Looking at the next column, "Selection purpose, regular

7    inspection, FMN, remediation, foreign affiliate, or off year

8    end," what does that refer to?

9    A.  This is a summary basically of the reason we're picking the

10   selection.  Is it basically because it is a foreign affiliate

11   so it is helping us get coverage in that program?  Is it off

12   year end?  Does it have some of these FMN actions in place?

13   That's why we put that there.

14   Q.  OK.  Let's skip ahead a couple of columns to column J,

15   titled, "Areas recommended for inspection and rationale."  What

16   is this referring to?

17   A.  So for these couple of -- the next column couple of

18   columns, we will document for each of the areas we selection

19   for inspection, why we picked that area.

20   Q.  And when you say the areas you've selected for inspection,

21   what does that mean?

22   A.  The financial statement area.  So if we're looking at

23   revenue or inventory or stock compensation, whatever the

24   specific financial statement item that we want to look at, we

25   have that documented here and why.

J2edmid1                          Rodriguez - direct

1   Q.  So just so it is clear, the PCAOB doesn't look at every

2   area when it conducts an inspection?

3   A.  No, that's correct.

4   Q.  And this is discussing the areas you are going to look at?

5   A.  Correct.

6   Q.  OK.  Let's go, then, to column N, "Top 30 issuer."  Can you

7   remind the jury how this factors into the selection?

8   A.  So we have to -- in this year we were supposed to look at

9   between three to five Top 30 issuers, so this identifies which

10  are our Top 30 issuers.

11  Q.  And what about the next two columns, "3 star referral, 2

12  star referral"?

13  A.  The same thing for the star referrals.  If this is meeting

14  the criteria we needed for star referrals, we indicate that in

15  these boxes.

16  Q.  Let's look at the column numbered AC, titled, "Estimated

17  workpaper archive date."

18  A.  Mm-hmm.

19  Q.  What does that refer to?

20  A.  So when financial statements are filed, the firm is

21  required to archive their work papers within 45 days, and

22  archiving basically means the work papers are locked.  No

23  further editing is allowed and they are stored.  So what we do

24  here is we estimate what that date will be based on when they

25  last filed the set of financial statements.  Because we're --

J2edmid1                         Rodriguez - direct

1    you know, we're doing the screening earlier in the year and

2    they haven't filed financial statements yet, so we have to

3    estimate when that will be.  So we take the last issuance date

4    when they filed the financial statements, we add 45 days, and

5    that's when they estimate they will have closed their files.

6    Q.  Why does it matter for the PCAOB to understand when the 45

7    days will be up?

8    A.  Because we do not notify inspections to the firm prior to

9    that date, so we need to get an idea of how we can actually

10   schedule this process and how this will look based on what that

11   estimated archive date will be.

12   Q.  Why doesn't the PCAOB notice inspections before the 45 days

13   are up?

14   A.  Our goal is to review workpapers that haven't been altered

15   or modified with knowledge of an upcoming inspection, so we

16   don't provide that to the firm until we know those workpapers

17   have been archived.

18              MS. MERMELSTEIN:  OK.  Mr. Cooney, if we can now keep

19   scrolling all the way to the right to get a sense of the number

20   of columns.

21              (Pause)

22   Q.  OK.  Now, approximately how long a process is it for ORA to

23   weigh in with its risk assessment and then for the planning

24   team to analyze all this information and come up with the

25   proposal of which audits will be inspected?

J2edmid1                          Rodriguez - direct

A.   From when the bulk of the planning begins, about four

months.

Q.   We just looked at 2015.  So using that as an example,

approximately how many man-hours, PCAOB man-hours, go into that

process?

            THE COURT:  You mean staff hours.

            MS. MERMELSTEIN:  I do, your Honor.

            MR. OHTA:  Objection, your Honor.  Foundation.

            THE COURT:  If you know, you can answer.

A.   For any given year, it is about 25 hours.

            (Continued on next page)

J2E5mid2                          Rodriguez - direct

1   BY MS. MERMELSTEIN:

2   Q.  And approximately how much does that, as an estimate, based

3   on the number of staff hours, how much does that cost the

4   PCAOB?

5              MS. LESTER:  Objection.

6              MS. MERMELSTEIN:  I can ask a few more questions

7   first, your Honor.

8              THE COURT:  Please.

9   Q.  In your role, Ms. Rodriguez, as the associate team lead and

10  then the team lead, did you have access, for planning purposes,

11  to the number of people and the file to which they were

12  assigned to work on the planning process?

13  A.  Yes, I do.

14  Q.  And have you also, since that time, had access, from the

15  human resources department, to PCAOB records, concerning

16  people's salary information?

17  A.  Yes, I have.

18  Q.  And based on those two facts, the number of hours people

19  spent and their sort of the cost to the PCAOB of employing

20  them, have you participated in calculating a rough estimate of

21  what the cost to the PCAOB is of all of those hours?

22  A.  Yes, I have reviewed that.

23             MS. LESTER:  We still object.

24             MR. OHTA:  Objection, your Honor.

25             THE COURT:  Objection noted, and overruled.

J2E5mid2                         Rodriguez - direct

1   BY MS. MERMELSTEIN:

2   Q.  You can answer.  What is the approximate cost?

3   A.  Approximately $500,000.

4   Q.  Is that roughly a similar number for 2016 and 2017?

5   A.  2017 is a little bit different, just because of some of the

6   planning efforts that happened but, yes, it is for 2016.

7   Q.  So, we will talk more about the later years as we go on.

8           So, once the inspection team has come up with a plan,

9   what is the next step in the process?

10  A.  So, once our team has finalized a plan, we present that

11  plan to the national office and GNF leadership, and then we

12  present that plan to the board.

13  Q.  At the time that the kind of proposed list is presented

14  first to the GNF planning team in the national office and then

15  to the board, is it completely final?

16  A.  It has not been.  No, it is not completely final.

17  Q.  Are you familiar with something called an internal

18  inspection?

19  A.  Yes.

20  Q.  What is that?

21  A.  So, we pick, in any given year if our goal is, let's say,

22  52 issuers, in our initial plan we will only identify 47

23  because what we do is we leave a certain amount available to go

24  ahead and look at issuers who went through the internal

25  inspection program within the firms.

J2E5mid2                          Rodriguez - direct

1   Q.   Okay.  So, let me ask you to slow down a tiny bit and I

2   will slow down a tiny bit.

3         Why is it that the PCAOB specifically looks at a group

4   of audits that have been subject to an internal inspection?

5   A.   The internal inspection, it's a significant effort and the

6   monitoring programs within the firms, they do their own

7   inspection of audits completed and we look at that to determine

8   the effectiveness of that program.

9   Q.   Are there ever instances in which, after the general plan

10  has been set, there are changes to the inspection plan in terms

11  of who is going to be inspected?

12  A.   Yes.

13  Q.   What are some examples of why that might happen?

14  A.   It could happen because of scheduling issues, it could be

15  issues where an issuer is the subject of an SEC investigation

16  or an investigation that our DEI division is performing so we

17  will not look at those.  It could have gone through the firm's

18  inspection process and the firm can assess it as an

19  unsatisfactory audit and we can look at those.

20         There is a variety of issues why we will make changes

21  to the schedule.

22  Q.   So I understand the thing you said last, if the firm

23  conducts, you intentionally look at some of the audits that the

24  firm has internally inspected but if the firm itself concludes

25  it failed, then you don't look at it again?

J2E5mid2                          Rodriguez - direct

1    A.  Correct.

2            THE COURT:  We just had some technical issues but I

3    think we are back on track.

4    BY MS. MERMELSTEIN:

5    Q.  So, once the list is generally finalized, what kind of

6    information about the inspection schedule is first shared with

7    KPMG?

8    A.  At that time in the 2015-2016 time frame, we provided the

9    notification of the first issuer inspections when those were

10   planned to begin, and then we also provided the firm a list

11   that did not include the issuer names but included the weeks we

12   planned to inspect what cities we planned to go to to help them

13   on their planning side.

14   Q.  Leaving aside the general notification of where you were

15   going to be geographically at particular times, how is a firm

16   first notified that a particular audit had been selected for

17   inspection?

18   A.  They received a notification from us.

19   Q.  And when does that notification go out relative to the end

20   of the 45 days?

21   A.  Generally, sometime between two and four weeks before we

22   plan to begin the inspection, so after the 45 days.

23   Q.  And again, why does the PCAOB wait so long to notify KPMG

24   of which audits it intends to inspect?

25   A.  It's a consistent approach that we apply to everyone and

J2E5mid2                          Rodriguez - direct

1    it's to allow the team a sufficient enough time to prepare for

2    our inspection and provide us workpaper access and what have

3    you, prior to the inspection.

4    Q.  Why is it not provided any earlier?

5    A.  Because the audit is complete and so it has just never been

6    determined necessary to provide the list up front.  We don't

7    want everybody working on it for months in advance of us

8    showing up.  We just want to go in and review those workpapers.

9    Q.  Why is it important to the PCAOB that the documentation be

10   complete before notification is made?

11   A.  We do not want firms modifying the workpapers with

12   knowledge of us just because it is going to be inspected.

13   Q.  Are you familiar with any instances in which,

14   notwithstanding that general policy, a firm was notified prior

15   to the expiration of the 45 days?

16   A.  Yes

17   Q.  How has that happened?

18   A.  When we go through that estimation process in the beginning

19   and we include that information on the planning profile, part

20   of what we do is we go back in and update that number with the

21   actual date that the financial statements were filed for that

22   year.  So, if there is an error in that process where either a

23   date doesn't get updated or the wrong date is entered, we can

24   be a couple of days after when we notify.

25   Q.  Just an error in terms of tracking when it was done?

J2E5mid2                          Rodriguez - direct

1    A.  Yes.

2    Q.  What, if anything, did the KPMG inspection team do in such

3    a circumstance?

4    A.  When that happened, we contacted the firm to let them know

5    that we had done that, we were aware we did it, and then we

6    asked them to document any changes or modifications that were

7    made to those workpapers once they received notification from

8    us.

9    Q.  And was that, that request that the firm document any

10   changes, was that limited to changes that constituted new audit

11   work or just any changes to the documentation at all?

12   A.  Any changes.

13              MR. OHTA:  Your Honor, vague as to time.

14              THE COURT:  Vague as to time?

15              MR. OHTA:  Yes.

16              MS. MERMELSTEIN:  I think we established at the

17   beginning of Ms. Rodriguez' time we were talking about 2015 to

18   early 2017 as a general principle unless otherwise specified.

19              Is your answer for that time period?

20              THE WITNESS:  Yes.

21              MR. OHTA:  She is talking about a specific exception

22   to a general policy.  That's why it is vague as it time.

23              THE COURT:  Were you talking in general about those

24   years?

25              THE WITNESS:  Yes.

1            THE COURT:  Okay.  It is allowed.  Did you get an

2    answer to the question?

3    BY MS. MERMELSTEIN:

4    Q.  Let's make sure it is clear.  I think I did, your Honor.

5            When the KPMG inspection team would ask KPMG to keep

6    track of any changes to the documentation, was that request

7    limited to changes to the documentation that constituted new

8    audit work or to any changes made to the documentation of any

9    kind?

10   A.  Any changes.

11   Q.  And is the quality of the documentation itself important to

12   the PCAOB?

13   A.  Yes, it is.

14   Q.  So, going back to the, just to the formal notification

15   process, when the PCAOB notifies a firm that a particular audit

16   has been selected for inspection, does it tell the firm why an

17   audit has been selected?

18   A.  No, we do not.

19   Q.  Why not?

20   A.  It is a confidential process.

21   Q.  What happens next in the process after that notification

22   goes out?

23   A.  So, once that notification goes out, the inspection team

24   and the engagement team or the national office representative

25   for that engagement team will begin communications and planning

J2E5mid2                              Rodriguez - direct

1    for the inspection, and one week prior to the beginning of

2    field work for us we receive access to their workpapers.

3    Q.   Just to clarify the terminology here, the engagement team

4    is the KPMG auditors who worked on that particular audit?

5    A.   Correct.

6    Q.   And the inspection team is the group of PCAOB inspectors

7    who are going to go inspect the audit?

8    A.   Correct.  Yes.

9    Q.   What do you mean by field work?

10   A.   So, we generally go to the KPMG office where we are going

11   to be inspecting a specific team or issuer audit and we work

12   from that office for the inspection.  We sometimes have what we

13   call our PCAOB base where we do this all telephonically, but

14   the vast majority of our inspections are conducted in person

15   and that is what we refer to as field work for us.

16   Q.   What is kind of the big first event of the field work?

17   A.   The first event will be, it will take place either the

18   Thursday or Friday before we begin field work or the Monday

19   beginning field work and we will have an opening meeting with

20   the engagement team.

21   Q.   Does that meeting have a particular name?

22   A.   The kickoff meeting or opening meeting.

23   Q.   What happens or who attends that meeting?

24   A.   The engagement team members from KPMG and members from

25   their national office, it is at their discretion, and from the

J2E5mid2                          Rodriguez - direct

1    PCAOB it is all of our inspection team and, at times, whatever

2    team lead was in the field or the ATL if they were in the

3    field, they would attend.

4    Q.  What happens at that meeting?

5    A.  That is the opportunity for the firm to present the focus

6    areas that we are going to be looking at and they will discuss

7    their approach and rationale for why they performed the

8    procedures they performed, and they also may talk about some

9    more global issues to the audit.  So, they could talk about

10   what risks they thought were present in the audit and how they

11   went through that process.

12           They sometimes talk about scoping decisions.  And what

13   scoping is is when you have an issuer who exists in many

14   locations, they're not going to do work at every single

15   location because that's impractical.  So, they will make a

16   determination what locations are going to perform work, that's

17   called scoping, so sometimes they'll talk about that.

18           So, it is generally they talk about their audit

19   approach and then the specific focus areas we have asked them

20   to discuss.

21   Q.  Why is that presentation important?

22   A.  It's important because it is our first kind of insight into

23   the engagement team and their thoughts, their rationale, their

24   knowledge of the issuer.  That's our first experience with it.

25   Q.  How does the team's command of the audit affect the PCAOB's

J2E5mid2                          Rodriguez - direct

1   view of the audit?

2   A.   It can impact that.   Teams that are extremely well prepared

3   and very knowledgeable, it helps us understand workpapers, it

4   helps us to quickly understand knowledge that the team may

5   have, and it helps us to understand why they made decisions

6   they made and risk assessments they made.   So, it sets an

7   immediate groundwork for that inspection.

8   Q.   Can that affect the outcome of the inspection itself?

9           MR. OHTA:   Objection, your Honor.

10          THE COURT:   Overruled.   You can answer.

11          THE WITNESS:   It could.

12  BY MS. MERMELSTEIN:

13  Q.   What is sort of the next step after that kickoff meeting?

14  A.   So, after that kickoff meeting we have individual meetings

15  with the team members that perform the audit work in the focus

16  areas we are looking at.

17  Q.   Generally speaking, how long does the field work portion of

18  the inspection last?

19  A.   The most common length of an inspection is a week.   It is

20  not uncommon to be either two weeks and, at times for very

21  large issuers, we can be there three to four weeks.

22  Q.   And that is an assessment of the workpapers, generally?

23  A.   Workpapers or hours helps us to get a sense for how large

24  the audit is.

25  Q.   How does the quality of the workpapers affect the PCAOB's

J2E5mid2                      Rodriguez - direct

1    view of an audit?

2    A.  It impacts it because it helps us understand what was done.

3    Things that are very well documented that we can easily read we

4    can easily cross-reference, we can work our way through the

5    workpapers.  It helps, because we understand what happened and

6    there is a very clear documentation and understanding of what

7    work was actually performed.

8    Q.  And, can the quality of the workpapers affect the outcome

9    of an inspection?

10   A.  Yes.

11   Q.  What happens when the PCAOB completes its field work?

12   A.  Upon completion of the field work, there will either be a

13   comment form issued if we found deficiency, or there will be no

14   comment forms issued in instances where we have no findings

15   within the inspection.

16   Q.  What is a deficiency?

17   A.  A deficiency is when we find work that should have been

18   done to be in compliance with the auditing standards that was

19   not done.  We call those deficiencies.

20   Q.  Can an audit receive more than one comment form?

21   A.  Yes, it can.

22   Q.  Does KPMG have an opportunity to respond to any comments?

23   A.  Yes.

24   Q.  How?

25   A.  The comment form, within the comment form itself there is a

1    place for the firm to denote that it agrees with the facts and

2    if they do not agree, why they do not agree, and whether or not

3    they agree with the issue we have identified and if they do not

4    agree with the issue, why they do not agree with the issue.

5    Q.  In addition to looking at all of these individual audits,

6    what does the PCAOB do to evaluate the firm as a whole?

7    A.  I'm not sure I understand.

8    Q.  Let me rephrase.

9         Does the PCAOB look at the firm's own internal

10   controls?

11   A.  Yes, we do.

12   Q.  What are the firm's internal controls?

13   A.  That is part of the quality control review we do, yes.

14   Q.  What is a quality control review?

15   A.  We look at some of the controls that the firm has in place

16   around some of the areas we mentioned previously; independence

17   rules, their partner review and evaluation process, client

18   acceptance.  It was different -- in any given year the focus

19   may change.

20   Q.  During the course of the annual inspection process, does

21   the PCAOB inspection team communicate with KPMG leadership

22   about the inspection process?

23   A.  Yes, we do.

24   Q.  How frequently do such meetings occur?

25   A.  Once a month.

J2E5mid2                          Rodriguez - direct

1   Q.   Who, generally, attends those meetings?

2   A.   Generally it will be the audit leadership from KPMG and

3   anybody else that they wanted to attend depending on the topic

4   at the meeting, and then the inspection team leadership and

5   anybody that we would invite to the meeting based on the topics

6   at that meeting.

7   Q.   What are the general topics of the meetings?

8   A.   There is always a standing item for inspection update and

9   that's where we will talk about the current status of the

10  inspection.  And then what we would generally do is there is

11  different remedial actions that the firm may want to discuss or

12  the large part of the agenda is left up to the firm to discuss.

13  So, usually remedial actions, inspection status, things like

14  that.

15  Q.   Was ALLL a frequent topic of communication at those

16  meetings?

17  A.   At that time, yes.

18  Q.   Why?

19  A.   It had been an area of historical findings for the firm.

20  Q.   When you say that KPMG leadership attended, generally

21  speaking, in that time period we have been talking about, did

22  that include David Middendorf?

23  A.   Yes, it did.

24  Q.   Were there kind of formal agendas for those meetings?

25  A.   Yes, there were.

J2E5mid2                         Rodriguez - direct

1   Q.  So, after the field work for all of the audits being

2   inspected is complete, approximately how long does it take for

3   the whole inspection process to play out in the active phase?

4   A.  Field work weeks you mean?

5   Q.  Yes.

6   A.  Generally, we would be in the field from the March time

7   frame to sometime September-October.

8   Q.  How does the PCAOB report its ultimate findings?

9   A.  Ultimately, the culmination of the inspection process

10  results in a report that we will issue for the firm.

11  Q.  What does that report contain?

12  A.  There are primarily two sections to that report.  There is

13  Part I, and that is publicly published and that contains a

14  summary of the issuers that we determined had unsupported audit

15  opinions and were failed audits, those were in Part I.  Part II

16  is not made public for a certain amount of time, or potentially

17  never depending on the remediation assessment for the firm, but

18  that contains the quality control findings we may have

19  identified and any thematic findings we may have had at the

20  firm.

21  Q.  You just referenced unsupported audit opinions and called

22  them failed audits.  What does that mean?

23  A.  That means at the time of the audit we determined that

24  there wasn't sufficient audit evidence to support the opinion

25  that was issued.

J2E5mid2                          Rodriguez - direct

1   Q.  Are comments ever issued in circumstances that don't quite

2   rise to that level?

3   A.  Yes.

4   Q.  And do those appear in Part I?

5   A.  No.

6   Q.  Where, if anywhere, do they appear?

7   A.  They would potentially, depending what they related to,

8   they may be in Part II if they fit in with some of the other

9   quality control observations or thematic observations that we

10  had.

11  Q.  Turning first to Part I to the section that talks about

12  issuers where there were failed audits, does that part of the

13  report identify, by name, the issuer, the company being

14  audited?

15  A.  No.

16  Q.  And with respect to the Part I and Part II, who receives

17  the nonpublic portion of the report?

18  A.  The firm and the SEC.

19  Q.  And where is the public portion of the report made

20  available?

21  A.  The PCAOB website.

22  Q.  So, let me direct your attention to Government's Exhibits 1

23  through 6.  I think it may be easiest for you to look at them

24  in the hard copy in front of you so you can flip through.

25  A.  Okay.

J2E5mid2                         Rodriguez - direct

1    Q.   Do you recognize these?

2    A.   Yes.  Yes, I do.

3    Q.   What are they?

4    A.   These are the 2014 reports for KPMG, 2015 reports -- it was

5    through what number?

6    Q.   6.

7    A.   The 2016 report and the 2017 report.

8            MS. MERMELSTEIN:  Your Honor, I believe 1, 3, and 5

9    are already in evidence so the government offers 2, 4, and 6

10   and to the extent not already offered, 1, 3, and 5 as well.

11           THE COURT:  2, 4, and 6 are received, and I will

12   confirm that Government's Exhibits 1, 3, and 5 were already

13   received

14           (Government's Exhibits 2, 4, and 6 received in

15   evidence).

16   BY MS. MERMELSTEIN:

17   Q.   I would like to take a look at Government Exhibit 3, just

18   as an example.  Which report is this?

19   A.   This is the 2015 inspection report.

20   Q.   Looking at the first page of the report, on what date was

21   this issued?

22   A.   November 9, 2016.

23   Q.   And that's for inspection year 2015?

24   A.   Yes.

25   Q.   Is that a typical amount of time between the inspection

J2E5mid2                        Rodriguez - direct

1    year and the issuance of the report?

2    A.   Yes.   That's not unusual.

3    Q.   Why does it take so long?

4    A.   When we finished inspections in, let's say October, there

5    is still a significant amount of work to do related to those

6    quality controls that we talked about that we looked at, so

7    that can go on through early in the following year, the

8    January, February time frame.  And then, drafting this report

9    and the numerous levels of review that it goes through, takes

10   time.

11   Q.   Can you read the text in the black box on the front of the

12   report, please?

13   A.   *This is a public version of a PCAOB inspection report.*

14   *Portions of the complete report are omitted from this document*

15   *in order to comply with Sections 104(g)(2) and 105(b)(5)(A) of*

16   *the Sarbanes-Oxley Act of 2002.*

17   Q.   So we are looking at the portion of the report that would

18   have been made immediately publicly available?

19   A.   Yes.

20   Q.   Let's go to page 3 and let me ask you to read that first

21   paragraph.

22   A.   *Certain of the deficiencies identified were of such*

23   *significance that it appeared to the inspection team that the*

24   *firm, at the time it I issued its audit report, had not*

25   *obtained sufficient appropriate audit evidence to support its*

 1   *opinion that the financial statements were presented fairly, in*

 2   *all material respects, in accordance with the applicable*

 3   *financial reporting framework and/or its opinion about whether*

 4   *the issuer had maintained, in all material respects, effective*

 5   *Internal Control over Financial Reporting (ICFR).  In other*

 6   *words, in these audits, the auditor issued an opinion without*

 7   *satisfying its fundamental obligation to obtain reasonable*

 8   *assurance about whether the financial statements were free of*

 9   *material misstatement and/or the issuer maintained effective*

10   *ICFR.*

11   Q.  Let me ask you to slow down just a tiny bit.

12   A.  Okay.

13   Q.  What does that mean in regular person language?

14   A.  That means at the time that this audit opinion was issued,

15   there were audit procedures that were omitted that were of such

16   significance the audit opinion was determined to have been not

17   supported.

18   Q.  And then let's go to the second paragraph and let me ask

19   you to read that paragraph a little more slowly.

20   A.  The fact that one or more deficiencies in an audit reach

21   this level of significance does not necessarily indicate that

22   the financial statements are misstated or that there are

23   undisclosed material weaknesses in ICFR.  It is often not

24   possible for the inspection team, based only on the information

25   available from the auditor, to reach a conclusion on those

J2E5mid2                          Rodriguez - direct

1   points.

2   Q.   What does that mean?

3   A.   So, what that means is because there are deficiencies in

4   the audit, that does not necessarily mean that the financial

5   statements have errors in them.  Sometimes the work that is not

6   included in the audit file doesn't allow us to know whether or

7   not the number is right or wrong.  What we have insight into is

8   that the audit procedures weren't sufficient in order to know

9   whether the number was right or wrong.

10  Q.   Let's go to Government Exhibit 4.  And what are we looking

11  at now?

12  A.   This is the 2015 inspection report for KPMG.

13  Q.   Go ahead.

14  A.   This is another version, an additional version of that

15  report.

16  Q.   This is portion that was initially non-public?

17  A.   That's correct.

18  Q.   Is it still nonpublic?

19  A.   Portions of it are no longer nonpublic.

20  Q.   So that portions are now public?

21  A.   Or that, yes.

22  Q.   Why?

23  A.   Based on the remediation work that was done by the firm,

24  portions of that remediation work were determined not to be

25  sufficient, therefore those respective portions of Part II

J2E5mid2                        Rodriguez - direct

1    remained public.

2    Q.  Okay.  Let's jump quickly to page 46 of the report, I think

3    it is 47 in the pdf, Mr. Cooney.  Directing your attention to

4    the section:  Issues related to qualify controls, Part 2; what

5    is this section of the report?

6    A.  This is the section where we discuss quality control

7    findings within the firm.

8    Q.  Let's jump ahead to page 51 of the document, 52 in the pdf,

9    and if you read, can you read the first paragraph under

10   deficiencies in the system of quality control related to

11   testing accounting estimates?

12   A.  *The inspection results indicate that the firm's system of*

13   *quality control does not provide the reasonable assurance*

14   *described in QC 20, paragraphs .03 and .17, that the work*

15   *performed by the firm's personnel with respect to testing*

16   *accounting estimates, including the ALL, will meet the*

17   *requirements of AS No. 14, AU 328, and AU 342.  The inspection*

18   *team identified nine audits in which the firm appeared not to*

19   *have met those requirements including six audits discussed in*

20   *Part I of this report.*

21   Q.  So, what does that mean?

22   A.  So, what that means is we have findings related to the

23   auditing around the ALL and we had findings in nine audits, but

24   for six of them the findings were determined to be of such

25   significance that the audit opinion would have been unsupported

1   so those six are in Part I.

2   Q.   And the other three are just?

3   A.   They're in this finding section where we talk about overall

4   issues with the auditing of estimates, specifically the ALL.

5   Q.   Okay.  We can take that down.  Thank you, Mr. Cooney.

6           So, you said that the firm gets the full report in the

7   first instance and the SEC gets the full report.  Why does the

8   SEC get the full report?

9   A.   In their role as oversight over the PCAOB, they obtain that

10  report.

11  Q.   Other than providing the inspection report itself, were

12  there other ways in which the PCAOB reported on inspection

13  results to the SEC?

14  A.   There are other ways we communicate, yes.

15  Q.   Can you give us some examples?

16  A.   Yes.  We issue, at times what we call 4004 reports, and

17  those reports communicate to the SEC any time we see violations

18  of the SEC rules when we are looking at an issuer audit or an

19  inspection of the firm, and we also issue them in instances

20  where we find GAAP or accounting rule violations that are

21  significant, we report those also.

22  Q.   So, 4004 reports don't just report that an audit was done

23  poorly, for example?

24  A.   No.

25  Q.   Were there ever in-person meetings between PCAOB personnel

J2E5mid2                          Rodriguez - direct

1    and the SEC?

2    A.   There were.

3    Q.   And, did you participate in those meetings?

4    A.   I have not.

5    Q.   Who did, generally?

6    A.   Different, depending on the topic.  It would often be

7    leadership within the PCAOB, the division, or the GNF program

8    Q.   So, I want to return for a moment to some of your earlier

9    testimony and let me direct your attention back to Government

10   Exhibit 102.  Can you remind the jury -- it is going to take a

11   minute to come up -- what Government Exhibit 102 is?

12   A.   This is the planning profile.

13   Q.   And can you remind the jury, generally, how the PCAOB made

14   sure that there would be big-picture consistency across the

15   GNF, inspection of GNF firms?

16   A.   The GNF national office develops our approach, annually.

17   Q.   Would it be typical for the member of one planning team,

18   say the Deloitte planning team, to look at the GNF profile for

19   the KPMG planning team?

20   A.   Not in my experience, no.

21   Q.   Why not?

22   A.   Because the information contained within this file is

23   confidential for that team.

24   Q.   Would it have been useful for the member of another team to

25   look at this?

J2E5mid2                              Rodriguez - direct

1    A.  Not in my experience, no.

2    Q.  Why not?

3    A.  Because this information is very specific to the firm.  It

4    talks about risks that are at the firm's issuers or risks that

5    are present in the firm.  So, it is very specific for our firm.

6    Q.  Let me direct your attention to what's in evidence as

7    Government Exhibit 92 and just so it is clear, prior to

8    preparing to testify here, had you ever seen this document?

9    A.  No, I have not.

10   Q.  Directing your attention to the first document on the list,

11   copy of EY 2017 issuer screening template; what is that?

12   A.  I haven't see it, I haven't seen it before.  What that

13   document appears to be is a summary of some of the information

14   that is contained in our planning profile that we all use in

15   another document kind of skimming down to use for a screening.

16   Q.  You said "our."  You mean our PCAOB, right?  This is the

17   E&Y version of it?

18   A.  Yes, right.

19   Q.  So it is a subset of the GNF profile, essentially?

20   A.  That's what it appears to be.

21   Q.  And maybe this is the same question but would that have any

22   utility to someone working on planning for a non-E&Y team?

23   A.  Not in my experience, no.

24   Q.  And, can you remind the jury what EY is?

25   A.  Ernst & Young.

J2E5mid2                        Rodriguez - direct

1    Q.  Let me direct your attention now on this same document to

2    the document titled 2017 KPMG U.S. inspection, top 30

3    recommendations for 2017.  Sorry, it just says top 30

4    recommendations.  Let's take a look at that, at Government

5    Exhibit 80 in evidence.  What are we looking at, Ms. Rodriguez?

6    A.  This was a document prepared by our planning team in order

7    to discuss the top 30 recommendations that they had identified

8    for consideration for inspection.

9    Q.  And let's go to the second page for a moment and do you see

10   where it says:  Recommendation:  Valero Energy?

11   A.  Yes.

12   Q.  What is contained under reasons for inspecting in 2017?

13   A.  These would have been the risk factors present at Valero

14   that were reasons for the planning team to determine that we

15   should inspect this issuer.

16   Q.  What, if any utility, would this document have to someone

17   working on the planning team for a non-KPMG firm?

18   A.  None that I could see given the specific nature of all of

19   these comments within this document to these issuers or the

20   firm.

21   Q.  So let's look at another one of the documents listed on

22   Government Exhibit 92 and let's pull up Government Exhibit 81.

23   What is this?

24   A.  So, this document is a document prepared by our planning

25   team to use when myself, as the associate team lead at the

1    time, the U.S. team lead, and the global team lead, were

2    reviewing it.  There is a lot of documentation and planning so

3    in order to assist in seeing a global approach or a picture of

4    what the selections looked like and what our approach looked

5    like, this summary was prepared to assist in that review.

6    Q.  Let's look at the second page of that document for a

7    moment.  What is being discussed under Domestic Inspection

8    Buckets discussion?

9    A.  So, what this is going through are all the buckets that we

10   want to cover in an inspection year, so for instance top 30

11   issuers or the star referrals that we previously discussed, any

12   judgmental selections which are some that our team may have

13   picked based on risk factors at the team we were inspecting.

14   This goes through all of those buckets that we want to cover in

15   an inspection season and where we are going to land with those

16   buckets.

17   Q.  What about the topic area, areas of national office focus

18   for 2017?  What is this talking about?

19   A.  So, the national office determines certain areas that we

20   were going to inspect in any given year for a variety of

21   reasons, whether it's data-gathering or understanding where

22   areas of deficiencies are.  So, for those areas that are

23   determined by the national office for everyone, we would go

24   through how we were going to address those and how we were

25   building those in our plan.

J2E5mid2                          Rodriguez - direct

1    Q.  And then let's turn to page 3 of this document, please, and

2    let me direct your attention to the section titled Monitoring

3    Program Coverage, 2017 versus 2016.  What is this discussing?

4    A.  So, what this is talking about is part of the firm's

5    remediation or response to a previous report, they have certain

6    monitoring programs that they put in place to remediate those

7    deficiencies.  So, what we are looking at here is this is where

8    I mentioned earlier we would often find out how many issuers

9    were in any given program and then we would pick a certain

10   amount of those.  So, what this is going through is saying for

11   each of these programs, here is how many issuers participated,

12   here is how many we are looking at, and some information on

13   those programs.

14   Q.  So, directing your attention to the column ALL Monitoring

15   and Support Program, what does that indicate?

16   A.  So, what that is saying is the issuers, there were 29 that

17   were in the program, and we were going to inspect four of them.

18   Q.  Do all of the firms in the GNF program have the same

19   monitoring programs in place?

20   A.  No, they do not.

21   Q.  Again, what utility, if any, would Government Exhibit 81

22   have to someone who is not on the KPMG planning team?

23   A.  None that I would see given the specific nature of this

24   information.

25   Q.  Let's look at one more of the documents listed in

J2E5mid2                        Rodriguez - direct

1   Government Exhibit 92 and let's jump to Government Exhibit 91.

2   What is this?

3   A.   This is a similar document.  This is specifically focusing

4   on monitoring programs.

5   Q.   And again, what, if any, usefulness would this document

6   have to someone not on the KPMG U.S. team?

7   A.   None that I could see, given the specific nature of the

8   information.

9   Q.   Now, with respect to the document that we just looked at in

10  that category, where would those kinds of documents have been

11  stored at the PCAOB?

12  A.   Generally within the planning folders within our IIS file.

13  Q.   Let me turn your attention now to focus on KPMG.  Focusing

14  on approximately 2015, what was the makeup of the PCAOB team

15  responsible for inspecting KPMG?

16  A.   We would have had about 40 to 50 inspectors that were going

17  in the field and performing inspectors, and then we had a

18  global team lead who would have sat over the domestic and

19  international inspections for the firm, a U.S. team lead who

20  would be responsible for the U.S., an affiliate firm

21  coordinator, the AFC who would have been responsible for the

22  international inspections, the associate team lead which is the

23  role I held.  We would also have a remediation leader who would

24  be responsible for looking at all those remedial actions that

25  the firm had developed.  And, we would have an FMM leader who

J2E5mid2                              Rodriguez - direct

1    would be responsible for the procedures we were performing over

2    the quality controls within the firm as a control.

3    Q.  So, you say there were 40 to 50 inspectors performing the

4    inspections?

5    A.  Generally, yes.

6    Q.  In that rough time period, who was the global head for KPMG

7    inspections overseeing both the U.S. and the affiliate and

8    international?

9    A.  In 2015 it would have been Paul Bijou.

10   Q.  And who was the KPMG U.S. lead?

11   A.  In 2015, 2016 in that time friend it would have been Steve

12   Schindler.

13   Q.  What was your role?

14   A.  I was associate team leader.

15   Q.  What, if any role, did Boss Ross have?

16   A.  At that time, Bob sat over most of our banking inspections

17   and he was our banking ATL or associate team leader.

18   Q.  Between 2015 and 2017, was Jeffrey Wada on the KPMG U.S.

19   inspection team at any point in time?

20   A.  Not to my knowledge.

21   Q.  What, if any connection, did he have to the KPMG team?

22   A.  My understanding, he worked on the inspections of the Japan

23   affiliate so he would have been on the international side.

24   Q.  In 2015, how was KPMG performing on inspections.

25   A.  As compared to the other firms, they had a much higher rate

J2E5mid2                          Rodriguez - direct

1    than the other issuers in Part I.

2    Q.  Let me direct your attention to what is marked for

3    identification Government Exhibit 1357.  What is this?

4    A.  This is a summary schedule comparing the KPMG Part I

5    findings, those issuers that had the deficient audits or

6    unsupported opinions, to those of the other five members of the

7    GNF program.

8    Q.  What is the source of the information contained in this

9    chart?

10   A.  The Part I section of those published inspection reports.

11   Q.  Let me direct your attention to what is in front of you in

12   your binder as a CD marked for identification as Government

13   Exhibit 7.  It should be in kind of a plastic sleeve.

14   A.  I think I am seeing it -- yes.

15   Q.  Does that contain all of the inspection reports that

16   underlie this chart, other than the ones that are marked as

17   Government's Exhibits 1 through 6?

18   A.  Yes.

19          MS. MERMELSTEIN:  The government offers Government

20   Exhibit 1357.

21          THE COURT:  1357 is received.

22          (Government's Exhibit 1357 received in evidence)

23   BY MS. MERMELSTEIN:

24   Q.  Let's publish to the jury and look at this for a moment.

25          What is the title of this chart?

1    A.  1357; KPMG GNF firms:  Number of issuers with deficient

2    audits.

3    Q.  Is a deficient audit the same thing as an issuer who was in

4    Part I?

5    A.  Yes.

6    Q.  What does it show in the column all the way on the left?

7    A.  The inspection year.

8    Q.  And then, next to that, what does it show for KPMG?

9    A.  Those are the counts of the KPMG issuers in Part I for

10   those respective years.

11   Q.  Then, if we go all the way to the right to the column under

12   average number of issuers with deficient audits for other GNF

13   firms, what does that calculate?

14   A.  That takes the average number of issuers in Part 1 for the

15   other five firms in any given year.

16   Q.  So, in 2012, how many issuers did KPMG have in Part I?

17   A.  17.

18   Q.  What was the average for the other GNF firms?

19   A.  18.4.

20   Q.  So, KPMG was a little better than average?

21   A.  Yes.

22   Q.  And in 2013?

23   A.  23.

24   Q.  How does that compare to the competitor firms?

25   A.  19.4.

J2E5mid2                          Rodriguez - direct

1    Q.  What about how many issuers did KPMG have that had

2    deficient audits in 2014?

3    A.  28.

4    Q.  And how did that compare to the average for other GNF

5    firms?

6    A.  It was higher.  Theirs was 17.4.

7    Q.  So, more than 10 higher?

8    A.  Yes.

9    Q.  And 2015, how many deficient audits in Part I did KPMG

10   have?

11   A.  20.

12   Q.  And how did that compare to the other firms in the GNF

13   program?

14   A.  13.6 was the number.

15   Q.  Finally, looking at 2016, how many deficient audits did

16   KPMG have in Part I?

17   A.  22.

18   Q.  How did that compare to the other audits for the other GNF

19   firms?

20   A.  12.6 was the other.

21   Q.  Okay. we are going to talk more about what happened in 2016

22   but, just so it is clear, this 22 on the chart, is that out of

23   a universe of, does that include the replacement inspections

24   that we are going to talk about and the original ones?  Or just

25   one universe?

1    A.   I believe that is just the original.

2    Q.   So --

3    A.   Sorry, can I clarify that?  That is just the 51, it doesn't

4    include the additional three from the original.

5    Q.   We will come back to that so it is clear.

6         Now, other than the formal inspection process and the

7    monthly meetings we have talked about, were there other ways by

8    which members of a big firm, a GNF firm interacted with the

9    PCAOB?

10   A.   Yes.

11   Q.   What were those?

12   A.   There were board meetings held, sometimes once or twice a

13   year with the firm and the Board where they would come in and

14   speak to the Board on various topics that the Board would

15   request.

16   Q.   And, are you familiar with something called the SAG, the

17   Standing Advisory Group?

18   A.   I am.

19   Q.   So, what is that?

20   A.   So, that group has members that come from some of the large

21   firms, they come from large issuers or academia and they advise

22   the board on various topics that are standard setting or there

23   is of interest that the board is considering in looking at.

24        MS. MERMELSTEIN:  Your Honor, I am happy to keep going

25   but this is a logical breaking point if you want to take the

J2E5mid2                           Rodriguez - direct

1   midmorning break.

2              THE COURT:  Do you want to take a bathroom break?

3              JUROR:  Yes.

4              THE COURT:  We will take a 10-minute break, folks.

5   Leave your pads on your chairs and we will continue in 10

6   minutes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2E5mid2                        Rodriguez – direct

1              (Jury not present)

2              THE COURT:  Ma'am, you can step down as well, if you

3    would like.

4              THE COURT:  Folks, we will see you in 10 minutes.

5              (recess)

6              THE COURT:  Do we have everybody?

7              Okay, please, bring in the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2E5mid2                              Rodriguez - direct

1           (Jury present)

2           THE COURT:  Ms. Mermelstein, you may proceed.

3           MS. MERMELSTEIN:  Thank you, your Honor.

4    BY MS. MERMELSTEIN:

5    Q.  Ms. Rodriguez, I would like to turn your attention now to

6    approximately February of 2017.  Did there come a time that

7    KPMG informed the PCAOB that it was in possession of the

8    PCAOB's list of inspections for 2017?

9    A.  Yes.

10   Q.  At the time that the PCAOB received that notice, had it

11   begun the 2017 inspections?

12   A.  No, we had not begun inspections.

13   Q.  What did the PCAOB do in response to learning that

14   information?

15   A.  We had to replan all of the 2017 inspection selections and

16   get rid of our old list and begin again.

17   Q.  So, you started fresh in picking audits that would be

18   inspected?

19   A.  Yes.  That's correct.

20   Q.  How much work was it to do that?

21   A.  It was a significant amount of work.

22   Q.  Approximately how many people were involved?

23   A.  We had approximately up to 25 people involved in that

24   effort.

25   Q.  And when you say it was a significant amount of work, can

J2E5mid2                         Rodriguez - direct

1   you put a rough estimate of the number of staff hours that were

2   put towards doing that?

3   A.  For just our team, the KPMG planning team, it was

4   approximately 2,000 hours.

5   Q.  Meaning that doesn't include other components of the PCAOB

6   that also participated?

7   A.  Correct.

8   Q.  I want to show you, just for identification, Government's

9   Exhibits 1351 through 1356.  Mr. Cooney is going to scroll

10  through them.  They are also in the front cover of the binder

11  in front of you.

12          Do you recognize these?

13  A.  Yes, I do.

14  Q.  What are they?

15  A.  These are the issuer lists -- issuers selected for

16  inspection for 2015, 2016, and 2017.

17  Q.  In reviewing these charts, did you rely on various PCAOB

18  documents?

19  A.  Yes, I did.

20  Q.  So, let me direct your attention back to those sleeves with

21  the CDs in front of you, and showing you first Government

22  Exhibit 125 for identification.

23  A.  Okay.

24  Q.  What is contained on that CD?

25  A.  That is the 2015 inspection summary memorandum.

J2E5mid2                         Rodriguez - direct

1    Q.  And, just so the jury understands, what are summary

2    inspection memoranda?

3    A.  So, at the end of every inspection each inspection team

4    will prepare what we call incident inspection summary

5    memorandum, you often hear them referred to as ISMs, and that

6    will document the procedures that we performed and the work

7    that we reviewed in all of the focus areas and any other areas

8    of interest on our inspection, and we will also document if

9    there were any comment forms or findings based on those

10   procedures.

11   Q.  So, one exists every time there is an inspection?

12   A.  That's correct.

13   Q.  Turning your attention to Government Exhibit 126 for

14   identification --

15   A.  Yes.

16   Q.  -- what does that contain?

17   A.  Those are the 2016 inspection summary memorandum.

18   Q.  Turning to 127 for identification, what does that contain?

19   A.  Those are the 2016 inspection notifications.

20   Q.  And we will get to this in a moment, but are those all of

21   the inspection notifications or just inspection notifications

22   for inspections that did not ultimately occur?

23   A.  Those that did not ultimately occur.

24   Q.  Let's turn to 128 for identification.  What is that?

25   A.  This is the 2017 KPMG attribute schedule.

J2E5mid2                          Rodriguez - direct

1    Q.   And 129; what is that?

2    A.   That is the 2017 GNF planning profile as of February 3rd.

3    Q.   Are those all documents that underlie the lists of issuers

4    that were inspected?

5    A.   Yes, they are.

6    Q.   And then, just one more document while you are looking at

7    documents, let me direct your attention to Government Exhibit

8    130, it is a a hard copy document, we can also pull it up,

9    Mr. Cooney.

10            What is that?

11   A.   That is the 2016 issuer key.

12   Q.   What is the issuer key?

13   A.   When we prepare an inspection report, the issuers that they

14   relate to or write-ups relate to do not disclose what issuer

15   they are specifically, so we use a referencing system where we

16   will use a number in the alphabet or something, depending how

17   we use the letters, it will say issuer AA, or issuer BB, and

18   this is the key that links that reference in the report to the

19   issuer we are speaking about.

20            MS. MERMELSTEIN:   The government offers Government's

21   Exhibits 1351 to 1356.

22            THE COURT:   They're received.

23            (Government's Exhibits 1351 to 1356 received in

24   evidence)

25   BY MS. MERMELSTEIN:

J2E5mid2                          Rodriguez - direct

Q.  Let's walk through the chart and let's start with

Government Exhibit 1355.  Let me ask you to read, slowly, the

heading of this document.

A.  2017 Inspections:  KPMG Issuers on PCAOB Inspection List as

of January 9, 2017.

Q.  How do you know that these were the issuers that the PCAOB

was planning to inspect as of January 9 of 2017?

A.  We have various schedules we use as part of our planning

process and one of them is the KPMG attribute schedule and that

will summarize any attributes or items that this inspection is

going to help us get coverage on or any special items that are

of interest, and we have a version from January 9th that

contained these issuers.

Q.  And so, in the bottom right-hand corner where it says

GX- 128 attribute schedule, that's just referencing where this

information came from?

A.  That's correct.

Q.  Is that system of keeping track of where things came from

true for all the charts we are about to look at?

A.  The reference at the bottom, yes.

Q.  Let's go to 1356, please, and again, if you can read the

title of this document?

A.  2017 Inspections, KPMG Issuers on PCAOB Inspection List as

of February 3rd, 2017.

Q.  Again, how do you know that these were the issuers the

J2E5mid2                              Rodriguez – direct

1   PCAOB planned to inspect as of February 3rd, 2017?

2   A.  So, the planning profile, which is that very large

3   spreadsheet we looked at earlier, we have a version from

4   February 3rd that contains these issuers.

5   Q.  Did you participate in the 2017 inspection of KPMG?

6   A.  Yes, I did.

7   Q.  In what role?

8   A.  I was the associate team lead at that time.

9   Q.  And that inspection took place after PCAOB had been

10  notified about this confidential information issue?

11  A.  Yes.

12  Q.  Did the PCAOB approach that inspection any differently in

13  light of the information it had learned beyond choosing new

14  issuers to inspect?

15  A.  No.

16  Q.  Is there any difference in how it decided whether to write

17  a comment?

18  A.  No.

19  Q.  Did there also come a time that the PCAOB learned that KPMG

20  had been in possession of confidential PCAOB information with

21  respect to financial issuers inspected in 2016?

22  A.  Yes.

23              (Continued on next page)

24

25

J2edmid3                         Rodriguez - direct

1    Q.  At the time that the PCAOB learned that information, had

2    the 2016 inspections taken place?

3    A.  Yes, they had.

4    Q.  What, if anything, did the PCAOB do in light of that

5    information?

6    A.  We made the decision to inspect all of the financial

7    services issuers that we had reselected for 2017 to also look

8    at them for 2016.

9    Q.  Did the PCAOB know for sure when it received that

10   information whether or not the audits had actually been

11   affected in any way by the receipt of confidential information?

12   A.  No, we did not.

13   Q.  From the PCAOB's perspective, what, if any, purpose did

14   selecting replacement inspections serve in that regard?

15   A.  So in the event that there was in fact a breach of

16   confidentiality and those audits could have been affected or

17   those files were affected, this allowed us to pick a new set of

18   inspections that would not have been known to anyone at that

19   time and provide us a confidential list to work from again.

20   Q.  Would that allow you to compare the results with respect to

21   the first set for which there was an allegation that

22   confidential information had been received and the second set

23   where there was no such problem?

24   A.  Yes.

25   Q.  Again, did the PCAOB approach these 2016 financial

J2edmid3                         Rodriguez - direct

1    institution replacement inspections any differently than it

2    generally approaches an inspection?

3    A.  No, we did not.

4    Q.  And was there any difference with respect to whether or not

5    it decided to run a comment?

6    A.  No, there was not.

7    Q.  Can you describe for the jury the process by which after an

8    individual inspection team has written a comment, how that

9    flows through the PCAOB and into the ultimate decision as to

10   whether or not that will be included in the inspection report

11   at all and whether or not it will be in Part I or Part II?

12   A.  Sure.  So after there is a comment written, the firm

13   responds as to whether or not they agree, if there was any

14   additional information for us to consider.  And in the event

15   that there is additional information, we go through that

16   information and we reevaluate whether or not that comment

17   should still be included in the report or not.  Once that

18   process is completed and we have the list of comments that

19   should be included in the report, the KPMG inspection team will

20   draft the Part I and Part II sections of the report, and they

21   go through a review from inspection team member all the way

22   through the U.S. team lead and at times the global team lead.

23   They are then provided to the report writing national office

24   group, who reviews in detail those sections of the report and

25   compares them to the comment forms and underlying support, and

J2edmid3                          Rodriguez - direct

1    that group does that for all of the GNF firms.  And once it has

2    gone through that level of review, we have a level of we call

3    it a vault check, and that checks the accuracy.  So it does all

4    the support, matches what we've written.  And once it has gone

5    through vault check, it goes through review the report.  Then

6    we'll go through the review of our standards group, our OGC, or

7    General Counsel's Office, and the board.

8    Q.  OK.  So let me turn your attention now to 1352, in

9    evidence.  What is the title of this?

10   A.  "KPMG 2016 inspections:  KPMG issuers initially inspected

11   by the PCAOB."

12   Q.  And so what does that mean?

13   A.  This is the listed issuers we inspected in 2016 prior to

14   this.

15   Q.  And let's go to 1353.  What is this?

16   A.  So there is two groups of issuers here.  At times we will

17   send a notification to the firm that we would like to inspect

18   an issuer and for a variety of reasons, we already not

19   ultimately perform that inspection.  So those first five

20   issuers are issuers where we notified KPMG we would be

21   performing an inspection but did not, and the second group of

22   issuers are issuers where we planned to perform an inspection

23   but for reasons within the engagement team -- I'm sorry, the

24   inspection team prior to notification of the firm, we made a

25   change.

J2edmid3                         Rodriguez - direct

1   Q.  And with respect to the first group, what is the source of

2   that information?

3   A.  The notifications we provided to the firm.

4   Q.  And what about the second group?

5   A.  That's based on my recollection and documentation within

6   our files, yes.

7   Q.  OK.  So now let's look at Government Exhibit 1354.  What is

8   this?

9   A.  Those are the additional financial services replacement

10  inspections that we performed for 2016 in 2017.

11  Q.  So this is the group you selected after you were notified

12  of the confidential information by PCAOB -- by KPMG, excuse me?

13  A.  Yes.

14          MS. MERMELSTEIN:  We can take that down.  Thank you,

15  Mr. Cooney.

16  Q.  Has the 2016 report come out?

17  A.  Yes, it did.

18  Q.  When did it come out?

19  A.  This January.

20  Q.  January of what year?

21  A.  '19.

22  Q.  How does that compare to when the report typically would

23  have been issued?

24  A.  It's not unusual for the timing.  It's on the latter end of

25  it, but it's within the range of when reports have been issued.

J2edmid3                              Rodriguez - direct

1    Q.  Sorry.  I think my question is a bit unclear.

2            Let's look at it this way.  Let me show you Government

3    Exhibit 1359, in evidence.  What is this?

4    A.  This is a schedule that lists the dates of the-- the report

5    release date of a report publication date, the date we issued

6    our reports for the respective firms.

7    Q.  Can you just go through for the jury the date on which the

8    KPMG report issued in 2013 through 2015?

9    A.  Sure.  The 2013 report issued on 9/24/2014.  The 2014

10   report issued 10/15/2015.  The 2015 report issued on 11/9/2016.

11   Q.  Stop there for a second.

12           So, in other words, in those years the KPMG report

13   issued in the September to November of the following year; is

14   that right

15   A.  That's correct.

16   Q.  And if you, generally speaking, sort of look at the chart

17   for all the GNF firms, that sometimes spilled into December,

18   even January of the following year?

19   A.  Mm-hmm.  That's correct, yes.

20   Q.  When did the 2016 report issue?

21   A.  January 15th, 2019.

22   Q.  Was that sort of the normal expected schedule for when it

23   would issue?

24   A.  That is delayed.

25   Q.  Why was it delayed?

J2edmid3                          Rodriguez - direct

A.   We had to -- it's primarily delayed because we had to

perform the additional ten inspections that we performed in

2017, which was our next inspection year.  And then once we

completed those inspections, we had to write them up in Part I.

And, in addition, we had to reconsider Part II of our report in

light of those findings.  So all of our quality controls and

schematic findings that we would normally have in Part II had

to be reevaluated based on updated findings.

Q.   Now, this chart shows that for 2017, which you would have

expected to issue in September or December of 2018,

approximately, those have not issued for Ernst & Young, Grant

Thornton, BDO or PwC.  Why is that?

A.   I don't know every reason because I am not on those teams,

but what I do know is that in order to get the --

          MS. LESTER:  Objection.

          THE COURT:  I will sustain it.

BY MS. MERMELSTEIN:

Q.   Leaving aside any other explanation of which you are not

aware of --

A.   OK.

Q.   -- what is your personal knowledge about the delay in the

issuance of these reports?

A.   To issue the KPMG 2016 and 2017 reports, there was a

significant manpower that was required to do that work, so

there was a full focus of the report writing, national office

J2edmid3                          Rodriguez - direct

1     resources and team resources focused on KPMG and working on

2     these reports.

3              MS. MERMELSTEIN:  Can I have one moment?

4              THE COURT:  Yes.

5              (Pause)

6              MS. MERMELSTEIN:  I apologize.  I think I have not

7     formally offered Government Exhibit 1359 but I will do so now.

8              THE COURT:  1359 is received.

9              (Government's Exhibit 1359 received in evidence)

10    BY MS. MERMELSTEIN:

11    Q.   In general terms, how did KPMG perform on the 2016 initial

12    financial institution inspections as compared to the

13    replacement inspections?

14    A.   So the 2016 original selections had -- did not have any

15    findings related to the general reserve piece of the ALL, and

16    there were I believe two comment forms or two issues.  There is

17    one in one part of the report and one in another related to a

18    different issue with the ALL on the specific reserve.

19    Q.   And that is a very specific thing that one area didn't have

20    comments.  Why was that significant?

21    A.   That was the area of historical findings for the firm.

22    Q.   And how did that compare to the replacement set?

23    A.   The replacement set I believe had six issuers that had

24    findings in Part I related to the general reserve.

25    Q.   So much worse?

J2edmid3                           Rodriguez - direct

1    A.  Yes.

2    Q.  And just to clarify, what you do mean by "findings"?

3    A.  So, findings would be deficiencies in the audit or comment

4    forms that are issued.  It is not necessarily one comment form,

5    so it is not a one-to-one, but it is deficiencies in that area.

6    Q.  And now that we've talked a little bit about the

7    replacement inspections, can you explain what you meant with

8    respect to -- let's pull up 1357, if we can, Mr. Cooney, for a

9    moment.

10        When you said that the number for 2016 here included

11   the replacement inspections but not the initial set, what do

12   you mean by that?

13   A.  So when we drafted the 2016 report, you will see discussion

14   of 51 issuers.  And what those 51 issuers are, the initial 52

15   that we inspected, minus the 11 which were potentially

16   compromised, plus the additional ten we performed.  So, that

17   totaled to 51 issuers.

18   Q.  OK.  Understood.

19        MS. MERMELSTEIN:  OK.  So let me now show just the

20   witness Government Exhibit 1358.

21   Q.  Do you recognize this?

22   A.  Yes, I do.

23   Q.  What is it?

24   A.  This is a summary of issuers in Part I of the report, with

25   findings related to the ALL general reserve.

J2edmid3                          Rodriguez - direct

1            MS. MERMELSTEIN:  The government offers Government
2    Exhibit 1358.
3            THE COURT:  1358 is received.
4            (Government's Exhibit 1358 received in evidence)
5            MS. MERMELSTEIN:  If we could publish that,
6    Mr. Cooney.
7            Can I have just one moment, your Honor?
8            THE COURT:  Yes.
9            (Pause)
10   BY MS. MERMELSTEIN:
11   Q.  Sorry, Ms. Rodriguez.  OK.
12           So let's walk through this.  First, when you say "KPMG
13   issuers with ALLL general reserve deficiencies," again, what is
14   the significance of that category?
15   A.  So, when you look at the allowance for the loss, there is
16   two components to it.  There is the specific reserve, which
17   identifies reserves on specific loan balances, and then there
18   is the general reserve, which looks at all of your loans
19   together and makes decisions about a reserve that's needed on
20   that balance.  The area where we historically had repeated
21   findings in the firm was the work done on that general reserve.
22   And so that this is summarizing the general reserve findings in
23   Part I of all of these respective reports.
24   Q.  And so when we've talked during your testimony about sort
25   of the problems with ALLL at KPMG, we're generally referring to

J2edmid3                          Rodriguez - direct

1   the general reserve problem?

2   A.  That is correct.

3   Q.  OK.  So what does this show about how many issuers within

4   Part I had deficiencies with respect to the general ALLL

5   reserve in 2014?

6   A.  Ten.

7   Q.  And just for a sense of context, approximately how many

8   financial issuers are inspected in a given year, plus or minus?

9   A.  10/11, somewhere in that neighborhood.

10  Q.  And what about in 2015, how many of the KPMG financial

11  institution issuers had comments in the ALLL general reserve

12  deficiency area in Part I?

13  A.  Five.

14  Q.  So that's something like 50 percent-ish?

15  A.  In that ballpark.

16  Q.  What about in the first -- the initial 2016 inspection?

17  A.  There were none.

18  Q.  And I think you were saying that there were none in this

19  area but there was one in a different ALLL area, is that right?

20  A.  Yes.  There was one issuer in Part I that had a finding in

21  that specific reserve area, yes.

22  Q.  So that was unrelated to the historic problem area?

23  A.  That's correct, yes.

24  Q.  When you compare that to how KPMG did in the replacement

25  set of 2016 financial institution inspections, how did it look?

J2edmid3                          Rodriguez - cross

1    A.  There were six.

2    Q.  So something like 60 percent, then, of them?

3    A.  That's correct.

4    Q.  And what about in 2017?

5    A.  There were five.

6    Q.  You testified earlier that part of the reason the PCAOB

7    wanted to do replacement inspections was to see what, if any,

8    effect the confidential information that KPMG had might have

9    had on the inspections themselves.  What does this show?

10   A.  This shows that there is historic difference between the

11   initial inspection in 2016 and the replacement issuers in 2016.

12   Q.  Other than the possession of confidential information, can

13   you think of any other explanation for the dramatic difference?

14           MS. LESTER:  Objection.

15           MR. OHTA:  Objection.

16           THE COURT:  Overruled.

17           You can answer if you have an understanding.

18   A.  I can't.

19           MS. MERMELSTEIN:  Nothing further, your Honor.

20           THE COURT:  OK.  Cross-examination, Ms. Lester.

21           MS. LESTER:  Thank you, your Honor.

22   CROSS-EXAMINATION

23   BY MS. LESTER:

24   Q.  Good afternoon, Ms. Rodriguez.

25   A.  Hello.

J2edmid3                          Rodriguez - cross

1  Q.  My name is Amy Lester, and I represent Mr. David

2  Middendorf.

3         At the outset of your testimony, you talked a little

4  bit about the establishment or the creation of the PCAOB.

5  A.  Yes.

6  Q.  And you talked a little bit about the role that the PCAOB

7  has in overseeing public accounting firms.  Do you remember

8  that testimony?

9  A.  I do.

10  Q.  One aspect of that role is that the PCAOB sets audit

11  standards that audit firms have to follow when they're

12  conducting their work; is that correct?

13  A.  That's correct.

14  Q.  And you're familiar with those audit standards and you use

15  them in your work, is that right?

16  A.  I do.

17  Q.  And are you familiar with an audit standard known as AS 3?

18  A.  Yes.

19  Q.  And that audit standard covers audit documentation, is that

20  right?

21  A.  Yes.

22  Q.  And audit documentation is basically a way of referring to

23  the workpapers that are the part -- part of the audit file,

24  correct?

25  A.  Yes.

J2edmid3                         Rodriguez - cross

1    Q.  And the audit documentation, the purpose of the

2    documentation is to show the work that was done by the

3    auditors, correct?

4    A.  Yes.

5    Q.  And so AS 3 is the standard that governs what the

6    objectives are of the audit documentation, it defines audit

7    documentation, and it talks about the requirements for audit

8    documentation, is that right?

9    A.  Yes.

10   Q.  And included within those requirements is a section that

11   addresses the 45-day period that you have referenced in your

12   testimony, right?

13   A.  Yes.

14         MS. LESTER:  I would like to pull up government -- I'm

15   sorry, Defense Exhibit M176, which I believe is in evidence.

16   Q.  Do you recognize this as AS 3?

17   A.  Yes.

18         MS. LESTER:  Please look at more than one page.

19   A.  Yes.  I see the introduction, yes.

20   Q.  And if we could look at Section 15, which I think is on the

21   fifth page.

22         And that section talks about the 45-day requirement,

23   is that right?

24   A.  Yes, that's correct.

25   Q.  And it says that "A complete and final set of audit

J2edmid3                         Rodriguez - cross

1   documentation should be assembled for retention as of a date

2   not more than 45 days after the report release date."  Do you

3   see that?

4   A.  Yes, I do.

5   Q.  And the "report release date" refers to the date on which

6   the issuer, that is, the company that's being audited, releases

7   its financial statement and the accompanying audit opinion,

8   correct?

9   A.  Correct.

10  Q.  And so that date, the 45-day -- the end of the 45-day

11  period is known as the document completion date?

12  A.  Yes, that's correct.

13  Q.  OK.  This standard -- Auditing Standard 3, didn't always

14  exist, did it?

15  A.  I don't remember before it but that's correct.

16  Q.  I'm sorry?

17  A.  I don't remember when it came into effect but, yeah, that

18  would be correct.

19  Q.  OK.  And prior to its existence, there wasn't this 45-day

20  requirement, correct?

21  A.  I don't believe so, that's correct.

22  Q.  In fact, there was no specific deadline for finalizing the

23  audit workpapers, right?

24  A.  I don't remember that.  I don't remember.

25  Q.  You don't remember either way?

J2edmid3                        Rodriguez - cross

1  A.  I don't remember if there was a different requirement in

2  effect at that time.

3  Q.  The 45-day requirement is tied to the issuance of AS 3,

4  right?

5  A.  Yes.

6  Q.  And AS 3 -- if you look at the first page, you might know

7  this off the top of your head, but it indicates that the final

8  rule was released in 2004.

9  A.  I see that, yes.

10  Q.  You testified on direct that the documentation period is

11  primarily for cleaning up the workpapers; is that fair to say?

12  A.  Yes, mm-hmm.

13  Q.  And so the work is completed during the actual audit

14  time -- that is, throughout the year when the company is also

15  conducting its business and preparing its financial

16  statements -- that's finalized in time for the audit opinion to

17  be released with the financial statements themselves, and then

18  the documentation period is for assembling and editing the

19  workpapers, correct?

20  A.  Yes.  The audit standard allows for assembly of workpapers

21  in this 45 days, yes.

22  Q.  And so the work, the actual substantive audit work, is

23  already completed?

24  A.  Yes.  All audit procedures are required to be completed

25  prior to that report release, yes.

J2edmid3                        Rodriguez - cross

1   Q.   So in terms of the quality of the audit work itself, it

2   should be completed when the report is actually issued?

3   A.   Yes.

4   Q.   And the documentation is meant to reflect the quality of

5   the audit?

6   A.   Yes.

7   Q.   Or not, I suppose?

8   A.   Right.

9   Q.   The PCAOB's official position was that it does not -- or is

10  that it does not give comments based on deficiencies in

11  documentation, correct?

12  A.   So we do not generally write comments for deficiencies that

13  are solely documentation issues.

14  Q.   And instead you use the documentation to determine whether

15  the work was actually performed that's set forth in the

16  documentation itself, right?

17  A.   So documentation becomes complicated.  There is different

18  kinds of documentation, so there is documentation where it is

19  easy to see, it is kind of summarizing the procedures that are

20  performed, seeing if you can get comfortable by looking at the

21  work, if it in fact happened.  There are other types of

22  documentation that are the auditor's assessment for

23  reasonableness, or rationale decisions, so that documentation

24  is -- that's what becomes a little bit more difficult.  That

25  has to be done by the report release date to support the work

J2edmid3                        Rodriguez - cross

1    that was done.

2    Q.  But ultimately, your assessment as a PCAOB inspector is

3    focused on the underlying work, correct?

4    A.  It's focused on it, yes, ensuring that the audit work was

5    completed at that report release date.

6              MS. LESTER:  I would like to show the witness only

7    what's been marked for identification as Government Exhibit

8    100, and pursuant to the procedure we discussed yesterday, we

9    will renumber it with a defense exhibit.

10             I will actually renumber it with Defense Exhibit 263.

11   So, it will be M263.

12   Q.  Do you see that document?  We could show you a couple of

13   pages, maybe.

14             (Pause)

15   A.  Yes, I see it.

16   Q.  Do you recognize this?

17   A.  I do.

18   Q.  And what is it?

19   A.  This was information provided to audit committees about our

20   inspection process.

21   Q.  When you say "our inspection process," you mean the PCAOB

22   inspection process?

23   A.  Yes, I do.

24   Q.  What is an audit committee?

25   A.  The audit committees belong to various public companies.

J2edmid3                           Rodriguez - cross

1    It is a group of individuals who are responsible for the audit

2    of the company, who approve the appointment of auditors, who

3    receive the communications of the auditors, and they're

4    responsible for overseeing that piece of it.

5    Q.  And is this a document that was prepared by the PCAOB to

6    aid communications with audit committees of public companies?

7    A.  This was actually information that was meant -- the

8    audience is audit committees, yes.

9    Q.  So this was meant to be distributed to audit committees of

10   public companies by the PCAOB?

11   A.  It's on our website and available, yes.

12            MS. LESTER:  Your Honor, we offer Defense Exhibit

13   M263.

14            MS. MERMELSTEIN:  No objection.

15            THE COURT:  M263 is received.

16            (Defendant's Exhibit M263 received in evidence)

17   BY MS. LESTER:

18   Q.  Audit committees are a part of the Board of Directors of

19   public companies, is that correct?

20   A.  Yes.

21   Q.  And they help advise the board on financial matters, right?

22   A.  Every audit committee is different for companies but they

23   can do that, yes.

24   Q.  Generally speaking?

25   A.  Yes, mm-hmm.

J2edmid3                          Rodriguez - cross

1    Q.   And another role that the audit committee can play is the

2    liaison between a company's outside audit firm, the one that

3    independently inspects the firm's -- I'm sorry, the company's

4    financials, and the internal audit functions at a company, is

5    that right?

6    A.   I'm not sure I understand you.

7    Q.   So public companies in general have to perform their own --

8    they assemble their own financial statements, is that right?

9    A.   Yes.

10   Q.   And in doing so, they're checking those financial

11   statements to make sure that they're accurate?

12   A.   Yes.

13   Q.   But public companies also hire an outside accounting firm

14   or audit firm to double-check their work to make sure that the

15   financial statements are accurate, right?

16   A.   To audit the work and provide the audit opinion, yes.

17   Q.   Yes.

18   A.   Yes.

19   Q.   And so the audit committee might play a role in terms of

20   acting as a liaison between the company and its outside

21   auditors; is that fair to say?

22   A.   Generally speaking, the audit firms do directly report to

23   audit committees, yes.

24   Q.   OK.  If I could direct you to page 5.  There is an

25   executive summary in the beginning but then the actual page

1    number 5.  There is a section in the middle there, Section 1.

2    It is titled, "Assertions that characterize criticisms as

3    documentation deficiencies rather than as deficiencies in the

4    performance of procedures to obtain audit evidence."

5            This document generally, you said, was meant to be

6    distributed to audit committees, right?

7    A.  Yes.

8    Q.  And do you understand its purpose to be essentially talking

9    points for audit committees or question and answers in terms of

10   issues that their audit firm -- outside auditors might raise

11   with them giving them some perspective on those questions?

12   A.  Yes.

13   Q.  And so one of the things that the PCAOB is informing the

14   audit committees of are the fact that their outside auditors

15   might characterize the criticisms of the PCAOB in certain ways;

16   is that fair to say?

17   A.  Yes.

18   Q.  And so this is the PCAOB's explanation to the audit

19   committees of why they should take what their outside auditors

20   are telling them with a grain of salt, is that right?

21   A.  Not "a grain of salt," but it's offering some insight into

22   some common responses we made here and what those may really

23   mean and how that compares to some of the common forms of

24   deficiencies we see identified, yes.

25   Q.  And that's because one would expect, in the general course,

J2edmid3                        Rodriguez - cross

1   that an audit firm would communicate with the company that's

2   being audited the general nature of the PCAOB's findings about

3   that audit, is that right?

4   A.  They may, yes.

5   Q.  Are they required to do that?

6   A.  I'm not aware.  I don't believe they are required but I am

7   not aware of that.

8   Q.  But you have a general understanding that that tends to

9   happen?

10  A.  It can happen.

11  Q.  And so in that circumstance -- let's just look at the

12  language of the first paragraph of that section.  It says:  "In

13  addressing inspection report criticisms, firms' responses

14  sometimes characterize the deficiency in terms of audit

15  documentation.  That is, firms sometimes assert or imply that

16  the firm performed procedures to obtain the necessary audit

17  evidence and that the criticism arises only because the firm

18  did not sufficiently document its procedures."

19          Do you see that?

20  A.  I do.  Yes.

21  Q.  So is your understanding that this is communicating that

22  the auditor might say to the company, well, we did the work,

23  the PCAOB is just nitpicking because we didn't write it down in

24  the right way?

25  A.  So, what this is referring to is at times we may have a

1    deficiency or identified deficiency around work that is not

2    performed.  And at times a firm may say, well, we just didn't

3    write that down, but it is not really about whether you wrote

4    down or not, it is about whether the work was performed.  That

5    is explaining the differences in those two meanings.

6    Q.  And the next sentence in the following paragraph is:  "In

7    the Board's view, such assertions should be viewed with

8    skepticism."  Is that right?

9    A.  Yes.

10   Q.  And the rest of that paragraph I think addresses what you

11   were just saying, that the PCAOB does not consider itself to be

12   giving comments based solely on documentation, it's looking to

13   whether the underlying work was actually performed?

14   A.  Yes.

15   Q.  And this was a document, as we already discussed, that's

16   distributed to audit committees by the actual PCAOB board,

17   right?  This is a board document?

18   A.  Yes.  It's made available publicly on our website, yes.

19   Q.  So this is an official document of the PCAOB; this is their

20   view?

21   A.  Yes.  It is a public release, yes.

22   Q.  And this was a view that was shared by PCAOB inspectors,

23   correct?

24   A.  Yes.

25   Q.  And this view was expressed to audit firms, including KPMG,

1    correct?

2    A.  Yes.

3            MS. LESTER:  We could take that down.  Thank you.

4    BY MS. LESTER:

5    Q.  You talked about the inspection process and the GNF

6    Program, which is the sixth largest accounting firms, right?

7    A.  Yes.

8    Q.  And at KPMG there was a specific group of inspectors who

9    were assigned to each of the GNF firms, correct?

10   A.  Yes.

11   Q.  And you worked on the KPMG team and you still do?

12   A.  Yes.

13   Q.  And you described how many members of the team there were

14   during the period at issue.

15          Have there been changes in the makeup or role of

16   the -- the role -- I'm sorry, the makeup or the number of the

17   team members since there was a leak of confidential

18   information?

19   A.  I'm not sure I follow the question.

20   Q.  You described how many people are on -- were on the KPMG

21   inspection team at the time.  You said -- we were talking, when

22   you were speaking with Ms. Mermelstein, it was largely 2015 to

23   2016, correct?

24   A.  Yes.

25   Q.  Have there been any changes in terms of the number of

1   people assigned to KPMG since that time?

2   A.  Like today?  I don't know if I am allowed to ask a

3   question, but do you mean where our team stands today?

4   Q.  Correct.

5   A.  There has been changes to our program, yes.

6   Q.  And those changes are a result of the events that gave rise

7   to this case?

8   A.  I don't -- I don't have any insight as to whether or not

9   they are, no.

10  Q.  Can you describe some of the changes?

11  A.  We're -- one of the changes is we used to look at the

12  inspections of Grant and BDO on a little bit of a delayed

13  schedule, so we would start the Big Four and then we will go to

14  Grant and BDO in the June and July timeframe, and currently we

15  are looking now at everyone at the same time.  They start

16  concurrent.  We pretty much all start at the same time.  So the

17  teams have -- the team members are distributed a little bit

18  differently to accommodate for that.

19  Q.  And have any people -- specific team members been removed

20  from the KPMG team since the timeframe you were discussing

21  earlier as of now?

22  A.  People have left and rotated off.  They've left for a

23  variety of reasons.  The team that inspected in 2017 is not

24  necessarily the team that did '18, or there are changes every

25  year on our team.

J2edmid3                          Rodriguez - cross

1   Q.  And you spoke about access to planning information and the

2   like.  Has the PCAOB implemented any changes with respect to

3   the way it deals with planning information and access to that

4   information?

5   A.  Yes, we have.

6   Q.  And what are those changes?

7   A.  Access is removed if you are no longer on the current team.

8   It's -- previously that access may or may not have been

9   removed.  It is now currently removed.

10  Q.  Any other changes related to access of information?

11  A.  Not that's coming to my -- there may be.  I just don't

12  remember them right now.

13  Q.  You spoke about the planning process and looked at that

14  large spreadsheet, Government Exhibit 102.  There were a lot of

15  columns on that spreadsheet, fair to say?

16  A.  Yes, there are.

17  Q.  But much of the information that was on that spreadsheet, a

18  fair amount of it is provided by the audit firm itself,

19  correct?

20  A.  There's a lot of information that comes from the firm on

21  that spreadsheet, yes.

22  Q.  And some of the information on the spreadsheet is from

23  publicly available sources, is that right?

24  A.  There are some of it that is publicly available, yes.

25  Q.  And, in general, I think what you testified is that the

J2edmid3                        Rodriguez - cross

1   object of all of that planning and the data in that spreadsheet

2   is to identify risk factors, fair to say?

3   A.  Yes.

4   Q.  And when the PCAOB selects issuers to audit, it's looking

5   for high risk, right?

6   A.  That is a piece of our inspection program, yes, it is.

7   Q.  And so this is not unknown to the firms that are being

8   inspected, correct, that the PCAOB is identifying high risk?

9   A.  I don't believe it is, no.  I think they are aware of that,

10  yes.

11  Q.  And, in fact, the PCAOB encourages the audit firms

12  themselves to identify their high risk clients?

13  A.  Yes.  We speak in terms of risk as a whole, not the

14  specific components with which we are evaluating the risk but

15  high risk as a whole, yes.

16  Q.  And in terms of particular areas or topics of interest to

17  the PCAOB in a particular inspection cycle, those are things

18  that are also discussed with the firms, correct, generally

19  speaking?

20  A.  Once we notify of an inspection, there may be certain

21  things that we do communicate that we're gathering information

22  on and there may be other things that we don't.  It just kind

23  of depends on what we're looking at in any given year.  So some

24  of it may be public, some of it may be not disclosed to them.

25  Q.  You mentioned that in addition to the risk-based inspection

J2edmid3                         Rodriguez - cross

1   targets, the PCAOB also selects a few random audits to look at,

2   correct?

3   A.  Yes.

4   Q.  And those random inspections are meant to -- withdrawn.

5           The firms, within their own internal monitoring or

6   inspection processes, are, to your knowledge, looking at audits

7   that have particular problems or risks, correct?

8   A.  Yes.

9   Q.  In other words, the firms themselves are identifying the

10  same types of issues that the PCAOB is looking at when it's

11  making inspection determinations, selections?

12  A.  I --

13  Q.  That was a bit of a poor question.  I will reword it.

14          Firms -- you were aware that firms such as KPMG have

15  internal monitoring programs, right?

16  A.  Yes.

17  Q.  And in selecting the audits to be included in those

18  internal monitoring programs, the firms are selecting based on

19  oftentimes a particular risk factor?

20  A.  At times, yes.

21  Q.  And that risk factor might overlap with a risk factor

22  that's also looked at by the PCAOB in making its internal

23  selection decision?

24  A.  Yes, it could.

25  Q.  You talked about the notification to the firms of the fact

1   that a particular audit has been selected for inspection.  Do

2   you remember that testimony?

3   A.  I do.

4   Q.  And you said in general the firms receive two to four

5   weeks' notice that a particular audit is going to be inspected?

6   A.  That's correct, yes.

7   Q.  But prior to that, at least during the time period you were

8   discussing with Ms. Mermelstein, the PCAOB would send notice to

9   KPMG of the general geographic location where an inspection

10  might take place, correct?

11  A.  Yes, we do.

12  Q.  And that was for planning purposes?

13  A.  Yes.  To put an inspection on, it's very difficult to

14  coordinate resources, so we would provide the firm a list of

15  the geography where we would be and the time but not the

16  issuers.

17  Q.  And in addition to the geographic location, so, for

18  example, would it be the home office of KPMG, the closest home

19  office?  How specific was the geographic information?

20  A.  I'm trying to remember just because we haven't done that

21  schedule in awhile.  I can't remember if it was a -- if it was

22  this unit or it was the actual office location.  I don't

23  remember that.

24  Q.  And there was a description, was there not, of the type of

25  issuer that would be inspected?  So, for example, it would say

J2edmid3                          Rodriguez - cross

1   "financial services" if it was a bank or a financial

2   institution?

3   A.   There were only certain ones where we gave that information

4   if there was some reason that they would have a specialized

5   resource there, so we did not provide all industry information.

6   Only I think financial service and I think broker-dealer was on

7   that.  If they were, we would also coordinate their inspections

8   for them also.  So if we were going to be in a city, we would

9   let them know that the broker-dealer was coming also.

10  Q.   OK.  But if it was a financial institution or a bank, the

11  PCAOB would have provided advance notice of the general

12  geographic location?

13  A.   Yes.

14  Q.   So in the normal course, you talked about the planning that

15  takes place prior to the actual inspection and that the PCAOB

16  receives access to the workpaper files -- I believe that's

17  known as the e-audit file, correct?

18  A.   Yes, mm-hmm.

19  Q.   A week ahead of actually arriving on site for the

20  inspection?

21  A.   Yes, that's customary.

22  Q.   And then there is a kickoff meeting or opening meeting --

23  A.   Yes.

24  Q.   -- once the inspectors arrive?

25  A.   Yes, or sometimes it happens -- it was once the inspectors

1    arrive.  We did move to a model, for making the most use of

2    that time in the field, to doing it the Thursday or Friday

3    before, one of the two.

4    Q.  Very close in time, if not on the day that they were --

5    A.  Yes, absolutely.

6    Q.  And so if the firm is notified, say, four weeks before the

7    inspectors actually arrive on site, then they have four weeks

8    to prepare for that opening meeting, correct?

9    A.  About, yes.

10   Q.  But sometimes they may only have two weeks if the PCAOB

11   only gave them two weeks' notice, right?

12   A.  That could happen, mm-hmm.

13   Q.  And so the time -- the preparation time that the firm has

14   can vary considerably, correct?

15   A.  Generally in a year, it's a three- to four-week window.  At

16   times, if there was a scheduling issue when we were working

17   with the firm to figure out timing, location issues, what have

18   you, that is when it would kind of get closer to the two weeks,

19   but generally was not there.  That's the ranges.  It was

20   almost, I don't want to say with certainty, but I think

21   extremely high end of the issuers was three to four weeks

22   pretty consistently.

23   Q.  OK.  But it could vary, correct?

24   A.  It could vary, yes.

25   Q.  You mentioned that one reason why the PCAOB doesn't give

J2edmid3                          Rodriguez - cross

1    notice before the end of the 45-day period is that you want to

2    have a picture of what the workpapers look like when they are

3    locked down at the end of the documentation period, is that

4    correct?

5    A.   That's correct, yes.

6    Q.   The PCAOB has the ability to inspect an audit firm under

7    its supervision at any time, correct?

8    A.   I don't know that.  The standard -- the statute could say

9    that.  I'm not sure.

10        MS. LESTER:  May I approach, your Honor?

11        THE COURT:  Yes.

12   Q.   If you could just read the bottom portion to yourself and

13   then look up when you are finished.

14        (Pause)

15   A.   OK.

16   Q.   Does that refresh your recollection that the board actually

17   has the authority to conduct surprise inspections on its own

18   initiative?

19   A.   I think that's the first I've ever read this section of it,

20   and I don't know that I know that that is what this section

21   means.

22   Q.   OK.  You can put that to the side.

23   A.   OK.

24   Q.   Now, after the on-site inspection is completed, the

25   inspectors have a closing meeting where they give their

1    informal view to the engagement team of how the inspection went

2    generally; is that fair to say?

3    A.   We refer to them as status meetings just because sometimes

4    it kind of continues on if we're working through the comment

5    form process, and in those meetings they will communicate if

6    there was any comment forms and some general commentary, yes.

7    Q.   That was going to be my next question.  So that's the time

8    when the engagement team learns, generally speaking, whether

9    the PCAOB is likely to have comments on the audit, correct?

10   A.   At that time, they will learn what our determination was at

11   the end of the inspection as to whether we were going to do it.

12   But during the inspection, we are talking about at some point

13   in that inspection whether we believe this could be a comment

14   form as we're working toward that status meeting, yes.

15   Q.   And there are often informal discussions during that

16   process that you just described where the engagement team and

17   the inspectors will have a discussion about whether a comment

18   is actually warranted, correct?

19   A.   Yes.

20   Q.   And sometimes the inspectors will be shown something by the

21   engagement team, perhaps a workpaper or a reference to some

22   other aspect of a workpaper, and they will agree that in fact

23   no comment is warranted, correct?

24   A.   Yes.

25   Q.   And even if at the end of the actual on-site inspection the

1    team is inclined to include a comment in its inspection summary

2    memo, that doesn't necessarily mean that that comment

3    ultimately makes it into the report, correct?

4    A.   Once it's in the inspection summary memorandum and we're

5    talking about issued comments, the vast majority of those end

6    up in the report, because that would be after the deliberation

7    back and forth with the engagement teams.  There are instances

8    where that may not happen.  If additional documentation is

9    provided in response to the comment form, that could happen.

10   It's just not common.

11   Q.   But it does happen sometimes that comments that are

12   included in the inspection summary memos are not actually in

13   Part I of the report, correct?

14   A.   That is possible, yes.

15   Q.   That process, the process of the back and forth between the

16   firm itself and the inspection team, takes place not only in

17   person but also through discussions after the inspection team

18   has left the site, correct?

19   A.   That is possible if they are still working on an issue for

20   us, yes.

21   Q.   And then once the PCAOB inspectors return to their home

22   office and start the report writing process, there is a

23   discussion within the team itself about whether comments should

24   be issued, correct?

25   A.   When we're drafting the report, we're working off of issued

J2edmid3                          Rodriguez - cross

1    comment forms.

2    Q.  But there is a discussion within the team -- in other

3    words, comments aren't just written by the inspectors on the

4    ground, they have to be approved at a higher level; is that

5    fair to say?

6    A.  Yes.  They go through a review process prior to issuance,

7    yes.

8    Q.  And so it could be the case that a supervisor, a team lead,

9    for example, could disagree with the inclusion of a comment --

10   the appropriateness of the inclusion?

11   A.  I think I'm confused on if you are talking about issuing

12   the comment form or inclusion in the report.

13   Q.  Well, let's start with issuing a comment form.

14          Issuing a comment form would be more likely to just be

15   the inspection team's decision, correct?

16   A.  No.  The inspection team will only draft the comment form,

17   and then it has to go all the way through the global team lead

18   prior to being issued.

19   Q.  So even those comments have to be approved at a higher

20   level?

21   A.  Yes, they do.

22   Q.  And then for actual inclusion in the report, those have to

23   be approved again?

24   A.  That's correct, yes.

25   Q.  And sometimes there are differences of opinion amongst

1    members of the inspection team on certain issues, including,

2    perhaps, the application of an accounting or auditing rule,

3    correct?

4    A.  There could be.

5    Q.  Could I show you what's been marked for identification as

6    M245.

7           MS. LESTER:  If you could show the first few pages,

8    please, Ms. O'Connor.

9           (Pause)

10   Q.  Do you recognize this document, Ms. Rodriguez?

11   A.  Yes.  It's the inspection manual.

12   Q.  When you say "the inspection manual," what does that mean?

13   A.  This sets forth the guidelines over our inspections

14   process.

15   Q.  For the PCAOB?

16   A.  Yes.

17           MS. LESTER:  We offer M245.

18           MS. MERMELSTEIN:  No objection.

19           THE COURT:  M245 is received.

20           (Defendant's Exhibit M245 received in evidence)

21   BY MS. LESTER:

22   Q.  If I could direct your attention to Section 900.

23           Now, Chapter 9, of which Section 900 is a part, is

24   titled, "Consultation protocol and differences of opinion."

25           So, is it fair to say this section is about how to

J2edmid3                        Rodriguez - cross

1   handle differences of opinion within the inspection team,

2   should they arise?

3   A.   That's a piece -- that is included within that section,

4   yes.

5   Q.   Yes.  And now looking at 900.6.  This section is titled,

6   "Resolving differences of opinion," correct?

7   A.   Yes.

8   Q.   The first two sentences say:  "Differences of professional

9   opinion related to accounting, auditing, and reporting matters

10   may arise during both the conduct of an inspection, as well as

11   during formal consultations.  Such differences could also occur

12   related to judgments regarding whether to communicate oral

13   observations, issue comment forms, include issues in reports,

14   or other matters of significance."

15          And this is what we were just talking about a moment

16   ago, correct?

17   A.   Correct, yes.

18   Q.   And that is that this manual recognizes that it's a natural

19   part of the process to have differences of opinion that may

20   need to be resolved amongst the inspection team members,

21   correct?

22   A.   It's not common but it certainly happens.

23   Q.   And this lays out a protocol for how to handle that,

24   correct?

25   A.   Yes.

J2edmid3                          Rodriguez - cross

1    Q.  And one of the things in the second sentence that's listed

2    specifically is what we were talking about, that is, whether to

3    issue comment forms or include issues in reports, right?

4    A.  Yes.

5           MS. LESTER:  OK.  You can take that down.  Thank you.

6    Q.  Now, you spoke about the different parts of the actual

7    inspection reports, the Part I versus Part II, and Part II you

8    said may not become public, correct?

9    A.  Yes.

10   Q.  But Part I, even though it is public, the names of the

11   companies that are the subject of the audits are never made

12   public, correct?

13   A.  To my knowledge, no, they're not.

14   Q.  They're simply referred to by issuer A, issuer B, right?

15   A.  Correct.  Yes, correct.

16   Q.  So members of the public, even though the reports are

17   publicly available on your website, do not know what the

18   companies are, correct?

19   A.  That's correct.

20   Q.  You also talked about the timing of the reports' release

21   and specifically looked at Government Exhibit 1359.

22

23          MS. LESTER:  If we could put that up?  That is in

24   evidence.

25          (Pause)

1              Sorry.  Technical snafu.

2    Q.  You have reviewed this document, I'm sorry, this chart with

3    Ms. Mermelstein, correct?

4    A.  I have, yes.

5    Q.  And were you involved in the preparation of this chart?

6    A.  Yes.

7    Q.  And that was when you were preparing with the government

8    for your testimony?

9    A.  Yes.  I reviewed all the data within that chart, yes.

10   Q.  And so this has the dates of release of the various reports

11   for all of the GNF firms, correct?

12   A.  It does, yes.

13   Q.  And in general, it's fair to say that the report is

14   released certainly not until at least a year after the actual

15   inspection, right?

16   A.  I believe so, generally, yes.  About 10 months, 12 months,

17   13 months, somewhere in that frame, yes.

18   Q.  So some are even longer than that?

19   A.  Could be, mm-hmm.

20   Q.  And the inspection year itself is looking at audits for

21   fiscal years that ended in the prior year most typically,

22   right?  Let me -- I think you agree, but let me just explain it

23   better for the jury so they understand what we're talking

24   about.

25              Most public -- or many public companies are on the

J2edmid3                          Rodriguez - cross

1   regular calendar year in terms of their fiscal year, right?

2   A.  Right.  Most have a 12/31 year end, yes.

3   Q.  So at the end of 2012 would be the end of the 2012 fiscal

4   year?

5   A.  Yes.

6   Q.  And then the 2013 inspection year would be looking at those

7   2012 financials, correct?

8   A.  For the most part, yes.

9   Q.  And so then the report comes out in 2014, according to this

10  chart, all of that year, all of the reports came out in 2014?

11  A.  Yes.

12  Q.  So that's relating to a fiscal year that at that point is a

13  year-and-a-half to two years ago?

14  A.  Something around that timeframe, yeah.  Mm-hmm.

15  Q.  If we look at Grant Thornton, in particular, it's -- the

16  release of its reports was often, at least in 2014, 2015, was

17  two years after the inspection year, right?

18  A.  I'm surveying this really quickly.

19           (Pause)

20           That's what it would show on this report, yes, on this

21  schedule, yes.

22           MS. LESTER:  We can take that down.  Thank you.

23  Q.  You also looked at Government Exhibit 1357.  Do you

24  remember this exhibit?

25  A.  I do.

J2edmid3                          Rodriguez - cross

1  Q.  Did you also have a role in preparing this exhibit for the
2  government?
3  A.  I reviewed the document, yes.
4  Q.  And this exhibit shows the number of audits that received
5  Part I comments, correct?
6  A.  That is correct, yes.
7  Q.  And if you notice -- you already went over this with
8  Ms. Mermelstein, but in 2012, for example, Ernst & Young had a
9  higher number of deficient audits than KPMG, correct?
10  A.  That is correct, yes.
11  Q.  And so did Grant Thornton?
12  A.  Yes, that is correct.
13  Q.  And so did PwC?
14  A.  Yep.  Yes, that is correct.
15  Q.  And in 2013, Ernst & Young again had a higher number than
16  KPMG, correct?
17  A.  That is correct, yes.
18  Q.  And that was 28 in that year?
19  A.  That is correct.
20  Q.  And in the following year, KPMG had 28, correct?
21  A.  Yes.
22  Q.  Have you heard of the phrase "Too big to fail"?
23  A.  I have.
24  Q.  Have you heard it in the context of the PCAOB not issuing
25  more than 28 comments to an audit firm?

J2edmid3                         Rodriguez - cross

A.   I've never heard that, no.

Q.   So there is no cap on the number of audits that can be deemed failed by the PCAOB?

A.   No, I've never heard that before.

            (Continued on next page)

J2E5mid4                              Rodriguez - cross

1    BY MS. LESTER:

2    Q.  And you have never been told that 28 is that number?

3    A.  Never.

4    Q.  Are you aware of whether there has ever been a finding of

5    more than 28?

6    A.  I don't know, no.

7    Q.  There is no number higher than 28 on this sheet, correct?

8    A.  On this sheet?  No, there is not.

9    Q.  The Big Four firms are the first four firms listed on this

10   chart, correct, reading from left to right?

11   A.  Yes, they are.  Yes.

12   Q.  And Grant Thornton and BDO are slightly smaller firms,

13   correct?

14   A.  They have less issuers.  Yes, they are.  Yes.

15   Q.  Is it also the case that the PCAOB inspects fewer audits

16   from those firms because they have fewer issuers?

17   A.  Yes.

18   Q.  So, for Grant Thornton, for example, which in 2012 had 22

19   deficient audits, do you know out of how many actual inspected

20   audits that was?

21   A.  I don't.  No.

22   Q.  Would you expect it to be a lower number than the number

23   inspected for the Big Four?

24   A.  I would.  Yes.

25   Q.  Do you know by how many you expect it to be lower?

J2E5mid4                              Rodriguez - cross

1    A.  No, I do not.  No.

2    Q.  If I told that you in general -- I think you have already

3    testified that the number for The Big Four was around 50?

4    A.  In its 50s, yes.

5    Q.  And the number for Grant Thornton and BDO, if it was in

6    the, let's start with BDO, 20 to 30 range, would that sound

7    correct to you?

8                MS. MERMELSTEIN:  Objection to the request for

9    speculation, your Honor.

10               THE COURT:  If you have knowledge of it you can

11   understand, as long as you are not speculating.

12               THE WITNESS:  I honestly don't remember.

13   BY MS. LESTER:

14   Q.  But you do know that the number of audits inspected for BDO

15   and Grant Thornton is lower than the number for the big four,

16   correct?

17   A.  Yes.

18   Q.  Therefore, the number of deficient audits depicted on this

19   chart would be a larger percentage because it's a lower number

20   of audits, correct?

21   A.  Yes.  I believe so, yes.

22   Q.  You can take that down.  Thank you.

23               You looked at one of the inspection reports from KPMG

24   with Ms. Mermelstein and I would like to take you through some

25   of the sections of one of the reports.  We will just use as an

J2E5mid4                         Rodriguez - cross

1    example Government Exhibit 6 which is in evidence.  This is for

2    the 2017 inspection and the report was issued this January,

3    correct?

4    A.  Yes.

5    Q.  Let's look at page 2 of the report, please.

6           Now, this is the executive summary.  This is sort of

7    the overview of the year's inspection fair to say, correct?

8    A.  Yes, it is.

9    Q.  Now let's look at the third paragraph beginning with:  *The*

10   *Board cautions...*  I am just going to read this.

11          *The Board cautions against using the number of audits*

12   *with deficiencies in the public portion of a report to draw*

13   *conclusions about the frequency of deficiencies throughout the*

14   *firm's practice.  The audits to be reviewed are most often*

15   *selected based on perceived risk and not through a practice*

16   *designed to identify a representative sample that could be*

17   *extrapolated to the firm's entire practice.  The portions of*

18   *these audits that are reviewed often involve the most risky*

19   *areas of the financial statements.  Thus, much of the audit*

20   *work that is inspected presents, in the inspection team's view,*

21   *a heightened possibility of auditing deficiencies.*

22          So, this is part of what you were talking about with

23   Ms. Mermelstein of what the PCAOB is doing in its selection

24   process, it's looking for the riskiest audits, correct?

25   A.  The largest part of our inspections process, yes.

1    Q.  And so that limits the use, in some sense, of the report

2    itself because the pool from which the audits are drawn are

3    supposed to be, at least a large portion of them, the riskiest

4    audits of the firm?

5    A.  So, what it is saying is you can't take the number, the

6    percent that comes out, 22 percent, and put 22 percent across

7    the whole practice, but it does give you insight into the

8    quality of the audit work being done by the firm.  So.

9    Q.  But the Board itself is cautioning readers of this report,

10   which would include members of the public, correct --

11   A.  Yes.  Absolutely.

12   Q.  -- that they should not use the number of audits with

13   deficiencies, in other words the number of audits included in

14   Part I, correct?

15   A.  Yes.

16   Q.  To draw conclusions about the frequency of deficiencies

17   throughout the firm's overall practice?

18   A.  Right.  Yes.

19   Q.  Let's look at page 5, starting with the two sentences and

20   the paragraph:  *Inspections are designed*...  I'm sorry, there

21   are two paragraphs that start that way, it is the third

22   paragraph, please.

23            So, the first two sentences:  *Inspections are designed*

24   *to identify deficiencies in audit work and defects or potential*

25   *defects in the firm's system of quality control.  This focus on*

J2E5mid4                        Rodriguez - cross

1   *deficiencies and defects necessarily carries through to*

2   *inspection reports and, therefore, the reports are not intended*

3   *as balanced report cards or overall rating tools.*

4           So this is another, essentially, disclaimer in terms

5   of what people should draw from the report, correct?

6   A.  Yes.  It is a clarification on that, yes.

7   Q.  And it says the reports are not intended as balanced report

8   cards.

9   A.  Because it is not reviewing every aspect of it.  We have

10  focused reviews on certain pieces so it is not a complete

11  statement of every aspect of their quality control.  That is

12  correct.

13  Q.  Is a fair interpretation of this language that the general

14  public should not draw overall conclusions about the quality of

15  a firm's audit work based simply on their performance in a

16  particular year's inspection?

17  A.  Can you say that one more time?

18  Q.  I will read my question.  I don't know if I can say it

19  again:

20          Is a fair interpretation of these two sentences that

21  the general public, who may be reading this report that is

22  publicly available, should not draw overall conclusions about

23  the quality of a firm's audit work based simply on their

24  performance in this particular year's inspection?

25  A.  Yes.  I think so, yes.

1   Q.  I think you already looked at this language with

2   Ms. Mermelstein but just in case not, on page 6, the final

3   paragraph, the carryover paragraph -- sorry, I mean on page 6,

4   that an audit deficiency, there is a sentence there that says

5   that an audit deficiency reached the level of significance to

6   be included in Part 1.A of an inspection report does not mean

7   that the financial statements are misstated or that there are

8   undisclosed material weaknesses in ICFR.

9          Just to remind the jury, ICFR refers to?

10  A.  Internal Control Financial Reporting.

11  Q.  So, this sentence is telling investors, who might be

12  reading this report, that they shouldn't assume that the

13  financial statements are unsound of the companies that are

14  being audited, correct?

15  A.  Yes.

16  Q.  In fact, the investors can't even tell what companies those

17  are, right, because the names aren't included in the inspection

18  report?

19  A.  Right.  An individual issuer is not identifiable.

20  Q.  Right.

21          But this means, this sentence means that even if an

22  audit has a deficiency such that it is included in Part I, that

23  doesn't necessarily mean that the company has to take steps

24  such as a restatement of its financials, correct?

25  A.  So, the company does not necessarily have to modify

J2E5mid4                          Rodriguez – cross

1    financials.  There are steps the auditor should take in order

2    to support the opinion they in fact issued to determine that

3    there are no errors in the financials.

4    Q.  So it is directed more towards the auditor's work, not the

5    significance of the financial statements?

6    A.  Yes.  Our report addresses the auditor's work.

7    Q.  Thank you.  You can take that down.  Thank you,

8    Ms. O'Connor.

9              Your Honor, if this is a convenient time, it might

10   make sense to break for lunch before I get into a new topic.

11             THE COURT:  Okay.

12             I was wondering if we might be able to get by with a

13   45-minute lunch in the hope that we could finish the witness

14   today, if possible.  Would you guys be okay with a 45-minute

15   lunch do you think?

16             THE JURY:  Yes.

17             THE COURT:  Great.  So, it is 12:52.  Let's try to be

18   back and start at --

19             JUROR:  1:35?

20             THE COURT:  1:35.  Thank you.

21             1:35.  Thanks.  Have a good lunch.  Please leave your

22   notepads on your chairs and we will see you at 1:35.

23             (Continued on next page)

24

25

J2E5mid4                          Rodriguez – cross

1                  (Jury not present)

2                  THE COURT:  You can go ahead and step out.

3                  THE WITNESS:  Thank you.

4                  (witness steps down)

5                  THE COURT:  You may be seated.

6                  I just wanted to touch base on timing.  How are we?

7      Do you have a sense of how much longer?

8                  MS. LESTER:  I think we will finish today.  I can't

9      speak for Mr. Ohta who is also cross-examining, but I can't

10     imagine my cross would go beyond mid-afternoon.

11                 THE COURT:  Okay.

12                 Do you have any sense, Mr. Ohta?

13                 MR. OHTA:  I am going to be so good I will be done by

14     5:00.

15                 THE COURT:  Okay.

16                 Anything else anybody needed to talk about?

17                 MS. MERMELSTEIN:  No, your Honor.

18                 THE COURT:  Okay.  Have a good lunch.

19                 (Luncheon recess)

20                 (Continued on next page)

21

22

23

24

25

J2E5mid4                          Rodriguez - cross

1                    A F T E R N O O N   S E S S I O N

2                              1:45 p.m.

3              (Trial resumed; jury not present)

4              THE COURT:  All the jurors are here.  Are we ready?

5              (Jury present)

6              THE COURT:  You may be seated.

7              Good afternoon, folks.

8              THE JURY:  Good afternoon.

9              THE COURT:  Continuing with cross-examination.

10   Ms. Lester, you may proceed.

11             MS. LESTER:  Thank you, your Honor.

12   BY MS. LESTER:

13   Q.  Ms. Rodriguez, on your direct testimony I believe you

14   testified about meetings that happened periodically between

15   members of the PCAOB and members of KPMG?

16   A.  Yes.

17   Q.  And you said those happened approximately once a month?

18   A.  Yes, they did.

19   Q.  You participated in at least some of those meetings,

20   correct?

21   A.  Yes, I did.

22   Q.  And was Mr. Middendorf present at least some of those

23   meetings that you attended?

24   A.  Yes, he was.

25   Q.  And there were also other members of KPMG's national office

J2E5mid4                          Rodriguez - cross

1    who attended as well, correct?

2    A.  Correct.

3    Q.  Including usually the vice chair of the audit department?

4    A.  Yes.

5    Q.  And that would be at different times, either Jim Liddy or

6    Scott Marcello?

7    A.  Yes.  When I was involved in the firm I think there was

8    only once that Jim Liddy was there but, yes, it was

9    transitioning to Scott Marcello, yes.

10   Q.  And that was the person to whom David Middendorf reported,

11   correct?

12   A.  Yes.

13   Q.  Is it fair to say that some of the meetings were tense?

14   A.  I don't know that I would categorize them as tense based on

15   my memory.

16   Q.  Was there active discussion of some of the difficulties

17   that KPMG was facing in terms of its audits?

18   A.  Yes.

19   Q.  And, was there sometimes disagreement in terms of the most

20   effective approach between KPMG staff and PCAOB staff?

21   A.  Disagreements don't pop out in my memory on that.  There

22   certainly could have been, I am just not remembering them.

23   Q.  Okay.  We will look at some of the meetings.

24   A.  Okay.

25   Q.  Were you aware generally that there had been, that KPMG had

1   been informed by the PCAOB that it had a "tone at the top"

2   problem?

3   A.  Yes, I have.

4   Q.  And, in fact, that was included, I believe, in a Part II

5   finding about the firm?

6   A.  Yes.

7   Q.  And "tone at the top" means that the PCAOB did not think

8   that the leadership of KPMG were doing a good job at sending

9   the right message to KPMG staff.  Is that fair to say?

10  A.  In summary, yes.

11  Q.  And, the message that the PCAOB was communicating in

12  telling KPMG that they had a "tone at the top" problem, was

13  that things should change from the top down?

14  A.  I don't remember.  Every year is a little bit different,

15  observations are a little bit different, but the general

16  context or the purpose of that section is talking about issues

17  at the top of the firm; yes.

18  Q.  And do you know, before the time when you started attending

19  the PCAOB KPMG monthly meetings, do you know whether high-level

20  KPMG personnel like the vice chair of audits were in the habit

21  of attending those meetings?

22  A.  When I started on the firm that was -- they were attending

23  the meeting.  I have heard stories prior to me being on the

24  team.

25  Q.  That they had not attended in prior years?

J2E5mid4                        Rodriguez - cross

1          MS. MERMELSTEIN:  Objection to a question that is

2     calling for hearsay, your Honor.  The witness just said she has

3     no personal knowledge but heard stories.

4          THE COURT:  Sustained.

5     BY MS. LESTER:

6     Q.  And, at those monthly meetings, is it fair to say that KPMG

7     would often conduct presentations of its various audit quality

8     efforts including internal monitoring programs?

9     A.  Yes.  That is, yes.

10    Q.  And often times that would include like a PowerPoint

11    presentation that they would do during the meeting for the

12    PCAOB staff in attendance, correct?

13    A.  That's correct.  Yes.

14    Q.  And I think you have mentioned on your direct that often

15    times the agenda included discussion of inspections results if

16    it was in the middle of the inspection cycle, right?

17    A.  That is correct.  Yes.

18    Q.  And, as part of the general discussion about KPMG's

19    internal programs, did KPMG also discuss with the PCAOB the

20    results of those programs and how successful they were or

21    unsuccessful?

22    A.  Yes.  At times they would share their internal

23    observations.

24    Q.  And, did the PCAOB ask KPMG to report back on certain

25    aspects of the programs?  So, for example, they would say at

J2E5mid4                          Rodriguez - cross

1   the next meeting we would like to hear about X?

2   A.  Oh, yes.  Uh-huh.

3   Q.  And in those meetings it was clear, was it not, that the

4   PCAOB was aware that one of the things that KPMG was doing was

5   hiring former PCAOB employees, correct?

6   A.  Yes, we were aware.  Uh-huh.

7   Q.  And including Brian Sweet?

8   A.  Yes.

9   Q.  And Louann Sakala?

10  A.  Yes.

11  Q.  And Ms. Sakala's speciality was root cause analysis,

12  correct?

13  A.  That I believe -- to my memory that is where she was

14  working within the firm, yes.

15  Q.  What is root cause analysis?

16  A.  So, root cause analysis is the process by which the firms

17  would go through when a deficiency is identified, in trying to

18  find out what the actual cause of the deficiency is, what the

19  root cause is, in order to effectively design programs or

20  actions that they call remedial actions to address it.

21  Q.  So, it is looking at the underlying issues that are causing

22  audit quality problems, correct?

23  A.  Yes.

24  Q.  And that was someone that KPMG had hired away from the

25  PCAOB to help them address that issue?

J2E5mid4                         Rodriguez - cross

1    A.  I believe on my memory, yes, that is what Louann did.

2    Q.  Mr. Sweet, did you know him when he was at the PCAOB?

3    A.  I did.

4    Q.  And he was a banking inspector largely, correct?

5    A.  That's correct, yes.

6    Q.  So that was sort of his subject matter expertise?

7    A.  Yes.

8    Q.  And, fair to say he was very well regarded at the PCAOB?

9    A.  Yes, he was.

10   Q.  Would you say he was a, quote, super star?

11   A.  He was definitely known as a very high-quality inspector,

12   yes.

13   Q.  And, in fact, when he had been hired by KPMG, do you

14   remember at one of the monthly meetings Paul Bijou remarked

15   that?

16           MS. MERMELSTEIN:  Objection to hearsay, your Honor.

17           MS. LESTER:  It is not for the truth, your Honor, but

18   I can move on.

19           THE COURT:  Okay.

20   BY MS. LESTER:

21   Q.  In those internal monitoring programs that KPMG was running

22   itself, there is nothing improper about such programs, correct?

23   A.  The existence of an internal monitoring program itself is

24   not inappropriate, no.

25   Q.  And, in fact, the auditing standards, including AS 3,

J2E5mid4                          Rodriguez - cross

1   recognize that there may be times in which an auditor conducts

2   an internal review of its work papers, correct?

3   A.   I don't remember that but I have no reason to believe

4   that's not in the standard.  I am sure it is.

5   Q.   Okay.  We can look at the standard.

6   A.   Okay.

7   Q.   If you would please pull up M-176?

8           This is AD 3, we looked at it a moment ago.  Let's

9   look at Section 3 on the second page.  The first sentence says:

10  *Audit documentation is reviewed by members of the engagement*

11  *team performing the work and might be reviewed by others.*

12          Do you see that?

13  A.   Yes, I do.

14  Q.   And it says:  Reviewers might include, and it gives some

15  examples.

16  A.   Uh-huh.

17  Q.   "E" is internal and external inspection teams that review

18  documentation to assess audit quality and compliance with

19  auditing and related professional practice standards,

20  applicable laws, rules and regulations; and the auditor's only

21  quality control policy.

22          Do you see that?

23  A.   I do.  Thank you.

24  Q.   So, is that an example where AS 3 specifically recognizes

25  that internal reviews would fall within its guidelines?

J2E5mid4                          Rodriguez - cross

1     A.  Yes.

2     Q.  And AS 3 also contemplates that in the course of such an

3     internal review there might be a need for additional audit

4     work, that is, it might be discovered during the review that

5     there was not work performed that actually does need to be

6     performed?

7     A.  That is correct, yes.

8     Q.  And if that in fact happens, there is a separate auditing

9     standard that covers how to document that additional work,

10    correct?

11    A.  Correct.

12    Q.  And I believe you referenced that on your direct testimony

13    that is AU 390?

14    A.  Yes.  That's correct.

15    Q.  If, during an internal review the review team realizes that

16    some work was actually done so there doesn't need to be

17    additional work but it wasn't included in the documentation and

18    it is still within the documentation period, that is the 45-day

19    period after the close of the audit, in your view is it

20    permitted under AS 3 to add a notation of that work that

21    already took place?

22    A.  If you clearly identify that these are procedures being

23    performed subsequent to the report released date, yes, you can

24    add that to your workpapers.

25    Q.  So, in other words, as long as it is clear when that

J2E5mid4                          Rodriguez - cross

1    information is added?

2    A.  When the AU 390 -- when the information is added, why it

3    was added that information, yes.

4    Q.  But are you talking about AU 390?

5    A.  We are talking about them a little bit together so it might

6    be crossing.  You know, I want to make sure I understand what

7    you are asking.

8    Q.  Sure.  I want to make sure I understand what you say as

9    well.

10           So, if during an internal review, such as that

11   contemplated under Section 3 of AS 3 that we were just looking

12   at --

13   A.  Yes.

14   Q.  -- the review team realizes that there was work performed

15   but was not adequately documented so I will give you an

16   example.

17   A.  Okay.

18   Q.  If the engagement team orally confirms something but they

19   didn't write it down and during the internal review, which is

20   still within the documentation period the review team says did

21   you do this and they say, oh yeah, we did, we orally confirmed

22   it; and they say, well, you really should write that down; do

23   you consider that permissible under AS 3?

24   A.  Okay.  I understand now.

25           You can add documentation to a file that has clearly

1    evidenced the work was performed prior to the report release

2    date.  So, sometimes it gets a little bit subjective because

3    you have to understand how are you comfortable the work was

4    indeed performed prior to that date.  But, if there is other

5    persuasive evidence that exists that supports the work was done

6    in fact and you are documenting it, that's fine.

7    Q.  And that would be permitted within the 45-day period?

8    A.  Yes; as long as there is evidence of the work being

9    performed.  Yes.

10   Q.  And that would not be an additional procedure under

11   AU 3890, correct?

12   A.  That is correct.  In that instance, yes.

13   Q.  Because AU 390 contemplates that audit procedures were not

14   actually performed, correct?

15   A.  That's correct.  Yes.

16   Q.  So, under AU 390, if during an internal review you realize

17   that there was work that was not done, then you have to

18   document it in a particular way?

19   A.  Right.  Then you have to indicate it was an omitted

20   procedure.  Correct.

21   Q.  Okay.  You can take that down.  Thank you.

22            I would like to go through some of the meetings, the

23   monthly meetings between the PCAOB and KPMG.  Are you aware

24   whether there were notes taken by someone attending the

25   meeting?

J2E5mid4                          Rodriguez - cross

1    A.  Yes.

2    Q.  And are you aware whether those notes were written up into

3    some sort of summary memo?

4    A.  The PCAOB did do that for our records, yes.

5    Q.  And were those kept in the ordinary course of the PCAOB's

6    business?

7    A.  Yes, they were.

8    Q.  Did you review any of those meeting minutes in preparation

9    for your testimony?

10   A.  Yes, I did.

11   Q.  Do you know how the government obtained those meeting

12   minutes?

13   A.  I don't think I do, no.

14   Q.  Do you know whether they were in fact produced as a result

15   of a defense subpoena?

16           MS. MERMELSTEIN:  Objection, your Honor.

17           THE COURT:  Sustained.

18   BY MS. LESTER:

19   Q.  But you reviewed some of these meeting minutes that we are

20   talking about in the course of your preparation, correct?

21   A.  I did.  Yes.

22   Q.  Okay.

23           I would like to show you what's been marked for

24   identification as Government Exhibit 152 and I'm going to

25   renumber that as Defendant's Exhibit 264.

J2E5mid4                          Rodriguez - cross

1              THE COURT:  M-264?

2              MS. LESTER:  Yes, sorry; M-264.  Thank you, your

3     Honor.

4     BY MS. LESTER:

5     Q.  If we could flip through a few of the pages?  Now back to

6     the first page.

7              Do you recognize this document, Ms. Rodriguez?

8     A.  This looks to be the minutes from one of the monthly

9     meetings.

10    Q.  And is the date of this particular meeting October 1st,

11    2014?

12    A.  It does say that, yes.

13    Q.  And do you see your name on the list of PCAOB attendees?

14    A.  I do.

15             MS. LESTER:  Your Honor, the government offers

16    Defendant's Exhibit M-264.

17             MS. MERMELSTEIN:  Sorry.  The government?

18             MS. LESTER:  Did I say government?

19             MS. MERMELSTEIN:  No objection, your Honor.

20             MS. LESTER:  It was a government exhibit but now it is

21    a defendant's exhibit.  Sorry, your Honor.

22             THE COURT:  M-264 is received.

23             MS. LESTER:  Thank you.

24             (Defendant's Exhibit M-264 received in evidence)

25    BY MS. LESTER:

J2E5mid4                          Rodriguez - cross

1   Q.  Ms. Rodriguez, you attended this meeting, as did Paul Bijou

2   Steve Schindler, Bob Ross, Brian Sweet, Joe Haldeman, and Amy

3   Hunt from the PCAOB.

4           Do you see that?

5   A.  I do see that.

6   Q.  At that time Paul Bijou was the global leader for KPMG?

7   A.  Yes, he was.  Yes.

8   Q.  And Steve Schindler, I believe you said, was the U.S. team

9   leader?

10  A.  Yes, he was.

11  Q.  And you served under them, correct?

12  A.  Yes, I did.

13  Q.  And from the firm personnel, that refers to KPMG attendees,

14  correct?

15  A.  Yes, it does.

16  Q.  And do you see Mr. Middendorf's name there?

17  A.  Yes, I do.

18  Q.  And at this time Jim Liddy would have been the vice chair

19  of audit, correct?

20  A.  Yes.

21  Q.  Let's look at page 3 towards the bottom two thirds of the

22  page starting with the paragraph that starts:  *The four*

23  *programs,* the fourth bullet point.

24          Is this an example of KPMG -- first of all, do you

25  know who GH is, based on the description at the front of the

J2E5mid4                          Rodriguez - cross

1   page?  Or maybe you know off the top of your head.  If not, we

2   can go back to the first page.

3   A.  I think it is George Hermann, I think.

4   Q.  Yes.

5        And George Hermann is a KPMG employee?

6   A.  He was, yes.

7   Q.  Do you know what his title was?

8   A.  I think, if I am remembering correctly, it was chief

9   auditor.  I could be wrong, but I think that's what it was.

10  Q.  And he is describing four programs that KPMG had worked on

11  and is presenting those findings.  Is this typical of the type

12  of information that KPMG would present at these monthly

13  meetings?

14  A.  Yes, it was.

15  Q.  And, if we can scroll down a bit, KPMG is talking about the

16  investment of time and resources in these programs including

17  that 30 partners and senior managers took part for six to eight

18  weeks.

19        Do you see that?

20  A.  Yes.

21  Q.  Can we go, please, to page 10?

22        Do you know who PB is?

23  A.  I believe that's Paul Bijou.

24  Q.  Do you recall earlier we were discussing the PCAOB's

25  official position that they don't give comments based solely on

J2E5mid4                              Rodriguez - cross

1    a documentation issue in relation to the audit committee

2    guidance that we looked at?

3    A.  Uh-huh.

4    Q.  Now, at the top of the page, could you read, just to

5    yourself, what Mr. Bijou says there and then I'm going to ask

6    you some questions.

7             (pause)

8             So the second sentence Mr. Bijou says:  We generally

9    don't write comment forms due to a lack of documentation unless

10   it is egregious.

11            And that echoes what we looked at in the audit

12   committee guidance, correct?

13   A.  Yes.

14   Q.  That is, the PCAOB is focused on the work, not so much on

15   the documentation?

16   A.  We are focused on the work that's performed and the

17   documentation is part of that but it's not the only thing and

18   there could be other persuasive evidence that supports work was

19   done, yes.

20   Q.  Okay.  We can take that down.  Thank you.

21            I would like to show you another example of the

22   meeting minutes, if we could look at what's been marked for

23   identification as Government Exhibit 157, which I will renumber

24   as Defendant's Exhibit M-266.

25            Does this appear to be another summary of the monthly

J2E5mid4                          Rodriguez - cross

1   meeting, this one taking place on May 27th, 2015?

2   A.  Yes, it is.

3   Q.  And, do you see your name on the list of PCAOB attendees?

4   A.  Yes, I do.

5           MS. LESTER:  Your Honor, the defense offers

6   Defendant's Exhibit M-266.

7           MS. MERMELSTEIN:  No objection.

8           THE COURT:  M-266 is received.

9           (Defendant's Exhibit M-266 received in evidence)

10  BY MS. LESTER:

11  Q.  If we can look at the agenda there at the top of that page

12  it says, no. 1, current inspections, no. 2, please provide an

13  update regarding the implementation of the following actions:

14  Flowcharting and accelerating audit execution initiative.

15          Accelerating audit execution, do you have an

16  understanding of what that program was at KPMG?

17  A.  Yes, I do.

18  Q.  Was it a program that KPMG implemented to encourage audit

19  teams to conduct their work not only at the very end of the

20  year but to try to space it out more throughout the year so

21  there wasn't as much of a crunch at year-end?

22  A.  Yes.

23  Q.  And so, the point of that initiative was to try to improve

24  overall audit quality by not doing everything in a rush at the

25  year's end, correct?

J2E5mid4                          Rodriguez – cross

1    A.   That's correct.

2    Q.   And then, no. 3 is:  Please provide an update on root cause

3    analysis for the following:  Professional skepticism and

4    supervision and review.

5            And this root cause analysis is what we were

6    discussing a moment ago, this is trying to get to the bottom of

7    particular audit quality issues, right?

8    A.   That's correct.  Yes.

9    Q.   So, examining through the work of the audit teams what is

10   at the root of the problem, correct?

11   A.   That's correct.

12   Q.   And, again, this was another initiative that KPMG was

13   undertaking to improve their audit quality, right?

14   A.   Correct.

15   Q.   And they were reporting on it to the PCAOB?

16   A.   Yes, they were.

17   Q.   Could we look at page 9?

18           So, this is part of the discussion about the root

19   cause analysis and in the middle Jim Liddy, who is the vice

20   chair of audit for KPMG is saying please look at them if you

21   have a chance.  They've just been going through a bunch of

22   slides.

23           So, he appears to be asking the PCAOB to take a look

24   at the slides that they've just presented on, correct?

25           If you want to look at the whole page we can zoom back

1    out.

2    A.   Okay.  I can read it, let me read it for a second.

3    Q.   Okay.

4            (pause)

5    A.   Okay.

6    Q.   And, do you see where Mr. Liddy is saying we would

7    appreciate any feedback you might have?

8    A.   Yes, I do.

9    Q.   So, he appears to be asking the PCAOB if it has feedback on

10   the reactions to KPMG's presentation on their root cause work,

11   correct?

12   A.   From what I am reading it appears to be asking us for

13   feedback on their KVNs unless from -- from what I am reading on

14   this page.

15   Q.   We could look at the prior page if we could, Ms. O'Connor?

16           Oh, this is accelerating audit exclusion -- I

17   apologize -- so it is item 2B, accelerating audit exclusion.

18   They have a handout and then they're asking for feedback.

19   A.   Uh-huh.  Yes, it appears that they're asking for feedback

20   on the KVNs, the information they gave us.

21   Q.   If we could look now at page 16 and 17, if it is possible?

22   I don't know if it is possible to do a dual screen or if we can

23   flip between them.  Maybe not?  Okay, so now we have both

24   pages.

25           Directing your attention to the bottom part of page 16

1   starting with, When talking about the mindset...

2   A.   Okay.

3   Q.   If we can go back for a second to make sure I know who is

4   talking?  I think it is Steve Georgian.  Yes.

5           So, Steve Georgian is talking in the middle of the

6   page and he continues after he does the numbered points he

7   says:   *When talking about the mindset and client relations, I*

8   *mentioned that clients are not always understanding or*

9   *appreciating current regulatory requirements.  We think that a*

10  *portfolio review is part of what fits into there.*

11          Do you have an understanding of the tensions that

12  might arise between an audit firm and its clients over the

13  impact of certain regulatory requirements with respect to

14  audits in particular?

15  A.   In a broad sense, yes.  Yeah.

16  Q.   And, do you understand from your conversations, with KPMG

17  or other audit firms, that sometimes their clients, that is the

18  actual businesses, express frustration with the impact of the

19  audit firms?

20          MS. MERMELSTEIN:  Objection to relevance, your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  I have heard the firms say that, yes.

23  BY MS. LESTER:

24  Q.   You have heard firms say that?

25  A.   I have heard KPMG say that.

J2E5mid4                          Rodriguez – cross

1   Q.  Can we go to the next page, page 17?

2          And, Jim Liddy, about a quarter of the way down the

3   page, he says:  *We have actively been exiting client*

4   *relationships.  We have also had instances where we had honest*

5   *conversations with our clients about the level of effort and*

6   *the cost of that and asked for fee increases.  We can walk you*

7   *through specific examples.*

8          And then he says:  *I worry about teams getting bit by*

9   *clients that do not appreciate the value of what we are doing*

10  *and why we are doing it.*

11         Do you see that?

12         MS. MERMELSTEIN:  Sorry.  Objection, your Honor.  May

13  we approach?

14         THE COURT:  Yes.

15         (Continued next page)

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          MS. MERMELSTEIN:  I don't see the relevance of it at

3    all, of information that KPMG clients were pushing back on the

4    fact that sort of the regulator was requiring certain audit

5    procedures.  And, I think there is a real 403 problem here

6    because the implication is the PCAOB's requirements were

7    unreasonable, were unfair, or were negatively affecting KPMG

8    and its ability to affect clients and I think that kind of,

9    kind of nullification, bullying of the victim is a real 403

10   problem, and it has no relevance to the issues at trial and so

11   we couldn't be going into complaints whether or not the PCAOB

12   sort of work was actually sort of helpful or necessary.  It

13   existed and that's the point.  Sort of people's personal views

14   about whether or not it imposed too many burdens is irrelevant.

15          THE COURT:  What is the relevance?

16          MS. LESTER:  Your Honor, fist of all, this document is

17   in evidence already and I am simply reading from it.  I am not

18   arguing, but it is relevant.  This case is all about

19   Mr. Middendorf's intent and these statements, this view that

20   KPMG held that it was a business decision that they were

21   representing, that they had certain clients who faced

22   additional hurdles that were in some cases beyond those

23   client's capacities and that they were struggling to meet the

24   PCAOB requirements is directly relevant to his intent in this

25   case.

1          THE COURT:  I mean, I am concerned about waste of

2     time.  I am concerned about time.  It is in evidence, so.

3          MS. MERMELSTEIN:  It is, your Honor, but to be clear,

4     the document is a business record and the fact that these

5     meetings took place and there are other portions of what

6     they're talking about, efforts to improve audit quality I think

7     that are fair game, doesn't render everything in it an

8     appropriate area for questioning and argument just because the

9     document has come in as admissible.

10          MS. LESTER:  I am not going to belabor it, your Honor,

11     but I think leaving it where it is with this particular point,

12     I have a few more questions specific to KPMG's client base,

13     that is, that they represented a larger number of financial

14     institutions than the other Big Four and that that has a direct

15     impact on the significance of the ALLL assessment which is

16     related to those clients.  Other firms didn't have as much of

17     an issue because they didn't have as many of those clients.

18          That's the overall relevance.

19          THE COURT:  I think there is some reliance.  I will

20     allow you to go a little bit more with it.

21          MS. LESTER:  Okay.

22

23

24

25

J2E5mid4                          Rodriguez - cross

```
 1                (In open court)
 2      BY MS. LESTER:
 3      Q.  So, I believe we were in the middle of page 17 of
 4      Defendant's Exhibit M-266.  Do you recall discussions where
 5      KPMG told the PCAOB that it was evaluating its client
 6      relationships because of the regulatory burdens imposed on
 7      those clients?
 8      A.  I remember discussions about them evaluating client
 9      relationships.  I do not remember the reason why.
10      Q.  Okay.  Thank you.  You can take that down.
11                Let's move on to what's been marked for identification
12      as Government Exhibit 160, which I will renumber as Defendant's
13      Exhibit M-267.  Do you recognize this document or do you
14      recognize it to be another of the monthly meeting minute notes,
15      this one dated June 24th, 2015?
16      A.  I do.
17      Q.  And, do you see your name on the list of PCAOB personnel
18      attending?
19      A.  Yes, I do.
20                MS. LESTER:  Your Honor, the defense offers
21      Defendant's Exhibit M-267.
22                MS. MERMELSTEIN:  No objection to the admission
23      generally, your Honor.
24                THE COURT:  M-267 is received.
25                (Defendant's Exhibit M-267 received in evidence)
```

J2E5mid4                          Rodriguez - cross

1    BY MS. LESTER:

2    Q.  Let's look at the bottom of page 1.  You are actually

3    speaking, you are giving an update on the status of current

4    inspections and emerging themes and you are saying that the

5    PCAOB has completed 24 inspections with 32 comments forms and

6    have issued 27.

7           What is the difference there between the 32 comment

8    forms versus, what does it mean to issue 27?

9    A.  I believe in this instance that would mean five were in

10   process of being written.

11   Q.  Okay, because then it says five comments are in process.

12   Okay.

13          Let's go to the top of the next page.  So, this is

14   still you speaking and you are mentioning that the firm

15   recently disagreed with a comment.

16          Do you see that?

17   A.  Yes, I do.

18   Q.  And if you could -- I'm sorry, expand the screen a little

19   bit so we can see a little more?

20          Do you have any specific recollection of this

21   incident?

22   A.  No, I don't.

23   Q.  Okay.  So, let's Ms. O'Connor, can we zoom out and let her

24   read the entire page?

25   A.  Thank you.

1    Q.  Yes.  And if you could scroll down a bit more, please?

2    Thank you.  I think that's good.  And if you can tell me when

3    you are ready?

4    A.  Okay.  (pause)  Okay, I have read the page.

5    Q.  So, is it fair to say that this discussion here is about a

6    situation in which the firm that is KPMG relied on information

7    directly from the company or from an affiliate firm, I guess,

8    and did not document it?

9              Is that correct?

10   A.  So, in this instance what it appears to be is that the firm

11   used the work, the U.S. firm used the work from a foreign

12   affiliate and did not, there was no evidence of the file of

13   their evaluation of the knowledge, skill, and ability of the

14   affiliate firm team members.

15   Q.  So, in other words, they relied on it without verifying

16   sufficiently its accuracy or reliability?

17   A.  Of the people actually performing the work, yes.

18   Q.  Okay.  If we can go to the next page, page 3?

19             Do you see at the top Tom Whittle, do you know what

20   his role was at KPMG at this time?

21   A.  Yes.  He was the head of inspections.

22   Q.  And he is explaining that, in the firm's view, the reason

23   that they disagreed was that this was an exception because the

24   engagement team was, in his words, joined at the hip with the

25   foreign affiliate team and understood what they had performed,

1   correct?

2   A.  That is what this says, yes.

3   Q.  So he is explaining the reason for the disagreement with

4   the proposed comment, correct?

5   A.  Correct.

6   Q.  So, is this an example of what we were talking more about

7   in the abstract, this process where the PCAOB informs the firm

8   of potential areas of comment or its intention to issue a

9   comment and then the firm provides context or explains why they

10  don't think a comment is warranted?

11  A.  Yes.  So, in our comment forms there is an opportunity for

12  the firms to say whether they agree or disagree and provide

13  additional information in the event that they disagree, and

14  then in those instances we may attempt to have further

15  discussions; so, yes.  That appears to be what this is.

16  Q.  So, in other words, it appears from the prior page that we

17  looked at that the firm actually did that, that they, in

18  writing, disagreed, and then there is further discussion at

19  this monthly meeting about the reason for the disagreement,

20  correct?

21  A.  Yes.  That appears to be what this is.

22  Q.  We can take that down.  Thank you.

23          I don't have too many more of these but let's look at

24  what's been marked for identification as Government Exhibit

25  165, which I will renumber as Defendant's Exhibit M-268.  This

1    is another monthly meeting notes, this one is dated October

2    19th, 2015, and do you see yourself as one of the people

3    attending this meeting?

4    A.  I do.

5             MS. LESTER:  Your Honor, defense offers Exhibit M-268.

6             MS. MERMELSTEIN:  No objection.

7             THE COURT:  M-268 is received.

8             (Defendant's Exhibit M-268 received in evidence)

9    BY MS. LESTER:

10   Q.  If we can look down at the bottom of this first page?  If

11   we could zoom in a bit on the first and carry over page?

12            Is "SS" Steve Schindler?

13   A.  Yes, it is.

14   Q.  What was his role again at this time?

15   A.  At this point he would have been the U.S. team lead.

16   Q.  So, I believe "SR" is you and you are providing a recap of

17   the inspection status, and then Steve Schindler is indicating

18   that the disagree rate, KPMG's disagree rate was 9 out of 46 or

19   20 percent.

20            What does that refer to, "disagree rate?"

21   A.  Disagreement rate, in general, is when the firm disagrees

22   with a piece of the comment form or the comment form as a

23   whole.  So, I'm not sure if these are pieces or wholes, but it

24   is some combination thereof.

25   Q.  Would 9 out of 46 indicate to you that out of 46 comments

1   KPMG is disagreeing with 9 of them?

2   A.  Or disagreeing at least with a piece of 9 nine of them.

3   Q.  Underneath that it says:  Still sizeable number compared to

4   peer firms.

5        Correct?

6   A.  It says that, yes.

7   Q.  And it says:  Last year the disagree rate was 39 percent?

8   A.  That's correct.

9   Q.  Isn't it the fact that a consistent criticism of KPMG

10  during this time period was the fact that it disagreed with too

11  many comments?

12  A.  I'm trying to remember the actual nature of it.

13  Disagreeing happens and that's okay, but the differences is are

14  you disagreeing to disagree because there is actually an issue

15  here, or disagreeing just to disagree.  So, I have to go back

16  and look at that, but there was an issue with disagreement at

17  that time.

18  Q.  And the PCAOB, fair to say, felt that KPMG disagreed too

19  much?

20  A.  That is what this says, yes.

21  Q.  And not just that's what this says but do you recall that

22  being a topic of discussion at these monthly meetings?

23  A.  I don't know if we said too much as much as there was

24  discussion around it being high and wanting to understand what

25  the nature of the issue was behind that.

J2E5mid4                         Rodriguez - cross

1    Q.  And when you say high, that would be in comparison to the

2    other Big Four firms, correct?

3    A.  That is what it says here, yes.

4    Q.  Would it be the other GNF firms when they're using the term

5    "peer firms" or would it just be the Big Four?

6    A.  I don't remember that.

7    Q.  But at the very least it would be amongst the Big Four,

8    correct?

9    A.  That seems reasonable.  I would think so.

10   Q.  Okay, we can take that down.  Thank you.

11          I would like to show you what's been marked for

12   identification as Government Exhibit 169, which I will renumber

13   as Defendant's Exhibit M-269.  Does this appear to be the

14   monthly meeting minutes for March 26, 2016, and do you see

15   yourself as one of the attendees from the PCAOB?

16   A.  Yes, I do.

17          MS. LESTER:  Your Honor, defense offers Defendant's

18   Exhibit M-269.

19          MS. MERMELSTEIN:  No objection.

20          THE COURT:  M-269 received in evidence)

21          (Defendant's Exhibit M-269 received in evidence)

22   BY MS. LESTER:

23   Q.  If we can go to page 3?  At the bottom half of that page,

24   do you see the words "audit quality bonus?"

25   A.  Yes, I do.

J2E5mid4                          Rodriguez - cross

1   Q.  Did you have an understanding that at some point KPMG
2   instituted an audit quality bonus?
3   A.  Yes, I did.
4   Q.  And that would be given to members of an engagement team
5   who achieved no comments on an inspection.  Was that your
6   understanding?
7   A.  Yes.  An external inspection, yes.
8   Q.  Did you have an understanding of the amount of the bonuses?
9   A.  Not that I -- I may have at the time.  I don't remember.
10  Q.  Were you aware, from your own work on KPMG inspections,
11  whether there were also members of the national office who
12  participated as part, to liaise with the engagement teams
13  during the field work?
14  A.  On PCAOB inspections?
15  Q.  Yes.
16  A.  Yes, there were national office members there; yes.
17  Q.  So there was the engagement team who was the normal audit
18  team who had worked with that business?
19  A.  Yes.
20  Q.  And then, in addition to that, there were at least one
21  other person who came from the national office to sort of
22  assist with the inspection.  Is that fair to say?
23  A.  Yes, that is.  Yes.
24  Q.  And sometimes that person was a former PCAOB employee?
25  A.  It very well might have been, yes.

J2E5mid4                          Rodriguez - cross

1    Q.  Did you ever have that situation on one of your inspections

2    where it was a former PCAOB employee?

3    A.  I don't remember.  Could have.  I don't have any memory of

4    it.

5    Q.  Are you aware whether Brian Sweet, for example, served in

6    that role as a liaison on some of the KPMG inspections?

7    A.  I think he did, yes.

8    Q.  And, as we already discussed, he was a former PCAOB

9    employee who then joined KPMG and he had a speciality in

10   banking, correct?

11   A.  That's correct.

12   Q.  And so, did you have an understanding about whether this

13   audit quality bonus applied to the engagement teams or to the

14   liaisons, or to both?

15   A.  I don't remember if it was beyond the engagement team.  I

16   don't.  I don't know that I know that.

17   Q.  So, you understood it at least to apply to the engagement

18   team members?

19   A.  Yes.

20   Q.  Okay, you can take that down.  Thank you.

21         Last one, I think.  Let's look at what's been marked

22   for identification as Government Exhibit 173, which I will

23   renumber as Defendant's Exhibit M-270.  Does this appear to be

24   meeting notes for a meeting that happened on May 24th, 2016,

25   which you attended, at least telephonically it indicates?

J2E5mid4                          Rodriguez - cross

1    A.  It appears I was telephonic, yes.

2              MS. LESTER:  Your Honor, the defense offers

3    Defendant's Exhibit M-270.

4              MS. MERMELSTEIN:  No objection.

5              THE COURT:  M-270 is received.

6              (Defendant's Exhibit M-270 received in evidence)

7    BY MS. LESTER:

8    Q.  If we can go to page 5, do you see that no. 4, Lost Issuer

9    Bank List?

10   A.  Yes.

11   Q.  Do you have an understanding of what that refers to?

12   A.  I vaguely remember this, yes.

13   Q.  Do you want to read the page to see if you remember more?

14   A.  That would be helpful.  Yes, thank you.

15             MS. MERMELSTEIN:  Your Honor, this is the same

16   objection at side bar.  I think there has been enough leeway

17   already.

18             THE COURT:  I will allow you to go with this document.

19             MS. LESTER:  Thank you, your Honor.

20             (pause)

21             THE WITNESS:  Okay.

22   BY MS. LESTER:

23   Q.  Do you remember on your direct examination when you looked

24   at Government Exhibit 102, that very large planning

25   spreadsheet?

1   A.  Yes, I do.

2   Q.  And one of the columns, I believe, that Ms. Mermelstein

3   directed you to, was a column about whether the, it was the

4   last year that that audit client had been at KPMG?

5   A.  Yes.

6   Q.  In other words, had switched audit firms?

7   A.  Yes.

8   Q.  And that was something that the PCAOB looked at and

9   evaluated in terms of its risk analysis, correct?

10  A.  I believe it was one of the items, yes.

11  Q.  Why is that something that the PCAOB cared about?

12  A.  I would have to look at that profile but I think it had a

13  lower weight of the items.  If I am remembering correctly, a

14  lot of them we wanted to understand the reason for the switch.

15  It is not just that it switched, it is why did it switch.

16          That is what we were looking at.

17  Q.  And, is it fair to say there might be a number of different

18  reasons why a firm that is a business chooses to switch its

19  audit firms?

20  A.  Yes.

21  Q.  And so that's one reason why you wanted to know more than

22  the fact of the switch, you wanted to know the reason behind

23  it?

24  A.  Yes.

25  Q.  And one reason might be the cost?

J2E5mid4                         Rodriguez - cross

1   A.  It could be.

2   Q.  And one reason might be convenience, perhaps, or a

3   relationship with another audit firm?

4   A.  There is a ton of reasons why.

5   Q.  There are many reasons?

6   A.  Yes.  Yes.

7   Q.  Isn't it the fact that PCAOB asked KPMG to give it a list

8   of clients who had left the firm?

9   A.  It appears to be in the minutes to say that.  I don't

10  completely remember that whole issue, but from the minutes it

11  appears that that did happen.

12  Q.  And so, KPMG is saying that they did that, they put

13  together a three-year history of their bank clients and they're

14  reporting this to the PCAOB, correct?

15  A.  Yes.  It appears to.

16  Q.  And, in the middle of the paragraph, Mr. Canfarotta is

17  talking.  And who is Mr. Canfarotta at this time?  What is his

18  title?

19  A.  I know he was one of the leaders in the financial services

20  banking practice.

21              (Continued on next page)

22

23

24

25

J2edmid5                          Rodriguez - cross

1    Q.  And so in the beginning -- I'm sorry, in about the center,

2    there is a sentence, "A total of 9 have been lost due to

3    acquisitions and 17 situations where engagements were

4    terminated due to auditor changes."

5    A.  Yes.

6    Q.  And so those are some of the reasons, right, where if a

7    bank gets acquired by another entity, that other entity might

8    already have a different auditor and they might not continue

9    with KPMG, correct?

10   A.  Yes.  It says that the relationship was terminated due to a

11   change in auditor, yes.

12   Q.  And the next sentence, "Thinking about the 17, virtually

13   all of them, with the exception of HSSBC came about after one

14   or more audit years where there were considerable changes in

15   completing the ALL areas."

16          Do you see that?

17   A.  I do.

18   Q.  And that next sentence, "These dealt with changing

19   methodology requiring enhanced documentation, testing controls,

20   etc., especially in the 2014 to 2015 audits."

21   A.  Yes.

22   Q.  You said that banking is not your area, but do you have any

23   understanding of what that means, "the changing methodology

24   requiring enhanced documentation testing controls, etc."?

25   A.  I don't have any -- I don't really remember a lot of this

J2edmid5                         Rodriguez - cross

1   to speak to the specifics of that, no.

2   Q.  Is it fair to say that the ALL is a challenging area in

3   terms of degree of difficulty?

4   A.  It's a subjective challenging area, yes.

5   Q.  And it involves a fair amount of judgment on the part of

6   the auditor in terms of estimating the appropriate level of

7   reserve, correct?

8   A.  So the issuer -- the issuer will determine the reserve --

9   the company would determine the reserve and the auditor, right,

10  is looking at the reasonableness and that number, so there is a

11  lot of judgment involved in that.  There is a lot of judgment

12  involved on the part of the issuer, so the auditor has to

13  assess the reasonableness of that judgment, yes.

14          MS. LESTER:  We can take that down, thank you.

15  Q.  Were you aware -- strike that.

16          Is it the fact that several of the Big Four firms have

17  particular businesses -- types of businesses that they

18  specialize in?  In other words, their client base might be made

19  up in large part of a particular type of business?

20  A.  I don't know that any type of specialization that would be

21  happening at the other firms.

22  Q.  Do you know whether KPMG had a lot of banking and financial

23  institution clients?

24  A.  It was a focus area of theirs, yes, or is a focus area,

25  yes.

J2edmid5                        Rodriguez - cross

Q.   Did you know how that compared to the other Big Four firms?

A.   In broad strokes, it is a large practice but not how it

compared.

Q.   So you knew it was a large practice at KPMG, though?

A.   Yes.

Q.   And the ALLL is a particular auditing procedure that

applies in the case of financial institutions, correct?

A.   That is a focus area that you typically would see, yes.

Q.   Did you also have any understanding of the types of

financial institutions that KPMG represented in terms of audit

clients; that is, from your work on the inspection team, did

you have a sense of the size of the banks, for example?

A.   I know they audit some very large banks down to smaller

banks, like the scope of the banks but not with any specifics,

or I couldn't do that off memory now, no.

Q.   Did you have any sense of whether they audited a number of

smaller banks, community banks?

A.   They do have a community banking practice, yes.

Q.   And fair to say that many of those banks are located in

different places around the country, not necessarily in the

financial centers like New York or Los Angeles, they could be

in smaller communities?

A.   They are all over the country, yes.

Q.   And when you were talking about -- I believe you were

talking about the internal controls over financial reporting,

that that is one aspect of what an auditor needs to look at,

that is not just the financial statements themselves but

evaluating the controls that the business has in place,

correct?

A.  Correct, yes.

Q.  And so is it fair to say that a smaller institution might

not have as robust controls as a larger institution?

A.  That's possible.

Q.  And, in fact, a larger institution has more staff, for

example?

A.  That's not an unreasonable assumption.  That's possible,

yeah.

Q.  And, therefore, it might be able to implement more robust

internal controls over their financial reporting as well?

A.  It's possible.  It's hard to say, every issuer is so

different.  You could have a very small bank that has, you

know, great staffing but controls.  It's hard to make those

generalizations because it can be different.  These are not

unreasonable statements.  I don't know with any specificity

around those size of issuers and how they are going to work.

Q.  Do you have any personal knowledge of whether, for example,

for KPMG the issuers who received comments were more likely to

be smaller sized banks versus larger financial institutions?

A.  We've had those.  They have been in small and they have

been in large.

J2edmid5                         Rodriguez - cross

Q.  So you can't say based on your own personal knowledge
whether smaller institutions were more likely to receive
comments?

A.  No, because I've seen it in both instances so I couldn't
say with any certainty which had more.

Q.  I want to turn now to the 2016 replacement inspection, and
when I say that, I'm referring to the ten additional
inspections that were undertaken by the PCAOB, and I believe
the work was actually performed in 2017?

A.  That's correct, yes.

Q.  And that was after the PCAOB was notified that there had
been a leak of confidential information, correct?

A.  We performed those inspections after, yes.

Q.  And the PCAOB was informed in about April of 2017?

A.  I don't know exactly -- I received it later.  It came to me
and I was not the original person who received it.  I don't
know exactly when that notification came in because I wasn't
the initial point of contact on that, but I think it was around
that time, yes.

         MS. LESTER:  Could we just show the witness what's in
evidence as Government Exhibit 6.  Sorry.  Government Exhibit I
think it is 5.  And could we go to page 9?

         I'm sorry, I went too far.  8.  It should be the prior
page.  I'm sorry, Ms. O'Connor.  I don't have it in front of
me.  Could we go to page 7.  OK.

1    Q.  Can you read the top paragraph there to yourself?

2    A.  Yes.

3            (Pause)

4            OK.

5    Q.  This is the report of the 2016 inspection of KPMG, correct?

6    A.  Yes.

7    Q.  And this is a public document?

8    A.  Yes, it is.

9    Q.  Now?

10   A.  Yes.

11   Q.  And it says that the firm publicly announced in April of

12   2017 that the leak had occurred, correct?

13   A.  And that is when they publicly announced it.

14   Q.  And the "firm" there means KPMG, right?

15   A.  Yes.

16   Q.  OK.  So in April of 2016, KPMG had publicly announced that

17   this leak of information had occurred?

18   A.  April 2017, yes.

19   Q.  And then later that year is when the PCAOB conducted these

20   replacement inspections, correct?

21   A.  That is correct, yes.

22   Q.  And that was done through field work, correct?  It wasn't

23   done simply through -- it wasn't done remotely; it was still

24   done on site?

25   A.  It could have been a combination, but the majority would

J2edmid5                        Rodriguez - cross

1  have been on site, yes.

2  Q.  Do you know, actually?

3  A.  I actually don't know.  I have to look.  I know we do PCAOB

4  inspections, that's possible.  I don't know with specifics to

5  these.

6  Q.  OK.  But typically the way PCAOB inspections are conducted

7  is on site?

8  A.  Yes.

9  Q.  You just don't know in this instance whether that was the

10  case?

11  A.  I just don't remember.  I would have to have a look.

12          MS. LESTER:  You can take that down.  Thank you,

13  Ms. O'Connor.

14  Q.  And those reinspections, the replacement inspections,

15  occurred between approximately May and October of 2017.  Does

16  that sound right to you?

17  A.  That sounds right.

18  Q.  That's when the work was actually done?

19  A.  Yes.

20  Q.  And that was only for ten issuers, right?

21  A.  Those additional inspections, those ten additional occurred

22  in that time period.  There was other work occurring in that

23  time period, but I believe those are the dates for the ten.

24  Q.  Right.  My question was for the ten additional inspections,

25  the field work, or the inspection work was going under in that

J2edmid5                        Rodriguez - cross

1   time period?

2   A.   Yes.

3   Q.   And the PCAOB had already conducted its inspections of the

4   other issuers, the 41 or so that were included in the report,

5   correct?

6   A.   Correct.

7   Q.   That had already been completed in the normal course of the

8   prior year?

9   A.   That's correct.

10  Q.   So the only additional work that was going on in terms of

11  this particular year's inspection were the replacement

12  inspections?

13  A.   From an issuer's perspective.  There was other PCAOB work

14  going on at that time, but these issuers -- 2016 issue

15  inspections were occurring at that time also.

16  Q.   And if you need the report itself to come up again but

17  maybe you recall this off the top of your head.  The report

18  itself was not actually issued until January 2019, correct?

19  A.   Correct.

20  Q.   About a month ago?

21  A.   That is correct.

22  Q.   Yes.  A little bit the less than a month ago?

23  A.   Mm-hmm.

24  Q.   Did you have any role in determining the timing of when

25  that report would be issued?

J2edmid5                              Rodriguez - cross

1    A.  I did not.

2    Q.  Did you discuss with the government in your preparation for

3    your testimony today the timing of the report?

4    A.  Yes, I did.

5    Q.  What did you discuss?

6    A.  Whether that was unusual or not.

7    Q.  Did you meet with the government before the report was

8    issued?

9    A.  I think I might -- I think I did, yes.  I think that one of

10   our meetings was.

11   Q.  Did you discuss with them when the report would be made

12   public?

13   A.  I did not, no.

14   Q.  You didn't know?

15   A.  I did not, no.  I did not have that discussion.

16   Q.  Did you know when the report would be made public?

17   A.  I don't know that I knew that at the time, no, because some

18   of those discussions were at the board level so I wouldn't have

19   been involved in that, no.

20   Q.  I was just going to ask, who decides ultimately when to

21   release the report?

22   A.  The board.

23   Q.  And is there any particular magic to the timing?  You

24   looked at that chart earlier and the release dates were

25   variable.

J2edmid5                          Rodriguez - cross

1   A.  No, there is not a set rule or rules.  It's really when you

2   can get through the work and all issues can be resolved and

3   there is -- any types of discussions are going on are settled,

4   so there is not like a magic formula or anything like that for

5   the date.

6   Q.  So there is no set time or a certain number of days after

7   the work is completed that the report has to be issued?

8   A.  That is correct, no.

9   Q.  So it's up to the PCAOB in their discretion and depending

10  on how their timing is in terms of the work to decide when to

11  release the report?

12  A.  I believe so.

13  Q.  And in this case, the PCAOB decided to publicly release

14  that report on January 15, 2019, correct?

15  A.  I don't know -- I don't know if that is the date that it

16  was published --

17  Q.  We could show you -- why don't we put that up.

18          MS. LESTER:  Ms. O'Connor, could you put up the first

19  page of Government Exhibit 5, please.

20          (Pause)

21  Q.  So the date is January 15, 2019.

22  A.  Yes, that is the date of the report.  I don't know if that

23  is the date that it actually was put on the website.  Sometimes

24  those are different days depending on posting or what have you.

25  Q.  Sure.  Fair enough.  But this is the date that appears on

J2edmid5                          Rodriguez - cross

1   the front of the report?

2   A.  Yes, it is.

3   Q.  Could we just look at the front of Government Exhibit 6.

4           This is the 2017 inspection report, correct?

5   A.  Yes.

6   Q.  And this was issued on January 24, 2019?

7   A.  Yes.

8   Q.  So almost ten days -- a little bit less than ten days

9   later?

10  A.  Yes, that's correct.

11  Q.  And did you have any role in the timing of the release of

12  this report?

13  A.  No, I did not.

14  Q.  Do you know why these reports were issued less than ten

15  days apart?

16  A.  I don't know if they were issued less than ten days -- I

17  don't know that they were issued at the same time.  I think

18  there was a difference in completing them because of edits and

19  dealing with, you know, questions and what have you in the

20  report in the normal course.  I don't know if they were

21  released separately.  I don't know that.

22  Q.  Do you think they might have actually been completed at the

23  same time --

24  A.  No, I don't know when they are posted to the website.  I

25  don't know when that actually happens.

J2edmid5                         Rodriguez - cross

1   Q.  You agree that they are dated --

2   A.  Yes.

3   Q.  -- a little less than ten days apart?

4   A.  Yes, that is true.

5   Q.  And in the normal course, what is your understanding of how

6   quickly the reports are posted to the website?

7   A.  I don't know that I know that because I'm not involved in

8   that part of it.

9   Q.  OK.  So you -- when you're saying it could have been a

10  different date, you don't actually know whether they post --

11  they could post it the same day?

12  A.  That's what I am saying.  I don't know the date that it

13  actually posts.

14  Q.  OK.  But this is the date that it's issued in the sense

15  that this is the date that it's sent to the firm itself,

16  correct?

17  A.  I believe so.

18  Q.  It's unusual to have two years' reports issued one right

19  after the other like this, correct?

20  A.  I'm not aware of other instances, so I don't know that this

21  happened before.

22  Q.  You've never heard of it happening before?

23  A.  No.

24  Q.  When were you first notified by the government that you

25  were expected to be a witness in this case?

J2edmid5                         Rodriguez - cross

1         MS. MERMELSTEIN:  Objection to relevance, your Honor.

2         THE COURT:  I will allow it.

3         Go ahead.

4   A.   I don't remember when I was told that they might want to

5   speak with me.  I don't remember that day.

6   Q.   Do you remember approximately when it was?

7         (Pause)

8         Was it this year, in this calendar year, or the prior

9   year?

10  A.   No, I think it was in the prior year.  I just don't

11  remember when it was.

12  Q.   Was it prior to Christmas?  Was it towards the end of the

13  year?

14  A.   It was prior to Christmas.  I think it was in the latter

15  four months of the year or so, the latter three months.  I

16  don't remember.

17  Q.   And during that time, were you in communication with the

18  government about the timing of either the 2016 or the 2017

19  inspection report?

20        MS. MERMELSTEIN:  Objection to asked and answered and

21  the good faith basis for the question.

22        THE COURT:  Sustained.

23        MS. LESTER:  You can take that down.  Thanks,

24  Ms. O'Connor.

25  BY MS. LESTER:

J2edmid5                          Rodriguez - cross

Q.   You testified about the need to come up with the

additional -- both the additional replacement inspections and

the 2017 list.  You said that the 2017 list had to be redone,

correct?

A.   Yes, that's correct.

Q.   And, Ms. Mermelstein asked you to estimate the number of

staff hours that it took to do that, correct?

A.   Correct.

Q.   What was that based on?

A.   Where the number comes from are -- we schedule ourselves

out based on the actual project we are working on.  So I am

involved with the team and the scheduling, and I know what

they're working on at any given time.  So, it is based on those

records.

Q.   In the normal course, PCAOB employees do not keep track of

their time, do they?

A.   We schedule according to time, yes, that we schedule --

we've always scheduled according to project.  In that time

period, I don't know if time was recorded by activity, I don't

know when that started, but we've always scheduled by project,

yes.

Q.   What do you mean by "scheduled by project"?

A.   We have a scheduling system that lets you know what you're

going to be working on, and it maintains that information

historically, what you were scheduled on or working on in a

J2edmid5                          Rodriguez - cross

given period of time, and that's scheduled by activity within
the firm.  That has always occurred.

         There is time reporting so you then record the time
and the project you worked on.  I think it did record that, but
I don't remember because we're on a new time reporting system
so I don't know what the old system captured

Q.  Do you remember when that new system was put in place?

A.  Sometime this year.

Q.  Sometime this year?

A.  In '18.  I apologize.  Not in 2019.

Q.  And prior to that, if you were working on something on a
particular day, you didn't keep a time record of how many hours
you spent on which task, did you?

A.  We reported time.  I just don't -- the increments I think
might have changed since some of the data we gathered changed.
I believe -- I believe we did, but I don't remember exactly how
we recorded those hours.

Q.  You don't remember how they --

A.  You wouldn't go above eight hours a day if you were working
on an eight hours a day, but you recorded up to the eight hours
a day, yes.

Q.  That's for payroll purposes?

A.  I have no idea.  I don't know.

Q.  Are most PCAOB employees salaried employees?

A.  I would assume.

J2edmid5                        Rodriguez - cross

1  Q.  Are you a salaried employee?

2  A.  Yes, I am.

3  Q.  Are you aware of any employees that aren't salaried

4  employees?

5  A.  I don't know if they are there or not.

6  Q.  Did you review any documentation about people's salaries in

7  connection with their preparation for your testimony?

8  A.  I did.

9  Q.  And were those annual salaries?

10  A.  I saw an annual salary and I saw an estimated hourly

11  salary, so.

12  Q.  Was that based on a 40-hour workweek?

13  A.  It was based on the average hours an inspector works in a

14  year.

15  Q.  But you didn't see any indication in that review that

16  people were paid hourly; everything you reviewed was salaried

17  based on annual, annual salary?

18  A.  That is my understanding.

19  Q.  And so you testified as to the supposed cost to the PCAOB

20  of recreating the 2017 list.  Do you remember that?

21  A.  Yes, I think so.

22  Q.  Ms. Mermelstein asked you about that.

23  A.  Yes.

24  Q.  And so that was an estimate that you -- well, did you come

25  up with that number?

J2edmid5                              Rodriguez - cross

A.  I did not.  Our team did.  I did not.

Q.  Who is "our team"?

A.  The inspection team.  We have our hours and we have a
schedule that tells us what we are working on at any given time
so we have that information.

Q.  Who calculated the exact numbers?

A.  I don't know that I know who actually put the schedule
together.  I don't know that I know that.

Q.  What did you review to come up with the number?

A.  I reviewed the schedule that had a listing of everybody's
hours and the weeks that they worked on it, so I was able to
look at that in comparison to our scheduling system and the
records and verify that those in fact were the individuals that
were scheduled and when and verify the total in those hours on
that schedule.

Q.  Some of those spreadsheet that you looked at that
calculated people's hours were based on people's recollections,
correct?

A.  It was primarily based on the scheduling data, so we knew
what they were working on, meeting at nights.  So we knew who
was in what meetings and what time they had put into that.
There may have been a piece on recollection; I don't remember
it.  Whether it was a small piece, so I don't remember that.

Q.  And did you actually do the math to come up with the hours,
times, the particular salaries of employees to add it all up to

J2edmid5                         Rodriguez - cross

1    the number that you testified to?

2    A.   I sampled within that calculation to test the accuracy,

3    yes.

4    Q.   So you audited the numbers?

5    A.   The auditor audited, yet.

6    Q.   Did you prepare any documentation in connection with your

7    work?

8    A.   No, I did not.

9    Q.   OK.  So there is no notes of your calculations?

10   A.   I might have some notes where I verified and checked

11   numbers off as they worked, yes.

12   Q.   OK.  If there are any notes of those, would you have

13   provided those to the government?

14   A.   No, I would not have.

15   Q.   Would you still have them?

16   A.   I'd have to look.  I don't remember.

17             MS. LESTER:  For the record, your Honor, we would

18   request that the witness check to see if there are any such

19   notes and that those notes be produced to the defense.

20             THE COURT:  We will address that separately.

21   BY MS. LESTER:

22   Q.   You talked about, again in your discussion about Government

23   Exhibit 102, that massive spreadsheet, we didn't see all of it

24   because it was so large but we only saw a portion of the

25   issuers that would fit on the screen.  But is it fair to say

J2edmid5                          Rodriguez - cross

1    that that spreadsheet contains hundreds of issuer names?

2    A.  Yes, it is.

3    Q.  Is it all the issuers that KPMG performs audits for?

4    A.  It should be, yes.

5    Q.  And is it your understanding that number is over 700?

6    A.  We are in that ballpark, yes.

7    Q.  So that spreadsheet ranks -- provides data, rather, for all

8    of the issuers that KPMG works on?

9    A.  There is information -- different levels of information for

10   all those issuers, yes.

11   Q.  And so when the PCAOB performs its ranking analysis and

12   decides which issuers are going to be subject to inspection,

13   say, in 2017, it still has all the data that it gathered about

14   the other issuers for that year, correct?

15   A.  Yes.

16   Q.  Because there is a different planning profile spreadsheet

17   for every year -- every inspection year?

18   A.  Every year has a separate spreadsheet, yes.

19   Q.  And you gather all the same information every year and you

20   put it into that big spreadsheet?

21   A.  Intermittent.  There are some different variations every

22   year, yes, but for the most part they are similar information.

23   Q.  And so when the first selections were compromised, as you

24   put it, couldn't the PCAOB have simply gone to the next 50

25   issuers on its list that it had already compiled?

J2edmid5                         Rodriguez - cross

1    A.  We didn't necessarily screen an additional 50 issuers so we

2    have data on it but we don't have all of our data and we

3    haven't gone through and evaluated all the factors for those

4    issuers, which is what we had to do as a result of the replan.

5    Q.  But all of the data was already in the spreadsheet,

6    correct?

7    A.  Not all of it, no.

8    Q.  So I believe you testified a moment ago that you did have

9    data for all the issuers on the spreadsheet?

10   A.  Yes, we did have some data.  We had the data provided by

11   the firm, but we didn't have all the data that we use as part

12   of our planning process.

13   Q.  So at what point does the PCAOB decide so stop gathering

14   data about particular issuers?

15   A.  We have all the data that the firm provided, or we had,

16   but, for instance, the error referrals, we had to have new

17   error referrals done.  So, that is not necessarily in there.

18   It is in there for the first batch that they picked but then

19   had to be replaced.

20   Q.  So how much additional work had to be done from the

21   spreadsheet that already existed in order to get to the new

22   2017 list?

23   A.  The additional replan hours was about 2,000 hours.

24   Q.  What actually had to be done in those 2,000 hours?

25   A.  You had to rescreen additional issuers that were not

1    necessarily screened.  You had to go through new error

2    referrals.  We had to reevaluate those issuers and weigh them

3    against one mother.  We had to pick focus areas on issuers that

4    we may not have looked at previously.  That is a quick list of

5    some of the things we had to do.

6    Q.  And so even though the PCAOB had already compiled all this

7    information in that huge spreadsheet that we looked at with

8    many, many numbered tabs and different columns, you are saying

9    that it took 2,000 hours for the PCAOB to come up with a new

10   list?

11   A.  Yes, it did.

12   Q.  Did you review -- I'm sorry.  Just another question on your

13   calculations regarding the cost.

14        You didn't hire any new personnel in terms of working

15   on the 2017 list, right?  You worked with the people who were

16   already on staff?

17   A.  It was the 2017 inspection team members who worked to do

18   the planning within our team and others within the

19   organization.

20   Q.  And those were the same people who are normally involved in

21   the planning for KPMG?

22   A.  As far as I know.  There are additional, we had more people

23   than normal involved in it, but they were inspection team

24   members.

25   Q.  And so those are regular PCAOB employees, salaried

J2edmid5                        Rodriguez - cross

1   employees, to your understanding?

2   A.  To my understanding.

3   Q.  So those are people who would be paid their salary

4   regardless of whether or not they're working on a new 2017 list

5   or something else; they're just regular employees doing their

6   job for the PCAOB?

7   A.  Yes.

8   Q.  A little bit more on the replacement inspections.

9           We talked earlier about how it's not necessarily the

10  case that every written comment that the inspection team writes

11  up during the course of its inspection or at the end of its

12  inspection is actually included in the Part I section of the

13  report, correct?

14  A.  Yes.

15  Q.  And isn't it the case that in the replacement inspections,

16  there were nine comments out of ten issuers, correct?

17  A.  I'm sorry.  What was the question?

18  Q.  Did you review the inspection summary memos for the

19  replacement inspections in 2016?

20  A.  I did not.

21  Q.  You did not?

22  A.  The inspection summary memorandums?

23  Q.  Yes.

24  A.  No, I did not, no.

25  Q.  Well, correct me if I am wrong, but I think the government

J2edmid5                          Rodriguez - cross

1    showed you some lists that had the issuers that were subject to

2    inspection --

3    A.   Yes.

4    Q.   -- in various years.

5    A.   Yes, that's correct.

6    Q.   And some of that data was backed up, according to the

7    little note at the bottom of those exhibits, through inspection

8    summary memoranda?

9    A.   That's correct.

10   Q.   Which inspection summary memoranda did you review to create

11   those exhibits?

12   A.   OK.  I'm sorry.

13              I reviewed those.  I create the existence of the

14   inspection summary memorandums to the list to verify that those

15   inspections had in fact taken place.  I did not perform a

16   detailed review of the information within them as part of the

17   inspection process.

18   Q.   Do you have any understanding of the number of the

19   replacement inspections that received comments?

20   A.   I believe it was nine out of ten.

21   Q.   That's correct.  We could look in the report but that's

22   right.

23   A.   Yes.

24   Q.   And do you have any understanding of the prior year and how

25   many financial services firms had been included in Part I for

J2edmid5                          Rodriguez - cross

1    2015?

2    A.  In total for any comments?  I don't know that I know it off

3    the top of my head, no.

4    Q.  That might have been in that chart.

5           (Counsel conferred)

6           So on the replacement inspections, did you take part

7    in those personally?

8    A.  No, I did not.

9    Q.  Did you review any of the inspection summary memos or weigh

10   in on comments?

11   A.  I reviewed comments on one of them.

12   Q.  Do you recall which one that was?

13   A.  I think it was Heartland, if I can remember correctly.

14   Q.  And that comment was included in Part I, correct?

15   A.  I think so.

16   Q.  Do you know whether there was any effort made to replicate

17   the inspection teams who conducted the original 2016

18   inspections versus the replacement inspections?

19   A.  No.  They were -- no, I don't know.  No.  We had our

20   banking inspection team do those inspections.

21   Q.  And had the banking inspection team done the prior year

22   inspections, the original inspections?

23   A.  Certain members of that team were probably on both years.

24   Q.  But there was no effort to replicate exactly the people who

25   had done the prior inspection -- the original inspection in

J2edmid5                          Rodriguez - cross

1   2016 with the replacement inspection?

2   A.  Not to my knowledge.

3   Q.  And was there any attempt made to ensure that the

4   replacement issuers, the issuers that were the subject of the

5   replacement inspections, were comparable to the original

6   issuers?

7   A.  Not to my knowledge, no.  They were part of our regular

8   issuer inspection process, selection process.

9   Q.  OK.  So the pool of issuers that was the subject of the

10  original 2016 inspection -- or I guess it would be the

11  financial institution issuers, to be more precise, when the

12  replacement selections were chosen, there wasn't necessarily an

13  effort to replicate those or to make them comparable?

14  A.  They go through the same -- we use the same selection

15  process ever year, so the methodology by which we picked these

16  issuers every year did not change.

17  Q.  So the selection process was the same, but in terms of the

18  size of the issuers, for example, or the revenue, was there any

19  effort made to make those numbers comparable to the original

20  pool?

21  A.  I don't know if the banking team was involved in that.  I

22  am not sure.

23  Q.  Were you -- so you were not involved at all in the planning

24  or selection of the replacement inspection issuers?

25  A.  No, I was.  But the initial work, just look on our planning

team, is done by the team, and then we work up the review

process.  The banking inspection team, some of those members

are involved in the planning.  So I look at it at the review

level.  So some of that was done before.  I am not sure.  I

don't have knowledge of that.

Q.  Did you ask any questions about whether the issuers were

comparable in the two cycles?

A.  I don't remember.

Q.  You don't remember asking any questions?

A.  I don't remember if I did or if I didn't.

Q.  Did you make any effort to determine whether the issuers in

the replacement inspections had been in monitoring programs?

A.  So the way the replacement inspections worked were we made

selections in '17 and then looked at them in '16.  So that is

part of our standard review in any year, to look at if they

participate in monitoring programs.  So, yes, that would have

been a piece of it.

Q.  So you're saying when the replacement inspections were

chosen, part of the assessment was whether they were in

monitoring programs?

A.  That would have been a part of the consideration, yes.

Q.  And was there an effort to make sure that the proportion

that were in monitoring programs was the same as they had been

during the original 2016 inspections?

A.  I do not remember.

1   Q.  You don't remember whether that was done?

2   A.  I do not remember if that was done, no.

3   Q.  Now, at the time that the replacement inspections were

4   performed, it was public knowledge that the PCAOB had had a

5   leak of information, correct?

6   A.  Yes.

7   Q.  So the inspection team members knew that the reason that

8   the replacement inspections were being conducted was because

9   the prior years -- the prior inspections, that is, had been,

10  quote, compromised, in your words?

11  A.  The public announcement that a firm had already been made,

12  yes.

13  Q.  I don't think that answered my question.

14         Did the inspection team members, to your knowledge,

15  know what -- the reason why they were doing the replacement

16  inspections, that is, because of the leak of confidential

17  information?

18  A.  On the 10 banks?

19  Q.  Yes.

20  A.  I don't know if we had a specific discussion with the team.

21  I don't recall one where we discussed that piece of the data

22  being available to the firm.

23  Q.  Would you say it was common knowledge that at least one

24  PCAOB employee had been fired as a result of the leak?

25  A.  I'm trying to remember what was actually discussed.  It may

J2edmid5                          Rodriguez - cross

1    have been.

2    Q.  Were you aware that there were newspaper articles

3    discussing the fact of the leak and the firing of a PCAOB

4    employee?

5    A.  Yes.

6    Q.  And were you aware that there were press reports that the

7    incident, that is, the leak, was a, quote, black eye on the

8    PCAOB?

9            MS. MERMELSTEIN:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.  Were you aware that there were press reports discussing the

12   leak of confidential information?

13           MS. MERMELSTEIN:  Objection.  I think this point has

14   been made.

15           THE COURT:  Sustained.

16   BY MS. LESTER:

17   Q.  So, again, during the course of the replacement

18   inspections, this would have -- in your view -- you were aware

19   of this information at the time of the replacement inspections?

20   A.  I was aware.

21           MS. LESTER:  May I have a moment, your Honor?

22           THE COURT:  Yes.

23           (Pause)

24   BY MS. LESTER:

25   Q.  Thank you for your patience.  Just one more area, very

J2edmid5                        Rodriguez - cross

1    brief.

2              Are you aware that in the 2017 inspection cycle, the

3    PCAOB chose to inspect two years of some issuers' financials --

4    audit, sorry.  So, in other words, in the normal course in a

5    PCAOB inspection, you're looking at a single year's audit,

6    correct?

7    A.  That is correct, yes.

8    Q.  But in 2017, the PCAOB decided to look at two years at

9    once?

10   A.  We looked at two years in that current year.

11   Q.  Right.

12   A.  Mm-hmm.

13   Q.  So in 2017, you were looking at 2017 -- 2016 -- no.  Sorry.

14   I am messing it up.

15             You explain it.  You know what you are talking about.

16   A.  I messed these up, too, when I worked there, so I get it.

17             We performed for those reinspections, or additional

18   inspections, we performed an inspection for 2017, and in a

19   separate week we performed an inspection of 2016.  So they

20   didn't occur at the same time; there was some time in between

21   them, a little bit of time, but both years of inspections

22   occurred during 2017.

23   Q.  So in the same inspection cycle, in other words, you were

24   looking at two different years?

25   A.  That is correct, yes.

J2edmid5                          Rodriguez - cross

1   Q.  And that's unusual, right?

2   A.  Yes, it is.

3   Q.  Are you aware of that ever being done before?

4   A.  Not to my knowledge, no.

5   Q.  And would you expect that when that happens, you would see

6   the same mistakes both years?

7   A.  Actually, it didn't always happen like that.  Sometimes it

8   did; sometimes it didn't.

9   Q.  In the normal course, after the inspection, the firm is

10  given feedback obviously, in the form of comments or otherwise,

11  about things it didn't do to the PCAOB's satisfaction, correct?

12  A.  That's correct.

13  Q.  And the firm then has an opportunity to go back and fix

14  things either as part of its normal audit documentation for

15  that year or in the next years it will incorporate the PCAOB's

16  comments, hopefully, in its audit work, correct?

17  A.  That's correct.

18  Q.  And the firm didn't have that chance when you inspected two

19  back-to-back, correct?

20  A.  Well, it wouldn't have mattered in this instance because

21  the year we tacked on was going back in time.  So that work was

22  already done and archived.  Typically what happens is if you

23  have an observation in a year, the firm can, you know, fix that

24  year, or going forward they will modify their plan.  So because

25  we were going back in time, even though it was '17

1   observations, it wouldn't have benefited them because we were

2   going backwards.  If that makes sense, if I am explaining that

3   right?

4   Q.  Understood.

5         But the point is that looking at two years at once

6   doesn't take into account that in the normal course the firm

7   would try to fix some of the things -- some of its audit work

8   based on the PCAOB's comments, correct?

9   A.  So they would still have an opportunity in the normal

10  course to fix it going forward, like they would in any year.

11  What makes this different is we are looking at two years.  So,

12  we picked the historical year.  So even if we had done another

13  issuer, it would never would have mattered because we were

14  going back in time.  Those files were sealed so any observation

15  we had in '17 wouldn't have impacted work that we had already

16  done.

17  Q.  But that was totally out of the normal course for you to do

18  that, correct?

19  A.  It was different, yes.

20  Q.  And it had never been done before, to your knowledge?

21  A.  To my knowledge, no.

22         MS. LESTER:  No further questions, your Honor.

23         THE COURT:  Thank you.

24         Mr. Ohta.

25         MR. OHTA:  Your Honor, may we take our afternoon

J2edmid5                          Rodriguez – cross

1  ten-minute break.

2          THE COURT:  Yes.  Why don't we take the ten-minute

3  break, folks.  Please leave your pads on your chairs.

4          Come back in ten minutes.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2edmid5                          Rodriguez – cross

 1           (Jury not present)

 2           THE COURT:  You can step down.

 3           You may be seated.

 4           Anything we need to address before the break?

 5           MS. KRAMER:  Only one issue, your Honor -- just wait

 6    one moment.

 7           (Pause)

 8           Your Honor, the witness was asked questions on

 9    cross-examination about whose subpoena certain documents were

10    produced in response to, and if there is any relevance to that,

11    we certainly don't see what it is.  And we just ask that no

12    further cross-examination be permitted getting into the inside

13    baseball of who subpoenaed what documents.  As your Honor will

14    instruct the jury during your charge, there is no obligation

15    that the government use any specific investigative technique,

16    and this question certainly seems designed to elicit

17    information that is in conflict with that instruction.

18           MR. BOXER:  I think it is relevant, your Honor, to

19    show the jury what the government is interested in and not

20    interested in discovering in the case.

21           THE COURT:  I don't think it is relevant.

22           MR. BOXER:  I don't think it goes to investigative

23    techniques.  We're not criticizing their techniques.  But I

24    think we are allowed to argue that they didn't bring this to

25    your attention, we did.  I appreciate the ruling and will

J2edmid5                        Rodriguez - cross

 1   obviously adhere to it, but that was the reason why it was

 2   elicited.

 3              THE COURT:  I understand.  But it seemed like it

 4   stretched.  It really goes to prosecutors' strategy and

 5   thinking.  You know, I don't think it goes to anything other

 6   than that and investigative techniques, really.

 7              MR. WEDDLE:  May I be heard briefly on this issue,

 8   your Honor?

 9              THE COURT:  Yes.

10              MR. WEDDLE:  I that it also goes to bias of the

11   witness.  As your Honor is aware from -- as we've argued in a

12   number of our submissions to the Court, we think that there is

13   some strategic behavior occurring by the PCAOB --

14              THE COURT:  Well, I've let you do plenty with that.

15              MR. WEDDLE:  With respect to the documents they've

16   chosen to give to the government and the documents that they

17   haven't, I think we've pointed out the relative paucity of

18   PCAOB documents that we received in discovery and the fact that

19   it's -- you know, takes a lot of work for us to get documents

20   out of the PCAOB.  And I think that it's directly relevant to

21   the bias of the witness --

22              THE COURT:  It's the government that decided what

23   documents to get from the PCAOB, presumably.

24              MR. WEDDLE:  I don't know whether that is true or not,

25   your Honor, because I am confident that if the government asked

1    for a document, they would have gotten it.  But I suspect -- I

2    mean, we could find out the facts.  The lawyers for the PCAOB

3    are here.  We could talk to them about discussions between them

4    and the government.

5          I suspect that the lawyers for the PCAOB have made

6    decisions about what they think they should turn over to the

7    government and turned it over to the government voluntarily

8    without the government asking for things, and the government

9    has received the filtered information from the PCAOB without

10   delving further.  There is one asterisk that I need to put on

11   that, your Honor, which is that when we received the draft

12   report before it was publicly issued, before it was issued in

13   2019, the draft report for 2016, it had a stamp on it that said

14   it was produced pursuant to a grand jury subpoena and was

15   subject to grand jury secrecy.  Now, we've never found out

16   whether that stamp was a mistake or deliberate.

17         Of course, the government is not permitted to issue

18   grand jury subpoenas to prepare for trial.  So if there was a

19   grand jury subpoena calling for that document in 2018, which is

20   when we first received it, that would be totally improper.  I

21   would welcome a factual proffer from the government and the

22   PCAOB about the circumstances of that grand jury subpoena

23   stamp, because I think that that is relevant to this entire

24   issue of PCAOB bias.

25         THE COURT:  Ms. Mermelstein.

1          MS. MERMELSTEIN:  I don't know that a response is

2     required.  This is a fishing expedition that lacks, I think,

3     any basis in fact.  One, Ms. Rodriguez was not responsible for

4     producing documents from the PCAOB.  There are lawyers who are

5     charged with that.  So, I really can't see how it goes to her

6     bias in literally any fashion.

7          Mr. Weddle is quite right that I am not going to

8     answer questions about the government's process except to say

9     generally that a subpoena can be issued and continue to be open

10    and so they can be produced in response to it later without

11    violating any kind of trial and grand jury subpoena rules.

12         The defendants have subpoena power.  They have

13    exercised that power.  They have gotten documents from the

14    PCAOB.  As your Honor is aware, and as the government has

15    experienced, the PCAOB is very sensitive about this

16    confidential information and has striven to limit productions

17    only of that which is necessary to protect their confidential

18    information.  The whole thing is irrelevant and shouldn't be

19    before the jury.

20         And if the defendants feel there is a document that

21    they subpoenaed and didn't get, I think that is an issue for

22    them to take up with the PCAOB and the Court.  I am not aware

23    that that has happened.  But I think this is just a frolic and

24    detour that doesn't have any relevance to the trial and it

25    doesn't have any real support.

J2edmid5                          Rodriguez - cross

1          THE COURT:  The argument is not that this witness is

2     biased but the whole PCAOB is biased when a decision was made

3     from some in-house counsel at the PCAOB about what to produce

4     and not produce.  I am just not persuaded that it has

5     relevance.

6          MR. WEDDLE:  May I add a couple of points, your Honor?

7          THE COURT:  Sure.

8          MR. WEDDLE:  One is the prosecutor just referenced the

9     fact that documents can be produced pursuant to an old

10    subpoena.  That is not true with respect to documents that are

11    created after the subpoena was issued.  If a prosecutor used a

12    subpoena prospectively, that would be an illegal warrant, your

13    Honor.

14         So if a subpoena is issued and there is a rolling

15    production of documents in response to the subpoena, the

16    subpoena only calls for documents that are in existence on the

17    date the subpoena is issued.  To ask for the subpoena to cover

18    future-created documents is illegal.  So, that would not be a

19    proper use of a grand jury subpoena, and it would be inaccurate

20    to say that a document created after the subpoena was issued

21    was produced in response to a grand jury subpoena.

22         That is one point.

23         Another point is Ms. Rodriguez's testimony, I believe,

24    was in part elicited to show the discrepancy or the comparison

25    between reviews in 2016 that were done at the time and

J2edmid5                          Rodriguez - cross

 1    rereviews.  And part of our argument is that the PCAOB,

 2    including this witness, but not limited to this witness, has

 3    its own bone to pick with these defendants and has its own

 4    motivation to make the conduct look as bad as possible.

 5            THE COURT:  I know.  And I've allowed some of that.  I

 6    think you've been able to make those points.  But I just don't

 7    see how whether a document came through a subpoena or from the

 8    government's production really goes to that in a reliable way

 9    and in a way that isn't really going to investigative

10    techniques.

11            I don't know about your grand jury issue.  That might

12    be a separate issue.  I'm not familiar with that.  And if there

13    is a separate application or something I need to decide on

14    that, I will.

15            MR. WEDDLE:  Well, I mean, I suppose I can submit a

16    letter.  It sounds to me -- and I may be misreading the oral

17    presentation, but it sounds to me as if the PCAOB and the

18    prosecution team believe that a document created after the

19    execution of a grand jury subpoena was produced in response to

20    a grand jury subpoena, which is improper.

21            (Continued on next page)

22

23

24

25

1          THE COURT:  Do you have a response?

2          MS. MERMELSTEIN:  While I am not permitted to discuss

3     whether or not a grand jury subpoena has in fact issued so I do

4     not have a response, except to say that I don't think that

5     Mr. Weddle and Mr. Wada's defense team have any remedy to the

6     extent they are making any kind of supposition about what may

7     have happened and I think this is sort of just, as I have said,

8     a fishing expedition.  The documents are what the documents are

9     and I think there is nothing else to discuss with respect to

10    that.  If Mr. Weddle wants to file a letter, he is certainly

11    welcome to do so.  I can represent to the Court in a general

12    fashion that there has, of course, been no misuse of the grand

13    jury process and the subpoena process by the government in this

14    case.  Period.  And I think, given the timing, perhaps we could

15    take a bathroom break and resume and then take this up after

16    the jury is gone for the day, if there is anything to take up,

17    which I don't know that there is.

18          MR. WEDDLE:  One very brief point, your Honor?

19          THE COURT:  Yes.

20          MR. WEDDLE:  Rule 6(c) which governs grand jury

21    secrecy does not apply in the course of a judicial proceeding.

22    Here we are in court.  There is nothing preventing the

23    prosecution from discussing with your Honor in the context of

24    this hearing, right now, what they've done with respect to

25    grand jury subpoenas.

J2E5mid6                          Rodriguez – cross

1              THE COURT:  We will talk our break and then we will

2      continue this at the end of the day.

3              (recess)

4              THE COURT:  Please, be seated.

5              Ready for the jury?

6              MR. OHTA:  Yes, your Honor.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2E5mid6                          Rodriguez - cross

1           (Jury present)

2                THE COURT:  Please, be seated.

3                Good afternoon, folks.

4                THE JURY:  Good afternoon.

5                THE COURT:  Cross-examination of the witness,

6    Mr. Ohta.

7                MR. OHTA:  Thank you, your Honor.

8    CROSS EXAMINATION

9    BY MR. OHTA:

10   Q.  Good afternoon, Ms. Rodriguez?

11   A.  Hi.

12   Q.  My name is Jason Ohta and I represent Mr. Wada.

13           I first want to talk about your preparation for trial

14   today, your testimony?

15   A.  Okay.

16   Q.  When was the first time you met with the federal

17   prosecutors seated to my left?

18   A.  I think it was around January 15th, 16th.  Somewhere in

19   that area.

20   Q.  How long did you meet for?

21   A.  I think that meeting was about four hours, five hours.

22   Something around that time frame.

23   Q.  Were all three federal prosecutors present?

24   A.  Rebecca Mermelstein was there; Amanda was there, I don't

25   remember if she was in there the entire time.  I don't remember

J2E5mid6                         Rodriguez - cross

1   if Jordan was in the meeting or not.

2   Q.  Any case agents in the prep session with you?

3   A.  Yes.

4   Q.  What are their names?

5   A.  I leave it is Lyeson.  I'm not sure of his last name.

6   Q.  Anybody else?

7   A.  Not that I'm aware of.

8   Q.  After that meeting, around mid-January, did you have any

9   other meetings in preparation for your testimony?

10  A.  I did.

11  Q.  When was the --

12  A.  I believe it was two weeks later we met again.

13  Q.  Did you meet with the same people?

14  A.  Yes.

15  Q.  How long was that meeting for?

16  A.  About the same time frame.  About four hours was a good

17  estimate.

18  Q.  Was this an in-person meeting?

19  A.  Yes, it was.

20  Q.  Did you have another meeting after the meeting we just

21  discussed?

22  A.  Yes, I did.

23  Q.  When was that meeting?

24  A.  We met last week also.

25  Q.  Approximately how long did you meet for?

1   A.   I think it was somewhere between, around the three-hour

2   time frame.

3   Q.   Was this meeting in person also?

4   A.   That was not, no.

5   Q.   Teleconference?

6   A.   Yes.

7   Q.   Did you have another meeting before your testimony here

8   today?

9   A.   Yes.  There was another meeting last week also;

10  teleconference, not in person.

11  Q.   How long was that meeting for?

12  A.   About the same time frame.

13  Q.   About three hours?

14  A.   Three, four hours; yes.

15  Q.   Was it right after each other or was there a day in

16  between, do you recall?

17  A.   There was day in between I recall, I believe.

18  Q.   Did you have any other meetings after that meeting?

19  A.   We met this week also, yes.  This week, yes.

20  Q.   When did you meet this week?

21  A.   Let me remember.  Today is Thursday, so I believe we met

22  Monday night.  Monday evening we met.

23  Q.   How long did you meet for?

24  A.   I think that was about three hours.

25  Q.   Were all three prosecutors present for that meeting?

J2E5mid6                          Rodriguez - cross

1   A.   I don't think Amanda was in that meeting that I am

2   remembering.

3   Q.   How many case agents were at that meeting?

4   A.   I think there was one.

5   Q.   Did you have any other meetings?

6   A.   There was another meeting this week, yes.

7   Q.   When was that meeting?

8   A.   On Tuesday.

9   Q.   How long was that meeting for?

10  A.   I think it was about, maybe, two and a half hours,

11  somewhere around that time frame.

12  Q.   So put that on Tuesday.  Was that your last meeting with

13  the government?

14  A.   No.  I met with them also last night for maybe 10, 15

15  minutes.

16  Q.   And then now here you are?

17  A.   And now I am here, yes.

18  Q.   So, we talked about your meetings with federal prosecutors,

19  case agents.  In preparation for your testimony here today did

20  you also speak with PCAOB lawyers?

21           MS. MERMELSTEIN:  Objection, your Honor.  I think it

22  is about to call for privileged communications.

23           MR. OHTA:  Your Honor, I am just asking if they met.

24  I will not get into the substance of their conversation.

25           MS. MERMELSTEIN:  That's fine, your Honor.

J2E5mid6                          Rodriguez - cross

1            THE COURT:  Okay.

2            You can answer.

3            THE WITNESS:  We had phone discussions.  We talked on

4     the phone.

5     BY MR. OHTA:

6     Q.  No meetings in person?

7     A.  No.  Not to my memory, no.

8     Q.  How many phone calls did you have with PCAOB counsel?

9            MS. MERMELSTEIN:  Objection to this line of

10    questioning.

11           MR. OHTA:  In preparation for your testimony.

12           THE COURT:  Sorry?

13           MS. MERMELSTEIN:  I don't see how the extent of the

14    witness' communications with counsel are relevant or

15    appropriate.

16           MR. OHTA:  It is in preparation for her testimony,

17    your Honor.

18           THE COURT:  Go ahead.  You can ask.

19           THE WITNESS:  I really don't remember because they

20    were not extensive conversations so I don't remember how long

21    they were because they were very short.

22    BY MR. OHTA:

23    Q.  Do you remember the number of phone calls?

24    A.  I would be guessing, but it is in the two to three, very

25    short type phone calls.

 1   Q.  I appreciate that.  Thank you.

 2           Before today, have you ever seen my client before,

 3   Mr. Wada?

 4   A.  I don't remember a specific instance where I would have

 5   seen him, to memory.  I am sure he might have been in a room I

 6   was in, but I don't remember any specific instance, no.

 7   Q.  Did you ever work with Mr. Wada while at the PCAOB?

 8   A.  Not in my memory, no.

 9   Q.  I want to now get into the PCAOB inspection process that

10   you were discussing in your testimony.  Ms. O'Connor, I would

11   like to please put up M-245 which has already been admitted

12   into evidence, please.  Thank you.

13           Ms. Rodriguez, you recognize this manual, correct?

14   A.  I do.

15   Q.  And can we turn to the table of contents, please?

16           And please correct me if I am wrong with my

17   generalization of this document, but when you look at the first

18   page, these Chapters 1, 2, and 3, and if you can turn to the

19   next page -- chapter 4, Preparing for Issuer Inspection,

20   Chapter 5, Performing the Issuer Inspection, Chapter 6

21   Post-inspection Procedures; that this is the handbook for an

22   inspector on -- gives them a rule book on what they should be

23   doing or if they have any questions, this seems to be the

24   manual in which they should consult?

25   A.  This is our inspections manual which would have some of the

1  policies or procedures we follow as part of our inspections,

2  yes.

3  Q.  And you have been testifying to all of these policies and

4  procedures this morning, early this afternoon, correct?

5  A.  Yes.  We have discussed certain ones, yes.

6  Q.  If there was a conflict between what you recall in your

7  testimony and what's listed in this manual, would you agree

8  that the manual would control, as in, if there was a conflict,

9  the manual is the authority?

10 A.  I would believe, yes.

11 Q.  I want to talk about the number of people on an inspections

12 team, so not the whole KPMG team but the whole team that goes

13 out and inspects an issuer.

14 A.  Okay.

15 Q.  Generally, how many people are on an inspection team?

16 A.  The most common number on the team is probably around five.

17 Q.  Which would include inspection specialists?

18 A.  Yes.

19 Q.  An inspections leader?

20 A.  Yes.  Yes.

21 Q.  And an associate director?

22 A.  Yes.

23        So, let me clarify a little bit.  So at that time, if

24 we were talking '15-'16, it would be five to six depending how

25 many focus areas you were looking at.  Often times there would

1    be a location leader, an inspection leader and then inspection

2    specialists reviewing the areas, yes.

3    Q.  And then the location leader, pursuant to the, I believe

4    the manual we just had up for U.S. firms, has to be an

5    associate director or above, correct?

6    A.  No.  We can also, inspection leaders also serve as location

7    leaders.

8    Q.  Is that for U.S. firms or global or non-U.S. firms?

9    A.  U.S. firms also.

10   Q.  And that's for 2015 and 2016?

11   A.  Yes.  To my memory, yes.

12   Q.  You talked about focus areas.  Do the inspection

13   specialists generally look into the focus areas on an

14   inspection?

15   A.  Yes.  They generally are the ones performing the inspection

16   of a focus area, yes.

17   Q.  And if there was an associate director on the team then the

18   inspection leader would assist that associate director,

19   correct?

20   A.  Sometimes they assisted, sometimes they had their own focus

21   area depending on the actual areas we were looking at and

22   complexity, what have you.

23   Q.  So, for the time that there was an associate director on a

24   team, generally speaking they would have, or to put it another

25   way, they're the boss, right?

J2E5mid6                         Rodriguez - cross

A.   They do run the inspection, yes.

Q.   Ms. O'Connor, can you please pull up M-245, page 9, please?
And can you highlight where it says Deposition of Inspection
Teams; that paragraph, please?

          Just for my clarity the second sentence, would you
please read the second sentence for me, Ms. Rodriguez?

A.   Yes.

          *The inspection of a U.S. firm is under the direction
of a firm inspection team leader who may be at the level of
deputy director, regional associate director, or associate
director.*

Q.   So you previously testified that there could be an
inspections leader but I just want to make sure I am reading
this correctly.  When I was reviewing this memo or this manual,
it seems like only an associate director can be the leader of
inspection of a United States firm.

A.   So, when we were talking about five to six people, we are
talking about the inspection of an issuer.  So, that's
something that's actually happening out in the field when we go
to a firm office and do an issuer inspection, that can be an
associate director or an inspection leader, typically.

          What this manual is referring to is the inspection of
the U.S. firm, so the inspection of KPMG U.S.  That is
restricted to deputy director regional associate director, or
associate director.

 1   Q.  Thank you.

 2           Would you please turn to page 26, Ms. O'Connor?  Thank

 3   you.

 4           You previously testified about the notification of

 5   selections to the firm and I just want to talk a little bit

 6   about this portion of an inspection.

 7   A.  Sure.

 8   Q.  Thank you.

 9           I am trying to save you time.  The first sentence is

10   really long so the third line down where it starts:  *It is*

11   *preferred...* after the comma.

12   A.  Yes.

13   Q.  Can you read that portion of the sentence?

14   A.  Sure.

15           *It is preferred that the U.S. firm team leader provide*

16   *the firm with early notification of the offices that the field*

17   *inspection teams will be visiting and expected dates of those*

18   *inspections.*

19   Q.  Just looking at the language, "it is preferred," that means

20   it is not mandatory, correct?

21   A.  Correct.

22   Q.  It's the supervisors, deputy director, assistant, whoever

23   the leader is, it is their decision whether or not to give this

24   early notification to a firm?

25   A.  I would interpret that to say that the program as a whole

1    prefers to you give this notice to the firm of where we are

2    going to be and what days we are going to be there.

3    Q.  And at this point -- I called it early notification but at

4    this point it says early notification in the section but you

5    are just telling the firm about the geographic location of the

6    inspection, correct?

7    A.  That's correct, yes.

8    Q.  Would you please highlight the next sentence, please,

9    Ms. O'Connor?

10        I will read this:  *However, through this early*

11   *notification process, the firm must not be informed of the*

12   *specific engagements selected for inspection.*

13        Again, can't tell the firm about the issuer, correct?

14   A.  That's correct, yes.

15        MR. OHTA:  Your Honor, may I have moment with the

16   prosecution?

17        THE COURT:  Yes.

18        (Counsel conferring)

19   BY MR. OHTA:

20   Q.  Ms. O'Connor, just for counsel and the judge, would you

21   please put up Defendant's Exhibit 1523?

22        Do you see the exhibit, Ms. Rodriguez?

23   A.  Yes, I do.

24   Q.  Can you please scroll down to the bottom portion of the

25   e-mail?  Thank you.

1          Ms. Rodriguez, is that your name in the "from line" in

2   this e-mail?

3   A.  Yes, it is.

4   Q.  Dated April 27, 2016?

5   A.  Yes.

6   Q.  Is that your correct e-mail address in the from line?

7   A.  Yes, it is.

8   Q.  Were you the associate director, registration and

9   inspections of the PCAOB at this time?

10  A.  Yes, I was.

11  Q.  And the e-mail is sent to Thomas Whittle and it is copying

12  Steve Schindler, correct?

13  A.  Yes.  That's correct.

14  Q.  And the subject is schedule?

15  A.  Yes.

16  Q.  Did you send this e-mail in the regular course of your job

17  responsibilities at the PCAOB?

18  A.  Yes, I did.

19  Q.  Do you have any reason to doubt the accuracy of the

20  statement contained in this e-mail?

21  A.  No, I do not.

22          MR. OHTA:  Your Honor, we move Defendant's Exhibit

23  1523 into evidence.

24          MS. MERMELSTEIN:  No objection.

25          THE COURT:  1523 is received.

J2E5mid6                          Rodriguez - cross

 1              (Defendant's Exhibit 1523 received in evidence)

 2   BY MR. OHTA:

 3   Q.  Can you go to the second page, please?  Third page?

 4              Ms. Rodriguez, this spreadsheet was attached to the

 5   e-mail.  Can you explain why you sent this e-mail to

 6   Mr. Whittle?

 7   A.  Yes.

 8              This is the schedule we talked about, we talked about

 9   a couple times where we would give the firm notice of what

10   weeks we would be performing field inspections and then the

11   actual location we would be from the business unit or the

12   office and region to help them for planning purposes on

13   allocating their resources.

14   Q.  And this is what we just discussed, this is the

15   notification to the firm of the locations of the inspections,

16   correct?

17   A.  That's correct, yes.

18   Q.  No issuers?

19   A.  No issuers.

20   Q.  At this time, if you or someone notified KPMG of the

21   specific issuer, would you have an issue with that?

22   A.  I'm not sure I understood the question.

23   Q.  So, on April 27, 2016, you sent this list to KPMG and you

24   told KPMG the locations of these various inspections, right?

25   A.  Right.

J2E5mid6                         Rodriguez - cross

1    Q.  And you have also received that, generally speaking, when

2    you give KPMG official notice of the exact issuer, that's

3    approximately two to four weeks before you go out to visit?

4    A.  Yes.  That should be.  Yes.

5    Q.  So, if I look at these dates where it says the week, these

6    are the weeks that you have identified that KPMG U.S.

7    inspection team would go out and conduct these inspections?

8    A.  Yes.

9    Q.  So, if you were to go backwards and maybe I will pick a

10   date, if you are looking at 8/15, you would count back two to

11   four weeks which would be the appropriate time for your team to

12   send out the official notification that a specific issuer was

13   going to be inspected, correct?

14   A.  Yes.

15   Q.  Is there any circumstances where your team could give five

16   weeks' notice and it would be okay pursuant to PCAOB policy?

17   A.  I don't know that that would be an issue if there was a

18   reason.  I don't know why we would do that so I don't have a

19   memory of that having occurred.

20   Q.  I appreciate you don't have a memory of when it occurred

21   but right now would you have a -- would that be an issue, like

22   a violation of confidentiality or anything like that?

23   A.  Right.

24           Well, what can happen is we may notify of an

25   inspection and that timing doesn't work and then we have to

push it back further in the year, continue to do the

inspection.  So, if you looked at that initial notification to

when it maybe occurred, there could be a difference there

because of a scheduling issue working through something with

the firm.

Q.  Sure, and that, you don't have a problem with that from

when I say you, from a PCAOB perspective?

A.  No.  In that instance that wouldn't be an issue.

Q.  So, in those cases you notify the company of the issuer two

to four months in advance and then for some reason it needs to

get pushed back?

A.  Two to four weeks.

Q.  Sorry, two to four weeks?

A.  Yes, that can occur.

Q.  And then it can get pushed back a week, two weeks, three

weeks?

A.  It can happen.  It is not common at all that that happens,

but it can occur.

Q.  That is not something where, from your position at the

PCAOB, you would say that because the audit has been pushed

back or because the inspection has been pushed back you

wouldn't say the audit is bad or I'm not getting a correct

representation of the work papers because instead of it being a

two to four-week notice period, it has now been extended to

maybe six, seven, eight weeks, correct?

J2E5mid6                          Rodriguez - cross

A.   In a vacuum I don't think that that, in and of itself,

causes a problem.

Q.   So now I am still looking at the attachment and I want to

focus your attention on the July 11th date for the office in

Irvine, California.

A.   Okay.

Q.   So, we have July 11th we are coming out to Irvine,

California, and we need an additional week of time and we are

going to come out on July 25th, 2016; is that correct?

A.   Yes.

Q.   And the office that you are giving KPMG notice of is

Irvine, California; correct?

A.   Yes.

Q.   Were you aware, at this specific moment in time in July of

2016, that KPMG only had one financial services client located

in Irvine, California?

A.   I do not remember, no.

Q.   So, I see it again, the X says financial services company

so that's where I came to my conclusion, this is a financial

services company in Irvine, California.

          Would you agree with my interpretation?

A.   That is what the schedule says, yes.

Q.   So, since KPMG has only one client in Irvine, California

aren't you --

          MS. MERMELSTEIN:  Objection.  The witness just said

J2E5mid6                          Rodriguez – cross

1    she did not know that.

2              THE COURT:  Sustained.

3    BY MR. OHTA:

4    Q.  Then I will talk in hypotheticals.

5              Assuming that KPMG had one client that was a financial

6    services client in Irvine, California, would you consider this

7    notification to be a violation of PCAOB policy because the

8    notice is given about two and a half months in advance?

9    A.  I don't know when the notice was given.

10   Q.  The notice is given because there is only one client.

11   Again, my hypothetical, assuming there is one client, that on

12   4/26, 2016, or -- sorry.

13             On April 27, 2016, when this e-mail was sent to

14   Mr. Whittle at KPMG, that the PCAOB is giving notice to KPMG

15   two and a half months in advance that you guys will be

16   inspecting their one client in Irvine, California.

17   A.  We don't include any issuer names on this schedule and I'm

18   not -- I don't know how many issuers would be in that office so

19   it is hard to conclude that this would be a violation of

20   policy.

21   Q.  That's fair, but for purposes of just this discussion I am

22   asking you to assume that's the case.  I'm not saying you know

23   that.

24   A.  Right.

25   Q.  You have already said you don't know that.  But, just

1   assuming that there is one issuer and that I would be able to

2   show that later but just there is one issuer in Irvine,

3   California, would you consider this notice to be a violation of

4   PCAOB policy because you are essentially giving notice two and

5   a half months out?

6   A.  We don't include issuer names and it depends what we are

7   talking about with financial services versus bank and insurance

8   companies.

9           So, it is very hard to -- it is not a violation

10  because we don't have the issuer names, but financial services

11  is broad so it's hard to determine -- it is a hard question in

12  the hypothetical, if that makes sense.  We don't have any

13  issuer names on here so it is not a violation of the policy.

14  What it tells them is hard in the hypothetical because I don't

15  know what that makeup is in that office.

16  Q.  I'm just asking you to assume it's one client.  It can only

17  be one client.  I'm trying not to say the name because -- one

18  client.

19          MS. MERMELSTEIN:  Asked and answered, your Honor.

20          THE COURT:  Sustained.

21  BY MR. OHTA:

22  Q.  But it would be fair to say that, because we have gone over

23  this, two and a half months, that would be improper notice if

24  you are giving KPMG two and a half months' notice of a specific

25  issuer that you were going to inspect?

J2E5mid6                         Rodriguez - cross

```
1          MS. MERMELSTEIN:  Asked and answered, your Honor.
2          THE COURT:  Overruled.
3          THE WITNESS:  May I answer?
4          THE COURT:  You can answer, yes.
5          THE WITNESS:  Oh.
6          I don't know that the manual tells you exactly what
7    those weeks are.  I would have to look at the manual if it
8    tells you you cannot notify more than a certain amount of time.
9          So, to conclude it is a violation of policy I would
10   have to know each component of the policies, it doesn't have
11   issuer names.  So, from just this review it doesn't appear to
12   be but I don't know -- I would have to look at the other pieces
13   of the policy and see if in fact --
14   Q.  And I am really not trying to trick you.
15   A.  No, I understand.
16   Q.  You previously testified that if you are going to give the
17   names of an issuer because you need to protect the integrity of
18   an audit and you want to get a proper snapshot of what things
19   look like, you have testified that the notice you give is
20   between two to four weeks?
21   A.  That's our custom, yes.  That is customary with what we do,
22   yes.
23   Q.  Two to four weeks?
24   A.  Yes.
25   Q.  If someone at the PCAOB were to give KPMG notice of an
```

1   inspection of a particular issuer two and a half months out,

2   that would be a problem?

3        MS. MERMELSTEIN:  Objection to form and asked and

4   answered.

5        THE COURT:  You can answer if you understand the

6   question.

7        THE WITNESS:  I don't know that it is a violation of

8   policy because I don't see where it is written that this is

9   prohibited from telling them that but I also don't conclude

10  that this is telling them the issuer.  So, that's what's very

11  hard.  It is a hypothetical that I'm not sure exists.

12  BY MR. OHTA:

13  Q.  You also discussed communications with teams regarding

14  planning or maybe -- let me rephrase.  When you are working on

15  KPMG U.S. matters and doing the planning to inspect issuers I

16  think you testified that there would be no reason for someone

17  on an inspection team to look at what another inspection team

18  is doing for another big Four firm, correct?

19  A.  Yes.  Yeah.

20  Q.  Is that your preference or is that actual PCAOB policy?

21  A.  So, it's confidential what is happening within the

22  engagement, within our inspection teams and how we discuss

23  that, that's what's reinforced within practice within the

24  organization.  All of what we are doing is part of planning is

25  confidential and we reinforce within our teams, that our team

J2E5mid6                          Rodriguez - cross

1   discussions are confidential.

2   Q.  And when you say confidential in how you are using it,

3   confidential from even within people within the PCAOB?

4   A.  Yes.  We don't discuss selections within one team with

5   another, yes.

6   Q.  All being PCAOB employees, correct?

7   A.  Uh-huh.

8   Q.  So you are not just talking about public versus non-public?

9   A.  Correct.  Yes.

10  Q.  Ms. O'Connor, can we please pull up M-245 again, page 24?

11  The third paragraph, please, that one sentence?  Can you

12  highlight that for me?

13         Ms. Rodriguez, can you please read that sentence for

14  the jury?

15  A.  Yes.

16         *The inspection team should coordinate the selection of*

17  *broker-dealers that are issuers with the broker-dealer*

18  *inspections program.*

19  Q.  I believe you testified yesterday that there are three

20  programs within the PCAOB; is that correct?

21  A.  That's correct, yes.

22  Q.  The GNF program is a Global Network Firm program?

23  A.  Yes.

24  Q.  And then the broker-dealer program?

25  A.  Yes.

J2E5mid6                          Rodriguez - cross

1   Q.   And then something that started with an N.  I don't know

2   the other one.

3   A.   NAF, the Non-Affiliate Firm program.

4   Q.   Thank you.

5        So, what you just read to the jury, the inspection

6   team should coordinate -- and this is the GNF manual -- the GNF

7   inspection team should coordinate the selection of brokers and

8   dealers that are issuers with the broker-dealer inspections

9   program.

10        That seems to me that this manual is actually

11   encouraging coordination between two separate inspections teams

12   from different programs; is that accurate?

13   A.   So, what this is saying is that the program is also

14   organized like we are, according to team, so we will coordinate

15   with the KPMG broker-dealer team and the KPMG U.S. team for

16   scheduling purposes because we often work together.  So, it is

17   not with another firm's broker-dealer program, it is all within

18   the KPMG umbrella.  We talk with our KPMG teams.

19   Q.   But different programs, though, correct?

20   A.   Yes, we do.  We will coordinate being in the field or we

21   coordinate some work that we will share together, yes, with the

22   KPMG broker-dealer team.

23   Q.   Sticking with the notification I want to talk a little bit

24   about the 45 day rule.

25   A.   Yes.

1    Q.  You can take it off, Ms. O'Connor.  Thank you so much.

2            General policy of the PCAOB is you are going to give

3    notice to KPMG after the 45-day documentation period, correct?

4    A.  Yes.  That's correct.

5    Q.  That is because you want to keep that snapshot of the

6    workpapers that are closed after the 45 days, right?

7    A.  Correct.

8    Q.  But then you testified that in some instances there can be

9    a scheduling mistake where the PCAOB gives notification a

10   couple days or within the 45-day period; is that accurate?

11   A.  It has occurred that it happened a couple of days off.  It

12   doesn't happen every year, it just has occurred.  I have seen

13   it happen.  It is a very rare situation but it has happened,

14   yes.

15   Q.  And as I said --

16   A.  Yes, it has.

17   Q.  And then I think you testified that when those occasions

18   happened you would notify the firm, KPMG, or another Big Four

19   firm, that we made this mistake.  Please document any changes

20   that you have, if you make any changes, to the audit file,

21   correct?

22   A.  Correct.

23           So, the 45-day is a maximum so they could archive

24   before that.  And so, we will check when the file is archived

25   and there may be no issue because the file is archived there

J2E5mid6                         Rodriguez - cross

1    could have been no changes.  So, we do that in the event that

2    the file has not been archived.  Because it is still at the 45

3    days, we will ask them to give us changes, if that is the set

4    of circumstances we are dealing with.

5    Q.  I didn't want to interrupt you.

6            Objection, your Honor.  Non-responsive, move to strike

7    after the answer "correct."

8            THE COURT:  I think she was just clarifying her

9    answer.

10           So, go on.

11   BY MR. OHTA:

12   Q.  That notice that you are giving that, "don't change the

13   work papers," that is already an auditing standard, correct,

14   that we have been discussing today?

15   A.  The team is allowed to do documentation in that 45 days, so

16   if we are talking about in the 45 days the team can modify

17   documentation.  So we want to understand the nature of those

18   modifications, if there are any.

19   Q.  Of course, and pursuant to AS 3, firms are allowed to do

20   that?

21   A.  Yes, that's correct.

22   Q.  And as long as they document it, everything is fine?

23   A.  As long as it is not -- the documentation is not

24   documentation of any new work, then that is appropriate, yes.

25   Q.  Agreed.  All I was asking was if they were supplying with

J2E5mid6                          Rodriguez - cross

1   Auditing Standard 3, then it's okay?

2   A.  Yes.

3   Q.  I want to get into the IIS access.  You testified a little

4   bit about IIS?

5   A.  Uh-huh.

6   Q.  Can you remind the jury, what does IIS stands for again?

7   A.  I don't know what it stands for but IIS is our -- it is

8   inspection software so that's where we document all of our

9   inspection procedures from planning, to performance of the

10  inspection, to report writing.  It is all contained in that

11  software.

12  Q.  Do you receive training as an inspector on how to use IIS?

13  A.  I don't remember because that would have been many years

14  ago for me.  So, I don't remember.

15  Q.  Did you just come and could automatically use it, it is

16  that easy of a software to use?

17  A.  No.  I'm sure there was training, I just don't remember it

18  because it was quite a few years ago.

19  Q.  I understand.  Well, I'm going to see if you recognize this

20  document.

21  A.  Okay.

22  Q.  Ms. O'Connor, can you please put up Defendant's Exhibit

23  1439?  The title, it says PCAOB Inspections Information System

24  IIS step-by-step guide.  Do you see that?

25  A.  Uh-huh.

J2E5mid6                          Rodriguez - cross

1    Q.  Updated January 11, 2012?

2    A.  I see it.

3    Q.  Do you recognize this document?

4    A.  I don't recognize it.

5    Q.  I'm going to find someone who recognizes it.

6              MS. MERMELSTEIN:  Objection, your Honor.

7              MR. OHTA:  Withdrawn, your Honor.

8              THE COURT:  Okay.

9    BY MR. OHTA:

10   Q.  Let's talk about access.  So, let's talk about KPMG U.S.

11   A.  Okay.

12   Q.  I think you testified that a member that's on a KPMG U.S.

13   inspection team cannot access IIS to look at another team's

14   workspace in IIS.  For example, an inspector for KPMG U.S.

15   can't look at documents from PwC, correct?

16   A.  They should not do that, correct.

17   Q.  Ms. O'Connor, would you please put up Defendant's Exhibit

18   1439, please?  I'm sorry, wrong document.  My apologies.  Would

19   you please pull up Defendant's Exhibit 1478, please?

20             Ms. Rodriguez, do you recognize this document?

21   A.  I don't.  I don't remember looking at this or recognize it.

22   It looks like a PCAOB document.  I do not remember it or

23   recognize it off the top of my head.

24   Q.  Are you familiar -- I'm not speaking about the document,

25   but are you aware that there is policies by the PCAOB regarding

J2E5mid6                          Rodriguez - cross

1    the acceptable use of information technology computers,

2    laptops?

3    A.  Yes.

4    Q.  And you have certain requirements, I'm assuming, correct,

5    of what you can and can't do with those electronic equipment?

6    A.  I know they exist.  I don't know them off the top of my

7    head, no.

8    Q.  If a KPMG U.S. inspector requested access to another firm's

9    workspace in IIS, would that be a violation of PCAOB rules?  If

10   you know.

11   A.  It depends on the reason for the request for the access.

12   Q.  I want to talk just a little bit, because we have been

13   talking about it for, or previously about the costs of planning

14   for these inspections.

15   A.  Okay.

16   Q.  When you were talking about, in 2015, the cost of the

17   inspections, were you talking about the cost that you were

18   calculating in 2015 or was it the re-reviews that were

19   happening?  I didn't understand the timing of what was being

20   discussed.

21   A.  I don't know if I understand the question.

22   Q.  You mentioned, I think Ms. Mermelstein said man hours and

23   the Judge said staff hours.  That is the discussion I am

24   focusing in on.

25   A.  Right.

1   Q.  So, in what you were calculating, were you calculating the

2   staff hours it took to conduct the re-reviews in 2016 and 2017?

3   A.  I believe that what we were discussing was what planning

4   took for, if it was 2015 -- we have discussed a couple numbers

5   so I don't know which one you are referring to, I think it was

6   planning for 2015 but I don't know specifically which one we

7   were talking about at that point.

8   Q.  Then I will focus on 2016 because I think --

9   A.  Okay.

10  Q.  There was a calculation on the re-review for the planning,

11  the amount of hours it took to redo the 2016 --

12  A.  Yes.

13  Q.  -- banking inspections, correct?

14  A.  Yes.  Well, the replan is to replan the 2017 inspections.

15  That's the additional time.

16  Q.  Sure.  Okay.

17          That calculation, was that calculation done around

18  2017 or was it done more recently, like say a couple months

19  ago?

20  A.  I believe it was done more recently.  I don't know exactly

21  when but it wasn't done in 2017.

22  Q.  Were you actually told to run those calculations?

23  A.  I wasn't involved in those discussions so I don't know how

24  they originated, where the original discussion of that

25  calculation came from.

J2E5mid6                          Rodriguez - cross

1    Q.  But at some point in recent memory you were asked to review

2    those figures, correct?

3    A.  Yes, I was.

4    Q.  And that's what you testified to?

5    A.  Yes.

6    Q.  Do you know who conducted that review?

7    A.  Who prepared them?

8    Q.  Yes.

9    A.  I don't know who actually did those initial calculations,

10   who was actually doing them in those years.

11   Q.  Who presented that information for you to read?

12   A.  Who gave that to me, who provided me with those hours?

13   Q.  Yes.

14   A.  General counsel.

15   Q.  For the PCAOB?

16   A.  It was PCAOB, yes.

17   Q.  Were you explained where those figures came from?

18           MS. MERMELSTEIN:  Objection to calls for privilege,

19   your Honor.

20           MR. OHTA:  Your Honor, she testified to the number.

21           MS. MERMELSTEIN:  I believe she testified as to her

22   own personal knowledge from the documents but not what she was

23   told by a lawyer.

24           THE COURT:  I think you can answer the question

25   insofar as you know what went into the calculation.  That's it.

1          THE WITNESS:  Okay.

2          On my review of those calculations I have an

3   understanding of those hours and where they originated and how

4   they, what the actual time incurred was related to.

5          Does that make any sense?  I understand the basis for

6   those hours, how we generated them, and what that work actually

7   meant.

8   BY MR. OHTA:

9   Q.  So no one told you what those hours were, you just made

10  your own calculation at that moment looking at the spreadsheet?

11  A.  I saw a spreadsheet listing the hours out.  I was involved

12  in that work so I know what was happening, who was on the team.

13         I had an understanding of the project because I worked

14  on the project.

15  Q.  But, again, the calculation, just to be clear, it happened

16  a few weeks ago, correct?

17  A.  No.  It was not a few weeks ago.

18  Q.  Can you give me a sense of timing?

19  A.  I don't know when it originated but it wasn't a few weeks

20  ago.  It was a while ago.

21  Q.  How about a few months ago?  I am trying to get timing.

22  The timing is important.  I don't want to bore people but the

23  timing is very important.  That's why.

24  A.  I don't know when this was actually -- I don't know when

25  this started because I wasn't involved in creating the initial

document but it happened last year.  It was not a couple weeks

ago.

        I don't know if that makes sense.

Q.  And then you reviewed the document recently and now you are

testifying from your memory on just those figures?

A.  Yes.

Q.  Ms. O'Connor, can you please put up Government Exhibit 92?

        Ms. Rodriguez, I believe you testified that prior to

seeing this document on the witness stand you have never seen

it before; is that accurate?

A.  No.  I haven't seen it prior to preparing for the trial.

It wasn't just on the witness stand.  Today was not the first

time.  I think they had asked if I had seen it prior to

preparation for the trial.

Q.  So when was the first time you had seen this document?

A.  It was in discussions with the prosecution.  It was in

preparation for my testimony today.

Q.  In one of these prep sessions that we went over in the

beginning?

A.  Yes.

Q.  That was the first time?

A.  That was the first time I had seen that, yes.

Q.  Did you have an opportunity to speak with Mr. Chris Ren who

was the person who grabbed this screenshot that you are

reviewing on your screen right now?

J2E5mid6                          Rodriguez – cross

1   A.  No, I did not.

2   Q.  Counsel showed you some documents --

3            THE COURT:  Excuse me.  We are going to have to take a

4   quick break.  One of the jurors has to go to the bathroom so I

5   will release the jurors for five minutes and then we will

6   continue.  Okay?  Please leave your pads on your chairs.

7            MR. OHTA:  Thank you, your Honor.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2E5mid6                          Rodriguez - cross

1            (Jury not present)

2            THE COURT:  You can be seated.

3            MS. MERMELSTEIN:  Your Honor, we have conferred with

4    defense counsel and understand that they have no more than 20

5    minutes and that the government will have just a very few brief

6    minutes for redirect so that we can get Ms. Rodriguez home.  We

7    will wrap up the redirect as quickly as possible but if goes to

8    5:03 we won't propose ending given the schedule, if that's all

9    right, if we go just a very few minutes over the trial day.  I

10   understand that's okay.

11           THE COURT:  Sure.  That's fine.

12           And then, just to confirm while we are on the topic of

13   schedule, I will tell the jury that we are not sitting tomorrow

14   and we are not sitting Monday so we will see them Tuesday

15   morning.

16           (Recess)

17           (Continued next page)

18

19

20

21

22

23

24

25

J2edmid7                          Rodriguez - cross

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Ohta, you may proceed.

4          MR. OHTA:  Thank you, your Honor.

5   BY MR. OHTA:

6   Q.  Looking at Government 92, Ms. Rodriguez.

7   A.  Yes.

8   Q.  I want to call your attention to the first document you

9   testified to.  It is the copy of EY 2017 issuer screening

10  template.  Do you see that?

11  A.  I do.

12  Q.  I believe you testified that you reviewed this document, is

13  that correct?

14  A.  Yes.

15  Q.  Now, when you say you reviewed this document, was the

16  document the document from this spreadsheet or some other

17  document located in another place?

18          MS. MERMELSTEIN:  Objection to form.  I don't know

19  what that question means.

20          THE COURT:  Could you try to clarify, please?

21          MR. OHTA:  Of course, your Honor.

22  BY MR. OHTA:

23  Q.  Where did you review this particular document that is up on

24  your screen, the copy of the EY 2017 issuer screen template

25  XLSX?

J2edmid7                          Rodriguez - cross

1    A.  I reviewed that in preparation for my testimony today with

2    the prosecutors.  I was shown that document.

3    Q.  You were shown this document by the prosecutors?

4    A.  That is my understanding.

5              (Counsel conferred)

6    Q.  When you were shown this document, was PCAOB counsel in the

7    room during this preparation session?

8    A.  No.

9              (Pause)

10             Can I clarify that?  Did you mean internal counsel or

11   external counsel?

12   Q.  PCAOB counsel.  It could be internal or external.

13   A.  My attorneys were present, who also represent the PCAOB,

14   so, yes.

15   Q.  Is that Mr. Nitz?

16   A.  Yes.

17   Q.  Would your review of this particular document, was it at

18   PCAOB headquarters or was it in the United States Attorney's

19   office?

20   A.  It would have been in the United States Attorney's office.

21   Q.  And was it represented to you -- or how was it represented

22   to you that you were reviewing the particular document

23   identified in this exhibit?

24   A.  I believe they just said let us show you this document.

25   They just showed me that document.  There wasn't a lot of intro

J2edmid7                              Rodriguez - cross

1    to it.  It was just we're going to show you this document.

2    Q.  And do you happen to recall, when you opened up the -- or

3    when you were reviewing this spreadsheet, what it said on the

4    top?

5    A.  No, I don't remember that.

6    Q.  So even if it said copy of Jason Ohta party for his two

7    kids XLSX?

8    A.  I don't believe it said that because I would have noticed

9    that.  There was nothing in there that led me to believe this

10   was not in fact the documents that I was looking at.

11   Q.  Do you remember if it said "copy of" by any chance?

12   A.  I don't.  I don't remember.

13   Q.  I think you also testified that you looked at the 2017 U.S.

14   inspection Top 30, is that accurate?

15   A.  Yes.

16   Q.  Again, you don't remember if that spreadsheet had "copy of"

17   on top of the -- in the title?

18   A.  Yes.  On the name of the document, I don't remember that,

19   no.

20   Q.  Did your attorneys at least tell you that the documents

21   they were purporting to show you matched up with Government's

22   Exhibit 92?

23   A.  Yes.  They said let us show you this document or we'll look

24   at this document, yes.

25   Q.  And I want to be clear.  Mr. Ren was not present for these

J2edmid7                         Rodriguez - cross

1    meetings with the prosecutors and PCAOB counsel, correct?

2    A.  No.  I have not met Mr. Ren.

3            MR. OHTA:  Ms. O'Connor, could you please put up

4    Government's Exhibit 184, which I will renumber Defense Exhibit

5    1535.

6    Q.  Ms. Rodriguez, would you please review the document and

7    tell me if you recognize it.

8            (Pause)

9    A.  This appears to be the minutes from that monthly meeting.

10   Q.  And do you see your name on the first page where it says

11   "PCAOB personnel"?

12   A.  Yes.

13           MR. OHTA:  Your Honor, we move Defense Exhibit 1535

14   into evidence.

15           THE COURT:  1535?

16           MR. OHTA:  Yes, Defense Exhibit 1535.

17           THE COURT:  1535 is received.

18           (Defendant's Exhibit 1535 received in evidence)

19   BY MR. OHTA:

20   Q.  Will you please look at the date of the meeting.  It says

21   January 24, 2017, correct?

22   A.  Yes.

23   Q.  And I would like to go down under "Inspection update."  It

24   looks like there are some script with people --

25   A.  Mm-hmm.

J2edmid7                          Rodriguez - cross

1   Q.  -- or text.

2          Can you highlight the Steve Schindler part, the first

3   paragraph.

4          Do you remember this meeting?

5   A.  I don't remember the meeting.

6   Q.  I will read the Steve Schindler part.

7          Who is Steve Schindler again?

8   A.  Steve Schindler is the U.S. firm team lead at that time.

9   Q.  It says:  "Good morning.  We have a short agenda today.

10  The first item on the agenda that I want to make you aware is

11  that we have formed a new group we call the Banking Inspections

12  Group, known as BIG."

13         Does that refresh your memory about what was discussed

14  at that meeting?

15  A.  I just don't remember the meeting.  I have no reason to

16  believe it didn't occur, but I don't remember the specific

17  meeting.

18  Q.  Do you recall if this was the first time that the PCAOB

19  notified KPMG of this new Banking Inspections Group?

20  A.  I don't know if this was the first time.

21         MR. OHTA:  Ms. O'Connor, can you please go to the next

22  page and highlight the top two, on Mr. Whittle and

23  Mr. Schindler.

24  Q.  Do you know who Mr. Whittle is?

25  A.  I do.

J2edmid7                          Rodriguez - cross

1   Q.  At this time, what was his position at KPMG?

2   A.  I don't know -- I don't remember the exact title, but he

3   was the head of inspections for KPMG.

4   Q.  And he says:  "Is part of what you want to gain is having

5   the same individuals do inspections across all the firms so

6   they could have a better perspective and are leveraging their

7   skill set?"

8           And Mr. Schindler says, "Yes, that's correct."

9   A.  Yes.

10  Q.  Is that your understanding of what the Banking Inspections

11  Group, why it was formed?

12  A.  Yes.

13  Q.  I know my time is ending so I just have two more things to

14  cover.  This will be very short.

15          I would like to talk about the PCAOB employees who

16  have left work, or have left the PCAOB for KPMG.

17  A.  OK.

18  Q.  And I am going to give you some names.  I just want to know

19  if you are aware that they left the PCAOB for KPMG.

20  A.  OK.

21  Q.  Adrian Agular?

22  A.  I don't know who that is.

23  Q.  Anand Tailor; T-a-i-l-o-r, A-n-a-n-d?

24  A.  I don't remember that individual.

25  Q.  Brian Sweet?

J2edmid7                          Rodriguez - cross

1   A.  Yes.

2   Q.  Christopher Semesky, S-e-m-e-s-k-y?

3   A.  I don't remember that individual.

4   Q.  Cynthia Holder?

5   A.  Yes.

6   Q.  Hector Santana?

7   A.  Yes.

8   Q.  Louann Sakallah?

9   A.  Yes.

10  Q.  Michael Tucker?

11  A.  I don't know that I knew Michael Tucker.  I remember that.

12  Q.  Robert Larson?

13  A.  I know that I knew Rob Larson was at KPMG.

14  Q.  Brian Adams?

15  A.  I don't know that I knew that Brian Adams was at KPMG.

16  Q.  Ryan Evans?

17  A.  I don't know that I knew he was at KPMG, no.

18  Q.  Scott Furman?

19  A.  Yes.

20  Q.  Sheldon Kelly?

21  A.  Yes.

22  Q.  Joe Lynch?

23  A.  Yes.

24  Q.  Scott Henderson?

25  A.  Yes.

J2edmid7                          Rodriguez - redirect

1    Q.  Evan Benson?

2    A.  I don't have a memory of Evan Benson.

3    Q.  Thank you.  And, finally, just going back to the 45-day

4    notification, when, again, when that mistake or the

5    misscheduling happened, where you notified KPMG within the

6    45-day period --

7    A.  Yes.

8    Q.  -- did you, or anybody at the PCAOB, notify the SEC of that

9    delayed notification mistake?

10   A.  I don't know.

11              MR. OHTA:  No further questions, your Honor.

12              THE COURT:  OK.  Thank you.

13              Any redirect?

14              MS. MERMELSTEIN:  Very briefly, your Honor.

15              THE COURT:  Yes.

16   REDIRECT EXAMINATION

17   BY MS. MERMELSTEIN:

18   Q.  I'll be fast.

19              With respect to the inspection notifications that

20   contained geographic information, were you authorized to send

21   those notifications?

22              In other words, you did that as part of your regular

23   job description --

24   A.  Yes.

25   Q.  -- on the KPMG team, right?

J2edmid7                           Rodriguez - redirect

1    A.  Yes.

2    Q.  And if those inadvertently suggested who might be

3    inspected, that was just a mistake, right?

4    A.  Yes.

5              MR. OHTA:  Objection.  Leading, your Honor.

6              MS. MERMELSTEIN:  It is redirect, your Honor, and I am

7    trying to be plow through it.

8              THE COURT:  I will allow it.  It is fine.

9    BY MS. MERMELSTEIN:

10   Q.  How long generally were particular inspections noticed for?

11   How much advance notice was for a particular inspection?

12   A.  Generally, commonly three to four weeks, sometimes two.

13   Q.  In cases where it went longer because, for example, it got

14   rescheduled, the PCAOB knew that that particular engagement

15   team had had more time to prepare for the inspection, right?

16   A.  Yes, we did.

17   Q.  With respect to the 2016 replacement inspections and the

18   issuance of the 2017 report, how were the 2016 replacement

19   inspections chosen?

20   A.  The 2016 replacement inspections were chosen based on who

21   we chose for 2017.  So we went through a planning process for

22   2017 and repicked our issuers, and then we did those same

23   issuers, banking issuers, for 2016.

24   Q.  So through the regular process for 2017 and then you also

25   moved to 2016?

J2edmid7                        Rodriguez - redirect

1    A.  Yes.

2    Q.  And is the -- withdrawn.

3          In general, are inspection reports issued to the

4    public when they are complete and ready to go?

5    A.  Yes.  To my knowledge, yes.

6    Q.  From your perspective, anything different about the release

7    of the 2016 and 2017 KPMG reports?

8    A.  Not that I'm aware of.

9    Q.  With respect to the disagreement rate issues, so the extent

10   to which KPMG would disagree with either a portion of a comment

11   or the whole comment, how frequently did that result in a

12   comment not issuing at all?

13   A.  To my memory, not often.

14   Q.  With respect to Brian Sweet's presence on inspections once

15   he was at KPMG, was that only after his year of recusal had

16   expired?

17   A.  Yes.  If you leave the PCAOB to go to a firm, there is a

18   one-year cooling off period whereby you cannot interact with

19   the PCAOB or those inspections for that year.

20   Q.  Ms. Lester asked you a number of questions about the

21   content of the GNF planning spreadsheet, and elicited I think

22   that some of the information in there is otherwise available,

23   for example, it draws from public information.  Does that in

24   any fashion render the PCAOB's analysis and selection process

25   any less confidential?

J2edmid7                        Rodriguez - redirect

1    A.  No.

2    Q.  And to the extent that the PCAOB disclosed a particular

3    concern it had -- so, for example, the PCAOB said to everyone

4    we're worried about this audit standard and we're going to be

5    thinking about it -- that notice was given to every firm,

6    right?

7    A.  Yes.

8    Q.  And it could be considered by every engagement team working

9    on any engagement at the firm, right?

10   A.  That's correct.

11   Q.  There wasn't just special notice to a few engagements that

12   were going to be inspected, right?

13   A.  That is correct.

14   Q.  With respect to the purpose of an inspection generally, is

15   the purpose of an inspection to inspect the whole firm or just

16   the particular audits that are part of the inspection process?

17   A.  We perform an inspection of the U.S. firm, KPMG U.S.  It is

18   of the whole firm.

19   Q.  So let's look at Government Exhibit 1, page 2, very

20   quickly.

21           So let me read to you the first sentence of the

22   paragraph beginning, "The inspection."

23           "The inspection procedures included" -- I'm sorry, I

24   am looking at the wrong page.  It is page 2 of the pdf.  There

25   we go.

1          "Inspections are designed and performed to provide a

2    basis for assessing the degree of compliance by a firm with

3    applicable requirements related to auditing issuers."

4          And so does this indicate that the inspection report

5    is an inspection of particular engagements or of the firm as a

6    whole?

7    A.   It's an inspection of the firm as a whole whereby there

8    were a few particular engagements, but the inspection is of the

9    firm as a whole.

10   Q.   "The inspection included reviews of portions of selected

11   issuer audits.  These reviews were intended to identify whether

12   deficiencies existed in the reviewed work, and whether such

13   deficiencies indicated defects or potential defects in the

14   firm's system of quality control over audits."

15         What does that mean with respect to the purpose of the

16   inspection?

17   A.   So we review the issuers that we select, and those issuers

18   provide us information as to whether there are larger quality

19   control concerns evident in the firm, as evidenced by what we

20   see in this issue inspection.  They give us indications of

21   problems that could exist on a larger scale in the firm.

22   Q.   Let me turn your attention very briefly to the internal

23   inspections that took place at KPMG and to their monitoring

24   programs.

25   A.   OK.

J2edmid7                          Rodriguez - redirect

1   Q.  Do you understand those to be two different things?

2   A.  Yes, they are.

3   Q.  With respect to the internal inspections, were you aware

4   that those were conducted for every partner once every three

5   years?

6   A.  Yes.

7   Q.  So not sort of a risk-based issue?

8           In other words, they didn't look at the riskiest

9   partners more, they looked at everybody on a schedule?

10  A.  I believe it is a minimum of every three years.  They could

11  look a partner more if there are issues, but every three years

12  you looked at every parter.

13  Q.  Understood.  With respect to the monitoring programs, those

14  put extra resources to audits that had particular issues that

15  were complicated, right?

16  A.  Yes.

17  Q.  Are you familiar with the term "Preissuance Program"?

18  A.  Yes.

19  Q.  What does that mean about when the program was in place?

20  A.  That would indicate that the reviews were taking place

21  prior to the issuance of the financial statements and opinion.

22  Q.  In other words, the additional attention that was being

23  given to those was being done before the audit opinion issued?

24  A.  Correct.

25  Q.  And were those monitoring programs designed to improve

1   audit quality with respect to just engagements that were going

2   to be inspected by the PCAOB or to engagements that had that

3   particular issue more generally?

4   A.  More generally that had that issue.

5   Q.  I want to talk for just a minute about documentation.

6         So, you've been asked a fair amount about the notion

7   that the PCAOB doesn't issue comments just based on a lack of

8   documentation.  Ms. Lester I think gave you an example of

9   someone who says, well, I did make the phone call, I just

10  didn't write it down.

11        If someone on the engagement team says they performed

12  procedures but there is no evidence that they did it, does the

13  PCAOB just accept sort of their statement that they did it?

14  A.  No.  Oral evidence alone is not sufficient to indicate an

15  audit procedure has been performed.  We look for other

16  persuasive evidence to support the statement that it occurred.

17  Q.  Now, to give a different example, if, for example, I'm an

18  auditor on an engagement team and I did work in a workpaper.  I

19  saved it on my computer and I forgot to upload it to the audit

20  system.  And you said, You didn't do this work, and I said, No,

21  I can prove I had it, would you issue a comment in that

22  situation?

23  A.  That issue alone, that is what we mean by "other persuasive

24  evidence," and we would consider the existence of that other

25  evidence.

J2edmid7                          Rodriguez - redirect

1   Q.  So the fact that it wasn't in the audit file doesn't cause

2   a comment based just on the documentation in that it wasn't in

3   the right place?

4   A.  That's correct.

5   Q.  When we talk about audit workpapers, I think perhaps we

6   think a lot about certain numbers, but workpapers also include

7   a lot of narrative judgments, right?

8   A.  Yes.

9   Q.  And so let's look for a moment at Defense Exhibit 245,

10  M245, the inspections manual.

11          And can we go to page 1 of the document itself based

12  on the pages at the bottom of the document.

13          I'm sorry.  I think I have the wrong page.

14          (Pause)

15          With respect to evaluating whether or not an

16  engagement team has properly exercised its judgment, is the

17  description of how it analyzed an issue relevant to the

18  consideration of whether or not the audit work was properly

19  considered -- performed?

20  A.  Can you clarify that question more?

21  Q.  To the extent that the audit work at issue is an evaluation

22  of whether or not, for example, an engagement -- an issuer had

23  adequate controls, your assessment of whether or not the audit

24  work is sufficient is based on the documents you review, right?

25  A.  Yes.

J2edmid7                         Rodriguez - redirect

1   Q.  And so the nature of the quality of the documentation

2   matters in assessing whether or not the audit work was

3   sufficient?

4   A.  Yes, because it allows us to understand what was actually

5   done to test it.

6   Q.  OK.  So we've gotten to the right page here.

7           And so, for example -- can we pull this up

8   side-by-side with the prior page, please, Mr. Cooney.

9           (Pause)

10          OK.  So we've got the pages.  We'll just leave them.

11          Here in 500.3 they are talking about the inspection

12  opening meeting, and it describes the purpose of the meeting to

13  include, among other things -- now I'm looking at the top of

14  the next page -- an evaluation of the critical thinking and

15  professional judgments employed to determine significant

16  accounts and disclosures and relevant assertions.

17          Do you see that?

18  A.  Yes, I do.

19  Q.  And if we then go to the next page, to page 3, let me

20  direct your attention to the section beginning, "In general,

21  the more judgment that is required in an area, the greater the

22  need for the engagement team to support and document that

23  judgment."

24          And then it goes on to talk about the kinds of

25  analysis that's necessary to evaluate the team's judgment.

J2edmid7                        Rodriguez - redirect

1    Fair to say that the quality of the documentation
2    matters?
3    A.  Yes.
4    Q.  Last set of questions.
5         You were asked a fair amount about individuals who
6    left the PCAOB and went to work at audit firms, including at
7    KPMG.  And there is nothing wrong with someone sort of moving
8    from one entity to another, right?
9    A.  No, there is not.
10   Q.  No one at the PCAOB was aware, though, until this broke,
11   that anyone had taken confidential information with them,
12   right?
13            MR. OHTA:  Objection, your Honor.  Speculation.
14            THE COURT:  Sustained.
15   BY MS. MERMELSTEIN:
16   Q.  It would not be proper, however, for an employee of PCAOB
17   to leave and take with them confidential PCAOB information,
18   right?
19   A.  That would not be --
20            MR. OHTA:  Objection, your Honor.
21            THE COURT:  It would not be proper for an employee?
22            MS. MERMELSTEIN:  I will rephrase.
23   Q.  Would that be a violation of the PCAOB ethics code?
24   A.  Yes.
25            MS. MERMELSTEIN:  Nothing further.

J2edmid7

1          THE COURT:  OK.  Anything further?

2          MS. LESTER:  No, your Honor.

3          MR. OHTA:  No, your Honor.

4          (Witness excused)

5          THE COURT:  All right, folks.  It's just before

6    5 o'clock and you are done for the week.  Thank you for your

7    patience and attentiveness during this first week.  You are

8    going to be off tomorrow and also off Monday for President's

9    Day.  The courthouse is closed.

10          So, we'll resume Tuesday morning at 9:30.  We'll have

11   coffee at 9.  Shoot for 9/9:15, if you can.  We will try to

12   start as promptly as we can at 9:30.

13          I just want to remind you, since we are going into a

14   four-day weekend, you will be leaving your notepads here.  You

15   should not discuss the case.  Don't look into anything about

16   the case.  You should basically forget about the case for the

17   next four days.  And when you come back we'll continue with the

18   testimony.  So, you are not discussing the case with each other

19   or with anyone else other than to say you are on jury duty.

20          And I hope you have a good weekend, and we will see

21   you Tuesday morning and we will be in at 9:30.  Have a good

22   weekend.

23          (Continued on next page)

24

25

J2edmid7

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Anything anybody wanted to discuss?

4          MS. MERMELSTEIN:  Not from the government, your Honor.

5          MR. BOXER:  No, your Honor.

6          MR. OHTA:  I have just one thing.  It's a copy of the

7    E&Y spreadsheet.  The witness said she reviewed an E&Y

8    spreadsheet that the government said it didn't have, so we

9    would like to request -- we would like to request that in

10   discovery.

11         THE COURT:  OK.  So, what is the status -- is one --

12   were there disks submitted, or what?

13         MS. MERMELSTEIN:  Yes.  So this is how this played

14   out.  We obtained a copy of all of the documents that were

15   saved in that particular file folder on Mr. Wada's PCAOB

16   computer with the exception of the E&Y document, which did not

17   seem pertinent to this case and which contains confidential

18   information belonging -- I understand, I haven't seen it --

19   both to E&Y and to PCAOB.  We understood that the defendants

20   intended to argue that that was not improperly being viewed by

21   Mr. Wada, that it was an effort by him to show consistency

22   across his firm and other firms, which is why more than one

23   firm, not just KPMG but also E&Y.

24         In order to make sure that sort of that fairly got in

25   front of the jury, we asked Ms. Rodriguez if she was familiar

J2edmid7

with that particular document.  And then, in order to make sure

that she was correct, her counsel showed her that document on

counsel's computer.  It was physically in the U.S. Attorney's

Office, but it was not ever on our computer, it was on

counsel's computer, and we didn't ever get a copy of that

document.  And that is sort of how we ended up here.

         If defense counsel wants to subpoena that document

from the PCAOB, they certainly can.  I don't know sort of the

extent to which they feel that is necessary.  I think her

testimony came in confused about sort of who exactly showed it

to her.  We have never possessed it.

         THE COURT:  And you still don't?

         MS. MERMELSTEIN:  And we still don't.

         And so I think we are in the same place that we were

at the sidebar, which is if defense counsel feels it is

important to their case, they should take whatever steps are

appropriate to get it.

         I don't think that we should be saying in front of the

jury to a witness, well, I'm going to ask for that document.  I

think if defense counsel want to subpoena or otherwise request

documents, that should be done with lawyers and not put to

particular witnesses

         MR. OHTA:  Your Honor, based on that explanation, I

think the testimony should be stricken.  I have never been

given an opportunity to review that document because the

J2edmid7

1    government said they didn't have it so I couldn't do my own

2    analysis on it, and now it is a document that was shown on

3    PCAOB counsel's computer.

4              THE COURT:  She didn't testify to anything about the

5    document except that she saw it, so --

6              MR. OHTA:  From counsel's computer.  And I believe the

7    jury is -- well, I'm positive the jury is going to infer that,

8    based on the witness' testimony, that that document came from

9    Mr. Wada's computer, which I don't know if that's accurate

10   because she saw it on her counsel's computer.

11             THE COURT:  But it was on his computer, right?

12             MR. OHTA:  I'm assuming it was, your Honor.

13             THE COURT:  So what's the confusion?  I'm not seeing

14   the issue.

15             MR. OHTA:  Your Honor, not only did she say that she

16   saw the document on the computer, but there is testimony in the

17   record talking about the contents of the document.  Nothing

18   that I could cross-examine her on because I have never seen the

19   document.

20             THE COURT:  So you don't know if you want the document

21   in or not?

22             MR. OHTA:  I want the opportunity to review the

23   document, your Honor.

24             THE COURT:  Well, I think the only way to do that is

25   to get it from PCAOB.  Why don't you subpoena the document from

J2edmid7

1    PCAOB?

2             MR. OHTA:  We'll probably be sending you a letter

3    shortly, a request shortly, your Honor.

4             THE COURT:  OK.  Tell them that I intend to approve a

5    subpoena for that document.

6             MR. OHTA:  I appreciate it.

7             THE COURT:  And it will be treated as confidential.  I

8    may -- if there is some dispute about it, I will look at it in

9    camera.

10            MR. OHTA:  Thank you, your Honor.

11            THE COURT:  I think it makes sense, given that there

12   was testimony about it, that at least you should see it.

13            MR. OHTA:  Thank you, your Honor.

14            THE COURT:  Anything else you want to talk about?

15            MR. BOXER:  No, your Honor.

16            MS. MERMELSTEIN:  No, your Honor.

17            THE COURT:  OK.  We'll see you, say, 9:15 on Tuesday.

18            MS. MERMELSTEIN:  Thank you, your Honor.

19            THE COURT:  Thank you.  Have a good weekend.

20            MS. MERMELSTEIN:  You, too.

21            (Adjourned to 9:15 a.m. February 19, 2019)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

STEPHANIE RODRIGUEZ

Direct By Ms. Mermelstein  . . . . . . . . . . 430

Cross By Ms. Lester  . . . . . . . . . . . . 507

Cross By Mr. Ohta  . . . . . . . . . . . . . 620

Redirect By Ms. Mermelstein  . . . . . . . . 660

```
 1                    GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    20   . . . . . . . . . . . . . . . . . 443

 4    102  . . . . . . . . . . . . . . . . . 445

 5    2, 4, and 6  . . . . . . . . . . . . . 472

 6    1357 . . . . . . . . . . . . . . . . . 485

 7    1351 to 1356   . . . . . . . . . . . . 494

 8    1359 . . . . . . . . . . . . . . . . . 503

 9    1358 . . . . . . . . . . . . . . . . . 505

10                    DEFENDANT EXHIBITS

11    Exhibit No.                              Received

12    M263 . . . . . . . . . . . . . . . . . 514

13    M245 . . . . . . . . . . . . . . . . . 531

14    M-264  . . . . . . . . . . . . . . . . 557

15    M-266  . . . . . . . . . . . . . . . . 561

16    M-267  . . . . . . . . . . . . . . . . 568

17    M-268  . . . . . . . . . . . . . . . . 572

18    M-269  . . . . . . . . . . . . . . . . 574

19    M-270  . . . . . . . . . . . . . . . . 577

20    1523 . . . . . . . . . . . . . . . . . 632

21    1535 . . . . . . . . . . . . . . . . . 656

22

23

24

25
```