J2J5mid1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

          v.                                 18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

               Defendants.

------------------------------x

                                             February 19, 2019
                                             9:35 a.m.


Before:

                    HON. J. PAUL OETKEN,

                                             District Judge
                                             and a jury


                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  REBECCA G. MERMELSTEIN
     AMANDA K. KRAMER
     JORDAN LANCASTER ESTES
          Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
     Attorneys for Defendant David Middendorf
BY:  NELSON A. BOXER
     AMY R. LESTER
     ALEXANDRA REBECCA CLARK
          – and –
BRUCH HANNA LLP
BY:  GREGORY S. BRUCH

J2J5mid1

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
            – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


            – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal

J2J5mid1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.

3          I have received three letters and responses over the

4    weekend from counsel to Mr. Wada and I'm not sure, do we need

5    to address any of those before we begin today?

6          MS. KRAMER:  Yes, your Honor.

7          The motion to preclude Brian Sweet's testimony of

8    statements made to him by Cynthia Holder is going to come up

9    very early in his direct testimony.

10          THE COURT:  Okay.  Is he the next witness?

11          MS. KRAMER:  Yes, your Honor.

12          THE COURT:  Is there anything -- so, who wants to

13    address the motion on your side?

14          MR. WEDDLE:  I will, your Honor.

15          THE COURT:  I am a little confused.

16          The argument you are making is that because there was

17    an agreement to keep Mr. Wada's name out of it that that was

18    the conspiracy.  There is evidence -- the conspiracy as alleged

19    by the government subject to connection between Mr. Wada and

20    Ms. Holder, is the conspiracy to secretly provide the

21    inspection list information.  Whether there was a separate

22    agreement or part of that agreement to keep his name out of it

23    doesn't change the fact that by a preponderance, subject to

24    connection, there would be a conspiracy between Mr. Wada and

25    Ms. Holder.

J2J5mid1

1          I just don't even get the argument.

2          MR. WEDDLE:  Assuming that that's the case, your

3     Honor, that there is a conspiracy between Mr. Wada and

4     Ms. Holder, if it is what I have called a non-dissemination

5     conspiracy, that is, the terms of that agreement are that what

6     they say should stay between them --

7          THE COURT:  But it is keep my name out of it, it is

8     not don't provide the information further within KPMG.  There

9     is no suggestion that it's --

10         MR. WEDDLE:  I think it is both.  I think it is both,

11    your Honor.

12         I think that --

13         THE COURT:  You think he was providing the inspection

14    information to Ms. Holder just for her own amusement and not to

15    be used by KPMG?  That makes no sense.

16         MR. WEDDLE:  The point of our letter, your Honor, is

17    that the burden is on the government to prove by a

18    preponderance that that's not the case and I do think that

19    there is a theory that does make sense which is that Cynthia

20    Holder was hired by KPMG to help them in dealing with the

21    PCAOB.  So, here she is coming in with a bunch of experience

22    and wisdom about the PCAOB, ostensibly, and it is equally

23    likely, based on the -- first of all, we have heard none of the

24    evidence about the conspiracy so far but I think, even based on

25    the allegations in the indictment it is equally likely that

J2J5mid1

1    there was an agreement between Wada and Holder that was

2    designed to stay between them.  So, you could imagine a

3    conspiracy where he could give her information that she would

4    use to make herself look good, not that she would further

5    disseminate to anyone else at KPMG and not that she would tell

6    anyone else at KPMG I'm not that good at this stuff, I just

7    have inside information.

8            They have to disprove that kind of theory by a

9    preponderance and I think when we get right down to the

10   evidence, the only evidence that they have that's an attempt to

11   tip the balance one way or the other are the out-of-court

12   statements by Holder and those are not, alone, enough to

13   satisfy the Rule 104 burden of proof that they carry.

14           So, I think that there are a lot of different theories

15   about the contours of the agreement.

16           THE COURT:  Okay.  Ms. Kramer, would you like to

17   respond?

18           MS. KRAMER:  Ms. Estes is going to argue, your Honor.

19           MS. ESTES:  Your Honor, the evidence will show that

20   there was no plan to keep Wada's name out of it.  The whole

21   point of Wada disseminating this information is so that Cynthia

22   Holder and Brian Sweet would know that he was the leaker and

23   they would help him get a job at KPMG because he was the one

24   that gave them this information.  That's why he was doing it.

25   We cited a few examples in our letter yesterday of text

J2J5mid1

1    messages to this effect where Wada and Holder were talking

2    about how Brian and Cindy were going to help him get a job at

3    KPMG.  So, of course Cynthia Holder's statements that Wada was

4    the leaker to Brian Sweet who was going to help him get a job,

5    those were in furtherance of the conspiracy because Wada's

6    whole point, his whole motive in doing this was to get a job at

7    KPMG.

8            The statement that Mr. Weddle cites is basically after

9    all of the conduct here.  Holder promises Wada that she's not

10   going to tell the general counsel that he is the one involved.

11   That's completely consistent with there still be being

12   conspiracy that Wada wants Sweet and co-conspirators at KPMG to

13   know that he is the leaker because he wants to get a job.  He

14   needs them to know that.

15           THE COURT:  Okay.  I find that there is a sufficient

16   proffer for present purposes.  I'm going to deny request the

17   for a Rule 104 hearing and I'm going to allow the testimony,

18   subject to connection, as is the normal practice.  But, the

19   objection is in the record and is noted.

20           Can we begin?

21           MR. WEDDLE:  Your Honor, just very briefly.

22           Since we have done the letter writing on this issue,

23   to preserve our objection for down the road, do we need to

24   object each time they talk about these out-of-court statements

25   from Ms. Holder or is this letter writing sufficient.

J2J5mid1

1                THE COURT:  The letter writing is sufficient.

2                MR. WEDDLE:  Thank you.

3                THE COURT:  Your objection is preserved on the issue.

4                May we proceed?

5                MS. KRAMER:  Yes, your Honor.  May I put the witness

6       on the stand?

7                THE COURT:  Yes.

8                Sir, if you would please come up to the witness chair

9       here?  You can be seated.

10               THE WITNESS:  Thank you.

11               (Continued on next page)

J2J5mid1                         Sweet – direct

1             (Jury present)

2             THE COURT:  You may be seated.

3             Good morning, ladies and gentlemen.

4             THE JURY:  Good morning.

5             THE COURT:  I hope you had a good, long weekend.  Are

6   all your note pads there on your chairs?

7             JUROR:  Yes.

8             THE COURT:  We are continuing with testimony in the

9   case and the government may call its next witness.

10            MS. KRAMER:  Thank you, your Honor.  The government

11  calls Brian Sweet.

12            THE COURT:  Mr. Sweet is already on the stand.

13            Mr. Sweet, if you would please raise your right hand,

14  you will be sworn in.

15   BRIAN JOHN SWEET,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18            THE DEPUTY CLERK:  Please state your full name, and

19  spell your last name, slowly, for the record.

20            THE WITNESS:  Brian John Sweet.

21  DIRECT EXAMINATION

22  BY MS. KRAMER:

23  Q.  Good morning, Mr. Sweet.  How old are you?

24  A.  I am 41 years old.

25  Q.  In what state do you currently live?

J2J5mid1                          Sweet - direct

1   A.   I live in California.

2   Q.   Are you employed?

3   A.   Yes.

4   Q.   What kind of job do you have?

5   A.   I work for a private, family-owned manufacturing company.

6   Q.   What is your role there?

7   A.   I oversee the accounting department.

8   Q.   What's your educational background?

9   A.   I graduated with a bachelors degree from the University of

10  Notre Dame.

11  Q.   In what subject?

12  A.   Accounting.

13  Q.   In what year did you graduate from college?

14  A.   In the year 2000.

15  Q.   From the time you graduated from college in 2000 until

16  early 2017, what did you do for a living?

17  A.   I worked in public accounting, primarily in auditing roles.

18  Q.   Who were your employers between 2000 and 2017?

19  A.   I first worked for PricewaterhouseCoopers, also referred to

20  as PwC.  Then I worked for the Public Company Accounting

21  Oversight Board -- the PCAOB -- and then I worked for KPMG.

22  Q.   What kind of businesses are PwC and KPMG?

23  A.   They are both very large public accounting firms.

24  Q.   In very general terms, what does it mean to be a large

25  public accounting firm?

J2J5mid1                          Sweet - direct

A.   A public accounting firm is a firm that does public company

audits.

Q.   Can you give an example of a public company that has its

financial statements audited by a big public accounting firm

like KPMG?

A.   McDonald's, Apple, IBM.

Q.   And, in very general terms, what does it mean to audit the

financial statements of a public company?

A.   Auditing, it's really a set of tests and procedures in

order to issue an opinion that the financial statements can be

relied upon, that they're complete and accurate.

Q.   Between 2000 and 2017, did you have any professional

licenses?

A.   Yes, I did.

Q.   What kind of professional licenses did you have?

A.   I was a certified public accountant, or CPA.

Q.   In what states were you licensed as a CPA?

A.   In California, Illinois, and New York.

Q.   During approximately what years did you work at PwC?

A.   I worked at PwC from 2000 to 2009.

Q.   What positions did you hold there?

A.   I started off as an associate, then was a senior associate,

then a manager, then a senior manager, and then what became a

director.

Q.   During approximately what years did you work at the PCAOB?

J2J5mid1                          Sweet - direct

1    A.   I worked at the PCAOB from 2009 through 2015.

2    Q.   What positions did you hold there?

3    A.   I started off as an Inspection Specialist III, also often

4    referred to as IS-3; then I was inspections leader, or IL; and

5    then I became an associate director, or AD.

6    Q.   Were you assigned to a particular group at the PCAOB?

7    A.   Yes.

8    Q.   Which one?

9    A.   I worked in their inspections group.

10   Q.   Were you assigned to inspect the audits of any particular

11   public accounting firm?

12   A.   Yes.

13   Q.   Which one?

14   A.   KPMG.

15   Q.   In general terms, what is the PCAOB?

16   A.   The PCAOB is the regulatory body for public accounting

17   firms.

18   Q.   And, generally, what's your understanding about the

19   principal ways that the PCAOB regulates public accounting

20   firms?

21   A.   They regulate public accounting firms by setting auditing

22   standards, they have the right auditing standards, they do it

23   through their inspections group and inspections of the firm and

24   they have an enforcement function as well.

25   Q.   What do you mean by the PCAOB conducts inspections?  Could

J2J5mid1                          Sweet - direct

1    you explain what that means?

2    A.   So, one of the things that they'll do is they will select

3    and test a sample of the firm's financial statement audits each

4    year in order to determine whether or not those audits are good

5    audits or bad audits.  And, they also will go through and test

6    the firm's overall system of quality control in order to form

7    an opinion and ultimately issue a report on whether or not the

8    firm is good at conducting audits, and high quality or not.

9    Q.   And approximately how many audits performed by the

10   accounting firm does the PCAOB typically look at in testing a

11   sample of a firm's audits each year?

12   A.   For a big firm like KPMG it would be roughly 50 audits

13   every year -- 50 inspections of those audits every year.

14   Q.   Out of approximately how many audits of public companies?

15   A.   Out of 700 or 800.

16   Q.   When does the PCAOB typically give a firm like KPMG notice

17   of which of those individual audits it's going to inspect?

18   A.   They give notice two to three weeks before they plan to

19   start the inspection.

20   Q.   And what's your understanding about when the PCAOB gives

21   that notice relative to the end of the 45-day documentation

22   period for each audit?

23   A.   They give that notice only after the documentation period

24   has ended -- at least generally speaking.

25   Q.   And before the PCAOB gives that official notice, what is

J2J5mid1                          Sweet - direct

1   your understanding about whether the identification of which

2   audits the PCAOB is going to specifically inspect is

3   confidential or not?

4   A.  It is very much confidential.

5   Q.  Do you have an understanding from your time at the PCAOB as

6   to why the PCAOB typically does not give notice until the end

7   of the 45-day documentation period?

8   A.  Yes.

9   Q.  What's your understanding about that?

10  A.  The PCAOB doesn't want the name of who they plan to inspect

11  to get out because it wants to have an unbiased view of what

12  the real audit work would have been without the firm or without

13  the team doing anything different only because they know that

14  there is going to be an inspection.

15  Q.  What was your position when you worked at KPMG?

16  A.  I was hired as a direct admit partner.

17  Q.  Were you a partner the entire time you were at KPMG from

18  2015 through early 2017?

19  A.  Yes, I was.

20  Q.  Were you assigned to any particular group?

21  A.  Yes.

22  Q.  Which one?

23  A.  I was assigned to the KPMG's inspections group within their

24  national office.

25  Q.  What is the national office of KPMG, in your understanding?

J2J5mid1                         Sweet - direct

1    A.  The national office is really the centralized oversight

2    function that exists for the firm to help coordinate and manage

3    each of the various practice offices.

4    Q.  And what is the inspections group within the national

5    office?

6    A.  The inspections group does both internal inspections within

7    the firm, so self-checking the firm's own audits, and then also

8    coordinating with external regulators like the PCAOB

9    coordinating the PCAOB's inspection process.

10   Q.  Are you familiar with someone named David Middendorf?

11   A.  Yes, I am.

12   Q.  How do you know him?

13   A.  I knew David Middendorf from both my time at the PCAOB and

14   while I was at KPMG.

15   Q.  Take a look at what's in evidence as Government Exhibit

16   1502.  Do you recognize this exhibit?

17   A.  Yes, I do.

18   Q.  How?

19   A.  I recognize that to be a picture of Dave Middendorf.

20   Q.  What was his role at KPMG when you first met him?

21   A.  Dave was the partner in charge of the national office.  He

22   was the overall head of the national office.

23   Q.  And is that the role he held through early 2017?

24   A.  Yes.

25   Q.  When you were at KPMG, what was Dave Middendorf's role

J2J5mid1                              Sweet - direct

1    relative to yours?

2    A.   He was my boss' boss.

3    Q.   Generally, what is your understanding of what it means to

4    be the head of the national office?

5    A.   It meant that he was ultimately the partner in charge.   He

6    was the final decision maker and in charge of all of the

7    national office roles and responsibilities.

8    Q.   Who else did you work for at KPMG?

9    A.   My boss was Tom Whittle.

10   Q.   Approximately when did you meet Tom Whittle?

11   A.   I met Tom first while I was at the PCAOB and I think it was

12   sometime in 2012.

13   Q.   Take a look at what's marked for identification as

14   Government Exhibit 1505.  Do you recognize this exhibit?

15   A.   Yes, I do.

16   Q.   How do you recognize it?

17   A.   I recognize that to be a picture of Tom Whittle.

18           MS. KRAMER:  The government offers Government Exhibit

19   1505.

20           THE COURT:  1505 is received.

21           (Government's Exhibit 1505 received in evidence)

22   BY MS. KRAMER:

23   Q.   When you worked for Tom Whittle at KPMG, who did he report

24   to?

25   A.   Tom reported directly to Dave Middendorf.

J2J5mid1                          Sweet – direct

1    Q.  What was Thomas Whittle's role at KPMG when you worked

2    there?

3    A.  Tom was the partner in charge of the inspections group.

4    Q.  Are you familiar with someone named David Britt?

5    A.  Yes, I am.

6    Q.  How do you know David Britt?

7    A.  I knew David Britt from both my time at the PCAOB and again

8    from my time at KPMG.

9    Q.  Let's take a look at what's marked for identification as

10   Government Exhibit 1503.  Do you recognize this exhibit?

11   A.  Yes, I do.

12   Q.  How do you recognize it?

13   A.  I recognize this to be a picture of David Britt.

14            MS. KRAMER:  The government offers Government Exhibit

15   1503.

16            THE COURT:  1503 is received.

17            (Government's Exhibit 1503 received in evidence)

18   BY MS. KRAMER:

19   Q.  What was David Britt's role at KPMG during the time when

20   you worked there?

21   A.  David Britt was the co-banking leader within the national

22   office.

23   Q.  Did you work with him while you were at KPMG?

24   A.  Yes, I did.

25   Q.  What was his role relative to yours in terms of seniority?

J2J5mid1                              Sweet – direct

 1   A.  David Britt was very senior so he was a very senior partner

 2   in the national office, much more senior than me.

 3   Q.  Are you familiar with someone named Cindy Holder?

 4   A.  Yes, I am.

 5   Q.  How did you know Cindy Holder?

 6   A.  I knew Cindy from both my time at PCAOB and my time at the

 7   KPMG.

 8   Q.  Please take a look at Government Exhibit 1501.  Do you

 9   recognize this exhibit?

10   A.  Yes, I do.

11   Q.  How do you recognize it?

12   A.  I recognize that to be a picture of Cindy Holder.

13              MS. KRAMER:  The government offers Government Exhibit

14   1501.

15              THE COURT:  1501 is received.

16              (Government's Exhibit 1501 received in evidence)

17              MS. KRAMER:  Excuse me.  May I have a moment, your

18   Honor?

19              THE COURT:  Sure.

20              MS. KRAMER:  Your Honor, I understand that there may

21   be an issue with one or more of the jurors' screens.

22              (pause)

23              MS. KRAMER:  May I proceed, your Honor?

24              THE COURT:  Yes.

25   BY MS. KRAMER:

J2J5mid1                          Sweet - direct

1    Q.  When did you meet Cindy Holder, approximately?

2    A.  I believe it was back in 2011 while she and I were both at

3    the PCAOB.

4    Q.  How did you meet her?

5    A.  She worked -- she and I worked together on her first

6    inspection at the PCAOB.

7    Q.  When you were at the PCAOB together, was Cindy Holder

8    assigned primarily to a particular accounting firm's inspection

9    team?

10   A.  Yes.

11   Q.  Which one?

12   A.  She was also assigned to KPMG.

13   Q.  And is that the inspection team you were assigned to?

14   A.  Yes.

15   Q.  Were you friends with Cindy Holder?

16   A.  Yes.

17   Q.  Are you familiar with someone named Jeff Wada?

18   A.  Yes.

19   Q.  How do you know Jeff Wada?

20   A.  I knew of Jeff Wada from my time at the PCAOB.

21   Q.  Did you ever meet Jeff Wada in person while you were at the

22   PCAOB?

23   A.  Yes.

24   Q.  Please take a look at what's marked for identification as

25   Government Exhibit 1504.  Do you recognize this exhibit?

J2J5mid1                              Sweet - direct

1    A.  Yes.

2    Q.  How do you recognize it?

3    A.  I recognize this to be a picture of Jeff Wada.

4         MS. KRAMER:  The government offers Government Exhibit

5    1504.

6         THE COURT:  1504 is received.

7         (Government's Exhibit 1504 received in evidence)

8    BY MS. KRAMER:

9    Q.  When you were at the PCAOB do you know whether or not Jeff

10   Wada was assigned to the KPMG inspection team?

11   A.  Yes, I know.  He was not.

12   Q.  And when you were at KPMG, do you know whether or not

13   Jeffrey Wada was assigned to the KPMG U.S. inspection team?

14   A.  Yes, I know, and he was not assigned to them.

15   Q.  How do you know that?

16   A.  As part of my role in the inspections group in the national

17   office I was aware who all of the PCAOB inspectors were.

18   Q.  Did there come a time that Jeff Wada expressed interest in

19   working at KPMG?

20   A.  Yes.

21   Q.  When did he first express interest in working at KPMG?

22   A.  Beginning in 2016.

23   Q.  When did your employment with KPMG end?

24   A.  In March of 2017.

25   Q.  Were you fired or did you re-sign?

J2J5mid1                          Sweet – direct

1    A.   I resigned.

2    Q.   Immediately before you resigned, what was your employment

3    status?

4    A.   I had been placed on administrative leave.

5    Q.   Did you have an understanding as to why?

6    A.   Yes.

7    Q.   What was your understanding?

8    A.   The firm was in the process of conducting an internal

9    investigation into the inappropriate use and having obtained

10   confidential PCAOB information.

11   Q.   What kind of PCAOB confidential information had people at

12   KPMG received and used?

13   A.   Primarily included the names of issuers that the PCAOB was

14   planning to inspect in both 2015, 2016, and 2017.

15   Q.   And, just to be clear, when you say issuers the PCAOB was

16   going to inspect, what do you mean by issuers?

17   A.   The names of KPMG's audit engagements that were public

18   companies where KPMG performed a financial audit.

19   Q.   What role did you play in getting, sharing, and using this

20   confidential PCAOB inspection information?

21   A.   I had a very direct role.

22   Q.   Have you pled guilty to crimes in connection with the

23   conduct you have just described?

24   A.   Yes, I have.

25   Q.   What crimes have you pled guilty to?

J2J5mid1                          Sweet - direct

1    A.  I pled guilty to conspiracy to commit wire fraud and

2    conspiracy to defraud the U.S. government.

3    Q.  What part of the U.S. government did you conspire to

4    defraud?

5    A.  The Securities and Exchange Commission.

6    Q.  Is that also known as the SEC?

7    A.  Yes, it is.

8    Q.  How did you conspire to defraud the SEC?

9    A.  By taking action to manipulate the PCAOB's inspection

10   reports through -- because of the advanced notice that we

11   received or that we got of PCAOB inspections, and because the

12   SEC uses those reports in their oversight responsibilities.

13   Q.  During what years did you commit these crimes?

14   A.  In 2015, 2016, and 2017.

15   Q.  Did you commit these crimes alone or with other people?

16   A.  I committed these crimes with other people.

17   Q.  Was there a core group of people you committed these crimes

18   with?

19   A.  Yes.

20   Q.  Who was in that core group?

21   A.  David Middendorf, David Britt, Tom Whittle, Cindy Holder,

22   and Jeff Wada.

23   Q.  Please take a look at what's marked for identification as

24   Government Exhibit 1506.  Do you recognize this exhibit?

25   A.  Yes, I do.

J2J5mid1                          Sweet - direct

1   Q.   How do you recognize it?

2   A.   I recognize this to be the pictures and the names and the

3   positions of all the people that were involved in this with me.

4            MS. KRAMER:   The government offers Government Exhibit

5   1506.

6            THE COURT:   1506 received.

7            (Government's Exhibit 1506 received in evidence)

8   BY MS. KRAMER:

9   Q.   What information is in the boxes in 1506 underneath each

10  photo?

11  A.   Underneath each photo is the name of the person and the

12  name of where they worked.

13  Q.   Focusing on 2015, did the confidential PCAOB information

14  that you participated in obtaining, sharing, and using at KPMG

15  come from one person or more than one person?

16  A.   It came from more than one person.

17  Q.   Who did it come from?

18  A.   It came from myself, from Cindy Holder, and also from Jeff

19  Wada.

20  Q.   What kind of confidential PCAOB information did you

21  personally share in 2015?

22  A.   I shared the names of who the PCAOB was going to inspect in

23  2015.

24  Q.   Where did you get that information?

25  A.   I got that information, took that information with me when

J2J5mid1                          Sweet - direct

1    I left the PCAOB.

2    Q.  In what form did you take it?

3    A.   In both electronic and in hard copy forms.

4    Q.  Were they documents?

5    A.  Yes.

6    Q.  At the time that you shared the identity of the PCAOB's

7    inspection targets for KPMG clients in 2015, had the PCAOB

8    notified KPMG of its plan to inspect any of those audits?

9    A.  Yes.

10   Q.  Had the PCAOB notified KPMG of its plan to inspect all of

11   those audits?

12   A.  No.

13   Q.  What was your understanding about whether the ones that the

14   PCAOB had not yet notified KPMG about were still confidential?

15   A.   I knew that they were still very much confidential by the

16   PCAOB.

17   Q.  How do you know that confidential PCAOB information that

18   was shared with and used by KPMG in 2015 came from Cindy

19   Holder?

20   A.  Because she shared that information directly with me.

21   Q.  What kind of confidential PCAOB information did Cindy

22   Holder share with you in 2015?

23   A.   It included both confidential draft reporting information

24   from the PCAOB and also information about certain inspections

25   that the PCAOB was working on.

J2J5mid1                          Sweet - direct

1    Q.  Did she just give you information verbally or did she also
2    give you documents?  Or both?
3    A.  It was both.
4    Q.  How do you know that confidential PCAOB information that
5    was shared with and used by KPMG in 2015 came from Jeff Wada?
6    A.  Because he gave that information to Cindy Holder and she,
7    in turn, gave it directly to me.
8    Q.  What did she tell you about where it came from?
9    A.  She told me that she had gotten it directly from Jeff Wada.
10   Q.  What kind of confidential PCAOB information did Jeff Wada
11   share in 2015 that went to Holder and then went to you?
12   A.  It was confidential inspection information related to the
13   locations of where the PCAOB was planning to perform
14   inspections in the following year, 2016.
15   Q.  In 2015, what did you do with the confidential information
16   that you brought with you in the form of electronic and hard
17   copy documents you stole from the PCAOB and that came from
18   Holder and Wada?
19   A.  I shared that information directly with Tom Whittle, David
20   Britt, and Dave Middendorf.
21   Q.  Do you know whether or not they took any actions based on
22   that confidential information?
23   A.  Yes.
24   Q.  Did they?
25   A.  Yes.

J2J5mid1                           Sweet – direct

1   Q.  Turning to 2016, did the confidential PCAOB information

2   that was shared with and used by KPMG come from one person or

3   more than one person?

4   A.  It primarily came from Jeff Wada.

5   Q.  How do you know that it came from Jeff Wada in 2016?

6   A.  Because Jeff Wada gave that information to Cindy Holder and

7   she, in turn, gave it directly to me.

8   Q.  And what did she say to you about where the information

9   came from?

10  A.  She told me the information was coming directly from Jeff

11  Wada.

12  Q.  What kind of confidential PCAOB information did Jeff Wada

13  share in 2016?

14  A.  He provided, he gave advance notice of the specific names

15  of audit engagements that the PCAOB was planning to inspect in

16  2016.

17  Q.  Was it the full list or a partial list of the PCAOB's

18  planned inspections of 2016?

19  A.  It was a partial list.

20  Q.  At the time you received that confidential list of

21  inspections, do you know if the PCAOB had already notified KPMG

22  of those inspection targets?

23  A.  Yes.  I know that they had not notified the firm yet.

24  Q.  What was your understanding about whether that list of

25  inspection targets for 2016 was confidential to the PCAOB at

J2J5mid1                         Sweet - direct

1    the time Jeff Wada shared it?

2    A.  I knew that information was very confidential.

3    Q.  After Holder got this list of confidential inspection

4    selections from Jeff Wada, what did she do with it?

5    A.  She gave the list directly to me.

6    Q.  After Holder gave the list to you, what did you do with it?

7    A.  I gave the list to Tom Whittle, David Britt, and Dave

8    Middendorf.

9    Q.  Do you know if they took any actions based on that

10   confidential information?

11   A.  Yes.

12   Q.  Let's turn to 2017.  Did the confidential PCAOB information

13   that was shared with and used by KPMG come from one person or

14   more than one person?

15   A.  It came from one person.

16   Q.  Who did it come from?

17   A.  It came from Jeff Wada.

18   Q.  How do you know that it came from Jeff Wada?

19   A.  Because he gave it to Cindy Holder and Cindy Holder gave it

20   directly to me.

21   Q.  What did Cindy Holder tell you about where it came from?

22   A.  She told me that it came from Jeff Wada.

23   Q.  What kind of confidential PCAOB information did Jeff Wada

24   share in 2017?

25   A.  He first gave a preliminary list of what the likely

J2J5mid1                          Sweet – direct

1    inspections were going to be and then later provided the

2    complete list of all 50 or so inspections that the PCAOB was

3    planning for later in 2017.

4    Q.  In what months did he share this information in 2017?

5    A.  In both January and February 2017.

6    Q.  As of February 2017, what was the status of the audits on

7    the full inspection list that Wada shared?

8    A.  The audits were still live which meant that the audit

9    opinions had not yet been finalized by KPMG.

10   Q.  And, as of January 2017, with respect to the audit

11   engagements, the KPMG clients that were on the preliminary

12   list, what was the status of those audits?

13   A.  They were also still live and had not yet been finalized.

14   The opinions hadn't yet been issued.

15   Q.  What is your understanding about what actions can be taken

16   when an audit has not yet been finalized?

17   A.  Before an audit is finalized new procedures, new audit work

18   can be done without any sort of special documentation.

19   Q.  Do you know if the PCAOB had already notified KPMG of who

20   it was planning to inspect in 2017 as of February 2017?

21   A.  Yeah.  I know that they had not yet notified KPMG.

22   Q.  What was your understanding about whether the PCAOB's

23   selection of which audits it was going to inspect, as part of

24   its KPMG inspection, were confidential as of February 2017?

25   A.  I knew that information was highly confidential by the

J2J5mid1                          Sweet - direct

1    PCAOB.

2    Q.   After Holder got these lists from Jeff Wada in January and

3    February 2017, what did she do with them?

4    A.   She gave that information directly to me.

5    Q.   And what did you do with them?

6    A.   I, in turn, shared that information directly with Tom

7    Whittle, Dave Middendorf, and David Britt.

8    Q.   Do you know whether or not they took any actions based on

9    that confidential information in January and February 2017?

10   A.   Yes, they did.

11   Q.   At the time you engaged in this conduct throughout 2015,

12   2016, and in the beginning of 2017, did you know that what you

13   were doing was wrong?

14   A.   Yes.

15   Q.   Are you now cooperating with the government?

16   A.   Yes.

17   Q.   We will come back to your cooperation later.  Let's talk

18   about some fundamentals concerning audits and inspections.

19           You testified about public companies' financial

20   statements being audited.  What do you mean by financial

21   statements in this context?

22   A.   The financial statements are really the company's results

23   for the year so it's their assets and liabilities and reporting

24   on whether or not they made money or not, profits and loss.

25   Q.   What period of time do public companies' financial

1    statements publicly cover?

2    A.   One year.  12 months.

3    Q.   Is it always a calendar year?

4    A.   Not always, but that's most common.

5    Q.   What is the accounting term for the year-long period that

6    is reflected in a company's financial statements?

7    A.   The accounting term would be year-end audit or financial

8    statement period.

9    Q.   Is it referred to as the company's fiscal year?

10   A.   Yes.

11   Q.   And what is a fiscal year-end?  What is that date?

12   A.   The fiscal year-end would be the last date of the year.

13   So, for a calendar year-end company it would be December 31st.

14   Q.   When, in relation to a public company's fiscal year-end,

15   does it typically file its financial statements with the SEC?

16   A.   Depending on the size of the company it is 60 to 75 days.

17   Q.   And, what does an accounting produce at the end of its

18   audits of a public company's financial statements?

19   A.   It produces an audit opinion.

20   Q.   What's your understanding about whether or not a public

21   company can file its annual financial statements with the SEC

22   without that audit opinion?

23   A.   It is not -- a company cannot file its financial statements

24   without that audit opinion.

25   Q.   What is your understanding about whether an audit firm's

J2J5mid1                    Sweet – direct

opinion can be filed with the SEC, with a public company's

financial statements if that auditor is not registered with the

PCAOB?

A.   The accounting firm has to be registered with the PCAOB to

be able to do a public account audit.

Q.   To generate that opinion, how long does an auditor

typically work on an audit of a public company's financial

statements?

A.   It depends on the size but it can be as short as maybe two

months and as much as an entire year to complete that audit.

Q.   What is the audit of a public company's financial

statements considered to be finished?

A.   It is considered finished the date that the audit firm

signs its opinion.

Q.   And by that date does the auditor, the accounting firm

that's done the audit, have to have all of the paperwork or

documentation backing up the audit complete by that date?

A.   No.

Q.   How much time do they have?

A.   Under the PCAOB's rules the audit firm or the audit

engagement team has 45 days after the day it signs its opinion

to wrap up its work papers.

Q.   What about audit procedures?  Can those be done in the 45

days or do those have to be done by the issuance of the audit

opinion?

J2J5mid1                              Sweet - direct

```
 1   A.  No.  All audit procedures that are necessary for the firm
 2   to be able to sign its opinion have to be done prior to the
 3   opinion date.
 4   Q.  Is there a term for the documentation that reflects the
 5   work done in the audit?
 6   A.  It's referred to as workpapers -- audit workpapers.
 7   Q.  Can you give some examples of sample audit workpapers?
 8   A.  Yes.
 9   Q.  What are some simple audit workpapers, relative to the
10   subject matter that we are talking about when I say simple.
11   A.  It could be as simple as summarizing the results of a
12   meeting that the audit team might have with a company's chief
13   financial officer or chief executive or CFO, or it could be
14   documenting the results of tests that it might do over a cash
15   account or a cash balance.
16   Q.  What's an example of a complex workpaper?
17   A.  A complex workpaper might be where the firm, in order to
18   test whether the value of something was right, has to conduct
19   its own modeling efforts and develop advanced models in order
20   to test all of the underlying assumptions and the final results
21   of, like a company's investment portfolio.  Something like
22   that.  Or, derivative portfolio.
23   Q.  What kind of memos are included in audit workpapers?
24   A.  There would be memos that would summarize an approach so
25   the way the auditor is planing to conduct its procedures and
```

J2J5mid1                          Sweet - direct

1    certainly a lot of conclusion memos that would summarize the

2    result of all of the testing that they performed in a

3    particular audit area.

4    Q.  What is the longest memo you have seen in an audit work

5    file, if you can remember?

6    A.  Certainly more than 200 pages.

7    Q.  When you were at KPMG between 2015 and 2017, how were

8    workpapers maintained?

9    A.  KPMG used an electronic workpaper file.

10   Q.  Did it have a name that system?

11   A.  Yes.

12   Q.  What was it called?

13   A.  KPMG referred to that electronic work paper system as its

14   eAudIT file.  EAudIT.

15   Q.  Like e-Audit?

16   A.  Yeah.

17   Q.  What happened to workpapers in the eAudIT system after the

18   45 day documentation period?

19   A.  The firm would archive those work papers, which basically

20   meant that they would lock those workpapers down so they could

21   not be modified or changed after that 45-day period had ended.

22   Q.  When you were at KPMG did the eAudIT system track changes

23   made to workpapers?

24   A.  No.  It did not.

25   Q.  Did the eAudIT system maintain old and prior versions of

J2J5mid1                              Sweet - direct

1   work papers?

2   A.   No.  Once a set of workpapers got archived, it was only the

3   final set of work papers that would be retained.

4   Q.   To the best of your memory, what information about when a

5   workpaper was changed or edited did the eAudIT System maintain

6   when you were at KPMG?

7   A.   The eAudIT workpaper would document the date that a

8   workpaper was completed so completed by like a staff person,

9   and then the date that it was reviewed, so the date it was

10  reviewed by a manager or partner.

11  Q.   What's your understanding about where that 45-day archive

12  date comes from?

13  A.   The 45-day requirement comes right out of one of the

14  PCAOB's auditing standards.

15  Q.   Let's talk about the PCAOB.

16          In addition to inspecting a sample of about 50 of

17  KPMG's audits as you testified to earlier what else, if

18  anything, did the PCAOB look at in inspecting KPMG as a firm

19  each year?

20  A.   The PCAOB would also look at the firm's overall system of

21  quality control.

22  Q.   From your experience, how does the PCAOB look at that?

23  A.   It performs other inspection-type procedures, like, at the

24  national office level.

25  Q.   Can you give some examples of other types of things the

1    PCAOB does to inspect a firm's system of quality control?

2    A.  Yes.

3            They would inspect things like the firm's training

4    process to ensure that when a new accounting or auditing

5    standard comes out to make sure that the firm is effectively

6    able to train all of the staff across the entire audit

7    practice.  It would also do things like test auditor

8    independence to make sure that there is a process and strong

9    control in place to ensure that all of the auditors are

10   independent and work on, and also things to evaluate how

11   partners get compensated to make sure that partners get

12   compensated for things related to audit quality and not just

13   for picking up new business or selling more work.

14   Q.  What is auditor independence?

15   A.  One of the -- in the auditing world, one of the fundamental

16   foundational requirements is that auditors be completely free

17   of any sort of bias or that they would be completely objective

18   of the companies in which they are doing audit work on, like

19   can't have any sort of financial interest in their audit

20   clients.

21   Q.  During your time at the PCAOB, did you play any role in the

22   PCAOB's planning of the inspection process for KPMG?

23   A.  Yes, I did.

24   Q.  What role did you play in that process?

25   A.  In my early time at the PCAOB I was on the planning team so

J2J5mid1                         Sweet - direct

1    I would help do individual analysis of the firm -- of KPMG's

2    audit clients to recommend whether or not they should be

3    included as an inspection candidate that year.  And then, later

4    on as I advanced in my career at the PCAOB, I became more

5    involved in reviewing the results and helping affirm the

6    decisions made by the planning team.

7    Q.  Based on your experience I am going to ask you a few

8    questions about the PCAOB's planning process.

9            What's the PCAOB's first step in the process of

10   selecting which of KPMG's audits to look at in a given year?

11   A.  The first step is they get a -- they require the firms to

12   provide them with a big data request, or they get a whole bunch

13   of information about who the firm's public company clients are

14   and information about each of those audits.

15   Q.  Is it optional for a firm like KPMG to provide that

16   information in response to the PCAOB's request?

17   A.  No, it's not optional.

18   Q.  What is your understanding of where that requirement comes

19   from?

20   A.  My understanding is that requirement comes right out of the

21   Sarbanes-Oxley Act.

22   Q.  What kind of information does a firm like KPMG have to

23   provide in response to that data request?

24   A.  Information like who their audit clients are; you know, the

25   public company audits, who they are.  Who the team members are,

J2J5mid1                              Sweet – direct

1    which partners they assign to the engagement and information

2    about audit fees or how many hours they expected to take to

3    complete the audit.

4    Q.  In what form does KPMG provide that information to the

5    PCAOB?

6    A.  They provide it in Excel so it's electronic form.

7    Q.  And what is that Excel spreadsheet called?

8    A.  It is referred to the GNF planning profile.

9    Q.  What does GNF stand for?

10   A.  It's an acronym that PCAOB created that refers to Global

11   Network Firm.

12   Q.  Is KPMG a Global Network Firm?

13   A.  Yes.

14   Q.  Are the other Big Four accounting firms global network

15   firms?

16   A.  Yes, they are.

17   Q.  Once the PCAOB gets the GNF planning profile, how does the

18   PCAOB use that document?

19   A.  They take the information that the firm provides on this

20   GNF planning profile and they'll add columns into that, they'll

21   add other columns into that Excel spreadsheet and use that in

22   order to determine or make recommendations on whether or not

23   each of those audit clients should be considered for inspection

24   or not.

25   Q.  After the PCAOB adds those columns in to the GNF planning

J2J5mid1                         Sweet - direct

1    profile, does the PCAOB still call the document a GNF planning

2    profile?

3    A.  Yes, they do.

4    Q.  What kind of information did the PCAOB add into the columns

5    that they add into what they get from the firm in the GNF

6    planning profile?

7    A.  They'll add columns like, to indicate whether or not

8    they're recommending it for inspection or not, other columns

9    about if they are recommending it for inspection, why.  What

10   are the overall reasons for why it should be considered for a

11   PCAOB inspection.  And then, other information to support their

12   various risk assessments that they're doing, the quantitative,

13   all the various criteria that they use to evaluate.

14   Q.  What kind of factors does the PCAOB look at in evaluating

15   whether or not a specific audit should be part of its

16   inspection of KPMG for a given year?

17   A.  They consider both quantitative and qualitative factors.

18   Q.  Can you give an example of what you mean by a quantitative

19   factor?

20   A.  Yes.  Quantitative is numbers, just numbers.  They'll

21   compare things like how many hours does the firm say it is

22   going to take to complete the audit compared to the size of the

23   company and see if that makes sense.  Or, they'll look the

24   total number of partner hours that a partner is planning to

25   spend on the audit compared to the total number of audit hours;

J2J5mid1                          Sweet - direct

1   spend a hundred hours or a thousand hours.

2   Q.  Can you give an example of what you mean by a qualitative

3   factor that the PCAOB considers?

4   A.  Yes.

5           So, qualitative is really just a non-number component

6   to the risk assessment.  So a partner, for example, if the

7   audit is being conducted in, say, San Francisco, California,

8   but the partner lives in Florida, then the PCAOB would consider

9   that to be a qualitative risk factor because of the travel time

10  that the partner would have to go back and forth and so it

11  might result in less supervision of that particular audit.

12  Q.  How long, approximately, does the PCAOB planning process

13  take?

14  A.  The planning process typically takes around four months.

15  Q.  And how much of that time is taken up by the work that the

16  PCAOB is doing to try to select which audits to inspect?

17  A.  It's almost the entire time, all of it.

18          (Continued on next page)

19

20

21

22

23

24

25

J2jdmid2                          Sweet - direct

1   Q.  From your experience at the PCAOB, approximately how many

2   hours per week do members of the Planning Team work on

3   planning?

4   A.  About 40 hours a week.

5   Q.  And how many members are there on the Planning Team for a

6   given accounting firm?

7   A.  It would vary but 20/25.

8   Q.  And when you were at the PCAOB from 2009 through 2015, did

9   Jeff Wada play any part in the inspection planning process for

10  KPMG?

11  A.  No, not that I'm aware of.

12  Q.  Aside from the Planning Team, were there other people who

13  participated in some way in the planning process for which

14  audits, which KPMG clients should be inspected in a given year?

15  A.  Yes.

16  Q.  Where did those people come from within the PCAOB?

17  A.  So the PCAOB has, besides the inspectors for the

18  Inspections Group, they have an Office of Research and

19  Analysis, called their ORA Group, that also makes

20  recommendations of who should be inspected by each team, KPMG

21  inspection team, and then even the PCAOB's board themselves

22  make the final approval of the inspections at the end of the

23  planning phase.

24  Q.  All right.  Was the KPMG inspection team that you were

25  assigned to at the PCAOB broken up into subgroups?

J2jdmid2                           Sweet – direct

```
 1   A.  Yes.

 2   Q.  What were those subgroups?

 3   A.  There was a Planning Team subgroup.  They had a Banking

 4   Team subgroup.  They had a Root Cause Analysis subgroup.  There

 5   was a Report Writing subgroup and even a subgroup that they

 6   referred to as FMM or Firm Management and Monitoring.

 7   Q.  What did the Root Cause subgroup do?

 8   A.  The Root Cause subgroup would go through and evaluate the

 9   results of the inspections that the PCAOB teams do to evaluate

10   the underlying reasons for why an audit was either really,

11   really good or really, really bad.

12   Q.  And are you familiar with something called a Remediation

13   subgroup?

14   A.  Yes.

15   Q.  What is that?

16   A.  The Remediation subgroup would go through and evaluate

17   whether or not the team had taken sufficient remedial

18   corrective action to fix the problems that the PCAOB had

19   identified.

20   Q.  To fix the problems that the PCAOB had identified when?

21   A.  In both the comment forms that the PCAOB issued during the

22   inspection season, so to make sure that the firm went back and

23   fixed the underlying issues there, but also as it related to

24   the PCAOB's prior year report, the Part II section of the

25   report.
```

J2jdmid2                          Sweet - direct

1    Q.   What did the firm's Measurement and Monitoring subgroup do?

2    A.   They were the team that would primarily test the firm's

3    overall system of quality control, so the things like

4    independence and partner conversation that I had mentioned

5    earlier.

6    Q.   Was compliance with PCAOB rules in the purview of the Firm

7    Measurement and Monitoring Group?

8    A.   Yes, it was.

9    Q.   Do you have any sense of how they tested that?

10   A.   They would do testing at the firm's national office level

11   to evaluate, you know, how they were -- what processes the firm

12   had put in place, what controls, how the firm was ensuring its

13   own compliance.

14   Q.   From your experience at the PCAOB, did a firm's compliance

15   with PCAOB rules matter?

16   A.   Oh, yeah, it definitely mattered.

17   Q.   What was the Banking subgroup responsible for?

18   A.   The Banking subgroup were really comprised of the

19   specialist inspectors that had, you know, financial services

20   experience, and so they were the ones who were responsible for

21   inspecting the banks that the firm had -- the bank audit

22   engagements that the firm had.

23   Q.   And it may be obvious but what was the Report Writing Group

24   responsible for?

25   A.   The Report Writing Group would take the results of all of

J2jdmid2                           Sweet - direct

1    the comment forms that the inspection team had identified

2    during the course of the inspection season and even the result

3    of FMM's Group, given the national office procedures, and then

4    draft and ultimately produce the report that would then get

5    issued each year at the end of the PCAOB's inspection season.

6    Q.  All right.  I would like you to take a look at what's in

7    evidence as Government Exhibit 102.  Do you recognize this

8    document?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  I recognize this to be the PCAOB's GNF Planning Profile for

12   KPMG from 2015.

13   Q.  Do you know where the 2015 GNF Planning Profile that we're

14   looking at came from?

15   A.  Yes.

16   Q.  Where did it come from?

17   A.  It came from me because this was one of the documents that

18   I took with me when I left the PCAOB, I stole.

19   Q.  Where did you first get the 2015 GNF Planning Profile at

20   the PCAOB before you stole it?

21   A.  This document was included in the PCAOB's Inspections

22   Information System, their IIS system.

23   Q.  What is IIS?

24   A.  It's really the PCAOB's documentation repository where they

25   would store all the result of their planning and inspections

J2jdmid2                           Sweet - direct

1    work and even the report writing work for each firm for each

2    year.

3    Q.  When you were at the PCAOB, how was the IIS organized?

4    A.  It was organized by firm, so there was a KPMG section, and

5    then within that by year.  So, every year's inspections had its

6    own folder.

7    Q.  And did you say every year had its own folder?

8    A.  Yes.

9    Q.  Did you have to be granted access to get into the KPMG

10   portion of IIS or could anyone get into it?

11   A.  No, it was -- access was restricted so you had to be

12   granted access.

13   Q.  As the GNF Planning Profile is edited during the PCAOB's

14   planning process, does the IIS system keep track of changes

15   that are made to it?

16   A.  No.  Generally no.

17   Q.  All right.  So after you've accessed this 2015 GNF Planning

18   Profile on IIS, what did you do with it?

19   A.  I accessed it from the IIS system and then I saved it onto

20   my PCAOB computer.

21   Q.  Approximately when did you do that?

22   A.  I believe it was in March of 2015.

23   Q.  And did you download it to your computer in the first

24   instance to steal it?

25   A.  No, not in the first instance.

J2jdmid2                              Sweet - direct

1    Q.  Why did you save it to your PCAOB computer in March of

2    2015?

3    A.  This document was something that I would constantly refer

4    to during the course of my inspections activity at the PCAOB,

5    and so for the ones that I was going to lead the inspection for

6    I wanted to have this information available to go back and make

7    sure that I understood all the reasons for why my particular

8    inspection was -- had been identified, what the risk factors

9    were.

10   Q.  When you left the PCAOB, approximately what month and year

11   was that?

12   A.  I left the PCAOB in April of 2015.

13   Q.  And when you left the PCAOB in April 2015, what did you do

14   with the 2015 GNF Planning Profile, Government Exhibit 102,

15   that you had saved to your PCAOB computer?

16   A.  I transferred this document along with other documents and

17   saved them onto an external hard drive as part of me stealing

18   this information.

19   Q.  What did you do with this document after you put it on the

20   external hard drive?

21   A.  I took that hard drive with me when I started at KPMG and

22   then saved this information onto my KPMG computer.

23   Q.  Why did you do that?

24   A.  I did it so that I would have this information available to

25   help me in this new role that I was going into as a partner at

J2jdmid2                          Sweet - direct

1    KPMG.

2    Q.  And did there come time when you were at KPMG that you

3    accessed and used this document?

4    A.  Yes.

5    Q.  Did you do that once or more than once?

6    A.  More than once.

7    Q.  Did you share any of the confidential information from this

8    document with anyone at KPMG?

9    A.  Yes.

10   Q.  With whom did you share confidential information contained

11   on Government Exhibit 102 when you were at KPMG?

12   A.  Primarily with Tom Whittle, Dave Middendorf and David

13   Britt.

14   Q.  Anyone else?

15   A.  Yes.

16   Q.  With whom?

17   A.  With certain other audit partners that had found out that

18   they were going to be inspected during the year, I accessed

19   this information and used it to help assist them in preparation

20   for their inspection.

21   Q.  Anyone else?

22   A.  I also accessed this information with Cindy Holder.

23   Q.  Anyone else?

24   A.  Umm, not that I can remember right now.

25   Q.  OK.  When you did that, did you know that what you were

J2jdmid2                          Sweet - direct

1    doing was wrong?

2    A.  Yes, I did.

3    Q.  Why did you share this information with those people?

4    A.  I knew that by sharing this information it would make me

5    look good.  It helped advance my career by having this type of

6    information, but it was also something that was expected of me.

7    Q.  How do you know that it was expected of you?

8    A.  Because I was told that it was expected of me.

9    Q.  All right.  We'll come back to that.

10         Let's look at the tabs at the bottom of the screen in

11   Government Exhibit 102.

12         Out of all those tabs at the bottom of the screen, was

13   there one that the PCAOB used most in the process of selecting

14   which audits to inspect?

15   A.  Yes.

16   Q.  Which one?

17   A.  The tab that we are on right now, the Issuer Screening

18   template.

19   Q.  OK.  So I'm going to ask Mr. Urbanczyk to scroll across

20   slowly.

21         Can you give -- actually, before you scroll, just

22   looking at the home sort of screen, could you give an example

23   of the columns that are added by the PCAOB during its planning

24   process?

25   A.  Yes.  So the -- from what we're looking at here, each of

J2jdmid2                        Sweet - direct

1    these columns that are in green, so that the Business

2    Description, the Selection Recommendation with 1, 2 or 3, the

3    Final Selection and then the Rationale for Selection columns,

4    those are all columns that were added by the PCAOB.

5    Q.  All right.  And we'll go across in a moment, but what kind

6    of information is in the column entitled "Selection

7    Recommendation, Select = 1, Neutral = 2, Don't Select = 3"?

8    A.  That column would represent the individual PCAOB's

9    inspector that was doing the initial planning review for each

10   of these, and so it would be their initial recommendation as to

11   whether or not to select something or not.  So 1 would mean

12   that they were recommending that it be picked, and 3 would be

13   that they are recommending that it not be picked that year.

14   Q.  And approximately when in the calendar year -- withdrawn.

15             What is in the "Final Selection" column, what is that

16   column for?

17   A.  The Final Selection would then represent the final

18   determination or final conclusion by the PCAOB once the

19   planning was finished on what the final list of inspections

20   were then going to be for that season.

21   Q.  And roughly when in the calendar year is the Final

22   Selection column populated with about 50 1's, reflecting the

23   PCAOB's final list of which audits are going to be inspected?

24   A.  Generally in the February timeframe.

25   Q.  And in your experience at the PCAOB, does the number in the

J2jdmid2                          Sweet - direct

1   Selection Recommendation column change throughout the planning

2   process?

3   A.  Yes, it does.

4   Q.  Can you give an example of what may cause it to change, or

5   what caused it to change when you were at the PCAOB?

6   A.  So if during the planning cycle, you know, the company

7   announced that it was firing its CEO and CFO, that might be a

8   pretty big risk indicator that there could be a problem with

9   the financial statements, and so it's something that could then

10  trigger the PCAOB saying that they want to inspect it in that

11  following year.  So, it might go from a 3 or a 2 to then become

12  a 1.

13  Q.  And is there -- as of January, how many audit engagements

14  typically had a 1 in the Selection Recommendation column, so

15  before the process was finalized?  Would it be less than 50?

16  More than 50?

17  A.  Typically it would be more than 50, so, say, like 75 or 80.

18  Q.  Are you familiar with a PCAOB document called the

19  "Attribute Schedule"?

20  A.  Yes.

21  Q.  Does that contain all of the selections that have a 1 in

22  the Selection Recommendation column from the GNF Planning

23  Profile?

24  A.  Yes, it commonly would.

25  Q.  Are the two documents sync'd throughout the inspection

J2jdmid2                          Sweet - direct

1     planning process or is there a lag?

2     A.   There is a lag in those documents.

3     Q.   So do they always match up?

4     A.   No.

5     Q.   And approximately when does the number in the Selection

6     Recommendation column that's a 1 -- I think you testified that

7     there were more than 50, maybe 57 or 80 -- when does that get

8     narrowed down?

9     A.   It would get narrowed down in the final -- final planning

10    review process where it's getting reviewed by the leadership

11    for the inspection team, so typically around February.

12    Q.   All right.  Let's then scroll to the right, Mr. Urbanczyk.

13    So -- keep going.  OK.

14         So, there is a column, "Areas Recommended for

15    Inspection and Rationale, Section 1," and then the same thing

16    Section 2, and then I don't know if we can fit the next column

17    on the screen, Section 3.  What are the three columns entitled

18    "Areas Recommended for Inspection and Rationale" in general

19    terms?

20    A.   So those would represent the specific financial statement

21    areas that the PCAOB wants to inspect.  So once it has decided

22    that it wants to inspect the issuer, then these are the three

23    underlying financial areas that they would focus in on.

24    Q.   Is there a term that the PCAOB uses for those three areas?

25    A.   Yes.

J2jdmid2                          Sweet - direct

1  Q.  What is it?

2  A.  They are referred to as the focus areas, primary focus

3  areas.

4  Q.  OK.  And are there typically three?

5  A.  Yes, typically three focus areas for each inspection, yeah.

6  Q.  So let's look at one in the first Focus Area column, which

7  is J on our screens.

8          So, for example, looking at I think this American

9  Airlines?

10  A.  Yes.

11  Q.  So looking at the first Focus Area for American Airlines,

12  what is in the first line that says "Revenue" and then, in

13  parentheses, "O" comma and "V/A," close parentheses?

14  A.  So that would be the name of the specific focus area that

15  is being recommended.  So, revenue would be one of the areas

16  for specific inspection by the PCAOB.

17  Q.  What does O and V/A mean?

18  A.  Those are the financial statement assertions, which is just

19  the specific areas then within revenue, in an auditing world,

20  that they would focus in on.

21  Q.  OK.  So below that line "Revenue," can you generally

22  explain what the text is in the next --

23  A.  So --

24  Q.  -- 15 or so lines of that cell?

25  A.  Yes.  This would be the specific rationale or the reasons

J2jdmid2                          Sweet – direct

for why the, you know, Planning Group at the PCAOB is

recommending the revenue be inspected, so all of the risk

criteria, the evaluation, the information that they think makes

this a good focus area for the PCAOB's inspection.

Q.   OK.  When the time comes for the PCAOB to formally notify

KPMG of an inspection of, in this example, American Airlines,

do you know what information the PCAOB provides in the first

notification?

A.   Yes.

Q.   What information does the PCAOB provide?

A.   First they would only provide the name, so announcing that

they are going to inspect the audit work for American Airlines

and then the week that they plan to start that -- that

inspection.

Q.   Between the formal notification, where the PCAOB gives the

name of the audit to be inspected in a week, and the start of

the actual field work portion of the inspection, does the PCAOB

provide KPMG with additional information about the inspection?

A.   Yes, it does.

Q.   What information is provided in that window?

A.   It then provides the specific -- the three primary focus

area names, so at that point that's when they say revenue is

going to be one of our focus areas, and then they would also

provide the names of the inspectors who were going to be on

that given inspection.

J2jdmid2                          Sweet - direct

1   Q.  OK.  So looking, for example, at the first focus area on

2   here for American Airlines, "Revenue," what information from

3   this cell is shared by the PCAOB with KPMG?

4   A.  It would only be that first line, the Revenue and plus

5   what's in parentheses.

6   Q.  Does the PCAOB, in your experience at the PCAOB and the

7   KPMG, ever share the "Rationale" portion of this Focus Area

8   column?

9   A.  No, they do not.

10  Q.  And going back to a few columns over, Mr. Urbanczyk, to the

11  beginning.

12           So, what is in the "Rationale for Selection" column?

13  A.  This would reflect the overall summary reasons for why they

14  are recommending a particular issuer be -- engagement be

15  selected for inspection or not, so all of the specific reasons.

16  Q.  Does the PCAOB ever share with KPMG, from your experience

17  from 2009 through 2017, the contents of the column entitled

18  "Rationale for Selection"?

19  A.  No, they do not.

20  Q.  Does the PCAOB ever share its GNF Planning Profile with all

21  the columns added with KPMG?

22  A.  No, they do not.

23  Q.  To what extent is the GNF Planning Profile, once it's had

24  material added to it by the PCAOB, to what extent is that

25  document treated as confidential at the PCAOB?

J2jdmid2                         Sweet - direct

1   A.   It would be treated as very confidential.

2   Q.   All right.  Let's just scroll across, Mr. Urbanczyk, and

3   look at some other columns that are added by the PCAOB.

4              OK.  So stop for one moment.

5              Do you see the columns entitled "3-Star Referral" and

6   "2-Star Referral"?

7   A.   Yes, I do.

8   Q.   What do those refer to?

9   A.   Those would be the recommendations that would be made by

10  that PCAOB Office of Research and Analysis, or the "ORA" Group

11  that I mentioned earlier, that is also involved in planning.

12  So if they are referring or recommending something for

13  inspection, it would get tracked here.

14  Q.   Does the PCAOB ever share with firms like KPMG whether

15  something was a 3-Star or 2-Star referral?

16  A.   No, they don't.

17  Q.   Does the PCAOB ever share with firms like KPMG whether

18  something was recommended by ORA?

19  A.   No, they don't.

20  Q.   And what's in the "Top 30 Issuer" column?

21  A.   It's a "yes" or "no" answer.  The PCAOB would identify

22  which of the firms' audit engagements it believed were the Top

23  30, or the biggest clients, and it was a separate risk factor

24  that they would evaluate in making their recommendations.

25  Q.   And let's scroll across for a moment.  So -- I'm sorry, go

J2jdmid2                          Sweet - direct

1    back just a couple of columns, Mr. Urbanczyk.  Thanks.

2              So "Staff Practice Alerts," what do those columns

3    contain?

4    A.   Those are making reference to specific auditing guidance

5    that the PCAOB has issued that it believes is relevant for a

6    particular audit engagement.  And so, again, the yes or no

7    would be indications of whether or not they think that is

8    relevant and, you know, one of the considerations for what

9    would make a good inspection selection or not.

10   Q.   Is that ever shared with a firm?

11   A.   No, it is not.

12   Q.   Let's scroll across to the -- yes.

13             So the columns "Number of Location Leaders, Number of

14   FSA Inspectors, Number of ISA Inspectors, Total Estimated Field

15   Work Weeks," what are the numbers in these columns?

16   A.   Those are really more staffing considerations that the

17   PCAOB would evaluate in terms of figuring out how many

18   inspectors it would take to conduct a particular inspection and

19   how many weeks that that inspection will take.

20   Q.   OK.  And then what about "Scheduling Considerations," what

21   is in that column?

22   A.   Those, again, would be more staffing and

23   scheduling-related, so specific specialist needs that might be

24   necessary in order for the PCAOB to be able to complete one of

25   its inspections.

J2jdmid2                        Sweet - direct

1   Q.  And all of this staffing information, is that something

2   that the PCAOB shares with accounting firms?

3   A.  No.

4   Q.  All right.  After the PCAOB goes through its lengthy

5   inspection planning process, does the PCAOB notify -- sorry.

6   Approximately when is notice given to each accounting firm

7   about each inspection target, about each audit that is going to

8   be inspected?

9   A.  Each of the inspection targets are only named by the PCAOB

10  two or three weeks before the PCAOB plans to start its field

11  work, so they only get two or three weeks' notice.

12  Q.  In your experience at the PCAOB, is it ever the case that

13  the PCAOB notifies an accounting firm like KPMG of an

14  inspection before the end of the 45-day period?

15  A.  It's very rare for that to happen.

16  Q.  When that happens, what steps, if any, does the PCAOB take

17  as a result of giving notice to the firm before the end of the

18  45-day period?

19  A.  If they have to notify before the 45-day period is done,

20  then the PCAOB requires the firm to keep a log of all of the

21  changes that get made to a particular eAudIT file or set of

22  workpapers before those workpapers are archived or completed.

23  Q.  Even changes to word choice?

24  A.  Yes.  All changes would have to then be tracked.

25  Q.  What is your understanding about why the PCAOB requires

J2jdmid2                         Sweet - direct

1    that?

2    A.   They would require it because they want to understand what

3    types of changes are being made but also how many changes are

4    being made.

5    Q.   What's your understanding of why that matters during an

6    inspection?

7    A.   The PCAOB would want to understand if there are a

8    significant number of changes, say hundreds and hundreds of

9    changes being made only after the PCAOB has made notification

10   or at the very end of the documentation completion period, it's

11   a risk factor or a risk consideration on really whether or not

12   the audit team itself was a good team or a high-quality team.

13   Q.   To what extent did the nature of changes to workpapers like

14   that matter to you as a PCAOB inspector?

15   A.   It mattered a lot.

16   Q.   When you were at the PCAOB, did you receive training on

17   PCAOB rules?

18   A.   Yes, I did.

19   Q.   How frequently?

20   A.   At least every year.

21   Q.   Did you certify your compliance with those rules?

22   A.   Yes, I did.

23   Q.   In writing?

24   A.   Yes.

25   Q.   Are you familiar with the PCAOB ethics code?

J2jdmid2                         Sweet – direct

1    A.  Yes, I am.

2    Q.  And what's your understanding about whether the PCAOB

3    ethics code allows or doesn't allow employees to share

4    confidential PCAOB information?

5    A.  The ethics code makes it clear that PCAOB employees are not

6    allowed to share any confidential information both while

7    they're employed but even after they leave the PCAOB.

8    Q.  And what's your understanding about whether the ethics code

9    is part of PCAOB rules?

10   A.  Yes, the ethics code is part of the PCAOB's rules, yes.

11   Q.  Does the ethics code apply to all PCAOB employees?

12   A.  Yes, it does.

13   Q.  And what's your understanding -- what was your

14   understanding between 2015 and 2017 about whether the PCAOB's

15   lists of inspection selections were confidential?

16   A.  It was very confidential.

17   Q.  And the content of the GNF Planning Profile, what's your

18   understanding about whether that was confidential even after

19   the names of inspection targets had been shared with KPMG?

20   A.  Yes, very confidential.

21   Q.  Did you violate PCAOB rules, including the ethics code, for

22   your conduct in connection with this case?

23   A.  Yes, I did.

24   Q.  In what years did you do that?

25   A.  In 2015, 2016 and 2017.

J2jdmid2                          Sweet – direct

Q.  So in connection with the rationale that was on the GNF

Planning Profile that we were looking at, do you have an

understanding of why it matters to the PCAOB if a firm knows

the PCAOB's rationale for selecting a particular audit?

A.  Yes, it matters.

Q.  Why does it matter that the PCAOB -- if a firm knows its

rationale for selection?

A.  It, again, partly because it's confidential information,

knowing that information might allow the firm to be able to

figure out how the firm -- or how the PCAOB is making its

inspection choices.  But also for an engagement team to be

aware of the specific rational, it might allow them to better

answer questions or better prepare for a PCAOB inspection.

Q.  And how does that matter to the PCAOB?  Why does that

matter to the PCAOB if a firm can better prepare for an audit

because it knows the PCAOB's rationale for selection?

A.  Because part of the inspection process is for the

engagement team to ask questions and understand why an

engagement team chose to do the audit work that it did, and so

knowing that information might allow the engagement team to

answer questions differently or give different results than it

otherwise would have.

Q.  Do you have an understanding about where the PCAOB's

inspection reports go after they are issued?

A.  Yes.

J2jdmid2                              Sweet - direct

1    Q.   Where do they go?

2    A.   They go directly to the Securities and Exchange Commission,

3    or "SEC," but they are also made publicly available on the

4    PCAOB's website for any and all users.

5    Q.   How do you know that inspection reports go to the SEC?

6    A.   I know that from my time at the PCAOB and even my time at

7    KPMG.

8    Q.   All right.  Let's talk about the inspection process.

9              What are the different phases of the inspection

10   process?

11   A.   Very simply, it would be the planning phase, then the

12   inspection phase, and then the report writing phase.

13   Q.   What happens in the inspection phase?

14   A.   Once the firm has been given notice by the PCAOB, after

15   planning is complete and the name of the audit engagement has

16   been chosen, it gets notified to KPMG and then the -- KPMG's

17   national office will assign an inspector, and that inspector

18   will then coordinate with the location leader from the PCAOB to

19   help plan and prepare and facilitate that inspection.

20   Q.   Does the PCAOB inspection team get access to the eAudIT

21   files?

22   A.   Yes.

23   Q.   And what happens when the inspection team arrives for the

24   audit -- I mean for the inspection -- withdrawn.  Let me ask

25   that again.

J2jdmid2                          Sweet - direct

1          What happens when the inspection team arrives for the

2     inspection?

3     A.   For the inspection, the first thing that typically occurs

4     is that the engagement team from the firm, KPMG, will have an

5     opening meeting with the PCAOB inspectors to kick off the

6     inspection and provide an overview of the company it audited

7     and its financial statements and all of the focus areas that

8     the PCAOB has communicates.

9     Q.   OK.  Where do the inspections typically take place?

10    A.   They take place in the firm's practice offices, so the

11    office where the audit was originally conducted.

12    Q.   OK.  To be clear, when you say the firm's practice offices,

13    for KPMG, that's KPMG's practice offices?

14    A.   Yes.  So, KPMG's individual offices.  So if it was an audit

15    done out of Denver, it would be out of KPMG's Denver office.

16    Q.   Do you have any idea how many offices KPMG has across the

17    United States?

18    A.   Generally, yes.

19    Q.   Approximately how many?

20    A.   I would estimate probably 50 or so, 50 to a hundred.

21    Q.   OK.  And how long does an inspection team typically spend

22    on the field work portion of an inspection when they're at a

23    KPMG office?

24    A.   The inspection could be as short as one week of field work,

25    but it could go up to eight weeks long depending on how big the

J2jdmid2                          Sweet – direct

1   audit was, so depending on the size of the audit.

2   Q.  What kinds of public company audits require more than one

3   or two weeks of field work by the PCAOB inspection team?

4   A.  The Top 30 that we reviewed earlier on that GNF, those are

5   the best examples.  So the biggest companies, public companies

6   in the world, those are the ones that typically require a lot

7   more than one inspection week.

8   Q.  OK.  Now, you testified that formal notice is typically

9   given two to three weeks before an audit.  Separate from that,

10  formal notice of a particular inspection, does the PCAOB give

11  advance notice of what cities it is going to be in for

12  inspections?

13  A.  Yes, it does.

14  Q.  Why does the PCAOB do that?

15  A.  The PCAOB does that for scheduling purposes so that the

16  firm can be aware of which cities the PCAOB is planning to be

17  in and on what week so that they can reserve conference rooms

18  and office space in order to facilitate that PCAOB inspection.

19  Q.  To your knowledge, did giving that scheduling notification

20  ever result in KPMG figuring out which of its audit clients,

21  which of its engagements, were going to be inspected?

22  A.  Yes, it was possible from that scheduling notice.

23  Q.  And to your knowledge, was there any effort by the PCAOB to

24  avoid giving scheduling information if it would result in the

25  accounting firm figuring out which audit was going to be

J2jdmid2                           Sweet – direct

1    selected?

2    A.  Yes.

3    Q.  Was there one point person who typically gave notice of an

4    inspection from the PCAOB to KPMG?

5    A.  Yes.

6    Q.  And do you know how that notice was typically given?

7    A.  It was through email initially.

8    Q.  All right.  And between the time of that official notice

9    and the PCAOB's arrival for the on-site inspection work, you

10   testified about what some of the information is that's provided

11   by the PCAOB.  What else happens in that window?

12   A.  In that window the engagement team has to prepare some

13   advance information for the PCAOB that they provide.  They

14   provide the access to the electronic eAudIT workpapers.  They

15   reserve the conference room space.  And then the engagement

16   team will also prepare the opening meeting presentation that it

17   gives to the PCAOB the first day.

18   Q.  What is the opening meeting presentation?

19   A.  It is a PowerPoint presentation typically that the

20   engagement partner would lead that gives an overview of the

21   company itself but then also all of the summary of all of the

22   risk decisions that it made and how it planned the audit and

23   who was involved in the audit and then a summary of the work

24   that it performed in each of the focus areas that the PCAOB is

25   going to inspect.

J2jdmid2                         Sweet - direct

1   Q.  Are there typically visual aids that accompany this opening

2   meeting presentation?

3   A.  Yes.

4   Q.  What kind of visual aids?

5   A.  A big PowerPoint presentation is usually handed out to each

6   of the inspectors.

7   Q.  For the opening meeting presentation, did KPMG have a

8   template that the engagement teams, the teams that worked on an

9   audit, were to use during the opening meeting presentation?

10  A.  Yes.

11  Q.  I would like you to take a look at what's marked for

12  identification as Government Exhibit 1306.  Do you recognize

13  this document?

14  A.  Yes, I do.

15  Q.  How do you recognize it?

16  A.  I recognize this from my time at KPMG.

17  Q.  And was this a template that KPMG used?

18  A.  Yes.  This is the opening meeting presentation template

19  that was given to each of the engagement teams once they were

20  notified that their audit engagement would be inspected by the

21  PCAOB.

22          MS. KRAMER:  The government offers Government Exhibit

23  1306.

24          THE COURT:  Government's 1306 is received.

25          (Government's Exhibit 1306 received in evidence)

J2jdmid2                         Sweet - direct

1   BY MS. KRAMER:

2   Q.   All right.  Did you actually use this document when you

3   were at KPMG?

4   A.   Yes.

5   Q.   How did you use it?

6   A.   I also -- while I was at KPMG, I served as a inspection

7   liaison, which meant that I worked closely with audit

8   engagement teams as they prepared for and were inspected by the

9   PCAOB, and so I used this template in helping some of those

10  engagement teams prepare for their opening meeting

11  presentation.

12  Q.   All right.  And in general terms -- could we put up two

13  pages side-by-side, Mr. Urbanczyk?  Thank you.

14          Could you go to the next page.  Thank you.

15          So, generally, what's on the top half of the page

16  throughout this document?

17  A.   The top half of this page is the, you know, PowerPoint

18  slide itself that would, you know, get tailored or edited and

19  then presented to the PCAOB.

20  Q.   And what's on the bottom half of the pages throughout this

21  exhibit?

22  A.   The bottom half are the instructions or the guidance that

23  was given to -- it kept internally within the KPMG -- the KPMG

24  engagement team so that they could understand what it is that

25  they needed to do to prepare this presentation.

J2jdmid2                          Sweet - direct

1    Q.   What group at KPMG prepared this document?

2    A.   The Audit Engagement Team would take lead in preparing this

3    document.

4    Q.   And who, to your knowledge, prepared this template with all

5    of the instructions that are in it?

6    A.   The template was prepared by the Inspections Group in

7    KPMG's national office.

8    Q.   How long typically was the opening meeting presentation?

9    A.   It could be as short as two or three hours but as long as

10   really all day if we are at a very large company.

11   Q.   All right.  Let's look at page 3.  I think it might be

12   easier to read if we make it just one page again.  Thank you.

13            And what does the last sentence say in the bottom half

14   of that page?

15   A.   "The PCAOB will use the results of the Opening Meeting to

16   form a preliminary conclusion on audit performance and it may

17   influence the nature and extent of their inspection

18   procedures."

19   Q.   Do you agree with that sentence?

20   A.   I very much agree with that sentence.

21   Q.   In your experience as a PCAOB inspector, is that true?

22   A.   Yes.

23   Q.   Is the opening meeting the only meeting that takes place

24   during the field work phase of an inspection?

25   A.   No.

J2jdmid2                         Sweet - direct

Q.   What other meetings are there?

A.   After the opening meeting, there would be individual

meetings between the PCAOB inspectors and the Audit Engagement

Team to go through each of the primary focus areas.

Q.   What typically happens in the Focus Area meetings during an

inspection?

A.   The PCAOB would ask a lot of questions and conduct

interviews in order to understand -- better understand the

audit work that the engagement team did.

Q.   Do you have an understanding from your experience at the

PCAOB and at KPMG of whether the engagement team's performance

in the opening meeting and the Focus Area meetings can affect

whether or not comment is issued?

A.   Yes.

Q.   What is your understanding of that?

A.   That those meetings had a significant impact on the overall

inspection results.

Q.   And can they have an effect on whether a comment is issued,

in your experience?

A.   Yes.

Q.   Why?

A.   The PCAOB wants to understand not just the words that are

written in the audit workpapers but the context behind it and

other information that the team considered in deciding what

work to do and how much work to do, and so it places a lot of

J2jdmid2                              Sweet - direct

1    emphasis and weight on those interviews during the field work

2    phase in order to influence whether or not there really was a

3    problem in the audit or not.

4    Q.  And in preparing this slide deck for the opening meeting

5    presentation, how much time, in your experience, does it take

6    to just prepare the PowerPoint?

7    A.  It took quite a bit of time for the engagement team to

8    prepare this.

9    Q.  How much time does it take to review the workpapers to

10   prepare this?

11   A.  Quite a bit of time.

12   Q.  And then how much time does it take to enter the

13   information once the team has reviewed the paperwork?

14   A.  Yes, quite a bit of time.

15   Q.  OK.  Let's talk about the wrap-up phase.

16           How does the PCAOB inspection team decide whether or

17   not to issue a comment form, generally?

18   A.  The PCAOB goes through an internal review process.  So,

19   starting first with the inspection team themself to decide what

20   issues might rise to the level of a comment form.  And then it

21   goes -- the PCAOB then goes -- the inspection team then

22   discusses those issues with KPMG -- excuse me, with PCAOB

23   leadership to then determine whether or not there is -- the

24   issue is so significant that it requires to be issued as a

25   comment form to the firm.

J2jdmid2                         Sweet – direct

1    Q.  Approximately when is a comment form provided to the

2    accounting firm, likes KPMG, from the PCAOB?

3    A.  Typically one or two weeks after the inspection field work

4    phase is completed.

5    Q.  Is the comment form publicly issued?

6    A.  No, it's not.

7    Q.  Are firms given a chance to respond to comment forms?

8    A.  Yes.

9    Q.  And what does it mean for a firm to get a comment form on

10   an inspection?

11   A.  Generally, a comment form means that the firm, or the

12   engagement team, failed to do enough audit work and so its

13   audit opinion was unsupported and so it means that it

14   potentially is a failed audit.

15   Q.  And does that mean that there was a problem with the

16   financial statements of the public company?

17   A.  No, not the financial statements, just the audit work that

18   the accounting firm was required to do in order to issue its

19   opinion on those financial statements.

20   Q.  Does that mean that there was -- that the audit opinion was

21   unfounded and had to be withdrawn?

22   A.  No, not necessarily, just that there was -- there were not

23   enough procedures performed in order to make that audit

24   opinion.

25   Q.  Do all of the comment forms that the PCAOB inspection team

J2jdmid2                         Sweet – direct

1    sends to an accounting firm after an inspection end up as

2    comments in Part I of the PCAOB's inspection report at the end

3    of the year?

4    A.  No.

5    Q.  What happens between the time that a comment form is

6    provided and Part I of the inspection report is finalized?

7    A.  The PCAOB goes through even a further review process to

8    evaluate each of those comment forms and any response that the

9    firm provided on those comment forms to further evaluate

10   whether or not those comment forms, the written comment forms,

11   represent a failure in the audit itself.  So, it is just an

12   extra layer of review.

13   Q.  Generally, what goes into Part I of a PCAOB inspection

14   report?

15   A.  Part I of the report is a summary of all of the written

16   comment forms for each of the audit clients or engagements that

17   the PCAOB inspected where the PCAOB has determined that the

18   audit work was insufficient, so it was a failed audit.

19   Q.  So how many comments does it take during an inspection of a

20   given audit for that audit inspection to be considered failed?

21   A.  Any one comment could result in that conclusion.

22   Q.  What, generally, goes into Part II of the PCAOB's

23   inspection report?

24   A.  Part II of the report are the themes that the PCAOB would

25   identify related to failures or problems in the firm's overall

J2jdmid2                          Sweet - direct

1   system of quality control.

2   Q.  What's your understanding about when Part II is publicly

3   issued?

4   A.  Part II is not publicly issued until twelve months after

5   the report is issued if the firm is unable to prove to the

6   PCAOB that it has taken enough remediation or remedial action,

7   corrective action, to fix those Part II issues.

8   Q.  And when you were at KPMG, who worked on taking remedial

9   action to fix Part II comments?

10  A.  It was the Remediation Team -- I'm sorry.  Would you ask

11  the question again, please?

12  Q.  When you were at KPMG, who worked on trying to remediate

13  Part II comments to fix them so that they wouldn't end up in

14  the public version of Part II?

15  A.  At KPMG it was also done within the Inspections Group in

16  the national office.

17  Q.  Did you have an understanding when you were at KPMG as to

18  whether the SEC had been critical of KPMG's inspection results?

19          MS. LESTER:  Objection.

20          THE COURT:  Overruled.

21  A.  I'm sorry.  Would you ask the question again?

22  Q.  When you were at KPMG, did you have an understanding of

23  whether or not the SEC had been critical of KPMG's inspection

24  results?

25  A.  Yes.

J2jdmid2                           Sweet - direct

1   Q.  How did you get that understanding?

2   A.  I formed that understanding through my role as a partner

3   and in the Inspections Group and through meetings that I

4   attended and in conversations that I had.

5   Q.  Did you ever have any such conversations with David

6   Middendorf?

7   A.  Yes.

8   Q.  What did Dave Middendorf say on the subject?

9   A.  He had shared some of his experiences in communicating with

10  the SEC, that in fact the SEC had been very critical of the

11  worsening results from the PCAOB on KPMG's audit inspections.

12  Q.  Do you have any understanding of why you were told about

13  the SEC's criticisms of KPMG's inspection results?

14          MS. LESTER:  Objection.

15          THE COURT:  Sustained.

16  BY MS. KRAMER:

17  Q.  When you engaged in the conduct that led to your guilty

18  plea and conviction in this case, in terms of KPMG's inspection

19  results, what was your goal?

20  A.  My goal was to help KPMG improve its inspection results, so

21  to fare better and have been less deficiencies in its PCAOB

22  reports.

23  Q.  And who did you understand would get those reports?

24  A.  I knew that the SEC would get those reports and that those

25  reports would be made publicly available for audit committees

J2jdmid2                            Sweet - direct

1   and others to use.

2              MS. KRAMER:  Your Honor, this may be a good time for

3   the morning break.

4              THE COURT:  OK.  Folks, let's take a ten-minute break.

5   Please leave your notepads on your chairs and we'll continue in

6   ten minutes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Bring in the jury.

2          (Jury present)

3          THE COURT:  Ms. Kramer, you may proceed.

4          MS. KRAMER:  Thank you, your Honor.

5    BY MS. KRAMER:

6    Q.  Mr. Sweet, in 2015, how had KPMG been doing on its PCAOB

7    inspections?

8    A.  They had been progressively worse than the previous years.

9    Q.  Could you remind us what your role was at PCAOB in early

10   2015?

11   A.  I was an associate director in the inspections group

12   assigned to KPMG and so I led inspections of KPMG audits, and I

13   also worked on the report writing phase.

14   Q.  Did there come a time that KPMG reached out to you about an

15   employment opportunity?

16   A.  Yes.

17   Q.  Approximately when was that?

18   A.  The first -- they first reached out in the summer of 2014.

19   Q.  Who contacted you?

20   A.  A third-party headhunter/recruiter contacted me.

21   Q.  What was your response?

22   A.  I initially told them no, that I was not interested in

23   leaving the PCAOB.

24   Q.  Were you contacted once or more than once?

25   A.  More than once.

J2J5mid3                          Sweet – direct

1   Q.  Did you eventually express interest?

2   A.  Yes.

3   Q.  Were you interviewed at KPMG?

4   A.  Yes.

5   Q.  Approximately when did you interview with KPMG?

6   A.  In March or so, of 2015.

7   Q.  Did you disclose to the PCAOB ethics office that you were

8   interviewing with KPMG?

9   A.  Yes, I did.

10  Q.  When, in relation to the interview, did you do that?

11  A.  I did that prior to my interviews.

12  Q.  Do you remember approximately how many people from KPMG

13  interviewed you?

14  A.  Seven or eight or so.

15  Q.  Do you remember any of their names?

16  A.  Yes.

17  Q.  Who do you remember?

18  A.  I interviewed with Tom Whittle, David Britt, Dave

19  Middendorf, Jim Liddy, Scott Marcello, John V. Meyer, and Phil

20  Schimmel.

21  Q.  The people that you mentioned, other than Dave Middendorf,

22  Tom Whittle and David Britt, in general terms, what kinds of

23  roles did they have at KPMG?

24  A.  They were all partners and in very senior leadership

25  positions within the firm's national office.

J2J5mid3                        Sweet – direct

1  Q.  What was the outcome of your interviews at KPMG?

2  A.  I was offered a position as a direct admit partner into the

3  firm.

4  Q.  What does it mean to be a direct admit partner?

5  A.  It means that I would join the firm's partnership directly

6  without going outside the normal admittance cycle.

7  Q.  Were you offered a partner role in any particular group at

8  KPMG?

9  A.  Yes.

10  Q.  Which one?

11  A.  I was offered a partnership within the national office, and

12  specifically in the inspections group.

13  Q.  What was your understanding of the objectives of the

14  inspections group?

15  A.  The inspection group was there to facilitate all of the

16  PCAOB's inspection activities.

17  Q.  Did you discuss your job offer with Cindy Holder?

18  A.  Yes, I did.

19  Q.  What did you tell her?

20  A.  I told her that I had been offered this partnership

21  position.  I remember explaining to her what it was and that I

22  had ultimately decided to take that position and would be

23  leaving the PCAOB.

24  Q.  How did she respond?

25  A.  She was very happy for me but also told me that if the

J2J5mid3                          Sweet - direct

1   firm, KPMG were hiring other people, that she also wanted to

2   leave the PCAOB and would love to join KPMG.

3   Q.   How much did your compensation change when you left the

4   PCAOB and started at KPMG as a partner in the national office?

5   A.   My compensation more than doubled.

6   Q.   From approximately what to what per year?

7   A.   From around $240,000 to $525,000.

8   Q.   Do you recall approximately when your last day was at the

9   PCAOB?

10   A.   It was towards the end of April 2015.

11   Q.   Before you left the PCAOB, what was your understanding

12   about whether you were permitted to take with you confidential

13   PCAOB documents?

14   A.   I knew that under the ethics code that I was not permitted

15   to take anything confidential, and that what I knew was

16   confidential had to be kept confidential.

17   Q.   Did you take any PCAOB documents with you when you left?

18   A.   Yes, I did.

19   Q.   Electronic or paper, or both?

20   A.   Both.

21   Q.   What paper documents did you take, to the best of your

22   memory?

23   A.   I took notes that I had in a notebook and also hard copy

24   documents that included the PCAOB's inspection schedules for --

25   or the inspection list for 2015.

1    Q.  What happened to the notebook that you took with you when

2    you left the PCAOB in April of 2015?

3    A.  I disposed of it just in the normal course of cleaning up

4    my files.

5    Q.  What was your typical practice for throwing away notes or

6    notebooks?

7    A.  At the end of an inspection season or beginning of a new

8    audit year I would clean out the old and start new.

9    Q.  What electronic documents did you take from the PCAOB?

10   A.  I copied the contents of the computer I was using, the

11   information I had on the hard drive onto an external hard drive

12   document so I just copied it over.

13   Q.  Did that include the GNF planning profile you testified

14   about earlier that is in evidence as Government Exhibit 102?

15   A.  Yes.

16   Q.  Did it include other confidential PCAOB documents that were

17   in electronic form?

18   A.  Yes.

19   Q.  What kinds of electronic documents did you take when you

20   copied your PCAOB desktop to the hard drive?

21   A.  Copies of past comment forms that I had written, copies of

22   other inspection-related information that I produced while I

23   was at PCAOB, and draft report writing information that I had

24   worked on.

25   Q.  Did you download anything to your desktop before copying it

J2J5mid3                         Sweet – direct

1   from the IIS system just for the purpose of stealing it and

2   taking it with you?

3   A.  Yes.

4   Q.  What did you download for the purpose of taking it with

5   you?

6   A.  I remember downloading other planning-type information that

7   existed including some of the information that the ORA group

8   had produced, and other type of general just PCAOB inspection

9   procedural information, inspection guides, and things like

10  that.

11  Q.  What was your understanding about whether the ethics code

12  permitted you to take all of that material?

13  A.  I knew that the ethics code did not permit me to take that

14  material and that I was violating the ethics code and that it

15  was stealing confidential information.

16  Q.  How did you take those materials when you left PCAOB after

17  downloading them onto the hard drive?

18  A.  I took the hard drive with me and put it in my computer bag

19  on my last day.

20  Q.  And what about the hard copy documents that you had taken?

21  A.  I did the same, same thing.

22  Q.  And where did you take them to?

23  A.  I took them with me to KPMG on my first day.

24  Q.  Which office of KPMG did you work out of?

25  A.  I worked out of KPMG's 345 Park Avenue office, here in

J2J5mid3                              Sweet - direct

1   Manhattan.

2   Q.  Were you living in California at the time?

3   A.  Yes, I was.

4   Q.  What arrangement did you have that allowed you to live in

5   California and work in Manhattan?

6   A.  KPMG, as part of my offer to join, put me on a commuting

7   package which basically meant that they would pay for all of my

8   travel costs as I went back and forth between my home in

9   California and the firm's New York office.

10  Q.  Typically, how often were you in the New York office when

11  you worked for KPMG?

12  A.  Generally two or three weeks out of every month.

13  Q.  Did you also travel to the locations of inspections that

14  the PCAOB was conducting on KPMG audits when you worked for

15  KPMG?

16  A.  Yes, I did.

17  Q.  And when you were not traveling to an inspection location

18  or working out of the New York office of KPMG, where did you

19  work?

20  A.  I would work out of my home office in California.

21  Q.  Let's turn to your first day at KPMG.  Did there come a

22  time that you were invited to lunch that day?

23  A.  Yes.

24  Q.  Who set that up?

25  A.  Tom Whittle, my boss.

J2J5mid3                              Sweet - direct

1    Q.  What was his role?

2    A.  He was my boss but also partner in charge of the

3    inspections group within KPMG's national office.

4    Q.  Who did he report to?

5    A.  He reported to Dave Middendorf.

6    Q.  I want to show you what's marked for identification as

7    Government Exhibit 1361.  Do you recognize this exhibit?

8    A.  Yes, I do.

9    Q.  Very generally, what is it?

10   A.  This is a general org chart, organizational chart depicting

11   the hierarchy within the firm's national office.

12   Q.  Does this organizational chart reflect everyone in the

13   national office or just some people?

14   A.  No, not everyone, just some people.

15   Q.  And, did you prepare this document?

16   A.  No, I did not.

17   Q.  To your knowledge, is Government Exhibit 1361 an accurate

18   summary of the relative roles of some of the individuals in the

19   national office when you were there from 2015 to 2017?

20   A.  Yes.

21   Q.  Will it aid you in testifying today?

22   A.  Yes.

23          MS. KRAMER:  Your Honor, the government offers

24   Government Exhibit 1361.

25          THE COURT:  1361 is received.

J2J5mid3                         Sweet - direct

1              (Government's Exhibit 1361 received in evidence)

2       BY MS. KRAMER:

3       Q.   What are the three main parts of KPMG's business?

4       A.   The firm has three main practices; tax, advisory, and then

5       their audit practice.

6       Q.   Which part did you work in?

7       A.   Within the audit practice.

8       Q.   And when you started at KPMG in May of 2015, who was the

9       head of the audit practice?

10      A.   It was Jim Liddy.

11      Q.   And did there come a time that that changed?

12      A.   Yes.

13      Q.   To who?

14      A.   To Scott Marcello.

15      Q.   Approximately when did that change take place?

16      A.   On or around July of 2015.

17      Q.   And when you were at KPMG, who was the head of the national

18      office?

19      A.   David Middendorf was the head of the national office.

20      Q.   And who are two of the people who reported to David

21      Middendorf as reflected on this chart?

22      A.   Tom Whittle, who was the partner in charge of inspections

23      group, then and also George Hermann who was the partner in

24      charge of audit methodology and consultation practice.

25      Q.   And what was David Britt's role?

J2J5mid3                          Sweet - direct

1    A.  David Britt was co-banking leader for audits.

2    Q.  Who did he share that role with?

3    A.  With Tom Canfarotta.

4    Q.  Who is not on this chart, right?

5    A.  Right.

6    Q.  Looking to the right, who was Mike Flynn?

7    A.  Mike Flynn was also a banking partner within the

8    inspections group reporting up to Thomas Whittle.

9    Q.  And, what role did Cindy Holder have when you were at KPMG?

10   A.  Cindy Holder was an executive director in the inspections

11   group focused on internal inspections.

12   Q.  What does that mean?

13   A.  Within the inspections group there are two parts, both the

14   internal that I was part of that helped focus and coordinate

15   PCAOB inspections but the firm did its own internal inspections

16   and had its own program so it could go in on its own, did a

17   self-review of audits to figure out if they were, again, good

18   audits or not.

19   Q.  And who did Cindy Holder report to?

20   A.  She reported to Mike Flynn.

21   Q.  Who reported to?

22   A.  Tom Whittle.  Mike Flynn reported to Tom Whittle.

23   Q.  Did Tom Whittle supervise other people not on this exhibit?

24   A.  Yes.

25   Q.  Do you remember who attended the lunch that you went to on

J2J5mid3                         Sweet - direct

1    your first day at KPMG?

2    A.  Yes.

3    Q.  Who was there?  To the best of your memory.

4    A.  David Middendorf, David Britt, John Mucha, and I believe

5    also Tom Canfarotta.

6    Q.  John Mucha, if he were on on Government Exhibit 1361, where

7    would he be?

8    A.  He would be another partner that would report up to Tom

9    Whittle as part of the inspections group was well.

10   Q.  Do you remember where the lunch was?

11   A.  It was at a Mediterranean restaurant that was a couple of

12   blocks from KPMG's New York office.

13   Q.  Do you remember the name of the restaurant?

14   A.  I think it was Avra.  I'm not a hundred percent certain.

15   Q.  I would like to show you what's marked for identification

16   Government Exhibit 1507.  Do you recognize this exhibit?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  This is a picture of the inside of the restaurant that we

20   went to on my first day at KPMG.

21   Q.  Does this photo fairly and accurately depict the inside of

22   the restaurant from the first day in May of 2015?

23   A.  Yes.

24          MS. KRAMER:  The government offers Government Exhibit

25   1507.

1              THE COURT:  1507 is received.

2              (Government's Exhibit 1507 received in evidence)

3    BY MS. KRAMER:

4    Q.  At the lunch on your first day, what kind of table were you

5    sitting at?

6    A.  We were sitting in one of the circular booths.

7    Q.  Were you at the end of the booth, an outside chair or in

8    the middle of the booth?

9    A.  I was sitting at the end of the one of the -- sitting at

10   the end of the booth.

11   Q.  Who did you sit next to?

12   A.  I sat directly next to Dave Middendorf.

13   Q.  And who was sitting across from you?

14   A.  David Britt.

15   Q.  Did there come a time during the lunch that the subject of

16   the PCAOB selection process came up?

17   A.  Yes.

18   Q.  Who participated in that discussion?

19   A.  Generally everyone that was at the table, but certainly me

20   and Dave Middendorf and David Britt.

21   Q.  What questions did they ask, in general terms?

22   A.  They asked me about how the PCAOB made its selection

23   process, why they were picking so many banks for KPMG compared

24   to some of the other firms, other information about timing and

25   the inspection, the PCAOB's inspection team members themselves.

J2J5mid3                          Sweet - direct

1   Q.  How did you respond to their questions?

2   A.  I answered their questions.

3   Q.  Did there come a time during the lunch when the subject of

4   PCAOB's schedule of inspections came up?

5   A.  Yes.

6   Q.  Who participated in that discussion?

7   A.  Again, I remember David Middendorf and David Britt

8   participating in that.

9   Q.  What was discussed about PCAOB's inspection schedule?

10  A.  They indicated that they had received the PCAOB's advance

11  scheduling notification including the cities and the timing and

12  so we talked about that process.

13  Q.  What questions did they ask you, if any, about that

14  process?

15  A.  I remember them asking me specific questions about whether

16  or not issuers or KPMG audit clients were included within that

17  information.

18  Q.  What specific questions do you remember them asking on that

19  subject?

20  A.  I remember Dave Middendorf asking me if Wells Fargo was the

21  engagement that had been identified on that schedule as being a

22  financial services engagement in the San Francisco office later

23  that summer.

24  Q.  Did he give you any indication of why he was asking about

25  Wells Fargo?

J2J5mid3                          Sweet - direct

A.   Because the inspection schedule had indicated that they
would be in the San Francisco office for a fairly big block of
time and that the PCAOB's inspection would be for a bank or
financial services engagement.  It seemed clear that he had
tried to figure that out from the schedule.

Q.   Did you know at the time if Wells Fargo was in fact on the
PCAOB's list of audits to inspect that year?

A.   Yes, I did know, and yes, it was.

Q.   How did you know that?

A.   I knew that from my time at the PCAOB because I knew the
banks, the financial services engagements that were being
picked that year in both my role of planning but also because I
had taken information with me.

Q.   Had the PCAOB, at that time, at the time of the lunch on
your first day, had the PCAOB notified KPMG that it was going
to inspect Wells Fargo?

A.   No.

Q.   How did you respond to Dave Middendorf asking you if it in
fact was Wells Fargo that was going to be inspected?

A.   I remember kind of shrugging my shoulders and indicating,
*Well, could it be anyone else?*

Q.   Why didn't you just say yes?

A.   Because I knew that by directly answering "yes" was a very
clear violation of the PCAOB's ethics code because it was such
confidential information.

J2J5mid3                              Sweet - direct

1   Q.  What was your intention in shrugging your shoulders and

2   asking *could it be anyone else?*

3   A.  I wanted to answer the question to Dave Middendorf but do

4   it in such a way that might give me an out.

5   Q.  How did he respond?

6   A.  I remember him getting very animated and slapping the table

7   and saying:  *I knew it.*

8   Q.  Did there come a time during the lunch when the subject of

9   whether or not you knew which KPMG audits the PCAOB was going

10  to inspect in 2015 came up?

11  A.  Yes.

12  Q.  Who participated in that discussion?

13  A.  I know that both David Britt and David Middendorf were part

14  of that discussion.

15  Q.  What was said on that topic?

16  A.  Because we had been discussing the process and the

17  selection process.  They not only asked me about what sorts of

18  other things I had done but whether or not I was involved in

19  the PCAOB selection that year, and I remember acknowledging to

20  them that I did know who was getting picked that year.

21  Q.  How did they respond to you saying that you knew who was

22  getting picked that year?

23  A.  It was a positive response.

24  Q.  Did they ask you for the list of inspection targets at the

25  lunch?

J2J5mid3                              Sweet - direct

1    A.  No.  They did not.

2    Q.  Did there come a time during the lunch when the subject of

3    an Indianapolis discussion came up?

4    A.  Yes.

5    Q.  Who participated in that discussion?

6    A.  Again, I remember David Middendorf and David Britt

7    participating in that discussion.

8    Q.  What did they say on that topic?

9    A.  It was clear to me that they had deduced from this PCAOB

10   schedule that because the PCAOB was planning to go to

11   Indianapolis and inspect the bank there was only one bank in

12   Indianapolis that could be picked and that that was Stonegate

13   Mortgage.

14   Q.  Did they ask you any questions about Stonegate?

15   A.  They asked me if Stonegate was going to be the bank picked

16   in Indianapolis.

17   Q.  How did you respond to that question?

18   A.  I also confirmed it to them without trying to just come

19   right out and say yes.

20   Q.  As of that lunch, was that information confidential to the

21   PCAOB, to your knowledge?

22   A.  Yes.

23   Q.  And were you allowed to share that knowledge?

24   A.  I knew that I was not.

25   Q.  As of that lunch, were you allowed to share the information

J2J5mid3                         Sweet - direct

1   about Wells Fargo getting picked?

2   A.  No, I was not.

3   Q.  At any point during that lunch on your first day did David

4   Middendorf tell you not to tell him anything he wasn't supposed

5   to know?

6   A.  No.

7   Q.  Did you have an understanding, based on what David

8   Middendorf said at the lunch, about whether he wanted you to

9   keep confidential information to yourself or to share it?

10  A.  There was no -- he did not tell me to keep it to myself.

11  It was clear from all of the questions they were asking me that

12  they wanted me to explain all of that to them.

13  Q.  And when you say that they wanted you to explain all the

14  confidential information to them, who do you mean?

15  A.  David Middendorf and David Britt.

16  Q.  Did there come a time your first week where you had a call

17  with Jim Liddy and David Middendorf?

18  A.  Yes.

19  Q.  Let's look again at what is in evidence as Government

20  Exhibit 1361.  What role did Jim Liddy have in your first week

21  at KPMG?

22  A.  Jim Liddy was vice chair of audit which meant he oversaw

23  entire audit practice for the firm.

24  Q.  And at the time of the meeting with Jim Liddy and David

25  Middendorf, what was Jim Liddy's role, relative to David

J2J5mid3                              Sweet – direct

Middendorf's?

A.   Jim Liddy was David Middendorf's boss.

Q.   And what was David Middendorf's role, relative to yours?

A.   He was my boss' boss.

Q.   Okay.  So, the meeting you recall your first week with Jim
Liddy and David Middendorf, was it a call or a meeting or some
combination of the two?

A.   It was both.  Jim Liddy was on the phone and David
Middendorf and I were in person.

Q.   Did Jim Liddy participate the entire time that you and
David Middendorf were together?

A.   No.

Q.   Did there come a time that you and Middendorf spoke without
Jim Liddy being on the phone?

A.   Yes.

Q.   Was that before or after the part of the meeting when Jim
Liddy participated by phone?

A.   It was after the call with Jim Liddy.

Q.   Where were you and David Middendorf when this meeting
happened?

A.   We were upstairs in one of the KPMG executive conference
rooms in the KPMG New York office.

Q.   Do you remember when, during your first week, that
meeting/phone call took place?

A.   Yes.  It was on my second day, so the Tuesday of my first

J2J5mid3                          Sweet – direct

1   week.

2   Q.   During the portion of the meeting when Jim Liddy was on the

3   phone, did you take notes?

4   A.   Yes, I did.

5   Q.   During the portion of the meeting when it was just you and

6   David Middendorf in person in that conference room without Jim

7   Liddy on the phones, did you take notes?

8   A.   Yes, I did.

9   Q.   Do you remember what was discussed during the portion of

10  the meeting that Jim Liddy participated in by phone?

11  A.   Yes.

12  Q.   What was discussed in that meeting, to the best of your

13  memory?

14  A.   Generally, I remember Jim Liddy welcoming me to the firm,

15  telling me how glad that they were to have finally hired me and

16  that I was part of KPMG.  And, I remember him telling me not to

17  hold back, not to change my views, that because I had been such

18  a rigorous -- inspector-wise at the PCAOB for KPMG that they

19  didn't want me just to change that, to stay the same.  And I

20  remember him also asking me questions about generally what the

21  PCAOB thought of certain people that were on KPMG's leadership

22  team that would face-off each month with the PCAOB's leadership

23  team that I was on.

24  Q.   What happened after Jim Liddy got off the phone?

25  A.   David Middendorf had some other things he wanted to talk to

J2J5mid3                                Sweet – direct

1    me about.

2    Q.  How do you know that he had other things he wanted to talk

3    to you about?

4    A.  Because we sat in the conference room, this executive

5    conference room for a while after the call ended with Jim.

6    Q.  Do you remember everything that you and David Middendorf

7    talked about in this portion of the meeting that Jim Liddy

8    didn't participate in?

9    A.  No, not everything.

10   Q.  Is there anything that you could look at that would refresh

11   your recollection about what was discussed in that portion of

12   the meeting?

13   A.  I took notes from that meeting.

14   Q.  Can we please show the witness --

15            MR. BOXER:  Your Honor, may we approach?

16            THE COURT:  Yes.

17            (Continued next page)

18

19

20

21

22

23

24

25

1        (At side bar)

2        MR. BOXER:  There is not a proper foundation for

3   showing him the notes.  The question was do you remember

4   everything.  He said no.  And then counsel went right into what

5   would refresh his recollection.  There is items in notes that

6   it is obvious they want him to read but she has not yet asked

7   him what do you remember what was said and what he said.  And,

8   he very well may remember the items in the notes.

9        So, he shouldn't be bolstered with the notes until it

10  is established that he can't remember what is in the notes.

11       MS. KRAMER:  I don't think there is any bolstering

12  going on here, your Honor.  I asked him if he remembers

13  everything that was said and he said no.  That is a failure of

14  recollection.  I'm not sure I understand what the technical

15  difference is that makes one approach proper and one not.

16       MR. BOXER:  Because you haven't asked the question

17  "What do you remember?"  It is an admission, it comes in

18  against us, it is Mr. Middendorf speaking, he will answer the

19  question.  And if there is something in the notes he hasn't

20  remembered she can refresh his recollection with it, but you

21  don't get to jump ahead and show the jury that he has got

22  notes.

23       MS. KRAMER:  But then so it sounds like what counsel

24  is suggesting, after the witness has already said he doesn't

25  remember anything -- sorry, excuse me, he doesn't remember

1    everything, is that I ask him what do you remember and then he

2    says whatever he remembers, and I say anything else?  Anything

3    else?  And he says no, at which point I don't know that counsel

4    wouldn't object, or I say what, if anything, do you remember

5    about this topic, which I can do but I suspect that would draw

6    a different objection.

7              MR. BOXER:  I think we take it one objection at a

8    time, your Honor, but I think if -- she is certainly permitted

9    to refresh his recollection about something, his answer

10   indicates he does not recall.  We are just not at that point

11   yet.  I suspect he remembers this part of the conversation very

12   clearly.

13             THE COURT:  Are you focusing on a particular subject?

14             MS. KRAMER:  Yes.

15             There are a few statements were made.  The witness

16   does not remember off the top of his head everything that was

17   discussed and he took notes.  I mean, I would also note that I

18   think some of this is sort of academic because both defendants

19   opened on the fact that Mr. Sweet is a liar.  I suspect they're

20   going to attack the veracity of everything he says and his

21   notes will end up coming in on redirect as a prior consistent

22   statement offered to rebut a claim of recent fabrication.  So I

23   suspect it is academic.

24             MR. BOXER:  I think where he getting ahead of

25   ourselves, your Honor.

J2J5mid3                        Sweet - direct

1          THE COURT:  I think there is a fair point that the

2    broad brush, "do you remember everything," I think another

3    level of questioning is appropriate.

4          MS. KRAMER:  Okay.  Can I just get some clarity?  Is

5    there going to be objection if I ask him what, if anything, do

6    you remember being discussed about this topic?

7          MR. BOXER:  No, there would be objection because

8    that's leading him.  He said he doesn't remember everything.  I

9    think an appropriate question would be what do you remember.

10          MS. MERMELSTEIN:  What's the follow-up question?

11          THE COURT:  And then I think you can follow up by

12    saying about X.

13          MS. KRAMER:  So then I could.

14          THE COURT:  Yes.

15          MS. KRAMER:  Okay.  Thank you.

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2    BY MS. KRAMER:

3    Q.  So, Mr. Sweet, focusing your attention on the portion of

4    the meeting with David Middendorf during your first week after

5    Jim Liddy got off the phone, do you remember what David

6    Middendorf said during that part of your meeting?

7    A.  Yes.

8    Q.  What do you remember?

9    A.  I remember David Middendorf raising the topic of Stonegate

10   Mortgage again from the prior day and indicating that while I

11   might have felt that that was a gray area, that I was there at

12   the firm to share insight and add value wherever I could and

13   that that was his expectation of me and --

14   Q.  On that subject, had you discussed Stonegate Mortgage the

15   day before?

16   A.  Yes.

17   Q.  When?

18   A.  During the prior day lunch.

19   Q.  What did you understand him to be referring to when he

20   brought up the discussion of Stonegate Mortgage the day before?

21   A.  He was referencing kind of my uneasiness of confirming that

22   it was in fact Stonegate Mortgage that was going to be picked

23   by the PCAOB and trying to make it clear to me that the

24   expectation that I had in this new role in the national office

25   was, again, to share insights and add value and be fully open

1   when it came to that type of information.

2   Q.  And, do you specifically remember him using the phrase you

3   used a minute ago, "gray area?"

4   A.  Yes.

5   Q.  What did you understand him to mean when he referred to

6   Stonegate as a "gray area?"

7   A.  That Dave knew that that information was confidential PCAOB

8   information and I did too, and that while it had not been yet

9   communicated by the PCAOB that I shouldn't have hesitation

10  sharing that type of information.

11  Q.  What else do you remember David Middendorf saying in this

12  part of that meeting your first week after Jim Liddy got off

13  the phone?

14  A.  I remember Dave also bringing up the contacts and the

15  relationship that I had at the PCAOB indicating, again, one of

16  the expectations was that I would maintain strong contacts with

17  my former colleagues at the PCAOB because it was a unique

18  relationship that I had had since I had not only worked at the

19  PCAOB for so many years but I had specifically worked on the

20  KPMG inspection team.  So, I had a lot of friendships and

21  professional relationships with people that would continue to

22  work on KPMG inspections at the PCAOB.

23  Q.  Did you understand there to be anything inherently wrong

24  with keeping up with your PCAOB contacts?

25  A.  No.

J2J5mid3                          Sweet - direct

Q.  Based on the rest of your conversation with David
Middendorf, did you have an understanding about what he was
asking to you do when he asked you to stay in touch with those
people?

A.  Just generally that he wanted me to be able to paint the
firm in a very positive light when I was having conversations;
telling him all the great things the firm was doing as it
related to audit quality, but also to keep a listening ear to
be close with those contacts and stay aware of anything that
they might share with me.

Q.  Do you remember anything else that David Middendorf told
you during that meeting your first week?

A.  Not that I can remember right now.

Q.  Did there come a time in that meeting that David Middendorf
brought up the subject of your paycheck?

A.  Oh.  Yes.

Q.  What did he say about that?

A.  I remember that David Middendorf also indicated or told me
that I needed to remember where my paycheck came from and that
I was now a partner at KPMG and that it was expected of me to,
again, add value to KPMG wherever I could.

Q.  What did you understand that to mean?

A.  That, again, I was not to hold back, that my loyalty from
that point onward was to be at KPMG I, was a partner, I was a
part of this partnership.

J2J5mid3                          Sweet - direct

1   Q.  How did you respond to David Middendorf in this meeting

2   when he talked to you about your loyalty and your paycheck and

3   gray areas?

4   A.  I remember saying okay.

5   Q.  Why did you say okay?

6   A.  Dave was my boss' boss, I am brand-new to the firm and in

7   this role within the national office and it is second day of my

8   first week there and I felt like I had no choice but to say

9   okay.

10  Q.  What was your understanding, based on this meeting with

11  David Middendorf after Jim Liddy got off the phone, about what

12  David Middendorf expected of you?

13  A.  That he expected me to share whatever information I knew

14  about the PCAOB's selection process, insights that I learned,

15  keep close relationships, and be completely loyal to KPMG and

16  KPMG only.

17  Q.  Did there come a time that week when you went to lunch with

18  Thomas Whittle.

19  A.  Yes.

20  Q.  Who else was there?

21  A.  George Hermann was there as well.

22  Q.  What role did he have at the time?

23  A.  George was also in the national office.  He was the partner

24  in charge of the audit group.

25  Q.  When, during your first week, was this lunch with Thomas

J2J5mid3                         Sweet - direct

1   Whittle and George Hermann?

2   A.  I believe it was on the Thursday of my first week.

3   Q.  Do you remember where you had lunch?

4   A.  I don't remember the name of the restaurant but it was a

5   Chinese food place a few blocks from the office.

6   Q.  Did there come a time during the lunch when the subject of

7   PCAOB inspections came up?

8   A.  Yes.

9   Q.  Who participated in that discussion?

10  A.  Both George Hermann, Thomas Whittle, and myself.

11  Q.  What, if anything, did they ask you?

12  A.  Again, it was similar questions about how the PCAOB

13  processed worked both on selecting issuers for inspection,

14  insight about how the inspections themselves work, questions

15  about the PCAOB's leadership team and specific questions about

16  the people that had been assigned as inspectors on the KPMG

17  team.

18  Q.  Did you speak with Thomas Whittle that day just at the

19  lunch or were there other times?

20  A.  There were other times that day.

21  Q.  How did you get back to the office from the lunch?

22  A.  We walked.

23  Q.  Who did you walk with?

24  A.  I walked with Thomas Whittle.

25  Q.  Did you and Thomas Whittle talk during your walk?

J2J5mid3                              Sweet – direct

1    A.  Yes, we did.

2    Q.  What did you talk about?

3    A.  Again, the topic of the 2015 inspections for KPMG came up

4    and I acknowledged to Tom that I knew who was getting picked in

5    2015 by the PCAOB and I had taken documents with me from the

6    PCAOB.

7    Q.  What did you intend to convey to him when you said you had

8    taken documents with you from the PCAOB?

9    A.  Just that not only did I, you know, know in my head who was

10   getting picked, but that I also had stolen this information.

11   Q.  Meaning what?

12   A.  Meaning that I had the list, I had this information with

13   me, and that I brought it with me to KPMG.

14   Q.  After the walk back from the lunch, did you speak with

15   Thomas Whittle again that day?

16   A.  I did.

17   Q.  When?

18   A.  Later that evening Thomas Whittle came by my office where I

19   was sitting and he leaned against the door and asked me to give

20   him the list.

21   Q.  What did you understand him to mean by the list?

22   A.  That he wanted to see specifically who the PCAOB was going

23   to inspect for 2015.

24   Q.  How did you respond?

25   A.  I told him I would have to look and just to give me a few

J2J5mid3                          Sweet - direct

1    minutes.

2    Q.   Why did you say that you would have to look?

3    A.   Because I knew that I had that information several

4    different places and I wanted to try and think through what I

5    was going to do.

6    Q.   What did you do next?

7    A.   I took one of the hard copy documents that I had taken with

8    me from the PCAOB and I went over to Tom's office and went to

9    his desk and handed him the list.

10   Q.   What list did you show him?

11   A.   I showed him just the list of the banks and financial

12   services inspections that were going to be inspected for 2015.

13   Q.   And as of the Thursday of your first week at KPMG, had some

14   of the inspections on the list you showed Whittle been formally

15   identified by the PCAOB and notified to KPMG?

16   A.   Yes.  Some of them.

17   Q.   Had all of them been the subject of a PCAOB notification to

18   KPMG?

19   A.   No.

20   Q.   What was your understanding about whether the ones on the

21   list that the PCAOB had not given notice of to KPMG were still

22   confidential?

23   A.   I knew that information was very confidential at the PCAOB.

24   Q.   What was your understanding about whose property that list

25   was?

J2J5mid3                              Sweet - direct

1   A.  I knew that information was the PCAOB's property and not

2   mine.

3   Q.  What other information, aside from the names of the KPMG

4   audits that were going to be inspected, was on the document

5   that you showed Thomas Whittle?

6   A.  It included the schedule and so the timing of the audits --

7   or when the inspections would occur.  Excuse me.  It also

8   included which inspectors from the PCAOB were going to be

9   assigned.  And, I believe it also included the focus areas for

10  each of those bank inspections.

11  Q.  Was that part of the list also confidential?

12  A.  Very much so.

13  Q.  What happened after you showed Thomas Whittle the list?

14  A.  I took the list back with me and went home -- or went back

15  to my hotel.

16  Q.  What's the next thing that happened with respect to the

17  2015 list?

18  A.  The next morning, Tom Whittle sent me an e-mail and asked

19  me to give that list to his EA -- his executive assistant --

20  and that she was to scan it and send it to Tom.

21  Q.  How many days had you been working at KPMG at this point?

22  A.  That was my first week, so at that point I had only been

23  employed -- that was my fifth day with the firm.

24  Q.  And how many days had you been at the firm when you had

25  that meeting with David Middendorf after Jim Liddy got off the

J2J5mid3                          Sweet – direct

1   phone?

2   A.   That was my second day with the firm.

3   Q.   Let's take a look at what's marked for identification as

4   Government Exhibit 753.  Do you recognize this exhibit?

5   A.   Yes, I do.

6   Q.   How do you recognize it?

7   A.   I recognize this to be the e-mail correspondence between

8   Tom Whittle and I on the Friday of my first week of my KPMG

9   e-mail account.

10          MS. KRAMER:  Your Honor, I would like to offer

11   Government Exhibit 753 along with a stipulation that the

12   parties have entered into that's marked for identification as

13   Government Exhibit 1375.  It is an e-mail authenticity

14   stipulation.

15          THE COURT:  All right.

16          MS. KRAMER:  So, if we could show, Mr. Urbanczyk, the

17   witness, government, Court and counsel 1375?  And it is an

18   e-mail authenticity stipulation pertaining to certain e-mails

19   maintained by the PCAOB, SEC, AOL, and KPMG, and includes some

20   information.

21          If you, Mr. Urbanczyk, could go to paragraph 5 on page

22   2 about the various time zones that the different e-mails are

23   in?

24          The government offers the stipulation Government

25   Exhibit 1375 and the specific document that is before the

J2J5mid3                         Sweet – direct

1   witness, Government Exhibit 753.

2           THE COURT:  1375 the stipulation is received, and 753

3   is received.

4           (Government's Exhibits 753 and 1375 received in

5   evidence)

6           THE COURT:  Just to explain to the jury, as I will

7   explain in my instructions in more detail, a stipulation is

8   simply an agreed upon fact between the parties.  All the

9   parties agree to a fact and you accept it as true since it is

10  stipulated to.

11          Those documents are received.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J2jddmid4a                          Sweet – direct

1          MS. KRAMER:  Thank you, your Honor.

2     BY MS. KRAMER:

3     Q.  All right.  So, taking a look at Government Exhibit 753.

4     OK.

5          So, let's look at the first email in the chain in this

6     document.  When did you receive this email, Mr. Sweet?

7     A.  On Friday, May 8, 2015 at 8:25 a.m.

8     Q.  And what was the subject line of the email?

9     A.  The subject is "List."

10    Q.  Who sent the email to you?

11    A.  Tom Whittle.

12    Q.  What did he say in the email?

13    A.  He said, "Brian, could you have Lisa scan and send me the

14    banking selection list?  Thanks.  Tom."

15    Q.  All right.  And let's go back to your response.

16         How quickly did you respond?

17    A.  I responded within ten minutes later.

18    Q.  What did you say in your response?

19    A.  I said:  "Tom, just to clarify, are you referring to the

20    expect PCAOB banking selections?  If so I can email you

21    something that might be easier to use (rather than a scanned

22    version)."

23    Q.  OK.  And how quickly did Tom Whittle respond to you?

24    A.  Tom responded one minute later.

25    Q.  What did he say in his response?

1    A.  He said, "Yes, the selection list.  Thanks."

2    Q.  What did you understand him to be asking you when he asked

3    you to send him the selection list?

4    A.  That he was asking me to send him the document that I had

5    shared with him that prior night and specifically give him the

6    names of the PCAOB's banking inspections that were planned for

7    2015.

8    Q.  Do you know roughly what percentage or amounts of the

9    selections were still confidential as of that point?

10   A.  Most of those selections were still confidential.

11   Q.  All right.  What did you do in response to this request

12   from Tom Whittle?

13   A.  I decided to not only send him the banking selections, but

14   because I also had another hardcopy document with the full list

15   of inspections for 2015, the banks and the non-banks, I gave

16   that document to Lisa and had her send the whole thing to Tom.

17   Q.  Why did you send him the full list and not just the banks?

18   A.  Well, because I had acknowledged to Tom that I knew who was

19   getting picked and I knew that it was expected of me to share

20   all of the information that I knew, and I felt that if I only

21   sent just the banks, that I would get a follow-up request to

22   send the others, too, or give whatever else I knew, so I just

23   decided to send the whole thing.

24   Q.  All right.  Let's look at the list.

25              Could you take a look at what's marked for

1    identification as Government Exhibit 754A.

2             Mr. Urbanczyk, if you could flip through the document

3    for the witness, Court and counsel.

4             (Pause)

5             Do you recognize this exhibit?

6    A.  Yes.

7    Q.  How do you recognize it?

8    A.  I recognize this to be the document that I gave to Lisa,

9    Tom's executive assistant, to scan and email.  This is the

10   document.

11   Q.  And is this a document that you stole from the PCAOB?

12   A.  Yes, it is.

13            MS. KRAMER:  All right.  The government offers

14   Government Exhibit 754A.

15            THE COURT:  754A is received.

16            (Government's Exhibit 754A received in evidence)

17   BY MS. KRAMER:

18   Q.  All right.  Let's walk through the document.

19            So, what is in the left-most column?

20   A.  The left-most column is a date.  So, it is the start week,

21   so the date that the PCAOB's field work would start for the

22   inspection.

23   Q.  What is your understanding about when in relation to the

24   left-hand column date, the start week, that PCAOB would notify

25   KPMG of an inspection in the ordinary course?

J2jddmid4a                        Sweet - direct

1    A.  It would give two or three weeks' notice in advance of this

2    specific date.

3    Q.  OK.  So as of the date you shared this, what is your

4    understanding about whether inspections scheduled for June,

5    July or August had been notified?

6    A.  They had not been notified.

7    Q.  What is the next column after "Start Week"?

8    A.  The next column says, "Issuer," and so it's the specific

9    name – it represents the specific name of KPMG's audit

10   engagement that would be inspected by the PCAOB.

11          MS. KRAMER:  Mr. Urbanczyk, could you try zooming out

12   less and see if it is clearer?  Or picking a smaller area?  How

13   about a bigger area?

14   Q.  Can you read that, Mr. Sweet?

15   A.  Yes, I can.

16   Q.  OK.  So what goes in the "Issuer" column?

17   A.  It is the specific name of the KPMG audit engagement that

18   would get announced by the PCAOB.

19   Q.  And what is the next column entitled?

20   A.  It says "Industry."  So it is the industry in which that

21   particular audit client operates in.

22   Q.  And what is the heading of the next column?

23   A.  "Focus Areas."

24   Q.  What is in the Focus Areas column?

25   A.  So those are the specific areas of the financial statement

1    audit engagement that the PCAOB would look at, so exactly which

2    areas they would be inspecting.

3    Q.  And when does the PCAOB notify KPMG of the focus areas for

4    a particular inspection?

5    A.  It is after they have formally announced the inspection and

6    before they start their field work, so it's sometime between

7    that two- or three-week notification period.

8    Q.  All right.  And could you walk us through what's in the

9    next few columns?

10   A.  Yes.  The next column indicates Number of Weeks, so that

11   just represents how many weeks the PCAOB would be in the field

12   conducting its field work.  I believe the next column says

13   "Hours," and those are reflecting the total number of hours for

14   the audit, which was important information for the inspection

15   team to be aware of.  And then the next three columns are the

16   "Number of FSA Inspectors, "Number of ISA Inspectors" and then

17   "FTEs," which is full-time equivalent, so it is just

18   representing the total number of staff, inspection staff, that

19   would be participating in that inspection.

20   Q.  What are in the columns entitled "City" and "Year End"?

21   A.  "City," city represents the location in which the PCAOB

22   would be conducting its inspection, and then the "Year End" is

23   just the year end of the audit engagement that would be subject

24   for inspections, so where the fiscal year end is.

25   Q.  What is in the next column?

J2jddmid4a                              Sweet - direct

1   A.  It is "Issuer Description," so it is just a brief

2   description of what type of company would be inspected, what

3   type of company was being audited or had been subject to an

4   audit engagement.

5   Q.  All right.  Let's turn back to Government Exhibit 753.  And

6   let's look at the email that you sent to Tom Whittle on Friday,

7   May 8th, which is dated 9:54 a.m.

8            What was the first sentence in your email?

9   A.  I wrote:  "Lisa should have sent it to you so please let me

10  know if you haven't yet received the document."

11  Q.  What was the document you were referring to in this email

12  that you sent to Tom Whittle the morning of Friday, May 8th?

13  A.  It is referring to the document that we just reviewed, that

14  full listing of the 2015 inspections.

15  Q.  The list that's in evidence as Government Exhibit 754A?

16  A.  Yes.

17  Q.  And to be clear, that was a hardcopy document.  And what

18  did you do with it?

19  A.  I gave that hardcopy document to Lisa Dragonetti, who was

20  Tom Whittle's executive assistant.

21  Q.  OK.  What is the second sentence of your email?

22  A.  It says, "Just so you know, it is actually the full list of

23  anticipated inspections (including non-banks)."

24  Q.  Why did you write that in your email to Tom Whittle?

25  A.  Because I -- I mean, while it might have been obvious, this

1  document that I had given Lisa to send was different than the

2  one I had showed him the prior night.  The prior night was only

3  the banks, and this I had given was the full list of

4  inspections.

5  Q.  What is the next sentence you wrote?

6  A.  I wrote, "I'd appreciate the team's discretion to make sure

7  it isn't too widely disseminated."

8  Q.  Why did you write that?

9  A.  Because I knew how confidential this information was that I

10 was giving to Tom, and I also knew that it was -- that I only

11 had it because I had stolen it from the PCAOB, taken it with me

12 on my last day, and I did not want it getting back to the PCAOB

13 that I had taken this information.

14 Q.  All right.  Let's look at the next sentence, where you

15 wrote, "To the extent you think it would help for me to spend

16 some time with the individual engagement teams to provide some

17 additional info on what the PCAOB's planning considerations

18 were as part of their preparation (once they are notified)

19 please let me know," why did you offer to help the engagement

20 teams once they were notified and not sooner?

21 A.  Because the PCAOB's formal process was only to notify the

22 engagements two or three weeks before their planned inspection,

23 and so any work that Tom asked me to do to help ready those

24 teams before that two- or three-week notification process would

25 be a clear indicator to the team that we were operating on

1    confidential information or, you know, unauthorized

2    information, and, again, I didn't want the engagement teams to

3    be aware and certainly not get back to the PCAOB that I had

4    shared this information.

5    Q.  All right.  Let's look up in the email to Tom Whittle's

6    response that day.

7              What did he say to you?

8    A.  Tom wrote:  "Brian, got it and understand the sensitivity.

9    Have.  A safe flight and a great weekend.  Enjoy your DOM.  If

10   you come into New York the week before Memorial Day weekend,

11   you should plan to get out Thursday night.  Tom."

12   Q.  What did you understand him to be talking about when he

13   told you to "enjoy your Dom"?

14   A.  One of the things that the firm I think commonly did for

15   partners, or people who made partner, is they send a bottle of

16   Dom Perignon champagne, and my wife had let me know that week

17   that Tom had sent me a bottle to the house and so I thanked Tom

18   previously for that.

19   Q.  Did there come a time that Tom Whittle referenced your

20   value to him?

21   A.  Yes.

22   Q.  Do you remember when he referenced your value to him?

23   A.  I don't remember the specific date but within the first --

24   very close to me joining the firm and then several other times

25   after I had been with the firm for quite awhile.

J2jddmid4a                          Sweet - direct

1  Q.  What did he say about that when he referenced it close in

2  time to you joining the firm?

3  A.  I remember him telling me that I was most valuable to him

4  the first day that I joined KPMG and effectively that I had

5  less value as time went on.

6  Q.  Did you have an understanding of what he meant?

7  A.  Yes.

8  Q.  What was your understanding?

9  A.  That my usefulness was only because of the role that I

10  played in the PCAOB and that the utility of what I knew, the

11  benefit that the firm got from what I knew would decline over

12  time, that I had become less valuable and therefore that my job

13  would be less secure.

14  Q.  In general terms, and without getting into specifics, did

15  you speak with anyone else aside from Tom Whittle about the

16  2015 PCAOB inspection selections?

17  A.  Yes.

18  Q.  Generally speaking, what kinds of conversations did you

19  have?

20  A.  I had conversations with other partners once they had found

21  out, that they had been notified, to not only talk them through

22  the PCAOB's process but, you know, share with them some of the

23  rationale for why their particular audits had been selected and

24  also had other conversations with people where I shared

25  information about specific confidential information of who was

J2jddmid4a                          Sweet - direct

1   going to get picked that year.

2   Q.  All right.  Let's move on to your second week at KPMG.

3         Showing you what's marked for identification as

4   Government Exhibit 510.  Do you recognize this document?

5   A.  Yes.

6   Q.  How do you recognize it?

7   A.  I recognize this to be an email between Cindy Holder and I,

8   and I recognize the document that's attached.

9   Q.  What's the date of the email between you and Cindy Holder?

10  A.  It is May 12th, 2015.

11        MS. KRAMER:  The government offers Government Exhibit

12  510.

13        THE COURT:  510 is received.

14        (Government's Exhibit 510 received in evidence)

15  BY MS. KRAMER:

16  Q.  Let's look at the header information at the top of the

17  first page.  Which email accounts participated in this email?

18  A.  Cindy Holder sent this to me from her, you know, personal

19  AOL email account, and she sent it to my personal Yahoo!

20  account.

21  Q.  OK.  And what's the subject line of the email?

22  A.  The subject is, "Anonymous Email."

23  Q.  And is there anything in the text part of the email?

24  A.  Just a smiley face.

25  Q.  What's the attachment that's referenced in the first page

J2jddmid4a                           Sweet - direct

1   of this email?

2   A.   The attachment is "Report Writing themes, various."  So,

3   it's referencing various confidential draft PCAOB reporting

4   information for the Part II section of the PCAOB's report.

5            MS. KRAMER:   OK.  Could we go back to the first page

6   of the email, Mr. Urbanczyk.

7   Q.   So what is the title of the attachment from this email?

8   A.   It says, "RW Part 2 Themes - Various."

9   Q.   What does that mean?

10  A.   "RW" stands for Report Writing, which is that subgroup

11  within the KPMG team that I had worked on.  And then "Part 2

12  Themes" is referencing the Part 2 draft report, like themes,

13  that the PCAOB -- I had helped draft at the PCAOB for KPMG's

14  Part II section of their 2014 report.

15  Q.   OK.  As of May of 2015, had this been shared with the firm,

16  KPMG?

17  A.   No, it had not.

18  Q.   Did you have an understanding about whether or not this was

19  valuable information for the firm to have?

20  A.   Yeah, I knew -- yes.  It was, yes, very valuable.

21  Q.   Do you know what caused Cindy Holder to send you this draft

22  Part 2 portion of the PCAOB's report for KPMG?

23  A.   Yes.

24  Q.   What?

25  A.   I had called Cindy and asked Cindy to tell me what was in

J2jddmid4a                          Sweet - direct

these Report Writing drafts that even though I had worked on

them, that I couldn't remember what was included in them, and

that I had been asked to help -- or meet with other people in

the national office and that I wanted to refresh myself on what

things I had identified or the PCAOB had identified in these

Part II themes in preparation for this meeting.

Q.  Did you have an understanding at the time of where this

document was maintained at PCAOB?

A.  Yes.

Q.  What was your understanding of where this document was

maintained at the PCAOB?

A.  This -- I knew this document was included in the PCAOB's

Report Writing folder, subfolder, within that IIS system.

Q.  Did you want to receive this on your KPMG email account?

A.  No, I did not.

Q.  Why not?

A.  Because I thought it would increase the likelihood of

detection.

Q.  All right.  Let's look at the first two pages, if we could,

Mr. Urbanczyk, of the attachment.

         Generally, what information is in these comment

bubbles in the margins of the pages?

A.  They are -- generally they are either, you know, questions

or comments for, you know, as this document moved through the

Report Writing review phase within the PCAOB's national office,

but also specific references to support the statement that were

being made, so referencing the underlying support and findings.

Q.   From your experience at the PCAOB and the KPMG, did there

ever come a time that the PCAOB would share its -- the comment

bubbles' version of the Part II report with KPMG?

A.   No, it was confidential.

Q.   OK.  Did there come a time when Cindy Holder discussed with

you a potential comment she was considering writing for KPMG

while she was still an inspector at the PCAOB?

A.   Yes.

Q.   Approximately when was that?

A.   I don't remember the exact date but it was, again, within

several weeks of me joining the firm.

Q.   How did it come up?

A.   I remember getting a phone call from Cindy saying, hey,

Brian, I wanted to run -- or got a potential issue that I am

dealing with on this KPMG bank inspection and I wanted to run

it past you to get your views on it.

Q.   In substance, what did she say to you in that conversation?

A.   She told me she was debating whether or not to write a

comment form for that inspection she was on and talked me

through what the issue was to get my opinion, my feedback on

it.

Q.   And was she still assigned to the KPMG inspection team at

that time?

J2jddmid4a                        Sweet - direct

1   A.   Yes, she was.

2   Q.   And you were -- where were you employed at the time?

3   A.   I was employed at KPMG.

4   Q.   And based on conversations you had with Cindy Holder, do

5   you have an understanding as to whether or not she knew that

6   you were employed at KPMG?

7   A.   Yes, Cindy knew I was at KPMG at that point.

8   Q.   OK.  How did you respond to her asking you whether she

9   should write a comment on a KPMG inspection?

10  A.   I remember reminding her of a similar issue that we had

11  dealt with on a previous inspection where we had decided not to

12  write a comment and that I didn't think it warranted writing a

13  comment in this case, so, no, not to write a comment.

14  Q.   How did she respond?

15  A.   Saying, OK, yeah, that's what I thought, too, and, yeah,

16  I'm not going to write one.

17  Q.   Did you tell anyone about this conversation after it

18  happened?

19  A.   Yes.

20  Q.   Who did you tell?

21  A.   I remember going and telling Tom Whittle.

22  Q.   What did you tell him?

23  A.   I told him that I had just gotten a call from one of the

24  old PCAOB inspectors that I used to work with asking me my

25  advice on whether or not they should write a comment or not.

J2jddmid4a                         Sweet - direct

1   Q.  Did you tell him what you had told that PCAOB inspector

2   about whether or not they should write a comment?

3   A.  Yes.

4   Q.  Did you tell him that they had agreed not to write the

5   comment?

6   A.  Yes.

7   Q.  How did Tom Whittle respond?

8   A.  I remember him getting very animated and saying, Oh, gosh,

9   let me guess, what did you, you open up your desk drawer and

10  see who is, you know, signing your paycheck?  You know, of

11  course you're not going to tell them not to write a comment.

12  Q.  Did you tell anyone else about that conversation with Cindy

13  Holder about the comment?

14  A.  I remember also sharing that -- telling the story to David

15  Britt.

16  Q.  How did he respond?

17  A.  Very similar, very glad that they would not be getting a

18  comment in that area.

19  Q.  Did there come a time in the summer of 2015 that you and

20  Cindy Holder communicated about her leaving the PCAOB to come

21  work at KPMG?

22  A.  Yes.

23          MS. KRAMER:  Mr. Urbanczyk, could you pull up what's

24  in evidence as Government Exhibit 510.

25  Q.  Do you remember whether or not Cindy Holder first expressed

J2jddmid4a                          Sweet - direct

1     interest in coming to KPMG before or after she sent you this

2     anonymous email document?

3     A.   It was before May 12th.

4     Q.   What about in relation to her calling you and asking

5     whether or not she should write a KPMG comment?

6     A.   It was, again, before that event that she had told me she

7     wanted to leave and join KPMG.

8     Q.   Was Cindy Holder ultimately hired by KPMG?

9     A.   Yes.

10    Q.   In what group?

11    A.   She was hired into Tom Whittle's Internal Inspections Group

12    in the national office.

13    Q.   Did you play a role in Cindy Holder getting hired?

14    A.   Yes, I did.

15    Q.   What role did you play in that process?

16    A.   I had a very direct role in that process.

17    Q.   Specifically what kinds of things did you do to participate

18    in that process?

19    A.   I remember getting Cindy's résumé and providing her

20    feedback on her résumé to help make it as strong as possible.

21    I remember helping coordinate the hiring of PCAOB with KPMG's

22    internal recruiter and being a communication go-between in some

23    instances between Cindy and the recruiter.  I remember talking

24    with Tom Whittle about Cindy and expressing my very strong

25    recommendation that she be hired and also meeting with others

J2jddmid4a                              Sweet - direct

1   that Cindy ended up interviewing with to, again, provide a

2   strong reference and recommendation to Cindy.

3   Q.  Do you know what city Cindy Holder worked out of when she

4   worked for the PCAOB?

5   A.  Yes.

6   Q.  Which one?

7   A.  Cindy worked out of the PCAOB's Houston office.

8   Q.  And do you know in what city and state she lived in when

9   she worked for the PCAOB?

10  A.  Yes.

11  Q.  Which one?

12  A.  She worked out of the -- she lived in Houston, Texas, as

13  well.

14  Q.  Do you know what city she worked out of when she worked for

15  KPMG?

16  A.  Yes.

17  Q.  Which one?

18  A.  KPMG's New York office.

19  Q.  Do you know if she continued to live in Houston, Texas,

20  while she worked for KPMG out of the New York office?

21  A.  Yes, she did.

22  Q.  What arrangement did she had, to your knowledge, that

23  allowed her to live in Texas and work in New York?

24  A.  Cindy was also put on a commuting package, similar to me,

25  which meant that she could travel back and forth between her

J2jddmid4a                          Sweet - direct

1    home and Texas and the firm's Manhattan, New York office, and
2    that the firm would pay for all those travel expenses.
3    Q.   Was Cindy Holder a partner at KPMG like you were?
4    A.   No, she was not.
5    Q.   Was the commuting arrangement typical for non-partners at
6    KPMG?
7    A.   No, it was not.  Very rare.
8    Q.   Approximately when did she start at KPMG?
9    A.   It was later on at the end of the summer.  I think it was
10   around August of 2015.
11   Q.   Before Cindy Holder left the PCAOB, did there come a time
12   that you spoke with her about the documents that you had taken
13   when you left the PCAOB?
14   A.   Yes.
15   Q.   Approximately when did that happen?
16   A.   While she was still at the PCAOB, so before she joined
17   KPMG.
18   Q.   What did you tell her?
19   A.   I told her how that before I had left the PCAOB, that I had
20   taken -- transferred the documents that were on my computer
21   onto an external hard drive and that I had taken these
22   documents with me, including the information I got out of the
23   IIS system.
24   Q.   Why did you tell her that?
25   A.   Well, I knew that this information was helpful for me in my

J2jddmid4a                          Sweet - direct

1   job and I certainly wanted Cindy to be successful in her job,

2   too.  So, I told her what I had done, fully expecting that she

3   was going to then do the same things.

4   Q.  Did there come a time that you learned whether or not Cindy

5   Holder had taken confidential PCAOB documents when she left?

6   A.  Yes.

7   Q.  When was that?

8   A.  After Cindy joined KPMG, she told me that she had done the

9   same thing and taken information with her.

10  Q.  Did there come a time that you were asked to help recruit

11  other PCAOB employees to KPMG?

12  A.  Yes.

13  Q.  Who asked you to do that?

14  A.  Tom Whittle asked me to do that, both -- he asked me to do

15  that both before I joined KPMG and then a number of times after

16  I joined KPMG.

17  Q.  Did you have communications with PCAOB employees other than

18  Cindy Holder between 2015 and 2017 about them possibly coming

19  to KPMG?

20  A.  I did.

21  Q.  Did you review the résumés of any such PCAOB employees?

22  A.  Yes.

23  Q.  Who were some of the people whose résumés you remember

24  reviewing and talking to about coming to KPMG?

25  A.  Besides Cindy, I remember reviewing résumés for people like

J2jddmid4a                    Sweet – direct

1    Grady Peeler, David Nitz, and Jeff Wada.

2              THE COURT:  It's just after 1 o'clock.  Would this be

3    a good time to break?

4              MS. KRAMER:  Certainly, your Honor.

5              THE COURT:  OK, folks.  We're going to take an hour

6    for lunch.  Please remember, you are not yet deliberating so

7    you are not talking about the case with each other.  I am going

8    to give you an hour for lunch, and we'll continue back here at

9    2 o'clock.

10             Have a good lunch, everybody, and please leave your

11   pads on your chairs.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You may be seated.

3           You may step down, sir.

4           Anything anybody wants wanted to discuss before lunch

5           MS. LESTER:  Just one thing, your Honor.  I will wait

6    for the witness to leave.

7           (Witness not present)

8           MS. LESTER:  Your Honor, Ms. Kramer asked a question

9    about whether Mr. Sweet understood a document to be his

10   property or the PCAOB's property.  We didn't object at the

11   time, but we do have an objection to questions of that sort.  I

12   don't think it is necessary to use the word "property" where

13   the defendants contest whether the confidential information

14   itself is property under the wire fraud statute.  So, we would

15   ask that the government not ask any further questions involving

16   the word "property."

17          MS. KRAMER:  Your Honor, we do have a burden in this

18   case that we are allowed to meet through admissible evidence.

19   The witness' understanding of what he took and who it belonged

20   to is totally proper to fulfill the objective of this trial.

21   It's not a prejudicial term, and the question is whether he had

22   an understanding of it.

23          MS. LESTER:  Your Honor, I think the word "property"

24   is a legal term, and the witness does not have to use that

25   term.  The government can meet its burden by explaining the

1    nature of the information, as the witness has already

2    testified; he believed it was confidential.  He has explained

3    how it was kept at the PCAOB.  And then the government can

4    argue to the jury that all of those factors make the

5    information property.  They don't have to have the witness

6    testify to a legal conclusion.

7            MS. KRAMER:  Your Honor, "property" is hardly a legal

8    term of art.  And I cannot imagine a scenario where if

9    witnesses did not accurately talk about the material that's at

10   issue in a case -- if this were a narcotics case, witnesses

11   would certainly be allowed to talk about whether they

12   understood something to be cocaine, for example -- I cannot

13   imagine a situation where the defense wouldn't get up in a case

14   like this and make an argument to the jury at the end of it

15   that no one ever said anything about whether something was

16   property.  Therefore, how could you possibly conclude that it's

17   property?

18           So I think restraining the government from being able

19   to use relevant terminology and ask questions of whether a

20   witness understood something to fall within the plain meaning

21   of a basic word like property prevents us from being able to

22   put in evidence that is relevant to the case that the defense

23   would surely argue from, and I don't think that they can have

24   their cake and eat it, too, in this circumstance.

25           THE COURT:  You have no problem with a question

J2jddmid4a                              Sweet - direct

1    like -- referring to PCAOB's information; you just have a

2    problem with the word "property"?  I'm not going to prevent the

3    use of the word because I don't think it is an unfair word if

4    it is necessary to clarify that that's the witness'

5    understanding.

6                MS. LESTER:  Your Honor, I think a limiting

7    instruction would be appropriate to the extent the government

8    continues to elicit that word, because the jury will be asked

9    at the end of the case to determine whether the confidential

10   information was property.  It's for them to determine, not for

11   the witness to tell them.

12               MS. KRAMER:  Your Honor, part of what the jury has to

13   determine in this case -- everything the jury has to determine

14   in this case is based on the evidence that the government puts

15   before it.  So, whether it be, you know, who the relevant

16   entities are, what is at issue, all of that comes in through

17   documents and through testimony.  If the defense wants to argue

18   to the jury that something isn't property, notwithstanding the

19   fact that the government has witnesses who view it as property,

20   they can make that argument.  But certainly we're entitled to

21   put in proof of that based on witnesses' understanding who

22   actually participated in this and, indeed, the witness on the

23   stand who actually stole the property.

24               THE COURT:  I'm with the government on this.  I'll

25   consider it but I think that the government is right, that

J2jddmid4a                          Sweet – direct

1    there is nothing to preclude the witness from saying it is

2    property.  I don't think it is something that requires a

3    clarifying instruction.  So, the objection is overruled.

4              We'll see you at 2 o'clock.

5              MS. KRAMER:  Thank you, your Honor.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **A F T E R N O O N   S E S S I O N**

2                              2:04 p.m.

3          (Jury not present)

4          THE COURT:  Good afternoon.

5          MS. KRAMER:  Good afternoon, your Honor.

6          We have just two brief things to raise with the Court

7  before we continue with the witness.

8          First, I wanted to confirm on the record the

9  government's understanding, based on our communications with

10 defense counsel leading up to trial, that there will not be an

11 objection to me offering Mr. Sweet's cooperation agreement into

12 evidence during his direct testimony because of the fact that

13 both defense counsel attacked his credibility in their

14 openings.  So I just wanted to confirm that.

15         THE COURT:  Any objection?

16         MR. COOK:  No, your Honor.

17         MS. LESTER:  No.

18         THE COURT:  OK.

19         MS. KRAMER:  Second, with respect to scheduling, we

20 just wanted to update the Court that we're going slower than

21 expected.  If it is something that the Court and the jurors and

22 co-counsel are amenable to, we wanted to raise the possibility

23 of sitting part of or all of Friday to try to start to catch

24 up.  I understand that your Honor has scheduled matters for

25 Friday so we don't know if that is possible, but we wanted to

J2jdmid4b                        Sweet - direct

1    raise it as early as we could to see if we could stay as close

2    to or on track with our schedule.

3            THE COURT:  OK.  I'll check my schedule and think

4    about it and we'll see how we do.

5            Does anybody know their position on the Friday issue

6    at this point?  We can talk about it later, if you would like.

7            MR. COOK:  We can discuss it later, your Honor.

8            MS. LESTER:  There is just one other thing, your

9    Honor.

10           With respect to the order of cross-examination of

11   Mr. Sweet, Mr. Cook is going to go first and I will go second.

12   We already let the government know.

13           THE COURT:  OK.  That's fine.

14           All right.  Can we bring in the jury and the witness?

15           MS. KRAMER:  I will get the witness, your Honor.

16           THE COURT:  Yes.

17           MS. KRAMER:  Thank you.

18           (Continued on next page)

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  You may be seated.

 3              Good afternoon, ladies and gentlemen.

 4              JURORS:  Good afternoon.

 5              THE COURT:  We continue with the direct examination.

 6              Ms. Kramer, you may proceed.

 7              MS. KRAMER:  Thank you, your Honor.

 8   BRIAN JOHN SWEET,

 9         Resumed, and testified further as follows:

10   DIRECT EXAMINATION (Resumed)

11   BY MS. KRAMER:

12   Q.  Mr. Sweet, are you familiar with someone named Jung Lee?

13   A.  Yes, I am.

14   Q.  How do you know him?

15   A.  I knew Jung Lee from both my time at the PCAOB and also

16   while I worked at KPMG.

17   Q.  And throughout that period, where was he employed?

18   A.  He was employed at the PCAOB.

19   Q.  Did you ever communicate with Jung Lee about the

20   possibility of him working at KPMG?

21   A.  Yes, I did.

22   Q.  In what contexts?

23   A.  Jung had expressed interest in joining KPMG and in

24   particular their International Inspections Group and had sought

25   my help in getting a job at KPMG.

J2jdmid4b                        Sweet - direct

```
 1    Q.  Was he ever hired by KPMG?
 2    A.  No, he was not.
 3    Q.  Did he ever give you any confidential PCAOB information?
 4    A.  No, he did not.
 5    Q.  Did he ever share any information about international
 6    inspections with you?
 7    A.  Yes, he did.
 8    Q.  What kind of information did he share about that with you?
 9    A.  He shared information regarding a Spanish inspection in
10    Spain that he had been on, and had indicated that they had
11    received a significant number of comment forms, that it had
12    gone really bad for the firm, and that was confidential
13    information.
14    Q.  Other than that, did he ever give you any inspection lists
15    for the PCAOB?
16    A.  No, he did not.
17    Q.  All right.  Did there come a time that you were asked to
18    assist the Wells Fargo Audit Team?
19    A.  Yes.
20    Q.  Approximately when was that?
21    A.  A number of weeks after I had joined the firm, so early
22    part of the summer of 2015.
23    Q.  How were you asked to assess the Wells Fargo Engagement
24    Team?
25    A.  I was asked to go in and start to prereview their
```

J2jdmid4b                         Sweet - direct

1    workpapers because we were aware that they would be inspected.

2    Q.   Who asked you to do that?

3    A.   Tom Whittle.

4    Q.   In one conversation or different conversations?

5    A.   In different conversations.

6    Q.   Did you ever discuss your assistance with the Wells Fargo

7    Engagement Team with anyone else?

8    A.   Yes.

9    Q.   With who?

10   A.   I also discussed it with Dave Middendorf.

11   Q.   What did he say about it?

12   A.   That he wanted me to go in and help the Engagement Team

13   prepare for an upcoming inspection.

14   Q.   Do you have any understanding of what led Tom Whittle and

15   Dave Middendorf to ask you to help the Wells Fargo Engagement

16   Team before the inspection?

17   A.   Yes.

18   Q.   What was your understanding?

19   A.   Because they knew through the information that I had shared

20   with them, the 2015 list, that Wells Fargo would get inspected

21   by the PCAOB that year.

22   Q.   And what was your understanding of what you were to do in

23   assisting the Engagement Team?

24   A.   To help the Engagement Team prepare for and get ready for

25   the inspection by reviewing their audit workpapers and

J2jdmid4b                         Sweet - direct

1    identifying any potential problem areas so that they could be

2    able to respond to those in the best way possible.

3    Q.  To what end?

4    A.  In order to help make the inspection go better.

5    Q.  All right.  Let's take a look at what's marked for

6    identification as Government Exhibit 801.

7            Do you recognize this document?

8    A.  Yes, I do.

9    Q.  How do you recognize it?

10   A.  I recognize this to be an email from my KPMG email account

11   that I sent to the David Britt.

12   Q.  On what date?

13   A.  On June 16, 2015.

14           MS. KRAMER:  The government offers Government Exhibit

15   801.

16           THE COURT:  801 is received.

17           (Government's Exhibit 801 received in evidence)

18   BY MS. KRAMER:

19   Q.  All right.  What is the subject line of this email from

20   David Britt to you on June 16, 2015?

21   A.  The subject is "The PCAOB selections."

22   Q.  And what did David Britt write in the first sentence?

23   A.  Date Britt wrote:  "Thanks for catching up yesterday.  It

24   was very helpful."

25   Q.  As of June 16, 2015, had you been meeting with David Britt

J2jdmid4b                          Sweet - direct

1    on a regular basis?

2    A.   Yes.

3    Q.   For what purposes?

4    A.   Both to prepare for a presentation that he and I had made

5    at this banking partner manager conference, both to talk

6    through the results of PCAOB inspections that were occurring at

7    that point in the summer, and just on general other kind of

8    banking audit guidance matters.

9    Q.   But the management conference, or the partner management

10   conference that you referenced, do you remember when it was in

11   relation to this email, Government Exhibit 801?

12   A.   Yes.

13   Q.   Approximately when was it in relation to June 16, 2015?

14   A.   It was the previous week, so about a week before this

15   email.

16   Q.   Did you have any meetings with David Britt to prepare for

17   that conference?

18   A.   Yes, I did.

19   Q.   In any of those meetings, did the subject of PCAOB

20   selections come up?

21   A.   Yes.

22   Q.   On that subject, what did you and David Britt talk about?

23   A.   We discussed the banking inspections for 2015, including

24   the ones that had already been announced by the PCAOB, and I

25   told him, or gave him the names of the other banks that the

J2jdmid4b                        Sweet - direct

1   PCAOB was planning to inspect but had not yet been

2   communicated.

3   Q.   Did there come a time in that conversation when David Britt

4   asked you for anything?

5   A.   Yes.

6   Q.   What did he ask you for?

7   A.   He asked me for the names of those other banks, who else

8   was going to get inspected.

9   Q.   And as of the time that he made that request, had some of

10  them not been announced yet by the PCAOB?

11  A.   Yes.

12  Q.   What was your understanding at the time he asked you for

13  the identities of those banks that had not yet been announced

14  as to whether or not they were confidential?

15  A.   I knew that they were confidential.

16  Q.   Did you share the confidential information that David Britt

17  asked for?

18  A.   Yes.  I shared with him all the names that I could remember

19  off the top of my head.

20  Q.   Why did you do that?

21  A.   Both because it made me look good with David.  It was

22  information he was asking for, and I knew it was improving my

23  relationship and my standing with him by giving him that

24  information.  I also knew it was just expected of me to answer

25  those type of questions.

Q.  All right.  Let's take a look at the second sentence in

Government Exhibit 801.  What did he say there?

A.  He wrote:  "I wondered if you could do me a favor.  I think

when we were going through the list of bank selections, you

couldn't recall the last three bank names without your notes.

Would you be able to get me the last three for 2015?"

Q.  What did you understand him to be asking for?

A.  He was asking for the remaining names of who the PCAOB was

planning to inspect in 2015 for those banks.

Q.  And what is your understanding of why he asked for those?

A.  Because he was the co-banking leader in charge of audit,

and it was information that he would particularly find

important and useful to have.

Q.  What did you do in response to his request for the rest of

the confidential PCAOB banking selections?

A.  I remember replying to this email and giving him the rest

of those names, the complete list of banks and other financial

services issuers.

Q.  Let's take a look at what's marked for identification as

Government Exhibit 802R.

        Do you recognize this document?

A.  Yes, I do.

Q.  How do you recognize it?

A.  I recognize this to be an email that I sent from my KPMG

email account.

J2jdmid4b                           Sweet - direct

1   Q.  On what date?

2   A.  June 16th, 2015.

3           MS. KRAMER:  The government offers Government Exhibit

4   802R.

5           THE COURT:  802R is received in evidence.

6           (Government's Exhibit 802R received in evidence)

7   BY MS. KRAMER:

8   Q.  Looking at the first email in this chain, the last one on

9   the second page, is that the request from David Britt that is

10  in evidence as Government Exhibit 801 that you were just

11  testifying about?

12  A.  Yes.

13  Q.  OK.  And on what date did you respond?

14  A.  I responded that same day, Tuesday, June 16, 2015.

15  Q.  OK.  Focusing on the second paragraph of your email, what

16  did you write?

17  A.  I write:  "As for the 2015 inspections, here are the

18  targets.  Please note there is some sensitivity with these, and

19  some of the teams have not yet been officially notified by the

20  PCAOB, so please use your discretion with this info."

21  Q.  And what did you then provide below that paragraph?

22  A.  I provided him with the names of both the bank selections

23  that PCAOB was planning to inspect that year as well as the

24  other financial services inspections that they had on their

25  2015 inspections list.

J2jdmid4b                          Sweet - direct

1    Q.   Where did you get this list that you typed into the email

2    and sent to David Britt in June of 2015?

3    A.   I got this from the confidential information that I had

4    stolen from the PCAOB.

5    Q.   Did you get it from electronic documents or hardcopy

6    documents?

7    A.   I believe I got this -- I got this from the electronic 2015

8    GNF Planning Profile.

9    Q.   And that's one of the documents that you saved onto your

10   desk-top and then onto a hard drive and took with you to KPMG?

11   A.   Yes.

12   Q.   Why, looking back at the second sentence in this paragraph,

13   "Please note," why did you tell David Britt that this

14   information was sensitive?

15   A.   Well, I knew that -- well, I knew that David knew this was

16   confidential because this hadn't been announced.  That I did

17   not want David to forward or send this widely, to start telling

18   all these other banks that they weren't getting inspected,

19   because I did not want it to get back to the PCAOB that I had

20   taken it or was sharing this information.

21   Q.   All right.  Let's look below the list, at the sentence

22   beginning with the word "Note."  What did you write in that

23   sentence?

24   A.   "Note there were a few PCAOB selections which had yet to be

25   chosen some one or two other FS/banking inspections may get

J2jdmid4b                        Sweet - direct

1  added (the PCAOB will inspect a few selections which have been

2  subject to KPMG QP review in order to evaluate the efficacy of

3  that program)."

4  Q.  All right.  So in the first line where you wrote, "which

5  had yet to be chosen, some one or two," is that what you meant

6  to write?

7  A.  I meant to say "so" instead of "some:"  "So which had yet

8  to chosen so one or two other banking inspections may get

9  added."

10  Q.  Why did you write that sentence in your email to David

11  Britt letting him know that there may be additional financial

12  services inspections added?

13  A.  Because I wanted David to know that if the PCAOB announced

14  an inspection that was not on this list, that it was for

15  another reason and not because I was wrong, trying to in some

16  way save face in case there was something different.

17  Q.  In that first sentence when you wrote, "which had yet to be

18  chosen," what point in time were you referring to when you said

19  that there were a few PCAOB selections which had yet to be

20  chosen?

21  A.  I'm referring to the fact that this information was based

22  on what I had taken when I left the PCAOB, which had been, you

23  know, the end of April, and so because those hadn't been chosen

24  yet by the end of April, when I left the PCAOB to join KPMG, I

25  didn't have the most up-to-date information.

J2jdmid4b                        Sweet - direct

1   Q.  Did you make any effort in 2015 to predict which audits the

2   PCAOB would inspect in 2016?

3   A.  Yes, I did.

4   Q.  When you did that, did you use any of the confidential

5   PCAOB documents you had stolen?

6   A.  Yes.

7   Q.  Why did you make an effort to predict inspections for 2016?

8   A.  Well, partly because I was asked to do so, but I knew it

9   would be helpful information to the firm as they performed

10  monitoring and decided how to allocate national office

11  resources in advance of the, you know, year-end 2015 audits.

12  Q.  Take a look at what's marked for identification as

13  Government Exhibit 806.

14          Do you recognize this document?

15  A.  Yes, I do.

16  Q.  How do you recognize it?

17  A.  I recognize this to be an email that I sent from my KPMG

18  email account.

19  Q.  On what date?

20  A.  On that same day, June 16, 2015.

21          MS. KRAMER:  The government offers Government Exhibit

22  806.

23          THE COURT:  806 received.

24          (Government's Exhibit 806 received in evidence)

25  BY MS. KRAMER:

J2jdmid4b                          Sweet - direct

1   Q.  Who did you send this to?

2   A.  I sent this to both Dave Middendorf and Tom Whittle.

3   Q.  Why did you send it to them?

4   A.  Because Tom was my boss and Dave was my boss' boss, and

5   this was a topic that they had -- and that I had been

6   discussing with both of them.

7   Q.  What's the subject line of the email?

8   A.  "Likely 2016 PCAOB banking selections."

9   Q.  What did you write in the second sentence of your email?

10  A.  "This list represents the PCAOB's view of the higher-risk

11  banking audits based on the attributes ("Flags) it uses to

12  evaluate and so these were next-in-line for inspection this

13  year (I have tried to rank in order based on my best-guess of

14  the likelihood)."

15  Q.  What are the PCAOB's flags?

16  A.  That is just a reference to the criteria that PCAOB -- one

17  of the criteria the PCAOB uses to risk assess which inspections

18  it wants to select.

19  Q.  To your knowledge, were the PCAOB's flags confidential as

20  of the date you sent this email?

21  A.  Yes, I knew that it was very confidential.

22  Q.  In writing this sentence and preparing this list, what were

23  you drawing from?

24  A.  I was drawing from the confidential stolen GNF Planning

25  Profile that I had taken with me when I had left the PCAOB.

J2jdmid4b                    Sweet - direct

1    Q.  Where did you get the information that you describe in the

2    third line as "next in line for inspection"?

3    A.  From that same GNF Planning Profile document.

4    Q.  How did you know from the GNF Planning Profile that you

5    took on a hard drive when you left the PCAOB which inspections

6    were next in line?

7    A.  I went into the flag information and sorted it so that the

8    highest-ranking flags were at the top.  Then I removed the ones

9    that were going to be inspected by the PCAOB in 2015 and then

10   took the next grouping of banks, so the next highest rated

11   banks, from that flag information.

12   Q.  OK.  Did there come a time that you were asked to work with

13   a company named Palantir?

14   A.  Yes.

15   Q.  What kind of company is Palantir?

16   A.  Palantir is a third-party data analytics firm.

17   Q.  Who asked to you assist with Palantir?

18   A.  Both Tom Whittle and Dave Middendorf.

19   Q.  What was your understanding of what Palantir was doing at

20   the time with KPMG that you had been asked to assist with?

21   A.  Palantir was hired by KPMG to do predictive modeling so

22   that KPMG could try and guess, using this third-party, you

23   know, firm, who and where the PCAOB were planning to inspect or

24   would most likely inspect that following year, in 2016.

25   Q.  And approximately when were you asked to assist with this

1    Palantir project at KPMG?

2    A.  At the same time, in June of 2015.

3    Q.  What were you asked to do in connection with this project?

4    A.  I was asked to meet with both the day-to-day project owner

5    of this, a person from KPMG named John Amraen, and also meet

6    directly with Palantir and basically tell them what I knew

7    about the PCAOB's planning process and how they made

8    selections.

9    Q.  Who was in charge of the Palantir project for KPMG, to your

10   knowledge?

11   A.  Dave Middendorf was the overall project sponsor, so the

12   overall person in charge of this.

13   Q.  And what did you understand you had been asked to do?

14   A.  That Dave asked me to get with Palantir and tell them

15   everything I knew about how the PCAOB made its selections, the

16   criteria, and help make sure that Palantir's results were as

17   best as possible, as useful as possible.

18   Q.  And what did you understand him to mean when he told you to

19   tell them everything you knew?

20   A.  That I was to share all the insight that I had from my time

21   at the PCAOB, including the confidential information that I had

22   taken.

23   Q.  Let's take a look at what's marked for identification as

24   Government Exhibit 810.

25            Do you recognize this exhibit?

J2jdmid4b                          Sweet - direct

1   A.  Yes, I do.

2   Q.  How do you recognize it?

3   A.  I recognize this to be the email that I received from John

4   Amraen on my KPMG email account.

5   Q.  On what date?

6   A.  On June 30, 2015.

7            MS. KRAMER:  The government offers Government Exhibit

8   810.

9            THE COURT:  810 received.

10           (Government's Exhibit 810 received in evidence)

11  BY MS. KRAMER:

12  Q.  OK.  What was John Amraen's role at KPMG at the time of

13  this email, June of 2015?

14  A.  John was a director in the national office Inspections

15  Group.

16  Q.  Where was he previously employed?

17  A.  John Amraen was previously employed by the PCAOB.

18  Q.  All right.  Let's look at the email.

19           The first sentence has John saying, "Brian, thanks

20  again for your time yesterday on the selection process."

21           What had happened the day before that you understood

22  him to be thanking you for?

23  A.  The day before I had had a very long phone call with John

24  Amraen where I talked him through the specific criteria, the

25  details, of the PCAOB's risk assessment process, so the

1    specific weights and factors that the PCAOB used to make its

2    selections.

3    Q.  Could you read the second sentence of the email?

4    A.  "I put the following working document together from that

5    conversation principally to inventory the risk factors you read

6    off, some I documented better than others."

7    Q.  Were you reading from a document when you spoke with John

8    Amraen the day before?

9    A.  Yes, I was.

10   Q.  What document were you reading from?

11   A.  The 2015 GNF Planning Profile document that I had taken

12   with me from the PCAOB.

13   Q.  What information did you read off from the GNF Planning

14   Profile to John Amraen on your call the day before this email?

15   A.  I gave him the specific risk criteria, the factors, that

16   they were considering as well as the weights.

17   Q.  Could you give an example of what you mean by a factor or

18   risk criteria and the weights?

19   A.  Yes.  So, for example, one of the criteria might be if the

20   financial statements had been restated, then that would be a

21   risk factor.  Or if there had been an SEC tip received or a

22   PCAOB tip that the accounting -- that there were accounting

23   problems, or it could even be, as I mentioned earlier, that

24   there was a fly-in partner, so the KPMG partner assigned with

25   one city but the audit was in another city, the PCAOB would

J2jdmid4b                         Sweet - direct

1   assign typically a weighting of either 1, 2 or 3, and it would

2   add up all of those weights.

3   Q.  What was your understanding at the time you shared that,

4   from the PCAOB document, as to whether that information was

5   confidential to the PCAOB?

6   A.  I knew that information was very confidential to PCAOB.

7   Q.  In your experience, is that list of factors and weights

8   ever shared in full by the PCAOB with auditors like KPMG?

9   A.  No, it's not.

10  Q.  Take a look at what's marked for identification as

11  Government Exhibit 821.

12          Do you recognize this exhibit?

13  A.  Yes, I do.

14  Q.  How do you recognize it?

15  A.  I recognize this to be an email that I received on my KPMG

16  email account.

17  Q.  On what date?

18  A.  On Thursday, September 3, 2015.

19          MS. KRAMER:  The government offers Government Exhibit

20  821.

21          THE COURT:  821 is received.

22          (Government's Exhibit 821 received in evidence)

23  BY MS. KRAMER:

24  Q.  All right.  What is the subject line of this email from

25  John Amraen to you?

J2jdmid4b                          Sweet - direct

1   A.  The subject is "Palantir."

2   Q.  And could you read the first two sentences?

3   A.  "Brian, thanks again for your time today.  The folks at

4   Palantir were very appreciative of your forthrightness."

5   Q.  What had happened that day?

6   A.  I had met with Palantir to go through the PCAOB, to talk

7   them through the PCAOB selection process, how many they picked,

8   what the, you know, buckets or categories they commonly picked

9   from, how many big ones, small ones, and then to talk them

10  through other specific details about that selection process.

11  Q.  What did you understand John Amraen to mean when he said

12  that "The folks at Palantir were very appreciative of your

13  forthrightness"?

14  A.  He was referring to the fact that I was very transparent

15  and open with Palantir and that I just revealed a lot of very

16  specific details about the PCAOB selection process to them.

17              (Continued on next page)

18

19

20

21

22

23

24

25

J2J5mid5                          Sweet - direct

1  BY MS. KRAMER:

2  Q.  When you met with them, did you share information that you

3  knew to be confidential?

4  A.  Yes, I did.

5  Q.  Then, in the e-mail, John Amraen reminds you that they are

6  looking for 2015 random selections and 2015 top 30.

7       What did those terms mean to you?

8  A.  Those were both two of the buckets that they, the PCAOB had

9  used to pick its overall inspection list.  So, for example, of

10  the 50 inspections that they had planned for 2015, that year

11  they had 10 of them that were allocated as just random

12  selections, there were five that were included in the top 30.

13  Q.  And, what was your understanding as to whether the PCAOB

14  ever shared which inspections had been chosen as random

15  selections?

16  A.  They did not.  They did not share that information.

17  Q.  What was your understanding as to whether that information,

18  that portion of the GNF planning profile was confidential?

19  A.  I knew it was confidential.

20  Q.  Was that information that the PCAOB ever shared after it

21  had given a firm like KPMG notice of which inspections it was

22  going to audit?

23  A.  No, not to my knowledge, from my experience.

24  Q.  As you shared this information with John Amraen and

25  Palantir, did you know that what you were doing was wrong?

J2J5mid5                                    Sweet – direct

1    A.   Yes, I did.

2    Q.   When you shared this confidential information with John

3    Amraen and Palantir, did you have any concern about getting

4    caught?

5    A.   I knew that John Amraen reported directly to Tom Whittle

6    and since he was in charge of the day-to-day -- I also knew

7    that David Middendorf was the overall project sponsor, and then

8    again, ultimately John Amraen and me and Tom all reported up to

9    Dave and so I wasn't worried about getting caught because of

10   Tom and Dave's specific involvement.

11   Q.   What did that mean to you, Tom and Dave's specific

12   involvement?

13   A.   That it was very unlikely or that I did not have any

14   concern that this would get back to the PCAOB, that I had

15   shared this very confidential information.

16   Q.   Take a look at what's marked for identification as

17   Government Exhibit 931.  Do you recognize this exhibit?

18   A.   Yes, I do.

19   Q.   How do you recognize it?

20   A.   I recognize this to be an e-mail exchange from my KPMG

21   e-mail account.

22   Q.   From what date?

23   A.   From March 9th, 2016.

24            MS. KRAMER:   The government offers Government Exhibit

25   931.

J2J5mid5                          Sweet - direct

1              THE COURT:  931 received.

2              (Government's Exhibit 931 received in evidence)

3    BY MS. KRAMER:

4    Q.  Let's look at the bottom e-mail from John Amraen.  What did

5    John Amraen e-mail you on March 9, 2016?

6    A.  He emailed me kind of a summary of the selections that

7    Palantir, this third-party data analytics firm had made,

8    compared to the predictions that I had made.

9    Q.  And let's look at your response.  What did you say to John

10   Amraen in your response in the first two sentences, or three

11   sentences?

12   A.  I wrote:  John, this is excellent.  Thank you.  One final

13   edit, if possible.  Would you consider adding Wells Fargo and

14   the Credit Suisse U.S. and Deutsche Bank U.S. and components?

15   I communicated those to Dave/Tom separately as I expected them

16   to also get picked, and so they were also added to the

17   monitoring program as a result.

18   Q.  What led you to have the understanding that Credit Suisse

19   U.S. and Deutsche Bank U.S. would be selected for inspection?

20   A.  Cindy Holder had found out from Jeff Wada at the end of

21   2015 that the PCAOB was planning to do big banking inspections

22   in both Switzerland and Germany in 2016.

23   Q.  Let's take a look at what's marked for identification

24   Government Exhibit 824.  Do you recognize this exhibit,

25   Mr. Sweet?

J2J5mid5                          Sweet - direct

1   A.  Yes, I do.

2   Q.  How do you recognize it?

3   A.  It's an e-mail that I sent from my KPMG account.

4   Q.  On what date?

5   A.  October 20th, 2015.

6           MS. KRAMER:  The government offers Government Exhibit

7   824.

8           THE COURT:  824 received.

9           (Government's Exhibit 824 received in evidence)

10  BY MS. KRAMER:

11  Q.  What's the subject line of this e-mail from you to Jim

12  Liddy, David Britt and Scott Frew on October 20th, 2015?

13  A.  The subject is Japan and Switzerland banking inspections.

14  Q.  And, what roles did the individuals in the "to" line play

15  at KPMG as of October 20th, 2015?

16  A.  Jim Liddy was in a leadership role overseeing international

17  banks, audit quality for international banks; and Scott Frew

18  was also in a leadership role helping coordinate international

19  PCAOB inspections.

20  Q.  And who did you copy on this e-mail?

21  A.  William O'Mara, David Middendorf, and Thomas Whittle.

22  Q.  What role did William O'Mara have at the time?

23  A.  William O'Mara was in a very senior international

24  leadership position helping to coordinate with KPMG's other

25  international firms.

1    Q.  What's the first sentence of your e-mail?

2    A.  Jim/David/Scott.  I got a call from on old colleague over

3    the weekend and they let me know that a decision has been made

4    to inspect a big bank in both Switzerland and Japan next year,

5    so obviously Credit Suisse and Sumitomo.

6    Q.  Who was the old colleague you were referring to in this

7    e-mail?

8    A.  I was referring to Cindy Holder who had, in turn, received

9    a call from Jeff Wada.

10   Q.  Why didn't you tell them in this e-mail that the

11   information came from Jeff Wada?

12   A.  Because the people on the "to" and the "cc" line didn't

13   know who Jeff Wada was.

14   Q.  What was the substance of the information that Cindy Holder

15   relayed to you Jeff Wada had shared with her?

16   A.  That Jeff had told her that specifically where the PCAOB

17   was planning to inspect internationally and which ones of those

18   inspections were going to be banking inspections.

19   Q.  And how did you understand from that information that it

20   meant Credit Suisse and Sumitomo would be inspected?

21   A.  There is only one big bank in each of those countries.  The

22   only big bank in Switzerland is Credit Suisse and the only big

23   bank that KPMG audits in Japan was Sumitomo.

24   Q.  And the last sentence that begins with the Board won't

25   formally approve.  What did you write there?

J2J5mid5                         Sweet - direct

A.   I wrote that the board won't formally approve the

inspection plan for KPMG globally until early February so it is

possible something could change, but I wanted to give you a

heads up on this info as it may impact where we devote the most

time and attention in the coming months.

Q.   So, what was your understanding as of the date you sent

this e-mail as to whether the PCAOB had formally approved this

inspection plan?

A.   The PCAOB had not finalized its planning selections.  It

typically did not do that until February of the following year

and so there was a chance that information could change.

Q.   And, going back to the sentence that begins "I would

expect" you wrote:  I would expect the component audits in the

U.S. will also get picked as a result.

          What is a component audit in the U.S.?  What does that

mean?

A.   It really just means a subsidiary audit.  So, for like

Credit Suisse, which is a big bank headquartered in

Switzerland, KPMG Switzerland issues the audit opinion for the

financial statements for Credit Suisse as a whole in

Switzerland.  But, as part of that, because Credit Suisse is

such a big international bank, audit teams around the world

including the United States -- KPMG U.S. -- have to do work for

the component or the subsidiary portion of Credit Suisse that

exists in the U.S.

1  Q.  And so, what does this information mean about the

2  likelihood, or what did it mean to you at the time about the

3  likelihood of Credit Suisse and Sumitomo U.S. getting inspected

4  by the PCAOB?

5  A.  So, it meant that if KPMG Switzerland was going to get

6  inspected for Credit Suisse in Switzerland, then there was a

7  very high likelihood that KPMG U.S. -- so the U.S. firm that we

8  were a part of -- would also get inspected for the component

9  audit work that KPMG U.S. did for that.

10            So, it was a heads up as to where the PCAOB was also

11  going to inspect in the U.S.

12  Q.  What was your understanding, in October 2015, about the

13  significance of this information that Jeff Wada had shared for

14  KPMG?

15  A.  I believed it to be very significant.

16  Q.  Why?

17  A.  Because it gave, it meant that it would give KPMG an

18  opportunity to add national office resources and really pull

19  out all the stops to make sure that the audit work done in both

20  Switzerland and in the U.S. was as great as possible or as good

21  as possible.

22  Q.  And, what was your understanding as of October 20th, 2015,

23  as to whether these selections were confidential to the PCAOB?

24  A.  I knew that it was very confidential still at the PCAOB.

25  Q.  Take a look at what's marked for identification as

J2J5mid5                           Sweet - direct

1    Government Exhibit 876.  Do you recognize this exhibit?

2    A.  Yes, I do.

3    Q.  How do you recognize it?

4    A.  I recognize this to be an e-mail that I sent from my KPMG

5    e-mail account.

6              MS. KRAMER:  The government offers Government Exhibit

7    876.

8              THE COURT:  876 received.

9              (Government's Exhibit 876 received in evidence)

10   BY MS. KRAMER:

11   Q.  So, the bottom e-mail from you dated October 20th, 2015, is

12   that the document we just looked at that's in evidence as

13   Government Exhibit 824?

14   A.  Yes.  That is the e-mail that we just looked at.

15   Q.  And what is the e-mail at the top of the page we are

16   looking at now in Government Exhibit 876?

17   A.  So, it's an updated e-mail forwarding and replying back to

18   everyone 21 days later, three weeks later.

19   Q.  Who did you send this to?

20   A.  I sent it to Jim Liddy, David Britt, Scott Frew, and with a

21   copy again to William O'Mara, David Middendorf and Thomas

22   Whittle.

23   Q.  And what is the subject line of this e-mail on November

24   10th, 2015?

25   A.  Banking selection update.

J2J5mid5                              Sweet - direct

1    Q.   What was the update that you gave them in November 2015?

2    A.   We had -- that we had gotten new information from Jeffrey

3    Wada that the KPMG Japan inspection was going to be moved up

4    into January of 2016 and that they were not going to be looking

5    at a big bank -- meaning Sumitomo.

6    Q.   So, let's look at the first sentence.

7         When you wrote that the PCAOB has decided to move up

8    its inspection of KPMG Japan forward to January 2016 (they just

9    notified the firm).

10        Who just notified the firm, to your understanding?

11   A.   The PCAOB had notified the firm -- the KPMG Japan firm.

12   Q.   So that was official notification?

13   A.   Yes.

14   Q.   And could you read the second sentence?

15   A.   As a result of this timing, I've been told the PCAOB has

16   decided not to look at a bank in Japan.

17   Q.   Where did you get that information?

18   A.   Cindy Holder had discussed that directly with Jeffrey Wada

19   and then had, in turn, told me that information.

20   Q.   What does the next sentence say?   *Instead...?*

21   A.   Instead, they are replacing it with a bank in Germany so it

22   looks like Deutsche in lieu of Sumitomo.

23   Q.   Where did you get that information?

24   A.   From Cindy Holder, who had gotten it from Jeffrey Wada.

25   Q.   And what does the reference to Deutsche mean?

J2J5mid5                          Sweet - direct

A.   Deutsche is just an abbreviation for Deutsche Bank which is

a very big bank in Germany that KPMG audits.

Q.   What was your understanding at the time you sent this

e-mail as to whether this information that Wada shared with

Holder, who shared it with you, was confidential to the PCAOB?

A.   I knew it was very confidential information.

Q.   Let's take a look at what's marked for identification

Government Exhibit 1432.  Do you recognize this exhibit?

A.   Yes, I do.

Q.   How do you recognize it?

A.   I recognize this to be a text message exchange between

Cynthia Holder and myself.

          MS. KRAMER:  Your Honor, I would like to offer another

stipulation between the parties that concerns the extraction of

Cindy Holder's iCloud account and that stipulation is marked

for identification as Government Exhibit 1377.

          It provides, in relevant part, that a vendor performed

an extraction of the iCloud account of Cindy Holder, accessed

that iCloud account, extracted all of the recoverable data from

it, placed the data on a hard drive, and delivered the hard

drive to Holder's representative who then delivered it to a

postal inspector working with the United States Attorney's

office.

          I would like to offer Government Exhibit 1377, the

stipulation, and the text message 1432, subject to connection,

J2J5mid5                              Sweet - direct

1    from testimony we expect to elicit from another witness.

2            THE COURT:  All right.  1377 is received and 1432 is

3    received.

4            (Government's Exhibits 1377 and 1432 received in

5    evidence)

6    BY MS. KRAMER:

7    Q.  When did you have this text message exchange with Cindy

8    Holder?

9    A.  On November 9th.

10   Q.  And why did you write to her and tell her that you were

11   going to tell Jim Liddy that she deserved a huge raise?

12   A.  Because she was the one who had just provided that

13   information we were just discussing about the KPMG Japan and

14   Germany and I was very thankful to have received that from

15   Cindy.

16   Q.  Take a look at what's marked for identification as

17   Government Exhibit 1434.  Do you recognize this exhibit?

18   A.  Yes, I do.

19   Q.  How do you recognize it?

20   A.  I also recognize this to be just a text message exchange

21   between Cindy and myself.

22           MS. KRAMER:  The government offers Government Exhibit

23   1434, subject to connection.

24           THE COURT:  1434 is received.

25           (Government's Exhibit 1434 received in evidence)

J2J5mid5                           Sweet – direct

1    BY MS. KRAMER:

2    Q.  What are you and Cindy Holder texting about between 3:55

3    and 4:10 on this text message exchange?

4    A.  One of the other partners in the national office, John

5    Mucha, was trying to track down one of the PCAOB board members'

6    addresses.

7    Q.  And how did Holder respond when you asked her if she knew

8    one?

9    A.  She said she didn't but that she was going to ask Jeffrey

10   Wada.

11   Q.  And did you end up getting those e-mail addresses from

12   Wada?

13   A.  No, we did not, as I remember.

14   Q.  The PCAOB board members' e-mail addresses, are they

15   confidential or not confidential?

16   A.  They are not confidential.

17   Q.  Let's look at the bottom of the e-mail exchange.  At 4:11

18   p.m. you wrote:  "Tell Wada we own him big."

19           Is that what you intended to write?

20   A.  No.

21   Q.  What did you mean to write?

22   A.  I meant to say "owe" instead of "own," so "tell Wada we owe

23   him big."

24   Q.  Why did you want Cindy Holder to tell Jeffrey Wada that you

25   owe him big?

1    A.  I was sending positive reinforcement to Cindy expecting her

2    to pass that on to Jeff because Jeff had, up until that point,

3    had been providing this insight into these international

4    inspections.

5    Q.  And why did you tell Cindy Holder the beers are on me next

6    time he's in New York?

7    A.  That I wanted to thank Jeff personally for having done

8    that, if and when he was in New York next.

9    Q.  Why did you want to thank Jeffrey Wada for sharing this

10   confidential PCAOB information?

11   A.  Those e-mails, the information that he had provided about

12   KPMG Japan and Switzerland and Germany made me look really good

13   in the eyes of these very senior people at KPMG when I was

14   sharing that, and it was my way of kind of reinforcing that or

15   sending positive statements back to Jeff, via Cindy.

16   Q.  Why did you want to reinforce that behavior?

17   A.  Because I wanted the information to continue.

18   Q.  Take a look at what's marked for identification as

19   Government Exhibit 928.  Do you recognize this exhibit?

20   A.  Yes, I do.

21   Q.  How do you recognize it?

22   A.  This is a calendar invitation that was sent to me and

23   others on my KPMG e-mail account.

24   Q.  When was this calendar invitation sent?

25   A.  It was sent on January 12th, 2016.

1          MS. KRAMER:  The government offers Government Exhibit

2     928.

3          THE COURT:  928 received.

4          (Government's Exhibit 928 received in evidence)

5     BY MS. KRAMER:

6     Q.  Who is this calendar invitation from?

7     A.  It was sent from Jennifer Lauer.

8     Q.  Who did she report to?

9     A.  She reported directly to David Britt.

10    Q.  And who was the calendar invitation received by?  Who is in

11    the "to" field in this calendar invitation?

12    A.  Jenn Lauer, David Britt, John Klinge, me, Cindy Holder, and

13    Rob Finn.

14    Q.  Who is John Klinge or what role did he have at the time?

15    A.  John Klinge was a very senior banking partner.

16    Q.  And what role did Robert Finn have at the time?

17    A.  Rob Finn was also a very senior banking partner that was

18    working in the national office.

19    Q.  What is the subject line of this calendar invitation?

20    A.  Discuss Credit Suisse PCAOB comments 12/31/12 audit year.

21    Q.  What did you understand the PCAOB comments -- withdrawn.

22         Where did you understand the PCAOB comments from the

23    12/31/12 audit year to have come from?

24    A.  These were the comments that KPMG had received from the

25    PCAOB back in its prior inspection back in 2013.

J2J5mid5                          Sweet - direct

1    Q.   When was this meeting scheduled to take place?

2    A.   January 13, 2016.

3    Q.   Did you have an understanding of what was to be discussed

4    at the meeting?

5    A.   Yes.

6    Q.   What was that understanding?

7    A.   That the purpose of the meeting was to work through the

8    past comments that the audit engagement team had KPMG had

9    received from the PCAOB back in the last inspection, back in

10   2013, and that the purpose was to discuss those issues to make

11   sure that the national office was ensuring that that engagement

12   team was not making the same mistakes in 2016.  So, that it was

13   going to do, that it was going to have done enough audit work

14   to address these issues so that when the PCAOB came back or if

15   they came back, they wouldn't get repeat comment forms again.

16   Q.   What was your understanding about whether the Credit Suisse

17   U.S. audit was complete as of January 2016 for 2015?

18   A.   I knew that it was not a complete audit yet so the audit

19   was still live.

20   Q.   And with a live audit, can an engagement team perform new

21   procedures without any special documentation or did they have

22   to document new procedures?

23   A.   New work can be done with out any sort of special

24   documentation.

25   Q.   As of January 2016, had the PCAOB notified KPMG that it

J2J5mid5                           Sweet - direct

1   planned to inspect Credit Suisse?

2   A.  No.

3   Q.  What was your understanding about what led to this January

4   2000 meeting to discuss prior comments on the Credit Suisse

5   inspection?

6   A.  That this was directly in response from the information

7   that Jeffrey Wada had provided through Cindy and then to me

8   that the PCAOB was planning to do this big bank inspection in

9   Switzerland.

10  Q.  Throughout 2015 and 2016, did you get other confidential

11  information from Cindy Holder that you understood to have come

12  from Jeffrey Wada?

13  A.  Yes.

14  Q.  Take a look at what's marked for identification as

15  Government Exhibit 1436.  Do you recognize this exhibit?

16  A.  Yes.

17  Q.  How do you recognize it?

18  A.  I recognize this to be more text message exchanges between

19  Cindy and myself.

20          MS. KRAMER:  The government offers Government Exhibit

21  1436, subject to connection.

22          THE COURT:  1436 received.

23          (Government's Exhibit 1436 received in evidence)

24  BY MS. KRAMER:

25  Q.  Between 10:59 a.m. and 11:02 a.m. on February 5, 2016, what

1  were you and Cindy Holder texting about?

2  A.  We were texting about other KPMG international locations

3  and when they would be back on the PCAOB's inspection schedule.

4  Q.  What did Cindy Holder write to you at 12:04 p.m. on

5  February 5, 2016?

6  A.  She wrote:  *Call when you can.  I just talked to Wada about*

7  *many things.*

8  Q.  What did you understand her to mean by Wada?

9  A.  She is referring to Jeffrey Wada.

10  Q.  Do you recall specifically what the subject was of the

11  February 5, 2016 call about the many things she and Wada

12  discussed?

13  A.  I don't remember.

14  Q.  Take a look at what's marked for identification as

15  Government Exhibit 1437.  Do you recognize this exhibit?

16  A.  Yes.

17  Q.  How do you recognize it?

18  A.  I recognize this to be more e-mail -- sorry, text message

19  exchange between Cindy and myself.

20  Q.  From what date?

21  A.  From February 24, 2016.

22          MS. KRAMER:  The government offers Government Exhibit

23  1437, subject to connection.

24          THE COURT:  1437 received.

25          (Government's Exhibit 1437 received in evidence)

J2J5mid5                        Sweet - direct

1  BY MS. KRAMER:

2  Q.  Could you read the first text message from you to Cindy

3  Holder at 4:36 p.m. on February 24, 2016?

4  A.  Wada is the freaking man.  I'd so love to hire him.  Do you

5  think he he'd be willing to come do this international role?  I

6  can leave Louann out and just gauge interest with Henderson.

7  It would be awkward for Jeff as he'd have to recuse himself and

8  likely want some time to pass after this inspection.  Either

9  way, one day I want to buy that guy a beer.

10 Q.  Do you remember specifically what that was about?

11 A.  Yes, I believe so.

12 Q.  What do you recall?

13 A.  That KPMG had just found out there were not going to be any

14 comments on its KPMG Japan inspection so the entire firm's

15 inspection of all issuers we were not going to get any Part I

16 comments.

17 Q.  What did that have to do with you telling Cindy Holder that

18 Wada is the freaking man?

19 A.  I knew that Jeffrey Wada was the PCAOB location leader for

20 the KPMG Japan inspection, which meant that he oversaw all of

21 the inspections that were being done in Japan from that January

22 into February 2016 time frame.

23 Q.  What was your goal in sending this message to Cindy Holder?

24 A.  Well, I was very excited.  I mean, obviously to find out

25 there were no comment forms but that it was also just another

1   instance of me passing along very positive reinforcement to

2   Cindy and back to Jeff.

3   Q.  To what end?

4   A.  To continue to encourage Jeff on what he was doing.

5   Q.  All right.  I want to direct your attention to March 28,

6   2016.  Do you remember in what state you were working that day?

7   A.  March 28, 2016; I was working in California.

8   Q.  Did there come a time that day that Cindy Holder attempted

9   to contact you?

10  A.  Yes.

11  Q.  Did you have a KPMG desk phone number in New York?

12  A.  Yes, I did.

13  Q.  Do you remember what that number was?

14  A.  Not offhand.

15  Q.  Is there anything that you could look at that would refresh

16  your recollection?

17  A.  I know I had written that phone number down on the first

18  page of my notebook.

19  Q.  Mr. Urbanczyk, could you please pull up for the witness,

20  court, and counsel, what is marked for identification as

21  Government Exhibit 454A, page 9?

22          Mr. Sweet, take a look at the document that is in

23  front of us, read it quietly to yourself, and let us know when

24  you are finished.

25  A.  I'm finished.

J2J5mid5                          Sweet - direct

1    Q.  Would you take it down, please, Mr. Urbanczyk?

2           Did that refresh your memory about what your desk

3    phone number was in the KPMG New York office?

4    A.  Yes, it does.

5    Q.  What was it?

6    A.  It was area code 212-872-2140.

7    Q.  Did you have a cell phone in 2016?

8    A.  Yes, I did.

9    Q.  Do you remember what number was assigned to that cell

10   phone?

11   A.  Yes.

12   Q.  What number was that?

13   A.  Area code 559-977-3823.

14   Q.  Take a look --

15          MR. COOK:  Your Honor, may I ask the witness to repeat

16   the last answer?  I didn't get it.

17          THE COURT:  Yes.

18          If you can repeat it?

19          THE WITNESS:  My cell phone number was 559-977-3823.

20   BY MS. KRAMER:

21   Q.  Can you take a look at what's marked for identification as

22   Government Exhibit 1407?  Do you recognize the information

23   contained in this document?

24   A.  Yes.

25   Q.  How do you recognize it?

J2J5mid5                           Sweet - direct

1    A.   I recognize these to be both KPMG and PCAOB contacts that I

2    had in my cell phone.

3            MS. KRAMER:   Your Honor, the government offers

4    Government Exhibit 1407, subject to connection.

5            THE COURT:   1407 is received.

6            (Government's Exhibit 1407 received in evidence)

7    BY MS. KRAMER:

8    Q.   So, let's look at the contact information from your cell

9    phone for Cindy Holder on page 1.  What was the cell phone

10   number that Cindy Holder was using in 2016?

11   A.   Her cell phone number was 713-516-1277.

12   Q.   Let's take a look at what's marked for identification as

13   Government Exhibit 405, page 16.

14           Actually, your Honor, there is another stipulation I

15   would like to offer that relates to telephone records.  It is

16   marked for identification Government Exhibit 1378.  This one is

17   quite long so, actually, if we could bring it up for the

18   witness, Court, and counsel?  I am going to do my best to

19   paraphrase, your Honor.

20           So, the parties agree that certain witnesses from

21   phone companies would testify as to the fact that Government's

22   Exhibits 400, 401, 402, 405, 407, are true and accurate records

23   of AT&T for a specific time period that were made at or near

24   the time of the activity, were made by employees with personal

25   knowledge or received the information from other employees with

J2J5mid5                              Sweet - direct

1    personal knowledge, and it was the regular practice of AT&T to

2    make those records.

3              In addition, Government's Exhibits 403, 404 and 406, a

4    witness from Verizon would testify that those are true and

5    accurate records from Verizon that were also made at or near

6    the time of the activity reflected in those records, were made

7    by Verizon employees with personal knowledge of that

8    information or who received it from other Verizon employees

9    with that knowledge, and it was the regular practice of Verizon

10   to make and keep those documents.

11             There is also information in the stipulations about

12   which phone numbers were assigned to specific individuals.  We

13   may publish that portion of the stipulation at a later date but

14   with that summary, the government offers Government Exhibit

15   1378, the stipulation, as well as Government's Exhibits 400,

16   401, 402, 405, 407, 403, 404, and 406.

17             THE COURT:  Okay.  They're received.  1378, 400, 401,

18   402, 405, 407, 403, 404, and 406.

19             (Government's Exhibits 400, 401, 402, 403, 404, 405,

20   406, 407, 1378 received in evidence)

21             MS. KRAMER:  Thank you, your Honor.  And the

22   stipulation is 1378?

23             THE COURT:  Yes.

24             MS. KRAMER:  Thank you, your Honor.

25   BY MS. KRAMER:

Q.  Mr. Sweet, take a look at what's in evidence as Government
Exhibit 405 and I want to direct your attention to I believe
what is page 16 and focus your attention on the upper left-hand
corner under the line.  Do you recognize the number ending in
1277?

A.  Yes.

Q.  And I would note for the record that the parties stipulate
in Government Exhibit 1378 that that cell number, 713-516-1277
was subscribed to Cindy Holder and billed to Cindy Holder.

          Take a look at line 248 on page 18.  Do you see where
it says 3/28/16 17:33?

A.  Yes.

Q.  Fist, do you know what 17:33 is in non-military time?

A.  Yes.

Q.  What do you understand it to be?

A.  It would be 5:33 p.m.

Q.  What time zone is listed on this record under the heading
Connecting Time or Connection Time?

A.  It says UTC, which I understand to be the same as Greenwich
mean time.

Q.  And so, what do you understand 5:33 to be in Eastern time?

A.  5:33 would be 1:33 p.m. eastern time.

Q.  And what time, if it is 1:33 Eastern, what time is that in
California?

A.  10:33 a.m.

J2J5mid5                              Sweet - direct

1    Q.  Let's take a look at what's marked for identification as

2    Government Exhibit 405D.  Does this demonstrative exhibit

3    reflect the Eastern Daylight Time that corresponds with the

4    times on the line that you just read?

5    A.  Yes, it does.

6    Q.  Would it aid you in your testimony to use this document?

7    A.  Yes.

8              MS. KRAMER:  The government offers 405D.

9              THE COURT:  Received.

10             (Government's Exhibit 405D received in evidence)

11   BY MS. KRAMER:

12   Q.  So, under the heading originating number, what number do

13   you see there for line 248?

14   A.  I see Cindy Holder's cell phone number.

15   Q.  And, do you recognize the number that was called in line

16   248 that ends in 2140?

17   A.  Yes.

18   Q.  How do you recognize that number?

19   A.  That was my KPMG office line number.

20   Q.  Do you have an understanding of what is in the column

21   entitled ET?

22   A.  Yes.

23   Q.  What is your understanding of that?

24   A.  I believe the "ET" stands for elapsed time, which is just

25   how long the phone call occurred.

J2J5mid5                         Sweet - direct

1    Q.  So, looking at the call on line 248 at 1:33 p.m. Eastern,

2    what was the elapsed time of the call?

3    A.  It was zero seconds.

4    Q.  Looking at the next line down, line 249, about a minute

5    later, what number did Holder's cell phone call?

6    A.  She called my cell phone number.

7    Q.  And what's the duration of that call, according to this

8    phone record?

9    A.  Six seconds.

10   Q.  Did you actually speak with Cindy Holder from your office

11   number or your cell phone in these first two calls that are

12   listed here?

13   A.  No, I did not.

14   Q.  Looking at the next line, line 250 about a minute later,

15   what number did Holder's cell phone call?

16   A.  She again called my cell phone number.

17   Q.  And what's the elapsed time of that call?

18   A.  10 seconds.

19   Q.  Do you remember if you actually spoke when she called you

20   that time?

21   A.  No, we did not.

22   Q.  Take a look at what's marked for identification as

23   Government Exhibit 935.  Do you recognize this exhibit?

24   A.  Yes, I do.

25   Q.  How do you recognize it?

J2J5mid5                              Sweet - direct

1    A.   This is an e-mail exchange between Cindy and I.

2    Q.   From what date?

3    A.   That same day, Monday March 28, 2016.

4              MS. KRAMER:   The government offers Government Exhibit

5    935?

6              THE COURT:   935 received.

7              (Government's Exhibit 935 received in evidence)

8    BY MS. KRAMER:

9    Q.   So, what did you write to Cindy Holder in the first e-mail

10   at the bottom of this page?

11   A.   I wrote in the subject line: *On a call.  I'll call you*

12   *once it's over.  Everything okay*?

13   Q.   Why did you send this e-mail to Cindy Holder?

14   A.   Because I just received multiple calls from her in a row

15   that I had missed and I wasn't sure if there was something of

16   urgency or something urgent was going on.

17   Q.   How did she respond?

18   A.   She wrote yes... but you need to call ASAP with five

19   exclamation points.

20   Q.   Now, the time stamp on her e-mail says 10:36 a.m. and the

21   time stamp on your e-mail says 12:35 p.m.  Do you have any

22   understanding about why it appears that she responded to you

23   before you sent an e-mail?

24   A.   Yes, I do.

25   Q.   I'm sorry.  What was that?

J2J5mid5                         Sweet - direct

1    A.  Yes, I do.

2    Q.  Can you maybe move the mic a little bit closer to your

3    mouth?  Thanks.

4           What is your understanding about the times on this

5    e-mail?

6           MR. COOK:  Objection.

7           THE COURT:  Overruled.

8           You can answer, if you have an understanding.

9           THE WITNESS:  I do.

10          So, I was in California at 10:36 a.m.  Because this

11   was as soon as I missed the third call from Cindy, I know she

12   was based in Houston so operating on Central Time zone.  So,

13   10:36 my time was -- I'm sorry, yes, was 12:36 her time, she

14   was two hours ahead.  So, the times here are just because of

15   the different e-mail exchanges that we operated on and where we

16   were versus where the e-mail was being sent from.

17   BY MS. KRAMER:

18   Q.  And what did you write back to her after she said yes, but

19   you need to call ASAP?

20   A.  I wrote: *"Ahhh.  Okay.  I want to.  I think the call I'm on

21   may go for another 90 minutes."*

22   Q.  What was your understanding about when you sent that e-mail

23   and response to her?

24   A.  I sent that that same minute, so as soon as I got it so the

25   5:36 is the same as 10:36 a.m. California time where I was.

J2J5mid5                        Sweet - direct

1   Q.  What is your understanding, if you have one, about why the

2   top e-mail says 5:36?

3              MR. COOK:  Objection.

4              THE COURT:  You can answer if you have an

5   understanding.

6              THE WITNESS:  My understanding is that is the UTC time

7   or the Greenwich Mean Time because of the e-mail exchange, and

8   so it is seven hours ahead of where I was physically, in

9   California, at 10:36 a.m.

10  BY MS. KRAMER:

11  Q.  I would note that the stipulation that is in evidence is

12  Government Exhibit 1375, in paragraph 5 it indicates that the

13  time set forth in the e-mails that are referenced therein may

14  be in the following time zones, Eastern Standard Time; Central

15  Standard Time, which is one hour behind Eastern Standard Time;

16  Mountain Standard Time, which is two hours behind Eastern

17  Standard Time; Pacific Standard Time which, is three hours

18  behind Eastern Standard Time; and Greenwich Mean Time, also

19  known as Coordinated Universal Time which is four hours ahead

20  of Eastern Daylight Time during daylight savings time and five

21  hours ahead of Eastern Standard Time the rest of the year -- in

22  case anyone needed any more information about the time zones.

23             All right.  So, let's take a look at what's marked for

24  identification as Government Exhibit 935D.  Do you recognize

25  this exhibit?

J2J5mid5                           Sweet - direct

1    A.  Yes, I do.

2    Q.  How do you recognize it?

3    A.  This is the same e-mail exchange between Cindy and I on

4    March 28.

5    Q.  What is your understanding of what information is in the

6    yellow boxes that stick out in the right margin?

7    A.  That it is just clarifying and converting the funny times

8    on the e-mails to the consistent Eastern Daylight Time.

9    Q.  Would it aid you in your testimony to refer to Government

10   Exhibit 935D?

11   A.  Yes, it would.

12           MS. KRAMER:  The government offers 935D.

13           THE COURT:  Received.

14           (Government's Exhibit 935D received in evidence)

15   BY MS. KRAMER:

16   Q.  So, after you saw missed calls from Cindy Holder, what time

17   did you send her an e-mail on Monday March 28?

18   A.  At 1:35 Eastern Time.

19   Q.  What time did she write back to you saying that you need to

20   call ASAP?

21   A.  One minute later at 1:36 p.m. Eastern Time.

22   Q.  What time did you write back to her saying that you want

23   to, the call you were on may last for another 90 minutes?

24   A.  Immediately thereafter, so same time, 1:36 p.m.

25   Q.  Did you receive any text messages from Cindy Holder that

J2J5mid5                          Sweet - direct

1    day?

2    A.  Yes.

3    Q.  Please take a look at what's marked for identification as

4    Government Exhibit 1442.  Do you recognize this exhibit?

5    A.  Yes.

6    Q.  How do you recognize it?

7    A.  It is text messages between Cindy and I.

8    Q.  On what day?

9    A.  That same date, March 28, 2016.

10          MS. KRAMER:  The government offers Government Exhibit

11   1442, subject to connection.

12          THE COURT:  1442 received.

13          (Government's Exhibit 1442 received in evidence)

14   BY MS. KRAMER:

15   Q.  So, take a look at the message dated March 28 at 1:34 p.m.

16   Eastern.  Where were you at that time?

17   A.  Again, I was in my home office in California.

18   Q.  Do you know where Cindy Holder was?

19   A.  She was in the New York office -- KPMG's New York office,

20   as I understand it.

21   Q.  What did her message say to you?

22   A.  It said:  "Call me as soon as you can," with three

23   exclamation points.

24   Q.  Did there come a time that day that you spoke with Cindy

25   Holder?

J2J5mid5                          Sweet - direct

1    A.  Yes.

2    Q.  Let's go back and look at Government Exhibit 405 in

3    evidence, or 405D actually.  I want to direct your attention to

4    line 251.  What is the originating number that placed this

5    call?

6    A.  That is my cell phone number.

7    Q.  And what was the number that received the call?

8    A.  Cindy Holder's cell phone number.

9    Q.  How long did this call last?

10   A.  Just under 24 minutes.

11   Q.  Do you remember what you and Cindy Holder discussed in that

12   24-minute phone call on March 28?

13   A.  Yes.

14   Q.  In sum and substance, what did Cindy Holder tell you during

15   that phone call?

16   A.  That she had received a call from Jeffrey Wada and that

17   Jeff had provided her with the names of who the PCAOB was going

18   to be inspecting for the banks in 2016.

19   Q.  What, if anything, did she tell you about where Jeffrey

20   Wada got that information?

21   A.  She explained to me that Jeff had gone into the PCAOB's IIS

22   system and had accessed the planning information for the

23   PCAOB's KPMG inspection team and had specifically gone into the

24   schedule.

25   Q.  How did she know that that's how Jeffrey Wada got the

J2J5mid5                          Sweet - direct

1   information?

2   A.   Because that was how Jeff had read the information to her,

3   that's what Jeff had told her.

4   Q.   How did she describe for you the way that Jeffrey Wada read

5   this information to her on their call?

6   A.   That during her conversation with Jeffrey Wada that he said

7   I'm going to put the phone down and read out loud and then

8   proceeded to read names of KPMG's banking audit inspection

9   clients from this PCAOB document.

10  Q.   Did she tell you who the banking inspection targets were

11  for KPMG that Wada provided to her that day?

12  A.   Yes.

13  Q.   What, if anything, did you do while she was giving you

14  those names?

15  A.   I grabbed a piece of paper on my desk and wrote those names

16  down.

17  Q.   Do you still have that piece of paper?

18  A.   No, I don't.

19  Q.   Do you know what happened to it?

20  A.   I just threw it away in the normal course of cleaning up my

21  office.

22  Q.   Do you know when you threw it away?

23  A.   No.

24  Q.   Do you recall which inspection targets or issuers were on

25  that list?

J2J5mid5                          Sweet - direct

1   A.  Yes.

2   Q.  Do you remember all of them or just some of them?

3   A.  I believe I remember all of them.

4   Q.  What are the ones that you remember?

5   A.  AMBAC, Sallie Mae, Bank of California, Century Bancorp,

6   NewStar Financial, Washington Trust, UMB Financial, People's

7   United Bank, People's Financial; First Bank Corp., First

8   Business Financial, Fidelity Information Systems, and Bon-Ton

9   Stores.

10  Q.  Is Sallie Mae also known as SLM Corp?

11  A.  Yes.

12  Q.  At what stage were most of these audits as of March 28,

13  2016?

14  A.  My understanding was that all of these audits had been

15  finalized by KPMG, meaning that they had issued the audit

16  opinion but that they were still within the 45-day archive

17  date, the documentation completion period.

18  Q.  As of March 28, 2016, had the PCAOB told KPMG that these

19  audits were going to be inspected?

20  A.  No, they had not.

21  Q.  What was your understanding on March 28, 2016, about

22  whether this was confidential information?

23  A.  I knew this was highly confidential information from the

24  PCAOB.

25  Q.  How did you end things on your call with Cindy Holder -- on

J2J5mid5                              Sweet – direct

1   your first call with Cindy Holder that day?

2   A.  I told Cindy that I was going to call Tom Whittle to share

3   this information with him and would call her back.

4   Q.  What did you do next?

5   A.  I tried calling Thomas Whittle in the office.

6   Q.  Can you take a look at what's marked for identification as

7   Government Exhibit 936?  Do you recognize this exhibit?

8   A.  Yes, I do.

9   Q.  How do you recognize it?

10  A.  I recognize this to be an e-mail that I sent to Tom Whittle

11  on my KPMG e-mail account.

12  Q.  On what date?

13  A.  On March 28, 2016.

14          MS. KRAMER:  The government offers Government Exhibit

15  936.

16          THE COURT:  936 is received.

17          (Government's Exhibit 936 received in evidence)

18  BY MS. KRAMER:

19  Q.  Looking for a second at the sent information, it says March

20  28, 2016 6:22 p.m.  Do you recall what time of day you sent

21  this e-mail?

22  A.  Yes, I do.

23  Q.  Was it in the evening?

24  A.  No.  It was not.

25  Q.  What is your understanding about what time you sent this

J2J5mid5                          Sweet - direct

1    e-mail?

2    A.  I sent this at 11:22 a.m. California time where I was

3    working, which is right after I had gotten off the phone with

4    Cindy.

5    Q.  What did you write in this e-mail to Thomas Whittle?

6    A.  I wrote in the subject: *Do you have five minutes?  I just*

7    *tried you in the office but think you may still be in the*

8    *feedback meeting.*

9    Q.  Why did you write this e-mail to Tom Whittle?

10   A.  Because I had tried to call him and not been able to get

11   ahold of him and wanted to speak to him fairly urgently, given

12   what Cindy had just shared.

13   Q.  Why did you want to talk to him urgently given what Cindy

14   had just shared?

15   A.  Because the information that Jeffrey Wada had provided to

16   Cindy and then Cindy had given to me was so confidential and

17   very significant to KPMG.

18   Q.  Did you have an understanding on March 28, 2016, as to

19   whether that information was valuable to KPMG?

20   A.  Yes.

21   Q.  What was your understanding about that?

22   A.  It was very valuable to KPMG.

23   Q.  Take a look at what's marked for identification Government

24   Exhibit 937.  Do you recognize this exhibit?

25   A.  Yes.

J2J5mid5                              Sweet - direct

1   Q.  How do you recognize it?

2   A.  This is an e-mail that I sent to David Britt from my KPMG

3   e-mail.

4             MS. KRAMER:  The government offers Government Exhibit

5   937.

6             THE COURT:  937 received.

7             (Government's Exhibit 937 received in evidence)

8   BY MS. KRAMER:

9   Q.  What did you write to David Britt on March 28?

10  A.  I wrote in the subject:  *Can you please give me a call when*

11  *you get five minutes?  It is fairly pressing.  I just tried you*

12  *in the office.  Thanks, Brian.*

13  Q.  Same question about the time of this e-mail.  Do you recall

14  what time of day you sent this e-mail?

15  A.  Yes.

16  Q.  Was it in the evening?

17  A.  No, it was not.

18  Q.  What time did you send this e-mail?

19  A.  At -- it would be 11:28 a.m. in California where I was

20  working.

21  Q.  Why did you write this e-mail to David Britt?

22  A.  Because after not getting ahold of Tom Whittle I tried to

23  call David Britt as well because I wanted to share this

24  information with him as quickly as possible, too.

25  Q.  Why did you want to share this information with David Britt

J2J5mid5                              Sweet - direct

1    as quickly as possible?

2    A.   For the same reasons as with Tom; because it was so

3    valuable to KPMG and very time sensitive as well.

4    Q.   Did you connect with Tom Whittle or David Britt that day?

5    A.   Yes.

6    Q.   How?

7    A.   I spoke with both Tom Whittle and then with David Britt on

8    the phone.

9    Q.   Let's take a look at what's in evidence as Government

10   Exhibit 404, page 15.

11            First, actually, can we go back to the front page,

12   Mr. Urbanczyk?  Actually, can you move off of that page?

13            Do you understand -- what is your understanding about

14   whose phone records these are?

15   A.   These are my phone records.

16   Q.   And what is your understanding about what time zone the

17   calls are in?

18   A.   They would be in California time.

19   Q.   Let's look at page 15 at 10:56 p.m., California time.  So

20   what is your understanding about which call happened now

21   looking at your phone records at 10:56 a.m. California time on

22   March 28?

23   A.   So, that is the same call we looked at earlier from Cindy's

24   phone record, so this is me calling Cindy on her cell phone at

25   10:56 a.m. California time and the call lasting 24 minutes.

J2J5mid5                              Sweet – direct

1   Q.  Take a look at 11:21.  Do you know whose number that is?

2   A.  That is Tom Whittle's office number.

3   Q.  Did you connect with him when you tried to call him at

4   11:21 a.m.?

5   A.  No, I didn't.

6   Q.  Who did you call next?

7   A.  I then called Cindy.

8   Q.  Why did you call Cindy Holder back?

9   A.  After my first call with her I told her that I was going to

10  call Tom and then call her back.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2jdmid6                          Sweet - direct

1  Q.  And were you able to connect with David Britt?

2  A.  Yeah.  The next call, at 11:26, is to David Britt, and the

3  same thing happened where I called him and did not get ahold of

4  him either.

5  Q.  All right.  Let's look at the entry for 11:48 a.m.  How

6  long did that call last?

7  A.  It was eleven minutes.

8  Q.  And who was that call with?

9  A.  That was with Tom Whittle.

10 Q.  What did you tell Tom Whittle in that call?

11 A.  I told Tom that we had received notice -- or, I'm sorry,

12 advance notice from the PCAOB of who the PCAOB was going to

13 inspect for the banks that year and that this had come from a

14 former colleague at the PCAOB, and then I gave him the names

15 that Cindy had given me.

16 Q.  How did he react?

17 A.  Very positively and favorably.

18 Q.  And what did he say?

19 A.  That he would get Dave Middendorf out of a meeting so that

20 we could discuss the -- this information.

21 Q.  Did Tom Whittle indicate to you one way or another whether

22 he was going to fill Dave Middendorf in on what you had told

23 Tom Whittle?

24 A.  Yes.

25 Q.  What did he say about that?

J2jdmid6                          Sweet - direct

1   A.  He -- he told me that he would -- that he thought Dave was

2   in a meeting and that he would get David out of the meeting so

3   that we could fill him in on this information and would arrange

4   a conference call, or would get Dave and that they would, you

5   know, call me back.

6   Q.  And what, if anything, did you discuss with Tom Whittle

7   about talking to David Britt?

8   A.  I told Tom that I had tried to reach out -- that I tried to

9   get David Britt as well and had sent him an email that I

10  couldn't get him in the office, but that when David called me

11  back that I was going to share with David Britt the same

12  information.

13  Q.  All right.  Let's take a look back at Government Exhibit

14  404, the line at 11:59 a.m.

15          Who did you have a call with at 11:59?

16  A.  That is Cindy Holder.

17  Q.  And was that call interrupted at some point?

18  A.  Yes.

19  Q.  How?

20  A.  While I was in the middle of talking with Cindy, you could

21  see the next call at 12:03, David Britt then called me back.

22  Q.  Do you recognize that number, 212-954-3074?

23  A.  Yes.

24  Q.  How?

25  A.  I recognize that to be David Britt's phone number.

J2jdmid6                              Sweet - direct

1   Q.  Do you know what it means next to the word "planallow,

2   callwait"?

3   A.  Yes.

4   Q.  What does it mean?

5   A.  It means that call waiting -- because I was in the middle

6   of my phone call with Cindy Holder when Britt -- David Britt

7   called me back.

8   Q.  What did you discuss with David Britt?

9   A.  I told David, again, that we had just received the banking

10  inspections from an old colleague at the PCAOB and knew who all

11  the names were.  I told him who the names were.  And I told him

12  that I had just shared this information with Tom Whittle.

13  Q.  How did that call end?

14  A.  I let Dave -- David Britt know that Tom Whittle was going

15  to get Dave Middendorf out of a meeting and would get with

16  David Britt, and they were all going to call me back so that

17  the four of us could talk this through together.

18  Q.  Did you have another call with Cindy Holder?

19  A.  Yes, I did.

20  Q.  What did you discuss with her on your next call?

21  A.  After hanging up with David Britt, I remember calling Cindy

22  back just to reaffirm this information and make sure that it

23  really was what Cindy had said it was.

24  Q.  What, if anything, did you ask Cindy Holder to make

25  yourself comfortable that this was the information that she

J2jdmid6                          Sweet - direct

1    said it was?

2    A.  I asked her again to tell me how she had gotten this from

3    Jeff Wada and how Jeff had explained to Cindy, how he had

4    gotten and accessed this information and tried to understand

5    why Jeff had access to this information, and to give me more

6    details about -- about the specific names themselves.

7    Q.  What did she say in response to your questions?

8    A.  She told me that Jeff had access to the KPMG scheduling

9    information because of the role he had at another firm, plus

10   because he had been involved in the KPMG Japan inspection that

11   prior January and February, that that was another reason why he

12   would have access to this information.  She told me, again,

13   that it had come right from the scheduling information, and

14   that the order in which she had given me the names of those

15   twelve audit engagements was sequenced, which meant that they

16   were in the order in which the PCAOB was going to announce

17   those inspections to KPMG.  And I remember also discussing with

18   her the banks, the names of the banks, and I recognize them to

19   be KPMG audit clients, and that it was about the right number

20   that the PCAOB normally picks for its banking inspections as

21   part of its overall inspections program.

22   Q.  Did she refer to Jeff Wada by name in the conversation you

23   had with her that day when you called her back?

24   A.  Yes, she did.

25   Q.  And had she referred to Jeff Wada by name when she first

1   called you and told you about this?

2   A.  Yes, she did.

3   Q.  Did her answers to your questions in this follow-up call

4   give you comfort that you were getting a real PCAOB inspection

5   list?

6   A.  Yes, they did.

7   Q.  Was a call arranged that day with Middendorf, Whittle and

8   Britt?

9   A.  Yes.

10  Q.  What phone did you use to participate in that call?

11  A.  I was still using my cell phone.

12  Q.  Where were you when you participated in that call?

13  A.  I was still working out of my home office in California

14  that day.

15  Q.  What was your understanding of where Dave Middendorf, Tom

16  Whittle and David Britt were when you had this call with them?

17  A.  I understood that they were all in KPMG's New York office,

18  in one of the conference rooms, and specifically the conference

19  room next to Tom Whittle's office on the 22nd floor.

20  Q.  What gave you that understanding?

21  A.  Because they all called me together from the same room, so

22  I was the only one on the end of the phone, and they were in

23  the middle of talking to each other while I was on the phone or

24  when they dialed me in.

25  Q.  Would you take a look at what's in evidence as Government

1    Exhibit 404, page 16.  I want to direct your attention to the

2    entry at 1:10 p.m.

3             So, again, the record we're looking at, is this your

4    cell phone -- your cell phone records?

5    A.  Yes.

6    Q.  Do you recognize on the line that says "1:10," 212-954, do

7    you recognize those numbers?

8    A.  Yeah, I recognize that to be the area code and the prefix

9    for KPMG's New York office.

10   Q.  Do you specifically recognize the last four numbers, 7888?

11   A.  No, I don't.

12   Q.  And how long did this call last?

13   A.  60 minutes.

14   Q.  Did you say six-zero?

15   A.  Six-zero, yes.

16   Q.  And on your records, this 1:10 p.m. is California time or

17   another time zone?

18   A.  This would be California time.

19   Q.  And what time is that in New York?

20   A.  4:10 p.m.

21   Q.  Is this a record of the call you had with Middendorf,

22   Whittle and Britt that day?

23   A.  Yes, it is.

24   Q.  Was anyone else participating by phone in that meeting or

25   was it just you?

J2jdmid6                          Sweet - direct

1    A.   It was just me.

2    Q.   When the call started, could you explain what you heard?

3    A.   They were in the middle of already talking through the

4    list.  It was clear that David Britt had gathered some

5    information between the time that I had called him and when we

6    were having this group call and --

7    Q.   Excuse me.

8    A.   And so we specifically talked through each of the names of

9    the issuers that were on that list.

10   Q.   What was David Britt saying that made it clear to you that

11   he had gathered some information between the time you had

12   spoken with him and this group call?

13   A.   David was talking through specific information about each

14   of the audits, the status of the audits, when the opinions had

15   been issued, which of those audit engagements had been subject

16   to one of the banking monitoring programs that the national

17   office had led, information about the -- some specialists'

18   involvement on those audits, and just a general sense of kind

19   of risk, the inspections risk, for each of those audits.

20   Q.   What do you mean by "which of those audit engagements had

21   been subject to one of the banking monitoring programs that the

22   national office led"?

23   A.   One of the actions that KPMG was trying -- had taken in

24   2015 for those audits, for a sample of audits, was to take some

25   of those banks and have national office resources do a review

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    of some of the most challenging audit areas, like the allowance

2    for loan loss for those banks, those audit engagements, to make

3    sure that the national office was helping to verify that the

4    audit work was good.

5    Q.  And was there specifically a monitoring program for the

6    allowance for loan loss?

7    A.  Yes, there was.

8    Q.  What was it called?

9    A.  It was referred to as the ALL Monitoring Program.

10   Q.  Did you have an understanding of whether the ALL Monitoring

11   Program was something that was utilized while an audit was

12   still ongoing, before the opinion had been issued?

13   A.  Yes.

14   Q.  What was your understanding about that?

15   A.  I worked in that ALL Monitoring Program, and so the intent

16   was to have a national office specialist resource work

17   alongside the Audit Engagement Team to make sure that the audit

18   work for that area was being done as best as possible, so it

19   was occurring while the audit was going on, while it was still

20   live.

21             THE COURT:  Let me just interrupt for a second.

22             Does the jury need a quick break?

23             (Jurors indicated affirmatively)

24             THE COURT:  Would this be a good time?

25             MS. KRAMER:  Certainly, your Honor.

J2jdmid6                              Sweet - direct

1          THE COURT:  Why don't we take a ten-minute break,

2    folks.  Just leave your pads on your chairs.

3          (Jury not present)

4          THE COURT:  You may be seated.

5          (Recess)

6          (Jury present)

7          THE COURT:  Please be seated, everyone.

8          Welcome back, folks.

9          Ms. Kramer, you may inquire.

10          MS. KRAMER:  Thank you, your Honor.

11   BY MS. KRAMER:

12   Q.  All right.  Turning back to the phone call that you had

13   with Dave Middendorf, Tom Whittle and David Britt on

14   March 28th, did you have an understanding during the call of

15   whether David Britt was referencing any kind of document or

16   notes based on what he was saying during the call?

17   A.  Yes.

18   Q.  What was your understanding about that?

19   A.  That he had taken notes from my earlier phone call with him

20   and that he had used that information to prepare this -- gather

21   information for the call that we had as a group of four.

22   Q.  During this part of the conversation where Britt was

23   relaying this information, were Dave Middendorf and Tom Whittle

24   participating?

25   A.  Yes.

J2jdmid6                        Sweet - direct

1   Q.  How were they participating?

2   A.  By asking questions about the audit, asking questions about

3   the partners.  Tom was providing input as to, you know, his

4   experience with the partners from AQP, the Internal Inspection

5   Program, and just giving general commentary about which

6   partners had passed comment forms in the past by both the

7   Internal Inspection Program or by the PCAOB.

8   Q.  How many times did you go through the confidential PCAOB

9   inspection list in this call on March 28th with Middendorf,

10  Whittle and Britt?

11  A.  I don't remember but at least a couple.

12  Q.  What, if anything, did you discuss in this call about the

13  sequencing of the inspections on the list that Wada stole and

14  shared?

15  A.  I remember telling him what Cynthia had told me about the

16  order in which the list had been given to us was in order in

17  which they were going to be announced by the PCAOB.

18  Q.  Did you tell Middendorf, Whittle or Britt who the former

19  colleague was that provided this information?

20  A.  No, I did not.

21  Q.  Did any of them ask you?

22  A.  No, they did not.

23  Q.  Were all of the issuers on the March 28th list that Wada

24  stole and shared banking issuers or financial services

25  companies?

J2jdmid6                        Sweet - direct

1    A.   There were two issuers that were not, not banks on that

2    listing.

3    Q.   Did you discuss those two issuers on the call with

4    Middendorf, Whittle and Britt?

5    A.   Yes.

6    Q.   What was discussed about that?

7    A.   We -- I -- because I had previously asked Cindy about the

8    inclusion of those, we talked about those names and the fact

9    that the person, the former colleague that had given this

10   information from the PCAOB, was not a banking person and so

11   wasn't familiar with KPMG's audit clients or really which names

12   like on the schedule would be banks or not, and so he just kind

13   of read off as best he could.

14   Q.   Which were the two that were not banks?

15   A.   Both Fidelity Information Systems and then also Bon-Ton

16   Stores.

17   Q.   Did there come a time during the call that you became aware

18   that someone came into the room where Middendorf, Whittle and

19   Britt were seated?

20   A.   Yes.

21   Q.   How did that happen?

22   A.   Because Fidelity Information Systems and Bon-Ton Stores

23   were not banks, there wasn't a lot of information about the

24   status of those audits, and so Tom Whittle had reached out to

25   one of the people that worked for him, a guy named Willy

J2jdmid6                          Sweet - direct

O'Leary, William O'Leary, to get information about who the
partners were and where those were located, just other
information about those audits.

Q.  How do you know that Tom Whittle reached out to William
O'Leary?

A.  I remember Tom indicating on the call that he was going to
ask William O'Leary to get this information, and then I
remember when Willy O'Leary walked into the conference room
that they were all seated in.

Q.  How did you know, since you were on the phone, when Willy
O'Leary walked into the conference room where they were all
seated?

A.  I remember Tom Whittle saying, you know, Hold on, Brian.
Willy, you know, just walked in.  And I remember hearing Willy
then give the information that he had gathered for both
Fidelity Information Systems and Bon-Ton Stores.

Q.  May I ask you to keep your voice up just a little bit?

A.  Yes.

Q.  What was your understanding about why Tom Whittle told you
to hold on when O'Leary walked into the room?

A.  Because he did not want Willy to know what it was we were
discussing on that call and specifically the names of the other
issuers and this advance notice we had gotten from Jeff Wada.

Q.  Did anyone tell you when Willy O'Leary left the room?

A.  Yes.

J2jdmid6                          Sweet - direct

1    Q.   Who told you that?

2    A.   I remember Tom Whittle indicating, OK, Willy has left and

3    we can keep talking now.

4    Q.   What happened after Tom told you Willy had left and said we

5    can keep talking now?

6    A.   We continued the discussion about the remaining issuers

7    that were on the list.

8    Q.   Did there come a time in the meeting that you discussed --

9    that all of you discussed what to do with this confidential

10   PCAOB information?

11   A.   Yes.

12   Q.   Who participated in that part of the discussion?

13   A.   Everyone that was on the call.

14   Q.   And in substance, what was said about what to do with the

15   stolen PCAOB information?

16   A.   I remember Dave Middendorf saying we had to protect the

17   monitoring programs and, as a result, we were going to go

18   through and do a rereview of those banking engagements that had

19   been part of this Allowance Monitoring Program while they were

20   in this 45-day documentation wrap-up phase.

21   Q.   What did you understand Dave Middendorf to mean when he

22   said we have to protect the monitoring program?

23   A.   Because the -- because seven of the twelve banks who were

24   on that list had been getting this national office support

25   through this allowance monitoring program, that the PCAOB's

J2jdmid6                          Sweet - direct

1    inspection results mattered more on those seven than it did the

2    others.  So, specifically it was much more important for the

3    PCAOB to have really good inspections on those seven because of

4    the national office's involvement, and that was a critical

5    thing for the success of KPMG.

6    Q.  Why -- what was your understanding about why it was so

7    important, given the national office's involvement on those

8    audits, that the banks in the monitoring program not get

9    comments?

10   A.  One of the things that had been discussed and shared with

11   the PCAOB when these monitoring programs were introduced is

12   that one of the specific objectives of those monitoring

13   programs was to improve audit quality.  And so the firm, KPMG,

14   had characterized these monitoring programs as one of its

15   solutions, one of its, you know, corrective actions that it was

16   taking to address some of the past PCAOB's issues, and so the

17   success on whether or not those inspections passed the PCAOB

18   scrutiny the next year would matter very much so as a data

19   point for the PCAOB to consider in its overall evaluation of

20   the firm's quality and progress in addressing past issues.

21   Q.  What was your understanding about what effect, if any, an

22   absence of comments on inspections in the monitor program would

23   have on what would end up in the PCAOB's public Part II report

24   on KPMG?

25   A.  That there is a direct correlation between the two.  If the

1    PCAOB did not have comments on the engagements that had been

2    part of this national office-led monitoring program, that that

3    would be sufficient evidence and data points that both KPMG and

4    the PCAOB would consider to be able to keep these past, you

5    know, priority year Part II reports nonpublic.  So, it was very

6    significant to do that.

7    Q.  Had you had conversations with anyone in that meeting

8    previously about the monitoring program being part of KPMG's

9    efforts to remediate or correct the Part II comments?

10   A.  Yes.

11   Q.  Who had you discussed that with?

12   A.  With all three of those people.

13   Q.  OK.  So when Dave Middendorf said in the meeting on

14   March 28th that you had to protect the monitoring program, what

15   did you understand him to mean?

16           MR. BOXER:  Objection.  Asked and answered, Judge.

17           THE COURT:  Sustained.

18   BY MS. KRAMER:

19   Q.  What steps did you discuss in that meeting about how to

20   protect the monitoring program, as Dave Middendorf had said he

21   needed to do?

22   A.  We discussed forming kind of a task force -- a rereview

23   team of the best banking audit reviewers in the national office

24   to go through and do a rereview of the names of the issuers for

25   each of the named issuers that had been subject to this

J2jdmid6                          Sweet - direct

1    national office monitoring program.  So while they were in this

2    45-day period, we were going to go in and do this rereview of

3    the work to make sure that it was sufficient.

4    Q.  What did you understand was going to be the purpose of the

5    rereview?

6    A.  That we were going to go in and evaluate the audit work

7    and, when necessary, help fix and change that audit work to

8    ensure that it's reflected -- that it was the most positive or

9    favorable as possible in order to help improve the PCAOB's

10   inspections.

11   Q.  In this context, what does it mean to you to help improve

12   the PCAOB's inspections?

13   A.  That, really, it means to improve KPMG's results in those

14   inspections, meaning to not get any comment forms from the

15   PCAOB for those inspections.

16   Q.  What, if anything, was said in the meeting about whether

17   the rereview effort would be confidential or not?

18   A.  Yes, that was discussed.  Tom Whittle -- I remember Tom

19   Whittle specifically saying that we needed to maintain a circle

20   of trust, that only the people in that room were to know the

21   real reason for why we were doing these rereviews.

22   Q.  What, if anything, did Britt and Middendorf say in response

23   to that?

24   A.  They agreed with that.

25   Q.  Did you have an understanding about why everyone agreed to

J2jdmid6                              Sweet - direct

1    keep this confidential?

2    A.  Yes.

3    Q.  What was your understanding?

4    A.  Because if the PCAOB had found out that we had received

5    this advance notice and then were taking action to improve the

6    inspection results, that they would be very upset is probably

7    an understatement but they would be very angry about it.

8    Q.  What was your understanding about why that would be

9    negatively received?

10   A.  Because this was confidential information that had been

11   stolen from the PCAOB, and rather than report it back, we were

12   deciding to take action to do things to improve, potentially

13   manipulate the PCAOB's inspection results.

14   Q.  Was there any term used in that meeting for the planned

15   rereviews?

16   A.  Yes.

17   Q.  What term was used?

18   A.  It was referred to as a "stealth" review.

19   Q.  What was your role going to be in the stealth rereviews?

20   A.  I was going to have a very direct role in not only --

21   really, leading the stealth reviews.

22   Q.  Was it your plan, as someone who would lead the rereviews,

23   to comply with auditing standards during the rereviews?

24   A.  Yes.

25   Q.  Why was that your plan?

J2jdmid6                              Sweet - direct

A.   Because these rereviews required involving lots of other

people, not only the other people from the national office that

were identified to help in these stealth rereviews but also

working with -- directly with the audit engagement teams

themselves to go through their workpapers very late in this

45-day period to review them and potentially make changes, and

that to do anything other than comply with the auditing

standards would cause all those other people, or any one of

those other people, to realize that what was being done was not

on the premise on which it was stated, and so any one of them

could have said, hold on a second, we've got to notify the

PCAOB.  And it was just a way of ensuring that this was

confidential and that the real purpose of this wasn't known to

others.

Q.   What was your understanding of the effect of the real

purpose becoming known to others?

A.   That if others were to know the real reason, then that

would increase the likelihood of us getting caught by the

PCAOB.

Q.   Did you talk in that meeting about what you were going to

do in the rereviews?

A.   Yes.

Q.   Who participated in that discussion?

A.   Everyone on that call -- me, Tom Whittle, David Britt and

David Middendorf.

J2jdmid6                              Sweet - direct

1    Q.  What, if anything, was discussed about the parts of the

2    audit work that were going to be subjected to the rereview?

3    A.  Because the primary objective was to protect the monitoring

4    program, the primary focus was to focus on the allowance for

5    loan loss workpapers that had been subject to this national

6    office support, but that as time permitted that we would go in

7    and look at other areas that were also commonly picked by the

8    PCAOB for inspection.

9            MR. BOXER:  Objection, your Honor.  Move to strike.

10   He was asked what was discussed.

11           MS. KRAMER:  Your Honor, I believe the witness

12   answered what was discussed.

13           THE COURT:  Were you answering what was discussed?

14           THE WITNESS:  I was trying to.

15           THE COURT:  OK.  Overruled.

16   BY MS. KRAMER:

17   Q.  What was your understanding from this meeting as to whether

18   the plan among the group was to only look at the allowance for

19   loan losses?

20   A.  The plan was to not only look at the allowance but to look

21   at other areas as time permitted.

22   Q.  And what was your understanding in this context about what

23   it meant to look or review the workpapers in the rereview?

24   A.  That what that meant was to go in and review the workpapers

25   while they were being wrapped up and to identify if there were

any weaknesses and whether or not any changes or corrections

needed to be made in order to strengthen those workpapers so

that the firm had the best chance of having a positive

inspection by the PCAOB.

Q.   And what was your understandings of what the plan was if

changes were identified or fixes that needed to be made were

identified?

A.   That we would take action to recommend what those changes

needed to be and, if needed, do other audit work in compliance

with the auditing standards.

Q.   In this meeting on March 28th, did you all discuss who

would be conducting the rereviews?

A.   Yes.

Q.   What was said about that?

A.   We discussed who from the national office would be the best

people to be involved on this.  We discussed specific names of

people to assign to this stealth rereview team.

Q.   What, if anything, was discussed about their schedules?

A.   So, we identified first who was going to be identified.

And then two of the people reported up to Tom Whittle and one

of them reported up to Dave Britt, and so both Tom Whittle and

David Britt agreed to free up those people's schedules so that

they could participate in these stealth rereviews.

Q.   What, if anything, was discussed in the meeting about how

this process would start?

J2jdmid6                         Sweet - direct

1   A.   That -- yes, the first thing that was going to happen was

2   David Britt was going to get each of the rereviewers access to

3   the firm's workpapers, and then I was going to have a

4   conference call with the people assigned to this stealth

5   rereview team to talk them through what we were going to do and

6   which banks we were going to do it on.

7   Q.   Did you and Dave Middendorf, Tom Whittle and David Britt

8   discuss the timing of the rereviews?

9   A.   Yes.

10  Q.   What was said about that?

11  A.   We -- as part of the discussion that we had, we talked

12  about where each of those audits were within their 45-day

13  archive period, and so we discussed starting with the first one

14  that was the closest to be archived and ending with the last

15  one so that the timing was we were going to do them in order.

16  Q.   So on March 28, 2016, how much time was left in the 45-day

17  documentation period for the engagements that were on the list

18  that Wada had stolen and shared?

19  A.   I don't know the exact number of days, but it was generally

20  between a week of the -- the shortest had a week left and the

21  longest had three weeks or so left.

22  Q.   Did you say 30 weeks?

23  A.   Three weeks.

24  Q.   Oh, three weeks.

25  A.   I'm sorry.

J2jdmid6                          Sweet - direct

1    Q.  What was your understanding about whether the rereviews

2    were going to be completed before the end of the 45-day period

3    or after?

4    A.  That the rereviews would be done before the end of the

5    45-day documentation completion period.

6    Q.  Why?

7    A.  Because the workpapers had to be archived, had to be closed

8    on that 45-day date, and so the work had to be done before

9    then.

10   Q.  Were all of the KPMG audits on the list that Wada shared

11   already in the ALL Monitoring Program that KPMG had?

12   A.  No.

13   Q.  Do you remember which ones were not?

14   A.  Yes.

15   Q.  Which ones were not in the ALL Monitoring Program?

16   A.  Sallie Mae, AMBAC, NewStar, Bon-Ton, and Fidelity

17   Information Systems were not.

18   Q.  In that meeting on March 28th with Middendorf, Whittle and

19   Britt that you participated in by phone, was there a plan for

20   what to do with those audits that were not in the ALL

21   Monitoring Program?

22   A.  No.

23   Q.  What, if anything, was said about those?

24   A.  That they were going to go away and decide what to do with

25   those and that I was to focus on the seven that were part of

J2jdmid6                              Sweet - direct

1    the monitoring programs and what the stealth reviews were going

2    to cover.

3    Q.  Who was going to go away and decide what to do with those

4    that were not in the monitoring program?

5    A.  I understood it to be Tom Whittle and Dave Middendorf.

6    Q.  Let's take a look at what's marked for identification as

7    Government Exhibit 954.

8            Do you recognize this exhibit?

9    A.  Yes, I do.

10   Q.  How do you recognize it?

11   A.  I recognize this to be an email that I received from David

12   Britt on my KPMG email account.

13           MS. KRAMER:  The government offers Government Exhibit

14   954.

15           THE COURT:  954 is received.

16           (Government's Exhibit 954 received in evidence)

17   BY MS. KRAMER:

18   Q.  Focusing for a moment on the header information at the top

19   of the first page, how did you get this email?

20   A.  This email was forwarded to me by David Britt.

21   Q.  On what date?

22   A.  On that same day, March 28, 2016.

23   Q.  All right.  Let's look at the email that he forwarded to

24   you.

25           So who are the individuals, if you can describe them

J2jdmid6                           Sweet - direct

1    generally, in the "To" field of this email from David Britt on

2    March 28, 2016?

3    A.   Those are all of the banking partners at KPMG that had an

4    audit client that was part of one of the monitoring programs,

5    so those are the names that correspond to the table below.

6    Q.   And who is in the "cc" line?

7    A.   It is Tom Canfarotta, David Middendorf, and Jennifer Lauer.

8

9    Q.   What is the subject line of David Britt's email?

10   A.   "Urgent - ALL Monitoring Program follow up request."

11   Q.   Did you have an understanding, when you got this forwarded

12   to you, as to why the subject line said "Urgent"?

13   A.   Yes.

14   Q.   What was your understanding?

15   A.   Because the 45-day date was very close or closely

16   approaching for the first one on this list, it was urgent that

17   the rereviewers get access to the workpapers as quickly as

18   possible in order to conduct this stealth rereview.

19   Q.   Could you read the first sentence of this email?

20   A.   "As part of our wrap-up and reporting of the results of the

21   ALLL monitoring program, we need to gather some additional

22   information from the eAudIT files of your engagements that

23   participated in the ALLL Monitoring Program.

24            MS. KRAMER:  Mr. Urbanczyk, could you just blow up

25   this paragraph so that it is a little easier to read?  Thank

J2jdmid6                              Sweet - direct

1    you.

2    Q.  So was it your understanding that this was just -- that the

3    access that was being requested was just to gather some

4    additional information from the eAudIT files?

5    A.  No.

6    Q.  Was it your understanding that this request was being sent

7    as part of the wrap-up and reporting efforts?

8    A.  No.

9    Q.  Did you understand this first sentence to be true or a lie?

10   A.  This first sentence was -- was a lie, not true.

11   Q.  Let's look at the chart in this email.

12           What are the engagements for KPMG audit clients that

13   are listed in the chart in this email, to your understanding?

14   A.  These are all of the banking audit engagements that were

15   part of the Allowance Monitoring Program that year.

16   Q.  Were the ones that were on the Jeff Wada list, are those in

17   this chart?

18   A.  Yes.

19   Q.  Are there other ones in this chart that were not on the

20   Jeff Wada list?

21   A.  Yes.

22   Q.  Was it the plan to rereview all of the engagement in the

23   ALL Monitoring Program as part of the rereview after getting

24   the Wada list?

25   A.  No.

J2jdmid6                          Sweet - direct

1  Q.  Which ones did the group plan to rereview?

2  A.  Only the seven banks that were on the Jeff Wada list and

3  were subject to one of the monitoring programs.

4  Q.  What was your understanding, if you had one, about why this

5  email went to all of the engagement partners who had

6  engagements in the ALL Monitoring Program even if they weren't

7  going to have their engagements rereviewed?

8          MS. LESTER:  Objection.

9          THE COURT:  Overruled.

10 A.  I'm sorry.  Would you ask the question again?

11 Q.  Sure.

12         When you got this email, did you have an understanding

13 about why this was sent to every engagement partner in the ALL

14 Monitoring Program even though you were only actually going to

15 do a rereview of the ones on the Wada list?

16 A.  Yes.

17 Q.  What was your understanding about that?

18 A.  That this email was to provide cover, or camouflage, to the

19 real reason for the stealth rereviews.

20 Q.  What was your understanding about why you needed to give

21 cover, or camouflage, to the real reason for the rereviews?

22 A.  Because we did not want the PCAOB to find out why we were

23 doing these rereviews and that if it was -- that it would be

24 too much of a coincidence to only do the rereviews on the seven

25 banks that we knew were on this listing provided by Jeff Wada

J2jdmid6                         Sweet - direct

1   and that had been subject to a monitoring program.

2           (Continued next page)

J2J5mid7                    Sweet - direct

1    BY MS. KRAMER:

2    Q.  Let's look back at that fist paragraph that starts with, *As*

3    *part of our wrap up and reporting.*

4         Could you just read the whole paragraph, actually?

5    A.  Yes.

6         *As part of our wrap up and reporting of the results of*

7    *the ALL monitoring program, we need to gather some additional*

8    *information from the eAudIT files of your engagements that*

9    *participated innocent ALL monitoring program.  We need do this*

10   *as soon as possible and would like do this without further*

11   *disruption to you or your engagement teams.  To this end, we*

12   *are requesting that you grant access to the following seven*

13   *individuals from DPP to the extent they don't already have*

14   *access to your files.  If this could be done by close of*

15   *business tomorrow, it would be greatly appreciated.*

16   Q.  What is DPP?

17   A.  It is an acronym for Department of Professional Practice

18   which is the same thing as the national office.

19   Q.  And who are the seven individuals listed below this

20   paragraph?

21   A.  David Britt, Tom Canfarotta, me, Jennifer Stemple, Jenn

22   Lauer, Cynthia Holder, and Rob Larson.

23   Q.  Where in KPMG did those individuals work in March 2016?

24   A.  They all worked as part of the national office.

25   Q.  And were these individuals discussed in the meeting that

J2J5mid7                          Sweet - direct

1    you participated in by phone on March 28 with David Middendorf,

2    Thomas Whittle, and David Britt?

3    A.  Everyone but Tom Canfarotta, yes.  Me, Jennifer Stemple,

4    Jenn Lauer, Cynthia Holder, and Rob Larson were all discussed

5    in that meeting as being part of this stealth re-review team.

6    Q.  Let's go back to the first page.  Are you familiar with

7    someone named Chris Van Voorhies?

8    A.  Yes, I am.

9    Q.  How do you know him?

10   A.  I knew Chris Van Voorhies from my time at the PCAOB and

11   also while I was at KPMG.

12   Q.  In March 2016, do you know what Chris Van Voorhies was

13   working on?

14   A.  Yes.

15   Q.  What was his role at that time?

16   A.  He was a banking partner and was working on the audit of

17   NewStar Financial.

18   Q.  And, to be clear, who was his employer?

19   A.  KPMG.

20   Q.  Was NewStar one of the engagements on the March 28 Wada

21   list?

22   A.  Yes.

23   Q.  Take a look at what's marked for identification as

24   Government Exhibit 941.  Do you recognize this exhibit?

25   A.  Yes, I do.

J2J5mid7                          Sweet - direct

1    Q.  How do you recognize it?

2    A.  I recognize this to be an e-mail exchange between Britt and

3    I on our KPMG e-mail accounts.

4             MS. KRAMER:  The government offers Government Exhibit

5    941.

6             THE COURT:  941 received.

7             (Government's Exhibit 941 received in evidence)

8    BY MS. KRAMER:

9    Q.  Let's look at the e-mail that is the second from the bottom

10   from David Britt to you, March 28th.  It says 3:55 p.m.

11            What did David Britt write in the body of this e-mail?

12   A.  He wrote:  *Brian, would you invite Chris Van Voorhies to*

13   *your call?  I thought it might make sense to hear from you what*

14   *areas you will have the others focus on.  Thanks, David.*

15   Q.  Did you have an understanding at the time you received this

16   e-mail on March 28 what he was referring to when he referred to

17   your call?

18   A.  Yes.

19   Q.  What was your understanding?

20   A.  That one of the stated actions from the group call that we

21   had had, was that I was going to set up a conference call with

22   each of the national office people that were going to be

23   assigned to this re-review team to explain to them what it is

24   we were doing and how we were going to do it and David was

25   asking Chris to join that call.

1    Q.  What was your understanding about whether in that call you

2    were going to explain the true purpose of the re-reviews?

3    A.  We were not going to explain the real reason for the

4    re-reviews.

5    Q.  Okay.  When you got this e-mail, did you have an

6    understanding as to why David Britt was asking you to invite

7    Chris Van Voorhies to your call?

8    A.  Yes.

9    Q.  What was your understanding?

10   A.  That Chris was one of the banking partners at KPMG that was

11   working on the NewStar Financial audit and that even though

12   NewStar wasn't part of the seven audit engagements that were

13   going to be subject to our re-reviews, that he wanted Chris to

14   listen in so that Chris could do a similar exercise for the

15   NewStar Financial engagement.

16   Q.  So, was NewStar part of the ALL monitoring program?

17   A.  No, it was not.

18   Q.  Was NewStar on the Wada list?

19   A.  Yes, it was.

20   Q.  How did you respond to David Britt asking you to invite

21   Chris Van Voorhies to your call?

22   A.  I replied by e-mail and said:  *Yes, I sure will.  Thanks*

23   *David.  Have you spoken to him already.*

24   Q.  What were you getting at when you asked have you spoken to

25   him already?

1  A.  I wanted to understand whether or not David had explained

2  to him the real reason, like if he had brought him into the

3  circle of trust.

4  Q.  How did David Britt respond?

5  A.  He wrote:  *Yes.  Talking to him now.  I told him I would*

6  *ask you and that the others on the call did not know what I had*

7  *told him and he had to keep his mouth shut.*

8  Q.  Did you have an understanding when you got this e-mail on

9  March 28th as to what Britt was talking about when he said:

10  *Others on the call didn't know what I had told him*?

11  A.  Yes.

12  Q.  What was your understanding?

13  A.  That the other people involved in the re-review, besides

14  myself and Cindy, didn't know the real purpose for why we were

15  going to conduct these re-reviews and that Chris, at that point

16  now, did know, and that he wasn't to let any of the other

17  people know the real reason.

18  Q.  What was the real reason?

19  A.  Was to take action in order to improve the audit workpapers

20  so that the inspections by the PCAOB would later be announced,

21  would be the best possible.

22  Q.  Let's take a look at what's marked for identification as

23  Government Exhibit 942.  Do you recognize this exhibit?

24  A.  Yes, I do.

25  Q.  How do you recognize it?

1    A.  I recognize this to be a calendar appointment that I sent

2    out from my KPMG e-mail account.

3    Q.  On what date?

4    A.  On March 28th, that same day.

5            MS. KRAMER:  The government offers Government Exhibit

6    942.

7            THE COURT:  942 received.

8            (Government's Exhibit 942 received in evidence)

9    BY MS. KRAMER:

10   Q.  What's the subject line of the calendar invitation you sent

11   out?

12   A.  Monitoring program review.

13   Q.  And who are the recipients on this e-mail?

14   A.  Rob Larson, Cindy Holder, Jennifer Stemple, and Jen Lauer.

15   Q.  Who was copied on the e-mail?

16   A.  Chris Van Voorhies.

17   Q.  Why did you copy Chris Van Voorhies on this calendar

18   invitation?

19   A.  Because of the e-mail that I just received from David that

20   asked me to add Chris to the call.

21   Q.  Let's look down at the body of the calendar invite.  What

22   did you write in this calendar invitation about the purpose of

23   the call?

24   A.  I wrote that the purpose of the call is to discuss some

25   additional review procedures we would like to perform over the

J2J5mid7                          Sweet - direct

1    ALL monitoring program work.  I will explain tomorrow in more

2    detail.

3    Q.  And when was the call scheduled for?

4    A.  For that next day, March 29, 2016.

5    Q.  Did it happen that day?

6    A.  Yes, it did.

7    Q.  Did anyone participate other than the people in this

8    calendar invitation?

9    A.  No.  Not that I remember.

10   Q.  Did you talk to anyone about what you were going to discuss

11   in this call before the call happened?

12   A.  Yes.

13   Q.  Who did you talk to?

14   A.  I know I talked with Cindy Holder about the call.

15   Q.  What did you tell Cindy Holder about the call?

16   A.  That following the meeting with David Middendorf, David

17   Britt, and Thomas Whittle, we were going to assemble this

18   re-review team, told her about the circle of trust and at that

19   point about us getting access to all of these eAudIT files from

20   the David Britt e-mail, and that they were going to try and

21   allocate out the seven banks so that each person on this call

22   would take a lead and we would work through this together.

23          So, I gave her kind of a heads up as to what the plan

24   was going to be.

25   Q.  Why did you give her a heads up about what you were going

J2J5mid7                              Sweet - direct

1   to say about the call?

2   A.   Because I knew Cindy knew the real reason for why we were

3   doing these re-reviews and I also wanted to make sure that she

4   was consistent in that communication and didn't explain the

5   real purpose for these re-reviews.

6   Q.   Why didn't you want her to explain the real purpose?

7   A.   Because we did not, again, want it getting back to the

8   PCAOB, the real reason for these self-reviews.

9   Q.   On the conference call that you had that's scheduled in

10  Government Exhibit 942, did you assign specific engagements to

11  the re-reviewers?

12  A.   Yes.

13  Q.   What, if anything -- withdrawn.

14          Did you assign just the ones on the Wada list?

15  A.   Yes.

16  Q.   What, if anything, did you say about the fact that you had

17  assigned only a small subset of the engagements in the ALL

18  monitoring program for this re-review even though David Britt's

19  e-mail had requested access to all of the engagements in the

20  ALLL monitoring program?

21  A.   I don't remember the exact words I used but that I think I

22  characterized it as that these were the seven that we thought

23  may have the highest likelihood of getting picked and those

24  were the ones we wanted to really focus in on as part of this

25  re-review.

J2J5mid7                            Sweet - direct

1    Q.  Which re-reviews were you assigned to lead up?

2    A.  This was one of the things we discussed on the call with

3    David Middendorf, Thomas Whittle, and David Britt, and then

4    because David Britt had identified bank of California and

5    Century being the most challenging audits, I was assigned to

6    take the lead on those two.

7    Q.  And what were the other ones that were subject to the

8    re-review.  Do you remember which ones?

9    A.  Yes.

10   Q.  Which ones were they?

11   A.  Washington Trust, UMB Financial, People's United, First

12   Bank Corp., and First Business Financial.

13   Q.  Did you play any role in those other re-reviews that you

14   weren't assigned to lead?

15   A.  Yes.

16   Q.  What was your role in those?

17   A.  I was involved in the re-review efforts on all seven of the

18   banks so it included reviewing other areas that we thought

19   might get picked by the PCAOB as well as helping out the, kind

20   of the primary lead from this re-review team to review certain

21   significant workpapers that I had pretty good experience with.

22   Q.  And, specifically, what did you do in connection with your

23   work in those re-reviews?

24   A.  I met with the engagement teams either live or on the

25   phone.  I reviewed work papers and proposed edits and changes

J2J5mid7                          Sweet - direct

1   to those work papers for the engagement team to make in their

2   eAudIT files.

3   Q.   What was the objective of those workpaper changes?

4   A.   To make the audit work as complete and thorough and as good

5   as possible knowing that it was going to be reviewed at some

6   point by the PCAOB as part of an inspection.

7   Q.   To the best of your memory, did you propose any workpaper

8   changes that you understood violated auditing rules?

9   A.   No.

10  Q.   To the best of your knowledge, did anyone else propose

11  changes that you knew to violate auditing rules?

12  A.   No.

13  Q.   Did you have an understanding during this process as to

14  whether any one of the changes you proposed would make a

15  difference in whether or not the PCAOB gave a comment?

16  A.   I think some of the changes were certainly more significant

17  than others but it was really more the totality of the changes

18  that we made that I think had the biggest impact.

19  Q.   How did the work that you did -- withdrawn.

20           How did you intend for the work that you did editing

21  the work papers and having other people edit work papers to

22  have an impact on whether or not the firm got comments?

23           MR. BOXER:  Objection.  Asked and answered, your

24  Honor.

25           THE COURT:  Overruled.

J2J5mid7                              Sweet - direct

1          You can answer.

2          THE WITNESS:  Part of what the PCAOB does on an

3     inspection is to review the documentation that the engagement

4     team performed for each of its various audit procedures.  So,

5     our goal was to make sure that documentation was complete and

6     accurate and as thorough as possible so that all -- that it was

7     very complete.  And, also, to make sure that that documentation

8     tied back as closely as possible to the PCAOB's auditing

9     standards.

10    Q.  To be clear, what kinds of documentation did you recommend

11    edits to and did you observe other people recommending edits to

12    as part of these stealth re-reviews?

13    A.  It would include changes to both significant memos that

14    were produced to summarize work done in a particular area like

15    inclusion memos or planning memos or approach memos, but also

16    documentation within each of the individual eAudIT steps, the

17    individual tests that they performed throughout the complete

18    set of eAudIT workpapers.

19    Q.  And focusing for a moment on edits you suggested, generally

20    were they substantive, cosmetic, or both?

21    A.  Both.

22    Q.  What was your understanding about what steps, if any, were

23    to be taken to review and edit the workpapers for the

24    engagements on the Wada list that were not in the ALL

25    monitoring program like the one you described with Chris

1    Van Voorhies for NewStar?

2    A.  I'm sorry.  Would you mind asking the question one more

3    time?

4    Q.  Sure.  That was a very long question.  Let me try again.

5              So, you testified that Chris Van Voorhies was doing

6    his own review of NewStar because he wasn't in the ALL program.

7    Did you have any understanding of whether there were any other

8    efforts taken to do a re-review of the other engagements on the

9    Wada list that were not in the ALL monitoring program?

10   A.  Yes.

11   Q.  What was your understanding about that?

12   A.  I was aware that other action was taken on AMBAC financial

13   as well.

14   Q.  We will get to AMBAC in a minute.

15             Were you aware of any other efforts, aside from the

16   lie in David Britt's e-mail, to conceal the real reason for the

17   re-reviews?

18   A.  Yes.

19   Q.  What were you aware of?

20   A.  At the end of the re-review process, the end of the days,

21   Cindy Holder and I created a bunch of additional calendar

22   invitations, calendar entries into my calendar and her calendar

23   to include names of other banks that were part of the

24   monitoring program but not part of the real re-reviews.  And,

25   about a week and a half into the re-review program, Tom Whittle

J2J5mid7                          Sweet - direct

1    let me know that they were going to do kind of a very

2    high-level pass-through for other banks that were on the list

3    of monitoring programs but not part of the Jeffrey Wada list

4    and that I should get with David Britt to talk through that in

5    more detail.

6    Q.   Take a look at what's marked for identification Government

7    Exhibit 1003.  Do you recognize this document?

8    A.   Yes, I do.

9    Q.   How do you recognize it?

10   A.   I recognize this to be an e-mail exchange between David

11   Britt and I on our KPMG e-mail account.

12           MS. KRAMER:  The government offers Government Exhibit

13   1003.

14           THE COURT:  Received.

15           (Government's Exhibit 1003 received in evidence)

16   BY MS. KRAMER:

17   Q.   So, between what date and what date are the e-mails

18   exchanged on Government Exhibit 1003?

19   A.   Friday, April 8, 2016, through Sunday, April 10th, 2016.

20   Q.   And what were the four other engagements that were subject

21   to a high-level re-review to conceal the actual re-review?

22   A.   TCF, Northwest, CVB, and East West.

23   Q.   Did you assist in any way with this project?

24   A.   I had -- David asked me to have a conference call with the

25   two other national office people that were going to go through

J2J5mid7                                    Sweet - direct

1   and review these four so I had a conference call with them, but

2   I did not assist in any of the review work that was done for

3   these four engagements.

4   Q.  Did you have an understanding about how doing a re-review

5   on CVB, East West, TCF and Northwest would conceal the receipt

6   of confidential information from Jeffrey Wada on March 28?

7   A.  Yes.

8   Q.  What was your understanding of that?

9   A.  That the, by adding four others to the list, that if the

10  PCAOB were to ask why we had done a re-review on certain banks,

11  part of the monitoring program, that it wouldn't just be the

12  seven that happened to then get picked by the PCAOB, that it

13  was another effort to kind of camouflage or provide cover to

14  the real re-review efforts that were going on.

15  Q.  Were all of the engagements that were on the confidential

16  list Wada shared on March 28 ultimately inspected by the PCAOB

17  in 2016?

18  A.  No.

19  Q.  To the best of your memory, which ones were not?

20  A.  First Bancorp. was not, Washington Trust was not, and AMBAC

21  Financial was not.

22  Q.  Let's talk about First Bancorp.  Do you have an

23  understanding of why First Bancorp wasn't inspected?

24  A.  Yes.

25  Q.  What's that understanding?

1    A.   The PCAOB told us that they changed that inspection because

2    of the Zika virus scare that was going on in Puerto Rico at the

3    time.

4    Q.   Was First Bancorp in Puerto Rico?

5    A.   Yes, it was.

6    Q.   Did you have an understanding of why Washington Trust

7    wasn't inspected?

8    A.   Yes, I do.

9    Q.   What was your understanding?

10   A.   The audit partner for Washington Trust was the same audit

11   partner for both Century Bancorp and NewStar Financial -- a guy

12   named Joe Gencarella -- and because Joe Gencarella had been

13   subject, at that point, to two PCAOB inspections on both

14   Century Bancorp and NewStar Financial and they were both clean

15   PCAOB inspections meaning no comment forms, that the PCAOB

16   decided not to inspect him a third time that same inspection

17   season.

18   Q.   So, was Century Bancorp on the stolen list that Wada shared

19   on March 28?

20   A.   Yes.

21   Q.   Was it part of the stealth re-reviews?

22   A.   Yes.

23   Q.   Did it get any comments?

24   A.   No, it did not.

25   Q.   Was NewStar on the stolen list that Jeffrey Wada disclosed

1   on March 28, 2016?

2   A.  Yes.

3   Q.  Was it part of the stealth re-reviews?

4   A.  It was not part of the stealth re-review team but it was

5   the engagement that Chris Van Voorhies went in to review, per

6   his instructions from David Britt.

7   Q.  And that was the re-review that followed the David Britt

8   e-mail where he said he told Chris Van Voorhies to keep his

9   mouth shut?

10  A.  Yes.

11  Q.  And did NewStar get any comments?

12  A.  No, it did not.

13  Q.  What is your understanding of what impact it had on the

14  PCAOB's decision to cancel Washington Trust that Century and

15  NewStar were inspected and didn't get comments?

16  A.  That because both of those did not have any comments and

17  were the same audit partner, Joe Gencarella, as Washington

18  Trust, that that was why the PCAOB decided to cancel that third

19  inspection.

20  Q.  Let's talk about AMBAC.  Do you know if anyone was assigned

21  to review the AMBAC workpapers after Wada's March 28th

22  disclosure of the confidential list?

23  A.  Yes.

24  Q.  Who was assigned to do that re-review?

25  A.  John Broderick.

1   Q.   How do you know that?

2   A.   Because Tom Whittle told me.

3   Q.   What did he tell you about that?

4   A.   That he had asked John to go in and review the work papers

5   for AMBAC while it was in its 45-day documentation completion

6   period.

7   Q.   What, if anything, came about of that re-review that

8   happened because of the Wada list?

9   A.   That as a result of John Broderick's review of those work

10  papers that he identified very significant audit deficiencies

11  and, as a result of that, the firm decided that there was a

12  material weakness in the internal controls for AMBAC and so it

13  resulted in a restatement of the audit opinion.

14  Q.   Did AMBAC have to file new financial statements with the

15  SEC?

16  A.   Yes, it did.

17  Q.   With a new audit opinion?

18  A.   Yes.

19  Q.   Did you and Tom Whittle ever discuss whether the reason for

20  the re-review was disclosed by KPMG to the PCAOB?

21  A.   Yes, we did.

22  Q.   What did Tom Whittle tell you about that?

23  A.   That Tom Whittle told me that he had explained to the PCAOB

24  that this restatement event had just happened in the normal

25  course of the national office's review.

J2J5mid7                              Sweet - direct

1   Q.  Do you know if the PCAOB ultimately inspected AMBAC in

2   2016?

3   A.  They did not.

4   Q.  What is your understanding, if any, about how the discovery

5   of the material weakness in the re-review affected the PCAOB's

6   decision not to inspect AMBAC?

7   A.  It had a direct effect on that decision.

8   Q.  How do you know that?

9   A.  I know that from my conversations with Tom Whittle and

10  because of the firm restating its audit opinion meant that it

11  was self-identifying it as a failed audit.  And so, there was

12  no reason for the PCAOB to identify something that it had

13  already found to have been a failed audit.

14  Q.  Do you know whether the firm had any communications with

15  the PCAOB in asking the PCAOB not to inspect AMBAC?

16  A.  Yes.

17  Q.  Who told you that?

18  A.  Tom Whittle told me that.

19  Q.  Take a look at what's marked for identification as

20  Government Exhibit 357.  Do you recognize the form that is in

21  Government Exhibit 357?

22  A.  Yes, I do.

23  Q.  How do you recognize it?

24  A.  This is a form 10-K/A, which means it is the 10-K amendment

25  that's filed with the Securities and Exchange Commission.

J2J5mid7                          Sweet - direct

1   Q.  Mr. Urbanczyk, could you flip through these pages?  Is

2   Government Exhibit 357 an excerpt of the 10-K/A for AMBAC?

3   A.  Yes.  Yes, it is.

4          MS. KRAMER:  Your Honor, the government offers

5   Government Exhibit 357.

6          THE COURT:  Received.

7          (Government's Exhibit 357 received in evidence)

8   BY MS. KRAMER:

9   Q.  Do you know whether the PCAOB replaced the cancelled

10  inspections for First Bancorp, Washington Trust, and AMBAC?

11  A.  Yes.

12  Q.  Which engagement replaced AMBAC?

13  A.  AMBAC was replaced with TCF Financial.

14  Q.  Was TCF Financial part of the camouflage review?

15  A.  Yes.  It was one of those four banks that had been

16  identified by David Britt.

17         MS. KRAMER:  Your Honor, I note that it is a couple of

18  minutes past 5:00.  This a good stopping point?

19         THE COURT:  Yes.

20         It is 5:00, folks -- a little past 5:00.  I will let

21  you go for the evening.  We will continue tomorrow morning,

22  9:30.  We will have coffee for you again around 9:00.  Have a

23  good night, everybody, leave your note pads on your chairs, and

24  we will see you tomorrow morning.

25         (Continued on next page)

1             (Jury not present)

2             THE COURT:  Anything anyone wanted to address this

3    evening?

4             MS. MERMELSTEIN:  One matter briefly, your Honor.

5             I think your Honor had asked this morning which

6    outstanding matters required rulings.  I think the one that

7    requires a ruling before tomorrow is with respect to Wada's

8    request that he be allowed to question Mr. Sweet about the

9    criminal conduct that your Honor had precluded

10   cross-examination on in a modified form that would focus on its

11   embarrassing nature and the fact that it happened in multiple

12   locations but without naming the crime.

13            I think for the reasons we have said we don't think

14   that that is an inappropriate suggestion and I think that the

15   ruling your Honor has already made precluding that

16   cross-examination is appropriate.  There will be plenty for

17   defense counsel to work with with this witness but I think we

18   need a ruling because I expect that cross-examination will

19   start tomorrow.

20            THE COURT:  Okay.

21            Yeah.  My ruling on that stands.  There is an under

22   seal letter addressing proposed alternative questions.  I think

23   those questions are, if anything, more prejudicial and for the

24   same reasons I ruled previously, those questions will not be

25   permitted.

J2J5mid7                              Sweet - direct

1          Anything else we need to address?

2          MR. COOK:  Yes, your Honor.

3          One issue has come up, actually came up throughout

4    Ms. Kramer's direct examination that we didn't want to raise, I

5    didn't want to raise during the exam but I expect to be a

6    problem tomorrow, and that is this continued inclusion within

7    questions to the witness of statements like "the list Wada

8    stole," or "the confidential list that was taken by Mr. Wada,"

9    or "Wada's stolen list," on questions that have nothing to do

10   with the source of the information.  That is improper argument

11   couched within a question to the witness.  That evidence has

12   only been admitted subject to later prove-up which hasn't

13   happened yet.

14         So, we would request that she be instructed to refrain

15   from including that argument in future questions.

16         THE COURT:  Do you want to respond?

17         MS. KRAMER:  Your Honor, I am looping back into

18   questions what the witness has already testified to and not

19   making argument.  I don't know that any of us want to sit here

20   for the extra four hours that it would take for every time I

21   want to reference the list as part of a question, was that

22   engagement part of the list?  If I went back and read a

23   paragraph of the information that Mr. Cook is suggesting I

24   should read I think the witness testified about his

25   understanding based on both his experience and also what Cindy

1    Holder told him in furtherance of the conspiracy as to where

2    Wada got this information.

3             I don't think I am saying anything that is

4    argumentative and they're proper questions.

5             MR. COOK:  Your Honor, the only testimony we have

6    heard so far about about the source of what is very easily

7    described as the 2016 inspection list, the 2017 preliminary

8    list and 2017 final list, no issue with those descriptions.

9    The only thing we have heard is that Ms. Holder told this

10   witness that the source was Mr. Wada.  That's it.  And that

11   testimony, alone, has been admitted conditionally.  So,

12   repeatedly reinforcing by repetition this argument that the

13   Wada stolen list or the list that Wada stole is improper and we

14   ask that it not continue.

15            THE COURT:  Well, I'm going to direct that the

16   questions not use argumentative terms like "stolen."  I think

17   it is fine to say the 2016 inspection list or the list from

18   Wada because he testified about how he heard that he obtained

19   it through Holder from Wada.  So, it's fine.  I'm just going to

20   cut down on the use of "stolen" repeatedly.

21            MS. KRAMER:  Certainly, your Honor.

22            THE COURT:  Anything else?

23            MS. MERMELSTEIN:  One very brief -- go ahead.

24            MR. COOK:  You can say no.

25            MS. MERMELSTEIN:  Oh, in that case.

1              Unless I misunderstood -- and so you will correct me

2     if I am wrong, Mr. Cook -- we received a number of additional

3     defense exhibits last night that I understand are likely to be

4     used with Mr. Sweet and my understanding are not purely for

5     impeachment, that is, under the agreement you are intending to

6     offer at least some, majority of what you have given us, is

7     that right, that you intend to offer those things?

8              MR. COOK:  Some of which we intend to offer.

9              MS. MERMELSTEIN:  I flag it only because it may be

10    premature but a significant portion of the exhibits relate to

11    other illegal conduct by Mr. Sweet, principally relating to tax

12    issues and his ownership of various investment properties.  The

13    government obviously has no objection to being cross-examined

14    about those topics and confronted, if appropriate, with

15    documents, but in broad strokes, recognizing these may have to

16    be taken up one by one.  But, I think it is helpful for

17    everyone to be aware that it is coming.  I think they are

18    almost exclusively extrinsic evidence used to impeach a witness

19    and that is not proper.

20             And so, we can see how it all shakes out but I expect

21    the government will object to the admission of many of those

22    documents, though not to their use, and I just don't want them

23    to be surprised.

24             MR. COOK:  And, your Honor, we do intend to have most

25    of them or many of them admitted.  They are evidence of bias.

J2J5mid7                        Sweet - direct

1        That would be proper to have those documents admitted.  If they

2        have an objection to our offering them based on the testimony

3        of the witness, I am sure they'll raise it and we can deal with

4        it.

5                THE COURT:  You are saying it is not extrinsic

6        evidence used to impeach?

7                MR. COOK:  It is not extrinsic evidence to prove his

8        character, we are offering it as evidence of bias and that

9        evidence is admissible.

10               MS. MERMELSTEIN:  It's not.

11               Mr. Cook is of course right the evidence of bias is

12       never extrinsic, but evidence that the defendant engaged in

13       other wrongful conduct is not evidence of his bias.  I have not

14       briefed this but here is Courtroom Evidence on the issue.  Here

15       is a case, it is Giorgio, looking for the cite which is on the

16       prior page 777 F.3d 125, Third Circuit from 2015.  The defense

17       was permitted to cross-examine a cooperating witness about

18       post-cooperation acts of fraud.  The witness denied the

19       allegation and the Court barred further questioning on the

20       matter.  The defense sought to introduce testimony of witnesses

21       to prove the post cooperation fraud.  The Trial Court would not

22       permit it and that was upheld on appeal.

23               You can't take anything that has happened that's bad

24       and turn it into bias in order to avoid the general rule about

25       extrinsic evidence and so I think that maybe this is going to

1   have to be done sort of as things come in, but extrinsic

2   evidence that the cooperating witness, for example, engaged in

3   improper tax fraud is not about bias, it's just other bad acts

4   and it is sort of classic extrinsic evidence that can't come

5   in.

6          So, I wanted to flag it.

7          THE COURT:  Okay.  I will think about it.  I mean,

8   that sounds like extrinsic evidence that doesn't come in but

9   can be questioned about for impeachment.  But, I will take a

10  look at some of the sources tonight.

11         MR. COOK:  Okay.

12         MS. KRAMER:  And I think Mr. Cook has a plan on

13  cross-examination for use of technology that he just wanted to

14  put before your Honor that we know about and consent to.

15         MR. COOK:  Your Honor, I intended to use a flip chart

16  during the cross-examination and help aid, a demonstrative.

17  There is really no convenient place to place a flip chart where

18  everyone can see it.  So, I talked with Ms. Kramer about using

19  an electronic device that would, in real-time, list or display

20  what I am writing as if it were a flip chart.  I explained to

21  Ms. Kramer that of course she can object, I won't be writing

22  any argumentative but merely things that the witness testifies

23  to to aid the jury.

24         MS. KRAMER:  So, after Mr. Cook's cross concludes, he

25  is going to e-mail us whatever demonstratives he makes so that

J2J5mid7                         Sweet - direct

1    we have them as we would if they were a flip chart, and if that

2    happens we have no objection to the new technology.

3             THE COURT:  Okay.  I just want to be aware.  I

4    appreciate your flagging issues in advance like this during

5    testimony and before testimony.  One issue that I know I think

6    is, has been raised and I wanted to know the status of it is

7    the issue of the notes on I think it was Mr. Middendorf's

8    phone.  I was wondering if there was any update as to the

9    dispute about the notes.  I know it is kind of a technical

10   issue involving the notes.

11            MS. ESTES:  Yes, your Honor.  I don't think there is

12   any update right now.  The motion is before your Honor.  We are

13   not expecting to call that witness until next week at the

14   earliest, probably end of next week.

15            THE COURT:  Okay.  So, things stand, as stated, in the

16   latest letters.

17            MS. ESTES:  Yes, your Honor.

18            THE COURT:  Okay.  And there are also some letters

19   relating to Ms. Rodriguez' testimony, there is a motion to

20   strike as to her testimony based on hearsay and foundation and

21   I will rule on that.  The one question I had about that is is

22   there going to be any more relevant testimony involving someone

23   else who was involved in the preparation of those cost

24   estimates?

25            MS. MERMELSTEIN:  So, I think that there already

J2J5mid7                           Sweet - direct

1    have --

2              THE COURT:  Would you pull the mic closer?

3              MS. MERMELSTEIN:  Sorry.  Yes.

4              I would note that while it is not with respect to the

5    preparation of the cost estimates, Mr. Sweet has now added to

6    and confirmed the sort of estimate of hours that goes into

7    planning, generally, and I would say that it is not yet clear

8    but there may well be more testimony in various of these

9    pieces.  And so, to the extent that that would affect your

10   Honor's ruling, it may make sense to wait until we have had a

11   little more evidence come in to see if that changes how your

12   Honor feels.

13             THE COURT:  Okay.  Anything else?

14             MS. MERMELSTEIN:  No, your Honor.

15             MS. LESTER:  Your Honor, with respect to the last

16   statement by Ms. Mermelstein, part of the issue with

17   Ms. Rodriguez' testimony it was not clear to the defense that

18   while she testified about the planning process and we knew that

19   was going to be a subject matter she would cover, we did not

20   know that she would necessarily testify as to an amount and

21   that discovery was only provided to the defense the day her

22   direct examination started.

23             So, if there is going to be another witness who is

24   going to testify as to an amount rather than just general

25   testimony about the planning process, we would appreciate it if

J2J5mid7                           Sweet – direct

1    that witness could be identified, in advance.

2                MS. MERMELSTEIN:  That's no problem.

3                THE COURT:  Do you know if there will be?  Or not.

4                MS. MERMELSTEIN:  I think we are still considering but

5    we will make sure there is plenty of notice.

6                THE COURT:  Okay.  All right.  Thanks everybody.  Have

7    a good night.

8                (Adjourned to February 20, 2019 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    BRIAN JOHN SWEET

 4    Direct By Ms. Kramer . . . . . . . . . . . . . 684

 5                         GOVERNMENT EXHIBITS

 6    Exhibit No.                                 Received

 7    1505  . . . . . . . . . . . . . . . . . . . 691

 8    1503  . . . . . . . . . . . . . . . . . . . 692

 9    1501  . . . . . . . . . . . . . . . . . . . 693

10    1504  . . . . . . . . . . . . . . . . . . . 695

11    1506  . . . . . . . . . . . . . . . . . . . 698

12    1306  . . . . . . . . . . . . . . . . . . . 739

13    1361  . . . . . . . . . . . . . . . . . . . 757

14    1507  . . . . . . . . . . . . . . . . . . . 760

15    753 and 1375  . . . . . . . . . . . . . . . 781

16    754A  . . . . . . . . . . . . . . . . . . . 784

17    510  . . . . . . . . . . . . . . . . . . . . 791

18    801  . . . . . . . . . . . . . . . . . . . . 811

19    802R  . . . . . . . . . . . . . . . . . . . 815

20    806  . . . . . . . . . . . . . . . . . . . . 818

21    810  . . . . . . . . . . . . . . . . . . . . 822

22    821  . . . . . . . . . . . . . . . . . . . . 824

23    931  . . . . . . . . . . . . . . . . . . . . 828

24    824  . . . . . . . . . . . . . . . . . . . . 829

25    876  . . . . . . . . . . . . . . . . . . . . 833
```

1   1377 and 1432   . . . . . . . . . . . . . . 836

2   1434     . . . . . . . . . . . . . . . . . . 836

3   928   . . . . . . . . . . . . . . . . . . . 839

4   1436     . . . . . . . . . . . . . . . . . . 841

5   1437     . . . . . . . . . . . . . . . . . . 842

6   1407     . . . . . . . . . . . . . . . . . . 846

7   400, 401, 402, 403, 404, 405, 406, 407, . . . 847

8            1378

9   405D     . . . . . . . . . . . . . . . . . . 849

10  935   . . . . . . . . . . . . . . . . . . . 851

11  935D     . . . . . . . . . . . . . . . . . . 854

12  1442     . . . . . . . . . . . . . . . . . . 855

13  936   . . . . . . . . . . . . . . . . . . . 859

14  937   . . . . . . . . . . . . . . . . . . . 861

15  954   . . . . . . . . . . . . . . . . . . . 886

16  941   . . . . . . . . . . . . . . . . . . . 893

17  942   . . . . . . . . . . . . . . . . . . . 896

18  1003     . . . . . . . . . . . . . . . . . . 903

19  357   . . . . . . . . . . . . . . . . . . . 909

20

21

22

23

24

25