J2kdmid1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                New York, N.Y.

              v.                         18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

              Defendants.

------------------------------x

                                         February 20, 2019
                                         9:36 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                         District Judge
                                         and a jury

                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  REBECCA G. MERMELSTEIN
     AMANDA K. KRAMER
     JORDAN LANCASTER ESTES
          Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
     Attorneys for Defendant David Middendorf
BY:  NELSON A. BOXER
     AMY R. LESTER
     ALEXANDRA REBECCA CLARK
          - and -
BRUCH HANNA LLP
BY:  GREGORY S. BRUCH
```

J2kdmid1

1                          APPEARANCES CONTINUED

2    BROWN RUDNICK LLP
          Attorneys for Defendant Jeffrey Wada
3    BY:   STEPHEN COOK
          JUSTIN S. WEDDLE
4         SELBIE JASON
               – and –
5    LATHAM & WATKINS
     BY:   JASON MASASHI OHTA
6

7              – also present –

8    Lyeson Daniel, Postal Inspector
     Virginia Faughnan, Postal Inspector
9    Luke Urbanczyk, Government Paralegal
     Nathaniel Cooney, Government Paralegal
10   Kiezia Girard-Lawrence, Postal Inspector
     Stephanie O'Connor, Defendant Middendorf paralegal
11   Sarah Chojecki, Defendant Wada paralegal

12

13                              oOo

14

15

16

17

18

19

20

21

22

23

24

25

J2kdmid1

1                    (Jury not present)

2               THE COURT:  Good morning.

3               MS. KRAMER:  Good morning.

4               THE COURT:  How much longer do you think you have for

5     direct?

6               MS. KRAMER:  I think I'll finish by or around

7     lunchtime.

8               THE COURT:  OK.  I received defendant Wada's counsel's

9     letter regarding extrinsic evidence, and I don't know that we

10    need to address it today.  Do you think we -- I mean, right at

11    this minute?  Can we wait until lunch, or do you want to

12    address it now?

13              MS. KRAMER:  I think we can wait until lunch, your

14    Honor.  It is unlikely that cross would begin before lunch.

15              MR. WEDDLE:  I don't think we are even asking for a

16    ruling, your Honor.  I think the reason is to set out the law

17    because I disagree with the way it was described in court

18    yesterday, but I think that your Honor can make the decision on

19    a exhibit-by-exhibit basis.

20              THE COURT:  OK.  Anything else before we bring the

21    jury in?

22              MS. KRAMER:  Yes, your Honor.  We have one more issue

23    about the cross-examination of Brian Sweet that we understand

24    is still in dispute based on my conversations with Wada's

25    counsel, but that can also be taken up at lunchtime.

J2kdmid1                          Sweet – direct

1              THE COURT:  OK.  Anything else?

2              All right.  We will bring in the jury.

3              (Continued on next page)

J2kdmid1                         Sweet - direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen.

4          JURORS:  Good morning.

5          THE COURT:  Welcome back.

6          JURORS:  Thank you.

7          THE COURT:  I hope you all had a good night.

8          We're continuing with the testimony, the direct

9   testimony, of a witness.

10          And Ms. Kramer, you may proceed.

11          MS. KRAMER:  Yes, your Honor.

12          Would you like to remind the witness that he is still

13   under oath?

14          THE COURT:  Yes.

15          Mr. Sweet, you are still under oath when you were

16   sworn was it yesterday, yes, yesterday.  Thank you.  You are

17   still under oath.

18          MS. KRAMER:  Thank you, your Honor.

19    BRIAN JOHN SWEET,

20       Resumed, and testified further as follows:

21   DIRECT EXAMINATION

22   BY MS. KRAMER:

23   Q.  Yesterday, Mr. Sweet, we were talking about the effects of

24   the 2016 rereviews, so I would like to pick up there.

25          During the 2016 inspection season, were you tracking

J2kdmid1                          Sweet – direct

1    KPMG's performance on inspections?

2    A.   Yes.

3    Q.   How were you doing that?

4    A.   As part of my role in the national office in the

5    Inspections Group, I was on the distribution for every

6    inspection that the PCAOB was conducting internally.  So at the

7    end of the field work, we would be notified by any of the

8    liaisons of whether or not the PCAOB was intending to write a

9    comment form or not.

10   Q.   What's your understanding of how the liaisons knew at the

11   end of an inspection whether or not the PCAOB intended to write

12   a comment?

13   A.   I served as a liaison as well, so I know from direct

14   experience that at the end of the field work week, the PCAOB

15   Inspection Team would meet with the KPMG Engagement Team and

16   have what they called a final status meeting, kind of like a

17   closing meeting to the week, where they would communicate

18   whether or not they were considering any issues for comment.

19   And so if they said that they were not considering any issues

20   for comment, that meant no comment forms would be issued.

21   Q.   How did the firm do on the inspections of the engagements

22   that were on the March 28th Wada list?

23   A.   They did very well.

24   Q.   Take a look at what's marked for identification as

25   Government Exhibit 1439.

J2kdmid1                          Sweet - direct

1          Do you recognize this exhibit?

2   A.  Yes, I do.

3   Q.  How do you recognize it?

4   A.  I recognize this to be a text message exchange between

5   Cindy Holder and myself.

6   Q.  From what date?

7   A.  From June 6, 2016.

8          MS. KRAMER:  The government offers Government Exhibit

9   1439 subject to connection.

10         THE COURT:  It is received.

11         (Government's Exhibit 1439 received in evidence)

12  BY MS. KRAMER:

13  Q.  What were you and Cindy Holder discussing by text message

14  on June 6, 2016 in Government Exhibit 1439?

15  A.  This was a text message exchange about how the Century

16  Bancorp inspection was going.

17  Q.  In the second row, the row beginning with 4:07 p.m. Eastern

18  Time, when you said, "joe did a very crappy job explaining the

19  a particular issue," what were you talking about?

20  A.  I was referring to Joe Gencarella, who is the lead audit

21  engagement partner on Century, and it was in reference to one

22  of the focus area interviews that Joe and the Engagement Team

23  at KPMG was having with the PCAOB's Inspection Team on this

24  investments focus area.

25  Q.  And when you say they were having a focus area interview,

J2kdmid1                         Sweet – direct

1    is that the same thing as the focus area meetings you testified

2    about yesterday?

3    A.   Yes.

4    Q.   When you wrote in the last sentence in that row, "Right now

5    it's likely a comment so going to have to work hard to make it

6    go away," what did you mean?

7    A.   That based on the way I was observing the PCAOB's

8    inspection to go, because I was sitting in on all of the same

9    meetings with the Engagement Team, that the inspectors from the

10   PCAOB seemed to be very concerned about the audit work in that

11   particular area and seemed to be pressing on it as an issue.

12   And so the reference to have to work hard to make it go away

13   meant that we would have to make sure that the team was fully

14   prepared to answer and talk about this potential issue the next

15   day and point to all the other work that it had done that may,

16   you know, compensate for what the PCAOB was concerned about.

17   Q.   And in the sentence before that last one, you wrote, "It

18   was their very first question."  What significance to you did

19   it have at all that this was their very first question, the

20   inspectors' very first question?

21   A.   That was pretty common for me as well while I was at the

22   PCAOB as an inspector that during these focus area meetings,

23   the start of the meeting, you would start with your biggest

24   potential problem areas first, your biggest concerns first.

25   Q.   And in your experience, does the explanation given by a

J2kdmid1                        Sweet - direct

1    member of an Engagement Team in one of these focus area

2    meetings affect whether or not a comment is given?

3    A.  Yes.

4    Q.  How?  What's your understanding of how the explanations

5    given in these meetings affect whether or not comments are

6    issued?

7    A.  As part of the PCAOB's inspection, they thoroughly review

8    the audit workpapers.  So the written documentation this

9    includes, but they also place a lot of weight on what they

10   refer to other persuasive evidence, so what other factors and

11   what context was the Engagement Team considering when they

12   perform the procedures, the testing, that they did, and so

13   that's why the PCAOB does inspections on site with the

14   Engagement Team as they want there to be this Q & A process,

15   this interview process, so they can really understand all of

16   the things the team was thinking about.

17   Q.  And in your experience, when an Engagement Team gives the

18   strong answer, in contrast to the job that you're referencing

19   Joe Gencarella did on Century Bancorp, does that affect whether

20   a comment is issued?

21   A.  Yes.

22   Q.  How?

23   A.  We would sometimes refer to it as the first best answer,

24   meaning that when the PCAOB inspector asks a question, if they

25   can give the best answer the first time, then that in and of

J2kdmid1                          Sweet - direct

itself exudes confidence, demonstrates the Engagement Team was
very thoughtful and intentional about exactly what work they
were trying to perform.  And so being able to do that and avoid
having second or third or multiple follow-up questions on that
typically had a very strong correlation to whether or not there
was ultimately a comment form or not.

Q.  In the next line, at 4:08 p.m., Cindy Holder wrote back to
you:  "Darn it.  That was the main question we prepped him
for."

        What was your understanding of what she was referring
to when she talked about him being prepped for this question?

A.  I believe she was either referring to both the work that
had been done as part of the rereview process, but then
following the PCAOB's notification of the firm, the national
office also does an advance review of the workpapers again to
help identify potential problem areas and Cindy was involved in
that as well, and so I think it's referring to either one of
those.

Q.  OK.  And then at 4:09 p.m. you wrote:  "No kidding.  And I
talked him through it this morning."

        Had you had another discussion with Joe Gencarella
about this issue that morning?

A.  Yes.

Q.  Why?

A.  I was -- again, I was the PCAOB -- the KPMG national office

1    liaison assigned to support the Century bank inspection, and I

2    was aware of this issue and had thought it was a soft spot or a

3    potential problem area in the files, and so I had spent time

4    with Joe talking through that issue and how he was going to

5    respond and wanted to make sure that he was ready for the

6    question when it came.

7    Q.  To what end?

8    A.  So that, again, he could give the best first answer to the

9    PCAOB and really come across as confident and articulate and

10   thorough in his response.

11   Q.  Let's talk specifically about Sallie Mae.

12        Did the inspection of Sallie Mae result in any

13   comments in 2016?

14   A.  Yes.

15   Q.  About what?

16   A.  I don't remember specifically which focus area but it was a

17   confirmations-related comment form.

18   Q.  Can you explain as simply as possible what "confirmations"

19   is, or are?

20   A.  Yes.  So one of the things an auditor would do commonly as

21   part of their audit would be to send letters to verify a

22   balance.  So, for example, if a company said they had this

23   amount of cash on their -- as one of their assets, on their

24   balance sheet, then what an auditor might do would be to send

25   out a letter to the bank where that cash was deposited and

1   confirm that they really did have as much cash as they had on

2   hand.  So, it's a common audit procedure just to test the

3   existence and the accuracy and the completeness of a particular

4   balance.

5   Q.  And do you remember the problem with the Sallie Mae

6   confirmations that the PCAOB wrote a comment about?

7   A.  Yes.

8   Q.  What was that problem?

9   A.  The PCAOB was concerned about the sampling process that the

10  Engagement Team had gone through, meaning that they didn't

11  think that the engagement team had sent enough confirmations

12  out for the particular area that they were testing.

13  Q.  Did this comment come up at any KPMG conferences?

14  A.  Yes.

15  Q.  When did it come up?

16  A.  It came up in the June 2016 banking partner manager

17  conference.

18  Q.  How did it come up?

19  A.  Because Sallie Mae was one of the first inspections that

20  the PCAOB had performed that season, it was already completed

21  by the time this conference came up.  And David Britt, my

22  understanding, discussed the comment while he was on stage

23  making one of the presentations and saying here's an issue that

24  the PCAOB identified this year and, you know, all you banking

25  partners and managers need to be aware of this, this type of

1    issue in your own audits.

2    Q.  Did you have any conversations with Cindy Holder about

3    that?

4    A.  Yes.

5    Q.  What did she tell you?

6    A.  She told me about what David had said on stage and about

7    this issue and ultimately that one of the engagement teams was

8    going to take additional action as a result of that.

9    Q.  Which Engagement Team did she tell you was going to take

10   additional action as a result of that?

11   A.  The People's Financial Audit Engagement Team.

12   Q.  Was People's on the March 28th, 2016 Wada list?

13   A.  Yes, it was.

14   Q.  Who was the engagement partner on People's?

15   A.  The lead engagement partner was Peter Torrente.

16   Q.  Was People's part of the stealth rereview that you

17   participated in in 2016?

18   A.  Yes.

19   Q.  Do you have any conversations with Peter Torrente in the

20   spring of 2016 about the rereview?

21   A.  Yes.

22   Q.  And do you remember what, if anything, he said about his

23   understanding of the reason for the rereviews?

24   A.  He told me that he had spoken with David Britt and

25   understood why we were doing what we were doing.

J2kdmid1                              Sweet - direct

1   Q.   What did you understand that to mean?

2   A.   That he knew that People's was going to get inspected by

3   the PCAOB that year and that the reason that we were doing this

4   stealth rereview was to help ensure that the audit work was

5   documented as well as possible.

6   Q.   Do you know what actions the People's Engagement Team took

7   after learning that Sallie Mae had been issued a comment about

8   the number of confirmations it had sent out?

9   A.   Yes.

10  Q.   How do you know that?

11  A.   I know that from both my conversations with Cindy Holder

12  but also my conversations with John Broderick, who ended up

13  being the KPMG national office liaison that worked on that --

14  the PCAOB inspection.

15  Q.   What do you understand the People's Engagement Team to have

16  done after learning about this issue with the Sallie Mae

17  comment?

18  A.   After hearing about the issue at this banking partner

19  manager conference, the People's Engagement Team went back into

20  their files to see if they had had the same issue in their

21  audit workpapers.   They identified that they did have that same

22  issue and then decided to perform a special audit procedures

23  for the prior audit even though it was, you know, closed and

24  complete, you know, the workpapers had been archived at that

25  point.   They documented under one of the special accounting or

J2kdmid1                          Sweet - direct

1    auditing rules and performed the additional procedures to kind

2    of fix that work.

3    Q.  Did they comply with the auditing standards in terms of

4    documenting the additional work?

5    A.  Yes.

6    Q.  What's your understanding about why they went in to do that

7    additional work?

8    A.  Because they knew that the PCAOB was going to be inspecting

9    People's and that that announcement would come from the PCAOB

10   fairly soon and that it would be better for them if they had

11   self-identified and self-fixed this work before the PCAOB came

12   in to look at it.

13   Q.  Did the PCAOB inspect People's?

14   A.  Yes.

15   Q.  And what, if anything, did the PCAOB initially indicate it

16   would issue a comment about?

17   A.  They initially indicated that they were going to write a

18   comment in that same area because the original audit work

19   didn't -- hadn't had the same issue around confirmations and

20   sample sizes.

21   Q.  Do you know how the firm responded?

22   A.  Yes.

23   Q.  How?

24   A.  The firm told the PCAOB that because -- that while it was

25   true in the original set of workpapers that the Engagement Team

had self gone in and corrected this issue, after hearing about

it at the partner manager conference and that the PCAOB should

consider this fixed work as part of it's valuation.

Q.   What's your understanding of whether or not the PCAOB then

issued a comment on confirmations, as it had said it was going

to?

A.   I believe they may have issued the comment, but they

ultimately decided that they were not going to consider that

comment for the report.  They ended up agreeing with the firm's

view and determined that that would not be an issue that they

considered for Part I of their inspection report.

Q.   So this comment did not end up in Part I of the inspection

report or the PCAOB said it was not going to?

A.   Yes.

Q.   Do you know what effects, if any, the additional work that

the Engagement Team had done had on the PCAOB's decision not to

put this in Part I?

A.   That that was the reason that they decided not to, because

the team had gone and done that work, the PCAOB did not want to

write the comment -- or consider this an issue because the team

had taken these additional steps.

Q.   What's your understanding of whether or not the Engagement

Team told the PCAOB why it had gone in to do the additional

work?

          MR. COOK:  Objection.  Speculation.

1          MS. KRAMER:  I can rephrase, your Honor.

2          THE COURT:  Please.

3     BY MS. KRAMER:

4     Q.  Do you have an understanding, based on conversations you

5     had, as to whether or not the Engagement Team told the PCAOB

6     that it knew it was going to be inspected?

7          MR. COOK:  The same objection, your Honor.

8          THE COURT:  Overruled.

9     A.  Yes, I do.

10    Q.  What's your understanding of that?

11    A.  The Engagement Team did not tell the PCAOB that we had

12    received stolen confidential information and knew that People's

13    was going to get inspected.  They said that they did this just

14    in the normal course of learning about a potential area, or

15    issue, and going back and kind of self-correcting their

16    workpapers.

17    Q.  Are you familiar with the term "positive quality events"?

18    A.  Yes.

19    Q.  What do you understand that to mean?

20    A.  Positive quality event is a PCAOB term that is used for an

21    audit that goes really, really well.

22    Q.  Who makes the decision about whether an audit is a positive

23    quality event?

24    A.  The PCAOB does.

25    Q.  And why, in your understanding from your experience at the

J2kdmid1                    Sweet – direct

1   PCAOB, does the PCAOB classify some audits as positive quality

2   events?

3   A.   This ties back to what we were discussing yesterday about

4   these root cause analysis.  That one of the things the PCAOB

5   Inspection Team does as part of its, you know, national office

6   procedures is to evaluate the firm's overall system of quality

7   is they want to understand what were the underlying factors

8   that may have caused an audit to be really, really good or, in

9   turn, what were the underlying factors that caused an audit to

10  be really, really bad, when there would be a negative quality

11  event.  So, they would look at those root causes.

12  Q.   And does the PCAOB classify some audits as negative quality

13  events?

14  A.   Yes.

15  Q.   Do you have an understanding of how many audits the PCAOB

16  classifies as positive or negative quality events in a given

17  year?

18  A.   I don't know the total number, but from my experience when

19  I was at the PCAOB, because I worked with primarily in the

20  banking practice, there were always a few banks that made the

21  cut of being negative quality events each year, so meaning

22  really, really bad audits.

23  Q.   And so when the PCAOB decides that an audit is a positive

24  quality event, in your understanding, what does the PCAOB root

25  cause subgroup then do with that audit?

J2kdmid1                          Sweet - direct

A.   They make that determination after the inspection is done
and so they will then ask the Engagement Team to have one more
interview with them where they can talk through why the
engagement team thought -- what the factors were that caused it
to be, you know, really, really good or, again, for a negative
quality event, really, really bad.

Q.   How does the PCAOB notify the firm that an audit has been
deemed a positive quality event?

A.   One of the PCAOB inspectors assigned to this root cause
subteam will notify usually the national office liaison that
was assigned to support the firm or the Engagement Team through
that inspection.

Q.   Do members of the national office typically participate, in
your experience, in the follow-up interview that the PCAOB has
with the team about a positive quality event?

A.   Yes.

Q.   Do you recall whether or not any KPMG audits were
identified by the PCAOB as positive quality events at the end
of the 2016 inspections?

A.   Yes.

Q.   Which ones were?

A.   I know that Century Bancorp, Banc of California, and TCF
Financial were all identified as positive quality events.

Q.   And were any of those part of the rereviews that you
participated in after receiving the Wada list on March 28,

J2kdmid1                          Sweet – direct

1    2016?

2                MR. COOK:  Objection.  Characterization of the

3    inspection list as the "Wada list."

4                MS. KRAMER:  I can certainly rephrase, your Honor.  I

5    thought I was complying with your Honor's ruling yesterday.

6                THE COURT:  Just clarify what you are talking about.

7                MS. KRAMER:  Certainly, your Honor.

8    BY MS. KRAMER:

9    Q.  Do you recall whether any of those three audits, Century,

10   TCF or Banc of California, were part of the rereviews that you

11   participated in after Cindy Holder shared with you the list of

12   banking inspections for the -- that the PCAOB had for KPMG that

13   she had received from Jeff Wada on March 28, 2016?

14   A.  Yes.

15   Q.  Which ones were part of the stealth rereviews?

16   A.  Both Century Bancorp and Banc of California were two of the

17   rereviews done for these stealth reviews.

18   Q.  And to your knowledge, had TCF been subject to any

19   additional rereview?

20   A.  Yes.

21   Q.  What kind?

22   A.  TCF was one of the four banks that we had discussed

23   yesterday that were done as part of the -- the camouflage, so

24   there would be other engagements reviewed beyond just the seven

25   that we knew were on that listing provided by Jeffrey Wada.

J2kdmid1                          Sweet - direct

1   Q.  From your experience at the PCAOB on the KPMG Inspection

2   Team and then at KPMG, had KPMG previously had banking audits

3   selected as positive quality events by the PCAOB, to the best

4   of your memory?

5   A.  No.  I was not aware of any instance where there had been a

6   banking engagement that had been a positive quality event both

7   from my time at the PCAOB and at KPMG.

8   Q.  What's your understanding of the effect, if any, on the

9   firm of the PCAOB choosing a banking engagement as a positive

10  quality event?

11  A.  It was a very big deal.

12  Q.  Why?

13  A.  Because most or a significant number of the comments in the

14  prior years had been banking-related, and one of the Part II

15  themes in the KPMG's report from the PCAOB in the prior years

16  had been specific to these banking issues.  For the bank then,

17  and therefore for the firm, then in 2016 to not only have clean

18  inspections, clean banking inspections with no comments, but to

19  then have had three that were identified as not just, you know,

20  passing but of such good quality that they were determined to

21  be positive quality events gave both the PCAOB and KPMG a very

22  significant data point to use in trying to explain that they

23  had been taking such significant steps to fix past issues and

24  keep the prior Part II section of the PCAOB's report nonpublic.

25  Q.  And to be clear, what does Part II of the report address,

1    generally?

2    A.   Part II of the PCAOB's annual reports addressed the

3    thematic issues, so kind of the themes that the PCAOB

4    identifies as a whole relating to the firm's system of quality

5    control.  So it's separate from the individual issuer

6    inspections that are in are Part I, which ones get comment

7    forms.  These are more of the themes that are included in Part

8    II.

9    Q.   And do you know which specific theme in the Part II of

10   KPMG's inspection report the selection of these banking

11   engagements as positive quality events was related to?

12   A.   Yes.

13   Q.   Which one?

14   A.   There had been an allowance for loan loss in one of the

15   banking areas, audit areas, there had been a theme for that

16   kind of multiple years in a row at the PCAOB.

17   Q.   And what was your understanding of the effect on the

18   allowance for loan loss Part II comment of these banking

19   engagements being chosen as positive quality events?

20           MS. LESTER:  Objection.  Asked and answered.

21           THE COURT:  Sustained.

22   BY MS. KRAMER:

23   Q.   Do you have any understanding as to whether KPMG cited the

24   identification of these banking engagements as positive quality

25   events in its efforts to convince the PCAOB that the ALL

J2kdmid1                              Sweet – direct

1    comment in Part II should remain nonpublic?

2    A.  Yes.

3    Q.  What's your understanding about that?

4              MR. COOK:  Objection.  Foundation.

5              THE COURT:  Overruled.

6    A.  My understanding was that that was something that the firm

7    had been pointing to both in its monthly meetings with the

8    PCAOB but that it was also something that they were pointing to

9    in their response to the prior Part II additional remediation

10   response that they had to write.

11   Q.  Yesterday you testified about which of the banking

12   engagements from the March 28th list of PCAOB inspections that

13   Jeff Wada shared with Cindy Holder that she shared with you

14   were actually inspected in 2016.  Do you remember which ones

15   those were?

16   A.  Yes.

17   Q.  Which ones?

18   A.  The ones that had been subject to the stealth rereviews

19   that ultimately got inspected were Century Bancorp, Banc of

20   California, People's United, UMB Financial, and First Business

21   Financial.

22   Q.  Do you know in what areas, if any, those audits had

23   previously received comments by the PCAOB?

24   A.  I believe some of those were first-time inspections by the

25   PCAOB, but I know Banc of California was one because I've

J2kdmid1                          Sweet - direct

worked on that inspection when I was at the PCAOB and I
supported it through this liaison role in the rereview, and I
know that they had received four comment forms the prior time
that the PCAOB inspected.  And it included the allowance for
loan loss, investments, mortgage repurchase reserve, kind of
the -- I was going to say just some of the significant banking
areas that had been subject to that audit.
Q.   Do you know what specific area KPMG banking audits had
traditionally been receiving comments in by the PCAOB?
A.   Yes.
Q.   Which one?
A.   The most common area of comment by the PCAOB had been
within this allowance for loan loss area.
Q.   And with respect to the allowance, was there a particular
aspect of it that had previously been receiving comments in
KPMG inspections?
A.   Yes.
Q.   Which one?
A.   It's referred to as the general portion of the allowance
for loan losses.
Q.   And very simply, what does that mean?
A.   That in calculating how much losses are inherent within a
bank's kind of portfolio of loans that they would make, one of
the things that they would calculate under the accounting rules
is what the general reserve would need to be for those loans

J2kdmid1                          Sweet – direct

1   evaluated as a whole.

2   Q.  What does that mean, the general reserve?

3   A.  That it's just –– it's one of the components of the

4   allowance for loan loss calculation.

5   Q.  In your understanding, is that a reflection of the

6   allowance for a small group of loans or for the whole portfolio

7   of loans?

8   A.  For the majority of the loans but the biggest portion of

9   the loans.

10  Q.  Did any of the KPMG audits that were inspected that had

11  been part of the stealth rereviews after you got the list on

12  March 28th, did any of those get comments on the general

13  reserve aspect of the ALL, to your knowledge?

14  A.  No.

15  Q.  And how did those inspections fare relative to the prior

16  years' inspections of KPMG banking clients?

17  A.  There had been a significant improvement of those

18  inspections.

19  Q.  From your experience at KPMG and your experience working on

20  the rereviews and participating in the inspections that were

21  subject to the rereviews, what is your understanding of why the

22  results were so much better?

23  A.  Because the workpapers presented the work in the best light

24  possible, I believe that the rereviews had a very direct impact

25  on the ultimate inspection outcomes.

J2kdmid1                          Sweet - direct

1  Q.  Did there come a time that you had any conversations with

2  Dave Middendorf about the firm's performance on the 2016

3  inspections?

4  A.  Yes.

5  Q.  How many conversations do you specifically remember having

6  with him about that?

7  A.  I remember at least one conversation.

8  Q.  Approximately when did that conversation take place?

9  A.  It was in the fall of 2016.  I remember it was at the very

10 end of the PCAOB's inspection cycle.

11 Q.  Where were you when you had this conversation with Dave

12 Middendorf?

13 A.  I was in New York.

14 Q.  For what?

15 A.  I had just completed supporting one of the engagement teams

16 through an inspection, a PCAOB inspection, and I remember going

17 and meeting Dave Middendorf and Tom Whittle and others at a

18 restaurant for dinner.

19 Q.  Do you remember where in the restaurant you were when you

20 had this conversation?

21 A.  I remember we were -- yes.

22 Q.  Where were you?

23 A.  I remember we were standing around kind of the bar area at

24 the end of the dinner.

25 Q.  Who participated in this conversation with you and Dave

J2kdmid1                            Sweet - direct

1    Middendorf?

2    A.   Tom Whittle was also there.

3    Q.   What did Dave Middendorf say to you about the inspection

4    results?

5    A.   I remember him saying how pleased he was that the

6    inspection results had been so improved from the prior year.  I

7    remember him also pointing to the fact that there were so many

8    clean banking inspections, including the ones that had been

9    subject to the stealth rereviews, and that three of those had

10   been subject to this positive quality event.

11   Q.   Did there come a time in the fall of 2016 that you

12   endeavored to predict the PCAOB banking selections for 2017?

13   A.   Yes.

14   Q.   Take a look at what's marked for identification as

15   Government Exhibit 1067.

16        MS. KRAMER:  Your Honor, may I have a moment, please?

17   My screen is not working.

18        THE COURT:  Sure.

19        MS. KRAMER:  Thank you.

20        (Pause).

21   Q.   Do you recognize this document?

22   A.   Yes, I do.

23   Q.   How do you recognize it?

24   A.   I recognize this to be an email that I sent from my KPMG

25   email account.

J2kdmid1                          Sweet - direct

1   Q.  On what date?

2   A.  On November 18, 2016.

3            MS. KRAMER:   The government offers Government Exhibit

4   1067.

5            THE COURT:   1067 is received in evidence.

6            (Government's Exhibit 1067 received in evidence)

7   BY MS. KRAMER:

8   Q.  All right.   What's the subject line of this email?

9   A.  "Bank Screening Analysis."

10  Q.  And who did you send this to?

11  A.  I sent this to Tom Whittle.

12  Q.  Could you read the first sentence of your email?

13  A.  "Tom - attached is the screen analysis that Cindy and I

14  pulled together based off of our own experiences of how the

15  PCAOB performs its planning."

16  Q.  Did you and Cindy Holder pull this together based only on

17  your own experiences?

18  A.  No.

19  Q.  So that sentence was a lie?

20  A.  Yes.

21  Q.  What did you base this on aside from your own experiences?

22  A.  Cindy and I also accessed that 2015 GNF Planning Profile

23  that I had taken with me.

24  Q.  Why did you not say in this email that the bank screening

25  analysis that you had done was also based on the 2015 GNF

J2kdmid1                          Sweet - direct

1   Planning Profile?

2   A.   Because I wasn't sure how Tom would -- whether or not Tom

3   would forward this email to anyone, and I also knew at that

4   point that Tom was well aware that I had taken documents with

5   me when I left the PCAOB.

6   Q.   What was your concern about Tom forwarding this to someone?

7   A.   That me -- if I had referenced this 2015 GNF Planning

8   Profile, it would make it clear to anyone else reading this

9   that I was -- we were basing this analysis in part on stolen

10  confidential information from the PCAOB.

11  Q.   Looking at the last line, who were you referring to as when

12  you said, "I'll work through this with David before we pursue

13  any actions"?

14  A.   That's a reference to David Britt since he was one of the

15  co-banking leaders in the audit practice in the national

16  office.

17  Q.   What had you and Tom Whittle discussed about sharing this

18  with David Britt?

19  A.   That because Cindy and I were identifying where we thought

20  the PCAOB would likely inspect in 2017, that David was

21  really -- David Britt was really the person that coordinated

22  the national office's monitoring and other support for those

23  banking engagements and so that he really needed to be kept in

24  the loop on those things and so it was his call.

25  Q.   Let's look at the attachment.

J2kdmid1                          Sweet - direct

 1           Can you read that?

 2   A.   Yes.  I believe I can.

 3   Q.   What's in the first few columns?

 4   A.   The first few columns are the issuer's name, so the name of

 5   the KPMG audit that we had identified as having a high

 6   likelihood.  Then we included a risk rating, kind of our

 7   prediction first being the most likely to be get picked.  And

 8   "trading symbol" is just the ticker symbol, the stock trading

 9   symbol.  "Opinion City" is the location that the audit's

10   opinion is issued in.  "Opinion State" is the state.  "Fiscal

11   year-end" would be just the year-end date for the audit.

12   Q.   OK and let's scroll to the right.  What is in the next

13   couple of columns?

14   A.   "AQSN" and "ALL monitoring program" are both references to

15   two of the national office quality support initiatives that

16   were being done that year.  So "AQSN" stands for the audit

17   quality support network.  So some of the engagements had been

18   assigned to this AQSN, which meant that a national office

19   reviewer was going to support the Engagement Team.  And then

20   "ALL Monitoring Program" is similar but just focused only on

21   the allowance, where there would be a national office person.

22   So, an X in the box would indicate that the engagement was

23   already subject to one of those programs.

24   Q.   OK.  Next column.

25   A.   "Partner Risk" is where we believed or make an indication

J2kdmid1                        Sweet - direct

1   that the lead audit engagement partner, or one of the other

2   partners that was in a significant role in the engagement, had

3   had past quality issues either through PCAOB comment forms in

4   the past, an inspection, or internally.

5          And then "Reasons for Possible Selection" is just a

6   summary of why we thought it was likely that that particular

7   engagement would get picked.

8   Q.  OK.  And in the "Reasons for Possible Selection" column,

9   did you utilize information from the 2015 GNF Planning Profile

10  that you stole when you left the PCAOB?

11  A.  Yes.

12  Q.  Throughout your time at KPMG, did you maintain contacts

13  with your former colleagues at the PCAOB?

14  A.  Yes, I did.

15  Q.  Who do you remember maintaining contact with?

16  A.  There were quite a few people, but it certainly included

17  Bob Ross, Jung Lee, Grady Peeler, David Nitz, Steve Schindler,

18  and others.

19  Q.  In what ways did you communicate with your former

20  colleagues at the PCAOB?

21  A.  Through emails, text exchanges, I guess occasionally

22  through phone conversations, and then in-person meetings like,

23  you know, grabbing dinner together or lunch together and maybe

24  drinks.

25  Q.  When you got back together with your former colleagues,

J2kdmid1                          Sweet - direct

what kinds of things did you discuss with them?

A.   Generally, they would ask how I was doing at the firm, how I liked KPMG.  They would, you know -- a lot of them I had personal relationships with so we would talk about family and, you know, how they were doing.  And then I would commonly ask them how they were doing and what sorts of things they were working on and how things were going at the PCAOB.

Q.   Did you ever try to get confidential information from your former colleagues at the PCAOB?

A.   Yes.

Q.   What kind of information did you try to get from them?

A.   I would sometimes ask, you know, probing questions such as, hey, you're traveling anywhere fun next year, you know, overseas?  And if I knew they worked for -- on the KPMG Inspection Team and they said, yeah, I'm going to be going to this country, then that was a pretty big tip off to me that, well, they are likely going to be looking at a bank in that country, or, you know, how they were doing on their inspections with, you know, another firm, sometimes they would tell me.

Q.   What did you do when you got that information?

A.   Generally every time I would go back and tell others at KPMG.

Q.   Who were the people you told at KPMG?

A.   Tom Whittle, David Britt, certainly Cindy Holder, Dave Middendorf.

J2kdmid1                          Sweet - direct

1    Q.  Generally, how did they respond when you shared this

2    information with them?

3    A.  Very favorably, very positive to have that kind of

4    additional insight.

5    Q.  All right.  Let's take a look at what's marked for

6    identification as Government Exhibit 956R.  We'll just look at

7    a couple of examples.

8              Do you recognize this exhibit?

9              MS. KRAMER:  If you could scroll through,

10   Mr. Urbanczyk.

11   A.  Yes, I do.

12   Q.  How do you recognize it?

13   A.  I recognize this to be an email exchange that I sent from

14   my KPMG email account.

15   Q.  On what date?

16   A.  January 4th.

17   Q.  What year?

18   A.  Of 2016.

19             MS. KRAMER:  The government offers Government Exhibit

20   956R.

21             THE COURT:  It says 956.  Is that different from 956R?

22             MS. KRAMER:  Yes.  The top-left portion of the first

23   page is redacted in 956R.

24             THE COURT:  OK.  956R is received.

25             (Government's Exhibit 956R received in evidence)

J2kdmid1                          Sweet – direct

1    BY MS. KRAMER:

2    Q.  So who did you send this email to -- looking at the whole

3    email chain, who did you send your first email to on January 4,

4    2016 at 11:08 a.m.?

5    A.  I sent it to Tom Whittle, Dave Middendorf and George

6    Hermann.

7    Q.  And what did you write in the first email in the chain?

8    A.  I wrote:  "Happy new year, gentlemen.  I thought you might

9    all appreciate knowing that Bob Ross has been assigned off of

10   the KPMG team and will be inspecting" Deloitte & Touche, or

11   "D&T this year.  I'm not sure how immediate the change will

12   take place.  (He'll still be asked to follow through any

13   unresolved prior year issues, reporting writing work, etc.)

14   I'm supposed to have lunch with Steve later this week so will

15   let you know if I hear anything else.

16         "All the best, Brian."

17   Q.  Who was Bob Ross?  What role did he play at the time?

18   A.  Bob Ross was an associate director at the PCAOB who worked

19   on KPMG inspections.

20   Q.  And when you referred to "Steve," who were you referring

21   to?

22   A.  I was referring to Steve Schindler.

23   Q.  What role did he play at the time?

24   A.  Steve Schindler was also an associate director at PCAOB,

25   and he was KPMG's overall team lead for the PCAOB's Inspection

J2kdmid1                              Sweet - direct

1   Team.

2   Q.  How did you know that Bob Ross was assigned off of KPMG?

3   A.  He and I had had lunch and he told me.

4   Q.  Was that fact public, as far as you knew?

5   A.  No.

6   Q.  Why did you share it with Dave Middendorf, Tom Whittle and

7   George Hermann?

8   A.  Because all three of them had been asking about whether or

9   not Bob would continue, and it had been just a topic of a

10  number of conversations because they were hoping that Bob would

11  move off of KPMG's Inspection Team and on to one of the other

12  firms.

13  Q.  Let's look at Tom Whittle's response.

14          How did Tom Whittle respond?

15  A.  Tom responded by saying:  "There must really be a Santa.

16  Is he still going to do DB in Germany?"

17  Q.  What did you understand him to mean when he referred to

18  "doing DB in Germany"?

19  A.  "DB" is a reference to Deutsche Bank, which is KPMG's

20  biggest banking audit client in Germany.

21          I'm sorry.  So he's asking is he still going to, you

22  know, lead the inspection of Deutsche Bank for the PCAOB in

23  Germany.

24  Q.  How did you respond?

25  A.  I responded by saying:  "I'm not sure.  They could easily

J2kdmid1                        Sweet - direct

1    make a case to keep Bob on Germany given how big that bank is

2    and because DT-US doesn't have a big banking practice to keep

3    him busy year-round.  The full schedule and team assignments

4    get finalized internally at the PCAOB in March so we'll know a

5    lot more then."

6    Q.  When you wrote "We'll know a lot more then" after the

7    PCAOB's schedule and team assignments get finalized internally,

8    how did you plan to learn about that?

9    A.  I had expected that I will have another lunch with Bob and

10   then he would no doubt tell me where he was going to be

11   working.

12   Q.  Did you plan to probe him on that subject?

13   A.  Yes.

14   Q.  And what did you plan to do when he shared that information

15   with you?

16   A.  To then go and tell Tom Whittle, Dave Middendorf, George

17   Hermann, Cindy Holder, David Britt.

18   Q.  And is Dave Middendorf on your January 4, 2016 email when

19   you said, "The full schedule and team assignments get finalized

20   internally at the PCAOB in March so we'll know a lot more

21   then?"

22   A.  Yes.

23   Q.  Did Dave Middendorf ever tell you not to share confidential

24   PCAOB information with him?

25   A.  No.

J2kdmid1                          Sweet - direct

1    Q.  All right.  Let's look at another example.

2            Did there come a time that you discussed with Bob Ross

3    the size of the PCAOB's banking group?

4    A.  Yes.

5    Q.  Approximately when was that?

6    A.  I don't -- I don't remember.  I believe it may have also

7    been in a subsequent conversation in January 2016, but I'm not

8    certain of the time.

9    Q.  Did you take notes of that conversation?

10   A.  I didn't take notes while I was having lunch with Bob, but

11   I remember going back, once I got back to the office after

12   lunch, and taking notes of it.

13   Q.  In sum and substance, what did he tell you?

14   A.  That the PCAOB was planning to double the size of its

15   banking inspection staff, meaning the number of inspectors that

16   had banking experience for the KPMG team, and that they were

17   going to double the number of banking associate directors for

18   the KPMG Inspection Team as well.

19   Q.  What did you do with that information, if anything?

20   A.  I remember going back to the office and sharing that

21   information with Tom Whittle, David Britt, Dave Middendorf.

22   Q.  What did you understand the significance of that

23   information to be for KPMG at the time that led you to share it

24   with them?

25   A.  The significance was that because Tom told me they were

J2kdmid1                                    Sweet - direct

1    going to double the size of the -- it was very significant

2    information because it clearly indicated that the PCAOB's

3    doubling the size of the inspection staff for KPMG that had

4    banking experience meant that they could do more banking

5    selections and also bigger banks.

6    Q.   How did Dave Middendorf, David Britt and Tom Whittle react

7    to this information?

8    A.   Again, very, very favorably.

9    Q.   In addition to these Bob Ross communications that you

10   testified about, did you have other similar conversations in

11   which you got similar information?

12   A.   Yes.

13   Q.   And what did you do in these circumstances typically?

14   A.   Typically the same thing.  I would go back and report it to

15   Tom Whittle, David Britt and Dave Middendorf.

16   Q.   And based on your conversations with them, did you have an

17   understanding of whether they wanted you to continue to get

18   this kind of information from the PCAOB?

19   A.   Yes.

20   Q.   What was your understanding?

21   A.   That even going back to my first week, that that was

22   something that was expected of me.  They wanted me to maintain

23   these relationships with my former colleagues at the PCAOB

24   because that was very unique for me, because I had worked at

25   the PCAOB and was now working in, you know, as a partner at

J2kdmid1                          Sweet - direct

1    KPMG and other people didn't have those same kind of close

2    personal relationships with PCAOB inspectors like that.

3    Q.  All right.  Let's turn to the events of January 9, 2017.

4            Please take a look at what's marked for identification

5    as Government Exhibit 1072.

6            Do you recognize this exhibit?

7    A.  Yes, I do.

8    Q.  How do you recognize it?

9    A.  I recognize this to be an email exchange between Cindy

10   Holder and myself on our KPMG email account.

11           MS. KRAMER:  The government offers Government Exhibit

12   1072.

13           THE COURT:  1072 is received.

14           (Government's Exhibit 1072 received in evidence)

15   BY MS. KRAMER:

16   Q.  All right.  What date did you have this email exchange with

17   Cindy Holder?

18   A.  January 9, 2017.

19   Q.  And who started the email exchange?

20   A.  Cindy did.

21   Q.  What did she write to you on January 9, 2017?

22   A.  She wrote to me in the subject line:  "Let me know when you

23   get back from lunch," with two exclamation points.

24   Q.  Was there anything in the body of her first email to you?

25   A.  No, just her signature line.

J2kdmid1                         Sweet - direct

1    Q.  How did you respond?

2    A.  I wrote by saying:  "Walking back now.  Going to grab a

3    Starbucks.  You want anything?"

4    Q.  OK.  And let's look on the first page.

5          What email did you send Cindy Holder when you were

6    back in your office on January 9th?

7    A.  I responded by saying:  "Just got back.  Swing by whenever

8    you are free to catch up (and would you mind if I borrowed your

9    Tide-stick?)"

10   Q.  What happened after you sent her that email?

11   A.  I remember her coming over to my office.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J2K5mid2                              Sweet - direct

1    BY MS. KRAMER:

2    Q.  What happened when Cynthia Holder got to your office on

3    January 9th, 2017?

4    A.  She told me that she had just spoken with Jeffrey Wada and

5    that Jeffrey Wada had given her information about PCAOB

6    inspectors, as well as a preliminary listing of who the PCAOB

7    was planning to inspect in 2017.

8    Q.  Did she specifically use Jeffrey Wada's name in that

9    conversation with you?

10   A.  Yes.

11   Q.  Let's go back for a moment to Government Exhibit 1072, in

12   evidence.  Do you recall what time of day you told her you had

13   just gotten back?

14           Can we look at the whole page, Mr. Urbanczyk?

15           So, looking in the bottom half of the first page, her

16   e-mail to you asking for a latte from Starbucks is Monday,

17   January 9th at 12:31 p.m.  Do you recall if you actually got

18   back to your office from Starbucks looking at the top e-mail at

19   5:45 p.m. or was it a different time of day?

20   A.  No.  That would be that same kind of Greenwich Mean Time so

21   I got back as soon as I got back to the office after lunch,

22   that's when I e-mailed her and said, okay, I'm back.  Swing by.

23   Q.  So, lunchtime is your recollection?

24   A.  Yes.  Just after I got back from lunch.

25   Q.  Okay, so let's go back to the conversation that you had

1    with Cindy Holder in your office.  What, if anything, did she

2    tell you about how Wada had gotten that information, to the

3    best of your memory?

4    A.   She told me that Jeff had gone in and accessed, in the

5    PCAOB's IIS system, the current version of what would have been

6    the 2017 GNF planning profile where the planning work was being

7    done and documented by the KPMG planning team, and had gone in

8    and looked at which ones were being recommended for inspection,

9    which ones had, like, the 1 ratings, which we looked at

10   yesterday.

11   Q.   What did you understand to be the significance of

12   engagements having a 1 rating next to them in the GNF planning

13   profile?

14   A.   A 1 rating indicated that it was an audit engagement that

15   the PCAOB was recommending for inspection and so it had a high

16   likelihood or very strong correlation to where the final

17   results would end up.

18   Q.   Did Cindy Holder tell you who those selections were that

19   Jeffrey Wada had shared with her from the IIS system at the

20   PCAOB?

21   A.   Yes, she did.

22   Q.   And before we get into who the selections were, what, if

23   anything, did Cynthia Holder tell you about what other topics

24   she and Jeffrey Wada discussed in their call?

25   A.   I remember her telling me that Jeff had -- Jeffrey Wada had

J2K5mid2                              Sweet – direct

1     just found out that he was not going to get promoted that year

2     to associate director, that there were -- that they were going

3     to make three promotions from inspection leaders to associate

4     director and that he was no. 4, so the first guy or first

5     person left out.  I remember her also sharing with me Jeff's

6     ratings that he had received kind of internally and performance

7     ratings, and then I remember she told me that Jeff had given

8     her this full list of inspectors that the PCAOB was going to

9     include in this brand-new group that it was identifying, that

10    it was creating.  It was referred to as this BIG which is the

11    Banking Inspections Group.

12    Q.  Do you know how long Jeffrey Wada had been trying to get

13    promoted at the PCAOB at that point?

14            MR. COOK:  Objection.  Speculation.  Foundation.

15            THE COURT:  Sustained.

16    BY MS. KRAMER:

17    Q.  Based on your experience at the PCAOB until April 2015 and

18    based on your conversations with Cynthia Holder, do you know

19    how long Jeffrey Wada had been trying to get promoted at the

20    PCAOB?

21            MR. COOK:  Objection.

22            THE COURT:  Sustained.

23    BY MS. KRAMER:

24    Q.  Let's take a look at what's marked for identification as

25    Government Exhibit 202.  Do you recognize this document?

J2K5mid2                              Sweet - direct

 1  A.  Yes, I do.

 2  Q.  How do you recognize it?

 3  A.  I recognize this to be a PCAOB internal e-mail sent from

 4  Helen Munter, on the PCAOB e-mail exchange, to inspectors.

 5  Q.  And what is the date of this e-mail?

 6  A.  Tuesday, March 3rd, 2015.

 7  Q.  Were you an employee of the PCAOB at that time?

 8  A.  Yes, I was.

 9  Q.  Were you a recipient of e-mails that were addressed to

10  "inspection staff - all?"

11  A.  Yes, I was.

12          MS. KRAMER:  The government offers Government Exhibit

13  202.

14          THE COURT:  202 received.

15          (Government's Exhibit 202 received in evidence)

16  BY MS. KRAMER:

17  Q.  What's the subject line of this e-mail from Helen Munter to

18  inspection staff - all, on March 3rd, 2015?

19  A.  It says promotion announcement - congratulations to all.

20  Q.  And when you were at the PCAOB in March 2015, what was

21  Jeffrey Wada's position?

22  A.  He was an inspections leader.

23  Q.  Could you look at Government Exhibit 202 at the list of

24  individuals being congratulated on promotions and let us know

25  if you see Jeffrey Wada's name on there?

1   A.  His name is not on this list.

2   Q.  Did you ever have any conversations with Cindy Holder about

3   things Jeffrey Wada told her about his desire to be promoted at

4   the PCAOB?

5   A.  Yes.

6   Q.  And what did she tell you about that?

7   A.  I remember Cindy saying that Jeff had wanted to leave the

8   PCAOB but that he wanted to wait until he had gotten promoted

9   to associate director so that when he left he could ideally go

10  into a partnership position at one of the firms.  So, he was

11  waiting to get promoted before he left.

12  Q.  So, turning back to the conversation that you had with

13  Cindy Holder on January 9th, 2017, when she told you that Jeff

14  Wada told her that he was no. 4 in line for a promotion and

15  they were only promoting three, did she tell you how he knew

16  what he said about how he knew that he was the next in line?

17  A.  Yes.

18  Q.  What did she tell you about that?

19  A.  That the associate director promotion decisions had been

20  made already at that point and so his performance manager had

21  let him know that he was not going to get promoted again that

22  year in 2017, so he would stay as an inspections leader for

23  another year.

24  Q.  Did Cindy Holder show you any documents in your office on

25  January 9th, 2017?

J2K5mid2                          Sweet – direct

1    A.  Yes.

2    Q.  What did she show you?

3    A.  She had her notebook with her and I remember she had taken

4    notes from her conversation with Jeffrey Wada and had used a

5    red pen.  And so, I remember her showing me those notes

6    including all the times of not only the pre-inspection list,

7    the names of the issuers that the PCAOB had been recommended as

8    a 1, but also the names of all the people in this Banking

9    Inspections Group.

10   Q.  How many pages of notes did she show you that day from her

11   conversation with Jeffrey Wada?

12   A.  I remember there being two pages of notes.

13   Q.  What categories of information were on each of those two

14   pages?

15   A.  So, the first page included information about Jeff's lack

16   of promotion that year and details about the promotion to AD,

17   and then also information about the specific inspectors that

18   PCAOB was putting into this Banking Inspections Group.  And

19   then the other category was the names of the specific issuers

20   that had been identified as a 1 or a likely inspection target

21   for 2017 for KPMG.

22   Q.  What, if anything, did you do with the page of notes that

23   had the identification of the PCAOB's inspection targets that

24   Wada had shared with Holder after getting them from the IIS

25   system?

J2K5mid2                          Sweet - direct

1   A.   I remember writing those names down and I may have taken a

2   picture of that, that page of notes with my phone.  I just

3   can't remember.

4   Q.   What did you copy the names of the inspections targets down

5   onto?

6   A.   I grabbed a, kind of a folder that was on my desk that was

7   easily accessible and remember writing it down, to the best of

8   my recollection, on that folder.

9   Q.   Take a look at what's marked for identification as

10  Government Exhibit 1444.  Do you recognize this exhibit?

11  A.   Yes.

12  Q.   How do you recognize it?

13  A.   I recognize this to be the photo that I took of the other

14  page of notes that Cindy had written down from her conversation

15  with Jeffrey Wada that day on January 9th.

16  Q.   And when you say the other page of notes, what do you mean?

17  A.   That the second page was the listing that included the kind

18  of advanced notice of the likely inspection targets, that that

19  was on the other page.  This is the page that has details about

20  Jeff's promotion and inspectors.

21           MS. KRAMER:  The government offers 1444.

22           MR. COOK:  May we be heard, your Honor?

23           THE COURT:  Yes.

24           (Continued next page)

25

J2K5mid2                              Sweet – direct

1          (At side bar)

2          MR. COOK:  We have no objection to the exhibit.  We

3     object to it being redacted in the way that it has been as

4     displayed on the screen.  We think the entire exhibit should be

5     in evidence.  The redacted portion is Brady material, it is

6     relevant, and there is no basis to have it removed.

7          THE COURT:  What's redacted?

8          MS. KRAMER:  What is redacted, your Honor, is Jeffrey

9     Wada's medical information.  He was having heart surgery after

10    the -- sort of after this time period.

11         MR. COOK:  During this time period, many of the

12    conversations Mr. Wada had with Ms. Holder were about this

13    serious heart condition that he had and not anything to do with

14    inspection lists, confidential information.  We intend to

15    elicit that in our case, that much of the conversation had

16    nothing to do with confidential information but related to his

17    health condition.  This is evidence of that.

18         THE COURT:  How is it Brady?

19         MR. COOK:  Because this is what they were talking

20    about, they weren't talking about confidential information, and

21    in particular when we get to the 2017 final list, that was the

22    subject of their conversation, that he was having open heart

23    surgery days after he supposedly gave the list.  That's why

24    they were talking for the length at which they communicated.

25         THE COURT:  But why is that relevant?

1           MR. COOK:  Because the government, I have no doubt, is

2      going to elicit or introduce evidence of phone conversations

3      between Mr. Wada and Ms. Holder that were very lengthy.  We are

4      going to introduce them if they don't.  The subject matter of

5      that conversation was this, not confidential information.

6           MR. WEDDLE:  Your Honor, can I add?

7           I mean, I assume that Ms. Kramer is going to show a

8      text message soon from Jeffrey Wada that says, in all caps, "we

9      need to talk," from this day.  I assume that the government is

10     either going to argue or the jury is going to be permitted to

11     infer that Jeffrey Wada -- on the top of Jeffrey Wada's mind on

12     January 9th was the updating and disclosure of inspection

13     lists.  This document says right on it, he's going to have an

14     angiogram through the wrist, he is meeting with his

15     cardiologist on January 13th.  That's critical information to

16     put into context what was going on at that time in his life and

17     how to properly interpret the text messages and the calls, both

18     the frequency and the content of those messages.

19          MS. KRAMER:  Okay.  So, a couple of things, your

20     Honor.

21          First, as relevant background, we had discussions with

22     defense counsel before the motion *in limine* deadline in which

23     we notified them that we thought the fact that Wada was having

24     some kind of surgery, we did not intend to preclude.  We

25     thought that the fact that he was having open heart surgery was

J2K5mid2                          Sweet - direct

designed to engender sympathy and not otherwise relevant.   It

could be major surgery but it doesn't need to be open heart

surgery.   Part of what the defense told us at the time was that

if we intended to put in the evidence of how Jeffrey Wada

didn't sort of refuse to comply with the internal

investigation, that they wanted to rebut that with this heart

surgery thing.   In other words, that if we wanted to put in

evidence that he sort of said I'm not going to participate in

this interview anymore, we can do it, we can continue it later

and then said never mind, it is too stressful, that they wanted

to refute that with evidence that his heart problems impacted

his finding that this was stressful.   We then told them that we

did not intend to put in that evidence.   So, I thought that the

particular issue of the fact that he had a heart problem was

resolved by that.   They certainly can ask or put in evidence.

        We understand that one of the things that they intend

to argue is that when Wada shared the grocery list, Cynthia

Holder later explained that Wada's cover story was that these

were about actual groceries because of his surgery.   So, we

understand they intend to argue that.   So, there is some amount

of the fact that he was having a surgery that we expect to come

into evidence, but the specific details of the fact that he had

heart surgery, it's (A) more prejudicial than probative because

of the sympathy that it is designed to engender; and second, if

offered by them, is hearsay in this document.

1              MR. COOK:  It's precisely the seriousness of the

2      health condition that makes it so relevant as to why they were

3      talking, why Cindy was anxious to talk to him about it, for

4      instance, this is something they discussed all the time.

5              THE COURT:  But I don't know how it is relevant other

6      than the length of the conversations and the exclamation point

7      in a text, perhaps.

8              MS. KRAMER:  One other thing I would add?

9              MR. WEDDLE:  They were talking about it.  It is

10     written down in the document.  They shouldn't be permitted to

11     offer the document in a sanitized form.  That's misleading the

12     jury.

13             THE COURT:  The government is offering the relevant

14     parts to the charges.

15             MR. WEDDLE:  Your Honor, they're sanitizing a piece of

16     paper.  It is a one-page document that comes from Brian Sweet's

17     phone.  It is a photograph that he took.  It is a critical

18     piece of evidence and it is misleading to try to sanitize it

19     and take out of it some of the context --

20             THE COURT:  To take out the irrelevant parts?

21             MR. WEDDLE:  Your Honor, it's the --

22             THE COURT:  Why is it relevant?

23             MR. WEDDLE:  It is a major purpose for which they were

24     speaking on that day.

25             THE COURT:  And if they also committed fraud in the

1      conversation, why is it relevant what the other parts were?

2                  MR. WEDDLE:  Because it lends context to all of the

3      other text messages, the purpose for which they were speaking.

4      It lays out some of the chronology of what was happening on

5      these critical days.

6                  THE COURT:  Can you put in the whole document?

7                  MS. MERMELSTEIN:  It is hearsay, your Honor.  It is

8      just hearsay.

9                  MS. KRAMER:  The fact that the -- go ahead.

10                 MS. MERMELSTEIN:  You go ahead.

11                 The fact that he had surgery, we don't contest, can

12     come in.  But it has to come in in a proper evidentiary form.

13     Mr. Sweet -- a photograph of what Cindy Holder wrote down to

14     prove that that was true is hearsay.  It can't come in in that

15     form.  There are certainly admissible ways it can come in.

16     This isn't one of them.

17                 MS. KRAMER:  Also, your Honor, this is other evidence

18     to -- this is classic evidence the defense intends to put in to

19     say, look, they had a conversation about something

20     non-criminal, therefore they didn't commit a crime and that's

21     not permissible.  That evidence is not admissible because the

22     fact that someone does something that is noncriminal together

23     doesn't in any way counter the fact that they also did

24     something criminal.  But, I also think that the sympathy that

25     is trying to be engendered by focusing on the specifics of a

J2K5mid2                          Sweet - direct

1    heart condition is improper.

2          MR. WEDDLE:  Your Honor, there is nothing unfair and

3    prejudicial about the facts of what we are going on.  It lends

4    credence to the interpretation of the events that they are very

5    serious.  We are not intending to argue anything about

6    sympathy.  It is what the document says and --

7          THE COURT:  How is that part of it not hearsay?

8          MR. WEDDLE:  Well, the first thing that I can think of

9    off the top of my head, your Honor, I think there are probably

10   other reasons why it is not hearsay, is what is described on

11   this piece of paper is a statement of intent so it's an intent

12   by Wada to attend a future appointment and he is describing his

13   future appointments:  I am going to the cardiologist on the

14   13th.  That's admissible under the state of mind exception to

15   the hearsay rule as a statement of intent to show that the

16   person who is going to carry through with that intent in the

17   future.  I can get your Honor a cite on that.

18         THE COURT:  What do you say to that, that it is an

19   exception to another exception to hearsay?

20         MS. MERMELSTEIN:  I don't think that that is a fair

21   characterization of the nature of the notes.  I separately

22   think that it's double hearsay.  Even if it were true that

23   Wada's own statement, *I am going to the cardiologist,* was a

24   statement of future intent, these are now notes that are Cindy

25   Holder's written record of what was said.  It has a whole other

J2K5mid2                              Sweet - direct

1    level of hearsay that can't be overcome even assuming the

2    underlying statement fits into the first exception which I am

3    not convinced it does.

4              THE COURT:  I am going to overrule the objection.  I

5    find it is hearsay and on the basis of 403 I just don't think

6    there is any relevance that's not substantially outweighed by

7    unfair prejudice.

8              MS. MERMELSTEIN:  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2K5mid2                          Sweet - direct

1            (In open court)

2            MS. KRAMER:  Your Honor, the government offers

3    Government Exhibit 1444.

4            THE COURT:  1444 received.

5            (Government's Exhibit 1444 received in evidence)

6    BY MS. KRAMER:

7    Q.  So, what are we looking at right now, Mr. Sweet, that is

8    Government Exhibit 1444?

9    A.  This is a photo that I took of Cindy Holder's notes from

10   her conversation with Jeffrey Wada on January 9th.

11   Q.  What's in the upper right-hand corner of this page?

12   A.  This is a reference to what I mentioned earlier about that

13   Jeff had found out that he was not going to get promoted to

14   associate director.

15   Q.  So, what is "taking 3, he's no. 4" a reference to?

16   A.  It meant that the PCAOB was taking three people to

17   associate director -- promoting three -- and that he was the

18   fourth person.

19   Q.  And what is the -- I'm not sure if we have all of it in the

20   picture, where it says distinguished EE, EE and then a bracket

21   "no promote."

22            What does that mean?

23            MR. COOK:  Objection.  Speculation.

24   Q.  Based on your conversation with Cindy Holder, did you have

25   an understanding of what that meant?

J2K5mid2                          Sweet - direct

1    A.  Yes.

2                MR. COOK:  Objection.  Foundation.

3                THE COURT:  Overruled.  He can testify to what she

4    told him.

5                THE WITNESS:  Yes, I understood what that meant.

6    BY MS. KRAMER:

7    Q.  Based on your conversation with Cindy Holder about what

8    Jeffrey Wada told her that day, what was your understanding of

9    what these notes meant?

10   A.  That in June she told me that Jeff had said -- had told her

11   that he had received a distinguished performance rating

12   internally at the PCAOB and then two EEs for Exceeds

13   Expectations, so very high marks at the PCAOB.  But, no promote

14   meant that despite those high performance ratings, he was still

15   not getting promoted.

16   Q.  And then, in the upper left-hand corner, did Cindy Holder

17   discuss with you anything about Middendorf and Thomas Whittle

18   and Bob Harcourt in relaying her conversation with Jeffrey

19   Wada?

20   A.  Yes.

21   Q.  What did she say about that?

22   A.  As I remember it, Bob Harcourt was a retired KPMG partner

23   that had been working on PCAOB inspections at the PCAOB -- they

24   had this retired partner program -- and that Bob Harcourt knew

25   Tom Whittle and was going to refer Jeff or recommend Jeff to

J2K5mid2                          Sweet - direct

1   Tom Whittle and then to David Middendorf.

2   Q.  Let's zoom out.  Generally speaking, what is on the bottom

3   half of the page, to your knowledge, based on your conversation

4   with Cynthia Holder where she relayed what Jeffrey Wada had

5   told her?

6   A.  Yes.

7            She had taken down notes and Jeffrey Wada had given

8   her all of the names of the PCAOB inspectors that were going to

9   be assigned to this new Banking Inspections Group.  So, at the

10  top would be the PCAOB's associate directors and then there is

11  names of specific PCAOB people, associate directors with

12  banking experience, and then the rest of the names are the

13  other PCAOB inspections staff, ILs referring to inspection

14  leader and then in parentheses to some of the names were what

15  she and Jeffrey Wada had talked about on specific people of who

16  was good or a friend of Jeffrey Wada, who had a similar humor

17  to Jeffrey Wada.

18  Q.  Did you make any efforts to delete this photo of the notes

19  that Holder took during her call with Jeffrey Wada on January

20  9th, 2017?

21  A.  Yes.

22  Q.  When did you try to delete those?

23  A.  In February of 2017 I became aware that KPMG was doing an

24  internal investigation into this matter and were going through

25  my notes, my e-mails, and my photos, and I deleted this.  This

J2K5mid2                        Sweet - direct

1    was one of the pictures I deleted.

2    Q.  Why did you delete this picture of the notes that Cindy

3    Holder took during her January 9th call with Jeffrey Wada?

4    A.  Because this was clearly confidential information and the

5    only way that anyone would -- that I would have known this

6    information was because it had come directly from the PCAOB and

7    so by having that on my phone, this photo on my phone was just

8    a clear indication that I had been made aware of this

9    confidential information.

10   Q.  Approximately how many names of KPMG clients who the PCAOB

11   was targeting for inspection did Cindy Holder tell you Jeffrey

12   Wada shared on January 9th, 2017?

13   A.  I don't remember the exact number but I believe it was

14   around 10, 12.

15   Q.  And you testified that you wrote them down on a manila

16   folder.  Why did you do that?

17   A.  It is kind of the one of the ways I retained information is

18   to write it down, visual like that.  So, the manila folder was

19   something that I had on my desk.

20   Q.  Why did you want to retain this information?

21   A.  Because the next step after learning it from Cindy was to

22   go share it with Thomas Whittle, David Britt, and David

23   Middendorf.

24   Q.  Let's take a look at what's marked for identification as

25   Government Exhibit 655.  Do you recognize this exhibit?

J2K5mid2                          Sweet - direct

1   A.  Yes, I do.

2   Q.  How do you recognize it?

3   A.  This is -- well, it is my handwriting, these are the notes

4   that I took including the notes from that, that conversation

5   with Cindy, the names that Jeffrey Wada provided on January

6   9th, 2017.

7               MS. KRAMER:  The government offers Government Exhibit

8   655.

9               MS. LESTER:  Objection.

10              THE COURT:  Did you say no objection or objection?

11              MS. LESTER:  Objection.

12              THE COURT:  What's the objection?

13              MS. LESTER:  Your Honor, I'm not sure what this is

14  being offered for.  The witness hasn't said he doesn't remember

15  the names that he wrote down.

16              MR. WEDDLE:  Your Honor, we also have an objection.

17  Hearsay.

18              MS. KRAMER:  Your Honor, the fact that it was made and

19  the effect on the listener.

20              THE COURT:  Objection is overruled.  655 is received.

21              (Government's Exhibit 655 received in evidence)

22  BY MS. KRAMER:

23  Q.  So, first, what does the "RJF" in the middle of this folder

24  stand for?

25  A.  It's the name of one of KPMG's banking audit clients.  It

J2K5mid2                        Sweet - direct

1   stands for Raymond James Financial.

2   Q.  Why did you write this information down on a Raymond James

3   Financial folder?

4   A.  In January of 2017 I was wrapping up some re-review work

5   that I was doing with Cindy Holder on Raymond James Financial.

6   Q.  What portion of Government Exhibit 655 that we are looking

7   at on the screen contains the list of the PCAOB's inspection

8   targets that Wada shared with Holder and that she relayed to

9   you in your office on January 9th, 2017?

10  A.  It is the information that's written in black on the

11  right-hand side of this folder, so underneath the, sort of on

12  the top right-hand side underneath the top 30 and then all the

13  way to that black line that's written.

14  Q.  Is that the section now that is zoomed in on between the

15  words "top 30" and the line under "BONY," B-O-N-Y?

16  A.  Yes.

17  Q.  When do you recall writing down these notes?

18  A.  To the best of my recollection, I wrote this down when

19  Cindy was sharing with me the names that Jeff had given to her

20  on January 9th.

21  Q.  And, on January 9th, 2017, what's your understanding about

22  whether any of these KPMG clients had been formally selected

23  for inspection by the PCAOB?

24  A.  I knew these to be, that this was totally confidential

25  information, that none of these had been notified, and because

1   my understanding was that these were all still live audits so

2   the audits were still in progress.

3   Q.  So, these audits had not yet even been completed?

4   A.  Yes.

5   Q.  Which KPMG clients did Cindy Holder tell you Jeffrey Wada

6   had shared with her on January 9th, 2017, looking at Government

7   Exhibit 655?

8   A.  So, starting from the top, Citigroup, Valero, Applied

9   Materials, Chartered Communication, Macy's; and then down in

10  kind of the next section with brackets, Lakeland, Midland

11  States, National Bank Holdings, and Heartland.

12  Q.  And what is your understanding of why your notes include

13  Home Depot, Synchrony, and Northern Trust?

14  A.  That those were, at that point, maybes by the PCAOB so

15  issuers that they were considering.  With Synchrony it is clear

16  that it says on list of next in, and I remember discussing

17  that, or down below not compelling compared to Citi but is only

18  top 30.  And so, it was kind of the next one in line for the

19  big banks.

20  Q.  Let's just look at the language that you were just

21  referencing.  So, in the brackets next Synchrony --

22  Mr. Urbanczyk could you highlight the brackets that says on

23  list of next in?  No, go back.  It gets too blurry when it is

24  that big.  Thank you.

25  A.  So in the middle of this list with the arrow across --

J2K5mid2                          Sweet - direct

1   Q.  So, in the highlighting now next to Synchrony -- what does

2   it say next to Synchrony before the brackets?

3   A.  Financial.  Synchrony Financial.

4   Q.  So F-I-N-A-N is abbreviation for financial?

5   A.  Yes.

6   Q.  And what did you understand "on list of next int" to mean?

7   A.  That it was on the PCAOB's planning list as being the next

8   in line to get picked.

9   Q.  Looking at the second entry in these notes under Citi, do

10  you see where it says "Wells" and that's crossed out?

11  A.  Yes.

12  Q.  And then the word "not" appears?

13  A.  Yes.

14  Q.  What is your understanding of that?

15  A.  That the PCAOB was not, or at least the planning inspection

16  team at PCAOB had determined that Wells Fargo should not be

17  inspected that year.

18  Q.  Next to the names of the KPMG clients, do you see

19  individual names in some cases and some other information?

20  A.  Yes.

21  Q.  Where did that information come from?

22  A.  I remember, after Cindy had given or shared this

23  information with me, that I had gone and pulled up the listing

24  of which engagement partners worked on the particular audits

25  and then also whether or not any of these had been subject to

J2K5mid2                          Sweet - direct

1    this national office monitoring or a national office monitoring

2    program, or were part of this Audit Quality Support Network

3    that was in the national office and leaving notes or putting

4    notes next to that.

5    Q.  Why did you take those notes down of that additional

6    information you looked up?

7    A.  I remembered in March of 2016 when Jeffrey Wada had shared

8    the first listing of the banks that were going to get picked by

9    the PCAOB in 2016 that one of the things that David Britt had

10   done before the, kind of the group call that I had with Thomas

11   Whittle, David Middendorf, and David Britt, is that he had gone

12   and looked up some information about these banking issuers and

13   particularly which partners were on them and which ones were

14   part of a support -- I'm sorry a monitoring program.  And so, I

15   was attempting to do the same before going and discussing this

16   with David Britt and Thomas Whittle.

17            MS. KRAMER:  Your Honor, I have just realized it is

18   actually after 11:00.  Is this a good breaking point for the

19   mid-morning break?

20            THE COURT:  Yes.  Why don't we take 10 minutes, folks.

21   Leave your pads on your chairs.  We will continue in 10

22   minutes.

23            (Continued on next page)

24

25

J2K5mid2                         Sweet – direct

1              (Jury not present)

2              THE COURT:  You may be seated.

3              You can step down.

4              (witness steps down)

5              MR. WEDDLE:  Your Honor, may I be heard with some

6      additional points regarding the documents we talked about when

7      the witness leaves?

8              THE COURT:  Yes.

9              MR. WEDDLE:  Your Honor, I just wanted to make a

10     record relating to the exhibit they were talking about which

11     the witness has identified as handwritten notes of Cynthia

12     Holder.  I think it is Government Exhibit 1404?

13             MS. KRAMER:  1444.

14             THE COURT:  1444.

15             MR. WEDDLE:  Thank you; which has been admitted in

16     redacted form.

17             As I said at the side bar, it is my view –– the

18     government said that the redacted portion, which relates to

19     Jeffrey Wada's health conditions that were taking place right

20     at that time of his doctor's appointments, are hearsay.

21     They're not hearsay because of the state of mind exception to

22     the hearsay rule.  In addition, your Honor, they're admissible

23     under Rule 106 which is the rule of completeness which requires

24     the admission of additional portions of a statement when

25     required to make the admitted portion not misleading.  I think

1   that it does make the document misleading to sanitize it and

2   redact from it some of the important information.

3           The prosecutor also offered or attempted to meet the

4   objection of both defendant to the admission of Brian Sweet's

5   handwritten notes by saying the fact that they were made.  If

6   that's a reason to admit Brian Sweet's handwritten notes then

7   it is equally a reason to admit Cynthia Holder's handwritten

8   notes and it overcomes the hearsay objection that was made at

9   the side bar by the prosecution.

10          Also, your Honor, I think that there is a deeper

11  hearsay problem with the redaction proposed by the government

12  and that is Cynthia Holder is not a witness at this trial.

13          Your Honor has admitted certain statements of Cynthia

14  Holder as subject to connection as co-conspirator statements

15  made in furtherance of a conspiracy.  We have written a

16  submission on this, we maintain our objection, and we don't --

17  we believe that at the end of the case the government will fail

18  in its burden of proving by evidence beyond the statements

19  themselves that there was any such conspiracy or that the

20  statements were made in furtherance of a conspiracy such that

21  they could be admitted against Mr. Wada.

22          If Cynthia Holder were a witness here, your Honor, she

23  would testify regarding what she was told by Jeffrey Wada.  To

24  the extent she had a failure of recollection, the government

25  might ask her to try to refresh her recollection with her

1    handwritten notes.  If that didn't work and she laid the

2    foundation for past recollection recorded, she might, under the

3    rules, be permitted to read from her notes but the notes

4    themselves would not be admitted in evidence.  The same would

5    be true of a law enforcement witness.  This happens all the

6    time.  Law enforcement witnesses are in meetings with witnesses

7    or targets, they take notes, they write reports, they testify

8    about what was said.

9              THE COURT:  But those aren't statements in furtherance

10   of a conspiracy and therefore within the hearsay exception for

11   that reason.

12             MR. WEDDLE:  I agree, your Honor, and I'm going to get

13   to that.  But, my point is that if it is a live witness they

14   don't simply admit their notes or their report of what was

15   said, they testify about what was said and they can use the

16   notes for certain purposes under the rules of evidence.  To

17   simply admit the notes, I believe, is an assertion by the

18   government, adopted by your Honor, that the taking of the notes

19   is a statement in furtherance of the conspiracy.  It's not

20   simply the conversation that is a statement in furtherance of

21   the conspiracy, it is the taking of notes and Cynthia Holder

22   took the notes for purposes of the conspiracy.  The writing

23   down is another hearsay act.  That's why law enforcement agents

24   don't simply admit their notes, they testify to their

25   recollection.  The writing down itself is a hearsay act, it is

J2K5mid2                         Sweet - direct

1    an out-of-court statement that needs its own basis to be

2    admitted.

3            So, what the government is doing by offering the notes

4    is saying that the writing down is a statement in furtherance

5    of the conspiracy and therefore the notes themselves are

6    admissible.

7            Well, your Honor, there is no way to parse that basis

8    for admission according to what is written down on the page.

9    If Cynthia Holder is taking notes in order to further the

10   conspiracy, then she's taking notes in order to further the

11   conspiracy and everything that she writes down is in

12   furtherance of that act, your Honor.

13           THE COURT:  I don't know why that follows at all.  I

14   don't know why a conversation that includes things about a

15   completely collateral, unrelated, personal topic would be in

16   furtherance of the conspiracy as well, just because it is part

17   of the same conversation.  If you say get me a Starbucks coffee

18   and then you go on to say things relating to the conspiracy,

19   that doesn't make the Starbucks coffee comment part of the in

20   furtherance of a conspiracy.

21           MR. WEDDLE:  Your Honor, the writing, the writing has

22   to be in furtherance of the conspiracy.  She chose to write it

23   down, she chose to show it to Brian Sweet, in furtherance of

24   the conspiracy.  That should not be sanitized in front of the

25   jury and it should not be parsed according to what somebody's

1      after-the-fact view is about why she wrote it down.  If she

2      wrote it down in furtherance of the conspiracy then it should

3      come in and if she didn't write it down in furtherance of the

4      conspiracy but simply said things in furtherance of the

5      conspiracy, then it shouldn't come in.

6              So, that's the record that I would like to make on

7      that exhibit, your Honor, but I would also like to make another

8      point which is I believe that it's not proper questioning to

9      say based on your conversations with Cynthia Holder, what does

10     this page of Cynthia Holder's notes mean or what is your

11     understanding of what it means.  His understanding of what it

12     means is not relevant or helpful to the jury.

13             THE COURT:  But he said based on his conversation

14     about the notes with Cynthia Holder, another level of

15     statements in furtherance of the conspiracy.

16             MR. WEDDLE:  What he should be asked is what did she

17     say about this and he should testify about what she said.  He

18     shouldn't be allowed to say based on unidentified and undefined

19     conversations that I had with Cynthia Holder, this is what my

20     understanding of her notes are where he is clearly just looking

21     at the page and interpreting them for the jury which is

22     prejudicial, barred by the hearsay rule, lacks a proper

23     foundation, and is barred by the rule regarding lay opinion

24     testimony, your Honor, because it is not helpful to the jury

25     for him to simply interpret notes that are in evidence under

J2K5mid2                          Sweet – direct

1    the guise of some amorphous body of undefined and unarticulated

2    conversations that he had with Cynthia Holder.

3                THE COURT:  Would you like to respond?

4                MS. KRAMER:  Yes.  Briefly, your Honor.

5                I think there is a more than ample foundation here for

6    the witness' testimony about that.  He gave testimony before

7    the notes were even in front of him about what Cynthia Holder

8    told him.  He is a co-conspirator.  It is certainly appropriate

9    to ask him what he understood something to mean in a

10   conversation he participated in.

11               Holder, as the evidence made clear said, *call me as*

12   *soon as you are back*, many exclamation points, and took the

13   notes to Brian Sweet's office to show him to talk to him about

14   it.  This is all in furtherance of the conspiracy.  I think

15   that the -- I don't know if your Honor needs to hear more on

16   this.

17               THE COURT:  I guess the one question I will ask you is

18   if the taking of the notes was an act that was in furtherance

19   of the conspiracy, why shouldn't the jury also see the notes?

20   She had some reason to write down the unrelated medical-related

21   issues and you have redacted them.  It is a very small part of

22   the document.  She had some reason to write that down.  If the

23   whole thing was in furtherance of the conspiracy why shouldn't

24   that come in as well, either for rule of completeness or for

25   that all being arguably part of the conspiracy?

J2K5mid2                          Sweet - direct

1              MS. KRAMER:  So, I think the fact that Jeffrey Wada

2    told her that he was having an angiogram on a certain date was

3    not a statement that was made in furtherance of the conspiracy.

4    It was like your Honor's Starbucks example and nothing about

5    the rule of completeness calls for that to be put before the

6    jury.

7              The only portion of a document that should be put

8    before the jury in a context like this under the rule of

9    completeness is where if, in fairness, it ought to be

10   considered statement.  So, if it actually gives context.

11   Right?

12             So, if we had redacted something that was necessary to

13   explain the admitted evidence, something about the substance

14   here, not a completely unrelated collateral matter that has to

15   do with the defendant's specific health.  I remain totally

16   befuddled by the argument that the fact that Jeffrey Wada had a

17   heart problem is relevant in any way to the case.  We have

18   agreed with defense counsel that they can put before the jury

19   the fact that he was having some kind of major surgery around

20   the time of this because we understand it is a defense they

21   want to raise that the grocery list code word was actually

22   about groceries because of the fact that he was having this.

23   The specific fact that it was a heart problem I still have not

24   heard any proffer from Wada's defense counsel about why that is

25   relevant and not purely designed to engender sympathy which is

1    in contradiction with a specific instruction your Honor will

2    give the jury.  It is irrelevant and collateral and that's why

3    it has been redacted and should stay redacted.

4              MR. WEDDLE:  Your Honor, I don't want to belabor the

5    record but I do want our objection to be very clear in the

6    record.

7              THE COURT:  Okay.

8              MR. WEDDLE:  Mr. Cook thinks that I may not have been

9    clear enough in my position that either the entire document

10   should be in evidence or the entire document should not be in

11   evidence.

12             Our objection is to admit it in the way that it is

13   admitted with redacted portions -- with portions redacted.  So,

14   either the entire document should not be in evidence or an

15   unredacted document should be in evidence.

16             If I could, so that's making the record regarding my

17   objection.

18             THE COURT:  On that issue you have made your record

19   clear.  My ruling stands.

20             MR. WEDDLE:  The events of January-February 2017 are

21   critical to this case.  They're not academically critical.

22   Jeffrey Wada had heart surgery on February 7th and was in the

23   ICU, I believe, for two days.  He was going to doctors

24   throughout this time period.  I think that he had an

25   appointment either on the 9th or 10th of January for this

J2K5mid2                          Sweet - direct

1    angiogram to find out what was going on with his heart.  He had

2    a follow-up appointment with his cardiologist on the 13th.  Not

3    only are the days and the activities of people day-to-day in

4    this time period critically important to the case, but the

5    hours and the minutes are critically important to this case.

6              We are not seeking to elicit any of this for sympathy.

7    Thank God Jeffrey Wada is fine.  He was cured with the surgery

8    but it is deeply prejudicial.

9              THE COURT:  What is the relevance?

10             MR. WEDDLE:  It is relevant because it talks about

11   what he is doing on particular days.  It's relevant because

12   Cynthia Holder, he thought was a close friend of his and he

13   talked to her regularly about his health conditions.  Part of

14   the reason for that is because Cynthia Holder had recently gone

15   through a situation, I believe, with someone in her family

16   related to a health condition.  Part of the reason is that it

17   is bound up with his decision-making about how interested he

18   was in leaving the PCAOB for other employment.  I anticipate

19   that the government is going to present evidence that on

20   January 10th or in the nighttime between January 9th and 10th,

21   Jeffrey Wada sent his résumé to Cynthia Holder.

22             The government's theory is that he sent his résumé

23   because that was the payback for the confidential information

24   that he talked about on the 9th.  We are entitled to rebut

25   that.  We should not be handcuffed in rebutting this.  The

1    facts of what happened are true.  What is true is that he was

2    fighting and facing a life-threatening heart condition.  He was

3    going to doctors' appointments.  It entered into his thinking

4    in terms of what his future plans were.  It is a completely

5    valid argument and a perfectly proper method of attacking the

6    government's attempt to prove beyond a reasonable doubt that he

7    was doing these things as part of a conspiracy that he was

8    seeking employment solely as part of a conspiracy.

9            THE COURT:  But that makes him more motivated to get a

10   job at KPMG.  I don't see how that is helpful.  I just don't

11   get the --

12           MR. WEDDLE:  Your Honor, it is *res gestae*.  It is what

13   happened.

14           They should not be able to sanitize the facts of what

15   took place in a critical five-week period of time when there is

16   phone calls and text messages that they're going to interpret

17   as being, expressing a sense of urgency because of the need for

18   Jeffrey Wada to convey inspection lists in order to help a

19   bunch of people at KPMG who are perfect strangers to him.

20           It is deeply prejudicial, your Honor, to keep that

21   information out.  We are not offering it for an improper

22   purpose and there is no chance that the jury is going to be

23   confused into thinking we are offering it for an improper

24   purpose.  When we say he is going to this doctor's appointment

25   or this thing is recording the fact that he has an angiogram on

1    the 9th which involves a procedure through his wrist and a

2    follow-up appointment with his cardiologist, an appointment on

3    the 13th, it is to show what was going on between him and

4    Cynthia Holder, she is not a witness in the case, and it is

5    deeply unfair to Jeffrey Wada's defense to try to sanitize the

6    facts and present a portion of them to the jury.

7               THE COURT:  Did you want to add anything?

8               MS. KRAMER:  I just want to make clear the government

9    does not want to hamstring the defense which is why we have

10   been abundantly clear that we won't object to evidence of some

11   kind of medical procedure he is having.  There still has not

12   been a proffer about why the specific nature of his health

13   condition is in any way relevant.

14              THE COURT:  I still don't see why it is an exception

15   to hearsay.  I don't see how it comes in under 403 and I don't

16   see why the government should be forced to include evidence

17   that it doesn't think is part of the conspiracy.

18              Ms. Lester?

19              MS. LESTER:  Your Honor, I wanted to address

20   Government Exhibit 655, to which we and Mr. Wada's counsel

21   objected, and the government asked that it be admitted for the

22   fact that it was made and the effect on the listener which is

23   an exception to the hearsay rule, which means that it

24   wouldn't -- my understanding is that it means the government

25   wouldn't be offering it for its truth.  But then Ms. Kramer

J2K5mid2                          Sweet – direct

1    proceeded to ask the witness questions about the names of the

2    issuers listed on the document in a way that she was relying on

3    the document as the truth.

4            So, we either think the Court should give a limiting

5    instruction as to the purpose for which the document can be

6    considered, or that testimony should be stricken.

7            MS. KRAMER:  Your Honor, to be clear, Government

8    Exhibit 655 is admissible also as a statement in furtherance of

9    the conspiracy so it can be considered for its truth, as well

10   as for the fact that it was made that the statements that are

11   reflected in it were made, and for the effect on the listener.

12           THE COURT:  But can it be, if it is a statement made

13   in furtherance of the conspiracy it can be for the truth?

14           MS. KRAMER:  Yes, your Honor.

15           THE COURT:  I agree.

16           We will see you in about five minutes.

17           MS. KRAMER:  Thank you, your Honor.

18           (recess)

19

20

21

22

23

24

25

J2kdmid3                              Sweet - direct

1           (Jury present)

2           THE COURT:  You can be seated.

3           All right.  We will go until about 1 o'clock and then

4    we will break for an hour lunch.

5           Ms. Kramer, you may proceed.

6           MS. KRAMER:  Thank you, your Honor.

7           May I proceed?

8           THE COURT:  Yes.

9           MS. KRAMER:  Thank you, your Honor.

10   BY MS. KRAMER:

11   Q.  All right.  Taking a look at what's in evidence as

12   Government Exhibit 655, and let's focus on the upper right-hand

13   portion.

14           What, if anything, did Cindy Holder share with you on

15   January 9, 2017, about Macy*s from her conversation with Jeff

16   Wada?

17   A.  For Macy*s, she also shared with me that Jeff had -- Jeff

18   Wada had provided to her some of the specific rationale for why

19   the PCAOB was considering picking Macy*s.

20   Q.  Do your notes reflect the rationale for Macy*s?

21   A.  No.

22   Q.  Do you remember any about what Cindy Holder told you about

23   the rationale for the PCAOB selection of Macy*s based on her

24   conversation that day with Jeff Wada?

25   A.  Yes.

J2kdmid3                              Sweet - direct

1   Q.   What do you recall?

2   A.   That part of the reason why Macy*s was being considered by

3   the PCAOB for inspection was because it had announced --

4   recently announced that it was going to close 5,000 of its

5   stores and that resulted in audit risk about its ability to

6   continue as a company.  And then also because Dave Middendorf

7   was the engagement quality review partner, in that concurring

8   review partner role on Macy*s and because of his specific

9   leadership position, that that was one of the factors as well.

10  Q.   What does it mean to be the concurring review partner or

11  the engagement quality review partner, as you described it?

12  A.   That's a role that's required.  It is a second partner that

13  will review the work and sign off on the audit before the

14  opinion can be issued by the firm, kind of a second, like,

15  quality check that's in place.

16  Q.   After Cindy Holder shared the list with you that she said

17  she had gotten from Jeff Wada on January 9, 2017, what did you

18  do next?

19  A.   I then went with Cindy and we went into Tom Whittle's

20  office to share this information with Tom Whittle.

21  Q.   What happened in the meeting with Tom Whittle?

22  A.   We -- I remember Cindy and I sitting at Tom Whittle's desk.

23  Cindy had brought her notes.  And we both told Tom Whittle that

24  I received a call from a former colleague at the PCAOB and that

25  he had provided advance notice on who was likely to get picked

J2kdmid3                           Sweet - direct

1   by the PCAOB for its inspections of KPMG in 2017.

2   Q.  Did you and Cindy Holder provide Tom Whittle with the names

3   of the KPMG audit clients that Jeff Wada had given to Cindy

4   Holder that day?

5   A.  Yes.

6   Q.  And what, if anything, was discussed in the meeting with

7   Tom Whittle about the rationale for the Macy*s pick?

8   A.  I remember we discussed that specifically with Tom.  We

9   shared with him that information that Jeff Wada had provided to

10  Cindy.

11  Q.  How did the meeting with Tom Whittle end on January 9,

12  2017?

13  A.  I told Tom that I was going to go speak with David Britt

14  because I wanted to give David Britt a heads, up and Tom

15  indicated that he would speak with Dave Middendorf and share

16  the information with him.

17  Q.  What happened next?

18  A.  I remember also discussing with Tom that since CitiGroup

19  was on the list, that because it was likely to get picked then

20  by the PCAOB and was such a large audit engagement, that I had

21  been supporting it in its audit quality support network role

22  and that I wouldn't be able to get through all of the work --

23  be able to review all of the work, and so Cindy asked Tom

24  whether or not he would permit her to also work on CitiGroup as

25  they were going through and trying to finalize their audit

J2kdmid3                          Sweet - direct

1    work.

2    Q.   OK.   How did he respond?

3    A.   He responded by telling Cindy she could, that she would be

4    happy for Cindy -- that he would be happy for Cindy to help out

5    with the CitiGroup audit, and also that I should reach out to

6    Mike Tucker, who was another former PCAOB employee that KPMG

7    had hired into the national office, and so that we could all

8    work on CitiGroup together.

9    Q.   What happened next?

10   A.   I remember leaving Tom's office with Cindy going back into

11   my office, which is when I took the picture of the notes, you

12   know, Cindy's red notebook, the red pen, on my phone.

13   Q.   Where did you go next?

14   A.   I went to David Britt's office.

15   Q.   Was he available when you went to his office?

16   A.   No.   I remember David Britt had the door shut and he was on

17   the phone, and so I remember looking in the glass window.   He

18   kind of waved at me and gave me like the five-minute sign that

19   he would come grab me when he was done.

20   Q.   Who was the next person that you spoke with?

21   A.   Jen Lauer.

22   Q.   What was her role at the time?

23   A.   I can't remember her title but I think she was a managing

24   director.   But she reported directly to David Britt in the

25   Banking Audit Group within the national office.

J2kdmid3                          Sweet - direct

Q.  And what, if anything, did you tell her?

A.  She came by my office and said, "Hey, David said you want
to speak."  And I said, "Yep.  We got a heads up of who the
PCAOB may be inspecting for 2017."  And I shared with her the
list that Cindy had provided.

Q.  Why did you feel comfortable telling Jen Lauer this
information?

A.  Jen had been part of the rereview, the stealth rereview
team, from March of 2016, and I believed that she had been
brought into the circle of trust, that she had been aware of
the real reason why we had done the reviews in 2016.

Q.  Did there come a time that day when you spoke with David
Britt?

A.  Yes.

Q.  Approximately when was that?

A.  Later on that evening.  I don't remember the exact time but
it was in the evening.

Q.  Where did you speak with David Britt?

A.  In my office.

Q.  When he showed up, were you alone or was anyone else there?

A.  Tom Whittle was in my office.

Q.  Had Tom showed up in your office unannounced, or had you
made a plan to meet?

A.  He had shown up unannounced.

Q.  Let's talk about your meeting with Tom Whittle before David

1   Britt arrived.

2              What did Dom Whittle tell you in your office that

3   evening on January 9th?

4   A.   He told me that he had spoken with Dave Middendorf and had

5   shared the information that Jeff Wada provided with Cindy that

6   we had just shared with Tom earlier that day and specifically

7   the names of who the PCAOB was likely to inspect, and had --

8   that they had worked out kind of an action plan as to who to

9   notify and what to do in response to this knowledge of some of

10  at least the biggest issuers that were on that list.

11  Q.   What, if anything, did you understand their action plan to

12  be with respect to the Macy*s audit based on what Tom Whittle

13  told you?

14  A.   Tom indicated that they had decided to have Joe Lynch, who

15  was another PCAOB colleague that KPMG had hired into the

16  national office, and that Dave Middendorf had indicated that

17  Joe had already been out to Macy*s and had given I think a

18  presentation to the Engagement Team, and that Dave was going to

19  have Joe Lynch come back out to help out the Audit Engagement

20  Team as they finalized their year-end audit.

21  Q.   What was the status of the Macy*s audit as of May 9th --

22  sorry.  Withdrawn.

23             What was the status of the Macy*s office as a --

24  withdrawn.

25             What was the status of the Macy*s audit as of

J2kdmid3                        Sweet – direct

1    January 9, 2017?

2    A.  It was still a live audit, so the audit was still in

3    progress.

4    Q.  And what does that mean about whether new procedures

5    performed have to be specially documented?

6    A.  Because the audit was still in progress, any new procedures

7    could be added without any special documentation.

8    Q.  Did Tom Whittle tell you anything else before David Britt

9    showed up in your office the evening of January 9th?

10   A.  Yes.

11   Q.  What else do you remember him saying?

12   A.  We also talked through some of the other large KPMG clients

13   that were on that listing and what the plan was going to be,

14   who specifically was going to get involved from the national

15   office to support those other audits as well.

16   Q.  And when you refer to "that listing," are you referring to

17   the list that Cindy Holder gave you that she said she had

18   gotten from Jeff Wada?

19   A.  Yes.

20   Q.  Do you remember specifically discussing any particular KPMG

21   engagement on that list that Wada shared?

22   A.  Yes.

23   Q.  Which ones do you recall discussing?

24   A.  I remember we also discussed Valero and that Tom was going

25   to ask Scott Henderson, who was another PCAOB employee that

J2kdmid3                         Sweet - direct

1    KPMG had hired into a partner role, and I remember him saying

2    that Scott Henderson owed him one so he was going to have Scott

3    Henderson help out with the Valero Engagement Team, and also

4    that Hector Santana was going to be asked to help out with the

5    Charter Communications -- the Charter Communications audit.

6    Hector was another partner that KPMG had hired from the PCAOB

7    and was based -- was commuting back and forth from the same

8    geographical area.  And then lastly that Tom was also going to

9    speak with Craig Black, who was -- had worked that summer for

10   Tom Whittle in the National Office Inspections Group and was

11   the -- I believe he was the EQCR on applied materials.

12   Q.  Were you given any specific directions by Tom Whittle

13   before David Britt showed up?

14   A.  Because I was serving as the AQSN for CitiGroup, we had

15   talked about me speaking with the lead audit partner of

16   CitiGroup and letting him know of the likely PCAOB inspection.

17   And I believe we again discussed having Cindy and Mike Tucker

18   support the -- from the national office perspective the audit

19   of CitiGroup.

20   Q.  What does it mean to be the AQSN on Citi?

21   A.  It was a specialist role that the national office had

22   created.  One of the other kind of quality initiatives that

23   they were putting together was this audit quality support

24   network, so specialist partners with really a good auditing

25   skill set to get involved on certain engagements to, similar to

J2kdmid3                          Sweet - direct

1    the monitoring programs, help ensure that the audit work that

2    they were doing was high quality work.

3    Q.  OK.  And what did that have to do with you being asked to

4    speak with the engagement partner on Citi?

5    A.  So, because I had been assigned as this audit AQSN audit

6    network partner on CitiGroup, that I was already very engaged

7    at that point in the year with Citi's audit.  I had been

8    working with them for quite awhile.  So I had been working very

9    close with Citigroup's lead audit partner, and so it just made

10   sense for me then to give him a heads up of the likelihood of

11   PCAOB inspections.

12   Q.  Who was Citi's lead audit partner at that time?

13   A.  Paul Tupper.

14   Q.  And did you have an understanding, based on what Tom

15   Whittle told you in this conversation in your office on

16   January 9th, about whether these directives were Tom Whittle's

17   alone?

18   A.  No.  My understanding was that this is what he and Dave

19   Middendorf had discussed following mine and Cindy's meeting

20   with Tom Whittle.

21   Q.  All right.  After David Britt came to your office and

22   joined the conversation, what was discussed?

23   A.  We talked through each of the names of the KPMG audit

24   clients that, again, Cindy had received from Jeff Wada,

25   including the action plan that had been decided for these big

J2kdmid3                         Sweet - direct

1    clients.  We also talked about the banks that were on the

2    listing, since David was very involved in those bank audits in

3    his role as the co-banking leader.

4    Q.  What, if anything, did you say in that meeting about the

5    status of the PCAOB's selections for inspection as of

6    January 9, 2017?

7    A.  I remember telling them both that from my experience this

8    was -- the beginning of January was still fairly early in the

9    PCAOB's planning cycle and that from my experience that the

10   names of the specific inspections weren't finalized by the

11   PCAOB until February, and so I wanted them to be aware that

12   there could be changes made to these names.  And so if they

13   didn't end up ultimately getting picked by the PCAOB, that

14   there was a chance that that could happen.

15   Q.  What, if anything, did Tom Whittle say in response?

16   A.  I remember Tom saying, after I said that, that, "Well,

17   Brian, we're going to get the list again, right?"

18   Q.  What did you understand him to be asking when he said,

19   "brian, we're going to get the list again, right?"

20   A.  That he was confirming with me the expectation that we were

21   going to get the final listing of inspections once it had been

22   concluded by the PCAOB in the same way that we had in March of

23   2016.

24   Q.  And did Tom Whittle ask you that in front of David Britt?

25   A.  Yes.

J2kdmid3                          Sweet - direct

1  Q.  How did you respond?

2  A.  I remember shrugging my shoulders and saying, "I guess so."

3  Q.  Aside from notifying Paul Tupper about Citi and doing some

4  extra work on Citi, what, if anything, were you asked to do on

5  January 9th?

6  A.  Tom Whittle also asked me to update the previous bank

7  predictions list that I had created with Citi -- excuse me,

8  with Cindy Holder and to add the four additional names that

9  Jeffrey Wada had provided on this listing into that bank

10  screening analysis.

11  Q.  Was David Britt present when Tom Whittle gave you that

12  direction?

13  A.  Yes.

14  Q.  Did you have an understanding of why you were being asked

15  to add those four names that had come from Jeff Wada that day

16  to the prediction list you had previously put together?

17  A.  So that it would really camouflage any actions that the

18  national office decided to take in response to knowing these

19  four names from Jeff Wada and have kind of a plausible reason

20  for why, make it seem like it had just been based on our own

21  prediction and not really that it had come from Jeff Wada.

22  Q.  How did that meeting end?

23  A.  I remember Tom Whittle also saying to both David Britt and

24  I that we had to keep this information totally confidential,

25  that we could not tell anyone that we had received this

J2kdmid3                         Sweet - direct

1    information, again, from this former colleague at the PCAOB.

2    Q.  After your meeting with Whittle and Britt on January 9th in

3    which you were asked if you were going to get the list again,

4    did you have any conversations with anyone about that?

5    A.  Yes.

6    Q.  Who?

7    A.  I remember telling Cindy Holder that and debriefing her on

8    my conversation with Tom Whittle and David Britt that night.

9    Q.  Why did you tell Cindy Holder about that conversation?

10   A.  Because it was clear that Tom's expectation was that we

11   would get the 2017 list again, and Cindy had been receiving

12   that, this advance issue or notice, from Jeff Wada, because she

13   was the go-between, Jeff Wada that wanted her to know what Tom

14   had said.

15   Q.  What was your expectation, if any, about what Holder would

16   do when you told her that that's what Tom had said?

17   A.  That she would use that direction and then go and get the

18   final list of issuers from Jeff once the list had been

19   finalized.

20   Q.  All right.  Let's take a look at what's marked for

21   identification as Government Exhibit 1073.

22            Do you recognize this exhibit?

23   A.  Yes, I do.

24   Q.  How do you recognize this exhibit?

25   A.  I recognize this to be an email that Cindy had forwarded to

J2kdmid3                          Sweet - direct

1    me on January 10, 2017.

2               MS. KRAMER:  The government -- sorry.

3    A.  I was just going to say on my KPMG email account.

4               MS. KRAMER:  OK.  The government offers Government

5    Exhibit 1073.

6               THE COURT:  1073 is received.

7               (Government's Exhibit 1073 received in evidence)

8    BY MS. KRAMER:

9    Q.  All right.  Let's look at this first email in this chain.

10              OK.  So it starts at the bottom of page 1 of

11   Government Exhibit 1073 and continues onto the next page.

12              Who is this email from?

13   A.  This email is from Jeff Wada.

14   Q.  At what email address?

15   A.  Jeff.Wada@gmail.com.

16   Q.  To whom is it addressed?

17   A.  To Cindy Holder.

18   Q.  At what email address?

19   A.  Cindy's personal email, cholder21@aol.com.

20   Q.  What is the subject line of the email?

21   A.  "Résumé attached."

22   Q.  And what time and date is on this email?

23   A.  It is dated January 10, 2017, at 12:55 a.m.

24   Q.  So essentially the night of January 9th, 2017?

25   A.  Yes.

J2kdmid3                          Sweet - direct

1  Q.  All right.  Let's look at the body of the email.

2            Could you read the first paragraph.

3  A.  "Cindy, good evening.  You are still the only person I know

4  who still uses AOL LOL.  Please see the attached résumé.  I

5  have provided you both a Word version and a pdf version for

6  your reference.  The formating may be a bit tricky so if you

7  have any changes you want me to process, please let me know and

8  I will be happy to update it for you."

9  Q.  All right.  And let's look at the third paragraph.

10           Starting in the third line of the third paragraph,

11 could you read the sentence that begins with "I don't toot my

12 own horn?"

13 A.  "I don't toot my own horn about this at the PCAOB because

14 it doesn't prove anything here other than that you are a petty,

15 insecure, small human being; however, seeing as I am now trying

16 to sell myself to KPMG, I was thinking that I would like to

17 make sure that I stress these aspects of my work history

18 because I think it sets me apart from others - what do you

19 think?

20 Q.  All right.  And let's look at the fourth line from the

21 bottom.  Could you read the sentences beginning with "It's

22 funny how?"

23 A.  "It's funny how I was on the fast track to partner and

24 clearly recognized for my talents at Deloitte and then I ended

25 up at this effin place with all the BS politicking that I loath

J2kdmid3                          Sweet – direct

1    and now I can't get a GD promotion to save my life just because

2    I refuse to kiss people's asses and spread the political

3    rhetoric.  God, this place sucks."

4    Q.  All right.  Let's look at the P.S.

5            So, actually, how is the email -- how is the email

6    signed off on, the last line, and then the signature block?

7    A.  It says, "Please let me know what else you need from me.

8    Thank you, Jeff."

9    Q.  And let's look at the P.S.

10           Could you read the first three sentences?

11   A.  "P.S. By the way, will you be asking around the firm to

12   find out the partners' views of those I had inspected?  If so,

13   is there a way you can also get the thoughts of the partners at

14   KPMG AZSA?  I can give you a list of names of the partners I

15   inspected over there in Tokyo.  One of the senior partners on

16   the Honda Engagement Team really liked my style and respected

17   my approach."

18   Q.  What's your understanding about what role Jeff Wada played

19   in a KPMG Tokyo inspection?

20   A.  I knew that KPMG was the overall team lead for a KPMG Japan

21   inspection that occurred that prior December, January and

22   February of 2016.

23   Q.  Who was the overall team lead for that KPMG Japan

24   inspection?

25   A.  It was Jeff Wada.

J2kdmid3                          Sweet - direct

1    Q.  And that was when he was employed where?

2    A.  At the PCAOB.

3    Q.  All right.  Let's take a look at the résumé that was

4    attached to this email.

5            Whose résumé is this?

6    A.  This is Jeff Wada's résumé.

7    Q.  And what's the phone number at the top of the résumé?

8    A.  (714) 206-2356.

9    Q.  What is the email arrest on his résumé?

10   A.  Jeff.wada@gmail.com.

11   Q.  Was this résumé and email forwarded to you?

12   A.  Yes.

13   Q.  All right.  Let's look at those emails.

14           So in the bottom half of the first page of Government

15   Exhibit 1073, do you see header information above the subject

16   line "FWD:  Résumé attached?"

17   A.  Yes.

18   Q.  And who is that being sent from and to?

19   A.  Cindy Holder is sending this from her personal AOL account

20   to her KPMG work email account.

21   Q.  And let's look at the email above that one.

22           Who is this email being sent from and to?

23   A.  Cindy then sent it from her KPMG email account to me at my

24   KPMG work email account.

25   Q.  Is there anything in the body of the email from Cindy

J2kdmid3                              Sweet – direct

1   Holder to you?

2   A.  No.

3   Q.  Did you have an understanding when you received this of why

4   it was being sent to you?

5   A.  Yes.

6   Q.  What was your understanding?

7   A.  That Jeff wanted to apply for a job at KPMG and before he

8   did that he wanted both Cindy and I to review his résumé to see

9   if there is anything that he needed to change that could help

10  strengthen his résumé.

11  Q.  Did you look over Jeff Wada's résumé?

12  A.  Yes.

13  Q.  Did you provide comments?

14  A.  Yes.

15  Q.  Why?

16  A.  It was something that I had done for other people on

17  résumés, but ultimately it was because Jeff had -- that was the

18  reason that Jeff was sending his résumé was so that we could

19  provide feedback, and by me giving him feedback on his résumé

20  would continue to encourage the behavior.

21  Q.  What behavior did you want to encourage?

22  A.  The sharing of confidential stolen PCAOB information.

23  Q.  Let's take a look at what's marked for identification as

24  Government Exhibit 1079.

25          Do you recognize this document?

J2kdmid3                          Sweet – direct

1    A.  Yes.

2    Q.  How do you recognize it?

3    A.  This is an email that I sent to Cindy on my KPMG email

4    account.

5    Q.  On what date?

6    A.  On Monday, January 30, 2017.

7            MS. KRAMER:  The government offers Government Exhibit

8    1079.

9            THE COURT:  Received.

10           (Government's Exhibit 1079 received in evidence)

11   BY MS. KRAMER:

12   Q.  All right.  Let's look at the email from you to Cindy

13   Holder at the bottom of the first page of Government Exhibit

14   1079, in evidence.

15           First, what is the subject line of this email?

16   A.  It is "Résumé – J Wada."

17   Q.  What are the first two lines that you wrote to Cindy in

18   this email?

19   A.  I wrote:  "Cindy – Jeff's résumé looks extremely strong to

20   me.  What a solid background and I can't wait to get him on

21   board.  I've attached" --

22   Q.  Sorry.  Why did you write that?

23   A.  Because I knew that Cindy would take my feedback on his

24   résumé and whatever I wrote and forward that directly to Jeff

25   Wada.

J2kdmid3                          Sweet - direct

1  Q.  Did you actually feel positive about the prospect of Jeff

2  Wada leaving the PCAOB and joining KPMG?

3  A.  No, I did not.

4  Q.  Why did you lie about your feelings in the email?

5  A.  Again, to encourage -- to send positive reinforcement and

6  really encourage Jeff to continue doing and sharing what he had

7  been sharing.

8  Q.  Why did you want him to continue sharing confidential PCAOB

9  information?

10  A.  Because it was clearly an expectation that we would

11  continue to get this, that Cindy and I would continue to get

12  this information, but I also knew that it made me look good by

13  sharing this information.  It was advancing my career.

14  Q.  Who did you understand it to be an expectation of that you

15  would continue to get this confidential information?

16  A.  Tom Whittle and Dave Middendorf.

17  Q.  All right.  Let's turn back -- actually, let's look at the

18  top of Government Exhibit 1079.

19          Do you see the forwarding information at the top of

20  this page?

21  A.  Yes.

22  Q.  Who was the email that you sent forwarded to and who was it

23  forwarded from?

24  A.  Cindy Holder is forwarding it to her -- back to her

25  personal email account, the AOL email account, from her KPMG

J2kdmid3                              Sweet – direct

1    work email.

2    Q.  All right.  Let's turn back to that banking prediction list

3    that you testified Tom Whittle asked you to update.

4           Did you follow Tom Whittle's instructions on

5    January 9th to add those additional four banks to your prior

6    prediction list?

7    A.  Yes.

8    Q.  Let's look at what's marked for identification as

9    Government Exhibit 1076.

10          Do you recognize this exhibit?

11   A.  Yes.

12   Q.  How do you recognize it?

13   A.  This is the email that I sent via my KPMG email account.

14   Q.  On what date?

15   A.  January 13, 2017.

16          MS. KRAMER:  The government offers Government Exhibit

17   1076.

18          THE COURT:  Received.

19          (Government's Exhibit 1076 received in evidence)

20   BY MS. KRAMER:

21   Q.  All right.  So let's look at the header information.

22          Who did you send this to?

23   A.  I sent this to both Tom Whittle and to David Britt.

24   Q.  And what did you write in the body of this email?

25   A.  I wrote:  "Tom/David – attached is the bank screening/risk

J2kdmid3                          Sweet - direct

1    assessment analysis that Cindy and I pulled together.  Please

2    let me know if you have any questions.  Thanks, Brian."

3    Q.  And what was the date you sent this?

4    A.  On January 13th.

5    Q.  How many days after January 9th was that?

6    A.  Four days.

7    Q.  What was attached to your email on January 13th to Tom

8    Whittle and David Britt?

9    A.  It's the Excel file of -- called "Bank Screening Analysis."

10   Q.  All right.  Let's look side-by-side at the one that you had

11   sent November 2016, Government Exhibit 1067, and this one from

12   January 13, 2017, Government Exhibit 1076.

13          OK.  So the new one from January 13th is on the left

14   as Government Exhibit 1076, is that right?

15   A.  Yes.

16   Q.  And the older one is on the right as Government Exhibit

17   1067.

18          So let's look side-by-side at the first column,

19   Mr. Urbanczyk.  Could you put up the first two columns on the

20   right, please.  Thank you

21          So the font is tiny but can you read this?

22   A.  Yes, I can.

23   Q.  What changes did you make to the Bank Screening Analysis

24   from January 13, 2017 that's on the left as Government Exhibit

25   1076?

J2kdmid3                          Sweet - direct

A.   I added the names of the four banks that Jeffrey -- that

Jeff Wada provided to Cindy on January 9th that it shared with

Tom and David Britt, and then I also moved CitiGroup up to the

very top.

Q.   All right.  So looking at the popped-out box on the left

side from Government Exhibits 1076, which are the names that

you added?

A.   So the names that I added are Heartland Financial, which is

number 5 on the left side; Midland States Bancorp, which is

number 9 on the left side; National Bank Holdings, which is

number 12 on the left side; and then Lakeland Bancorp, which is

number 14 on the left side.

Q.   And what change did you make to CitiGroup?

A.   CitiGroup we had previously ranked as number 5 on the right

side in our original bank screening analysis, and because we

knew now, based on the information Jeff Wada shared on

January 9th, we moved it to number 1 in the ranking.

Q.   Let's look at what's marked for identification as

Government Exhibit 1077.

         Do you recognize this exhibit?

A.   Yes.

Q.   How do you recognize it?

A.   I recognize this to be an email I received on my KPMG email

account.

Q.   On what date?

J2kdmid3                          Sweet - direct

1  A.  January 17, 2017.

2              MS. KRAMER:  The government offers Government Exhibit

3  1077.

4              THE COURT:  Received.

5              (Government's Exhibit 1077 received in evidence)

6  BY MS. KRAMER:

7  Q.  What is at the bottom of the first page of Government

8  Exhibit 1077?

9  A.  The bottom is the email -- the last email that we were just

10 looking at that I had sent to Tom Whittle and David Britt with

11 the updated bank risk assessment analysis.

12 Q.  And what is in the top half of this page?

13 A.  It is Tom Whittle's response back to me and David Britt.

14 Q.  When did Tom Whittle send his response?

15 A.  Four days later.

16 Q.  And what did he say in his response?

17 A.  He wrote:  "Brian - I appreciate all the hard work you and

18 Cindy put into this over the past several months.  Tom."

19 Q.  Had you put any work into this analysis between when you

20 first sent it in November of 2016 and when you updated it in

21 January 2017?

22 A.  No.

23 Q.  Did you have an understanding when you got this email of

24 why Tom Whittle was thanking you for hard work over the past

25 several months that you had not put in?

J2kdmid3                         Sweet - direct

A.   That, again, it is just an attempt to camouflage the real

reason for why we were adding these four additional names to

this listing.

Q.   What did you understand was the purpose of adding these

names to the listing and moving Citi to the top of the list?

A.   So that if the -- so that KPMG would have a reason to point

back to for any additional actions that it decided to take from

a national office perspective, that it could point to this

list, or this screening analysis as the reason for making those

changes, why national office would provide support for these

engagements when in fact the real reason was because we had

received this preliminary listing from Jeff Wada.

Q.   All right.  Aside from the actions you've already testified

about, did you take any other action in January 2017 in

response to getting this list from Jeff Wada?

A.   Yes.

Q.   What actions did you take?

A.   I discussed with both Paul Tupper, who was a lead partner

at CitiGroup, the fact that we had an idea or a very strong

indication that the PCAOB would be inspecting.  And I remember

also calling and speaking with the lead audit partner for

National Bank Holdings as well as the lead audit partner for

Midland States bank, to let both of them know that the PCAOB

was likely going to inspect their bank audit engagements that

year.

J2kdmid3                          Sweet - direct

1    Q.  Let's look at what's marked for identification as

2    Government Exhibit 1074.

3              Do you recognize this exhibit?

4    A.  Yes.

5    Q.  How do you recognize it?

6    A.  It is an email that I sent from my KPMG account.

7    Q.  On what date?

8    A.  Wednesday, January 11, 2017.

9              MS. KRAMER:  The government offers Government Exhibit

10   1074.

11             THE COURT:  1074 received.

12             (Government's Exhibit 1074 received in evidence)

13   BY MS. KRAMER:

14   Q.  OK.  So looking at the email on the bottom three-quarters

15   of the box that's popped out right now, what's the subject line

16   of the email you sent to Stephen Penn on Wednesday, January 11,

17   2017?

18   A.  The subject says, "Happy new year."

19   Q.  Who is -- what role did Stephen Penn play at KPMG as of

20   January 11, 2017?

21   A.  Steven Penn was the lead audit engagement partner that had

22   been assigned to National Bank Holdings.

23   Q.  Was National Bank Holdings on the list Wada shared on

24   January 9th?

25   A.  Yes.

J2kdmid3                              Sweet - direct

1   Q.  And in the second paragraph of your email to Stephen Penn,

2   you wrote:  "Separately I wanted to run something past you.

3   Would you mind letting me know when you have a couple of

4   minutes to chat, and what number is best to reach you on?"

5          What did you want to run past Stephen Penn on

6   January 11, 2017?

7   A.  I wanted to tell Stephen Penn that we had a good idea --

8   very strong inclination, where I had gotten a heads up, that

9   his bank, National Bank Holdings, would be inspected by the

10  PCAOB that year.

11  Q.  Did Stephen Penn respond to your email?

12  A.  Yes.

13  Q.  What did he say in his response at the top of Government

14  Exhibit 1074?

15  A.  He said:  "Thanks Brian.  Now and the rest of today is good

16  or tomorrow afternoon."  And then he provided me with his phone

17  number.

18  Q.  Did you have the conversation with Stephen Penn that you

19  wanted to have?

20  A.  Yes.

21  Q.  What did you tell him?

22  A.  I told Steven that the bank he worked on, National Bank

23  Holdings, had come up in a conversation with a former colleague

24  at the PCAOB and that that meant that it had a very strong

25  likelihood of getting picked by the PCAOB for inspection that

J2kdmid3                          Sweet – direct

year and that he should try and do a really good audit.

Q.  Did you tell him anything specific about National Bank

Holdings?

A.  Yes.

Q.  What did you tell him?

A.  I remember one of the things that Cindy told me that Jeff

Wada had shared with her about National Bank Holdings was that

part of the reason why the PCAOB was likely to inspect it was

because it had a specific risk indicator.

                    (Continued on next page)

J2K5mid4                          Sweet - direct

1    BY MS. KRAMER:

2    Q.   What did Cynthia Holder tell you Jeffrey Wada shared with

3    her was the risk indicator for National Bank holdings?

4    A.   That Stephen Penn, for this audit engagement, had been

5    identified as a fly-in partner; that Stephen Penn was based in

6    Kansas City but this audit opinion was being issued out of the

7    KPMG Denver, Colorado, office and so that was one of the risks

8    that made it likely that this would be picked for inspection.

9    Q.   What was the status of the National Bank Holdings audit as

10   of January 11th, 2017?

11   A.   It was still a live audit which meant the audit was still

12   in progress and the audit opinion had not yet been issued.

13   Q.   Why did you want Stephen Penn to know that there was a very

14   strong likelihood of his engagement National Bank Holdings

15   getting picked by the PCAOB that year?

16   A.   Because he was the lead audit partner, he was the one that

17   had that primary oversight of the audit work, and I wanted him

18   to know how important it was that he do the best audit work

19   possible so that if the PCAOB did in fact select and pick

20   National Bank Holdings, that it would have the best likelihood

21   of going through that inspection by the PCAOB without receiving

22   any comment forms.

23   Q.   How did Steven Penn respond?

24   A.   He told me how thankful he was to, that he was very

25   thankful for getting the information, that he would try and do

J2K5mid4                              Sweet – direct

1    the best he could on his audit.

2    Q.  Let's look at what's marked for identification as

3    Government Exhibit 1075.  Do you recognize this exhibit?

4    A.  Yes.

5    Q.  How do you recognize it?

6    A.  I recognize this to be an e-mail that I sent from my KPMG

7    e-mail account.

8    Q.  On what date?

9    A.  Also on January 11, 2017.

10             MS. KRAMER:  The government offers Government Exhibit

11   1075.

12             THE COURT:  1075 received.

13             (Government's Exhibit 1075 received in evidence)

14   BY MS. KRAMER:

15   Q.  So, what was the subject line of this e-mail that you sent

16   to Andrew Davidson on January 11th, 2017?

17   A.  The subject said:  Time for a quick chat?

18   Q.  What was Andrew Davidson's role at KPMG at the time?

19   A.  David Anderson was also a lead audit partner in the banking

20   group and he was the partner in charge of the Midland States

21   Banking audit engagement.

22   Q.  Was midland states one of the engagements on the lists that

23   Cynthia Holder told you Wada shared with her on January 9th?

24   A.  Yes.

25   Q.  Let's look at the text of the e-mail.  What did you write

J2K5mid4                         Sweet - direct

1    in the sentence that begins:  Would you mind...?

2    A.  I wrote:  *Would you mind letting me know when you have a*

3    *couple of minutes to chat and what number is best to reach you*

4    *on?*

5    Q.  What did you write in the next sentence?

6    A.  *I wanted to try and talk through something with you.*

7    Q.  What did you want to talk through with Andrew Davidson?

8    A.  I wanted to tell him pretty much the same thing that I had

9    told Steven Penn; that his banking engagement, Midland States,

10   had come up during a conversation with an old colleague at the

11   PCAOB and that it was very likely going to get inspected by the

12   PCAOB that year.

13   Q.  Did you in fact have that conversation with Andrew

14   Davidson?

15   A.  Yes, I did.

16   Q.  Why did you tell him that had come up during a conversation

17   with an old colleague at the PCAOB?

18   A.  Because I also wanted Andrew Davidson to be aware of the

19   likelihood of the PCAOB picking his bank that year and that,

20   again, to encourage him to try and do the best audit he could.

21   Q.  Why did you want him to think this had just come up in a

22   conversation?

23   A.  Well, I didn't want him to know the real source of this

24   information, that we were getting this confidential information

25   from the PCAOB.  I wanted to characterize it more as just an

J2K5mid4                              Sweet - direct

1   accident, like it just happened to come up randomly.  But, I

2   also wanted him, obviously, to take action and do the best

3   audit he could on that engagement.

4   Q.  What was the status of the audit of Midland States as of

5   January 11th, 2017?

6   A.  It was also still a live audit, meaning that the opinion

7   hadn't yet been signed.

8   Q.  Let's look back at what's in evidence as Government Exhibit

9   655.  You have testified about the upper right corner of this.

10  What is on the rest of the document?

11  A.  The rest of this document reflects notes that I took on

12  February 3rd during a conversation I had with Jeffrey Wada --

13  excuse me, during a conversation I had with Cindy Holder after

14  she told me she had just had a conversation with Jeffrey Wada

15  where Jeffrey Wada had provided to Cindy Holder the complete

16  listing of all issuers that the PCAOB was planning on

17  inspecting in 2017.

18  Q.  And is this your handwriting on the entirety of Government

19  Exhibit 655?

20  A.  Yes, it is.

21  Q.  Where were you when you had the conversation with Cindy

22  Holder in which she relayed this information to you?

23  A.  I was working out of my home office in California.

24  Q.  And what telephone did you use for this conversation?

25  A.  My cell phone number.

J2K5mid4                              Sweet - direct

1   Q.  What, if anything, does Cynthia Holder tell you at the

2   beginning of the call?

3   A.  I remember answering her call and she said grab a pen.

4   Q.  After she told you to grab a pen, what did she tell you?

5   A.  That she had just received the complete inspections list

6   from Jeffrey Wada for where the PCAOB was planning to inspect

7   for KPMG in 2017.

8   Q.  What did you understand her to mean when she made reference

9   to the complete inspection list?

10  A.  That the planning information had been finalized at the

11  PCAOB for KPMG and that Jeff had gone in again and accessed,

12  from the PCAOB's IIS system, and had given Cindy every name.

13  Q.  Every name of what?

14  A.  Of where the PCAOB would be inspecting for KPMG in 2017.

15  Q.  After Cindy Holder told to you grab a pen, what did you do?

16  A.  I did get a pen, a blue pen, and I grabbed the same folder

17  that I had used back in January that was sitting on my desk

18  again, and started writing down what she was telling me.

19  Q.  So, after you had the pen and the manila folder in hand,

20  what happened next on that phone call?

21  A.  She started reading to me the ticker symbols, which are

22  like the stock trading symbols of the names that she had

23  written down from her conversation with Jeffrey Wada.

24  Q.  Can you explain, briefly, what a ticker symbol is?

25  A.  A ticker symbol is anything from one to three or four

J2K5mid4                          Sweet – direct

1   characters that are used to trade stock, so it's like the stock

2   trading symbol.  Because these are public companies and public

3   company audits, they all have a stock trading symbol.

4   Q.  Can you give some examples of ticker symbols of commonly

5   known companies?

6   A.  Yes.  CitiGroup is C.  I think IBM is IBM.  Disney is DIS.

7   Q.  What did Cindy Holder tell you Jeffrey Wada had told her

8   about how he got this information?

9   A.  She explained that Jeff had again gone in and accessed the

10  planning information from the PCAOB's IIS system and had gone

11  into the GNF planning profile, specifically.  And the ticker

12  symbols are one of the left most columns and so he had just

13  read down the list to her of those ticker symbols.

14  Q.  And what, if anything, did she say about how he gave her

15  this information?

16  A.  She told me that he had told her that her grocery list was

17  ready.  So, he had specifically referred to it as a grocery

18  list.

19  Q.  What did you do as she read you the stock ticker symbols

20  for the PCAOB inspection targets that Wada had given to her?

21  A.  I started to write those stock ticker symbols down.  And I

22  remember we got through a few of them, the first 10 or so, and

23  I didn't recognize most of those stock ticker symbols just off

24  the top of my head and so I told her to hold on, and I went and

25  opened up an Excel file that I had which was the original data

J2K5mid4                        Sweet - direct

submission that KPMG had provided to the PCAOB that had the

complete listing of KPMG audit engagements so that I could

cross reference the ticker symbols to the actual audit

engagement name.

Q.   So, looking at Government Exhibit 655, where on this

document did you start to write down the ticker symbols as she

gave them to you?

A.   There is a big line in the middle of this page going

horizontally, and so underneath that line I started writing

down each of the ticker symbols and then the name of the

company next to it.

Q.   And so, where did you get the information looking, for

example, at the first line where it says AHC Dallas, AH Bello

Corp.  What, of that line, came from Cindy Holder, and what of

that line came from the document you looked at on your

computer?

A.   The AHC ticker symbol, and I believe also the city name,

Dallas came directly from Cindy Holder.  That's what she had

received from Jeffrey Wada.  And then the name next to it, AH

Bello Corp, that's what I pulled down or matched it to the data

submission that I was accessing at the same time as writing

down these notes.

Q.   Let's go through some of the items on the list.  So, the

second line AMAT, and then it says Santa Clara.  What do you

understand Santa Clara to be a reference to?

J2K5mid4                          Sweet - direct

1    A.  It is a reference to the Santa Clara KPMG office where the

2    audit for Applied Materials was being done.

3    Q.  And what is Applied Materials relative to AMAT?

4    A.  Applied Materials is the issuer engagement name, like the

5    actual issuer name of the company, and AMAT is the stock ticker

6    symbol.

7    Q.  And what is the date in those brackets there of 10/31?

8    A.  I believe the date is a reference to the year-end date, the

9    fiscal year-end date of the company, so 10/31 would be the

10   year-end date of Applied Materials, to the best of my

11   recollection.

12   Q.  And so, in this line where did the -- which information in

13   this line came from Jeffrey Wada via Cynthia Holder and which

14   came from the document you were looking at on your computer?

15   A.  The stock ticker symbol came directly from Jeff to Cindy.

16   I believe also the city but, again, the information to the

17   right of that.  So, the name Applied Materials and what's in

18   the bracket were my notes.

19   Q.  Let's look at the next two lines, BKU, Bank United; and

20   BCR, CR Bard.  To the left of those do you see the letters

21   AQSN?

22   A.  Yes.

23   Q.  What was that a reference to?

24   A.  That's a cross-reference that both of those engagements had

25   been subject to that Audit Quality Support Network so they were

J2K5mid4                          Sweet - direct

1   part of an existing national office program.

2   Q.   Where did you get that information?

3   A.   That I, after going through this listing, I also went and

4   checked which of these engagements had been part of a

5   monitoring program or this Audit Quality Support Network so I

6   could have more complete information about these engagements.

7   Q.   Now, let's look down at Macy's -- so, Mr. Urbanczyk, if you

8   could highlight all the way across -- what is all of that

9   information in those big brackets next to Macy's?

10  A.   For Macy's, in addition to just finding out from Jeffrey

11  Wada that Macy's was going to be inspected by the PCAOB that

12  year, Jeffrey Wada had also provided to Cindy the specific

13  focus areas that the PCAOB was going to inspect.  So, they were

14  not only going to inspect Macy's but the exact areas of the

15  financial statement audit that they were going to look at.

16  Q.   And so, when you wrote that down on these notes, where did

17  that information come from?

18  A.   It had come from Jeffrey Wada to Cynthia Holder and that is

19  what Cynthia Holder was telling me he had given her.

20  Q.   I want to direct your attention to, in the middle left side

21  of the page, do you see two question marks in circles in the

22  margin next to FDL and FNGN, I believe?

23  A.   Yes.

24  Q.   What are those question marks a reference to?

25  A.   To the best of my recollection, those were two ticker

J2K5mid4                        Sweet - direct

1    symbol names that I couldn't easily find on the data list that

2    I was looking at and trying to cross-reference to, and so I

3    couldn't figure out if these were actually KPMG clients or not,

4    KPMG issuer engagements.  And so, I put a question mark there

5    because I wasn't quite sure.

6    Q.  And when you put that question mark there, did you also

7    write down those names that are next to those ticker symbols?

8    A.  Yes.

9    Q.  In what order did you write down the ticker symbols and

10   check the list?

11   A.  I did it in the order in which Cindy was giving them to me,

12   which was the same order that she had said she had received

13   from Jeffrey Wada so it's generally in alphabetical order.

14   Q.  Okay.  And the document that you were looking at on your

15   computer you said was the firm's data submission.  What do you

16   mean?

17   A.  As I testified to yesterday, the first step in the PCAOB's

18   planning process is to -- that it requires the firm to provide

19   it a data submission, they call it the GNF planning profile,

20   and that the PCAOB ends up taking that data submission and then

21   they add a bunch of columns and they use that to complete its

22   planning analysis.  And so, because that data submission is

23   KPMG information that they provided to the PCAOB, I was also

24   given a copy of that because I was in the inspections group in

25   the national office.

J2K5mid4                          Sweet - direct

1   Q.  So you were looking at the version, to be clear, that KPMG

2   had provided to the PCAOB, not the version that the PCAOB then

3   made changes to on their end?

4   A.  That's right.  Just the raw information, yeah.

5   Q.  And what, if anything, did you do with the planning

6   document that you were looking at while you went through and

7   took down this list from what Cynthia Holder told you she had

8   been told by Jeffrey Wada?

9   A.  Because this data submission document had all 700 or so of

10  KPMG's audit engagements, when I got to one, when I found the

11  one that was on this Jeffrey Wada-provided listing, I

12  highlighted the entire row in yellow on the Excel spreadsheet

13  and so that I could filter it by those colors later and kind of

14  just have the single snapshot of exactly which of those issuers

15  on the entire data submission were the ones that were going to

16  get picked that year.  And, I also added a couple of different

17  columns into that data submission so that I could then track

18  which of those engagements were part of this AQSN or one of the

19  monitoring programs, which ones were getting this national

20  office support already.

21  Q.  Why did you do that?

22  A.  Because, again, I remember back in March of 2016, when the

23  initial listing had been provided from Jeffrey Wada, that that

24  was the information that David Britt had shared with Thomas

25  Whittle and David Middendorf and I on the call and that David

J2K5mid4                          Sweet - direct

Middendorf's instructions on that were that we had to protect
the monitoring program, which meant we needed to protect the
work that the national office was specifically involved in
because that had a bigger impact for KPMG.

So, I knew that I would end up or my plan was to share
this immediately with Thomas Whittle, David Britt and David
Middendorf, and so having the information about which ones were
in a monitoring program or this national office support I knew
would be directly, or would be very important to those people.

Q.  So, when you learned that one of the engagements on this
February 3rd list was subject to national office support what,
if anything, did you do to reflect that on Government Exhibit
655?

A.  On the left side of the ticker symbol name I wrote AQSN,
which is the reference to, again this Audit Quality Support
Network, and then I believe in the section above that is not
highlighted I indicate for those banks which ones, which of
those banks were in a monitoring program, I believe.

Q.  Okay.  Let's zoom out on Government Exhibit 655.

what is on the top of the page, aside from the black
ink handwriting that we have already talked about, what is on
the top of the page above that big line?

A.  There, it's a -- the top of this page reflects additional
information that Jeffrey Wada had shared with Cynthia Holder on
that day, February 3rd.

J2K5mid4                           Sweet - direct

1  Q.  What, if anything, is the sort of common denominator

2  between the engagements on the list?  We are looking at now,

3  starting from 1 and Northern Trust and going down through 9 or

4  8 BMO.

5          MR. WEDDLE:  Objection.  Vague.

6          THE COURT:  Could you clarify, please?

7          MS. KRAMER:  Certainly.

8  BY MS. KRAMER:

9  Q.  So, do you see the list, Mr. Sweet, that begins with

10 Northern Trust, and then goes Northern Trust, City, Chemical

11 Financial, on down through Financial Engines and BMO?

12 A.  Yes.

13 Q.  Do those KPMG audit clients have anything in common?

14 A.  Yes.

15 Q.  What do they have in common?

16 A.  Those are the population of the banks and other financial

17 services engagements that are on the list below but it's the

18 ones that are specific to financial services.

19 Q.  Okay.  Where did the information come from that is to the

20 right of the names of those issuers?

21 A.  So, similar to what we had discussed below on Macy's, that

22 Jeffrey Wada, in addition to providing the names of the banks,

23 he also provided the specific areas of focus from that planning

24 spreadsheet of the PCAOB, so the specific areas that PCAOB was

25 going to inspect for the banks in 2017 for KPMG.

J2K5mid4                           Sweet - direct

1    Q.  And is that what Cynthia Holder told you?

2    A.  Yes.

3    Q.  Did you also add other information to these notes based on

4    documents that you looked at?

5    A.  Yes.

6    Q.  Can you give us some examples?

7    A.  So, the first one, Northern Trust, I added the 1 next to

8    it, so the 1 through 9 -- or kind of 9 is crossed out -- but 1

9    through 8, those represent the banks.  So, of the financial

10   services issuers, I added and tried to count up, well, how many

11   banks in this listing of roughly 50, how many of them were

12   banks and figured out it was about nine.

13           Then, to the left of that, the M and the AQSN

14   reference, that is also what I added to indicate which of these

15   engagements were part of the monitoring program or the Audit

16   Quality Support Network.

17   Q.  What is above that line above Northern Trust in the upper

18   left corner of the page?

19   A.  Cindy had told me that during her conversation with Jeffrey

20   Wada that Jeff had also read off to her a listing that the

21   PCAOB had been tracking of very bad partners, the audit

22   partners that they had very big quality concerns.

23   Q.  What's your understanding from your experience at the PCAOB

24   and at KPMG about whether the PCAOB ever shares with KPMG the

25   entire list of what it considers to be severe offenders?

J2K5mid4                          Sweet - direct

A.  They do not share that information.

Q.  And, to your knowledge as of February 3rd, 2017, when
Holder gave you this information that Wada gave her looking at,
let's look at all of Government Exhibit 655, what's your
understanding about the status of those audits?

A.  That for the most part, almost every one of these audits
was still live at this point, which meant that the audit
opinions had not yet been finalized and so new audit work could
be done, added, actions could be taken without any sort of
special documentation.

Q.  What was your understanding about whether this complete
list, including focus areas, was confidential to the PCAOB as
of February 3rd, 2017?

A.  I knew this was incredibly confidential information.

Q.  Let's look at the top right corner of Government Exhibit
655 under the word "board."  What does this note reflect?

A.  These are also notes I took when Cindy shared other
information that Jeff had shared with her on this phone call,
or Jeff told Cindy and she was, in turn, telling me the
board -- the PCAOB -- the Public Company Accounting Oversight
Board -- and that they were planning to cut inspections
globally, cost-cutting -- in order to do some cost-cutting.
And that second bullet says their new mode of operation was to
keep asking "and, and, and" with respect to their risk
assessment.

J2K5mid4                          Sweet - direct

1    Q.  Did you have any understanding of whether the Board's

2    priorities was confidential to the PCAOB?

3    A.  Yes.

4    Q.  What was your understanding?

5    A.  I knew that that was, again, confidential information being

6    shared.

7              MS. KRAMER:  Your Honor, I note that it is 1:00.  If

8    you would like me to stop for lunch, this may be a good

9    breaking point.

10             THE COURT:  Why don't we break for lunch.

11             Folks, we are going to take an hour for lunch.

12   Please, leave your note pads on your chairs, have a good lunch,

13   and we will start back at 2:00.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J2K5mid4                          Sweet - direct

1                   (Jury not present)

2                   THE COURT:  You may be seated.

3                   Anything anybody wanted to address before lunch?

4                   MS. MERMELSTEIN:  Yes, your Honor.  I will just wait

5      for Mr. Sweet to step out.

6                   (Witness steps down)

7                   MS. MERMELSTEIN:  A number of matters, your Honor,

8      that I think need to be addressed before Mr. Sweet's

9      cross-examination begins, which I expect will be this

10     afternoon, about which the parties have not been largely able

11     to reach any agreement.

12                  So, first, I think the government was largely excluded

13     from the communications regarding this but there was a subpoena

14     served on, ultimately on Mr. Sweet, through his counsel.  There

15     was some fighting, I think, about whether or not he was evading

16     service.  I understand that Mr. Sweet's counsel has explained

17     that the characterization of that as evasion was inaccurate.

18                  Defense counsel for Mr. Wada marked as an exhibit the

19     letter that Mr. Morvillo wrote explaining his view that that

20     was an unfair characterization and that is not what happened

21     and, ultimately, it was all resolved.  I think, one, I can't

22     see any basis for admission of that letter; but secondarily, I

23     don't think it would be appropriate to cross-examine Mr. Sweet

24     about his purported evasion when it appears from what the

25     government knows that that's not an accurate characterization.

J2K5mid4                          Sweet - direct

1    And so, questions along those lines would not have an

2    appropriate foundation.  My understanding, if I am getting this

3    right, is Mr. Middendorf's counsel does not intend to

4    cross-examine him about that and that Mr. Wada's counsel is not

5    definitely going to do it has not made a decision but I think

6    we need a ruling before cross-examination begins.

7              Do you want me to go through my whole list or do you

8    want me to take them one at a time?

9              THE COURT:  Probably one at a time.

10             Do you know if are you going to ask about that?

11             MR. COOK:  Concerning the possibility of

12   cross-examination on the evasion of service, Mr. Sweet's

13   attempt to evade to receive a subpoena that called for the

14   disclosure of documents that reveals lies that he told to the

15   government, that's relevant.  I don't know that we are going to

16   go in that direction, I don't know if he is -- how he is going

17   to testify on cross.  But, if we were to pursue that, I don't

18   see anything improper with that.  And the government has

19   represented that he will deny that he was evading service so

20   I'm not sure what the prejudice or the harm is.

21             THE COURT:  Do you have a basis for believing he

22   evaded service?

23             MR. COOK:  Yes.

24             THE COURT:  What is it?

25             MR. COOK:  We had a process server outside of his

1    hotel for two full days.

2              THE COURT:  Was he there?

3              MR. COOK:  They called up from the front desk.  He

4    refused to come down to receive the subpoena.

5              MS. MERMELSTEIN:  Well, as I understand it, a person

6    who did not identify themselves in any fashion called up saying

7    will you come downstairs?  And Mr. Sweet said I don't -- no.

8    That is, absent information that he knew that person was or

9    why, the notion that that constitutes evading process is

10   nonsensical.  He also is someone who is represented by counsel

11   so for him to say I'm not personally going to do this seems

12   not, at all, like evasive behavior.

13             So, I think the question is improper and prejudicial,

14   given what it suggests.

15             MR. COOK:  Your Honor, three points.

16             One, I don't think we should be required to preview

17   our cross-examination.

18             Second, his lawyer, in response to our request to

19   accept service, responded with the words "no can do" which is

20   what forced us to have to attempt to serve him personally.  So,

21   that is a problem of their own making.

22             THE COURT:  I don't think it is a proper question.

23             MR. COOK:  I'm sorry?

24             THE COURT:  I don't think it is a proper question.

25             MS. MERMELSTEIN:  So, number two, your Honor, relates

J2K5mid4                          Sweet - direct

1   to Mr. Wada's medical situation.  I think we can fight about

2   the extent of the admissibility of that another time.  I wanted

3   to raise that with your Honor because Mr. Sweet, of course, has

4   no firsthand knowledge about that.  I expect he would know what

5   was told to him by Ms. Holder, all of which is hearsay and so I

6   can't see any proper basis for putting questions to him about

7   Mr. Wada's medical situation.  Again, the government is not

8   suggesting that at least some of that could not properly be put

9   as evidence before the jury, but I don't think this witness has

10  a basis, an appropriate basis to answer those questions and so

11  I wanted to flag that issue.

12          THE COURT:  Do you intend to ask about that?

13          MR. COOK:  I don't know, your Honor.  The witness

14  hasn't even finished direct examination.  However, if I were to

15  ask those questions, I think they would be proper in order to

16  again, as Mr. Weddle explained thoroughly earlier, the full

17  scope of the relationship between Mr. Wada and Ms. Holder and

18  what Ms. Holder communicated to Mr. Sweet, including reasons

19  why Mr. Wada may have sent his résumé to Ms. Holder, reasons

20  why he may have been interested in pursuing employment at KPMG.

21          THE COURT:  Well, it is double hearsay so why would it

22  be -- I can see how that level would go to Mr. Wada's state of

23  mind, arguably, but how would it go to Ms. Holder's state of

24  mind?  How would it be an exception to what she said?

25          MR. COOK:  I'm sorry.  What she said?

1           THE COURT:  There is another level of hearsay in that

2     what Ms. Holder is saying to Mr. Sweet is hearsay.

3           MR. COOK:  Your Honor, all of their -- the government

4     has elicited virtually every aspect of the conversation between

5     Ms. Holder and Mr. Sweet with the exclusion of this particular

6     evidence which colors, it adds color and context to the nature

7     of this so-called conspiracy.

8           THE COURT:  Right, but it's -- well, it's not

9     statements in furtherance of the conspiracy.  I don't know how

10    you can argue that it is.

11          MR. COOK:  They're all wrapped up together.  The

12    context of their communications, an essential component of that

13    is his medical condition; what they were discussing, why were

14    they discussing it, specific timing of those discussions.  All

15    of that is relevant to the defense.

16          MR. WEDDLE:  Can I add one thing on this, your Honor?

17          As I said before the break, the manner in which the

18    government elicited testimony from Mr. Sweet was in an

19    undefined way that they chose to ask the questions which was:

20    *Based on your conversations with Ms. Holder, for example please*

21    *interpret this document.*  And he proceeded to do so.  So, for

22    the government to now say he has no base of knowledge for

23    interpreting the document, I think, is another example of the

24    prejudice to the defense and for us to ask him questions, for

25    example, about Cynthia Holder's notes and what his

J2K5mid4                          Sweet - direct

 1    understanding is based on his discussions with Ms. Holder, is

 2    no different than when the government is doing it, and it

 3    provides context to the testimony that he already gave.  It is,

 4    once again, it is I think a different argument from what we

 5    made before the break, your Honor, or at the last break,

 6    because this is not an argument about the redacted portion,

 7    this is an argument about the things that he did testify about

 8    and about the document that is in evidence and asking him to

 9    interpret the document that is in evidence.

10         THE COURT:  The document that's in evidence doesn't

11    include anything about the medical condition?

12         MR. WEDDLE:  I think it depends on what the witness is

13    going to say, your Honor.

14         THE COURT:  Okay.

15         MR. WEDDLE:  As Mr. Cook said, your Honor, and as we

16    have said in our letter that was submitted last night regarding

17    the evidence that's admissible during the cross-examination of

18    Mr. Sweet, I have never seen a cooperator who has lied,

19    purported to come clean, lied again, purported to come clean,

20    and lied again, more than this cooperator has.

21         THE COURT:  Really?

22         MR. WEDDLE:  Yes, your Honor.  And I was a federal

23    prosecutor for 15 years.

24         THE COURT:  I know.

25         MR. WEDDLE:  And I have never seen it and I was Deputy

1   Chief of the Appeals Unit in the Southern District of New York

2   for three years.  I have never seen it.  I have had a

3   cooperator in a case of mine who admitted, during trial prep,

4   that he had committed a tax felony.  He pled guilty to that

5   crime before he testified.  We are receiving 3500 material from

6   last night, your Honor, that has new disclosures about tax

7   crimes.  So, we should not be required to preview our

8   cross-examination until Mr. Sweet and his lawyer are no longer

9   in a position to try to clean up the lies that he has told.

10  So, we are happy to do that after he is done with direct

11  examination and can no longer be prepped by the government, can

12  no longer be prepped by his lawyer to handle cross-examination

13  questions, and we would be happy to do that at length and in

14  detail, your Honor, because your Honor, I'm sure, hasn't read

15  the material but there are 40 -- 4-0 -- marked 3500 exhibits

16  with respect to Mr. Sweet.  There is more than 30 meetings with

17  the government.  They are replete with lies and, as far as I

18  know, there has been no disclosure that there has been any

19  threat to Mr. Sweet to say that he has violated his agreement.

20  And to deny him the benefits of his agreement.  There has been

21  no disclosure that anyone has discussed with Mr. Sweet the

22  possibility that his bail might be revoked for committing

23  felonies while he is on release.  There has been no discussion

24  about Mr. Sweet taking responsibility for his felonious actions

25  and pleading guilty to new crimes perhaps with a new agreement.

1    There has been none of that, your Honor.  There has

2    been no discussion, as far as I know, about Mr. Sweet taking

3    responsibility for lying to the government in earlier meetings

4    and claiming that he is coming clean or saying that this is it,

5    these are my tax lies, for example, and hiding other material

6    that has not come to light, if at all, until much later.

7        So, all of these areas are fair cross-examination,

8    it's all admissible evidence.  We would be happy to proffer it

9    step by step with your Honor after Mr. Sweet is disabled from

10   figuring out a new way to weasel out of his lies.

11       THE COURT:  Would you like to respond?

12       MS. MERMELSTEIN:  I guess so, your Honor.

13       I mean, I won't bother disputing the characterization

14   of Mr. Sweet's lies which I think have been oversold or his

15   unusual status as a cooperator which I have been doing this for

16   15 years but I don't find it unusual but I think that's all

17   irrelevant.

18       We were talking about whether or not he could be

19   questioned about his knowledge of Wada's medical situation.  I

20   don't find the relevance of anything Mr. Weddle just said to

21   that.  He has no personal knowledge.  That's the end of that.

22   He shouldn't be asked questions about it.  To the extent that

23   it is appropriate for there to be proof of Mr. Wada's medical

24   situation, that will have to come from an appropriate,

25   admissible source.

1    So, on that I think we would like a ruling and we are

2    at the lunch break.  We are not going to have a long break

3    before cross, we are trying to be efficient to get rulings so

4    things can come in in a logical order.

5         THE COURT:  Did you have another issue?

6         MS. MERMELSTEIN:  I do.  I apologize, your Honor.

7         The other issue is I think we obviously didn't receive

8    this letter until we woke up this morning so we haven't put

9    something in in response, but I think the letter is not correct

10   about the law and I agree, I think, with Mr. Weddle, that with

11   respect to some of these it may be that an advanced ruling is

12   not possible because things have to play out before a ruling is

13   possible but there are essentially four arguments that are made

14   in the letter with respect to the purported admissibility of

15   all of these documents that relate to Mr. Sweet's ownership of

16   investment properties and tax issues in broad strokes.

17        THE COURT:  Let me just cut it short because I do want

18   to give you a chance to say what you want to say but last night

19   I read -- I took some time and I read all of those cases and I

20   basically am aware of the law which I think is largely properly

21   stated.  There is a different -- 608B precludes extrinsic

22   evidence only in the limited category that it does and if

23   something is proper for bias or motive or for some other

24   reason, there can be extrinsic evidence but it might be

25   excludable under 403, basically.  But if there is something

J2K5mid4                          Sweet - direct

1    else you want to say for the record, you can.

2              MS. MERMELSTEIN:  No, your Honor.

3              I think that is certainly a correct statement of the

4    law that your Honor has just given.  I think that part of the

5    problem comes in terms of characterizing what turns something

6    from one category into the other and when, sort of, it trips

7    into bias.  Obviously there is a whole category, they've made

8    arguments regarding both prior inconsistent statements and

9    impeachment by contradiction.  That would obviously require

10   Mr. Sweet to say something different on the stand which has not

11   yet happened and I would note that many of the documents that

12   have been marked are not his statements at all, they're sort of

13   other things, and it may be case by case but we wanted to flag

14   for your Honor that I think the letter goes much too far in

15   suggesting what is likely to be admissible and we can take it

16   up as it comes.

17             THE COURT:  I think we will have to take it up as it

18   comes and I may need to look at these documents.

19             Now, I assume that the government is going to put in

20   the cooperation agreement?

21             MS. MERMELSTEIN:  Yes.  It is coming in.

22             THE COURT:  It is coming in.  You are going to offer

23   it?

24             MS. MERMELSTEIN:  We are.

25             THE COURT:  And the reason the cooperation agreement

J2K5mid4                        Sweet - direct

frequently comes in, I assume, notwithstanding 608B, I know
there is some law that the government can take the sting out of
the impeachment that would happen on cross but the reason it
comes in I would think, is because of the bias principle.

          MS. MERMELSTEIN:  Yes, I think it comes in both for
that and his credibility is attacked, the truth telling
provisions are relevant, and sort of the contract itself is of
course not hearsay so it is coming in; I understand there is no
objection to it coming in from the defense, subject of course
to your Honor admitting it.

          And, the final one on defendant's exhibit for cross --
we obviously don't have anything that's purely for impeachment
so there may be more -- is that Mr. Wada has marked the
entirety of the chats from Mr. Sweet's phone.  I'm not
suggesting that some of those chats are not properly admitted,
they may well be, but it is clear that I think the entirety is
not; it is much too broad and not relevant.  And so, I think
that we have asked that they offer only those portions that are
in fact relevant which we can take up one by one.  We just want
to note our objection to the entire exhibit coming in.

          THE COURT:  All right.  Do you want to respond to
anything?

          MR. WEDDLE:  Yes, your Honor.

          The absence of communications is obviously highly
relevant here and so the entirety of Mr. Sweet's chats prove

J2K5mid4                         Sweet - direct

1    that he did not have a single text message with our client

2    Jeffrey Wada.  Not one.  We are not offering them all for their

3    truth but that is a single immediate reason why the entirety of

4    those chats are admissible.  There are other reasons that

5    different portions would be admissible as well but the context

6    is extremely important here and for the government to try to

7    try this case with case with blinders on is extremely

8    prejudicial to the defendants.

9              THE COURT:  You can ask a single question about

10   whether the witness has had any chats with your client and I

11   don't know that that -- whatever the answer is that doesn't get

12   in all his chats.

13             MR. WEDDLE:  The last witness we would ever want to

14   rely on for a truthful statement in favor of our client is

15   Brian Sweet.

16             THE COURT:  Okay.

17             MS. MERMELSTEIN:  That question is obviously the

18   correct way it do it.  The government is not trying the case

19   with blinders and we are not trying to prejudice the defense,

20   but the rules of evidence apply in a trial and they have to be

21   enforced.

22             There are any number of ways to prove the absence of

23   that without putting in every single personal text message or

24   other relevant text message in that including that the

25   government would be happy to stipulate that with respect to the

1    chats recovered from that phone there were none with Mr. Wada.

2          So, I think that that's not a justification for

3    dumping in all kinds of irrelevant things or the content of the

4    texts could be redacted and just the sort of who you are

5    communicating with could be left in.  That would also establish

6    that there is nothing with Mr. Wada.

7          So, there is lots of ways to do it.

8          THE COURT:  Yes.

9          Just a preview on the issue raised in the letter.  I

10   have read a bunch of cases about this including the ones that

11   you cite and the cooperation agreement can be extrinsic

12   evidence that comes in.  I think there are situations where

13   bias is established but it is also the case that something

14   that's addressed in the cooperation agreement that is sort of

15   another crime or another bad act is very commonly excluded

16   under Rule 403 because the idea is you don't want to have a

17   mini trial relating to things that are essentially biased as to

18   which is already established by the cooperation agreement.

19         So, you know, I don't know what you are planning to do

20   in terms of this tax fraud issue.  I am not going to let you

21   spend hours of time going through and trying to get a bunch of

22   documents in that when you put 50 of them together you can

23   establish tax fraud.

24         MR. WEDDLE:  Your Honor, would it be possible to take

25   up this discussion after Mr. Sweet is in a position where he

J2K5mid4                        Sweet - direct

1   can no longer prep for his cross-examination?

2                THE COURT:  Sure.

3                MS. KRAMER:  Very briefly, your Honor?

4                I am going longer than I expected but I think we will

5   be done after lunch at some point.  So, I don't know how long

6   the discussion will be that involves the issue that Mr. Weddle

7   wants to take up then but we are running behind schedule, I

8   just want to note that.  And, for the record and so to that end

9   I guess I would reraise the issue of possibly sitting Friday to

10  keep things moving.

11               Also, I just want to clarify something for the record.

12  Twice today I think Mr. Weddle has characterized one of the

13  questions I posed to Mr. Sweet about the notes he took of the

14  January 9th call or the picture of the notes that Cindy Holder

15  had taken that he discussed with her as based on some amorphous

16  unidentified collection of conversations with Cynthia Holder.

17  To be clear, that is not I think what the transcript will

18  demonstrate.  In response to a defense objection for lack of

19  foundation I asked Mr. Sweet if he had an understanding based

20  on his conversation with Cynthia Holder quite plainly referring

21  to the conversation that he was testifying about.

22               So, I don't want our silence on this to be

23  misconstrued in the record in any way as agreeing that there

24  was something vague about that question or a lack of foundation

25  for the following testimony.

J2K5mid4                              Sweet - direct

1        THE COURT:  Okay.  Fair enough.

2        Ms. Lester?

3        MS. LESTER:  One more thing, your Honor.

4        Mr. Sweet testified today on direct about a

5    conversation he had with Mr. Middendorf at a restaurant, I

6    believe he said that they were standing at a bar area at the

7    end of a dinner.  Mr. Whittle, he said, was also there, and he

8    mentioned that Mr. Middendorf said to him how pleased he was

9    that the inspection results had improved from prior years and

10    this was said to be in the fall of 2016, I believe.

11        We have not seen any indication of this conversation

12    in the 3500 material which, as Mr. Weddle mentioned, is very

13    voluminous.  What we have seen over time is Mr. Sweet's

14    recollection of certain events changing.  Particularly when the

15    defense raises a certain issue with the government we sometimes

16    see a change in how he describes certain events.  So, if that

17    is present in the 3500, we would like the government to point

18    it out to us.  If it is not present in the 3500, I think we

19    would like an explanation as to why it just came out today.

20        THE COURT:  Any response?

21        MS. KRAMER:  We will discuss it, your Honor.

22        THE COURT:  All right.  Okay.  We will see you all at

23    2:00.

24        (Luncheon recess)

25        (Continued on next page)

J2kdmid5                          Sweet - direct

1                    **A F T E R N O O N   S E S S I O N**

2                              2:14 p.m.

3          (Jury not present)

4          THE COURT:  Good afternoon.

5          ALL COUNSEL:  Good afternoon, your Honor.

6          THE COURT:  Can we bring the witness in?

7          MS. KRAMER:  Yes, your Honor.

8          (Jury present)

9    BRIAN JOHN SWEET,

10        Resumed, and testified further as follows:

11          THE COURT:  You may be seated.

12          Good afternoon.

13          JURORS:  Good afternoon.

14          THE COURT:  Ms. Kramer, you may continue.

15          MS. KRAMER:  Thank you, your Honor.

16   DIRECT EXAMINATION (Resumed)

17   BY MS. KRAMER:

18   Q.  Mr. Sweet, I just want to ask you a few more questions

19   about what's in evidence as Government Exhibit 655.

20          MS. KRAMER:  Mr. Urbanczyk, could you please enlarge

21   the top part of the page above the line.

22   Q.  Mr. Sweet, looking at the entry number 4, "BankUnited," can

23   you read what it says to the right of "BankUnited"?

24   A.  It says "ORA" in parentheses.  Then "Miami."  Then "11,800"

25   in parentheses.  Then "Jim McGrath/David Britt."  And then in

J2kdmid5                          Sweet – direct

```
 1   brackets:  Loans plus ALL, AFS, plus derivative hedging or
 2   hedge accounting.
 3   Q.  And what does each piece of that line mean?
 4   A.  So starting after BankUnited, the first part in
 5   parentheses, ORA, is an indication that this was one of those
 6   internal PCAOB ORA referrals, so that was the reason that it
 7   was being selected.
 8           Then Miami would be the KPMG office location where the
 9   opinion is being issued.
10           11,800 would be an indication of that's how many hours
11   it would take to complete that audit.
12           Jim McGrath is a reference to the lead audit
13   engagement partner on BankUnited.
14           David Britt served in that EQCR current review partner
15   role.
16           And then what is in the brackets there, loans,
17   allowance and AFS, it is a type of investments in the
18   derivatives.  Those were the specific focus areas that Jeff
19   Wada had provided that PCAOB was planning to inspect.
20           MS. KRAMER:  Mr. Urbanczyk, could you highlight the
21   row number 8 next to Brooklyn, or "Brookline Bancorp."
22   Q.  Mr. Sweet, what is in the text in that line next to the
23   name Brookline Bancorp?
24   A.  In parentheses "5800."  Then "Joe Gencarella/Alan
25   Brown/Inga."  And then in the box directly next to it it says,
```

J2kdmid5                              Sweet - direct

1    "Loans and leases plus ALL," then "Deposits," and then "AFS

2    securities."

3    Q.   And what do each of those items mean?

4    A.   So the parentheses 5800 is again a reference to how many

5    audit hours it took to -- or was expected to take for the

6    Engagement Team to complete the audit of Brookline Bancorp.

7    Joe Gencarella was the lead audit engagement partner for

8    Brookline.  Alan Brown was the EQCR, the second concurring

9    review partner assigned to that engagement.  Inga is a

10   reference to the senior manager that was working on Brookline.

11   So that's Inga Tracy Bronson, who was a KPMG senior manager.

12   She is Inga and then the last name is Tracy Bronson.

13          And then the part that's in that box were the focus

14   areas, again specific to that were going to be inspected by the

15   PCAOB for Brookline, so it would be the loans and leases area,

16   plus the allowance for loan loss focus area, plus deposits, and

17   then available for sale, securities, which is just part of

18   their investment portfolio for this bank.

19   Q.   To the left of the number 8 in the margin -- in the margin,

20   do you see where something is crossed out?

21   A.   Yes.

22   Q.   Do you know what text is underneath the crossout line?

23   A.   Yes.

24   Q.   What is it?

25   A.   It originally said "AQSN."

J2kdmid5                          Sweet - direct

 1   Q.  Do you have a memory of why that's crossed out?

 2   A.  I don't, no.

 3   Q.  OK.  Do you know whether Brookline Bancorp was in the

 4   monitoring program?

 5   A.  I don't see an "M" next to it so it would lead me to think

 6   that it is not but I don't know one way or another.

 7   Q.  All right.  Let's go down to the bottom half of the page

 8   and look at Macy*s.

 9              So I had asked you before generally about what's in

10   these brackets.  Can you read your handwriting in the brackets

11   next to Macy*s?

12   A.  Yes, I can.

13   Q.  And what's in the first batch of writing?

14   A.  So the first part of it says "Net sales."  Then it says,

15   "Pension plan assets and liabilities."  And underneath that

16   it's saying "To" and I'm not sure what the "BA" is saying, but

17   to not classify a fair value hierarchy using NAV, which is Net

18   Asset Value; it is an accounting rule.

19   Q.  OK.  What general auditing issue is captured by that last

20   note relating to NAV?

21   A.  One of the accounting rules that was in place is that

22   investments -- certain investments could be priced using a net

23   asset value when there wasn't another, you know, readily

24   available market price.  So, it is some very specific

25   information about that particular focus area that the PCAOB was

J2kdmid5                              Sweet - direct

1    planning to make.

2    Q.  OK.  And then to the right, what does it say within the

3    brackets?

4    A.  "Inventory," and then again specifying that within the

5    inventory I believe it is saying "vendor" and then "allowance"

6    and LIFO.

7    Q.  What is LIFO?

8    A.  It's again another accounting principle that refers to last

9    in-first out.  When you are accounting for your inventory, you

10   would take the last items added to your inventory and those

11   would be the first ones to get relieved when you are expensing

12   something.

13   Q.  OK.  What does is say below that?

14   A.  Then it says, "Store closures, impairment and other

15   charges."

16   Q.  And underneath that?

17   A.  "Non-GAAP measures."

18   Q.  OK.  Were all of these items in the brackets focus areas

19   that Cindy Holder told you Jeff Wada had told her for Macy*s?

20   A.  They're focus areas plus I guess very specific information

21   about those focus areas.

22   Q.  OK.  And what is the reference to "store closures"?  Was

23   that a focus area?

24   A.  It's information I believe about the focus areas that they

25   were looking at the impairment and other charges because of the

J2kdmid5                          Sweet - direct

1    store closures.

2    Q.  OK.  So after you wrote this document on February 3rd, or

3    most of it, that's in evidence as Government Exhibit 655, what

4    did you do next?

5    A.  I called Tom Whittle.

6    Q.  What did you tell him?

7    A.  I told him that we had received the full list of where the

8    PCAOB was planning to inspect in 2017.

9    Q.  In sum and substance, what did he say?

10   A.  He was very glad to have received it.  He asked me for the

11   names.  And I, you know, read him down not only the names of

12   the focus area -- I'm sorry, the names of the issuers but then

13   gave him the additional focus areas that had been provided as

14   well.

15   Q.  Did you have any other calls that day?

16   A.  Yes.

17   Q.  With who?

18   A.  I also spoke with David Britt.

19   Q.  What was said in that conversation?

20   A.  Very similar to the conversation with Tom.  I took him --

21   told him that, again, we had received a full list of PCAOB

22   inspections for that year, and that gave him the list of all

23   the names, read him off all the focus areas, especially for the

24   banks, pointed out that BankUnited was one of their planned

25   targets.  I remember he commented on that since that was his

J2kdmid5                          Sweet - direct

1   own engagement.

2   Q.  Could you tell during your conversation whether or not

3   David Britt was writing down what you were saying?

4   A.  I don't -- I don't remember him saying that he was writing

5   it down, but he and I had several other conversations about the

6   list after the first call in which he had referenced and

7   clearly had been thinking about the banks and the focus areas

8   and why they were, you know, looking at this particular focus

9   area this many times and that one this many times so he clearly

10  had been thinking about it and doing some analysis, so it

11  certainly led me to believe that he had taken notes from my

12  first conversation with him and written it down.

13  Q.  In your conversations with Tom Whittle or David Britt that

14  day, did you discuss next steps?

15  A.  Yes.

16  Q.  What was discussed?

17  A.  When I spoke with Tom on the first call, I asked him what

18  he wanted to do next, did he want to set up another call, like

19  he had done in March of 2016 with Dave Middendorf and David

20  Britt and Tom and myself so the four of us would talk through

21  it.  And he said, yes, let's have a call but let's do it on

22  Monday, since it was getting close to -- it was Friday at that

23  point, and so he asked me to arrange a call on the following

24  Monday.

25  Q.  Between getting the information from Cindy Holder that she

1    had gotten from Jeff Wada on February 3rd and having this call

2    on Monday, February 6th, what, if anything, did you do with the

3    information that you had obtained?

4    A.   I spoke to a couple of -- besides the call with Tom Whittle

5    and David Britt and then setting up a calendar invitation for

6    the following Monday, I had a call with both Paul Tupper, who

7    was the partner on CitiGroup, and also Diana Kunz, who was the

8    partner on Chemical, one of the banks.

9    Q.   Why did you have calls with Paul Tupper and Diana Kunz?

10   A.   I had been -- well, because I knew both of them very well.

11   Both of them were the lead audit partners on two of the banks

12   that were on the listing that we had just received, the final

13   listing, and I was giving them the heads up that they were

14   going to be inspected.

15   Q.   All right.  What did you tell Diana Kunz, in sum and

16   substance?

17   A.   I remember when I called Diana, she answered the phone and

18   said, like, oh, crap, it's never a good thing when you call me.

19   And I said, Yeah, Diana, we just got a heads up, and it looks

20   like Chemical is going to get inspected by the PCAOB this year.

21   I told her what the focus areas were going to be, and asked her

22   how she was feeling about her audit, whether or not she was

23   getting support on it, was she subject to monitoring programs,

24   or did she have any concerns, any questions.  And she told me

25   she felt fairly competent about each of our audit areas.

1  Q.  Did she send you any follow-up emails?

2  A.  Yes.

3  Q.  About what?

4  A.  I remember after ending the conversation with her, shortly

5  thereafter she sent me an email asking if I had any idea what

6  the timing was going to be for the PCAOB's inspection, so did

7  we know when in 2017 it would occur.

8  Q.  How did you respond?

9  A.  I believe I responded by indicating, no, we don't know the

10 specific timing.

11 Q.  What did you discuss with Paul Tupper?

12 A.  Very similar, that we now knew that CitiGroup was in fact

13 going to get picked by the PCAOB for inspection.  We just

14 reaffirmed the January 9th preliminary listing, and also shared

15 with Paul Tupper the specific focus areas that had been

16 provided from Jeff Wada to Cindy that I had written down.

17 Q.  Why did you reach out to Diana Kunz and Paul Tupper?

18 A.  Well, during my conversation with Tom Whittle as we were

19 going through, I was sharing with him, you know some of the

20 different partners, and he knew, because I reported to Tom,

21 that I had been -- I was the AQSN on CitiGroup and that I knew

22 Paul Tupper very well.  And he said, Oh, yeah, give Paul a

23 heads up.

24         And when we got to Diana, I had been working closely

25 with her in 2016 as part of the rereview efforts, the stealth

1    rereview on First Business Financial, and then when the PCAOB

2    inspected that engagement, and he said, Oh, yeah, we should

3    give Diana a heads up.  And so I did it in part because Tom

4    instructed me to but also because I felt I had a very close

5    relationship with both of those two partners and wanted them to

6    be aware.

7    Q.  Did you have conversations with any other engagement

8    partners between February 6 -- excuse me, between

9    February 3rd and February 6th?

10   A.  Yes.

11   Q.  With who?

12   A.  I believe between those dates I also then spoke with both

13   Stephen Penn and Andrew Davidson.

14   Q.  What did you talk to them about?

15   A.  They were the two banking partners that had been identified

16   on the preliminary listing that we had received from Jeff Wada

17   on January 9th for National Bank Holdings and Midland States.

18   And I previously told them earlier in January that they were

19   likely going to get picked.  And now after having gotten this

20   final listing, we knew that they were not, those two banks were

21   not on the list, so I remember calling them to tell them that.

22   Q.  All right.  Did you in fact schedule a call for

23   February 6th?

24   A.  Yes.

25   Q.  And did that call take place?

J2kdmid5                        Sweet – direct

1    A.  Yes.

2    Q.  Who participated in that call?

3    A.  It was me, Tom Whittle and Dave Middendorf on that call.

4    Q.  Did David Britt participate?

5    A.  No.

6    Q.  Did you speak with David Britt between February 3rd, when

7    you got the information, and the February 6th call with

8    Middendorf and Whittle?

9    A.  Yes.

10   Q.  Once or more than once?

11   A.  More than once.

12   Q.  What was the substance of your conversations with David

13   Britt over that weekend.

14   A.  After telling David and giving him the names of all the

15   issuers at the banks and the focus areas, I let him know that

16   we were going to have a call on Monday with Dave Middendorf and

17   that I had talked to Tom Whittle already.  And he told me that

18   he wasn't able to make that call, that he would -- I think he

19   was traveling on that Monday and he had also clearly been doing

20   some analysis about the focus areas on the banks and thinking

21   about why they were picking those banks.  And so I remember he

22   and I discussing kind of the focus areas and the why behind

23   them a few different times.

24   Q.  What gave you the understanding that David Britt had been

25   doing analysis on the banks that were on the list that Holder

J2kdmid5                          Sweet - direct

1   shared with you after she got it from Jeff Wada on

2   February 3rd?

3   A.   Again, because I remember him having done like specific

4   evaluation of like the number of times they were looking at

5   like the deposits focus area or the number of times they were

6   looking at loans, and so he had been thinking about the number

7   of focus area selections for the population of banks that were

8   on this final listing and trying to figure out why the PCAOB

9   was choosing to do it that way and what that might indicate

10  about, you know, the inspections and...

11  Q.   All right.  Where were you when this call took place on

12  Monday, February 6th, with Dave Middendorf and Tom Whittle?

13  A.   I was here in New York working out of the CitiGroup

14  offices.

15  Q.   Do you know where Dave Middendorf and Tom Whittle were?

16  A.   No.

17  Q.   Did the call take place over KPMG's conference call system?

18  A.   Yes.

19  Q.   Who hosted the call?

20  A.   We used -- I hosted the call.  It was my dial-in number.

21  Q.   Did you know during the call where Dave Middendorf was?

22  A.   I remember him indicating that he was leaving dinner and

23  that he was getting into a taxi, and then during the call he

24  was getting out of his taxi and I believe getting into --

25  walking into the hotel he was staying in.

1   Q.   What did you tell them during the call?

2   A.   I remember giving them the list of names, so all of the

3   information that Jeff had shared, Jeff Wada provided to Cindy,

4   on the specific names of the issuers.  We talked about the

5   focus areas.  And we talked about which ones were part of the

6   AQSN or monitoring program.  I remember sharing with him the

7   other information that I had written down about those partners

8   that were severe offenders were on that list.

9   Q.   What, if anything, did you tell them about where you got

10  the list?

11  A.   I again made it clear that this had come from, you know,

12  the former colleague at the PCAOB.

13  Q.   Did you have an understanding, based on what Dave

14  Middendorf said during the call, about whether he was taking

15  down in any way the list as you read it?

16  A.   Yes.

17  Q.   What was your understanding of that?

18  A.   That he was taking notes.  I got the impression he was

19  taking notes into his phone because he was, you know, leaving

20  his dinner and his taxi, because there were a number of times

21  as we were talking through the specific issuers that he was

22  asking me how to, you know, spell it or what was that ticker

23  symbol or what was that name again.

24          MS. KRAMER:  And could we pull up, Mr. Urbanczyk,

25  Government Exhibit 655, in evidence.

J2kdmid5                          Sweet - direct

1    Q.  So, during the call did you go through the entire list

2    below the line on Government Exhibit 655?

3    A.  Yes.

4    Q.  And during the call, did you go through the information

5    about the banks that are above the line on Government Exhibit

6    655?

7    A.  Yes.

8          MS. KRAMER:  Can you go back to the document,

9    Mr. Urbanczyk.

10   Q.  So the information about the banks above the line, you went

11   through that as well?

12   A.  Yes.

13   Q.  Do you remember whether this was a short call or a long

14   call?

15   A.  It was a fairly long call.

16   Q.  Based on what Dave Middendorf said during the call, did you

17   have an understanding of what his reaction was to getting this

18   information?

19   A.  Yes.

20   Q.  What was your understanding?

21   A.  It was, again, very pleased to have had this information.

22   Q.  What, if anything, did you say on the call about whether

23   you had asked for this information?

24   A.  Yeah.  I remember telling them, both Tom and Dave

25   Middendorf, that I wanted them to know that I had not solicited

J2kdmid5                        Sweet - direct

1    this information and that I didn't ask for it and that I didn't

2    know what to do with it.

3    Q.  Why did you tell them that?

4    A.  I knew that this information felt just different to me than

5    the previous lists, because this was a final set of the PCAOB's

6    inspection targets for 2017, and with a few exceptions, these

7    were all still live audits.  Whereas the March listing, those

8    were audits that had already at least had their opinion

9    finalized and they were within that 45-day documentation date

10   and the information that I shared in 2015, I understood all of

11   those to be finalized audits and all the documentation

12   completed.  And so I just -- I wasn't sure -- I didn't quite

13   know how they were going to react.  I was a little nervous

14   about this information.

15   Q.  How did Dave Middendorf respond to you saying that?

16           MS. LESTER:  Objection.  Asked and answered.

17           THE COURT:  Overruled.

18   A.  Dave -- after I having expressed -- after I said I didn't

19   know what to do with this, Dave Middendorf responded by saying,

20   Hey, Brian, this is information that's too good not to use.

21   Q.  What, if anything, did you say during the call about the

22   conversations that you had already had with Paul Tupper and

23   Diana Kunz?

24   A.  We went through the list a second time on the call.  And

25   during the second time we focused in on who the particular

1    partners were.  And so when we got to like CitiGroup, I said,

2    Hey, I had already given Paul Tupper a heads up.  And with

3    Diana, the same thing, I had given Diana a heads up.

4    Q.  What, if anything, was the plan that came out of the

5    February 6th call?

6    A.  There were a couple of other banks that were on there

7    where, you know, the instruction or what we had talked about

8    was to, you know, speak -- for me to speak to a couple of the

9    banking partners and notify them.  And I remember kind of at

10   the end of the call Tom and Dave saying:  OK.  Hey, Brian,

11   we'll go and figure this out and figure out what to do with

12   this and, you know, we'll kind of let you know.

13   Q.  Do you remember any of the specific engagements that were

14   discussed on the February 6th call?

15   A.  Yes.

16   Q.  Which ones do you remember specifically being discussed in

17   terms of future action at that time?

18   A.  So, for First Bancorp, I remember Tom telling me, Hey,

19   Brian, give Lucette Negron a heads up.  And when do you, remind

20   her that First Bancorp had been scheduled for inspection by the

21   PCAOB in 2016 but they had canceled it because of the Zika

22   virus.  That is that Puerto Rico bank.

23           And with Joe Gencarella, he was the audit partner on

24   Brookline Bancorp, and he was the one who had been a partner in

25   2016 and had been subject to both NewStar and Century that were

J2kdmid5                              Sweet – direct

1    both clean inspections and so they canceled that third one.

2    And so he said, Hey, Brian, when you give Joe a heads up, make

3    sure you tell him about this other partner in the banking

4    practice that had been inspected two times the same year by the

5    PCAOB, had clean inspections, and the PCAOB still picked them

6    again the following year.  So that I was to, you know,

7    characterize, Hey, good likelihood of getting picked and here's

8    the way -- you know, here's how to say it.

9    Q.  When you were given those instructions, was Dave Middendorf

10   still on the call?

11   A.  Yes.

12   Q.  Did he say anything about that?

13   A.  No, I don't remember him saying anything specific about

14   those two.

15   Q.  Did he interject at any point and tell you not to reach out

16   to those people?

17   A.  No.

18   Q.  What, if anything, was discussed on the February 6th call

19   about Macy*s?

20   A.  We discussed again the fact that it was on the list.  We

21   discussed the specific focus areas, and again kind of

22   reaffirmed that Joe Lynch was going to be engaged once he had

23   finished supporting on the CitiGroup audit to go out and help.

24   Q.  Let's look again at Government Exhibit 655.

25              You testified earlier about a couple of items on the

J2kdmid5                          Sweet - direct

1    list that had question marks.

2              So on the left side, FDL and FNGN, were those

3    discussed at all on the February 6th call?

4    A.  Yes.

5    Q.  What was said about them?

6    A.  I remember telling them that these were the ticker symbols

7    that we had received and that it looked like those were those

8    issuers but that I couldn't match it up to the data request.

9    And I remember Tom Whittle saying, Hey, can you go back to, you

10   know, the colleague and check on those, confirm those?

11             And I remember Dave Middendorf saying, Nope, you don't

12   need to do that.  Don't worry about it, Brian.  I've got access

13   to the firm's system of clients.  I'll chick on those, you

14   know, myself.

15   Q.  All right.  At any point in the call, did anyone say

16   anything about being uncomfortable with this information?

17   A.  I indicated I was uncomfortable with this information.

18   Q.  Did anyone else say anything about that?

19   A.  No.

20   Q.  Did anyone on the call say anything about not wanting to

21   have this information?

22   A.  No.

23   Q.  Over the next day or two, what steps, if any, did you take?

24   A.  I remember speaking with Paul Tupper, Joe Gencarella,

25   Lucette Negron, talked -- spoke with, you know, Cindy,

1   debriefed with her about the call, talked to another, you know,

2   managing director who was working out at Citi with me.

3   Q.  Did there come a time that you took a photo of the list

4   that you had written down on the manila folder?

5   A.  Yes.

6   Q.  Why did you take a picture of it?

7   A.  I remember being with Paul Tupper, who was the lead audit

8   partner on Citi.  And after confirming to him that Citi was

9   going to get picked, he -- he said, Hey, Brian, I've got this

10  other small banking engagement that I work on.  Do you happen

11  to know if they're going to get picked?

12          And I didn't have the list with me.  I remember

13  say9ing, OK, let me go check, Paul, and come back to you.  And

14  I remember after that thinking I have to take a picture of this

15  so that I have the information handy on my phone in case other

16  questions like that come up from other people.

17  Q.  Do you remember approximately when you took that picture of

18  the list?

19  A.  I know it was sometime after February 6th but I don't know

20  the date.

21  Q.  On February 8th, did there come a time that you had a call

22  with Tom Whittle?

23  A.  Yes.

24  Q.  What happened in that call?

25  A.  Tom Whittle called me and said, Hey, did you tell Diana we

J2kdmid5                          Sweet - direct

1       had the list?

2                   And I remember lying and saying, No, I didn't tell her

3       we had a list.

4                   And he said, Well, did Cindy Holder tell her?

5                   And I said, I don't think so.

6                   Then he said -- I remember him saying, Well, she

7       knows.

8       Q.   And in reference to "Diana," who did you understand him to

9       mean?

10      A.   He was referring to Diana Kunz, who was the partner on

11      Chemical that I had spoken with on that Friday.

12      Q.   Why did you tell Tom Whittle that you hadn't told Diana?

13      A.   Because I was scared.  I knew that Tom would be angry with

14      me for having told Diana really the truth about this list and

15      knowing that it had come from the PCAOB versus, you know, using

16      some other kind of made-up story about why we thought it might

17      have a high chance of getting picked.  And, you know, Tom was

18      the one who had mentioned the circle of trust, you know, in the

19      first instance in March of 2016, and I was clearly violating

20      the circle of trust by telling her the way I did.

21      Q.   What did Tom Whittle say next?

22      A.   I remember him saying that Diana had reported it up to the

23      leadership in our office and that I think it had gone to one of

24      the firm's regional risk management partners, and I remember

25      Tom saying, I don't know if we can stop this train.

1  Q.  What, if any, direction did he give you about further

2  action on the list?

3  A.  He told me to stand down and to not let anyone else know

4  about the listing and to not do anything further with this, and

5  asked me if -- asked me to tell Cindy Holder the same thing.

6  Q.  Did there come a time when you learned that KPMG lawyers

7  were investigating how the firm had gotten the February 2017

8  PCAOB inspection list?

9  A.  Yes.

10 Q.  Do you remember approximately when you learned that?

11 A.  I believe it was on February 14th, so about a

12 week-and-a-half later.

13 Q.  February 14, 2017?

14 A.  Yes.

15 Q.  How did you learn that there was an investigation?

16 A.  I received a phone call from a partner in KPMG's Legal

17 Department, their Office of General Counsel.

18 Q.  Did you give him any substantive information in that first

19 phone call?

20 A.  No, I didn't.

21 Q.  How did you leave things at the end of that call?

22 A.  I told him that I had a client call coming up and that I

23 didn't -- wouldn't have enough time to talk this through with

24 him and that I need to take this client call and that I would

25 call him right back.

J2kdmid5                          Sweet - direct

Q.  Did you actually have a client call?

A.  Yeah, I did.

Q.  Is that why you told him that you needed to call him back?

A.  No.

Q.  Why did you tell him you needed to call him back?

A.  Because I was scared, didn't know what to do, and I wanted to figure out -- I wanted to talk to Tom, figure out what to do.

Q.  What did you do next?

A.  I don't remember if I first called Tom Whittle or Cindy Holder, but I remember speaking with Cindy and telling Cindy Holder, Hey, I just got this call from Mark Rubino at KPMG's internal counsel.  You know, have you gotten one yet?  I told her I was going to either try get Tom Whittle or that I had tried.  And she said, yeah, yeah, definitely make sure you speak with Tom before you call Mark back.  And then trying Tom a couple of times until I finally got him.

Q.  Did you speak with Cindy Holder once or more than once that day?

A.  More than once that day.

Q.  Do you remember specifically what she said in each individual conversation?

A.  Not in each one.

Q.  Do you remember generally what she said in the conversations overall?

J2kdmid5                          Sweet - direct

1   A.  Yes.

2   Q.  What did she say?

3   A.  I remember her telling me that when KPMG's kind of internal

4   legal counsel called her to ask her about it, that she was just

5   going to say that she had received this list of ticker symbols

6   anonymously in the mail and that she was going to never -- or

7   not tell them about Jeff Wada and that Jeff Wada had been the

8   source of this information.

9   Q.  When she said that she was not going to tell them that Jeff

10  Wada had been the source of the information, what did you

11  understand her to mean?

12  A.  That she was going to deny knowing who the information had

13  come from at the PCAOB and was going to lie about it really

14  coming from Jeff Wada.

15  Q.  Did you have any understanding about whether or not Cindy

16  Holder had told Jeff Wada that you knew that he was the source?

17  A.  Yes.

18  Q.  What was your understanding about that?

19          MR. COOK:  Objection.  Foundation.

20          THE COURT:  Sustained.

21  BY MS. KRAMER:

22  Q.  Where did you get that understanding?

23  A.  It was -- my understanding was that --

24  Q.  Let me just stop you.

25          Without saying what your understanding was on the

1    subject, could you explain first how you came to have an

2    understanding about whether Cindy Holder had told Jeff Wada

3    that you knew that he was the source?

4    A.  Cindy and I had talked about Jeff Wada multiple times from

5    2015, 2016, 2017, I mean in every instance that he had provided

6    this information, and in those conversations it was clear to me

7    that Cindy had told him that her next step after getting this

8    was going to be to call me.  It was also very clear to me, even

9    thinking back to the January 9th listing, because Cindy had

10   told me that preliminary listing had come from Jeff Wada and

11   then hours later had forwarded me Jeff Wada's résumé with the

12   expectation that I was going to review that résumé and then

13   return it back with comments to Jeff Wada.

14        There were also other text messages that Cindy and I

15   had exchanged back and forth going back, you know, especially

16   in 2016, where I remember telling Cindy things like, you know,

17   after finding out that KPMG Japan's inspection was clean,

18   saying make sure you tell Jeff Wada that, you know, something

19   like I think he's the freaking man or, you know, tell him that

20   next time he's in New York, you know, we've got to go get a

21   beer together or beers together, beers are on me.

22   Q.  So based on this communication --

23        MR. COOK:  Your Honor, I object to the narrative

24   summation he just gave and move to strike everything after his

25   statement that I believe his words were -- my realtime stopped.

J2kdmid5                          Sweet - direct

His words were to the effect of "my understanding."  It is

clear his testimony is based on inferences and speculation and

not anything other than that.

          THE COURT:  I think he testified to the bases for his

understanding.  I am not going to strike it.

BY MS. KRAMER:

Q.  So what was your understanding about whether he knew that

Cindy Holder was telling you that he was the source?

A.  That he knew that I knew.

Q.  All right.  So when -- at the time that you and Cindy

Holder spoke on February 14, 2017, at that point did you have

an understanding about whether the investigation was into the

2017 list alone or also the earlier lists?

A.  Only the 2017 list.

Q.  How did you respond to Cindy Holder telling you that she

wanted to protect Jeff Wada as the source?

A.  I told Cindy that -- that I would do the same, that at that

point we had only been referring to Jeff Wada as a former

colleague and that really only Cindy and I knew who the real

person was at the PCAOB providing this.

Q.  Did there come a time that day that that you spoke with Tom

Whittle?

A.  Yes.

Q.  And what was said in that conversation?

A.  I remember telling Tom that I had just received a call from

Mark Rubino, who was KPMG's internal counsel, and that I didn't know what to do.  And Tom said -- I remember Tom saying, Well, I guess I'm going to get the next call.

And I said, OK, Tom, I'm really sorry.

And he said -- and I said, I'll call you back after I speak with Mark Rubino.

And he said, Well, I don't think you're going to be able to.

Q.   Did you speak with Mark Rubino, counsel for KPMG, again that day?

A.   Yes, I did.

Q.   Did you understand the fact that he was calling you and asking you questions was serious?

A.   Yes, I did.

Q.   Did you tell him the truth or did you lie?

A.   I lied to him.

Q.   What did you lie about?

A.   I told him that I didn't know who this information had come from at the PCAOB, which was a lie.  I told him that Cindy had just -- had told me it was received anonymously in the mail, which I knew to be a lie, right.  I also did not mention to him that the same thing had occurred in March of 2016 or in January of 2017 or the other instances where other information had come from Jeff Wada.  And I lied about -- I also lied about the list itself.

J2kdmid5                            Sweet - direct

1    Q.  What did you tell him about the list?

2    A.  He asked me if I still have the list, and I told him I did.

3          He said, OK, I want you to, you know, scan it and send

4    it to me so I could see it.

5          And I said, OK, I'll do that after the call.

6          And I looked at the list and realized that if I sent

7    him the real version of the list, my real notes, that it would

8    be clear that it was -- it was inconsistent with the lie of

9    just having received a list anonymously in the mail from Cindy

10   because it had all of this other information on it on focus

11   areas and partners and, you know, there were severe offenders,

12   and so I recreated a fake copy of the list and only wrote down

13   basically the ticker symbols, which I knew was a lie.

14   Q.  Why did you lie to Mark Rubino that day?

15   A.  I was scared about losing my job.  I didn't want to get

16   caught.

17   Q.  Did you know that what you had done was wrong?

18   A.  Oh, yeah.

19   Q.  Did you understand that what you had done had an improper

20   purpose?

21   A.  Yes.

22   Q.  Let's take a look at what's marked for identification as

23   Government Exhibit 650.

24          Do you recognize this exhibit?

25   A.  Yes.

J2kdmid5                          Sweet - direct

1   Q.  How do you recognize it?

2   A.  I recognize this as the -- this is my handwriting.  This is

3   the fake copy of the list that I created after that call with

4   Mark and scanned and sent to him.

5           MS. KRAMER:  The government offers Government Exhibit

6   650.

7           THE COURT:  Received.

8           (Government's Exhibit 650 received in evidence)

9   BY MS. KRAMER:

10  Q.  All right.  Let's put 650 side-by-side with 655.

11          So, to be clear, what is the list on the left,

12  Government Exhibit 650?  Is that the fake list or the real

13  list?

14  A.  That is the fake list.

15  Q.  And Government Exhibit 655, on the right, is that the fake

16  list or the real list?

17  A.  The one on the right is the real list.

18  Q.  It looks like from the edges that Government Exhibit 650 is

19  written on a manila folder, is that correct?

20  A.  Yes.

21  Q.  Why did you write the fake list on a manila folder?

22  A.  Because I had written the original list on a manila folder,

23  I decided to do the same thing with the fake list I created.

24  Q.  OK.  And was your decision not to copy down onto the fake

25  list Government Exhibit 650 all of the information on the real

J2kdmid5                        Sweet - direct

1    list, Government Exhibit 655, was that a deliberate decision?

2    A.   Yes.

3    Q.   Why did you make that decision?

4    A.   Because I knew that by copying all the information down,

5    that it would be inconsistent with this lie that I had just

6    told him about Cindy having received it in the mail from an

7    anonymous person.

8    Q.   And to be clear, what was the lie that you passed along

9    about what Cindy Holder had received in the mail?

10   A.   She had told me that she was going to say that she had just

11   received a listing of ticker symbols anonymously in the mail

12   that she had recognized to be KPMG audit clients and that she

13   was going to say there had been no return address on there so

14   she couldn't tell who it had been sent from, and that if Mark

15   Rubino was going to ask her, that she would just say, well,

16   lots of people at the PCAOB had her home address because she

17   sent Christmas cards to people.

18   Q.   How did you get this fake list, Government Exhibit 650, to

19   Mark Rubino on February 14th?

20   A.   I scanned it on my home scanner/printer and then emailed it

21   to Mark Rubino.

22   Q.   Is Government Exhibit 655, the real list, is that a

23   photograph or a photocopy?

24   A.   That is the photograph that I took of my list.

25   Q.   And who took that photo?

J2kdmid5                          Sweet - direct

1    A.  I took the photo.

2    Q.  Do you still have the original manila folder with your

3    handwritten notes of the 2017 lists from both January and

4    February that's Government Exhibit 655?

5    A.  No, I do not.

6    Q.  Where is that document?

7    A.  Later that day after the call with Mark Rubino, I took the

8    original document and I burned it in my home barbecue.

9    Q.  In the barbecue grill in your backyard?

10   A.  Yes.

11   Q.  Did you destroy anything else in your barbecue that day?

12   A.  No, I did not.

13   Q.  Why did you burn the real 2017 list in your backyard

14   barbecue in February of 2017?

15   A.  I was trying to cover my tracks.

16   Q.  And what, if anything, did you do with the picture on your

17   phone of the February 2017 list, Government Exhibit 655?

18   A.  I deleted it from my phone.

19                  (Continued on next page)

20

21

22

23

24

25

J2K5mid6                        Sweet - direct

1   BY MS. KRAMER:

2   Q.  Why did you delete it?

3   A.  Again, another way to cover my tracks.

4   Q.  Do you now understand that the photograph of the real list

5   was recovered from your phone?

6   A.  Yes.

7   Q.  Did there come a time that you told Cynthia Holder that you

8   gave Marc Rubino the fake replica of the list?

9   A.  Yes.

10  Q.  Approximately when did you tell her that?

11  A.  This was after my second call with Mark Rubino on that day,

12  February 14th.

13  Q.  What was her reaction?

14  A.  I remember she was mad at me.  She called me stupid or an

15  idiot or something like that, and said, Why didn't you say you

16  threw it away, say you didn't have it?

17  Q.  Did there come a time in February 2017 that you discussed

18  with Cynthia Holder whether either of you had electronic

19  documents that you had taken from the PCAOB?

20  A.  Yes.

21  Q.  How did that come up?

22  A.  A few days -- I remember it was a few days after the

23  initial phone call with Mark Rubino.  Cindy called me and said,

24  hey Brian, they're monitoring our e-mails and she referenced a

25  specific e-mail that she had sent to me, and I remember then

1  starting to think or worry that if internal counsel was in fact

2  monitoring my e-mails, and I knew I had all of this stolen

3  PCAOB information, the stuff that I had taken with me when I

4  left the PCAOB that I had copied onto my KPMG computer.  And I

5  remember telling Cindy that and her then saying, calling me an

6  idiot, and saying that I shouldn't have done that and that she

7  had been much, you know, smarter and never copied it off of her

8  flash drive and that it was hidden somewhere where no one else

9  could find it.

10  Q.  Going back for a moment, did Cynthia Holder tell you why

11  she thought that your e-mails were being monitored?

12  A.  Yes.

13  Q.  What did she tell you about that?

14  A.  She said that Mark Rubino, in a call that he had had with

15  her, had asked her about an e-mail with the subject line that

16  said GEO risk, like G-E-O risk, and that Mark had asked her

17  about what that meant.  And it was an e-mail that Cindy had

18  sent me and GEO probably looked like a ticker symbol but it was

19  really a reference to one of the Citigroup memos that we were

20  working on, a geographical risk assessment that we had been

21  reviewing.

22  Q.  Did there come a time that you were asked to provide phone

23  records to KPMG counsel?

24  A.  Yes.

25  Q.  Were you and Cynthia Holder still in communication during

J2K5mid6                         Sweet - direct

1    that time?

2    A.   Yes.

3    Q.   What, if anything, did you and Cindy Holder discuss

4    concerning the fact that you had received a request for phone

5    records?

6    A.   That because Cindy and I had been asked if we would give to

7    KPMG counsel or phone records that Cindy and I did not want to

8    have this -- this long exchange of calls back and forth that

9    would coincide with each of the internal counsel's calls to us,

10   and so we devised a plan to try and communicate in other ways

11   to avoid detection.

12   Q.   What were those other ways that you talked to Cindy Holder

13   about using to avoid detection?

14   A.   Cindy suggested that we get burner phones.  Cindy and I

15   talked about using Instagram as a code that if either of us

16   posted a picture, like a direct message in Instagram of a

17   college football team picture, that that would be a code to

18   then dial into a conference call number.  I also gave her -- I

19   think I gave her my spouse's phone number and she gave me her

20   spouse's phone number so that we could try and communicate with

21   each other that way.

22   Q.   Did you ever follow up on Cindy Holder's suggestion that

23   you get burner phones?

24   A.   I did not get a burner phone, but I understand that Cindy

25   did and she gave me the number for it.

J2K5mid6                              Sweet - direct

1    Q.   What do you understand a burner phone to be?

2    A.   I understand a burner phone to just be a phone that

3    couldn't be traced back, the phone number can't be traced back

4    like a prepaid phone or something like that.

5    Q.   And, did you ever communicate with Cindy Holder through

6    these different means to avoid detection?

7    A.   Yes.

8    Q.   Did you ever speak with her from a phone other than your

9    phone or your spouse's phone?

10   A.   Yes.

11   Q.   And was the decision to call her from other numbers not

12   your own cell phone, deliberate?

13   A.   Yes.

14   Q.   Why did you do that?

15   A.   To try and conceal the fact that she and I were speaking.

16   Q.   During any of your conversations with Cindy Holder during

17   this time period, did you discuss how to handle questions from

18   KPMG counsel?

19   A.   Yes.

20   Q.   What did she say about that?

21   A.   Cindy, because she had, she told me that -- well, she told

22   me that because she had previously worked in law enforcement

23   that she knew how to handle interviews.  And she told me that,

24   you know, what I needed to do was take control of the

25   conversation and don't get, you know, suckered in, basically,

1   to you know, long pause.  In other words, if they ask me a

2   question or said something and there was a long pause, that she

3   said she was the one who had invented the long pause and she

4   knew how to deal with that and I needed to be smarter when I

5   was talking to internal counsel Mark Rubino.

6   Q.  And, in any of your conversations in February 2017 was

7   Cindy Holder, did she report back to you about conversations

8   she had had with Jeffrey Wada?

9   A.  Yes.

10  Q.  What did she tell you about that?

11  A.  She told me that she had given or told Jeff that she and I

12  had both been contacted about the internal investigation and

13  she had assured Jeff that she would not tell KPMG's internal

14  lawyer that either she or I knew that Jeff Wada was the person.

15  I remember her telling me as well that the text message or that

16  the grocery list indication, referring to this March -- sorry,

17  the February 2017 list being your grocery list is ready that

18  she was just going to be able to explain that away as she was

19  going to buy Jeff groceries.

20  Q.  Did there come a time that you were interviewed by a law

21  firm in connection with KPMG's internal investigation?

22  A.  Yes.

23  Q.  Approximately when was that?

24  A.  I don't remember the first date but I believe it was in

25  March of 2017.

J2K5mid6                         Sweet - direct

1   Q.  Did you participate in one interview or in more than one

2   interview?

3   A.  It was more than one interview.

4   Q.  Were you truthful in those interviews or did you tell lies?

5   A.  I told lies.

6   Q.  What kinds of lies did you tell in those interviews?

7   A.  I lied about not knowing -- not knowing who the original

8   source was, that Jeff Wada was the person at PCAOB.

9           Actually, I take that back.  I think at that point

10  I -- no, I'm sorry.  At that point I -- at that point I had

11  told them that it was Jeff Wada.  Excuse me.

12          I lied about the different people that I knew I had

13  brought into the circle of trust trying to say that it was

14  limited.  I generally lied about my involvement in this trying

15  to shift blame to other people by saying, well, I was really

16  only the middleman and that Cindy was the one who was getting

17  this and once she told me, I immediately passed it on trying to

18  deflect blame wherever I could and generally told lies to try

19  and minimize my involvement in this, make myself look as good

20  as possible.

21  Q.  Why did you lie in those interviews?

22  A.  I was scared.  I was completely embarrassed and ashamed for

23  having had a role in this.  I wasn't sure if I was going to

24  keep my job or not.

25  Q.  Going back for just a moment to the conversations that you

J2K5mid6                          Sweet - direct

had with Cindy Holder during the investigation, did there ever

come a time that she talked to you about Jeff Wada's access to

the IIS system?

A.  Yes.

Q.  What did she say about that?

A.  She told me that Jeff was going to be able to explain that

he had had access to this, the KPMG's IIS system, it was kind

of restricted access.  Because of a role that he had on the

firm that he was primarily assigned to at the PCAOB and that

because of that role, it required him to be aware of what other

schedules existed so that he could coordinate loaner resources

or temp resources as the PCAOB shared staff from one team to

another.

           MS. KRAMER:  May I have just one moment, your Honor?

           THE COURT:  Yes.

           (Counsel conferring)

BY MS. KRAMER:

Q.  Mr. Sweet, you testified I think yesterday that you pled

guilty to conspiring to defraud the SEC and the PCAOB.  Did you

plead guilty pursuant to a cooperation agreement with the

government?

A.  Yes.

Q.  Approximately when did you begin meeting with the

government in an effort to cooperate?

A.  In July -- on or around July of 2017.

J2K5mid6                          Sweet - direct

1   Q.  At that point had you been charged with any crimes?

2   A.  No, I had not.

3   Q.  Approximately how many times have you met with the

4   government, both before pleading guilty and in preparation for

5   this trial?

6   A.  I don't know the exact number but more than a dozen, I

7   believe.

8   Q.  When is the most recent meeting you had with the

9   government?

10  A.  Last night.

11  Q.  And in your meetings with the government in preparation for

12  trial, were you ever shown any text messages between Cindy

13  Holder and Jeff Wada?

14  A.  No.

15  Q.  In your meetings with the government to prepare for trial,

16  did you ever listen to any voice mails from Jeff Wada?

17  A.  No.

18  Q.  Have you told the government about your role in stealing,

19  sharing, and using confidential PCAOB inspection lists?

20  A.  Yes.

21  Q.  Have you told the government about other individuals

22  involved in this scheme?

23  A.  Yes.

24  Q.  Is this the only unlawful conduct you have engaged in?

25  A.  No.

J2K5mid6                          Sweet - direct

1    Q.  Did you obtain a mortgage for the home you lived in from

2    approximately 2011 through 2014?

3    A.  Yes.

4    Q.  In approximately what year did you get that mortgage?

5    A.  In 2011.

6    Q.  Were you working at the PCAOB at the time?

7    A.  Yes.

8    Q.  When you applied for that mortgage, did you tell lies to

9    the lender?

10   A.  Yes.

11   Q.  Did you tell one lie or more than one lie?

12   A.  I told more than one lie.

13   Q.  What did you tell lies about?

14   A.  I lied about an investment account that was my father's

15   that I represented was my own.  I lied about my income; that I

16   had received a W-2 form from PwC, which was my prior employer

17   before the PCAOB, and I told the lender that that W-2 was

18   because of ongoing consulting work that I was doing for PwC

19   because of this audit specialist skill set I had when I knew

20   that was a lie, it was only for expense reimbursement.  And, I

21   also lied about a gift that I had said had come from my

22   father-in-law but was really a separate loan that I had taken

23   in order to have enough money for the downpayment.

24   Q.  Did you cause any documents to be sent to the lender in

25   connection with that purported loan from your father-in-law?

J2K5mid6                        Sweet - direct

1   A.  Yes.

2   Q.  What kind of document did you cause to be sent to the

3   lender?

4   A.  Filled out a gift letter that characterized this money from

5   my father-in-law as a gift when in fact it was not.

6   Q.  Did you ask your father-in-law to sign the letter?

7   A.  Yes.

8   Q.  Did you ask your wife to sign the letter?

9   A.  Yes.

10  Q.  Did you know at the time that you did that that it

11  contained false statements?

12  A.  Yes.

13  Q.  Turning to the money that you got from PwC, what did you

14  claim that money was for?

15  A.  I claimed that it was for consulting work that I had been

16  doing for PwC.

17  Q.  Was that the truth or a lie?

18  A.  It was a lie.

19  Q.  What was it actually for?

20  A.  It was for expense reimbursement.  I think it was tax

21  reimbursement.

22  Q.  Would the PCAOB have permitted you to work as a consultant

23  for PwC while you were working there?

24  A.  No.

25  Q.  Did you prepare any documents in connection with that lie?

J2K5mid6                          Sweet - direct

1    A.   Yes.

2    Q.   What kind of document did you prepare?

3    A.   I wrote a letter to the lender explaining that, or lying

4    about the nature of this, this W-2 income that mischaracterized

5    or that lied entirely about what it really was.

6    Q.   What did the letter say about your expertise in accounting?

7    A.   It said that I was earning this income because of this

8    accounting and auditing specialist skill set I had.

9    Q.   And what did the letter say about whether you are expected

10   to continue earning such money?

11   A.   It said -- I believe it said that I was likely going to

12   continue earning similar money like that.

13   Q.   And, was all of that a lie?

14   A.   Yes.

15   Q.   Who sent that letter in to the lender?

16   A.   I did.

17   Q.   From where?

18   A.   From my, I believe it was my PCAOB computer.

19   Q.   After telling those lies to the lender, did you get the

20   mortgage?

21   A.   Yes.

22   Q.   Did you pay off that mortgage?

23   A.   Yes.

24   Q.   Have you ever told that lender that you had lied to get the

25   mortgage?

J2K5mid6                          Sweet - direct

1   A.  No.

2   Q.  Did you purchase a vacation home in 2016?

3   A.  Yes.

4   Q.  Where?

5   A.  In Shaver Lake, California.

6   Q.  Do you still own that vacation home?

7   A.  No.

8   Q.  Approximately when did you sell it?

9   A.  In late 2017.

10  Q.  Right before buying that vacation home, did you have

11  another property that you sold?

12  A.  Yes.

13  Q.  What kind of property?

14  A.  It was a rental property.

15  Q.  What kind?

16  A.  A four-unit apartment.

17  Q.  And in what year did you sell it?

18  A.  2015.

19  Q.  When you filed your taxes for 2015, did you report the sale

20  of that apartment building?

21  A.  I reported the sale but did not pay any gains or taxes on

22  the gains from the sale.

23  Q.  What did you do in your taxes to prevent you from having to

24  pay taxes on the gains for the sale?

25  A.  I classified the sale as, under the IRS rules, as a 1031

J2K5mid6                          Sweet - direct

1    exchange.

2    Q.  What does that mean?

3    A.  It basically means that when you sell something and then

4    buy a similar asset, that you can defer paying any taxes on any

5    gains because you are rolling it into the new property.

6    Q.  And what was the new property that you claimed you were

7    rolling the rental apartment building into?

8    A.  A vacation home, a cabin.

9    Q.  What effect did that have on the amount of taxes that you

10   had to pay with your 2015 income tax returns?

11   A.  It lowered the amount of taxes that I had to pay.

12   Q.  By how much?

13   A.  I don't know the exact number but by quite a bit.  I would

14   estimate at least $30,000.

15   Q.  Did you ever list the vacation home on a website for rent?

16   A.  No.

17   Q.  Did you ever rent out the vacation home for profit?

18   A.  No.

19   Q.  Was there ever a time that you planned to rent out the

20   vacation home?

21   A.  Yes.

22   Q.  When did you abandon that plan?

23   A.  In the middle of 2016 sometime.

24   Q.  And when did you file your 2015 taxes?

25   A.  In October of 2016.

J2K5mid6                           Sweet - direct

1   Q.  So, after you abandoned the plan for renting it?

2   A.  Yes.

3   Q.  And in those taxes you claimed the 1031 exchange?

4   A.  Yes.

5   Q.  And that was a lie?

6   A.  Yes.

7   Q.  Who prepared your 2015 taxes?

8   A.  KPMG.

9   Q.  Did you tell your tax preparer that the vacation home was a

10  rental property?

11  A.  Yes.

12  Q.  And at the time you filed your taxes, did you sign them?

13  A.  Yes.

14  Q.  Did you understand them to contain false statements?

15  A.  Yes.

16  Q.  Did you intentionally sign false tax returns?

17  A.  Yes.

18  Q.  Why did you do that?

19  A.  To avoid paying taxes.

20  Q.  In addition to those returns being filed with the federal

21  government, were they also filed with the State of California?

22  A.  Yes.

23  Q.  Who prepared your taxes for 2016?

24  A.  KPMG.

25  Q.  Did you provide that tax preparer with information about

J2K5mid6                          Sweet - direct

1    the vacation home?

2    A.  Yes.

3    Q.  Did you lie to the tax preparer?

4    A.  Yes.

5    Q.  How did you lie to the tax preparer for your 2016 taxes?

6    A.  I told them that the vacation home was really a rental

7    property when I knew it was not.  I told the tax preparer that

8    I had rented it out for days when I knew I had not.  I lied to

9    the tax preparer about income that I had not actually earned

10   for this cabin and as a result was able to then take all of the

11   expenses for the cabin and use it to decrease the amount of

12   tax.  I took a loss on the property to offset my taxes.

13   Q.  Had you in fact collected rental income for any days on the

14   cabin in 2016?

15   A.  No.

16   Q.  Do you remember how much rental income you claimed you

17   received on that home in 2016?

18   A.  I don't remember the exact number but it was about $10,000,

19   I believe.

20   Q.  And, was that a lie?

21   A.  Yes.

22   Q.  Did you sign the tax returns that contained that false

23   information?

24   A.  Yes.

25   Q.  Did you know that you were signing false tax returns?

J2K5mid6                        Sweet – direct

1    A.  Yes.

2    Q.  And, were those returns also filed with the State of

3    California?

4    A.  Yes.

5    Q.  Did your 2017 tax returns contain similar lies about income

6    that you hadn't collected and expenses for that vacation home?

7    A.  Yes.

8    Q.  When did you file your 2017 tax returns?

9    A.  In October of 2018.

10   Q.  Had you already signed a cooperation agreement with the

11   government in this case by that time?

12   A.  Yes, I had.

13   Q.  Did you understand that the cooperation agreement

14   prohibited you from filing false tax returns?

15   A.  Yes.

16   Q.  Why did you include those lies on your 2017 tax returns?

17   A.  I was worried that, by having not revealed this lie to the

18   government during my initial meetings with them, that I was

19   violating the cooperation agreement and was scared about losing

20   it, and thought that I could just fix this later when I refiled

21   all my other past returns that I knew had errors and lies in

22   them.

23   Q.  When did it first occur to you that you should have told

24   the government about the lies about your vacation home on your

25   tax returns?

J2K5mid6                          Sweet - direct

1  A.  When I started filling out my 2017 returns in or around

2  March.

3  Q.  And why didn't you tell the prosecutors then?

4  A.  Because I was worried that by, if I told them then it was

5  after I signed the original cooperation agreement, that it

6  would indicate that I had not -- I should have told them this

7  earlier.

8  Q.  So, did you tell the same lies on your 2017 taxes after

9  realizing it was wrong?

10  A.  Yes.

11  Q.  Why?

12  A.  Because I thought that I could just fix it later without

13  anyone knowing about it.

14  Q.  And, what did you think the consequence would be of telling

15  the prosecutors that you had not previously told them about

16  this in connection with your 2016 tax returns?

17  A.  I thought they would be mad at me for not having told them

18  this earlier.

19  Q.  On the topic of the lies that you told to obtain your

20  mortgage on a home that you lived in from 2011 to 2014, when

21  did you disclose that to the government?

22  A.  In December or around December of 2017.

23  Q.  Why didn't you disclose that to the government in any of

24  your earlier meetings?

25  A.  I hadn't thought of it.

J2K5mid6                          Sweet - direct

Q.   What caused you to remember that in December 2018?

A.   We, in response to questions about properties that I had

purchased, I went through a process of looking through my old

files on this hard driver and I identified it then.

Q.   And on the topic of the lies you told to the IRS about your

vacation home and the expenses, when did you disclose that to

the government?

A.   Beginning in December of 2018 but not completely until

February of 2019.

Q.   Have your tax returns contained other false or inaccurate

information aside from what you have already testified about?

A.   Yes.

Q.   What kind of false or inaccurate information have your tax

returns contained?

A.   They included overstatement of charitable deductions;

overstatement of expenses related to business, you know,

apartments and apartment expenses and others; taking advantage

of credits that I didn't really qualify for; and in connection

with the apartments, that my wife was a real estate

professional.

Q.   Can you give an example of a personal expense that you

claimed as a business expense?

A.   Like, if we had bought something, home repair supplies at

Home Depot, like paint that we were going to use for my

personal home, that I would have then characterized that as an

J2K5mid6                         Sweet - direct

apartment expense, work we would do at our apartment when it

was really for our home.

Q.  For approximately what tax years did you tell those kinds

of lies on your tax returns, overstating the deductions, taking

credits, and in connection with charitable deductions?

A.  2012 through 2017.

Q.  And you mentioned claiming that your wife was a real estate

professional.  For what years have your tax returns claimed

that your wife is a real estate professional?

A.  I don't remember the first year but at least through, at

least through 2012 through 2017.

Q.  What effect has that had on your tax exposure?

A.  Characterizing my wife as a real estate professional means

that losses that we earn or that we incur on any rental

properties that we have owned and do own can be used to then

offset my income, so it has the effect of us paying less taxes.

Q.  Has your wife actually managed rental properties that you

have owned during that time period?

A.  Yes.

Q.  Is there a requirement that she spend a certain number of

hours per year managing rental properties to qualify for that

real estate professional status?

A.  Yes.

Q.  What's that number of hours that's the minimum per year?

A.  750 hours.

J2K5mid6                          Sweet - direct

1   Q.  And when you calculated those hours for your 2016 and 2017

2   tax returns, did you include the hours that she spent on your

3   vacation home that you falsely claimed was an investment

4   property?

5   A.  Yes.

6   Q.  Do you know if without the hours that she spent on your

7   vacation home, did she meet the 750-hour requirement?

8   A.  No.

9   Q.  And, what effect did claiming her as a real estate

10  professional have on your reporting of your vacation home as an

11  investment property?

12  A.  It allowed us to offset all of the expenses that we had on

13  the vacation home and applied those against my income so that

14  we would ultimately pay less taxes, lowered our adjusted gross

15  income.

16  Q.  When you left PwC in 2009 to go work for the PCAOB, did you

17  take any PwC materials with you?

18  A.  I did.

19  Q.  What did you take?

20  A.  I took other confidential information from PwC.

21  Q.  Did you understand that you were not allowed to take

22  confidential information from PwC?

23  A.  Yes.

24  Q.  And, what did you use to take the confidential information

25  from PwC?

1  A.  I used the same hard drive that I used when I took that

2  confidential information from the PCAOB.

3  Q.  When you graduated from college in 2000, did you graduate

4  with honors?

5  A.  Yes, I did.

6  Q.  What kind?

7  A.  I graduated *cum laude*.

8  Q.  What does that mean?

9  A.  Means I had a grade point average between 3.4 and 3.6.

10  Q.  Did you ever claim that you graduated *magna cum laude*?

11  A.  Yes, I did.

12  Q.  Is that higher honor than what you earned?

13  A.  Yes.

14  Q.  In what context did you claim that you graduated with

15  higher honors?

16  A.  I used it in like a biography of myself, a profile of

17  myself, and on a résumé.

18  Q.  Do you know approximately what years you did that?

19  A.  I don't know the first time that I put it on but I had it

20  on there between 2005 or '06 and 2009.

21  Q.  Turning back to the cooperation agreement, before you

22  signed that agreement did you review it with your attorneys?

23  A.  Yes, I did.

24  Q.  Take a look at what's marked for identification as

25  Government Exhibit 1450 and, Mr. Urbanczyk, if you can flip

J2K5mid6                              Sweet – direct

1    through to the last page, please?

2              Do you recognize this document?

3    A.  Yes, I do.

4    Q.  How do you recognize it?

5    A.  I recognize my signature on this document and this to be

6    the cooperation agreement that I signed.

7              MS. KRAMER:  The government offers Government Exhibit

8    1450.

9              THE COURT:  1450 is received.

10             (Government's Exhibit 1450 received in evidence)

11   BY MS. KRAMER:

12   Q.  Did you sign any supplemental agreements to your

13   cooperation agreement with the government?

14   A.  Yes.

15   Q.  I am showing you what's been marked for identification as

16   Government Exhibit 3522-36.  What is the date of this

17   supplemental agreement?

18   A.  February 10th, 2019.

19   Q.  Take a look at the first and second page; do you recognize

20   this document?

21   A.  Yes.

22   Q.  How do you recognize it?

23   A.  I recognize my signature.

24   Q.  And what do you recognize this to be?

25   A.  The supplement to the cooperation agreement.

J2K5mid6                        Sweet - direct

1            MS. KRAMER:  The government offers Government Exhibit

2      3522-36.

3            THE COURT:  Received.

4            (Government's Exhibit 3522-36 received in evidence)

5      BY MS. KRAMER:

6      Q.  What crimes did you plead guilty to pursuant to your

7      cooperation agreement?

8      A.  I pled guilty to both conspiracy to defraud the government

9      and conspiracy to commit wire fraud.

10     Q.  Why did you plead guilty to those crimes?

11     A.  I pled guilty because I am guilty.

12     Q.  And in connection with the wire fraud count, did you intend

13     to steal the PCAOB's property in committing that crime?

14     A.  Yes.

15     Q.  Approximately when did you plead guilty?

16     A.  In January -- excuse me.  In January of 2018.

17     Q.  After your guilty plea, did you continue to hold CPA

18     licenses in Illinois, New York, and California?

19     A.  No.

20     Q.  Why not?

21     A.  I resigned those licenses.

22     Q.  What kinds of jobs have you had since leaving KPMG in 2017?

23     A.  Accounting and audit-related jobs.

24     Q.  Have you told those employers about your involvement in

25     this case?

J2K5mid6                          Sweet - direct

1    A.   Yes.

2    Q.   Let's turn, for a moment, to when you entered your guilty

3    plea.  Did you appear in a courtroom in this district to plead

4    guilty?

5    A.   Yes.

6    Q.   At the time that you entered your plea, were you asked

7    questions about whether you understood at the time that what

8    you were doing was unlawful?

9    A.   Yes.

10   Q.   How did you answer?

11   A.   I answered that I didn't know it was unlawful at the time

12   but that I knew it was wrong.

13   Q.   And when you engaged in the conduct that led to your guilty

14   plea, did you understand that you were committing federal

15   felony crimes?

16   A.   I didn't know at the time but I realize that now.

17   Q.   Did you know you were violating a specific statute?

18   A.   No.

19   Q.   Did you know that what you were doing was wrong?

20   A.   Yes.

21   Q.   Did you have a wrongful purpose?

22   A.   Yes.

23        MR. BOXER:  Objection.  Calls for a legal conclusion,

24   your Honor.

25        MR. COOK:  Join.

1          THE COURT:  Overruled.

2     BY MS. KRAMER:

3     Q.  Have you been sentenced yet?

4     A.  No, I have not.

5     Q.  What is your understanding of the maximum sentence you face

6     as a result of your guilty plea?

7     A.  Up to 25 years in jail.

8     Q.  And what's your understanding of your obligations under the

9     cooperation agreement?

10    A.  That I am obligated to appear, if asked to testify.  That I

11    am obligated to tell the truth completely and to the best of my

12    ability.  That I am obligated not to commit any more crimes.  I

13    am obligated to amend and refile my tax returns.

14    Q.  What is your understanding of what you will receive in

15    return from the government if you comply with the terms of your

16    cooperation agreement?

17    A.  If I comply with the agreement, that the government will

18    write a letter that would be received by my sentencing judge to

19    indicate whether or not I have complied with the cooperation

20    agreement.

21    Q.  And what is your understanding of who writes that letter?

22    A.  The U.S. Attorney's office.

23    Q.  What's your understanding of what type of information goes

24    into that letter?

25    A.  That letter will include all of the bad things that I have

J2K5mid6                         Sweet - direct

1    done and disclosed to the government, in connection with this

2    case and the other crimes that I have told them about, and that

3    it will also include any good things that the government knows

4    about me.

5    Q.  You testified previously about other unlawful and wrongful

6    conduct you told the government in your meetings.  What is your

7    understanding about whether the letter will include that

8    unlawful and wrongful conduct?

9                MR. COOK:  Asked and answered.

10               THE COURT:  Overruled.

11               You can answer.

12               THE WITNESS:  I know that the letter will include all

13   of the wrongful conduct that I have done.

14   BY MS. KRAMER:

15   Q.  What is your understanding about whether that letter will

16   include what you told the government about the fact that you

17   filed false tax returns after signing your cooperation

18   agreement?

19   A.  I know that will be included in the letter.

20   Q.  What is your understanding about whether the cooperation

21   agreement or the supplemental agreement you signed provides you

22   with any protection from prosecution for tax crimes?

23               MR. COOK:  Objection.  Legal conclusion.

24               THE COURT:  Overruled.

25               THE WITNESS:  The cooperation agreement does not

J2K5mid6                          Sweet - direct

1   provide me with any protection from prosecution for the tax

2   crimes that I have committed.

3   BY MS. KRAMER:

4   Q.  What's your understanding of who receives the letter the

5   government writes in connection with your sentencing?

6   A.  The sentencing judge.

7   Q.  And with that letter, what is your understanding of the

8   lowest sentence you could get?

9   A.  Time-served.

10  Q.  And with that letter, what's your understanding of the

11  highest sentence you could get?

12  A.  25 years in jail.

13  Q.  Do you know what you will be sentenced to?

14  A.  No, I do not.

15  Q.  Were you promised any particular sentence or range of

16  sentences?

17  A.  No, I was not.

18  Q.  What do you hope to be sentenced to?

19  A.  Time-served.

20  Q.  What's your understanding what happens if you don't tell

21  the truth in this trial?

22  A.  I know that I will be in violation of my cooperation

23  agreement.

24  Q.  And what's your understanding of what effect that has on

25  whether you get that letter at sentencing?

J2K5mid6                         Sweet - direct

1   A.   That I will not get that letter.

2   Q.   Could you withdraw your guilty plea if that happened?

3   A.   No, I cannot.

4   Q.   What is your understanding of whether the jury verdict in

5   this trial has any effect on whether or not you receive that

6   letter?

7   A.   The jury verdict in this trial has no effect on whether or

8   not I have cooperated.

9   Q.   What is your understanding of who decides your sentence?

10  A.   The sentencing judge.

11            MS. KRAMER:   May I have a moment, your Honor?

12            THE COURT:   Yes.

13            (Counsel conferring)

14            MS. KRAMER:   Nothing further, your Honor.

15            THE COURT:   Folks, why don't we take a 10-minute

16  break.  It is midafternoon, we will take 10 minutes.  Please,

17  leave your pads on your chairs and we will continue in 10.

18            (Continued on next page)

19

20

21

22

23

24

25

J2K5mid6                          Sweet - direct

1               (Jury not present)

2               THE COURT:  You may step down.

3               (Witness steps down)

4               MR. COOK:  We ask the Court to instruct the witness

5    not to speak with the prosecution team or his lawyer concerning

6    the subject matter of his testimony while he is under

7    cross-examination.

8               THE COURT:  Yes.

9               The witness will not be speaking to the prosecution

10   team at this point.

11              MS. KRAMER:  Correct.

12              Your Honor, the postal inspectors have been assisting

13   the government in this case.  I have asked them to escort

14   Mr. Sweet into the hallway and to not have any substantive

15   conversations.  So, I think rather than letting him float

16   around unattended, if it is all right, with the Court's

17   permission, they will escort him in and out but not have any

18   substantive conversation with him.

19              MR. COOK:  Your Honor, the instruction should include

20   his counsel as well.  He is represented by counsel who is here.

21              MR. MORVILLO:  Your Honor, Richard Morvillo for

22   Mr. Sweet.

23              We will refrain from talking to Mr. Sweet about the

24   subject of his testimony, though I would ask if we could at

25   least talk to him between now and the time that he takes the

J2K5mid6                          Sweet - direct

1    stand.  He hasn't been asked any questions and I would like to

2    at least chat with him a little about his state of mind.

3              THE COURT:  But not about the subject of his

4    testimony.

5              MR. MORVILLO:  Not about the subject of his testimony.

6              THE COURT:  Okay.  That's fine.

7              MR. MORVILLO:  Thank you.

8              THE COURT:  We will we will continue in 10.

9              MR. WEDDLE:  Sorry, your Honor.  One thing?

10             THE COURT:  Yes.

11             MR. WEDDLE:  Along the same lines of what was raised

12   by Ms. Lester before the last break, we heard in this session

13   of Mr. Sweet's testimony about a statement that he attributed

14   to Mr. Wada regarding Mr. Wada's access to planning documents

15   and the IIS system.  If I am not mistaken, that appears nowhere

16   in the 3500 material, and so I would welcome an explanation for

17   why that is and why that's never been disclosed before the

18   witness testified on the stand.

19             THE COURT:  Okay.  I will ask counsel to confer about

20   that and let me know if there is an issue.

21             MS. KRAMER:  Thank you, your Honor.

22             THE COURT:  Thank you.

23             (Recess)

24             MS. KRAMER:  Your Honor, should we get the witness on

25   the stand or are there any matters to take up?

J2K5mid6                         Sweet – direct

1           THE COURT:  Does anybody have anything to address?

2       You can bring him in.

3           MS. KRAMER:  Thank you.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2K5mid6                          Sweet - cross

1          (Jury present)

2          THE COURT:  Please, be seated.

3          We are now ready for cross-examination.

4          Mr. Cook.

5    CROSS EXAMINATION

6    BY MR. COOK:

7    Q.  Mr. Sweet, my name is Steve Cook.  I represent Jeffrey

8    Wada.  I want to start by following up on some of the questions

9    the prosecutor just finished asking you.

10         Would it be fair to say that you are willing to lie

11   when you believe it will save you money?

12   A.  I have in the past, yes.

13   Q.  And you'll lie when you believe it will help your career?

14   A.  I have in the past, yes.

15   Q.  You will lie when you believe it will get you out of

16   trouble?

17   A.  Yes.

18   Q.  You will create fake documents in order to obtain a

19   mortgage?

20   A.  I did, yes.

21   Q.  And by doing that defraud a financial institution?

22   A.  I did, yes.

23   Q.  You will create fake documents also to get out of trouble,

24   right?

25   A.  I did in connection with the fake list, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2K5mid6                          Sweet – cross

1   Q.  You will lie to your employers?

2   A.  Yes.

3   Q.  You will even tell lies involving your wife and your father

4   if you think it will help you, right?

5   A.  I did.

6   Q.  You are willing to tell lies to the lawyers who were

7   investigating your conduct in connection with this case?

8   A.  Yes, I did.

9   Q.  You lied to them repeatedly, right?

10  A.  Yes, I did.

11  Q.  You lied even to the prosecutors in order to minimize the

12  consequences of the other crimes that you didn't disclose to

13  them?

14  A.  I did not tell them when I first realized but I did tell

15  them the truth.

16  Q.  You are willing to tell lies in order to keep the

17  cooperation agreement that you signed with the government?

18  A.  No.  That's not the case.  My obligation under the

19  cooperation agreement is only to tell the truth.

20  Q.  It is your testimony that you would draw the line at a lie

21  told for the purpose of preserving your cooperation agreement

22  with the government; is that right?

23  A.  No, that's not -- that's not the case.

24  Q.  You wouldn't do that?

25  A.  If I tell a lie I would be in violation of my cooperation

J2K5mid6                          Sweet - cross

agreement.  I am obligated under that cooperation agreement to

only testify truthfully.

Q.  You knowingly violated your cooperation agreement in this

case, haven't you?

A.  I don't know how the prosecutors determine that.  I told

them what I had done.  It's their determination.  I don't know

what is in their head.

Q.  Well, let's talk about what some of your obligations are

under that agreement.  One is that you tell them the truth,

correct?

A.  Yes.

Q.  Another requirement is that you disclose all past criminal

conduct, correct?

A.  Yes.

Q.  Another requirement, not only of your cooperation agreement

but the conditions of your release on bond, is that you commit

no further crimes, correct?

A.  Yes.

Q.  That was a condition of your cooperation agreement, right?

A.  Yes.

Q.  And having signed that cooperation agreement you then filed

a false tax return in October of 2018, correct?

A.  Yes, I did.

Q.  You did that after you signed the cooperation agreement?

A.  Yes, I did.

J2K5mid6                          Sweet - cross

1    Q.  You did that after you signed a cooperation agreement that

2    required you to commit no further crimes?

3    A.  Yes, I did.

4    Q.  And you did that because you did not want to lose your

5    cooperation agreement?

6    A.  Yeah.  That's -- I mean, I did it thinking I could fix it

7    later because I was obligated to amend my taxes and I thought I

8    could do it all at the same time.

9    Q.  When you sign a tax return you are aware that you sign it

10   under penalty of perjury, correct?

11   A.  Yes, sir.

12   Q.  So you committed perjury when you filed a false tax return

13   in October of 2018, just a few months ago, correct?

14   A.  Yes.

15   Q.  And you did that after you agreed with the government that

16   you would commit no further crimes?

17   A.  Yes.

18   Q.  You understood at the time as well that the only reason you

19   are not in custody right now is because you are out on bond

20   that requires you, obligates you to commit no further crimes,

21   right?

22   A.  That's right.

23   Q.  So you violated the conditions of your release when you

24   filed that false tax return?

25   A.  I don't know what constitutes a crime or not as it relates

J2K5mid6                        Sweet – cross

1    to tax evasion.

2    Q.   You know perjury is a crime, right?

3    A.   Yes.

4    Q.   And you know when you filed the false tax return and you

5    signed it you committed perjury, right?

6    A.   I know I signed a false tax return, yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2kdmid7                         Sweet - cross

1   Q.   And perjury is a felony, isn't it?

2   A.   Again, I don't know -- I don't know what constitutes a

3   crime under that.  I don't know.

4   Q.   I just want to make sure I understand your testimony.

5            So it's your understanding as you sit here today that

6   you're not sure if committing perjury when you sign a false tax

7   return is a crime or not?

8   A.   I know I signed a false tax return.

9   Q.   But you're not sure if it is a crime?

10  A.   I'm not -- it's not my determination.  It's not my -- I

11  can't -- I'm not the person who decides what's a crime or not.

12  Q.   I understand that completely, Mr. Sweet, and I certainly

13  don't want you to speculate about what other people would do.

14  My question is what your understanding is.

15           As you sit here today, is it your understanding that

16  committing perjury is a crime?

17  A.   I know I filed a false tax return.  I know what the

18  statement was on that tax return.  I disclosed that.  I agreed

19  to amend that tax return, and I knew it was wrong.

20  Q.   Did you know it was a crime?

21  A.   Again, I don't know.  I don't know what's a crime or not,

22  and when it comes down, I don't know what meets the definition

23  of a crime or not.  Like I said, I knew it was wrong.  I knew

24  it was wrong when I did it.  I know it's wrong now.

25  Q.   You understand, perjury is the same offense as, for

J2kdmid7                              Sweet - cross

1    example, lying as a witness in federal court?  You are

2    violating the oath that you took in committing perjury, right?

3    A.  Yes.

4    Q.  Are you unsure as to whether or not that is a crime?

5    A.  I certainly know that's a crime.

6    Q.  You know that's a crime?

7    A.  Yes.

8    Q.  Are you aware of different types of perjury, perjury with

9    tax is not a crime; testifying under oath in court, that kind

10   of perjury is a crime?

11   A.  I know that if I lie in court, that is a complete violation

12   of my cooperation agreement, that it would get torn up here.  I

13   am obligated -- I am here only to tell the truth.

14   Q.  Why is it that you believe your cooperation agreement would

15   be torn up if you told a lie in court?

16   A.  Because my cooperation agreement says that I will provide

17   truthful evidence, if asked to testify in court.

18   Q.  But your cooperation also says that you must disclose all

19   prior criminal conduct and not commit any crimes.  Was your

20   cooperation agreement torn up?

21   A.  I have disclosed all of my prior criminal conduct --

22   Q.  Was your cooperation agreement torn up?

23   A.  No, it was not.

24   Q.  You're still operating, testifying pursuant to the same

25   cooperation agreement you signed over a year ago, correct?

J2kdmid7                              Sweet – cross

1   A.  Yes.

2   Q.  And notwithstanding your admission to violating that

3   cooperation agreement on multiple occasions, the government has

4   not torn it up, right?

5   A.  Again, I can't speak for the U.S. Attorney's Office on what

6   they determine to be a crime or not.  As mentioned earlier, my

7   cooperation agreement explicitly states that they cannot and do

8   not protect me from any tax consequences, any future

9   prosecution of the tax crime that I've admitted to.  I'm

10  obligated to amend my returns.

11  Q.  Are you finished?

12  A.  Yes.

13  Q.  Let me try --

14          MS. KRAMER:  Objection.  Argumentative.

15  Q.  Let me try my question again.

16  A.  OK.

17  Q.  Notwithstanding your admission to violating the cooperation

18  agreement on multiple occasions, the government has not torn up

19  that agreement, correct?

20  A.  My cooperation agreement is still in place, yes.

21  Q.  At the beginning of the day yesterday, you acknowledged

22  that you pled guilty to two crimes, and you did that again just

23  a few minutes ago, right?

24  A.  Yes.

25  Q.  And in response to the prosecutor's question, you testified

J2kdmid7                           Sweet - cross

1   that there are other people involved in that criminal activity,

2   correct?

3   A.  Yes.

4   Q.  And would it be fair to say that the criminal conduct to

5   which you pled guilty began around April 2015, when you left

6   the PCAOB?

7   A.  Yes.

8            MR. COOK:  Can we put up Government Exhibit 1506 in

9   evidence.

10  Q.  Do you recognize this document?

11  A.  Yes, I do.

12  Q.  You were shown it yesterday, right?

13  A.  Yes, sir.

14  Q.  And you identified the individuals on Exhibit 1506 as what

15  you call the core group, right?

16  A.  Yes.

17  Q.  And in connection with the crimes that you testified about,

18  you said that you had direct discussions or communications with

19  Mr. Middendorf, right?

20  A.  Yes.

21  Q.  Face-to-face?

22  A.  Yes.

23  Q.  Email?

24  A.  Yes.

25  Q.  Phone calls?

J2kdmid7                          Sweet - cross

1  A.  I don't remember phone calls with Mr. Middendorf.

2  Certainly maybe.

3  Q.  Conference calls with Mr. Middendorf?

4  A.  Yes.  Yes.

5  Q.  OK.  And with regard to Mr. Whittle, emails with

6  Mr. Whittle in furtherance of the crimes that you testified

7  about?

8  A.  Yes.

9  Q.  Text messages?

10 A.  I don't -- Tom and I didn't usually text each other.  I

11 don't remember.

12 Q.  Phone calls?

13 A.  Yes.

14 Q.  Conference calls?

15 A.  Yes.

16 Q.  Face-to-face meetings.

17         Please answer audibly.

18 A.  Yes.

19 Q.  And with regard to Mr. Britt, the top row far right, you

20 had direct face-to-face communications with Mr. Britt in

21 connection with the criminal activity you testified about?

22 A.  Yes.

23 Q.  Emails with Mr. Britt?

24 A.  Yes.

25 Q.  Phone calls?

J2kdmid7                        Sweet - cross

1    A.  Yes.

2    Q.  Did you have any text communications with him about this?

3    A.  Not that I remember.

4    Q.  Conference calls?

5    A.  Yes.

6    Q.  And with regard to Ms. Holder, face-to-face conversations?

7    A.  Yes.

8    Q.  About the activity that you have testified about?

9    A.  Yes.

10   Q.  Emails?

11   A.  Yes.

12   Q.  Phone calls?

13   A.  Yes.

14   Q.  Text messages?

15   A.  Yes.

16   Q.  Conference calls?

17   A.  Yes.

18   Q.  And with regard to Mr. Wada, did you personally exchange

19   any text messages with Mr. Wada about the conduct that you've

20   testified about for the past two days?

21   A.  No.

22   Q.  Exchange any emails with him directly about the conduct

23   you've testified about?

24   A.  Just that my emails were forwarded to him from Cindy.

25   Q.  So no direct communication via email with Mr. Wada?

J2kdmid7                         Sweet - cross

1    A.  No.

2    Q.  Face-to-face meetings with Mr. Wada?

3    A.  No.

4    Q.  Phone calls with Mr. Wada?

5    A.  No, not that I remember.

6    Q.  Do you see Mr. Wada sitting over there?

7    A.  Yes.

8    Q.  You know him, right?

9    A.  I knew him from my time at the PCAOB.

10   Q.  Prior to your testimony in this case, when was the last

11   time you laid eyes on Mr. Wada?

12   A.  I don't remember the specific date but likely at one of the

13   PCAOB trainings.  The last one I went to was in March of 2015.

14   Q.  And you left the PCAOB in April 2015?

15   A.  Yes.

16   Q.  And that's when you just testified the criminal activity,

17   as you've described it, began, correct?

18   A.  Yeah.

19   Q.  So you haven't laid eyes on him other than in this

20   courtroom since April -- or, I'm sorry, March 2015, correct?

21   A.  Yes.

22   Q.  And that was I believe you said at a conference, do you

23   think?

24   A.  Yeah.

25   Q.  To your knowledge, did Mr. Middendorf have any

J2kdmid7                          Sweet - cross

communications with Mr. Wada about the conduct that you've

testified about over the past two days?

A.   No, not that I'm aware of.

Q.   To your knowledge, did Mr. Whittle have any contact with

Mr. Wada about the conduct that you have testified about over

the past two days?

A.   Not that I'm aware of.

Q.   The same question for Mr. Britt?

A.   No, not that I'm aware of.

Q.   The only direct contact that you have testified about

between any members of the core group and Mr. Wada was with

Cindy Holder, correct?

A.   Yes.

Q.   Now, you testified that part of the reason why you shared

confidential information from the PCAOB with your other KPMG

partners was because I think you said you believed it was

expected of you; is that right?

A.   That's right, but I also knew that it advanced my career,

made me look good.

Q.   I think you testified that you believed you were under some

pressure to give up the information?

A.   I certainly felt pressure my first week.

Q.   You testified about how you think people made you feel like

your paycheck or your job might depend upon it, giving up the

information, correct?

1   A.  That was told to me.

2   Q.  When you were first considering a job at KPMG, I believe it

3   came through a recruiter, right?

4   A.  Yes.

5   Q.  In your first contact with that recruiter, did that

6   recruiter suggest to you in any way, shape or form that it

7   would be expected of you to bring confidential PCAOB

8   information with you to KPMG?

9   A.  No.

10  Q.  Did the recruiter suggest to you in any manner whatsoever

11  that you should or it would be expected of you to download

12  confidential PCAOB information and take it with you to KPMG if

13  you were to get a job there?

14  A.  No.

15  Q.  In your interviews with KPMG, as part of the application

16  process, at that point did anyone suggest to you that it would

17  be expected of you to give up confidential PCAOB information?

18  A.  No.

19  Q.  Did anyone tell you that you should download information

20  and bring it with you?

21  A.  No.

22  Q.  So when you accepted your job -- accepted your offer at

23  KPMG, you had no expectation whatsoever of being required to

24  reveal confidential information as part of your job?

25  A.  No.

J2kdmid7                         Sweet – cross

1    Q.  And you felt no pressure from anybody at KPMG, or acting at
2    KPMG's behest, prior to starting your job there to do anything
3    improper with regard to your obligations to the PCAOB?
4    A.  No.
5    Q.  So, your decision, then, to download what you contend to be
6    highly confidential PCAOB information into a personal hard
7    drive before you left the PCAOB, that was not prompted by any
8    pressure, suggestion or insinuation of any kind from anybody at
9    KPMG that you would be expected to bring that information with
10   you?
11   A.  It was entirely my decision.
12   Q.  It was all you, right?
13   A.  Yes.
14   Q.  And you decided to use that PCAOB information at KPMG
15   before you even left the PCAOB, right?  That was the whole
16   purpose for you downloading it was to use it?
17   A.  Yes.
18   Q.  Before your first lunch with any KPMG partner, you had
19   already made the decision, and taken action in furtherance of
20   that decision, to use confidential PCAOB information to advance
21   your own career at KPMG?
22   A.  Yes.
23   Q.  That didn't require any pressure, any threats, at all for
24   you to make that decision?
25   A.  I chose to take that information on my own.

J2kdmid7                          Sweet - cross

1    Q.  And this wasn't your first time stealing confidential

2    information from an employer, was it?

3    A.  I had done the same thing at PwC, yes.

4    Q.  Did -- I think we know the answer to this but I'll ask it:

5    Did anyone at the PCAOB suggest to you that they wanted you to

6    take PwC information with you and bring it to the PCAOB?

7    A.  No, sir.

8    Q.  That was all you as well?

9    A.  Yes.

10   Q.  Let me ask you a little bit about your interactions with

11   Mr. Wada.

12            Were you ever on the same inspection team together?

13   A.  Nope.

14   Q.  Did you ever hang out together?

15   A.  We did not.

16   Q.  Ever talk on the phone -- and I'm speaking of when you were

17   at the PCAOB -- talk on the phone?

18   A.  No.

19   Q.  Ever text each other?

20   A.  No.

21   Q.  Go out to lunch or dinner?

22   A.  Not that I remember.

23   Q.  Go get drinks after work?

24   A.  Not that I remember.

25   Q.  Did you ever meet each other's families?

J2kdmid7                        Sweet - cross

1   A.  No.

2   Q.  You both live in California, right?

3   A.  Yes.

4   Q.  He has never been up to your house or your cabin in Shaver

5   Lake?

6   A.  No.

7   Q.  Are you Instagram or Facebook friends or other social media

8   connections?

9   A.  No, sir.

10  Q.  Let's talk about after you joined KPMG.

11          Jeff Wada was still working at the PCAOB, correct?

12  A.  Yes.

13  Q.  Did you tell Mr. Wada before you left the PCAOB that you

14  were going to take confidential PCAOB information with you?

15  A.  No, I did not.

16  Q.  Did you -- did Jeff Wada even know you were leaving before

17  you left, if you know?

18  A.  I don't know.

19  Q.  You didn't reach out to him and let him know you were

20  leaving, did you?

21  A.  No.

22  Q.  He wasn't amongst the PCAOB contacts that you forwarded to

23  yourselves so that you could keep in touch, was he?

24  A.  No, he was not.

25  Q.  And I'm assuming with regard to after you left PCAOB and

1   were at KPMG, there were no phone calls, emails, texts,

2   lunches, dinners, drinks, any contact at all with Mr. Wada by

3   you?

4   A.   Just through Cindy.

5   Q.   Everything was through Cindy?

6   A.   Yes.

7   Q.   You never discussed with Mr. Wada any scheme to defraud the

8   United States, did you?

9   A.   Just through Cindy and, no, not using those words.  I mean,

10  I certainly encouraged his behavior through the reinforcement

11  that I sent on emails that I knew would be forwarded, text

12  messages I sent to Cindy, conversations with Cindy.

13  Q.   Well, we're going to talk about all of that.  But my

14  question is your direct communications with Mr. Wada, you never

15  discussed with him a scheme to defraud the United States or the

16  SEC in any words whatsoever?

17  A.   I didn't discuss with him directly.

18  Q.   You never discussed with him, directly, a scheme to defraud

19  the PCAOB, right?

20  A.   Again, I didn't speak with him directly.

21  Q.   So let's talks about the person who funneled this

22  information to you, Cindy Holder.

23  A.   OK.

24  Q.   You testified that I believe you met her in 2011?

25  A.   I believe that was the first year, yes.

J2kdmid7                          Sweet - cross

Q.   And you were on her -- you were on her first inspection?

A.   Yes, that's right.

Q.   Were you -- and you had been there a couple of years, right?

A.   Yes.

Q.   Were you a mentor to her?

A.   She actually worked for me on that first inspection.   We worked on the same team, yes.

Q.   So you were supervising her?

A.   I was more senior than her, yes.

Q.   You were also friends?

A.   Yes, we were.

Q.   You worked together in London?

A.   Yeah.

Q.   You worked together in London with Bob Ross and August Bellome?

A.   Mm-hmm.

Q.   You have to answer "yes" or "no."

A.   Yes.

Q.   It's your testimony that every bit of confidential PCAOB information that you claim came to you from Jeff Wada was funneled through Cynthia Holder, right?

A.   Yes.

Q.   You received no PCAOB confidential information that you believed was from Jeff Wada from any other source than Cindy

J2kdmid7                        Sweet - cross

1   Holder?

2   A.  Yeah, that's right.  Yes.

3   Q.  And it's your -- it's been your testimony, I think,

4   repeatedly that Ms. Holder told you that Mr. Wada gave her

5   confidential PCAOB information, correct?

6   A.  I'm sorry.  Would you ask that again?

7   Q.  Sure.  It's your understanding from Ms. Holder that Jeff

8   Wada gave her confidential information?

9   A.  It's more than my understanding, but, yes, that's right.

10  Q.  Well, it's more than your understanding.  You were not --

11  withdrawn.

12          Is it your understanding that all of the confidential

13  PCAOB information that Jeff gave to Cindy who then gave to you

14  was delivered to Cindy over the telephone?

15  A.  Telephone, text messages, yes.

16  Q.  Are you aware of any confidential information delivered by

17  Jeff Wada to Cindy Holder over text message?

18  A.  I know that the text messages were used to indicate like

19  the grocery list or the grocery list was ready, that was the

20  indication that ready to give you the confidential information.

21  Q.  Yes, but my question was a little different.

22          Actual confidential PCAOB information, are you aware

23  of any of it being conveyed by Jeff Wada to Cindy Holder via

24  text message?

25  A.  No.

J2kdmid7                          Sweet – cross

1   Q.  So all of the confidential information that Mr. Wada

2   conveyed to Ms. Holder you understand was done over the phone?

3   A.  Yes.

4   Q.  And were you a participant in any of those phone calls?

5   A.  Not -- not on those phone calls, just after those phone

6   calls.

7   Q.  You were not a participant on any of the phone calls in

8   which Mr. Wada supposedly gave Ms. Holder confidential

9   information?

10  A.  I was not on those phone calls.

11  Q.  And are you aware of whether there are any recordings of

12  those phone calls?

13  A.  No, I'm not aware.

14  Q.  You have not heard any, right?

15  A.  I have not.

16  Q.  How about transcript, you know, verbatim transcript where

17  he said, she said, did you see anything like that?

18  A.  No, I have not.

19  Q.  So when you say it's more than your understanding that Jeff

20  Wada gave confidential information to Cindy Holder, your

21  understanding is based solely, one-hundred percent, on what

22  Cindy Holder told you, right?

23  A.  Told me, showed me, forwarded to me, yes.

24  Q.  Did Cindy Holder forward to you some documents that she

25  obtained from Jeff Wada other than his résumé?

J2kdmid7                          Sweet - cross

1    A.  His résumé the day we got the January 9th --

2    Q.  That wasn't confidential, was it, his résumé?

3    A.  No.

4    Q.  No.  So did, again, did Cindy Holder forward to you any

5    confidential information that she claimed she got from Jeff

6    Wada, email or text message, or regular mail?

7    A.  Umm, I saw Cindy's notes from her conversations.  She told

8    me exactly what Jeff had said.  And when I pressed her and

9    tried to understand why and how he got access, I remember

10   seeing the text message about the grocery list.

11   Q.  But let me try it again.

12       Actual documents that Jeff Wada sent to Cindy Holder,

13   text message, email, regular mail, did you ever see that?

14   A.  No.  Like I said, just the notes from those --

15   Q.  Those are notes that she wrote, right?

16   A.  Yes.

17   Q.  Those aren't -- that's not Jeff Wada's handwriting, is it?

18   A.  No.  Cindy's notes, that's right.

19   Q.  So you have no -- you yourself, sitting there today, you

20   have no firsthand knowledge that Jeff Wada was the source of

21   any confidential PCAOB information; all comes from Ms. Holder?

22   A.  Yes.  It comes from Ms. Holder, yes.

23   Q.  When you told the jury that -- and this was yesterday after

24   Ms. Holder received the 2016 inspection list, that she gave it

25   directly to you, you don't know that, do you?  You don't know

J2kdmid7                          Sweet - cross

1   that she gave it directly to you, do you?

2   A.  I'm not sure what you mean.  She -- I'm not sure what you

3   mean.

4   Q.  Let's assume for a second that she got it from somebody

5   else.  You don't know that she gave it to you as soon as she

6   received it, do you?  You don't know how long she had it?

7   A.  Well, she told me she had just gotten off the phone with

8   Jeff Wada, so yes.

9   Q.  That's what she told you?

10  A.  Yes.

11  Q.  You were interviewed on February 14, 2017, correct?

12  A.  Yes.

13  Q.  You talked about that for a few minutes just an hour or so

14  ago.

15          You remember that interview pretty clearly?

16  A.  Yes.

17  Q.  Who conducted it?

18  A.  The call was with Mark Rubino from KPMG's internal counsel.

19  Q.  You didn't say anything about Mr. Wada in that interview,

20  right?

21  A.  I lied to him during that interview.

22  Q.  Just so I'm clear, this interview took place eleven days

23  after you claim to have received the 2017 final inspection

24  list?

25  A.  Yes.

J2kdmid7                          Sweet - cross

1    Q.  Less than two weeks later?

2    A.  Yes.

3    Q.  And, in fact, you told Mr. Rubino that you were being

4    one-hundred percent open and honest, right?

5    A.  I don't know if I said those words.  I don't remember

6    saying that.

7    Q.  Do you remember saying something like that, that you were

8    telling the truth?

9    A.  I don't remember what I told him.

10   Q.  Do you remember telling the government in one of your

11   interviews that you told him that?

12   A.  I don't remember.  I may have.  I don't remember.  I know I

13   lied to him, and I lied to him on multiple occasions.

14   Q.  Let me show you what's been marked for identification as

15   Defense Exhibit 3522-29.

16          Do you have it up on your screen?

17   A.  Yes, sir.

18   Q.  I'm not going to ask you to read it out loud.  I'm going to

19   direct your attention -- do you see, just underneath the

20   typewritten text about a third of the way down the page?

21   A.  Yes.

22   Q.  Do you want to read that to yourself.

23   A.  OK.

24   Q.  Did you read the handwritten text?

25   A.  Yes.

J2kdmid7                          Sweet - cross

1                MR. COOK:  Turn that off, please.

2    Q.  Does that refresh your recollection as to whether you told

3    Mr. Rubino that you were being one-hundred percent open and

4    honest?

5    A.  Those are my notes.  No, it does not.

6    Q.  You don't think Mr. Rubino was writing things down that you

7    didn't say, do you?

8                MS. KRAMER:  Objection, your Honor.

9                THE COURT:  Sustained.

10   BY MR. COOK:

11   Q.  You told Mr. Rubino that there were lots of disgruntled

12   people at the PCAOB; do you remember that?

13   A.  I don't remember saying that, but yeah.

14   Q.  I'm sorry?

15   A.  I don't remember saying that.  I may have.  I don't

16   remember it.

17   Q.  You told Mr. Rubino that you can't imagine who sent the

18   list to Cindy Holder?

19   A.  I don't remember saying that.  Again, I know I -- I lied to

20   Mr. Rubino about who I knew to be the true source of the list

21   and how Cindy got it and --

22   Q.  It would be fair to say that your recollection or

23   statements about your involvement in the stolen PCAOB

24   confidential information have evolved over time?

25   A.  I don't know what you mean by "evolved."

J2kdmid7                          Sweet - cross

1    Q.   Changed.

2    A.   There are certainly things that I have been able to refresh

3    my memory on as I've had a chance to look at actual documents,

4    including some of the things that I had deleted that ended up

5    being recovered.

6    Q.   Those are in your meetings with the government?

7    A.   I don't believe I'm allowed to answer questions about my

8    meetings with internal -- with my own --

9    Q.   And I don't want you to.  I don't want you to.

10   A.   OK.

11   Q.   But did the government show you documents in your meetings

12   with them that aided in your recollection?

13   A.   Yes.

14   Q.   And your recollection of what happened in 2015, '16 and

15   '17, that has changed over time?

16   A.   I don't know it has changed over time, but it has certainly

17   become more clear and accurate as I have had a chance to go

18   back and look at, like I said, the documents that I deleted.

19   For example, I don't remember all 50 names of the issuers that

20   I wrote down on February 3, 2017, but I know that was the photo

21   I took.  I see my own notes.

22   Q.   Do you recall being interviewed after Mr. Rubino's

23   interview by outside counsel for KPMG?

24   A.   Yes.

25   Q.   On more than one occasion?

1    A.  Yes.

2    Q.  Long interviews?

3    A.  Yeah.

4    Q.  I am going to focus your attention back to March 2016, when

5    you claim Cindy Holder gave you the 2016 inspection list.  OK?

6    Let's focus on that time period.

7    A.  OK.

8    Q.  When you were asked about this incident by KPMG's lawyers,

9    you told them that you didn't believe -- you didn't believe

10   Cindy Holder when she told you that Jeff Wada was the source.

11   A.  I don't --

12   Q.  Did you say that?

13   A.  I don't remember saying that, no.

14   Q.  You don't remember saying that?

15   A.  No.

16   Q.  You thought that she might have come up with the list

17   herself in order to add value to the firm; do you remember

18   telling them that?

19   A.  Oh, I think you are misunderstanding, sir.  In my second

20   phone conversation or before -- after I had spoken with Tom

21   Whittle and David Britt and knew that the plan was to have a

22   phone conversation then with Dave Middendorf and Tom Whittle

23   and David Britt, I had another call with Cindy to say, all

24   right, Cindy, tell me again how you got this information.  I

25   want to be sure this is what it is.  Explain to me how you got

J2kdmid7                          Sweet – cross

1    this, who you got this from.

2              And she said, Jeff Wada.

3              How did Jeff access this information?  Where did it

4    come from?

5              So I did have another call with Cindy that day to

6    clarify, make sure I fully understood where this information

7    was coming from, because I was about to get on a call with some

8    very senior people from the firm.

9    Q.  Your first reaction was to not believe her?

10   A.  No.

11   Q.  Right?

12             No?

13   A.  No.

14   Q.  You believed her the first time she told you Jeff Wada was

15   the source?

16   A.  Yes, I did.

17   Q.  Let's take a look at -- well, let me ask you this.

18             Would reviewing the notes taken by KPMG's lawyers of

19   your interview, might that refresh your recollection of what

20   you said?

21   A.  It might.

22   Q.  Let's take a look at 3522-01, at page 27.

23             (Pause)

24             Go ahead and read the first line to yourself.

25             Do you see that?

J2kdmid7                          Sweet - cross

1   A.  Yeah, I see that.

2           MR. COOK:  Go ahead and take it down.

3   Q.  Does that refresh your recollection as to whether or not

4   you had doubts that Jeff Wada was the source?

5   A.  Again, I think that's being taken out of context.  My

6   doubts were not that Jeff Wada was the source.  My doubts

7   were -- I wanted confirmation from Cindy in March that this

8   really is what she was saying it is.

9   Q.  Did you think that Cindy Holder was trying to use this

10  information to advance herself within KPMG?

11  A.  Yeah.  I mean, I was, too.  Right?  It sure made us both

12  look very good.

13  Q.  You -- you believed that Cindy Holder was manipulative?

14  A.  I think there were times that -- yeah.  Yes.

15  Q.  For example, she knew that you were active in your church

16  and that she used that knowledge --

17          MS. KRAMER:  Objection.

18  Q.  -- in order to --

19          MS. KRAMER:  Objection, your Honor.

20          May we approach?

21          THE COURT:  Yes.

22          (Continued on next page)

23

24

25

1          (At the sidebar)

2          MS. KRAMER:  Your Honor, I'm not sure we know where

3    this is going, but on the subject of Cindy Holder being

4    manipulative, there is a particular issue that we have raised

5    with counsel.  We've gotten confirmation that the defense

6    counsel does not intend to go into a particular area on cross,

7    and it certainly seems like that is where this is headed and so

8    we wanted to come to the sidebar.

9          Cindy Holder was -- is, to our understanding, married

10   to a woman and lied to Mr. Sweet and others and described her

11   spouse as a man.  We've spoken with defense counsel about this.

12   Both defendants' lawyers have represented that they don't

13   intend to go into this, but this seemed where we were going and

14   once the genie is out of the bottle there is no putting it

15   back.

16         MR. COOK:  I'm not going anywhere close to that, your

17   Honor.

18         MS. MERMELSTEIN:  I think to the extent that Ms.

19   Holder had not been sort of open with him, the discovery of

20   what had been an understood shared -- I think that he was taken

21   back discovering that she was lying about her marriage in

22   particular in light of what had up to that point been a kind of

23   shared understanding of their shared views.  And so I'm not

24   saying it is going to go there, but it is very hard to thread

25   this needle, I think, about being betrayed without walking into

J2kdmid7                          Sweet - cross

1    the why, which I think is going to be about the status of her

2    marriage.

3              MR. COOK:  Your Honor, I don't even know that he felt

4    betrayed about that.  I had no information about that.

5              My examination is limited strictly -- and I'm getting

6    there in the next two questions -- to a document, very

7    manipulative document, that Cindy emailed -- that Cindy Holder

8    sent him on his first day at KPMG.  It had nothing to do about

9    her relationship.  I am not going to ask her any questions

10   about whether he knew about it, was concerned about it, or felt

11   betrayed by it.

12             THE COURT:  What is the question about the church?

13             MR. COOK:  She sent him an email, basically a prayer,

14   that Mr. Sweet told the government that felt that was an

15   attempt to manipulate him.

16             MS. MERMELSTEIN:  In light of what he subsequently

17   learned.

18             MS. KRAMER:  Yes.

19             MR. COOK:  That is nowhere in the 3500 material.

20   Nowhere, your Honor.

21             MS. MERMELSTEIN:  That's why we asked for a sidebar,

22   to explain to you what you are about to head into.

23             MR. COOK:  It is a little late.  I am in the middle of

24   my cross-examination.  If they omitted statements from the

25   cooperator from the 3500, I don't know how I can be held to

J2kdmid7                          Sweet - cross

1    understand things that they chose not to disclose.  I'm not

2    sure if they're suggesting that the witness, in response to my

3    question when I showed shim this email, I am going to ask him

4    did you believe this was an attempt to manipulate you.  I don't

5    know how that elicits anything other than a yes or no, and I

6    will move on from there.

7              MS. MERMELSTEIN:  At the time he received this.

8              MR. COOK:  At the time he received it.

9              MS. MERMELSTEIN:  It should be OK.

10             THE COURT:  OK.

11             (Continued on next page)

J2kdmid7                          Sweet - cross

1          (In open court)

2     BY MR. COOK:

3     Q.  Mr. Sweet, I believe my question was:  Ms. Holder knew you

4     were active in your church, correct?

5     A.  Yes, she did.

6     Q.  And you believed that she used that knowledge to manipulate

7     you?

8     A.  No.  Nope, I don't think so.

9     Q.  I would like to show you what's been marked for

10    identification as Government Exhibit 500.

11          Mr. Sweet, do you see that email in front of you?

12    A.  Yes.

13    Q.  From Ms. Holder to you?

14    A.  Yes.

15    Q.  Do you recall this email?

16    A.  Yes.

17          MR. COOK:  I offer it.

18          MS. KRAMER:  Objection, your Honor.  Basis?

19          THE COURT:  Are you using it to refresh?

20          MR. COOK:  No, I'm using it to impeach.  He just said

21    he didn't feel like she was manipulating him.

22          MS. KRAMER:  No inconsistency, your Honor.

23          THE COURT:  No.  I don't see -- at this point, I don't

24    think it shows an inconsistency.

25          MR. COOK:  OK.  You can take it down.

J2kdmid7                          Sweet - cross

1   BY MR. COOK:

2   Q.  Mr. Sweet, do you recall receiving an email from Ms. Holder

3   in which she included in that email a prayer for you on your

4   first day at work?

5   A.  Yes.

6   Q.  Do you remember that?

7           And you believed that her sending you that email was

8   part of an effort to get you to push her to get her a job at

9   KPMG?

10  A.  No.  I -- Cindy and I were friends.

11  Q.  Did you believe that that email that she sent you was part

12  of an effort to get you to push for her to get a job at KPMG?

13          MS. KRAMER:  Objection.  Asked and answered.

14          MR. COOK:  I didn't receive an answer, your Honor.

15          MS. KRAMER:  Your Honor, the witness said "No."

16          THE COURT:  Did you answer it?

17          THE WITNESS:  I thought I did.

18          THE COURT:  Did you say "no"?

19          THE WITNESS:  Yes.

20          THE COURT:  OK.

21  BY MR. COOK:

22  Q.  Let me show you what's, for identification, 3522-03.

23          (Pause)

24          Do you recall when you met with the government that

25  there were not only the prosecutors but postal inspectors

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2kdmid7                          Sweet - cross

1   present?

2   A.   Yes.

3   Q.   Do you recall that they were taking notes?

4   A.   Yes.

5   Q.   And on some occasions they were typing notes?

6   A.   Yes.

7   Q.   You haven't had a chance to review any of those notes, have

8   you?

9   A.   No.

10   Q.   I ask you if we could turn to page 5, the bottom paragraph.

11           I ask you to just read the sentence that begins with

12   the word "he" to yourself.

13           (Pause)

14           MS. KRAMER:   I am still going to raise an objection,

15   your Honor.   There has not been a foundation for refreshing.

16           (Pause)

17           MR. COOK:   Impeachment by contradiction, your Honor.

18   He said the opposite.

19           THE COURT:   Overruled.

20   BY MR. COOK:

21   Q.   Mr. Sweet, if you would please read -- your Honor, I would

22   like to offer at least this limited portion.

23           MS. KRAMER:   Your Honor, I object to this being

24   offered.   I believe that the witness -- counsel can confront

25   the witness with an inconsistent statement but cannot offer

J2kdmid7                          Sweet – cross

1   this document as extrinsic evidence.

2          MR. COOK:  I'll read it, your Honor.

3          THE COURT:  OK.

4          MS. KRAMER:  I think, your Honor, he can ask the

5   witness if he said what is in the document.

6          THE COURT:  You can ask him to explain it.

7   BY MR. COOK:

8   Q.  Mr. Sweet, do you see the text in front of you that's been

9   written --

10          MS. KRAMER:  Your Honor, I'm sorry.  I am going to

11   object to the reading of a document that's not in evidence.

12          MR. COOK:  Your Honor, I don't know how I can impeach

13   him without reading it or offering it.  He said one thing.  The

14   document says something else.

15          THE COURT:  I think you need to start with refreshing.

16          Does this refer to the email that you asked about?

17          MR. COOK:  No.  This is the 3500 material from an

18   interview that he gave to the government.

19   BY MR. COOK:

20   Q.  Mr. Sweet, please read the text in front of you to

21   yourself, and let me know if that refreshes your recollection

22   as to what you told the government.

23          (Pause)

24          Have you had a chance to read it?

25   A.  I'm almost finished.

 1                 (Pause)

 2                 OK.

 3       Q.   Did you tell the government, as part of an interview, that

 4       you felt that Cindy knew you were religious and said things to

 5       get close to you and that she would manipulate you to get you

 6       to push for a job?

 7       A.   That does not refresh my memory.  There were certainly

 8       times I felt manipulated by Cindy, as I said earlier, but not

 9       as -- I don't remember it in the context of my faith.

10                 MR. COOK:  Your Honor, I would like to read that

11       sentence from the document.

12                 THE COURT:  I thought you just did.

13                 MR. COOK:  I asked him if it refreshed his

14       recollection.  I would like to read from the actual document.

15                 MS. KRAMER:  Objection, your Honor.

16                 THE COURT:  You can read those couple of sentences.

17       BY MR. COOK:

18       Q.   "He feels she knew he was religious and said things to get

19       close to him.  There were things Cindy would say to manipulate

20       Sweet to push for her to get a job at KPMG."

21                 Did I read that correctly?

22       A.   You read that correctly.  But when I think about that, I

23       think about, for example, the phone call that Cindy called me

24       when she was an inspector and asked me my --

25       Q.   I am going to ask you to stop for a second.  There is no

J2kdmid7                         Sweet - cross

1    question pending.  Let me ask another question and then you

2    will get an opportunity to answer.  OK?

3    A.  OK.

4    Q.  Now, remind us when the PCAOB writes a comment during an

5    inspection, what does that mean?

6    A.  The PCAOB will write a comment form when they believe there

7    is a failure in the audit work.

8    Q.  And you recall, or I believe you testified, that you

9    received a phone call from Cindy after you had joined KPMG

10   while she was still at PCAOB while she was on an active PCAOB

11   inspection?

12   A.  Yes.

13   Q.  And she asked you whether or not she should write a

14   negative comment.  Do you recall that?

15   A.  Yes.

16   Q.  And you told her that in similar situations in the past, a

17   comment had not been written, right?

18   A.  Yes.

19   Q.  She was on a -- was it a KPMG inspection?

20   A.  Yes, it was.

21   Q.  And that whole phone call from Ms. Holder to you asking you

22   whether she should write a comment, you again thought she was

23   trying to manipulate you as part of the that phone call?

24   A.  That's what I was just about to reference earlier.

25   Q.  You thought she was I think your words were blowing smoke.

1    Does that sound right?

2    A.  I think Cindy had been an inspector long enough, and there

3    was an existing review structure in place at the PCAOB while we

4    were friends.  She didn't need to call me to decide whether or

5    not to write a comment.

6    Q.  Especially when she's on a KPMG inspection and you are at

7    KPMG, right?

8    A.  Yes.

9    Q.  She was just letting you know that she could be valuable to

10   you, that's fair?

11   A.  Yeah.  Yes.

12   Q.  And despite this attempt at manipulation, you thought she

13   could be valuable to you at KPMG, as well?

14   A.  Sorry.  Would you say that again?  Would you ask it again?

15   Q.  Despite this attempt at manipulation, you nevertheless

16   believed that she could be valuable to you at KPMG?

17   A.  I thought Cindy was a very strong inspector.

18   Q.  And when she sent you that email that we talked about with

19   the prayer on your first day at KPMG, do you remember

20   responding to her?

21   A.  I don't remember how I responded.

22          MR. COOK:  Let's take a look at Government Exhibit

23   501.

24          Could you blow up the top email, the top thread.

25   There we go.

J2kdmid7                              Sweet - cross

1    Q.  Mr. Sweet, I am going to ask you to just take a look at

2    that, just read it to yourself, and tell me if it refreshes

3    your recollection on how you responded to Ms. Holder's email?

4              (Pause)

5              Did you have a chance to read it?

6    A.  Yes.

7    Q.  Does that refresh your recollection?

8              MR. COOK:  Go ahead and take it down.

9    Q.  How did you respond?

10   A.  I -- yes, I responded, "Thanks, Cindy."

11   Q.  You told her she was amazing?

12   A.  Yes.

13   Q.  And you told her you were going to share her résumé within

14   KPMG?

15   A.  Yes.

16   Q.  And you did share her résumé to other KPMG partners, right?

17   A.  I did.

18   Q.  And you were instrumental in getting her a job at KPMG?

19   A.  I was directly involved, as I mentioned yesterday.

20   Q.  And you also told her, prior to her leaving, about how you

21   had stolen PCAOB information before you left, right?

22   A.  Yes.

23   Q.  And you gave her that information in such a way as to

24   convey to her, maybe without telling her directly, that she

25   should do the same thing?

J2kdmid7                        Sweet - cross

1    A.  Yes.

2    Q.  And you testified yesterday that you did this because you

3    wanted her to be successful in her job at KPMG?

4    A.  Yes.

5    Q.  That wasn't all of it, though, was it?

6           It wasn't the only reason you told her to take

7    confidential information, was it?

8    A.  I had taken confidential information already.  I didn't

9    think that Cindy was going to have -- or take anything that I

10   didn't already have.

11   Q.  Well, she was still there after you left, right?

12   A.  Yes.

13   Q.  New information is being created every day at the PCAOB,

14   right?

15   A.  Comment forms, but the firm receives those comment forms.

16   Q.  You knew that if she brought confidential information with

17   her when she joined KPMG, that would help you as well as help

18   her?

19   A.  Yeah.

20   Q.  Let me show you what's already been admitted as Government

21   Exhibit 510.

22          This is that email we talked -- or you spoke with the

23   prosecutor about yesterday with the subject line "Anonymous

24   email."  Do you remember this?

25   A.  Yes.

J2kdmid7                          Sweet - cross

1   Q.  This is the one from Ms. Holder's personal email account to

2   your personal email account?

3   A.  Yes.

4   Q.  This didn't come from Mr. Wada, did it?

5   A.  No.

6   Q.  And this was containing confidential PCAOB information,

7   right?

8   A.  Yes.

9        MR. COOK:  Thank you.  You can take it down.

10  Q.  In addition to being I think you said -- you testified on

11  direct Ms. Holder was smart, and we established that you

12  believed she was manipulative, you knew that Ms. Holder had

13  also been a special agent with the FBI?

14  A.  Yes, I did.

15  Q.  Did she tell you about her experience working in organized

16  crime and intelligence gathering?

17        MS. KRAMER:  Objection.

18        THE COURT:  Sustained.

19  BY MR. COOK:

20  Q.  I'm going to show you what's been marked for identification

21  as Government Exhibit 503.

22        Do you see the document on your screen?

23  A.  Yes.

24  Q.  Is this an email exchange that you had with Ms. Holder?

25  A.  Yes.

1  Q.  In May of 2015?

2  A.  Yes.

3  Q.  And in this email exchange, Ms. Holder attached her résumé?

4  A.  Yes.

5          MR. COOK:  I offer it.

6          THE COURT:  Any objection?

7          MS. KRAMER:  May we have one moment, your Honor?

8          THE COURT:  Yes.

9          (Pause)

10         MS. KRAMER:  No objection.

11         THE COURT:  Government Exhibit 503 is received -- I

12  guess it will be renumbered as a defense exhibit.

13         MR. COOK:  We will renumber it, your Honor.

14         (Government's Exhibit 503 received in evidence)

15         MR. COOK:  If we could return to the résumé that was

16  attached to the email.

17         The next page.  That part.  Bring that out.

18  BY MR. COOK:

19  Q.  You reviewed this résumé when you received it from

20  Ms. Holder, correct?

21  A.  Yes.

22  Q.  You even made comments to it, right?

23  A.  Yes.

24  Q.  Would you read Ms. Holder's experience as a special agent

25  of the FBI as she describes it?

J2kdmid7                         Sweet – cross

1   A.  "Federal Bureau of Investigation, San Francisco,

2   California.

3            "Special Agent.

4            "Received leave of absence from Pricewaterhouse;

5            "Member of the organized crime/narcotics squad;

6            "Responsible for intelligence gathering,

7   investigation, documentation and prosecution of drug, organized

8   crime and money laundering cases.  This included coordination

9   with local district and assistant district attorneys as well as

10  testifying before grand jury members;

11           Received extensive accounting training in money

12  laundering, computer fraud, forensic accounting, and other

13  specialized accounting areas at FBI Academy in Quantico,

14  Virginia."

15  Q.  Thank you.

16           MR. COOK:  Take it down.

17  Q.  Have you ever heard the word "tradecraft"?

18           MS. KRAMER:  Objection, your Honor.

19           THE COURT:  Overruled.

20  A.  No, I don't know.  Tradecraft?

21  Q.  Tradecraft, have you heard that term?  It is more applied

22  to techniques and actions of undercover law enforcement

23  intelligence agents, have you ever heard of that term in that

24  context?

25  A.  Not that I remember.

J2kdmid7                         Sweet - cross

```
 1   Q.  But you testified an hour or so ago about a number of
 2   actions that you and Ms. Holder took to conceal your activities
 3   and the conduct that you have been talking about.  Do you
 4   recall that?
 5   A.  Yes.
 6   Q.  That included burner phones?
 7   A.  Yes.
 8   Q.  It included secret codes using social media messaging?
 9   A.  Yes.
10   Q.  It included advice from Ms. Holder on not just deleting
11   confidential information from your computer but deleting
12   certain documents from your computer?
13   A.  Yes.
14   Q.  She told you don't delete everything, that will be
15   suspicious, just delete the worst and leave some of it on
16   there; do you remember that?
17   A.  Yes.
18   Q.  She told you -- I believe you testified about how to avoid
19   being tricked by long pauses during interviews by
20   investigators?
21   A.  Yes.
22   Q.  And did she tell you that the confidential information that
23   she had stolen, she hid it inside of an electrical outlet in
24   her home?
25   A.  Yes, she told me that.
```

J2kdmid7                          Sweet - cross

1    Q.  She was angry when you didn't take similar precautionary

2    measures?

3    A.  Yes.

4    Q.  Let's talk for a few minutes about the confidential

5    information that you shared in 2015.  We're going back in time

6    a little bit.

7    A.  OK.

8    Q.  I am going to show you what's already been admitted as

9    Government Exhibit 102.

10           Do you recognize this as the GNF Planning Profile for

11   2015?

12           (Pause)

13           We can scroll down if you need to see more of it.

14   A.  Do you mind scrolling to the left, if that is possible?

15   I'm sorry, the left.

16           OK.

17   Q.  Is that good?

18   A.  Yes.

19   Q.  Do you recognize it is as a 2015 GNF Planning Profile?

20   A.  I see the date, and, yes, this looks consistent.  I didn't

21   recognize the name off the top.

22   Q.  The GX102?

23   A.  I don't recognize that or the other name to the right of

24   it.

25   Q.  Got it.  That is just our computer operator.

J2kdmid7                          Sweet - cross

1    A.  OK.

2    Q.  You said that you showed this document to Mr. Whittle,

3    correct?

4    A.  No, I didn't.

5    Q.  You did not?  You didn't show this to Mr. Whittle?

6    A.  No.

7    Q.  OK.  Did you show it to Mr. Middendorf?

8    A.  No, I did not.

9    Q.  Did you show it to Mr. Britt?

10   A.  No, I did not.

11   Q.  Did you show it to any other KPMG audit partners?

12   A.  Yes.

13   Q.  Who did you show it to?

14   A.  I showed it to Tom Garton.

15   Q.  Who else?

16   A.  I discussed it with other partners, but Tom Garton is the

17   only one I can remember right now who I showed it to.

18   Q.  He is the only one you actually showed the document to; am

19   I understanding you correctly?

20   A.  From what I can remember, yes.

21   Q.  And when you say you discussed it with other KPMG partners,

22   when you did that, did you make clear to them, or do you

23   believe they understood that what you were talking about was a

24   confidential PCAOB document?

25   A.  Yes.

J2kdmid7                          Sweet - cross

1   Q.  Now, just so we're perfectly clear, you were not and have

2   not suggested in any way that Mr. Wada was the source of this

3   document, correct?

4   A.  This document I took.

5   Q.  The 2015 document?

6   A.  When I left the PCAOB, yes.

7   Q.  Look at Government Exhibit 824R, which I believe is in

8   evidence.

9         Do you have that in front of you, sir?

10  A.  Yes.

11  Q.  Do you see the document in front of you?

12  A.  Yes, I do.

13  Q.  This is the email in which you said you got a call from an

14  old colleague over the weekend, right?

15  A.  Yes.

16  Q.  And I believe you testified yesterday, when you were

17  asked -- or you were asked by the prosecutor, who was the old

18  colleague you were referring to; do you remember that?

19  A.  Yes.

20  Q.  And do you recall answering that you were referring to

21  Cindy Holder who had in turn received a call from Jeff Wada; is

22  that accurate?

23  A.  Yes.

24  Q.  Now, your testimony, however, again, is not based -- this,

25  that Mr. Wada is the source, is not based on any first-hand

1    information; it's based on what Ms. Holder told you, right?

2    A.  Yes, based on what Cindy told me.

3    Q.  And your understanding that Mr. Wada is the source of this

4    document assumes that Ms. Holder was telling you the truth?

5    A.  Yeah.  I wrote this email so I was the source of this

6    document, but Jeff Wada was the one that Cindy had told me had

7    given her this heads up about the big bank in Switzerland, yes.

8    Q.  I appreciate that clarification.  You wrote this email.

9         The information that we're talking about, though,

10   information that your testimony is Cindy told you she got from

11   Jeff, right?

12   A.  Yes.

13   Q.  And your assumption that Jeff Wada was indeed the source

14   assumes that Ms. Holder was telling you the truth, correct?

15   A.  Yes.

16   Q.  And just so we're clear about this particular piece of

17   information that you got from Cindy Holder, it did not include

18   the name of any inspection targets, did it?

19   A.  No.

20   Q.  Let's take a look at what's been admitted as Government

21   Exhibit 876.

22        MR. COOK:  Your Honor, I see it is after 5 p.m.  This

23   would be a convenient stopping point.

24        THE COURT:  OK.  Why don't we break for the evening.

25        Folks, yeah, it's a little after 5.  We'll break for

1    tonight.  We'll have a full day tomorrow.

2              I wanted to raise the issue of Friday with you all.  I

3    have said generally we won't be sitting on Fridays, but I may

4    raise the issue of possibly sitting Friday morning just to make

5    progress getting through the trial.  But I wanted to just put

6    that out there, and then maybe tomorrow morning I can see

7    whether anyone has a conflict.  If you do have a conflict, you

8    have already made plans or something for Friday, then we won't,

9    since I said generally we'll be Monday to Thursday.

10             Does anyone know right now that they definitely could

11   not do Friday?

12             You cannot?

13             JUROR:  Well, I have a meeting but I could try to

14   reschedule it.

15             THE COURT:  You could reschedule it.

16             JUROR:  Probably.

17             THE COURT:  Is there anyone else who knows they could

18   not do Friday.

19             JUROR:  I could try to reschedule.

20             THE COURT:  OK.  I may ask about that tomorrow.  We

21   could do maybe just the morning, like 9:30 to 1 or something

22   likes that.

23             Yes?

24             JUROR:  Your Honor, for myself, I commute two hours.

25   So to come in for two hours and then like, you know, that is a

J2kdmid7

1   bit heavy.

2           THE COURT:  So you want to do a full day Friday.

3           JUROR:  No, your Honor.

4           THE COURT:  So you are saying it is an inconvenience?

5           JUROR:  Pretty much.

6           THE COURT:  OK.  Well, anyway, I wanted to put it out

7   there.  We can talk about it tomorrow.  And we'll be on track

8   for tomorrow morning.  We'll have coffee for you at 9, and then

9   we will begin at around 9:30.

10          So, have a good night.  Leave your pads on your

11  chairs, and we'll see you tomorrow.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J2kdmid7

1        (Jury not present)

2        THE COURT:  You can step down.

3        You may be seated.

4        (Witness not present)

5        Is there anything people wanted to address before we

6   break?

7        MS. KRAMER:  Very briefly, your Honor.

8        I think that the government objects to reading from

9   documents not in evidence in a way that makes plain that there

10  are notes of federal agents that are being read from.  So today

11  the document was identified and described very specifically and

12  it was very clear, in fact, announced to the jury that counsel

13  is reading from it.  There is, you know, a challenge I think in

14  impeaching with a prior inconsistent statement, but there

15  should be some effort made to make it not quite so obvious that

16  you are reading from a document that is not in evidence under

17  the circumstances when it is an issue that would not permit the

18  offering or the proving by extrinsic evidence of the prior

19  inconsistent statement --

20        (Continued on next page)

21

22

23

24

25

J2K5mid8

1        THE COURT:  The prior inconsistent statement can

2   actually come into evidence.

3        MS. KRAMER:  But it should be:  *Didn't you say in this*

4   *interview blah-blah-blah;* not:  *Take a look at this document*

5   *that's marked for identification, I want to read these three*

6   *sentences from it.*

7        I think that that is actually not okay.  That's our

8   objection to that.

9        THE COURT:  Okay.  Well, there was a question whether

10  it was really inconsistent because the first questions

11  generally about being manipulative, I don't know if they were

12  focused enough to go to a specific statement here.  But if it

13  truly was an inconsistent statement it could come into

14  evidence, however this was not a verbatim transcript, this was

15  notes of a law enforcement officer.

16        Is your objection that you don't think it is fair to

17  even say what it is?

18        MS. MERMELSTEIN:  Yes.  I think it is improper, your

19  Honor.  It is not appropriate for defense counsel to

20  essentially testify to the jury that there are notes and that

21  they are reading from them and that that is what the notes say.

22  I think the way the question has to go is as follows.  You say

23  to the witness, *Isn't it true that you thought Ms. Holder is*

24  *manipulative?*  The answer is, *Yes/No/I don't know.*  If there is

25  an inconsistent statement you then say, *Well, didn't you meet*

*with the government on that date?  Didn't you say on that date*

*blah-blah-blah?*  If he then says, *Well, I did say that,* then

that's the end of it.  If he says, *I didn't say that*, then you

now have a prior inconsistent statement that can come in,

subject to the proper foundation.  Or, if he says, *I don't*

*remember*, then you can say, *Well, look at this document.  Does*

*it refresh your recollection?*  What you can't do is say to the

jury, well, there are notes that a law enforcement agent took

that say that are you not telling the truth.

That's not okay.

MR. COOK:  Your Honor, there are a couple options.

I could have redacted the document and introduced the

document.  It was far easier, and I think frankly far less

prejudicial to the government than to simply read the statement

and the statement, I can't just read it without providing the

context of what it is I'm reading.  So, I think I did the bear

minimum to impeach the witness.  It was a clear inconsistency

with his testimony.  If the government would prefer that we

introduce -- if this were to happen again, actually introduce a

redacted form the document that contains the inconsistent

statement along with the header that demonstrates what the

source is, we can do that, but that seems unnecessarily

cumbersome.

THE COURT:  Right, but I do think that the government

makes a fair point that you shouldn't represent that an FBI

J2K5mid8

1  agent wrote something down.  You should say did you in fact

2  meet with the government and isn't it true that you said X.

3          MR. COOK:  That's fine, your Honor.

4          Any other issues you all want to talk about?

5          MS. MERMELSTEIN:  No, your Honor.

6          THE COURT:  Okay.  Have a good night, everybody.  See

7  you tomorrow morning.

8          (Adjourned to February 21, 2019 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                           Page

3     BRIAN JOHN SWEET

4    Direct By Ms. Kramer . . . . . . . . . . . . 925

5    Cross By Mr. Cook  . . . . . . . . . . . . .1115

6                       GOVERNMENT EXHIBITS

7    Exhibit No.                              Received

8     1439  . . . . . . . . . . . . . . . . . . 927

9     1067  . . . . . . . . . . . . . . . . . . 948

10    956R  . . . . . . . . . . . . . . . . . . 953

11    1072  . . . . . . . . . . . . . . . . . . 959

12    202  . . . . . . . . . . . . . . . . . . . 964

13    1444  . . . . . . . . . . . . . . . . . . 975

14    655  . . . . . . . . . . . . . . . . . . . 979

15    1073  . . . . . . . . . . . . . . . . . . .1008

16    1079  . . . . . . . . . . . . . . . . . . .1013

17    1076  . . . . . . . . . . . . . . . . . . .1015

18    1077  . . . . . . . . . . . . . . . . . . .1018

19    1074  . . . . . . . . . . . . . . . . . . .1020

20    1075  . . . . . . . . . . . . . . . . . . .1024

21    650  . . . . . . . . . . . . . . . . . . . .1081

22    1450  . . . . . . . . . . . . . . . . . . .1105

23    3522-36  . . . . . . . . . . . . . . . . . .1106

24    503  . . . . . . . . . . . . . . . . . . . .1157

25
```