```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                            18 Cr. 0036(JPO)

 5   DAVID MIDDENDORF and JEFFREY
     WADA,
 6
                   Defendants.
 7
     ------------------------------x
 8

 9                                           February 21, 2019
                                             9:38 a.m.
10

11   Before:

12                    HON. J. PAUL OETKEN,

13                                           District Judge
                                             and a jury
14

15                    APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
18        AMANDA K. KRAMER
          JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20   PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant David Middendorf
21   BY:  NELSON A. BOXER
          AMY R. LESTER
22        ALEXANDRA REBECCA CLARK
               – and –
23   BRUCH HANNA LLP
     BY:  GREGORY S. BRUCH
24

25
```

                        APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
      JUSTIN S. WEDDLE
      SELBIE JASON
            – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


          – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal




                              oOo

1    (Jury not present)

2    THE COURT:  Good morning, everyone.

3    ALL COUNSEL:  Good morning.

4    THE COURT:  Any matters to discuss?

5    MS. MERMELSTEIN:  Incredibly briefly, your Honor.  We

6    received a number of new defense exhibits last night.  I think

7    a large number of them are more tax records; they are going to

8    fall into the buckets we've already thought about.  But one we

9    wanted to object to before it gets shown to Mr. Sweet.  It's

10   Defense Exhibit 1626.

11   We're not plugged in so I don't know if someone can

12   pull it up for the Judge.  It's a photograph of what I assume,

13   although I don't know, is Mr. Sweet's vacation home.  I can't

14   see any relevance to a photograph of a home he purchased.  It

15   seems to me that its only relevance is to suggest somehow that

16   he was wealthy, that he owned a vacation home -- an argument I

17   would note the defendants explicitly moved to preclude the

18   government from making with respect to the defendants and which

19   the government agreed was not proper.  And so, since I think it

20   has no relevance at all, it should be precluded.  And that's

21   our only issue to raise this morning.

22   THE COURT:  OK.  Mr. Weddle.

23   MR. WEDDLE:  Your Honor, in my view, the witness

24   minimized his conduct when he said that he took deductions and

25   did this 1031 exchange related to a vacation home or cabin, and

1    I think the government showed him a picture of the restaurant

2    where he had lunch on his first day of work, and I think we're

3    entitled to show the jury what he is talking about when he says

4    "cabin."  It's a million-dollar vacation home in the mountains.

5            MR. BOXER:  We agree, your Honor.  From the

6    photograph, it is no cabin, and I think it impeaches him.

7            MS. MERMELSTEIN:  Can we pull the photograph up?

8            That is literally a cabin.  I have no objection to

9    Mr. Sweet being asked the cost of the home.  He was in no

10   fashion suggesting, I don't believe, by calling it a cabin that

11   it was inexpensive, right, or wasn't sort of valuable.  That's

12   a rustic cabin.  It is made out of logs.  It is not inaccurate

13   for him to describe it that way.  And the photograph itself has

14   no legitimate purpose.

15           MR. BOXER:  That was exactly the impression I think he

16   tried to convey and conveyed to the jury.  I don't know what

17   wood it is made out of, but sitting on that lake and looking at

18   it I think impeaches his testimony.  And I agree with

19   Mr. Weddle, the impression that was made was something very

20   different.

21           I think it is also relevant to the various tax returns

22   and deductions and 1031 exchanges that didn't happen, and this

23   is right in the middle of the story.  But I think it is

24   impeachment.

25           MR. WEDDLE:  And, your Honor, if I could just add?  I

1   mean, it demonstrates the -- I can't think of the right word --

2   blatancy, if I can probably make up a word, of his tax frauds.

3          THE COURT:  Of his tax?

4          MR. WEDDLE:  Of his tax frauds.

5          And I think that, you know, the objection that this --

6   maybe this is a cabin, it looks like a cabin to me, I think

7   that is an objection that goes to the weight, not the

8   admissibility.  It is for the jury to determine whether they

9   think that this is actually impeaching or not impeaching.  They

10  may think, oh, you know, Brian Sweet purchased a cabin.  That

11  is not minimizing at all.  I think it is a totally fair

12  representation.

13         THE COURT:  But whether it is a cabin or not, isn't

14  the tax fraud issue sort of whether it was rented or not

15  rented?

16         MR. WEDDLE:  No.  Let me back up for a second.

17         I think the tax fraud issue -- and this is a critical

18  point, and I read the transcript last night and I'm not sure I

19  was completely clear in some of my arguments.  What is unusual

20  about Brian Sweet is not that he cheated on his taxes and has

21  pled guilty to these crimes.  What is unusual -- because

22  obviously we've all seen cooperators who have engaged in other

23  bad conduct.  What's unusual about Brian Sweet is the number of

24  times he lied to the government about his conduct and his

25  trickling representations to the government about his conduct

1   and his continuing criminal conduct while meeting with the

2   government and while promising to them that he was coming clean

3   and was accepting responsibility for his conduct.

4          And so the 1031 exchange issue is something that he

5   never revealed to the government until the government started

6   meeting with him it looks to me like three successive business

7   days, and it looks to me as if Mr. Sweet spent the weekend

8   studying the documents on his hard drive.  And that's a period

9   of time between December 13, 2018, two months ago, and

10  December 17, 2018.  And what was happening at that time is that

11  the defense, collectively, were in communications with the

12  government and disagreeing with the government about the extent

13  to which the government should produce the contents of Brian

14  Sweet's hard drive.

15         At the same time the government was telling us that

16  there is no Giglio or Brady discovery material in what we were

17  asking for, Mr. Sweet was spending the weekend trying to figure

18  out what we were going to get, and he finally came in on

19  December 17th and said, well, there is this 1031 exchange.

20  Even on that day, your Honor, he seemed to be claiming that it

21  was valid, that it was a proper exchange.  That was a lie, and

22  it was a violation of his plea agreement.  The entirety of his

23  conduct from January 4th to December 17th was a violation of

24  his plea agreement with respect to that.

25         So, it is a critical point.  And it is not just more

1  bad conduct, it has to do with his interactions with the

2  government and the fact that the government, when they found

3  out about the 1031 exchange, they didn't say, well, this is a

4  real problem, because what he told them on that day -- and

5  hopefully I'm not misremembering, but on December 17, 2018, he

6  told them I did this 1031 exchange.  I took a rental property,

7  sold it, had gain on it, made money on that sale, and paid no

8  tax on it because I did this 1031 exchange because at the time

9  I was planning to rent out this property.

10             THE COURT:  Just to be clear, that's buying or selling

11  the cabin?

12             MR. WEDDLE:  It's buying the cabin.  So the tax event

13  is the sale --

14             THE COURT:  The sale of the four-bedroom apartment and

15  buying this and yet the 1031 exchange was premised on the idea

16  that this cabin was going to be a rental property, is that

17  right?

18             MR. WEDDLE:  Yes.

19             THE COURT:  I just want to make sure I understand.

20             MR. WEDDLE:  Yes.

21             THE COURT:  OK.

22             MR. WEDDLE:  And so the character of the property is

23  relevant to show how obvious it was that this was tax fraud.

24             It's also relevant --

25             THE COURT:  But I don't see how the picture -- maybe

1    it is impeaching because the of the word "cabin," I don't know.

2    But I don't see how the picture makes it more or less likely

3    that it was conceived of as a rental versus non-rental

4    property.  I mean, it looks nice.  It looks more likely to be a

5    rental property, I don't know.

6           MR. COOK:  Your Honor, one of the things that

7    Mr. Sweet has already testified and told the government

8    repeatedly is at the time he engaged in this transaction, he

9    intended to rent out this property.  So he sold the apartments.

10   He bought this million-dollar vacation home.  And he said at

11   the time I intended to use it as a rental property.  That was a

12   lie at the time.

13          And I think the character of the property is relevant

14   to establish the fact that at the time he knew he had no

15   intention of ever renting it out.  So, the picture itself is

16   relevant.  This was not a lifetime exchange, using the phrase

17   colloquially.  And at the time he knew it was not going to be a

18   lifetime exchange, and the character of the property is further

19   evidence of that fact.

20          MS. MERMELSTEIN:  Yes, that is just wrong.  Mr. Sweet

21   did intend to use it as a rental property.  He was not lying

22   when he said that.  He did not ultimately do it and that makes

23   this a fraud, as the government elicited from him on direct and

24   disclosed to everyone and that's all fine and good.  I don't

25   understand how any of the closing arguments about Mr. Sweet's

1    trustworthiness have anything to do with the admissibility of

2    this photo, which is in fact a cabin.  And even if someone

3    could argue that, you know, in New Hampshire they call it a

4    camp when it is in fact sort of an estate, that that is the

5    colloquial term for it, the notion that it has any impeachment

6    value is frankly silly.  And if it had any, the probative value

7    would be vastly outweighed by the prejudicial effect of saying

8    to the jury, look, this guy has a million-dollar vacation

9    house.

10            So, I don't think I have anything else to say on this.

11            MR. COOK:  Your Honor, they elicited during direct

12   what his intent was at the time he engaged in the transaction.

13   We will show demonstrably that that was false at the time.  And

14   this is further evidence -- that's right, false at the time

15   that he testified as well as when he told it to the government.

16   The picture is one piece of evidence of that.  There is other

17   physical evidence of that that we'll introduce on cross.

18            THE COURT:  Physical evidence of what?

19            MR. COOK:  Actual documents that he signed at the time

20   he engaged in the transaction where he represented that this

21   absolutely was not a vacation home, it was intended as a second

22   home for his family.

23            THE COURT:  OK.  I don't see -- I mean, I don't really

24   see a lot of value to the picture, but I don't see it as hugely

25   prejudicial either.  So, insofar as there might be a suggestion

1    that he minimized what it was, I will allow it.  I don't see

2    any particular reason not to allow it.

3              Anything else?

4              MS. MERMELSTEIN:  No, your Honor.

5              THE COURT:  All right.  Let's bring in the jury.

6              And you can bring in the witness, actually.

7              (Continued on next page)

```
 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3              You may be seated in the courtroom.

 4              Welcome back, folks.

 5              We are continuing.  We will take a break in about an

 6   hour, hour-and-a-half, and then we will take a lunch break at

 7   1 o'clock.

 8              And, Mr. Cook, you may proceed.

 9              You are still under oath from yesterday.

10    BRIAN JOHN SWEET,

11      Resumed, and testified further as follows:

12   CROSS-EXAMINATION

13   BY MR. COOK:

14   Q.  Good morning, Mr. Sweet.

15   A.  Good morning.

16   Q.  Did you speak with anyone from the government last night

17   after you concluded your testimony?

18   A.  No, I did not.

19   Q.  Did you speak with your lawyers?

20   A.  Not about this case, no.

21   Q.  Let's talk for a few minutes about what you did to prepare

22   for your testimony at this trial.

23              You are represented by three lawyers, is that right?

24   A.  Yes.

25   Q.  And I assume you met with them over the course of the past
```

1  year, year-and-a-half, since you began speaking with the

2  government?

3  A.  Yes.

4  Q.  You met with the government on many occasions?

5  A.  Yes.

6  Q.  Over 30 times?

7  A.  I don't know the exact number but, yeah, quite a few times.

8  Q.  It wouldn't surprise you if it was more than 30 times?

9  A.  No, it would not.

10 Q.  And during those meetings, you discussed the subject matter

11 of your testimony?

12 A.  Yes.

13 Q.  You reviewed with the prosecutors the questions they would

14 ask and the answers you would give?

15 A.  We didn't rehearse, if that's what you're asking.  They

16 asked me questions and I answered.

17 Q.  Well, they gave you a good idea of what they were going to

18 ask you on direct examination, right?

19 A.  Yes.

20 Q.  And you reviewed documents with them?

21 A.  Yes.

22         MR. COOK:  If we could put you up Government's Exhibit

23 1434, which is in evidence.

24 Q.  Sir, you were asked questions about this document on direct

25 examination.  Do you recall?

1  A.  Yes, I think so.  Yes.

2  Q.  A series of text messages between you and Ms. Holder?

3  A.  Yes.

4  Q.  And in this exchange you asked about how to obtain the

5  email addresses for PCAOB board members?

6  A.  Yeah, one board member in specific or specifically.

7  Q.  Well, the first text is, "Do you happen to know how I could

8  get the PCAOB board member email addresses?" is that correct?

9  A.  Yeah.

10  Q.  That's what you said?

11  A.  Yeah.

12          MR. COOK:  And if we could pull back.  Thank you.

13  Q.  And Ms. Holder suggested that she could ask Mr. Wada.  Do

14  you see that?

15  A.  Yes.

16  Q.  And then you say that you had just asked Randy Bunkley.  Do

17  you see that?

18  A.  Yes.

19  Q.  And did Randy Bunkley get you those email addresses?

20  A.  No, he was not able to, as I recall.

21  Q.  And John got them for you?

22  A.  John is referring to John Mucha, who was a partner at KPMG,

23  and he was the one who originally asked.  So, he got them for

24  himself.

25  Q.  So Mr. Mucha was asking you if you could get them but he

1    ended up getting them himself?

2    A.   That's right.

3    Q.   OK.  And then you say, in this part of the same

4    conversation -- and if you look at the timestamp -- within one

5    minute of you telling Ms. Holder that John got them, Ms. Holder

6    says, "OK."  And then you say, "Tell Wada we owe him big."  Do

7    you see that?

8    A.   Yes.

9    Q.   And that was within 10 or 12 minutes of you asking

10   Ms. Holder if she could help you get those email addresses and

11   her saying "I can ask Wada," correct?

12   A.   Yes.

13   Q.   And your testimony on direct was that you weren't referring

14   to the conversation in this email -- or this text exchange that

15   had just taken place within minutes, but you were instead

16   referring back to something that's not in the text exchange at

17   all, is that right?

18   A.   Yes.

19   Q.   You cannot testify, as you sit here today, that what you

20   were referring to when you said "Tell Wada we owe him big" was

21   the information that you claim came from Mr. Wada about

22   Deutsche Bank and Credit Suisse, is that right?

23   A.   No.  That's how I remember this text message exchange.

24   That's what I remember thinking in December of 2015.

25   Q.   That's not --

1  A.  That is when --

2  Q.  I'm sorry.  I didn't mean to cut you off.

3  A.  In December of 2015 was when Jeff Wada had been identified

4  as the team lead for KPMG Japan, and he had been communicating

5  with Cindy about not only that inspection but other

6  international inspections.

7  Q.  That's not what you told the government on January 25,

8  2019, is it?

9  A.  I don't remember.

10  Q.  Do you recall what you told the government when they asked

11  you about what you were referring to when it says "Tell Wada we

12  owe him big"?

13  A.  I don't remember.

14  Q.  You don't remember what you told the government?

15  A.  I don't remember a specific conversation from January 25,

16  2019.  You asked me about what words I said.  I said I can't

17  right now tell you.

18  Q.  Let me ask you more broadly.

19       In the 30-plus conversations you had with the

20  government, do you ever recall telling them that you were

21  certain what you were referring to in this text message was the

22  alleged disclosure of confidential information at some time

23  previous and not Cindy asking Jeff Wada for a favor in this

24  text message?  Do you ever telling the government that you were

25  certain they were referring to this other confidential

1    information?

2    A.  I'm sorry.  Would you ask it one more time, please?

3    Q.  That was a complicated question.  Let me start over.

4            Did you ever tell the government, on any occasion,

5    that you were certain that what you were referring to in this

6    text message was the information you claim Mr. Wada provided on

7    an earlier occasion about Credit Suisse and Deutsche Bank?

8    A.  I don't remember, sir.

9    Q.  You said that Jeff Wada first expressed interest in getting

10   a job at KPMG in 2016?

11   A.  That is the first time I remember having a conversation

12   with Cindy about that, yes.

13   Q.  Well, those are two different things.

14           Did Mr. Wada, to your understanding, express an

15   interest in getting a job at KPMG in 2016?

16   A.  Yes.

17   Q.  And you understand that's different from you and Cindy

18   Holder talking about whether Mr. Wada might be interested in

19   coming to KPMG?  Right?  Do you see the distinction?

20   A.  I do.

21   Q.  And it is your testimony that in 2016 Mr. Wada actually

22   expressed interest in coming to KPMG?

23   A.  I had a conversation with Cindy in March of 2016, when the

24   initial list of the dozen or so banks and couple of nonbanks,

25   but that March 28, '16, to say why is Jeff providing this

1   information.  And I remember her saying, listen, Jeff -- Jeff

2   wants to wait until he gets promoted to associate director at

3   the PCAOB before he applies for a job.  He doesn't want to

4   leave the PCAOB yet.  He wants to wait.

5        And so I remember starting in March of 2016 was the

6   first time having conversations with Cindy where she expressed

7   what Jeff's intent was on leaving and when he wanted to leave

8   and future job prospects.

9        MR. COOK:  If we could look at Government's Exhibit

10  1437, which is in evidence.

11  Q.  This is another text exchange that you testified about on

12  direct examination.  Just take a look at it and see if you

13  recall the conversation.

14        (Pause)

15  A.  Yes.

16  Q.  Do you recall testifying about this exchange?

17  A.  I think so, yeah.

18  Q.  So this is from February 24, 2016, correct?

19  A.  Yes.

20  Q.  Between you and Ms. Holder?

21  A.  Yes.

22  Q.  And you say on that, 4:36 p.m., "Wada is the freaking man.

23  I'd so love to hire him.  Do you think he'd be willing to come

24  do this international role?"  Do you see that?

25  A.  I do.

1   Q.  That's what you wrote?

2   A.  Yes.

3   Q.  Mr. Sweet, Ms. Holder responds to your text message saying,

4   "He's not on KPMG so recusal not an issue.  He has two young

5   kids and can't travel that much, but I'm going to keep trying."

6           What did you understand her to mean when she said "I'm

7   going to keep trying"?

8   A.  That she was going to continue to keep encouraging Jeff to

9   seek employment with KPMG and leave the PCAOB.

10  Q.  And then you respond to her:  "Yes for sure.  And if he

11  ever changes his mind I'll make a huge push to get him in."

12          What were you referring to when you said "changes his

13  mind"?

14  A.  Changes his mind about leaving the PCAOB.

15  Q.  You used the phrase yesterday "circle of trust."  Do you

16  remember that?

17  A.  I do.

18  Q.  Mr. Whittle used that phrase after you disclosed to him the

19  PCAOB's 2016 inspection list?

20  A.  Yes.

21  Q.  You were on the phone with Mr. Whittle and Mr. Middendorf

22  and Mr. Britt, you were all in an office in New York when he

23  used that phrase?

24  A.  Yes.  I believe they were in a conference room, yes.

25  Q.  They were in a conference room together and you were on the

1   phone?

2   A.  Yes.

3   Q.  And to your recollection, that's the first time you heard

4   that phrase used, "circle of trust," in the context of this

5   confidential information?

6   A.  Yes.

7   Q.  Do you know if Mr. Wada was in the room?

8   A.  No.

9   Q.  He was not, was he?

10  A.  No.

11  Q.  Wasn't on the phone either, was he?

12  A.  No.

13  Q.  Did you relay the discussion you had with your KPMG

14  partners about your plans for this information to Mr. Wada?

15  A.  No.

16  Q.  That was the purpose of the meeting, right, is to discuss

17  what you were actually going to do with this information now

18  that you had it?

19  A.  Yes.

20  Q.  And Mr. Whittle said that he needed to maintain a circle of

21  trust?

22  A.  Yes.

23  Q.  What did you understand "circle of trust" to mean?

24  A.  I think it's a reference to a movie, but that only the

25  people in that room should know the real intent, that it was to

1    be kept as confidential as possible.

2    Q.   And Jeff Wada was not a part of this circle of trust, was

3    he?

4    A.   No, he was not.

5              MR. COOK:   Could we look at Government's Exhibit 935D?

6    It is in evidence.

7    Q.   Sir, you testified about this document on direct

8    examination, and I want to direct your attention specifically

9    to the yellow boxes where the time -- time changes.  Do you see

10   that?

11   A.   I do.

12   Q.   Now, these are emails you exchanged with Cindy Holder on

13   March 28, 2016?

14   A.   Yes.

15   Q.   What do the yellow boxes represent?

16   A.   They are the conversion of the email time stamps into

17   Eastern Daylight Time.

18   Q.   How do you know that?

19   A.   Well, I know that because I know what time I spoke with

20   Cindy Holder.  I know where I was in California, and I know

21   that 1:35 p.m. Eastern Daylight Time is 10:35 in California,

22   which is when I first received -- when I had missed her phone

23   calls, this text message, and then sent this email.

24   Q.   So looking at the top email, where it says "5:36 p.m." and

25   then there is a box that says "1:36 p.m. Eastern," do you see

 1    that?

 2    A.   Yes.

 3    Q.   Do you know whether or not this email was received -- sent

 4    by you and received by Cindy Holder at 5:36 p.m. Eastern, UTC

 5    Time, Pacific Time, Central Time, Mountain Time, by any

 6    reference within the email itself?

 7    A.   It was -- I received this email back at -- actually, I sent

 8    this email at 10:36 California time.

 9    Q.   How do you know that?

10    A.   Because --

11    Q.   That's what I'm asking.

12    A.   Because I was sitting in California on a conference call --

13    I think it was like a performance management call, if I

14    remember correctly -- and I remember missing successive phone

15    calls from Cindy on my cell phone, getting this text message,

16    and thinking like what's going on, and typing this email

17    because I could hang up on the phone I was on to call Cindy

18    back.  So I remember it happening very quickly like that.

19    Q.   So I want to make a distinction here.  I want you to

20    distinguish what you think the time was based on a sequence of

21    events outside of this email and what you know from what's in

22    the email itself.  So I'm asking you to confine your answer to

23    what's in the email itself.

24         Do you know that this email was sent or received at

25    1:36 p.m. Eastern Daylight Time or 5:36 p.m. Eastern Daylight

1    Time or Central Time or Mountain Time from the email itself?

2              MS. KRAMER:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.  I remember this came -- or I responded back within a

5    minute, as shown on here.  I remember being in California and

6    it was 10:36 California time.  I know that the email system at

7    KPMG, because I was physically in California, it bounces

8    through servers.  I worked in New York.  That bounced

9    international -- I mean, the email time zones were always funny

10   like this.

11   Q.  How did that work?  Again, I'm asking you not to tell me

12   about the sequence of events from outside the email but what

13   you actually know about how KPMG's email servers work.

14   A.  I can't speak -- I can't speak to -- I'm not an IT expert,

15   but I was constantly traveling in multiple time zones.  Other

16   people I worked with were in multiple time zones.  I'm

17   certainly not an email or an IT expert.

18   Q.  I understand.  And that's what I'm getting at, Mr. Sweet,

19   is you don't know how the email system within KPMG works and

20   how the time stamps are applied to particular emails, do you?

21   A.  I remember the sequence of events because I was the one who

22   initiated the original email and sent the email at the top,

23   too.  I remember exactly where I was.  I remember that it was

24   late morning California time.  So, I believe it's exactly the

25   way I've explained it.

1    Q.  You believe it's exactly the way you've explained it

2    because of your reference to events outside of this email, is

3    that right?

4            MS. KRAMER:  Objection.  Asked and answered and

5    argumentative.

6            THE COURT:  Sustained.

7    BY MR. COOK:

8    Q.  If we could look at Government's Exhibit 1444, which is in

9    evidence.

10           Mr. Sweet, you -- do you have the document in front of

11   you?

12   A.  Yes, sir.

13   Q.  This is the red text, the notes that you testified about

14   extensively yesterday?

15   A.  Yes.

16   Q.  And it's your understanding that these are notes that were

17   taken by Ms. Holder?

18   A.  Yes.

19   Q.  Did she explain her notes to you?

20   A.  Yes.

21   Q.  So -- and I want to be clear when I'm asking, did she

22   physically show you the notes and point to portions of the

23   notes and tell you what she meant by the things she wrote?

24   A.  She sat across my desk from me.  I remember her putting the

25   notes on the desk.  Yes.

1  Q.  OK.  So let me see if I understand.

2      So you were sitting across from each other?

3  A.  Yes.

4  Q.  And facing each other?

5  A.  Yes.

6  Q.  And a desk between you and the notes on the desk?

7  A.  Yes.

8  Q.  And she's describing to you what?  What is she telling you?

9  A.  That she had just gotten off the phone with Jeff Wada and

10 that he had shared with her information about who from the

11 PCAOB was going to be put into this Banking Inspections Group.

12 She shared with me this preliminary listing of what the

13 PCAOB -- which audit engagements the PCAOB was planning to

14 inspect in 2017.  I remember her talking me through her

15 conversation with Jeff.  I remember looking at this -- these

16 notes as she talked it through, and we went through the names

17 of the people.

18 Q.  And so did you come around the table and so you could sit

19 next to each other and sort of review the notes, or she was

20 just describing to you what were on the notes?

21 A.  The desk that I had in my office wasn't very wide, so, I

22 don't know, a few feet.  So she put them down, and I remember

23 sitting across from her, the notes kind of sideways, looking at

24 them with her.

25 Q.  Were you present when she took the notes?

 1  A.  No, I was not.

 2  Q.  Did she tell you when she took the notes?

 3  A.  Yes, that it had been from her phone call with Jeff Wada.

 4  Q.  Did she tell you when that had taken place?

 5  A.  That day, but I don't know the specific time.

 6  Q.  You don't know the time?

 7  A.  No.

 8  Q.  Were the notes in a notebook or was it a single sheet?

 9  A.  It was in a notebook.

10  Q.  Spiral notebook?

11  A.  Yes.

12  Q.  This is not -- Government's Exhibit 1444 -- this is not the

13  inspection list, correct?

14  A.  No.

15  Q.  Did Ms. Holder tell you that she wrote down the inspection

16  list?

17  A.  I saw the inspection list, yes.

18  Q.  Was it in her handwriting?

19  A.  Yes.

20  Q.  The same red text?

21  A.  Yes.

22  Q.  Had the list of issuers?

23  A.  Yes.

24  Q.  Is that the last time you saw that list?

25  A.  We -- after meeting with Cindy, after she shared this with

1   me, as I testified to yesterday, we then went into Tom

2   Whittle's office, her and I.  She brought her notebook with

3   her.  I remember where I sat, where she sat.  She had her

4   notebook on her lap, so I saw it then as we were sharing the

5   information with Tom.  And then after finishing the

6   conversation with Tom Whittle, we went back into my office and

7   we sat down again.  And at that point is when I said, "All of

8   these inspectors, Cindy, let me just take a picture of this."

9   Q.  I'm going to ask you to just repeat that last phrase.  All

10  these inspectors and?

11  A.  That can I take a picture of your notes so that --

12  Q.  And she responded how?

13  A.  Sure.  She said yes.

14  Q.  And was the page open to Government's Exhibit 1444 or to

15  the inspection list?

16  A.  It was certainly open to this page.  I don't remember if

17  she had both pages side-by-side, if it was open or folded.

18  Q.  What did she say when you asked to take a picture?

19  A.  She said, OK, sure.

20  Q.  And you took a picture of this page, 1444, correct?

21  A.  Yes.

22  Q.  Did you take a picture of the other page?

23  A.  I can't remember if I did or not, and I'm not sure.

24  Q.  So you remember when you first discussed this list, 1444,

25  and the other list, the office you were in with Ms. Holder.

1    You remember how you received it, correct?

2    A.   Yes.

3    Q.   You remember the orientation of the document as you

4    discussed the list, right?

5    A.   Yes.

6    Q.   You remember going into the other office and the notebook

7    was actually sitting in Ms. Holder's lap, right?

8    A.   Yes.

9    Q.   Do you remember what was discussed during the meeting?

10   A.   Yes.

11   Q.   Do you remember going back to your -- was it your office

12   you went back to?

13   A.   Yes.

14   Q.   That you discussed these two lists again, right?

15   A.   Yes.

16   Q.   You remember taking a picture of Government's Exhibit 1444?

17   A.   Yes.

18   Q.   But with regard to the inspection list, you don't recall

19   whether you took a picture?

20   A.   I had written them down so I don't remember.

21   Q.   In terms of relative significance and benefit to KPMG, you

22   would agree that the inspection list would be more important

23   than Government's Exhibit 1444?

24   A.   Yes.

25   Q.   And if that document existed the way you described it, it

1  would be unusual for you not to take a picture of it and take a

2  picture of 1444?

3  A.  I had written down the names of the issuers that Cindy had

4  shared, so I already had taken my own notes of those issuers.

5  And we had just gone in and shared that same listing with Tom

6  Whittle, so now he knew the names of the issuers, I had the

7  names of the issuers, and so I would agree that that is the

8  more significant information but that's why I chose to write

9  that down.

10  Q.  But it's still your testimony that you are not sure if you

11  took the picture, right?

12  A.  I remember -- because I deleted the pictures that I took on

13  my phone when I went back through, I don't remember if this was

14  another picture that I had taken and deleted and couldn't be

15  recovered.  I just don't remember.

16  Q.  To your knowledge, no such picture has been recovered?

17  A.  To my knowledge, yes.

18  Q.  So the only record that we have of the list you claim you

19  got from Cindy Holder are the list of issuers that you wrote

20  down yourself, is that right?

21  A.  I certainly don't know all of the documents that have been

22  recovered --

23  Q.  But you knew --

24  A.  -- as part of this is certainly what I remember and, yes.

25      MR. COOK:  If we could take a look at Government's

1    Exhibit 655, which is in evidence.

2    Q.  You recall Government's Exhibit 655, don't you?

3    A.  Yes, sir.

4    Q.  This is your handwriting?

5    A.  It is.

6    Q.  So the text -- well, step back.

7            January 9, 2017, describe your day that day as best

8    you can recall.  Where were you?

9    A.  I was working out of the KPMG's New York office in

10   Manhattan.

11   Q.  Did you have anything on your schedule that day that you

12   recall?

13   A.  I remember having lunch, and I believe the lunch I had was

14   with Bob Ross.

15   Q.  Where did you have lunch with Bob Ross?

16   A.  We commonly went to a place called Bill's Burger, but I

17   don't know if that was the place we went to on that day but I

18   went there quite a few times.

19   Q.  And Bob Ross was one of your sources of confidential PCAOB

20   information, correct?

21   A.  Bob Ross did provide me with confidential information.

22   Q.  What was his position at PCAOB on January 9, 2017?

23   A.  He was an associate director working on one of the other

24   Big Four accounting firm inspection teams.

25   Q.  And you were an associate director when you left the PCAOB,

1  correct?

2  A.  Yes, I was.

3  Q.  You would consider Bob Ross a friend?

4  A.  Yes.

5        MR. COOK:  If you could blow up the portion of the

6  handwriting on 655, where it says "Top 30."

7  Q.  You testified on direct examination that the names in this

8  portion of the document are what?

9  A.  You are referring to what is in the brackets for the Top

10  30?

11  Q.  Yes.  Underneath Top 30, what does that represent?

12  A.  Top 30 was a grouping -- kind of a classification grouping

13  that the PCAOB would go through where they would identify what

14  each of the biggest firms' Top 30 audit engagements were, and

15  that was a separate criteria that they would evaluate and make

16  inspection selections from.

17  Q.  Is this information that you received from Cindy Holder?

18  A.  Yes.

19  Q.  You testified that you wrote down the names of the issuers

20  on the 2017 final inspection list on this document, is that

21  correct?

22  A.  Are you referring to the other notes, not what we're

23  looking at here, the blue?

24  Q.  Zoom out.

25        Did you write down the names that you received from

1   Cindy Holder of the PCAOB's inspection targets for 2017?

2   A.   Yes.

3   Q.   And you received those when?

4   A.   February 3rd.

5   Q.   And you wrote them down on this document?

6   A.   I did.

7   Q.   Which portion of the document reflects those issuers?

8   A.   It is -- everything that is in blue on this document was

9   what I wrote down on -- from that conversation with Cindy, plus

10   the other notes that I added on the side, as we talked about

11   yesterday.

12   Q.   When did you first tell the government that what you just

13   described, the portion of the document that you just described,

14   is actually the 2017 final inspection list?

15   A.   I don't remember what date.

16   Q.   Generally?

17   A.   I don't know, sir.

18   Q.   You don't remember?

19   A.   I remember describing this document to them, and because it

20   was a document that I had delete from my phone following the --

21   following me becoming aware of the internal investigation and

22   it was a document, as I mentioned yesterday, that I burned, I

23   didn't think that it could be recovered, and so I remember

24   describing this document to them and what I had done when they

25   first asked me about it.

1   Q.  Do you remember discussing this document with them a couple

2   of days ago?

3   A.  Yes.

4   Q.  Do you remember discussing with them the black writing in

5   the upper right-hand portion of the document?

6   A.  Yes.

7   Q.  And what did you tell them about the black writing in the

8   upper right-hand portion of the document two days ago?

9   A.  That it reflected my notes of the -- of the initial

10  January 9th conversation, the initial listing of inspection

11  targets that Cindy had received from Jeff Wada.

12  Q.  That was the first time you told the government that,

13  wasn't it?

14  A.  Yes.

15  Q.  And that was February 19th, just a couple of days ago, is

16  that right?

17  A.  Yes.

18  Q.  It would be fair to say that the topic of how you obtained

19  the 2017 final PCAOB inspection list is one of the most

20  important topics of conversation you have had with the

21  government since you began your conversations with them, is

22  that fair?

23  A.  I think it's pretty important, sure.  Yes.

24  Q.  It's been critical to, what, all of your discussions,

25  30-plus discussions with the government?

1    A.  Yes.

2    Q.  And in none of those discussions, none of them until just a

3    couple of days ago -- you were about ready to testify -- did

4    you tell them for the -- did you ever tell them until then that

5    these were your notes of the 2017 final inspection list?

6    A.  It -- I had an opportunity to review this document and

7    really think through it, and so by actually being able to look

8    at my notes and the words and how I wrote it, it certainly

9    helped refresh my recollection.

10   Q.  February 19, 2019, was that the first time you were shown

11   this document?

12   A.  I don't believe so, no.

13   Q.  You've seen it many times before, for months, right?

14   A.  Yes.

15   Q.  So it is not accurate for you to testify that only then did

16   you have an opportunity to review the document and consider

17   what it actually meant?

18   A.  In the past -- well, in the past we were much -- I remember

19   being more focused on what's in blue, the final listing,

20   because there is just so much information there.

21   Q.  Sir, isn't it true that in not just one but in multiple

22   conversations with the government they presented you with

23   what's been marked as Government's Exhibit 655 and asked you to

24   tell them what everything on this document meant, right?  They

25   went through the whole thing with you?

1    A.   Yes.

2    Q.   Multiple times?

3    A.   Yes.

4    Q.   Right?

5    A.   Yes.

6    Q.   And only on the eve of trial did you come up with this new

7    information, revelation, recovered memory, that --

8              MS. KRAMER:  Objection your Honor.

9              THE COURT:  Sustained.

10   Q.   Have you remembered anything else about this document since

11   you testified on direct?

12   A.   No.

13   Q.   You testified, I believe -- and correct me if I am wrong,

14   Mr. Sweet -- that Mr. Wada accessed the GNF Planning Profile in

15   order to obtain the 2017 inspection list?

16   A.   Yes.

17   Q.   You don't know that, do you, yourself?

18   A.   I was -- no, I wasn't there when he accessed it.

19   Q.   And Ms. Holder did not tell you that Mr. Wada told her that

20   that's what he did?

21   A.   Cindy explained to me how Jeff got the information and why

22   he had access to this information and --

23   Q.   Did Ms. Holder tell you that Mr. Wada accessed the 2017 GNF

24   Planning Profile?

25   A.   She said that he accessed the planning information in the

1    PCAOB's IIS folder for KPMG.

2    Q.  Now, you told the government, when asked about what

3    Ms. Holder told you on that conversation, that you only had the

4    clear impression that that's what Mr. Wada did, not that

5    Ms. Holder told you that Mr. Wada said he had accessed that

6    document, isn't that right?

7    A.  I asked her to explain to me how and why Jeff would have

8    access, and she explained that.  And because I'd worked at the

9    PCAOB for so many years, I'm very familiar with the IIS system,

10   thought through -- I mean, I put it -- yeah.  Yes.

11   Q.  So Ms. Holder did not tell you that Jeff Wada told her that

12   he accessed the document; that was simply an impression you got

13   from what Ms. Holder was saying, correct?

14   A.  Yeah.

15        MR. COOK:  Let's look at Government's Exhibit 1067.

16   It is in evidence.

17   Q.  Let's look at the first sentence of the email.

18        Could you read the first sentence of the email,

19   please, Mr. Sweet.

20   A.  Would you like me to read it out loud or to myself?

21   Q.  Out loud.

22   A.  Out loud.  OK.

23        "Tom - Attached is the screening analysis that Cindy

24   and I pulled together based off of our own experiences of how

25   the PCAOB performs its planning."

1  Q.  Now, you testified on direct that you said that "Cindy and

2  I pulled together based off our own experiences," that you used

3  that language instead of the fact that you got it from somebody

4  else because you were concerned that Mr. Whittle might forward

5  it, the email, on to other people; do you recall testifying

6  along those lines?

7  A.  Yes.  But I think you may be confusing the two different

8  versions of this email.  So, this was the initial bank

9  screening analysis that Cindy and I had put together in

10  November of 2016.  And then following the information that

11  Cindy had received from Jeff in January 9th, one of the actions

12  was that Tom asked us to add these -- the four additional banks

13  into this version, this is the original version, and edit this

14  listing and then re-send it.

15  Q.  Let me ask this again.

16       When you said that "Cindy and I pulled together based

17  off our own experiences of how the PCAOB performs its

18  planning," and you were referring to the attached document, was

19  that a true statement, that you came up with this listing based

20  on solely your own experience?

21  A.  We -- as part of doing that, we also accessed the 2015

22  planning information that I had stolen from the PCAOB and had

23  copied onto my PCAOB computer.

24  Q.  I see.  So, let me ask my earlier question a little bit

25  differently, then.

1   The reason why you didn't mention that you got the

2   information from the 2015 document that you had taken was

3   because you were concerned that Mr. Whittle might forward this

4   email along, is that right?

5   A.  I'm sorry.  Would you ask it one more time?

6   Q.  I believe you testified yesterday that you were concerned

7   that Mr. Whittle would forward this email to other people and

8   that's why you wrote it the way you did and did not mention

9   that the source for the insights in this attached document was

10  information you had stolen from the PCAOB.

11  A.  Yes.

12  Q.  You did testify to that, correct?

13  A.  I don't remember if that was in the context of the January

14  or this listing, but, yes.

15  Q.  Well, let me just ask you about this one, then.  Let's set

16  aside what you said before.

17  Is it true that you did not mention the 2015 list that

18  you stole in this email because you were concerned Mr. Whittle

19  would forward the email to other people and then they would

20  know that you had taken documents?

21  A.  Yeah.  In part, yes.

22  Q.  In part?  What were the other reasons why you framed it the

23  way you did?

24  A.  Well, Tom -- Tom Whittle was also aware that I had these

25  documents, so some of this didn't -- some of that didn't even

1    need to be said.

2    Q.  Well, you told Mr. Whittle this is based off our own

3    experiences?

4    A.  Mm-hmm.

5    Q.  It is not as if you left it open and let him fill in the

6    blanks as to how you got the documents.  You told him this is

7    based on your own experiences.  And you did that deliberately

8    because you didn't want the fact that you had inside

9    information to be in this email with the possibility of it

10   being circulated.  Right?

11   A.  Yes.

12   Q.  And the reason -- the additional reason why you didn't

13   mention the 2015 document in here is because by framing it the

14   way you did, it made you and Cindy Holder look good, right?

15   A.  Yes.

16   Q.  That you were able to actually think and plan and predict

17   on your own; you didn't need to rely exclusively on stolen

18   information?

19   A.  That's right.

20   Q.  So if you told the jury yesterday that the reason you

21   framed it this way was simply because you were concerned about

22   security, that wouldn't have been the whole truth, right?

23   A.  I think, as I said yesterday, that in all of this, all of

24   this sharing of confidential information, I did it in part

25   because I knew that it was career-advancing for me.  It made me

1   look good.  It was something that I knew they wanted, and so

2   that was a motivator for me throughout this entire process.

3          (Continued on next page)

1   Q.   You testified yesterday that you pled guilty to two crimes

2   in connection with your conduct, correct?

3   A.   Yes.

4   Q.   You entered your guilty plea in front of a magistrate judge

5   on January 5, 2018, correct?

6   A.   Yes.

7   Q.   Before you entered your plea, just as before you took the

8   stand here, you raised your right hand and swore to tell the

9   truth, correct, you took an oath?

10  A.   Yes.

11  Q.   The same oath that you are subject to today?

12  A.   Yes.

13  Q.   The judge during this process told you that failing to tell

14  the truth would be a crime, right?

15  A.   Yes.

16  Q.   You told the truth during that hearing, didn't you?

17  A.   Yes.

18  Q.   As part of that guilty plea, you were asked by the judge to

19  tell him in your own words what it is that you did that was in

20  violation of the law?

21  A.   Yes.

22  Q.   After he asked you that, you read a prepared statement to

23  the court?

24  A.   Yes.

25  Q.   Somebody else wrote that statement for you, right?  You can

1  answer yes or no.

2  A.  Yes.  I'm trying to be very careful not to --

3  Q.  I'm not asking you to invade your attorney-client

4  privilege.  Somebody else wrote it for you?

5  A.  Yes.

6  Q.  But after you were done reading your prepared statement,

7  the judge asked you another question.  He asked you whether you

8  committed these acts; when you committed these acts, did you

9  know that they were illegal and in violation of law.  Do you

10  remember that question?

11  A.  Yes.

12  Q.  You did not have a prepared statement for that question,

13  did you?

14  A.  No.

15  Q.  You answered that on your own?

16  A.  Yes.

17  Q.  When you answered that question, the question being when

18  you committed these acts did you know they were illegal and in

19  violation of the law, you said that you did not have an

20  understanding of that at the time but that you understand it

21  now.  Is that what you said?

22  A.  Yes.

23  Q.  That was true, wasn't it?

24  A.  It was true.  You asserted what I was doing was wrong --

25  Q.  There is no question pending.  Once you started working at

1    KPMG in May 2015, you immediately focused on helping KPMG find

2    additional PCAOB people to recruit, right?

3    A.   I was asked even before joining to identify who else might

4    be good candidates for KPMG to hire.

5    Q.   This was a significant concerted effort by KPMG to bring

6    over PCAOB inspectors, right?

7    A.   Yes.

8    Q.   They had enjoyed some success, is that true?

9    A.   You mean the firm?

10   Q.   The firm, KPMG.

11   A.   Yes.

12   Q.   They were successful in bringing people over?

13   A.   Yes.

14   Q.   How many people, approximately, that you are aware of did

15   KPMG recruit from the PCAOB from 2015 until your departure in

16   2017?  I know you won't know exact, but roughly.

17   A.   Ten, maybe more.

18   Q.   Could be more than that?

19   A.   Yes.  Somewhere around there, I believe.

20   Q.   Did you have a hand in assisting, recruiting, encouraging

21   many of those people to make that change?

22   A.   Yes.

23   Q.   When you started at KPMG in May 2015, Mr. Whittle

24   specifically asked you and Joe Lynch to create a list of PCAOB

25   employees that KPMG could interview, right?

1    A.  Yes.

2    Q.  Joe Lynch was also a former PCAOB employee?

3    A.  Yes.

4    Q.  You created that list in May 2015 with Mr. Lynch containing

5    individuals at the PCAOB that you believed and Mr. Lynch

6    believed KPMG should consider?

7    A.  Yes.

8    Q.  The list was broken down into three tiers, right?

9    A.  I think so.

10   Q.  Correct me if I'm wrong, but the three tiers were, first,

11   people who expressed interest in KPMG whom you thought were

12   really good.  That was one category, right?

13   A.  I think so.

14   Q.  Interested and good.  Then, people who would be willing to

15   move to KPMG but were not that good; bucket number two, right?

16   A.  I think so.

17   Q.  So interested but not good.  Then, number three, people who

18   had not expressed an interest in KPMG but that were good.  Does

19   that sound right?

20   A.  Generally, yes.

21   Q.  Interested and good; interested, not good; not interested

22   but good?

23   A.  I think so, yes.

24   Q.  Confusing enough?

25   A.  Yes.

 1    Q.  The idea of this list and the three tiers was that you

 2    would try and recruit people from the good list, right?  Those

 3    were your targets?

 4    A.  Yes.  The purpose of the list was to share it with Tom

 5    Whittle and then take direction and help recruit, yes.

 6    Q.  Was Mr. Wada on this list?

 7    A.  I don't remember.

 8    Q.  After Mr. Whittle received this list, you met with him and

 9    Mr. Lynch to discuss the recruits, potential recruits?

10    A.  Say that one more time, please, sir.

11    Q.  After you sent the list to Mr. Whittle, you and Mr. Lynch

12    met with him to discuss it?

13    A.  I think we may have met with him first and then sent it,

14    but I can't remember the order.  I think we met with him first.

15    Q.  In any case, you discussed it with Mr. Whittle?

16    A.  Yes.

17    Q.  In addition to creating lists of potential recruits, you

18    also as part of this effort would edit or make comments to

19    colleagues' résumés that were sent to you?

20    A.  Yes.

21    Q.  That included many of your former colleagues with PCAOB?

22    A.  Yes.

23    Q.  That included Sean Kelly's résumé?

24    A.  I can't remember if I edited Sean's résumé, but I remember

25    supporting him through his application process, so I very well

 1    may have.

 2    Q.  Do you remember sending Mr. Kelly your actual résumé for

 3    him to use as a template?

 4    A.  I may have.  I know I did that with several people.

 5    Q.  It wouldn't surprise you if you had?

 6    A.  No, it would not.

 7    Q.  You also received David Knibbs' résumé?

 8    A.  Yes.

 9    Q.  And Jung Lee's résumé?

10    A.  Yes.

11    Q.  Cynthia Holder's résumé, obviously?

12    A.  Yes.

13    Q.  And Jeff Wada's résumé?

14    A.  Yes.

15    Q.  Which you got from Cindy Holder?

16    A.  Yes.

17    Q.  That was in 2017, right?

18    A.  Yes.

19    Q.  It was not in 2016?

20    A.  No.

21    Q.  Not in 2015?

22    A.  No.

23    Q.  Mr. Wada didn't send you his résumé directly, did he?

24    A.  No.

25    Q.  Your response to the email you received from Cindy Holder

1  containing Mr. Wada's résumé, that went back to Cindy Holder,

2  correct?

3  A.  Yes.

4  Q.  Did you submit for consideration Mr. Knibbs' résumé, do you

5  recall?

6  A.  I did.  I recall doing that.

7  Q.  Did you submit Mr. Lee's résumé for consideration by KPMG?

8  A.  Yes.

9  Q.  You of course submitted Ms. Holder's résumé, and she was

10  ultimately hired, right?

11  A.  Yes.

12  Q.  You testified that you provided feedback on Mr. Wada's

13  résumé in order to encourage the theft of confidential

14  information, is that right?

15  A.  Yes.

16  Q.  Is that true of all the individuals whose résumés you

17  provided comments on?

18  A.  No.

19  Q.  Was there anything special or extraordinary about the

20  comments you provided to Mr. Wada's résumé?

21  A.  Not that I remember.

22  Q.  They were along the lines of the same comments you provided

23  to everyone else's résumé that came across your desk, right?

24  A.  Most likely, yes.  I don't remember the specific comments

25  on his versus others, but probably.

1   Q.  In June 2016 you were the KPMG liaison for the PCAOB's

2   inspection of Century Bank Corp.?

3   A.  Yes.

4   Q.  Jung Lee was a PCAOB inspector of Century Bank Corp. in

5   2016, right?

6   A.  Yes, he was.

7   Q.  Mr. Lee sent you -- let me back up.  He was an inspector at

8   Century Bank Corp. in June 2016?

9   A.  Yes, for the PCAOB.

10  Q.  He sent you his résumé in April 2016?

11  A.  Yes.

12  Q.  Two months before he was inspecting KPMG, he was sending

13  you his résumé?

14  A.  Yes.

15  Q.  You felt that Mr. Lee was not as objective as he normally

16  would have been on that inspection, right?

17  A.  Yes.

18  Q.  You felt like he cut KPMG some slack?

19  A.  That was my general sense, yes.

20  Q.  That was at the time you had his résumé in hand?

21  A.  Yes.

22  Q.  Jeff Lutz was also a PCAOB inspector at Century Bank Corp.

23  in June 2016, right?

24  A.  Yes.  He was the associate director on that leading the

25  inspection.

1   Q.  Mr. Lutz sent you his résumé two months after the

2   inspection?

3   A.  Yes.

4   Q.  You told Mr. Lutz on receiving his résumé that things are

5   definitely in motion, do you remember that?

6   A.  I don't remember that, but I certainly may have.

7   Q.  It wouldn't surprise you if you had said that?

8   A.  No.

9   Q.  Take a look at Government Exhibit 1073.  This was the

10  résumé that Cindy Holder forwarded to you from Mr. Wada, an

11  email with the résumé attached?

12  A.  Yes.

13  Q.  You had testified earlier that you had seen that Mr. Wada

14  used colorful language to describe his view of the PCAOB?

15  A.  Yes.

16  Q.  I believe you read some of that to the jury.

17  A.  Yes.

18  Q.  You yourself had used colorful language to describe the

19  PCAOB to your colleagues at KPMG, right?

20  A.  Yes.

21  Q.  You had referred in fact to an entire group of colleagues,

22  on video, to leaving PCAOB as being like leaving the dark side

23  from Star Wars, right?

24  A.  I remember, yes.

25  Q.  Like you were Darth Vader taking off the mask and joining

1    the light?  I think that's how you described it.

2    A.  I remember, yes, saying something like that.

3    Q.  When you were first interviewed by the lawyers, when you

4    were interviewed by KPMG's lawyers, you testified you lied

5    quite a bit to them, right?

6    A.  Yes.

7    Q.  Was everything you told them a lie?

8    A.  No.

9    Q.  You lied about the things that could get you into trouble,

10   right?

11   A.  Yes.  I generally tried to point blame at other people and

12   underemphasize my role in this, yes.

13   Q.  Point blame to other people?

14   A.  Yes.

15   Q.  Do you recall telling those lawyers that Ms. Holder had

16   told you that Mr. Wada simply was not interested in commuting

17   to New York as he may have been required to do if he joined

18   KPMG?

19   A.  I don't remember if that was one of the things I said to

20   them or not.

21   Q.  That would have been true, though, if you had said it,

22   right?

23   A.  Would you repeat it one more time.

24   Q.  Sure.  Do you remember Ms. Holder telling you that Mr. Wada

25   was not interested in joining KPMG because he didn't want to

 1   commute to New York?

 2   A.   I don't remember.

 3   Q.   You don't remember that?

 4   A.   I don't.

 5   Q.   What did you do with Mr. Wada's résumé once you received it

 6   other than give comments back to Ms. Holder?  Did you pass it

 7   along to KPMG?

 8   A.   No, I did not.

 9   Q.   You did not forward it to your partners and suggest that he

10   be hired?

11   A.   No, I did not.

12   Q.   You did not escalate his résumé at all?

13   A.   No.

14   Q.   This is because you remembered asking Ms. Holder if Mr.

15   Wada even wanted to move to New York and Ms. Holder commenting

16   in the negative, do you remember that?

17   A.   There were a number of reasons why I didn't pass it on

18   initially.

19   Q.   You didn't pass it on, that's my question.

20   A.   No, I did not.

21   Q.   Among the reasons you didn't pass it on was because Mr.

22   Wada had had some negative interactions with Louann Sakala?

23   A.   I remember, yes.  No, yes.

24   Q.   You weren't sure that he could even be hired because of

25   that?

1   A.   Right.

2   Q.   The deal that you negotiated with the government, when you

3   negotiated that, you were represented by counsel, correct?

4   A.   I am represented by counsel, yes.

5   Q.   But when you negotiated the deal with the government, you

6   were represented; you didn't do it on your own?

7   A.   No.

8   Q.   Look at Government Exhibit 1450, which is in evidence.   Do

9   you recognize, sir, this document as being the initial

10  cooperation agreement that you signed with the government?

11  Maybe we can flip through it to your signature.

12  A.   Yes.

13  Q.   That's your signature?

14  A.   Yes, it is.

15  Q.   Your lawyer signed it as well?

16  A.   Yes.

17  Q.   Also signed by Ms. Mermelstein?

18  A.   Yes.

19  Q.   It is your understanding that both you and the government

20  are required to follow the terms of the agreement?

21  A.   Yes.

22  Q.   Like a contract, right?

23  A.   Yes.

24  Q.   You are testifying here today that pursuant to this

25  agreement the government has required you to testify?

1    A.  Yes.

2    Q.  Let's talk about how the agreement came about.  Before you

3    signed it -- your first meeting with the government was in July

4    2017, right?

5    A.  Yes.

6    Q.  That was just a couple of months after this whole thing

7    fell apart and it was discovered by KPMG that you had this

8    information?

9    A.  Yes.

10   Q.  That took place when?

11   A.  Beginning in February of 2017.

12   Q.  Beginning of February 2017 is the end of this activity at

13   KPMG.  Then you had a couple of interviews with KPMG's lawyers,

14   right?

15   A.  Yes.

16   Q.  Then it escalated from there and you became aware that now

17   you had federal prosecutors who wanted to talk to you?

18   A.  Yes.

19   Q.  Now you knew it was serious?

20   A.  Yes.

21   Q.  Now you knew that the government was actually considering

22   criminal charges?

23   A.  Yes.

24   Q.  So you met with the government on July 25, 2017, at the

25   U.S. Attorney's office here in New York?

1   A.   I don't remember the specific dates, but yes.

2   Q.   Generally, it was in July of 2017?

3   A.   Yes.

4   Q.   You had three lawyers there representing you?

5   A.   Yes.

6   Q.   There were lawyers there also from the U.S. Attorney's

7   office?

8   A.   Yes.

9   Q.   Was Ms. Kramer there?

10   A.   Yes.

11   Q.   And Ms. Mermelstein?

12   A.   Yes.

13   Q.   You had a lawyer or lawyers there from other branches of

14   the U.S. Department of Justice?

15   A.   I don't remember.

16   Q.   Do you remember a lawyer being there from the SEC?

17   A.   Yes.

18   Q.   There were also federal agents, U.S. postal inspectors

19   present?

20   A.   Yes.

21   Q.   There were a lot of people there?

22   A.   Yes.

23   Q.   You were interviewed?

24   A.   Yes.

25   Q.   Prior to that interview you were shown a proffer agreement,

1   do you remember that?

2   A.  Yes, I believe so.  Yes.

3   Q.  Let's take a look at Defense Exhibit 1625 marked for

4   identification.  Take your time and take a look at the

5   document.  We will scroll through it for you.  Tell me if you

6   remember it.  Is that your signature?

7   A.  It is my signature, yes.

8   Q.  Do you recognize the document?

9   A.  Yes.

10  Q.  Are those your initials next to each paragraph?

11  A.  No, I don't believe so.  Would you mind going back up to

12  the first page?

13  Q.  Sure.

14  A.  No, those aren't my initials.

15  Q.  Do you remember reading the document while you were in the

16  room?

17  A.  Yes.

18  Q.  Did you understand it?

19  A.  Yes.

20  Q.  If you didn't understand it, you had three lawyers there

21  who could help, right?

22  A.  Right.

23  Q.  You would have asked them and they could have explained it,

24  correct?

25  A.  Yes.

1   MR. COOK:  Your Honor, I offer 1625.

2   MS. KRAMER:  No objection.

3   THE COURT:  Defense Exhibit 1625 is received.

4   (Defendant's Exhibit 1625 received in evidence)

5   Q.  Let's go to the last page.  July 25, 2017, correct?

6   A.  Yes.

7   Q.  This was your first meeting with the government?

8   A.  I believe so, yes.

9   Q.  They didn't know what you were going to say?  Not from you

10  anyway, right?

11  A.  I don't know what they knew.  But yes.

12  Q.  They didn't know if what you were going to tell them would

13  be helpful or unhelpful to their case?

14  A.  I don't know what they knew, but . . .

15  Q.  They hadn't heard anything directly from you, though,

16  right?

17  A.  No.

18  Q.  You felt like you were being tested?

19  A.  Tested?  I don't know that I would use that word.  It was

20  stressful.

21  Q.  Let's take a look at the first sentence in the first

22  paragraph.  Right at the beginning, bold text, all caps, "This

23  is not a cooperation agreement."  Do you see that?

24  A.  Yes, sir.

25  Q.  That would come later, right?  You signed a cooperation

1    agreement later?

2    A.   Yes.

3    Q.   Would you read the first sentence, please.

4    A.   "The client has agreed to provide the government with

5    information and to respond to questions so that the government

6    may evaluate the client's information and responses in making

7    prosecutive decisions."

8    Q.   So your understanding of the purpose of the meeting was for

9    you to provide them with information so that they could

10   evaluate that information in connection with any prosecutive

11   decisions they would be making?

12   A.   Yes.

13   Q.   You understood from this agreement that what you told them

14   during these proffer meetings under this agreement, as long as

15   you told the truth, could not be used against you in a future

16   prosecution if you didn't reach an agreement with them, right?

17   A.   Yes.

18   Q.   But you also understood that if you didn't tell the truth,

19   if you lied to them, they could use everything you say not only

20   in that meeting but also any other evidence that they had

21   collected against you in a future prosecution; you knew that as

22   well?

23   A.   I don't quite remember how that all works.  I'm sure there

24   is language in here.  It's been quite a while since I've read

25   this, sir.

1  Q.  You did know that if you lied to them, you could get in

2  trouble?

3  A.  Yes.

4  Q.  You could be prosecuted for that?

5  A.  Yes.

6  Q.  You know that making a false statement to a federal agent

7  is itself a felony, right?

8  A.  Yes.

9  Q.  There were multiple federal agents in the room, right?

10 A.  Yes.

11 Q.  They were taking notes of what you said?

12 A.  Yes.

13 Q.  Did you get the impression from the prosecutors at that

14 time that they liked what you had to say?

15         MS. KRAMER:  Objection to form, your Honor.

16         THE COURT:  Sustained.

17 Q.  You knew that the proffer agreement meant that if the

18 government were to -- withdrawn.  Let's scroll down to the last

19 page of the document and blow up the dates at the bottom.  Sir,

20 these are additional meeting dates in which you had

21 conversations with the government subject to this proffer

22 agreement, correct?

23 A.  Yes.

24 Q.  August 14, 15, and 16, those were long days, right?  You

25 were there for many hours each day talking to the government?

 1   A.   Yes.

 2   Q.   Your understanding of those conversations was that they

 3   were subject to the proffer agreement and you were obligated to

 4   tell the truth?

 5   A.   Yes.

 6   Q.   During those meetings you were asked to disclose all of

 7   your criminal history, right?

 8   A.   Yes.

 9   Q.   They asked that question in the broadest possible terms:

10   anything, no matter how long ago or how small, anything that

11   you have done wrong, you need to tell us about it right now,

12   right?

13   A.   Yes.

14   Q.   In fact, you understood what they were asking for to be so

15   broad that you disclosed to them that you stole candy when you

16   were 5 years old?

17   A.   Yes.

18   Q.   You disclosed that you stole a doormat when you were in

19   college?

20   A.   Yes.

21   Q.   You took a CD from a college party?

22   A.   Yes.

23   Q.   You knew they wanted everything?

24   A.   Yes.

25   Q.   And you lied to them?

1    A.  I did not tell them about the other tax things that we

2    discussed yesterday or the bank fraud.

3    Q.  You lied to the federal prosecutors and federal agents who

4    were in that room, right?

5    A.  I was not thinking about those at the time.

6    Q.  We'll try it one more time.  You lied to the federal

7    prosecutors and the federal agents who were in that room?  Yes

8    or no.

9              MS. KRAMER:  Objection: asked and answered.

10             THE COURT:  Overruled.

11   A.  I was not thinking about those things at the time.

12   Q.  Are you able to answer that question with a yes or no?

13   A.  I did not lie to them at the time.

14   Q.  You did not lie to them at the time, is that what you said?

15   A.  I was not thinking about those other things, no.

16   Q.  Sir, you were thinking about candy when you were 5 years

17   old but you weren't thinking about the mortgage fraud that you

18   had committed, the tax fraud that you had committed?  None of

19   that came to mind, but the doormat from college, you remembered

20   that one?

21   A.  I talked through -- yes.  Yes.  I talked through the tax

22   stuff that I did, other tax stuff that I did.  I was thinking

23   about other things.

24   Q.  So you did disclose some tax fraud but not all of it,

25   right?

1   A.  I remember telling them that I knew that I had overstated

2   expenses, credits, yes.

3   Q.  Would it be fair to say that you chose to disclose some

4   issues and chose to omit others?

5   A.  No.

6   Q.  It is your testimony that you did not lie to them because

7   you simply did not remember some of the other crimes that you

8   had committed during the course of that meeting?

9   A.  I was not thinking about those at the time.

10  Q.  In order for them to prompt your recollection, they just

11  didn't ask you to tell us everything you ever did wrong, they

12  went through a whole list of possible criminal activity, didn't

13  they?

14  A.  Yes.

15  Q.  So they didn't leave it to you to sort of recollect

16  everything you had ever done wrong.  They prompted you with

17  questions like how about arson, did you ever commit arson; and

18  they asked you about domestic violence, were you ever involved

19  in that; a whole list of things, right?

20  A.  Yes.

21  Q.  One of those things was did you ever sign a document

22  falsely?

23  A.  Yes.

24  Q.  Did you ever submit a mortgage application falsely?

25  A.  Yes.

1    Q.  They asked you about your taxes and whether you had cheated

2    on your taxes?

3    A.  Yes.

4    Q.  Very specific questions to which you had answered each one

5    individually?

6    A.  Yes, I told them I had cheated on my taxes.

7    Q.  You didn't tell them about all the times you cheated on

8    your taxes?

9    A.  All the ones I remembered.

10   Q.  You didn't remember everything?

11   A.  Right.

12   Q.  Do you remember telling the government that it was your

13   intention, beginning with your first meeting with them, to come

14   clean and take responsibility?

15   A.  Yes.

16   Q.  You did not do that at first, did you?

17   A.  I tried to accept full responsibility for my actions, sir.

18   Q.  You did not do that at first, though, did you?

19   A.  You mean in terms of these things I forgot or that I wasn't

20   thinking about?

21   Q.  Let me make sure I'm clear about what you are saying.  Is

22   it your testimony that on no occasion in any of your meetings

23   with the government did you deliberately withhold information?

24   Is that your testimony?

25   A.  No.

1    Q.  So in fact you did withhold information from the

2    government, you did not completely come clean with them?

3    A.  Yes.

4    Q.  On those occasions did it appear to you, when you were

5    withholding information or lying to the agents and the

6    prosecutors, that they believed what you were saying?

7              MS. KRAMER:  Objection, your Honor: speculation.

8              THE COURT:  Sustained.

9    Q.  Did anyone give you any indication during your meetings

10   that they did not believe what you were telling them?

11   A.  No.

12   Q.  These are trained law enforcement officers and agents?

13             MS. KRAMER:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.  You were eventually forced to admit the conduct that you

16   had withheld from the government, right?

17   A.  I did admit it all to them, yes.

18   Q.  You admitted all of it to them?

19   A.  Yes.

20   Q.  Let me ask you this, Mr. Sweet.  I want you to think

21   carefully about this.  As you sit here today, is there any

22   criminal conduct that as of right now you're aware of and you

23   have not yet disclosed to the government?

24   A.  Not that I'm aware of.

25   Q.  Is it possible there is or are you pretty confident you

1  have disclosed everything?

2  A.  Pretty confident I've disclosed everything.

3  Q.  At this point, given that you knew this was going to happen

4  and you would be asked these questions, you have had plenty of

5  time now to reflect upon your past, reflect upon your

6  activities, review documents, and to consider whether there is

7  anything you have left out, right?

8  A.  I sure tried, yes.

9  Q.  Take a look at Government Exhibit -- actually, back out of

10  this one and go to the first page, please.  We have been

11  talking about the proffer agreement and the interviews you had

12  with the government under the proffer agreement, just so we

13  have some context, July 2017 and August 2017, correct?

14  A.  Yes.

15  Q.  It was during those interviews that you were asked to

16  disclose your prior criminal activity?

17  A.  Yes.

18  Q.  It was then later, after you had had these meetings, after

19  you had disclosed the activity and told them that that was

20  everything, that they decided to offer you a cooperation

21  agreement?

22  A.  Yes.

23  Q.  On January 4, 2018, you met with them again, and on that

24  occasion they offered to enter into an arrangement with you

25  that we have been referring to as this cooperation agreement,

1    right?

2    A.   Yes.

3    Q.   Let's take a look at that document, Government Exhibit 1450

4    already in evidence.   Scroll through and, Mr. Sweet, please

5    make sure this is the cooperation agreement that you signed.

6    A.   Yes.

7    Q.   Let's take a look at paragraph 2.   Let me confirm: when you

8    signed this agreement, you were represented by counsel?

9    A.   Yes.

10   Q.   You understood the document that you were signing?

11   A.   Yes.

12   Q.   If you had any questions, you had qualified counsel there

13   that could answer them for you, right?

14   A.   Yes.

15   Q.   So you knew what it was you were signing?

16   A.   Yes.

17   Q.   Could we go to the next paragraph.   You were required to

18   cooperate fully with the U.S. Attorney's office and any other

19   law enforcement agency designated by the government, correct?

20   A.   Yes.

21   Q.   You were required to attend every meeting that the

22   government asked you to attend, is that right?

23   A.   Yes.

24        MR. COOK:   Thank you, Ms. O'Connor, I appreciate that.

25   Now we have the right paragraph.

1   Q.  You were required to, as you were entering into the proffer

2   agreement, tell the government all crimes which you have

3   committed, correct?

4   A.  Yes.

5   Q.  Further, you were required to commit no further crimes

6   whatsoever, right?

7   A.  Yes.

8   Q.  Did you, at the time you were meeting with the government

9   on this occasion, disclose the other crimes that you had not

10  told them earlier?

11  A.  I had not talked about, no.

12  Q.  You agreed pursuant this document that if you committed any

13  further crimes or if you gave the government any information

14  that was false, misleading, or incomplete, you could be

15  prosecuted for any crime that the government knew about, right?

16  A.  Yes.

17  Q.  Including making false statements to the government; you

18  knew that?

19  A.  Yes.

20  Q.  You knew the word "incomplete."  You were required to tell

21  them not just pieces of your prior activity but all of it; you

22  couldn't mislead, right?

23  A.  Yes.

24  Q.  This was a continuing obligation that you had.  If you

25  learned about something or you did something, you had to notify

1   them, right?

2   A.   Yes.

3   Q.   You knew that if you lied to the government, gave them

4   incomplete information, didn't disclose something you were

5   obligated to disclose, the agreement could be canceled, among

6   other things?

7   A.   Yes.

8   Q.   You testified earlier, on direct examination, that you were

9   shooting for, you were aiming for, an ultimate sentence of time

10  served, right?

11  A.   Yes.

12  Q.   Down from what you understand to be a maximum of 25 years?

13  A.   Yes.

14  Q.   You would agree that is a big gap?

15  A.   Yes.

16  Q.   What is your understanding of the term "time served"?

17  A.   It means what it says.

18  Q.   I'm asking you what your understanding is just so we are

19  all on the same page.

20  A.   That I would not have to serve any jail time.

21  Q.   So not that you only have to serve the time you already

22  spent in jail, but your understanding is no jail time, right?

23  A.   Following sentencing, that's what that would mean, yes.

24  Q.   You are sentenced and you hope the judge tells you no time,

25  correct?

 1    A.   Yes.

 2    Q.   That's your goal?

 3    A.   Yes.

 4    Q.   What was your understanding of your exposure in terms of

 5    criminal penalties if you didn't take the deal that the

 6    government was offering?

 7    A.   I'm sorry.  Would you ask that again.

 8    Q.   Sure.  You testified that under the four corners of the

 9    agreement, the document that you signed, there is a range

10    between 25 years all the way down to time served, right?

11    A.   Yes.

12    Q.   But if you didn't sign that agreement, what did you

13    understand your exposure to be?

14    A.   The same.

15    Q.   You thought it was the same?

16    A.   I know that as part of this cooperation agreement, if it's

17    determined that I have complied with the cooperation agreement,

18    I'll get a letter that would permit the sentencing judge to

19    take into account my cooperation at the time of sentencing.

20    Q.   The government has promised you in this agreement that if

21    you provide them with substantial assistance in their

22    prosecution, they would write that very important letter for

23    you, right?

24    A.   Yes.

25    Q.   In that letter they would disclose all of the bad conduct

1  that you have talked to them about, right?

2  A.  Yes.

3  Q.  But all of the assistance that you provided them in the

4  prosecution as well?

5  A.  Yes, the good and the bad.

6  Q.  And if you did not take the government's offer, there would

7  be no chance of getting that letter from the government, right?

8  A.  Right.

9  Q.  Let's go to the second page of the document.  Pull up the

10  paragraph with the handwriting.  Sir, do you see the called-out

11  portion on your screen?

12  A.  Yes.

13  Q.  It says, "It is further understood that at least two weeks

14  prior to the date of sentencing the defendant shall file with

15  the IRS and provide copies to the office accurate amended tax

16  returns for the years 2012 through 2016 as necessary"?  Am I

17  reading that right?

18  A.  Right.

19  Q.  The "2012 through 2016," that's a handwritten change to the

20  typewritten document, right?

21  A.  Yes.

22  Q.  Do you remember what the original language said?

23  A.  I can't tell.

24  Q.  Does it look like "2014 and 2015"?

25  A.  Yes.

1  Q.  Instead of "2012 through 2016," does that appear to be what

2  it says?

3  A.  I think so.

4  Q.  Why was that change made?

5  A.  Because I had disclosed to them expense, other issues in my

6  taxes, and I wanted to make sure that I had a chance to go back

7  and ensure that all those tax returns were corrected and

8  amended.

9  Q.  Originally it says '14 and '15, and then it was expanded to

10  a wider time frame.  Is that because you disclosed additional

11  activity that would implicate those additional years?

12  A.  Yes.

13  Q.  So they modified their agreement to expand the scope of

14  coverage to cover those additional years for you?

15  A.  Yes, that I am required to fix those returns too.

16  Q.  So, when you disclosed that additional misconduct, they

17  didn't tear up the agreement, they just rewrote it for you?

18  A.  You see the changes.

19  Q.  The benefits that this document provides, among others, are

20  (1) that you could plead guilty to two felonies instead of

21  whatever else they might charge you with in connection with

22  your activity with the PCAOB's confidential information?

23  That's one, right?

24  A.  I can't speak to how the U.S. Attorney's office determines

25  what crimes that you are asking about.

1   Q.  You understood it to be a benefit that you were only

2   required to plead guilty to two crimes?

3   A.  Pleading guilty to those two crimes I would not

4   characterize as a benefit, but I am in fact guilty of those

5   crimes.

6   Q.  Would it be fair to say that pleading guilty to two

7   felonies is better than being prosecuted for five?

8   A.  Yes.

9   Q.  Second, you would receive that letter from the government

10  if you provided substantial assistance, right, and that would

11  help you at sentencing?

12  A.  Yes.

13  Q.  With the goal of getting that time served?

14  A.  Yes.

15  Q.  The government wouldn't use any of the tax fraud evidence

16  that you provided to them against you in a tax prosecution?

17  A.  No, that is not the way this was.  The government, as I

18  understand it, has made -- there is no -- this document does

19  not prevent any tax prosecution.  I think it is pretty clear

20  that that is not part of the this agreement.

21  Q.  You're right, it does not preclude tax prosecution.  My

22  question was: it precludes the government from using the

23  information you provided to them about your tax frauds in a tax

24  prosecution?

25  A.  I don't know.

1  Q.  You confessed to tax fraud, right?

2  A.  Yes.

3  Q.  While the government can still prosecute you for that, they

4  can't use your confession against you; did you understand that?

5  A.  I know I told them all the -- yes, I guess.

6  Q.  On December 17, 2018 -- we are fast-forwarding here.  This

7  agreement was signed by you on January 5, 2018, right?

8  A.  Mm-hm.

9  Q.  You don't meet with the government again for many months,

10  right?

11  A.  Right.

12  Q.  You do have a meeting with them on December 17, 2018?

13  A.  I don't remember the exact date, but certainly in December

14  of 2018 we met, yes.

15  Q.  Towards the end of the year, near Christmas?

16  A.  Yes.

17  Q.  That rings a bell?

18  A.  Yes.

19  Q.  During that meeting you admitted to lying to the government

20  about at least four additional felonies, none of which you had

21  disclosed to the government previously, right?

22  A.  I told them about the other things that I had not

23  previously disclosed that I had become aware of.  I don't know

24  if they are separately felonies or not, sir.  I don't know what

25  constitutes -- I told them what happened, yes.

1    Q.  Fair enough.  I understand you may not know the definition

2    of felony.  But you knew you were disclosing criminal conduct?

3    A.  I told them what I had done wrong, yes.

4    Q.  You knew it was criminal conduct?

5    A.  I knew it was wrongful conduct.

6    Q.  Let me try it differently.  Did you know it was criminal

7    conduct?

8    A.  I knew what I had done was wrong.  I think it's up to them

9    to decide what meets the definition of a criminal or --

10   again --

11   Q.  You're right, it is up to them to decide that.  I'm asking

12   what your understanding is.

13            MS. KRAMER:  Objection to the commentary, your Honor.

14            THE COURT:  Sustained.

15   Q.  Was it your understanding, you, that the conduct you were

16   disclosing was criminal?

17   A.  I knew that what I had done on my taxes and in connection

18   with this mortgage loan from 2011 was wrong, completely wrong.

19   Q.  I'm going to ask you, yes or no, did you know it was

20   criminal?

21   A.  I don't know.  I knew it was wrong.  I don't know what -- I

22   knew it was totally wrong, sir.

23   Q.  But you weren't sure if it was criminal?

24   A.  I don't know what would meet the definition of a crime.  I

25   knew it was wrong.  I knew it was completely wrong.

1   Q.   The first thing you disclosed to them on that occasion was

2   that you had identified yourself, claimed yourself to be a

3   consultant for PCAOB when in fact you weren't, and that was in

4   order to obtain a mortgage?

5   A.   In connection with a mortgage, yes.

6   Q.   You knew that if you accurately revealed the nature of your

7   relationship with PCAOB you wouldn't get the mortgage?

8   A.   Well, that they wouldn't count that income in the factor of

9   the mortgage.  I don't know if it would have killed the

10  mortgage.  But it is certainly the way I characterized that W-2

11  income.

12  Q.   When you told the prosecutors this, did they say to you,

13  Mr. Sweet, you have lied to us, the deal's off?

14  A.   No.

15  Q.   Did anyone tell you that because you had lied to them, they

16  just couldn't use you as a testifying witness in court?

17  A.   No.

18  Q.   The second thing you disclosed to them was that you needed,

19  was it $65,000, in order to qualify for the mortgage, but all

20  of your properties that you could use as collateral had

21  mortgages so you needed some additional capital, right?

22  A.   Right.

23  Q.   So you borrowed $65,000 from a local farmer through your

24  father-in-law with the understanding that you would pay the

25  farmer back?

 1    A.  Yes.

 2    Q.  Which you did, right?

 3    A.  Yes, I did.

 4    Q.  But you signed the letter that you submitted as part of

 5    this mortgage application saying that that $65,000 was in fact

 6    a gift and not a loan?

 7    A.  Yes.

 8    Q.  You understand that it is important information for a

 9    lender to know what other obligations you have so they know how

10    risky their loan is going to be?

11    A.  Yes.

12    Q.  So you lied to them about that?

13    A.  I did.

14    Q.  Did you know that was bank fraud?

15    A.  I wasn't thinking that it was bank fraud at the time, but I

16    knew it was a lie to a mortgage lender, yes.

17    Q.  At this point in the conversation with the government in

18    December of 2018, did one or more of the prosecutors tell you,

19    sorry, Mr. Sweet, the deal's off?

20    A.  No.

21    Q.  Did they tell you that at this point we have concerns about

22    your reliability as a witness and we're not going to use you to

23    testify in court?

24    A.  No.

25    Q.  You also disclosed to them in connection with the mortgage

1    application that you submitted a $20,000 bank statement as your

2    own that in fact belonged to somebody else, right?

3    A.   Yes.

4    Q.   Again cooperation agreement not canceled, right?

5    A.   Right.

6    Q.   The fourth thing relates to this what you have told us

7    about as a 1031 exchange, right?

8    A.   Yes.

9    Q.   You are going to know far more about this than I am, so

10   tell me if I get this wrong.  A 1031 exchange would allow

11   somebody who owns an investment property over here, property A,

12   to sell that property, and the money they make from the sale,

13   they wouldn't pay taxes on it if they take that money and they

14   put it into another property that is also an investment

15   property?

16   A.   Yes.

17   Q.   Is that accurate?

18   A.   Right.

19   Q.   If a person sells investment property A, takes the money

20   they make and puts it in property B and that's not an

21   investment property, that's not a proper 1031 exchange,

22   correct?

23   A.   Say that last part again.

24   Q.   Sure.  If the money that is obtained from selling the

25   investment property is put into another property that is not an

 1   investment property, that's not a proper 1031 exchange?

 2   A.  Right.  It has to be a like kind of property.

 3   Q.  A like kind, meaning investment property to investment

 4   property?

 5   A.  Yes.

 6   Q.  Not investment property to a vacation home?

 7   A.  Right.

 8   Q.  If, however, you sell property A, the investment property,

 9   and you make money on that, if you don't put it into a like

10   kind, another investment property, then you have to pay taxes

11   on it?

12   A.  Right.

13   Q.  The benefit of this arrangement, which is allowed by IRS,

14   is it allows people the business of owning investment

15   properties to buy and sell within the investment property

16   bucket and defer or postpone the payment of taxes?

17   A.  Right.

18   Q.  This fourth issue that you disclosed to them during this

19   December meeting which related to the 1031 exchange, tell me

20   what you told them you had done.  I want you to confine your

21   answer to what you told them during that December 2018 meeting

22   about the 1031 exchange.

23   A.  I don't remember exactly what I told them in December.

24   Q.  You told them that you had bought a cabin outside of

25   Fresno, where you live --

1  A.  Mm-hm.

2  Q.  -- as a vacation home but you claimed it as an investment

3  property, correct?

4  A.  Yes.

5          MR. COOK:  May I have a moment, your Honor?

6          THE COURT:  Yes.

7          MS. MERMELSTEIN:  Your Honor, perhaps we should take

8  the mid-morning break now.

9          THE COURT:  It is time for a break.  Let's do that.

10  Let's take a 10-minute break, folks.  Please leave your pads on

11  your chairs.  We will continue in 10 minutes.

12          (Recess)

13          THE COURT:  We are continuing cross-examination.  Mr.

14  Cook.

15  BY MR. COOK:

16  Q.  Mr. Sweet, let's pause where we are with our discussion of

17  your cooperation agreement and turn to a different topic.  I'd

18  have you take a look at Defense Exhibit 1473, which has been

19  marked for identification.  Take a look at the document on the

20  screen.  Do you see it?

21  A.  Yes.

22  Q.  Let's blow up the email header at the top of the first

23  page.  This is an email from your personal email account,

24  correct?

25  A.  Yes.

1    Q.  To Cindy Holder?

2    A.  Yes.

3    Q.  That is her personal email address?

4    A.  Yes.

5    Q.  Dated May 5, 2015?

6    A.  Yes.

7    Q.  Could we scroll through that and tell me if you recall the

8    exchange.  Sir, this is an email exchange between you and Ms.

9    Holder that includes a copy of her résumé, correct?

10   A.  Yes.

11              MR. COOK:  I offer it.

12              MS. KRAMER:  No objection.

13              THE COURT:  Defense 1473 is received in evidence.

14              (Defendant's Exhibit 1473 received in evidence)

15   Q.  If we could take a look at the first page, first paragraph,

16   beginning with "LOL."  You say, "LOL.  Absolutely, Cindy, it's

17   all part of the plan."  This is in connection with your desire

18   for you to help her get a job at KPMG, correct?

19   A.  Yes.

20   Q.  Let's take a look at Defense Exhibit 1483, which has been

21   marked for identification.  Sir, this is an email from you,

22   from your KPMG email account, to Joe Lynch, correct?

23   A.  Yes.

24   Q.  Dated May 6, 2015?

25   A.  Yes.

1    Q.   You are discussing a meeting agenda, correct?

2    A.   One moment, please.  Yes.  I think so, yes.

3    Q.   If you turn to the third page of the document --

4             MR. COOK:  Your Honor, I offer 1483.

5             MS. KRAMER:  No objection, your Honor.

6             THE COURT:  1483 is received.

7             (Defendant's Exhibit 1483 received in evidence)

8    Q.   If we could take a look for everyone to see the third page

9    of the document and blow that up.  Sir, we talked earlier about

10   this list of potential recruits and the three buckets or three

11   tiers that you developed.  Do you remember that?

12   A.   Yes.

13   Q.   Is this email and this document in furtherance of that

14   effort by you to develop a list and recruit PCAOB employees?

15   A.   Yes, Joe Lynch and I, right.

16   Q.   You and Joe Lynch?

17   A.   Yes.

18   Q.   Thank you.  Let's take a look at Defense Exhibit 1488

19   marked for identification.  Blow up the header, please.  This

20   is an email again from Ms. Holder and her personal email

21   account to your personal email account, correct?

22   A.   Yes.

23   Q.   It includes a copy of Ms. Holder's résumé?

24   A.   Yes.

25             MR. COOK:  Your Honor, I offer 1488.

 1          MS. KRAMER:  No objection.

 2          THE COURT:  1488 received.

 3          (Defendant's Exhibit 1488 received in evidence)

 4   Q.  This was, again, sent to you by Ms. Holder in furtherance

 5   of her desire to have you help her get a job at KPMG?

 6   A.  Yes.

 7   Q.  Let's take a look next at Defense Exhibit 1593, which has

 8   been marked for identification only.  If we could blow up the

 9   middle portion.  Sir, would you take a look at this document

10   and tell me if it reflects text messages that you exchanged

11   with Ms. Holder in July of 2015.

12   A.  Yes, sir.

13   Q.  Do you recognize this exchange?

14   A.  I do.

15          MR. COOK:  Your Honor, I offer 1593.

16          MS. KRAMER:  No objection, your Honor.

17          THE COURT:  1593 is received.

18          (Defendant's Exhibit 1593 received in evidence)

19   Q.  If we could blow up the last three text messages in the

20   exchange.  Ms. Holder writes to you, "Jeff W's voice actually

21   cracked when he congratulated me after I told him that I had

22   resigned.  Felt awful.  That said, I'm getting pretty excited."

23   It is your understanding that Ms. Holder was referring to Mr.

24   Wada?

25   A.  You know, sir, I think that may be a reference to Jeff

1  Watkins.  I'm not certain.  I think it may have been Jeff

2  Watkins.

3  Q.  Jeff Watkins, was he a PCAOB employee at the time?

4  A.  He was an associate director at the PCAOB, yes.

5  Q.  He was also somebody that you had frequent communication

6  with?

7  A.  Yes.

8  Q.  Was he someone you were interested in bringing over to

9  KPMG?

10  A.  No, not really.

11  Q.  He was somebody you wanted to maintain a relationship with?

12  A.  Yes.

13  Q.  Let's take a look now at Defense Exhibit 1632 marked for

14  identification.  Sir, I'm going to ask you to take a look at

15  these documents and ask you if you recognize them as meeting

16  appointments generated by your Outlook, the Outlook system that

17  you would have received at KPMG, otherwise known as calendar

18  invites.

19  A.  Yes.  What was the question again, sir?

20  Q.  Each of these calendar invites refer or are sent to or

21  require your attendance at a meeting?

22  A.  Yes.

23              MR. COOK:  I offer 1632.

24              MS. KRAMER:  No objection.

25              THE COURT:  1632 is received.

1          (Defendant's Exhibit 1632 received in evidence)

2  Q.  Sir, it is true that simply because you received a calendar

3  invite doesn't mean that you actually attended an appointment,

4  does it?

5  A.  Yes, that's true.

6  Q.  Take a look at Defense Exhibit 1633 for identification

7  only.  I'll ask you to confirm that this is a series of

8  appointments or calendar invites from you to various people.

9  A.  Yes.  I think some of these are just actually calendar

10 invites to myself.  I put the time in my own calendar and not

11 to other people.  But they are calendar invites, yes.

12 Q.  That is an important distinction.  Sometimes you sent it to

13 yourself so it would register in your calendar that you had an

14 appointment with someone else?

15 A.  Right.

16          MR. COOK:  I offer 1633.

17          MS. KRAMER:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 1633 received in evidence)

20 Q.  I note on the first page of 1633 this reflects an

21 appointment with Jeff Watkins, who we were just referring to,

22 correct?

23 A.  Yes.

24 Q.  Let's take a look next at Defense Exhibit 1631 for

25 identification.  Sir, is this an email that you sent from your

1   KPMG email account to Jonathan Clancy?

2   A.   Can you give me a moment to read it?

3   Q.   Take your time.   Your email?

4   A.   Yes, sir.

5            MR. COOK:   I offer 1631.

6            MS. KRAMER:   No objection.

7            THE COURT:   Received.

8            (Defendant's Exhibit 1631 received in evidence)

9   Q.   Who is Randy Bunkley?

10  A.   Randy Bunkley is an inspector at the PCAOB.

11  Q.   Scroll down to the email at the bottom of the first page,

12  first line, "I just spoke with a close friend."   Randy Bunkley

13  was a close friend of yours?

14  A.   Yes.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    Q.  He's somebody that you maintained close contact with once

2    you left the PCAOB?

3    A.  Yes.

4    Q.  Let's take a look next at what's been marked as Defense

5    Exhibit 1630, for identification.

6             Is this an email you received from Louann Sakala at

7    KPMG on or about February 18, 2016?

8    A.  Did you say received from Louann Sakala?

9    Q.  Sorry.  That you sent to Louann Sakala.

10   A.  Yes.  To Louann Sakala, Hector Santana and Scott Anderson.

11             MR. COOK:  I offer it.

12             MS. KRAMER:  No objection.

13             THE COURT:  1630 is received.

14             (Defendant's Exhibit 1630 received in evidence)

15   BY MR. COOK:

16   Q.  In this email you tell Louann Sakala -- and just remind us,

17   Louann Sakala was somebody that Mr. Wada had had a difficult

18   relationship with?

19   A.  Yes.

20   Q.  And in this email you say, "Here's what I have heard so far

21   about who had been promoted," correct?

22   A.  Yes.

23   Q.  That was at the PCAOB?

24   A.  Yes.

25   Q.  Who did you receive this information from?

1   A.  I don't remember.  It may have been Cindy.  It was likely

2   Cindy but I don't remember -- I don't remember for sure.

3   Q.  There were certainly other people that you maintain

4   relationships with that could have provided you this

5   information, right?

6   A.  Yes.

7   Q.  Let's take a look at Defense Exhibit 1490, marked for

8   identification.

9          I ask you if this is an email that you received from

10  Sean Kelley at KPMG, a lawyer at KPMG?

11  A.  Yes.

12          MR. COOK:  I offer it, 1490.

13          MS. KRAMER:  No objection.

14          THE COURT:  1490 is received.

15          (Defendant's Exhibit 1490 received in evidence)

16          MR. COOK:  If you could blow up the first full

17  paragraph at the top of the page.

18  Q.  So this is from Sean Kelley to you.  Where was Mr. Kelley

19  working at the time?

20  A.  At the PCAOB.

21  Q.  And he was sending you his résumé?

22  A.  Yes.

23  Q.  This is one -- an example of one of the many résumés that

24  you received and you provided comments to?

25  A.  Yeah.

1    MR. COOK:  Let's take a look next at Defense Exhibit

2   1106.  If we can blow up the header for Mr. Sweet.  There we

3   go.

4   Q.  It is also an email thread in which you were involved, Mr.

5   Sweet?

6   A.  Would you mind going back up to the top, please?

7   Q.  Sure.

8   A.  Just to confirm.

9       Yes, it was an email thread that I was a part of, yes.

10  Q.  And this, again, related to résumés of potential recruits?

11  A.  Yes.

12  Q.  I'm sorry.  I cut you off.

13  A.  I thought you were asking a question.

14  Q.  Your answer was yes?

15  A.  Yeah.  You asked if this was an email of potential

16  recruits.  I was answering yes to that.

17  Q.  Thank you, sir.

18  A.  Yes.

19  Q.  The top of the second page.

20      Sir, is this -- these eight names here, do you recall

21  what they represent, why you were writing them?

22  A.  These are all PCAOB inspectors.

23  Q.  Are they people that were potential recruits?

24  A.  Yeah.  Do you -- can you go up?  I think there is a bit --

25  let me just see what the context was.

1        (Pause)

2        Yes.  Yes.

3        MR. COOK:  Can we go back to the second page?

4   Q.  Did you provide -- this is information you provided about

5   these folks?

6   A.  Yeah.  As I remember, I had gotten together with the people

7   that were in that subject line up above, and we had talked

8   about, OK, there's this new push to hire more people into KPMG,

9   and so this was a summary of who that group had discussed.

10  There are certain people on this list -- I want to make that

11  distinction because there are certain people on this list that

12  I didn't really know.

13  Q.  This was a collaborative effort?

14  A.  Yeah.

15        MR. COOK:  Let's scroll up to that subject line so

16  that we see who is involved in this.

17  Q.  Joe Lynch, of course.

18        Cindy Holder?

19  A.  Yes.

20  Q.  Louann Sakala?

21  A.  Yes.

22  Q.  She is former PCAOB?

23  A.  Yes.

24  Q.  Hector Santana?

25  A.  Yes.

1    Q.  Former PCAOB?

2    A.  Yes.

3    Q.  Michael Tucker?

4    A.  Also former PCAOB.

5    Q.  So everyone involved in this collaboration had come from

6    the PCAOB?

7    A.  Yes, sir.

8              MR. COOK:  Your Honor, I offer 1106.

9              MS. KRAMER:  No objection.

10             THE COURT:  1106 is received.

11             (Defendant's Exhibit 1106 received in evidence)

12             MR. COOK:  I apologize.  I thought it had been

13   offered.  I don't think the jury saw it, so why don't we

14   display that for everybody.

15             Go to the second page.

16   Q.  Again, Mr. Sweet, the list of eight names, these are the

17   folks that this group of former PCAOB employees were discussing

18   as potential recruits?

19   A.  Yes.

20   Q.  If we could scroll up to the subject line.

21             The names that we were just discussing are there in

22   the "to" line of this email that's from you?

23   A.  Yes.

24   Q.  Thank you.  Let's take a look at Defense Exhibit 1452,

25   marked for identification.

1       I'll ask you, Mr. Sweet, if this is an email that you

2   received from Sean Kelley?

3   A.  Yes.

4   Q.  Attaching his résumé?

5   A.  Excuse me.  Yes.

6   Q.  And you received it while working at KPMG?

7   A.  Yes.

8           MR. COOK:  I offer 1452.

9           MS. KRAMER:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 1452 received in evidence)

12          MR. COOK:  Can you scroll down to his résumé.

13  Q.  Again, Mr. Kelley, as reflected in his résumé, he was an

14  associate director at PCAOB?

15  A.  Yes.

16  Q.  The same position you held when you came over?

17  A.  Yes, sir.

18  Q.  Let's look next at Defense Exhibit 1460.

19          And, Mr. Sweet, take a look at this document and tell

20  me if it is an email from you to Tom Whittle, which includes an

21  earlier thread as well?

22  A.  Yes, it is.

23  Q.  And it is an email that you received on May 14, 2015 --

24  that you sent on --

25  A.  Yes.  Yes, sir.

1    MR. COOK:  I offer 1460.

2    MS. KRAMER:  No objection.

3    THE COURT:  1460 received.

4    (Defendant's Exhibit 1460 received in evidence)

5  BY MR. COOK:

6  Q.  Sir, May 14, 2015, the date that you sent this email, how

7  long had you been at KPMG?

8  A.  Ten days.  My second week, I believe.

9  Q.  And you are already forwarding obviously Ms. Holder but

10 also Mr. Knibbs' résumé to Mr. Whittle for his consideration?

11 A.  Yes.

12   MR. COOK:  Can we scroll down a little bit to the

13 third page.  There we go.

14 Q.  And this is a clearer version of the document that we saw

15 earlier which is that list of potential recruits that you and

16 Mr. Lynch put together, correct?

17 A.  Yeah.  Yes.

18 Q.  And as we discussed, tier 1, tier 2 and tier 3, they each

19 had different criteria for the names that are underneath those

20 designations?

21 A.  Yes.

22 Q.  Was this a living document that was evolving and

23 developing, adding to and taking away, over time?

24 A.  Yes, I believe so.

25 Q.  Who maintained the document?

1   A.  I believe Joe Lynch had the -- kind of maintained this

2   document, but there were certainly different people that had

3   input into it.

4   Q.  Were the people who had input into it all former PCAOB

5   employees?

6   A.  Yes, sir.

7   Q.  Let's take a look next at Defense Exhibit 1477, for

8   identification.

9        Tell me, sir, if this is an email that you sent from

10  your personal account to -- personal email account to your KPMG

11  account?

12  A.  Yes.

13  Q.  And it is attaching the résumé of David Knibbs?

14  A.  Yes.

15        MR. COOK:  I offer 1477.

16        MS. KRAMER:  No objection.

17        THE COURT:  1477 received.

18        (Defendant's Exhibit 1477 received in evidence)

19  BY MR. COOK:

20  Q.  If we can just look at the email header at the top, did

21  Mr. Knibbs -- or Mr. Knibbs sent it to your personal email

22  account?

23  A.  Yes.

24  Q.  Was Mr. Knibbs a friend?

25  A.  Yes.

1   Q.  Was he someone that over time you made an effort to

2   maintain a relationship with?

3   A.  Yes.

4   Q.  And this email thread is much later; this is January 2016,

5   correct?

6   A.  Yes.

7   Q.  So this effort to recruit PCAOB employees continued over

8   the entire time you were at KPMG?

9   A.  Yeah.

10  Q.  Let's look next at what's been marked as Defense Exhibit

11  1595, for identification only.

12          Sir, if you could take a look at this document and

13  tell me if it reflects a text message exchange between you an

14  Mr. Knibbs?

15  A.  Yes, it was.

16          MR. COOK:  I offer 1595.

17          MS. KRAMER:  Your Honor, may I have a moment, please?

18          THE COURT:  Yes.

19          (Pause)

20          MS. KRAMER:  No objection.

21          THE COURT:  1595 received.

22          (Defendant's Exhibit 1595 received in evidence)

23  BY MR. COOK:

24  Q.  Sir, if we could -- do you have it on your screen still?

25  A.  I do.

1  Q.  OK.  Mr. Knibbs writes to you, Hey give me a call when I --

2  when your -- I'm not sure what that meant, but he wants to ask

3  you something, right?

4  A.  Yes.

5  Q.  "Or tomorrow or next, week, just curious why Ross was

6  asking about me."

7  A.  Yes.

8  Q.  Do you have an understanding that he's referring to Bob

9  Ross?

10  A.  Yes.

11  Q.  And then Mr. Knibbs asks, "And why he was asking about

12  U.K."?

13  A.  Yes.

14  Q.  Did you have a conversation with Mr. Knibbs after this text

15  exchange on this topic?

16  A.  I don't remember but probably.  I'm sure we did.

17  Q.  Well, you were close friends with Bob Ross, correct?

18  A.  Yes, I was.

19  Q.  And you maintain a relationship with David Knibbs?

20  A.  Yes.

21  Q.  And to your knowledge, Mr. Knibbs and Mr. Ross, were they

22  also friends?

23  A.  I don't think so.

24  Q.  Did they work together, if you know?

25  A.  I don't think they worked together while I was at the

1   PCAOB.  I guess I couldn't speak to whether they did

2   afterwards.

3   Q.  Mr. Knibbs -- let me ask you this.  When you received it,

4   was it your understanding that Mr. Knibbs was asking you why

5   Mr. Ross might be trying to contact him because Mr. Knibbs knew

6   you maintain a very close relationship with Bob Ross?

7   A.  Yeah.  That's right.  That's right.

8   Q.  Let's take a look at what's been marked as Government

9   Exhibit 756.

10          Sir, as with the other documents, take a look at this

11  email and tell me if it's an email thread in which you were a

12  participant.

13  A.  Can you go back up just real quick?  OK.  Thank you.

14          Would you mind going down.

15          I'm sorry.  What was the question again, sir?

16  Q.  Was this an email exchange with Mr. Whittle in which you

17  were a participant?

18  A.  Yes, it was.

19          MR. COOK:  I offer Government 756.

20          MS. KRAMER:  No objection.

21          THE COURT:  Government 756 is received.

22          (Government's Exhibit 756 received in evidence)

23  BY MR. COOK:

24  Q.  If we could look at the second email on the first page, the

25  last sentence in the first paragraph.

1    This is you writing to Mr. Whittle stating that, "I'm

2  meeting with Bob Ross the week of June 1 so hopefully we'll see

3  some fruit from that."

4  A.  Yes.

5  Q.  And the fruit that you were referring to was confidential

6  information that you hoped that you could elicit from Mr. Ross?

7  A.  Yeah.  I mean, yeah.  I think so.

8  Q.  Look next at what has been marked for identification as

9  Government Exhibit 930.

10    Sir, is this an email from you at KPMG to Tom Whittle

11  and others at KPMG?

12  A.  Yes.

13    MR. COOK:  I offer 930.

14    MS. KRAMER:  No objection.

15    THE COURT:  Government's 930 received in evidence)

16    (Government's Exhibit 930 received in evidence)

17    MR. COOK:  If you could blow up the first sentence on

18  the first page.

19  BY MR. COOK:

20  Q.  So this is you writing to Mr. Whittle and others saying:

21  "In case any of you are interested in the latest insight on the

22  PCAOB Inspection Team structure for KPMG this year, Jeff

23  Watkins just let me know that he was let go today from the

24  PCAOB due to performance issues he had on a non-KPMG

25  international inspection before the holidays."

1    Did I read that correctly?

2  A.  Yes.

3  Q.  And this is the same Jeff Watkins that we've talked about

4  previously that you've maintained a relationship with?

5  A.  Yes.

6  Q.  Did you have any contact with Mr. Watkins after he was let

7  go from the PCAOB?

8  A.  I did, yes.

9  Q.  And you maintained -- you also had contact with him in the

10  period leading up to his departure from the PCAOB, correct?

11  A.  Yes.

12  Q.  Was Mr. Watkins interested in a job at KPMG?

13  A.  After he was let go from the PCAOB, he sent his résumé to

14  multiple people at KPMG, so, yes, he very much was.

15  Q.  And you had conversations with him about that possibility

16  of him coming to KPMG, correct?

17  A.  Yes.

18  Q.  In fact, he was very motivated to find a job at KPMG,

19  having been let go, right?

20  A.  Yes.

21  Q.  Let's look next at what's been marked as Defense Exhibit

22  1594.

23    And before we talk about this document, let me ask

24  you, what did you understand about the circumstances of

25  Mr. Watkins' departure from the PCAOB?

1    MS. KRAMER:  Objection.  Relevance.

2    THE COURT:  Overruled.

3    You can answer it.

4  A.  It has been awhile but my understanding was that he was on

5  a KPMG -- excuse me.  He was on a PCAOB international

6  inspection that was not a -- not for KPMG, one of the other

7  firms, and he fell asleep during a meeting.  The firm -- that

8  firm complained to the PCAOB, and he had a couple of other

9  performance issues.  And because there had been a trend with

10  Mr. Watkins, he ended up getting let go from the PCAOB.

11  Q.  Now, let me have you take a look at what's on your screen,

12  Defense Exhibit 1594, and ask you if this is a text message

13  exchange between you and Cindy Holder on February 5, 2016?

14  A.  Yes.

15  Q.  Do you remember this exchange?

16  A.  Yes.

17    MR. COOK:  I offer 1594.

18    THE COURT:  1594 received.

19    MS. KRAMER:  I'm sorry, your Honor.  Objection, your

20  Honor.  Hearsay.  I didn't hear the offering.

21    MR. COOK:  You are objecting?

22    MS. KRAMER:  Yes.

23    MR. COOK:  I'm not offering it for the truth, your

24  Honor.

25    THE COURT:  I will allow it.  1594 received.

1    (Defendant's Exhibit 1594 received in evidence)

2  BY MR. COOK:

3  Q.  If you look at the first exchange with Ms. Holder, do you

4  see she says "From Jeff" and then colon:  "Cindy, I decided to

5  resign at the end of the month, so my search is now public."

6  Then she continues.

7        Is it your understanding that the Jeff she was

8  referring to was Jeff Watkins?

9  A.  Yes.

10 Q.  Take a look next at Defense Exhibit 1604.

11       Sir, is this an email exchange you had with

12 Mr. Watkins in March of 2016?

13 A.  Yes.

14       MR. COOK:  I offer 1604.

15       MS. KRAMER:  No objection.

16       THE COURT:  Received.

17       (Defendant's Exhibit 1604 received in evidence)

18 BY MR. COOK:

19 Q.  And this email exchange you had with Mr. Watkins, was this

20 after he had been let go?

21 A.  Yes.

22 Q.  And he's asking for your help finding a job?

23 A.  Yes.

24 Q.  Did you provide him with any assistance?

25 A.  I shared his résumé with several people, including Tom

1    Whittle.  I spoke about him to others.  Yes.

2    Q.  Do you recall talking with Mr. Watkins on the phone or text

3    messages or face-to-face during this time period?

4    A.  I knew we spoke on the phone.  I don't remember if we

5    texted and I don't remember seeing him face-to-face.

6    Q.  As of March 2016, did -- withdrawn.

7         Do you remember, roughly, when he actually left the

8    employment of the PCAOB?

9    A.  Before March of 2016.  I don't remember if it was January

10   or February.  I think the last text message exchange indicated.

11   Q.  We can take a look at it again.  1594, please.

12        The first exchange with Ms. Holder, he's passing along

13   something that Mr. Watkins sent her saying that he decided to

14   resign at the end of the month.  Do you see that?

15   A.  Yes.

16   Q.  And this is -- this text exchange took place in

17   February 2016?

18   A.  Yes.

19   Q.  So assuming he's -- this is accurate, then his -- the end

20   of his employment was roughly around the end of February 2016?

21   A.  Inferring from that, yeah.

22   Q.  Well --

23        MS. KRAMER:  I'm just going to object, your Honor,

24   only because it was -- counsel represented that this was not

25   being offered for its truth and just asked the witness to

1    assume the truth of the document.

2              THE COURT:  Fair enough.

3              MR. COOK:  Withdrawn.

4              THE COURT:  OK.

5    BY MR. COOK:

6    Q.  Your email exchange in 1604, that was towards the end of

7    March 2016 when he's asking for a job or for your help?

8    A.  Yes.

9    Q.  Take a look next at Defense Exhibit 1506.

10             Sir, is this an email exchange, again, that you had

11   with Mr. Watkins in May of 2016?

12   A.  It looks like it started in April 2016 and went through

13   June of 2016.

14   Q.  The beginning of the conversation or the thread is the end

15   of April, and the last portion of it Mr. Watkins is writing in

16   June, 2016, correct?

17   A.  Yes.

18             MR. COOK:  I offer 1506.

19             MS. KRAMER:  No objection.

20             THE COURT:  Received.

21             (Defendant's Exhibit 1506 received in evidence)

22   BY MR. COOK:

23   Q.  And, Mr. Sweet, you wrote to Mr. Watkins, the first line of

24   the top email:  "Jeff - Absolutely, I'd love to be a reference

25   for you and will of course make it a glowing one."

1        Did you do that?

2    A.  I don't remember if I actually got asked -- I offered to be

3    a reference.  I don't remember if I actually got a call from

4    anyone to provide a reference.

5    Q.  You were willing to do that, though, had he asked?

6    A.  I was, yes.

7    Q.  Let's take a look next at Defense Exhibit 1537.

8        Do you know someone named Jeff Lutz?

9    A.  Yes.

10   Q.  Who was Jeff Lutz?

11   A.  Jeff was an associate director at the PCAOB.

12   Q.  Is he no longer there?

13   A.  I don't know.

14   Q.  The last you knew he was an associate director?

15   A.  Yes.

16   Q.  If you could take a look at the exhibit on your screen,

17   1537, is this an email exchange that you had with Joseph

18   Gencarella?  Am I pronouncing that correctly?

19   A.  Gencarella, yes.

20        (Pause)

21        I'm sorry.  What was the question?

22   Q.  Is this an email exchange that you had with Mr. Gencarella?

23   A.  I apologize.  Yes, it was.

24   Q.  In or about May of 2016?

25   A.  Yes.

```
 1                  MR. COOK:  I offer 1537.

 2                  MS. KRAMER:  Hearsay, your Honor.

 3                  THE COURT:  Is this offered for the truth?

 4                  MR. COOK:  It is, your Honor.

 5                  THE COURT:  Why is it not hearsay?

 6                  MR. COOK:  I can lay a foundation as a business

 7      record.

 8                  THE COURT:  Business record because it is an email?

 9                  MR. COOK:  Yes.  The content -- the purpose of the

10      document -- the purpose of the email was in furtherance of

11      Mr. Sweet's required and expected business activities as an

12      employee at KPMG at the time.

13                  MS. KRAMER:  That doesn't get it done, your Honor.

14                  THE COURT:  I agree.  Sustained.

15      BY MR. COOK:

16      Q.  Mr. Sweet, were you aware of whether Mr. Lutz was the

17      location leader for the Century Bancorp inspection?

18      A.  Yes, he was.

19      Q.  Did you ever tell anyone at KPMG that you knew that he was

20      the inspection leader for that particular inspection?

21      A.  Yeah.  That was part of the notification process, yes.

22      Q.  Did he used to work for you?

23      A.  Yes.

24      Q.  At the PCAOB?

25      A.  He did.
```

1    Q.  And did you reach out to Mr. Lutz in order to obtain the

2    focus areas for the inspection?

3    A.  Yes.

4    Q.  Part of your expected duties and obligations as an

5    employee, right?

6    A.  That was the standard communication protocol setup, yes.

7    Q.  And this would not have been confidential information at

8    the time?

9    A.  No.

10   Q.  This was an expected interaction between you and a

11   regulator?

12   A.  Yes, after the formal notification.

13   Q.  And this was after the formal notification?

14   A.  Yes.

15   Q.  And your communication with Mr. Gencarella, in connection

16   with the discussion about you talking to your regulator, this

17   is something -- the type of communication you would have all

18   the time, right?

19   A.  I'm sorry, will you ask that again, please.

20   Q.  Yes.  Who is Mr. Gencarella?

21   A.  Jim Gencarella was the lead audit engagement partner for

22   Century Bancorp.

23   Q.  And given your position and his position, it was not

24   unusual for you to interact with him about your contacts with

25   PCAOB?

1    A.  No.

2    Q.  And you were -- were you a liaison at the time?

3    A.  I'm sorry.  Earlier you said not -- I meant yes, it is not

4    unusual.

5    Q.  It is not unusual?

6    A.  No, it is not unusual.

7    Q.  This was your job?

8    A.  Yes.

9    Q.  Were you ever asked -- withdrawn.

10          Did you socialize with Mr. Lutz -- lunches, dinners --

11   while you were at KPMG?

12   A.  Not that I recall at KPMG.  We certainly did at the PCAOB.

13   Q.  Take a look at Defense Exhibit 1455.

14          Sir, is this an email exchange you had with Mr. Lutz

15   on or about September 2016?

16   A.  Yes.

17   Q.  And this, again, is in connection with a résumé?

18   A.  Yes.

19          MR. COOK:  I offer 1455.

20          MS. KRAMER:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 1455 received in evidence)

23   BY MR. COOK:

24   Q.  Sir, your communication with Mr. Lutz earlier in the year,

25   in June, while he was the PCAOB location leader for Century

1    Bancorp, that was in June 2016, correct, May or June?

2    A.   I think it started in May and the inspection was in June,

3    as I remember.

4    Q.   And then a couple of months later, in September 2016, he

5    was sending you his résumé?

6    A.   Yes.

7    Q.   Did you advance his résumé within KPMG?

8    A.   I don't remember -- I don't remember.

9    Q.   Do you recall any communication with Mr. Lutz between

10   June 2016 and when you received this email in September 2016?

11   A.   Yes.

12   Q.   Phone calls?

13   A.   We -- yeah.  We spoke on the phone.

14   Q.   Did you meet?

15   A.   During the course of the inspection season, yes.

16   Q.   When did the inspection season end?

17   A.   Before this email, the end of August -- well, for his

18   inspections, as I understood it, it ended at the end of

19   August 2016.

20   Q.   Did you meet with him after the end of the inspection

21   season and before you received this email?

22   A.   Not in person but I believe we had a phone call or phone

23   calls.

24   Q.   And those phone calls related to his desire to leave the

25   PCAOB and come to KPMG?

 1   A.  Yes.

 2   Q.  Take a look next at Defense Exhibit 1361.

 3          Take a look at this, sir, and tell me if this is,

 4   again, an email exchange you had with Mr. Lutz in October 2016.

 5   A.  Yes.

 6          MR. COOK:  I offer 1361.

 7          MS. KRAMER:  No objection.

 8          THE COURT:  Received.

 9          (Defendant's Exhibit 1361 received in evidence)

10   BY MR. COOK:

11   Q.  Sir, this email, again, is in furtherance of Mr. Lutz's

12   desire and attempt to get a job at KPMG, correct?

13   A.  Yes.

14   Q.  Was he hired by KPMG?

15   A.  No.

16   Q.  Take a look at Defense Exhibit 1598.

17          Is this an email, sir, from you to August Bellome on

18   or about March 9, 2016?

19   A.  Yes.

20          MR. COOK:  I offer 1598.

21          MS. KRAMER:  No objection, your Honor.

22          THE COURT:  1598 received.

23          (Defendant's Exhibit 1598 received in evidence)

24   BY MR. COOK:

25   Q.  So we are back in March now of 2016.

1        August Bellome is a good friend of yours, right?

2   A.  Yes.

3   Q.  You had spent time working together?

4   A.  Yes.

5   Q.  Was he with you in London?

6   A.  Yes.

7   Q.  With Cindy Holder?

8   A.  Yes.

9   Q.  And Bob Ross?

10  A.  Yes.

11  Q.  And you frequently met for lunch or dinner?

12  A.  Yes.

13  Q.  After you had joined KPMG?

14  A.  Yeah.  I think with August it was only a couple of times,

15  or a few times.  I don't know if it was frequently, but we did

16  certainly meet for lunch and dinners.

17  Q.  Where was Mr. Bellome based at the PCAOB?

18  A.  Out of the PCAOB's New York office.

19  Q.  So when you were in New York, you would frequently make

20  arrangements to see him, go out to lunch, dinner?

21  A.  Again, it wasn't overly frequent with August.  I mean, it

22  was a few times over the period of a couple of years.

23  Q.  Is he still employed with the PCAOB, to the best of your

24  knowledge?

25  A.  I don't know.

1    Q.  Was he looking for a job at KPMG, that you know of?

2    A.  No.

3    Q.  Let's look next at Defense Exhibit 1453.

4            Sir, is this an email exchange that you had with Scott

5    Henderson in April of 2016?

6    A.  Yes.

7    Q.  And it concerns or is in furtherance of your understanding

8    that part of your job function was to recruit PCAOB inspectors?

9    A.  Yes.

10           MR. COOK:  I offer 1453.

11           MS. KRAMER:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 1453 received in evidence)

14   BY MR. COOK:

15   Q.  Now this email relates to Jung Lee, right?

16   A.  Yes.

17   Q.  If you look at the first sentence of your email to Scott

18   Henderson, you say, "Jung Lee from the PCAOB forwarded me his

19   résumé and appears to be extremely interested in the

20   international role."

21           Do you see that?

22   A.  Yes.

23   Q.  Was Jung Lee a friend?

24   A.  Yes.

25   Q.  Somebody that you maintained regular contact with once you

1   joined KPMG?

2   A.   Yes.

3   Q.   And he was -- he asked for your assistance in getting a job

4   there?

5   A.   Yes.

6   Q.   Did you meet with Mr. Lee face-to-face once you left KPMG?

7   A.   Oh, once I left KPMG?

8   Q.   Yes.

9   A.   No.

10   Q.   How did you communicate with him?

11   A.   He and I emailed.  We had phone conversations.  And while I

12   was at KPMG we met face-to-face.

13   Q.   While you were at KPMG you met face-to-face?

14   A.   Yes.

15   Q.   Where was that?  Where did you meet with him?

16   A.   I remember we went to a sushi restaurant.

17   Q.   I should have been more clear.

18            What city were you in?

19   A.   Oh, New York.

20   Q.   Was he based in New York?

21   A.   Yes, he was.

22   Q.   Let's take a look next at Defense Exhibit 1601.

23            Sir, is this an email exchange that you had with Jung

24   Lee in or around May of 2016?

25   A.   Yes.

1    Q.  And are you making arrangements to meet with him?

2    A.  Yes.

3    Q.  Do you recall if that meeting took place?

4    A.  Yes.

5    Q.  Let's take a look next at Defense Exhibit 15 -- excuse me

6    for just a moment.

7           (Pause)

8           I apologize.  If I haven't offered it, I offer 1601.

9           MS. KRAMER:  No objection.

10          THE COURT:  1601 received.

11          (Defendant's Exhibit 1601 received in evidence)

12   BY MR. COOK:

13   Q.  Mr. Sweet, turning now to Defense Exhibit 1599.

14          Sir, if you could just take a look at this document

15   and tell me if it reflects a series of emails between you, John

16   Broderick and Jung Lee?

17   A.  Sorry.  Could you go back up to that second email just so I

18   can look at it?  Thank you.

19          OK.  Would you mind going down now.

20          OK.

21   Q.  Is that what this is?

22   A.  Yes.

23          MR. COOK:  Your Honor, I offer 1599.

24          MS. KRAMER:  Your government -- your Honor, the

25   government doesn't object to this coming in for the fact of

1    what it shows, but would object to it as hearsay if any of the

2    statements are then being offered for their truth.

3            THE COURT:  1599 is received.

4            (Defendant's Exhibit 1599 received in evidence)

5    BY MR. COOK:

6    Q.   Who is John Broderick?

7    A.   John Broderick was a banking partner at KPMG within the

8    Inspections Group.

9    Q.   And can you tell us generally why Jung Lee, John Broderick

10   and you are communicating in this email?  What is the purpose?

11   A.   Just to be clear, I don't think Jung is communicating with

12   me in this email.  Jung communicated with John Broderick, and

13   then John Broderick forwarded that email to me and another

14   partner, Hector Santana.

15   Q.   I think the Jung and the John, we were getting -- we were

16   overlapping.

17   A.   OK.  I got it.

18   Q.   What is being discussed in this email generally?

19   A.   Generally, John Broderick had been assigned as the KPMG

20   inspection liaison for the People's United Financial banking

21   inspection by the PCAOB.  Jung Lee was the inspections leader.

22   And in advance of I guess one of the meetings he wanted to --

23   after the PCAOB had notified KPMG formally of the inspection of

24   People's, he wanted to speak with John to tell John what are

25   some of the questions that they wanted to have answered at the

 1   next meeting.

 2   Q.   And why were you involved in this?

 3   A.   John hadn't had a request like that, I guess, and he wanted

 4   to get clarification from Hector and I to gain additional

 5   context into that approach.

 6   Q.   Did John know that you had a relationship with Jung Lee?

 7   A.   Yes.

 8   Q.   Let's take a look at what's been marked as Defense Exhibit

 9   1178.

10        Sir, is this an email exchange that you had with Jung

11   Lee in August of 2016?

12   A.   Yes.

13        MR. COOK:  I offer 1178.

14        MS. KRAMER:  Objection.  Hearsay.

15        MR. COOK:  Your Honor, I'm not offering this for the

16   truth.

17        MS. KRAMER:  I don't know what purpose it is being

18   offered for, your Honor.

19        THE COURT:  Sustained.

20   BY MR. COOK:

21   Q.   Did you maintain your relationship with Jung Lee through

22   August of 2016?

23   A.   Yes.

24   Q.   Take a look next at Defense Exhibit 1450.

25        Is this an email that you sent to Jim Liddy at KPMG in

1    September of 2016?

2    A.  Yes.

3              MR. COOK:  I offer 1450.

4              MS. KRAMER:  No objection.

5              THE COURT:  Received.

6              (Defendant's Exhibit 1450 received in evidence)

7    BY MR. COOK:

8    Q.  Sir, in September -- sir, if you take a look at the

9    document and you take a look at the second page of it,

10   September of 2016, Mr. Lee is sending you his résumé, correct?

11   A.  Yes.

12   Q.  He was interested in a job at KPMG?

13   A.  Yes, he was.

14   Q.  And you were passing it on to Mr. Liddy why?

15   A.  Jim Liddy was in like an international banking role, and I

16   thought he would be aware of whether or not any KPMG

17   international locations had a need for someone like Jung.

18   Q.  So you were advancing his résumé within KPMG?

19   A.  Yes.

20   Q.  Was Mr. Lee ultimately hired, do you know?

21   A.  No.

22   Q.  Do you know where he is working now?

23   A.  I do not know.

24   Q.  Let's take a look next at Defense Exhibit 1634.

25              Sir, is this one of those appointments that we talked

1  about -- calendar entries that we talked about earlier that you

2  wrote in connection with that communication or call with

3  Mr. Lee?

4  A.  Is this the second page?  Is there a -- it looks like a

5  first page.  Oh, I see the different -- yeah, this looks to be

6  a calendar appointment that I was putting into my own calendar.

7  Q.  This says from you to yourself, so it populates your online

8  calendar?

9  A.  Right.

10  Q.  And do these reflect appointments that you made in your

11  calendar for a meeting or call -- I'm sorry, a call with

12  Mr. Lee?

13  A.  Yeah.  Yes.  Generally that's what they would do.

14          MR. COOK:  I offer 1634.

15          MS. KRAMER:  If we can just scroll through for the

16  witness all of the pages?  Otherwise no objection.

17          (Pause)

18          THE COURT:  Is it two pages?

19          MR. COOK:  There are three pages.

20          So you're looking at --

21          MS. KRAMER:  No objection.

22          THE COURT:  1634 received.

23          (Defendant's Exhibit 1634 received in evidence)

24  BY MR. COOK:

25  Q.  Look at the third page.  This is for an appointment in

1    December 2016 to call Jung.

2            And "Jung" refers to Jung Lee, correct?

3    A.  Yes.

4    Q.  And the previous page, page 2, it is another appointment to

5    call Mr. Lee in November of 2016, correct?

6    A.  Yes.

7    Q.  Then the first page is another appointment, or maybe we

8    should call it a reminder for you to email Jung?

9    A.  Yes.

10   Q.  Let's look next at Defense Exhibit 1596.

11           Sir, can you take a look at this document and tell me

12   if this is a text message exchange that you had with Mr. Lee?

13   A.  Yes.

14   Q.  In January of 2017?

15   A.  Yes.

16           MR. COOK:  I offer 1596.

17           MS. KRAMER:  No objection, your Honor.

18           THE COURT:  Received.

19           (Defendant's Exhibit 1596 received in evidence)

20   BY MR. COOK:

21   Q.  Sir, we're now moving into 2017, and you're maintaining

22   your relationship with Mr. Lee, correct?

23   A.  Yes.

24   Q.  And at this point, is Mr. Lee still employed by the PCAOB?

25   A.  My understanding was he had been fired a couple of months

1    prior to this, or let go.

2    Q.  And by "a couple of months prior," you are talking about in

3    the fall or late fall/winter of 2016, correct?

4    A.  It was my understanding, yes.

5    Q.  And that's during that same time period that we saw those

6    calendar entries for calls and emails with Mr. Lee?

7    A.  Yes.

8    Q.  OK.  Take a look next at Defense Exhibit 1489.

9             Sir, if you could look at this document and tell me if

10   this is an email -- and we'll scroll through it for you -- that

11   you received from Grady Peeler to your personal email address?

12   A.  Are there any more pages to this?  No?

13            Yes.  That is an email from Grady to my personal email

14   address.

15            MR. COOK:  I offer 1489.

16            MS. KRAMER:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit 1489 received in evidence)

19   BY MR. COOK:

20   Q.  You've got it on the screen now.

21            First page, from Grady Peeler to that's your email

22   address, correct?

23   A.  Yes.

24   Q.  Yahoo!

25            And the subject line is "For our chat today" and then

1    he attaches his résumé, right?

2    A.   Yes.

3    Q.   Do you recall having a conversation with Mr. Peeler around

4    this time?

5    A.   Yes.

6    Q.   It was for the purpose of discussing his interest in

7    employment at KPMG?

8    A.   Yes.

9    Q.   And at the time he was employed by the PCAOB?

10   A.   Yes.

11   Q.   Was he -- if you recall, was he on that tiered list of

12   potential recruits?

13   A.   I believe he was, yes.

14   Q.   Take a look next at Government Exhibit 800.

15        Sir, could you tell me if this is an email exchange

16   that you had while at KPMG with John Broderick?

17   A.   Is there another page or is this just the front page?

18   Q.   One page.

19   A.   One page.

20        Yes, this is an email between John Broderick and I on

21   our KPMG email.

22   Q.   I know we talked about this earlier, but remind us who John

23   Broderick is?

24   A.   John Broderick was a banking partner or a partner with

25   banking and insurance experience that was in the KPMG

1    Inspections Group.

2    Q.  Was he a partner at KPMG?

3    A.  Yes.

4    Q.  If you look at the email at the bottom of the page, the

5    second email, from you to Mr. Broderick, Broderick, dated

6    June 4, 2015.  The last sentence in the first paragraph --

7            MS. KRAMER:  Objection.  It's not in evidence.

8            MR. COOK:  I apologize.  I offer it, your Honor.

9            MS. KRAMER:  Objection.  Hearsay.

10           MR. COOK:  Your Honor, I'm not offering it for the

11   truth, only to maintain the relationship.

12           THE COURT:  800 -- Government Exhibit 800 is received

13   for a limited purpose.

14           (Government's Exhibit 800 received in evidence)

15   BY MR. COOK:

16   Q.  Did you describe with Mr. Broderick in or around June of

17   2015 a lunch that you had with Bob Ross?

18   A.  Yes.

19   Q.  And Bob Ross was one of your sources of confidential PCAOB

20   information, correct?

21   A.  Yes, he had provided me with confidential information.

22   Q.  Let's take a look next at what's been marked as Government

23   Exhibit 450.

24           Sir, do you have an email address that you've used in

25   the past, "bsweet@harvestfresno.org"?

1   A.  Yes.

2   Q.  That is an email that you have access to, or had access to?

3   A.  Yes.

4   Q.  In August of 2016?

5   A.  Yes.

6   Q.  Is this an email that you sent from that email address in

7   August 2016?

8   A.  Yes.

9   Q.  Who did you send it to?

10  A.  Myself.

11          MR. COOK:  I offer 450.

12          MS. KRAMER:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 450 received in evidence)

15  BY MR. COOK:

16  Q.  Difficult to translate what's written here, would you

17  agree?

18  A.  Yes.

19  Q.  But this is -- these are notes, quick notes that you made

20  to yourself of a conversation that you had with Bob Ross,

21  correct?

22  A.  After that conversation, but, yeah, from the conversation

23  with Bob Ross, these are notes that I was leaving for myself.

24  Q.  So you had dinner with Bob Ross, was it in San Francisco?

25  A.  Yes.

1   Q.  And was it on August 12th, the date of the email?

2   A.  I believe it was the day before, if I remember correctly,

3   but I may be off on the day.

4   Q.  Assuming our time zones are right, this is 10 in the

5   morning.  So if it was dinner, it would probably be the night

6   before, correct?

7   A.  That's -- yes.

8   Q.  And some of the notes that you made here -- well, the

9   reason you made the notes is because you wanted to be sure you

10  could remember some of the things that Mr. Ross had told you at

11  that dinner?

12  A.  Yes.

13  Q.  And some of the things he told you at that dinner were

14  confidential PCAOB information?

15  A.  Yes.

16  Q.  And you made this list here so it would prompt your memory

17  when you had a discussion later with your partners at KPMG

18  about what Bob had told you, right?

19  A.  Yes.

20  Q.  Take a look next at Defense Exhibit 1602.

21          Sir, is this an email exchange with you -- between

22  you, Scott Henderson of KPMG, and also John Broderick of KPMG?

23  A.  Yes.

24          MR. COOK:  I offer 1602.

25          MS. KRAMER:  May I have a moment, your Honor?

 1          THE COURT:  Yes.

 2          (Pause)

 3          MS. KRAMER:  Objection.  Hearsay.

 4          MR. COOK:  Your Honor, I am not offering it for the

 5   truth, just the fact of the communication.

 6          THE COURT:  I will allow it for a limited purpose.

 7          Defense 1602 is received.

 8          (Defendant's Exhibit 1602 received in evidence)

 9   BY MR. COOK:

10   Q.  Sir, would you take a look at the top email of August 20,

11   2015.

12          In this email, Mr. Broderick is telling you that Bob

13   Ross had already told him that he had comments on this

14   inspection of Deutsche Bank, correct?

15   A.  Yes.

16   Q.  Was the fact that Deutsche Bank was being inspected next

17   year confidential at that time?

18   A.  Yes.

19   Q.  Take a look next at Defense Exhibit 1184.

20          MR. COOK:  May I have a moment, your Honor?

21          THE COURT:  Yes.

22          (Pause)

23          MS. KRAMER:  Your Honor, I would like to renew my

24   objection to Government Exhibit 1602, and move to strike the

25   testimony that was elicited after Mr. Cook represented to the

1    Court that he was offering the document not for the truth of

2    the matter asserted.  He then highlighted text and had the

3    witness confirm the truth of the text that was highlighted.

4    And that's hearsay.  That is inadmissible.

5              MR. COOK:  Your Honor, may I respond?

6              THE COURT:  Yes.

7              MR. COOK:  What I highlighted was the fact that Bob

8    Ross had communicated information to Mr. Broderick.  I then

9    asked the witness whether the fact that they knew Deutsche Bank

10   was being inspected was confidential, to which the witness

11   answered in the affirmative.

12             MS. KRAMER:  And the fact that was being asked about

13   was established through a document because it was offered for

14   the truth of the statement that Mr. Cook then relied --

15   referred to as a fact.

16             THE COURT:  Well, I'm going to direct the jury that

17   when -- there is a bunch of rules about evidence that you don't

18   need to worry about for the most part, but there is something

19   called hearsay when in certain circumstances when something --

20   a document is admitted not for the truth of the facts in the

21   document but for other purposes, for example, its effect on the

22   listener.  So the facts stated in an email might not be

23   admissible, and I'll direct you as in that example you may

24   consider it only for other purpose, like the effect on the fact

25   that someone received an email stating something.  The fact

1    stated is not necessarily accepted as a fact.  But the effect

2    on the listener, or the fact that the communication was

3    received between one person and another is admissible and may

4    be considered.

5           MS. KRAMER:  Your Honor, I'm going to just renew my

6    objection again because the fact that there was a communication

7    between these individuals is not relevant if not for the truth

8    of the statement.  So we move to strike Government Exhibit 1602

9    and the testimony that followed the claim that the document was

10   being offered for the fact that the communication happened.

11          MR. COOK:  I can rephrase my question, your Honor.

12          THE COURT:  OK.

13   BY MR. COOK:

14   Q.  Do you know, Mr. Sweet, whether the statement made in the

15   first sentence of the email is true or not?

16          MS. KRAMER:  Objection.

17          MR. COOK:  I don't think he does know whether it is

18   true or not, your Honor.  The fact -- the point of the question

19   is if this information was conveyed, would it have been

20   confidential?

21          MS. KRAMER:  We can take this up at the next break,

22   your Honor.

23          THE COURT:  OK.

24   BY MR. COOK:

25   Q.  Take a look at 1184, Defense Exhibit 1184.

1          Sir, is this an email exchange between you and David

2   Britt?

3   A.  Yes.

4   Q.  In October 2015?

5   A.  Yes.

6          MR. COOK:  I offer 1184.

7          MS. KRAMER:  Objection.  Hearsay.

8          MR. COOK:  May I have a moment, your Honor?

9          THE COURT:  Yes.

10         (Pause)

11         MS. KRAMER:  No objection, your Honor.  I understand

12  that there is a redacted version of the exhibit.

13         THE COURT:  1184 is received.

14         (Defendant's Exhibit 1184 received in evidence)

15         MS. KRAMER:  The version we have has a redaction

16  that's not appearing on the version that is up on the screen.

17         MR. COOK:  It is on your screen.

18         MS. KRAMER:  Oh, now it is.  It wasn't a minute ago.

19  Thank you.

20  BY MR. COOK:

21  Q.  If I can direct your attention to the bottom of the first

22  page, sir.

23         This is an email from you to Mr. Britt, correct?

24  A.  Yes.

25  Q.  What is iRadar?

1   A.   From memory, it's a KPMG international valuation tool.

2   Q.   And what role does -- withdrawn.

3            Take a look at the second page.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Take a look at the second page.  Do you see where you say,

2    "I've got lunch with Bob next week so we'll also poke at the

3    subject with him then"?

4    A.  Yes.

5    Q.  Were you referring to Bob Ross?

6    A.  Yes.

7    Q.  What was the subject that you were going to --

8    A.  Would you mind going up just slightly?

9    Q.  Sure.  Let's go to the previous page.

10   A.  It looks like it's in the context of this iRadar, sir.

11   Q.  Why would Bob Ross have information about that?

12   A.  I remember being on the same inspection with Bob Ross in

13   the UK, and I remember iRadar coming up on that inspection.

14   Q.  Your response to Mr. Britt's email where you say "I've got

15   lunch with Bob next week" comes from a question that Mr. Britt

16   asked you at the bottom of the second page.  He says, "Do you

17   have any sense where the PCAOB is on this?" right?

18   A.  Yes, I believe so, yes.

19   Q.  You were going to have lunch with Bob and see if you could

20   elicit some information from him on this topic, is that right?

21   A.  Yes, I believe so.

22   Q.  Take a look at Defense Exhibit 1461.

23          THE COURT:  It is after 1:00.  Do you want to finish

24   this one and break or just break?

25          MR. COOK:  This is a good time, your Honor.

1    THE COURT:  It is just after 1 o'clock, folks.  We

2  will start back up again at 2 o'clock.  Please leave your pads

3  on your chairs.  Have a good lunch and we will see you at 2

4  o'clock.

5    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present, witness not present).

2            THE COURT:  Could you all put 1602 back up.  Do you

3    want to address this?

4            MS. KRAMER:  Yes, your Honor.  This was offered for

5    the truth of the fact that Bob Ross told John Broderick that he

6    had comments for the German firm inspection of Deutsche Bank,

7    that is, the truth of the matter asserted.  It is classic

8    hearsay.  It does not fall into any exceptions.

9            Notwithstanding that, it was represented as being

10   offered for simply the fact of the communication, the fact that

11   John Broderick sent an email saying this has absolutely no

12   meaning or relevance to the case other than the statement that

13   is in it.  And the follow-up questions indicated that the sole

14   purpose of its admission was to establish the truth of the

15   matter asserted.

16           The witness was then asked questions about that that

17   indicated the necessity of the truth of this being established

18   in that he asked if the fact that the PCAOB was going to

19   inspect Deutsche Bank next year, a fact established only

20   through this hearsay, was known or had already been formally

21   communicated by the PCAOB, sort of doubling down on the

22   hearsay.

23           It is not admissible and it shouldn't have happened,

24   and now it should be stricken and the jury should be instructed

25   to disregard it and the testimony.

1          THE COURT:  It is not co-conspirator.  I don't know

2     how the fact that Mr. Sweet received this is relevant.  What is

3     the nonhearsay purpose?

4          MR. COOK:  It is the fact that Mr. Broderick told Mr.

5     Sweet this information, the question being would that

6     information be confidential.  It is not whether or not Mr.

7     Broderick was accurate or whether he ever talked to Bob Ross,

8     but would this have been confidential if it had taken place.  I

9     don't know if it did or not.  He doesn't know if it did or not.

10         THE COURT:  Tell me exactly if what information had

11    taken place.

12         MR. COOK:  That they knew that the inspection of

13    Deutsche Bank was going to take place next year at this time,

14    the time the email was sent.

15         THE COURT:  If the communication of that would have

16    been confidential?

17         MR. COOK:  If the knowledge of that inspection would

18    have been confidential at the time.  That is the question I

19    put.  I apologize if I was unclear, but that is the question I

20    intended to put to the witness.

21         THE COURT:  I think you did.  I am going to overrule

22    the objection and allow it.

23         MS. KRAMER:  Your Honor, may I ask a clarifying

24    question?

25         THE COURT:  Yes.

1          MS. KRAMER:  Given the limited admissibility of this

2    as your Honor originally ruled, I want to confirm that defense

3    counsel cannot then argue from this document in closing that

4    Bob Ross shared the location of the Deutsche Bank inspection in

5    Germany because that is the truth of the content of the

6    document that they are saying they didn't offer this for.

7          THE COURT:  I think that's right.

8          MR. WEDDLE:  I'm not doing the closing, but I'm sure

9    that is not part of Mr. Cook's closing.

10         I did also want to note in addition -- I know your

11   Honor overruled the objection -- I think the open discussion

12   among people at KPMG relating to what would be confidential

13   information if it came from the PCAOB is something that may be

14   part of the closing.  It was part of the opening too, that

15   there were multiple sources of leaks.  I think that is fair

16   game.

17         I'm not saying that this is proof that there was a

18   disclosure of confidential information by Bob Ross to John

19   Broderick in or about August 2015.  We are not saying that.

20   There is other evidence of other leaks for sure.  This has a

21   couple of purposes.

22         First of all, this witness doesn't know one way or the

23   other whether it is true.  All he is going on is what was said.

24   The second purpose is they are all having this discussion about

25   what would be a confidential leak if it were true and nobody

1    seems particularly concerned about it.

2              THE COURT:  I understand.  I think that is a valid

3    argument as long as that information has come in properly.

4              From Mr. Middendorf's counsel there is a motion to

5    quash the subpoena on the PCAOB.  I wanted to see if you were

6    going to respond to it.

7              MR. BOXER:  We were going to mention that today.  I

8    think we will have something in by the weekend, roughly.  I

9    would say before we start court on Monday.  We started to look

10   at that.  Hopefully, we'll have it in sooner that.

11             THE COURT:  Anything else?

12             MS. MERMELSTEIN:  On the schedule, your Honor, I

13   wanted to check with Mr. Cook.  Earlier this morning he thought

14   he would be done this afternoon.  I don't know if that has

15   panned out as expected or not.

16             THE COURT:  Any update on expected timing?

17             MR. COOK:  I think I'm on track, in that area, that

18   neighborhood.

19             MS. MERMELSTEIN:  If that's right, and these things

20   are hard to predict -- my understanding is Ms. Lester thinks

21   she is going to have a couple of hours.  Is that still true?

22             MS. LESTER:  Yes.

23             MS. MERMELSTEIN:  The question is this.  If we could

24   finish with Mr. Sweet this week, we would really have regained

25   the ground we have lost.  I don't know if that means, for

1    example, if we sat late today, if we could just plow through

2    and be done and then not force the jury to come back tomorrow.

3            THE COURT:  I think the jury and I would prefer going

4    a little bit later today and not doing tomorrow.  Would you all

5    be up for going until 6:00, 5:30, or whatever if we could?

6            MR. COOK:  That's fine with us.

7            MR. BOXER:  It's fine with us, your Honor.  It's just

8    hard to predict how long it will take.

9            THE COURT:  I understand.

10           MS. MERMELSTEIN:  Totally understood.  The issue is if

11   we push into tomorrow with Mr. Sweet, we have one local put to

12   put on so I don't know that we will fill the whole morning.  We

13   want to flag the timing issue in the hope that we can wrap it

14   up and see where it goes.

15           MR. COOK:  Cook one observation.  I'm worried that if

16   we have some recross, that we are not hamstrung by the fact

17   that the jury is here late and we need to end.

18           THE COURT:  We can't predict these things and there is

19   no guarantees.  It's also possible that when I raise the issue

20   one of the jurors will I say I have a childcare issue and have

21   to leave at 5:00.  We'll deal with it.  But I'll raise the

22   issue about possibly going a little little past 5:00 today with

23   no guarantees.

24           MS. MERMELSTEIN:  Zoetis clear, if we don't finish

25   today, are we going to sit tomorrow morning?  We are trying to

1   tell the witnesses who would have to testify tomorrow and it is

2   all dominoes in terms of what happens next week.

3          THE COURT:  Do you have a position on that?  There are

4   a couple of jurors who have a shoe with it, that are possibly

5   surmountable.  The juror who has a two-hour commute each way

6   was not excited about coming in for three hours or whatever.

7          MS. MERMELSTEIN:  We are sympathetic with that, your

8   Honor.  But I think the government's strong view is that we

9   should either sit late tonight to fish or sit tomorrow to

10  finish with Mr. Sweet.  If we needed a short amount of time

11  tomorrow for Mr. Sweet we would also call a second witness to

12  fill additional time, and that would allow a number of

13  relatively short witnesses who have to TROFL from a out of

14  town, many of whom are audit partners at XM, this is audit

15  Cezanne, not a good time for them to be coming, then we could

16  say you are coming Monday.  It would be helpful.  We would like

17  to either stay late tonight or go tomorrow and just keep Mr.

18  Sweet as the witness.

19         MR. COOK:  My first question is unless I missed it, I

20  don't have an estimate for Ms. Kramer as to how long she might

21  have.

22         MS. MERMELSTEIN:  We need to see how cross will be

23  firstting if we are here late, I'm not going to be the reason

24  that we are here forever.  We'll keep it very brief.

25         MR. WEDDLE:  Your Honor, the concern that seems to be

1    expressed the government is talking about a lot of scheduling

2    issues in order to that Mr. Sweet be finished with his

3    testimony and not have to continue to be on cross-examination

4    over the weekend.  I'm not sure why we have to inconvenience

5    jurors, lawyers, rush a redirect or a recross in order that Mr.

6    Sweet gets to breathe a sigh of relief on Friday, Saturday, and

7    Sunday.  If he needs to come back on Monday morning and do a

8    little bit more testimony, I don't see what the harm in that

9    is.  I don't think it is worth making a juror commute two hours

10   just so.

11          MS. MERMELSTEIN:  This is completely not about Mr.

12   Sweet's schedule at all.  It's about two things.  It's about

13   keeping the trail apace because if we get too far behind and we

14   are spilling into weeks five and six we are going to have juror

15   problems for people \who said\who does they were available for

16   four weeks.  Number two, it is about civilian witnesses who are

17   invegetablely busy in their own professional lives and trying

18   to be able to predict with certainty what they will be able to

19   get on the stand.  If Mr. Sweet is still going into Monday and

20   we don't know \however\how far into Monday he goes, we are

21   going to have to drag people here to sit around Monday and not

22   know if they get on and not know if they are going to have to

23   be here Tuesday.  The aim is to keep the trial moving as

24   promised to the jury and accommodating future witnesses.  It is

25   completely not about Mr. Sweet's schedule.  He will be here

1    whenever he is told to be here.

2          MR. WEDDLE:  Your Honor, if my experience, if there is

3    a little bit of cross-examination and redirect and recross that

4    carries over into the next day especially when there is an

5    intervening weekend, it tends to be much KRAFPer and shorter

6    and efficient if we do it on Monday morning than if we do it

7    tonight at 6:00 p.m. or tomorrow morning as a special

8    accommodation for Mr. Sweet and then to fill the time with one

9    other civilian witness.  It seems to me that if he is carrying

10   over and he is not done this evening, it is not a big deal for

11   him to come back on Monday and finish his testimony, I'm

12   guessing right now, let's say it's 30 minutes of testimony.

13   All the civilian witnesses will have a high level of

14   predictability about what's going to happen.

15         THE COURT:  Let me get your position.  You don't want

16   to sit Friday?

17         MR. WEDDLE:  I'm going to be here.  I don't mind

18   sitting on Friday.  I don't think there is a valid reason to

19   inconvenience the jurors in order to accomplish this task.

20         THE COURT:  Do you have a position, Mr. Boxer?

21         MR. BOXER:  Similar to the last bit Mr. Weddle said.

22   We will accommodate the Court with whatever is necessary.  Our

23   only concern is the jurors and whether it can be managed in a

24   way that doesn't hurt is long term as far as the jury.

25         THE COURT:  I hesitate to sit on Friday when I have

1    basically told them mostly we won't be sitting Friday, to do

2    that already in the second week.  My hope is that we can finish

3    today, although in saying that I don't mean to put time limits

4    on any cross-examination or redirect.  I don't think I can

5    resolve this right now.  I'm going to try to get a sense from

6    the jury and then I think we will know more at the end of the

7    day.  Sorry I can't give you more now.

8                MS. MERMELSTEIN:  Thank you, your Honor.

9                THE COURT:  Have a good lunch.

10               (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2                 2:00 p.m.

3         (Jury present)

4    BRIAN SWEET, resumed.

5         THE COURT:  Good afternoon, folks.  Welcome back.  We

6    are continuing with testimony.

7         I did want to ask in terms of scheduling, I know a

8    couple of you had scheduling issues with tomorrow.  I wanted to

9    raise the possibility of going a little longer than 5 o'clock

10   today if that could prevent us from having to come in tomorrow.

11   Would anyone have a problem with going a little past 5:00?

12   Yes, you do.  So you want to stop at 5:00 today.

13        Let me get an update, given that, on whether anyone

14   has a real problem with coming in tomorrow.  If you do, if we

15   sat like 9:30 to, say, 12:30 or 1:00 tomorrow, raise your hand

16   if you would have a problem with that.  It's okay if you do.

17        JUROR:  I just have to reschedule some things.

18        THE COURT:  Would it be a problem?

19        JUROR:  No.

20        THE COURT:  Anyone else?  All right.  We'll check in

21   at the end of today on that.  Thank you.

22        Mr. Cook, you may proceed.

23   CROSS-EXAMINATION (continued)

24   BY MR. COOK:

25   Q.  Let's take a look at Defense Exhibit 1461, please, for

1    identification.  Sir, if you could take a look at the email and

2    let me know if this is an email exchange that you had with Bob

3    Ross in August and September of 2015.

4    A.  Do you mind scrolling all the way down to the bottom?  Or

5    is that the bottom?  Yes, this is an email exchange between Bob

6    Ross and I.

7             MR. COOK:  I offer 1461.

8             MS. KRAMER:  Objection, hearsay and 403.

9             MR. COOK:  Your Honor, if I could confer with

10   government counsel?

11            THE COURT:  Yes.

12            MS. KRAMER:  We have no objection to a portion of the

13   document, your Honor.  I understand defense counsel is going to

14   redact some of it.

15            THE COURT:  All right.

16            MR. COOK:  Your Honor, I offer 1461 which we will

17   redact and renumber as 1461-R.

18            THE COURT:  1461-R is received.

19            (Defendant's Exhibit 1461-R received in evidence)

20   Q.  I will direct your attention to the email on the screen.

21   If you could read for me Mr. Ross's email to you on September

22   10, 2016, beginning with the second paragraph.

23   A.  "As an aside, I understand that your firm has recently

24   hired Scott Furman IL in the New York office.  Do you know how

25   many people in total from the PCAOB the firm is looking to

1    hire?  I'd consider it if they are willing to triple my salary.

2    And I could guarantee the number comment forms they receive

3    would go down by hiring me.  How is Cindy doing?  Is the firm

4    happy with her so far?"

5    Q.  Then the first sentence of that email, "Next week I will

6    probably not be around, but the week of September 28 looks good

7    for grabbing lunch."  You had lunch with Mr. Ross often, right?

8    A.  Yes.

9    Q.  He ultimately joined KPMG or is he still at PCAOB, to your

10   knowledge?

11   A.  No, he did not join KPMG.  To my knowledge, he is still at

12   the PCAOB.

13   Q.  Take a look next at Defense Exhibit 1457.  Sir, if you

14   could take a look at this email and tell me if it reflects an

15   email conversation you had with Mr. Ross in August of 2016 and

16   September of 2016.

17   A.  Are we at the bottom, sir?

18   Q.  I believe that's the bottom except for the disclaimers.

19   A.  Yes.

20   Q.  An email between you and Mr. Ross?

21   A.  Yes, it is.

22   Q.  In August and September of 2016?

23   A.  Yes.

24            MR. COOK:  I offer Defense Exhibit 1457.

25            MS. KRAMER:  No objection.

 1              THE COURT:  Received.

 2              (Defendant's Exhibit 1457 received in evidence)

 3  Q.  Sir, especially the more recent emails in this thread

 4  reflect a dinner that you had with Mr. Ross in August of 2016,

 5  correct?

 6  A.  Yes.

 7  Q.  Would it be fair to say that in many of your meetings with

 8  Mr. Ross alcohol figured prominently?

 9  A.  Not in the lunch meetings, no, but certainly in this

10  dinner, yes.

11  Q.  In fact, you were commenting on how you felt the next day

12  after your meeting, correct?

13  A.  Yes.

14  Q.  Your dinner.  Let's take a look next at Defense Exhibit

15  1636.  Sir, if you could review the email, which we will scroll

16  for you, and tell me if it's a series of emails between you and

17  other KPMG employees.

18  A.  Are we at the bottom, sir?

19  Q.  We are at the bottom.

20  A.  Yes.

21  Q.  This is an email that you sent, email thread from December

22  of 2016?

23  A.  Yes.

24              MR. COOK:  I offer 1636 as a defense exhibit.

25              MS. KRAMER:  Objection: hearsay.

1          THE COURT:  Sustained.

2   Q.  Take a look at Defense Exhibit 1635.  Sir, is this an email

3   exchange between you and Cindy Holder while at KPMG in December

4   2016?

5   A.  Yes, it is.

6          MR. COOK:  I offer Defense Exhibit 1635.

7          MS. KRAMER:  Objection: hearsay.

8          MR. COOK:  May we be heard on this, your Honor?

9          THE COURT:  Yes.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. COOK:  Your Honor, the purpose of offering this is

3     they have suggested that Cindy Holder was circulating

4     confidential information during this time period.  This

5     evidences the fact that they were receiving confidential

6     information from other sources as well.

7          MS. KRAMER:  Your Honor, the only relevance of this is

8     the truth about what was happening at the PCAOB at the time and

9     how they were staffing it.  That is something that defense

10    counsel has already tried to put into evidence as a matter of

11    fact, and the truth of the matter here can't be taken out of

12    this claimed purpose.

13         MR. COOK:  It is a statement of his intent as well.

14         MS. KRAMER:  It is also not confidential, your Honor.

15    There is no evidence of that.  It was announced in the bottom

16    email.  "Helen Munter just announced financial services pooled

17    team to the SEC reviewing partners."  SEC reviewing partners

18    are KPMG employees assigned to be the second audit partner.

19    Helen Munter had a leadership role at the PCAOB.  This is

20    saying she just announced this to KPMG.  It is not

21    confidential.  It doesn't even establish the point they are

22    offering this for?

23         MR. COOK:  Your Honor, it is a statement of his intent

24    to get additional details from Bob beyond what was released

25    publicly.

1          THE COURT:  Of Sweet's intent.  Why is Sweet's intent

2    relevant?

3          MR. COOK:  His intent to obtain information from Bob

4    Ross, his source of confidential information.

5          MR. WEDDLE:  He is saying here I need to get together

6    with Bob to get the details.  He is not saying I need to get

7    together with Jeff Wada to get the details.  That is a

8    statement of intent that is admissible under 803(3) as an

9    exception to the hearsay rule.

10         I think there are at least four reasons why this email

11   and the prior exhibit are admissible both for their truth and

12   not for their truth.  One is that Brian Sweet has already

13   testified that it was part of his job responsibilities and we

14   have seen throughout the exhibits, that it was shared among

15   other personnel of KPMG, to update each other on information

16   that they learned from their PCAOB contacts.  He's doing that

17   by email.  That's a regular course of business, a business

18   record.  I'm not saying that every email is admissible as a

19   business record.

20         The government specifically elicited from him that it

21   was part of his job duties as he understood it to keep in

22   contact with people and keeping an open ear.  And we have seen

23   throughout all these that it was part of his business practice

24   to update people about what he learned via email.  It's a

25   business record and so is the prior exhibit.

1        There is the same element of intent issue.  There are

2   also a couple of nonhearsay purposes, multiple nonhearsay

3   purposes.  One is that Brian Sweet testified that on January

4   9th he received two pieces of confidential information that he

5   attributed to Cindy Holder.  One was a bunch of information

6   about the banking inspections group.  That is the exhibit that

7   we have looked at which is Holder's notes.  He also claims that

8   he received from Cindy Holder the preliminary inspections list

9   for 2017.  This directly rebuts the testimony elicited from

10  this witness by the government about the confidentiality of

11  information that Cindy Holder was giving to him that she

12  claimed she offered Jeff Wada.

13        THE COURT:  How is it rebutted?

14        MR. WEDDLE:  The prosecutor just argued that because

15  Helen Munter announced something to the SEC reviewing partners,

16  that is public, it is not confidential information.  Mr. Sweet

17  testified it was confidential information.

18        MS. KRAMER:  To be clear, your Honor, this email says

19  that Helen Munter announced the concept to the SEC reviewing

20  partners, not the identity of every single staff member at the

21  PCAOB who was going to be working on the banking inspection.

22        MR. WEDDLE:  That argument goes to weight, not

23  admissibility.  In fact, in evidence are notes of a meeting

24  between Steve Schindler and KPMG leadership on January 24,

25  2017, in which item number 1 on the agenda was for Steve

1    Schindler to announce the creation of this group.  He thought

2    it was newsworthy enough to put it on item number 1 of his

3    meeting with leadership.  And this shows that there is a real

4    question about what is and isn't confidential, which we have

5    been arguing from the beginning of this case, your Honor.

6          In addition, as we said before the lunch break, the

7    fact that everyone was sharing information about confidential

8    or not confidential or who knows what the various levels of

9    confidentiality are for the information among themselves, as if

10   it's no big deal, is exculpatory evidence that tends to rebut

11   the assertion that the only communications here of confidential

12   information were among the circle of trust in the criminal

13   conspiracy.  This directly rebuts that.

14         And, your Honor, it directly rebuts the assertion that

15   EC9 means what it says.  When Helen Munter gives this speech to

16   the SEC reviewing partners and makes this announcement, I will

17   bet -- we probably shouldn't make bets on the record.  My guess

18   is there is no board resolution from the PCAOB board

19   authorizing Helen Munter to disclose that fact to that meeting,

20   which is what would be required under the district terms of

21   EC9, your Honor.

22         MS. KRAMER:  That is ludicrous, for the record.  I

23   don't know if your Honor needs to hear anything else from us on

24   this.

25         MS. MERMELSTEIN:  She was the head of inspections.

1          MR. COOK:  In any case, the statement here that Ms.

2   Kramer just described --

3          MS. MERMELSTEIN:  Please permit Ms. Kramer to finish.

4          MS. KRAMER:  Either this, as Mr. Weddle and Mr. Cook

5   initially argued, is not offered for its truth but offered to

6   show the sharing of additional confidential information, as

7   this is confidential or this is not confidential.  It is not.

8   It is a recitation of Helen Munter publicly announcing to

9   KPMG's SEC reviewing partners the concept of something.  The

10  iterative disclosures of the details of that were beyond the

11  concept.  It does not refute or rebut the confidentiality of

12  that.

13         THE COURT:  Why shouldn't it come in to show the fact

14  of sharing information in that Sweet is saying, I need to get

15  together with Bob to get details?

16         MS. KRAMER:  To the extent that is a statement of

17  Sweet's intent at this point, it has been the subject of

18  probably at least an hour of his testimony and dozens of

19  documents and is cumulative and in violation of 403 at this

20  point.  Because of the fact that you don't really get to the

21  truth of the matter asserted in the underlying email.  And this

22  has already been beaten to death.  He admitted it on direct and

23  admitted it on cross numerous times.

24         MR. WEDDLE:  He admitted on direct that this was

25  confidential information that he got from Cindy Holder.

1          MS. KRAMER:  He did not.

2          THE COURT:  I'll allow it for the nonhearsay purposes.

3          (Continued on next page)

1          (In open court)

2          THE COURT:  We are talking about 1635, right?

3          MR. COOK:  Correct.

4          THE COURT:  1635 is received for the limited purpose.

5          (Defendant's Exhibit 1635 received in evidence)

6   BY MR. COOK:

7   Q.  Sir, do you see Exhibit 1635 on your screen?

8   A.  Yes.

9   Q.  If I could direct your attention to the first paragraph in

10  the email at the top.  That's from you to Cindy Holder,

11  correct?

12  A.  Yes.

13  Q.  December 12, 2016?

14  A.  Yes.

15  Q.  Could you read those two sentences, please.

16  A.  "Thanks for forward.  Tom was prepping with her for this

17  session last week and she announced it to him too, so it's

18  officially public."

19  Q.  The last sentence.

20  A.  "I need to get together with Bob to get the details, but it

21  will likely be in Jan."

22  Q.  Details of what?  We can scroll down to the bottom of the

23  document.

24  A.  This is referring to this FS pooled team concept.

25  Q.  Who is Helen Munter?

1   A.   Helen Munter was a director of inspections, the division of

2   registration and inspections at the PCAOB.

3   Q.   She had just announced the pool team concept here?

4   A.   Yes.

5   Q.   If we could go back up to the first email again.  You were

6   telling Cindy Holder that you were going to get together with

7   Bob Ross to get the details concerning that announcement,

8   correct?

9   A.   Yes.

10  Q.   That's what you were referring to, what you were intending

11  to do, get the details about the announcement that Ms. Munter

12  made?

13  A.   Yes.

14  Q.   "Bob" here is Bob Ross, then an associate director at the

15  PCAOB?

16  A.   Yes.

17  Q.   Thank you.  Let's take a look at Defense Exhibit 1462.

18  Take a look at the email as we scroll it down your screen.

19  Tell me if this is an email between you and Bob Ross in January

20  2017.

21  A.   Yes, it is.

22            MR. COOK:  I offer 1462.

23            MS. KRAMER:  No objection.

24            THE COURT:  Received.

25            (Defendant's Exhibit 1462 received in evidence)

1    Q.  Discussing a lunch meeting with Mr. Ross?

2    A.  Yes.

3    Q.  Did that lunch meeting take place?

4    A.  Did you say when or where?

5    Q.  Did it take place?

6    A.  Did it take place?  Yes.

7    Q.  At the usual Bill's?

8    A.  Bill's Burger, yes.

9    Q.  Is that where it happened?

10   A.  Yes.  To the best of my recollection, yes.

11   Q.  On January 9, 2017?

12   A.  Yes.

13   Q.  Take a look at Defense Exhibit 1597.  Sir, if you take a

14   look at the email on top, is this an email from you to Joe

15   Lynch at KPMG in August of 2016?

16   A.  The email at the top, yes.

17   Q.  Who is Bob Stofflet?

18   A.  Barb Stofflet was an inspections leader at the PCAOB.

19   Q.  Did you say "Barb," as in "Barbara"?

20   A.  Yes.

21   Q.  At the time of this email, was she -- withdrawn.  On August

22   1, 2016, to your knowledge, was she an employee of PCAOB?

23   A.  I remember she left the PCAOB at some point.  It looks like

24   she was still employed at the PCAOB at this time.

25   Q.  Was Barb Stofflet one of your sources of confidential PCAOB

1  information?

2  A.  Not to me, no.

3  Q.  She was a source for Joe Lynch though?

4  A.  I don't remember the context.  Is it possible to look down

5  at the rest of this email?  I don't know.  Looking at the email

6  at the bottom, she is certainly giving insight to Joe.

7  Q.  Let me stop you there.  I don't want you to comment on the

8  email.  It is not in evidence.  My question is do you know if

9  Barb Stofflet is a source of confidential PCAOB information,

10  whether for you or for somebody else?

11  A.  Not for me.  I guess I don't know to what extent she and

12  Joe Lynch communicated.

13  Q.  It would not surprise you if she did provide information to

14  Joe Lynch, based on your understanding of their relationship?

15         MS. KRAMER:  Objection: speculation.

16         THE COURT:  Sustained.

17  Q.  Take a look next as Defense Exhibit 1600.  If you look at

18  the email on top, Mr. Sweet, this an email from you to David

19  Britt and Jennifer Lauer in October of 2016?

20  A.  Yes, it is.  I'm sorry.  What date?  It's from October 24,

21  2016, yes, between David, Jen Lauer, and myself, yes.

22  Q.  Earlier in the thread there are other communications

23  involving you and Hector Santana, also of PCAOB, correct?

24  A.  Hector was a partner in KPMG.  Is that what you were

25  asking?

1    Q.  I'm sorry.  The email thread includes communications

2    between you and Hector Santana of KPMG?

3    A.  Yes.  I see one there, yes.

4              MR. COOK:  I offer defense 1600.

5              MS. KRAMER:  Objection: hearsay and 403.

6              THE COURT:  Sustained.

7    Q.  If we could take a look at Defense Exhibit 1008.  Sir, I am

8    not going to scroll through all of these, but I'll represent to

9    you that Defense Exhibit 1008 includes what has already been

10   admitted into evidence as Government Exhibit 404 with the

11   exception of what begins at page 61 of the document.  So if we

12   could scroll forward to that portion.  It's a big document and

13   takes a while.  There we go.  If you could take a look at what

14   is on your screen, sir, and tell me, first of all, was Verizon

15   a carrier that you were a subscriber of for a cell phone?

16   A.  Yes.

17   Q.  Was that the case in February of 2016?

18   A.  Yes.

19   Q.  If we scroll forward from this point.  Stop right there,

20   please.  Thank you.  You will see that there is a statement at

21   the bottom of the document regarding Kenneth Blair.  Who is

22   Kenneth Blair?

23   A.  He is my father-in-law.

24   Q.  There is a phone number there.  Do you see the number?

25   A.  Yes.

1    Q.  Do you recognize the number?

2    A.  Yes.

3    Q.  What is it?

4    A.  It is my cell phone number.

5    Q.  Do these appear to be your cell phone records?

6    A.  Yes.

7            MR. COOK:  Your Honor, I offer defense 1008.

8            MS. KRAMER:  No objection.

9            THE COURT:  Received.

10           (Defendant's Exhibit 1008 received in evidence)

11           MR. COOK:  We can take that down.  Thank you.

12   Q.  Sir, you testified on direct that you are familiar about

13   the inspections information system, or IIS, of PCAOB?

14   A.  Yes.  I used it when I was at PCAOB.

15   Q.  That is the repository for documents relating to PCAOB

16   inspections, is that right?

17   A.  Yes.

18   Q.  Did you receive training on how to use IIS when you were at

19   PCAOB?

20   A.  Yes.  I believe during its initial roll-out I may have,

21   yes.

22   Q.  I'm going to show you what has been marked for

23   identification as Defendant's Exhibit 1439.  I will ask you to

24   take a look at the document.  It's a long document.  Tell me as

25   we scroll through it if it's a document that you recognize from

1   your days at PCAOB.  Sir, do you recognize this as a user guide

2   for the PCAOB's inspections information system?

3   A.  That's what it says on the front, yes.

4   Q.  Do you recognize it, though, from when you were an employee

5   at PCAOB?

6   A.  I see it's dated 2012.  It was so long ago, I don't

7   remember, sir.  I was at the PCAOB then.

8   Q.  That's fair enough.  I'm just asking you if you recognize

9   the document as something that you recall seeing or relying

10  upon while you were working there.

11  A.  I don't remember seeing this one in particular.

12  Q.  Thank you.  If we could take a look at Government Exhibit

13  655.  And if we could highlight the portion in black ink at the

14  top right-hand portion of the document.  This is in evidence.

15          Sir, I want to make sure that I didn't misspeak

16  earlier.  Is it your testimony that the portion of the document

17  that is displayed on your screen, which is the black text on

18  the upper right-hand portion of Government Exhibit 655, is that

19  what you contend to be the preliminary inspection list that you

20  received from Cindy Holder?

21  A.  Yes.

22  Q.  Let's take a look at Government Exhibit 1444.  You said

23  this is a photograph that you took of Cindy Holder's notes,

24  correct?

25  A.  Yes.

1  Q.  It is your recollection that you deleted this photograph in

2  February of 2017?

3  A.  Yes, I did.

4  Q.  After you deleted it, isn't it correct that you did not see

5  it again until January of 2019 at a meeting with the

6  government?

7  A.  I don't remember the first date or the date that this was

8  first shown, but it was likely around then.

9  Q.  It was this year, 2019, correct?

10  A.  Again, maybe it was December.  I don't remember the

11  specific date, sir.  It was, yes, fairly recent I think.

12  Q.  Did you say fairly recently?

13  A.  I think, yes.

14  Q.  Do you recall that you were shown this photo and then asked

15  about it in a meeting with the prosecution?

16  A.  Yes.

17  Q.  You weren't asked about it, you weren't shown it in any of

18  your earlier meetings with the government prior to this

19  calendar year?

20  A.  Again, I don't remember the specific date, but yes.

21  Q.  Before that, you had told the government that on January

22  9th Cynthia Holder told you that she had received a preliminary

23  list of inspections, correct?

24  A.  Yes.

25  Q.  You did not, prior to seeing this photo, say that Cindy

1   Holder told you about the new banking inspections group, or

2   BIG, right?  Do you want me to rephrase the question?

3   A.  Yes, please.

4   Q.  Prior to seeing this photograph that was shown to you by

5   the government recently, you never told the government that

6   Cynthia Holder told you about the banking information group?

7   A.  I don't remember.  But I do remember this document.  Once

8   it was recovered and I had a chance to look at it, it certainly

9   refreshed my recollection on the full extent of my conversation

10   with Cindy on January 9, 2017.

11   Q.  So it is your testimony that prior to seeing this document

12   in the recent past, you didn't recall that Cindy had told you

13   about the banking information group, is that right?

14   A.  That's right, yes.

15   Q.  Isn't it true that before you were shown this photograph,

16   you told the prosecutors, and before you pled guilty, that Bob

17   Ross gave you the information about the new banking information

18   group?

19   A.  I remember telling them, yes, that Bob had told me about

20   this banking inspections group, yes.  I remember also telling

21   him that Cindy's notes were in red and that I had taken a

22   picture of it and deleted it.  That's all what I said, sir.

23   Q.  So you said that Bob Ross told you about the banking

24   information group, right?  And speaking of the time period

25   before this photo was recovered, it is your testimony that you

1    told them about a photograph you took with Cindy Holder's notes

2    in red ink, is that your testimony?

3    A.   Mm-hm.

4    Q.   But you never told them that the information contained in

5    those notes, in that photograph that hadn't been recovered yet,

6    was actually the banking information group?

7    A.   Just to be totally clear, I remember having conversation

8    with Bob Ross about the existence of this banking inspections

9    group and that the PCAOB was thinking about creating it or

10   going to create it, something to that extent.  The specific

11   names of the inspectors that are included on this document,

12   that was not something that Bob had shared with me, other than

13   the fact that he was going to be a part of this banking

14   inspections group.  I did not have the full list of every

15   person's name of who was going to be in there and what position

16   and that David Marjanoff was going to be the leader of that

17   group and all of that.  That came from Cindy's notes from her

18   conversation with Jeff Wada that day.

19   Q.   What you just testified to, that all the names of the

20   inspectors in this banking information group, all of that

21   information that you just talked about just now, none of that

22   was disclosed to the government prior to them putting this

23   photograph in front of you, isn't that right?

24   A.   Yes, I think that's probably right.  I was certainly more

25   focused on January 9th, the fact that we had this preliminary

1  listing of issuers and that that was the confidential

2  information that day that I was focused on.

3  Q.  Sir, before the break we were talking about your

4  cooperation agreement.  We were talking about moving

5  chronologically through the meetings that you had with the

6  government and the various disclosures that you made at those

7  meetings.  When we left this topic, we were talking about

8  meetings that took place in December of 2018.  That is just to

9  orient you where we are.

10       Do you remember that these meetings in December of

11  2018 took place over three successive business days?  Do you

12  recall that?

13  A.  I believe so, yes.

14  Q.  There was a weekend.  There was a Thursday, Friday, and

15  then a Monday, or there may have been a Friday and then a

16  Monday and Tuesday.  But there was a weekend dividing it,

17  right?

18  A.  Yes, I believe so.

19  Q.  They were asking you, the government, the agents, asking

20  you about the contents of a hard drive, one of your hard

21  drives, correct?

22  A.  Yes, the hard drive that I had used to copy all this

23  information when at the PCAOB.

24  Q.  Exactly.  The same hard drive that you had used to

25  copy/restore stolen PWC information that you brought to PCAOB,

1   right?

2   A.   Yes.

3   Q.   The same hard drive that I used to put PCAOB information

4   onto, correct?

5   A.   Yes.

6   Q.   And that you brought with you to KPMG?

7   A.   Yes.

8   Q.   All on the same hard drive?

9   A.   Right.

10  Q.   That hard drive also contained a lot of your tax

11  information?

12  A.   Yes.

13  Q.   Just prior to those meetings, you had learned that

14  defendants in this case had subpoenaed some of your documents,

15  documents from your banks, correct?

16  A.   Yes.

17  Q.   As a result, you and the prosecution were going through the

18  records on the hard drive to see what it is they might reveal,

19  right?

20  A.   Yes.

21  Q.   The first few days, first two days of those meetings is

22  when you disclosed those three lies that we talked about: the

23  use of your father's bank statement, the gift letter, and the

24  W-2 PWC characterization of your former job, correct?

25  A.   Yes, it was part of that December meeting.  I don't

1  remember which day specifically.

2  Q.  Fair enough.  But when you disclosed those issues to the

3  government, you characterized them as lies, didn't you?

4  A.  Yes, they were lies.

5  Q.  It wasn't something that you had forgotten about and it

6  suddenly came to your recollection; you lied about it?

7  A.  I'm sorry.  I misunderstood you, sir.  What I meant is they

8  were lies in connection with when I made that application for a

9  mortgage with the bank.  They were very much lies.  I knew it

10  wasn't a gift letter.  Knew the characterization of the W-2 was

11  a lie.  I knew that characterizing representing my

12  father-in-law -- my father's account was a lie.  That is right.

13  Q.  So the lie that you described to the government, it is your

14  testimony, was not the lie in not disclosing it when asked but

15  the original lie when you made these false representations back

16  in 2011?

17  A.  That's right.

18  Q.  That weekend, the weekend that separated the two meetings,

19  the three meetings, you reviewed these documents on your hard

20  drive?

21  A.  Yes.

22  Q.  Then, on Monday, December 17th, two months ago, you told

23  the government about more misconduct?

24  A.  Yes.

25  Q.  That was after reviewing your hard drive some more?

1   A.  Yes, sir.

2   Q.  This was the first time that you revealed this additional

3   bad conduct?

4   A.  Yes.

5   Q.  This was more than a year after they had asked you to

6   disclose all of this criminal activity, correct?

7   A.  Yes.  This mortgage loan was from 2011, and I hadn't been

8   thinking about it during the initial proffer sessions.

9   Q.  On December 17, 2018, you told the government about a cabin

10  that you bought, I think you characterized it as a cabin, in

11  Shaver Lake?

12  A.  Yes.

13  Q.  Shaver Lake is near where you live in Fresno?

14  A.  Yes, sir.

15  Q.  Let's take a look at Defendant's Exhibit 1626 for

16  identification.  Sir, does this photograph depict the cabin

17  that you talked about, that we were talking about?

18  A.  Yes.

19          MR. COOK:  I offer 1626.

20          THE COURT:  Received.

21          (Defendant's Exhibit 1626 received in evidence)

22  Q.  You bought this cabin for a million dollars?

23  A.  Around there, yes.

24  Q.  When you were telling the government about the cabin, you

25  told them that when you initially were making the purchase, it

1    was your intent to use the cabin as an investment property?

2    A.   Yes.

3    Q.   This goes back to our 1031 exchange conversation from

4    earlier.  You were selling some rental properties and you had

5    some money that you had earned from that, correct?

6    A.   Yes.

7    Q.   Were those apartments?

8    A.   Yes.

9    Q.   Apartments in Fresno?

10   A.   Yes.

11   Q.   So you made some money on the sale of those apartments, and

12   you wanted to put that into a like kind investment?

13   A.   Yes.

14   Q.   Another rental property?

15   A.   Yes.

16   Q.   You told the government that this cabin, the Shaver Lake

17   cabin that you were purchasing, when you originally purchased

18   it, it was with the intent to rent it out so it would be a

19   legitimate 1031 exchange?

20   A.   That was our original intent, yes.

21   Q.   Then, within six months or so you concluded that you

22   weren't going to rent it out, it was going to be just a second

23   home?

24   A.   That's right.

25   Q.   Once you made that decision, once you concluded that it

1    would not be a legitimate 1031, you would have been obligated

2    to unwind that transaction and pay the taxes that were owed on

3    the same of those apartments, right?

4    A.   Yes.   The whole thing has to be unwound, yes.

5    Q.   Did you ever actually collect any rent from any tenant at

6    the cabin?

7    A.   No, I did not.

8    Q.   Then you went on to explain to the government when you were

9    telling them about this 1031 issue that you lied on your taxes

10   because you in fact did not unwind it, you represented that it

11   was in fact an investment property, right?

12   A.   That's the way I represented it on my tax returns, and I

13   knew that was wrong, yes.

14   Q.   That was for your 2016 taxes?

15   A.   Yes.

16   Q.   In addition to the 1031 issue and saving money on the sale

17   of the apartments, the reason why it benefited you to have this

18   identified as an investment property is because you could

19   deduct expenses?

20   A.   That's right.

21   Q.   Furnishings and renovations, that type of thing?

22   A.   Yes, depreciation, taxes, interest.

23   Q.   All of that would be deductible if it were a legitimate

24   investment property?

25   A.   Right.

1    Q.  You said nothing to them during this meeting in December

2    2018 about filing false 2017 returns?

3    A.  I didn't, no.

4    Q.  I'm sorry?

5    A.  No, I didn't.

6    Q.  You only disclosed the 2016 return?

7    A.  Yes.

8    Q.  You had filed your 2017 returns at that point, right?

9    A.  Yes, I had.

10   Q.  That wasn't something that you simply forgot.  You had just

11   done it a couple of months ago.

12   A.  I had filled out the information for that return in March,

13   so it would have been more than a couple of months.  But I did

14   file them in October, yes.

15   Q.  You filed them in October?

16   A.  Yes.

17   Q.  The meeting was in December?

18   A.  Yes.

19   Q.  So this was not one of the issues that you explained

20   before, where it was so long in the past you just didn't think

21   of it; this was front of mind and you deliberately omitted it?

22   A.  It wasn't deliberate.  I was focused on the fact that I had

23   sold the cabin in 2017, so I was thinking, well, it's all been

24   unwound in 2017 so it's one year or another.  I remember

25   leaving that conversation with them and telling them I had to

1   go back and check my 2017 returns in order to go back and work

2   out what needed to be done.

3           MR. COOK:  May I have a moment, your Honor?

4           THE COURT:  Yes.

5   Q.  At this point in your conversation with the government when

6   you revealed all of this stuff to them, did they suggest to

7   you, tell you that your cooperation agreement was going to be

8   withdrawn?

9   A.  No, they did not.

10  Q.  Did they tell you that they did not believe they could

11  trust you to tell the truth at trial and that you would not be

12  testifying?

13  A.  No, they did not.

14  Q.  You met with the government again in January 2019, just a

15  couple of months ago, correct?

16  A.  Yes.

17  Q.  This time it was by phone, and I think you had, was it a

18  Webex presentation?

19  A.  Yes.

20  Q.  Correct me if I'm wrong.  Webex would allow you to talk

21  with them on the phone, but on your computer screen you could

22  share documents so you could both look at the same document?

23  A.  Yes.

24  Q.  Is that what you were doing?

25  A.  Yes.

1   Q.  It was during that meeting that you acknowledged additional

2   tax fraud in connection with the Shaver Lake cabin?

3   A.  Yes.

4   Q.  Stuff that you didn't reveal in December?

5   A.  Yes.

6   Q.  This time you were acknowledging that you had declared

7   rental income from the Shaver Lake cabin from 2017 taxes as you

8   had done in 2016 that didn't exist?

9   A.  Right.

10  Q.  On this occasion you did acknowledge that you did it

11  deliberately because you were afraid that they would pull the

12  cooperation agreement from you?

13  A.  I don't remember which conversation that came up, but I did

14  explain to them, yes.

15  Q.  You also told them, you acknowledged that you knew that the

16  cooperation agreement prohibited illegal tax conduct?

17  A.  Yes.

18  Q.  So not only affirmative conduct, but also your cooperation

19  agreement prohibited providing incomplete information?

20  A.  Yes.

21              (Continued on next page)

22

23

24

25

1    Q.  And they didn't withdraw the cooperation agreement at that

2    point either, did they?

3    A.  No.

4    Q.  They didn't tell you that you couldn't be trusted to

5    testify?

6    A.  No.

7    Q.  But they did add a benefit to your agreement, didn't they,

8    when they amended it?

9         MS. KRAMER:  Objection, your Honor.

10         THE COURT:  Sustained.

11   BY MR. COOK:

12   Q.  Did the government amend your cooperation agreement after

13   that conversation?

14   A.  My cooperation agreement was amended so that I am also

15   obligated to amend my 2017 return as part of fixing all the

16   other tax returns that I had previously mentioned to them so --

17   I just was going to say just to be clear, sir, the amendment

18   makes it very clear that there is no protection as it relates

19   to my disclosure of all of these tax wrongdoings.  It

20   specifically states that there is -- there is not a benefit as

21   a result of that.

22   Q.  It's your understanding that there was no benefit conveyed

23   to you in connection with you telling them about this tax

24   fraud?

25   A.  I am sure I'm going to get the words of that cooperation

1  agreement amendment wrong, or at least not stated as precisely

2  that it needs to be, but it explicitly states, to my

3  understanding, that there is -- that the government does -- it

4  does not protect me from future charges that may be filed as it

5  relates to my tax crimes -- or, excuse me, the tax wrongdoing

6  that I have disclosed to them, that I told them about.  What it

7  does say is that in connection with my cooperation agreement,

8  that I am also agreeing to amend my 2017 tax returns.

9  Q.  Let's take a look at Government Exhibit 3522-36, in

10  evidence.

11          Sir, if you would just take a look at this document

12  and confirm that this is in fact the amendment to your

13  cooperation agreement?

14          (Pause)

15          Is that your signature?

16  A.  Yes, it is.

17          MR. COOK:  Would you go over to the previous page,

18  please.  I am just looking for the paragraph.

19  Q.  Is that your amended cooperation agreement?

20  A.  Yes.

21          MR. COOK:  If we could highlight the second paragraph.

22  Q.  Could you read that for me, please, the first sentence.

23  A.  "In addition to the understandings set forth in the

24  agreement, the parties agree that if the defendant fully

25  complies with the understandings specified in this agreement,

1    he will not be prosecuted criminally by this office for making

2    false statements, and causing false statements to be made, to a

3    mortgage lender in or about 2011 in an effort to secure a

4    mortgage, to the extent that he has disclosed such conduct to

5    this office as of the date of this letter."

6    Q.   That language was not in your original cooperation

7    agreement, was it?

8    A.   For the -- no.

9    Q.   You had not disclosed to them those three lies from the

10   2011 mortgage statement, right?

11   A.   That's right.

12   Q.   Then you disclosed it to them, and as result you got

13   immunity for them, you got a pass for them, right?

14   A.   Yes.

15          I thought you were referring earlier, sir, to the tax

16   stuff, which is in the next sentence.

17   Q.   Fair enough.

18          And to be completely accurate, the office, the U.S.

19   Attorney's Office, has not agreed not to prosecute you for

20   criminal tax violations, right?  They could prosecute you for

21   tax violations at any time; is that your understanding?

22   A.   Yeah.

23   Q.   That was the same as the original agreement?

24   A.   Let me read it one more time to be absolutely certain.  "It

25   is understood that this office cannot and does not agree not to

1    prosecute the defendant for criminal tax violations, if any."

2    Q.   That was the same understanding you had from the original

3    agreement, right?

4    A.   Yes.

5    Q.   So the change here, the benefit that you received in this

6    amendment, was you got a pass for the 2011 fraud?

7              MS. KRAMER:  Objection.  Mischaracterizes the

8    evidence.

9              THE COURT:  Sustained.

10             MR. COOK:  Can we go to the second page -- sorry, just

11    the first page of the document.  Highlight the date.

12    BY MR. COOK:

13    Q.   The document is dated the day before this trial began,

14    right?

15    A.   Yes.

16    Q.   You still had not disclosed all of your criminal activity

17    as of this date, isn't that right?

18    A.   Yes.

19    Q.   You met with the government this past Sunday, on

20    February 17th?

21    A.   Yes.

22    Q.   Two days before you took the witness stand and after this

23    trial had already started, right?

24    A.   Yes.

25    Q.   You knew, again, that the defendants had subpoenaed KPMG

1    and Turbo Tax for your tax records, right?

2    A.   Yes.

3    Q.   And so faced with that knowledge, you then went to the

4    government and admitted, for the first time, that in March 2018

5    you input the same false claims about the Shaver Lake property

6    again for the specific purpose of keeping the government from

7    finding out about it?

8    A.   I don't think the sequencing of that is quite correct, but

9    that it is correct that I, as we continued to talk through the

10   cabin, I explained to them not only that it was incorrect from

11   my 1031 exchange correction perspective and that the 2016 were

12   incorrect, but that the Schedule E on -- for 2017, the income,

13   the expenses, that all of that was incorrect as well.

14   Q.   And you told the government that you made these false

15   statements on your 2017 return in order to hide from the

16   prosecutors the fact that you had made similar false statements

17   on your previous returns?

18   A.   No.  It's not that -- well, what I said was that I was

19   scared that by telling them about this in two-thousand --

20   excuse me, in March, when I realized this, that I would be in

21   violation of my cooperation agreement because it was not

22   something I had previously told them, and I thought I could

23   just fix this when I amended the rest of my returns, because in

24   order to correct this, I've got to unwind the transaction for

25   2015, which means cleaning up the 2017, and that I needed to

```
 1   get real tax professional help because this is so far beyond my
 2   skill set.
 3   Q.  You have been doing your taxes on your own since 2012?
 4   A.  No, not -- KPMG did my taxes for 2015 and 2016.
 5   Q.  Fair enough.  When you were working for the PCAOB, you did
 6   your own taxes?
 7   A.  Yes.
 8   Q.  You are a Certified Public Accountant, correct?
 9   A.  Not anymore, sir.
10   Q.  You were at the time you did the taxes?
11   A.  Back then, yes.
12   Q.  And notwithstanding the loss of your license, you retained
13   the knowledge that you had before as a CPA, correct?
14   A.  Yeah.  I never worked in taxes, just to be clear, but,
15   yeah, I was a monitor.
16   Q.  I just want to make sure we have your testimony clear.
17            On February 17, 2019, when you met with the
18   government, you told them that you made the same false claims
19   again about the Shaver Lake cabin to avoid the government
20   learning about it and you losing your cooperation agreement;
21   that's what you told them, right?
22   A.  That's what I was scared about, yes.
23   Q.  That's what you told them, right?
24   A.  Yes.
25   Q.  What is Schedule E?
```

1   A.  Schedule E is one of the tax schedules.

2   Q.  Does Schedule E -- what information is Schedule E supposed

3   to reflect in a tax return?

4   A.  Information I guess in connection with I know real estate

5   rentals, that's where you include the rental activity.

6   Q.  But when you testified a few moments ago that the 2017

7   Schedule E was incorrect, would it be more accurate to say that

8   it was deliberately false?

9   A.  Yes, that's right.

10  Q.  Now, when you made these disclosures a couple of days ago,

11  at that point did the government say that's it, we've had

12  enough, cooperation agreement, tearing it up?  Did they tell

13  you that, or did they put you on the witness stand?

14              MS. KRAMER:  Objection.  Argumentative.

15              THE COURT:  Sustained.

16              The first part is fine.

17  BY MR. COOK:

18  Q.  You began your testimony in this case on Tuesday,

19  February 19th, right?

20  A.  Yes.

21  Q.  And you took an oath and you testified all day long that

22  day?

23  A.  Yes.

24  Q.  And then you met with the government that evening?

25  A.  Yes.

1    Q.   Who requested that meeting?

2    A.   The U.S. Attorney's Office.

3    Q.   And at that meeting you again disclosed more criminal

4    conduct?

5    A.   In connection with the same issue, explaining the other

6    implications of it, yes.

7    Q.   You explained to the government that you had for 2016 and

8    2017 identified your wife on your tax returns as a real estate

9    professional, right?

10   A.   Right.

11   Q.   And in fact, you've -- do you prepare the tax returns

12   primarily for your family?

13   A.   In the years that I did them, yes.

14   Q.   And -- well, even when they were done by someone else, you

15   provided the backup documentation so they could be done?

16   A.   Yes.

17   Q.   You were the -- you had primary responsibility for that?

18   A.   Yes.

19   Q.   And even prior to 2016 and 2017, you had identified your

20   wife on your tax returns as a real estate professional?

21   A.   Yes.

22   Q.   From 2009 all the way through 2017, correct?

23   A.   Yes.

24   Q.   And you told the government yesterday, the day before

25   yesterday, that the designation of your wife as a real estate

1  professional for 2016 and 2017 was false, right?

2  A.  I know it is wrong in those two years, sir, yes.

3  Q.  Because you told the government she didn't qualify because

4  you were counting the Shaver Lake cabin as an investment

5  property, and since that was no longer an investment property,

6  you told the government she wouldn't qualify?

7  A.  That's right.

8  Q.  Your cooperation agreement, to your knowledge, still in

9  place?

10  A.  Yes.

11  Q.  You've had rental properties since 2008, right?

12  A.  Yes.

13  Q.  And since 2009, as I think you testified, since 2009, you

14  have designated your wife as this real estate professional,

15  right?

16  A.  I don't remember if it has been every year but very likely.

17  Q.  Very likely every year?

18  A.  Yes.

19  Q.  And just to be clear, this designation and the implications

20  of that designation, "real estate professional," has saved you

21  tens of thousands of dollars in taxes?

22  A.  Yes.

23  Q.  Since late 2009, you've used the services of a property

24  management company in connection with all of your rental

25  properties?

1    A.  Not all of them but, yes.

2    Q.  Well, that property management company is responsible for

3    all aspects of management of those properties, correct?

4    A.  No.

5    Q.  One of those properties that you retained, is it Fresno

6    Management Services, is that the name of the company?

7    A.  Yes, the same company, yes.

8    Q.  One of the properties in which you engaged the services of

9    this company was located on El Paso Avenue in Fresno?

10   A.  Yes.

11   Q.  Take a look at what's been marked for identification as

12   Defense Exhibit 1550.

13           If you could take a look at this document and tell me

14   if this is the contract you signed with Fresno Management

15   Company in 2009.

16   A.  Would you mind flipping through the pages, please.

17           (Pause)

18           Yes.

19   Q.  That's it?  That's the contract?

20   A.  It has been almost ten years since I have seen this, but,

21   yes, I recognize my signature.

22   Q.  You signed similar contracts with the same company over the

23   years, haven't you?

24   A.  Yes.

25   Q.  And those contracts all have the same terms and conditions

1    as to what services the company is going to provide?

2    A.   Yes.

3              MR. COOK:  If you could scroll back to the first page.

4              And if we can call out paragraph 3, please.

5    Q.   Could you read paragraph 3 of the contract?

6    A.   "Management Services:  Agent will provide the following

7    services" --

8    Q.   My apologies.

9              MR. COOK:  Your Honor, I move 1550 in evidence.

10             MS. KRAMER:  Objection.  Relevance.  403.

11             MR. COOK:  Can I be heard, your Honor?

12             MS. KRAMER:  608.

13             THE COURT:  Overruled.  1550 is received.

14             (Defendant's Exhibit 1550 received in evidence)

15   BY MR. COOK:

16   Q.   Can you read that paragraph 3, please, sir, out loud.

17   A.   Out loud?  OK.

18   Q.   Thank you.

19   A.   "Management Services:  Agent will provide the following

20   services in the name of and on behalf of the owner, and the

21   owner hereby grants agent the authority and powers required to

22   perform these services."

23   Q.   Let's go down to the next page and talk about -- let's take

24   a look at the services that they agree to provide.

25             Subsection B includes lease negotiations, correct?

 1   A.   Yes.

 2   Q.   "The agent shall handle all lease negotiations with

 3   prospective tenants with respect to leases," right?

 4   A.   Yes, that's what's in these standard terms, yes.

 5   Q.   OK.  And then Subsection C:  "Agent shall advertise the

 6   property for rent, signs, participate in all paid advertising

 7   costs," etc.?

 8   A.   Yes.

 9   Q.   That was part of their duties?

10   A.   That was one of the things they did, yes.

11   Q.   And then Subsection D, the collection of rents.  They were

12   responsible for collecting rent from the property, correct?

13   A.   Yes.

14   Q.   Subsection E -- I'm summarizing here, but let me know if it

15   is accurate -- they were responsible for providing you with

16   account statements and balances, right?

17   A.   Yes, they would.

18   Q.   They would take care of maintenance and repairs?

19   A.   Some maintenance and repairs.

20   Q.   Take a look at the sentence that begins with "The agent"

21   about halfway down the paragraph on the right side.

22   A.   Yes.

23   Q.   It says, "The agent is authorized to conduct any and all

24   repairs need in the amount of $100 or less per occurrence."

25        Do you see that?

1    A.  Yes.

2    Q.  If it was more expensive than that, then they would take

3    care of it but they had to get approval from you, correct?

4    A.  No.  They would notify us of the repair, and then we would

5    decide how to proceed with that, whether or not it was a repair

6    we wanted to do on our own, whether we wanted to engage our own

7    contractors, plumbers, electricians, or if we wanted them to

8    proceed with the repair.

9    Q.  So you had the option of doing it yourself if you wanted?

10   A.  That's right.

11   Q.  But they would do it if you wanted them to?

12   A.  If we said yes.

13   Q.  Look at the next section.

14          Now, they were also responsible for sending you

15   checks, right?  They brought in the rent and then they would

16   send you the proceed, correct?

17   A.  Yes.

18   Q.  When they sent you checks, they didn't send the checks to

19   your wife's name, they sent them to you, correct?

20   A.  Yeah, to our joint account but, sure.

21   Q.  Did you say it was a joint account that they sent the

22   checks to?

23   A.  Yes, my wife and my account.

24   Q.  Sir, didn't you have an account at EECU?

25   A.  If you're talking about this property, 342 El Paso, which

1    is this contract, the rents, the money that they collected went

2    to my account with my wife.

3    Q.  And for your other rental properties?

4    A.  For the rental property, there had been rental properties

5    that we've co-owned with two of our high school friends, and

6    those -- that account, we have a shared account with them.

7    Q.  You have your own accounts at EECU?

8    A.  No, it is a joint account with them.

9    Q.  With your friends?

10   A.  Yes.

11   Q.  My question is do you have a separate account at EECU?

12   A.  I do not.

13   Q.  And when you received or when they sent out the accounting

14   statements, did they go to you and your friend or did they go

15   to your wife?

16   A.  They would go to my friend and I.

17   Q.  The monthly account statements that they sent out were not

18   in your wife's name, were they?

19   A.  We bought the -- which accounts --

20   Q.  Were any of them in your wife's name?

21   A.  I don't know.

22   Q.  You had a property management company responsible for

23   managing these properties and you declared your wife as a real

24   estate professional which required her, to your understanding,

25   to spend at least 750 hours a year managing the properties,

1   right?

2   A.   Yeah, for the cumulative properties, that is the rule.   So

3   not 750 hours per property but in total for all the properties

4   we have owned for that year.

5   Q.   And it is your testimony that she met those requirement for

6   each year except for 2016 and 2017 in which you designated her

7   a real estate professional?

8   A.   We would get together and evaluate at the end of the year

9   and discussed it with PwC at the beginning to make sure I

10  understood how this worked, and I believe we had a good faith

11  basis for treating it that way.

12  Q.   Take a look at Defense Exhibit 1580.

13          I am going to ask you to take a look at this document,

14  see if it is your handwriting and your signature on the later

15  pages.

16          (Pause)

17  A.   Yes, it is.

18  Q.   It is your handwriting?

19  A.   Yes, it is.

20  Q.   It is your signature?

21  A.   Yes.

22  Q.   Your wife's signature?

23  A.   Yes.

24  Q.   Dated November 2013?

25  A.   Yes.

1    Q.  And this is during the time period in which you were

2    identifying your wife as a real estate professional, correct?

3    A.  On our tax returns, yes.

4    Q.  Well, you said "on your tax returns."

5           This isn't an artificial term that you can just apply

6    to somebody, correct; they actually have to meet certain

7    requirements?

8           MS. KRAMER:  Objection.  Argumentative.

9           THE COURT:  Overruled.

10   A.  Yes, they have to meet specific requirements, yes.

11          MR. COOK:  If you take a look at the first page of the

12   document, and highlight your spouse's occupation and how long.

13          Your Honor, I offer 1580.

14          MS. KRAMER:  Objection, your Honor.  The same basis.

15          THE COURT:  Received.  1508 is received.

16          (Defendant's Exhibit 1580 received in evidence)

17   BY MR. COOK:

18   Q.  In this document, you identify your spouse's occupation as

19   a homemaker, correct?

20   A.  Yes.

21   Q.  You did not disclose that she was supposedly a real estate

22   professional?

23   A.  Well, she also takes care of our three children at home.

24   Q.  I have no doubt that she meets all the requirements of a

25   homemaker.

1          The question is in this application, in which you were

2    obligated to tell the truth, you did not disclose that she was

3    a real estate professional?

4          MS. KRAMER:  Objection to the commentary, your Honor.

5    Move to strike.

6          THE COURT:  Sustained.

7    BY MR. COOK:

8    Q.  Is that correct?

9    A.  I'm sorry.  Will you ask that question again?

10   Q.  You did not disclose the fact that you considered her or

11   deemed her for IRS purposes a real estate professional at this

12   time?

13   A.  I wrote "Homemaker."

14   Q.  Take a look at Defense Exhibit -- take that down.

15         You testified yesterday that when you purchased your

16   vacation home at Shaver Lake, you testified today as well, that

17   you intended to rent it out, right?

18   A.  That was our initial -- yes.

19   Q.  That's what you told the government as well?

20   A.  Yes.

21   Q.  That wasn't true, was it?

22   A.  When we purchased the property?

23   Q.  To be very clear, at the time you purchased the property,

24   you were not intending to rent it out; you intended, at that

25   time and in every time thereafter, to be a vacation home?

1  A.  No.  We intended to both use it as a vacation home and rent

2  it out.

3  Q.  Take a look at Defense Exhibit 1588, the second page.

4         Sir, could you take a look at this document and tell

5  me if that is your signature at the bottom?

6  A.  Yes, it is.

7  Q.  And this document is dated December 30, 2015?

8  A.  Yes.

9  Q.  And it is a document that you signed in order to secure a

10  mortgage for the cabin, right?

11  A.  Yes.

12         MR. COOK:  I offer Defendant's Exhibit 1588.

13         THE COURT:  Received.

14         (Defendant's Exhibit 1588 received in evidence)

15         MR. COOK:  If you could back out a little bit and

16  highlight paragraph 6.

17  Q.  Sir, would you read that paragraph for me out loud?

18  A.  "Occupancy.  Borrower shall occupy, and shall only use the

19  property as borrower's second home.  Borrower shall keep the

20  property available for borrower's exclusive use and enjoyment

21  all times, and shall not subject the property to any time

22  sharing or other shared ownership arrangement or to any rental

23  pool or agreement that requires borrower either to rent the

24  property or give a management firm or any other person any

25  control over the occupancy or use of the property."

1    Q.  It is a document you signed to get the mortgage to buy the

2    cabin, correct?

3    A.  Yes.

4    Q.  And you agree, in this document, that you had no intent of

5    using the property as an investment house, correct?

6    A.  Yeah.  That's what it says there, but that was not our

7    intent.

8    Q.  Well, was it mortgage fraud or lying to the government?

9           MS. KRAMER:  Objection.

10          THE COURT:  Sustained.

11   BY MR. COOK:

12   Q.  Take a look at the next paragraph in the document.  You

13   know when you signed this that you would be in default on the

14   mortgage if you in fact did give any misleading, false, or

15   inaccurate information to the lender in connection with the

16   mortgage, right?

17   A.  I see that, yes.

18   Q.  Take a look at Defendant's Exhibit 1585.

19          Sir, if you could take a look at the top portion of

20   the document and tell me if that's your signature on the top?

21   A.  Yes, it is.

22   Q.  Is this the loan application for the loan for the cabin

23   property?

24          MR. COOK:  And we can zoom out so you can see the

25   document a little better.  Highlight the address.

1    A.  Yes, it is.

2           MR. COOK:  And if you could highlight the top third of

3    the document.

4           (Pause)

5    Q.  If you look down to about halfway down your screen, sir, on

6    the right-hand side, this is the application you completed for

7    the loan, right?

8    A.  Yes.

9    Q.  OK.  And so it asks you "Property will be" and then you

10   check a box, right?

11   A.  Yes.

12   Q.  And you checked the box "Secondary Residence"?

13   A.  Yes, I did.

14   Q.  Not "Investment"?

15   A.  That's right.

16   Q.  When you told the government, when you told the jury, when

17   you told all of us that at the time you bought this property

18   you intended to rent it out and so it really was a legitimate

19   1031 that just had to be on one later, all of that was false?

20   A.  No, that's not true.  I mean, I filled this application

21   out, you are entirely right.  This is what I put.  We did a --

22   we -- I went through the 1031 steps with the intent of renting

23   this property out in the beginning, at least in part.  Our plan

24   was to use it and rent it.

25          MR. COOK:  Your Honor, I offer 1585.

1          THE COURT:  Received.

2          (Defendant's Exhibit 1585 received in evidence)

3    BY MR. COOK:

4    Q.  Sir, as you sit here today, is there anything else that you

5    haven't disclosed to the government?

6    A.  I mean, I certainly don't remember all of these documents,

7    and so nothing that I can think of, sir.

8    Q.  At the time -- let's -- my understanding of what you're

9    saying is that you didn't knowingly lie to the government, the

10   lie is in the documents; is that fair?

11   A.  This wasn't -- yeah, I guess so.  Yes.

12   Q.  It would be fair to conclude that you were willing to tell

13   a lie, even if it is a criminal lie, if you believe it will

14   advance your own self-interest?

15   A.  I have certainly done that in connection with all of the

16   things I've talked about in this case.  That is true.

17          MR. COOK:  Thank you.

18          THE COURT:  Would this be a good time for a quick

19   break?

20          All right.  Let's take ten minutes, folks.  Please

21   leave your pens on your chairs.  We'll see you in ten minutes.

22          (Continued on next page)

23

24

25

1           (Jury not present)

2           THE COURT:  You may be seated in the courtroom.

3           Anyone want to address anything before the break?

4           MS. KRAMER:  No, your Honor.

5           MR. WEDDLE:  We don't have to do it before the break,

6    but I would like to have a discussion with your Honor about

7    something that came up at the last sidebar.  I don't think it

8    has to happen while the jury is here.  It's just an important

9    argument that I would like to discuss at some point.

10          THE COURT:  OK.  Could we do it at 5?

11          MR. WEDDLE:  Yes, that would be perfect.

12          THE COURT:  OK.  Thanks.  I'll see you in ten minutes.

13          (Recess)

14          THE COURT:  Schedule.  Assuming you don't finish at 5,

15   Ms. Lester, assuming I ask the jury to come in tomorrow, you

16   said we would complete cross, redirect, and then you said you

17   would have one witness tomorrow, or not?

18          MS. MERMELSTEIN:  Yes, your Honor.  If your Honor

19   prefers not to call that witness and just finish with

20   Mr. Sweet, we could do that, but we another witness we are

21   prepared to call.

22          THE COURT:  Do you know how long that witness would

23   be?

24          MS. MERMELSTEIN:  I think, although it is a little

25   hard to say, something like 45 minutes on direct, and I don't

1  expect a lengthy cross of him.  It is Enrique Santos for the

2  defense.  He is works in the U.S. Attorney's Office and

3  conducted the cell phone extraction that is relevant here, and

4  then he is going to read some of these text messages that are

5  from the cell phone he extracted.  But we're open to doing that

6  differently depending on how the timing goes in terms of

7  someone else can do it later, etc., etc.

8          THE COURT:  All right.  Well, I'm inclined to sort of

9  get a read from the jury, and if they don't seem necessarily

10  opposed to coming in tomorrow morning, then I am inclined to go

11  ahead and do it just to sort of try and be on track time wise.

12          Any other thoughts?

13          MR. WEDDLE:  Your Honor, I just wanted to note that

14  when your Honor was asking if anyone had a problem with Friday,

15  in my observation, Juror Number 5 didn't say anything but she

16  seemed to be scowling.  She expressed her disagreement with the

17  plan yesterday so I didn't think she felt any need to repeat

18  herself, but as I observed her, she seemed to be scowling at

19  the idea of coming in on Friday, which I interpreted to be

20  related to her long commute.

21          THE COURT:  OK.  Bring in the witness.

22          (Continued on next page)

23

24

25

```
 1                (Jury present)

 2           THE COURT:  Please be seated.

 3           Good afternoon, folks.

 4           JURORS:  Good afternoon, Judge.

 5           THE COURT:  We'll now have the cross-examination.

 6           JURORS:  Very good.

 7           THE COURT:  Good afternoon.

 8           We'll now have the cross-examination by counsel for

 9   Mr. Middendorf.

10           Ms. Lester.

11           MS. LESTER:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MS. LESTER:

14   Q.  Good afternoon, Mr. Sweet.

15   A.  Good afternoon.

16   Q.  You testified on cross-examination with Mr. Cook about some

17   of your preparation for your testimony here today.  Do you

18   remember that testimony?

19   A.  Yes.

20   Q.  You testified about the number of meetings that you had

21   with the prosecutors in the case?

22   A.  Yes.

23   Q.  And you testified about the number of people who were

24   present at those meetings.  Do you remember that?

25   A.  Yes.
```

1   Q.   Including three attorneys for you, right?

2   A.   Yes.

3   Q.   And two of the prosecutors who are here today?

4   A.   Yes.

5   Q.   And then there was also an attorney for the SEC present?

6   A.   In the initial meetings.

7   Q.   And at least one postal inspector, correct?

8   A.   Yes.

9   Q.   So you think that's up to about seven, seven people, seven

10  or eight people present at these meetings, is that right?

11  A.   Yes.

12  Q.   And that was on most occasions when you met with the

13  government there were that many people, correct?

14  A.   Certainly in the beginning but not -- not always.

15  Q.   And in many of those meetings, as you just reviewed with

16  Mr. Cook, you weren't fully truthful, isn't that right?

17  A.   Yes.

18  Q.   You lied during those meetings, didn't you?

19  A.   Yes, I did not initially tell them about the tax issues

20  that we had been discussing.

21  Q.   And you hoped that you could get through the meetings,

22  having told those lies, and not be discovered, right?

23  A.   As I mentioned before, I thought I could just fix my 2017

24  return because I knew I was already going to have to refile my

25  2015 and '16 returns and, yes.

1    Q.  You were just hoping to skate through, right?

2    A.  That is not the way I would characterize it but I

3    understand what you're saying.

4    Q.  And the reason you did that, Mr. Sweet, is because you have

5    a cooperation agreement that you were trying to at first work

6    towards with the government, right?

7    A.  Yes.

8    Q.  And then once it was in place you were trying to protect

9    it, right?

10   A.  Yes.

11   Q.  In fact, you said on cross-examination with Mr. Cook that

12   that was the reason that you lied in March of 2018, because you

13   had just signed your cooperation agreement in January, right?

14   A.  Yes.

15   Q.  And you were afraid of losing it?

16   A.  Very scared, yes.

17   Q.  And these more recent lies that were uncovered just in

18   December of this year, right?

19   A.  Yes.

20   Q.  And then also some more recent disclosures that you made in

21   January of this year and in February of this year, right?

22   A.  Yes.

23   Q.  When you made those -- when you lied on those occasions, or

24   revealed those lies, you were also scared about losing your

25   cooperation agreement, weren't you?

 1   A.  Very.

 2   Q.  You were scared that the government was going to tell you

 3   that they didn't need you to testify at the trial, right?

 4   A.  Yes.

 5   Q.  Now, you understood under the cooperation agreement that

 6   you had an obligation to be truthful about your own actions,

 7   right?

 8   A.  Yes.

 9   Q.  But you lied nonetheless?

10   A.  Yes.

11   Q.  You also understood you had an obligation to tell the

12   government about the actions of others, right?

13   A.  Yes.

14   Q.  And you had an obligation to be truthful about that?

15   A.  Yes.

16   Q.  Have you been truthful about the actions of others,

17   Mr. Sweet?

18   A.  Yes, to the best of my ability.

19   Q.  And you're asking this jury to believe you although you

20   lied about your own actions?

21          MS. KRAMER:  Objection.  Argumentative.

22          THE COURT:  Sustained.

23   BY MS. LESTER:

24   Q.  You testified on direct examination about the welcome lunch

25   on your first day at KPMG.  Do you remember that?

1   A.  I do.

2   Q.  You testified that you went to lunch, I believe, with

3   Mr. Middendorf, Mr. Britt and John Mucha?

4   A.  Yes.

5        MS. LESTER:  Could we look at what's marked for

6   identification as Exhibit M37?

7   Q.  Do you recognize this, Mr. Sweet?

8   A.  Yes, I do.

9   Q.  Is this a meeting invitation for that lunch?

10  A.  Yes.

11       MS. LESTER:  Your Honor, the defense offers Defense

12  Exhibit M37.

13       MS. KRAMER:  No objection.

14       THE COURT:  M37 received.

15       (Defendant's Exhibit M37 received in evidence)

16  BY MS. LESTER:

17  Q.  And, sorry, I excluded Mr. Canfarotta, but was he also

18  present at the lunch that day?

19  A.  I believe he was, yes.

20  Q.  And that was on May 4, 2015, your first day?

21  A.  Yes.

22  Q.  And you testified that it took place at a restaurant.  The

23  name is on the calendar invite.  Is that the restaurant that

24  you remembered?

25  A.  Yeah, I couldn't remember the restaurant.  It was a

 1    Mediterranean place, but I believe it is this Avra.

 2    Q.  Does that name sound familiar to you?

 3    A.  It does, yes.

 4         MS. LESTER:  You can take that down.  Thank you, Ms.

 5    O'Connor.

 6    Q.  And the prosecutors showed you a photograph of the interior

 7    of the restaurant when you were testifying about that welcome

 8    lunch.  Do you remember that?

 9    A.  Yes.

10         MS. LESTER:  Could we take a look at that?  That is

11    Government Exhibit, in evidence, 1507.

12    Q.  This is the photograph that the prosecutor showed you,

13    right?

14    A.  Yes.

15    Q.  And you'd seen this photograph during your preparation with

16    the prosecutors before testifying, correct?

17    A.  Yes.

18    Q.  And you had identified it?

19    A.  Yes.

20    Q.  And when the prosecutors showed it to you, you said on the

21    stand that it fairly and accurately depicted the interior of

22    the restaurant that you had lunch at, right?

23    A.  Yes.

24    Q.  And you described how you and the rest of the attendees at

25    the lunch were sitting at one of the circular booths, right?

1    A.   Right.

2    Q.   Those are the ones on the left-hand side of the picture?

3    A.   Yes.

4    Q.   And you said you were sitting at one end of the booth and

5    Mr. Middendorf sat next to you, right?

6    A.   Yes.

7    Q.   David Britt sat across from you, I think you said?

8    A.   Yes.

9              MS. LESTER:  Can we take this down, please.

10             Could we put up what has been marked for

11   identification as Defense Exhibit M277.

12   Q.   Mr. Sweet, directing your attention to the right-hand side

13   of the screen, do you recognize that as being the same

14   photograph we were just looking at?

15   A.   Yes.

16   Q.   And do you see the address?

17   A.   Yes.

18   Q.   Is that the location where you had lunch that day?

19   A.   The calendar invite indicated it was on 48th Street.

20   Q.   And what -- does that appear to be the same restaurant

21   where you had lunch?

22   A.   Yes.

23   Q.   Can you explain the discrepancy?

24   A.   No.

25             MS. LESTER:  Your Honor, I would like to admit,

1    subject to authentication, Defense Exhibit M277.

2              MS. KRAMER:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit M277 received in evidence)

5    BY MS. LESTER:

6    Q.  Mr. Sweet, when we looked at the calendar entry, it said

7    that the address was East 48th Street, right?

8    A.  Yes.

9    Q.  And it appears from this website that Avra has two

10   locations.  One is on 60th Street, right?

11   A.  Yes.

12   Q.  And the photograph that you identified was of the interior

13   on 60th -- of the 606th Street location, correct?

14   A.  Yes.

15   Q.  Do you want to change your testimony that that fairly and

16   accurately depicted the interior of the restaurant where you

17   had lunch?

18   A.  No.

19   Q.  So you believe that you actually went to the 60th Street

20   location?

21   A.  I believe we went to the 48th Street.  I remember we sat at

22   a round booth.  I remember it was a Mediterranean restaurant.

23   I remember exactly where we sat.  I remember when I first saw

24   this picture, I explained to the U.S. Attorney's Office that I

25   remember it was actually inverted the way this was viewed, that

 1   we would be -- the equivalent would be on the left side of

 2   where the booths were.  There were other columns.  Although I

 3   didn't know where the entrance was on this picture, that's the

 4   way I described it to them.

 5   Q.  So you stand by your testimony that that photograph, which

 6   is now on M277, on the right-hand side is a photograph of the

 7   interior of the restaurant where you had lunch?

 8   A.  It -- I had this lunch four years ago.  It looks very

 9   similar to what I remember the inside of the restaurant looking

10   like.

11          MS. LESTER:  OK.  We can take that down.

12   Q.  Do you remember during the lunch you testified about the

13   fact that the PCAOB sent geographic information, that is,

14   regional information, about the office and type of issuer that

15   was to be inspected to KPMG ahead of the time when the official

16   notification would come?

17   A.  Yes.

18   Q.  And in that type of notification, the PCAOB would often

19   indicate, as well, the number of weeks that they were to be

20   present on site for the inspection, right?

21   A.  Yes.

22          MS. LESTER:  If we could put up what's been marked for

23   identification as Defense Exhibit M41.

24          If we could focus on the bottom half of the page,

25   please.

1    BY MS. LESTER:

2    Q.   Mr. Sweet, are you familiar with this type of notification

3    email?

4    A.   I was not on this email, but commonly Meredith Hardisty,

5    who was at KPMG, would be one of the point people with the

6    PCAOB on scheduling notifications.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did you see emails like this during the course of your

2    employment at KPMG?

3    A.  Similar, yes, that when they were notifying specific

4    inspections, the names of inspections two or three weeks in

5    advance of those inspection starts, that Meredith Hardisty

6    would be the point person and she would then distribute that

7    out to a group of people.

8    Q.  If we could also put up what's been marked for

9    identification as Defense Exhibit M42.  Would you put it side

10   by side with M41, please.  While we were looking for it, does

11   that appear to be the schedule that is attached to M41, the

12   email?

13   A.  Just to be clear, I was not on the email that I think you

14   are referring to as M41, so I don't know that I actually saw

15   this inspection schedule, because this was sent prior to my

16   first day joining KPMG.

17   Q.  Understood.

18   A.  Okay.

19   Q.  Could you read the content of M41 to yourself and then look

20   at M42 and tell me whether you think this appears to be the

21   attachment to that email.

22            MS. KRAMER:  Objection, your Honor: speculation.

23            THE COURT:  Overruled.  If you think you can tell this

24   from the emails, you can answer the question.

25            MS. KRAMER:  Your Honor, if I may, the witness said

1    that he did not get this email.  The question is simply asking

2    him if a document that he has said he hasn't seen matches up

3    with the description in another document that he has said he

4    has not seen.

5           MS. LESTER:  Your Honor, the witness has said he has

6    seen emails like this.

7           THE COURT:  You can answer if you can tell from them.

8    A.  To be clear, when I was referring to emails that I have

9    seen like this would be following -- my understanding of the

10   process was that following the notification of -- this was for

11   scheduling purposes.  Then, when the PCAOB is actually ready to

12   announce their specific inspections, which was two or three

13   weeks, sometimes one, they would then notify Meredith Hardisty,

14   who would then forward in a similar manner to the schedule the

15   specific names of the issuers that are being announced to the

16   lead audit partners and to the folks that appear to be cc'd on

17   the bottom of M41 with the specific engagements.  I see that

18   the name of the attachment matches the releases similar to the

19   name on the top left.

20   Q.  Did you ever receive a tentative inspection schedule during

21   your time at KPMG?

22   A.  I guess if I did, it would have only been in 2016.  I don't

23   remember.  I certainly may have.

24   Q.  When you were at the PCAOB, were you aware that the PCAOB

25   set such tentative schedules?

 1   A.  I was aware, yes.

 2   Q.  Did you see them on the PCAOB side going out?

 3   A.  I don't think I was on those communications either, ma'am.

 4   Q.  But you are aware that the PCAOB prepares such schedules,

 5   correct?

 6   A.  Yes.

 7   Q.  And that they send them to firms like KPMG?

 8   A.  Yes.  For scheduling purposes to coordinate space, yes.

 9          MS. LESTER:  Your Honor, the defense offers Defense

10   Exhibit M41 and M42.

11          MS. KRAMER:  Objection, your Honor: lack of

12   foundation.

13          THE COURT:  Sustained.

14   Q.  You were aware, Mr. Sweet, that geographic location

15   information was sent to the firm?

16   A.  Yes.

17   Q.  If the firm only had as a client one issuer in a particular

18   region, the firm could guess that that was the likely issuer

19   that would be inspected, correct?

20   A.  Yes.

21   Q.  As we already talked about, the PCAOB would also provide an

22   estimation of the number of weeks that it expected the

23   inspection to take, right?

24   A.  Yes.

25   Q.  In addition, it would indicate on those schedules whether

1   the issuer was a financial services institution, right?

2   A.   Yes.

3   Q.   And also whether it was a broker-dealer.

4   A.   I was not involved on the broker-dealer side of the

5   communication.  Actually, it was part of the PCAOB inspections

6   group.  It was really a separate team, somewhat coordinated.

7   But I was certainly more familiar with the financial services

8   and other parts of it.

9   Q.   So you are not aware of whether broker-dealer was

10  indicated?

11  A.   I just saw the schedule, but I wasn't aware of that

12  previously.

13  Q.   But you do know from your own experience that financial

14  services institutions were listed specifically?

15  A.   Yes, ma'am.

16  Q.   Is it fair to say that if the PCAOB designates four weeks

17  for an inspection, that would indicate that it is a large

18  financial institution, if it is also a financial institution

19  inspection?

20  A.   Yes.

21  Q.   Sorry.  I hit the microphone.  Is that yes?

22  A.   Yes.

23  Q.   You are aware, are you not, that firms could sometimes

24  deduce from the geographic list, as we have discussed, which

25  issuers would be inspected?

1    A.   Yes.

2    Q.   At the welcome lunch you described a conversation on direct

3    examination about a bank that would be picked in San Francisco,

4    right?

5    A.   Yes.

6    Q.   You said that Mr. Middendorf said that the bank must be

7    Wells Fargo?

8    A.   In sum and substance, yes.

9    Q.   That was based on the geographic notification, correct?

10   A.   Yes.

11   Q.   He had figured it out?

12   A.   Yes.

13   Q.   You said that he and Mr. Britt had also figured out from

14   the PCAOB geographic notification that Stonegate Mortgage in

15   Indianapolis was likely to be inspected, right?

16   A.   Yes.

17   Q.   But you said you felt uncomfortable because you thought

18   that confirming what Mr. Middendorf and Mr. Britt had already

19   figured out based on the geographic notification was a breach

20   of the ethics code, right?

21   A.   Yes.  But I guess, just to be totally precise with you,

22   ma'am, the notification that would come from the PCAOB for

23   scheduling purposes would say something like four weeks in San

24   Francisco for financial services.  While one could certainly

25   deduce that that would then be a large financial services,

1    there was still certainly the possibility that that could just

2    be a collection of one-week financial services inspections or

3    two two-week inspections, or two one-week and one two-week

4    inspections.  So with the example you gave if there is one

5    issuer in that one office --

6    Q.  Mr. Sweet, sorry, I don't mean to cut you off, but thank

7    you, I understand your clarification.

8    A.  Okay.

9    Q.  So it would be on the particular clients that the firm had

10   in that location?

11   A.  Yes.

12   Q.  You testified that you felt uncomfortable and you felt

13   pressured at that lunch, right?

14   A.  Yes.

15   Q.  This was despite the fact that before leaving the PCAOB,

16   before your last day of employment, you downloaded documents

17   from the PCAOB IIS system and took them with you, right?

18   A.  Yes, I did.

19   Q.  No one was pressuring you to do that, right?

20   A.  No.

21   Q.  You didn't testify about feeling uncomfortable when you did

22   that, did you?

23   A.  No, I didn't testify about that.

24   Q.  You knew at the time that you did that that that was a

25   violation of the PCAOB ethics code, right?

1  A.  Yes.

2  Q.  You told the jury that when you downloaded that information

3  in the first instance -- and I'm referring now specifically to

4  the GNF planning profile document for 2015 -- you testified on

5  direct that when you downloaded that in the first instance you

6  didn't intend to steal it, right?

7  A.  Yes.

8  Q.  You said that you did that in March of 2015?  You have to

9  answer audibly, sir.

10 A.  Sorry.  I'm thinking.  Yes.

11 Q.  Isn't it true, sir, that in March of 2015 you decided to

12 interview with KPMG?

13 A.  Yes.

14 Q.  That same month, we don't know the exact day that you

15 downloaded it, but that very same month you were stealing

16 confidential information and preparing to interview at KPMG,

17 right?

18 A.  That's right.

19 Q.  But your testimony is still that you didn't take it or

20 download it with the intention of stealing it at that time?

21 A.  When I initially downloaded this information from the IIS

22 system --

23 Q.  It's a yes-or-no question.  Sorry, sir.  Did you intend to

24 steal it at the time?

25 A.  No.

1   Q.   During your last week or two before you left the PCAOB, you

2   copied multiple files from the IIS system onto your desktop,

3   right?

4   A.   Yes, I did.

5   Q.   You searched IIS proactively for anything that you thought

6   would be helpful to you in your new job, right?

7   A.   Yes, I did.

8   Q.   You took inspection guides?

9   A.   I did.

10  Q.   You took PCAOB manuals?

11  A.   Yes.

12  Q.   You took planning information?

13  A.   Yes.

14  Q.   You took old comment forms?

15  A.   Yes, I did.

16  Q.   And you saved those onto an external hard drive that you

17  took with you when you left, right?

18  A.   Yes.

19  Q.   You also had documents at your home, right?

20  A.   I did.

21  Q.   And you didn't return those documents to the PCAOB, you

22  kept those?

23  A.   I returned some, but I kept the ones that I thought would

24  be helpful to me.

25  Q.   So you kept ones that you thought would be helpful and

1    returned unhelpful ones?

2    A.  Yes.

3    Q.  When you first talked to the KPMG lawyers who were

4    conducting the internal investigation, you weren't truthful

5    about your conduct in downloading those documents, were you?

6    A.  No, I was not.

7    Q.  You didn't tell them that you had searched IIS for helpful

8    documents?

9    A.  No.

10   Q.  In fact, you told them that you had inadvertently copied

11   your desktop over to your hard drive, right?

12   A.  Yes.

13   Q.  You told them that it was only after you got to KPMG that

14   you realized you had made a mistake, you had actually copied

15   confidential documents?

16   A.  Yes, and that was a lie.

17   Q.  That wasn't true, right?

18   A.  Right.

19   Q.  In any event, you didn't delete the comments once you

20   supposedly realized that, right?

21   A.  That's right.

22   Q.  You told the lawyers that you ended up telling yourself it

23   was okay because the documents related to KPMG, right?

24   A.  Yes.  I think I said, well, it was information that I had

25   worked on and the information was in my head already, and so --

1   yes.

2   Q.  But you actually knew that you had documents that weren't

3   just limited to KPMG, right?

4   A.  Yes.

5   Q.  You didn't delete those either, right?

6   A.  No, I did not.

7   Q.  You also took some notebooks with you when you left the

8   PCAOB, right?

9   A.  Yes, I did.

10  Q.  And some hardcopy documents?

11  A.  Yes.

12  Q.  But originally when you spoke to the KPMG lawyers, you told

13  them you didn't recall taking any paper documents, right?

14  Isn't it true, sir, that they had to show you a hardcopy

15  document before you told them, oh, yeah, now I remember, I did

16  take hardcopy documents?

17  A.  I don't remember.  It certainly may have happened that way.

18  Q.  You didn't tell the KPMG lawyers at the time that you had

19  purposely kept these documents for your own benefit, did you?

20  A.  No, I didn't.

21  Q.  You thought these documents would help you in your new job

22  at KPMG, right?

23  A.  Yes, I did.

24  Q.  You wanted the documents to be prepared for your role as a

25  partner, right?

1   A.   Yes.

2   Q.   In fact, your pitch to the KPMG partners who you

3   interviewed with was that you could help them because you had

4   so much knowledge about the PCAOB inspection process, right?

5   A.   Yes.

6   Q.   That was how you sold yourself to the firm?

7   A.   Yes.

8   Q.   Isn't it true, sir, that when you interviewed, you stressed

9   that you had a very strong banking background in terms of your

10   own audit work?

11   A.   Yes.

12   Q.   You did that because you understood that KPMG had been

13   having difficulties with its audit quality in the banking area,

14   right?

15   A.   I knew that very well from my time in the PCAOB, yes.

16   Q.   So you sold yourself during the interviews as someone who

17   could help KPMG address those specific audit quality issues,

18   right?

19   A.   Yes.

20   Q.   In your interviews isn't it true that you specifically said

21   that in terms of the two current heads of the banking practice,

22   David Britt and Tom Canfarotta, if they were doing such a great

23   job, you didn't think KPMG would be talking to you, right?

24   A.   Yes, I remember that.

25   Q.   You told the people you interviewed with, including Mr.

 1   Middendorf -- you interviewed with Mr. Middendorf?

 2   A.  Yes, I did.

 3   Q.  You told him and the other people you interviewed with that

 4   you would fix these problems for KPMG, right?

 5   A.  I don't think I was as bold to say that I would on my own

 6   be able to fix them, but that I would certainly work to do

 7   that.

 8   Q.  Didn't you tell them that you knew the people, the

 9   methodology, the culture of the firm because of your

10   interactions with it?

11   A.  Yes.  I had been inspecting KPMG for five years, five-plus

12   years at the PCAOB.

13   Q.  And you described yourself as a perfect fit, right?

14   A.  Yes.

15   Q.  When you talked about your PCAOB experience when you were

16   interviewing with the firm, you told KPMG how the PCAOB had

17   heavily recruited you while you were at PWC, right?

18   A.  I don't remember if that's the way I characterized it, but

19   I may have.

20   Q.  Didn't you point out that Helen Munter, the director of

21   inspections for the PCAOB, had hired you directly?

22   A.  Yes.

23   Q.  And that was meant to convey that you were someone who was

24   highly thought of at the PCAOB, right?

25   A.  Yes.

1   Q.  You pointed out to the people you interviewed with at KPMG

2   that you were top rated every year you had worked with the

3   PCAOB, right?

4   A.  Yes.

5   Q.  You were rated a number one associate director, right?

6   A.  That's what I had been told, yes.

7   Q.  You even touted that you were one of two people to win the

8   superior achievement award since that award had been created at

9   the PCAOB, right?

10  A.  Yes.  One of two individuals, yes.

11  Q.  You also told the people you interviewed with at KPMG that

12  you were a terrific public speaker, right?

13  A.  I had done quite a few public speaking engagements, yes.

14  Q.  So you would be able to train and help engagement teams or

15  other partners within the audit practice, tell them what the

16  PCAOB was looking for, right?

17  A.  Again, I don't remember if that was one of the specific

18  things we discussed, but it's not inconsistent with the way I

19  felt.

20  Q.  You thought that you could come in and help build up the

21  training process at KPMG, right?

22  A.  Again, I don't know.  I'm not certain if that was a

23  specific interview topic, ma'am, but that's certainly one of

24  the things that I thought about my skill set.  I was a good

25  trainer.  I had done a lot of training at the PCAOB.

1  Q.  At this time when you were preparing to interview at KPMG

2  and reviewing these aspects of your employment and career, this

3  was the same period of time when you were downloading this

4  information from IIS onto your own hard drive, right?

5  A.  It's, yes, consistent timing.

6  Q.  You're taking that information with the express purpose of

7  using it to benefit yourself in your new role at KPMG, right?

8  A.  That is why I took all that information, yes.

9  Q.  That was your hope?

10 A.  Yes.

11 Q.  No one at KPMG ever asked you during the interview process

12 to take confidential information from the PCAOB, right?

13 A.  No.

14 Q.  You had no understanding at the time you were hired that

15 you would be asked to do anything illegal or unethical, right?

16 A.  No.

17 Q.  You knew former PCAOB employees who worked at KPMG, right?

18 Yes?

19 A.  Yes.

20 Q.  You spoke with some of those people when you were

21 interviewing, right, before joining KPMG?

22 A.  I think it was just one person, but yes.

23 Q.  That person didn't tell you that you needed to take

24 confidential information in order to be successful at KPMG?

25 A.  No, he did not.

1    Q.  That was just something you decided to do on your own,

2    right?

3    A.  Yes.

4    Q.  Going back to your welcome lunch, no one at that lunch knew

5    that you had downloaded the GNF planning profile for 2015,

6    right?

7    A.  No.

8    Q.  No one at that lunch knew that you had taken a hardcopy

9    document of the 2015 list of inspections, right?

10   A.  No.

11   Q.  And no one asked you to give them that information at the

12   lunch, right?

13   A.  I remember them asking me if I knew who was going to get

14   selected in general terms.  They certainly asked me about Wells

15   Fargo and Stonegate Mortgage, as I mentioned previously.

16   Q.  Isn't it the case, sir, that Mr. Middendorf told you, tell

17   us what you can but don't tell us anything you're not allowed

18   to?

19   A.  No.

20   Q.  You testified that you thought, based on the questions

21   being asked you at that lunch, that there was an expectation

22   that you provide confidential information, right?

23   A.  Yes.  All of those people at that lunch were very involved

24   in the --

25   Q.  I'm sorry, sir.  It was a yes-or-no question.  Did you

1    testify that you believed those questions to you conveyed an

2    expectation that you should give confidential information?

3    A.  Yes.

4    Q.  This is on your first day of work?

5    A.  Yes.

6    Q.  Prior to this lunch, you had met Mr. Middendorf at some of

7    the monthly meetings between the PCAOB and KPMG, right?

8    A.  Yes.

9    Q.  How many meetings would you say you were at together?

10   A.  I don't know.  Six to twelve.

11   Q.  This is in a group of people, right?  These aren't

12   one-on-one meetings?

13   A.  Group of people, yes.

14   Q.  He interviewed you when you applied to KPMG, right?

15   A.  Yes.

16   Q.  Was that a 30-minute interview, hour-long interview?

17   A.  I think most of them were an hour long, but I don't

18   remember exactly.  I don't remember.

19   Q.  You didn't know Mr. Middendorf from any other contacts

20   other than your interactions when you were at the PCAOB, right?

21   A.  That's right, only through the PCAOB.

22   Q.  You didn't know him socially?

23   A.  No.

24   Q.  But your testimony is on the first day at the firm, after

25   interacting with you for only a handful of hours, Mr.

1  Middendorf asked you to violate your ethical obligations to the

2  PCAOB?

3  A.  Yes.

4  Q.  He set forth the expectation you should continue to provide

5  confidential information in order to keep your job at KPMG?

6  A.  Yes.

7  Q.  Your testimony is that you felt so insecure in your job as

8  a KPMG partner that you felt you had to comply with his

9  request?

10 A.  To be clear, it was not just the request for confirming

11 Wells Fargo and Stonegate at the first lunch, but just the

12 series of things that occurred that week and --

13 Q.  We are focused on the welcome lunch right now.  That's my

14 question.

15 A.  Okay.

16 Q.  You didn't feel you could say no?

17 A.  My boss's boss asked me a question, the person in charge of

18 the entire national office sitting next to me.  I'm sitting

19 across from the co-banking leaders, all very, very senior

20 people at the firm.  My very first day, I had been there three

21 hours, four hours.  No, I didn't feel I could say anything

22 other than what I did.

23 Q.  Mr. Sweet, when you were at the PCAOB, you were sometimes

24 in an adversarial position with respect to people at KPMG,

25 right?

1   A.  Yes.

2   Q.  Fair to say that sometimes there were disagreements in

3   terms of point of view over inspection results between people

4   at KPMG and people at the PCAOB, right?

5   A.  That's right.

6   Q.  Sometimes you were a part of those disagreements?

7   A.  Yes.

8   Q.  Did you have any trouble standing up to people from KPMG in

9   those circumstances?

10  A.  Generally, no.  I certainly had support of the other PCAOB

11  leadership when I was defending why something was going to be

12  included in part 1 or why the PCAOB was making the decision

13  that it did.  It was something that we had all agreed at the

14  PCAOB prior to those meetings.

15  Q.  But from your first day of work forward, you decided that

16  you needed to give over confidential information in order to

17  keep your job?

18  A.  Yes.

19  Q.  Even when you weren't asked for it, you decided you needed

20  to volunteer confidential information, right?

21  A.  To be clear, if we are still talking about the first day or

22  the first week, I was asked for this, yes.

23  Q.  In your first month, do you recall volunteering information

24  that you weren't asked for directly?

25  A.  I'm sure I did.

1    Q.  Your testimony is that you did that because you felt so

2    pressured from these first few days at KPMG?

3    A.  Yes.

4    Q.  By the way, Wells Fargo wasn't actually inspected in 2015

5    by the PCAOB, was it?

6    A.  They decided to cancel the inspection because multiple

7    inspectors had left the PCAOB at that point and they couldn't

8    schedule it, was my understanding.  So it was planned but

9    pulled.

10   Q.  You found out about the cancellation from Cindy Holder,

11   right?

12   A.  Yes.

13   Q.  You found out about that ahead of the official notification

14   from Cindy Holder, right?

15   A.  Yes.

16   Q.  You volunteered that information to the engagement partner

17   on Wells Fargo, right?

18   A.  Yes.

19   Q.  That was Mark McCauley?

20   A.  Yes.

21   Q.  You also volunteered that information to David Britt, one

22   of the co-heads of banking, right?

23   A.  I did, yes.

24   Q.  That was because you wanted to make yourself look good,

25   right?

1    A.   I had been asked that summer to start preparing the

2    engagement team for the inspection of Wells Fargo, start to get

3    into their work papers and review and identify the soft spots.

4    So that was one of the things I was working on.  When I found

5    out that they were not going to be inspected, I told the lead

6    audit partner, I told David Britt, I believe I also told Tom

7    Whittle.

8    Q.   To be clear, Mr. Sweet, the PCAOB did provide official

9    notification that it was not going to be inspecting Wells

10   Fargo, right?

11   A.   I don't remember.  They may have.

12   Q.   Your testimony is that without you learning from Cindy

13   Holder and telling the engagement team, they wouldn't have

14   otherwise known that it was going to be canceled?

15   A.   I don't remember the specific sequence of events for Wells

16   Fargo specifically.  When the PCAOB would notify that they were

17   going to inspect and then they changed their mind, then they

18   would notify the firm.  They would say we have announced on

19   Friday, but on Tuesday we have decided to change our mind, we

20   can't do it.  That is when they would notify the firm formally.

21        If it was just an inspection that they had scheduled

22   in the future but that they hadn't already notified the firm,

23   then oftentimes they wouldn't say, well, we were going to pick

24   this company and now we are not.  That was not very common.

25   Q.   Fair enough.  Thank you for the explanation.  But the point

1   is that you learned of the cancellation from Cindy Holder,

2   right?

3   A.  I did, yes.

4   Q.  And you shared that information?

5   A.  Yes.

6   Q.  Moving ahead a little bit in that first week, you testified

7   about the 2015 list that you gave to Mr. Whittle.  Do you

8   remember that?

9   A.  Yes.

10  Q.  You testified on direct that the 2015 list was significant

11  because some of the audits had not yet gotten to the end of the

12  45-day period, right?

13  A.  No, I don't believe that's what I said on direct, ma'am.  I

14  think it was significant because the PCAOB had not yet notified

15  all of those -- they had not yet notified KPMG of the specific

16  names of the issuers.  But my understanding was in the

17  beginning of May 2015 that at that point all or at least the

18  majority of all had already completed their 45-day archive

19  date.  So those audits, at least to my understanding, not only

20  had the opinions been issued but also the documentation

21  completion period had passed.

22  Q.  Actually, at the time that you sent the 2015 list, PCAOB

23  had already provided notice that it was going to inspect many

24  of those issuers, right?

25  A.  Certainly for the inspections that occurred in April and,

1    say, beginning of May.  But not for the ones for June, July,

2    August, September; those ones would not have been notified yet

3    by the PCAOB because they gave a two- or three-week advance

4    notice.

5    Q.  In terms of notification prior to the end of the 45-day

6    period, you testified on direct that the PCAOB doesn't

7    generally -- tries not to provide notice prior to the end of

8    that period because it wants to have an unbiased view of what

9    the real audit work would have been.  Do you remember that

10   testimony?

11   A.  Yes.

12   Q.  But you also testified that you don't ever remember anyone

13   violating auditing standards in terms of doing work outside of

14   the permitted period, right?

15   A.  Are you speaking specifically to like the March 2016

16   re-reviews?

17   Q.  I think you were asked generally, sir, whether you ever

18   remembered seeing any auditing violations?

19   A.  For KPMG specifically?

20   Q.  Yes.

21   A.  I know PCAOB was aware of AS 3 auditing violations and they

22   were very public about those.

23   Q.  Let me be more specific.  During your time at KPMG in terms

24   of the audit work that you were exposed to, were you ever aware

25   of a violation of AS 3?

1   A.   No.

2   Q.   If one is complying with AS 3, that means that at the end

3   of the 45-day period the file is locked down, right?

4   A.   Yes.

5   Q.   And if any additional work has to be done, it has to be

6   done pursuant to AU 390, right?  Are you familiar with that

7   standard?

8   A.   That's right.  Just to be extremely precise, if even during

9   the 45-day period there is new work that needs to be done that

10  wasn't otherwise done as part of the original audit, even while

11  they are in the 45-day period and AS 3 is still applicable, the

12  AU 390 work has to be done.  It can be done within the same

13  audit file, but it would have to be specially documented.

14  "Contemporaneously documented" is the words.  Just to be very

15  precise.

16  Q.   Understood.  The report date is the date on which the audit

17  opinion is released, right?

18  A.   Yes.

19  Q.   And the 45-day period is the next 45 days thereafter?

20  A.   Yes.

21  Q.   As of the report date, when the audit opinion is issued,

22  that's when all the audit work has to be done, right?  The

23  underlying audit work supporting the opinion is supposed to be

24  done at that point?

25  A.   The documentation has to be complete, completed by the end

 1   of the 45-day date.

 2   Q.  I'm sorry.  We are crossing over each other.

 3   A.  Okay.

 4   Q.  The date that the opinion is issued, the report release

 5   date --

 6   A.  Yes.

 7   Q.  -- all the underlying audit work has to be complete, right?

 8   A.  That's the rule, yes.

 9   Q.  Then the next 45 days are to complete any documentation or

10   assemble the work papers?

11   A.  Yes, wrap up the documentation, assemble the final set of

12   work papers.

13   Q.  What you were explaining a moment ago is that if it is

14   discovered during the documentation period or really at any

15   time after the close of the audit opinion that an additional

16   audit procedure has to be performed, that is, new work, then

17   you have to comply with AU 390 and document it in a particular

18   way, right?

19   A.  Yes.

20   Q.  During your time at KPMG, you never were aware of any

21   violations of AU 390, right?

22   A.  No, not that I can recall.

23   Q.  In connection with your testimony on direct about the 2015

24   list of inspections, you said that preparation for the opening

25   meeting with the PCAOB was important.

1    A.  Yes, it was.

2    Q.  The government showed you a PowerPoint template that KPMG

3    tended to use for opening meetings with the PCAOB, right?

4    A.  Yes.

5    Q.  If we could take a look at that.  That is in evidence as

6    Government Exhibit 1306.  Do you remember seeing this, Mr.

7    Sweet?

8    A.  Yes, I do.

9    Q.  If we can scroll through maybe to the next page.  Next

10   page.  This is essentially a slide deck that the engagement

11   team fills in in preparation for the opening meeting with the

12   PCAOB, right?

13   A.  Yes.  It's the template that they would use.

14   Q.  They do that once they learn that the engagement is going

15   to be inspected?

16   A.  Yes.

17   Q.  These slides are preexisting, right?  They just need to be

18   filled in with the information that is specific to the

19   particular engagement?

20   A.  Yes, that's right.  They have to be tailored for the

21   specific audit engagement.

22   Q.  You testified in the normal course that you believe the

23   PCAOB gives two to three weeks notice in advance of an

24   inspection?

25   A.  That was common, most common, two to three weeks notice.

1    There are certainly exceptions there.  It might be one week,

2    and that occurred.  For international inspections it could be a

3    little bit longer.  But generally it was two to three weeks for

4    the U.S. firm.

5    Q.  So the engagement team had to prepare this template in that

6    period of time, right?

7    A.  Yes.

8    Q.  Your testimony is that a few extra weeks in terms of the

9    2015 list would make such a material difference in the team's

10   preparation that the PCAOB might not issue comments on the

11   engagement?

12   A.  Yes.  But it is a little bit more than that, the way you

13   are characterizing it.  The benefit of having a very robust

14   opening meeting presentation is that it would give the

15   opportunity for the engagement team to proactively address any

16   soft spots that had been identified.  So the knowledge of which

17   inspections would get picked by the PCAOB well in advance of

18   the three-week date would permit the engagement team or give

19   the engagement team the ability, or the national office, to go

20   through the file, identify where the soft spots might be, and

21   then address those in this opening meeting presentation in

22   order to give the first, best answer, characterized as we did

23   it this way on purpose because we thought about this, this,

24   this, and this, because it was the only thing that was

25   compensated.  So that was really where the benefit was.  The

1    first time it came out, it could be presented in such a way

2    that the risk had been mitigated through other procedures.

3    Q.  I understand that is your view.  But at this time all of

4    the audit work, the underlying audit work, would be completed,

5    right?

6    A.  I'm sorry.  At what time?

7    Q.  At the time the engagement team is preparing this

8    presentation for the opening meeting, all the audit work would

9    be done?

10   A.  Generally, if we are talking about the most common examples

11   of where we had two or three weeks notice, yes.

12   Q.  So the engagement team is looking back through a file that

13   is closed?

14   A.  Yes.

15   Q.  The PCAOB is interested in underlying audit work, right?

16   Isn't that what you testified to?

17   A.  Yes.

18   Q.  They want to have an unbiased view of the real audit work;

19   that was your testimony on direct, right?

20   A.  Yes.

21   Q.  You are aware that the PCAOB's official position is that it

22   doesn't write comments based on mere documentation or

23   representations from the engagement team, it is actually

24   looking at the work, right?

25   A.  Yes, I'm well aware of that from my time at the PCAOB.  I

1    have probably said that statement a hundred times.

2    Q.  But your testimony is still that this presentation, this

3    prepackaged slide show that the engagement team would work

4    on,could make such a big impact on the PCAOB that they wouldn't

5    issue a comment on the engagement?

6    A.  One of the things that I would do when I led inspections at

7    the PCAOB --

8    Q.  Sir, is that your testimony?  Yes or no.

9    A.  I'm sorry.  Would you ask the question again then.

10   Q.  This presentation, Government Exhibit I think it is 1306,

11   would make such a big impact on the PCAOB that they wouldn't

12   issue a comment on the engagement?  Yes or no.

13   A.  I sincerely apologize.  Can you please ask that one more

14   time.  I really want to make sure I get it right.

15   Q.  Is your testimony that this presentation that we are

16   looking at, Government Exhibit 1306, which is a prepackaged

17   slide show that the engagement team prepared for the opening

18   meeting with the PCAOB, this presentation could make such an

19   impact on the inspection team that they would decide not to

20   issue a comment?

21   A.  Not this template, but the actual opening meeting

22   presentation had a very big impact.  Yes, that is my

23   experience, my direct experience from my time at the PCAOB and

24   what I would even tell engagement teams while I work at KPMG as

25   a liaison.

1  Q.  You testified that during your first month at the PCAOB you

2  believe you may have had occasions where you volunteered

3  confidential information because of that directive that you

4  believe you received in your first week on the job, right?

5  A.  I'm sorry.  Did you say my first month at the PCAOB?

6  Q.  I'm sorry.  KPMG.  All these acronyms.  KPMG.

7  A.  Yes.

8  Q.  Sometime in your first or second week on the job you were

9  introduced to an audit partner named Tom Garton, right?

10  A.  Yes.

11  Q.  He was the lead partner on an engagement called Entegris?

12  A.  I don't remember the name of his engagement, but I knew it

13  was a nonfinancial services one in Minneapolis.  And it was

14  that first week, yes.

15  Q.  When you met him, he had already received notification,

16  official notification, from the PCAOB that he was going to be

17  inspected, right?

18  A.  Yes.

19  Q.  He asked you for assistance in telling him a little bit

20  about the inspectors who were on the team, right?

21  A.  Yes.

22  Q.  This is because you had just left the PCAOB, so he thought

23  you might know who they are?  Was that your understanding?

24  A.  Yes.

25  Q.  When he talked to you about the inspectors on the team, you

1    volunteered to him the reasons why you thought the PCAOB had

2    picked his engagement, isn't that right?

3    A.  Yes.  But just to be, again, very clear, when he approached

4    me, it was more than just let's talk through the inspectors.

5    That was certainly a common thing that was done.  But it was

6    also, hey, can you talk me through the PCAOB's inspection

7    process and how this works.  He had just moved into this

8    national office role supporting Tom Whittle, and this was

9    following my lunch with Tom Whittle on that Thursday, so I did

10   talk him through risk assessment and basis for selection and

11   focus areas.

12   Q.  Can we look at I believe what is in evidence as Government

13   Exhibit 759.  I think there is a second page.  Can we take it

14   off the jury's screen, please.  Mr. Sweet, could you take a

15   look at this.  If you need us to scroll through it, we can

16   scroll through more.

17   A.  Do you mind going to the top, please, if that's okay?

18   Q.  Does this look like an email exchange that you had with Mr.

19   Garton about topic we were just discussing?

20   A.  Yes.

21          MS. LESTER:  The government offers Government Exhibit

22   759.

23          MS. KRAMER:  No objection.

24          THE COURT:  Government Exhibit 759 received.

25          (Government's Exhibit 759 received in evidence)

1    Q.  If we could scroll down to the second page.  There is an

2    email dated May 7th.  Is that the Thursday of your first week?

3    A.  Yes, ma'am.

4    Q.  Mr. Garton says, "Hi, Brian.  It was nice to meet you

5    yesterday.  We're happy to have you on board.  Let me know a

6    convenient time to connect and discuss my upcoming inspection.

7    I would love your perspective."  Do you see that?

8    A.  Yes.

9    Q.  If we could scroll up, please.  You email him back a short

10   while later and say, "I'm free.  Please feel free to let me

11   know if you need an alternative time."  Then, scrolling up to

12   the next one, he says he'll stop down.  Eventually it seems

13   like you end up actually speaking, right?

14   A.  Yes.

15   Q.  Isn't it true that you told Mr. Garton that Entegris was a

16   three-star referral in terms of the PCAOB's rating system?

17   A.  I don't remember the specific details, but if that's what

18   it says -- I remember pulling up the GNF planning profile in my

19   office with him sitting at my desk, putting it on one of the

20   monitors and turning it to show him.  If it said that it was a

21   three-star referral on that document, then it would have been

22   something we likely discussed.

23   Q.  Had you ever met Mr. Garton prior to this day?

24   A.  No.

25   Q.  He stopped by your office because he had found out that you

1    just started, right, and he had an engagement that was about to

2    be inspected by the PCAOB, correct?

3    A.  Yes.

4    Q.  Your testimony that you pulled up on the computer this

5    highly confidential GNF planning document and showed it to him?

6    A.  Yes.

7    Q.  He didn't ask you if you had such a document, did he?

8    A.  No.

9    Q.  And you didn't tell him that it was a confidential PCAOB

10   document that you were showing to him, did you?

11   A.  I don't remember how I characterized that document to him.

12   I don't know.  I don't know if I told him.

13   Q.  You don't remember whether you told him?

14   A.  That it was a confidential PCAOB?  I don't remember.  I

15   certainly may have.  It would be pretty obvious, in my opinion,

16   to anyone in the national office looking at that document.  But

17   I don't remember, I can't remember what words I said.

18   Q.  So your testimony is it would have been obvious to him that

19   it was a confidential PCAOB document?

20   A.  I certainly may have told him that, ma'am.  Tom Garton was

21   working for Tom Whittle in the inspections group in the

22   national office.

23   Q.  I'm sorry.  I appreciate some of the explanation, but you

24   need to answer my question.  Is your testimony that it would

25   have been obvious to him that it was a confidential PCAOB

1   document?

2   A.  Yes.

3   Q.  This is not a document that was supposed to be distributed

4   outside of the PCAOB, right?

5   A.  No.

6   Q.  Someone who worked at KPMG who never worked at the PCAOB

7   would have never seen this document before, right?

8   A.  Yes.

9   Q.  But your testimony is that you are sure he knew what it

10  was?

11  A.  I remember -- yes.  I took him through the basis for

12  selection.

13  Q.  Your answer is yes?

14  A.  Yes.

15          MS. KRAMER:  Your Honor, objection.  The witness was

16  answering the question.

17          THE COURT:  Did you complete your answer?

18          THE WITNESS:  No, not quite.

19          THE COURT:  You can complete it.

20  A.  The cells on the spreadsheet that I showed him were the

21  PCAOB's basis for selection, the specific bullet points about

22  why he and this specific issue engagement got picked, each of

23  the focus areas that explained what the PCAOB's rationale for

24  selection was for each of those focus areas.  So that in and of

25  itself, we made it pretty clear that if I hadn't told him

1  directly that it was confidential, I certainly may have, and I

2  think that information in and of itself made it very clear to

3  him.

4  Q.  You showed this to him on the Thursday of your first week

5  of work, right?

6  A.  Yes.

7        MS. LESTER:  We can take that down.  Thank you.

8  Q.  Another person, engagement partner, you spoke to relatively

9  early on in your time at KPMG was Mike Flynn, right?

10 A.  Yes.

11 Q.  Do you remember talking to him about the fact that he had

12 had a series of clean inspections with the PCAOB?

13 A.  I knew that to be the case with Mike.  I don't remember at

14 what point we discussed that, but I knew that to be the case

15 with Mike.

16 Q.  Do you recall, sir, that you and he were joking or talking

17 about the fact that he was probably likely to get inspected

18 because he had had clean inspections in the past?

19 A.  I don't remember that joking, but it certainly may have

20 happened, yes.

21 Q.  Do you remember a conversation with Mike Flynn about

22 whether he was going to get inspected?

23 A.  Yes.

24 Q.  Do you remember that you checked on the GNF planning

25 spreadsheet, the document we were just talking about, and you

 1  told him that in fact Hanmi, which was an engagement of his,

 2  was going to get picked, right?

 3  A.  I remember being asked to prep Mike for an announced PCAOB

 4  inspection, but I don't remember when that had been announced

 5  relative to when I had been asked to help out with the kind of

 6  pre-inspection review.  So I'm not certain on the timing,

 7  ma'am.

 8  Q.  Do you recall talking to him and telling him what the focus

 9  areas were?

10  A.  I certainly may have, ma'am.

11  Q.  Again, this wasn't someone you knew prior to starting at

12  KPMG, right?

13  A.  No.

14  Q.  Mr. Middendorf never asked you to share this confidential

15  information, the GNF planning profile, with Mr. Garton or Mr.

16  Flynn, right?

17  A.  He had asked me to add value and share my insights whenever

18  I could.  Both Mr. Garton and Mr. Flynn reported directly to

19  Tom Whittle in the inspections group.  But no, Dave Middendorf

20  didn't ask me specifically to meet with Mike Flynn.

21  Q.  Do you know someone, another audit partner at KPMG, named

22  Steve Georgian?

23  A.  Yes.

24  Q.  Do you recall early on in your time at the firm that Steve

25  Georgian was preparing a presentation on KPMG's root cause

1    analysis?

2    A.   Yes.

3    Q.   That was to be presented at a monthly meeting with the

4    PCAOB, right?

5    A.   Yes.

6    Q.   You testified a bit about this on direct.  You asked Cindy

7    Holder to send you common forms that you worked on so that you

8    could give those or show shows to Steve Georgian regarding the

9    root cause analysis that he was doing, right?

10   A.   They weren't the common forms, but they were the draft

11   reporting language that I had written at the PCAOB.

12   Q.   They were language to be included in a part 2 section, is

13   that right?

14   A.   That's right.

15   Q.   If we could pull up for a moment Government Exhibit 510,

16   which is in evidence.  This is that smiley face email that Ms.

17   Holder sent you, do you remember, with EFS?

18   A.   Yes.

19   Q.   This is the email that attached those confidential

20   documents from the PCAOB, right?

21   A.   Yes.

22   Q.   She sent it to your Yahoo address?

23   A.   Yes.

24   Q.   You didn't tell Mr. Georgian that the advice that you were

25   giving him about his root cause analysis presentation was based

1  on these confidential documents, did you?

2  A.  No, I don't believe I did.

3  Q.  In fact, you printed out a public PCAOB document from the

4  website and gave it to Mr. Georgian, right?

5  A.  Yes, I believe so.

6  Q.  You wanted him to believe that what you were telling him

7  was coming out of your own head, right?

8  A.  Yes.

9  Q.  Mr. Middendorf never asked you to share that information

10  with Mr. Georgian, did he?

11  A.  No.

12              MS. LESTER:  Your Honor, should we stop?

13              THE COURT:  Yes.

14              It's almost 5:00.  I told you that I would let you all

15  go at 5 o'clock today.  The question on the table is whether we

16  can sit tomorrow.  I want to ask whether there is a juror who

17  would have a significant problem with coming in tomorrow and

18  sitting for a few hours, basically for the morning, probably

19  9:30 to 1:00.  Are you up for it?

20              THE JURY:  Yes.

21              THE COURT:  You can do it?

22              THE JURY:  Yes.

23              THE COURT:  We will sit tomorrow just to try to keep

24  the trial on track with our estimate of overall timing.  I very

25  much appreciate it.  Hopefully, we won't have to do it next

1    week.  But we will sit tomorrow at 9:30.  I'm not sure exactly

2    when we will be done, but I don't think it will be a full day.

3    I think it will be probably until about lunchtime.  We will get

4    through as much as we can and then we will break for the

5    weekend.  We will have extra fine coffee for you tomorrow

6    morning at 9 o'clock and breakfast for you as well.  I

7    appreciate your patience and attentiveness during the trial.

8    We will continue tomorrow morning at 9:30 and be done probably

9    in the early afternoon.

10            Thanks everybody.  Have a good night.  Leave your pads

11   on your chairs and we will see you tomorrow morning.

12            (Jury not present, witness not present)

13            THE COURT:  Ms. Lester, any sense of how much longer

14   you will be on cross?

15            MS. LESTER:  On my limited experience with cross-

16   examination makes me reluctant to give any estimation.  I would

17   say maybe an hour and a half at the most, I think.

18            THE COURT:  All right.  Then how about redirect?

19            MS. KRAMER:  I'm hoping for 15 minutes.

20            THE COURT:  Okay.  Anything else anyone wanted to

21   address this evening?

22            MR. WEDDLE:  I did want to raise one point, your

23   Honor, briefly.  When we were at the sidebar, we were talking

24   about Defense Exhibits 1635 and 1636, I believe.  Actually,

25   1635 was admitted in evidence and we were arguing at the

1    sidebar, and I was making an argument that there were a series

2    of reasons why that was admissible.  1636 had been offered

3    before the sidebar but not admitted.

4           One of the reasons that I gave related to the fact

5    that this was in 1635, which is in evidence, a disclosure by

6    Helen Munter of this planned new bank inspection group.  The

7    prosecution team referred to that argument as ludicrous.  I'm

8    not saying that to complain about it, your Honor.  I'm just

9    saying that to orient everybody to the part of the discussion

10   that we were having.  The prosecution team also said it's Helen

11   Munter, she is the head of inspections.

12          The point that I think is a fair point and that makes

13   both of these documents admissible for an additional reason is

14   that the indictment itself talks about EC9.  It quotes EC9 in

15   full.  EC9 says unless authorized by the board, no board member

16   or staff shall disseminate or otherwise disclose any

17   information obtained in the course and scope of his or her

18   employment which has not been released, announced, or otherwise

19   made available in public.  There is nothing in the rule that

20   says the board or Helen Munter or the board or head of

21   inspections or the board or an associate director Bob Ross.

22   There is nothing like that in the rule.

23          Two points in that regard, your Honor.  One is that to

24   the extent there is an argument that the rule doesn't really

25   mean what it says and that what is confidential at the PCAOB is

1    what the PCAOB basically says is confidential, I think we have

2    made this argument to your Honor.  The defense collectively

3    have made this argument to your Honor in motions in limine I

4    think number 1 and number 3, which your Honor denied.

5           I think that that is a constructive amendment of the

6    indictment.  And it is a prejudicial variance, your Honor.  To

7    the extent that there is a shifting target about what exactly

8    is the rule or the rule is whatever someone says it is, it is

9    not only those two defects, your Honor, but it is also a due

10   process violation.  After all, this is a criminal case.  The

11   basis cited in the indictment for the criminal prosecution is

12   the violation of a rule.

13          I'm a lawyer.  I have never worked at the PCAOB.  But

14   as I read this rule, unless there is a board resolution saying

15   that Helen Munter is allowed to say this to the KPMG partners,

16   it's a violation of the rule.  And if it's unknowable to the

17   world which violations of the strict terms of the rule are

18   really violations of the rule and which ones are not really

19   violations of the rule and which ones may turn into a wire

20   fraud prosecution, that is a due process violation, your Honor.

21          Then, as an evidentiary matter, your Honor, in

22   Government Exhibits 1635 and in 1636, in addition to the

23   argument that I made at the sidebar, which was that the fact

24   that people are openly discussing these matters rebuts the

25   claim that discussions among certain people, which has been

termed by this witness a "circle of trust," are evidence of

criminal conspiracy, it rebuts that argument that the

discussion of confidential PCAOB information must be part of a

conspiracy.

The fact that there are emails with people who are not

co-conspirators, who are not alleged to be unindicted

co-conspirators, openly discussing information they have

learned aside from published with the approval of the board

information that people have learned from the PCAOB, that

rebuts the conspiracy claim.

In addition, your Honor, in both of these exhibits

Brian Sweet, who is a former PCAOB employee and a former

associate director of the PCAOB, reacts.  In one of the

exhibits, which is 1636, your Honor -- can we put that up on

the screen, please, 1636.  If we blow up the bottom half of

1636.  This is a document not in evidence.

Here at the bottom Louann Sakala, who is not an

unindicted co-conspirator, former PCAOB employee, is talking

about what she heard, which is the PCAOB is putting together a

GNF banking team.  It will be led by Dave Marjanoff.  She sends

that information to a group of people.  Some of those people

are alleged to be co-conspirators.

George Hermann is an unindicted co-conspirator.  Tom

Whittle of course is alleged to be a co-conspirator; we are

going to hear from him later in trial.  John Mucha is not an

1    unindicted co-conspirator.  David Britt is an indicted

2    conspirator.  Brian Sweet by his claim is a conspirator.

3    Hector Santana is a former PCAOB employee, not a

4    co-conspirator.

5              (Continued on next page)

1          MR. WEDDLE:  (Continuing) And then if we take a look

2     at the top of this piece of paper, Brian Sweet takes this

3     information and he sends it to Cindy Holder, the indicted

4     conspirator; Joe Lynch, former PCAOB, not -- I believe not an

5     unindicted co-conspirator; Robert Larson, not an unindicted

6     co-conspirator, former PCAOB; and Michael Tucker, not an

7     unindicted co-conspirator, former PCAOB.  And Brian Sweet says

8     to that audience, "Sounds like it may be officially official

9     now."

10         So I think that that is highly probative evidence that

11    this audience of former PCAOB people treat this informal

12    discussion with Louann Sakala, and whoever her source is, as an

13    official announcement, which goes to the first point, which

14    is -- which we've argued from the beginning of the case:  This

15    rule can't mean what it says.  And if this rule means what it

16    says, it's violated all day every day at the PCAOB.

17         And this is no basis to say we're not talking about a

18    violation of the strict terms of the rule, because that happens

19    all the time, look at this audience of people who are all

20    experienced PCAOB people, they think this is an official

21    announcement.  That shows that the scope of this rule is

22    unknowable, which we submit is proof that there can be no

23    criminal intent.

24         So for both -- and there is a similar thing going on

25    with the exhibit that is in evidence, your Honor.  It is also

1    referred to as an official announcement.

2         So, I think all of those points are valid points.

3    They have been raised throughout the case.  They are both

4    evidentiary points and legal points.  They are also points that

5    go to the prejudice of a constructive amendment or an

6    unknowable rule, or a variance in the evidence being the

7    subject of a criminal prosecution.

8         I just wanted to elaborate on that.  I think it is a

9    critical point, and it has a number of facets to it that I

10   wanted to be able to explain that whispering at the sidebar.

11        THE COURT:  OK.  Does anyone want to respond.

12        MS. MERMELSTEIN:  Not really, your Honor.  If you want

13   us to say something, I am happy to, but I think that argument

14   is as ludicrous now as it was at the sidebar.  The exhibit is

15   not admissible.  If it were admissible, it is still barred by

16   403, and there still has been no constructive amendment or

17   variance.  And I think everyone is ready to go home, but I can

18   say more if you want me to.

19        THE COURT:  That is OK.  I want to give you a chance

20   to make a record for whatever purpose.

21        When I was allowing some of these documents, it was on

22   the idea that I think it is fair game to have testimony about

23   emails that I've viewed as for the purpose of showing not the

24   truth of what's in the emails but the fact that information was

25   communicated, partly in I think support of the theory that the

1    defendant is offering here.  I was trying to make that

2    distinction based on the emails.  You know, whether I got it

3    wrong or right, I don't know.

4            But I understand -- I think understand the point, and

5    it is what it is.

6            Anything else anybody wanted to talk about this

7    evening?

8            MR. BOXER:  No, your Honor.

9            MS. MERMELSTEIN:  No, your Honor.

10           THE COURT:  OK.  We'll see you tomorrow.  Have a good

11   night.

12           (Adjourned to 9:30 a.m. February 22, 2019)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

 BRIAN JOHN SWEET

     Cross By Mr. Cook . . . . . . . . . . . .1181
     Cross By Ms. Lester . . . . . . . . . . .1360




                    GOVERNMENT EXHIBITS

Exhibit No.                              Received

 450   . . . . . . . . . . . . . . . . . . . .1289

 756   . . . . . . . . . . . . . . . . . . . .1264

 759   . . . . . . . . . . . . . . . . . . . .1399

 800   . . . . . . . . . . . . . . . . . . . .1288

 930   . . . . . . . . . . . . . . . . . . . .1265




                    DEFENDANT EXHIBITS

Exhibit No.                              Received

 1008   . . . . . . . . . . . . . . . . . . .1323

 1106   . . . . . . . . . . . . . . . . . . .1258

 1184   . . . . . . . . . . . . . . . . . . .1294

 1361   . . . . . . . . . . . . . . . . . . .1276

 1450   . . . . . . . . . . . . . . . . . . .1283

 1452   . . . . . . . . . . . . . . . . . . .1259

 1453   . . . . . . . . . . . . . . . . . . .1278

 1455   . . . . . . . . . . . . . . . . . . .1274

```
 1                          DEFENDANT EXHIBITS

 2    Exhibit No.                              Received

 3    1457     . . . . . . . . . . . . . . . . .1310

 4    1460     . . . . . . . . . . . . . . . . .1260

 5    1461-R   . . . . . . . . . . . . . . . . .1308

 6    1462     . . . . . . . . . . . . . . . . .1319

 7    1473     . . . . . . . . . . . . . . . . .1248

 8    1477     . . . . . . . . . . . . . . . . .1261

 9    1483     . . . . . . . . . . . . . . . . .1249

10    1488     . . . . . . . . . . . . . . . . .1250

11    1489     . . . . . . . . . . . . . . . . .1286

12    1490     . . . . . . . . . . . . . . . . .1255

13    1506     . . . . . . . . . . . . . . . . .1270

14    1550     . . . . . . . . . . . . . . . . .1347

15    1580     . . . . . . . . . . . . . . . . .1352

16    1585     . . . . . . . . . . . . . . . . .1357

17    1588     . . . . . . . . . . . . . . . . .1354

18    1593     . . . . . . . . . . . . . . . . .1250

19    1594     . . . . . . . . . . . . . . . . .1268

20    1595     . . . . . . . . . . . . . . . . .1262

21    1596     . . . . . . . . . . . . . . . . .1285

22    1598     . . . . . . . . . . . . . . . . .1276

23    1599     . . . . . . . . . . . . . . . . .1281

24    1601     . . . . . . . . . . . . . . . . .1280

25    1602     . . . . . . . . . . . . . . . . .1291
```

DEFENDANT EXHIBITS

Exhibit No.                                    Received

1604   . . . . . . . . . . . . . . . . . .1268

1625   . . . . . . . . . . . . . . . . . .1225

1626   . . . . . . . . . . . . . . . . . .1331

1630   . . . . . . . . . . . . . . . . . .1254

1631   . . . . . . . . . . . . . . . . . .1253

1632   . . . . . . . . . . . . . . . . . .1252

1633   . . . . . . . . . . . . . . . . . .1252

1634   . . . . . . . . . . . . . . . . . .1284

1635   . . . . . . . . . . . . . . . . . .1318

M277   . . . . . . . . . . . . . . . . . .1367

M37   . . . . . . . . . . . . . . . . . .1364