J2pdmid1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4             v.                            18 Cr. 0036(JPO)

 5    DAVID MIDDENDORF and JEFFREY
      WADA,
 6
                 Defendants.
 7
      ------------------------------x
 8

 9                                           February 25, 2019
                                             9:42 a.m.
10

11    Before:

12                      HON. J. PAUL OETKEN,

13                                           District Judge
                                             and a jury
14

15                         APPEARANCES

16    GEOFFREY S. BERMAN
           United States Attorney for the
17         Southern District of New York
      BY:  REBECCA G. MERMELSTEIN
18         AMANDA K. KRAMER
           JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20    PETRILLO KLEIN & BOXER LLP
           Attorneys for Defendant David Middendorf
21    BY:  NELSON A. BOXER
           AMY R. LESTER
22         ALEXANDRA REBECCA CLARK
              – and –
23    BRUCH HANNA LLP
      BY:  GREGORY S. BRUCH
24

25
```

J2pdmid1

1                              APPEARANCES CONTINUED

2    BROWN RUDNICK LLP
          Attorneys for Defendant Jeffrey Wada
3    BY:  STEPHEN COOK
          JUSTIN S. WEDDLE
4         SELBIE JASON
                – and –
5    LATHAM & WATKINS
     BY:  JASON MASASHI OHTA
6

7              – also present –

8    Lyeson Daniel, Postal Inspector
     Virginia Faughnan, Postal Inspector
9    Peter Urbanczyk, Government Paralegal
     Nathaniel Cooney, Government Paralegal
10   Kiezia Girard-Lawrence, Postal Inspector
     Stephanie O'Connor, Defendant Middendorf paralegal
11   Sarah Chojecki, Defendant Wada paralegal

12

13                               oOo

14

15

16

17

18

19

20

21

22

23

24

25

J2pdmid1

```
 1                 (trial resumed; jury not present)
 2                 THE COURT:  Good morning, everybody.
 3                 ALL COUNSEL:  Good morning, your Honor.
 4                 THE COURT:  I have received a number of letters over
 5      the weekend which I am absorbing.
 6                 And who is the next witness?
 7                 MS. ESTES:  Diana Kunz.
 8                 THE COURT:  Is there anything we need to address
 9      before that testimony?
10                 MR. COOK:  Your Honor, very briefly.  After we
11      adjourned court last week, we learned that Mr. Ohta's law firm
12      does some work for KPMG in wholly unrelated matters.  We don't
13      believe the nature of that work rises to the level of any
14      conflict, particularly given the posture of Mr. Wada to KPMG.
15      However, we wanted to raise that issue with your Honor, and let
16      the Court know we don't believe there is a need for a Curcio
17      hearing.  We would also inform the Court that we've discussed
18      the matter with Mr. Wada and don't believe there is any issue
19      there either.
20                 THE COURT:  OK.  Does anybody believe there is a need
21      for a Curcio hearing?
22                 MS. ESTES:  No, your Honor.
23                 THE COURT:  All right.
24                 MS. KRAMER:  Two brief things, your Honor.
25                 THE COURT:  Yes.
```

J2pdmid1

1          MS. KRAMER:  One is that when I was examining

2     Mr. Sweet on redirect, I offered Defense Exhibits M117 through

3     i believe it is 121 as Government Exhibits 2000 through 2005.

4     My math was off and it should be Government Exhibits 2000

5     through 2004.

6          THE COURT:  OK.  Got it.  So it is M117 through M121?

7          MS. KRAMER:  Yes.

8          THE COURT:  And that should be Government 2000 through

9     2004?

10          MS. KRAMER:  Yes.

11          THE COURT:  Got it.

12          MS. KRAMER:  I just added one extra government exhibit

13     number.

14          THE COURT:  OK.

15          MS. KRAMER:  Then, second, one of the motions, the

16     motion to preclude a government exhibit and related testimony

17     from Barbara Hannigan, which was filed yesterday evening,

18     potentially does implicate testimony that we may hear from her

19     this afternoon depending on how quickly the day proceeds.  We

20     will be filing a response momentarily.  So we don't need to

21     take it up this morning, but we may need to take it up at

22     lunch, depending on how quickly the morning goes.  I don't

23     think she would be called before probably the 4 o'clock hour if

24     we get to her today, but I wanted to alert the Court to that.

25          THE COURT:  OK.  Well, we can talk about that later, I

J2pdmid1

1    guess.  I will take a look at the letter, first.

2              MR. WEDDLE:  Your Honor, in terms of the PCAOB-related

3    filings, speaking for myself, I think that the week may go

4    faster than I had predicted on Friday.  We heard from the

5    government yesterday that they had eliminated some witness that

6    they had previously had on their list and there was some chance

7    of finishing the case -- the government case this week.  So in

8    the event we prevail in our motions relating to the PCAOB,

9    that's going to have to be a quick turnaround for the PCAOB.  I

10   just wanted to alert your Honor to the possibility of the

11   government resting this week.

12             THE COURT:  OK.  Thank you.

13             MR. BOXER:  Yes.  Just to add to that, your Honor.  I

14   think we were informed that they were not calling six witnesses

15   that they had previously identified as witnesses.  We're

16   working through our scheduling issues as far as the defense

17   case we were anticipating further down the road.  So if we do

18   have any scheduling issues, we will bring them to your

19   attention.  I don't have anything to raise right now.

20             THE COURT:  So you said they are now calling six

21   witnesses?

22             MR. BOXER:  They are not calling six witnesses that

23   they had previously discussed that they were calling.

24             THE COURT:  OK.  Got it.

25             MR. BOXER:  That changes the timing for our case

J2pdmid1

1       significantly.

2               THE COURT:  Got it.  All right.

3               All right.  Are we ready for the next witness?

4               MS. ESTES:  Yes, your Honor.  Should we get her on the

5       stand?

6               THE COURT:  Yes.

7               (Witness present)

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2pdmid1                        Kunz - direct

1            (Jury present)

2            THE COURT:  You may be seated.

3            Good morning, folks

4            JURORS:  Good morning.

5            THE COURT:  Welcome back.  I hope you all had a good

6       weekend.

7            And, government, you may call -- Ms. Estes, the

8       government may call its next witness

9            MS. ESTES:  Your Honor, the government calls Diana

10      Kunz.

11           THE COURT:  Ms. Kunz, will you please raise your right

12      hand and Mr. Hampton will swear you in.

13       DIANA KUNZ,

14           called as a witness by the government,

15           having been duly sworn, testified as follows:

16           THE CLERK:  Please state your full and spell your last

17      name slowly for the record.

18           THE WITNESS:  Diana Kunz, K-u-n-z.

19           THE COURT:  Ms. Estes, you may inquire.

20      DIRECT EXAMINATION

21      BY MS. ESTES:

22      Q.  Good morning.

23      A.  Good morning.

24      Q.  What is your educational background?

25      A.  I have a bachelor's in accounting from Illinois State

J2pdmid1                          Kunz - direct

1    University.

2    Q.  Do you have any professional licenses?

3    A.  I'm a Certified Public Accountant in the State of Illinois

4    and a member of the AICPA.

5    Q.  Where do you currently work?

6    A.  KPMG.

7    Q.  How long have you worked for KPMG?

8    A.  21-and-a-half years.

9    Q.  Do you work in a particular office?

10   A.  I am in the Chicago office.

11   Q.  What do you do at KPMG?

12   A.  I'm an audit partner.

13   Q.  Do you have any other titles?

14   A.  I'm also the Chicago Office Audit Financial Services

15   Practice Leader.

16   Q.  And when did you become the Financial Services Audit

17   Practice Leader in the Chicago office?

18   A.  In April of 2018.

19   Q.  And when did you become an audit partner, more generally,

20   at KPMG?

21   A.  October of 2010.

22   Q.  Do you specialize in auditing any particular type of

23   client.

24   A.  Financial services companies.

25   Q.  Is that banking?

J2pdmid1                          Kunz – direct

1    A.  Yes, banking.

2    Q.  Now, generally speaking, what are your duties and

3    responsibilities as an audit partner at KPMG?

4    A.  I have the overall responsibility of oversight of the

5    execution of the audit that is performed by my team to support

6    the opinion that we issue on the financial statements.

7    Q.  How many audits do you typically work on in a year?

8    A.  Anywhere from eight to twelve a year.

9    Q.  And how many of those audits are audits involving public

10   companies?

11   A.  Two to three.

12   Q.  Now, Ms. Kunz, generally speaking, what is the purpose of

13   an audit?

14   A.  The purpose of an audit is to obtain evidence to support a

15   conclusion on the material correctness of financial statements

16   that the company we are auditing is issuing.

17   Q.  When you are the lead partner on an audit, what sort of

18   work do you do on the audit?

19   A.  Oversight, review of workpapers prepared and performed by

20   my team, communications with management executives, audit

21   committee members, board members.

22   Q.  After an audit is complete, is there any work product

23   produced?

24   A.  We issue an opinion.

25   Q.  And what is the opinion?

J2pdmid1                         Kunz - direct

1    A.   The opinion is the conclusion on the financial statements

2    and internal controls of the company that we're auditing.

3    Q.   Now, Ms. Kunz, focusing on the time period of 2016, after

4    the opinion is issued, was there any sort of documentation

5    timeframe that you have for the audit?

6    A.   Following the issuance of the opinion, we have in the past

7    had 45 days to final assemble and final edit or complete the

8    workpapers supporting the opinion.

9    Q.   And when you say "workpapers," what do you mean by that?

10   A.   Those are the memorandum or audit support that we've

11   obtained from the company and prepared regarding our procedures

12   to support our conclusions.

13   Q.   During the 45-day documentation period, are you allowed to

14   do any audit procedures?

15   A.   No.

16   Q.   Now, as to the workpapers, how are those organized?

17   A.   They are electronic in a tool that KPMG has called eAudIT.

18   Q.   And, again, focusing on the timeframe of 2016, generally

19   speaking, what would happen with respect to the eAudIT when the

20   45-day documentation period is complete?

21   A.   Either at the end of that 45 days or prior to that, if we

22   were finished with everything, the eAudIT file would become

23   locked.  We would close out the file, it would become locked,

24   and we would store it in our documentation retention system.

25   Q.   Can you make any changes to the workpapers in eAudIT after

J2pdmid1                          Kunz - direct

1    the file locks?

2    A.  Not into the electronic tool.

3    Q.  Now, Ms. Kunz, during your work at KPMG, have any of your

4    audits been inspected by the PCAOB?

5    A.  Yes.

6    Q.  Generally speaking, what is the lead audit partner's role

7    in an inspection?

8    A.  We have the ultimate responsibility for communication and

9    responding to the PCAOB and their requests and questions.

10   Q.  And generally speaking, how long before an inspection do

11   you find out that the inspection is going to take place?

12   A.  Likely, two to three weeks.

13   Q.  Before an inspection begins, do you present anything to the

14   PCAOB?

15   A.  Yes.  We prepare a PowerPoint presentation, which is a

16   kickoff deck that walks through background on the issuer that

17   has been subject to our audit procedures, as well as background

18   relating to focus areas that the PCAOB has told us they would

19   be looking at.  That will include the types of procedures we

20   performed, the results, as well as our conclusions.

21   Q.  And when do you share this PowerPoint presentation with the

22   PCAOB?

23   A.  In my experiences, it has been the week prior to them

24   coming on site to do the inspection, but larger engagements

25   that have been selected, I understand that generally will

J2pdmid1                        Kunz - direct

1    happen the first day of the inspection if it is a multi-week

2    engagement or inspection.

3    Q.  In your understanding, what significance, if any, does that

4    opening presentation have?

5    A.  It is the PCAOB's first impression of the audit engagement

6    partner and the team.

7    Q.  Now, generally speaking, as an audit partner, what is your

8    goal with respect to PCAOB inspections?

9    A.  To have a successful inspection.

10   Q.  How do you have a successful inspection?

11   A.  By receiving no comments from the PCAOB at the end of the

12   inspection period.

13   Q.  What is a comment?

14   A.  A comment is a written form that the PCAOB will issue if

15   they identified something in our audit procedures that was

16   insufficient to support our opinion.

17   Q.  Now, Ms. Kunz, I would like to direct your attention to

18   2016.

19          Now, during that time, who did you report to within

20   KPMG?

21   A.  John Rodi.

22   Q.  And what was his position?

23   A.  He was the business unit partner in charge of audit in the

24   Chicago office.

25   Q.  And in the first few months of 2016, were you working on

J2pdmid1                         Kunz - direct

1    any audits of public companies?

2    A.  Yes, First Business Financial Services and Northern Trust.

3    Q.  So first focusing on First Business Financial Services,

4    what kind of company is that?

5    A.  That is a financial institution.

6    Q.  Where is it headquartered?

7    A.  Madison, Wisconsin.

8    Q.  And what kind of financial institution is it?

9    A.  It is a community bank.

10   Q.  Now, when you were working on this audit in early 2016, was

11   that for a particular fiscal year of First Business Financial?

12   A.  The 12/31/15 fiscal year end.

13   Q.  Now, what was your role on the First Business Financial

14   audit?

15   A.  I was the lead audit partner.

16   Q.  Were there any other partners on the audit?

17   A.  Only my SEC reviewing partner.

18   Q.  What is an SEC reviewing partner?

19   A.  They are the quality reviewer on the back end of the audit.

20   All public companies have to have a SEC-designated reviewing

21   partner.  All other companies also have reviewing partners;

22   they don't necessarily need to be SEC reviewing partners.

23   Q.  Now, turning back to the First Business Financial audit.

24            When did you start working on the audit for the fiscal

25   year ending in December 2015?

J2pdmid1                           Kunz - direct

1    A.   Right around April of 2015.

2    Q.   And when did that audit end?

3    A.   Approximately mid-March, when we issued the opinion.

4    Q.   And mid-March of which year?

5    A.   I'm sorry.  2016.

6    Q.   And is that when the 45-day documentation period began?

7    A.   Yes.

8    Q.   Now, approximately how many people were working on that

9    audit?

10   A.   Seven or eight as the quarantine members.

11   Q.   Was the First Business Financial audit part of any

12   monitoring program at KPMG?

13   A.   Yes.  It was a part of two monitoring programs.  There was

14   a National Office Allowance Monitoring Program as well as a

15   Chicago Business Unit Internal Controls Over Financial

16   Reporting Monitoring Program.

17   Q.   So, first, Ms. Kunz, you mentioned the National Office.

18   What is that?

19   A.   That is our Department of Professional Practice.  It is our

20   National Office, head of our -- head of the firm.

21   Q.   And what is the National Office's Allowance Monitoring

22   Program?

23   A.   That was the program to provide assistance to engagement

24   teams with a resource from the National Office that would be

25   involved with the Engagement Team in reviewing our risk

1    assessment, our planning, our execution, and ultimately our

2    documentation around the allowance for loan losses.

3    Q.  And what is the allowance for loan losses?

4    A.  The allowance for loan losses is an estimate by management

5    of the potential uncollectible receivable amounts they have on

6    their balance sheet.

7    Q.  So, how did this monitoring program affect your work on the

8    audit?

9    A.  It was an additional set of eyes, an additional perspective

10   as we planned and executed our audit.

11   Q.  And were there any people in particular in the beginning

12   working on the monitoring program in connection with that

13   audit?

14   A.  The National Office assigned Hector Santana to be our

15   liaison.

16   Q.  When was Hector Santana working on that audit primarily?

17   A.  Most of the work was done in December of '15, January,

18   February, into early March of 2016.

19   Q.  Was that before the opinion was issued?

20   A.  Yes.

21   Q.  Now, did Hector Santana work only on the allowance area or

22   did he work on other areas as well?

23   A.  Hector only worked on the allowance.

24   Q.  Did anybody else help on the audit?

25   A.  The Chicago office assigned Andy Sparks as the individual

1    to assist for the internal controls over financial reporting
2    monitoring, so he also assisted Hector in the review of the
3    allowance.
4    Q.   Now, Ms. Kunz, you mentioned you were also working on the
5    Northern Trust audit in early 2016.  Were you the lead partner
6    on that audit or did you play a different role?
7    A.   I was not the lead partner.  I was a supporting second
8    partner.
9    Q.   And as the second partner, generally speaking, what were
10   your responsibilities with respect to that audit?
11   A.   As a second partner, you support the lead audit partner in
12   his responsibilities, and also I had specific responsibilities
13   in certain process areas, so certain accounts that I saw from
14   beginning to end.  So, planning through execution of those
15   procedures.
16   Q.   And with respect to the Northern Trust audit, who was
17   responsible for the allowance area in particular?
18   A.   Chuck Fuller, the lead audit partner.
19   Q.   Was the Northern Trust audit part of any monitoring
20   program?
21   A.   Yes.
22   Q.   Which program?
23   A.   The Allowance Monitoring Program from the National Office.
24   Q.   And in connection with that monitoring program, who was
25   helping with the Northern Trust audit?

J2pdmid1                         Kunz - direct

1    A.  Cindy Holder.

2    Q.  And, generally speaking, when was she helping in connection

3    with the monitoring program?

4    A.  She was helping throughout the year, so she was actively

5    involved all of '15, probably again April to May of '15 through

6    the end issuance of that opinion.

7           MS. ESTES:  Mr. Urbanczyk, can you please publish

8    what's in evidence as Government Exhibit 954.

9           And if you could zoom into the bottom of the email.

10   BY MS. ESTES:

11   Q.  Ms. Dunes, do you recognize this email?

12   A.  Yes.

13   Q.  And who is the email from?

14   A.  From David Britt.

15   Q.  What is the date of the email?

16   A.  March 28, 2016.

17   Q.  And do you see your name in the "To" line of the email?

18   A.  Yes.

19   Q.  What is the subject line of this email?

20   A.  "Urgent - Allowance Monitoring Program follow up request."

21   Q.  So is this a reference to the allowance program you were

22   talking about?

23   A.  Yes.

24   Q.  Now, Ms. Kunz, where it says, "As part of our wrap up and

25   reporting of the results of the ALLL Monitoring Program, we

J2pdmid1                          Kunz - direct

1    need to gather some additional information from the eAudIT

2    files of your engagements that participated in the ALLL

3    Monitoring Program," what did you understand that to mean?

4    A.  They wanted to look into our electronic audit files.

5    Q.  And when you say "they," who did you understand wanted to

6    look into your electronic audit files?

7    A.  DPP and specifically the individuals in this email.

8    Q.  Let's turn to the individuals listed here.

9            Who is David Britt?

10   A.  David Britt was the head of our banking and capital markets

11   practice in the National Office.

12   Q.  And where it says "Brian Sweet" there in the middle of the

13   page, who is he?

14   A.  He was the partner in the Inspections Group in the National

15   Office.

16   Q.  And who is Jenn Stemple?

17   A.  She is an audit partner in the National Office.

18   Q.  Now, Ms. Kunz, when you received this email, how busy were

19   you at work?

20   A.  This was a very busy time.  We were wrapping up the 45-day

21   period for our year-end audits.  We were beginning to plan for

22   our 2016 audits, starting with the first quarters, and I was

23   actually rolling onto a new engagement at this time as well as

24   the lead partner.

25   Q.  So what was your reaction to receiving this email?

J2pdmid1                         Kunz - direct

1   A.  That it was going to just add more time to my day.  There

2   was going to be more questions that I was going to need to

3   focus on.

4          MS. ESTES:  All right.  Mr. Urbanczyk, can you go to

5   the second page of this email.

6   Q.  And, Ms. Kunz, do you see any of your engagements listed on

7   the second page?

8   A.  Yes.  First Business and Northern Trust.

9          MS. ESTES:  Thank you.  Mr. Urbanczyk, you can take

10  that down.

11  Q.  Now, Ms. Kunz, around the time you received this email, did

12  there come a time when you spoke to Brian Sweet?

13  A.  Yes.

14  Q.  Was that over the phone or in person?

15  A.  Over the phone.

16  Q.  And did he call you or did you call him?

17  A.  He called me.

18  Q.  What did he say when he called you?

19  A.  He called and indicated that he thought the First Business

20  Financial Services engagement might be selected by the PCAOB

21  for inspection that upcoming year.

22  Q.  Now, when he said that he thought First Business Financial

23  might be selected by the PCAOB for inspection, did he say

24  anything about why he thought it might be selected?

25  A.  No.

J2pdmid1                              Kunz - direct

1   Q.   Did you have any understanding as to what his belief that

2   it might be selected was based on?

3             MR. BOXER:   Objection.

4             THE COURT:   Overruled.

5             If you have an understanding, you can answer.

6   A.   No.

7   Q.   Did his comment that he thought it would be selected

8   surprise you in any way?

9   A.   Not really.  I thought myself that it might be selected.

10  Q.   And why did you think it might be selected?

11  A.   It was my final year on the engagement which had never been

12  selected and I had been selected in the past, so I thought

13  it -- I just had that tendency to think I might be selected, or

14  it might be selected.

15  Q.   Now, when Brian Sweet called you, what was the status of

16  this audit?

17  A.   We were in the 45-day period, so the opinion had been

18  issued.

19  Q.   Now, what, if anything, did Brian Sweet say on the call

20  with respect to the workpapers on this audit?

21  A.   Could you repeat the question?

22  Q.   What, if anything, did Brian Sweet say on the call

23  regarding workpapers, the audit file?

24  A.   Brian asked me not to close the file any earlier than the

25  45-day window.

J2pdmid1                          Kunz - direct

1    Q.  What else, if anything, did he say about the file?

2    A.  He indicated that he and Jenn Stemple would be going

3    through the file.

4    Q.  What, if anything, did he say about what they would be

5    looking for in the file?

6    A.  He indicated that they would be focusing on reviewing our

7    workpapers supporting the allowance for loan losses as well as

8    available for sale investment securities.

9    Q.  And when you say "available for sale investment

10   securities," very generally, what does that refer to?

11   A.  That is the valuation work that supports the audit of the

12   positions that a company, a bank, will hold in investments on

13   their balance sheet.

14   Q.  Now, what, if anything, did Brian Sweet say on the call

15   about who you should share this information with?

16   A.  Brian indicated I should share it with whom I thought

17   needed to know.

18   Q.  And who did you think needed to know?

19   A.  My lead senior manager was who I was planning to share it

20   with, and then because he was also working for another partner,

21   John Rodi, who was my supervisor, I also shared it with John

22   Rodi.

23   Q.  Who was your lead senior manager?

24   A.  Lane Flood.

25   Q.  And why did you think you needed to tell Lane Flood and

J2pdmid1                          Kunz – direct

1   John Rodi?

2   A.   Because I knew that Jenn and Brian, as they went through

3   the work, they would have questions, and Lane would be best

4   suited with myself to respond to those questions.

5   Q.   Did you tell anybody other than Lane Flood and John Rodi?

6   A.   After I told John Rodi, he suggested that I also let Dave

7   Marino know that.

8   Q.   Who is Dave Marino?

9   A.   He was the business unit professional practice partner for

10  Chicago.

11  Q.   Now, what was your understanding of why Brian Sweet asked

12  you only to share the information with those who needed to

13  know?

14          MR. BOXER:   Objection.

15          THE COURT:   Sustained.

16  BY MS. ESTES:

17  Q.   Now, Ms. Kunz, you testified earlier that Jenn Stemple was

18  going to be involved in looking at the workpapers.  Was she

19  ultimately involved in doing that?

20  A.   Yes.

21  Q.   Was Brian Sweet involved?

22  A.   Yes.

23  Q.   Was anybody else involved in looking at the workpapers?

24  A.   Yes.

25  Q.   What role, if any, did you have in the review of the

J2pdmid1                          Kunz - direct

1    workpapers for First Business Financial?

2    A.  I was going through my normal clearing of my open notes

3    from the 45-day period as well as responding to questions from

4    Jenn, Brian and the others, jumping on calls, etc.

5    Q.  How often were you discussing the workpapers with Jenn

6    Stemple, Brian Sweet, and the others?

7    A.  At first it was probably approximately daily, and as it got

8    closer to the 45-day window being closed, it became more

9    frequent.

10   Q.  How did this review of the workpapers from Jenn Stemple and

11   Brian Sweet affect the volume of your work?

12   A.  It increased the work.

13   Q.  Can you describe how it increased the work?

14   A.  It just extended my day.  So there were, again, several

15   calls, emails and questions and refreshes in the workpapers

16   that we needed to go back and just refresh on, so it required

17   more time on our part.

18   Q.  Now, generally speaking, in your discussions with the

19   reviewers, what kind of things, topics, would you discuss?

20   A.  Clarifications ensuring we could explain our process.  That

21   was the bulk of the discussions.

22   Q.  And, generally speaking, what kind of changes were made

23   during the review?

24   A.  Clarifications to workpapers, taking credit for work that

25   we'd already performed and was documented and evidenced in

J2pdmid1                         Kunz - direct

1   other sections of the workpapers, and editorial type changes.

2   Q.  Were the changes you made during your review consistent

3   with the PCAOB's auditing standards?

4   A.  Yes.

5           MS. ESTES:  Mr. Urbanczyk, can you pull up what's been

6   marked for identification as Government Exhibit 1005.

7   BY MS. ESTES:

8   Q.  Ms. Kunz, do you recognize this email?

9   A.  Yes.

10  Q.  Does this email relate to the review?

11  A.  Yes.

12          MS. ESTES:  Your Honor, the government offers

13  Government Exhibit 1005.

14          THE COURT:  1005 received.

15          (Government's Exhibit 1005 received in evidence)

16          MS. ESTES:  Mr. Urbanczyk, can you zoom in to the top

17  portion of the email.

18  BY MS. ESTES:

19  Q.  Now, Ms. Kunz, who is the email from?

20  A.  Jenn Stemple.

21  Q.  And what is the date of the email?

22  A.  April 15, 2016.

23  Q.  And what is the subject?

24  A.  "Allowance monitoring question."

25  Q.  Now, Ms. Kunz, is this email an example of the kind of

J2pdmid1                    Kunz - direct

1    communication you received from the reviewers during this

2    timeframe?

3    A.  Yes.

4            MS. ESTES:  Thank you.  Mr. Urbanczyk.  You can take

5    that down.

6            And can you pull up what's been marked for

7    identification as Government Exhibit 1006.

8    Q.  Ms. Kunz, do you recognize this email?

9    A.  Yes.

10   Q.  And does this email relate to the review of that audit

11   file?

12   A.  Yes.

13           MS. ESTES:  Your Honor, the government offers

14   Government Exhibit 1006.

15           THE COURT:  Received.

16           (Government's Exhibit 1006 received in evidence)

17   BY MS. ESTES:

18   Q.  Ms. Kunz, who is this email from?

19   A.  Jenn Stemple.

20   Q.  And what is the date of this one?

21   A.  April 15, 2016.

22   Q.  And who is this one to?

23   A.  Lane Flood and Cindy Holder, with a copy to myself.

24   Q.  Now, Ms. Kunz, looking at the questions listed in the email

25   here, generally speaking, how long did it take you and Lane to

J2pdmid1                         Kunz - direct

1  respond to the questions from the reviewers?

2  A.  It would depend on the type of question.  Some were very

3  quick.  If we knew the answer, immediately.  Others, we would

4  have to refresh back to the workpapers and take a look at what

5  we had documented over that whole year.  So, it could be

6  anywhere from minutes to hours.

7          MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

8  that down.

9          And if you could pull up what's been marked for

10  identification as Government Exhibit 1007.

11  Q.  Ms. Kunz, do you recognize this email?

12  A.  Yes.

13  Q.  Does this email relate to the review?

14  A.  Yes.

15          MS. ESTES:  Your Honor, the government offers

16  Government Exhibit 1007.

17          THE COURT:  Received.

18          (Government's Exhibit 1007 received in evidence)

19  BY MS. ESTES:

20  Q.  Ms. Kunz, who is this email from?

21  A.  Cindy Holder.

22  Q.  And what is the date of this email?

23  A.  April 18, 2016.

24  Q.  And what is the subject line there?

25  A.  "Language to utilize where appropriate."

J2pdmid1                         Kunz - direct

1   Q.  What is your understanding of the purpose of this email?

2   A.  It was a suggestion of language we could add to our

3   workpaper in any places we thought it made sense and was

4   appropriate.

5   Q.  Do you remember if you actually used this language?

6   A.  I do not remember.

7        MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

8   that down.

9   Q.  Now, Ms. Kunz, stepping back a little bit.

10       In connection with this review, were there any

11  deficiencies uncovered in the audit?

12  A.  Yes.

13  Q.  How did that come up?

14  A.  Jenn Stemple raised a question on a couple of the controls

15  we had performed and whether the work was performed with

16  evidence from the period subject to audit, which was 2015.

17  Q.  What happened when Jenn Stemple discovered there was an

18  issue with the controls you had performed?

19  A.  She asked questions to Lane and I to make sure she

20  understood, and Lane and I reviewed the questions, rereviewed

21  the controls, and actually further went back to our files and

22  identified a few additional controls in the same regard.

23  Q.  After Jenn Stemple uncovered this deficiency, did you have

24  to do any additional audit procedures?

25  A.  Yes.

J2pdmid1                          Kunz - direct

1    Q.  And did you document those audit procedures?

2    A.  We did.

3    Q.  How did you document them?

4    A.  We documented them in our documentation modification

5    workpaper, which was the firm template that we utilize under

6    the professional standards.

7    Q.  And is there an auditing standard that that relates to?

8    A.  Yes, AU 390.

9         MS. ESTES:  Mr. Urbanczyk, can you pull up what has

10   been marked for identification as Government Exhibit 1009.

11   Q.  Ms. Kunz, do you recognize this email?

12   A.  Yes.

13   Q.  And does this email relate to the review?

14   A.  Yes.

15        MS. ESTES:  Your Honor, the government offers

16   Government Exhibit 1009.

17        THE COURT:  1009 received.

18        (Government's Exhibit 1009 received in evidence)

19        MS. ESTES:  Mr. Urbanczyk, can you go to the second

20   page here, or, actually, the third page.

21   Q.  Now, Ms. Kunz, what is the date of this bottom email?

22   A.  April 21, 2016.

23   Q.  And focusing on the substance of the email, where it says

24   "Are either or both of you available to jump on a really quick

25   phone call related to the IPE items," what are "the IPE items"?

J2pdmid1                          Kunz - direct

1   A.   "IPE" stands for information produced by the entity, and

2   those were the specific controls that we were performing

3   additional procedures on.

4   Q.   Was this related to the deficiency that was uncovered?

5   A.   Yes.

6            MS. ESTES:   Thank you, Mr. Urbanczyk.   You can take

7   this email down.

8            And can you pull up what's been marked for

9   identification as Government Exhibit 1013.

10  Q.   Ms. Kunz, do you recognize this email?

11  A.   Yes.

12  Q.   Does this email relate to the review?

13  A.   Yes.

14           MS. ESTES:   Your Honor, the government offers

15  Government Exhibit 1013.

16           THE COURT:   1013 received.

17           (Government's Exhibit 1013 received in evidence)

18  BY MS. ESTES:

19  Q.   Ms. Kunz, what is the date of this email?

20  A.   April 22, 2016.

21  Q.   And who is it from?

22  A.   Myself.

23  Q.   And what are you sending in this email?

24  A.   This is the draft of the workpaper modification template

25  that I had mentioned a moment ago.

J2pdmid1                          Kunz - direct

1   Q.  So was this the modification related to the deficiency

2   uncovered?

3   A.  Yes.

4          MS. ESTES:  All right.  Mr. Urbanczyk, can you go to

5   the second page here.

6   Q.  Ms. Kunz, what is this we are looking at?

7   A.  That is the documentation modification workpaper template.

8   Q.  And, Ms. Kunz, just to be clear, the procedures you did and

9   the documenting you did with respect to this deficiency, was

10  that all consistent with auditing standards?

11  A.  Yes.

12         MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

13  that down.

14         And can we pull up what's been marked for

15  identification as Government Exhibit 1011.

16  Q.  Ms. Kunz, do you recognize this email?

17  A.  Yes.

18  Q.  Does this relate to the review?

19  A.  Yes.

20         MS. ESTES:  Your Honor, the government offers

21  Government Exhibit 1011.

22         THE COURT:  1011 is received.

23         (Government's Exhibit 1011 received in evidence)

24  BY MS. ESTES:

25  Q.  Now, Ms. Kunz, who is this email from?

J2pdmid1                          Kunz - direct

1    A.  Brian Sweet.

2    Q.  And what is the date of this email?

3    A.  April 22, 2016.

4    Q.  Are there attachments to this email?

5    A.  Yes.

6    Q.  And, generally speaking, what do these attachments contain?

7    A.  These contained memos that were in our workpapers that

8    Brian had reviewed and provided questions and suggestions on.

9            MS. ESTES:  Mr. Urbanczyk, can we go to page 2.

10   Q.  Ms. Kunz, what sort of document is this?

11   A.  This is a memo prepared by my team included in the

12   workpapers.

13           MS. ESTES:  And, Mr. Urbanczyk, can you go to page 6.

14   Q.  Now, Ms. Kunz, what sort of edits do you see here?

15   A.  These are questions, clarifications, and editorial

16   suggestions.

17           MS. ESTES:  And, Mr. Urbanczyk, can you go to the next

18   page.

19   Q.  What do you see here, Ms. Kunz?

20   A.  Can you zoom that?

21   Q.  Sorry.

22   A.  That's a clarification.

23           MS. ESTES:  And, Mr. Urbanczyk, can you keep flipping

24   through this document.

25           (Pause)

J2pdmid1                        Kunz - direct

1              Mr. Urbanczyk, can you go back to the page before
2      that.  And if you could zoom in to the left here, the comments
3      on the left.
4      Q.  Ms. Kunz, what sort of suggestions do you see here?
5      A.  This is to take credit for something we had documented
6      elsewhere.
7      Q.  And, Ms. Kunz, generally speaking, how long did it take you
8      to respond to the edits that Brian Sweet sent?
9      A.  Some of them that we had done were very quick and others we
10     had to do a little more rereviewing of our own workpapers and
11     ensuring that they were appropriate.
12             MS. ESTES:  Mr. Urbanczyk, can you take this down and
13     pull up what's in evidence as Defense Exhibit M107.
14     Q.  Ms. Kunz, do you recognize this email?
15     A.  Yes.
16     Q.  And does this also relate to the review?
17     A.  Yes.
18     Q.  What is contained in the attachments here?
19     A.  Additional memorandum in our file with Brian's suggestions
20     and editorial comments.
21             MS. ESTES:  Mr. Urbanczyk, can you take this down and
22     pull up what's been marked for identification as Government
23     Exhibit 1012.
24     Q.  Ms. Kunz, do you recognize this email?
25     A.  Yes.

J2pdmid1                          Kunz - direct

1    Q.  Does this email relate to the review?

2    A.  Yes.

3           MS. ESTES:  Your Honor, the government offers

4    Government Exhibit 1012.

5           THE COURT:  1012 is received.

6           (Government's Exhibit 1012 received in evidence)

7    BY MS. ESTES:

8    Q.  Ms. Kunz, who is this email from?

9    A.  Brian Sweet.

10   Q.  And what is the date of this email?

11   A.  April 22, 2016.

12   Q.  And what are the attachments to this email, generally?

13   A.  Memorandum included in our workpapers that Brian had

14   reviewed and provided commentary on.

15   Q.  Do these memoranda relate to a particular part of the

16   audit?

17   A.  The allowance for loan losses.

18          MS. ESTES:  Mr. Urbanczyk, can you take this down and

19   just flip through the rest of the document.

20          (Pause)

21   Q.  Ms. Kunz, how would you describe the volume of edits from

22   Brian Sweet?

23   A.  There were a fair amount.

24   Q.  Would you describe it as a large volume?

25          MR. BOXER:  Objection.

J2pdmid1                              Kunz - direct

1            THE COURT:  Overruled.

2  A.   There were a number of documents that he provided comments

3  on.

4  Q.   And, generally speaking, can you estimate how long it took

5  you to input these suggestions and edits?

6  A.   Lane and I both worked on this.  And, again, similarly, if

7  they were very easy, it would just be a few minutes, so some of

8  them could be a few minutes.  Others may take hours.

9  Q.   Ms. Kunz, was First Business Financial actually inspected

10 in 2016?

11 A.   Yes.

12 Q.   Did you receive any comments?

13 A.   Initially we did but ultimately we did not.

14 Q.   When you say "initially we did," what do you mean by that?

15 A.   The PCAOB issued a comment form to the firm.

16 Q.   And what was that comment related to?

17 A.   Impaired loans.

18 Q.   Did KPMG contest the comment?

19 A.   Yes.

20 Q.   And how was the issue ultimately resolved?

21 A.   The PCAOB agreed not to include it in Part I of their PCAOB

22 report.

23 Q.   And what does that mean with respect to whether you passed

24 the inspection?

25 A.   It meant we passed.

J2pdmid1                        Kunz - direct

1   Q.  Now, Ms. Kunz, let me direct your attention to

2   February 2017.

3           What audits were you working on at that time?

4   A.  Chemical Financial was my primary client.

5   Q.  And directing your attention to February 3rd of 2017, did

6   you receive a call from Brian Sweet that day?

7   A.  Yes.

8   Q.  Where were you when you received the call?

9   A.  I was working from my home.

10  Q.  What did he tell you on the call?

11  A.  Brian told me that Chemical Financial was going to be

12  inspected that upcoming year, and he also told me the focus

13  areas that were going to be reviewed by the PCAOB.  He also

14  told me the reasons the Chemical Financial audit was selected

15  by the PCAOB, and he also told me that it had gone through

16  board approval.

17  Q.  Now, when Brian Sweet said it had gone through board

18  approval, what did you understand that to mean?

19  A.  At that time I didn't think about what that meant, but I

20  believe it was the PCAOB board.

21  Q.  And when he said the reasons it was going to be unexpected,

22  in your experience with inspections, had you ever been told the

23  reasons for an inspection by the PCAOB?

24  A.  No.

25  Q.  You testified he also told you about focus areas.  What did

J2pdmid1                          Kunz - direct

1    he say about the focus areas?

2    A.  He told me the focus areas were going to be the allowance

3    for loan losses, business combinations, available-for-sale

4    securities, and loans.

5    Q.  Now, what, if anything, did Brian Sweet say on the call

6    about the audit file?

7    A.  He indicated that I should not have my team close the file

8    out earlier than the 45-day period.

9    Q.  What, if anything, did he say on the call about who you

10   should share this information with?

11   A.  Brian told me not to tell anyone because his bosses did not

12   know yet.

13   Q.  Who did you understand his bosses to be?

14   A.  At that time I didn't know who that was.

15   Q.  How did you respond when Sweet told you this information?

16   A.  I was disappointed, thinking about my team and the work we

17   had just performed on the very challenging audit and that it

18   was going to extend our year, an already stressful time.

19   Q.  What do you mean by extend your year?

20   A.  A PCAOB inspection is a lot of work in advance to get ready

21   for the review, and it's a very stressful period to go through

22   when you're getting inspected.

23   Q.  Now, when Brian Sweet called you, what was the status of

24   the Chemical Financial audit?

25   A.  We were still completing our audit procedures.

J2pdmid1                           Kunz - direct

1    Q.  So, had the opinion issued?

2    A.  No.

3    Q.  Generally speaking, how busy were you when he called you?

4    A.  February is our busiest month in the audit practice.

5    Q.  What did you do after he called you?

6    A.  I continued to work.

7             MS. ESTES:  Mr. Urbanczyk, can you pull up what's been

8    marked for identification as Government Exhibit 1125.

9    Q.  Ms. Kunz, do you recognize these emails?

10   A.  Yes.

11   Q.  And do these relate to your conversation with Brian Sweet

12   on February 3, 2017?

13   A.  Yes.

14            MS. ESTES:  The government offers Government Exhibit

15   1125.

16            THE COURT:  1125 is received.

17            (Government's Exhibit 1125 received in evidence)

18   BY MS. ESTES:

19   Q.  So, Ms. Kunz, looking at the bottom email here, where you

20   say, "Hey Brian - did you get any perspective on timing," what

21   were you referring to there?

22   A.  When the inspection was going to happen.

23   Q.  And why did you want to get a perspective on timing?

24   A.  I was thinking about my team and the summer vacations.

25            MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

J2pdmid1                          Kunz - direct

1   that down.

2   Q.  Now, Ms. Kunz, directing your attention to the next day,

3   Saturday, what were you doing that day?

4   A.  Working.

5   Q.  Why were you working on a Saturday?

6   A.  Again, it's our busiest time in February.

7   Q.  Now, when you were working that Saturday, did you share

8   with anybody what Brian Sweet had told you?

9   A.  Yes.  I told my two managers on the Chemical Engagement

10  Team.

11  Q.  Why did you tell them?

12  A.  We were in a status meeting discussing the status of the

13  audit and I felt that they should know.  They were in the

14  trenches with me on this job.

15  Q.  What, if anything, did you say to them with respect to

16  sharing the information?

17  A.  I told them not to tell anybody else on the team because I

18  did not want the team to be more stressed out than they already

19  were at that time.

20  Q.  Did you speak to either of the managers about access to the

21  eAudIT file?

22  A.  I did speak to Andy, I don't know if it was at that meeting

23  or shortly after, and I told him that Brian Sweet and Cindy

24  Holder would be getting access to our file.

25  Q.  Now, Ms. Kunz, did your thinking on your Friday

J2pdmid1                          Kunz - direct

1    conversation with Brian Sweet evolve over the weekend?

2    A.  Yes.

3              MR. BOXER:  Objection.

4              THE COURT:  Overruled.

5    BY MS. ESTES:

6    Q.  What happened?

7    A.  As I continued to -- again, I was working all weekend.  As

8    I continued to think about the specificity of the information

9    that Brian told me, something didn't seem right.

10   Q.  Why didn't something seem right?

11   A.  Because it was very specific and it was -- that it was

12   going to be inspected.  There was no ambiguity or uncertainty

13   to it.

14   Q.  And why did it not seem right to get information on

15   something that was going to be inspected at that time?

16   A.  Because we were still conducting the audit.

17   Q.  Now, what, if anything, did you decide to do based on these

18   concerns?

19   A.  I had a meeting scheduled with John Rodi on Monday at an

20   Audit Committee meeting we were attending together, so I

21   decided to tell John prior to that Audit Committee meeting.

22   Q.  Why did you decide to tell John Rodi?

23   A.  He's my supervisor and a trusted colleague, and I wanted to

24   share the information I had obtained from Brian with him.

25   Q.  And why did you want to tell your supervisor?

J2pdmid1                           Kunz - direct

1   A.  Because, again, as the weekend went on, something did not

2   seem right.

3   Q.  Did you tell John Rodi on Monday?

4   A.  I did.

5   Q.  How did he react when he you told him?

6   A.  He had a lot of questions.  He was very surprised.

7   Q.  And after your conversation with John Rodi, did there come

8   a time when you spoke to Dave Marino about this?

9   A.  Yes.

10  Q.  When did you speak to Dave Marino about this?

11  A.  I believe it was on Wednesday, after I told John.

12  Q.  What did you tell Dave Marino on the call?

13  A.  I told him the same thing I had told John Rodi.

14  Q.  And without going into the substance of what Dave Marino

15  said, what was his tone when you told him?

16  A.  He was angry.

17  Q.  Now, during your conversation with Dave Marino, what, if

18  anything, did he say to you with respect to the eAudIT file?

19  A.  He told me not to give access to anybody from the National

20  Office.

21  Q.  What did you do after your call with Dave Marino?

22  A.  I went in to check with Andy that we had not given access

23  to Brian or Cindy at that time, and we had given Cindy access.

24  So, I asked Andy to remove that access.

25  Q.  And when you say "Andy," is that one of the managers you

J2pdmid1                         Kunz- cross

1   were referring to?

2   A.  Yes.  That was my lead senior manager on Chemical.

3   Q.  Why did you ask him to remove Cindy's access?

4   A.  Because Dave had told me not to have them in the file, and

5   at that point I knew that something wasn't right and I didn't

6   want them in my file.

7   Q.  Why didn't you want them in your file?

8   A.  Because they had some information they shouldn't have.

9   Q.  Why did you think they shouldn't have the information?

10  A.  Because we were still conducting our audit.

11          MS. ESTES:  No further questions.

12          THE COURT:  Cross-examination.

13          MR. BOXER:  Yes.  Thank you, your Honor.

14          THE COURT:  Mr. Boxer.

15  CROSS-EXAMINATION

16  BY MR. BOXER:

17  Q.  Good morning, Ms. Kunz.

18  A.  Good morning.

19  Q.  My name is Nelson Boxer.  I represent Dave Middendorf.

20          Ms. Estes asked you a few questions about Brian Sweet.

21  When you first met Brian Sweet, do you recall that in June of

22  2015 he spoke at a KPMG banking conference in Washington, D.C.

23  that you attended?

24  A.  Yes.

25  Q.  And he was on stage with Mr. Britt and Mr. Canfarotta

J2pdmid1                          Kunz- cross

1  during that conference?

2  A.  Yes.

3  Q.  And he spoke about the PCAOB and his experience there,

4  correct?

5  A.  He did.

6  Q.  And he highlighted key findings and observations from the

7  PCAOB about KPMG, correct?

8  A.  I don't recall if that was him or the other individuals on

9  the stage but that was discussed.

10  Q.  Is it fair to say that Mr. Sweet demonstrated knowledge

11  about all the ins and outs of the PCAOB inspection process and

12  various auditing issues; is that correct?

13  A.  He -- could you repeat that question, please?

14  Q.  It was a poor question.

15          Mr. Sweet demonstrated that he really knew his stuff

16  at that banking conference, correct?

17  A.  He was knowledgeable about his experiences at the PCAOB.

18  Q.  You remember him citing very specific guidance or

19  regulations and bullet points and sub-bullet points that the

20  audit team should be mindful of during the presentation?

21  A.  I don't remember specifically.

22  Q.  OK.  He made a good impression on you substantively at that

23  conference, correct?

24  A.  I don't recall how I felt at that conference.

25  Q.  OK.  Do you remember a couple of months later attending a

J2pdmid1                        Kunz- cross

1    global systemically important financial institutions meeting --

2    a lot of acronyms there so I will spare on the acronym -- in

3    New Jersey where Mr. Sweet also presented?

4    A.  I remember attending the conference.  I don't remember all

5    the presenters but --

6    Q.  You remember attending the conference?

7    A.  Yes.

8    Q.  Do you remember that Mr. Sweet presented?

9    A.  I don't remember specifically.  There was a lot of meetings

10   at that time.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2prmid2                         Kunz - Cross

1          MR. BOXER:  Ms. O'Connor if you could show the witness

2     Exhibit M283, please.

3     Q.  I ask you to take a look at that.  After you have had a

4     chance to review it as its pages are turned, you can put it

5     down and I'll ask you another question.

6          Having looked at Exhibit M283, does that refresh your

7     recollection that Mr. Sweet presented at I will call the SIFI

8     in August of 2015?

9     A.  I don't remember specifically his presentation.

10    Q.  But does it refresh your recollection that he did make a

11    presentation at that conference?

12    A.  No, I don't recall.

13    Q.  The document in front of you, that is an email from Mr.

14    Sweet to Mr. Fuller first, correct, and then Mr. Fuller to you?

15    A.  Yes.

16    Q.  Then you take the email and you distribute it to whom?

17    A.  To Amy Anchetta, Andy Sparks with a copy to Lane Flood.

18    Q.  Did you distribute that email so that those recipients --

19    Mr. Sparks, Ms. Anchetta, the others -- would have the benefit

20    of the analysis in M283 as they conducted their audits?

21    A.  Yes.

22         MR. BOXER:  I offer it, your Honor.

23         MS. ESTES:  No objection.

24         THE COURT:  Received.

25         (Defendant's Exhibit M283 received in evidence)

J2prmid2                          Kunz - Cross

1    Q.  If I could direct your attention first to the email from

2    Brian Sweet, it starts, "As I reflect back on our meeting last

3    week" and provides some summary points, correct?  It's just a

4    general question.  He is providing his summary observations

5    from the conference, correct?

6    A.  Can you go back to the lead-in?

7    Q.  Sure.  Maybe I'll rephrase it.  He wrote, "As I reflect

8    back on our meeting last week, I thought it might help if I

9    followed up with a note outlining some of the most pressing

10   matters the PCAOB will be focused on during its inspections of

11   RSIFI audits, correct?

12   A.  Yes.

13   Q.  If we turn to item 4, that is titled "ALL Testing Hot

14   Topics," correct?

15   A.  Yes.

16   Q.  Mr. Sweet wrote, "With respect to the ALL, PCAOB will be

17   particularly focused on the following matters," and then he

18   lists matters A through J and provides details, correct?

19   A.  Yes.

20   Q.  He provides details, Mr. Sweet, for item 4 regarding where

21   the PCAOB will be particularly focused with respect to ALL,

22   correct?

23   A.  Yes.

24   Q.  That goes on to the next page, to item J.  Then, if we can

25   go to item 10, Mr. Sweet writes that the PCAOB will evaluate

J2prmid2                          Kunz - Cross

whether the completeness and accuracy has been obtained for any

information produced by the entity in accordance with AS 15

paragraph 10, right?

A.   Yes.

Q.   That IPE information is the area that required additional

audit procedures during the FBFS audit that you described a

moment ago, correct?

A.   Yes.

Q.   The government showed you various exhibits regarding

interactions you had with Mr. Sweet and Ms. Stemple about the

work papers on the FBFS audit, correct?

A.   Yes.

Q.   I think you said you understood the purpose of what Mr.

Sweet and Ms. Stemple were doing was to make sure the work

papers were clear, is that right, a purpose?

A.   The questions and suggestions they were making or when they

were discussing questions with us was to get clarification.

Q.   To make sure that the work papers described the work that

was actually done, correct?

A.   They were trying to make sure they understood it as they

were reviewing the work papers.

Q.   Some of their suggestions, I think you pointed to one in

one of the work papers, was trying to add a sentence to reflect

a lot of work that had been done but wasn't included in the

particular section of the work papers, is that right?

J2prmid2                          Kunz - Cross

1    A.  Yes.

2    Q.  You also provided input regarding language with Mr. Sweet

3    and Ms. Stemple, do you recall that?

4    A.  Yes.

5    Q.  I'd like to show you what's been marked as Defense Exhibit

6    M289.  Do you recognize M289?

7    A.  Yes.

8    Q.  It's an email from you to Mr. Sweet, correct?

9    A.  Yes.

10             MR. BOXER:  I offer it, your Honor.

11             MS. ESTES:  No objection.

12             THE COURT:  M289 is received.

13             (Defendant's Exhibit M289 received in evidence)

14   Q.  In this email, M289, you are asking for someone to take a

15   look at two other areas in the audit work papers, correct?

16   A.  Yes.

17   Q.  To see if there was any improvement in the descriptions

18   that could be found in those areas as well, correct?

19   A.  Yes, to have somebody take a look at them and ask us any

20   questions they had.

21   Q.  So you found helpful what Mr. Sweet and Ms. Stemple were

22   doing, correct?

23   A.  Certain pieces of it.

24   Q.  It was taxing on your time, I understand, correct?

25   A.  Yes.

J2prmid2                         Kunz - Cross

1    Q.  When Mr. Sweet or Ms. Stemple wrote any proposals to the

2    work papers, you understood those to be suggestions for changes

3    that could be made to the work papers, correct?

4    A.  Right.  I had final say on what we were making.

5    Q.  That was exactly going to be my next question.  Isn't it

6    true that all of the changes that were made to the FBFS work

7    papers complied with the auditing standards, correct?

8    A.  Yes.

9    Q.  One of those standards is AS 3, right?

10   A.  Yes.

11   Q.  You were asked a few questions about this form AU 390.  I

12   think it went into evidence as Government Exhibit 1013.

13            MR. BOXER:  If we can display that, please.

14   Q.  If you turn to the third page, do you see the column --

15   first, I have a few questions about each of the columns.  The

16   first column says "Activity REF."  What does that mean?

17   A.  Those are the workpaper references.

18   Q.  And IPE is information produced by the entity that we

19   discussed, correct?

20   A.  Yes.

21   Q.  Did it turn out that upon further review, some of these

22   references were removed from the AU 390 because additional

23   audit work didn't actually need to be done?

24   A.  Yes.

25   Q.  But two of them remained, as I recall?

J2prmid2                          Kunz - Cross

1    A.   I don't recall how many.

2    Q.   Then the date of the modification, is that the date the

3    additional audit work was performed?

4    A.   Yes.

5    Q.   Engagement team member who made it, correct?

6    A.   Yes.

7    Q.   Then it says, "Circumstances encountered resulting in

8    modification," right?

9    A.   Yes.

10   Q.   It is written, "During the final review, in conjunction

11   with the closeout, the management team determined that the IPE

12   testing for this report was performed in 2016 using 2016

13   report."  That's what it says, correct?

14   A.   The engagement team.

15   Q.   Excuse me.  I misspoke.  The engagement team.  Was that

16   language accurate?

17   A.   Yes.

18   Q.   You understood it to be accurate?

19   A.   Yes.

20   Q.   There is a line at the bottom for your approval.  You

21   ultimately signed the form?

22   A.   Yes.  This is a draft, but I signed the final form.

23   Q.   This is a form that is created by KPMG, correct?

24   A.   This template, yes.

25   Q.   It's not something that the PCAOB has put out as the

J2prmid2                          Kunz - Cross

1    required form, right?

2    A.   Not that I'm aware of.

3    Q.   I think you testified that you weren't surprised that FBFS

4    was inspected, is that right?

5    A.   Correct.

6    Q.   You thought it was likely that it would be inspected?

7    A.   Yes.

8    Q.   That was because, if I heard correctly, this was your last

9    year of the five years as the engagement partner and it had not

10   been inspected previously, is that right?

11   A.   Yes.

12   Q.   You mentioned that Mr. Sweet informed you of the focus

13   areas, I believe, correct?

14   A.   No.

15   Q.   He did not.  That was in 2017?

16   A.   Correct.

17   Q.   He didn't inform you of the focus areas in 2016?

18   A.   He did not.

19   Q.   Were you surprised by any of the focus areas of the

20   inspection?

21   A.   When it was ultimately selected?  No.

22   Q.   In your practice it's generally obvious which areas PCAOB

23   will focus on in an inspection, correct?

24   A.   Two of the areas are generally the same.

25   Q.   That's the allowance?

J2prmid2                          Kunz - Cross

1    A.  Yes.

2    Q.  What is the other area?

3    A.  Investment securities.

4    Q.  You testified about your first meeting for the PCAOB

5    inspection, I believe.  You mentioned a PowerPoint that was put

6    together, correct?

7    A.  The opening deck.

8    Q.  The opening deck, yes.  Were you present in person for that

9    meeting?

10   A.  No.

11   Q.  You were on the phone, correct?

12   A.  Yes.

13   Q.  Would you agree with me that it is harder to give a good

14   first impression on the phone as opposed to in person?

15   A.  I don't think so, not in that case.

16   Q.  Was it a video conference?

17   A.  No.

18   Q.  You were just dialing in?

19   A.  Yes.

20   Q.  Did you give your best first answer at the start of the

21   presentation?

22   A.  I presented the deck, and we answered questions if they

23   were asked or we took them back to respond to when the PCAOB

24   was on-site.

25   Q.  Are you familiar with that term "best first answer" at

J2prmid2                          Kunz - Cross

1    KPMG?

2    A.  I have heard that before.

3    Q.  What do you understand that to mean?

4    A.  Being as prepared as you can be, so when a question is

5    asked, you are familiar with the response.

6    Q.  Were you as prepared as you could be for that opening

7    inspection meeting for the FBFS inspection?

8    A.  I certainly tried to be.

9    Q.  As I understand it, it nonetheless at least initially still

10   received a comment, correct?

11   A.  It did.

12   Q.  Turning to February 2017, it was on February 3rd that Mr.

13   Sweet called you to tell you that Chemical Financial was going

14   to by inspected, is that right?

15   A.  Yes.

16   Q.  It was in this call that he told you the focus areas as

17   well, correct?

18   A.  He did.

19   Q.  Do you remember what they were?

20   A.  The allowance for loan losses, investment securities,

21   business combinations, and loans.

22   Q.  Was there a CFO change as well that he mentioned was the

23   reason for it being inspected, do you recall?

24   A.  Yes.

25   Q.  Is it fair to say that these red flags were obvious to you,

J2prmid2                          Kunz - Cross

1    being the engagement partner on the matter?

2    A.   What do you mean?

3    Q.   For example, a change of CFO, you understood that that was

4    a red flag for the PCAOB and could be a reason for them to

5    decide to inspect an audit, correct?

6    A.   Significant management changes was the one that I had

7    heard.

8    Q.   Business combinations as well was another red flag that you

9    had heard of that the PCAOB looks at in deciding whether to

10   conduct an inspection, correct?

11   A.   Yes.

12   Q.   The allowance you had spoken of, that is something that the

13   PCAOB is always interested in, correct?

14   A.   For financial institutions, yes.

15   Q.   And Chemical is a financial institution, correct?

16   A.   Yes.

17   Q.   Mr. Sweet told you that he had not yet relayed what he was

18   telling you to Mr. Sweet's bosses, right?

19   A.   He indicated that he had not yet told his bosses or his

20   bosses did not yet know.

21   Q.   I think you said at that time you didn't understand who his

22   bosses were, right?

23   A.   Correct.

24   Q.   Did you later come to learn who his bosses were?

25           MS. ESTES:   Objection.

J2prmid2                              Kunz - Cross

1              THE COURT:  You can answer the question.

2      A.   I believe they were Tom Whittle and Dave Middendorf.

3      Q.   At the time you were informed by Mr. Sweet that Chemical

4      Financial was going to be inspected, Mr. Middendorf didn't know

5      of that at that point, correct?

6      A.   Based on what Brian indicated.

7      Q.   Based on what Mr. Sweet had said, correct?

8      A.   That's what he told me.

9      Q.   Did he tell you that he had spoken to anybody else, Mr.

10     Sweet, about inspections for 2017?

11     A.   Yes.

12     Q.   He mentioned to you, didn't he, that he had informed some

13     engagement partners that their audits would not be inspected,

14     correct?

15     A.   Yes.

16     Q.   Did he mention the particular engagement partners?

17     A.   No.

18     Q.   Did he say how many?

19     A.   No.

20     Q.   After you received this information, you went on with your

21     work on the audit, correct?

22     A.   The audits I was working on.

23     Q.   The audits you were working on.  You didn't call Mr. Rodi,

24     you didn't hang up the phone with Mr. Sweet and call Mr. Rodi,

25     correct?

J2prmid2                          Kunz - Cross

1    A.  No.

2    Q.  In fact, after you spoke with Mr. Sweet, you let Mr. Ben

3    Larson know about the conversation, correct?

4    A.  On Saturday morning.

5    Q.  And on Saturday morning you also let Andy Sparks know,

6    correct?

7    A.  Yes.

8    Q.  As I think we saw in evidence, on February 3rd you also

9    emailed back to Mr. Sweet -- if we could put up Government

10   Exhibit 1125 -- you followed up with him after the call about

11   timing, right?

12   A.  Yes.

13   Q.  So still over the weekend no call to Mr. Rodi, right?

14   A.  I spoke to John on Monday.

15   Q.  You could have called him on his cell over the weekend,

16   couldn't you?

17   A.  I was working.

18   Q.  You didn't have a moment to call him on Saturday or Sunday

19   or Friday to let him know what you had learned?

20              MS. ESTES:  Objection.

21              THE COURT:  Overruled.

22   A.  I had a meeting scheduled with John on Monday.

23   Q.  So you decided to wait until Monday to let him know about

24   the call to Mr. Sweet, correct?

25   A.  When I decided to tell John, I knew I had a meeting with

J2prmid2                          Kunz - Cross

1    him on Monday.

2    Q.  When did you decide to tell John?

3    A.  It evolved over the weekend.

4    Q.  Is it fair to say that by some time on Sunday you decided

5    you were going to tell your boss?

6    A.  I don't remember the specific time.

7    Q.  Was it before Monday?

8    A.  Yes.

9    Q.  Whenever it was, over the weekend you decided you were

10   going to tell your boss; you waited until Monday to tell him,

11   correct?

12            MS. ESTES:  Objection: asked and answered.

13            THE COURT:  Sustained.

14   Q.  By the way, were you friends with Mr. Sweet?

15   A.  No.

16   Q.  Were you particularly close with him at the time he called

17   you about Chemical Financial?

18   A.  No.

19   Q.  Besides calling Mr. Rodi on Monday -- I guess that's the

20   6th, correct?

21   A.  Yes.

22   Q.  The email was the 3rd, right, 11:25?

23            MR. BOXER:  Could you put that back up again.

24   Q.  February 3rd was a Friday, when you heard from Mr. Sweet,

25   right?

J2prmid2                              Kunz - Cross

1    A.  Yes.

2    Q.  So it would be Monday, February 6th, when you called Mr.

3    Rodi, correct?

4    A.  No.

5    Q.  Sorry.  Withdrawn.  You met with him on told him on the

6    6th?

7    A.  Yes.

8    Q.  You didn't call anybody else about this topic other than

9    Mr. Rodi, right?

10   A.  No.

11   Q.  You mentioned you spoke with Mr. Marino during your direct

12   testimony, correct?

13   A.  Yes.

14   Q.  Mr. Marino called you and asked you about your conversation

15   with Mr. Sweet, right?

16   A.  Yes, he either called me or emailed me and ask me to call

17   him.

18   Q.  The only person you reported Mr. Sweet's conversation to

19   that you called was Mr. Rodi, correct?

20   A.  Again, I spoke with John in person.

21   Q.  I've done that twice now.  I apologize.  I'll try it again.

22   The only person you proactively informed about the conversation

23   with Mr. Sweet on Friday was Mr. Rodi on Monday?

24   A.  I told my managers on Saturday and I told John in person on

25   Monday.

J2prmid2                          Kunz - Cross

1    Q.  That was the only superior of yours that you informed

2    yourself on your own initiative, Mr. Rodi, correct?

3    A.  Yes.

4    Q.  Then you left it to Mr. Rodi to inform his superiors or do

5    whatever he thought was appropriate with the information,

6    correct?

7    A.  John told me he was going to be talking to others.

8    Q.  He didn't include you in those conversations, correct?

9    A.  He did not.

10   Q.  So you left it to Mr. Rodi to take the information and do

11   whatever he thought was appropriate?

12         MS. ESTES:  Objection: asked and answered.

13         THE COURT:  Sustained.

14   Q.  I may have missed this in your direct.  You mentioned that

15   at some point Ms. Holder was denied access to the eAudit file

16   of Chemical Financial, is that correct?

17   A.  She was removed.

18   Q.  Does that mean at some point she was permitted, if that's

19   the right word, to have access to the eAudit file?

20   A.  Yes.

21   Q.  When did that occur?

22   A.  I'm not certain.

23   Q.  Do you have an approximate idea of when it occurred?

24   A.  It was I believe sometime between the morning when I spoke

25   to Andy and Ben and when I had him remove it on Tuesday or

J2prmid2                          Kunz - Cross

1   Wednesday when I spoke to Dave.

2   Q.  So between Saturday morning and Tuesday, correct?

3   A.  Again, I'm not sure when Andy gave her the access.

4   Q.  Who gave her the access?

5   A.  I believe it was Andy Sparks.

6   Q.  Did he inform you of that fact?

7   A.  That he had given her access?

8   Q.  Yes.

9   A.  Not till I asked him on Wednesday.

10  Q.  So, from Friday with the call with Mr. Sweet and Wednesday,

11  you didn't know Ms. Holder had access, is that correct?

12  A.  Could you repeat the question?

13  Q.  Sure.  From the time Mr. Sweet called you on Friday until

14  the following Wednesday, you were unaware that Ms. Holder had

15  access to the Chemical Financial eAudit file, is that correct?

16  A.  Yes.  But again, I don't know when she was granted that

17  access.

18  Q.  I'm just asking about your knowledge.  It wasn't until

19  Wednesday that you even knew she had access, is that right?

20  A.  Yes.

21  Q.  That knowledge came from a conversation with Andy, is that

22  right?

23  A.  Yes.

24  Q.  During that conversation, did you at that moment tell Andy

25  to remove her from access?

J2prmid2                         Kunz - Cross

 1   A.  Yes.

 2   Q.  Did Andy say anything to you as to how it came to be that

 3   he gave Ms. Holder access to the file?

 4   A.  No, I don't recall.

 5   Q.  Do you know if it occurred after you had informed Andy of

 6   your conversation with Mr. Sweet on that Saturday the 4th?

 7   A.  I believe it did, but I'm not certain.

 8   Q.  In the end, if I understand your testimony correctly --

 9   withdrawn.  Was anything different done on the Chemical

10   Financial audit as a result of the conversations with Mr. Sweet

11   and the access that Ms. Holder had for a period of time to the

12   audit file?

13   A.  No.

14   Q.  I wanted to ask you a few questions about FBFS.  I think

15   you mentioned that it was headquartered in Madison, Wisconsin,

16   is that correct?

17   A.  Yes.

18   Q.  Approximately how much assets does it have in the bank?

19   A.  About 2 billion.

20   Q.  About 2 billion.  Would you agree with me that's a very

21   small bank by public accounting standards?

22   A.  It's a community bank.  It's a smaller community bank.

23   Q.  Compared to, for example, Wells Fargo, which I understand

24   has almost $2 trillion worth of assets, it's much, much

25   smaller, correct?

J2prmid2                         Kunz - Cross

1    A.  Correct.

2    Q.  Is it fair to say that because it's a community bank it has

3    less people committed to the internal audit function than would

4    be committed at a large institution like Wells Fargo?

5    A.  They outsource their internal audit function.

6    Q.  They don't even use their own employees for that, is that

7    right?

8    A.  Correct.

9    Q.  Is it also fair to say that at a community bank of that

10   size there would be less controls in quantity than a bank like

11   a Wells Fargo would have for its internal controls?  Do you

12   agree with me?

13   A.  It could be.

14   Q.  KPMG had a lot of community banks for clients, is that

15   right?

16   A.  Yes.

17   Q.  Is it fair to say it had the most community bank clients of

18   the Big Four accounting firms?

19   A.  I believe at some point, yes.

20   Q.  In your experience with the PCAOB, is it fair to say -- I

21   think you testified to this -- that if it inspected financial

22   institution, specifically a bank, it would focus on the ALL,

23   correct?

24   A.  Yes.

25   Q.  In its focus on the ALL, there were two elements to the

J2prmid2                         Kunz - Cross

1    ALL, specific reserves and general reserves, is that right?

2    A.  We break it down into three.

3    Q.  What are the three?

4    A.  Specific reserves, quantitative reserves, and qualitative

5    reserves.

6    Q.  Would the qualitative reserves be similar to what is

7    sometimes referred to as general reserves?

8    A.  The qualitative reserves are the management judgment

9    combined with the quantitative reserve.

10   Q.  By management judgment, that is the portion of the reserve

11   that is not subject to some calculation but what management

12   feels is an appropriate amount to set aside as a reserve?

13   A.  It may have a calculation.  It just has the most judgment

14   in it.

15   Q.  Is it fair to say that that's the aspect of ALL that the

16   PCAOB had the most criticism of in its inspections of community

17   banks?

18   A.  They were pretty broad in the allowance for loan losses,

19   and I wouldn't limit it to community banks either.

20   Q.  Just sticking with community banks, as far as the

21   qualitative reserve, is it fair to say in your experience that

22   the PCAOB, for a community bank, felt like there was too much

23   money set aside in the qualitative reserve?

24              MS. ESTES:  Objection: speculation.

25              THE COURT:  If you understand that, you can answer.

J2prmid2                          Kunz - Cross

1    A.  No, not that I'm aware of.

2    Q.  You are aware of instances where they felt like there was

3    too little set aside in the qualitative reserve?

4            MS. ESTES:  Objection: calls for speculation.

5            THE COURT:  Overruled.  If you have an understanding,

6    you can answer.

7    A.  Not that I'm aware of.

8    Q.  If the community bank had too much set aside for general

9    reserves, that would mean that the PCAOB felt like they were

10   being too conservative with their reserve, correct?

11           MS. ESTES:  Objection with respect to questions as to

12   PCAOB's feelings.

13           THE COURT:  Sustained.

14   Q.  If you were to receive a comment that the general reserve

15   was too high, that would mean that too much was set aside for a

16   rainy day, so to speak, by the bank, correct?

17   A.  I'm not aware of those comments.

18   Q.  But if there was one, that would be what the PCAOB would be

19   saying, that you had reserved too much, set aside too much in

20   the general reserve?

21   A.  Again, I'm not aware of those comments.

22   Q.  You never received a comment like that?

23   A.  No.

24   Q.  With respect to internal controls, I think you said those

25   were outsourced at FBFS?

J2prmid2                          Kunz - Cross

1    A.  No.  I said their internal audit function was outsourced.

2    Q.  That is a form of control, isn't it?

3    A.  Their internal audit function performs control work for the

4    company, control testing for the company.

5    Q.  Set aside internal audit.  The control work at FBFS, was

6    that performed internally or externally or both?

7    A.  We perform control work to support our opinion.

8    Q.  Did the bank also perform internal control work?

9    A.  They hired a firm to perform that work for them.

10   Q.  Internally at the bank, nobody performed that work, the

11   internal control work?

12   A.  The internal control testing was performed outsource, was

13   outsourced.

14   Q.  Did anyone internal at the bank perform any work to support

15   the bank's internal controls?

16   A.  I'm not positive.  There may have been a few people.

17   Q.  Is it fair to say that the PCAOB has been critical of the

18   internal controls at community banks as not being robust

19   enough?

20   A.  I haven't seen a comment that would suggest that.

21   Q.  Have you seen similar types of comments?

22   A.  I've seen comments with regards to control testing by the

23   audit team.

24   Q.  At community banks?

25   A.  I would say it's more broad than at community banks.

J2prmid2                         Kunz - Cross

1    Q.  At smaller banks?

2    A.  I would say in my experience it's internal controls at all

3    banks.

4    Q.  Have you heard of the expression "too small to be big, too

5    big to be small"?

6    A.  No.

7    Q.  Never heard that?  You never heard of that?

8    A.  No.

9    Q.  Going back for a moment to the first meeting at the

10   inspection, in your experience are there instances where an

11   inspection is noticed and then, after it's noticed, the time

12   for the inspection is delayed for whatever reason but it ends

13   up occurring later in time than originally noticed?

14   A.  In my experience that has not happened with me.

15           MR. BOXER:  If we can show the witness Government

16   Exhibit 284.

17   Q.  I ask you to take a look at that.

18           THE COURT:  Is this M284?

19           MR. BOXER:  I'm sorry.  M284.  Thank you, your Honor.

20   Q.  Is this an email between you and Mr. Marino and you and

21   people on one of your engagement teams?

22   A.  This is from D. Marino to the partners and managers in

23   Chicago and Milwaukee offices.

24   Q.  That includes you, correct?

25   A.  Yes.

J2prmid2                          Kunz - Cross

1           MR. BOXER:  I offer it, your Honor.

2           MS. ESTES:  No objection.

3           THE COURT:  M284 is received.

4           (Defendant's Exhibit M284 received in evidence)

5    Q.  If we look at the first email from Mr. Marino to the team

6    that you just mentioned, on the second page, he writes,

7    "Further, the PCAOB has accommodated a number of scheduling

8    changes in the first month of inspections and informed us that

9    future accommodations will be limited at best."  Do you see

10   that?

11   A.  Yes.

12   Q.  By "scheduling changes," you understood he meant to delay

13   the actual date when the inspection would occur, correct?

14   A.  Delay or move up, change.

15   Q.  Do you think, based on reading that email, that he is

16   talking about making the inspections occur earlier?

17   A.  It's just about not the week it was scheduled.

18   Q.  The next sentence says, "Engagement team should not count

19   being able to move their PCAOB inspection week."  In your

20   experience have members of your team asked for less time to

21   have before the inspection occurs?

22   A.  Yes, on my first inspection.

23   Q.  When that occurs, do you still have sufficient time to give

24   a best first answer at the inspection meeting, the kickoff

25   meeting?

J2prmid2                          Kunz - Cross

1   A.  We still have sufficient time to prep.

2   Q.  So two to three weeks is sufficient time to prep, correct?

3   A.  In my experience it has been sufficient.

4   Q.  If it's maybe even earlier than two to three weeks, that

5   also would be sufficient time to prep for the kickoff meeting,

6   correct?

7   A.  I've always had sufficient time to prep.

8   Q.  You have had in some instances less than two to three weeks

9   to prepare?

10  A.  Yes.

11  Q.  That was sufficient, correct?

12  A.  Yes.

13          MR. BOXER:  I have nothing further.  Thank you.

14          THE COURT:  Would this be a good time for a quick

15  break?  Any objections?  All right.  We'll take a 10-minute

16  break, folks.  Please leave your pads on your chairs.  We will

17  continue in ten minutes.

18          (Recess)

19          THE COURT:  Mr. Weddle, you may inquire.

20  CROSS-EXAMINATION

21  BY MR. WEDDLE:

22  Q.  Good morning, Ms. Kunz.  My name is Justin Weddle.  I

23  represent Mr. Jeffrey Wada.

24  A.  Good morning.

25  Q.  Am I correct that in your testimony so far today you have

1    not said anything about Mr. Wada?

2    A.  Yes.

3    Q.  Have you ever had any contact with Jeffrey Wada as far as

4    you know?

5            MR. WEDDLE:  Jeffrey, can you stand up.

6    A.  No.

7            MR. WEDDLE:  Nothing further.  Thank you.

8            THE COURT:  Any redirect?

9            MS. ESTES:  Yes, your Honor, briefly.

10   REDIRECT EXAMINATION

11   BY MS. ESTES:

12   Q.  Ms. Kunz, you were asked a number of questions by Mr. Boxer

13   about a document where Brian Sweet shares some information

14   about general focus areas of the PCAOB.  Do you remember that?

15   A.  Yes.

16   Q.  Ms. Kunz, is it your understanding that the PCAOB often

17   shares general information on the areas it is going to be

18   looking at?

19   A.  Yes.

20   Q.  Is it your understanding that that's different from the

21   focus areas that PCAOB looks at on a particular engagement?

22   A.  Yes.

23   Q.  For example, although they may share general focus areas in

24   advance, they don't tell you the focus areas on a particular

25   engagement until they announce the inspection, isn't that

1    right?

2    A.  Yes.

3    Q.  Ms. Kunz, you were also asked a number of questions by Mr.

4    Boxer about the time it takes to prepare for an opening

5    meeting.  Do you remember those questions?

6    A.  Yes.

7    Q.  You were asked if two weeks is sufficient time to prepare,

8    do you remember that?

9    A.  Yes.

10   Q.  Ms. Kunz, generally speaking, is it better to have more

11   time if you could?

12             MR. BOXER:  Objection.

13   A.  Yes.

14             THE COURT:  Overruled.  You can answer.

15   A.  Yes.

16   Q.  Switching gears a little bit, Ms. Kunz, Mr. Boxer asked you

17   a number of questions about how you only reported this

18   proactively to one person, John Rodi.  Do you remember that?

19   A.  Yes.

20   Q.  Mr. Rodi was your supervisor, right?

21   A.  Yes, he is.

22   Q.  Why did you decide you needed to report it to your

23   supervisor?

24   A.  Because he is my supervisor and a trusted colleague.

25   Q.  Why did you decide you wanted to elevate it to your

J2prmid2                         Marino - direct

1    supervisor?

2    A.  Because, again, as the weekend went on, it didn't seem

3    right that I had been told that information.

4    Q.  Did you have an understanding of whether he intended to

5    take action based on your supervision?

6    A.  I did the next day, when he called me.

7               MS. ESTES:  No further questions.

8               MR. BOXER:  Nothing, your Honor.

9               THE COURT:  Thank you.  You may step down.

10              (Witness excused)

11              THE COURT:  The government may call your next witness.

12              MS. ESTES:  Your Honor, the government called Dave

13   Marino.

14    DAVID MARINO,

15       called as a witness by the government,

16       having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. ESTES:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  What is your educational background?

22   A.  I have a Bachelor's and a Master's of accountancy from

23   DePaul University.

24   Q.  Did you have any professional licenses?

25   A.  Yes.  I'm a CPA, a certified public accountant, in the

J2prmid2                          Marino - direct

1   state of Illinois.

2   Q.  What company do you work for?

3   A.  KPMG.

4   Q.  How long have you worked for KPMG?

5   A.  For 35 years.

6   Q.  Do you work in a particular office?

7   A.  Yes.  I'm in the Chicago office.

8   Q.  What do you currently do at KPMG?

9   A.  I am an audit partner at KPMG.

10  Q.  When did you become an audit partner at KPMG?

11  A.  In 1996.

12  Q.  Do you specialize in auditing any particular kind of

13  companies?

14  A.  Primarily companies that operate in the consumer products

15  and industrial market spaces.

16  Q.  In addition to being an audit partner, have you held any

17  other positions at KPMG?

18  A.  Yes.  I'm also what is known as an SEC reviewing partner,

19  which is the highest technical acumen in the firm.  I also for

20  eight years until September of 2018 was the professional

21  practice partner for the Chicago and Milwaukee offices, which

22  is a risk management role.

23  Q.  Is that known as the business unit professional practice

24  partner?

25  A.  That's correct.

J2prmid2                         Marino - direct

1  Q.   Why did you change positions in September 2018?

2  A.   I changed positions because I had taken on a very

3  significant audit client and it didn't allow for me to perform

4  both roles.  In fact, I was sort of past the expected tenure

5  for the professional practice role at the time.

6  Q.   What is the typical tenure for that role?

7  A.   Oftentimes we think of it somewhere close to five years,

8  and I had been in it for eight years.

9  Q.   Focusing on the time when you were the business unit

10 professional practice partner, what were your duties and

11 responsibilities?

12 A.   It's very much risk management and audit quality role.

13 Everything from accepting new clients into the firm, assigning

14 partners to particular accounts, dealing with difficult

15 technical issues that teams may be dealing with out in the

16 field.

17         As well, dealing with the PCAOB when they come in to

18 perform their inspections, involved in opening meetings,

19 working with the team throughout the inspection, understanding

20 what issues were being raised, dealing with the closing

21 meetings with the PCAOB.  Then, if there is required

22 remediation at the end of the inspection, being involved in

23 that process as well.

24 Q.   Mr. Marino, when you were that business unit professional

25 practice partner, who did you report to within KPMG?

J2prmid2                         Marino - direct

1   A.   I reported to Laurie Mullen, who was the regional

2   professional practice partner for the west region.

3   Q.   Mr. Marino, you described some responsibilities you had

4   with respect to PCAOB inspections.  In your role as the

5   business unit professional practice partner, were you made

6   aware of KPMG's performance on PCAOB inspections each year?

7   A.   Yes, I was aware of their performance.

8   Q.   Focusing on the time frame of 2014-2015, how was KPMG doing

9   on PCAOB inspections with respect to comments?

10  A.   There's a couple of ways to look at it.  If you look at it

11  in terms of the comments received during the course of the

12  inspections, what we refer to as part 1 comments, where there

13  was a deficiency identified, it would go into part 1.  If you

14  look at it on that basis, the percentage of inspections that

15  had received comments during that time period was higher than

16  our competitors.

17         If you look at it in terms of restatements that came

18  out of inspections, restatements of financial statements that

19  came out of inspections, or internal control opinions that had

20  to be changed because of an inspection -- for example, if you

21  had said the internal controls were effective and you had to

22  change it to ineffective because of a finding from the PCAOB --

23  we had very few, and we would have shown favorably to the

24  competition in terms of restatements and withdrawn opinions.

25  Q.   Generally speaking, if you get a part 1 comment, how, if at

J2prmid2                    Marino - direct

1  all, does that affect the financial statements?

2  A.  Sometimes it doesn't affect it at all.  If there is a

3  comment that results in a change to the numbers in the

4  financial statements that is a material change and as a result

5  the financial statements need to be restated, that's one

6  possibility.  The other possibility is there is a finding on

7  internal controls and the auditor now concludes where we

8  thought they were effective internal controls, but based upon

9  the finding of the inspection we now believe the internal

10  controls are not effective, that would have to be a withdrawn

11  opinion.

12  Q.  Generally speaking, with respect to inspections, what is

13  the goal with regard to comments?

14  A.  The goal would be to get as few as possible.

15  Q.  Mr. Marino, let me direct your attention to February 6,

16  2017.  Were you working that day?

17  A.  I was.

18  Q.  Did there come a time that day when you got a call from

19  John Rodi?

20  A.  Yes.

21  Q.  Who is John Rodi?

22  A.  John Rodi is the business unit partner in charge of the

23  Chicago and Milwaukee office.

24  Q.  What was your relationship to him within KPMG?

25  A.  We co-led the Chicago and Milwaukee office.  He was the

J2prmid2                          Marino - direct

1    operational guy and I was the risk management guy.

2    Q.   Where were you when John Rodi called you?

3    A.   I was out at a client.

4    Q.   What did you learn from John Rodi on the call?

5    A.   John Rodi called and informed me that he that conversation

6    with one of our Chicago office partners, Diana Kunz.  Diana had

7    informed him that she received a call from Brian Sweet and made

8    her aware that her engagement, which was currently in the field

9    being executed, had been selected for a future inspection by

10   the PCAOB and that inspection had been approved by the board of

11   the PCAOB.

12   Q.   Mr. Marino, let me break that down a little bit.  First,

13   who is Diana Kunz?

14   A.   Diana Kunz is a Chicago office audit partner.

15   Q.   What was your relationship to her within KPMG?

16   A.   She was one of our partners.  I was in a leadership

17   position in the office, so I would handle many of the risk

18   management issues that she might deal with.

19   Q.   You mentioned Brian Sweet.  Who is Brian Sweet?

20   A.   Brian Sweet was somebody who worked -- a partner that

21   worked in our inspections group that we had hired from the

22   PCAOB.

23   Q.   When you learned that Sweet had told Kunz that her the

24   inspection of her audit had been reviewed by the board, what

25   did you understand that to mean?

J2prmid2                    Marino - direct

1    A.  It was clear to me that if she was going to be getting

2    notification at that point in time while the audit was ongoing,

3    that we had information in advance that we should not be privy

4    to under any circumstance.

5    Q.  Why did you believe you had information that you shouldn't

6    be privy to under any circumstance?

7    A.  Because we would never be notified from a regulator that

8    there was going to be an inspection of an engagement while that

9    engagement was still being executed.

10   Q.  To be clear, was Ms. Kunz's engagement still live at the

11   time?

12   A.  Her engagement was ongoing at the time, yes.

13   Q.  When are you typically notified by the PCAOB that an

14   engagement will be inspected?

15   A.  It would be after the work papers have been assembled for

16   retention, all the work is complete.  It would be sometime

17   after what we call a document completion date.

18   Q.  What is your understanding of why the PCAOB notifies the

19   firm only after the documentation completion date?

20               MR. BOXER:  Objection.

21               THE COURT:  Overruled.  You can answer.

22   A.  Could you repeat the question.

23   Q.  Yes.  What is your understanding of why the PCAOB notifies

24   a firm only after the documentation completion date?

25   A.  Because they are looking for an objective assessment, they

J2prmid2                    Marino - direct

are looking to make an objective assessment of the quality of
our work and they want to see what our work looks like without
any kind of notification that there is going to be an
inspection on the back end.

Q.  What, if anything, is your understanding of why
notification during a live audit could be a problem?

          MR. BOXER:  Objection: asked and answered.

          THE COURT:  Overruled.

A.  Again, in order to get an objective view of our work,
somebody that is executing an audit shouldn't know if that
particular audit is going to be inspected or not.  So, in order
to get that objective view, there shouldn't be any notification
until after it's complete.

Q.  Mr. Marino, going back to your call with John Rodi, what,
if anything, did you learn on the call with respect to the
eAudit file?

A.  He told me that Brian Sweet had requested access to the
engagement that was ongoing.  I told John Rodi that we were not
going to play that game.  I asked if we had granted access to
that file.  He was not sure if access had been granted.  So I
told him that I would get on the phone immediately with Diana
Kunz and find out.

Q.  Stepping back a bit to the eAudit file, generally speaking,
who has access to it?

A.  It would be the engagement team that's executing the work

J2prmid2                          Marino - direct

1    would have access to the file.

2    Q.  Why did you tell John Rodi that you were not going to play

3    that game with respect to giving Sweet access to the eAudit

4    file?

5    A.  It was clear to me that that would be unethical behavior,

6    to allow somebody in the file after being notified that there

7    was going to be an inspection.

8    Q.  Why would that be unethical behavior, in your

9    understanding?

10    A.  Because, again, this was an attempt to go into the file and

11    perhaps manipulate the work papers, I don't know.  It was

12    certainly not something that was the right behavior, to allow

13    somebody who knew we were going to be inspected into the file

14    in any way, shape, or form.

15          MR. BOXER:  Objection.  Move to strike.  He testified

16    he did not know.

17          MR. WEDDLE:  We join.

18          THE COURT:  Overruled.

19    Q.  Mr. Marino, you testified that you wanted to talk to Diana

20    Kunz after learning this, is that right?

21    A.  Yes.

22    Q.  Did you in fact talk to Diana Kunz?

23    A.  I did.

24    Q.  When was that?

25    A.  Right after I talked to John Rodi.

J2prmid2                         Marino - direct

1   Q.  During your call with Diana Kunz, what, if anything, did

2   you learn about whether access to the eAudit file had been

3   granted?

4   A.  Diana informed me that access had been granted and that

5   Cindy Holder was looking to get into the file.

6   Q.  Who is Cindy Holder?

7   A.  Cindy Holder is another person that was working in our

8   inspection group that we had hired from the PCAOB.

9   Q.  How did you respond when you learned that access had been

10  granted to the eAudit file?

11  A.  I told Diana that she is to lock that access, to not allow

12  access to the file, and that if she gets any kind of inquiries

13  as to why that access has been blocked, to have them call me

14  directly.

15  Q.  What did you do after talking to Diana Kunz?

16  A.  After talking to Diana, I called Laurie Mullen.

17  Q.  Why did you call Laurie Mullen?

18  A.  I just thought that that was sort of the next logical step.

19  She was the person that I reported to.  She was the regional

20  professional practice partner.  I thought that it was sort of a

21  logical step to elevate this matter.

22  Q.  What, if anything, did you discuss with Laurie Mullen about

23  next steps to take?

24  A.  Laurie said that she would try to get to Dave Middendorf,

25  who was her boss, as soon as possible.

J2pdmid3                         Marino - direct

1    Q.  And why did you and Laurie decide to talk to Dave

2    Middendorf about this?

3    A.  Again, it was sort of a -- the next logical step.  Dave was

4    Laurie's boss and I was just continuing to raise it.  And at

5    this point we didn't know beyond Brian Sweet who was aware of

6    this, so we were just trying to get more facts.

7    Q.  Now, did there come a time later that week when you spoke

8    to Laurie Mullen again about this issue?

9    A.  Yeah.  I called -- I hadn't heard from Laurie on Tuesday so

10   I called her on Wednesday morning, and she informed me that

11   she --

12            MR. BOXER:  Objection.

13            MR. WEDDLE:  Objection, your Honor.

14            THE COURT:  Sustained.

15   BY MS. ESTES:

16   Q.  Without saying what you discussed, did there come a time

17   that week when you spoke to Laurie Mullen again?

18   A.  I spoke to her again on Wednesday and I spoke to her again

19   on Friday.

20   Q.  Now, with respect to your call on Friday, what, if

21   anything, did you discuss regarding next steps to take?

22   A.  The next steps that I discussed on Friday was that I would

23   discuss this matter with Scott Marcello, who was coming into

24   the Chicago office to attend a board meeting at my client's.

25   So, I discussed with Laurie that I would discuss the matter

J2pdmid3                    Marino - direct

1   with Scott.

2   Q.  Who was Scott Marcello?

3   A.  Scott Marcello was the Vice chair -- he was the Vice chair

4   of Audit for the U.S.

5   Q.  And what is his relationship to Dave Middendorf within the

6   KPMG?

7   A.  He would be Dave's boss.

8   Q.  And why did you decide that you needed to talk to Scott

9   Marcello about this?

10  A.  Again, it was all part of -- you know, at that point I felt

11  very strongly that this needed to continue to get raised

12  quickly, leading to self-reporting, so it -- it wasn't moving

13  as fast as I had hoped and as Laurie had hoped, so we were

14  moving it up the chain.

15  Q.  And when you say you wanted it to lead to self-reporting,

16  what do you mean by that?

17  A.  Meaning that we would make the regulators aware of this and

18  come clean.

19  Q.  And why did you think you needed to make the regulators

20  aware of this?

21          MR. WEDDLE:  Objection, your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry, your Honor.  Did you say

24  "overruled"?

25          THE COURT:  Yes.  You can answer.

J2pdmid3                    Marino - direct

1           THE WITNESS:  Would you repeat the question, please.

2     BY MS. ESTES:

3     Q.  Why did you believe you needed to make the regulators aware

4     of this?

5     A.  Because we are a regulated industry and we had information

6     from them that we should not be privy to, we need to make them

7     aware of it.  And if they decided that they would make new

8     selections, we have to -- we had to offer that opportunity up,

9     but we had to come clean with our regulator.

10    Q.  And when you say if they decided they needed the

11    opportunity to make new selections, what do you mean by that?

12    A.  I mean by that if they chose to make selections whereby

13    there wasn't any kind of advanced information coming into the

14    firm, they need to be given that opportunity to make sure they

15    get an objective view of our results.

16    Q.  Now, when did you plan to discuss this with Scott Marcello?

17    A.  I had a phone call already with Scott on Monday morning, so

18    I revised the agenda to cut it in half and devote the second

19    half to discuss this matter.

20    Q.  And did you plan to discuss it with Scott Marcello alone or

21    with anybody else?

22    A.  I asked John Rodi to join me for the second half of that

23    meeting so he would be part of the discussion.

24    Q.  And why did you want John Rodi to join you?

25    A.  Just given the importance of the matter, I felt it was best

J2pdmid3                         Marino - direct

1    that there were two partners involved.

2    Q.  And what do you mean by "the importance of the matter"?

3    A.  Just the fact that I was, you know, concerned about the

4    magnitude of the situation, that we had information from a

5    regulator that we shouldn't have.  I thought it was a big deal.

6    Q.  Did you prepare anything for your discussion with Scott

7    Marcello?

8    A.  I did.  I scripted what I was going to say over the

9    weekend.

10   Q.  Why did you prepare a script?

11   A.  I prepared a script because I just wanted to make sure that

12   in the heat of the moment, that all -- everything I wanted to

13   communicate came out, that all the key messages got across.

14   Q.  Did anybody else help you prepare it?

15   A.  I shared the script -- I read the script over the weekend

16   to both John Rodi and Laurie Mullen, and they had some

17   editorial changes.

18   Q.  Now, turning to that Monday, February 13th, did you in fact

19   talk to Marcello that day?

20   A.  I did.  We had the phone call.

21   Q.  And where were you when the phone call happened?

22   A.  I was out at a client.

23   Q.  Where was Scott Marcello, to your understanding?

24   A.  Scott was actually in the Chicago office at the time of the

25   phone call.

J2pdmid3                          Marino - direct

1    Q.   And where was John Rodi?

2    A.   John Rodi was in the Chicago office as well.  So when we

3    got to the second half of the meeting where we were going to

4    talk about the matter, John joined him in his office in the

5    Chicago office.

6    Q.   Now, do you remember what you said to Scott Marcello when

7    you talked to them?

8    A.   I do.  I said that I had a deep level of concern for the

9    firm.  I said that the comments that I was about to make were

10   shaped by our own in the firm's core and ethical values.  I

11   told him that one of our partners had been contacted on

12   February 3rd by Brian Sweet and told that her inspection had

13   been approved by the board of the PCAOB.  I told him that Brian

14   had requested access to the file.  And I told him that we had

15   blocked that access and that we will not be complicit in that

16   unethical behavior.  I told him that we have an informant at

17   the PCAOB who has provided us with information that we should

18   not be privy to under any circumstance.  I told him we cannot

19   have the regulator's selections, period.  I told him that we

20   must now do the right thing and we must rectify this lapse of

21   judgment and there was only one course of action, and that

22   course of action was to self-report this matter to the

23   regulators, make them aware that we have this information, and

24   allow them to select new engagements, if they so choose.  I

25   told him that hiding this is unethical and possibly illegal and

J2pdmid3                         Marino - direct

1    that this matter needs to be immediately raised to the Board of

2    Directors, to the CEO and Chairman of the firm, and to the head

3    of Legal.

4    Q.  All right.  Mr. Marino, let me break that down a little

5    bit.

6            I believe you testified you told Scott Marcello that

7    you were concerned for the firm.  What did you mean by that?

8    A.  Again, I was concerned that we -- there was information

9    brought into the firm that was not information that we should

10   be privy to and that we had information from our regulator that

11   we shouldn't have, and I was concerned about it.

12   Q.  And you testified you told them it involved the firm's core

13   and ethical values.  What did you mean by that?

14   A.  I meant that -- you know, when I think about the firm's

15   core and ethical values, there is a couple of things that I

16   think about.  One is it starts with acts with integrity and it

17   ends with acts with integrity.  And the other thing we talk

18   about is doing the right thing in the right way.  And I didn't

19   think this met any of those standards.

20   Q.  Mr. Marino, in your understanding, why is it important that

21   an auditor act with integrity?

22   A.  Because the capital markets rely on auditors to be

23   independent and to be objective and to have the utmost

24   integrity when we're putting our opinions out there on

25   financial statements and internal control opinions, so we have

J2pdmid3                          Marino - direct

1    to have integrity.

2    Q.  Mr. Marino, you testified that I believe you said the Chair

3    of the firm needed to be notified.  Why did you think that

4    needed to happen?

5    A.  I felt that this -- it was very clear to me that this had

6    to be raised to the highest levels of the firm and had to be

7    self-reported to the regulator.

8    Q.  Why did you think it had to be raised to the highest levels

9    of the firm?

10             MR. BOXER:  Objection.

11             THE COURT:  Overruled.

12             You can answer.

13   A.  It had to be raised to the highest levels of the firm just

14   given the magnitude of the situation.  It was clear to me that

15   this was a very big deal.

16   Q.  How did Scott Marcello respond when you told him this?

17   A.  Scott Marcello responded that he understood and agreed and

18   that he would get ahold of the head of Legal, Judge Holmes, as

19   soon as possible.

20   Q.  Did you see Scott Marcello the next day?

21   A.  Yes.  I had breakfast with Scott the next day before the --

22   before our board meeting at the client.

23   Q.  And when you saw Scott Marcello the next day, did you see

24   him on the phone?

25   A.  Yes.  When I -- we were having breakfast at a hotel, and

J2pdmid3                    Marino - direct

1   when I -- when he walked into the lobby, he was on a phone

2   call.

3   Q.  Do you have an understanding of whether he reported the

4   information to Judge Holmes?

5   A.  Yes.  When he got off the phone, he said that he was

6   talking to Judge Holmes and that the Judge was fully informed

7   and that they would be contacting the PCAOB as soon as

8   possible.

9   Q.  Do you have an understanding of whether anybody else was on

10  the phone with him?

11  A.  My understanding is that Dave Middendorf was on that phone

12  call as well.

13  Q.  Did you ever speak with Dave Middendorf directly about any

14  of these issues?

15  A.  I did not.

16  Q.  Did you ever speak to Brian Sweet directly about any of

17  these issues?

18  A.  No.

19  Q.  Now, Mr. Marino, stepping back a bit and turning to 2015,

20  did there come time in June 2015 when you learned about

21  upcoming inspections from John Rodi?

22  A.  Yes.

23  Q.  And what, if anything, did he tell you about how he learned

24  of the inspections?

25  A.  He ran into Brian Sweet at a national training, and Brian

J2pdmid3                          Marino - direct

1   Sweet mentioned to him the two selections for Chicago that were

2   upcoming in July.

3   Q.  And at that time did you attach any significance to your

4   conversation with John Rodi?

5   A.  Not at all.

6   Q.  Why not?

7   A.  Because the selections -- the inspections were upcoming in

8   July.  John ran into Brian Sweet, who was in our Inspections

9   Group, and my assumption was that simply, you know, Brian had

10  received those from the PCAOB in normal course.  We get

11  communicated those selections the month before, and receiving

12  those selections in the month of June for July inspections was

13  not unusual whatsoever.

14  Q.  Now, Mr. Marino, turning to 2016, in your role then as the

15  Business Unit Professional Practice Partner, were you aware

16  that there was a review of the workpapers on certain audits?

17  A.  Yes.

18  Q.  And what is your understanding of why those reviews of

19  workpapers were taking place?

20  A.  My understanding is that it was a monitoring program.  I

21  believe it was primarily for financial institution engagements,

22  and it was to improve our audit quality.

23  Q.  Were you personally involved in any of the reviews?

24  A.  I was not.

25  Q.  Did you have any understanding that these reviews were

J2pdmid3                          Marino - cross

1   being done because of confidential information from the PCAOB?

2   A.  Absolutely not.

3           MS. ESTES:  One moment, your Honor.

4           (Pause)

5           No further questions.

6           THE COURT:  All right.

7           Cross.

8           MR. BOXER:  Yes.

9           THE COURT:  Mr. Boxer.

10          MR. BOXER:  Yes.

11  CROSS-EXAMINATION

12  BY MR. BOXER:

13  Q.  Good morning, Mr. Marino.  My name is Nelson Boxer.  I

14  represent Dave Middendorf.

15  A.  Good morning.

16  Q.  Good morning.  Good afternoon, almost.

17          The call you had described a moment ago on I believe

18  February 6th that you received from Mr. Rodi, do you remember

19  your testimony about that?

20  A.  Yes.

21  Q.  Do you recall what time of day it was you received that

22  call, approximately?

23  A.  I believe it was -- it was morning, probably mid-morning.

24  Q.  OK.  And are you aware that you were informed of what

25  Mr. Sweet had before even Mr. Middendorf was informed of what

J2pdmid3                         Marino - cross

1    Mr. Sweet had?

2    A.  I am not aware of when Dave was informed.

3    Q.  You are not aware that he was informed after you were?

4              MS. ESTES:  Objection.

5              THE COURT:  Overruled.

6    BY MR. BOXER:

7    Q.  Do you want me to repeat that?

8    A.  Yes, please.

9    Q.  You are not aware that he was informed after you were

10   informed?

11   A.  I don't know.

12   Q.  And the audit was live at that point, correct?

13   A.  Yes.

14   Q.  That's the reason you testified this was -- a few times you

15   said that was a very big deal for that reason, correct?

16   A.  Yes.

17   Q.  And your reaction was you called Laurie Mullen?  You called

18   Laurie Mullen and you called Diana Kunz?

19   A.  Yes.

20   Q.  And Ms. Mullen was your boss at that time?

21   A.  Correct.

22   Q.  Did you do anything else besides call Laurie Mullen and

23   Diana Kunz at that time?

24   A.  And then I talked to Scott Marcello.

25   Q.  That was several days later, correct?

J2pdmid3                          Marino - cross

1   A.  Correct.

2   Q.  OK.  Did you call the hotline at KPMG?

3   A.  I did not.

4   Q.  What is the hotline at KPMG?

5   A.  It's an ethics -- and I assume you are referring to ethics

6   and compliance?

7   Q.  I am.

8   A.  If you've got an ethics or compliance matter, you might use

9   that route.  It's one of several routes you could use.

10  Q.  And is it your understanding that that ethics hotline leads

11  right up into the compliance and legal departments at KPMG?

12  A.  I don't know that but I would assume that.

13  Q.  OK.  Are you aware of anyone you testified about -- Ms.

14  Mullen, Ms. Kunz, Mr. Rodi -- contacting the KPMG hotline?

15          MS. ESTES:  Objection.  Calls for speculation.

16          MR. BOXER:  I am just asking if he was aware, your

17  Honor.

18          THE COURT:  You can answer it.

19  A.  I don't know the answer to that.

20  Q.  OK.  Is it an anonymous hotline, by the way?  In other

21  words, can you make a report to the hotline without giving your

22  name?

23  A.  I believe so.  I believe that's correct.

24  Q.  So you called Ms. Mullen, and she -- and after that you

25  spoke with -- several days after that you spoke with

J2pdmid3                          Marino - cross

1    Mr. Marcello, correct?

2    A.  Yes, one week later.

3    Q.  OK.  And when you spoke to Mr. Marcello a week later, was

4    it clear to you that he had also spoken with Mr. Middendorf

5    about this topic?

6    A.  It was --

7              MS. ESTES:  Objection.

8              THE COURT:  Do you understand the question?

9              You can answer it.

10   A.  I didn't know if he talked to him or not.

11   Q.  And based on your conversation with him, were you able to

12   tell whether he had spoken to Mr. Middendorf or not?

13             MS. ESTES:  Objection.  Asked and answered.

14             THE COURT:  Overruled.

15             And you answered "no," right?  Did you answer the

16   question?

17   Q.  You can answer.

18             THE COURT:  You can answer it.

19   A.  Please repeat the question.

20   Q.  OK.  Based on your conversation with Mr. Marcello, did you

21   conclude that Mr. Marcello had already spoken to

22   Mr. Middendorf?

23   A.  I have no idea.  There was no discussion of that.

24   Q.  OK.  When you spoke to Mr. Marcello, Mr. Rodi was in person

25   for that meeting, correct?

J2pdmid3                         Marino - cross

1   A.   That's correct.

2   Q.   And you were not in person for the meeting, correct?

3   A.   No.

4   Q.   You didn't -- you didn't think it was important for you to

5   be there in person for this meeting?

6   A.   I felt it was -- it was a very important meeting.

7   Unfortunately, I had a board meeting the next day and I had to

8   meet with some -- the audit Chair and others at my client's, so

9   I couldn't be there in person.

10  Q.   OK.  And at the time of this -- this meeting was on

11  February 13th, correct?

12  A.   Yes.

13  Q.   And at the time of this meeting, was it clear to you that

14  the issue as to what to do about the information Mr. Sweet had

15  rested with Mr. Marcello at that point in time?

16  A.   No.

17  Q.   Who did you understand to be responsible for that?

18  A.   You mean after the conversation with Scott?

19  Q.   No.  I'm saying before you -- moments before the meeting

20  with Scott started, you, as you said, you moved half of the

21  calendar for Mr. Marcello's meeting call to be about this

22  issue, correct?

23  A.   Yes.

24  Q.   And at the time you did that -- withdrawn.

25        At the time the meeting started -- I'll call it a

J2pdmid3                    Marino - cross

1   meeting even though for you it is a call, for Mr. Rodi it is a

2   meeting, right?

3   A.  Yes.

4   Q.  OK.  At the time the meeting started, was it your

5   understanding that the decision as to what the firm was going

6   to do rested with Mr. Marcello at that time, correct?

7   A.  I don't know if it rested with him.  It was all part of the

8   process of getting this raised to the highest levels of the

9   organization.

10  Q.  As far as you know, he was the most senior person who knew

11  about it at that time; is that your testimony?

12  A.  As far as I knew.

13  Q.  And as you said, you wrote a script to inform Mr. Marcello

14  of what you thought Mr. Marcello should do with the

15  information, correct?

16  A.  Yes.

17  Q.  And based on your discussions and what you heard during

18  this I will call it a meeting with Mr. Marcello, it was clear

19  to you that this was not the first time that Mr. Marcello was

20  hearing about this information, correct?

21  A.  No.  I have no idea if that was -- he certainly didn't say

22  he heard about it previously.

23  Q.  In the way he discussed the issue, it wasn't clear to you

24  that he had already known about it?

25  A.  No.

J2pdmid3                         Marino - cross

1    Q.  OK.  And did you become aware that Mr. Marcello made

2    certain comments to Mr. Rodi about how it could be that the

3    firm came to possess this information from Mr. Sweet?

4             MS. ESTES:  Objection.  Hearsay.

5             MR. BOXER:  I will just ask the first question, if he

6    became aware.

7             THE COURT:  OK.  You can ask that.

8             THE WITNESS:  Please repeat the question.

9    BY MR. BOXER:

10   Q.  OK.  Did there come a time when you became aware from

11   Mr. Rodi that Mr. Marcello had views as to how it could be that

12   the firm came into possession of this information?

13            MS. ESTES:  Objection.  Hearsay.

14            THE COURT:  Sustained.

15   BY MR. BOXER:

16   Q.  Did you -- after the meeting ended, did you have a call

17   with Mr. Rodi afterwards?

18   A.  Yeah, I talked to John afterwards.

19   Q.  OK.  And did John inform you of further discussions he had

20   with Mr. Marcello --

21            MS. ESTES:  Objection.

22   Q.  -- after you dropped off the line?

23            MR. BOXER:  I haven't asked what was said in those

24   discussions, your Honor.

25            MS. ESTES:  Your Honor, I think what John Rodi told

J2pdmid3                         Marino - cross

1    him at all is hearsay.

2              THE COURT:  What is the question?  Did John inform you

3    of further discussions he had?

4    BY MR. BOXER:

5    Q.  Did Mr. Rodi inform you that he in fact had had further

6    discussions with Mr. Marcello after you dropped off the line?

7              MS. ESTES:  Your Honor, I believe that is calling for

8    hearsay.

9              MR. BOXER:  I am just asking him the fact of

10   whether --

11             MS. ESTES:  That is a fact that John Rodi said.

12             THE COURT:  Sustained.

13             MR. BOXER:  I believe the hearsay would be the

14   statement.

15             All right.  I will move on.

16   BY MR. BOXER:

17   Q.  You testified about how in 2014 and 2015, if I heard it

18   correctly, that KPMG was not doing well relative to its peers

19   on inspection comments, it was doing very well with respect to

20   its peers for restatements or audit opinions that needed to be

21   withdrawn and things like that, is that correct?

22   A.  Yes.

23   Q.  And would you agree with me that a financial restatement is

24   a far more serious event for a public company than its auditor

25   receiving a comment on an inspection?

J2pdmid3                          Marino - cross

A.   It's -- they are both important.  I don't want to -- I

can't measure one against the other.

Q.   You can't compare one against the other?

A.   They are both important.

Q.   Based on your experience, is it fair to say that for a

shareholder of a public company, a restatement because of a

material omission or error in the financial statements, is a

more important event that a comment on a PCAOB inspection?

          MS. ESTES:  Objection.  It calls for speculation.

          THE COURT:  Overruled.

A.   Again, it's facts and circumstances.  I can't assess what

one shareholder versus another shareholder would think as far

as importance.

Q.   Let me ask you your view.

          In your view, is a financial restatement because of a

material error a more significant event for that -- or for a

public company than its auditor receiving a comment in a PCAOB

inspection?

          MS. ESTES:  Objection.

          Your Honor, may we approach?

          THE COURT:  Yes.

          (Continued on next page)

1           (At the sidebar)

2           MS. KRAMER:  Your Honor, the question is not proper

3   for several reasons.  First, what is important to a public

4   company is wholly irrelevant to this case.  This goes to two

5   things that are not OK to put before the jury.  One is sort of

6   nullification of the jury that this really was no big deal.

7   And sort of relatedly but different is that it is the argument

8   that if you are committing a fraud but you think it is going to

9   work out in the end, that there won't be any significant harm

10  done, that that is somehow relevant to whether you committed

11  the crime.  Both are improper.

12          Second, there is a -- he is not a public company.  He

13  is an auditor who works for an auditor, so having him opine on

14  what is important or significant to a public company calls for

15  speculation even if it is cabined by his experience.  And so

16  it's irrelevant and improper, and it sort of gives more fodder

17  to arguments I think we visited with your Honor before about,

18  you know, sort of the whether the PCAOB was critical, whether

19  comments were given too much or too little.

20          MR. BOXER:  Your Honor, they opened the door to this

21  conflict by asking him on direct KPMG's performance on

22  inspections and then asking him in the same breath about

23  restatements, and so I was exploring on cross that topic in

24  more detail.  It has nothing to do with nullification or saying

25  fraud is OK.  He put the two together in context and --

J2pdmid3                    Marino - cross

1              THE COURT:  I think he made the distinction that it

2      enhanced it.  I don't think it came up in a question.  So,

3      maybe the witness --

4              MR. BOXER:  I think the question was in 2014 to 2015,

5      how were they doing in inspections.  And I thought there was a

6      question after, but he certainly mentioned it, how were they

7      doing with respect to restatements, or issues like that.  So, I

8      think they opened door on that topic.  I think it is admissible

9      on cross.

10             THE COURT:  Why is it relevant?

11             MR. BOXER:  I think it's relevant to the impact on the

12     SEC and whether somebody would -- in an attempt to secure an

13     advantage on inspection, may still not have an understanding or

14     an intent to defraud the SEC when it turned out that they were

15     involved in these inspections and getting all of these comments

16     but none of them are leading to restatements, which I was going

17     to ask him if that is an issue that gets addressed at the SEC.

18     I thought they opened the door on that and I was trying to ask

19     further questions about it.  I don't see it as a nullification

20     issue.

21             MR. WEDDLE:  Your Honor, can I have one moment?

22             With respect to the prosecutor's first point, which is

23     that there is an irrelevance argument to the effect on the

24     market and investors and issues like that, if that's the case,

25     then we are going to move to strike substantial portions of Mr.

J2pdmid3                    Marino - cross

1   Bricker's testimony, who was the Chief Accountant from the SEC,

2   and the government spent an extensive period of time having

3   Mr. Bricker talk all about the integrity argument and how

4   important this was to the integrity of the market and

5   everything that he briefed about the integrity of the market.

6           MS. KRAMER:  Your Honor, the two things are totally

7   unrelated.  There is a false equivalence going on here.  The

8   question was comparing apples to oranges, PCAOB comments to

9   restatements.  That doesn't have anything to do with

10  Mr. Bricker's testimony.  The witness didn't open the door to

11  it, and you can't open the door to irrelevant evidence.  The

12  two were not linked in the way that counsel is trying to make

13  them linked.  That topic was not part of the witness'

14  testimony.  The fact that you mentioned inspection results and

15  you mentioned restatements doesn't allow for this kind of

16  comparison.  That raises something that is just not at all

17  relevant to what is at issue in the trial.

18          MR. BOXER:  Maybe, your Honor, if I can be permitted

19  to just ask him, since he testified on all of it, that I

20  understand through his testimony that just because an

21  inspection receives a comment, that doesn't mean that there

22  will be a restatement of fact.  As he said, there were many

23  more instances of comments as opposed to restatements.

24          THE COURT:  You can ask that.  Other than that, I

25  think that the objection is right in that basically it is

J2pdmid3                        Marino - cross

1   apples and oranges and it is not relevant, but I will allow you

2   that.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2pdmid3                         Marino - cross

1           (In open court)

2    BY MR. BOXER:

3    Q.  Mr. Marino, do I understand your testimony correctly to be

4    that just because an inspection receives a comment, that

5    doesn't mean that there will be a restatement of the issuer's

6    financial statements, is that right?

7    A.  That's correct.

8    Q.  And, in fact, as you've testified, there are many more

9    instances of comments on KPMG audits than financial

10   restatements related to KPMG's audits, correct?

11   A.  That's correct.

12   Q.  Just one last question -- I think one:  When the PCAOB

13   publishes the results of its inspections, say of KPMG, does it

14   reveal the identity of the issuers that were -- of whose audits

15   were inspected?

16   A.  No.  It refers to them by a letter.

17   Q.  So a public shareholder, for example, would not be able to

18   tell whether he or she owns stock in any of the issuers listed

19   in the PCAOB inspection report because those names are

20   anonymous, correct?

21   A.  Correct.

22           MR. BOXER:  I have nothing further, your Honor.

23           THE COURT:  OK.

24           Mr. Weddle.

25           MR. WEDDLE:  Thank you your Honor.

J2pdmid3                              Marino - cross

1    CROSS-EXAMINATION

2    BY MR. WEDDLE:

3    Q.  Good afternoon, sir.  My name is Justin Weddle.  I

4    represent Jeffrey Wada.

5    A.  Good afternoon.

6            MR. WEDDLE:  Jeff, could you stand up for a second?

7    Q.  Have you had any contact with Jeffrey Wada?

8    A.  I have not.

9    Q.  And in your direct testimony -- or in your testimony up

10   until now, you haven't mentioned Jeffrey Wada in any way, have

11   you?

12   A.  I have not.

13   Q.  In your direct testimony when the prosecutor was asking you

14   questions, you mentioned a few times the idea of coming clean.

15   Do you recall that?

16   A.  Yes.

17   Q.  What does that phrase mean to you, "coming clean"?

18   A.  It means self-report, make the regulator aware of

19   something.

20   Q.  And in your mind does it mean report part of the

21   information or the entirety of the information?

22   A.  It would mean reporting the entirety of the information.

23   Q.  So, for example, if somebody told part of the story but

24   lied and concealed another part of the story and continued to

25   commit crimes, would that be coming clean in your view?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MS. ESTES:  Objection.  Argumentative.

2           MR. WEDDLE:  It is a fair question, your Honor.

3           THE COURT:  Overruled.

4           You can answer.

5           THE WITNESS:  Please repeat the question.

6    BY MR. WEDDLE:

7    Q.  If somebody told part of the story but then lied and

8    concealed other parts of the story to their regulator or

9    whoever their audience was, then continued to commit crimes,

10   would that count as coming clean in your view?

11          MS. ESTES:  Objection, your Honor.  May we approach?

12          THE COURT:  I am going to sustain the objection.

13   BY MR. WEDDLE:

14   Q.  In your view, in somebody purported to be coming clean but

15   in fact was only telling part of the story and concealing other

16   important parts of the story, would that count as coming clean?

17          MS. ESTES:  Objection.

18          THE COURT:  Sustained.

19          MR. WEDDLE:  I have nothing further, your Honor.

20          THE COURT:  Any redirect?

21          MS. ESTES:  Yes, your Honor, just briefly.

22   REDIRECT EXAMINATION

23   BY MS. ESTES:

24   Q.  Mr. Marino, do you remember Mr. Boxer asking you some

25   questions about the fact that you elevated this to Scott

J2pdmid3

1    Marcello?

2    A.   Yes.

3    Q.   And if Scott Marcello hadn't agreed to report this to Judge

4    Holmes, what did you plan to do?

5    A.   I was going to report it.

6    Q.   And why were you going to report it to Judge Holmes if

7    Scott Marcello didn't agree to?

8    A.   Because it was absolutely clear to me that this needed to

9    go to the highest levels and needed to get reported to the

10   PCAOB.

11              MS. ESTES:   Nothing further.

12              MR. BOXER:   Nothing further, your Honor.

13              THE COURT:   Thank you.   You may step down.

14              (Witness excused)

15              THE COURT:   The government may call its next witness.

16              MS. ESTES:   Your Honor, the government calls Laurie

17   Mullen.

18    LAURIE MULLEN,

19        called as a witness by the government,

20        having been duly sworn, testified as follows:

21              THE CLERK:   Please state your name and spell your last

22   name slowly for the record.

23              THE WITNESS:   Laura Laurie Mullen, M-u-l-l-e-n.

24              THE COURT:   And is it Laura or Laurie?

25              THE WITNESS:   My real name is Laura.

J2pdmid3                        Mullen - direct

1           THE COURT:  Laura, L-a-u-r-a?

2           THE WITNESS:  Yes.

3           THE COURT:  OK.  Ms. Estes, you may inquire.

4   DIRECT EXAMINATION

5   BY MS. ESTES:

6   Q.  Good afternoon.

7   A.  Good afternoon.

8   Q.  What is your educational background?

9   A.  I have a bachelor's degree in business administration from

10  California State University, Long Beach.

11  Q.  Do you have any professional licenses?

12  A.  I have a CPA in the State of California, a Certified Public

13  Accountant's license.

14  Q.  What company do you work for?

15  A.  KPMG LLP.

16  Q.  How long have you worked for KPMG?

17  A.  36 years.

18  Q.  Do you work in a particular office?

19  A.  I work in the Santa Clara, California office.

20  Q.  What do you currently do at KPMG?

21  A.  I'm a partner.

22  Q.  When did you become a partner at KPMG?

23  A.  July 1st, 1996.

24  Q.  And are you an audit partner?

25  A.  Yes.

J2pdmid3                         Mullen - direct

1    Q.  Do you specialize in auditing any particular kind of

2    company?

3    A.  I specialize in auditing technology companies.

4    Q.  Now, Ms. Mullen, I would like to focus your attention on

5    the timeframe of 2015 through February 2017.

6            What was your position at that time?

7    A.  I was Regional Professional Practice Partner for the West

8    Region of KPMG.

9    Q.  And when did you become the Regional Professional Practice

10   Partner?

11   A.  October 1st, 2013.

12   Q.  What were your duties and responsibilities in that

13   position?

14   A.  I was responsible for professional practice oversight of

15   the ten business units that made up the West Region of KPMG.

16   Q.  And when you say "business unit," what do you mean by that?

17   A.  A business unit is an office or a group of offices in a

18   particular geographic area that works together.

19   Q.  And what were some of the business units in the West

20   Region?

21   A.  Some of them were Chicago Metro, Gateway West, Northern

22   Heartland, Mid-America, Houston, Dallas, Pacific Northwest,

23   Denver, Pacific Southwest, and the Bay area.

24   Q.  Now, from 2015 through February 2017, who did you report to

25   within KPMG?

J2pdmid3                    Mullen - direct

1   A.  Dave Middendorf.

2   Q.  What was his position?

3   A.  He was National Managing Partner of Audit Quality and

4   Professional Practice.

5   Q.  How often did you interact with him during that timeframe

6   at KPMG.

7   A.  Often.

8   Q.  Is that daily?  Weekly?

9   A.  Probably at least weekly.

10  Q.  How would you describe your working relationship?

11  A.  Very good.

12  Q.  Were you close?

13  A.  We were close professionally, yes.

14  Q.  Now, when you were the Regional Professional Practice

15  Partner, did you also work directly on audits?

16  A.  Yes.

17  Q.  And during the 2015 through early 2017 timeframe,

18  approximately how many audits did you work on directly in a

19  given year?

20  A.  Directly, probably three to five during that timeframe.

21  Q.  And what was your role in those audits?

22  A.  My role was Engagement Quality Control Review Partner,

23  EQCR.

24  Q.  What does that mean?

25  A.  That is a specified role in an audit engagement that's

J2pdmid3                         Mullen - direct

1    responsible for agreeing with significant judgments that are

2    made by the Engagement Team.

3    Q.  Now, aside from the audits that you worked directly on, did

4    you also consult on other audits?

5    A.  Yes.

6    Q.  And in what context?

7    A.  In the context of my role as Regional Professional Practice

8    Partner, there were numerous required consultations with

9    engagement teams.

10   Q.  Now, in your role as Regional Professional Practice

11   Partner, did you have any interaction with the PCAOB?

12   A.  Yes.

13   Q.  What sort of interaction?

14   A.  I was responsible, along with my counterpart, for answering

15   their questions on an annual basis about audit partner ratings

16   and compensation.

17   Q.  Did you have any interaction with the PCAOB in the context

18   of inspections?

19   A.  Not directly.

20   Q.  In your role as Regional Professional Practice Partner,

21   were you made aware of KPMG's performance on PCAOB inspections

22   each year?

23   A.  Yes.

24   Q.  And how was KPMG doing with respect to PCAOB inspections in

25   the 2014/2015 timeframe?

J2pdmid3                          Mullen - direct

1    A.   During that timeframe, we had a Part I issuer inclusion

2    rate that was larger than our competitors, higher than our

3    competitors.

4    Q.   And when you say a Part I inclusion rate, what do you mean

5    by that?

6    A.   Part I is the annual inspection report that PCAOB issues

7    that is made public that has specific criticisms of our audits

8    of particular issuers.

9    Q.   Were there any industries in particular that were not doing

10   well?

11   A.   Financial services.

12   Q.   And were there discussions about these issues at KPMG?

13   A.   Yes.

14   Q.   Did you ever participate in calls with David Middendorf

15   where inspection results were discussed?

16   A.   Yes.

17   Q.   What sort of calls were those?

18   A.   Dave had I think it was a bi-weekly call for his direct

19   reports and that was I call it a standing agenda item.

20   Q.   Were there other standing agenda items related to audit

21   quality, for example?

22   A.   Yeah.  We would talk about a variety of issues on those

23   calls, including audit quality initiatives where we had ideas

24   to improve audit quality.

25   Q.   Now, Ms. Mullen, are you familiar with a KPMG initiative

J2pdmid3                          Mullen - direct

1    involving Palantir?

2    A.  Yes.

3    Q.  And what is your understanding of what that involved?

4    A.  My understanding is that the firm hired Palantir on a

5    contingency basis to try to predict a risk rate of which

6    engagement would be subject to PCAOB inspection.

7    Q.  And what was your understanding of the purpose of the

8    Palantir initiative?

9    A.  My understanding was we wanted to focus our audit quality

10   initiatives on those engagements that would be more likely to

11   be inspected by the PCAOB.

12   Q.  Now, Ms. Mullen, let me direct your attention to

13   February 6, 2017.  Did you work that day?

14   A.  Yes, I did.

15   Q.  Did there come a time that day when you got a call from

16   Dave Marino?

17   A.  Yes.

18   Q.  Who is Dave Marino?

19   A.  Dave Marino at the time was the Professional Practice

20   Partner for the Chicago Metro Business Unit.

21   Q.  And so what was your relationship to him within KPMG?

22   A.  He was my direct report.

23   Q.  Where were you when Dave Marino called you?

24   A.  I was in my office.

25   Q.  And what did he tell you on the call?

J2pdmid3                         Mullen - direct

1    A.  First of all, he had apologized for dragging me into

2    something that we both would likely come to regret.  He told me

3    that Brian Sweet had called Diana Kunz and told Diana Kunz that

4    one of her engagements was one hundred percent likely to be

5    inspected by the PCAOB in 2017 and that it had been approved by

6    the board.

7    Q.  What was your reaction to learning that Brian Sweet had

8    told Kunz that her engagement was a hundred percent likely to

9    be inspected?

10   A.  I was confused because that was not something that we would

11   likely to have known on February 6th.

12   Q.  And why wouldn't you have known that information on

13   February 6th?

14   A.  Because the PCAOB does not inform us of the engagements

15   that they are going to inspect until the audits are finished.

16   Q.  And what was your understanding of the status of Ms. Kunz's

17   audit at the time?

18   A.  It was in process.

19   Q.  What is your understanding of why the PCAOB notifies the

20   firm of inspections only after the audits are finished?

21   A.  Well, that's the way the inspection process works.  The

22   firm finishes the audits and then the PCAOB informs the firm of

23   which audits they're going to inspect after the audits are

24   done.

25   Q.  What is your understanding of why the inspection process

J2pdmid3                         Mullen - direct

1  works that way?

2  A.  Well, the PCAOB's charge is to improve audit quality for

3  all audits, not just audits that they're going to inspect, and

4  so the firm is not informed of what audits are going to be

5  inspected until after the audit is done.

6  Q.  Now, what else, if anything, did Marino tell you on this

7  call that Sweet told Kunz?

8  A.  He told me that Brian had also told Diana that he, Brian,

9  had called another partner and told that partner that his

10  engagement was not going to be selected.

11  Q.  What, if anything, did Marino tell you about whether the

12  conversation involved access to the audit file?

13  A.  He told me that Brian had requested access to Diana's

14  clients' eAudIT file and that either Diana had granted him

15  access and then subsequently revoked it or had not granted him

16  access.  I can't remember exactly which.

17  Q.  And, generally speaking, who has access to an audit file?

18  A.  Generally speaking, the Engagement Team would have access

19  to an eAudIT file.  However, certain partners or individuals

20  that were involved in our monitoring program might have access

21  to it as well.

22  Q.  Now, what was Marino's tone when he told you this

23  information?

24  A.  He was -- I would say he was pretty excited.

25  Q.  How did you respond when Marino told you this?

J2pdmid3                    Mullen - direct

1   A.  How did I respond?  Well, I told him that I -- I didn't

2   know what it was all about and that I would call Dave

3   Middendorf about it.

4   Q.  And just to be clear, when you said that Marino was pretty

5   excited, what do you mean by "excited"?

6   A.  He was animated.  He was not calmly telling me this.

7   Q.  I believe you said after Marino told you this, you said you

8   had called Dave Middendorf about it, is that right?

9   A.  That's right.

10  Q.  And why did you plan to call Dave Middendorf about it?

11  A.  Well, I had reported to Dave and I figured that he should

12  know about it, and that would be the chain of command to try to

13  sort something like that out.

14  Q.  Now, at the time that you decided to call Dave, did you

15  have any reason to believe Dave Middendorf knew about the

16  information?

17  A.  No.

18          MS. ESTES:  Mr. Cooney, can you pull up what has been

19  marked for identification as Government Exhibit 1128.

20  BY MS. ESTES:

21  Q.  Ms. Mullen, do you recognize this document?

22  A.  Yes.

23  Q.  And what does this relate to?

24  A.  The bottom part of the document is an Outlook invitation

25  that I sent Dave on Monday requesting a call at 3:30 p.m., or

J2pdmid3                          Mullen - direct

3 o'clock p.m., to catch up.  And the top part is an email I

sent him shortly after 3 Pacific to tell him that I just tried

him in his office and he didn't pick up so I asked him to call

me in mine.

          MS. ESTES:  Your Honor, the government offers

Government Exhibit 1128.

          THE COURT:  1128 received in evidence)

          (Government's Exhibit 1128 received in evidence)

BY MS. ESTES:

Q.  Now, Ms. Mullen, focusing on the bottom email there, so

what's the date of the email?

A.  Monday, February 6, 2017.

Q.  And can you read what you said in the email?

A.  Yes.

          "Dave - Do you have time this afternoon to catch-up on

a confidential matter?  This time looks open on your calendar.

It should not take 30 minutes."

Q.  Now, when you said "confidential matter," what did you mean

by that?

A.  It was -- the subject I did not want to put the subject in

the email.

Q.  And why didn't you want to put the subject in the email?

A.  Because I wanted to explain it to him ear to ear.

Q.  Why did you want to explain it to him ear to ear?

A.  It was -- it's not just a yes-or-no question, so I wanted

J2pdmid3                          Mullen – direct

1   to talk to him about it.

2   Q.  And did you talk to Middendorf on February 6th after

3   sending these emails?

4   A.  No.

5   Q.  Did you eventually talk to Dave Middendorf?

6   A.  Yes.

7   Q.  When did you talk to him?

8   A.  On Wednesday, February 8th.

9   Q.  Now, before you talked to Middendorf on February 8th, did

10  you speak to Dave Marino again?

11  A.  Yes.

12  Q.  Was that in person or over the phone?

13  A.  It was over the phone.

14  Q.  Who was on the call?

15  A.  It was Dave and John Rodi.

16  Q.  How long did that call last?

17  A.  About 30 minutes.

18  Q.  And during that call with Dave Marino and John Rodi, what,

19  if anything, did you discuss regarding next steps to take with

20  respect to the information you had learned?

21          MR. BOXER:  Objection.

22          THE COURT:  Overruled.

23          You can answer.

24          THE WITNESS:  I'm sorry.  Could you repeat the

25  question, please?

J2pdmid3                         Mullen - direct

1   BY MS. ESTES:

2   Q.  During that call with Dave Marino and John Rodi, what, if

3   anything, did you discuss regarding next steps to take with

4   respect to the information you had learned.

5   A.  Well, we discussed that really the only thing to do --

6   assuming it was true, assuming that Brian Sweet did have some

7   information from the PCAOB that he shouldn't have had, under

8   that assumption the only appropriate action would be to go and

9   self-report that to the PCAOB and to allow them to make another

10  selection.

11  Q.  So why do you believe the only appropriate action was to

12  self-report this to the PCAOB?

13  A.  Well, if it was true that the engagement was going to be

14  selected and we have that information inappropriately, that

15  would have really compromised the integrity of the regulatory

16  process.  If we had information that we shouldn't have known,

17  it would be, you know, simple enough to go and tell them and

18  allow them to make another selection.

19  Q.  And so why did you believe allowing them to make another

20  selection would resolve the issue?

21  A.  Well, I didn't know whether it would resolve the issue but

22  I -- I believe that would be the appropriate next step.

23  Q.  Why did you think that would be the appropriate next step?

24           MR. BOXER:  Objection.  Asked and answered.

25           THE COURT:  Overruled.

1  A.  I -- we -- we talked through it, and we could not think of

2  any other way to cure this, assuming it were true.

3  Q.  So did you talk to Dave Middendorf after your call with

4  Dave Marino and John Rodi?

5  A.  Yes.

6  Q.  Where were you when you had this call?

7  A.  I was in my office, I believe.

8  Q.  What did you say to Dave Middendorf on the call?

9  A.  I told Dave what Dave Marino had told me.

10 Q.  So you told Dave that Sweet had told Kunz that her audit

11 would be inspected?

12         MR. BOXER:  Objection.

13 A.  Yes.

14         THE COURT:  Sustained.

15 Q.  Can you explain what you told Dave Middendorf specifically?

16 A.  I told Dave that Brian Sweet had called Diana and told her

17 that he was a hundred percent sure her engagement would be

18 selected, that the board had approved it, and that assuming

19 that were true, the only way to cure it would be for us to go

20 and self-report that to the PCAOB.

21 Q.  How did Dave Middendorf react when you told him this?

22 A.  Dave told me that in fact Brian had obtained the entire

23 list of 2017 inspections.  I asked him -- well, Brian had

24 obtained the 2017 list, that there were really not a lot of

25 surprises on the list that.  In particular, one very large

J2pdmid3                    Mullen - direct

1  financial institution client was on the list.  Most of them

2  were in the monitoring program.  And I asked him who knew, who

3  else knew.  And he said Scott Marcello knew, Tom Whittle knew,

4  and then George Hermann also knew.  And he told me that he

5  couldn't unknow it.

6  Q.  All right.  Let me break that down a little bit,

7  Ms. Mullen.

8          First you said that Dave Middendorf told you that

9  Brian Sweet had the entire list of 2017 inspections.  What did

10  you understand that to mean?

11  A.  I understood it to mean the 50 or so audit engagements that

12  the PCAOB planned to inspect in 2017.

13  Q.  And how did you react when you learned that Brian Sweet had

14  the whole list of inspections?

15  A.  I don't know how I verbally reacted but I was shocked.

16  Q.  Why were you shocked?

17  A.  Because up until that point I thought it was one engagement

18  that had been compromised, and then I learned that in fact it

19  was the whole inspection season that the PCAOB had planned that

20  was compromised.

21  Q.  Now, I believe you testified that Dave Middendorf told you

22  there were not a lot of surprises and that one very large

23  financial institution was on the list, is that right?

24  A.  That's right.

25  Q.  What was that large financial institution?

1   A.  It was CitiGroup.

2   Q.  And how did you respond when he told you CitiGroup was on

3   the list?

4   A.  I asked him to not tell me any more clients that were on

5   the list.

6   Q.  Why didn't you want to know any more clients on the list?

7   A.  Because it's confidential information and I shouldn't have

8   been and didn't want to know.

9   Q.  Now, I believe you testified that he told you that Tom

10  Whittle, George Hermann and Scott Marcello knew, is that right?

11  A.  Yes.

12  Q.  Who is Tom Whittle?

13  A.  Tom Whittle at the time was the Head of Inspections for

14  KPMG.

15  Q.  And who is George Hermann?

16  A.  George Hermann at the time was our Chief Auditor.

17  Q.  And who was Scott Marcello?

18  A.  Scott Marcello at the time was our Vice Chairman of

19  Auditing.

20  Q.  What, if anything, did Dave Middendorf tell you about when

21  he learned of this inspection list?

22  A.  He told me he learned about it on Monday.

23              (Continued on next page)

24

25

J2prmid4                        Mullen - Direct

1   Q.  I believe you testified that Middendorf told you he

2   couldn't un-know it.  What did you understand that to mean?

3   A.  I understood it to mean that he knew what he knew and he

4   couldn't un-know it, he couldn't forget it.

5   Q.  How did you react when he told you that?

6   A.  I believe I said something in form or in substance that I

7   understand you can't un-know it but that doesn't mean we don't

8   do something about it.

9   Q.  What, if anything, did you say to Dave Middendorf about

10  self-reporting?

11  A.  I told day of that the only thing that we could do would be

12  for him to tell PCAOB and tell them what he knew.

13  Q.  How did he respond to that?

14  A.  He didn't agree or disagree with them.  He told me he would

15  talk to Scott Marcello about it.

16  Q.  What was his relationship to Scott Marcello within KPMG?

17  A.  He reported directly to Scott.

18  Q.  What was Middendorf's tone, if you recall?

19  A.  Very calm, very affable, regular Dave.

20  Q.  What was your tone during the call?

21  A.  I don't recall, but I would imagine it was a little bit

22  more tense than his tone.

23  Q.  When he said that he was going to talk to Scott Marcello,

24  how did you respond?

25  A.  I said okay and I asked him to please keep me posted and to

J2prmid4                        Mullen - Direct

1    let me know as soon as he did talk to Scott.

2    Q.  Why did you ask him to keep you posted?

3    A.  Because I wanted to make sure that we were continuing to

4    work this issue up the chain of command.

5    Q.  Why did you want to make sure you were doing that?

6    A.  Because I wanted to make sure it was getting taken care of.

7    Q.  Were you surprised by Middendorf's reaction on the call?

8              MR. BOXER:  Objection.

9              THE COURT:  Overruled.

10   A.  Can I answer that question?

11   Q.  Yes.

12   A.  I was, I was a little bit surprised.

13   Q.  Why were you surprised?

14   A.  Because I thought he would have the same reaction that I

15   did.

16   Q.  To be clear, what was your reaction?

17   A.  My reaction was surprise and a belief that we needed to go

18   and self-report this and self-report it quickly, and my

19   expectation was that he would immediately agree with me on

20   that.  And he didn't appear to immediately agree.

21   Q.  What else, if anything, do you remember discussing on that

22   call?

23   A.  I think that's all.  I can't remember anything else.

24   Q.  Did you talk to Dave Middendorf again that week?

25   A.  I did.

J2prmid4                          Mullen - Direct

1   Q.  When did you talk to him next?

2   A.  On Friday the 10th.

3   Q.  Was that over the phone or in person?

4   A.  Over the phone.

5   Q.  How long was that call?

6   A.  Not very long.  Probably less than 30 minutes.

7   Q.  What did you discuss on that call?

8   A.  I asked him whether he had talked to Scott and whether we

9   had self-reported, and he said yes, he had talked to Scott,

10  that Scott had some questions.  Two of the questions I remember

11  are what if the PCAOB wants us to have this information, what

12  if the other firms have this information.  That's what I

13  remember about what he said about Scott.

14  Q.  What was your reaction after Middendorf told you that Scott

15  had said what if the other firms have this information?

16  A.  I believe I said something like it doesn't really matter

17  whether the other firms have it or not; if we go down and tell

18  the PCAOB that we have it and they say it's okay, the other

19  firms have it, then we'll know the answer.

20  Q.  What, if anything, on that call did you discuss regarding

21  next steps?

22  A.  I told Dave that Scott Marcello was going to be in Chicago

23  on Monday to meet with a client there and that Dave Marino and

24  John Rodi were going to talk to him about this issue.

25  Q.  What was his reaction to that?

1    A.  He said, "I don't have any problem with anybody talking to

2    Scott Marcello about this issue."

3    Q.  What, if anything, did Dave Middendorf say on that call

4    about what he intended to do to address the issue?

5    A.  I don't recall him saying anything about what he intended

6    to do.

7    Q.  What, if anything, was discussed on the other call

8    regarding a small group?

9              MR. BOXER:  Objection: leading after she gave an

10   answer.

11             THE COURT:  Sustained.

12   Q.  Do you recall him saying anything else on the call?

13   A.  Yes, I do.  I recall him saying three other things.  I

14   recall him saying that he told Tom Whittle to tell Brian Sweet

15   that if anybody at the PCAOB ever offered Brian this type of

16   information in the future, to just say no thank you.  He told

17   me that he was going to convene a small group to develop an

18   optimal solution for the problem.  And the last thing he told

19   me was he asked me how everything else was going.

20   Q.  Turning to the small group to develop an optimal solution

21   for the problem, what did you understand that to mean?

22   A.  I think just the plain English meaning of that.

23   Q.  Did you understand that you would be part of the group?

24   A.  I made the statement, I said, Dave, I don't know whether

25   I've going to be part of that small group, but I think we need

J2prmid4                          Mullen - Direct

1    to convene it pretty quickly.

2    Q.  Ms. Mullen, you said that the last thing he asked you was

3    how everything was going.  What was your reaction to that?

4    A.  I don't recall what my reaction was to that.  At that point

5    there wasn't anything else that was going for me.

6    Q.  What do you mean there wasn't anything else?

7    A.  This was the one thing, the one and only thing I can think

8    of at this point in time.

9    Q.  Ms. Mullen, during either of your conversations with Dave

10   Middendorf, did he tell you anything about getting information

11   in previous years?

12   A.  No.

13   Q.  After your conversation with Dave Middendorf, did you have

14   any additional conversations about this over the weekend?

15   A.  Yes.

16   Q.  Who did you talk to over the weekend?

17   A.  I had a conversation with Dave Marino on Saturday or

18   Sunday.

19   Q.  What, if anything, did you discuss with Dave Marino about

20   next steps?

21   A.  We discussed talking points that he and John Rodi were

22   going to use for their discussion with Scott Marcello on

23   Monday.

24   Q.  Turning to Monday, February 13th, did you have any

25   conversations with Scott Marcello that day?

J2prmid4                        Mullen - Direct

1    A.  Yes.

2    Q.  Was that over the phone or in person?

3    A.  It was over the phone.

4    Q.  What did you discuss with Scott Marcello?

5           MR. BOXER:  Objection.

6           THE COURT:  Sustained.

7    Q.  Ms. Mullen, after your conversation with Scott Marcello,

8    did you have an understanding of whether the issue was being

9    reported to the PCAOB?

10          MR. WEDDLE:  Objection.

11          THE COURT:  Overruled.  You can answer.

12   A.  Scott Marcello told me that he was in full agreement with

13   Dave and John and I, that this needed to be reported to the

14   PCAOB and needed to be reported quickly.  He told me --

15          MR. BOXER:  Objection, your Honor.  I think you

16   sustained the objection.

17          THE COURT:  Sustained as to what he said.

18   Q.  Ms. Mullen, without going into substance, did you have an

19   understanding after your conversation with Scott Marcello as to

20   whether this issue was going to be reported to the PCAOB?

21   A.  Yes.

22          MS. ESTES:  No further questions.

23          THE COURT:  Cross?

24          MR. BOXER:  I do.  Not too much.

25   CROSS-EXAMINATION

J2prmid4                          Mullen - Cross

1    BY MR. BOXER:

2    Q.  Hello, Ms. Mullen.

3    A.  Hello.

4    Q.  I represent Dave Middendorf.  Nelson Boxer.  I understand

5    you testified to a call on February 8th and a call on February

6    10th.  I have a few questions about each.  On the February 8th

7    call isn't it true that Dave said to you that if you had called

8    me when you had first emailed him, he wouldn't have known about

9    this issue?

10   A.  I'm sorry.  Repeat that question, please.

11   Q.  I'll try it again.  You tried to email Mr. Middendorf on

12   the 6th and 7th to set up a call, correct?

13   A.  Yes.

14   Q.  You finally were able to speak to him on the 8th, is that

15   right?

16   A.  Right.

17   Q.  He gave you his cell phone and told you to call him at home

18   before the call occurred, is that right?

19   A.  No.  I think that was on the 10th that he told me to call

20   him at home.

21   Q.  You called him at his office on the 8th?

22   A.  I believe so.

23   Q.  During that call Mr. Middendorf let you know that he was

24   aware of what Mr. Sweet had obtained, correct?

25   A.  Dave told me that Brian had obtained the entire list.  He

J2prmid4                        Mullen - Cross

1   told me that on the 8th.

2   Q.  On the 8th?

3   A.  Yes.

4   Q.  Isn't it a fact that he also told you that if you, Ms.

5   Mullen, had spoken to Dave when you first sent him an email,

6   the confidential email we saw a moment ago, that at that time

7   Dave did not know about Mr. Sweet obtaining the list of

8   inspections?

9               MS. ESTES:  Objection: hearsay.

10              THE COURT:  Sustained.

11  Q.  As you said, on that initial call Mr. Middendorf told you

12  that he knew, Mr. Whittle knew, Mr. Hermann knew, and Mr.

13  Marcello knew, correct?

14  A.  Correct.

15  Q.  I think you said it was on this call that you said Dave was

16  acting like regular Dave, I think were your words, correct?

17  A.  Yes.

18  Q.  He's generally an affable person in your experience,

19  correct?

20  A.  Yes.

21  Q.  He's mild mannered, right?

22  A.  Yes.

23  Q.  He doesn't get very agitated with people, correct?

24  A.  Correct.

25  Q.  You testified that essentially that's how he was on this

J2prmid4                         Mullen - Cross

1    call as well, correct?

2    A.   That's correct.

3    Q.   You understood when you were talking to Mr. Middendorf that

4    this was not the first time he was hearing this information,

5    correct?

6    A.   I believe I testified that he had told me he had found out

7    on Monday.

8    Q.   So he had had time to process the information by the time

9    you spoke to him, correct?

10   A.   I don't know what he processed and what he didn't.

11   Q.   He was aware of it for two days by the time you spoke to

12   him on Wednesday?

13   A.   That's what he told me, yes.

14   Q.   You described to us what in the second call Dave described

15   were Mr. Marcello's thoughts on this issue of Mr. Sweet

16   obtaining the full list of 2017 inspections.  Do you recall

17   that?

18   A.   I do.

19   Q.   You said that Dave told you that Marcello wanted to know

20   how we didn't know that the PCAOB wanted us to have this

21   information, correct?

22   A.   Correct.

23   Q.   Mr. Marcello, he told you, was also asking whether the

24   other firms had the information as well, correct?

25   A.   Can you repeat that?

J2prmid4                    Mullen - Cross

1    Q.  Sure.  What I'm asking you is on the second call Mr.
2    Middendorf told you certain things that Mr. Marcello had
3    expressed to Mr. Middendorf, correct?
4    A.  Yes.
5    Q.  One of those things Mr. Marcello expressed and Mr.
6    Middendorf told you was how did we know the PCAOB doesn't want
7    us to have this information, right?
8    A.  Right.
9    Q.  The other thing Mr. Middendorf told you that Mr. Marcello
10   expressed was how do we know that the other firms don't have
11   this information as well, correct?
12   A.  That's correct.
13   Q.  Isn't it a fact that after the meeting with Mr. Marcello in
14   Chicago on the 13th you were made aware that Mr. Marcello had
15   expressed those very same questions to Mr. Marino and Mr. Rodi?
16           MS. ESTES:  Objection: hearsay.
17           THE COURT:  Sustained.
18   Q.  I understood you said that to you there was nothing else
19   but this issue when you were answering some questions on direct
20   examination.  Is that correct?
21   A.  Yes.
22   Q.  Why was it that you did not attend the meeting in Chicago
23   in person with Mr. Marcello on the 13th if there was nothing
24   else but this?
25   A.  There was no reason for me to be there in person.  Dave and

J2prmid4                        Mullen - Cross

1    John and I were in complete agreement on what the communication

2    was going to be to Scott.

3    Q.  This is Dave Marino, right?

4    A.  Yes.

5    Q.  Not Dave Middendorf?

6    A.  That's right.

7    Q.  You were Dave Marino's boss, right?

8    A.  That's right.

9    Q.  So where there was nothing else but this, you were going to

10   leave it to someone who reported to you to take the meeting

11   with the vice chair of audit of the whole firm, is that your

12   testimony?

13   A.  Yes.

14   Q.  Were you in Chicago at that time?

15   A.  No.

16   Q.  Were you able to dial in if you wanted to?

17   A.  No.

18   Q.  Why was that?

19   A.  We had decided that they were going to make the

20   communication, that I would follow up with Scott later that

21   morning, which I did.

22   Q.  You testified about part 1 inclusion rate during your

23   direct testimony.  Do you recall that?

24   A.  Yes.

25   Q.  And how in 2014 KPMG had a higher inclusion rate than its

1  competitors, do you remember saying that?

2  A.  Yes.

3  Q.  Isn't it true that in prior years other Big Four firms had

4  higher inclusion rates than KPMG?

5  A.  Yes.

6  Q.  Isn't it also true that which particular firm had the

7  highest tended to be a cyclical event with the PCAOB?  In other

8  words, it would be one firm for a few years, then it would be a

9  different firm for a few years, and in 2014 KPMG was that firm;

10  isn't that how it happened?

11  A.  It is true that certain firms have higher part 1 rates in

12  certain years.  I don't think I would describe it as cyclical,

13  which implies something that is regular.

14  Q.  Were you ever aware of a particular year where two Big Four

15  firms at the same time had significantly high inclusion rates

16  in part 1?

17  A.  Not significantly, but it's possible.

18  Q.  I appreciate it's possible, but in your recollection that's

19  not the way it went, correct?

20  A.  I really don't recall that.  I don't recall focusing that

21  much on the part 1 inclusion rate of the other firms.

22  Q.  You mentioned Palantir during your direct testimony.  Are

23  you aware that Palantir was a project approved by the board of

24  directors of KPMG?

25  A.  I was not aware that it was approved by the board.

J2prmid4                          Mullen - Cross

1   Q.  Were you aware that Judge Holmes, the head of compliance,

2   was the head of the Palantir project?

3   A.  No.

4   Q.  Before its inception?

5   A.  No.

6   Q.  The PCAOB chooses which audits to inspect on a risk-based

7   approach, is that right?

8   A.  That's my understanding.

9   Q.  What is your understanding of what that means, a risk-based

10  approach?

11  A.  My understanding is the PCAOB does a lot of analysis in

12  making their selections, considering risk factors within the

13  company.  I don't know how to be more specific.

14  Q.  That's fine.  Isn't the idea that the PCAOB wants to

15  inspect what it concludes are the riskiest audits of the firm?

16  A.  I think that's a fair statement, yes.

17  Q.  Isn't it true that efforts at improving audit quality

18  within KPMG were also addressed to the riskiest audits of the

19  firm?

20  A.  Yes.

21  Q.  Would you agree with me that's a good thing that KPMG focus

22  its efforts on the riskiest audits of the firm?

23  A.  Yes.

24  Q.  To conclude, you mentioned some of the contact you have

25  with Mr. Middendorf.  I want to show you what's marked as

J2prmid4                         Mullen - Cross

1   Defense Exhibit 286.  Do you recognize Defense Exhibit 286?

2   A.  Yes.

3             MR. BOXER:  I offer it, your Honor.

4             MS. ESTES:  No objection.

5             THE COURT:  M286 is received.

6             (Defendant's Exhibit M286 received in evidence)

7   Q.  What is M286?

8   A.  This is an Outlook invitation to a recurring call.  Maybe

9   this one isn't a particular recurring.  At that point in time

10  we had biweekly calls with the senior audit leadership team,

11  and that would have been the individuals on the 2 line.

12  Q.  There were various items discussed at these calls?

13  A.  Yes.

14  Q.  The recipients of the invite are those other people besides

15  yourself who report up to or through others to Mr. Middendorf?

16  A.  No.  On this invitation Kevin O'Hara and myself were the

17  only two that reported directly to Dave.

18  Q.  Scott Marcello is who Dave report to, correct?

19  A.  That's right.

20  Q.  Who is Mr. Ebner?

21  A.  John Ebner was the national managing partner of our

22  operations at the time.

23  Q.  Bruce Pillar?

24  A.  Bris Pillar was the regional managing partner for the west

25  region.

J2prmid4                    Mullen - Cross

1    Q.   And Mr. Gerard?

2    A.   John Gerard was the regional managing partner for the east

3    region.

4    Q.   Do those folks report up to Mr. Middendorf?

5    A.   No.

6    Q.   Who did they report to?

7    A.   I believe they reported to John Ebner, although they might

8    have reported directly to Scott.

9    Q.   I would like to show you what's marked as Defense Exhibit

10   M287.  I ask you if you recognize M287.

11   A.   Yes.

12            MR. BOXER:  I offer M287.

13            MS. ESTES:  No objection.

14            THE COURT:  Received.

15            (Defendant's Exhibit M287 received in evidence)

16   Q.   What is M287, Ms. Mullen?

17   A.   This is the Outlook invitation for Dave's weekly

18   professional practice calls.

19   Q.   You were invited to those calls?

20   A.   Yes.

21   Q.   On this invite is it fair to say that the recipients either

22   reported to Dave or reported up to Dave, through others to

23   Dave?

24   A.   Yes.

25   Q.   This was a weekly call?

J2prmid4                          Mullen - Cross

1    A.  Yes.

2    Q.  Who is Mr. Davison, Glen Davison?

3    A.  I believe at this time Glen would have been our chief

4    accountant.

5    Q.  This was a weekly call amongst this group?

6    A.  Yes, it was scheduled for weekly.

7    Q.  Did Dave lead the call each week?

8    A.  Yes.

9    Q.  Were there various items on the agenda each week?

10   A.  Yes.

11   Q.  Is it fair to say that Dave initiated a variety of

12   initiatives in 2015-2016 to help improve audit quality?

13   A.  Yes.

14   Q.  For example, accelerating audit execution, correct?

15   A.  Correct.

16   Q.  And others, correct?

17   A.  Correct.

18   Q.  Would you agree with me that Dave cared deeply about

19   improving audit quality at KPMG?

20              MS. ESTES:  Objection: calls for speculation.

21              THE COURT:  Sustained.

22              MR. BOXER:  No further questions, your Honor.

23              MR. WEDDLE:  No questions, your Honor.

24              THE COURT:  Any redirect?

25              MS. ESTES:  No, your Honor.

J2prmid4                    Mullen - Cross

1           THE COURT:  Thank you.  You may step down.

2           (Witness excused)

3           Folks, we are going to break for lunch.  It's 1:10 so

4      we will give you until 2:10.  Please leave your pads on your

5      chairs and we will see you at 2:10.

6           (Jury not present)

7           THE COURT:  Anything we should address at this point?

8           MS. KRAMER:  Yes, your Honor, two updates.  First,

9      somewhat minor, the letter that the government submitted to the

10     Court this morning responding to the motion to preclude certain

11     aspects of Barbara Hannigan's testimony and a government

12     exhibit, two things about that.

13          First, we expect Barbara Hannigan to be the next

14     witness.  Although you got our brief two hours ago, we will

15     unfortunately need a ruling from your Honor before she takes

16     the stand after lunch.

17          Second, in the government's footnote in that brief

18     about the timing of the defendant's notice to us indicating

19     that they no longer objected to Government Exhibit 21, the

20     letter said that that was on February 2nd.  I checked this

21     morning and realized it was February 6th.  So they told us on

22     February 6th that they didn't intend to object.  I just wanted

23     to correct that.

24          Second, we are going at least twice as fast as we

25     thought we would today.  We weren't even sure if we would be

1    calling Barbara Hannigan today, if we would get to her.  The

2    witnesses this morning have gone much, much quicker than

3    anticipated.  So we plan to call Barbara Hannigan next.  After

4    that Tom Whittle will be the next witness.  We had told defense

5    counsel he would be next, but we thought he would not be taking

6    the stand until tomorrow.  So we wanted to let the Court know

7    about that.

8          MR. BOXER:  Does that mean he is testifying today or

9    tomorrow?

10          MS. KRAMER:  Today.  He is next after Barbara

11    Hannigan.  Unless Barbara Hannigan's cross takes hours, we will

12    be calling Mr. Whittle today.

13          MR. BOXER:  It will not take hours.

14          THE COURT:  I'll have to look at the letters during

15    lunch.  I had a chance to look at the letter this morning

16    quickly.  I haven't seen the government response.  The issue

17    with Ms. Hannigan's testimony is the references in PCAOB

18    documents to revealing certain information being a violation of

19    federal law?  Is that essentially the issue?

20          MR. COOK:  Correct, your Honor.

21          THE COURT:  Tell me documents that is referenced in.

22          MR. COOK:  Government Exhibit 21, and there is one

23    additional document, 200.

24          MS. KRAMER:  Your Honor, we can bring up Government

25    Exhibit 21 to show the Court now.  It's a slide deck that was a

J2prmid4                    Mullen - Cross

1    training that Barbara Hannigan presented to new employees,

2    including Jeff Wada when he started at the PCAOB.  Page 2.  It

3    is the last bullet point on the page that defense counsel takes

4    issue with.

5          There are approximately one dozen citations in the

6    government's letter this morning to other cases in this

7    district in which similar compliance materials have been

8    admitted not for their truth but for the fact that the

9    defendant was advised of the relevant rules or law.  We have

10   listed a number of them.  We tried to capture them.  I am sure

11   there are many more that we haven't captured.

12         In fact, sometimes the directives in the trainings

13   that are admitted are far more explicit than what is here and

14   include a recitation of securities law.  Even in those cases

15   courts admit them for the very probative fact that the

16   defendant was advised of this information.  It goes to the

17   defendant's state of mind, knowledge, and intent, which, as

18   your Honor knows, is highly contested in this case.

19         In those cases the district courts have given limiting

20   instructions at the time the evidence comes in.  Whether it is

21   at the time the evidence comes in or later, courts have given

22   limiting instructions at both points in time at trials, letting

23   the jury know that this is not offered for the truth, that the

24   judge is going to instruct the jury on the law and that they

25   are required to follow the judge's instructions on the law.  As

J2prmid4                    Mullen - Cross

1   your Honor knows, such instructions are presumed to be followed

2   by juries.

3          The weight of authority is strongly in favor of

4   admitting them for the purpose that it has been offered.  We

5   could not find any cases in which this type of evidence was

6   kept out, nor did counsel for Wada cite any.

7          THE COURT:  The cases you are talking about, do they

8   have something as explicit as this violation is a violation of

9   federal law?

10         MS. KRAMER:  Even more explicit, your Honor.  In many

11  insider trading cases in this district the government has

12  offered compliance type slides that say insider trading is a

13  federal crime, it is illegal to trade on material nonpublic

14  information, this is what that is, walks through the elements

15  that mirror what the court is going to instruct the jury on.

16         This is more neutral than that because it simply says

17  a violation of federal law.  It does not say a violation of

18  federal criminal law.

19         THE COURT:  I understand that distinction.  I think

20  that is important.  It is true that the statute directs the

21  PCAOB to come up with an ethics code for PCAOB employees, but

22  is it clear that it has the status of federal law?  I know they

23  are published in the Federal Register, but they are not

24  codified in the C.F.R.  Isn't it disputed that that is in fact

25  a violation of federal law?

J2prmid4                        Mullen - Cross

1          MS. KRAMER:  The plain language of the Sarbanes-Oxley

2     Act that has been received in evidence in this trial says on

3     its face that violations of PCAOB rules are violations of the

4     Sarbanes-Oxley Act.  What that means in terms of penalty and

5     whether those can be criminally penalized or not is perhaps a

6     matter that the parties dispute.  But the plain language of the

7     evidence that is before the jury says that.

8          This is not in conflict with that in any way, shape,

9     or form.  Indeed, in <u>United States v. Offrier</u>, Judge Engelmayer

10    allowed such evidence in where the statement of law was so

11    clear that it explained the difference between classic and

12    misappropriation securities fraud.  The defendants in this case

13    have contended that we have to prove that Jeff Wada knew that

14    this conduct was illegal.  If that is the case, we should not

15    be hamstrung from showing the jury that he received this slide

16    deck, that he got this training.  It was shown to him, emailed

17    to him, and read to him.

18         Even if it were wrong, we are not offering it for its

19    truth.  We are offering the fact that he was told this.  It is

20    therefore highly probative of his knowledge that what he was

21    doing was in violation of federal law, whether his knowledge of

22    that or his belief of that was as a matter of law accurate or

23    not.

24         THE COURT:  Can you also address, before you sit down,

25    the argument that I believe defendant makes that it was ten

J2prmid4                        Mullen - Cross

years ago or whatever and then that the subsequent versions of

the ethics code deck provided to employees took this bullet

out?

          MS. KRAMER:  Sure.  I think those are totally fair

points for the defendants to raise in cross-examining Barbara

Hannigan about this.  They go purely to weight and not to

admissibility.

          THE COURT:  Is there going to be evidence about why it

was taken out?

          MS. KRAMER:  I don't think so, your Honor.  They are

free to ask Barbara Hannigan about that.  But this is a classic

example of the weight versus admissibility situation.  If they

want to say that he was told this and between 2005 and 2016 he

totally forgot and came to have the view that this was

completely proper, that's an argument that they can make that I

think doesn't hold water.

          He is certified annually, his compliance with the

PCAOB rules and with the PCAOB ethics code.  He received this

training.  He got an email with this training in 2012.  The

training says the same thing from 2012.  We can put that

exhibit up.  We'll find that for your Honor.  But this was

originally given to him in 2005 when he started.  Barbara

Hannigan will say that she said that to him, that it was

emailed to him again in 2012.

          MS. ESTES:  To be clear, your Honor, the presentation

1    is not emailed to him in 2012.  It is an email that contains

2    similar language in the substance of the email.

3          THE COURT:  Anything you want to highlight?  I'm not

4    going to rule right now because I want to go back and read

5    letters closely.

6          MR. COOK:  A couple of things with regard to the

7    supposed withdrawal of our objection.  We had a meet-and-confer

8    with the government in which we indicated our objection to

9    their offering this for the reasons we are talking about now.

10   It appears on February 6th an email was sent to the government

11   that had a lengthy spreadsheet that listed our objections and

12   it said in that spreadsheet no objection.  That was inadvertent

13   on our part.  We were very clear in our conversation with the

14   government our position on this.  In fact, when I spoke over

15   the weekend with Ms. Estes, she expressed no surprise

16   whatsoever that we would be taking this position.

17          With regard to the cases that are cited, I haven't had

18   time to study all of them, but I suspect, and based on my

19   initial perusal, not one of them deals with the situation where

20   the truth of the underlying statement was at issue in the case.

21   That's exactly what we have here: whether or not the statement

22   that is made that the ethics code is a violation of federal

23   law, that statement itself, the truth of which is in question.

24          If it's not true, then it has no relevance on the

25   effect on Mr. Wada.  If it is true, that's a different story,

J2prmid4                    Mullen - Cross

1      but it's not.  I can explain why and we do explain in our

2      letter.  If it's not true or it doesn't matter if it's true, as

3      the government contends, then what relevance is it?  What

4      relevance does it have if Ms. Hannigan makes an untrue

5      statement to Mr. Wada in 2005 as to the effect it would have on

6      him?

7                 MS. KRAMER:  Your Honor, first, I think the relevance

8      of it is plain: that's what it means when something is not

9      offered for the truth but for the fact that someone heard that.

10     Second, we have no objection to your Honor's limiting

11     instruction making clear to the jury that the truth of that

12     statement is in dispute, that the lawyers will argue at the end

13     of the case something about this.  I don't actually think that

14     this is an argument that is necessarily relevant to the actual

15     charges in this case, but we have no objection to your limiting

16     instruction notifying the jury that the lawyers debate the

17     truth of this.

18                 I want to say one thing in response.  If your Honor

19     has not yet read the government's letter because you were of

20     course presiding over this trial all morning, what we were both

21     referring to in the footnote is the government has notified the

22     Court that the defendant's motion on this is untimely.

23                 On February 6th we received notice from them, as Mr.

24     Cook referred to, in the form of a spreadsheet updating its

25     position on certain exhibits that said "no objection."  It was

J2prmid4                    Mullen - Cross

1    not raised until this weekend notwithstanding the fact that our

2    exhibits were produced many weeks ago and the 3500 material was

3    produced many weeks ago, which included explicit reference to

4    this testimony.

5            We received this motion to preclude in the 5 o'clock

6    hour of the night before this witness is testifying.  I spent

7    many hours overnight working on the response.  It should in our

8    view factor in to the Court's evaluation of the motion that is

9    untimely with no good cause.

10           MR. COOK:  Your Honor, the spreadsheet that we sent to

11   the government on February 6th was for the intent of telling

12   them what we were stipulating to, that was the whole purpose of

13   sending them that email, on authenticity issues.  Again, there

14   was no surprise whatsoever when we had this conversation.

15           MS. KRAMER:  Your Honor, I want to dispute that.  I

16   don't know how Mr. Cook knows what Ms. Estes was thinking when

17   this conversation was first raised.  There was a lot of

18   surprise on our part in finding this out the day before the

19   witness is taking the stand.

20           THE COURT:  In any event, I'll rule on that when we

21   come back from lunch.

22           MS. LESTER:  One more point bout cases in which

23   similar evidence has been submitted.  Most typically in a

24   securities case where this type of evidence is admitted, the

25   instruction or the PowerPoint or training manual tends to

1    describe the actual conduct.

2         As Ms. Kramer alluded to, it says something like

3    misappropriating and trading on material nonpublic information

4    could be a securities violation, a federal crime.  It describes

5    the action.  It doesn't say something like a violation of this

6    company's workplace policy is a federal crime.  There is a

7    difference between the type of evidence that is being offered

8    here and the type of evidence that typically comes in in a

9    securities case.

10        THE COURT:  I understand.  But, in defendants' letter

11   I think it reproduces the brief and makes an argument that it

12   is not criminal.  But to say it's a violation of federal law is

13   not to say it's a violation of federal criminal law.

14        MR. COOK:  Your Honor, maybe this wasn't clear in what

15   we submitted.  Section 32 of the Securities and Exchange Act of

16   1934 says any person who willfully violates any provision of

17   this title, and this is incorporating Sarbanes-Oxley, or any

18   rule or regulation thereunder, the violation of which is made

19   unlawful.

20        That particular section makes a distinction.  It says

21   that just because you have a violation of a rule does not

22   necessarily make it unlawful.  This is before we even get to

23   whether it's criminal.  So, unless the statute specifically

24   makes a violation of a rule unlawful, it is not deemed

25   unlawful.  Then we go on to conclude that it is also not

J2prmid4                         Mullen - Cross

criminal.

          MS. KRAMER:  Your Honor, even if you assume defense

argument is correct, it could not matter less if what the slide

says was mistaken as a matter of law.  The fact that is highly

probative of defendant Wada's knowledge and intent is that he

was told this.  He was on notice that it was the ethics

officer's view that violating an ethics code provision was a

violation of federal law that goes to his intent.  Everything

else is weight, not admissibility, and can be addressed in a

limiting instruction.

          THE COURT:  I think I understand your arguments.

          MS. KRAMER:  Thank you, your Honor.

          THE COURT:  Thank you all.  We'll see you at 2:10.

          (Luncheon recess)

**A F T E R N O O N   S E S S I O N**

2:22 p.m.

(Jury not present)

THE COURT:  Good afternoon, folks.

I have reviewed the letters regarding the letter
motion to limit the testimony of Barbara Hannigan regarding
what we discussed just prior to lunch.  I am going to deny the
motion to preclude on the principal ground that it is not
offered for its truth but for the fact that the statements were
communicated to Mr. Wada insofar as that is relevant to his
knowledge and intent, and I'm happy to do a limiting
instruction on the language.

I've also thought about the defendants' position that
it's incorrect, and I'm not persuaded that it is incorrect.
Section 7202 of Title 15 clearly says that a violation by any
person of the Act or any rule or regulation of the Commission
or any rule of the Board shall be treated for all purposes as a
violation of the Securities Exchange Act.  I understand the
defendants' arguments about willful violations being criminal,
but I don't think that saying something is a violation of
federal law implies that it is a criminal violation.  This
was -- ethics rules were subject to notice and comments.  They
are put in the Federal Register.  I think essentially they are
federal law.  I don't know that they are criminal in themselves
because prosecutions have been brought under those regulations.

J2pdmid5

1    It is brought under separate statutes.  So I am just not

2    persuaded that it is incorrect to say that it's federal law.

3           But I am happy to do a limiting instruction at the

4    relevant time.

5           Anything else you all wanted to talk about?

6           MS. ESTES:  Your Honor, I wanted to bring up one thing

7    in connection with Ms. Hannigan.

8           So, Ms. Hannigan was involved in the internal

9    investigation at PCAOB after the leak of confidential

10   information.  We've had discussions with defense counsel on

11   this.  And we at this point do not intend to elicit anything

12   regarding the internal investigation, because if we did that

13   involving other people, like Jeffrey Lutz or anything like

14   that, or the defense wanted to do that on cross involving those

15   people, it might open the door for us to offer stuff regarding

16   Mr. Wada.  So, we have an agreement that we're going to steer

17   clear of that.  I just wanted to put that on the record.

18          THE COURT:  All right.

19          MS. LESTER:  Your Honor, also just for your notice,

20   Mr. Cook is going to be going first on cross-examination and

21   then I will follow.

22          THE COURT:  OK.  Thank you.

23          Shall we bring in the witness?

24          MS. ESTES:  Yes, your Honor.

25          (Continued on next page)

J2pdmid5                          Hannigan- direct

1           (Witness present)

2           (Jury present)

3           THE COURT:  You may be seated.

4           Good afternoon, ladies and gentlemen.

5           JURORS:  Good afternoon, Judge.

6           THE COURT:  Government, you may call your next

7    witness.

8           MS. ESTES:  Your Honor, the government calls Barbara

9    Hannigan.

10          THE COURT:  All right.  Ms. Hannigan, if you please

11   raise your right hand, Mr. Hampton will swear you in.

12    BARBARA BULGER HANNIGAN,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15          THE CLERK:  Please state your full name and spell your

16   last name slowly for the record.

17          THE WITNESS:  My name is Barbara Bulger, B-u-l-g-e-r,

18   Hannigan, H-a-n-n-i-g-a-n.

19          THE CLERK:  Thank you.

20          THE COURT:  Ms. Estes, you may proceed.

21   DIRECT EXAMINATION

22   BY MS. ESTES:  Good afternoon.

23   A.  Good afternoon.

24   Q.  What is your educational background?

25   A.  I have a bachelor's degree from Georgetown University.  I

J2pdmid5                         Hannigan- direct

1   have a master's in English literature from Georgetown

2   University, and I have a law degree from the Washington College

3   Block American University.

4   Q.  Where do you currently work?

5   A.  I currently work at the Public Company Accounting Oversight

6   Board.

7   Q.  Is there an abbreviation for that?

8   A.  Yes, PCAOB.

9   Q.  What is the PCAOB?

10  A.  The PCAOB is the first independent public interest

11  regulator of registered public accounting firms.

12  Q.  What do you do at the PCAOB?

13  A.  I am the Ethics Officer of the PCAOB, and I am responsible

14  for running the day-to-day ethics program.

15  Q.  How long have you worked for the PCAOB?

16  A.  I have only been there 15 years very soon this month.

17  Q.  And when you started at the PCAOB, what was your position?

18  A.  I was the Ethics Officer.

19  Q.  So just to be clear, you have been the Ethics Officer the

20  entire time?

21  A.  Yes.  At one point I had a new phrase added to my title,

22  and it became Ethics Officer and Senior Compliance Counsel.

23  Q.  Now, Ms. Hannigan, as the Ethics Officer at the PCAOB,

24  generally speaking, what are your duties and responsibilities?

25  A.  My primary duty is to advise the staff of the PCAOB and the

1    board members of the PCAOB on the ethical rules that are set

2    forth in our ethics code and to advise them on how to comply

3    with those rules as well as if there is potential violation of

4    those rules, to advise them on that.

5    Q.   Now, Ms. Hannigan, before you worked at the PCAOB, what did

6    you do?

7    A.   Before I worked at the PCAOB, my last job was serving as

8    the Ethics Counsel of the Securities -- the U.S. Securities and

9    Exchange Commission.

10   Q.   Is that the SEC?

11   A.   Yes, it is.

12   Q.   And how long did you work at the SEC?

13   A.   In that job as well as other jobs, about 17 years.

14   Q.   Ms. Hannigan, you mentioned that the PCAOB has an ethics

15   code.  What is that, generally speaking?

16   A.   The ethics code is a set of conduct rules that apply to the

17   board and the staff to ensure that they avoid conflicts of

18   interest, or even the appearance of a conflict of interest, to

19   ensure that the public will have confidence in the work -- the

20   independence and integrity of the work that we do.

21   Q.   Were you working at the PCAOB when that ethics code was

22   drafted?

23   A.   I was working at the Securities and Exchange Commission at

24   that time.

25   Q.   When you were working at the Securities and Exchange

1   Commission, did you have any involvement in the drafting of the

2   PCAOB's ethics code?

3   A.  Yes.  In my role at the SEC, I provided technical advice

4   and assistance to the PCAOB on drafting the ethics code.

5   Q.  And what relationship, if any, does the SEC have to the

6   PCAOB's ethics code?

7   A.  The SEC had to approve the PCAOB's ethics code before it

8   became final, just as they do any other rule of the PCAOB.

9   Q.  And since the ethics code was first created, has it been

10  amended?

11  A.  It has been amended one time around the time of the

12  Dodd-Frank amendments, which gave us jurisdiction over certain

13  auditors and broker-dealers.

14  Q.  And when was the ethics code first passed?

15  A.  The ethics code was passed shortly after the PCAOB came

16  into being, I believe it was November 2003.

17          MS. ESTES:  Mr. Cooney, could you please publish what

18  is in evidence as Government Exhibit 20.

19  Q.  Ms. Hannigan, what are we looking at here?

20  A.  Excuse me.  May I pour some water?

21  Q.  Yes.  Go ahead.

22          (Pause)

23  A.  We are looking at the PCAOB's ethics code.

24          MS. ESTES:  Mr. Cooney, could you please turn to page

25  3 of the pdf and zoom into EC3.

J2pdmid5                        Hannigan- direct

1    Q.  So, Ms. Hannigan, I want to walk through a few provisions

2    of the ethics code.

3             First, could you read the first sentence of this

4    provision?

5    A.  Yes.

6             "The purpose of this Code is to maintain the highest

7    standards of ethical conduct among Board members and staff, and

8    to provide the public with confidence in the objectivity of the

9    Board's decisions by seeking to avoid both actual and perceived

10   conflicts of interest among Board members and staff."

11   Q.  Ms. Hannigan, generally speaking, what is your

12   understanding as to why it is important to provide the public

13   with confidence in the objectivity of the board's decisions?

14   A.  If the public does not have confidence in the objectivity

15   and integrity and independence of the board's decision, we

16   would not be able to fulfill our mission of regulating auditors

17   and overseeing audit reports.  So, it's very important that the

18   board members and staff abide by these principles.

19             MS. ESTES:  Now, Mr. Cooney, if you could turn to page

20   9 and zoom into EC9.

21   Q.  Ms. Hannigan, could you read this provision?

22   A.  Yes.

23             "Non-public information:

24             "Unless authorized by the Board, no Board member or

25   staff shall disseminate or otherwise disclose any information

obtained in the course and scope of his or her employment, and

which has not been released, announced, or otherwise made

available publicly."

          (b) The provisions of this section shall continue in

effect after the termination of employment or Board

membership."

          And there is a note:

          "Concurrent restrictions on disclosure of non-public

information are provided in EC5(c)."

Q.  And, Ms. Hannigan, when did this provision become

effective?

A.  This became effective with the original promulgation or

issuance in the ethics code on November 17, 2003.

Q.  When you were at the SEC, did you have any role in

consulting on this provision?

A.  Yes, I did.  A draft version of this provision that came to

my attention had a set number of years for former PCAOB staff

and Board members keeping information confidential, and I -- my

advice was that that was not sufficient because you couldn't

say, oh, five years after an employee left, the information

would no longer need to be confidential and that in fact you

could not predict how long some information needed to stay

confidential, and, therefore, I urged a lifetime ban, which is

what is currently in the rule.

Q.  Ms. Hannigan, what is your understanding of what types of

J2pdmid5                          Hannigan- direct

1  non-public information this provision covers?

2  A.  This provision would cover all different types of

3  information that relate to the Board's work.  It is a broad

4  provision, and it says that if the Board has not released the

5  information, it would have to be kept confidential.

6  Q.  What is your understanding of what type of information

7  related to inspection this covers?

8  A.  Well, virtually any information related to inspections

9  could be covered by this because that information is very

10  sensitive information.  So, you know, draft inspection reports,

11  you know, memoranda that the staff may have on things that

12  they're going to look at at an inspection, the list of audits,

13  the names of the companies whose audits will be inspected, all

14  this type of information I would consider to be very sensitive.

15  Q.  Now, Ms. Hannigan, this provision references that the Board

16  may authorize certain disclosures.  Are you aware of any Board

17  resolutions regarding the disclosures that can be made by

18  leadership in the PCAOB?

19  A.  Yes.  There is a --

20           MR. COOK:  Objection to the leading, your Honor.

21           THE COURT:  Overruled.  You can answer.

22  A.  There is a Board resolution that is essentially a blanket

23  authorization for Board members, division directors, and I

24  believe certain of their designated people to disclose

25  different types of information.

Q.  Ms. Hannigan, are you familiar with Helen Munter?

A.  Yes, I am.

Q.  What was her status at the PCAOB?

A.  When she left, she left as the Division (sic) of the

Inspections Division.

Q.  So would she be covered by the resolution you just

referenced?

A.  Yes.

        MS. ESTES:  Mr. Cooney, if you could take this down

and turn to page 10 and EC12.

Q.  Ms. Hannigan, could you read part (a)(1) of this provision?

A.  "Negotiating prospective employment.

        "1.  Board members and professional staff may not

negotiate prospective employment with a public accounting firm,

issuer, broker, or dealer, without first disclosing (pursuant

to the procedures in Section EC8(b)) the identity of the

prospective employer and recusing himself or herself from all

Board matters directly affecting that prospective employer."

Q.  And can you also read part 2 there?

A.  Yes.

        "For purposes of this section, 'negotiating

prospective employment' means participating in an employment

interview, discussing an offer of employment, or accepting an

offer of employment, even if the precise terms are still to be

developed.  Submitting a résumé or job application to a group

J2pdmid5                         Hannigan- direct

of employers, or receiving an unsolicited inquiry of interest

that is rejected, do not alone constitute 'negotiating

prospective employment.'"

Q.  Now, Ms. Hannigan, where it says that the Board member or

professional staff may have to recuse himself or herself, what

is that referring to?

A.  Well, recusal means that you cannot work on a matter, or

for a Board member who might vote on a matter, the Board member

can't participate in a vote.  Essentially, it is a blackout.

You have to just completely remove yourself from anything

having to do with that matter.

Q.  And to be clear, does this apply to inspectors at the

PCAOB?

A.  Yes, it does.

Q.  So if an inspector was seeking employment from a particular

accounting firm, how would this work in practice?

A.  So in that case, the inspector -- we urge the inspector --

our guidance under the rule is that the inspector should come

to us at the earliest possible stage of his or her interest in

looking for a job with an accounting firm, and we would then

advise the inspector if you're not working on anything

involving this entity now, you have to formally recuse yourself

and confirm that you will not do so in the future.  If you were

working on something involving that entity, we say you have to

put your pen down and completely stop working on the matter

J2pdmid5                          Hannigan- direct

1    before you can talk -- discuss employment with that prospective

2    accounting firm employer.

3           MS. ESTES:  Mr. Cooney, you can take this down.

4    Q.  Ms. Hannigan, in addition to EC9, are there other sources

5    of confidentiality obligations for PCAOB employees?

6    A.  Yes.  The Sarbanes-Oxley Act, which created the PCAOB, in

7    Section 105(b)(5) has provisions prohibiting the disclosure of

8    any information regarding our inspections work or our

9    enforcement investigations, subject to the certain limited

10   exceptions.

11          MS. ESTES:  Mr. Cooney, could you pull up what's in

12   evidence as Government Exhibit 355.

13   Q.  And, Ms. Hannigan, looking at the middle of the first page

14   here, can you -- what are we looking at?

15   A.  I'm looking at the first page of the Sarbanes-Oxley Act.

16          MS. ESTES:  Mr. Cooney, if you could go to page 17,

17   and if you could zoom into Section (5) there.

18   Q.  Ms. Hannigan, do you recognize this provision?

19   A.  Yes.  This is Section 105(b)(5) of the Sarbanes-Oxley Act.

20   Q.  So this is what you were just referring to?

21   A.  Yes.  Yes, it is.

22   Q.  And, Ms. Hannigan, starting at (5)(a), next to

23   "Confidentiality," could you read there through "evidentiary

24   matter"?

25   A.  Yes.

J2pdmid5                          Hannigan- direct

1          "Confidentiality - Except as provided in subparagraph

2     B, all documents and information prepared or received by or

3     specifically for the Board, and deliberations of the Board and

4     its employees and agents, in connection with an inspection

5     under Section 104 or with an investigation under this section,

6     shall be confidential and privileged as an evidentiary matter."

7          MS. ESTES:  Thank you, Mr. Cooney.  You can take that

8     down.

9     Q.  Ms. Hannigan, during the course of your work at the PCAOB,

10    have you become familiar with the offer letters that the PCAOB

11    sends out to people who have been hired?

12    A.  Yes, I have.

13         MS. ESTES:  Mr. Cooney, can you pull up Government

14    Exhibit 10, marked for identification.

15    Q.  Ms. Hannigan, do you recognize this?

16    A.  Yes, I do.

17    Q.  And what is this?

18    A.  This is the PCAOB's offer letter to Mr. Jeffrey Wada, dated

19    December 15, 2004.

20         MS. ESTES:  Your Honor, the government offers

21    Government Exhibit 10.

22         THE COURT:  Government's 10 received.

23         (Government's Exhibit 10 received in evidence)

24         MS. ESTES:  Mr. Cooney, can you zoom in there.

25    BY MS. ESTES:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2pdmid5                          Hannigan- direct

1   Q.  Now, Ms. Hannigan, can you read the first sentence of the
2   letter?
3   A.  "Dear Mr. Wada:  On behalf of the Public Company Accounting
4   Oversight Board, I am pleased to offer you the position of
5   Manager of Inspections in the Division of Registration and
6   Inspections, reporting to Gary McCormick, Regional Associate
7   Director of Inspections."
8           MS. ESTES:  Mr. Cooney, can we turn to page 2 of the
9   document and zoom into the top half.
10  Q.  Ms. Hannigan, could you read the paragraph starting with,
11  "This offer of employment."
12  A.  Yes.
13          "This offer of employment is contingent upon the
14  following:
15          "1.   Your compliance with the PCAOB's Code of Ethics.
16  The PCAOB has adopted, and the SEC has approved, the Ethics
17  Code for Board members, staff, and designated contractors and
18  consultants.  Please familiarize yourself with the entire
19  Ethics Code and identify any questions you might have about its
20  application to you.  Among other things, the Ethics Code:"
21  Q.  Thank you, Ms. Hannigan.  Let's stop there.
22          And if we could zoom out again.  And Mr. Cooney, could
23  you go back to that page.
24          Could you zoom in to where it says "A through E."
25          And, Ms. Hannigan, can you read what it says in line E

J2pdmid5                          Hannigan- direct

1   there?

2   A.   Excuse me.  Did you say E?

3   Q.   Yes.

4   A.   "Requires staff to certify, at the commencement of their

5   service with the Board and annually thereafter, their agreement

6   to comply, and their continuing compliance, with the Ethics

7   Code."

8   Q.   Thank you.

9        MS. ESTES:  Mr. Cooney, you can take that down.

10        Let's go to page 3, actually.  And could you zoom into

11   the bottom.

12   Q.   Ms. Hannigan, turning to the very bottom, can you read the

13   sentence above the signature block at the bottom?

14   A.   Yes.

15        "I have read and understand the provisions of this

16   letter, and intend to accept employment with PCAOB as proposed

17   in the above letter."

18   Q.   What is the date?

19   A.   The date is December 20, 2004.

20   Q.   What is the reporting date?

21   A.   February 21, 2005.

22   Q.   And what does that refer to?

23   A.   That is the day that he was required to report to work at

24   the PCAOB.

25        MS. ESTES:  Thank you, Mr. Cooney.  You can take that

1    down.  And if you could pull up for the witness what's been

2    marked for identification as Government Exhibits 11 and 12.

3    Q.  Ms. Hannigan, do you recognize these documents?

4    A.  Yes.  These are offer letters from the PCAOB to Brian Sweet

5    and Cindy Holder.

6            MS. ESTES:  Your Honor, the government offers

7    Government Exhibits 11 and 12.

8            THE COURT:  11 and 12 are received.

9            (Government's Exhibit 11 and 12 received in evidence)

10           MS. ESTES:  Mr. Cooney, could you just keep up

11   Government Exhibit 11, and let's turn to page 2.

12   Q.  Ms. Hannigan, does this letter contain the same provision

13   on compliance with the Code of Ethics?

14   A.  Yes, it does.

15           MS. ESTES:  Thank you, Mr. Cooney.  You can take that

16   down.

17   Q.  Now, Ms. Hannigan, when an employee first joins the PCAOB,

18   does he or she receive any sort of ethics training?

19   A.  Yes.  When an employee joins the PCAOB, they receive an

20   ethics orientation generally on their first day of employment.

21   Q.  And is that training in person?

22   A.  Typically it's in person.  Actually, more recently, we've

23   been doing some by BTC, but since be there have been

24   interactions with a live human being, I would call them in

25   person.

J2pdmid5                          Hannigan- direct

1    Q.   When you say "BTC," what are you referring to?

2    A.   I'm sorry.  Video teleconferencing.

3    Q.   Now, who gives the ethics training?

4    A.   Myself or a lawyer who is either my deputy Ethics Officer

5    or in the past I have had a couple of lawyers in the General

6    Counsel's office assist me, but through the years I have been

7    involved, too.

8    Q.   And could you describe the training?

9    A.   So at the training we talk to the new employee about the

10   importance of being a public regulator and how it requires

11   higher ethical standards, given our mission and, as we've

12   discussed before, the need for the public's confidence in our

13   mission.  We also go through the key provisions of the Ethics

14   Code and try to give some real life examples as well.

15   Q.   How long does the training last, approximately?

16   A.   Typically lasts about a half hour.

17            MS. ESTES:  Mr. Cooney, can you pull up what's been

18   marked for identification as Government Exhibit 21.

19   Q.   Ms. Hannigan, do you recognize this?

20   A.   Yes.  This is a slide deck that has been used for ethics

21   orientation.

22   Q.   And what years, approximately, did you use this slide deck?

23   A.   Well, in the earlier years, so definitely when I started in

24   2004, and I don't know until what period I stopped using them.

25   Q.   Did you use it for a few years after you started it?

J2pdmid5                      Hannigan- direct

A.  Yes, I did.

        MS. ESTES:   your Honor, the government offers

Government Exhibit 21.

        MR. COOK:  Objection, your Honor.  May we be heard

briefly?

        THE COURT:  Yes.

        (Continued on next page)

J2pdmid5                         Hannigan- direct

1                  (At the sidebar)

2                  MR. COOK:  My only concern is we have an agreement

3        with the government that the confidentiality stamp would be

4        removed from these documents.  I think it was inadvertently

5        left on.  So the government is going to just zoom in so that

6        part is not displayed when they correct the document.

7                  MS. ESTES:  We will do that.

8                  THE COURT:  OK.

9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2pdmid5                              Hannigan- direct

1              (In open court)

2              (Pause)

3              THE COURT:  Government's 21 is received subject to the

4     clarification at the sidebar.

5              (Government's Exhibit 21 received in evidence)

6     BY MS. ESTES:

7     Q.  Ms. Hannigan, so what are we looking at on the screen here?

8     A.  This is part of that slide deck which was our ethics

9     orientation slide deck.

10    Q.  And just to be clear, was this slide deck shown to the new

11    hires who were employed at the PCAOB?

12    A.  Yes, it was.

13    Q.  Now, looking at this first page here, can you just read

14    through what it says on the page?

15    A.  Yes.

16              "PCAOB Ethics Code.

17              "Adopted by PCAOB and approved by SEC.  For staff,

18    compliance with the Ethics Code is a condition for employment.

19    For contractors, compliance is a contractual obligation.  Any

20    violation of the Ethics Code is a violation of federal law."

21              MS. ESTES:  And, Mr. Cooney, can we go to slide 3.

22    Q.  Now, Ms. Hannigan, looking at this slide, so what is

23    covered on this slide?

24    A.  These are the key provisions of the Ethics Code that we

25    review in the ethics orientation.

J2pdmid5                          Hannigan- direct

Q.   Directing your attention to the sixth bullet point, where
it says, "Disclosure of Nonpublic Information," what does that
refer to?

A.   That refers to the Ethics Code provision EC9.

Q.   And what do you typically say when you are giving the new
hire orientation about this issue?

A.   Typically what I say is that confidentiality is an
extremely important issue at the PCAOB and that under the
Sarbanes-Oxley Act we are prohibited from disclosing any
information about our inspections work or enforcement work, but
that the Ethics Code goes even further in that EC9 says that
any information that you come across in the scope of your work
at the PCAOB must be kept confidential regardless of what the
subject matter is unless the Board has authorized you to
disclose it or unless it has already been publicly released.

          MS. ESTES:  Mr. Cooney, can we go to page 4 of this.

Q.   And, Ms. Hannigan, can you read the bullet points here?

A.   Yes.

          "Where specific restrictions are not covered,
employees required to act according to the spirit and general
principles of the Code, focusing on the need to:  Avoid
conflicts of interest and the appearance of conflicts of
interest, being sensitive to public perceptions related to the
Board's integrity, objectivity, impartiality, and
independence."

1            MS. ESTES:  Thank you, Mr. Cooney.  You can take that

2    down.

3    Q.  Now, Ms. Hannigan, aside from the initial training at the

4    orientation, did PCAOB employees receive other trainings on

5    ethics.

6    A.  Yes, they do.

7    Q.  What kind of trainings?

8    A.  For inspectors, they have an annual training program,

9    called Annual Inspections Training, and they're required to

10   come from all across the country to Washington, D.C., and they

11   receive training on a number of different areas, including an

12   ethics session.  In addition to that, we do training of various

13   individual other offices at the PCAOB, and we also hold special

14   sessions as needed when the issue arises.

15   Q.  Now, turning to the annual training, could you describe the

16   ethics session at the annual training, generally?

17   A.  So the ethics session at annual training is always a little

18   different.  We might cover the same issues in one year to the

19   next, but we always try to be responsive to what we think are

20   the important issues at that time, or some issues are always

21   important, and we try to be very engaging.  So, we've used

22   different modes of training such as playacting and

23   hypotheticals to really get the audience engaged.

24   Q.  So what type of issues do these trainings cover?

25   A.  They cover the full gamut of issues that arise in real life

1    at the PCAOB under the Ethics Code, including financial and

2    personal conflicts of interest, interactions with accounting

3    firm personnel, social interactions, confidentiality, just the

4    full gamut.

5    Q.  Now, Ms. Hannigan, let me direct your attention to 2013.

6    Did you conduct the inspections training that year?

7    A.  Yes, I did.

8    Q.  And did the trainings that year cover any topics related to

9    confidential information?

10   A.  I don't recall.

11   Q.  Is there anything that would refresh your recollection as

12   to whether it was covered that year?

13   A.  The script for that year.

14          MS. ESTES:  Mr. Cooney, could you pull up for the

15   witness, the parties, and the Court only what has been marked

16   as Government Exhibit 27.

17          And, Mr. Cooney, if you could display pages 2 and 3

18   side-by-side.

19   Q.  Now, Ms. Hannigan, if you could read to yourself starting

20   from the bottom of page 2 through the top of page 3, and just

21   let me know when you are done.

22          (The witness complied with the request)

23   A.  Prosecutor, did you say to the top of page 3?

24   Q.  Yes.  Just read to the top of page 3 and let me know when

25   you are done.

1   A.  I'm finished.

2            MS. ESTES:  Thank you, Mr. Cooney.  You can take that

3   down.

4   Q.  Ms. Hannigan, does that refresh your recollection as to

5   whether anything related to confidential information came up at

6   the ethics training that year?

7   A.  Yes, it did.

8   Q.  How did it come up that year?

9   A.  Well, we gave the audience a hypothetical involving a

10  social activity with an accounting firm, and we gave them the

11  criteria under which they could attend such an event and with a

12  reminder to them that, of course, since they would be with

13  accountants that we are regulating, that they would have to be

14  careful not to discuss confidential information at the event.

15           MS. ESTES:  Mr. Cooney, could you pull up for the

16  witness what's been marked as Government Exhibit 28.

17  Q.  Ms. Hannigan, do you recognize this document?

18  A.  Yes.  This is the sign-in sheet for AIT training for 2013.

19           MS. ESTES:  Your Honor, the --

20  Q.  And what is "AIT training"?

21  A.  That is annual inspections training, the program that I was

22  mentioning that all inspectors come to.

23           MS. ESTES:  Your Honor, the government offers

24  Government Exhibit 28.

25           MR. COOK:  Objection.  Hearsay.  Foundation.

J2pdmid5                          Hannigan- direct

1           THE COURT:  Overruled.  Government 28 is received.

2           (Government's Exhibit 28 received in evidence)

3    BY MS. ESTES:

4    Q.  Now, Ms. Hannigan, now that the jury can see this document,

5    let's just walk through it a little bit.

6           First, what are you seeing in the last name and first

7    name columns here?

8    A.  I'm seeing the name of the inspectors, their last and first

9    names for the inspectors who attended the annual training that

10   year.

11   Q.  And then where it says "CPE Sheet," what does that refer

12   to?

13   A.  "CPE" is continuing professional education, and accountants

14   I believe in all jurisdictions are required to have so many

15   credits of CPE every year, and they're able to get some of them

16   at our own annual training program.  So, this sheet would show

17   the CPE that they've earned under various categories.

18   Q.  And turning to the columns that are marked at the very top

19   of the document with "T" through "BB," generally speaking, what

20   do those columns represent?

21   A.  Those are the titles of the different sessions, the topics

22   that the sessions cover that the inspectors attended.

23   Q.  And looking at the column that has "AC" at the very top,

24   what column is that?

25   A.  That's ethics, for the ethics session.

J2pdmid5                          Hannigan- direct

1           MS. ESTES:  Now, Mr. Cooney, could you turn to line

2     502 of this document.

3     Q.  Ms. Hannigan, whose name is there?

4     A.  Jeff Wada.

5     Q.  And can you tell from this document whether he attended the

6     ethics session that year?

7           MR. COOK:  Objection.  Foundation.  Hearsay.

8     Q.  Ms. Hannigan, by looking at this document, is there a way

9     to tell whether he attended the ethics session that year?

10    A.  Yes.

11    Q.  And looking at this document, how would you be able to tell

12    that?

13    A.  I would go to the column that says "Ethics," and I would go

14    to his name and next to his name under that column there is a

15    "30," reflecting that he attended the full 30-minute session.

16          MS. ESTES:  Mr. Cooney, can you go to line 470 here.

17    Q.  Ms. Hannigan, whose name is there?

18    A.  Brian Sweet.

19    Q.  And looking at this document, can you tell whether he

20    attended the ethics session?

21    A.  Yes.  He attended the 30-minute ethics session.

22          MS. ESTES:  And, Mr. Cooney, can you go to line 213.

23    Q.  Ms. Hannigan, looking at this document -- well, whose name

24    is listed there?

25    A.  Cindy Holder.

J2pdmid5                          Hannigan- direct

```
 1   Q.  And can you tell whether she attended the ethics session
 2   that year?
 3   A.  Yes.  She attended the 30-minute ethics session.
 4          MS. ESTES:  Thank you.  Mr. Cooney, you can take this
 5   one down.
 6   Q.  Now, Ms. Hannigan, directing your attention to 2016.  Did
 7   you conduct the inspection annual training that year?
 8   A.  Yes, I did.
 9   Q.  And did the training that year cover any topics related to
10   confidential information?
11   A.  I don't recall.
12   Q.  Is there anything that would refresh your recollection?
13   A.  Yes, the script from that year.
14          MS. ESTES:  Mr. Cooney, can you pull up for the
15   witness, the parties, and the Court only what has been marked
16   as Government Exhibit 30.  And if we could go to page 2 of
17   this.
18   Q.  Now, Ms. Hannigan, if you could read this page to yourself
19   and let me know when you are done.
20          (The witness complied with the request)
21   A.  I've read the page.
22          MS. ESTES:  Thank you.  Mr. Cooney, can you take that
23   down.
24   Q.  Ms. Hannigan, does that refresh your recollection as to if
25   confidentiality came up in the training that year?
```

J2pdmid5                         Hannigan- direct

1    A.  Yes, it does.

2    Q.  How did it come up?

3    A.  We provided a scenario involving a current inspector

4    running into a former inspector who had been on her team, and

5    so the former inspector asked her very specifically about the

6    company that they had inspected.  And the question was, well,

7    there shouldn't be any problem with the current inspector

8    discussing this with the former inspector?  After all, the

9    former inspector already knows the name of the company and

10   knows about this inspection.  And we made clear in our answer

11   to that scenario that that would in fact be a problem, because

12   the minute an employee walks out the door, they are no longer

13   an employee and they are just like any other person outside the

14   PCAOB, and even if they know some nonpublic information

15   already, we can't confirm it, deny it, or share any additional

16   information with them.

17              MS. ESTES:  Now, Mr. Cooney, could you pull up what's

18   been marked for identification as Government Exhibit 31.

19   Q.  Ms. Hannigan, do you recognize this?

20   A.  Yes.  This is the annual inspection training CPE sign-in

21   sheet for the annual training in 2016.

22              MS. ESTES:  Your Honor, the government offers

23   Government Exhibit 31.

24              MR. COOK:  No objection.

25              THE COURT:  Government 31 is received.

1           (Government's Exhibit 31 received in evidence)

2     BY MS. ESTES:

3     Q.  Now, Ms. Hannigan, what year does this cover, to be clear?

4     A.  2016.

5           MS. ESTES:  Mr. Cooney, could you go to line 477.

6     Q.  Whose name is there, Ms. Hannigan?

7     A.  Jeffrey Wada.

8     Q.  And turning to the column K there that says "ETH," what

9     does that column represent?

10    A.  That's the ethics column.

11    Q.  And what does it say in that column next to "Jeffrey Wada"?

12    A.  That he attended a half hour of ethics training.

13          MS. ESTES:  Thank you, Mr. Cooney.  You can take that

14    down.

15    Q.  Now, Ms. Hannigan, are PCAOB employees required to make

16    certain certifications regarding the Ethics Code?

17    A.  Yes, they are.

18    Q.  Could you explain what those are?

19    A.  Yes.  When an employee comes -- first comes on board, and

20    then every year on an annual basis, they have to certify that

21    to the best of their knowledge they believe that they're in

22    compliance with the Ethics Code, and this is something that

23    they're required to do.

24    Q.  Were those electronic certifications or are they in paper

25    form?

J2pdmid5                         Hannigan- direct

1   A.   In our early days they were in paper form, but they are now

2   in electronic form and have been for some number of years.

3        MS. ESTES:  Mr. Cooney, could you pull up what's been

4   marked for identification as Government Exhibits 22 and 23.

5   Q.   Ms. Hannigan, do you recognize these documents?

6   A.   Yes.  These are paper annual certifications of continuing

7   compliance with the Ethics Code.

8   Q.   And who do they relate to?

9   A.   These are signed by Jeffrey Wada.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2prmid6                          Hannigan - Direct

1          MS. KRAMER:  Your Honor, the government offers

2    Government Exhibits 22 and 23.

3          THE COURT:  They are received.

4          (Government's Exhibits 22 and 23 received in evidence)

5          MS. ESTES:  Mr. Cooney, if you could publish

6    Government Exhibit 22 and zoom in to the top.

7    Q.  Ms. Hannigan, what is the title at the top?

8    A.  "Annual certification of continuing compliance with ethics

9    code."

10   Q.  Could you read the line next to number 1.

11   A.  "I have received and reviewed a copy of the ethics code of

12   the Public Company Accounting Oversight Board and I am familiar

13   with its contents.

14         THE COURT:  Let's read number 2.

15   A.  "I understand that the ethics code includes specific

16   restrictions concerning financial and employment interests,

17   investments, participation in outside activities, acceptance of

18   gifts and honoraria and other things of value, disclosure of

19   interests and relationships that require recusal, nondisclosure

20   of nonpublic information, speaking for the board, negotiating

21   post-PCAOB employment, and practicing before the board after

22   the end of my PCAOB service.

23   Q.  Can you zoom out.  What is the date at the bottom of this

24   certification?

25   A.  April 13, 2005.

J2prmid6                    Hannigan - Direct

1          MS. ESTES:  Mr. Cooney, could you now pull up what's

2     been marked for identification as Government Exhibit 24.

3     Q.  Ms. Hannigan, do you recognize this document?

4     A.  Yes.  This is a summary of the annual certification filings

5     made by Jeff Wada from 2008 and 2016 that's been generated by

6     our electronic certification system.

7          MS. ESTES:  Your Honor, the government offers

8     Government Exhibit 24.

9          THE COURT:  Received.

10          (Government's Exhibit 24 received in evidence)

11     Q.  Now, Ms. Hannigan, I believe you said it goes from 2008 to

12     2016.  How are you getting the years there?

13     A.  At the bottom of the report it says "status submitted,"

14     meaning he filed his report electronically, and then "status

15     date" is the date that he did that.

16     Q.  Let's go to the second page of the document.  Is there

17     another year there?

18     A.  Yes, 2007.  He submitted on April 26, 2007.

19     Q.  When it says "status submitted," what does that represent?

20     A.  He has completed the certification.  He has certified that

21     to the best of his knowledge he was in compliance with the

22     ethics code.

23          MS. ESTES:  Mr. Cooney, can you take that down and

24     pull up for the witness what have been marked for

25     identification as Government Exhibits 25 and 26.

1   Q.  Ms. Hannigan, do you recognize these documents?

2   A.  Yes.  These are the same documents for Brian Sweet.  It's a

3   summary of his electronic filings.  It's a little hard to see

4   the bottom here, but it looks like it's 2009 to 2014.  And the

5   report on the annual filings made electronically by Cindy

6   Holder, the bottom year that I can see, it's 2011 through 2015.

7           MS. ESTES:  Your Honor, the government offers

8   Government Exhibits 25 and 26.

9           THE COURT:  They are received.

10           (Government's Exhibits 25 and 26 received in evidence)

11           MS. ESTES:  Mr. Cooney, you can take that down.

12   Q.  In addition to the trainings you discuss in these annual

13   certifications we have talked about, what else, if anything,

14   does the ethics office do to remind PCAOB employees of their

15   ethical obligations?

16   A.  We issue guidance in different forms, including FAQs,

17   memoranda, tips.  We have even made videos offering guidance,

18   and we will circulate that via email or and/or we post it on

19   our Internet page called MyPCAOB.

20           MS. ESTES:  Mr. Cooney, can you pull up what's been

21   marked as Government Exhibit 200.

22   Q.  Ms. Hannigan, do you recognize this document?

23   A.  Yes.  This is a reminder on confidentiality obligations

24   from myself to all PCAOB employees dated October 25, 2012.

25           MS. ESTES:  Your Honor, the government offers

1    Government Exhibit 200.

2              THE COURT:  Received.

3              (Government's Exhibit 200 received in evidence)

4    Q.  Ms. Hannigan, looking at the top of the email here, where

5    it says "to PCAOB all," what does that mean?

6    A.  That's all PCAOB employees and board members.  I'm not sure

7    if it includes certain consultants or contractors.

8    Q.  Does it include inspectors?

9    A.  Yes, all inspectors.

10   Q.  What is the subject here?

11   A.  Confidentiality obligations.

12             MS. ESTES:  Mr. Cooney, could you zoom into the first

13   paragraph here.

14   Q.  Ms. Hannigan, can you read that paragraph.

15   A.  Yes.  "You will soon receive a link to the PCAOB security

16   manual which explains how the PCAOB protects your health and

17   other personal information.  This is an opportune time to

18   remind everyone of our fundamental duty as members of the PCAOB

19   staff to maintain and protect confidentiality of nonpublic

20   information.  We have access to very sensitive nonpublic

21   confidential information, and we must always be mindful that

22   disclosure of such information could undermine our mission and

23   hinder the PCAOB's reputation.

24   Q.  Where it says "access to very sensitive nonpublic

25   confidential information," could you give an example of this

J2prmid6                    Hannigan - Direct

1    type of information.

2    A.   Examples would be if the enforcement division had drafted a

3    memorandum with its theories of the case, when inspection draws

4    up its list of issuers to be inspected.  These would be

5    examples of sensitive nonpublic information.

6    Q.   Why is the inspection list considered highly sensitive?

7    A.   Because it's not shared with anyone except the firm at the

8    designated time to be shared with the firm, and we don't want

9    anybody, including the firm, to have advance notice of what we

10   are going to be inspecting.

11             MS. ESTES:  Mr. Cooney, let's zoom in to the second

12   paragraph here.

13   Q.   Ms. Hannigan, could you read that paragraph.

14   A.   "As we all know, the Sarbanes-Oxley Act, subject to certain

15   exceptions, prohibits disclosure of information related to the

16   board's work on inspections and investigations.  In addition,

17   the ethics code generally prohibits disclosure of other

18   information about our work that has not yet been publicly

19   disclosed."

20             MS. ESTES:  Mr. Cooney, could we now zoom in to the

21   bottom paragraph.

22   Q.   Ms. Hannigan, can you read that paragraph.

23   A.   "We must be mindful that even an inadvertent disclosure of

24   seemingly nonsubstantive information could have serious

25   negative consequences.  In order to ensure the success of our

J2prmid6                          Hannigan - Direct

1    mission, each of us must assume personal responsibility for

2    maintaining and protecting the confidentiality of nonpublic

3    information.  If you have any questions or concern with respect

4    to these issues, please contact me at ethics@pcaobus.org."

5            MS. ESTES:  Mr. Cooney, you can take that down.

6    Q.  Ms. Hannigan, switching gears, focusing on the time frame

7    of 2015, with respect to ethics, was anything done when an

8    employee left the PCAOB?

9    A.  Yes.  When an employee left the PCAOB, we scheduled a

10   post-employment ethics briefing with them to review with them

11   their continuing ethical obligations, which include certain

12   provisions on not practicing before the board for a year, types

13   of matters that they could never practice on, as well as their

14   lifetime confidentiality obligation.  We would explain to them

15   that they must keep confidential all the nonpublic information

16   they know about the board for the rest of their lives.

17           MS. ESTES:  Mr. Cooney, could you pull up what's been

18   marked for identification as Government Exhibit 203.

19   Q.  Ms. Hannigan, do you recognize this?

20   A.  Yes.  This is an email from Cindy Holder to we call it the

21   ethics mailbox, our communication email tool, dated May 20,

22   2015.

23           MS. ESTES:  Your Honor, the government offers

24   Government Exhibit 203.

25           THE COURT:  Received.

J2prmid6                    Hannigan - Direct

1          (Government's Exhibit 203 received in evidence)

2    Q.  Ms. Hannigan, what is the date of the email?

3    A.  May 20, 2015.

4    Q.  Where it says "to ethics," what does "ethics" represent?

5    A.  We have what we call an ethics mailbox, and employees, all

6    they have to do is type in "ethics" and their email will go to

7    the ethics team, primarily myself and my deputy.  So if one of

8    us isn't there, the other one can answer it and we have a

9    record.

10   Q.  Could you read the first sentence of this email.

11   A.  "I was contacted today by a recruiter for KPMG asking if I

12   would be interested in a job at the firm.  I told them that I

13   was not interested but thought I should let you know that the

14   phonecall occurred.  Please let me know if I need to do

15   anything else relating to this matter thank you.  Cindy."

16        MS. ESTES:  Mr. Cooney, could you pull up what's been

17   marked for identification as Government Exhibit 204.

18   Q.  Ms. Hannigan, do you recognize this email?

19   A.  Yes.  This is another email from Cindy Holder to the ethics

20   mailbox.

21        MS. ESTES:  Your Honor, the government offers

22   Government Exhibit 204.

23        THE COURT:  Received.

24        (Government's Exhibit 204 received in evidence)

25   Q.  Ms. Hannigan, what is the date of this email?

1    A.  This is May 26, 2015.

2    Q.  Where it says "Nancy, do you have time for a quick chat,"

3    who is Nancy?

4    A.  Nancy is the deputy ethics officer.

5            MS. ESTES:  Mr. Cooney, if you could take this down

6    and pull up what is marked for identification as Government

7    Exhibit 205.

8    Q.  Ms. Hannigan, do you recognize these emails?

9    A.  Yes.  These are emails back and forth between Cindy Holder

10   and myself.

11           MS. ESTES:  Your Honor, the government offers

12   Government Exhibit 205.

13           THE COURT:  205 received.

14           (Government's Exhibit 205 received in evidence)

15   Q.  Ms. Hannigan, what is the date of these emails?

16   A.  The lower, the first one, is May 28, 2015, and the response

17   is also May 28, 2015.

18   Q.  What does the bottom email say?

19   A.  "Barbara, do you have time for a quick chat to update you

20   on our call from Tuesday afternoon?"

21   Q.  Ms. Hannigan, do you remember if you spoke to Cindy Holder

22   after this email?

23   A.  I don't remember.

24           MS. ESTES:  Mr. Cooney, you can take that down.  If

25   you can pull up what's been marked for identification as

J2prmid6                          Hannigan - Direct

1   Government Exhibit 206.

2   Q.  Ms. Hannigan, do you recognize these emails?

3   A.  Yes.  These are more emails back and forth between Cindy,

4   the ethics mailbox, myself, and the deputy ethics officer.

5            MS. ESTES:  Your Honor, the government offers

6   Government Exhibit 206.

7            THE COURT:  Received.

8            (Government's Exhibit 206 received in evidence)

9            MS. ESTES:  Mr. Cooney, if we could go to the bottom

10  email.

11  Q.  Ms. Hannigan, who sent this email?

12  A.  This is from Cindy Holder.

13  Q.  If you could read the first two sentences of the email.

14  A.  "Barbara, I know you're swamped so I thought an email might

15  work better for you.  After talking to the recruiter, it does

16  sound like something I'd like to explore."

17  Q.  Turning to the very bottom sentence of the email, can you

18  read that one.

19  A.  "Thank you so much for helping me through this process.  I

20  just want to be clear.  I love my job here, but I don't want to

21  regret not exploring this opportunity."

22  Q.  What did you understand exploring the opportunity to refer

23  to?

24  A.  That she wanted to talk to the firm about whether there was

25  a job that she'd be qualified for there.

J2prmid6                          Hannigan - Direct

1          MS. ESTES:  Mr. Cooney, you can take that down.  And

2     if we can pull up what's been marked for identification as

3     Government Exhibit 207.

4     Q.  Ms. Hannigan, do you recognize these emails?

5     A.  Yes.  These are more emails back and forth between Cindy,

6     the ethics mailbox.

7          MS. ESTES:  Your Honor, the government offers

8     Government Exhibit 207.

9          THE COURT:  Received.

10         (Government's Exhibit 207 received in evidence)

11    Q.  Ms. Hannigan, do you have any specific memories of your

12    interactions with Cindy Holder during this time frame?

13    A.  No, I don't.

14    Q.  Would you consider your interactions with her routine or

15    unusual?

16    A.  I would say fairly routine.  The only unusual speak to is

17    that it was very rare for an employee to be interested in

18    seeking employment with the firm that they were assigned to

19    work on.  The reason for that is usually people didn't want to

20    raise their hand to the whole team and say I need to get off

21    the team and recuse myself in the middle of an inspection to go

22    talk about employment in the firm.  So that part was unusual.

23    Otherwise, everything here looks pretty garden-variety.

24    Q.  To be clear, did you understand that Cindy Holder worked on

25    KPMG inspections at the PCAOB?

J2prmid6                          Hannigan - Direct

1   A.  Yes.

2   Q.  Putting aside what you just described is unusual, was it

3   common for people leaving the PCAOB to go to other accounting

4   firms?

5   A.  Yes, very common.  Most of the inspectors at the PCAOB had

6   come from accounting firms and they do go back.

7           MS. ESTES:  Mr. Cooney, you can take that down.

8   Q.  Ms. Hannigan, switching gears a little bit, are you

9   familiar with the standard advisory group?

10  A.  Yes, I am.

11  Q.  What is that?

12  A.  The standard advisory group is a group of outside

13  professionals of different types who are appointed by the

14  board, the governing board, of the PCAOB to advise us on our we

15  call it standard setting, our audit rules that we pass.  This

16  group is convened by the board one or more times a year to

17  advise them on what we call the standard-setting or the rule

18  agenda of the PCAOB.

19  Q.  Who comprises the standard advisory group?

20  A.  It's a variety of different types of professionals.  There

21  are lawyers.  There are very senior partners from accounting

22  firms, including the Big Four.  There are accounting academics.

23  And there are financial preparers and representatives from the

24  issuer, also known as the public company community.  So a

25  variety of different types of professions.

J2prmid6                        Hannigan - Direct

Q.  Approximately how many people are in the standard advisory

group?

A.  The number has changed through the years, but I would say

around the 30 mark.

Q.  What role, if any, do you have in connection with the

standard advisory group?

A.  I do a couple of different tasks with respect to the group.

First of all, I work on vetting them when they are close to a

nomination to ensure that we don't have any problems.  Then,

once they come on board, I typically give an orientation talk

to the new members of the standing advisory group, and once a

year I give a refresher update session.  At both the

orientation and at the annual refresher I go through a document

that they are required to sign, I believe it is called

conditions of member.

Q.  First turning to that ethics orientation talk, what do you

do in connection with that talk?

A.  At that talk I go through the ethics-related provisions of

that agreement called I believe conditions of membership that

they sign, and also let them know that if they have questions

about it, they should come to me.

Q.  Do you cover confidentiality issues in that talk?

A.  Yes, I do.

Q.  What do you say about them in the talk?

A.  What I say is that you now agree to abide by EC9, as our

1    employees do, and that is our confidentiality provision, and

2    that to date I do not believe that the staff has intentionally

3    shared confidential information with the SAG, but if the board

4    ever proves that, it would be well aware that it was

5    confidential information and that they should not share.

6             MS. ESTES:  Mr. Cooney, can you pull up what's been

7    marked for identification as Government Exhibit 29.

8    Q.  Ms. Hannigan, do you recognize this document?

9    A.  Yes.  This is the document I was speaking of, standard

10   advisory group conditions of membership.

11            MS. ESTES:  Mr. Cooney, can you go to page 3.

12   Q.  Who does this relate to, Ms. Hannigan?

13   A.  This is David Middendorf.

14            MS. ESTES:  Your Honor, the government offers

15   Government Exhibit 29.

16            THE COURT:  Received.

17            (Government's Exhibit 29 received in evidence)

18            MS. ESTES:  Mr. Cooney, let's go back to the first

19   page.

20   Q.  Ms. Hannigan, what is the title of the document?

21   A.  "Standing Advisory Group Conditions of Membership."

22   Q.  What does it say next to the little "a" there?

23   A.  "PCAOB release number 2003-009 (June 30, 2003) provides

24   that each appointee to the standing advisory group shall agree

25   in writing to specified conditions of membership in order to

J2prmid6                          Hannigan - Direct

avoid potential conflicts of interest and to ensure that the

board's standard setting agenda is met.  These conditions of

membership, among other things, require SAG members to annually

certify their continuing compliance with conditions of

membership.

          MS. ESTES:  Mr. Cooney, can we now go to the little

"e" there.

Q.  Ms. Hannigan, can you read this provision.

A.  Yes.  "Ethical duties of advisory group members.  Members

of an advisory group shall comply with EC3, EC8(a), EC9, and

with respect to any private publication or public statement

about the board or any advisory group or any activities of the

board or any advisory group, EC10 of the board's ethics code."

          MS. ESTES:  Mr. Cooney, let's go to page 3 of the

document, if we could zoom in to the top.

Q.  Ms. Hannigan, can you read the text here.

A.  Yes.  "In order to avoid potential conflicts of interest in

connection with my membership on the Public Company Accounting

Oversight Board's standing advisory group, I, David J.

Middendorf, agree (a) to serve as a member of the standing

advisory group on a voluntary basis without compensation from

the board."

          MS. ESTES:  Mr. Cooney, can we now zoom in to (h).

Q.  Ms. Hannigan, can you read that part.

A.  "to be bound by EC3, EC8(a), EC9, and with respect to any

J2prmid6                          Hannigan - Direct

1    private publication or public statement regarding the board or

2    the SAG or any activities of the board or the zag, EC10 of the

3    board's ethics code, and."

4              MS. ESTES:  Mr. Cooney, can you zoom in to the

5    signature line at the bottom there.

6    Q.  Ms. Hannigan, what is the date on this document?

7    A.  It's November 30, 2015.

8              MS. ESTES:  Thank you, Mr. Cooney.  You can take that

9    down.

10   Q.  Ms. Hannigan, you also referenced that you give a lunch

11   talk each year to the standards advisory group.

12   A.  Yes.

13   Q.  What do you cover in that talk?

14   A.  In that talk I go through the key ethics provisions of the

15   conditions of membership.  I gave examples sometimes, I guess

16   all the time, to illustrate the points to the group.  I also

17   make clear that I'm available to answer any questions they may

18   have should they arise.

19   Q.  Do you cover EC9 during the lunch talk?

20   A.  Yes, I do.

21             MS. ESTES:  No further questions.

22             THE COURT:  Cross-examination?  Mr. Cook?

23             MR. COOK:  May I be heard briefly, your Honor?

24             THE COURT:  Yes.

25             MR. COOK:  Your Honor, will this be a good time to

J2prmid6                        Hannigan - Direct

1    take a break?

2              THE COURT:  Yes.  Please leave your pads on your

3    chairs and we will continue in 10 minutes.

4              (Jury not present; witness not present).

5              MR. WEDDLE:  Your Honor, we filed a motion to compel

6    production of materials sought by subpoena.  I believe that we

7    issued the subpoena to the PCAOB on January 24th, a couple of

8    weeks before trial, returnable on February 11th.  The subpoena

9    specifically calls for any board resolutions authorizing

10   disclosure of certain specifically identified documents that

11   disclosed information about inspections.  We have gotten

12   nothing in response to that subpoena.

13             We moved to compel.  We have gotten no discovery to

14   that effect.  Today Ms. Hannigan is testifying about a

15   purported board resolution which delegates authority to all

16   sorts of people to make disclosures in their discretion

17   notwithstanding what the clear terms of the ethics code say.

18             We have a number of alternative applications with

19   respect to that.  First, I think the simplest thing to do is to

20   strike that testimony by Ms. Hannigan.  The second is probably

21   to adjourn the trial for a time period so we can get some

22   discovery and prepare a proper cross-examination of Ms.

23   Hannigan based on those documents, which we are hearing about

24   for the first time today.

25             THE COURT:  Is this part of the motion to quash the

1    subpoena?

2              MR. WEDDLE:  It is, your Honor.  The PCAOB moved to

3    quash a separate subpoena that we issued to the PCAOB.  We

4    opposed that motion to quash and cross-moved to compel

5    production of the material in that subpoena and also this

6    specific material that had never been produced and returnable

7    on the first day of trial.

8              Throughout this time period I suspected that what the

9    ethics code rule says is not actually what the PCAOB does in

10   practice and that the PCAOB routinely makes what they think of

11   as official announcements of confidential information without

12   any kind of authorization from the board.  So, by the strict

13   terms of the rule, they violate the rule on a daily basis.

14             Given that we received no documentation indicating

15   otherwise, we have been proceeding on that basis, your Honor.

16   Then today we hear testimony from Ms. Hannigan that there is an

17   entirely different practice and there is actually a board

18   resolution that no one has ever seen that purports to authorize

19   certain people to make disclosures separate and apart from the

20   strict terms of the ethics code.

21             This relates to the issue that I raised the other day,

22   your Honor.  To orient everyone, this is the one that I think

23   was called ludicrous a number of times.  That is that the

24   indictment quotes specifically the ethics code.  There is no

25   knowable legal duty when you are talking about the criminal law

1    to say that the ethics code says one thing and there is some

2    hidden resolution from the board that says something else that

3    gives a bunch of people discretion to do what they want to do

4    when they want to do it.

5          So there is a subpoena violation, there is a discovery

6    violation, there is a constructive amendment of the indictment

7    and a prejudicial variance.

8          THE COURT:  Would you like to respond?

9          MS. ESTES:  Your Honor, this information has been in

10   Ms. Hannigan's 3500.  It was in there on Friday.  We had never

11   discussed it with her because it only came up in the context of

12   these arguments during trial.  We asked her on Friday about it,

13   and she gave us her understanding based on her position as the

14   ethics officer.

15         The government does not have a copy of the board

16   resolution, so we do not believe we are in any discovery

17   violation here.  It is not in our possession or control.  We

18   haven't been privy to the litigation between the PCAOB and

19   counsel for Mr. Wada.  If this was an issue, they have known

20   about this since they got the 3500 on Friday and they could

21   have brought it to our attention before her testimony today.

22         THE COURT:  I didn't focus on her testimony about

23   board resolutions.  Can you remind me?  I don't remember that

24   being a major part about what she testified about.

25         MS. ESTES:  It was very brief, your Honor.  In the

J2prmid6                        Hannigan - Direct

1    context of discussing EC9, there is a provision in EC9 that

2    says unless there is board authorization that you can't

3    disclose nonpublic information.  I asked her, are you aware of

4    any board authorizations, and she said there is a blanket one

5    for directors, like Helen Munter.

6             This is specifically because Mr. Weddle the other day

7    brought up an issue where Helen Munter, who is a very senior

8    leader in the PCAOB, disclosed information.  There was a

9    suggestion that she did that improperly.  But, as Ms. Hannigan

10   testified, it is completely consistent with this board

11   resolution that gives people of that certain level

12   authorization to do this.

13            THE COURT:  She said there is a board resolution that

14   covers what exactly?

15            MS. ESTES:  That would give somebody of Ms. Munter's

16   level the ability to disclose information from the PCAOB.  This

17   comes up in the context -- I think you heard a little testimony

18   on this from Ms. Kunz earlier today that the PCAOB regularly

19   will say this year we are focusing on these couple of issues.

20   They will make that pronouncement from a high level of

21   leadership.  There has been some suggestion from the defense

22   that that is improper.  Ms. Hannigan's testimony about this

23   board resolution shows that that is something the board has

24   specifically authorized.

25            MR. WEDDLE:  Your Honor, the 3500 material that the

1    prosecutor is referring to, we got I believe late Friday night.

2    These are notes of a conversation that apparently the

3    prosecution had with Ms. Hannigan on Friday night.  The PCAOB's

4    motion to quash our subpoena was filed Friday at 4:30 p.m.  We

5    filed our response at I believe 8:30 p.m. on Saturday.  And we

6    had just had a sidebar argument about this very issue.  The

7    prosecution did not say there is a board resolution.

8            For Ms. Hannigan to say or for the 3500 material to

9    say that she has an understanding that there is a board

10   resolution that authorizes some things, it is not even her

11   personal knowledge, her understanding about how things happen

12   at the PCAOB, is no basis for a criminal prosecution.  It's

13   unconstitutional, your Honor.  If this is the legal duty that

14   people are alleged to have violated that subjects them to

15   felony punishment, it's unconstitutional.

16           And that is not what the indictment says.  The

17   indictment says that they violated EC9.  We have not seen a

18   board resolution, the government says that they have not seen a

19   board resolution.  I don't know if that means that this is a

20   similar situation to what happened with Ms. Rodriguez, where

21   Ms. Hannigan was in a room and prosecutors were in a room and

22   Ms. Hannigan's lawyers showed her a board resolution so she

23   could then come in here and testify about a document that we

24   have never seen and they can claim that they don't have.

25           We have set forth at length in our opposition and our

J2prmid6                     Hannigan - Direct

1   cross-motion to the PCAOB's motion what I believe to be

2   improper discovery conduct by the government in coordination

3   with the PCAOB or rather that the PCAOB is filtering

4   information to the government in a manner that substantially

5   prejudices the defense.

6           THE COURT:  I'm not going to stop the trial.  I think

7   there is very little, if any, relevance to this board

8   resolution.  There is no suggestion that there is a board

9   resolution that covers the information at issue in this trial,

10  is there?

11          MR. WEDDLE:  I've never seen the document, your Honor,

12  so I don't know.  There has been plenty of evidence about all

13  sorts of disclosures by all sorts of people of information that

14  other witnesses have said is the type of information that is

15  highly confidential.  So there has been a lot of ambiguity in

16  the testimony.

17          THE COURT:  You will be able to cross-examine on it.

18          MR. WEDDLE:  We won't if we don't have the documents,

19  your Honor.  We can't cross-examine on them if we don't have

20  the documents.  The same issue came up with Ms. Rodriguez.  We

21  got discovery after she left the stand.

22          At the close of her cross-examination it became clear

23  that she was testifying not based on personal knowledge and we

24  were forced to make a motion to strike that.  Now we have a

25  repeat of the same situation, your Honor.  The PCAOB's lawyers

J2prmid6                       Hannigan - Direct

are in the courtroom.  We could ask them why we haven't gotten

the board resolutions that were subpoenaed on returnable on

February 11th.

                THE COURT:  You are asking it to be stricken?

                MR. WEDDLE:  The simplest thing is to strike I believe

it is four lines of testimony.  We don't have line and page

numbers right now.  The question is.

"Q. This provision references that the board may authorize

certain disclosure.  Are you aware of any board resolutions

regarding any disclosures that can be made by rather than in

the PCAOB.

                Mr. Cook objected.

                The answer was, "There is a board resolution that is

essentially a blanket authorization for board members, division

directors, and I believe certain of their designated people to

disclose different types of information."

                We move to strike that testimony, your Honor.

                THE COURT:  I'll consider it.  We'll be back in ten

minutes.

                (Recess)

                THE COURT:  There is an additional letter from counsel

for the PCAOB addressing the issue about board authorizations,

which I think is the specific issue at hand.  Counsel for the

PCAOB says there are no responsive documents.  It's possible

that they have interpreted the subpoena differently, but this

1   is why counsel needs to meet and confer to resolve that.  Do

2   you have the letter?

3          MR. WEDDLE:  I have not seen it, your Honor.  I can

4   pull it up on my on my iPad.

5          THE COURT:  Is counsel for PCAOB here?

6          MR. SHUR:  Yes, Judge.

7          THE COURT:  Could you come to the podium, please.  If

8   you would please state your name and affiliation.

9          MR. SHUR:  Good afternoon, your Honor.  Justin Shur,

10  S-H-U-R, from MoloLamken on behalf of the PCAOB.

11         THE COURT:  The reason I'm confused is because there

12  is a motion to quash a different subpoena, and then the issue

13  that has just come up concerns an earlier subpoena,

14  specifically the request for certain board approvals of release

15  of certain information.  I understand from your latest letter

16  that your interpretation of that resulted in a no responsive

17  documents response, is that right?

18         (Continued on next page)

1           MR. SHUR:  Correct, Judge

2           THE COURT:  But the witness testified to board -- sort

3    of blanket board permissions about release of certain

4    information for certain high-level people.  Does that change

5    the response?

6           MR. SHUR:  I don't believe it does, Judge, and I am

7    happy to explain why.

8           THE COURT:  OK.

9           MR. SHUR:  So that the subpoena at issue and the

10   request that we are talking about is documents reflecting board

11   approval of the 2016 disclosure to KPMG reflected in particular

12   emails, and the subpoena has sort of a laundry list of Bates

13   numbers reflecting emails of PCAOB inspection staff to KPMG I

14   believe notifying the firm of upcoming inspections a few weeks

15   out, if I understand correctly.  And there are no responsive

16   documents to that, meaning there are no board authorizations

17   authorizing these particular communications or disclosures.

18   And I believe we explained this in our recent filing, your

19   Honor, but the board approves the inspection generally, and in

20   the ordinary course as part of the inspection program these

21   notifications or disclosures are made a few weeks out.

22           The resolution that Ms. Hannigan testified about, our

23   understanding is this was a resolution that was made very early

24   on, meaning shortly after the PCAOB came into effect, and

25   concerns -- so, for example, certain senior leaders of an

1    organization have blanket authorization to make certain

2    disclosures.  So, for example, if the head of inspections was

3    speaking at a conference, as the head of inspections, they have

4    the authority to make certain communications to the public at

5    that conference, for example.  So, I believe we're essentially

6    talking about apples and oranges here, Judge.

7              THE COURT:  But is there some actual resolution from

8    that earlier blanket approval from the board?

9              MR. SHUR:  Is there a physical paper?  So, Judge, we

10   learned about this resolution essentially at the same time that

11   I believe the government did during Ms. Hannigan's recent

12   interview, and so we've asked the PCAOB to pull that.  I've not

13   set eyes on it yet, your Honor.

14             THE COURT:  And you believe it's just one resolution?

15             MR. SHUR:  Versus a series of resolutions?

16             THE COURT:  Yes.

17             MR. SHUR:  That is our understanding.

18             THE COURT:  You said it is from the early days at the

19   PCAOB?

20             MR. SHUR:  Correct.

21             THE COURT:  OK.  Thank you.

22             MR. SHUR:  Thank you, Judge.

23             THE COURT:  Anything else?

24             MS. ESTES:  Your Honor, I think if it is possible to

25   get that resolution, we could take Mr. Whittle out of order and

1    have Ms. Hannigan crossed tomorrow after they have seen this

2    document, if it is possible to get it tonight.

3              MR. WEDDLE:  Your Honor, I mean, I am flabbergasted.

4    I don't know what to say.  We have a letter which was received

5    while I was in court that says there are no responsive

6    documents, and now they are saying there is a responsive

7    document.  Clearly, it is or it isn't.  And no one has seen the

8    document.  The government specifically chose to elicit this

9    testimony from Ms. Hannigan based on nobody seeing the

10   document.  I just am stunned by it, your Honor.

11             And I should add that the government at the sidebar,

12   whenever that was, I guess on Thursday, said, you know, their

13   response was, well, Helen Munter is an associate director, so

14   obviously this is not confidential information that she

15   announced in December 2016 regarding the formation of the new

16   banking inspection group.  That was in the context of multiple

17   emails from multiple people who were making that announcement,

18   not all of them were Helen Munter.  And the argument that I

19   made was that when former PCAOB people sent that information

20   around and among themselves, they considered it to be an

21   official announcement.  Even for the Helen Munter or the

22   non-Helen Munter people, the notifications that go to the firm

23   saying that we're going to do an inspection of these issuers on

24   these particular dates I believe are all sent by someone named

25   Ann King, who was an inspections leader.  So, not an associate

1    director, apparently not covered by the testimony of

2    Ms. Hannigan.

3         And this is the point, your Honor, that if nobody

4    knows what the rule is, it should not be the subject of a

5    prosecution.  So I don't think that it is a great solution.  I

6    think that the contradictory answers by the PCAOB's counsel

7    highlight the issue, and I think the testimony should be

8    stricken and probably there is other relief that we need to

9    correct this problem.  But, I mean, I am doing this on the fly,

10   your Honor.  Obviously, I would like to have a little bit more

11   time to look at the documents, but my first inclination was to

12   stand up and say we renew our motion to dismiss.

13        THE COURT:  Well, you've done that I think several

14   times, in effect, which is fine, but my ruling remains the

15   same.  But, you know, insofar as there is a proper subpoena, I

16   will enforce it, and, you know, there has been testimony about

17   this.  I think it is a fair thing -- I don't think it is crazy

18   for the PCAOB to have interpreted the subpoena the way they

19   did.  And it turns out that there is a blanket resolution that

20   they saw as apples versus oranges, you know, I don't think that

21   that's something terrible.  I think if we get the resolution

22   that was represented by Mr. Shur, you know, we should be able

23   to go forward.  It is not like there is a bunch of resolutions

24   that are missing, I think.

25        So, I think it might make sense to go ahead with the

J2pdmid7                        Hannigan - direct

1    next witness and then proceed tomorrow with this witness.

2                MS. MERMELSTEIN:  We're happy to do, your Honor,

3    whatever keeps the trial moving along.  I think it is worth

4    saying on the record that even if the resolution is never

5    produced, there is no basis to strike Ms. Hannigan's testimony

6    on that front.  There is nothing improper about a witness

7    testifying as the lead Ethics Officer of the PCAOB, charged

8    with advising that what the confidentiality rules mean -- and

9    she understood that this existed -- whether or not the physical

10   document has been produced.

11               I also think it is unfair and legally inaccurate to

12   conflate the government with the PCAOB.  We don't have the

13   document.  We're not a party to the litigation about the

14   subpoena.  We have no position on the litigation about the

15   subpoena.  And to the extent that defense counsel gets a

16   document they've asked for and there has been a

17   miscommunication about what the subpoena meant, I think that

18   sort of is to be resolve between the parties.

19               I don't think we have to take Mr. Whittle out of order

20   because I don't think there is any basis to delay

21   Ms. Hannigan's completion of her testimony pending this, but if

22   the defense wants to do that, if they think that is important,

23   we have no objection to allowing that to work itself out.

24   Mr. Whittle is here and we can certainly do it.

25               I think that the continued suggestion that the PCAOB

J2pdmid7                         Hannigan - direct

1    notifying KPMG of the inspections in the ordinary course was

2    somehow a violation of EC9, or that it was unclear to people

3    whether or not that was a violation of EC9 gave rise to a

4    constitutional problem, I'll look for a new word that's not

5    ludicrous, but my view has not changed.

6              THE COURT:  OK.  What is your position, Mr. Weddle?

7              MR. WEDDLE:  Your Honor, I think that on the

8    assumption that we're basically going to get one document,

9    which is similar to what Ms. Hannigan has testified about, and

10   not a set of documents, you know -- rather, that the letter

11   from the PCAOB and this document are going to be arguably

12   consistent with each other, I think on that basis we would like

13   to preserve the objection but just go ahead with the cross of

14   Ms. Hannigan.  And if we're somehow surprised by what comes,

15   then maybe we will make an application to your Honor to recall

16   her.  But rather than breaking up the testimony and starting

17   with Mr. Whittle and having her back a while from now, I would

18   propose to do that, if that is satisfactory with everybody

19   else's views.

20             THE COURT:  OK.  All right.

21             Can we bring back the witness and I'll bring in the

22   jury.

23             (Continued on next page)

24

25

1              (Jury present)

2              THE COURT:  Good afternoon, folks.  You may be seated.

3         We will now have cross-examination of the witness.

4         Mr. Cook.

5    CROSS-EXAMINATION

6    BY MR. COOK:

7    Q.  Good afternoon, Ms. Hannigan.  My name is Steve Cook and I

8    represent Jeff Wada.

9    A.  Good afternoon, Mr. Cook.

10   Q.  Ms. Hannigan, under PCAOB rules, is nonpublic information

11   the same as confidential information?

12   A.  We do use those terms interchangeably.

13   Q.  So under PCAOB rules, is there a distinction between

14   confidential information, very confidential information, highly

15   confidential, and nonpublic information, or are all those terms

16   used interchangeably?

17   A.  We don't have different categories, as you were suggesting

18   just now, as categorical definitions.

19   Q.  The same would be true for I think you use the phrase "very

20   sensitive information?"

21   A.  Yes.  That's -- I wouldn't call it a term of art, but, yes,

22   we would use that term to describe particularly sensitive

23   information.

24   Q.  But in terms of the Ethics Code, there is only one -- two

25   categories of information -- public and nonpublic, correct?

J2pdmid7                              Hannigan - cross

1   A.  That's right.

2   Q.  And nonpublic information is defined in Ethics Code 9?

3   A.  That's correct.

4           MR. COOK:  Let's take a look at Government Exhibit 20,

5   the Ethics Code, and turn to page 18.  If we can blow up EC9.

6   Q.  So according to EC9, no board member or staff can disclose

7   nonpublic information except under the circumstances described

8   within EC9, is that right?

9   A.  That's right.

10  Q.  And EC9 defines "nonpublic information" as "any information

11  obtained in the course and scope of his or her employment" --

12          And we're speaking of PCAOB board members and staff,

13  right?

14  A.  Correct.

15  Q.  -- "and which has not been released, announced, or

16  otherwise made available publicly."

17          That's the definition of nonpublic information,

18  correct?

19  A.  I never -- I wouldn't call it a definition.  It is our

20  provision on nonpublic information, but it describes what

21  nonpublic information is in a very broad way.

22  Q.  Well, if I were a PCAOB employee and I wanted to know what

23  information the PCAOB deems confidential or nonpublic, I would

24  go to EC9 and read this statement, correct?

25  A.  Yes, you would.

J2pdmid7                        Hannigan - cross

1   Q.  So there is no -- I'm going to use a phrase that perhaps

2   you are familiar with as a lawyer -- there is no materiality

3   threshold to EC9; meaning it doesn't matter whether it is

4   highly sensitive or not that sensitive, if it is nonpublic, it

5   fits the definition of EC9, it cannot be disclosed, is that

6   right?

7   A.  That's right.

8   Q.  So -- and I'm just going to be --

9   A.  Although I would add that, obviously, as you're suggesting

10  now, there is a range or a spectrum of different types of

11  information, and there could be some insignificant information

12  that we would not deem covered by EC9.

13  Q.  OK.  Well, let me follow up on that.

14          If, just for example, the PCAOB office in Fort

15  Lauderdale increased its copy paper order for the month.

16  That's not public information.  That would technically be

17  covered by EC9, correct?

18  A.  Technically it would be, but we would apply a rule of

19  reason there and we would say telling the Xerox vendor how much

20  paper you used last month does not violate EC9.

21  Q.  So who decides within the PCAOB whether technically

22  nonpublic information is really not nonpublic information that

23  could subject you to disciplinary action within the PCAOB?

24  A.  We advise employees that they should come into the ethics

25  office or to the general counsel's office and seek advice if

J2pdmid7                         Hannigan - cross

1    they have doubts about whether the information can be disclosed

2    or not.

3    Q.  But who makes the decision as to whether or not something

4    is nonpublic information that could lead to disciplinary

5    behavior if disclosed or nonpublic information that is deemed

6    not significant enough to worry about?

7    A.  Well, on a case-by-case basis, that would be decided -- it

8    might be decided by myself or lawyers in the general counsel's

9    office, or there might be situations where the matter is sent

10   to the board for an opinion or approval.

11   Q.  Now, you testified earlier on direct examination -- we

12   looked at a document in which there is a statement that any

13   violation of the Ethics Code is a violation of federal law; do

14   you recall that?

15   A.  Of the orientation five you are referring to?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Is that an accurate statement, that any violation of the

19   Ethics Code is a violation of federal law?

20   A.  Again, it would depend upon the facts and circumstances

21   involved in the situation and where it was on the spectrum.

22   The example you just gave about the copier, while someone

23   technically could say that violated EC9, we would apply a rule

24   of reason and with any rule -- you know, as with any rule,

25   we're doing that all the time with respect to EC9 in analyzing

1   specific facts and circumstances.

2   Q.  So is it correct to say that not every violation of the

3   Ethics Code is actually a violation of federal law; is that a

4   correct statement?

5   A.  I believe that it is.

6   Q.  And, in fact, you removed that statement from the materials

7   given to new employees, correct?

8   A.  At some point in time we did change the slides.

9   Q.  Well, the only thing you changed was to remove that bullet

10  point, right?

11  A.  Well, we changed the -- you know, we changed the

12  presentation possibly more than once through the years, so.

13  Q.  Let's take a look at Government Exhibit 21, which is in

14  evidence.

15          This is the slide deck we were just referring to,

16  correct?

17  A.  Yes.

18          MR. COOK:  If we could scroll forward.  Stop there.

19  Q.  And this contains the bullet point that says any violation

20  of the Ethics Code is a violation of federal law, correct?

21  A.  Yes.

22  Q.  OK.  And I'm going to show you what's been marked for

23  identification as Defense Exhibit 1643R.

24          And if you could take a look at this, Ms. Hannigan --

25  we are going to scroll through it for you -- and tell me if you

J2pdmid7                         Hannigan - cross

 1   recognize this as a different version of that same

 2   presentation.

 3              (Pause)

 4   A.  Yes, it is.

 5   Q.  OK.  If we could --

 6              MR. COOK:  I offer 1643R, your Honor.

 7              MS. ESTES:  No objection.

 8              THE COURT:  1643R is received.

 9              (Defendant's Exhibit 1643R received in evidence)

10   BY MR. COOK:

11   Q.  If we could put GX21, Government Exhibit 21, side-by-side

12   with 1643R, please.

13              And, Ms. Hannigan, I am just going to scroll through

14   these, it is not a very long presentation, and ask you if you

15   could identify any differences between the two presentations.

16              I think as a starting point, you see that there is an

17   additional name on Defense Exhibit 1643, correct?

18   A.  Yes.

19   Q.  OK.  Carole Yanofsky?

20   A.  That is correct.

21   Q.  Does she still work for the PCAOB?

22   A.  No, she does not.

23   Q.  But she is somebody who worked with you while she was

24   there, correct?

25   A.  Yes.

J2pdmid7                          Hannigan - cross

1    Q.  And she assisted you with putting together this

2    presentation?

3    A.  I don't remember who actually worked on the presentation,

4    but she would give it -- we would alternate giving the

5    presentation.

6    Q.  OK.  Let's go to the second page.

7         This is the page on Government's Exhibit 21 that

8    contains that bullet point.  Do you see that there on the left?

9    A.  Yes, I do.

10   Q.  And on the right, Defense Exhibit 1643, do you see that the

11   preceding three bullet points are the same but the fourth is

12   gone now?

13   A.  Yes, I do.

14   Q.  If we could scroll to the next pages.  I am not going to

15   ask you to read each page, Ms. Hannigan, but could you just

16   confirm that the rest of the document, 1643R, is the same as

17   Government Exhibit 21?

18   A.  Yes.

19         (Pause)

20   Q.  I am going to show you, please, what's been marked for

21   identification as Defense Exhibit 1644R.

22         Do you see that on your screen now?

23   A.  Yes, I do.

24   Q.  Is this another version of the same presentation?

25   A.  If I saw the next page, I would know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2pdmid7                        Hannigan - cross

1          (Pause)

2          Yes, it is.

3          MR. COOK:  I offer 1644R.

4          THE COURT:  Received.

5          (Defendant's Exhibit 1644R received in evidence)

6          MR. COOK:  And if we could put them side-by-side,

7     please 1644R and GX21.

8     BY MR. COOK:

9     Q.  Again, the only difference on this page, Ms. Hannigan, is

10    that there is -- there we go -- another name, Nancy Doty, in

11    addition to your own, correct?

12    A.  That's correct.

13    Q.  If we can go to the second page.

14         Again, on the second page, if we compared Government's

15    Exhibit 21, the document you were shown on direct exam, with

16    1644R, we see that bullet point is removed, correct?

17    A.  That's right.

18    Q.  And we can scroll through the other pages of 1644, and can

19    you confirm that other than that one deletion, the documents

20    are the same?

21    A.  Yes, with different contact information at the end.

22    Q.  Correct.  In the newer document, 1644R, it says,

23    ethics@pcaobus.org, correct?

24    A.  Correct, yes.

25    Q.  So the bullet point that you testified about on direct was

J2pdmid7                         Hannigan - cross

1    removed from subsequent presentations because it was not

2    technically accurate, right?

3    A.   I would say that it's something that I wasn't completely

4    comfortable saying all the time to the new employees.

5    Q.   You provide ethics training at the annual inspections

6    training meeting, correct?

7    A.   Yes.

8    Q.   And you talked a little bit about that earlier?

9    A.   Yes, I did.

10   Q.   During those meetings, you provided examples of questions

11   that your office has received from PCAOB staff members, right?

12   A.   Or extrapolations thereof.  We might use a real-life

13   situation and create our own hypothetical or we might just

14   create a hypothetical.

15   Q.   So some of them based on actual questions you received,

16   others based on questions that you might receive?

17   A.   That's correct.

18   Q.   And during those meetings, you've told the inspectors who

19   are assembled that there often is no black-and-white answer to

20   some ethics questions, correct?

21   A.   That's -- I don't specifically remember that but it is the

22   kind of thing I would say.

23   Q.   But it's true, right?

24   A.   Yes, it is true.

25            MR. COOK:  Now, let's take a look again at Government

J2pdmid7                          Hannigan - cross

1   Exhibit 20, the Ethics Code, on page 19.  If we could blow up

2   EC12.

3   Q.  And I'm going to ask, Ms. Hannigan, about the time period

4   2015 to 2017 for my next couple of questions.  OK?

5   A.  OK.

6   Q.  And is it accurate to say that the Ethics Code during that

7   time period required professional staff, such as an inspections

8   leader, for example, to disclose the fact that they were

9   negotiating prospective employment with a public accounting

10  firm?

11  A.  Yes, that's correct.

12  Q.  And KPMG is a public accounting firm, correct?

13  A.  Yes, it is.

14  Q.  And, again, during this time period -- your Honor, I

15  believe one of the screens is not working.

16          THE COURT:  It is out?

17          (Jurors indicated affirmatively)

18          (Discussion off the record)

19          (Pause)

20          THE COURT:  Can you all see the screen now that is

21  working?  OK.

22  BY MR. COOK:

23  Q.  Ms. Hannigan, again, speaking of the 2015 through 2017 time

24  period, the Ethics Code defines negotiating prospective

25  employment as participating in an employment interview

J2pdmid7                          Hannigan – cross

1    discussing an offer of employment or accepting an offer of

2    employment, is that correct?

3    A.  That's correct.

4    Q.  And in 2017, an employee who sends his or her résumé to

5    KPMG, for example, that alone would not constitute negotiating

6    prospective employment, right?

7    A.  That's correct.

8         MR. COOK:  If I could see if we could pull up

9    Government Exhibit 10.

10   Q.  Ms. Hannigan, this is Government Exhibit 10.  This is

11   Mr. Wada's offer letter, which you testified about earlier.  Do

12   you recognize it?

13   A.  Yes, I do.

14        MR. COOK:  If you could turn to page 2, and highlight

15   the sentence just above number 1.

16   Q.  That sentence reads:  "This offer of employment is

17   contingent upon the following:"

18        What does your understanding of the word "contingent

19   upon" mean in this context.

20   A.  That if you are not willing to abide by these provisions,

21   we are not going to make you an offer of employment.

22   Q.  And if we take a look at the number 1, the first thing that

23   Mr. Wada's employment was contingent upon was his compliance

24   with the PCAOB's Code of Ethics, correct?

25   A.  That's correct.

J2pdmid7                        Hannigan - cross

1  Q.  And meaning if he did not comply with the PCAOB's Code of

2  Ethics, then his employment could be terminated, correct?

3  A.  Potentially, yes.

4  Q.  Or if he was not willing to comply by signing this letter,

5  he could not be hired, right?

6  A.  That's right.

7         MR. COOK:  So let's take a look at the bottom of page

8  3.  The bottom of page 3.  There we go.  Perfect.

9  Q.  And at the bottom of every offer letter, at least during

10  this time period, there was this statement, "I have read and

11  understand the provisions of this letter, and intend to accept

12  employment with the PCAOB as proposed in the letter above,"

13  correct?

14  A.  I believe that is correct.

15  Q.  And then the candidate or the prospective employee either

16  signs or doesn't sign, right?

17  A.  Right.

18  Q.  So would it be fair to say that the understanding that

19  what's conveyed to the employee is that it is a condition of

20  their employment, among other things, that they abide by the

21  Code of Ethics?

22  A.  Yes, that's correct.

23  Q.  And they acknowledge that they've read and understand the

24  provisions of the letter, including that particular provision,

25  right?

J2pdmid7                        Hannigan - cross

1   A.  Yes.

2   Q.  And is it fair to say that nowhere in the letter does it

3   state to the prospective employee that failure to follow the

4   Ethics Code is a violation of federal law?

5   A.  I don't believe that's in the letter.

6   Q.  Cindy Holder -- you testified about her earlier -- do you

7   recall her leaving the PCAOB in or around July 2015?

8   A.  I know that she did.  I saw the correspondence.  I don't --

9   she wasn't in the D.C. office where I was, so I don't

10  physically remember her leaving.

11  Q.  Your understanding is that's about the time she left?

12  A.  Yes, that's right.

13  Q.  And you're aware that she went to work at KPMG, right?

14  A.  Yes.

15  Q.  Let's take a look at Defense Exhibit 1646, for

16  identification.

17          On your screen, Ms. Hannigan, is an email, the top

18  email, from Ms. Doty to you?

19  A.  Yes.

20  Q.  It is dated July 20, 2015?

21  A.  Yes, it is.

22  Q.  And the email below it, where it says "From notifications

23  HR," do you see that?

24  A.  Yes, I do.

25  Q.  Is this "notifications HR" email, is this something that

J2pdmid7                         Hannigan - cross

1    you would receive in the course of your employment anytime

2    somebody is leaving the PCAOB?

3    A.   Yes.  At a certain point in time I started receiving this.

4            MR. COOK:  I offer 1646.

5            THE COURT:  1646 is received.

6            (Defendant's Exhibit 1646 received in evidence)

7            MR. COOK:  If you could highlight the top email.

8            Actually, I'm sorry.  Could we back out and highlight

9    the box at the bottom.

10   Q.   Now, this portion of the email, it identifies Louann Sakala

11   as separating from the PCAOB effective July 31, 2015, is that

12   right?

13   A.   That's correct.

14           MR. COOK:  OK.  And then if you could go up to the top

15   email, please.

16   Q.   This says Ms. Doty.  She was somebody working in your

17   office at the time, correct?

18   A.   Yes, that's right.

19   Q.   And she is writing to you saying:  "Wow!  Cindy Holder and

20   Louann on the same day."

21           Do you see that?

22   A.   Yes, I do.

23   Q.   Does that suggest to you that Cindy Holder and Louann

24   Sakala were leaving on the same day or at about the same time?

25   A.   Yes, it does.

J2pdmid7                          Hannigan - cross

1   Q.  And both Cindy Holder and Louann Sakala went to go work at

2   KPMG, correct?

3   A.  Yes, that's correct.

4   Q.  And who is Hector, if you know?

5   A.  I believe his last name is Santana or Santana, a name close

6   to that, and he, too, went to KPMG.

7   Q.  And he was an in inspections, correct?

8   A.  Yes.

9          MR. COOK:  Thank you.  We can take that down.

10  Q.  Now, a couple of months after Ms. Holder left the PCAOB,

11  did you come to find out that she may have been sharing

12  confidential information?

13  A.  Yes, I did.

14  Q.  And you called to speak with her about that?

15  A.  Yes, I did.

16  Q.  And during that conversation, you found Ms. Holder to be

17  sincere?

18  A.  I did.

19  Q.  You found her to be credible?

20  A.  I did.

21         MS. ESTES:  Objection.  Relevance.

22         THE COURT:  Overruled.

23  Q.  You found her to be credible?

24  A.  Yes, I did.

25  Q.  And those impression that you had of Cindy Holder, they

J2pdmid7                          Hannigan - cross

1    were consistent with your prior impressions of Ms. Holder,

2    correct?

3              MS. ESTES:  Objection.

4              THE COURT:  Overruled.

5    A.  I don't -- I don't know that I really had a -- had thought

6    deeply about Cindy Holder.  I mean, her -- her email exchanges

7    when she was seeking employment looked like she was doing all

8    the right things.  So, generally, yes.  I haven't thought

9    deeply about that.

10   Q.  And you had no idea at the time that she had already stolen

11   highly confidential, very sensitive PCAOB information, correct?

12             MS. ESTES:  Objection.

13             THE COURT:  Sustained.

14   BY MR. COOK:

15   Q.  Let's take a look at Defense Exhibit 1639, for

16   identification.

17             Ms. Hannigan, do you recognize this person depicted in

18   this photograph?

19   A.  No.

20   Q.  Let's take a look at Defense Exhibit 1640.

21             Do you recognize this person?

22   A.  No.

23   Q.  Take a look at Defense Exhibit 1641.

24             Do you recognize this individual?

25   A.  No.

J2pdmid7                          Hannigan - cross

1   Q.   And Defense Exhibit 1642.

2            Do you recognize this individual?

3   A.   No.

4   Q.   Let me show you what's been marked as Defense Exhibit 1439,

5   for identification.

6            Do you recognize this document, Ms. Hannigan?

7   A.   No, I do not.

8   Q.   Let me show you what's been marked as Defense Exhibit 1511.

9            Do you recognize this document?

10  A.   I -- I know that there is -- that there are inspections

11  manuals.

12  Q.   Have you seen the inspections manuals?

13  A.   I have provided advice on sections of the inspections

14  manual.

15  Q.   Let's scroll through this one and tell me if this is the

16  Global Network Firm Inspection Manual from 2014?

17           MS. ESTES:   Objection.  I think she testified she just

18  provided advice; she hasn't seen it.

19           THE COURT:   Are you asking if she has seen it?

20           MR. COOK:   Yes.  I am asking if she recognizes the

21  document.

22           THE COURT:   OK.

23  A.   No, I do not.

24  Q.   Do you have -- Ms. Hannigan, do you yourself have any

25  personal knowledge of whether Jeffrey Wada gave Cindy Holder a

J2pdmid7                        Hannigan - cross

1   PCAOB inspection list in 2016?

2   A.  I'm not sure I understand the question.

3   Q.  I'll rephrase it.

4           Do you yourself have any personal knowledge of Jeffrey

5   Wada giving Cindy Holder an inspection list in 2016?

6   A.  I have no personal knowledge of that.

7   Q.  What about in 2017?

8   A.  I have no personal knowledge of that.

9           MR. COOK:  Thank you.

10          No further questions.

11          THE COURT:  OK.

12          Ms. Lester.

13          MS. LESTER:  May I just have a moment, your Honor?

14          THE COURT:  Yes.

15          (Pause)

16  CROSS-EXAMINATION

17  BY MS. LESTER:

18  Q.  Good afternoon, Ms. Hannigan.

19  A.  Good afternoon.

20  Q.  My name is Amy Lester, and I represent David Middendorf.

21          A moment ago you were testifying about an incident in

22  the summer of 2015 when you learned that Cindy Holder had

23  passed along confidential information.  Do you remember that?

24  A.  I'm not sure what you are referring to.

25  Q.  A moment ago Mr. Cook asked you whether you had learned at

J2pdmid7                          Hannigan - cross

1    some point in time that Ms. Holder had shared confidential

2    information.  Do you remember, you said yes?

3    A.  I'm just not remembering right now.

4    Q.  Do you have any memory of an incident in which you learned

5    that Cynthia Holder had shared confidential information --

6    A.  Yes.

7    Q.  -- after leaving the PCAOB?

8    A.  Oh, yes.  Yes.  That, I'm sorry, yes, I do.

9    Q.  And you said that you spoke to her on the phone about that,

10   correct?

11   A.  That's right.

12   Q.  Did you ever speak to anyone at KPMG about that incident?

13   A.  I don't believe that I did.

14   Q.  You never spoke to David Middendorf about that, correct?

15   A.  I didn't, no.

16   Q.  During your direct testimony, you looked at Government

17   Exhibit 29, which is in evidence.

18            If we could put that up for a moment.

19            And that's the Standing Advisory Group Conditions of

20   Membership.  Do you remember seeing that?

21   A.  Yes, I do.

22   Q.  And then you also looked at EC9, which is on Government

23   Exhibit 20, page 18.

24            MS. LESTER:  If we could just put those side-by-side,

25   Ms. O'Connor.

1              If we could go to page 18 of Government Exhibit 20.

2              There we go.

3    Q.  You testified that you had some role with respect to the

4    Standing Advisory Group that included vetting the members, is

5    that right?

6    A.  That's right.

7    Q.  And also conducting some training when new members joined?

8    A.  That's correct.

9    Q.  You said you gave an ethics orientation talk and talked

10   about the conditions of membership?

11   A.  Yes, that's correct.

12   Q.  And you said you covered confidentiality of information in

13   that training, right?

14   A.  Right.

15   Q.  Including that the members of the Standing Advisory Group

16   were agreeing to abide by EC9, correct?

17   A.  That's correct.

18   Q.  Now, EC9 provides that board members and staff shall not

19   disseminate or otherwise disclose information obtained in the

20   course and scope of their employment, right?

21   A.  That's correct.

22   Q.  So for a member of the Standing Advisory Group, EC9 would

23   mean that they couldn't disclose information they learned in

24   the course of being a member of the Standing Advisory Group, is

25   that correct?

1   A.   That's correct.

2   Q.   And I believe you said that, to your knowledge, you were

3   not aware of the board ever authorizing the release of

4   nonpublic information to the standing advisory group, is that

5   correct?

6   A.   That's essentially correct.

7   Q.   But you said that you told the members if that should

8   happen, they should not share that information, correct?

9   A.   Correct.

10            MS. LESTER:  May I have a moment, your Honor?

11            THE COURT:  Yes.

12            MS. LESTER:  No further questions.

13            THE COURT:  OK.

14            Any redirect, Ms. Estes?

15            MS. ESTES:  Yes, your Honor, just briefly.

16   REDIRECT EXAMINATION

17   BY MS. ESTES:

18   Q.   Now, Ms. Hannigan, do you remember that Mr. Cook asked you

19   if there are some ethics questions that don't have a

20   black-and-white answer?

21   A.   Yes, I do.

22   Q.   And you testified that there are some ethics questions that

23   don't have a black-and-white answer, is that right?

24   A.   Yes.

25   Q.   Now, if the ethics question is whether you can leak the

J2pdmid7

1    PCAOB's inspections list, does that have a black-and-white

2    answer?

3    A.   That has the most black-and-white answer you could have

4    because that is such highly sensitive information, it is clear

5    that you cannot leak that list.

6    Q.   So is that a violation of EC9 in your understanding?

7    A.   Yes, it is.

8              MS. ESTES:  No further questions.

9              THE COURT:  Anything further?

10             MR. COOK:  No, your Honor.

11             MS. LESTER:  No, your Honor.

12             THE COURT:  OK.  Thank you.  You may step down.

13             THE WITNESS:  Thank you.

14             (Witness excused)

15             THE COURT:  All right, folks.  It is almost 5.  I

16   think I will let you go for the evening.  We'll try to break at

17   5 each day.

18             And I just want to remind you that you are not yet

19   deliberating so you are not discussing the case, please, with

20   each other or with anyone else.  And have a good night.  We'll

21   have coffee for you tomorrow morning at 9, and we'll start at

22   9:30.

23             Have a good night, everybody.  Please leave your pads

24   on your chairs.

25             (Continued on next page)

1           (Jury not present)

2           THE COURT:  You may be seated.

3           Just checking in on the schedule.  Is Mr. Whittle the

4    next witness.

5           MS. MERMELSTEIN:  He is, your Honor.

6           THE COURT:  All right.  And then do you know -- well,

7    what else is on tap for tomorrow?

8           MS. MERMELSTEIN:  I just don't know if that's going to

9    take us all the way through the day, your Honor.  I think he's

10   between, best guess, three and three-and-a-half hours on

11   direct, so that may take us through the day.

12          To the extent it doesn't, we intend to next call

13   Zachary Greenwood -- who was with the Postal Inspection Service

14   in the computer forensic area at the time of this case, he is

15   now in Secret Service -- to testify about the Middendorf phone.

16   I think that raises -- there is a pending motion on that before

17   your Honor about the admissibility of some of that, so that

18   will be tomorrow.

19          And then I think we are gaiting relatively close to

20   the end.  So, there is a handful of -- a variety of small

21   witnesses I think we'll have to juggle in terms of scheduling

22   that includes not a witness but someone who I expect will read

23   some of the emails that have not been used with any particular

24   witness, a summary chart witness.  We have three very small

25   PCAOB witnesses who are in the mix.  One will talk about IIS.

 1   And then there are two custodians for the time and compensation

 2   records that are the subject of a letter filed by the defense

 3   last night and which I expect we will file an opposition to

 4   tonight.  I apologize, we didn't do it today but we didn't get

 5   it until we got in this morning.  And so, pending a resolution

 6   of that, we expect to call two document custodians.  I

 7   understand there is not an appetite to stipulate on that,

 8   although we continue to be in discussions.

 9           We intend to call Ken Cock, who is -- Cook, who is a

10   PCAOB -- excuse me, a KPMG IT person to talk about a sort of

11   handful of different issues.  And then we may also call either

12   Williams & Connolly lawyer and/or Mark Rubino, who is in-house

13   at KPMG, to discuss statements made by Mr. Middendorf.  And I

14   think that barring any surprises, that's it for the government.

15           THE COURT:  And so when do you expect all of that will

16   be done?

17           MS. MERMELSTEIN:  I think we're going to rest this

18   week.  I hate to make predictions, but I think that we'll rest

19   Wednesday or Thursday.

20           THE COURT:  All right.

21           MS. MERMELSTEIN:  Ms. Kramer tells me Thursday.

22           THE COURT:  All right.

23           MR. BOXER:  Your Honor, in light of that schedule, as

24   I mentioned this morning, we do have one defense witness who is

25   unavailable next week.  So, I am going to ask him to be here

J2pdmid7

1    and ready to go on Thursday.  And it doesn't sound like we will

2    have to take him out of turn, but if that happens, that they

3    haven't rested, his name is Frank Blake, B-l-a-k-e, I wanted to

4    alert the Court to that because he is unavailable the following

5    week so I would like to put him on then in our case.

6         Thank you.

7         THE COURT:  OK.  Do defendants have any expert

8    witnesses?

9         MR. BOXER:  We do.  We have two.

10        THE COURT:  Two.

11        MR. BOXER:  Standing here today, it is still our

12   present intention to call them both, but I confess, we talk

13   about that regularly whether we still want to go forward and do

14   that.  So, I think by the end of this week we will be able to

15   inform the government and the Court if we will be calling both.

16        THE COURT:  OK.  So I know -- anything else you all

17   wanted to address?

18        MR. BOXER:  One other item, your Honor.

19        MS. LESTER:  Maybe two, actually.

20        The first is last night the government filed a motion

21   to reconsider your Honor's ruling at the sidebar about the

22   Sweet notes.  We can submit something on that this evening, if

23   your Honor would like a submission.  We don't think

24   reconsideration is warranted.  And in any event, now that the

25   witness has left the stand, the defense would be prejudiced by

1    the inability to recross on that document.  So we will submit

2    something if the Court desires, but otherwise we can rest on

3    the arguments made at the sidebar.

4           THE COURT:  Well, I did read the government's letter

5    on that and we might as well address it briefly.

6           I fear I may have been incorrect in my reading of

7    801 -- what is it, 801(d)(1), because there do appear to be

8    cases that arguably interpret the phrase "is subject to

9    cross-examination" not as narrowly as I had assumed.  But it

10   does put us in a bit of a bind because I think at least there

11   is a good argument that for it to come in, the defendants would

12   have to have an opportunity to do recross on the statement.

13   So, I don't know where that leaves us.

14          MR. BOXER:  I think, actually, your Honor, there was

15   no record ever made by Mr. Sweet that there were these notes.

16   I think we approached right when it went up on the screen

17   before Ms. Kramer inquired about that.  That is my

18   recollection.  So I don't even think we have the direct

19   testimony that would then lay the foundation for us to cross.

20          MS. KRAMER:  I am happy to address both of those

21   points, your Honor.

22          So, first, as to foundation, it is correct that

23   counsel objected to the witness even being shown the document.

24   He did testify that he took handwritten notes.  We can offer

25   those notes through a witness from the Williams & Connolly law

J2pdmid7

firm that conducted the internal investigation for KPMG, who

would testify that the notebook in which those two pages were

contained was received by Williams & Connolly after having been

produced.  And sitting here right now, I can't recall.  There

were two batches of hardcopy documents.  Either one was -- you

know, one was produced by Sweet's counsel.  One was retrieved

from his office, I believe.  So, I would have to confirm which

one it is.

And then the sort of, you know, issue of whether those

notes are notes of the meeting goes to weight, not

admissibility.  So, we sort of lose the strength of being able

to confirm that they were the notes.  That's something that we

have to deal with.  We can argue based on the heading of the

notes that, you know, it says, Dave/Jim and then they match up

with what was discussed.  But we can certainly authenticate

them as notes that were retrieved from either Brian Sweet's

office or produced by his counsel.  And we can prove up, you

know, that other aspects of the notes were his.  For example,

you know, there is information from his first day of his phone

number and things like that.  So I think as to authenticity, we

do not need to recall Brian Sweet for that.

(Continued on next page)

J2prmid8

1    For example, as to the opportunity to cross-examine

2    him, and we can put in a supplemental letter on this if this is

3    the sticking point, your Honor, the case law makes quite clear

4    that the opportunity to cross is simply an opportunity that the

5    defense had in this case and chose not to take advantage of.

6    They had them in this case in abundance, more so than other

7    cases, even one that we cite in our letter, which is not in

8    front of me, where the government didn't proffer the statement

9    until after the declarant was off the stand and the court had

10   the declarant recalled.

11   Here we notified defense counsel explicitly at sidebar

12   during direct examination that we believed that this statement

13   was coming in as a prior consistent statement.  They had an

14   ample opportunity to cross him about it.  The fact that they

15   chose not to does not affect any prejudice on them.  That is a

16   result of their decision, not the lack of opportunity.

17   In fact, the sidebar conversation gave them such an

18   opportunity that they made clear when we had the argument about

19   whether this should come in as a prior consistent statement,

20   that they had deliberately refrained from crossing on this.

21   That was their choice, they made it, and he does not need to be

22   recalled to be crossed on this because they had a full

23   opportunity.

24   MS. LESTER:  Your Honor, first, with respect to Mr.

25   Sweet's notebooks, there is missed opportunity if he is not

1    recalled to cross him on why he kept that particular notebook

2    when his practice, as he testified on direct examination, was

3    to discard notebooks after a certain period of time at the end

4    of an audit year.  Yet miraculously he happens to have a

5    notebook that overlaps with his start time at KPMG.  We would

6    have asked him about that if the notes were introduced, and we

7    now do not have that opportunity if he is not recalled.

8           As for the last argument about the opportunity to

9    recross, we will look at the cases.  We haven't had a chance to

10   do that in depth.  But it was a strategic decision not to cross

11   him in the first instance on that conversation with the

12   understanding that then he would not be able to be accused of

13   recent fabrication and thus rehabilitated through the notes

14   that were, he testified, taken simultaneously.

15          THE COURT:  But it is recent fabrication or motive,

16   and there is certainly general impeachment of motive.

17          MS. LESTER:  Understood, your Honor.  But I think the

18   government is taking a broad view of the cases that isn't

19   warranted here.  Specifically with respect to the 2014

20   amendment, I think that counsel did not correctly describe what

21   the purpose of that amendment is.  So we would like an

22   opportunity to submit something if your Honor is not prepared

23   to just deny the motion for reconsideration right now.

24          THE COURT:  You're welcome to submit something, and

25   I'll reserve on that.

J2prmid8

 1          I realize I have to rule on the Rodriguez testimony

 2     issue, which I will, and the issue of the iPhone notes.  There

 3     is no update on those.  Everything is in the letters, correct?

 4          MS. MERMELSTEIN:  I think that's right, your Honor.

 5     The tweak on the Rodriguez issue is that defense counsel

 6     complained that there was a lack of foundation for her

 7     testimony.  For all the reasons set forth in our letter, and I

 8     won't repeat them here, we think that is not right.

 9          But in an effort to satisfy them, we have obtained the

10     documents that they think should have been utilized in the

11     first instance.  They are clearly business records.  There is

12     not at least at this point a willingness to stipulate, and we

13     are prepared to call custodians who will say these are business

14     records prepared in the ordinary course of PCAOB's business.

15     They are exactly the records that track to the time that was

16     spent.

17          Ms. Rodriguez testified both from her own personal

18     knowledge as the supervisor of the whole team how much time was

19     generally spent on this, but also that she had consulted the

20     business records of the PCAOB time track system, I think it was

21     called Stafftrack.  Those are the records we propose to offer.

22          Similarly, we have obtained from HR the full

23     compensation records, the summary of which was provided to her.

24     I do think that if there was any doubt that her testimony was

25     proper and had a foundation, any concern about that is

1    completely allayed by the underlying records being offered as

2    we intend to do.

3           Defense counsel, I think in a sort of desperate effort

4    to keep out this clearly relevant information about the cost of

5    the list, is now saying we shouldn't get to put in those

6    documents either because you only just gave them to us and it

7    is a rule 16 violation.

8           It is of course not a rule 16 violation since we

9    turned them over literally the morning we got them and we

10   didn't have them before, as we will put in a letter, unless

11   your Honor wants to hear from us on this tonight.  I think

12   those two things are a little intertwined.  The admissibility

13   of the records themselves, because they do come in, it obviates

14   any issue with Ms. Rodriguez testimony.  Although, even if the

15   didn't, there is no issue there.

16          THE COURT:  You intend to put them in regardless of

17   how I rule on that?

18          MS. MERMELSTEIN:  We do, your Honor.  There was a

19   substantial attack on Ms. Rodriguez, whether or not she was

20   right, whether or not she could be right.  Since she is, it is

21   our intention to make clear to the jury that there is no

22   dispute on this fact.

23          MR. WEDDLE:  Your Honor, very briefly, it has been a

24   few days since we wrote that letter, so it is not as fresh in

25   my mind as I would like it to be.  I think the testimony of Ms.

J2prmid8

Rodriguez showed at the end of the day that she did not have

first-hand information, she had second-hand information from

other people's summaries tailor-made for litigation basically.

Then in the midst of trial, after that testimony, we get

documents that are purported to be business records. I think

that just confirms our motion.

          If she didn't have the information and testified as if

she did, the testimony should be stricken. If they want to try

to do that again with a different witness, who has actual

business record information, that's a different story. I think

it is a discovery violation and it is a problem. But I think

that the attempt to rehabilitate with actual first-hand

information doesn't save Rodriguez's testimony, it confirms

that it should be stricken.

          MS. LESTER: Not to belabor the point, your Honor, but

I agree with what Mr. Weddle just said. The government has

known since the outset of the case that it intended to prove up

some cost amount that the PCAOB expended in connection with

this case, yet it produced no discovery at all on this issue

until the end of January. That was the first effort we ever

received on this topic.

          The bulk of it came the day of Ms. Rodriguez's

testimony and a week after her testimony. That is really not

proper. And I don't understand the government's argument that

they didn't have it before. This is evidence that they should

J2prmid8

1    have gathered that they intended to put in as part of their

2    case in chief from the beginning.  I don't understand why it

3    was never turned over under rule 16, obtained by the government

4    and turned over in a timely fashion.

5              THE COURT:  Did you want to say something?

6              MS. ESTES:  Your Honor, I want to turn to the

7    Middendorf notes on his iPhone.  I think that may come up

8    tomorrow.  There no real dispute that these notes were found on

9    the phone.  My understanding is that defense counsel disputes

10   what are some of the arguments we can make from those notes.  I

11   wanted to update the Court that one of the notes in issue is

12   undated notes that list several entities on there: Lakeland,

13   Midland, Heartland, certain financial services companies.

14             Since we have filed the letters, Brian Sweet has

15   testified that those entities on the notes were part of the

16   preliminary list that was leaked in January 9, 2017.  That

17   testimony just shows how highly probative these notes are.

18   There is no real dispute that they are on the phone.  There may

19   be a dispute about what we can argue from it, but I don't see

20   how there is anything that should bar Mr. Greenwood from

21   testifying about those notes tomorrow and us offering them in

22   evidence.

23             THE COURT:  Anything else for tonight?  Thanks

24   everybody.  Have a good night.

25             (Adjourned to 9:30 a.m., February 26, 2019)

<pre>
 1                        INDEX OF EXAMINATION

 2    Examination of:                          Page

 3     DIANA KUNZ

 4      Direct By Ms. Estes . . . . . . . . . . . .1552

 5     Cross By Mr. Boxer . . . . . . . . . . . . .1586

 6     Cross By Mr. Weddle  . . . . . . . . . . . .1612

 7     Redirect By Ms. Estes  . . . . . . . . . . .1613

 8     DAVID MARINO

 9     Direct By Ms. Estes  . . . . . . . . . . . .1615

10     Cross By Mr. Boxer . . . . . . . . . . . . .1634

11     Cross By Mr. Weddle  . . . . . . . . . . . .1648

12     Redirect By Ms. Estes  . . . . . . . . . . .1649

13     LAURIE MULLEN

14     Direct By Ms. Estes  . . . . . . . . . . . .1651

15     Cross By Mr. Boxer . . . . . . . . . . . . .1672

16     BARBARA BULGER HANNIGAN

17     Direct By Ms. Estes  . . . . . . . . . . . .1695

18     Cross By Mr. Cook  . . . . . . . . . . . . .1752

19     Cross By Ms. Lester  . . . . . . . . . . . .1769

20     Redirect By Ms. Estes  . . . . . . . . . . .1772

21                      GOVERNMENT EXHIBITS

22    Exhibit No.                           Received

23     1005   . . . . . . . . . . . . . . . . . . .1569

24     1006   . . . . . . . . . . . . . . . . . . .1570

25     1007   . . . . . . . . . . . . . . . . . . .1571
</pre>

1   1009   . . . . . . . . . . . . . . . . . .1573

2   1013   . . . . . . . . . . . . . . . . . .1574

3   1011   . . . . . . . . . . . . . . . . . .1575

4   1012   . . . . . . . . . . . . . . . . . .1578

5   1125   . . . . . . . . . . . . . . . . . .1582

6   1128   . . . . . . . . . . . . . . . . . .1660

7   10   . . . . . . . . . . . . . . . . . .1705

8   11 and 12   . . . . . . . . . . . . . . . .1708

9   21   . . . . . . . . . . . . . . . . . .1712

10   28   . . . . . . . . . . . . . . . . . .1717

11   31   . . . . . . . . . . . . . . . . . .1721

12   22 and 23   . . . . . . . . . . . . . . . .1723

13   24   . . . . . . . . . . . . . . . . . .1724

14   25 and 26   . . . . . . . . . . . . . . . .1725

15   200   . . . . . . . . . . . . . . . . . .1726

16   203   . . . . . . . . . . . . . . . . . .1729

17   204   . . . . . . . . . . . . . . . . . .1729

18   205   . . . . . . . . . . . . . . . . . .1730

19   206   . . . . . . . . . . . . . . . . . .1731

20   207   . . . . . . . . . . . . . . . . . .1732

21   29   . . . . . . . . . . . . . . . . . .1735

22                       DEFENDANT EXHIBITS

23   Exhibit No.                              Received

24   M283   . . . . . . . . . . . . . . . . . .1589

25   M289   . . . . . . . . . . . . . . . . . .1592

1   M284      . . . . . . . . . . . . . . . . . . .1611

2   M286      . . . . . . . . . . . . . . . . . . .1679

3   M287      . . . . . . . . . . . . . . . . . . .1680

4   1643R     . . . . . . . . . . . . . . . . . . .1757

5   1644R     . . . . . . . . . . . . . . . . . . .1759

6   1646      . . . . . . . . . . . . . . . . . . .1765

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25