```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           18 Cr. 0036(JPO)

5    DAVID MIDDENDORF and JEFFREY
     WADA,
6
                 Defendants.
7
     ------------------------------x
8

9                                          February 26, 2019
                                           9:35 a.m.
10

11   Before:

12                    HON. J. PAUL OETKEN,

13                                         District Judge
                                           and a jury
14

15                       APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
18        AMANDA K. KRAMER
          JORDAN L. ESTES
19            Assistant United States Attorneys

20   PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant David Middendorf
21   BY:  NELSON A. BOXER
          AMY R. LESTER
22        ALEXANDRA R. CLARK
               – and –
23   BRUCH HANNA LLP
     BY:  GREGORY S. BRUCH
24

25
```

                          APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
             – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


          – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard–Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal




                            oOo

1        (Trial resumed; jury not present)

2        THE COURT:  Good morning everyone.

3        I issued an order this morning on the outstanding

4   subpoena issues.  We can give you copies.  I'm also prepared to

5   rule on a number of other issues.  Before I rule on the one

6   regarding the letter that came in last night, I understand the

7   government wanted to respond.

8        MS. KRAMER:  Yes, briefly, your Honor, on the matter

9   of authenticity.  I think there is more than sufficient

10  evidence already in the record to establish the authenticity of

11  the notes at issue.  I will point to a couple of those items.

12       First, Brian Sweet's handwriting is already in

13  evidence in a couple of different places from which the jurors

14  can compare the notes at issue with what is already in

15  evidence, both from workpaper edits that he handwrote that are

16  in evidence, including Government Exhibits 1011 and 1012, and

17  from the February 2017 long list that has a lot of his

18  handwriting, which is in evidence as Government Exhibit 655.

19       I would also note that the two pages of notes are in a

20  notebook that was retrieved from his office after the scheme

21  ended, and that notebook has other pages that contain very

22  clear indicia of authenticity.  I have a copy of the notebook

23  if it is helpful for your Honor.  On page 3 of it there is a

24  page that has a heading "10175 Archie" and then a list of

25  tasks, "install new drainage."  That 1017 Archie is an address

1  that belongs to Brian Sweet as evidenced by an exhibit that was

2  introduced by Wada, which is Defense Exhibit 1585, page 8.  It

3  is a W-9 for Sweet that lists that address as his home address.

4       There are also a couple of references in the notebook

5  "to Fresno," where he said he lives.  On the Bates number page

6  ending in 2182 of the notebook there are notes that reflect

7  what was elicited by Ms. Lester on the cross of Brian Sweet

8  about things he said to Dave Middendorf in his interview,

9  including that "If Britt and Whittle were doing a good enough

10  job, then you wouldn't be talking to me."  That's in Brian

11  Sweet's notes that appear to be from his preparation for that

12  interview, but that testimony was elicited by defendant

13  Middendorf.

14       The page ending in Bates number 2184 contains his

15  office phone number, his conference call number, which appears

16  to be information he wrote down on his first day.  Then there

17  is another page that references Shaver Lake, California, I

18  believe from when he was doing his search for the vacation home

19  that he bought.  That testimony that he had a vacation home in

20  Shaver Lake, California, is already in evidence and was

21  explored thoroughly by defense counsel on cross.

22       So, both because of all of the indicia of authenticity

23  in the notebook itself from which the two pages flow and from

24  the handwriting comparisons that the jury can look at

25  themselves and make, there is more than sufficient evidence of

1   authenticity.

2         THE COURT:  I'm prepared to rule on that and some

3   other open issues.

4         First, with respect to the Sweet notes, and this is

5   Government Exhibit 452 which was not admitted, the government

6   has moved for reconsideration.  I grant reconsideration in

7   part.  Upon reconsideration, I conclude that my exclusion of

8   the document based on rule 801(d)(1)(B) was in error.  That is

9   because there is a sufficient basis to find that the notes of

10  Mr. Sweet were contemporaneous, were consistent with his

11  testimony, and were properly offered to rebut an express or

12  implied charge that Sweet recently fabricated or acted from a

13  recent improper influence or motive in testifying:

14  specifically, the suggestions in opening statements and on

15  cross-examination that Sweet was lying due to the motives

16  arising from his cooperation with the government.  The case law

17  does not require that the charge of fabrication or influence or

18  motive relate specifically to the statement itself.

19        However, I also conclude that rule 801, in fairness,

20  at least in the circumstances here, gives the defendants the

21  right to cross-examine the witness about the prior statement.

22  Therefore, I will allow the admission of the prior consistent

23  statement only on the condition that Sweet be recalled for

24  recross.

25        Second, defendant Middendorf moves to preclude

1    Government Exhibit I believe it is 654, which is a report from

2    the Notes function of Mr. Middendorf's iPhone 8.  The motion to

3    preclude is denied.  I conclude that the proffered evidence may

4    be offered by a lay witness.  I further conclude that the

5    issues regarding what inferences may be drawn from this

6    evidence are proper subjects of cross-examination and go to

7    weight rather than admissibility.

8         Third is defendant's letter motion to strike the

9    Stephanie Rodriguez testimony regarding certain PCAOB costs in

10   replanning 2017 inspections and reinspecting certain 2016

11   audits.  Defendants have moved to strike this testimony on the

12   grounds that over the course of the testimony it became clear

13   that the witness was not testifying based on her personal

14   knowledge.

15        Based on my review of the testimony, I agree, and I

16   grant the motion to strike Ms. Rodriguez testifying regarding

17   employee costs incurred by the PCAOB in connection with

18   replanning and reinspecting certain audits.  She testified that

19   she did not do the calculations but that she "sampled" or

20   "audited" them.  She was not able to provide specific

21   information about numbers that went into the calculation.

22        I also conclude that the testimony was not properly

23   based on admissible business records, although this is a closer

24   question.  But the testimony did not sufficiently establish

25   that the estimates and calculation were based on true business

1    records as opposed to a document prepared for trial.  For

2    example, the witness did not give a clear answer about whether

3    and how employees kept contemporaneous time records in the

4    organization's system.

5           Therefore, subject to comment from counsel, I would

6    propose instructing the jury the following.  "You heard

7    testimony from a witness, Stephanie Rodriguez, involving an

8    estimate of costs to the PCAOB in employees' time in replanning

9    and reinspecting certain audits in 2016 and 2017.  I am

10   striking that testimony and I instruct you to disregard it."

11          There was no the document received on that, is that

12   right?

13          MS. MERMELSTEIN:  That's correct, your Honor.

14          THE COURT:  Fourth, defendants have also moved to

15   preclude documentary evidence relating to these same costs on

16   the ground that they were not produced until February 22nd.

17   The government represents that it did not receive the documents

18   until February 22nd, and there is no reason to doubt that

19   representation.

20          Because the documents were not in the possession of

21   the government before that date, there is no violation of rule

22   16.  I also find the defendants are not unfairly prejudiced by

23   the disclosure.  The issue of these costs being part of the

24   government's case is not a surprise to defendants, and the

25   defense teams are in a position to adequately prepare for their

1 use during trial.

2          The last question I wanted to address is there was

3 discussion about the references to violation of federal law in

4 Government Exhibit 21, the PowerPoint.  I didn't give a

5 contemporaneous limiting instruction.  The testimony just sort

6 of happened, it flowed, so I didn't.  But I wanted to ask the

7 parties if they wanted me to do that now or at a different

8 time.

9          MR. WEDDLE:  Your Honor, we talked about it.  We think

10 that it may just highlight the prejudice, so we prefer to have

11 no instruction separate and apart from your Honor's standard

12 instructions at the end of the case.

13          THE COURT:  All right.  Anything else?

14          MS. KRAMER:  Yes, your Honor, two things.  First, with

15 respect to the notes of Brian Sweet and your Honor's ruling

16 that they can only be offered if he is recalled for cross,

17 given that we are now in a position where we think we may rest

18 possibly tomorrow and he lives 3,000 miles away, we want to

19 revisit our application in footnote 3 of our letter that

20 because the ability of the government to meet the attacks that

21 were made by defense counsel was thwarted by their objection to

22 our introduction when he was here, we would like your Honor to

23 preclude any specific attacks on the veracity of Sweet's

24 testimony about the May 5th meeting with Middendorf.

25          We are in this situation because they made an argument

that we believe is not based in a correct reading of the law.

He is now 3,000 miles away.  I don't know that we could even

get him here.  So we would like them to not be able to argue

that in closing.

Second, with respect to the Stephanie Rodriguez

testimony, if your Honor could add to the instruction that the

jurors should not speculate as to why that testimony is being

stricken, we would like that.

THE COURT:  Anything from the defendants?

MR. BOXER:  That is an extraordinarily broad request

as far as the May 5th conversation.  There were a lot of

aspects to it.  Even just the context for it, that Mr. Sweet

brought over confidential information without any request or

being asked by anybody at KPMG, certainly not Mr. Middendorf.

I think we should be permitted to argue in summation on any

aspect of that meeting.  I appreciate he is 3,000 miles away,

but they can call him back.  I don't think we should be

limited.

MS. MERMELSTEIN:  Your Honor, this is a situation

intentionally created by defense counsel.  They attacked his

credibility again and again and again, specifically suggesting

that when he claimed that he had been pressured by Mr.

Middendorf, that was false.  Then, in a very cute effort not to

allow this incredibly helpful corroboration that he did not

recently fabricate that testimony, they didn't ask one

1    question.

2         The argument that Mr. Boxer has made proves exactly

3    why the argument they made to preclude it was so wrong, because

4    the two things are completely intertwined.  Saying we shouldn't

5    be constrained now from making that argument sort of proves

6    exactly why the two things are intertwined.

7         They have created the situation where the government

8    cannot now put in the evidence that supports Mr. Sweet's

9    testimony as having been wholly proper and true.  So they

10   shouldn't have the benefit of keeping it out and then making an

11   argument the government can't rebut.  That is just not fair.

12        MR. BOXER:  I'm not quite sure why the personal

13   pejorative is a part of this argument.  We weren't trying to be

14   cute.  We were representing our client and trying to do the

15   best we can to do that.

16        I think the request was that there should be no

17   summation on the specific testimony about the May 5th

18   conversation or meeting or event.  I think that is incredibly

19   broad.  We are not going to argue that you didn't see any notes

20   in evidence to corroborate what Mr. Sweet said.  We are

21   certainly not going to do that.  That would be improper.

22        But I think we are allowed to attack his credibility

23   saying that he felt pressure right from the beginning from Mr.

24   Middendorf to do the things that he did.  Whether the notes are

25   in evidence or not, we would be making that very same argument.

1    I don't think there is anything improper about it.

2         MS. MERMELSTEIN:  They can generally argue about Mr.

3    Sweet's credibility.  But what they shouldn't be allowed to do

4    is challenge that it is true that Mr. Middendorf told Sweet

5    those things on his first day.  Second day, excuse me.  And I

6    don't mean cute in a pejorative way.  It was a strategic move

7    by sophisticated defense counsel to try and have it both ways.

8    But that doesn't comply with the rules of evidence.

9         You can't not ask a question intentionally so as to

10   avoid it coming in and then argue to the jury specifically what

11   you didn't ask the witness himself, which is that statement was

12   not true.  They should not be allowed to argue that Mr.

13   Middendorf did not say those things on Sweet's second day or

14   that Sweet did not say them, having created the situation where

15   the government is unable to prove that it is not only Mr.

16   Sweet's testimony that demonstrates that that is true.

17        THE COURT:  I understand the argument.  If there is

18   anything else?  Ms. Lester?

19        MS. LESTER:  With respect to the implication that we

20   created the situation, the government has known since it

21   produced its original exhibit list in January that we objected

22   to the admission of these notes and could have briefed it

23   beforehand and raised this issue with the Court.  I don't think

24   it is our burden to do that when the government is the one that

25   wants to prove the evidence.

1    THE COURT:  I think I understand the arguments and I'm
2  going to reserve on this.
3    Mr. Weddle.
4    MR. WEDDLE:  My only suggestion, your Honor, was let's
5  find out if he can get here.  If your Honor is being asked to
6  make some kind of ruling which in my view is extraordinary with
7  respect to what people are allowed to argue in summation based
8  on documents not in evidence, it should really only be if it is
9  impossible for him to get here.  If it is possible for him to
10  get here, he should just get here, and then this isn't an
11  issue.
12    MS. KRAMER:  Your Honor, one brief thing.  When we
13  raised at the sidebar on the direct examination of Brian Sweet
14  that we intended to put these in, we didn't say we may offer
15  them or we think they are admissible.  We said this is academic
16  because these are coming in as a prior consistent statement,
17  and defense counsel said nothing about it at the time.  It is
18  such black letter law that it did not seem like something that
19  needed to be briefed in advance.  We raised it then, and they
20  didn't say I don't think you have a valid basis for it.  I know
21  your Honor is sick of hearing about this, so I'll sit down.
22    THE COURT:  That's fine.  I want you to make a record.
23  I feel in some ways it is my fault because I ruled the way I
24  did.  I don't want to unduly blame any particular party.  I
25  don't think anyone was doing anything but acting in good faith

1    here.

2         I will say just for purposes of planning, my initial

3    view is that I don't think it is right to limit the defense.  I

4    understand the government's argument and I'm going to think

5    about it more and see if there is case law on the issue.  I

6    think there is a line between saying specifically there were no

7    notes or something like that and generally attacking

8    credibility across the board of a cooperating witness.  But I

9    want to think about that before I rule.

10         Any other issues before we start?

11         MR. BOXER:  One last point on that, your Honor.  If

12   the notes were in evidence, we would be attacking the veracity

13   of the notes as well.  I appreciate they are not in evidence,

14   so we can't reference the notes, and we won't.  But it is not a

15   situation like if they were in, then we would be stuck with the

16   inference that he credibly said that.

17         If you look at the notes, he has markings on it to

18   prepare himself.  He has reminders to himself.  He's got the

19   words at issue.  We would attack the credibility of that

20   recorded recollection.  All I'm saying is we are not going to

21   bring up the lack of notes in attacking his credibility.

22         MS. KRAMER:  That just doesn't get it done, your

23   Honor.  They opened on the fact that Dave Middendorf never

24   asked Brian Sweet for this stuff.  His testimony about the May

25   5th meeting is evidence to the contrary.  The notes, these

1    particular notes, were in a notepad that was found in his

2    office amongst other papers.  They can attack it all they want,

3    but it is with his list about remodeling a property, the office

4    number of the first day.  That just does not get it done.

5           Whether you want to call it cute or strategy, it is

6    still totally unfair to have this situation and then allow the

7    defense to argue affirmatively from a vacuum of evidence, of

8    strong corroborating evidence, that is a vacuum they created.

9           Your Honor, if we are able to recall Mr. Sweet for

10   planning purposes, would that testimony as your Honor permits

11   it be limited to the notes and then cross be limited to the

12   notes, or are we talking about a much longer day in terms of

13   planning purposes?

14           THE COURT:  I think it would be limited to a recross

15   on the notes.  I think that's all it would be.

16           MS. KRAMER:  Thank you, your Honor.  We will consider

17   that while your Honor considers or application about the

18   closing.

19           THE COURT:  Are we ready to start?

20           MS. MERMELSTEIN:  Yes, your Honor.

21           THE COURT:  Is Mr. Whittle next?

22           MS. MERMELSTEIN:  He is.

23           THE COURT:  Bring him and we'll get the jury.

24           (Continued on next page)

25

```
 1                 (Jury present)

 2                 THE COURT:  Good morning, ladies and gentlemen.

 3                 THE JURY:  Good morning, your Honor.

 4                 THE COURT:  Welcome to Tuesday.

 5                 Government, you may call your next witness.

 6                 MS. MERMELSTEIN:  Thank you, your Honor.  The

 7    government calls Mr. Thomas Whittle.

 8    THOMAS W. WHITTLE III,

 9           called as a witness by the government,

10           having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MS. MERMELSTEIN:

13    Q.  Good morning, Mr. Whittle.

14    A.  Good morning.

15    Q.  Why don't you start by moving the microphone a little

16    closer to yourself.

17    A.  How is that?

18    Q.  Try again.

19    A.  Better?

20    Q.  Yes.  Good morning again.  Mr. Whittle, how old are you?

21    A.  55.

22    Q.  In what state do you live?

23    A.  New Jersey.

24    Q.  Who do you live with?

25    A.  My wife, my son, and my mother-in-law.
```

1  Q.  Are you presently employed?

2  A.  I'm not.

3  Q.  How were you previously employed?

4  A.  I was a partner at KPMG.

5  Q.  When did you cease to be a partner at KPMG?

6  A.  In April of 2017.

7  Q.  Why did you stop being a partner at KPMG?

8  A.  I was offered the opportunity to either retire or be

9  terminated for cause.

10  Q.  Which did you choose?

11  A.  I retired.

12  Q.  While you were at KPMG, are you involved in any illegal

13  activity?

14  A.  Yes, I was.

15  Q.  We are going to talk about it in more detail later, but

16  generally speaking what was the nature of that activity?

17  A.  I obtained confidential information from the PCAOB that I

18  used to help improve the inspection results of the firm.

19  Q.  During approximately what time frame did that occur?

20  A.  May of 2015 through February 2017.

21  Q.  Did you engage in that activity alone or with others?

22  A.  With others.

23  Q.  Who were the principal people with whom you engaged in that

24  illegal activity?

25  A.  David Middendorf, David Britt, Brian Sweet, Cindy Holder.

1  Q.  Have you pled guilty to crimes in connection with your

2  participation in obtaining and using confidential PCAOB

3  information?

4  A.  Yes, I have.

5  Q.  Are you now cooperating with the government?

6  A.  Yes, I am.

7  Q.  We will come back to all that, but let's start with some

8  background.  Can you describe your educational background.

9  A.  I have a Bachelor's degree in accounting from LaSalle

10  University.

11  Q.  What did you do when you graduated from college?

12  A.  I joined Peat Marwick Mitchell & Company, which was the

13  predecessor of KPMG, in their New Jersey office.

14  Q.  When you first joined the KPMG predecessor in New Jersey,

15  what kind of work were you doing?

16  A.  I was a staff auditor.

17  Q.  What does that mean?

18  A.  I audited the books and records of public and private

19  companies.

20  Q.  Did there come a time that you were promoted to partner?

21  A.  Yes, in 1997.

22  Q.  Did there come a time that you left the New Jersey office

23  of KPMG?

24  A.  Yes.  I did a couple of different rotational assignments in

25  our national office in New York.

1   Q.  When, approximately, did you begin your last rotation in

2   the national office in New York?

3   A.  In I think it was October of 2013 time frame.

4   Q.  Is the national office known by any other names?

5   A.  Yes.  Within the firm it's known as department of

6   professional practice, or DPP.  It's also technically called

7   the audit quality and professional practice group.

8   Q.  In broad strokes, what is the national office?

9   A.  It's sort of the think tank of the firm.  It handles all

10  the technical accounting and auditing questions that come up

11  from the field office.  It deals with our regulators.  It deals

12  with new standards that come out and is there to be of help to

13  the rest of the firm.

14  Q.  What was your title when you first joined the national

15  office for that last rotation in 2013?

16  A.  Partner in charge of inspections.

17  Q.  Did that remain your title?

18  A.  No.  In June of 2014 I took over the role as national

19  partner in charge of inspections.

20  Q.  I'm going to show you Government Exhibit 1361 in evidence.

21  Do you recognize this?

22  A.  Yes.  It looks like a partial organizational chart.

23  Q.  For the national office?

24  A.  Yes.

25  Q.  You said partial.  Does this reflect everyone who worked in

1   the national office at the time that you were the national

2   partner in charge of inspections or quality management?

3   A.  No, it does not.

4   Q.  Does it accurately reflect the positions of the individuals

5   who are reflected on the chart?

6   A.  Yes, it does.

7   Q.  Let's start in the middle of the page, where it says the

8   national office under David Middendorf's name.  When you first

9   arrived at the national office in roughly 2013, who was the

10  head of national office?

11  A.  Sam Ranzilla.

12  Q.  Did that change?

13  A.  Yes.

14  Q.  Approximately when?

15  A.  I'm not sure of the date.  It was I think sometime in 2014,

16  but I'm not quite sure.

17  Q.  Who took over from Mr. Ranzilla?

18  A.  David Middendorf.

19  Q.  Who did Mr. Middendorf report to?

20  A.  Originally he reported to Jim Liddy, who was then the vice

21  chair of audit.  Then that changed later to Scott Marcello.

22  Q.  On this chart, on either side of audit in blue are the

23  words "tax" and "advisory."  What are those references to?

24  A.  KPMG has three practice groups: audit, tax, and advisory.

25  Those are the other two practice groups.

1  Q.  Did your principal work at the national office relate to

2  the tax or advisory business?

3  A.  Not directly, but I used tax and the advisory professionals

4  as part of my internal inspection process and in dealing with

5  PCAOB inspections.

6  Q.  Let's look back at the national office for a minute.

7  Approximately how many groups were there within the national

8  office?

9  A.  There were five groups.

10  Q.  Are they all depicted on this chart?

11  A.  No, just two of them.

12  Q.  Let's talk about those two.  Directing your attention first

13  to the audit group, who ran the audit group?

14  A.  George Hermann.

15  Q.  Generally speaking, what did the audit group do?

16  A.  The audit group handled auditing questions from the field.

17  They also interacted with standard setters who were going to

18  set new auditing standards.  They got involved in a lot of

19  other things, including firm training, either delivering it or

20  preparing it.  They also ran all of the audit quality

21  monitoring programs that we employed.

22  Q.  Where did David Britt work?

23  A.  I'm sorry?  Say again.

24  Q.  Where did David Britt work?

25  A.  David Britt was an audit partner.  He reported to George

1    Hermann within the audit group.

2    Q.  Generally speaking, what was David Britt's role in the

3    audit group of the national office?

4    A.  His specialty was financial services and particularly

5    banking.  He was one of the banking partners in the audit

6    group.

7    Q.  Let's turn next to the inspections group.  Who ran that

8    group?

9    A.  I did.

10   Q.  What is the inspections group?  In general terms, what does

11   it do?

12   A.  We oversee the -- we measure the quality of the work that's

13   being done by our audit team, whether that be through internal

14   inspections or external inspections.

15   Q.  Underneath you is Brian Sweet.  What was his role in the

16   inspections group?

17   A.  Brian was a partner in the group.  His principal role was

18   to support teams that were going through PCAOB inspections.

19   Then, as a secondary role, he worked with the audit group on

20   certain of the monitoring programs that they were running.

21   Q.  What about Cindy Holder?  What was her role in the

22   inspections group?

23   A.  Cindy was executive director within the internal

24   inspections group.  She was doing self-inspections within the

25   firm.  When she wasn't doing that, like Brian Sweet, she was

1  supporting some of the monitoring programs that the audit group

2  ran.

3  Q.  You just referenced an internal inspection.  What is an

4  internal inspection?

5  A.  There is a requirement, professional requirement, that a

6  firm as part of their system of quality control has a mechanism

7  to evaluate its own work.  This is an inspection of those

8  workpapers to see if they conform to both firm standards and to

9  professional standards.

10 Q.  Approximately how many internal inspections does KPMG

11 conduct a year?

12 A.  About 400.

13 Q.  How does KPMG decide which of its audits will be subject to

14 an internal inspection in a particular year?

15 A.  The professional standards require that partners be

16 reviewed on a regular basis.  So once every three years a

17 partner comes up on, if you will, a rotational basis and that

18 partner's work is subject to inspection.  Then one of the

19 partner's engagements is inspected.

20 Q.  You said one of the partner's engagements.  Do most

21 engagement partners at KPMG work on more than one audit at a

22 time?

23 A.  It varies.  If you're on a very large engagement, you may

24 only have one.  And if you've got a lot of small ones, you

25 could have a dozen or more.

1   Q.  When are KPMG partners notified that an audit of theirs has

2   been selected for an internal inspection?

3   A.  Roughly three to four weeks before the inspection.  But

4   it's as long as the workpapers are completed and put into our

5   electronic file room.

6   Q.  When you say put into your electronic file room, is that

7   the same thing as the end of the 45 days and the workpapers

8   being locked down?

9   A.  Yes, it is.

10  Q.  Why is it that partners are not notified of an internal

11  inspection until their workpapers have been locked down?

12  A.  We want to make sure that it is a complete file, that the

13  work that we are reviewing represents the final work of the

14  engagement team.  If we were to notify them before, they might

15  make changes to the work that wouldn't reflect what they

16  otherwise would have done.

17  Q.  How were the results of an internal inspection communicated

18  to the audit partner whose audit had been inspected?

19  A.  At the end of each inspection they would get a report card

20  and they would get a rating on it.  It was either rated

21  satisfactory, in other words, it met all the standards; or it

22  was rated unsatisfactory, meaning there was some significant

23  problem with the work that needed to be remedied; or they could

24  also receive sort of a middle grade of needs improvement, maybe

25  barely met the standards but some work to be done.

1  Q.  What was the impact to a particular partner of receiving an

2  unsatisfactory, satisfactory, or needs improvement rating?

3  A.  If you got a satisfactory rating, great, you're off for the

4  next three years until your next inspection.  If you had an

5  unsatisfactory rating or needs improvement, both of those would

6  be noted in the partner's personnel file.

7        If it was unsatisfactory, they would receive another

8  inspection, if we could fit it in, in that current year, and

9  then they would be reinspected the next year.  In addition, the

10 team would have to go back and fix the work that was

11 insufficient.  That would involve getting the team back

12 together, involving the client, a lot of work.  If a partner

13 had a record of successive unsatisfactory ratings, it could

14 also impact their overall ratings, their quality rating, and

15 their compensation.

16 Q.  You said that if an audit was inadequate and was discovered

17 to be so as a result of an internal inspection, more work might

18 have to be performed.  How could that be done after the end of

19 the 45 days?

20 A.  The auditing standards permit you to do additional work at

21 any time if you discover an either omitted procedure or an

22 insufficiently performed procedure.  You can do that at any

23 time.  But you've got to document that separately from the

24 original work.  You can't change the original work.  You would

25 add that in.  You would document how you came about finding it,

1  what was the additional work.  And then the firm also had

2  special, additional reviews on any work that was done outside

3  of the normal audit.

4  Q.  How, if at all, did KPMG leadership utilize internal

5  inspection results across the firm?

6  A.  They looked at them in evaluating leadership as to what

7  their roles are.  We used it to evaluate whether our training

8  was effective.  We looked at it as to how we had potential

9  other changes to our system of quality control, whether our

10  guidance was good.  It could have a really big impact on a

11  number of things.  It gave us insight into how individuals, how

12  engagement teams performed and what we needed to do as a firm

13  to make things better.

14  Q.  Did KPMG share the results of internal inspections with the

15  PCAOB?

16  A.  Yes.  All internal inspections relative to public company

17  or issuer audits, the same ones that PCAOB would inspect, we

18  would share those results with them.

19  Q.  Why?

20  A.  Because one of the things the PCAOB looks at is not only do

21  they inspect individual engagements, individual audits, but

22  they also look at the firm's system of quality control.  As I

23  said earlier, the internal inspection process is an important

24  part of that system of quality control.  So they want to

25  evaluate whether our own review of ourselves was an effective

1  tool.

2  Q.  Let's turn from internal inspections to talking about

3  external or PCAOB inspections.  First, who conducted the

4  principal external inspections of KPMG?

5  A.  The PCAOB.

6  Q.  What is the PCAOB?

7  A.  They are an organization set up as a result of the

8  Sarbanes-Oxley law to oversight the public accounting

9  profession and look at the quality of audits that are being

10  done.

11  Q.  Who oversees the PCAOB?

12  A.  The Securities and Exchange Commission.

13  Q.  What is the core purpose of the PCAOB?

14  A.  To regulate the public accounting firms, to evaluate the

15  quality of those, and to ultimately safeguard investors.

16  Q.  What is the principal way by which the PCAOB regulates

17  public accounting firms and evaluates the quality of the firms'

18  audits?

19  A.  Through their inspection process.

20  Q.  Approximately how many KPMG audits does the PCAOB inspect

21  each year?

22  A.  During my tenure, somewhere between 50 and 53 inspections

23  each year of issuers.

24  Q.  What is your understanding of how the PCAOB selects which

25  audits of KPMG it will inspect in a given year?

1  A.   They go through a process.  Their process is designed, as I

2  understand it, to identify the engagements with the highest

3  risk of audit failure.  They have a number of what I think they

4  call flags or risk factors that they put in.  That's how they

5  come up with their list.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  What was the Inspection Group's role in providing

2  information to the PCAOB for the PCAOB to use in the

3  upcoming -- PCAOB's use in making that determination?

4  A.  So each August/September timeframe we would get a request

5  from the PCAOB to provide a lot of information, lots of

6  detailed information about every engagement, you know, what the

7  name of the company was, you know, how big its sales were, how

8  big the company was sales wise, the names of the engagement

9  partners and certain other specialists that worked on the

10 engagement and so forth.  So it was a tremendous data-gathering

11 exercise, and we will provide that to them as part of their

12 planning process for the upcoming inspection year.

13 Q.  And what, if any, impact did internal inspections have on

14 the PCAOB inspections?

15 A.  One of the things that they did as part of their inspection

16 process is to reinspect the engagements that KPMG inspected.

17 So if we found a job that was satisfactory, they would pick,

18 you know, anywhere from maybe four to six engagements each year

19 and they would reinspect, or, you know, reinspect the same job

20 we did to see if they came to the same conclusion that the

21 internal inspectors came up with.

22 Q.  What is the first indication in a given year that KPMG

23 receives about the inspection schedule of that year?

24 A.  Sometime in April we usually got a schedule that provided

25 the names of the cities that they were going to visit, how many

1    weeks -- week or weeks they were going to be in attendance and

2    what weeks they were, and whether the engagement they were

3    selecting was either a financial services company or a

4    non-financial services company.

5    Q.  Does that information generally inform KPMG which specific

6    engagements are going to be subject to inspection?

7    A.  Generally not, but there were occasions, let's take an

8    example, where there was a small office and there was only one

9    financial services client in that office, it may be pretty easy

10   to figure out who it was because there was only one possible

11   choice.

12   Q.  At what point in the audit process does the PCAOB notify

13   KPMG which particular engagements will be subject to

14   inspection?

15   A.  They always notice us after the 45-day workpaper assembly

16   period is complete.

17   Q.  Why is that?

18   A.  I think, similar to our internal inspection, they want to

19   make sure they are looking at a complete file and they don't

20   want any of the workpapers changed beforehand to give a true

21   view as to the quality of the work being performed.

22   Q.  How does the PCAOB communicate its selection of a

23   particular audit for inspection to KPMG?

24   A.  Either by phone call or an email would come into one of

25   the -- my team members, you know, when they -- when they have

1    the notices sent out.

2    Q.  How was that communicated from one of your team members to

3    the engagement team itself?

4    A.  She would take the information.  She would figure out who

5    were the players, who were the particular engagement team

6    members on that selection, who were -- what office were they

7    from, what business unit, and she would put together an email

8    that would spell out, you know, all the right players and the

9    right leadership people and notify them.

10   Q.  Let me direct your attention to Government Exhibit 1063,

11   for identification.

12           Do you recognize this?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's one of the emails I was just referencing about an

16   engagement selection.

17           MS. MERMELSTEIN:  The government offers Government

18   Exhibit 1063.

19           THE COURT:  1063 is received.

20           (Government's Exhibit 1063 received in evidence)

21   BY MS. MERMELSTEIN:

22   Q.  Just so it is clear, this is just a sort of random example

23   of the kind of email that went out to the engagement team?

24   A.  Yes.  We had a standard template and once it was set for

25   the year, I'm not sure we changed it.

1  Q.  In broad strokes, what kind of information does this email

2  provide to the engagement team?

3  A.  It provides them with logistics, you know, when it is going

4  to occur and in what office.  It provides them with information

5  attachments that they need to fill out for the PCAOB as part of

6  their planning and their process, and then it provides them

7  with internal guidance that we give to teams as to, you know,

8  how to conduct themselves and how to prepare for the

9  inspection.

10 Q.  So let's look at this a little more closely, and let me

11 direct your attention to the top of the second page of the

12 email, titled, "Workpaper Modification."  Let me ask you to

13 read the first two sentences.

14 A.  "Workpaper Modification – You are strongly encouraged to

15 refamiliarize yourself with all audit documentation, however

16 you must adhere to firm and PCAOB guidance on workpaper

17 modifications.  If an audit has been completed and the

18 documentation completion date has passed, no modifications,

19 deletions, additions or changes of any type are to be made to

20 the workpapers."

21 Q.  And why was it that no modifications, deletions, additions

22 or changes of any type could be made to the workpapers at this

23 point in time?

24 A.  Again, the objective was to identify whether the team had

25 done a quality job as of the date the notice came out.

1    Q.  OK.  Let's look at the next sentence.  Let me ask you to

2    read the next sentence.

3    A.  "If the report release date has passed but the

4    documentation completion date has not yet passed, adhere to

5    Auditing Standard Number 3 (AS 3) and applicable state laws and

6    regulations; however, a log should be maintained of any new

7    documentation, changes made to the documentation, or sign-offs

8    of any documentation subsequent to this notification."

9    Q.  So this suggests that it was possible for notification from

10   the PCAOB to come during the documentation period.

11            Did you know that to ever actually occur?

12   A.  Not during my tenure, no.

13   Q.  What does this direct in the event that notification was to

14   arrive during the 45 days?

15   A.  That you sort of put the work down and start a new set of

16   workpapers with anything new that you had so they could see

17   where it was -- where the work stood --

18            MR. BOXER:  Objection.

19   A.  -- as of the date of notification and then subsequent.

20            MR. BOXER:  I move to strike from the portion I

21   objected as nonresponsive, your Honor.

22            THE COURT:  Overruled.

23   BY MS. MERMELSTEIN:

24   Q.  Now, to be clear, are documentation changes permitted

25   during the 45 days?

1  A.  Yes.

2  Q.  So if documentation changes are allowed, why did this email

3  sent by your group to engagement teams direct that if they

4  received notice during the 45 days, they had to maintain a log

5  of every change they made to the documentation?

6          MR. BOXER:  Objection.  No foundation.

7          THE COURT:  Sustained.

8  BY MS. MERMELSTEIN:

9  Q.  Were you involved each year in putting together this email

10  that went out to each of the engagement teams giving them

11  information about their upcoming inspection?

12  A.  Yes.  I would review it each year, yes.

13  Q.  And do you have an understanding about why this directive

14  was included in the email that went to engagement teams?

15  A.  Yes.

16  Q.  And so what is your understanding about why this directed

17  that a log had to be maintained of any documentation changes

18  that were made during the 45 days?

19  A.  Again, it was a way to look up what work was done and the

20  quality of the work at the time of the notification, and then

21  subsequent to that they would be able to evaluate how the team

22  finalized the work.

23  Q.  In the absence of such a log, do KPMG's electronic

24  workpapers track the changes that are made during the 45 days?

25  A.  No.

1  Q.  OK.  So let's look at some of the attachments to this

2  document.  And if we can start with the first attachment, which

3  is page 4 of the pdf, in broad strokes, what is this document?

4  A.  This is just basic information that the PCAOB wants about

5  in this case it is the engagement team listing, you know, who

6  were the players on the engagement.

7  Q.  OK.  Let's go to the next attachment, which is the "Public

8  Company Accounting Oversight Board 2016 engagement team

9  Integrated Team Audit Discussion Aid."

10         In general terms, what is this.

11  A.  It is -- it's guidelines around, you know, what the

12  engagement teams need to prepare in advance of a PCAOB

13  inspection and how to get ready.

14  Q.  Let's go to the section titled "Advanced Preparation by

15  engagement team for Opening Meeting" at Page 58, and let me ask

16  you to read the first paragraph.

17  A.  "A significant input to the integrated audit inspection

18  process is obtaining information directly from the engagement

19  team to enable the Inspection Team to understand and evaluate

20  the various judgments the auditor applied during the integrated

21  audit.  To facilitate this process the engagement team is

22  expected to do the following."

23  Q.  What does that mean?

24  A.  It means that the inspectors are going to interact directly

25  with the engagement team in Q & A and questions, and the

1  engagement team should be prepared to answer those questions

2  and be familiar with the areas that they are going to ask

3  questions about.

4  Q.  And in your understanding, was it correct that a

5  significant input to the inspection process was those in-person

6  communications between the engagement team and the Inspection

7  Team?

8  A.  Yes.

9  Q.  Let me direct your attention to paragraph 2, beginning,

10  "The signing audit partner," and ask you to read that

11  paragraph, please?

12  A.  "The signing audit partner, and the other engagement team

13  members, as appropriate (example IT partners, tax partners,

14  etc.) should be prepared to lead a robust and detailed

15  discussion with the Inspection Team related to the matters

16  noted in the previous section.  This should include providing,

17  among other information, detailed insight into the critical

18  thinking and professional judgments applied by the engagement

19  team in understanding transaction flows and related controls,

20  assessing and reassessing risk at various stages of the

21  engagement, scoping, and evaluation of audit findings."

22  Q.  What does that mean?

23  A.  It's -- it basically says, you know, engagement team, bring

24  all your key members, make sure they're prepared to go through

25  the things in here, not only what is in the workpapers but how

1   you came up with your thoughts and the sort of the why.  You

2   get down under the covers a little bit in terms of the thought

3   process of the engagement team.

4   Q.  Let's check the next attachment at page 65 of the pdf,

5   please.

6        What is this?

7   A.  This is a slide deck -- a standard slide deck that my team

8   had prepared and was sent out to each engagement team so the

9   firm had a standard way to conduct an opening meeting with the

10  PCAOB and be responsive to the things that we just reviewed.

11  Q.  Why did your team provide this kind of standardized

12  PowerPoint for the engagement teams to prepare?

13  A.  To make sure they covered all the points the PCAOB wanted

14  them to cover.  Also, the PCAOB Inspection Team knew that no

15  matter which engagement -- no matter what KPMG team they met

16  with, they would be receiving the same information in the same

17  format.

18  Q.  Let's turn to the next attachment at page 100 of the pdf,

19  titled, "2016 PCAOB Inspection.  What should I expect?"

20        What is this?

21  A.  This is a slide deck that we used to communicate directly

22  with each engagement team.  After they had received a notice,

23  we would hold a conference call with -- not only with the

24  partner but their broader team.  Some people had been through

25  lots of inspections, some hadn't, or some hadn't in a while, so

1   it was a way to instruct those who had never been through it,

2   or to refresh the memory of those who had, about how an

3   inspection gets conducted from, you know, from notice all the

4   way to completion.

5   Q.  Let's turn to page 4 of this attachment.

6       Let me ask you to read the first three bullet points.

7   A.  "Inspections are designed to identify and address

8   weaknesses and deficiencies related to how KPMG conducts

9   audits.  PCAOB achieves its objectives, in part, through

10  detailed inspections of selected engagements.  The inspection

11  will focus on a portion of the audit work determined by the

12  inspectors."

13  Q.  What does that mean that the inspection will focus on a

14  portion of the audit work?

15  A.  An audit is lots of hours and lots of different things they

16  cover in a set of financial statements, and the PCAOB will pick

17  out usually three areas that they want to focus and they call

18  them focus areas.  So they are going to be the areas that are

19  going to be either most important to the financial statements

20  or the riskiest parts of the audit.

21  Q.  And let me ask you now to read the last bullet on that

22  page.

23  A.  "KPMG is not informed as to why your engagement was

24  selected."

25  Q.  Is that accurate, that the PCAOB informed KPMG why an

1  engagement had been selected for inspection?

2  A.  I don't recall them telling us ever why they were

3  inspected.

4  Q.  After an inspection team had been noticed for an inspection

5  and before the inspection actually began, what involvement did

6  the Inspections Group have with respect to that particular

7  inspection?

8  A.  So I would assign a member of my team, we called them

9  liaisons, so they would work between the engagement team and

10  the PCAOB.  First and foremost with respect to the engagement

11  team, they would talk to them about the logistics, make sure

12  that's all set.  And then they would actually go through a

13  review of the workpapers in the areas of focus that the PCAOB

14  had selected with the objective of trying to come up with the

15  types of questions that the PCAOB would have.  They would also

16  review the various data requests that the PCAOB had given them

17  to see that they were accurate and had been provided back to

18  the PCAOB, and so they would help them prepare the team and get

19  them refocused on their audit.

20  Q.  Let's go to page 6 of this PowerPoint.

21       And let me ask you to read the third bullet point.

22  A.  "Expect - Engagement group liaisons to perform a detailed

23  review of the workpapers in the focus areas -- expect questions

24  and challenges from the liaisons -- not an inspection (no

25  rating)."

1   Q.   Why did the inspection group liaison perform a detailed

2   review of the workpapers in the focus areas chosen by the PCAOB

3   before the PCAOB arrived for its inspection?

4   A.   The objective was to get the teams ready to give their

5   first best answer.  So, when they're asked a question from the

6   PCAOB, they would have given thought and they had reviewed the

7   workpapers, and they could give a really good answer.  And our

8   experience was that if the team was well prepared, it was able

9   to give a comprehensive, detailed answer to it, the chances of

10  a follow-up question or follow-up challenges by the inspectors

11  went down.  And if you didn't get follow-up questions, you

12  typically did not get a written comment from the PCAOB.

13  Q.   Let me direct your attention to the third bullet point from

14  the bottom and ask you to read that.

15  A.   "To prepare the engagement team to provide best first

16  answers to the PCAOB during the inspection."

17  Q.   What is a "best first answer"?

18  A.   Again, it's just being -- you know, having a well thought

19  out, detailed answer to a question that you know is going to

20  come and with the objective of not getting that follow up that

21  leads to a deficiency comment.

22  Q.   In your view, did providing a best first answer have the

23  ability to avoid a comment ultimately being issued?

24  A.   Yes.

25  Q.   Going to page 7 of the PowerPoint, let me ask you to read

1    the third and fourth bullet points.

2    A.  "Do – Inform your client (management and AC)," which is

3    Audit Committee," that your audit documentation is being

4    inspected.  Expect to provide your client with appropriate

5    updates in accordance with protocols customary for

6    communications with your client."

7    Q.  Why did the PowerPoint direct that an engagement team

8    should tell their client that audit documentation was being

9    inspected?

10   A.  Ultimately to avoid surprises, but I guess a couple of

11   other things.  One is we wanted to remind clients that one --

12   we wanted to inform them, one, to remind them that it was an

13   inspection of KPMG and not the company.  And if there were

14   questions that came up or deficiencies that were noted in the

15   audit, we wanted to make sure they knew that there was an

16   inspection going on and it wasn't a surprise later.  And,

17   finally, if there were deficiencies noted and comments written

18   and those comments rose to the level that the PCAOB believed

19   there was a significant deficiency in the audit, that was going

20   to require the involvement potentially of the client and two

21   things.  One would be to remediate any of the work.  We would

22   have to go back and do more work to fix what was deficient.

23   And then last is if it ended up in the public part of the

24   PCAOB's report, they would need to know because the Securities

25   and Exchange Commission would also get a copy of the report,

1    and they would also get a key code as to the fact that that

2    particular company's audit was in the PCAOB report.

3    Q.  Let's go to page 10 of the PowerPoint, and let me ask you

4    to read the first bullet point.

5    A.  "Opening meeting is the most important meeting of the

6    inspection."

7    Q.  Why is that?

8    A.  Just like, you know, trying to make a great first

9    impression.  With any group of people, or people or persons, if

10   the engagement team felt that -- the engagement team is

11   confident, it came across as they really knew what they were

12   doing and had control over the audit, our experience was that

13   the inspection went better.  And, again, the objective was try

14   to minimize or eliminate comments -- written comments from the

15   PCAOB.

16   Q.  So let's step away from the PowerPoint, then, and go back

17   to talk about the inspection process.

18           What happened sort of next after the opening meeting?

19   A.  During the week or weeks of the inspection, there would be

20   I'd say almost continuous meetings between members of the PCAOB

21   inspection staff and the engagement team where they would go

22   through specific questions that they had about the area of

23   focus, about the workpapers.  It could be as simple as

24   navigating to find things, or it could be really detailed about

25   how the engagement team addressed the specific risk.

1   Q.  What happened after the week or weeks were completed on the

2   groundwork?

3   A.  At the conclusion of their time of inspection, they would

4   hold a status meeting, and at that status meeting the PCAOB

5   inspectors would generally tell the team whether they believed

6   there was any written comments that would be forthcoming.

7   Q.  Beyond that communication to the individual engagement

8   team, did KPMG representatives communicate with the PCAOB as a

9   whole during the pendency of the inspection season?

10  A.  Yeah.  We would hold a monthly meeting.  I'm not sure that

11  it was held every single month, but there was something on the

12  calendar nearly every month to meet with -- the leadership of

13  the audits group at KPMG would meet with the leadership of the

14  inspection team tasked with inspecting KPMG.

15  Q.  Who attended those meetings on behalf of KPMG?

16  A.  Over time, I think the -- who attended changed based on a

17  number of different things, but certainly towards the end of my

18  tenure, the standing group would be David Middendorf, as the

19  head of the National Office; or Scott Marcello, as the Vice

20  Chair of Audit; myself, as the Head of Inspections or Quality

21  Measurement; George Hermann, who was the head of the Audit

22  Group; and an individual would represent -- who represented our

23  root cause analysis process would attend, and then depending on

24  the nature of the meeting, others would attend.  So, for

25  instance, if the agenda included banking topics, David Britt

1   and/or other financial services partners would attend.

2   Q.   What was the general topic at those meetings?

3   A.   It was always about inspections of the firm.  Typically,

4   the meeting with start with the PCAOB giving an update as to

5   where they stood in the inspection process, if they saw any

6   themes of issues that came up across a number of different

7   engagements.  And then we would also have topics -- they would

8   ask us sometimes to talk about topics that interested them.

9   And then as we were addressing quality control matters, we

10  would try to get back to them and let them know how we were

11  doing on particular deficiencies they had noted in the past.

12  Q.   During the course of the inspection season, did KPMG keep

13  track of inspection results as they came in?

14  A.   Yes.

15  Q.   How was this information shared with KPMG leadership?

16  A.   Every week I would send out a communication to leadership,

17  both in the audit practice and with the Chairman's office.

18  Q.   Did that include Mr. Middendorf?

19  A.   Yes, it did.

20  Q.   How closely did David Middendorf track inspection results?

21          MR. BOXER:   Objection.

22          THE COURT:   Sustained.

23  BY MS. MERMELSTEIN:

24  Q.   Did you have communications with Mr. Middendorf about

25  inspection results?

1  A.  I did.

2  Q.  And based on those conversations, what is your

3  understanding of how closely he tracked them?

4  A.  I would say he tracked them fairly closely.  You know, I

5  would certainly copy him as inspections come in sort of and on

6  a realtime basis as well as on a weekly basis as part of the

7  broader communication.

8  Q.  Let me show you what's been marked for identification as

9  Government Exhibit 1017, and if we can zoom in so it is a

10 little more readable.

11          Do you recognize that?

12 A.  I do.

13 Q.  What is it?

14 A.  This is an email that I sent out to David Middendorf and

15 certain direct reports of his and other leaders within the

16 audit practice about how the inspections were going.

17          MS. MERMELSTEIN:  The government offers Government

18 Exhibit 1017.

19          THE COURT:  1017 is received.

20          (Government's Exhibit 1017 received in evidence)

21 BY MS. MERMELSTEIN:

22 Q.  How frequently did an email of this type go out?

23 A.  Tried to send it out every week once the inspection cycle

24 got going.

25 Q.  And this email in particular was sent in April of 2016.

1  Where is that relative to when the inspection cycle gets going?

2  A.  Pretty early.  There would have been -- the PCAOB would

3  have done two inspections -- they usually try to do two in the

4  fall the prior year, and then they would have started noticing

5  inspections for 2016, let's say, in mid-March.  So, they would

6  have gotten a couple done by this point.

7  Q.  Let's look at the first attachment, called, "Audit Quality

8  Executive Dashboard."

9      Generally speaking, what are we looking at here?

10 A.  It was a way just on one page to just visually see how the

11 inspections were going.  Green was good.  Yellow is in process,

12 and red was a deficiency.

13 Q.  So zooming in on the top left-hand corner, "2016 PCAOB

14 Inspections as of April 11, 2016," what does this show?

15 A.  It says that five engagements had been inspected and we had

16 not received any comments.

17 Q.  And then looking in the top right corner, "Historical PCAOB

18 Inspection Engagement Results," what does this show?

19 A.  This is the bar graph saying, you know, how many

20 engagements got comments versus how many had not from 2012 to

21 2015.  And then on the 2016 line, it shows that same five that

22 were completed and that eight we had either gotten a notice and

23 hadn't been started, the inspection, or maybe it was in the

24 middle of the inspection.

25 Q.  For 2014, what does this show about the KPMG's PCAOB

1  inspection results?

2  A.  For 2014, that 62 percent of the engagements that were

3  inspected received at least one written comment.

4  Q.  OK.  Let's look at the bottom left corner, "Financial

5  Services Issuer Audits with ALL Comments."  What does this

6  refer to?

7  A.  So "ALL" is the allowance for loan and lease losses.  That

8  was an area of particular deficiency that we had in the prior

9  periods.  And as you can see from the 2015 cycle, half of the

10  engagements inspected received comments in that area, and so

11  because it was a particular interest both to the PCAOB and to

12  us, it was separately called out to track.

13  Q.  And what does this show about how at least inspections of

14  issuers with ALLL was going in 2016 relative to 2015?

15  A.  There was one engagement that had been inspected and it had

16  not received a comment -- one banking engagement audit

17  received -- one banking engagement was inspected.  It did not

18  receive a comment in the ALL area.

19  Q.  And then let's look at the last attachment.  Sorry, one --

20  there we go.  Thank you, Mr. Cooney.

21       What is this PCAOB Comment Summary Form?

22  A.  This -- I guess with respect to this report, there hadn't

23  been any comments received so there was nothing here.  But

24  if -- for each written comment that we got, we had a running

25  list of who it was and what the -- you know, how many elements

1    it had, who the partners were, and a little bit of information

2    around specifically what the comment was about.

3    Q.  After the PCAOB completed the entirety of its inspections

4    of individual audits, how did KPMG -- excuse me, of KPMG, how

5    did the PCAOB report its findings?

6           MS. MERMELSTEIN:  You can take that down, Mr. Cooney.

7    Thank you.

8    A.  It issues a report.

9    Q.  How many parts does that report have?

10   A.  It has two parts.  Part I is the public part of the report.

11   Part II is the private part of the report.

12   Q.  And what is included in Part I?

13   A.  It's a summary of all of the engagements that they felt I

14   would say, for lack of a better word, failed audits, that did

15   not meet the standards that were significantly deficient, and

16   it listed each engagement and what the comments were, but it

17   didn't tell the name of the company; it gave it a letter, A, B,

18   C, D.

19   Q.  And what is in Part II of the report?

20   A.  Part II is all their comments about the firm's systems of

21   quality control that they felt were deficient.

22   Q.  What is a system of quality control?

23   A.  It's the overall controls that the firm has around its

24   audit practice.  So, it would include things, as I mentioned

25   earlier, like internal inspections, but other things like

1    training and performance evaluations and guidance that we issue

2    as well as a number of other matters that you could think about

3    how you control any organization.

4    Q.  Is Part II made public?

5    A.  Not initially.  Part II is only made public if the firm

6    fails to sufficiently move, you know, progressing against the

7    deficiency within a year after that issued that report.

8    Q.  Is there anyone who receives the complete report, both Part

9    I and Part II, at the time that it is issued?

10   A.  The firm receives it and I understand the Securities and

11   Exchange receives the full report.

12   Q.  What is the Securities and Exchange Commission?

13   A.  It's a federal government agency that regulates the

14   financial markets, but in particular from where I sat it

15   regulated the accounting profession and audit firms directly

16   and through the PCAOB.

17   Q.  Does the SEC receive the identity of the particular audits

18   that are listed in Part I?

19   A.  Yes, they do.

20   Q.  Did KPMG notify its clients that they were going to be

21   included in Part I of the report?

22   A.  Yes, we did.

23   Q.  Why?

24   A.  Because of the fact that the SEC would get the key code to

25   who issuer A, B, C would be and they would know who it was, and

1  there were occasions when the SEC would follow up with their

2  own letters to that particular company.

3  Q.  Let me direct your attention to Government Exhibit 925, for

4  identification.

5       Do you recognize that as an email you received?

6  A.  Yes.

7       MS. MERMELSTEIN:  The government office Government

8  Exhibit 925.

9       THE COURT:  925 is received.

10      (Government's Exhibit 925 received in evidence)

11 BY MS. MERMELSTEIN:

12 Q.  So, who is sending this email?

13      MR. BOXER:  Can we see the portion that is not

14 highlighted on the email?

15      MS. MERMELSTEIN:  Of course.

16      MR. WEDDLE:  Your Honor, we object to this.

17      MR. BOXER:  I have no objection to the very top

18 portion of the document, but the below portion is hearsay and I

19 object to it.

20      MS. MERMELSTEIN:  It is not being offered for its

21 truth, your Honor.

22      MR. BOXER:  What else could it be offered for?  It is

23 a lengthy speech and statement and --

24      MS. MERMELSTEIN:  Perhaps we should approach, your

25 Honor.

1        THE COURT:  Give me a second.

2        (Pause)

3        The document is received.  I am just going to instruct

4   the jury that this document is admitted not for the purpose of

5   the truth in the content of the email but insofar as it may be

6   relevant to the fact that it was received by any particular

7   recipients and insofar as that could be relevant to their

8   knowledge or state of mind.

9        MS. MERMELSTEIN:  Thank you, your Honor.

10        THE COURT:  925 received.

11        MS. MERMELSTEIN:  Can we publish that, Mr. Cooney.

12   BY MS. MERMELSTEIN:

13   Q.  Addressing your attention to the top of the page, who is

14   that email from?

15   A.  Robert Wade.

16   Q.  And who are the recipients in the "To" line?

17   A.  Scott Marcello, John Ebner, David Middendorf.

18   Q.  We won't go through them all, but are you one of the

19   recipients in the cc line?

20   A.  Yes.  I am the first one.

21   Q.  Let me direct your attention to the title, "SEC's White:

22   Too Many Auditors Not Following U.S. Securities Laws."

23        First of all, who was Mary Jo White at this point in

24   time?

25   A.  I believe she was the Chair of the Securities and Exchange

1    Commission.

2    Q.  And if we can zoom down to the main portion of the email.

3          Let met me ask you to read the first three paragraphs.

4    A.  "The U.S. Securities and Exchange Commission is concerned

5    that financial auditors are not living up to the requirements

6    of the securities laws, chair Mary Jo White told a meeting of

7    Certified Public Accountants on Wednesday.

8          "'in The worrisome column, we still observe too many

9    instances where companies and their auditors have not

10   discharged their responsibilities adequately under the

11   securities laws and professional standards,' White said at the

12   National Conference of the American Institute of CPAs.

13         "She said recent inspections by the Public Company

14   Accounting Oversight Board had found 'significant deficiencies'

15   in assessing and responding to risks of misstatement, auditing

16   accounting estimates, and the work performed by some firms in

17   cross-border audits."

18   Q.  And then let me ask you to just read the third paragraph

19   from the bottom, beginning "Earlier this month."

20   A.  "Earlier this month, audit firm Grant Thornton LLP and two

21   of its partners agreed to settle SEC charges that they ignored

22   red flags and fraud risks at two publicly traded companies."

23   Q.  Were you aware that the SEC can bring actions against audit

24   firms on the basis that they had ignored red flags?

25   A.  Yes.

1          MS. MERMELSTEIN:  Let's take that down.  Thank you,

2    Mr. Cooney.

3    Q.  Were inspection results important to KPMG?

4    A.  Yes.

5    Q.  Why?

6    A.  The PCAOB was our -- was the audit practice's major

7    regulator, and so they came in and had the ability to conduct

8    inspections, so we wanted those to go well.  There was -- there

9    is a cost to the firm to remediate deficiencies, specifically

10   those related to Part II, the system of quality control

11   matters.  Lots of time, effort, money needs to be directed

12   towards those.  We also recognized, or certainly I recognized

13   that the SEC oversights the PCAOB, and they are another

14   regulator that has oversight.

15         MR. BOXER:  Objection.

16         MS. MERMELSTEIN:  I think he is literally answering

17   why it mattered to the KPMG was the question.

18         THE COURT:  Overruled.

19   BY MS. MERMELSTEIN:

20   Q.  Sorry.  I think you were saying something about the SEC.

21   A.  The SEC is also a regulator.  It oversees the firm and the

22   profession, and they would look at those results.  We're also

23   concerned because clients and prospective clients may also look

24   at the firm's results and may make decisions about their

25   auditors based on those inspection results.

1  Q.  Were inspection results, beyond the report itself being

2  available, were they reported on in the press?

3  A.  Yes.  I know for sure they always appeared in the Wall

4  Street Journal, and I'm sure they appeared in other papers as

5  well.

6  Q.  Was it important to KPMG that the PCAOB be satisfied with

7  performance on inspections?

8  A.  Yes.

9  Q.  Was it important to KPMG that the SEC be satisfied with its

10 performance on inspections?

11          MR. BOXER:  Objection.

12          THE COURT:  Overruled.

13 A.  Yes.

14 Q.  And was it important to KPMG that its clients be satisfied

15 with its performance on inspections?

16 A.  I believe so, yes.

17 Q.  I want to turn your attention now to 2014, and to the time

18 when you first fully assumed leadership of the Inspections

19 Group.

20          What were KPMG's inspection results like at that time?

21 A.  They were poor.  They were poor relative to our historic

22 inspections, and they were poor relative to our peer group, the

23 other Big Four accounting firms.

24 Q.  I want to turn your attention to December of 2014 in

25 particular.

1    Did you attend a PCAOB board meeting at that time?

2  A.  I did.

3  Q.  Who else attended from KPMG that you can remember?

4  A.  John Veihmeyer, who was the Chairman of the firm at the

5  time; Scott Ozanus, who was the Deputy Chairman at the time;

6  Sven Holmes, the Vice Chair of Legal Risk and Regulatory; Jim

7  Liddy, the Vice Chair of Audit; David Middendorf, the head of

8  Audit Quality and Professional Practice; and myself as in

9  charge of inspections.

10 Q.  Who attended that you can recall from the PCAOB?

11 A.  The PCAOB board members and their staffs, Helen Munter, who

12 headed up inspections for the PCAOB; Steve Schindler, who

13 oversaw our U.S. inspections; and Paul Bijou, who oversaw I

14 guess KPMG's inspections for the PCAOB globally.

15 Q.  Where did that meeting take place?

16 A.  At the PCAOB's offices in Washington, D.C.

17 Q.  What was the tone of that meeting?

18 A.  The tone started off after some pleasant hellos as sort of

19 what I would call sort of a punch in the gut by the PCAOB when

20 one of the board members stated that he believed that the firm

21 had a tone at the top issue, in other words, that the firm

22 didn't -- the firm had bad inspection results and we didn't --

23 we weren't taking their comments seriously enough and, you

24 know, we were not being responsive to the PCAOB.

25 Q.  Beyond that initial reference to the tone at the top, what

1   else was discussed at that meeting?

2   A.  They went through a list of deficiencies that the firm had.

3   So in my area, for inspections, they criticized the efficacy of

4   our internal inspection process, that it wasn't up to speed,

5   that we -- there was too big a disparity between the rate of

6   failure that the PCAOB found and the rate of failure that my

7   internal inspection team found.  They were very critical of our

8   work in banking.  Banking was, you know, a fairly large part of

9   our portfolio.  And we had been -- had high failure rates in

10  the allowance for loan loss areas, and that in particular was a

11  hot topic for them.

12  Q.  When you say there was too big of a discrepancy between

13  internal and external inspection results, what does that mean?

14  A.  In other words, that means that there was a percentage of

15  failure that they identified or deficiencies that they

16  identified versus what we called an unsatisfactory engagement,

17  and that percentage difference was -- had a big -- had a wide

18  difference that really couldn't be explained in terms of how

19  you made the selections.

20  Q.  In other words, the PCAOB inspection process was finding

21  more problems than the internal inspection process?

22  A.  Yes.  To be clear, yes, they were finding far more problems

23  than we were.

24  Q.  How seriously did KPMG take the concerns expressed by the

25  PCAOB?

1    A.  From my perspective, very seriously.  We changed --

2              MR. BOXER:  Objection.  Nonresponsive.

3              THE COURT:  Sustained.

4              Next question.

5    BY MS. MERMELSTEIN:

6    Q.  What did KPMG do in response to the criticisms from the

7    PCAOB?

8    A.  We made changes to personnel in the National Office and

9    significantly increased the number of individuals working in

10   the National Office in lots of areas.  We upped our game in

11   terms of the types of monitoring programs and other quality

12   programs we put in place across the board.  We went back and

13   reevaluated our training.  We changed the timing of when

14   engagement team were asked to start their planning.  I

15   increased the number of folks and reevaluated the way we did

16   internal inspections.  We added a more robust root cause

17   process, to name a few.

18   Q.  What, if any, action did KPMG take with respect to

19   personnel?

20   A.  We significantly increased the size of the National Office

21   and the folks that were working on the top issues.

22   Q.  How did you significantly increase the size of the National

23   Office?

24   A.  I can't speak for all of the National Office, but

25   particularly in my area in inspections, we brought in people

 1   from the field offices to be both permanent partners in the

 2   internal inspections as well as we started a process to try to

 3   hire more folks from the outside, and we also increased the

 4   number of folks permanently involved in supporting PCAOB

 5   inspections as well.

 6   Q.   Who participated in the effort to hire I think you said

 7   more folks from the outside?

 8   A.   It was directed by me, and then depending on whether it was

 9   the internal inspection or the external inspection group, I

10   involved some of the other partners in my group as well.

11   Q.   Did anyone above you in the National Office participate in

12   that effort?

13   A.   Yes.   Certainly getting approval to make the hires was

14   approved by at the time both Jim Liddy and David Middendorf.

15   Q.   How did you go about identifying potential candidates?

16   A.   From internal sources, they were -- they were evaluated and

17   brought forward by the business unit, so we sort of knew who

18   they were.   From the outside, we had hired one individual from

19   the PCAOB, Scott Henderson, so we asked him for some input on

20   folks that he thought might be a good addition to the firm.

21   And we also knew a number of the PCAOB inspectors, having

22   worked with them over the years, and we made our own list of

23   folks that we thought would be, again, good additions to our

24   team to address the significant deficiencies that we were

25   approaching.

1   Q.  Did there come a time that you identified a particular

2   candidate from the PCAOB that you were interested in hiring?

3   A.  Yes.  As I said, the allowance for loan losses is a banking

4   issue, and one of the -- one of the folks from the PCAOB who we

5   thought could be a good addition was Brian Sweet.

6   Q.  Why did you think Brian Sweet could be a good addition?

7   A.  He wrote a lot of comments.  He understood our -- he

8   understood the failures that the firm had, the deficiencies we

9   had.  He understood our processes.  He was part of their

10  leadership team.  He had a banking background not only at the

11  PCAOB but in his previous employer.  And he was young enough,

12  he had a long enough runway; we thought he would be somebody

13  who could be a longterm player at the firm.

14  Q.  How did KPMG approach Mr. Sweet?

15  A.  Originally, we used an outside headhunting firm, an

16  individual, to approach Mr. Sweet on a no-name basis, in other

17  words, just to sort of feel him out as to whether he was even

18  interested in leaving the PCAOB.  And it was because we were in

19  the middle of the inspection process, we didn't want to taint

20  his ability to continue to inspect the firm, so we proceeded

21  cautiously by using an outside person.

22  Q.  What do you mean by "a no-name basis"?

23  A.  The objective was to say, hey, there's a large firm that's

24  interested in making some hires at the partner level.  Would

25  you be interested in leaving the PCAOB?

1  Q.  Why did proceeding on a no-name basis prevent there being

2  any taint on his ability to continue to inspect the firm?

3  A.  My understanding is once an individual from the PCAOB gets

4  into a certain level of negotiation with a firm on employment,

5  they need to recuse themself from other -- from working with

6  that firm as an inspector.

7  Q.  Was Sweet initially interested?

8  A.  No.  He turned the -- he turned us down or turned the --

9  turned down the opportunity to leave the PCAOB.

10 Q.  Did there come a time that Sweet's interest changed?

11 A.  Yes.

12 Q.  Did there come a time he had an interview with the KPMG?

13 A.  Yes.

14 Q.  And who did he interview with?

15 A.  I don't recall who, everyone he interviewed with, but he --

16 as a requirement, he would have interviewed with the Vice Chair

17 of Audit who at the time was Jim Liddy, and at least one KPMG

18 board member, who was Scott Marcello, and then other members --

19 other partners in leadership as required by our forms.

20 Q.  Did that include Mr. Middendorf and Mr. Britt?

21 A.  I believe both interviewed or had discussions with

22 Mr. Sweet.

23 Q.  And did you interview Mr. Sweet?

24 A.  I did speak to him on a number of occasions.  I was his

25 sponsoring partner, so I don't think it technically counted as

1    an interview.

2    Q.   Did there come a time that Mr. Sweet was hired?

3    A.   Yes.

4    Q.   Let me show you Government Exhibit 750, for identification.

5         What are the procedural steps necessary to bring on a

6    partner?

7    A.   There is a number of steps, including, as mentioned,

8    interviews by different firm leadership, a discussion with our

9    Office of General Counsel to understand if there are certain

10   restrictions an individual has with respect to joining the

11   firm, and there is also a process to notify the board.  The

12   firm reviews a memo that's prepared that describes why we need

13   to hire an outside person to becomes a partner with the

14   business cases, etc., and their qualifications.  And then they

15   take a vote, and there is notice sent out to the partnership as

16   to whether there is any objections to that individual becoming

17   a KPMG partner.

18   Q.   So directing your attention back to Government Exhibit 750,

19   for identification, do you recognize that document?

20   A.   Yes.

21   Q.   Did you participate in drafting this document?

22   A.   This -- this notification gets sent out by the Chairman's

23   office, not but me.

24   Q.   I apologize.  Let's go to the second page, to the

25   attachment.

1    Do you recognize that?

2    A.  Yes.

3    Q.  What is that?

4    A.  It is a document that -- a memorandum that summarizes

5    Mr. Sweet's qualifications, the business case as to why he

6    should be a partner, some logistics, who he reports to, etc.

7    Q.  And did you participate in drafting this memo?

8    A.  I did.

9    MS. MERMELSTEIN:  The government offers Government

10    Exhibit 750.

11    THE COURT:  750 is received.

12    (Government's Exhibit 7507 received in evidence)

13    BY MS. MERMELSTEIN:

14    Q.  Let me direct your attention to the section -- I think it

15    is the next page, Mr. Cooney -- one more -- sorry.  Let's go

16    back to the beginning.  And look at the section titled

17    "Practice Needs and Responsibilities of the Role."  There we

18    go.

19    Can you read the full -- the first full third

20    paragraph.

21    So, please zoom in on the third paragraph.  Thank you.

22    A.  "As a result of the size of the firm's financial services

23    audit practice, bank audit engagements are selected for

24    inspection each year by the PCAOB.  A large number of those

25    engagements have received written comments related to the

1   auditing of the allowance for loan and lease losses (ALLL),

2   among other matters, in the last several years, and those bank

3   engagements have appeared in the public portion of the PCAOB's

4   report on the firm.  Improving the quality of our audits of

5   banks, and in particular the ALLL, is an area of significant

6   effort for the firm.  We believe that Brian's addition to the

7   Inspections Group will assist us in identifying and addressing

8   existing and emerging challenges in the audit of banks by

9   leveraging his extensive industry experience and knowledge as a

10  former inspector of KPMG.  Brian will also be involved in the

11  firm's ALLL realtime monitoring program (in-flight review

12  program) designed, in part, to assist engagement teams in the

13  execution of high quality audits of the ALLL."

14  Q.  What is the "in-flight review program"?

15  A.  It's a -- as compared to my inspections, my inspections

16  occur afterwards.  These are programs designed to help teams

17  while they are actually conducting an audit.  So, they're in

18  the process of doing the audits.

19  Q.  And during what period of the audit itself does an

20  in-flight review program operate?

21  A.  They vary.  They vary anywhere from planning to completion,

22  depending on the program.

23  Q.  And what does "completion" mean?

24  A.  When the audit report gets signed and released to -- as

25  part of the filing of the financial statements with the SEC by

1   the client.

2   Q.  Was Brian Sweet ultimately hired as a partner?

3   A.  He was.

4   Q.  When, approximately, did he start?

5   A.  First week in May of 2015.

6          MS. MERMELSTEIN:  Your Honor, I think this is a

7   logical breaking point, if people are ready for a mid-morning

8   break.

9          THE COURT:  Sure.  Why don't we take ten minutes,

10  folks.  Please leave your pads on your chairs and we'll take a

11  ten-minute break and then continue.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  You can step down, sir.

 3              (Witness not present)

 4              THE COURT:  Anything we need to address before the

 5   break?

 6              MS. MERMELSTEIN:  No, your Honor.

 7              THE COURT:  I'll see you in ten minutes.

 8              (Recess)

 9              THE COURT:  Should we bring in the witness?

10              MS. KRAMER:  Yes.  Thank you, your Honor.

11              THE COURT:  All right.

12              (Witness present)

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Jury present)

 2              THE COURT:  You may be seated.

 3              Welcome back, folks.

 4              And, Ms. Mermelstein, you may proceed.

 5              MS. MERMELSTEIN:  Thank you, your Honor.

 6   BY MS. MERMELSTEIN:

 7   Q.  Mr. Whittle, when we broke we were just talking about

 8   Mr. Sweet having been hired by KPMG.  What, if anything, was

 9   done to welcome Mr. Sweet to the firm in his first week?

10   A.  All new employees attend a national training in the office,

11   get their computers or badges, whatever, and they usually ask

12   the sponsoring person -- partner, in my case -- to arrange the

13   lunch his the first day, and I did that although I did not

14   attend that lunch.

15   Q.  Why didn't you attend?

16   A.  I was traveling.

17   Q.  Did you come to have lunch with Mr. Sweet in his first

18   week?

19   A.  I did.

20   Q.  Approximately when was that?

21   A.  I believe it was the Thursday of that first week.

22   Q.  Did anyone else attend?

23   A.  George Hermann and John Mucha.

24   Q.  In general terms, what was the nature of the discussion at

25   lunch?
```

1    A.  First, it was a way to get to know Mr. Sweet.  I worked

2    with him as an inspector but, you know, get to know him a

3    little more on a personal level.  And the rest of the

4    discussion was, you know, sort of shop talk about what was

5    going on on the inspection -- in the inspection world and our

6    interactions with the PCAOB.

7    Q.  In May of 2015, when Mr. Sweet started, where in the

8    inspection process was KPMG?

9    A.  The bulk the inspections were -- I should say, with respect

10   to them, we would have started getting notices for inspections

11   in, say, mid-March, so we would have been -- inspections would

12   be going on in the end of March and the month of April.  We

13   also would have received the notice of where -- the calendar of

14   the cities that we discussed earlier.

15   Q.  So fair to say you had received some inspection

16   notifications but not all of them?

17   A.  That's correct.

18   Q.  Did there come a time the day of that lunch that you went

19   to Mr. Sweet's office?

20   A.  Yes.

21   Q.  What, if anything, did you discuss?

22   A.  I discussed -- I was checking in.  He had a lot of required

23   firm training to do that day so it was a matter of checking in

24   and seeing how he was doing on that, and, you know, because he

25   is part of the Inspections Group and so his -- the topic to

1  move on to the inspections and where we were in the inspection

2  cycle.

3  Q.  What, if anything, did you discuss about the upcoming

4  inspection cycle?

5  A.  A couple of things.  One, confirmed that one of the -- one

6  of the engagements on the -- the inspection schedule, we had

7  suspected that it was the Wells Fargo engagement, and he

8  confirmed in fact Wells Fargo was going to be inspected.  And

9  in the course of that discussion, you know, one of the

10 challenges that people always wanted to know is whether they

11 were going to be inspected and they would always ask me whether

12 they were going to be inspected.  And in the course of my

13 discussion with him, he indicated that, you know, of course I

14 know who all the inspections are going to be.  And I responded

15 that, you know, I would expect so; you were on the part of a

16 leadership team at the PCAOB that made these selections.

17 Q.  What else did you discuss about his knowledge of who would

18 be inspected?

19 A.  In addition to that discussion, he indicated that he can

20 provide -- he can provide a list of the inspections that the

21 PCAOB was going to conduct, and asked me if I wanted to know

22 who they all were in addition to confirming Wells Fargo.

23 Q.  How did you react to being offered that information?

24 A.  I wasn't initially surprised that he knew, but once he

25 offered it, I indicated that before I got it from him, I wanted

1    to check with my boss, Dave Middendorf.

2    Q.  Did you understand that the information being offered was

3    confidential PCAOB information?

4    A.  Yes.

5    Q.  Did you understand it to belong to Mr. Sweet or to the

6    PCAOB?

7    A.  It was the PCAOB's.

8    Q.  What was your understanding about whether Sweet was

9    permitted to share it with you?

10             MR. BOXER:  Objection.

11             THE COURT:  Overruled.

12   A.  He was not permitted based on my understanding of the way

13   things are conducted.  We had never been notified early of

14   inspections before so that would have certainly been out of the

15   ordinary, and he was limited in the things that he could

16   provide to the firm about things that he worked on at the

17   PCAOB.

18             (Continued on next page)

19

20

21

22

23

24

25

1  Q.  In your understanding, what precluded him from sharing

2  things with the firm that he had worked on at the PCAOB?

3  A.  It was some sort of ethics policy or some other policy he

4  needed to conform with as a former PCAOB staff member.

5  Q.  Did you understand it was wrong for Sweet to be offering up

6  the information?

7  A.  Yes.

8          MR. BOXER:  Objection.

9          THE COURT:  Overruled.

10  Q.  You said you indicated to Mr. Sweet you wanted to talk to

11  Mr. Middendorf.  Why was that?

12  A.  This was unusual, to be offered a list of inspection

13  selections before they were noticed.  I certainly didn't want

14  to get information I thought was wrong and then have my boss

15  tell me that I shouldn't have gotten it.

16  Q.  Did you in fact speak to Mr. Middendorf about Sweet's offer

17  to provide the list?

18  A.  I did.

19  Q.  What did you tell him?

20  A.  That Brian had offered to give us the list of inspections.

21  At the time I thought they were just the banking inspections

22  that were selected.

23  Q.  How did Mr. Middendorf respond?

24  A.  He responded that I should go ahead and get that list.

25  Q.  What did you do after Mr. Middendorf told you to get the

list?

A.  I sent an email to Mr. Sweet, asked him to give the list to

my admin assistant to have her scan it in and send it to me.

Q.  Let me direct your attention to Government Exhibit 753 in

evidence.  Let's start at the second page, please.  Directing

your attention to the bottom of the page, to the May 8th email

from you to Brian Sweet, could you read the first line of the

email, please.

A.  "Brian, could you have Lisa scan and send me the banking

selection list.  Thanks.  Tom."

Q.  If we can go up one email in the chain, how does Mr. Sweet

respond in the first paragraph of the email?

A.  "Tom, just to clarify, are you referring to the expected

PCAOB banking selections?  If so, I can email you something

that may be easier to use rather than a scanned version."

Q.  If we can scroll up again and go to the first page at the

bottom, how do you respond to Mr. Sweet?

A.  "Yes, the selection list.  Thanks."

Q.  If we can scroll up one more.  How does he respond?

A.  "Lisa should have sent it to you, so please let me know if

you haven't yet received the document.  Just so you know, it's

actually the full list of anticipated inspections, including

nonbanks.  I'd appreciate the team's discretion to make sure it

isn't too widely disseminated.  To the extent you think it

would help me to spend some time with the individual engagement

1   teams to provide some additional info on what the PCAOB's

2   planning considerations were as part of their preparation once

3   they are notified, please let me know.  So far it seems those

4   discussions have been very appreciated by Tom Garton, Mark

5   Niswonger, and Mike Flynn."

6   Q.  First, what did you understand Sweet to mean when he said

7   he would appreciate the team's discretion to make sure it isn't

8   too widely disseminated?

9   A.  My understanding is that he knew it was confidential PCAOB

10  information and he certainly wouldn't want others to know that

11  he had provided it to the firm.

12  Q.  What did you understand him to mean by "additional info on

13  what the PCAOB's planning considerations were as part of their

14  preparation"?

15  A.  In the course of my discussions with him, he also indicated

16  that he knew why certain engagements were selected.  That's

17  what he is referring to here.  I'd given him the okay to go and

18  talk to those engagement teams and let them know why.  Again,

19  it comes back to being well prepared for the PCAOB --

20          MR. BOXER:  Objection.

21          THE COURT:  Sustained.

22  Q.  When you said that he told you he had this information

23  about why things had been inspected, did you understand that

24  information about why the engagement had been selected was

25  confidential PCAOB information?

1    A.   Yes.  I understood that to be confidential.

2    Q.   Why was that information helpful to an engagement team?

3    A.   Again, in order to provide their first best answer to a

4    question from the PCAOB, if they knew why it was selected,

5    there might be a particular type of transaction or an event

6    that caught the PCAOB's attention in making that selection, and

7    that would be part of the reason they are focused on that

8    engagement or within that engagement.

9    Q.   How did Mr. Sweet come to speak to Tom Garton, Mark

10   Niswonger, and Mike Flynn about reason for selection?

11           MR. BOXER:  Objection.

12           THE COURT:  Sustained as to foundation.

13   Q.   Did you have any conversations with Mr. Sweet about him

14   speaking to engagement teams to share with them the reason they

15   had been selected?

16   A.   Could you repeat the question, please.

17   Q.   Yes.  I'm sorry.  What, if any, involvement did you have

18   personally in Mr. Sweet's going to speak to the individuals

19   listed on this email to share with them the reason they had

20   been selected?

21   A.   I introduced Mr. Sweet to those individuals and asked him

22   to provide whatever insights he had about the selection.

23   Q.   Did you tell anyone else besides the three individuals

24   listed here that Sweet was sharing with engagement teams the

25   reason that the PCAOB had selected their engagement for

1   inspection?

2   A.   Yes.   I shared that with David Middendorf.

3   Q.   Then, if we can go up to the top of the email chain, let me

4   ask you to read the first sentence of your response.

5   A.   "Got it and understand the sensitivity.   Have a safe flight

6   and great weekend."

7   Q.   What did you mean when you said you understand the

8   sensitivity?

9   A.   I understood that to be the PCAOB's confidential

10   information.

11   Q.   Did Sweet in fact have Lisa Dragonetti send you the list?

12   A.   Yes.

13   Q.   Showing you Government Exhibit 754 for identification and

14   the attachment 754A, which is already in evidence, do you

15   recognize those?

16   A.   Yes.

17   Q.   What is this?

18   A.   This is the inspection list that I received from Brian

19   Sweet through my admin assistant.

20         MS. MERMELSTEIN:   The government offers Government

21   Exhibit 754.

22         THE COURT:   Received.

23         (Government's Exhibit 754 received in evidence)

24   Q.   Directing your attention to the bottom of that page, the

25   email from Lisa Dragonetti to you, subject "from Brian Sweet,"

1   what was attached to that email?

2   A.   The inspection list.

3   Q.   If we look at the top, what did you do with the inspection

4   list?

5   A.   I forwarded it to David Middendorf.

6   Q.   What did you say to him?

7   A.   "The complete list, obviously very sensitive.  We will not

8   be broadcasting this.

9   Q.   Why did you send it to Mr. Middendorf?

10   A.   He had requested to obtain it from Mr. Sweet.

11   Q.   Let's take a look at the attachment.

12          MS. MERMELSTEIN:  If we can turn that around, Mr.

13   Cooney, so it is easier to read.

14   Q.   What is indicated in the first column of this document?

15   A.   The start week of the inspection.

16   Q.   It is a little grainy, but what is indicated in the second

17   column?

18   A.   The issuer or otherwise the name of the company that we

19   audited.

20   Q.   What about in the fourth column?

21   A.   The focus areas.

22   Q.   When in the ordinary course of an inspection cycle does

23   KPMG receive the focus areas for a particular inspection?

24   A.   At the date of notification or shortly thereafter.

25          MS. MERMELSTEIN:  Let's take that down, please.

 1    Q.   Other than sending that to Mr. Middendorf, did you send

 2    that list to anyone else?

 3    A.   Yes.

 4    Q.   Who?

 5    A.   William O'Leary.

 6    Q.   Who is William O'Leary?

 7    A.   He is an executive director on my team who is I'll say the

 8    administrator of our internal inspection process.

 9    Q.   Showing you Government Exhibit 755 for identification, do

10    you recognize that?

11    A.   Yes.

12    Q.   What is it?

13    A.   My email correspondence with Mr. O'Leary.

14              MS. MERMELSTEIN:   The government offers Government

15    Exhibit 755.

16              THE COURT:   Received.

17              (Government's Exhibit 755 received in evidence)

18    Q.   Let me ask you, Mr. Whittle, to read the email from Mr.

19    O'Leary to you at the top of that chain.

20    A.   "Tom, attached is the analysis you requested for the

21    engagements on the schedule you received from Brian Sweet.  Let

22    me know if you have any follow-up questions."

23    Q.   Why did you request the analysis Mr. O'Leary is sending?

24    A.   To compare the PCAOB selection list to our internal

25    inspection list.

1    Q.   Why did you want to do that?

2    A.   To determine if I wanted to make any changes to either the

3    timing or the selections made for internal inspections.

4    Q.   Why would the list provided by Sweet cause you to make any

5    changes to your timing or selections of internal inspections?

6    A.   As I noted before, the PCAOB would come in and do

7    re-reviews of our own inspections to see if they came to the

8    same conclusion.  If there was a particular selection on our

9    list that was on their list that I felt was risky, I could

10   change our internal inspections and avoid them picking one that

11   might cause us to have a problem not only for the engagement

12   team and that particular engagement but also be noted as a

13   deficiency in our internal inspection process.

14   Q.   Based on the analysis that was provided, do you remember if

15   you ultimately made any changes to the internal selection plan?

16   A.   I don't believe I made any changes ultimately to the plan.

17   Q.   Was the information contained in the 2015 list used in any

18   other way?

19   A.   Yes, with respect to the Wells Fargo engagement.

20   Q.   What was done with respect to the Wells Fargo engagement?

21   A.   We moved up the timing of the support that we provided to

22   the Wells Fargo engagement team in getting them prepared for

23   inspection.

24   Q.   What does it mean that you moved up the timing of the

25   support that you provided to get them prepared for inspection?

1    A.  Typically, we would not assign a liaison to do the

2    workpaper review and other work with the team until we got the

3    notice from the PCAOB.  In the case of Wells Fargo, because we

4    had confirmed that it was in fact going to be inspected, we

5    moved that preparation time up several weeks or months before.

6    Q.  I think you just said that you suspected that Wells Fargo

7    was going to be inspected.

8            MR. BOXER:  Objection.  His testimony should stand,

9    your Honor.

10           MS. MERMELSTEIN:  I'm trying to orient the witness to

11   the follow-up question, your Honor.

12           THE COURT:  The transcript says, "In the case of Wells

13   Fargo, because we had confirmed that it was in fact going to be

14   inspected."

15           MS. MERMELSTEIN:  Yes.

16   Q.  Prior to confirming that it was going to be inspected, did

17   you suspect it was going to be inspected?

18   A.  We did.

19           MR. BOXER:  Objection overruled.

20   Q.  Why not put resources towards it based on the suspicion was

21   going to be inspected, why wait for confirmation?

22   A.  We had limited resources to provide to teams.  If we

23   started making a habit of every time suspect there was going to

24   be an inspection, engagements would say can you move my prep

25   time up, I want more time to prepare.  We just didn't have the

1    resources to continue to do that.

2    Q.   Who was assigned to provide the initial resources to the

3    Wells Fargo team?

4    A.   Brian Sweet and John Broderick, who was another partner in

5    MyPCAOB inspection team.

6    Q.   Who assigned them to spend more time with the Wells Fargo

7    team?

8    A.   I did.

9    Q.   Who, if anyone, at KPMG did you discuss the fact that these

10   additional resources were being assigned to Wells Fargo?

11   A.   With David Middendorf.

12   Q.   At the time that Sweet and Broderick were assigned to look

13   at Wells Fargo, where in its audit was Wells Fargo?

14   A.   The audit was complete and the workpapers were in the

15   electronic file room.

16   Q.   Given that the workpapers were complete and in the

17   electronic file, what could be done at that point that would

18   help with the inspection by Sweet and Broderick?

19   A.   Just simply having more time to consider the questions.

20   Wells Fargo is a very large, many thousands of hours of work.

21   This was an opportunity to get a headstart on reviewing the

22   workpapers and identifying questions that the PCAOB might ask.

23   Q.   Leaving aside for a moment the sharing of the list, were

24   there other instances in which Sweet shared other kinds of

25   confidential PCAOB information?

1  A.  Yes.

2  Q.  Generally speaking, what was the nature of that

3  information?

4  A.  It was information he gleaned or received from his

5  interactions with current PCAOB staff members.

6  Q.  What, if any, direction did you give Sweet with respect to

7  keeping in touch with his PCAOB colleagues?

8  A.  I encouraged him to keep in touch with those colleagues.

9  Q.  When Sweet shared the information he gleaned or learned

10  from his former PCAOB colleagues with you, did you share it

11  with anyone else?

12  A.  Yes, with David Middendorf.

13  Q.  How did you react when Sweet shared the information he had

14  gleaned from his PCAOB colleagues with you?

15  A.  I was always pleased that we had received some information

16  and certainly encouraged him to continue to find out what he

17  could.

18  Q.  How did Mr. Middendorf react when you shared Sweet's

19  gleaned information with him?

20  A.  Similarly.

21  Q.  I'm showing you Government Exhibit 756 for identification.

22  Do you recognize this?

23  A.  Yes.

24  Q.  I should say if it is hard to read on the screen, there is

25  a binder there in front of you that also has hardcopies.  Do

 1   you recognize this?

 2   A.  Yes.

 3   Q.  What is it?

 4   A.  An email correspondence between myself and Brian Sweet.

 5           MS. MERMELSTEIN:  The government offers Government

 6   Exhibit 756.

 7           THE COURT:  Received.

 8           (Government's Exhibit 756 received in evidence)

 9   Q.  Mr. Whittle, let me direct your attention to Mr. Sweet's

10   email to you at the bottom of the page and ask you to read the

11   first large paragraph.

12   A.  "Also FYI I had dinner with Jeff Watkins and several of the

13   PCAOB inspectors from the BoNY," Bank of New York, "team last

14   night and it sounds like things are going well.  I debriefed

15   with John about it this morning, but I made sure I passively

16   aggressively sent the message about all the wonderful things

17   the firm is doing to focus on audit quality.  I'm meeting with

18   Bob Ross this week, the week of June 1, so hopefully we will

19   see some fruit from that."

20   Q.  Directing your attention to the second paragraph, let me

21   ask you to read that as well.

22   A.  "I've also been spending some quality time with Stephen

23   Penn and Mike Flynn getting both prepped for their inspections

24   and in Stephen's case making several issues going away.  Both

25   have some hair on them, but in Stephen's case I hope I've

1  coached him effectively on what/how to say a number of things."

2  Q.  Where in the audit process were the Stephen Penn and Mike

3  Flynn's engagements at the time Mr. Sweet sent you this email?

4  A.  The engagements themselves would have been completed and

5  the work in the file.

6  Q.  So how could Mr. Sweet make an issue go away at that point

7  in time?

8  A.  It would be a matter of reviewing the workpapers and

9  interviewing the team as to what they did and trying to help

10  the team put together an argument as to how they addressed a

11  particular risk or audit a particular factor and put it in a

12  way that the PCAOB would understand and accept it, I'd say put

13  it in PCAOB-speak in part, but also pull together all the work

14  done across all the workpapers.

15  Q.  Let me direct your attention to Government Exhibit 876,

16  which is in evidence.  Starting with the bottom email, October

17  20th of 2015, can you read the email at the bottom of the

18  chain.

19  A.  "Jim, David, Scott, I got a call from an old colleague over

20  the weekend and they let me know a decision had been made to

21  inspect a 'big bank' in both the Switzerland and Japan next

22  year.  So obviously Credit Suisse and Sumitomo.  I would expect

23  that the component audits in the U.S. will also get picked as a

24  result.

25          They weren't sure if that meant Germany would not have

1    a bank inspected due to resource constraints the PCAOB would

2    have, but the likelihood is somewhat lower.  The board will

3    won't formally approve the inspection plan for KPMG globally

4    until early February.  So it is possible something could

5    change.  But I wanted to give you a heads-up on this info as it

6    may impact where we devote the most time and attention in the

7    coming months."

8    Q.  Why was it obvious if a big bank was going to be inspected

9    in both Switzerland and Japan, that obviously meant that it was

10   Credit Suisse and Sumitomo?

11   A.  Credit Suisse is the only bank we audit in Switzerland and

12   Sumitomo I believe is the biggest bank we audit in Japan.

13   Q.  Turning to the email at the top of the chain, who are the

14   recipients of this email in the cc line?

15   A.  William O'Mara, David Middendorf, and myself.

16   Q.  What about in the "to" line?

17   A.  Jim Liddy, David Britt, Scott Frew.

18   Q.  Let me ask you to read the email at the top of the chain.

19   A.  "The PCAOB has decided to move up its inspection of KPMG

20   Japan forward to January 2016.  They just notified the firm.

21   As a result of this timing, I've been told the PCAOB has

22   decided not to look at a bank in Japan.  Instead they are

23   replacing it with a bank in Germany.  So it looks like Deutsch

24   in lieu of Sumitomo.  Also the PCAOB is also currently planning

25   on doing a bank inspection in Colombia next year."

1  Q.  Let me ask you to read the second paragraph of the email?

2  A.  "Again, nothing is final until the board approves the KPMG

3  inspection plan and local country regulators can weigh in on

4  the selections.  But with Japan already notified, it looks

5  fairly locked down now from the PCAOB's perspective."

6  Q.  Did you understand the selection of a bank in a particular

7  country to be confidential PCAOB information?

8  A.  Yes.

9  Q.  What did you understand about whether Sweet was permitted

10  to share that information with PCAOB personnel?

11  A.  He will not be permitted to share confidential information.

12  Q.  Was this email the only time Sweet shared information of

13  this nature or were there other times?

14  A.  There were other times.

15  Q.  When Sweet shared information of this nature with you, who,

16  if anyone, at KPMG did you share it with?

17  A.  I would share it with David Middendorf, and in this case it

18  was shared directly with him.

19  Q.  In addition to information about inspection schedules, did

20  Sweet ever share information about the PCAOB's decision to

21  issue a comment?

22  A.  Yes.

23  Q.  What did he share?

24  A.  That he had received a call from a PCAOB staff member about

25  an ongoing -- that was in the middle of an ongoing inspection

1   of the firm and asked for Brian's input on whether to issue a

2   comment or not.

3   Q.   How did you react to Sweet sharing that information with

4   you?

5   A.   I was surprised that one would reach out to call him.  That

6   was certainly never -- I hadn't seen that before.  I certainly

7   was happy that Brian was able to respond to it and offer his

8   view that a comment should not be written.

9   Q.   What was your understanding about whether or not it was

10  permitted for a current PCAOB inspector to consult with Brian

11  Sweet on whether or not to write a comment?

12  A.   I do not believe that's permitted.

13  Q.   Did you share that information Mr. Sweet provided with

14  anyone else?

15  A.   Yes, with David Middendorf.

16  Q.   How did Mr. Middendorf react?

17  A.   He first wanted to know whether Brian told him not to issue

18  a comment.  I said he told them they shouldn't.  He was pleased

19  that Brian was trying to help us avoid a comment there.

20  Q.   Did you ever learn the identity of the PCAOB inspector who

21  had called Mr. Sweet with that question?

22  A.   Yes.

23  Q.   How did you learn that?

24  A.   Brian told me.

25  Q.   Who was it?

1  A.  Cindy Holder.

2  Q.  Let me direct your attention to Government Exhibit 806 in

3  evidence.  Let's scroll to the top there.  Who is this email

4  from?

5  A.  Brian Sweet.

6  Q.  Who is it to?

7  A.  David Middendorf and myself.

8  Q.  Let me ask you to read the email, please.

9  A.  "Dave, Tom, I want to send you both a list of what I

10  anticipate will be the most like PCAOB banking inspections for

11  2016.  This list represents the PCAOB's view of the higher risk

12  banking audits based on the attributes flags it uses to

13  evaluate, and so these were the next in line for inspection

14  this year.  I've tried to rank in order based on my best guess

15  of the likelihood.

16       "The PCAOB will almost certainly look at 12 banks

17  again in 2016 consist with 2013 to 2015, so there are a few

18  here that will not get picked.  The PCAOB will also make a few

19  'random' selections as well as others to evaluate the efficacy

20  of the QP/inflight monitoring programs, so there may be a few

21  differences.

22       "Note: Stonegate Mortgage is very high on this list

23  since it was pulled from the PCAOB's planned 2015 inspections.

24  If it gets replaced this year, I suspect it will be with Fulton

25  Financial.  And if so, that engagement likely won't get

reinspected in 2016."

Q.  What was your understanding about whether the PCAOB's view of what banking audits had more risk flags was confidential PCAOB information?

A.  That would be confidential.

Q.  What was your understanding about which engagements had just missed the cutoff from being inspected this year but were next in line, whether or not that was confidential PCAOB information?

A.  That information would also be confidential.

Q.  What was your understanding about whether or not Sweet was permit to share either of those types of confidential information?

A.  He was not permitted to supply confidential information.

Q.  For example, the comment that PCAOB will almost certainly look at 12 banks, was that news to you?

A.  No.

Q.  Why not?

A.  Because, as he notes in here, that had been their way of operation in the past several years of inspecting 12 banks.

Q.  What about the fact that the PCAOB would likely pick a few engagements in order to view the efficacy of the monitoring programs.  Was that news to you?

A.  No.

            MS. MERMELSTEIN:  You can take that down.  Thank you,

1   Mr. Cooney.

2   Q.  As KPMG actually received the inspection information as the

3   2015 inspection season unfolded, did you have any additional

4   conversations with Mr. Middendorf about the accuracy of the

5   information provided by Mr. Sweet?

6   A.  Yes.

7   Q.  What did you discuss?

8   A.  He had noted to me in a discussion that the information

9   Brian had sent us was tracking directly with the list that he

10  had provided.

11  Q.  Are you familiar with a project called Palantir project?

12  A.  Yes.

13  Q.  What was that?

14  A.  It was an attempt to use data and analytics to predict

15  PCAOB's inspections.

16  Q.  Who was involved in that project?

17  A.  The sponsor of the project was David Middendorf and another

18  partner who oversaw the audit practices, data and analytics.

19  Roger O'Donnell was also involved.

20  Q.  What involvement, if any, did Mr. Sweet have with the

21  Palantir project?

22  A.  One of the things Palantir wanted to understand was how it

23  worked, so I assigned Brian to talk with the PCAOB about how --

24  talk with Palantir about how PCAOB makes its selections.

25  Q.  What was your understanding about whether Sweet was sharing

1    confidential PCAOB information with Palantir?

2    A.   He shared confidential information about which prior

3    inspections were part of their random selection program.

4    Q.   How do you know that?

5    A.   Because he told me.

6    Q.   Do you know whether he shared additional confidential PCAOB

7    information with Palantir?

8    A.   I don't.

9    Q.   Did you put any limitations on what he should share with

10   Palantir?

11   A.   I did not.

12   Q.   During Sweet's initial time at the firm, did you have any

13   other conversations with him about his value to the firm or how

14   it had changed over time?

15   A.   I did.

16   Q.   What did you say?

17   A.   Coming from the PCAOB, he knew the personalities, he knew

18   how they operated, he knew --

19            MR. BOXER:   Objection: unresponsive, your Honor.

20            THE COURT:   Limit your answer just to what you said.

21   Maybe that's what you were doing.

22            THE WITNESS:   Yes.

23            THE COURT:   Go ahead.

24   A.   Let me start over.

25   Q.   Why don't you first say what you said to Mr. Sweet, and

1   then you can explain why you said it.

2   A.   I told him that he was of most value because he had just

3   come from the PCAOB and knew how they operated and knew what

4   their issues were, but over time that information will be less

5   relevant as they make changes in personnel and they come up

6   with new issues.  It was my job to then make sure that he was

7   adding value in other ways to the firm and being seen as adding

8   value to the firm in other ways.

9   Q.   Following the hiring of Brian Sweet, did KPMG hire

10  additional personnel from the PCAOB?

11  A.   Yes.

12  Q.   In particular, did there come a time that KPMG hired

13  someone named Cindy Holder?

14  A.   Yes.

15  Q.   How did KPMG come to hire Cindy Holder?

16  A.   She was on a list, she was on a recommendation list that

17  Brian Sweet had provided.

18  Q.   What, if any, involvement did you have in her hiring?

19  A.   The ultimate decision was made by partners in my internal

20  inspection group.  My role consisted of discussions about her

21  being located in the Houston office.  Her title as executive

22  director and what title she would actually have were probably

23  the two principal areas I got involved with.

24  Q.   Could you explain what you mean by your participation in

25  discussions about her being located in the Houston office.

1   A.   Almost all the people that we hired from PCAOB below the

2   level of managing director or partner, we moved them to the New

3   York area to live.  Because of other personal issues, she

4   couldn't, so I had to work it out with the Houston office that

5   she would be resident there and support some things in the

6   Houston office but spend most of the time working for my group.

7   Q.   What did she do principally for your group?

8   A.   She was an inspection leader or inspection participant in

9   internal inspections for most of the year.  When that cycle

10  ends in the September-October time frame, she would switch and

11  work on the allowance for loan loss monitoring program.

12  Q.   I want to turn your attention now to March of 2016.  At

13  that point in the year, where in the audit cycle was KPMG?

14  A.   Most of our clients have a December year end.  The audit

15  reports typically would have been issued for most of those

16  clients, which means that those teams would be in the middle of

17  their 45-day documentation assembly process.

18  Q.   Let me direct your attention to Government Exhibit 936 in

19  evidence.  Who is this email from?

20  A.   Brian Sweet.

21  Q.   Who is the recipient of this email?

22  A.   I am.

23  Q.   What is the date and time of the email?

24  A.   March 28, 2016, 6:22 p.m.

25  Q.   Do you remember receiving this email?

 1   A.  I do.

 2   Q.  Did you receive it at 6:22 p.m.?

 3   A.  I did not.

 4   Q.  Do you recall when you received it?

 5   A.  It was early afternoon.

 6   Q.  Let me ask you to read the subject line and then the

 7   content of the email.

 8   A.  The subject is "Do you have five minutes?  I just tried you

 9   in your office but think you may still be in the feedback

10   meeting."

11   Q.  Did you have a conversation with Mr. Sweet as a result this

12   email?

13   A.  I did.

14   Q.  What, if anything, did Mr. Sweet tell you in that

15   conversation?

16   A.  He told me that he had received information about certain

17   selections the PCAOB had made for the 2016 inspection cycle.

18   Q.  What, if anything, did he tell you about the source of that

19   information?

20   A.  That it had come from someone at the PCAOB.

21   Q.  Did he say who it had come from at the PCAOB?

22   A.  He did not.

23   Q.  Had you explicitly asked Mr. Sweet to get this information?

24   A.  I did not explicitly ask him to get it.

25   Q.  Did you implicitly ask him to?

1       MR. BOXER:  Objection.

2       THE COURT:  Overruled.

3   A.  Yes.  Through the course of continuously asking him to get

4   whatever information he could get from his interactions with

5   the PCAOB staff members, I think it was an implied request to

6   get whatever information he could.

7   Q.  What did you do in response to Mr. Sweet informing you that

8   he had a subset of the inspection list from the PCAOB?

9   A.  I spoke with two partners.  One was in the course of my

10  conversations with Mr. Sweet he identified that he had also

11  shared the same information with David Britt.  So I went to Mr.

12  Britt's office to speak with him.  Then subsequently I

13  discussed the information with Mr. Middendorf.

14  Q.  Let's start with Mr. Britt.  Why did you go to his office

15  after you learned that Mr. Sweet had shared the information

16  with Mr. Britt?

17  A.  I wanted to confirm that in fact he had done that, and I

18  let Mr. Britt know that I was going to attempt to put together

19  a meeting and that he should attend that meeting with myself,

20  Mr. Sweet, Mr. Middendorf.

21  Q.  Turning to Mr. Middendorf, how did you reach out to Mr.

22  Middendorf?

23  A.  There was a feedback meeting going on on the first floor of

24  the office, an evaluation meeting of our personnel.  I went

25  down to the meeting and got Mr. Middendorf to step out of the

1  meeting for a moment and shared with him what Brian had told

2  me.

3  Q.  Did there come a time that the meeting between Mr.

4  Middendorf, Mr. Britt, yourself, and Mr. Sweet that you had

5  discussed with them took place?

6  A.  Yes.

7  Q.  Did all four of you participate in that meeting?

8  A.  Yes.  Mr. Middendorf and Mr. Britt and myself were in

9  person and Mr. Sweet participated by phone.

10  Q.  Where did the people who had gathered together actually

11  meet for that meeting?

12  A.  They met in the conference room next to my office.

13  Q.  How did the call/meeting begin?

14  A.  I recapped that for everyone that Brian had received some

15  information from the PCAOB about inspections, upcoming

16  inspections, and turned it over to Brian to walk through the

17  list of engagements.

18  Q.  In what fashion did Mr. Sweet walk through the list of

19  engagements?

20  A.  He talked about each of the engagements, the name of the

21  engagement, and then ensued a conversation about each one of

22  them.

23  Q.  When you say a conversation ensued about each one of them,

24  what was the nature of the conversation about each of the

25  engagements on the list?

1    A.   Each of the four of us shared what we knew about the

2    engagement, who the engagement partners were.  Certainly if

3    there were inspection results that I was aware of related to

4    either that engagement or that partner, I would share that.

5    Mr. Britt had information with respect to which of -- most of

6    the engagements on that list were banks -- so which of those

7    were involved in our allowance for loan loss monitoring

8    program.  So everyone shared what they could about the nature

9    of the engagement.

10   Q.   What did you understand about whether it was allowed for

11   Mr. Sweet to have gotten this information from someone at the

12   PCAOB?

13   A.   It was not allowed.

14   Q.   What did you understand about whether he was permitted to

15   share it with personnel at KPMG?

16   A.   Also not allowed.

17   Q.   Did you understand that accepting that information was

18   wrong?

19   A.   Yes.

20   Q.   Did you understand that accepting that information was a

21   federal crime?

22            MR. BOXER:   Objection.  Withdrawn.

23            THE COURT:   You can answer.

24   A.   At the time I did not, no.

25   Q.   Was your purpose in accepting that information improper?

1   A.   Yes.

2   Q.   Returning to the discussion of the engagements on the list

3   and the risk factors for each of them, was anyone taking notes

4   during that meeting?

5   A.   Yes.

6   Q.   Do you remember who in particular?

7   A.   Mr. Sweet I couldn't see, who was on the phone.  But I

8   believe Mr. Britt and Mr. Middendorf did take notes.

9   Q.   Were you familiar with all of the engagements that were

10  discussed from that list?

11  A.   No.

12  Q.   In general, what types of engagements were on the list that

13  Mr. Sweet shared?

14  A.   The majority were banks, smaller banks, and then there were

15  a handful that were nonbanking clients.

16  Q.   What, if anything, did Mr. Sweet say about why the majority

17  of the engagements were banks but not all of them?

18  A.   I don't recall specifically what he said, but I believe

19  that the person that provided --

20            MR. WEDDLE:  Objection, your Honor.

21            MR. BOXER:  Objection as to leading, your Honor.

22            THE COURT:  Overruled as to leading.  Rephrase the

23  question, please.

24  Q.   Do you have, leaving aside the exact words, a general

25  recollection of what was explained about the nature of the list

1   having mostly banks but not totally banks during that

2   phonecall?

3   A.   Generally, that it was someone who had worked in the

4   banking group at the PCAOB.

5   Q.   You said that you walked through all the engagements and

6   talked about who was on them and what you knew about them.

7   What was the purpose of walking through all that information?

8   A.   To consider what the risks were that we would have

9   deficient audits on those engagements and to consider what

10  steps we could take to help those engagement teams actually go

11  and avoid PCAOB comments.

12  Q.   What was discussed about how you could help the engagement

13  teams to go and actually avoid PCAOB comments?

14  A.   That we would reach out to the engagement teams in one

15  fashion or another to gain access to the workpapers and see if

16  we could improve the documentation of those particular audits.

17  Q.   During the call, was there any discussion of AU 390?

18  A.   Yes.

19  Q.   What was the discussion about AU 390?

20  A.   AU 390 is the auditing standard that deals with

21  documentation in particular within the 45-day documentation

22  assembly period.  So that was where we focused our attention

23  because that is where these engagements for the most part were.

24  Q.   Why did it matter to your decision about what you would or

25  wouldn't do that it was in the documentation period?

1   A.  If during the documentation period you identified, omitted,

2   or insufficiently performed a procedure and you have to do more

3   work, you need to separately document the fact that you were

4   doing more work and go through the review process within the

5   firm.  If we were to direct teams to continue to do more work,

6   that would be unusual in my view both for the engagement team

7   and for subsequent PCAOB reviewers to see a large amount of new

8   work being done during the 45-day period.

9   Q.  Why would it matter if it was unusual for the engagement

10  team or for PCAOB reviewers to see a large amount of work that

11  had been done during the 45-day period?

12  A.  Because if we were directing them to do that work, that may

13  expose the fact that we had in fact received in advance notice

14  on the PCAOB selections.

15  Q.  Was your avoidance of a valuation of AU 390 a result of

16  your interest in abiding by the accounting standards or an

17  effort not to get caught?

18          MR. BOXER:  Objection.

19          THE COURT:  Overruled.

20  A.  It was an effort to avoid being caught.

21  Q.  Was there any discussion during the call about efforts to

22  keep the possession of the list a secret?

23  A.  I don't recall anything explicit, but it was certainly

24  implied that only the people that were in that room were going

25  to know, or who were on the phone, know of the existence --

1    that we had the selection list.

2    Q.  What was the purpose of providing engagement teams with

3    some extra assistance as a result of your receipt of the list?

4    A.  Could you repeat the question?

5    Q.  Sure.  In this discussion of what could be done, what was

6    the goal of whatever it was you were going to do with respect

7    to these engagements?

8                    MR. BOXER:  Asked and answered, your Honor.

9                    THE COURT:  Overruled.

10   A.  The objective was to get the workpapers in great shape so

11   that we would avoid PCAOB comments.

12   Q.  Why would you care about avoiding PCAOB comments?

13   A.  Because they could result in appearing in our part 1 report

14   and then have had a cascading effect on the deficiencies in our

15   part 2 report.

16   Q.  With respect to the banking engagements on the list, what

17   did you agree to do during that call?

18   A.  David Britt would prepare and send out an email to the

19   engagements that were in the allowance for loan loss monitoring

20   program, asking them to give access to their workpapers to a

21   select group of members of the national office that were

22   involved in banking.

23   Q.  Why did you need to request access to the workpapers?

24   A.  The workpapers are actually owned by the engagement team.

25   They are electronic.  Access to them is by invitation only.

1  This was asking them to invite certain members to their files.

2  Q.  Was the ALLL monitoring program intended to extend in this

3  way into the documentation period?

4  A.  Not as we originally designed it and executed it.

5  Q.  What, if anything, did you discuss about which areas of

6  those engagements that were on the list these re-reviews would

7  look at?

8  A.  The re-reviews would focus on the allowance for loan

9  losses, and to the extent that the re-reviewers had time, they

10  could look at other areas as well.

11  Q.  Why the focus on the allowance for loan and lease losses?

12  A.  It was the area of greatest deficiency.  It was the focus

13  that the PCAOB board had given us in our December 2014 meeting,

14  and it was probably our most significant deficiency we were

15  trying to resolve.

16  Q.  Was there any significance to avoiding comments for audits

17  in the monitoring program in particular?

18  A.  Yes, it was.

19  Q.  What was the significance?

20  A.  Our response to deficiencies in part 2, we put forth a

21  number of different programs that we have as to how we are

22  trying to fix them.  The PCAOB would evaluate how effective

23  those monitoring programs or other programs might be.  If you

24  had a failure in an engagement that was part of a monitoring

25  program, it would be sort of a double hit.  One would be a hit

1  for the engagement team that had failed, but it would also say

2  your monitoring program also did not work.

3  Q.  Did this plan to gain access to the workpapers through the

4  ALLL program go forward?

5  A.  Yes.

6  Q.  We will come back to that.  What, if anything, did you

7  discuss doing for engagements that were not in the ALLL

8  program?

9  A.  David Middendorf and I discussed those since we were not

10 involved.  Since David Britt was taking care of the banks, Mr.

11 Middendorf and I discussed how we would divide them up to get

12 access to those workpapers.

13 Q.  Do you remember the names of any of the engagements that

14 were on the 2016 list but were not in the ALLL monitoring

15 program?

16 A.  There were a few: Bon Ton, AMBAC, Macquarie, and Fidelity

17 Information Systems.

18 Q.  Let's start with AMBAC.  Who took responsibility for

19 contacting the AMBAC team?

20 A.  I did.

21 Q.  Why?

22 A.  AMBAC is an insurance type company and the firm had some

23 deficiencies that we noted in our internal inspections the

24 prior year within the insurance industry.  I knew that the

25 partner had a number of more inspections from internal

1    inspections in the past.  One of the team members that I had

2    was an insurance partner and had helped to work on that area,

3    so he would be an obvious person to use to do that.

4    Q.   Would you have assigned extra resources to AMBAC if you had

5    not received the list?

6    A.   It was my intention to review some insurance company

7    because of the deficiencies we had in the past.  AMBAC would

8    have been an obvious choice.  But certainly once I knew it was

9    on the list, it became the obvious choice.

10   Q.   Who was the partner with insurance experience that you

11   asked to look at AMBAC?

12   A.   John Broderick.

13   Q.   What, if anything, did you tell Broderick about why you

14   were asking him to look at AMBAC?

15   A.   I simply told him that -- I reminded him that he had been

16   involved in some of the corrective actions we took with respect

17   to insurance audits, and I shared with him that the engagement

18   partner had had a number of unsatisfactory ratings from

19   internal inspections and seemed like a good place to look at

20   those workpapers.

21   Q.   Was that the entirety of the reason you were asking him to

22   look at the workpapers?

23   A.   No.  I purposely omitted the fact that we had had the

24   selection list from the PCAOB.

25   Q.   I direct your attention to Government Exhibit 950 for

1   identification.  Do you recognize this?

2   A.  Yes.  It's an email correspondence between myself and David

3   Middendorf.

4           MS. MERMELSTEIN:  The government offers Government

5   Exhibit 950.

6           THE COURT:  Received.

7           (Government's Exhibit 950 received in evidence)

8   Q.  Let's start at the bottom of this email chain, at the email

9   from you to Mr. Middendorf.  What is the date of this email?

10  A.  Monday, March 28, 2016.

11  Q.  What is the subject line?

12  A.  "Retailer."

13  Q.  Can you read the email, please.

14  A.  "The SECRP," which stands for SEC review partner, "changed

15  on the retailer.  Thoughts on proceeding?  Go to the BUPPP LAEP

16  or EQCR to get rolling."

17  Q.  What is going on here?

18          MR. BOXER:  Objection.

19          THE COURT:  Please were he phrase.

20  Q.  Why are you emailing Mr. Middendorf and saying the SEC

21  review partner changed on the retailer?

22  A.  The retailer in question was Bon Ton, who was on our list.

23  In our discussions in our meeting, one of the things we didn't

24  know was who the second partner, the SECRP partner was on Bon

25  Ton.  We hadn't decided as to who would contact the engagement

1    team or how.  Mr. Middendorf was familiar with the retail space

2    and wanted to know who that partner was.

3    Q.  Did you check to see who the partner was?

4    A.  I did.

5    Q.  What do you mean when you say the SEC review partner

6    changed?

7    A.  For some reason or another, that second partner had changed

8    from one partner to another during the year.

9    Q.  What do you mean when you ask "thoughts on proceeding"?

10   A.  That was relative to how we were going to contact that

11   engagement team to get access to their workpapers.

12   Q.  Let's scroll up to the next email in the chain, please.

13   How does Mr. Middendorf respond to you?

14   A.  "Who is the new EQCR?"

15   Q.  Then how do you respond to him?

16   A.  "Howard Meltzer."

17   Q.  Why is the subject, in your understanding of this email,

18   retailer and not Bon Ton?

19   A.  Because we didn't want anyone to know that we were

20   corresponding about an engagement that was on the PCAOB

21   selection list.

22   Q.  Who ultimately made the contact with the Bon Ton team?

23   A.  I did.

24   Q.  Why was that?

25   A.  Because I had a relationship from a former inspection with

1    Steve Ritter, who was the engagement partner.

2    Q.  What did you do with respect to Bon Ton?

3    A.  I called the partner and told him that from time to time

4    the PCAOB does do inspections of small retailers and they

5    hadn't done one in a while, I thought maybe it would be a good

6    time.  I asked him if it was okay if I had a member of my team

7    take a look at his workpapers.

8    Q.  What was the real reason you reached out to Steve Ritter on

9    Bon Ton to ask him to take a look at the work first?

10   A.  They were on the PCAOB inspection list that we had

11   received.

12   Q.  Why didn't you give that explanation to Mr. Ritter?

13   A.  Because I was trying to keep that close to the vest and

14   certainly would not want him to report that and be caught that

15   we had confidential PCAOB information.

16   Q.  Let's turn next to Government Exhibit 949 for

17   identification.  Zoom in on the top.  Do you recognize this?

18   A.  Yes.

19   Q.  What is it?

20   A.  An email between myself and David Middendorf.

21              MS. MERMELSTEIN:  The government offers Government

22   Exhibit 949.

23              THE COURT:  Received.

24              (Government's Exhibit 949 received in evidence)

25   Q.  What is the date of that email?

1  A.  March 28, 2016.

2  Q.  What is the subject line?

3  A.  "10-K research."

4  Q.  Can you read the email, please.

5  A.  "Dave, with respect to the 10-K research you requested, it

6  is not an FS company," which stands for financial services

7  company, "but a tech company.  Big acquisition and change in

8  segments in 2015."

9  Q.  What 10-K research had Mr. Middendorf requested?

10  A.  He had requested information about the company that was on

11  the list identified as Fidelity.

12  Q.  Why did Mr. Middendorf request research on the company

13  listed as Fidelity?

14  A.  Because during the meeting we weren't sure who that client

15  was.  Mr. Britt did not recognize it as any of our bank clients

16  having the word "Fidelity," and we had to do some further

17  digging to figure out who it was.

18  Q.  What did you find out when you looked into it for Mr.

19  Middendorf?

20  A.  That the company was named Fidelity Information Systems,

21  and that in reading their filings with the SEC the company had

22  made a large acquisition during the year and that required them

23  to change their segment disclosures, both of which are the

24  types of matters or flags that the PCAOB would have in making

25  this type of selection.

1    Q.   Who did you ultimately agree you would reach out to to get

2    access to the Fidelity Information Systems workpapers?

3    A.   Mr. Middendorf.

4    Q.   Why was this one assigned to Mr. Middendorf?

5    A.   Because the engagement partner, Steve McMullen, was the

6    business unit professional practice partner and indirectly

7    reported to Mr. Middendorf.

8    Q.   Did Mr. Middendorf reach out to the engagement partner?

9    A.   Yes.

10   Q.   How do you know?

11   A.   Because the requirement was that I would have to assign a

12   member of my internal inspection team to gain access to the

13   workpapers, and that could only be done by invitation that we

14   received from the engagement team.

15   Q.   Did you in fact assign someone to look at the workpapers?

16   A.   I did.

17   Q.   Let me turn your attention now to Macquarie.  Who did you

18   agree would reach out to Macquarie?

19   A.   Mr. Middendorf.

20   Q.   Let me show you Government Exhibit 951 for identification.

21   Do you recognize that?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's an email chain between Mr. Middendorf, Matthew Mount,

25   and myself.

1          MS. MERMELSTEIN:  The government offers Government

2     Exhibit 951.

3          THE COURT:  Received.

4          (Government's Exhibit 951 received in evidence)

5     Q.  Let's start at the bottom of the email chain, the email

6     from Matthew Mount to Mr. Middendorf.  Who's Matthew Mount?

7     A.  He is a partner in the Dallas office.

8     Q.  What does he write in this email, March 29th, to Mr.

9     Middendorf?

10    A.  "Our audit report date was February 22, so I believe we

11    have until April 7."

12    Q.  What was the significance at this point in time of the date

13    of the audit report?

14    A.  That was the date that the 45-day clock starts.

15    Q.  When Mr. Mount says, "I believe we have until April 7th,"

16    what does that mean?

17    A.  That means that's when his 45 days expires and he needs to

18    have his workpapers in the electronic file room.

19    Q.  Let's look up at the top email on this chain.  Who is this

20    email from?

21    A.  David Middendorf.

22    Q.  Who is the recipient?

23    A.  I am.

24    Q.  What does Mr. Middendorf write?

25    A.  "FYI, please send me the name of the individual that should

1   be invited to the eAudit file."

2   Q.  What do you understand Mr. Middendorf to be asking for

3   here?

4   A.  Who on my team would be doing the review of the Macquarie

5   workpapers.

6   Q.  Finally, let me direct your attention to an engagement

7   called Sallie Mae.  Is that an engagement that was discussed on

8   the March 28th call?

9   A.  Yes.

10  Q.  What kind of company is that?

11  A.  It's a student loan servicing organization.

12  Q.  Is it also abbreviated as SLM?

13  A.  Yes.

14  Q.  Was it in the ALLL monitoring program?

15  A.  I don't believe so.

16  Q.  During the March 28th call, what, if anything, do you

17  recall doing with respect to Sallie Mae?

18  A.  That we would try to gain access to the workpapers as we

19  would with the other engagements, but we weren't sure who the

20  engagement partner at the time was.

21  Q.  Let me direct your attention to Government Exhibit 952 for

22  identification.  Do you recognize that?

23  A.  Yes.

24  Q.  What is it?

25  A.  An email chain involving myself, David Britt, and David

1    Middendorf.

2             MS. MERMELSTEIN:  The government offers Government

3    Exhibit 952.

4             THE COURT:  Received.

5             (Government's Exhibit 952 received in evidence)

6    Q.  Starting at the bottom email on this chain, what is the

7    date of that email?

8    A.  March 29, 2016.

9    Q.  What do you write to Mr. Britt?

10   A.  "David, did you get a chance to talk audit approach with

11   Mark N on his former client?  Do we have a path forward?  Dave

12   was asking."

13   Q.  What do you mean when you asked, "Did you get a chance to

14   talk audit approach with mark N on his former client"?

15   A.  We were trying to understand how they approached the audit,

16   any information about the audit, what information we had about

17   the audit of Sallie Mae.

18   Q.  Who is mark N?

19   A.  Mark Niswonger.

20   Q.  What was his connection to Sallie Mae?

21   A.  We thought he was the current engagement partner.  It turns

22   out he had moved off that engagement, so he became the former

23   engagement partner.

24   Q.  What do you mean when you asked, "Do we have a path

25   forward"?

1   A.   Reference to gaining access to the workpapers.

2   Q.   What do you mean when you say, "Dave was asking"?

3   A.   Dave Middendorf had asked me to find out where we were in

4   the process.

5   Q.   Let's focus in on the next email in the chain.  How does

6   Mr. Britt respond to you?

7   A.   "I haven't as yet.  Hope to catch him in the morning."

8   Q.   Then let's go to the top of the chain.  What do you do with

9   that email?

10  A.   I forward it to Mr. Middendorf.

11  Q.   Why did you forward it to Mr. Middendorf?

12  A.   Because he had asked me to give him a status on where we

13  stood with respect to the Sallie Mae re-review.

14  Q.   Let me turn your attention back now to the re-reviews being

15  conducted for engagements in the ALLL monitoring program.

16  What, if anything, did you discuss on the March 28th call about

17  who would actually conduct the re-reviews?

18  A.   That as many of the re-reviews as possible would be

19  conducted by Brian Sweet and Cindy Holder.

20  Q.   Did Brian Sweet and Cindy Holder have other work

21  obligations at that point in time?

22  A.   Yes.

23  Q.   How were they able to take on the re-review project?

24  A.   I reassigned them to this as their sole focus at the time.

25  Q.   Did you ever hear these re-reviews called by any other

1   name?

2   A.   Yes.

3   Q.   What did you hear them called?

4   A.   Stealth reviews.

5   Q.   Who did you hear call them that?

6   A.   A member of Mr. Britt's team.

7   Q.   What was your response to hearing that term used?

8   A.   I cringed because it seemed to denote a nefarious process

9   that we were certainly trying to keep hidden from anyone else.

10  Q.   To be clear, were the re-reviews in fact a nefarious

11  process?

12            MR. BOXER:   Objection.

13            THE COURT:   You can answer if you have an

14  understanding.

15  A.   Yes, I believed that we were using confidential information

16  in an inappropriate way to improve our audit inspection

17  results.

18            MS. MERMELSTEIN:   I understand that 952, your Honor,

19  may have been inadvertently not published to the jury.  If it

20  is all right, we will go back and do 952 briefly again.

21            THE COURT:   Yes.

22  Q.   Let's look at 952 in evidence again.

23            MS. MERMELSTEIN:   Apologies, ladies and gentlemen.  It

24  looks like it's up now.

25            Your Honor, would you mind asking the jury if there

1    are other exhibits they haven't seen?

2              THE COURT:  The last exhibits before this, were you

3    able to see them on your screen?

4              JUROR:  A couple we missed.

5              THE COURT:  A couple you missed?

6              JUROR:  Yes.

7              THE COURT:  Do you remember which ones?

8              JUROR:  The last two.

9              JUROR:  951 and 952.

10             MS. MERMELSTEIN:  We'll go back to those if that's

11   okay, your Honor.

12             THE COURT:  Okay.

13   Q.  952 is up.  We will do 952 first and then 951.  Mr.

14   Whittle, to recap this one, directing your attention to the

15   bottom of the email chain, the email from you to Mr. Britt,

16   subject "Mark N," and you write, "David, did you get a chance

17   to talk audit approach with Mark N on his former client?  Do we

18   have a path forward?  Dave was asking."  Can you remind the

19   jury, who was Mark N?

20   A.  He was the former audit partner on the Sallie Mae

21   engagement.

22   Q.  Why are you asking Mr. Britt if you had had a chance to

23   talk to Mark N?

24   A.  We were trying to gain access to the workpapers and

25   understand what risk there would be within the engagement.

1   Q.   What do you mean by Dave was asking?

2   A.   It was in response to a request I received from Mr.

3   Middendorf to find out where we stood on Sallie Mae.

4              (Continued on next page)

5   Q.   So let's go up to the middle of the chain.  How does

6   Mr. Britt respond?

7   A.   "I haven't as yet hope to catch him in the morning."

8   Q.   And then going to the top of the chain, what do you do with

9   that email?

10   A.   I forward it to Mr. Middendorf.

11   Q.   OK.  Let's go back to 951, in evidence, for a second.

12              And let me direct your attention to the bottom of that

13   chain, an email from Matthew Mount to David Middendorf in which

14   he writes:  "Our audit report date was February 22 so I believe

15   we have until April 7."

16              Again, who was Matthew Mount?

17   A.   He was the engagement partner on Macquarie.

18   Q.   What was the significance on March 29, 2016, of the fact

19   that Macquarie's audit report had issued February 22?

20   A.   That their 45-day workpaper completion period would end on

21   April the 7th.

22   Q.   And then if you scroll up to the top of that email chain

23   from Mr. Middendorf to you:  "FYI, please send me the name of

24   the individual that should be invited to the eAudIT file."

25              What was your understanding of why Mr. Middendorf was

1   asking you to send the name of the individual who should be

2   invited to the eAudIT file?

3   A.  So they could perform the rereview of the file -- of the

4   workpapers before the April 7th date.

5   Q.  Is the eAudIT file the same thing as the workpapers?

6   A.  Yes, it is.

7   Q.  OK.  So now, before we realized we had tech problems, we

8   were talking about the fact that you at some point heard

9   someone working for Mr. Britt refer to these rereviews as

10  "stealth" rereviews.

11          What, if anything, did you do after you heard someone

12  working for Mr. Britt refer to the reviews in that way?

13  A.  I talked to Mr. Britt about it.

14  Q.  So what, if anything, did you say to Mr. Britt about the

15  fact that someone who worked for him used the word "stealth

16  rereview"?

17  A.  I was concerned that people would ask why we're calling it

18  a stealth review and that, you know, someone might discover the

19  fact that we had received this confidential selection list

20  about the PCAOB's upcoming inspections.

21  Q.  Now, the plan to conduct the rereviews for the engagements

22  on the 2016 list, what, if any, concerns did that raise about

23  the internal inspection results?

24          MR. BOXER:  Objection.  It should be focused to this

25  witness.  It is nonspecific.

1      THE COURT:  OK.  Fair enough.

2  BY MS. MERMELSTEIN:

3  Q.  What, if any, concerns did that raise for you about the

4  internal inspection results?

5  A.  I was concerned that the internal inspection results might

6  be different than the PCAOB's results.  In other words, that we

7  might find issues on the allowance for loan losses on a bank

8  inspection internally and -- but the PCAOB, because of the

9  rereviews, would not.

10  Q.  So the PCAOB inspection results would be better than the

11  internal inspection results?

12  A.  That's right.

13  Q.  And how did that compare to the historical way in which the

14  two kinds of inspections had compared?

15  A.  Just the opposite.

16  Q.  Did you discuss that problem, the risk of the internal

17  inspection results would be worse, with anyone else?

18  A.  I discussed it initially with Mr. Britt.

19  Q.  And what did you discuss could be done with Mr. Britt?

20  A.  That we would extend the rereviews to cover those

21  engagements that were going to be inspected internally as well.

22  Q.  And what effect did you hope that would have on the

23  consistency of the two kinds of inspections?

24  A.  That they would have the same or similar results at the end

25  of the process.

1   Q.   Let me show you Government Exhibit 948, for identification.

2            Do you recognize that?

3   A.   Yes.

4   Q.   What is it?

5   A.   It is an email chain between Mr. Leery and myself and

6   Mr. Britt.

7            MS. MERMELSTEIN:  The government offers Government

8   Exhibit 948.

9            THE COURT:  948 is received.

10           (Government's Exhibit 948 received in evidence)

11           MS. MERMELSTEIN:  We can now publish it to the jury.

12           Thank you, Mr. Cooney.

13           THE COURT:  Did it come up on the jurors' screen.

14           JUROR:  Yes.

15           THE COURT:  If someone can't see it, please raise your

16   hand.  Thank you.

17   BY MS. MERMELSTEIN:

18   Q.   Let me direct your attention, Mr. Whittle, to the bottom of

19   this page, to the email from Willy O'Leary to you:  "Tom,

20   attached as requested is a schedule of engagements in the ALLL

21   work stream program selected for coverage in the 2016 QPR."

22           What is Mr. O'Leary sending you here?

23   A.   As a result of my request, he's telling me all the

24   engagements that we selected for internal inspections that were

25   a part of the ALLL monitoring program.

1   Q.   What does "2016 QPR" mean?

2   A.   That is a reference -- "QPR" is a reference to our internal

3   inspections.

4   Q.   Can you explain why Mr. O'Leary was sending you a list of

5   engagements in the ALLL work stream program that had been

6   selected for internal inspection?

7   A.   So I could determine which ones were issuer audits and be

8   able to extend the rereviews to those engagements.

9   Q.   Looking at the top of the screen, at the email from you to

10  Mr. Britt, can you read your email to him.

11  A.   "David - As discussed, the list is confidential and should

12  not be faired with BUPPs or LAEPs.  Tom."

13  Q.   And what is "the list"?

14  A.   It is a list of four engagements that were selected for

15  internal inspection that were in the ALL work stream program,

16  monitoring program.

17  Q.   And what were those four engagements?

18  A.   TCF Financial Corporation, Northwest Bank Shares, CVB

19  Financial Corp., and East West Bancorp, Inc.

20  Q.   What, if anything, did you do with respect to TCF

21  Financial, Northwest Bank Shares, CVB Financial and East West

22  Bancorp?

23  A.   Mr. Britt assigned members of his team to review the -- to

24  gain access to the workpapers and review them.

25  Q.   What, if anything, did you tell Mr. Middendorf about the

1    plan to do these extra rereviews for targets of internal

2    inspections?

3    A.   I told him that we'd identified the potential for a

4    mismatch between internal and external inspection results and

5    that David Britt was going to assign additional folks to do the

6    rereviews of those engagements.

7    Q.   How did he react?

8    A.   He thought that was a good idea.

9    Q.   Now, as the rereviews unfolded, were you generally kept

10   aware of the progress of the rereviews?

11   A.   Yes.

12   Q.   How?

13   A.   For the non-banks, where there were individuals assigned

14   from my team, they knew that I would make those assignments, so

15   there was direct correspondence with some of those team

16   members.   And with respect to the banks, it was sort of check

17   ins with either David Britt or Brian Sweet as to how they were

18   going.

19   Q.   Did you share information about the progress of the

20   rereviews with anyone else at KPMG?

21   A.   Yes.

22   Q.   Who?

23   A.   David Middendorf.

24   Q.   Why?

25   A.   He was part of the original plan and he wanted to -- he

1   wanted to know how it was going and what we were finding, if

2   anything, as part of those rereviews.

3   Q.  I want to turn your attention back to AMBAC for a second.

4           Generally speaking, what did John Broderick report to

5   you about the quality of the AMBAC audit?

6   A.  That it was of poor quality.

7   Q.  Did he report the identification of any particular issues?

8   A.  Yes.  I'd asked him to focus initially on the insurance

9   reserve area, which is an area that has similarities, let's

10  say, to the allowance for loan losses, and he quickly

11  identified what appeared to be a significant deficiency in our

12  audit and a potential material weakness in the company's

13  internal controls.

14  Q.  You said a "potential material weakness."  What is the

15  consequence of identifying something that is determined to be a

16  material weakness?

17  A.  In the case that we've already issued our report, that

18  would require us to withdraw our report on internal controls

19  and reissue that report noting a material weakness.

20  Q.  Did you discuss with anyone else at KPMG John Broderick's

21  findings with respect to AMBAC?

22  A.  Yes.  I discussed it with David Middendorf.  I also

23  discussed it with George Hermann, who was in charge of the

24  Audit Group.

25  Q.  Now, at the time that John Broderick made that report to

1    you, had you yet received notice that the PCAOB would inspect

2    AMBAC?

3    A.  No.

4    Q.  Did there come a time you made a decision about what to do

5    with respect to the AMBAC opinion?

6    A.  Yes.

7    Q.  What did you decide?

8    A.  A conclusion was drawn by the -- by the client that they in

9    fact had a material weakness and by our Audit Group that we

10   should in fact withdraw our report and reissue it as a material

11   weakness.

12          MS. MERMELSTEIN:  Your Honor, I am happy to stop

13   anytime or I can keep going.

14          THE COURT:  We could probably go for five more minutes

15   and break at 1.

16          MS. MERMELSTEIN:  Perfect.

17   BY MS. MERMELSTEIN:

18   Q.  When the determination was made that the opinion would be

19   pulled with respect to AMBAC, how did you handle that decision

20   with respect to the PCAOB?

21   A.  We notified them that -- they were aware that we were

22   withdrawing our report.

23          MR. BOXER:  Objection to "we."

24          THE COURT:  Sustained.

25   BY MS. MERMELSTEIN:

1  Q.  When you say we notified them, who do you mean actually

2  notified them?

3  A.  I had conversations with Steve Schindler, who was the lead

4  inspector for the PCAOB, that the firm was going to withdraw

5  its report and reissue a material weakness.

6  Q.  When you say "we," did you just mean KPMG?

7  A.  Yes, and me in particular with respect to Mr. Schindler.

8  Q.  What did you tell Mr. Schindler about how the problems with

9  AMBAC had been discovered?

10  A.  I gave him the same story that we had done some remedial

11  work in the industry -- in the insurance industry and that the

12  engagement partner had a number of failed internal inspections

13  and that's the reason we had started looking at those

14  workpapers.

15  Q.  Did you disclose to Mr. Schindler that you had had

16  knowledge that AMBAC would be inspected when you did that

17  additional work?

18  A.  No.  I purposely left that information out.

19  Q.  Why?

20  A.  Because I knew that it was confidential and did not want

21  him to know that we had received such information.

22  Q.  Did you discuss your conversation with Mr. Schindler with

23  anyone else at KPMG?

24  A.  Both with Brian Sweet and with David Middendorf.

25  Q.  What was your understanding about whether the deficiency

1  that John Broderick identified during the rereview of AMBAC

2  would have given rise to a comment had AMBAC been inspected?

3  A.  It definitely would have gotten a comment.

4  Q.  What was your understanding about whether the generally

5  otherwise poor quality of the AMBAC audit would have been

6  likely to result in other comments?

7          MR. BOXER:  Objection.  Foundation.

8          THE COURT:  Overruled.

9          You can answer if you have an understanding of that.

10  A.  Based on the poor quality across numerous areas, I believe

11  that the engagement team would have received more than one

12  comment from the PCAOB.

13  Q.  Did the PCAOB ultimately inspect AMBAC?

14  A.  They did not.

15  Q.  Why not?

16  A.  Once the notice came out and I let Mr. Schindler know that

17  we were dealing with a potential recall of our report, they

18  initially deferred the inspection.  And then when we made a --

19  when the firm came to a conclusion about the fact that the

20  report would be recalled, they canceled the inspection and

21  referred the matter to their Enforcement Division.

22  Q.  Did there come a time that John Broderick became aware of

23  the real reason for the AMBAC rereview?

24  A.  Yes.

25  Q.  How did he become aware?

1    A.   I don't recall whether I told him or he found out from

2    Mr. Sweet.

3    Q.   Did you have any conversations with him about the true

4    reason for the AMBAC rereview?

5    A.   Yes.

6    Q.   What was that conversation?

7    A.   He was concerned that we had confidential PCAOB information

8    about the -- about AMBAC in advance of the notice.

9    Q.   After the rereviews -- the 2016 rereviews were complete,

10   did you pay attention to whether the engagements on the list

11   were in fact inspected?

12   A.   Yes.

13   Q.   Based on your conversations, did anyone else pay attention?

14   A.   Yes.

15   Q.   Who was that?

16   A.   Mr. Britt, Mr. Sweet and Mr. Middendorf and I all paid

17   attention.

18   Q.   Were all of the engagements on the 2016 list ultimately

19   inspected?

20   A.   No.

21   Q.   How did the engagements from the 2016 list that were

22   inspected perform on the PCAOB inspections in 2016?

23   A.   Generally, with respect to the banks in the allowance for

24   loan loss areas, where we historically got comments, none of

25   those -- none of those engagements received comments in 2016.

1  Q.  None of them?

2  A.  None of them.

3  Q.  What did you -- what was your reaction to that?

4  A.  Mixed reaction.  On the one hand, I was very pleased that

5  our inspection results were so -- were so good, but also

6  concerned that if we didn't have that same information in a

7  subsequent period, that we could see a return of deficiencies

8  that would be difficult to explain.

9  Q.  What was your understanding of whether that improvement

10 could have been caused just by other improvements KPMG was

11 undertaking in audit quality?

12            MR. BOXER:  Objection.  Foundation.

13            MR. WEDDLE:  701 as well, your Honor.

14            THE COURT:  Sustained, as to foundation.

15            MS. MERMELSTEIN:  Excuse me, your Honor?

16            THE COURT:  Sustained as to foundation.

17 BY MS. MERMELSTEIN:

18 Q.  Were you aware of other efforts to improve audit quality at

19 KPMG?

20 A.  Yes.

21 Q.  And did you have some personal participation in those

22 efforts?

23 A.  Yes.

24 Q.  Based on your participation in the other efforts to improve

25 audit quality, did you believe that the improvement in 2016

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    could have been cause solely by KPMG's legitimate activities?

2              MR. BOXER:  Objection.

3              THE COURT:  Overruled.

4    A.  I believe that there would have been improvement in our

5    results, but I would have been very surprised if they had gone

6    especially in the allowance for loan losses area to zero

7    comments.

8              MS. MERMELSTEIN:  Your Honor, I think I have gone to

9    1:02.

10             THE COURT:  Folks, we are going to break for one hour

11   for lunch.  We'll see you back at 2 o'clock and we'll continue.

12   Have a good lunch.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (Jury not present)

2              THE COURT:  You can step down.

3              And you may be seated.

4              Anything the parties wanted to address before lunch?

5              MS. MERMELSTEIN:  Not from the government, your Honor.

6              MR. BOXER:  No, your Honor.

7              THE COURT:  OK.  We are in recess for lunch.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **A F T E R N O O N   S E S S I O N**

2                              2:10 p.m.

3              THE COURT:  Good afternoon, everyone.

4              MS. MERMELSTEIN:  Good afternoon, your Honor.

5              THE COURT:  Shall I bring in the witness?

6              MS. MERMELSTEIN:  Yes, your Honor.

7              (Witness present)

8              (Jury present)

9    THOMAS W. WHITTLE III,

10         Resumed, and testified further as follows:

11   DIRECT EXAMINATION (Resumed)

12             THE COURT:  Please be seated.

13             Good afternoon, folks.

14             JURORS:  Good afternoon.

15             THE COURT:  I know it's very hot in the jury room back

16   there.  We're going to try and get the building folks to take a

17   look at that so hopefully we'll get it fixed.  This building is

18   from the mid-1930's so we have a plethora of technical issues

19   that arise, but we will try to get them to take a look at that

20   so it is more comfortable back there.

21             We are continuing with the testimony.

22             And, Ms. Mermelstein, you may proceed.

23             MS. MERMELSTEIN:  Thank you, your Honor.

24   DIRECT EXAMINATION (Resumed)

25   BY MS. MERMELSTEIN:

Q. Good afternoon, Mr. Whittle.
A. Good afternoon.
Q. Before we move on, on the March 28th call -- the March 28, 2016 call that you said this morning that you understood that the source of the list was someone in banking, was that said on the call or was that your understanding?
A. That was my impression given the fact that most of the engagements on the list were banks.
Q. I want to direct your attention now to Government Exhibit 1310, for identification.

Do you recognize this?
A. Yes.
Q. What is it?
A. It's a draft script for a -- to prepare for a meeting with the PCAOB board.
Q. Did you participate in the preparation of this script?
A. I did.
Q. Were such scripts prepared in the ordinary course of KPMG's business in anticipation of meetings with the PCAOB?
A. Yes.

MS. MERMELSTEIN: The government offers Government Exhibit 1310.

THE COURT: Received.

(Government's Exhibit 1310 received in evidence)

BY MS. MERMELSTEIN:

1    Q.  Let's turn to page 4 -- and, well, I've spoken too fast.

2          If we can start on the first page, what is the date of

3    either the meeting or the notes on this memo?

4    A.  September 29, 2016.

5    Q.  This is a number of months after the March 28, 2016 call?

6    A.  Yes.

7    Q.  OK.  Let's turn to page 4, and let me ask you to read the

8    second bullet point.

9    A.  "One example of success is related to our auditing of

10   allowance for loan losses.  This was an area of the highest

11   number of deficiencies and we utilized root cause analysis to

12   identify significant remedial actions to improve auditor

13   performance.  This included substantial training;

14   implementation of an invasive, risk-based monitoring and

15   support program that focused on complex judgments used in

16   estimating the allowance along with the related internal

17   controls."

18   Q.  Now, let me ask you also to read the second bullet point,

19   please -- excuse me, the third.

20   A.  "And the results have been terrific.  During the past two

21   years, we have seen a very significant reduction in the number

22   of issuers in Part I, and in 2016 all 10 issuer banks inspected

23   participated in the monitoring program and received no comments

24   in our historical areas of deficiencies in testing complex

25   aspects of the allowance."

1    Q.  And this was a presentation being prepared to be given to

2    the PCAOB by KPMG?

3    A.  Yes.

4    Q.  In your view, was it a fair representation to attribute the

5    terrific results in 2016 solely to the improvement as a result

6    of root cause analysis and the monitoring program?

7    A.  No.

8    Q.  What, if any, conversations did you have with Sweet or with

9    Middendorf about the improved results in 2016?

10   A.  We had all been tracking the results, and I believe that we

11   all noted the same thing, that the rereviews had been

12   successful in eliminating the comments.

13          MR. BOXER:  Objection.  Move to strike.  He testified

14   to what we all knew.

15          THE COURT:  Sustained.

16          If you could confine your answer to any conversations

17   that you had.

18          MS. MERMELSTEIN:  Your Honor, I believe the witness

19   was describing the substance of a conversation he had, but I am

20   happy to clarify.

21          THE COURT:  If you could just clarify with the

22   witness.

23   BY MS. MERMELSTEIN:

24   Q.  Based on your conversations with Mr. Middendorf, what was

25   your understanding about his views about the success of the

1   rereviews?

2   A.   That the rereviews were successful and that they led in

3   part or in substance to reducing or eliminating these comments

4   in the ALL area.

5   Q.   I want to turn your attention now past 2016 and into

6   January of 2017.

7        In January of 2017, where was KPMG generally in the

8   audit process?

9   A.   With most of our clients being December year-ends, we were

10  in the final stages of the audit but most of those are -- or

11  all of those audit reports would not have been issued yet.

12  Q.   I want to direct your attention to January 9th of 2017.

13       Did there come a time that you obtained additional

14  confidential PCAOB information?

15  A.   Yes.

16  Q.   How did that come about?

17  A.   I received it from Brian Sweet.

18  Q.   Did he contact you or did you contact him?

19  A.   He contacted me.

20  Q.   And what did he tell you?

21  A.   He told me that he had received some preliminary inspection

22  selections from someone at the PCAOB.

23  Q.   Did he name his source at the PCAOB?

24  A.   He did not.

25  Q.   What did you understand him to mean by "preliminary

1    selections"?

2              MR. BOXER:  Objection.

3              THE COURT:  Overruled.

4    A.  We had the discussion around how the PCAOB goes about

5    making their inspection selections, and so the staff -- my

6    understanding is the staff of the PCAOB comes up with a list of

7    who they think should be on that list and that is their

8    preliminary list.  And then it goes on for various reviews

9    within the PCAOB and ultimately is presented to the PCAOB board

10   for their review and final approval.  So, this would be before

11   that final board approval.

12   Q.  Did you explicitly ask Mr. Sweet to get the 2017

13   preliminary list?

14   A.  I did not explicitly ask him, no.

15   Q.  Did you implicitly ask him?

16   A.  Yes --

17             MR. WEDDLE:  Objection, your Honor.

18             THE COURT:  Overruled.

19   Q.  You can answer, Mr. Whittle.

20   A.  Yes.  Based on the fact that we had encouraging him to get

21   information from the PCAOB, certainly we had been positive with

22   him with respect to receiving the 2016 list and the 2015 list.

23   I believe there was an implied request for any information, and

24   that would include a preliminary list.

25   Q.  During your conversations with Mr. Sweet about his having

1    gotten the preliminary list, was there any discussion about

2    whether or not he might get a later or more final list?

3    A.   I don't recall specifically asking him if he got -- we were

4    going to get one, but, again, I think there was an implied

5    request given --

6              MR. WEDDLE:  Objection, your Honor.

7              THE COURT:  Overruled.

8    Q.   You can continue.

9    A.   An implied request given the nature of the conversation

10   about the process that the PCAOB went on and, again, that we

11   had received lists from him in the past.

12   Q.   Did you share the information that Mr. Sweet had the

13   preliminary list with anyone else at KPMG?

14   A.   Yes.

15   Q.   Who?

16   A.   David Middendorf.

17   Q.   And what did you tell Mr. Middendorf?

18   A.   I relayed the conversation I had with Mr. Sweet regarding

19   the fact that it was preliminary, where they were in their

20   process, that it was possible that that preliminary list could

21   change and likely would change.

22   Q.   Did you have any discussion with Mr. Middendorf about any

23   of the engagements that were on the preliminary list?

24   A.   Yes.

25   Q.   And what are some of the engagements that you can recall

1    being on the preliminary list?

2    A.  Citibank, Macy*s, Valero.  There was another one that

3    escapes me at the moment.

4    Q.  We can come back to it.

5    A.  OK.

6    Q.  What, if anything, did you and Middendorf discuss doing

7    with the preliminary list?

8    A.  Given the time of the year that it was, we -- with limited

9    resources -- at that time of the year the firm is fully engaged

10   in completing audits so it is sort of working to capacity,

11   there was limited resources available to do something for that

12   day.  We also knew that we were in the middle of the audit so

13   we had plenty of time before the audits would be completed and

14   the workpapers would be filed.  So, we focused our attention on

15   things that we could do on particular engagements.

16   Q.  And in particular, what were the things you focused on

17   being able to do?

18   A.  Basically checking in with certain of those engagement

19   teams as to how they were doing in the audit, what their risks

20   were, to identify places where we might perform some additional

21   procedures or have additional follow up.

22   Q.  And were there instances in which additional resources were

23   devoted to those engagements on the preliminary list in light

24   of their presence on the preliminary list?

25   A.  Yes.

1    Q.  So let's talk through a few of the ones that you mentioned.

2         You mentioned that Citi was on the preliminary list.

3    What was done with respect to Citi?

4    A.  Brian Sweet had already been assigned to Citibank -- the

5    Citibank audit team, so he was focused on the allowance for

6    loan losses already.  But there were other areas of the bank

7    that we had concerns with, and we assigned Cindy Holder and

8    members of my IT inspection team to go out to Citibank, some of

9    whom had been involved in prior years and understood the bank

10   and understood their issues, to check in with the team, see how

11   they were proceeding, see what risks they approached -- how

12   they approached the risks, and see if there was anything they

13   could do to help them.

14   Q.  Did you discuss with Mr. Middendorf the plan to send those

15   additional personnel to work on the Citi audit?

16   A.  Yes.

17   Q.  Would you have done that if Citi had not been on the

18   preliminary list?

19   A.  No.

20   Q.  So you mentioned I think also an engagement called Charter?

21   A.  Charter Communications, the other one I was trying to

22   remember.

23   Q.  You didn't mention it.

24        What, if anything, was done with respect to Charter

25   Communications?

1    A.   The second partner on the -- on that audit happened to be

2    on an assignment in the National Office, and so I went down to

3    his office and checked in with him, how it was going, what he

4    and the engagement team were focused in on.  It appeared to me,

5    based on that conversation, that he was focused on the right

6    matters, but I did ask him if he needed any additional

7    resources.

8    Q.   How did he respond?

9    A.   At the time he said no, but a day or so later he contacted

10   me and asked if I could -- if he could get some assistance in

11   reviewing the revenue area, and I assigned one of the partners

12   on my team.

13   Q.   And, again, would you have done that if Charter

14   Communications had not been on the preliminary list?

15   A.   I would not.

16   Q.   Let's turn next to Valero.  What, if anything, was done

17   with respect to that engagement?

18   A.   Valero is an oil and gas company, audited out of the

19   Houston office, and they had contacted Cindy Holder early in

20   January, before the preliminary list, to get involved in

21   reviewing some areas, which I had approved her to do.  Around

22   the time that the preliminary list came out, they had a --

23   there was another request for some additional assistance that

24   came through Cindy Holder.  And as a result of that, I assigned

25   another partner to step in and look at some oil-and-gas

1    specific areas that were outside of her expertise.

2    Q.  You say, "And as a result of that, I assigned another

3    partner."  As a result of what?

4    A.  Having knowledge of the fact that Valero was on the

5    preliminary list.

6    Q.  And turning to Macy*s, what, if anything, was done with

7    respect to Macy*s?

8    A.  In the previous fall, a member of my team -- an inspector

9    on my internal inspection team had been involved with the

10   Macy*s engagement and a partner in his business unit on audit

11   quality issues, and that partner had been requesting that the

12   individual return to help with the Macy*s engagement later.  I

13   had never given him an answer as to whether he could get into

14   the resource later, but once it was on the preliminary list, I

15   authorized him to return to Macy*s at the appropriate time and

16   work with the engagement team.

17   Q.  What connection did David Middendorf have to the Macy*s

18   engagement?

19   A.  Mr. Middendorf was the second partner on the engagement, so

20   he was a member of the Macy*s engagement team.

21   Q.  Did you discuss with Mr. Middendorf the plan to provide

22   additional resources to the Macy*s team in light of its

23   presence on the list?

24   A.  I did.

25   Q.  Now, why not do something in January of 2017 similar to

1    what you had done in March of 2016?

2    A.  It was -- at that point in time, we had lots of time to

3    formulate a plan.  The list wasn't final and we just had

4    limited resources to do more at that point, but the check in

5    would provide us with some information about how we might

6    proceed going forward.

7    Q.  Did you take any steps in January of 2017 to cover up the

8    fact that you had received a preliminary list of engagements to

9    be inspected?

10   A.  In the check ins that I did, I did not indicate to any of

11   the partners that I spoke to that they were on any list at all.

12   It was more merely just a check in without any explanation.

13   Q.  Let me direct your attention to Government Exhibits 1076,

14   in evidence.

15            And let's zoom in on the top, please.

16            Do you recognize this email from Mr. Sweet to you and

17   Mr. Britt?

18   A.  Yes.

19   Q.  Why was this -- what is your understanding of why this was

20   sent to you on January 13th of 2017?

21            MR. WEDDLE:  Objection.  Leading.

22            THE COURT:  Sustained.

23   BY MS. MERMELSTEIN:

24   Q.  Did you give Brian Sweet any direction with respect to

25   sending you an updated bank screening analysis?

1    A.  I did.

2    Q.  What direction did you give him?

3    A.  When the preliminary -- when he shared the clients on the

4    preliminary inspection list with me, I asked him how the -- how

5    the banks compared to the bank screening analysis he had

6    prepared the previous fall, for two reasons.  One was to

7    determine if there was some flag, some risk factor that he

8    hadn't considered in his analysis; and, second, I asked him to

9    then update this to make sure to add those additional banks as

10   a cover if we were ever to do some additional procedures on

11   those banks, that we would be able to point to an internal

12   analysis as to why we were following up and doing additional

13   procedures, whether it be rereviews or otherwise.

14   Q.  And other than you, who else is a recipient of this email?

15   A.  David Britt.

16   Q.  Let me now direct your attention to February 3rd of 2017.

17       Did there come time that you received a phone call

18   from Brian Sweet on that day?

19   A.  Yes.

20   Q.  What, if anything, did he tell you?

21   A.  He told me that he had just received the final board

22   approved list of 2017 PCAOB inspections.

23   Q.  What was your reaction?

24   A.  I was -- I was shocked.

25   Q.  Why?

1    A.  This was information we had never gotten before.  It was a

2    complete list.  It was -- so it was certainly a much longer

3    list than in the past.  The audits were still in progress.  And

4    it was just shocking that he would be able to have obtained

5    that information.

6    Q.  Were you unhappy to receive that?

7    A.  I think I had mixed emotions.  I was pleased to get it but

8    certainly concerned about, you know, how we would be able to go

9    about effecting changes on that scale.

10   Q.  How did the list you received in February of 2017 compare

11   to the preliminary list you had received in January of 2017?

12   A.  There were quite a few differences between them.

13   Q.  How did you respond when Sweet provided you with the

14   information?

15   A.  My response was that we should get in touch with Dave

16   Middendorf and we should have a call to discuss the list.

17   Q.  Did you in fact arrange a call?

18   A.  I asked Brian Sweet to arrange a call, which he did for the

19   following Monday.

20   Q.  So February 6th of 2017?

21   A.  Correct.

22   Q.  Let me show you Government Exhibit 1124, for

23   identification.

24        Do you recognize this?

25   A.  Yes.

1    Q.   What is it?

2    A.   It's the calendar invite for the call where we discussed

3    the final 2017 list.

4    Q.   Now, this says that the start time of the call is

5    February 7th at 1:30 in the morning.  Is that the correct time

6    for that call?

7    A.   No.

8    Q.   When did the call take place?

9    A.   It took place on February the 6th, approximately, you know,

10   8/8:30 at night.

11          MS. MERMELSTEIN:  The government offers Government

12   Exhibit 1124.

13          THE COURT:  Received.

14          (Government's Exhibit 1124 received in evidence)

15   BY MS. MERMELSTEIN:

16   Q.   Looking at this calendar invite, it indicates that the

17   location is a conference call and provides a dial in and what

18   appears to be a password.

19          Was it in fact conducted via conference call?

20   A.   Yes.

21   Q.   And the recipients of this calendar invite are you,

22   Mr. Middendorf and Mr. Sweet.  Were those the participants who

23   in fact participated in the call?

24   A.   Yes.

25   Q.   What, if anything, did Mr. Sweet say about where the list

1    had come from?

2    A.  He said it came from a disgruntled PCAOB employee.

3    Q.  Did he say who the employee was?

4    A.  He did not.

5    Q.  What generally was discussed on the call?

6    A.  Similar to 2016, we walked through each of the engagements

7    on the list and added what color we could around the risks that

8    we knew about those engagements or facts that we knew about

9    those engagements or the engagement partners.

10   Q.  What was the purpose of walking through all of that

11   information about each of the engagements on the list?

12              MR. BOXER:  Objection.

13              THE COURT:  You can testify to what you viewed the

14   purpose as.

15   A.  I viewed the purpose as how we were going to use the list

16   to improve our inspection results.

17   Q.  Were there any engagements on the list that you had trouble

18   identifying?

19   A.  Yes.

20   Q.  And why was that?

21   A.  I think they were somehow coded or they were, you know,

22   similar to 2016 where we just had Fidelity, there was just some

23   that no one could recognize the names of the clients.

24   Q.  And was there any discussion on the call about how to

25   figure out which engagements those referred to?

1    A.  There was some discussion but I don't recall specifically

2    what was done -- you know, who was going to follow up, but

3    there was discussion trying to find out -- identify each one of

4    them.

5    Q.  Did you come up with a specific plan during that call about

6    how to use the information?

7    A.  We did not come to a conclusion on a specific plan.

8    Q.  Was there any discussion about whether or not a system

9    similar to 2016 might be employed?

10   A.  We did discuss that.  One of the -- when Mr. Sweet went

11   through the list, he had information about which of the

12   engagements had been involved in one of the various monitoring

13   programs the firm had in place, and we had a discussion about

14   using a similar scheme to what we did in 2016 by extending

15   monitoring programs to cover the workpaper completion period.

16          MR. BOXER:  I object to the use of the word "scheme,"

17   your Honor.  I ask that that be stricken.  It is a legal

18   conclusion.

19          MS. MERMELSTEIN:  It is just the witness's testimony.

20          THE COURT:  It is the witness' testimony.  I am going

21   to allow it insofar as it goes to his view of it.

22          MR. BOXER:  Thank you, your Honor.

23   BY MS. MERMELSTEIN:

24   Q.  Was there any discussion other than the use -- the

25   potential use of monitoring programs again, about how you might

1   take steps to act on information but keep secret your real

2   reason?

3           MR. WEDDLE:  Objection, your Honor.  Leading.

4           THE COURT:  Sustained.

5   Q.  Was there any discussion about an engagement that had been

6   canceled as a result of the Zika Virus?

7   A.  Yes, there was.

8   Q.  What was that discussion?

9   A.  I believe the client's name was First Bank, and it was an

10  engagement in Puerto Rico that had been selected in 2016 by the

11  PCAOB, and at that time there was a outbreak of the Zika Virus

12  in Puerto Rico and the PCAOB apparently had trouble staffing

13  the engagement -- staffing the inspection, so they canceled it,

14  and it appeared back on the 2017 list.  So, we had a discussion

15  about that would be an obvious way to contact and get in touch

16  with the engagement team and tell them that it was obvious that

17  they got canceled last year, they are probably at the top of

18  the list for this year; it would be a good way to get access to

19  the workpapers and get engaged with the team to review their

20  work.

21  Q.  Did anyone on the call suggest that KPMG's receipt of

22  confidential information should be reported to the PCAOB?

23  A.  No.

24  Q.  Did anyone suggest that it should be reported to the SEC?

25  A.  No.

1  Q.  Did anyone suggest that it should be reported internally at

2  KPMG?

3  A.  No.

4  Q.  Did anyone suggest that you shouldn't have the information?

5  A.  No.

6  Q.  Did anyone express hesitation in using the information?

7  A.  No.

8  Q.  By the end of the call, was there a final plan about how to

9  use the information?

10 A.  There was not a final plan.  Mr. Middendorf said he wanted

11 to think more about it and was -- said that he was going to

12 talk to Scott Marcello, the Vice Chair, about it.

13 Q.  When was the next time you spoke to Mr. Middendorf?

14 A.  I believe it was that Wednesday that same week.

15 Q.  How did that come about?

16 A.  I was in my office and I could see Mr. Middendorf walking

17 what I thought was with purpose towards my office.  He came in,

18 closed the door, sat down, and, excuse my language, but said,

19 "What the fuck is Brian Sweet doing?  Why is he telling people

20 thereon they're being inspected?"

21 Q.  What did he say about how he had come to understand that

22 Brian Sweet told someone they were going to be inspected?

23 A.  He relayed to me that Diana Kunz, a partner in the Chicago

24 office, had been contacted by Brian Sweet and was told she was

25 on the final inspection list and she had become concerned about

1  the receipt of confidential information and she discussed it

2  with her business unit leadership, who then raised it to Laurie

3  Mullen, who is a Regional Professional Practice Partner, who

4  raised it up to Mr. Middendorf.

5          MS. MERMELSTEIN:  Your Honor, may I have one moment to

6  consult with defense counsel?

7          THE COURT:  Yes.

8          (Pause)

9          MS. MERMELSTEIN:  Sorry, Mr. Whittle.

10 Q.  What was your understanding about why Mr. Middendorf was

11 upset to learn that Mr. Sweet had told someone they were going

12 to be inspected?

13         MR. BOXER:  Objection.

14         MR. WEDDLE:  Objection, your Honor.

15         THE COURT:  Overruled.

16         THE WITNESS:  Could you repeat the question, please?

17 BY MS. MERMELSTEIN:

18 Q.  Sure.  What was your understanding about why Mr. Middendorf

19 was upset to learn that Mr. Sweet had told an engagement

20 partner that he or she would be inspected?

21 A.  That he was sharing that with others that we had

22 confidential information about the upcoming inspections.

23 Q.  What, if anything, did Mr. Middendorf tell you to do?

24 A.  He told me to call Mr. Sweet and tell him to stop telling

25 engagement partners that they were on the inspection list.

1  Q.  Were you upset to learn that Mr. Sweet was telling

2  engagement partners they were on the list?

3  A.  Yes.

4  Q.  Why?

5  A.  Because then we were caught.  We were caught with having

6  confidential information that wasn't ours.

7  Q.  Did you have the conversation with Mr. Sweet that

8  Mr. Middendorf had told you to have?

9  A.  I did.

10  Q.  Did there come a time when KPMG conducted an internal

11  investigation into the possession of confidential PCAOB

12  information?

13  A.  Yes.

14  Q.  In connection with that investigation, were you asked to

15  turn over your cell phone?

16  A.  Yes.

17  Q.  And did you turn over your cell phone?

18  A.  I did.

19  Q.  Were you also asked for passwords relating to that cell

20  phone?

21  A.  Yes, I was.

22  Q.  And did you provide them?

23  A.  I provided the passcode to get into the phone, but they

24  asked for some sort of encryption passcode that would allow I

25  guess the downloading of the information and I did not have

1  that passcode.

2  Q.  And did you take steps to assist them in gaining access to

3  the phone?

4  A.  Yes, I did a couple of things.  The firm had sent an IT

5  person to my house, and I spent time with him on his computer

6  typing in every passcode I could possibly think of with respect

7  to that encryption code.  None of those worked.  And then on

8  another day we met at the AT&T store across from the KPMG

9  office in New York and talked to the folks at the store as to

10  whether there is a way to get that encryption passcode.  And

11  the person at the store said, no, it was a common problem, and

12  the way to get information was to upload information to iCloud

13  and then it could be download from there.

14  Q.  In connection with the internal investigation at KPMG, were

15  you interviewed by KPMG in-house counsel?

16  A.  Yes.

17  Q.  Were you also interviewed by KPMG's outside counsel?

18  A.  I was.

19  Q.  Were you completely truthful in those interviews?

20  A.  No.

21  Q.  Why not?

22  A.  I was afraid that I would lose my job, that I would be

23  subject to other penalties.

24  Q.  Did there come a time that you were arrested in connection

25  with the present matter?

1    A.   Yes.

2    Q.   Approximately when was that?

3    A.   January of 2018.

4    Q.   Did you ultimately decide to cooperate with the government?

5    A.   I did.

6    Q.   As part of that cooperation, did you participate in

7    meetings with the government?

8    A.   Yes, I did.

9    Q.   Since deciding to cooperate and until your testimony here

10   today, approximately how many times have you met with the

11   government?

12   A.   10 or 11 times, I guess.

13   Q.   And what did you have to do in those meetings with the

14   government?

15   A.   Tell the truth.

16   Q.   Tell the truth about what?

17   A.   About the -- the obtaining and using confidential PCAOB

18   information.

19   Q.   Did you talk about your own criminal conduct?

20   A.   Yes.

21   Q.   And the criminal conduct of others?

22   A.   Yes, I did.

23   Q.   And were you asked about any wrongdoing outside of the

24   present charges?

25   A.   I was.

1  Q.  What, if anything, did you tell the government about your

2  use of a housekeeper?

3  A.  I was asked whether I was paying taxes for my housekeeper

4  and I said no.  And so the question arose as to whether I

5  should be, and I thought at first I -- based on the discussion

6  that I should have been paying income taxes for my housekeeper,

7  but then as I went and investigated it, it turns out that she

8  was filing her tax returns as an independent contractor and it

9  appeared to me that she was filing them appropriately.

10  Q.  In connection with your cooperation, did you provide the

11  government with documents from your iCloud account?

12  A.  Yes.

13  Q.  Did there come a time when you pled guilty to federal

14  criminal charges?

15  A.  I did.

16  Q.  Was that pursuant to a cooperation agreement?

17  A.  Yes, it was.

18  Q.  Showing you Government Exhibit 1451, for identification, do

19  you recognize that?

20  A.  Yes.

21         MS. MERMELSTEIN:  Can we scroll through it, please,

22  Mr. Cooney.  Thank you.

23  Q.  What is it?

24  A.  It's my cooperation agreement.

25         MS. MERMELSTEIN:  The government offers Government

```
1    Exhibit 1451.

2              MR. BOXER:  No objection.

3              MR. WEDDLE:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 1451 received in evidence)

6              MS. MERMELSTEIN:  If we can go back to the first page,

7    Mr. Cooney.

8    Q.  What did you plead guilty to, Mr. Whittle?

9    A.  One charge of defrauding the federal government,

10   specifically the Securities and Exchange Commission, and four

11   counts of wire fraud.

12   Q.  And is one of those a conspiracy count and three are

13   substantive counts?

14   A.  That's correct.

15   Q.  What are your obligations under the cooperation agreement?

16   A.  First and foremost, to tell the truth, to commit no other

17   crimes, and to appear to testify when called.

18   Q.  What do you understand the government will do if you comply

19   with the terms of your cooperation agreement?

20   A.  That they'll write a letter to the judge before sentencing.

21   Q.  What is your understanding of whether the government will

22   recommend a particular sentence in that letter?

23   A.  They will not recommend a sentence.

24   Q.  With or without that letter, what is the maximum sentence

25   you could receive in this case?
```

1    A.  85 years.

2    Q.  What is the minimum sentence you could receive?

3    A.  Zero.

4    Q.  And what sentence are you hoping to receive?

5    A.  I'm hoping to avoid any jail time.

6    Q.  Has anyone promised you any particular sentence?

7    A.  No.

8    Q.  Does the outcome of -- does your sentence depend in any

9    fashion on the outcome of this trial?

10   A.  It does not.

11   Q.  Who decides what sentence you will receive?

12   A.  The judge decides.

13   Q.  What is your understanding of what happens if you lie

14   during your testimony here today?

15   A.  My understanding is that the agreement will be ripped up.

16   Q.  Would you be permitted to withdraw your guilty plea?

17   A.  No.

18            MS. MERMELSTEIN:  Nothing further, your Honor.

19            THE COURT:  All right.  Cross-examination.

20            MR. BOXER:  Yes, your Honor.

21            THE COURT:  Mr. Boxer.

22   CROSS-EXAMINATION

23   BY MR. BOXER:

24   Q.  Good afternoon, Mr. Whittle.

25   A.  Good afternoon.

1  Q.  My name is Nelson Boxer.  I represent David Middendorf.

2          At the time the conduct you testified about came to

3  light -- and that was roughly February of 2017, correct?

4  A.  From March of 2015 to February 2017.

5  Q.  Yes.  That's when -- in February of 2017 is when KPMG

6  conducted -- began conducting an internal investigation,

7  correct?

8  A.  Yes.

9  Q.  And at that time, you didn't believe or think that you had

10  committed a crime, right?

11  A.  I did not.

12  Q.  And you were worried about losing your job, correct?

13  A.  Correct.

14  Q.  And you were worried about I think you said other

15  penalties, right?

16  A.  Yes.

17  Q.  And by "other penalties," did you mean penalties related to

18  practicing as a CPA?

19  A.  Yes.

20  Q.  OK.  And you did not at that point in time decide to

21  cooperate with the government, right?

22  A.  Would you repeat that, please?

23  Q.  In February of 2017, you had not yet made the decision to

24  cooperate with the government, correct?

25  A.  That's correct.

1   Q.  And throughout 2017, you did not make that decision to

2   cooperate with the government, correct?

3   A.  Correct.

4   Q.  Sometime during 2017, you became aware that Brian Sweet was

5   cooperating with the government, isn't that right?

6   A.  Yes.

7   Q.  And then in January of 2018, you were charged in this case,

8   you were indicted?

9   A.  That's correct.

10  Q.  And at that time, you did not decide to cooperate with the

11  government, correct?

12  A.  That's correct.

13  Q.  You pled not guilty to the charges in January of 2018?

14  A.  That's correct.

15  Q.  And it was not until when you were -- withdrawn.

16          When you were charged in January of 2018 in this case,

17  you still did not believe you had committed a crime, correct?

18  A.  I had pled not guilty, that is correct.

19  Q.  And you first met with the prosecutors on July 30, 2018, is

20  that right?

21  A.  I don't recall the date but that timeframe sounds

22  appropriate.

23  Q.  In the summer of last year, correct?

24  A.  Yes.

25  Q.  And you knew that Mr. Sweet was cooperating, correct?

1   A.  Yes.

2   Q.  And you understood that you needed to be of assistance to

3   the government in order for them to enter into a cooperation

4   agreement with you, correct?

5   A.  I knew I needed to talk to them and provide them

6   information.  They would make that decision as to whether they

7   wanted me to be a cooperator or not.

8   Q.  Well, you needed to be able to provide "substantial

9   assistance" I think is the expression, correct?

10  A.  I think that's the term from the agreement.

11  Q.  And we'll look at the agreement in a second.

12          So you knew you needed to provide substantial

13  assistance when you first started meeting with the government,

14  right?

15  A.  Yes.

16  Q.  And you understood that the only place where you could

17  provide substantial assistance was against Mr. Middendorf,

18  correct?

19          MS. MERMELSTEIN:  Objection.

20          THE COURT:  Sustained.

21  BY MR. BOXER:

22  Q.  When you first started cooperating with the government, you

23  understood that if you provided information about

24  Mr. Middendorf, that would help the government's case, correct?

25  A.  Yes.

1    Q.  And they already had Brian Sweet, correct?

2    A.  Yes.

3    Q.  Brian Sweet was not a direct report to Mr. Middendorf,

4    correct?

5    A.  Correct.

6    Q.  You were a direct report to Mr. Middendorf, correct?

7    A.  Yes.

8    Q.  OK.  So -- well, why don't we take a look at that

9    cooperation agreement.  If we could put up I think it is 1451.

10            Just a second.  I'm sorry.  It just went into

11   evidence.

12            Let's see if we can look, Ms. O'Connor, at the second

13   page first, and if you could highlight the total maximum

14   sentence.

15            And I appreciate you were just asked this.  You are

16   facing 85 years in prison as a maximum sentence, correct?

17   A.  That's correct.

18   Q.  And if we look at the last paragraph on the next page,

19   could you read from the portion where it says "However"?

20   A.  "However, this Office will inform the probate (sic) office

21   and the Court of (a) this agreement; (b) the nature and extent

22   of the defendant's activities with respect to this case and all

23   other activities of the defendant which this Office deems

24   relevant to sentencing; and (c) the nature and extent of the

25   defendant's cooperation with this office."

1    Q.  And if we turn to the next page, starting with the words,

2    "In addition," if you could read that sentence?

3    A.  "In addition, if this Office determines that the defendant

4    has provided substantial assistance in an investigation or

5    prosecution, and if he has fully complied with the

6    understandings specified in this Agreement, this Office will

7    file a motion, pursuant to Section 5K1.1 of the Sentencing

8    Guidelines requesting the Court to sentence the defendant in

9    light of the factors set forth in Section 5K1.1(a)(1) through

10   (5)."

11   Q.  And that's the language that cites substantial assistance,

12   correct?

13   A.  I don't know but I -- based on reading this, I assume that

14   does.

15   Q.  Well, it provides that if you provide substantial

16   assistance, the government will do what it says in the

17   agreement, correct?

18   A.  Yes.

19   Q.  And in this case, you understood that "substantial

20   assistance" meant providing evidence against Dave Middendorf,

21   correct?

22   A.  Providing information about my -- all my activity relative

23   to this matter.

24   Q.  Well, is it fair to say in your direct testimony that there

25   was nothing you testified about that you didn't testify you

 1   shared with Mr. Middendorf?

 2   A.  Repeat the question, please.

 3   Q.  You throughout your direct testimony with respect to

 4   everything you testified about, you included Mr. Middendorf,

 5   isn't that right?

 6           MS. MERMELSTEIN:  Objection to form.

 7           THE COURT:  You can answer if you understand the

 8   question.

 9   A.  I'm not sure I follow the question.

10   Q.  There were some documents you were shown during your

11   testimony, correct?

12   A.  Yes.

13   Q.  Many of them did not have Mr. Middendorf's name on them,

14   correct?

15   A.  There were a lot -- over the course, I've looked at lots of

16   documents, and not all of them have Mr. Middendorf's name on

17   them.

18   Q.  We'll go through some of them, but many of the emails

19   between you and Mr. Britt or you and Mr. Sweet and you and

20   others did not include Mr. Middendorf in the emails, correct?

21   A.  I've had emails with lots of people, so yes --

22   Q.  Yes.  I'm sorry.  I'm just speaking about the ones you

23   reviewed this morning and this afternoon.  There are several of

24   those, if not many, that did not have Mr. Middendorf in the

25   email chain, correct?

1  A.  I'm not sure I recall every one, but I'm sure there were

2  some that did not include Mr. Middendorf, yes.

3  Q.  Is it fair to say many of them did not include

4  Mr. Middendorf of the ones you reviewed today?

5  A.  I'm not sure I could say whether there was many, a few, or

6  there were some.

7  Q.  OK.  But in the instances where there was no email with

8  Mr. Middendorf, you testified that you shared information with

9  him, is that right?

10 A.  That's correct.

11 Q.  So with -- just as a few examples, with respect to adding

12 resources to the Wells Fargo team in 2015, you said you shared

13 that with Mr. Middendorf, right?

14 A.  Correct.

15 Q.  By the way, in KPMG, what floor did you sit on?

16 A.  I -- I cannot remember.  Honestly, I don't remember,

17 sitting here.  Sorry.

18 Q.  The 20th floor, perchance?

19 A.  That sounds about right.

20 Q.  And isn't it correct that when Mr. Middendorf first came to

21 the National Office, he sat on the 22nd floor?

22 A.  He sat one floor above me.

23 Q.  And then after that, he moved to the 40th floor, correct?

24 A.  That's correct.

25 Q.  OK.  So he wasn't next door like Mr. Sweet, where you could

1    just walk over and have a quick chat with him and share the

2    information about the Wells Fargo resources, right?

3    A.   It was -- the way you describe it is correct, he sat on a

4    different floor.

5    Q.   OK.  And when Brian Sweet informed you that he spoke to an

6    inspector, an actual PCAOB inspector, and avoided a comment in

7    2015, Mr. Middendorf wasn't on that email that you testified

8    you shared that information with him, correct?

9    A.   That's correct.

10   Q.   And when you described the I think you called them

11   incremental four banks that were rereviewed in 2016, that was

12   discussed today in an email between you and Mr. Britt, correct?

13   A.   Yes.

14   Q.   Mr. Middendorf was not on the email, correct?

15   A.   That's correct.

16   Q.   But you testified you discussed that with Mr. Middendorf?

17   A.   I did.

18   Q.   OK.  And the 2017 -- we'll talk more about that --

19   conversation with Mr. Sweet on January 9th, I think you

20   testified, correct?

21   A.   Yes.

22   Q.   And you said that you discussed with Mr. Sweet planning to

23   send resources to Citibank, correct?

24   A.   Correct.

25   Q.   And that, too, you said you discussed with Mr. Middendorf,

```
 1    right?

 2    A.   Yes.

 3    Q.   No email emails, right --

 4    A.   Correct.

 5    Q.   -- on that topic?

 6          There is no way on the topics I just mentioned for the

 7    government to corroborate whether you're telling the truth

 8    about those things, right?

 9          MS. MERMELSTEIN:  Objection.

10          THE COURT:  Sustained.

11    BY MR. BOXER:

12    Q.   There is no document you have seen that backs up your

13    statement on those topics that you discussed them with

14    Mr. Middendorf, correct?

15    A.   Correct.

16    Q.   And you understand that to achieve substantial assistance

17    under the cooperation agreement, you need to provide

18    incriminating information about Mr. Middendorf, right?

19          MS. MERMELSTEIN:  Objection.

20          THE COURT:  Overruled.

21          You can answer.

22    A.   My understanding is I was to provide information about

23    anyone and everyone involved, and that would include

24    Mr. Middendorf.

25    Q.   If you were only able to provide incriminating information,
```

1   say, about Cindy Holder, in your mind do you think you would be

2   providing substantial assistance to the government?

3            MS. MERMELSTEIN:  Objection, your Honor.

4            THE COURT:  Sustained.

5   BY MR. BOXER:

6   Q.  I wanted to ask you a few questions about hiring Mr. Sweet.

7            You led that process, correct?

8   A.  That's correct.

9   Q.  Mr. Middendorf did not, right?

10  A.  Correct.

11  Q.  And you thought of him, Mr. Sweet, as a longterm hire, as I

12  understand it, correct?

13  A.  That's correct.

14  Q.  You were not thinking of him as someone to just get

15  information from for a year and then have no more use for him,

16  correct?

17  A.  That's correct.

18  Q.  If Mr. Sweet said that you said that, he would be lying,

19  right?

20           MS. MERMELSTEIN:  Objection.

21           THE COURT:  Sustained.

22  BY MR. BOXER:

23  Q.  In fact, you spoke to Mr. Sweet about moving from the

24  National Office out to an engagement team eventually, correct?

25  A.  Yes.  That was part of the discussions that I would have

1  with him.

2  Q.  And that would help improve audit quality, in your view,

3  correct?

4  A.  It would.

5          MR. BOXER:  If we can look at Government Exhibit 750?

6          You can take that one down.  Thank you.

7          If we can look at Exhibit M7, please.  Just for the --

8  not for the jury.

9  Q.  Do you recognize M7?

10          Maybe we could scroll through it.

11  A.  Could you just broaden it out a little bit?

12          (Pause)

13          Yeah, I do recognize it.

14  Q.  And is that an email involving you concerning the hiring of

15  Mr. Sweet?

16  A.  Yes.

17          MR. BOXER:  I offer it, your Honor.

18          MS. MERMELSTEIN:  Objection.  Hearsay, your Honor.

19          MR. BOXER:  I could explain.

20          May I approach, your Honor?

21          THE COURT:  Is it not for the truth?

22          MR. BOXER:  It is not for the truth.  It is for his

23  state of mind.  It also describes certain facts that I think

24  are nonhearsay.

25          There is a second document coming so if you would like

1    to hear further, but I think for not for the truth, it is a

2    valid --

3              MS. MERMELSTEIN:  Perhaps we should approach now, your

4    Honor.

5              THE COURT:  Yes, why don't we approach.

6              (Continued on next page)

1           (At the sidebar)

2           MR. BOXER:  This concerns M7 and M6, which they are

3    emails in the process -- that were sent around in the process

4    of hiring Mr. Sweet, including M6, which is sent to an attorney

5    who explains the rules of the road as to how he should clear

6    ethics at the PCAOB and what the requirements are.  It is on

7    the second page.  I think it is relevant to show that

8    Mr. Middendorf understood that this was a legitimate and fair

9    and appropriate process.  It is not for the truth.

10          THE COURT:  That he understood the hiring of Mr. Sweet

11   was an appropriate process?

12          MR. BOXER:  Yes.  And on 6, Mr. Middendorf receives it

13   as well, so as to his state of mind as well.

14          MS. MERMELSTEIN:  Your Honor, I have an objection to

15   Mr. Whittle being asked about his understanding that this was a

16   proper process, that he did not intend at the time he hired

17   Sweet to go down this road.  There may facts in this email that

18   may be offered for that limited purpose without getting into

19   hearsay.  But I think if Mr. Boxer is going where I think he is

20   going, which is that there is a whose series of these --

21          MR. BOXER:  No.

22          MS. MERMELSTEIN:  You are just doing this one?

23          MR. BOXER:  Two.

24          MS. MERMELSTEIN:  I object to the inclusion of the

25   portion where it recounts the conversation of Mr. Sweet

1   himself.  I have no objection to this is the proposal of how to

2   do this --

3            MR. BOXER:  Which portion is that?

4            MS. MERMELSTEIN:  I'm sorry.

5            (Pause)

6            MR. BOXER:  That is actually from Mr. --

7            MS. MERMELSTEIN:  I'm sorry.  Maybe I am looking at

8   the wrong one.

9            MR. BOXER:  Yes.

10           MS. MERMELSTEIN:  I have no objection to 6 itself with

11  respect to the earlier weighing in on the way to do it.  I

12  object more to the one that included a recitation by the

13  recruiter about what Mr. Sweet was saying.  If you are not

14  going there, then we may not have an issue.

15           MR. BOXER:  No, I was going to go there as well, I

16  thought.

17           MR. WEDDLE:  Your Honor, my view is that it is

18  relevant not for its truth because it demonstrates how

19  Mr. Sweet operates, and it shows that he is a convincing

20  salesman for himself in all kinds of different contexts, and he

21  presents credibly and promotes his experience.  So, we're not

22  trying to prove that he is a high performer at TwC.  We're

23  trying to prove that this is how he comes off.

24           MS. MERMELSTEIN:  The notion that it is somehow

25  probative to try and prove that a person interviewing for a job

1   presents their credentials is completely irrelevant, and any

2   relevance is completely outweighed by 403 concerns.  His own

3   statements cannot come in for that per se purpose.  I have no

4   objection to evidence that makes clear that this was not a

5   fraud from the getgo and that they consulted people on how to

6   hire Mr. Sweet.  That is totally fine.  But the notion of

7   Mr. Sweet's presenting himself well -- first of all, it is not

8   clear that this email does that, but if it did, it would be

9   irrelevant.  And the risk that this hearsay is going to be

10  taken as true, so that incredibly only helpful and

11  uncontroversial proposition does not justify the position.

12         MR. BOXER:  It is relevant for Mr. Middendorf's state

13  of mind.  It shows what he understands the candidate to be.  He

14  has seen him at a couple of PCAOB board meetings.  He doesn't

15  know him.  So it is relevant to is his state of mind.

16         MS. MERMELSTEIN:  There has been extensive testimony.

17  Mr. Whittle I think will openly and clearly agree that these --

18  Ms. Rodriguez says I think he was a rock star.  There is no

19  debate here, there is no dispute that he is qualified for this

20  job and that that was a reasonable basis on which to hire him.

21  So the need to prove that some other way doesn't make any

22  sense.  And the risk of it putting in hearsay and recounting a

23  person who is not testifying at this trial, recounting what

24  Mr. Sweet told him, we have no idea if these recruiters are

25  giving an accurate assessment of what Mr. Sweet said or they

1    are the ones sort of as part of their recruitment involvement

2    amping it up, and so it is totally misleading.

3          MR. BOXER:  That is the whole point is that it goes to

4    what he was told, not the truth of it.

5          THE COURT:  Was this received by Mr. Middendorf?

6          MS. MERMELSTEIN:  7 is, your Honor.

7          MR. BOXER:  6 and 7 were both received by him.  I'm

8    sorry, 6 is.

9          MS. MERMELSTEIN:  Given all of the testimony that

10   Mr. Middendorf is well within reason to think that Mr. Sweet

11   was a good hire, I can't understand how the need to prove that

12   overcomes the hearsay problems.

13         THE COURT:  This doesn't go to Middendorf?

14         MR. BOXER:  It goes to Whittle.

15         THE COURT:  Oh, it goes to Whittle.

16         MR. BOXER:  Right.

17         MS. MERMELSTEIN:  He has already said that he thought

18   Sweet was a good choice.

19         MR. BOXER:  But we are able to corroborate and further

20   establish it through a document that he received --

21         MS. MERMELSTEIN:  You want to corroborate Mr.

22   Whittle's testimony?

23         MR. BOXER:  I want to corroborate through the

24   document.

25         THE COURT:  So you're saying that this goes to

1   Whittle's state of mind and that therefore is background to

2   Middendorf's state of mind?

3        MR. BOXER:  This goes to Whittle's state of mind that

4   he sought him out not for an improper purpose, that they had a

5   longterm plan for him, and that he wasn't just trying to

6   capture as much download as he could the first few months of

7   his appointment.

8        And then 6, which I admit is more relevant, but I

9   think they are both admissible, finds its way to

10  Mr. Middendorf, which shows that Heidi Murdy-Michael, senior

11  counsel, had laid out the rules of the road.

12       MS. MERMELSTEIN:  We've withdrawn our objection to 6,

13  so I don't want you to waste your time fighting about it.

14       THE COURT:  So why is the government troubled by 7 in

15  that it could go to Whittle's, you know, understanding about

16  stuff that he has already testified about?  And there is some

17  relevance.

18       MS. MERMELSTEIN:  But it contains double hearsay.  We

19  have no idea if the recruiter is accurately reporting what

20  Sweet is saying.  And, indeed, it would not be surprising in

21  the nature of recruiting for a recruiter to, you know, put a

22  little gloss on what they're saying, and now it's coming before

23  the jury as though it is true and for a purpose that -- but it

24  has no reasonable actual value added here.  It's cumulative to

25  the testimony that Mr. Whittle has already admitted.

1          MR. BOXER:  I don't have anything to add, your Honor.

2     I think it is relevant for the fact that it is said.

3          MS. MERMELSTEIN:  Are there more of these or these are

4     the two?

5          MR. BOXER:  These are the two.

6          MS. MERMELSTEIN:  OK.

7          MR. BOXER:  Let me just check.  I have some other

8     emails on the topic of hiring from the PCAOB.

9          THE COURT:  Why is Whittle's state of mind relevant?

10         MR. BOXER:  Because he is the one who is in charge of

11    hiring Sweet.  He drives the process.  So, it just shows that

12    he's pursuing it for a legitimate purpose.

13         MR. WEDDLE:  Your Honor, I think it also follows up on

14    Mr. Whittle's direct testimony where he said that they were

15    criticized by the PCAOB board, and some of the things that they

16    said back to the PCAOB board was that they had less resources

17    and they were going to embark on a hiring program.  And it was

18    a broad hiring program.  And I intend to prove during my

19    cross-examination there are any number of people that they

20    hired.  We already hear about Louann Sakala.  We heard about

21    Mr. Santana.  We heard about Cindy Holder.  We heard about

22    Brian Sweet.  They are all leaving PCAOB within the space of a

23    couple of months of each other, and the other one who decides

24    to steal a bunch of stuff is Brian Sweet and his, you know,

25    number two, Cindy Holder, and everyone else comes on board

1    totally legitimately.  I think that that is highly relevant to

2    whether there exists a conspiracy or not.

3            MS. MERMELSTEIN:  I don't object to cross-examination

4    about the hiring of other PCAOB employees at KPMG.  If they

5    think it is relevant, that is fine.

6            THE COURT:  There is some relevance.  I don't see how

7    it's particularly prejudicial, you know, if it is admitted for

8    a nonhearsay purpose.  So, I will allow them, M6 and 7.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court)

2    BY MR. BOXER:

3    Q.  Mr. Whittle, I think we were looking at M7.

4            MR. BOXER:  I offer it, your Honor.

5            THE COURT:  M7 is received.

6            And I am just going to clarify that this is admitted

7    not for the truth of the statements in the document but to the

8    extent that it could go to the recipient or reader's or

9    hearer's understanding or state of mind.

10           (Defendant's Exhibit M7 received in evidence)

11   BY MR. BOXER:

12   Q.  And if I could direct you to the bottom of the document.

13   There is an email from David Clapp, correct, to Jason Rickert?

14   A.  That is correct.

15   Q.  Who are those people?

16   A.  David Clapp was an outside headhunter, and Jason Rickert

17   was an internal HR recruiting professional.

18   Q.  And they were people you were working with in your efforts

19   to hire Brian Sweet, correct?

20   A.  Correct.

21   Q.  And then Mr. Rickert forwards the email to you, correct?

22   A.  Yes.

23   Q.  And he highlights to you the notes below about Brian Sweet?

24   A.  Yes.

25   Q.  And if you go back to the summary on the bottom, those are

1    the bullet points, the highlights from -- and "Dave" here is

2    David Clapp, correct?  I should have asked you that when you

3    were looking at it.

4             Do you see the note?

5    A.   Yes.  It is David Clapp, yes.

6    Q.   Right.  And that's a summary of the attributes, the

7    qualities of Mr. Sweet, correct?

8             He was a high performer at PwC, right?

9    A.   Yes.

10   Q.   He had partner opportunities?

11   A.   He did.

12   Q.   His experience is quite deep in the banking sectors?

13   A.   That's correct.

14   Q.   A little further down, he left PwC well and returned there

15   as well as to another firm, correct?

16   A.   Yes.

17   Q.   And his compensation is approximately $250,000, correct?

18   A.   Correct.

19   Q.   By the way, when he was hired, Mr. Sweet, was he paid --

20   was he offered a market-rate compensation?

21   A.   I believe he was paid the market rate that we thought was

22   appropriate for what we were getting, yes.

23   Q.   OK.  And then if I could show you what's been marked as M6.

24   Do you recognize M6?

25   A.   Yes, I do.

 1            MR. BOXER:  I offer it, your Honor.

 2            THE COURT:  M6 is received.

 3            (Defendant's Exhibit M6 received in evidence)

 4  BY MR. BOXER:

 5  Q.  If we could start with the first email, which is at the

 6  very bottom of the first page, from Heidi Murdy-Michael to you

 7  and Mr. Middendorf, correct?

 8  A.  Yes.

 9  Q.  And this is in July of 2014, right?

10  A.  Correct.

11  Q.  Who is Heidi Michael-Murdy?

12  A.  Heidi Murdy-Michael is --

13  Q.  Heidi Murdy-Michael.

14  A.  -- is a member of Sven Holmes' team within the Legal Risk

15  and Regulatory Group at KPMG.

16            MR. BOXER:  I think, your Honor, we have another video

17  situation.

18            THE COURT:  OK.  Sorry about that.

19            Yours is off, too?

20            JUROR:  Yes.

21            (Pause)

22            THE COURT:  Is the back one working?

23            JUROR:  Yes.

24            THE COURT:  And yours is not?

25            JUROR:  Correct.

1          THE COURT:  We have one screen that is not working.

2          JUROR:  Two screens.

3          THE COURT:  Are you able to see that screen?

4          JUROR:  Yes.

5          THE COURT:  Can you see it?

6          JUROR:  Yes.

7          THE COURT:  You can look over her shoulder, OK.

8          It looks like they can all see now.

9          MR. BOXER:  Thank you, your Honor.

10   BY MR. BOXER:

11   Q.  Heidi Murdy-Michael, who is she?

12   A.  She is part of the Legal Risk and Regulatory Team under

13   Sven Holmes.

14   Q.  And who is Mr. Holmes?

15   A.  He is the Vice Chair of Legal Risk and Regulatory.

16   Q.  And what role do you recall Ms. Murdy-Michael had in the

17   hiring of Mr. Sweet?

18   A.  She had been previously employed by the PCAOB, and she

19   provided some information relative to hiring someone from the

20   PCAOB.

21   Q.  Looking on the second page, if you could read the very

22   first sentence, "After a little."

23   A.  "After a little more reflection, I wanted to suggest the

24   following approach to speaking with the prospect."

25   Q.  And if you go to item 2, "Specifically what," what does she

1    indicate there?  What does she say in her email?

2    A.  "Specifically what activities he'd be prevented from

3    engaging in if he came to KPMG.  Please note that on this last

4    point, a mere recital of the Ethics Code will not be

5    sufficient.  We'll be benefited by a concrete understanding of

6    what specific items within his purview he can continue to work

7    on here (e.g., may not be involved in the drafting of a

8    response to an inspection he was a part of, but may help to

9    remediate issues identified by an inspection he worked on)."

10   Q.  So those were the rules of the road, so to speak, for

11   hiring Mr. Sweet that came from Ms. Murdy-Michael, correct?

12   A.  Correct.

13   Q.  And then the email after that is from you thanking her for

14   outlining the approach, correct?

15   A.  Correct.

16   Q.  Then Mr. Middendorf weighs in:  "Thanks, Heidi.  Very

17   helpful."

18   A.  Yes.

19   Q.  So your understanding from the beginning, when an effort

20   was made to hire Mr. Sweet, that it was being done for a proper

21   purpose, correct?

22   A.  Correct.

23   Q.  To improve audit quality of the firm?

24   A.  Yes.

25   Q.  And to follow whatever rules or requirements the PCAOB had

1   for recruiting one of its people, correct?

2   A.  Correct.

3   Q.  Now, you were also aware that KPMG itself had internal

4   means and ethics requirements for people it brought into the

5   firm, is that right?

6   A.  Yes.

7   Q.  There is something called the Office of General Counsel at

8   KPMG, right?

9   A.  Correct.

10  Q.  And any new hire, including a new partner, has to sit down

11  with the Office of General Counsel before they start work, or

12  at least at the time they start work at KPMG, correct?

13  A.  That's correct.

14  Q.  And at that meeting, the new hire is informed of the firm's

15  expectations as far as compliance and rule following, correct?

16  A.  I've not participated in a discussion with the Office of

17  General Counsel.

18  Q.  What's your understanding of what takes place at such a

19  discussion?

20          MS. MERMELSTEIN:  Objection.  He has just testified he

21  doesn't know.

22          THE COURT:  Sustained.

23  Q.  Is it fair to say that you understood that Mr. Sweet,

24  before or at the time he started his term as a partner at KPMG,

25  went through some kind of orientation process?

1   A.  He did go to orientation, yes.

2   Q.  And is it your understanding that at that orientation he is

3   advised of some of the rules that apply to him in being a

4   partner at KPMG?

5   A.  I didn't attend.  I've never attended that orientation so I

6   don't know what's covered in the orientation process.

7   Q.  Could we just look back at M7 for a moment.

8           If we can look at the very top, you write:  "Thanks,

9   Jason.  I will discuss next steps with Jim Liddy and get back

10  to you."

11          Who is Jim Liddy?

12  A.  He -- at the time, he was the Vice Chair of Audit.

13  Q.  And was he supervising your efforts to recruit Mr. Sweet?

14  A.  Yes, he was involved.

15  Q.  If we can look at Exhibit M25.

16          Do you recognize M25?

17  A.  Yes.

18          MR. BOXER:  I offer it, your Honor, with the same

19  limitation as the previous exhibit.

20          MS. MERMELSTEIN:  Well, Mr. Boxer represented that we

21  weren't going to have any more of these at the sidebar so we

22  wouldn't need to come back.

23          MR. WEDDLE:  Objection to the commentary.

24          MR. BOXER:  I thought I did represent that there was

25  one more.

1      THE COURT:  I thought you said these two, but in any

2   event --

3      MR. BOXER:  That is fine, your Honor.  I will move on.

4      THE COURT:  OK.

5      MR. BOXER:  If we can look at Exhibit M38, please.

6   BY MR. BOXER:

7   Q.  Do you recognize Exhibit M38, Mr. Whittle?

8   A.  Yes, I do recognize it.

9      MR. BOXER:  I offer it, your Honor.

10      MS. MERMELSTEIN:  No objection.

11      THE COURT:  M38 received.

12      (Defendant's Exhibit M38 received in evidence)

13   BY MR. BOXER:

14   Q.  The email is to you, Mr. Middendorf, from Joe Lynch,

15   correct?

16   A.  Yes.

17   Q.  Who is Joe Lynch?

18   A.  Joe was a senior manager for -- a managing director of my

19   team, of my internal inspection team.

20   Q.  OK.  And looking at the email, what do you understand it to

21   be?

22   A.  Joe is providing a list of the hires that each of the firms

23   had made from the PCAOB.

24   Q.  And this is as of April 29, 2015, correct?

25   A.  Yes.

1    Q.  So Deloitte had eight hires, correct?

2    A.  Yes.

3    Q.  And E & Y has nine hires?

4    A.  That's correct.

5    Q.  PwC has four?

6    A.  Correct.

7    Q.  And Grant Thornton has eight?

8    A.  Correct.

9    Q.  And BDO has three?

10   A.  That's correct.

11   Q.  And if you go to the top, KPMG, including Mr. Sweet and

12   Mr. Tucker, who I take it has not yet started as of this date,

13   correct?

14   A.  Yes, there were five.

15   Q.  There were five.  So Mr. Sweet starts next week in May,

16   correct?

17   A.  Correct.

18   Q.  And Mr. Tucker hasn't started yet?

19   A.  Correct.

20   Q.  This is nothing unusual about KPMG recruiting hires from

21   the PCAOB?

22   A.  That's correct.

23   Q.  Other firms were doing it, correct?

24   A.  Yes.

25   Q.  In fact, other firms had been doing it before KPMG was

1   doing it?

2   A.  That's also correct.

3   Q.  And the idea was to bring the knowledge and expertise of a

4   PCAOB inspector into the firm to help improve audit quality,

5   correct?

6   A.  Yes.

7           MR. BOXER:  If we can put up Exhibit M41.

8   Q.  I want to move forward now to the first week of Mr. Sweet's

9   employment, starting with May 1st.  Well, it is actually

10  May 4th, but starting with the Friday before, May 1st.

11          I want to show you what's marked as M41, and then if

12  we could also show you M42.

13          Do you recognize those two documents?

14  A.  Could you go back to the first one for a second, please?

15  Q.  Sure.

16  A.  Yes, I do recognize it.

17  Q.  You testified earlier today about this email and the

18  attachment?

19  A.  Yes, I did.

20          MR. BOXER:  I offer them, your Honor.

21          MS. MERMELSTEIN:  No objection.

22          THE COURT:  M41 is received and also M42.

23          MR. BOXER:  M41 and M42, your Honor.

24          THE COURT:  Is M42 an attachment?

25          MR. BOXER:  It is.  They are marked separately.

1    THE COURT:  M41 and M42 are received.

2         (Defendant's Exhibits M41 and M42 received in

3  evidence)

4  BY MR. BOXER:

5  Q.  What is M41, Mr. Whittle?

6  A.  It is -- it's an email from Meredith Hardisty to the

7  Business Unit Professional Practice Partners providing them

8  with a tentative PCAOB schedule by location, by timing, and

9  whether there are financial services or not financial services.

10  Q.  And this is the schedule that I think you testified in some

11  instances allows the firm to predict where the inspection will

12  occur, correct?

13  A.  Yes.

14  Q.  And these schedules are sent out throughout the inspection

15  cycle?  Is there one -- withdrawn.

16         My question is is there one email where the schedule

17  is sent out or does it happen in several emails?

18  A.  Just one email.

19  Q.  So this is it for 2015, M41?

20  A.  Correct.

21  Q.  If we look at M42, that's what the schedule looks like,

22  correct?

23  A.  Yes.

24  Q.  And the week in the far left column is the week of the

25  inspection, correct?

```
 1   A.   Yes.

 2   Q.   The week that the inspection --

 3   A.   The first week of the inspection.

 4   Q.   That was my next question.

 5        And then the second column indicates whether any

 6   additional weeks will be necessary for the inspection, right?

 7   A.   Correct.

 8   Q.   So many of them did not have an additional week, which I

 9   take it means it is a one-week inspection?

10   A.   That is correct.

11   Q.   And then, as you said, there is an indication of whether or

12   not it's financial services or broker-dealer, right?

13   A.   Right.

14   Q.   And then the KPMG business unit, the geographical unit?

15   A.   Correct.

16   Q.   And then the specific office?

17   A.   Correct.

18   Q.   So if we look at the entry for June 8th, and -- thank you,

19   Ms. O'Connor -- this is sent on May 1st, correct, 2015?

20   A.   Yes.

21   Q.   So when you received this, you know there is an inspection

22   on June 8th of a financial services client, correct?

23   A.   Yes.

24   Q.   In the Indianapolis office?

25   A.   That's correct.
```

1    Q.  And so you knew this was Stonegate at the time you received

2    it, correct?

3    A.  I don't recall specifically, but we would look to see what

4    financial services clients were in Indianapolis and if that was

5    one or the only one, then that would be -- that's how we would

6    go about it.

7    Q.  Understood.  And so if we go down to August 17th, the one

8    with three additional weeks, that's a four-week inspection,

9    right?

10   A.  Yep.

11   Q.  In San Francisco, correct?

12   A.  Correct.

13   Q.  Of a financial services client, correct?

14   A.  Correct.

15   Q.  And that's the notice that you testified earlier that you

16   believed that Wells Fargo was being inspected, correct?

17   A.  That is correct.

18   Q.  It was a very large inspection of a financial institution

19   in San Francisco, correct?

20   A.  That's correct.

21   Q.  So at the time -- this is on May 1st, 2015, right?

22   A.  Yes.

23   Q.  So at the time Brian Sweet starts at KPMG on May 4th, 2015,

24   you understood that in the 2015 inspection Wells Fargo was

25   going to be inspected on August 17th, 31st, September 14th and

1    September 21st, correct?

2    A.   That was what we suspected, yes.

3    Q.   And that is what you understood, correct?

4    A.   Yes.   That's what we were -- that's what we were expecting.

5    Q.   OK.   So now I want to turn to that lunch you described.

6         You mentioned that the first lunch that you attended

7    it was you, I believe you said Mr. Mucha, Mr. Hermann and

8    Mr. Sweet, correct?

9    A.   That's correct.

10   Q.   And you spent the first part of the lunch getting to know

11   each other, right?

12   A.   Yes.

13   Q.   And then I think you said you talked shop?

14   A.   Correct.

15   Q.   You weren't putting pressure on Mr. Sweet during that

16   lunch, correct?

17   A.   From my perspective, no.

18   Q.   You weren't making him uncomfortable with any requests you

19   were making of him?

20             MS. MERMELSTEIN:   Objection.

21   Q.   As best you could tell?

22             THE COURT:   You can answer.

23   A.   Yes, from my perspective, no, I don't -- I don't believe

24   so.

25   Q.   It was the first meeting as a new colleague, correct?

1  A.  Yes.

2  Q.  Either during the lunch or on the walk back from the lunch,

3  he didn't mention anything about having a list of 2015

4  inspections, correct?

5  A.  I'm not sure I recall specifically what we talked about

6  either during the lunch or afterward or in that walk back.

7  Q.  I thought your testimony was that you heard about the list

8  when you stopped by his office later that day to check in and

9  see how he was doing, correct?

10  A.  Yes.

11  Q.  And when he mentioned something about a list, when he did

12  that, that was the first time you had learned from Mr. Sweet

13  that he had a list, right?

14  A.  I believe so.

15  Q.  It hadn't come up during the lunch, correct?

16  A.  Not that I recall.

17  Q.  And at this time, May 7th, I believe, 2015 -- does that

18  sound right?

19  A.  Was that the Thursday?

20  Q.  I think May 7th, yes.

21  A.  OK.

22  Q.  You had no knowledge of Mr. Sweet bringing confidential

23  PCAOB information with him from the PCAOB over to KPMG,

24  correct?

25  A.  Prior to him offering the list, no.

1    Q.   You knew nothing about any materials he took with him from

2    PCAOB -- from the PCAOB before that encounter in his office,

3    correct?

4    A.   That's correct.

5    Q.   And he said something to you about the list -- he has a

6    list of bank issuers I think is what you said but I want to

7    make sure I have it clear.  Is that right?

8    A.   When we were discussing -- when he said that he knew who

9    the engagement -- knew who was on the list, it was my

10   presumption that it was about the banks because he was a part

11   of the bank leadership team.  So at that initial discussion, in

12   my mind it was just about the banks.

13   Q.   So you don't remember whether or not he used the word bank

14   list or list is what I understand you to be saying?

15   A.   I don't -- I don't recall.

16   Q.   But you understood it to be the bank list, correct?

17   A.   That is what I was expecting.

18   Q.   And that's what you wrote in your email with him, correct?

19   A.   That's correct.

20   Q.   So this was after the audit opinions had been issued for

21   the engagements, correct?

22   A.   For the most part, yeah, I believe for -- I'm not sure it

23   was all but certainly for the vast majority.

24   Q.   And the documentation period for the vast majority had also

25   ended, correct?

1  A.  Oh, that's correct.

2  Q.  And so there was nothing that could be done as far as the

3  audit work or the documentation at the time you were having

4  this conversation with Mr. Sweet, correct?

5  A.  Not unless we reopen the workpapers.

6  Q.  Not unless what?  I'm sorry.

7  A.  Not unless you added new workpapers and went through the

8  documentation of that additional work.

9  Q.  And you didn't do that, correct.

10 A.  No.

11 Q.  You didn't direct anybody to do that, correct?

12 A.  I did not.

13         MR. BOXER:  If we can just put up Government Exhibit

14 753, please.

15 Q.  This is the email we were just speaking about, right,

16 Mr. Whittle?

17 A.  Yes, it is.

18 Q.  And if we can go to your very first email, the very last

19 page, and if you could read the first line.

20 A.  "Brian – Could you have Lisa scan and send me the banking

21 selection list?  Thanks.  Tom."

22 Q.  Lisa I think you mentioned is Lisa Dragonetti, correct?

23 A.  That's correct.

24 Q.  She was your assistant?

25 A.  She was my admin assistant, but she was also the admin

1  assistant for most of the partners in my group.

2  Q.  So in asking Brian to give it to Lisa, you weren't acting

3  with any stealth or secrecy, correct?

4  A.  No, I was asking him to send it.

5  Q.  And you were asking him to have Lisa scan it right into the

6  KPMG server where it could be found two years later and so we

7  knew where it was, correct?

8  A.  Correct.

9  Q.  And he was a few doors away, Mr. Sweet, right?

10 A.  That's correct.

11 Q.  So instead of walking over to him, you just asked him to

12 scan it, correct, or have it scanned?

13 A.  I don't believe I was in the office on that Friday.

14 Q.  And you wrote the banking selection list, and that's what

15 you were alluding to earlier.  You understood him to have the

16 list of the banks that were going to be inspected, correct?

17 A.  Yes.

18 Q.  And instead you got a more -- a larger list?

19 A.  That's correct.

20 Q.  And your testimony, if I remember correctly, was before you

21 did this, you needed to check with Mr. Middendorf because you

22 didn't want to get in trouble with him; is that your testimony?

23 A.  Yes.

24 Q.  Do we have -- you didn't write him an email asking him if

25 it was OK for you to get the list?

1    A.  I did not.

2    Q.  And you didn't -- you didn't even go up to try to see

3    him -- well, you just said you were out of the office on that

4    Friday, correct?

5    A.  I believe I was.

6    Q.  You didn't call him, correct?

7    A.  I did call him -- I did call -- we had -- I did call him to

8    discuss the list.

9    Q.  And instead of what you asked Lisa Dragonetti to do, to

10   just scan it, you didn't send the mail or forward this email to

11   Mr. Middendorf to ask for his approval, correct?

12   A.  Could you repeat that?  I'm sorry.

13   Q.  You didn't forward any of the emails in Government Exhibit

14   753 to Mr. Middendorf to ask if this was OK?

15   A.  No.

16   Q.  And at the time you were doing this, I think you testified

17   you thought it may not be ethical; is that your testimony?

18   A.  I thought it was wrong.

19   Q.  And you thought that at the time you were doing this?  You

20   had a conscious understanding at that moment, standing outside

21   his office, that you were doing something wrong; is that your

22   testimony?

23   A.  Yeah, that this wasn't -- it was confidential.  We were --

24   we had never gotten advance notice, and it would be out of the

25   protocol.

1   Q.  And all of that is going through your mind as you're

2   standing in his office and saying how are things going?  You're

3   realizing you're doing something wrong?

4   A.  We were getting information that we shouldn't have had,

5   yes.

6   Q.  And so you realized you were doing something wrong, and

7   then you emailed Mr. Sweet to involve your admin to scan you

8   the list, correct?

9   A.  Yes.

10  Q.  And -- but you didn't think you were committing a crime at

11  the time; is that what I understand your testimony to be?

12  A.  That's correct.

13  Q.  And then after this occurs, you give the OK for Mr. Sweet

14  to talk to three of the engagement teams, I believe, correct?

15  A.  That's correct.

16  Q.  Do you recall which engagement teams those were?

17  A.  Mr. Garton, Mr. Flynn and Mr. Niswonger.  I don't recall

18  which engagements they were.

19  Q.  And at the time you did that, were you thinking to yourself

20  I'm going to let them do this but this is wrong?

21  A.  I'm not sure I thought that one all the way through.

22  Q.  Isn't it fair to say that when you were outside his office,

23  you weren't thinking about whether it was right or wrong, it

24  was just something that he asked and something you said OK?

25          MS. MERMELSTEIN:  Objection to asked and answered and

1    asked and answered.

2              THE COURT:  If you understand the question, you can

3    answer.

4              THE WITNESS:  Could you repeat the question?

5    BY MR. BOXER:

6    Q.  Is it the truth, Mr. Whittle, that when you had this

7    initial conversation with Mr. Sweet outside his office, you

8    hadn't given it any thought as to whether you were doing

9    something wrong when he said he had the list and you said OK?

10   A.  I knew at the time it was not something I was supposed to

11   have.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  You gave it that thought while you were standing there?

2              MS. MERMELSTEIN:  Objection: asked and answered.

3              THE COURT:  Sustained.

4  Q.  Now if we can look at Government Exhibit 755, please.  This

5  is the instance of you forwarding the list to William O'Leary,

6  correct?

7  A.  Yes.

8  Q.  Mr. Middendorf is not on this email either, right?

9  A.  He is not.

10 Q.  This was a request you made of Mr. O'Leary to do an

11 analysis relating to the list?

12 A.  That's correct.

13 Q.  When you made that request and you sent the email and then

14 you got it back, the whole time you were thinking this is

15 wrong; is that my understanding of your testimony?

16 A.  Certainly when I got the list, I knew it was wrong.  I'm

17 not sure I had a conscious thought relative to forwarding it to

18 Mr. O'Leary.

19 Q.  Are you not sure if you had a conscious thought of right or

20 wrong when you got the analysis back as well?

21 A.  I'm not sure with respect to that exchange.  I would say

22 that applies to both.

23 Q.  If we can look at Government Exhibit 806, please.  Now we

24 have an email that Mr. Middendorf is on, correct?

25 A.  That's correct.

1   Q.  If you could read first sentence.

2   A.  "Dave, Tom, I wanted to send you both a list of what I

3   anticipate to be the most likely PCAOB banking inspections for

4   2016."

5   Q.  When you read that, did you think at that time you were

6   receiving something that was wrong?

7   A.  Certainly not with respect to that sentence.

8   Q.  That's because he wrote "the most likely PCAOB banking

9   inspections, correct"?

10  A.  I would say that I focused on "what I anticipate."

11  Q.  "What I anticipate will be the most likely PCAOB banking

12  inspections," correct?  You have to say yes or no.

13  A.  Yes.

14  Q.  He is predicting, Mr. Sweet, correct?

15  A.  He is predicting.

16  Q.  In your mind that's okay, right?

17  A.  If he is predicting and not using confidential information,

18  I think it would be perfectly fine.

19  Q.  Based on what is written in Government Exhibit 806, to use

20  your analysis, this would be perfectly fine, correct?

21          MS. MERMELSTEIN:  Objection to form, your Honor.  Is

22  he talking about the highlighted sentence or the whole email?

23          MR. BOXER:  I'm talking about the whole exchange.

24  I'll rephrase the question.

25  Q.  When you received Government Exhibit 806, you didn't think

1   you were doing any wrong by receiving it, correct?

2   A.   I wasn't sure because we got information that he is using

3   the "next in line," which is confidential to the PCAOB as to

4   what the next inspections are.   I certainly wasn't sure whether

5   that was confidential at the time, but it appeared to be

6   confidential information.

7   Q.   You didn't know if the use of "next in line" was

8   confidential or not, correct?

9   A.   It appeared to be, but I wasn't totally sure.

10  Q.   He writes, "I have tried to rank in order based on my best

11  guess of the likelihood," correct?

12  A.   Yes, he does.

13  Q.   That's a guess, best guess, correct?

14  A.   Best guess, yes.

15  Q.   When you read that, you don't think there is something

16  wrong going on, correct?

17  A.   Not with respect to the rank and order.

18  Q.   "What I anticipated," as you said, "will be the most likely

19  banking inspections," when you read that, you don't believe

20  there is something wrong with that either, correct?

21  A.   Not taken by itself, no.

22  Q.   Mr. Sweet sent a lot of emails like Government Exhibit 806,

23  correct?

24  A.   He did from time to time send emails like this, yes.

25  Q.   He made predictions, correct?

1    A.  He did.

2    Q.  He talked about his best guess, correct?

3    A.  He did.

4    Q.  He talked about what based on his experience he anticipates

5    will happen, correct?

6    A.  Yes.

7    Q.  Mr. Middendorf was on many of those emails, as were you,

8    right?

9    A.  I presume so, yes.

10   Q.  When you received an email that said it was a prediction or

11   something like a prediction, you didn't think there was

12   anything wrong with you receiving that information, correct?

13   A.  It depended on the information.

14   Q.  If he told you he was predicting what he thought would

15   occur or words to that effect, predicting, you thought that was

16   okay, correct?

17   A.  If he was doing it with his own work, I would think that

18   was okay.

19   Q.  You would never know for sure what work he had or hadn't

20   done.  For example, in this email you don't know what he had or

21   hadn't done when he writes the email, correct?

22   A.  Here he references the inspections that were next up that

23   weren't in this year's inspection.  Presumably, if they didn't

24   inspect them this year, maybe they were high risk for next

25   year.

1  Q.  That's an obvious prediction, correct?

2  A.  If you knew that information.

3  Q.  If something is not inspected this year, it is often

4  obvious that it might be inspected the following year, correct?

5  A.  Yes.

6  Q.  Let me try it a different way.  When you received an email

7  from Mr. Sweet where he made predictions about things that were

8  going to happen, you didn't think you were receiving something

9  wrong at that time?

10        MS. MERMELSTEIN:  Asked and answered, your Honor.

11        THE COURT:  Overruled.  You can answer.

12  A.  It depended on the email.  There were some emails where he

13  predicted certain inspections in other countries where he had

14  received that information from people at the PCAOB.

15  Q.  I want to show you that email.  If I understand what you

16  are saying, and to make sure I do understand, if he just said a

17  prediction, you thought that was okay, but if he said something

18  a prediction and something else, that may or may not be okay is

19  what you thought, is that fair?

20  A.  Yes.

21  Q.  If we can look at Exhibit M50, please.  This is in

22  evidence.  Are you able to read it or should we make it bigger?

23  Start with the bottom portion.  June 16th email from Mr. Sweet

24  to you and Mr. Middendorf, correct?

25  A.  Yes.

1    Q.   It's titled "Likely 2016 inspections," and it starts with

2    "A list of what I anticipate will be the most likely PCAOB

3    banking inspections for 2016," correct?

4    A.   Yes.

5    Q.   That's a prediction, correct?

6    A.   It is.

7    Q.   He is saying most likely, right?  That's what he said, the

8    most likely inspections, correct?

9    A.   Yes.

10   Q.   Then Mr. Middendorf replies, "Thanks.  How is everything

11   going after six weeks on the job," right?

12   A.   Yes.

13   Q.   Then what does Mr. Sweet respond?

14   A.   Would you like me to read it?

15   Q.   Please, the first two sentences.

16   A.   "David, it has been a fantastic experience so far and I've

17   had no second thoughts or regrets whatsoever.  I have had

18   conversations with Alain and Hector and told them the same.

19   Everyone has been very welcoming, and I continue to be

20   impressed on how focused the teams are on audit quality."

21   Q.   When you read Government Exhibit 50 when you received it,

22   you didn't think that Mr. Sweet was feeling unfair pressure

23   from the firm, correct?

24   A.   No.

25   Q.   Your understanding from Mr. Sweet was just what is written

1    in Exhibit 50, that he was very pleased with the experience,

2    correct?

3    A.  That's correct.

4    Q.  He didn't complain about being put under pressure to do

5    things he didn't want to do, correct?

6    A.  No, none.

7              THE COURT:  Mr. Boxer, I want to take our

8    mid-afternoon break.  Is this a good time?

9              MR. BOXER:  Yes, your Honor.  Thank you.

10             THE COURT:  Folks, let's take ten minutes.  Please

11   leave your pads on your chairs and we will continue in ten

12   minutes.

13             (Recess)

14             THE COURT:  Good afternoon, folks.  We'll go to 5

15   o'clock today.

16             Mr. Boxer.

17             MR. BOXER:  Thank you, your Honor.

18             If we could display Government Exhibit 808, which we

19   will remark as defense Middendorf Exhibit 297.

20   BY MR. BOXER:

21   Q.  Do you recognize that email, Mr. Whittle?

22   A.  Yes, I do.

23             MR. BOXER:  I offer it, your Honor.

24             MS. MERMELSTEIN:  No objection.

25             THE COURT:  M297 received.

1          (Defendant's Exhibit M297 received in evidence)

2    Q.  It's a June 18, 2015, email from Mr. Sweet to you, correct?

3    A.  Yes.

4    Q.  Mr. Middendorf is not on the email, correct?

5    A.  Correct.

6    Q.  What does Mr. Sweet write, if you could read the sentence

7    "Tom FYI."

8    A.  "Tom, FYI I just heard that the PCAOB is going to cancel

9    and not replace the First Bank's inspection in St. Louis.  It's

10   probably best to wait for the official notification to come

11   through before letting engagement team know, but wanted to pass

12   along info so you are aware."

13   Q.  You didn't think there was anything wrong when you received

14   this email from Mr. Sweet, correct?

15   A.  No.

16   Q.  You didn't stop him and tell him not to continue sending

17   emails like this, right?

18   A.  I did not.

19   Q.  It was, in effect, what you could call inside baseball

20   about the PCAOB; is that a fair way to describe what he is

21   doing, inside information but innocuous?

22   A.  This was innocuous.  He heard something that we would get

23   the official notification probably at the same time.

24   Q.  It was typical for Mr. Sweet to share rumors and similar

25   types of information regarding the PCAOB with you?

1   A.  Yes.

2           MR. BOXER:  If we could turn to Government Exhibit

3   823, please.  We will mark that as M298.  If we can blow up the

4   bottom portion, Ms. O'Connor.

5   Q.  See if you recognize it, Mr. Whittle.

6   A.  I do recognize it.

7   Q.  It's an email that you are on that includes Brian Sweet and

8   Mr. Middendorf, correct?

9   A.  That's correct.

10          MR. BOXER:  I offer it, your Honor.

11          MS. MERMELSTEIN:  No objection.

12          THE COURT:  M298 is received.

13          (Defendant's Exhibit M298 received in evidence)

14  Q.  If we go to the first sentence of Mr. Sweet's email to you

15  and Mr. Middendorf, what does he write?

16  A.  "I spent quite a bit of time with Palantir trying to guide

17  their modeling efforts but thought it may be beneficial to

18  provide you both with what I suspect to be the most likely

19  nonbank targets for inspection in 2016."

20  Q.  Again a prediction from Mr. Sweet in Exhibit 298, correct?

21  A.  Yes.

22  Q.  You didn't think there was anything wrong when you received

23  Exhibit 298, correct?

24  A.  I did not.

25  Q.  I think you mentioned Palantir in your testimony earlier

1  today, correct?

2  A.  Correct.

3  Q.  Were you aware that Palantir was a board-approved project

4  at KPMG?

5  A.  I was not.

6  Q.  Were you aware that Mr. Holmes, the head of compliance, was

7  aware of the Palantir project?

8  A.  I'm not sure I recall one way or the other.

9  Q.  Is it possible that he was aware of the project, Mr.

10  Holmes?

11        MS. MERMELSTEIN:  Objection.

12        THE COURT:  Overruled.

13  A.  Could you repeat the question.

14  Q.  Is it possible that Mr. Holmes was aware of the Palantir

15  project?

16  A.  Certainly possible.

17  Q.  You understood that the Palantir arrangement was that

18  Palantir would be paid a fee if it was able to predict a

19  certain percentage of the 2016 inspections correctly, right?

20  A.  Yes.

21  Q.  Mr. Middendorf was involved in the Palantir project,

22  correct?

23  A.  Correct.

24  Q.  You would agree with me that it wouldn't make sense for the

25  firm to pay a fee to an entity to predict correctly the

1  inspections if it knew that it was going to be receiving

2  inspections from Mr. Sweet?  That wouldn't make sense, correct?

3  A.  Could you repeat the question?

4  Q.  It wouldn't make sense for the firm to pay a fee to

5  Palantir if Palantir correctly predicted inspections if at the

6  same time the firm or Mr. Middendorf was aware that Mr. Sweet

7  was going to be providing the information about who was going

8  to be inspected?

9  A.  It would not.  That makes sense.

10  Q.  You would agree with me?

11  A.  Yes.

12  Q.  If we can look at Government Exhibit 876, please.  This is

13  in evidence.  I think this is one of the ones you alluded to

14  before, if I remember correctly.  The first email is from Brian

15  Sweet, on the bottom, talking about how he got a call from an

16  old colleague over the weekend, correct?

17  A.  Yes.

18  Q.  "They let me know a decision has been made to inspect a big

19  bank in both Switzerland and Japan next year," right?

20  A.  Yes.

21  Q.  He writes, "So obviously Credit Suisse and Sumitomo,"

22  correct?

23  A.  Yes.

24  Q.  He sent that email to Jim, David, and Scott.  David is not

25  Dave Middendorf, correct?

 1    A.  No, it is not.

 2    Q.  That's David Britt, right?

 3    A.  Correct.

 4    Q.  One way to distinguish between David Britt and David

 5    Middendorf is David Britt was known as "David" and David

 6    Middendorf was known as "Dave," right?

 7    A.  Typically, yes.

 8    Q.  Typically?

 9    A.  Yes.

10    Q.  When you received this email, did you think it was wrong

11    that you had it?

12    A.  I received the email -- I guess I was copied on the next

13    iteration of this email.

14    Q.  Fair enough.  Let's look at the next iteration.  That is

15    Brian Sweet forwarding the email to a number of people, right?

16    A.  Yes.

17    Q.  I think you mentioned James Liddy was the vice chair of

18    audit.  But at this time he has a new role, I believe, correct,

19    in November of 2015?

20    A.  Not sure the exact time, but once he stopped being the vice

21    chair, he did take on a role in a global banking role, type of

22    role.

23    Q.  Whether he is still vice chair of audit or not, he has a

24    very senior leadership position at KPMG in November of 2015,

25    correct?

 1    A.  Yes.

 2    Q.  I think you have described Mr. Britt, but I'm not actually

 3    sure if you have.  Who is David Britt?

 4    A.  David Britt was a partner in the national office, part of

 5    the audit group.  He specialized in banking.

 6    Q.  Was he the co-head of the banking group in the audit

 7    department?

 8    A.  Yes.  He was either the head or the co-head depending on

 9    the time frame.

10    Q.  With Mr. Canfarotta, correct?

11    A.  Correct.

12    Q.  Who is Scott Frew?

13    A.  Scott Frew was my predecessor in my role, and after that he

14    moved into a similar position on a global basis.

15    Q.  So he went to a more senior position, or is that considered

16    a lateral change?

17    A.  Not sure.  But he would be certainly a senior person within

18    the firm.

19    Q.  Then you and Mr. Middendorf.  Let me ask you the question

20    where you correctly pointed out that you hadn't received the

21    email yet.  When you received the email that we are looking at

22    now that is forwarded to you, did you think you were doing

23    something wrong in receiving that email?

24    A.  We certainly were getting inside information that had not

25    been noticed to us absent the fact that -- we had received the

1    information about the Japan move.  But in terms of what they

2    were inspecting or the types of things they were inspecting

3    would not be something we would have otherwise received had it

4    not been for Mr. Sweet.

5    Q.   Did you think it was wrong that you received this email at

6    the time you received it in November of 2015?

7    A.   Not sure what I thought about it at that time.

8    Q.   Isn't it true that Mr. Liddy did not complain, to your

9    knowledge, about receiving this email, Government Exhibit 876,

10   right?

11   A.   He did not complain to me.

12   Q.   You are not aware of Mr. Britt receiving the email,

13   correct?

14   A.   Same: he did not complain to me.

15   Q.   Mr. Frew didn't complain about receiving the email?

16   A.   He did not.

17   Q.   Neither did Mr. O'Mara or Mr. Middendorf write back and say

18   we are not supposed to have this, correct?

19   A.   That's correct.

20   Q.   Would you agree with me that it is not so obvious when you

21   look at Government Exhibit 876 that what Mr. Sweet is

22   describing is confidential information that is wrong for the

23   firm to have?  It's not so obvious?

24   A.   From my perspective as the head of inspections, I would

25   know that that was information we should not have.

1  Q.  But you testified that you weren't sure whether it was

2  wrong to have this information in this email.  I thought that's

3  what you just said a few questions ago.

4  A.  It depends on the type of information that is here in each

5  case.  We weren't noticed of a particular bank or a particular

6  type of engagement that was noticed, so that would be

7  confidential at that time.

8  Q.  You can look at this email and look through every word in

9  every sentence and come up with a reason why there must be a

10  confidential information behind it, correct?

11          MS. MERMELSTEIN:  Objection.

12          THE COURT:  Sustained.

13          MR. BOXER:  I'll withdraw it, your Honor.

14  Q.  My question is simply:  In November of 2015 none of the

15  people who received this email indicated that there was a

16  problem that they had received it, correct?

17  A.  That's correct.

18  Q.  Just speaking for yourself, you weren't sure, you couldn't

19  tell by receiving it, what was written here, whether it was a

20  problem or not that you had received it, right?

21  A.  Some of it was not a problem for sure and some potentially

22  was a problem.

23  Q.  Potentially, correct?

24  A.  Yes.

25  Q.  You didn't know, right?

1   A.  Some of it I would know was not, and some was, and some was

2   in the middle somewhere.

3   Q.  Would you agree with me that the information Mr. Sweet was

4   providing, it wasn't so easy to tell how much of it was rumor

5   and how much of it was because he had something on his computer

6   that he stole from the PCAOB?

7           MS. MERMELSTEIN:  Objection.

8           THE COURT:  Sustained.

9   Q.  When you would receive information like we saw in the last

10  two emails, you couldn't tell where he was drawing that

11  information from, correct?

12          MS. MERMELSTEIN:  Objection: asked and answered.

13          THE COURT:  Overruled.

14  Q.  You couldn't tell?

15  A.  He indicates I believe in the other email that he had a

16  call from someone at the PCAOB.

17  Q.  Right.  You don't know who from the PCAOB, right?

18  A.  I do not.

19  Q.  You don't know if he even got a call, correct?

20  A.  I do not.

21  Q.  If we could look at Exhibit M62.

22          MR. BOXER:  I guess, Ms. O'Connor, we should start at

23  the end and move up for Mr. Whittle to be able to at least scan

24  through it.

25  Q.  Do you recognize these emails?

1    A.  Yes, I do.

2    Q.  It starts with an email from Mr. Sweet to you about PCAOB?

3    A.  Yes.

4           MR. BOXER:  I offer it, your Honor.

5           MS. MERMELSTEIN:  One moment, your Honor.  Your Honor,

6    the redacted version of this is already in evidence as a

7    government exhibit, and we have no objection to that.  But the

8    redactions that were already deemed appropriate should remain

9    with this exhibit as well.

10          MR. BOXER:  I don't remember which portions were

11   redacted, your Honor, but I think it all goes to his state of

12   mind.

13          MS. MERMELSTEIN:  I believe the top of the email is

14   hearsay, your Honor.

15          MR. BOXER:  The very last?

16          MS. MERMELSTEIN:  The top of the email.

17          MR. BOXER:  The first sentence?

18          MS. MERMELSTEIN:  The top two emails in the chain.

19          THE COURT:  Do you know what the government exhibit

20   is?

21          MS. MERMELSTEIN:  I do not off the top of my head,

22   your Honor.  We can certainly go and look.  One moment.  Your

23   Honor, 956.

24          THE COURT:  Do you want to just do it as 956?

25          MR. BOXER:  I do want to offer this.

1              THE COURT:  You do want to?

2              MR. BOXER:  Yes.

3              THE COURT:  All right.  I'm going to receive it.  M62

4    received.

5              MS. MERMELSTEIN:  Your Honor, may we approach?

6              THE COURT:  Yes.

7              (At the sidebar)

8              MS. MERMELSTEIN:  Your Honor, the email at the top of

9    the chain is given by the defendant reflecting his view that

10   perhaps their conversations with Jay Hanson and Helen Munter

11   are bearing some fruit.  That is problematic in two regards.

12   One, it is hearsay offered to demonstrate the truth of the

13   matter asserted, that is, that Mr. Middendorf has been

14   complaining to the PCAOB about his opinion about the

15   inspections of KPMG and the fact that he feels that that may be

16   working.

17              Separately, as we have had discussions at sidebar any

18   number of times, this notion that somehow the PCAOB was unfair,

19   that Mr. Middendorf thought they were unfair, is wholly

20   irrelevant.  You cannot blame the PCAOB and suggest -- I don't

21   know what you are suggesting -- that you had no choice but to

22   do this because they are unfair or that somehow this isn't a

23   crime because the PCAOB is being unreasonable.  That whole line

24   of evidence is totally inappropriate even if it wasn't hearsay.

25   I do think it was redacted in the first instance for an

1   appropriate reason, and it shouldn't come in now.

2            MR. BOXER:  I think it is relevant because it shows

3   Middendorf's state of mind that he doesn't think what is being

4   reported by Mr. Sweet occurred because of any confidential

5   information or anything Mr. Sweet did.  And he is not put on

6   notice, Mr. Middendorf, that it is because of Mr. Sweet and

7   something changed at the PCAOB because of his conversations

8   with two of the board members.  So I don't think it is for the

9   truth as to whether Helen Munter and Jay Hanson actually

10  affected that change, but it is relevant for Mr. Middendorf's

11  state of mind.

12           MR. WEDDLE:  It is the type of thing that tends to

13  show that a person doesn't have a mental state that all that is

14  happening here is the use of confidential information.  When he

15  hears there is a good result, his initial reaction is maybe our

16  discussions with Helen Munter and Jay Hanson have gone through,

17  good job guys, you deserve a bonus for stealing information.

18           MS. KRAMER:  Your Honor, the relevance --

19           MR. BOXER:  I misspoke about Ms. Munter.  Mr. Hanson

20  is a board member, Ms. Munter is not.

21           MS. KRAMER:  The relevance is the confidential sharing

22  of information, not why the PCAOB made staffing changes.  That

23  has no bearing on this whatsoever.  Mr. Middendorf saying maybe

24  our conversations with Helen Munter and Jay Hanson are bearing

25  some fruit connect to something that has absolutely nothing to

1  do with the case.

2         MS. MERMELSTEIN:  To guess that that goes to his state

3  of mind essentially because he believes what he is saying would

4  swallow hearsay in its entirety.  That is not state of mind.

5         MR. BOXER:  I am repeating myself, your Honor.  I

6  think it shows that he doesn't think it is confidential

7  information that is affecting the results here.

8         THE COURT:  But I think it is because of the truth

9  that it has a value, right?

10         MR. BOXER:  He perceives it as the reason why this

11  might have happened.  It doesn't mean that is what happened.

12         MS. MERMELSTEIN:  He can testify and say that.

13  Otherwise, he can't sneak it in through a back door.

14         MR. WEDDLE:  Your Honor, I think it is admissible not

15  for its truth for the fact that it was said because it is

16  probative of the type of state of mind that a person would have

17  under the circumstances.  That is, the results are being

18  affected, the outcomes are being affected by regular

19  communications.

20         THE COURT:  But it is his intent that is an issue, and

21  he is saying it and you are using it for the truth of what he

22  is saying.

23         MR. WEDDLE:  In that respect, your Honor, if that is

24  the way that it is interpreted, it is admissible under 803(3)

25  as his then-existing state of mind.  His current belief or his

1   current surmise that maybe their discussions are affecting

2   outcomes is admissible for its truth under 803(3).  It is also

3   the type of thing that a person might say who thinks that the

4   outcomes are created by all sorts of things other than

5   deficiency.

6        THE COURT:  Why couldn't it be his then-existing state

7   of mind?

8        MS. MERMELSTEIN:  That's not what then-existing state

9   of mind means.  The suggestion that that is what it means would

10  mean that a drug dealer who said I don't think these are drugs

11  could then offer that statement for his then-existing state of

12  mind.  It is not a feeling.  It is not an emotion.

13       He is making a factual assertion.  Now he wants to

14  offer that factual assertion to prove that it is true.  That is

15  hearsay.  He is the defendant.  He cannot offer it.  He can

16  testify and share with the jury his view or he cannot, but he

17  cannot sneak it in through the documents.

18       MR. WEDDLE:  It is all about his intent, your Honor.

19       THE COURT:  I am going to sustain the objection.

20       (Continued on next page)

21

22

23

24

25

```
 1                  (In open court).
 2            THE COURT:  M62 is not received in evidence, but the
 3   version of the prior document that was admitted is in evidence.
 4            MR. BOXER:  If you could display Government Exhibit
 5   956.  You don't have it?  That's okay.  If we can look at
 6   Government Exhibit 930, please.
 7   BY MR. BOXER:
 8   Q.  This is an email from Mr. Sweet to you and to others on
 9   February 4, 2016, correct?
10   A.  Yes.
11   Q.  What does the first sentence say, if you can read that?
12   A.  "In the case any of you are interested in the latest
13   insight from the PCAOB inspection team structure for KPMG this
14   year, Jeff Watkins just let me know that he was let go day from
15   the PCAOB due to performance issues he had on a non-KPMG
16   international inspection" --
17            MR. BOXER:  I'm sorry.
18   Q.  Why don't we start again.  I apologize.
19            THE COURT:  It is in evidence or not?
20            MS. MERMELSTEIN:  Perhaps we are wrong.  We don't have
21   it in evidence, your Honor.
22   Q.  Do you recognize the email?
23   A.  Yes.
24            MR. WEDDLE:  Your Honor, if it is helpful, we have it
25   as February 21st.
```

```
 1              MS. MERMELSTEIN:  I have an objection to its
 2    admission, if that's helpful.
 3              MR. BOXER:  I offer it perhaps for a second time.
 4              THE COURT:  Apparently it is in evidence.  You can
 5    publish it.
 6    Q.  You can pick up where you left off.
 7    A.  "Jeff Watkins let me know that he was let go today from
 8    PCAOB due to performance issues he had on a non-KPMG
 9    international inspection before the holidays."
10    Q.  Then Mr. Sweet goes on to speculate as to what may happen,
11    right?  It's possible that they may either, and he gives a few
12    examples, correct?
13    A.  That's correct.
14    Q.  Then he says, "I probed to see if he'd be going overseas on
15    one of the possible bank inspections, and he said no," right?
16    A.  Yes.
17    Q.  When you received Government Exhibit 930, you didn't think
18    there was anything wrong with having this email, correct?
19    A.  No.
20    Q.  In it Mr. Sweet is reporting some of the inside information
21    he's been asking about, in this case his now former PCAOB
22    colleague, correct?
23    A.  Correct.
24    Q.  I want to ask you some questions about the March 28th, 2016
25    meeting that you described.  You said that it was in a
```

 1   conference room next to your office, is that right?

 2   A.  That's right.

 3   Q.  Mr. Sweet was on the phone, correct?

 4   A.  Correct.

 5   Q.  Mr. Britt was there?

 6   A.  Yes.

 7   Q.  And Mr. Middendorf had to be taken out of an evaluation

 8   meeting that he was a part of at the firm, right?

 9   A.  Before the meeting, yes.

10   Q.  Isn't it true that in fact Mr. Middendorf was not in your

11   conference room next to your office at the time the call from

12   Mr. Sweet first started, correct?

13   A.  I don't recall if he was there when the phone was dialed or

14   not.

15   Q.  Isn't it true that you previously stated that you aren't

16   sure whether or not Mr. Middendorf was in the meeting when it

17   first began?

18          MS. MERMELSTEIN:  He just testified now that that's

19   true.  I'm not sure what the relevance is to what he said

20   before.

21          MR. BOXER:  I'm sorry.  I might have misheard his

22   answer.

23          THE COURT:  He said, "I don't recall if he was there

24   when the phone was dialed or not."

25   Q.  Isn't it true that he was not there when the phone

1    conference first started?

2    A.   I don't recall.

3    Q.   As I understand it, a number of re-reviews, as they are

4    referred to, occurred after this phonecall, correct?

5    A.   Yes.

6    Q.   Isn't it true that the instruction that was given at the

7    conclusion of the call was that AS 3, the documentation period

8    standard, would be followed on any re-review?

9    A.   We were trying to stay within AS 3, yes.

10   Q.   That was the understanding that was expressed during the

11   meeting, that AS 3 would be followed, correct?

12   A.   That's correct.

13   Q.   I think you testified that you didn't do additional audit

14   work under AU 390 because you thought you would be found out if

15   you did that?  Is that what your testimony is?

16   A.   Yes, that was the plan.

17   Q.   The idea would be to review -- withdrawn.  I thought the

18   plan was to avoid a comment, is what I thought you said.

19   A.   Ultimately that was the objective.

20   Q.   So doing AU 390 work that was necessary in fact would have

21   avoided a comment, right?

22   A.   Repeat the question.

23   Q.   If in fact you did AU 390 work, it could have avoided a

24   comment, right?

25   A.   Yes.

1   Q.  If you were aware of AU 390 work that needed to be done but

2   you didn't do it, then you knew you were going to get a

3   comment, because if the review team saw it, the inspectors were

4   going to see it, correct?

5   A.  That's possible.

6   Q.  So this notion that you didn't want to do AU 390 work is

7   inconsistent with the goal of not receiving any comments or

8   receiving less comments, correct?

9   A.  I'm not sure I would agree with that.  I think any time you

10  can improve the audit workpapers, make them clearer, make them

11  better reflect what work was completed and how it's expressed

12  in the workpapers is a way to reduce comments even if you're

13  not doing new work.

14  Q.  I'm going to ask you about the workpapers in a second, but

15  I'm just for now focusing on your testimony about AU 390 work.

16  That's additional audit procedures that are permitted if it's

17  documented and is necessary, correct?

18  A.  AU 390 is broader than just new procedures.  AU 390 covers

19  the workpaper assembly period as to what can and can't be

20  documented and identifies, if you omitted work, an additionally

21  performed procedure, what else you need to do.  AU 390 is

22  broader about audit documentation.

23  Q.  AU 3 covers what?

24  A.  Same thing.  It's a similar -- I have never read them next

25  to each other, but I take them as being the same.

1    Q.  The AU 390 memo, that is something that is created if

2    additional audit work is done after the opinion is closed,

3    correct?

4    A.  I'm not sure I would call it --

5    Q.  What would you call it?

6    A.  I would just say it was new work.  It might reference that

7    it was done after the audit period and why.

8    Q.  At KPMG there was a template that needed to be used if any

9    work was done after the audit opinion was issued, correct?

10   A.  Yes.

11   Q.  Have you heard that template referred to as an AU 390 memo?

12   A.  I'm not sure, but that would be contextually proper.  In

13   the context it would be a proper description.

14   Q.  Would you agree with me that if it was decided not to do

15   any AU 390 work, that decision could lead to more comments

16   being found by the PCAOB inspectors when they conducted their

17   inspections?

18   A.  Could you clarify the question?

19   Q.  I'll try it again.  If the decision was made not to do any

20   additional work pursuant to AU 390, that decision could lead to

21   more comments in the PCAOB inspection as opposed to if AU 390

22   work was done?

23   A.  Yes, that's a possibility, yes.

24   Q.  With respect to AS 3, would you agree with me that you are

25   permit to make word changes, add descriptions, do other kinds

1  of things to your workpapers under AS 3 as long as it is

2  describing work that was already performed?

3  A.  That's correct.

4  Q.  It's a way of getting credit for the work that the team

5  actually did, correct?

6  A.  That's correct.

7  Q.  It's not making up procedures that in fact did not happen,

8  right?

9  A.  That's correct.

10  Q.  As far as these re-reviews, it was your understanding from

11  the meeting that the re-reviews would comply with that rule of

12  AS 3, correct?

13  A.  Yes, that it would be focused on the workpaper

14  documentation and the work done and to avoid doing the work.

15  Q.  That way to show the work that the engagement teams did as

16  best as possible, and if that could avoid a comment, that would

17  be great?

18  A.  Yes.

19  Q.  You mentioned -- I apologize if I forget the exact word --

20  a concern about a difference or discrepancy between the PCAOB

21  inspections and the internal inspections.  Did I phrase that

22  close enough?

23  A.  Yes.

24  Q.  Your concern was that if the re-reviews had done additional

25  work, the PCAOB inspection performance could be better than the

1  internal inspection performance, right?

2  A.  Correct.

3  Q.  If there was that discrepancy, you were concerned that you

4  would be caught, right?

5  A.  Correct.

6  Q.  Isn't it true that on the internal inspections the

7  inspectors not only review the substantive work, but they

8  actually review the quality and clarity of the workpapers?

9  A.  Say that one more time, please.

10 Q.  In the internal inspections, the workpapers themselves are

11 subject to review by the internal inspectors, correct?

12 A.  Yes.

13 Q.  When the PCAOB does its inspections, it doesn't inspect the

14 workpapers themselves, it confines itself to the actual audit

15 work that was or was not done, right?

16        MS. MERMELSTEIN:  Objection.  It's a confusing

17 question, your Honor.

18        THE COURT:  Could you clarify, please.

19 Q.  The PCAOB, are you familiar with any of the publications or

20 documents it makes public about its inspection process?

21 A.  I've read some of them, yes.

22 Q.  I would assume you have as the head of inspections,

23 correct?

24 A.  Yes.

25 Q.  Are you familiar with a PCAOB document that's directed

1    towards audit committees of public companies?

2    A.  Yes.

3    Q.  Are you aware that in that document the PCAOB informs the

4    audit committees that if it makes a comment, it's not because

5    of a documentation problem, it's because of an auditing

6    problem, correct?

7    A.  Yes.

8    Q.  That's different than the internal inspections at the firm

9    which looks at the auditing but also does inspect the

10   collection, assembly, and clarity of the workpapers, correct?

11   A.  I would say that over my tenure we moved our internal

12   inspections to mirror the type of inspections the PCAOB was

13   doing and to focus on the audit conclusions and the audit work.

14   Q.  At the time of March 2016, isn't it true that internal

15   inspection was still reviewing engagement workpapers as part of

16   its inspections?

17   A.  It always reviews engagement workpapers.

18   Q.  In that way the results of the internal inspection wouldn't

19   necessarily be a fair comparison to PCAOB inspections, right?

20          MS. MERMELSTEIN:  Your Honor, objection.  The

21   testimony is that PCAOB inspections review workpapers.  I don't

22   understand.

23          MR. BOXER:  I don't think counsel should be speaking

24   for the witnesses.

25          THE COURT:  If you understand the question, you can

1    answer.

2    A.   Let me maybe try to clarify.  Internal inspections and

3    PCAOB inspections, we both look at workpapers and we both

4    evaluate the work documented in the workpapers to see if they

5    comply with PCAOB standards.  We look at those the same way.

6    We moved our internal inspections to not write comments about

7    simply documentation issues so that it would give the same --

8    we would have the same approach as the PCAOB.

9    Q.   Prior to that change, the internal inspection would give, I

10   don't know if "comments" is the right word, but would make

11   findings about just the workpapers themselves as opposed to the

12   underlying audit procedures, correct?

13   A.   Maybe the word you are looking for is the documentation as

14   opposed -- the workpapers are all of the work that we do.  So

15   I'm a little confuse with the question.  I'm just trying to

16   help.  In terms of if we misdocumented something or something

17   wasn't clear in the workpapers, there was a time before or when

18   I first got to the inspection group that there were comments

19   written on that.  I eliminated those as being part of what we

20   did.

21   Q.   That would be in internal inspections you would withdraw

22   that type of comment that you just described, correct?

23   A.   Yes, prior to my tenure.

24   Q.   The PCAOB does not give comments for those types of issues

25   I'll call it?

1    A.  Correct.

2    Q.  You were shown some emails.  Maybe we'll start with

3    Government Exhibit 950.  You were asked some questions about

4    this exhibit, correct?

5    A.  Correct.

6    Q.  If we can focus on the very first email.  You were asked

7    about the subject line "Retailer" correct?

8    A.  Yes.

9    Q.  You wrote that email, right?

10   A.  I did.

11   Q.  It was your decision to title it "Retailer" as opposed to

12   one of the other names you testified about, correct?

13   A.  Yes.

14   Q.  Similarly, if we look at 949, Government Exhibit 949, you

15   wrote that email as well, right?

16   A.  That's correct.

17   Q.  You wrote the subject as 10-K research, right?

18   A.  That's correct.

19   Q.  That was your decision to do that, correct?

20   A.  Yes.

21   Q.  If we could look at Government Exhibit 951.  That's an

22   email written by Mr. Middendorf, correct?  If we scroll below,

23   Mr. Mount titles it "Audit report date," right?

24   A.  Yes.

25   Q.  That would not be the type of title that you would have

 1    used in Government Exhibit 950 or 949, right?

 2              MS. MERMELSTEIN:  Objection to form, your Honor.

 3    Q.  I'll try to rephrase.  "Audit report date," that's a term

 4    that is relevant to the question of the re-review, right?

 5    A.  Yes.

 6    Q.  That was a term initially used here by Mr. Mount in his

 7    email to Mr. Middendorf, right?

 8    A.  It was.

 9    Q.  Mr. Mount wasn't present at the meeting on March 28th,

10    correct?

11    A.  He was not.

12    Q.  So he didn't try to disguise the subject matter of his

13    email in any way, right?

14    A.  I didn't write the email, so I don't know what he was

15    thinking.

16    Q.  "Audit report date" would you agree with me is not the same

17    as just calling it "Retailer"?

18              MS. MERMELSTEIN:  Objection, your Honor.

19              THE COURT:  Sustained.

20    Q.  When Mr. Middendorf forwards Mr. Mount's email to you, he

21    keeps the subject line of "Audit report date," correct?

22    A.  He does.

23    Q.  He doesn't try to delete or change the re line from the

24    email that was forwarded to him, right?

25    A.  He does not.

1  Q.  A couple more questions about this topic.  One is a general

2  one.  I think you mentioned something about the eAudit software

3  at KPMG not recording every change that is made into the

4  workpapers.  Did I hear that or understand that correctly?

5  A.  The final filing that's put into the electronic file room

6  does not track changes up to that point.

7  Q.  That wasn't something that was agreed upon during the March

8  28, 2016, conversation you have testified about today, correct?

9  A.  That's the firm process.

10 Q.  And it was the firm process in existence at that time in

11 March 2016?

12 A.  Yes, it was.

13 Q.  As you said here today, is it fair to say you are unaware

14 any re-reviews that violated AS 3?

15 A.  I didn't review the workpapers, so I'm not sure that I'm

16 the best to answer that.

17 Q.  I'm not asking you if you're the best to answer it.  I'm

18 just asking you as you sit here are you aware of any re-reviews

19 that violate AS 3?

20 A.  None came to my attention.

21 Q.  I wanted to ask you a few questions about AMBAC.  Tell us

22 what happened in the AMBAC re-review.

23 A.  In the re-review?

24 Q.  Yes.

25 A.  John Broderick looked at the workpapers, focused in on the

1   insurance reserves area, and immediately identified that there

2   was a missed audit procedure or insufficiently performed audit

3   procedure and felt that based on what he saw, it could lead to

4   a material -- that the client had an unidentified material

5   weakness.

6   Q.   So that re-review led to withdrawing the audit opinion that

7   KPMG had issued for that client, correct?

8   A.   Correct.

9   Q.   Because it could no longer say there was no material

10  weakness with respect to the client's internal controls, right?

11  A.   That's correct.

12  Q.   That's a big deal when that happens for a client, right?

13  A.   Absolutely.

14  Q.   Were you aware that Mr. Middendorf was on a lengthy

15  phonecall with the CEO and the CFO of AMBAC discussing whether

16  or not KPMG would withdraw its audit opinion?

17          MS. MERMELSTEIN:   Objection.   That calls for hearsay

18  notwithstanding the phrasing.

19          MR. BOXER:   I didn't ask about any conversations.

20  Just if he was aware of it.

21          THE COURT:   Sustained.

22  Q.   Did you participate in any conversations with anybody from

23  AMBAC after it was decided to withdraw the audit opinion?

24  A.   I did not.

25  Q.   Do you know of anybody else who participated in

1    conversations with the client?

2    A.  Certainly the engagement team was involved with

3    discussions.  I believe there were members of the audit group

4    that met with the client as well.  And I believe that senior

5    members of the audit practice, may have been Mr. Middendorf

6    and/or Mr. Marcello, also had some conversations.

7    Q.  I think you said that as a result of the withdrawal of the

8    audit opinion -- withdrawn.  There was also an AU 390 work that

9    was done to correct what the issue was that Mr. Broderick

10   found, right?

11   A.  Yes.  Work has to be done to remediate the work.

12   Q.  That work was done, correct?

13   A.  Correct.

14   Q.  It was documented, yes?

15   A.  I believe so.  I didn't review it, but I understand that it

16   was.

17   Q.  I think you said as a result of the additional work, the

18   matter was referred to enforcement, I believe you said?

19   A.  Enforcement at the PCAOB, yes.

20   Q.  That was my question.  It was enforcement at the PCAOB,

21   correct?

22   A.  Correct.

23   Q.  It wasn't enforcement at the SEC, right?

24   A.  That's correct.

25   Q.  Would you agree with me that KPMG withdrawing its audit

1    opinion provided additional information to shareholders of

2    AMBAC as to the state of AMBAC's internal controls?

3              MS. MERMELSTEIN:  Objection.

4              THE COURT:  Overruled.

5    A.  Could you repeat the question?

6    Q.  I will.  Would you agree with me that KPMG withdrawing its

7    audit opinion provided additional information to shareholders

8    of AMBAC as to the state of AMBAC's internal controls?

9    A.  I think whenever that occurs, it does provide initial

10   information, yes.

11   Q.  If we can put up Exhibit M126, please.  If you could flip

12   through it.  The first email is from Mr. Sweet, correct?

13   A.  Yes.

14             MR. BOXER:  I offer it.

15             MS. MERMELSTEIN:  Objection to relevance, your Honor.

16             MR. BOXER:  I think it is similar to the other ones

17   that have come into evidence.

18             THE COURT:  I'll allow it.  M126 received.

19             (Defendant's Exhibit M126 received in evidence)

20   Q.  If we can start at the email on the bottom from Mr. Sweet

21   to you, Mr. Whittle, and to Mr. Britt, cc Hector Santana.  I

22   believe you testified he was a former PCAOB employee as well?

23   A.  Yes, Mr. Santana was a former PCAOB.

24   Q.  I'm not sure if you did or didn't say that.  But he was?

25   A.  He was.

1          MS. MERMELSTEIN:  Objection to testifying by counsel.

2          THE COURT:  Sustained.

3   Q.  If you could read the first two sentences of Mr. Sweet's

4   email.

5   A.  "Tom, David, I wanted to send you both a quick note to

6   update you on the results of our pre-inspection review for SVB.

7   We have been through all the workpapers in each of the focus

8   areas -- ALL, warrants, investments, deposits, and audit

9   findings -- and have the team well prepared going into the

10  start of the inspection week."

11  Q.  If you could read the next sentence.

12  A.  "However, the files are not in great shape and there are

13  quite a few soft spots that I expect will likely be

14  significantly challenged."

15  Q.  Then, if I'm reading it correctly, you forward the email

16  FYI.  You forwarded it to Middendorf, correct?

17  A.  It would appear so, yes.

18  Q.  Mr. Middendorf responds.  If you could read his response,

19  please.

20  A.  "Shame on us that an inspection that went badly previously

21  is likely to go bad again.  If we don't learn from our

22  mistakes, we deserve to be in part 1.  We should debrief after

23  this inspection."

24  Q.  Part 1 is the portion of the PCAOB inspection report where

25  it lists comments that it finds on its inspections, correct?

1    A.  Yes, for specific engagements.

2    Q.  If we could look at Government Exhibit 1067, please.  I

3    think you were shown this on your direct testimony.  This is an

4    email from Mr. Sweet to you cc'ing Cindy Holder, correct?

5    A.  It is an email.  I'm not sure that was part of my direct or

6    not.

7    Q.  I'll stop doing that.  What was your understanding of the

8    bank's screening analysis that is described by Mr. Sweet in

9    this email?

10   A.  It was an analysis that Brian and Cindy put together based

11   on the information that we had provided to the PCAOB as part of

12   their planning, so he and she used it internally to make a

13   prediction of what banks have a higher risk of inspection.

14   Q.  You understood it to be a prediction, correct?

15   A.  I did.

16   Q.  He uses the expression "I don't expect this will be a

17   perfect guess," right?

18   A.  He does.

19   Q.  If we could show Defense Exhibit M271, please.  If you look

20   towards the bottom, you can see that you forwarded the email

21   you just read -- you replied, I should say, to the email you

22   just read, and you added Mr. Middendorf and Mr. Britt as ccs,

23   correct?

24   A.  Yes.

25   Q.  Could you read the last paragraph that you wrote.

1    A.   Can you make that larger?

2    Q.   The one that starts, "Dave, are other actions?"

3              THE COURT:  This is already in evidence?

4              MR. BOXER:  It is.

5    A.   "Are there other actions you believe we should take?  For

6    instance, shall we discuss the analysis with Kevin and Laurie?

7    As background, they started with the data the firm submitted to

8    the PCAOB at the end of September looking for anomalies in the

9    data and layering and other information that might be

10   considered relevant based on their knowledge and public source

11   information."

12   Q.   Who are Kevin and who are Laurie that you referred to?

13   A.   They are the east and west regional professional practice

14   partners, respectively Kevin O'Hara and Laurie Mullen.

15   Q.   In this email you are asking Dave if he wants to seek their

16   input as to this bank screening analysis, Kevin and Laurie,

17   correct?

18   A.   Yes.

19   Q.   So the bank's screening analysis not being kept a secret in

20   these emails, right?

21   A.   No, it is not.

22   Q.   There is nothing wrong about it in your view while you are

23   writing this email on November 18th, correct?

24   A.   Correct.

25   Q.   If we could show Defense Exhibit M272, which I think is not

1    in evidence.  Scrolling down, does that appear to you to be the

2    attachment bank screening analysis you just referenced in the

3    mail you just read?

4    A.  It very well could be.

5            MR. BOXER:  I offer it, your Honor.

6            MS. MERMELSTEIN:  I don't think it very well could be

7    as a foundation, your Honor, but no objection.

8            THE COURT:  M272 is received.

9            (Defendant's Exhibit M272 received in evidence)

10   Q.  If we could focus on column J for a minute, starting at the

11   first bank on the attachment, which is Wells Fargo.  "Reasons

12   for possible selection," do you see that column, Mr. Whittle?

13   A.  Yes, I do.

14   Q.  For Wells Fargo there are seven there, correct?

15   A.  Yes, correct.

16   Q.  "Current bad press" is the first one, right?

17   A.  Yes.

18   Q.  "Subject to monitoring program," correct?

19   A.  Yes.

20   Q.  These reasons are what you understood to be flags or

21   potential issues that might cause the PCAOB to pick an

22   engagement for inspection, right?

23   A.  Yes.

24   Q.  They were well known throughout KPMG what these flags were,

25   right?

1    A.  I'm not sure well known by everyone, but certainly my group

2    and others.  There were people that understood what the flags

3    were.  I'm not sure how widely known that was to everyone.

4    Q.  In your email you are asking if Laurie Mullen or Kevin

5    O'Hara should add input to this information, correct?

6    A.  Yes.

7    Q.  It's fair to say that senior leadership in the audit group

8    were familiar with these types of flags or issues that could

9    cause the PCAOB to pick an engagement for inspection, right?

10   A.  Yes, I would say that was fair.

11   Q.  Would you also agree with me that what's going on here is

12   an effort to predict which engagements will be inspected the

13   following year, right?

14   A.  Yes.

15   Q.  You didn't think there was anything wrong with that, right?

16   A.  I did not.

17   Q.  In fact, is it your understanding that the PCAOB also

18   doesn't think there is anything wrong with the exercise here?

19             MS. MERMELSTEIN:  Objection to speculation, your

20   Honor, about what the PCAOB thinks.

21             THE COURT:  Sustained.

22             It's 5 o'clock.  Is this a good time to break?

23             MR. BOXER:  If I could ask two more questions?

24             THE COURT:  Sure.

25             MR. BOXER:  Thank you.

1   Q.   The PCAOB chooses inspections based on risk, right?

2   A.   Correct.

3   Q.   That's well known, correct?

4   A.   Yes, it is.

5   Q.   Risk-based inspections, right?

6   A.   Yes.

7   Q.   The inspection that we were just looking at, the bank

8   screening analysis, was an effort by KPMG to also predict which

9   of the engagements and audits were the riskiest, right?

10  A.   Yes.

11  Q.   It was doing that so it too could try to predict which

12  inspections the PCAOB might inspect, right?

13  A.   Yes.  It was an attempt to evaluate the banks and look at

14  their relative risks on each one.

15  Q.   Then the firm, your group, would act on those predictions

16  to try to devote resources to the inspections that out of this

17  analysis were predicted to be the riskiest, right?

18  A.   No.

19  Q.   What was the purpose of the bank screening analysis?

20  A.   As you said, I think it was an attempt to evaluate the

21  relative risks of all our bank issuer audits.  But in terms of

22  what gets done with it, my group supports inspections.  There

23  are other groups in the firm that would run monitoring programs

24  or execute other programs relative to specific engagements.

25  Q.   Is it fair to say that other groups, the audit group as a

1    whole, would devote more resources to the riskier engagements

2    than it would to the less riskier engagements?

3    A.  Generally, yes.  I'm not sure specifically how they

4    utilized the bank screening analysis.

5           MR. BOXER:  Now is a good time, your Honor.  Thank

6    you.

7           THE COURT:  Ladies and gentlemen, thank you for your

8    continued attentiveness to the trial.  We will continue

9    tomorrow morning at 9:30 a.m.  I know breakfast was a little

10   late this morning.  Hopefully, it will be on time.  We will

11   have coffee for you tomorrow morning and we will try to start

12   at 9:30.  Have a good evening.  See you tomorrow.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury not present, witness not present).

2                    THE COURT:  I have another matter in my regular

3     courtroom.  Is there anything people want to do here before we

4     break?

5                    MS. KRAMER:  Not us, your Honor.

6                    MR. COOK:  No, your Honor.

7                    MS. LESTER:  Your Honor, just that last exhibit, I

8     think the Court said 271 received.  It was actually M272 that

9     was received, just for the record.

10                   THE COURT:  Okay.  M272.  Got it.  Have a good night

11    everybody.

12                   (Adjourned to 9:30 a.m., February 27, 2019)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

THOMAS W. WHITTLE III

    Direct By Ms. Mermelstein . . . . . . . .1802
    Cross By Mr. Boxer  . . . . . . . . . . .1939

GOVERNMENT EXHIBITS

Exhibit No.                              Received

754  . . . . . . . . . . . . . . . . . . .1860

755  . . . . . . . . . . . . . . . . . . .1862

756  . . . . . . . . . . . . . . . . . . .1867

925  . . . . . . . . . . . . . . . . . . .1836

948  . . . . . . . . . . . . . . . . . . .1903

949  . . . . . . . . . . . . . . . . . . .1891

950  . . . . . . . . . . . . . . . . . . .1889

951  . . . . . . . . . . . . . . . . . . .1894

952  . . . . . . . . . . . . . . . . . . .1896

1017 . . . . . . . . . . . . . . . . . . .1831

1063 . . . . . . . . . . . . . . . . . . .1817

1124 . . . . . . . . . . . . . . . . . . .1928

1310 . . . . . . . . . . . . . . . . . . .1915

1451 . . . . . . . . . . . . . . . . . . .1938

7507 . . . . . . . . . . . . . . . . . . .1848

                          DEFENDANT EXHIBITS

Exhibit No.                                  Received

 M41 and M42   . . . . . . . . . . . . . . .1969

 M6    . . . . . . . . . . . . . . . . . . .1961

 M7    . . . . . . . . . . . . . . . . . . .1959

 M38   . . . . . . . . . . . . . . . . . . .1966

 M126   . . . . . . . . . . . . . . . . . . .2017

 M272   . . . . . . . . . . . . . . . . . . .2021

 M297   . . . . . . . . . . . . . . . . . . .1988

 M298   . . . . . . . . . . . . . . . . . . .1989