J2rdmid1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           18 Cr. 0036(JPO)

5    DAVID MIDDENDORF and JEFFREY
     WADA,
6
                  Defendants.
7
     ------------------------------x
8

9                                          February 27, 2019
                                           9:40 a.m.
10

11   Before:

12                      HON. J. PAUL OETKEN,

13                                         District Judge
                                           and a jury
14

15                         APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
18        AMANDA K. KRAMER
          JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20   PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant David Middendorf
21   BY:  NELSON A. BOXER
          AMY R. LESTER
22        ALEXANDRA REBECCA CLARK
               – and –
23   BRUCH HANNA LLP
     BY:  GREGORY S. BRUCH
24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

J2rdmid1

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
              – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


        – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Peter Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal



                          oOo

J2rdmid1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          MS. MERMELSTEIN:  Good morning, your Honor.

4          THE COURT:  Any preliminary matters anyone wanted to

5     address?

6          MS. KRAMER:  Yes, your Honor.  There are two issues

7     that I think are going to require a resolution by the Court.

8     First, on the prior consistent statement of Brian Sweet that

9     your Honor ruled the government could offer, the government

10    produced the redacted version of Government Exhibit 452,

11    leaving unredacted only the prior consistent statement the

12    government seeks to offer.  I can pass up a copy, your Honor,

13    or we can put it up on the screen, if you would like.

14          I understand from counsel for defendant Middendorf

15    that they intend -- that they think that the entirety of the

16    notes should come in with the exception of a portion of the

17    second page that appears to be from a different meeting.

18          They should not.  The rest of the notes are not

19    necessary to place the portion that we intend to admit into

20    context --

21          THE COURT:  You're recalling Mr. Sweet?

22          MS. KRAMER:  Yes, your Honor.

23          So could I pass up or could we put up on the screen

24    Government Exhibit 452R, page 1, next to page 2?

25          So, this is what the government intends to offer, your

J2rdmid1

1    Honor, which is limited to the prior consistent statement.  The

2    heading on the left page that reflects that Jim and Dave, and

3    then on the second page, the statement that was at issue and

4    was the subject of all the briefing about sort of, if I could

5    read underneath the sort of number 1 heading, "Stonegate/Gray

6    Area/Here to share insights and add value wherever I can."

7    Next line, "Know where paycheck comes from."  And then the next

8    line, "Stonegate, Mike Flynn," and then there are some other

9    notations.  And then number 5 is "PCAOB contact," which is the

10   other piece that Mr. Sweet testified about, that he was asked

11   to keep his PCAOB contacts, keep in touch with them.

12          The items that are redacted are -- I can show your

13   Honor, if you would like, but they consist -- just leave this

14   up for a minute -- they consist generally of Mr. Sweet's notes

15   preparing for this meeting, then the portion of the meeting

16   where Mr. Liddy talked to him.  And then on the second page,

17   between 1 and 5, are topics 2 through 4, which are other things

18   that Dave Middendorf said during the meeting.  And the right

19   side that is redacted are notes from another day.

20          If your Honor --

21          THE COURT:  I'm sorry.  Could you just say what you

22   just said again?

23          MS. KRAMER:  Sure.  So looking at the second page, the

24   block on the right side is notes from another meeting, so no

25   one suggested that that should come in.  Between 1 and 5 --

J2rdmid1

1   could you pull up on the left side 452, page 2, please, and on

2   the right side 452R, page 2.

3        OK.  So what you can see, your Honor, on the left side

4   that we've redacted, items 2, 3, 4 and 6, which are other

5   things that Middendorf said to Sweet during this meeting.  They

6   are in totally different paragraphs.  They were not the subject

7   of his testimony.  They are not prior consistent statements.

8        And if your Honor recalls, when I first asked

9   Mr. Sweet do you remember everything that Dave Middendorf said

10   to you in this meeting, he said, no, I don't.  I tried to show

11   him this document to refresh his recollection, and defense

12   counsel objected to me even showing him to refresh at this

13   point.  We had an argument at sidebar about it, and I was then

14   not allowed to show him to refresh and was required to ask him,

15   you know, what do you remember.  He said what he did remember,

16   and then I moved on.  He did not testify about items 2, 3, 4 or

17   6, and I believe that -- I suspect that part of the reason that

18   defense counsel wants these other items in under the claim that

19   they're necessary for completeness or to put the notes that we

20   are offering, the prior consistent statement, into context, is

21   so that they can cross-examine Mr. Sweet about not saying or

22   talking about 2, 3 and 4, which is improper because they

23   prevented him from being refreshed on it in the first place and

24   they could have asked him about it on cross and they didn't;

25   and, second, to suggest that Mr. Middendorf also talked to

J2rdmid1

1    Brian Sweet about other legitimate things in the meeting, which

2    is essentially other good act evidence that's not relevant.

3            So the rule of completeness is quite limited.  And I

4    have a case, your Honor, to pass up to you.  It is United

5    States v. Marin, M-a-r-i-n, 689 F.2d -- may we approach, your

6    Honor?

7            THE COURT:  Yes.

8            MS. KRAMER:  689 -- I'm sorry, 669 F.2d 73 (2d Cir.

9    1982).  And if your Honor turns to it's page 8 in the printout,

10   under the heading "Cede the redacted statement," the Second

11   Circuit approved the district court's decision to not admit

12   into evidence a portion of a prior statement that the defendant

13   wanted to arguably complete or place into context the prior

14   consistent statement that the government was offering.

15           And at the bottom of page 8, the Court said, you know,

16   when the defendant seeks to introduce his own prior statement

17   for the truth of the matter asserted, it is hearsay.  I suspect

18   you are going to hear that is not what they are going to offer

19   it for.  When the defendant offers his own statement simply to

20   show that it was made, rather than to establish the truth of

21   the matter, the fact that the statement was made must be

22   relevant, and the Court goes on to discuss the rule of

23   completeness doctrine, and makes clear, on page 9, that the

24   rule of completeness does not require introductions of portions

25   of a statement that are neither explanatory nor relevant to the

J2rdmid1

1   admitted passages.  And this is consistent with the Second

2   Circuit's holding in Kozeny, K-o-z-e-n-y, that the omitted

3   portions must be necessary for context for completeness.

4          In this case, the Second Circuit says, "The

5   completeness doctrine did not require admission of Ramiro's

6   entire statement."  the redacted statement omitted all

7   reference to, in this case, a bag, which I would suggest is

8   very similar to the gray area/Stonegate discussion.  Paragraph

9   1 here is the entirety of what Mr. Middendorf said on this

10  topic.  If we redacted a portion of what is under paragraph 1,

11  so we had some words but not others, then I think that the

12  defense would have a rule of completeness argument.  But this

13  paragraph, this subsection 1, stands alone and needs no other

14  explanation.

15         The other things are other topics discussed in the

16  meeting, they do nothing to complete or put into context this

17  statement other than to say he said to you things other than

18  what's here.  And that can be accomplished with that single

19  question on cross and pointing out on the redacted version,

20  452R, that you go from number 1 to number 5 and there are other

21  notes in the middle, without walking through

22  statement-by-statement those things.

23         So the same decision that we're asking your Honor to

24  make was upheld in 1982 by the be Second Circuit and has been

25  echoed in similar cases like Kozeny, which is 667 F.3d 122

J2rdmid1

1    (2011).

2                    THE COURT:  Would you like to respond?

3                    MS. LESTER:  Yes, your Honor.

4            If the Court is willing to give us more time, I

5    haven't yet looked at <u>Marin</u>.  We raised this with the

6    government last night but they hadn't yet provided that case

7    cite, but it may not be necessary.

8            Your Honor, our contention is actually that the notes

9    on page 2 do not represent Mr. Middendorf's statements.  We

10   intend to cross Mr. Sweet on the entire context of the notes,

11   and we think they need to come in for completeness so that we

12   can establish that there are phrases here that wouldn't

13   naturally reflect -- or we would argue wouldn't reflect

14   statements made by someone else to him.

15           So, for example, in the part that the government

16   believes should come in, which we agree under your Honor's

17   ruling, at the very top:  "Slash here to share insights and add

18   value wherever I can" appears to be a statement written by the

19   person who is making that statement, that is, Mr. Sweet.  So,

20   we believe that other aspects of the note support that

21   inference, that these are statements that Mr. Sweet was making

22   during the meeting, not statements that Mr. Middendorf was

23   making.

24           So I think that the case that Ms. Kramer cited is --

25   although I haven't read it, it sounds like it may be inapposite

J2rdmid1

1    because our contention is these are not in fact

2    Mr. Middendorf's statements.  And I think for that reason, for

3    completeness purposes, the entire document, with the exception

4    of the portion on the second page right-hand side, should come

5    in, because that would permit us to question and for the jury

6    to have insight into whether these statements actually reflect

7    statements that were made by someone else or statements that

8    were made by Mr. Sweet or notes to himself in preparation.  For

9    example, the part on the first page, I believe he would say, as

10   he said in the 3500 material, that those are his preparation

11   notes.

12            So that is the point in terms of our cross, is that we

13   would like to undermine the assertion by the government that

14   these are Mr. Middendorf's statements, not that we're trying to

15   get additional statements by Mr. Middendorf in.

16            And as to the point that Mr. Sweet didn't testify

17   about some of these sections on direct, we wouldn't intend to

18   ask him in an impeaching fashion, you didn't -- you never said

19   he asked you about the internal inspection process.  Again,

20   that's not the goal of our cross-examination.  It's to impeach

21   his assertion that these are actually statements made by

22   Mr. Middendorf.

23            THE COURT:  So why do you need the others for the

24   purpose you mentioned?  You just gave an example of one that

25   the government wants in.  Why would you need the other examples

J2rdmid1

1  to cast out on whose statements they are?

2          MS. LESTER:  So, for example, under 3, "Monthly

3  Meetings," the last dash says, "Dave/Tom/Steve, very good."

4  Our belief is that that relates to a statement Mr. Sweet made

5  to Mr. Middendorf, that is, that Dave, Mr. Middendorf, Tom

6  Whittle and Steve Georgian were very good in those monthly

7  meetings with the PCAOB, that there was a perception that they

8  were on top of it, because if you see on the second dash, it

9  says, "Emphasize tone at top every time."  And then the next

10 slash is "leadership attendance."  And I believe there's

11 already been evidence at the trial that in an effort to address

12 the "tone at the top" concerns that the PCAOB expressed to

13 KPMG, there was a change in the attendees at the monthly

14 meetings, that is that now Mr. Middendorf began attending and

15 other high-level people within the Audit Group began attending

16 these meetings to emphasize to the PCAOB that they did -- they

17 were taking this tone at the top comment seriously.  So our

18 contention is that these are things that Mr. Sweet may have

19 said to Mr. Middendorf, not the reverse.

20         MS. KRAMER:  So this is the first we're hearing of

21 this, your Honor.  Yesterday the challenge to these was that

22 Mr. Sweet --

23         MS. LESTER:  I'm sorry, your Honor.  This was in our

24 letter.  We specifically pointed to this point of the notes.

25         MS. KRAMER:  So, your Honor, this is the first we're

J2rdmid1

1      hearing in terms of the reason that this is necessary to place

2      these into context and that these are actually -- any of these

3      are actually Mr. Sweet's notes, because yesterday we were told

4      that perhaps Mr. Sweet went back into his office and wrote

5      these notes after learning of the internal investigation, which

6      is something we're prepared to disprove.

7              But in any event, I think, to Ms. Lester's point,

8      Mr. Sweet can be cross-examined about that based on the portion

9      that we want to offer.  And he can be asked about the fact

10     that, as she indicated, what's in this 3500, and has been

11     consistent from the getgo, is that above -- so turn to 452,

12     page 1.  So above the line on the first page were his

13     preparation notes.  Just zoom out.  So above that line, on the

14     top third of the first page, those are his preparation notes.

15     Below that line on the first page, he has been consistent with

16     those are the notes of what Jim Liddy said to him.  And then

17     turning to the next page, on the left side of the line are the

18     notes from what Mr. Middendorf said to him.  So, the cross can

19     be fully achieved with what we intend to offer without getting

20     into anything else.

21             If your Honor is inclined to -- I mean, first of all,

22     I think when you're writing notes, even when someone else says

23     to you "you should do this," you generally don't write "you,"

24     you write "me" or you substitute the person's name or it

25     doesn't make sense.  So I think if your Honor is inclined to

J2rdmid1

1     entertain any of the application, then it should be limited

2     only to adding in number 3 from the second page, where it says

3     "Dave/Tom/Steve, very good," so that the second page would

4     include just that bullet point, and none of the rest is

5     relevant even to the point that the defense wants to make.

6              THE COURT:  OK.  We don't need to decide this right

7     now, do we?

8              MS. KRAMER:  So --

9              THE COURT:  Schedule wise?

10              MS. KRAMER:  No, your Honor, although we do have a

11    second issue that needs to be decided for this afternoon which

12    relates to this, because we're going to be calling a witness

13    who retrieved this notepad and at that point potentially

14    offering subject to connection what we've marked as Government

15    Exhibit 452R.  So we don't need to decide the notes issue this

16    morning but we will by lunchtime.

17              And so, relatedly, your Honor, the second issue is

18    that we notified defense counsel that we intend to call this

19    afternoon Mark Rubino, who is associate general counsel at

20    KPMG, to testify only about the fact that he retrieved the

21    notepad that contains these notes from Mr. Sweet's office on or

22    about March 16, 2017, and that's it.  And we asked defense

23    counsel to let us know if they think they are entitled to

24    cross-examine him about any other matters beyond that scope,

25    because he did conduct some of the interviews that happened at

J2rdmid1                         Whittle − cross

1   the beginning part of the internal investigation case before

2   KPMG had outside counsel.  We asked defense counsel to notify

3   us if they think they are entitled to cross him on anything

4   beyond that so that we can raise it with your Honor, and

5   counsel for Wada has indicated that they do believe they intend

6   to cross −− they are entitled to cross Mr. Rubino about other

7   topics.  We asked what those topics are and we didn't get a

8   response.  So that is something that we will need to resolve

9   before we call him and which we expect or hope will be after

10  lunch.

11          THE COURT:  OK.  Any other issues for now?

12          (Pause)

13          MR. BOXER:  No, your Honor.

14          THE COURT:  All right.  And Mr. Whittle is ready to

15  proceed?

16          Please get the witness.

17          (Witness present)

18          (Continued on next page)

19

20

21

22

23

24

25

J2rdmid1                         Whittle – cross

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  You

3     may be seated.

4              You may be seated in the courtroom.

5              We are continuing with the testimony.

6              Mr. Whittle, you were sworn in yesterday.  You remain

7     under oath.

8              And, Mr. Boxer, you may proceed.

9              MR. BOXER:  Thank you, your Honor.

10    THOMAS W. WHITTLE III,

11         Resumed, and testified further as follows:

12    CROSS-EXAMINATION (Resumed)

13    BY MR. BOXER:

14    Q.  Good morning, Mr. Whittle.

15    A.  Good morning.

16    Q.  I want to start with your testimony yesterday.

17             In 2017, I understand you had a conversation with

18    Brian Sweet about a preliminary list.  Do you recall that

19    testimony?

20    A.  Yes.

21    Q.  And as I recalled it, he contacted you about that list?

22    A.  Yes.

23    Q.  This was in January of 2017, correct?

24    A.  That's correct.

25    Q.  And it was before various internal reviews needed to take

J2rdmid1                    Whittle - cross

1    place at the PCAOB to decide what the actual list would be, is

2    that right?

3    A.  I believe that was the process that the PCAOB would go

4    through.  They would have some reviews and approvals, yes.

5    Q.  And during this conversation, he gave you a list of issuers

6    that were preliminary, in his words, correct?

7    A.  That's correct.

8    Q.  And this is where you said you didn't ask him for the list,

9    right?

10   A.  I did not expressly ask him for the list.

11   Q.  But you implicitly, I think was your testimony, you

12   implicitly asked him for the list, correct?

13   A.  It was an implicit request for any information that might

14   come his way and that would be helpful to the firm.

15   Q.  And so "implicit" meaning you didn't use any words

16   directing or asking him to retrieve this list for you, correct?

17   A.  That's correct.

18   Q.  And that recognition by you of implicitly asking him, was

19   the first time that you came to that recognition after you sat

20   down with the prosecutors in December of 2018?

21   A.  No.  I think we had certainly encouraged him -- I certainly

22   encouraged him to remain in contact with his former colleagues

23   at the PCAOB and find out any information that he could gather.

24   Q.  And were you -- when you actually used those words with

25   Mr. Sweet, you weren't telling him to retrieve confidential

1  information from the PCAOB, right?

2  A.  I wasn't -- I don't think I was very clear one way or the

3  other.

4  Q.  You didn't use the words, provide me with the confidential

5  list, or words to that effect, with him, correct?

6  A.  I did not.

7  Q.  And you never shared with Mr. Middendorf your understanding

8  that you were implicitly asking Mr. Sweet to do certain things,

9  right?

10 A.  I don't believe we had a conversation about implicit

11 requests.

12 Q.  OK.  So you have this conversation with Mr. Sweet and then

13 you call Mr. Middendorf, correct?

14 A.  Yes.

15 Q.  And he's traveling at the time, right?

16 A.  I don't recall.

17 Q.  You don't recall.

18         Do you recall if you called his cell or called him in

19 the office?

20 A.  I don't remember.

21 Q.  OK.  But it was not face-to-face, it was a call, correct?

22 A.  I believe it was a call, yes.

23 Q.  And you told him about what Mr. Sweet told you, correct?

24 A.  Yes.

25 Q.  And as you said, you said this was preliminary, right?

J2rdmid1                        Whittle - cross

1    A.   I did.

2    Q.   That it was still in process, what was going to happen as

3    far as the list, correct?

4    A.   Yes.

5    Q.   That it could change, the list, correct?

6    A.   Yes.

7    Q.   And I think you testified that you told Mr. Middendorf it

8    was likely to change, right?

9    A.   Yes.

10   Q.   Would you agree with me that what you were expressing to

11   him was a prediction as to what the list might be in the future

12   for 2017?

13   A.   I'm not sure I would call it a prediction.  It was

14   information that had come through Mr. Sweet from the PCAOB, so

15   it was information that was relevant at that time, but it was

16   not the final list, for sure.

17   Q.   And in that sense, it was no different than a prediction,

18   correct?

19   A.   Again, I'm not sure that I would characterize it that way.

20   It was current information.

21   Q.   Do you think it's unreasonable for Mr. Middendorf to

22   characterize it as a prediction?

23            MS. MERMELSTEIN:  Objection, your Honor.

24            THE COURT:  Sustained.

25   BY MR. BOXER:

J2rdmid1                         Whittle - cross

1  Q.  There was uncertainty as to whether any of the names you

2  discussed would or would not be on the final list, correct?

3  A.  There was uncertainty as to what the final list would be

4  and how much would be the same and how much would be different

5  than the preliminary list.

6  Q.  Other than it was likely to change in some respect,

7  correct?

8  A.  Correct.

9  Q.  And you testified yesterday about four issuers, I believe.

10         The first was Citi, right?

11  A.  Correct.

12  Q.  And you said that Brian Sweet was already present on site

13  working on the Citi audit, correct?

14  A.  That's correct.

15  Q.  I think the expression is he was embedded with the

16  engagement team, is that right?

17  A.  That sounds right.

18  Q.  And is that another way of saying he's working closely on

19  the audit with the engagement team?

20  A.  Yes.

21  Q.  And that occurred before this conversation with Mr. Sweet,

22  right?

23  A.  That's correct.

24  Q.  And you said that there were IT people who in the prior

25  year had gone out and assisted the Citi engagement team before

J2rdmid1                        Whittle - cross

1   the audit opinion was issued, correct?

2   A.  That's correct.

3   Q.  And after this conversation with Mr. Sweet, those same IT

4   people were sent out to Citi to assist in the engagement again,

5   correct?

6   A.  Yes.

7   Q.  And that was going to happen whether Mr. Sweet had this

8   conversation with you or not, they were going to assist on the

9   audit, right?

10  A.  That is not correct.

11  Q.  It's -- is it fair to say it's one of the three biggest

12  engagements at KPMG?

13  A.  It is one of our largest engagements, yes.

14  Q.  Mr. Sweet spent literally thousands of hours or at least a

15  thousand hours working on the engagement?

16  A.  I'm not sure how many hours he spent but he spent a fair

17  amount of time on the audit, yes.

18  Q.  And your testimony is but for -- except for this

19  conversation with Mr. Sweet, you would not have had the same IT

20  people who looked at the audit last year come out and help with

21  the audit in 2017; is that your testimony?

22  A.  That is correct.

23  Q.  You wouldn't have done that?

24  A.  I would not have done that.

25  Q.  OK.  And then you mentioned Charter.  And that was one

J2rdmid1                    Whittle - cross

1  where I think you said you checked in with the engagement

2  partner?

3  A.  I checked in with the second partner, the EQCR, on the

4  engagement.

5  Q.  And you asked -- was it a him or a her?

6  A.  Him.

7  Q.  Him.  What is his name?

8  A.  Frank Blake.

9  Q.  Frank Blake.  And you asked Mr. Blake if he needed any

10  additional resources, right?

11  A.  I did.

12  Q.  And he said no, correct?

13  A.  Initially he had said no.

14  Q.  When you asked him that question, he said no?

15  A.  Yes.

16  Q.  And after he said no, you didn't take it upon yourself to

17  assign additional resources to the Charter audit, right?

18  A.  I did not.

19  Q.  And then he calls you back, he changes his mind, and he

20  says yes, right?

21  A.  Correct.

22  Q.  And it's after he says yes that then you assign an

23  additional person to the audit, right?

24  A.  Correct.

25  Q.  And then there was Valero, I believe?

J2rdmid1                    Whittle - cross

1   A.  Yes.

2   Q.  And that was the one where Ms. Holder had already been

3   contacted by the engagement team before the call from

4   Mr. Sweet, right?

5   A.  Yes.

6   Q.  And had already requested additional resources before the

7   call from Mr. Sweet, right?

8   A.  It was around the same time.

9   Q.  I believe you testified that it was before because you said

10  it was after that you authorized it.  Am I misremembering that?

11  A.  Could you repeat that again?

12  Q.  I will.

13          I thought you testified yesterday that after you had

14  this conversation with Mr. Sweet was when you said yes to the

15  request for additional resources from either Ms. Holder or

16  somebody else from the Valero engagement team, is that right?

17  A.  Yes, that's correct.

18  Q.  So the request for additional resources came in from the

19  Valero team before your conversation with Mr. Sweet, right?

20  A.  It was around the same date or time.  I'm not sure exactly

21  how it lined up with the discussion with Mr. Sweet, but it was

22  approximately the same timing.

23  Q.  OK.  So let's do this again because I thought you had

24  answered it.

25          You made the authorization for the additional

J2rdmid1                          Whittle - cross

1  resources -- for the request for additional resources after you

2  spoke to Mr. Sweet, right?

3  A.  Yes.

4  Q.  But the request was pending at the time you spoke to

5  Mr. Sweet, right?

6  A.  I don't recall the exact timing of when it came in, of

7  whether I spoke to him and the request came in immediately

8  thereafter and then I approved it.  I certainly approved it

9  after the discussion with Mr. Sweet.

10 Q.  OK.  And it's not your recollection today that Ms. Holder

11 had already requested additional resources at the time that

12 call came in from Mr. Sweet?

13 A.  Just I know it was approximately the same time.  I don't

14 have a clear recollection of the dates that were involved.

15 Q.  OK.  And then the fourth one was Macy*s, I believe, right?

16 A.  Yes.

17 Q.  And this is the one where you had sent an additional

18 resource in the fall -- so that would be the fall of 2016 -- to

19 assist on the audit, right?

20 A.  He was assisting with the engagement partner the audit and

21 other things in that business unit, yes.

22 Q.  And was that Joe Lynch?

23 A.  Yes.

24 Q.  And who is Joe Lynch?

25 A.  Joe Lynch is an IT inspector that worked in my internal

J2rdmid1                          Whittle - cross

1     Inspection Group.

2     Q.   And what was his prior experience?

3     A.   He had been in public accounting and then had spent a

4     number of years at the PCAOB.

5     Q.   So he was another resource the firm hired to improve audit

6     quality, the firm hired from the PCAOB, correct?

7     A.   That's correct.

8     Q.   And so he was out at Macy*s in the fall.  And a request had

9     already come in for him to come back out in January, right?

10    A.   At some point during the audit.  I'm not sure whether it

11    was January or another timeframe, but, yes, at some point.

12    Q.   That request for Macy*s -- from the Macy*s -- withdrawn.

13         The Macy*s engagement partner, what was his name?  Is

14    it Jon Atkinson?

15    A.   Jon Atkinson.

16    Q.   Correct?

17    A.   That's correct.

18    Q.   So Mr. Atkinson had requested for Mr. Lynch to come back

19    out and do more work on the audit before you received the

20    January call from Mr. Sweet, correct?

21    A.   Correct.

22    Q.   And then your testimony was you said OK and you received

23    that call from Mr. Sweet, right?

24    A.   Correct.

25    Q.   Is it your testimony that you were going to say no to

J2rdmid1                          Whittle - cross

1   Mr. Atkinson about having Mr. Lynch come back out to assist the
2   audit team up and until you received the call from Mr. Sweet?
3   A.  I had not made a conclusion, but based on my broad -- I
4   used to get requests all the time for additional resources, and
5   in nearly all cases I would say no just because I had limited
6   resources and if I just started sending my people out to
7   everyone who asked for it, I would have no one left.
8   Q.  I understand.  But you had already sent Mr. Lynch out in
9   the fall, correct?
10  A.  Yes.
11  Q.  And as you mentioned, your boss, Mr. Middendorf, was a
12  reviewing partner on the Macy*s account, correct?
13  A.  Correct.
14  Q.  So sitting here today, isn't it fair to say that if
15  Mr. Atkinson asked for Mr. Lynch to come back out, you would
16  have said yes?
17  A.  Not necessarily.
18  Q.  Well, you said yesterday that you needed approval from
19  Mr. Middendorf to receive the list in 2015 because you didn't
20  want him to be mad at you.  That was your testimony, right?
21  A.  Yep.
22  Q.  You said that, right?
23  A.  Yes.
24  Q.  And so when it comes to resources, you are telling us that
25  you would be OK if Mr. Middendorf was mad at you?

J2rdmid1                     Whittle - cross

1          MS. MERMELSTEIN:  Objection, your Honor.

2          THE COURT:  Sustained.

3   BY MR. BOXER:

4   Q.  So your testimony is that as far as Macy*s and Joe Lynch,

5   you don't know what you would have done in January if you

6   hadn't received a call from Mr. Sweet?

7          MS. MERMELSTEIN:  Asked and answered, your Honor.

8          THE COURT:  Overruled.

9   A.  Can you repeat the question?

10  Q.  Sure.  So your testimony is that as far as Macy*s and Joe

11  Lynch, you did not know what you would have done in January if

12  you hadn't received a call from Mr. Sweet?

13  A.  That's correct.

14  Q.  And in all four of these instances -- Macy*s, Charter,

15  Valero and Citi -- resources were already in place on those

16  audits, correct?

17  A.  They certainly all had engagement teams in place in the

18  local office to serve those clients.

19          That's what you were asking?

20  Q.  That is what I was asking.  Thank you.

21          And there was no rereview team assigned to any of

22  those audits, correct?

23  A.  No.

24  Q.  And as you mentioned, the preliminary list that you learned

25  of was likely to change, correct?

J2rdmid1                          Whittle - cross

1    A.  Correct.

2    Q.  OK.  So fast-forwarding just a few days to January 13th, if

3    we could show you what's marked as Government Exhibit 1076,

4    which I understand is in evidence.

5          And this is an email from Mr. Sweet to you, attaching

6    the bank screening risk assessment analysis, correct?

7    A.  Correct.

8    Q.  Mr. Middendorf is not cc'ed on the email, right?

9    A.  That's correct.

10   Q.  And this was an update to the screening analysis we looked

11   at yesterday that came over in November of 2016, right?

12   A.  That's correct.

13   Q.  And the one in November of 2016, which Mr. Middendorf --

14   withdrawn.

15         Mr. Middendorf was copied on the one in November of

16   2016, correct?

17   A.  I don't -- I don't recall at the moment.

18   Q.  Fair enough.

19         The one in November of 2016 reflected Mr. Sweet and

20   Ms. Holder's predictions for the 2017 inspections, correct?

21   A.  That's correct.

22   Q.  And in this version, in this January 13th, you had directed

23   Mr. Sweet and Ms. Holder to add Citi and I don't know if there

24   were -- I'll ask you if there were others, but at least to add

25   Citi to the screening analysis so that if Citi was chosen, it

J2rdmid1                        Whittle - cross

1   wouldn't seem suspicious.  Did I state that correctly?

2   A.  I don't believe that Citi was added.  I don't recall all

3   the names off the top of my head but I don't believe it was

4   Citi.

5   Q.  Do you recall any of the names that were added?

6   A.  I don't without comparing the two lists.

7   Q.  But you instructed Mr. Sweet and Ms. Holder to add names to

8   the list that they had prepared in November, right?

9   A.  I instructed Mr. Sweet to do so.  I did not discuss it with

10  Ms. Holder.

11  Q.  And you did that to avoid detection; that was the purpose,

12  correct?

13  A.  If we -- yes.

14  Q.  And that was an explicit instruction from you to Mr. Sweet,

15  correct?

16  A.  Correct.

17  Q.  There was nothing implicit about that instruction, right?

18  A.  Correct.

19  Q.  And the result of that explicit instruction is Government

20  Exhibit 1076 in front of you, correct?

21  A.  Correct.

22  Q.  And this news media analysis, I will call it, you didn't

23  Ford that along to Mr. Middendorf, correct?

24  A.  I did not.

25  Q.  I would like to now ask you a few questions about February

J2rdmid1                     Whittle - cross

```
 1   of 2017, starting with the call you received on
 2   February 3rd from Mr. Sweet.
 3           And I won't ask you to repeat your feeling about it or
 4   what you said about it, but you agree with me that you were
 5   shocked by the call?
 6   A.  Yes.
 7   Q.  And I think you testified that it was totally different
 8   from anything else that you had received from Mr. Sweet in the
 9   past, is that right?
10   A.  That's correct.
11   Q.  And it was different than the information about the four,
12   about Citi and Charter and Valero and Macy*s, that we just
13   discussed, correct?
14   A.  Correct.  It was the final approved list.
15   Q.  And it was different than in 2015, when he sent over the
16   list of inspections, right?
17   A.  That's correct.
18   Q.  It is a yes or no question, Mr. Whittle.  It's different
19   than what was sent over in May of 2015 from Mr. Sweet, correct?
20   A.  They were both final lists.
21   Q.  My question was what you received -- what you were told and
22   received from Mr. Sweet on February 3, 2017 was different, to
23   you, than what Mr. Sweet had sent over in May of 2015, right?
24   A.  It was different.
25   Q.  And you were totally shocked by what you had received,
```

J2rdmid1                    Whittle - cross

1   correct?

2   A.  I was.

3   Q.  And that's because the audits were still open, right?

4   A.  That's correct.

5   Q.  In May of 2015 the audits were not open, right?

6   A.  That's correct.

7   Q.  In March of 2016, the audits were not open, correct?

8   A.  Some might have been.  I would have to go through the list.

9   There may have been one that was still ongoing, but for the

10  most part the audits had been completed and we were in the

11  documentation phase.

12  Q.  The audits that you assigned a rereviewer to in March of

13  2016, all those audits were no longer open, correct?

14  A.  I have to double-check on the timing of Bon-Ton.

15  Q.  OK.  But to the best of your knowledge, as you sit here

16  today, most, if not all, of the audits that you discussed in

17  March of 2016 were closed, correct?

18  A.  Correct.

19  Q.  And here for the first time, on February 3rd, Mr. Sweet is

20  presenting you with the list of inspections to occur later in

21  the year for audits that were -- all of which were open, right?

22  A.  That would not be totally correct.  There were -- it would

23  be correct for audits that had December or later year ends.  If

24  the audits had earlier year ends, they may well have been

25  closed.

J2rdmid1                    Whittle - cross

1    Q.  The vast majority of the audits that Mr. Sweet informed you

2    of on February 3rd that were going to be inspected, the final

3    list, had open audits, correct?

4    A.  That would be correct.

5    Q.  And that's why you were totally shocked?

6    A.  That's correct.

7    Q.  And you understood -- withdrawn.

8            You informed Mr. Sweet, on February 3rd, that the two

9    of you needed to speak to Mr. Middendorf about it, correct?

10   A.  Yes.

11   Q.  And you told Mr. Sweet that nothing was to be done until he

12   and you spoke to Dave, correct?

13   A.  That was what I took away from the conversation.

14   Q.  I appreciate you don't recall your exact words, but your

15   understanding was that nothing was to be done and that that was

16   conveyed to Mr. Sweet until the two of you spoke to

17   Mr. Middendorf, correct?

18   A.  He was involved in other -- in work with Citi and other

19   engagements so that work would continue.  So that wasn't

20   stopping what he was already engaged with with different

21   engagement teams, including Citi, but that otherwise it would

22   have been a correct statement.

23   Q.  So nothing out of the ordinary should have been done by

24   Mr. Sweet, that was your understanding, until the two of you

25   spoke with Mr. Middendorf, correct?

J2rdmid1                          Whittle - cross

1    A.   That was my understanding.

2    Q.   Didn't Mr. Sweet say that he was going to reach out to,

3    say, for example, Diana Kunz during the call on February 3rd?

4    A.   No.

5    Q.   You did not authorize him on February 3rd to reach out to

6    Ms. Kunz, correct?

7    A.   That's correct.

8    Q.   And then on February 6th, you and Mr. Sweet have a call

9    with Mr. Middendorf, right?

10   A.   Correct.

11   Q.   You're each on your cell phone at the time of that call?

12   Is that a fair statement?

13   A.   I was on my cell phone.  I can't speak for the other two.

14   Q.   You were not -- none of you were in the presence of any of

15   the others during the call, correct?

16   A.   Correct.

17   Q.   It was a dial-in and all three of you dialed into the call,

18   right?

19   A.   That's correct.

20   Q.   And at the conclusion of the call, Mr. Middendorf said not

21   to do anything or call anyone until he spoke to his boss,

22   Mr. Marcello, correct?

23   A.   I don't recall specifically what he said, but my take away

24   was he was going to speak with Mr. Marcello before we finalized

25   plans as to how to use the list.

J2rdmid1                          Whittle - cross

1    Q.  And that was a clear understanding you had at the

2    conclusion of that call, correct?

3    A.  Yes.

4    Q.  Did you hear any mention of reaching out to Diana Kunz

5    during the February 6th call?

6    A.  Mr. Sweet, in the course of the conversation as we went

7    through different engagements, would certainly offer which

8    partners he knew.  I can't recall if Ms. Kunz's name came up,

9    but who he knew, how he knew them, what work he was doing with

10   them.  So, that was part of that conversation.

11   Q.  I think I asked a different question.

12          Do you recall Mr. Sweet informing the group that he

13   was going to reach out or had reached out to Ms. Kunz about the

14   fact that he had a complete list of the inspections?

15   A.  He did not.

16   Q.  And do you recall Mr. Sweet informing the group that he had

17   spoken with Paul Tupper prior to the call about the fact that

18   he had a complete list of the PCAOB inspections?

19   A.  He did not.

20   Q.  And then what happens next is February 8th, when

21   Mr. Middendorf comes into your office pretty excited, right?

22   A.  Correct.

23   Q.  And that was because Mr. Middendorf had learned, through a

24   chain of command, that Mr. Sweet had reached out to Ms. Kunz,

25   right?

J2rdmid1                          Whittle - cross

1   A.  Yes.

2   Q.  And both you and Mr. Middendorf were shocked by that,

3   right?

4   A.  Yes.

5   Q.  And it was your understanding that no work or nothing was

6   to be done until Mr. Middendorf had spoken with Mr. Marcello

7   and a decision had been reached, correct?

8   A.  Could you repeat the question?

9   Q.  Withdraw the question.

10          The result of that meeting with Mr. Middendorf was

11  that you called Mr. Sweet to tell him to stop reaching out to

12  partners, correct?

13  A.  Yes.

14  Q.  And you were pretty angry when you had that call as well,

15  right?

16  A.  I was upset about it, yes.

17  Q.  And when you spoke to Mr. Sweet and told him what had

18  occurred, Mr. Sweet denied having reached out to Ms. Kunz,

19  correct?

20  A.  He did start a denial about it but I didn't let him finish

21  getting it out before just telling him to stop, cease and

22  desist talking to partners.

23  Q.  So his first reaction was to lie, correct?

24  A.  It seemed he was heading in that direction.

25  Q.  He never corrected the lie because you stopped him and said

J2rdmid1                         Whittle - cross

1    cease and desist, right?

2    A.  He did not return to it.

3    Q.  OK.  I think I want to change topics and just cover a few

4    remaining topics with you.

5            You mentioned yesterday that you attended PCAOB board

6    meetings; do you recall that?

7    A.  Yes.

8    Q.  And you were shown, if we could put it up, Government

9    Exhibit 1310.

10           I think you described this as a script, is that right?

11   It is a script?

12   A.  Yes.

13   Q.  And this one is for the September 29, 2016 KPMG meeting

14   with the board of the PCAOB, right?

15   A.  Correct.

16   Q.  And about how many board meetings do you think you

17   attended?

18   A.  I know I attended at least two; it could have been three.

19   I know I've been to at least two, maybe more.

20   Q.  And is it fair to say that they occur once, sometimes twice

21   a year?

22   A.  I would say probably once every year to 18 months.

23   Q.  And they are important meetings for KPMG, correct?

24   A.  Correct.

25   Q.  It's important for the firm to make a good impression at

J2rdmid1                          Whittle - cross

1    the PCAOB board meetings, right?

2    A.  Yes.

3    Q.  And as a result, the firm wants to be well prepared for

4    those meetings, right?

5    A.  Correct.

6    Q.  And that's the purpose of Government Exhibit 1310, right?

7    A.  Yes.

8    Q.  It's a script that outlines answers to questions that might

9    be raised during the meeting, correct?

10   A.  Yes, and it was in response to an agenda that the PCAOB

11   would provide to us in advance.

12   Q.  I'm getting to that.

13          And it even assigned different people different

14   responsibilities for certain answers, right?

15   A.  Correct.

16   Q.  On the first page, Ms. Doughtie -- she is the Chairwoman of

17   the firm, correct?

18   A.  Yes.

19   Q.  And so she's going to make the opening remarks, according

20   to the script?

21   A.  Correct.

22   Q.  And you mentioned agenda.  So does there come a time where

23   the PCAOB sends to the firm an agenda for the meeting?

24   A.  Yes.

25   Q.  And do you recall how long before the meeting itself that

J2rdmid1                          Whittle - cross

1    agenda is sent to the firm?

2    A.  I don't.  I don't receive it directly.  I usually get it

3    from someone else, but it could be days or a week.  It is

4    relatively short time before the meeting.

5    Q.  And in the preparation for the meeting, are there joint

6    meetings within the firm where the partners, you, Ms. Doughtie,

7    others, discuss how to prepare for the meeting?

8    A.  Yes.

9    Q.  And was Mr. Middendorf at some of those meetings?

10   A.  Yes.

11   Q.  And at those meetings, were you aware that -- withdrawn.

12           Did Mr. Middendorf inform the group, including

13   yourself, at those meetings that he had received a draft agenda

14   of the board meeting from one of the PCAOB board members?

15           MS. MERMELSTEIN:  Objection to hearsay, your Honor.

16           MR. BOXER:  It is all state of mind, your Honor.

17           MS. MERMELSTEIN:  I don't follow that argument.

18           THE COURT:  Overruled.

19   BY MR. BOXER:

20   Q.  Do you want me to repeat the question?

21   A.  Yes, please.

22   Q.  Did Mr. Middendorf inform the group, including yourself, at

23   those meetings that he had received a draft agenda of the board

24   meeting from one of the PCAOB board members?

25   A.  I do recall at least one time we did get a draft or

J2rdmid1                          Whittle - cross

1   something through one of the board members, yes.

2   Q.  And that draft came in before the official agenda was

3   received by the firm, correct?

4   A.  I believe so.

5   Q.  And that came in through Mr. Middendorf, is that right?

6   A.  Either Mr. Middendorf or Mr. Marcello.

7   Q.  And you were aware that two of the board members had

8   meetings with Mr. Marcello and Mr. Middendorf prior to receipt

9   of the draft agenda, correct?

10          MS. MERMELSTEIN:  Objection to foundation, your Honor.

11   It is clearly calling for hearsay.

12          MR. BOXER:  I will try it again.

13          THE COURT:  OK.

14   BY MR. BOXER:

15   Q.  At the time you became aware that the firm had received a

16   draft agenda, did you also learn how it was that the firm

17   received the draft agenda?

18   A.  Yes.

19   Q.  And did you learn that from Mr. Middendorf?

20   A.  I believed --

21          MS. MERMELSTEIN:  The same objection, your Honor, to

22   what was learned from something someone told him.

23          THE COURT:  Sustained.

24          (Continued on next page)

25

1    Q.  Were you told by Mr. Middendorf how the firm had received

2    the draft agenda?

3            MS. MERMELSTEIN:  Same objection.

4            THE COURT:  Sustained.

5    Q.  The draft agenda in the one instance you recall, did you

6    and others preparing for the meeting use the draft agenda?

7    A.  I believe so, yes.

8    Q.  In what way was it used?

9    A.  Used as if it was the actual agenda, and we tried to

10   prepare remarks that would be responsive to it.

11   Q.  After the draft agenda was received, did there come a time

12   when the official agenda was received?

13   A.  Yes.

14   Q.  Do you recall how long in between the time the draft agenda

15   was received and the official agenda was received?

16   A.  I'm sorry, I do not.

17   Q.  In using the draft agenda in the way you described, did

18   everybody in the group who was preparing use the draft agenda

19   in that way?

20   A.  Yes.

21   Q.  That group included Ms. Doughtie, correct?

22   A.  Correct.

23   Q.  It included Sven Holmes, correct?

24   A.  Yes.

25   Q.  Who is Sven Holmes?

J2rrmid2                        Whittle - Cross

1  A.  He is the vice chair of legal risk and regulatory.

2  Q.  He was formerly a federal judge before he joined KPMG,

3  correct?

4          MS. MERMELSTEIN:  Objection to foundation and hearsay

5  and relevance.

6          MR. BOXER:  I think I can establish relevance.

7          THE COURT:  Overruled.  You can answer if you know.

8  A.  Yes, my understanding is he has been a federal judge prior

9  to joining KPMG.

10  Q.  When you were with Mr. Holmes, you referred to him as

11  "Judge Holmes," correct?

12  A.  Sometimes.

13  Q.  Generally speaking, when you heard people speaking to Mr.

14  Holmes, he was referred to as "Judge Holmes," correct?

15  A.  He was referred to that way, yes.

16  Q.  Others besides Ms. Doughtie and Mr. Holmes who were

17  preparing included Mr. Marcello, right?

18  A.  Yes.

19  Q.  Included Mr. Liddy?

20  A.  If at the time he was a vice chair.

21  Q.  The draft agenda that you received, that provided more time

22  for the firm to prepare for the PCAOB board meeting, correct?

23          MS. MERMELSTEIN:  Objection, your Honor.  May we

24  approach?

25          MR. BOXER:  It seems to me a perfect valid question.

J2rrmid2                         Whittle – Cross

1            THE COURT:  You may approach.

2            (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MS. MERMELSTEIN:  Your Honor, I object to this whole

3      line of questioning, which is suggesting a number of

4      problematic things.  First, it is a hundred percent being put

5      in for its truth that a board member provided a draft agenda,

6      and that is problematic because it is hearsay.

7              Number two, the notion that there is some relevance to

8      the fact that a member of the board disclosed a draft agenda is

9      somehow a suggestion that either the board member was violating

10     EC9 or that everyone had an understanding that it was okay to

11     get information from the PCAOB and that there was some

12     similarity between a board member providing a draft agenda and

13     confidential PCAOB information about inspections being stolen

14     and secretly provided is I think factually unsupported and

15     legally irrelevant.

16              To the extent that it is evidence of some other person

17     acting badly, it is relevant.  And to the extent that this is

18     evidence that this was not wrong because someone else did it in

19     a different context, that too is not a proper argument.

20              MR. BOXER:  None of those are reasons for offering it.

21     As Ms. Mermelstein knows next week we will be calling one of

22     the former board members, Jay Hanson, who will testify

23     consistent with what Mr. Whittle just described.  So I think

24     the relevance of establishing it will be corroborated.

25              This whole case is about Mr. Middendorf's intent,

whether he had good faith in using the information that he did

in 2016.  In fact, we have heard testimony from Ms. Mullen, and

maybe Mr. Marino, that Mr. Marcello's response in 2017 to the

list was maybe the PCAOB wanted us to have it, maybe the other

firms have it.

          Whether he thought what he received was confidential

and he was using it in a fraudulent way in his mind is what the

case is about.  This evidence shows, as other evidence did,

that there is a lot of free flow of information from the PCAOB

to the firm, including at the highest levels.  So, when a

preliminary list or a prediction comes across in 2016 and he

uses it, he's using it in good faith, he doesn't think he is

committing a fraud.  In 2017 he ultimately doesn't use it.

          In fact, there is evidence in the record from Mr.

Marcello that Mr. Marcello thought twice about it because he

thought maybe they want us to have it, they've given us things

in the past.  It explains his behavior not just contextually

but his intent.

          It is not being offered to say that two wrongs make a

right.  We have no problem with an instruction to that effect.

But it is relevant to what Mr. Middendorf intended in real

time.

          THE COURT:  Isn't it being offered for the truth in

that it is being offered for the fact that a draft agenda, for

example, was provided to KPMG?

1    MR. BOXER:  I'm offering it to establish the fact that

2    it was provided as relevant to Mr. Middendorf's state of mind.

3    I appreciate Mr. Whittle is not on trial, but he is a charged

4    co-conspirator.  So I think it is relevant to the state of mind

5    of the conspiracy.  It did take me a question or two to move

6    from Mr. Whittle's knowledge to Mr. Middendorf's knowledge.  I

7    think it is relevant to the state of mind of the conspiracy.  I

8    appreciate Mr. Whittle is not charged, at least at this point,

9    but it took a question or two to get into Mr. Middendorf's head

10   and his state of mind.

11        THE COURT:  Are you suggesting that this draft agenda

12   was confidential information?

13        MR. BOXER:  Absolutely.  In fact, the board didn't

14   give the firm a lot of time with the agenda precisely for the

15   same reason it didn't give the firm a lot of time with the

16   inspection list.  It wanted it to not overprepare for the

17   meeting.  Here is an instance we will establish in our case

18   that one of the board members thought that was unfair and he

19   revealed an agenda and information in a private meeting with

20   Mr. Middendorf and Mr. Marcello before every single board

21   meeting.

22        MR. WEDDLE:  I think your Honor's question points out

23   the objection that I have repeated a number of times in the

24   case, which is nobody knows this is confidential information.

25   The indictment in paragraph 13 says, "Unless authorized by the

1   board," and this is quoting EC9, "Unless authorized by the

2   board, no board member or staff shall disseminate or otherwise

3   disclose any information obtained in the course or scope of his

4   or her employment and which has not been released, announced,

5   or otherwise made available publicly."

6        THE COURT:  I understand this goes to the breadth

7   argument.

8        MR. WEDDLE:  The prosecutor just said there is no

9   similarity, this is allegedly or ostensibly or by everybody's

10  understanding a draft agenda disclosed by a board member that

11  is totally different.  The rule by its plain terms doesn't

12  permit board members to do anything different from what staff

13  members can do.  That's the issue.

14       The fact that a bunch of people are sitting around

15  understanding, whether or not it is true, understanding that

16  this is a draft agenda that was disclosed by a board member,

17  not a board-approved disclosure, and they are working with it

18  is highly probative of everybody's state of mind.  And it

19  highlights the defect in this prosecution, which is the rule in

20  a criminal case cannot be whatever the prosecutors decide it

21  may be in a particular circumstance.

22       MS. MERMELSTEIN:  I think we have gotten far afield

23  from the objection to this testimony, which is hearsay.

24  Leaving aside for a moment whether or not Mr. Hanson's

25  testimony on this may be proper, there is a motion to preclude

J2rrmid2                          Whittle - Cross

1    most of his testimony pending before your Honor.  He is not on

2    the stand.  The fact that he will be called has nothing to say

3    about what is hearsay with respect to this witness.

4            I think Mr. Boxer has just conceded that the statement

5    made to this witness by Mr. Middendorf that he received it from

6    a board member has been offered to prove that he received it

7    from a board member.  It cannot show the effect on Mr.

8    Middendorf.  He is the declarant.  It is not being told to him

9    to show he understood its truth.  He is the one saying it.

10           This is totally to establish this is true.  This is

11   the definition of hearsay.  It is not appropriate.  If another

12   witness has a nonhearsay basis to offer testimony on this topic

13   that is relevant, which I don't think it is, we can have that

14   fight later.  That is an issue for another day.

15           This is hearsay with respect to this witness.  We

16   renew our objection to this line of questioning and move to

17   strike the questions that have elicited hearsay.

18           MR. BOXER:  I think it was just stated in the reverse.

19   It was Mr. Middendorf saying it to Whittle.

20           MS. MERMELSTEIN:  Right, exactly.

21           MR. BOXER:  I'll withdraw the last question and we can

22   move on.

23           I would like to address their application regarding

24   Mr. Hanson's testimony briefly.  I meant to do that.

25           THE COURT:  I assume at some point we will talk about

J2rrmid2                        Whittle - Cross

1    that.  I take the point.  I am going to give some leeway for

2    the state of mind.  I think the backdrop of the back-and-forth

3    communications with PCAOB board members or low-level staff is

4    important context for the defendant's state of mind.  I accept

5    that.  But I think this particular example, Middendorf said I

6    received this, is actually squarely within the hearsay

7    exception.  I am going to sustain the objection as to that for

8    that reason.

9                MR. BOXER:  Understood.  I'll move on.

10               MS. MERMELSTEIN:  And strike the testimony that has

11   been improperly offered, your Honor?

12               MR. BOXER:  I don't know what that means, improperly

13   offered.

14               MS. MERMELSTEIN:  My initial to objection to this

15   being hearsay was correct, so the testimony that followed that

16   is improper and should be stricken.

17               MR. BOXER:  He testified about his own knowledge.  He

18   used the draft.

19               THE COURT:  He didn't say it came from defendant.

20               MS. MERMELSTEIN:  We can check the transcript, but

21   I'll fairly confident he was asked, did Mr. Middendorf tell you

22   that, and he agreed to that.

23               MR. WEDDLE:  The objection was sustained.

24               THE COURT:  I think he said, I came to know it.

25               MS. MERMELSTEIN:  I'm happy to look back for it,

J2rrmid2                         Whittle – Cross

1    Judge.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2      BY MR. BOXER:

3      Q.  New topic, Mr. Whittle.  You were the head of inspections

4      at KPMG, correct?

5      A.  Yes.

6      Q.  I know it had a longer title about quality measurement, but

7      essentially you were the head of inspections, right?

8      A.  Correct.

9      Q.  You never attended a meeting with the SEC in the past, is

10     that correct?

11     A.  That's correct.

12     Q.  You did not attend a meeting at any time with Wes Bricker,

13     correct?

14     A.  I never attended a meeting with Mr. Bricker.

15     Q.  And you never attended a meeting with Mary Jo White,

16     correct?

17     A.  Correct.

18     Q.  You were never asked to provide an update on KPMG's

19     performance in PCAOB inspections in a meeting with the SEC,

20     right?

21     A.  Correct.

22     Q.  You were shown yesterday Government Exhibit 925, if we can

23     show that, an article about a speech Ms. White gave, correct?

24     A.  That's correct.

25     Q.  It's December 2015, right?

J2rrmid2                        Whittle - Cross

1   A.  Correct.

2   Q.  It speaks to ignoring red flags.  If we go to the middle of

3   the first page, where it starts with "Reporting and auditing,

4   missing or ignoring red flags," correct?

5   A.  Yes.

6   Q.  Those red flags, isn't it true, concerned falsifying

7   entries in financial statements, correct?

8   A.  Could you repeat the question.

9   Q.  The red flags that Ms. White is speaking about concerned

10  falsifying information in financial statements by people who

11  worked at issuers?

12  A.  I'm not sure specifically the reference that's here.  I'm

13  not sure I know the answer.

14  Q.  That's fine.  Is it also fair to say that the reference

15  here does not refer to results on PCAOB inspection reports,

16  correct?

17  A.  It does not appear to be about inspection results.

18  Q.  If we can turn to the third page of Exhibit 925 and point

19  you to the first full paragraph.  I ask you to read the first

20  sentence.

21  A.  "But, as you know, debate persists about" --

22          MS. MERMELSTEIN:  Your Honor, I apologize.  This was

23  not offered for its truth, so I'm concerned that it is about to

24  be used in a manner that is for its truth.

25          MR. BOXER:  I am going to ask a question about his

1    state of mind with respect to this sentence, your Honor.

2               MS. MERMELSTEIN:  I'm so sorry, your Honor.  May we

3    approach?

4               MR. BOXER:  It's in evidence.

5               MS. MERMELSTEIN:  It has proper and improper purposes.

6    This is the exact same blaming-the-victim argument we have had

7    many times now, and this is not proper.

8               MR. BOXER:  I object to that comment.

9               MR. WEDDLE:  Objection to the comment, your Honor.

10              THE COURT:  Sustained.

11   Q.  May I try it this way and see if it doesn't draw objection.

12   You don't know whether any of the statements in Government

13   Exhibit 925 are true or not true, right?

14   A.  I do not.

15   Q.  My question is whether any of the statements in 925

16   affected your view of the inspection process, whether it went

17   to your state of mind.  With that predicate, my question is,

18   the first sentence that is highlighted, whether you were aware

19   of that, what is reflected in that statement at this time in

20   2015.

21              MS. MERMELSTEIN:  Objection to the relevance of this,

22   your Honor.

23              THE COURT:  Overruled.

24   Q.  You can read it to yourself, Mr. Whittle.

25   A.  Your question again, please.

J2rrmid2                          Whittle - Cross

1    Q.  You were aware at this time in 2015 that there was debate

2    within the accounting profession as to whether the PCAOB was

3    requiring too many or even too few rules on auditors?

4               MS. MERMELSTEIN:  Objection.

5               THE COURT:  Overruled.

6    A.  There was debate.  There was debate broadly about that

7    topic, yes.

8    Q.  Just one example of that would be the application of what

9    is called AS 5, correct?

10   A.  It could cover many different things, sure.

11   Q.  The one I reference had to do with auditing and testing for

12   internal controls, correct?

13   A.  Right.

14   Q.  There was debate within the industry as to whether there

15   was too much requirement from the PCAOB or just right or not

16   enough, right?

17   A.  Correct.

18              MR. BOXER:  You can take that down.

19   Q.  You touched on this in your direct testimony.  It sounded

20   to me like you assumed your role pretty close in time to when

21   Mr. Middendorf assumed his role as national managing partner.

22   Is that fair to say?

23   A.  I assumed my final role, I assumed that in June of 2014.

24   Q.  That was about the same time that Mr. Middendorf became

25   national managing partner of what is referred to as DPP,

1   correct?

2   A.  Approximately the same time.  I don't recall when he took

3   that position.

4   Q.  It's fair to say that Mr. Middendorf supported a lot of

5   initiatives to improper audit quality at KPMG, correct?

6   A.  Correct.

7   Q.  One I think you mentioned, his predecessor did not attend

8   the monthly PCAOB meetings but Mr. Middendorf began to and

9   attended all of those meetings, correct?

10  A.  That's correct.

11  Q.  That was designed to address the PCAOB's criticism in its

12  part 2 comment from the year before that there was a problem

13  with the tone at the top, right?

14  A.  In part, yes.

15  Q.  Mr. Middendorf was near the top, so he wanted to be present

16  at those meetings and be engaged in those meetings with the

17  PCAOB, correct?

18  A.  It was certainly part of our response to the criticism.

19  Q.  Mr. Middendorf's bosses, first Jim Liddy and then Scott

20  Marcello, they also started attending those monthly PCAOB

21  meetings, right?

22  A.  Yes, they did.

23  Q.  Mr. Middendorf and you as well were responsive to requests

24  from the PCAOB for improvements in audit quality, correct?

25  A.  Everyone was.  Everyone became very responsive.

J2rrmid2                          Whittle - Cross

1    Q.  Programs were added, right, within KPMG?

2    A.  Yes, they were.

3    Q.  People were added, right?

4    A.  Yes.

5    Q.  Money was spent, correct?

6    A.  Correct.

7    Q.  By the way, when money is spent in DPP, that's not expenses

8    that could be charged to any particular client of the firm,

9    right?

10   A.  Correct.

11   Q.  It just can't be recouped like the hours somebody works on

12   an audit that gets billed to a client, right?

13   A.  That's correct.

14   Q.  It just takes away from the profitability of the firm, the

15   more you spend on DPP, correct?

16   A.  Yes.

17          THE COURT:  Could you remind the jury what DPP is.

18          THE WITNESS:  DPP stands for the department of

19   professional practice.  There are several different names we

20   use to describe the national office.

21   Q.  The firm initiated an audit quality bonus program, correct?

22   A.  Yes.

23   Q.  That was to reward the staff people and senior managers on

24   an engagement team if their audit went through inspection

25   without a comment, correct?

J2rrmid2                          Whittle - Cross

1    A.  An outside, external audit -- external inspection, right.

2    Q.  That was something that the PCAOB wanted to see the firm

3    do, correct?

4    A.  They never specifically opined on any particular activity

5    that we did.

6    Q.  Understood.  The situation before the bonus program was

7    that someone on an engagement team can suffer a penalty if they

8    were to have one of their audits fail an outside inspection,

9    right?

10   A.  Yes.

11   Q.  The PCAOB in those monthly meetings raised the issue of why

12   the firm wasn't rewarding a bonus and incentivizing its

13   employees for an external inspection that was passed, right?

14   A.  They did raise a question as to why there was only

15   penalties.

16   Q.  After they raised the question, the firm initiated the

17   bonus program you just spoke about, correct?

18   A.  Yes.

19   Q.  Then there were monitoring programs, right?

20   A.  I'm sorry.  Which ones?

21   Q.  Monitoring programs that were instituted, right?

22   A.  Yes.

23   Q.  There was something called accelerating audited execution

24   that was instituted, correct?

25   A.  Yes.

J2rrmid2                    Whittle - Cross

1   Q.  Could you explain what accelerating audit execution is.

2   A.  It was an attempt to get teams to start their planning and

3   their interim work earlier in the calendar year with the hopes

4   that if you planned early and better, you would have a better

5   outcome on the audit.

6   Q.  You approved the training within your group I think you

7   testified yesterday, correct?

8   A.  Yes.

9   Q.  You mentioned, these may not be your exact words, a more

10  robust root cause analysis program, is that right?

11  A.  Correct.

12  Q.  Could you explain for the jury what root cause analysis is.

13  A.  It's a way to look at a problem and not just sort of fix

14  the symptom but see if there is some underlying cause for why

15  we would continue to have an audit deficiency.  We implemented

16  a methodology to try to drill down into determining what the

17  underlying cause is and try to fix that with the hope that it

18  would remediate the deficiency.

19  Q.  You also added more internal inspectors to your group,

20  correct?

21  A.  Yes.

22  Q.  You were seeing results from all of these efforts, right?

23  A.  Correct.

24  Q.  Audit quality was improving, correct?

25  A.  Yes.

J2rrmid2                        Whittle - Cross

Q.  You were asked some questions yesterday about a 2016

inspection and the results from that inspection.  Do you recall

being asked those questions?

A.  Yes.

Q.  I'm not going to repeat those questions.  Let me start with

a few that I think were addressed.  If I remember correctly,

there were 11 financial institutions that were rereviewed in

2016, in March and early April 2016.  Is that consistent with

your recollection?

A.  Approximately.

Q.  I think you testified that in that 2016 report, none of the

banks or institutions that were rereviewed received a comment

for ALL.  Do I have that right?

A.  No.

Q.  Please correct me.

A.  None of them received a comment on the allowance for loan

loss area where we had had historical deficiencies.

Q.  You testified that you would have expected to see

improvement but you were surprised that that was the case for

all of them where there were historical deficiencies, correct?

A.  Correct.

Q.  In the actual inspection, there were 10 financial

institutions -- excuse me -- 11 financial institutions that

were actually inspected, is that right?

A.  Approximately.

1    Q.  Not all of those were subject to the re-review, correct?

2    A.  That's correct.

3    Q.  I believe only 6 were subject to the re-review, is that

4    right?

5    A.  I don't recall specifically.

6    Q.  Is it correct that 4 of 11 institutions that were inspected

7    by the PCAOB were not rereviewed?

8    A.  I don't recall the specific numbers as to how many.  I know

9    there were some that did not go through re-review.

10   Q.  Assuming there were 4 that did not go through re-review,

11   you agree with me that the fact that those 4 did not receive

12   any comments had nothing to do with the re-review, correct?

13   A.  I would agree with that, yes.

14   Q.  The programs with respect to those 4 that you championed

15   and Mr. Middendorf championed, those were the things that led

16   to no comments, correct?

17   A.  Certainly in the execution by the engagement team, it was

18   paramount.

19   Q.  There were also some of the institutions that were

20   rereviewed that did receive comments, right?

21   A.  In areas not included within the -- outside of the

22   historical allowance for loan loss areas, there were some

23   institutions that got comments.

24   Q.  In fact, there were 3 that received comments, initial

25   comments, correct?

J2rrmid2                          Whittle - Cross

1    A.  I know there were some.  I don't have recall on how many.

2    Q.  Do you recall that one that received an initial comment

3    through debate with KPMG ultimately did not appear in part 1?

4    A.  I don't recall.  I'm sorry.

5    Q.  Do you recall that of the institutions re-reviewed, 2 of

6    them had comments that appeared in part 1?

7    A.  There were some that appeared in part 1.  I know one was in

8    a new area of the allowance for loan loss.  I don't recall

9    again how many specifically there were.

10   Q.  When you say it was in a new area, it's a subset of the

11   topic of allowance for loan loss where it received a comment?

12   A.  Yes.

13   Q.  The re-reviewers, like Mr. Sweet, Ms. Holder, they went in

14   and looked at the workpapers concerning allowance for loan

15   loss, right?

16   A.  Yes.

17   Q.  And 2 still got a comment in part 1, correct?

18   A.  I know there was at least 1.  I don't recall if there were

19   2.

20   Q.  The re-reviews, those all occurred after the substantive

21   audit work was completed, right?

22   A.  After the release of the audit report, yes.

23   Q.  As you said, the standards were followed during the

24   re-reviews, best you understood, correct?

25   A.  Best I understood, yes.

J2rrmid2                        Whittle - Cross

1   Q.  It was the intent, your intent, that the standards be

2   followed during the re-review, correct?

3   A.  Yes.

4   Q.  If an institution that was re-reviewed and did not receive

5   a comment, that would be based on the substantive work that was

6   done before the opinion was released, correct?

7   A.  Could you repeat that?

8   Q.  If an institution that was re-reviewed and did not receive

9   a comment, the fact that it didn't receive a comment would be

10  based on the substantive audit work that was done by the team

11  before the re-review even occurred, before the opinion was

12  issued, isn't that correct?

13  A.  I'm not sure that's entirely correct.

14  Q.  As we spoke yesterday, the PCAOB says they don't give

15  comments for documentation issues, right?

16  A.  They don't.  However, the documentation is a critical part

17  of the workpapers.  We have found that if the documentation is

18  good, it leads to avoiding questions and therefore follow-on to

19  comments.  So it's a critical part of the process.

20  Q.  I understand.  I'm not disputing that.

21           MS. MERMELSTEIN:  Objection to the commentary.

22  Q.  My question is:  The audits that were re-reviewed and did

23  not receive comments, the inspection was based on the

24  substantive audit work that was done and completed before the

25  re-review started, true?

J2rrmid2                          Whittle - Cross

1        MS. MERMELSTEIN:  Objection: asked and answered.

2        THE COURT:  Overruled.

3   A.  The inspection is done on the completed set of workpapers.

4   Q.  That occurred before the re-review started, right?

5   A.  No.  The completed workpapers include the work done during

6   the rereview period.

7        MR. BOXER:  I don't think I have had my question

8   answered, your Honor, so I'm going to try one more time.

9        THE COURT:  Okay.

10  Q.  The audits that were re-reviewed did not receive a comment.

11  The substantive work on those audits was completed before the

12  re-review began?  Yes or no.

13       MS. KRAMER:  The witness has answered this question

14  three times.

15       THE COURT:  Overruled.

16  A.  Could you repeat the question.  I'm sorry.

17  Q.  The audits that were re-reviewed that did not receive a

18  comment, those audits, the substantive work on those audits was

19  completed before the re-review began?  Yes or no.

20  A.  I have trouble --

21  Q.  I'm asking about the substantive audit work.  The

22  substantive audit work on the audits that did not receive a

23  comment was completed before the re-review began, correct?

24  A.  When you say substantive audit work, that is as opposed to

25  control work?

J2rrmid2                        Whittle - Cross

1    Q.  As opposed to documentation.

2    A.  The audit procedure in a line audit procedure should have

3    been completed at the date of the release of the audit report.

4    Q.  That date was before the re-review began, correct?

5    A.  Correct.

6    Q.  I want to conclude with a few questions, Mr. Whittle,

7    asking you to identify a few photographs.  If we could show you

8    Exhibit M291.  Do you recognize that picture, who that is?

9    A.  Yes, I do.

10   Q.  Who is that?

11   A.  That's the chairman of the firm, Lynn Doughtie.

12            MR. BOXER:  We offer 291.

13            MS. MERMELSTEIN:  No objection.

14            THE COURT:  M291 received.

15            (Defendant's Exhibit M291 received in evidence)

16   Q.  Next M292.  Do you recognize who that's a picture of?

17   A.  Yes.

18   Q.  Who is that?

19   A.  Sven Holmes.

20            MR. BOXER:  We offer M292, your Honor.

21            MS. MERMELSTEIN:  No objection.

22            THE COURT:  M292 received.

23            (Defendant's Exhibit M292 received in evidence)

24   Q.  M293, do you recognize that photograph?

25   A.  Yes.

J2rrmid2                    Whittle - Cross

```
1   Q.  Who is that?

2   A.  Jim Liddy.

3           MR. BOXER:  We offer M293, your Honor.

4           MS. MERMELSTEIN:  No objection.

5           THE COURT:  Received.

6           (Defendant's Exhibit M293 received in evidence)

7   Q.  Showing you M294, do you recognize that picture?

8   A.  I don't recognize the picture.

9   Q.  Do you recognize who that is?

10  A.  I do.

11  Q.  Who is that?

12  A.  Scott Marcello.

13          MR. BOXER:  We offer M294, your Honor.

14          MS. MERMELSTEIN:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit M294 received in evidence)

17  Q.  M295, do you recognize who is depicted in M295?

18  A.  Yes.

19  Q.  Who is that?

20  A.  Laurie Mullen.

21          MR. BOXER:  We offer M295, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit M295 received in evidence)

24  Q.  Lastly, showing you M296, do you recognize the person

25  depicted in M296?
```

J2rrmid2                          Whittle – Cross

1    A.  Yes.

2    Q.  Who is that?

3    A.  John Goodheart.

4               MR. BOXER:  We offer M296, your Honor.

5               THE COURT:  Received.

6               (Defendant's Exhibit M296 received in evidence)

7               MR. BOXER:  No further questions.

8               THE COURT:  Would this be a good time for a quick

9    break?  Let's take a 10-minute break.  It's 11:05.  We will

10   start back at 11:15.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rrmid2                        Whittle - Cross

 1            (Jury not present, witness not present)

 2            MS. KRAMER:  Your Honor, there was a point where Mr.

 3   Boxer said, "I understand.  I'm not disputing that," Ms.

 4   Mermelstein said "Objection to the commentary."  I heard your

 5   Honor say "sustained" but I didn't see it on the transcript.

 6   If you sustained that objection, I just wanted the transcript

 7   to be clear.

 8            MR. BOXER:  If you didn't sustain it, I have no

 9   objection.  It was an inappropriate statement.

10            THE COURT:  I did say "sustained," not loudly enough.

11            MS. KRAMER:  Thank you, your Honor.

12            MR. WEDDLE:  Your Honor, on that same note, I objected

13   a number of times to the commentary by the prosecutor.  We have

14   been very careful in making nonspeaking objections and not

15   injecting commentary to the trial.  For the prosecutor to say

16   he's blaming the victim is completely inappropriate, and I

17   object it.

18            MR. BOXER:  I agree and ask that it be stricken.

19            THE COURT:  I sustain the objection.

20            MR. WEDDLE:  Thank you, your Honor.

21            THE COURT:  That may have been my fault because the

22   prosecutor asked for a sidebar and I wasn't having it.  In any

23   event, I think everyone is on notice that those sorts of

24   comments should be avoided.

25            We'll be in recess for ten minutes.

1        (Recess)

2        THE COURT:  One thing I wanted to mention, and this is

3   a scheduling matter.  Ms. LaStrange, who is Juror No. 5, had

4   told us in the first week, maybe even in jury selection, that

5   on Thursday the 28th she had to leave at 4:00 p.m. because of a

6   commitment she had.  I may have forgotten to mention this, I

7   probably did.  We had sort of generally assured her if there is

8   a particular day where we have to stop one hour early because

9   of a witness's prior commitment, that wouldn't be a problem.  I

10  want to let everyone know that I believe we'll have to break at

11  4 o'clock tomorrow.

12       MR. BOXER:  As a reminder, your Honor, our defense

13  witness Mr. Blake is only available tomorrow.

14       THE COURT:  So we'll either have to take him out of

15  order or --

16       MR. BOXER:  Maybe he will come in order.  I just

17  wanted to alert the Court.

18       MS. KRAMER:  Your Honor, one point before Mr. Whittle

19  gets back on the stand.  We expect our next witness is going to

20  be Zachary Greenwood and we will get to him before lunch.  We

21  put in our letter that we intended to not offer him as an

22  expert.  But we do think he is qualified as an expert, and

23  after discussion with defense counsel we are going to elicit

24  his qualifications.  I still think we are not going to offer in

25  front of the jury that he is an expert, consistent with our

J2rrmid2                        Whittle - Cross

1      position on what should be done with Mr. Atkins, but I believe

2      we are going to elicit his qualifications, and I believe his

3      nature will be a little more in the nature of expert testimony.

4                THE COURT:  All right.

5                MS. KRAMER:  Your Honor, following up on my this

6      morning, I conferred with counsel for defendant Wada, who no

7      longer intends to question Mr. Rubino on anything other than

8      the limited system he is going to give on direct about

9      retrieving the notes.  I never heard from counsel for

10     Middendorf, so my understanding is that defense counsel is not

11     going to try to cross Rubino beyond his limited testimony about

12     the notepads.  I think that issue is off the table.

13               Then we expect to call Brian Sweet tomorrow about the

14     notes, so we will need a ruling from your Honor on that.

15               THE COURT:  Let me ask one thing about the notes.

16     Given what Ms. Lester was arguing about how it is a rule of

17     completeness type argument, to the extent that some of the

18     other entries outside the government's proposed version might

19     be sort of first-person type notes, I would think to some

20     extent it supports an argument that some of these notes were

21     not necessarily statements of someone else but were his own

22     thoughts.  I can't necessarily tell just by looking what is and

23     what isn't.

24               You gave one example.  There is one example in the

25     government's part, I think.  I think they argued that that is

 1    enough.  But I think if there are other examples, it could be

 2    admitted for that purpose because it shows the context and

 3    arguably supports an argument that it is misleading to limit it

 4    in a way that doesn't include the possibility of an argument

 5    that it is something else.

 6         However, the cross-examination will have to be limited

 7    in that situation where I allow the larger part in so as not to

 8    allow it to be simply a backdoor way of getting in statements

 9    of Mr. Middendorf that are good conduct statements, because

10    that would be improper hearsay if used for that purpose.

11         MS. KRAMER:  Your Honor, the only ones that fall into

12    that bucket are the paragraphs that the government wants to

13    offer.  Paragraph 1 on page 2 and paragraph 3 on page 2 was the

14    example Ms. Lester gave, the last line being "Dave, Tom, Steve,

15    very good."  What Ms. Lester said this morning is that is a

16    reference to Dave Middendorf, so it wouldn't be something that

17    he himself had said.  So just paragraphs 1 and 3 on page 2.

18    And then the other one we want to cover was 5, PCAOB contacts,

19    for the prior consistent statement.

20         Page 1 was not at all the notes that Mr. Sweet took

21    during his meeting with Middendorf, which is not in dispute.

22    That's been consistent in the 3500 material.  So it is just

23    page 2, paragraphs 1, 3, and 5, and we would not object to that

24    coming in for the reasons your Honor stated.

25         THE COURT:  What is it that the defendants want?  Do

J2rrmid2                        Whittle - Cross

1    you want something more from page 1?

2              MS. LESTER:  Yes, your Honor.  We would like all of

3    page 1 and all of page 2 with the exception of the portion to

4    the right of the line and the notation above the vertical line

5    that says 4/1 KVN.

6              THE COURT:  Back up a second.

7              MS. LESTER:  The entirety of page.

8              THE COURT:  All of page 1.

9              MS. LESTER:  Yes and the entirety of the page 2 with

10   the exception to the right of the vertical line and the circle

11   above that says "4/1 KVN" and some illegible notation right

12   above it.

13             THE COURT:  Let's start with page 1.  What can you

14   represent to me about page 1?

15             MS. LESTER:  Your Honor, the reason we need the entire

16   document is that it helps put in context the second page.  The

17   way that it does that is this.  Mr. Sweet has described in his

18   3500 material that these two pages represent notes that were

19   made in connection with the meeting/call with Mr. Middendorf

20   and Mr. Liddy.

21             I believe, although the prosecutors will correct me if

22   I'm wrong, that the top part above the line, the horizontal

23   line, is the portion that he wrote to himself as notes to

24   prepare for that.  Then the portion below the horizontal line

25   are the parts that recount the discussion with Mr. Liddy.  I

 1    believe he would say that those are Mr. Liddy's comments to

 2    him.

 3            The second page, our view is that arguably these may

 4    be similar to the top part of the first page and that they are

 5    not preparation notes but they are notes that Mr. Sweet took of

 6    what he was saying or what the substance of what he intended to

 7    say during the meeting with Mr. Middendorf.  We believe that

 8    the entirety has to come in so that we can properly place in

 9    context the portions that on the second page clearly imply to

10    us statements by Mr. Sweet, not by Mr. Middendorf.

11            THE COURT:  I understand the argument.

12            MS. KRAMER:  Should I respond, your Honor?

13            THE COURT:  No, you don't need to.  Can we go forward

14    now with the testimony?

15            MS. KRAMER:  Yes.  Can we get a ruling from your Honor

16    on this by the end of the today so I can prepare for tomorrow?

17            THE COURT:  Yes.

18            MS. KRAMER:  Thank you, your Honor.

19            MR. WEDDLE:  Your Honor, while the witness is coming

20    in, I wanted to alert your Honor that to try to speed things

21    up, I'm going to try to do two packets of emails with the

22    witness.  I haven't had any time to prepare with him.  I have

23    put them at the witness stand.  We'll see if he can answer them

24    in one fell swoop.  I'll hand a copy to your Honor, and I have

25    shown them to the prosecutors.

J2rrmid2                          Whittle – Cross

1              THE COURT:  Okay.

2              (Continued on next page)

J2rrmid2                         Whittle - Cross

1              (Jury present, witness resumed)

2              THE COURT:  Welcome back, ladies and gentlemen.  We

3    will now have the cross-examination of the witness by counsel

4    for Mr. Wada, Mr. Weddle.

5    CROSS-EXAMINATION

6    BY MR. WEDDLE:

7    Q.  Good morning, sir.  My name is Justin Weddle.  I represent

8    Jeffrey Wada in this case.  In your direct testimony you didn't

9    mention Mr. Jeffrey Wada at all, right?

10   A.  That's correct.

11             MR. WEDDLE:  Jeff, can you stand up.

12   Q.  Have you ever had any contact with Mr. Wada, to your

13   recollection?

14   A.  No.

15   Q.  When you talked in your direct testimony about recruiting

16   Brian Sweet, you said it was part of an effort to recruit more

17   broadly from the PCAOB, right?

18   A.  That's correct.

19   Q.  Let me show you some photos as well.

20             MR. WEDDLE:  Can we put UP just for the witness and

21   Court and counsel Defense Exhibit 1639.

22   Q.  Do you recognize that to be a photograph of David Knibbs?

23   A.  I do not.

24   Q.  Can we put up 1640.  Do you recognize that to be a

25   photograph of Jeffrey Lutz?

J2rrmid2                          Whittle - Cross

1   A.  Yes.

2          MR. WEDDLE:  We offer Defense Exhibit 1640.

3          THE COURT:  1640 is received.

4          (Defendant's Exhibit 1640 received in evidence)

5   Q.  Let's put up defense Exhibit 1641.  Do you recognize that

6   to be a photograph of Jeffrey Watkins?

7   A.  I do not.

8   Q.  Can we put up just for the Court and counsel Defense

9   Exhibit 1642.  Do you recognize that to be a photograph of

10  Randy Bunkley?

11  A.  I do not.

12  Q.  Mr. Lutz was a PCAOB inspector at least during part of the

13  time 2015 to 2017, right?

14  A.  He was a PCAOB inspector.  I don't know what times he

15  worked at the PCAOB.

16  Q.  In terms of hiring from the PCAOB, you may recall you

17  talked when Mr. Boxer was cross-examining you about the fact

18  that all your competitor firms were also hiring people from the

19  PCAOB, right?

20  A.  Yes.

21  Q.  When you embarked on an effort to increase your hiring from

22  the PCAOB, who was your number one candidate?

23  A.  Brian Sweet.

24  Q.  Do you remember who was your number two candidate before

25  Mr. Sweet got there?

J2rrmid2                          Whittle – Cross

1    A.  Bob Ross.

2    Q.  Let's take a look for Court and counsel at Defense Exhibit

3    1207.  Sir, do you see that this is an email chain involving

4    you and Brian Sweet relating to recruiting?

5    A.  Yes.

6    Q.  It is from May 2015, right?

7    A.  That's correct.

8            MR. WEDDLE:  We offer Defense Exhibit 1207.

9            MS. MERMELSTEIN:  No objection.

10           THE COURT:  1207 is received.

11           (Defendant's Exhibit 1207 received in evidence)

12   Q.  Let's start with the second email on this page, so the

13   bottom half of this page.  That email is from Joe Lynch, right?

14   A.  Correct.

15   Q.  It's to you and Brian Sweet, right?

16   A.  Yes.

17   Q.  The date is May 6, 2015, right?

18   A.  Yes.

19   Q.  Do you recall that that was Mr. Sweet's third day of work?

20   A.  Yes.

21           (Continued on next page)

22

23

24

25

J2rdmid3                        Whittle – cross

1   Q.  Joe Lynch you testified earlier, I believe, but just for

2   everyone's reminder, Joe Lynch was a former PCAOB person who

3   worked at KPMG at this time, right?

4   A.  That's correct.

5              THE COURT:  Hold on one second.  My LiveNote isn't

6   working.  Is yours?

7              MS. MERMELSTEIN:  No, your Honor.

8              MR. WEDDLE:  No, I'm sorry, your Honor.

9              (Discussion off the record)

10  BY MR. WEDDLE:

11  Q.  So we were talking about this May 6th email that's on the

12  screen, Mr. Whittle, and fair to say that on the third day, you

13  had a conference call with Brian Sweet and Joe Lynch about

14  recruiting, right?

15  A.  It would appear, yes.

16             MR. WEDDLE:  And, Ms. O'Connor, if we could put on the

17  screen the third page of the exhibit.

18  Q.  And part of the attachments to the conference call, or the

19  meeting, on that third day about recruiting, was this list of

20  potential candidates, right?

21  A.  Yes.

22  Q.  And as you can see, there are three tiers, there is Tier 1,

23  Tier 2 and Tier 3, right?

24  A.  Yes.

25  Q.  And the first tier is "Approached us and should consider,"

J2rdmid3                        Whittle - cross

1  right?

2  A.  Yes.

3  Q.  And then there is a list of names, right?

4  A.  Yes, there are.

5  Q.  And it is your understanding that Brian Sweet worked

6  together with Joe Lynch to put together this list, right?

7  A.  That's my recollection, yes.

8  Q.  And the list are people who are currently at PCAOB, right?

9  A.  I believe at the time -- I don't know all the names but

10  some of the names that I do recognize were at the PCAOB.

11  Q.  OK.  And so, for example, item number 1 is, "David Knibbs,

12  IS3 - core (The KPMG UK)." Do you see that?

13  A.  I do.

14  Q.  That doesn't mean that David Knibbs is working at KPMG UK,

15  right?

16  A.  That's correct.

17  Q.  That means that he is on the inspection team for KPMG UK,

18  right?

19  A.  That's the way I read it, yes.

20  Q.  He is one of the inspectors for an affiliate firm overseas

21  at KPMG LLP, right?

22  A.  Yes.

23  Q.  You worked at KPMG LLP, right?

24  A.  I did.

25  Q.  And that's the United States firm, right?

J2rdmid3                    Whittle - cross

1    A.  It also happens to be -- the "LLP" is also added in certain

2    other countries as well.

3    Q.  But the place you worked is the United States firm?

4    A.  Correct.

5    Q.  And KPMG is a global organization, it has affiliate firms

6    in many countries around the world, right?

7    A.  Yes.

8    Q.  And on this list -- oh, and so Tier 1 is a list of people

9    who it says "approached us and should consider."

10            Your understanding is that these people have expressed

11   some interest to KPMG in working at KPMG, and the

12   recommendation from Brian Sweet and Joe Lynch is that KPMG

13   should consider hiring them?

14   A.  My understanding is that they approached either Mr. Sweet

15   or Mr. Lynch, and that was -- and I would say you're correct,

16   that they were recommending that we consider them for

17   appointment.

18   Q.  I see.  So you're saying when it says "approached us," that

19   doesn't necessarily mean that they approached someone who

20   worked at KPMG at the time of the approach, they might have

21   approached Brian Sweet before he left PCAOB?

22   A.  That's possible.

23   Q.  And item 4 on Tier 1 is "Cindy Holder."  Do you see that?

24   A.  Yes.

25   Q.  And there is an entry there that says "KPMG" next to Cindy

J2rdmid3                        Whittle - cross

1    Holder, right?

2    A.  Correct.

3    Q.  That means that she is on the KPMG U.S. inspection team,

4    right?

5    A.  That's the way I understand it, yes.

6    Q.  Then there is "Grady Peeler."  Do you see that?

7    A.  Yes.

8    Q.  Also on the KPMG U.S. inspection team, right?

9    A.  Yes.

10   Q.  OK.  And then let's take a look at Tier 2.  And Tier 2, the

11   category is for "People who have approached us," the same

12   phrase as Tier 1, right?

13           And as to those people, it "needs additional

14   discussion."  Do you see that?

15   A.  I do.

16   Q.  So not a simple recommendation from Joe and Brian but KPMG

17   should considering hiring these people?

18   A.  Correct.

19   Q.  And the first one on the list is Steve Schindler, who is

20   the KPMG lead, right, inspector?

21   A.  For the U.S. inspection, yes.

22   Q.  And then there is Ann King on the list, right?

23   A.  Yes.

24   Q.  And it says she's also on the KPMG U.S. inspection team,

25   right?

J2rdmid3                          Whittle - cross

1    A.  Correct.

2    Q.  And it says "IS3."  Do you have an understanding of what

3    "IS3" means next to her name?

4    A.  It's some level, some grade at the PCAOB.

5    Q.  It is like a rank?

6    A.  A rank, you can call it, sure.

7    Q.  And it's a lower rank than associate director, for example?

8    A.  I understand that to be true, yes.

9    Q.  It's a person who is an inspector, not a director level?

10   A.  Right.

11   Q.  And then you see number 11 on this list is Randy Bunkley.

12   Do you see that?

13   A.  I do.

14   Q.  And he's also on the KPMG inspection team, right?

15   A.  Yes.

16   Q.  But it's not -- this is not a list solely of people on the

17   KPMG inspection team, right?

18   A.  That's correct.

19   Q.  There are some who worked for other firms; some it doesn't

20   even say what their inspection assignment is?

21   A.  Correct.

22   Q.  OK.  Let's take a look at Tier 3.

23        And Tier 3 is a list of people who it says "Not

24   approached but should consider," right?

25   A.  It does.

J2rdmid3                    Whittle - cross

1   Q.  So it looks like that's Joe Lynch and Brian Sweet's view

2   that, hey, these are good people to hire, let's maybe reach out

3   to them, for whatever reason; these are good recommendations

4   for KPMG proactively to make an approach to?

5   A.  Certainly we should consider, based on them being placed on

6   the list.

7   Q.  OK.  And number 1 on that list is Hector Santana, right?

8   A.  Right.

9   Q.  And he was an associate director?

10  A.  Yes.

11  Q.  At PCAOB, right?

12  A.  Correct.

13  Q.  And some -- if we can just look at the whole page, if we

14  can, Ms. O'Connor.

15          Some of the people on this list ended up being hired,

16  right?

17  A.  That's correct.

18  Q.  And people who -- there may be people who are not on this

19  list who KPMG eventually hired from the PCAOB, right?

20  A.  I haven't studied the list but that's possible, yes.

21  Q.  Fair to say that by January 2017 -- do you have the

22  timeframe?  I am kind of jumping a head a bit.  January 2017

23  KPMG had hired about a dozen former PCAOB people, right?

24  A.  It sounds about right.

25  Q.  So we've already talked about Brian Sweet and Joe Lynch and

J2rdmid3                        Whittle - cross

1   Cindy Holder, right?

2            KPMG also hired Louann Sakala, right?

3   A.  Correct.

4   Q.  And Hector Santana, right?

5   A.  Correct.

6   Q.  We just talked about him on Tier 3, right?

7   A.  Yes.

8   Q.  Robert Larson, right?

9   A.  Correct.

10  Q.  He is on Tier 1.

11  A.  Correct.

12  Q.  Ryan Adams?

13  A.  Correct.

14  Q.  John Amraen?

15  A.  He is -- he had previously been hired but, yes, he was a

16  KPMG employee.

17  Q.  He was hired before Brian Sweet?

18  A.  Correct.

19  Q.  But he's former PCAOB?

20  A.  Correct.

21  Q.  Anand Tailor?

22  A.  Correct.

23  Q.  Scott Henderson?

24  A.  Yes.

25  Q.  Sean Kelley?

J2rdmid3                          Whittle - cross

1  A.  Yes.

2  Q.  Michael Tucker?

3  A.  Yes.

4  Q.  All former PCAOB people who came to work at KPMG sometime

5  before January 2017, right?

6  A.  Correct.

7  Q.  If you take a look at this list that is on the screen, is

8  there anyone else that you see there that you think KPMG ended

9  up hiring?

10  A.  I don't see any.

11  Q.  And Jeffrey Wada is not on this list, right, and it is

12  spelled W-a-d-a?

13  A.  He is not.

14          MR. WEDDLE:  If we jump back to the first page,

15  Ms. O'Connor, of this exhibit.

16          Actually, can we just jump to the fourth page of the

17  exhibit and kind of scroll through from there.

18  Q.  So part of this exhibit is also a number of résumés, right?

19  A.  Yes.

20  Q.  And there are some of the people's names that we've already

21  talked about.

22          Let me know if you want me to slow down the scrolling.

23  A.  I've seen a couple, yes, that we did talk about.

24  Q.  And the last one in the exhibit is David Knibbs.  Do you

25  see that?

J2rdmid3                           Whittle - cross

1   A.  I do.

2   Q.  And the one just prior to the last one in the exhibit is

3   Cindy Holder, right?

4   A.  Yes.

5           MR. WEDDLE:  OK.  I'm done with that.  Thank you.

6   Q.  Now, do you recall in this timeframe, 2015 to 2017 -- or

7   2015 to 2016, let's say, KPMG paid bonuses to eligible KPMG

8   employees who played an important role in recruiting someone

9   who got hired at KPMG?

10  A.  I do recall.

11  Q.  How did that work?

12  A.  It was called a referral bonus, and if you -- if there was

13  an open spot and someone at the staff or manager level -- I

14  think it went to the managers, I don't recall exactly, but if

15  you referred a friend and they came to join the firm, you got a

16  bonus for doing so.

17  Q.  And it could be thousands of dollars, right?

18  A.  Yes.

19  Q.  Do you recall it being around $10,000?

20  A.  I don't recall the exact amounts.

21  Q.  And partners who played an important role in recruiting

22  someone to the firm, they were not eligible for this referral

23  bonus program, right?

24  A.  Correct.

25  Q.  It had to be a nonpartner KPMG employee?

J2rdmid3                    Whittle - cross

A.  I don't recall whether managing directors were eligible or

not.

Q.  OK.  Do you remember what Cindy Holder's title was when she

came to KPMG?

A.  Executive director.

Q.  She would have been eligible for a referral bonus if she

recruited people, right?

A.  She was not a partner or a managing director, so presumably

yes.

Q.  And what about Louann Sakala, would she have been eligible

for referral bonuses if she recruited people to KPMG?

A.  She would not.  She joined the firm as a partner.

Q.  OK.  And so I'm going to try to do this in hopefully a

speedier fashion but it is going to take a tiny bit of work on

your part.  I've put in the manila folder that's in front of

you two packets of emails, and I want you to take as long as

you need for this but I'm just going to give you a preview of

what the question is going to be.

        So, we're going to start with the bigger packet of

emails, and the question is going to be:  Are these all mails

that involved you and recruiting of PCAOB alumni?  That's the

only question.  But if you look through and see if you can -- I

can ask you again after you have had a chance to look at it,

but just take a look with that question in mind and then I'll

ask you afterwards.

J2rdmid3                          Whittle - cross

```
 1   A.  OK.

 2              (Pause)

 3              MR. WEDDLE:  For the record, your Honor, let me just

 4   say the exhibit numbers.

 5              It is Defense Exhibit 1017, 1018, 1196, 1200, 1207,

 6   1208, 1251, 1374, 1418, 1422, 1458, 1459 and 1481.

 7              And the packet includes the email that we just

 8   admitted, which is 1207.

 9              (Pause)

10   Q.  Thank you for taking the time to do that, Mr. Whittle.  So

11   the question is are those all KPMG mails relating to the

12   recruitment of PCAOB alumni?

13   A.  There were two that one has to -- one is Defense Exhibit

14   1208, which has to do with logistics of Mr. Sweet starting his

15   employment, so he would have already accepted his role.

16              How broadly do you define "recruitment"?  I just offer

17   that as on a point.

18   Q.  Thank you.

19   A.  And with respect to Defense Exhibit 1422, which is an email

20   from Mr. Lynch that describes who the other firms -- "all the

21   firms I've hired," I would not say that is directly related to

22   recruitment by KPMG.

23   Q.  Right.  And I think we saw another version of that when

24   Mr. Boxer was cross-examining you, and that's the list of

25   people who were working at other firms, right?
```

J2rdmid3                         Whittle - cross

 1   A.   That were hired -- that had been hired from the PCAOB.

 2   Q.   OK.

 3              MR. WEDDLE:   I offer that list of exhibits, your

 4   Honor.   Would you like me to read them again?

 5              MS. MERMELSTEIN:   No objection.

 6              THE COURT:   I think I have the list and they are all

 7   received.

 8              MR. WEDDLE:   Thank you.

 9              (Defendant's Exhibits 1017, 1018, 1196, 1200, 1207,

10   1208, 1251, 1374, 1418, 1422, 1458, 1459, 1481 received in

11   evidence)

12   BY MR. WEDDLE:

13   Q.   So let's take a look at Defense Exhibit 1459.   It is one of

14   the ones in the packet but I am going to put it on the screen

15   or Ms. O'Connor is going to put it on the screen for you, sir.

16              And let's start with the bottom email in the chain.

17              And so this is an email from January 19, 2016.   Do you

18   see that?

19   A.   Yes.

20   Q.   And it is from Brian Sweet to you, right?

21   A.   Correct.

22   Q.   And could you just read out loud the first paragraph of the

23   email?

24   A.   "Tom - I had a meeting with Hector, Louann, Cindy, Mike and

25   Joe and we came up with a short list of folks who we think

J2rdmid3                    Whittle - cross

would be a great fit for the international role you mentioned.

Each were strong performers at the PCAOB and have a lot of

international experience (including IFRS and a variety of root

cause, FMM, and industry expertise)."

Q.   Then there is a list of people, right?

A.   Correct.

Q.   And so the people that Brian is referring to -- Brian Sweet

is referring to in the first sentence, those are the first

names of some of the same people we were talking about before

who are former PCAOB people who had been hired at KPMG, right?

A.   That's correct.

Q.   And so those -- let's see, we have five people -- Hector,

Louann, Cindy, Mike and Joe, that's five people; plus Brian

Sweet, that's six people.  Those six people apparently had a

role in putting together this list of recommended recruitment

candidates, right?

A.   That's correct.

Q.   And this is just to remind everyone, this is half a year

later -- more than half a year later after Brian Sweet started,

right?

A.   That's correct.

Q.   Then David Knibbs is still first on the list, for example?

A.   That is correct.

Q.   And some of the other people haven't changed -- or let me

withdraw that.

J2rdmid3                        Whittle - cross

1              It is a shorter list than what we looked at before.

2     There may be differences and overlaps.  You haven't compared

3     them, right?

4     A.  I have not.

5     Q.  OK.  And Jeffrey Wada is not on this list, right?

6     A.  He is not.

7     Q.  So let's take a look at the email which is at the top of

8     this email chain, still in Defense Exhibit 1459.

9              I'm sorry, let's look at the middle one.  Sorry, I

10    asked for the wrong one.

11             So the middle email is just, let's see, a week or

12    so -- a little more than a week later.  Brian Sweet emails you

13    and says:  "attached is a résumé for Sean Kelley," right?

14    A.  Correct.

15    Q.  He is following up on that list before he is sending you a

16    résumé for one of the people, right?

17    A.  Presumably, yes.

18             MR. WEDDLE:  Actually, if we can take a look back at

19    just the whole page, Ms. O'Connor.  Let me see.  Yes.

20    Q.  Sean Kelley is number 2 on that list in the January 19th

21    email, correct?

22    A.  That's correct.

23    Q.  And in this middle email, Brian says, "Sean is a top

24    performer at the PCAOB and has significant international

25    inspections experience," right?

J2rdmid3                    Whittle - cross

1    A.  Correct.

2    Q.  He's recommending Sean Kelley, right?

3    A.  That's correct.

4    Q.  And then let's take a look at -- and he's not in this email

5    that's on the screen, he is not recommending Jeffrey Wada?

6    A.  He is not.

7    Q.  Let's take a look at Government Exhibit 1437, in evidence.

8          And this is a -- you may never have seen this document

9    before, sir, but this is a -- it has been admitted into

10   evidence as a series of texts or chat conversations -- chat

11   conversations between Brian Sweet and Cindy Holder.  Do you see

12   it?

13   A.  I do see it.

14   Q.  And the date of it is February 24, 2016.  Do you see that?

15   A.  I do.

16   Q.  Let's take a look at -- if you could cull out,

17   Ms. O'Connor, the date and the first message.

18          So this is February 24, 2016, so just a few weeks

19   later than the email we were just looking at, which was

20   January 29, 2016, right?

21   A.  Yes.

22   Q.  And Brian Sweet, according to this document in evidence, is

23   saying to Cindy Holder:  "Wada is the freaking man!  I'd so

24   love to hire him.  Do you think he'd be willing to come do this

25   international role?"

J2rdmid3                         Whittle - cross

1          Do you see that?  And then it goes on, right?

2   A.  I do see that.

3   Q.  Mr. Whittle, did Brian Sweet ever send you Jeff Wada's

4   résumé?

5   A.  Not that I recall.

6   Q.  In fact, Brian Sweet never recommended to you that KPMG

7   hire Jeff Wada, right?

8   A.  Not that I recall.

9          MR. WEDDLE:  Thank you, Ms. O'Connor.

10  Q.  Now, you testified yesterday -- I am going to change topics

11  now.  You testified yesterday that aside from inspection lists

12  which you talked about, Brian Sweet also shared other kinds of

13  confidential information that he had learned about the PCAOB,

14  right?

15  A.  That's correct.

16  Q.  And you testified that you encouraged him to keep in touch

17  with his former colleagues and to see what he could find out?

18  A.  That's correct.

19  Q.  And the reason that you did that, that you encouraged him

20  to keep in touch with his former colleagues, was because in

21  your experience in those kinds of situations where people are

22  in contact with PCAOB employees, information flows, right?

23  A.  That's fair.

24  Q.  And you knew that from your own personal experience, too,

25  in terms of your contacts with PCAOB employees, right?

1    A.  We certainly would have conversations about KPMG matters,

2    and it was part of the normal dialogue with PCAOB inspectors.

3    Q.  Yeah.  And statements when you were in contact with PCAOB

4    inspectors, information flowed to you, right?

5    A.  Yes.

6    Q.  So let's take a look at Defense Exhibit 1535, which is in

7    evidence.

8            MR. WEDDLE:  It also has a sticker on it, your Honor,

9    for Government Exhibit 184.  I believe it was admitted as 1535.

10   Q.  And, sir, do you see that this -- can we pull up the top

11   half of the page?

12           This appears to be meeting notes of a meeting from

13   January 24, 2017, and it is a meeting between KPMG personnel

14   and PCAOB personnel.  Do you see that?

15   A.  Yes, I see it.  They are meeting notes between the KPMG and

16   PCAOB personnel.

17   Q.  These aren't your notes, right?

18   A.  They are not.

19   Q.  And the document that's in evidence says that the meeting

20   was held telephonically, right?

21   A.  Yes.

22   Q.  And you were a participant in this meeting, right?

23   A.  Yes.

24   Q.  And let's take a look at the first text paragraph

25   underneath this table.

J2rdmid3                        Whittle - cross

1              And you see that the first item on the agenda, or as

2       the first item on the agenda Steve Schindler announced -- he

3       says:  "I want to make you aware" -- leaving out the word

4       "is" -- "that we have formed a new group we call the Banking

5       Inspections Group, known as 'BIG'.  This group is going to work

6       across all firms.  We won't have a dedicated KPMG Banking Team

7       this year."

8              Do you see that?

9       A.  I do.

10      Q.  Do you remember this announcement in January -- January 24,

11      2017 from Steve Schindler?

12      A.  I remember the discussion that it occurred on January 24th.

13      I don't recall that date, but I do recall having heard that

14      from Mr. Schindler.

15      Q.  And you will agree with me that this was an announcement by

16      Mr. Schindler?

17      A.  Yes.

18      Q.  And let's take a look at the second page of this document

19      at the top.

20              You had a follow-up question for Mr. Schindler.

21              Can you put up Mr. Schindler's answer there, too?

22              And you asked, after he announced this thing, the

23      creation of the BIG Banking Inspections Group, you said:  "is

24      part of what you want to gain is having the same individuals do

25      inspections across all the firms so they have better

J2rdmid3                         Whittle - cross

1    perspectives and are leveraging their skill set?  Is that a

2    good way of thinking of the goal here?"

3            Do you remember asking that?

4    A.  I don't remember if those were the exact words but

5    certainly consistent with what I would have -- the type of

6    thing I would have ask him.

7    Q.  And Mr. Schindler said, "Yes, that's correct," right?

8    A.  That's what it says, yes.

9    Q.  And what you're trying to convey there is that -- maybe in

10   a polite way -- you were saying that maybe having a dedicated

11   Banking Team that operated across not just KPMG but PwC and

12   Deloitte and Ernst & Young and so on, the type of review they

13   did might be more consistent across firms, is that right?

14   A.  That would be fair.

15   Q.  And it would depend less on the personalities or the

16   particular let's say method used by particular bank inspections

17   who might only be previously working on one audit firm's

18   inspections?

19   A.  I'm not sure ultimately that the perspectives and

20   individual personalities don't ultimately come through in an

21   inspection, but in terms of trying to gain a level of

22   consistency, certainly that would be the objective I was trying

23   to -- would be trying to get across.

24   Q.  Now, but you, sir, had already heard before this

25   announcement by Mr. Schindler in this meeting on January 24th,

J2rdmid3                          Whittle - cross

1    you had already heard that they were creating this Banking

2    Inspections Group called BIG, right?

3    A.  I believe so, yes.

4            MR. WEDDLE:  Let's take a look at Defense Exhibit

5    1635.

6            It is in evidence but for a nonhearsay purpose, your

7    Honor.

8    Q.  And I want to focus you -- oh, actually, let me just -- OK.

9    So if you just take a look -- you're not on this email chain,

10   right?

11   A.  I'm not.

12   Q.  OK.  So just to orient you, at the bottom there is an email

13   from December 12, 2016 and it says, "Helen Munter just

14   announced FS pooled team concept to the SEC reviewing partners.

15   That stinks.  Chuck."

16           Do you see that?

17   A.  Yes.

18   Q.  And then let's take a look at the top email.

19           So, this is an email at the top also from December 12,

20   2016, and it's from Ryan Sweet to Cindy Holder, right, not

21   including you on the email chain?

22   A.  Correct.

23   Q.  And Brian says, "Thanks for forward.  Tom was prepping with

24   her for this session last week and she announced it to him,

25   too, so it's officially public."  Do you see that?

J2rdmid3                    Whittle - cross

1    A.  I do.

2    Q.  Then he goes on to say:  "I need to get together with Bob

3    to get the details, but it will likely be in January."

4            Do you see that?

5    A.  I do.

6    Q.  So, Helen Munter -- who was Helen Munter in December of

7    2016?

8    A.  She was the director of inspections for the PCAOB.

9    Q.  And fair to say that from time to time she came and gave

10   talks to KPMG personnel, right?

11   A.  Yes.

12   Q.  And in fact, do you recall that she did give a talk to a

13   group of KPMG personnel who were partners at KPMG on or about

14   December 12, 2016?

15   A.  Not exactly the date, but in December of each year we would

16   hold our SEC reviewing partner conference and that's where she

17   would come to speak to us.

18   Q.  OK.  And you had a separate meeting in advance of her talk

19   to the KPMG partners to help her prepare for it, right?

20   A.  Yes.

21   Q.  And that took place the week prior, right?

22   A.  Typically, yes, at some point before we would get together

23   and go over the topics for her discussion.

24   Q.  OK.  So the week of December 6, 2016, you met with Helen

25   Munter and talked to her to prepare for this speech or talk she

J2rdmid3                        Whittle - cross

1   was going to give to KPMG partners the next week, right, on

2   December 12th?

3   A.  Sometime before.  I couldn't tell you exactly which day or

4   week it was but prior to the -- prior to her talk, yes.

5   Q.  And in that prep, she told you that they were going to

6   create this new Banking Inspections Group, called BIG, right?

7   A.  She did tell me they were going to create this new way to

8   operate on bank inspections, yes.

9   Q.  So she had kind of beaten the announcement by Steve

10  Schindler by more than a month, right?

11  A.  Based on the dates, yes.

12          MR. WEDDLE:  And let's take a look at another exhibit.

13  This one is not in evidence, so if we could just put it on the

14  screen for the Court and counsel.  Defense Exhibit 1636.

15  Sorry.  Court, counsel, and the witness.

16  Q.  I want to focus you on the email at the bottom, which is

17  from December 2, 2016.  That is an email to you and a number of

18  other people relating to PCAOB inspections.  Do you see that?

19  A.  Yes.

20  Q.  And the email just above -- and that's from Louann Sakala,

21  right?

22  A.  Correct.

23  Q.  And the email just above that is from Brian Sweet to the

24  same group of people, including you, right?

25  A.  Yes.

J2rdmid3                    Whittle - cross

1   Q.  And it still says "PCAOB inspections," right?

2   A.  Correct.

3   Q.  December 2, 2016, right?

4   A.  Yes.

5   Q.  And then the top email on this chain is another email, not

6   including you, but it's from Brian Sweet to four KPMG employees

7   on the same day forwarding this same chain of emails, right?

8   A.  Yes.

9   Q.  So this email chain appears to be an email chain involving

10  you for the most part and a number of other KPMG employees,

11  right?

12  A.  Yes.

13          MR. WEDDLE:  I offer it, your Honor.

14          MS. MERMELSTEIN:  No objection, your Honor.

15          THE COURT:  Defense 1636 is received in evidence.

16          (Defendant's Exhibit 1636 received in evidence)

17          MR. WEDDLE:  Now let's look at the bottom email in the

18  chain for the jury as well.

19  BY MR. WEDDLE:

20  Q.  So December 2, 2016, that's ten days before the Helen

21  Munter speech we were just talking about, right?

22  A.  Correct.

23  Q.  And a week before your private meeting with Helen Munter

24  where you heard the information, more or less?

25  A.  More or less, yes.

J2rdmid3                          Whittle - cross

1    Q.  And Louann is sending an email to George Hermann, right?

2            Who was he at the time?

3    A.  He was the head of the Audit Group.

4    Q.  OK.  And you?

5    A.  Correct.

6    Q.  And then John Mucha.  Who was he at the time?

7    A.  John was a partner in my group.

8    Q.  OK.  And David Britt.  Who was he at the time?

9    A.  David was partner in the Audit Group that focused on

10   banking.

11   Q.  And she is cc'ing Brian Sweet and Hector Santana, right?

12   A.  Correct.

13   Q.  And she says:  "Hi - just letting you know.  I heard today

14   that the PCAOB is putting together a GNF Banking Team, which

15   will have all the dedicated financial service inspectors in it.

16   It will be led by Dave Mardjanov" -- I apologize to him if I am

17   mispronouncing his name.  It says, "(AD, was the USTL for

18   Deloitte)."

19           Do you see that?

20   A.  I do.

21   Q.  And then it goes on.

22           And GNF Banking Team, the phrase "GNF," that means the

23   sixth biggest accounting firms in the United States, right?

24   A.  I believe so, yes, the largest firms.

25   Q.  It is the Big Four, including KPMG and Deloitte, for

J2rdmid3                        Whittle - cross

1    example?

2    A.  Correct.

3    Q.  And also Grant Thornton, right?

4    A.  Correct.

5    Q.  And BDO, right?

6    A.  Correct.

7    Q.  And so it says it will be led by Dave Mardjanov (AD, was

8    the USTL for Deloitte).

9         Can you decode for us those acronyms.

10   A.  "AD" I believe stands for associate director, and "USTL" I

11   think stands for U.S. team leader.

12   Q.  OK.  And then at the end of this email, she says, "The

13   banking team will be used to staff all financial service

14   inspections (both domestic and international).  This means you

15   could see Bob Ross again next year on financial service

16   inspections, as this will be a pool to select from and

17   schedule."

18        Do you see that?

19   A.  I do see that.

20        MR. WEDDLE:  And let me look at the whole page for a

21   second.  Let's look at the email just above this.

22        Well, actually, let me back up.

23   Q.  So from the Louann email from December 2nd, she was

24   reporting to you, and a number of other partners at KPMG, that

25   she had heard this news that got announced almost two months

J2rdmid3                        Whittle - cross

1     later by Steve Schindler in a meeting that you were at, right?

2     A.  Yes.

3     Q.  OK.  And the -- and so then Brian responds to everybody on

4     December 2nd, and he says:  "Thanks for the heads-up on this

5     Louann.  I know this had been in the works for quite some time

6     and Bob has suggested to me that he is going to be also taking

7     some sort of leadership/oversight role in it as well."

8          Right?  And then he goes on?

9     A.  Correct.

10          MR. WEDDLE:  So we just looked -- actually, we are

11    done with that.

12          Done with that.  Thank you.

13    Q.  So let's take a look at another example, Defense Exhibit

14    1195, not in evidence.

15          Sir, would you like a hardcopy of this?  I can hand

16    you one.

17    A.  No, it is OK.

18    Q.  It is a several-page document.  Just let me know.

19          But let's take a look at the second page for a second

20    and then we'll go back up and talk about the first.

21          (Pause)

22          And so the second page, do you see there is an email

23    from Ann King?  She is a PCAOB inspector at the time, May 2015,

24    right?

25    A.  She was with the PCAOB, yes.

J2rdmid3                    Whittle - cross

1   Q.  OK.  And then if we will jump back to page 1 of the

2   exhibit, there is an email conversation that ultimately ends up

3   in your in box among only KPMG people, right?

4   A.  That's correct.

5   Q.  And if Mr. Whittle could look at the whole page and see if

6   this is sort of the conversation at KPMG after Ann King's

7   email, right?

8   A.  Maybe go to the second page.

9   Q.  I mean, that is -- Ann King, who doesn't work at KPMG,

10  sends an email and then there are three emails after that that

11  are only KPMG people, right?

12  A.  Yes.

13             MR. WEDDLE:  I offer Defense Exhibit 1195.

14             MS. MERMELSTEIN:  No objection, your Honor.

15             THE COURT:  1195 is received.

16             (Defendant's Exhibit 1195 received in evidence)

17  BY MR. WEDDLE:

18  Q.  So let's just look briefly at page 2 just so the jury can

19  see the Ann King email.

20             And it is talking about issuer selection and focus

21  areas, right?

22             And you're not on this email, right, Mr. Whittle?

23  A.  I am not.

24  Q.  OK.  And then if we will look at the next email

25  chronologically.

J2rdmid3                    Whittle - cross

1        So this is Asad Chaudry emailing other KPMG people,

2   not including you, Mr. Whittle on May 13, 2015, right?

3   A.  Yes.

4   Q.  And Asad Chaudry says:  "All, received this unofficially

5   ... please keep confidential for now."

6        Do you see that?

7   A.  I do.

8   Q.  And then it goes on to say a number of other things, right?

9   A.  I'm sorry?

10  Q.  I'm sorry.  I just said it goes on to say other things, and

11  you just have to say yes or no.

12  A.  Yes, it does go on to say other things.

13  Q.  Then if we take a look at the top email on this chain.  It

14  is for -- Scott Henderson sends it to you and Mr. Mucha and

15  Brian Sweet, right?

16  A.  Yes.

17  Q.  And Scott Henderson, again, is a former PCAOB person who

18  was at that time working at KPMG, right?

19  A.  Correct.

20        MR. WEDDLE:  I'm done with that exhibit.  Thank you.

21  Q.  Do you also remember hearing in January 2016 that someone

22  at KPMG found out from the PCAOB that oil and gas would be a

23  very big focus for them in the 2015/2016 inspections; do you

24  recall that?

25  A.  I don't.

J2rdmid3                          Whittle - cross

1          MR. WEDDLE:  Let's take a look at a document not in

2     evidence.  If we could show Mr. Whittle and the Court and

3     counsel Defense Exhibit 1331.  And we really only need to look

4     at the center of the page, so the Darin Kempke email through

5     item number 1.

6          So take a look at this email.  You are not part of it,

7     right?

8     A.  I'm not.

9     Q.  And I'm going to invite your attention to the item number

10    1.  If you could just read that to yourself not out loud.  Just

11    read the first couple of sentences of that to yourself.

12         (Pause)

13         You have read it?

14    A.  I read point 1, yes.

15    Q.  Does that refresh your recollection that people at KPMG had

16    heard that a focus for the PCAOB would be oil and gas and a

17    huge focus?

18    A.  I'm sorry, it does not.

19         MR. WEDDLE:  I offer Defense Exhibit 1331.

20         MS. MERMELSTEIN:  Objection, your Honor.  The witness

21    didn't recognize it and is not on it.

22         THE COURT:  Sustained.

23    BY MR. WEDDLE:

24    Q.  Now, focusing now on Brian Sweet again, so we started this

25    discussion talking about Brian Sweet from time to time getting

J2rdmid3                        Whittle - cross

1    what in your view is confidential information from the PCAOB,

2    including but not limited to the lists that you've testified

3    about, right?

4    A.  Yes.

5    Q.  And when Brian Sweet told you -- and often if he heard

6    information, he would email you and other people about it,

7    right?

8    A.  That's correct.

9    Q.  And what he said in emails, what his source was for the

10   information, you had no personal knowledge about whether that

11   was true or not, right?

12   A.  I would not be part of the conversation so, therefore, I

13   didn't have a basis one way or the other.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J2rrmid4                    Whittle - Cross

1    Q.  You were just relying on what Brian Sweet says, right?

2    A.  That's correct.

3    Q.  To the extent it mattered to you, right?

4    A.  To the extent he sent me information, it would apply

5    equally.

6    Q.  Take a look at the smaller packet I gave you.  I think

7    that's six emails.  I'll try to do the same thing.  I'll tell

8    you what the question is before I ask you to take a look at

9    them.  All of these six emails are emails involving you and

10   Brian Sweet where Brian Sweet is conveying some information

11   about PCAOB information to you and other people.  I'll say for

12   the record the exhibit numbers.  Take a look at them and see if

13   you could confirm that simple fact.  It's Defense Exhibit 1019,

14   1096, 1174, 1197, 1199, 1389.  Ready?

15   A.  Yes.

16   Q.  Thank you, sir.  Let's start with the last one, which is

17   Defense Exhibit 1389.  Here he is not really conveying

18   information to you, he is proposing a phonecall with you,

19   right?

20   A.  That's correct.

21   Q.  You talked about encouraging Mr. Sweet to keep contact with

22   PCAOB people, right?

23   A.  Yes.

24   Q.  In your view, that was part of his job, right?

25   A.  Yes.

J2rrmid4                          Whittle - Cross

Q.  When he did that, if he found out information, it was part

of his job not to keep it secret but rather to share it with

the right people at KPMG, right?

A.  Yes.

Q.  And in the ordinary course of business, he typically did

that by email, right?

A.  Yes, sometimes in person.

Q.  Not always but often, right?

A.  Often, yes.

Q.  Those emails were kept in the ordinary course of business

at KPMG, right?

A.  Yes.

Q.  We have them here, right?

A.  We certainly do.

          MR. WEDDLE:  I offer those exhibits, your Honor.

There is a mixture of statements in them that might be subject

to 801 and statements that are not.  To the extent that they

are subject to 801, I offer them pursuant to 803(6), your

Honor.

          MS. MERMELSTEIN:  Your Honor, for the record the

documents plainly do not meet the business records exception.

          MR. WEDDLE:  I object to the commentary.

          MS. MERMELSTEIN:  It's only to the basis for which Mr.

Weddle offered them.  We have no objection to their admission,

but we have an objection to that purported basis.

J2rrmid4                     Whittle - Cross

1          THE COURT:  They are received.  1019, 1096, 1174,

2     1197, 1199, 1389 received.

3          (Defendant's Exhibits 1019, 1096, 1174, 1197, 1199,

4     and 1389 received in evidence)

5  Q.  Thank you, sir.  I am not going to ask you about them

6     anymore.  You can set all those emails aside.

7          In your direct testimony, early in your direct

8     testimony, so a while ago now, you talked about kind of the

9     mechanics of inspections by the PCAOB.  Do you recall that?

10 A.  Yes.

11 Q.  You said that the PCAOB communicates to KPMG its selection

12    of particular audits to inspect either with a phonecall or

13    email.  Do you recall that?

14 A.  Yes.

15 Q.  Do you remember who it was that typically made those

16    phonecalls or sent those emails in the 2015-2016 time frame?

17 A.  It was typically whoever Steve Schindler's deputy was or

18    second person in line that.  That changed over time, but that

19    was the typical person that would do that.

20 Q.  It was sometimes Ann King, right?

21 A.  I don't know.  I didn't always get those directly, so I'm

22    not sure who it was.

23 Q.  It could just be a phonecall, right?

24 A.  Sure.

25 Q.  If it was a phonecall, it didn't come to you, right?

J2rrmid4                      Whittle - Cross

A.   Occasionally it would come to me, but most of the time it
came to Meredith Hardigsty, who was a director on my team.
Q.   As far as you know, these PCAOB people were making these
phonecalls or sending these emails as part of their jobs,
right?
A.   Yes.
Q.   As far as you knew, was there like a formal board
resolution at the PCAOB authorizing them to make those
phonecalls or send those emails?
A.   Not that I'm aware of.
Q.   You talked about the March 28, 2016 meeting, right?
A.   Yes.
Q.   Are you with me?  Okay.  I'm going to try not to repeat
what everyone else did.  During this meeting on March 28, 2016,
in your presence, while you were there, the term "stealth
re-review" was not used in that meeting at all, right?
A.   Correct.
Q.   You described in your direct testimony that at some point
you heard someone use the phrase "stealth re-review," right?
A.   That's correct.
Q.   It was after that meeting, right?
A.   Yes.
Q.   You said you heard it from a member of Mr. Britt's team, do
you recall that?
A.   Yes.

J2rrmid4                      Whittle - Cross

1   Q.  Who was it that you heard it from?

2   A.  I can't remember her name at the moment.

3   Q.  Was it Jen Lauer?

4   A.  Yes, it was Jen Lauer.  Thank you.

5   Q.  Was she former PCAOB?

6   A.  No.

7   Q.  When she said that, you cringed, right?

8   A.  I did.

9   Q.  Let me jump ahead to the preliminary list.  I have a couple

10  of questions about that.  In your direct testimony and this

11  morning on questioning by Mr. Boxer you talked about learning

12  about a preliminary inspection list in the January time frame,

13  January 2017 time frame, right?

14  A.  Correct.

15  Q.  In your direct testimony, in asking you about that event,

16  the prosecutor first directed your attention to January 9,

17  2017.  Do you remember that?

18  A.  Yes.

19  Q.  Do you have a memory that you first heard about the

20  inspection list on January 9, 2017, or in terms of your memory

21  was it just around that date?

22  A.  Around that date.

23  Q.  You said that Brian Sweet contacted you, you didn't contact

24  him, right?

25  A.  Correct.

J2rrmid4                          Whittle - Cross

1   Q.   How did Brian Sweet contact you?

2   A.   I believe it was by phone.

3   Q.   Could have been in person?

4   A.   Could have, but --

5   Q.   Your best recollection.

6   A.   My best recollection is it was by phone.

7   Q.   It was right after lunchtime, right?

8   A.   I don't remember the time of the day.

9   Q.   Where were you when you discussed this preliminary list for

10  the first time with Brian Sweet?

11  A.   I believe I was in the office.

12  Q.   In your office?

13  A.   In my office in New York, yes.

14  Q.   Who else was there when you had this discussion with Brian

15  Sweet in your office in New York?

16  A.   It was just Brian and I.

17  Q.   About how long was your initial discussion with Brian

18  Sweet, probably by phone, about the preliminary list?

19            MS. MERMELSTEIN:  Objection, your Honor, to the

20  misstatement of the testimony.

21            THE COURT:  "About how long was your initial

22  discussion."  I think he did say it was probably by phone,

23  right?  I think he said, "My best recollection was that it was

24  by phone."

25            MS. MERMELSTEIN:  It's fine, your Honor.

1          THE COURT:  Would you repeat the question, please.

2          MR. WEDDLE:  Yes.

3    Q.  About how long was your initial discussion with Brian

4    Sweet, probably by phone, about the preliminary list?

5    A.  I don't recall how long when we spoke about it.

6    Q.  Either in that initial discussion or let's say the day

7    after that initial discussion, did you have a discussion with

8    Brian Sweet about the preliminary list that also included Cindy

9    Holder?

10   A.  I don't recall speaking to Ms. Holder about it.

11   Q.  Does that mean it didn't happen or you're just not --

12   A.  I don't have a recollection of speaking to her about it.

13         MR. WEDDLE:  Could we pull up just for the witness,

14   the Court, and counsel 3526-3, the 14th page.  Actually, let's

15   start with this page for a second.

16   Q.  Take a look at the top half of this page, Mr. Whittle.  Do

17   you see that?

18   A.  I see it.

19   Q.  Now if you would take a look at page 14 of 3526-3, page 14.

20   In the third paragraph down it starts, "In January."

21         MR. WEDDLE:  If we could pull up one more line, Ms.

22   O'Connor.  Perfect.

23   Q.  Do you see in the third line from the bottom is the word

24   "he"?

25         MR. WEDDLE:  Can you highlight that sentence, please,

 1  Ms. O'Connor.  Actually, that's great.

 2  Q.  Sir, do you remember meeting with the prosecution team --

 3              MS. MERMELSTEIN:  Your Honor, objection to the method

 4  that is being used here.

 5              THE COURT:  Sustained.

 6              MR. WEDDLE:  I'm just trying to orient the witness,

 7  your Honor.  It's a separate question.  I haven't asked the

 8  question that I think the prosecution is --

 9              MS. MERMELSTEIN:  Shall we approach, your Honor?  I

10  don't think this is a proper way to proceed.  If Mr. Weddle

11  wants to ask, without referencing the document, whether or not

12  viewing it refreshes Mr. Whittle's recollection --

13              MR. WEDDLE:  I may not be doing that, your Honor.  We

14  haven't gotten there yet.

15              MS. MERMELSTEIN:  I don't think talking about what the

16  document is in this fashion is a proper way to do this.  I

17  think that objection was sustained.  I can say more at sidebar

18  or we can move on.

19              MR. WEDDLE:  Why don't we do this, your Honor.

20              I am probably going to come back to this, Ms.

21  O'Connor, but could you take it off the screen for a second.

22  Q.  Sir, do you recall meeting with the prosecution team on or

23  about July 30, 2018?

24  A.  I met with them on numerous occasions in the summer.  That

25  specific date, not sure.  But in that time frame, yes.

J2rrmid4                      Whittle - Cross

1   Q.   How many times did you meet with them starting in the

2   summer of 2018 before you entered into a cooperation agreement?

3   A.   Several times, three or four times.  I'm not sure exactly

4   how many.

5   Q.   When you met with the prosecution team, there were normally

6   more than one prosecutor, right?

7   A.   Yes.

8   Q.   And normally more than one law enforcement agent, right?

9   A.   Yes.

10  Q.   You did not take notes, correct?

11  A.   I did not.

12  Q.   Sir, do you recall when you met with the prosecution team

13  telling the prosecution team that you didn't bring Holder --

14  sorry -- Sweet did not bring Holder on a discussion of the

15  preliminary list?

16              MS. MERMELSTEIN:  Again objection to the propriety of

17  this method, your Honor.

18              THE COURT:  Are you refreshing or not?

19              MR. WEDDLE:  I'm doing the question right before

20  refreshing.  I don't know if he recalls it or not.

21              MS. MERMELSTEIN:  The witness has testified that he

22  doesn't remember.  He can be refreshed or not, but that's it.

23              THE COURT:  Sustained as to that.

24              MR. WEDDLE:  Ms. O'Connor, can you put that

25  highlighted line back up, please.

J2rrmid4                        Whittle - Cross

1    Q.  Sir, does looking at the highlighted line on the screen

2    refresh your recollection that in your meeting, in a meeting

3    with the prosecution team, you said Sweet did not bring Holder

4    in a discussion of the preliminary list?

5              MS. MERMELSTEIN:  Objection again to the method.

6              THE COURT:  Sustained.

7    Q.  Sir, does looking at that document refresh your

8    recollection about Cindy Holder being present for a discussion

9    of the preliminaries?

10   A.  The document disappeared.

11             MR. WEDDLE:  May we have it back.

12   A.  Can you repeat the question.

13   Q.  Does looking at this document refresh your recollection

14   about Cindy Holder not being present for a discussion of the

15   preliminary list?

16   A.  It doesn't really help me.  I just don't recall whether we

17   had any discussion about Ms. Holder or whether she was included

18   or not.

19   Q.  When you discussed the list, the preliminary list, with Mr.

20   Sweet, do you recall anyone having written down on a piece of

21   paper in your presence the list?

22   A.  No.

23   Q.  Let me jump ahead to February 2017.  You talked about

24   receiving a final inspection list, what you understood to be a

25   final inspection list in early 2017, right?

J2rrmid4                        Whittle - Cross

1   A.  Right.

2   Q.  I mean in early February 2017.

3   A.  Correct.

4   Q.  Before, you were asked questions about that on direct

5   testimony, the prosecutor directed your attention to February

6   3, 2017.  Do you recall that?

7   A.  Yes.

8   Q.  Do you remember the date or do you think it was just around

9   then, from your recollection?

10  A.  My recollection was it was on a Friday, and I believe

11  Friday was the 3rd.

12  Q.  So you have a pretty clear recollection that it was on a

13  Friday?

14  A.  Yes.

15  Q.  You said on direct that Brian Sweet called you?

16  A.  Yes.

17  Q.  What time of day was it that Brian Sweet called you?

18  A.  I would be guessing to say it was in the afternoon.

19  Q.  You don't have to guess.

20  A.  I don't have a specific time in mind as to what it was.

21  Q.  Where were you when you received a call from Brian Sweet

22  about the final inspections?

23  A.  I was working at home that day.

24  Q.  Do you recall what phone he called you on?

25  A.  All my calls would come in to my cell phone.

J2rrmid4                        Whittle - Cross

1    Q.  To your knowledge, where was Brian Sweet that day?

2    A.  I don't know where he was that day.

3    Q.  How long was the call?

4    A.  It wasn't very long.  I don't know exactly how long, but it

5    wasn't a lengthy call.  It wasn't as long as the call we had on

6    the following Monday.

7    Q.  That call was about how long, the following Monday call?

8    A.  An hour and a half or so.

9    Q.  Was anyone present when you had this first call with Brian

10   Sweet about the final inspection list?

11   A.  No.

12   Q.  Now I'm going to back up to kind of the beginning of your

13   direct testimony, all the way back to when you started this.

14   You talked in your testimony about the importance of first

15   impressions.  Do you remember that?

16   A.  Yes.

17   Q.  Brian Sweet makes a good first impression, right?

18            MS. MERMELSTEIN:  Objection, your Honor.

19            THE COURT:  You can answer if you have an answer.

20   A.  I believe he does.

21   Q.  Sir, is it fair to say that sometimes first impressions can

22   be deceiving?

23            MS. MERMELSTEIN:  Objection, your Honor.

24            THE COURT:  Sustained.

25            MR. WEDDLE:  No further questions, your Honor.

1    THE COURT:  Thank you.

2        MS. MERMELSTEIN:  I'm very brief, your Honor.

3        THE COURT:  Redirect, Ms. Mermelstein.

4    REDIRECT EXAMINATION

5    BY MS. MERMELSTEIN:

6    Q.  I'll be quick.  Do you remember the exact times or dates

7    with respect to the January and February of 2017 events?

8    A.  I'm sorry.  The January 17?

9    Q.  January and February of 2017.

10   A.  The exact times, no.

11   Q.  I think you testified on cross-examination that you were

12   not sure with respect to a particular conversation, whether it

13   took place in person or on the phone.  Let me pull up just for

14   the witness, the Court, and counsel 3526-3 page 14.

15       MR. BOXER:  Your Honor, I object.  Unless he adopts

16   the exhibit in some way, I don't think it will refresh him.

17       MS. MERMELSTEIN:  You can refresh with literally

18   anything.

19       MR. WEDDLE:  Your Honor, that is not the objection.

20   It is not the type of refreshing.  It is the predicate for

21   doing so that is the objection.

22       MS. MERMELSTEIN:  Your Honor, the witness testified he

23   didn't recollect, and I was going to see if I could refresh his

24   recollection.

25       THE COURT:  You may.  Overruled.

1    MS. MERMELSTEIN:  Let me ask you to highlight that one

2    sentence, Mr. Cooney.

3    Q.  Mr. Whittle, let me ask you to read just to yourself the

4    sentence that begins towards the end of the second line.  Are

5    you finished reading?

6    A.  Yes.

7    MS. MERMELSTEIN:  You can take that down, Mr. Cooney.

8    Q.  Does that refresh your recollection about whether or not

9    your conversation with Mr. Sweet in January 2017 about the

10   preliminary list was in person or on the phone?

11   A.  No, it does not.

12   Q.  You just don't remember one way or the other?

13   A.  No.

14   Q.  All right.  You were asked a number of questions on

15   cross-examination about whether or not you ever attended

16   meetings with the SEC.  Did you ever have discussions with Mr.

17   Middendorf about him attending meetings with the SEC?

18   A.  Yes.

19   Q.  Did you ever provide information to Mr. Middendorf for

20   those meetings?

21   A.  Yes.  In preparation I usually get a request about the

22   latest inspection results, where we stood, that type of

23   information.

24   Q.  Let me direct your attention to Government Exhibit 925 in

25   evidence.  If we can go to page 5.  On cross-examination Mr.

J2rrmid4            Whittle - Redirect

1  Boxer asked you to read from some of these statements by the

2  SEC chair.  Let me ask you to read beginning underneath

3  "Responsibility of Regulators" with "Let me first return."

4  A.  Would you like me to read that?

5  Q.  Yes, please.

6  A.  "Let me first return briefly to the PCAOB.  We work closely

7  and collaboratively with the board to achieve our shared goals

8  on behalf of investors, and it is an extraordinarily important

9  partnership."

10 Q.  Now let me ask you to continue, beginning "For the

11 commission's part."

12         MR. BOXER:  Objection, your Honor.  There is no

13 question and it was in for a limited purpose.  That portion

14 that the witness just read needs to be directed to a question

15 about state of mind.  Otherwise --

16         MS. MERMELSTEIN:  Since Mr. Middendorf is a recipient

17 of this, I think its contents to go to state of mind.

18         THE COURT:  I will allow it for state of mind, not for

19 the truth of the matters asserted.

20         MS. MERMELSTEIN:  Thank you, your Honor.

21 Q.  Mr. Whittle, if you could read that paragraph.

22 A.  "For the commission's part, our staff works closely with

23 the PCAOB and all of the parties in the financial reporting

24 chain to ensure the reports continue to serve to protect

25 investors and build confidence in our markets.  This work, of

1    course, reflects the work of our office of the chief

2    accountant, expertly led by Jim Schnurr, who you will hear from

3    shortly, and includes the extensive and very impressive work

4    with the division of corporation finance in reviewing and

5    commenting on the financial reports of over 4,000 registrants

6    each year.  It also includes a strong enforcement program that

7    prioritizes financial reporting cases."

8    Q.  Thank you.

9          MS. MERMELSTEIN:  Let's take that down, Mr. Cooney.

10   Q.  I want to ask you a few follow-up questions about the March

11   28, 2016 call.  Mr. Boxer asked you a number of questions about

12   exactly when Mr. Middendorf arrived to that call and whether it

13   was before or after you had dialed in.  To be clear, was he on

14   the call when you talked about using the ALLL monitoring

15   program to conduct secret re-reviews of the workpapers?

16         MR. BOXER:  Objection.

17         THE COURT:  Overruled.

18         MR. BOXER:  To the form of the question.

19         THE COURT:  Rephrase as to his knowledge.

20   Q.  You participated in the entirety of the call, is that

21   right?

22   A.  Yes.

23   Q.  Based on your participation in that call, was Mr.

24   Middendorf on the call at the time that you talked about using

25   the ALLL monitoring program to conduct secret reviews of the

1    workpapers?

2                    MR. BOXER:  Objection.

3                    THE COURT:  Overruled.

4    A.  Yes.

5    Q.  Was he, based on your participation, on the call when you

6    discussed which engagement partners you would reach out to and

7    which engagement partners he would reach out to to arrange for

8    access to workpapers so re-reviews could be conducted?

9    A.  Yes.

10   Q.  Was he on the call when Mr. Sweet indicated that he had

11   obtained confidential PCAOB information about the 2016

12   inspections?

13                   MR. BOXER:  Objection.

14                   THE COURT:  Overruled.

15   A.  Yes, he was.

16   Q.  You were asked a number of questions about the PCAOB

17   statement to audit committees that it does not give comments

18   just based on documentation.  In your experience did the

19   quality of the workpapers themselves affect whether or not a

20   comment was given?

21   A.  Yes, I believe they did.

22   Q.  Did the 2015 re-reviews work on improving documentation or

23   work on improving audit work?

24   A.  I look at them as somewhat indistinguishable.  The

25   documentation documents, the work, and the way you describe it

J2rrmid4                 Whittle - Redirect

1    and how you describe it and the fullness of the description

2    makes a big difference to an inspector.

3    Q.  What was the purpose of conducting those re-reviews?

4    A.  To improve the adoption, improve the work, and show it in

5    its best light to avoid comments from the PCAOB.

6    Q.  You were asked about your reaction and Mr. Middendorf's

7    reaction to learning that Brian Sweet told Diana Kunz that she

8    was going to be inspected.  Were you concerned that Mr. Sweet

9    was using the confidential PCAOB information or concerned that

10   he was telling people that it was confidential PCAOB

11   information?

12              MR. BOXER:  Objection.

13              THE COURT:  Overruled.

14   A.  Could you repeat the question.

15   Q.  Of course.  Were you concerned when you learned about Mr.

16   Sweet's notification to Ms. Kunz that he was using the

17   confidential information that had been received or that he was

18   disclosing to other people that KPMG was in possession of

19   confidential information?

20   A.  That he was disclosing it to other people and we could get

21   caught.

22   Q.  You were asked a number of questions about Mr. Sweet and

23   KPMG's efforts to predict what engagements might be inspected,

24   and I think you said standing alone there is nothing wrong with

25   making predictions, is that right?

1   A.  Yes.

2   Q.  Is it wrong to use confidential PCAOB information in order

3   to make those predictions?

4   A.  Yes.

5   Q.  Is there any doubt in your mind that it was wrong to have

6   the PCAOB's 2015 inspection list before those inspections had

7   been noticed to KPMG?

8   A.  I believe it was wrong.

9   Q.  Was it wrong to have the 2016 list before those inspections

10  were noticed to KPMG?

11  A.  Yes.

12  Q.  Was it wrong to use that information in an effort to

13  improve inspection results?

14  A.  Yes.

15  Q.  Was it wrong to have the 2017 preliminary list?

16  A.  Yes.

17  Q.  Was it wrong to have the final 2017 list?

18  A.  Yes.

19  Q.  Does anything about the fact that, for example, Mr.

20  Middendorf received a draft agenda from a PCAOB board member

21  alter your assessment that it was wrong to have any of these

22  lists?

23          MR. BOXER:  I object, your Honor.

24          THE COURT:  Overruled.

25  A.  I'm sorry.  Could you repeat the question?

1    Q.  Sure.  You testified that you understood Mr. Middendorf had

2    received a draft agenda from a PCAOB board member.  Did the

3    fact that he received a draft agenda change in any fashion your

4    understanding that it was wrong to possess a confidential PCAOB

5    inspection list?

6    A.  No, it doesn't change my view.

7    Q.  If the PCAOB's requirements for inspections were too

8    onerous, would that justify using the inspection lists that

9    were obtained, the confidential inspection lists, in an effort

10   to secretly affect the inspection results?

11              MR. BOXER:  Objection.

12              THE COURT:  Overruled.

13   A.  No.

14              MS. MERMELSTEIN:  Nothing further.

15              THE COURT:  Is there anything further?

16              MR. BOXER:  Yes, your Honor.

17              THE COURT:  Mr. Boxer.

18   RECROSS-EXAMINATION

19   BY MR. BOXER:

20   Q.  Mr. Whittle, you were just asked some questions about Mr.

21   Sweet's behavior in February of 2017 when you learned that he

22   had reached out to Diana Kunz, correct?

23   A.  Yes.

24   Q.  Were you angry because Mr. Sweet had also used the

25   information that he had received regarding the lists?

J2rrmid4                 Whittle - Recross

1    A.  Could you repeat the question?

2    Q.  You understood that Mr. Sweet had reached out to Diana

3    Kunz, correct?

4    A.  Yes.

5    Q.  You had also understood that he had asked for access to the

6    eAudit file for Ms. Kunz' engagement that appeared on the list,

7    correct?

8    A.  I was unaware that he asked for access to her workpapers.

9    Q.  You didn't know about that fact?

10   A.  I did not.

11   Q.  So, when you heard from Mr. Middendorf on February 8th

12   about Mr. Sweet, the only information you were made aware of

13   was that Mr. Sweet had told Diana Kunz about the existence and

14   his possession of the list, is that correct?

15   A.  That he had told her she was going to be inspected, yes.

16   Q.  Other than that piece of information, you were unaware of

17   anything else that Mr. Sweet had informed Ms. Kunz or asked Ms.

18   Kunz, correct?

19   A.  That's correct.

20           MR. BOXER:  Nothing further, your Honor.

21           MR. WEDDLE:  One line of cross that may take up to

22   five minutes, your Honor.

23           THE COURT:  Are you okay for five minutes?

24           THE JURY:  Yes.

25           THE COURT:  All right.

1    RECROSS-EXAMINATION

2    BY MR. WEDDLE:

3    Q.  Mr. Whittle, the prosecutor asked you to read from a press

4    report about a speech by Mary Jo White.  Do you recall that?

5    A.  Yes.

6    Q.  That quote that you read ended with a reference to the

7    SEC's strong enforcement program, do you remember that?

8    A.  Yes.

9    Q.  Sir, in any of your meetings with the prosecution team, was

10   anyone from the SEC present?

11   A.  Yes.

12           MS. MERMELSTEIN:  Objection.  Beyond the scope.

13           THE COURT:  Sustained.

14   Q.  Sir, a civil action, that is, a noncriminal action, has

15   been brought against you by the SEC, right?

16           MS. MERMELSTEIN:  Objection to beyond the scope of

17   redirect.

18           THE COURT:  Sustained.

19           MR. WEDDLE:  Your Honor, it is directly relevant to

20   that reference.

21   Q.  Are you aware that there are SEC lawyers in the courtroom

22   right now?

23           MS. MERMELSTEIN:  A continued objection.

24           THE COURT:  Sustained.

25           MR. WEDDLE:  Nothing further.

J2rrmid4                Whittle - Recross

1              (Witness excused)

2              THE COURT:  Folks, we are going to break for lunch.

3    It is 1:05.  We will begin at 2:05.  Have a good lunch

4    everybody.

5              (Jury not present, witness not present)

6              THE COURT:  Anything to address?

7              MS. KRAMER:  I think Mr. Rubino may be called after

8    lunch at some point, your Honor.  My current plan is to show

9    him what is marked as Government Exhibit 452, the full two

10   pages, so that he can authenticate them as from the notebook,

11   and not offer anything through him.  Then I'll offer, whatever

12   the final ruling is from your Honor, what is admissible through

13   Mr. Sweet, so that comes in tomorrow.  I don't have to recall

14   Mr. Rubino.  I want to raise that now so if there are any

15   issues with that, we can address it.

16             MS. MERMELSTEIN:  One scheduling issue.  We indicated

17   to the defendants that we expected to call Zach Greenwood next.

18   I expect he will still testify this afternoon.  But we have two

19   document custodians from the PCAOB and an IT professional from

20   KPMG, all of whom are very short and all of whom are out of

21   town and have travel issues.  I expect to put them on right

22   after lunch so we make sure we finish, and then we'll go to

23   Zach Greenwood.

24             MS. LESTER:  One thing on the notes.  That suggestion

25   Ms. Kramer made is fine with us.  I think it makes sense.  But

J2rrmid4            Whittle - Recross

1    I do have additional points I could make to the Court about why

2    we think the totality of the document should come in with the

3    exception of the portion on the second page that we discussed.

4    I would prefer not to announce those in front of the

5    prosecution because they reveal our cross-examination strategy.

6    I just wanted to offer that to the Court.  There is some

7    hesitation about the entirety of the document.  I do have some

8    additional points I can make.

9            THE COURT:  Why don't we come back at 2:00 and address

10   that.

11           MR. BOXER:  One final thing, your Honor.  The

12   government submitted a letter last evening about two of our

13   witnesses, Mr. Blake and Mr. Hanson.  In their letter they

14   acknowledge admissible bases for each of them, and then they go

15   through the rule 26.2 statements we produced about what

16   wouldn't be admissible.

17           I don't think it is appropriate that we should have to

18   respond to that letter.  We don't preview our objections to

19   their 3500 metal and very often they don't elicit a lot of the

20   things that are in their 3500 material.  I will do my best and

21   intend to adhere to the rules of admissibility, and when it

22   comes to character witnesses those rules as well.  That is how

23   I propose proceeding.

24           If your Honor wants a letter response, of course we

25   will to it.  But I don't think it is an appropriate approach

```
 1   where they look at our materials and then try to litigate pre
 2   the witness hitting the stand what can and can't be elicited.
 3   My request would be that I not have to respond to this
 4   submission, but I of course will take instruction from the
 5   Court.
 6             THE COURT:  That's fine.  I don't think you need to
 7   respond.
 8             MR. BOXER:  Mr. Blake would be tomorrow and Mr. Hanson
 9   Monday morning.
10             THE COURT:  If there are things we can anticipate in
11   the morning, particular categories or anything, that's fine, we
12   can do that orally.
13             MR. BOXER:  I will look over it again more carefully,
14   and if there is something that I can tell we are going to be
15   joining issue, I will alert the Court.
16             THE COURT:  That's fine.  No need to write a letter.
17             MS. KRAMER:  Your Honor, we wrote the letter in an
18   effort to avoid litigating this at lengthy sidebars in front of
19   the jury.  Of course, we recognize that everything in a
20   witness's 26.2 statement may not be what is elicited on the
21   stand.  But I think both parties move to preclude the testimony
22   of certain witnesses for similar reasons.  So we would like to
23   address the issues that we have raised in our letter before the
24   witness is on the stand and what we believe are arguably
25   improper questions are put to the witness in front of the jury.
```

J2rrmid4            Whittle - Recross

1              MR. BOXER:  I appreciate the reasoning for it.  But it

2       requires us to preview our direct examination, and I don't

3       think that is appropriate.

4              THE COURT:  At the end of the day we can speak broadly

5       to make sure that I have the right understanding of what is in

6       and what is out just generally in a way that I don't think

7       requires you to preview details about your direct.

8              MR. BOXER:  I will review the letter again with that

9       spirit in mind.  Thank you, your Honor.

10             THE COURT:  Have a good lunch.

11             (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rrmid4            Whittle - Recross

1                           AFTERNOON SESSION

2                                2:15 p.m.

3              (Jury not present)

4              THE COURT:  Good afternoon.  I wanted to ask regarding

5     the notes, the Brian Sweet notes, Exhibit 452, where is it in

6     the 3500 material that he describes that?  Is there a

7     particular place?  Maybe you can just summarize for me again.

8              MS. KRAMER:  Certainly, your Honor.  I don't have the

9     page handy, but I can summarize above the line on the first

10    page.

11             THE COURT:  Yes.  On the first page, what is it that

12    you could represent, and they can correct or clarify, how he

13    described the different categories?

14             MS. KRAMER:  On the first page, let's call it the top

15    third above that line were generally his notes to himself in

16    preparation for the meeting.

17             THE COURT:  The meeting with Jim and Dave?

18             MS. KRAMER:  Yes, the meeting with Jim and Dave.

19             THE COURT:  What did you say about below the line?

20             MS. KRAMER:  Below the line on the first page reflects

21    the note that he took during the portion of the meeting when

22    Jim Liddy was speaking on the phone.  That is consistent with

23    his testimony about that.  I think he testified that Liddy said

24    please don't hesitate to speak up, and the first line says,

25    "Please don't be shy."

J2rrmid4              Whittle - Recross

1              THE COURT:  Remind me of the situation.  Was Mr.

2      Middendorf in the room or on the call or what?

3              MS. KRAMER:  Middendorf and Sweet were in a conference

4      room together at KPMG and Liddy was on the phone.

5              THE COURT:  So the notes he said below the line were

6      the ones when Liddy was speaking from the phone?

7              MS. KRAMER:  Yes.  That is consistent with his

8      testimony too.  The note about people is consistent with his

9      testimony that they discussed people and sort of what the PCAOB

10     thought of them.

11             THE COURT:  All right.

12             MS. KRAMER:  To the left of the vertical line, second

13     page, are the notes that Sweet took during his meeting with

14     manufacture after Liddy hung up the phone.

15             THE COURT:  Got it.  Is that consistent with your

16     understanding of what he said in 3500 and/or his testimony?

17             MS. LESTER:  I think that is consistent with the 3500

18     material, your Honor, but we just had the opportunity to

19     inspect the actual notebook.  After that review, I actually

20     think there is some question as to whether the information on

21     the left-hand side of page 2 was all written at the same time,

22     because of the difference in pen.  If your Honor were to look

23     at the original, we could explain what we mean.

24             MS. KRAMER:  I assume the reference is to the fact

25     that line 6 is in a different color ink.  Is there another

J2rrmid4              Whittle - Recross

1    difference?

2            MS. LESTER:  I'm not an expert, but it appears to

3    match up with some of the ink used on the right-hand side of

4    the second page.  I can't quite recall if Mr. Sweet was asked

5    to explain that in the course of his preparation with the

6    government.  It is not included in what Ms. Kramer just

7    described.

8            Also, you can see a line through number 1 at the top

9    of the page, "internal inspections."  That diagonal line

10   appears to be in that same blue pen that number 6 is written in

11   and that the vertical line underneath the 4/1KVN, those all

12   appear to be in the same pen.

13           MS. KRAMER:  I don't see the relevance of that, your

14   Honor.

15           THE COURT:  What is your request?  Is it still to

16   include the first page and the left-hand side of the second

17   page or has it changed?

18           MS. LESTER:  That is still what we would propose be

19   admitted, your Honor.  I think we would reserve perhaps

20   depending on what comes out, the ability to reference the

21   original notepad.

22           THE COURT:  Do we have the original notepad?

23           MS. KRAMER:  We do, your Honor.  We have no plans to

24   offer it, but simply to then the date what we do intend to

25   offer.

J2rrmid4              Whittle - Recross

1            MR. WEDDLE:  Your Honor, as everyone was talking, I

2      went through the 3500.  I think where Mr. Sweet talks about his

3      notes is 3522-25.

4            THE COURT:  Thank you.

5            MS. MERMELSTEIN:  Your Honor, we will pull it up for

6      you.

7            MR. WEDDLE:  I agree with all of Ms. Lester's

8      arguments.  The fact that I am inviting everyone's attention to

9      this 3500 material I think is no substitute for live testimony.

10     I think there has been no actual live testimony that

11     establishes the predicate facts that make this document

12     relevant at all under 104.

13            MS. KRAMER:  That is ludicrous, your Honor.  We

14     weren't allowed to show the witness this.  We certainly tried,

15     twice.  What we are offering as the proponent of the evidence

16     is the prior consistent statements.  We are not offering the

17     whole thing, nor do we have to.

18            MS. LESTER:  Your Honor, for the reasons we discussed

19     earlier on the record, we do think that the portions that I

20     have already explained to the Court that we would like to come

21     in should come in.  And I renew my offer to the Court of

22     further explanation of the relevance of the two pages, why it

23     is necessary to have the two pages together, which I would be

24     happy to explain to the Court further but would prefer not to

25     say in front of the government.

1          THE COURT:  I'm sort of inclined to accept the rule of

2     completeness argument as to the left side of the second page.

3     But because there is sort of a divide between that insofar as

4     the entirety of that section might be appropriate for

5     completeness purposes, I just don't know that his notes to

6     himself go to that same point and the parts that straight-

7     forwardly, the Liddy part, need to come in on that

8     justification of completeness.

9          MS. LESTER:  Your Honor, I think I can explain that

10    further.  That is the part I would prefer not to say in front

11    of the government.  But if your Honor is not going to allow me

12    to say it ex parte, I can explain further why we believe the

13    first page should come in in its entirety as well.

14         THE COURT:  We don't need to decide it right now,

15    right?  You need to know by the end of the day?

16         MS. MERMELSTEIN:  It affects the government's

17    decision-making about a number of the witnesses who are

18    testifying today.  It doesn't have to be this minute, but I do

19    think we would strongly prefer not to wait until the end of the

20    day to sort this out.  I'm sensitive to demanding that the

21    defendants proffer in advance what they are arguing.  But given

22    the fairly clear lack of the need to include the first page for

23    rule of completeness, I don't believe it is fair to the

24    government to allow the defendants to argue that ex parte and

25    not be permitted to respond to whatever that argument is about

J2rrmid4              Whittle - Recross

1   whether or not something should be admitted.

2              MS. LESTER:  Your Honor, I can give one small example.

3              THE COURT:  Okay.

4              MS. LESTER:  The first page is relevant.  First of

5   all, the top says "Jim and Dave."  I understand the government

6   agrees that that portion could come in.  Mr. Sweet has said in

7   his preparation that those are his prep notes before the

8   meeting.

9              The below the line portion which are supposedly Mr.

10  Liddy's comments or the part where Mr. Liddy is talking, first

11  of all, there is plenty of room on this page to continue the

12  points that supposedly Mr. Middendorf is making as part of the

13  same meeting.  But instead on the second page there is

14  discussion or notes about many of the same things that are at

15  the top of the first page.

16             For example, the three names that appear at the very

17  top -- Steve Georgian, John Mucha, John Broderick -- those same

18  names appear under number 4 -- John B, Steve, John Mucha.  That

19  is just one example of the similarities between what he has

20  described as his prep notes on the first page at the top and

21  the notes on the second page.  There are others.

22             MS. KRAMER:  Your Honor, that just has nothing to do

23  with what the rule of completeness means or says or how it is

24  applied.  The Second Circuit in Gupta affirmed a similar

25  exclusion.  I just don't see it.  They can certainly

J2rrmid4                 Whittle - Recross

1    cross-examine Sweet about whether these are his notes from what

2    Mr. Middendorf said.  If they want to suggest that he was

3    telling himself that Stonegate, as he was asked about the day

4    before, is a gray area but that he has to share insights and

5    add value wherever he can and remember where his paycheck comes

6    from, they can make that argument from the portion that we are

7    intending to offer.

8              MS. LESTER:  Your Honor, the entire context helps make

9    clear that it is more likely that these notes are Mr. Sweet's

10   notes to himself, not notes of things that were said to him.

11             MS. MERMELSTEIN:  I just think it is an enormous

12   stretch to say that the context makes that clear from the

13   example Ms. Lester has given.  I think we are perhaps doing an

14   overly close read about a person's decision to start notes on

15   the top of a new page when a new person is speaking.  That

16   seems perfectly reasonable.  It is also not at all surprising

17   that the thoughts Mr. Sweet had about preparing for a meeting

18   touched on the very same topics that were in fact touched on in

19   that meeting.  Indeed, that seems perfectly obvious.

20             The suggestion that because the topics overlap from

21   the preparation and the meeting, that those were not Sweet's

22   notes of what Middendorf said but were rather Sweet's

23   preparation notes or other notes to himself is preposterous.  I

24   think as Ms. Kramer said, the facial meaning of Mr. Sweet's own

25   notes is nonsensical as notes to himself made without prompting

1    by any third party to remember where his own paycheck comes

2    from.

3              MS. LESTER:  Your Honor, again, I can give more

4    examples if the Court would find it helpful, including the

5    phraseology is similar between the top of page 1 and what is on

6    the left-hand side of page 2.  So another example, under

7    "little wins," the box on the right-hand side, it says "copy of

8    AS 5."  Then on page 2 under dash "little things," in paren it

9    says "AS 5 copy."

10             THE COURT:  I see what you are saying.  That shows

11   that he planned to speak about something and then he spoke

12   about something.

13             MS. LESTER:  He spoke about it or he wrote notes again

14   repeating the same thing he had already prepped on with himself

15   before.  It supports our position, your Honor, I think it is

16   legitimate cross-examination as to whether Mr. Sweet can be

17   believed that these are the notes from a conversation with Mr.

18   Middendorf that represent Mr. Middendorf's statements when the

19   same phrases that Mr. Sweet has used himself in his own

20   preparation are repeated on the second page.  I think that is

21   completely legitimate cross-examination.

22             MS. KRAMER:  Your Honor, nothing about remembering

23   what his paycheck comes from or a gray area is in his prep

24   notes.  I don't really understand how this is the argument that

25   is being made when we did additional investigation because of

1    concerns that defense counsel raised that these notes had been

2    somehow planted by Sweet in his office during the internal

3    investigation or altered by him to investigate whether he had

4    access to his office.  Either they were made up and were

5    planted by him or now they are not notes of what Middendorf

6    said, all of those are arguments but none of those make the

7    entire document admissible under the rule of completeness.

8         MS. LESTER:  Just one more thing, your Honor.  That

9    last point about the paycheck, on the prep notes Mr. Sweet says

10   "not upsetting PCAOB by hiring."  He's making notes to himself

11   about why it's okay that he is now on the other side of the

12   table.  So it is not completely improbable that he would be

13   saying as a phrase that he might plan to use, "I know where my

14   paycheck comes from."

15        With respect to Ms. Kramer's last argument about my

16   questions about when Mr. Sweet had access to his office, I

17   asked those questions because in our letter we asserted that

18   arguably Mr. Sweet had a motive to fabricate as of the time

19   these notes were supposedly written.  That is, he knew he had

20   already stolen confidential information, he acknowledged that

21   he knew at the time that he was breaking the ethics rules of

22   the PCAOB.

23        So there is a plausible argument that if he was

24   recording things that he thought helped show that he was facing

25   pressure, he would keep that notebook from that time period

where he had written those things down and not destroy it,

whereas he chose to destroy other things that he thought were

incriminating, such as the list that he testified he burned in

his barbecue.  That was the reason for my questions about

whether he had access to his office after he learned about the

internal investigation.

Your Honor, if you are comparing the two pages, I will

just lay it all out.  If you look at right on her "monthly

meetings" on page 2, it says dash, I can't actually read the

first word, but it says something like re--

MS. KRAMER:  Reinforce.

MS. LESTER:  "Reinforce how significant PCAOB takes

it."  On the first page it says under "little wins," the last

entry, "Monthly meeting is of significance, importance, to" I

believe that is a P.

On the left-hand side, under "three main things DT and

PWC did," the first one is "change in tone" and the second one

is "internal inspections."

If you look at the second page, "internal inspections"

is number 2 and the "change in tone" is referenced under number

3, "monthly meetings emphasize tone at the top every time."

There are a few other small things that are similar,

but I think these items that I pointed out in total show that

there is a colorable argument that these notes were prepared by

Sweet not in the context of conversation with someone else,

that is, reflecting that person's statements, but either

perhaps reflecting his own statements or reflecting his own

preparation in connection with an entirely separate meeting

MR. WEDDLE:  Your Honor, may I add one thing to this?

I may be wrong, but I believe that the first time we have a

written record of Brian Sweet interpreting these notes is from

January 29, 2019.  Less than one month ago is the first time he

apparently met with the government and interpreted these notes.

In that context the fact that he started lining up these notes

with attributions to David Middendorf has, let's say, multiple

highly plausible explanations.

One of them is that he is tailoring his testimony and

attributing statements to David Middendorf because he is

looking at black and white and blue ink cryptic notes.  They

give him plenty of room to come up with a story line that helps

him.  This is in the face of, as Ms. Lester has said, other

indications in the 3500 material and in the testimony.

He claimed that he on a routine basis got rid of his

notes.  In the 3500 material Mr. Whittle at one point told the

government that when he saw Brian Sweet's office, he saw a

stack of notebooks there that he assumed were from the PCAOB.

I believe other witnesses in the 3500 material have talked

about what an assiduous note take Mr. Sweet was.

So I think the entirety of the circumstances here,

including the completeness of the exhibit, are important

1   because they are relevant, they are probative of alternative

2   arguments.

3           THE COURT:  It is true that the rule of completeness

4   is limited to what in fairness should be included with the

5   properly offered prior consistent statement.  The tricky thing

6   here is I don't think, just looking at them, the rule of

7   completeness necessarily does it until you play out this

8   argument, and the question is how plausible is that argument

9   that these similarities slash differences support an argument

10  about the notes.

11          It is true that these two pages of notes relate to one

12  meeting.  I am persuaded that --

13          MS. KRAMER:  Your Honor, may I say one thing in

14  response to what Mr. Weddle said?

15          THE COURT:  Yes.

16          MS. KRAMER:  I fear we are going to end up going down

17  a prior consistent statement rabbit hole if this is where

18  things are going.  Because on July 25, 2017, in the 3500

19  material that we are putting up on the screen here, without

20  looking at the notepad, Mr. Sweet recounted this conversation.

21  It is 3522-30, page 8, from July 25, 2017.  He recounted this

22  meeting then consistent with his testimony and with the

23  notepad, without referring to the notes whatsoever and said

24  exactly the same things.

25          If you are going to allow defense counsel to have this

1    whole sideshow about what his prep meeting notes were and the

2    shocker that he discussed some of the things he prepared to

3    discuss and go into what is going to amount to probably at

4    least an hour of cross-examination about the authenticity of

5    notes that we are offering three lines of, then we are going to

6    respond by putting in the July 25, 2017, prior consistent

7    statement and elicit that he told us all of this when he wasn't

8    looking at the notes, we didn't show him the notes.  It is

9    going to be, I fear, a big sideshow.

10        This is a prior consistent statement that we are

11   putting in to directly respond to the claim of recent

12   fabrication and turning it into this whole other hearing is far

13   beyond the scope of the rule of completeness.

14        THE COURT:  It is a prior consistent statement, but it

15   is not a small matter.  This is important testimony.  The fact

16   that he said something consistent in July 2018, after he was

17   cooperating, is not inconsistent with a somewhat conspiratorial

18   theory.

19        MS. KRAMER:  Except that I think Mr. Weddle just

20   talked about how we showed him the notebook a month ago, and

21   surprise, surprise, he conformed his testimony to it.  That is

22   refuted.

23        THE COURT:  I am not relying on that particular point.

24   It is just overall it certainly provides context to the notes

25   that he was taking in these two pages.  I think it could avoid

1    the possibility that there is something misleading in certain

2    of these notes that the government wants to offer.  If they

3    believe Sweet's testimony, obviously they are not going to

4    accept any alternative interpretation.

5         MS. KRAMER:  The fact that he prepared for the

6    meeting, your Honor, it's a different set of statements

7    entirely.  It doesn't place the statement that we are offering

8    in context.  The case that I handed up this morning excised a

9    different portion of the same memo and affirmed that.  Same

10   thing in Gupta.

11        I certainly understand the argument they want to make,

12   but allowing the other notes in, it's almost impeachment by

13   extrinsic evidence on a collateral matter.  It is not

14   completeness of the actual statement we are offering.

15        MS. LESTER:  Your Honor, I disagree with that.  But to

16   the extent that it could be viewed as extrinsic evidence, I

17   think arguably it goes to bias and improper motive for the

18   reasons we have already explained.

19        THE COURT:  I am going to allow the first page and the

20   second page, not including the section on the right.

21        MS. KRAMER:  Thank you, your Honor.

22        THE COURT:  I am also going to read what I said I was

23   going to read about Stephanie Rodriguez's testimony.  I think I

24   will do that when they come in.

25        MS. KRAMER:  Did your Honor consider the government's

J2rrmid4                    Whittle - Recross

1   request to include the admonition to the jury of why it was

2   being stricken?

3              THE COURT:  Yes.  I was going to include that.

4              MS. KRAMER:  Thank you, your Honor.

5              THE COURT:  Anything else?

6              MR. BOXER:  No, your Honor.

7              THE COURT:  Who is the next witness?

8              MS. MERMELSTEIN:  May we have one moment, your Honor?

9              THE COURT:  Sure.

10             MS. KRAMER:  Your Honor, our next witnesses are the

11  PCAOB witnesses who are going to be putting in the records

12  relating to the costs.  We have some concern about confusing

13  the jury if you instruct them to disregard the testimony of

14  Stephanie Rodriguez on this issue immediately before the

15  witnesses testify on this issue.

16             THE COURT:  I would assume it would be better to do it

17  before than after.  I could do it later.

18             MS. KRAMER:  That's fine, your Honor.  None of them

19  are great choices, obviously, from our perspective.

20             THE COURT:  I understand.  Do you want to go ahead and

21  bring the witness in or should we do the jury first?

22             MS. MERMELSTEIN:  We can do the witness first.

23             (Continued on next page)

24

25

J2rrmid4                           Edwards - Direct

1            (Jury present)

2            THE COURT:  Good afternoon, folks.  I was going to

3   apologize for the long recess, but you have already thanked me.

4   So you're welcome.  Occasionally we have legal issues that we

5   need to address and occasionally I'm running late because of

6   other things.  So I apologize and you're welcome, both.

7            Before we continue with the testimony, one thing I

8   wanted to state is that you heard testimony during the first

9   week of trial from a witness named Stephanie Rodriguez.  A

10  certain portion of her testimony involved an estimate of the

11  cost to the PCAOB of employees' time in replanning and

12  reinspecting certain audits in 2016 and 2017.  I'm striking

13  that testimony and I instruct you to disregard that specific

14  testimony.  You are not to speculate as to why that testimony

15  is being stricken.

16            We will now continue with the government's next

17  witness.

18            MS. MERMELSTEIN:  Thank you, your Honor.  The

19  government calls Latoya Edwards.

20   LATOYA EDWARDS,

21       called as a witness by the government,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. MERMELSTEIN:

25  Q.  Ms. Edwards, how old are you?

J2rrmid4                          Edwards - Direct

```
1    A.  30.
2    Q.  Where are you currently employed?
3    A.  PCAOB.
4    Q.  How long have you been employed at the PCAOB?
5    A.  Since June 2015.
6    Q.  What is your current title?
7    A.  Analyst.
8    Q.  What are your general duties and responsibilities as an
9    analyst at the PCAOB?
10   A.  I manage a scheduling system called Stafftrack, and I also
11   provide reporting based on inspection, staffing, and head
12   count.
13   Q.  Do you as well work on inspections yourself, or do you just
14   provide staffing and scheduling support?
15   A.  Just staffing and scheduling support.
16   Q.  Do you work or do you do staffing for a particular division
17   of the PCAOB?
18   A.  Yes, DRI, which is division of registration and
19   inspections.
20   Q.  If you know, does that division include the office of
21   research and analysis known as ORA, or is that a separate
22   group?
23   A.  Separate.
24   Q.  What, if any, system does DRI use to schedule PCAOB
25   inspector time?
```

J2rrmid4                          Edwards - Direct

1    A.   We use a system called Stafftrack.

2    Q.   What is Stafftrack?

3    A.   Stafftrack is a scheduling system that maintains a record

4    of inspections and also the inspectors' schedule for the given

5    year.

6    Q.   How does information about scheduling make its way into

7    Stafftrack?

8    A.   We receive requests from either the scheduling champion or

9    approved request from the inspector.

10   Q.   What is a scheduling champion?

11   A.   A scheduling champion is -- all the inspectors are on a

12   team.  Each team has a scheduling champion that maintains their

13   scheduling.  They send it to us, and we update Stafftrack.

14   Q.   So just a point person on scheduling?

15   A.   Yes.

16   Q.   Is information in the Stafftrack system created, kept, and

17   maintained in the ordinary course of the PCAOB's business?

18   A.   Yes.

19   Q.   Is the information created by persons with knowledge of or

20   created from information transmitted by persons with knowledge

21   of the information shown?

22   A.   Yes.

23   Q.   Is the information created at or near the time the

24   information became available?

25   A.   Yes.

J2rrmid4                          Edwards - Direct

1   Q.  Let me direct your attention to Government Exhibits 132 to

2   135 for identification.  They are going to come up on your

3   screen.  There is also a folder next to you in a manila

4   envelope.  If it is easier to look at them in hardcopy, you've

5   got hardcopies there.  Take your time and let you ask you if

6   you recognize those.

7   A.  I do.

8   Q.  What are they?

9   A.  They are reports based on the planning time for a given

10  period of time for the KPMG assignment code.

11  Q.  Is this data extracted from Stafftrack?

12  A.  Yes.

13  Q.  It relates I think you said to a particular firm?

14  A.  Yes.

15  Q.  Which firm is that?

16  A.  KPMG.

17  Q.  Does it relate to a particular kind of work for that firm?

18  A.  The data is filtered on planning time.

19  Q.  What does that mean, that you filter the data on planning

20  time?

21  A.  This report here is a pivot of the mega schedule and is

22  sorted by the assignment, which would be KPMG, and the job

23  code, which would be planning.

24  Q.  Did you extract the data contained in Government Exhibits

25  132 through 135 from the larger dataset at Stafftrack?

J2rrmid4                         Edwards – Direct

1    A.  Yes.

2              MS. MERMELSTEIN:  The government offers Government

3    Exhibits 132 through 135.

4              MR. OHTA:  Your Honor, could we have a moment for a

5    sidebar, please?

6              THE COURT:  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar).

2            MR. OHTA:  Your Honor, could you reserve your ruling

3     on the entry of this document into evidence.  While Ms.

4     Mermelstein did attempt to lay a foundation for business

5     records, we are objecting based on the relevance because right

6     now we know why the government wants to put it into evidence.

7     They want to show actual costs of the planning process.

8            All we know right now is we have a scheduler that

9     schedules hours and it's in the Stafftrack system and that's

10    it.  It's not actual hours worked.  As it stands right now,

11    it's just a schedule of costs.  It is a record of just a

12    schedule, not actually hours worked.  We would like the

13    opportunity to cross-examine on that fact.  Of course, the

14    Court can make a determination of whether or not it is

15    relevant.

16            MS. MERMELSTEIN:  I really first of all can't

17    understand why this is being raised at the sidebar now for a

18    witness whose testimony was disclosed and for whom documents

19    were disclosed.  The notion that this is not admissible is

20    preposterous.  It is the most classic example of a business

21    record.

22            To the extent that there is some challenge and if you

23    want to ask do you know for sure that every hour that was

24    scheduled to be worked was worked, you can do that.  That does

25    not make them inadmissible.  That goes to weight, not

J2rrmid4                         Edwards - Direct

admissibility.  That is an argument to be made.  There is no

basis to reserve decision.  They should be received in evidence

now.

          THE COURT:  Is this greater than the people who did

the planning and reinspections that we talked about, or is this

a broader universe?

          MS. MERMELSTEIN:  It is actually a smaller universe,

your Honor.  As the witness testified, this only relates to

hours for members of the department of inspection.  For

example, it does not include any hours worked by members of

ORA, which is significant.  But for ease of proving it, we are

willing to accept a smaller group.  This is hours for which

KPMG inspectors were scheduled to work on the job of planning.

It seems very straightforward.

          THE COURT:  Is it all planning?

          MS. MERMELSTEIN:  It is for designated time periods

that correspond to the time periods for which there has been

testimony were the planning periods for those four relevant

time periods.

          THE COURT:  So it is specific to, say, the 10

reinspections, the planning relating to the reinspected audits?

          MS. MERMELSTEIN:  It does not relate to the planning

for the 10 reinspected audits.  I think there has been some

confusion in the way the defendants have raised their objection

to Ms. Rodriguez's testimony.  She in fact did not testify

J2rrmid4                        Edwards - Direct

1    about the cost of planning the additional 10 inspections.  She

2    testified about doing the 10 additional inspections.  There was

3    actually virtually no cost of planning the 10 additional ones.

4            They chose the 2017 group and then they used the same

5    group of financial institutions and also did the 2017.  It

6    includes the planning for 2015, the planning for 2016, the

7    initial planning for 2017, and the rate planning for 2017.

8    That is why there are four exhibits broken out into time

9    frames.

10           THE COURT:  Is it somehow limited to the

11   reinspections?

12           MS. MERMELSTEIN:  There were no reinspections for

13   2015.

14           THE COURT:  Right.

15           MS. MERMELSTEIN:  In 2016 it relates to the cost of

16   creating the list in the first instance.  It doesn't relate to

17   the cost of performing new inspections.  That would be a

18   different job code, not planning.  We are not doing that.  For

19   2017 it has the initial planning costs and then the replanning

20   costs.

21           THE COURT:  Why is it not relevant?

22           MR. OHTA:  Your Honor, you have a proffer by the

23   government on what it purports to show.  But as it stands right

24   now, that is not what it shows.  It is just hours based on

25   someone's schedule.  That's all it is.  It's just based on what

J2rrmid4                          Edwards - Direct

1    hours have been scheduled for these particular people who put

2    in planning.

3            Although planning is in Stafftrack, I don't know how

4    planning gets into Stafftrack, I don't know what these people

5    are doing.  Is it random?  Who makes the selections?  Who makes

6    the determination on whose schedules or who does the actual

7    planning?  Maybe I'm in the field but by some mistake the

8    department puts in planning; those aren't planning hours,

9    that's fieldwork hours.  We just don't know.  That's why I want

10   to cross-examine the witness.

11           MS. LESTER:  Beyond that, your Honor, as Ms.

12   Mermelstein just explained, these planning hours that are

13   scheduled relate to time periods.  My understanding is the

14   planning time would not actually be relevant to -- I guess I'm

15   a little unclear.  I should ask the prosecutor.  It goes to the

16   value, the argument as to all of lists?

17           MS. MERMELSTEIN:  Exactly, your Honor.  There has been

18   an argument floated by the defense that the list doesn't have

19   financial value to the PCAOB.  It does because it costs a lot

20   of money to create.  PCAOB has obviously been harmed in other

21   financial ways by the costs of having to do additional work.

22   That is not what this evidence is about.  It's about the cost

23   of creating the list.

24           The notion that it is possible that someone didn't

25   work those hours or there is an error in the business records

1    doesn't render the business record inadmissible.  It would be

2    nonsensical.  We would have to call every person on the

3    planning to testify to how many hours he work.

4           This is a business record.  That's why we have the

5    business records exception.  There can be any amount of

6    cross-examination on whether or not this is a perfect record,

7    but it is a completely fair representation about the planning

8    hours, which is completely consistent with Ms. Rodriguez

9    testimony that it was about 5,000 hours.

10          MS. KRAMER:  There was also testimony from Mr. Sweet

11    about the planning team and what they to and how the different

12    accounting firm teams are divided.

13          MS. LESTER:  So, your Honor, as we moved prior to

14    trial in our motion in limine, the dollar amount, the

15    quantification after the fact of the value of the lists or the

16    information compiled within the PCAOB is a completely

17    fabricated exercise that has no relevance to this jury's

18    determination about whether the confidential information at

19    issue had value within the meaning of the wire fraud statute.

20          THE COURT:  I understand the arguments.  I ruled on

21    that.  I find that it is admissible as a business record.  And

22    I find that the challenges being raised go to weight, not

23    admissibility.  So the objections are overruled but noted for

24    the record.

25          (Continued on next page)

1              (In open court)

2              THE COURT:  Government's Exhibits 132 through 135 are

3      received.

4              (Government's Exhibits 132-135 received in evidence)

5              MS. MERMELSTEIN:  Thank you, your Honor.

6              Can we publish 132 to the jury, please.

7      BY MS. MERMELSTEIN:

8      Q.  Ms. Edwards, for what time period does this reflect the

9      planning hours worked by the KPMG inspection team?

10     A.  August 2014 through May of 2015.

11     Q.  On line 4, where it says "Job Code Planning," what does

12     that mean?

13     A.  That is the sorting from the Mega Report or the largest

14     schedule for just that job code.

15     Q.  These hours all pertain to planning and not some other

16     activity?

17     A.  Correct.

18     Q.  And where it says "KPMG 14 "in row 8, what does that mean?

19     A.  That is the inspection or the assignment code for 2014.

20     Q.  For KPMG?

21     A.  For KPMG.

22             MS. MERMELSTEIN:  If we can scroll to the bottom of

23     this document, please.

24     Q.  In yellow, what does it reflect about the total number of

25     hours worked on schedule for planning for PCAOB inspectors for

J2rdmid5                          Edwards - direct

1   the time period listed at the top of the chart for August 2014

2   to May 2015?

3   A.   So this is the total time for the 2014 time August through

4   December, and also the 2015 time January through May.

5   Q.   And what is that number, the total time?

6   A.   5,244 hours.

7             MS. MERMELSTEIN:   Can we look at Government Exhibit

8   133 for a moment.

9   Q.   So directing your attention to the top, this indicates

10  "2016 KPMG Planning August 2015 to May of 2016."

11            If we can again scroll all the way to the bottom of

12  the exhibit.

13            How many hours in yellow were scheduled total for the

14  planning for this time period?

15  A.   4,707.

16  Q.   If we can go to Government Exhibit 134.

17            For 2017, August 2016 through May 2017 -- if we can

18  scroll to the bottom -- what is the total number of planning

19  hours billed during that time period?

20  A.   6,168 hours.

21  Q.   Ms. Edwards, aside from the subjects we've covered just

22  now, have you had any involvement in this case?

23  A.   No.

24  Q.   Do you know anything about the nature of the charges?

25  A.   No.

J2rdmid5                          Edwards - cross

1   Q.  And other than the documents I have just shown you, were

2   you asked to review any other documents or pull any other data

3   for this trial?

4   A.  No.

5           MS. MERMELSTEIN:  Nothing further, your Honor.

6           THE COURT:  OK.  Cross.  Who would like to go first?

7   Ms. Lester?

8           MS. LESTER:  Yes, your Honor.

9   CROSS-EXAMINATION

10  BY MS. LESTER:

11  Q.  Hello, Ms. Edwards.  My name is Amy Lester and I represent

12  David Middendorf.

13          You testified that your job -- a part of your job is

14  to take information that you receive from the inspection team

15  Scheduling Champion -- I believe you used that term?

16  A.  Yes.

17  Q.  -- and input that information about people's schedule, that

18  is, members of the inspection team, into StaffTrack, right?

19  A.  Yes.

20  Q.  And so when you receive that information, that's in advance

21  of the time actually spent by those individuals doing whatever

22  it is that they're scheduled to do?

23  A.  Planned hours, yes.

24  Q.  Right.  So it is a plan of what they intend to do, correct?

25  A.  Yes.

J2rdmid5                              Edwards - cross

1    Q.   It doesn't reflect what they actually did, right?

2    A.   Yes.  I don't have any knowledge of what they actually did.

3    Q.   And it is not updated at some later date to reflect how

4    many hours they actually spent versus how many hours were

5    planned, right?

6    A.   It can be if the Scheduling Champion comes back to us.

7    Q.   But without that, if the Scheduling Champion doesn't come

8    back to you and make a change, it is never updated later on,

9    correct?

10   A.   Correct.

11   Q.   If we could take a look at Government Exhibit 132, in

12   evidence, which you were just looking at a moment ago.

13            Up at the top, it says "August 2014 to

14   December 2014 -- I'm sorry, not right at the top but that part.

15   Do you see that in line 3 of the Excel?

16   A.   Yes.

17   Q.   Is that actually the time period during which planning

18   takes place, if you know?

19   A.   I don't know.

20   Q.   If we can look at the second tab on the Excel spreadsheet

21   of 14 Schedule.  And if we could scroll across, please, to the

22   date range.

23            Do you see it starts in Column U with "Week of

24   7/28/14?"

25   A.   Mm-hmm.

J2rdmid5                              Edwards - cross

1   Q.  And that's blank, correct?

2   A.  Yes.

3   Q.  And then if we scroll ahead further to the right, there are

4   no entries until you get to the Column AE, which is the week of

5   October 6, '14, right?

6   A.  Yes.

7   Q.  So is it fair to -- and the relationship between this

8   schedule that we're looking at right now, which is a different

9   tab of the Excel spreadsheet, and the first tab that we looked

10  at is that the first tab summarizes the information that's on

11  this other tab, is that right?

12  A.  Yes.

13  Q.  So when turning back to the first tab, when it says August

14  to December 2014, it reflects hours within that period but not

15  every week within that period.  August to December 2014 may

16  have actually had hours in the spreadsheet, correct?

17  A.  Can you repeat that?

18  Q.  Yes.  It was confusing.  Sorry.

19          So we just looked that there were several blank

20  columns, and the first entry was actually for October 2014,

21  right?  October 6th?  We can look back or you can look at your

22  hardcopy.  Column AE.

23          And all the prior columns to the left are blank,

24  right?

25          You can scroll back.

J2rdmid5                           Edwards - cross

1              So that means that even though on tab 1 it says August

2      to December, there weren't actually any hours planned until

3      October, right?

4      A.   For KPMG.

5      Q.   There weren't any hours scheduled during that prior period?

6      A.   For that specific assignment code and job code.

7      Q.   OK.  And if we can look at the third tab of the 15 Schedule

8      and also scroll to the left.  If we could stop there.

9              So we see that starting in the -- in column AG, where

10     it says "Week of March 30, 2015," you see it is empty, and then

11     if we keep scrolling to the left there are no more entries?

12     A.   Yes.

13     Q.   So going back to the first tab, again, on the bottom half

14     of that page, it says "January to May 2015" at the top?

15     A.   Mm-hmm.

16     Q.   But you would agree with me that the tab that we just

17     looked at doesn't include time passed I believe it was

18     March 30, 2015, right?

19     A.   Can we go back to the --

20     Q.   Yes, the third tab.

21             Starting in the week of March 30th, there is no

22     entries, correct?

23     A.   There are no entries for KPMG 15 Planning.

24     Q.   OK.  So is it fair to say that in the first tab, the months

25     listed at the top of each entry, that is in this instance

J2rdmid5                              Edwards - cross

1    January to May 2015, and above, August to December 2014,

2    doesn't necessarily mean that there was work scheduled during

3    each of those months, correct?

4    A.  I don't know.

5    Q.  Well, you'll agree with me that this tab that we're looking

6    at now is a summary of the two Excel spreadsheets, right?

7    A.  Yes.

8    Q.  And we saw periods of time in which no hours were scheduled

9    out, right?

10   A.  For that job code, no, combination.

11   Q.  So when this summary says January to May, it is not -- it

12   doesn't necessarily mean that hours were scheduled in each of

13   those months, correct?

14   A.  The schedule wouldn't be blank so there are hours

15   scheduled.  They just may not be to this particular job code

16   and assignment.

17   Q.  Understood.  But this page that we're looking at now, the

18   first tab includes the job code planning, correct?

19   A.  Yes.

20   Q.  So there are no hours scheduled under the planning job code

21   for KPMG in, for example, May of 2015, correct?

22   A.  Yes.

23   Q.  OK.  So this date description is just overinclusive is what

24   I'm getting at?

25   A.  Yes.

J2rdmid5                          Edwards - cross

1   Q.   OK.   In the normal course, are the StaffTrack spreadsheets

2   that we're looking at maintained for a certain period of time

3   and then deleted or written over, or are they maintained

4   indefinitely?

5   A.   Maintained indefinitely.

6   Q.   But, again, you never revisit the schedule absent some

7   specific direction from the Scheduling Champion, correct?

8   A.   No.

9            MS. LESTER:   No further questions, your Honor.

10           THE COURT:   All right.

11           Mr. Ohta.

12           MR. OHTA:   Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. OHTA:

15   Q.   Good afternoon, Ms. Edwards.   My name is Jason Ohta and I

16   represent Jeff Wada.

17           Building upon the topic that Ms. Lester was talking

18   about, in StaffTrack, is it just current information for the

19   particular year is in StaffTrack?

20   A.   Yes.

21   Q.   So for historical information, for example, in 2015, where

22   would that information be housed in?

23   A.   We run reports as of the as-of date, so we have historical

24   data for all of this time, all historical data.

25   Q.   Is that historical data actually located in StaffTrack or

J2rdmid5                           Edwards - cross

1    is it located in another system or --

2    A.   So based on the as-of date, it is in StaffTrack, but say

3    the next day that I've made some changes, then if you run the

4    report the next day the data will change.

5    Q.   So for this case, when you were asked to run the

6    information for 2015, for example --

7    A.   Mm-hmm.

8    Q.   -- how did you do that?

9    A.   I used the last report of the year.

10   Q.   Which is what date?

11   A.   12/31.

12   Q.   So you input 12/21/2015 into StaffTrack?

13   A.   No.  We run reports constantly and date them the date that

14   we run the report.

15   Q.   Sure.

16   A.   The as-of date.

17   Q.   All I'm trying to figure out is is it in StaffTrack or

18   somewhere else?

19   A.   Is the data in StaffTrack?

20   Q.   Yes.

21   A.   Yes.

22   Q.   Thank you.

23           MR. OHTA:  Ms. O'Connor, can we please turn to

24   Government Exhibits 133, please.  That is in evidence.

25           Can we turn to the second tab, please.

J2rdmid5                         Edwards - cross

```
 1              Ms. O'Connor, can you please scroll up on the
 2       right-hand side?  I think we are missing one row.  I'm sorry,
 3       the other way.  Thank you.
 4       Q.  So, Ms. Edwards, I'm going to just look at the first four
 5       lines of this spreadsheet.  And just under "Assignments, where
 6       it stays "KPMG-15" or "KPMG-16," I'm assuming that's the year,
 7       but can you explain what the difference between KPMG-15 and
 8       KPMG-16 is under "Assignment"?
 9       A.  I'm not sure.
10       Q.  And I believe you also testified that the hours --
11       Ms. O'Connor, can you scroll to the right?  Thank you.
12              And go to the week of February 29, 2016.  It would be
13       in column 9.
14              Sorry.  Is this Government's Exhibit 133?
15              (Pause)
16              Yes.  Thank you very much.  And row 9.
17       Q.  So, Ms. Edwards, I'm just going to take this one example.
18              So you are getting the hours from the Scheduling
19       Champion, correct?
20       A.  Yes.
21       Q.  And the Scheduling Champion, there is one for each firm.
22       For example, there is a Scheduling Champion for KPMG, right?
23       A.  Right.
24       Q.  Perfect.  And then looking down, so the Scheduling Champion
25       for KPMG tells you that for Christopher Schaefer and Yoomi So,
```

J2rdmid5                              Edwards - cross

1   so those two individuals for the week of February 29, 2016 will

2   be working 16 hours -- sorry, are scheduled for 16 hours for

3   planning, correct?

4   A.  Yes.

5   Q.  So for Ms. -- so for Yoomi So, if, for example, Yoomi So

6   was on a -- was scheduled for an annual inspections training in

7   Washington, D.C. --

8   A.  Yes.

9   Q.  -- on March 2nd through the 4th -- that's Monday,

10  Tuesday -- or that would be Wednesday, Thursday, Friday, of

11  course you can't -- the scheduler wouldn't put planning on

12  there because that person is at an annual inspections training,

13  correct?

14  A.  Right.

15  Q.  I'll represent that Ms. Yoomi So lives in Los Angeles so --

16          MS. MERMELSTEIN:  Objection to defense counsel

17  representing something.

18          THE COURT:  Sustained.

19  BY MR. OHTA:

20  Q.  Do you know where Ms. Yoomi So works?

21  A.  I don't know.

22  Q.  Do you know, for traveling purpose, is there a traveling

23  job code that you could put down in a spreadsheet like this?

24  A.  No.

25  Q.  So if someone were to travel for the entire day, you would

J2rdmid5                          Edwards - cross

1    never get that job code?

2    A.   We don't track travel in StaffTrack.

3    Q.   So if someone were traveling, you would never know?

4    A.   Correct.

5    Q.   That information would never be populated in a spreadsheet

6    like this?

7    A.   No.  We don't track travel in StaffTrack.

8    Q.   What other things do you track in StaffTrack?

9    A.   There are other activities such as field work, home office,

10   training meetings, things like that.

11   Q.   Again, the scheduler says this person is planning for two

12   days, you take that as accurate?

13   A.   Yes.

14   Q.   But if they were traveling for that particular day, you

15   would never know?

16   A.   No, we don't track travel.

17   Q.   Thus, if you were traveling on a day where it was scheduled

18   for planning, you would agree that they wouldn't be working

19   that day on planning, correct?

20   A.   I can't speak on that.

21   Q.   I think you mentioned four -- or do you know actually how

22   many job codes there are that you could input into a

23   spreadsheet like this?

24   A.   There is no limit, so I don't know the number.

25   Q.   Which ones -- but you just testified to the ones you are

J2rdmid5                          Edwards - cross

1   familiar with?

2   A.  It was just an example of them, yes.

3   Q.  Do you have any other examples that you can recall right

4   now?

5   A.  Training, home office, not applicable.  There are so many I

6   can't think of off the top of my head.

7   Q.  Usually when the Scheduling Champion gives you the

8   assignment in the job code, is it ever switched on Monday --

9   or, sorry, is there a mix, for example, field work for four

10  hours, planning for four hours?

11  A.  Not that particular combination but you can have two

12  activities in one day.

13  Q.  Is it a rare thing to see?

14  A.  For that particular combination or just split for the day?

15  Q.  Split for the day.

16  A.  No, it is not rare.

17  Q.  How about for planning?

18  A.  I don't know.

19  Q.  Do you normally see planning split up in four-hour

20  increments?

21  A.  I can't say I normally see it.  It can happen.  I don't

22  know if it is normal.

23  Q.  Based on your experience and in working at PCAOB, how often

24  do you see something like that?

25  A.  I don't know.

J2rdmid5

```
 1   Q.  I would say not often because I'm looking at the planning
 2   spreadsheet and it looks like you can divide the majority of
 3   the numbers by 8.
 4           MS. MERMELSTEIN:  Objection to counsel's commentary on
 5   what the document says.
 6           THE COURT:  Sustained.
 7   BY MR. OHTA:
 8   Q.  When would -- withdrawn.
 9           My last question, Ms. Edwards.
10           I think you testified that sometimes the Scheduling
11   Champion comes back and corrects the schedule?
12   A.  They'll update it.
13   Q.  Do they ever update planning hours, in your recollection?
14   A.  I don't know.
15   Q.  Do you recall that ever happening to you?
16   A.  I can't -- I don't know.  I don't remember.
17           MR. OHTA:  Thank you.
18           No further questions, your Honor.
19           THE COURT:  OK.  Thank you.
20           Anything further?
21           MS. MERMELSTEIN:  No.  Thank you, your Honor.
22           THE COURT:  OK.  Thank you.  You may step down.
23           (Witness excused)
24           THE COURT:  Government, you may call your next
25   witness.
```

J2rdmid5                         Lee - direct

1              MS. MERMELSTEIN:  The government calls Antoine Lee,

2    your Honor.

3              And if I could just leave the documents for the

4    witness?

5              THE COURT:  Yes.

6              Please come on up to the witness chair and you can be

7    seated in the chair.

8              And if you would please raise your right hand, you

9    will be sworn in.

10    ANTOINE LEE,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13             THE CLERK:  Please state your full name and spell your

14    first and last name slowly for the record.

15             THE WITNESS:  Antoine Lee.  My first name

16    A-n-t-o-i-n-e; last name Lee, L-e-e.

17             THE CLERK:  Thank you.

18             THE COURT:  You said L-e-e?

19             THE WITNESS:  Yes.

20             THE COURT:  If you would speak into the mic, please.

21    Thanks.

22    DIRECT EXAMINATION

23    BY MS. MERMELSTEIN:

24    Q.  Mr. Lee, can I ask you to state your name again for the

25    jury?

J2rdmid5                          Lee - direct

1   A.  Certainly.  Antoine Lee.

2   Q.  Mr. Lee, good afternoon.

3            Where are you employed?

4   A.  The PCAOB.

5   Q.  And how long have you been employed at the PCAOB?

6   A.  Since July 7th of 2014.

7   Q.  What is your current title?

8   A.  Senior employee relations and compliance specialist.

9   Q.  As a senior employee relations and compliance specialist

10  with the PCAOB, are you familiar with the way in which the

11  PCAOB maintains compensation information?

12  A.  Yes.

13  Q.  How do they do that?

14  A.  We maintain our compensation information out of the -- our

15  UltiPro System.

16  Q.  What is UltiPro?

17  A.  So UltiPro is a product of Ultimate Software.  Ultimate

18  Software, they provide a cloud-based human capital management

19  system, and within that system there are various components,

20  one component being a payroll component, another being our

21  timekeeping component, and other benefits of components.

22  Q.  Kind of an HR database?

23  A.  That is correct.

24  Q.  Is the information in the UltiPro system created, kept, and

25  maintained in the ordinary course of the PCAOB's business?

J2rdmid5                          Lee - direct

1    A.  Yes.

2    Q.  Is the information created or input by persons with

3    knowledge of, or created from information transmitted by

4    persons with knowledge of, the information shown?

5    A.  Yes.

6    Q.  Is the information created at or near the time the

7    information becomes available?

8    A.  Yes.

9    Q.  I want to direct your attention to Government Exhibit 131A,

10   for identification.

11           I am going to pull it up on the screen for you, but a

12   full hard copy is in that binder that is sitting on the ledge

13   there.

14           Do you recognize governments Exhibit 131A?

15   A.  I do.

16   Q.  What is it?

17   A.  This is a compensation record -- compensation summary,

18   rather, that is housed within the UltiPro System.

19   Q.  Did you pull this compensation summary record from the

20   UltiPro System?

21   A.  Yes.

22   Q.  Do these records truly and accurately reflect the

23   compensation information for the employees listed?

24   A.  Yes.

25   Q.  And does Government Exhibit 131A contain compensation

J2rdmid5                          Lee - direct

1    information for all PCAOB employees or just for the ones who

2    are listed in this document?

3    A.  Just the ones that are listed.

4            MS. MERMELSTEIN:  The government offers Government

5    Exhibit 131 -- excuse me, 131A, your Honor.  Thank you.

6            MS. LESTER:  The same objection, your Honor.

7            MR. OHTA:  The same objection, your Honor.

8            THE COURT:  The objections are noted and overruled,

9    and the document is received, 131A.

10           (Government's Exhibit 131A received in evidence)

11           MS. MERMELSTEIN:  Thank you.

12           Ms. Urbanczyk, can we go to the third employee, which

13   I think is probably page 6 of this document.  There we go.

14   Perfect.  Thank you.

15   BY MS. MERMELSTEIN:

16   Q.  Mr. Lee, can you explain just as an example looking at this

17   what we are looking at here?

18   A.  Certainly.  So what's listed here is Blayne's current

19   salary, which is broken out on an annual pay period, weekly,

20   and hourly breakdown.

21           There is a job detail, which provides his job title,

22   his exemption status, salary versus hourly.  It looks like he

23   is a salaried exempt from overtime employee.  Yes, and there

24   should be a history, too.

25   Q.  Let's go to the second page.

J2rdmid5                          Lee - cross

1          What were we looking at now?

2   A.  So this is a history of what his salary has been going back

3   to 2014.

4   Q.  Aside from the subjects I've just asked you about, have you

5   had any involvement in this case?

6   A.  No.

7   Q.  And other than the document I just showed you that you

8   pulled from the UltiPro System, have you been asked to review

9   or pull any other documentation in this case?

10  A.  No.

11          MS. MERMELSTEIN:  Nothing further, your Honor.

12          THE COURT:  All right.

13          Ms. Lester.

14          MS. LESTER:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MS. LESTER:

17  Q.  Good afternoon, Mr. Lee.  My name is Amy Lester and I

18  represent David Middendorf.

19          Looking again, if we could, at Government Exhibit

20  131A, you can just look at the first entry.

21          This format, this two-page format, is this a format

22  that the PCAOB or you use at all in your work, the format in

23  which this report appears?

24  A.  I guess I don't understand your question.

25  Q.  Well, if we go just to the next page, Ms. O'Connor.

J2rdmid5                          Lee - cross

1              This two-page document for this particular employee,

2      this compensation summary, is this a document that you use in

3      the normal course of your employment at the PCAOB?

4      A.   No.

5      Q.   Have you ever created this type of compensation summary

6      previously to when you were asked to do it for this case?

7      A.   I have had to print these out before, but these on a

8      routine basis, no.

9      Q.   Could we look at the date in the upper left-hand corner on

10     the page that says "2/21/2019, Print Preview."  Do you see

11     that?

12     A.   Yes.

13     Q.   And were you the person who prepared this on February 21st

14     of this year?

15     A.   Yes.

16     Q.   And you printed out these documents or made these documents

17     available in electronic form?

18     A.   That's correct.

19              MS. LESTER:  And we can take that down.  Thanks,

20     Ms. O'Connor.

21              If we could talk for a moment about -- I'm sorry, I

22     didn't need the whole document, just that little portion.  If

23     we could look at a different part of the document.

24     Q.   In the "Pay Currency," it says, "Pay Currency, Annual,

25     period, weekly, and hourly."  Do you see that?

J2rdmid5                         Lee - cross

1    A.  Yes.

2    Q.  The pay period is twice a month, is that right?

3    A.  That's right.

4    Q.  And the weekly and hourly rates, are those rates that the

5    PCAOB uses in the normal course in determining payroll if

6    employees are paid on a twice-a-month basis?

7    A.  I don't understand your question.

8    Q.  Do you ever need to calculate someone's hourly wage for any

9    purpose in your job?

10   A.  Yes.

11   Q.  For what purpose is that?

12   A.  So a part of my responsibility is the drafting of

13   separation agreements.  So if by chance I'm drafting a

14   separation agreement, I would use the hourly rate to calculate

15   that amount, whatever is --

16   Q.  How would the hourly rate be used in connection with a

17   separation agreement?

18   A.  So the hourly rate would be calculated by 40, 40 hours in a

19   workweek, and then that 40 hours will be calculated by whatever

20   the determination of the total amount would be of the timeframe

21   that we're offering the person.

22   Q.  Are you saying that if, for instance, someone left not at

23   the end -- left the PCAOB not at the end of a pay period, you

24   would need to calculation how many additional hours the person

25   had worked so that you could figure out their payroll for that

J2rdmid5                            Lee - cross

1    period?

2    A.  No.

3    Q.  OK.  I'm not understanding the significance of what you're

4    saying, then, in connection with the separation agreement.

5    A.  Right.  So with the separation agreement, if by chance we

6    say, you know, you will be paid two weeks your salary, what I

7    would do, it would be to take the hourly rate, the $69.  I

8    would multiply that by 40 hours in the week.  And then I would

9    multiply the 40 hours by two -- or I would multiply it by 80

10   hours for two weeks to come out with what the amount would be

11   for that two-week period.  So I could take that weekly rate and

12   calculate that by two to get that amount, or I can take the

13   hourly rate and do the same thing.

14   Q.  And is it fair to say that for a salaried employee, you're

15   always relying on the assumption of an eight-hour workday or a

16   40-hour workweek, is that correct?

17   A.  Yes.

18   Q.  And I don't know if you have had a chance to flip through

19   every single page of 131A, but you testified that you were

20   involved in preparing it.

21           So isn't it a fact, sir, that all of the employees

22   listed here are salaried employees?

23           You can flip through, if you would like, the hardcopy.

24   A.  Let me take a look.

25   Q.  Sure.

J2rdmid5                    Lee - cross

1              (Pause)

2    A.  Yes, that's correct.

3    Q.  And you testified, I believe on direct, that salaried

4    employees are exempt from any overtime pay, is that right?

5    A.  That's right.

6    Q.  So regardless of how many hours they work in a week, for

7    example, if they have a sick day, they still get paid their

8    regular salaried rate for that week, correct?

9    A.  Correct.

10             MS. LESTER:  No further questions.

11             THE COURT:  OK.  Mr. Ohta.

12             MR. OHTA:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. OHTA:

15   Q.  Good afternoon, Mr. Lee.  My name is Jason Ohta and I

16   represent Jeff Wada.

17   A.  Good afternoon.

18   Q.  The UltiPro System, when was that implemented?

19   A.  The UltiPro System was implemented in 2014.

20             MR. OHTA:  No further questions, your Honor.

21             THE COURT:  OK.  Anything further?

22             MS. MERMELSTEIN:  No, your Honor.

23             THE COURT:  All right.  Thank you, sir.  You may step

24   down.

25             THE WITNESS:  Thank you.

J2rdmid5                           Koch – direct

1           (Witness excused)

2                   THE COURT:  The government may call its next witness.

3                   MS. ESTES:  Your Honor, the government calls Kenneth

4    Koch.

5           (Pause)

6                   THE COURT:  Sir, if you would please come on up to the

7    witness stand and be seated in the witness chair.

8           And if you would please raise your right hand, you

9    will be sworn in.

10    Kenneth CHARLES KOCH,

11         called as a witness by the government,

12         having been duly sworn, testified as follows:

13                  THE CLERK:  Please state your full name and spell your

14   last name slowly for the record.

15                  THE WITNESS:  Kenneth Charles Koch, K-o-c-h.

16                  THE CLERK:  Thank you.

17   DIRECT EXAMINATION

18   BY MS. ESTES:

19   Q.  Good afternoon.

20   A.  Hello.

21   Q.  Where do you currently work?

22   A.  KPMG.

23   Q.  How long have you worked for KPMG?

24   A.  16 years.

25   Q.  Before you were at KPMG, where did you work?

J2rdmid5                          Koch - direct

1    A.  I was active duty in the Air Force for ten years.

2    Q.  What did you do in the Air Force?

3    A.  I started out in Crypto Electronics and Telecommunications,

4    and then I was recruited into the Air Force Office of Special

5    Investigations.

6    Q.  After you left the Air Force, when you first started at

7    KPMG, what did you do?

8    A.  I was a manager in the forensics practice.

9    Q.  What is the forensics practice?

10   A.  Forensics practice is a part of our advisory practice that

11   we go out and conduct corporate fraud investigations and

12   computer forensics for government investigations and other

13   litigation.

14   Q.  What is your current role at KPMG?

15   A.  I'm a principal in the Atlanta office.

16   Q.  By "a principal," do you mean partner?

17   A.  Yes, partner without a CPA.

18   Q.  Are you in a particular group?

19   A.  I am.  I am still in the forensic practice.

20   Q.  And what are your duties and responsibilities as a

21   principal in the forensic practice?

22   A.  I lead the Southeast U.S. for all things forensic,

23   technology.  So that includes computer forensics and electronic

24   discovery and data analytics, and I oversee all of our people

25   in that area and have client responsibilities for engagements

J2rdmid5                         Koch - direct

1   where we deliver our services and then also for business

2   development.

3   Q.  And in your role as a principal in the forensics practice,

4   do you also sometimes serve as a records custodian for KPMG?

5   A.  I do.

6   Q.  And what does it mean to be a records custodian?

7   A.  It means that I authenticate the records that are our

8   business records at the firm.

9   Q.  Mr. Koch, I am now going to hand you a CD that contains

10  Government Exhibits 700 through 702, 750 through 759, 800

11  through 825, 875 through 876, 925 through 956, 1000 through

12  1017, 1050 through 1078, and 1124 through 1144.

13          Mr. Koch, do you recognize this CD?

14  A.  I do.

15  Q.  And generally speaking, what is contained on this CD?

16  A.  On this CD are 144 exhibits that are emails and other types

17  of documents and correspondence from KPMG.

18  Q.  Did KPMG produce these emails and other types of

19  correspondence to the government?

20  A.  Yes.

21  Q.  How do you know that?

22  A.  I know that because I inspected the CD and inspected the

23  Bates numbers on the documents themselves.

24  Q.  And what is a Bates number?

25  A.  A Bates number is a unique identifier for a document.

J2rdmid5                        Koch - direct

1   Q.  Now, Mr. Koch, stepping back a bit:  How does KPMG store

2   emails?

3   A.  We store emails on a variety, a number of email servers

4   that are located in Montvale, New Jersey, in our data center.

5   Q.  What is an email server?

6   A.  An email server is a computer server that acts as the

7   manager for organizing the sending and receiving and storage of

8   email and in a variety of individual user mailboxes and group

9   mailboxes, etc.

10  Q.  And does KPMG have one server or more than one?

11  A.  We have multiple servers.

12  Q.  And I believe you said they were located in Montvale, New

13  Jersey?

14  A.  Yes, that's correct.

15  Q.  How long have they been located in Montvale, New Jersey?

16  A.  At least for the past ten years.  I believe we moved

17  everything to Montvale in 2005.

18  Q.  Do emails sent from a KPMG email address have to travel

19  through the server?

20  A.  That's correct.

21  Q.  So to be clear, emails sent in 2015, 2016 and 2017 from a

22  KPMG email account, would they have traveled through the

23  servers in New Jersey?

24  A.  Yes.

25  Q.  So even if someone in KPMG's New York office emails someone

J2rdmid5                          Koch - direct

1    else in KPMG's New York office, does that email still travel

2    through New Jersey?

3    A.  Yes.

4            MS. ESTES:  Mr. Urbanczyk, can you pull up what's been

5    marked for identification as Government Exhibit 1144?

6    Q.  Mr. Koch, do you recognize this exhibit?

7    A.  I do.

8    Q.  And what's the date of the emails here?

9    A.  It was sent on February 15, 2017.

10   Q.  And who are the parties to the emails?

11   A.  It was sent from David Middendorf to Mark Rubino.

12           MS. ESTES:  Your Honor, the government offers

13   Government Exhibit 1144.

14           THE COURT:  Received.

15           (Government's Exhibit 1144 received in evidence)

16           MS. ESTES:  Now, Mr. Urbanczyk, can you zoom in on the

17   second email from the top.

18   Q.  Mr. Koch, who is this email from?

19   A.  It's from Mark Rubino.

20   Q.  And looking at the signature block there, what is his title

21   at KPMG?

22   A.  Principal and Associate General Counsel.

23   Q.  And who is this email to?

24   A.  This email is to David Middendorf.

25   Q.  Can you read the email?

J2rdmid5                          Koch - direct

1    A.  It says:  "Dave, when you have a chance, can you email me

2    the list you generated from your call on 2/6?  Thanks.  Mark."

3          MS. ESTES:  Mr. Urbanczyk, can you zoom out of that

4    and zoom into the top email.

5    Q.  Mr. Koch, who is this one from?

6    A.  This is from David Middendorf.

7    Q.  And what does the email say?

8    A.  It says, "See attached."  And it has a list.docx attached.

9          MS. ESTES:  Mr. Urbanczyk, can you go to the third

10   page of this document.

11   Q.  Is this the attachment, Mr. Koch?

12   A.  Yes, it is.

13   Q.  What is the title at the top?

14   A.  The title is "List."

15         MS. ESTES:  And if you could, Mr. Urbanczyk, if you

16   could zoom back in just for a minute.

17   Q.  Mr. Koch, can you just read the first five names on the

18   list?

19   A.  AH Belo Corp, Applied Materials, Bank United, Bio Rad Labs

20   and BMO.

21         MS. ESTES:  Mr. Urbanczyk, can you zoom out.

22   Q.  How many entries are on this list, Mr. Koch?

23   A.  There are 47.

24         MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

25   that down.

J2rdmid5                          Koch - direct

1            And if you could pull up what's been marked for

2    identification as Government Exhibit 1124.

3    Q.  Mr. Koch, do you recognize this document?

4    A.  I do.

5    Q.  And what is this?

6    A.  This is a meeting request.

7    Q.  Who is it from?

8    A.  It is from Brian Sweet.

9    Q.  And what is the date listed there?

10   A.  February 3, 2017.

11            MS. ESTES:  Your Honor, the government offers

12   Government Exhibit 1124.

13            THE COURT:  Received.

14            (Government's Exhibit 1124 received in evidence)

15   BY MS. ESTES:

16   Q.  Mr. Koch, looking at this document, what is the date next

17   to the "Sent" line?

18   A.  It's February 3, 2017.

19   Q.  And what is the time there?

20   A.  8:03 in the evening.

21   Q.  Based on your experience at KPMG's forensics practice and

22   your work as a records custodian, what is your understanding of

23   what time zone this is in?

24   A.  That time zone is in UTC.

25   Q.  And who is this calendar invite to?

J2rdmid5                          Koch - direct

1    A.  Let's see.  It's Brian Sweet, Thomas Whittle and David

2    Middendorf.

3    Q.  What is the subject line?

4    A.  "Catch-up meeting."

5    Q.  And what is the conference call number listed there?

6    A.  888-921-7713, with the passcode of 8475012.

7    Q.  And what is the start time listed there?

8    A.  The start time is February 7th at 1:30 a.m.

9    Q.  And what is your understanding of what time zone this

10   reflects?

11   A.  That my understanding would be whatever the local time zone

12   is on the person's computer.  So if they're local to New York

13   and have a New York time set on their computer, that's what

14   time it will be.

15   Q.  And, Mr. Koch, generally speaking, is it common for emails

16   produced by KPMG to reflect UTC Time at the top of the email?

17   A.  Yes.

18   Q.  Now, switching gears.

19          MS. ESTES:  Mr. Urbanczyk, you can take that down.

20   Q.  Are you familiar with KPMG's eAudIT system?

21   A.  I am.

22   Q.  What is that?

23   A.  KPMG's eAudIT system is essentially our electronic

24   workpapers for our audit engagements.

25   Q.  Is this system commercially available or is it

J2rdmid5                          Koch - direct

1    KPMG-specific?

2    A.  No, it is KPMG custom built.

3    Q.  What sort of records are maintained on the eAudIT system?

4    A.  All of the workflow items as part of the audit engagement

5    for the delivery of the audit engagement so the decisions that

6    are made and the actions that are taken, and there are forms

7    that you fill out within the eAudIT system.  And you can also

8    attach supporting files, so like documents and Excel files and

9    things like that and supporting documentation.

10   Q.  Now, if there is an eAudIT file of a particular engagement,

11   can anybody access it or is the access limited in some way?

12   A.  No, the access is limited.  The engagement partner and

13   engagement senior manager will provide access to the team

14   members that they designate need access to it, and those are

15   the only people who will have access.

16   Q.  Mr. Koch, are you generally familiar with the 45-day

17   documentation period in connection with an audit?

18   A.  I am.

19   Q.  Now, with respect to the eAudIT system, what happens after

20   that 45-day documentation period closes?

21   A.  It goes through a technical closeout where it creates an

22   "ret" file for our retention, and it locks down the file so

23   that it can't be changed.

24   Q.  Now, during the documentation period, does the KPMG eAudIT

25   system have a way of tracking the changes that are made to

J2rdmid5                          Koch - direct

1   workpapers during that period?

2   A.  No, it doesn't.

3   Q.  And once the papers are closed, is there any way to go back

4   and see what they looked like, say, on day 20 of the

5   documentation period?

6   A.  No.

7   Q.  Now, Mr. Koch, switching gears again.

8           What office do you work out of again?

9   A.  In the Atlanta office.

10  Q.  Do you ever work out of a different office at KPMG?

11  A.  I do.  I travel quite a bit, so I'm in various offices

12  often.

13  Q.  Does KPMG have a term for working out of a different

14  office?

15  A.  We do.  So if you show up at a different office, you will

16  hotel.  So it's called the hoteling system and so you'll use

17  that to get an available office and a place to sit.

18          MS. ESTES:  Mr. Urbanczyk, can you pull up what's been

19  marked for identification as Government Exhibit 953.

20  Q.  Mr. Koch, do you recognize this?

21  A.  I do.

22  Q.  And what are the date of these emails?

23  A.  The date is March 28, 2016.

24  Q.  And who are the parties to the emails?

25  A.  It's from Cindy Holder to Michael Flynn.

J2rdmid5                          Koch – direct

1          MS. ESTES:  Your Honor, the government offers

2     Government Exhibit 953.

3          THE COURT:  Received.

4          (Government's Exhibit 953 received in evidence)

5     BY MS. ESTES:

6     Q.  Now, Mr. Koch, going to the bottom email there, who is the

7     bottom email from?

8     A.  From Cindy Holder.

9     Q.  And what does the bottom email say?

10    A.  It says:  "Mike, do you have time for a quick chat?

11    Cindy."

12    Q.  Who is the middle email from?

13    A.  It is from Michael Flynn.

14    Q.  What does it say?

15    A.  It says:  "I am in a meeting currently.  Will call when

16    available."

17    Q.  Who is the top email from?

18    A.  It is from Cindy Holder.

19    Q.  And what does the top email say?

20    A.  "Great.  Thanks.  212-954-2251."

21    Q.  And turning to this top email here, do you have an

22    understanding of what time zone this top email is in?

23    A.  The top email would be in UTC.

24          MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

25    that down.

J2rdmid5                         Koch - direct

1              And if you could pull up what's been marked for

2      identification as Government Exhibit 1309.

3      Q.   Mr. Koch, do you recognize this?

4      A.   Yes.

5      Q.   And what are we looking at here?

6      A.   This is a screenshot from our telephone systems that is

7      part of the telephone system database.

8      Q.   And is the telephone system database kept in the regular

9      course of KPMG's business?

10     A.   Yes, it is.

11     Q.   And are the records in this database made by KPMG employees

12     who have personal knowledge of who has the phone numbers they

13     belong to?

14     A.   Yes.

15     Q.   And are the records generally updated as phone numbers

16     change at KPMG?

17     A.   Yes.

18              MS. ESTES:  Your Honor, the government offers

19     Government Exhibit 1309.

20              THE COURT:  1309 is received.

21              (Government's Exhibit 1309 received in evidence)

22              MS. ESTES:  Mr. Urbanczyk, can you zoom into the top

23     portion of the document.

24     Q.   Mr. Koch, looking at this screenshot here, what does

25     "directory number" refer to?

J2rdmid5                          Koch - direct

1    A.  Directory number refers to the telephone number.

2    Q.  And what does the description there referred to?

3    A.  "NYO," that description refers to the office.

4    Q.  And where it says "Guest 030," what does that refer to?

5    A.  That means that it is part of a guest pool, so a pool of

6    numbers that can be used by visiting guests.

7    Q.  Is that visiting people from other offices?

8    A.  Yes.

9            MS. ESTES:  And Mr. Urbanczyk --

10           THE COURT:  Ms. Estes, I want to do an afternoon break

11   fairly soon.  So if you want to do a few more questions or we

12   can break now.

13           MS. ESTES:  If we can do just one other thing right

14   now, your Honor, and we will take the break.

15           THE COURT:  Sure.

16           MS. ESTES:  Actually, Mr. Urbanczyk, can you pull that

17   back up.

18           And, Mr. Urbanczyk, can you pull up Government Exhibit

19   953 side-by-side with this.

20           And if you could zoom into the phone numbers in both

21   of these.

22   BY MS. ESTES:

23   Q.  Mr. Koch, looking at these document here, are those the

24   same phone numbers?

25   A.  They are.

J2rdmid5                           Koch - direct

1              MS. ESTES:  All right.  Your Honor, this is a good

2      time for a break.

3              THE COURT:  OK.  Folks, we will take ten minutes.

4      Please leave your pads on your chairs and we'll continue in ten

5      minutes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rdmid5                        Koch - direct

1                (Jury not present)

2                THE COURT:  You may be seated.

3                You may step down, sir.

4                We will be in recess for ten minutes.

5                MS. ESTES:  Thank you.

6                (Recess)

7                MS. ESTES:  Should we get the witness back on the

8     stand?

9                THE COURT:  Yes, please.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rdmid5                              Koch - direct

1                  (Jury present)

2                  THE COURT:  Please be seated.

3                  OK, folks.  We'll go until about 5 today and then

4      tomorrow is Thursday.  So, we will actually end tomorrow at 4,

5      and then we won't be sitting on Friday.  So your weekend for

6      purposes of jury duty will end tomorrow at 4.  All right?

7                  JURORS:  Thank you.

8                  THE COURT:  And we'll continuing with the witness.

9                  Ms. Estes, you may proceed.

10                 (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rrmid6                              Koch - Direct

1        (Jury present)

2            THE COURT:  We'll go until about 5:00 today.  Tomorrow

3    is Thursday.  We will actually end tomorrow at 4:00.

4            MS. ESTES:  Mr. Urbanczyk, can you pull up what is in

5    evidence as Government Exhibit 1124.  And if you could zoom in

6    to the top.

7    BY MS. ESTES:

8    Q.  Mr. Cook, looking back at this exhibit and focusing on the

9    start and end time there, can you read what it says.

10   A.  Yes.  It says start time February 7, 2017, at 1:30 a.m. and

11   at 2:30 a.m.

12   Q.  I believe you testified earlier that this was in the local

13   time zone of the person involved in the email.  Did you want to

14   clarify your answer on that?

15   A.  Yes.  That was a mistake.  That whole piece of this is all

16   in UTC.

17           MS. ESTES:  Mr. Urbanczyk, can you take that down.

18   And can you pull up what is in evidence as Government Exhibit

19   953 zoom in to the stop email.

20   Q.  In this document at the very top email, what is your

21   understanding of what time zone that is in?

22   A.  The very top is in UTC.

23   Q.  Looking at the middle email there, what is your

24   understanding of what time zone that is in?

25   A.  The middle of the email would be whatever the local time of

J2rrmid6                        Koch - Direct

1   the computer is.

2   Q.  Then what about the bottom email there?

3   A.  Same thing.  Anything within the body in the thread down

4   below is in the local time for the computer, whatever the time

5   computer was set to.

6   Q.  Thank you.

7          MS. ESTES:  Mr. Urbanczyk, you take that down.

8   Q.  Mr. Cook, is there any security at KPMG regarding entry

9   into KPMG's offices?

10  A.  Yes.  We have a badge reader access to get into our

11  offices.

12  Q.  What do you mean by that?

13  A.  An electronic security badge.  There is a badge reader on

14  the outside of the door.  You place the badge next to it, and

15  it buzzes and lets you in.

16  Q.  Do you have to use the badge reader to get into a

17  particular floor?

18  A.  In some offices, yes.

19  Q.  Does KPMG maintain information to show when an employee

20  swipes in to the office?

21  A.  Yes, we do.

22  Q.  Is that information kept in the regular course of KPMG's

23  business?

24  A.  Yes.

25  Q.  Is it made at or around the time of the swipes?

J2rrmid6                          Koch - Direct

1   A.  Yes, it is.

2   Q.  Let me pull up what's been marked for identification as

3   Government Exhibit 1308.  Mr. Koch, do you recognize this?

4   A.  I do.

5   Q.  What are we looking at here?

6   A.  This is a report from our badge reader system.

7   Q.  Who does this report relate to?

8   A.  Cindy Holder.

9   Q.  What dates does this report refer to?  If we can start from

10  the top.

11          MS. ESTES:  Then, Mr. Urbanczyk, if you can scroll to

12  the last page.

13  A.  It covers badge entry for essentially the month of March

14  2016.

15          MS. ESTES:  Your Honor, the government offers

16  Government Exhibit 1308.

17          THE COURT:  Received.

18          (Government's Exhibit 1308 received in evidence)

19  Q.  Mr. Koch, what is the title of this document?

20  A.  Badge history archive report.

21  Q.  Where it says "last name" and "first name," what does that

22  refer to?

23  A.  The badge carrier.

24  Q.  So this document in particular is for Cindy Holder?

25  A.  Correct.

J2rrmid6                          Koch - Cross

1   Q.  Where it says "reader," what does that column refer to?

2   A.  That is the actual security reader device on the outside of

3   the door that you badge into.

4   Q.  Where it says, for instance, "345 Park, 18th FL main entry"

5   at the top, what does that refer to?

6   A.  That's our office in New York at 345 Park Avenue on the

7   18th floor.

8           MS. ESTES:  Mr. Urbanczyk, can you go to the second

9   page of this document.  If you could zoom in to the two entries

10  for March 28, 2016.

11  Q.  Mr. Cook, what does it say in the reader column there for

12  this day?

13  A.  It's the 345 Park office on the 22nd floor.

14  Q.  That's the New York office?

15  A.  Yes.

16          MS. ESTES:  No further questions.

17          THE COURT:  Ms. Lester.

18  CROSS-EXAMINATION

19  BY MS. LESTER:

20  Q.  Good afternoon, Mr. Koch.

21  A.  Hello.

22  Q.  My name is Amy Lester, and I represent David Middendorf.

23  You testified on direct examination about the eAudit system.

24  Do you remember that?

25  A.  Yes.

J2rrmid6                        Koch - Cross

1  Q.  Since the time 2014 through the present, isn't it the case

2  that eAudit has never tracked changes in terms of the audit

3  work papers, correct?

4  A.  Yes, that is my understanding.

5  Q.  Isn't it also the case that in theory if someone wanted to

6  take a snapshot of the work papers at any particular point in

7  time prior to the date where the work papers are locked down,

8  that could be done in the eAudit system, correct?

9  A.  What do you mean by a snapshot?

10 Q.  For example, at the lock-down date, that is the date on

11 which the file is closed in the audit; you can't see any track

12 changes, correct?

13 A.  Yes.

14 Q.  If at some point prior to the lock-down date you wanted to

15 go into the eAudit system and see how the documents appeared on

16 that date, you could take a snapshot, an electronic snapshot,

17 and preserve it as of that date, correct?

18 A.  I suppose you could, yes.

19 Q.  I'd also like to take a look at what is in evidence as

20 Government Exhibit 1144, which you also looked at in your

21 direct examination.  Do you remember reviewing this email?

22 A.  Yes.

23 Q.  This is an email exchange between Dave Middendorf and Mark

24 Rubino, correct?

25 A.  Yes.

J2rrmid6                          Koch - Cross

1    Q.  Who is Mark Rubino?

2    A.  He's a principal in our office of general counsel, an

3    attorney there.

4    Q.  Is he based in the New York office?

5    A.  Yes.

6    Q.  Isn't it the case, sir, that Mr. Rubino was involved in the

7    internal investigation of this matter?

8            MS. ESTES:  Objection: outside the scope.

9            THE COURT:  Overruled.

10   A.  I'm really not aware of his involvement.

11   Q.  You have no idea whether he was involved in an internal

12   investigation?

13           MS. ESTES:  Objection: asked and answered.

14           THE COURT:  Sustained.

15   Q.  Are you aware, sir, that KPMG conducted an internal

16   investigation beginning in approximately February 2017?

17           MS. ESTES:  Objection: outside the scope.

18           THE COURT:  Sustained.

19   Q.  Mark Rubino is an associate general counsel, correct?

20   A.  Yes.

21   Q.  One of the things that the general counsel's office does is

22   conduct internal investigations should those be necessary,

23   correct?

24           MS. ESTES:  Objection, your Honor: completely outside

25   the scope.

J2rrmid6                          Koch - Cross

1              THE COURT:  Sustained.

2              MS. LESTER:  No further questions.

3              THE COURT:  Mr. Cook.

4    CROSS-EXAMINATION

5    BY MR. COOK:

6    Q.  Good afternoon, Mr. Koch.  My name is Steve Cook.  I

7    represent Jeffrey Wada.

8    A.  Hello.

9    Q.  Sir, do you still have that disc in front of you that you

10   testified about earlier?

11   A.  I do.

12   Q.  I believe you testified that that disc contains 144

13   exhibits?

14   A.  That's correct.

15   Q.  Those exhibits consist of emails and other types of

16   documents and correspondence from KPMG?

17   A.  Yes.

18   Q.  You testified that they were produced to the government by

19   KPMG, is that right?

20   A.  Yes.

21   Q.  How do you know that?

22   A.  It's my understanding by the production Bates numbers that

23   the documents were produced.  I have looked at the Bates

24   numbers, and they represent the production.

25   Q.  Let's take a look at what you refer to as Bates numbers.

J2rrmid6                          Koch - Cross

1              MR. COOK:  Could we pull up Government Exhibit 1141.

2      If we could zoom in to the bottom right portion of the

3      document.

4      Q.  Are these the Bates numbers to which you were referring?

5      A.  Yes.

6      Q.  You testified that you know that the documents were

7      produced by KPMG to the government because of the Bates

8      numbers, is that correct?

9      A.  Yes.

10     Q.  Just underneath that yellow government exhibit sticker

11     there is a series of letters and numbers that start with S dash

12     KPMG dash PCAOB, etc.?

13     A.  Yes.

14     Q.  Does the S dash KPMG indicate to you that that means the

15     document was produced by KPMG to the government?

16     A.  Yes.

17     Q.  Then at the end of that series of letters there is a series

18     of numbers.  Do you see that?

19     A.  Yes.

20     Q.  Is it your understanding that every page of every exhibit

21     that is contained on that disc would have a sequential number

22     to it?

23     A.  Yes.

24     Q.  For example, Government Exhibit 1141 that we are looking at

25     here begins with page number 27, is that correct?

J2rrmid6                        Koch - Cross

1    A.  Yes.

2              MS. ESTES:  Your Honor, I believe Government Exhibit

3    1141 is not evidence.

4              MR. COOK:  Your Honor, I am only going to refer to

5    Bates number.

6              THE COURT:  So it has not been admitted in evidence.

7              MR. COOK:  Your Honor, I do not intend to show the

8    substance of the document.  I don't have the documents that are

9    on the disc in front of me.  I just want to demonstrate what

10   the Bates numbering system looks like and that's all.

11             THE COURT:  Okay.

12   Q.  Mr. Koch, is it true that this scheme, Bates numbering

13   system, is the same that is used on all of the documents on

14   that disc in front of you?  In other words, KPMG-PCAOB and then

15   a series of numbers that represent page numbers?

16   A.  I believe so, yes.

17             MR. COOK:  We can take this down.

18   Q.  Let's take a look at what's been marked for identification

19   as Defendant's Exhibit 1463.  It's a large exhibit, sir, so I'm

20   going to hand you a hardcopy as well for you to refer to.

21             MR. COOK:  May I approach, your Honor?

22             THE COURT:  Yes.

23             MS. ESTES:  Your Honor, may we approach?

24             THE COURT:  Yes.

25             (Continued on next page)

J2rrmid6                              Koch - Cross

1              (At the sidebar)

2              MS. KRAMER:  Your Honor, we object to the use of this

3      exhibit and believe that defense counsel lacks a good faith

4      basis for showing it to this witness.  We understand and have

5      relayed to defense counsel that KPMG counsel prepared this

6      document after the government requested a phone list of some

7      sort, that this is not a regular business record of KPMG.

8              It was prepared in connection with an investigation

9      and drawn from a number of other documents.  We relayed that to

10     defense counsel and.  They have no good faith basis to offer

11     this as a business record of KPMG, and we object it being shown

12     to this witness.

13             MR. COOK:  Your Honor, I listened very carefully to

14     the business record foundation laid by Ms. Estes to this

15     witness to get in the documents that they got in and that

16     consisted of the Bates numbering scheme consisting of "KPMG,"

17     and that's about it.  That's all he had personal knowledge of.

18     Bates numbering, "KPMG" on it, that's how he knew they were

19     produced to the government.  On that basis these documents were

20     admitted.

21             THE COURT:  No, I don't think so.

22             MS. ESTES:  They were not admitted.  These were mostly

23     already in evidence.  That was just to establish that these

24     emails were connected to the server.  We didn't admit any of

25     those emails on that disc through him.  We admitted three

J2rrmid6                          Koch - Cross

1   emails that he recognized.  We listed the names.  And those

2   were admissible not as business records but because they were,

3   for example, an email from David Middendorf or a calendar

4   invite directly related to the facts of the case.

5           MR. COOK:  I appreciate that clarification.  I do not

6   intend to introduce this document into evidence through this

7   witness, only to have him identify the Bates labeling scheme

8   that is used on it, and we will tie it up later and introduce

9   it through another witness.

10          MS. KRAMER:  There is no relevance, your Honor.  The

11  fact that something was stamped with a Bates number for

12  production to the government in this case has no bearing under

13  the rules of evidence.

14          THE COURT:  I don't know how the Bates number is

15  relevant to anything.

16          MR. COOK:  That was his testimony for the reason why

17  he got documents indicated on that disc.

18          THE COURT:  No, that wasn't the basis for the

19  admission of any document.

20          MR. WEDDLE:  Your Honor, the entire point of his

21  testimony was that he said that he testifies as a business

22  records custodian for KPMG, and he said based on his review of

23  the disc and of the Bates numbers he could tell what those

24  exhibits were.

25          We can pull up the live feed and see exactly what he

J2rrmid6                         Koch - Cross

said, but I looked at it very carefully when he said it, and he

in fact concluded from his review of Bates numbers two things:

one, that these were KPMG documents produced to the government;

and two, that they had been produced in discovery.  The

prosecution elicited that testimony from him.  I'm surprised

that he has that personal knowledge, but that's the testimony

that he has been brought here to deliver.

What we are doing is exactly the same thing.  It is

directly relevant to what the prosecution proceeded to do with

this witness after having him testify about what the Bates

numbers mean.  What they did after that, your Honor, is they

spent a while displaying documents to the jury that showed a

phone number association with Cindy Holder.  In this document

there is a different phone number associated with Cindy Holder.

This document has the same KPMG-PCAOB Bates numbers as the

documents he has already testified about and said to the jury

that he can identify them in that manner as KPMG records.

These arguments that they go to the weight, not the

admissibility.  The fact that they say how this was prepared,

they can bring a witness in to talk about that.  But the fact

of the matter is when they asked for a phone record from KPMG,

they got this.  I doubt that KPMG had its data entry people

type whatever this is, a thousand-page spreadsheet anew for

purposes of litigation.

What they did is they did something and extracted this

information from KPMG's system.  If that information that they

extracted from KPMG's system was produced to the government

with that Bates numbering scheme and based on the Bates

numbering scheme this witness is prepared to testify that these

are KPMG documents produced to the government, this stands on

exactly the same footing and is highly relevant and probative

evidence to rebut the argument they made for use of comparison

and display of documents that this witness identified on

exactly the same basis to attribute a phone number to Cindy

Holder.

          The fact that this document that they asked for from

KPMG and that KPMG produced with the exact same methodology to

the government says something inconsistent with their case is

exculpatory evidence, it does not make it not admissible.

          MS. KRAMER:  Your Honor, first, I think it bears

noting that the defendant successfully moved to strike a

summary exhibit that was produced to us by the PCAOB collecting

data from a system that wasn't in evidence.  This was something

that was prepared for litigation.  The Bates number reflects

that, that it was produced to us, not as underlying a

foundation.

          We inquired about the metadata for that and whether

there was a date.  We were told that it was prepared for us in

the investigation from myriad sources that couldn't be retraced

and that it was in fact prepared long after the scheme in this

J2rrmid6                          Koch - Cross

case ended.  So in terms of the timing, it is not accurate.

          The number that is at issue in this case, the Cindy
Holder number, the business record that exists to identify what
that number was was received in evidence.  There is no
foundation for this.  It is hearsay.  It was prepared for
litigation.

          I think that defense counsel's attempt to put this in
when we have made a good faith representation to them of its
lack of reliability should not be countenanced.

          THE COURT:  I don't think that the last witness got to
authenticate Bates numbers.  You don't get to authenticate a
document through Bates numbers.

          MR. WEDDLE:  Look at the testimony.  It is pretty
clear.

          MS. ESTES:  That is absolutely not right.  You guys
stipulated that those emails are from KPMG's server.  We have
already offered most of them in evidence.  The whole purpose
was for him to be to say these are emails that came from the
server, not that they are admissible as business records.

          THE COURT:  The connection of the Holder number was
clearly from a business record to a guest office where she was
working in an email where she said call me.

          MS. ESTES:  That one we offered.  We did not establish
that there was a Bates number on that document at all.  We did
the business records foundational questions for that document

1    and that's how we offered it.

2                MR. WEDDLE:  That is Cindy Holder's email.  That is

3    not a document made in the ordinary course of business to

4    prove --

5                MS. ESTES:  It is better than that.

6                MR. WEDDLE:  There are two documents, there may be

7    more.  There may be a hundred documents that can come out of

8    KPMG with different identification of who this belongs to.  It

9    is reasonable doubt.

10               THE COURT:  That doesn't go to the evidentiary issue.

11               MR. WEDDLE:  Your Honor, respectfully, I think it

12   would be very helpful to look at this witness's testimony on

13   direct and what exactly he purported to do with respect to

14   Bates numbers.  Mr. Cook hasn't even asked him a question yet.

15   I think what Mr. Cook is going to do is ask him to look at it,

16   he is going to see if he can identify it on that same basis,

17   and then we are going to move from there.  I think we should

18   take it step by step.

19               I think it would be very helpful to look at his direct

20   testimony.  We didn't elicit his direct testimony.  We didn't

21   call him as a witness to do this.  The prosecution put him

22   forward to do this.  We are doing exactly the same thing.  If

23   he answers questions in the same way, and we'll see.

24               This document, your Honor, is clearly an extraction.

25               MS. ESTES:  It is not.  It totally is not.

J2rrmid6                          Koch - Cross

1          MR. WEDDLE:  I can look at this document, and it

2     appears to be an extraction from a database with thousands of

3     people's names, including Cindy Holder and other people.  If

4     you read across the line, it tells whether they are active or

5     terminated.

6          It was produced to us in exactly this form, your

7     Honor.  It is a PDF document, not a spreadsheet, but it looks

8     to me like it was printed from a spreadsheet.  Confusingly, you

9     have to look at two pages side by side.

10          For example, let's just use Holder because that is an

11     easy one.  Here is Holder in line 173999, Cynthia Ann Holder,

12     terminated April 2017.  If you imagine this as a spreadsheet,

13     it would go out into further columns.  It is a PDF, so if we

14     jump ahead, the number is 17399.

15          THE COURT:  Was this witness involved in the creation

16     of this?

17          MS. ESTES:  He was not.  The other phone number he is

18     referencing, the one we brought up there, it has a different

19     person's name there.  That person started at KPMG months after

20     this email was sent, which just shows how irrelevant this

21     document is to Mr. Weddle's claim that this is Brady.  That

22     person wasn't working at KPMG when the relevant call happened.

23          MR. WEDDLE:  Your Honor, right now I'm talking about

24     Cynthia Holder.  She has an assigned a 212 phone number in the

25     New York office.  Remember, she is on the commuting plan.  Her

J2rrmid6                          Koch - Cross

1    number is 212-594-1417.

2                    MS. ESTES:  I don't think that changes the email.

3                    MR. WEDDLE:  That is the number.  The prosecution

4    spent a long time displaying this email for the jury saying

5    call me at this number at a particular time.  We talked about

6    time zones.  I've said to your Honor before, the time zones,

7    the minute-by-minute situation in this case is going to be

8    important.  It is important.

9                    This Cynthia Holder phone number coming out of a

10   document produced by KPMG according to the same Bates numbering

11   scheme is probative of what number is Cynthia Holder's, which

12   is important when we get further into the case because there is

13   a phonecall that they are going to say is a phonecall from

14   Cynthia Holder to Jeff Wada, and I don't think they can prove

15   that beyond a reasonable doubt.

16                   MS. ESTES:  Your Honor, just to be clear --

17                   MS. KRAMER:  Could we be heard for a second?

18                   MR. WEDDLE:  Go ahead.

19                   MS. ESTES:  The phonecall that is relevant is on the

20   exact date of the email when she says call me at the number we

21   just displayed here, which is why I don't think this is

22   probative of anything when on the date of the relevant

23   phonecall she said call me at this number.  We have told

24   counsel if they tell us what they want from the document we

25   would and try to work out a stipulation.  We are not opposed to

J2rrmid6                         Koch - Cross

1    putting in something along those lines.  But this is not right

2    document.

3              THE COURT:  You are trying to get this witness to

4    authenticate this based on the Bates number?  That is not

5    enough.

6              MR. WEDDLE:  Your Honor, that is exactly the basis

7    that they did on direct.

8              THE COURT:  I disagree.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rrmid6                              Koch - Cross

1                   (In open court)

2        BY MR. COOK:

3        Q.   Mr. Cook, you testified on direct that in response to a

4        question from Ms. Estes, that generally speaking it is common

5        for emails produced by KPMG to reflect UTC time.  Do you recall

6        that testimony?

7        A.   Yes.

8        Q.   I want to unpack that statement a little bit.  You said

9        generally speaking.  Does that mean that they don't always

10       reflect UTC time?

11       A.   They do for our e-discovery processes, yes.

12       Q.   What does that mean, for your e-discovery processes?

13       A.   To normalize the time at the top of the header to UTC

14       across the emails so that it is normalized in the system.

15                   MR. COOK:  If we could pull up Government Exhibit 953.

16       Q.   You testified concerning this email earlier.  Do you recall

17       that?

18       A.   Yes.

19       Q.   I believe you testified that the time at the top of this

20       document 6:48 p.m., that is in UTC time, is that correct?

21       A.   That's correct.

22       Q.   The time below that, the first email chronologically, is

23       that also in UTC time?

24       A.   No.

25       Q.   Why is that?

J2rrmid6                        Koch - Cross

A.   That is the way emails are constructed.  That is part of

the body of the email.  So it is text that was represented

there.  That is not normalized.  That is in whatever time zone

that the computer was set to that sent it or received it.

Q.   So the only portion of an email thread, a chain of emails

that would be normalized to UTC time would be the top email,

most recent in time, that would be UTC, and the rest would be

the local time zone of the person who sent it?

A.   Sent or received and depending on whose computer you got it

from or which side it was on.  But yes, the very top is in UTC.

Q.   For the second email in the chain, the email from Mr. Flynn

to Cindy Holder, is that time the local time for the sender or

the recipient?

A.   It would have been represented by either Michael Flynn's

computer time or Cindy Holder's computer time depending on

which custodian to compute the email from.

Q.   We know the custodian by the top email?  Isn't that the

last person on the thread was the final custodian of the

document?

A.   Yes.  It was sent from Cindy Holder to Michael Flynn.

Q.   Correct me if I'm wrong.  Michael Flynn was the custodian

of that document as the final recipient?

A.   I don't know.  It depends.  What I'm saying is when I say

custodian, I mean if we collected this -- if this email came

from Michael Flynn's computer as it was sent to him, then

J2rrmid6                          Koch - Cross

that's one instance.  The other instance is if it came from

Cindy Holder's sent items.  Does that make sense?

Q.  I'm trying.  If the document came from Michael Flynn's

computer, if we can just assume that for a moment, what does

that tell us about the time zone for the second email in the

thread?  That it would be local to Michael Flynn's computer or

local to Cindy Holder's computer?

A.  My understanding is it would be local to Michael Flynn's

computer.

Q.  If this came from, the top email again in Government

Exhibit 953, if this was extracted from Cindy Holder's sent

items, then that would tell us that the time reflected in the

email just underneath it is based on the local time of Cindy

Holder's computer?  Do I have that right?

A.  I believe so, that's correct.

Q.  But there is no way to know from the face of the document

where it came from, whether from Michael Flynn's inbox or from

Cindy Holder's sent box, correct?

A.  Not just from the face of it, no.

Q.  So we can't know for every email below the top one, in this

case there is just one but assume there are many, we can't know

what time zone is reflected in all of those other emails in the

thread, is that right?

A.  I think that's correct.

Q.  If there are other emails in the thread from people --

J2rrmid6                          Koch - Cross

withdrawn.  Let me start over.  Let's assume this was a more

lengthy email that included other people other than Mr. Flynn

and Ms. Holder lower down in the thread, earlier emails.  And

let's assume that this email came from Cindy Holder's sent

items box.  Can we determine the time zone of emails much

earlier in the thread that involved people not involved in the

Flynn-Holder email at the top?  I hope you followed that.

A.  I would need to do a little digging on that to say.  I'd be

speculating.

Q.  Fair enough.  The bottom line is we can't know what time

zone is reflected in this email sent on March 28, 2016, based

on Government Exhibit 953 as we see it here?

A.  I'm sorry.  Can you ask that question again?

Q.  Sure.  We can't know what time zone is reflected in the

second email in this thread based on just looking at Government

Exhibit 953 alone?

A.  That's correct.

Q.  Let's take a look at Government Exhibit 1309.  You

testified regarding this concept of hoteling, is that correct?

A.  Yes.

Q.  As I understand it, that's when a KPMG employee visits an

office they are based in and they are assigned some office

space, is that right?

A.  Yes.

Q.  Can you tell us, does Government Exhibit 1309 have a name,

J2rrmid6                          Koch - Cross

1    colloquial name, that you would refer to in the ordinary course

2    of business?

3    A.   It would be a record from our voice systems, from our

4    computers that run or telephone systems.

5    Q.   So this relates to assigning telephone numbers or to

6    visiting offices?

7    A.   This particular record is a reflection of that, yes.

8    Q.   Correct me if I'm wrong.  It does not reflect the actual

9    physical location that somebody will be in; it reflects the

10   phone number that is assigned to them while they are in a

11   particular building?

12   A.   It does reflect a physical location of our New York office.

13   That would be at 345 Park.  But that's as granular as it gets.

14   Q.   So we can't tell from 1309 the actual office space that is

15   being used by any particular individual that is assigned a

16   phone number here?

17   A.   That's correct.

18   Q.   Let's use the New York office as an example.  When somebody

19   comes to visit that office, how does a phone number get

20   assigned to that person?

21   A.   Through the hoteling system it will pull one out of the

22   pool or there is one assigned to the phone when you show up at

23   whatever office you've gotten assigned to you.

24   Q.   What is the mechanics of that process?  If I'm a KPMG

25   employee visiting the New York office, how do I get assigned to

J2rrmid6                         Koch - Cross

1    a particular phone number?  What do I do?

2    A.  I don't know the mechanics of it.

3    Q.  Fair enough.

4    A.  I ask my admin to set it up and she does it.

5    Q.  I understand completely.  Who creates, who inputs the data

6    into Government Exhibit 1309?

7    A.  This wasn't necessarily input.  Like when I looked at it,

8    it was the record that was pulled up, so it existed already.

9    That is a number that is in a guest pool in New York, and

10   that's just the way the pool has been since it's been created.

11   Q.  If we could zoom in on the left-hand portion beginning with

12   the directory number.  It is your testimony that this number,

13   212-594-2251, I believe you said it is assigned to a guest

14   pool?

15   A.  Yes.

16   Q.  So it is a pool of numbers that is available for use if

17   somebody is visiting?

18   A.  Yes, temporary numbers.

19   Q.  That particular phone number, is it assigned to a

20   particular office within the New York office?

21   A.  I don't believe so.

22   Q.  If a person is visiting the New York office and at

23   receptions you have been assigned for this hoteling program to

24   office number 5, for example, do they also get a new phone

25   number for that office or do they just use the number that is

J2rrmid6                         Koch - Cross

1   already assigned to that office?

2   A.  It could probably be either way.  The numbers are not tied

3   directly to the offices.

4   Q.  So this phone number could be assigned to multiple offices

5   depending on circumstances?

6   A.  It's in a pool for the New York office on 345 Park.  But

7   yes, within that building it could exist at different

8   locations.

9   Q.  The system that you are talking about that includes this

10  information, does it record the history of the assignment of

11  this phone number?  In other words, to whom it was assigned on

12  various days and times?

13  A.  No, I don't believe so.

14  Q.  There is no way to tell from this record, Government

15  Exhibit 1309, whether or not it was assigned to a particular

16  person or a particular physical office on any particular day,

17  is that right?

18  A.  Correct.

19          MR. COOK:  No further questions.  Thank you.

20          THE COURT:  Any redirect?

21          MS. ESTES:  No, your Honor.

22          THE COURT:  Thank you.  You may step down.

23          (Witness excused)

24          THE COURT:  Are you going to have another witness

25  today?

j2rrmid6                          Greenwood - direct

 1          MS. ESTES:  Yes, your Honor.  We have Zachary

 2   Greenwood here.

 3          THE COURT:  Does it make sense to go ahead and do it?

 4          MS. ESTES:  I think so.  He is a pretty short witness.

 5   We may not finish him.

 6          THE COURT:  How short is he, 5-6, 5-5?  Courtroom

 7   humor.  Go ahead and bring him in.

 8    ZACHARY GREENWOOD,

 9        called as a witness by the government,

10        having been duly sworn, testified as follows:

11          THE COURT:  Ms. Estes.

12   DIRECT EXAMINATION

13   BY MS. ESTES:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16   Q.  Where do you work?

17   A.  I'm currently employed by the United States Secret Service

18   as a network intrusion forensic analyst.

19   Q.  What does it mean to be a network intrusion forensic

20   analyst?

21   A.  My primary responsibilities are to analyze digital evidence

22   that is brought into our lab or initiated through a case.  That

23   is, I analyze things such as computers, cell phones, network

24   devices for evidence of a crime.  In particular, I have focuses

25   on intrusion, such as hacking-based crimes, as well as helping

1    our local electronic crime task force partners for a variety of

2    crimes, from sexual assault, homicide, money laundering, and

3    other financial related crimes.

4    Q.  How long have you worked for the Secret Service?

5    A.  I have been employed there since July of 2018.

6    Q.  Before you worked at the Secret Service, where did you

7    work?

8    A.  Prior to that I was employed by the United States Postal

9    Inspection Service for approximately two years as a computer

10   forensic analyst.

11   Q.  What were your duties and responsibilities in that

12   position?

13   A.  My duties were very similar to those that I maintain now,

14   but the crimes that I focused on related to those that the

15   postal service handles.

16   Q.  Before you joined the United States Postal Inspection

17   Service, what did you do?

18   A.  I was a director of digital forensics at Precision

19   Discovery.  Precision Discovery is a private electronic

20   discovery and digital forensic firm.  That is, we specialize in

21   massive review of electronic documents like emails, Word

22   documents, and digital forensic investigations for civil

23   clients.

24   Q.  Before you worked at Precision Discovery, what did you do?

25   A.  Prior to that, I was employed by the Manhattan district

1    attorney's office in several roles -- as a trial preparation

2    assistant, an investigative analyst -- where my primary duties

3    were drafting legal documents, such as subpoenas, search

4    warrants, reviewing wiretap records, and also analyzing data

5    for other cases.  Following that, I was employed in their

6    high-tech analysis unit as a computer forensic analyst with

7    duties similar to that of my current job but with crimes

8    focused in the County of Manhattan.

9    Q.  Mr. Greenwood, are you familiar with the term "forensic

10   extraction"?

11   A.  I am.

12   Q.  What is that?

13   A.  A forensic extraction, in terms of mobile devices in

14   particular, is the process by which data is acquired from a

15   mobile device, such as a cell phone, iPhone, or Android, where

16   the contents are extracted out into another container format,

17   minimally modifying, if at all modifying, the contents of the

18   original device.

19   Q.  Have you been involved in performing forensic extractions

20   in your positions at the Secret Service, the United States

21   Postal Inspection Service, and your other jobs?

22   A.  Yes.

23   Q.  Have you received training on forensic extractions?

24   A.  Yes.

25   Q.  What kind of training?

1  A.   I received in the hundreds of hours of forensic training

2  from a variety of sources.  Much of my training has been

3  in-house, that is, provided by my prior employers.  I have also

4  received dozens upon dozens of hours from the National

5  White-Collar Crime Center in digital forensic acquisition and

6  analysis and as well as from SANS, S-A-N-S, the Sys Admin Audit

7  Network and Security, a global provider of information security

8  certifications in computer forensics.

9  Q.   Mr. Greenwood, are you familiar with Cellebrite?

10 A.   Yes.

11 Q.   What is Cellebrite?

12 A.   Cellebrite, a combination of software and hardware that is

13 used in the digital forensic field for digitally extracting

14 data from a mobile device.

15 Q.   Have you received training on Cellebrite?

16 A.   Yes.

17 Q.   Over the course of your career, approximately how many

18 forensic extractions of cell phones have you performed?

19 A.   I would say the number is in the thousands.

20 Q.   How many of those were iPhones?

21 A.   I couldn't say exactly, but I would say over a third to a

22 half.

23          MS. ESTES:  Your Honor, at this time I would like to

24 read part of a stip between the parties.

25          THE COURT:  Yes.

1           MS. ESTES:  Mr. Urbanczyk, can you pull up for me

2    Government Exhibit 1379.

3           The stip has a preamble that it is stipulated and

4    agreed by parties.  Then it states:

5           1.  On March 17, 2017, David Middendorf voluntarily

6    surrendered his personal cellular telephone, an iPhone bearing

7    serial number F2LRL53WGRWT (the Middendorf cell phone) to

8    counsel for KPMG.  Also on March 17, 2017, a forensic image was

9    taken of the Middendorf cell phone by a vendor retained by

10   counsel for KPMG.  Thereafter, a copy of the forensic image of

11   the Middendorf cell phone was provided to the United States

12   Attorney's office.

13          Your Honor, at this time we offer the stipulation

14   Government Exhibit 1379.

15          THE COURT:  Received.

16          (Government's Exhibit 1379 received in evidence)

17          MS. ESTES:  Mr. Urbanczyk, you can take that down.

18   Q.  Mr. Greenwood, in connection with your work at the United

19   States Postal Inspection Service, were you involved in the

20   analysis of phone dad from phones from David Middendorf and

21   Brian Sweet?

22   A.  Yes, I was.

23   Q.  How did you receive that data?

24   A.  These were received from postal inspectors at the United

25   States Postal Inspection Service that delivered a hard drive

j2rrmid6                          Greenwood - direct

1  containing previously extracted devices, that is, just the raw

2  data taken from those phones.

3  Q.  In what form was the raw data?

4  A.  The data was in the form of a TAR file, T-A-R, and a .ufd

5  file.  The TAR file can be thought of as the extraction put

6  into a compressed format.  The UFD file is a pointer for that

7  file and indicates details about the extraction.  That also

8  indicates to me that the tool used to extract these devices was

9  the UFED, or universal forensic extraction device.

10 Q.  What is the UFED?

11 A.  UFED is the combination of software and hardware that is

12 Cellebrite that I spoke of earlier.

13 Q.  What did you do when you received this data?

14 A.  Based on instruction provided to me, I took the extractions

15 after write-blocking the hard drive, that is, preventing any

16 modification for that original data that I received, made two

17 copies of it, one for our archiving purposes and one to be used

18 as a working copy.

19         From there I loaded them in the UFED physical

20 analyzer, a software suite used to parse or render out the

21 contents of the phone data.  That is, the raw data is

22 unstructured.  After it is pushed through the Cellebrite

23 physical analyzer, I can see things such as text messages,

24 notes, photos, etc.

25 Q.  After you pushed through the data through the Cellebrite

j2rrmid6                        Greenwood – direct

1    analyzer, is there any sort of report generated?

2    A.  Yes.  After the data was ingested into this, a portable

3    case file was created of this data for further review by

4    inspectors and the U.S. Attorney's office.

5    Q.  Did you have any involvement in that further review?

6    A.  No.

7            MS. ESTES:  Your Honor, may I approach?

8            THE COURT:  Yes.

9    Q.  Mr. Greenwood, I have handed you what's been marked for

10   identification as Government Exhibit 656-D.  Do you recognize

11   this CD?

12   A.  I do.

13   Q.  How do you recognize it?

14   A.  I recognize this based on the label affixed to it and the

15   date and initials, which are mine.  I created the CD.

16   Q.  Did you review the contents of the CD before your testimony

17   today?

18   A.  Yes.

19   Q.  What is contained on the CD?

20   A.  This CD contains partial extraction or partial report of

21   some of the data from that first phone.  It contains photos and

22   I believe Notes data.

23   Q.  Is that from the Middendorf phone?

24   A.  Yes.

25   Q.  Does it contain the full Notes data or a selection of it?

1   A.   It contains the full Notes data.

2   Q.   Does it contain the full photo data or just a selection of

3   IT?

4   A.   No, just a selection.

5           MS. ESTES:   Your Honor, the government offers

6   Government Exhibit 656-B.

7           THE COURT:   Received.

8           (Government's Exhibit 656-B received in evidence)

9           MS. ESTES:   Mr. Urbanczyk, can you please publish.

10  Q.   Mr. Greenwood, what are we looking at here?

11  A.   This is the report contained on this CD 656-B.  It is the

12  UFED reader report that allows for navigation an and review of

13  the contents of this phone.

14  Q.   Looking at the extraction summary there, can you tell what

15  kind of phone this was for?

16  A.   This was reported to be an Apple iPhone 6S Plus.

17  Q.   Mr. Greenwood, looking at the data on the left there, where

18  it says "Notes," what does that contain?

19  A.   In there are IOS Notes.  That is the Notes function from an

20  Apple IOS or iPhone device.

21          MS. ESTES:   Mr. Urbanczyk, can you click on the notes.

22  Q.   Mr. Greenwood, how many notes are listed there?

23  A.   There are 27 notes listed here.

24  Q.   Mr. Greenwood, can you run any sort of reports from this

25  UFED reader?

j2rrmid6                         Greenwood - direct

1    A.   Yes.

2    Q.   What kind of report?

3    A.   Reports can be generated in several different formats.

4    That is the portable case, like this is now, or HTML, PDF,

5    Word, a variety of reports for review.

6              MS. ESTES:  Mr. Urbanczyk, can you pull up what's been

7    marked for identification as Government Exhibit 656-A.

8    Q.   Mr. Greenwood, do you recognize this?

9    A.   I do.

10   Q.   What are we looking at here?

11   A.   I recognize this to be a PDF report of the notes extracted

12   from this device.

13             MS. ESTES:  Your Honor, the government offers

14   Government Exhibit 656-A.

15             THE COURT:  Received.

16             (Government's Exhibit 656-A received in evidence)

17             MS. ESTES:  Your Honor, I would note it is 4:59.  This

18   might be a logical stopping point before we go through this

19   document.

20             THE COURT:  We will break for the evening, ladies and

21   gentlemen.  Please leave your pads on your chairs.  Remember

22   you are not yet deliberating so please don't discuss the case

23   with each other or with anyone else.  We will continue at 9:30

24   tomorrow morning and break at 4 o'clock tomorrow afternoon.

25   Have a good night everybody.

J2rrmid6

1              (Jury not present, witness not present)

2              THE COURT:  I'll start by asking the government where

3     we are in terms of witnesses and what's on the schedule for

4     tomorrow.

5              MS. ESTES:  Your Honor, after Mr. Green wood, we do

6     expect to read some text messages and emails.  We have Brian

7     Sweet and Mark Rubino tomorrow as well, then a summary chart

8     witness.  And we have a couple of stipulations to go through as

9     well.

10             THE COURT:  You said finish Mr. Greenwood, reading

11    texts?

12             MS. ESTES:  Reading text messages, reading emails.

13             THE COURT:  Sweet and Rubino?

14             MS. ESTES:  Yes, and then a summary chart witness, two

15    summary chart witnesses.

16             THE COURT:  Have you all reached agreement on where in

17    that order you are planning to have Mr. Blake?

18             MR. BOXER:  I was intending to have him here at noon,

19    12:30, figuring by 2 o'clock it would be safe.  Perhaps they

20    will have rested by then.  I think he is probably 20 minutes to

21    a half hour of direct.  I don't know how close we want to cut

22    it to the 4 o'clock promise, but it seems like it's going to

23    work out.

24             THE COURT:  Does that make sense to you?

25             MS. ESTES:  Yes, your Honor.

J2rrmid6

1          THE COURT:  Anything else you all wanted to talk

2     about?

3          MS. MERMELSTEIN:  Yes, your Honor.  I understand Mr.

4     Boxer's point about not having to proffer everything the

5     witness is going to say, and we are not asking for that.  But

6     there are statements in Mr. Blake's I call it 3500, I know that

7     is not really the right reference, but in his 3500 material

8     that I think are wholly improper testimony.

9          We are not suggesting that everything in there is

10    going to be elicited.  But I think it is fair to say either

11    there should be a proffer that that is not going to be elicited

12    or we should understand that defense counsel thinks that is

13    proper testimony so we can fight about its admissibility before

14    we have the witness on the stand and we are objecting to

15    questions and having lengthy sidebars.  I think Hanson is more

16    complicated, but he is not testifying this week, so let's not

17    go down that road.

18         With respect to Mr. Blake, I think that his testimony

19    about his own view about the value of inspection results and

20    that he didn't care about them is of questionable

21    admissibility.  But we are not going to fight about that.  He

22    has three things in his 3500 material that I think are

23    completely inappropriate.  This is in our letter which I

24    realize now doesn't have page numbers, but it is on page 3.

25         He had a perception of the PCAOB as a political

J2rrmid6

1    organization and a government bureaucracy interested in

2    expanding its power; that with regard to the hiring of PCAOB

3    personnel by KPMG, that's the way regulatory agencies work; and

4    that he was not aware of any interaction between the PCAOB and

5    the SEC, and that it makes no sense that the issues of the

6    PCAOB are the issues of the SEC.

7              I can't see any relevance whatsoever to some person's

8    understanding of it.  He is not an auditor.  He didn't interact

9    with the SEC as Mr. Middendorf did directly.  So it is

10   completely irrelevant that he doesn't know a particular thing

11   to be true that is true.  And his general clearly fairly

12   uneducated understanding of the PCAOB which he thinks is a

13   government bureaucracy -- it is in fact not a government

14   entity -- is somewhere between irrelevant and complete

15   speculation.  I think it is both.

16             So none of these are appropriate to have someone who

17   is not a proper witness to it opine on important issues that he

18   has no personal knowledge of, no foundation for, and in many

19   cases which he is wrong about.  So we don't think that is

20   appropriate.  If defense counsel is intending to do it, we

21   think they should be precluded from doing it

22             MR. BOXER:  I think that presentation highlights why I

23   think this approach is inappropriate, no less for the

24   defendant, who doesn't have a burden whatsoever.  I think Mr.

25   Blake will be able to establish his ability to have a view on

J2rrmid6

1    PCAOB and his relationship with the SEC.  He was the CEO of

2    Home Depot for many years.  He is the chairman of the board of

3    Delta Air Lines.  He was the chair of various audit committees

4    of public companies.  We are calling him largely for his

5    interaction with Mr. Middendorf.

6              THE COURT:  Not specific instances but opinion or

7    reputation of character?

8              MR. BOXER:  And based on specific instances.  Mr.

9    Middendorf was the engagement partner of Home Depot for 5 years

10   while Mr. Blake was the CEO, and he met with him regularly.

11             He is also, as they have conceded, going to testify

12   about whether inspection results had any bearing on his view of

13   KPMG or whomever the accounting firm was for the audit

14   committee he was chair of.  He was on a few.

15             As far as the more general topics about whether his

16   view on the bureaucracy of the PCAOB, I don't intend to go

17   there.  As far as his view of the SEC and the PCAOB's influence

18   on the SEC, I'm not sure whether I'm going to go there or not.

19   But if I do, I'll lay an appropriate foundation for that.

20             Their whole burden is about how Mr. Middendorf had the

21   intent to defraud the SEC.  If he can provide relevant evidence

22   on that topic, I think we are permitted to elicit it.  As I sit

23   here today or stand here today, I'm not sure if I'm going to do

24   that.  But I don't think I'm required to lay out my direct in

25   the defense case so they can try to preempt what we do or do

J2rrmid6

1    not do with the witness.

2          I don't expect a big area of dispute.  As you heard,

3    they don't contest, and it is in their letter, that Mr. Blake's

4    views on the impact of inspection reports on him as a client of

5    the firm and as the chair of an audit committee is admissible.

6    And he certainly had a lot of personal dealings with Mr.

7    Middendorf.  I think it is about 20 minutes, 30 minutes.  I

8    don't expect there to be any big issues.

9          MS. MERMELSTEIN:  I'm completely baffled.  What we

10   have just heard makes clear there are big issues.  I can't

11   understand how it is improper for the government to try and

12   raise evidentiary issues with the Court in advance of testimony

13   so that we are not objecting in real time and having improper

14   questions put to witnesses.

15         Number one, I think it is important that it be clear

16   that he can opine on his thoughts about how this matter

17   affected him but he can't opine on this matter generally to

18   other people who he is not one.  His general opinion about the

19   relationship between the SEC and PCAOB is as relevant as my

20   opinion: it matters zero.  The question is what was in Mr.

21   Middendorf's head.

22         MR. BOXER:  I said that, your Honor.

23         MS. MERMELSTEIN:  So what is the relevance of Mr.

24   Blake's --

25         MR. BOXER:  I don't have to explain to her how I may

J2rrmid6

or may not get it.

MS. MERMELSTEIN:  I think you do.  I don't think you can say the testimony might be improper but I'm not going to answer whether or not I'm going to put that question to the witness.  If it is improper, it should be precluded.  Mr. Boxer doesn't have to say he is going to go there, but then we would like a ruling that that question is inappropriate because Mr. Blake's knowledge has no impact whatsoever on Mr. Middendorf.  Mr. Middendorf met with the SEC directly.  The notion that other people don't have an understanding of that relationship is wholly irrelevant.

I'm concerned.  Mr. Boxer just answered in respect to your Honor's questions about character evidence that he does intend to elicit specific incidents of conduct.  We generally discussed this letter with Mr. Boxer, who said he obviously is going to abide by the clear rules of character evidence testimony, which are very clear that you can't go into specific instances of conduct.

And I don't want to be objecting to that testimony in real time which is tell me about this great particular thing he did, objection.  It shouldn't be put to the witness in the first instance.  We shouldn't have to object.  So I do think some guidance from the Court and ruling about what is going to be permitted is appropriate both with respect to the character evidence and with respect to this issue about the SEC.

J2rrmid6

1          THE COURT:  As to character evidence, I think the rule

2     is pretty clear that the defendant is limited to evidence of a

3     person's character or character trait is admissible when it is

4     admissible.  That is, if it's pertinent, it may be proved by

5     testimony about the person's reputation or by testimony in the

6     form of an opinion and not specific acts.  That's pretty clear.

7     That is very short testimony, I think.

8          MR. BOXER:  Yes.  And I think the witness has to have

9     a basis for that opinion.

10          THE COURT:  But if the basis is specific acts, he

11     can't be testifying to them.

12          MR. BOXER:  He can testify that he knew him for five

13     years, he met with him every quarter, he was the lead auditor.

14          THE COURT:  I think he can testify to the foundation

15     for having an opinion.

16          MR. BOXER:  Yes.  Otherwise, the opinion doesn't have

17     much relevance.

18          THE COURT:  I think that's right.  But when you get

19     into specific examples of good conduct, that is exactly what is

20     precluded.  I also have to say I'm not sure why his view on the

21     PCAOB or the SEC is relevant.

22          MR. BOXER:  The reason it is relevant is because

23     throughout the case and with I think every witness they have

24     elicited that KPMG was literally in crisis because its

25     inspection results were so poor and that it was desperate to

J2rrmid6

|     |                                                                              |
|-----|------------------------------------------------------------------------------|
| 1   | improve its inspection results.  Through Mr. Sweet, but maybe                 |
| 2   | even through Mr. Whittle, they talked about client                            |
| 3   | opportunities.                                                                |
| 4   |          Here is a client.  Here is a CEO who is going to say                 |
| 5   | whether they had five comments or four comments, none of it                   |
| 6   | mattered to him.  So the motive, the intent that Mr. Middendorf               |
| 7   | would commit a fraud because he needed to improve the                         |
| 8   | inspection results is contradicted by his client's testimony                  |
| 9   | that that's not the case, that he didn't care about the                       |
| 10  | inspection results.                                                           |
| 11  |          THE COURT:  I think that is exactly what he can                      |
| 12  | testify to, but sort of generalized opinion about the PCAOB                   |
| 13  | being political.                                                             |
| 14  |          MR. BOXER:  Absolutely.  That is what I was trying to                |
| 15  | address before.  I agree.                                                    |
| 16  |          THE COURT:  And he doesn't have personal knowledge of               |
| 17  | the relationship between the PCAOB and the SEC.                              |
| 18  |          MR. BOXER:  I think he does have personal knowledge.                |
| 19  | He is a pretty experienced person with the SEC.  But we are not              |
| 20  | calling him as an expert witness to opine on the relationship.               |
| 21  | I think he could answer all those questions based on personal                |
| 22  | knowledge.  He sat on audit committees for 20 years.  I think                |
| 23  | he understands the process and relationship.  But we are not                 |
| 24  | calling him for that purpose.                                                |
| 25  |          MS. MERMELSTEIN:  Just so it is clear, there won't be               |

1    questions put to this witness about his views of the PCAOB or

2    relationship between the PCAOB and the SEC.  He will be allowed

3    to describe in general terms the nature of his relationship

4    with Mr. Middendorf as the foundation for either/or his own

5    opinion as to Mr. Middendorf's whatever relevant trait,

6    trustworthiness, etc., and if he can lay the foundation Mr.

7    Middendorf's reputation in their respective community for that.

8    Then he can testify that as a member or head of an audit

9    committee he personally did not care about inspection results.

10   That seems fine.  I think anything beyond that seems

11   problematic.

12           MR. BOXER:  That's my intent.  There is definitely a

13   foundation to be laid for both of those areas.  As I said, I

14   don't special agent an issue but, I think I have said before, I

15   don't think I have to preview entire examination.  But that's

16   our plan.

17           THE COURT:  Fair enough.  Anything else anybody wanted

18   to address?

19           MS. MERMELSTEIN:  Not from the government, your Honor.

20           MR. WEDDLE:  One thing.  With respect to the text

21   messages that I think the government proposes to read, we have

22   been in communication with the government about text messages.

23   They have certain text messages that they want to offer.  We

24   have some additional chats that we would like to offer.  We

25   also have some chats that basically encompass their excerpt and

J2rrmid6

1    provide additional context to it.

2              THE COURT:  Right.  This is something that was raised

3    before.  Is this the rule of completeness relating to texts?

4              MR. WEDDLE:  I think the rule of completeness issue

5    has really fallen away, your Honor.  We have discussed and they

6    have incorporated some of our suggestions.  There are some that

7    they don't agree with.  But I think we just have alternative

8    versions.

9              It is not that theirs is deceptively incomplete such

10   that we are relying on the rule of completeness.  We just think

11   that there are additional texts that we would propose that are

12   also admissible.  By and large the government I think doesn't

13   object to the admission of those.  There are some where some of

14   the texts that we propose to offer the government does object

15   to, I think mostly on hearsay grounds but there are some other

16   objections as well.  I don't want to speak too much for Ms.

17   Estes.

18             What I would request, your Honor, is just that at a

19   convenient time for the Court perhaps we could go through our

20   proposals line by line.  It is text message by text message

21   really.  And very briefly talk about them and say this one is

22   not for its truth so this one think they is hearsay, we think

23   it is state of mind, and run through them quickly at a time

24   when we don't have to waste the jury's time.  That is one issue

25   I wanted to put out there.

J2rrmid6

1          The second is that of course the government is calling

2     someone who is going to read the documents that are going to be

3     in evidence that we are not objecting to which are the

4     government's excerpts.  For our excerpts, I propose that we

5     have that person read our excerpts.  It is sort of like a

6     cross-examination.  I think the government doesn't agree to

7     that.  That is our proposal.

8               THE COURT:  Are you talking about the texts still?

9               MR. WEDDLE:  It's not a stip.  It is just different

10    excerpts.

11              THE COURT:  Of texts or emails or something else?

12              MR. WEDDLE:  Just texts.

13              MS. ESTES:  Your Honor, these are text messages that

14    Enrique Santos authenticated last week.  We intend to offer the

15    exhibit, and then we just intended to have one of our

16    paralegals, Mr. Cooney, read them from the witness stand.

17              What we would object to is having our paralegal read

18    defense exhibits.  This is our case.  We are going to offer our

19    exhibits.  We are not going to object to a number of their

20    defense exhibits and we are not going to object to their

21    authenticity.  We are not going to make them recall Mr. Santos

22    or anything like that.  But we think they should have to

23    present their own exhibits in their case.

24              I would note something like this proposal has been

25    raised in other cases.  Specifically in United States v.

J2rrmid6

1  <u>Galanis</u>, 16 CR 371, Judge Abrams expressly rejected this

2  argument when defense counsel tried to make it in the case.  We

3  should not in the government's case have to put on defense

4  exhibits.  If they want to put on a case, they are certainly

5  entitled to, but they have to do it in their own case, not in

6  the government's case.

7          THE COURT:  Let me go back to the first issue about

8  the texts.  How much of a volume of judgment calls are here

9  that I am going to have to make?

10         MR. WEDDLE:  I think it is 10 conversations.  Most of

11 them are less than a page.  So 15, 20 text messages back and

12 forth.  Some of them are two pages.  Many of them are questions

13 or greetings or something like that.  So out of 10 excerpts

14 there are probably 20 potential hearsay objections.

15         MS. ESTES:  Your Honor, I would note that the

16 objections are with the defense exhibits, so I think we could

17 take this up after the government has rested, take up the

18 questions of these objections.

19         THE COURT:  I don't think it is proper for me to

20 require the government to put them in.  Unless it is rule of

21 completeness, I don't think it is right for me to have the

22 defense offer portions necessarily unless it is agreed upon.

23         MR. WEDDLE:  So we will do that on our defense case.

24         THE COURT:  Yes.

25         MR. WEDDLE:  At some point prior to that at a

J2rrmid6

1     convenient time for the Court it might be helpful to go through

2     that.

3             THE COURT:  Okay.  In terms of in case the jury is

4     wondering if we are still on crack for four weeks, I know I

5     can't promise anything, do you all think we are on track for

6     going to the jury next week?  If you don't want to tell me, you

7     don't have to.

8             MR. BOXER:  We were discussing this at the last break.

9     It seems like it does.

10            MS. MERMELSTEIN:  In that regard I wonder if it is not

11    too early to talk about when we are going to have a charge

12    conference.  It seems to me depending on the length of the

13    defense case, it could be as early as Tuesday.

14            THE COURT:  That's a very good question.

15            MR. BOXER:  We have some decisions to make, your

16    Honor.  We will for sure have some witnesses on Monday.  Then

17    there are a few that we will decide over the weekend.  So I

18    think Monday morning we will have a lot more clarity,

19    hopefully.

20            THE COURT:  We could have a charge conference Monday

21    afternoon.

22            MS. MERMELSTEIN:  Your Honor, I'd be inclined not to

23    wait that long.  I appreciate the defense is still figuring out

24    the defense case.  But it is often the case that the defense

25    case gets stripped down.  If we are closing on Tuesday, this

J2rrmid6

1    is, as everyone knows, a case where there is likely to be more

2    than the average amount of fighting about the charge.  We are

3    going to make submissions and need to have more clarity on what

4    it is.  I think given the possibility closings will be on

5    Tuesday, we ought to do it before that.  I don't know what

6    people's availability is, including my own team, but either

7    Thursday after court or Friday sometime.

8         MR. BOXER:  Your Honor, we sat last Friday after

9    numerous requests to keep the trial moving.  We are now almost

10   over.  Speaking for my time, we could certainly use the Friday

11   to get ourselves ready for next week.  If we rest on Monday, we

12   can do a charge conference on Tuesday.  I don't quite see the

13   prejudice or harm.  I don't know how long the case is going to

14   be for Mr. Wada, but we need to have a conference before the

15   summation.  I don't know why we need it earlier than that.

16        MS. KRAMER:  I can only speak for myself, your Honor.

17   I have blank pages right now in terms of what the Court is

18   going to charge on some critical issues.  If, for example, we

19   have the charge conference Monday and we were closing Tuesday

20   morning, that is very little time to incorporate your Honor's

21   rulings an some of these issues.

22        We don't have a sense.  We have not gotten definitive

23   answers on whether the defense has decided not to call any

24   particular witnesses on their list, and that's fine.  They are

25   thinking about it.  But it does sound like they could rest on

J2rrmid6

1    Monday.  If we are going to close Tuesday, we need some time, I

2    at least need some time, to incorporate the rulings on the

3    charge into the closing argument.

4             THE COURT:  I have started working on the charge, but

5    I don't have a complete draft yet.  We could have an initial

6    charge conference tomorrow at 4 o'clock after we break.  I

7    don't know that I will have a complete draft at that point.  Or

8    we could do Friday, or Monday morning or Monday afternoon Cook

9    what are.  What are the odds that you are going to be closing

10   on Tuesday?

11            MR. COOK:  That seems unlikely.  That is pretty

12   optimistic.  Wednesday seems like the earliest possible

13   closing.  On behalf of Mr. Wada, we have no problem with having

14   the conference on Monday.  However, as we will be preparing the

15   summation, it will be helpful if your Honor has made a decision

16   on whether the Court intends to adopt Judge Abrams on

17   willfulness issue, it would be helpful ton that because it

18   would help frame the arguments.

19            (Continued on next page)

20

21

22

23

24

25

J2rdmid7

1          THE COURT:  At this point, I think I probably will

2    adopt Judge Abrams' version of willfulness.

3          MR. COOK:  Thank you, your Honor.

4          THE COURT:  We can address it further at the charge

5    conference.

6          Ms. Lester.

7          MS. LESTER:  Your Honor, this is with respect to a

8    summary chart that I think the government intends to offer

9    tomorrow.  It's been sent to us as Government Exhibit 1371,

10   which is the summary from the two witnesses who testified today

11   from the PCAOB about the hourly rates of various employees and

12   then the planning time.

13         The summary chart -- I don't know if someone would be

14   able to pull it up for the Court a little bit.  Thank you.

15         (Pause)

16         The summary chart includes a column that says "Cost

17   (hourly rate times hours)" at the top.  We object to -- first

18   of all, as the Court knows, we sort of object to the

19   calculation of any cost in general.  We think that the

20   testimony and documents now together make clear that the hours'

21   calculations are based on scheduling, not actual hours worked.

22   We don't quibble with the hourly rate in the sense that these

23   are salaried employees and if you break down their salary for a

24   40-hour workweek, that's their hourly rate eight hours a day.

25         But to calculate in this way a supposed cost and for

J2rdmid7

1    the government to argue that that reflects an actual cost

2    expended by the PCAOB is improper for the reasons we've already

3    articulated but I can articulate again for the Court.  These

4    are all salaried employees who would have been paid regardless

5    of what they were working on.  And to the extent the government

6    is going to argue that this goes to a loss or a harm to the

7    PCAOB, we think that's improper.

8            To the extent they're arguing that this is merely a

9    representation of the value of the list information, we think

10   that this exhibit should be reconfigured so that the term

11   "cost" is not used.

12           I'm not sure exactly what the government intends to

13   argue in summation from this exhibit, but those are our

14   objections.

15           MR. OHTA:  Mr. Wada joins, your Honor.

16           THE COURT:  Would you like to respond?

17           MS. MERMELSTEIN:  If your Honor would like me to?

18           I think the -- I won't recite the argument about the

19   admissibility of this evidence generally.  It is obviously

20   already in evidence.  I think cost is perfectly accurate.  And

21   to the extent there is any uncertainty of what that means, the

22   chart itself lays out that it is what that calculation means.

23           The idea that because an entity has salaried

24   employees, the cost of those employees is not a cost to the

25   entity is simply wrong.  A manufacturing company that pays

J2rdmid7

1    employees to work in the manufacturing plant pays those

2    employees a salary, and that comes at a cost that factors into

3    the costs of the company and employees that are doing one thing

4    can't be doing another.  So the fact that it's a sunk cost with

5    respect to these employees does not mean that it is not a cost.

6              And I think that it is perfectly reasonable for the

7    government to argue, in a case where the defendants say this is

8    not property, that it comes at enormous expense and effort to

9    the PCAOB.  I don't think there is anything -- this chart

10   represents a literal mathematical calculation of documents that

11   are in evidence, and the cost, which is defined clearly as the

12   hourly rate by hours, is clearly indicated for the jury.  And

13   the defense is welcome to argue in summation that that's not a

14   reasonable way to think about it or it shouldn't be thought

15   about that way.  I don't think that there is anything about the

16   chart that needs to be changed.

17             THE COURT:  So, who is the witness who is going to

18   testify about the summary chart?

19             MS. MERMELSTEIN:  Mr. Urbanczyk is going to do it,

20   your Honor.

21             THE COURT:  OK.

22             MS. MERMELSTEIN:  It is a chart -- as you can see,

23   it's literally -- I may get the government exhibit wrong but

24   it's Government Exhibit 132, or whatever the 2015 planning

25   numbers are with two columns inserted.  One is people's hourly

J2rdmid7

1   rates from government Exhibit 131A and then a calculation

2   across.

3           THE COURT:  Yes.  I'm going to overrule the objection.

4   I don't find that the word "cost," which is just -- that it is

5   so prejudicial that it makes it something other than a summary

6   chart.  So, I am going to overrule the objection.

7           Anything else you all want to talk about tonight?  I

8   didn't say anything definitively on the charge conference.  Let

9   me reassess where I am in the charge and try to figure out

10  whether it is going to be Friday or Monday.

11          If it were Friday, could it be Friday afternoon, or

12  does that pose particular problems, say for an hour on Friday

13  afternoon?

14          MR. BOXER:  We don't have any particular problems.

15  Whenever your Honor's schedule permits.

16          THE COURT:  Just general problems.

17          MR. BOXER:  Just generally.  We will be available when

18  you would like us, your Honor.

19          MR. COOK:  The same, your Honor.  However, could

20  Mr. Wada be excused from participation in the conference?

21          THE COURT:  Yes, if that is OK with him.

22          MR. BOXER:  Yes.  If it is Friday, we would likely

23  make the same request.  If it is Monday, we may not.

24          (Continued on next page)

25

J2rdmid7

1              THE COURT:  OK.  We will decide tomorrow.  All right?

2              MS. MERMELSTEIN:  Thank you, your Honor.

3              THE COURT:  All right.  Have a good night, everybody.

4              (Continued on next page)

5              (Adjourned to 9:30 a.m. February 28, 2019)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    THOMAS W. WHITTLE III

 4    Cross By Mr. Boxer  . . . . . . . . . . .2044

 5   Cross By Mr. Weddle  . . . . . . . . . . .2101

 6   Redirect By Ms. Mermelstein  . . . . . . .2146

 7   Recross By Mr. Boxer . . . . . . . . . . .2153

 8   Recross By Mr. Weddle  . . . . . . . . . .2155

 9    LATOYA EDWARDS

10   Direct By Ms. Mermelstein  . . . . . . . .2175

11   Cross By Ms. Lester  . . . . . . . . . . .2187

12   Cross By Mr. Ohta  . . . . . . . . . . . .2192

13    ANTOINE LEE

14   Direct By Ms. Mermelstein  . . . . . . . .2199

15   Cross By Ms. Lester  . . . . . . . . . . .2203

16   Cross By Mr. Ohta  . . . . . . . . . . . .2207

17    Kenneth CHARLES KOCH

18   Direct By Ms. Estes  . . . . . . . . . . .2208

19   Cross By Ms. Lester  . . . . . . . . . . .2227

20   Cross By Mr. Cook  . . . . . . . . . . . .2230

21    ZACHARY GREENWOOD

22   Direct By Ms. Estes  . . . . . . . . . . .2249

23                        GOVERNMENT EXHIBITS

24   Exhibit No.                              Received

25    132-135  . . . . . . . . . . . . . . . .2185
```

1   131A   . . . . . . . . . . . . . . . . . .2202

2   1144   . . . . . . . . . . . . . . . . . .2212

3   1124   . . . . . . . . . . . . . . . . . .2214

4   953   . . . . . . . . . . . . . . . . . . .2218

5   1309   . . . . . . . . . . . . . . . . . .2219

6   1308   . . . . . . . . . . . . . . . . . .2226

7   1379   . . . . . . . . . . . . . . . . . .2253

8   656-B   . . . . . . . . . . . . . . . . .2256

9   656-A   . . . . . . . . . . . . . . . . .2257

10                    DEFENDANT EXHIBITS

11   Exhibit No.                              Received

12   M291   . . . . . . . . . . . . . . . . . .2091

13   M292   . . . . . . . . . . . . . . . . . .2091

14   M293   . . . . . . . . . . . . . . . . . .2092

15   M294   . . . . . . . . . . . . . . . . . .2092

16   M295   . . . . . . . . . . . . . . . . . .2092

17   M296   . . . . . . . . . . . . . . . . . .2093

18   1640   . . . . . . . . . . . . . . . . . .2102

19   1207   . . . . . . . . . . . . . . . . . .2103

20   1017, 1018, 1196, 1200, 1207, 1208, . . . .2115

21           1251, 1374, 1418, 1422, 1458,

22           1459, 1481

23   1636   . . . . . . . . . . . . . . . . . .2126

24   1195   . . . . . . . . . . . . . . . . . .2130

25   1019, 1096, 1174, 1197, 1199, and 1389  .....2136