J2srmid1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

                  Defendants.

------------------------------x

                                             February 28, 2019
                                             9:30 a.m.

Before:

                     HON. J. PAUL OETKEN,

                                             District Judge
                                             and a jury

                          APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   REBECCA G. MERMELSTEIN
      AMANDA K. KRAMER
      JORDAN L. ESTES
          Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
      Attorneys for Defendant David Middendorf
BY:   NELSON A. BOXER
      AMY R. LESTER
      ALEXANDRA REBECCA CLARK
            – and –
BRUCH HANNA LLP
BY:   GREGORY S. BRUCH
```

J2srmid1

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
            – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


        – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal


                            oOo

J2srmid1                        Greenwood – Direct

1           (Trial resumed; jury not present)

2           MS. KRAMER:  Just to let your Honor know, we have

3   decided not to call Brian Sweet or Mark Rubino.  We notified

4   defense counsel last night.

5           (Jury present)

6           THE COURT:  Okay.

7    ZACHARY GREENWOOD, resumed.

8           THE COURT:  Good morning, ladies and gentlemen.  Mr.

9   Greenwood is on the stand.

10          You were sworn yesterday.  You remain under oath.

11  DIRECT EXAMINATION

12  BY MS. ESTES:

13  Q.  Good morning, Mr. Greenwood.

14  A.  Good morning.

15  Q.  Do you remember testifying yesterday about your involvement

16  in the extraction of notes from Mr. Middendorf's phone?

17  A.  Yes.

18          MS. ESTES:  Mr. Urbanczyk, can you pull up what is now

19  in evidence as Government Exhibit 656-A.

20  Q.  Mr. Greenwood, what is this document?

21  A.  This is a record of the notes derived from that device.

22  They are in PDF format, just an alternate way to view them.

23          MS. ESTES:  Mr. Urbanczyk, if you could go to the

24  second page here, and let's zoom in to note number 5.

25  Q.  Mr. Greenwood, what is the created date of this note?

J2srmid1                          Greenwood - Direct

1    A.   The created date reads 1/10/2017 at 1:23:01 p.m. adjusted

2    for UTC minus 5.   That is, it has been adjusted to our local

3    standard time.

4    Q.   That's Eastern Standard Time?

5    A.   Yes.

6    Q.   Based on your experience in telephone extraction, what does

7    the created date and time refer to?

8    A.   The created date reflects the creation date of this note

9    itself, when it was first put on this device.

10   Q.   What does it say underneath there, where it says

11   "modified"?

12   A.   Underneath the modified date reads 2/15/2017 at 10:12:35

13   a.m., also adjusted for local time.

14   Q.   What does the modified date refer to?

15   A.   The modified date refers to the last date that the content

16   was modified.

17   Q.   Do iPhones track every date the note is modified or just

18   the last modified date?

19   A.   In this particular instance in this SQLite database it only

20   tracks the last time that a note was modified.   No previous

21   edits could ever be determined.

22   Q.   To be clear, if there were any edits between February 15

23   and January 10, is there any way to know that?

24   A.   No.

25   Q.   Now, Mr. Greenwood, does an iPhone retain data of what a

1    note looked like when it was originally created?

2    A.  No, it does not.

3    Q.  So the content of the note you see on the right here, is

4    that the content of the note as of the modified date?

5    A.  Yes.

6    Q.  Let's go to the note on the right.  Mr. Greenwood, could

7    you read the title there?

8    A.  The title is "List."

9    Q.  If you could read just the first five or so entries on the

10   list?

11   A.  The first five entries read A.H. Belo, Applied Materials,

12   Bank United, Bio Rad labs, and BMO.

13           MS. ESTES:  Mr. Urbanczyk, can we now go to note 26.

14   Zoom in to that.  Can you actually zoom out and zoom into the

15   entire page across.

16   Q.  Mr. Greenwood, is there a date or time associated with this

17   note?

18   A.  No, there is not.

19   Q.  Based on your experience in forensic extraction, do you

20   have an understanding of why there is no date or time there?

21   A.  Yes.  Based on my experience and testing, when a note is

22   permanently deleted, the contents themselves are not

23   necessarily removed from the database itself until certain

24   commands are hit, like a vacuum command by the database in the

25   background, meaning that some of the data may still remain

J2srmid1                          Greenwood - Direct

1   after a note is deleted or not visible to the user.  Some of

2   the content may remain but some of the other content, such as

3   dates and times, may be erased.

4   Q.  Mr. Greenwood, was this note deleted?

5   A.  Yes.

6   Q.  How do you know that?

7   A.  On the right-hand side we see a marking that says "yes."

8   That is actually an indicator that this was deleted within the

9   database itself.  It was explored and found that this had a

10  marker that said yes, this note was deleted.

11  Q.  Based on your training and experience in forensic

12  extraction, what does it mean for something to be deleted?

13  A.  In my experience, it typically means that a user has

14  permanently deleted a note.

15          MS. ESTES:  Mr. Urbanczyk, can you pull up Government

16  Exhibit 655 side by side with this.  On 655 could you zoom in

17  to the last writing on the right.  I'm sorry, on 656 can you

18  now zoom in to the body of the note.

19  Q.  Mr. Greenwood, turning to the notes on the left there, can

20  you read the first few entries next to "body."

21  A.  The fights two entries read Citi, Synchrony, Wells, and

22  BoNY.

23  Q.  Can you read the next five entries there.

24  A.  The next five entries read Valero, Applied Materials,

25  Charter Communications, Macy's, Home Depot.

J2srmid1                          Greenwood - Direct

1    Q.   Can you read the next five entries.

2    A.   The next five read Lakeland, Midland State, National Bank

3    Holdings, Heartland, Northern Trust.

4    Q.   Finally the last two?

5    A.   The last two read Raymond James, BMO.

6            MS. ESTES:  Mr. Urbanczyk, you can take that down.

7    For 656-A, if we could go back to note 24.

8    Q.   Mr. Greenwood, what do you see in the body of the note

9    here?

10   A.   In the body I see a formatted contents, that is, the body

11   of the note itself.  One of the shortcomings of the PDF is that

12   it does not render this actual content in proper formatting,

13   HTML actually.

14   Q.   Is there a way to view this note in the proper formatting?

15   A.   Yes.  It is much easier to review in the UFDR reader

16   report.

17           MS. ESTES:  Mr. Urbanczyk, if we could pull up what is

18   in evidence as 656-B, and let's go to note 24 there.

19   Q.   Mr. Greenwood, is this one of the notes we were looking at

20   in the other document?

21   A.   Yes, it is.

22   Q.   Is that the body of the note you see on the right side of

23   the page?

24   A.   Yes.

25           MS. ESTES:  Mr. Urbanczyk, in the UFED reader, if you

J2srmid1                          Greenwood - Direct

1    could click on where it says "text."

2    Q.  Mr. Greenwood, is this what the note looked like when all

3    the coding was in it?

4    A.  Yes.

5              MS. ESTES:  Mr. Urbanczyk, can you click on HTML.

6    Q.  Mr. Greenwood, looking at the note as it looks now, if you

7    were using the phone, is this what the note would look like?

8    A.  Yes.

9              MS. ESTES:  Mr. Urbanczyk, can you scroll down a

10   little bit.

11   Q.  Mr. Greenwood, where it says "Macy's" there, can you read

12   what it says in parentheses.

13   A.  After "Macy's" it reads "(net sales, pension assets and

14   liabilities, inventory, vendor allowances, and store closures,

15   AN)," followed by what appears to be some HTML formatting.

16             MS. ESTES:  Mr. Urbanczyk can you highlight the areas

17   at the bottom of the note, starting with A.H. Belo.

18   Q.  Mr. Greenwood, can you read the first three or so entries

19   there.

20   A.  The first three entries read, "A.H. Belo (craft), Applied

21   Materials — 10 back slash 31 (Jeremy Peters) Bank United—all

22   (McGrath)."

23   Q.  Mr. Greenwood, where it says "Brookline Bancorp" lower

24   down, what does it says next to that?

25   A.  Next to "Brookline Bancorp," it reads dash (Gencarella);

J2srmid1                        Greenwood - Direct

1   not monitored."

2            MS. ESTES:  Mr. Urbanczyk, can you click on where it

3   says "images" on the left here on the UFED reader.

4   Q.  Mr. Greenwood, what are we looking at now?

5   A.  These were four images that were extracted from this phone.

6   Q.  What kind of image files are these?

7   A.  These image files are PNG files.  They are a standard file

8   format for pictures and network graphics.  In this version of

9   IOS, PNGs were also commonly associated with the default format

10  for screenshots.

11           MS. ESTES:  Mr. Urbanczyk, can you now pull up what's

12  been marked for identification as Government Exhibit 657.  If

13  you could scroll through it.

14  Q.  Mr. Greenwood, do you recognize this?

15  A.  I do.

16  Q.  What are we looking at here?

17  A.  I recognize these to be those pictures.

18           MS. ESTES:  Your Honor, the government offers

19  Government Exhibit 657.

20           THE COURT:  Received.

21           (Government's Exhibit 657 received in evidence)

22           MS. ESTES:  Mr. Urbanczyk, can you pull up Government

23  Exhibit 656-A side by side with this.  And if we could go to

24  note 5 and zoom in to that note.  I apologize, Mr. Urbanczyk.

25  Can we zoom out and zoom in to the note, including the created

J2srmid1                          Greenwood - Direct

1    and modified date.

2    Q.  Mr. Greenwood, looking at the screenshot in evidence on the

3    left and the note on the right, are the first few entries there

4    the same?

5    A.  Yes, they appear to be.

6    Q.  Is the modified date on the note the same as the date list

7    there on the screenshot?

8    A.  Yes, it is.

9    Q.  Does this appear to be a screenshot of the notes we see on

10   the right?

11   A.  It appears to be.

12          MS. ESTES:  Thank you, Mr. Urbanczyk.  You can take

13   that down.

14   Q.  Mr. Greenwood, switching gears, I believe you testified you

15   were also involved in extraction of a phone of Brian Sweet.

16   A.  Yes.  I was asked to process the extraction that was

17   provided to me.

18          MS. ESTES:  Mr. Urbanczyk, can you pull up what has

19   been in evidence subject to connection as Government Exhibit

20   1407.

21   Q.  Mr. Greenwood, do you recognize this?

22   A.  I do.

23   Q.  How do you recognize this?

24   A.  I recognize this based on my prior review prior to my

25   testimony, and it is from the Sweet phone.  It is a subset of

1    contacts.

2              MS. ESTES:  Your Honor, I believe we offered this

3    previously subject to connection.  I believe now the connection

4    has been established.

5              THE COURT:  Received.  This is Government Exhibit

6    1407, right?

7              MS. ESTES:  Yes, your Honor.

8              (Government's Exhibit 1407 received in evidence)

9              MS. ESTES:  Mr. Urbanczyk, can you take that down and

10   pull up for the witness what has been marked for identification

11   as Government Exhibit 1446, and if you could scroll through it.

12   Q.  Mr. Greenwood, do you recognize this?

13   A.  I do.

14   Q.  What are we looking at here?

15   A.  I recognize this to be a report that I generated concerning

16   two graphics derived from that phone.

17   Q.  From the Brian Sweet phone?

18   A.  Yes.

19             MS. ESTES:  Your Honor, the government offers

20   Government Exhibit 1446.

21             THE COURT:  Received.

22             (Government's Exhibit 1446 received in evidence)

23             MS. ESTES:  Mr. Urbanczyk, if we can go to the second

24   page here.

25   Q.  Mr. Greenwood, to be clear, are these all images on Mr.

J2srmid1                              Greenwood - Direct

1    Sweet's phone or just a selection?

2    A.   These are just a selection of photos.

3    Q.   What do you see in the thumbnail column there on the right?

4    A.   On the furthest column to the try to it says "deleted

5    trash," meaning these two files were marked for deletion.

6    Q.   What is the column next to that?

7    A.   The column next to that is a thumbnail representation of

8    those pictures.  That is, if you were to click on it, it would

9    link to a full-blown version of this.

10        MS. ESTES:  Mr. Urbanczyk, can you pull up what is in

11   evidence as Government Exhibit 1444 side by side with this.

12   Q.   Mr. Greenwood, does this picture in evidence as Government

13   Exhibit 1444 appear to be the thumbnail there?

14   A.   It appears to be very similar minus the redactions that

15   were made.

16        MS. ESTES:  Mr. Urbanczyk, can you zoom out of that

17   and zoom in to the picture as well as the additional file info.

18   Q.   Mr. Greenwood, looking at the information in the additional

19   file info box, what kind of information is list?

20   A.   The information here is called metadata.  Metadata is

21   simply data about data.  It tells more about the file itself.

22   First, we see size, how many bytes this file is; followed by

23   its created date, that is, when it was born on this system,

24   which is reflected as 1/9/2017 at 7:45:40 adjusted for local

25   Standard Time.

J2srmid1                          Greenwood - Direct

1          The modified dated reflects the same date and time,

2     that is when were the contents last modified.  The final

3     selection is the deleted at it, when was this marked for

4     deletion, which reflects a date of 2/24/2017 at 3:12:08 p.m.

5     adjusted for local time.

6          Furthermore, the pictures maintain their own metadata.

7     If the picture were to travel from device to device, the

8     metadata below would commonly stay with the photo itself.  For

9     example, this demonstrates that this photo was taken with an

10    Apple iPhone 7 Plus at a capture time that matches the created

11    time.

12         MS. ESTES:  Mr. Urbanczyk, if you could take down

13    Government Exhibit 1444 and pull up what is in evidence as

14    Government Exhibit 655.  If you could display Government

15    Exhibit 1446 side by side with this one.  Mr. Urbanczyk, let's

16    zoom in to the second note there.  And if we could zoom in to

17    the number 2, Mr. Urbanczyk.  Thank you.

18    Q.  Mr. Greenwood, does the photograph in evidence as

19    Government Exhibit 655 appear to be the same thumbnail image we

20    see in Government Exhibit 1446?

21    A.  It does appear to be.

22    Q.  What is that creating date of this photograph?

23    A.  The created date is 2/7/2017 at 3:44:56 p.m. adjusted for

24    local time.

25    Q.  What is the deleted date of this photograph?

J2srmid1                    Greenwood - Cross

1   A.  The deleted date reads 2/8/2017 at 4:49:17 p.m., also

2   adjusted for local time.

3            MS. ESTES:  No further questions.

4            THE COURT:  Cross?

5            MR. BOXER:  Your Honor, Ms. Clark is going to

6   cross-examine this witness.

7            THE COURT:  Sure.

8   CROSS-EXAMINATION

9   BY MS. CLARK:

10  Q.  Good morning, Mr. Greenwood.  My name is Alex Clark.  I

11  represent Dave Middendorf.  Mr. Greenwood, you testified

12  yesterday and today that you are a forensic analyst, correct?

13  A.  Yes.

14  Q.  You have experience working with digital evidence, like

15  cell phones?

16  A.  Yes.

17  Q.  I believe you testified at the end of the day yesterday

18  that you performed forensic extractions on cell phones

19  thousands of times during your career, correct?

20  A.  Correct.

21  Q.  You did not perform the forensic extraction of Mr.

22  Middendorf's cell phone, correct?

23  A.  That is correct.

24  Q.  You instead received the data from someone else?

25  A.  Yes.

J2srmid1                    Greenwood - Cross

```
1    Q.  Then, working with that data that you received, you took
2    various forensic steps and ended up with a PDF of the
3    Cellebrite that you were just looking at with Ms. Estes, right?
4    A.  Correct.
5           MS. CLARK:  Could we see that again, please, Ms.
6    O'Connor, Government Exhibit 656-A in evidence.  Thank you.
7    Q.  The notes appearing on this page 1 that we are looking at,
8    these are active note files, correct?
9    A.  Correct.
10          MS. CLARK:  If we zoom in, please, Ms. O'Connor, on
11   the header in rows 1 and 2, can we see perhaps across the full
12   breadth of the report.
13   Q.  Those rows for these examples of active notes, Mr.
14   Greenwood, the deleted column in the far right is blank, is
15   that correct?
16   A.  Correct.
17   Q.  In the column on the left with the word "time" at the top,
18   that's filled in, correct?
19   A.  Yes.
20   Q.  For example, on row 1 we see a created date and time?
21   A.  Correct.
22   Q.  That tells you that a note was created in the phone on that
23   date and time, correct?
24   A.  Yes.
25   Q.  It says nothing at all about what content was in that Notes
```

J2srmid1                        Greenwood – Cross

1   file when it was created, correct?

2   A.   Yes.

3   Q.   Under that we have the word "modified"?

4   A.   Yes.

5   Q.   That tells you the last date and time that the Notes

6   content was modified?

7   A.   Correct.

8   Q.   So we know from looking at this that the content in the

9   next column over saying "note," that's the way the content

10  appeared as of that last modification?

11  A.   Correct.

12  Q.   We know nothing at all about what might have appeared there

13  before?

14  A.   That is correct.

15  Q.   Likewise, you know nothing about how many times this note

16  might have been modified?

17  A.   Correct.

18  Q.   When those modifications might have taken place?

19  A.   Correct.

20  Q.   Or what those modifications might have entailed?

21  A.   Right.

22  Q.   The note could have changed entirely?

23  A.   Yes, it is possible.

24  Q.   There is no way at all to tell that from the forensic

25  evidence?

J2srmid1                        Greenwood - Cross

1    A.  No.

2             MS. CLARK:  If we turn, please, Ms. O'Connor, to page

3    3 of the report.

4    Q.  Now we see at the top of this page, Mr. Greenwood, some

5    additional active notes, correct?

6    A.  Yes.

7    Q.  Followed by some notes with the word "yes" appearing in

8    that column on the right?

9    A.  Yes.

10   Q.  It appears in red.  That is the column that has "deleted"

11   at the top, right?

12   A.  Correct.

13   Q.  Now we look for these notes to the left-hand column.  We

14   see at the top of the page created and modified dates for the

15   active notes, correct?

16   A.  Yes.

17   Q.  But then that column is completely blank for these notes

18   with "yes" in the right-hand column, correct?

19   A.  Correct.

20   Q.  That means that there is no longer any date or time data

21   associated with these notes, correct?

22   A.  Yes.

23   Q.  We don't know when they were created?

24   A.  Correct.

25   Q.  We don't know what they looked like when they were created?

J2srmid1                         Greenwood - Cross

1     A.  No.

2     Q.  We don't know if they were modified?

3     A.  Correct.

4     Q.  We don't know when they were modified?

5     A.  Right.

6     Q.  It sounds to me from your direct testimony, even if they

7     were definitively deleted by the user --

8              MS. ESTES:  Objection.

9     A.  Yes.

10             MS. ESTES:  Objection to the testimony and the

11    question.

12             THE COURT:  Clarify, please.  Could you repeat the

13    question.  I want to make sure it's clear.

14             MS. CLARK:  I'm happy to change the question, your

15    Honor, if that works.

16             THE COURT:  Sure.

17    Q.  Mr. Greenwood, you said in your direct testimony today that

18    in your experience typically "deleted" means that the user

19    deleted data in the phone, correct?

20    A.  Yes.

21    Q.  But you did not testify today that in this instance you

22    know forensically that this data was deleted by the user,

23    correct?

24    A.  That is correct.

25    Q.  You don't know that Mr. Middendorf deleted these Notes

1    files appearing toward the end of this report, correct?

2    A.   No.  That is outside my scope of knowledge.

3    Q.   On direct examination you testified to your training and

4    experience in connection with forensic examination of cell

5    phones, correct?

6    A.   Yes.

7    Q.   You testified that you had received hundreds of hours of

8    forensic training, correct?

9    A.   Correct.

10   Q.   But you did not testify to receiving any training specific

11   to interpreting the data in a UFED report from an iPhones Notes

12   function, correct?

13   A.   That training was received through Cellebrite, the physical

14   analyzer training.

15   Q.   Apple is the manufacturer of the iPhone Notes function,

16   correct?

17   A.   Yes.

18   Q.   Apple does not make available any instructions or manuals

19   about how to interpret the data in its Notes function, correct?

20   A.   Correct.

21   Q.   A person using an iPhone can open an Apple note and modify

22   it, right?

23   A.   Yes.

24   Q.   But Apple has not made available any information explaining

25   whether, when that happens, the older version of the note from

J2srmid1                    Greenwood – Cross

1    before it was modified then appears as deleted data, correct?

2    A.  Correct.

3    Q.  There is no information from the design or Apple about

4    that?

5    A.  Correct.

6    Q.  Isn't it true that you performed testing to determine if

7    modifying a note would result in the old version of the note

8    appearing as deleted content?

9    A.  Yes.

10   Q.  Your testing showed that when an entry was modified, the

11   new content overwrote the old content, correct?

12   A.  Correct.

13   Q.  In your direct examination today you were asked to look

14   specifically at rows 24 and 26 in this report, correct?

15   A.  I believe so.

16         MS. CLARK:  If we could pull up, Ms. O'Connor, the

17   report just to confirm.

18   A.  Yes, 24.

19         MS. CLARK:  Then could we look at 26, please.

20   A.  Yes.

21   Q.  Thank you.  These two rows, they have the word "deleted"

22   appearing in the right-hand column, correct?

23   A.  Yes.

24   Q.  Therefore, they have no data appearing in the left-hand

25   column where we would see creation or modified data, correct?

J2srmid1                         Greenwood - Cross

1    A.  Correct.

2    Q.  So we have no idea at all when these notes were created?

3    A.  Correct.

4    Q.  And we have no idea when they were modified or if they were

5    modified?

6    A.  Correct.

7    Q.  When they were deleted or if in fact they were even

8    actively deleted by Mr. Middendorf?

9    A.  Correct.

10   Q.  It is impossible to say, therefore, based on forensic

11   examination of the phone data, when the data in these rows with

12   a "yes" in the far right-hand column was typed into the phone?

13   A.  Correct.

14   Q.  You were asked to look also today at Government Exhibit

15   655.

16   A.  Yes.

17           MS. CLARK:  Could we look, Ms. O'Connor, at 655 and

18   next to it 656-A.  Within 656-A, could we look, please, at row

19   26.  Thank you very much.

20   Q.  You were asked to read, Mr. Greenwood, some of the names

21   listed in row 26 before.  I'd like you to read, please, the

22   last two entries in that row.

23   A.  The last two entries read, "Raymond James" and followed by

24   "BMO."

25           MS. CLARK:  Ms. O'Connor, could we look at 655,

J2srmid1                          Greenwood - Cross

1    please.  Would it be possible to zoom in on the portion towards

2    the top right.  Let's pull the view down a little bit further,

3    if we could, until that next line appearing -- I need to see

4    just a bit more.  The whole way down to the right of that phone

5    number.  Thank you.

6    Q.  I appreciate that this is in handwriting, Mr. Greenwood,

7    but do you see anything in government 565, in that section that

8    Ms. O'Connor just pulled up to you, that says either of those

9    two names that you just read?

10   A.  It doesn't appear to me.

11   Q.  It doesn't appear to.  Could we take a look, please, at

12   656-B.  Here we are looking within 656-B, Mr. Greenwood, at the

13   images from the phone data, correct?

14   A.  Yes.

15   Q.  We have four images here?

16   A.  Correct.

17   Q.  If we look at the column on the right part of the screen,

18   we have a created date, correct?

19   A.  Yes.

20   Q.  That date reads March 14, 2017, yes?

21   A.  Yes, it does.

22   Q.  And we have a modified date as well, correct?

23   A.  Yes.

24   Q.  That reads March 14, 2017?

25   A.  Yes, it does.

J2srmid1                          Greenwood - Cross

1    Q.  There is the word "deleted" and a colon.  Do you see that?

2    A.  Yes.

3    Q.  There is nothing next to that, correct?

4    A.  Correct.

5    Q.  That means this image was not deleted?

6    A.  Correct.

7              MS. CLARK:  Nothing further.

8              THE COURT:  Thank you.

9              Anything further?

10             MR. OHTA:  Yes, your Honor.

11             THE COURT:  Mr. Ohta.

12             MR. OHTA:  Your Honor, may I have one moment with

13   counsel?

14             THE COURT:  Sure.

15   CROSS-EXAMINATION

16   BY MR. OHTA:

17   Q.  Good morning, Mr. Greenwood.

18   A.  Good morning.

19   Q.  My name is Jason Ohta, and I represent Jeff Wada.  How many

20   times have you testified in court before?

21   A.  The number is well over 30 times at this point.  I've lost

22   count.

23   Q.  How many in criminal cases have you testified in?

24   A.  They have all been criminal cases.

25   Q.  You also testified that you received hundreds of hours of

J2srmid1                    Greenwood - Cross

1    forensic training primarily from your prior employers, correct?

2    A.  Correct.

3    Q.  You also received dozens upon dozens hours of training from

4    the National White Collar Crime Center in digital forensic

5    acquisition and analysis as well as from SANS, a global

6    provider of information securities certifications and computer

7    forensics, correct?

8    A.  Yes, sir.

9    Q.  Do you have any certifications in computer forensics?

10   A.  I do.

11   Q.  What are they?

12   A.  I hold the SANS certificate, the GCFA; the GX certified

13   forensic analyst is an analyst in Windows-based computer

14   systems; and GCFE forensic examiner in intrusion analysis.  I

15   also hold certificates from each of the classes that I have

16   taken through the National White Collar Crime Center in the

17   acquisition of data, intermediate data recovery, advanced data

18   recovery, as well as certificates from each of the classes I

19   have taken through the Department of Homeland Security.

20   Q.  Would you consider those certifications important for your

21   job?

22   A.  Yes.

23   Q.  Are you familiar with the American Society of Crime lab

24   Directors, or ASCLD?

25   A.  Yes, I am.

J2srmid1                        Greenwood - Cross

1  Q.  What is that?

2  A.  That is the certification body for accredited labs.  Under

3  the United States Postal Inspection Service, the lab was

4  accredited, that is, subject to peer review by other labs and

5  to standards set by the international forensic community.

6  Q.  You said standards.  Did you follow those standards when

7  you were extracting the data that you testified to in this

8  case?

9  A.  I did not extract the data in this case, so I'm not able to

10  comment on that.  It's outside the scope.

11  Q.  But they do have standards that people can follow for

12  extracting electronic data, correct?

13            MS. ESTES:  Objection: relevance.

14            THE COURT:  Sustained.

15  Q.  You described your training.  When you pulled the

16  information or when you ran the extraction reports for both

17  phones --

18  A.  Yes.

19  Q.  You used your training and experience, correct?

20  A.  Correct.

21  Q.  You did not use just common sense?

22  A.  Correct.

23  Q.  I want to show you what's been marked as Defendant's

24  Exhibit 1650.  This is just for the witness, Court, and

25  counsel.  Do you recognize this extraction report?

J2srmid1                         Greenwood - Cross

1    A.  I do.

2    Q.  What is it?

3    A.  This appears to be a version of a report concerning several

4    JPEG images.

5    Q.  From the extraction report can you tell what phone this is

6    from?

7    A.  Offhand I do not recall.  I believe it was the latter of

8    the phones.

9    Q.  Mr. Sweet's phone?

10   A.  I believe so.  But I'd have to compare it to the other one

11   that was actually introduced.

12        MR. OHTA:  Ms. O'Connor, can we pull up Government

13   Exhibit 1446 side by side with this exhibit, again just for the

14   witness, Court, and counsel.

15        Your Honor, we are having a technical issue.  May I

16   approach the witness?

17        THE COURT:  Yes.

18   Q.  We are going old school today.

19   A.  Works for me.

20   Q.  Me too.

21   A.  Thank you.

22   Q.  Mr. Greenwood, that is a paper version of Government

23   Exhibit 1446.  Do you recognize that?

24   A.  I do.

25   Q.  Is that the same exhibit that you were talking about

J2srmid1                         Greenwood - Cross

1  previously in terms of Mr. Sweet's phone?

2  A.  Yes, it is.

3  Q.  It has two images on it, correct?

4  A.  Yes, it does.

5  Q.  Defense Exhibit 1650 has three images, correct?

6  A.  Yes, it does.

7  Q.  Two of the three images are the images on Government

8  Exhibit 1446, correct?

9  A.  No, that's incorrect.  Only one of the images is

10  represented.

11  Q.  Which image is that?

12  A.  Image 0523 is not duplicated, so it is only image 0444 is

13  the duplicate.

14        MR. OHTA:  Your Honor, may I approach because there is

15  only one paper copy?

16        THE COURT:  Sure.

17  Q.  Which one did you say was the duplicate?

18  A.  The duplicate that exists on both reports is IMG_0444.

19  Q.  That's number 1 on Government Exhibit 1446?

20  A.  That is correct.

21  Q.  For number 2?

22  A.  Number 2 is not duplicated on the defense exhibit.

23  Q.  That would represent what number on the defense exhibit?

24  A.  It would be closest in appearance to number 1, but it is

25  not the same.

J2srmid1                          Greenwood - Cross

1    Q.   Thank you.   On Defense Exhibit 1650, have you seen this

2    photograph before from Mr. Sweet's phone?

3    A.   1650?  I do not recall seeing that before today.

4    Q.   You were only asked by the government to review Government

5    Exhibit 1446 and the two pictures, correct?

6    A.   Right.

7    Q.   Some of the metadata in Defendant's Exhibit 1650, number 2,

8    can you tell that comes from Mr. Sweet's phone based on the

9    metadata that you see there?

10   A.   I can report that it is consistent with coming from that

11   device, being that the make and model of it was an iPhone 7

12   Plus from the extraction report and that the created, modified,

13   and capture dates are all the same.

14          MR. OHTA:   Your Honor, we offer Defendant's Exhibit

15   1650.

16          MS. ESTES:   Objection: foundation and relevance to the

17   second entry there.

18          MR. OHTA:   Your Honor, it is from Mr. Sweet's phone.

19          MS. ESTES:   Your Honor, not everything from the phone

20   is relevant.   May we approach?

21          THE COURT:   Yes.

22          (Continued on next page)

23

24

25

J2srmid1                    Greenwood - Cross

1           (At the sidebar)

2           MS. ESTES:  Your Honor, I don't believe a foundation

3     has been established that this is from Mr. Sweet's phone.  He

4     said it looks consistent with it, but I believe he testified he

5     hadn't seen, this photograph.  He's run thousands of different

6     versions of UFED reports.  I don't think him just saying I

7     think it might be is sufficient to offer it into evidence.  I

8     don't think the relevance of the middle picture there has been

9     established, and there seems to be no reason for offering that

10    part of an extraction report.

11          MR. OHTA:  Your Honor, the best part about this

12    witness testifying is he testified to the metadata.  Not just

13    the picture, the metadata is the same.  It comes from Mr.

14    Sweet's phone.  Everything is consistent with this photo coming

15    from Mr. Sweet's phone.  The relevance, your Honor, is that

16    these are the focus areas of the upcoming inspections.  And we

17    have exculpatory information here, your Honor: up here "Ross."

18    This could come from somebody else, your Honor.

19          MR. WEDDLE:  Your Honor, this photo is from the exact

20    same date as the bottom photo that was in Government Exhibit

21    1446.  This is what was originally produced to us as Government

22    Exhibit 1446, and the government later updated it to include

23    only two photos.

24          THE COURT:  This was produced as?

25          MR. WEDDLE:  I just put a sticker on top of the

1   government exhibit sticker.

2          MR. OHTA:  It used to be Government Exhibit 1446.

3          MR. WEDDLE:  They updated it.

4          MR. OHTA:  To just include these two pictures and

5   excluded this one.

6          THE COURT:  Why was one of them different?  It was

7   similar but different?

8          MS. ESTES:  This one, your Honor, was originally taken

9   from a thumbnail.  When we reran it, we ran the full image

10  because the thumbnail doesn't have the complete metadata and

11  doesn't show that it was deleted.  When you have the full

12  image, you get all of the metadata.  That's why we included

13  that one.

14         MR. WEDDLE:  If I look at the data that was produced

15  from Brian Sweet's phone, the three or four images that look

16  like this picture of the file folder, as Ms. Estes just said,

17  some of them are smaller in data size.  Some of them are

18  thumbnails, some of them are medium size, some are larger.

19  This is the large version.  I think what the government put in

20  for these two are the large version.

21         MS. KRAMER:  Your Honor, may I say something about the

22  relevance of this document?  I actually know what this is.

23  That does not say "Ross," that says "loss."  We didn't offer

24  this.  We didn't establish any testimony about what it says or

25  what it is about.  But there is no good faith basis to think

J2srmid1                        Greenwood - Cross

1    this says "Ross" other than the fact that they are reading half

2    of a letter and think that's what it may be.  That is not what

3    it is, but there is not a foundation for the relevance of this.

4            MS. ESTES:  Frankly, your Honor, that is not even how

5    you would write an R.

6            MR. WEDDLE:  We are happy to explain the good faith

7    basis on an ex parte basis, your Honor.

8            MS. MERMELSTEIN:  I think we have moved a little

9    afield.  This happens a lot.  You can't conflate relevance and

10   admissibility.  The witness says this looks consistent with the

11   report of Sweet's phone, not that he can say it is.  So it

12   can't be offered through this witness.

13           MR. OHTA:  Your Honor, this is your classic goes to

14   the weight not the admissibility.  The government is free to

15   argue what they will argue, we will argue what we argue, and

16   have the jury decide.

17           THE COURT:  I think he established a foundation.  He

18   did say all the metadata is consistent with this coming from

19   the Sweet phone.  Is there any question that it did?  It

20   obviously did.

21           MS. KRAMER:  Your Honor, what he said is this looks

22   like metadata, this looks like a UFED report.  He said that a

23   bunch of times.  He didn't do any analysis on this image.  This

24   is just like the superficial testimony about the spreadsheet

25   and the Bates numbers.  "This looks like a document that was

J2srmid1                         Greenwood – Cross

1    produced by KPMG, this looks like a spreadsheet" is not a

2    foundation.  It is just not enough that he is saying on a

3    superficial level this is consistent with what a UFED report

4    from the image looks like.  So they can't get it in through

5    this witness because he has not analyzed this.

6         MR. OHTA:  Your Honor, your analysis is correct.  This

7    is the original of the 1446.  If you want to review it.

8         THE COURT:  Remind me.  He didn't create the

9    extraction report or he did?

10        MS. ESTES:  Me extracted the full phone.  He got an

11   image from KPMG.  He extracted the full phone.  But the full

12   phone is like 40,000 or whatever many pages of things, and

13   there are a variety of different reports you can run.  We ran a

14   report that we marked as our exhibit and asked him to compare

15   it back to the full phone.  He did that ahead of time.  That is

16   why he is comfortable saying he knows that was from the phone.

17        But I don't think that means he should be shown

18   anything from the phone.  He would have to review, go compare

19   it to the original, to authenticate it, and that hasn't been to

20   be here.

21        MR. WEDDLE:  Your Honor, in his direct testimony the

22   way he authenticated the report was based on his identifying

23   this identifying information.  He is not sitting on the stand

24   comparing this back to an original image of the phone.

25        This is the document that was marked and produced as a

J2srmid1                          Greenwood - Cross

1    government exhibit.  I physically put a sticker on top of it

2    and wrote this new number 1650.  There is no question that it

3    comes from Brian Sweet's phone.  The government marked it and

4    produced it.  They have this witness here testifying on the

5    same basis about the other photos.

6          MS. KRAMER:  I'm sorry, your Honor.  His testimony was

7    that he reviewed the metadata.  He looked at these in the

8    extraction of the device.  That's why he recognizes the two

9    images that he testified about, not just because he sees the

10   fields populated.  He has testified 30 times.  He knows better

11   than to do that.  That's not what he was saying.  He would have

12   to compare this to what is in the phone for there to be an

13   adequate foundation for this.  That just hasn't been done.

14         MR. WEDDLE:  Your Honor, we could take a break and ask

15   him to take a look at it on a computer.  The full extraction

16   has never been produced to the defense.  We have written

17   letters about this, your Honor.  We have this that was produced

18   as a government exhibit.  Unless something nefarious was going

19   on, and clearly there wasn't, this comes from the phone.

20         All he would need to do is exactly what he did

21   presumably in preparation for testifying here today.  He didn't

22   initial Government Exhibit 1446.  He was handed a document

23   which he was capable of recognizing and admitting into

24   evidence.  He didn't ask to sit on the stand and look at a

25   computer to review it.  So I think the idea that he has no

1    ability to authenticate this is not correct.

2            In addition, your Honor, this is a question of

3    admissibility, and I think the standard for admissibility is

4    whether the evidence that is available is sufficient to permit

5    a reasonable jury to find that the document is what it is.  I

6    think the standard of proof for that is preponderance of the

7    evidence, and it is clear that that exists here.

8            MS. KRAMER:  Your Honor, we produced a revised version

9    of the exhibit clearly notifying counsel that we intended only

10   to offer the two images and not the third.  They could have,

11   like counsel for defendant Middendorf did, gotten their own

12   witness, looked at the phone, done an analysis to be in a

13   position to testify about this.  The government shouldn't be

14   required to have its witness go back and do further analysis in

15   a device when we clearly gave notice of our intention only to

16   offer two images.

17           If we put exhibit stickers on things that we think we

18   are going to offer, then we change our mind, that doesn't bind

19   us to offering those things.  The fact that it is in an exhibit

20   doesn't mean that a foundation has been laid in court before

21   the jury.

22           THE COURT:  I agree with that.  The Bates numbering

23   doesn't do it.  But I do question whether his analysis of what

24   this is provides a sufficient foundation and authentication for

25   what it is.

J2srmid1                              Greenwood - Cross

 1                 Is this the entirety of the image?

 2                 MR. OHTA:  Yes.

 3                 MS. KRAMER:  Yes.

 4                 THE COURT:  Does it go any higher?

 5                 MS. KRAMER:  No.

 6                 MR. OHTA:  No.

 7                 THE COURT:  You are going to try to get this in

 8     evidence?

 9                 MR. OHTA:  No, I am not trying to get in the old

10     version of 1446.  Sorry.  The answer is yes.  We call it 1650.

11     Then after this is in evidence, I'm just going to say take at a

12     look at this, is that a picture of item 2, and then I'll move

13     on.

14                 MR. WEDDLE:  And offer both of them.

15                 MS. MERMELSTEIN:  What is the relevance of offering

16     this?

17                 THE COURT:  That's a good question.

18                 MS. ESTES:  We don't have any testimony about this at

19     all.

20                 THE COURT:  The witness wasn't asked about this.  What

21     is the relevance?

22                 MR. WEDDLE:  Can I explain that to you, your Honor, in

23     camera?

24                 MS. MERMELSTEIN:  No.  They are offering it as an

25     exhibit.

J2srmid1                          Greenwood - Cross

1          THE COURT:  I don't think that is fair.

2          MR. WEDDLE:  What we have said so far at the sidebar,

3     your Honor, is this is a key date, January 9, 2017.  The

4     government has already admitted this photograph taken at 7:45

5     p.m. with Brian Sweet's phone.  This is a document that clearly

6     relates to inspection type information at the very least.  I

7     think the government would agree with that.  And on the very

8     same day, at 6:52 p.m. Brian Sweet took a photograph of this

9     white board.  I think those facts alone make it relevant to the

10    issues in dispute in this case.

11         MS. KRAMER:  Your Honor, I just asked Mr. Urbanczyk to

12    get the 3500 material for Brian Sweet.  I'm not certain about

13    this, but I believe that it is in the 3500, what this is, and

14    explains it.  It has no reference to Bob Ross or whatever the

15    argument is that they are going to make.  It has to do with

16    discussing extra work that they were going to do.

17         There is no record of this before the jury.  They

18    certainly could have asked Mr. Sweet about it.  If it is in the

19    3500, what he said about it, they don't have a good faith basis

20    to suggest what they are trying to suggest now after having

21    intentionally refrained from crossing Brian Sweet about it and

22    eliciting the truth, which is that this doesn't say "Bob Ross."

23         MR. WEDDLE:  Your Honor, our contention is that Brian

24    Sweet is not a reliable source.  The fact that there is

25    something in the 3500 material that Mr. Sweet told the

J2srmid1                          Greenwood - Cross

prosecution that is consistent with Brian Sweet's what I

contend to be false story line has nothing to do with whether

we have a good faith basis and it has nothing to do with

relevance, which is not a high standard of admissibility,

combined with the rule 104 standards for admissibility, which

are also not high standards for admissibility.

          MR. COOK:  They are free to call Brian Sweet in their

rebuttal case if they believe that is necessary.

          MS. KRAMER:  Your Honor, they shouldn't proffer a good

faith basis for suggesting what they intend to suggest to the

jury.  There were, I think, three people in the room, including

Mr. Sweet, when this white board was written on.  Unless they

have spoken to one of the other people who has said this was

Bob Ross, they don't have a good faith basis to do this.  To

suggest the shape of half a letter means something that there

is no evidence of violates 403.

          MR. COOK:  That is not the only relevance of this

picture.  It is the fact that they were discussing this

inspections-related information and that the picture was taken

at the time it was.  As we have said repeatedly, the time line

of events particularly on these days is critical to our defense

and is critical to the prosecution's case.

          One of the exhibits that they just marked that I

believe they intend to introduce today is a detailed minute-by-

minute time line of what happened on these dates.  That is

J2srmid1                          Greenwood – Cross

1   equally important to our case in the sense it establishes what

2   Brian Sweet was doing at particular times of the day.

3          MS. KRAMER:  What is the relevance of the time that

4   this photo was taken?  You still have not proffered anything

5   about that.

6          MR. WEDDLE:  It's the key day.  I don't know what else

7   we need to say about it.  There is more we could say about it,

8   but I'd rather not preview our defense before the government.

9          THE COURT:  I am going to allow it.  I think there is

10  a sufficient argument that it is relevant because it goes to

11  the issues they discussed about inspections, and I do think

12  there is a sufficient foundation based on the witness's

13  testimony.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J2srmid1                        Greenwood - Cross

1              (In open court)

2              MR. OHTA:  Your Honor, the defense moves 1650 into

3     evidence.

4              THE COURT:  Defense 1650 is received.

5              (Defendant's Exhibit 1650 received in evidence)

6              MR. OHTA:  Ms. O'Connor, can you please put that on

7     the screen for the jury.

8     BY MR. OHTA:

9     Q.  Mr. Greenwood, the picture that we were talking about, the

10    new photo, that's image number 2, correct?

11    A.  Correct.

12             MR. OHTA:  Ms. O'Connor, can you put up Government

13    Exhibit 1445 just for the witness, Court, and counsel.  Then

14    can you put up what was just admitted into evidence, Defense

15    Exhibit 1650.  Ms. O'Connor, can you pull up item 2 so Mr.

16    Greenwood can have a better view of the thumbnail.

17    Q.  Mr. Greenwood, comparing the thumbnail or the enlarged

18    image on Defense Exhibit 1650 with Government Exhibit 1445, is

19    that the same photo, comparing the two?

20    A.  They appear visually similar.

21             MR. OHTA:  Your Honor, we will renumber, but we offer

22    Government Exhibit 1445.

23             THE COURT:  Received.

24             (Defendant's Exhibit 1445 received in evidence)

25             MR. OHTA:  Can you show 1445 to the jury, please, Ms.

J2srmid1                          Greenwood - Cross

1     O'Connor.

2     Q.  Mr. Greenwood, can you read Government Exhibit 1445.

3     A.  Starting from the top, "materiality"?

4     Q.  Perfect, thank you.

5     A.  "And" dash.  I can't read the red writing next to it very

6     well.  The next one reads "scoping" dash "MNSA" followed by

7     "fraud risk, journal entries, all, investments" question mark

8     "derivatives," I can't read what that says, "deposits, good

9     will, loans, audit, columns 35, 24, audit findings," and

10    "related parties."

11    Q.  Thank you, Mr. Greenwood.

12          MR. OHTA:  You can take that down, Ms. O'Connor.

13    Q.  Mr. Greenwood, when were you initially asked to assist in

14    this criminal investigation?

15    A.  I was initially asked to assist in this when I received the

16    device's extractions themselves and to produce reports for

17    review.

18    Q.  Was that approximately August of 2017?

19    A.  That sound about right.

20    Q.  You were employed by the United States Postal Inspection

21    Service in all of 2017, is that accurate?

22    A.  Yes.

23    Q.  Were you ever asked by the prosecution team to forensically

24    examine Jeffrey Wada's PCAOB laptop?

25    A.  No, I was not.

J2srmid1                     Greenwood - Redirect

1   Q.  Were you ever asked to forensically examine any other

2   laptop from the PCAOB for this investigation?

3   A.  No, I don't believe so.

4              MR. OHTA:  No further questions, your Honor.

5              THE COURT:  Thank you.  Any redirect?

6              MS. ESTES:  Yes, just briefly, your Honor.

7   REDIRECT EXAMINATION

8   BY MS. ESTES:

9   Q.  Mr. Greenwood, you were just asked some questions about

10  what has been marked as Defense Exhibit 1650, I believe.  Do

11  you remember that?

12  A.  Yes.

13  Q.  Was one of the images in there a thumbnail image?

14  A.  Yes, it was.

15  Q.  What does it mean for something to be a thumbnail image?

16  A.  A thumbnail image is quite simply what it sounds like, a

17  thumbnail.  It is a preview of another picture.  Your device

18  may store it as a smaller representation as you are scrolling

19  through things or as things are quickly previewed and opened up

20  but not fully extended to full size.

21  Q.  If you have a thumbnail image, is it always marked as

22  deleted even if the original image is deleted?

23  A.  Not necessarily.

24  Q.  Mr. Greenwood, you were also shown a picture of something

25  that looked like a white board with writing on it.  Do you have

J2srmid1                    Greenwood - Redirect

1   any idea what that photograph relates to?

2   A.  No.

3           MS. ESTES:  Mr. Urbanczyk, if you could pull up what

4   is in evidence as Government Exhibit 656-A.  And if you could

5   go back to note 26.  Pull up side by side what is in evidence

6   as Government Exhibit 655 and zoom in to the far right.  Mr.

7   Urbanczyk, can you zoom in on the far right or highlight on the

8   far right where it says "Citi."

9   Q.  Mr. Greenwood, do you see the word "Citi" in the body of

10  that note?

11  A.  Yes, I do.

12          MS. ESTES:  Mr. Urbanczyk, can you highlight where it

13  says "Valero" on the far right.

14  Q.  Mr. Greenwood, do you see where it says "Valero" in the

15  note?

16  A.  Yes, I do.

17          MS. ESTES:  Mr. Urbanczyk, can you highlight where it

18  says "Applied Materials."

19  Q.  Mr. Greenwood, do you see that in the note?

20  A.  Yes.

21          MS. ESTES:  Mr. Urbanczyk, can you highlight where it

22  says "Chartered Comm."

23  Q.  Mr. Greenwood, do you see "Charter Communications" in the

24  note?

25  A.  Yes, I do.

1              MS. ESTES:  Mr. Urbanczyk, can you highlight where it

2      says "Macy's."

3      Q.  Mr. Greenwood, do you see that in the note?

4      A.  Yes.

5              MS. ESTES:  Mr. Urbanczyk, can you highlight where it

6      says "Home Depot."

7      Q.  Mr. Greenwood, do you see that in the note?

8      A.  Yes, I do.

9              MS. ESTES:  Mr. Urbanczyk, can you highlight where it

10     says "Synchrony."

11     Q.  Mr. Greenwood, do you see that at the top of the note?

12     A.  Yes, I do.

13             MS. ESTES:  Mr. Urbanczyk, can you highlight where it

14     says "Lakeland."

15     Q.  Mr. Greenwood, do you see that in the note?

16     A.  Yes.

17             MS. ESTES:  Mr. Urbanczyk, can you highlight "Mid

18     State."

19     Q.  Mr. Greenwood, do you see "Midland State" in the note?

20     A.  Yes, I do.

21             MS. ESTES:  Mr. Urbanczyk, can you highlight "National

22     Holdings."

23     Q.  Mr. Greenwood, do you see "National Bank Holdings" in the

24     note?

25     A.  I do.

J2srmid1

1          MS. ESTES:  Mr. Urbanczyk, can you highlight

2     "Heartland."

3     Q.  Mr. Greenwood, do you see that in the note?

4     A.  Yes.

5          MS. ESTES:  Finally, Mr. Urbanczyk, can you highlight

6     "Northern Trust."

7     Q.  Mr. Greenwood, do you see that in the note?

8     A.  I do.

9          MS. ESTES:  No further questions.

10         THE COURT:  Anything further?

11         MS. CLARK:  No, your Honor.

12         THE COURT:  Thank you.  You may step down.

13         (Witness excused)

14         THE COURT:  Government, you may call your next

15    witness.

16         MS. ESTES:  Your Honor, at this time we wanted to

17    offer some text messages into evidence and we are going to read

18    them.  I believe the foundation for these text messages was

19    originally established through the government's witness Enrique

20    Santos, who testified last week.  The exhibit numbers are

21    Government Exhibits 1410 through 1440 and then 1442 and 1443.

22    We would offer those now.

23         THE COURT:  1410 through 1440 and 1442 and 1443?

24         MS. ESTES:  Your Honor, I would note that a few of

25    these, 1432, 1434, 1436, 1437, 1439, and 1442 were previously

J2srmid1

```
1    offered subject to connection.  I believe Mr. Santos

2    established that connection.

3             THE COURT:  All right.  Those are received.

4             (Government's Exhibits 1410 through 1440, 1442, and

5    1443 received in evidence)

6             MS. ESTES:  Your Honor, we would now call Mr.

7    Nathaniel Cooney, our paralegal specialist, to read the text

8    messages from the stand.

9             THE COURT:  Okay.  Do I need to swear him in?

10            MS. ESTES:  I don't believe so, your Honor.

11            THE COURT:  He is just reading text messages that you

12   nor in evidence?

13            MS. ESTES:  Yes, your Honor.

14            THE COURT:  Okay.

15            MS. ESTES:  Mr. Urbanczyk, can you pull up Government

16   Exhibit 1410.  If you could zoom in to the top part of the

17   document.

18            Mr. Cooney, what is the heading at the top of this

19   document?

20            MR. COONEY:  The heading is "November 9, 2015,

21   iMessages between Holder and Wada."

22            MS. ESTES:  What is the time of the first message

23   listed there?

24            MR. COONEY:  It is 8 p.m. Eastern Standard Time.

25            MS. ESTES:  Mr. Cooney, I would like to walk through
```

J2srmid1

this document.  I will read the text messages from Cindy Holder
and if you could read the text messages from Jeffrey Wada.  The
first message:

      "I'm trying to work it.  Fingers crossed."

      MR. COONEY:  "Stop texting me then . . . LOL."

      MS. ESTES:  "Ha-ha-ha.  No."

      MR. COONEY:  "Are you coming out to Tokyo?  Can you?
Isn't that too soon, or will you work in the shadows?"

      MS. ESTES:  "I'm trying, but timing sucks.  I'd be in
the shadows except for breakfast and lunch with you.  Ha-ha.  I
mean breakfast and dinner.  We were friends before."

      MR. COONEY:  "Very true.  So the U.S. firm has been
notified?  You working with Craig Inquist.  We are trying to
stay at the Conrad."

      MS. ESTES:  "I probably am not supposed to know, but
yes, Japan let us know."

      MR. COONEY:  "That's cool.  I won't say anything."

      MS. ESTES:  Mr. Urbanczyk, can we go to the next page.

      At 8:04 p.m., "Brian is trying to get us both
on-site."

      MR. COONEY:  "I wish you could go.  Bruno is coming."

      MS. ESTES:  "Oh, man.  I might just take PTO.
Ha-ha-ha."

      MR. COONEY:  "You can socialize with us on the
weekends.  No one has to know."

J2srmid1

1          MS. ESTES:  "I'll loiter in the lobby."

2          MR. COONEY:  "Besides, I like a challenge.  You know

3     my moods.  LOL . . . JK."

4          MS. ESTES:  "I know.  It would be awesome.  I don't

5     even care about the inspection.  Just kidding.  I'm not sure

6     how 2015 will look.  Is Jack AB?  If he is, I can't possibly

7     miss all three of you."

8          MR. COONEY:  "It would be great if you came.  No . . .

9     no bank.  Oops . . . said too much."

10          MS. ESTES:  "Oh, okay.  I hope AB doesn't know me

11     then.  LOL.  We can really have fun."

12          Mr. Urbanczyk, if we could now pull up Government

13     Exhibit 1433.

14          Mr. Cooney, what are the dates of these messages?

15          MR. COONEY:  These messages are dated November 13th

16     and 14th of 2015.

17          MS. ESTES:  Who are these between?

18          MR. COONEY:  Cindy Holder and Brian Sweet.

19          MS. ESTES:  I'll read the Cindy Holder text, and if

20     you could read the Brian Sweet ones.

21          At 8:41 p.m.:  "Wada said dates now confirmed as

22     discussed.  Early January it is.  Four-week gig."

23          MR. COONEY:  "Solid.  That's what I heard from

24     Japanese firm too.  I had all call with Liddy today and suggest

25     that you be the best person to provide on-site support (I told

J2srmid1

1    him how you led efforts on Nomura).  Do you know Scott Frew?

2    He has also been very involved."

3            MS. ESTES:  "No, I don't.  I'll ask Wada about him.

4    Oh, he's KPMG.  I checked address.  No, I don't know him."

5            MR. COONEY:  "Yeah, he is KPMG.  He used to work in

6    Tom Whittle's role and now does a lot of the international

7    coordination."

8            MS. ESTES:  Mr. Urbanczyk, let's now pull up

9    Government Exhibit 1411.

10           Mr. Cooney, could you read the heading at the top.

11           MR. COONEY:  "December 10, 2015, iMessages between

12   Holder and Wada."

13           MS. ESTES:  If you could again read the Wada messages

14   and I'll read the Cindy Holder messages.

15           MR. COONEY:  "I need to tell you about my possible

16   promotion.  I'm on the list."

17           MS. ESTES:  "Awesome.  That made me smile?

18           MR. COONEY:  "Thanks.  I appreciate the support.

19           MS. ESTES:  Mr. Urbanczyk, let's now pull up

20   Government Exhibit 1412.

21           Mr. Cooney, what is the heading at the top here?

22           MR. COONEY:  "January 5, 2016, iMessages between

23   Holder and Wada."

24           MS. ESTES:  I'll start with the Cindy Holder messages.

25           9:14 a.m.:  "When are you leaving for Tokyo?"

J2srmid1

1          MR. COONEY:  "Happy New Year.  I'm leaving Sat.  You

2     coming out too."

3          MS. ESTES:  "Same to you.  Not this time.  Please be

4     careful.  And remember of you see Godzilla, tell him thank you

5     for saving San Francisco last year.  Ha-ha-ha-ha."

6          MR. COONEY:  "Boo.  Maybe in Feb.  Is the Japanese

7     firm freaked out?"

8          MS. ESTES:  "I'm really trying to get down to okay for

9     the second trip, but looking good.  They are a bit nervous.

10    LOL.  Opening meeting presentation is horrible.  Brian and I

11    are going to have a call with him today to give him suggestions

12    to improve."

13         MR. COONEY:  "Nervous with me?  I'm harmless.  I don't

14    bite.  Thank you for helping them.  Helping them will help us."

15         MS. ESTES:  "Right.  It's only help if they listen.  I

16    think they will."

17         MR. COONEY:  "It should be a slam-dunk.  The Honda

18    team was already inspected by the Japanese regulators, right?"

19         MS. ESTES:  "Ah, but not by the best and the

20    brightest.  LOL."

21         MR. COONEY:  "I would ask the overall question about

22    any recent findings from the Japanese regulators.  LOL.  They

23    will of course need to be prepared to address the Japanese

24    regulators findings with us if any deficiencies relate to U.S.

25    GAAP/GAAS matters."

J2srmid1

1           MS. ESTES:  "Understood."

2           MR. COONEY:  "You have a minute to chat on the phone."

3           MS. ESTES:  "Sure.  Call me maybe.  Any other

4    noteworthy AD changes?  LOL."

5           MR. COONEY:  "You may know better.  LOL.  I only know

6    about the PWC team.  Hear anything?"

7    "Q. I'll let you know if I hear anything else."

8           MR. COONEY:  "LOL.  Thanks."

9           MS. ESTES:  Mr. Urbanczyk, can you pull up Government

10   Exhibit 1413.

11          Mr. Cooney, what is the heading at the top here?

12          MR. COONEY:  "January 5, 2016, iMessages between

13   Holder and Wada."

14          MS. ESTES:  At 9:42 p.m. Cindy Holder says, "Honda

15   looks much better."

16          MR. COONEY:  "Good to hear, but why are you still

17   working?"

18          MS. ESTES:  "Because I'm in public accounting.  LMAO."

19          MR. COONEY:  "I'm working still but I'm 3 hours behind

20   you."

21          MS. ESTES:  "Good point, grasshopper."

22          MR. COONEY:  "Come out in February.  Get all your

23   other shit done."

24          MS. ESTES:  "I am really trying."

25          MR. COONEY:  "So your bosses can't say no.  LOL."

J2srmid1

1          MS. ESTES:  "That would be south fun."

2          MR. COONEY:  "Yes, it would.  Go home.  Don't work too

3     late."

4          MS. ESTES:  "Never.  You either.

5          MR. COONEY:  "I suppose so.  Difference is I'm working

6     at home now and you make double my salary."

7          MS. ESTES:  "Well, when you say it like that --"

8          MR. COONEY:  "Right?"

9          MS. ESTES:  "Not double."

10          MR. COONEY:  "Say hi to Mr. Sweet and Hector for me."

11          MS. ESTES:  "Will do."

12          MR. COONEY:  "Pretty damn close to double."

13          MS. ESTES:  "You too can join the dark side."

14          MR. COONEY:  "If the money is right, I can get my AD

15     title first, you know I'm going to call you about a job."

16          MS. ESTES:  "I'll be waiting and ready to push for

17     it."

18          MR. COONEY:  "400K starting pay too much to ask for?

19     LOL."

20          MS. ESTES:  "Not for you with those creds."

21          MR. COONEY:  "Whatever . . . LOL.  I was kidding."

22          MS. ESTES:  "Drinks are on you when we celebrate."

23          MR. COONEY:  "Not right now.  I'm broke as a joke."

24          MS. ESTES:  Mr. Urbanczyk, let's pull up Government

25     Exhibit 1414.

J2srmid1

1           Mr. Cooney, what the heading at the top?

2           MR. COONEY:  "February 5, 2016, iMessages between

3    Holder and Wada."

4           MS. ESTES:  If you can start with the 2 p.m. message

5    from Jeffrey Wada.

6           MR. COONEY:  "So, does Scott Frew want me to come in

7    for an interview?  LOL . . ."

8           MS. ESTES:  "You know he would if you were

9    interested."

10          MR. COONEY:  "Unfortunately . . . not yet.  I need

11   some more PCAOB marinating.  If I get to be a 'well seasoned'

12   AD, maybe I could get that partner title and a fat payday."

13          MS. ESTES:  "LOL.  If you stay so.  I agree though,

14   but just for AD title."

15          MR. COONEY:  "Thank you for your support.  I hope

16   Watkins lands on his feet."

17          MS. ESTES:  "Me too."

18          Mr. Urbanczyk, can you zoom out and pull up Government

19   Exhibit 1443.

20          Mr. Cooney, what is the heading at the top here?

21          MR. COONEY:  "March 27, 2016, iMessages between Holder

22   and Wada."

23          MS. ESTES:  I'll start with the 7:19 p.m. Cindy Holder

24   message.  "Happy Easter.  I am so sorry.  Having to NYC as we

25   speak.  Let me know when you have time to chat tomorrow."

J2srmid1

1        MR. COONEY:  "Happy Easter.  How are you?  Traveling

2    again?  I can't do your job.  LOL."

3        MS. ESTES:  "Boarding now.  Let's talk tomorrow.  I'm

4    in a meeting 1 to 3 EST.  All else clear."

5        MR. COONEY:  "Christy Zhang is still interested?

6    Okay.  Call me.  Call me first thing if you can."

7        MS. ESTES:  "Okay.  Scott H has halted hiring at the

8    moment.  I'll explain tomorrow."

9        MR. COONEY:  "Really.  Sound like there is a story

10   behind it.  Okay, call me when you can.  Safe travels."

11       MS. ESTES:  Mr. Urbanczyk, let's pull up Government

12   Exhibit 1415.

13       Mr. Cooney, what the title at the top?

14       MR. COONEY:  "April 12, 2016, iMessages between Holder

15   and Wada."

16       MS. ESTES:  If you can start with the 10:41 a.m.

17   message.

18       MR. COONEY:  "FYI . . . raises SUCKED this year.  You

19   will have an easy time recruiting from the PCAOB this year.

20   Many, many bitter people.  I only got 4 percent for an EE.

21   FMEs are getting 3 to 3.5.  So . . . I bust my ass and make it

22   to the higher levels of ILs for .5 percent more.  Fuck

23   me . . ."

24       MS. ESTES:  "That sucks.  I'm mad too."

25       MR. COONEY:  "Why?  You're going to be able to hire me

J2srmid1

now.  LOL.  Did Henderson ever figure out if he's going to hire

another partner versus hiring more actual workers?  I heard

Sykes is lazy.  If Sykes gets hired, his reputation may scare

off."

            MS. ESTES:  Mr. Urbanczyk, if you could now pull up

Government Exhibit 1416.  Mr. Cooney, what is the title at the

top?

            MR. COONEY:  "April 26, 2016, iMessages between Holder

and Wada."

            MS. ESTES:  If you could start with the 8:32 p.m.

Jeffrey Wada message.

            MR. COONEY:  "So . . . I had a conversation with an AD

today, and he said he has talked to two different ILs about a

position in DPP in the last month.  How many guys are you

hiring?  LOL . . . Gee . . . I feel special, like a whore at

Mardi Gras.  LOL."

            MS. ESTES:  "Ha-ha-ha.  Not true.  You were first

choice.  Don't forget that."

            MR. COONEY:  "I hear that there is one IL that is

close to signing with you guys.  I also heard that KPMG isn't

taking any more partners."

            MS. ESTES:  "Hm.  Let me see."

            MR. COONEY:  "I will have to come in as a managing

director, wouldn't I?"

            MS. ESTES:  "Annad is one, I think."

J2srmid1

1            MR. COONEY:  "Annad?  An AD?"

2            MS. ESTES:  "You need to make AD next year.  He's an

3     IL, isn't he?"

4            MR. COONEY:  "So I do need to stick around . . .

5     Annand Tailor ISA?"

6            MS. ESTES:  "Yes, that's him.  Brian and I are

7     waiting, watching.  You will be the first to know if a partner

8     slot opens up and we will handle Louann."

9            MR. COONEY:  "No . . . he's an IS2.  He's a really

10    nice guy, not a bad ISA either.  Well spoken . . . not sure

11    about the quality of his work though.  I only worked with him

12    when he was new."

13           MS. ESTES:  "If you would move to NY, we'd be working

14    together already."

15           MR. COONEY:  "He's only been with us for four years.

16           MS. ESTES:  "Asshole."

17           MR. COONEY:  "LOL.  NY is completely off the table.

18    Sorry."

19           MS. ESTES:  "Asshole squared.  No contest."

20           MR. COONEY:  "Your firm is limiting its pool of talent

21    by forcing these trips to NY."

22           MS. ESTES:  "Yep."

23           MR. COONEY:  "More people . . . more talented people

24    would be serious about coming over if not for the NY thing.  I

25    would have moved by now . . . if the salary was in range as

J2srmid1

1    well.  LOL."

2        MS. ESTES:  "Yours would be."

3        MR. COONEY:  "I guess I'll have to stick to my

4    original time line and pray I make AD next spring.  After last

5    week I'm completely drained."

6        MS. ESTES:  "I'm sorry."

7        MR. COONEY:  "I have no motivation to go through

8    another inspection season only to get fucked over again come

9    Feb 2017.  That sucks."

10        MS. ESTES:  "Let's make sure it doesn't happen then.

11    How can I help?"

12        MR. COONEY:  "It's not you . . . you know that, silly.

13    LOL.  I don't think I will ever make AD at this fuckin' place.

14    If that's the case, I should just go over there now.  I

15    committed to my RAD that I will see what happens after the Aug

16    PRC MTG and then make my decision.  By then you guys will have

17    a full boat of ex-PCAOB staff."

18        MS. ESTES:  "No, but I can help you.  Let Brian and I

19    help with your assessment at the end of the year."

20        MR. COONEY:  "Myself assessment?  It's not about my

21    assessment.  It's the politics.  I made too many enemies.  They

22    like to keep me down because I talked too much shit and ran my

23    mouth often, too often."

24        MS. ESTES:  "We will make a slot if at all possible.

25    Brian and I will step up for you."

J2srmid1

1          Mr. Urbanczyk, if you can pull up Government Exhibit

2    1417.

3          Mr. Cooney, what is the title of this document?

4          MR. COONEY:  "May 2, 2016, iMessages between Holder

5    and Wada."

6          MS. ESTES:  If you could start with the 9:46 p.m.

7    message from Jeffrey Wada.

8          MR. COONEY:  "Did you get into the city okay tonight?"

9          MS. ESTES:  "Waiting on a gate at LGA."

10          MR. COONEY:  "Oops . . . so is Sweet in town too?"

11          MS. ESTES:  "No.  He took family to Disney."

12          MR. COONEY:  "I see . . . in two weeks then?"

13          MS. ESTES:  "You're stuck with just me.  Yes, you will

14    be in two weeks."

15          MR. COONEY:  "I was hoping to have a serious convo

16    with both of you now.  LOL . . . that's not what I meant."

17          MS. ESTES:  "I know.  I was just kidding."

18          MR. COONEY:  "I think I'm ready to seriously consider

19    my next step."

20          MS. ESTES:  "Great.  Let's have a serious chat."

21          MR. COONEY:  "I think Anjo is going to screw me on my

22    eval for last week, so I may not make it again to AD."

23          MS. ESTES:  "Ann had a PME and made it.  We have a

24    gate."

25          MR. COONEY:  "Not I . . . Special treatment . . . My

J2srmid1

1    name is mud to them."

2              MS. ESTES:  "Very doubtful."

3              MR. COONEY:  "That's why I keep getting fucked over."

4              MS. ESTES:  "I think if this year is as good as last

5    year, and it will be, the past will be the past.  Screw Anjo.

6    He's just one week."

7              MR. COONEY:  "True, but the doubts are starting to

8    creep in.  I'm not sure I have enough in the tank to get

9    there."

10             MS. ESTES:  "Just yours but no one else's.  You are

11   tougher on yourself than anyone else."

12             MR. COONEY:  "I don't know . . . it's so hard to make

13   AD now.  And then the doors closing over there with all the

14   PCAOB people you're hiring."

15             MS. ESTES:  "How did day one go for you?"

16             MR. COONEY:  "I have to clean up Anjo's review notes.

17   Day one was good."

18             MS. ESTES:  "I should be working but I'm exhausted."

19             MR. COONEY:  "I think we are gonna be good with Rev

20   but not GW.  I thought you lived outside of Houston.  You

21   should live closer given your travels."

22             MS. ESTES:  "Just outside the city limits but still

23   have Houston as my address.  We did, but moved to be closer to

24   my parents."

25             MR. COONEY:  "Once I have a serious chat with you,

J2srmid1

```
1    I'll take it to Marion to discuss, but hopefully my travels

2    won't be that bad over at the firm."

3              MS. ESTES:  Mr. Urbanczyk, let's now pull up

4    Government Exhibit 1418.

5              Mr. Cooney, what is the heading at the top?

6              MR. COONEY:  "May 3, 2016, iMessages between Holder

7    and Wada."

8              MS. ESTES:  I'll start with the 10:48 p.m. message

9    from Cindy Holder.  "Exactly why it's not a good thing to stay

10   at the Marriott East.  LOL.  John told me what a great guy you

11   were.  He said you got stuck BIE stuff."

12             MR. COONEY:  "Wow . . . he remembered.  It was the Air

13   Gas inspection.  I can't believe he remembered.  He was a nice

14   guy or I-S, is a nice guy, guy.  So . . . he didn't say

15   anything else.  I didn't write him up.  LOL.  He was our DPP

16   rep on a couple of inspections in 2012."

17             MS. ESTES:  "He was all good.  He another advocate

18   when the time comes."

19             MR. COONEY:  "He was with us on Pfizer and FMC in

20   Houston.  I can't believe I remember."

21             MS. ESTES:  "See, everything happens for a reason."

22             MR. COONEY:  "I never wrote up a comment form when he

23   was with me.  No one wonder he is cool with me."

24             MS. ESTES:  "LOL.  Not that simple.  You're a great

25   inspector."
```

J2srmid1

```
 1              MR. COONEY:  "Thank you.  That means a lot."

 2              MS. ESTES:  Mr. Urbanczyk, let's pull up Government

 3    Exhibit 1419.

 4              Mr. Cooney, what does it say on the top?

 5              MR. COONEY:  "May 17, 2016 iMessages between Holder

 6    and Wada."

 7              MS. ESTES:  I'll start with the 4:23 p.m. one from

 8    Cindy Holder.  "Just ran over your favorite former AD and

 9    almost knocked her on her rear."

10              MR. COONEY:  "You should have put her in the hospital

11    . . . or a body bag."

12              MS. ESTES:  "LOL.  She was exiting elevator and I was

13    getting on.  She dilly-dallied, so I didn't know she was on

14    it."

15              MR. COONEY:  "Fuck her.  Bitch . . ."

16              MS. ESTES:  "LOL."

17              MR. COONEY:  "She's the reason I'm toiling as an IL

18    still."

19              MS. ESTES:  "I know.  She sucks."

20              Let's pull up Government Exhibit 1420.

21              Mr. Cooney, what is the date at the top of these?

22              MR. COONEY:  June 18, 2016, iMessages between Holder

23    and Wada.

24              MS. ESTES:  If you could start with the Jeffrey Wada

25    message at 1145 a.m.
```

J2srmid1

1              MR. COONEY:  "Good morning . . . how was Detroit?

2              MS. ESTES:  "I got pulled off and had to go to NYC.

3    So glad you weren't there.  I would have been pissed.  LOL.

4    How are you?"

5              MR. COONEY:  "Why pissed?  What happened?

6              MS. ESTES:  "No, only pissed if you had been in

7    Detroit the same week."

8              MR. COONEY:  "Got it . . . my inspection is good,

9    probably clean.  I think Anjo is going to block me from getting

10   AF, AD.  He's covering his own ass."

11             MS. ESTES:  "Fuck her.  He can't have that much ball.

12   Mitch can trump him."

13             MR. COONEY:  "Oh, well  . . . another year of

14   bullshit.  Mitch can, but I'm not sure he likes me."

15             MS. ESTES:  "Why?"

16             MR. COONEY:  "He's fuckin' weird.  Hard to know where

17   I stand."

18             MS. ESTES:  "Ask him.  Didn't you talk to him earlier

19   and have a convo about your goal whole to make AD?"

20             MR. COONEY:  "I did . . . he knows.  EVERYONE knows.

21   It's not gonna be easy.  Harder and harder every year."

22             MS. ESTES:  "You deserve it.  Anjo is an ass?

23             MR. COONEY:  "Oh, well . . . what can I do?"

24             MS. ESTES:  "You're doing all you can."

25             MR. COONEY:  "I am . . . we will see what the

J2srmid1

1   discussion at the PRC is like in August."

2           MS. ESTES:  "I'm crossing my fingers because it really

3   is outside your control at this point?

4           MR. COONEY:  "Thank you.  I appreciate it.  Well, I

5   just want to check in on our usual Saturday texts.  Hang in

6   there."

7           MS. ESTES:  "You too.  Take some time off, buddy,

8   #Family first."

9           MR. COONEY:  "#Fuck my life.  LOL."

10          MS. ESTES:  Let's pull up Government Exhibit 1421.

11   Mr. Cooney, what is the date of these messages?

12          MR. COONEY:  "July 10, 2016, iMessages between Holder

13   and Wada."

14          MS. ESTES:  If you can start with the 6:40 p.m.

15   message.

16          MR. COONEY:  "I leave for Tokyo on the 29th.  Not the

17   same without you."

18          MS. ESTES:  "Okay.  I'm going to try like crazy to get

19   back early.  Where are you saying?"

20          MR. COONEY:  "Weston downtown.  How far are you from

21   downtown?  Like 45 min, right?"

22          MS. ESTES:  "Well, I can come back get you.  Not bad

23   at all."

24          MR. COONEY:  "We can't get cars anymore.  PCAOB is

25   cracking down."

J2srmid1

 1          MS. ESTES:  "No worries.  I don't mind driving to see

 2     my baby brother."

 3          MR. COONEY:  "I used to get a car all the time in

 4     Houston.  Not . . . no . . . more.  It's get worse, Cindy."

 5          MS. ESTES:  "Bastards there too I see."

 6          MR. COONEY:  "It's awful.  All this focus on expenses

 7     and being tight."

 8          MS. ESTES:  "I'm so sorry.  We have got to figure out

 9     how to get you over here where it works for you and the

10     family."

11          MR. COONEY:  "500K plus one million bonus, I will sign

12     right now.  LOL."

13          MS. ESTES:  "LOL.  And you'll pay me a finder's fee,

14     right?"

15          MR. COONEY:  "$2.  That will work, right?"

16          MS. ESTES:  "Ha-ha-ha."

17          MR. COONEY:  "LOL."

18          MS. ESTES:  Let's pull up Government Exhibit 1422.

19     Mr. Cooney, what is the date at the top of this document?

20          MR. COONEY:  August 25, 2016, iMessages between Holder

21     and Wada.

22          MS. ESTES:  I'll start with the 3:18 p.m. from Cindy

23     Holder.  "Damn it, why did you never tell me about Castle --"

24          MR. COONEY:  "You saw that show?  Better late than

25     never."

J2srmid1

1             MS. ESTES:  "Yes.  Stupid but funny."

2             MR. COONEY:  "I liked it.  LOL.  How are you?"

3             MS. ESTES:  "I laughed during the whole thing.  I'm

4    good, at LAX as we speak."

5             MR. COONEY:  "LA?  How did it go?"

6             MS. ESTES:  "Well, back next week.  Come visit.  LOL."

7             MR. COONEY:  "LOL.  Too bad I can't."

8             MS. ESTES:  "No contest."

9             MR. COONEY:  "I'm sorry."

10            MS. ESTES:  Mr. Urbanczyk, can you pull up Government

11   Exhibit 1423.

12            Mr. Cooney, what is the date at the top here?

13            MR. COONEY:  October 27, 2016.

14            MS. ESTES:  If you could start with the 1:51 p.m.

15   message from Jeffrey Wada.

16            MR. COONEY:  "Hey . . . I'm hearing that Jung is on

17   the hot seat.  He may be looking to go over there sooner rather

18   than later.  Schindler has been very unhappy with him lately.

19   How are you?  Did you find me a desk yet?  LOL."

20            MS. ESTES:  "Jung is pushing hard.  Wonder what

21   finally tipped the scales for Steve.  I will personally buy you

22   whatever desk you want."

23            MR. COONEY:  "I think there have been too many

24   complaints.  You can't have it."

25            MS. ESTES:  "And no Bob Ross buffer."

J2srmid1

1          MR. COONEY:  "They are trying to thin the top ranks.

2     ILs and ADs have targets."

3          MS. ESTES:  "Bob got them hired."

4          MR. COONEY:  "On their backs.  LOL.  Bob is an idiot."

5          MS. ESTES:  "Yep."

6          MR. COONEY:  "I'm not worried.  I can run circles

7     around most of them.  They can't fire me for incompetence, just

8     harassment."

9          MS. ESTES:  "All of them at AD and IL."

10          MR. COONEY:  "LOL.  Not all, but many."

11          MS. ESTES:  "All."

12          MR. COONEY:  "I have to show some humility.  LOL."

13          MS. ESTES:  "Don't argue with me.  I am woman, hear me

14     roar."

15          MR. COONEY:  "I'm not the smartest guy in the room,

16     but I can hold my own."

17          MS. ESTES:  "Helen Reddy quote too much?"

18          MR. COONEY:  "Let's see what's going on in K17

19     planning . . . LOL."

20          MS. ESTES:  "LOL.  You really are the best of the best

21     over there.  I mean it."

22          MR. COONEY:  "Nah.  I'm okay.  Seriously, there are

23     plenty of smart people here."

24          MS. ESTES:  "Crap.  On call in two minutes.  Stand

25     by."

J2srmid1

1              MR. COONEY:  "I just don't have the political desire

2      to do that extra bit to help get the promotion.  No worries."

3              MS. ESTES:  "Yes, but they don't have fucking people

4      skills like you do?

5              MR. COONEY:  "Call this cell which you free up."

6              MS. ESTES:  "Just tried to call and went straight into

7      VM.  Call when you can."

8              MR. COONEY:  "Give me five min."

9              MS. ESTES:  "And not one second longer."

10             Your Honor, we still have a decent number of text

11     messages.  This might be a good time for a break.

12             THE COURT:  Why don't we take ten minutes, ladies and

13     gentlemen.  Please leave your notepads on your chairs.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J2sdmid2

1          (Jury not present)

2          THE COURT:  Are we all ready for the jury?

3          MS. ESTES:  Yes, your Honor.

4          (Jury present)

5          THE COURT:  Please be seated.

6          Good morning, folks.  We'll go until about 1 for

7    lunch.  We'll break at 1 for lunch 'til 2 and then, as I said

8    yesterday, we'll break at 4 today and, again, we're not sitting

9    tomorrow.

10          Ms. Estes, you may proceed.

11          MS. ESTES:  Mr. Urbanczyk can you pull up Government

12    Exhibit 1410.

13          And, Mr. Cooney, I believe we looked at this before

14    but neglected to read the last page, so let's go to the last

15    page of this document.

16          And if you could read the Jeffrey Wada messages and

17    I'll read the Cindy Holder ones.

18          MR. COONEY:  "Probably won't.  We haven't picked one

19    yet.  So far, just the Japanese.  You heard about this last

20    week?  Boy, the Japanese firm doesn't waste time asking for

21    help."

22          MS. ESTES:  "Good.  I'm really going to try and weasel

23    a visit.  I'm not going to offer that it's not a bank.  LOL."

24          MR. COONEY:  "This will be the first time former PCAOB

25    people were working with the firm.  This is great, we can use

J2sdmid2

1  back channels to help each other."

2           MS. ESTES:  "Yep."

3           MR. COONEY:  "Just landed."

4           MS. ESTES:  "Maybe they will let you AD."

5           MR. COONEY:  "I will text later."

6           "Nope.  Jack's a dick."

7           MS. ESTES:  "OK.  Safe travels to hotel."

8           Mr. Urbanczyk, can we now pull Government Exhibit

9  1424.

10           Mr. Cooney, what is the date of these?

11           MR. COONEY:  November 29, 2016.

12           MS. ESTES:  And if you could start with the Jeffrey

13  Wada text at the top.

14           MR. COONEY:  How is work?  Ready for another season?"

15           MS. ESTES:  "Yes, she is and sounds great.  Yes, I

16  miss you.  You're on PTO, right?

17           "No on the busy season."

18           MR. COONEY:  "Nope, working on planning and Top 30

19  stuff.  Already working on issuers?"

20           MS. ESTES:  "When does your PTO start?"

21           MR. COONEY:  "No rest for the weary.  PTO starts on

22  Dec 12.  Are we scheduling an in-house?  LOL."

23           MS. ESTES:  "LOL."

24           MR. COONEY:  "I heard there will probably be only be 3

25  to 4 promos to AD this year.  I'm screwed."

J2sdmid2

1          MS. ESTES:  "Not necessarily.  Heard about Calexit.

2     I'll miss you."

3          MR. COONEY:  "What have you heard from your other

4     contacts?  Calexit is a joke."

5          MS. ESTES:  "Nothing at all."

6          MR. COONEY:  "We won't leave."

7          MS. ESTES:  "I know but it's still funny."

8          MR. COONEY:  "Isn't Jung complaining about the lack of

9     promotion?  I heard Korea went well."

10         MS. ESTES:  "I think he's getting axed."

11         MR. COONEY:  "What city are you in?  What?  I haven't

12    heard that.  I heard he was talked to but he still went out on

13    a few trips.  I doubt they would send him if he was gonna get

14    dropped.  Did Tom deicide to bring him in for an in-house?"

15         MS. ESTES:  "I'm in NY this week.  He called Brian and

16    said he was quiting when got back, which made no sense unless

17    getting fired.  No on that.  Tom doesn't like him."

18         MR. COONEY:  "Impossible...really?  That does make no

19    sense.  I think Jung is posturing.  Me.  I'm not...if I don't

20    get promoted, I have to go."

21         MS. ESTES:  All right.  Mr. Urbanczyk if you could

22    pull up Government Exhibit 1425.

23         Mr. Cooney, what is the date here?

24         MR. COONEY:  November 30, 2016.

25         MS. ESTES:  And I'll start with the 1:31 p.m. message.

J2sdmid2

1          "What is your PM telling you about promotion track?  I

2     know, I'm being nosy."

3          MR. COONEY:  "He's in the dark.  He thinks it's all bs

4     too.  He feels like I've been railroaded for the last few

5     years."

6          MS. ESTES:  "Is he advocating?"

7          MR. COONEY:  "Yeah, but he has no clout."

8          MS. ESTES:  Mr. Urbanczyk, let's now pull up

9     Government Exhibit 1426.

10          And, Mr. Cooney, if you could start from the message

11     at the top.

12          MR. COONEY:  December 13th -- I'm sorry.

13          "Jung was fired last week."

14          MS. ESTES:  "Wow."

15          MR. COONEY:  "Too bad they haven't fired any ADs.

16     LOL.

17          MS. ESTES:  "Hahaha."

18          MR. COONEY:  "I should know in a few weeks whether or

19     not they are going to 'nominate' me for AD."

20          MS. ESTES:  "I'm praying every night for it."

21          MR. COONEY:  "Bob Harcourt has been ducking my calls

22     ... not sure I can rely on him.

23          "Oh, well.  Thank you.

24          MS. ESTES:  "Really?  I wonder why."

25          MR. COONEY:  "He may be busy.  I left him a message

J2sdmid2

1    last week just to check on him.  I wasn't planning on talking

2    to him about the firm.  Yesterday I used my personal cell and

3    called him.  He picked up and then quickly told me he would

4    call me back.  Never did."

5            Sad face.

6            "No content.

7            "Fuckin' ole bastard.

8            "Just kidding.  I really do hope he's OK.  Anywho ...

9    stay warm."

10           MS. ESTES:  "Trying.  Anybody else get axed?"

11           MR. COONEY:  "Not that I'm aware.  So ... when does

12   Jung start at KPMG?"

13           MS. ESTES:  "Ah, never."

14           MR. COONEY:  "LOL.  Just checking."

15           MS. ESTES:  All right.  And if we can pull up

16   Government Exhibit 1429.

17           Mr. Cooney, what is the date of these?

18           MR. COONEY:  January 9, 2017.

19           MS. ESTES:  And I'll start with the 2:24 p.m. message

20   from Cindy Holder.

21           "Any idea who the ADs will be in the banking group

22   yet, or anyone, for that matter?  LOL.

23           "I'm back in my office and will be indefinitely.  LOL.

24   Long night."

25           MR. COONEY:  "Can I call you in 30 min?"

J2sdmid2

1              MS. ESTES:  "Absolutely."

2              MR. COONEY:  "Sorry.  Call went long.  Can I call you

3     about 400 p.m. Pacific in 40 min?  We need to talk."

4              MS. ESTES:  "Sure."

5              And, Mr. Urbanczyk, can we pull up Government Exhibit

6     1427.

7              Mr. Cooney, what's the date here?

8              MR. COONEY:  January 24, 2017.

9              MS. ESTES:  And if you could start with the message at

10    the top.

11             MR. COONEY:  "LOL ... good morning.  Edits to my

12    résumé, huh?  OK, fine.  Hahaha.

13             "Thank you.  Hopefully it was halfway decent.  How

14    busy are you guys?  Have you had a chance to officially ask

15    around about a position?"

16             MS. ESTES:  "It was great.  Edits are to shorten a

17    bit.  I haven't been in NY but will be next week with Brian.

18    We will informally start setting the stage then."

19             MR. COONEY:  "By the way, Duane tried to discourage me

20    from talking to you guys saying that Brian told him that KPMG

21    isn't hiring from the PCAOB anymore.  Can you believe it?  He

22    tried to imply that you and Brian were lying to me.

23             "Geez.  If they are so desperate to hold on to me they

24    should fucken promoted me.  LOL."

25             MS. ESTES:  "That's just stupid.  We have been

J2sdmid2

1   instructed to try to bring more in from PCAOB.  Maybe he was

2   talking about partners which they aren't bringing in but we are

3   going to try and push you through as an exception."

4            MR. COONEY:  "LOL ... Duane was talking about all

5   levels.  I think he's just being a jerk."

6            MS. ESTES:  Mr. Urbanczyk, can you pull up Government

7   Exhibit 1428.

8            What is the date at the top here?

9            MR. COONEY:  February 2, 2017.

10           MS. ESTES:  And, Mr. Cooney, does this document have a

11   deleted column here?

12           MR. COONEY:  It does.

13           MS. ESTES:  Let's start with the 7:37 p.m. message

14   from Jeffrey Wada.

15           MR. COONEY:  "Hey...flying home tonight?"

16           MS. ESTES:  "Yep.  On board now.  How you doing?

17           "Land 8:30 CST."

18           MR. COONEY:  "I'm OK.  Getting close to the day.  If

19   you have a chance to talk tomorrow, I can fill you in."

20           MS. ESTES:  "It is.  You got this.  I know just know

21   it and need I remind you, I'm a know it all.

22           "You got it.  Call when you want.  I'll be up."

23           MR. COONEY:  "OK, I have the grocery list.  All the

24   things you'll need for the year."

25           MS. ESTES:  And, Mr. Cooney, are those two messages

J2sdmid2

1    marked "deleted"?

2              MR. COONEY:  Yes.

3              "Safe travels..."

4              MS. ESTES:  "OK.  Thanks Jeff."

5              Mr. Urbanczyk, can you pull up Government Exhibit

6    1430?  What is the date at the top here?

7              MR. COONEY:  February 3, 2017.

8              MS. ESTES:  And I'll start with the 10:35 a.m. message

9    from Cindy Holder.

10             "I'm up when you want to chat."

11             MR. COONEY:  "Busy?"

12             MS. ESTES:  "Busy?"

13             MR. COONEY:  "I can call you."

14             MS. ESTES:  Thanks.

15             And, Mr. Urbanczyk, if you can pull up Government

16   Exhibit 1431.

17             And, Mr. Cooney, what is the date at the top here?

18             MR. COONEY:  February 3, 2017.

19             MS. ESTES:  And who are these messages between?

20             MR. COONEY:  Holder and Sweet.

21             MS. ESTES:  All right.  I will start with the

22   1:03 p.m. one from Cindy Holder.

23             "Please call ASAP."

24             And then at 2:28 p.m., Cindy Holder:  "Call when can."

25             Thank you, Mr. Cooney.  I think that's all we have for

J2sdmid2

1    reading the text messages.

2              THE COURT:  Ms. Mermelstein.

3              MS. MERMELSTEIN:  Thank you, your Honor.  We are going

4    to offer some stipulations and then read a few emails.

5              THE COURT:  All right.

6              MS. MERMELSTEIN:  First, Government Exhibit 1376 is a

7    stipulation that reads:

8              "If called as a witness, a custodian of records from

9    the Public Company Accounting Oversight Board (the "PCAOB")

10   would testify that Government Exhibits 1 through 4, 10 to 12,

11   20 to 26, 28 to 29, 31, 40 to 41, 43 to 47, 49 to 52, 54 to 55,

12   57 to 59, 62 to 63, 65 to 68, 70 to 72, 74, 77, 79 to 92, 100

13   to 102, 150, 152, 156, 157, 160 to 66, 168 to 69, 171 to 78,

14   180 to 81, and 184 are true and accurate copies of documents

15   maintained by the PCAOB, were made at or near the time of the

16   activity reflected in those documents, were made by PCAOB

17   employees who either had personal knowledge of the matters set

18   forth therein or who received the information from other PCAOB

19   employees with that knowledge, and it was the regular practice

20   of the PCAOB to make and keep the documents.

21             "If called as a witness, a custodian of records from

22   the Securities and Exchange Commission (the "SEC") would

23   testify that Government Exhibits 350 through 354 are true and

24   accurate copies of the documents maintained by the SEC, were

25   made at or near the time of the activity reflected in those

J2sdmid2

documents, were made by SEC employees who either had personal

knowledge of the matters set forth therein or who received the

information from other SEC employees with that knowledge, and

it was the regular practice of the SEC to make and keep the

documents.

"If called as a witness, a custodian of records from

KPMG LLP would testify that Government Exhibits 151, 153 to 54,

158 to 59, 167, 170 and 182 are true and accurate copies of

documents maintained by KPMG, were made at or near the time of

the activity reflected in those documents, were made by KPMG

employees who either had personal knowledge of the matters set

forth therein or who received the information from other KPMG

employees with that knowledge, and it was the regular practice

of KPMG to make and keep the documents.

"It is further stipulated and agreed that this

stipulation is admissible in evidence as a government exhibit

at trial."

And the government offers 1376.

THE COURT:  Received.

(Government's Exhibit 1376 received in evidence)

MS. MERMELSTEIN:  Stipulation number two is Government

Exhibit 1381.  It reads as follows:

"The PCAOB's Inspection Information System ("IIS"),

from at least 2015 through April 2017, did not maintain an

electronic record of individuals who accessed, saved,

J2sdmid2

downloaded and/or copied documents from the KPMG U.S. workspace in IIS.  Defense Exhibit 1439 is a true and accurate copy of the PCAOB's IIS step-by-step guide as updated on January 11, 2012, which was in effect through at least April 2017.

"Government Exhibit 138 is a true and accurate record of Mr. Wada's logins to IIS between January 2016 and March 2017.  The login times represent Mr. Wada's initial logins to IIS on the days described in Government Exhibit 138, and do not indicate any particular access to a specific workspace within IIS, for example, the KPMG U.S. workspace. IIS does not record a user's access to a specific workspace within IIS or logout times.

"The times reflected in Government Exhibit 138 are in Central Time.

"The version of the 2017 KPMG GNF Planning Profile that was in existence on January 9, 2017 was corrupted due to a technological problem and no longer exists.  The copy of monitoringprogramselectioncriteria.xlsx, listed on Government Exhibit 92 existed in IIS as monitoringprogram-selectioncriteria.xlsx as of December 6, 2016 and was never modified thereafter.

"It is further stipulated and agreed that this stipulation, DX1439, and Government Exhibit 138 are admissible in evidence as exhibits at trial."

The government offers 1381 and Government Exhibit 138.

J2sdmid2

1            THE COURT:  Received.

2            (Government's Exhibits 1381 and 138 received in

3   evidence)

4            MS. MERMELSTEIN:  If we can publish 138 briefly to the

5   jury, please, Mr. Urbanczyk.

6            Mr. Urbanczyk, if I could ask you to highlight the

7   entry from March 28th of 2016 on the next page, I believe.

8            There are access times at 11:53:30 a.m. and

9   4:03:25 p.m. Central Time.

10            If we can go to January 9, 2017, please.

11            And, finally, if we could look at February 1st of

12   2017.

13            (Indicating)

14            MS. MERMELSTEIN:  Thank you, Mr. Urbanczyk.

15            Your Honor, the government now offers a number of

16   Government Exhibits for which there is already an authenticity

17   stipulation, and if it is all right, I will ask Mr. Urbanczyk

18   to take the stand and just to read them.

19            THE COURT:  Yes.

20            MS. MERMELSTEIN:  The government exhibits, while Mr.

21   Urbanczyk is taking the stand, that we offer are Government

22   Exhibits 875, 208, 209, 210, 211, 515, 221, 521, 758, 820, 825,

23   318, 938, 944, 1000, 219 and 1078.

24            THE COURT:  They are received.

25            (Government's Exhibits 875, 208, 209, 210, 211, 515,

J2sdmid2

221, 521, 758, 820, 825, 318, 938, 944, 1000, 219, 1078

received in evidence)

MS. MERMELSTEIN:  Thank you, your Honor.

Mr. Urbanczyk, let's start with Government Exhibit 875.

And let me direct your attention to the email second from the top, and let me ask you to read the "to," "from" and "date" of that email.

MR. URBANCZYK:  Sure.  It's from Brian Sweet to Cindy Holder on Monday, November 9, 2015.

MS. MERMELSTEIN:  Can you read the text of the email, please.

MR. URBANCZYK:  "Cindy -- see the exchange below.  Do you have any personal tips for a successful inspection in Japan that you think might be useful?  I expect this will be a Jeff Watkins led inspection.  I am hoping we can help them push back on the timing as it seems awful to me.

MS. MERMELSTEIN:  Cindy Holder responds:

"Let me put some thought into it."

And then skipping to the last paragraph:

"Wada has been trying to call me and we haven't been able to connect for about a week ... I'll make a point to catch him tonight and see what he offers."

Let's go to Government Exhibit 208, please.

And, again, Mr. Urbanczyk, if I can ask you to start

J2sdmid2

1    at the bottom and read the "to," "from" and date of the email?

2            MR. URBANCZYK:  It is from Jeffrey Wada to Donald

3    Hollis on February 25, 2016.

4            The subject reads:  "Knocking it out of the park."

5            MS. MERMELSTEIN:  Go ahead and read the email.

6            MR. URBANCZYK:  "The body of the email reads:

7            "Don, good evening.  So I got my evaluation from Fred.

8    Either he is a really easy grader or he really thinks I walk on

9    water.  He told me that he is going to talk to both Jack and

10   Duane and let them know that he is going to push for a

11   'Distinguished Performance' overall rating.  Attached is the

12   realtime feedback form that I filled out and he approved.  He

13   will be using this to fill out my PPR1, which I am going to

14   process shortly.  The feedback form gives ratings by competency

15   and he gave me 6 EEs and 3 DPs.  I know these ratings are all

16   subject to Jack's approval as the AFC for KPMG but I thought

17   maybe this evaluation could be the start of a conversation

18   where you can maybe reach out to Duane (after Fred talks to

19   Duane directly about this inspection) and if all three of you

20   approach Jack and get him to see things Fred's way, it's about

21   time I start asking more strongly for the high ratings that I

22   know I deserve and I should be getting.  If I have another year

23   of 3 PPRs with DP-EE-EE ratings, the PRC cannot deny that I

24   should be promoted.

25           "Thoughts?

J2sdmid2

          "Jeff."

          MS. MERMELSTEIN:  Donald Hollis responds:

          "That is great news.  I'm glad to hear that you took
last year's feedback to heart and that you finally turned
things around in 2016."

          Skipping to the end of that paragraph:

          "You should keep trying to get the great PPRs, but
please remember, not to throw cold water on you, that one
variable that you have no control over is the number of
promotions next year."

          MR. URBANCZYK:  And Mr. Wada responds:

          "Thank you for your thoughts.  In the feedback form I
sent over to you, I have documented, in great detail, the
supporting facts for all the EE and DP ratings.  The DP ratings
have even more narrative in it.  I think I may have my backside
covered on this.  I understand it's still a numbers game but
hopefully more ADs will leave this year."

          MS. MERMELSTEIN:  Let's turn to Government Exhibit 209
and start at the bottom, please.

          MR. WEDDLE:  Your Honor, I am sorry to interrupt.  We
have some objections to some of these exhibits and not as to
authenticity, we have a stipulation as to that.  But this is
one of the exhibits that we have a 403 objection to, and one
that was read two or three minutes ago it appears we have an
objection to.  I apologize for raising this now but the

J2sdmid2

1   stipulation happened so fast --

2          THE COURT:  OK.  Did we need to do this separately?  I

3   didn't know there were objections.

4          MS. MERMELSTEIN:  They are in evidence, your Honor, so

5   I'm not sure --

6          MR. WEDDLE:  That's what I am trying to raise, your

7   Honor, is that -- we can do this at the sidebar, but there was

8   an authenticity stipulation and then there was an offer, and I

9   couldn't get the documents fast enough to raise my objections

10  to the list of exhibits that were read.  And so if you give me

11  a minute, I can give you the objections to which ones and the

12  basis, or we can take it up at the break.  But I think that the

13  offer -- they were admitted.

14         MS. MERMELSTEIN:  Your Honor, it sounds like -- I'm

15  sorry to say, it sounds like we need a sidebar.

16         THE COURT:  Yes, I believe we do.

17         (Continued on next page)

18

19

20

21

22

23

24

25

J2sdmid2

```
 1              (It at the sidebar)

 2              MS. KRAMER:  Can we give your Honor some background

 3     before we get to the objections?

 4              THE COURT:  Yes.

 5              MS. MERMELSTEIN:  Your Honor, I don't understand why

 6     it is that the objections are being lodged in the middle of the

 7     Government's presentation of evidence, for this exact reason.

 8     We sent defense counsel an email with a list of the emails we

 9     intended to read so if there was ever any objection, this could

10     be handled.  So it was not -- we did not create a situation in

11     which defense counsel didn't have time to catch up to what was

12     being offered.  We teed this up in advance with any issues to

13     be addressed in advance, and then we offered them and they were

14     received.

15              They are all admissible both -- with respect to

16     authenticity, I don't think there was an objection and on the

17     other bases.  So, we can take them up one-by-one, but I really

18     don't understand why this is being raised in this fashion once

19     we've already started the testimony.

20              MR. WEDDLE:  Your Honor, we raised with the government

21     our objections not as to authenticity but other preserved

22     objections to these exhibits, and we put them in a spreadsheet

23     that we sent them weeks ago.  So, I mean, the fact that the

24     government sends us an email, which, frankly, I don't recall

25     receiving -- I am sure we did receive it but I was doing a lot
```

J2sdmid2

1    of things yesterday -- and thinks that that email constitutes

2    some kind of waiver of all of the objections that we've

3    discussed with them in meet-and-confers, we memorialized in the

4    spreadsheet, and we've given to them, and to think that we

5    should just speed through legitimate objections without us

6    having a chance to raise them and have them ruled upon by your

7    Honor I think is not an appropriate criticism of our conduct

8    here.

9              THE COURT:  OK.  Let's get to the objections.

10             MR. WEDDLE:  So we have 875, the top email we have a

11   hearsay objection to, which is -- this is an email that was

12   read to the jury.  And this is Cynthia Holder saying to Brian

13   Sweet, "Wada has been trying to call me, and we haven't been

14   able to connect for about a week."  That's hearsay, your Honor.

15   It is not a statement in furtherance of the conspiracy not only

16   for the reasons that we've already presented to your Honor by

17   letter but, also, for this particular one, there is nothing

18   about this statement which is in furtherance of the conspiracy.

19   And to the extent it is offered for the truth of what Wada has

20   been doing, it is not admissible.

21             MS. MERMELSTEIN:  Your Honor, the entire dispute from

22   Mr. Wada's perspective was whether or not he was the person

23   leaking information to Cynthia Holder.  Cynthia Holder is

24   communicating to a co-conspirator that Wada's been trying to

25   call her, and that is the context for "I'll make a point to

J2sdmid2

1    catch him tonight and see what he offers," which is a statement

2    in furtherance of the conspiracy and so it is admissible not as

3    hearsay.  And even if it were hearsay, which it is not, it is

4    relevant to Sweet's understanding of what is going on that

5    Holder is saying I will make it a point to try and catch Wada

6    and see what he offers.  It's clearly admissible.

7            THE COURT:  OK.  I am going to overrule that

8    objection.  So, that is one.

9            MR. WEDDLE:  I lost the list of exhibits.

10           208.  No objection to 208, your Honor.

11           209, we have an 403 objection to the second page of

12   this document, which is some crude language used by someone not

13   Jeff Wada.  We don't have an objection to the first page.

14           MS. MERMELSTEIN:  Which crude language are you

15   referring to?  I'm sorry, I don't see it.

16           (Pause)

17           We were not intending to read that part.  I am happy

18   to redact it, and we can simply zoom in when we show it to the

19   jury now so that they don't see it.  "Want a punch to the

20   throat?"  I don't think it is that objectionable.  In any

21   event,  we are only going to show the top so we can zoom in.

22   not a problem.

23           THE COURT:  OK.

24           MR. WEDDLE:  That is fine.  It is the Eric Olmack

25   email and below, so you will just redact that?

J2sdmid2

1              MS. MERMELSTEIN:  We will zoom it in for the jury now

2      and redact it.

3              MR. WEDDLE:  211, no problem.

4              I apologize, your Honor, that I was not able to move

5      fast enough on this.

6              515, no objection.

7              221, no objection.

8              521, no objection.

9              758, I have no problem with 758.

10             820, we have a hearsay and relevance objection to 820.

11             MS. MERMELSTEIN:  What is the objection?

12             MR. WEDDLE:  Hearsay and relevance.

13             MS. MERMELSTEIN:  So it's not hearsay and it is

14     relevant.  With respect to the bottom email, that is a business

15     record of KPMG.  There has been testimony that these emails

16     notifying the engagement team that they are going to be

17     included in Part I were sent during the ordinary course.  But,

18     more importantly, it is not being offered for that purpose.  It

19     is being offered to show evidence of David Middendorf's

20     knowledge and intent with respect to the SEC PCAOB inspection

21     reports and the fact that they include the issue of the SEC.

22     So if you look at the top of that email, Meridith Hardisty says

23     to this engagement partner:  The report includes specific

24     findings on several issuers anonymously, but note they are

25     identified to the -- they are identified anonymously but the

J2sdmid2

1    copy of the report that the PCAOB sends to the SEC will include

2    the names, and then that email is forwarded to Mr. Middendorf

3    and that is the purpose of that.

4              THE COURT:  I am going to allow it for that purpose.

5              MR. WEDDLE:  The next one that we have an objection

6    to, your Honor, is Government Exhibit 1000.

7              MS. MERMELSTEIN:  What is the basis of the objection?

8              MR. WEDDLE:  I think that this is simply not

9    admissible against Mr. Wada.  It is not a statement in

10   furtherance of the conspiracy, any conspiracy that it has been

11   proved that he was part of.  It is an internal KPMG matter, and

12   it is a communication outside the conspiracy, by the

13   government's allegation.  So, it may be admissible as to

14   Mr. Middendorf but not as to Mr. Wada.

15             MS. MERMELSTEIN:  Mr. Middendorf and Mr. Wada are both

16   co-conspirators.  Mr. Middendorf's knowledge and intent is

17   admissible against them both.  This is incredibly probative

18   evidence of Mr. Middendorf's knowledge and intent with respect

19   to the importance of PCAOB inspection results, which the first

20   defense witness will be testifying this afternoon that they

21   didn't matter to Mr. Middendorf.  This is Mr. Marcello,

22   Mr. Middendorf's boss, telling Mr. Middendorf and others that

23   reducing PCAOB comments is our first priority.

24             Mr. Marcello is an unindicted co-conspirator.

25             THE COURT:  I think it is admissible for that purpose.

J2sdmid2

1              MR. WEDDLE:  That is the only one that we have, and I

2    apologize for causing a sidebar.

3              Did we get a ruling on the Wada phone calls?  Wada has

4    been calling me; I think that was 208

5              MS. MERMELSTEIN:  The Judge said that was admissible.

6              Thank you, your Honor.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2sdmid2

1              (In open court)

2              MS. MERMELSTEIN:  Government Exhibit 209, at the

3       bottom of the page, Mr. Urbanczyk, if you could start by

4       reading the "to," "from" at the bottom of that page.

5              MR. URBANCZYK:  It is froms Jeffrey Wada to Eric

6       Olmack on March 10, 2016.

7              MS. MERMELSTEIN:  If we can go to just the top of the

8       next page, Mr. Cooney.

9              Mr. Urbanczyk, if you can read the text of the email,

10      please?

11             MR. URBANCZYK:  "Oops...sorry, I guess my information

12      was wrong.  If Pete is our guy, of course he should look it

13      over.  For some reason I thought Duane mentioned to me that you

14      are our income tax guy this year.  Lemme go back to my notes

15      and double-check.

16             "I was planning on reaching out to Pete next week to

17      discuss our plan about having you take on more of an IL role

18      and me the AD role and having Pete kick back and check his

19      emails.  What do you think?"

20             MS. MERMELSTEIN:  Mr. Olmack responds:

21             "Perfect.  Let's talk next week and enjoy your PTO

22      man.  I'm just giving you a hard time."

23             MR. URBANCZYK:  Mr. Wada responds:

24             "Sounds like a plan.  I wish I could enjoy my PTO but

25      I'm already getting slammed with requests so I need to take

J2sdmid2

1   care of them.  The things we do to try to get promoted.  I

2   can't believe we both got screwed last year."

3               MS. MERMELSTEIN:  Let's go to Government Exhibit 210.

4               Starting at the bottom, an email from Pamela Robinson

5   to Jeffrey Wada on March 24th of 2016:

6               "Thanks for participate, buddy.  I really appreciate

7   it.  I got a bunch of questions from people so I thought it

8   would be useful to have the call.  And then nothing."

9               MR. URBANCZYK:  Then Mr. Wada responds:

10              "No worries ... I just wanted to make sure the PwC

11  team is doing exactly what you wanted.  Given that I am the

12  AS18 'champ' this year, it's in my best interest to ask all my

13  questions, no?

14              "That's the new Jeff v.3.0.

15              "when we get a chance to meet up for drinks again, I

16  will make sure Jeff v.1.0 is there.  LOL.

17              "Thank you for taking the time to walk through the

18  work programs with us."

19              MS. MERMELSTEIN:  Pamela Robinson responds:

20              "Haha.  I kinda like both versions, so maybe a Jeff

21  version 2.0.  My pleasure -- let me know if you have any

22  questions at any time."

23              MR. URBANCZYK:  "Jeff v.2.0 was a failure and it ended

24  up getting my promotion delayed so I buried it and came up with

25  v.3.0."

J2sdmid2

1          MS. MERMELSTEIN:  Let's turn to Government Exhibit

2     211, and if we can again start at the bottom of the first page.

3          Email from Mr. Ishibashi to Jeffrey Wada on March

4     28th of 2016:

5          "Haha, I take your point -- I ended up fully working

6     two of three PTO days last week...

7          MR. URBANCZYK:  And Mr. Wada responds:

8          "I took two days of floating holidays off a few weeks

9     ago and I ran into the same problem.  Do you feel like we are

10    going back to the days of the Big 4 again?  I'm starting to

11    feel like this organization has reverted back to those days."

12         MS. MERMELSTEIN:  "Not sure it is the same, but I do

13    feel that I am getting less money than what I deserve for..."

14         MR. URBANCZYK:  "Agreed...we better get promoted to AD

15    this year."

16         MS. MERMELSTEIN:  Let's turn to Government Exhibit

17    515.

18         Mr. Urbanczyk, if I could ask you to read the "to,"

19    "from" and "date" at the top of the email?

20         MR. URBANCZYK:  Sure.  It is from Jeff Wada to

21    cholder21@aol.com on August 18, 2016.

22         MS. MERMELSTEIN:  Let me ask you to read just the text

23    of the email up, stopping when you get to the list.

24         MR. URBANCZYK:  Sure.

25         "Cindy, it was really good talking to you

J2sdmid2

earlier...So, I did some checking and found a very detailed

list.  Apparently, the PCAOB uses the designation of 'emerging

markets' and 'frontier markets' based on a classification from

MSCI Inc., a research firm.  You can find the countries at this

website."

              And then there is a website link.

              "Because it's a public website that is accessible to

anyone, I would send the link above to the partner that was

asking as well as ensuring that the link is included in all

SAPA 8 guide/templates and also have it noted within KAM as a

reference.  Call me if you have any additional questions.

              "Here is what that website would indicate:"

              MS. MERMELSTEIN:  Turning to Government Exhibit 221,

and beginning at the bottom of the page with the email from

Aaron Altman to Jeffrey Wada, "Subject:  Thanks," on

January 12th of 2017:

              "Jeff, I spoke to Duane yesterday, and he convinced me

to take on the Scheduling Assistant role (it is not

official...he is going to discuss with Mitch 1st).  It appears

to be the best path for promotion, as the scheduling role is

viewed highly by leadership (and is usually IS3/IL level).  I

will also have a year to get up to speed under Sal.  Also, I

will likely still have my role in remediation, so I will still

be highly involved with the firm and any new

trends/findings/etc.

J2sdmid2

1           "It definitely seemed like the best opportunity to

2      continue to exceed expectations and achieve IS3 ASAP.

3           "Thanks for making time for our discussion yesterday.

4      I always appreciate it."

5           MR. URBANCZYK:  And Mr. Wada responds:

6           "Anytime...I am glad this role will turn out to be

7      helpful for your career path.  You will make AD before me."

8           MS. MERMELSTEIN:  Let's turn to Government Exhibit

9      521.

10          And, Mr. Urbanczyk, starting at the bottom email, if

11     you could read the email "to," "from" and "sent" date?

12          MR. URBANCZYK:  Sure.  It is from Brian Sweet to Cindy

13     Holder, and it's on January 30, 2017.

14          MS. MERMELSTEIN:  Could you read the text of the email

15     please?

16          MR. URBANCZYK:  Sure.

17          "Cindy -- Jeff's resume looks extremely strong to me.

18     What a" solid "background" -- "What a sold background and I

19     can't wait to get him on board.  I've attached a few suggested

20     edits/thought in the attached.  The PCAOB experience is by far

21     the most relevant, so added a couple of bullets to possibly

22     help emphasize that.  Also is he a CPA?  If so, he'll

23     definitely want to add that.  It would be good to keep it at 2

24     pages, so with my edits he may want to consolidate some of the

25     D&T work (some of that doesn't seem quite as relevant for an

J2sdmid2

1    Inspections Group role so he could consider combining the M&A

2    and AA Professional Development captions possibly).

3             "Hope this helps.  Brian."

4             MS. MERMELSTEIN:  Moving up to the next email in the

5    chain, Cindy Holder, at caholder@kpmg.com, forwards the email

6    to cholder21@aol.com, and then writes in the next email up on

7    the chain:  "Let me know your thoughts."

8             Mr. Urbanczyk, can you read the header information on

9    the top email in this chain?

10            MR. URBANCZYK:  Sure.

11            It's from Jeff Wada to Cindy Holder on February 3,

12   2017.  The subject is "Re:  Resume J. Wada," and an attachment

13   of his resume, j Wada.

14            MS. MERMELSTEIN:  Can we look briefly at the

15   attachment?

16            Mr. Urbanczyk, how many pages is the attachment?

17            MR. URBANCZYK:  It appears it's two pages.

18            MS. MERMELSTEIN:  And looking at the second page of

19   the attachment, directing your attention to the category

20   "Other," could you read the first bullet point?

21            MR. URBANCZYK:  "Certified Public Accountant (licensed

22   in California)."

23            MS. MERMELSTEIN:  Let's turn to Government Exhibit

24   758.  And looking at the first email in that chain -- I

25   apologize, the first email at the top.

J2sdmid2

1          Email from Brian Sweet to Joe Lynch on May 4th of

2     2015, "Subject" "Re:  Welcome."

3          "Excellent Joe -- thanks.

4          "As an aside, I've got a 'welcome' call with Jim Liddy

5     and Dave Middendorf tomorrow early afternoon.  Did you have a

6     similar call once you arrived, and, if so, is there anything

7     specifically that I should be aware of?"

8          Let's turn to Government Exhibit 820.

9          Mr. Urbanczyk, if I could ask you to read the "to,"

10    "from," skipping the cc's, and "date" of the email in the

11    middle of the page?

12          MR. URBANCZYK:  Sure.

13          It's from Meridith Hardisty to Bradley Forsberg on

14    September 3, 2015.

15          MS. MERMELSTEIN:  Can you read the first paragraph of

16    the email, stopping when you get top "Dillard's is Issuer J"?

17          MR. URBANCZYK:  "Brad, we recently received the

18    PCAOB's draft report on its 2014 inspection of KPMG LLP.  We

19    anticipate that Part I of the report will be released publicly

20    shortly thereafter.  The report includes specific findings on

21    several issuers which are anonymously cited -- i.e., they are

22    not named, but are identified as Issuer A, B, C, etc. (however,

23    the copy of the report that the PCAOB will provide to the SEC

24    will include the specific names of the issuers)."

25          MS. MERMELSTEIN:  Going up to the email at the top of

J2sdmid2

the chain, Bradley Forsberg forwards to, among others, David

Middendorf, saying:  "So you know what I was talking about in

my previous email, you can see the suggested PCAOB language in

the attachment below."

        Turning next to Government Exhibit 825; October 28,

2015 email on behalf of David Britt:

        "Please find attached the final list of engagements in

your Business Unit that have been selected to participate in

the 2015 ALL Monitoring and Support Program."

        And if we can look at that first chart and if you can

highlight the third engagement team down, "Credit Suisse."

        Turning next to Government Exhibit 318.

        Starting at the top email on the first page, email

from David Middendorf to Brian Croteau, "Re:  Meeting with

Chair White."

        "Brian -- See proposed agenda.  I welcome any feedback

or comments.

        "Introductions, Lynne Doughtie -- Chairman & CEO.

        "Scott Marcello -- Vice Chair-Audit.

        "Dave Middendorf -- National Managing Partner-Audit

Quality & Professional Practice.

        "KPMG Strategy Overview (Doughtie).

        "KPMG Practice Strategy Overview (Marcello)

        "PCAOB -- Relationship and Inspection Results

(Doughtie, Marcello and Middendorf)."

J2sdmid2

1           Let's go to Government Exhibit 938.

2           Mr. Urbanczyk, if I could ask you to read the header

3      information in that email, including the subject line?

4           MR. URBANCZYK:  Sure.

5           It's from Thomas Whittle to William O'Leary on

6      March 28, 2016.  The subject reads:  "Please stop by."

7           MS. MERMELSTEIN:  Go to Government Exhibit 944,

8      please.

9           Beginning with the email at the bottom of the chain --

10     I'm sorry, I meant to say 944.

11          Beginning with the email at the bottom of the chain:

12     Email from Matthew Mount to David Middendorf on March 29, 2016.

13          "Our audit report date was February 22 so I believe we

14     have until April 7."

15          And then, Mr. Urbanczyk, if you could read the top

16     email from Mr. Middendorf?

17          MR. URBANCZYK:  Sure.

18          Mr. Middendorf responds:

19          "Please invite Scott Henderson to the eAudIT file as

20     we discussed.  Thanks."

21          MS. MERMELSTEIN:  Let's go to Government Exhibit 1000.

22          Starting at the bottom of the page, Mr. Urbanczyk, if

23     you could read the header information and then the email

24     itself?

25          MR. URBANCZYK:  Sure.  It's from David Middendorf to

J2sdmid2

1    Lynn Doughtie, Scott Ozanus, Scott Marcello, Sven Holmes,

2    cc'ing Patrick Ford and Paul Knopp, on April 1, 2016, and the

3    subject is "PCAOB Inspections."

4              MS. MERMELSTEIN:  Can you read the, email please?

5              MR. URBANCZYK:  "As an update, the inspection season

6    started in full force this week.  We had three inspections

7    completed this week.  All three closed without comment.  Adding

8    those to the two from the fall, we are starting out 5-0.  Last

9    year we were 1-4 at this point.  I don't want to jinx myself,

10   but this feels pretty damn good.

11             "Enjoy the weekend."

12             MS. MERMELSTEIN:  Moving up to the top of the chain,

13   Scott Marcello responds to David Middendorf, David Britt,

14   Thomas Whittle, and others:

15             "Dave, George, Tom, Steve, John, David and Tom C, with

16   reference to the great start noted below:"

17             Then I'll skip to the second paragraph.

18             "Please don't take my comments to suggest I believe we

19   'should declare victory' or are in any way finished.  While I

20   believe we are making great progress, I also know we have quite

21   a ways to go.  ("miles to go before [we] sleep", to quote

22   Robert Frost (no, Steve, it wasn't Charles Bronson)).  While

23   reducing our PCAOB comments is our first priority, leading with

24   respect to AQ is our ultimate goal; and it is way too early to

25   protect out to our ultimate comment rate (but, Dave, I'm still

J2sdmid2

1    pushing for 52-0).  It is NOT too early, however, to pause to

2    thank you for all you are doing to drive our efforts."

3           Going to Government Exhibit 219, please.  Email from

4    Ann King to Meredith Hardisty, copying Steve Schindler and

5    Stephanie Rodriguez.  "Subject:  Inspection commencing – week

6    of 8/15."

7            "Hi, Meredith.

8            "We plan to commence the following inspection the week

9    of 8/15.

10           "People's United Financial."

11           Going to Government Exhibit 1078, our last email.

12           Starting at the bottom of the page, Mr. Urbanczyk, if

13   you could read the header information and then the email?

14           MR. URBANCZYK:  Sure.  It's from Thomas Whittle to

15   David Middendorf on January 10, 2017.  "Subject:  Chat."

16           The body of the email reads:

17           "Dave –– I need a few minutes to discuss a number of

18   matters.  Not sure if you are traveling.  Please give me a call

19   in the office or maybe better on my cell.  Thanks.  Tom."

20           MS. MERMELSTEIN:  David Middendorf responded:

21           "I am in the GAQIC meeting in Miami.  Can you chat

22   between 1 and 2 p.m. or at 6 p.m.?"

23           MR. URBANCZYK:  Mr. Whittle responds:

24           "Try 1 p.m. on my cell.  If we strike out, we can go

25   to 6 as a fallback."

J2sdmid2

1          MS. MERMELSTEIN:  Finally, your Honor, I would like to

2     read one more stipulation and publish a few exhibits.

3          This is Government Exhibit 1380:

4          "Government Exhibit 652 consist of handwritten notes

5     removed from the office of David Britt at KPMG LLP, 345 Park

6     Avenue, New York, New York.

7          "During a March 2017 interview with outside counsel

8     for KPMG, Britt acknowledged the existence of the handwritten

9     notes that comprise Government Exhibit 652 and thereafter

10    produced them and other documents that were in his office to

11    outside counsel for KPMG."

12         The government offers Government Exhibit 1380 and 652.

13         THE COURT:  Received.

14         (Government's Exhibits 1380 and 652 received in

15    evidence)

16         MS. MERMELSTEIN:  One moment, your Honor.

17         (Pause)

18         And if we can pull up 652, now in evidence,

19    side-by-side with 1352.

20         Give me one moment, your Honor.

21         (Pause)

22         And, Mr. Cooney, if you could -- as I read the names

23    listed on Government Exhibit 652, which is now in evidence as

24    notes taken by David Britt, could you highlight the names I'm

25    reading and then highlight them as they appear on Government

J2sdmid2

1    Exhibit 1352, the list of 2016 inspections for KPMG issuers.

2         Century Bancorp.

3         UMB Financial.

4         Bank of California.

5         First Business Financial Services.

6         People's United Financial.

7         NewStar.

8         Macquarie.

9         SLM.

10        Fidelity.

11        And then if we could take down just 1352 and replace

12   it with 1353, which is in evidence as the 2016 inspections of

13   KPMG issuers selected for inspection but not inspected, and if

14   we can do the same thing beginning with number 4 in Mr. Britt's

15   notes:

16        Washington Trust.

17        First Bancorp.

18        AMBAC.

19        And Bon Ton Stores.

20        And then -- you can take those down.  Thank you,

21   Mr. Cooney.

22        If we can go back to Government Exhibit 1380, which is

23   now in evidence, and I'll read the second paragraph.

24        "Government Exhibit 653 consists of handwritten notes

25   removed from the office of David Britt at KPMG LLP, 345 Park

J2sdmid2

 1    Avenue, New York, New York.

 2              "During a February 2017 interview with internal

 3    counsel for KPMG, Britt acknowledged the existence of the

 4    handwritten notes that comprise Government Exhibit 653 and

 5    thereafter identified those handwritten notes in his office and

 6    produced them to internal counsel for KPMG."

 7              And the government now offers Government Exhibit 653.

 8              THE COURT:  Received.

 9              (Government's Exhibit 653 received in evidence)

10              MS. MERMELSTEIN:  If we can now publish, Mr. Cooney,

11    Government Exhibit 653 on one side of the screen and then if we

12    can publish that side-by-side with Government Exhibit 655.

13              And if we can do the same thing, Mr. Cooney, as I read

14    down on the left-hand document, the notes from Mr. Britt's

15    office, the names that appear on the list.

16              Citi.

17              Northern Trust.

18              Chemical Bank.

19              BankUnited.

20              First Commonwealth.

21              First Bancorp.

22              Valley National.

23              Brookline.

24              And BMO.

25              And then just one more, Mr. Cooney.  If you could

J2SDMID2                          Urbanczyk – direct

1   highlight the words in the list -- the second list of nine

2   items, number 3:

3                 Loans ALL business combinations.

4                 And then if you could look to the right of the words

5   Chemical Bank:  Loans ALL, bis.com AFS.

6                 Thank you, Mr. Cooney.

7                 Your Honor, Mr. Urbanczyk is now going to testify

8   about a summary chart rather than just read emails and so he'll

9   now need to be sworn, please.

10                THE COURT:  All right.  Please raise your right hand.

11  Mr. Hampton will swear you in Mr. Cooney.

12   PETER LUKE URBANCZYK,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15                THE CLERK:  Please state your full name for the

16  record.

17                THE WITNESS:  My name is Peter Luke Urbanczyk, last

18  name is spelled U-r-b-a-n-c-z-y-k.

19  DIRECT EXAMINATION

20  BY MS. MERMELSTEIN:

21  Q.  Good afternoon, Mr. Urbanczyk.

22  A.  Good afternoon.

23  Q.  How old are you?

24  A.  I'm 24.

25  Q.  Where do you work?

J2SDMID2                          Urbanczyk - direct

1    A.   The U.S. Attorney's Office for the Southern District of New

2    York.

3    Q.   And what is your position there?

4    A.   I am a paralegal specialist.

5    Q.   How long have you been a paralegal specialist in the U.S.

6    Attorney's Office?

7    A.   About a year and a half.

8    Q.   Mr. Urbanczyk, did you prepare a summary chart in

9    connection with this case?

10   A.   I did.

11   Q.   Before preparing this chart, did you review certain

12   exhibits that were admitted into evidence at this trial?

13   A.   I did.

14   Q.   And what kind of exhibits did you review?

15   A.   They were exhibits containing information regarding

16   compensation information and planned work hours.

17   Q.   Let me direct your attention to Government Exhibit 1370,

18   for identification.

19          Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   It's the summary chart I participated in creating.

23   Q.   And does this accurately reflect information from exhibits

24   offered at trial?

25   A.   Yes.

J2SDMID2                          Urbanczyk - direct

1              MS. MERMELSTEIN:  The government offers Government

2     Exhibit 1370.

3              MS. LESTER:  We have an objection from yesterday to

4     this chart.

5              THE COURT:  Yes.  The objection is noted.

6              Government 1370 is received.

7              MS. MERMELSTEIN:  Thank you, your Honor.

8              Mr. Cooney, can we put up what's in evidence as

9     Government Exhibit 132 side-by-side with Government Exhibit

10    1370.

11             Your Honor, may I have one moment?

12             THE COURT:  Yes.

13             (Pause)

14             MS. MERMELSTEIN:  I apologize, your Honor.  I have

15    given the wrong exhibit number, so let me start one more time.

16    BY MS. MERMELSTEIN:

17    Q.  Mr. Urbanczyk let me show you 1371.

18             Is that the final version of the summary chart you

19    prepared?

20    A.  Yes.  The previous one you showed me was an earlier

21    version, but both of these are summary charts that I

22    participated in creating.

23             MS. MERMELSTEIN:  Thank you, your Honor.

24             The government withdraws Government Exhibit 1370 and

25    offers Government Exhibit 1371.

J2SDMID2                          Urbanczyk - direct

1              MR. BOXER:  The same objection, your Honor, as

2      previously noted.

3              THE COURT:  OK.  Noted.

4              1370 is withdrawn and 1371 is received.

5              (Government's Exhibit 1371 received in evidence)

6              MS. MERMELSTEIN:  Thank you, your Honor.

7              And now if, Mr. Cooney, if we can put 1371 up

8      side-by-side with 132.

9      BY MS. MERMELSTEIN:

10     Q.  Mr. Urbanczyk, can you explain how you used Government

11     Exhibit 132 to prepare Government Exhibit 1371?

12     A.  Sure.  So 132 was essentially the starting point for 1371

13     on the left, and then hourly rate -- the two columns to the

14     right that don't exist on 132 were added by me.

15     Q.  Can we look at, Mr. Cooney, if you could highlight the

16     column "Hourly Rate" from GX131A.

17             What does that reflect?

18     A.  That reflects hourly rate information for a number of

19     individuals that I got from GX131-A.

20     Q.  And then directing your attention to the last column,

21     "Cost:  Hourly rate times hours," what does that reflect?

22     A.  So it reflects the hourly rate multiplied by the hours.

23     So, the hourly rate coming from GX131-A and the number of hours

24     come from GX132.

25             MS. MERMELSTEIN:  If we can scroll to the second page

J2SDMID2                        Urbanczyk - cross

1    of this exhibit, please, Mr. Cooney.

2    Q.  Mr. Urbanczyk, directing your tension to the yellow

3    highlighted number at the bottom, what does this reflect about

4    that calculation, in other words, the total number of hours

5    times the hourly rates added altogether?

6    A.  It totals to $389,516.97.

7               MS. MERMELSTEIN:  Thank you.

8               No further questions, your Honor.

9               THE COURT:  All right.

10              MS. LESTER:  Your Honor, actually, could I just ask a

11   few brief questions?

12              THE COURT:  Yes.

13   CROSS-EXAMINATION

14   BY MS. LESTER:

15   Q.  Mr. Urbanczyk, you testified that you reviewed the contents

16   of Government Exhibit 131A in your preparation of Government

17   Exhibit 1371, correct?

18   A.  That's correct.

19   Q.  The term "Cost," the word "cost," does not appear anywhere

20   in Government Exhibit 131A, correct?

21   A.  I don't have it in front of me but I don't recall seeing

22   that in that exhibit.

23   Q.  Would you like to look at it to confirm?

24   A.  I believe it's quite a long document, but I can look at it

25   if you'd like.

J2SDMID2                        Urbanczyk - cross

1              THE COURT:  Maybe you can just stipulate on this, or

2     do you all know?

3              MS. MERMELSTEIN:  I don't know but we are happy to

4     check and stipulate, your Honor.

5              THE COURT:  OK.

6     BY MS. LESTER:

7     Q.  And the work "cost" that you included on Government Exhibit

8     1371, how did you decide to include that word in that chart?

9     A.  I personally did not decide to use that word in the chart.

10    Q.  Were you instructed to include that word?

11    A.  When I made the chart there was a previous draft version,

12    and that previous draft version included that word.

13    Q.  Did you prepare the previous draft?

14    A.  The previous draft -- there was a previous draft that I did

15    not prepare but then I created a new version and reran all the

16    calculations and checked all the numbers.

17    Q.  Do you know who prepared the prior draft?

18    A.  I do.

19    Q.  Who was that?

20    A.  Ms. Mermelstein.

21             MS. LESTER:  Thank you, your Honor.

22             No further questions.

23             THE COURT:  OK.  Anything further?  Any redirect?

24             MS. MERMELSTEIN:  No, your Honor.

25             MR. COOK:  No, your Honor.

J2SDMID2                         Pyun - direct

1            THE COURT:  OK.  You may step down.

2            (Witness excused)

3            THE COURT:  Ms. Estes.

4            MS. ESTES:  Your Honor, the government calls Sarah

5    Pyun.

6            THE COURT:  Please come on up and sit in the witness

7    chair.

8            And if you would please raise your right hand, you

9    will be sworn in.

10    SARAH PYUN,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13            THE CLERK:  Please state your full name and spell your

14    first and last names slowly for the record.

15            THE WITNESS:  Sarah Pyun, S-a-r-a-h P-y-u-n.

16            THE CLERK:  Thank you.

17    DIRECT EXAMINATION

18    BY MS. ESTES:

19    Q.  Good afternoon.

20    A.  Good afternoon.

21    Q.  Where do you work?

22    A.  The U.S. Attorney's Office.

23    Q.  What is your position at the U.S. Attorney's Office?

24    A.  I'm a paralegal specialist.

25    Q.  And Ms. Pyun, did you prepare summary charts in connection

J2SDMID2                         Pyun - direct

1   with this case?

2   A.  Yes.

3   Q.  Before preparing those charts, did you review certain

4   exhibits that were admitted in evidence at this trial?

5   A.  Yes.

6   Q.  What kind of exhibits did you review?

7   A.  In general, phone records, text records, emails and

8   voicemails.

9   Q.  And did you also review testimony in this trial?

10  A.  Yes.

11          MS. ESTES:  Mr. Cooney, if you could pull what's been

12  marked for identification as Government Exhibit 1362.

13          If you could flip through it.

14  Q.  Ms. Pyun, do you recognize this exhibit?

15  A.  Yes.

16  Q.  Are these the summary charts you prepared?

17  A.  They are.

18          MS. ESTES:  Your Honor, the government offers

19  Government Exhibit 1362.

20          THE COURT:  This is the summary chart?

21          THE WITNESS:  Yes.

22          THE COURT:  1362 is received.

23          (Government's Exhibit 1362 received in evidence)

24  BY MS. ESTES:

25  Q.  All right.  Ms. Pyun, let's walk through this summary

J2SDMID2                        Pyun - direct

1    chart.

2              Starting with the first page you see here, what is the

3    date at the top?

4    A.   March 27, 2016.

5    Q.   And what is the source for the information on this page?

6    A.   This is Government Exhibit 1443.

7    Q.   What sort of information is displayed on this page?

8    A.   These are text messages between Jeffrey Wada and Kristy

9    Holder.

10   Q.   Is that Cindy Holder?

11   A.   Or Cindy Holder.  I'm sorry.

12   Q.   What time zone are these text messages in?

13   A.   This is in March so this would be Eastern Daylight Time,

14   the time it would be in New York.

15   Q.   And, Ms. Pyun, if you could just read the bottom two text

16   messages there.  They are the ones at 7:25 p.m.

17   A.   At 7:25, Wada says:  "OK, call me.  Call me first thing if

18   you can."

19             MS. ESTES:  All right.  Mr. Cooney, if you could go to

20   the next page.

21   Q.   Ms. Pyun, what is the date of this document?

22   A.   March 28, 2016.

23   Q.   That is the date after the messages we just looked at?

24   A.   Yes.

25   Q.   What are the sources for this document?

1    A.   These come from Government Exhibit 404, 405, 405D, 406,

2    935, 1309, 1405, 1442 and Brian Sweet's testimony.

3    Q.   All right.  So looking at the top box in yellow there, what

4    does that represent?

5    A.   The top box is a call from the 212-954-2251 number to Wada,

6    which lasted for 51 minute.

7    Q.   And what time was the call?

8    A.   At 12:42.

9            MS. ESTES:  And, Mr. Cooney, if you could pull up

10   side-by-side what's in evidence as Government Exhibit 953.

11           And if you could zoom into the top email there,

12   Mr. Cooney.

13   BY MS. ESTES:

14   Q.   Ms. Pyun, looking at this email from Cindy Holder, can you

15   read the phone number listed there?

16   A.   212-954-2251.

17   Q.   And is that the same phone number we just looked at in the

18   yellow box?

19   A.   Yes.

20           MS. ESTES:  Thank you, Mr. Cooney.  You can take that

21   email down.

22           And let's go back to the summary chart.

23   Q.   So, Ms. Pyun, after the call in the yellow box, what do we

24   see there at 1:33 p.m.?

25   A.   At 1:33, Holder calls Sweet, which lasted for zero minutes.

J2SDMID2                          Pyun - direct

1    Q.  And, generally speaking, Ms. Pyun, when you have boxes in

2    blue here, what does that represent?

3    A.  They are communications sent from Holder.

4    Q.  And what do you see at 1:34 p.m.?

5    A.  Another call from Holder to Sweet which lasted for zero

6    minutes, as well as a text message from Holder to Sweet which

7    said:  "Call me as soon as you can."

8    Q.  And, sorry, going back up to the first call, where it says

9    "51 minutes" there, what does that refer to?

10   A.  This is the duration of the call.

11   Q.  And what time did that call end?

12   A.  At 1:33 p.m.

13   Q.  And then what time did the next call from Holder to Sweet

14   begin?

15   A.  The same time, 1:33.

16   Q.  All right.  Let's go to the last entry at 1:34 p.m.

17          What do you see there?

18   A.  Another call from Holder to Sweet which lasted for zero

19   minutes.

20   Q.  And let's go to 1:35 p.m.  What does that represent?

21   A.  So this is an email that Sweet sent to Holder at 1:35.  He

22   said, "On a call.  I'll call you once it's over.  Everything

23   OK?"

24   Q.  And, generally speaking, when you have the boxes in purple,

25   what does that represent in your summary charts?

J2SDMID2                         Pyun - direct

1    A.  The purple boxes are communications sent from Brian Sweet.

2    Q.  And what do you see one minute later, at 1:36 p.m.?

3    A.  Holder responds to Sweet via email.  She says:  "Yes, but

4    you need to call ASAP."

5    Q.  And what is next, at 1:36 p.m.?

6    A.  Sweet replies via email.  He says, "Ah, OK, I want to.  I

7    think the call I'm on my go for another 90 minutes."

8    Q.  And, finally, what do you see at the bottom, at 1:56 p.m.?

9    A.  At 1:56 p.m. Sweet called Holder, and that call listed for

10   23 minutes and 42 seconds.

11              MS. ESTES:  Right.  Mr. Cooney, if we could go to the

12   next page.

13   Q.  And, Ms. Pyun, let's just walk through this page as well.

14              What do you see at 2:21 p.m.?

15   A.  At 2:21 p.m., Sweet calls Whittle and that call lasted for

16   one minute.

17   Q.  What do you see at 2:22 p.m.?

18   A.  Sweet at 2:22 p.m. emails Whittle and asks, "Do you have

19   five minutes?"

20   Q.  What is at 2:23 p.m.?

21   A.  Sweet called Holder and that call lasted for three minutes.

22   Q.  What do you see at 2:26 p.m.?

23   A.  Sweet calls Britt and that call lasted for one minute.

24   Q.  Where it says 2:28 p.m., what do you see there?

25   A.  Sweet emails Britt and he asks:  "Can you please give me a

J2SDMID2                              Pyun - direct

1   call when you get five minutes?  It's fairly pressing (I just

2   tried you in the office)."

3   Q.  Let's go to the 2:48 p.m. box.  What do you see there?

4   A.  Whittle calls Sweet and that call lasts for eleven minutes.

5   Q.  Generally speaking, in these charts when you use the orange

6   color there, what does that represent?

7   A.  Communications sent by Tom Whittle.

8   Q.  And what do you see at 2:59 p.m.?

9   A.  Sweet calls Holder at 2:59 p.m. and that call lasts for 4

10  minutes and 36 seconds.

11  Q.  Then what do you see at 3:03 p.m.?

12  A.  At 3:03 Britt calls Sweet, which lasts for 14 minutes.

13  Q.  What do you see at 3:17 p.m.?

14  A.  Sweet then calls Holder, which lasts for 20 minutes and 57

15  seconds.

16  Q.  And, finally, what do you see at 4:10 p.m.?

17  A.  A number belonging to KPMG calls Sweet and that call lasts

18  for around 60 minutes.

19  Q.  Let's go to the next slide.

20          What is the date at the top here?

21  A.  This is January 9, 2017.

22  Q.  And what do you see at 2:24 p.m. there?

23  A.  This is a text message from Holder to Wada, and she says:

24  "Any idea of who the Ads will be in the banking group yet (or

25  anyone for that matter).  LOL."

J2SDMID2                              Pyun - direct

1    Q.  What do you see at 3:23 p.m.?

2    A.  A call from Wada to holder -- actually, a voicemail.  And

3    he said:  "Hey Cindy, it's Jeff.  Um, I have the list, and I --

4    so, um, grocery list.  Anyway, feel free to give me a call

5    back."

6    Q.  And, Ms. Pyun, what is represented by the boxes we have

7    here from 4:39 p.m. to 6:20 p.m.?

8    A.  This is a series of text messages between Holder and Wada.

9    Q.  And could you read the last two text messages there?

10   A.  So at 6:19 Wada says, "We need to talk."  And Holder

11   responds, "Sure," at 6:20."

12   Q.  All right.  Let's go to the next page.

13            And, Ms. Pyun, is this the same day?

14   A.  Yes.

15   Q.  And what do you see at 7:02 p.m. here?

16   A.  At 7:02, Wada calls Holder, and that call lasts for 28

17   minutes and 53 seconds.

18   Q.  What time does the call end?

19   A.  At 7:30.

20   Q.  And what do you see 15 minutes later, at 7:45 p.m.?

21   A.  At 7:45 we see that Sweet takes a photo of Holder's notes,

22   and that's depicted in Government Exhibit 1444.

23   Q.  And, Ms. Pyun, what are the sources for the information on

24   this slide?

25   A.  That's 14 minutes from Exhibit 405, 1405, 1444, 1446, and

J2SDMID2                         Pyun - direct

1    Brian Sweet's testimony.

2    Q.  Let's go to the next page.

3         What is the date at the top here?

4    A.  This is January 10, 2017.

5    Q.  So the next day?

6    A.  Yes.

7    Q.  And what do you see at 9:37 a.m.?

8    A.  Tom Whittle sends an email.  This is between him and

9    Middendorf.

10        He says:  "Dave, I need a few minutes to discuss a

11   number of matters.  Not sure if you are traveling.  Please give

12   me a call in the office or maybe better on my cell.  Thanks.

13   Tom."

14   Q.  What do you see at 10:25 a.m.?

15   A.  Middendorf responds:  "I am in the GAQIC meeting in Miami.

16   Can you chat between 1 to 2 or at 6 p.m.?"

17   Q.  And, generally speaking, when you have this sort of light

18   pink color in the summary charts, what does that represent?

19   A.  These are communications sent by Middendorf.

20   Q.  So what do you see at 10:26 a.m., one minute after the

21   Middendorf email?

22   A.  Whittle responds:  "Try 1 p.m. on my cell.  If we strike

23   out, we can go to 6 as fallback."

24   Q.  What do you see in the pink box below?

25   A.  So from 1:13 p.m. to 1:56 p.m., Middendorf calls Whittle,

J2SDMID2                          Pyun - direct

1   and that call lasted for 42 minutes and 57 seconds.  And during

2   that time, at 1:23 p.m., Middendorf created a note on his

3   iPhone.

4            MS. ESTES:  Mr. Cooney, if you could go to the next

5   slide.

6   Q.  Ms. Pyun, what is the date of this chart?

7   A.  This is February 2, 2017.

8   Q.  And what is the source for this chart?

9   A.  Government Exhibit 1428.

10  Q.  And if you could just read the two messages marked

11  "deleted" there?

12  A.  At 7:49 p.m. Wada says:  "OK, I have the grocery list."

13  And at 7:50 he says, "All the things you'll need for the year."

14  Q.  Let's go to the next page.

15           What is the date of this one?

16  A.  February 3, 2017.

17  Q.  So then a day later?

18  A.  Yes.

19  Q.  What do you see in that first box up there?

20  A.  A text message from Holder to Wada at 10:39 a.m.  She says,

21  "I'm up when you want to chat."

22           And at 12:10 p.m., he asks, "Busy?"

23  Q.  And what happens at 12:15 p.m.?

24  A.  At 12:15 to 1:02 p.m., Holder calls Wada and that call

25  lasts for 47 minutes and 31 seconds.

J2SDMID2                           Pyun - direct

1    Q.  What happens a minute after that call ends, at 1:03 p.m.?

2    A.  At 1:03 Holder calls Sweet, which lasted for one second.

3    Q.  What happens later, at 1:03 p.m.?

4    A.  At 1:03 as well, Holder texts Sweet and says, "Please call

5    ASAP."

6    Q.  What happens at 1:21 p.m.?

7    A.  At 1:21 p.m., Sweet calls Holder, and that call lasted for

8    31 minutes and 19 seconds and ended at around 1:52 p.m.

9    Q.  Let's go to the next chart.

10             Is this the same day?

11   A.  Yes.

12   Q.  What happens at 1:52 p.m.?

13   A.  At 1:52 p.m., Holder texts Wada, "Busy?"

14             And a minute later Wada responds, "I can call you."

15   And Holder says, "Thanks."

16   Q.  What happens at 1:53 p.m., after that?

17   A.  Wada calls Holder, which lasted for zero seconds.

18   Q.  And then what happens in the next box?

19   A.  Holder calls Wada back, and that lasted for 31 minutes and

20   50 seconds.

21   Q.  What time did that call end?

22   A.  At 2:25 p.m.

23   Q.  And what happens at 1:53 p.m. as well?

24   A.  So at the same time as the previous call started, Sweet

25   called Whittle, which lasted for seven minutes and 55 seconds.

1    Q.  What happens at 2:46 p.m.?

2    A.  At 2:46 Sweet calls Holder, and that lasts for 11 minutes

3    and 33 seconds.

4    Q.  And then what happens at 3:03 p.m.?

5    A.  Sweet sends a calendar invite to Middendorf and Whittle for

6    February 6, 2017, titled, "Catch up meeting."

7    Q.  Let's go to the next slide.

8         Ms. Pyun, what do we see here at 3:57 p.m.?

9    A.  So this is the same day at 3:57 p.m.  Sweet calls Britt and

10   that lasts for one minute.

11   Q.  What do you see at 4:01 p.m.?

12   A.  Wada calls Holder, which lasts for one minute and 28

13   seconds.

14   Q.  What happens at 4:31 p.m.?

15   A.  At 4:31 Wada leaves Holder a voicemail, and he says:  "Boy

16   was I wrong.  It, uh, yeah, wasn't what I thought.  But anyway,

17   I'm back, and I'm lookin' at my grocery list, so feel free to

18   give me a call back.  Thanks.  Bye."

19   Q.  What happens at 4:43 p.m.?

20   A.  Holder calls Wada and it lasted for four seconds.

21   Q.  What happens next?

22   A.  Wada then calls Holder at 4:43 as well, and that lasted for

23   23 minutes and 49 seconds.

24   Q.  And what happens at 5:07 p.m., right after the call from

25   Wada to Holder ends?

J2SDMID2                         Pyun - cross

1   A.  Holder calls Sweet and that lasts for 23 minutes and four

2   seconds.

3   Q.  And then what happens at 7:39 p.m.?

4   A.  At 7:39 Britt calls Sweet, and that lasts for 27 minutes.

5              MS. ESTES:  No further questions.

6              THE COURT:  OK.

7              Mr. Weddle.

8   CROSS-EXAMINATION

9   BY MR. WEDDLE:

10  Q.  Good afternoon.

11  A.  Good afternoon.

12  Q.  My name is Justin Weddle.  I represent Jeffrey Wada in this

13  case.

14             So we have just -- it is just one exhibit that you

15  testified about, right?

16  A.  Yes.

17  Q.  That's Government Exhibit 1362?

18  A.  Yes.

19  Q.  And you said you prepared summary "charts," plural, and

20  there is one exhibit.  Are we talking about the same thing or

21  different things?

22  A.  Yeah.  So each page I guess would be a chart in itself but

23  it's combined into one.

24  Q.  OK.  And did you prepare drafts of the charts?

25  A.  There were draft versions, yes.

J2SDMID2                        Pyun - cross

1    Q.  Did you prepare the drafts?

2    A.  Yes.

3    Q.  Did other people prepare earlier drafts?

4    A.  I'm not quite sure about that.

5    Q.  So I guess to put it a different way:  Did you basically

6    start from scratch from when you started to embark on this

7    chart preparation project, or did you have some other work

8    product to start from?

9    A.  There was other previous work product, but the iteration on

10   the screen was created by me.

11   Q.  And obviously the iteration on the screen has a graphic

12   quality to it, right?

13   A.  Yes.

14   Q.  It is more picturesque than just regular spreadsheets or

15   text, right?

16   A.  Yes.

17           MR. WEDDLE:  Can we just pull up 1362, that first

18   page?

19   Q.  And you said that -- I guess you said generally that there

20   were a number of sources that you used in preparing the charts

21   which are compiled into 1362?

22   A.  Yes.

23   Q.  And one of the sources -- sorry, let me back up.

24           Each of the charts, or the entirety of 1362, let's

25   say, is chronological, right?

J2SDMID2                          Pyun - cross

1   A.  Yes.

2   Q.  So that is each entry has a time associated with it, right?

3   A.  Yes.

4   Q.  And the times go in order, right, from earliest to latest?

5   A.  Correct.

6   Q.  When you prepared the versions that you prepared for 1362,

7   were you looking at the underlying sources that are listed

8   under the source in the bottom left-hand corner?

9   A.  Yes.

10  Q.  OK.  So the sources don't have the same time -- don't

11  necessarily have the same time expression as what's in your

12  chart, is that right?

13  A.  In some circumstances, yes, depending on how they were

14  portrayed.

15  Q.  And is it fair to say that in your view, what you did is

16  sometimes convert what was on the underlying source, you know,

17  a time number on the underlying source, to the time number that

18  you put in your chart, right?

19  A.  Yes.

20  Q.  So, for example -- well, I can't do this from memory.  But

21  just to take the page that we're looking at, it says 7:19 p.m.,

22  and I think that you had said that in your chart you've

23  attributed -- you've attributed this page of the chart as a

24  text conversation, if you will, between Jeffrey Wada and Cindy

25  Holder, is that right?

J2SDMID2                          Pyun - cross

1    A.  Yes.

2    Q.  And you said the blue boxes in your chart, or bubbles, I

3    don't know what you want to call them, are sent by Holder?

4    A.  Yes.

5    Q.  And the green ones are sent by Wada?

6    A.  Yes.

7    Q.  Do you remember whether you used -- so if you have, let's

8    say, a Jeff Wada cell phone extraction and -- or -- that's

9    probably a bad example.  Let's go to the next page.

10             OK.  So -- and then on this page, in a similar

11   fashion, you used color coding to designate other things,

12   right?

13   A.  Yes.

14   Q.  So if you look down at 1:36 p.m., you have an email from

15   Holder to Sweet, right?

16   A.  Yes.

17   Q.  And then you have an email from Sweet to Holder, right?

18   A.  Yes.

19   Q.  Do you know if those different emails come from -- you

20   would expect, because you operate with email, right, in your

21   daily life?

22   A.  Yes.

23   Q.  You would expect that a copy of that email would be on

24   Brian Sweet's computer and on Cindy Holder's computer, right?

25   A.  I'm not sure how things were produced in this case, but you

J2SDMID2                          Pyun - cross

1    would expect that, yes.

2    Q.  Let's say at some point in time that would have existed,

3    right?

4    A.  Yes.

5    Q.  And do you remember what -- which the sources were, like

6    which custodian, let's say, you used for the Holder emails?

7    A.  I don't recall.

8    Q.  The same answer for Sweet?

9    A.  I don't recall.

10   Q.  Do you see on this page, it says, "Sweet testimony"?  Do

11   you see that?

12   A.  Yes.

13   Q.  It has that as one of the sources?

14   A.  Mm-hmm.

15   Q.  Which aspect of this page relies on Brian Sweet's

16   testimony?

17   A.  So I believe it, in part, pertains to the calls between

18   Holder and Sweet that lasted for zero minutes.

19   Q.  When you say "in part" as it relates to that, what do you

20   mean?

21   A.  That he received calls from Holder for zero minutes.

22   Q.  So you think those entries are not from call records

23   themselves, those are from Brian Sweet's testimony?

24   A.  Those are both from the call records for Cindy Holder as

25   well as for the testimony.

J2SDMID2                              Pyun - cross

1   Q.  OK.  And were you here when Brian Sweet testified?

2   A.  No.

3   Q.  Where were you when Brian Sweet testified?

4   A.  I was back at my office.

5   Q.  Which is 1 St. Andrew's Plaza?

6   A.  Yes.

7   Q.  Which is about a block way from here?

8   A.  Yes.

9   Q.  And so when you relied on Brian Sweet's testimony, how did

10  you do that?

11  A.  I read through the transcripts pertaining to the summary

12  charts we were focusing on.

13  Q.  OK.  And so did you read through the entirety of Brian

14  Sweet's transcript testimony?

15  A.  No.

16  Q.  Just selected portions?

17  A.  Yes.

18  Q.  Did you select which portions to read?

19  A.  I did.

20  Q.  You selected them?

21  A.  Yes.  Based on the days of the charts that we were focusing

22  on.

23  Q.  OK.  When you say "we," who are you talking about?

24  A.  Myself and the prosecution team.

25  Q.  OK.  And when you read through Brian Sweet's testimony, you

J2SDMID2                          Pyun - cross

1    took it as true, right?

2    A.  Yes.

3    Q.  Let's see.  Now, your chart is, whatever this is, ten or so

4    pages long, right?

5    A.  Yes.

6    Q.  This doesn't contain all of the communications between

7    Wada's cell phone and Holder's cell phone, right?

8    A.  No.

9    Q.  And it doesn't contain all the communications between

10   Holder's cell phone and Brian Sweet's cell phone, right?

11   A.  No.

12   Q.  Nor does it contain all of the email communications?

13   A.  No.

14   Q.  And it is a selection, fair to say?

15   A.  Yes.

16   Q.  Did you decide which things to include in it?

17   A.  No.

18   Q.  Who decided?

19   A.  The prosecution team.

20   Q.  Do you remember which member of the prosecution team?

21   A.  I don't remember.

22   Q.  How did that get conveyed to you, which items to include?

23   Was that in writing or orally or a combination?

24           MS. ESTES:  Objection.

25           THE COURT:  Sustained.

J2SDMID2                          Pyun - cross

1   BY MR. WEDDLE:

2   Q.  OK.  Now, I think when you were testifying on direct, you

3   talked about this page 2 and compared -- maybe I am wrong, but

4   can we compare Government Exhibit 953 to this?  Can we pull

5   that up also?

6           Let me check to see if that's in evidence, actually,

7   953.

8           (Pause)

9           MR. WEDDLE:  That is in evidence.  Can we display it?

10  Thank you.

11  Q.  OK.  I forgot what I was even asking about.  Great.  953.

12          OK.  So we have 953 here on the right-hand side, and

13  you compared this in your direct testimony with your chart,

14  which is on the left-hand side, right?

15  A.  Yes.

16  Q.  And specifically you compared the phone number, this

17  212-954 number 2251 to what's on your chart, right?

18  A.  Yes.

19  Q.  And that is not a cell phone number, right?

20  A.  No.

21  Q.  And it's not in any of the cell phone records that you

22  reviewed for cell phones that are subscribed to Jeffrey Wada,

23  right?

24  A.  I don't believe so.

25  Q.  Actually, let me clarify that.  So, I think I misspoke

J2SDMID2                         Pyun - cross

 1   before.

 2         I think -- so the entry 2251 to Wada, do you remember

 3   the source for that fact, that there is a phone call from 2251

 4   to Wada?

 5   A.  I believe it was Jeffrey Wada's phone records.

 6   Q.  Which just shows an incoming call, right?

 7   A.  Yes.

 8   Q.  And it doesn't say who the 212-954-2251 number belongs to,

 9   right?

10   A.  Not on his record.

11   Q.  Did you review any records of the outgoing call?  Like, for

12   example, you would expect if someone gets an incoming call,

13   some information would show up in their records and also the

14   person -- the records relating to the phone that is making the

15   call would also have information about it.  Did you review the

16   other side of it?

17         MS. ESTES:  Objection to the "what would you expect."

18   It calls for speculation.

19         THE COURT:  Sustained.

20   BY MR. WEDDLE:

21   Q.  Did you review phone records relating to the phone number,

22   you know, for the subscriber of the phone number 212-954-2251?

23   A.  Not for the 2251 number.

24   Q.  Which phone -- when you say "not for the 2251 number," what

25   are you talking about?  What other number did you review phone

J2SDMID2                          Pyun - cross

1   records for?

2   A.  For the other one -- the other phone records that we had

3   available to us.

4   Q.  I thought you were talking about another specific 212

5   number or --

6   A.  No.

7   Q.  OK.  So no subscriber information and phone records for

8   212-954-2251?

9   A.  No.

10  Q.  And do you see the time -- can we highlight the time on

11  Government Exhibit 1362 relating to that entry, 12:42 p.m. to

12  1:33 p.m.

13          And can we highlight the time on Government Exhibit

14  953.

15          Do you see that that is 6:48 p.m., right?

16  A.  Yes.

17  Q.  Do you have an understanding of what time zone Government

18  Exhibit 953's entry of 6:48 p.m. is?

19  A.  My understanding is that the top email, the most recent

20  email in the chain, is in UTC Time.

21  Q.  OK.  So do you know how to convert UTC Time on March 28,

22  2016, to New York time on March 28, 2016?

23  A.  Yes.  So that would be Eastern Daylight Time, which is

24  minus four from UTC.

25  Q.  OK.  So if you use your conversion, what time was Cindy

J2SDMID2                        Pyun - cross

1  Holder telling Michael Flynn to call there at this particular
2  number?
3  A.  So that would be 2:48 p.m.
4  Q.  OK.  So according to your time zoning on Government Exhibit
5  1362, that's two hours after the start of the call, right?
6  A.  Correct.  But it also depends on where this email comes
7  from, whose computer it is, and what time zone they are in,
8  which I'm not sure of in this case.
9  Q.  I thought you said that your understanding is the top email
10  is always in UTC and some of the other -- maybe some of the
11  other emails are not converted to UTC but the top one is, or
12  you are not sure?
13  A.  My understanding is that the top one is in UTC, but the
14  emails further down the chain reflect whatever the time zone of
15  the person whose email account this is taken from.
16  Q.  OK.  Is that one of the things that you are relying on
17  Brian Sweet's testimony for, that is, the fact that the top
18  email is in UTC and the other emails are in the time zone of
19  the person's computer who sent the email?
20  A.  Brian Sweet and as well as some other testimony from the
21  trial.
22  Q.  What other testimony?
23  A.  Ken Koch.
24  Q.  OK.  But Ken Koch is not listed as a source on your chart,
25  right?

J2SDMID2                        Pyun - cross

1    A.  No.

2    Q.  And then you see the next entry on this page is 1:33 p.m.

3           MR. WEDDLE:  I think we're done with 953.  Yes, we are

4    done with 953.  Thank you, Ms. O'Connor.

5    Q.  The 1:33 p.m. entry -- I'm sorry -- yes.  Can we go back

6    to -- there we go.

7           1:33 p.m. entry on page 2 of Government Exhibit 1362

8    says, "1:33 p.m., Holder to Sweet."

9    A.  Yes.

10   Q.  That call is not from 212-954-2251, correct?

11   A.  Yes.

12   Q.  What phone number is that from?

13   A.  I believe that's a phone number -- Holder's cell phone

14   number.

15   Q.  And do you know if the source for this Holder to Sweet call

16   is from Holder's cell phone records or Sweet's cell phone

17   records?

18   A.  I believe these are from Holder's cell phone records.

19   Q.  Let's take a look at Government Exhibit 405, page 18.

20          MR. WEDDLE:  This is in evidence, your Honor.

21   Q.  And if we can blow up -- so we've got -- can you tell from

22   looking at this which line made it onto your chart at 1:33?

23   A.  So I believe --

24   Q.  And if you would see, all the way on the left there is a

25   line number, it's called "Item," which may make it easier to

J2SDMID2                        Pyun - cross

1  talk about.

2  A.  248, 249 and 250.

3          MR. WEDDLE:  Can we blow those up, 248, 249 and 250.

4          We need to go all the way across or most of the way

5  across, I guess.  Do we?

6          Just through the first one, two, three, four, five,

7  six, seven columns.  Perfect.  That's great.

8  Q.  OK.  So here we have -- in line 248, we have March 28,

9  2016, at 17:33, which is military time, right?

10 A.  Yes.

11 Q.  We have I guess seizure time of one second and zero second

12 duration, correct?

13 A.  Yes.

14 Q.  And then your understanding from this -- well, is it your

15 understanding that the originating number here is Cindy

16 Holder's cell phone number?

17 A.  Yes.

18 Q.  And what is your understanding about what the 212-872-2140

19 number is?

20 A.  My understanding is that that belonged to Brian Sweet.

21 Q.  That looks like a landline number, right, 212 area code?

22 A.  Yes.

23 Q.  What is your -- based on what is it your understanding that

24 that 212-872 number belongs to Brian Sweet?

25 A.  From Brian Sweet's testimony.

J2SDMID2                        Pyun - cross

1   Q.  And then you said -- let's see, I think you said that there

2   was an additional source at 1:34 p.m.  I guess that is a

3   text -- let's just stick with this exhibit on the screen for a

4   second.

5           We have a phone call and text 1:34 p.m.  So what is

6   your source for the phone call at 1:34 p.m. in this exhibit

7   that's on the screen -- if this exhibit is one of your sources?

8   A.  This exhibit is the source.

9   Q.  OK.  So is that line 249?

10  A.  Yes.

11  Q.  And line 249 is "Holder cell phone number."  That's your

12  understanding, that that 1277 number is Holder's cell phone

13  number?

14  A.  Yes.

15  Q.  And it's calling this 559 area code number ending in 3823.

16  Your understanding is that's what?

17  A.  That's Brian Sweet's cell phone number.

18  Q.  And then at -- and then here, it says -- and then line 250

19  is -- the time is 17:35:21; 17 hours, 35 minutes, 21 seconds,

20  right?

21  A.  Yes.

22  Q.  And it says seizure time 30 seconds, duration 10 seconds?

23  A.  Yes.

24  Q.  So do you have a copy of your chart in front of you?

25  A.  No, I do not.

J2SDMID2                         Pyun - cross

1    Q.  Not to be nick picky about it, but it looks like you've got

2    these up on your chart as 1:34 p.m. also?

3    A.  Yes.  So that technically should be 1:35.

4         MR. WEDDLE:  Can I take that back?  Thank you.

5    Q.  So just to go back to the time zone, so this raw data

6    source here as the 17 hours 34, or 33 minutes, whatever,

7    whichever line you want to look at, and that is in UTC?

8    A.  Yes.

9    Q.  And I guess you relied in part on Brian Sweet to know that

10   UTC -- how to convert UTC, or did you look that up somewhere?

11   A.  I just knew it from previous experience.

12   Q.  OK.  And it gets tricky in March, right, some years?

13   A.  Yes.

14   Q.  Why is that?

15   A.  Because Daylight Savings means that in from March to

16   November, I believe, we're in Eastern Daylight Time in New

17   York, which is minus four from UTC, and then the rest of the

18   year we're in Eastern Standard Time, which is minus five.

19   Q.  Do you remember what it is?  It is like the second

20   Sunday --

21   A.  Of March.

22   Q.  -- of March or something?

23        So UTC doesn't change but New York time varies?

24   A.  In relation to it, yes.  It changes.

25   Q.  So sometimes it is minus four?

J2SDMID2                      Pyun - cross

1   A.  Mm-hmm.

2   Q.  And sometimes it's minus five, right?

3   A.  Yes.

4   Q.  So did you calculate all the time zone conversions, or did

5   someone else help you with that?

6   A.  I converted some of them and the rest were helped.

7   Q.  By other members of the prosecution team?

8   A.  Yes.

9   Q.  Did you verify them, the ones that other people calculated?

10  A.  When I checked back from the source charts to the summary

11  charts, or the source documents to the summary charts, yes,

12  sir.

13  Q.  OK.  But the source documents themselves don't always tell

14  you -- like in that email we were just looking at, the source

15  document itself doesn't actually say what the time zone is?

16  A.  No.

17  Q.  So for that you have to rely on testimony, right?

18  A.  Yes.

19  Q.  To know that the top emails should be read as if it is UTC

20  instead of the top email being read as if it is New York time?

21  A.  Yes.

22  Q.  Let's take a look at page 3.

23          MR. WEDDLE:  Actually, you know what, if you will give

24  me one second your Honor?  I apologize.

25          THE COURT:  Yes.

BY MR. WEDDLE:

Q.  In your direct testimony -- maybe you can help me.  In your
direct testimony, I think you said that there was a call that
was to a number subscribed, or, I'm sorry, a number belonging
to KPMG?

A.  Yes.

Q.  Is that one of the ones on this page?

A.  Yes.  The one at 4:10.

Q.  4:10 p.m.?

        MR. WEDDLE:  Oh, I see, KPMG to Sweet.  That is what I
was looking for.  Thank you.

Q.  So how do you know that that is a phone -- do you remember
what the phone number is, 4:10?

A.  I can't recall what the actual number is.

Q.  Do you recall any part of it?

A.  It began in 212.

Q.  Is that it?  That's all you remember?

A.  I believe the only other thing I know is that the prefix to
the number, the numbers that came -- the three numbers that
came after 212 belonged to KPMG.

Q.  OK.  You think they might have been 954?

A.  That sounds about right.

Q.  And how did you know that those -- that that's a KPMG
number?

A.  That came from Brian Sweet's testimony.

J2SDMID2                          Pyun - cross

1    Q.   OK.   And is it your understanding that KPMG subscribes to a

2    large number of phone numbers in New York?

3              MS. ESTES:   Objection.   That calls for speculation.

4              THE COURT:   Sustained.

5    BY MR. WEDDLE:

6    Q.   This isn't the only phone number -- the number that you

7    were using for 4:10 is not the only KPMG phone number in New

8    York, right?

9              MS. ESTES:   Objection.

10             THE COURT:   Sustained.

11   BY MR. WEDDLE:

12   Q.   Based on the records that you reviewed, did you see any

13   other KPMG phone numbers besides the one that you are

14   referencing here in 4:10?

15   A.   I don't recall based on subscriber records to KPMG but from

16   the testimony, yes.

17   Q.   And when you say "from the testimony," you are talking

18   about Brian Sweet?

19   A.   Yes.

20   Q.   And only Brian Sweet?

21   A.   There may have been other testimony.   I'm not sure.

22   Q.   I'm not asking you what else happened at the trial.   I'm

23   speaking about what you relied on -- what you are talking about

24   as to what you relied on.

25   A.   I may have read other portions of the testimony that

J2SDMID2                          Pyun - cross

1   referred to KPMG numbers but I'm not sure.

2   Q.   OK.   Do you recall which other witnesses' parts of their

3   testimony you read?

4   A.   Not at the moment, no.

5   Q.   And let's take a look at -- oh, page 4.   Can we take a look

6   at page 4?

7            I think you just misspoke, but at 3:23 you initially

8   said that that was a phone call and then you said it was a

9   voicemail?

10  A.   Yes, it is a voicemail.

11  Q.   There are no recorded phone calls that you are aware of in

12  this case?

13  A.   No.

14  Q.   You certainly didn't rely on a recording of a phone call?

15  A.   No.

16  Q.   Let's take a look at page 5.

17           Well, I guess -- well, let's take a look at page 5.

18  Page 5 starts with 7:02 p.m., right?

19  A.   Yes.

20  Q.   Then let's back up to page 4.

21           And page 4 ends at 6:20 p.m., right?

22  A.   Yes.

23  Q.   And you haven't included anything between 6:20 p.m. and,

24  what was it, 7:02 p.m.?

25  A.   7:04.

J2SDMID2                         Pyun - cross

1   Q.  7:04.  Thank you.

2   A.  No.

3           MR. WEDDLE:  Can we pull up Defense Exhibit 1650 and

4   Government Exhibit 1445.

5           And if we could blow up in 1650 the second entry in

6   the table.

7   Q.  OK.  So do you see -- well, first of all, Defense Exhibit

8   1650 -- how long have you worked at the United States

9   Attorney's Office?

10  A.  For two-and-a-half years.

11  Q.  Are you familiar with phone extraction reports?

12          MS. ESTES:  Objection.  It is completely beyond the

13  scope.

14          THE COURT:  Sustained.

15  BY MR. WEDDLE:

16  Q.  Does it look to you like 1650 is a phone extraction report?

17          MS. ESTES:  Objection.

18          THE COURT:  Sustained.

19  BY MR. WEDDLE:

20  Q.  Do you see in 1650 there is a photograph referenced in it,

21  and it looks like Government Exhibit 1445 on the right.  And

22  that exhibit, 1650, says that that photograph was created at

23  6:52 p.m. on January 9, 2017.  Do you see that?

24  A.  Yes.

25  Q.  You did not include this photograph in your chart, right?

J2SDMID2                        Pyun - cross

1     A.  No.

2            MR. WEDDLE:  And if we could see the rest of 1650 for

3     a second?  If you can blow up the third item?

4     Q.  And do you recognize -- it is a thumbnail on far right-hand

5     side, but do you recognize that thumbnail as one of the images

6     that you did include in your chart?

7     A.  Yes.

8     Q.  And do you remember that your chart says, "7:45 p.m., Sweet

9     takes photo of Holder notes"?

10    A.  Yes.

11    Q.  OK.  And how did you get the time for this entry?

12    A.  We had an exhibit that showed -- that reflected the time

13    created.

14    Q.  What did the exhibit look like?

15    A.  It looked similar to what's marked here as Defense Exhibit

16    1650.

17           MR. WEDDLE:  Can we just look at all of 1650?

18    Q.  In what ways did it look similar to Defense Exhibit 1650?

19           MS. ESTES:  Objection, your Honor.

20           THE COURT:  Sustained.

21    Q.  Was it an extraction report?

22           MS. ESTES:  Objection, your Honor.

23           THE COURT:  Sustained.

24           MR. WEDDLE:  Can we pull up Government Exhibit 1446 on

25    the right-hand side, and leave 1650 where it is.

J2SDMID2

1              Sorry, Defense Exhibit 1650.

2              Can we go back to page 1.

3    Q.  So Government Exhibit 1446 is one of the sources on this

4    page 5 of your chart, right?

5    A.  Yes.

6    Q.  Do you recognize the second page of 1446 as the source for

7    your time entry for these -- this image of --

8    A.  Yes.

9    Q.  -- handwritten notes?

10             MR. WEDDLE:  May I have a moment, your Honor?

11             THE COURT:  Yes.

12             (Pause)

13             MR. WEDDLE:  Thank you.  I have nothing further.

14             THE COURT:  OK.  Is there anything further from the

15   government?

16             MS. ESTES:  No, your Honor.

17             (Witness excused)

18             THE COURT:  And is there anything we need to do before

19   lunch, or can I break for lunch?

20             MS. ESTES:  Break for lunch.

21             THE COURT:  All right.  Folks, we kept you a little

22   past 1, so we will give you a full hour for lunch.  So, we will

23   start around 2:15.

24             Please leave your notepads on your chairs.  Have a

25   good lunch, everybody.

J2SDMID2

1              (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2SDMID2

```
 1              (Jury not present)
 2              THE COURT:  You may be seated.
 3              Is that going to complete the government's case?
 4              MS. MERMELSTEIN:  It is, your Honor.  We are going to
 5     rest after lunch I think once we have confirmed that everything
 6     we think is in is in but we are substantively done.
 7              THE COURT:  All right.  And then we'll have your
 8     witness?
 9              MR. BOXER:  He is here, yes, your Honor.
10              THE COURT:  Anything else we need to address before
11     lunch?
12              MR. COOK:  One issue, your Honor.
13              You recall we had a sidebar during Mr. Greenwood's
14     testimony in which we looked at some photographs from
15     government exhibits.  During that sidebar, I think both parties
16     inaccurately stated to the Court that there was not a better
17     photograph of Government's Exhibit 1445 that would depict the
18     top of the image.  In fact, when we looked at the electronic
19     version of that image, we noticed that the printout cut off
20     portions, so you can read the characters that was part of the
21     subject of the sidebar.  I would like to show it to the Court,
22     and I will provide a copy to government counsel.  And then we
23     make a request to return the document.
24              THE COURT:  All right.
25              MR. BOXER:  Your Honor, on scheduling, we only have
```

J2SDMID2

1    one witness present today that will not take us to 4 o'clock.

2    I don't know if you will entertain Rule 29 arguments before he

3    takes the stand?  What are your practices as far as that goes?

4    I would like to make them at the appropriate time and have the

5    witness testify.

6            THE COURT:  Yes.  So can we -- since the government

7    has represented it expects that it is going to rest, I would

8    think we can hear that after your witness.

9            MR. BOXER:  Perfectly fine.

10           THE COURT:  So I don't think you need to make the

11   motion in front of the jury, right?

12           MR. BOXER:  No, not at all.  But as long as we make

13   it, it is preserved, and then we address it after Mr. Fletcher

14   is done testifying, that will be fine.

15           THE COURT:  Is that OK?

16           MS. MERMELSTEIN:  That's fine.  I think we can just

17   deem it made and take it up whenever your Honor would like.

18           THE COURT:  That's fine.  I will deem it --

19           MR. WEDDLE:  We join in that.

20           THE COURT:  I will deem the defendants to have made

21   the motion as soon as the government rests.

22           MR. BOXER:  Thank you.

23           MR. COOK:  Your Honor, I have handed up to the Court

24   Government's Exhibit 1445 as admitted as well as a better copy

25   of the same document that was produced to us that more clearly

J2SDMID2

shows the first character of the word at the top of the image.

As the Court will recall, one of the bases for the relevance of

the document was the word at the top of the image, and I think

it more clearly shows that the letters is an R, not an L, at

least arguably so.

There are a couple of options.  One is that the

parties could agree to substitute the more correct documents

for the exhibit.  It comes from the same image file.  It's just

a better printout.  Or we could of course call the witness

again in our case and have then two competing images from the

same document.  That would seem to be unnecessary.

MS. KRAMER:  So we renew our objection to this, your

Honor, for a couple of different reasons.

One, the witness who testified about this in the first

place couldn't authenticate it, is in no better position to

authenticate a larger version than he was earlier.

Second, we object to this for two reasons.  One, this

was not marked as a defense exhibit, and there was no notice

that they intended to offer this until they slapped a sticker

on it during the testimony of Mr. Greenwood, in contravention

of your Honor's order and the disclosures the parties have been

making to each other.

Second, this is extrinsic evidence used to impeach the

testimony of Brian Sweet that should not come in for that

reason.  You know, so for the late disclosure, it should be

J2SDMID2

1    out.  It prejudiced the government's ability to ask any

2    questions of Mr. Sweet about this.  It is extrinsic evidence on

3    a collateral matter.  And the relevance is not, in the

4    government's view, even remotely close to the prejudice that

5    results from its admission.  The argument that they can make

6    that the first letter is an R and not an L, you know,

7    reasonable minds can disagree about that.  But I think part of

8    what they also testified to is that what's listed on this

9    whiteboard are focus areas.

10        What the testimony has clearly established from a

11   number of witnesses is that there were three focus areas chosen

12   by the PCAOB for each of the inspections.  Occasionally I think

13   there was testimony that there was a fourth.  What we're

14   looking at here is not three focus areas.  If they want to

15   argue that this is confidential information about an

16   inspection, that is not what is reflected in the notes on this

17   whiteboard, about which there has been no substantive testimony

18   because the government wasn't even noticed of their intent to

19   offer it.  They asked no questions of the only person who could

20   testify about it.  And it's sandbagging.

21        And, you know, to the extent that they are going to

22   say they just made the decision to use it, this is something

23   that they pointed out at sidebar was in a prior version of the

24   government's extraction report.  So, they knew about it.  It

25   wasn't just on a massive extraction.  And, you know, the

J2SDMID2

1    relevance of it is zero without testimony about it, and they

2    shouldn't be allowed to argue from it any wild interpretation

3    that they want that's not grounded in actual evidence.

4                (Continued on next page)

J2srmid3

1          MR. COOK:  Your Honor, my purpose in raising the issue

2      was not to invite reconsideration of the Court's prior ruling.

3      It was simply to point out that there is a better copy of the

4      same document that is already in evidence and we would

5      recommend, we would suggest and request, that this version,

6      this more accurate version, be substituted for the one that is

7      part of the record.

8          It was a government exhibit.  It was marked as a

9      government exhibit.  It is in evidence.  The only issue as I

10     understand it that I have raised and that should be decided now

11     is whether we should put a more accurate copy of the document,

12     which your Honor requested at sidebar, into evidence.  It was

13     only through both parties' misunderstanding that the copy we

14     had was a full version that 1445 made its way into evidence.

15         MS. KRAMER:  To be clear, we would have reraised this

16     anyway.  I don't want Mr. Cook to have the impression that only

17     because he asked to substitute the photo were we relitigating

18     this.  We intended to do it anyway.

19         THE COURT:  I understand.  I am going to stick with my

20     ruling.  I believe this appears to be just a fuller version and

21     I think it should be replaced with this.

22         MR. COOK:  Thank you, your Honor.

23         THE COURT:  Anything else?

24         MR. WEDDLE:  Your Honor, for the record, when the

25     government rests or just prior to the government rests, we

J2srmid3

1    would renew our objection we made in writing at the beginning

2    prior to Mr. Sweet's testimony that the evidence that was

3    admitted subject to connection as co-conspirator statements of

4    Ms. Holder to Mr. Sweet, as reported by Mr. Sweet, not be

5    admitted.

6         We think that the evidence is nearly all in right now.

7    Given the rule that your Honor can't make the foundational

8    finding based solely on the out-of-court statement itself, we

9    submit that there has not been a connection and that the Court

10   should make a finding that there has not been a showing by a

11   preponderance of the evidence, by evidence beyond the

12   out-of-court statement itself, to support a finding that there

13   was a conspiracy that involved Mr. Wada and Ms. Holder and that

14   the statements that were admitted were in furtherance of that

15   conspiracy.  That testimony should be stricken.

16        THE COURT:  I find that there is a sufficiently

17   adequate foundation and that it is adequately connected, and

18   therefore the objection is noted and overruled.

19        We will start back at 2:15, 2:20.

20        (Luncheon recess)

21

22

23

24

25

J2srmid3

AFTERNOON SESSION

2:20 p.m.

1        (Jury not present)

2        THE COURT:  Good afternoon.  The government is

3   planning to rest or is there any additional evidence?

4        MS. KRAMER:  Your Honor, the government rests.  The

5   jury is not here.  We are planning to rest, your Honor.

6        THE COURT:  We'll go forward with the one defense

7   witness.  We will bring in the jury.

8        MR. COOK:  Your Honor, there is one housekeeping

9   issue.  We have been talking with the government about various

10  technological possibilities for summation.  One option,

11  assuming it would work technologywise, would be to place a

12  large screen over near the jury exit on this side.  We wanted

13  to see if that would be okay with the Court if that were even

14  technologically possible.

15       THE COURT:  If it is okay with the parties and the

16  jurors can see it, I'll be okay with it.

17       MR. COOK:  Thank you.

18       MR. BOXER:  Shall I wait until they rest to actually

19  bring in the witness?

20       THE COURT:  You can bring him in and call him up after

21  they rest.

22       (Jury present)

23       THE COURT:  Good afternoon, ladies and gentlemen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J2srmid3                              Blake - Direct

1    Welcome back.

2              Ms. Kramer.

3              MS. KRAMER:  Your Honor, the government rests.

4              THE COURT:  Ladies and gentlemen, you have heard all

5    the evidence in the government's case.  As I mentioned earlier,

6    because the government has the burden of proof beyond a

7    reasonable doubt, the defendants do not have to put in any

8    evidence.  However, they may if they wish to.  At this time I

9    will turn to counsel for defendant Mr. Middendorf and ask if

10   you would like to present any evidence.

11             MR. BOXER:  We would, your Honor.  We call Frank

12   Blake.

13    FRANCIS S. BLAKE,

14        called as a witness by the defendant,

15        having been duly sworn, testified as follows:

16             THE COURT:  Mr. Boxer.

17             MR. BOXER:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. BOXER:

20   Q.  How old are you, Mr. Blake?

21   A.  69 years old.

22   Q.  What education did you have?

23   A.  I graduated grammar school, high school, college, and law

24   school.

25   Q.  Where and when did you attend college and law school?

J2srmid3                              Blake - Direct

A.   I graduated Harvard College in 1971 and Columbia Law School
in 1976.

Q.   After Columbia Law School, what work experience did you
have, starting with right after law school?

A.   After law school I clerked for a year for Judge Feinberg,
actually in this building, the Second Circuit Court of Appeals.
Then I clerked for a year for Justice John Paul Stevens on the
United States Supreme Court.

Q.   After your clerkship, what did you do after that?

A.   After my clerkship, I started working at a private law firm
in Washington, D.C.  I did that a few years.  Then I worked for
then Vice President George Bush as his deputy counsel.

Q.   After you were deputy counsel to the vice president, what
happened next?

A.   Then I started another law firm with a group of colleagues.
We started a law firm in Washington, D.C.  I did that for a few
years.  I went back into government and was the general counsel
of the U.S. Environmental Protection Agency for a few years.  I
went back into the same law firm that I had originally started.
I did that for another few years.  Then I joined General
Electric.

Q.   What position did you hold at General Electric?

A.   I started at General Electric as general counsel of their
power systems business up in Schenectady, New York.  I did that
for several years within GE.  Then I transferred from the legal

J2srmid3                          Blake - Direct

1    side to the business side, largely did mergers and acquisitions

2    and strategic planning for the power systems business,

3    eventually transferred to Connecticut and did it for the entire

4    company.

5    Q.  You were the general counsel for the whole company?

6    A.  No.  By that time I was no longer a lawyer.  The job was

7    called business development.  I was a senior vice president for

8    business development for GE.

9    Q.  I understand.  After your work at GE, what did you do after

10   that?

11   A.  Then I left GE and became deputy secretary of energy.  I

12   did that for about a year.  This was in 2001-2002.  I left that

13   and did that same strategic development, business development

14   job at the Home Depot.

15   Q.  Approximately when did you start working at the Home Depot?

16   A.  I started working at Home Depot in March of 2002.  As I

17   said, I did the mergers and acquisitions and strategic planning

18   for the Home Depot and then became the CEO in January 2007.

19   Q.  When you became the CEO of Home Depot, were you also the

20   chairman of the board of directors of Home Depot?

21   A.  Yes, I was.

22   Q.  For how long did you serve in those capacities at Home

23   Depot?

24   A.  I was CEO for eight years.  As I was retiring, I stayed one

25   extra quarter as the chairman.  I retired from the Home Depot

J2srmid3                                     Blake - Direct

1    in January 2015.

2    Q.  2015?

3    A.  Yes.

4    Q.  When you were the CEO of Home Depot, would you attend the

5    audit committee meetings of Home Depot?

6    A.  Yes.

7    Q.  Since retiring from Home Depot, have you begun serving on

8    any boards of directors?

9    A.  I serve on three public company boards.  I am the

10   nonexecutive chair of Delta Air Lines.  I am on the Procter &

11   Gamble board and on the Macy's board.

12   Q.  On the Delta board, do you sit on the audit committee?

13   A.  I do.

14   Q.  On the Procter & Gamble board, do you sit on the audit

15   committee?

16   A.  Yes, I do.

17   Q.  On the Macy's board, did you sit on the audit committee?

18   A.  No, I don't.

19   Q.  Do you know Dave Middendorf?

20   A.  Yes, I do.

21   Q.  Do you see him in the courtroom today?

22   A.  I do.  I don't know how it is appropriate to point him out,

23   but he is sitting at that table there.

24   Q.  How do you know him?

25   A.  He was the lead auditor for the Home Depot while I was the

J2srmid3                          Blake - Direct

1   CEO.  It's a five-year rotation, so he was there for five of

2   the eight years that I was the CEO.

3   Q.  Do you recall which auditing firm Mr. Middendorf?

4   A.  Yes, KPMG.

5   Q.  So KPMG was the outside independent auditing firm of Home

6   Depot, right?

7   A.  Yes.

8   Q.  Do you recall approximately when Mr. Middendorf --

9   A.  I would say 2008-ish, yes.  It was a five year term as I

10  remember.

11  Q.  Did you have a practice as far as conducting meetings with

12  Mr. Middendorf when he was in charge of the KPMG audit of Home

13  Depot?

14  A.  We would have one-on-one meetings every quarter.  We had

15  that as a routine practice.  We would have other meetings over

16  the time period, but we had a regular practice of quarterly

17  one-on-one meetings.  And then obviously, as I said, there

18  would be other meetings, either audit committee meetings or

19  separate meetings where I would see David.

20  Q.  What was the purpose of the one-on-one meetings?

21  A.  The purpose of the one-on-one meetings was, first, to

22  ensure from my perspective that what David saw was going on in

23  the company in terms of developing accurate representations of

24  our financials as appropriate.  We called these tone at the top

25  meetings.  So if he was concerned with anything that he would

J2srmid3                              Blake – Direct

1  see within the Home Depot organization, he could feel free to

2  say it and then talk about some of the substantive issues that

3  we had.

4  Q.  Substantive financial accounting issues?

5  A.  Exactly.  We'd have some issues that required significant

6  judgment, and he'd give me his judgment.  That's what we

7  discussed.

8  Q.  Understood.  Have you heard of the PCAOB?

9  A.  Yes.

10  Q.  Do you know what it is?

11  A.  Yes.  I would characterize it as it's sort of the auditor

12  for the auditors.

13  Q.  Are you familiar at all with the PCAOB inspection process

14  of the auditors?

15  A.  At a general level, yes.

16  Q.  Can you describe for us at that general level what you

17  understand the PCAOB inspection process to be.

18  A.  It's easier for me to express what the output of it is or

19  at least what I understood the output is.  They would do the

20  audit.  There would typically be some lag of sometimes an

21  extensive period of time between when they would do the audit

22  and when they would release the report.  The report would come

23  out, there would one part of the report that would be public

24  and then another part of the report that was, I assume, more

25  directed communication with the auditor.

J2srmid3                              Blake - Direct

1    Q.   Have you ever read one of the PCAOB inspection reports?

2    A.   Perhaps.  It certainly hasn't lodged in my head.  They

3    would be in our audit books, so we might see something in the

4    audit book for the audit committee.

5    Q.   Have the contents of PCAOB inspection reports had any

6    influence on you, either serving in your present audit

7    committee roles or when you were the CEO of Home Depot?

8    A.   Both as CEO of the Home Depot and on the audit committees

9    on which I serve, we receive the report, we get a summary of

10   the report.  The conversation is more around how do we

11   constantly make the auditing process better and better.  The

12   interaction between the audit firm and the PCAOB from my

13   perspective was one of how do you make this function a better

14   function.

15   Q.   When you say "you," you mean the auditing firm?

16   A.   How one, how we'd set a structure to make this a better

17   function.

18   Q.   Were the contents of those reports of concern to you?

19   A.   No.  As I say, the discussion would typically be here was

20   the findings: this is what we are working on, this is how we

21   are improving it.  Had there been something that was a material

22   misstatement -- the focus was always on you wanting to give

23   your investors the clearest understanding of the company as

24   possible, so you want to state your financials accurately.  Had

25   there been concerns on that, that would have been notable.  But

J2srmid3                              Blake - Direct

the back-and-forth on how the process is improved, less so.

MS. MERMELSTEIN:  Objection to the nonresponsiveness
of the answer after the word "no," and we move to strike after
the word "no."

MR. BOXER:  I think it was responsive, your Honor.

THE COURT:  I'm not going to grant the motion to
strike.  I'll direct the witness to focus on the question.  You
can ask your next question.

Q.  In your meetings with Mr. Middendorf, was the way the
financial statements were presented and the underlying
financial data, was that also the focus of your meetings with
Mr. Middendorf?

A.  Yes.

Q.  Do you recall if anybody from KPMG ever met with you about
a PCAOB inspection report?

A.  What I recall as process was that the audit committee would
annually have a performance evaluation with KPMG.  We'd talk
about the fee structure, we'd talk about what they did for the
year.  There would often be another one or two KPMG partners at
the meeting, and there probably had been some discussion around
the PCAOB and the interaction with the PCAOB.

Q.  Did anything you read in any PCAOB report or any
interaction you had regarding a PCAOB report when you were at
Home Depot influence your decision to use KPMG as the company's
auditors?

J2srmid3                          Blake - Cross

1   A.  No, sir.

2   Q.  Based on your interactions with Mr. Middendorf, do you have

3   an opinion as to his character?

4   A.  I have the highest opinion of Mr. Middendorf's character.

5   As I said, for five years we would do quarterly one-on-one

6   meetings.  David was always very straightforward.

7           MS. MERMELSTEIN:  I'm sorry to object, your Honor, but

8   I think the question can't be put as a general matter of

9   character.  It has to be more specific than that.

10          THE COURT:  I'll let you follow up with more specific

11  questions.

12          MR. BOXER:  Your Honor, I was trying to avoid the

13  admonition from yesterday about certain specific things.

14          THE COURT:  Understood.

15  Q.  Did you complete your answer, Mr. Blake?

16  A.  David was someone on whose judgment I relied and who I saw

17  in action providing the highest level of advice and integrity

18  within the Home Depot.

19  Q.  Do you have an opinion as far as his honesty?

20  A.  Highest level.

21          MR. BOXER:  I have nothing further, your Honor.

22          THE COURT:  Ms. Mermelstein.

23          MS. MERMELSTEIN:  Very briefly, your Honor.

24  CROSS-EXAMINATION

25  BY MS. MERMELSTEIN:

J2srmid3                          Blake - Cross

1  Q.  Good afternoon, Mr. Blake.

2  A.  Good afternoon.

3  Q.  I think I missed something in your bio.  Was there at a

4  time you were at a law firm, you said?

5  A.  Multiple times.

6  Q.  What law firms were those?

7  A.  I was in the law firm of Leva Haus Symington & Oppenheimer

8  in Washington, D.C., for two or three years.  Then I was at the

9  law firm of Swidler & Berlin, also in Washington, D.C.  The

10 interim was probably five to six years.

11 Q.  As I see you as a company and former practicing lawyer,

12 fair to say that the integrity of an auditor is among an

13 auditor's most important characteristics?

14 A.  Yes.

15 Q.  Your relationship with Mr. Middendorf was a professional

16 one, is that right?

17 A.  Yes.

18 Q.  You met a few times a year in connection with his work on

19 the Home Depot audit?

20 A.  Yes.

21 Q.  You testified that you would not have changed auditors

22 based on inspection results.  KPMG audited about 800 public

23 companies, right?

24 A.  I don't know.

25 Q.  A lot fair to say?

J2srmid3                           Blake - Cross

1    A.  I'll take your word for it.

2    Q.  You don't know what their attitudes were with respect to

3    inspection results, right?

4    A.  I do not.

5    Q.  In fact, isn't it true that KPMG, in pitching clients,

6    failed to obtain certain accounts because of its poor

7    inspection results?

8              MR. BOXER:  Objection.

9              THE COURT:  Sustained.

10   Q.  You don't know how other people in the industry viewed the

11   inspection results, fair to say?

12   A.  I don't.

13   Q.  You, in all of your various roles, have never worked for

14   the SEC, is that right?

15   A.  No, I haven't.

16   Q.  You never worked for the PCAOB, right?

17   A.  No, I have not.

18   Q.  You don't have any information or knowledge about how the

19   SEC utilizes PCAOB inspection results, is that right?

20   A.  That's correct.

21   Q.  Are you aware that in May of 2015 Mr. Middendorf received

22   an email containing a confidential advance list of the 2015

23   inspection targets for KPMG?

24   A.  No.

25   Q.  Are you aware that in March of 2016 Mr. Middendorf received

J2srmid3                        Blake - Redirect

1  an advance list of financial institutions and other entities

2  that would be inspected by the PCAOB?

3  A.  No.

4  Q.  Are you aware that Mr. Middendorf was involved in launching

5  stealth re-reviews in an effort to improve the inspection

6  results for the engagements for which there was advance notice?

7  A.  No.

8  Q.  Are you aware that in January of 2017 Mr. Middendorf

9  received a preliminary list of the PCAOB's then still

10  confidential inspection targets for KPMG?

11  A.  No.

12  Q.  And are you aware that in 2017, in February, he received a

13  final PCAOB list of PCAOB targets for that coming year?

14  A.  No.

15  Q.  Fair to say you don't have any personal knowledge about the

16  facts of this particular case at all?

17  A.  Fair to say.

18          MS. MERMELSTEIN:  Nothing further, your Honor.

19          MR. BOXER:  Briefly, your Honor.

20          THE COURT:  Yes, Mr. Boxer.

21  REDIRECT EXAMINATION

22  BY MR. BOXER:

23  Q.  Mr. Blake, do you have some general familiarity with the

24  charges against Mr. Middendorf?

25  A.  Yes, from reading the newspaper.

J2srmid3                          Blake - Redirect

1    Q.  Have you followed news accounts related to the case?

2              MS. MERMELSTEIN:  Objection to the relevance of this,

3    your Honor.

4              THE COURT:  Overruled.

5    A.  What was the question again?

6    Q.  Have you read news accounts that summarized the allegations

7    in this case?

8    A.  I have, yes.

9    Q.  Having read those accounts, do you have a change of opinion

10   as far as Mr. Middendorf?

11             MS. MERMELSTEIN:  Objection, your Honor.

12             MR. BOXER:  I think that was the whole purpose.

13             THE COURT:  Hold on.  You can answer.

14             MS. MERMELSTEIN:  Your Honor, may we approach?

15             THE COURT:  No.  Go ahead.

16   Q.  Is there anything, having read those news accounts, that

17   changes your opinion as far as Mr. Middendorf?

18   A.  No.

19             MR. BOXER:  Nothing further, your Honor.

20             THE COURT:  Anything further?

21             MS. MERMELSTEIN:  No, your Honor.

22             THE COURT:  Any questions from defense counsel?

23             MR. COOK:  No, your Honor.

24             THE COURT:  Thank you, sir.  You may step down.

25             (Witness excused)

J2srmid3

1          THE COURT:  Can I let the jury go for today?

2          MR. BOXER:  For today.  We are not done calling

3     witnesses, but we are for today.

4          THE COURT:  We are going to let you off for today,

5     folks, and tomorrow.  I think we are still on track for next

6     week to be the last week.  I can't make any promises, but I

7     think we are doing pretty in terms of time.  So I'm going to

8     let you go today and also tomorrow.

9          We will start back on Monday at 9:30 with the

10    continued evidence in the case.  I want to remind you over the

11    long weekend not to do any research on the case or to discuss

12    the case or anyone involving the case over the weekend.  We'll

13    continue on Monday morning.  Have a good weekend everybody.

14    Leave your pads on your chairs.

15          (Jury not present)

16          THE COURT:  Do you want to address any defense motions

17    at this point or anything else before that?

18          MS. KRAMER:  We have a couple of housekeeping matters,

19    but we are happy to go in any order your Honor wants.

20          MR. BOXER:  We would like to address the rule 29

21    application.

22          MR. WEDDLE:  I would also like to have five minutes to

23    collect my thoughts.  Maybe I'll do it while Ms. Lester is

24    talking, since she wants to go first.

25          THE COURT:  I think you should listen to Ms. Lester.

J2srmid3

1          MS. KRAMER:  A couple of things, your Honor.  We want

2     to put on the record what we understand from defense counsel to

3     be the current state of play with respect to their case and

4     raise one issue about two witnesses that we understand Mr.

5     Middendorf is intending to call.  I'll start with the last item

6     first.  We understand that Mr. Middendorf is intending to call

7     Mark Rubino, in-house counsel at KPMG, and Tom Selby.

8          MR. BOXER:  I'm sorry to interrupt you.  We are 50-50

9     on both witnesses.  I'm fine with you addressing it.  But if we

10    come back over the weekend, I don't want the Court to feel like

11    we wasted it's time.  It's fine with you addressing it if you

12    like.

13         MS. KRAMER:  Thank you.  I appreciate the update.

14         This may be moot, but in the event it's not, I don't

15    know how much of a defense case they have, so it may come up on

16    Monday.  We understand the possibility is they will be called

17    to testify about the fact that they interviewed Mr. Middendorf

18    in the internal investigation.  Without getting into what Mr.

19    Middendorf said, just the fact that he sat for these

20    interviews, we object to that testimony as wholly improper.

21         Our understanding is that the participation in the

22    internal investigation was not entirely voluntary.  Employees

23    of the firm were required to participate, so the implication

24    that he voluntarily sat would be misleading.  Without us

25    eliciting that he could potentially lose his job if he did not

J2srmid3

1    participate and without the content of the interview and

2    without the context of the fact that it was somewhat

3    compulsory, it would be misleading and there would be a

4    suggestion that he was voluntary and truthful, which is

5    obviously not our position either.

6              I don't know in what form your Honor wants to hear it.

7    We can raise it Monday morning if the issue is ripe at that

8    point, but we did want to flag it because it is a significant

9    issue from our perspective.

10             THE COURT:  You said Mark Rubino is in-house at KPMG?

11             MR. BOXER:  Yes.

12             MS. KRAMER:  He is in-house at KPMG.  He conducted

13   some interviews in the case before outside counsel came in to

14   do an internal investigation.  So there is the Mark Rubino

15   interview and outside counsel interview.

16             MR. BOXER:  As you recall, your Honor, there was

17   litigation over Mr. Middendorf's statements at these

18   interviews.  The government designated certain portions of them

19   and your Honor ruled.  They identified both a Williams &

20   Connolly lawyer and Mr. Rubino as witnesses for their case.  I

21   think last weekend we were informed they were not testifying.

22             In addition, I think it was yesterday a document came

23   into evidence showing Mr. Middendorf turning over his cell

24   phone to Mr. Rubino.  I'm sorry.  To be precise, he sent a note

25   list that was on his cell phone to Mr. Rubino, which we haven't

J2srmid3

1     been able to elicit.  That goes to Mr. Are you Middendorf's

2     state of mind as to why he did it.

3           It is their prerogative not to call these witnesses

4     and elicit statements they wanted to elicit.  I appreciate we

5     can't elicit the statements because they are not party

6     admissions for us.  But the mere fact that he, and I would say

7     voluntarily, sat with both sets of lawyers I think has

8     relevance.  In fact, he had been terminated from the

9     partnership prior to at least one of the interviews, maybe two.

10    So they were voluntary in the sense that was described.

11          Having said all of that, we are rethinking those two

12    witnesses.  We will have more to say to the government over the

13    weekend with that.

14          THE COURT:  Is Tom Selby Williams & Connolly?

15          MR. BOXER:  Related to them.  The inquiry would simply

16    be you asked for the interview, he sat for the interview.  With

17    Mr. Rubino it would be you asked for the note file and Mr.

18    Middendorf sent it to you.  I think it is relevant because it

19    shows he was prepared to sit with them and answer questions in

20    real time more or less, or some anyway.

21          MS. KRAMER:  Your Honor, our position, as you know

22    from the briefing, is that he lied in those interviews.  The

23    implication that he sat for them without eliciting the

24    statements is misleading.  Also, I don't know the specifics, it

25    is certainly none of the government's business, but as a

J2srmid3

1    general matter our understanding is that even after termination

2    the payment of counsel fees by the insurance company is

3    sometimes contingent on cooperation with the internal

4    investigation.  I don't know how anyone is being paid and I am

5    not raising that, but I think it goes into how much follow-up

6    there would need to be to place this in context.  And it paints

7    a misleading picture of something that is irrelevant.  It is

8    not necessary to place anything in context.

9         The exhibit on its face displays Rubino asking Mr.

10   Middendorf to send a list and Mr. Middendorf sending the list.

11   It doesn't suggest that it was compulsory in any way, so it

12   doesn't need to be responded to.  And at counsel for Mr.

13   Middendorf's request, the stipulation about his cell phone

14   included the language that he voluntarily provided it.  We

15   don't think it was totally voluntary, but to avoid a much

16   longer recitation of what happened or something that would

17   raise more questions in the jury's mind, we included that.

18        So there is absolutely nothing misleading in the

19   record about the way this happened.  We can address this more

20   Monday if it is necessary.

21        THE COURT:  That's fair.  To be clear, I noted the

22   list email sent from Mr. Middendorf to Rubino on February 15th

23   or something like that.  What I couldn't remember is does that

24   same document have the request from Mr. Rubino?

25        MS. KRAMER:  Yes, it does, your Honor.

J2srmid3

1          THE COURT:  As long as that is in evidence, you have

2     it.  I'm happy to hear from you more.

3          MR. BOXER:  No.

4          THE COURT:  Given that the government didn't call the

5     witnesses to elicit statements, I don't know exactly what is

6     being rebutted by calling them.  I don't want to prejudge it.

7     I'll decide it on Monday if we need to.

8          MS. KRAMER:  Then, we understand that counsel for Mr.

9     Middendorf has identified to us one witness that is going to

10    take the stand Monday morning and is going to let us know by

11    tomorrow morning what other witnesses they intend to call aside

12    from Mr. Middendorf, which we certainly understand will be a

13    decision that is made not necessarily tomorrow.

14         Counsel for Mr. Wada has notified us today in court

15    that they are seeking to call two witnesses from KPMG that have

16    not yet been identified, and may want to recall Mr. Whittle,

17    it's unclear for what purpose.  We have not been notified of

18    other witnesses for Mr. Wada.  And potentially, I'm sorry, a

19    custodian of records from a phone company.  Hopefully, we will

20    get sufficient notice so that we can prepare and don't need a

21    delay once things get moving next week.  We just wanted to

22    confirm that our understanding is accurate.

23         THE COURT:  I'm happy to hear any update defendants

24    can give me at this point as well as whether the two experts

25    are going to be called.

1          MR. BOXER:  That's what I was going to mention, your

2     Honor.  I think it was in two different conversations.  We are

3     calling Mr. Atkins.  We are unclear about the other.  We may,

4     just as Ms. Kramer said, know soon.  And we are calling Jay

5     Hanson, one of the form PCAOB employees.  We have a few other

6     witnesses that we have given 26.2 materials over for, I

7     believe.  And we will make some financial decisions in the next

8     day.  And as counsel said, we will make a decision about Mr.

9     Middendorf eventually.

10          THE COURT:  Mr. Cook.

11          MR. COOK:  Our witnesses, your Honor, largely could be

12     resolved by stipulation.  We are in the process of working that

13     out.

14          THE COURT:  Meaning there won't be any if it's

15     resolved by stipulation?

16          MR. COOK:  It's possible.

17          THE COURT:  Do you think you will finish with evidence

18     on Monday?  What are the odds of that as opposed to going into

19     Tuesday?  I know you can't promise me.

20          MR. BOXER:  I think it will be determinative as to

21     whether or not Mr. Middendorf testifies.  If he doesn't

22     testify, I think we will finish on Monday.

23          THE COURT:  Any other housekeeping matters?

24          MS. KRAMER:  No, your Honor.

25          THE COURT:  Do you want to address rule 29 motions.

J2srmid3

1          MS. LESTER:  Yes, your Honor.  Now that the

2     government's evidence is in, we would submit that on this

3     record a jury could not reasonably find Mr. Middendorf guilty

4     beyond a reasonable doubt.

5          As to Count One, as the Court is aware, section 371

6     requires proof of the defendant's specific intent to defraud a

7     government agency.  Here that agency is alleged to be the SEC.

8     Defrauding the SEC must be one of the objectives of the

9     conspiracy.  We believe the jury must unanimously agree on the

10    object of the conspiracy, which in this case means that a

11    particular function of the government agency was intended to be

12    impeded by the co-conspirators.

13         Here the evidence, even construed in the light most

14    favorable to the government, does not establish that there was

15    an intent to actually defraud a lawful function of the SEC.

16    There is no evidence that the SEC was actually the target of

17    the scheme.

18         Both cooperators' testimony focused on the effect of

19    the scheme on the PCAOB, not the SEC.  Any mention that they

20    made of the SEC was completely incidental to the scheme itself.

21    They both testified that the goal of the scheme was to improve

22    PCAOB inspection results for KPMG.  They acknowledged that they

23    knew that inspection reports were sent to the SEC.  But under

24    the case law, mere knowledge of the fact that the reports are

25    sent is not enough.

J2srmid3

1          The government has not established that the defendants

2     had in their mind any particular function of the SEC that they

3     agreed to impede.  It's unclear whether the cooperating

4     witnesses in fact had any understanding of any functions of the

5     SEC beyond the fact that they received the PCAOB reports and

6     that they had general oversight of the PCAOB.  Again, knowledge

7     of that general oversight function, just like knowledge of the

8     receipt of the reports is not enough under Tanner.  The SEC

9     itself has to be the target of the scheme.

10         Moreover, the government has not established what

11    function the SEC performs could have been the target of the

12    scheme.  The only witness who really spoke to that at all was

13    Wes Bricker, the chief accountant of the SEC.  But the

14    functions that he described that related to the SEC's oversight

15    of the PCAOB were of the budgeting process, the evaluation of

16    prospective PCAOB board members, and the approval of PCAOB

17    rules.  Those three functions are completely unrelated to a

18    scheme that aimed to improve PCAOB's inspection results.

19         The other sort of soft uses of the reports that Mr.

20    Bricker testified about are either related only to the SEC's

21    general oversight of the PCAOB and not the audit firms

22    themselves.  When his testimony is read closely, the supposed

23    uses he was describing were very circular.

24         His answers were often the SEC uses the reports to

25    read the reports, to understand the reports.  He often just

```
 1   tied it back to the general oversight function.  Because of
 2   Tanner, that's not enough.  It can't be that a scheme that we
 3   believe the testimony establishes was aimed at only the PCAOB
 4   can be transformed into a scheme to defraud the SEC merely
 5   because the SEC oversees the PCAOB.
 6           Mr. Bricker also testified about the mission of the
 7   SEC.  He mentioned investor protection in particular.  It is
 8   not really clear to the defense what function the government is
 9   relying on with respect to Count One because it is not
10   specifically alleged in the indictment.
11           But to the extent that a function of investor
12   protection is the function that the government is alleging was
13   impeded, there is absolutely no testimony in the record that
14   the scheme was aimed at investors or intended to harm investors
15   in some way or that there was any acknowledgment on the
16   cooperating witnesses' part that anything they were doing could
17   be interpreted one way or the other by investors.  There was no
18   testimony that the scheme resulted in investors receiving a
19   misleading impression or misleading information.
20           Mr. Bricker also testified, again in a sort of
21   circular fashion, about the importance of the design of the
22   inspection process.  The design of the inspection process does
23   not appear to be a function of the SEC.  It's a function of the
24   PCAOB.  To the extent that he is relying on that to perform
25   some separate function, it was unclear from his testimony what
```

J2srmid3

that function would be.

Sometimes he seemed to indicate that the SEC's view of the overall audit quality of a firm could be impacted by some compromise to the design of the inspection process.  This makes no sense given that other evidence in the record established that PCAOB reports should not be viewed as general report cards of the overall quality of the audit firms.  That's what the reports themselves say.  So Mr. Bricker's testimony about the design of the inspection process also does not prove that a function of the SEC was impeded.

In sum, it is unclear from the proof at trial how the scheme as charged, as proven in the light most favorable to the government, could even interfere with the SEC at all, let alone how Mr. Middendorf could have intended to impede a lawful function of the SEC.

Turning to the wire fraud counts, as your Honor knows, the most basic part of wire fraud is that the government has to prove a deprivation of property.  Here we would argue that the government has not established that the information at issue is in fact property under the wire fraud statute.  Now that the proof is in on this, and I know your Honor denied this at the motion to dismiss stage, we would submit that it is now clear based on the record that the information was not held confidentially by the PCAOB.

They have an ethics provision that covers

J2srmid3

confidentiality of information.  But, as Ms. Hannigan herself

acknowledged, EC9 is completely overbroad and the rule of

reason has to be applied even to determine what disclosures are

violative of EC9 and which are not.  So it is not clear on its

face in terms of what the confidential information actually is.

Even if the information were deemed to be

confidentially held by the PCAOB, it is clear now from the

government's proof that the information at issue is really an

intangible regulatory interest and not actually property within

the meaning of the statute.  The testimony at trial confirmed

that the information at issue has absolutely no value beyond

its regulatory use.  It serves no other function other than the

inspections process, which is the statutorily mandated process

that the PCAOB was in part created to undertake.

The list of inspection targets and the timing of the

release of the information, which is supposedly the

confidential information at issue, that is the inspection

process itself.  It is completely intertwined and inseparable.

So it is impossible to separate whatever the information is

supposed to be from the regulatory statutorily mandated

process, that is, the inspection process itself.

The government's evidence as to the supposed cost,

that demonstrates nothing more than that the PCAOB used a

portion of its budget and its employees' salaries and devoted

that money to planning inspections.  It doesn't demonstrate

J2srmid3

that the information itself had any monetary value.  And the

fact that the PCAOB spends some of its budget in facilitating

its own regulatory function in planning and conducting

inspections doesn't mean that the information at issue has any

monetary value or is in fact property.  That is with respect to

the wire fraud count as a whole.

        With respect to the substantive counts, Count Three in

particular depends almost entirely on Brian Sweet's testimony.

Even taking his testimony in the light most favorable to the

government, it's clear that Count Three itself, the substantive

wire fraud, was complete when he arrived at KPMG, before anyone

else was involved.

        He testified that he stole the information from the

PCAOB in his last weeks on the job and that he did so because

he intended to use it once he joined KPMG.  He also testified

that he was never asked for that information before he left

with it.  He did not do that at anyone's request from KPMG, let

alone at Middendorf's request.  So the deprivation of property

and the use, the intent to use it, both were complete before he

even joined KPMG.  At that point Mr. Middendorf couldn't have

aided or abetted a crime that is already complete.

        Furthermore, to the extent that the mere use of

already embezzled property can be a separate crime, which we do

not believe it is legally, there isn't even any proof in the

record that Mr. Middendorf ever did anything with the 2015

J2srmid3

1     list.  Mr. Middendorf should be acquitted entirely on Count

2     Three.

3           Counts Four and Five, we rely on the argument that I

4     just made about the use being a separate crime.  Even though

5     the scheme in the indictment is overbroad, is alleged in a very

6     broad sense, it is an embezzlement scheme that also tries to

7     loop in the separate use of the embezzled property.  We believe

8     that is improper under the wire fraud statute and that both

9     with respect to 2016 and 2017 the use itself of the information

10    cannot be charged separately and Mr. Middendorf cannot be

11    guilty of those counts for the same reason.

12          Moreover, the government, even looking at their

13    evidence in the most favorable light, has not proven that Mr.

14    Middendorf had the specific intent to defraud the PCAOB.  He

15    acted in good faith.  There was testimony of universal

16    agreement that the re-reviews in 2016 would comply with the

17    auditing standards.  There was no proof presented at trial that

18    there was any violation of the auditing standards.  There was

19    also testimony that the purpose of the re-reviews themselves

20    was to better show the work that already been completed.  There

21    was absolutely no proof that additional work was done outside

22    of what was allowed.

23          For all these reasons, your Honor, we would ask for a

24    judgment of acquittal for Mr. Middendorf on all the counts.

25          THE COURT:  Thank you.

J2srmid3

 1              Mr. Weddle.

 2              MR. WEDDLE:  Thank you, your Honor.  As predicted, I

 3     agree with everything that Ms. Lester said.  I don't want to

 4     repeat.  I do want to be clear that our motion is

 5     comprehensive.  That is, our motion is that the government has

 6     failed to meet its burden of proving beyond a reasonable doubt

 7     each element of the charges in the indictment.  That is true

 8     with respect to each count.

 9              To add a little bit to what Ms. Lester said about Mr.

10     Bricker, Ms. Lester certainly described the totality of his

11     testimony.  He did at points talk about other uses that he

12     asserted the SEC had for the reports.  As Ms. Lester

13     summarized, all of those were circular and tended to come back

14     to general oversight roles.  But there were a few other

15     specific ones that are encompassed within that that I have

16     written down.

17              He mentioned that they use inspection reports to make

18     judgments about whether they can change to PCAOB rules or SEC

19     rules.  He also testified, your Honor, and this was on direct

20     examination, that very early in the time frame that we have

21     been discussing he testified that he ruled out any need for a

22     change in PCAOB or SEC rules with respect to the deficiencies

23     that had been identified at KPMG.  So that use of the reports

24     had been ruled out before the start of the conspiracy according

25     to the testimony of Mr. Bricker.

J2srmid3

         Another use that he mentioned of the use of inspection
reports was that there is a provision in the law for the audit
firm to essentially take an appeal from a comment asserted by
the PCAOB and have that adjudicated by the SEC.  But Mr.
Bricker also acknowledged that there were no such appeals
during the relevant time frame by KPMG.

         On the point about ruling out the need for a change in
PCAOB or SEC rules, the direct testimony was at page 178 line
12 through 181 line 12.  There is other testimony to the same
effect.  On the appeal by the audit firm of comments to the
SEC, one example of the testimony where Mr. Bricker ruled that
out was at 318 lines 18 to 21.

         Another example of a potential use that he pointed to
was deregistration.  There has been absolutely no testimony
that anyone ever gave consideration to deregistering KPMG.
There is no evidence that that was a potential use or that the
charged conspiracy impeded the SEC in its ability to deregister
one of the Big Four accounting firms.

         Your Honor, on my cross-examination at 319 I
specifically asked Mr. Bricker if there was anything else other
than the examples that Ms. Lester has given and that I have
given, and he answered that question.  The only other thing
that he pointed to was in referral matters.  And the evidence
has shown quite clearly, taken in the light most favorable to
the government, that the only possible effect of the conduct

J2srmid3

alleged by the government here was not to impede a referral
matter but to create a referral matter, and that specifically
is the example of AMBAC.

         The allegation by the government is that the use of
information obtained wrongfully by KPMG resulted in a re-review
of AMBAC by Mr. Broderick and that re-review resulted in the
pulling of that opinion, which resulted in a referral to PCAOB
enforcement.  That is not any impingement on the conduct of the
SEC at all.  In fact, it is something that generated an
enforcement matter at the PCAOB level.

         Those were all the examples that he had.  I agree with
Ms. Lester that he did talk more generally about general
oversight and the need to read the reports in order to read the
reports, neither one of which is sufficient under Tanner.

         In addition to what Ms. Lester has said with respect
to EC9, as we have argued a number of times during the course
of the trial, your Honor, not only is the rule of reason
testified to by the witnesses in the case and, as explained by
Ms. Lester a fatal defect in the case with respect to EC9, but
it's also the case that the evidence has shown that EC9 simply
is not applied as written.

         There are routine disclosures that are not authorized
by the board by both board members and by PCAOB employees on a
regular basis.  Some of those are judged by certain individuals
that we have heard testimony about to be improper disclosures

J2srmid3

1    and some of them are judged to be regular job duty disclosures,

2    including, your Honor, the actual official notices of

3    inspection, which are not board-approved and which are not sent

4    by the board and are not encompassed within the board

5    resolution that is not yet in evidence but will be.  The board

6    resolution does not say anything about disclosing inspections.

7            Finally, with respect to Mr. Wada, the allegation by

8    the government is that Mr. Wada embezzled confidential

9    information and that that constituted a fraud.  The

10   embezzlement is the wire fraud predicate with respect to Mr.

11   Wada.  The evidence taken in the light most favorable to the

12   government has shown not an embezzlement but a theft.  Theft is

13   not fraud, your Honor, and that is a very clear proposition in

14   the law.  Unfortunately, I don't have in front of me a case

15   cite, but I can send one to your Honor.

16           Embezzlement has been said to be a species of fraud.

17   But embezzlement requires that a person be entrusted with the

18   object embezzled and then to convert or misuse that object for

19   his or her own purposes.  The testimony that we have heard is

20   that only people on the inspection team were permitted to

21   access the inspection information regarding KPMG, and we have

22   heard that Mr. Wada was not on that team, he is not on the KPMG

23   U.S. inspection team.  So, to the extent he is alleged to have

24   access to information, and this clearly is an allegation by the

25   government, this evidence that he has accessed information and

J2srmid3

1    put it onto his laptop, that's a theft or a computer intrusion.

2              There is another recent case -- and I apologize that I

3    don't have the names handy, your Honor -- I think by the Second

4    Circuit or the Supreme Court of the United States talking about

5    computer intrusion and hacking.  The issue presented in the

6    case was is hacking a fraud.  The answer by the court was very

7    clear: it depends.  Some hacking is a fraud and some hacking is

8    not.

9              THE COURT:  Hold that thought for a second.  When you

10   said that the evidence doesn't show embezzlement but may show

11   theft, is that because you are arguing Mr. Wada was not

12   entrusted with the information?

13             MR. WEDDLE:  Exactly, your Honor.

14             THE COURT:  Okay.  I just wanted to make sure I

15   understood that.

16             MR. WEDDLE:  If he is not entrusted with the

17   information, that can't be an embezzlement.  And if it's not an

18   embezzlement, it is not a fraud.  If he obtained the

19   information by stealing it, that's theft, not a fraud.  If he

20   obtained the information by computer intrusion, using a

21   colloquial term "hacking," if he engaged in a computer

22   intrusion, the court that I was referring to a moment ago has

23   said computer intrusion may or may not be a fraud, it depends

24   on whether it involves fraud, that is, false statements, some

25   kind of deception or misleading of the intrusion victim in

J2srmid3

order to get access.  That might constitute a fraud.

To take an example of computer intrusion, if somebody engaged in a phishing attack and defrauded that person into giving up their login credentials and then using those login credentials to access the computer, that might be a fraud scheme.  There is no allegation here that Mr. Wada accessed the documents that he is alleged to have accessed using deception.

For example, if a computer is left unlocked, if it doesn't have credential controls, and a person who does not have authority to access it, that is, they are forbidden from accessing it, they are not authorized to access it, but they physically have the capability of accessing it, that is a theft or a computer intrusion without fraud.

Analogize to a safe.  If there is a safe that is left open and everybody knows you're not allowed to take the money out of the safe, it doesn't belong to you, but someone comes along and takes the money out of the safe, that's theft, not fraud or embezzlement.  If somebody somehow dupes a person into giving up the password for the safe or dupes somebody into opening the safe so that they could take material out, that would be the type of computer intrusion, safe intrusion in this example, that constitutes fraudulent activity.

So, taken in the light most favorable to the government, at best they have proven a theft, and a theft cannot be a wire fraud predicate.

J2srmid3

|   |   |
|---|---|
| 1 | THE COURT:  Did you want to respond to any of that? |
| 2 | MS. ESTES:  Would you like me to? |
| 3 | THE COURT:  You can briefly. |
| 4 | MS. ESTES:  Yes, your Honor. |
| 5 | First, this is in the posture of a rule 29.  A lot of |
| 6 | arguments defense counsel is making about Mr. Bricker's |
| 7 | testimony and nitpicking at things he said on cross, he said on |
| 8 | direct sufficiently that the SEC, one of their functions is to |
| 9 | regulate auditors.  That's one of their purposes.  So I think a |
| 10 | lot of their arguments in general are just not in the right |
| 11 | posture here.  But I do want to take them one by one. |
| 12 | Starting with the SEC and the intent to defraud, I |
| 13 | think it is clear from the case law that the primary purpose |
| 14 | does not have to be intending to defraud this particular |
| 15 | entity.  It can be an incidental purpose.  That's in United |
| 16 | States v. Gurary case, 860 F.2d 521, a Second Circuit case from |
| 17 | 1988. |
| 18 | Here there was overwhelming evidence that the |
| 19 | defendants were involved in the scheme, that the purpose of the |
| 20 | scheme was to falsely inflate PCAOB inspection results for all |
| 21 | the purposes that followed from that.  One of the purposes was |
| 22 | to defraud the PCAOB, one was to defraud the SEC.  Even beyond |
| 23 | that, this would affect KPMG's standing with clients.  So, the |
| 24 | fact that it also defrauded the PCAOB does not make it any |
| 25 | less -- |

J2srmid3

1              THE COURT:  Do you agree that one of the purposes has

2    to be to, whatever the language is, interfere with a lawful

3    function or defraud a lawful function of the SEC?

4              MS. ESTES:  Yes, your Honor, we completely agree.

5              THE COURT:  There has to be an objective of the

6    conspiracy and purpose.

7              MS. ESTES:  Yes, your Honor.  There was testimony from

8    Mr. Whittle and Mr. Sweet that they intended to defraud the

9    SEC, that that was one of their purposes.  Everybody in the

10   scheme, they testified they knew the inspection reports went to

11   the SEC.  So it was part and parcel of the scheme that they

12   would falsely inflate these inspection results and that those

13   results would then go to the SEC.

14             There was testimony from Mr. Bricker about this come

15   to Jesus meeting that Mr. Middendorf participated in, that

16   meeting where the SEC was saying you're not doing well enough

17   on inspections.  So Mr. Middendorf in particular was well aware

18   that the SEC was looking at these inspection results, that they

19   cared about them in connection with their function of

20   regulating auditors.

21             As to Mr. Bricker's testimony, he did testify

22   extensively that that is one of the SEC's functions, that they

23   rely on auditors to check the financial statements of public

24   companies, and to do that they also have to regulate the

25   auditors.  I can provide your Honor some cites if it is

J2srmid3

relevant.  For instance, on page 154 of the transcript Mr.
Bricker testified about how they rely on these inspection
reports to do their job of regulating auditors and that they
were affected by the delay in receiving these inspection
reports.

          Your Honor, I would note that on the primary purpose
issue, in all of these cases, all of the <u>Klein</u> conspiracy
cases, it is often not the purpose, the primary purpose, the
main purpose, to defraud the government agency.  A lot of these
cases are IRS cases.  They are not out to defraud the IRS.
They are trying to launder money or do other things, and they
know that when they do that, it is going to defraud the IRS.
That is the same situation we have here.  They did intend to
defraud the SEC.

          THE COURT:  Are you familiar with the Judge Boudin's
opinion in the <u>Goldberg</u> First Circuit case?

          MS. ESTES:  I believe I have looked at it, your Honor,
but I don't have it at the top of my mind.

          THE COURT:  The <u>Gurary</u> case and some of the Second
Circuit cases are consistent with what you say, and I think
that's right.  But the First Circuit case is one of the most
thoughtful discussions of the trickiness of the 371 <u>Klein</u>
conspiracy with respect to purpose.  Judge Boudin carefully
discusses how tricky it is and says you really do have to have
a purpose, a purpose to defraud the government agency from

J2srmid3

performing its lawful functions.  It can't be the case that
every bank robber who robs a bank just because they know it's
going to result in tax fraud, that that has the purpose of
defrauding the IRS.

          The court ends up affirming the conviction based on
the fact that they were directly involved in signing phony IRS
documents.  They say that is close enough to showing the
purpose of defrauding a government entity.  It is 105 F.3d 770.
It just shows how tricky this is.  I think there are cases in
other circuits that make it even closer.  This is all obviously
related to the jury instructions.

          MS. ESTES:  Yes, your Honor, understood.  I think here
we have established that purpose.  Certainly there is
sufficient evidence for this to go to the jury, and they can
infer an intent to defraud the SEC from the evidence in the
record.  There was the testimony about the come to Jesus
meeting as they talked to Middendorf.

          He met with the SEC, he met with Mr. Bricker, and they
talked about the inspection results, how they were doing poorly
on inspection results.  That's in the record, and that is right
in the heartland of the scheme.  That's in February 2016 right
before March 2016, when they get the information and do the
self-reviews.  That's Mr. Middendorf in a meeting with the SEC.

          Your Honor, there was also the testimony from the
cooperating witnesses, both cooperating witnesses, that they

J2srmid3

1    intended to defraud the SEC.  This is sufficient evidence to go

2    to the jury on a rule 29 motion.

3              THE COURT:  Do you want to address the wire fraud?

4              MS. ESTES:  Yes, your Honor, just briefly on that.

5    First, I think the idea that this is not something of value to

6    the PCAOB is, frankly, pretty ridiculous.  There has been

7    extensive testimony about the hours it takes to create these

8    inspection lists, the time it takes to plan it, the importance

9    of creating these lists and of the firm not knowing of which

10   audits are going to be inspected.  That is the whole design of

11   this regulatory process, that it is kind of a surprise

12   inspection so you don't know what audits they are going to look

13   at.  So these lists have incredible value to the PCAOB.  I

14   think there is more than sufficient evidence for that to go to

15   the jury.

16             On the EC9 point, your Honor, that is also something

17   on which defendants are grasping at straws there.  Every

18   witness that has testified has said that they absolutely know

19   that inspection lists are highly sensitive, are incredibly

20   confidential.  The notion that just because some people are

21   sharing tidbits of where they are traveling to means that

22   people wouldn't know that when you leak the entire list of

23   inspections for the year, that was wrong, that you were leaking

24   something of incredible value to the PCAOB, that is, frankly,

25   pretty ridiculous.  This isn't a case about copy paper, one of

1    the examples that was used with Ms. Hannigan.  I think she said

2    this is the most black and white of anything that can be.  It's

3    very obvious.  This is sensitive, confidential information.

4           Very briefly on the embezzlement point raised by Mr.

5    Weddle.  There has been evidence in the record, even the

6    stipulation today, that Mr. Wada had access to the PCAOB's IAS

7    system.  And Mr. Sweet testified that because Wada was on KPMG

8    international, that's how he had access to the KPMG GNF

9    planning profile.  That is uncontradicted testimony by Mr.

10   Sweet.  It is corroborated by text messages we looked at today

11   where they are talking about Mr. Wada's involvement on the KPMG

12   Japan inspection.  So I think there is sufficient evidence to

13   go to the jury on that point.

14          THE COURT:  I wanted to give you a chance to make your

15   arguments and have them on the record.  I am going to deny the

16   motions under rule 29 without prejudice to renewal at the close

17   of all the evidence and have the case go to the jury.

18          I want to talk about the charge conference and ask a

19   few questions to preview.  There are clearly legal issues, as

20   evidenced by the letters that keep coming in, that I am going

21   to have to work through.  I have been reading a bunch of cases

22   and I'm going to have to read more.  As I see it, there are a

23   couple of legal issues that I want to highlight.  You know what

24   they are.

25          The first one is the 371 conspiracy.  This issue that

J2srmid3

1   we have been talking about, that being one of the purposes

2   being defrauding a government entity versus knowledge that a

3   defrauded entity would send information to a government entity,

4   I don't think there is anything more to say about that.

5   There's a bunch of cases on it.  I have the jury instructions

6   from Judge Stein in the Copeland case.  Does anyone know if

7   there has been a more recent case that's gone to the Second

8   Circuit involving a Klein conspiracy?  I think that might be

9   the most recent one.

10          MR. WEDDLE:  There may be a more recent one, but I

11   just don't know off top of my head.  Copeland was more than a

12   decade ago.  I think it may be one of the more recent tax Klein

13   conspiracy cases, but there may be a more recent one.  I guess

14   it is not so helpful for me to say that.

15          THE COURT:  What I have been puzzling over is what I

16   just said.  Copeland is a case that went to the Second Circuit,

17   and the circuit actually approved the jury instruction.  On the

18   371 count the defense is asking me to go outside the Second

19   Circuit and on the wire fraud count the government is asking me

20   to go outside Second Circuit.  In both cases there are a

21   difficult judgment calls about how to craft the right jury

22   instruction on state of mind.

23          As I said, there is the Goldberg case and other cases

24   that seem to really emphasize the requirement of a purpose more

25   pointedly.  That's all I'm going to say about that.  I'll be

J2srmid3

working on the language and hoping to get you a draft of the
jury instructions either tomorrow or over the weekend, and then
I think we are going to have to have a charge conference on
Monday.

          The other issues I wanted to flag that you all have
been writing about with authorities and great persuasive
abilities is the wire fraud count and the issue of willfulness.
One question I have is, based on the governments most recent
letter, do the parties have a view as to whether the Title 15
willfulness standard applies?  Could the Title 15 willfulness
standard be higher than under the wire fraud statute?

          MS. ESTES:  Your Honor, our view is that willfulness
is not in the wire fraud statute, that word is not in there.
That is the difference with Title 15.  With the wire fraud
statute, Congress' intent in the statute is the specific intent
to defraud.  There is no willfulness requirement in there.  As
your Honor knows, we initially briefed that it shouldn't be
required at all.  Even if willfulness is read into the statute,
it certainly shouldn't be a high level of willfulness because
Congress didn't even put that word in the statute.  We would
submit that it is much lower than the standard in Title 15.

          THE COURT:  If you apply the willfulness requirement
here, could it be higher than Title 15 securities fraud?

          MS. ESTES:  I don't see how it could be.  We would
just be making that up out of thin air, I think.

J2srmid3

1          THE COURT:  Does anyone want to address that?

2          MR. WEDDLE:  I apologize, your Honor.  I can't call to

3   mind the exact wording of the Title 15 definition of

4   willfulness.  That's all I have in response to your Honor's

5   question.

6          I did want to make one very brief point with respect

7   to the government's most recent letter on willfulness.  I

8   haven't had a chance to respond to it and I'm not sure that

9   your Honor wants more briefing on this.  I think the cases are

10  well known to everyone and the arguments pretty well known to

11  everyone.

12         The case that is not cited in the government's letter

13  is Finnerty.  We have talked about this before as a group.

14  This case presents squarely the need to reconcile Finnerty with

15  all these other arguments.  Finnerty says that violation of

16  workplace rules and ethical rules is not enough.  That's why I

17  believe the government's letter falls short of the task that is

18  presented to your Honor, which is to reconcile Finnerty with

19  the other case law regarding willfulness.

20         MS. ESTES:  Your Honor, briefly on that, we are not

21  alleging a violation of workplace rules here.  We are alleging

22  an intent to defraud.  That is the standard in the statute.

23  That is the standard that has been laid out in the case law and

24  that is what we have to prove here.  That is a high standard.

25  It is a specific intent standard, and we embrace that standard.

J2srmid3

1           We shouldn't be ingrafting a willfulness requirement.

2     It is not in the statute.  Getting it out of thin air as it is,

3     it certainly shouldn't be a really high willfulness standard

4     for no reason, especially when the case law is very clear that

5     mistake of law is not a defense.

6           THE COURT:  Let me follow up on this issue that is

7     raised about workplace rules not being enough.  The

8     government's argument that you just made, your position is that

9     it is fraud.

10          MS. ESTES:  Yes.

11          THE COURT:  It is not violation of a separate law.

12    Are you relying or do you plan to rely at all on EC9's status

13    as something like it's law or it's a regulation or anything

14    like that?

15          MS. ESTES:  If your Honor gave an unlawful

16    instruction, we would have to do that.  As it is, if there is

17    an instruction about an improper purpose or something like

18    that, we would point to EC9 to show they clearly knew this was

19    something that was wrong.  I think we would be amenable too to

20    some language in the charge saying that a violation of

21    workplace rules isn't enough, what you need is a specific

22    intent to defraud.  We are not averse to something like that.

23    It is the unlawful thing which suggests that defendants have to

24    know it's illegal, and that is not what is in the case law,

25    that is not what is required.

1              THE COURT:  Ms. Lester.

2              MS. LESTER:  Your Honor, briefly on this last point

3    about specific intent to defraud, we certainly agree that that

4    is the language in the statute.  But for reasons we explained

5    in our letter prior to the final pretrial conference, we think

6    that in this case this is particularly so for Mr. Middendorf,

7    who is not alleged to have breached a duty himself because of

8    the nature of this case factually.  That is, it doesn't involve

9    misrepresentations made by Mr. Middendorf to a victim where he

10   is personally obtaining money from someone, sort of a typical

11   fraud case where specific intent to defraud is amenable to

12   understanding by a layperson.  They can relate to the fact that

13   if you are lying to someone to get their money, that is a

14   specific intent to defraud.

15             Here the facts were such that the conduct that the

16   government alleges constitutes fraud on Mr. Middendorf's part

17   has to be explained in greater detail in terms of fleshing out

18   the specific intent to defraud standard.  It is not enough to

19   simply say specific intent to defraud and has specific intent

20   to defraud.  The jury has to be given some more guidance about

21   what that purpose is: a bad purpose, an unlawful purpose with

22   knowledge of conscious wrongdoing.  There has to be some

23   language like that even if the Court doesn't want to use the

24   word "willfully."

25             THE COURT:  That's fair.  I know from the government's

J2srmid3

letter citing <u>Kaiser</u> under Title 15 securities fraud, which

actually which does include the word "willfully," I believe,

that case says Title 15 securities fraud does not require

showing that a defendant had an awareness of the general

unlawfulness of his conduct but rather that he had an awareness

of the general wrongfulness of his conduct.  This is kind of

like Judge Rakoff's wire fraud instruction which just says a

wrongful purpose or a bad purpose.  <u>Lumiere</u>.

          I should put you all on notice that I am not committed

to the Judge Abrams instruction, even though I have been saying

I have been leaning toward that, because this is a tricky area

of law and there is kind of a morass in the case law on this

point.

          MS. LESTER:  Your Honor, we are already on record as

saying we believe that is more appropriate in this case given

the specific circumstances.

          I also wanted to speak briefly on the 371 count.  If

the government is relying on the function of regulating the

auditors, if that is the SEC function that was impeded, that

just highlights the reason for a special, to adopt the

government's word, instruction here that makes clear to the

jury because there is dual regulation.  Mr. Bricker testified

that the PCAOB regulates the auditors and the SEC regulates the

auditors.  The jury has to differentiate conduct between the

PCAOB's regulation of KPMG and the SEC's regulation of KPMG.

J2sdmid4

1          THE COURT:  I think that's a fair point, and I

2     think -- you know, I don't know how bespoken I am going to get,

3     but I think -- I don't know if I am going to use all the

4     verbiage of defendants' proposal because I like a pretty

5     slimmed down version as close to Sand and standard instructions

6     as I could get.  But I do think it is fair to point out that

7     for Count One it is not sufficient -- that intent to defraud

8     the PCAOB is not sufficient.  It must be -- and because that is

9     not the government agency addition in Count One.

10          MS. LESTER:  We agree, your Honor, but I think also

11     because we have a structure of sort of dual oversight where the

12     SEC is overseeing the PCAOB itself but also then overseeing, at

13     least according to Mr. Bricker, the auditors that audit the

14     audit firms, it has to be made especially clear to the jury

15     that when they're thinking about the function, it has to be

16     directed to the SEC's view at the firms, not the SEC's view of

17     the PCAOB.  That's why the danger of not giving some specific

18     instructions that tells the jury general oversight -- the SEC's

19     general oversight function of the PCAOB is not enough.  That's

20     not what the fraud can be directed to.  It has to be directed

21     at something other than general oversight of the other agency.

22          THE COURT:  I see the point.

23          MR. WEDDLE:  I just wanted to add to that.

24          THE COURT:  Yes.

25          MR. WEDDLE:  Your Honor, because of the nature of the

J2sdmid4

1    evidence here –– and we cited –– your Honor may not have had a

2    chance to read our letter yet, but we cited ––

3              THE COURT:  Is this the one from an hour ago or three

4    hours ago?

5              MR. WEDDLE:  It was early this morning, your Honor.

6              THE COURT:  OK.

7              MR. WEDDLE:  Not that early, 9 or 10.

8              There is the Regan case which says that the Court

9    should and must tailor the instructions to the evidence.  And

10   the evidence here has a mix of broad allegations and –– well, I

11   think the defense has argued there are no specific allegations

12   of what the function is, and we stand by that.  But whatever

13   they may be, there is such a mix of testimony from Mr. Bricker

14   and the cooperators, and maybe also from the PCAOB witnesses,

15   about the interactions between the SEC and the PCAOB, and some

16   of that clearly falls into the category of general oversight,

17   which is not a proper basis for the prosecution.

18             To the extent any of it falls outside of that, that is

19   a difficult line to draw, and it's a line that has been muddied

20   because of the nature of the testimony.  And so I think that

21   that needs to be a clearly –– that is a legal issue –– it is

22   both a factual and a legal issue.  First of all, it is a legal

23   issue, and then we get to what was actually contemplated ––

24   what the evidence can prove about what was contemplated by the

25   defendants, which is a different issue.

J2sdmid4

1          But I submit -- and I share in what Ms. Lester said --

2     that it is important, given that testimony, for the Court to

3     draw a line and explain the difference between which types of

4     things fall into the general oversight not proper grounds to

5     convict and which are actual specific enough functions that

6     could be targeted -- you know, could be the purpose by a

7     defendant to impede a function, a lawful function of the SEC.

8     And given the way that the testimony came in, there is both in

9     this trial.  And I think that is a legal issue that the jury

10    should be clearly instructed on.  It should be given clear

11    guidance on what types of things can count and what types of

12    things cannot count.

13          And then there is the separate evidentiary point which

14    is they have to find, because Mr. Bricker, of course, testified

15    that most of his understanding about the integrity of the

16    inspection process is not written down anywhere, it was known

17    to him, not published.  He talked about his own personal use of

18    the reports, which obviously is not -- there is no basis in the

19    evidence for inferring that any defendant knew about Wes

20    Bricker's secret uses of inspection reports and intended or had

21    a purpose of impeding that function.

22          So there is -- you know, there are two different

23    layers to this.  One is I think the jury should have clear

24    legal guidance about how to draw that line set out by Tanner

25    and they should also have guidance about what has to be

J2sdmid4

1      contemplated by the defendants in order to convict.

2                THE COURT:  So, _Tanner_ is the case in your letter --

3      in your letter?

4                MR. WEDDLE:  Yes.  _Tanner_ is the case that stands for

5      the proposition that general oversight by a government agency

6      of another agency, if the second agency is defrauded, that's --

7      the general oversight by the first agency, which is a United

8      States government agency, is not enough to constitute fraud or

9      impairment of a lawful function of the United States.  That was

10     a very confusing way of saying it.

11               THE COURT:  I understand.

12               MR. WEDDLE:  That is the case.

13               MS. LESTER:  Your Honor, just the last thing on this.

14     With respect to what Mr. Weddle was just saying about the

15     government function, I mean, most of the 371 cases that do talk

16     about jury instructions describe what the function is.  And the

17     fact that, standing here today, I don't think we as the defense

18     really know what the function is that the government is relying

19     on, or whether they are relying on more than one function.

20     That's not clear to us because it wasn't alleged in the

21     Indictment.  And I think that the jury needs to be given

22     guidance as to what function they're supposed to be determining

23     is an issue.

24               THE COURT:  Let me also ask -- back to the wire fraud

25     counts.  The defendants have a lot of embezzlement language.  I

1   was just going to give standard wire fraud language.  I was not

2   going to basically put in the elements of embezzlement.

3           MR. WEDDLE:  I think this is the argument that we just

4   made in the Rule 29 context, which is that in order for a

5   taking by Mr. Wada to be a predicate, it has to be an

6   embezzlement, it can't be a theft.  And so in order to satisfy

7   their burden -- in order for the government to satisfy its

8   burden of proving these counts beyond a reasonable doubt, the

9   government has to prove that Mr. Wada was entrusted with the

10  information.  And I don't want to reargue the Rule 29, which

11  your Honor has already ruled on, but to respond to Ms. Estes,

12  the prosecutor pointed to the access stipulation for the IIS

13  system.  That evidence shows physical access, but it does not

14  show entrustment, if you see what I mean, your Honor.

15          If Mr. Wada has a key to get into the entirety of the

16  computer system but he's been told, or the rule is, that you're

17  not allowed to wander the halls of this system, you're only

18  supposed to look at things that are pertinent to your job, and

19  then he wanders the halls and goes somewhere he is not supposed

20  to go and has the physical capability of getting there because

21  he has the credentials to get in, that might be a computer

22  intrusion without fraud.  That's a fact.  So what the

23  government has to prove to make out the embezzlement aspect of

24  a wire fraud predicate is that Mr. Wada was entrusted with the

25  information.  And the information here, it can't just be that

J2sdmid4

1   he was entrusted with the ability to get into the PCAOB system;

2   he needs to be entrusted with the planning information for KPMG

3   LLP that the government has alleged he downloaded onto his

4   laptop and then conveyed to people at KPMG.

5           If he was not entrusted with that information, all

6   we're talking about is a theft, which is not an embezzlement

7   and doesn't satisfy the government's burden.  I think it is

8   both a legal argument and it is a failure of proof, your Honor.

9           And Mr. Cook reminds me that a computer intrusion

10   without fraud, the Second Circuit has likened that to breaking

11   and entering.  Breaking and entering is not a fraud.  If

12   someone kicks in your door at your house, that's not a fraud.

13   It might be a theft, a breaking into the house --

14           THE COURT:  But, I mean, he was a PCAOB employee who

15   was entrusted with the internal information of the PCAOB,

16   including the IIS system.  You are saying that because he

17   wasn't specifically entrusted with the KPMG U.S. information,

18   that that's not entrustment?

19           MR. WEDDLE:  Yes, your Honor.  He was given physical

20   access to the IIS system, right, so he has a keep to open the

21   lock, but he's not authorized -- he's not authorized to access

22   information beyond his job responsibilities --

23           THE COURT:  But then it would be misappropriation.

24           MR. WEDDLE:  No, not unless you've -- it has to be

25   embezzlement.  I mean, I'm not sure if we are saying the same

J2sdmid4

thing, your Honor, if misappropriation is the same thing as

embezzlement.  If you have been authorized to access the

information, that is, entrusted with the information -- not

just that he has the physical capability of getting his hands

on it -- then it could be an embezzlements or a

misappropriation that would count as fraud.  But if the rule is

you're not allowed to just wander around in the IIS system as a

PCAOB employee, you're only allowed to access the stuff that

you're working on -- and that is what the evidence has shown.

The evidence has shown that at the PCAOB, the only people who

are allowed to access the KPMG LLP planning materials are

people on that team.

         And so the evidence, taken in the light most favorable

to the government -- and if I could revise what I said before.

I said the evidence has shown and I don't think the evidence

has shown anything.  But taken in the light most favorable to

the government, the evidence is that Mr. Wada did not -- he was

not entrusted with the KPMG LLP planning information.  He took

it, and he was able to take it because there were not physical

or electronic barriers to him entering a room that he was not

entrusted with, authorized to enter, but he did enter it.

         So, you know, if you analogize that to breaking and

entering, you know, if someone leaves their door unlocked and

someone who is not authorized to be there goes in there, that

is breaking and entering.  If they lock their door -- if they

J2sdmid4

1    have better locks or worse locks, if the door is unlocked or

2    not unlocked, that doesn't change the entrustment.

3              THE COURT:  OK.  Let me ask the government if you want

4    to response to this, just because it might play into how I am

5    crafting the jury instructions, whether you would like to

6    respond to this argument about embezzlement/misappropriation

7    and entrustment versus mere theft that can't be fraud?

8              MS. ESTES:  Your Honor, I think we -- we didn't know

9    this was frankly going to be an issue until today, so I think

10   we would like to a chance to take a look at the law and maybe

11   put in a letter.

12             THE COURT:  OK.

13             MR. BOXER:  That is fine, your Honor.

14             But going back to our initial motion to dismiss the

15   substantive counts, we raised this issue, because the typical

16   fraud instruction speaks to material omissions or

17   misstatements.  And we have spoken, as Ms. Lester just

18   mentioned, that our client didn't have a duty.  So it doesn't

19   fit within, for example, the typical securities fraud type of

20   case or money fraud case.  And we've understood that this

21   theory of embezzlement was presented as the basis for the

22   fraud.  And that's why the actual taking, which Mr. Weddle has

23   spent time explaining, is very, very relevant, and I think the

24   jury is going to need guidance about that.

25             But up until this moment, we understood the government

J2sdmid4

1    to proffer this is an embezzlement theory of fraud, and that's

2    where the thought came in with <u>Carpenter</u> and some of the other

3    precedence that they tried to speak to.

4              MS. ESTES:  Your Honor, what I meant is we did not

5    know there was going to be any sort of allegation that he had

6    not -- that he somehow stole this money, so that's what we

7    wanted to look into.

8              MS. MERMELSTEIN:  What I wanted to say, your Honor, is

9    I think Mr. Weddle's representation factually is just

10   inaccurate with respect to what happened.  All the analogies to

11   the break-in situations, to the extent that they are helpful,

12   the analogy is factually misguided.  Mr. Wada was not just

13   wandering around with unlocked doors, he was specifically

14   granted access to this particular aspect of the IIS in his

15   specific capacity, in his specific role at the PCAOB.  He did

16   not break in and he did not wander into something that was not

17   guarded.  He was specifically entrusted and granted the access,

18   which is what the record reflects.  So separate and apart from

19   the legal issues here, that factual assertion is just wrong,

20   and so if that's what's been guiding the argument, it breaks

21   down immediately.

22             THE COURT:  The other thing I wanted -- oh, I wanted

23   to see if the government also wanted to respond to the points

24   Ms. Lester and Mr. Weddle raised about it does seem as though

25   the specific functions of the government agency are often

J2sdmid4

listed in the indictment and/or in the jury instructions, like

in the Coplan case, and I was just wondering if you wanted to

address, one, the Tanner issue of my carving out -- maybe

you've already done this in a letter, I'm not sure, I haven't

read all of the letters, but carving out oversight of another

agency versus oversight of the auditors here and/or whether you

wanted to specify some specific functions for purposes of my

role of instructing the jury.

MS. ESTES:  Your Honor, on the Tanner point, so I

think what Tanner stands for is that just because -- it's true,

just because the PCAOB is over -- the SEC oversees the PCAOB,

that is not enough.  But I think what the defendants have been

doing in their instructions was, which is confusing, is

suggesting that there can't be two targets of a fraud, that you

can't, you know, attempt to defraud both the PCAOB and the SEC

and possibly your clients.  So what we would object to in the

context of their instruction is any sort of language as that

makes that suggestion that suggests that just because they

intended to defraud the PCAOB, they couldn't have intended to

defraud the SEC.

And I think the Tanner case makes that clear when it

sent the case back down and remanded it to see if there was

sufficient evidence to show that they did intend to defraud the

government agency.  I believe the issue in that case was then

that there was an instruction that because that agency oversaw

J2sdmid4

this entity, that they had to find that they intended to
defraud them.  And they sent it back to say that you can still
separately consider whether there was sufficient evidence to
show the intent to defraud.  And so that's our issue with their
instruction.  I just need to make plain they can intend to
defraud both.

          THE COURT:  Did you want to address the other issue I
raised about --

          MS. KRAMER:  Specific functions, your Honor?

          THE COURT:  Yes.

          MS. KRAMER:  So we don't think that it is necessary
for the charge to identify the specific functions, it is not
done in every case, but if your Honor wants to do that, we can
provide you with a list of all of the functions that Wes
Bricker testified about in connection with the SEC's use of the
inspection reports.

          We think that those should be instructed as the
functions, that's what the evidence was.  And all of the
arguments that counsel made in connection with, you know, sort
of chipping away at Mr. Bricker's testimony, or calling it
circular, are appropriate grounds for their closing argument,
but we can provide a list of the functions he testified about
if you are inclined to give that.

          THE COURT:  I am not necessarily asking for that.  I'm
just -- unless someone believes it is a legal requirement and

J2sdmid4

1    then I would consider it, but I'm not asking at this point.

2              MS. KRAMER:  We don't believe it is a legal

3    requirement, your Honor.  And there was a lot of testimony

4    about the various ways the SEC actually uses the reports, not

5    simply the fact they oversee an agency that produces them, or

6    an entity that produces the reports.  So, we don't think it is

7    necessary.

8              THE COURT:  Does the government think that it is

9    necessary for the jury to agree on a particular function

10   unanimously?

11             MS. KRAMER:  Absolutely not, your Honor.  This was in

12   a letter that I can't remember which one it was in, but there

13   is no specific unanimity requirement on this.  And I think this

14   was in the letter that we -- perhaps in a footnote in the

15   letter that we filed after the charge -- or perhaps no.  I know

16   when we brought this up.  It was in one of our responses to a

17   motion in limine.  This was actually raised somehow in that

18   connection with respect to Mr. Bricker's testimony, and so I

19   believe we responded there.  I am happy to find that brief.

20             THE COURT:  We can find it.

21             MS. KRAMER:  OK.  Thank you, your Honor.

22             MR. BOXER:  Your Honor, just responding to what

23   counsel said earlier.  We welcome the list of functions, but it

24   needs to be in the context of what my client intended to

25   defraud.  He has to have a specific intent to defraud that

J2sdmid4

1    function.  It can't simply be that if these functions exist

2    with respect to PCAOB and if you find that those functions

3    exist, you can define it first.  That has been a challenge for

4    us why I would point it out many times.  It is not even

5    referenced in the Indictment what function they conspired --

6    allegedly conspired and agreed to defeat and defraud.  But that

7    is the issue.

8           On the unanimity point and the specific function, I

9    confess, I don't recall the cases and we will look at them as

10   well, but it needs to be framed in reference to the defendant's

11   intent to defeat or defraud that specific function.

12          MS. KRAMER:  And that case was actually not raised by

13   either of the defendants in this trial.  The request for an

14   instruction on unanimity as to the functions was raised by

15   counsel for Britt in one of the motions in limine.

16          MS. LESTER:  Your Honor, those were joint motion and

17   the case was Rosenblatt.

18          MS. KRAMER:  OK.  Then my apologies.  I didn't realize

19   that was one of the arguments that was made jointly.

20          THE COURT:  Rosenblatt is the case that defendants

21   cited?

22          MS. LESTER:  Yes, that talks about unanimity.

23          THE COURT:  OK.  The other issue I just wanted to flag

24   is I think there is a requested instruction from defendants

25   about multiple conspiracies, and I wanted to see if the

J2sdmid4

1   parties, if that's something we can anticipate talking about

2   now or if there is agreement on that.

3           MS. ESTES:  Your Honor, we would oppose that.  I don't

4   think there is any basis for a multiple conspiracy instruction

5   here.  There was one conspiracy.  Mr. Sweet I do think is the

6   hub of it, but I don't see any basis for there being separate

7   conspiracies.

8           THE COURT:  And do defendants have a view on that?

9           MR. WEDDLE:  We think that is it is a major issue in

10  the case, your Honor.  And I think that the government's

11  evidence -- and we've made this argument on the evidentiary

12  point as well.  The government's evidence has not shown

13  conspiratorial agreement that encompasses all the participants

14  in the same conspiracy.  The government's evidence is equally

15  consistent with an interpretation of the evidence that -- an

16  interpretation of the agreements being that there may have been

17  an agreement between Mr. Wada and Ms. Holder for certain

18  purposes without any connection to Mr. Sweet.  And there may

19  have been a different agreement between Ms. Holder and

20  Mr. Sweet without any connection to Mr. Britt or Mr. Whittle or

21  Mr. Middendorf.

22          And there are lots of ways to break that down.  But

23  there is no allegation of any kind of communication or

24  understanding or anything that that person could even -- a

25  person in Mr. Wada's position could even glean a general

J2sdmid4

1    understanding of the specific things that were done with

2    information, for example, after March 28th.  We've heard a lot

3    of testimony about the decision to do rereviews and to assign

4    certain people to do certain things, never doing anything that

5    was contrary to any auditing rule.

6             There is no evidence from which anyone could infer

7    that Mr. Wada had an understanding about what KPMG was going to

8    do.  And there is -- and I think this is the flip side of an

9    argument that's been made by other defendants' counsel, which

10   is, you know, one of their arguments is the information got to

11   us without any agreement, it just arrived, and --

12            MR. BOXER:  Mr. Weddle just saved me from making that

13   argument, your Honor, on multiple conspiracies.

14            THE COURT:  OK.

15            MR. WEDDLE:  That is just the flip side of the same

16   coin, which is if Mr. Sweet takes information and then offers

17   it unprompted to people at KPMG to do things with it, the

18   taking of that information is not part of the same conspiracy.

19            THE COURT:  Well, I think that's a stretch.  I think

20   that this is one of those situations where the taking of

21   information from the PCAOB, assuming the government is right

22   that it is confidential, etc., and it is important, it makes no

23   sense unless it is given to a firm like KPMG.  And its use is

24   part of the same thing as the taking.

25            Similarly, the use of it, if you know -- admittedly,

J2sdmid4

```
1    the government has to prove that they have to know that the use
2    was improper and wrongful.  The using of it in a fraudulent,
3    deceptive way would only make sense if you knew it was taken.
4    I mean, it is all one -- I think it is all one thing.  That is
5    the government theory, at least.
6         MR. WEDDLE:  Well, I'm obviously not doing a good
7    enough job making Mr. Middendorf's arguments, so let me leave
8    that to Ms. Lester and Mr. Boxer.
9         But from our perspective, your Honor, on the Jeff Wada
10   side of the equation, there is no evidence about any
11   understanding by him about what was going to be done.  And I
12   think that the evidence, taken in the light most favorable to
13   the government, is equally consistent with at least two
14   possible agreements.  One possible agreement that is consistent
15   with the evidence is an agreement by Mr. Wada to share
16   information with Ms. Holder in order to help Ms. Holder in her
17   job.  And, you know --
18        THE COURT:  But the only way it would plausibly help
19   Ms. Holder in her job is if KPMG was using it and therefore
20   helping her.
21        MR. WEDDLE:  I disagree with that, your Honor.  I
22   think that that is a possible way in which it would be helpful
23   to her.  But it would also be helpful to her -- and we saw this
24   in the evidence both with -- I think both with respect to
25   Ms. Holder but also with respect to Mr. Sweet, that sometimes
```

J2sdmid4

they took credit for work product as if it came from their

knowledge and experience, as if it was reflective of their

abilities and their contribution, their lawful contribution to

KPMG, when in fact what was happening is they were using

confidential information that they had taken, by the

government's allegation, from PCAOB before they left.

So in that situation, both Mr. Sweet and Ms. Holder

are lying to, or they're concealing from their audience that

the information that they're using is improperly obtained.  And

what that means is that in that example that I have just given,

Mr. Sweet and Ms. Holder have their own agreement to make

themselves look good.  Maybe.  Or maybe it is just Mr. Sweet

himself decided to try to make himself look good by using

information provided to him by Ms. Holder.

But it is not a necessary interpretation of the

evidence that there is a single charge -- there is a single

conspiracy, which is the conspiracy charged in the Indictment.

It's equally consistent with the evidence that there are either

no agreements; that is, I think there is a consistent read of

the evidence which is that Ms. Holder is essentially preying on

and using her relationship with Mr. Wada to get information

that, you know, counts more like gossip that she finds to be

valuable or that KPMG finds to be valuable.  So that's not a

known use by Mr. Wada.

He's talking to her about, you know -- this was read

J2sdmid4

1    today to the jury.  He's chatting with her about are you going

2    to be in Tokyo in February, and she's taking that as a

3    disclosure of confidential information and interpreting it in a

4    way.  And Mr. Sweet is conveying the fruits of that to other

5    people at KPMG.  And there is no necessary agreement even

6    between Mr. Wada and Ms. Holder about that information, let

7    alone between Mr. Wada and all the people at KPMG who were the

8    audience for that information.

9              So, it's the government's burden, right, to prove

10    beyond a reasonable doubt this conspiracy that they've charged,

11    and if the evidence is equally consistent with the existence of

12    no agreement, or different agreements that are smaller and not

13    the same as the one that's charged, that requires an acquittal.

14              THE COURT:  OK.

15              MR. BOXER:  I would just say briefly, your Honor, I

16    think the record justifies giving the multiple conspiracy

17    charge.  Just even from our perspective, crediting the evidence

18    in the light most favorable to the government, there is no

19    evidence that Mr. Middendorf knew how the information was

20    taken, what manner, how it was embezzled.  I think that

21    provides a predicate for charging the jury that be mindful of

22    multiple conspiracies, and they have to unanimously agree

23    beyond a reasonable doubt that the conspiracy that was charged

24    was what they found.  So I think the predicate is there for the

25    charge.

J2sdmid4

1          THE COURT:  Say again.

2          MR. BOXER:  I think the factual predicate in the

3     record is there to give the charge.

4          MS. MERMELSTEIN:  Do you need a response, your Honor?

5          THE COURT:  Just briefly.

6          MS. MERMELSTEIN:  That is preposterous.  There is, as

7     your Honor has just pointed out, no plausible explanation for

8     why Mr. Wada would give the information to Ms. Holder if not

9     for it to be used by her at KPMG.  So, the notion that there

10    could have been one conspiracy to acquire and send it over and

11    then a different conspiracy to use it is facially ridiculous.

12    It can't be.  It makes no sense.  This is no predicate in the

13    factual record for suggesting that that could be true because

14    it is completely illogical.

15          And there is lots of evidence that Mr. Middendorf knew

16    that it was coming from inside the PCAOB.  Mr. Whittle himself

17    testified that that was so, that he had direct conversations

18    about that with Mr. Middendorf, as did Mr. Sweet.  And in 2015

19    there is documentary evidence where he is literally sent an

20    email containing the list, and then subsequently the

21    confidential PCAOB is put by him onto his own phone.

22          So, he knew exactly where it was coming from.  There

23    is no requirement that he knew the exact mechanics by which

24    Mr. Wada had acquired it, nor is there any requirement that he

25    knew that it was specifically Mr. Wada, which the government

J2sdmid4

1       doesn't contend that he did.  But this is a hundred percent one

2       conspiracy.  It cannot plausibly be read as more than that, and

3       so there should be no multiple conspiracies charged.

4               THE COURT:  Any other high-level statements anybody

5       wanted to raise?  We'll have the real charge conference on

6       Monday.

7               MS. KRAMER:  Yes, your Honor.  We've a couple of times

8       at the sidebar opposed what we have I think characterized to

9       your Honor as a sort of "blame the victim" argument from

10      defense counsel through cross-examination and principally the

11      government witnesses in this case.  So, we would request a

12      variation on the "blame the victim" charge that has been given

13      in other fraud cases.  I can read your Honor what we propose,

14      and then ask if you want us to put a letter in on it or just

15      hear from us now?

16              THE COURT:  Is there something in what you submitted

17      yet or not yet?

18              MS. KRAMER:  No, your Honor.

19              So this is taken from several other fraud cases, and

20      the language obviously has been tweaked to make sense in this

21      case:  There is one more thing I must tell you about the

22      schemes to defraud.  If you find that such schemes existed, it

23      is irrelevant whether the PCAOB or the SEC were careless or

24      even negligent.  If you find that a scheme to defraud the PCAOB

25      existed, it is irrelevant whether the PCAOB inspection process

J2sdmid4

1   was onerous or whether the PCAOB was a difficult regulator.

2            And that we believe is absolutely necessary to counter

3   any irrelevant suggestion that, as we have described it, there

4   is a sort of blaming of the victim or a nullification argument

5   that because the PCAOB inspection process was difficult, that

6   that somehow impacts whether or not there was a scheme to

7   defraud.  We recognize that defense counsel has asked some of

8   these questions and your Honor has allowed it to put in

9   evidence and argument of the defendant's state of mind as to

10  overall context and backdrop of what was happening.  That is

11  why the charge starts with, "If you find the scheme to defraud

12  existed."  So, not suggesting that they can't consider what has

13  been put before them in evaluating the defendant's intent, but

14  making clear that if there is a scheme that they have found,

15  once they get to that place, it's irrelevant whether the PCAOB

16  was too tough or whether they were careless.

17            MR. BOXER:  We'll look at it, your Honor.  I think if

18  there is a similar explanation that such evidence could be

19  relevant for judging the defendant's intent, maybe it is

20  something we could compromise on and we can look at it.

21            THE COURT:  OK.

22            MR. BOXER:  But as counsel said, I do think it is

23  relevant to the specific intent and lack of it for our client.

24  So let us study it, and we will be prepared at the charge

25  conference to respond.

J2sdmid4

1              THE COURT:  All right.

2              Anything else?

3              MS. KRAMER:  So we recognize that the schedule right

4    now is very tenuous, but for planning purposes, it sounds like

5    your Honor is thinking of a charge conference on Monday at the

6    end of the day.  Do you anticipate that if the defense has

7    rested by the end of the day Monday, we will be closing on

8    Tuesday?

9              THE COURT:  Well, I'll hear from you all on that.  I'm

10   open to ideas.  If you would like, I could give the jury

11   Tuesday off.

12             MS. KRAMER:  Your Honor, with respect to the charge

13   and the charge conference, did you say that you anticipate

14   getting a draft charge out before Monday or -- I don't want to

15   put you on the spot, but just in terms of planning how much

16   time we'll need from the charge conference to closing, I think

17   some of that, from at least my perspective, depends on when we

18   get the draft charge in the likely event that there is not an

19   enormous movement from the draft charge after the charge

20   conference.

21             THE COURT:  Yes.  I would like to get it out -- a

22   draft out this weekend.  I mean, I'm shooting for Friday night

23   or Saturday.

24             MR. BOXER:  On the question of Tuesday off, your

25   Honor, if it is OK, we would like to defer answering that

J2sdmid4

1    question at this point and see how it goes.

2              MR. COOK:  The same, your Honor.

3              THE COURT:  That's fine.

4              MR. BOXER:  We had a related question, which is your

5    Honor's practice on a week from this Friday, in the event the

6    jury is still deliberating on Thursday, is it your practice to

7    have them come back Monday or they would --

8              THE COURT:  I would normally have them deliberate

9    Friday.

10             MR. BOXER:  Thank you.

11             MR. COOK:  Your Honor, I just have a couple of very

12   quick questions.

13             If I could ask what the Court's preference is with

14   regard to the Indictment going back to the jury during

15   deliberations?

16             THE COURT:  That is another thing -- I was going to

17   ask about that and the verdict form.  I think there was mention

18   in some of the papers about a slimmed down version of the

19   Indictment going back.  Is that something you have views about?

20   I am happy to hear your views.

21             MR. COOK:  Speaking for Mr. Wada, our preference would

22   be for the Indictment at least in its current form not to go

23   back.  I am happy to look at a new indictment.

24             MR. BOXER:  We agree.

25             I note that even slimmed down, willfulness appears

J2sdmid4

1   throughout at least the actual counts in the Indictment.  My

2   client has been charged with and put on notice of it.  I think

3   that aspect should be included, but the whole factual history

4   we agree.

5            MS. ESTES:  Your Honor, we think it might just be

6   easier not to send it back.  I mean, willfulness will be in the

7   charge so --

8            MS. KRAMER:  Maybe not.

9            MS. ESTES:  I don't think that part of the Indictment

10  matters.

11           MS. KRAMER:  To add to what Ms. Estes said, you know,

12  your Honor is going to instruct the jury at some length on what

13  the charges are and what the elements are.  We could spend a

14  fair amount of time debating what version of the Indictment

15  should go back, so it just may be more straightforward not to

16  send it back, as many judges choose to do.

17           THE COURT:  I would be happy to just be clear in the

18  jury charge, you know, what each count charges, and then I'll

19  be giving them 12 copies of the jury charge.  Maybe that is

20  enough.

21           MR. COOK:  Thank you, your Honor.

22           Just a couple of other housekeeping questions.

23           What is your Honor's practice with regard to the

24  exhibits going back with the jury?

25           THE COURT:  I have all the exhibits go back.  And for

J2sdmid4

1    electronic, maybe we could get a laptop that has --

2              MS. MERMELSTEIN:  I was going to ask if you want the

3    government to get sort of a clean laptop that either can have

4    CDs put into it or will have exhibits that can only be used

5    electronically saved to the laptop.

6              THE COURT:  I think that will be helpful.

7              MR. COOK:  Great.

8              MS. MERMELSTEIN:  That is no problem.

9              MR. COOK:  Does the Court have a preference or a

10   problem with counsel using excerpts from the transcript during

11   summation?

12             THE COURT:  I think -- assuming no objection, I think

13   that is fine.

14             Is anyone going to use any -- well, I guess you

15   probably will.  You are going to be creating PowerPoints and

16   things, I assume.  As long as it is limited to what's in

17   evidence, including testimony that is in evidence, I assume

18   that's fine.

19             Are there going to be any surprises in terms of

20   demonstratives or anything in closings other than your big

21   screen?

22             MR. COOK:  We will not be presenting anything that we

23   don't show to the government in advance of the summation.

24             MR. BOXER:  We are going to rely on the evidence and

25   the transcript and the documents.  I don't know that there will

J2sdmid4

1   be anything to show, but if we do anything outside of that via

2   demonstrative, we will show the government.

3           MS. KRAMER:  I think some of our slides will have

4   argument in them but all based on the evidence that has been

5   put before the jury.

6           THE COURT:  OK.  Will you show it to the defendants?

7           MS. KRAMER:  Certainly --

8           MS. MERMELSTEIN:  I actually don't.  I don't think we

9   typically show them the slides in advance, just like we don't

10  gibe them the text of the argument we are going to read.

11          MR. BOXER:  I think under the rules, if it is not in

12  evidence and it is some sort of summary, we are required to

13  receive notice of it.

14          MS. MERMELSTEIN:  I don't know what rule --

15          MR. COOK:  I am comfortable, recognizing it has got to

16  be fair argument and any representations as to the evidence has

17  to be accurate, proceeding on that basis and not exchanging

18  them.

19          MS. MERMELSTEIN:  Agreed, your Honor.  I've never seen

20  the parties exchange slides for closing.  For opening, yes.

21  And I think so long as people are going to be putting in

22  exhibits, testimony and argument, I don't see any reason why

23  people can't be trusted to limit it to that appropriate

24  category.

25          THE COURT:  I guess that is right.  A couple of times

J2sdmid4

1    I have had objections at the last minute and it creates a

2    distraction for the jury.  So, just be careful with what you

3    say as argument.  And if there is a problem, I am just going to

4    repeat what I often repeat, which is closing is argument of

5    lawyers, it is not evidence.  If there is any disagreement

6    between what's in the closings or the openings and what you saw

7    and heard in evidence, you rely on what you saw and heard in

8    evidence.  And I will just repeat that if there is objections

9    about these sorts of things.

10             MR. COOK:  Understood, your Honor.

11             MS. KRAMER:  Understood, your Honor.

12             One other thing.  We will be speaking with Mr. Hampton

13   and the Court video people to try to figure out if we can get

14   another screen in here, which your Honor already approved.

15             And then with respect to the defendants' expert,

16   Mr. Atkins, we made an application in our pretrial motions or

17   motions in limine, to not have him proffered as an expert

18   before the jury.  We had some debate between the parties, if

19   your Honor may recall, about whether Wes Bricker should or

20   shouldn't be deemed an expert.  We made a disclosure to satisfy

21   the defendants' request, but we did not proffer him as an

22   expert or have him qualified before the jury, and we would

23   object to that being done with Mr. Atkins in the jury's

24   presence.

25             MR. BOXER:  Your Honor, we have no objection to that

J2sdmid4

approach as long as when we ask Mr. Atkins questions like based
on his experience, what is the SEC focused on, for example,
which is the one that drew the most attention in the motion
practice, that we are not going to get an objection because
there is no predicate made for him giving an expert opinion.

          MS. KRAMER:  I think after he is qualified, we should
have the opportunity to voir dire him and then the examination
could proceed.  So if he is testifying as an expert, I think
that procedure is standard, but without saying we proffer him
as an expert in front of the jury and having the sort of
imprimatur of, you know, him speaking from on high before the
jury.  That's what we object to but --

          THE COURT:  You want to do the expert qualification
before the jury comes in, is that it?

          MS. KRAMER:  No, we would do it in front of the jury,
but I just don't think he should be deemed an expert witness.
So, you know, some judges, for example, say, you know:  "Do you
now proffer him?"  "Yes, I do."  "You may proceed."  That kind
of thing.  We just don't want him being called an expert in
front of the jury when they haven't heard that term yet.  They
heard similar testimony from Mr. Bricker without that.

          THE COURT:  Yes.  Defense counsel can go through his
qualifications and then we'll just proceed, I assume.

          MR. BOXER:  That is fine, your Honor.

          THE COURT:  OK.  All right.  Anything else?

J2sdmid4

1          MS. KRAMER:  You had mentioned the verdict form, your

2     Honor, and scheduling.

3          THE COURT:  Yes.  I don't think we've -- we haven't

4     exchanged a verdict form yet?  Has anyone?

5          MS. KRAMER:  No, your Honor.

6          THE COURT:  Does anyone have -- is that going to be --

7     are there any tricky issues with the verdict form?

8          MS. MERMELSTEIN:  Only that we think it is, you know,

9     a straight forward, five counts -- nine counts, two-defendant,

10     check the box.  I think the issue is going to be whether or not

11     there will be some specific finding of unanimity that we don't

12     think is required.  So, our verdict form is going to look like

13     sort of every verdict form.  I don't know what the defense is

14     going to say about that in light of what arguments they have

15     just made.

16          MR. BOXER:  We haven't conferred on it and we would

17     like to.

18          THE COURT:  At any point between now and Monday, you

19     can just send me something and we will talk about it on Monday.

20          OK?

21          MS. KRAMER:  Thank you, your Honor.

22          MS. MERMELSTEIN:  Thank you, your Honor.

23          MR. WEDDLE:  Thank you, your Honor.

24          (Adjourned to 9:30 a.m., March 4, 2019)

25

<pre>
 1                    INDEX OF EXAMINATION
 2   Examination of:                           Page
 3    ZACHARY GREENWOOD
 4   Direct By Ms. Estes  . . . . . . . . . . .2279
 5   Cross By Ms. Clark . . . . . . . . . . . .2290
 6   Cross By Mr. Ohta  . . . . . . . . . . . .2299
 7   Redirect By Ms. Estes  . . . . . . . . . .2317
 8    PETER LUKE URBANCZYK
 9   Direct By Ms. Mermelstein  . . . . . . . .2379
10   Cross By Ms. Lester  . . . . . . . . . . .2383
11    SARAH PYUN
12   Direct By Ms. Estes  . . . . . . . . . . .2385
13   Cross By Mr. Weddle  . . . . . . . . . . .2397
14    FRANCIS S. BLAKE
15   Direct By Mr. Boxer  . . . . . . . . . . .2428
16   Cross By Ms. Mermelstein . . . . . . . . .2436
17   Redirect By Mr. Boxer  . . . . . . . . . .2439
18                    GOVERNMENT EXHIBITS
19   Exhibit No.                            Received
20    1410 through 1440, 1442, and 1443  . . . .2321
21    1381 and 138  . . . . . . . . . . . . . .2354
22    875, 208, 209, 210, 211, 515, 221, 521, . .2354
23            758, 820, 825, 318, 938, 944,
24            1000, 219, 1078
25    1380 and 652  . . . . . . . . . . . . . .2376
</pre>

```
1    653   . . . . . . . . . . . . . . . .2378

2    657   . . . . . . . . . . . . . . . .2285

3    1362  . . . . . . . . . . . . . . . .2386

4    1371  . . . . . . . . . . . . . . . .2382

5    1376  . . . . . . . . . . . . . . . .2352

6    1407  . . . . . . . . . . . . . . . .2287

7    1446  . . . . . . . . . . . . . . . .2287

8                   DEFENDANT EXHIBITS

9    Exhibit No.                          Received

10   1445  . . . . . . . . . . . . . . . .2315

11   1650  . . . . . . . . . . . . . . . .2315

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```