J34dmid1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

                Defendants.

------------------------------x

                                             March 4, 2019
                                             9:38 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                             District Judge
                                             and a jury

                         APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   REBECCA G. MERMELSTEIN
      AMANDA K. KRAMER
      JORDAN LANCASTER ESTES
          Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
      Attorneys for Defendant David Middendorf
BY:   NELSON A. BOXER
      AMY R. LESTER
      ALEXANDRA REBECCA CLARK
          – and –
BRUCH HANNA LLP
BY:   GREGORY S. BRUCH

J34dmid1

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
      JUSTIN S. WEDDLE
      SELBIE JASON
            – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


        – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal




                              oOo

J34dmid1

1          (Jury not present)

2          THE COURT:  Good morning, everyone.

3          ALL COUNSEL:  Good morning.

4          THE COURT:  The jury is all here notwithstanding the

5    weather.

6          Anything anybody wanted to address?

7          MS. MERMELSTEIN:  Yes, your Honor.  We had filed last

8    week a motion to preclude portions of Mr. Hanson's testimony,

9    who is Mr. Middendorf's first witness.  I think we just forgot

10   to take it up on Thursday afternoon so I think we need to take

11   it up before he testifies.

12         THE COURT:  OK.  Mr. Boxer, do you want to respond?

13         MR. BOXER:  I don't think any of the portions that the

14   government raised concern with I will be eliciting from

15   Mr. Hanson.  It is going to be his services as a PCAOB board

16   member, some questions about the board, and then his

17   interactions and conversations with Mr. Middendorf.  I have a

18   few documents to show him that were Outlook invitations to

19   meetings they had, and that's really it.  So, I don't expect

20   there to be an issue.

21         THE COURT:  OK.  Anything else?

22         MS. MERMELSTEIN:  Your Honor, one other thing that I

23   may be misreading is going to be with Mr. Hanson, but last

24   night or this morning Mr. Middendorf marked Defense Exhibit

25   M300, which is an agenda for a KPMG PCAOB board meeting that

J34dmid1

1    Mr. Hanson attended, and it includes an attachment of

2    handwritten notes.  To the extent they are intending to offer

3    that through Mr. Hanson, I think it is hearsay.

4            MR. BOXER:  We are not.

5            MS. MERMELSTEIN:  If not, then no need to raise it.

6            MR. BOXER:  All right.  It is there in case that we

7    need to refresh his recollection.

8            THE COURT:  All right.  Mr. Cook.

9            MR. COOK:  Your Honor, there are several exhibits that

10   we admitted that had Government Exhibit stickers that we have

11   now renumbered with defense exhibit sticker numbers that we

12   want to put those in the record.

13           THE COURT:  All right.

14           MR. COOK:  Government Exhibit 450 has been relabeled

15   as Defense Exhibit 2450.  Government Exhibit 503 has been

16   renumbered Defense Exhibit 2503.  Government Exhibit 756 has

17   been renumbered Defense Exhibit 2756.  Government Exhibit 800

18   has been renumbered Defense Exhibit 2800.  Government Exhibit

19   930 has been renumbered as Defense Exhibit 2930.

20           THE COURT:  All right.  Thank you.

21           Am I right that the first witness is Mr. Hanson?

22           MR. BOXER:  Yes, your Honor.

23           THE COURT:  All right.  And anything else before we

24   start?

25           (Pause)

J34dmid1

1                OK.  We can bring in the jury.

2                Do you want to bring the witness in first?

3                MR. BOXER:  Sure.

4                (Witness present)

5                THE COURT:  Good morning.  You can come on up to the

6     witness chair.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated in the courtroom.

3          Good morning, ladies and gentlemen.

4          JURORS:  Good morning, your Honor.

5          THE COURT:  Welcome back.  You all made it in

6     notwithstanding the weather issues.  So, well done.

7          We're continuing with the testimony in the defense

8     case.

9          And, Mr. Boxer, you may call your next witness.

10          MR. BOXER:  Thank you, your Honor.

11          The defense calls Jay Hanson.

12     JAY HANSON,

13        called as a witness by defendant Middendorf,

14        having been duly sworn, testified as follows:

15          THE CLERK:  Please state your full name and spell your

16     last name slowly for the record.

17          THE WITNESS:  Jay Hanson, H-a-n-s-o-n.

18          THE CLERK:  Thank you.

19     DIRECT EXAMINATION

20     BY MR. BOXER:

21     Q.  Good morning, Mr. Hanson.

22     A.  Good morning.

23     Q.  How old are you?

24     A.  62.

25     Q.  And could you describe your educational background and

J34dmid1                         Hanson - direct

1    experience?

2    A.  I received a Bachelor of Arts degree from Concordia

3    College.

4    Q.  Is that in Minnesota?

5    A.  Yes.

6    Q.  And could you describe for the jury your work experience

7    after graduating from Concordia College?

8    A.  I started my career in public accounting with a firm that

9    was known at the time as McGladrey Hendrickson, and I worked

10   there as an employee and a partner through January of 2011.

11   Q.  And could you briefly describe the positions you held in

12   McGladrey and the experience you had there?

13   A.  In the early part of my career, I was an audit staff

14   member.  I was later promoted to manager, later promoted to

15   senior manager, later admitted to the partnership at McGladrey,

16   all the time being an auditor.  And in the middle of my career

17   I was quality control resource, involved in reviewing products

18   that the audit practice issued to clients.  And the last part

19   of my career with McGladrey I was in the National Office as

20   National Director of Accounting.

21   Q.  At the time you left McGladrey in January 2011, how big a

22   firm was McGladrey, approximately?

23   A.  I don't -- there are many different measures.  It could be

24   in terms of revenue, in terms of people --

25   Q.  In terms of people.

J34dmid1                    Hanson – direct

1    A.  I believe there were over 5,000 people in the firm.

2    Q.  And how did it compare, generally, to the Big Four

3    accounting firms at that time?

4    A.  If my memory serves me right, it was approximately the

5    fifth largest firm in terms of total U.S. revenues.

6    Q.  And in your audit experience in McGladrey, did you work on

7    audits of public companies?

8    A.  Yes.

9    Q.  Any particular type of public companies that you had

10   expertise in?

11   A.  I had no specific expertise.  It ranged in various

12   industries.

13   Q.  And prior to January 2011, did you also sit on a task force

14   of the FASB?

15   A.  Yes.

16   Q.  That is the Financial Accounting Standards Board, correct?

17   A.  Correct.

18   Q.  And just briefly, what was the goal of the task force?

19   A.  The task force was the Emerging Issues Task Force, which

20   was involved with providing advice to the FASB on the

21   application of accounting standards in emerging areas or areas

22   where there may have been a diversity in practice or something

23   unclear in the accounting standards.

24   Q.  And in January 2011, what did you do then?  What happened?

25   What was the next work you had?

J34dmid1                          Hanson - direct

1    A.   In early January 2011, I was informed by the Securities and

2    Exchange Commission that I had been appointed as a board member

3    at the PCAOB, and I started that role on February 1, 2011.

4    Q.   And how long did you stay in that role for?

5    A.   Approximately six years.

6    Q.   Until approximately December of 2016, correct?

7    A.   Yes.

8    Q.   And have you been working since that time, December of

9    2016?

10   A.   No, I'm retired.

11   Q.   Could you describe for the jury what the PCAOB is?

12   A.   The PCAOB is the regulator of auditors that audit companies

13   that trade in the United States.

14   Q.   And how does it do that?  How does it perform that

15   function?

16   A.   It performs that function through the inspection of firms

17   that are registered with the PCAOB.  It sets the audit

18   standards, so the rulebook that auditors use to conduct their

19   audits.  It conducts, if necessary, enforcement investigations

20   and procedures, and it just generally oversees the conduct of

21   auditors.

22   Q.   And would those enforcement proceedings be brought against

23   an audit firm or an employee or partner of an audit firm?

24   A.   Yes.

25   Q.   And how is the PCAOB structured?

J34dmid1                              Hanson - direct

1    A.  There are five board members and approximately 800 staff.

2    Q.  And are there divisions within the PCAOB?

3    A.  Yes.

4    Q.  And as best you recall, what are those divisions?

5    A.  The divisions include Inspections.  Within Inspections is

6    Registrations, the Office of the Chief Auditor involved in

7    standard setting, the Enforcement Division.  There is an

8    International Affairs office, IT function, administrative

9    function, and a research group.  Those are the ones that come

10   to mind.

11   Q.  OK.  And you said there are five board members.  How long a

12   term or period of time does each board member serve for?

13   A.  A board member serves -- well, the term is specified in the

14   Sarbanes Oxley Act.  It is a five-year term with the

15   possibility of a single five-year renewal.

16   Q.  And when you were a board member, did you have staff that

17   was specifically assigned to you?

18   A.  Yes.

19   Q.  Could you describe what kind of staff that was assigned to

20   you?

21   A.  I had one administrative assistant and one professional

22   assistant who was an attorney.

23   Q.  And as a board member, what did you do on a daily basis?

24   What were the duties and responsibilities of a PCAOB board

25   member?

J34dmid1                          Hanson – direct

A.   The board approved inspection reports that were issued

after the completion of an inspection of a firm.  The board

approved any remediation determinations of the firm's efforts

to remediate the quality control deficiencies that were

communicated to the firm.  The board reviews and approves draft

audit standards and other rule-making as well as the final

products, if those come to a final determination.  The board

approves the initiation of formal enforcement actions and in

some situations is involved after the enforcement action is

concluded, if there is an appeal to the board.  The board

approves arrangements with non-U.S. regulators for the purpose

of conducting inspections of firms that are registered but not

located in the United States.  The board approves the annual

budget for the PCAOB.

Q.   I'm not sure if you mentioned this a moment ago, but are

you a CPA?

A.   Yes.

Q.   And does Sarbanes-Oxley have any requirement about whether

board members of the PCAOB should also be CPAs?

A.   Of the five board members, to the best of my recollection,

the Sarbanes-Oxley Act says that two of the board members shall

be CPAs and the other three shall not be CPAs.

Q.   So when you served, you were one of the two board members

who was a CPA?

A.   Yes.

J34dmid1                          Hanson - direct

1    Q.   Who funds the PCAOB?

2    A.   The primary funding comes from issuers, or the public

3    companies that are subject to audit by the auditors.

4    Q.   And beside the issuers, are there any other sources of

5    funding that pays for the expenses and operation of the PCAOB?

6    A.   Yes.

7    Q.   And what would those be?

8    A.   A minor portion of the budget comes from the annual fees

9    that the firms that are registered paid, and then a portion of

10   the budget comes from brokers and dealers.

11   Q.   And is any of the funding -- does any of the funding come

12   from the United States?  Does the government contribute to the

13   funding?

14   A.   No.

15   Q.   Does the SEC contribute to the funding?

16   A.   No.

17   Q.   So you mentioned inspection reports.  Could you just

18   briefly describe what those are?

19   A.   At the completion of an inspection of a registered firm,

20   there is a report prepared that has multiple parts.  The unique

21   portion for a firm, generally referred to as Part I, describes

22   the number of engagements that were -- or number of issuers

23   that were selected to inspect all or a portion of the audit and

24   of those that were selected how many of those had a finding

25   that was reported with a deficiency that rose to the level of

J34dmid1                        Hanson - direct

1   something that the board believes should be reported in the

2   report, and then for each of the anonymized issuers a brief

3   description of what the issue was.

4   Q.  And the deficiency you just referenced, that's what's known

5   as a comment, correct?

6   A.  Could you be a little more precise on the question?

7   Q.  Sure.  You mentioned deficiencies being noted in Part I of

8   the reports.  My question is are those deficiencies often

9   referred to as a comment or comments?

10  A.  That's not the context that comments are used in at the

11  PCAOB.

12  Q.  What is your understanding of the context that comments are

13  used?

14  A.  The context that I understand is a comment form, which is a

15  form that forms the basis for the discussions with a firm if

16  the inspectors that are physically doing the inspection see

17  something they believe is a deficiency, the facts that the

18  PCAOB staff understand are written into the form as well as the

19  issue that the facts present in terms of deficiency in that

20  form is provided to the firm for feedback and essentially

21  concurrence that the facts are right and then any views on the

22  issue presented.

23  Q.  And if at the end of the day it's decided that the subject

24  of that comment form makes it into Part I of the report, am I

25  understanding you correct that at that point it is not called a

J34dmid1                     Hanson - direct

1    comment any longer, as you understand it?

2    A.  Yes.  That is not a term that I would have used or I heard

3    used.  It was more a reported failure, deficiency in the

4    report.

5    Q.  Understood.  And you mentioned that there was anonymity

6    with respect to the issuers I think you said, is that correct?

7    A.  That is correct.

8    Q.  Could you explain how that works?

9    A.  Well, the deficiencies are described with a heading that

10   the very first one in a report might be issuer A and then a

11   description of what -- a brief description of the facts, which

12   just a description of the audit procedures that were not

13   performed.

14   Q.  So the general public is not informed of the issuer that

15   the report speaks to its deficiencies in the audit of that

16   issuer?

17   A.  That's correct.

18           MS. MERMELSTEIN:  Objection to leading, your Honor.

19           THE COURT:  Sustained.

20   BY MR. BOXER:

21   Q.  Are you familiar with PCAOB Rule 4004 reports?

22   A.  Yes.

23   Q.  What do you understand those to be?

24   A.  Those reports are -- it is a document that is sent from the

25   PCAOB to the SEC to describe primarily -- and I'm just

J34dmid1                        Hanson - direct

1    reflecting on my personal experience of the majority of those

2    reports that I saw -- an accounting issue that the inspector

3    observed in an audit that was inspected where the inspector

4    didn't believe that the accounting was proper and the firm nor

5    the issuer had done anything to correct that improper

6    accounting.  So, that was reported to the SEC through a Rule

7    4004 report.

8            There are other types of things that were reported on

9    a 4004 report.  One that comes to mind is an independence issue

10   that the firm may not have been independent with respect to the

11   client they are auditing.

12   Q.  Have you ever seen a 4004 report addressed to deficiencies

13   that were explained or described in Part I of an inspection

14   report?

15   A.  Yes.

16   Q.  And was that in connection with the accounting that was

17   performed at the issuer?

18   A.  That would have been if there was an accounting issue that

19   was not subsequently properly addressed.

20   Q.  Were you aware that the Big Four firms were recruiting from

21   the PCAOB at the time you were on the PCAOB board?

22   A.  Yes.

23   Q.  And did you have a view on that practice at that time?

24           MS. MERMELSTEIN:  Objection.

25           MR. BOXER:  I will try a few additional questions

J34dmid1                          Hanson - direct

 1    first, your Honor.

 2              THE COURT:  OK.

 3    BY MR. BOXER:

 4    Q.  Did you have discussions with your other board members

 5    about the Big Four firms hiring from the PCAOB?

 6    A.  Occasionally the topic would come up.

 7    Q.  And did you think it was a good thing or a bad thing that

 8    that was going on?

 9              MS. MERMELSTEIN:  Objection.

10              THE COURT:  Sustained.

11    BY MR. BOXER:

12    Q.  Do you have any understanding, Mr. Hanson, as to how

13    issuers were chosen for inspection by the PCAOB?

14    A.  Yes.

15    Q.  And what was your understanding?

16    A.  My general understanding was for the majority of the time I

17    served in the board, for the largest firms, the selection

18    process was based on a variety of risk factors.

19    Q.  And what kind of risk factors were those?

20    A.  What comes to mind are risk factors of something in the

21    company's financial statements didn't look correct or may have

22    been inconsistent with others in the industry.  That's one type

23    of risk factor.  Another risk factor might be the personnel

24    involved in conducting the audit, the partner and other

25    supporting personnel.  Another factor might be if the

J34dmid1                          Hanson - direct

1   accounting issue presented in the company's financial

2   statement, that may have initially raised a question.  If the

3   firm has -- overall has had problems with that either in the

4   office that was serving the issuer or the firm overall.

5   Q.  And those risk factors, have you or members of the board

6   spoken publicly about those kinds of risk factors?

7   A.  I don't remember specifically, but it sounds like -- I

8   don't remember specifically but --

9   Q.  Were the risk factors kept secret by the PCAOB?

10  A.  The precise risk factors applying to any issuer were

11  secret, yes.

12  Q.  The general risk factors that were applied by the PCAOB,

13  were those kept secret?

14  A.  There were some -- no.

15  Q.  And did you think it would be difficult for a Big Four firm

16  to assess what risk factors would apply?

17          MS. MERMELSTEIN:  Objection.

18          THE COURT:  Sustained.

19  Q.  Were you aware of any of the accounting firms trying to

20  guess which of their clients' audits would be inspected?

21          MS. MERMELSTEIN:  Objection.

22          THE COURT:  Overruled.

23  A.  I was -- at the time I was on the board, I wasn't aware of

24  any specific efforts that any firm was putting into -- into

25  trying to guess which of their clients would be inspected.

J34dmid1                              Hanson - direct

1   Q.  Were you aware of any general efforts at the time you were

2   on the board?

3   A.  I was generally aware that firms were trying to look at

4   the -- across their client base at the riskiest clients that

5   they served to ensure that the standards are properly followed.

6   Q.  And do you think that behavior was appropriate?

7               MS. MERMELSTEIN:  Objection.

8               THE COURT:  Sustained.

9   BY MR. BOXER:

10  Q.  Did you ever criticize any of the accounting firms for

11  doing what you just described with respect to risk factors?

12              MS. MERMELSTEIN:  Objection.

13              THE COURT:  Sustained.

14  Q.  Do you know Dave Middendorf?

15  A.  Yes.

16  Q.  Do you see him here in the courtroom today?

17  A.  Yes.

18  Q.  Could you point him out?

19              (The witness complied)

20  Q.  And how do you know Mr. Middendorf?

21  A.  I was aware that he was a member of the leadership team of

22  his firm and met him in connection with meetings that the board

23  would have with his firm.

24  Q.  And would those be at PCAOB board meetings?

25  A.  They would be at -- yes.

J34dmid1                          Hanson - direct

Q.  Were there other meetings besides PCAOB board meetings when

you met with Mr. Middendorf?

A.  Yes.

Q.  Could you generally describe those meetings?

A.  The meetings in general were discussing how KPMG was

progressing on their inspections, how they're progressing on

their remediation of prior deficiencies, and asking questions

of if there is anything else I should be aware of that he

wanted to bring to my attention.

Q.  And you answered those questions?  You answered his

questions?

A.  Well, I was as much directing questions at him, and with

the question he would ask me, I would give general answers to

the questions.

Q.  Let's start with the board meetings.

        How often did the board meet with -- the PCAOB board

meet with KPMG?

A.  It was approximately every six months.

Q.  And who attended those meetings?

A.  From the PCAOB, the board members were all invited,

generally were present for the meetings.  The senior staff of

the PCAOB was invited to the meetings.  The general counsel's

office of the PCAOB was invited to the meetings, and the firm

itself would bring whatever number of people they felt was

appropriate to bring to the meetings.

J34dmid1                       Hanson - direct

1    Q.   And was the board holding similar meetings with the other

2    Big Four firms as it did with KPMG?

3    A.   Yes.

4    Q.   And was there -- did the meetings occur in a conference

5    room?  Could you describe where the meetings took place?

6    A.   In a what was referred to as the general purpose meeting

7    room of the PCAOB.

8    Q.   And -- oh, by the way, do you know a person named Stephanie

9    Rodriguez?

10   A.   I recognize the name.  I can't place her face.

11   Q.   OK.  Do you know if she was at PCAOB board meetings?

12   A.   I don't know.

13   Q.   And with respect to KPMG, who, generally, attended those

14   board meetings from KPMG, to the best of your recollection?

15   A.   To the best of my recollection, the CEO, the Vice Chair of

16   the Audit Practice, the National Managing Partner, such as

17   Mr. Middendorf's role, the partner in of the inspections, and

18   usually there was an individual that was a lawyer.  I don't

19   know specifically what his role was.

20   Q.   Is that Mr. Holmes, Mr. Sven Holmes?

21   A.   Yes.

22   Q.   And generally what topics were discussed at these board

23   meetings with KPMG?

24   A.   Generally, the topics were around how the current year's

25   inspection, what was going -- whatever inspection was in

J34dmid1                          Hanson - direct

1    process, how the firm was addressing the most significant

2    deficiencies that were recurring as reported in past inspection

3    reports.  Sometimes the focus would be on what was working well

4    and why, what was not working, and what are you going to do

5    about it.  Sometimes the topics would range into other oral

6    events such as some of the challenges that U.S. companies faced

7    with some of the -- the economic challenges at various European

8    countries, sometimes organizational leadership changes that the

9    firm had done or was contemplating.  That's the general nature

10   of the discussions across all the firms.

11   Q.  And were those meetings important to you as a PCAOB board

12   member?

13   A.  Yes.

14   Q.  And why were they important?

15   A.  I felt that I got some information from the firm to better

16   understand what they were doing and factor that into my views

17   of their overall efforts to improve their audit quality.

18   Q.  And was the firm -- was KPMG informed in advance of the

19   meeting as to what topics the PCAOB board wanted to discuss at

20   the meeting?

21   A.  Yes.

22   Q.  And how did that occur?

23   A.  In general, they were provided a written agenda for the

24   meeting.

25   Q.  And do you know how far in advance of a meeting KPMG would

J34dmid1                        Hanson - direct

1    receive the written agenda?

2    A.  My understanding is it varied from two weeks to maybe just

3    a few days.

4    Q.  And did there come a time when you attended meetings with

5    Mr. Middendorf that occurred soon before the PCAOB board

6    meetings?

7    A.  Yes.

8    Q.  And how did that come about?

9    A.  Sometime after I started with the board in 2011, I was

10   approached by a member of leadership of another firm with just

11   a request that they wondered if I would be willing to meet with

12   them before their scheduled meeting with the board to share my

13   personal views on what I thought was most important to get out

14   of the meeting.  And after having several meetings like that

15   with other firms, I made it known to all the firms that I could

16   that if anybody wanted to talk with me before the meeting,

17   phone call or meeting, I would be willing to do that.

18   Q.  And did you make it known to KPMG?

19   A.  Yes.

20   Q.  Do you recall who at KPMG you made it known to?

21   A.  Yes.

22   Q.  Who was that?

23   A.  It would have been either Mr. Middendorf or at the time his

24   boss, the Vice Chair of Audit, Mr. Liddy, or both of them.

25   Q.  And did Mr. Liddy or Mr. Middendorf accept your offer to

J34dmid1                          Hanson - direct

1    have the meetings that you just described?

2    A.   Yes.

3    Q.   Did the other Big Four firms also accept your offer?

4    A.   Some yes, but it was inconsistent.

5    Q.   And was Mr. Middendorf present at the first I'll call it a

6    preboard meeting, if that is OK with you, was Mr. Middendorf

7    present at the first preboard meeting that you had with KPMG?

8    A.   To the best of my recollection, yes.

9    Q.   And was he there with Mr. Liddy as well?

10   A.   Yes.

11   Q.   And besides Mr. Middendorf and Mr. Liddy, who else attended

12   the first preboard meeting?

13   A.   I don't recall who else attended the first one.

14   Q.   Did you bring anybody with you to the first meeting, that

15   you recall?

16   A.   I don't specifically recall who came with me for the first

17   meeting, but generally I brought another one of my fellow board

18   members with me to a meeting.

19   Q.   And why was that?

20   A.   I understood the general guidance provided to board members

21   was that for meetings of any kind with firm leadership, that it

22   was advisable to have another board member or staff

23   representative of the PCAOB accompany the board member.

24   Q.   So you observed that rule?

25   A.   Yes.

J34dmid1                          Hanson - direct

Q.  And did your -- did anybody from your staff attend any of

the preboard meetings with Mr. Middendorf?

A.  Yes.

Could I go back?

Q.  You want to correct an answer?

A.  Yes.  What I just said, it was not an unqualified yes to

that prior question about did somebody accompany me.  I made

every effort to have somebody with me.  There may have been an

occasion or two where the circumstances were such that I ended

up meeting by myself.

Q.  Understood.  And was there a particular board member who

would accompany you to these preboard meetings with

Mr. Middendorf when you brought somebody with you?

A.  Yes.  I believe I said my fellow board member, Jeanette

Franzel.

THE COURT:  Jeanette Franzel?

THE WITNESS:  Yes.

THE COURT:  Is that F-r-a-n-z-e-l-l?

THE WITNESS:  A single L.

THE COURT:  OK.  Thanks.

BY MR. BOXER:

Q.  And at these preboard meetings, did anyone from your staff

also attend?

A.  I don't specifically recall for the premeetings, especially

with KPMG, if any of my staff came with me.

J34dmid1                          Hanson - direct

Q.   Did you inform your staff that you were having the preboard

meetings with Mr. Middendorf?

A.   Yes.

Q.   Did you inform your fellow board members that you were

having the preboard meeting -- preboard meetings with

Mr. Middendorf?  Did you let the other board members know about

that?

A.   Generally other than Ms. Franzel, I did not make it a habit

of telling my fellow board members about the meetings.

Q.   And specifically to Mr. Middendorf, what do you recall

being discussed at the preboard meetings that Mr. Middendorf

attended with you?

A.   I don't have any recollection of any specific discussions,

but the general discussion would have been my views of the

topics presented to them in the agenda and my questions that I

had that may have been in more depth than I would have asked

with the full board just as a practical -- not enough time in a

full board meeting to get all the questions that I had, and the

ability to have a conversation and question him on things in

the agenda that the board was interested in that I was

particularly interested in that would help inform me personally

as to what questions I may raise with the full board in the

meeting.

Q.   And was the purpose of these preboard meetings to help KPMG

prepare for the board meetings?

J34dmid1                         Hanson - direct

1   A.  I believe that they understood or that they -- well, I

2   viewed it as a way to share my personal views of what I felt

3   was most important to me on the agenda.

4   Q.  And did you believe that that would help KPMG be better

5   prepared at the actual board meeting?

6   A.  Yes.

7   Q.  Did you review the agenda with Mr. Middendorf at these

8   preboard meetings?

9   A.  Generally, yes.

10  Q.  And were there instances when the agenda had not yet been

11  released to KPMG at the time of these preboard meetings?

12  A.  Yes.

13  Q.  And were there instances where you handed a draft agenda to

14  Mr. Middendorf for his review at these preboard meetings?

15          MS. MERMELSTEIN:  Objection to all the leading, your

16  Honor.

17          THE COURT:  Sustained, but just with a warning.  This

18  one is fine.

19          MR. BOXER:  Understood.

20  BY MR. BOXER:

21  Q.  Do you recall whether or not you ever provided any

22  materials to Mr. Middendorf during these preboard meetings?

23  A.  I don't recall specifically.  I do recall a meeting where,

24  to my surprise, the agenda had not been provided to the firm

25  yet and I used my personal copy of the draft agenda with my

J34dmid1                          Hanson - direct

1   views of what the agenda should be, which in the normal process

2   of creating the agenda, board members would provide their views

3   as to what should be on the agenda.  And it might be wording,

4   it might be ordering, it might be additional topics to add, it

5   might be questions about why topics are on there.  So I recall

6   that I had my version of the draft that I had hoped would be

7   the agenda, not knowing what the final agenda would be, and I

8   would have discussed what I viewed to be the agenda not knowing

9   if it was going to be the final agenda.

10  Q.  And did you give that agenda that you just described that

11  had your personal views did you give that to Mr. Middendorf to

12  keep at the meeting?

13  A.  I don't recall if I gave it to him or not.

14  Q.  Do you recall approximately when this meeting that you just

15  described took place?

16  A.  No.

17          MR. BOXER:  If we can show the witness Exhibit M13,

18  not yet in evidence, please.

19          (Pause)

20  Q.  I just ask you to take a look at that, Mr. Hanson, and tell

21  me if you recognize it.

22  A.  I don't specifically recall this exact document, but it

23  appears to be a calendar invite for --

24  Q.  From you?

25  A.  From me.  That's what it shows.

J34dmid1                         Hanson - direct

1    Q.  You can't describe it until it is evidence.  You shouldn't

2    be describing it too much.

3              MR. BOXER:  I offer it, your Honor, M13.

4              THE COURT:  M13, any objection?

5              MS. MERMELSTEIN:  No, your Honor.

6              THE COURT:  M13 is received.

7              (Defendant's Exhibit M13 received in evidence)

8    BY MR. BOXER:

9    Q.  I apologize for interrupting, but now, Mr. Hanson, if you

10   could just describe what M13 is?

11   A.  The document in front of me shows "Appointment" across the

12   top, which to me suggests it was something from an Outlook

13   calendar invite, that shows it is sent from me to myself,

14   Jeanette Franzel, Nancy George, who I don't know but I assume

15   was an administrative person at KPMG, and Jim Liddy to set the

16   date and time for a meeting with what appears to be a lunch

17   meeting.

18   Q.  With you and Ms. Franzel, a fellow board member?

19   A.  Yes.

20   Q.  And the lunch meeting is at a hotel in Washington, D.C.,

21   correct?

22   A.  Yes.  And I can see the subject says "Lunch meeting."  What

23   I don't understand is the start time shows 5:30 p.m.  That

24   doesn't make any sense to me.

25   Q.  It doesn't.  And I could just represent that the times in

J34dmid1                    Hanson - direct

1   some instances is it fair to say are Greenwich Mean Time, is

2   that --

3            MS. MERMELSTEIN:  I'm not sure counsel should be

4   representing anything.

5            MR. BOXER:  Withdrawn.

6            MS. MERMELSTEIN:  It is fine.

7   BY MR. BOXER:

8   Q.  Leaving aside the time -- withdrawn.

9            Do you know where Mr. Middendorf worked, where his

10  office was

11  A.  I understood it to be New York City.

12  Q.  OK.  If we could show now show you what's been marked as

13  Exhibit M1.

14           Do you recognize that document?

15  A.  I don't recognize the specific document, the --

16  Q.  That's fine.

17           MR. BOXER:  I offer it, your Honor.

18           MS. MERMELSTEIN:  Your Honor, the witness is not on

19  this document, and I don't think a foundation has been laid.

20           MR. BOXER:  His name is on it.

21           MS. MERMELSTEIN:  He is not a sender or a recipient,

22  and he said he didn't recognize it.

23           THE COURT:  Sustained.

24  BY MR. BOXER:

25  Q.  Do you recall whether or not you had another preboard

J34dmid1                          Hanson - direct

1   meeting with Mr. Middendorf on April 22, 2015?

2   A.  I don't recall a specific date for a meeting.

3   Q.  If I could show you again M1 and ask you to look at that

4   and just tell me if that refreshes your recollection as to

5   whether or not you had a meeting -- well, I'll wait until you

6   are done reading it.

7   A.  The subject line --

8   Q.  Please don't read from it.

9         Have you looked at it?

10  A.  I have looked at it.

11  Q.  OK.  We can take it off the screen.

12        Does that refresh your recollection that a preboard

13  meeting occurred between you and Ms. Franzel and Mr. Middendorf

14  on April 22, 2015?  Does it refresh your recollection?

15  A.  It refreshes my recollection that the location specified in

16  the email was a location that I remember having a meeting at.

17  I don't remember the date.

18  Q.  And what was that location?

19  A.  Reagan Airport.

20  Q.  And where -- do you recall who was at this meeting at

21  Reagan Airport besides you and Mr. Middendorf?

22  A.  Yes.

23  Q.  Who else was present?

24  A.  Mr. Liddy.

25  Q.  And was anybody -- was another PCAOB board member with you

J34dmid1                          Hanson - direct

1   as well?

2   A.   If my memory serves me correct, Ms. Franzel was intending

3   to be at the meeting with me and got held up in another meeting

4   so I was by myself.

5   Q.   And where in Reagan Airport do you recall the meeting took

6   place?

7   A.   At a restaurant.

8   Q.   And why did it occur at Reagan Airport, do you recall?

9   A.   I don't recall the specifics other than timing was -- the

10  timing and logistics for setting these meetings were often a

11  challenge, and I don't recall if I had -- well, I recall that

12  they flew in to meet with me.  I don't recall my personal

13  circumstance as to why we chose Reagan.

14  Q.   And do you recall anything about the substance of the

15  meeting?

16  A.   I recall that that was the meeting that I was surprised

17  that they didn't have the agenda with them, so that I just

18  shared my personal views of what was my personal draft, not

19  knowing that that was going to be the final agenda.

20  Q.   And do you recall what those personal views or topics were

21  that were discussed at that meeting?

22  A.   Not specifically.

23  Q.   And do you recall attending a preboard meeting on

24  February 4, 2016, with Mr. Middendorf?

25  A.   I don't recall a specific meeting on that date.

J34dmid1                      Hanson - direct

1    Q.  I am going to show you what's marked as M73 and again ask

2    you to just look at it to see if it refreshes your

3    recollection, and then look up and I will ask you the question

4    again.

5              (Pause)

6    A.  I can see the information but I --

7    Q.  Sorry to interrupt you again.

8    A.  I don't specifically recall that meeting.

9    Q.  OK.  Do you recall at one of your meetings -- you can take

10   it down.

11             Do you recall that one of your meetings with

12   Mr. Middendorf occurred at the Capital Hill Hilton in

13   Washington, D.C.?

14   A.  Could you be a little more precise on that, that

15   description of the hotel?

16   Q.  It's the Capital Hill Hilton, the Northgate Grill

17   Restaurant.  Do you recall a meeting taking place there?

18   A.  I don't believe there is a hotel called -- I am not aware

19   of a hotel called the Capital Hill.  I understand there is a

20   Capital Hilton, but I don't specifically recall a meeting

21   there.

22   Q.  At the Capital Hilton?

23   A.  No.

24   Q.  And did there come a time when instead of Mr. Liddy someone

25   else attended these preboard meeting with you and

J34dmid1                          Hanson - direct

1   Mr. Middendorf?

2   A.   Yes.

3   Q.   And who was that?

4   A.   Mr. Scott Marcello was the one after Mr. Liddy -- after

5   Mr. Liddy's position was replaced by Mr. Marcello, he started

6   attending the meetings.

7   Q.   And do you recall that in one instance, instead of a

8   meeting, you had a phone call with Mr. Middendorf before the

9   board meeting?

10          MS. MERMELSTEIN:   Objection to leading, your Honor.

11          THE COURT:   Overruled.

12  A.   I don't specifically recall a phone call.

13          MR. BOXER:   OK.   If I could show the witness what's

14  marked as Exhibit M130.

15          And if you could -- if we could scroll down to the

16  bottom.

17          And then scroll up to the top.

18          (Pause)

19  Q.   Do you recognize this document?

20  A.   I don't specifically recall or recognize it, but it appears

21  to be interaction back and forth about setting up a meeting.

22  Q.   Emails between you and Mr. Middendorf?

23  A.   Yes.

24          MR. BOXER:   I offer it, your Honor.

25          MS. MERMELSTEIN:   Objection to the hearsay, your

J34dmid1                          Hanson - direct

1    Honor.

2             MR. BOXER:  It is not offered for the truth, your

3    Honor.

4             THE COURT:  Overruled.  M130 is received.

5             (Defendant Middendorf Exhibit M130 received in

6    evidence)

7             MR. BOXER:  If we could go to the bottom email,

8    please.

9    Q.  And if you could read the last two sentences of that email

10   from Mr. Middendorf to you on September 6, 2016, please?

11            If you could read that out loud.

12   A.  "I wanted to reach out and see if you, and Jeanette, would

13   have some time to meet with Scott Marcello and myself before

14   our meeting with the Board to help us prepare and get some idea

15   of what may be on the agenda.  Could you provide some dates and

16   time you would be available to meet with us?"

17   Q.  Then if we go up to the bottom of the first page, if you

18   could read the second paragraph of your response to

19   Mr. Middendorf?

20   A.  "We have not had our internal prep meeting yet, and I can't

21   find that it has been scheduled.  However, let's get something

22   on the calendar to talk.  Here are some dates that would work

23   for a meeting or call."

24   Q.  So is it fair to say that -- withdrawn.

25            What did you mean by when you said "we have not had

J34dmid1                        Hanson - direct

1    our internal prep meeting yet"?

2    A.   Before an agenda would be presented to the firm for

3    purposes of preparing for the meeting with the board, there

4    would be an internal prep meeting involving the PCAOB board and

5    relevant staff from the Inspections Division to share with the

6    board an overview of how the current year's inspection was

7    going, any relevant things that the staff thought was

8    appropriate to bring to the attention of the board.  At the

9    board prep meetings, there was typically a draft agenda

10   presented to the board for feedback.  Some but not all board

11   members were usually present at those meetings.  And at the

12   conclusion of those meetings, the staff took whatever input

13   they received from the board, whether it be oral or a written

14   input, and from that point made decisions.  And I personally

15   don't know how the decisions are made or what exactly would be

16   on the agenda, but at some point subsequent to that, the

17   internal prep meeting involving the board, the agenda would be

18   transmitted to the firm.

19   Q.   And looking at M130, are you indicating to Mr. Middendorf

20   that you wanted to meet with him after that internal prep

21   meeting took place?

22               MS. MERMELSTEIN:  Objection to leading.

23               THE COURT:  Overruled.

24   A.   My general practice was meeting with the firm when they had

25   the agenda in their hands, and sometimes just for pure

J34dmid1                        Hanson - direct

1    logistics to get something on the calendar, as I suggested

2    here, I wanted to get something on the calendar expecting that

3    by the time I came, the firm would have the agenda from the

4    board -- or from the staff, as it transmitted it, as a basis

5    for the discussion.

6    Q.  I would like to show you now what's marked as M129.

7         And do you recognize that document, just generally?

8    A.  Generally, this looks like a calendar --

9              MR. BOXER:  I offer it, your Honor.

10             MS. MERMELSTEIN:  No objection.

11             THE COURT:  129 is received.

12             (Defendant's Middendorf Exhibit M129 received in

13    evidence)

14             MR. BOXER:  If we can display it to the jury.

15    BY MR. BOXER:

16   Q.  What is the subject of M129?

17   A.  "Discuss meeting with PCAOB board on September 29th."

18   Q.  And the date for the phone call is September 26th?

19   A.  Correct.

20   Q.  Is this an invitation for a phone call for a preboard

21   meeting of the kind you have been describing this morning?

22   A.  Yes.

23   Q.  OK.  During these preboard meetings with Mr. Middendorf,

24   did you ever discuss with him your understanding of what the

25   mission of the PCAOB is?

J34dmid1                        Hanson - direct

1    A.  I don't recall ever discussing that, no.

2    Q.  Did you ever discuss with him audit quality at any of those

3    meetings?

4    A.  Yes.

5    Q.  And what do you recall about those discussions?

6    A.  I don't recall specifics, but the general discussions would

7    have been around the things that KPMG was doing to improve

8    audit quality in the areas where there were deficiencies

9    identified.

10   Q.  Did you ever discuss with Mr. Middendorf your view on

11   things the PCAOB was doing or not doing to improve audit

12   quality?

13             MS. MERMELSTEIN:  Objection to leading and relevance.

14             MR. BOXER:  It goes to his state of mind, your Honor.

15             MS. MERMELSTEIN:  Your Honor, I think this was

16   submitted specifically in the letter.

17             THE COURT:  Overruled.

18             You can answer it.

19             THE WITNESS:  I'm sorry, could you repeat the

20   question?

21             MR. BOXER:  Sure.

22   BY MR. BOXER:

23   Q.  Did you ever discuss with Mr. Middendorf your view on

24   things that the PCAOB was doing or not doing to improve audit

25   quality?

J34dmid1                        Hanson - direct

```
1   A.  I don't specifically recall any discussions like that.

2   Q.  Do you recall any general discussions on that topic?

3   A.  Well, I recall general discussions that I have had with

4   many people about my views of what the PCAOB should be -- could

5   be doing to improve audit quality, but I don't recall

6   specifically any discussions with KPMG on that topic or Dave

7   Middendorf.

8   Q.  And what general discussions on that topic do you recall?

9           MS. MERMELSTEIN:  Objection, your Honor.

10          MR. BOXER:  Let me try it this way.

11  Q.  Were those -- you said you had discussions about your views

12  of what the PCAOB should be doing with many people, correct?

13  A.  Correct.

14  Q.  Were those public discussions that you were just referring

15  to?

16  A.  I don't specifically recall those, but in my role as a

17  board member, I gave many speeches, met with many groups

18  outside the PCAOB, and I recall that I routinely would have

19  shared my views on things that I thought the PCAOB could do

20  towards improving -- helping all registered firms improve audit

21  quality.

22  Q.  And what were those things that you shared routinely as to

23  what all firms could be doing to improve audit quality?

24          MS. MERMELSTEIN:  Objection, your Honor.

25          THE COURT:  Sustained.
```

J34dmid1                         Hanson - direct

1   BY MR. BOXER:

2   Q.  Did you -- do you recall discussions with Mr. Middendorf at

3   these preboard meetings about PCAOB inspections?

4   A.  Yes.

5   Q.  And what do you recall about what you said at preboard

6   meetings about PCAOB inspections?

7   A.  I don't recall any specific things that I would have said,

8   but generally I was interested in hearing Mr. Middendorf's

9   views as to the progress in the current inspection progress

10  overall in addressing inspection deficiencies.

11  Q.  Did you have any discussions at these preboard meetings

12  with Mr. Middendorf about PCAOB inspectors?

13          MS. MERMELSTEIN:  Objection, your Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  Could you repeat the question?

16  BY MR. BOXER:

17  Q.  Did you have any discussions at these preboard meetings

18  with Mr. Middendorf about PCAOB inspectors?

19  A.  I recall some -- yes, I recall some discussions.

20  Q.  You do or you don't?  I'm sorry.

21  A.  Yes.

22  Q.  And could you describe those discussions --

23          MS. MERMELSTEIN:  Objection.

24  Q.  -- to Mr. Middendorf, what you said to Mr. Middendorf?

25          MS. MERMELSTEIN:  Objection to hearsay, relevance, and

J34dmid1                         Hanson - direct

1    I think this has been briefed and your Honor ruled on this this

2    morning.

3              MR. BOXER:  I'm not sure what ruling we are referring

4    to, but I think it is not being offered for the truth, it's a

5    board member speaking to Mr. Middendorf.

6              THE COURT:  Overruled.

7              You can answer.

8              MR. BOXER:  Should I repeat it?

9              THE WITNESS:  Yes.

10             MR. BOXER:  OK.

11   BY MR. BOXER:

12   Q.  Could you describe discussions that you had with

13   Mr. Middendorf about PCAOB inspectors?

14   A.  I don't remember specific discussions, but the discussions

15   sometimes I recall were Mr. Middendorf just --

16             MS. MERMELSTEIN:  Objection, your Honor, to what

17   Mr. Middendorf said.

18             THE COURT:  Sustained.

19   Q.  If you could describe what you recall generally you said on

20   that topic to Mr. Middendorf?

21   A.  The only thing I recall with any specificity is at the time

22   KPMG hired a particular senior person from the PCAOB that I had

23   personally interacted with many times in my role as a board

24   member, and I thought this particular person was a very solid,

25   sound, quality individual and I thought it was a good addition

J34dmid1                           Hanson - direct

1   to his firm.

2   Q.  Do you recall the name of that individual?

3   A.  Yes.

4   Q.  And what was his name?

5   A.  Her name was Louann.

6   Q.  I apologize.  What was her name?

7   A.  Louann Sakala.

8   Q.  Sakala?

9   A.  Sakala.  I don't know the spelling of that.

10  Q.  Did you at these preboard meetings have any discussions

11  with Mr. Middendorf about KPMG's performance on the inspection

12  reports?

13  A.  Yes.

14  Q.  And what do you recall about those discussions?

15  A.  My general recollection was the -- KPMG's focus on reducing

16  the number of inspection findings and improving audit quality

17  and the things that they were doing to improve audit quality.

18  Q.  And do you recall any discussion with Mr. Middendorf where

19  those two concepts, audit quality and improving inspection

20  performance, you had discussions with him about those two

21  concepts together?

22  A.  Yes.

23  Q.  And what do you recall about that?

24  A.  I recall a general discussion about the efforts of KPMG to

25  reduce inspection findings should be holistic in terms of

J34dmid1                        Hanson - direct

1    improving audit quality which would then result in fewer

2    inspection findings.

3    Q.   What do you mean by "holistic"?

4    A.   Focused on all clients in ensuring the compliance with the

5    PCAOB standards, which would then result in fewer inspection

6    findings.

7    Q.   And did you have any discussion at that time with

8    Mr. Middendorf about whether or not the PCAOB inspectors were

9    acting in a holistic way?

10              MS. MERMELSTEIN:   Objection.

11              THE COURT:   Overruled.

12   A.   I don't recall a conversation like that.

13   Q.   If I could show you what's marked as JH1, and ask you -- do

14   you have it?

15              MR. BOXER:   May I approach, your Honor?

16              THE COURT:   Yes.

17              (Pause)

18   Q.   If you can look at what's marked as JH1, the sixth

19   paragraph, and I ask you if you could read that, and then when

20   you are done reading it, put it down.

21   A.   So you're asking me just to read --

22   Q.   Just to read it.   Then I am going to ask --

23              THE COURT:   To yourself.

24              MR. BOXER:   To yourself.

25              Thank you, your Honor.

J34dmid1                          Hanson – direct

1              MS. MERMELSTEIN:  Your Honor, I apologize.  May we

2        approach?

3              THE COURT:  Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J34dmid1                        Hanson - direct

1                (At the sidebar)

2                MS. MERMELSTEIN:  Mr. Boxer is now treading broadly

3       into the topics that we moved to preclude and which he said he

4       would not go into.  He has just attempted to refresh

5       Mr. Hanson's recollection that Mr. Hanson had previously said

6       that there was an attitude at the PCAOB about "gotcha"

7       mentality where they were sort of looking for problems.  Much

8       of that it is clear is in fact based on hearsay, although the

9       question does not say did someone tell you, because this is a

10      witness who was never an inspector, he was never a member of an

11      inspection team.  His only information about sort of what

12      people were doing on the ground is hearsay.

13                Separately, it is completely irrelevant.  The notion

14      that somehow some PCAOB inspectors were harsh or that there was

15      an attitude of looking for problems is irrelevant.  The

16      question here is not whether or not the PCAOB was overly harsh

17      as a regulator, and it's irrelevant and prejudicial.  So,

18      nothing about this should be asked.

19                MR. BOXER:  A few things, your Honor.

20                First, this is a PCAOB board member speaking with our

21      client, so the state of mind as far as Mr. Middendorf is very

22      relevant.  And I think the relevance is that -- I'm not sure he

23      is going to remember this, but the relevance is that when it

24      comes to 2016 and he authorizes a review of the workpapers, he

25      does that because he thinks -- he intends for them to get a

J34dmid1                        Hanson - direct

1  fair shake on the inspection knowing that -- from the board

2  member, that inspectors are out there to find problems.  And it

3  is an unfairness and that's why he does it, for better or

4  worse.

5          As far as him never being an inspector, I think all of

6  that goes to the weight of the evidence.  But he is sitting

7  down at this somewhat secret meeting with a member of the

8  board, and the board member is saying instead of worrying about

9  holistic audit quality, he's concerned that the inspectors are

10  just trying to play gotcha and find comments.  So my client has

11  that in his mind when this list comes in 2016, and he says,

12  yeah, go ahead, do the rereview, look at the workpapers, make

13  sure they are as clear as they could be so that they can't play

14  a game of gotcha.  That is the relevance of it.

15          I don't know if he is going remember it or not.  It is

16  actually my last question so I don't have any further place to

17  go on this.

18          MS. MERMELSTEIN:  That just makes clear the problem,

19  your Honor.  If Mr. Middendorf's defense is that it was OK to

20  cheat because the test was unfair, then that is not a

21  legitimate defense and the question is not proper.  And I also

22  think it is hugely problematic to put to this witness this

23  general what did you discuss, because what Mr. Middendorf said

24  is hearsay.  And if he wants to put in what he said, then he

25  should testify, as he may do.

J34dmid1                           Hanson - direct

1                What Mr. Hanson said may or may not be relevant to

2     state of mind.  It is clearly not in this case.  But it can't

3     be lumped together in that fashion to avoid the hearsay issue

4                MR. BOXER:  I just want to correct something counsel

5     said.  The defense is not that it was OK to cheat.  He didn't

6     view it as cheating because AS 3 was complied with and they

7     were in the documentation period.  Why he allowed it, why he

8     permitted it was informed by what he heard from the board

9     member.

10               THE COURT:  I think this is tricky because I think it

11    could be relevant to state of mind in terms of the overall

12    background.  It is a communication from a PCAOB board member,

13    which I think is significant.  I think it is tricky to go too

14    much into this because it could get into cross-examination on

15    the terms of this witness' separation from the PCAOB, which I

16    precluded testimony that I think goes to opinion that could

17    improperly elicit bias and motive, but this is getting closer.

18               If you think this is the last question on this, I'm

19    going to allow you to refresh and see where that goes.

20               MR. BOXER:  It will be the last question, your Honor,

21    and it is actually the last question of the examination.

22               MS. MERMELSTEIN:  Your Honor, I think, two things.  I

23    think one is it is important that that question make clear what

24    Mr. Middendorf said versus what Mr. Hanson said.  I think those

25    things are very different.  And I think the letter your Honor

J34dmid1                         Hanson – direct

1    may refer to is still ex parte and under seal with respect to

2    the bias issue.

3              THE COURT:  I received two ex parte letters.

4              MR. BOXER:  I was going to say --

5              MS. MERMELSTEIN:  But we have not -- we may or may not

6    want to be heard depending on where this goes.

7              MR. BOXER:  For the record, this is the first I'm

8    hearing of the ex parte letters, and I am actually unaware of

9    any topic that would be ex parte with regard to this witness.

10   So whatever was written about it, I'm sure I am not going

11   there?

12             MS. MERMELSTEIN:  I don't think you are going there.

13   We may want to go there.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J345mid2                           Hanson - cross

1              (In open court)

2    BY MR. BOXER:

3    Q.  Mr. Hanson, having looked at Exhibit JH-1, does that

4    refresh your recollection about any statements you made to

5    Mr. Middendorf during these pre-board meetings about improving

6    audit quality and the actions of the inspectors at the PCAOB?

7    A.  I don't recall specific discussions like that with

8    Mr. Middendorf.

9    Q.  Do you recall any general discussions?

10   A.  No.

11   Q.  I will take the exhibit back.

12           MR. BOXER:  I have nothing further, your Honor.

13           THE COURT:  Thank you.

14           Ms. Mermelstein?

15           MS. MERMELSTEIN:  Thank you, your Honor.

16   CROSS EXAMINATION

17   BY MS. MERMELSTEIN:

18   Q.  Good morning, Mr. Hanson.

19   A.  Good morning.

20   Q.  You mentioned in your direct testimony on a number of

21   occasions the Big Four, that is, Ernst & Young, KPMG, Deloitte

22   and PwC; is that right?

23   A.  That's correct.

24   Q.  Those are the largest four accounting firms in the United

25   States?

J345mid2                         Hanson - cross

1    A.  That's correct.

2    Q.  And they're sort of in their own category, that's why they

3    get talked about as the Big Four all the time?

4    A.  That's correct.

5    Q.  The PCAOB regulates auditors, right?

6    A.  Correct.

7    Q.  The SEC also regulates auditors, right?

8    A.  That is my understanding.

9    Q.  For example, the SEC sets auditor independence rules?

10   A.  That's my understanding.

11   Q.  They bring enforcement actions directly against auditors?

12   A.  Yes.

13   Q.  Which the PCAOB does as well?

14   A.  Yes.

15   Q.  And the SEC oversees the PCAOB, right?

16   A.  That's correct.

17   Q.  So, for example, it approves the budget?

18   A.  Yes.

19   Q.  It appoints board members like you?

20   A.  Yes.

21   Q.  And, as a PCAOB board member, you interacted somewhat

22   frequently with the SEC, right?

23   A.  Yes.

24   Q.  You provided the SEC with updates on what the PCAOB was

25   seeing in inspections?

J345mid2                           Hanson - cross

1    A.  Yes.

2    Q.  And then the SEC and the PCAOB considered, among other

3    things, the inspection findings in considering how to set or

4    change audit standards or whether or not audit standards should

5    be changed?

6              MR. WEDDLE:  Objection to the form of the question.

7              THE COURT:  I'm sorry?

8              MR. WEDDLE:  Objection to the form.

9              THE COURT:  If you could please rephrase.

10   BY MS. MERMELSTEIN:

11   Q.  Sure.  One of the things -- withdrawn.

12            The SEC and PCAOB consulted about the setting of new

13   audit standards; is that right?

14   A.  Broadly using the word consulting, yes.

15   Q.  And one of the things that was considered in whether or not

16   a new audit standard should be implemented or whether or not

17   the existing standard was appropriate was inspection findings

18   with respect to that audit standard, right?

19   A.  Yes.

20             MR. WEDDLE:  Object to the form.

21             THE COURT:  Overruled.

22   BY MS. MERMELSTEIN:

23   Q.  The SEC also received the PCAOB inspection reports, right?

24   A.  Correct.

25   Q.  They received both the public and the non-public version,

J345mid2                         Hanson - cross

1  right?

2  A.   That is my understanding.

3  Q.   And they received the identity of the issuers that were

4  anonymized for the public?

5  A.   That's correct.

6  Q.   In some instances the SEC followed up with the PCAOB about

7  the content of insection reports, right?

8            MR. BOXER:  Objection.

9            THE COURT:  Overruled.

10           THE WITNESS:  That is my understanding.

11  BY MS. MERMELSTEIN:

12  Q.   So, for example, representatives from the SEC's Office of

13  the Chief Accountant came to the PCAOB physically to review

14  comment forms and the other underlying documentation that

15  contained much more detail about inspection results than the

16  inspection report itself?

17           MR. BOXER:  Objection.  Compound.

18           THE COURT:  If you understand the question you can

19  answer.

20           THE WITNESS:  I understand the question and that's my

21  understanding.

22  BY MS. MERMELSTEIN:

23  Q.   Now the principal way by which PCAOB regulates auditors is

24  through the inspection process, right?

25           Are you struggling with principal?

J345mid2                         Hanson - cross

1          MR. BOXER:  Objection, your Honor.  He is trying to

2     answer.

3          THE COURT:  Sustained.

4     BY MS. MERMELSTEIN:

5     Q.   The vast majority of the PCAOB's personnel work on

6     inspections, right?

7     A.   I'm not sure if I understand the full characterization of

8     vast majority.  I can tell you the numbers as I recall them.

9     Q.   How many people on PCAOB work on inspections as inspectors?

10    A.   The inspectors division includes approximately 500 people.

11    Q.   So, more than half of the total personnel of the PCAOB?

12    A.   That's correct.

13    Q.   And, the PCAOB doesn't notify a firm of a particular

14    inspection until shortly before that inspection is going to

15    take place, right?

16    A.   That's my understanding.

17    Q.   And after the expiration of the 45-day documentation

18    period, right?

19    A.   That's my understanding.

20    Q.   The documentation period is, to put it colloquially, an

21    opportunity for the firm to put a bow on its work, right?

22         MR. BOXER:  Objection.

23         THE COURT:  Sustained.

24    BY MS. MERMELSTEIN:

25    Q.   Have you previously described the documentation period as

J345mid2                          Hanson - cross

1   an opportunity for a firm to put a bow on its work?

2   A.  Yes.

3   Q.  And the purpose of that is not for the firm to be doing new

4   audit work, right?  That's prohibited?

5   A.  That's correct.

6   Q.  And it is not for extensive documentation to be done?

7              MR. BOXER:  Objection.

8              THE COURT:  Overruled.

9   BY MS. MERMELSTEIN:

10  Q.  If you can answer the question and then I will let you

11  clarify.  The purpose is not for extensive documentation to be

12  done during the 45 days, right?

13             MR. BOXER:  Objection.

14             THE COURT:  Overruled.

15             You can testify to your understanding.

16             THE WITNESS:  I understand the purpose is not to do

17  extensive documentation in that 45-day period.

18  Q.  To go back, with respect to doing new audit work in the 45

19  days, that is generally prohibited, right?

20             MR. BOXER:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  When you say "generally," there is a

23  provision that if additional audit work is done then certain

24  protocols must be followed.

25  BY MS. MERMELSTEIN:

J345mid2                         Hanson - cross

1    Q.  You have gotten ahead of me.

2            So, if new audit work has to be done, that has to be

3    carefully documented, right?

4    A.  That's correct.

5    Q.  There has to be a record that new audit work was performed

6    after the expiration of the 45 days, right?

7    A.  That's correct.

8    Q.  Now, the reason that the PCAOB doesn't notify a firm that

9    an inspection is going to occur until after the 45 days have

10   expired is because it wants to see exactly what work the firm

11   had done prior to the notice being received, right?

12           MR. BOXER:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  That's my general understanding.

15   BY MS. MERMELSTEIN:

16   Q.  And it wants to see what the quality of the documentation

17   was prior to the notice being received, right?

18   A.  That's my understanding.

19   Q.  And quality of the documentation work can affect whether or

20   not a comment is written, right?

21   A.  I personally struggle to answer precisely that question

22   because I understand -- my personal view is the quality of the

23   documentation could affect the, whether an issue is raised or

24   comment is written but I was personally never an inspector, I

25   never sat in the chair of making that decision.

J345mid2                          Hanson - cross

1    Q.   So, that's just your view?

2    A.   Yes.

3    Q.   As a board member of the PCAOB you're familiar with the

4    PCAOB ethics code; is that right?

5    A.   Yes.

6    Q.   In fact, you had to certify your compliance with the ethics

7    code each year?

8    A.   Yes.

9    Q.   And, in particular, you are familiar with EC 9?

10   A.   Yes.

11   Q.   That governs confidentiality of the PCAOB information?

12   A.   Yes.

13   Q.   You are also familiar with the Sarbanes-Oxley Act, right?

14   A.   Generally familiar.  I don't know the specific words in it

15   anymore.

16   Q.   Fair enough.

17          The focus area for a particular inspection is

18   confidential PCAOB information, right?

19          MR. WEDDLE:  Objection, your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  That is my understanding.

22   BY MS. MERMELSTEIN:

23   Q.   Now, sometimes the PCAOB would publicly announce a

24   particular area that was going to be something the PCAOB looked

25   at in a particular year.  It might say we are interested in

J345mid2                         Hanson - cross

1    this particular audit standard, for example; right?

2    A.   That is correct.

3    Q.   That is not the same thing as giving advance notice of what

4    the focus areas would be for particular inspections, right?

5                MR. BOXER:   Objection.

6                THE COURT:   Overruled.

7    A.   That's correct.

8    Q.   Now, you testified about some meetings with Mr. Middendorf

9    and Mr. Marcello or Mr. Liddy in advance of the PCAOB-KPMG

10   board meetings and, just so it is clear, in general, you

11   scheduled those meetings intentionally to occur only after the

12   firm had received the agenda for the meeting; is that right?

13               MR. BOXER:   Objection.

14               THE COURT:   Overruled.

15               THE WITNESS:   That was my goal, yes.

16   BY MS. MERMELSTEIN:

17   Q.   And I think you testified that there was one instance in

18   which you assumed the firm had received the agenda and then

19   discovered, upon arriving at the meeting, that they had not?

20   A.   That's correct.

21   Q.   And when you engaged in discussions during that particular

22   meeting, did you limit yourself to topics that you understood

23   the firm had already been made aware of?

24   A.   Yes.

25   Q.   You attended meetings with Mr. Middendorf on multiple

J345mid2                          Hanson – cross

1    occasions in 2016; is that right?

2    A.   Could you be more precise on multiple?

3    Q.   At least two, fair to say?

4    A.   That's my recollection but I don't -- I can't say that for

5    certain.

6    Q.   Did he ever tell you that he had received advance notice of

7    an inspection list for financial engagements that were going to

8    be inspected for KPMG?

9    A.   No.

10   Q.   Did he ever tell you that KPMG was going to conduct

11   re-reviews for inspections that it learned were on the PCAOB's

12   list of engagements be to be inspected?

13   A.   No.

14   Q.   Are PCAOB inspection lists confidential?

15   A.   Could you be more precise with inspection list, how you are

16   referring to?

17   Q.   PCAOB's inspection selections for a firm are highly

18   confidential until they are formally provided to the firm,

19   right?

20            MR. BOXER:   Objection.

21            THE COURT:   Overruled.

22   A.   They are highly confidential always and I understand the

23   firm understands that when they are notified about individual

24   engagement to be inspected, that they know at that time what

25   the individual issuer is.

J345mid2                        Hanson - cross

```
 1    Q.  In other words, it is confidential from the rest of the
 2    world even after the firm has been noticed?
 3    A.  Yes.
 4    Q.  But it is confidential with respect to the firm until they
 5    have been formally noticed?
 6    A.  That's correct.
 7    Q.  You are familiar with the content of auditor integrity,
 8    right?
 9    A.  Yes.
10    Q.  That's sort of the backbone of what it means to be an
11    auditor?
12    A.  That, I agree.
13    Q.  What protects the capital markets is the trust that can be
14    placed in an auditor?
15              MR. BOXER:  Objection.
16              THE COURT:  Sustained.
17    BY MS. MERMELSTEIN:
18    Q.  Part of auditor integrity is an auditor's behaving with
19    integrity in a truthful fashion, right?
20              MR. BOXER:  Objection.
21              THE COURT:  Overruled.
22              THE WITNESS:  I agree.
23    BY MS. MERMELSTEIN:
24    Q.  If the PCAOB asked an auditor to provide information about
25    how the audit firm was improving audit quality, the auditor is
```

J345mid2                          Hanson - cross

1    obligated to provide a truthful answer, right?

2    A.  I agreed.

3    Q.  An audit firm can't hide from the PCAOB that they've

4    devoted extra resources to certain audits based on the

5    possession of confidential PCAOB information, right?

6              MR. BOXER:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  I agree with that statement.

9    BY MS. MERMELSTEIN:

10   Q.  And that's true even if the extra resources devoted to

11   those audits are designed only to improve documentation, right?

12   A.  I would agree with that.

13             MS. MERMELSTEIN:  Nothing further.

14             THE COURT:  All right.  Anything further?

15             MR. WEDDLE:  I have one question, your Honor.

16             THE COURT:  Okay.  Mr. Weddle.

17   CROSS EXAMINATION

18   BY MR. WEDDLE:

19   Q.  Good morning, Mr. Hanson.  My name is Justin Weddle.  I

20   represent Jeffrey Wada in this case.

21   A.  Okay.

22   Q.  You were talking about auditor integrity.  Is it fair to

23   say that auditor integrity is a higher a standard than the bear

24   minimum required by the criminal law?

25             MS. MERMELSTEIN:  Objection, your Honor.

J345mid2                        Hanson - redirect

1           THE COURT:  Sustained.

2           MR. WEDDLE:  Thank you, your Honor.

3           THE COURT:  Mr. Boxer?

4           MR. BOXER:  Thank you, your Honor.

5           May I approach, your Honor?

6           THE COURT:  Yes.

7    REDIRECT EXAMINATION

8    BY MR. BOXER:

9    Q.  Showing you, Mr. Hanson, what will be marked as M-314.  Do

10   you recognize that document?

11          MS. MERMELSTEIN:  Your Honor, objection to the

12   relevance of this.

13          MR. BOXER:  I think it's highly relevant in light of

14   the cross, your Honor.

15   Q.  Do you recognize it?

16   A.  I recognize the document.

17   Q.  I'm sorry?

18   A.  Yes.

19   Q.  And what is it?

20   A.  It is a subpoena to testify at a hearing or trial in a

21   criminal case for Mr. Middendorf.

22          MR. BOXER:  I offer it, your Honor.

23          MS. MERMELSTEIN:  Objection, your Honor, to the

24   relevance.

25          MR. BOXER:  I think I will establish it, your Honor.

J345mid2                          Hanson – redirect

1              THE COURT:  I think I am going to reserve on that.

2              Do we need to have a side bar?

3              MS. MERMELSTEIN:  I think we would like to understand

4    where this is going, your Honor.

5              MR. BOXER:  I have a couple more questions which I

6    think will make it clear.

7              MS. MERMELSTEIN:  I think we prefer to have a proffer

8    of where it is going first, your Honor.

9              THE COURT:  Go ahead and ask your question.

10   BY MR. BOXER:

11   Q.  Have you and I met before today?

12   A.  No.

13             MS. MERMELSTEIN:  Objection, your Honor.  We would

14   like a side bar, please.

15             THE COURT:  Okay.  Side bar.

16             (Continued next page)

17

18

19

20

21

22

23

24

25

J345mid2                          Hanson - redirect

1              (At side bar)

2              MR. BOXER:  Your Honor, the witness didn't meet with

3    us even though it is our subpoena, we are the ones who brought

4    him here.  He met with the government, he prepared with them.

5    He was asked a series of questions related to the allegations

6    in the indictment.  I think it is relevant to the weight of his

7    evidence that they were able to meet and prepare with him and I

8    didn't.

9              It is very simple.

10             MS. MERMELSTEIN:  Well, first of all, it is completely

11   inaccurate to suggest that he was unable to meet with this

12   witness.  He never asked to meet with the witness, as I

13   understand it.

14             MR. BOXER:  How does Ms. Mermelstein know what I asked

15   or didn't ask?

16             THE COURT:  The notes were based --

17             MS. MERMELSTEIN:  The notes were from an investigator,

18   I believe, who met with him, not counsel.

19             That is my understanding.

20             MR. BOXER:  Yes.

21             THE COURT:  So someone on your team met with him?

22             MR. BOXER:  The investigator met with him, spoke with

23   him, served him the subpoena, and then before testifying he met

24   with the government and they prepared him for his testimony, at

25   least for the questions they were going to ask.

J345mid2                        Hanson - redirect

1              So, I think that's relevant.  It is nothing more --

2              THE COURT:  So this is a defense subpoena, right?  So.

3              MR. BOXER:  Yes.  They didn't call a PCAOB board

4    member.  We did.  And this was our subpoena to have him appear.

5              THE COURT:  It is just about the prep.  I don't see

6    why it's --

7              MS. MERMELSTEIN:  I think it is completely irrelevant

8    that a witness that was called by the defense also agreed to

9    meet with the government, your Honor.  They called this

10   witness.

11             I think it is misleading to suggest that somehow he

12   didn't meet with the defense.  He met with the government.

13   They never asked to meet with him and he would, it is my

14   understanding from discussions with his counsel, haven't met

15   with the defense.  So, I think it is misleading and I don't

16   think it is proper impeachment of their own witness.

17             MR. BOXER:  I don't think it's impeachment.  To the

18   extent it is impeaching the answers that he answered on cross

19   it shows that they were able to prepare him.  That's it.

20             MS. MERMELSTEIN:  If it is not impeachment what is its

21   relevance?  Isn't the only possible relevance to suggest his

22   answers to the government were somehow tainted because he met

23   with the government?

24             MR. BOXER:  Fair.

25             MS. MERMELSTEIN:  It has such minimal probative value

J345mid2                         Hanson - redirect

1    your Honor is going to instruct the jury it is not at all

2    unusual -- your Honor is going to instruct the jury that it is

3    not at all unusual for lawyers to meet with witnesses.  The

4    only purported probative value is to impeach his testimony on

5    cross by suggesting that it was prepared with the government

6    and --

7                THE COURT:  That is the probative value, I think.

8                MS. KRAMER:  Your Honor, may I add one thing?

9                We are unable to recross on this because we can't ask

10   this witness about communications he had with his counsel.

11   Right?  So, we can't really ask this witness, well, did

12   Mr. Boxer, did the defense ask to meet with you?

13               THE COURT:  Why can't you ask that?

14               MS. KRAMER:  I assume his knowledge is based on what

15   he learned from counsel which is protected by privilege,

16   communications with counsel.  So we understood, we were trying

17   to figure out if the witness is actually testifying that these

18   discussions happened.  So, it creates a misleading impression

19   that we are barred from correcting because of the

20   attorney-client privilege.

21               MR. BOXER:  It is simply a fact he met with them, he

22   was prepared by them.

23               MS. MERMELSTEIN:  But you are suggesting.

24               MR. BOXER:  I'm not suggesting they did something

25   wrong or improper.  I am saying, yes, it is impeachment of the

J345mid2                         Hanson - redirect

1    cross and undermines, it impeaches it.  And if it's such of

2    minimal value then I don't get why we are standing here and

3    they care so much.

4              MS. MERMELSTEIN:  I think it is prejudicial and of

5    minimal probative value.  That's why we are standing here.

6              THE COURT:  Well, I think it is fair game.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J345mid2                           Hanson - redirect

1                    (In open court)

2                    THE COURT:  M-314 is received.

3                    (Defendant's Exhibit M-314 received in evidence)

4     BY MR. BOXER:

5     Q.   Is the reason you are testifying here today because you

6     received M-314?

7     A.   Yes.

8     Q.   And have you and I met before to discuss your testimony

9     today?

10    A.   No.

11    Q.   And, have you met with Ms. Mermelstein with respect to your

12    testimony before today?

13    A.   Yes.

14    Q.   You mentioned EC 9.  What do you understand EC 9 to

15    provide?

16    A.   Without having it in front of me, it is a simple statement

17    obtained in the course of, as my personal role as a board

18    member or employee a the PCAOB, is confidential.

19    Q.   And, on the occasion where you handed over or displayed an

20    agenda that KPMG had not yet received during your meeting with

21    Mr. Middendorf --

22                   MS. MERMELSTEIN:  Object to misstating his testimony.

23                   THE COURT:  Please rephrase.

24    BY MR. BOXER:

25    Q.   Did you violate EC 9 in the instance where KPMG had not

J345mid2                        Hanson - redirect

1   received the agenda or discussed the draft agenda with

2   Mr. Middendorf?

3   A.  No.

4   Q.  Why is that?

5   A.  I had the draft that I believed should be the agenda and

6   discussed my views on that but did not represent it as a board

7   agenda, represented as my personal agenda.

8   Q.  You informed Mr. Middendorf that what I'm telling you is

9   just my personal view?

10  A.  I don't specifically recall that but just my general

11  practice would have been to issue a disclaimer that I always

12  did when speaking publicly and to others that it was my own

13  personal view.

14  Q.  So, you don't know whether you told Mr. Middendorf that

15  "this was just my personal view" at the time in that meeting?

16  A.  I don't recall explicitly doing that.

17  Q.  And you don't believe you violated EC 9 because you --

18  well, withdrawn.

19          At that meeting were you sharing non-public

20  information with Mr. Middendorf, non-public information from

21  the PCAOB?

22  A.  No.

23  Q.  It was just information coming from your head?

24  A.  That's correct.

25  Q.  And it had no bearing and no relationship to any PCAOB

J345mid2                          Hanson - redirect

1    information.  That's your testimony?

2    A.  Well, any PCAOB information.  That's a very broad

3    statement.

4    Q.  I'm asking that question.  Did you think what you shared

5    with Mr. Middendorf at Regan Airport that day had any bearing

6    on information belonging to the PCAOB?

7    A.  It was my personal -- no.  It was my personal view of what

8    I thought should be on the agenda.

9    Q.  And there were no discussions with your fellow board

10   members at that point about what should be on the agenda?

11   A.  I don't specifically recall but I believe the board

12   pre-meeting had happened by the time I met with Mr. Middendorf.

13   Q.  So, your testimony is that nothing from the board

14   pre-meeting informed your discussion with Mr. Middendorf at

15   Regan Airport; is that correct?

16   A.  The information I gathered from the pre-meeting informed my

17   personal views.

18   Q.  And you don't remember whether you told Mr. Middendorf that

19   we had the pre-meeting, it informed my personal views, but

20   these are my personal views, sort of take it for that?

21   A.  I don't recall those specific words.

22   Q.  Is it fair to say that you were left with the impression

23   that Mr. Middendorf was given a heads up as to what was going

24   to be discussed at the board meeting?

25            MS. MERMELSTEIN:  Objection.

J345mid2                          Hanson - redirect

 1              THE COURT:  Overruled.

 2              THE WITNESS:  Well, he was after the impression of my

 3     personal views about the agenda.

 4     BY MR. BOXER:

 5     Q.  Which you don't recall whether you said personal views or

 6     not?

 7     A.  I don't personally recall that discussion.

 8     Q.  I see.

 9              In the e-mail we looked at -- if we could display

10     M-130?  At the bottom of M-130, the beginning of the second

11     paragraph you write:  We have not had our internal prep meeting

12     yet; correct?

13     A.  That appears to be what I wrote, yes.

14     Q.  And you wanted to have that internal prep meeting before

15     the meeting with Mr. Middendorf occurred, right?

16     A.  Correct.

17     Q.  So, when you spoke to Mr. Middendorf after the internal

18     prep meeting you would be able to share with him information

19     from that prep meeting, right?

20              MS. MERMELSTEIN:  Objection to all the leading.

21              THE COURT:  Sustained.

22     BY MR. BOXER:

23     Q.  What was the reason why you wanted to have the call with

24     Mr. Middendorf after you had the internal prep meeting?

25     A.  So I was best informed as to what the current status of the

J345mid2                           Hanson - redirect

1    inspection was and the other things that the staff had the

2    ability to share with me.

3    Q.  And on that call after the internal prep meeting, did you

4    say anything to Mr. Middendorf about whether you were sharing

5    your personal view or the board's view?

6    A.  Well, I don't recall in this particular call if he had the

7    agenda or not so I don't recall having that discussion.

8    Q.  If he had the agenda -- withdrawn.

9           You mentioned that you had previously said the

10   documentation period was, I think the words you were asked,

11   putting a bow on it.  Is that correct?

12   A.  I believe that I agreed that's what I said.

13   Q.  Did you tell Mr. Middendorf that you viewed the

14   documentation period as putting a bow on the audit workpapers?

15   A.  I don't recall having a discussion with him.

16   Q.  Are you familiar with AS 3?

17   A.  I generally am aware of what AS 3, what the topic is.

18   Q.  It is an auditing standard?

19   A.  That's correct.

20   Q.  Issued by the PCAOB, correct?

21   A.  That's correct.

22   Q.  While you were a board member it was in effect, right?

23   A.  It was in effect when I was a board member.

24   Q.  That was my question.

25   A.  Yes.

J345mid2                        Hanson - cross

1   Q.  And, what do you understand it to be?

2   A.  I understand it is a board standard that addresses the need

3   for and some guidance as to what should be in documentation of

4   audit procedures performed and when it should be prepared.

5   Q.  And, does AS 3 permit an auditing firm to document work

6   that it had performed before the audit was closed?

7   A.  Does it permit?

8   Q.  Yes.  Is an auditing firm allowed to, for example, draft

9   the memo describing work that it had performed during the audit

10  before the audit opinion was issued?

11  A.  Yes.

12  Q.  And AU 390, I think you mentioned that as well on your

13  cross.  Do you know what AU 390 is?  Maybe you didn't mention

14  it.

15  A.  I don't remember being questioned about AU 390.

16  Q.  Do you know what AU 390 is?

17  A.  No.  Refresh my memory.

18  Q.  That's fine.  If you don't know what it is, that's fine --

19  A.  I mean I --

20          MR. BOXER:  I have nothing further, your Honor.

21          THE COURT:  Anything further?

22          MS. MERMELSTEIN:  Very briefly, your Honor.

23  CROSS EXAMINATION

24  BY MS. MERMELSTEIN:

25  Q.  Good afternoon, again, Mr. Hanson.

J345mid2                          Hanson - cross

1          You were asked questions about speaking to the

2    government before your testimony here today.  Just to

3    clarify --

4          MR. BOXER:  Objection to the conversation.

5    Irrelevant.

6          THE COURT:  Sustained.

7    BY MS. MERMELSTEIN:

8    Q.  Prior to testifying here today, you were first contacted by

9    representatives of the defense team for Mr. Middendorf, right?

10   A.  That's correct.

11   Q.  And you were interviewed by a representative of the defense

12   team for Mr. Middendorf, right?

13   A.  Yes.

14   Q.  And then, in advance of testifying here today and without

15   asking you to share with the jury anything your counsel said to

16   you, but Mr. Boxer relayed questions about what you would say

17   to certain things to your counsel and answers were provided to

18   Mr. Boxer, right?

19         MR. BOXER:  Objection.  The question asked for his

20   communications with his counsel.

21         THE COURT:  Sustained.

22   BY MS. MERMELSTEIN:

23   Q.  Leaving out counsel, you understand that representations

24   were made to Mr. Boxer about what you would say to certain

25   questions, right?

J345mid2                          Hanson - cross

1          MR. BOXER:  Objection.  Same objection.

2          THE COURT:  Sustained.

3  Q.  Mr. Boxer never asked to meet with you himself, in person;

4  right?

5          MR. BOXER:  Objection.

6          THE COURT:  Overruled.

7  A.  That's what I understand.

8  Q.  You were equally willing to meet with any of the parties to

9  this case; is that fair?

10 A.  That's correct.

11         MS. MERMELSTEIN:  Nothing further.

12         MR. BOXER:  Nothing further.

13         THE COURT:  Okay.  Thank you, sir.  You may step down.

14         THE WITNESS:  Your Honor, I still have this --

15         MR. BOXER:  I will take it.

16         May I approach?

17         THE COURT:  Yes.

18         Do you guys need a break?

19         THE JURY:  Yes.

20         THE COURT:  Well, the Judge needs a break so we are

21 going to take 10 minutes, folks.  Please leave your pads on

22 your chairs.

23         (Jury not present)

24         (Recess)

25         (Continued next page)

J34dmid3

 1              (Jury not present)

 2              THE COURT:  Who is the next witness?

 3              MS. LESTER:  Your Honor, we have a stipulation that we

 4    are going to read into the record, and the next witness is Paul

 5    Atkins.

 6              THE COURT:  OK.

 7              MS. LESTER:  We could put the witness on the stand.

 8              THE COURT:  How long is the stipulation?

 9              MS. LESTER:  It is pretty short.

10              THE COURT:  OK.  We can go ahead and do that.

11              Anything else we need to address before we bring the

12    witness and the jury in?

13              OK.  We can get the witness.

14              Sir, you can come on up to the witness stand.

15              (Witness present)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

J34dmid3

1          (Jury present)

2          THE COURT:  Please be seated, folks.

3          Welcome back, ladies and gentlemen.  We're continuing

4     with the evidence in the trial.

5          And Ms. Lester.

6          MS. LESTER:  Your Honor, at this time we'd like to

7     read a stipulation that's marked for identification as Exhibit

8     M211.

9          THE COURT:  All right.

10          MS. LESTER:  Ladies and gentlemen, the stipulation is

11     between the parties and it reads as follows:

12          "On December 21, 2018, the Public Company Accounting

13     Oversight Board ("PCAOB") received a subpoena requesting the

14     production of all KPMG-related PCAOB 4004 reports related to

15     KPMG inspections that the PCAOB submitted to the SEC for the

16     period January 1, 2013 to February 10, 2017.

17          "In January 2019, in response to the subpoena, the

18     PCAOB produced three 4004 reports.  No other 4004 reports were

19     produced by the PCAOB in response to the subpoena.

20          "The three 4004 reports produced by the PCAOB in

21     response to the subpoena have been marked as Defense Exhibits

22     M207, M208, and M209.

23          "It is further stipulated and agreed that this

24     stipulation, marked as Defendant Exhibit M211, is admissible in

25     evidence at trial.

1              Thank you, your Honor.

2              At this time, the defense calls Paul Atkins.

3              (Defendant's Exhibit M211 received in evidence)

4              THE COURT:  All right.  Mr. Atkins is on the witness

5    stand.

6              Sir, if you would please raise your right hand, you

7    will be sworn in by the courtroom deputy, Mr. Hampton.

8     PAUL STUART ATKINS,

9         called as a witness by defendant Middendorf,

10        having been duly sworn, testified as follows:

11             THE CLERK:  Please state your full name and spell your

12    last name slowly for the record.

13             THE WITNESS:  Paul Stuart Atkins, A-t-k-i-n-s.

14             THE CLERK:  Thank you.

15    DIRECT EXAMINATION

16    BY MR. BRUCH:

17    Q.  Good morning, Mr. Atkins.  I'm Greg Bruch, counsel for

18    David Middendorf.

19             Could you describe your educational background for the

20    jury?

21    A.  I went to college at Wofford College, in Spartanburg, South

22    Carolina, studied -- I double majored in accounting and English

23    literature, and then went to law school straight out after

24    that.

25    Q.  Did you graduate from law school?

J34dmid3                          Atkins - direct

1   A.  In 1983.

2   Q.  OK.  What was your first job after you got out of law

3   school?

4   A.  I worked here in Manhattan at Davis Polk & Wardwell, a law

5   firm.

6   Q.  Can you generally describe what you did there?

7   A.  Well, I was what we call a corporate associate.  I worked

8   on securities transactions, mergers and acquisitions, new

9   products for investment advisors and generally SEC-related type

10  of law work.

11  Q.  How long did you work at Davis Polk & Wardwell?

12  A.  For six years.

13  Q.  What came next for you?  What job did you take next?

14  A.  I went to Washington, D.C.  I worked at the Securities and

15  Exchange Commission in the Chairman's office as an attorney

16  fellow.

17  Q.  How long did you work as an attorney fellow?

18  A.  A couple of years or so until the Chairman asked me to be

19  his Chief of Staff.

20  Q.  So you were Chief of Staff to the then Chairman of the SEC.

21  Who was that?

22  A.  Richard Breeden.

23              THE COURT:  Richard?

24              THE WITNESS:  Breeden, B-r-e-e-d-e-n.

25              THE COURT:  Thank you.

J34dmid3                    Atkins - direct

1   BY MR. BRUCH:

2   Q.  How long were you Chief of Staff?

3   A.  Well, he left in May '93.  So it was maybe about a year or

4   something like that.

5   Q.  Did you stay at the SEC after Mr. Breeden left?

6   A.  Yes.  After the election occurred in whenever that was,

7   1992, and Richard was asked to stay on by the incoming Clinton

8   Administration and Arthur Levitt was nominated the Chairman, so

9   Arthur called me after that and asked me to stay on when he

10  came to be Chairman.

11  Q.  OK.  When did you leave the SEC?

12  A.  In November 1994.

13  Q.  What job did you go to at that point?

14  A.  I joined Coopers & Lybrand as a principal.

15  Q.  What kind of firm was Coopers & Lybrand?

16  A.  It was an accounting firm.

17  Q.  Did the name of Coopers & Lybrand change while you were

18  there?

19  A.  Yeah.  It merged with Pricewaterhouse and now it is called

20  PriceWaterhouseCoopers.

21  Q.  And PriceWaterhouseCoopers is one of the Big Four

22  accounting firms?

23  A.  Yes.

24  Q.  Did you work as an accountant at PriceWaterhouseCoopers?

25  A.  No, I have an accounting degree, but I never became a CPA,

J34dmid3                         Atkins - direct

1    I went straight to law school, and so I was the equivalent of a

2    partner in the firm and a principal.

3    Q.  Can you briefly describe your work at

4    PriceWaterhouseCoopers?

5    A.  Well, I worked with a group that dealt with regulatory

6    issues for financial services firms, so for broker-dealers and

7    asset managers like mutual funds.  So we did things like mock

8    SEC examinations and helped them with compliance issues that

9    they had to try to -- help them stay out of trouble, basically,

10   so they could do the right thing with respect to compliance.

11   Q.  Did you follow SEC developments closely during that period?

12   A.  Yeah, it was part of the job.

13   Q.  Did there come a time when you left PriceWaterhouseCoopers

14   for another job?

15   A.  I did.  In 2002, I was nominated to be Commissioner of the

16   Securities and Exchange Commission by the President and was

17   confirmed by the Senate in 2002.

18   Q.  So, how many commissioners are there at the SEC?

19   A.  Five, five commissioners.

20   Q.  You one of the five commissioners nominated by the

21   President.  How long did you serve as a commissioner?

22   A.  For six years.

23   Q.  Six years.  Can you generally describe your duties as a

24   commissioner of the SEC?

25   A.  Well, so the SEC is a government agency, of course, and

J34dmid3                           Atkins - direct

1    there are about 4600 people.  There are five what we call

2    officers of the United States, meaning the five commissioners

3    are the ones who are appointed by the President and confirmed

4    by the Senate, and so they act as the governing body of the

5    agency.  And they approve as a body the rules of the SEC, and

6    then they sit as a body to decide whether or not to sue

7    somebody or, you know, an enforcement action and that sort of

8    thing, or they sit as an appellate body for if there are

9    appeals from organizations that report to the SEC where people

10   make appeals to the.  But -- and then there are of course, as I

11   mentioned, 4600 or so employees and so they report to the

12   Chairman of the agency.

13   Q.  OK.  So your tenure at the SEC was what years?  2002

14   through when?

15   A.  August 2002 and I left in August of 2008.

16   Q.  During 2000 -- your tenure as a commissioner at the SEC,

17   was there any major legislation passed that affected the work

18   of the SEC?

19   A.  Yeah.  Right as I was coming aboard, there was a statute

20   enacted, called the Sarbanes-Oxley Act.  So that was in July or

21   so of 2002, about ten days before I was confirmed.  And so we

22   had to -- that was the big deal there for the first couple of

23   years was to try to implement the legislation, because Congress

24   passes a statute and then it directs agencies like the SEC to

25   come up with rules to implement what the statute says.

J34dmid3                         Atkins - direct

1   Q.  Was one of the components of Sarbanes-Oxley the Public
2   Company Accounting Oversight Board?
3   A.  Yes.  That was one of the main things that came out of that
4   legislation.
5   Q.  Were there other things in Sarbanes-Oxley that had nothing
6   to do with the Public Accounting Oversight Board?
7   A.  Sure.  There were directives to the SEC with respect to
8   rules that we needed to adopt for public companies.  There were
9   things that affected stock exchanges and that sort of thing,
10  directives like, for example, an audit committee of a public
11  company had to be all independent directors.  So, there were a
12  lot of things in Sarbanes-Oxley.
13  Q.  So you left the SEC in 2008.  What was your next job?
14  A.  I took off some time, a few months, and then I was asked to
15  be by the -- appointed by the Senate of the United States to be
16  on the Congressional Oversight Panel for the Troubled Asset
17  Relief Program, the TARP program.  So this was a body of a size
18  similar to the SEC, but we were to oversee what Treasury was
19  going to do with the TARP money with respect to the banking
20  system after the financial crisis.
21  Q.  And did you take a private sector job as well after you
22  left the SEC?
23  A.  At the same time, I started the firm that I am with now,
24  Patomak Global Partners.
25  Q.  What is your position at Potomak?

J34dmid3                          Atkins - direct

A.   I am the Chief Executive.

Q.   What does Potomak do?  Can you describe that in a brief way?

A.   Well, we -- similar to what I described I did at PriceWaterhouseCoopers, we try to help companies stay out of trouble by being in compliance with all the various regulations that they have to deal with, so be they the SEC, the CFTC, banking regs, so mainly we, you know, help brokerage houses, mutual funds and their advisors, banks and insurance companies and then public companies with respect to SEC, CFTC and those sorts of regulations, and help them with new products.  If they get in trouble, try to help them deal with the issues, whether it be litigation or enforcement or that sort of thing.

Q.   Have you had any employment where you have been appointed by any government agencies?

A.   Yes.  So I've been asked to be -- or in fact by this court to be a monitor with respect to a bank that had issues with the reporting of transactions to the Commodities Futures Trading Commission as being what is called an independent compliance consultant in the wake of enforcement actions by the SEC, the CFTC, the Federal Reserve, the Department of Justice, that sort of thing.

Q.   In the most recent presidential election, did you have any role with respect to the changing of the guard at the regulatory agencies?

J34dmid3                        Atkins - direct

1   A.   Yeah.  For the -- after the convention, I was asked to help

2   with the transition for what became the current President.  But

3   every -- the law requires both candidates to plan for the

4   eventuality of perhaps winning the election so you don't start

5   off thinking, oh, my gosh, where do I go from here.  So we

6   planned for -- at least my role was to look at the independent

7   financial agencies so that it doesn't -- mainly financial

8   services agencies to figure out, you know, what was going on at

9   them, what the policy issues would be, and then to maybe start

10  thinking about personnel to fill the various spots.

11  Q.   So how do you currently stay informed of SEC practices,

12  policies, procedures, and the like?

13           MS. KRAMER:   Objection, your Honor.

14  Q.   Do you stay informed of SEC current policies and

15  procedures?

16  A.   Yes, I have to to do my job.

17  Q.   Can you describe how you stay informed?

18  A.   Well, by of course reading and following what goes on at

19  the agencies, because it is not just SEC but it is others.  We

20  have a number of people who produce memoranda for clients about

21  new events and new regulations that are being adopted or

22  considered.  I participate in conferences as a speaker or --

23  and then also like one of the main ones is called SEC Speaks

24  where as a former commissioner I am asked to be on various

25  panels that deal with issues, and so we're supposed to give

J34dmid3                          Atkins - direct

1    feedback to the staff and the commissioners as to, you know,

2    various things that come up.  So I try to stay involved that

3    way.  I know obviously the various commissioners at the

4    different agencies.  So, you know, there are a lot of things

5    that are going on in Washington, obviously, at the various

6    agencies.

7    Q.  As a result of your professional experience, are you

8    familiar with the SEC's oversight function with respect to the

9    PCAOB?

10   A.  Yes.

11   Q.  Have you previously testified as an expert?

12   A.  Yes.

13   Q.  How many times?  Do you have an approximate number?

14   A.  Well, in a court only a handful, maybe three or four, but

15   as an expert with reports on the civil side, about 15 over the

16   last ten years.

17   Q.  When you say on the civil side, do you mean lawsuits

18   between private actors?

19   A.  Right.

20   Q.  OK.  And can you briefly describe the subject matter of

21   your prior testimony -- subject matters, generally?

22            MS. KRAMER:  Objection to relevance, your Honor.

23   Q.  Can you describe to the jury your hourly rate?

24   A.  This matter is 1450.

25   Q.  And in your practice, is that a market rate for you?

J34dmid3                         Atkins - direct

1   A.   Yeah, formally for a matter like this, expert testimony.

2   Q.   So let me ask you some questions about the SEC.

3          Can you briefly describe for the jury when the SEC was

4   established?

5   A.   In 1934, after the stock market crash of 1929, a number of

6   statutes were enacted by Congress, the Securities Exchange Act,

7   and that's what established the SEC as an agency.

8   Q.   What is the SEC's mission, if you know?

9   A.   Well, the statute has a three-part mix.  The first part is

10  investor protection, to try to make sure that there is good

11  information in the marketplace and that investors can rely on

12  that information, among other things, and to try to keep bad

13  actors out of the markets, and then to facilitate fair and

14  orderly and efficient markets, meaning stock exchanges

15  primarily, and then finally to promote capital formation,

16  because that's the reason why companies sell stock is to raise

17  money so that they can hire people and build factories and that

18  sort of thing.

19  Q.   Does the SEC -- SEC's mission extend to the regulation of

20  public companies?

21  A.   Yes, that's one of the primary groups of entities that it

22  oversees.

23  Q.   Do you know approximately how many public companies there

24  are?

25  A.   There are about 3600 now that our registered and have their

J34dmid3                          Atkins - direct

1   securities listed, which is about half of what it was 20 years

2   ago, but anyway.

3   Q.   Do the 3600 public companies file documents with the SEC?

4   A.   Yes, a fair number of them.  They have to file annual

5   reports of their financial results and quarterly reports as

6   well and then other things in similar ways.

7   Q.   Is the SEC staff expected to review the filings public

8   companies make with the SEC?

9   A.   Yeah.  There is a division of corporation finance that

10  looks at filings of public companies and then does some

11  management, looks at filings of mutual funds, and so those are

12  two primary --

13  Q.   Can you give us a sense of the scale of the SEC, how many

14  employees?

15  A.   Today it's about 4600.

16  Q.   And located in a number of offices?

17  A.   Yeah.  Well, there is a home office in Washington, and then

18  there are about a dozen regional offices scattered about.

19  Q.   And can you give us a sense of what the current budget is

20  for the SEC?

21  A.   It is about a billion-and-a-half dollars or so.

22  Q.   That is a billion with a B?

23  A.   With a B, right.

24          MR. BRUCH:  OK.  I would like to publish for the

25  witness and for counsel M305.

J34dmid3                         Atkins - direct

1    Q.  I just ask you if you have seen this document before?

2    A.  Yes.  This is an organization chart of the Securities and

3    Exchange Commission.

4              MR. BRUCH:  I would move this for admission, your

5    Honor.

6              MS. KRAMER:  If we could just get a clarification of

7    the timeframe for this document?

8              MR. BRUCH:  Certainly.

9    BY MR. BRUCH:

10   Q.  Do you know when this document -- does it appear to be a

11   current document, a current representation of the SEC?

12   A.  It does, yes.

13             MS. KRAMER:  No objection.

14             THE COURT:  M305 is received.

15             (Defendant's Exhibit M305 received in evidence)

16   BY MR. BRUCH:

17   Q.  So if you look at M305, can you describe what this document

18   purports to be?

19   A.  Well, it shows -- well, as I described, if you look at the

20   top row, you see the Commission.  So those are the five

21   commissioners.  And so they sit, again, as a governing body,

22   adopting rules and deciding what actions the SEC is going to

23   take.

24             In the middle you see the Chairman and the Chairman's

25   office.  So, there is one line going down.  So, according to

J34dmid3                          Atkins - direct

1   the statutes, since President Truman's days, the entire staff

2   reports to the Chairman.  He has the oversight of the budget

3   and over the human resources aspect of the agency.

4   Q.  OK.

5   A.  He has to go to the commissioners to get approval for

6   various actions that the agency takes.

7   Q.  OK.  Can you describe of all these boxing which of these

8   boxes represent the largest operating units of the SEC?

9   A.  Well, the next tier down after the commission, so if you

10  look at the far left where it says "enforcement," so that is

11  the Enforcement Division.  So, that is the largest division.

12  It has about 1500 of the 4600 people.

13          If you go all the way to the right, where it says

14  "Compliance Inspections and Examinations," that's the second

15  biggest, and so they are the ones who do inspections and

16  examinations of registered entities.

17  Q.  OK.  Let's go to "Enforcement."

18          What does the Division of Enforcement do?

19  A.  It's a division that has think of it as litigators.

20  Basically people who do -- who bring cases against people that

21  they allege have violated the rules and regulations of the SEC,

22  and so there is a process.  And they bring about, say, 800-ish

23  cases a year 7/800, something like that, and most of them are

24  settlements.  They don't all go to trial.  By far, most of them

25  are settled matters.

J34dmid3                         Atkins - direct

1    Q.  Do you know whether they bring actions against auditors of

2    public companies?

3    A.  They can, yes.

4    Q.  They can.  Do you have an approximate sense of how

5    frequently the Division of Enforcement brings auditor cases

6    from the Enforcement Division?

7            MS. KRAMER:  Objection.  Vague as to timeframe.

8            THE COURT:  You can specify as to timeframe.

9    Q.  Do you have a sense of within the past five years, roughly,

10   how many days cases have been brought by the Division of

11   Enforcement against auditors of public companies,

12   approximately?

13   A.  Yeah.  Say against the Big Four, it might be about one a

14   year or so, the Big Four accounting firms, and against all

15   accounting firms, it's, you know, a few every year.

16   Q.  And that's out of approximately 800 cases per year filed by

17   the Division?

18   A.  Yes, 7 or 800.

19           MS. KRAMER:  Objection to the leading, your Honor.

20           THE COURT:  Overruled.

21   BY MR. BRUCH:

22   Q.  And you have talked about the box on the far right, the

23   "Compliance Inspections and Examinations."  What does that

24   organization do?

25   A.  So that's a group that looks after -- or does examinations

J34dmid3                        Atkins - direct

of investment advisors, so like if you think of Fidelity or

Vanguard or the big mutual fund firms.  So, these are called

registered investment advisors.  So you register as an

investment advisor with the SEC.  So the SEC goes in and

examines them to see if they are operating their business

according to the rules.  And they also look at broker-dealers,

so brokerage houses like Merrill Lynch or Morgan Stanley or

whatever.  And they also look at stock exchanges like the New

York Stock Exchange or NASDAQ.  Similarly to that, they look at

transfer agents.  So there are a whole bunch of different types

of entities.

Q.  I am going to try to ask you a contextual question.

       Approximately how many registered investment advisors

are there that report to the SEC, if you know?

A.  About probably 15,000.  It is more than 10,000, anyway.  I

don't know what the current number is but it is a lot.

Q.  So the Office of Compliance Inspections and Examinations,

to your knowledge, conducts no inspections or examinations of

the public auditing business, is that correct?

A.  Right.  It's -- that's left to the PCAOB.

Q.  OK.  The Division of Corporation Finance, that is the box

that is second from the left, do you see that?

A.  Yes.

Q.  Do you know approximately how many -- what does the

Division of Corporation Finance do, if you know?

J34dmid3                        Atkins - direct

A.  Well, they are the ones -- when we talk about the 3600 or

so public companies, they are the ones that look at their

registration statements if they are going to issue new stock.

They look at their annual what's called a 10-K, the annual

report that has their annual, you know, statement of earnings

and that sort of thing.  So, they have to look at all of those

filings.

        And then besides the 3600 companies, there are a

number of other what we call reporting entities, so people --

companies that don't necessarily have listed stocks.  So all in

all, Corporation Finance has probably about 8,000 entities that

they need to keep up with and so it's like a machine where they

review things, give comments on, and so they have a lot of work

to do.

Q.  OK.  Are you familiar with something called a

self-regulatory organization?

A.  Yes.

Q.  Does that play a role in what the SEC's work is?

A.  Yeah.  Well, a part of the statutes, going back to 1934,

allows entities to be the self-regulatory entities, which are

membership organizations, so think of the New York Stock

Exchange or organizations of brokers.  So they adopt their own

rules, but they're under the oversight of the SEC, because the

rules have to be approved by the SEC, and the SEC, you know,

examines them as to how they are abiding by the law.

J34dmid3                          Atkins - direct

Q.  Do you know if there is a form of self-regulatory

organization called Financial Industry Regulatory Authority?

A.  Yes.  "FINRA" for short.

Q.  Can you give us a sense of how large the industry is that

FINRA regulates?

          MS. KRAMER:  Objection to relevance, your Honor.

          THE COURT:  Overruled.

A.  Yes.  Well, FINRA has something -- it is like 700,000

registered representatives.  So these are think of your, if you

ever have met a broker at Morgan Stanley or something like

that, each broker is a registered representative and has to

pass a test that FINRA administers the whole series of

different tests, and so FINRA oversees those at about 3700

brokerage firms.  So, the big ones that you have heard of but

then there are lots of smaller ones, and so FINRA has all of

those to look after as well.

Q.  Do you know whether FINRA has an inspection function of its

member firm activity?

A.  Very large, to look after all of those people, yes.

Q.  OK.  Is the PCAOB a self-regulatory organization?

A.  No.  The PCAOB is formed separately.  There is some -- it's

analogous, it is similar in a way to self-regulatory

organizations, but the PCAOB was set up by the Sarbanes-Oxley

Act to be specifically not a self-regulatory organization

because it doesn't have a membership.  It's basically a

J34dmid3                    Atkins - direct

1    regulatory organization over the accounting industry.

2    Q.  OK.  And of the pure self-regulatory organizations,

3    approximately how many are there that report to the SEC?

4    A.  Probably it's fewer than 50.  It is like 46 or so, at the

5    last count, I think.  So those are all the stock exchanges,

6    FINRA, you know, other sorts of clearing corporations and

7    things like that, so.

8    Q.  So the PCAOB is not a self-regulatory organization.  Can

9    you describe what characteristics there are of the PCAOB?

10   A.  Well, so similar to the SEC, it has a board of five members

11   that are appointed by the commissioners of the SEC.  And they

12   have a staggered term; one term expires -- one term of each

13   board member expires every year.  And only two of the five can

14   actually be accountants, can be CPAs.  So it was meant to be --

15   by Congress to be an independent body that doesn't really have

16   any, you know, connection to the accounting industry.

17   Q.  Can you -- do you have an opinion, do you have knowledge

18   why -- sorry.  Let me take that back.

19          In the Sarbanes-Oxley Act, did Congress delegate

20   oversight of independent auditors to the PCAOB?

21          MS. KRAMER:  Objection, your Honor.  It calls for a

22   legal conclusion.

23          MR. BRUCH:  I will withdraw the question, your Honor.

24          THE COURT:  OK.

25   BY MR. BRUCH:

J34dmid3                          Atkins - direct

1   Q.   What type of entity is the PCAOB?

2   A.   It's a not-for-profit corporation established in

3   Washington, D.C.

4   Q.   Does the PCAOB regulate the public auditing profession?

5   A.   Yes.

6   Q.   By public auditing, that means companies that are public

7   filers with the SEC, correct?

8   A.   Right.  So the auditing firms that audit public -- so it

9   called the Public Company Accounting Oversight Board because

10  auditors that audit public companies, meaning companies that

11  have sold stock to the public, that's the group that the PCAOB

12  oversees.

13  Q.   OK.  Does the PCAOB regulate -- an exclusive regulator of

14  the auditing profession?

15  A.   Of the auditing profession, I mean, so you have auditors

16  are kind of like lawyers, they have to pass a test to become

17  certified public accountants, but that test is administered by

18  the American Institute of Certified Public Accountants, the

19  AICPA.  Then every state has its own auditing board,

20  accountancy board, so they are the ones who license the

21  individual auditors to be practicing CPAs.  So they are the

22  ones who have oversight over, you know, if they get out of, you

23  know, the ethics and whatnot, the restrictions and rules of the

24  particular state.

25  Q.   Do auditing firms register with the PCAOB?

J34dmid3                         Atkins - direct

1    A.  Yes.  So if an auditing firm audits a public company, then

2    they need -- or a broker-dealer, they need to register with the

3    PCAOB directly.  So there are some firms, you know, a lot of

4    auditing firms actually that do not register with the PCAOB.

5    Q.  So do you know how many firms, how many auditing firms,

6    have registered with the PCAOB?

7    A.  Yeah.  Offhand, I, you know -- I don't know offhand.  It

8    can be really --

9    Q.  Do you know if it is more than a thousand?

10   A.  Yeah.  It's probably around a thousand, yes, 1500,

11   something like that.

12   Q.  Do you know how many employees PCAOB has?

13   A.  There are about probably 800-ish, something like that.

14   Q.  Are each of the firms' -- accounting firms, auditing firms

15   registered with the PCAOB subject to periodic inspection, if

16   you know?

17   A.  I'm sorry.  Can you say that again?

18   Q.  Do you know whether each of the accounting firms, the

19   auditors registered with the PCAOB, are subject to periodic

20   inspection from the PCAOB?

21   A.  Yes.  The accounting firms -- yes, the PCAOB has its

22   examination function, inspection function, and does that over

23   the firms every year.

24   Q.  Do you know how many inspection reports are created and

25   generated by the PCAOB every year, approximately, within the

J34dmid3                          Atkins - direct

1    past five years?

2    A.  It's a little over a hundred, probably.

3    Q.  Does the PCAOB have accounting standard authority?

4    A.  No.  So accounting -- so you have to draw a distinction

5    between accounting, which are rules of putting together

6    financial statements, you know, whether, you know, how

7    something should be treated as, you know, expenses or whatever

8    and how you recognize revenue, versus auditing, which is how

9    does an auditor go in and, you know, examine then the

10   statements that a company has come up with that, you know, its

11   profit and loss and all of that.  So those auditing standards

12   is what the PCAOB looks at.

13   Q.  Do they differentiate between accounting standards and

14   auditing standards?

15   A.  Yes.  So that's a difference that the accounting standards

16   are overseen by another group called the Financial Accounting

17   Standards Board, which is just vaguely overseen by the SEC but

18   the SEC looks after its budget, according to the Sarbanes-Oxley

19   Act.  But there is another group called the Financial

20   Accounting Foundation which is focused on the -- on FASB, it's

21   called, "FASB," the Financial Accounting Standards Board.  So

22   that's more of an accounting profession-driven type of thing,

23   although the SEC does have influence over it.

24   Q.  Do you know whether the PCAOB has an Enforcement Division?

25   A.  It does, yes.

J34dmid3                          Atkins - direct

1    Q.  Are you familiar with the jurisdiction of the PCAOB's

2    Enforcement Division?

3    A.  Yes.  Well, they look after the rules that the PCAOB has

4    adopted, and they are -- so they bring cases in that regard if

5    people have violated a particular rule.

6    Q.  Do you know whether they have any jurisdiction over public

7    companies themselves, "they" the PCAOB?

8    A.  No.  That's the SEC that does -- and the Department of

9    Justice.

10   Q.  Do you know if the PCAOB has any jurisdiction over

11   investors or market participants other than auditors?

12   A.  No.  So they look after auditors of public companies.

13   Q.  OK.  Prior to the creation of the PCAOB, do you know

14   whether there was an inspection function directed at public

15   auditors, public company auditors?

16   A.  Not --

17             MS. KRAMER:  I am going to object to the relevance

18   of --

19             MR. BRUCH:  I am trying to establish the context, your

20   Honor, with which the inspection function occurred at the

21   PCAOB.

22             THE COURT:  You can answer it.

23   A.  Well, before Sarbanes-Oxley was enacted, the accounting

24   profession had what's called peer review.  So at the time they

25   were the Big Eight or even going farther back more than that;

J34dmid3                         Atkins - direct

1    now there are of course the Big Four.  But, anyway, the big

2    accounting firms would look at sample audits of one another and

3    then kind of critique that.  And so Congress decided in the

4    wake of Enron and WorldCom, if you have heard of those

5    companies that precipitated the Sarbanes-Oxley Act in 2002,

6    Congress thought that there should be another body that was

7    statutorily set up to look after the -- what was going on with

8    respect to audits and to systematize it.

9    Q.  Do you have an opinion of whether the PCAOB when it was

10   created took over any core functions of the SEC's regulation of

11   the auditing profession?

12   A.  Well, basically what Congress did was delegate to PCAOB the

13   examination of the firms, the auditing firms, and as a private

14   sector entity, basically, and --

15   Q.  Was that a function undertaken by the SEC prior to this

16   time?

17   A.  No, it had general oversight.  But before that the -- there

18   was a group called the Public Oversight Board, POB, and that

19   was a group set up by the auditing profession to oversee audits

20   and that sort of thing, so it was not the SEC.

21   Q.  OK.  Are you aware that the PCAOB has a process whereby an

22   auditing firm can be deregistered?

23            MS. KRAMER:  Objection to the leading, your Honor.

24            THE COURT:  Overruled.

25   A.  Yes.  So if an auditing firm doesn't meet the requirements

J34dmid3                          Atkins - direct

1   of registration at the PCAOB, it can be deregistered.

2   Q.  Have you ever seen the PCAOB take action to deregister

3   accounting firms?

4   A.  Yes.  When I was a commissioner one year, I can't remember,

5   '06/'07, something like that, there were a number of accounting

6   firms that had registered with the PCAOB but then they were

7   found to have been, you know, not -- so they didn't audit

8   sufficiently a number of public companies or the right size of

9   companies and so there were like a hundred or some of them I

10  think that were basically drummed out from the PCAOB.

11  Q.  Would you be able to characterize the kind of firms that

12  were deregistered?

13          MS. KRAMER:  Objection, your Honor.

14          THE COURT:  Overruled.

15  A.  Small accounting firms.

16  Q.  Are you familiar with any deregistration proceedings that

17  the PCAOB has ever initiated against large accounting firms?

18  A.  No.

19  Q.  Are you familiar with deregistration proceedings being

20  initiated by the PCAOB against any of the Big Four?

21  A.  Well, here in the last couple of years, there has been a

22  tussle with China over -- so these are the Chinese affiliates

23  of the Big Four accounting firms where they -- the SEC was

24  seeking the working papers of audits, and the Chinese

25  government wouldn't let them be produced.  So the SEC, you

J34dmid3                          Atkins - direct

1    know, started that process to try to, you know, have them not

2    be accepted in the United States.  But that, you know --

3    Q.  These were the Chinese accounting firms that were

4    affiliated with the Big Four, though, correct?

5    A.  Exactly.  And they would -- that would have created let's

6    just say havoc in the marketplace had that occurred, so the SEC

7    didn't go down that road.

8    Q.  OK.  And do you have an opinion of what would happen if

9    there were a deregistration proceeding against one of the Big

10   Four auditing firms?

11                MS. KRAMER:  Objection, your Honor.  Irrelevant and

12   speculation.

13                THE COURT:  Overruled.

14   A.  I can't imagine ever a Big Four accounting firm being

15   deregistered.  I just -- we only have four of them, and that

16   would, again, create absolute havoc in the marketplace, because

17   we can't really -- I mean, four is about the minimum, I think,

18   of what we could have.

19   Q.  Let me ask you some questions, some brief questions, about

20   the SEC's oversight of the PCAOB.

21                Does the SEC exercise oversight of the PCAOB?

22   A.  Yes, that's part of its mandate.

23   Q.  How would you describe that oversight?

24   A.  Well, there are a lot of things the SEC has to do, but

25   mainly through the Office of Chief Accountant, the SEC looks

J34dmid3                        Atkins - direct

1  after what the PCAOB is doing on an annual basis.  It needs to

2  approve the budget, and that's probably the most important

3  function.  But it looks at, you know, what the PCAOB is

4  spending and what it's business plan is and that sort of thing.

5  Q.  You mentioned Office of Chief Accountant.  How many -- do

6  you know how many employees there are in the SEC's Office of

7  Chief Accountant?

8  A.  There are 50.  Maybe 46 or 8, something like that.

9  Q.  So do you know the size of the PCAOB's budget?

10  A.  It's 200-and-some-odd million, 250-ish, something like

11  that.

12  Q.  Do you know the source of the PCAOB's funding?

13  A.  Yes.  It's mainly from public companies.  It is kind of a

14  wealth tax.  They have to pay based on their market

15  capitalization.  So if you multiply all the shares outstanding

16  times price per share, that's what you would call market

17  capitalization.  And so there is a formula in the statute, in

18  the SEC rules, from which that is calculated.  And then also

19  the accounting profession pays money into the budget, a smaller

20  portion, and the broker-dealers who are examined by their -- by

21  the PCAOB as well.

22  Q.  When you were an SEC commissioner, were you involved in the

23  review of the PCAOB's budget?

24  A.  Yes.  So we looked during my first couple of years, those

25  were the beginning years of the PCAOB, and in fact I demanded

J34dmid3                        Atkins - direct

1   that we have a public hearing to air, you know, what they were

2   going to be doing with all the money they were being given.

3   Q.   In connection with that role, did you ever review a single

4   firm's PCAOB inspection report?

5   A.   No.

6   Q.   Are you aware of any SEC commissioner at any time that has

7   reviewed a single firm's inspection report in connection with

8   the PCAOB budget request?

9            MS. KRAMER:   Objection, your Honor.   Hearsay.

10           THE COURT:   Overruled.

11  A.   No.   I can't imagine -- I doubt that ever would be part of

12  looking after the budget.

13  Q.   Was one of your responsibilities as an SEC commissioner the

14  appointment of PCAOB board members?

15  A.   Yes.

16  Q.   Does that continue to be the responsibility of the SEC

17  commissioners?

18  A.   Yes.

19  Q.   When you were an SEC commissioner, did you ever review a

20  single firm's inspection report in connection with your

21  appointment of board members?

22  A.   No.

23  Q.   Are you aware of any SEC commissioners who have reviewed

24  single-firm inspection reports in connection with the

25  appointment of board members?

J34dmid3                          Atkins - direct

1   A.  Yes, I doubt it.  I can't imagine.

2   Q.  Do you have an opinion on whether that single-firm

3   inspection report would be important in that respect?

4   A.  In respect to appointment of --

5   Q.  Appointment of board members.

6   A.  No.  No, I mean, it's --

7   Q.  No, you have an opinion, or no?

8   A.  I'm sorry.  I don't think it would be important because it

9   doesn't deal with individuals.  Really, it's a general report

10  about a firm.

11  Q.  OK.  And the SEC also approves the PCAOB rules, is that

12  correct?

13  A.  Yes.  All the rules have to go to the SEC for approval.

14  Q.  Do you have an opinion on whether a single firm's

15  inspection report would be important in the SEC's consideration

16  of PCAOB rules?

17  A.  No.

18  Q.  Why is that?

19  A.  Because, again, the inspection reports are very general,

20  very conclusory, very high level.  And I mean, just, again, it

21  is only one firm, it's not -- it wouldn't really -- the rule is

22  much broader than one firm and is subject to notice and

23  comment.  I mean, the PCAOB puts it out for -- to get public

24  comment.  So with respect to rule, and then the SEC looks at

25  those comments as well.  So there is a long process with

J34dmid3                          Atkins - direct

1   respect to rules, and it is meant to get input from all sorts
2   of affected people.
3   Q.  Are you aware, Mr. Atkins, that some portion of the Office
4   of Chief Accountant plays a role in reviewing PCAOB inspection
5   reports?
6   A.  Oh, sure.
7   Q.  And can you describe your understanding of the focus of the
8   Office of Chief Accountant's review of those inspection
9   reports?
10              MS. KRAMER:  Objection, your Honor.
11  Q.  Can you describe your understanding, if you have one?
12              MS. KRAMER:  Objection, your Honor.  Vague as to time
13  period and also foundation.
14              MR. BRUCH:  Since the PCAOB was created.
15              THE COURT:  Overruled.  You can answer.
16  A.  Well, yes.  I mean, so the Office of Chief Accountant is
17  concerned about, you know, trends I guess in the profession
18  and, you know, concerned about audit quality and to try to make
19  sure that is, you know, maintained at a good level.  But
20  mainly, you know, we're concerned about investor protection and
21  to try to avoid what's called a restatement, which is basically
22  an audit failure.  So those are not really covered by
23  inspection reports.  So, in general, this is one way to kind of
24  see what's going on in the audit profession.
25  Q.  So are you familiar with the Division of Enforcement?

J34dmid3                         Atkins - direct

1   A.  Yes.

2   Q.  Of the SEC, I should be clear.

3   A.  Yes.

4   Q.  Do you know whether the Division of Enforcement of the SEC

5   since the PCAOB has been created has reviewed PCAOB single-firm

6   inspection reports?

7           MS. KRAMER:  Your Honor, I am going to maintain the

8   objection to questions that call for what's happened internally

9   at the SEC since the time that this witness left the SEC.

10          THE COURT:  If you could establish his understanding.

11          MR. BRUCH:  Sure.

12  BY MR. BRUCH:

13  Q.  Do you have an understanding, based upon your discussions

14  with participants in the securities regulatory industry and

15  based upon your reading and knowledge of the securities

16  regulatory industry, how the SEC enforcement staff functions?

17  A.  As to whether they look at examination reports or

18  inspection reports?

19  Q.  The specific question will go to whether they review

20  inspection reports.

21  A.  Yes, I obviously keep up with what goes on at the

22  Commission, you know, with respect to enforcement and

23  examinations and through discussions with people and

24  interactions with my clientele and that sort of thing.  And

25  then as far as --

J34dmid3                         Atkins - direct

1    Q.  Do you have an understanding generally of the sources of

2    investigative leads in beginning investigations for the

3    Division of Enforcement at the SEC?

4    A.  Sure.

5    Q.  In your time as Commissioner and since that time as you

6    have been President of Patomak Global Partners and worked in

7    this industry.

8    A.  Yes.  Well, it's basically put their antennae out to try to

9    pick up leads through like their 20-some-thousand

10   whistleblowing tips that come into the SEC per year.  There are

11   newspaper reports.  There's, you know, rumors and tips that

12   come in directly to the Enforcement Division.  Self-reporting.

13   There are companies that, you know, have discovered things

14   going on and they have undertaken an internal investigation,

15   and then they come to the Commission and say, you know, look

16   what we've found here, this is bad stuff, and, you know, you

17   need to know about it.  So there are a lot of different ways

18   for the Enforcement Division to pick up on things.

19   Q.  Do you have any understanding of the importance of

20   timeliness in the enforcement practice at the SEC?

21   A.  Yeah.  I mean, the timing is crucial.  I mean, you have a

22   statute of limitations, so called, where if, you know, it takes

23   so long and if it -- you know, if you don't bring a case within

24   the requisite time period, then, you know, the case can't be

25   brought.  So the Enforcement Division, if they hear about

J34dmid3                         Atkins - direct

something, they want to jump on it and try to bring the case so

that we have the markets that, of course, if it's information

that can move stock prices or whatnot, then you need to try and

get that, you know, addressed as quickly as possible.

Q.  So we talked about the -- you said that the Commission --

and I think the time period as clarified by the government was

within the past five years -- has brought maybe a handful of

cases, I think you said less than five, against the major

public accounting firms every year?

A.  Yeah, something like one a year or so.

Q.  Can you characterize what the Commission's interest is in

bringing enforcement actions in public auditing -- I guess

public auditing participants?

A.  Well, again, a lot of these have to do with foreign

affiliates, because you have to remember these big accounting

firms are like networks of clubs.  It is like a club with every

country has its own rules and own way of choosing and

qualifying accountants.  And the accounting firms, in order to

be able to audit big multinational companies, have to have

people scattered about the world.  And so those -- you know,

the SEC brings cases then to try to -- if they see wrongdoing

or if there has been a problem with what we call a restatement

or a company has filed its annual report with the SEC that, you

know, in its balance sheet or income statement or whatnot, if

there be a mistake, then you have to go back and restate that

J34dmid3                         Atkins - direct

1  to make it correct.  And so oftentimes that's an indication of

2  an audit failure where either an auditor didn't do something

3  right as far as overseeing what the company did, the company

4  internally didn't do something right.  So those are the real

5  major -- that's the real major focus of the SEC.

6  Q.  Is it safe to say that the inspection reports are one way

7  that the PCAOB staff communicates with the Securities and

8  Exchange Commission?

9               MS. KRAMER:  Objection to the leading, your Honor.

10              THE COURT:  Sustained.

11 Q.  Are there ways in which the PCAOB staff communicates with

12 the SEC that do not involve the inspection process?

13 A.  Oh, sure.  I mean, there is a -- well, there should be a

14 good healthy exchange of information, and they get together at

15 conferences.  There are informal meetings.  You know, I myself,

16 when I was a commissioner, went over to the peek-a-boo to talk

17 to them about, you know, what was going on to meet the staff

18 and board members.  So, there should be a healthy exchanges.

19              THE COURT:  I just want to clarify.

20              MS. KRAMER:  Objection, your Honor.  I think perhaps

21 my objection relates to the follow-up question your Honor was

22 going to ask.

23              THE COURT:  I was just going to ask about the use of

24 the term "peek-a-boo."

25              MS. KRAMER:  Yes.  If we could have a sidebar on that,

1   your Honor, or we would object to the term and any testimony

2   about it.

3          MR. BRUCH:  I just want to ask the witness to clarify.

4          THE COURT:  OK.  Go ahead.

5          MS. KRAMER:  Objection to that question, your Honor,

6   under 403.

7   BY MR. BRUCH:

8   Q.  Could you clarify what you meant by "peek-a-boo"?

9   A.  I'm sorry.  So that's an endearment maybe inside the Public

10  Company Accounting Oversight Board because it doesn't --

11         MS. KRAMER:  Objection.

12         THE COURT:  Without going into any detail, let me just

13  confirm, "peek-a-boo" is just a reference to PCAOB?

14         THE WITNESS:  Yes.

15  BY MR. BRUCH:

16  Q.  It is not intended to be a pejorative reference, is it,

17  Mr. Atkins?

18  A.  No.

19  Q.  Do any of the PCAOB's interactions with the SEC staff or

20  commissioners, are there any restrictions on those

21  communications?

22  A.  Certainly between the staff.

23  Q.  The staff -- between board members, commissioners?  Broad

24  question.

25  A.  Not that I can think of.  Not if it is maybe confidential

J34dmid3                        Atkins - direct

1    information or something that I, you know, I think between the

2    two agencies or two entities there --

3    Q.  Is there anything that prohibits the PCAOB board from

4    calling the SEC at any time for any reason?

5    A.  Oh, no.

6    Q.  It doesn't depend on the inspection process, correct?

7    A.  No.  There is a fluidity there and they have lunch

8    together --

9    Q.  Anything that prohibits the SEC from contacting the PCAOB

10   at any time?

11   A.  Not that I can think of.

12   Q.  For any reason?

13   A.  I can't imagine.

14   Q.  It does not depend on the inspection report being

15   delivered, correct?

16           MS. KRAMER:  Objection.  Asked and answered.

17           THE COURT:  Overruled.

18   A.  No.

19   Q.  Does the SEC interact directly with the auditing firms

20   themselves?

21   A.  Sure.  A lot.  The auditing firm come to the SEC on a whole

22   host of issues normally having to do with their public company

23   clients and, you know, how to treat different issues,

24   especially novel issues, but there are lots of meetings between

25   the staff of the agency, especially corporation finance and the

J34dmid3                         Atkins - direct

1   various accounting firms.

2   Q.  Would you characterize most of these involvements as

3   involving auditing issues or accounting issues?

4   A.  No.  They would be mostly accounting issues at the SEC.

5   Q.  Do any of the SEC interactions with the public accounting

6   profession mandate the involvement of the PCAOB?  In other

7   words, can the SEC directly communicate with the auditing

8   profession?

9   A.  Yes.  I mean, they communicate all the time and that's --

10  should be an open dialogue.  The SEC needs to hear directly

11  from the profession, you know, the issues that they're coming

12  up with.  And I think the SEC's, you know, very welcoming, or

13  should be, the staff should be, as far as having people come

14  forth and tell them what's going on.  I have an open door, you

15  know, as far as auditing firms coming to discuss things.

16  Q.  None of that depends on the SEC waiting for an inspection

17  report for a single firm, correct?

18  A.  No.  I mean, the timeframe of these inspection reports is

19  so elongated, it's kind of old news by the --

20  Q.  Do you have an understanding of how elongated the timeframe

21  is between the events being inspected and the receipt of the

22  report?

23  A.  When you look at them, it's like a year and a half or more.

24  I mean, it's a long process of review, and a lot of it is

25  confidential to, you know, the PCAOB.  So it, you know, takes a

J34dmid3                         Atkins - cross

1  while.

2  Q.  Would you say that if the information in the report --

3          MS. KRAMER:  Objection to the leading, your Honor.

4          THE COURT:  Sustained.

5          MR. BRUCH:  I have no further questions for

6  Mr. Atkins.

7          THE COURT:  OK.  Cross.

8          MS. KRAMER:  Yes, your Honor.

9          THE COURT:  Ms. Kramer.

10  CROSS-EXAMINATION

11  BY MS. KRAMER:

12  Q.  Good morning, Mr. Atkins.

13  A.  Good morning.

14  Q.  Or good afternoon, actually.

15  A.  Yes.

16  Q.  You gave some testimony about how you have kept apprised of

17  issues at the SEC since you left in mid-2008.  Do you recall

18  giving that testimony?

19  A.  A few minutes ago, yeah.

20  Q.  And you testified that you followed SEC developments.

21          Those were publicly knowable developments, right?

22  A.  Sure.

23  Q.  What you've read in the paper?

24  A.  Or what the agency comes out with through speeches and

25  enforcement actions and a whole host of proposals for rule

J34dmid3                         Atkins - cross

1   making and things like that.

2   Q.  Things that are discussed at conferences?

3   A.  Yes, partly, sure.

4   Q.  You left the SEC in August of 2008, is that correct?

5   A.  Yes.

6   Q.  And you didn't work there in 2009, right?

7   A.  Right.

8   Q.  2010?

9   A.  Right.

10  Q.  You haven't gone back to the SEC since you left in 2008,

11  right?

12  A.  No, I've been back.  I mean, I go back for meetings and

13  parties, you know, departure parties and welcoming parties.

14  Q.  Social events, right?

15  A.  Right, but also during the transition I was there as well,

16  so talking about policy.

17  Q.  When you were on President Trump's Transition Committee?

18  A.  Yes.

19  Q.  And you were there talking about policy for a meeting,

20  right?

21  A.  Right.

22  Q.  And you had clients that have led you to go advocate at the

23  SEC?

24  A.  No, not a lobbyist or a --

25  Q.  OK.  But you have not been an employee of the SEC since you

J34dmid3                        Atkins - cross

1   left in mid-2008, right?

2   A.  Right.

3   Q.  You weren't working at the SEC when -- in 2015, right?

4   A.  Right?

5   Q.  Or 2016.

6   A.  Right.

7   Q.  Or 2017?

8   A.  Right.

9   Q.  You didn't participate at meetings between the SEC and

10  people from KPMG, including David Middendorf, in 2015, right?

11  A.  Right.

12  Q.  Or 2016?

13  A.  Right.

14  Q.  You weren't a party to those communications?

15  A.  Right.

16  Q.  You testified a fair amount about your familiarity with the

17  Sarbanes-Oxley Act.  Do you recall that?

18  A.  Yes.

19  Q.  OK.  And the Sarbanes-Oxley Act mandates that the PCAOB

20  conduct inspections, correct?

21  A.  Right.

22  Q.  And that they make reports of those inspections, correct?

23  A.  Yes.

24  Q.  And that they transmit those inspections to the SEC,

25  correct, and otherwise report wrongdoing that they discover to

J34dmid3                          Atkins - cross

1    the SEC, right?

2    A.  Right.

3    Q.  And that reporting can happen before inspection reports are

4    ready, correct?

5    A.  Absolutely.

6    Q.  It can happen by phone during the inspection process,

7    right?

8    A.  Right.

9    Q.  And the Sarbanes-Oxley Act doesn't specifically speak to

10   what the SEC does once it gets the reports, right?

11   A.  Right.  Absolutely.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J345mid4a                        Atkins - cross

BY MS. KRAMER:

Q.  That SEC has internal procedures to deal with reports that
are not laid out in the Sarbanes-Oxley Act, right?

A.  Yes.

Q.  And, the internal functioning of the SEC has changed over
time, right?

A.  Probably.  Sure.

Q.  Well, even within your tenure as a commissioner there were
differences from year to year, right?

A.  Yes.

Q.  Different priorities?

A.  Sure.  Yes.

Q.  Things changed within a given division when a division head
took over?

A.  Right.

Q.  The organization evolved internally, right?

A.  Yes.

Q.  As it has to because times and circumstances changed,
right?

A.  Yes.

Q.  And you testified a fair amount about when you were
commissioner whether you personally reviewed the inspection
reports for individual auditors.

        Do you remember giving that testimony?

A.  Yes.

J345mid4a                          Atkins - cross

1    Q.  And you talked about how you didn't review those reports,

2    right?

3    A.  Yes.

4    Q.  Approving the PCAOB budget or approving PCAOB board

5    members, right?

6    A.  Right.

7    Q.  When you were a commissioner, the Office of the Chief

8    Accountant was in place then true as it is now, right?

9    A.  Yes.

10   Q.  And the Office of the Chief Accountant is led by the chief

11   accountant for the SEC, right?  And that person is the

12   commission's principal advisor on accounting matters, right?

13   A.  On financial accounting matters.

14   Q.  And on PCAOB-related matters, right?

15   A.  I would think so, yes.

16   Q.  And when you were a commissioner, did you actually

17   participate in decision-making about PCAOB board members,

18   whether they should be approved or not approved?

19   A.  Yes.

20   Q.  And when you did that, the chief accountant advised you;

21   isn't that right?

22   A.  He played a role but I had my nominees that I advocated for

23   for particular spots so it is a give and take among the

24   commissioners to, you know, figure out what's the best person

25   to have there.

J345mid4a                      Atkins - cross

Q.  Mr. Urbanczyk, can we put up what is in evidence
Defendant's Exhibit M-305.

        So, this is the organizational chart that you
testified about and so you were one of the five boxes at the
top, right?

A.  Yes.

Q.  So when you were making decisions, like approving PCAOB
board members, there were a lot of people below the level of
commissioner who prepared materials to aid in your review for
decisions like that, right?

A.  Sure, but in that case it was mostly probably the general
counsel that had the main focus on an appointment like that.

Q.  On your nominees?

A.  Well, in the commission's -- how we were considering the
people to go on to the board of the PCAOB.

Q.  You principally relied on the general counsel.  Is that
what you are saying?

A.  No.  The general counsel was the one that had the primary
role of vetting people and summarizing their background.  That
sort of thing.

Q.  And the person in the general counsel's office reached out
to other divisions and offices within the SEC to gather
information, right?

A.  Sure.

Q.  That's the typical process, right?

J345mid4a                    Atkins - cross

1    A.  Right.

2    Q.  And, as a commissioner who gets the end product of all that

3    vetting, a memo or some other document, is that the kind of

4    thing you would get at the end of that type of vetting process?

5    A.  Yes; that there would be like an audit trail, if you want

6    to call it that, as far as like enforcement has no, nothing

7    that they found or whatever.

8    Q.  So you get sort of memos from each division or office and

9    then sometimes some back up materials, right?

10   A.  Right.

11   Q.  You weren't privy to what every single person preparing

12   that briefing material reviewed in doing it, were you?

13   A.  No.  Of course not.  But I mean, if there would be some

14   objection, they would presumably have that specified.

15   Q.  That would sort of defeat the purpose of giving you

16   something succinct to review, right?

17   A.  Right.

18   Q.  And you testified, I believe, that the SEC oversight of the

19   PCAOB is mainly through the Office of the Chief Accountant.

20           Do you remember saying that?

21   A.  Yes.

22   Q.  And you didn't work, am I correct, in the Office of the

23   Chief Accountant when you were at the SEC?

24   A.  No, because --

25   Q.  So, before you were a commissioner you were a chief of

J345mid4a                      Atkins - cross

1    staff to a commissioner, right?

2    A.  For the chairman.

3    Q.  For the chairman.

4          You didn't work in one of these smaller boxes under

5    that top row, right?

6    A.  No, but I had -- I mainly had a lot of interaction with it,

7    yes.

8    Q.  You had a lot of interaction when you were the chief of

9    staff for the chairman?

10   A.  Yes.

11   Q.  And that was before the Sarbanes-Oxley Act was enacted by

12   Congress, right?

13   A.  Yes.

14   Q.  And just looking at M 305, defendant's exhibit on the

15   screen, Mr. Urbanczyk, could you just circle for me as I go

16   through, you are aware, are you not, Mr. Atkins, that PCAOB

17   inspection reports arrive at the SEC through the office of the

18   secretary?  That's in the second row on the right in the

19   middle.  Right?

20   A.  Yes.  Down there, yes.

21   Q.  And then the office of the secretary sends the reports to

22   different places in the SEC, right?

23   A.  Yes.

24   Q.  They go to the Office of the Chief Accountant?

25   A.  Right.

J345mid4a                        Atkins - cross

1    Q.   And they also go to other divisions, right, when they come

2    in?

3    A.   Right.

4    Q.   Division of Enforcement?

5    A.   Sure.

6    Q.   The Division of Corporation Finance?

7    A.   Right.

8    Q.   Do they also go to Investment Management when they come in?

9    A.   Probably.  I mean, I don't know offhand.

10   Q.   Within the Office of the Chief Accountant there are two

11   different groups that dive into the reports, right?

12   A.   Right.

13   Q.   There is the accounting group?  Yes?

14   A.   Yes.

15   Q.   And the professional practice group?

16   A.   Right.

17   Q.   And they both look at the reports for slightly different

18   things, right?

19   A.   Right.

20   Q.   And then once they do that review, separate from the

21   reports having already gone to other divisions, the people in

22   the Office of the Chief Accountant can make referrals from

23   those inspection reports to any of these highlighted boxes on

24   the top or in the second row, right?

25   A.   Right.

J345mid4a                        Atkins - cross

1   Q.  Plus, also, maybe I left out trading and markets but they
2   made referrals to these other offices, right?
3   A.  Sure.  I can imagine.
4   Q.  And you talked a little bit about how, I think you might
5   have said that inspection reports, by the time they come in,
6   are old news?
7   A.  Yes.
8   Q.  Do you remember saying that?
9   A.  Yes.
10  Q.  And so, is it your opinion then, that this path that we
11  just talked about, all these offices and divisions at the SEC
12  reviewing the reports are just reading them for nothing?
13  A.  No.  I would never say that.
14  Q.  They're not wasting their time, right?
15  A.  Well, but anything that comes in, us know, there is
16  somebody that needs to look at it but I do not know of anything
17  like that that has led to, say, an enforcement action from an
18  inspection report.
19  Q.  Let's talk about that for one second.
20          Enforcement actions are basically lawsuits, right?
21  A.  Yes.
22  Q.  They're publicly filed, right?
23  A.  Yes.
24  Q.  In courts, right?
25  A.  Mostly I would think so.

J345mid4a                         Atkins - cross

1   Q.   And so, they're publicly knowable events, right?

2   A.   Yes.

3   Q.   When the SEC has an investigation -- let's make it easy and

4   say within the Division of Enforcement the SEC has an

5   investigation.  Are you with me?

6   A.   Yes.

7   Q.   There is no report of the opening of an SEC investigation

8   generally, right?

9   A.   Right.

10   Q.   That's confidential, right?

11   A.   Should be.  Sometimes it's not, but.

12   Q.   If it works the way it should it is confidential, right?

13   A.   Yeah.

14   Q.   If you are in the Division of Enforcement and you are

15   investigating someone you generally don't want them to know

16   you're investigating them, right?

17   A.   Right, until --

18   Q.   Or if they know there are reasons you don't make it public,

19   right?

20         And investigations don't always result in charges,

21   right?

22   A.   Right.

23   Q.   A lot of investigations, in fact, don't result in charges,

24   right?

25   A.   That's true; because it doesn't rise to the level where the

J345mid4a                    Atkins - cross

1    Agency wants to bring a case.

2    Q.  So, there are different things that could happen that stop

3    an investigation from becoming an actual public case, right?

4    A.  Right.

5    Q.  There could be not enough evidence, right?

6    A.  Right.

7    Q.  There could be, in perhaps the view of the people

8    investigating enough but then the Commission says "no" for some

9    reason, right?

10   A.  Sure.  Policy, prosecutorial discretion.  All of that.

11   Q.  And then sometimes isn't it true that investigations end

12   with a settlement of some kind before there are actual charges,

13   right?

14   A.  Right.  Yes.

15   Q.  So, putting aside clients that you have had that we have

16   told you they have an investigation, right, or sort of people

17   giving you those pieces of information, since you have left the

18   SEC in 2008 you haven't been privy to their roster of

19   investigations, right?

20   A.  No.  That's right.

21   Q.  That would be highly unusual, right?

22   A.  Right.

23   Q.  You know what's been publicly filed as an actual case,

24   right?

25            THE COURT:  I didn't hear an answer.

J345mid4a                      Atkins - cross

1                  THE WITNESS:  Yes.

2                  THE COURT:  Okay.

3       BY MS. KRAMER:

4       Q.  One of the things that you talked about when you were

5       describing at the beginning the overall role that the SEC plays

6       is that the SEC decides appeals from organizations that report

7       to the SEC.

8                  Do you remember talking a little bit about that?

9       A.  Yes.

10      Q.  That includes appeals from decisions made by the PCAOB,

11      doesn't it?

12      A.  Yes.

13      Q.  And those appeals are reviewed by the Commission.  Isn't

14      that right?

15      A.  Yes.

16      Q.  And that's something that happened or happens on a yearly

17      basis, right?

18      A.  Well --

19      Q.  For the inspection reports they're issued each year, so an

20      appeal of that is made generally on report that is filed each

21      year?

22      A.  Right, if they're being appealed.

23      Q.  If there is an appeal.

24                 That's is something the Commission does with

25      inspection reports, right?

J345mid4a                        Atkins - cross

1    A.  Yes, but -- yes.

2    Q.  And, when you were a commissioner, you testified that you

3    didn't personally read the inspection reports for the Big Four

4    firms?

5    A.  Right.

6    Q.  Just to be clear in the number that we are talking about

7    because I want to make sure this is not confusing, so is it

8    true that there is one report for each of the Big Four

9    accounting firms in the U.S. issued each year?

10   A.  Right.

11   Q.  And then within that one report for, say KPMG is, are the

12   negative findings from the 50 or so inspections of individual

13   audits that were conducted, right?

14   A.  Right; on a no-names basis, but.

15   Q.  On a no-names basis.

16            But the SEC gets the code, right?

17   A.  Right.

18   Q.  So, the SEC can know exactly who each issuer is, right?

19   A.  Right.

20   Q.  To help the SEC do its job with the reports, right?

21   A.  Right.

22   Q.  And then the Part II of the report has the negative

23   findings of the firm like KPMG that aren't necessarily specific

24   to a given inspection, right?

25   A.  Right.

J345mid4a                        Atkins - cross

1    Q.  So the themes that came out of inspections, right, you have

2    a lot of problems in this particular area, right?

3    A.  Right.

4    Q.  And then also general concepts, like tone at the top,

5    right?

6    A.  Yes.

7    Q.  So, to adjudicate those appeals the SEC gets the inspection

8    report, right?

9    A.  Right.

10   Q.  The commissioners have to, who are working on the appeal

11   have to read the inspection report, at least the part that is

12   being appealed, right?

13   A.  Well, in theory.  I don't know of any appeal that's ever

14   happened, but yes.

15   Q.  You didn't deal with an appeal by the time you left in

16   2008, right?

17   A.  That's right.

18   Q.  And that was 11 years ago?

19   A.  Right.

20   Q.  And this appeal process isn't a matter of public report

21   typically, right?

22   A.  Right.

23   Q.  So, let's just talk for one second about that Part II theme

24   that comes up sometimes, tone at the top.

25           You are familiar with that phrase, right?

1  A.  Yes.

2  Q.  And it generally means, does it not, the leadership -- the

3  leadership's view -- withdrawn.

4        Generally it means the leadership of a firm's view or

5  tolerance of bad conduct.  Is that a fair description of it?

6  A.  Yes.  The upper echelon should set a proper tone.

7  Q.  And the tone at the top matters, right?

8  A.  For most organizations I would think so, yeah.

9  Q.  And you have written about that, have you not?

10 A.  Yes.

11 Q.  And tone at the top, in the context of a public accounting

12 firm has a lot to do, does it not, with auditor integrity?

13 A.  Absolutely.

14 Q.  And you agree, don't you, that it's important for the

15 auditing profession to have integrity, right?

16 A.  Yes.

17 Q.  To be effective?

18 A.  Yes.

19 Q.  Because auditors are gatekeepers of sorts, right?

20 A.  Right.

21 Q.  And they're first line of defense that investors have

22 against people who lie, cheat, and steal; right?

23 A.  That's -- they, lawyers and others, right, need to act

24 accordingly.

25 Q.  But auditors, public auditors are the first line of defense

J345mid4a                         Atkins - cross

1    that investors have, right?

2    A.  Actually, the first line of defense is ethics at the

3    corporation public company because they're the ones putting

4    together the financial statements and the auditors, of course,

5    are the ones to come in thereafter and give a report to the

6    board and shareholders as to the, that the statements are

7    produced in accordance with Generally Accepted Accounting

8    Principles.

9    Q.  Do you recall participating in a lecture or giving a

10   lecture at Fordham Law School in 2008?

11   A.  Sure.  Yes.

12   Q.  On the subject of corporate securities and financial law?

13   A.  Yes.  Probably.

14   Q.  And you don't say things when you will give lectures that

15   are not true, right?

16   A.  I hope not.  Right.

17   Q.  Didn't you say in this lecture in 2008: *We want to ensure*

18   *that there is a robust and effective auditing profession.  Of*

19   *course that is the first line of defense that investors have*

20   *against people who would lie, cheat, and steal.  So, we*

21   *definitely need to concentrate on that.*

22           Do you remember saying that in that speech?

23   A.  I don't remember it but I-

24   Q.  It has been awhile?

25   A.  -- but I would agree with it.

J345mid4a                          Atkins - cross

Q.  You testified on direct examination at the beginning of
your testimony that the SEC rates auditors, right?

A.  Well, the audit firms, as far as their adherence to the
standards that are laid out.

Q.  So, I think you used the word "delegated" when you were
testifying earlier.  Do you remember that?

A.  Maybe.  I don't have that.

Q.  Well, the PCAOB is in charge of the inspection process,
right?

A.  Yes.

Q.  And then they have to send those reports to the SEC, right?

A.  Yes.

Q.  They can't just keep them to themselves, they have to send
them to the SEC, right?

A.  Right.

Q.  But the SEC also continues to regulate auditors of public
companies, right?

A.  Well, again, I mean in the first instance it is the states,
of course, that, the individuals, but with respect to the firms
if the -- if there is an audit failure or what not, if the
accounting firm hasn't audited in accordance with respect to
GAAP principles and if there has to be a restatement that
affects the public company, then that's how the SEC steps in
for the most part and if there are ethics issues or something
like that with respect to an accountant practicing before the

J345mid4a                    Atkins - cross

1   SEC, the SEC also has its own rules in that record.

2   Q.  So, yes, then the SEC, the SEC regulates auditors, right?

3   A.  Right.  Yes.

4   Q.  And, you mentioned the ethics and professional standards,

5   you are talking about SEC Rule 102?

6   A.  Yes.

7   Q.  So, the SEC can bring actions against individuals who fail

8   to follow professional standards or act with integrity, right?

9   A.  Yes.  It's a civil process, right.

10  Q.  And that's another way that the SEC regulates accountants

11  and auditors, right?

12  A.  Right.  The practice before it.  Right.

13  Q.  Right; of public companies?

14  A.  Yes.

15  Q.  So, someone who is an accountant who is not working on a

16  public company, put those aside?

17  A.  Right.

18  Q.  The accountants and the audit firms that regulate -- that

19  audit public companies are regulated by the SEC including by

20  Rule 1-02(e), right?

21  A.  Yes.  Yes.

22  Q.  Going back for just one second to the time that you were at

23  the SEC as a commissioner, I asked you some questions about how

24  the process went for your approval of PCAOB board members,

25  right?

J345mid4a                    Atkins - cross

1   A.   Right.

2   Q.   I want to turn to just a couple of other ways that the SEC

3   interacted with the PCAOB.

4        So, with respect to the budget you talked a little bit

5   about how you had a hearing when you were a commissioner to ask

6   the PCAOB some pointed questions about its budget.

7        Do you remember that?

8   A.   Yes.

9   Q.   You have not, in your work since leaving the SEC,

10  participated in any cases or assignments that have had to do

11  with the SEC's approval of PCAOB's budget, right?

12  A.   No.   I have talked to commissioners about it but, no, I

13  haven't personally been involved with it.

14  Q.   And since you left the SEC you don't know what the chief

15  accountant at the SEC considers in evaluating the PCAOB's

16  budget, right?

17  A.   Not.   Right, not in detail, no.

18  Q.   You haven't had any conversations with the chief accountant

19  about what he considers in evaluating the PCAOB's budget,

20  right?

21  A.   Well, I mean -- well, not specifically, right.   In general,

22  I have talked to former chief accountants about the budget in

23  chief and about how PCAOB has operated.

24  Q.   Generally, but not specifically, about what they consider

25  in evaluating the PCAOB's budgets, right?

J345mid4a                         Atkins - cross

1    A.  Right.

2    Q.  Or what they have their staff do, right?

3    A.  Right.

4    Q.  Similarly you don't know exactly what the Chief Accountant

5    at the SEC does internally within the Office of the Chief

6    Accountant to tell his staff how to deal with the referrals

7    from reports that come in, right?

8    A.  Sorry.  Referrals from the report?  The audit?

9    Q.  So, when the chief accountant's staff is reviewing the

10   PCAOB inspection reports to make referrals there is a process

11   that's involved there, right?

12   A.  Yes.

13   Q.  And there are conversations that happen between the chief

14   accountant and the staff about what should and shouldn't be

15   referred, right?

16   A.  Right.

17   Q.  And you have not been personally involved in any of that

18   process, right?

19   A.  Right, not.  Yes.

20   Q.  You are aware, aren't you, that some of what the SEC has

21   done in terms of using and looking at PCAOB inspection reports

22   changed in 2009, right?

23   A.  Sure.  I'm sure it changes a lot, like you were saying.

24   Q.  But after the financial crisis and the collapse of Lehman

25   there was a change within the SEC in terms of how --

J345mid4a                         Atkins - cross

1              MR. WEDDLE:  Objection, your Honor.

2              MS. KRAMER:  I'm sorry.  What was the basis of the

3    objection?

4              MR. WEDDLE:  Objection to discussion about Rule 403

5    with respect to the prosecutor's immediately expressed

6    question, your Honor.

7              THE COURT:  Sustained.

8              MS. KRAMER:  Your Honor, I believe that the witness

9    testified about this on direct examination.  I can find the

10   place in the transcript but there was overt testimony about

11   that.

12             THE COURT:  I think that was different.

13             MS. KRAMER:  Okay.

14             THE COURT:  I sustain the objection.

15             MS. KRAMER:  Certainly, your Honor.

16   BY MS. KRAMER:

17   Q.  So you are aware generally, Mr. Atkins, that things that

18   happen in the marketplace affect the way the SEC does things,

19   right?

20   A.  Yes.

21   Q.  When there is a need for more regulation the SEC often

22   implements more regulation, right?

23   A.  Well, if it has authority and jurisdiction.  Sometimes when

24   it tries it fails, like with hedge funds before Dodd-Frank and

25   that sort of thing.

J345mid4a                         Atkins - cross

1   Q.  When it has the authority, for instance under

2   Sarbanes-Oxley, and it sees a need to implement more regulation

3   to fulfill its mission it does that, right?

4   A.  Well, it has to go through a notice and comment period and

5   it has to make a lot of decisions along the way but, yeah,

6   especially in the wake of Dodd-Frank and the financial crisis.

7   I mean, Dodd-Frank gave the SEC a lot more authority with

8   respect to regulation.

9   Q.  And, so putting aside the comment period for rule making,

10  just in terms of enforcement within the SEC's already

11  established authority when there is a particular need to

12  address a problem, the SEC responds and tries to address that

13  problem, right?

14          MR. WEDDLE:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  I think I -- yeah, it depends.  I mean,

17  again, based upon authority and whatever the rules are but,

18  yeah, it might focus more attention on particular issues than

19  on others that it might not have looked at before.

20  BY MS. KRAMER:

21  Q.  So, when it has the authority and there is a need to

22  address an issue the SEC focuses on that issue, right?

23  A.  Yes.

24  Q.  I want to just go back to something you said at the

25  beginning of your testimony and then I will wrap up, your

1    Honor.  I see it is almost 1:00 but I will be done before the

2    lunch break.

3            You testified early in your testimony that you are

4    getting paid -- your hourly rate is, I think you said, $1,450,

5    right?

6    A.  Right.

7    Q.  So, that's $1,450 an hour, right?

8    A.  Right.

9    Q.  And you are not the only person from your firm who has

10   worked on this case, right?

11   A.  Right.

12   Q.  Has Walton Liles also worked on this case?

13   A.  Yeah.

14   Q.  And he bills $850 an hour?

15   A.  I don't know, but if you say so.  I don't know how much it

16   is.

17   Q.  That sounds right, doesn't it?

18   A.  Somewhere around there.

19   Q.  And Randall Wilson, he also has worked on this case?

20   A.  Yes.  Probably.

21   Q.  And Harrison Procter?

22   A.  I guess so, yes.

23   Q.  And they also bill in the hundreds of dollars an hour,

24   right?

25   A.  Probably.

J345mid4a                          Atkins - cross

1    Q.  How much has your firm collected in exchange for your

2    testimony here at this trial?

3    A.  I have no clue.

4    Q.  You haven't sent out any bills yet?

5    A.  Maybe we have.  I don't know what that would be.

6    Q.  Well, thousands of dollars, right?

7    A.  Probably.

8    Q.  Multiple bills that you have sent out since you started

9    working on this case?

10   A.  I don't know.

11   Q.  So much that you have lost track?

12   A.  No, I -- that's handled by other people so, within my firm,

13   so I haven't seen the bills.

14          MS. KRAMER:  May I have a moment, your Honor?

15          THE COURT:  Yes.

16          MS. KRAMER:  Nothing else, your Honor.

17          THE COURT:  All right.

18          Is there anything further?

19          MR. WEDDLE:  I have a line of questioning, your Honor.

20          THE COURT:  Do you think we should break for lunch or

21   do you think it is going to be relatively short.

22          MR. WEDDLE:  Mine is less than three minutes.

23          THE COURT:  Okay.

24   CROSS EXAMINATION

25   BY MR. WEDDLE:

J345mid4a                    Atkins - redirect

1   Q.  Good afternoon, sir.  My name is Justin Weddle, I represent

2   Jeffrey Wada in this case.

3          On cross-examination you were talking about tone at

4   the top and a speech that you may have given at Fordham Law

5   School.  Do you remember that?

6   A.  Yes.

7   Q.  Is it your understanding that each and every deficiency in

8   tone at the top should be punished by the criminal law?

9          MS. MERMELSTEIN:  Objection, your Honor.

10          THE COURT:  Sustained.

11  BY MR. WEDDLE:

12  Q.  Is it your understanding that each and every lapse in

13  auditor integrity should be pushed as a crime.

14          MS. KRAMER:  Objection to this line of questioning,

15  your Honor.

16          THE COURT:  Sustained.

17          MR. WEDDLE:  Nothing further.

18          THE COURT:  Mr. Bruch.

19  REDIRECT EXAMINATION

20  BY MR. BRUCH:

21  Q.  Very quickly.

22          The prosecution asked a few questions about the SEC's

23  regulation of auditors.  Has the SEC ever required auditors to

24  register?

25  A.  Auditors to register?

J345mid4a

1    Q.  Register with the SEC.

2    A.  Not that I know of.

3    Q.  Has the SEC ever conducted inspections of auditors?

4    A.  No.

5    Q.  Has the SEC ever required auditors to file periodic reports

6    or anything with the SEC?

7    A.  No.  That's not their role.

8    Q.  Now, the government asked you about Rule 1-02(e) of the

9    Commission's practice and suggested it was a regulatory

10   measure.  What is the purpose of Rule 1-02(e)?

11   A.  Well, it's the rule of professional conduct with respect to

12   the SEC itself as to with lawyers and other professionals like

13   accountants.  So, it is a discretionary rule by the SEC.

14   Q.  Is it the rule that permits --

15           MS. KRAMER:  Objection to the testifying and leading,

16   your Honor.

17           THE COURT:  Sustained.

18           MR. BRUCH:  No further questions.

19           THE COURT:  All right.  Ladies and gentlemen, we are

20   going to break for lunch.

21           You can step down.

22           (Witness excused)

23           THE COURT:  Ladies and gentlemen, we will take an hour

24   for lunch.  It is just about 1:00 and we will start back at

25   2:00.  Please leave your note pads on your chairs.  Have a good

J345mid4a

1    lunch.  We will see you at 2:00.

2              (Continued on next page)

J345mid4a

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Anything anybody wanted to address before lunch?

4              MR. WEDDLE:  Your Honor, we have one housekeeping

5     matter.

6              MR. COOK:  Your Honor, we would ask for oral

7     permission -- we haven't drafted an order to this effect -- to

8     allow some technical experts to come in and test the courtroom

9     for a screen to be used during summation.

10             THE COURT:  Okay.

11             MR. COOK:  If that would be permissible.

12             THE COURT:  Okay.

13             MR. COOK:  And the microphone, a wireless microphone.

14             THE COURT:  So you want a wireless microphone?

15             MR. COOK:  Using the existing system, whether we can

16    use a separate wireless mic so we can move between the screen

17    and podium during summation.

18             THE COURT:  Okay.  I guess that's okay.  Usually I

19    don't like wandering summation where it's kind of like the

20    Maury Povich Show, but you can use the wireless mic if it helps

21    and it is fine if you are going to have a screen to go and

22    point to something on the screen and go back to the podium.

23    So, I don't have a problem with that.

24             MR. COOK:  Thank you.

25             MS. MERMELSTEIN:  Just in terms of the plan for the

J345mid4a

1   rest of the day.

2           I understand Mr. Lundelius is testifying next, we

3   don't have any sense of whether or not there are any witnesses

4   after that and we have not pushed the issue of whether or not

5   the defendants are testifying, recognizing that that often is a

6   late-time decision but I think we would like it know if they're

7   testifying and, if not, I think your Honor should allocute them

8   on the fact that that was their decision.

9           MR. BOXER:  I didn't hear the last bit.

10          THE COURT:  She asked me to allocute the defendants on

11  whether that was their decision if in fact a decision has been

12  made not to testify.

13          MR. BOXER:  We will decide after Mr. Lundelius'

14  testimony if an allocution of some sort is necessary.

15          THE COURT:  So, Mr. Lundelius is next?

16          MR. BOXER:  He is next, yes.

17          THE COURT:  Aside from defendants, is there any other

18  witness?

19          MR. BOXER:  We have a summary chart witness as well,

20  your Honor.

21          THE COURT:  All right.

22          Anyone else.

23          MR. COOK:  We will have some, in addition to the

24  possibility of Mr. Wada testifying which we are still

25  evaluating, we have some stipulations to read into the record.

J345mid4

1              THE COURT:  Okay.

2              MR. WEDDLE:  We may have one custodial witness from

3     Verizon, your Honor.

4              THE COURT:  All right.

5              Okay.  We will be in recess until 2:00.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J345mid4

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | A F T E R N O O N   S E S S I O N                            |
| 2  | 2:10 p.m.                                                    |
| 3  | THE COURT:  Good afternoon.                                  |
| 4  | Next is the testimony by.                                    |
| 5  | MS. LESTER:  Mr. Charles Lundelius, your Honor, our          |
| 6  | expert.                                                       |
| 7  | THE COURT:  Anything you all need to address before          |
| 8  | that?                                                         |
| 9  | MS. KRAMER:  Two very brief scheduling issues, your          |
| 10 | Honor.                                                        |
| 11 | First, while we were in court this morning, counsel          |
| 12 | for both defendants filed written objections that are together |
| 13 | quite lengthy to the Court's proposed charge.  We have       |
| 14 | obviously been here on trial and would like an opportunity to |
| 15 | look at them and digest them and respond to them before the  |
| 16 | charge conference.  So, I don't know in light of that that we |
| 17 | are in position to be ready for the charge conference right  |
| 18 | when we stop today.  So, we wanted to raise that.  We can see |
| 19 | where we are at the end of the day and talk about what makes |
| 20 | sense but we wanted to put that on your radar.               |
| 21 | THE COURT:  Yes.                                             |
| 22 | MS. KRAMER:  Second, we understand that counsel for         |
| 23 | Defendant Wada is potentially going to call a witness from   |
| 24 | Verizon to offer some phone records.  We will then have a small |
| 25 | rebuttal case that we will need to put on.  There is a witness |

J345mid4

who, you will recall, it was not out-of-state or anything, but

because it is unclear right now how much more there is on the

defense case and it sounds like it won't be clear until after

the next witness testifies, we aren't having that person come

to court today because it seems like it could be today or could

be tomorrow depending on how things go.

          So we wanted to put that on your radar.

          THE COURT:  So you are assuming we are going into

tomorrow with testimony?

          MS. KRAMER:  I don't know.  I think if both witnesses

testify then, yes.  And even if just Mr. Middendorf testifies,

then I think that is a strong possibility but I obviously have

no idea how long his direct would be so I don't know but just

trying to plan for the eventualities.

          THE COURT:  Anybody want to add anything?

          MR. WEDDLE:  Your Honor, just with respect to the

Verizon witness that I mentioned earlier we may, instead of

calling the witness, offer a Rule 902 certification which I

think covers this issue.  Obviously you don't see Rule 902

certifications too frequently in criminal cases because if the

government is not permitted to offer them because of the

defense's confrontation clause rights but, as offered by the

defense there is no obstacle to use of a 902 certification

other than calling custodial witness.  So, if we get that

signed we won't have to call a witness.  If we don't get it

J345mid4

1   signed or if there is some problem with the 902 certification

2   then we would have this custodial witness from Verizon.  I

3   don't think we can have the custodial witness from Verizon here

4   today so if we needed to do that we would ask the Court's

5   permission to do that first thing in the morning, if that's

6   where we are in the trial.

7              THE COURT:  All right.

8              MS. LESTER:  Just one more thing, your Honor.

9              During the cross-examination of Mr. Sweet I offered

10  Defendant's Exhibit M-277, which was a photograph from a

11  website subject to authentication.  The government has agreed

12  to stipulate to the authentication of that witness so I just

13  want to put that on the record, that it is now fully in

14  evidence.

15             MS. KRAMER:  That's correct, your Honor.

16             THE COURT:  M-277.

17             MS. LESTER:  Yes, your Honor.

18             THE COURT:  Just to be clear for the record, that's in

19  evidence.

20             (Defendant's Exhibit M-277 received in evidence)

21             MR. WEDDLE:  And, with respect to Defendant Wada's

22  case, your Honor, this is an issue that we raised at some point

23  last week, which is that we intend to offer some excerpts of

24  chats and I propose that if there is a convenient time for the

25  Court, that we could go through and talk about the individual

J345mid4

1    basis for the admission.  They're all admissible not for their

2    truth.  Some of them, also, I think would fall within the state

3    of mind exception to the hearsay rule but I don't know if your

4    Honor wants to do that at some point when we are not delaying

5    the jury or if you want to do that on the fly.  We are happy to

6    do it either way.

7              THE COURT:  Is the government going to be objecting to

8    those?

9              MS. ESTES:  We are not objecting to authenticity.

10   There are a few where we have hearsay objections.

11             THE COURT:  All right.

12             MS. KRAMER:  Just to be clear, your Honor, on the 902

13   certification issue, we have not seen any certifications to

14   date, and have a right to inspect them and it is not clear that

15   we have seen the actual exhibit either.  We understand that it

16   comes from data that was in that spreadsheet but that defense

17   counsel is operating on the information that some of the data

18   in that spreadsheet is Verizon.

19             We haven't seen the exhibit, we haven't seen the

20   certifications, and so I don't want our silence to be

21   misconstrued as consenting to that procedure because it is not

22   clear that we will.

23             MR. WEDDLE:  To give a little bit more explanation,

24   your Honor, the government produced to the defense a number of

25   spreadsheets that they said in their cover letter were KPMG

J345mid4

conference call data.  We got a very large compilation

spreadsheet several weeks ago and then in the middle of trial I

think we got 30 or 40 a additional spreadsheets which, we were

told by the government, were produced to KPMG by KPMG's service

provider Verizon, and then produced to the government and

produced to us as conference call data.

There are three conference calls that we plan to admit

into evidence under Rule 902.13.  The conference call data

itself is admissible, it is the result of a process that is

when conference calls are made, the computer system records

data about the conference call, it is not a human being who

records it.  So, 902.13 is specifically intended to avoid

having to call custodial witnesses to authenticate things like

computer processes that accurately and automatically record

data regarding things that are taking place in the computer.

So, there isn't actually an exhibit.  We have tried to

reach a stipulation with the government with respect to this,

with respect to one of the spread sheets that the government

produced to us.  We were not successful in reaching the

stipulation.  We don't need to admit the spreadsheet which has

thousands of lines in it, maybe tens of thousands of lines.

There is just three lines that we think are admissible and we

propose to put them directly into the 902.13 certification and

the certification would basically be by someone at Verizon who

says that Verizon provides conference call hosting services to

J345mid4

KPMG, that when a conference call is hosted the computer system
records certain data including the call date and time and
duration as well as the call-in number that is the phone number
of the person who is entering the conference call.  That data
is automatically recorded by the computer system and those
three lines of data we would just put directly into the 902.13
certification.

THE COURT:  Okay.  So the government is aware of what
those three lines are?

MS. KRAMER:  We haven't see any certification, your
Honor.

We have had a lot of discussions that aren't worth
airing here about the nature of the evidence and it's accuracy.
So, once we see what the defense proposes to offer, we will
respond to them.  Time is obviously running out in the trial
and so we just wanted to alert your Honor to that and if they,
whether they put it in through custodian or through one of
these certifications, we will have a rebuttal case.

So, once we have a better sense of timing, we will get
that witness here.

THE COURT:  Okay.  So, should we go ahead with
Lundelius for now and then see where we are after that, and
your summary witness.

MS. LESTER:  That's fine with us, your Honor.

MR. BOXER:  Yes.

J345mid4

1              THE COURT:  You can bring him in and we will get the

2       jury in.

3              (Continued on next page)

J345mid4                         Lundelius – direct

 1              (Jury present)

 2              THE COURT:  Good afternoon, ladies and gentlemen.

 3              THE JURY:  Good afternoon, sir.

 4              THE COURT:  Welcome back.  We are continuing with the

 5     evidence in the case and Ms. Lester, you may call your next

 6     witness.

 7              MS. LESTER:  Thank you, your Honor.  The defense calls

 8     Charles Lundelius.

 9              THE COURT:  Sir, if you would please raise your right

10     hand, Mr. Hampton will swear you in.

11      CHARLES REYNOLD LUNDELIUS, JR.,

12          called as a witness by the Defendants,

13          having been duly sworn, testified as follows:

14              THE DEPUTY CLERK:  Please state your full name and

15     spell your last name, slowly, for the record.

16              THE WITNESS:  Charles Reynold Lundelius, Jr.

17     L-U-N-D-E-L-I-U-S.

18     DIRECT EXAMINATION

19     BY MS. LESTER:

20     Q.  Good afternoon, Mr. Lundelius.

21     A.  Good afternoon.

22     Q.  Where are you employed?

23     A.  I'm employed at Berkeley Research Group in Washington, D.C.

24     Q.  Is Berkeley Research Group also known as BRG?

25     A.  Yes, it is.

J345mid4                     Lundelius - direct

1   Q.  And what type of organization is that?

2   A.  It's a consulting firm.  We have economists, accountants,

3   as well as specialists in other fields.

4   Q.  How long have you worked at BRG?

5   A.  About seven years.

6   Q.  And, in your work there, what are your general duties and

7   responsibilities?

8   A.  I run the capital markets group.  That's a group of

9   individuals that deal with regulatory, as well as finance

10  issues.  They specialize in accounting, as well as other areas.

11  Q.  What did you do prior to working at BRG?

12  A.  I was at another consulting firm for about 11 years.

13  Previous to that I was at both Coopers & Lybrand and Deloitte

14  at various points in time working in their audit groups or

15  their financial advisory group.

16  Q.  What is your educational background?

17  A.  I have a Bachelors of Science in Commerce from the

18  University of Virginia with a concentration in accounting, and

19  then I have a Masters in Business Administration from Tulane

20  University with a concentration in finance.

21  Q.  Do you hold any certifications?

22  A.  I do.  I am a certified public accountant, I am accredited

23  in business evaluation business the American institute of CPAs,

24  and I am certified in financial forensics by the American

25  Institute of CPAs.

J345mid4                    Lundelius – direct

1    Q.  In the course of your career, have you had experience,

2    direct experience in auditing the financial statements of

3    financial institutions, in particular?

4    A.  Yes, I have.

5            When I first started in public accounting that was in

6    1980.  I started at what was one of the big 8 firms and was on

7    their financial institution's audit team.

8    Q.  As a result of your work and training, do you have general

9    familiarity with auditing standards that apply to the work of

10   auditors?

11   A.  That I do.  Yes.

12   Q.  And are you familiar with AS 3, for example?

13   A.  Yes.

14   Q.  And AU 390?

15   A.  Yes.

16   Q.  Have you written any articles or books relative to the

17   accounting field?

18   A.  I have.  I have published -- well, the American Institute

19   of CPAs has published two of my books.  They deal with

20   financial reporting fraud they also deal with internal control

21   at firms.

22   Q.  Have you ever testified previously in court?

23   A.  Yes, I have.

24   Q.  How many times, approximately?

25   A.  Over 30.

J345mid4                         Lundelius - direct

1    Q.  Have you been retained by the defense group in this case?

2    A.  Yes, I have.

3    Q.  What is your hourly rate for your services?

4    A.  Well BRG, my employer, charges $950 an hour for my time.

5    Q.  Is that your standard rate?

6    A.  Yes, it is.

7    Q.  In prior cases where you have testified, Mr. Lundelius,

8    have you reviewed audit workpapers in preparation for that

9    testimony?

10   A.  That, I have.  Yes.

11   Q.  And, in preparation for your testimony in this case, did

12   you also review some audit workpapers?

13   A.  Yes, I did.

14   Q.  We will return to that in a moment.  For now let's talk

15   about some general terms related to auditing.

16          Could you explain to the jury, generally, what is the

17   role of an auditor?

18   A.  Well, an auditor is charged with certifying whether the

19   financial statements are fairly presented in accordance with

20   U.S. Generally Accepted Accounting Principles.

21   Q.  How does the auditor do that?

22   A.  The auditor does that by performing certain procedures.

23   Some include tests, some include inquiry, confirmation of

24   balances, various other activities and procedures to verify the

25   validity of the financial statements.  The auditor will first

J345mid4                    Lundelius - direct

1    start with looking at the general controls at a firm and then,

2    after testing those, they'll go and look at the actual balances

3    that show up on the income statement and the balance sheet.

4    Q.  What is the work product, if any, that an auditor

5    generates?

6    A.  At the end of the process an auditor generates, for a

7    public company like the ones that we are dealing with here, two

8    different opinions.  One is an opinion on the financial

9    statements themselves, whether they're fairly presented, just

10   as I said, in accordance with generally accepted accounting

11   principles.  The second opinion is an opinion that attests to

12   management's assertion, that is every company's management as

13   to determine whether or not their internal controls over

14   financial reporting are operating properly and the auditor

15   issues a second opinion on management's assertion.

16   Q.  Do you have a general understanding, based on your own

17   experience at an audit firm, of what the role of the national

18   office of an audit firm is?

19   A.  Yes.

20        The major accounting firms like KPMG all have a

21   national practice office.  It's a group of individuals that are

22   specialists in accounting and auditing issues.  They assist

23   the, what they call the line partners, the partners that are

24   out in the field actually running audits on companies, they

25   will sometimes need assistance in terms of accounting advice or

J345mid4                          Lundelius - direct

1    auditing advice and they can call on these individuals at the

2    national practice office and hopefully get that advice.

3    Q.  So, is it fair to say that the members of the national

4    office are not the people on the ground who are actually

5    conducting the audits themselves?

6    A.  Yes.  That's correct.  They are not.

7    Q.  For the next set of questions let's assume that we are

8    talking about public companies and the audits of public

9    companies.  Okay?

10   A.  Okay.

11   Q.  Assuming such a company operates on a fiscal year that's

12   the same as the regular calendar year, is there typical

13   timeline for the auditor's work on that company's financial

14   statements?

15   A.  Yes.  The auditor has to finish this process within a very

16   short period of time after the end of the year.  It depends on

17   how large the audited entity is but that time frame is either

18   60 or 75 days to get the audit opinion deleted and a report

19   filed with the SEC.  So, because of that tight time pressure

20   auditors begin their work before year-end trying to do as much

21   test work to get this out of the way so in that very narrow

22   window that they have after year-end they go back and finish up

23   their work.

24   Q.  You mentioned a 60 or 75-day period after the end of the

25   fiscal or calendar year in our case.  What is the significance

J345mid4                        Lundelius - direct

1  of that date 60 or 75 days later?

2  A.   That is the date that is determined by the SEC for actually

3  filing a, in this case a form 10-K annual statement that goes

4  to the SEC and it then is published and it contains not only

5  your financial statements but a lot of disclosures that are

6  made by the company management as well.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J34dmid5                         Lundelius - direct

1   Q.  And so that's a deadline for the company itself, not the

2   auditor?

3   A.  That's correct, that's the deadline for the company itself.

4   Q.  And does that date also have significance for the auditor?

5   A.  Yes.  The auditor has to finish his work and actually be in

6   a position to release his report at sometime before that so

7   that it gets incorporated into the SEC file.

8   Q.  And by that point in time, what's the status of the audit

9   procedures?

10  A.  At that point in time, the audit procedures are to finalize

11  the various procedures that are being done, the tests, the

12  confirmations.  Everything that needs to be done that couldn't

13  be done before year end now has to be wrapped up in those first

14  couple months that follow after year end.  And then there is a

15  process the auditor goes through to actually get ready to sign

16  off on the report, and hopefully that's done in a timely

17  fashion.  And then the auditor also signs off on the opinion on

18  the internal control, and then that's all wrapped up into the

19  10-K filing.

20  Q.  And is that sometimes referred to as the report release

21  date?

22  A.  Right.  The report release date is the date that the

23  auditor has actually said the report -- his report, the audit

24  firm's report, is ready now to be released.

25  Q.  And at that point are audit procedures complete?

J34dmid5                         Lundelius - direct

A.   Audit procedures may continue.  The audit rules allow for

the auditors to take 45 days after the report release date to

wrap up their documentation of the process.  That wrap-up

period should include, or should involve completing the

documentation on work that was done and tests that were done

before that report release date.

Q.   And that could include documenting work that had already

taken place but for which there was no documentation up to that

45-day period?

A.   It could include that, or it could -- more often it

involves simply finishing the documentation it perhaps started

before the report release date.

Q.   Is there an auditing standard that governs the

documentation period?

A.   Yes, there is, and for our purposes that is that's AS 3.

          MS. LESTER:  I would like to put up what's already in

evidence as M176.

Q.   Is this Auditing Standard Number 3, or AS 3, Mr. Lundelius?

A.   Yes, it is.

          MS. LESTER:  We can take that down.  Thank you.

Q.   What happens if at some point after the report release date

an auditor realizes that additional work has to be done?

A.   There is a procedure set up for that in the audit

standards.  The issue is if the auditor felt like there was

some procedure that they omitted that they should have done

1    before the report release date but they didn't, so now they're

2    playing catch up and trying to get that done, they have --

3    during that 45-day window, they have a period of time in which

4    then can actually pursue the additional work and get it done,

5    and that's governed by a separate standard called AU 390.

6                MS. LESTER:  If we could put up for the witness what's

7    been marked for identification as Defense Exhibit M186, please.

8    Q.  Do you recognize this, Mr. Lundelius?

9    A.  Yes.  That is the consideration of omitted procedures after

10   the report date.

11   Q.  And is that AU 390 to which you were just referring?

12   A.  It was, yes.

13               MS. LESTER:  Your Honor, we offer M186.

14               THE COURT:  M186 is received in evidence.

15               (Defendant's Exhibit M186 received in evidence)

16   BY MS. LESTER:

17   Q.  And so, Mr. Lundelius, you mentioned, I believe, that if

18   additional work is necessary during the 45-day documentation

19   period, this is the rule that applies or the standard that

20   applies.  What about work that is discovered, for whatever

21   reason, after the 45-day period?

22   A.  Well, if there is something that is discovered after that

23   period of time that needed to be done and it was -- it relates

24   to presumably something that's important, something that was

25   omitted that you now need to go back and test, you can actually

1    do that under the standards, but now you have -- you have to

2    document that as well and make it clear that -- the only

3    changes you can make to the audit documentation at this point

4    is to add more documentation to the file.  You can't delete it

5    after the 45-day period ends.

6    Q.  And so if you did additional work, would you use AU 390 to

7    document that work?

8    A.  You do to the extent that it's needed, but you also have

9    another provision that comes into play if indeed you found new

10   facts and that's AU 561.

11           MS. LESTER:  You can talk that down.  Thank you,

12   Ms. O'Connor.

13   BY MS. LESTER:

14   Q.  What happens at the end of the 45-day period?

15   A.  At the end of the 45-day period, you actually are at the

16   documentation completion date, and so all documentation to that

17   point should be in the file.  As I said, you could add to it

18   after that date but you cannot change or delete anything after

19   the documentation completion date.

20   Q.  Has that 45-day deadline for documentation always existed?

21   A.  No, it has not.  It was implemented with AS 3.

22   Q.  Do you know when, about, approximately, AS 3 was put in

23   this place?

24   A.  I believe it was sometime around 2004/2005, in that

25   timeframe.

```
 1   Q.  And based on your experience, do audit firms nowadays keep
 2   their workpapers in electronic or in hardcopy form?
 3   A.  Well, they keep it in electronic form mostly now.
 4   Q.  And so at the end of the 45-day period, what happens to the
 5   electronic file?
 6   A.  The electronic file should be locked down in some form such
 7   that changes made after that date are simply added to the file
 8   and you can't delete.
 9   Q.  Mr. Lundelius, are you familiar with the term "allowance
10   for loan lease losses," or "ALLL"?
11   A.  Yes.
12   Q.  What does that mean?
13   A.  Well, that is an allowance -- or the nonaccounting term is
14   a reserve, but it's a set aside for loans that may go bad or
15   some portion of loans that may go bad.
16   Q.  And does that term apply only to institutions that make
17   loans of some sort?
18   A.  It applies to, yes, an institution that makes loans, yes,
19   any entity that makes loans, correct.
20   Q.  So it doesn't necessarily have to be a bank, it would just
21   have to be another financial service institution, for example,
22   that makes a loan?
23   A.  That is correct, yes.
24   Q.  The reserve or the allowance that you mentioned, does it
25   have more than one aspect to it?
```

J34dmid5                          Lundelius - direct

1   A.   It comes in two general forms.   There is a general

2   liability -- general loan loss liability, and then there is a

3   specific loan loss liability.   Those are typically the way

4   financial institutions handle it.

5             They'll put a pool of loans into the general liability

6   section and then figure out out of that pool what percentage,

7   roughly, will go bad at certain points in time; that will

8   determine general liability.   Then the specific liability

9   relates to loans that have actually indicated or looked like

10   they are going bad, and they'll move them over into that

11   liability and start assessing a separate charge for credit loss

12   based off of that group.

13   Q.   So do lending institutions keep track of those two sets of

14   reserves separately?

15   A.   They do internally, that's right, though I think they

16   report them as combined.

17   Q.   How do lending institutions go about determining what the

18   reserve or the allowance for loans that might go bad should be?

19   A.   They look at a number of factors.   The GAAP standard is

20   the -- GAAP is written very tightly.   It has -- essentially

21   requires that it is probable that a certain loan has incurred a

22   loss.   And "probable" is a very high standard for accountants.

23   Probable means likely to happen.   And if you want to put a

24   percentage on it, accountants usually say it is like an

25   80 percent chance or more of having happened.   So, it's a very

J34dmid5                          Lundelius - direct

1    high bar.

2           And what the reserves are attempting to do is to see

3    how many loans have deteriorated to the point where they hit

4    that bar or go over it.  And so what will happen is the -- say

5    the general liability reserve will look back in time and say,

6    well, you know, so many loans go bad out of this particular

7    type of group, say the commercial loans or residential loans,

8    and they'll run a percentage calculation off of that against

9    the loan balance, and they'll adjust it.  There is a lot of

10   subjectivity here but they can adjust it, and then they report

11   out a general liability reserve.

12   Q.  You mentioned the term "GAAP."  Could you explain to the

13   jury what that is?

14   A.  Generally Accepted Accounting Principles is GAAP.  It is a

15   set of accounting rules that are set up by the Financial

16   Accounting Standards Board.  The FASB is based up in Norwalk,

17   Connecticut.  And they write these rules for U.S. issuers.

18          There's another rule standard setter that is in

19   Europe, and they write rules for international firms.

20   Q.  Now, the exercise that you described just a moment ago of

21   estimating the amount of the allowance for the reserve, is that

22   something that is undertaken by the lending institution or by

23   the auditor?

24   A.  The lending institution has to come forward and actually

25   make these estimates.  The role of the auditor is to come in

J34dmid5                         Lundelius - direct

1    and test the reasonableness of the estimates.

2    Q.  How does the auditor do that?

3    A.  The auditor does it with great difficulty.  The process is,

4    as I said, subjective in many cases.  If you look at, say --

5    well, for a given let's say a given liability -- general

6    liability reserve, you're trying to get a percentage number to

7    multiply against the total loan balance to tell people how many

8    loans or how much in dollar amount in loans will go bad.  That

9    process has a quantitative aspect to it, very numbers-driven,

10   and then a qualitative aspect to it that's very squishy.  It's

11   like -- the qualitative aspect is do we think business

12   conditions are going to get better or worse?  Do we think our

13   loan officers are getting better at their jobs or worse at

14   their jobs?  Really, really subjective.

15          The quantitative side is not free of subjectivity,

16   though it has got a lot of subjectivity.  It says, well, let's

17   see.  Where do we think a loan first started to go bad, because

18   that's going to impact our numbers?  If it was a year ago, that

19   gives us one result.  If we think the loan started to go bad

20   two years ago, then that gives us a completely different

21   result.  So you're in there trying to get us -- or get to a

22   point where you can make a defensible argument, I should say,

23   that the loans started to go bad at, you know, 12 months, 18

24   months, 24 months before they actually did show up as a charge

25   off.

J34dmid5                          Lundelius - direct

1    Q.  And that exercise of judgment that you were just

2    describing, is that something that the lending institution

3    undertakes or the auditor?

4    A.  Again, the lending institution is doing this.  The auditor

5    comes along and tests these subjective judgments as best as the

6    auditor can.  The auditor has a fairly daunting task, though.

7    The auditor is looking at these subjective measures and trying

8    to see how much support there is that management has for these

9    judgment calls that management is making.  And the issue really

10   is is how much does the auditor have to document in order to

11   get some level of actually being able to convey to the

12   auditor's superiors that he has looked at a lot of this stuff

13   and really, really examined it and pulled it apart.  There are

14   no clear standards for that.  It's a judgment call as to how

15   subjective the reserving process is, and then it is another

16   judgment call as to how subjective the audit documentation

17   process is.

18   Q.  Generally speaking, with respect to auditors' work, are

19   there many areas that involve a level of judgment?

20   A.  Yes, there are.  There are estimates of all sorts.  We've

21   got a whole range of new accounting standards that involve

22   estimates.  So this is certainly the case that you have a lot

23   of estimates.  I find in this area where we are talking about,

24   loan loss, it's -- it's estimates upon estimates upon estimates

25   and it gets multilayered and it gets pretty complex pretty

J34dmid5                        Lundelius - direct

1    quick.

2    Q.  So how would you describe, for lack of a better term, the

3    degree of difficulty in terms of estimating the allowance for

4    loan lease losses compared to other types of auditor judgment

5    areas?

6    A.  Yeah, I put it like at the top of the areas where it is

7    most difficult for an auditor to both assess as well as

8    document.

9    Q.  At the beginning of your testimony, Mr. Lundelius, you

10   referenced the fact that you had reviewed workpapers in

11   preparation for your appearance here today.

12        Just generally speaking, what did you review?

13   A.  I looked at a set of workpapers that were produced in this

14   matter.  The workpapers included well fairly complete sets of

15   workpapers for about six different audit clients of KPMG that

16   are at issue here, and then I have some limited amount of

17   workpapers on some other KPMG clients.

18   Q.  And in connection with your review, did you also review

19   email correspondence that related to those workpapers?

20   A.  That I did, yes.

21   Q.  And were you asked in particular to look at examples of

22   suggested changes to those workpapers?

23   A.  Yes, I did.

24   Q.  What types of suggested changes did you see, generally

25   speaking?

J34dmid5                         Lundelius - direct

1    A.  I saw changes that were -- I mean, they were important to

2    the documentation but they were fairly specific and fairly

3    minor in that they would either be requests to go and explain

4    something more, which is not at all surprising given the

5    subjectivity involved in loan losses, and then there were some

6    requests for it to summarize findings.  Just simply, you would

7    have a list of findings and then the request would be, well,

8    please add a summary at the bottom.  There were other requests

9    to do some fairly straightforward calculations of some findings

10   that had been presented earlier.  That I think was the majority

11   of the changes that were requested.

12   Q.  And the workpapers and email correspondence that you

13   reviewed, did you understand that to relate to specific audits

14   that had been subjected to a rereview during the 2016 period?

15   A.  Yes.  These were all changes -- I think in terms of the

16   emails that I saw, these were changes related to the rereview

17   that I was summarizing.

18   Q.  And you understood that those workpapers related to the

19   charges in this case?

20   A.  That's my understanding, yes.

21   Q.  In your review of those workpapers, did you see any

22   documents that established a violation of any account auditing

23   standards?

24   A.  No, I did not.

25   Q.  And did you review any workpapers that reflected additional

1    audit procedures that were performed after the report release

2    date?

3    A.  Yes, I did.  I did in two instances.

4    Q.  Do you remember what those were?

5    A.  Yes.  The specific issuer or -- one was AMBAC, the other

6    was FBFS.

7    Q.  And was there any particular documentation prepared in

8    connection with those instances of additional work?

9    A.  Yes.  KPMG had a special form that they would use for AU

10   390 type of work.  That is additional procedures done after the

11   report release date.  So that form would be -- it's found in

12   both those files.

13   Q.  And based on your review of that documentation, did the

14   work that you reviewed comply with the AU 390 standard?

15   A.  Yes, it did.

16           MS. LESTER:  May I have a moment, your Honor?

17           THE COURT:  Yes.

18           (Pause)

19           MS. LESTER:  No further questions.

20           THE COURT:  OK.  Ms. Estes.

21   CROSS-EXAMINATION

22   BY MS. ESTES:

23   Q.  Good afternoon, Mr. Lundelius.

24   A.  Good afternoon.

25   Q.  So I just want to go back to your background a little bit

J34dmid5                          Lundelius - cross

1      first.

2              I believe you testified on direct examination that you

3      currently work at a consulting firm, is that right?

4      A.  That is correct, yes.

5      Q.  And you testified that you also worked at Deloitte for a

6      little bit, is that right?

7      A.  I did, yes.

8      Q.  Was that in the 1908s?

9      A.  No.  That was in the late '90s.

10     Q.  Late '90s.

11             And since you worked at Deloitte in the late '90s,

12     have you worked at any auditing firm?

13     A.  No, I have not.

14     Q.  And you've never worked at the PCAOB, right?

15     A.  That's correct.

16     Q.  You've never worked at the SEC, right?

17     A.  I was retained by the SEC for various matters and including

18     one matter that involved when I was retained by the Inspector

19     General of the SEC to look into why the SEC failed to catch

20     Madoff.  So if that counts as employment at the SEC, I've --

21     Q.  You've never been employed by the SEC directly, right?

22     A.  Well, I've worked under contract to them so I guess

23     that's -- my answer is no direct employment.

24     Q.  Now, when you worked at -- you worked at Deloitte in the

25     1990's, right?  That was before the PCAOB was in existence?

J34dmid5                        Lundelius - cross

1    A.  That's correct, yes.

2    Q.  And you claim you are familiar with the PCAOB's auditing

3    standards through your current work, right?

4    A.  That is correct, yes.

5    Q.  You hadn't worked as an auditor since the PCAOB was formed,

6    right?

7    A.  That is correct, yes.

8    Q.  Not a day?

9    A.  Not a day.

10   Q.  And you testified extensively about AS 3, right?

11   A.  I testified about AS 3, yes.

12   Q.  That is a PCAOB standard?

13   A.  Yes, it is.

14   Q.  And it was promulgated I think you said in 2004, 2005?

15   A.  That's correct, yes.

16   Q.  So, again, that's after you were -- after your work as an

17   auditor ended, right?

18   A.  That's correct, yes.

19   Q.  So you've never personally applied AS 3 in an audit?

20   A.  Well, I have applied AS 3 and looked at it with regard to

21   certain litigation engagements that I have been working on that

22   involve a review of audit workpapers.  So, yes, I have applied

23   AS 3.

24   Q.  So when you have been hired as an expert witness and been

25   paid for that you have applied AS 3, right?

J34dmid5                          Lundelius - cross

1    A.  Yes, right.

2    Q.  OK.  And I think you said you also had direct experience

3    auditing financial institutions, is that right?

4    A.  Yes.

5    Q.  So that was back in the 1980s, you said?

6    A.  Yes.  And then I was retained in -- I think it was around

7    2003 I was brought in to assist with the internal investigation

8    of Freddie Mac, and that was working closely with their

9    auditor, PriceWaterhouseCoopers.

10   Q.  Again, that was as an expert witness, right?

11   A.  That was part of the investigator team.  There was no

12   expert witness work in that.

13   Q.  You were paid for your work, right?

14   A.  Yes.

15   Q.  And you worked at a consulting firm at that point, right?

16   A.  Correct, I did.

17   Q.  And you worked at various consulting firms since the early

18   2000s, right?

19   A.  Right.

20   Q.  Primarily as an expert witness, right?

21   A.  No.  I'd say -- I've been involved in quite a few

22   investigations and I wouldn't say primarily.

23   Q.  Now, you testified that for this case you're billing about

24   $950 an hour, right?

25   A.  That's correct, yes.

J34dmid5                          Lundelius - cross

1   Q.  And so about how much total do you expect to be paid?

2   A.  Well, my firm -- I will get paid.  I know it is in excess

3   of a hundred thousand dollars.  I don't know what it is exactly

4   beyond that.

5   Q.  You said over a hundred thousand dollars?

6   A.  Yes, that is correct.

7   Q.  And is that just for you or for others on the case, too?

8   A.  That includes a team, a team of other CPAs that work with

9   me.

10  Q.  Now, Mr. Lundelius, I am going to return to your work on

11  this case.

12          You reviewed certain documents in the case, right?

13  A.  That I did, yes.

14  Q.  Documents provided to you by the defense?

15  A.  Yes.

16  Q.  And some of those documents involve the allowance, right?

17  A.  Yes.

18  Q.  And you testified that you didn't see any work that was

19  done and not documented, right?

20  A.  I don't recall a specific question on that.  I said that --

21  I found additional work that was documented.

22  Q.  Putting aside the AU 390, aside from that, I think you

23  testified you didn't see anything that would violate AS 3, is

24  that right?

25  A.  Correct, I did not.

J34dmid5                         Lundelius - cross

1    Q.  And I believe you testified that the allowance, that

2    involves a lot of subjectivity when it comes to the financial

3    institution's determination of the allowance, right?

4    A.  It does, yes.

5    Q.  I think you called it "squishy"?

6    A.  There is some element to it, the qualitative factors that

7    tend to be squishy, yes, because they're very subjective.

8    Q.  And you said the auditor has a daunting task of evaluating

9    the judgment calls the financial institution makes, right?

10   A.  In my opinion, yes.

11   Q.  And when they are evaluating that, they have to explain

12   their judgments in these workpapers, right?

13   A.  That is correct, yes.

14   Q.  And those explanations are important, right?

15   A.  They're required and the issue is how much explanation is

16   really needed, that's the issue that's open, but there is an

17   explanation required, yes.

18   Q.  So you want to do the best job possible with an

19   explanation, right?

20   A.  I think a monitor does, yes, as a general rule, but there

21   is a difference between a standard and trying to do the best

22   job possible, but the standard is not well set out and it is

23   not very clear.

24   Q.  But we can agree that the word you put in the workpapers,

25   how you explain your judgment, they matter, right?

J34dmid5                          Lundelius - cross

1    A.  Yes, they matter, yes.

2    Q.  And sometimes these memos explaining the judgment, they can

3    be hundreds of pages, right?

4    A.  They can, yes.

5    Q.  Now, Mr. Lundelius, even though you reviewed documents in

6    this case, you didn't actually talk to any of the auditors, did

7    you?

8    A.  I did not, no.

9    Q.  So you have no way of knowing sort of what procedures they

10   actually did in the case, right?

11   A.  No, that's not correct.  The audit standards say that the

12   audit workpapers need to be written at such a level, and it is,

13   such that it is possible that a knowledgeable CPA can come in

14   and pick them up and understand the procedures that were

15   performed.  That's the standard.  As far as I could tell for

16   the documents that we had, particularly for the six firms we

17   had fairly complete documents, I was able to do that.

18   Q.  But -- so as to these workpapers, you said you reviewed

19   certain changes, right?

20   A.  I'm sorry?

21   Q.  You reviewed edits to the workpapers, right?

22   A.  Yes, I did.

23   Q.  And those were handwritten edits you saw on the documents,

24   right?

25   A.  Some were handwritten, some were done in a Word document.

J34dmid5                        Lundelius - cross

1    Q.   And you understand that the eAudIT system doesn't track

2    every change made in the workpapers, right?

3    A.   That is my understanding, yes.

4    Q.   So there is no way of knowing exactly what changes were

5    made to the workpapers, right?

6    A.   There is no way of knowing what was changed up to the

7    document completion date.

8    Q.   No way of knowing without talking to the actual auditors,

9    right?

10   A.   Well, we actually had -- for many of these workpapers, we

11   actually had an original that was marked up in some way, and

12   then we saw the changes that were indicated and then we could

13   get to the final version of the workpapers.  So we actually had

14   multiple workpapers that could allow us to step through that

15   process.

16   Q.   This is assuming that any changes -- that the only changes

17   were handwritten comments, right?

18   A.   Well, yeah, I think the handwritten comments and the emails

19   and the word -- insertions in the Word documents, those were I

20   think the principal elements that were related to this case.

21   So I think we've got the key points.  There could very well

22   have been some phone conversation or something like that that,

23   you know --

24   Q.   Right.  Mr. Lundelius, so, for example, somebody could call

25   the auditor saying make this change in the document and they

J34dmid5

1   might just make it, right, and you would never see it?

2   A.   That certainly is possible, though at least for the ones

3   that I think were relevant to this case, I think we've pretty

4   much found documentation for that.

5   Q.   But you are aware that in this case some changes were

6   actually made directly in the workpapers, right?

7   A.   No, I am not aware but it wouldn't surprise me.

8   Q.   And you didn't talk to any of those auditors who had made

9   those changes, right?

10  A.   Well, I wouldn't have the record of what the change was so,

11  no, I did not.

12  Q.   So you don't have any way to evaluate those kind of

13  changes?

14  A.   Yeah.  It's -- again, the changes that I could evaluate

15  were the ones where we had some paper trail.

16          MS. ESTES:  One moment, your Honor.

17          (Pause)

18          No further questions.

19          THE COURT:  All right.  Anything further?

20          MS. LESTER:  No, your Honor, nothing from us.

21          MR. WEDDLE:  Nothing, your Honor.

22          THE COURT:  Thank you.  You may step down.

23          (Witness excused)

24          MR. BOXER:  Your Honor, we call David Middendorf.

25          THE COURT:  All right.

J34dmid5                          Middendorf- direct

1              Sir, please have a seat, and please raise your right

2      hand and you will be sworn in.

3       DAVID MIDDENDORF,

4            a defendant herein, called as a witness by

5            Defendant Middendorf, having been duly sworn,

6            testified as follows:

7              THE CLERK:  Please state your full name and spell your

8      last name slowly for the record.

9              THE WITNESS:  David Middendorf, M-i-d-d-e-n-d-o-r-f.

10             THE CLERK:  Thank you.

11             MR. BOXER:  May I, your Honor?

12             THE COURT:  Yes.

13     DIRECT EXAMINATION

14     BY MR. BOXER:

15     Q.  Mr. Middendorf, I would like to direct your attention to

16     the day of February 6, 2017.

17     A.  OK.

18     Q.  And please tell the jury what happened that day.

19     A.  On February 6th I had an all day meeting with my boss,

20     Scott Marcello, and my peer, the other national managing

21     partner of audit operations for KPMG.

22     Q.  Did you receive anything during the day?

23     A.  I received something either over the weekend or that day

24     that was a calendar invitation for a call that evening at

25     8:30 p.m. Eastern Time.

J34dmid5                         Middendorf- direct

1    Q.  And do you recall from whom the invitation was from?

2    A.  From Brian Sweet.

3    Q.  And do you remember if any other KPMG employees were

4    invited to the call?

5    A.  Tom Whittle.

6    Q.  Do you recall if the invite had a subject matter

7    referenced?

8    A.  I think it was something generic, like catch up or chat.

9    Q.  When you received the invite, did you know why, the purpose

10   of the call?

11   A.  No, I did not.

12   Q.  What happened after you received the invite?

13   A.  So the meeting I referred to earlier, there was a dinner

14   following.  I left the dinner in time to get into the cab,

15   taxi, to take the call at 8:30, so I dialed into the conference

16   call number that was on that calendar invitation.

17   Q.  And what happened after you dialed into the call?

18   A.  I dialed in and Mr. Whittle and Mr. Sweet were both on the

19   phone.

20   Q.  Who spoke first?

21   A.  I believe it was Mr. Whittle.

22   Q.  And do you recall what he said?

23   A.  I believe he said Mr. Sweet had obtained the entire PCAOB

24   inspection list for KPMG for 2017.

25   Q.  And did you respond to that statement?

1   A.  I don't recall if I -- well, I did respond to that

2   statement.  I asked Mr. Sweet how he had obtained that

3   information, and he had responded that he -- it came to him

4   anonymously and he was not seeking it out.

5   Q.  And what happened after Mr. Sweet said he received it

6   anonymously and was not seeking it out?

7   A.  He commenced walking me through the list, the information

8   that he had.

9   Q.  And while Mr. Sweet was walking through the list, what did

10  you do?

11  A.  So I was on my cell phone with my headphones and I didn't

12  have any paper with me, so I started putting that information

13  into the notes app on my iPhone.

14  Q.  And why did you put it into your notes app?

15  A.  To me he was giving me information.  I needed to record it

16  so I could share it when I told my boss about it.

17  Q.  And do you recall, besides the names, if Mr. Sweet said

18  anything else about the list?

19  A.  As he went through the list of companies, he would on some

20  companies have other information, who the audit partner might

21  be, what the focus areas might be, etc.

22  Q.  He provided that information during the call?

23  A.  Yes, but I don't believe it was for every company on the

24  list.

25  Q.  And what happened after that?

1  A.  So I mentioned earlier I was in a taxicab.  I got to my

2  apartment in New York.  I got out of the taxi, got on my

3  elevator and I dropped off the call, and so when I got up to my

4  apartment I dialed back into the call and Mr. Whittle and

5  Mr. Sweet were still on the call.

6  Q.  And what happened after you dialed back into the call?

7  A.  So I don't remember what part of the information Mr. Sweet

8  had gone through, but he either finished going through the

9  list.  But at some point I asked him to go back through it

10 because having dropped off and trying to take notes on my phone

11 and my thumbs don't type so fast, I wanted to make sure I had

12 all the information that he was sharing.

13 Q.  And did Mr. Sweet go through the list again?

14 A.  He did.

15 Q.  And what happened after he went through the list?

16 A.  So at the end of the call, I made a statement that don't do

17 anything with this information until I have a chance to talk to

18 my boss, Mr. Marcello.

19 Q.  Is that Scott Marcello?

20 A.  Scott Marcello, Vice Chair of Audit.

21 Q.  That was my next question.

22          Did Mr. Sweet indicate whether or not he had already

23 told anyone besides you and Mr. Whittle about the list?

24 A.  No, he did not.

25 Q.  Was the information Mr. Sweet shared with you over this

1   phone call different from previous information you had received

2   from Mr. Sweet?

3   A.  Yes, it was.

4   Q.  In what way?

5   A.  It appeared to be the entire inspection list for KPMG.

6   Q.  And did it come at a particular time that made it different

7   than previous information you had received from Mr. Sweet?

8   A.  Yes.  So February 6th is the right during the heart of

9   audits, so these audits are live versus being in the

10  documentation period.

11  Q.  And what happened after the call between the three of you

12  concluded?

13  A.  So we concluded the call.  Mr. Whittle called me back I'll

14  say within a few minutes, and we had a short discussion about,

15  wow --

16  Q.  Who said "Wow"?

17  A.  I can't remember, maybe both of us, that the conversation

18  was around I wonder where Brian is getting this information.

19  Q.  And did you have any discussion with Mr. Whittle at that

20  time about Mr. Marcello?

21  A.  No.  I think it was clear on the first call that I wanted

22  to talk to Mr. Marcello.

23  Q.  And did you speak with any -- about any other things with

24  Mr. Whittle on that second call?

25  A.  Since I had been out of pocket all day, I believe we

1    chatted about a couple of other things he had on his list to

2    cover with me.

3    Q.  What happened the next day, on February 7th?

4    A.  So the next morning I went to my office, and KPMG has a

5    system called the Partner Rotation System.  It is basically a

6    listing of all the firm's clients and who the partners are.  So

7    I went into the PRS system to -- there were some of the

8    companies on that list I had never heard of before, but the big

9    clients, I know some companies so I was basically verifying are

10   they clients of the firm.

11   Q.  And did you verify that they were clients of the firm?

12   A.  Yes.

13   Q.  Was there a reason why you thought it necessary to verify

14   that they were clients of the firm?

15   A.  Although it appeared the information Mr. Sweet had was

16   legitimate, I think if the list includes all KPMG clients, it

17   kind of establishes the legitimacy.  And when I talked to

18   Mr. Marcello, I wanted to make sure it seemed like it was the

19   official list.

20   Q.  And when you went on the PRS system, did you any more

21   information, additional information, into your iPhone?

22   A.  I might have picked up partner names on ones that Mr. Sweet

23   did not have.

24   Q.  What happened after that?

25   A.  So later that afternoon I had a meeting with Mr. Marcello,

1    and part of that meeting I pulled out my iPhone and we sat next

2    to each other.  And I walked him through -- well, I first had

3    told him about the phone call the night before with Mr. Whittle

4    and Mr. Sweet, and then I walked him through the list that was

5    on my iPhone.

6    Q.  And did you say anything to Mr. Marcello to distinguish

7    this information from previous information that you had

8    received from Mr. Sweet?

9    A.  I did.  I compared it to 2016, where it was a partial list

10   and it was during the document completion period, and had

11   pointed out this appeared to be the entire list and also was

12   during the audits.  These audits were live.  We did not reach

13   the report release date on I'd say most if not all of these

14   compliance.

15   Q.  And what did Mr. Marcello say?

16   A.  He kind of looked at me, and I think it's the question of,

17   you know, OK, what do we do from here?  So we had a

18   conversation about the information.  And basically I said let's

19   give some thought to, you know, what are the options here as it

20   relates to what do we do with this information.

21   Q.  And did you have a meeting later that day where the topic

22   of the list came up again?

23   A.  I did.

24   Q.  And when was that, approximately?

25   A.  Sometime, I'd say, late afternoon/early evening.

J34dmid5                          Middendorf- direct

1    Q.  And where was the meeting?

2    A.  It was with George Hermann, my Chief Auditor, in his

3    conference room.

4    Q.  And what was the planned purpose of the meeting?

5    A.  We had a meeting set up with George Hermann and myself and

6    a senior manager to discuss sampling, which is one of the audit

7    procedures we do when we are looking at making changes to our

8    sampling methodology.  So, that was the purpose of the meeting.

9    Q.  And tell us what happened at the sampling meeting with

10   Mr. Hermann.

11   A.  So I don't remember all the details of the actual sampling

12   meeting, but we had the sampling meeting with myself,

13   Mr. Hermann and the senior manager, and at the end of that

14   meeting the senior manager excused him so I was left with

15   Mr. Hermann.

16   Q.  And what did you say to Mr. Hermann at that time?

17   A.  So I told him that the night before I had been on a call

18   where I found out that Brian Sweet had obtained the list, the

19   inspection list, for 2017, and I had had a conversation earlier

20   that day with my boss, Mr. Marcello, and so I was just filling

21   in Mr. Hermann.

22   Q.  Did you tell Mr. Hermann that you had informed Mr. Marcello

23   about the list?

24   A.  I did.

25   Q.  And what was Mr. Hermann's response?

J34dmid5                         Middendorf- direct

1   A.  I'd say very agitated, very maybe fired up is the right

2   term.  He had made some derogatory comments about Mr. Sweet and

3   that we shouldn't have this information.

4   Q.  And did that reaction make an impression on you?

5   A.  It did.

6   Q.  And in what way?

7   A.  It was a data point from a person that I had high regard

8   for, that it upset him that the firm had this information.

9   Q.  And by "data point" what do you mean?

10  A.  A piece of information.  So I'm processing information as

11  it relates to my views on having the information, and he shared

12  his views on that he was very upset about having this

13  information.

14  Q.  And what did you do after that meeting with Mr. Hermann?

15  A.  So at some point -- I can't remember if it was later that

16  evening or the next day -- I informed Mr. Marcello of my

17  conversation with Mr. Hermann.

18  Q.  Do you recall what Mr. Marcello said at that point?

19  A.  I don't.  He -- both of us had known Mr. Hermann for many

20  years, so he has high regard, or my belief was he had high

21  regard for Mr. Hermann.  So, I thought it was important to

22  share that with Mr. Marcello also.

23  Q.  If I could turn your attention to the next day,

24  February 8th, 2017.

25          Did you receive a calendar invite for a call on that

J34dmid5                         Middendorf- direct

1    day?

2    A.  I did.

3    Q.  And from whom?

4    A.  Laurie Mullen.

5    Q.  And who is Laurie Mullen?

6    A.  Laurie was the West Region professional practice partner,

7    reporting directly to me.

8    Q.  She was one of your direct reports, correct?

9    A.  Correct.

10   Q.  And did you have an understanding when you saw that

11   calendar invite as to why Ms. Mullen wanted to speak with you?

12   A.  I did not.  It also had a subject line that was somewhat

13   generic, catch up, or something similar to that.

14   Q.  And did you speak with Ms. Mullen on the 8th?

15   A.  I did.

16   Q.  And what do you recall about that conversation?

17   A.  So she kind of answered the phone, and she kind of went

18   right into that Diana Kunz, an audit partner in Chicago, had

19   received a call from Brian Sweet on Friday, February 3rd, so

20   the Friday before, and had told Ms. Kunz that her engagement

21   was going to be inspected by the PCAOB and he requested access

22   to her workpapers.

23   Q.  Did she say anything else about what had occurred?

24   A.  Yes.  The way she found out was Ms. Kunz told her business

25   unit partner in charge, John Rodi, who had told his I'll say

1    counterpart leader in Chicago, Dave Marino, that information,

2    and Mr. Marino and/or Mr. Rodi had called Ms. Mullen about that

3    whole chain of events.

4    Q.  And did Ms. Mullen say anything whether or not -- as to

5    whether or not Mr. Sweet in fact did obtain access to

6    Ms. Kunz's engagement files?

7    A.  I think it was her view that access had been granted and

8    then later revoked during the period between February 3rd and

9    when she talked to me on February 8th.

10    Q.  And what did you say to Ms. Mullen?

11    A.  I told her that had she called me two days prior, this

12    would have been news to me, but the fact that -- I told her

13    about my call on Monday evening, February 6th, that Mr. Whittle

14    and Mr. Sweet had called me.  So I said I was aware that we had

15    the PCAOB inspection information.

16    Q.  Did you say anything with respect to Scott Marcello to

17    Ms. Mullen?

18    A.  I did.  I told her -- as part of that conversation, I told

19    her when I had been on the call Monday evening, and the next

20    day I had told my boss Scott Marcello and we were working on

21    it.

22    Q.  And what did Ms. Mullen say in response?

23    A.  She was also, I'd say, very upset and animated that Brian

24    had gotten this information and that we needed to act on it.

25    And I told her I had told Mr. Marcello and we were working on

J34dmid5                              Middendorf- direct

1    it.  And she kind of ended the call with, well, let's make sure

2    we follow up.

3    Q.  And after your call with Ms. Mullen on the 8th, what did

4    you do?

5    A.  I'm trying to think what happened on the 9th.

6    Q.  Do you remember having a meeting right after your call --

7    A.  Oh, yes, I do.

8    Q.  Who did you have the meeting with?

9    A.  Yes.  So based on the call with Ms. Mullen, I was very

10   upset that Mr. Sweet had acted on the information, that I had

11   thought I was clear on the call on the 6th to not do anything

12   with the information.  So I went to Mr. Whittle's office and

13   told him to please -- or told him about the call with

14   Ms. Mullen and told him that Brian apparently had reached out

15   to a partner before he had even told me he had the list and to

16   call him to cease and desist and stop talking to anybody about

17   this information.

18   Q.  For who to call whom?

19   A.  For Mr. Whittle to call Mr. Sweet.

20   Q.  Did Mr. Whittle during that conversation make any mention

21   of the fact as to whether he knew about the list on

22   February 3rd, the Friday before your call with him?

23   A.  He seemed surprised by the fact that Mr. Sweet had reached

24   out to anybody with that information.

25   Q.  And what did you do after that conversation?

J34dmid5                         Middendorf- direct

1   A.  So he -- Mr. Whittle came back to me in some period of

2   time, maybe within an hour, maybe within two, and basically

3   said he had delivered the message to Mr. Sweet, and when he

4   talked to Mr. Sweet he denied that he had actually reached out

5   to Ms. Kunz.  And I looked at Tom and said, well, how else

6   would she have known.  There was only, you know, myself,

7   Mr. Marcello, Tom and Brian who at that point I thought knew

8   and of course the folks in Chicago and -- but Tom said

9   basically the message was delivered.

10  Q.  So Mr. Sweet denied to Mr. Whittle that Mr. Sweet had

11  reached out to Ms. Kunz?

12  A.  Correct.

13  Q.  And after your conversation with Mr. Whittle, did you speak

14  to Mr. Marcello?

15  A.  I believe so.  I can't remember if it was later on the

16  8th or on the 9th, but I wanted to inform him of my

17  conversation with Ms. Mullen.

18  Q.  And did you do that later on the 8th or on the 9th?

19  A.  Yes.

20  Q.  And what happened on the 10th?

21  A.  So Ms. Mullen circled back with me.  I had not reached out

22  to her so she reached out to me on just any updates that I had.

23  Q.  And what did you tell her?

24  A.  I told her that I had been informing Mr. Marcello of all

25  the conversations that I had had and that we were working on

1    it, and I kind of took a view that she didn't find my answer

2    fulfilling.

3    Q.   What made you perceive that?

4    A.   She told me that Mr. Marcello was going to be in Chicago on

5    Monday meeting with a client and that her and Mr. Marino and

6    Mr. Rodi were going to approach Mr. Marcello in Chicago on the

7    13th.

8    Q.   And what did you say in response to Ms. Mullen?

9    A.   I said, that's fine.  He is aware of everything I am aware

10   of at that point.

11   Q.   And after that call on February 10th with Ms. Mullen, did

12   you speak to Mr. Marcello?

13   A.   I did.

14   Q.   And what happened during that conversation?

15   A.   So I talked to him -- once again, I don't remember the

16   exact date and time, but I think sometime over the weekend I

17   had a conversation with him about when he got to Chicago, that

18   it was the intent of Ms. Mullen, Mr. Rodi and Mr. Marino to

19   talk to him about this matter.

20   Q.   And what did Mr. Marcello say?

21   A.   Pretty much, fine.

22   Q.   And the Monday after that weekend was February 13th,

23   correct?

24   A.   Correct.

25   Q.   And did you have any calls on the 13th about the list?

J34dmid5                          Middendorf- direct

1    A.  I did.  So Mr. Marcello called me at some point, I'd say,

2    early afternoon, and said he thinks the appropriate path is to

3    notify Judge Holmes.  He is the Vice Chair of Legal Risk and

4    Regulatory, at KPMG.

5    Q.  And what did you say?

6    A.  I said I agree.

7    Q.  And what happened after that?

8    A.  At some point -- I can't remember within, you know, the

9    next hour or few -- there was an email from Mr. Marcello to

10   Judge Holmes and either to me or copying me saying Dave and I

11   have a PCAOB matter we need to discuss with you.

12   Q.  And was a call arranged with Mr. Holmes?

13   A.  Yes.  So at some point there was a calendar invitation that

14   came out to schedule a call for 7 a.m. Eastern Time the next

15   morning, February 14th.

16   Q.  And did the call take place at that time?

17   A.  Yes, it did.

18   Q.  Who was on the call?

19   A.  Myself and Mr. Marcello and Mr. Holmes.

20   Q.  And what do you remember about who said what during that

21   call?

22   A.  So my recollection is Mr. Marcello I'll say gave a kickoff

23   that, you know, we determined that we may have the PCAOB

24   inspection list and Dave has more of the details so I'm going

25   to let him walk through them.

J34dmid5                        Middendorf- direct

1   Q.  And did you walk through the details that you had?

2   A.  I did.  I walked Judge Holmes and Mr. Marcello had heard

3   about it before, but I walked him through the sequence of

4   events as I knew them starting on the February 6th call that I

5   received.

6   Q.  Was it your understanding that Mr. Holmes was learning

7   about this information for the first time?

8   A.  It was.

9   Q.  And what do you base that understanding on?

10  A.  He didn't indicate that he had heard it from anyone else

11  and he seemed certainly bothered by having the information and

12  made a comment, "I think we're going to need to take this to

13  the PCAOB."

14  Q.  Did he also make a comment about informing any of his

15  superiors at KPMG?

16  A.  Yes.  And he said he would need to inform the CEO of KPMG,

17  Lynn Doughtie.

18  Q.  Is it fair to say, based on his comment, that you

19  understood Ms. Doughtie did not know about this information?

20  A.  Correct.

21  Q.  What happened after that?

22  A.  So that call was the morning of the 14th.  I had a client

23  engagement that I needed to go to, so I flew to Dallas.  And so

24  later on the 14th, I would say sometime in the evening, I got

25  an email from Mark Rubino, who worked in the --

1   Q.  Who is Mark Rubino?

2   A.  He is the Associate General Counsel at KPMG.

3   Q.  Do you recall what he said in the email?

4   A.  I think it was also fairly generic of I need to talk to you

5   about something.  Having been around the firm a long time, I

6   assumed it related to the conversation we had with Judge Holmes

7   earlier that day.

8   Q.  And how did you respond to Mr. Rubino?

9   A.  I told him that I was out of town with client meetings and

10  gave him some windows of when I was available for a call the

11  next day.

12  Q.  And did you have a call with Mr. Rubino the next day?

13  A.  I did.

14  Q.  And what do you recall about -- what do you recollect about

15  the conversation you had with Mr. Rubino the next day?

16  A.  I think Mr. Rubino started by just saying I'm following up

17  on the conversation you and Scott had with Judge Holmes

18  yesterday and if you can walk me through what you walked him

19  through.

20  Q.  Did you do that?

21  A.  I did.

22  Q.  And what did he say?

23  A.  Not a lot.  I think he was just taking notes and maybe

24  asking follow along questions.

25  Q.  Did there come a time when he asked some general follow

J34dmid5                          Middendorf- direct

1   along questions?

2   A.   Yeah.  At some point he had said, you know, is there

3   anything else or whether I volunteered it.  I told him about

4   the 2016 information.

5   Q.   What did you tell him?

6   A.   I had told him that in 2016 we had gotten some information

7   from the PCAOB, apparently through Brian Sweet anonymously,

8   that there was a small group of clients that we thought might

9   be inspected and we had done rereviews.

10  Q.   And based on Mr. Rubino's words, did you have the

11  impression as to whether Mr. Rubino had heard that information

12  prior to you telling him?

13              MS. ESTES:  Objection.

14              THE COURT:  Overruled.

15  A.   Yes.

16  Q.   Yes?

17  A.   Yes, I believe he had not heard of that information before.

18  Q.   And why do you say that?

19  A.   Because he seemed bothered by me telling him that because

20  he had not heard that yet.

21  Q.   And did he ask you at some point why what happened in 2016

22  didn't bother you?

23  A.   Yeah.  I had told him because of being in the document

24  completion period and I said it was probably a poor judgment on

25  my part.

1    Q.  Did he say anything -- withdrawn.

2            Did he make any requests regarding the list that you

3    learned about on February 6, 2017?

4    A.  Yes, he did.  He asked me to send him the list.  I told him

5    that it was in my notes app on my iPhone and I had no idea how

6    to cut and paste or, you know, send -- forward that onto him,

7    so I said I would put it in a Word document and email it to

8    him.

9    Q.  And did you do that?

10   A.  Yes, I did.

11   Q.  And did you do that on September 15th, after that phone

12   call?

13   A.  February 15th.

14   Q.  Excuse me.  February 15th.  Thank you.

15   A.  Yes.

16   Q.  After that phone call?

17   A.  Yes.

18   Q.  Did there come a time, Mr. Middendorf, when KPMG put you on

19   administrative leave?

20   A.  Yes, probably the first week of March.

21   Q.  And did there come a time when KPMG removed you from the

22   KPMG partnership?

23   A.  Yes.

24   Q.  When was that?

25   A.  April 10th.

J34dmid5                          Middendorf- direct

1    Q.  Of what year?

2    A.  2017.

3    Q.  And did there come a time when the SEC brought a lawsuit

4    against you alleging a violation of Section 102(e)?

5            MS. ESTES:  Objection.  Relevance.

6            THE COURT:  Overruled.

7    A.  Yes.  The same day I was indicted for this matter, crime, I

8    also received a civil action by the SEC.

9            MR. BOXER:  I am going to change gears at this point,

10   your Honor.  Is this a convenient time for a break or should I

11   keep going?

12           THE COURT:  Why don't we take a ten-minute break.

13           Folks, we will take ten minutes.  Please leave your

14   notepads on your chairs.  We will be in recess for ten minutes.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J34dmid5                          Middendorf- direct

1            (Jury not present)

2            THE COURT:  You may be seated.

3            You can step down.

4            (Recess)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J345mid6                        Middendorf - direct

1          MR. WEDDLE:  Your Honor, can I raise one thing very

2     quickly?  I don't think it affects whether the witness takes

3     the stand or not.

4          With respect to the certification that I talked to

5     your Honor about before, to facilitate Verizon's work in

6     confirming the information, I would like to send them the

7     spreadsheet that was produced to us in discovery.  My

8     understanding that is a spreadsheet that came from Verizon to

9     KPMG to the Government to us.  I think it is covered by

10    protective order and would require Verizon to sign the

11    protective order before we send it to them but the protective

12    order also permits your Honor to order that we can do it.

13         So, I request that your Honor order that we can send

14    it back to Verizon.

15         MS. KRAMER:  No objection.  I think we would like to

16    be heard before this comes in on 403 and 401 grounds, but

17    that's it.  No objection to the --

18         THE COURT:  As long as they treat it as confidential

19    you are permitted to send it to them and they are permitted to

20    review it.

21         MR. WEDDLE:  Thank you, your Honor.

22         THE COURT:  Ready for the jury?

23         MR. BOXER:  Yes, your Honor.

24         (Continued on next page)

25

J345mid6                        Middendorf - direct

1              (Jury present)

2              THE COURT:  Mr. Boxer, you may proceed.

3              MR. BOXER:  Thank you, your Honor.

4    BY MR. BOXER:

5    Q.  Mr. Middendorf, how old are you?

6    A.  54 years old.

7    Q.  Where do you reside?

8    A.  Marietta, Georgia.

9    Q.  What is your educational background?

10   A.  I received a bachelor of business administration degree

11   from the University of Cincinnati.

12   Q.  Is that where you were raised, in Cincinnati?

13   A.  I was.

14   Q.  And, do you have a family?

15   A.  I do.

16   Q.  Would you describe your family?

17   A.  I have a wife I have been married to, it will be 25 years

18   in May, and I have three daughters; 23 and 17-year-old twins.

19   Q.  And, after graduating from college, how were you employed?

20   A.  I began straight out of college with a firm known as Peat

21   Marwick, Mitchell & Co. which, within after about six months

22   after I started, became now what is known as KPMG.

23   Q.  And what year was that?

24   A.  1987.

25   Q.  And, when you started with what's now known as KPMG, in

J345mid6                         Middendorf - direct

1   which office did you work?

2   A.  Cincinnati, Ohio.

3   Q.  And what kind of work did you do there?

4   A.  So, I started out as a staff accountant.  The typical path

5   is staff accountant for a couple of years, senior accountant

6   for two or three years, manager usually two years, senior

7   manager for some number of years, five, six, seven years, and

8   then partner.

9   Q.  And, what kind of engagements did you work on when you were

10  staff accountant and a manager in the other positions you just

11  described?

12  A.  Yes.  I have been in the audit practice of KPMG for my

13  entire career.

14  Q.  And, did you have any speciality or area of expertise

15  within the audit practice?

16  A.  I did.  KPMG Cincinnati had a new client at the time, it

17  was called Federated Department Stores.  It is what is now

18  Macy's.  So, I grew up on that account so I became a retail

19  expert.

20  Q.  And we will go through it in more detail but at the time of

21  your administrative leave in 2017, had you worked for any other

22  company besides KPMG?

23  A.  No.  30 years at KPMG.

24  Q.  Did you become a CPA at some point?

25  A.  I did.

J345mid6                          Middendorf - direct

1    Q.  Certified public accountant?

2    A.  Yes.

3    Q.  When was that?

4    A.  I believe I became certified in 1989.

5    Q.  And, after working in Cincinnati at Peat Marwick -- now

6    KPMG -- what did you do next?

7    A.  I spent I guess nine, almost 10 years in the Cincinnati

8    office of KPMG.  I was, by that point, a senior manager, and

9    the firm asked me to relocate to New York to the national

10   office on a rotational assignment.

11   Q.  And the national office is sometimes referred to as DPP?

12   Is that correct?

13   A.  Yes; the Department of Professional Practice or DPP.

14   Q.  And so you did that in what year?

15   A.  My wife and I had a 1-year-old at the time, moved to New

16   York in April of 1997.

17   Q.  And, while you were at DPP at that time did you become a

18   partner of KPMG?

19   A.  Yes.

20   Q.  And, when was that?

21   A.  July 1, 1998.

22   Q.  And, can you explain to the jury what it means to be a

23   partner at a firm like KPMG?

24   A.  So, a partner is an owner in the firm so although you might

25   think of the typical partnership being two or three people or

J345mid6                          Middendorf - direct

1   10 people, KPMG has 2,000 plus partners.  So, I became an owner

2   as part of one of those 2,000 people.

3   Q.  And, while you were -- by the way, how long were you in DPP

4   in New York when you started in 1997?  How long did that last

5   for?

6   A.  I moved there in April of '97, made partner July 1, 1998,

7   and moved back to Cincinnati basically July 1, 1999.

8   Q.  And when you were in DPP between 1997 and 1999, what kind

9   of work did you do?

10  A.  There are various pieces of the national office.  I spent

11  most of my time, we call it the practice advisory group.  So,

12  engagement teams call the national office with their problems,

13  their technical matters, issues they may have with the client

14  and what is the proper accounting, etc.

15  Q.  And, did you take phone calls from the field on any

16  particular areas of, or questions about technical accounting

17  issues when you were at DPP?

18  A.  So, having spent at that point 10 years, probably nine of

19  my 10 years as a retail person, I certainly handled lots of the

20  retail inquiries but the purpose of going to the national

21  office was to get, I will say a broad base of experience and a

22  lot of different technical areas with the goal of, as a partner

23  who has been through the national office, you become a very

24  strong partner that hopefully will be assigned to larger

25  engagements.

J345mid6                    Middendorf - direct

1    Q.  And did you in fact have a broad experience and broad

2    exposure when you were at DPP?

3    A.  I did.  I probably answered somewhere in the 1,200 to 1,500

4    inquiries during my two-plus year tenure in the national office

5    or in DPP.

6    Q.  So, in 1999 you left DPP, right?

7    A.  Correct.

8    Q.  And tell us where you went and why.

9    A.  So, the why is because the firm asked me to.  They asked

10   that I be the lead audit partner on what was still at that

11   point known as Federated Department Stores that is now Macy's.

12   So, I moved my wife and then three and a half-year-old back to

13   Cincinnati to become the lead partner on Macy's.

14   Q.  What does that mean to be the lead partner on Macy's or any

15   audit client of KPMG?

16   A.  So, as I mentioned before, these different levels of

17   staff -- senior manager, senior manager, the partner is the

18   person who signs the opinion, so when we do our audits,

19   responsible for planning the audit and making risk assessments

20   and conducting the audit procedures which may be done by all

21   these individuals, staff and managers, etc., but the ultimate

22   conclusions that are reached and it's the partner who signs the

23   firm's name signed KPMG, LLP, to the opinion of the client's

24   financial statements.

25   Q.  And when you were the lead engagement partner of Federated

J345mid6                        Middendorf - direct

or Macy's, would you attend meetings of the Macy's audit
committee?

A.  Yes, I would.

Q.  And why did that occur?

A.  So, I will just say the typical board of a public company,
the audit committee meets, I will say, sometime between four
and maybe eight times a year so part of my responsibility as
the lead partner would be to communicate not just with the
management of the company but with the audit committee who is
really responsible for the oversight of the auditor, the audit
firm and its relationship with the company.

        So, at meetings earlier in the year you would present
the audit plan so you would present to the audit committee this
is our plan on how we are going to execute the audit.  When the
company is ready to file its financial statements, which have
been talked about a number of times the last few weeks, around
that end of February time period we would have an audit
committee meeting to go over the findings of our audit and
share those with the audit committee before we issued our
opinion.

Q.  And for how long were you the lead engagement partner on
the Macy's audit?

A.  So, when we moved back to Cincinnati, the old rules were a
seven-year rotation, the maximum time you could spend as a
partner.

J345mid6                        Middendorf - direct

1   Q.  As the lead engagement partner?

2   A.  As the lead engagement partner.

3          And, during my tenure, it was maybe two or three years

4   into my tenure on Macy's is when the Sarbanes-Oxley Act was

5   issued which changed that to a five-year limit to be the --

6   Q.  So, by 2004 you needed to come off as the -- you needed to

7   no longer be the lead engagement partner on Macy's, correct?

8   A.  Correct.

9   Q.  So, what happened after that?

10  A.  So, the firm had asked me, I would say maybe four years

11  into my Macy's assignment, if I would be willing to relocate to

12  the Dallas area to be the lead partner on the JC Penney

13  engagement.

14  Q.  And what did you say?

15  A.  I said yes.

16  Q.  And so, when did you start as the lead partner on the JC

17  Penney engagement?

18  A.  So, the summer, I guess -- we moved the family July 1,

19  2004, and so I would have signed for that fiscal year of 2004

20  would have been my first year signing on the JC Penney

21  engagement.

22  Q.  When you say you moved your family, did you now have three

23  children at the time of this move?

24          MS. ESTES:  Objection.

25          THE COURT:  Sustained.

J345mid6                    Middendorf - direct

1    BY MR. BOXER:

2    Q.   How long did you serve as the engagement partner -- lead

3    engagement partner for JC Penney?

4    A.   I began for 2004 so I think the 2008 year was my final year

5    under the five-year rotation requirement for the lead audit

6    partner.

7    Q.   And while you were the lead audit partner for JC Penney,

8    did you also serve as SEC reviewing partner for other

9    engagements?

10   A.   Yes.

11   Q.   What is an SEC reviewing partner?

12   A.   Yes, so, the SEC reviewing partner designation is the

13   second partner review on public companies.  You have to be

14   designated that within KPMG so at some point in my tenure in

15   Dallas I was asked by the leadership of the firm to become an

16   SEC reviewing partner and then served in that role.

17   Q.   And is it called SEC reviewing partner because that second

18   review is required by the SEC?

19            MS. ESTES:  Object to the leading.

20            THE COURT:  Sustained.

21   BY MR. BOXER:

22   Q.   Why is it called the SEC reviewing partner?

23   A.   There is a requirement to have a second partner review it.

24   Some people refer to it as Concurring Review Partner and other

25   people now call it the Engagement Quality Control Reviewer.

J345mid6                          Middendorf - direct

```
 1   Q.  EQ --
 2   A.  CR.
 3   Q.  Thank you.
 4            How long did you serve as the lead engagement partner
 5   for JC Penney?
 6   A.  Five years.
 7   Q.  And what happened after, would that be in 2009?  What
 8   happened next?
 9   A.  Yes.  So, I was approached maybe about three years through
10   my tenure on JC Penney by firm leadership if I would be willing
11   to relocate my family again to Atlanta to become the lead audit
12   engagement partner for the Home Depot.
13   Q.  And what did you say?
14   A.  I said yes.
15   Q.  And when did you become the lead engagement partner for
16   Home Depot?
17   A.  So, I moved my family in January of 2009 and
18   reverse-commuted back to Dallas to wrap up JC Penney and then
19   started in 2009 as the lead partner on the Home Depot.
20   Q.  And who was the CEO of Home Depot when you became the lead
21   engagement partner?
22   A.  Mr. Frank Blake.
23   Q.  And, did you meet with Mr. Frank Blake while you were lead
24   engagement partner on Home Depot?
25   A.  Yes.
```

J345mid6                        Middendorf - direct

1   Q.  Did you have a practice as to when you would meet with him?

2   A.  I did.

3   Q.  What was your practice?

4   A.  I would meet with Frank on, I will say a regular cadence,

5   approximately quarterly, to discuss various matters.  I would

6   keep an agenda of things that I thought about through the

7   quarter that I wanted to make sure he was aware of and then I

8   would also, of course, if there was a matter that I thought

9   required his attention more quickly, I had the ability to reach

10  out to his office and get something scheduled.

11  Q.  And those meetings, were they one-on-one or were others

12  present as well?

13  A.  One-on-one.

14  Q.  And, did you also meet with the audit committee of Home

15  Depot?

16  A.  Yes, I did.

17  Q.  Was Mr. Blake present at some of those meetings?

18  A.  Yes.

19  Q.  Did there come a time when you became a professional

20  practice partner or leader of the firm?

21  A.  Yes.

22          So, the vice chair of audit at the time asked me

23  pretty much when I arrived in Atlanta in early 2009 if I would

24  also take on the role of the Business Unit Professional

25  Practice Partner for the Mid-South which KPMG defined as

J345mid6                          Middendorf - direct

1    Georgia, Alabama, Tennessee, and Mississippi.

2    Q.  And did you take on that role?

3    A.  Yes, I did.

4    Q.  And what was involved in that role?

5    A.  Several different aspects.

6           I think first and foremost was for the audit partners

7    in that geography I was a person they could call if they had an

8    issue, if there was a technical matter, if it was a difficult

9    client situation that maybe they wanted somebody else to come

10   meet with them and talk to their client or to their audit

11   committee and then have interactions with the PCAOB as they

12   would inspect engagements within my geography.  We would

13   orchestrate to make sure the team was prepared and participated

14   in that inspection.

15   Q.  And, did there come a time when you were elected or

16   appointed to the Board of Directors of KPMG?

17   A.  Yes.

18   Q.  When was that?

19   A.  So, while I was still in Dallas, I was asked by a member of

20   the nominating committee of the Board if I would consider

21   putting my name in to run for the Board.  I told him at that

22   point in time because I was wrapping up JC Penney, moving my

23   family to Atlanta, starting my new engagement with Home Depot,

24   I didn't think it was the right time to do that.

25   Q.  Did there come a time when you agreed to be nominated for

J345mid6                      Middendorf - direct

1   the board?

2   A.   Yes.  Once I was settled in Atlanta later that year in 2009

3   I was asked again if I would consider that and I said my family

4   is settled, I have wrapped up my old client, am comfortable

5   with my new client, and I would go through the nomination

6   process.

7   Q.   And were you elected to serve on the board?

8   A.   Yes, I was.

9   Q.   And for how long did you serve on the Board of Directors of

10  KPMG?

11  A.   It is typically a five-year term and I completed my full

12  five-year term.

13  Q.   And what happened after the five -- withdrawn.

14          Did you serve as lead engagement partner in Home Depot

15  for five years?

16  A.   Yes, I did.

17  Q.   What happened after those five years were over?

18  A.   Well, like the other situations before that time ended, I

19  would say probably sometime six months or a year before I was

20  going to be rotating off of the Home Depot engagement, I was

21  approached by Jim Liddy, the vice chair of audit at the time.

22  I think I approached him about what is my next assignment?  I

23  assumed it would be another client assignment and I met with

24  Mr. Liddy at his office in New York and he asked me if I would

25  take on the role of National Managing Partner, Audit Quality

J345mid6                        Middendorf - direct

1    and Professional Practice.

2    Q.  And what did you say?

3    A.  We talked about what -- why he wanted me to do the role and

4    I had told him my -- I just was in a position with my children

5    that I could not move --

6              MS. ESTES:  Objection.  Relevance.

7              MR. BOXER:  I think he is about to explain the

8    relevance.

9              THE COURT:  That's fine.  Go ahead.

10             THE WITNESS:  That I would not be able to relocate to

11   New York but I would take the position and my family would stay

12   in Marietta and I would commute to New York.

13   BY MR. BOXER:

14   Q.  Was that agreeable to Mr. Liddy?

15   A.  Yes, it was.

16   Q.  Is this what is sometimes called as a commuting arrangement

17   or a commuter package?

18   A.  Yes.

19   Q.  Was a commuter package uncommon at KPMG?

20   A.  No, it was not.

21   Q.  Would you say it was common?

22   A.  I would say it would be common, in particular, for certain

23   roles within the firm, the top leadership of the firm, almost

24   all of them do not live in New York but their job is in New

25   York.

1    Q.  When did you start as National Managing Partner for Audit

2    Quality and Professional Practice in New York?

3    A.  June 1 of 2014.

4    Q.  And, did you have a practice as far as when you would be in

5    New York and when you would be in Georgia?

6    A.  So, typically if I was going to be in New York I would fly

7    in Monday morning, fly home Thursday evening, but my role

8    involved me being on the road, I will say, a fair amount

9    visiting KPMG offices, visiting with KPMG clients.  So,

10   typically if I was in New York it would be Monday through

11   Thursday but I was in other locations quite often.

12   Q.  And when you became national managing partner, did you

13   continue to serve as an SEC reviewing partner or the EQCRP? --

14   I think I got the letters wrong.

15   A.  EQCR.  Yes, I did.

16   Q.  Sorry, no P.

17        On what engagements?

18   A.  Darden Restaurants, Rent-A-Center, and I went back on to

19   Macy's as the EQCR having been off Macy's for 10 years.

20   Q.  Did you have any experience with PCAOB inspections when you

21   were the SEC reviewing partner on those engagements?

22   A.  Yes.  In 2016 the Darden engagement was inspected and then

23   a couple of months later the Rent-A-Center engagement was

24   inspected.

25   Q.  Did there come a time when you were appointed to the PCAOB

J345mid6                        Middendorf - direct

1    SAG?

2    A.  Yes.

3    Q.  Do you recall approximately when that was?

4    A.  The way I would narrow it down, I began my role June of

5    2015, there was a partner in the firm who was in, I will say

6    their term on the SAG, and I would say maybe a year after I was

7    in my role Jay Hanson approached me and said that the partner

8    from KPMG that had been on the SAG, his time was expiring and

9    maybe I should consider joining the SAG.

10   Q.  And did you join the SAG?

11   A.  I did.

12   Q.  And, who is Jay Hanson?

13   A.  PCAOB board member.

14   Q.  If we could show what's marked Government Exhibit 29, in

15   evidence?  If we could scroll down to the third page?

16           Is that your signature, Mr. Middendorf?

17   A.  Yes, it is.

18   Q.  Do you remember receiving this document?

19   A.  I don't remember receiving it timely but having been shown

20   it in evidence or in preparing for the trial, yes.

21   Q.  Do you remember receiving it at the time it was dated,

22   November 2015?

23   A.  No.

24   Q.  Do you remember any inspections, discussions particular to

25   inspections while you were on the SAG?

J345mid6                         Middendorf - direct

1    A.  No.

2    Q.  What was discussed on the SAG?

3    A.  The SAG would have an agenda that the PCAOB had basically

4    established so there would be different things of interest.  If

5    the PCAOB had a potential or proposed new auditing standard,

6    maybe that would be covered.  I remember at one of the meetings

7    there was a discussion of non-GAAP measures that some companies

8    use.

9    Q.  Do you recall receiving any information that you considered

10   confidential to the PCAOB while you were on the SAG?

11   A.  No.

12   Q.  You mentioned a couple times about PCAOB inspections.

13   Could you -- withdrawn.

14          Did you have personal experience with PCAOB

15   inspections?

16   A.  Yes.  I was inspected by the PCAOB on one of my audits when

17   I was the lead partner on JC Penney, and I was also -- some of

18   the engagements for which I was the EQCR over my career were

19   also inspected by the PCAOB.

20   Q.  And, the inspection of JC Penney when you were the lead

21   partner, do you recall when that was?

22   A.  I would say probably about 2007.

23   Q.  And, just briefly, do you remember what occurred during the

24   inspection?

25   A.  I do, because it was an unusual inspection.

J345mid6                         Middendorf - direct

1   Q.   And what was unusual about it?

2   A.   The PCAOB has typically done its inspections after the

3   completion of the engagement.  I was approached by someone in

4   risk management within the firm and asked if I would be willing

5   to undergo an in-flight inspection by the PCAOB.

6   Q.   What does that mean, an in-flight inspection?

7   A.   While the audit was still progressing.

8   Q.   And, did you agree?

9   A.   I didn't feel like I had a whole lot of choice, it was

10  probably a rhetorical question but, yes, I agreed and it was

11  the purpose of it was driven because audit standard 5 on

12  internal controls was a new standard that was issued.

13  Q.   And, the PCAOB wanted to observe how the engagement was

14  applying audit standard 5 in real-time; is that right?

15  A.   Correct; on what we were doing different.  Audit Standard 5

16  replaced Audit Standard 2 on the audit of internal controls so

17  they were interested in what we were doing different between

18  now being under Audit Standard 5 and having previously been

19  under Audit Standard 2.

20  Q.   And after the in-flight inspection concluded, what

21  happened?

22  A.   So, the in-flight inspection was only a few days.  We

23  completed the audit and then I got selected for what I will

24  calling a normal inspection by the PCAOB that summer.

25  Q.   And -- of the audit of JC Penney, correct?

J345mid6                          Middendorf - direct

1    A.  Correct.

2    Q.  And, approximately when do you recall when you received

3    notice of the inspection?

4    A.  I do not recall.

5    Q.  Do you have an understanding as to how the PCAOB provides

6    notice of inspections?

7    A.  Yes.

8    Q.  And, could you describe for the jury your understanding?

9    A.  Yes.

10          So, typically the PCAOB notifies someone in Thomas

11   Whittle's group, typically a woman named Meredith Hardesty, and

12   then she sends and e-mail out to the engagement teams that have

13   been selected for inspection.

14   Q.  And, does any notice from the PCAOB come before the notice

15   you just described?

16   A.  Yes.

17          So, in order to plan and prepare our people for when

18   they might be inspected, they send out a list of cities that

19   they will be going to for inspection.  They indicate if it's a

20   financial institution or a non-financial institution.  They

21   indicate how many weeks they will be in that location

22   conducting the inspection.

23   Q.  And the notice you just described, does that typically come

24   before or after the documentation period closes?

25   A.  I don't recall.

J345mid6                         Middendorf - direct

1    Q.  And, based on that notice that you just described, are

2    there instances when you are able to determine whether the

3    specific PCAOB inspection -- withdrawn.

4         Are you able to determine some instances which

5    engagement is in particular going to be inspected based on the

6    notice of city and date?

7    A.  Yes.

8    Q.  And how is that?

9    A.  Based on the size of the practice.

10        So, there are certainly some large offices of KPMG and

11   there are smaller offices based on the client makeup, how many

12   financial institutions may be a client in that office.  It's, I

13   would say easily determinable.  Not in all instances, but in

14   some and in maybe quite a few instances.

15   Q.  You have heard testimony during the trial about the opening

16   meeting of the inspection with the PCAOB, correct?

17   A.  Yes.

18   Q.  Could you describe your experience using JC Penney or any

19   engagement where you were part of the inspection of the opening

20   meeting with the PCAOB?

21   A.  Yes.

22        So, I think our view is always like any interaction

23   you would have with someone, a first impression is an important

24   impression so the firm had tailored a PowerPoint presentation

25   that kind of, any KPMG inspection by the PCAOB would look

J345mid6                         Middendorf – direct

1    somewhat similar.  Certainly the content within that document

2    would be different and the engagement team would prepare that

3    document to prepare themselves for the opening meeting.

4    Q.  And, is the initial meeting with the PCAOB a meeting in

5    person?

6    A.  It was at one point but not for a number of years.

7    Q.  And your participation in that opening meeting in recent

8    years, was it in person or on the phone?

9    A.  On the phone.

10   Q.  And, was the PCAOB in person or on the phone at the

11   location of the engagement?

12   A.  They were not at the location of the engagement, it was by

13   phone.

14   Q.  And, do you have an understanding as to why that practice

15   developed over the PCAOB being on the phone?

16   A.  Yes.

17   Q.  And, what is your understanding?

18   A.  So, the PCAOB, I will say in the early years, if they were

19   coming to an office for a one-week inspection, would not have

20   the opening meeting until the first morning, Monday morning,

21   and I think they determined that it would be more productive

22   for them to maybe hit the ground running on Monday morning.

23   So, they moved the opening meeting back to the week before and

24   since they weren't yet onsite it became a telephonic meeting.

25   Q.  You have heard the expression "the best first answer to the

J345mid6                          Middendorf - direct

1   PCAOB?"

2   A.  Yes.

3   Q.  What do you understand that expression to mean?

4   A.  Best first impression, basically.  Can you be knowledgeable

5   about the work that you performed that you seem to have a

6   command of the facts.

7   Q.  You believe a strong best first answer to the PCAOB at the

8   opening meeting can avoid a comment?

9   A.  No.

10  Q.  What do you think it can accomplish, a very good best first

11  answer?

12  A.  Yes.  So, I think like any interaction where it's a first

13  impression what is your first impression if someone is, has

14  command of the facts, it can certainly help the other person.

15  In this case the inspectors have a view of that you know what

16  you are doing in a positive first impression but if the work

17  that supports that, the audit work is not of high quality, it

18  doesn't really matter, the first impression, the quality of the

19  work is not there.

20  Q.  Do you have a view if the opening meeting is a poor

21  performance by the engagement partner as to whether or not that

22  can lead to a comment?

23  A.  I don't think that, in and of itself, would lead to a

24  comment.  I think it's kind of the inverse of what we just

25  chatted.  If you had a bad first impression you may get more

1    questions from a PCAOB inspector because they have a view maybe

2    you don't understand the details of the engagement you signed

3    off on.  But, I think as long as your work product, with the

4    audit work that was performed is of high quality, your lack of

5    wowing them with the first impression shouldn't have an impact

6    on whether the quality of the work was there.  It make the

7    inspection tougher, but it shouldn't change the outcome.

8    Q.  How long does the engagement team have to prepare for that

9    first call, typically?

10   A.  Typical notification is three to four weeks.

11   Q.  And, is that sufficient time to be prepared?

12   A.  Yes.

13   Q.  How long do you think is sufficient time for an engagement

14   team to be prepared for a first meeting with the PCAOB for an

15   inspection?

16   A.  I think what auditors do for a living and work a lot of

17   hours that the amount of time may get compressed but a week

18   would be sufficient.  It would be nice to have more time but

19   you can accomplish it in a week or less.

20   Q.  Did you ever work on an engagement team or lead an

21   engagement team of a financial institution?

22   A.  No.

23   Q.  When you assumed your role as national managing partner,

24   did you become aware of an issue or issues the firm was having

25   with respect to audits of financial institutions?

J345mid6                        Middendorf - direct

1    A.  Yes, I did.

2    Q.  And, did that concern the auditing of the allowance or the

3    ALL?

4    A.  Yes.  For the most part.

5    Q.  And, what did you learn about that when you assumed the

6    role as national managing partner?

7    A.  So, not being a banker I had seen our reports, PCAOB

8    reports that there was a high rate of deficiencies related to

9    inspections of financial institutions and a fair amount of

10   those comments related to the allowance for loan losses but

11   also other areas.

12   Q.  And, at the time you assumed your role as national managing

13   partner, had KPMG received any Part II comments from the PCAOB?

14   A.  So, the firm always receives Part II comments that are not

15   public.

16   Q.  Had the firm received a Part II comment concerning its tone

17   at the top at the time you assumed your role as national

18   managing partner?

19   A.  I don't remember if that was, I will say in-house, if we

20   had a report from the PCAOB when I arrived or if it came

21   shortly after I arrived.

22   Q.  And, did it concern behavior before you arrived?

23   A.  Yes.  My view was I was not in my role for a, at all or a

24   substantial period during that report period, during that

25   inspection period.

J345mid6                    Middendorf - direct

1    Q.  I will ask you in a bit about what you did to remediate

2    that tone at the top comment but I just had a few more

3    questions about the inspection process.

4              What is your understanding of what a comment is?

5    A.  So, if the PCAOB inspectors find a deficiency in or what

6    they believe is a deficiency in the level of audit work, they

7    will draft a comment that the engagement team would need to

8    address.

9    Q.  And, is there a timeline for addressing a PCAOB comment?

10   A.  So, yes.

11   Q.  And what is your understanding of the timeline?

12   A.  So, once the comment is received, we have 10 days to

13   respond to the comment.  One of the issues is the comments can

14   come in at various times so sometimes you may get a comment.

15   If the inspection ended today maybe you would get the comment

16   in a few days, maybe you would get it in a week, it could be

17   even a couple of months.  So, it is based on the date the

18   comment is actually received by the firm.  You have 10 days to

19   respond.

20   Q.  And then does the firm respond to the comment?

21   A.  Yes.

22   Q.  And how does it respond?

23   A.  So, the comment comes in writing.  The comment form

24   indicates background information, and then it has a section on

25   what the issue is so what is the deficiency in the audit work,

J345mid6                         Middendorf - direct

1    and then the firm has a section of the comment form to agree or

2    disagree with the facts.  So, sometimes the facts aren't quite

3    right and then discuss the issue and either agree or disagree

4    with the comment.

5    Q.  So, there is a fact section and an analysis section,

6    correct?

7    A.  That's a good way to put it.

8    Q.  And after KPMG submits its response to the comment form,

9    what happens after that?

10   A.  So, if it's an agree, nothing much happens until, I will

11   say, towards the end of the inspection cycle.  The PCAOB will

12   inform us if they intend to put that comment in the Part I of

13   our report.  If it is a disagree comment then there will be

14   further discussion.

15   Q.  And if it's a disagree comment and there is further

16   discussion, is there similarly a resolution as to whether a

17   comment will appear in Part I of the inspection report?

18   A.  Yes.  So, the PCAOB, if we disagree, usually goes up to the

19   inspection team leaders and part of the disagree is why you

20   disagree with it and they will review and determine if they

21   are, I guess, convinced of your arguments on why you disagree,

22   or if they are not convinced and then if they're convinced, the

23   comment basically goes away.  If they are not convinced then

24   the same process if they determine whether it should go in

25   Part I.

1   Q.  So, is it fair to say not all comments received by the firm

2   make it into Part I of the report?

3   A.  Correct.

4   Q.  Is it also fair to say that a comment that KPMG does not

5   object to may or may not make it into the report?

6   A.  Correct.

7   Q.  Does a comment making it into the report provide any

8   indication as to whether the issuer's financial statements are

9   inaccurate?

10  A.  No.

11  Q.  And, what's the difference between those two questions?

12  A.  The inspections relate to the audit itself versus the

13  financial statements of the issuer.

14  Q.  And then when is the timing of when KPMG receives an

15  inspection report in any given year?

16  A.  So, if the inspection is for the period of, I will just

17  pick numbers to lay it out, if it is inspections done in the

18  summer/fall of 2014, it's for companies mainly that have a

19  12/31/13 year-end and that inspection report would probably be

20  issued sometime in the fall of 2015.

21  Q.  So that would be a year and a half or longer after the

22  close of the fiscal year for the issuer?

23  A.  Correct.

24  Q.  And, I asked you a question about Part II.  What's the

25  difference between Part I and Part II of the inspection report?

J345mid6                        Middendorf - direct

1   A.  So, Part I lists the issuers by an anonymous letter, issuer

2   A, B, C, etc.  That is the comments that the PCAOB has written

3   about a particular engagement inspection and then Part II is

4   the overall views of the PCAOB on particular matters for a

5   firm, you mentioned tone at the top before, it could be a

6   particular audit areas of the firm's scoping, how it scopes out

7   what work is in and what work is out or estimates or other

8   topics.

9   Q.  And is there a period of time for the firm to respond to a

10  potential Part II comment?

11  A.  So, yes.

12  Q.  And what is that period of time?

13  A.  When the report is issued, so Part I becomes public, it is

14  posted to the PCAOB website, the firm receives a copy of the

15  entire report including the Part II and we have one year from

16  that date to respond to the Part II criticisms which is usually

17  a very lengthy document, and then the PCAOB would review that

18  document and determine if the remediation was sufficient in

19  their minds to remediate those deficiencies.

20  Q.  Remediation meaning fix the problem?

21  A.  Correct.

22  Q.  Did you observe any trends with respect to the Big Four

23  accounting firms and the number of comments that they received

24  in Part I of PCAOB inspection reports?

25  A.  Yes.

J345mid6                        Middendorf - direct

1    Q.  And what did you observe?

2    A.  So, there were one firm that would have a high number, I

3    will say the most Part I comments and then it would hit a peak

4    and then come down, and then a couple of years later there was

5    another firm that had, hit a peak, the peak seemed to be 28,

6    and then would come down, then another firm would have a year

7    or two later hit the peak of 28 issuers in their Part I, and

8    then in 2014 KPMG became the firm that hit the peak of 28

9    issuers in Part I.

10   Q.  In observations you just described, did Jay Hanson discuss

11   those with you in any meetings you had with him?

12              MS. ESTES:  Objection.  Hearsay.

13              MR. BOXER:  For his state of mind, your Honor.

14              THE COURT:  You can answer.  Overruled.

15              THE WITNESS:  Yes.  He had indicated that he thought

16   the PCAOB had some people had a gotcha mentality.

17   BY MR. BOXER:

18   Q.  And, PCAOB inspection -- withdrawn.

19              If a client's audit had received a comment in Part I

20   of an inspection report, was there any process or procedure

21   about discussing that fact with the client or the firm?

22   A.  Yes.

23   Q.  And, what was that?

24   A.  The procedure the firm had would be that the client would

25   be informed that there is an item in our Part I, once again

J345mid6                          Middendorf - direct

your issuer A or B or C, and let them know that that comment

was going to be in there, the typical or I guess the firm's

desired approach was that it was someone other than the lead

audit engagement partner who would present that to the audit

committee.

Q.  And so you would tell the client which issuer they were in

the report?

A.  Correct.

Q.  And, did you participate in any discussions with firm

clients about the client appearing in Part I of a KPMG

inspection report?

A.  Yes, I did.

Q.  And, do you recall which issuers had that discussion with?

A.  Yes.  There is a number of my SEC reviews, I think Super

Value Costco, Foot Locker, Reynolds American.  Maybe a few

others.  And then I mentioned Darden and Rent-A-Center.

Q.  Did they all receive a comment in Part I?

A.  No.  Some did.

Q.  And for the ones that did, were you present for any

conversations about the comments with the audit committee of

the issuer?

A.  Yes?

Q.  And how often do you think that occurred where you were

present?

A.  How many times I had been in those meetings?

J345mid6                        Middendorf - direct

1    Q.   Yes.

2    A.   Probably half a dozen to a dozen times.

3    Q.   And, what was your impression of the audit committee's

4    level of interest in the fact that the audit of the issuer had

5    received a comment in Part I?

6            MS. ESTES:  Objection.  Calls for speculation.

7            MR. BOXER:  Fair enough.

8            THE COURT:  Sustained.

9            MR. BOXER:  I will try to rephrase it, your Honor.

10           THE COURT:  Sustained.

11   BY MR. BOXER:

12   Q.   Do you recall any specific conversations with an audit

13   committee or audit committee member where that issuer had a

14   comment from the audit appear in Part I?

15   A.   Yes.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

J34dmid7                          Middendorf - direct

1   Q.  And could you tell us what you were told by the audit

2   committee member?

3            MS. ESTES:  Objection.

4            THE COURT:  Overruled.

5   A.  So it happened multiple times but I'll just use one

6   example.  The audit committee Chair, I had called him and said,

7   you know, the inspection that we had told them about the year

8   before that had happened, we just received our Part I report

9   and that company was in as issuer, once again, you know, letter

10  A, B, C, and I wanted to make sure that I informed him as the

11  audit committee Chair and then would present that at the entire

12  audit committee -- the next audit committee meeting and --

13  Q.  What did the Chair say to you?

14  A.  I remember his response being, "I don't care and so be

15  brief."

16  Q.  And was that typical of the responses you heard from audit

17  committee chairs in similar situations?

18  A.  Yes.

19  Q.  I want to ask you a few questions about your reports, you

20  direct reports, and how DPP was structured.

21            When you arrived in June of 2014, what was the

22  structuring of DPP?

23  A.  So my predecessor had various individuals who reported to

24  him that there was an Audit Group, an accounting group, a SEC

25  practice advisory group, inspections, and an audit quality

J34dmid7                         Middendorf - direct

1    process monitoring group.

2    Q.  And who was the head of the accounting group when you

3    arrived at DPP?

4    A.  Mark Beilstein.

5    Q.  And was there a Chief Accountant that reported to you at

6    that time?

7    A.  He did not have the name or the title Chief Accountant,

8    but, yes, he was the leader of DPP.

9    Q.  And who was that?

10   A.  Glenn Davison.

11   Q.  And was there a leader of audit?

12   A.  Yes.

13   Q.  Who was that?

14   A.  George Hermann.

15   Q.  And Mr. Beilstein, what were his duties and

16   responsibilities?

17   A.  So he was head of the accounting department, so focused on

18   matters of accounting.  So there was a new standard coming out

19   right when I got to my role, there was a new revenue

20   recognition standard the Financial Accounting Standards Board

21   had issued that would be implemented over the next few years.

22   So, that would be something his group would work on to prepare

23   guidance for engagement teams to prepare publications,

24   basically a book, that we would give out to clients that this

25   is guidance for them on how to do this.  You know, anything

J34dmid7                    Middendorf - direct

1     accounting-related we had people who sat on the emerging issues

2     task force of the Financial Accounting Standards Board, etc.,

3     so all items accounting.

4     Q.  You mentioned the SEC Practice Advisory Group.  Who headed

5     that when you started back at DPP?

6     A.  It was co-led by John Ellison and Carmen Bailey.

7     Q.  And what kind of work did that group perform?

8     A.  So in general, that is the I'll call it the technical call

9     center.  If you are an engagement team, an engagement partner,

10    the engagement manager on the audit side that has a technical

11    inquiry, you call that group.  And that group also had

12    responsibility for SEC matters, so clients that maybe had a

13    comment letter from the Division of Corporation Finance, maybe

14    had an issue from Enforcement, those matters would all go up

15    through that group.

16    Q.  And who was Craig Crawford?

17    A.  Craig Crawford was the partner who was in charge of a group

18    called the audit process -- Audit Quality Process Monitoring

19    Group.

20    Q.  That was another group that reported to you?

21    A.  Correct.

22    Q.  And I assume they monitored audit quality, as the name

23    suggests?

24    A.  Yes.  I'd say it was maybe the early stages of the root

25    cause analysis process.

J34dmid7                          Middendorf - direct

1    Q.   What is a root cause analysis?

2    A.   A root cause analysis is to say here are my problems, my

3    deficiencies, and what is the actual root cause that's causing

4    that deficiency.  You may just think it's the engagement team

5    wasn't appropriately staffed or the engagement team wasn't

6    knowledgeable, but rather than guess what the root cause of the

7    problem was, it was to do analysis to determine what's really

8    causing the deficiency, causing a particular deficiency.

9    Q.   And was there an Inspections Group that reported to you?

10   A.   Yes.

11   Q.   And who was the head of the Inspection Group?

12   A.   Tom Whittle.

13   Q.   And do the regional practice group heads also report to

14   you?

15   A.   Yes.  So --

16   Q.   Who were they?

17   A.   KPMG splits the country into an East and West Region just

18   for managing the audit practice.  Laurie Mullen was the West

19   Region professional practice partner, and Kevin O'Hara was the

20   East Region professional practice partner.

21   Q.   And how many practice groups or offices in total did

22   Ms. Mullen and Mr. O'Hara oversee?

23   A.   So within the regions, the firm broke down the country into

24   18 business units.  Ten of those reported up to Ms. Mullen and

25   eight reported to Mr. O'Hara.

J34dmid7                        Middendorf - direct

1   Q.  And Ms. Mullen and Mr. O'Hara reported to you, correct?

2   A.  Yes, they were my direct reports, two of my direct reports.

3   Q.  And then at some point you restructured DPP a little bit,

4   is that right?

5   A.  Yes.

6   Q.  Could you explain what the restructure was?

7   A.  I'd say not significant changes but important changes, and

8   it was I had probably been in my role I'll say around a year.

9   So --

10  Q.  What changes did you institute?

11          MS. ESTES:  Objection, your Honor, to the

12  interrupting.

13          THE COURT:  That is fine.  Go ahead.

14  A.  So originally I mentioned Mr. Glenn Davison was the head of

15  DPP directly below me.  The Audit Group, the Accounting Group

16  and the Practice Advisory SEC group all reported to him.  I

17  felt that because of the audit quality issues we were having

18  and numerous initiatives we were putting in place, Mr. Hermann

19  should report directly to me.  So, we made that change.  And

20  then Mr. Davison, who was very close to the firm's mandatory

21  retirement age for partners, I changed the individual who was

22  in that role.  Mr. Davison stayed on maybe for another year or

23  two, but Jeff Jones became the head of the Accounting and

24  Practice Advisory Groups, and I changed his title to Chief

25  Accountant.  And I forgot to mention Mr. Hermann became -- his

1    title became Chief Auditor.

2    Q.  And did the other groups that you previously mentioned, did

3    they still report to you?

4    A.  Yes.  I made a change.  Mr.Crawford, who was the head of

5    the Audit Process -- Audit Quality Process Monitoring Group was

6    also nearing retirement.  I asked an individual named Steve

7    Georgian to join that group and ultimately take over, and I

8    changed that from reporting directly to me to reporting to

9    George Hermann, the chief auditor.

10   Q.  So when you started in your role at DPP, did you have

11   certain goals in mind?

12   A.  Yes.

13   Q.  And what were they?

14   A.  I'd say one was the National Office.  DPP had historically

15   been viewed as the, you know, premier part of the firm to

16   advance your career, you know, learn different industries,

17   become a technical expert on both accounting and auditing.  And

18   over the years, I'd say maybe five or so, ten years before I

19   got to my role, that had kind of slipped, that it was

20   recruiting resources became very hard because folks in the

21   business, the business units, wanted to keep their high quality

22   people to do the audits in the field and gain new clients, etc.

23   Q.  So you wanted to change that?

24   A.  I wanted to change that.

25   Q.  Anything else you set for yourself as goals?

J34dmid7                    Middendorf - direct

1    A.  Yeah.  So I came into my role with -- you know, we were

2    trending, as I mentioned before, the firm that was now having

3    the highest number of Part I issuers and focused on how do we

4    improve audit quality, and improving audit quality is the goal

5    but the, you know, one of the outputs of that would be to help

6    reduce the inspection number of Part I issuers.

7    Q.  And did you institute and support various programs to

8    improve audit quality at KPMG?

9    A.  I did, but first I needed to increase the level of

10   resources in my group.

11   Q.  And were you able to accomplish that?

12   A.  Yes.  It wasn't easy.  I'll just use an example.  When I

13   got to my role, the National Office has a rotational philosophy

14   I mentioned when I was -- did that in the late 1990s, so people

15   come in for a few years.  We try to help groom them and then

16   rotate out.  My goal was -- well, I guess I had talked to all

17   of my direct reports.  We need more resources to accomplish the

18   things we wanted to accomplish.  When I got to my role, only

19   about 15 people came in on that rotational basis.  And after

20   talking to all of my direct reports, we were looking to recruit

21   about 90 people over my first year in that role, which would be

22   a huge increase from the 15 we had just gotten, and, you know,

23   we needed to focus on how we were going to recruit that many

24   resources.

25   Q.  I would like to show you what's marked as Exhibit M306.

J34dmid7                    Middendorf - direct

1          Do you recognize that document?

2   A.  Yes.

3   Q.  And what do you recognize it to be?

4   A.  It is a graphic that we used as part of a presentation to

5   both the PCAOB and to our inspection team.  We had monthly

6   meetings with the PCAOB inspection team, and then we also

7   presented this to the KPMG board.

8   Q.  And does M306 reflect various initiatives that were

9   instituted from the time you became national managing partner?

10  A.  Yes.

11          MR. BOXER:  I offer it, your Honor.

12          MS. ESTES:  No objection.

13          THE COURT:  M306 is received.

14          (Defendant's Exhibit M306 received in evidence)

15  BY MR. BOXER:

16  Q.  Could you walk the jury through first generally how it is

17  structured without going through each particular circle?  What

18  is depicted in M306?

19  A.  Yeah.  So it depicts numerous audit quality initiatives

20  that we had put in place and were putting in place.  And if you

21  see on the I'll say kind of the bottom left side, it has an

22  arrow that talks about some things have an indirect impact on

23  audit quality and some things have a direct impact.  So if you

24  look at the first kind of maybe the infield of the baseball

25  diamond here, specific issues that were coming up as audit

J34dmid7                    Middendorf - direct

1    quality issues, whether in external inspections or internal

2    inspections or estimates, the internal control over financial

3    reporting as "ICOFR."  "ALL" being the allowance for loan

4    losses.  Supervision and review, professional skepticism, etc.,

5    so those were at the engagement team level.

6          If you go up, the next blue band is a lot of our audit

7    quality monitoring programs that we had put in place, which

8    would be to supplement the engagement teams having some kind of

9    monitoring program.  And if you get to the next band out that

10   is kind of a teal color, it says "Process Improvement."  Those

11   are things on a much larger scale that maybe aren't direct

12   impacts to audit quality but have indirect impact.

13         So "Resource Management Scheduling," do we have the

14   right resources that are being scheduled on audit engagements?

15         Root cause analysis, we mentioned a little bit ago of

16   we had to change the leadership of that group.  We hired

17   someone from the PCAOB to be in that group.  We hired a

18   consultant to help us develop a more robust root cause analysis

19   process, you know, trained up the people, we added resources in

20   that area.  So that's -- I haven't gone through everything but

21   that's kind of an overview of what it is.

22   Q.  The second level, the monitoring programs, is it fair to

23   conclude from M306 that there were eight separate monitoring

24   programs that were instituted at DPP after you became national

25   managing partner?

J34dmid7                    Middendorf - direct

1   A.  Yes.

2          MR. BOXER:  Your Honor, I am going to move on to the

3   PCAOB now, and it is a convenient time to break, if that is OK,

4   or I can keep going if you would like.

5          THE COURT:  Yes.  It is almost -- it is about four

6   minutes to 5 so why don't we break.

7          Folks, I am just going to remind you to leave your

8   notepads on your chairs.  You are not yet deliberating so don't

9   discuss the case.

10         We will continue, as we have in the past, at 9:30

11  tomorrow morning.  We will have coffee by around 9.

12         Have a good night and we'll see you tomorrow morning.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You may be seated.

3          MR. BOXER:  Your Honor, as far as scheduling, I do

4   have a fair amount more left to go.  I'm turning to more of the

5   evidence, the emails and things like that that are in evidence.

6   So I think it could be a half a day tomorrow.  I am going to

7   look at it tonight and try to make it, what usually happens,

8   which is make it shorter, but as far as planning for the

9   government, I think for sure it will pass the first break.

10  Maybe I will be proven wrong but I just wanted to put them on

11  notice.

12          THE COURT:  All right.

13          So we talked about a charge conference tonight, but it

14  sounds like I'm absorbing the letters we received earlier today

15  and the government wants to spend some time with it as well.

16  So, maybe we should put that off to perhaps tomorrow and see

17  where things stand tomorrow.

18          MS. KRAMER:  That makes sense, your Honor.

19          THE COURT:  All right.  Anything else anybody want to

20  discuss tonight?

21          MS. KRAMER:  I would like to discuss the conference

22  call records that defendant Wada intends to put in whether by

23  certification or custodial witness.

24          They are not relevant and whatever probative value

25  they have is substantially outweighed by the danger of her

J34dmid7                     Middendorf - direct

1   confusion.  The records reflect conference calls on the KPMG

2   conference call system on March 28, 2016 at and around the time

3   that the government alleges Cindy Holder was on the phone with

4   Jeff Wada getting the March 2016 list.  The number that dialed

5   into the calls that the defense wants to put before the jury is

6   a phone number that was not assigned to Cindy Holder until four

7   months later.  So, it is as relevant as picking any other desk

8   number that was used at that day at the same time as that call

9   with Jeff Wada and putting it in front of the jury and trying

10   to argue that Holder wasn't on the phone with Wada because,

11   look, another call had a number.  That number had no connection

12   to her whatsoever until four months later.

13           I think there was some confusion about this because it

14   was in her email folders at some point, and so I think this

15   started with a good faith belief that perhaps it was her

16   number.  But it has been clarified.  We've produced an email

17   from KPMG that we recently received demonstrating that she

18   didn't have that number until July.  So, it has no probative

19   value whatsoever that someone else at KPMG was on the call.

20           KPMG has told counsel for Wada that.  We have produced

21   the email.  And so if they put this in, we will put in a

22   rebuttal witness to prove that she wasn't assigned this number,

23   but it just shouldn't happen in the first place under 403.

24           THE COURT:  Is this the same number that is referenced

25   in the email where she says call me at this number, or this is

J34dmid7                          Middendorf - direct

something else?

          MS. KRAMER:  No, your Honor, this is something else.

          So the day of the March 28th call, she did not have a
New York desk number assigned by KPMG.  That didn't happen
until four months later.  So, you know, the email that she
sends to someone two hours after the Wada call saying call me
on this number, that is not the subject of the conference call
records they want to put in.  They want to put in a conference
record showing that someone using, just as an example, the
number ending in 1234 had a conference call at the same time,
and it happens to be that that number was assigned to her four
months later but it was not assigned to her on March 28th.  It
is just -- it is misleading to suggest otherwise.

          And so, you know, there is a little bit of a trial
within a trial that's going to happen as a result of this, and
there is just -- there is no relevance and no probative value.
And what arguments they want to make from it are misleading
based on the evidence that they've seen and representations
that have been made to them and so we think it should be
precluded.

          MR. WEDDLE:  Your Honor, the government marked as a
government exhibit I believe it was Exhibit 1304, which was a
spreadsheet of conference call dates.  In that spreadsheet,
there is a phone number referenced which ends in 1417.  The
spreadsheet says that that number belongs to Cindy Holder.  The

J34dmid7                      Middendorf - direct

government also produced in discovery a global directory for

KPMG.  It was the subject of some argument at the sidebar one

day, your Honor may recall.  It's a document that comes in a

binder that is about five inches thick, I think.  And that

global directory lists the number 1417 as Cindy Holder's

number, and it lists a different person as the owner of the

phone number 2251 -- the phone number ending in 2251.  The

government has contended, and they have put into their summary

chart, that the number 2251 is a number that Cindy Holder was

using on that particular day.  On that particular day, there is

a phone call to Jeff Wada from the number 2251.

        There is -- in my view, so from my perspective, I've

got two business records of KPMG associating the number 1417

with Cindy Holder, with no ambiguity about the date range or

anything like that.

        There are extensive business records of KPMG that said

1417 is Cindy Holder's phone number.  There are a number of

emails in evidence in which Cindy Holder's signature line for

her email said that her number is 1417.  There has been

testimony that KPMG also has the ability for people to borrow

phone numbers, this hoteling concept, and testimony that the

number 2251 was in the hoteling system at a particular time.

But contrary to that evidence, your Honor, is this global

directory which has 2251 associated with a particular person's

name.

1              So -- and I should add that yesterday, for the first

2      time, I saw a document produced by the government in discovery,

3      which was an email from July 2016 saying that the number 1417

4      was assigned to Cindy Holder, and the email I think has in it

5      either as recipients or senders the hoteling system.

6              So I have had discussions with KPMG's counsel.  I may

7      be misremembering, but I've heard different timeframes in terms

8      of when the number was assigned to her, some different

9      confusion about why is it that Cindy Holder's name appears in

10     two other business records, one of which was marked as a

11     Government Exhibit in the case.  So it seems to me that there

12     is a lot of confusion and that -- or to put it a different way,

13     there are bits of information and evidence pointing in

14     different directions.  And when there are bits of information

15     and evidence pointing in different directions, we have a trial.

16             So we intend to present our evidence.  If they have a

17     rebuttal case to present, they could present their rebuttal

18     case.  The first time any disclosure has been made about their

19     purported rebuttal case was yesterday, when I got this email

20     produced in discovery that purports to date the assignment of

21     this phone number.  So it's not the situation where -- this

22     isn't a situation where all of the information points in a

23     particular direction.  This is a situation where information

24     points in different directions, and both sides should be able

25     to present their argument.

J34dmid7                    Middendorf - direct

1          THE COURT:  Tell me exactly what you are trying to get

2     in.

3          MR. WEDDLE:  So what we are planning to present in the

4     form of a 902.13 certification from Verizon is specific

5     information about three conference calls.  And the conference

6     calls were dialed into by the 1417 phone number, the one that I

7     have told you is listed in KPMG business records, including

8     Government Exhibit 1304, as Cynthia Holder's number.  For a

9     period of time it overlaps with the phone call from 2251 that

10    the government contends is Cindy Holder's phone call to Jeff

11    Wada.  So the phone calls that are in the conference call data,

12    there is one at 9:54 a.m.  There is one at 12:28 a.m.

13         THE COURT:  On which date?

14         MR. WEDDLE:  Sorry.  On March 28, 2016, so a key date.

15    Obviously March 28, 2016, it is a date that the government

16    contends KPMG obtained the 2016 inspection list.

17         THE COURT:  So the information you have is that the

18    conference call, the 1417 number called into on that date.

19         MR. WEDDLE:  Correct.  And the three conference calls

20    on that date the 1417 participated in, and the one that I think

21    is the most important one is the one where 1417 dialed into a

22    conference call at 12:28 p.m. for 18 minutes.

23         So 12:28 p.m. for 18 minutes.  If I can do math in my

24    head well enough for this audience, we'll see, but I think that

25    that takes us to 12:46 p.m.  If we assume that that's all in

J34dmid7                        Middendorf - direct

1    New York time, that's a four-minute overlap with the call that

2    the government has put into its summary chart as taking place

3    between 12:42 p.m. and 1:33 p.m. from the number ending in 2251

4    to Jeff Wada.  That is a 51-minute call.  So --

5              THE COURT:  But what is the evidence you have that the

6    1417 number was used by Cindy Holder on 3/28?

7              MR. WEDDLE:  Well, I don't have any evidence from

8    3/28, your Honor.  The government also doesn't have evidence

9    that's exactly contemporaneous with the attribution that

10   they're trying to make.  So they have an email from a couple of

11   hours later, on March 28th, by Cindy Holder telling someone to

12   call her at that number.

13             THE COURT:  At 2251?

14             MR. WEDDLE:  No, at -- right, at 2251.  That's right.

15             And so the -- I mean, I think that it's fair argument.

16   They have a different time.  They have a document with a

17   different time on it from Cindy Holder saying call me at this

18   number.  They've also put in evidence that the number is not

19   assigned -- 2251 is not assigned to Cindy Holder at any time.

20   We have a phone number that is assigned to Cindy Holder at some

21   time.  There seems to be a dispute about when that is.  It is a

22   phone number that's permanently assigned to her such that it

23   appears in her signature line of her email.

24             And I think that -- look, this may not be a great

25   argument, your Honor, but I don't think it has to be a great

J34dmid7                        Middendorf - direct

1    argument in order for us to try the case according to the

2    evidence and to put the government to its proof.  But in every

3    organization that I've worked in, the organization has not

4    found it to be useful to reassign phone numbers to different

5    people at different times, if they can help it.  KPMG, I

6    understand, has the capability of assigning a phone number to a

7    KPMG employee and having that phone number ring at whichever

8    physical phone a KPMG employee may be working at on a

9    particular day.  They also have, you know, what I think of as

10   desk offices or hoteling numbers because their people travel

11   all the time.  I travel a lot.  In my law firm we have guest

12   offices.  Sometimes I just use a number.  Sometimes I walk into

13   an empty office and I say call me at this desk phone.

14          So the fact that Cindy Holder says call me at 2251 a

15   couple of hours after a key phone call I think is -- there is

16   room for argument there that that's -- this is weak evidence.

17   I mean, the point that we're making is this email from a couple

18   of hours later is very weak evidence that Cindy Holder is this

19   caller.

20          And it's a critical fact because if the government

21   doesn't believe beyond a reasonable doubt that Cindy Holder is

22   that caller and if the government doesn't believe -- I mean, if

23   the jury doesn't believe beyond a reasonable doubt that they

24   can infer what the content of that call was from 2251, a number

25   not assigned to Cindy Holder, there is no -- there is no case

J34dmid7                    Middendorf - direct

1    on the 2016 list.  There are other defects as well, your Honor,

2    but I think this is a situation where we are entitled to test

3    the government's proof.  I don't think they should be seeking

4    to just preclude us from admitting relevant evidence.

5               THE COURT:  When does this signature line say 1417?

6    Do you know what dates that comes up?

7               MR. WEDDLE:  I know that the ones in evidence, I think

8    the earliest one is October 2016, so after the timeframe.  And

9    after the timeframe that the government contends is the date

10   assigned.  They have -- you know, they have produced a document

11   yesterday for the first time which says that the assignment

12   occurred in July 2016.

13              THE COURT:  Is there evidence that it was assigned to

14   her two months later?  Because if that is the case, I think

15   that undermines any probative value to this number.

16              MR. WEDDLE:  I'm sorry.  Evidence --

17              THE COURT:  Well, the spreadsheet itself doesn't give

18   any date information.  It just says at some point it was

19   assigned to her.  Is that right?

20              MR. WEDDLE:  Yes, that's right.

21              THE COURT:  There is no update?

22              MR. WEDDLE:  There is a word "Cindy Holder" next to

23   that phone number.

24              THE COURT:  There is no information about when it was

25   assigned?

J34dmid7                      Middendorf - direct

1           MR. WEDDLE:  But it's a spreadsheet that covers a long

2     period of time, your Honor.  So this spreadsheet that's marked

3     as Government Exhibit 1304 -- I hope I'm not getting that

4     number wrong -- I think it is 1304, it is a spreadsheet, and it

5     contains, I didn't count them, thousands of conference calls.

6     And on the conference call that I'm talking about on

7     March 28th, there is a line, Government Exhibit 1304, for this

8     conference call of 18 minutes.  And one of the columns says --

9     I think it says Cynthia Holder.  I don't know if it has her

10    middle name there.  But it's there in the line on the day and

11    time as the conference call that we're seeking to admit into

12    evidence.  That is something that was produced by KPMG to the

13    government.  Presumably KPMG was taking this criminal

14    investigation of KPMG and its personnel seriously.  They

15    produced that spreadsheet to the government as part of its

16    cooperation with the government's investigation, and the

17    government produced it to us as a marked government trial

18    exhibit.

19          THE COURT:  I don't care about that.  Obviously, the

20    system just assigned her name to that number at some point.  I

21    mean, I don't know why you say that the 2251 email from two

22    hours later is not strong evidence.  It's very strong evidence.

23          MR. WEDDLE:  I didn't say it is not strong evidence --

24          THE COURT:  It is evidence two hours later.  She said

25    call me at this number.

J34dmid7                        Middendorf - direct

1            MR. WEDDLE:  All I said, your Honor, is I am entitled

2     to test the evidence.  I don't think the government is entitled

3     to preclude us from testing their evidence.  It's evidence.

4     The jury may think it is strong evidence.  They may think that

5     we're making a weak argument.  But it's an argument, your

6     Honor, and I think we are entitled to put them to their proof.

7     They have the burden of proving these facts beyond a reasonable

8     doubt.  KPMG produced a document that has associated with this

9     very call on March 28th her name.

10           THE COURT:  Ms. Kramer.

11           MS. KRAMER:  Your Honor, they're certainly entitled to

12    argue to the jury that two hours later an email saying call me

13    at this number does not mean that she was using the number two

14    hours earlier.  Fine.  That does not in any way, shape or form

15    make the fact that someone else using a phone number that would

16    later be assigned to her had a call on March 28th.  There has

17    been no connection --

18           THE COURT:  He's saying the jury might reasonably

19    conclude that that was her number.

20           MS. KRAMER:  I'm sorry, that which was her number,

21    your Honor?

22           THE COURT:  That she was using the 1417 number on

23    3/28.

24           MS. KRAMER:  That is not a reasonable conclusion, and

25    it shouldn't be put before the jury because we have evidence

J34dmid7                      Middendorf - direct

1    and a witness who will say that that was not assigned to her

2    until July 2016.

3              THE COURT:  Tell me about that evidence.

4              MS. KRAMER:  Certainly, your Honor.  So we have email

5    that we did produce yesterday because, you know, as your Honor

6    knows from when defense counsel tried to put in this

7    spreadsheet, we've been pursuing, you know, their argument

8    based on this document that we have repeatedly explained was

9    compiled for litigation and has no dates on it whatsoever.  So

10   we produced it to them.  It is an email that I think we can put

11   up for your Honor.

12             (Pause)

13             It is a request that Cindy Holder needs a New York

14   number and then the New York number is assigned.

15             So looking at the bottom, your Honor, July 14, 2016,

16   three-and-a-half months after the phone call that is at issue

17   here:  "Can I please request a New York number for Cindy

18   Holder?"  And then this is the response.  July 22,

19   three-and-a-half months after call at issue, that she is

20   assigned the 1417 number.  There is not a single email footer

21   with her using the 1417 number in March 2016, because she was

22   no more using that number than I was.  It was not assigned to

23   her.  It has no connection to her whatsoever.  And it's --

24             THE COURT:  I'm not seeing the 1417.

25             MS. KRAMER:  The 7 goes to the next line, your Honor,

J34dmid7                        Middendorf - direct

1    in the top email.  So it is 212 -- can you highlight it

2    please -- 212-954-1417.

3              THE COURT:  Got it, 212-954-1417.

4              MS. KRAMER:  We have represented to counsel, KPMG

5    counsel has represented, and is in the courtroom and can

6    certainly provide more information if your Honor needs it,

7    repeatedly, repeatedly, that the spreadsheet they're relying on

8    means nothing.  It has information that was in the system

9    somewhere at the time that it was compiled for us in the course

10   of our investigation.  We have repeatedly made that clear to

11   them.  We have followed up and found this document to show

12   them.  The fact that this is still being pursued just blows my

13   mind, and this is evidence that should not be put before the

14   jury because it has no relevance whatsoever to what happened

15   four months before she was assigned this number.

16             THE COURT:  I don't see how it's anything other than

17   misleading or at best wasting time, confusing the issue for the

18   jury, given this.  I mean, unless you think there is something

19   unbelievable about this?

20             MR. WEDDLE:  Well, I don't think the document speaks

21   for itself.  The first time I ever saw this document was

22   yesterday.  You know, the document is sent to New York hoteling

23   services.  It looks like it is probably a permanent assignment,

24   but, you know, I don't think that that's beyond all possible

25   doubt.  And I think we're talking about five minutes of trial

1   time, your Honor.  I think that what we have here is a conflict

2   in the evidence.

3              THE COURT:  I don't think there is any evidence that I

4   have heard of that Cindy Holder could possibly have been using

5   the 1417 number on 3/28, as opposed to two months later after

6   that, given what's been represented.

7              MR. WEDDLE:  I don't think that there is -- no one has

8   nailed down who was assigned 2251 on March 28th.

9              THE COURT:  Right.  But you have, even better than

10  that, you have her saying call me at this number.  That's

11  better than any spreadsheet.

12             MR. WEDDLE:  But -- well, your Honor --

13             THE COURT:  I mean, I'm speaking freely, I realize.  I

14  don't mean to say it is dispositive.  I'm just saying that that

15  is pretty strong evidence to support an inference that two

16  hours later she was at that number.

17             MR. WEDDLE:  That's my point, your Honor.  I don't

18  think that anything that we've heard is dispositive, so we are

19  entitled to test the evidence.  It doesn't have to be -- it

20  doesn't have to be the strongest argument in your Honor's mind

21  for it to be something that we are entitled to argue.

22             And the evidence that they've put in about the 2251

23  number is that it is a temporarily assigned number.  There has

24  been no evidence of who it was assigned to on March 28th at

25  all.  And so at a moment in time on March 28th, Cindy Holder

J34dmid7                      Middendorf - direct

says call me at this number.  I don't think that it is

necessary for the jury to infer from that that it was assigned

to her on that day.  They could infer that it was assigned to

her on that day from that information, or they could infer that

she wandered into another office.  Every other phone call that

she made that day, as far as I know, is from her cell phone.

          So there is this one phone call and there is a dearth

of information about it.  And the government wants to say it's

clear as day that this has to be Cindy Holder.  There are all

sorts of things that could be going on.  That and, you know,

and then after that debate, there is a major question, and I

think a failure of proof, about what the content of the phone

call was.  Even if they could establish that this was Cindy

Holder's phone number --

          THE COURT:  That is a whole different issue.

          MR. WEDDLE:  I think what we are talking about here is

five minutes of trial time.  I don't think that they get to

preclude us from raising -- from pressing them, even if they

think it is an incredibly weak argument or a weak inference.

And even if your Honor agrees it is a weak inference from the

emails that are in evidence, that this number was assigned to

her at a different time from what this email says in July 2016,

I don't think that there is a -- I don't think that it is

misleading.  I think it may be -- maybe your Honor thinks it is

a weak argument, but I think it is one that we are entitled to

J34dmid7                        Middendorf - direct

1    put in.

2              THE COURT:  Just to go back for a second.  What

3    exactly you want to put in is three lines from -- this is the

4    Verizon information?

5              MR. WEDDLE:  Right.  Exactly right, your Honor.

6              THE COURT:  And what exactly does it purport to show?

7              MR. WEDDLE:  The Verizon information --

8              THE COURT:  Oh, that is the three conference calls.

9    Sorry.

10             MR. WEDDLE:  It just says three conference calls.  It

11   just has the phone number.  When we started this pursuant on

12   the defense side, we were working with a marked government

13   exhibit that had Cynthia Holder's name in it.  Counsel is

14   correct that we had conversations both with the prosecution and

15   with KPMG's lawyers about these documents, and the

16   understanding has changed over time.  I'm not saying that

17   anyone misstated anything at any point in time, but what

18   appeared to us to be a business record of KPMG when we looked

19   at it we were later told is not, it is a compilation, it is

20   made for litigation.  And then we started drilling down into

21   what are the underlying documents.

22             And so we have ended up where we are, which is with a

23   request, you know, to Verizon for these three calls.  And the

24   association with the 1417 number without the name Cindy Holder,

25   because Verizon doesn't have that in their system -- that's

J34dmid7                         Middendorf - direct

something that came from Government Exhibit 1304 -- and we're

continuing to pursue it, I mean, in all of our extra free time

during this trial.  And then yesterday we get an email from the

government that of course doesn't answer the question, but,

frankly, the way that this thing is going, I think who knows

how it is going to evolve.  And we're talking about three

conference calls.  They can put in their email.  Maybe, you

know, maybe the argument disappears.

          THE COURT:  Well, I think it is a stretch but I don't

know that I can preclude --

          MS. KRAMER:  Your Honor, may I just say one more

thing?

          THE COURT:  Sure, you can try again.

          MS. KRAMER:  The defense is not precluded from making

all of the arguments that are available to them from the time

difference between the call between the 2251 number and Jeff

Wada on March 28th and the time when Cindy Holder sent the

email to her immediate supervisor two hours later saying call

me at this number.  That is the thrust of their argument that

Mr. Weddle has repeatedly referred to.  He wants to test our

evidence.  And that is fine, and we're not seeking to preclude

arguments about that time difference.

          This is now a bridge too far, because what they're

doing is taking evidence that they know in good faith does not

say what they originally thought it said.  In good faith, they

J34dmid7                        Middendorf - direct

1    started pursuing this, as they said, not realizing the sort of

2    nature of the document they were looking at.  But now everybody

3    is on equal footing and understands that Cindy Holder was not

4    assigned the 1417 number.  So, you know, it is not just five

5    minutes of the defense case and putting in the three conference

6    calls.  We're going to call, you know, one or two witnesses

7    from KPMG to testify about that email, that Cindy Holder was

8    assigned to it.  We're going to go back to our office now and

9    figure out is there a witness who can give testimony that the

10   1417 number was assigned to someone else on March 28, 2016, to

11   clean up the confusion that this misleading evidence will

12   create for the jury.

13            So it's not just a waste of time, which is not

14   insignificant.  It's also confusion for the jury.  And it is

15   irrelevant what number participated in a conference call when

16   that number was not assigned to Cindy Holder until far later.

17   They're the proponent of this evidence, and they've proffered

18   nothing whatsoever that connects the 1417 number to Cindy

19   Holder until July of 2016.

20            MR. WEDDLE:  Could I just add one thing, your Honor?

21            THE COURT:  Yes.

22            MR. WEDDLE:  So the phrase "good faith" has been

23   thrown about.  I think that given the way that the information

24   that we have has evolved over time and given the fact that the

25   government itself is saying that it is going to need two

1    witnesses to establish the facts that they say is

2    incontrovertible from the email, which I say is not

3    self-explanatory, I think is -- I mean, that's more than enough

4    good faith basis.  I think that, you know, we started this with

5    some business records from KPMG, and, you know, KPMG I think is

6    not in the business of typing information into computer systems

7    that is inaccurate.

8              THE COURT:  Well, the fact that there is that

9    information, that might have the given them a good faith basis

10   that no longer exists.

11             MR. WEDDLE:  But my point is -- I'm sorry, I don't

12   mean to cut you off.

13             THE COURT:  No.  Go ahead.  Make your point.

14             MR. WEDDLE:  My point is we've seen this entry in KPMG

15   records, and now we're told, oh, those records are wrong,

16   here's the right record.  I don't know who that 1417 was

17   assigned to.  If they say it wasn't assigned to Cindy Holder

18   before July 2016, who was it assigned to, then?  I mean, you

19   know, so.  And the fact that they need to call a couple of

20   witnesses to testify about something that they say is

21   incontrovertible I think shows that it demonstrates quite

22   clearly that it is not incontrovertible.  This is not a simple

23   question.  And we're just pulling on a thread that seems to

24   keep unraveling.

25             MS. MERMELSTEIN:  Your Honor, I'm sorry to keep

J34dmid7                              Middendorf - direct

1    beating this horse.  But Mr. Weddle is the proponent of this

2    evidence, and he has not met the basic threshold of showing

3    that it is relevant, which is, in fairness, an incredibly low

4    threshold and he has not met it.  You cannot establish that I

5    was on a conference call yesterday by showing what my telephone

6    extension was when I worked at Simpson Thacher 12 years ago.

7    It is not relevant.  You have to first show some connection

8    that the person was using the phone number at that time.

9            The fact that KPMG has a record that shows that at

10   some point in time that was used, that was her number, and

11   there has been definitive evidence that it was not at this

12   point in time makes this evidence not relevant under the rules

13   of evidence.  And it is going to be wildly confusing for the

14   jury and a complete sideshow.

15           And in the absence of some evidence that Cindy Holder

16   was using a number four months before it was assigned to her,

17   the evidence is inadmissible on a relevance basis, period.

18           The spreadsheet that Mr. Weddle has continued to refer

19   to is not a business record and it does not show anything.  We

20   understand how defense counsel sort of thought this was an

21   avenue worth pursuing, but it is now clear that that simply has

22   no basis in fact.  And relevance is the preliminary threshold.

23   How much evidence the government would have to bring to

24   disprove this nonsense theory is not the point --

25           THE COURT:  OK.  OK.

J34dmid7                      Middendorf - direct

1           I think information about the three conference calls

2       on 3/28 from the 1417 number is information that is not

3       relevant without some additional foundation.  I mean, this is

4       Rule 104:  When the relevance of evidence depends on whether a

5       fact exists, proof must be introduced sufficient to support a

6       finding that the fact does exist.

7           And I don't think this is a situation where there is

8       any -- given what's on the table, what we all know, I don't

9       think there is a sufficient foundation for the relevance of

10      those conference calls from the 1417 number on 3/28.  So

11      without an additional proffer, I am going to sustain the

12      objection to it.

13          What else?

14          (Pause)

15          Did you have -- you have text messages that you want

16      to get in, or are they emails?

17          MR. WEDDLE:  Yes, your Honor.  We do have a series of

18      text messages that we plan to offer.

19          As to some of them, the government has indicated a

20      hearsay objection.

21          So, just to orient the Court, your Honor, during the

22      testimony of Enrique Santos -- he testified about Cindy

23      Holder's cell phone -- we authenticated but did not offer a

24      fairly comprehensive set of Cindy Holder chats.  We've marked

25      it as Government Exhibit 1013.  And that's the one where at the

J34dmid7                    Middendorf - direct

1     end Ms. Jason was doing the cross-examination of Mr. Santos,

2     and he explained that at the end of this particular report

3     there is what's known as a timeline of the chats which shows in

4     chronological order the various different conversations she was

5     having, you know, in overlapping times.

6               We've marked as defense exhibits a number of excerpts

7     from 10/13.  And we've been in discussion with the prosecution

8     about these, and I think I have some of their objections and I

9     think some of them I'm not sure whether or not they object.  It

10    may be my fault for giving them the excerpts late, your Honor.

11              But I'll just -- this is mostly from Ms. Estes.  But

12    of the ones that we've marked, I think we are going to skip and

13    not offer A, B or C.

14              Then we have 1013D, which I believe the government

15    does not object to.

16              And then 1013E, which I'm not sure about.

17              And we can display this on the screen, your Honor, or

18    I don't know what would be easiest for you.

19              (Pause)

20              THE COURT:  Do I have these or not?

21              MR. WEDDLE:  Let me check.

22              THE COURT:  I think I just have 1013.

23              MR. WEDDLE:  Sorry, your Honor.  Maybe I have a set.

24              (Pause)

25              Your Honor, we have them in folders.  I can hand you a

1   stack of folders.  It is more than one copy per exhibit, but

2   that is the way it was produced.  I apologize, I didn't have a

3   binder set up for you.

4           So this is 1013E.  I don't know if there is a

5   objection to this.  What we've done here, your Honor, to

6   explain is we've taken some additional chats beyond what the

7   government has marked in some instances.  So the blue

8   highlighted portion is marked as a government exhibit that's

9   already been admitted.  And then there is some additional bits,

10  some of them are in plain white and some of them are in other

11  colors, to show other conversations that were taking place at

12  around the same time.

13          This one, for example, I think -- well, I think all of

14  the things that I'm talking about, your Honor, all of these

15  chats are admissible not for their truth, for a number of

16  reasons.  They show the character of the conversations between

17  Mr. Wada and Ms. Holder.  They show the context of different

18  statements that are being made by both of them.  And so for

19  that -- on that basis alone, they are admissible.

20          There are some chats that look like they are

21  assertions of fact.  This one doesn't have, I think, assertions

22  of fact.  And if they are assertions of fact, we are not

23  offering them for their truth.

24          There are other chats where there are some assertions

25  of fact that I think are also admissible for their truth based

J34dmid7                          Middendorf - direct

1   on the state of mind assertion.

2            But this was -- 1013E is one where I don't think I

3   heard one way or the other from the government if they have an

4   objection or didn't have an objection, so I am just not sure.

5            MS. ESTES:  Your Honor, we don't object to 1013E.

6            MR. WEDDLE:  OK.

7            THE COURT:  OK.

8            MR. WEDDLE:  So 1013G I also am not sure if the

9   government objects.

10           MS. ESTES:  We don't object to this one either.

11           THE COURT:  All right.

12           MR. WEDDLE:  1013I the government does object, I

13   understand, is that right?

14           MS. ESTES:  Your Honor, we don't object to this if it

15   is not offered for its truth.

16           MR. WEDDLE:  We had are not offering it for its truth.

17           THE COURT:  OK.  That is I?

18           MR. WEDDLE:  Yes.

19           THE COURT:  All right.

20           MR. WEDDLE:  1013J I think is admissible not for its

21   truth.  I believe the government does object to 1013J to the

22   extent it is offered for its truth.

23           MS. ESTES:  That is correct, your Honor.

24           THE COURT:  But you don't object insofar as it is

25   offered for I guess state of mind?

J34dmid7                    Middendorf - direct

1            MS. ESTES:  Your Honor, I am not sure how that is

2     exactly relevant since these aren't -- some of these texts

3     aren't with Jeff Wada, they are with Cindy Holder and Brian

4     Sweet.  I mean, I suppose the Jeff Wada ones could arguably be

5     admissible for state of mind, but I don't know how the Brian

6     Sweet and Cindy Holder ones are relevant to Wada's state of

7     mind.

8            MR. WEDDLE:  We're definitely not offering Brian Sweet

9     or Cindy Holder texts for their truth.  This is mostly to show

10    the context and the back and forth that kind of -- in some of

11    the same moments when Cindy Holder is texting with Jeff Wada,

12    and that particular conversation has a certain character to it,

13    she is also texting with Brian Sweet.  And I think that the

14    manner in which those two things are juxtaposed, your Honor,

15    well, I think is relevant to show whether or not it appears

16    that they are all part of a single conspiracy or if they are

17    doing different things and they are different independent

18    conversations.

19            THE COURT:  And on this one, there is no government

20    exhibit -- there were other emails on the same -- other texts

21    on the same day?

22            MR. WEDDLE:  There is no corresponding government

23    exhibit for this date.

24            THE COURT:  So what is its relevance exactly?

25            MR. WEDDLE:  Well, I mean, it is showing the character

1   of the conversation between Jeff Wada and Cindy Holder.  She is

2   conversing with him basically about how is -- what's happening

3   with his promotion, ostensibly, at the same time she is

4   conversing with Brian Sweet about who actually got promoted.

5   Right?  So they're sharing information back and forth about

6   what is happening to who and how they feel about it at the

7   PCAOB.

8           And then Cindy Holder asks Jeff Wada for the list of

9   who has been promoted.  And then, you know, she is reporting

10  back to Brian Sweet about her request to Jeff Wada to email a

11  list of who was promoted.

12          THE COURT:  OK.  I guess for a nonhearsay purpose it

13  is all right.

14          MR. WEDDLE:  And 1013K, I believe the government also

15  objects to this on hearsay grounds.

16          Again, your Honor, we are offering this not for its

17  truth -- or it is relevant not for its truth but also to show

18  the state of mind of Mr. Wada.  I think the government's

19  allegation is that Mr. Wada was violating the rules as part of

20  a criminal conspiracy and what he hoped to get out of it was a

21  job.  This series of discussions has t do with other people and

22  Mr. Wada proposing other people as recruitment targets for KPMG

23  in the context where we've heard evidence that Cindy Holder

24  could get a pretty substantial bonus for recruiting people.  So

25  it is a different purpose.  It is inconsistent with the

J34dmid7                    Middendorf - direct

1    government's allegation for this conversation, and it sheds

2    light upon the character of their relationship that the

3    government has contended is a criminal conspiracy that includes

4    Brian Sweet and others.

5              THE COURT:  And this is all between Wada and Holder?

6              MR. WEDDLE:  Yes.  Most of these are questions, your

7    Honor.  So there is not a hearsay objection to a question, of

8    course.  But the ones that are statements I think are

9    admissible not for their truth but to show the things that I

10   just said before.

11             THE COURT:  Yeah.  I think they probably would be

12   admissible for their truth.  I'm just not exactly sure how they

13   are relevant.  I mean, they -- I guess they could go to -- you

14   are saying they go to the general character of the

15   communications?

16             MR. WEDDLE:  Yes, and it is inconsistent.  If the

17   government's theory is Mr. Wada wants a job so badly that he

18   will engage in a criminal conspiracy, it is inconsistent with

19   that to be proposing other candidates for recruitment by KPMG.

20             MS. ESTES:  Your Honor, we object to this being

21   offered for their truth.  I think it is a stretch that they are

22   relevant, but -- you know, it is fine, we are not going to

23   object to them coming in at all.

24             THE COURT:  OK.  So I'll let K in.

25             Are there others --

J34dmid7                        Middendorf - direct

1              MR. WEDDLE:  L is also objected to on hearsay grounds.

2       The back and forth with Mr. Sweet has to do with, you know,

3       sort of gossip about PCAOB personnel, including Joe Miller, who

4       other texts will show Cindy Holder corresponded with.  He was a

5       current PCAOB employee at the time.  There is a reference to

6       Bob, which I think is Bob Ross.  We've heard testimony about

7       that also.

8              And then there is a little bit of back and forth

9       between Mr. Wada and Ms. Holder.  The part that is relevant is

10      where Mr. Wada is saying I wanted to check in about Kristy

11      Zang.  That's all.  So, here again, he's checking in with

12      Ms. Holder not about providing information or getting himself a

13      job at KPMG but in proposing another coworker for a job at

14      KPMG.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J345mid8

1          THE COURT:  Does the government object?

2          MS. ESTES:  Your Honor, I'm not sure of the relevance

3     of the Brian Sweet text at the top, we don't object to the Wada

4     ones at the bottom.

5          THE COURT:  Yes.  I'm having a hard time seeing how

6     the Sweet/Holder communications, especially when they're not

7     even on the same day as the bottom two, could come in but I

8     will let the bottom two in.  How about that?

9          MR. WEDDLE:  1013M is primarily a repeat of

10    Government's Exhibits.  All we have added are two back and

11    forths with Joe Miller and obviously this is an important day

12    in the case, your Honor, and I think that it's relevant that

13    Cindy Holder is reaching out to Joe Miller in the midst of that

14    day who is a current PCAOB employee.

15         MS. ESTES:  Your Honor, I'm not sure how a text saying

16    "Happy Easter" is really relevant to the events of that day.

17    We obviously don't object to the ones that are already in

18    evidence as Government Exhibit 1442 and 1443.

19         THE COURT:  I don't see how the text saying "Happy

20    Easter" is relevant to anything.

21         MR. WEDDLE:  Your Honor, I think there is lots of

22    testimony about the fact that Brian Sweet thought it was part

23    of his job to maintain relationships with PCAOB personnel.

24    Mr. Whittle testified that in his experience, when people are

25    in contact with PCAOB personnel information flows, was the

1    testimony that he gave.  I think the evidence before the Court

2    has shown that Cynthia Holder seems to have taken her lead

3    before Brian Sweet in terms of finding it to be part of her job

4    to cultivate sources of information and to use those sources of

5    information for her own purposes and the fact that on March

6    28th, the day that the government contends an inspection list

7    was obtained by KPMG, she has decided to reach out to Joe

8    Miller is relevant, your Honor.

9              THE COURT:  Okay.  I will allow it.

10             Next one is O.

11             MR. WEDDLE:  Yes, we are not going to offer O.

12             THE COURT:  All right.  P?

13             MR. WEDDLE:  P.  This is a text back and forth between

14   Brian Sweet and Cindy Holder and I think this sheds light on

15   Brian Sweet's state of mind for some of the same reasons I was

16   just discussing, your Honor.

17             Both Brian Sweet and Cindy Holder appear to have

18   thought it was part of their job to cultivate sources of

19   information and so this -- I think the fact that Brian Sweet

20   says "I saw Bob last night, got him drunk and heard some

21   interesting things about D firm," is relevant to Mr. Sweet's

22   relationships with PCAOB personnel including Bob Ross who we

23   have heard about.

24             MS. ESTES:  Your Honor, I think they're only offering

25   this "I saw Bob last night and got him drunk" text for the

J345mid8

1    truth of what it says -- that Sweet saw Bob Ross and got him

2    drunk.  They certainly could have asked Mr. Sweet about this in

3    his testimony.  Instead, they didn't do that and now they want

4    to offer a text that is hearsay.  This doesn't go to his state

5    of mind.  They're trying to offer it for the truth so I don't

6    see how it is admissible.

7         MR. WEDDLE:  There is a distinction, your Honor, and

8    maybe a fine distinction, but I don't actually care whether Bob

9    Ross was drunk or how well he holds his liquor.  What we are

10   offering this for is to show Brian Sweet's intent in his

11   ostensible -- his meeting with Bob Ross which may have

12   ostensibly had other purposes.  His intent as part of that

13   meeting was to get him drunk and find out other information.

14        MS. ESTES:  Your Honor, I think it only shows his

15   intent if you accept the truth of "I saw Bob Ross."  So, that's

16   the problem.

17        THE COURT:  I think that is hearsay.

18        R?

19        MR. WEDDLE:  R.  The first couple of pages are all

20   government exhibits.

21        THE COURT:  And you are adding?

22        MR. WEDDLE:  We are adding some additional context.

23        THE COURT:  Any objection to this?

24        MS. ESTES:  Yes, your Honor.

25        The last couple pages are hearsay and also just should

J345mid8

be precluded under 403.  Mr. Wada, for instance, texted Cindy

Holder about the death of his mom, a medical problem that his

brother had about the death of his grandfather and about his

own heart condition.  And, his dad flatlined.

All of these medical issues of his family, there is no

relevance here and they're incredibly prejudicial and they're

really asking the jury to find him sympathetic.  So, we think

all of these should be precluded.

MR. WEDDLE:  Well, your Honor, we will withdraw the

last page and the two lines that Ms. Estes just talked about

which is the 9:47 and 9:48 texts about his dad.

I think there are statements by Mr. Wada that are

admissible under 803.3.  For example, on the page prior to

that, so the number in the lower left of the page says

DX 1013R-3, here there is a conversation that's going on

between Jeffrey Wada and Cynthia Holder about Jung Lee, who is

another PCAOB employee that we have heard testimony about, and

Jeffrey Wada says "I need to check out my heart murmur first."

That's a statement about his state of mind, that's admissible

under 803.3, and it shows what is forefront in his mind at that

time period when Cynthia Holder is trying to talk to him about

some other things including Jung Lee and what is going on with

Jung Lee's employment.  He is worried about and expressing that

in a manner that is clearly within an exception to the hearsay

rule.  He is talking about what he needs to do and then he

J345mid8

makes a number of statements about what he plans to do which

are also admissible under 803.3 based on his statement of

intent and he is talking about, you know, his health condition.

MS. ESTES:  Your Honor, we don't have an objection to,

for instance, the 9:47 a.m. text, "if I have a heart murmur and

it is all stress related I can't go back to the Big Four."  And

I guess whatever couple of surrounding tests may be needed to

add context to that.

On page 3 there is a 9:42 a.m. text they have here

standing alone without the text that precedes it.  The text

that precedes it, I believe, is a text where Wada says

something about Mr. Jung Lee is going to have to get hired by

Mr. Trump.  But it frames actually this following text so I

don't think the 9:42 a.m. text is relevant or admissible

without the text in front of it which explains, like, why Cindy

Holder replies that to Jeffrey Wada.

MR. WEDDLE:  We will withdraw that one, your Honor.

THE COURT:  Okay.  You are withdrawing that one.  What

about starting with the bottom of that page?

MR. WEDDLE:  I think those are admissible.

MS. ESTES:  Your Honor, I think on this maybe it makes

sense, since it sounds like they are withdrawing something and

we are agreeing, for us to consult and once we have a new

exhibit to see if there are any issues.

MR. WEDDLE:  That's fine.

J345mid8

1          THE COURT:  Okay.

2          MR. WEDDLE:  S, like Sam, it is mostly a government

3   exhibit and it is mostly to show the interspersed, what you

4   might say are back-channel communications that are taking place

5   in the midst of this conversation between Cynthia Holder and

6   Jeffrey Wada are her back-channel communications with Brian

7   Sweet.

8          MS. ESTES:  Your Honor, this one is fine with us.

9          THE COURT:  All right.

10          MR. WEDDLE:  T, we are not offering for its truth.

11          MS. ESTES:  Your Honor, I don't think we understand

12   the relevance of it, if not for its truth.

13          MR. WEDDLE:  It is basically saying that Brian Sweet

14   heard information about whether Wells Fargo was going to be

15   inspected from a different source.

16          MS. ESTES:  Right, your Honor.

17          I think that, again, is the part that is hearsay that

18   Brian Sweet says Dave just called me because he got a call from

19   Torrente about Wells not getting picked.  To accept the

20   argument you have to accept that is true.

21          Again, this is something they could have asked Brian

22   Sweet about in his testimony.  They chose not do it.  I don't

23   think they should be able to back door this in through a text

24   message that is clearly hearsay.

25          THE COURT:  I think it is hearsay.

J345mid8

1          MR. WEDDLE:  It is just relevant for the fact that he

2     is saying it, your Honor.  I mean he is saying it, that Wells

3     is not going to be picked, to Cynthia Holder, it is relevant to

4     both of their states of mind and it sheds light on the

5     confidentiality of the information that supposedly they learned

6     days later.

7          THE COURT:  But it's all based on the truth of the

8     fact that he got a call from Torrente about Wells not getting

9     picked.

10         MR. WEDDLE:  I think it is also relevant for the

11    effect on the listener Cynthia Holder.  Whether or not he got a

12    call she was told that he got a call and that's old news and he

13    is getting confidential information from other sources.  Or

14    information from other sources.  I don't know if it is

15    confidential or not confidential, in the government's view.

16         MS. ESTES:  Your Honor, I think it is just hard to

17    even articulate.  What are they going to actually argue about

18    Cynthia Holder's state of mind based on this?  They clearly

19    want to argue that Sweet got a call saying Wells is not getting

20    picked on January 6.  That's what they want to argue?  I don't

21    think they've articulated any relevance that is not basic

22    hearsay.

23         THE COURT:  I think I agree.  I don't see any

24    non-hearsay purpose.

25         Letter U.

1          MS. ESTES:  This is fine, your Honor.

2          THE COURT:  And V?

3          MR. WEDDLE:  V, I think, is the beginning of the

4    conversation, your Honor, and the government exhibit kind of

5    starts midstream, "I'm talking about edits to my résumé."  It

6    is something proposed by Cindy Holder coming from Brian Sweet.

7          MS. ESTES:  Your Honor, we offered most of the first

8    message.  The only part we redacted the part after this "week

9    or early next week" where it says, "Hope are you doing okay.

10   Sending prayers for you, Marian and the kids.  You got this."

11   We redacted all of that part.  And, "for the record, I won't

12   officially stalk until 2/8," because it seemed irrelevant.  It

13   seems like it is, again, another plea for sympathy and just an

14   unnecessary reference to his wife and kids.  It has no

15   relevance.

16         MR. WEDDLE:  Your Honor, it is not a plea for

17   sympathy.  I think that it shows that one of the things that

18   they were talking about, in fact I would submit one of the most

19   important things they were talking about in the time frame were

20   the health issues that Mr. Wada was going through and this is

21   whatever this is, this is less than two weeks from when he has

22   heart surgery.  So, it is an evolving situation and they're in

23   contact about his health.  There is going to be a stipulation

24   about the series of health-related tests and appointments that

25   he had in this time frame and I think it sheds light on the

J345mid8

1 content of their conversations.

2     THE COURT:  I don't think it sheds light in any

3 relevant way.

4     Is that it?

5     MR. WEDDLE:  We have a couple more that are not

6 excerpted from there.  I don't want to spring this on Ms. Estes

7 but we have 1648, which is chats from Ms. Holder and Jung Lee.

8     MS. ESTES:  What is this?  The May and June ones?

9     MR. WEDDLE:  May and June, yes.

10     MS. ESTES:  Your Honor, those are fine if they're not

11 offered for the truth.

12     THE COURT:  All right.

13     MR. WEDDLE:  And I think we have -- well, why don't we

14 take this up separately.  We have two from Brian Sweet's phone

15 but I don't think we discussed them.

16     That's all I think we have for those.  Hopefully the

17 other two are not an issue.

18     THE COURT:  Okay.

19     MR. WEDDLE:  Thank you, your Honor.

20     THE COURT:  All right.  And anything else anybody

21 wanted to talk about this evening?

22     MR. BOXER:  Not from us your Honor.

23     MS. MERMELSTEIN:  Nothing further, your Honor.

24     THE COURT:  Okay.  Have a good night, everybody.

25     (Adjourned to March 5, 2019 at 9:30 a.m.)

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     JAY HANSON

 4    Direct By Mr. Boxer  . . . . . . . . . . . .2509

 5    Cross By Ms. Mermelstein . . . . . . . . . .2551

 6    Cross By Mr. Weddle  . . . . . . . . . . . .2562

 7    Redirect By Mr. Boxer  . . . . . . . . . . .2563

 8    Cross By Ms. Mermelstein . . . . . . . . . .2574

 9     PAUL STUART ATKINS

10    Direct By Mr. Bruch  . . . . . . . . . . . .2579

11    Cross By Ms. Kramer  . . . . . . . . . . . .2615

12    Cross By Mr. Weddle  . . . . . . . . . . . .2640

13    Redirect By Mr. Bruch  . . . . . . . . . . .2641

14    CHARLES REYNOLD LUNDELIUS

15    Direct By Ms. Lester . . . . . . . . . . . .2654

16    Cross By Ms. Estes . . . . . . . . . . . . .2672

17     DAVID MIDDENDORF

18    Direct By Mr. Boxer  . . . . . . . . . . . .2681

19                        DEFENDANT EXHIBITS

20    Exhibit No.                              Received

21     M13    . . . . . . . . . . . . . . . . . .2531

22     M130    . . . . . . . . . . . . . . . . . .2537

23     M129    . . . . . . . . . . . . . . . . . .2539

24     M-314   . . . . . . . . . . . . . . . . . .2569

25     M211    . . . . . . . . . . . . . . . . . .2579
```

1    M305        . . . . . . . . . . . . . . . .2590

2    M-277       . . . . . . . . . . . . . . . .2649

3    M186        . . . . . . . . . . . . . . . .2663

4    M306        . . . . . . . . . . . . . . . .2740

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25