```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                            18 Cr. 0036(JPO)

 5   DAVID MIDDENDORF and JEFFREY
     WADA,
 6
                    Defendants.
 7
     ------------------------------x
 8

 9                                           March 5, 2019
                                             9:30 a.m.
10

11   Before:

12                   HON. J. PAUL OETKEN,

13                                           District Judge
                                             and a jury
14

15                      APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     BY:  REBECCA G. MERMELSTEIN
18        AMANDA K. KRAMER
          JORDAN L. ESTES
19            Assistant United States Attorneys

20   PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant David Middendorf
21   BY:  NELSON A. BOXER
          AMY R. LESTER
22        ALEXANDRA REBECCA CLARK
              – and –
23   BRUCH HANNA LLP
     BY:  GREGORY S. BRUCH
24

25
```

                         APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:  STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
             – and –
LATHAM & WATKINS
BY:  JASON MASASHI OHTA


         – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal




                           oOo

1          (Trial resumed; jury not present).

2          THE COURT:  Good morning everyone.  I understand we

3    are having LiveNote issues.  Are we still?  Is there anything

4    anybody wanted to address, preliminary matters?  All the jurors

5    are here.

6          MS. LESTER:  Your Honor, if we want to use the time

7    and we don't need the LiveNote, there is an issue with respect

8    to an exhibit we want to put in through our witness.  It is

9    M210.  I am going to ask Mr. O'Connor to pull it up for the

10   Court.  Our understanding is that the government objects to

11   this based on the fact that it goes back to 2009, which is

12   obviously before the time period charged in the case.  It is

13   based on publicly available documents.  I don't think they

14   object in the sense that they agree that it is accurate, but it

15   is more of a relevance objection.

16          Our view is that this is very relevant to what several

17   witnesses have already testified about in terms of historical

18   inspection results by the Big Four and the trend where certain

19   firms would be at the peak at certain points in time and then

20   they would come back down and another firm would go up.  This

21   is also relevant to Mr. Middendorf's state of mind at the time,

22   that there was a cycle to the inspection results over a period

23   of time.

24          MS. MERMELSTEIN:  That is an accurate summary of the

25   government's view.  The government doesn't contest that the

1    information contained in the chart is accurate or based on

2    publicly available information.  But the argument, and we have

3    objected to this as efforts have been made to try and step in

4    this direction, the argument that somehow the PCAOB was

5    targeting KPMG as being relevant is wrong.  It matters not at

6    all if that were true, which it is not.  It doesn't matter if

7    it's true because you can't cheat on the test because you feel

8    like you are being unfairly tested.

9         The purpose of this chart is to try and show that

10   other firms were doing worse at other periods in time but are

11   not at issue in this case, and it is just not relevant.  Whole

12   argument is improper.  So the chart is relevant and we don't

13   think it should come in.

14        THE COURT:  Does somebody want to explain to me how it

15   is relevant.

16        MS. LESTER:  Yes, your Honor.  As I stated a moment

17   ago, it is relevant to Mr. Middendorf's state of mind.  The

18   historical inspection performance is something he knew about at

19   the peer firms and obviously at KPMG.  When he enters his job

20   at DPP in 2014, that's the peak of KPMG's negative inspection

21   results or increased number of deficiencies.

22        So the fact that he knows, as the government has

23   argued, that KPMG is on this upward trend and that he somehow

24   has a motive therefore to commit the crime charged, the

25   historical performance of other firms is relevant to his

1   mindset and whether he actually had a motive.  He knows that

2   historically other firms have been at a peak and have come back

3   down.

4            It also shows that KPMG is not really an outlier.

5   There has been a suggestion by the government that KPMG had the

6   possibility of losing clients as a result of its negative

7   inspection results.  Mr. Middendorf will testify about his view

8   of that.  But this chart is relevant to that as well in that it

9   tends to show that there was a general ebb and flow to the

10  inspection results over time and that in Mr. Middendorf's mind

11  clients understood that as well and that a peak of negative

12  inspection results was not a reason why a client would change

13  audit firms.

14           THE COURT:  I think the relevance is pretty minimal.

15  But for the reasons you explained, I think there is some

16  arguable relevance to it, so I'm going to allow it.

17           Is the LiveNote working?

18           MS. LESTER:  Yes.  Thank you, your Honor.

19           THE COURT:  Can we start?

20           MR. BOXER:  Yes.

21           (Continued on next page)

22

23

24

25

 1          (Jury present)

 2   DAVID MIDDENDORF, resumed.

 3          THE COURT:  Good morning, ladies and gentlemen.

 4          THE JURY:  Good morning, your Honor.

 5          THE COURT:  We are continuing with the direct

 6   examination of Mr. Middendorf.

 7          Mr. Middendorf, you were sworn in yesterday.  You

 8   remain under oath.

 9          Mr. Boxer, you may proceed.

10          MR. BOXER:  Thank you, your Honor.

11   DIRECT EXAMINATION (continued)

12   BY MR. BOXER:

13   Q.  Mr. Middendorf, when you were the national managing partner

14   did you have standing regular meetings with people who reported

15   to you?

16   A.  Yes.

17   Q.  If I can show you what's been marked as M53.  What is that,

18   M53?

19   A.  That is a calendar invitation to a meeting-slash-call that

20   I would hold with my various direct reports.

21          MR. BOXER:  I offer it, your Honor, M53.

22          MS. ESTES:  No objection.

23          THE COURT:  M53 received.

24          (Defendant's Exhibit M53 received in evidence)

25   Q.  Looking at M53, are the people in the "to" line your direct

1    reports at that time?

2    A.   Yes.   The first name is my administrative assistant at the

3    time.   The others are direct reports.

4    Q.   Could you read the subject line, please.

5    A.   "Dave Middendorf's audit quality and professional practice

6    weekly call/meeting."

7    Q.   The location, does that indicate the floor you were working

8    on at the time?

9    A.   Yes.   That is a conference room next to my office.

10   Q.   On the 23rd floor?

11   A.   Correct.

12   Q.   If I could show you what's been marked as M286, which is in

13   evidence.   Do you recognize M286?

14   A.   Yes, I do.

15   Q.   What is it?

16   A.   It is a biweekly audit senior leadership call.   My boss,

17   the vice chair of audit Scott Marcello, and my peer John Ebner,

18   who was the other national managing partner in the audit, and

19   then the four regional leaders at the audit practice.

20   Q.   By "biweekly," what does that mean?   How often is biweekly?

21   A.   Every two weeks.

22   Q.   If I could show you what is in evidence as M287.   Do you

23   recognize M287?

24   A.   Yes.

25   Q.   What is it?

1    A.   Another weekly call calendar invitation for January 6,

2    2016.

3    Q.   Can you read the subject, please.

4    A.   "Dave Middendorf's audit quality and professional practice

5    weekly call/meeting."

6    Q.   Was that another standing meeting that you had with people

7    who reported to you?

8    A.   Yes.

9    Q.   What was discussed at those meetings?

10   A.   A typical agenda would be I'll call it kind of a round

11   robin, anyone who had something they needed to chat about with

12   the rest of the group.  Then I would have an agenda for items I

13   wanted to share with my direct reports.

14   Q.   In addition to standing meetings, did you travel to KPMG's

15   offices as national managing partner?

16   A.   Yes.

17   Q.   For what purpose and how often?

18   A.   For various purposes.  Sometimes there was a particular

19   client issue or meeting that I would attend.  One of the things

20   Scott Marcello, my boss, and John Ebner, my peer, and I did was

21   throughout the year we would visit one of the offices in each

22   of the 18 business units that the firm had.

23   Q.   I want to turn your attention to PCAOB board meetings.

24   What did you understand was the purpose of PCAOB board

25   meetings?

1    A.   For the senior leadership of the firm to meet with the

2    PCAOB board and chat about whatever was on the PCAOB board's

3    agenda.

4    Q.   Did you attend PCAOB board meetings?

5    A.   Yes.

6    Q.   Do you recall how many you attended?

7    A.   In my tenure as national managing partner audit quality and

8    professional practice, I attended four of those meetings.

9    Q.   Who else attended from KPMG?

10   A.   The chairman and CEO who was John Veihmeyer prior to July

11   1, 2015, and then after that Lynne Doughtie became the chairman

12   and CEO; the deputy chairman and COO, Scott Ozanus attended all

13   four; the vice chair of legal risk and regulatory Sven Holmes

14   attended all four; Jim Liddy, who was the vice chair of audit

15   prior to July 1, 2015; and then after July 1, 2015, Scott

16   Marcello became the vice chair of audit; myself for those

17   meetings as the national managing partner audit quality and

18   professional practice; and then Tom Whittle, who was the head

19   of inspections during that period.

20   Q.   Who from the PCAOB attended those meetings, as best you

21   recall?

22   A.   The five PCAOB board members, the head of our inspection

23   team, Paul Bijou and Steve Schindler, Helen Munter.

24   Q.   Paul Bijou and Steve Schindler, whom did they work for?

25   A.   They were the head of the inspection team at the PCAOB.

1    Q.  Of the inspection team of KPMG?

2    A.  Correct.

3    Q.  Please continue.

4    A.  Helen Munter, who was director of inspections at PCAOB.

5    Those were the people I will say at the table.  And then there

6    were lots of people I'll say in the gallery.  They could have

7    been people on the KPMG inspection team, could have been other

8    staffers at the PCAOB.

9    Q.  When you say in the gallery, was the meeting in a theater?

10   A.  It was in a very large room, basically four tables

11   together, so square.  We sat on one side, the PCAOB board

12   members on the other side -- Helen Munter, Paul Bijou and Steve

13   Schindler on one side -- and then behind the PCAOB board there

14   was a set of rows of chairs.

15   Q.  Did you consider these meetings to be important?

16   A.  Absolutely.

17   Q.  Did KPMG consider them to be important?

18   A.  Absolutely.

19   Q.  What kind of things were discussed?

20   A.  We received an agenda from the board.  Those agendas would

21   contain various items.  Inspection results were always on their

22   other issues that may be in the press, news items, areas

23   related to our part 2, etc.

24   Q.  Did there come a time when you attended any meetings with

25   any PCAOB board members before the actual board meeting?

1    A.   Yes.

2    Q.   Approximately when did that occur?

3    A.   I would say anywhere from a few days prior to the meeting

4    with the PCAOB board to maybe ten days prior to the meeting

5    with the board.

6    Q.   When was the first time you learned about such a meeting?

7    A.   I started in my role as national managing partner audit

8    quality control and professional practice on June 1, 2014, and

9    the first meeting I attended was in December of 2014.

10   Q.   How did you find out about the meeting in December of 2014?

11   A.   I received a calendar invite from my boss, Jim Liddy.

12   Q.   If I could show you what's been marked as M13 in evidence.

13   I ask if you could read the location.

14   A.   Lafayette, Hay Adams Hotel, 800 16th Street Northwest.

15   Q.   The start date is what?

16   A.   December 8, 2014.

17   Q.   Is this the first meeting that you just described?

18   Withdrawn.  Did the first meeting you just described occur on

19   December 8, 2014, at the Hay Adams Hotel?

20   A.   Yes.

21   Q.   Do you see your name in the "to" line?

22   A.   I do not.

23   Q.   Mr. Liddy's name is there, correct?

24   A.   Correct.

25   Q.   Who is Jay Hanson?

1    A.   He was one of the PCAOB board members.

2    Q.   Who is Jeanette Franzel?

3    A.   She was also one of the PCAOB board members.

4    Q.   Nancy McGeorge?

5    A.   She was Mr. Liddy's administrative assistant.

6    Q.   What happened when you went to the meeting on December 8,

7    2014?

8    A.   Myself and Mr. Liddy met Mr. Hanson and Ms. Franzel, sat

9    down, probably talked some pleasantries.  Then Mr. Hanson

10   handed us a draft of the agenda for the PCAOB board meeting

11   that would happen in about six days.

12   Q.   Did you have a similar type of meeting with Mr. Hanson

13   before each of the four board meetings that you attended?

14   A.   Yes.  I believe there were two more in-person meetings, and

15   the fourth meeting was a call.

16   Q.   The two others that were in person, were you handed

17   anything at either of those meetings?

18   A.   Yes.  At both of these meetings they also handed us a draft

19   agenda of the meeting with the PCAOB board that would take

20   place sometime after.

21   Q.   Going back to the meeting on December 8th, after you were

22   handed the draft agenda, what happened?

23   A.   Mr. Hanson would walk through the agenda, add his

24   commentary.  Ms. Franzel would add her commentary and give us

25   their views.  The stated purpose was to help us be more

 1   prepared, give us more time to prepare.

 2   Q.   Prepare for what?

 3   A.   For the meeting with the PCAOB board.

 4   Q.   Did those meetings with Mr. Hanson and Ms. Franzel give you

 5   and KPMG more time to prepare for the board meetings?

 6   A.   Yes.

 7   Q.   Other than going through the agenda, did Mr. Hanson share

 8   his views about the PCAOB with you and in this case Mr. Liddy?

 9   A.   Yes.

10   Q.   Do you recall what he said?

11   A.   Yes.

12   Q.   What did he say?

13   A.   He made comments about a gotcha mentality, that he felt

14   like some of the board members were focused more on number of

15   comments that would be written for firms versus actual audit

16   quality.

17   Q.   Did he say anything to you and Mr. Liddy about the focus of

18   PCAOB inspections?

19   A.   Yes.

20   Q.   What did he say?

21   A.   He said he felt that they had a focus on one firm at a

22   time.  He used the phrase "It's your turn in the box."

23   Q.   Sticking with this meeting on December 8th, what did you

24   and Mr. Liddy do after the meeting?

25   A.   We went back to New York to our offices and shared it with

 1   the other folks who would be attending the meeting with the

 2   PCAOB board.

 3   Q.   When you say "it," what did you share?

 4   A.   The agenda that Mr. Hanson and Ms. Franzel had given us.

 5   Q.   Was that agenda then used by anyone at KPMG?

 6   A.   Yes.

 7   Q.   In what way?

 8   A.   We would have a meeting with the attendees for the PCAOB

 9   board meeting from KPMG -- the CEO, the COO, vice chair of

10   legal risk and regulatory, Mr. Liddy, myself, and Mr.

11   Whittle -- to walk through both the draft agenda he had given

12   us to help us prepare, and then also share the comments that

13   Mr. Hanson or Ms. Franzel had shared with us.

14            MR. BOXER:  If you could display M11, please, not in

15   evidence.

16   Q.   Do you recognize this document, Mr. Middendorf?

17   A.   Yes.

18   Q.   What is it?

19   A.   It is a calendar invite from John Veihmeyer, the then CEO

20   of the firm, to the attendees for the PCAOB board meeting on

21   December 15th.

22            MR. BOXER:  I offer it, your Honor.

23            MS. ESTES:  No objection.

24            THE COURT:  M11 is received.

25            (Defendant's Exhibit M11 received in evidence)

1    Q.  If you could highlight, please, the start and end date of

2    the invite.

3    A.  December 15, 2014, 2:00 to 4:00 p.m.

4    Q.  The required attendees are the individuals you just

5    mentioned, correct?

6    A.  Correct.

7    Q.  I show you what's marked as Exhibit M1, not in evidence.

8    Do you recognize Exhibit M1?

9    A.  Yes.

10   Q.  Is it another calendar invite?

11   A.  Yes, it is.

12   Q.  In this instance to yourself, correct?

13   A.  Correct.

14          MR. BOXER:  I offer it, your Honor.

15          MS. ESTES:  No objection.

16          THE COURT:  M1 is received.

17          (Defendant's Exhibit M1 received in evidence)

18   Q.  Could you explain what you did, why you sent Exhibit M1 to

19   yourself.

20   A.  Yes.  Just to make sure I had my calendar blocked for the

21   meeting between myself and Mr. Liddy with Jay Hanson at the

22   Reagan Airport, at a place called Cibo Bistro & Wine Bar.

23   Q.  The meeting took place on April 22, 2015?

24   A.  I remember the meeting.  I assume it happened on that date.

25   Q.  Do you recall why it happened at Reagan Airport just

1   outside terminal B security?

2   A.  Mr. Liddy and I, our office was in New York, Mr. Hanson's

3   office was in Washington, D.C.  So just based on trying to

4   accommodate schedules, I think Mr. Hanson may have been flying

5   out somewhere, it was easiest to just meet at the airport.

6   Q.  Do you recall if Ms. Franzel attended the meeting outside

7   terminal B security at Reagan Airport?

8   A.  She did not attend that meeting.

9   Q.  Did Mr. Hanson say why she did not attend?

10  A.  I believe she had been scheduled to attend and had some

11  other commitment, that she could not attend.

12  Q.  I show you what's marked as M35 not in evidence.  Do you

13  recognize M35, Mr. Middendorf?

14  A.  Yes.

15  Q.  What is it?

16  A.  An invitation from the KPMG CEO John Veihmeyer to the KPMG

17  attendees who would be attending the meeting with the PCAOB

18  board on Monday, April 27th.

19          MR. BOXER:  I offer it, your Honor.

20          THE COURT:  M35 is received.

21          (Defendant's Exhibit M35 received in evidence)

22  Q.  You just said the date is April 27th.  If we could scroll

23  down to "participants" and highlight all the participants,

24  first from KPMG, and then the PCAOB board.  Are those

25  participants that you recall attending the board meetings that

1   you attended?

2   A.  Yes.

3   Q.  As far as the PCAOB staff, other than Mr. Bijou and Mr.

4   Schindler, did you know or are you familiar with any of the

5   other staff that attended the PCAOB board meetings?

6   A.  The third line down, Martin Baumann, was the PCAOB's chief

7   auditor and director of professional standards.  I knew Mr.

8   Baumann.  About halfway down, Greg Jonas, director of the

9   office of research and analysis, I had had meetings with.  The

10  next person down, Chris Mandelaris, senior deputy director

11  division of registration and inspections, I had met Mandelaris

12  before.  Helen Munter, direct of division of registration and

13  inspections, I had had a number of meetings with her.

14          I don't know any of the other individuals.

15          MR. BOXER:  If we can show Mr. Middendorf Exhibit M73

16  not received in evidence.

17  Q.  Do you recognize M73?

18  A.  Yes.

19  Q.  Is it a calendar invite like the previous exhibit?

20  A.  Yes.

21          MR. BOXER:  We offer M73, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit M73 received in evidence).

24  Q.  What is indicate in Exhibit M73, Mr. Middendorf?

25  A.  A calendar invitation from me to myself and to Scott

1  Marcello.  The subject is "Meet Jay Hanson and Jeanette Franzel
2  for breakfast at the Capital Hilton."
3  Q.  Did that meeting take place?
4  A.  Yes.
5  Q.  In 73 it says Mr. Marcello.  Why is it that it says Mr.
6  Marcello and not Mr. Liddy?
7  A.  Mr. Marcello became the vice chair of audit, replacing Mr.
8  Liddy on July 21, 2015.
9       MR. BOXER:  If we could show Mr. Middendorf
10  Exhibit M65 also not in evidence.
11  Q.  Do you recognize M65?
12  A.  Yes.
13  Q.  What is it?
14  A.  It is a calendar invite from Lynne Doughtie, the chairman
15  and CEO of KPMG, to herself, Scott Ozanus, Sven Holmes, Scott
16  Marcello, myself and Tom Whittle.  Subject:  PCAOB board
17  meeting on February 9, 2016.
18       MR. BOXER:  I offer M65, your Honor.
19       THE COURT:  Received.
20       (Defendant's Exhibit M65 received in evidence)
21       MR. BOXER:  If you could highlight the very bottom of
22  the invite.
23  Q.  Can you read what it says, Mr. Middendorf.
24  A.  "PCAOB to issue agenda approximately ten days before
25  meeting."

1    Q.  In your experience for the four board meetings you

2    attended, did the PCAOB issue its agenda approximately ten days

3    before the board meeting?

4    A.  No.

5    Q.  What was your experience with respect to when KPMG received

6    the PCAOB board agenda?

7    A.  I believe it varied.  There were times when we may receive

8    it a few days, even a week, before the board meeting, and there

9    were times when it came in I'd say almost last minute, maybe a

10   day before the meeting.

11   Q.  Do you recollect any particular topic that was discussed at

12   the February 9, 2016, PCAOB board meeting?

13   A.  I do.

14   Q.  Was it a topic that was discussed in the meeting depicted

15   on the previous exhibit?  I show it to you again, M73, if we

16   can display that.

17   A.  Yes.

18   Q.  Can you tell the jury what you recall about that meeting?

19   A.  At the meeting with Mr. Hanson and Ms. Franzel on February

20   4th, so five days before the meeting with the PCAOB board, they

21   had given us a draft agenda for the meeting with the PCAOB

22   board, and one of the topics on that agenda was referred to

23   HBOS.

24   Q.  At that time did you know what HBOS was?

25   A.  I did not.

1  Q.  Do you recall what, if anything, Mr. Hanson or Ms. Franzel

2  said about HBOS?

3  A.  They described HBOS --

4         MS. ESTES:  Objection: hearsay.

5         THE COURT:  Overruled.

6  A.  They described HBOS as the Halifax Bank of Scotland, which

7  was a bank in the UK that had failed I think during the

8  financial crisis.

9  Q.  Did they indicate anything with respect to the upcoming

10  PCAOB board meeting and HBOS?

11  A.  They did.  They indicated that the UK regulator had -- let

12  me back up.  HBOS was audited by KPMG in the UK.  The UK

13  regulator had been doing some inquiries into HBOS.  Several of

14  the PCAOB board members were interested in talking to KPMG

15  about HBOS in particular or any people that worked on the HBOS

16  engagement working on any public companies in the U.S., audits

17  of public companies in the U.S. by KPMG.

18  Q.  In other words, if a KPMG HBOS auditor also was auditing

19  KPMG U.S. clients?

20  A.  Correct.  Maybe an example was HBOS had operations around

21  the globe; was anyone who worked on HBOS either in the UK or

22  any of those locations working on a KPMG U.S. bank that had

23  operations in the UK or any of those other locations and was

24  anyone working on HBOS in the U.S. that was working on a U.S.

25  issuer bank.

1    Q.  After this meeting on February 4, 2016, what did you do?

2    A.  After the breakfast meeting, Mr. Marcello and I returned to

3    New York and had a meeting with the CEO, COO, vice chair of

4    legal risk and regulatory, Mr. Whittle, and all the attendees

5    at the PCAOB board meeting to go over that draft agenda and

6    share the comments that were made by Mr. Hanson and Ms.

7    Franzel, including the discussion around HBOS.

8    Q.  What happened after that?

9    A.  Based on the discussion with the KPMG folks in that meeting

10   I just described, Mr. Holmes said he would reach out to the UK

11   general counsel to try to understand all the particulars

12   related to HBOS, and then he instructed Mr. Marcello to reach

13   out to his counterpart at KPMG in the UK.

14   Q.  After Mr. Holmes said that, what happened after that, from

15   your perspective?

16   A.  Those two actions happened.

17   Q.  If I can show you what is marked as M76 not in evidence.

18   Do you recognize that document?

19   A.  Yes.

20   Q.  What is it?

21   A.  It is referring to the subject final script for tomorrow

22   for the meeting with the PCAOB board on February 9, 2016.

23   Q.  Is it an email to you?

24   A.  Me and others.

25        MR. BOXER:  I offer it, your Honor.

1          THE COURT:  M76 is received.

2          (Defendant's Exhibit M76 received in evidence)

3   Q.  If we can highlight the portion you just read, the text of

4   the email underneath "all."  If you could read that, please.

5   A.  "Attached is the final script for tomorrow, including all

6   comments received from the weekend and today on the Belfast and

7   HBOS matters."

8   Q.  What did you understand that sentence to mean?

9   A.  Where it refers to the final script, there was a rather

10  lengthy document that was prepared to prepare all of us for the

11  board meeting.  It was not really a script.  It was a document

12  to prepare you.  You wouldn't read off of it.  But it gave us

13  information to have in our possession when we talked to the

14  PCAOB board.  It says it includes all comments received from

15  the weekend and today on the Belfast and HBOS matters.  So

16  included in that script would be the information we had

17  gathered on those two matters.

18  Q.  If I can show you what is marked as M77 not in evidence.

19  Do you recognize M77?

20  A.  Yes.

21  Q.  What do you recognize it to be?

22  A.  To be the script that we just talked about could the last

23  exhibit.

24  Q.  The script, does it appear to you to be the script attached

25  to the email you just read from?

1    A.  Correct.

2              MR. BOXER:  We offer it, your Honor.

3              THE COURT:  M77 is received.

4              (Defendant's Exhibit M77 received in evidence)

5    Q.  Looking at Roman numeral I and II, if you could explain the

6    structure of the script.

7    A.  The item number I and item number II would have been the

8    agenda items on the PCAOB agenda.  Item number I, chairman's

9    welcoming remarks, would be the PCAOB chairman Jim Doty.  And

10   then item number II, firm direction and leadership, would be

11   first item that KPMG would address on the agenda.

12   Q.  If I could ask you to turn to page SDNY 544.  If we can

13   highlight "International developments" and Roman numeral A.

14   Then one more line down, please.  What do you understand is

15   depicted in Roman numeral V letter A?

16   A.  I believe Roman numeral V, or 5, was the fifth item on the

17   PCAOB's agenda for that meeting related to international

18   developments.  Then A, "Discuss the status of efforts to

19   improve the process to provide reasonable assurance that the

20   segments of the firm's engagements performed by firm's

21   affiliates are performed in accordance with professional

22   standards," so the non-U.S. KPMG member firms that supported

23   the audits of U.S. clients.

24   Q.  If we can turn two pages forward to 546(ii) at the top.

25   Can you read what that says.

1   A.  "Given the recent news reports regarding HBOS financial

2   reporting or any of the firm's personnel involved in work for

3   HBOS, have any personnel involved in HBOS matters participated

4   in any of the firm's audits?"

5   Q.  Did you draft "given the recent news reports," that

6   language in the script?

7   A.  Could you ask that question again?

8   Q.  Did you draft the heading of the script?

9   A.  I did not.

10  Q.  The statement "given the recent news reports regarding

11  HBOS," was that an accurate description as to why the firm was

12  addressing HBOS at the PCAOB board meeting?

13  A.  No.

14  Q.  What would have been an accurate description?

15  A.  Because Jay Hanson and Jeanette Franzel had given us a

16  draft of the agenda and shared their views on what that item

17  would be on the agenda.

18  Q.  If you could scroll down to the part where it says Sven

19  Holmes Belfast matter.  Would this be a portion of the meeting

20  where Judge Holmes would speak?

21  A.  Correct.

22  Q.  To be clear, would he necessarily be reading from this

23  script word for word during the PCAOB board meeting?

24  A.  No.

25  Q.  What is reflected did this portion of the script?

1   A.   That if the Belfast matter is being discussed, Sven Holmes

2   would handle that item, and then the items 7, 8, 9 would be

3   kind of the talking points of what you would want to tell the

4   PCAOB board.

5   Q.   If we can turn to the next page, where it says "HBOS

6   matter."  That is the plan in the script as to what to say

7   about HBOS, correct?

8   A.   Correct.

9   Q.   With respect both to the Belfast matter and the HBOS

10  matter, were those items that you reported back from your

11  meeting with Mr. Hanson and Ms. Franzel to Mr. Holmes and

12  others?

13  A.   Yes.

14  Q.   If we could display M130.  Do you recognize M130?

15  A.   Yes.

16  Q.   What is it?

17  A.   It was a set of emails, the top one being from Scott

18  Marcello to myself copying his administrative assistant.

19  Subject:  Regarding KPMG meeting with PCAOB board on September

20  29th.

21        MR. BOXER:  I believe it is in evidence, so you could

22  display it, Ms. O'Connor.

23  Q.   If I could take you back to the very first email on the

24  second page.  It's from you to Mr. Hanson, correct?

25  A.   Correct.

1    Q.  If you could read the email, please.

2    A.  "Jay, I hope you had a great Labor Day weekend.  I wanted

3    to reach out and see if you and Jeanette would have some time

4    to meet with Scott Marcello and myself before the meeting with

5    the board to help us prepare and get some idea of what may be

6    on the agenda.  Could you provide some dates and time you would

7    be available to meet with us?  Thanks."

8    Q.  If we scroll forward to Mr. Hanson's reply, could you read

9    the first two sentences of the second paragraph, please.

10   A.  "We have not had our internal prep meeting yet and I can't

11   find that it has been scheduled.  However, let's get something

12   on the calendar to talk."

13   Q.  Did a date and time get on the calendar to talk?

14   A.  Yes, that's my recollection.

15   Q.  If I could have displayed M129, please.  Do you recognize

16   that document?

17   A.  Yes.

18   Q.  What is it?

19   A.  It is a calendar invite to Scott Marcello, Jay Hanson,

20   Jeanette Franzel, and myself to have a call to discuss the

21   meeting with the PCAOB board on September 29th.

22   Q.  I believe it is in evidence, so if we could have that

23   displayed.  Was this the invite for the call that was

24   referenced in the prior email between you and Mr. Hanson?

25   A.  Yes.

1    Q.  Did the call take place?

2    A.  Yes, to the best of my recollection.

3    Q.  I want to ask you a few questions about Brian Sweet.

4    A.  Okay.

5    Q.  Do you recall how you came to learn that he was being

6    considered to be hired by KPMG?

7    A.  Yes.

8    Q.  How did you learn that?

9    A.  In some discussion with the vice chair of audit, my boss

10   Jim Liddy at the time, and Mr. Whittle, they had talked to an

11   external recruiter to pursue Mr. Sweet.

12   Q.  What was your understanding of the reason why the firm was

13   pursuing Mr. Sweet?

14   A.  I'd say for several reasons.  One, we were looking to bring

15   on lots of resources to the national office, so hiring from the

16   PCAOB was one of those avenues.  Then also because of our rate

17   of deficiencies in the auditing in the allowance for loan loss,

18   Brian Sweet was one of the banking inspectors on the KPMG

19   inspection team at the PCAOB and my team, the national office

20   folks in particular, my banking folks, had a lot of respect for

21   him and thought he was very sharp and a good auditor.

22   Q.  Prior to Mr. Sweet becoming a partner at KPMG, had you ever

23   met him before?

24   A.  I had.

25   Q.  Did you know him well?

1   A.   I did not.

2   Q.   In what context had you met him?

3   A.   There were monthly meetings between the PCAOB board and

4   KPMG, myself and some of my team.  He would attend some of

5   those monthly meetings and sometimes present and sometimes just

6   make comments about certain issues.

7   Q.   I want to show you what's in evidence as Exhibit M6.  Do

8   you recognize this email?

9   A.   Yes.

10  Q.   Who is Heidi Murdy-Michael?

11  A.   She is basically works for Judge Sven Holmes, the vice

12  chair of legal risk and regulatory.

13  Q.   Is she an attorney?

14  A.   Yes.

15  Q.   What was her prior employment prior to working at KPMG?

16          MS. ESTES:  Objection: relevance.

17          THE COURT:  Overruled.

18  A.   She worked at the PCAOB let's scroll through mer email.  It

19  starts on the bottom of the first page.  What do you understand

20  Ms. Murdy-Michael to be spelling out in this email.  Could you

21  scroll down a little bit.  Okay.  Ms. Murdy-Michael is giving

22  us some of the I'll say ground rules related to hiring someone

23  from the PCAOB, and Mr. Sweet's name is mentioned several times

24  here, so related to the hiring or at least the recruiting of

25  Mr. Sweet.

1  Q.  And did KPMG have a process for providing the rules to new

2  hires, new partners, in the partnership?

3  A.  Yes.

4  Q.  And what was that process?

5  A.  For any direct entry partner into the firm, that individual

6  would meet with someone in the Office of the General Counsel,

7  usually a gentleman named David Shontz, and Mr. Shontz would go

8  through their prior employment and any restrictions related to

9  that.  So if somebody worked at another accounting firm or at a

10  consulting firm and had noncompete agreements, they would go

11  through that, and if you had worked in some government agency,

12  PCAOB, SEC, they would go through what restrictions you had and

13  that you understood those and agreed to abide by those.

14  Q.  At the time Mr. Sweet joined KPMG, did you believe that he

15  had met with OGC in the way you just described?

16  A.  Yes.

17  Q.  On Mr. Sweet's first day of work at KPMG, did you an attend

18  a lunch with him?

19  A.  Yes.

20  Q.  If I could show you what's marked as M37, in evidence.

21       What is M37?

22  A.  It looks like a calendar invitation to that lunch on

23  May 4th.

24  Q.  And what is the name of the restaurant and its location?

25  A.  Avra, 48th between Lex and Third.

 1   Q.  And if I could show you what's marked as M45, not in

 2   evidence.

 3           Do you recognize M45?

 4   A.  Yes.

 5   Q.  And it is an email to you from Mr. Mucha about Mr. Sweet's

 6   lunch the first day?

 7   A.  Yes.

 8           MR. BOXER:  I offer it, your Honor.

 9           MS. ESTES:  No objection.

10           THE COURT:  M45 is received.

11           (Defendant's Exhibit M45 received in evidence)

12           MR. BOXER:  And if you could highlight the name and

13   location of the restaurant.

14   Q.  And if you could read that, Mr. Middendorf?

15   A.  "AVRA – just off 48th and Lex toward 3rd."

16   Q.  And Mr. Sweet, when he came to KPMG, which group did he

17   work in?

18   A.  The Inspections Group.

19   Q.  And who was the leader of the Inspections Group?

20   A.  Tom Whittle.

21   Q.  And Mr. Whittle's name is not on the invite, correct?

22   A.  Correct.

23   Q.  Do you recall why that was?

24   A.  I believe he had some kind of conflict.

25   Q.  So did you attend the lunch with Mr. Sweet?

1    A.   Yes.

2    Q.   On May 4th?

3    A.   Yes.

4    Q.   And whom do you recall being there?

5    A.   The people on this email -- David Britt, Tom Canfarotta,

6    myself, John Mucha and Brian Sweet.

7    Q.   And what do you remember about what was said at that lunch?

8    A.   So I believe the -- we sat down and had our pleasantries,

9    welcome to the firm.  Since there was some level of knowing him

10   in particular by Mr. Britt and Mr. Canfarotta more so than

11   myself, you know, some of that was probably less than someone

12   who is brand new to the firm that really doesn't know anybody.

13   Q.   Why would Mr. Britt and Mr. Canfarotta know him or know him

14   well or just know him?

15   A.   Mr. Britt and Mr. Canfarotta were the co-heads of the

16   banking practice in DPP.

17   Q.   And in that role they had dealt with Mr. Sweet?

18   A.   Yes.  So they had interaction with Mr. Sweet both in

19   monthly meetings with the PCAOB and interactions as when he was

20   an inspector at the PCAOB on the KPMG team.  He inspected some

21   of the KPMG banking engagements.

22   Q.   And so what do you remember being said at the lunch?

23   A.   So I remember early in the conversation just saying I want

24   to learn as much as I can from you -- processes, personalities,

25   what the PCAOB thinks of KPMG -- you know, me personally,

 1    others on my team, but I understand you have restrictions, and

 2    I only want you to share what you're allowed to share.

 3    Q.   And do you recall anything said by Mr. Sweet?

 4    A.   He seemed to understand that.

 5    Q.   Did you feel like you were putting pressure on Mr. Sweet at

 6    that lunch?

 7    A.   I did not.

 8    Q.   Did the topic of Wells Fargo and whether it was going to be

 9    inspected come up at the lunch?

10    A.   I don't recall a discussion about Wells Fargo from my

11    recollection of the lunch, but it had certainly come up in

12    testimony the last few weeks.

13    Q.   If I could show you what's in evidence as Exhibit M41, and

14    if you can scroll also to the second page.

15         Do you recognize M41, Mr. Middendorf?

16    A.   Yes.

17    Q.   And what is it?

18    A.   It is the tentative schedule from the PCAOB of basically

19    where they're doing their inspections throughout the coming

20    inspection season.

21    Q.   And this is the Friday before the Monday Mr. Sweet started

22    and you had lunch with him, correct?

23    A.   Correct.

24    Q.   If we can scroll to the second page.  I'm sorry, we need to

25    put up M42, the attachment.

1      Looking at M42, do you recall whether you had a view,

2  after receiving M41 and M42, as to whether Wells Fargo would be

3  inspected later that year?

4  A.  Yes.

5  Q.  And why was that?

6  A.  It says the PCAOB is going to do an inspection related to

7  financial services in San Francisco for four weeks,

8  August 17th -- the week of August 17th, August 31st,

9  September 14th and September 21st.

10      MR. BOXER:  If you can highlight that row, please.

11  Q.  And why is the information that's highlighted, why did it

12  lead you to believe that Wells Fargo was going to be inspected

13  later that year?

14  A.  Wells Fargo is the only sizable financial institution in

15  the San Francisco office that would warrant an inspection that

16  would go on for that long.  If you look at the line above,

17  there is another inspection in San Francisco for one week for

18  financial services, so that would be a smaller institution for

19  the one-week inspection.

20  Q.  After the lunch, did Mr. Sweet share with you how he was

21  enjoying or not enjoying his work at KPMG?

22  A.  He seemed to be very happy.

23  Q.  If I could show you what's marked as M50, in evidence, and

24  first scroll down to your email.

25  A.  "Thanks.  How is everything going after 6 weeks on the

job?"

Q.   And I should have started with his first email.  It is to
Dave and Tom.

         That is Tom Whittle, right?

A.   Correct.

Q.   And what is the first line he says in his email?

A.   "I wanted to send you both a list of what I anticipate will
be the most likely PCAOB banking inspections for 2016."

Q.   And if you could read the next sentence?

A.   "This list represents the PCAOB's view of the higher-risk
banking audits based on the attributes ("flags") it uses to
evaluate and so these were next in line for the inspection this
year.  I've tried to rank in order based on my best guess of
the likelihood."

Q.   And did you -- when you received this email, do you recall
if you thought there was anything wrong with the information
Mr. Sweet was sharing?

A.   No.

Q.   Why is that?

A.   It talks about anticipating, you know, views on higher risk
banking audits based on flags.

Q.   He says it is his best guess, correct?

A.   Correct.

Q.   Now, if we can go above, after you ask him how it's going,
if you can read the first line of his response?

1   A.   "Dave – it has been a fantastic experience so far and I've

2   had no second thoughts or regrets whatsoever (I've had

3   conversations with Louann and Hector and told them the same)."

4   Q.   And if you can ask skip ahead to the sentence that reads,

5   "I've also spent."

6   A.   "I've also spent some meaningful time with Steve Georgian

7   to debrief on PCAOB views regarding root cause analysis

8   (something Steve Schindler is particularly focused on) as well

9   as John Mucha to talk through what the PCAOB Part II themes are

10  going to look like in the next report."

11  Q.   Did you have a view as to whether the information Mr. Sweet

12  shared with Mr. Georgian or Mr. Mucha was improper?

13  A.   No, I did not believe so.

14  Q.   Did Mr. Georgian or Mr. Mucha ever come to you and indicate

15  that they thought they had received improper information from

16  Mr. Sweet?

17  A.   No, they did not.

18  Q.   What was your impression of Mr. Sweet as you got to know

19  him?

20  A.   Very bright, very articulate, and seemed to be working well

21  with teams as he would go out and support engagement teams that

22  were being selected for inspection, received a number of

23  positive comments about his interactions with the teams, so he

24  seemed to be coming in and doing a great job.

25  Q.   Did he impress you as competent in the area of auditing

 1  financial institutions?

 2  A.  Absolutely.  He was a very strong auditor, understood the

 3  PCAOB's standards, understood auditing in general and judgments

 4  that needed to be made.

 5  Q.  If I could show you what's in evidence as Government

 6  Exhibit 754.

 7       Could you tell us what, if anything, you remember

 8  about Government Exhibit 754?

 9  A.  So, I did not remember receiving this email until one of my

10  interviews with Williams & Connolly, KPMG's external law firm

11  that was investigating this matter back in the spring of 2017.

12  Q.  Do you recall taking any action in the spring of 2015

13  regarding the attachment that -- the document that's attached

14  to Mr. Whittle's email?

15  A.  No, I do not.

16  Q.  Turning your attention to the SEC.

17       After you became national managing partner of DPP, did

18  you have interactions with the SEC?

19  A.  Yes.

20  Q.  And could you describe them generally?

21  A.  Various meetings with the Office of the Chief Accountant.

22  The Chief Accountant at the time when I was first in my role

23  was Jim Schnurr.  He had two deputies, Daniel Murdoch and Brian

24  Croteau, and Mr. Murdoch left the SEC and was replaced by Wes

25  Bricker as the Deputy Chief.  So, various meetings on

1    independence matters and other items.

2    Q.  If I could show you what's marked as Government Exhibit

3    300, in evidence.

4            Do you recognize Government Exhibit 300?

5    A.  Yes.

6    Q.  And what is it?

7    A.  The bottom email is from Wes Bricker, the then Deputy Chief

8    Accountant at the SEC, to myself and my three peers at the

9    other Big Four firms.  Mr. Bricker indicates that he's going to

10   be at a meeting in Chicago, the CAQ Symposium, and he had some

11   free time if anyone wanted to or needs to have a meeting with

12   him while he is in Chicago, he was offering that.

13   Q.  And scrolling up a bit, where it says Wes, you responded,

14   right?

15   A.  Yes.

16   Q.  And what did you write back?

17   A.  "Wes – I will also be at the CAQ Symposium on Sunday.  It

18   would be great to introduce myself to you.  I also spoke with

19   Mark Northan the other day and I would be happy to give you my

20   views on the allowance for loan losses issues I am observing.

21   Let me know if there is a particular time on Sunday that would

22   work for you to meet.

23           "Thanks.  Dave."

24   Q.  Who was Mark Northan?

25   A.  He was a partner in the accounting group at DPP at the

National Office.

Q.  And was he -- did he have expertise on allowance for loan

loss?

A.  He was a banking partner by background.

Q.  And did you meet with Mr. Bricker on August 9, 2015?

A.  Yes, on that Sunday at the CAQ Symposium.

Q.  And tell us what you recall about that meeting.

A.  I remember talking to Mr. Bricker about the struggles we

were having as it relates to the allowance for loan loss,

auditing the allowance for loan loose.  And I knew through

Mr. Northan that Wes Bricker was a banker by background, or I

should say a bank auditor, while he was at PwC, so I thought he

was someone who understood auditing the allowance for loan loss

and wanted to just have a chance to basically pick his brain,

if he could help us with the issues we were having.

Q.  And do you recall anything Mr. Bricker said at that

meeting?

A.  I think we ended up having -- well, I know we ended up

having a follow-up meeting.  So we had the discussion on that

Sunday, and I think he said let's, you know, have a further

meeting with some of my team back in Washington at the SEC at

some point.

Q.  If I could show you what's marked as M251, in evidence.

        Do you recognize M251?

A.  Yes.

1   Q.  And what is it?

2   A.  It is a calendar invitation from Wes Bricker to himself and

3   me, Subject:  "KPMG allowance meeting at Wes' office on

4   August 31, 2015."

5   Q.  And if we can scroll down to Mr. Bricker's email on

6   August 24th to you, cc'ing Brian Croteau, could you read what

7   Mr. Bricker wrote?

8   A.  "Dave – Brian mentioned that you and he had spoken and that

9   you're available to meet on the 31st.  Please let me know if

10  3:30 would work for you and your team.  I look forward to

11  continuing the discussion about SAB 102.

12  Q.  And what is SAB 102?

13  A.  SAB 102 is Staff Accounting Bulletin 102.  A staff

14  accounting bulletin is a rule issued by the SEC, and in

15  particular it deals with the allowance for loan losses.

16  Q.  And do you know approximately when the SEC issued Staff

17  Accounting Bulletin 102?

18  A.  I am not a bank expert by background, so, no, but it had

19  been outstanding for quite a long time was my understanding.

20  Q.  And was SAB 102 relevant to the discussions with

21  Mr. Bricker and Mr. Croteau?

22  A.  Yes.

23  Q.  In what way?

24  A.  It is the rules as it relates to what the clients need to

25  do as it relates to supporting their allowance for loan losses

```
 1   that then the auditor would audit what the company has

 2   prepared.

 3   Q.   When you say "the client," you mean the KPMG client?

 4   A.   The KPMG audit client.

 5   Q.   So using the prior example, it's what a Wells Fargo or

 6   similar kind of institution needs to do?

 7   A.   Correct.

 8   Q.   And if I could turn your attention to Exhibit M301, in

 9   evidence.

10        On Friday, August 28th, you send Mr. Bricker an agenda

11   for the meeting, right?

12   A.   Yes.

13   Q.   If we turn to the second page, if you can just read the

14   most outside bullet point starting with "Impact of the current"

15   that you put on the agenda.

16        Did you draft the agenda, by the way?

17   A.   No.

18   Q.   Do you know who did?

19   A.   I'm sure Mr. Britt and Canfarotta, my two banking leaders,

20   drafted the agenda.

21   Q.   And is that because they were banking auditors and you were

22   a retail auditor?

23   A.   Correct.

24   Q.   So the first outside bullet point says what?

25   A.   "Impact of the current credit environment on the ALLL
```

 1   estimate and internal controls over financial reporting."

 2           That's what "ICOFR" stands for.

 3   Q.  Then going down to KPMG's response.

 4   A.  "KPMG's response to the related audit challenge."

 5   Q.  And then the next outside bullet point.

 6   A.  "Application of SAB 102."

 7   Q.  And then the last one.

 8   A.  "Inspection challenge - Establishing 'reasonable

 9   assurance.'"

10   Q.  And then if you can just read the very final bullet point

11   for us, please.

12   A.  "Is the estimate auditable within the standard?"

13   Q.  Is there anywhere in the agenda an item for PCAOB

14   inspections and comments?

15   A.  I assume that bullet that says "Inspection Challenge -

16   establishing 'reasonable assurance.'"

17   Q.  And what is "reasonable assurance"?

18   A.  That's what the auditor needs to get to from a -- to

19   determine if a balance is correct, you need to get to

20   reasonable assurance.

21   Q.  And do you recall during the meeting if the SEC at any time

22   brought up a number of comments that KPMG was receiving?

23   A.  No.

24   Q.  And how would you describe the meeting?  What did you

25   understand it to be about?

1  A.  The purpose when I met with Mr. Bricker at the CAQ

2  Symposium to further a discussion was KPMG has a large market

3  share in the audit of banks.  We seemed to be struggling with

4  our inspection results and audit quality related to that, and

5  we viewed this as an educational session with the folks at the

6  SEC both to educate them on what we were doing and get their

7  feedback on if they thought there were issues with our audit

8  approach to auditing the allowance for loan loss and the other

9  bullets on this page.

10 Q.  At the meeting of this August 31st meeting, were you

11 participating substantively on the issues of SAB 102 and the

12 other items referenced in the agenda?

13 A.  So I participated in that I had set up the meeting with

14 Mr. Bricker, but substantively I am not an expert in auditing

15 the allowance for loan losses so I was more in listening mode

16 and let my banking leaders lead the meeting.

17 Q.  And if I could show you what's marked as Government Exhibit

18 306, which is in evidence.

19        What do you understand Government Exhibit 306 to be?

20 A.  So it is a calendar invitation for a follow-up meeting at

21 the SEC with me and some of my team to talk about the ALL

22 guidance that we had provided to the SEC after the first

23 meeting on August 31st.

24 Q.  And if we scroll down just a little bit to where it appears

25 "ALLL guidance – meeting with KPMG," correct?

1    A.   Correct.

2    Q.   And do you recall this meeting?

3    A.   Yes.

4    Q.   And what do you recall occurred at the meeting?

5    A.   So coming out of the prior meeting, we had offered to the

6    SEC, or I guess requested them, that we would share our

7    guidance, methodology, etc., around auditing the allowance for

8    loan losses, and asked if they would review those to, once

9    again, you know, tell us if you think we're missing something.

10   You know, we're trying to make sure we're doing the right

11   things as it relates to auditing the allowance for loan losses.

12   Q.   And by "guidance," you mean guidance to the people on the

13   engagement with KPMG --

14   A.   Yes, so KPMG guidance to our auditors for this area.

15   Q.   And what do you remember coming back from the SEC at this

16   meeting?

17   A.   Not much.  There was I think a comment about maybe the

18   organization of the guidance isn't, you know, the easiest to

19   follow, but no, you know, smoking guns of we think you're

20   missing, you know, this or that.  So it was I'll say a general

21   discussion of what they had reviewed and then some comments but

22   no major follow-up items.

23   Q.   And how was the meeting left at the conclusion?

24   A.   Kind of next steps and I guess if you want to keep the

25   conversation up, but, once again, since they really didn't say

1   there was anything we were missing, we viewed that as they were

2   comfortable with our guidance.  If they were not, they

3   certainly would have told us that.

4   Q.  Do you recall in February of 2016 attending a meeting with

5   Mr. Schnurr and then with Mary Jo White, the Commissioner of

6   the SEC?

7   A.  Yes.

8   Q.  And if I could show you what's marked as M306 -- excuse me.

9   Government Exhibit 318, in evidence.

10          Do you recognize Government Exhibit 318?

11  A.  Yes.

12  Q.  And what do you recognize it to be?

13  A.  At the bottom, an email from me to Brian Croteau, who was

14  one of the deputy chief accountants, saying I will send you a

15  proposed agenda from our side later today for the meeting with

16  Chair White.

17  Q.  And could you read your email to Mr. Croteau, please?

18  A.  "Brian, I will send you a proposed agenda from our side

19  later today.  Let me know if there are specific items that

20  Chair White would like to cover, in addition to or in place of,

21  the items on my list."

22  Q.  And then if we go to the top of the document.  If you could

23  read your email at 10:35 a.m. on January 28th.

24  A.  Yes.  So:

25          "To:  Brian Croteau.

1              "Meeting with Chair White.

2              "Brian -- See proposed agenda.  I welcome any feedback

3    or comments."

4              First item:  "introductions.

5              "Lynn Doughtie -- Chairman and CEO.

6              "Scott Marcello -- Vice Chair-Audit.

7              "Dave Middendorf -- National Managing Partner -- Audit

8    Quality & Professional Practice."

9              Next item:  "KPMG Strategy Overview (Doughtie)

10             "KPMG Audit Practice Strategy Overview (Marcello)

11             "PCAOB -- Relationship and Inspection Results

12   (Doughtie, Marcel and Middendorf)."

13   Q.  And starting at the first item on the agenda,

14   "Introductions" -- did you draft this agenda?

15   A.  Yes.

16   Q.  Why did you put "Introductions" as the first item on the

17   agenda?

18   A.  So this meeting with Chair White was the first time

19   Ms. Doughtie and Mr. Marcello were meeting Ms. White.

20   Q.  And the meeting was on February 9, 2016, correct?

21   A.  Correct.

22   Q.  And when was Ms. Doughtie elected as Chair of KPMG?

23   A.  July 1, 2015.

24   Q.  And did you understand that -- withdrawn.

25             Had Mr. Croteau said anything to you about this

1    meeting regarding Ms. Doughtie?

2    A.   I don't remember if it was Mr. Croteau or Mr. Schnurr, but

3    there was certainly a view that the SEC expected that the new

4    Chairman and CEO and the new Vice Chair of Audit would have

5    come to visit them sooner than eight months after their tenure

6    started.

7    Q.   And is that why you put that item first on the agenda?

8    A.   Yes.

9    Q.   And going down to the last -- going down to the last bullet

10   point, "PCAOB - Relationship and Inspection Results," why did

11   you put the word "Relationship" on the agenda?

12   A.   So in the beginning of my tenure in my role and the first

13   meeting we had with the PCAOB board that I attended in December

14   of 2015, one of the PCAOB board members, Steven Harris, had

15   really I'll say attacked us or challenged us regarding tone at

16   the top within the firm, our level of disagreement with

17   comments historically, or lack of timely response to PCAOB

18   comments, the lack of timely remediation of -- when you receive

19   a comment, basically it says you need to do remediation to fix

20   your problems.  So we were reporting that coming out of that

21   meeting, we had made progress in our relationship with the

22   PCAOB was our view.

23   Q.   And just -- you may have misspoken or not, but that initial

24   meeting was December of 2014, your initial PCAOB board meeting?

25   A.   Correct.

1    Q.  And what do you recall -- how many meetings were there on

2    February 9, 2016, with representatives from the SEC?

3    A.  Two meetings.

4    Q.  And who was the first meeting with?

5    A.  Jim Schnurr, the Chief Accountant of the SEC at the time,

6    and his two deputies, Brian Croteau and Wes Bricker.

7    Q.  And who was there from KPMG?

8    A.  Lynn Doughtie, Chairman and CEO; Scott Marcello, Vice Chair

9    of Audit, and myself.

10   Q.  And where did the meeting take place?

11   A.  At the SEC's offices in Washington.

12   Q.  And what do you recall about what was said at that meeting

13   by the SEC?

14   A.  The opening greetings, I'll say Ms. Doughtie introduced

15   herself and said something like it's nice to meet you.  And

16   Mr. Schnurr immediately kind of attacked back and said, well,

17   you've been in your role for about a year so I would have

18   thought we would have met sooner, or something along those

19   lines.

20   Q.  And what else do you remember being discussed at that

21   meeting?

22   A.  To me it was an introductory meeting.  Once again, after

23   Mr. Schnurr's comments, Ms. Doughtie said, can we, you know,

24   kind of reset here, and talked about just the relationship

25   between the SEC and the firm.

1  Q.  And do you remember anything specific that was discussed?

2  A.  Not in any details.

3  Q.  Was it a lengthy meeting?

4  A.  No.  Probably 30 minutes.

5  Q.  And where was the next meeting that day with the SEC?

6  A.  So after the meeting with Mr. Schnurr, Bricker and Croteau,

7  Mr. Bricker and Schnurr took myself, Ms. Doughtie and

8  Mr. Marcello to what I believe was another floor, to Chair

9  White's office.

10 Q.  And did anybody else from KPMG join you for that meeting?

11 A.  Judge Holmes, Judge Sven Holmes, Vice Chair of Legal Risk

12 and Regulatory, met us there for that meeting.

13 Q.  And who was at the meeting -- did the meeting take place?

14 A.  Yes.

15 Q.  And who was at the meeting from the SEC?

16 A.  Chair White and Jim Schnurr.  Wes Bricker did not join us;

17 he just walked up with us.  And there was either one or two

18 other people, I assume Chair White's Chief of Staff or staff

19 attorney or something.  I don't recall.

20 Q.  Did Mr. Bricker say why he was not joining the meeting?

21 A.  He did not.

22 Q.  And approximately how long did the meeting last with Chair

23 White?

24 A.  I would say probably 30 minutes or less.

25 Q.  And what do you recollect about what was said during that

1   meeting?

2   A.   The same kind of introductory meeting.   We came in.   Chair

3   White got in I'll say that, you know, it's nice to meet you

4   since you have been in your role for a year to Ms. Doughtie.

5   You know, she said, you know, we're, you know, sorry, and we're

6   moving on from there.   And then to me it was kind of a general

7   conversation, more of a meeting meet and greet.

8   Q.   And you say it lasted about 30 minutes?

9   A.   Or less.

10  Q.   In your experience, has the SEC -- have you observed the

11  SEC using comments in inspection reports in any way in your

12  audits or your practice?

13  A.   Not to my knowledge.

14  Q.   After the February 9th meeting, did you have other

15  interactions with the SEC?

16  A.   Yes.

17  Q.   And what did those concern?

18  A.   For the most part, I would say independence matters.   I was

19  in meetings -- I was a member of a group called the Center for

20  Audit Quality, as were my peers from the other Big Four firms

21  and others, and we would meet with the SEC Chief Accountant's

22  office twice a year.   So, yeah, just kind of regular meetings

23  if there was an issue.

24  Q.   I would like to show you what's marked as Government

25  Exhibit 806, in evidence.

1              What is the date on the email?

2    A.   June 16, 2015.

3    Q.   And if you could read the first sentence.

4    A.   "Dave/Tom - I wanted to send you both a list of what I

5    anticipate will be the most likely PCAOB banking inspections

6    for 2016."

7    Q.   Did you think there was -- do you recall receiving this

8    email?

9    A.   Not before preparing for the current trial and matters.

10   Q.   As you read it, do you think there is anything improper

11   about the first sentence of this email?

12   A.   No.

13   Q.   Did Mr. Whittle ever express to you that he thought the

14   information he was receiving from Mr. Sweet was improper?

15   A.   No.

16              MR. BOXER:   If we could turn to Exhibit M57.  I

17   believe it is not in evidence.

18   Q.   Do you recognize M57?

19   A.   Yes.

20   Q.   And just generally, can you tell us what it is?

21   A.   It looks like it is an email -- do you want me to talk

22   about the bottom or the top?

23   Q.   Just describe it and then I am going to offer it into

24   evidence.

25   A.   So the subject is "SIFI meeting."  That's systematically

1   important financial institution.  So there was a meeting within

2   KPMG related --

3   Q.  Are you a recipient of the email at the top?

4   A.  Yes.

5            MR. BOXER:  I offer it, your Honor.

6            MS. ESTES:  No objection.

7            THE COURT:  M57 is received in evidence.

8            (Defendant's Exhibit M57 received in evidence)

9   BY MR. BOXER:

10  Q.  What is a -- if we can go to the "Re" line, what does

11  "SIFI" refer to?

12  A.  Systematically important financial institution.

13  Q.  And whose meeting is that?

14  A.  Whose?

15  Q.  Is it a KPMG meeting?

16  A.  Yes.

17  Q.  An internal KPMG meeting?

18  A.  Yes.

19  Q.  And if we scroll down to the email from Mr. Sweet, he's

20  emailing a lot of people, correct?

21  A.  Correct.

22  Q.  You are one of those people in the middle to the right.

23  A.  OK.

24  Q.  And if you could read the first two sentences of Mr.

25  Sweet's email.

A.   "As I reflect back on our meeting last week, I thought it

might help if I followed-up with a note outlining some of the

most pressing matters the PCAOB will be focused on during its

inspections of our SIFI audits.  I know minutes of our meeting

will be distributed, and various actions are being planned, but

each of the items below have led to PCAOB comment forms for

large financial institutions and so I wanted to make sure each

of you received."

Q.   And then if we just scroll down to the bottom, Mr. Sweet

highlights several areas that he discusses in the email, right?

A.   Yes.

Q.   When you received this email, did you think there was

something wrong with Mr. Sweet sending it to you?

A.   No.

Q.   If we can go back to the very top, there is a reply from

Larry Leva, right?

A.   Yes.

Q.   And he sends it to a few recipient, not all the recipients

on the initial email, right?

A.   Correct.

Q.   And who is Larry Leva?

A.   Larry was a U.S. -- KPMG U.S. partner but was in the role

of the Head of Global Risk Management for KPMG all around the

globe.

Q.   Would you describe that as a very senior role at KPMG?

 1   A.   Yes.

 2   Q.   And could you read the first line of his email.

 3   A.   "Brian – tremendously valuable.  Thanks for taking the

 4   time."

 5   Q.   If I could show you now what's admitted in evidence as

 6   M298.

 7             And do you recollect M298?

 8   A.   Once again, I've seen it in prepping for trial but I don't

 9   remember receiving it timely.

10   Q.   If we can highlight on the "Dave/Tom" in the middle email,

11   and if you could just read the first sentence.

12   A.   "Dave/Tom – I've spent quite a bit of time with Palantir

13   trying to guide their modeling efforts, but thought it may be

14   beneficial to provide you both with what I suspect could be the

15   most likely non-banking targets for potential inspection in

16   2016."

17   Q.   And who is Palantir?

18   A.   Palantir is a data and analytics firm that we had hired to

19   help predict who the PCAOB might inspect.

20   Q.   And how was it that you first heard of Palantir?

21   A.   A partner at KPMG named Bill Lovallo, who was the national

22   managing partner for risk management, approached me one day and

23   said he had used a data and analytics firm and some of the

24   things he had done in the risk management area and asked if I

25   had thought about the -- seeing if Palantir or if a data and

1   analytics firm would be able to help us predict who the PCAOB

2   might select for inspection.

3   Q.   And to whom did Mr. Lovallo report at KPMG?

4   A.   Judges Sven Holmes.

5   Q.   And after that conversation with Mr. Lovallo, did you make

6   contact with the company Palantir?

7   A.   After I talked with Mr. Lovallo, I talked to Jim Liddy, my

8   boss at the time, Vice Chair of Audit, about the concept, and

9   we involved a couple of partners from KPMG who had actually

10  worked in the data and analytic space and had a connection with

11  Palantir.

12  Q.   And did there come a time when the firm hired Palantir to

13  try and make predictions?

14  A.   Yes.

15  Q.   And prior to the firm hiring Palantir, did that work need

16  to be approved by anybody?

17  A.   Yes.  I did not have the authority to sign the contract.

18  Q.   Why didn't you have the authority?

19  A.   Just I wasn't allowed to commit the firm to a

20  million-dollar expenditure.

21  Q.   And we'll go back to the authority, but could you describe

22  how or if it became a million-dollar expenditure, the hiring of

23  Palantir?

24  A.   It did not.  The contract was based on a success rate that

25  they had to be at least 50 percent successful, and anything

1   over 50 percent successful would be a pro-rata share of a

2   million dollars.

3   Q.   Ultimately how successful were they?

4   A.   I think seven percent.

5   Q.   So you didn't have the authority to enter into the

6   contract, so what did you do?

7   A.   By the time I think this contract was signed, Mr. Marcello

8   had replaced Mr. Liddy as Vice Chair of Audit.  He took it to

9   Scott Ozanus, the Deputy chairman and COO of KPMG, to get

10   approval for the project.

11   Q.   And is it your understanding that it was approved?

12   A.   Yes.

13   Q.   Did there come a time where you had to describe the project

14   to senior leadership or anyone else at the firm?

15   A.   Yes.  So quarterly me and/or my boss, Scott Marcello, would

16   present to the Professional Practice Ethics and Compliance

17   Committee of KPMG's board, and I remember talking about it on

18   several occasions with that committee of the board.

19   Q.   And was Judge Holmes present on those occasions?

20   A.   Yes.  He was the management I'll say leader on that board

21   committee.

22          MR. BOXER:  This is a good spot to take a break or I

23   could keep going, your Honor.

24          THE COURT:  Let's do a break.

25          MR. BOXER:  OK.

1            THE COURT:  Let's take a ten-minute break.

2            Folks, please leave your notepads on your chairs.

3   We'll be in recess for ten minutes.

4            (Recess)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Boxer.

2          MR. BOXER:  Thank you, your Honor.

3   BY MR. BOXER:

4   Q.  Mr. Middendorf, did there come a time in March of 2016 when

5   Mr. Whittle spoke to you about information Brian Sweet had

6   about 2016 inspections?

7   A.  Yes.

8   Q.  Do you recall when that was?

9   A.  I don't recall the exact date.  That's the second half of

10  March 2016.

11  Q.  Was it a conversation just between you and Mr. Whittle?

12  A.  Yes.

13  Q.  What do you recollect about that conversation?

14  A.  Mr. Whittle indicated that Mr. Sweet had made some

15  predictions of who might be inspected for 2016, and he had

16  indicated since the date would have been after the report

17  release date but before the document completion date, they

18  thought that it was appropriate to go look at some of those

19  engagements before the document completion date.

20  Q.  When you say "they," did you have an understanding as to

21  who Mr. Whittle was referring to?

22  A.  Mr. Sweet and maybe some others.

23  Q.  What did you do after hearing about this from Mr. Whittle?

24  A.  I had just a normal catch-up meeting with Mr. Marcello,

25  shared that concept with him, and he didn't have a problem with

1    it either.

2    Q.  And you didn't have a problem with it, correct?

3    A.  Correct.

4    Q.  Why didn't you have a problem with it?

5    A.  I didn't see any issue with reviewing engagements after the

6    report release date before the document completion date.

7    Q.  Why is that?

8    A.  Because within audit standard 3, as long as you are not

9    doing incremental audit procedures and just clarifying the work

10   that had already been done, that complies with audit

11   standard 3.

12   Q.  Did there come a time when you had a second conversation

13   with Mr. Whittle on the topic of Mr. Sweet and 2016

14   inspections?

15   A.  Yes.

16   Q.  About how long after the conversation you just described

17   did the second conversation take place?

18   A.  A number of days.  A week or so.

19   Q.  Tell us what you remember about the second conversation

20   with Mr. Whittle.

21   A.  Mr. Whittle indicated that Brian Sweet may have information

22   from the PCAOB of who some of the selections might be, and the

23   objective would be to do the same things we had planned to do

24   when there were predictions.

25   Q.  Do you recall where this conversation took place?

1  A.  I do not.

2  Q.  Do you recall if anyone else was present?

3  A.  Just Mr. Whittle and I.

4  Q.  Did you have an understanding from Mr. Whittle, anything

5  about how accurate these predictions or selections might be?

6  A.  I think there was some question about where the information

7  came from and how accurate it might be.  But it was clear that

8  the view was it came from someone at the PCAOB.

9  Q.  What was the end result of this conversation with Mr.

10 Whittle?

11 A.  I agreed that I didn't have a problem with us conducting

12 those reviews, and then I shared that conversation with Mr.

13 Marcello.

14 Q.  You have heard testimony during the trial about a meeting

15 Mr. Whittle described in his conference room where you attended

16 and Mr. Sweet was on the phone.  Do you recall that testimony?

17 A.  I recall the testimony.

18 Q.  Do you recall sitting in Mr. Whittle's conference room and

19 participating in the meeting as described by Mr. Whittle?

20 A.  I do not recall participating in that meeting.

21 Q.  Did you have the same reasoning as to why you thought the

22 review or the work you just described?

23         MS. ESTES:  I object to the leading.

24         THE COURT:  Sustained.

25 Q.  Did you approve Mr. Whittle taking the action he described?

1    A.  Yes.

2    Q.  Did Mr. Marcello approve the action as well.

3    A.  He certainly did not object.

4    Q.  And why did you approve the action that Mr. Whittle

5    described?

6    A.  My view was all you could do in the document completion

7    period would be clarifications/edits to work that had already

8    been done.  So it was just basically taking credit for the work

9    that had been done if you followed audit standard 3.

10   Q.  Was it your understanding that audit standard 3 would be

11   followed?

12   A.  Yes.

13   Q.  I want to show you what is in evidence as Government

14   Exhibit 954, an email from Mr. Britt on March 28, 2016.  Do you

15   recall this email?

16   A.  I did not recall the email at the time.

17   Q.  You have seen it in connection with this case?

18   A.  Yes.

19   Q.  You read the email in connection with this case?

20   A.  Yes.

21   Q.  Based on your reading of the email, do you have an

22   understanding that a purpose of why work papers would be

23   reviewed was not made clear to recipients of the email?

24          MS. ESTES:  Objection: leading.

25          THE COURT:  Sustained.

 1   Q.  Did you have any conversations with Mr. Whittle about

 2   whether the engagements that were on Mr. Sweet's list would be

 3   discussed with engagement partners, the fact that they were on

 4   the list?

 5   A.  No, they would not.

 6   Q.  Why was that?

 7   A.  Basically, the PCAOB inspection process is extremely

 8   stressful to the engagement team.  And if these were true

 9   selections, inspection selections, telling somebody 3 months, 6

10   months in advance, we just didn't think it was a good idea.

11   Q.  The group of issuers that came from Mr. Sweet, were they in

12   a particular category of clients at KPMG?

13   A.  Most were banks.

14   Q.  Were some nonbanks?

15   A.  Correct.

16   Q.  Were you involved at all in the execution or the review of

17   the work papers?

18   A.  No, I was not.

19   Q.  What role, if any, did you have?

20   A.  For some of the nonbanks I reached out to the engagement

21   partners to determine when their document completion period

22   would end to determine if we could have someone do a review of

23   the work papers.

24   Q.  I want to show you what's marked as Government Exhibit 949.

25   Do you recognize that email?

1   A.  Yes.

2   Q.  What do you recognize it to be?

3   A.  It is an email from Tom Whittle to myself, subject: 10-K

4   research.

5   Q.  Do you recall anything about this email in discussion with

6   Mr. Whittle?

7   A.  What I recall is the first line says, "With respect to the

8   10-K research you requested is not an FS company but a tech

9   company," "FS" being financial services.  "Tech company"

10  relates to Fidelity Information Services, which is one of the

11  engagements that was reviewed during the March period.

12  Q.  If I could show you Government Exhibit 950.  It starts at

13  the bottom with an email from Mr. Whittle, the subject line

14  "Retailer."  Do you recall this email exchange?

15  A.  Yes.

16  Q.  What do you remember about it?

17  A.  I believe it relates to Bon Ton, which was one of the

18  companies to be reviewed.

19  Q.  In the middle you ask who is the new EQCR, correct?

20  A.  Correct.

21  Q.  Do you recall why you asked that question?

22  A.  The EQCR is the engagement quality control reviewer.  I

23  think the original email, I knew who the engagement quality

24  control reviewer was and therefore would have reached out to

25  that individual.  But as Tom said, it had changed, so I asked

1    who the new one was.

2    Q.   Was the EQCR an individual who could grant access to the ER

3    filing and work papers?

4    A.   No.

5    Q.   Turning to Government Exhibit 951, do you recognize

6    Government Exhibit 951?

7    A.   Yes.

8    Q.   What is it?

9    A.   It is an email from Mat Mount to me regarding audit report

10   date.

11   Q.   What do you recollect about this email exchange with Mat

12   Mount?

13   A.   It appears based on his message I called him, so he is

14   responding.  Audit report date was February 22nd, so I believe

15   we have until April 7th, which would be indicating the end of

16   the document completion period.

17   Q.   Do you recollect which KPMG client this concerned?

18   A.   Yes.

19   Q.   Which one was that?

20   A.   Macquarie.

21   Q.   Was that one of the names provided by Mr. Sweet in March

22   2016?

23   A.   Yes.

24   Q.   Then if we could show you Government Exhibit 952.  Do you

25   recognize this email exchange?

1   A.  Yes.

2   Q.  What do you understand it to be?

3   A.  A question related to an individual partner, Mark N, Mark

4   Niswonger, asking something about his former client.

5   Q.  Do you know who the former client is?

6   A.  I did not recall.

7   Q.  The email was forwarded to you by Mr. Whittle, correct?

8   A.  Correct.

9   Q.  Did the ALL monitoring program have any role in the

10  workpaper review in March of 2016?

11  A.  I'm not sure I understand the question.

12  Q.  If we could go back to 954.  The first sentence at the

13  bottom of the email says, "As part of our wrap-up in reporting

14  on the results of the ALL monitoring program."  Were you aware

15  of any use of the monitoring program to execute review of work

16  papers from information provided by Mr. Sweet in 2016?

17  A.  Yes.

18  Q.  What were you aware of?

19  A.  That it was a method just like the other emails to various

20  partners to get access to the files, the eAudit files, to

21  perform the reviews.

22  Q.  Were you involved in that method as you described?

23  A.  Yes, I believe I knew.

24  Q.  Did you take any action to execute on the knowledge you

25  had?

1   A.  No.

2   Q.  At the time this was occurring, did you think that the

3   additional review of work papers would lead to less comments on

4   a PCAOB inspection report?

5   A.  My view was take credit for the audit work that had been

6   done prior to the report release date, and through edits,

7   clarifications in the work papers maybe it avoids comment,

8   maybe it doesn't, probably helps the inspection go better just

9   because the documentation is clearer.

10  Q.  You heard in the government's opening statement that you

11  cheated.  Do you think you cheated?

12  A.  No.

13  Q.  Why do you think you didn't cheat?

14  A.  To me, I was focused on what you could do as auditors.  If

15  you complied with audit standard 3 and only were taking credit

16  for work that was already done, that wasn't cheating.

17  Q.  Have you ever used the word "stealth" in connection with

18  the review of the work papers that we have been speaking about?

19  A.  No.

20  Q.  Have you ever used the term "circle of trust" in connection

21  with the review of the work papers we have been speaking about?

22  A.  No.

23  Q.  Have you ever heard either of those terms, "stealth" or

24  "circle of trust" used by someone else in describing the review

25  of work papers we have been speaking about?

 1   A.  No.

 2   Q.  If we could show you what is marked as Government Exhibit

 3   948.  Do you recall seeing this, Government Exhibit 948, during

 4   the trial?

 5   A.  Yes.

 6   Q.  You heard testimony about it, Government Exhibit 948,

 7   during the trial, correct?

 8   A.  Yes.

 9   Q.  You're not on the email exchange, right?

10   A.  Correct.

11   Q.  Were you aware of any camouflage or other re-reviews done

12   in order to deceive anybody about the source of information

13   that led to the re-reviews?

14   A.  No.

15   Q.  Was AMBAC one of the clients whose work papers were

16   reviewed around this period of time in March of 2016?

17   A.  Yes.

18   Q.  Were you involved in the review of those work papers?

19   A.  No.

20   Q.  Did anything about the review of those work papers ever

21   reach your desk, so to speak?

22   A.  Yes.

23   Q.  What was that?

24   A.  I was told by Mr. Whittle that as part of the re-review it

25   was determined that what's called a SOC 1 report, a report that

1   the company relies on as part of its controls, was about a year

2   old and therefore not good audit evidence, stale audit

3   evidence, and therefore that was a problem and we may have to

4   withdraw our report, our report on internal controls relate to

5   AMBAC.

6   Q.  Did the firm ultimately decide that its report on internal

7   controls had to be withdrawn?

8   A.  Yes.

9   Q.  Was that decision communicated to the client, the AMBAC?

10  A.  Yes.

11  Q.  Were you assigned any role in those communications?

12  A.  Mr. Marcello and I had a call with the engagement partner,

13  and there may have been other members of the engagement team on

14  the call, with the CEO, chief executive officer, and the chief

15  financial officer of AMBAC.

16  Q.  How would you describe the tone and words that were said by

17  those executives at AMBAC?

18  A.  They weren't happy about us withdrawing our report.

19  Q.  But the firm did withdraw its report, correct?

20  A.  Yes.

21          MR. BOXER:  If we could show the witness Government

22  Exhibit 1017.

23  Q.  I briefly want to ask you a question about this exhibit.

24  Do you recognize Government Exhibit 1017?

25  A.  Yes.

1  Q.  If we could turn to the second page.  What is the title of

2  the exhibit on the second page?

3  A.  "Audit quality executive dashboard."

4  Q.  Just generally, what is this?

5  A.  It was a document prepared by my group, the national

6  office, to share with leaders in the audit practice and leaders

7  of the firm.  Kind of what a dashboard typically is is a one-

8  or two-page summary to give them highlights of information.

9  Q.  The bar graph, I think that's what it's called, the green

10  and the red, and then the italics, could you briefly explain

11  what is depicted there.

12  A.  Yes.  The red bar shows the number of engagements that

13  received comments.  For 2012, 29 engagements received comments;

14  for 2013, 29 engagements received comments; for 2014, 32

15  engagement received comments; then for 2015, 23 engagements

16  received comments.

17       Then the black little bracket thing above each of

18  those tells you how many are included in the part 1 report by

19  the PCAOB.  For 2012, 29 engagements received comments but only

20  17 went into part 1.  In 2013, 29 engagements received

21  comments, 23 ended up in part 1.  Then in 2014, 32 engagements

22  received comments and 28 ended up in part 1.  For 2015, 23

23  ended up receiving comments, and 20 were in our part 1 report.

24  Q.  So for 2012, 2013, and 2014, the red portion of the bar was

25  more or less at the same location, same number, correct?

1   A.  Correct, consistent result on the number of issuers

2   receiving comments.

3   Q.  During that period of time an increase in the number or

4   percentage of those had made it to part 1, correct?

5   A.  Correct.  The PCAOB decides which of those end up in

6   part 1.

7   Q.  If we could scroll down to "firm response, PCAOB comments

8   and timing," the first line, "agree with comment," what is

9   being tracked there?

10  A.  As the PCAOB issues comments, I think I might have

11  mentioned yesterday, when we receive the comment, you can agree

12  or disagree.  One of the things coming out of the 2014 board

13  meeting is we disagreed too much.

14  Q.  So you were keeping track as to how much you disagreed?

15  A.  Correct.

16  Q.  Was whether or not you thought the comment was fair

17  calculated into whether you should or shouldn't disagree?

18  A.  Not really.

19         MR. BOXER:  If we could show the witness Exhibit M126

20  in evidence.

21  Q.  What is the date of this email exchange, Mr. Middendorf?

22  A.  August 5, 2016.

23  Q.  If we could scroll down to Mr. Sweet's email.  It's to Mr.

24  Whittle, Mr. Britt, and Mr. Santana, correct?

25  A.  Correct.

1    Q.  It's addressed "Tom, David," right?

2    A.  Correct.

3    Q.  Within DPP was there a way that your first name was

4    referred to and a way that Mr. Britt's first name was referred

5    to?

6    A.  Yes.  I'm "Dave," he's "David."

7    Q.  Could you generally describe what Mr. Sweet is writing to

8    Mr. Whittle and Mr. Britt and Mr. Santana about SVB

9    pre-inspection review.

10   A.  Yes.  A pre-inspection review is where some people from the

11   national office look at the files before the PCAOB arrives to

12   help prepare the team.  The sentence says, "However, the files

13   are not in great shape and there are quite a few soft spots

14   that I expect will be significantly challenged."

15   Q.  If we scroll up to your response, what do you write back?

16   A.  What was the question?

17   Q.  What do you write back in response?

18   A.  "Shame on us that an inspection that went bad previously is

19   likely to go bad again.  If we don't learn from our mistakes,

20   we deserve to be in part 1.  We should debrief after this

21   inspection."

22           MR. BOXER:  If we could show the witness M271 in

23   evidence.

24   Q.  Do you recall Exhibit M271?

25   A.  Yes.

1    Q.  What do you recall about it?

2    A.  Just that it's a bank screening analysis prepared by Mr.

3    Sweet.

4    Q.  What do you remember about Mr. Sweet preparing a bank

5    screening analysis towards the end of 2016?

6    A.  He was preparing predictions of who might be inspected.

7    Q.  Did you understand that analysis to be based upon any

8    confidential information Mr. Sweet had?

9    A.  No.

10   Q.  If you could read the first line, first two lines of the

11   top email from Mr. Sweet to Mr. Whittle and to you.

12   A.  "Tom, thank you for the feedback.  Cindy and I have already

13   connected with John Rodi/Mike Martens for the two-year ends at

14   the top of our list -- BMO Financial, Raymond James -- since

15   they are close to their filing dates."

16   Q.  Did you have an understanding of what Mr. Sweet was

17   speaking about with respect to BMO Financial and Raymond James?

18   A.  Yes.

19   Q.  What did you understand?

20   A.  BMO Financial is Bank of Montreal and Raymond James is a

21   bank in Florida.

22   Q.  What, if anything, occurred with respect to those two

23   audits as far as you knew at or about this time in November of

24   2016?

25   A.  As he says, they are close to their filing dates.  Both of

1     those companies are what I would call an over-calendar

2     year-end, so they are not a 12/31 fiscal year.  I believe they

3     are either a September 30 or an October 31 year-end company.

4     So the filing date, I'm not sure if that is referring to the

5     report release date or the document completion date.

6     Q.  Were you aware of any work that Mr. Sweet was engaged in at

7     this time regarding Bank of Montreal or Raymond James?

8     A.  Yes.

9     Q.  What were you aware of?

10    A.  Mr. Sweet reviewed both of those engagements during their

11    45-day period after the report release date and before the

12    document completion date to help the engagement team make

13    suggested edits, clarifications to the work papers, etc.

14    Q.  Did you have an understanding as to why Mr. Sweet did that

15    for those two engagements?

16    A.  Mr. Rodi was connected with both of those engagements and

17    had a history of quality issues.  So I think the choice was to

18    do the review to make sure we thought the work papers were in

19    as good a shape as they could be.

20              MR. BOXER:  You can take that down.

21    Q.  Directing your attention to 2017, did there come a time

22    when you had a conversation with Mr. Whittle about predictions

23    that Mr. Sweet had for 2017?

24    A.  Yes.

25              MR. BOXER:  I'd like to show the witness Government

1    Exhibit 1078 in evidence.

2    Q.  Do you recognize Government Exhibit 1078?

3    A.  Yes, I do.

4    Q.  Does this reflect at or about the time you had a

5    conversation with Mr. Whittle about Mr. Sweet's predictions?

6    A.  I believe so.

7    Q.  Tell us what you remember as best you can.

8    A.  I was out of town that entire week, so Mr. Whittle emailed

9    me to find a time to chat.  He called me or I called him, I

10   can't remember which, and we had a conversation about a number

11   of matters.  One was that Mr. Sweet had made some predictions

12   related to who might be inspected in 2017.

13   Q.  Do you recall any of the names of the predictions?

14   A.  I do.  They were at all large companies.  Citigroup was on

15   that list.  The conversation I recall around that was we had

16   already embedded Brian Sweet in Citigroup for about a thousand

17   hours to help improve the audit quality on that engagement, so

18   nothing more to do.

19        Macy's was on the list, which was one of the

20   engagements I was the EQCR for.  Joe Lynch, former PCAOB

21   inspector, had been involved with Macy's in the fall.  My view

22   was the plan was for him to go back at year end, so no further

23   actions to be taken.

24   Q.  Do you recall any other names Mr. Whittle shared with you?

25   A.  Home Depot, which was my former engagement through 2014.

1    We had gone through internal inspection when I took my role as

2    national managing partner, so just a couple of years prior to

3    that.  I felt that engagement was in good shape and we didn't

4    need to do anything.

5              Then Charter Communications was a client where the

6    EQCR actually reported -- was in Mr. Whittle's group and a very

7    strong partner, so the view was we didn't need to do anything

8    on Charter.  At the end of the conversation to me it is

9    January, there really aren't a lot of resources to move around,

10   nothing would be done based on those predictions.

11   Q.  Do you recall if you took any notes of the conversation?

12   A.  No.

13             THE COURT:  No, you didn't, or no, you don't recall?

14             THE WITNESS:  No, I did not.

15   Q.  Do you recall if you made any entries on your phone

16   regarding the conversation?

17   A.  Yes, I did.

18             MR. BOXER:  If we could show the witness Exhibit M316

19   not in evidence.

20   Q.  Do you recall this email exchange?

21   A.  Yes.

22   Q.  It's an email to you.  I'm sorry.  What do you understand

23   it to be?

24   A.  It is a calendar invitation for a call.  It says

25   "conference call host," Brian to myself and Mr. Whittle.

1          MR. BOXER:  I offer it, your Honor.

2          THE COURT:  M316 is received.

3          (Defendant's Exhibit M316 received in evidence)

4    Q.  The part where it says "Tom, Dave," you understand that to

5    be written by Mr. Sweet?

6    A.  Correct.

7    Q.  What does he write?

8    A.  "I wanted to follow up on your last conversation and get

9    some time in your calendars for the three of us to debrief on

10   the RJF monitoring program and provide you with an update on

11   Citi."  Please don't he hesitate to let me know if you prefer

12   an alternative time.

13   Q.  The RJF monitoring program was what you described as having

14   been in place in November 2016, correct?

15   A.  The review of those files occurring the document completion

16   period.

17   Q.  Citi was an engagement that Mr. Sweet was already embedded,

18   right?

19   A.  Correct.

20   Q.  Do you remember if you had the call?

21   A.  Yes.

22   Q.  What do you remember about it?

23   A.  Mr. Whittle did not participate.  I think he ended up

24   having the flu.  So Mr. Sweet walked me through his

25   observations on the Citigroup audit and where things were going

1    well and where there were some shortcomings in his view of some

2    of the auditing around the allowance for loan losses.

3           Then on Raymond James Financial and Bank of Montreal,

4    he had done the review during the document completion period

5    and indicated to me his views on having done that review, that

6    the work papers in I think the Raymond James situation were not

7    in good shape, and he tried his best during the document

8    completion period to do what he could to help improve the

9    documentation on both Raymond James audit work papers and the

10   Bank of Montreal audit work papers.

11          MR. BOXER:  If I could show the witness what is marked

12   as M317 not received in evidence.

13   Q.  Do you recognize M317?

14   A.  Yes.

15   Q.  An email between you and Mr. Whittle on January 18, 2017?

16   A.  Yes.

17          MR. BOXER:  I offer it, your Honor.

18          THE COURT:  M317 is received.

19          (Defendant's Exhibit M317 received in evidence)

20   Q.  What does Mr. Whittle write to you on the bottom?

21   A.  "Dave, sorry I missed the call with Brian.  I fell asleep.

22   Can't recall last time I was this sick.  Did you get what you

23   needed on the situations?  Tom."

24   Q.  You wrote back?

25   A.  "No problem.  I assumed you were not feeling up to the

1    call.  Good discussion with Brian.  I will feel you in later."

2    Q.  Do you recall hearing testimony during the trial from Mr.

3    Whittle about Mr. Sweet and Ms. Holder making additions to the

4    bank screening analysis list in for a deceptive purpose?

5    A.  Yes.

6    Q.  What do you recall about that?

7    A.  That after they got information relating to PCAOB

8    preliminary inspection selections, they went in to modify the

9    bank screening analysis that had been prepared earlier.

10   Q.  Were you aware of that?

11   A.  I was not.

12         MR. BOXER:  May we show the witness Government Exhibit

13   1076.

14         THE COURT:  In evidence?

15         MR. BOXER:  In evidence.

16   Q.  Is this the email exchange you were just referring to?

17   A.  Yes.

18   Q.  You're not on the email, correct?

19   A.  Correct.

20         MR. BOXER:  If we could show the witness Government

21   Exhibit 656A.

22   Q.  Have you seen 656A before, Mr. Middendorf?

23   A.  Yes.

24   Q.  I want to first direct your attention to the last page, row

25   26, and ask you if, looking at that, you recall what that is.

1   A.   Yes.   I think that is the list of engagements that Mr.

2   Whittle had indicated were predictions in early January 2017.

3   Q.   Is every entry in row 26 a list of engagements that Mr.

4   Whittle said were predictions for 2017?

5   A.   I don't recall if Raymond James and BMO were on that call.

6   I don't believe they were.

7   Q.   Were those the two clients that were the subject or a

8   subject of the call you had with Mr. Sweet on January 18, 2017?

9   A.   Yes.

10  Q.   By the way, these predictions in January of 2017, did Mr.

11  Whittle share with you how he had received them or anybody else

12  had received them or from whom?

13  A.   Mr. Whittle had just said that they were predictions from

14  Mr. Sweet.

15  Q.   I have a few documents to show you, Mr. Middendorf.

16  Starting with Government Exhibit 1124, do you recognize that

17  document?

18  A.   Yes.

19  Q.   It's something you testified about yesterday?

20  A.   Yes.

21  Q.   Can you briefly describe what it is.

22  A.   It is the calendar invite from Brian Sweet to myself and

23  Tom Whittle, subject: catch-up meeting, a conference call.  It

24  says the start time is February 7th at 1:30 a.m.  It was at

25  8:30 p.m. on February 6th.

1    Q.  If I could have shown to you Exhibit M315 not received in

2    evidence.  Do you recognize 315?

3    A.  Yes.

4    Q.  Generally, what is it?

5    A.  Looks like some email traffic with Laurie Mullen and myself

6    regarding catch-up.

7              MR. BOXER:  I offer it, your Honor.

8              THE COURT:  M315 received.

9              (Defendant's Exhibit M315 received in evidence)

10   Q.  The re line says what?

11   A.  "Catch-up."

12             MR. BOXER:  Then if we could show the witness

13   Exhibit M307 not in evidence.

14   Q.  What is M307?

15   A.  A calendar invitation from Laurie Mullen to herself and me,

16   subject: "Dave and Laurie catch-up."  "Laurie to call Dave at,"

17   that was my New York office number," on February 8th, 8:00 p.m.

18   I think that needs to be adjusted for UTC time.

19             MR. BOXER:  I offer it, your Honor.

20             THE COURT:  M307 received.

21             (Defendant's Exhibit M307 received in evidence)

22             MR. BOXER:  If we could establish that.

23   Q.  Showing you what's marked as M310 not in evidence, do you

24   recognize that?

25   A.  Yes.

```
 1   Q.  What is it?

 2   A.  Email from Laurie Mullen to me.  "Do you have time today

 3   for an update on the matter we discussed earlier this week?

 4   I'm in my office."  And a response from me, "Just tried your

 5   office, call my house," Friday, February 10th.

 6           MR. BOXER:  I offer it, your Honor.

 7           THE COURT:  Received.

 8           (Defendant's Exhibit M310 received in evidence)

 9           MR. BOXER:  If we could publish that.  If you could

10   display Government Exhibit 656A again, please.

11   Q.  I would direct your attention, Mr. Middendorf, to row 5

12   this time.  Do you have any recollection or understanding as to

13   the entries in row 5 in 656A?

14   A.  Yes.

15   Q.  What is your understanding?

16   A.  That is the list of 2017 inspections that Mr. Sweet had

17   shared with me on February 6th call.

18   Q.  The one you described taking notes on your phone?

19   A.  Correct.

20           MR. BOXER:  If we could display Exhibit M312 not in

21   evidence, please.

22   Q.  What is M312?  What do you recognize it to be?

23   A.  An email from Scott Marcello to Judge Sven Holmes copying

24   me and our three administrative assistants.  Subject: time for

25   an important discussion.
```

1    MR. BOXER:  I offer it, your Honor.

2    THE COURT:  M312 is received.

3    (Defendant's Exhibit M312 received in evidence)

4  Q.  Is M312 email you described yesterday, Mr. Marcello,

5  reaching out to Mr. Holmes?

6  A.  Yes.

7    MR. BOXER:  If we could show you M313, please.

8  Q.  Do you recognize M313?

9  A.  Yes.

10  Q.  What is it?

11  A.  A calendar invitation from Nancy McGeorge, who is Scott

12  Marcello's administrative assistant, to Scott Marcello, Judge

13  Holmes, myself, copying Judge Holmes and my administrative

14  assistant.

15    MR. BOXER:  I offer it, your Honor.

16    THE COURT:  Received.

17    (Defendant's Exhibit 313 received in evidence)

18    MR. BOXER:  Can we publish it.

19  Q.  Is this the call you described yesterday where Mr. Marcello

20  and you informed Mr. Holmes about the 2017 list?

21  A.  Yes.

22    MR. BOXER:  If we could display 657 in evidence.

23  Q.  Do you recognize 657?

24  A.  Yes.

25  Q.  May we scroll down a few pages as well.  What do you

1    recognize Government Exhibit 657 to be?

2    A.  The list of 2017 inspections that were in my Notes app and

3    screenshots of that list.

4    Q.  Do you have an understanding of what happened to those

5    screenshots?

6    A.  Yes.  When I started working with my attorneys related to

7    this matter --

8    Q.  Without telling me anything you said with your attorneys.

9    Just what did you do?

10   A.  I took screenshots of the list to send to my attorneys.

11   Q.  To send to whom?

12   A.  My attorneys.

13   Q.  You mentioned yesterday a phonecall with Mr. Rubino.  Do

14   you recall how many instances you spoke with Mr. Rubino about

15   the issues related to -- withdrawn.  Do you recall how many

16   times you spoke to Mr. Rubino at or about February 15, 2017?

17   A.  Yes.

18   Q.  How many times?

19   A.  Two times.

20   Q.  The lawyers for KPMG were Williams & Connolly, their

21   outside counsel, correct?

22   A.  Correct.

23   Q.  How many times at you speak with the lawyers for Williams &

24   Connolly?

25   A.  Three times.

 1    Q.  Were you ever compelled to speak with those lawyers?

 2             MS. ESTES:  Objection.

 3             MR. BOXER:  I believe it was in the government's

 4    questions.  I'll try it a different way.  I think I know what

 5    the objection is.

 6    Q.  Did you feel forced to speak to them in any way?

 7             MS. ESTES:  Same objection.

 8             THE COURT:  Overruled.

 9    A.  No.

10    Q.  Do you recall roughly the months or even dates when you

11    spoke to Williams & Connolly?

12    A.  I believe March of 2017, April of 2017, and either August

13    or September of 2017.

14    Q.  When you spoke to Williams & Connolly in March of 2017, had

15    the firm already put you on administrative leave?

16    A.  Yes.

17    Q.  When you spoke to Williams & Connolly in April of 2017, had

18    you already been removed from the partnership at KPMG?

19    A.  I believe so.

20    Q.  When you spoke to Williams & Connolly in August of 2017,

21    had you been removed from the KPMG partnership by that period

22    of time?

23    A.  Yes.

24    Q.  Mr. Middendorf, during the events you have testified about

25    the last couple of days, did you ever think or believe you were

1    committing a crime?

2    A.   No.

3    Q.   You heard testimony from Mr. Whittle that he thought what

4    he was doing was wrong.  You heard that testimony, correct?

5    A.   Yes, I did.

6    Q.   Did you feel the same way?

7    A.   No, I did not.

8    Q.   Do you feel that way now?

9    A.   I don't believe what I did was wrong.  But certainly in

10   hindsight I look back on the fact that we had confidential

11   PCAOB information that we used and should not have done that.

12   I was focused on what you could do as an auditor, and following

13   the standards did not seem to be wrong.

14           I was 30 years with KPMG.  I dedicated my life to the

15   firm.  My family sacrificed for the firm.  I would never do

16   anything to hurt the firm.  I love the firm.  So it was not

17   driven by I thought I was doing something wrong.  I thought it

18   was probably stretching the limits in a gray area, but not

19   something that I did wrong.

20   Q.   Your conversations with Ms. Mullen and Mr. Hermann in 2017

21   that you described yesterday, did that influence you or any

22   action you took?

23   A.   Yes.

24   Q.   In what way?

25   A.   They had a very strong negative reaction to having the

1    information.  And although I had informed Mr. Marcello, my

2    boss, he did not have that kind of a strong reaction.  So

3    sharing those reactions with him got him steering down the path

4    of what we needed to do.

5               MR. BOXER:  No further questions, your Honor.

6               (Continued on next page)

1           THE COURT:  Cross, Ms. Estes.

2           We'll go for another half hour and then break for

3   lunch at 1 o'clock.

4   CROSS-EXAMINATION

5   BY MS. ESTES:

6   Q.  Good afternoon.

7   A.  Good afternoon.

8   Q.  Now, Mr. Middendorf, you testified yesterday that you were

9   involved in reporting this in 2017, right?

10  A.  Correct.

11  Q.  But to be clear, you were not a whistleblower in 2016,

12  right?

13  A.  2016?

14  Q.  Right.

15  A.  Correct.

16  Q.  You knew in 2016 that the firm had confidential information

17  from a source at the PCAOB, right?

18  A.  Correct.

19  Q.  You authorized people to act on it?

20  A.  Yes.

21  Q.  And you didn't tell the PCAOB what you were doing, did you?

22  A.  No, I did not.

23  Q.  You didn't blow the whistle?

24  A.  To who?

25  Q.  You didn't report that you had confidential information

1    that year, did you?

2    A.  I had told my boss, Scott Marcello, about the confidential

3    information.

4    Q.  You didn't tell Judge Holmes?

5    A.  No, I did not.

6    Q.  And to be clear, Mr. Middendorf, what happened in 2016,

7    that was -- that was over -- or when you reported in 2017, that

8    was over ten months after you had first gotten confidential

9    PCAOB information in 2016, right?

10   A.  Yes.

11   Q.  Over 300 days later?

12   A.  It sounds about right.

13   Q.  That's when you were involved in reporting it within the

14   firm, right?

15   A.  Correct.

16   Q.  And as you just testified, that was only after you were

17   confronted about it by Laurie Mullen and George Hermann, right?

18   A.  They shared their views.

19   Q.  It's Scott Marcello I believe you testified yesterday, he

20   was confronted about it by people who reported to Laurie

21   Mullen, right?

22   A.  Correct.

23   Q.  And then he told you you needed to report it?

24   A.  Correct.

25   Q.  That's why you reported it?

1   A.   I agreed when he told me that that was his plan of action.

2   Q.   Now, Mr. Middendorf, before you testified, you reviewed the

3   government's exhibits carefully, right?

4   A.   Do you have any particular exhibits in mind?

5   Q.   You've seen some of the government's exhibits, right?

6   A.   Through the testimony earlier than the last three weeks?

7   Q.   You saw them before the trial even started, right?

8   A.   But didn't review all the discovery and I reviewed some of

9   the exhibits.

10  Q.   You reviewed sort of the key emails you were on, right?

11  A.   Yes.

12  Q.   The documents that you've seen shown on the screen during

13  this trial, generally speaking, right?

14  A.   I would say generally speaking.  I just don't remember all

15  the ones that were on the screen.

16  Q.   And in some of those key documents, you had them for about

17  a year, right?

18  A.   I'm just trying to understand.  "Key" documents being those

19  exhibits?

20  Q.   Yes.

21  A.   Yes, I had them for some period of time.  I can't say the

22  exact amount of time but plenty of time.

23  Q.   So you had a lot of time to study them?

24  A.   Yes.

25  Q.   To look at what you said in the email?

1   A.  Yes.

2   Q.  To look at what somebody said in response in the email?

3   A.  Yes.

4   Q.  To make sure you could explain it, right?

5   A.  To understand what the email was.

6   Q.  And the same thing, I think you just looked at exhibits

7   from your phone, right?  Notes from your phone?

8   A.  Correct.

9   Q.  You have had time to look over those notes, right?

10  A.  Yes.

11  Q.  So you could explain them?

12  A.  Yes.

13  Q.  And, Mr. Middendorf, you've listened carefully to all of

14  the witnesses in trial?

15  A.  Yes.  My life is on the line, absolutely.

16  Q.  Even before trial, you have seen interviews of what these

17  witnesses have said, right?

18  A.  So for myself and other witnesses.  I have not seen the

19  interviews -- well, let me take that back.  I had not seen the

20  interviews.  When my attorneys received them, they read them to

21  me.  I did not have copies of them, and I guess some of them

22  I've seen in maybe the 3500 material.

23  Q.  OK.  So you have seen the 3500 material?

24  A.  But I haven't read everything but certainly my attorneys

25  have pointed me towards things.

1   Q.  And when you say "3500 material," those are generally sort

2   of reports of interviews, right?

3   A.  That's my knowledge, that's what I reviewed.

4   Q.  So, Mr. Middendorf, is it fair to say you have had a lot of

5   time to think about the evidence in this case?

6   A.  Yes.

7   Q.  A lot of time to think about the government's theory in the

8   case?

9   A.  Yes.

10  Q.  All of this before testifying?

11  A.  Yes.

12  Q.  Now, Mr. Middendorf, I want to talk about your position at

13  KPMG for a little bit.

14          You testified you were the national managing partner

15  of Audit Quality and Professional Practice?  Did I get the

16  title right?

17  A.  Yes.

18  Q.  So that's in the National Office, right?

19  A.  Correct.

20  Q.  You were head of the National Office?

21  A.  Correct.

22  Q.  And that was very high up in KPMG, right?

23  A.  Yes.

24  Q.  You were part of the leadership?

25  A.  Yes.

1   Q.  And even the people who reported to you, like Laurie

2   Mullen, Tom Whittle, they were high up within KPMG, right?

3   A.  Yes.

4   Q.  Tom Whittle, he was the national partner in charge of

5   inspections?

6   A.  Correct.

7   Q.  Laurie Mullen, she was a Regional Professional Practice

8   Partner for the entire West Region, right?

9   A.  Correct.

10  Q.  And Tom Whittle, he was in charge of the Inspections Group

11  at the National Office, right?

12  A.  Yes.

13  Q.  And so you oversaw that group since he reported to you,

14  right?

15  A.  Yes.

16  Q.  And now part of your job in overseeing that group was to

17  make sure KPMG was doing well on inspections; fair to say?

18  A.  Yes.

19  Q.  And that's partly why you started hiring people from the

20  PCAOB to come work at KPMG, right?

21  A.  Certainly to bring them on as resources to help address our

22  audit quality issues.

23  Q.  You also thought they would be able to help you with

24  inspections, right?

25  A.  Some of those individuals worked in a pre-inspection

1    support role, so in those cases, yes.

2    Q.  You thought they could help you with documentation on

3    inspections, right?

4    A.  If they were a part of a pre-inspection review team, that

5    would be after the document completion period, but if they

6    worked in other roles, for example, Brian Sweet working on

7    Citi, yes.

8    Q.  So, in general, you thought the PCAOB was looking for

9    better documentation of audit procedures that had been

10   performed, right?  Is that fair to say?

11   A.  The PCAOB's position has been they don't write comments

12   related to documentation only, so improving audit documentation

13   is important but the actual audit work that is done is what's

14   really important.

15   Q.  So is your testimony that you don't think the PCAOB was

16   looking for better documentation of audit procedures?

17   A.  If you believe the fact that the PCAOB does not write

18   comments related to documentation matters, they are focused on

19   the quality of the actual work that has been performed, and

20   then you document the work that you did.

21   Q.  Mr. Middendorf, you've talked a little bit about your

22   interviews in connection with the internal investigation of

23   PCAOB -- of KPMG, right?

24   A.  Correct.

25   Q.  One was on March 13, 2017?

1    A.   It sounds about right.  It was March.

2    Q.   In that interview, didn't you say you thought PCAOB was

3    looking for better documentation of audit procedures that had

4    been performed?

5    A.   I don't remember everything -- every detail I said in those

6    interviews.

7         MS. ESTES:  Mr. Cooney, can you pull for the witness,

8    the parties and the Court what's marked for identification as

9    Government Exhibit 602.

10        And if you could show pages 1 and 2 side-by-side.

11   Q.   Mr. Middendorf, I would like you to just read to yourself

12   the bottom paragraph on the first page here and then the end of

13   that paragraph on the second page, and let me know when you are

14   done.

15        (Pause)

16   A.   OK.

17   Q.   Mr. Middendorf, does that refresh your recollection as to

18   whether you told the attorneys in the internal investigation

19   that you thought in some instances the PCAOB was looking for

20   better documentation of audit practices that had been

21   performed?

22   A.   Yes.

23   Q.   So you did say that in the internal investigation, right?

24   A.   It appears so.

25   Q.   And you also said that that's partly why you were hiring

1   people from the PCAOB, right, to help with that?

2   A.  Yes.

3   Q.  To help with the documentation, right?

4   A.  Correct.

5        MS. ESTES:  Thank you, Mr. Cooney.  You can take that

6   down.

7   Q.  Now, Mr. Middendorf, your ultimate goal on these PCAOB

8   inspections, you wanted to avoid comments, right?

9   A.  Or just any inspection?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Because a comment, that's a deficiency in the audit, right?

13  A.  Correct.

14  Q.  So you don't want that, right?

15  A.  I would prefer not to have an issue.

16  Q.  And you thought better documentation might help avoid

17  comments, right?

18  A.  My view was take credit for the work that was performed and

19  maybe that avoids a comment, maybe it doesn't.

20  Q.  And taking credit for the work that was performed, that's

21  something you do in the documentation, right?  You do that in

22  the workpapers?

23  A.  Correct.

24  Q.  Now, Mr. Middendorf, KPMG had been doing poorly on PCAOB

25  inspections when you took on your role as head of the National

1    Office, right?

2    A.   Yes.  Trending worse.

3    Q.   There had been a lot of comments in particular in the

4    allowance area?

5    A.   Yes.

6    Q.   And part of your job in your new role was to turn things

7    around, right?

8    A.   My role was to improve audit quality, which, therefore,

9    should improve inspection results.

10   Q.   You did oversee the Inspections Group, right?

11   A.   Tom Whittle, who ran the Inspections Group, reported to me,

12   correct.

13   Q.   So you did also -- I mean, you always want to improve audit

14   quality, but you also want to do well on inspections, right?

15   That matters?

16   A.   To me improving audit quality does improve inspection

17   results.

18   Q.   You care, though, if you get comments from the PCAOB,

19   right?

20   A.   I care, yes.  I would like to have fewer comments from the

21   PCAOB.  I would think anybody at any firm, that would be their

22   goal.

23   Q.   And so, Mr. Middendorf, KPMG, I think part of the reason

24   they hired Brian Sweet was to help turn things around on the

25   inspections, right?

1    A.  I wouldn't use the word "turn things around" because that's

2    a job that's bigger than one individual; but, yes, we hired

3    Brian and others from the PCAOB because they knew how the PCAOB

4    thought, they knew how inspectors would think, and could help

5    engagement team perform better documentation and perform better

6    audit procedures.

7    Q.  And he was in the banking group, right?

8    A.  Brian Sweet, yes.

9    Q.  You thought he could also help with the allowance in

10   particular, right?

11   A.  Correct.

12   Q.  Now, Mr. Middendorf, I want to take just a few minutes to

13   talk about the inspection process.

14           You testified yesterday about your experience with an

15   inflight inspection by the PCAOB; do you remember that?

16   A.  Yes.

17   Q.  And that was where I think you said it was J.C. Penney,

18   right?

19   A.  Yes.

20   Q.  And they were looking at your audit as you were actually

21   doing it, when it was live, right?

22   A.  The PCAOB, yes.

23   Q.  And is it fair to say that this inflight inspection was

24   unusual?

25   A.  Yes.

1   Q.  So the typical process is you are notified by the PCAOB a

2   few weeks in advance of the inspection, isn't that right?

3   A.  Yes, that is the typical process.

4   Q.  They send a notice to Meredith Hardisty?

5   A.  Yes.

6   Q.  She is at KPMG?

7   A.  Yes.

8   Q.  And then she notifies the Inspections Group, right?

9   A.  I believe she was in the Inspections Group.  She reported

10  up through Mr. Whittle.  I don't think she reported to him.

11  Q.  But she, when she receives the notice, she tells others in

12  KPMG, right?

13  A.  Correct.

14  Q.  And this notification you get from the PCAOB, it's normally

15  after the workpapers were closed, right?

16  A.  Normally, yes.

17  Q.  That's after the 45-day documentation period ends, right?

18  A.  Correct.

19  Q.  And when that documentation period ends, the eAudIT files

20  are locked, right?

21  A.  Correct.

22  Q.  So at that point you can't go back in and make other

23  changes to the workpapers?

24  A.  Correct.

25  Q.  So that's when you typically get notice, when you can't

1    make any changes to the workpapers, right?

2    A.  Yes.

3    Q.  Now, Mr. Middendorf, you testified a little bit about lunch

4    with Mr. Sweet on his first day.

5    A.  Yes.

6    Q.  You testified it was at Avra, right?

7    A.  That's what the calendar invitation said.

8    Q.  And I believe you testified there weren't that many

9    pleasantries because people kind of already knew him, right?

10   A.  That's my recollection.

11   Q.  David Britt already knew him?

12   A.  Yes.

13   Q.  So you basically went right into talking shop with him,

14   right?

15   A.  Not sure how you define "shop."

16   Q.  So you talked to him about the PCAOB, right?

17   A.  Yeah, we talked to him about his experiences at the PCAOB.

18   Q.  And you talked about his experiences on inspections, right,

19   generally speaking?

20   A.  I'm not sure I understand the question, experiences on

21   inspections.

22   Q.  Well, at the PCAOB he was in the Inspections Group, right?

23   A.  Correct.

24   Q.  Now, you testified earlier that you told him you didn't

25   want him to violate any confidentiality restrictions, right?

1    A.  Yes.

2    Q.  So you understood he had those from his job at the PCAOB,

3    is that right?

4    A.  I knew as a former PCAOB employee he had restrictions.  I

5    did not know the details of those restrictions.

6    Q.  You understood he was still bound by them after he left the

7    PCAOB, right?

8    A.  I knew he had restrictions.  I did not know what those

9    restrictions were or how long he was bound by those

10   restrictions.

11   Q.  Generally speaking, you understood there were things he

12   couldn't talk to you about; is that fair to say?

13   A.  Yes.

14   Q.  Things that if he told you, he'd be in violation of PCAOB

15   rules, right?

16   A.  Yes.

17   Q.  Now, Mr. Middendorf, as to the PCAOB's inspection list,

18   KPMG never got a full list of engagements that would be

19   inspected in advance from the PCAOB, right?

20   A.  Not to my knowledge.

21   Q.  Nothing that had the issuer names listing them all out,

22   right?

23   A.  Not to my knowledge.

24   Q.  You would get a few a week during inspection season; is

25   that fair to say?

1    A.   Correct.

2    Q.   And that was on a rolling basis?

3    A.   Yes.

4           MS. ESTES:   Mr. Cooney, can you pull Defense Exhibit

5    M42.   And if you could zoom into the text.

6    Q.   Now, Mr. Middendorf, you testified yesterday and a little

7    today that sometimes you get this inspection schedule from the

8    PCAOB and you can make some determinations about what's going

9    to be inspected, right?

10   A.   Yes.

11   Q.   You would agree with me, there are no issuer names on this

12   inspections schedule you get from the PCAOB, right?

13   A.   There are not client names on this list.

14   Q.   So you have some of the cities that are going to be

15   inspected, is that right?

16   A.   Yes.

17   Q.   Sometimes it tells you it is financial services?

18   A.   Yes.

19   Q.   Sometimes broker-dealer?

20   A.   Yes.

21   Q.   Sometimes nothing, right?

22   A.   Yes.

23          MS. ESTES:   So, Mr. Cooney, if you could highlight the

24   second one on 6/15, just that row there.

25   Q.   So here, Mr. Middendorf, all you know is that there is

1  going to be an inspection in New York on the week of June 15th,

2  right?

3  A.  Correct.

4  Q.  So there is no way to predict based on this, for example,

5  like what's going to be inspected, right?

6  A.  For a large office like New York, correct.

7  Q.  So fair to say that for most of these you are not able to

8  predict what's actually going to be inspected, right?

9  A.  I would say there are -- depending on the size of the

10  office and the number of clients, public clients, number of

11  financial institutions, you may be able to determine but not

12  for a majority of those on the list.

13        MS. ESTES:  Thank you, Mr. Cooney.  You can take that

14  down.

15  Q.  And you testified you never got the full issuer list in

16  advance, and you never asked for that full list, right?

17  A.  Which list?

18  Q.  The list of issuers who were going to be inspected.

19  A.  Correct.

20  Q.  It would be kind of silly to ask for the list, right?

21  A.  Ask who?

22  Q.  The PCAOB.

23  A.  Yes, I never asked them for the full list.

24  Q.  That's not the way the inspection process was designed,

25  right?

1    A.  I don't know how the inspection process was designed.

2    Q.  But in your experience, you only get them on a rolling

3    basis throughout the year, right?

4    A.  Correct.

5    Q.  And only after the workpapers are closed down, right?

6    A.  Typically.

7            MS. ESTES:  Mr. Cooney, can you pull up what's in

8    evidence as Government Exhibit 754.  And if you could zoom into

9    the top email here.

10   Q.  Now, Mr. Middendorf, you testified a little bit about this

11   on your direct examination, right?

12   A.  Yes.

13   Q.  The date of this email, 5/8/2015, this is Brian Sweet's

14   first week of work, right?

15   A.  Correct.

16   Q.  And the subject line there, it says:  "Forward:  From Brian

17   Sweet," right?

18   A.  Yes.

19   Q.  Now, your testimony on direct was that you didn't recall

20   this email until a later interview in the internal

21   investigation, is that right?

22   A.  Correct.

23   Q.  And this is an email from Thomas Whittle, right?

24   A.  Yes.

25   Q.  One of your direct reports?

1    A.  Yes.

2    Q.  And in the email, he says:  "The complete list."

3         Do you see that?

4    A.  Yes.

5    Q.  He says:  "Obviously, very sensitive.  We will not be

6    broadcasting this."

7         And your testimony is you don't remember seeing this

8    email from one of your direct reports?

9    A.  Correct.

10   Q.  Isn't this email a little unusual, fair to say?

11   A.  I just have no recollection of receiving the email.

12   Q.  No recollection of seeing an email saying it contains very

13   sensitive information during the first week of Brian Sweet's

14   work, right?

15   A.  Correct.

16         MS. ESTES:  Now, Mr. Cooney, if you could pull up

17   Government Exhibit 806.  And if you could zoom into the top

18   part of this email.

19   Q.  So, Mr. Middendorf, you also testified about this email on

20   your direct examination, right?

21   A.  Yes.

22   Q.  From Brian Sweet in June 2015?

23   A.  Yes.

24   Q.  And I think you testified that the first sentence there,

25   you didn't see anything unusual about the first sentence,

1    right?

2    A.   Correct.

3         MS. ESTES:  Mr. Cooney, could you highlight the second

4    sentence.

5    Q.   Now, Mr. Middendorf, where it says, "This list represents

6    the PCAOB's view of the higher-risk banking audits based on the

7    attributes ("flags") it uses to evaluate and so these were

8    next-in-line for inspection this year," that's an unusual

9    sentence, right?

10   A.   I don't know if I would call it unusual.

11   Q.   Sweet's telling you about PCAOB's flags it uses to evaluate

12   those that are in line for inspection, right?

13   A.   Yes.

14   Q.   And you understand that the flags are things that the PCAOB

15   uses to rate whether things should be inspected, essentially,

16   right?

17   A.   Yes.  I would say there were conversations around flags in

18   general within the National Office.

19   Q.   And in your experience, the PCAOB doesn't come out and tell

20   you what the flags are, right?

21   A.   No.

22   Q.   So Sweet is telling you what PCAOB flags are for certain

23   banking selections, right?

24   A.   "Higher risk banking audits based on the attributes

25   ("flags") it uses to evaluate."  Yes.

1   Q.  And the PCAOB doesn't tell you those flags because that's

2   confidential information, right?

3   A.  I think there was a view that we knew a lot of the flags

4   that the PCAOB would focus on.  I don't know if we thought we

5   knew them all.

6   Q.  So you thought you could guess the flags; is that what

7   you're saying?

8   A.  Not all but I think there are lots of items we knew that

9   were flags -- flying in partners, partners who had quality

10  incidents in the past, changes in management at a company,

11  impairment charges at a company, etc.  So there were a lot of

12  things that we knew could potentially cause an audit to have a

13  higher risk of inspection.

14  Q.  But this sentence here, this isn't -- this isn't saying

15  KPMG's view of the flags, right?

16  A.  Correct.

17  Q.  Sweet's telling you the PCAOB's view, right?

18  A.  Correct.

19  Q.  And where it says "next-in-line for inspection,"

20  Mr. Middendorf, you understand that what the PCAOB views as

21  next-in-line for inspection, that would be confidential, right?

22  A.  Was this in Brian Sweet's head?  I don't know what that

23  sentence meant.

24  Q.  Putting aside what's in Brian Sweet's head, the PCAOB's

25  view of what is next-in-line for inspection, that's something

1    that's confidential to the PCAOB, right?

2    A.  I guess it depends on where he got that information from

3    next-in-line for inspection.

4            MS. ESTES:  Now, Mr. Cooney, if you could pull up

5    Government Exhibit 754 again.

6    Q.  Now, Mr. Middendorf, you testified you didn't recall this

7    document, but if you had the PCAOB inspection list, the

8    complete list, you would understand that was confidential PCAOB

9    information, right?

10   A.  Yes.

11   Q.  That that's information you shouldn't have, right?

12   A.  Correct.

13           MS. ESTES:  Your Honor, this might be a good time for

14   a break.

15           THE COURT:  OK.  It is 1 o'clock.  We will take an

16   hour for lunch, ladies and gentlemen.

17           Just to remind you, you are not yet deliberating so

18   you are not discussing the case.

19           We'll take one hour.  Please leave your notepads on

20   your chairs, and we'll start back at 2 o'clock.

21           Have a good lunch.

22           (Continued on next page)

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down.

3          And you may be seated in the courtroom.

4          Anything you all wanted to address before we break?

5          MS. MERMELSTEIN:  No, your Honor.

6          THE COURT:  OK.  Have a good lunch.

7          (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **A F T E R N O O N   S E S S I O N**

2                              2:09 p.m.

3          (Jury present)

4          THE COURT:  You may be seated.

5          Good afternoon, ladies and gentlemen.

6          JURORS:  Good afternoon, your Honor.

7          THE COURT:  Welcome back.

8          We are continuing with the cross-examination.

9          Ms. Estes, you may proceed

10   DAVID MIDDENDORF,

11        Resumed, and testified further as follows:

12   CROSS-EXAMINATION (Resumed)

13          MS. ESTES:  Mr. Cooney, could you bring up again

14   Government's Exhibit 754.

15   BY MS. ESTES:

16   Q.  Now, Mr. Middendorf, you were testifying about this before

17   the lunch break, right?

18   A.  Yes.

19   Q.  And I believe you testified before the lunch break that if

20   you had gotten the inspection list from the PCAOB, that would

21   not be OK, right?

22   A.  Correct.

23   Q.  Because that would be confidential information?

24   A.  Correct.

25          MS. ESTES:  And, Mr. Cooney, can you go to the second

1    page here.

2    Q.  Mr. Middendorf, you testified you don't recall the email.

3            Do you have any recollection of the attachment here?

4    A.  No, only prep for trial.

5    Q.  So you don't recall the email, you don't recall the

6    attachment, but I believe you testified on your direct

7    testimony you remembered some things like when Tom Whittle had

8    the flu, right?

9    A.  Correct.

10   Q.  You remembered he couldn't make a call because he had the

11   flu?

12   A.  Correct.

13           MS. ESTES:  Mr. Cooney, can you go back to the first

14   page.

15   Q.  So you don't remember getting this email where Whittle

16   says, "Very sensitive information," right?

17   A.  No, I do not.

18           MS. ESTES:  All right.  Mr. Cooney, can we pull up

19   what's in evidence as Government Exhibit 824.  And if you could

20   zoom into the whole email, please.

21   Q.  Now, Mr. Middendorf, this is an email from Brian Sweet, and

22   you're one of the people cc'ed on the email, right?

23   A.  Yes.

24   Q.  And it's October 20, 2015?

25   A.  Yes.

1   Q.  And in the first line of the email, Sweet says:  "I got a

2   call from an old colleague over the weekend and they let me

3   know a decision has been made to inspect a 'big bank' in both

4   the Switzerland and Japan next year (so obviously Credit Suisse

5   and Sumitomo)."

6           Do you remember getting this email?

7   A.  Yes, I do.

8   Q.  And when you got this email, you understood that "an old

9   colleague" that Sweet was referring to, that that meant

10  somebody from the PCAOB, right?

11  A.  Yes.

12  Q.  And when he says "a decision has been made to inspect a

13  'big bank,'" you understood he's referring to a PCAOB decision,

14  right?

15  A.  Yes.

16  Q.  So you would agree this is advance notice of a PCAOB

17  inspection, right?

18  A.  Yes.

19  Q.  That Sweet got from somebody in the PCAOB?

20  A.  Yes.

21  Q.  And this was October 2015, right?

22  A.  Yes.  That's the date of the email.

23  Q.  And just to be clear, this advance notice, this is also

24  confidential PCAOB information, right?

25  A.  I would view this email more along the lines of gossip.

1   Q.  So your testimony is you view it as gossip because it

2   relates to a single inspection; is that fair?

3   A.  Just a call from an old colleague over the weekend, just

4   somebody who has got a connection.

5   Q.  So where it says "they let me know a decision has been made

6   to inspect," is your testimony that the PCAOB's inspection,

7   like what they decide to inspect, that that's gossip?  Is that

8   your testimony?

9   A.  My testimony is as I read this email, it appeared to me

10  that it was gossip.

11  Q.  So you didn't -- you didn't report this email in any way,

12  then, right?

13  A.  No.

14  Q.  Because you believed it was gossip?

15  A.  Yes.

16  Q.  Information on the PCAOB's decision making?

17  A.  Yes.

18  Q.  That was your testimony?

19  A.  Yes.

20  Q.  Now, Mr. Middendorf, I want to talk about the Standing

21  Advisory Group.  You testified a little about that on direct.

22  Do you remember that?

23  A.  Yes.

24          MS. ESTES:  And, Mr. Cooney, could you pull up

25  Government Exhibit 29.

1    Q.  Now, Mr. Middendorf, as part of your membership in the

2    Standing Advisory Group, you had to sign this document, right?

3    A.  Yes.

4              MS. ESTES:  And, Mr. Cooney, if we could go to the

5    first page, and let's zoom into Section E there at the bottom.

6    Q.  Now, this document says, "Members of this group shall

7    comply with EC3, EC(a) and EC9."  That's what the document

8    says, right?

9    A.  Yes.

10   Q.  And you understand EC9 to refer to a provision in the

11   Ethics Code about the nondisclosure of confidential

12   information, right?

13   A.  When I signed this document, I assumed I was shown EC3,

14   EC(a) and EC9, but until I was preparing for trial I didn't

15   have a recollection of what EC9 was.

16   Q.  So you don't remember specifically being told -- you don't

17   remember exactly what EC9 is, right?

18   A.  I didn't remember until preparing for trial and it was

19   shown to me.

20   Q.  So you signed the documentation, you complied, right?

21   A.  Correct.

22   Q.  But you didn't actually digest what the provisions mean; is

23   that your testimony?

24   A.  I don't remember what I was shown when I signed this

25   document.

1  Q.  Do you remember somebody briefing you on ethics before you

2  signed the document?

3  A.  No.

4  Q.  You remember Ms. Hannigan testifying, right?

5  A.  I do.

6  Q.  Do you remember her talking about briefing people on ethics

7  before she gives them this document?

8  A.  I do remember that testimony.

9  Q.  And you don't have a memory of that briefing; is that your

10  testimony?

11  A.  I do not.

12        MS. ESTES:  All right.  Let's go to page 3 of the

13  document.  And, Mr. Cooney, if you could zoom into the top.

14  Q.  Now, Mr. Middendorf, that's your name there, right?

15  A.  Yes.

16  Q.  And so in connection with your membership, you agree to

17  various provisions, right?

18  A.  Yes.

19        MS. ESTES:  And, Mr. Cooney, if you could go to H.

20  Q.  So one of the things you agreed to is that you would be

21  bound by EC9, right?

22  A.  Yes.

23        MS. ESTES:  And, Mr. Cooney, please go to the bottom.

24  Q.  You signed the document, so you agreed to that, right?

25  A.  Yes, I did.

1   Q.  To be bound by that provision in the PCAOB's Ethics Code?

2   A.  Yes.

3   Q.  And that's your signature right there?

4   A.  That is my signature.

5   Q.  And that's -- it is 11/30/15.  That's the date, right?

6   A.  Yes.

7         MS. ESTES:  Now -- Mr. Cooney, you can take this down.

8   Q.  Now, Mr. Middendorf, switching gears a little bit.

9         In February 2016, I believe you testified you

10  participated in meetings with the SEC about inspection results,

11  is that correct?

12  A.  I participated in meetings with the SEC.  I think there was

13  an agenda item about inspection -- PCAOB relationships or

14  inspection results.  I don't remember the exact details.

15  Q.  You heard Mr. Bricker testify about this in his testimony,

16  right?

17  A.  Yes.

18  Q.  He called one of the meetings with the SEC a "come to

19  Jesus" meeting?

20  A.  I do remember him referring to it that way.  I don't think

21  we at KPMG referred to it that way.

22  Q.  He testified that's how he called it, right?

23  A.  Yes.

24  Q.  And then in one of the meetings Jim Schnurr was in the

25  meeting, the Chief Accountant at the SEC, right?

1    A.  Yes.

2    Q.  Mary Jo White, Commissioner of the SEC, was in one of the

3    meetings?

4    A.  Yes.

5    Q.  You were there with other leaders from your office, right?

6    A.  Yes.

7            MS. ESTES:  Mr. Cooney, can you please pull up

8    Government Exhibit 318, and if you could zoom into the top.

9    Q.  Now, Mr. Middendorf, this was the proposed agenda for the

10   meeting, right?

11   A.  Yes.

12           MS. ESTES:  Mr. Cooney, could you highlight the bottom

13   line there.

14   Q.  Mr. Middendorf, can you read that line?

15   A.  "PCAOB - Relationship and Inspection results (Doughtie,

16   Marcello and Middendorf)"

17   Q.  Your testimony on direct is that you don't remember any

18   aspect -- you don't remember this part of the meeting, right?

19   A.  I do not.

20   Q.  You don't remember talking about inspection results?

21   A.  I do not.

22   Q.  And that's your name in the parentheses there, right?

23   A.  That is my name.

24   Q.  So this is one of the topics that you were going to be

25   involved in covering, right?

1    A.  Yes, if it was covered.

2                MS. ESTES:  One moment.

3                (Pause)

4                All right.  Mr. Cooney, can you pull up what's been

5    marked, just for -- actually, what's in evidence as Government

6    Exhibit 307.

7                Oh, it's marked for identification.  I'm sorry.

8    Please, not for the jury.

9                And, Mr. Cooney, if you could page through the

10   document a little bit.

11               (Pause)

12               And if you could, starting at page 2, if you could put

13   up page 3 side-by-side?

14               MR. BOXER:  I object, your Honor.  It is not in

15   evidence.  There is no question about the document.

16               MS. ESTES:  Your Honor, I believe the witness

17   testified he didn't remember, and I was trying to refresh his

18   recollection with this.

19               MR. BOXER:  That's fine if that is the question.

20               THE COURT:  OK.

21               (Pause)

22   BY MS. ESTES:

23   Q.  Mr. Middendorf, starting from the bottom of page 2, can you

24   read to yourself page 2?

25               MS. ESTES:  Mr. Cooney, if you could take that down.

1    Q.  If you could read to yourself starting from the bottom

2    paragraph on page 2 through the end of page 3 and let me know

3    when you're done.

4              (Pause)

5    A.  To the bottom of page 3?

6    Q.  Yes.

7    A.  OK.

8    Q.  Mr. Middendorf, does that refresh your recollection that

9    you talked about inspection results at this meeting?

10   A.  Could you go back to page 1 for just a second?

11             (Pause)

12             So this appears to me to be an internal --

13   Q.  Mr. Middendorf, I don't want any testimony about what the

14   document is.

15             If you could just tell me, looking at this document,

16   does that refresh your recollection, yes or no?

17   A.  I do not have a recollection of talking about all of these

18   items.

19   Q.  Thank you.

20             MS. ESTES:  Mr. Cooney, you can take that down.

21   Q.  Now, Mr. Middendorf, turning to 2016.

22             So you testified today that in 2016, in March, Tom

23   Whittle first told you that Brian Sweet had predictions of what

24   engagements would be inspected in 2016, is that right?

25   A.  Yes.

1  Q.  Then Whittle asked for access to the audit files to clean

2  up the workpapers, is that right?

3  A.  Asked for access based on the discussion around

4  predictions?  I don't recall if he asked for access at that

5  point in time.

6  Q.  Just clarify it, then.  When did he ask for the access?

7  A.  I don't recall.

8  Q.  OK.  But after the predictions, the discussion about that,

9  you learned that Sweet actually had confidential information on

10  inspections from the PCAOB, right?

11  A.  Yes.

12  Q.  That he had gotten a list of certain engagements that were

13  actually going to be inspected, right?

14  A.  I don't know if he got a list.  He got information.

15  Q.  About ten engagements, information on about ten of them?

16  A.  Correct.

17  Q.  And I think you testified you learned this from

18  Mr. Whittle, right?

19  A.  Yes.

20  Q.  And he told you he had gotten it, the information, from

21  Brian Sweet?

22  A.  Correct.

23  Q.  And that Brian Sweet had gotten it from inside of PCAOB,

24  right?

25  A.  He just said from someone at the PCAOB.

 1    Q.   Some anonymous person?

 2    A.   I never knew who.

 3    Q.   And your understanding is that the information, these were

 4    certain engagements that were going to be selected for

 5    inspection, right?

 6    A.   I'd say potentially inspected.

 7    Q.   This was information you -- you said "potentially."  You

 8    didn't understand these were actually going to be inspected?

 9    A.   My recollection is it was potential inspections, but I

10    assumed they were going to be inspected.

11    Q.   You assumed it because it came from inside the PCAOB,

12    right?

13    A.   Correct.

14    Q.   And this was information you wouldn't normally have this

15    time of year, right?

16    A.   Correct.

17    Q.   Someone doesn't just call you up and tell you, hey, these

18    are the ten banks we're going to select this year, right?

19    A.   Yes.

20    Q.   You don't get an email listing all of certain banking

21    engagements that are going to be selected, right?

22    A.   Not that I'm aware of.

23    Q.   I think you testified earlier, you usually get it on a

24    rolling basis, right?

25    A.   Correct.

1    Q.  And not from some anonymous person at the PCAOB, right?

2    A.  Correct.

3    Q.  There is a formal notification process.  It goes to

4    Meredith Hardisty, right?

5    A.  Correct.

6    Q.  So even though you got this confidential information from

7    the PCAOB, you authorized acting on it, correct?

8    A.  Yes.

9    Q.  You authorized Sweet and others to go back into the

10   workpapers, right?

11   A.  Yes.

12   Q.  To look at the documentation?

13   A.  Yes, to review documentation.

14   Q.  And to change it, if necessary, right, to fix it?

15   A.  They would suggest changes, edits, for the engagement team

16   to consider, and the engagement partner ultimately makes that

17   decision.

18   Q.  But the whole purpose, right, is if there were changes to

19   be made and the engagement partner agreed, they would make

20   those changes, right?

21   A.  Yes.

22   Q.  To make the documentation look better?

23   A.  To clarify the documentation.

24   Q.  So you're saying it was just to clarify the documentation?

25   A.  Clarifications, edits, suggested edits.  I didn't review

1    those workpapers, but from prepping for trial that's what I'm

2    aware of.

3    Q.  But it's your understanding the whole point of this was to

4    make the documentation look better to the PCAOB, right?

5    A.  The purpose was to take credit for the work that had been

6    performed before the report release date, and if that resulted

7    in avoiding an inspection comment, it could.

8               (Continued on next page)

1   Q.  The purpose for taking credit, just to be clear, was

2   because you wanted to do better on inspections, right, by

3   taking credit for the work?

4   A.  It could result in avoiding comments in an inspection to

5   reduce the number of comments.

6   Q.  You're saying you were doing this on the off chance it

7   would result in that?  Are you saying that's what you were

8   hoping would happen, right?

9   A.  Hoping that it would reduce comments?

10  Q.  Yes.

11  A.  Yes.

12  Q.  That was why you wanted to do it?

13  A.  That is not the sole purpose.  The sole purpose is our

14  engagement teams I felt were doing high-quality work.  If they

15  were doing high-quality work but because their documentation

16  wasn't clear, whatever it was, they would get a comment to help

17  them be clearer in their documentation.

18  Q.  To be clear, Mr. Middendorf, you didn't do this for

19  engagements that were not on the list, right?  You didn't do

20  this for every engagement of the firm?

21  A.  Correct.

22  Q.  This was focused on ones where you had inside information

23  the PCAOB was going to inspect them, right?

24  A.  Yes.

25  Q.  That was what you were looking at?

1   A.   Those were the engagements that were re-reviewed.

2   Q.   So you gave more resources to those engagements?

3   A.   We did not give more resources to the engagement team.   We

4   used resources to complete the re-reviews.

5   Q.   Resources from the national office went to those audits,

6   right?

7   A.   Yes.

8   Q.   To make them look better?

9   A.   To clarify the documentation of work that was already done.

10  Q.   I think you testified the whole point of clarifying this is

11  you're trying to look better in the inspections to avoid

12  comments if possible, right?

13              MR. BOXER:   Objection: asked and answered.

14              THE COURT:   Sustained.

15  Q.   Mr. Middendorf, you understood that the people from the

16  national office spent a lot of hours working on these

17  workpapers, right?

18  A.   I don't know how much time was spent on this.

19  Q.   The plan was for them to go through the workpapers

20  carefully, right?

21  A.   In certain areas.

22  Q.   Areas like the allowance?

23  A.   Yes.

24  Q.   You knew that was an area that the PCAOB had given you a

25  lot of comments on, right?

1   A.  Yes.

2   Q.  You wanted to make sure the workpapers on the allowance

3   were perfect, right?

4   A.  I don't think there is a perfect set of workpapers.

5   Q.  You wanted to make them as good as they could possibly be?

6   A.  Following audit standard 3, what the review team could do

7   to help clarify, suggest edits, to make the workpapers as clear

8   as they could be of the work that had been performed.

9   Q.  To be clear again, a lot of engagements that you audit

10  cover the allowance, right?

11  A.  Yes.

12  Q.  This re-review is only focused on the ones the PCAOB was

13  going to inspect, right?

14  A.  The information that came from or through Mr. Sweet.

15  Q.  Right.  You weren't looking at the allowance in this

16  re-review more broadly, right?

17  A.  Correct.

18  Q.  Mr. Middendorf, the timing on this authorization you gave

19  to act on these workpapers, this was just a few months after

20  that December 2015 board meeting you talked about in your

21  direct examination, right, the meeting with the PCAOB?

22  A.  The PCAOB board meeting in December was 2014.

23  Q.  I believe there was a meeting where you talked about how

24  the PCAOB was challenging your tone at the top, right?

25  A.  Yes.  I believe that was December of 2014.

1   Q.  You said they attacked you.  That was your testimony on

2   direct?

3   A.  Board member Stephen Harris came out pretty harsh.

4   Q.  After that, you authorized acting on this information,

5   right?

6   A.  Are we talking about March of 2016?

7   Q.  You say in general, after criticism from the PCAOB, you

8   authorized acting on confidential PCAOB information, right?

9   A.  I would not link those two together, because they are 15

10  months apart.

11          MS. ESTES:  Mr. Cooney, if you could pull up what is

12  in evidence as Government Exhibit 954.  Zoom in to the email

13  there.

14  Q.  Mr. Middendorf, you received this email, right?

15  A.  Yes, I did.

16  Q.  At the time you received this email, you understood you had

17  confidential information from the PCAOB, right?

18  A.  Yes.

19  Q.  This was past the point where you thought they were just

20  predictions.  This is where you learned Brian Sweet had that

21  source at the PCAOB, right?

22  A.  Yes.

23  Q.  Reading the text of the email here -- first, in the "to"

24  line, who are in general the people that this email is

25  addressed to?

1   A.   I believe it is the engagement partners of the clients

2   listed below on this email.

3   Q.   In the text of the email there is no reference to getting

4   confidential information from the PCAOB, right?

5   A.   No.

6   Q.   Nothing in the email says the firm has received engagement

7   names from an anonymous source at the PCAOB there, right?

8   A.   No, it does not.

9   Q.   And it doesn't say anything about knowing that certain

10  engagements on this email will be inspected, right?

11  A.   No, it does not.

12  Q.   You didn't talk to any of the engagement partners on this

13  email about the information you had, did you?

14  A.   No, I did not.

15  Q.   You didn't tell them you had the confidential information

16  from the PCAOB?

17  A.   No, I did not.

18  Q.   Only a few people knew about this confidential information,

19  right?

20  A.   Correct.

21  Q.   Tom Whittle, David Britt, Brian Sweet, Scott Marcello, and

22  you?

23  A.   There may have been a few others, but yes, I would say that

24  would be correct.

25  Q.   Anyway, it was a small core group, right?

1   A.   Yes.

2   Q.   You didn't want this information to be widely broadcast?

3   A.   Correct.

4           MS. ESTES:   Mr. Cooney, if you could go to the second

5   page of this email.  Actually, if you could put pages 1 and 2

6   side by side and zoom in to the clients there.

7   Q.   Mr. Middendorf, the engagements listed on this email, this

8   is far greater than the number that were actually going to be

9   reviewed by Sweet and his team, is that right?

10  A.   Yes.

11  Q.   I believe you testified you had only gotten information on

12  about ten engagements, right?

13  A.   That sounds about right.

14  Q.   Not even all of those were banking engagements, right?

15  A.   Correct.

16          MS. ESTES:   If we can go back to the first page of the

17  email and zoom in to the text.

18  Q.   Mr. Middendorf, where it says, "As part of our wrap-up and

19  reporting of the results of the ALLL monitoring program, we

20  need to gather some information from the eAudit files of your

21  engagements that participated in the ALLL monitoring program

22  and we are going to ask for these people to get access."

23          They are not getting access to all of the engagements

24  on the list, right?

25  A.   No, they are not.

1  Q.  They were only going to get access to those few where you

2  had inside information that were going to be inspected, right?

3  A.  Correct.

4  Q.  Wouldn't you agree with me this email is a little

5  misleading, right?

6  A.  Yes.

7  Q.  Because it suggests that there are going to be re-reviews

8  of every engagement on those first and second pages, right?

9  A.  It doesn't say re-reviews.  But yes, it indicates something

10 would be done on all of those engagements.

11 Q.  Mr. Middendorf, in general, the ALLL program wasn't

12 designed typically to extend into the documentation period,

13 right?

14 A.  It was referred to as a pre-issuance monitoring program,

15 and pre-issuance would be before the report release date.

16 However, I would say all of the monitoring program's

17 documentation wrap-up would roll into the documentation

18 completion period.

19 Q.  But generally, the resources from the national office that

20 go into this monitoring program, most of the work they do is

21 before the opinion is released, is that fair to say?

22 A.  Correct.

23 Q.  You heard testimony from Diana Kunz about Hector Santana

24 working on her audit before the opinion was released, right?

25 A.  Correct.

1   Q.  Mr. Middendorf, looking at this email, you testified it's

2   misleading.  In fact, it is really an outright lie, isn't that

3   fair to say?

4   A.  It is not truthful.

5   Q.  This was sent by David Britt, one of the people in your

6   core group, is that right?

7   A.  Yes.

8   Q.  As to the people in that group, Tom Whittle reports to you,

9   right?

10  A.  Yes.

11  Q.  David Britt, his boss reports to you, right, Britt's boss's

12  boss, is that right?

13  A.  Yes.

14  Q.  As to these reviews, there was a larger group involved in

15  the reviews, right?

16  A.  Yes.

17  Q.  Some of the other people from the national office were on

18  this email, right?

19  A.  Are you referring to the list of names kind of in the

20  middle?

21  Q.  Yes.

22  A.  Yes.

23  Q.  You kept them in the dark, some of these people, about the

24  real reason you were doing your reviews, right?

25  A.  I don't believe I talked to any of these people who

1    performed the re-reviews.

2    Q.  There was an understanding you weren't going to, the group,

3    the core group, was not going to tell them that the reviews

4    were being done based on confidential information, right?

5    A.  Correct.

6    Q.  You didn't want them to know, right?

7    A.  Correct.

8    Q.  You thought maybe somebody would report it if they knew,

9    right?

10   A.  Not **sure**.

11   Q.  That thought never crossed your mind, that's your

12   testimony?

13   A.  Just not sure.

14            THE COURT:  Did you say not sure?

15            THE WITNESS:  Not sure.

16            THE COURT:  You didn't say not true?

17            THE WITNESS:  Not sure, S-U-R-E.

18            THE COURT:  I just wanted it to be clear for the

19   record.

20            MS. ESTES:  We can take that down.

21   Q.  Mr. Middendorf, let's go back to the ten engagements.  Some

22   of the engagements you got information on in 2016 were not

23   banks, right?

24   A.  Correct.

25   Q.  There were some engagements that are not in the ALLL

1  monitoring program, right?

2  A.  Correct.

3  Q.  There was Bon Ton, AMBAC, is that right?

4  A.  Correct.

5  Q.  Fidelity and Macquarie, right?

6  A.  Yes.

7  Q.  Let's pull up Government Exhibit 950.  I think you

8  testified about it on direct.  Mr. Middendorf, these emails are

9  about Bon Ton, right?

10  A.  I believe so.

11  Q.  The bottom one is dated March 28, 2016.

12  A.  Yes.

13  Q.  It's Tom Whittle to you, right?

14  A.  Yes.

15  Q.  In the subject line just says "Retailer," right?

16  A.  Yes.

17  Q.  Then Whittle says, "The SEC RP changed on the retailer docs

18  on the proceeding," right?

19  A.  Yes.

20  Q.  Then if we can go to the email right above that.  You just

21  respond, "Who is the new EQCR," right?

22  A.  Yes.

23  Q.  When you just said retailer, you knew exactly what he was

24  talking about, right?

25  A.  Yes.

1   Q.  You knew he was talking about Bon Ton?

2   A.  Yes.

3   Q.  You had discussed it because you had this inside

4   information on the PCAOB, right?

5   A.  Yes.

6   Q.  That's why Bon Ton was on your radar in March 2016?

7   A.  Correct.

8           MS. ESTES:  Mr. Cooney, if we can pull up Government

9   Exhibit 949.

10   Q.  Mr. Middendorf, you also testified about this email on

11   direct, right?

12   A.  Yes.

13   Q.  I think you said that this email refers to Fidelity, right?

14   A.  Yes.

15   Q.  Another company on this list from the PCAOB?

16   A.  Yes.

17   Q.  In this email Whittle is saying that Fidelity is not an FS

18   company, it's a tech company, right?

19   A.  Correct.

20   Q.  "FS" is financial services?

21   A.  Yes.

22   Q.  After learning that Fidelity was on this list, you asked

23   Tom Whittle to do research on it, right?

24   A.  I don't recall that just because I knew what Fidelity was.

25   I knew it was not an FS company.

1  Q.  Where he says with "respect to the 10-K research you

2  requested," your testimony is that is not in response to a

3  request you made?

4  A.  It probably is.  I just said I understood that Fidelity was

5  not a financial services company.

6  Q.  In general, in this email you are taking action, you are

7  doing some research based on the information you have from the

8  PCAOB, right?

9  A.  Yes.

10 Q.  Because you are worried this is going to be inspected,

11 right?

12 A.  It was on the list.

13 Q.  Mr. Middendorf, you ultimately reached out to Fidelity, is

14 that right?

15 A.  I believe I reached out to the engagement partner on

16 Fidelity.

17 Q.  That was Steve McMullen?

18 A.  Yes.

19 Q.  You asked McMullen to grant access to somebody on Whittle's

20 team so they could access the workpapers, right?

21 A.  I don't remember the details of the call, but yes,

22 essentially asked to get access to the file.

23 Q.  You wanted somebody from the national office to go in, look

24 at the documentation, and see if there was anything to clean it

25 up, right?

1    A.   Yes.

2    Q.   So you could do better on an inspection?

3            MR. BOXER:  Objection: asked and answered.

4            THE COURT:  Overruled.

5    A.   Once again, purpose was to take credit for the work that

6    had been done prior to the report release date, and if it

7    avoids a comment, that's great, but not it is not a guarantee

8    that it would.

9    Q.   You've rehearsed that line a lot, haven't you, Mr.

10   Middendorf?

11           MR. BOXER:  Objection.

12           THE COURT:  Sustained.

13           MS. ESTES:  Mr. Cooney, if you could pull up what is

14   in evidence as Government Exhibit 951.

15   Q.   Mr. Middendorf, I believe you also testified about these

16   emails on direct, right?

17   A.   Yes.

18   Q.   These are emails on March 29, 2016, between you and Mathieu

19   Mount, Wright?

20   A.   Yes.

21   Q.   He was the lead partner on Macquarie in 2016?

22   A.   I believe so.

23   Q.   Macquarie is on your radar this month because it is on the

24   confidential list from the PCAOB, right?

25   A.   Yes.

1   Q.  Going to the top email there, this is from you to Tom

2   Whittle, right?

3   A.  Yes.

4   Q.  You say, "Please send me the name of the individual we

5   invited to the eAudit file," right?

6   A.  Yes.

7   Q.  That is the person from the national office who is going to

8   be going back in the file and cleaning up the workpapers?

9   A.  Looking at the workpapers and suggesting clarifications,

10  edits, etc.

11          MS. ESTES:  Mr. Cooney, can you pull up what is in

12  evidence as Government Exhibit 944.

13  Q.  Mr. Middendorf, the top email here is the email from you to

14  Mathieu Mount, right?

15  A.  Correct.

16  Q.  "Please invite Scott Henderson to the eAudit file as we

17  discussed," right?

18  A.  Yes.

19  Q.  Scott Henderson, he is somebody from the national office?

20  A.  Yes, he is.

21  Q.  You understood he had worked at the PCAOB previously,

22  right?

23  A.  I did know that.

24  Q.  You wanted him to go take a look at the workpapers, right,

25  clean them up?

```
 1              MR. BOXER:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  Mr. Middendorf, sending all these people from the national

 4   office back into the workpapers after the opinions had issued,

 5   that was unusual, right?

 6   A.  Yes.

 7   Q.  That was the first time you had authorized something of

 8   that nature, right?

 9   A.  Yes, it was.

10   Q.  You did it, you did this unusual thing, because you had

11   inside information from the PCAOB, right?

12   A.  Yes.

13   Q.  Mr. Middendorf, you testified on direct that you didn't

14   think there was anything improper about what you did in 2016,

15   right?

16   A.  I did not.

17   Q.  You testified it was perfectly okay to act on this advanced

18   inside information you got from the PCAOB, right?

19              MR. BOXER:  Objection.

20              THE COURT:  Rephrase, please.

21              MS. ESTES:  Yes, your Honor.

22   Q.  Mr. Middendorf, to be clear, even though you authorized

23   this and you say it was not improper, you didn't tell the PCAOB

24   about it in 2016, did you?

25   A.  No, we did not.
```

1   Q.  You attended meetings with the PCAOB after this happened in

2   2016, right?

3   A.  Yes.

4   Q.  I think you testified on direct that you considered these

5   PCAOB meetings important, right?

6   A.  Yes.

7   Q.  They related to inspection results?

8   A.  Yes, they would usually go through inspection status.

9   Q.  You talked about ALLL, right?

10  A.  Talked about the various initiatives we had.

11  Q.  In not one of those meetings did you tell the PCAOB you had

12  gotten this advance notice, right?

13  A.  No, we did not.

14  Q.  You didn't say one word?

15  A.  No.

16  Q.  It would have been kind of easy to say it, right?

17          MR. BOXER:  Objection.

18          THE COURT:  Overruled.

19  A.  We did not mention it.

20  Q.  Mr. Middendorf, you also testified about pre-board meetings

21  you had with Jay Hanson, right?

22  A.  Yes.

23  Q.  You heard him testify about some of those?

24  A.  Yes, I did.

25  Q.  You never told Jay Hanson that you had inside information

1    from the PCAOB in 2016, did you?

2    A.  No, I did not.

3    Q.  You never told him we went back into workpapers and the

4    reviews after we got inside information, did you?

5    A.  No, I did not.

6    Q.  That just didn't come up?

7    A.  No, it did not.

8    Q.  The decision not to tell Mr. Hanson of the PCAOB, that was

9    deliberate, right?

10   A.  There are many things I didn't tell him, but I did not tell

11   him that either.

12   Q.  You didn't tell him.  You chose not to tell him, fair to

13   say?

14   A.  Yes.

15   Q.  You chose not to tell the PCAOB, fair to say?

16   A.  Yes.

17   Q.  You also testified on the standing advisory group, right?

18   A.  Yes.

19   Q.  There was a standing advisory group meeting in May 2016, do

20   you remember that?

21   A.  I don't remember the date, but I do know I attended one or

22   two SAG meetings.

23   Q.  Do you remember one meeting pretty soon after the reviews

24   in 2016?

25   A.  May sounds about right.

1   Q.  In that May SAG meeting you didn't mention that you had

2   confidential information from the PCAOB, did you?

3   A.  No, I did not.

4   Q.  You didn't mention that you were doing reviews based on

5   confidential information from the PCAOB, did you?

6   A.  The SAG has about 40 members, many who are not PCAOB

7   employees, so I would never thought would have been appropriate

8   to mention to that group.

9   Q.  You didn't think it was going to be appropriate to mention

10  it to anybody at the PCAOB, right?

11  A.  Correct.

12          MS. ESTES:  Mr. Cooney, can you pull up Government

13  Exhibit 1310 that is in evidence.

14  Q.  Mr. Middendorf, the top of this document says "PCAOB

15  meeting with KPMG representatives."  Do you see that?

16  A.  Okay, yes.

17  Q.  September 29, 2016.  If I can direct your attention to the

18  second bullet point there.  Do you see your name listed there?

19  A.  Yes.

20  Q.  So you attended a meeting with the PCAOB September 29,

21  2016, right?

22  A.  Yes, I do recall that.

23  Q.  Tom Whittle attended too?

24  A.  Yes.

25  Q.  Judge Holmes?

1    A.  Yes.

2    Q.  Now if we could go to page 4 of this document.  If we could

3    zoom in to the second bullet point from the top.  Mr.

4    Middendorf, here it says, "One example of success is related to

5    our auditing of allowance for loan losses.  This was an area

6    with the highest number of deficiencies.  Can we utilize root

7    cause analysis to identify significant remedial actions to

8    improve auditor performance?"  It then goes on to say, "This

9    includes substantial training, implementation of an invasive

10   risk-based monitoring and support program."  That was the

11   reason given in this meeting for an improvement in ALLL.  Do

12   you see that?

13   A.  Yes, I do.

14           MS. ESTES:  Mr. Cooney, if we could go to the

15   paragraph below that too.

16   Q.  Below that it says, "And the results have been terrific.

17   During the past two years we have seen a very significant

18   reduction in the number of issuers in part 1, and in 2016 all

19   ten issuer banks inspected participated in the monitoring

20   program and received no comments in our historical areas of

21   deficiencies in testing complex aspects of the allowance."

22           Mr. Middendorf, these were remarks given by KPMG at

23   this meeting, right?

24   A.  This document is a document to prep.  I don't know if these

25   exact words were read in that meeting or if they were

1    discussed.  But it's prep notes for that meeting.

2    Q.  These were the preparation comments for that meeting,

3    right?

4    A.  Yes.

5    Q.  Generally speaking, in your experience, are the preparation

6    notes usually said at the meeting in some fashion or form?

7    A.  The document is a very long document.  You wouldn't cover

8    everything.  But being on the early pages probably was

9    discussed.

10   Q.  These comments here, there is no reference to doing better

11   in allowance for loan losses because you did reviews in 2016

12   based on confidential information, right?

13   A.  No, it does not say that.

14   Q.  That is not something that was volunteered at this meeting,

15   to your recollection, right?

16   A.  No, it was not.

17   Q.  It didn't say you had gone back in the workpapers, edited

18   them after you got advance notice?

19   A.  No, it does not say that.

20   Q.  Instead, you're saying your internal programs is the reason

21   you do well in these inspections, right?

22   A.  I certainly believed the internal programs we had put in

23   place were having a positive impact on the results in the ALL

24   ALL program, or in the ALL audits.

25   Q.  Mr. Middendorf, if you didn't think you did anything wrong

1    in 2016, this was your opportunity to tell them, hey, I think

2    we improved because we went back in after we got advance

3    notice, right?

4                MR. BOXER:  Objection.

5                THE COURT:  Overruled.

6    A.  No, we did not say that.

7    Q.  Judge Holmes, he was in this PCAOB meeting, right?

8    A.  Yes, he was.

9    Q.  After the meeting you never told him about the advance

10   notice, right?

11   A.  No, we did not.

12   Q.  After this meeting, right after, you didn't tell him about

13   the re-reviews, right?

14   A.  Say that again.

15   Q.  You didn't tell him about the re-reviews of the workpapers,

16   right, in 2016?

17   A.  No.

18   Q.  You didn't tell him the real reason you did better on the

19   ALLL allowance, right?

20   A.  I don't know the exact real reason.  There were multiple

21   reasons.  The re-reviews may have been part of the reason for

22   that.

23   Q.  They were part of the reason, that was the part you left

24   out, right?

25               MR. BOXER:  Objection: misstates his testimony.

```
 1              THE COURT:  Overruled.

 2    A.   No, we did not.

 3    Q.   You chose not to share that with the PCAOB, right?

 4    A.   Correct.

 5    Q.   That was a conscious, deliberate decision, right?

 6    A.   I don't think I made a conscious, deliberate decision in

 7    preparing for that meeting to not do that, but we did not do

 8    that.

 9    Q.   You did not want them to know, did you?

10    A.   No.

11    Q.   Mr. Middendorf, in your direct testimony you testified

12    about some calls that you had with your reports, like Laurie

13    Mullen, Kevin O'Hara.  Do you remember that?

14    A.   Yes.

15    Q.   Those were kind of regular calls you had, right?

16    A.   Yes.

17    Q.   In the calls with your reports, you never told them that in

18    March 2016 you acted on confidential information you got from

19    the PCAOB, right?

20    A.   No, we did not.

21    Q.   You also talked about senior audit leadership team

22    meetings, right?

23    A.   Correct.

24    Q.   They were meetings you attended, right?

25    A.   Yes, I did.
```

1   Q.   In those meetings you never talked about the fact that in

2   2016 you acted on confidential information from the PCAOB,

3   right?

4   A.   No, I did not.

5   Q.   This was not discussed openly at KPMG?

6   A.   No, it was not.

7   Q.   It was a secret in the core group?

8   A.   It was not widely disseminated.

9   Q.   Another way of saying not widely disseminated is saying it

10  was secret, right?

11  A.   I didn't use that word.  I didn't think that way.  I told

12  my boss, and we kept it to a small group.

13  Q.   But you did that purposely, right?

14  A.   Yes.

15  Q.   Mr. Middendorf, on your direct you talked about some

16  information you received in January 2017 on what you called

17  predictions from Brian Sweet, right?

18  A.   From Mr. Whittle.

19  Q.   I believe you testified Whittle got them from Sweet, is

20  that right?

21  A.   Correct.

22  Q.   To be clear, Sweet, that's where you got the confidential

23  from in 2016, right?

24  A.   Correct.

25  Q.   He's the one who got it from the source at the PCAOB,

1   right, that was your testimony?

2   A.  Yes.

3   Q.  In January 2017 Whittle tells you Sweet has more

4   information, right?

5   A.  He said he has made predictions.

6   Q.  I understand your testimony is that they were predictions,

7   right?

8   A.  Correct.

9   Q.  You didn't ask Whittle what those predictions were based

10  on, did you?

11  A.  No.  Brian was doing lots of predicting on a regular basis.

12  Q.  You didn't check in with Brian Sweet, knowing he had

13  confidential information in the previous year, to see what his

14  predictions were based on, right?

15  A.  I did not follow up with Brian.

16  Q.  You didn't ask him whether the predictions were based on

17  information from the PCAOB?

18  A.  I did not.

19  Q.  You just went with it, right?

20  A.  Tom had told me they were predictions.  I didn't --

21  Q.  You didn't question it?

22  A.  I didn't question it.

23  Q.  You didn't want to know if it was based on confidential

24  information, right?

25  A.  I didn't have a reason to doubt Tom Whittle.

 1  Q.  You're saying you didn't have a reason to think this was

 2  anything but predictions even though in the year before you had

 3  gotten confidential information from the PCAOB?

 4  A.  Correct.

 5  Q.  That's your testimony?

 6  A.  Yes.

 7  Q.  Mr. Middendorf, you ultimately walked through this list of

 8  predictions with Tom Whittle, right?

 9  A.  I believe some of the names on the list.

10  Q.  I think you testified about Charter, Citi, Home Depot,

11  Macy's, right?

12  A.  I believe those were the ones.

13  Q.  You talked about whether there was anything you could to

14  with those audits based on the information, right?

15  A.  Correct.

16  Q.  To be clear, the status of these audits, these were live

17  audits, right?

18  A.  Correct.

19  Q.  I believe you testified you made an entry on your phone

20  when Whittle gave you this information, right?

21  A.  Correct.

22          MS. ESTES:  Mr. Cooney, can you pull up Government

23  Exhibit 656A.  Let's go to note 26.

24  Q.  Mr. This is the list you testified you took down after

25  talking to Tom Whittle, right?

1   A.  Correct.

2   Q.  I think you said Raymond James and BMO were not part of

3   what you understood to be predictions but the other ones were,

4   is that right?

5   A.  My recollection is I'm not sure about Raymond James and

6   BMO, if that was part of that first discussion or not.

7   Q.  You took this down because you wanted to keep track of

8   these predictions, right?

9   A.  Yes.  I don't remember.  I know I was traveling, so yes, I

10  logged them in my phone.

11  Q.  You thought it was important, this information you were

12  getting from Tom Whittle?

13  A.  Yes.

14  Q.  Information that ultimately came from Brian Sweet before

15  that?

16  A.  Yes.

17  Q.  You wanted a record of it, right?

18  A.  Yes.

19  Q.  Mr. Middendorf, you testified about several interviews you

20  had in connection with KPMG's internal investigation, is that

21  correct?

22  A.  Yes.

23  Q.  You had one with Mark Rubino in February 2017, right?

24  A.  Yes.  I think it was February 15, to 17.

25  Q.  Then three others: March 2017, April 2017, November 2017,

1  right?

2  A.  I think I had two with Rubino and then three with Williams

3  & Connolly.

4  Q.  These were very important meetings, right?

5  A.  Yes.

6  Q.  It was important to you that you tell the truth in the

7  meetings, right?

8  A.  Yes.

9  Q.  The whole truth?

10  A.  Yes.

11  Q.  In the first two meetings when you met with Mark Rubino and

12  the first time you met with Williams & Connolly, you didn't

13  mention a word about these predictions in January 2017, did

14  you?

15  A.  I don't recall.  But to me they weren't part of the issue.

16  They were predictions in January of 2017.  That's why I would

17  not have mentioned them if I didn't mention them.

18  Q.  You have testified that in March 2016 you got confidential

19  information from Brian Sweet, right?

20  A.  Correct.

21  Q.  Then in February 2017 the confidential information came

22  from Brian Sweet, right?

23  A.  Correct.

24  Q.  You didn't think it was relevant to tell them that in

25  January 2017 you got information from Sweet that you called

1    predictions?

2    A.   I did not.

3    Q.   You left that out?

4    A.   I did not tell them about it if you say it's not in the

5    notes.

6    Q.   Mr. Middendorf, the other predictions, you talked about

7    some on direct testimony, that banking list, those were sent by

8    email, right?

9    A.   Yes.

10   Q.   This January 2017, these predictions, Whittle told you them

11   over the phone, right?

12   A.   Yes.  I was traveling that week.

13   Q.   He could have emailed you while you were traveling, right?

14   A.   Yes, he could have.

15   Q.   He could have sent you a list of these by email?

16   A.   He could have.

17   Q.   Instead, he told you them over the phone?

18   A.   Correct.

19   Q.   The predictions.  Mr. Middendorf, you testified that in

20   February 2017, when you got this information, it was a big deal

21   because the audits were live, right?

22   A.   Correct.

23   Q.   In January 2017, those audits were live, right?

24   A.   Yes, they were.

25   Q.   If you got confidential information in January to 17, that

1    would be a big problem, right?

2    A.   Yes.

3    Q.   It would be wrong to have that at that point, right?

4    A.   Correct.

5    Q.   But your testimony is that you didn't have that, you just

6    had predictions, right?

7    A.   That is what I thought I had from Tom Whittle in January of

8    2017.

9    Q.   Mr. Middendorf, those predictions on your phone, they are

10   deleted, right?

11          MR. BOXER:   Objection.   That is not what the evidence

12   says.   She can ask him what it says.

13          MS. ESTES:   Mr. Cooney, if you could put back up

14   Government Exhibit 656A.

15          MR. BOXER:   May we approach, your Honor?

16          THE COURT:   Yes.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BOXER:  Your Honor, I have no objection if counsel

3   asks the witness if he deleted that list from his phone.  That

4   is a proper question.  But the word "yes" in the right-hand

5   column, the evidence has come in that nothing can be concluded

6   about whether Mr. Middendorf deleted it or when he deleted it

7   or who deleted it or if it was overwritten.  It was all

8   inconclusive, as I understood it, based on the software that

9   was used downloading the data from the phone.

10          I thought from Ms. Clark's cross-examination from the

11  series of questions, that was established.  If Ms. Estes wants

12  to ask if he deleted it, I think that's fine.  But to suggest

13  that it shows that you deleted it, did you delete it, I think

14  that is improper.

15          MS. ESTES:  Your Honor, I do think Mr. Greenwood

16  testified that he did testing and generally that means it was

17  deleted by the user.  He testified about that on direct.  I'm

18  happy to rephrase.  I think it is appropriate to ask him what

19  does this column say and then ask him did you delete it.  I'm

20  happy to rephrase it like that.  But I think the document is

21  kind of self-explanatory.  It is in evidence and it is

22  consistent with the testimony of the earlier witness.

23          MR. BOXER:  That's misleading from how it is in

24  evidence.  Ms. Clark, do you want to address that?

25          THE COURT:  I don't remember the specific testimony

1    about that issue.

2          MS. CLARK:  My recollection is that the testimony was

3    that typically in his experience with forensic data in general,

4    "deleted" means user deleted, but that it could not be applied

5    to this particular PDF Cellebrite report from Mr. Middendorf's

6    phone, he couldn't conclude anything about how that data got in

7    those particular rows.  So I think it is misleading to ask that

8    question.  We have it in the record that it can't be concluded

9    forensically from the report.

10         MS. MERMELSTEIN:  This witness deleted the notes, if

11   they were deleted.  It is perfectly proper to ask him the

12   question.  Frankly, it is objectionable for Mr. Boxer to say in

13   front of the jury, it is fine to ask this question but you are

14   not misstating the report.  We are not misstating anything.  We

15   are asking the witness if he deleted the notes.

16         THE COURT:  You can do that without this document.

17         MS. MERMELSTEIN:  I think we have to show the document

18   we are talking about to the witness when we ask him if he

19   deleted it the note we are asking about.

20         MR. BOXER:  That's what is misleading about it, what

21   wasn't proven, trying to in the question establish something

22   that their own witness couldn't establish.

23         MS. ESTES:  Your Honor, I think our witness did.  It

24   was chipped away a tiny bit on cross.  He said it's possible in

25   some world the user didn't delete, but he testified on direct

1   he had done testing and that's generally what that shows.

2          MS. CLARK:  We need to pull up Mr. Greenwood's

3   testimony.  We can do that.  I don't believe that is what the

4   record reflects.

5          THE COURT:  I'll have to check that.  But the document

6   is in evidence.

7          MR. BOXER:  It is.

8          THE COURT:  I am going to allow the question.  If we

9   need to allow redirect on it, we will have to.

10          MS. MERMELSTEIN:  Thank you, your Honor.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court).

2   BY MS. ESTES:

3   Q.  Mr. Middendorf, going back to note 26 there, you see the

4   "yes" in the right-hand column there, right?

5   A.  Yes, I do.

6   Q.  You testified these were your prediction notes on your

7   phone, right?

8   A.  Yes.

9   Q.  You deleted these notes, didn't you?

10  A.  I don't know if I deleted them or overwrote over them.  But

11  it says they were deleted.

12  Q.  Mr. Middendorf, in 2017, after you got this information

13  from Brian Sweet, you took action on some of the information,

14  right?

15  A.  What period are you talking about?

16  Q.  In January 2017.  Right?

17  A.  To my knowledge, I had a discussion with Tom Whittle, and

18  we didn't take action.

19  Q.  Valero was one of the audits on the list we just looked at,

20  right?

21  A.  Yes.

22  Q.  That's an energy company, right?

23  A.  I believe so.

24  Q.  In January 2017 you approved Scott Henderson to work on the

25  Valero audit, isn't that right?

1    A.   I don't have a recollection of that.

2            MS. ESTES:  Mr. Cooney, can you pull up for the

3    witness, the parties, and the Court what is marked for

4    identification as Government Exhibit 1145.

5    Q.   Mr. Middendorf, I want you to read to yourself the third

6    email down here.

7            MS. ESTES:  Mr. Cooney, if you could zoom in to that.

8    Q.   Mr. Middendorf, let me know when you are done reading this

9    email.

10   A.   Okay.

11   Q.   Does that refresh your recollection as to whether you

12   approved Scott Henderson to work on the Valero audit?

13   A.   I do not remember approving him, and I don't remember

14   talking about Valero with Mr. Whittle.

15           MS. ESTES:  Mr. Cooney, you can take that down.

16   Q.   Now I want to turn to February 2017, Mr. Middendorf.  You

17   testified that on February 6th you received a conference call

18   invite from Brian Sweet, or sometime around February 6th you

19   received that conference call invite, right?

20   A.   Correct.

21   Q.   The invite was for February 6th, right?

22   A.   Correct.

23   Q.   That night you had a call with Brian Sweet and Tom Whittle,

24   right?

25   A.   Yes.

1  Q.  During that call Sweet told you he had obtained the entire

2  PCAOB inspection list, right?

3  A.  Yes.

4  Q.  He said he had gotten it anonymously?

5  A.  Correct.

6  Q.  And he walked you through the list in fact during that

7  call, right?

8  A.  Yes, he did.

9  Q.  During the call you took it down on your phone?

10  A.  Yes.

11  Q.  You put some partner names down on the list?

12  A.  Yes.

13  Q.  He told you some focus areas?

14  A.  Yes.

15  Q.  You wrote it down because you wanted to keep track of it,

16  right?

17  A.  Correct.

18  Q.  You even told him to slow down at some point so you could

19  make sure you got all the information, right?

20  A.  Yes.

21  Q.  On that call you didn't express any outrage that Brian

22  Sweet had given you the entire inspection list, did you?

23  A.  No, I did not.

24  Q.  You didn't hang up the phone and say I'm going to call

25  Judge Holmes and tell him what Brian Sweet just told me, right?

1    A.  No, I did not.

2    Q.  Sweet was giving you information just like he had in March

3    2016 and January 2017, right?

4              MR. BOXER:  Objection.

5              THE COURT:  Overruled.

6    A.  He was giving information that was coming from the PCAOB

7    that was similar to March of 2016.

8    Q.  This was a long call, right?

9    A.  Yes.

10   Q.  Long enough so you could take down all the information?

11   A.  Yes.

12   Q.  All 47 issuers, right?

13   A.  Yes.

14   Q.  After the call you went back to this list and you went into

15   the KPMG system to clarify who was on the list, right?

16   A.  Yes, the next day.

17   Q.  I think you testified you went into the partner rotation

18   system, right?

19   A.  Yes.

20   Q.  You wanted to make sure you had everything right?

21   A.  Correct.

22   Q.  Then I think you testified that the next day you told Scott

23   Marcello about this, right?

24   A.  Yes.

25   Q.  Marcello, he knew about the confidential information from

1  the PCAOB in to 2016, didn't he?

2  A.  Yes.

3  Q.  Scott Marcello, he didn't report it in 2016, did he?

4  A.  Not to my knowledge.

5  Q.  He knew you acted on it in 2016, right?

6  A.  Yes.

7  Q.  When you talked to Scott Marcello about it, you and Scott

8  Marcello didn't agree to report to the PCAOB, right?

9  A.  Not on the call on February 7th.

10 Q.  Even though you knew you had the full list, right?

11 A.  Yes, it appeared that we did.

12 Q.  You knew that that list was incredibly confidential, right?

13 A.  It was confidential.

14 Q.  But you didn't agree to report it, not on February 7th,

15 right?

16 A.  Correct.

17 Q.  Then you talked to George Hermann about it?

18 A.  Yes.

19 Q.  You were George Hermann's boss, right?

20 A.  Yes.

21 Q.  He reported to you?

22 A.  Yes.

23 Q.  He reacted pretty badly, right?

24 A.  Yes.  He was very upset.

25 Q.  He yelled at you a little bit?

1    A.  Probably.

2    Q.  He said you were jeopardizing the firm, right?

3    A.  I don't remember his exact words.

4    Q.  He knew you shouldn't have the information, right?

5    A.  Yes.

6    Q.  He knew it was wrong?

7    A.  Taken by his comments, yes.

8    Q.  After that, you spoke to Laurie Mullen about it, right?

9    A.  Yes.

10   Q.  She reported to you, right?

11   A.  Yes, she did.

12   Q.  She contacted you because she had heard that Diana Kunz had

13   gotten information on an inspection from Brian Sweet, right?

14   A.  Yes.

15   Q.  When Ms. Mullen called, she was pretty upset, right?

16   A.  Yes, she was.

17   Q.  Fair to say she only knew about one engagement when she

18   called, right?

19   A.  Yes.

20   Q.  She was upset about that one engagement that you had

21   advance notice on, right?

22   A.  She did appear upset.

23   Q.  At that point you knew you had the whole list?

24   A.  Yes, I did.

25   Q.  You weren't that upset?

1    A.  I was still processing the information I had.

2    Q.  You didn't have the same reaction as Ms. Mullen, right?

3    A.  No, I did not.

4    Q.  She wanted Brian Sweet fired, right?

5    A.  I don't remember what all her comments were.

6    Q.  You were still processing it?

7    A.  Yes.

8    Q.  Ms. Mullen, she told you that you needed to report it to

9    the PCAOB, right?

10   A.  Once again, I don't remember all the details of my

11   conversation with her.

12   Q.  In general, you recall that she thought you needed to

13   self-report, that KPMG needed to self-report?

14   A.  Yes, I believe so.

15   Q.  That was February 8th, right?

16   A.  Yes.

17   Q.  You didn't self-report on February 8th, did you?

18   A.  No, we did not.

19   Q.  You didn't report it to Judge Holmes on February 8th, did

20   you?

21   A.  No, we did not.

22   Q.  You spoke to Mullen again on February 10th, right?

23   A.  Yes.

24   Q.  She brought up self-reporting again?

25   A.  I don't recall the details of that conversation.

1    Q.  She told you she was going to have her report, Dave Marino,

2    talk to Scott Marcello about it, right?

3    A.  She said her and Dave Marino and John Rodi were going to

4    meet with Scott Marcello.  I don't remember the details of

5    that.

6    Q.  I believe you testified on direct that Ms. Mullen, you had

7    the impression she wasn't very fulfilled by your conversation

8    that day, right?

9    A.  That sounds about right.

10   Q.  So she was moving past you, going to Scott Marcello, right?

11   A.  Yes.

12   Q.  In your conversations with Laurie Mullen on February 8th

13   and February 10th, you didn't tell her about the March 2016

14   information, did you?

15   A.  No, I did not.

16   Q.  You didn't tell her you had inside information the year

17   before and you acted on it, right?

18   A.  No, I did not.

19   Q.  You didn't want her to know that?

20   A.  I did not volunteer that information.

21   Q.  You didn't tell her about the January 2017 predictions,

22   right?

23   A.  No, I did not.

24   Q.  Mr. Middendorf, you understood that Marcello met with Dave

25   Marino on February 13th, right?

1    A.  Yes.

2    Q.  I think you testified that after that Marcello came to you

3    and said it needed to be reported to Judge Holmes, right?

4    A.  Yes.

5    Q.  Marcello is the one who said that to you, right?

6    A.  Yes, he did.

7    Q.  Just to be clear, it was not your idea to report it to

8    Judge Holmes, was it?

9    A.  I did not tell him that.

10   Q.  At the point when it was reported, he was essentially

11   forced to report, right?

12              MR. BOXER:  Objection.

13              THE COURT:  Sustained.

14   Q.  You testified that on February 14, 2017, you were on the

15   call where Marcello reported to Judge Holmes, right?

16   A.  We were both on the call with Judge Holmes.

17   Q.  In that call you did not tell Judge Holmes about the March

18   2016 information, did you?

19   A.  No, I did not.

20   Q.  You didn't tell him you had authorized acting on inside

21   information the previous year, right?

22   A.  No, I did not.

23   Q.  You didn't tell him about the January 2017 predictions, did

24   you?

25   A.  No, I did not.

1    Q.  You could have told him in that conversation, right?

2    A.  I could have.

3    Q.  You were coming clean about February 2017, there was no

4    reason not to tell him we had this information the year before,

5    right?

6    A.  I didn't tell him.

7    Q.  You didn't want to do that, right?

8    A.  I told Mark Rubino the next day.  So I don't know why I

9    didn't tell Judge Holmes on that call.

10   Q.  You told Mark Rubino the next day.  You testified about

11   that on direct.  At that point the gig was up, right?

12              MR. BOXER:  Objection.

13              THE COURT:  Overruled.

14   A.  I don't know what the gig is.

15   Q.  The fact that you had confidential information from the

16   PCAOB in February 2017 had been report to Judge Holmes, right?

17   A.  Yes, it was.

18   Q.  That was a big deal?

19   A.  Yes, it was.

20   Q.  It had been reported within KPMG.  When it was reported, it

21   was clear that that information came from Brian Sweet, right?

22   A.  For February of 2017?

23   Q.  Right.  You told Judge Holmes that, right?

24   A.  Correct.

25   Q.  Brian Sweet was the one who gave you the information in

1  March 2016, right?

2  A.  Yes.

3  Q.  So at this point you knew it's going to come out that Sweet

4  gave inside information in 2016, right?

5  A.  Yes.  I knew about the March of 2016 information, so I told

6  Mr. Rubino what I knew.

7  Q.  You told him because you had to at that point, right?

8  A.  I told him because I thought it was appropriate to tell him

9  that.

10  Q.  You knew other people were talking to him, right?

11  A.  I assumed other people would be talking to him.

12  Q.  You assumed Brian Sweet would be talking to him?

13  A.  I would have assumed that, yes.

14  Q.  And Tom Whittle would be talking to him?

15  A.  I assumed that.

16  Q.  They both knew about March 2016, right?

17  A.  Yes, I did.

18  Q.  You assumed they would testimony him about March 2016,

19  right?

20  A.  I don't know what they would tell them.  I would assume

21  they would tell the truth.

22            MS. ESTES:  Mr. Cooney, if you could pull up

23  Government Exhibit 656A.  Let's go to note 5.

24  Q.  Mr. Middendorf, this is the list you took down in February

25  2017, right?

1   A.   Correct.

2   Q.   The modified date there, February 15, 2017, that is the

3   date you met with Mark Rubino, right?

4   A.   I had a call with Mr. Rubino on February 15th.

5   Q.   You sent Mr. Rubino a list on that date, right?

6   A.   He asked me to send him the list.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   And you sent it, right?

2    A.   Yes.

3    Q.   And that same day you changed the list on your phone,

4    right?

5    A.   It says modified 2/15, so, yes.

6    Q.   So the day you know you're talking to Mark Rubino, you

7    know -- you know he's looking into this, you modify the list on

8    your phone, right?

9    A.   I -- the modification is when Mr. Rubino asked me to send

10   the list because he said he wanted the list, not the other

11   information.

12   Q.   So you made modifications to the list after talking to Mark

13   Rubino?

14   A.   Yes, I assume so.

15   Q.   You took out other information that was on it?

16   A.   Yes.  I believe I -- as he requested the list, I wanted the

17   list I gave him and what was on my phone to match.

18   Q.   So you deleted information from what was on your phone so

19   it matched the list you sent him, route?

20   A.   Correct.

21   Q.   And Rubino didn't tell you to delete the information on

22   your phone, did he?

23   A.   No.  He asked me for the list.

24   Q.   And we have no way of knowing what it looks like on your

25   phone before you deleted that information on February 15, 2017,

1    right?

2    A.   I don't know.

3              MS. ESTES:   Your Honor, this might be a good time for

4    a break.

5              THE COURT:   OK.   Let's take a ten-minute break, folks.

6              Please leave your notepads on your chairs and we will

7    be in recess for ten minutes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  You may be seated.  You may step down.

3            MS. LESTER:  Your Honor, on the issue that came up at

4    the sidebar with respect to the phone report that is Government

5    Exhibit 656A, the government misstated the testimony of

6    Mr. Greenwood, their witness.  On direct examination, he

7    testified that typically, based on his training and experience,

8    when it says -- the question was:  "What does it mean for

9    something to be deleted?"

10            And he said:  "in my experience, it typically means

11   that a user has permanently deleted the note."

12            Then on cross-examination he was asked:  "You did not

13   testify today in this instance, you knew forensically that the

14   data was deleted by the user, correct?

15   "A   That is correct.

16   "Q   You don't know that Mr. Middendorf deleted these note files

17   appearing toward the end of the report, correct?

18   "A   No.  That is outside my scope of knowledge."

19            THE COURT:  He said you knew forensically.

20            MS. ESTES:  Your Honor, I think he is testifying he

21   doesn't know it was Middendorf or somebody else who deleted it.

22   In the direct he was pretty clear that in his experience it

23   means a user deletes it.

24            MS. LESTER:  We disagree, your Honor.  I think what he

25   was saying is forensically just because the note data appears

1    as deleted, it does not mean that you can conclude that the

2    user actually deleted it.  And Ms. Estes was trying to get

3    Mr. Middendorf to interpret a forensic report, which he's not

4    capable of doing, and all he ended up doing was saying, yes, it

5    says it's deleted.  It leaves a misleading impression when the

6    government's own witness on this point said that forensically

7    you can't determine whether the data was deleted or not.

8            THE COURT:  I don't think it leaves any impression

9    other than whatever impression existed before, because all he

10   has testified to was I don't remember and it says this.  So, I

11   don't think it changes anything.

12           MS. LESTER:  Your Honor, I think we may ask -- we will

13   discuss this with the government, we will confer with them.

14   But we may ask for some relief in terms of the argument that

15   they're going to make in closing.  This was the issue that we

16   tried to address before the start of the trial, but we do think

17   that they're trying to use the report in a misleading way

18   that's not supported by the forensic evidence.

19           THE COURT:  Well, fair enough.

20           Let me ask this, actually, just based on counsel's

21   representations of what really happened.  There was also

22   evidence of the screenshots.  Does that reflect the same thing

23   as on row 26?  And he gave that to his counsel.  So doesn't

24   that suggest that he deleted it only after he had counsel?

25           MS. KRAMER:  There are earlier drafts essentially in

1    the note, your Honor, in the report, so some of the different

2    rows have a "Yes" for "Deleted," and then it is that final line

3    that is the one he testified at the end that he said that he

4    deleted some of the other information in there before sending

5    it to his counsel.  And so I think we would -- we'll certainly

6    confer, but I think both sides have fair argument to make from

7    the testimony, both the direct examination and the

8    cross-examination.

9         MS. ESTES:  And, your Honor, I would note, looking at

10   his interview memo from November 2017, in this interview he

11   acknowledged that he deleted the January information from his

12   phone at some point.

13        THE COURT:  At some point.

14        MS. ESTES:  That he is what Middendorf said in his

15   interview, he acknowledged that he deleted it.  So I think it

16   is --

17        MR. BOXER:  I think he testified today he either

18   deleted it or overwrote it, he wasn't sure.  But the objection

19   was to using the report as forensic proof of what he did, and

20   the record doesn't establish that.  We actually had noticed our

21   own expert on this point after Mr. Greenwood's cross and the

22   record he made, and he couldn't tell whether this user had

23   deleted it.  We decided not to call our expert on that point.

24        I think it comes down to the juxtaposition of the

25   question and the report, and they got the witness to say, yeah,

1    I see it says yes here.  And I think that leaves the impression

2    with the jury that he is acknowledging that he must have

3    deleted it.

4           THE COURT:  Did he in fact delete it or not?

5           MR. BOXER:  He said -- I don't think anybody knows

6    what he did.  He did say that -- the testimony was he might

7    have overwritten it, he might have deleted it.  I don't think

8    forensically you could tell.

9           There was, later on, testimony about a different row

10   in the report.  I think that was what Ms. Kramer was referring

11   to with the 52 names.

12          THE COURT:  But how did the screenshots come into

13   evidence?

14          MS. MERMELSTEIN:  Your Honor, I think you are

15   confusing the February list and the January list.

16          THE COURT:  You are right, I am.

17          MS. MERMELSTEIN:  So it is the February list that

18   there are screenshots of.  It is the January one that

19   Mr. Middendorf previously admitted he deleted.  That is not

20   what he said on the stand.  We'll see what happens on the rest

21   of cross.  But that is his own prior statement.  So the

22   suggestion that it is wild and crazy for the government to

23   suggest that that is what happened seems a little misplaced.

24          MR. BOXER:  That's not -- that is really unfair to

25   suggest that's what we doing.  He even said at the sidebar she

 1   can inquire on this topic, but using a forensic document to get

 2   him to say yes when their own forensic expert didn't create

 3   that record, that's what's improper about it.  They had this

 4   prior statement.  If they want to cross-examine him about it,

 5   that's all fine, but they exaggerated the import of the report.

 6          MS. KRAMER:  We disagree, your Honor, and that is

 7   actually completely contradicted by what Zachary Greenwood

 8   said.  His testimony, as Ms. Lester quoted, went on a little

 9   bit more in direct, and he said that the note was deleted

10   because of the marking.  And what his understanding is, based

11   on his experience, is that it typically means deleted.  They

12   asked him questions about whether he was one hundred percent

13   certain of that, and he said, no.  But the fact that it

14   typically means deleted, that is evidence.  That is totally

15   valid evidence from which the government can make the argument

16   that the witness, as he previously admitted, deleted this.

17          THE COURT:  OK.  So I understand you are going to

18   confer on this, and in the meantime I will take a look at the

19   testimony.  On what date did Greenwood testify?

20          MS. LESTER:  It is on February 28, your Honor, the

21   direct.  It is the second day.  His direct testimony resumed

22   that morning of February 28.

23          MS. KRAMER:  So page 2282, your Honor, is where he

24   gave the testimony that he government has cited to.

25          THE COURT:  OK.

1            MS. LESTER:  And the cross is at 2294 to 2295.

2            THE COURT:  OK.  Thank you.

3            (Recess)

4            MR. BOXER:  Your Honor, should Mr. Middendorf take the

5    stand?

6            THE COURT:  Yes.  Please.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)

 2                    THE COURT:  You may be seated.

 3                    Ms. Estes.

 4     BY MS. ESTES:

 5     Q.  Now, Mr. Middendorf, you testified that you don't remember

 6     a lot of things regarding the conduct in this case, right?

 7                    MR. BOXER:  Objection.

 8                    THE COURT:  You can answer.

 9     A.  I don't know how you would define "a lot."  I got a hundred

10     emails a day so I don't remember every email I got.

11     Q.  So let me go through some examples.  Mr. Middendorf, for

12     example, you testified on direct that during the first day at

13     lunch with Brian Sweet you don't remember asking Sweet about

14     Wells Fargo, right?

15     A.  No, I do not.

16     Q.  You testified that you don't remember receiving an email

17     from Tom Whittle in 2015 where he sent you the complete list,

18     right?

19     A.  No, I do not.

20     Q.  Where he said it was obviously very sensitive, right?

21     A.  That's what the email said.

22     Q.  You testified that you don't remember in 2016, where you

23     and Whittle had a conference call with Brian Sweet and went

24     through the 2016 information, right?

25     A.  No, I do not.
```

1  Q.  You testified that as to that SEC meeting in 2016, you

2  don't remember the SEC talking to you about inspection results,

3  right?

4  A.  No, I do not.

5  Q.  You testified you don't remember that ethics certification

6  and the standing advisory group; you don't remember that

7  document, right?

8  A.  I remember the document I signed.  I don't recall if I had

9  attachments to it covering EC9, correct.

10  Q.  You don't remember getting training on EC9 from that

11  document, right?

12  A.  No, I don't.

13  Q.  And, Mr. Middendorf, you know that the government has

14  offered all of this as evidence against you in this trial,

15  right?

16          MR. BOXER:  Objection.

17          THE COURT:  Overruled.

18  A.  Could you repeat the question?

19  Q.  You know the government has offered all of these things

20  against you as evidence in this trial?

21  A.  Yes.

22  Q.  And you don't remember because you're guilty, right; they

23  show you're guilty?

24  A.  No, I don't think they do.

25          MS. ESTES:  No further questions.

 1              THE COURT:  Mr. Boxer, redirect.

 2              MR. COOK:  Your Honor, I have some cross-examination.

 3              THE COURT:  I'm sorry.  Mr. Cook.

 4    CROSS-EXAMINATION

 5              MR. COOK:  Ms. O'Connor, can we take a look at

 6    Government's Exhibit 824R, please.

 7    BY MR. COOK:

 8    Q.  Mr. Middendorf, on your screen is Government's Exhibit

 9    824R.

10              Do you see the date of that email?

11    A.  Yes.

12    Q.  October 20, 2015?

13    A.  Yes.

14    Q.  Do you recall if Cindy Holder had joined KPMG by that time?

15    A.  I do not remember her start date.  I think it was in the

16    fall.  I just don't recall.

17    Q.  Right around -- well, it was in 2015, correct?

18    A.  Yes.

19    Q.  You don't remember whether it was before or after

20    October 20th?

21    A.  I do not.

22    Q.  OK.  And the first line of the email says:

23    "Jim/David/Scott - I got a call from an old colleague over the

24    weekend and they let me know a decision has been made to

25    inspect a 'big bank' in both the Switzerland and Japan next

1    year (so obviously Credit Suisse and Sumitomo)."

2            Do you see that?

3    A.  Yes, I do.

4    Q.  And this is from Mr. Sweet?

5    A.  Yes, it is.

6    Q.  And he says he got a call from an old colleague.

7            Did he ever tell you that the old colleague was

8    Jeffrey Wada?

9    A.  No, he did not.

10   Q.  And you testified about the 2016 inspection list; do you

11   recall that?

12   A.  Yes.

13   Q.  Did Mr. Sweet or anyone else ever say that his source was

14   Mr. Wada?

15   A.  No, he did not.

16   Q.  And you testified about -- I think you called it the

17   January predictions from January 2017; do you recall that?

18   A.  Yes.

19   Q.  And you got that from Mr. Whittle?

20   A.  Correct.

21   Q.  Did Mr. Whittle or Mr. Sweet or anybody else ever say that

22   they obtained that information from Mr. Wada?

23   A.  No.

24   Q.  And with regard to the final inspection list in

25   February 2017, did Mr. Sweet or Mr. Whittle or anyone else tell

1   you that it came from Jeffrey Wada?

2   A.   No.

3   Q.   You talked about a number of meetings that you were a part

4   of in connection with this information that had come from the

5   PCAOB, correct?

6   A.   Correct.

7   Q.   Was Jeffrey Wada involved either by phone or in person in

8   any of those meetings?

9   A.   Not that I'm aware of.

10   Q.   Was he involved in any way with the rereviews, that you

11   know about?

12   A.   No, he did not work at KPMG.

13   Q.   And there was nobody from outside of KPMG involved in those

14   rereviews, correct?

15   A.   No.

16   Q.   And you testified about what I believe Ms. Estes

17   characterized as a core group.  Do you remember that?

18   A.   Yes.

19   Q.   Was Mr. Wada a part of this core group, to your knowledge?

20   A.   No, he was not.

21   Q.   Prior to your involvement in this case, had you ever seen

22   Mr. Wada before, to your knowledge?

23   A.   No, I had not.

24   Q.   And prior to being asked -- you being asked about Mr. Wada

25   during interviews with the Williams & Connolly lawyers, had you

1   ever heard his name before?

2   A.  No, I had not.

3           MR. COOK:  No further questions.  Thank you.

4           THE COURT:  OK.

5           Mr. Boxer.

6           MR. BOXER:  No questions, your Honor.

7           THE COURT:  OK.  You may step down.

8           (Witness excused)

9           MS. LESTER:  Your Honor, we call Krista Hess.

10          THE COURT:  OK.

11   KRISTA MARIE HESS,

12       called as a witness by defendant Middendorf,

13       having been duly sworn, testified as follows:

14          THE CLERK:  Please state your name and spell your last

15   name slowly for the record.

16          THE WITNESS:  My name is Krista Marie Hess, H-e-s-s.

17          THE CLERK:  Thank you.

18          THE COURT:  And could you spell Krista Marie also?

19          THE WITNESS:  Sure.  It is K-r-i-s-t-a.  Marie is

20   M-a-r-i-e.

21          THE COURT:  Thank you.

22   DIRECT EXAMINATION

23   BY MS. CLARK:

24   Q.  Hello, Ms. Hess.

25   A.  Hello.

 1   Q.  How old are you, Ms. Hess?

 2   A.  I'm 28 years old.

 3   Q.  And where do you work?

 4   A.  I work at the law firm Bruch Hanna LLP.

 5   Q.  What is your position there?

 6   A.  I am an associate attorney.

 7   Q.  And how long have you held that position, Ms. Hess?

 8   A.  A little over four months.

 9   Q.  Did you have a role, Ms. Hess, in the preparation of

10   summary charts in connection with this case?

11   A.  Yes, I did.

12   Q.  And did you review certain materials to assist in the

13   preparation and verification of those charts?

14   A.  Yes.  I reviewed PCAOB publicly available inspection

15   reports.

16   Q.  Did you verify any government exhibits in connection with

17   those charts?

18   A.  Yes.  I verified the information in Government Exhibit

19   1357.

20        MS. CLARK:  Ms. O'Connor, could you show what's marked

21   for identification as M210 just to the witness, counsel and

22   Court, please.

23   Q.  Ms. Hess, do you recognize this document?

24   A.  Yes, I do.

25   Q.  And what do you recognize it to be?

1  A.  This is one of the summary charts that I assisted in

2  preparing.

3  Q.  And does this accurately reflect information that you

4  reviewed and verified?

5  A.  Yes, it does.

6         MS. CLARK:  Your Honor, we offer M210.

7         THE COURT:  M210 is received.

8         (Defendant's Exhibit M210 received in evidence)

9         MS. CLARK:  Ms. O'Connor, could you publish that to

10  the jury, please.

11  BY MS. CLARK:

12  Q.  Ms. Hess, please describe briefly for the jury the

13  information shown in M210.

14  A.  Sure.  This is a line graph that depicts the number of

15  issuers with deficiencies in the PCAOB inspection reports for

16  PwC, Deloitte, Ernst & Young and KPMG for the years 2009

17  through 2015.

18  Q.  So what do the different colors mean in this line graph?

19  A.  Each color represents a different audit firm.  So green is

20  PwC.  Blue is Deloitte.  Purple is Ernst & Young.  And navy is

21  KPMG, as indicated in the key at the bottom.

22  Q.  And what's indicated in the numbers running up along the

23  horizontal -- sorry running up along the vertical side of the

24  graph there?

25  A.  The vertical axis indicates the number of issuers with

1  deficiencies in the audit report and the inspection report.

2  Q.  So then what do the trajectory of these lines show,

3  Ms. Hess?

4  A.  These lines track the number of issuers with deficiencies

5  in their PCAOB inspection reports for the different audit firms

6  through these years.

7         MS. CLARK:  Thank you.  You can take that down,

8  Ms. O'Connor.

9         Could you please show, Ms. O'Connor, just to the

10  witness, counsel and Court what's been marked for

11  identification as M303.  And if you could click through I think

12  this has two parts.  Perfect.  Thank you.

13  Q.  Do you recognize this, Ms. Hess?

14  A.  Yes, I do.

15  Q.  And what is it?

16  A.  This is another summary chart that I assisted in preparing.

17  Q.  And did you verify the information underlying this chart?

18  A.  Yes, I did.

19  Q.  And did you perform and check the mathematical calculations

20  underlying this chart?

21  A.  Yes, I did.

22         MS. CLARK:  We offer M303, your Honor.

23         THE COURT:  M303 is received.

24         (Defendant's Exhibit M303 received in evidence)

25         MS. CLARK:  Can we publish that, please.

1         We can go ahead, Ms. O'Connor, and click through to

2    the overlay.  Thank you.

3    Q.  So looking at the columns starting on the left, we have

4    "Inspection Year."

5         Then could you explain, Ms. Hess, "KPMG" through

6    "BDO," what is reflected in those columns?

7    A.  Those columns reflects the percentage of audits with

8    deficiencies in the PCAOB inspection reports for those years.

9    Q.  Did you calculate those percentages?

10   A.  Yes.  I input the numbers into an Excel chart that did the

11   calculations.

12   Q.  And where did you get the number of issuers with deficient

13   audits for each of these audit firms for these years?

14   A.  I pulled that from Government Exhibit 1357 and then

15   verified it against the PCAOB inspection reports.

16   Q.  And where did you find the total number of issuers

17   inspected for each of these boxes?

18   A.  I also pulled that from the PCAOB inspection reports.

19   Q.  And was that number, the total number of issuers inspected

20   by the PCAOB, for each of these audit firms the same year to

21   year?

22   A.  No.  It varied year to year and firm to firm.

23   Q.  And turning now to the column on the far right, what does

24   this show?

25   A.  This shows the average percentage of issuers with deficient

1    audits for the other GNF firms listed, that is, the ones that

2    are not KPMG.

3    Q.  And how did you calculate those percentages?

4    A.  To calculate the individual percentages within the chart,

5    in the KPMG, Deloitte, Ernst & Young and PwC, etc., columns, I

6    divided the number of issuers with the deficient audits by the

7    total number of issuers inspected to get the percentage.  In

8    order to get the average percentage for the other GNF firms, I

9    added the percentages for Deloitte, Ernst & Young, PwC, Grant

10   Thornton and BDO and divided by five to get the average.

11             MS. CLARK:  Ms. O'Connor, we can take this down.

12             And could you show to the witness, counsel and the

13   Court what's been marked as M290, please.

14   Q.  Do you recognize this, Ms. Hess?

15   A.  Yes, I do.

16   Q.  And what do you recognize this to be?

17   A.  This is another summary chart prepared for this case.

18   Q.  And did you verify the information reflected in this chart?

19   A.  Yes, I did.

20             MS. CLARK:  Your Honor we offer M290.

21             THE COURT:  M290 is received.

22             (Defendant's Exhibit M290 received in evidence)

23             MS. CLARK:  Could we publish that, please.

24   BY MS. CLARK:

25   Q.  What does this chart show, Ms. Hess?

1   A.  This is an organizational chart showing different personnel

2   and their positions in relation to each other at KPMG.

3           MS. CLARK:  Thank you.

4           Nothing further.

5           THE COURT:  Ms. Mermelstein.

6           MS. MERMELSTEIN:  Thank you, your Honor.  Very

7   briefly.

8   CROSS-EXAMINATION

9   BY MS. MERMELSTEIN:

10  Q.  Good afternoon, Ms. Hess.

11  A.  Good afternoon.

12  Q.  With respect to the two charts that you just testified

13  about, you prepared those at the direction of defense counsel,

14  right?

15  A.  There are three, but, yes, those I verified the

16  information.

17  Q.  So sorry.  Two exhibits, three charts?

18  A.  Yes.

19  Q.  Defense Exhibit M210 and M303?

20  A.  Oh, yes.

21  Q.  You prepared those at the direction of defense counsel,

22  right?

23  A.  Yes.

24  Q.  They told you what to include, right?

25  A.  Yes.

1    Q.  And then you took the data and sorted it as directed,

2    right?

3    A.  Yes.

4    Q.  Let's look at M303 -- excuse me, let's start with M210 for

5    a second, Mr. Cooney.

6            This chart shows performance for four audit firms

7    going back to 2009, right?

8    A.  Yes, that's correct.

9    Q.  PwC, Deloitte, Ernst & Young and KPMG?

10   A.  Yes.

11   Q.  You know those are called the Big Four, right?

12   A.  Yes, I do.

13   Q.  And they are sort of -- withdrawn.

14           This goes back all the way to 2009 because defense

15   counsel asked you to make that the date range, right?

16   A.  I don't recall.  I believe so, yes.

17   Q.  What made you pick 2009 as a start date?

18   A.  I had received an earlier draft, so, yes, that did come

19   from -- I received a draft and then verified the information,

20   so, yes, that did come from other defense counsel.

21   Q.  Meaning defense counsel prepared a draft and then asked you

22   to finalize and confirm it?

23   A.  Yes.

24   Q.  You are aware that the charges in this case only relate to

25   conduct beginning in 2015, right?

1   A.  Yes.

2   Q.  And the reason that these are the four firms whose

3   inspection results are being compared here is because they are

4   each other's competitors, right?

5   A.  I understand they are each other's competitors, yes.

6   Q.  So then let's take a look at M303, for a second.

7           If we can go to the second page with the percentages.

8           So Grant Thornton and BDO weren't on your first chart

9   because they are not in the Big Four, right?

10  A.  I'm not sure why they weren't included but they are not in

11  the first chart.

12  Q.  And not in the Big Four, right?

13  A.  No.

14  Q.  And if you look at KPMG's inspection results as against the

15  other ones in the Big Four in 2014, KPMG had a 54 percent

16  failure rate for its audits, right?

17  A.  Yes, KPMG had 54 percent of audits with deficiencies in

18  their 2014 inspection report.

19  Q.  Deloitte had 21 percent, right?

20  A.  Yes.

21  Q.  Ernst & Young had 36 percent?

22  A.  Yes.

23  Q.  PwC had 29 percent?

24  A.  Yes.

25  Q.  Fair to say KPMG had done vastly worse than the others in

1    the Big Four, right?

2    A.   I don't know whether it's vastly or not vastly, but those

3    are the numbers that accurately reflect the inspection reports.

4    Q.   Pretty close to twice as bad, right?  54 percent is more

5    than twice of 21 percent, for example?

6    A.   Yes.

7    Q.   So pretty significantly worse, right?

8    A.   It's -- yeah, those are the numbers.

9            MS. MERMELSTEIN:  Nothing further.

10           THE COURT:  OK.  Anything further?

11           MS. CLARK:  I have some redirect, your Honor.

12           THE COURT:  OK.

13   REDIRECT EXAMINATION

14           MS. CLARK:  Ms. O'Connor, could you pull up Government

15   Exhibit 1357, please, for everyone, in evidence.

16           Thank you.

17   BY MS. CLARK:

18   Q.   Ms. Hess, are you familiar with this exhibit?

19   A.   Yes, I am.

20   Q.   How are you familiar with it?

21   A.   I reviewed it in connection with preparing the other

22   charts.

23   Q.   How does the other chart with the overlay compare to this?

24   A.   So the other chart more accurately represents a comparison

25   of KPMG with the other audit firms in relation to the amount of

1  deficient audits in their inspection reports.

2  Q.  And this chart, how many audit firms does it include?

3  A.  Six.

4  Q.  And that is the same number of audit firms you included in

5  your overlay, correct?

6  A.  Yes, that's correct.

7          MS. CLARK:  Nothing further.

8          THE COURT:  OK.  Thank you.  You may step down.

9          (Witness excused)

10         MR. BOXER:  We rest, your Honor.

11         THE COURT:  All right.

12         MR. COOK:  Your Honor, we have several stipulations we

13  would like to read into the record.

14         THE COURT:  OK.

15         MR. COOK:  Your Honor, Defendant's Exhibit 1655 is a

16  stipulation that the parties have entered into.  I would like

17  to offer it into evidence, please.

18         THE COURT:  No objection?  This agreed upon, right?

19         MS. MERMELSTEIN:  That is right, your Honor.

20         THE COURT:  OK.  Defendant's 1655 is received.

21         (Defendant's Exhibit 1655 received in evidence)

22         MS. MERMELSTEIN:  I'm sorry.  Can we take that down

23  for a minute, actually?  I think we have one issue.  I think it

24  is the wrong version.

25         (Pause)

1            MR. COOK:  Your Honor, we have a signed stipulation.

2    There seems to be some dispute as to whether it is the correct

3    one so we will set that aside for now, 1655.

4            THE COURT:  All right.

5            MR. COOK:  Can we put Defense Exhibit 1656 on the

6    screen for counsel and the Court?

7            Your Honor, this is a signed stipulation the parties

8    have entered into.  I offer it.

9            THE COURT:  1656 is received.

10           (Defendant's Exhibit 1656 received in evidence)

11           MR. COOK:  May I publish and read it?

12           THE COURT:  Yes.

13           MR. COOK:  The parties entered into the following

14   stipulation:

15           On November 22, 2016, Mr. Wada received a medical

16   diagnostic test and was diagnosed with a heart murmur in

17   Huntington Beach, California.

18           On January 3, 2017, Mr. Wada received a medical

19   diagnostic test in Irvine, California.

20           On January 9, 2017, Mr. Wada attended a medical

21   appointment with a cardiologist in Huntington Beach,

22   California.

23           On January 10, 2017, Mr. Wada received a medical

24   diagnostic test in Fountain Valley, California.

25           On January 13, 2017, Mr. Wada attended a medical

1    appointment with a cardiac surgeon in Fountain Valley,

2    California.

3              On February 1, 2017, Mr. Wada received a medical

4    diagnostic test in Fountain Valley, California.

5              On February 7, 2017, Mr. Wada had cardiac surgery in

6    Fountain Valley, California.  Mr. Wada has since made a full

7    recovery.

8              Can we put Defense Exhibit 1657 on the screen for

9    counsel and the Court.

10             Your Honor, the parties have entered into a

11   stipulation that has been numbered Defense Exhibit 1657.  I

12   offer it.

13             THE COURT:  Defense 1657 is received.

14             (Defendant's Exhibit 1657 received in evidence)

15             MR. COOK:  May I publish and read?

16             THE COURT:  Yes.

17             MR. COOK:  The parties hereby stipulate:

18             First, if called as a witness, a representative of the

19   PCAOB would testify:

20             In 2015 through 2017, the PCAOB sent inspection

21   notifications to KPMG, usually in email format, to identify the

22   issuer-audits to be inspected and the focus areas of the

23   inspections.

24             In each of these years, the board generally approved

25   the inspection plan for the given year.  The inspection

1    notifications followed in the ordinary course based on the

2    board's approval of the plan.  Because there was not a separate

3    written authorization of the inspection notifications, there

4    are no documents reflecting board approval of those

5    notifications to KPMG for this time period.

6            If Barbara Hannigan were recalled as a witness,

7    Ms. Hannigan would testify:  Defense Exhibit 1647 is the board

8    resolution referenced in her testimony as providing

9    authorization for certain persons to make certain disclosures.

10           Your Honor, I offer Defense Exhibit 1647.

11           THE COURT:  1647 is received.

12           (Defendant's Exhibit 1647 received in evidence)

13           MR. COOK:  May I publish it?

14           THE COURT:  Yes.

15           MR. COOK:  Defense Exhibit 1647 does not authorize the

16   disclosure or notification of particular issuer inspections.

17           If we could put Government Exhibit 1381 on the screen

18   for counsel and the Court.

19           Your Honor, Government Exhibit 1381 is a stipulation

20   the parties have entered into and I offer it.

21           THE COURT:  1381 is received.

22           (Defendant's Exhibit 1381 received in evidence)

23           MR. COOK:  May I publish and read?

24           THE COURT:  Yes.

25           MR. COOK:  The parties have stipulated:

1                The PCAOB's Inspections Information System ("IIS"),

2     from at least 2015 through April 2017, did not maintain an

3     electronic record of individuals who accessed, saved,

4     downloaded, and/or copied documents from the KPMG U.S.

5     workspace in IIS.

6                Defense Exhibit 1439 is a true and accurate copy of

7     the PCAOB's IIS Step-By-Step Guide as updated on January 11,

8     2012, which was in effect through at least April 2017.

9                Your Honor, I offer Defense Exhibit 1439.

10                THE COURT:  1439 is received.

11                (Defendant's Exhibit 1439 received in evidence)

12                MR. COOK:  Government Exhibit 138 is a true and

13     accurate record of Mr. Wada's logins to IIS between

14     January 2016 and March 2017.  The login times represent

15     Mr. Wada's initial logins to IIS on the dates described in

16     Government Exhibit 138 and do not indicate any particular

17     access to a specific workspace within IIS, for example, KPMG

18     U.S. workspace.

19                IIS does not record a user's access to a specific

20     workspace within IIS or logout times.

21                The times reflected in Government's Exhibit 138 are in

22     Central Time.

23                Your Honor, I offer Government's Exhibit 138.

24                THE COURT:  Received.

25                (Government's Exhibit 138 received in evidence)

1           MR. COOK:  The version of the KPMG GNF Planning

2    Profile that was in existence on January 9, 2017, was corrupted

3    due to a technological problem and no longer exists.

4           The "Copy of Monitoring Program Selection

5    Criteria.xlsx" listed on Government's Exhibit 92 existed in IIS

6    as "Monitoring Program Selection Criteria.xlsx" as of

7    December 6, 2016 and was never modified thereafter.

8           Your Honor may I have a moment?

9           THE COURT:  Yes.

10          (Pause)

11          MR. COOK:  Your Honor, Defense Exhibit 1658 is a

12   stipulation that the parties have entered into.  I offer it.

13          THE COURT:  Defense 1658 is received.

14          (Defendant's Exhibit 1658 received in evidence)

15          MR. COOK:  Defense Exhibit 1658 reads:

16          The parties hereby stipulate Defense Exhibit 1648

17   accurately reflects information excerpted from a phone

18   extraction from Cindy Holder's phone.

19          Your Honor, we offer Defense Exhibit 1648.

20          THE COURT:  Received.

21          MR. COOK:  Defense Exhibit 1654 accurately reflects

22   information excerpted from a phone extraction from Brian

23   Sweet's phone.

24          Your Honor, I offer Defense Exhibit 1654.

25          THE COURT:  Received.

1          (Defendant's Exhibit 1654 received in evidence)

2          MR. COOK:  Your Honor, I have a series of excerpts

3    from text messages that we discussed yesterday that the parties

4    have -- or the Court has ruled upon and the parties have

5    otherwise reached an agreement.  I would like to read those

6    exhibit numbers and offer them.

7          Defense Exhibit 1013-D, as in David; Defense Exhibit

8    1013-E, as in Edward; Defense Exhibit 1013-G, as in George;

9    Defense Exhibit 1013-I; Defense Exhibit 1013-J; Defense Exhibit

10   1013-K; Defense Exhibit 1013-M, as in Mary; Defense Exhibit

11   1013-R; Defense Exhibit 1013-S; Defense Exhibit 1013-U.

12          THE COURT:  And those are the same ones --

13          MR. COOK:  They are the ones we discussed yesterday.

14          THE COURT:  Right.

15          OK.  Those are received.

16          (Defendant's Exhibits 1013-D, 1013-E, 1013-G, 1013-I,

17   1013-J, 1013-K, 1013-M, 1013-R, 1013-S, 1013-U received in

18   evidence)

19          MR. COOK:  And, your Honor, I apologize.  One moment.

20          THE COURT:  Yes.

21          (Pause)

22          MR. COOK:  Your Honor, if I could ask for just a

23   moment so we can resolve this issue with one of the

24   stipulations?

25          THE COURT:  Sure.

1                    (Pause)

2                    If it is going to take a few minutes, I can let the

3       jury go back for a break.

4                    MR. COOK:  It will take probably one minute.

5                    THE COURT:  OK.

6                    (Pause)

7                    MR. COOK:  Your Honor, it will take a few minutes so

8       perhaps this will be a good time for a break.

9                    THE COURT:  OK.  It is probably more comfortable for

10      you folks to go back and take another break, so I will let you

11      go and probably come and get you in five or ten minutes.

12                   Please leave your notepads on your chairs.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  You can be seated in the courtroom.

 3              MR. COOK:  We do have a signed stipulation.  However,

 4      it may be that the version that was signed was inadvertently a

 5      previous -- the wrong version.  I just want to fix that issue.

 6              THE COURT:  That is fine.

 7              Did you want to address something else?

 8              MR. BOXER:  I permitted Mr. Middendorf to leave for

 9      the restroom.

10              THE COURT:  That is fine.  I think -- yes, everyone

11      can take a break for five minutes or whatever.  I may stay here

12      just because I am checking emails, but we are in recess for

13      five minutes.

14              (Recess)

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MS. KRAMER:  Your Honor, one quick thing.  The

2    government has two brief documents to offer in a rebuttal case.

3    It's not totally clear if there will be objections to them or

4    not, but we may need to take them up at the sidebar when the

5    time comes.

6          THE COURT:  I also wanted to ask about timing

7    generally and whether I should say anything to the jury about

8    when they might get the case and the possibility of coming in

9    on Friday.  They might be wondering about Friday.  I thought,

10   but I wanted to run it by the parties first, I could give them

11   some information about if you're deliberating Thursday, then

12   you are also welcome to come in Friday.  I can say nothing if

13   you prefer.  Any information you can give me on timing and

14   whether I should say something would be helpful.

15         MR. COOK:  Your Honor, we have this last stipulation

16   and then we will be resting.  We have no objection to the phone

17   records the government intends to introduce in rebuttal.

18         MS. MERMELSTEIN:  Your Honor, it seems like a good

19   idea from the government's perspective to tell the jury what

20   you expect for the rest of the trial and to say something along

21   the lines of it is generally your Honor's practice to have the

22   jury or allow the jury to sit on Friday if they are

23   deliberating, but they don't have to make a decision until we

24   hit Thursday afternoon.

25         THE COURT:  What about tomorrow?  What did you all

1    have in mind for tomorrow?

2          MR. COOK:  Speaking on behalf of Mr. Wada, your Honor,

3    our preference would be to finish the evidence today -- I

4    understand we are going to do the charging conference today

5    after court -- and to take the day tomorrow to allow the

6    parties to incorporate the instructions into their summations

7    and then close on Thursday.

8          MS. KRAMER:  We are ready to close tomorrow, your

9    Honor.

10         MR. BOXER:  The schedule proposed by Mr. Cook is fine

11   with us.

12         THE COURT:  You are proposing I give the jury off

13   tomorrow.  I wasn't sure if we were going to do a charge

14   conference tomorrow or tonight because I thought I might be

15   getting a letter from the government in response to the

16   objections.  We can do it all oral orally if you prefer.

17         MR. BOXER:  We have no problem being here in the

18   morning for the charge conference with your Honor.

19         MR. COOK:  The same.

20         MS. MERMELSTEIN:  We spoke to defense counsel about

21   their letter last night, and because there was not as much

22   agreement as we thought --

23         THE COURT:  Was there another letter last night?

24         MS. MERMELSTEIN:  No.  We conferred last night about

25   their letter.  It didn't seem like it was necessary for the

1    government to put them in.  We are prepared to address it

2    orally today.  We think we should close tomorrow.  We are ready

3    to close tomorrow.  The charge is basically in final form.  We

4    have had it since Friday.  We are ready to go.  If the jurors

5    can't deliberate Friday and we don't sit tomorrow, we are sort

6    of leaving them with jury addresses and maybe not even being

7    charged over a long weekend.  That doesn't seem ideal.  So we

8    would like to try and move forward.

9         MR. BOXER:  I think that assumes acceptance of the

10   charge as proposed.  There are at least a number of important

11   areas where we have objections to the charge.  I don't know if

12   counsel feels the same way.

13        THE COURT:  I envisioned fairly substantial discussion

14   and possible changes to the charge based on the defendants'

15   letters.

16        MR. BOXER:  I should have been more clear in seconding

17   Mr. Cook's proposal.  To see us here until 7, 8, 9 tonight and

18   then summing up in the morning wouldn't be ideal, especially

19   after Mr. Middendorf's testimony.  From our perspective, the

20   charge conference tomorrow morning and sum up Thursday would be

21   fine.  That seems to make sense.  I appreciate the concern

22   about the jury.  That is reasonable.  I don't know how long the

23   government intends to sum up, but they could get the case on

24   Thursday it seems like.  The charge didn't seem that long.  I

25   don't know what their plan is as far as how long they will go.

1          THE COURT:  I didn't realize you had had discussions

2     and reached agreement on a bunch of the issues.

3          MS. MERMELSTEIN:  Perhaps we haven't your Honor.  I

4     think there are small areas where we don't have an objection

5     and it is easy to resolve.  I had understood that many of the

6     objections that were lodged are on issues where there continues

7     to be legal disagreement and defense counsel wanted to make

8     sure that the record was preserved.

9          I appear to be misspeaking.  I understood there was

10    some understanding that certain decisions had been made so they

11    weren't going to be revisited, so objections were being lodged

12    but sort of we all understood where this was.  If that is not

13    true, then I don't know what to say about where we are on the

14    charge.

15         MS. KRAMER:  There are a number of issues that I think

16    the defendants have raised where there is not going to be big

17    debate.  There is some agreement on some of them.

18         MR. COOK:  We anticipated a substantial discussion,

19    your Honor.  That was a large part of my suggestion that we

20    close on Thursday.

21         THE COURT:  If we started closings at 9:30 Thursday,

22    how long will they take?  There is a lot of evidence in this

23    case.  I know it is impossible to predict.

24         MS. MERMELSTEIN:  It is hard to say.  I think the

25    government's closing will be less than two hours.  I have no

1   idea what the defense closings will be.  Given the amount of

2   evidence and what I expect the defense closings will be, I

3   think the rebuttal will not be super short.  Maybe it all comes

4   in in a day.  I don't see the jury getting the charge the same

5   day, but who knows.

6            THE COURT:  You believe it could be closings all day

7   Thursday, jury charge Friday morning?

8            MS. MERMELSTEIN:  I think that's right, with the

9   possibility that the rebuttal ends up Friday morning depending

10  on the length of the defense closings.

11           THE COURT:  I think I need the time.  There are

12  certain issues that I have pretty much resolved, and I see the

13  defense is continuing to make good arguments on those issues,

14  but there are some that I will be making changes on.  Some of

15  them are things where the defense said we should make it

16  simpler by going back to Sand.  I think some of those I am

17  going to do.  What I think is important for you is to have a

18  final version of the charge enough time in advance.  I'd like

19  to get that to you sometime Wednesday so that if you close on

20  Thursday you know exactly what the charge is.

21           MS. MERMELSTEIN:  Understood.  Your Honor, in light of

22  that, and if we are not going to sit tomorrow, if we could have

23  the charge conference tomorrow morning rather than late into

24  the evening.  And we do think it makes sense to ask the jury to

25  sit Friday if we are risking otherwise having closings and not

1    having a charge until three days or four days later.

2          THE COURT:  What I propose is that we do a charge

3    conference tomorrow but maybe do a mini high-level conference

4    where the government could tell me what areas of objection are

5    not disputed so I can try to start working on maybe a new

6    version of the charge that incorporates some of the objections.

7    Then we have a charge conference tomorrow morning.  Does that

8    work?

9          MR. COOK:  That sounds good, your Honor.

10         MR. BOXER:  Thank you, your Honor.

11         THE COURT:  We'll be done in 20 minutes, do you think?

12         MR. COOK:  Less.

13         THE COURT:  Then rebuttal will be short as well?

14         MS. KRAMER:  Yes, your Honor.

15         MR. BOXER:  We don't have objection to the

16   authenticity or admissibility of Government Exhibit 1145.  I

17   understand there is a second document.

18         MS. KRAMER:  There are two documents on the rebuttal

19   case.  Without objections, it will be lightning fast.

20         THE COURT:  All right.  Can we bring in the jury?

21         MR. WEDDLE:  Yes, your Honor.

22         (Jury present)

23         THE COURT:  Continuing, Mr. Cook.

24         MR. COOK:  Your Honor, there is one additional text

25   excerpt that we would offer.  It's Defense Exhibit 1013L.

1          THE COURT:  Defense 1013L is received.

2          (Defendant's Exhibit 1013L received in evidence)

3          MR. COOK:  One last stipulation, your Honor, Defense

4    Exhibit 1655.  I offer it.

5          THE COURT:  Defense 1655 is received.

6          (Defendant's Exhibit 1655 received in evidence)

7          MR. COOK:  Your Honor, because we have agreed to make

8    some modifications to it, I will not be able to publish it, but

9    I'll read it.

10          "The parties have agreed, if called as a witness,

11    Melinda Hardy Esq., assistant general counsel, office of the

12    general counsel, U.S. Securities and Exchange Commission (the

13    "SEC"), would testify that the SEC ran a search for emails to

14    and from jeff.wada@gmail.com and wadaj@pcaob.us.org through the

15    emails existing in the SEC's records for the time period of

16    January 1, 2008, to April 1, 2017.  No documents resulted from

17    this search.

18          "If called as a witness, Ms. Hardy would also testify

19    that the SEC does not have any written policies that set forth

20    the SEC's understanding or expectations regarding the manner in

21    which the PCAOB selects audits for inspection."

22          Thank you.

23          THE COURT:  All right.  Anything further from

24    defendant Wada?

25          MR. COOK:  No.  The defense rests.

1                THE COURT:  Thank you.

2                Both defendants have rested.  The government has a

3       chance for any rebuttal evidence.  Ms. Kramer.

4                MS. KRAMER:  Thank you, your Honor.  The government

5       has two documents to offer into evidence on admissibility

6       stipulations of the parties.  The first is marked for

7       identification as Government Exhibit 412.  I show the Court.

8       Your Honor, the government offers Government Exhibit 412.

9                THE COURT:  412 is received.

10               (Government's Exhibit 412 received in evidence)

11               MS. KRAMER:  Could we publish that.  These are Verizon

12       phone records for the number ending in 2356 for 2015 and the

13       beginning of 2016.

14               The next one, your Honor, is marked for identification

15       as Government Exhibit 1145.  The government offers 1145, your

16       Honor.

17               MR. COOK:  No objection.

18               THE COURT:  1145 is received.

19               (Government's Exhibit 1145 received in evidence)

20               MS. KRAMER:  Mr. Urbanczyk, could you please pop out

21       the email sent January 17, 2017, at 11:45 a.m. from Tom Whittle

22       to Cindy Holder and Scott Henderson, subject: re Valero

23       request.  I would direct the jury's attention to the last line

24       of that email and the sentence "Dave also approved our using

25       our combined resources on this one."

1          The government rests.

2          THE COURT:  Thank you.

3          MR. BOXER:  Your Honor, may we briefly approach?

4          THE COURT:  Yes.

5          (At the sidebar)

6          MR. BOXER:  I was just thinking further about the

7    government's representation that they were prepared to sum up

8    and would propose as another alternative, to not lose the jury,

9    to do the charging conference in the morning tomorrow, take

10   their summation, and we would do the rest of the closings on

11   Thursday.  As Ms. Mermelstein suggested, it is very possible

12   she will have overnight to deal with our summations, so I don't

13   think that creates any different advantage.

14          I raise that because that would allow the jury to come

15   back after lunch tomorrow to hear the government sum up, and

16   then we could start our summations on Thursday morning

17          MS. KRAMER:  Your Honor, we object to that proposal.

18   We would like as much effort as possible to be made for all of

19   the parties to sum up the same day rather than having the

20   government's closing delivered after a long charge no matter

21   how enthusiastically it is delivered.  It's a long day and then

22   they have an entire day of just defense argument.  That would

23   be a prejudice to the government.

24          MR. BOXER:  That's what I'm saying.  They would have

25   their rebuttal submission that day and the charge.

1          THE COURT:  You mean the charging conference.

2          MS. KRAMER:  I'm sorry, yes.

3          MS. MERMELSTEIN:  There may be substantial changes to

4    the charge that the government could immediately sum up after

5    the charge conference and defense counsel should have a full

6    extra 24 hours to prepare for closing over Ms. Kramer.  We

7    strenuously object.

8          MR. COOK:  I would say that the same applies to us.

9    We believe there would be prejudice to us if the government is

10   allowed to do its rebuttal on the following day.  So take

11   whatever time is necessary to finish all of the summations in

12   one day.

13         THE COURT:  I don't know if we will be able to or not.

14   We'll try.  There is only so much we can do to control that.

15         MR. BOXER:  Exactly.  That's why it occurred for me if

16   they went in the afternoon tomorrow and then the issue Mr. Cook

17   raised would be resolved.

18         THE COURT:  I think it probably makes sense to keep

19   tomorrow open.  I want to make sure you all have an overnight

20   with the final version of the charge.

21         MR. COOK:  Your Honor, the Government Exhibit 412,

22   which is the phone records, has a redaction at the top of --

23         MS. KRAMER:  It started on a new page.

24         MS. MERMELSTEIN:  We did it on the fly because they

25   were just being offered.  We'll do it that way.

1          MR. COOK:  No problem.  I just wanted to make sure.

2     Thank you.

3          (In open court)

4          THE COURT:  Ladies and gentlemen of the jury, you have

5     now heard all of the evidence in the case.  It is still not yet

6     time to deliberate, and that is because there are two things

7     both of which are very important.  The first is that the

8     lawyers for each side get a chance to do summations for closing

9     arguments.  In a case like this with a lot of evidence, that is

10    very important.  Each side gets a chance to explain to you how

11    they want you to think about the evidence and connect the

12    evidence.  Each party gets a chance to do that summation.

13         In addition to that, the other very important thing is

14    my instructions on the law.  I'm going to be charging you,

15    explaining to you in great detail what it is that you the jury

16    must find in order to make your determination of the facts in

17    this case.  It will be a long explanation of exactly what the

18    elements of each charge consist of.  Until you have those

19    important final pieces of the trial, you are not yet in a

20    position to deliberate.

21         In terms of timing, I wanted to ask you if you began

22    deliberating Thursday, would you be able to deliberate also on

23    Friday if you needed to?  If we did summations on Thursday and

24    the final jury charge, would you be able to deliberate also on

25    Friday?  Is there anyone who wouldn't be able to come in on

1    Friday?

2              You can't come Friday?

3              JUROR:  No.  All of Friday or part of the day on

4    Friday?

5              THE COURT:  It would be all.  Well, as much as

6    possible.

7              MR. BOXER:  Your Honor, may we approach?

8              (At the sidebar)

9              MR. BOXER:  I don't know if this would be

10   controversial with the jury, but maybe we should start at 9:00

11   on Thursday to have the whole thing and deliberate.  I don't

12   know how counsel feels 'that.

13             THE COURT:  Even if we start at 9:00, I don't know

14   that we'll get through all of the summations and the charge.

15             MR. BOXER:  We may not, but it might help.

16             MS. KRAMER:  I wasn't sure if your Honor told the

17   jurors that they wouldn't be sitting tomorrow, which might make

18   a difference on their availability on Friday.  They may be more

19   flexible if they know they have the day off.  We have no

20   objection to starting at 9:00.

21             MR. COOK:  Your Honor, they may want to sit a little

22   bit later on Thursday in order to complete.

23             MR. BOXER:  I would vote for the earlier start in lieu

24   of the later because as the day goes on it gets to be a lot.

25             THE COURT:  I'm fine with starting at 9:00.  Let me

1    try to find out if the Wednesday day off changes Friday

2    calculation.

3                (In open court)

4                THE COURT:  There are a few legal issues I have to

5    deal with to finalize the jury instructions.  One possibility

6    is we take tomorrow off.  I'm wondering if I gave you tomorrow

7    off, would you be able to work on Thursday and Friday?  Does

8    that help any issue with Friday?

9                JUROR:  No.  I had plans to be out of town for a

10   family function over the weekend.  That was the issue.  But if

11   I have to make everyone come back on Monday, I'd rather not do

12   that because I think that is more disturbing to everyone.

13               THE COURT:  So you think you would be able to do it

14   Friday, or would it be a real problem?

15               JUROR:  If I have to, I will be willing to do it, if I

16   have to.

17               THE COURT:  I appreciate that.

18               Unless somebody wants to talk at sidebar, the proposal

19   for going forward would be I'm going to give them tomorrow off

20   for the things that I need to deal with, and then we'll try to

21   start early on Thursday, get as much done as we can.  If we

22   start at 9 o'clock on Thursday, is that something you might be

23   able to do?

24               I know I'm asking a lot of you and we are in the

25   fourth week, and I really do appreciate it.  If you could come

1   in on Thursday at start at 9:00, we can get through as much as

2   we can on Thursday and see where things stand.  Tomorrow you

3   would not be sitting, you would have tomorrow off.  All right?

4   Okay.

5           Does anybody want to address anything at sidebar?

6           MR. BOXER:  No, your Honor.

7           MS. MERMELSTEIN:  No, your Honor.

8           THE COURT:  Folks, thank you very much for your

9   attentiveness and patience.  Again, tomorrow you don't need to

10  come in.  Leave your pads on your chairs, do not discuss the

11  case, do not research anything about the case.  We'll see you

12  as close to 9 o'clock as possible on Thursday.  Have a good

13  Wednesday.

14          (Jury not present)

15          MR. BOXER:  Ms. LaStrange's comments could be

16  interpreted in an unfortunate way: that she made it seem, if we

17  take her words literally, like the case needed to conclude on

18  Friday and she felt bad that she was making the jury come back

19  on Monday.  That may be just because she doesn't appreciate

20  that deliberations last as long as they need to.  She has been

21  told it's approximately a four-week trial.

22          I don't suspect she has made up her mind either way.

23  But that impression I would ask the Court in its experience to

24  deal with in an appropriate way, that they should be

25  deliberating as long as is necessary.  It's obviously a

1   critical part of the case and does not conclude by Thursday or

2   Friday if we don't sit Friday.

3           THE COURT:  That's a good point.  I will try to make

4   that clear.  There is no deadline here.  They deliberate as

5   long as they need to deliberate.

6           MR. BOXER:  Thank you.

7           THE COURT:  Any other issues anybody wanted to

8   address?

9           MR. WEDDLE:  Just as a matter of good form, your

10  Honor, we should renew our motion to dismiss for the reasons

11  previously stated.

12          MR. BOXER:  Same, your Honor.

13          MS. MERMELSTEIN:  Your Honor, I think we are putting

14  on the record that Mr. Wada understands that he had a right to

15  testify, that that was a decision he was entitled to make for

16  himself, not for him to be made by counsel, and he elected not

17  to testify.

18          THE COURT:  Do you have any objection to my asking

19  about that?

20          MR. COOK:  No, your Honor.

21          THE COURT:  To confirm, Mr. Wada, you had the

22  opportunity to speak with your counsel about the decision

23  whether to testify or not testify in the case?

24          DEFENDANT WADA:  Yes, your Honor.

25          THE COURT:  You understand you have the right to

1    testify if you choose to testify but you also have the right

2    not to testify?

3            DEFENDANT WADA:  Yes, I understand.

4            THE COURT:  You have chosen not to testify in the

5    case?

6            DEFENDANT WADA:  That is correct.

7            THE COURT:  Thank you.

8            Do you want to take a break before doing high-level

9    charge issues or not?

10           MR. WEDDLE:  Yes, your Honor.

11           THE COURT:  Let's take a ten-minute break.

12           MS. KRAMER:  Your Honor, is it possible for members of

13   the prosecution team who are not focused on this issue right

14   now to be excused?

15           THE COURT:  Yes, absolutely.  Anybody who wants to be

16   excused, who doesn't want to be heard to discuss charge issues,

17   is welcome to leave.

18           MR. COOK:  That includes the defendants?

19           THE COURT:  Yes, if they choose to.

20           (Recess)

21           THE COURT:  Everybody is here who wants to be here.

22   We'll have a charge conference tomorrow at 9:30.

23           MS. MERMELSTEIN:  That's fine, your Honor.

24           THE COURT:  What I was contemplating is the government

25   can tell me high-level from the defendants' objections which

1   ones you think you don't have a problem with.

2          MS. MERMELSTEIN:  We can tell you where you can stop

3   thinking about it from the perspective of the parties.  I'm

4   looking at the letter from counsel dated March 4th.

5          Paragraph 1, defendant's testimony, we have no

6   objection to that change.

7          Paragraph 2 with respect to the cooperating witness

8   testimony, first, I think there were no nonprosecution

9   agreements in this case, so that should come out.  I think none

10  of the parties like the proposed charge on this, maybe for

11  different reasons.  We don't object to taking out the language

12  that the defendants want to take out, but we think there is

13  more language that has to come out.  Part of the problem is

14  flowing from all of the discussion about you heard this witness

15  say and these lawyers argued.

16         THE COURT:  I'll take all that out.

17         MS. MERMELSTEIN:  We would suggest reverting to the

18  government's initial proposed instruction.

19         THE COURT:  Can I just use the Sand instruction on

20  cooperating witness?

21         MS. MERMELSTEIN:  I don't know if it is Sand or not.

22         MR. WEDDLE:  I think Sand has some of the stuff about

23  the government claims this or the defense claims that.  I think

24  in general we are all in agreement that that isn't properly

25  part of the charge, to characterize what either side is

1    arguing.  Sand has some of that in it.

2              MS. MERMELSTEIN:  We can take it up tomorrow, but I

3    think there is agreement that everyone would like a change.

4              THE COURT:  I'll take another look at what the parties

5    propose.  A lot of these charges come from this database at the

6    Southern District of judges where we share all these jury

7    instructions.  I often use the last ones I have used in a

8    criminal trial.  It ends up sort of being a Frankenstein

9    monster of a hodgepodge of Sand and some case two years ago.

10   Anyway, that doesn't matter but that's how it gets to be what

11   it is.  We'll take another look at that.

12             MS. MERMELSTEIN:  Number 3, on the objection to the

13   "either" language, we agree.  We have no objection to that

14   change.

15             Then going to number 4, to objection number 1 with

16   respect to the inclusion of the language "thing of value."

17             THE COURT:  I was going to change that to "money or

18   property" or change it all to "property."

19             MS. MERMELSTEIN:  That's fine, your Honor.  I think

20   "thing of value" is a definition of property, but it is true

21   that it doesn't belong.

22             THE COURT:  The standard would just be "money or

23   property."

24             MS. MERMELSTEIN:  That's fine.

25             THE COURT:  Is that fine with everybody?

1                  MS. LESTER:  Yes, your Honor.

2                  MR. WEDDLE:  Yes, your Honor.

3                  MS. MERMELSTEIN:  I think objection 2 relates back to

4     the "either" language.  To the extent we have consented to that

5     change, we similarly have no objection to a change here.

6                  Objection 3 and 4 start to be a little more

7     complicated, so we can take that up.  Objection 3 is a little

8     more nuanced.

9                  THE COURT:  The one thing I thought on objection 3 is

10    there does seem to be some repetition that I would like to

11    remove.

12                 MS. MERMELSTEIN:  That's fine, your Honor.  We have no

13    objection to the inclusion of the standard materiality

14    language, objection 4.

15                 THE COURT:  On page 4 of Middendorf's counsel's letter

16    they propose simply the Sand instruction.  I am kind of

17    inclined to do just that.

18                 MS. MERMELSTEIN:  That's fine.

19                 MR. WEDDLE:  Your Honor, we can take this up tomorrow.

20    I think the Sand instruction is good as far as it goes, but we

21    have asked for some additional language that is tailored to

22    this case based on the embezzlement theory.  I don't want you

23    to interpret us as conceding Sand covers the issue.

24                 MS. MERMELSTEIN:  I promise.  I wasn't going to take

25    up any of the really controversial issues.  The willfully, the

1    embezzlement, I think that is for tomorrow.

2         THE COURT:  That's fine.

3         MS. MERMELSTEIN:  On number 5 there is an objection to

4    language at the end of the first sentence, "Of course, proof

5    concerning accomplishment of the goals of the scheme may be the

6    most persuasive evidence."  We do think an instruction along

7    those lines is appropriate but have no objection to using the

8    standard Sand instruction.

9         THE COURT:  The bottom of the second paragraph?

10        MS. MERMELSTEIN:  Exactly.

11        THE COURT:  Yes, I was going to put that in.

12        MS. MERMELSTEIN:  6 I think is for tomorrow.

13        On 7, we can take this up more tomorrow, but I would

14   just note for your Honor that the defendants have objected to

15   the instruction that your Honor intends to give as not

16   sufficiently -- sorry.  I'm on 6 still.  They have objected

17   that under Mahafy the Court should give them guidance on what

18   kind of factors the jury might consider in determining whether

19   or not the information was both considered and treated as

20   confidential.

21        We don't object to some guidance on that, but the

22   proposed instruction doesn't actually do that, that the

23   defendants suggest.  We wouldn't have an objection in general

24   terms to an instruction that said this is not an exhaustive

25   list but some things you might consider are.  Otherwise, we

 1   think the instruction is better in its current form than what

 2   the defendants propose.  We can take that up tomorrow.

 3            7 gets into the more complicated issues.

 4            THE COURT:  One question about that.  The parties

 5   prefer that I not send a version of the indictment back to the

 6   jury, am I right about that?

 7            MS. MERMELSTEIN:  Yes, your Honor.

 8            THE COURT:  Defendants agree?

 9            MR. BOXER:  We agree, your Honor.

10            MR. WEDDLE:  Yes, your Honor.

11            THE COURT:  That requires that when I introduce each

12   count, I do something.  I think we tried to summarize what the

13   count charges.

14            MS. MERMELSTEIN:  Yes.

15            THE COURT:  That includes misappropriating,

16   embezzling, obtaining, sharing, using.

17            MS. MERMELSTEIN:  Agreed.

18            MR. WEDDLE:  That is the main focus of the letter that

19   I submitted on March 4th, that most of these verbs can't

20   constitute a wire fraud predicate.  Since we are not giving

21   them the indictment, I think we should pare it down to the

22   verbs that are proper wire fraud predicates and then define

23   them.

24            THE COURT:  I have thought a lot about this.  I think

25   this is a Carpenter confidential information case.  I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    think it collapses to embezzlement.  I don't think that a wire

2    fraud of the type charged here just becomes an embezzlement

3    charge, and therefore I'm not planning to put in all that

4    embezzlement stuff, although we can talk about it.

5         Carpenter says it is sufficient that one is deprived

6    of its right to exclusive use of confidential information.

7    That is both why it is not just embezzlement and also why it is

8    not multiple conspiracies.  I think it is one scheme.  If you

9    believe it is confidential and you believe -- the jury believes

10   that Mr. Wada took the information, it would mean nothing if he

11   gave that information to anyone except an audit firm.

12        As soon as the audit firm gets it, if it knows that it

13   is confidential from the PCAOB in the same way, that is, using

14   the information in a way that deprives the PCAOB of its right

15   to exclusive use of the information, I am persuaded that that

16   is a single thing.  You can talk about embezzlement in the way

17   that Carpenter does, but I don't think that means that the

18   elements of embezzlement are what this collapses to.

19        MR. WEDDLE:  Maybe this is something for tomorrow, but

20   it is something we have written in our letter and that we

21   argued at the rule 29 stage, which is that theft is not fraud.

22   The embezzlement is a critical point.  I take your Honor's

23   point that maybe this is not simply an embezzlement case,

24   although that is how I read the indictment.  If there are other

25   verbs, the other verbs have to be fraudulent verbs or they have

1   to be defined in a way to make clear to the jury that it has to

2   involve fraud.

3          To obtain information, even in a _Carpenter_ context, is

4   not a wire fraud predicate.  It has to be fraudulent.  In

5   _Carpenter_ people were trading on the information and making

6   money.  It was part of a scheme to make money from trading on

7   the information.  Here it's much more, I don't know what the

8   right word is, complicated, unusual, different from _Carpenter_.

9          The language that is in the indictment can be parsed,

10   legitimately parsed, as describing something that is not a

11   fraud at all.  We submit that it is error to permit that

12   language to stand because the jury could parse through it and

13   pick a word and say, well, they obtained it or, well, they

14   shared it or, well, they used it.  Use standing alone is not a

15   fraud, theft is not a fraud.

16          THE COURT:  Theft plus a duty is a fraud, plus

17   violation of a duty.

18          MR. WEDDLE:  I think there is somewhere where I would

19   agree with your Honor, but I think it is a little bit

20   different.  The way that it has been described is that if the

21   theft amounts to a fraud because of a breach of fiduciary duty,

22   then that is a different story.  The bottom line is simple use,

23   and this was in the motions to dismiss also, there are no

24   precedents for simple use being a wire fraud predicate.  All of

25   those cases are obtain and use confidential information.

1              I think it is a fair analogy that we also put in our

2    March 4th letter two insider trading cases where the same

3    language appears in rule 10b-5 about a scheme to fraud.  The

4    Supreme Court has said, and it's pretty well developed in that

5    area, that simply taking material nonpublic information is not

6    a scheme to defraud.  There has to be a personal involvement in

7    the taker.  That is, they have to be involved in the use.  In

8    that context the Supreme Court has talked about personal

9    benefit and the Second Circuit talked about personal benefit as

10   the test in Durst.

11             We need to be sure that the verbs that we are talking

12   about are fraud verbs.

13             THE COURT:  There will be stuff about fraud,

14   deception, swindle.  All of that stuff is a requirement in

15   fraud clearly defined.  But we are getting into tomorrow's

16   discussion.  To flag it for you, I don't know how the 10b-5

17   stuff helps defendants given the tippee liability fact.  The

18   fact is that a tippee is liable irrespective of the tippee's

19   duty.

20             MR. WEDDLE:  I represent the alleged tipper.  The

21   tipper has to have a stake in the outcome.

22             THE COURT:  Right.

23             MR. WEDDLE:  That's part of our argument.  I set forth

24   that it is the flip side of defendant Middendorf's argument.

25   If the scheme is a scheme to, if you will bear me with me for a

1    second, embezzle and misuse, if a particular defendant only

2    engages in half of that scheme --

3            THE COURT:  You're right if Mr. Wada took it and left

4    it at a 7-Eleven or gave it to his uncle.  But if in taking it

5    he was specifically intending to give it to an audit firm, that

6    does satisfy the relevant use, I think, intended use.

7            MR. WEDDLE:  I have tried to make this argument to

8    your Honor and failed to convince you before.  He can give it

9    to Cindy Holder.

10           THE COURT:  Who works at KPMG.

11           MR. WEDDLE:  With his understanding that she will use

12   it to make herself look good, which is not a fraud on the

13   PCAOB, which is the wire fraud that's been charged here.

14           THE COURT:  You can argue that, I agree.

15           MR. WEDDLE:  I need to have the legal instructions

16   that give the framework.  The legal framework has to be

17   explained to the jury such that my argument fits with the law

18   that they have heard.  People don't have to agree with this

19   theory, but I think it is similar to but not the same as the

20   multiple conspiracies issues.

21           There are different ways of looking at exactly the

22   same issue, which is that the scheme to defraud that the jury

23   has to consider is the scheme that's been charged, and the

24   scheme that's been charged is an embezzle and use scheme.  It

25   would be wrong to permit the jury to convict just on use and

1   not embezzle and it would be wrong to permit the jury to

2   convict on embezzle with no use accompanying it.  And if the

3   use is helped my friend Cindy look good for her co-workers, it

4   is not a fraud on the PCAOB.

5        These are different ways to think about and analyze a

6   similar issue.  The scheme that the government has to prove is

7   the one that they have charged.  They can't pick and choose

8   among these different verbs because some of them don't define a

9   fraud, some of them are not the scheme that has been charged.

10        There are pieces of a scheme.  Some of them are pieces

11   of different potential conspiracies which are not the

12   conspiracy charged.  Some of them, even if you put them

13   together in a particular way, might be considered to be a

14   fraud, like the Cindy Holder thing that I'm just talking about,

15   but it's not a fraud on the PCAOB.

16        MS. MERMELSTEIN:  Isn't that an issue for tomorrow?

17        THE COURT:  I think it is.  I'll be thinking about it

18   a lot.

19        Ms. Lester.

20        MS. LESTER:  Your Honor, we agree with most of what

21   Mr. Weddle said.  But, as you know from our submissions, there

22   is some daylight between our two positions with respect to the

23   embezzlement.  We will talk more about that tomorrow.

24        I just wanted to point out with respect to the remark

25   about Carpenter and this being a case about the deprivation of

1    the PCAOB's right to exclusive use of the information, I do not

2    think that is what is charged in the indictment.  That theory

3    is much closer, if it is not in fact, to a right to control

4    theory.  That is not what the charged here.  The government has

5    never said that it is relying on right to control.

6            We would object to the charge reflecting that sort of

7    theory.  We agree completely with Mr. Wada's counsel that this

8    is an embezzlement type case and that is the way the government

9    has charged it.

10           THE COURT:  Okay.

11           MS. MERMELSTEIN:  Number 9 on page 9, Mr. Middendorf

12   objects that it is not accurate to say that it doesn't matter

13   if the PCAOB was negligent in preventing the fraud.  I do think

14   they have a point there, your Honor.  Because the PCAOB has to

15   actually treat its information as confidential, it does matter

16   in some fashion if they were negligent in preventing the fraud.

17           Rather, there is an argument that that is relevant.

18   It is of course not relevant whether or not the PCAOB

19   inspection process was onerous or whether or not they were a

20   difficult regulator.  Although there are ways in which the

21   instruction is right, I think it probably is needlessly

22   confusing.  We would propose to take out the bolded language in

23   the first sentence and just leave in the "it doesn't matter if

24   they were a harsh regulator."

25           THE COURT:  You would take out both bolded passages?

1          MS. MERMELSTEIN:  I would.  I don't think that the

2    fact that the PCAOB was a harsh regulator has anything to say

3    about the defendants' state of mind and intent.  I think the

4    opposite is true: it literally does not matter and is

5    irrelevant.  So I don't think that should be in.  There is

6    going to be disagreement about that, so we can leave it for

7    tomorrow.

8          MS. LESTER:  Yes.

9          THE COURT:  To be clear, you are saying you want both

10   bolded parts out, you agree that both should be out?

11         MS. MERMELSTEIN:  We think both should be out.  I

12   think the defense only thinks the first should be out.

13         MS. LESTER:  That's right, your Honor.

14         MS. MERMELSTEIN:  Number 10, the first objection to

15   adding intent to defraud to the heading, that's fine.

16         THE COURT:  Which one was that?

17         MS. MERMELSTEIN:  I'm looking at government 10,

18   objection 1, asking the Court to include "intent to defraud" in

19   the parenthetical in the title.  That's fine.

20         We then disagree for a bunch of reasons.  On 13 we do

21   think that the draft instruction language, the particular use

22   charged in the indictment, is confusing.  We agree that it has

23   to be unanimous but think that the general unanimity

24   instruction is sufficient.  We can take up fighting about that

25   tomorrow.

1              THE COURT:  You would agree to take that out?

2              MS. MERMELSTEIN:  No.  The particular use charged in

3     the indictment is confusing language, especially when they are

4     not getting the indictment.  We have to find a better way to

5     phrase the first sentence of that.  I don't think it is

6     necessary to specifically instruct the jury that if they

7     unanimously agree on which wire they used, because I think

8     general unanimity instruction suffices in that regard.  I think

9     that will be an issue for tomorrow.

10             14 and 15 raise the same arguments we have been

11    having.

12             We have things to say on 16.

13             Ms. Lester is right, there are some other things to

14    talk about with 15, but we agree that the way the draft charge

15    describes the scheme is confusing and it would be easier to

16    understand if it was reversed: that is to say that the scheme

17    that is alleged to be the object is a scheme to defraud the

18    PCAOB of confidential information through the use of interstate

19    or international wires.

20             THE COURT:  Yes.

21             MS. MERMELSTEIN:  Thank you, Ms. Lester.

22             THE COURT:  Do you agree that the jury has to agree on

23    which wires, unanimously on which wires?

24             MS. MERMELSTEIN:  That is correct, your Honor.

25             THE COURT:  Are there specific wires charged?

1            MS. MERMELSTEIN:  They do not have to find

2   specifically that was one of the wires alleged in the

3   indictment.  It could be any wire.  There is a gazillion in

4   this case, so I don't think it would be appropriate to give

5   them a list.  It is not a case where there are three.  There

6   are any number.

7            THE COURT:  But they have to agree unanimously.

8            MR. BOXER:  On one.

9            MS. MERMELSTEIN:  Yes.

10           MR. WEDDLE:  Often the indictment does give some

11  examples.  The indictment here doesn't.  It just goes year by

12  year, says "the wires."

13           MS. MERMELSTEIN:  There are over acts that involve

14  wires.  In any event, I don't think we disagree.

15           THE COURT:  Got it.

16           MS. MERMELSTEIN:  That's it on things where we have

17  agreed.

18           THE COURT:  That's helpful.

19           MS. MERMELSTEIN:  Ms. Lester is asking whether or not

20  the government is still seeking conscious avoidance.  We always

21  were.  In light of Mr. Middendorf's testimony, we certainly

22  are, but I want to confer with the team before we take a

23  position.  We'll be ready to address it tomorrow.

24           MR. BOXER:  We had the complete opposite reaction to

25  the need for a conscious avoidance charge based on his

1   testimony, so it sounds like we need to talk about it tomorrow.

2          THE COURT:  We'll talk about it tomorrow.  See you all

3   at 9:30.  Have a good night.

4          (Adjourned to 9:30 a.m., March 6, 2019)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

DAVID MIDDENDORF

    Direct By Mr. Boxer . . . . . . . . . .2787
    Cross By Ms. Estes  . . . . . . . . . .2867
    Cross Mr. Cook  . . . . . . . . . . . .2957

 KRISTA MARIE HESS

    Direct By Ms. Clark . . . . . . . . . .2960
    Cross By Ms. Mermelstein  . . . . . . .2966
    Redirect Ms. Clark  . . . . . . . . . .2969

GOVERNMENT EXHIBITS

Exhibit No.                          Received

 138   . . . . . . . . . . . . . . . . . . .2974

 412   . . . . . . . . . . . . . . . . . . .2986

 1145  . . . . . . . . . . . . . . . . . . .2986

DEFENDANT EXHIBITS

Exhibit No.                          Received

 1013-D, 1013-E, 1013-G, 1013-I, 1013-J, . . .2976
         1013-K, 1013-M, 1013-R,
         1013-S, 1013-U

 1013L  . . . . . . . . . . . . . . . . . . .2985

 1381  . . . . . . . . . . . . . . . . . . .2973

 1439  . . . . . . . . . . . . . . . . . . .2974

 1647  . . . . . . . . . . . . . . . . . . .2973

 1654  . . . . . . . . . . . . . . . . . . .2976

 1655  . . . . . . . . . . . . . . . . . . .2970

```
 1                        DEFENDANT EXHIBITS

 2    Exhibit No.                            Received

 3    1655  . . . . . . . . . . . . . . . . .2985

 4    1656  . . . . . . . . . . . . . . . . .2971

 5    1657  . . . . . . . . . . . . . . . . .2972

 6    1658  . . . . . . . . . . . . . . . . .2975

 7    313   . . . . . . . . . . . . . . . . .2862

 8    M1    . . . . . . . . . . . . . . . . .2796

 9    M11   . . . . . . . . . . . . . . . . .2795

10    M210  . . . . . . . . . . . . . . . . .2962

11    M290  . . . . . . . . . . . . . . . . .2965

12    M303  . . . . . . . . . . . . . . . . .2963

13    M307  . . . . . . . . . . . . . . . . .2860

14    M310  . . . . . . . . . . . . . . . . .2861

15    M312  . . . . . . . . . . . . . . . . .2862

16    M315  . . . . . . . . . . . . . . . . .2860

17    M316  . . . . . . . . . . . . . . . . .2856

18    M35   . . . . . . . . . . . . . . . . .2797

19    M45   . . . . . . . . . . . . . . . . .2811

20    M53   . . . . . . . . . . . . . . . . .2787

21    M57   . . . . . . . . . . . . . . . . .2832

22    M65   . . . . . . . . . . . . . . . . .2799

23    M73   . . . . . . . . . . . . . . . . .2798

24    M76   . . . . . . . . . . . . . . . . .2803

25    M77   . . . . . . . . . . . . . . . . .2804
```