UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

                Defendants.

------------------------------x


                                             March 6, 2019
                                             9:47 a.m.


Before:

                    HON. J. PAUL OETKEN,

                                             District Judge
                                             and a jury


                         APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
BY:  REBECCA G. MERMELSTEIN
        JORDAN LANCASTER ESTES
            Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
        Attorneys for Defendant David Middendorf
BY:  NELSON A. BOXER
        AMY R. LESTER
        ALEXANDRA REBECCA CLARK
            – and –
BRUCH HANNA LLP
BY:  GREGORY S. BRUCH

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   JUSTIN S. WEDDLE
        SELBIE JASON


        - also present -

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal


oOo

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.

3              ALL COUNSEL:  Good morning.

4              THE COURT:  We're here for a charge conference to go

5    over the jury instructions, which I sent a draft of on Friday

6    to the parties and had gotten a letter from Mr. Middendorf's

7    counsel over the weekend and from Mr. Wada's counsel over the

8    weekend, another letter from Mr. Middendorf's counsel I believe

9    last night, and then a letter from the government this morning.

10             Do I have everything I should have on that?

11             MS. ESTES:  Yes, your Honor.

12             THE COURT:  All right.  So what's the best way to

13   proceed?  Is it just to go by page or big issues first, or what

14   do you think?

15             MS. ESTES:  I think by page would be a good way to

16   start.

17             THE COURT:  All right.  Is that OK?

18             (Pause)

19             We've started implementing various changes, some of

20   which we discussed last night, but we'll just use the version

21   that was sent to you so you can do it by page.

22             All right.  Where is the first issue anyone wants to

23   discuss page wise?

24             MS. ESTES:  Your Honor, we don't have anything until

25   page 14.

1              MS. LESTER:  I have two minor things on page 6 and 7.

2              THE COURT:  OK.

3              MS. LESTER:  On page 6, at the very end of instruction

4    F, the last sentence.  I would suggest that we end the sentence

5    after "not guilty" because the paragraph addresses all the

6    charges in the Indictment, so it's not -- to have the clause on

7    that count in the Indictment at the end is not in parallel with

8    the remainder of the paragraph, which is addressed to all of

9    the charges.  Just a period after "return a verdict of not

10   guilty."

11             THE COURT:  Is that OK with the government?

12             MS. ESTES:  That is fine, your Honor.

13             MS. LESTER:  And then on page 7, the first full

14   paragraph, the third sentence:  "Your function is to weigh the

15   evidence."  We would request that "and the lack of evidence be

16   added," which I think the Court has added previously in the

17   prior portion.

18             THE COURT:  Sorry.  Could you repeat where you were?

19             MS. LESTER:  Yes.  The first full paragraph on page 7.

20   This is instruction G.

21             THE COURT:  Yes.

22             MS. LESTER:  The third sentence, "Your function is to

23   weigh the evidence in the case," we would ask that "and the

24   lack of evidence" be added after "weigh the evidence."

25             MS. ESTES:  Your Honor, we don't think that's

1  necessary.  I think if that is added, we would prefer "or the

2  lack of evidence" instead of "and," because "and" implies that

3  there is a lack of evidence.

4        MS. LESTER:  Your Honor, if you look at the prior

5  page, page 6, second full paragraph, the Court used the phrase

6  in parentheses for a sentence that said, "if after a fair and

7  impartial consideration of all the evidence (and the lack of

8  evidence)," we would just ask that that same clause be inserted

9  on page 7.

10        MS. ESTES:  Your Honor, I think on this, too, we

11  prefer, if we're going to keep including it, that it be "or"

12  rather than "and."

13        THE COURT:  I think it does make sense to say "or" in

14  both places.

15        MR. WEDDLE:  I have page 10.

16        MS. ESTES:  Your Honor, there is one other thing on

17  page 8 before we get to 10.  Sorry.

18        On page 8, there is another place where it says "and

19  the lack of evidence."  It's in number 3, about the fifth line

20  down.  So we just ask that it says "or."

21        THE COURT:  OK.

22        All right.  Mr. Weddle, did you have the next one?

23        MR. WEDDLE:  Yes, your Honor.  On the first full

24  paragraph on page 10, at the end of that paragraph, the

25  instruction says, "The jury must be satisfied of the

1   defendant's guilt."  I would request that that instead read,

2   "The jury must be satisfied that the prosecution has proven the

3   defendant's guilt beyond a reasonable doubt."

4           THE COURT:  Any comments on that?

5           MS. ESTES:  Your Honor, we don't think it is necessary

6   but we also don't feel particularly strongly on that.

7           THE COURT:  All right.

8           MR. WEDDLE:  There are no summary charts that are not

9   admitted in evidence?

10          THE COURT:  Right.  The summary charts were all

11  admitted, right?  Are there going to be any others in closing?

12  Those are demonstratives but not summary charts, I guess,

13  right?

14          MS. MERMELSTEIN:  I think there will be things shown

15  to the jury on slides.  I don't know that they constitute

16  summary charts, and I don't think we need an instruction on

17  them since they are at sort of a different point in the trial.

18          THE COURT:  So we take out K.

19          All right.  Next.

20          MR. WEDDLE:  On page 12, at the bottom, the Court is

21  talking about bias.  So the last full paragraph, it says, "Such

22  a bias or relationship does not necessarily make the witness

23  unworthy of belief."  I just request the flip side of that and

24  just add three words, "but it can."

25          THE COURT:  OK.  Any issues with that?

1          MS. ESTES:  Your Honor, we don't think that is

2    necessary.  This is the standard language that's used.  I think

3    it is already clear that they can consider that.

4          THE COURT:  OK.  I'll consider that.

5          And 13?

6          MS. LESTER:  Your Honor, in our letter dated

7    March 4th, we had raised an objection to this instruction, "The

8    defendant's testimony," but I believe yesterday on the record

9    the government said that they did not object to our suggested

10   change, which was to add a sentence at the end.

11         THE COURT:  Yeah.  I was going to change it along the

12   following lines:  "In a criminal case, the defendant cannot be

13   required to testify, but if he chooses to testify, he is of

14   course permitted to take the witness stand on his own behalf.

15   In this case, Mr. Middendorf decided to testify.  You should

16   examine and evaluate his testimony just as you would the

17   testimony of any witness with an interest in the outcome of

18   this case.  However, the burden of proof remains on the

19   government at all times and the defendant is presumed

20   innocent."

21         And then:  "Mr. Wada did not testify in this case.

22   Under our Constitution, the defendant has no obligation to

23   testify," etc., etc., and then I repeat the burden as before.

24   So, I think I have incorporated that.

25         MS. LESTER:  Yes.  Thank you, your Honor.

1          THE COURT:  14 we took out "and nonprosecution

2     agreements" in the title of P, as in Paul.

3          MR. WEDDLE:  I'm sorry, your Honor, just to back up.

4          You are still going to do the final paragraph of

5     defendant's testimony, about not attaching any significance to

6     the fact that Mr. Wada's --

7          THE COURT:  Yes, that's all staying in.  Yes.

8          14?

9          15?

10          16?

11          MR. WEDDLE:  On 15, your Honor, I would -- I think

12     this can be shorter.

13          THE COURT:  Yes.  We're working on shortening it, as

14     discussed last night, and taking out, you know, defendants are

15     arguing, the government's arguing, but just have more of a

16     generic cooperating witness testimony.

17          MR. WEDDLE:  OK.  My comment may just overlap with

18     what your Honor is already doing, then, but I would suggest

19     delighting the paragraph that starts with Mr. Sweet and

20     Mr. Whittle in the middle of page 15.

21          THE COURT:  Yes.

22          MR. WEDDLE:  And then the following paragraph:

23     "However, it is also the case," I think we've also covered

24     those two things.

25          THE COURT:  Yes, I think we are essentially doing

1    that.

2              MS. ESTES:  So, your Honor, we -- do you have any

3    guidance as to what you intend to do on the cooperating witness

4    charge?

5              THE COURT:  It is really going to be the government's

6    version as proposed.

7              MS. ESTES:  OK.

8              THE COURT:  Which is just a standard, shorter

9    cooperating witness instruction.

10             MR. WEDDLE:  I had a comment on page 16.  I don't know

11   if it is --

12             THE COURT:  OK.

13             MR. WEDDLE:  -- beside the point if you are doing a

14   different instruction.

15             I think this may be obviated by just giving the

16   government's request.  But the pieces that I had an objection

17   to, if they are not obviated, are the paragraph that says, "One

18   final note in this regard" and it goes on.  I think it is

19   unnecessary and it could be cut, as it is not strictly

20   accurate.  I think it is permissible for the jury to consider

21   why the government was making agreements with people that they

22   were making agreements with.

23             THE COURT:  So, the "One final note" paragraph is

24   staying in.

25             MR. WEDDLE:  I think that it is not accurate, or to

1    put it a different way, I think that there are fair arguments

2    to be made that call upon the jury to have a concern about why

3    the government made agreements with witnesses.  They are

4    permitted to do so, but I don't think that means that we can't

5    comment on it.  And I don't think that the jury should be

6    instructed that they have to disregard any such comments.

7         MS. ESTES:  Your Honor, I think it is relevant what

8    the witness' understanding is about these agreements.  But the

9    fact that the government entered into these agreements is not

10   something the jury should really be considering.  So that's why

11   we do believe this paragraph is appropriate.

12        THE COURT:  I think that's right.  It is really

13   distinguishing why the government made the agreements with

14   whether the witness was giving truthful testimony, which

15   certainly can give the perspective of the witness and interest

16   and motive they have.

17        MR. WEDDLE:  I think the two things are intertwined,

18   your Honor.  I just wanted to be sure that we're not going to

19   be charged out of the case.  As I've said before in this case,

20   what is unique about Mr. Sweet is not his bad conduct as a

21   cooperator or the fact that he's a cooperator with a

22   cooperation agreement but the fact that he lied repeatedly

23   during the course of that cooperation to the government.  He

24   committed crimes.  He failed to bring to the government's

25   attention crimes of which he was aware.  And the government

1    essentially just gave him a pass for all of that conduct.  In

2    fact, they entered into an additional cooperation agreement

3    with him that gave him additional immunity for a mortgage fraud

4    felony that he had lied about in his meetings with the

5    government.

6          THE COURT:  But I think it's accurate that the

7    motivation and thinking of the government is not part of the

8    jury's deliberation.  You can certainly impeach him all you

9    want with that and what they think of the witness is fair game,

10   but I don't know why the government's thinking is relevant to

11   anything.

12         MR. WEDDLE:  We are entitled to comment on the

13   government's --

14         THE COURT:  Charging decision?

15         MR. WEDDLE:  -- conduct of the investigation and their

16   failure to pursue certain leads and their decision to bind

17   themselves irrevocably to Brian Sweet and his lying.  And we

18   plan to do so, and I don't think we should be charged out of

19   the case in making those arguments.

20         MS. ESTES:  Your Honor, the government is not on trial

21   here.  I don't think -- I think the jury should be instructed

22   that our decision on the agreements we made with witnesses,

23   that's not relevant.  It's relevant the witness'

24   understanding -- the witness' understanding of the agreement.

25   They can impeach all they want on the fact that, you know, the

1    witness said he committed more crimes and he still has his

2    cooperation agreement in his understanding.  They can do that.

3    But the witness has not testified about what the government

4    did.  He doesn't know what the government is thinking.  That is

5    not something that is in evidence, and so I don't think this

6    instruction is appropriate.

7              THE COURT:  You do think the instruction is

8    appropriate?

9              MS. ESTES:  Sorry.  We do think -- we don't think what

10   Mr. Weddle is suggesting is appropriate.

11             THE COURT:  Right.  Anyway, I think it is a correct

12   statement.  I will think about it and double-check.

13             MR. WEDDLE:  Your Honor, if I may just add to what

14   I've already said, which so far has not convinced your Honor,

15   but it seems to me to be a severe error, under <u>Kyles v.</u>

16   <u>Whitley</u>, to give an instruction that essentially tells the jury

17   not to consider the ways in which the government conducted its

18   investigation that's resulted in the proof that's before the

19   jury and the absence of proof that's before the jury.  It's a

20   mainstay of our argument, and we should be permitted to make it

21   without the Court taking part of it away from us.

22             It's squarely permitted by Supreme Court precedent and

23   Second Circuit precedent and the multiple agreements and

24   multiple lies by Mr. Sweet and continuing criminal conduct in

25   the face of all sorts of obligations, including his release on

bond, not to engage in criminal conduct, the fact than his bond

has not been revoked and the fact that the government

considering recalling him after he admitted a new mortgage

fraud during his testimony.

THE COURT:  So you think it is appropriate for the

jury to consider that the government's agreement with that

witness was improper?  The government's, as opposed to the

witness lying?  I don't think that is part of the jury's task.

MR. WEDDLE:  All we're asking for, your Honor, is that

your Honor not say it is no concern of yours why the government

made agreements with witnesses.

THE COURT:  Right.  That's why I'm asking --

MR. WEDDLE:  That is what I am asking for.

I don't think we are going to say you need to ask

yourself why did the government make an agreement with Brian

Sweet.  That's not the thrust of our argument.  But the thrust

of our argument very much will be they chose Brian Sweet.

That's their case.  That's their whole case.

THE COURT:  That's fine.  That's attacking the

evidence.  That's not attacking the government's decision.

MR. WEDDLE:  And then we're going to go further and

we're going to say that he lied.  He lied to them over and over

again and he committed crimes.  He violated his agreement over

and over and over again.  And there is no chance that he's

going to -- I mean, and now he says, well, he has to tell the

1   truth or his agreement is going to be ripped up.  I think that

2   the jury can find that to be utterly unworthy of belief because

3   the government's conduct in this case toward Mr. Sweet has

4   demonstrated over and over again that he is free to lie and

5   they will continue to use him, because they need him, because

6   they have nothing else.

7          MS. ESTES:  Your Honor, I think Mr. Weddle's arguments

8   still go to what Mr. Sweet's understanding of the agreement is.

9   He can make those arguments.  But it is still not relevant what

10  the government's decision making was.  And this is shown in the

11  context of other instructions, like, for example, there is

12  always a standard instruction on the government doesn't have to

13  use particular law enforcement techniques.  That's not

14  required.  That is a standard instruction.  Like the

15  government's decision to use particular law enforcement

16  techniques, its decision to enter into agreements with certain

17  people, the government's decision making is not on trial and is

18  not relevant, and we think this instruction making that clear

19  is appropriate.

20         THE COURT:  Ms. Lester, is this something on this or

21  something else?

22         MS. LESTER:  It is having to do with the cooperating

23  witness instruction but not on this particulars point.  Do you

24  want me to wait?

25         THE COURT:  No.  Go ahead.

1          MS. LESTER:  OK.  Your Honor, if the Court is inclined

2    to accept the government's proposed instruction, we feel very

3    strongly that there needs to be an addition to the first

4    paragraph along the lines of what's in our proposed

5    instruction.  So, this is at request number 4, page 6 of

6    Mr. Middendorf's proposed charge.  We had suggested that the

7    Court include an instruction that the jury should draw no

8    conclusions or inferences of any kind about the guilt of the

9    defendants from the fact that the prosecution witnesses have

10   pled guilty to criminal charges.  A witness' decision to plead

11   guilty is a personal decision about his own guilt.  It may not

12   be used by you in any way as evidence against or unfavorable to

13   the defendants on trial here.  That --

14          THE COURT:  All right.  That was in the old version.

15          MS. LESTER:  Yes.  That instruction is not in the

16   government's proposed instruction.  It is standard Sand, I

17   believe, and we feel, especially here, where Mr. Middendorf

18   testified --

19          MS. MERMELSTEIN:  I'm sorry to interrupt, but we have

20   no objection.

21          THE COURT:  Yes.  So you are talking about the

22   language that starts with, "You are instructed that you are to

23   draw"?

24          MS. LESTER:  Correct.  And ends with, "as evidence

25   against or unfavorable to" --

1          THE COURT:  Yes.  That's fine.  We will add that.

2          MS. LESTER:  Thank you.

3          THE COURT:  Mr. Weddle, I will consider the argument

4    you are making, but it still seems to me that why the

5    government made agreements with witnesses is on one side of the

6    line, and your arguments about credibility and the lack of

7    evidence and etc. are fair game, but I will think about it.

8          MR. WEDDLE:  And it may be that your Honor's intent in

9    using this language is to draw a distinction that we're not

10   crossing that line and we're in agreement.  I think that the

11   language chosen has a risk of being misunderstood by the jury

12   as a statement that our arguments are not proper arguments, or

13   they don't fit into the instruction.  So we're not -- I

14   think -- your Honor has heard what our argument is going to be.

15   If it is not contrary to this instruction, I would suggest that

16   we just take it out because we're not going to be arguing for

17   the thing that this instruction is addressing, and I think that

18   it's susceptible in its current form of undermining the

19   argument we intend to make.

20         I had one other point and this may -- I haven't had

21   time, I'm sorry, to just read carefully the government's

22   instruction, but on the draft that we have here, on the issue

23   of -- the last paragraph, which may be coming out, it says, "As

24   I've previously instructed you, the issue of credibility need

25   not be decided in an all-or-nothing fashion."  I think that the

1        law is that it may be --

2                    THE COURT:  Actually, I think we are taking that out.

3                    MR. WEDDLE:  Yes.

4                    THE COURT:  We are taking that out.

5                    Let's see.  Anything on 16?

6                    17?

7                    18?

8                    19?

9                    20?

10                   MS. MERMELSTEIN:  Your Honor, sorry, on 19.

11                   So, in the second paragraph at the top of the page,

12       you have, "I instruct you that you may not draw any inference,

13       favorable or unfavorable, towards the government or the

14       defendants from the fact that there may be people who have not

15       been tried as defendants in this case."  I think that that

16       language makes it sound like there has been some decision not

17       to charge certain people, as opposed to just a direction that

18       there should be no speculation about why certain people aren't

19       here.

20                   THE COURT:  Who may not be on trial here or --

21                   MS. MERMELSTEIN:  Yes.  You shouldn't speculate about

22       why any other person other than the defendants is not on trial

23       here I think is what was in the government's initial request,

24       so from the fact that any other person other than the

25       defendants is not on trial here.

 1              THE COURT:  OK.

 2              19?

 3              20?

 4              21?

 5              MR. WEDDLE:  Yes, your Honor.  Along the lines of the

 6    Kyles v. Whitley argument that I was making before, on page 20,

 7    the paragraph at the top, not the first full paragraph but the

 8    carryover paragraph, I would propose striking the last sentence

 9    of that paragraph:  "Their absence should not affect your

10    judgment in any way."

11              THE COURT:  Any objection?

12              MS. MERMELSTEIN:  Yeah.  I think the statement is

13    correct, and the fact that the jury shouldn't be speculating or

14    changing their views based on who did or didn't testify in the

15    trial, they should evaluate the evidence in the case on its on

16    without speculating about things outside of it.  So, I think it

17    is right the way it is.

18              MR. WEDDLE:  The absence of knowledge of the

19    witnesses, your Honor, is something that we can fairly comment

20    upon, and it could affect the jury's judgment.  It is the

21    absence of evidence.

22              MS. MERMELSTEIN:  They can certainly argue about the

23    absence of evidence, clearly.  I think that the point is that

24    they shouldn't be speculating about why a particular person

25    didn't testify or what they would have said and the fact that a

1  particular person wasn't called to testify.  Right?  It would

2  be improper to say, well, if the government's right about this,

3  why didn't they call this other person, right, just as it would

4  be improper for the government to make the same argument even

5  in the absence of the no burden issue.

6      You can certainly argue there is no evidence of a

7  particular issue or that the witnesses who did testify had

8  nothing to say about a particular issue and there was just a

9  complete lack of evidence in the case.  What you can't do is

10 say that there are particular witnesses who should have been

11 called and that you should speculate or decide anything based

12 on the fact that they weren't.  And I think this language is

13 correct here and in no way suggests that the defense can't

14 argue there is an absence of evidence.

15     MR. WEDDLE:  Your Honor, the remainder of the

16 paragraph, which was not requested to be deleted, fairly and

17 accurately instructs the jury on the law, that is, that they

18 shouldn't speculate about what an absent person would testify.

19 It is completely proper for them to consider and to have it

20 affect their judgment, the fact that other witnesses are not

21 present and the witnesses who are present are Brian Sweet,

22 giving secondhand information.

23     THE COURT:  Let me ask you.  Kyles is a Brady case,

24 right?

25     MR. WEDDLE:  Yes, it's a Brady case because it is a

1    case that stands for the proposition that it is fair argument

2    and exculpatory for the defense to argue that the government's

3    investigation was -- the investigation itself had failures.

4    So, other leads were not pursued, other investigative steps

5    were not taken, and, therefore, you have the case that you have

6    in front of you, or have the evidence that you have in front of

7    you, and that the manner in which the investigation was

8    conducted did not do what it should have done, to dispel

9    reasonable doubt.  So, it is an impeachment of the

10   investigation argument, which I think is what -- that's what I

11   am referring to when I spoke about _Kyles_ and maybe I am getting

12   it wrong.  But I think that it is a fair argument to say that

13   the investigation was conducted in a manner that did not dispel

14   the reasonable alternative interpretations, which is I think

15   another way of saying they did not address to the level of

16   beyond a reasonable doubt the issues in the case.

17            THE COURT:  Yeah.  I think you make a fair point, that

18   the sentence "Their absence should not affect your judgment in

19   any way," I think it is meant to emphasize the prior sentences,

20   but it could be read to mean the absence of evidence is somehow

21   off limits, and it's not.  So I think the paragraph before

22   fully covers it so I am fine with taking that out.

23            20?

24            21?

25            MR. WEDDLE:  I'm sorry, your Honor, on 20 still, under

1  "Particular Investigative Techniques not required," at the end

2  of that paragraph I would request that it be rephrased to say,

3  "The government has proven the defendants' guilt beyond a

4  reasonable doubt" rather than the passive-voice formulation

5  that exists now, "The defendants' guilt has been proven."

6             MS. ESTES:  That is fine, your Honor, with us.

7             MR. WEDDLE:  And then in the next paragraph, your

8  Honor, it says in the first -- in the second sentence, "You

9  must bear in mind that guilt is individual."  I would just ask

10 for the flip side, "that innocence or guilt is individual."

11            MS. ESTES:  That is fine with us.

12            THE COURT:  Innocence or guilt, or guilt or innocence?

13            MS. LESTER:  Always innocence first.

14            In paragraph -- I'm sorry, the bottom of page 20 and

15 top of 21, in instruction X, there is the phrase, "or her."

16 Since there are no female defendants, I think it is less

17 confusing to take that out.

18            THE COURT:  We cut that, yes.

19            MS. LESTER:  Then on 21, in substantive instruction A,

20 "Meaning of Indictment," the second full paragraph, the last

21 sentence, "What matters is the evidence," we would ask again

22 that, "or lack of evidence that you've heard and saw on the

23 trial."

24            THE COURT:  OK.

25            21?

1              22?

2              MR. WEDDLE:  Your Honor, on page 22, in describing the

3    counts of the Indictment, this was the subject of a motion to

4    dismiss by Mr. Wada.  But Count Two does not actually say who

5    is the target of the fraud, and that is exactly what your

6    Honor's proposed instruction does as well.  I think the way

7    that the case has been tried and in fact the way that the

8    government opened on the case was to say that Count Two is

9    intended to charge a conspiracy to commit wire fraud against

10   the PCAOB.

11             THE COURT:  Do you want to put that in there just to

12   make it clear?

13             MS. ESTES:  That is fine, your Honor.

14             THE COURT:  And then do we need to repeat that for

15   three, four, and five, or do you think it is clear enough?

16             MR. WEDDLE:  Yes, probably.  It may be that we cover

17   it -- let's see.  Do we cover it in --

18             MS. LESTER:  I think it is more clear in the

19   substantive counts that the fraud is directed against the

20   PCAOB.

21             THE COURT:  OK.

22             MR. WEDDLE:  On 23 and 24, your Honor gives a more

23   robust instruction about that.

24             THE COURT:  Yes, that's right.  OK.

25             23?

1            24?

2            MS. LESTER:  So now that we are on pages 24 and 25,

3    we're getting into the wire fraud instructions which we have a

4    set of more complicated objections to.  I think that your Honor

5    indicated yesterday that you were -- you agreed that the

6    alternative instruction, the "either" language, was going to be

7    changed.

8            THE COURT:  Yes.

9            MS. LESTER:  So I won't address that.

10           But I could either do it now, my more substantive

11   arguments, or we could continue with the line editing, whatever

12   the Court's pleasure is.

13           THE COURT:  Well, I'm fine doing the high level stuff

14   now.  I gather this is what's in your letter?

15           MS. LESTER:  Yes.

16           THE COURT:  Which I think makes some powerful points.

17   And if you want to reiterate anything, you are welcome to.

18           MS. LESTER:  Well, I won't belabor it, your Honor,

19   since I know you've read the submissions.  But the government

20   then put in a letter this morning citing O'Hagan and saying

21   that we were mistaken in citing it for the proposition that we

22   had.  We don't think we are mistaken.  O'Hagan is a securities

23   fraud case.  The securities fraud statute is entirely different

24   from the wire fraud statute.  As part of the crime of

25   securities fraud, the information must be used, because the

1    object of the scheme is to use the information to trade and to

2    make money.  The wire fraud statute has no such requirement.

3    It's focused on the fraud to obtain money or property.

4         The fundamental problem I think that we have with the

5    wire fraud charge is that it seems to try to combine two

6    separate types of conduct.  The first is the pure embezzlement

7    fraud that we've described in our letter, which is similar to

8    Carpenter and Sampson, and grounded in common law embezzlement.

9    That fraud is clearly charged.  The government alleges that

10   information was stolen in breach of a duty, and that there was

11   an omission made in that the person who held the duty did not

12   tell the PCAOB that they had stolen the information.  That is

13   squarely just like Carpenter.

14        The use that's associated with embezzlement is the --

15   under Sampson is the intent that the embezzler has to use it.

16   That's when that crime is complete.  It is not a separate use

17   later on.  All of the use that the government has described in

18   the Indictment regarding the use of the information in

19   connection with improving inspection results is actually

20   conduct that if you read the Indictment closely is directed at

21   the SEC.  It is not really directed at the PCAOB.  All of the

22   overt acts in Count One describe conduct that relates to the

23   PCAOB.  It is all related to use of the information.

24        The separate use by Mr. Middendorf or other people, as

25   alleged, at KPMG is not a crime in and of itself.  There is no

1   fraudulent misrepresentation.  There is no omission.  The

2   government has not alleged any duty on the part of

3   Mr. Middendorf to tell anyone that he had this information.

4   There is no fraud there.  This is what Mr. Weddle was getting

5   at yesterday.  Use, even of stolen information by itself, is

6   not a crime.  There has to be some fraudulent act in connection

7   with that.  The government has not alleged that.

8           Now, as to the wire fraud conspiracy, you know, it's

9   harder to break this down because then it is a conspiracy, it

10   is an agreement, and we understand why that could be viewed

11   differently and more broadly as a scheme.  But as to the

12   substantive counts, the "to wit" clause in this case just makes

13   no sense.  The use of information is not what is chargeable

14   under the wire fraud statute.  It has to be a scheme to deprive

15   money or property.  The information was taken.  That is the

16   wire fraud.  It's not the separate use after the fact.

17           So that's really the core of our argument and what

18   we've really been arguing since the beginning of the case.

19           THE COURT:  I understand.  But given where we, what is

20   your ask?  You are asking for something about when the

21   embezzlement type of fraud is ended?

22           MS. LESTER:  Yes.  I think we need some language both

23   in connection with the substantive offenses and the aiding and

24   abetting charge that makes clear that a defendant has to

25   understand and has to participate in the act of embezzlement

1    itself.  He has to have more knowledge of it.  And that's why

2    this case is almost charged, the substantives, as if they are

3    conspiracies, and we're saying that is improper.  There has to

4    be a participation on Mr. Middendorf's part in the act of

5    embezzlement, which is the fraud, otherwise he is not

6    participating in a fraud.

7              THE COURT:  Do you want to add to that?

8              MR. WEDDLE:  I have a couple of things to add, your

9    Honor, and --

10             THE COURT:  I mean, I want to hear from the government

11   on this, because I think this is really tricky stuff, and all

12   I've got is this one-and-a-half page letter today.  So I went

13   back to the government's opposition to the motion to dismiss

14   and there is about a page and a half on this.

15             But what I was describing as the government's theory

16   of this I think is more sophisticated than what the government

17   has laid out.  So, I want an answer to what the government's

18   theory of wire fraud is.  I don't have much trouble with fraud

19   against the United States.  We'll get to that when we do.  But

20   what do you want to add?

21             MR. WEDDLE:  I think three things, your Honor.

22             First of all, I appreciate the letter that

23   Mr. Middendorf's counsel sent in and we join in it.  It

24   prompted me to reread Carpenter last night after I got it, and

25   I noticed that there are a couple of interesting things in

 1   Carpenter --

 2            THE COURT:  I read Judge Stewart's District Court

 3   opinion as well.

 4            MR. WEDDLE:  Ah, see, you were up later than I was.

 5            THE COURT:  Yes.  But anyway, go ahead.

 6            MR. WEDDLE:  So a couple of interesting things that I

 7   noticed about Carpenter, which I think directly tie into what I

 8   was saying yesterday.  And I think that, as I said yesterday, I

 9   think that the defendants' arguments here are consistent,

10   although we obviously have a different emphasis.

11            And what I argued yesterday is that the scheme has to

12   be a scheme to embezzle and misuse, not just a scheme to

13   embezzle and not just a scheme to misuse.  Neither one works.

14   And I think that Carpenter provides direct support for that,

15   because Carpenter of course has two pieces to the opinion.  The

16   first piece is about what is property.  OK?  We skip over that

17   piece.

18            The second piece is what is the fraud.  And this also

19   I was thinking about your Honor's comments yesterday at the end

20   of the day, and I thought of an additional thing that I should

21   have said.  Your Honor said, in response to some of my

22   comments, that you were going to cover, you know, the deception

23   and the fraud, that's all in the specific intent to defraud

24   part.  And I think it's important to note that there are --

25   that fraud appears in two elements of wire fraud.  It has to be

1  a scheme to defraud combined with the defendant's specific

2  intent to defraud, and it needs to be both.  You can't have a

3  scheme to cross the street performed with a specific intent to

4  defraud and make that a wire fraud because that's not an

5  illegal scheme, crossing the street.

6          So I do think that there needs to be an illegal

7  scheme, and this ties into everything I said yesterday about

8  the variety of verbs that appear in the Indictment which do not

9  by themselves, if they are not defined to include a fraud

10 element to them or a fraud characteristic to them, they don't

11 describe as the first element of wire fraud a scheme to

12 defraud.  They may describe, or they're susceptible of a

13 reading that describes a scheme to cross the street, a scheme

14 to do something that's OK, combined with specific intent to

15 defraud, and I think the instruction needs to do both.

16          But in Carpenter, what I noticed is that in the second

17 half of this, which is about what is the fraud here, there are

18 a couple of places where the Court pointed out that the fraud

19 was not just the taking of confidential information, but it was

20 part of a scheme to share profits.  So I don't have a copy for

21 your Honor, but there is a paragraph --

22          THE COURT:  Which case?  Sorry.

23          MR. WEDDLE:  This is in Carpenter, your Honor.

24          THE COURT:  Right.

25          MR. WEDDLE:  So Carpenter, at page 3 -- no, sorry,

page 27, at the end of page 27 of 484 U.S. Reporter, the
sentence says:  "The district Court found that Winans'
undertaking of the Journal was not to reveal prepublication
information about his column, a promise that became a sham
when, in violation of his duty, he passed along to his
co-conspirators confidential information belonging to the
Journal."

             And here is the very critical point.  There is a comma
there, there is not a period.  If simple embezzlement of
information were enough under the wire fraud statute, the Court
could just put a period there.  The Court didn't do that.  The
Court went on to say:  "Pursuant to an ongoing scheme to share
profits from trading in anticipation of the heard column's
impact on the stock market."  So, do you see in that sentence
there, because the Court did not just put a period and say he
had a promise not to take this confidential information that he
was entrusted with and that promise became a sham.  Period.
Full stop.  If that described a fraud, then they wouldn't need
to keep going, but it did keep going and described the use, or,
you know, there are lots of different ways to articulate this.
And I talked yesterday about the Dirks case, D-i-r-k-s in the
insider trading context, but it is a similar concept.  And I
think that both of these cases are in different contexts, but
they're talking about what is a fraud.

             And part of what makes it a fraud is the benefit, or

1    here in Carpenter, the ongoing scheme to share profits.  That's

2    what makes it a fraud.  It is not simply the violation of the

3    confidentiality agreement with the Wall Street Journal for the

4    information that was entrusted to him.

5          And there is another example and this is a shorter

6    sentence, but at the very end of the opinion -- not very end,

7    second-to-last paragraph, the Court says:  "Winans continued in

8    the employ of the Journal, appropriating its confidential

9    business information for his own use."  Those three words, "for

10   his own use," describe the other essential component --

11         THE COURT:  Personal benefit.

12         MR. WEDDLE:  Personal benefit, for his own use, not

13   simply the taking or simply the violation of the workplace

14   rule.  Because otherwise the workplace rule -- if the workplace

15   rule and the violation of the workplace rule or the violation

16   of that agreement or duty were enough, that would collapse in

17   on itself and preclude the Finnerty decision.

18         So, I said I had three things.  Anyway, I have

19   probably forgotten one.

20         So our request, you know, our specific request -- and

21   it is always boring when somebody does this at a charging

22   conference -- is to use the instruction that we propose.  So I

23   think that the instruction that we propose covers the

24   requirement of embezzlement.  It covers the fact that the

25   scheme has to include the use or the benefit to the alleged

1    embezzler, and it covers the fact that theft is not fraud,

2    theft is not embezzlement.  And I think that, you know, those

3    are all important points that should be part of the

4    instruction.

5         And I think our instruction, although it is not a

6    joint proposal, it does include in it, I believe, some

7    language -- maybe not enough -- about the completion of an

8    embezzlement.

9         THE COURT:  OK.  Let me hear from the government.

10        MS. ESTES:  So, your Honor, I think there are sort of

11   two competing issues here.  I want to take up Ms. Lester's

12   point first.

13        In that context, I think we agree with Mr. Weddle that

14   the scheme is not just the embezzling.  It also includes the

15   use of the information, like that is what makes it a scheme to

16   defraud.  The scheme to defraud starts when Mr. Wada takes the

17   information from the PCAOB, in violation of his duty of

18   confidentiality, leaks it to KPMG, and it continues as KPMG

19   uses that information.

20        THE COURT:  But the only thing you have talked about

21   in the instructions is the type of fraud that is embezzlement

22   type fraud.  So, how is it -- if the embezzlement is done by

23   the time Mr. Middendorf gets the information, what kind of

24   fraud applies to him?

25        MS. ESTES:  So, your Honor, we do not believe the

1     embezzlement is -- Ms. Lester cites some cases in the context

2     of money that suggests that when money is taken, the

3     embezzlement is complete when the money is taken.  Your Honor,

4     we cited O'Hagan to you today because that is a case involving

5     the taking of confidential information.  And the difference

6     there is that the taking is not complete merely when the

7     confidential information taken.  For example, when Mr. Sweet

8     took that hard drive from the PCAOB with the information on

9     there, at that point there was no embezzlement.  He hadn't even

10    shared it with anybody.  He hadn't violated his duty.  The

11    embezzlement happens when they share it and when they use it

12    against the PCAOB.  This is information taken from the PCAOB

13    and then they use that information.  They don't tell the PCAOB

14    that they're going to use that information on --

15            THE COURT:  But what duty do they have to tell the

16    PCAOB anything?  Is it derivative of Mr. Wada's duty?  Does it

17    carry over like a tippee situation, or do you not need a duty?

18            MS. ESTES:  Your Honor, they know that it has been

19    disclosed to them in violation of a duty.  I believe

20    Mr. Middendorf testify testified to that yesterday, that he

21    knew this was inside information from the PCAOB, and then they

22    used that information in PCAOB inspections and they don't tell

23    the PCAOB.  I think we'd be in a completely different situation

24    if they said, hey, PCAOB, we have this anonymous information,

25    we're using it.  But they deliberately, purposefully omit that.

1    They don't tell them.

2            THE COURT:  But didn't you argue that Mr. Middendorf

3    had a duty to the PCAOB?

4            MS. ESTES:  Your Honor, we think it is derivative of

5    Mr. Wada's duty.  They know this is confidential information

6    and they use it without telling the PCAOB.

7            THE COURT:  And what's the fraud?

8            MS. ESTES:  So the scheme --

9            THE COURT:  It is still an embezzlement type of fraud?

10           MS. ESTES:  Your Honor, I think it is broader than

11   that.  It is a scheme to defraud.  It is an embezzlement type

12   of fraud starting with Mr. Wada, embezzlement or

13   misappropriation; I think they are very similar there.  But the

14   scheme -- the whole purpose of Mr. Wada leaking this

15   information is so that KPMG can use it on inspections.  If he

16   just leaked it to, you know, his mother-in-law and she did

17   nothing with the information, I don't know that there would be

18   any fraud at all; he would just be leaking information for no

19   purpose.  But the whole point was to leak it to KPMG so they

20   could put it to use.

21           THE COURT:  So does that mean if the list from the

22   PCAOB were left in a conference room and somebody from KPMG

23   wandered in and picked it up and then they used it, would that

24   be fraud?  In other words, they didn't know about an underlying

25   violation by someone in Mr. Wada's position, a breach of duty

1    by someone in that position.

2          MS. ESTES:  Your Honor, I think we might be in a

3    different -- I mean, those aren't the facts here.  The facts

4    here are they knew this came from a source inside the PCAOB, so

5    I don't think it is necessary to go there.

6          I would just note, turning back to the O'Hagan case,

7    this expressly came up there because the defendant had

8    embezzled confidential information, not money, from his

9    employer, and then he had used it to trade on securities --

10         THE COURT:  Right.  But he was the one with the duty.

11   He was the one who breached his duty to his employer.  Here,

12   you have someone at KPMG who has no duty to the PCAOB unless

13   you are going to argue that he does.

14         MS. ESTES:  Right, your Honor.  I guess the import of

15   this case is that this case makes clear that the fraud only

16   happens when the information is used.  That's when the fraud

17   happens, when the fiduciary gains the confidential information

18   and then uses the information.  In that case it is to purchase

19   or sell securities.  And in that case the Supreme Court

20   expressly distinguishes the type of embezzlement fraud

21   involving money that would be then complete when the money is

22   taken from a fraud involving confidential information.  The

23   whole point of a fraud involving confidential information is it

24   has to be put to use.

25         So here it's a scheme, it's not just -- you can't

1    isolate it incident by incident.  And the scheme is Wada leaks

2    the information so that KPMG will use it.  It is one scheme to

3    defraud.  You can't parse it out piece by piece.

4            THE COURT:  But isn't it possible that Wada --

5    arguably Wada and Sweet used the information when they shared

6    it and at that point the embezzlement was complete?  I mean,

7    that's what Ms. Lester is arguing, I think.

8            MS. ESTES:  The fraud is using the information in the

9    context of inspection.  It is like continuing to use it.  If

10   they had just shared it and KPMG hadn't acted on it, I don't

11   know that we would be in that situation.  But we have a

12   situation where they acted on it.  They authorized acting --

13   taking actions --

14           THE COURT:  The reason -- I mean, if you look at the

15   opposition to the motion to dismiss back in the day, May 2018,

16   with respect to -- I am at the bottom of page 26 of the

17   government's brief:  "With respect to wire fraud schemes based

18   on the embezzlement of confidential information, the crime is

19   complete not when an insider obtains the relevant information

20   but when he uses such information for personal gain or provides

21   it to a third party."  That suggests -- well, I'm not exactly

22   sure what it suggests, but if he provides it to a third party,

23   you're saying that the crime is complete?

24           MS. ESTES:  Your Honor, I'm sorry.  I did not brief

25   the motion to dismiss and I haven't looked back at it.

1          We're saying that the crime is complete when they turn

2     around and use it against the PCAOB.  This is information taken

3     from a victim, and then KPMG gets the information.  They have

4     the information they know was taken from the victim, and they

5     turn around and use it against the victim and they don't tell

6     the victim they're doing that.  I think it seems completely

7     artificial to take out the second half of what happened, when

8     they use the information against the victim, they deliberately

9     don't tell the victim that they're doing that, so that they can

10    do better on an inspection result.  That is the fraud.

11         THE COURT:  But your proposed instruction also

12    includes something on embezzlement and what embezzlement means,

13    but nothing else.  In other words, you don't -- you seem to

14    suggest today that there is a broader definition of fraud or

15    different types of fraud that do the work after Mr. Wada sends

16    the information to Holder and Sweet, whatever, but the only

17    thing you define in your instructions is embezzlement.

18         MS. ESTES:  Your Honor, I think we define, more

19    broadly, that there was a scheme to defraud.  We're asking for

20    an instruction on that.  We're asking for an instruction on an

21    intent to defraud.  And they will have to find that with

22    respect to Mr. Middendorf, he intended to defraud the PCAOB.

23         They can argue that, you know, all they want that he

24    didn't intend to do that.  But I think that by requiring the

25    jury to be instructed that Mr. Middendorf had an intent to

1    defraud the PCAOB, we're satisfying all the elements of this

2    charge.  As I said, it is just completely artificial to cut off

3    that they got information from the victim.  They turn around

4    and use it against the victim without telling the victim.  That

5    is part and parcel of this scheme.  It all goes together.  I

6    mean, you can't isolate that out.

7              THE COURT:  Ms. Lester.

8              MS. LESTER:  Your Honor, a couple of things with

9    respect to the government's argument.

10             First, the distinction of money or information is

11   really a red herring.  The only reason that O'Hagan is

12   different is because, as I said at the outset, it is a

13   securities fraud case.  Where use is integral to the scheme,

14   there can't be a scheme --

15             THE COURT:  Well, this is -- I think the type of

16   confidential information is pretty similar here.  I mean, as I

17   said yesterday, if this inspection list, that particular kind

18   of information were given to anyone else, it would be

19   irrelevant.  It's only useful if it is used by an audit firm.

20             MS. LESTER:  Correct.  But it's useful to the person

21   who embezzled it because he is using it for his own personal

22   gain, as alleged here, for purposes of his employment or for

23   gaining employment --

24             THE COURT:  Right.  But the only meaning to the

25   personal gain, the only reason that has substance, is if it's

1    used and valuable in the hands of an audit firm.

2            MS. LESTER:  Correct.  But that has to do with the

3    intent of the embezzler, not the intent of the user, who did

4    not have any part in the taking of the information or the

5    fraud.

6            And I would just say that the government cited, in its

7    motion to dismiss opposition, the Czubinski case, which is I

8    think a First Circuit case.  That case involved information

9    that defendant accessed -- had unauthorized access to an IRS

10   database, and the First Circuit held that his intent to use it,

11   even though he didn't use it, would have been enough to

12   constitute embezzlement.  So it doesn't require any use by a

13   third party.  It's clear that when the fraud is focused on

14   embezzlement, it is about the embezzler's intent to use and his

15   actual use, not a third party's.

16           The government mentioned for the very first time the

17   idea of a derivative duty here.  They have never alleged that,

18   your Honor.  In fact, we briefed prior to trial in our motion

19   in limine on the other duties issue because we wanted to

20   discuss out whether the government was going to make this

21   argument at closing, and they said that they did not intend to

22   argue that there were any other duties in place other than the

23   duties owed by PCAOB employees.  I don't think --

24           THE COURT:  Well, that is not inconsistent with what

25   they are now arguing, that any fraudulent conduct on the part

1   of KPMG personnel was derivative of that duty of a PCAOB

2   person.

3           MS. LESTER:  But, your Honor, she said -- Ms. Estes

4   said that it was because Mr. Middendorf and the other

5   defendants at KPMG didn't disclose to the PCAOB what they were

6   doing; they never told them what they were doing.  Even though

7   they are using the word "derivative," but what they're really

8   saying is that the defendants at KPMG owes some duty to the

9   PCAOB.  There is no such allegation in the government's

10  Indictment.  There is no such proof at trial that anyone at

11  KPMG owed a duty to the PCAOB.

12          Again, all of the conduct that Ms. Estes is describing

13  relating to the use of the information goes to the fraud

14  against the SEC.  That is what that conduct is relevant to.

15  The manipulation -- the purported manipulation of the

16  inspection results has to do with the fraud in Count One, not

17  the deprivation of property as to the PCAOB.

18          I would also say, your Honor, she mentioned whether if

19  the information -- the hypothetical that your Honor suggested,

20  if the information was simply found in a conference room and

21  not used, that would be a different case, because that is

22  precisely what happens in 2015 where maybe not under the

23  government's view of the facts, but information arrives in

24  Mr. Middendorf's in box.  It is never used.  He has no part in

25  seeking it out.  Mr. Sweet has already stolen it from the

1   PCAOB, and yet that's charged as a substantive count.

2          THE COURT:  Can I ask, should the charge only instruct

3   on embezzlement and should it not instruct on the general

4   fraudulent misrepresentation language that's in there?  Is

5   there any fraudulent misrepresentation issue?

6          MS. ESTES:  Your Honor, I think it should say

7   misappropriation, at least, as well, but other than that, I

8   think it is fine.

9          THE COURT:  When I talk about what the Indictment

10  charges, I was going to put in all of those verbs,

11  "misappropriating," "embezzling," "using," because they are not

12  going to have the Indictment so they need to have the language

13  from the Indictment.

14         MS. ESTES:  Yes, your Honor.  I do think "using"

15  should be in there.  And I think Mr. Weddle actually in his

16  letter had a suggestion that, on page 2, that it should say,

17  "In the context of a criminal scheme to defraud, the words

18  'obtain,' 'share' and 'use,'" and he defines them to make clear

19  that "obtain," "share" and "use" have to mean their obtained,

20  shared and use with the intent to defraud, and we would be fine

21  with further definition of those terms to make clear when we

22  say "use," it has to be used in connection with the intent to

23  defraud.

24         THE COURT:  Is this something defendants have argued

25  for?  I am not following what you are --

1          MS. ESTES:  I'm sorry, your Honor.  I was just -- on

2     page 2 of Mr. Weddle's letter, he talks about the scheme, how

3     it says:  "The government alleges there was a scheme to

4     misappropriate, embezzle, obtain, share, and use," and I think

5     in the second paragraph, he asks for a further definition of

6     "obtain," "share" and "use" just to make clear that that's with

7     the intent to defraud.  And we would be fine with --

8          THE COURT:  Is there some language that someone has

9     proposed?  You are making all of these arguments without giving

10    me specific language.

11         MS. ESTES:  Sure.

12         THE COURT:  You are OK with what Mr. Weddle proposes

13    on that?

14         MS. ESTES:  On page 2 of his letter, we are OK with

15    those two paragraphs.  We are not OK with his language on page

16    3.  It is his March 4th, 2019.

17         THE COURT:  So you are OK with the two paragraphs

18    about further defining the other terms?

19         MS. ESTES:  Yes, your Honor.

20         MR. WEDDLE:  Your Honor, and just to follow up on what

21    I said earlier.  I think that this definitional issue needs to

22    appear both in Count One -- in element one and in element two

23    of wire fraud, because the formulation that Ms. Estes just

24    quoted talks about intent to defraud, but it also has to be a

25    characteristic of the fraud itself.  So it is not just about

1    what's going on in someone's mind, it is that the fraud itself

2    needs to be fraudulent.

3         And I think that based on this discussion, your Honor,

4    I think that it simply invites confusion for the jury to have

5    all these verbs if that's not the government's theory.  And I

6    think that the government's theory is a simple one that

7    involves fewer verbs, and the theory is that there was a scheme

8    to embezzle and misuse this information.

9         THE COURT:  Well, do you want to change it to two

10   words or something?  I am only going to do it if everyone

11   agrees; otherwise, I am going to say what the Indictment says.

12        MR. WEDDLE:  Just to follow up on that.  I think that

13   misappropriation is susceptible to an interpretation either of

14   embezzlement or of theft, both things.  That is not a wire

15   fraud predicate.  So, I don't think misappropriation means

16   anything different from embezzlement unless it is something

17   that it shouldn't be in there; namely, it is not a wire fraud

18   predicate of theft.  So, I think we should be cutting these

19   extra words down because I am not sure if the jury -- I'm not

20   sure it is self-evident, given the fact that we have been

21   talking for a while about this issue, what "fraudulently

22   obtained" means, or what "fraudulently share" means.

23   "Embezzlement" I think is a much more concrete thing.  And, you

24   know, "fraudulently misuse" is part of the scheme.  They

25   charged a scheme that is both of those things, and it goes back

1    to what I was saying about Carpenter before.

2         That's the scheme that they've charged.  I think that

3    Mr. Middendorf has said they have a failure of proof in proving

4    any involvement by Mr. Middendorf at a point in time that would

5    encompass that scheme, and from our part they have multiple

6    failures of proof, including the fact that they haven't proven

7    involvement or awareness by my client that would encompass the

8    full scope of that scheme.  Plus, they have the theft versus

9    embezzlement issue.

10        THE COURT:  So we talked yesterday about putting in

11   the standard fraud language from Sand.  Is it your position now

12   that none of that should be in there and that this should just

13   be embezzlement?

14        MS. LESTER:  So, your Honor, we had suggested in our

15   proposed charge some language about embezzlement.  I think part

16   of the difficulty with this is that the defendants have been

17   struggling to understand exactly what the government's theory

18   is, and so at times they have described it as an embezzlement

19   theory.  That's why we suggested that language.  I think that

20   if -- and I think overall that more fits with the facts of the

21   case, so that the jury -- there is less potential for confusion

22   on the jury's part if there is some instruction that touches on

23   embezzlement.

24        But I think if the straightforward, say, Sand wire

25   fraud charge is given, then it's clear from that I think that

1   the substantive wire fraud charges, at least as to

2   Mr. Middendorf, are faulty, because there is no

3   misrepresentation or omission and breach of a duty --

4           THE COURT:  I think you need that language so you can

5   argue that, so I am going to put in the standard Sand.

6           MS. LESTER:  OK.  Your Honor, with respect to the

7   proposal about the additional clarification of words like

8   "use," I think this is why it's necessary to have some, as we

9   proposed in our proposed instruction on Count Two -- I'm sorry,

10  second element of wire fraud -- this is our request number 17

11  on page 27 of our proposed request to charge -- some language

12  about what it means to participate, again, for the wire -- the

13  substantive wire fraud instructions, because there is no

14  agreement in place that would link Mr. Middendorf to the first

15  part of the conduct.  There needs to be an instruction for the

16  jury about someone who joins in conduct after the fact once the

17  actual crime is committed and not be found guilty on a

18  substantive charge.

19          The scheme -- again, this all goes back to the lack of

20  clarity in the government's charging of this scheme on the

21  substantive counts in particular, but it would be completely

22  unfair if there were no explanation to the jury where they

23  understood that the crime of embezzlement ends at a certain

24  period of time.

25          THE COURT:  So that's the same point as your

3056

participation point?

MS. LESTER:  Yes.

THE COURT:  And this is -- OK.  So this is in your request number 17?

MS. LESTER:  Correct.

THE COURT:  All right.  I will take a look.

MR. WEDDLE:  And, your Honor, our request number 17 overlaps somewhat with Mr. Middendorf's, but it also has the flip side of what I've been arguing.  Theirs talks about the need for the jury to find participation in the embezzlement, and ours also talks about the need for the jury to find participation in the misuse.

(Continued on next page)

1          THE COURT:  Right.  What's next?

2          MR. WEDDLE:  Your Honor, one more issue which I think

3    is in Ms. Lester's or Mr. Middendorf's counsel's letter from

4    March 4th is the need for some language from Mahaffy.

5          THE COURT:  Yes, I am going to do that.  I am going to

6    put in a set of factors that the jury may consider.

7          MS. ESTES:  Your Honor, one thing on the personal

8    benefit point that Mr. Weddle has requested.  We would object

9    to that.  The personal benefit issue really comes up in the

10   context of securities cases here.  I don't think there is a

11   need to prove that Mr. Wada did this with the intent to use the

12   information for his personal gain.

13         We have to prove he intended to defraud the PCAOB.

14   But the personal benefit, that comes from case law on

15   securities fraud that is completely irrelevant here.  I think

16   making clear that he has to have the intent to defraud is

17   sufficient there, that we shouldn't add in language from case

18   law that is completely irrelevant.

19         THE COURT:  The personal benefit language is in which

20   request?

21         MR. WEDDLE:  It is in our request 17 in our requests

22   to charge at page 8.  I think we also quoted it in our letter

23   of March 4th.

24         To respond briefly, I think Carpenter confirms this in

25   the two quotations I read into the record today, and that is a

1    wire fraud case.  This obviously has been more hotly contested

2    and litigated in the insider trading context, I agree with

3    that.

4            I think the issue that the insider trading cases are

5    wrestling with in this area has to do with what it means to

6    have a scheme to defraud.  In this situation I think the

7    insider trading cases are indistinguishable from our situation.

8    That is not to say that I disagree with Ms. Lester's argument

9    regarding O'Hagan.  I think she is exactly right.  O'Hagan is

10   talking about something else which is specific to the

11   securities context, that is, the use in connection with a

12   security.

13           But the general principle that taking of confidential

14   information is not alone enough to constitute a fraud, that is

15   in Carpenter.  It is also in Dirks and all of the case law

16   after Dirks.  Newman, Salomon, etc., are all talking about

17   language that includes in rule 10b-5 the phrase "scheme to

18   defraud."

19           THE COURT:  What's next?

20           MS. LESTER:  The next thing might be the willfulness

21   charge, your Honor, at least on my part.

22           THE COURT:  We are talking about Count One?

23           MS. LESTER:  No.  Page 29.

24           THE COURT:  This is wire fraud.

25           MS. LESTER:  Both parties have briefed this already,

your Honor, and I think you know what our positions are.  For

the additional reasons cited in our letter, though, we think it

would be more fair at this point for the Court to give the

Tagliaferri instruction because that is what the Court had

indicated it was leaning towards.  I appreciate you didn't say

for sure at the outset of the case.  We think it is not only

more appropriate under the law but that for reasons of fairness

it should be given.

MS. ESTES:  Your Honor, on that point I would note

that at the final pretrial conference your Honor indicated you

were going to give an entirely different instruction that was

more consistent with the government's requested instruction.  I

don't think just the fact that you mentioned offhand that you

were leaning towards Tagliaferri should change anything.  The

briefing has been extensive on this, so there is no need to

really say anything more.  We request the instruction as it is

in the charge.

MR. WEDDLE:  I join in Ms. Lester's request.  I wanted

to note, your Honor, that this has been true throughout the

case and true prior to the case, and that is why we had the

extensive argument that we had at the final pretrial conference

and the briefing on willfulness that has occurred throughout

the case.

In the cross-examination of Mr. Middendorf there was a

good example of why this is such a critical issue.  That

1   cross-examination spent a substantial amount of time on EC9.  I

2   think the proof in the trial has shown that EC9, as Ms.

3   Hannigan testified, that even in the context of workplace

4   decision-making by the ethics office, they apply a rule of

5   reason, and things that are technical or strictly speaking

6   violations of EC9 are not even the subject of workplace

7   discipline based on that rule of reason.

8           Here we had 15 or 20 minutes of cross-examination of

9   Mr. Middendorf about the strictures of EC9, which just invites

10  the jury to confuse some kind of rule violation or ethical

11  lapse or lapse of integrity with the wrongfulness that

12  constitutes a crime.  Those are two very different things.  To

13  just say that the government needs to prove the defendants

14  intended to act wrongfully doesn't come close to distinguishing

15  those issues for the jury.

16          THE COURT:  What else?

17          MS. LESTER:  On page 30, your Honor, with respect to

18  the wire communications, there are no international wires

19  alleged, so that phrase on page 30, instruction H, the first

20  sentence, could be removed.

21          THE COURT:  Does everybody agree we can take out

22  international?

23          MS. ESTES:  Yes, your Honor.

24          MS. LESTER:  I don't think that the interstate

25  communication is that much at issue here, but the example that

1    your Honor gives in that first paragraph as, for example, a

2    telephone call or email between New York and New Jersey, we

3    would suggest that no example be given.  There was testimony by

4    Mr. Koch from KPMG that the servers are located in New Jersey.

5    It points the jury to specific evidence.  We think it is clear

6    what the jury has to find.  We would ask that the sentence end

7    after --

8              THE COURT:  Sorry to interrupt.  How about "between

9    two states"?

10             MS. LESTER:  Yes, that's what we would suggest.

11             THE COURT:  I want to be clear.  I think "interstate"

12   is understandable to most of us, but there is a whole range of

13   education level and even English-speaking level.  I want you to

14   bear that in mind in your summations as well.

15             MS. LESTER:  We have no problem with that.  We just

16   didn't want the specific example.

17             THE COURT:  Fair enough.  I'll make it "between two

18   states."

19             MR. WEDDLE:  Your Honor, I'm sorry to take a step

20   backward, but I wanted to emphasize with respect to

21   transgressing ethical standards and workplace rules, in your

22   Honor's initial formulation that concept is only addressed in

23   an aside set off by dashes.  I think that is such an important

24   concept that it deserves its own paragraph.

25             MS. MERMELSTEIN:  What page?

1          THE COURT:  Page 30, the last paragraph?

2          MR. WEDDLE:  Yes, page 30 there is a phrase set off

3     with dashes.  That is the only place in the draft that

4     addresses workplace rules and ethical standards, and I think

5     that is a critical distinction.

6          MS. ESTES:  Your Honor, if Mr. Weddle wants more

7     instruction on that, there should also be instruction that if

8     there is an intent to deceive, violating workplace standards

9     can be a fraud.  Insider trading is against a lot of workplace

10    standards and it is also a crime.  If this is set out in a

11    separate paragraph, it need to make the point that it is also

12    true that some violations of workplace rules are frauds.

13         MR. WEDDLE:  The paragraph we submitted, your Honor, I

14    think covers both sides of the issue.

15         THE COURT:  I'll take a look at that.

16         MR. WEDDLE:  On page 31, your Honor, at the tail end

17    of the wire transmission, which is completely standard, in a

18    few places in this instruction your Honor talks about variance

19    of dates.  I think that is not applicable to this particular

20    indictment because the indictment, as we talked about

21    yesterday, charges the wire fraud as a one-year period.  If

22    there were a variance broader than that, it would probably be a

23    prejudicial variance.  The language or the instruction about it

24    doesn't have to be an exact date is not really applicable to

25    this indictment with respect to wire fraud.

1          THE COURT:  You think it should come out entirely?

2          MR. WEDDLE:  Just to leave it, yes, your Honor.

3          MS. MERMELSTEIN:  It definitely needs to remain, your

4    Honor.  First of all, the language here is not talking about a

5    variance from the general terms of the scope of the conspiracy

6    in time.  It is talking about a variance from a particular

7    time, saying you can find a particular wire but it is okay if

8    the exact time of the wire is off.  That is of course exactly

9    right.  In other words, they can agree that the wire that was

10   sent in furtherance of the scheme to defraud was a particular

11   email even if the government got the time slightly wrong about

12   the time the email was sent.

13          I think this case is no different than every other

14   case in that there needs to be the general language that the

15   time periods have to be approximately correct but need not be

16   specifically correct.  I don't really understand the argument

17   that because of the way it is charged, it is not necessary

18   here.  I think it is necessary.  I have literally never, ever

19   seen a case where it is not included.

20          MR. WEDDLE:  In some indictments, as your Honor knows,

21   there is a chart of specific wire transmissions charged because

22   a specific wire transmission is an element of wire fraud.

23          THE COURT:  Actually, I already took out that

24   paragraph on 31.  I can't remember why, but I replaced it "The

25   jury must unanimously agree that at least one such wire

1   communication in furtherance of scheme to defraud was proven by

2   the government beyond a reasonable doubt."

3           MS. MERMELSTEIN:  That sounds fine, your Honor.

4           THE COURT:  But you disagree with the general

5   instruction on variance?

6           MS. MERMELSTEIN:  The general instruction on variance

7   is totally appropriate and necessary.  It doesn't have to be

8   right here, and your Honor's new language is fine with the

9   government.  I was moving on to page 33.

10          MS. LESTER:  I have something on 31 with respect to

11  aiding and abetting, your Honor.  This is a follow-up to the

12  comment I was making a moment ago about the crime of

13  embezzlement and when it is complete.  We would ask the Court

14  to consider our proposed instruction, the final paragraph on

15  aiding and abetting, which is request number 19 at page 37 of

16  our proposed requests to charge, which instructs the jury that

17  a defendant cannot aid and abet a crime that has not been

18  completed.

19          THE COURT:  You said the last paragraph?

20          MS. LESTER:  Yes, the final paragraph.  It's the

21  carryover from page 37 to 38 of our instruction.

22          THE COURT:  Okay.  32?

23          MS. MERMELSTEIN:  33, your Honor.  This is a minor

24  point, but in a number of places the draft charge summarizes

25  the indictment as charging who was in the conspiracy.  It says,

1  looking in paragraph J, in the second sentence of the first

2  paragraph, "Count Two of the indictment charges that defendants

3  Middendorf and Wada conspired with Whittle, Britt, Holder, and

4  others known and unknown."

5          Given the testimony before the jury about who was in

6  the conspiracy, it is confusing that Mr. Sweet is not here.  He

7  of course was charged in a separate instrument and this is the

8  language of the indictment.  In particular, since they are not

9  getting the indictment, we should just say it charges that

10  defendants David Middendorf and Jeffrey Wada conspired and

11  agreed with others, and not get into who it is because it think

12  it raises more questions than it answers.

13          THE COURT:  Any objection to that?

14          MS. LESTER:  No.  That's fine with us.

15          THE COURT:  Anything else on 33-34?

16          MR. WEDDLE:  Your Honor, I had line edits on 34, on

17  the object of the conspiracy.  I would just say, "The object of

18  the conspiracy is the illegal goal that the co-conspirators

19  agreed to achieve."

20          THE COURT:  The illegal goal?

21          MR. WEDDLE:  Just to avoid a circularity problem.

22  Conspiracy is conspiracy and then what is the object of the

23  conspiracy.

24          THE COURT:  How about "seek to achieve"?

25          MR. WEDDLE:  That's fine.

1          THE COURT:  Is "hope" enough?

2          MR. WEDDLE:  I think "hope" is too weak to be

3    conspiratorial.

4          THE COURT:  Any objection to "goal" as opposed to

5    "agreement"?  I think that makes more sense.

6          MS. LESTER:  That's fine with us, your Honor.  We had

7    discussed yesterday about reversing these two clauses.

8          THE COURT:  Yes.  I actually was going to say, "The

9    object of the conspiracy charged in Count Two is to commit wire

10   fraud," because that is what the indictment actually said.

11         MS. ESTES:  That's fine with us.

12         THE COURT:  34?  35?

13         MS. LESTER:  Your Honor, this is minor, but the second

14   full paragraph on page 35 uses the term "confederates."  We

15   would ask that that be stricken and that it just say "were also

16   co-conspirators of the defendants on trial."

17         THE COURT:  That makes sense.

18         35?  36?  37?

19         MR. WEDDLE:  On 37, your Honor, I think there should

20   be an instruction that is the flip side.  In the first

21   paragraph of page 37, the last sentence is "The defendant you

22   are considering need not have been fully informed as to all the

23   details or the scope of the conspiracy in order to justify an

24   inference of knowledge on his part."  The flip side of that is

25   "The defendant you are considering must, however, have agreed

1    to join the conspiracy charged, not a different conspiracy or a

2    smaller conspiracy."  I think this relates to the argument that

3    I made before about the scheme that's been charged and the need

4    for a multiple conspiracies charge.

5          THE COURT:  To orient me, where are you exactly?

6          MR. WEDDLE:  Page 37, first paragraph.  At the end

7    there is an instruction that says, "Moreover, the defendant you

8    are considering need not have been fully informed as to all the

9    details or the scope of the conspiracy in order to justify an

10   inference of knowledge on his part."

11         I don't think we need a long sentence there, but we

12   could just say, "However, the government is required to prove

13   that the defendant you are considering participated in the

14   conspiracy charged with knowledge of the general scope of the

15   agreement he was joining."

16         MS. MERMELSTEIN:  Your Honor, I think the addition of

17   that language is confusing.  The notion that the defendant has

18   to join the conspiracy, this conspiracy, knowingly is made

19   clear in many parts of the charge.  As Mr. Weddle himself has

20   just acknowledged in referencing his multiple conspiracies

21   request, what is happening here is an effort to backdoor the

22   multiple conspiracies idea into a charge notwithstanding that

23   there is no basis for a multiple conspiracies charge here, as I

24   think your Honor has already indicated.  I think this charge is

25   appropriate as it is and should not be changed in the way that

3068

 1   is suggested.

 2             THE COURT:  I'll take a look at that.

 3             MR. WEDDLE:  Your Honor, at the very end of that

 4   instruction, so at the top of page 38, we have some extra

 5   standard languages that is not applicable here.  There is only

 6   one object of the conspiracy.  I don't think we should say

 7   "some of the purposes or objectives of the conspiracy."  There

 8   is one object.  I think the definition that the law is drawing

 9   and that your Honor's instruction is trying to draw is the

10   difference between knowing each and every detail of a

11   conspiratorial agreement versus knowing the essential nature of

12   the conspiracy.  The second thing is required.

13             THE COURT:  You would change "with knowledge of at

14   least some of the purposes or objectives" to "with knowledge of

15   its purpose or objective"?

16             MR. WEDDLE:  Yes.  And I would add in front of the

17   word "intention" "with the specific intention of aiding in the

18   accomplishment of" -- I think that could be singularized, if

19   that is a word, "that unlawful act."  And there are probably

20   also line edits to the last sentence.

21             THE COURT:  All right.

22             MS. MERMELSTEIN:  Your Honor, in paragraph O on the

23   same page, I think language here is confusing and potentially

24   not correct.  You describe the time frame of the conspiracy

25   alleged and then say the government must prove beyond a

1    reasonable doubt that the conspiracy was formed and existed

2    from roughly April 2015 to February 2017.  I'm not sure that is

3    exactly true.

4            In other words, if the conspiracy had in fact existed

5    much longer in either direction, the government couldn't prove

6    that conduct had only taken place in those time periods given

7    what it charged, but it is not really necessary that it started

8    when the government said it started exactly.

9            What would be clearer is to move the description of

10   the time frame up front, when you first say what the conspiracy

11   is.  In paragraph J, when you describe the conspiracy, you say

12   Count Two of the indictment charges that there was this

13   conspiracy.  What I would do is say, "Count Two of the

14   indictment charges that defendants David Middendorf and Jeffrey

15   Wada conspired and agreed with others to commit wire fraud

16   between about April 2015 and February 2017," and then leave the

17   variance and date and time issue to -- there is, if I recall

18   correctly, a stand-alone variance in date and time at the end,

19   and I think that's fine.

20           THE COURT:  You would take out O?

21           MS. MERMELSTEIN:  I would take out O and move the date

22   range up to the description of the conspiracy, that's right.

23   So leave in W.  We will have to change W because they are not

24   getting the indictment, but giving the general instruction that

25   variance in dates and times is okay.

```
 1                THE COURT:  Any comments on that?

 2                Now we are on Count One.

 3                MR. WEDDLE:  Your Honor, before we get into Count One,

 4      may I propose a brief break?

 5                THE COURT:  I was just going to say that.  We'll take

 6      a quick break.

 7                (Recess).

 8                THE COURT:  Page 38, Count One.

 9                MR. WEDDLE:  Page 39.  Your Honor, my suggestion is

10      that we shorten the description of the Count One charge.  This

11      is in the second full paragraph on page 39 where you are

12      describing what the indictment charges.  I think it should say,

13      "The indictment charges the defendants and their alleged

14      co-conspirators with employing deceit, craft, trickery, and

15      dishonest means to impede, impair, defeat, and obstruct the

16      lawful functions of the SEC."

17                THE COURT:  That makes sense to me.  Does anybody have

18      any problem with that.

19                MS. ESTES:  I think that's fine, your Honor.

20                THE COURT:  Let me make sure I have it.

21                MR. WEDDLE:  It's just cutting from the word

22      "misappropriate" to the word "thereby."

23                THE COURT:  First of all, we are taking out the names,

24      right?

25                MS. ESTES:  Yes, your Honor.
```

1          THE COURT:  So we are keeping "In April 2015 to

2     February 2017 the defendants and their co-conspirators"?

3          MS. MERMELSTEIN:  "The defendants along with other

4     individuals conspired," either way.

5          MR. WEDDLE:  The comment that I made started after

6     that.

7          THE COURT:  Your comment started with --

8          MR. WEDDLE:  The second sentence.

9          THE COURT:  "The indictment charges"?

10         MR. WEDDLE:  To cut the language starting with the

11    word "misappropriate" and ending with the word "thereby."  Then

12    we would just have to change the endings of the verbs.

13         THE COURT:  Got it.  Anything else on 39?  40?

14         The big issue on Count One is defendants have argued

15    that the functions of the SEC that are pertinent to the

16    impeding, impairing, etc., cannot include the function of

17    overseeing the PCAOB.  I want to hear from the government on

18    that question.

19         MS. MERMELSTEIN:  Your Honor, I think it is true that

20    it would not be sufficient if the government's theory was that

21    essentially anything that impedes the function of the PCAOB

22    definitionally impedes the function of the SEC because the SEC

23    oversees the PCAOB.  That's Tanner, and it is not enough, I

24    think that's true.  But no one is arguing that.

25         It is clear from the testimony that the SEC's own

1    functions were impeded separate and apart from its oversight.

2    The oversight is relevant, though.  To the extent that it is

3    impeded because it normally relies on things from the PCAOB and

4    has a relationship with the PCAOB and this impeded its ability

5    to rely on the PCAOB's work product, that is proper.  I'm not

6    sure there is actually that much disagreement on the law here,

7    but we think the proposed instruction makes that clear and

8    doesn't need anything else.

9         THE COURT:  What exactly do you want, Ms. Lester, in

10   the instruction that's different?

11        MS. LESTER:  I think your Honor recognizes our point

12   in the way you articulated it.

13        THE COURT:  I didn't say I agreed with it.  I said I

14   wanted to hear from the government on it.

15        MS. LESTER:  I'm sorry.  I didn't mean to imply that

16   you had.

17        THE COURT:  I actually don't read Tanner that way at

18   all.  I think you are overreading Tanner, frankly, but the

19   Government agrees.  I don't see why the SEC's function of

20   overseeing the PCAOB is not within the functions, and that as

21   long as you have a purpose to obstruct it, it can't be one of

22   them.  I don't think Tanner says that at all.  What language do

23   you want?

24        MS. LESTER:  We would like language as we suggested in

25   our request number 24.  This is on page 51 of our proposed

 1  requests.

 2          THE COURT:  You said 24?

 3          MS. LESTER:  It is request number 24.  The actual

 4  language I would suggest is at page 53, which begins with the

 5  sentence at the very top of page 53.  "In order to agree to

 6  defraud the SEC, the defendants must have agreed that fraud,

 7  deceit, or other dishonest means would be targeted at the SEC.

 8  Fraudulent conduct directed solely at a third party, here the

 9  PCAOB, is not a fraud against the United States."

10          Your Honor has some of the suggested paragraph in your

11  charge.  But in particular because all the overt acts relate to

12  conduct that references the PCAOB, we think it has to be clear,

13  closer to the description of the overt acts, that the actual

14  agreement has to be targeted against the SEC.

15          We would suggest inserting that language on page 43

16  after the carryover paragraph or perhaps at the beginning of

17  the next paragraph.  And we do think that the indictment's

18  description of lawful functions is confusing and leads to this

19  convergence problem that we talked about where the jury could

20  perceive that the only function to which the inspection reports

21  relate is the SEC's oversight function.  We believe under

22  Tanner that is not sufficient.

23          The government has said in briefing that it would not

24  argue that it was the oversight standing alone that was

25  impeded.  We think there has to be clear language in the charge

1  itself that directs the jury to understand that the defendants

2  must have in their mind the SEC and an actual function of the

3  SEC beyond something directly related to its oversight of the

4  PCAOB

5          MS. MERMELSTEIN:  May I be heard, your Honor?

6          THE COURT:  Yes.

7          MS. MERMELSTEIN:  Your Honor's charge already makes

8  this clear, and I think the language Ms. Lester suggests is

9  legally incorrect and enormously misleading to the jury.  It is

10 not necessary that the dishonest means be targeted to the SEC.

11 That suggests that if all you did was interfere with the

12 inspections process of the PCAOB, then you definitionally can't

13 have intended to obstruct a function of the SEC.  That is

14 clearly not true.  It is very clear that you can interfere with

15 the function of a U.S. agency by interfering through an

16 intermediary essentially.

17          This suggests the opposite.  I think this language is

18 wrong and is going to suggest to the jury that unless there was

19 some fraudulent direct communication to the SEC by the

20 defendants, they can't be convicted.  That is, of course, not

21 at all correct.  I don't think the defendants even think that.

22 I think that is misleading, and I think the way it is is fine.

23 This in the government's view would be enormously problematic

24 to add.

25          MS. LESTER:  Your Honor, without any definition of the

1    lawful functions, which we discussed the other day -- we have

2    asked the government to explain what lawful functions they are

3    relying on.  They haven't specified.

4         The charge as currently drafted on page 43, the second

5    paragraph, says that the conspiracy means that the defendants

6    are accused of conspiring to impede, and then the very last

7    phrase, "the lawful functions of the SEC to carry out its

8    regulatory and enforcement functions."  That makes no sense and

9    is completely circular and gives the jury no instruction as to

10   what they should be focused on.

11        In a case where the government's proof has

12   demonstrated some amount of overlap between the SEC and the

13   PCAOB's role in terms of regulating the audit firms directly,

14   there has to be clarity given to the jury about what function

15   they are supposed to be focused on and that that function has

16   to be a specific aim of the defendants.

17        Without describing in more detail what exactly they

18   are supposed to be looking for, the jury is going to be left

19   having no idea of what the defendants could have possibly

20   intended to impede.  They are going to be relying on a general

21   sense that the conduct that is alleged in the overt acts, that

22   is, all the conduct that relates to the PCAOB, could in fact

23   apply to fraud against the SEC.

24        That can't be the case unless the jury separately

25   finds that the SEC was at least one of the targets of the

1    scheme.  That's what we are trying to express.  I think the

2    Court understands our point of view.  It is just that the

3    charge as written in places does not make that clear.

4            THE COURT:  I'll take a look at that.  I do think that

5    last sentence you mentioned on 43, first full paragraph, the

6    lawful functions of the SEC to carry out its regulatory and

7    enforcement functions, doesn't make sense.  I think it has to

8    be to impair, impede, etc., a lawful function of the SEC.

9            MR. WEDDLE:  To add to what Ms. Lester said -- and I

10   take your Honor's comment about disagreeing with the defense's

11   position about the scope of Tanner -- we did join in Mr.

12   Middendorf's request which is in the second paragraph on page

13   53 of those requests to charge.  It is two sentences that say

14   "In this regard, I instruct you that the SEC's oversight of the

15   PCAOB cannot transform a fraud on PCAOB into a fraud on the

16   SEC."  Then there is another sentence.  That is directly the

17   Tanner language, those two sentences.

18           THE COURT:  Is this the same language from request 24,

19   "in order to have agreed to defraud"?

20           MR. WEDDLE:  It is.  Maybe I'm being redundant, your

21   Honor.  Ms. Lester has pointed directly to the in order to have

22   agreed to defraud language.  I think in order to fairly

23   encompass Tanner, what we need are the concepts in both

24   paragraphs on page 53 of Mr. Middendorf's requests to charge,

25   not just the first paragraph, which is the one specifically Ms.

1    Lester adverted to.

2           I'm not saying she was trying to omit the second

3    paragraph.  I just wanted to be clear for the record that I

4    think there should be a sentence in the charge saying that the

5    general oversight responsibility of the SEC over the PCAOB does

6    not transform any fraud on the PCAOB into a fraud on the SEC.

7           THE COURT:  I'll take a look at that.

8           MR. WEDDLE:  Your Honor, since we have arrived at page

9    43, I have the same comment in terms of deleting some

10   additional language in the carryover sentence from page 42 to

11   43.  I would once again say "the defendants willfully and

12   knowingly, using deceit, draft craft, trickery, and dishonest

13   means, impeded, impaired, defeated, and obstructed the lawful

14   functions of the SEC."

15          THE COURT:  Bottom of 42?

16          MR. WEDDLE:  Bottom of 42 carrying over to 43.

17          THE COURT:  You would delete starting where?

18          MR. WEDDLE:  Starting with the words "by

19   misappropriating, embezzling."

20          THE COURT:  Okay.  And pick up . . .

21          MR. WEDDLE:  We have "trickery and dishonest means

22   defrauded the United States or an agency thereof, the SEC."  I

23   think we could keep the I-N-G endings of the words, and say "by

24   impeding, impairing, defeating, and obstructing the lawful

25   functions of the SEC."

```
 1              THE COURT:  You take from out "by misappropriating"
 2     until where?
 3              MR. WEDDLE:  Until the word "thereby," which is at the
 4     second-to-last line of the carryover paragraph on page 43.
 5              THE COURT:  Any objection?
 6              MS. ESTES:  No, your Honor.
 7              MS. LESTER:  I don't object.  I agree with the
 8     suggestion.  To track the language of the statute, it should be
 9     exactly as we edited it before, to be "to impede, impair,
10     defeat, and obstruct the lawful function of the SEC."
11              THE COURT:  That makes sense.  Anything else on 43?
12              MS. ESTES:  No, your Honor.  But we do have something
13     at the top of page 44.  On that page, at the end of the last
14     full paragraph, the last sentence there seems to imply that
15     there can be only one target of the conspiracy.
16              THE COURT:  Where are you?
17              MS. ESTES:  Top of page 44, the last paragraph, where
18     it says, "Therefore, if you conclude that the government has
19     proven that the only target of the conspiracy was the PCAOB."
20     We would ask the Court to include another sentence in there or
21     something to make it clear that there can be two targets of a
22     conspiracy.  I don't think that is necessarily clear in these
23     instructions.  Of course, on this count we agree they have to
24     find the ultimate target was the SEC.  But I think there needs
25     to be some language in here to make clear that it could be a
```

conspiracy that targeted both.

          MS. LESTER:  Your Honor, we think this sentence is
important.  This is the type of sentence that I was suggesting
should be added perhaps further up in the charge.  Perhaps if
the Court shortens the charge a little bit and puts that
language closer to the language that already exists in the
charge about how the intent to defraud the SEC may be
incidental to another primary motivation or purpose, which is
on the prior page, that will be clear to the jury and there is
no need to repeat the instruction that there can be more than
one target or purpose.

          MS. ESTES:  Your Honor, this could also be resolved by
striking the last sentence of that paragraph, "Therefore if you
conclude."  The sentence before that makes clear that the
ultimate target of the conspiracy must be the SEC.  It is that
one sentence that has this implication that there can only be
one target.  If that sentence is stricken, then it would be
fine with us.

          THE COURT:  You're talking about the "Therefore, if
you conclude" sentence?

          MS. ESTES:  Yes, your Honor.

          THE COURT:  Defendants want it in, right?

          MS. LESTER:  Yes, we do.  It doesn't have to be placed
there exactly, but we need that concept to be in for the
reasons I was stating earlier, which is that there is a lot of

1    overlap in the proof between the oversight responsibilities of

2    the PCAOB and the SEC.  I think it has to be clear.

3         And because of the overt acts that the jury is going

4    to be asked to assess, there does have to be some sentence that

5    says this outright.  The jury has to be told that finding that

6    the PCAOB was the sole target of the conspiracy is not enough.

7    I don't think that is directing them to assess the evidence.

8    It is just making clear what the law is.

9         THE COURT:  I'll take another look at that.

10        By the way, at the bottom of 43, the very last

11   sentence, I just noticed this, I'm not sure it makes sense.

12   "But the government must prove that the U.S. or one of its

13   agencies or departments was the ultimate target of the

14   conspiracy and that the defendants intended to defraud."

15        MS. LESTER:  It either needs another clause at the end

16   or you could just take out comma "and."

17        THE COURT:  We can take out comma "and."  I guess

18   that's verbatim from Copeland.  I still think it makes more

19   sense to take that last part out.

20        Anything else on 44-45?

21        MR. WEDDLE:  Just a small change.  At the end of 44,

22   your Honor, the last sentence on 44, I think we should take out

23   the words "tends to" and change it to "only an agreement to

24   engage in conduct that impedes the SEC and also involves

25   fraudulent."  We could take out "does" and just make it

```
1    "constitutes."

2              THE COURT:  You would say "only an agreement that

3    impedes the SEC"?

4              MR. WEDDLE:  Yes.

5              THE COURT:  "to engage in conduct that impedes,"

6    right?

7              MR. WEDDLE:  Yes.

8              THE COURT:  What was the next one?

9              MR. WEDDLE:  Towards the end of the line it says "does

10   constitute."  I think we could just make it "constitutes."

11             THE COURT:  Okay.  "Tends" is also verbatim from

12   Copeland.  But you guys write better than the Second Circuit

13   sometimes.

14             MS. LESTER:  I think we are up to conscious avoidance,

15   your Honor, on page 45.  The charge says if applicable.  We

16   don't think that it is applicable in this case.  We don't think

17   that there is a factual basis for it.  There was no evidence at

18   the trial of the fact that Mr. Middendorf consciously avoided

19   knowing, so we don't think it applies here.

20             MR. WEDDLE:  We agree.  In addition to the fact that

21   there is no predicate for it, your Honor, I think that the

22   language here can create a great deal of confusion where all we

23   have are single-object conspiracies.  Some of this language

24   comes from situations where, for example, someone joins a drug

25   distribution conspiracy and they never opened a package so they
```

1   don't know if it is cocaine or heroin.  But this is nothing

2   like that.

3        As we were just talking about with respect to Count

4   One, the government has to prove that the defendants

5   specifically targeted the SEC.  All this conscious avoidance

6   language makes it seem as if they can not know anything about

7   the SEC or be said to be avoiding knowledge about how the SEC

8   uses inspection reports.  I think it creates a lot of issues.

9        MS. ESTES:  Your Honor, we think this instruction is

10  appropriate, especially in light of Mr. Middendorf's testimony

11  yesterday.  First, with respect to March 2016, he essentially

12  testified that he did everything in connection with the crime

13  but his testimony was he didn't know it was wrong, he thought

14  it was a gray area.  We think there is an argument that he

15  consciously avoided grappling with the fact that it was wrong

16  when every other person who testified in this case said they

17  knew that using confidential information from the PCAOB was

18  wrong.

19       So we think the March 2016 conduct merits a conscious

20  avoidance instruction.  We also think it is merited by the

21  January 2017 information.  The testimony was that he got that

22  information after in March 2016 he got confidential information

23  from the PCAOB.  In January he gets information again, it comes

24  from Tom Whittle and Brian Sweet, the same people involved in

25  March 2016, and he doesn't do what he needs to do to find out

1      that it is confidential information, was his testimony.

2            He didn't ask about it.  He didn't ask where it came

3      from.  He just went with it.  In doing that, particularly in

4      light of the fact that the year before he knew it was

5      confidential, we would submit he consciously avoided in January

6      2017 finding out that this was confidential PCAOB information.

7      We think the instruction is appropriate.

8            THE COURT:  I do think it is applicable based on the

9      testimony.

10           MS. LESTER:  Your Honor, I think the government is

11     mistaken.  Conscious avoidance is triggered by a fact that the

12     defendant purposely avoids knowing.  Mr. Middendorf said that

13     he understood that the information on the operative dates, that

14     is, in March and February, March of 2016-February of 2017, that

15     he knew that the information came from the PCAOB.  I don't

16     think that the factual predicate has been laid.

17           There was no implication from Mr. Middendorf's

18     testimony that he did not ask additional questions.  He just

19     had a different understanding of the information in January.

20     He didn't deny that on the occasions where it was clear to him

21     that there was in fact confidential information, that he

22     understood that's what it was.

23           Even if the government were correct that it could

24     apply in January 2017, to give this instruction as an overlay

25     to all conduct charged in the indictment when they only really

1    have any basis to raise it with respect to that isolated period

2    of time, which is then completed a month later when he does

3    know and acknowledged on the stand that it was confidential

4    information, creates a completely misleading impression to the

5    jury that Mr. Middendorf was avoiding knowing facts when that's

6    not what was the case, what was actually proven at trial at

7    all.

8          THE COURT:  I thought there was some testimony about

9    not following up with, for example, Mr. Sweet about exactly the

10   path of the information.

11         MS. LESTER:  He also acknowledged, for example, in

12   2016 that he knew it was confidential PCAOB information.  It

13   doesn't matter if he didn't follow up if he had the knowledge.

14   He is not saying he didn't.

15         MR. WEDDLE:  Your Honor, to address this, Ms. Estes

16   made two arguments relating to Mr. Middendorf's testimony.  The

17   first one related to 2016.  That argument is error because

18   conscious avoidance is permissible under certain circumstances.

19   The example that I mentioned before, which is which illegal

20   drug is involved in a drug conspiracy, that is the knowledge

21   element of the conspiracy.

22         The wrongfulness of conduct is a subset of the

23   intention mens rea of the conspiracy.  To join a conspiracy,

24   the defendant has to have knowledge of the essential nature of

25   the conspiratorial agreement.  That part can be consciously

1    avoided.

2           The defendant also has to have an intention or a

3    purpose to help the conspiracy succeed.  That part cannot be

4    consciously avoided.  But it has within it a subpiece, which is

5    knowledge or awareness of the wrongfulness of the conduct and

6    intention to do it anyway.

7           The argument Ms. Estes just made had to do with Mr.

8    Middendorf purportedly avoiding consciously that he was aware

9    of the conduct.  The argument was that he avoided learning that

10   it was wrongful.  That is a piece of the intentional mens rea

11   element.

12          THE COURT:  You're saying that the conscious avoidance

13   does not apply to that piece?

14          MR. WEDDLE:  Exactly.  I think I can find a case cite

15   for that proposition.  The intention required to join a

16   conspiracy cannot be supported by a conscious avoidance

17   argument.

18          THE COURT:  I think that may be right, because I have

19   defined willfully to be wrongful purpose.  I don't think you

20   could use conscious avoidance to substitute for that.  I take

21   your point.

22          It seems to me you all are trying to limit the

23   government from arguing that the embezzlement carried over into

24   the conduct of Mr. Middendorf.  If that's true, shouldn't the

25   government be able to argue that the defendant consciously

1    avoided learning facts related to the underlying breach and

2    misappropriation and embezzlement?

3         MS. LESTER:  Your Honor, looking back at Mr.

4    Middendorf's testimony, it was clear that he admitted that he

5    knew that the information was from the PCAOB.  He didn't know

6    exactly how it had been transmitted to Brian Sweet, but that

7    doesn't matter.

8         If the proof showed that he had somehow encouraged

9    Brian Sweet to obtain the information similar to what Mr.

10   Whittle testified during his direct examination, that there was

11   an implicit understanding that Brian Sweet would obtain that

12   information, then it doesn't matter whether Mr. Middendorf

13   never inquired further as to the exact source, that is, the

14   person who provided Mr. Sweet with the information.  He did not

15   deny that he understood that it came from the PCAOB.

16        I just don't think it is applicable here.  I

17   completely agree with Mr. Weddle's arguments about the

18   knowledge versus intent.  But also in terms of specific facts,

19   there is no specific fact that Mr. Middendorf turned away from

20   or deliberately avoided knowing that would change the substance

21   of his testimony because he said he knew it came from the

22   PCAOB.

23        MR. WEDDLE:  I agree with Ms. Lester that the

24   statements made during the testimony of Mr. Middendorf

25   eliminate any predicate for conscious avoidance, but I would

1    add that this general conscious avoidance instruction is deeply

2    prejudicial to Mr. Wada.

3         THE COURT:  Half the appeals in the Second Circuit are

4    all about the conscious avoidance instruction.  It is always

5    upheld, but it is always a mushy determination of whether it

6    applies.

7         MR. WEDDLE:  I just don't think there is a predicate

8    here.  There certainly is no predicate with respect to Mr.

9    Wada.  I think anyone listening to this instruction could get

10   completely confused about the targeting of the SEC requirement

11   in Count One, for example.

12        MS. ESTES:  Your Honor, with respect to both

13   defendants, they have made this argument that they couldn't

14   possibly know a duty was breached because EC9 is this broad

15   thing and people were sharing draft agendas.  The conscious

16   avoidance instruction is also relevant to that.  To the extent

17   that they are going to argue that they didn't have this

18   knowledge, we would be able to argue that they consciously

19   avoided.

20        THE COURT:  Doesn't that go to the wrongful purpose

21   issue of conscious avoidance as opposed to something as to

22   which knowledge is required?

23        MS. ESTES:  It goes to the breach of the duty point.

24        THE COURT:  All right.  You are going to get a lot of

25   answers later today when you get this charge.  What else?

1          MS. MERMELSTEIN:  This is an easy one, your Honor.

2    Page 50, on the right to see the exhibits, you say, "You are

3    about to go into the jury room and begin your deliberations.

4    The exhibits that were received into evidence will be provided

5    to you in the jury room.  If you would like to review them, you

6    should make the request."  I thought we were sending everything

7    back to them.

8          THE COURT:  Yes.

9          MS. MERMELSTEIN:  In which case they need not make a

10   request.

11         THE COURT:  That's right.  I'll take out that third

12   sentence.

13         MS. MERMELSTEIN:  Just so it is clear to them, it may

14   be worth explaining that with respect to larger exhibits that

15   are difficult to print, we have gotten a clean laptop and we

16   have loaded those, and I have here from the defendants theirs.

17   We'll put them all in one place.  We have to exchange exhibit

18   lists for the jury, but we will note on the exhibit list that

19   we give them what is on the laptop so they can find it.  I

20   think some explanation about that so they are not confused

21   about where things are is worth giving.  I don't care what the

22   language is.

23         THE COURT:  Some explanation of the fact that some are

24   on a laptop?

25         MS. MERMELSTEIN:  Yes.  Just that we are going to send

1     you a laptop that contains things that can't be printed, the

2     exhibit list will tell you what is on the laptop.

3               THE COURT:  So there will be a laptop.

4               MS. MERMELSTEIN:  There will be a laptop.  It will

5     contain things that can't be put in hardcopy, things like

6     voicemails that are audio, things that are enormously large

7     such as phone records that are a thousand pages.  And we will

8     indicate on the list we give to the jury what exhibits are not

9     in hardcopy so if they want to look at them, they know where to

10    find them.

11              THE COURT:  Got it.  I'll add that.

12              MR. WEDDLE:  Your Honor, I have two other items before

13    we get all the way to page 50.  One is we drafted a statement

14    of the defense for Mr. Wada that we would propose in lieu of

15    the second sentence that your Honor has on page 47 under the

16    heading labeled "U."

17              In addition, your Honor, we request a multiple

18    conspiracies charge.  I think there is a clear factual

19    predicate for it here.  I think it is fair argument for us to

20    say there may be no agreements here, on the other hand there

21    may be multiple different agreements that are at divergent

22    purposes.  The jury should be instructed that in order to

23    convict, they have to find that the government has proven the

24    conspiracy charged in the case, just as they have to prove the

25    scheme charged in the case.

1          THE COURT:  What is your theory of the defense

2     instruction?  Is it lengthy?  And is there going to be one from

3     the Middendorf team?

4          MS. LESTER:  No, your Honor, not beyond what is in

5     here right now.  We would like the sentence about acting in

6     good faith at all times, but we have no additional instruction.

7          THE COURT:  You don't want that as to you?

8          MR. WEDDLE:  Ours is slightly different, your Honor,

9     partly because of this workplace rule issue.  It is not for me

10    to say, but if the first sentence is "Mr. Middendorf and Mr.

11    Wada deny the government's allegations," I think that is fine.

12    Then, if the second sentence is "Mr. Middendorf maintains that

13    he acted in good faith at all times and without the intend

14    alleged in each count of the indictment," that's fine.

15         Ours is three sentences.  I can read it.  I thought I

16    had a printout here.  We could email it to chambers.

17         THE COURT:  Why don't you read it.

18         MR. WEDDLE:  "Defendant Wada contends that the

19    government has failed to prove beyond a reasonable doubt that

20    he was the source of inspection list information obtained by

21    Brian Sweet in 2015, March 2016, January 2017, or February

22    2017."

23         (Continued on next page)

24

25

1          THE COURT:  OK.  That's sentence one.

2          MR. WEDDLE:  That's sentence one.

3          Sentence two is:  "Mr. Wada further contends that he

4   was not a member of any agreement to embezzle and misuse

5   confidential PCAOB information to improve KPMG's inspection

6   results."

7          THE COURT:  Could you repeat that, please?

8          MR. WEDDLE:  "Mr. Wada further contends that" -- and

9   here I have a series of clauses.  So, the first clause is:  "He

10  was not a member of any agreement to embezzle and misuse

11  confidential PCAOB information to improve KPMG's inspection

12  results," comma.

13         THE COURT:  "Confidential PCAOB information" -- after

14  "information"?

15         MR. WEDDLE:  "To improve KPMG's inspection results."

16         THE COURT:  OK.

17         MR. WEDDLE:  Comma, "that there was no such scheme to

18  defraud," comma, "and that he it not participate in any such

19  scheme to defraud."

20         THE COURT:  "In any such scheme to defraud," OK.

21         MR. WEDDLE:  And the last sentence is:  "As to Count

22  One, Mr. Wada further contends that the government has failed

23  to prove any purpose on his part" --

24         THE COURT:  OK.

25         MR. WEDDLE:  -- "directed at impairing or impeding the

1   United States in any way."

2           THE COURT:  OK.  Got it.

3           MR. WEDDLE:  Thank you.

4           THE COURT:  Going back for a second, I think the

5   Middendorf team had asked on the aiding and abetting charge, to

6   say "willfully and knowingly with intent to defraud," adding

7   "intent to defraud" to the "aiding and abetting," am I right

8   about that.

9           MS. LESTER:  In our proposed requests?

10          THE COURT:  Yes.

11          MS. LESTER:  I have to look at it a moment.

12          MR. WEDDLE:  I thought it was in your letter also of

13  March 4th.

14          MS. LESTER:  Oh, yes, we did.

15          THE COURT:  I didn't hear that one.  Is that something

16  the government addressed or wanted to address?  Do you have any

17  position?

18          MS. MERMELSTEIN:  No, your Honor.

19          MS. LESTER:  As we stated in our letter, your Honor,

20  we think that it has to be clear to the jury that the aider and

21  abettor must have the same mens rea as the principal.  That is

22  why we asked that that be included.

23          THE COURT:  OK.

24          MS. LESTER:  I should just note for the record that

25  there were some very more minor objections that I made in my

1 letter that I haven't stated orally but I would just preserve

2 those as --

3           THE COURT:  Yes.

4           MS. LESTER:  -- I know that the Court has read the

5 letter.

6           THE COURT:  Yes.

7           OK.  Going back to the defense, so I'll start with:

8 "Mr. Middendorf and Mr. Wada deny the government's allegations.

9 Mr. Middendorf maintains that he acted in good faith at all

10 times and without the intent alleged in each count of the

11 Indictment."  And then Mr. Wada contends the three sentences

12 proposed by Mr. Weddle.

13           Does the government have any issues with any of that?

14           MS. MERMELSTEIN:  No, your Honor.

15           THE COURT:  And anything else?

16           MS. MERMELSTEIN:  I guess one bigger picture question,

17 your Honor, which is I think that the biggest issue, it seems

18 to me, is the wire fraud instruction at this point.  And I am a

19 little concerned that we just aren't going to -- there is so

20 much in the mix now that I wonder if we are going to need the

21 opportunity to be heard after we have seen what the sort of

22 final-final charge is.  In particular, as we mull it over, I

23 worry that trying to meld the charges that exists -- the

24 charges the government requested with kind of the basic Sand is

25 going to be confusing and conceivably inaccurate in that, for

1    example, there is no need, as this case has been charged, for

2    there to be proof that Mr. Middendorf made a misrepresentation

3    or that Mr. Middendorf had a duty.  And so, I don't think I

4    have any particular requests until we see where your Honor

5    lands.  It is hard to say what is or isn't a problem.

6            THE COURT:  After our last discussion, I was just

7    saying, you know, I am not sure how this is going to be cobbled

8    together, because the government has sort of proposed the

9    standard fraud instruction, but the misstatement stuff isn't

10   relevant, I don't think.  And then you object to the inclusion

11   of embezzlement, although you included a piece of embezzlement.

12   I don't know what the government wants in terms of a charge in

13   a single place that makes sense.

14           MS. MERMELSTEIN:  I mean, I think what we want is

15   what's in our requests to charge, your Honor, and I think that

16   it is not that we object to the inclusion of embezzlement

17   language, which we certainly think is appropriate, it is that

18   we think that the charge should track the scheme that is

19   charged in the Indictment, which is to say that as defined in

20   the "to wit" clause, it is a scheme to misappropriate,

21   embezzle, use the confidential information in the way

22   specified.  And so I hear you that there has been a lot of

23   fighting about it and it is a complicated issue, but that's

24   what we think is the appropriate charge and not to just give

25   like the kind of classic wire fraud Sand that's hard to map

1    onto the facts here.

2         THE COURT:  What if I include the generic scheme to

3    defraud language but not any of the stuff about

4    misrepresentations?  Or do you think we need that?

5         MS. MERMELSTEIN:  I think that might be fine, but I

6    struggle to agree that that's going to be fine.  Until it has

7    been synthesized it is hard to say that we're going to agree at

8    the end of the day.  So I'm not I don't have a proposal

9    exactly, only a concern that this will not be a case where when

10   we get the final charge we say, OK, we lost some and won some

11   and we're ready to go, but that we think there is more to say.

12   I don't know what to say about that.

13        MR. BOXER:  I was only going to request that we have

14   closure today, and not 9 o'clock tomorrow morning, so that we

15   know where we are.

16        MS. MERMELSTEIN:  That also seems fair.

17        THE COURT:  That was the idea.

18        MS. LESTER:  Your Honor, in our proposed requests to

19   charge we did try to start with the Sand instruction and then

20   add embezzlement as part of the definition of what the fraud

21   could be, because we think that is how the case was charged.

22        The government's proposed charge on the second element

23   did not come from Sand.  It says it is an amalgamation of

24   cases.  And we think, you know, based on what the government

25   just said, it seems clear that they want to use the "to wit"

3096

1    clause as if it replaces the statutory language, which we think

2    is not correct.

3            And so, I mean, I agree with Ms. Mermelstein that it

4    may be that both parties really need to be heard further, but I

5    think at this point your Honor clearly understands where both

6    parties stand.  It's just a question of how to cobble it

7    together, as the Court put it.

8            But I would suggest for the Court's consideration our

9    propose charge with respect to the second element in

10   particular, because that is what we tried to do in that we

11   started with Sand and then added the embezzlement language.

12           THE COURT:  So, I mean, I'll turn the draft around and

13   get it to you all as soon as I can.  I think I will try to send

14   you a black line version and a clean version, whichever is

15   easier for you to look at.  And then I don't know that -- I

16   think we could schedule another charge conference at 6, or

17   something, or we could just -- are you saying that -- I still

18   want to do closings at 9 a.m., if we can.

19           MS. MERMELSTEIN:  So do we, your Honor.

20           THE COURT:  So are you suggesting that we might have

21   to revisit after the closings or today?

22           MS. MERMELSTEIN:  I'm not really sure what I am

23   suggesting, only that I have this concern that it is not going

24   to be the normal kind of charge where we say, well, we

25   wanted -- we didn't like the defense instruction on this and

1    they didn't want conscious avoidance, so like you have ruled

2    and here we are and then it is going to feel like there is more

3    to say.  I don't know.  I guess when we get it, if we feel that

4    we absolutely have to be heard again, we will let your Honor

5    know and we can cross that bridge.

6              THE COURT:  OK.  Fair enough.

7              MR. WEDDLE:  And just to make a pitch, your Honor, for

8    the instruction that we submitted, what we did is we took Ms.

9    Lester's instruction, which is, as she said, based on Sand and

10   then adds some important issues that the jury should be

11   instructed on, and then we just added to that a couple of

12   additional issues that we think are, as I've said, the flip

13   side of what Ms. Lester's argument is.  So it starts from Sand.

14   It incorporates what Ms. Lester says.  In part, it is shorter

15   than what Mr. Middendorf has submitted on the end of the

16   embezzlement, and then it adds the misuse piece of the scheme

17   that I have talked at length about.

18             THE COURT:  OK.

19             MS. LESTER:  The one final thing, your Honor, is the

20   verdict form.  The government had submitted a propose verdict

21   form.

22             THE COURT:  Oh, yeah, I meant to ask about that.

23             MS. LESTER:  We don't have a problem with it in terms

24   of format except that we would request that "not guilty" come

25   first and that "guilty" be the second line.

1          THE COURT:  Any issue with that?

2          MS. MERMELSTEIN:  Your Honor, this request hits me

3    every time.

4          THE COURT:  I have done it that way.

5          MS. MERMELSTEIN:  I think the standard is "guilty"

6    first and "not guilty" second.  I think that is the way people

7    talk when we say "guilty or not guilty," and we don't say "not

8    guilty or guilty."  So it is the more logical rendition.  It

9    tracks what the jury expects to see.  I don't think there is

10   any reason to change it.  I think that that is the greater

11   weight of tradition in this building, and I don't think there

12   is reason to change it.  Your Honor will do whatever your Honor

13   thinks is right.

14         MR. BOXER:  Your Honor, our suggestion reflects the

15   burden of proof and so they have to have overcome that burden

16   right up until the verdict.

17         THE COURT:  That is fine.  I have done it -- I think I

18   have, when it has been requested, I put "not guilty" first just

19   because, you know, irrespective of tradition, it is the

20   default, and I think it seems fine to put "not guilty" first.

21   So, I will do that.

22         Other than that, I assume the general verdict form is

23   fine.  I will have the foreperson sign and date.

24         Anything else?

25         We'll send something to you as soon as we can and

1    then, you know, we'll see what happens.

2              MS. MERMELSTEIN:  Thank you, your Honor.

3              THE COURT:  All right.  So, closings tomorrow at

4    9 a.m.

5              OK.  Have a good day.

6              MS. MERMELSTEIN:  You, too.

7              (Adjourned to 9 a.m. March 7, 2019)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25