UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

          v.                                 18 Cr. 0036(JPO)

DAVID MIDDENDORF and JEFFREY
WADA,

                    Defendants.

------------------------------x

                                             March 7, 2019
                                             9:15 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                             District Judge,
                                             and a jury

                         APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
BY:  REBECCA G. MERMELSTEIN
        AMANDA K. KRAMER
        JORDAN LANCASTER ESTES
            Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
        Attorneys for Defendant David Middendorf
BY:  NELSON A. BOXER
        AMY R. LESTER
        ALEXANDRA REBECCA CLARK
            – and –
BRUCH HANNA LLP
BY:  GREGORY S. BRUCH

APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:  STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
             – and –
LATHAM & WATKINS
BY:  JASON MASASHI OHTA


        – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal




                            oOo

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning everyone.  We are missing one

3      juror, No. 14, Ms. Melnick, Lauren Melnick.

4              We have another issue.  When Mr. Hampton was checking

5      on whether all the jurors are here, Juror No. 7, Michelle

6      Lewis, who is the second row, first person on the left, the one

7      who has been coughing a lot, said a relative had been in an

8      accident and is in ICU and has a grim prognosis.  As a result

9      of that, she asked if she could be excused tomorrow if

10     possible.  Before inquiring further, I wanted to put that to

11     the parties and see what you propose to do with that.

12             MS. KRAMER:  May we have one moment, your Honor?

13             THE COURT:  Yes.

14             MR. BOXER:  We have the issue to take up about Ms.

15     LaStrange at some point today.  I don't suggest that happen at

16     the beginning, but maybe at a break in the afternoon or

17     something like that.  She is the one who said she has to be

18     done by 5:00.

19             MS. KRAMER:  Your Honor, we have no objection to a

20     general reminder to the jury that they shouldn't feel time

21     pressure when deliberations begin, but a more specific colloquy

22     with a single juror we think may call undue attention to this

23     issue when it is not even clear that she was really raising the

24     concern that I think needs to be addressed.

25             MR. BOXER:  I agree.  I don't think a colloquy like

1   that should be done in the presence of the jury.  But it seems,

2   based on her reaction, that it would make sense for the Court

3   to speak with her individually to make sure she appreciates

4   that.

5          THE COURT:  I need to make clear to all the jurors

6   that there is no time limit, that they are going to take as

7   much time as they need to deliberate, there is no deadline of

8   Friday.  That is the main thing.  I obviously need to confirm

9   with her that we may go into tomorrow, so she is going to have

10  to change her plans, which she said she was willing to do.  I

11  think we are using Friday.  We may need Friday for the jury

12  charge.

13         MR. BOXER:  Right.  What you just suggested, your

14  Honors, was fine.  It would trigger a concern if she couldn't

15  deliberate next week, felt like she needed to reach a

16  conclusion tomorrow.  So I think that should be sufficient.

17         THE COURT:  What about Juror No. 7?

18         MS. KRAMER:  To clarify, your Honor, was she asking to

19  not return tomorrow or to be excused after tomorrow?

20         THE COURT:  It looked like she was asking to be

21  excused just tomorrow.  I haven't talked to her.  The

22  suggestion she gave to Mr. Hampton seemed to be this person

23  might have a few days to live and she would like to spend some

24  time with the person, I don't know who it is, tomorrow and

25  maybe the weekend.  It seemed as if she was not saying excuse

1    me from the trial but excuse me just tomorrow.

2          MS. KRAMER:  Your Honor, another question.  With

3    respect to No. 14, I believe your Honor said she is not here.

4    Does your Honor know if she is en route?

5          THE COURT:  I don't think we have heard from her.  We

6    assume she is en route.

7          No. 14, Ms. Melnick, is still not there.  She hasn't

8    left a message.  When Mr. Hampton calls her, he gets a

9    voicemail.  We assume she is on her way.

10          MS. KRAMER:  Your Honor, we are ready to set forth our

11    position if defense counsel is done conferring.  We think we

12    should wait for No. 14.  The jurors have been remarkably on

13    time every day.  We think there is a strong chance that she is

14    on her way.  If we have other potential juror issues, we don't

15    really want to move forward without No. 14 unless it is

16    absolutely necessary.

17          With respect to No. 7, we propose proceeding with her

18    on the jury today and taking it up at the end of the day,

19    seeing where we are with respect to timing.  Perhaps your Honor

20    can inquire with her at the end of the day about the status of

21    her relative in the event she has more information, and we can

22    take it up then.

23          MR. BOXER:  That approach is fine, your Honor.  Our

24    inclination is to try to keep her.  But waiting to see how it

25    stands at the end of the day and revisiting it is fine.

1          MR. COOK:  Same, your Honor.

2          THE COURT:  All right.  Just so I know how things are

3    going to proceed, Ms. Kramer you will be closing for the

4    government?

5          MS. KRAMER:  Yes, your Honor.

6          THE COURT:  Mr. Boxer?

7          MR. BOXER:  Yes, your Honor.

8          THE COURT:  And Mr. Cook?

9          MR. COOK:  Yes.

10          THE COURT:  I received a letter from counsel for Mr.

11    Wada last night regarding the exhibit.  I assume you are all

12    aware of the renumbering that occurred.

13          MR. WEDDLE:  Your Honor, while we are all here, I

14    wanted to preserve our request which your Honor did not include

15    in the charge.  I assume all that was deliberate and your Honor

16    had heard us and ruled on it.  The one in particular I wanted

17    to flag, because I am a bit of an unrealistic optimist, is

18    multiple conspiracies in the off chance your Honor meant to put

19    it in and didn't.

20          THE COURT:  I thought about it and concluded that it

21    was not necessary or appropriate.  But I understand your

22    argument.

23          MR. WEDDLE:  Thank you.

24          MR. BOXER:  Our objection is preserved as well, your

25    Honor.

1           THE COURT:  Yes.

2           MR. BOXER:  I was reminded of a matter, if we could

3    approach briefly, since we have some free time.

4           (At the sidebar)

5           MR. BOXER:  During Mr. Hanson's testimony it became

6    apparent that two submissions were filed ex parte under seal.

7    We were the party ex those filings.  I would ask that they be

8    produced to us, remaining under seal.  I obviously can't argue

9    the basis for why it needed to be submitted ex parte.  We have

10   had a lot of filings under seal.  Perhaps there is a very good

11   reason, but not knowing what one might be, I would make that

12   request.

13          THE COURT:  Any objection?

14          MS. MERMELSTEIN:  Yes, your Honor.  For the very

15   reason that it was filed ex parte, without going into the

16   content, as I think it was probably clear, it relates to

17   impeachment material for a witness defense called.  They are

18   not entitled to that information for any purpose.  Given the

19   reasons why it was filed under seal in the first instance,

20   which was not just to avoid the government's position on that

21   topic but in light of the nature of that information, I don't

22   see any reason for it to be disclosed.  Even more so given that

23   it didn't come up.

24          MR. BOXER:  That's a little self-defining.

25          THE COURT:  I'll think about it.  I'm not sure what

1      the relevant law on that is.

2              MR. BOXER:  That's fine.  I appreciate the case is

3      closed.  Our client has been asking me about it, and I don't

4      really have a good answer as to why we don't have it.  That is

5      the application.

6              MS. MERMELSTEIN:  I would just note that I assume that

7      the other ex parte filing came from Mr. Hanson's counsel.

8              THE COURT:  Yes.

9              MS. MERMELSTEIN:  I think he ought to be permitted to

10     be heard before his sealed filing becomes public.  And since

11     they relate to the same thing, it's one inquiry, I think.

12             MR. BOXER:  You don't have his filing?

13             MS. MERMELSTEIN:  No.

14             MR. BOXER:  So my application only relates to the

15     government's filing.

16             THE COURT:  I can say it relates to the terms of Mr.

17     Hanson's separation from the PCAOB.  Beyond that, I don't think

18     I can go into it.  If it was a proper ex parte filing, which I

19     think it was, it was just impeachment material relating to that

20     witness that didn't come up.

21             MR. BOXER:  Understood.  I appreciate that.

22             THE COURT:  I'll think about it and look into the law

23     whether it is appropriate to disclose it.

24             MR. BOXER:  Even the extra detail of this morning is

25     helpful.

1          MR. WEDDLE:  In a number of our letters we put in a

2   request that they needn't be sealed.  We have a general

3   position that 3500 material didn't need to be sealed.  I wanted

4   to flag that that application is outstanding.  I think there

5   are probably five letters under seal where we said that.

6          THE COURT:  That was on the record?

7          MR. WEDDLE:  It is only in the letter itself.  There

8   is nothing on the record.  When we filed some sealed letters,

9   we filed them under seal out of respect for the fact that prior

10  letters had been sealed and we were referring to 3500 material.

11  We put a footnote saying although we are filing it under seal,

12  we don't think it needs to be filed under seal.

13         THE COURT:  What is the date of that letter?

14         MR. WEDDLE:  I can look them up.  It's several

15  letters.

16         THE COURT:  That's from during the trial?

17         MR. WEDDLE:  During the trial.

18         THE COURT:  Okay.

19         (In open court)

20         THE COURT:  All the jurors are here.  Ready to begin?

21         MS. KRAMER:  Yes, your Honor.

22         THE COURT:  We'll bring them out.

23         (Jury present)

24         THE COURT:  Good morning, ladies and gentlemen.

25  Welcome back.

1          You have heard all the evidence in this case, ladies

2    and gentlemen of the jury.  The next stage is for counsel for

3    each of the parties to have a chance to give you summations, or

4    closing arguments.  As I said before, when the lawyers are

5    talking, it is not evidence in the case.  You have heard and

6    seen all the evidence in the case and you will have a chance to

7    see it when you are in the jury room deliberating.

8          However, an important part of the trial is that the

9    lawyers for each of the parties get a chance to talk about the

10   evidence, to tell you how they think you should interpret the

11   evidence and connect the evidence.  That is what a closing

12   argument is.

13         You may hear different views of the evidence,

14   different interpretations of the evidence from the parties.  It

15   is ultimately for you, the jury, the fact-finder in the case,

16   to find what the facts are.  I'll be explaining that in my jury

17   instructions to you afterward.

18         We will begin with the summation, or closing argument,

19   of counsel for the government.

20         Ms. Kramer.

21         MS. KRAMER:  Thank you, your Honor.

22         Good morning, ladies and gentlemen.

23         THE JURY:  Good morning.

24         MS. KRAMER:  For accounting firms like KPMG, almost

25   nothing is more important than inspection results.  For David

Middendorf, one of the top executives in the entire

corporation, there was nothing more important.  KPMG's

inspection results had been terrible.  Improving them was his

number one prior to.  It was literally his job.

        Against that backdrop, in the spring of 2015 this

fraudulent scheme was born.  David Middendorf, the defendant,

was at the heart of it.  He made a decision, a decision to

cheat, to improve the inspection results, to corrupt the

process that should have been done with truthfulness and

integrity.  That is exactly what he and his partners in crime

did, year after year after year, until they got caught.

        What happened when Brian Sweet started at KPMG in May

2015?  Right away Middendorf and his underlings started pumping

Sweet for confidential PCAOB inspection information.  Day one:

confirm these picks that we suspect.  Day two: remember where

your paycheck comes from, add value wherever you can, share

what you know even in the gray areas.  Day four: send me the

list.

        By the end of Sweet's first week at KPMG, Middendorf

and his subordinate Tom Whittle had asked for and received the

entire confidential PCAOB inspection list for 2015.  That was

the birth of the scheme perpetrated by Middendorf and his

subordinates Tom Whittle, David Britt, Brian Sweet, and Cindy

Holder.

        For it to keep going, for the scheme to keep going,

1    they would need fresh information, fresh confidential

2    information, a corrupt insider.  That's where Jeff Wada, the

3    defendant, came in.  He jumped into this fraudulent scheme head

4    first.  Why?  To help himself.  Wada was playing the long game.

5    He wanted to be a partner at KPMG one day, so he was putting

6    good will in the bank for a big payday later.

7           By the fall of 2015 Wada was a full-fledged member of

8    this conspiracy, passing confidential PCAOB inspection

9    information to KPMG, as he would again and again in 2016 and

10   2017.

11          Why did they secretly use the stolen confidential

12   information?  After sitting through this trial, ladies and

13   gentlemen, you all know the answer: to falsely inflate KPMG's

14   inspection results, to serve their own interests, to make KPMG

15   and themselves look better in the eyes of potential clients, in

16   the eyes of the PCAOB, and in the eyes of the SEC.

17          This was fraud plain and simple, ladies and gentlemen,

18   and that's why we are here today.

19          This closing argument is our opportunity to walk you

20   through the key evidence that you have heard and seen over the

21   last almost four weeks of this trial, to show you how all of

22   the evidence proves that the defendants are guilty as charged.

23   And, ladies and gentlemen, the evidence in this case is

24   overwhelming.

25          Before I get to all the proof, all the evidence that

1   you have seen for this trial, I want to take a moment to talk

2   about the charges.  Judge Oetken is going to give you detailed

3   instructions on the law when the case is over.  In talking

4   about the crimes charged in the case, it is my hope to give you

5   a roadmap, a roadmap about what is in dispute and how the

6   evidence fits together to show that the defendants are guilty

7   beyond any reasonable doubt.

8         There are three counts of wire fraud.  They are known

9   as substantive counts.  One count charges just Middendorf for

10   the 2015 list, one count charges Middendorf and Wada for 2016,

11   and one count charges Middendorf and Wada for 2017.  There is

12   also a conspiracy count charging both defendants with

13   conspiring to commit wire fraud.

14        I'll be speaking more about this, but the essence of

15   wire fraud, the essence of the wire fraud charges in this case,

16   is that Middendorf and Wada defrauded the PCAOB by stealing and

17   using confidential and valuable property from the PCAOB, their

18   closely guarded inspection lists, confidential information that

19   Wada was entrusted with, confidential information he had a duty

20   not to disclose.  It was a crime for Wada to breach that duty

21   and it was a crime for everyone else who helped him do it.

22        How do you know they committed wire fraud, ladies and

23   gentlemen?  With each inspection list, you have seen the

24   scheming, the deception, the lies to get their hands on the

25   PCAOB's most valuable confidential information: the names and

1    other details about KPMG's audits that the PCAOB, a regulator,

2    was going to inspect, inside information that KPMG wasn't

3    supposed to have, that the PCAOB deliberately held back so that

4    their inspections actually worked, so that their inspections

5    actually gave insight into how KPMG was doing on its audits,

6    how it was doing when no one was looking, how it was doing when

7    it didn't know that those would be inspected.

8              You have seen the devious plots to exploit that

9    information within the circle of trust and the stealth

10   re-reviews to change the inspection results, to get better

11   results than they otherwise would have gotten, to cheat.  All

12   of that shows you there was a scheme to defraud.

13             And you know that the defendants knew exactly what

14   they were doing when they played their parts in these crimes.

15   Middendorf was the boss.  He called the shots.  Everybody at

16   KPMG in the circle of trust reported to him.  He sought out the

17   confidential PCAOB information.  He applied the pressure.  He

18   helped craft the devious plan to use the stolen information.

19   He knew the purpose of the scheme.  He knew it was wrong.

20             Wada, of course, knew full well that he couldn't take

21   the PCAOB's most confidential information and share it, that

22   doing so was a breach of his duty to the PCAOB.  It was

23   confidential information he was entrusted with and obligated to

24   protect.

25             There is no doubt that these two men fully intended to

1   participate in these schemes and knew that what they were doing

2   was wrong.  They were lying and cheating and stealing for

3   years, and those things have never been right.

4           As I mentioned, both defendants are also charged with

5   conspiring or agreeing to commit wire fraud.  That's Count Two.

6   That illegal agreement, that's a separate crime from the actual

7   wire fraud counts.  This conspiracy began in the spring of

8   2015, and it kept on going through February 2017, when the

9   whistle-blowers found out and put an end to it.

10          Finally, the defendants are both charged with

11  conspiring, or agreeing, to defraud the Securities and Exchange

12  Commission, the SEC, in the same time period.  That's Count

13  One.  This crime is different from the wire fraud charges.  It

14  isn't about stealing property from the SEC.  It's about the

15  defendants' scheming to interfere with the SEC's ability to

16  regulate auditors and enforce their rules against KPMG and

17  other accountants, the gatekeepers of the financial markets.

18          Middendorf and the other members of this conspiracy

19  wanted better inspection results for a reason, ladies and

20  gentlemen.  They wanted to deceive not just the PCAOB but also

21  the SEC.  They wanted the SEC to think that KPMG had cleaned up

22  its act.  The SEC, KPMG's main government regulator, was

23  calling KPMG out for its poor work, for its poor inspection

24  results.  Cheating on those inspections with this stolen

25  confidential information, that was a way of tricking the SEC

1    and getting the agency off its back.  That's fraud.

2           Because several of the charges in the case involve

3    wire fraud, I am going to start by walking you through the

4    evidence of the scheme to defraud.  I'll talk to you later

5    about conspiracy to interfere with the work of the SEC, but

6    let's start with the scheme to defraud the PCAOB, and let's get

7    to it with the first inspection list in 2015, Count One.

8           To understand why this list was gold, why the

9    inspection results mattered so very much, why Middendorf was

10   willing to cross that criminal line, we have to look for a

11   minute at what was happening before the scheme started.  KPMG's

12   performance on PCAOB inspection results was terrible, terrible.

13   Middendorf and other KPMG leaders got dressed down at a meeting

14   with the head of the PCAOB's inspections division.  Tom

15   Whittle, then head of inspections, called it a punch in the gut

16   by the PCAOB.  Why?  You heard exactly why.  The PCAOB was very

17   critical of KPMG's high failure rates in the allowance for loan

18   loss area.  That was a hot topic for them.

19          High failure rates, ladies and gentlemen, that means

20   lots of comments, comments on that area of concern, the ALL,

21   comments that Middendorf and the rest of KPMG wanted to avoid.

22   Why?  Because KPMG was doing really badly.  For the inspections

23   conducted in 2014, 28 out of 51 had failed.  That's a 55

24   percent failure rate.  Even if that's a grade of the quality

25   only of KPMG's work on the riskiest audits, it's terrible.

1    It's a terrible outcome.

2          What did that mean to the firm at the time?  Tom

3    Whittle told you.  These results were poor, poor relative to

4    our historic inspections and poor relative to our peer group,

5    the other Big Four accounting firms.

6          These lousy results didn't exist in a vacuum.  They

7    were used by the PCAOB and the SEC.  They were looked at by

8    clients and they were big news in the business world.  They

9    were reported on in The Wall Street Journal.

10          So, what happened when Brian Sweet started at KPMG in

11    May 2015, after he had already taken confidential PCAOB

12    documents when he left for KPMG?  From day one, from day one,

13    Middendorf pumped him for information.  Over lunch Middendorf

14    asked Sweet about inspections and got increasingly more

15    pointed.  Middendorf asked Sweet to confirm inspections that

16    Middendorf already suspected based on the PCAOB's plan

17    schedule.  Is it going to be Stonegate Mortgage?  Is the PCAOB

18    going to inspect Wells Fargo?

19          When Sweet confirmed Wells Fargo, Middendorf let Sweet

20    know just how happy he was to get that confidential

21    information.  He got animated.  He slapped the table.  He said

22    "I knew it."  Middendorf wanted inside information, and that's

23    what he got that day.  He had a taste of it, and he wanted

24    Sweet to keep it coming.

25          Now I want to talk about what Dave Middendorf said

1    when he took that stand and testified in this trial.  But

2    before I do, I want to remind you of what you have already

3    heard and you will hear again: that of course a defendant has

4    absolutely no burden whatsoever.  He can absolutely choose not

5    to testify.  Doesn't even have to put on a case or have a

6    lawyer give an opening statement.  That burden rests with the

7    government at all times, and it is a burden that we embrace.

8           But when a defendant does testify or put on any kind

9    of case or make an argument, you should scrutinize what is

10   said.  You should take a close look at it, look carefully,

11   think about whether what you heard makes sense, whether it adds

12   up.  In this case it most certainly does not.

13          When asked about this during his testimony, what did

14   Middendorf say about asking Sweet to confirm Wells Fargo?  "I

15   don't recall."  Come on, ladies and gentlemen.  If you believe

16   Middendorf, he remembered specific words that a PCAOB board

17   member said to him over a lunch at an airport years ago.  He

18   remembered those words when they helped him, but he doesn't

19   remember this?  It doesn't add up.

20          On Sweet's first day, Middendorf wanted inside

21   information, and he made that crystal clear to Sweet.  And

22   because Middendorf was the boss, that information kept flowing.

23   On Sweet's second day he had what was supposed to be a welcome

24   meeting with Middendorf and Jim Liddy, then vice chair of

25   audit, Middendorf's boss.  Liddy participated by phone.  After

1   he hung up, it was just Sweet and Middendorf alone in an

2   executive conference room at KPMG.

3          Day two, Middendorf made his intent plain.  He told

4   Sweet, add value, share insights wherever possible, even in the

5   gray areas, like Stonegate.  He was talking about Stonegate

6   Mortgage, ladies and gentlemen, one of the audits on the 2015

7   list that the day before, at the first day lunch, Middendorf

8   asked Sweet to confirm.  Share insights even on things like

9   Stonegate, even when it means telling us who the PCAOB is going

10  to inspect, even when that is closely held, confidential

11  information.

12         What else did he say?  "Remember where your paycheck

13  comes from."  What was he saying there?  What does that mean?

14  Tell me what you are not supposed to, give up the confidential

15  information, earn that paycheck.  I'm your boss and I'm telling

16  you this is literally part of your job.  Remember where your

17  paycheck comes from.

18         Just two days later Sweet had lunch with Tom Whittle.

19  After the lunch they talked about an inspection list that Sweet

20  had taken with him from the PCAOB.  Whittle wanted to get that

21  list, but he checked with Middendorf first.  He told you that

22  he told Middendorf that Sweet had a list of banking

23  inspections, the PCAOB's planned inspections of KPMG banking

24  clients, most of which were still confidential.  What did

25  Middendorf say?  Go ahead and get that list.  Get that list,

1   ladies and gentlemen.

2          This illegal heads-up, this advance notice, could give

3   them extra time to get ready for the inspections they knew

4   would get picked, an opportunity, a criminal opportunity, to

5   turn around their bad results.

6          At Middendorf's direction Whittle emailed Sweet and

7   asked for the list.  "Send me the banking selection list."

8   That's Government Exhibit 735.  And Sweet delivered with the

9   full list, the full list for 2015.  Sweet had the list sent to

10  Whittle and told him it is actually the full list of

11  anticipated inspections, anticipated, not yet announced by the

12  PCAOB, highly confidential.  Sweet told Whittle, I appreciate

13  the team's discretion to make sure it isn't too widely

14  disseminated.  This was confidential, and Sweet made that

15  crystal clear.

16         Let's look at what Whittle did next.  Whittle sent the

17  list to Middendorf.  What did he say?  "The complete list,

18  obviously very sensitive.  We will not be broadcasting this."

19  That is Government Exhibit 754.  You can look at it as you

20  deliberate.  You will have all of the exhibits with you in the

21  jury room.

22         This is cold, hard proof that Middendorf got a

23  confidential PCAOB inspection list in 2015.  And the language

24  of this email, ladies and gentlemen, tells you this was no

25  surprise.  This wasn't news to him.  This was something he

1    expected, something he had asked for.

2           How does the email start?  An introduction?  No.  Does

3    it say, Dave, guess what, you won't believe it, Brian Sweet has

4    a list, a list of confidential selections?  There is no lead-in

5    at all, because there doesn't have to be.  The way this email

6    is written tells you everything you need to know about the fact

7    that Middendorf had told Whittle get that list and was

8    expecting it.

9           Whittle didn't need to see more.  He didn't need to

10   tell his boss what this was about.  That's why it doesn't say

11   "big news."  That's why there is no introduction whatsoever.

12   He didn't need to say any of that because Middendorf had

13   already talked to Whittle, had already learned about the list,

14   had already directed Whittle get that list.  That direction,

15   having Sweet disclose confidential information he was bound not

16   to share, that was fraud.

17          What did Whittle say?  "The complete list," a

18   reference of course to the list that Middendorf had asked for,

19   obviously very sensitive, "we will not be broadcasting this."

20   "Obviously," he said.  This wasn't a close call.  This wasn't a

21   gray area.  The inspection list was the most confidential

22   information, and that was plain as day to Middendorf, who

23   received this email.

24          Dave Middendorf has decades of experience.  You heard

25   him talk about that.  He was one of KPMG's top executives, the

1    head of their national office.  His very job was dealing with

2    the PCAOB and the SEC.  He got this confidential list, the

3    complete list, by email.

4         What did he say about it?  You know what he said,

5    ladies and gentlemen.  "I don't recall."  That was his answer

6    to the most devastating proof in the case.  But it doesn't add

7    up.  This was no average email.  Look at the cryptic language.

8    Look at the attachments.  Look at the subject line from Brian

9    Sweet on the Friday of Sweet's first week.  This would turn the

10   heads of anyone who got this email.  He didn't write back and

11   say what are you talking about, I have no idea what this means,

12   because he knew exactly what it meant and he had asked for it.

13        Why did he claim a failure of memory about this?

14   Because he has to.  He knows this email and his role in asking

15   for it and receiving it and using it puts the lie to the claim

16   that he didn't know that what he did was wrong.  Remember, both

17   Tom Whittle and Brian Sweet, two people who worked for

18   Middendorf, two people who participated with Middendorf in this

19   criminal scheme for years, they each pled guilty, admitted that

20   they knew what they were doing was wrong every step of the way,

21   admitted how this whole scheme was designed to defraud the

22   PCAOB and the SEC.

23        Before I go further in walking you through how they

24   used this confidential stolen information, I want to talk for a

25   minute about the fact that the lists are at the heart of the

 1    wire fraud charges.  I anticipate that Judge Oetken will

 2    instruct you that a wire fraud scheme has to target money or

 3    property.

 4            So, what constitutes property for purposes of wire

 5    fraud?  I expect that Judge Oetken will instruct you that the

 6    definition of property for these purposes includes an

 7    organization's or entity's confidential information that is of

 8    value to that organization or entity.

 9            The confidential PCAOB inspection lists that are the

10    heart of this case fit that definition to a T.  They are highly

11    confidential.  You have seen that again and again.  You

12    remember what Barbara Hannigan, the PCAOB's chief ethics

13    officer said about this.  When asked whether there is a

14    black-and-white answer to whether you can leak inspection

15    lists, that has the most black-and-white answer you could have.

16    That is such highly sensitive information.  It is clear that

17    you cannot leak that list.

18            That is because the PCAOB's ethics code, that rule you

19    have heard about so many times called EC9, that imposes a

20    lifetime ban -- while you work for the PCAOB, after you leave

21    the PCAOB -- a lifetime ban on sharing confidential PCAOB

22    information.  Sharing inspection lists, Barbara Hannigan told

23    you, is a violation of EC9.  Middendorf wants you to believe

24    that this is some gray area.  Literally no one, no one, who

25    testified in this trial agrees with him.

 1           These inspection lists aren't just confidential.  They

 2   are extremely valuable to the PCAOB.  They are at the heart of

 3   what the PCAOB does.  In terms of resources, it takes months of

 4   analysis to decide which 50 or so of KPMG's approximately 700

 5   public company audits it is going to inspect.  Dozens of people

 6   work on this effort at a cost of hundreds of thousands of

 7   dollars per year.  For 2015 alone it cost the PCAOB almost

 8   $400,000 to come up with the inspection list, and that is just

 9   2015.

10           As you consider each of the other wire fraud charges,

11   remember there was also the cost for planning in 2016 and then

12   the cost for replacing those inspections, for figuring out what

13   new picks to make after this scheme was uncovered.  There is

14   the cost for planning a whole 2017 list and replanning it after

15   the scheme came to light.  This information was extremely

16   valuable.

17           You know that the PCAOB inspection lists constitute

18   property for the wire fraud statute.  They are highly

19   confidential and highly valuable to the PCAOB.  So, going back

20   to 2015, after Middendorf gets the confidential inspection list

21   that Whittle forwards to him that came from Brian Sweet, what

22   do they do?  They used it.  They exploited it.  They acted on

23   it to try to improve KPMG's inspection results, another step in

24   their fraudulent scheme.

25           Whittle told you that he compared the engagements on

1   the stolen list with the planned internal inspections, those

2   inspections that KPMG did within its own staff.  He did an

3   analysis to see if they should change the firm's planned

4   internal inspections to avoid comments.

5        But that's not all they did with the stolen

6   information.  Sweet told three different KPMG partners whose

7   audits had already been notified by the PCAOB the highly

8   sensitive and confidential rationale for selection, the reasons

9   that the PCAOB picked those audits for inspection.  You heard

10  testimony from several witnesses that that rationale is never

11  shared with accounting firms.  It's highly confidential.

12       And Sweet did not do this in a vacuum, ladies and

13  gentlemen.  Tom Whittle testified that he discussed this with

14  David Middendorf.  Sweet told Whittle, Whittle told Middendorf.

15  Middendorf knew exactly what Sweet was doing: that they were

16  putting the stolen list to use.  Middendorf knew in Sweet's

17  very first week that the 2015 list was being put to criminal

18  use.

19       What could be done with the 2015 list when the audits

20  were done and the workpapers were already locked down after

21  that 45-day documentation period you have heard a lot about?

22  What could be done?  Plenty.  Plenty.  Certainly enough to make

23  a difference in the inspection results to avoid a dreaded

24  comment.

25       Why would they even try, ladies and gentlemen?  It

 1    makes no sense.  You heard that the time and effort to prepare

 2    for the opening meeting, that first part of a PCAOB inspection,

 3    that three- or four-hour opening meeting could make all the

 4    difference in whether a comment is issued.  You heard this from

 5    several witnesses.

 6          Brian Sweet told you that it has a significant impact

 7    on the overall inspection results.  Whittle, the former head of

 8    inspections, told you that when the engagement team was

 9    confident and showed that they had control over the audit, the

10    inspection went better.  What does an inspection going better

11    mean, ladies and gentlemen?  There's only one thing: comments

12    or no comments.  An inspection going better means fewer

13    comments.  Stephanie Rodriguez, the KPMG U.S. team lead at the

14    PCAOB also told you that the opening meeting makes a difference

15    in the outcome of the inspection.

16          So Middendorf and the others did everything they could

17    to get the greatest advantage from that stolen list even though

18    they got it late in the season.  They put extra resources on

19    Wells Fargo.  "Because we had confirmed that it was in fact

20    going to be inspected, we moved that preparation time up

21    several weeks or months before."  Whittle told you the only

22    reason they did that was because Sweet had confirmed that Wells

23    Fargo was on the list.

24          Make no mistake, Whittle did not do this alone.

25    "Q. Who, if anyone, at KPMG did you discuss the fact with that

1    these additional resources were being assigned to Wells Fargo?

2    "A. With David Middendorf,"

3           Whittle told you.  It was signed off on by Dave

4    Middendorf, the boss, another way you know that Middendorf

5    tried to exploit and use this confidential information.  So,

6    for 2015 you have seen overwhelming evidence of a scheme to

7    defraud.

8           And you know that Middendorf knew that these

9    confidential PCAOB inspection lists were provided by corrupt

10   insiders against PCAOB rules.  He admitted as much.  When

11   pressed on cross-examination he said he told you that he

12   understood that getting a confidential list in 2015 would be

13   wrong.  And for all the lists that he didn't claim to forget,

14   he admitted on cross-examination to knowing that they came from

15   a corrupt insider at the PCAOB.

16          And he knew about the PCAOB's confidentiality rules.

17   He said on cross that he knew when Sweet was hired that there

18   was information that he wasn't allowed to share, that there

19   were restrictions on what he could say.  You have seen

20   overwhelming evidence that Middendorf knew full well that what

21   he was doing was wrong.  And that is on top of some fundamental

22   information you have about him, about his smarts, his

23   experience, his sophistication.  That makes crystal clear that

24   getting a stolen inspection list from their regulator was

25   flat-out wrong.

1          You know that Middendorf was right in the middle of

2     the scheme to defraud the PCAOB out of its valuable property.

3     That breach, that fraud, it was material.  That just means that

4     it has to matter to an ordinary person in the PCAOB's position.

5     You already know from several PCAOB witnesses that it mattered

6     an enormous amount.  This was the most highly sensitive

7     information.

8          In fact, it mattered so much that the PCAOB spent

9     enormous resources doing reinspections, picking new targets

10    when it found out that its list had been stolen, when it found

11    out about this scheme.  Of course this mattered.  Of course the

12    confidentiality of the information, the surprise aspect of the

13    inspections, not getting notice until just before, that all

14    mattered to the PCAOB.  Of course it was material.

15         Finally on the wire fraud counts, the last thing the

16    government has to prove is that some sort of interstate wire

17    was used in furtherance of the scheme.  I expect that Judge

18    Oetken will tell you that that can be any sort of electronic

19    signal that goes across state lines, like an email or phone a

20    call or a text message.

21         You know that interstate wires were used in this

22    scheme.  Ken Koch, a KPMG partner, explained that every email

23    sent or received from a KPMG email address in 2015, 2016, and

24    2017, the time period of the crimes before you, those emails

25    traveled through servers in New Jersey.  So even when

participants in these crimes were sitting in their New York
office on Park Avenue emailing each other from Manhattan to
Manhattan, every single one of those emails passed through New
Jersey.  That's an interstate wire.

        You also have more because you know that Jeff Wada
lived in California, Cindy Holder lived in Houston, and the New
York office of KPMG is right here.  All of the text messages,
all of the emails, the voicemails you have seen, the emails
asking for the list, the email delivering the list, on an and
on, those all are interstate wires.

        That's Count Three, ladies and gentlemen, done.  Dave
Middendorf is guilty of Count Three.

        Was their ultimate goal successful in 2015?  Did they
make a difference to KPMG's inspection results?  Not as much as
could have happened, because they didn't get the stolen list
quite early enough in 2015 to do that much.  KPMG's performance
on the 2015 inspections was still bad.  20 out of 49
inspections were failures.

        Let me pause for a just a minute.  The fact that they
didn't make a huge difference in the inspection results in
2015, that does not matter to your determination of the
defendant's guilt.  You don't need to find that the stolen list
actually impacted the inspection results.

        For 2015 Middendorf was guilty when he told Whittle to
get that list, when Whittle sent the email asking for it, and

1    when Sweet sent it so that they could use it.  This was

2    valuable confidential information that Middendorf knew Sweet

3    was not allowed to share, was bound not to share.  So, whether

4    or not their inspection results actually improved with the

5    stolen list doesn't make him any less guilty, not one bit.

6            By the fall of 2015, Holder had come over to KPMG from

7    the PCAOB and was regularly reaching out to Jeff Wada to get

8    confidential information to pass to Sweet and his bosses,

9    including Middendorf, so that it could be used, all to satisfy

10   that ongoing request that started Sweet's first week.  This was

11   when Wada joins the conspiracy.  Let's spend a couple of

12   minutes talking about Jeff Wada and how he joined these crimes.

13           Because of his position at the PCAOB and his work on a

14   KPMG Japan inspection, he was entrusted with access to the KPMG

15   part of the PCAOB's computer system.  Again and again he

16   violated that trust.  He took confidential information that

17   wasn't his to share, and he passed it to KPMG so that it could

18   be used, something he knew full well he wasn't allowed to do.

19           I am going to walk you through one of the examples of

20   Wada doing this, passing confidential information to KPMG in

21   2015.  But before I do that, I want to pause and go over the

22   crushing evidence that Wada knew that he was not allowed to do

23   this.  There is so much of it.  Let's just take a look at a

24   couple of the things you have seen in this case.

25           First, you know that Wada was bound by the ethics code

1    EC9, which you have heard a lot about.  That is the rule that

2    prevents PCAOB employees from sharing confidential PCAOB

3    information.  EC9, which you have seen a lot of, is on the left

4    on this slide.  It's Government Exhibit 20.

5            Look at Wada's PCAOB ethics certification.  Year after

6    year you can see at the bottom of Government Exhibit 24 --

7    2008, 2009, 2010, and on through 2016 -- he certified that he

8    was in compliance with the PCAOB ethics code, that he knew the

9    rules, that he knew he could not disclose nonpublic

10   information, confidential information.  He knew the rules.  He

11   lied and said he was following them.

12           The notion that he couldn't possibly know that it was

13   wrong to disclose this confidential information -- the

14   inspection list, the most confidential of all of PCAOB's

15   information -- is preposterous.  Why else would he use coded

16   language like "grocery list," which we will talk about soon?

17   Come on.  Of course he knew these lists were confidential and

18   he wasn't allowed to share them.

19           Let's take a look at an example of his early

20   participation in these crimes.  He passed along information

21   about two of the PCAOB's international inspections of KPMG

22   clients.  He did it in October of 2015 and again in November

23   2015.

24           Let's look at the October 2015 email for a minute.

25   Brian Sweet emails Dave Middendorf, Tom Whittle, David Britt

 1    and others.  "I got a call from an old colleague over the

 2    weekend."  We'll talk about who that old colleague is, but you

 3    already know.  Cindy Holder called him, was passing

 4    confidential information that she had gotten from their source,

 5    Jeff Wada.

 6           "The old colleague let me know that a decision had

 7    been made."  That's a decision at the PCAOB, PCAOB's internal

 8    deliberations about who to inspect.

 9           "A big bang from Switzerland to Japan."  That means

10    Credit Suisse and Sumitomo.

11           Why did he share this?  He makes it clear in the last

12    sentence of this October 20th email.  "I wanted to give you a

13    heads-up as it may impact where we devote the most time and

14    attention in the coming months."  What is he saying there?

15    Here is some more confidential information and I'm sharing it

16    so we can use it.

17           Who was the old colleague?  Brian Sweet told you when

18    he wrote that email he was talking about Cindy Holder, who had

19    in turn received a call from Jeff Wada.

20           And how do you know that it was Wada in October?

21    Sweet said that he got a call over the weekend.  Let's look at

22    Wada's phone records.  On Saturday, October 17, 2015, Wada and

23    Holder spoke for 60 minutes.  This is from Wada's phone record,

24    Government Exhibit 412.  That cell phone number ending in 1277

25    is Cindy Holder's cell phone, as you have heard throughout the

1    case.  This 60-minute call between California and Texas,

2    between Wada and Holder, that was Wada passing this tip to

3    Holder.

4            How do you know that it was him in November 2015 when

5    there was a follow-up tip share?  Same thing again.  The day

6    before Sweet sends this November 10th email, the day before,

7    November 9th, Wada and Holder speak for 14 minutes.

8            On November 10th what was Sweet doing?  He was

9    updating Middendorf and the others about the information he had

10   shared in October.  He forwarded the October email on November

11   10th with this new information.  "I've been told that it's not

12   going to be Japan.  Instead it will be Germany.  So that means

13   Deutsche Bank in lieu of Sumitomo," confidential information

14   about who the PCAOB was going to inspect.

15           Jeff Wada's phone records, ladies and gentlemen, you

16   will have them in the jury room.  You can look at them.  They

17   are in evidence as Government Exhibits 406 and 412.  Those are

18   the records for the cell phone he used to talk to Holder, to

19   text with her.  All those incriminating text messages came from

20   that cell number.  That's the number he used every single time.

21   Look through those records, ladies and gentlemen.  Every time

22   there is confidential information coming through to KPMG, you

23   see a phonecall between Wada and Holder.

24           Now, why did Wada do this in 2015?  To help himself.

25   To prime the pump for an eventual job at KPMG.  Just months

before, he was passed over for promotion at the PCAOB, just

months before joining the scheme.  There was a promotion

announcement.  He wanted to make associate director, or AD.  He

wanted to do that so he could go to KPMG as a partner with a

commuting package.  If he gets to be a well-seasoned AD, he

said, maybe he could get that partner title and a fat payday.

Wada wanted the fat payday that he would get as a partner at

KPMG.

        In the fall of 2015 what did Sweet do with this

confidential information?  He turned around and, as you saw, he

gave it to Middendorf and others.  Two times Middendorf

received these emails, October 2015 and November 2015, more

hard evidence that Middendorf knowingly got confidential PCAOB

inspection information.

        Just like in May 2015, in October-November 2015 he

didn't below any whistles.  He didn't report this.  He used it.

He wanted it.  He demanded it.  And this was no gossip, as you

heard Middendorf say on the stand.

        Gossip at work, ladies and gentlemen, everyone knows

what gossip at work looks like.  It's when raises are going to

be announced, who gets the good parking space, whether Steve

from marketing and Nancy from HR are dating.  That's gossip.

        This was no gossip.  This was confidential information

about who KPMG's regulator was going to inspect as part of a

formal inspection instituted by a congressional act.  This was

1    not gossip.  That's absurd.

2         You know this wasn't just gossip because, just like

3    the 2015 list, this confidential tip was acted on.  David

4    Britt, another member of the scheme, sent an email to some

5    colleagues asking, saying, we may want to consider doing

6    something with Sumitomo.  Don't think it has an ALL, but ask

7    Steve.

8         What does that mean?  You heard a lot of testimony in

9    this case about the ALL monitoring program.  That's what Britt

10   is talking about here.  I don't think it has an ALL, I don't

11   think we can put it in the ALL monitoring program, but we can

12   take another look because of the fair value, we can take

13   another look through a different monitoring program.  This was

14   sent by another one of Middendorf's subordinates, another

15   member of the circle of trust.  Extra time, extra resources

16   because of confidential inside information.

17        Several months later, Brian Sweet said in an email --

18   and you can take a look at this, ladies and gentlemen,

19   Government Exhibit 931 -- Sweet says, because of this

20   confidential information about Credit Suisse and Deutsche Bank,

21   the October and November tips from Wada, because of that, these

22   two were added to the monitoring programs as a result.  More

23   work, more effort to affect comments because of this illegal

24   inside confidential information.

25        That wasn't all they did with the tip.  You saw in

1    January 2016 a group, including Sweet, met to go over comments

2    that were issued in the last inspection of Credit Suisse.  You

3    heard from Sweet that they didn't normally do this.  The only

4    reason they did this was because they had been told, thanks to

5    Wada, that Credit Suisse was going to be inspected.  More

6    action taken on illegal inside information, more of an effort

7    to manipulate the inspection results in a way that they thought

8    the PCAOB would never find out about.  Wada's inside

9    information was paying off.

10            But inspection results weren't really turning around.

11   You heard about that Palantir project, the project with the

12   data analytics firm that was spearheaded by Middendorf.  When

13   you think about Palantir, think about Middendorf's claim that

14   inspection results weren't really that important, that he

15   didn't really care about them.

16            Middendorf spearheaded this project.  He signed

17   a million-dollar contract with Palantir in exchange for

18   Palantir accurately predicting the PCAOB's inspection

19   selections.  This was not about improving overall audit

20   quality.  It was about figuring out the PCAOB's picks so they

21   could game the system.  Remember, Palantir's payout depended

22   entirely on its rate of success in picking the PCAOB's

23   selections.  The idea that turning around KPMG's inspection

24   results wasn't important to Middendorf is just outright

25   laughable.

1          Things were not turning around, at least not fast
2    enough.  In 2016 KPMG was in hot water with the SEC for its
3    track record of bad inspection results.  The chair of the SEC
4    even had a meeting with Middendorf and other KPMG leadership.
5    In the SEC's view, Middendorf and the others had to be taken to
6    task for their poor performance on PCAOB inspections, for their
7    lack of responsiveness.

8          The meeting was held at the SEC's headquarters in
9    Washington, D.C.  There were two meetings held that day with
10   the chief accountant and the chairman of the SEC.  That meeting
11   was held at the SEC.  It was known at the SEC as the Come to
12   Jesus meeting.  Why?  Because there were serious concerns
13   regarding the performance, the inspection performance, and the
14   responsiveness of the firm.

15         Ladies and gentlemen, think about this for a minute.
16   In KPMG's world it pretty much gets no higher than meeting with
17   the chair of the SEC.  In that meeting the SEC chair chastised
18   KPMG for its poor inspection results.  That is a huge deal.
19   What did Middendorf say to you about this, about the sharp
20   criticism that the SEC gave that day about KPMG's inspection
21   results?  Once again, "I don't recall."

22         The inspection results didn't just matter to the PCAOB
23   and the SEC.  Middendorf's own boss, Scott Marcello, the head
24   of audit for the entire firm, told Middendorf "reducing our
25   PCAOB comments is our first priority."  Whether PCAOB

1   inspection results mattered to Middendorf's friend and former

2   client, they sure mattered to his boss.  The pressure was on.

3           It was no coincidence that when Wada delivered a

4   confidential inspection list of the banking selections the very

5   next month, the very next month after the Come to Jesus meeting

6   at the SEC, Middendorf and his cohort jumped on it right away.

7   Let's look at what happened on March 28, 2016.  Middendorf

8   doesn't even dispute most of this.

9           Wada at that time was increasingly disgruntled.  Just

10  a couple of weeks before stealing and sharing the list, he sent

11  this email to a co-worker.  He saw himself as having gotten

12  screwed by the PCAOB.  Knowing exactly what he was doing, he

13  went into the PCAOB computer system and he took the list of

14  KPMG's banking clients that the PCAOB was going to inspect in

15  2016.

16          Why did it matter that these were banking clients?

17  That's because those are the ones with that allowance for loan

18  loss issue on their audits, the ALL that you have heard so much

19  about, an historic problem area for KPMG on inspections.

20          And this list, that wasn't a small heads-up.  This was

21  very serious.  KPMG had not been notified yet about a single

22  inspection on this list, not one of them.  And every single one

23  was highly confidential.  The audits were still in that 45-day

24  documentation period after the report was signed and the

25  opinion issues.  This illicit information could really be used.

 1                 On March 27, 2016, Wada asked Holder to call him.

 2   "Call me first thing if you can."  They spoke the next day.

 3   They spoke for 51 minutes in the middle of the day on March

 4   28th, Wada on his cell phone and Holder on this KPMG number.

 5   You know that the person Wada talked to that day for 51 minutes

 6   was Cindy Holder because just about an hour after hanging up

 7   with him she emailed her boss.  She told him to call her on

 8   that number when he asked for a five-minute chat.  That was

 9   Holder talking to Wada on March 28, 2016.

10                 And you know exactly what Wada passed to Holder on

11   that call because of what Holder did next.  She got off the

12   phone with Wada at 1:33 p.m.  The very same minute she hung up

13   with him, that very same minute she called Sweet.  She tried

14   desperately to reach him.  She called his office number one

15   minute later.  She called his cell number.  She texted him the

16   same minute.  "Call me as soon as you can," three exclamation

17   points.  She again called his cell number.

18                 Why?  Why was she frantically trying to reach Brian

19   Sweet after talking to Wada?  Because she had the list, the

20   list that Wada had just given her.

21                 (Continued on next page)

22

23

24

25

1              MS. KRAMER:  And then they spoke.  And what a call it

2    was.  Brian Sweet told you had about it.  Holder said she had

3    received a call from Jeffrey Wada, that Wada had provided her

4    with the names of who the PCAOB was going to be inspecting for

5    the banks in 2016.

6              So what did Sweet do?  Exactly what he knew he was

7    supposed to.  He immediately reached out to his bosses.  He

8    tried to call Whittle.  When he didn't reach him, he emailed

9    him.  He tried to call Britt.  When he didn't reach him, he

10   emailed him.  And then he spoke with Whittle and Britt -- two

11   other members of Middendorf's circle of trust.  They spoke and

12   decided to act quickly, right away, to try to set up a meeting

13   with the man in charge of them all -- Middendorf.  Whittle told

14   you, he pulled Middendorf out of the meeting.  He doesn't just

15   step out to tell him about this list.

16             Then just a couple of hours after Wada gave the list

17   to Holder, in breach of his duty, Middendorf, Whittle and Britt

18   gathered around a table in a KPMG conference room, right here

19   in Manhattan.  They got Sweet on the phone.  They spoke for an

20   hour while Sweet shared the secret confidential list of the

21   banking selections for 2016.

22             You have seen David Britt's notes from that day, notes

23   that contain the list, the very notes that were taken from his

24   office at KPMG after the scheme unraveled.  Now, I will come

25   back to these notes in a minute, but let's just pause for a

1    second at what Middendorf said about this meeting, about this

2    hour-long meeting, where the list was provided.  A meeting

3    that's corroborated not just by Britt's notes but also phone

4    records, Sweet's testimony, and Whittle's testimony.

5        What did he say about it on this stand?  "I don't

6    recall."  Once again, two witnesses from that meeting testified

7    that Middendorf was there.  Consistently, Tom Whittle told you

8    he wasn't acting on the stolen information, not at any of these

9    points in time, without Middendorf's sign-off.  And they both,

10   Whittle and Sweet, relayed to you that Middendorf was there,

11   that he fully participated.  He helped come up with the devious

12   plan for the stealth rereviews.

13       So why the claimed lack of memory?  Why "I don't

14   recall" again?  Because if Middendorf admits his participation

15   in this meeting, he knows that he's done:  "I don't recall."

16       So what did they do in that meeting?  You heard a lot

17   of testimony about this.  They hatched a criminal plan to

18   revise the workpapers for the audits on the list as much as

19   they possibly could without getting caught.  They decided to

20   conduct what they called "stealth" rereviews -- secret

21   rereviews.

22       Use using a legitimate monitoring program, the ALL

23   Monitoring Program, as a cover, they tried to hide from the

24   PCAOB, and anyone else who came looking, that they took all of

25   this action because of illegal confidential information.  They

1    tried to pretend it was just business as usual.  But this

2    wasn't business as usual, not by a long shot.  You've heard

3    that the monitoring program was normally used while the audits

4    were still live, while the engagement team were still actually

5    doing their work.  That was the point of the monitoring

6    program.  That's what Tom Whittle told you.  Not to go in, to

7    edit the workpapers.  But they were devious and they were

8    careful.  They were sophisticated.  And they wanted to cover

9    their tracks.

10           Now, one way, an easy way, that you know that this was

11   not legitimate in anyone's mind, they agreed to keep the plan

12   within their circle of trust, to keep it a secret.  So let's

13   look at the list that Wada shared.  He shared the real list

14   from the PCAOB.

15           So look at David Britt's notes from that day with the

16   PCAOB document that show you who it was going to inspect in

17   2016.  They match up perfectly.  I'll just go down the list --

18   Century Bancorp, UMB Financial.  You can see on Government

19   Exhibit 652 that it matches up with the PCAOB's documents --

20   one after another, after another, after another, the entire

21   list.  This was real.  And it's real because Wada, who had

22   access to this part of the PCAOB system, got in there and took

23   the real information, and he shared it so KPMG could use it.

24           So, that night, after the meeting, Britt sent out an

25   email that Middendorf was on -- his partner in crime and his

boss.

This is how the stealth rereviews started.  So let's look closely at what this email says.  It is Government Exhibit 954.  "URGENT," he wrote in the subject line.  "As part of our wrap up and reporting of the results of the ALLL monitoring program we need to gather some additional information from the eAudIT files."

This was a blatant lie.  They weren't gathering additional information.  This wasn't part of the wrap up and reporting.  It was a scheme to manipulate inspection results, to cheat the regulator.  And this email was a flat out lie -- a lie to their own partners at KPMG.

What did Middendorf say about this when he thought -- about what he thought when he received this email, with outright lies in it?  What did he take that stand and tell you?  "I don't recall."

Another incriminating email and another claimed lack of memory.

But when pressed on cross-examination, Middendorf conceded that it was untruthful.  He didn't want to say it was an outright lie, but that's exactly what it was.  And when something is business as usual, you don't lie to your own partners.  So how did he try to explain this to you?  This email that he didn't remember?  The fake cover story?  He said that he and Whittle didn't want to stress the partners out.

 1          That makes no sense even on the face of the email.  If

 2     you don't want to stress out your partners, do you send an

 3     email late at night with a subject line in all caps, "URGENT,"

 4     coming from the National Office at KPMG?  Of course not.  It's

 5     just silly.  It makes no sense.  They lied to avoid getting

 6     caught, not to avoid stressing people out.  Your reason and

 7     common sense tells you that, ladies and gentlemen.

 8          And they didn't just lie in the text of the email.

 9     They sent this to all of the engagement partners in the ALL

10     Monitoring Program -- every single one of them.

11          But you know from all the testimony that there were

12     only about seven banks on the stolen list that they actually

13     intended to do rereviews on.  So, why email every single

14     partner?  Why not just email the seven?  Even if you tell the

15     same lie, why not just email the seven you're going to look at?

16          Because they wanted to cover their tracks and they

17     wanted to do it well.  There's no other reason to include all

18     those people on this email.  They wanted to hide their scheme.

19     They wanted to avoid getting caught.

20          Do you want to know what intent to defraud looks like,

21     ladies and gentlemen?  This is it.

22          So when Middendorf tells you that he doesn't recall

23     this, you should take that testimony, along with all the other

24     claims, failures of recollection, as you bring your reason and

25     your everyday experience to the table in the jury room when

1   you're evaluating his credibility.  He's a seasoned,

2   sophisticated, smart executive.  And no matter how sympathetic

3   he may appear, or how much you may want to believe him, he

4   can't make facts disappear.  He can't forget away

5   incriminating, devastating, hard proof of his knowing

6   participation in this scheme.

7           So let's take one more look at the subject line,

8   because the why of the urgency is important.  Why was this

9   "URGENT", in all caps?  Because the clock was ticking.  They

10  were up against the end of the 45-day documentation period.

11  They wanted to get their hands on those workpapers so they

12  could make as many changes as they could get away with making

13  before the workpapers have to be locked down.  To fully exploit

14  this inside information, they had to act fast.  And act fast

15  they did.

16          Mere hours passed from the time Wada gave the inside

17  information to Holder and this email was sent.  The stealth

18  reviews were underway.  So they dispatched members of the

19  National Office, including Sweet, Holder and others, to conduct

20  the stealth rereviews.  And they lied.  They lied to partners

21  along the way about what they were doing.  And they didn't just

22  limit their scheme to the audits on the list that were in the

23  ALL Monitoring Program.  Right?  That was just cover for doing

24  everything they could to exploit the entire list.  So they had

25  to reach out individually to other people to look at the

1    workpapers, to try to make changes, or they couldn't use the

2    cover of this monitoring program.

3         You saw that David Britt asks Sweet to invite Chris

4    Van Voorhies, the engagement partner on NewStar, one of the

5    banks on the list, to be on the call that Sweet was going to

6    have with the rereviewers, so that Van Voorhies could do his

7    own rereview, to make his own changes to the workpapers.

8         And what did Britt say when Sweet asked if Van

9    Voorhies knew what was really going on?  "Have you spoken to

10   him already?" Sweet said.  This is Government Exhibit 941.

11   Sweet says, "I sure will add him.  Thanks, David.  Have you

12   spoken to him already?  Have you told him what we're really

13   doing here?  Have you told him why?"

14        How did Britt respond?

15        "I told him I would ask you, that the others on the

16   call did not know what I told him, and he had to keep his mouth

17   shut."

18        This -- this is not the language of business as usual

19   or doing something you think is OK.  This is the language of

20   criminality, and this was part of the scheme that Middendorf

21   participated in.  Part of the rereviews he helped orchestrate,

22   the stealth rereviews, that the real reason of which was kept

23   in the circle of trust.

24        So Sweet had his call the next day to get things

25   rolling, to tell the rereviewers what to look at.  And as he

1    had been told, he lied.  He told them that they were going to

2    start with the riskiest of engagements.  This was no risk

3    analysis.  This was a list of inside information from the

4    regulator.

5         And Sweet did as he was told and invited Van Voorhies

6    to the call.

7         So what was the objective of these rereviews?  What

8    was their purpose?  You heard Tom Whittle tell you:  "To get

9    the workpapers in great shape so that we would avoid PCAOB

10   comments."

11        And that's exactly why they made so many changes to

12   the workpapers.  Look at some of the workpapers that are in

13   evidence.  This is not a ledger, ladies and gentlemen.  This is

14   not the balancing of your checkbook where you're just crossing

15   the T's and dotting the I's.  These are complicated, extensive

16   memos designed to explain to the PCAOB inspectors why they did

17   some things, why they didn't do other things, what the weak

18   spots were, how their analysis can be relied on.

19        Look at them, ladies and gentlemen.  Look at the

20   changes, the extensive changes to these complex memos.  This

21   was not cleaning up.  This was trying to make them more

22   persuasive, make them more compelling, improve their quality,

23   make it look to the inspection team like KPMG's quality, when

24   no one was looking, was the end result of this.  When it

25   wasn't.  Not at all.  This was all extra, after they got the

1   inside information.

2          Every single witness you heard from agreed that the

3   quality of workpapers matters to whether a comment is issued.

4   These were edits that made a difference to PCAOB inspectors.

5          Stephanie Rodriguez, the KPMG team lead for the U.S.

6   at the PCAOB, told you that the quality of workpapers affects

7   the outcome.  And every other witness you heard from said the

8   same thing.

9          Now, you heard the argument that the rereviews didn't

10  matter, they were OK, because the PCAOB supposedly doesn't

11  write comments for documentation.  But that is a self-serving

12  claim after the fact that is not at all supported by the

13  evidence.  And for awhile, until he was confronted on

14  cross-examination, Middendorf tried to tell you the same thing.

15         But you heard again and again from witness after

16  witness that the quality of the workpapers matters a great

17  deal.  It's only the utter failure to document work that is

18  proven to have been done that doesn't get a comment.  That's

19  what no comments for documentation means.  Not that all of

20  these lengthy memos, what they say doesn't matter.  That's

21  ridiculous.  It's apples and oranges.

22         And your common sense tells you that's true for one

23  very, very simple reason.  If the changes to the workpapers

24  didn't matter, if they didn't affect whether comments were

25  given, why would they go through all this?  Why would they do

1    these rereviews if they thought it didn't make a difference

2    whether comments were issued?  Avoiding comments was the whole

3    point of this exercise.

4         Doing it, cleaning up the workpapers, changing them

5    without telling the PCAOB that those changes were made because

6    of secret inside information, that was pure deception.

7         And let's just stop here for one second because

8    there's so much evidence that the point of these workpaper

9    changes was to avoid comments without the PCAOB knowing.  This

10   really mattered to the PCAOB, seeing the true work of the

11   auditor.  You heard that again and again.  It was part of the

12   design of the inspection process.  It's the reason that they

13   almost never sent out notifications of inspections until after

14   the workpapers were shut down.  They wanted to sample, right,

15   to not look at all 700 audits, but to look at 50 and get a true

16   look at the quality of the firm.

17        Stephanie Rodriguez was unequivocal:  "We do not want

18   firms modifying the workpapers with knowledge of us -- just

19   because it is going to be inspected.  Our goal is to review

20   workpapers that haven't been altered or modified with knowledge

21   of an upcoming inspection."

22        And you heard testimony from two different witnesses

23   that the PCAOB expressly required firms to document workpaper

24   changes in those rare cases where the notification was sent

25   within the 45 days.  So, for scheduling or other reasons, when

1    the PCAOB tells the firm we're going to inspect a certain audit

2    and the 45-day work period -- workpaper period is not up, the

3    PCAOB asks the firm to document any changes or modifications

4    that were made to the workpapers after that notice.

5         Not just new audit work.  Not just work that would

6    require special documentation under an auditing standard.

7    Every single modification.

8         And Brian Sweet explained to you that that mattered

9    from his experience at the PCAOB as an inspector, and that it

10   had happened on a KPMG inspection.

11        And that -- that directive was in KPMG's own internal

12   emails telling the engagement teams that an inspection had been

13   notified.  Government Exhibit 1063, this is a KPMG email,

14   ladies and gentlemen, making plain that the PCAOB doesn't want

15   firms making changes after notification of any kind without

16   documentation, without the PCAOB knowing exactly what they

17   were.  So if the report release date has passed, right, if the

18   audit opinion has issued, but the documentation completion date

19   has not yet passed, you're still in that 45 days, adhere to the

20   auditing standards, but also a log should be maintained of any

21   new documentation, changes made to the documentation, or any

22   sign-offs on documentation after the notification.

23        The PCAOB told KPMG to document even the smallest of

24   changes in the 45 days.  It mattered to the PCAOB, and

25   Middendorf knew that.  The notion that he thought that there

1    was nothing wrong with keeping everything they did in the

2    rereviews a secret from the PCAOB, hidden from the regulator

3    that was doing the inspection, it defies not just common sense

4    but also KPMG's own experience with the PCAOB, KPMG's own words

5    on the subject.  It's an after-the-fact desperate claim, and

6    you should not give it a single ounce of weight.

7            Now, you heard a lot about how the rereviews complied

8    with the auditing standards.  Why was that?  They're breaking

9    the rules.  Why not break more?

10            Because they didn't want to get caught.  Keeping it a

11    secret was critical.  And when you have engagement teams who

12    were inputting your edits on the workpapers, they know if

13    you're breaking a rule.  They might blow the whistle.  And if

14    you're doing new audit work that gets documented and the

15    inspectors from the PCAOB come in and they notice, if they did

16    new documents and audit work on all seven of these banks that

17    were on our list, why is that?  What happened here?  And then

18    your scheme is blown.

19            So you heard this from Brian Sweet.  If others were to

20    know the real reason, that would increase the likelihood of us

21    getting caught.

22            And Whittle explains, the avoidance of AU 390 work,

23    that new audit work, wasn't because they wanted to abide by

24    accounting standards and follow the rules.  They're already

25    neck-deep in a fraudulent scheme breaking the rules.  That's

1    not why they did it.  They did it in an effort to avoid being

2    caught.

3            Do you think that this sophisticated executive with

4    decades of experience, at the highest level of the financial

5    world, would commit this crime in a way that would call PCAOB's

6    attention to it?  Do you think he would make it easy for

7    someone to catch him?  No way.  Complying with the auditing

8    standards is not evidence of innocence, ladies and gentlemen.

9    It's evidence of criminality.

10           THE COURT:  Is there an objection?

11           MR. BOXER:  Yes, to the last sentence.

12           THE COURT:  OK.  Hold on.

13           (Pause)

14           All right.  I will just clarify that I will be

15    explaining the relevant legal standards when I give you my

16    charge and those will control.

17           MR. BOXER:  Thank you, your Honor.

18           MS. KRAMER:  So as the rereviews progressed and the

19    inspections of audits on the stolen 2016 list move forward,

20    Middendorf kept close watch over what was happening.  You saw.

21    He requested research.  He got someone access to workpapers, to

22    do one of these rereviews outside the cover of the monitoring

23    program, and he followed up regularly.  He was careful with

24    what he put in writing.

25           You saw this email between the Whittle and Middendorf

1    about who should do the rereview for Bon-Ton, a department

2    store that was not in the ALL Monitoring Program.

3          They didn't say "Bon-Ton" in this email.  They just

4    called it a retailer.  And Whittle told you why.  "We didn't

5    want anyone to know that we were corresponding about an

6    engagement that was on the PCAOB selection list."

7          And as part of this scheme, they even outright lied to

8    the PCAOB.  You heard that in one of the rereviews, a team

9    discovered a problem with the audit of AMBAC's internal

10   controls over financial reporting.  KPMG withdrew its opinion

11   on that, and AMBAC had to file new financials with the SEC, an

12   amended 10-K.

13         Now, if the AMBAC audit was inspected after this, it

14   would definitely be a comment.  So, Whittle called the PCAOB

15   and outright lied.  He told the PCAOB that this restatement of

16   events had just happened in the normal course of the National

17   Office's review.  And he told the PCAOB nothing -- nothing --

18   about the inspection list.

19         He was asked if he disclosed to Mr. Schindler, from

20   the PCAOB, that he had knowledge that AMBAC would be inspected:

21   No.  I purposely left that the information out.

22         Why?

23         Because he knew -- he knew just like Middendorf

24   knew -- that it was confidential, and they didn't want the

25   PCAOB to know that they had that information.

1          And that wasn't the only lie they told to the PCAOB.

2          In September 2016, on the heels of the inspections

3    that were the subject of the stealth rereviews, Middendorf

4    participated in a meeting with PCAOB leadership.  In that

5    meeting, the success of KPMG's inspections on the ALL, that

6    historic problem area, was touted.  They bragged about getting

7    comments down to zero in the corrupted 2016 inspections.

8          What didn't they tell the PCAOB?  What was the

9    elephant in the room that they tried to keep secret?  That they

10   had cheated.  Middendorf admitted on cross-examination that he

11   didn't tell the PCAOB that they had confidential information.

12   That is not something they volunteered.  There was no

13   whistleblowing.

14         Why?  Why did he choose not to share that with the

15   PCAOB?  Because he didn't want them to know.

16         That is a breathtaking admission, ladies and

17   gentlemen.  Look at Middendorf's intent.  He didn't want them

18   to know.  Why?  Because he knew it was wrong.  So if you put

19   aside all of this evidence of his intent, his deliberate

20   conduct, the scheming, the lies, you put aside his

21   sophistication and his experience, everything they told him

22   about having these inspection lists from the regulator was

23   absolutely wrong, you also have other evidence that he knew

24   that what he was doing was wrong.

25         So do you remember EC9, the lifetime ban, that says

1    PCAOB employees can never share what they learn?  This was --

2    this was absolutely crystal clear to Middendorf because he

3    signed a document in 2015, when he joined the Standing Advisory

4    Group, he specifically signed a document in which he agreed to

5    be bound by EC9 if he got information through that group.  That

6    tells you that he fully understood EC9 by the time he got the

7    March list.  He fully understood it because he signed a

8    document agreeing to follow it.

9         When he joined the circle of trust, when he

10   participated in the stealth rereviews, he knew exactly how

11   wrong this was.

12        But what did Middendorf tell you about signing this

13   document?

14        And let me just say again, to be crystal clear,

15   defendants have no burden whatsoever.  They do not have to

16   prove their innocence.  The burden rests entirely with the

17   government.  But you absolutely should scrutinize when a

18   defendant does put on a case, when they do make arguments.

19        So look at what he said about yet another devastating

20   document:  "I don't recall."  Once again.

21        So, let's take a closer look at the results of the

22   corrupt 2016 inspections, because this time, this time their

23   scheme really paid off.  After months of scheming and plotting

24   and covering their tracks, the inspections were done and the

25   rereviews worked.  That problem area that KPMG had been plagued

1   by year after year, those comments went down to zero, ladies

2   and gentlemen.  It was such a stark improvement that Tom

3   Whittle, then Head of Inspections, was afraid of its

4   implications.  He told you on the one hand, he was very pleased

5   that the results were so good, but he was also concerned,

6   because if they didn't have the same information in a

7   subsequent period, the next year, that they could see a return

8   of deficiencies, more comments, and that would be difficult to

9   explain.

10          And that's kind of what happened.  Because once the

11   scheme was discovered, the PCAOB conducted replacement

12   inspections for 2016, ten or so new banks to replace the ones

13   that had been corrupted by the defendants, the ones on the

14   stolen 2016 list that Wada provided.  And without the benefit

15   of cheating on those 2016 replacements, no surprise here, the

16   firm was back up to its normal level of comments on this

17   problem area.  Their cheating had worked.

18          So for 2016 you've seen the scheme to defraud:

19   Overwhelming evidence that Middendorf and Wada participated

20   intentionally, with a wrongful purpose, and with the intent to

21   defraud, and of course all those emails and texts again across

22   state lines.

23          That's Count Four, ladies and gentlemen, and they are

24   guilty.

25          So, what did Middendorf do when the stealth rereviews

worked so well?  What did he say to Brian Sweet when the

comments came back at zero in that problem area?  He praised

him.  He said how pleased he was that the inspection results

had been so improved.  He pointed to the fact that there were

so many clean banking inspections, including the ones that had

been subject to the stealth reviews.  And he pointed out and

was happy about the fact that they had three banks that were

positive quality events identified by the PCAOB.

So let's just pause because that is a really

remarkable thing:  Two of KPMG's banking clients that were on

the stolen list were chosen by the PCAOB as emblematic of

excellent work, positive quality events that the PCAOB wanted

to study and learn more about so they could learn what worked

so well in those, share it with others, use that information.

KPMG participated in calls with the PCAOB about this, calls

where the PCAOB, the regulator, was trying to understand how

did you do so well on these.  And in not one of those calls did

anyone ever tell the PCAOB, we have the secret list, that's how

we did so well; we did these stealth rereviews that we thought

there was nothing wrong with, that's how we did so well.  They

didn't say any of that.  They kept it hidden.  They kept it

hidden because they knew it was wrong and they didn't want the

PCAOB to know.  They didn't want the PCAOB to know that they

had a stolen confidential inspection list.

So Middendorf was thrilled with the outcome.  And the

1  message was sent to Brian Sweet loud and clear, as clear as it

2  was Sweet's first week:  Add value, even in the gray areas.

3  "Get that list" was an open request.

4          And Whittle told you as much, through the course of

5  continuously asking him to get any information he could, it was

6  an implied request to get whatever information he could, to get

7  his hands on any confidential inspection information he could

8  share with Middendorf and the other members of this scheme.

9  The message was received loud and clear:  Keep the illegal

10  information flowing.

11          And flow it did, thanks to Jeff Wada.

12          Sweet talked about these requests with Holder, and

13  then Wada delivered, with confidential information, again and

14  again.

15          Here is an example from late 2016.  This is a

16  voicemail that Jeff Wada left for Cindy Holder in late 2016,

17  December.  Listen to his words, ladies and gentlemen.

18          (Government Exhibit 1401 played)

19          MS. KRAMER:  At the beginning of this trial, ladies

20  and gentlemen, Wada's counsel told you that Brian Sweet would

21  be the narrator of a silent movie.  This movie isn't silent.

22  It's got full audio.

23          And listen to Wada's words, coded language, following

24  up with Holder from their last conversation, from the last

25  request, that he breach his duty and share stolen confidential

1    information.

2              And Wada came through again on January 9th.

3              (Government Exhibit 1402 played)

4         MS. KRAMER:  Look at his words, ladies and gentlemen.

5    He says excitedly, "I have the list, and I'd certainly be" --

6    and then he catches himself.  He stops himself.  He realizes

7    he's saying too much on a voicemail.  So he tries to cover up

8    what he's talking about.  He scrambles:  "So, um, the grocery

9    list."

10             They weren't talking about a grocery list, ladies and

11   gentlemen.  They lived 1500 miles away from each other.  He was

12   in California.  She was in Houston.  And what does it even mean

13   to have someone else's grocery list and you want to talk about

14   it?  It's absurd.  "Grocery list" meant inspection list, and he

15   was saying he'd certainly be willing to share it, to breach his

16   duty yet again.

17             So on January 9th they spoke in the evening for almost

18   half an hour, and Holder wrote down the so-called grocery list.

19   She also took notes of other things Wada told her, about his

20   ongoing failure to get promoted at PCAOB and who the new

21   members of the Banking Inspection Group were.  So let's look at

22   those notes and the timeline for that day.

23             So that voicemail from Wada was in the afternoon, and

24   then Wada and Holder speak in the evening.  That's when she

25   takes down those notes in the red handwriting, Government

Exhibit 1444.

We'll talk about those notes a little bit more in a minute.

And Brian Sweet took a photo of the notes, he told you that, right around the time that he went to tell Whittle about this. And the metadata on that photo shows you that it was taken at 7:45 p.m., after the call between Wada and Holder.

Now, you may remember that Whittle couldn't remember exactly when that day he got the list from Sweet, and Sweet thought it was right after lunch when Holder emailed him. But you have the documents to tell you the precise time. You know that it was later in the day because of the timing of the voicemail, the call, and the photo of the notes.

And these little inconsistencies are normal and are powerful evidence that these witnesses are telling you the truth. They're not trying to get their story straight but telling you things exactly as they remember them.

And this testimony is corroborated from witnesses at the -- their testimony, Whittle's and Sweet's testimony, about this day, and about all the other things in the case, is corroborated by lots of other evidence that you've seen -- witnesses, some witnesses they barely ever talked to, at KPMG, the PCAOB, and the SEC, and by documents they weren't even on, calendar invites and emails. Their testimony is consistent with each other but not exactly so. And they didn't

1    conveniently forget every single document that was bad for

2    them.

3         So the evidence is clear that on January 9th, during

4    this call, Wada gives the list to Holder.  She then meets with

5    Sweet, and he takes it down in the top right corner of

6    Government Exhibit 655.  You can look at that, ladies and

7    gentlemen.

8         And Sweet spoke with Whittle and gave him the list.

9    And Whittle got the list to Middendorf, who took it down on his

10   phone.  That evidence isn't really in dispute.

11        But before we get to that, let's look at how Wada

12   stole the January 9th list, the preliminary list of some of the

13   PCAOB selections.  These are the documents that you saw during

14   the trial that were on Wada's computer, KPMG documents that he

15   had downloaded from the PCAOB system so that he could exploit

16   them and use them for his own benefit and share them.

17        Government Exhibit 89 is an Excel spreadsheet.

18   Government Exhibit 80 is a memo of the PCAOB's Top 30

19   recommendations.  These documents are what Wada used to pull

20   together the January 9th preliminary list and share it with

21   Holder.

22        So that spreadsheet, it's an Excel file, and you'll

23   have it in the jury room on the computer if you want to look at

24   it, Government Exhibit 89.  It's sorted by total combined

25   flags.  Remember, that's confidential PCAOB information about

1    the risk that they assigned to each audit.  And when you sort

2    it by financial institution in the ALL Monitoring Program, look

3    at the list you get.

4           Now, this document, you'll see in a stipulation that

5    is Government Exhibit -- or Defense Exhibit 1381, was last

6    modified December 6, 2016, before Wada's call with Holder.

7    When he gave this information to her, it was fresh.

8           The other document he used was Government Exhibit 80.

9    Now, this is a memo with recommendations of who should be

10   inspected.  And let's look at how the list was compiled:

11   "CitiGroup, not Wells Fargo, Valero, Applied Materials," and on

12   and on.  Let's compare that to Sweet's list, Government Exhibit

13   655.  You take each of the lists from those two documents and

14   you put it side-by-side with the list that Holder gave Sweet on

15   January 9th and it matches up perfectly.

16          You know what else matches up, ladies and gentlemen?

17   Some of the texts from the documents that Wada stole.  Looking

18   at Government Exhibit 80, "not a particularly compelling

19   inspection candidate when compared to CitiGroup.  However, it's

20   the only issuer in the Top 30 this year that's never been

21   inspected."  And what do Sweet's notes say from his meeting

22   with Cindy Holder where she passed him some information on

23   January 9th?  "Not compelling compared to Citi but is only Top

24   30."  this is Wada's information that was shared on

25   January 9th.

1        Now, Wada's counsel has made the suggestion to you

2   through this trial that Wada wasn't the person at the PCAOB who

3   leaked this information, that it was one of -- a list of many

4   people, anyone who worked there, basically.  The mountain of

5   evidence that you've seen in this case absolutely decimates

6   that ridiculous claim.  The calls, the text messages, the code

7   words, and the documents on Wada's own computer that match the

8   list he shared, they all make that claim that it was someone

9   else absolutely ridiculous.

10       And, importantly, you know of course now exactly why

11  he did this on January 9th.  That night, just after midnight,

12  hours after sharing the January 9th list, Wada sent his résumé

13  to Holder, finally trying to cash in on all that confidential

14  information he had shared.  And he did this just hours after

15  complaining to Holder again that he wasn't promoted.

16       On the right of Holder's notes from January 9, 2017,

17  on the top part is about Wada's failure to advance, "Once again

18  getting screwed by the PCAOB."  He told her he was

19  distinguished, he had received these rewards, EE, but no

20  promote.

21       That tells us everything you need to know, ladies and

22  gentlemen, that résumé coming in just after midnight the day he

23  shared the January 9th list, that tells you everything you need

24  to know about Wada's intent, his knowing participation in this

25  scheme, his intent to defraud the PCAOB.

1          So let's look at what happened the next day.

2   Middendorf and Whittle speak for 43 minutes.  And you know that

3   Whittle told you he was sharing the list with Middendorf on

4   that call.  And about ten minutes into the call, as he

5   admitted, Middendorf created this note on his iPhone.  He

6   started writing the list down in the notes function of his

7   phone.

8          So let's think about this call for a second, ladies

9   and gentlemen.  A high-level executive at one of the top four

10  international accounting firms in the world, in the middle of

11  the day, speaks with a subordinate who starts giving him

12  information, someone he could with the snap of his thumbs order

13  to write a memo or to send an email.

14         And you've seen lots of emails with prediction lists,

15  analyses.  Right?  That was common.  That's not what Middendorf

16  did here.  Instead, he stood or sat somewhere, with his phone

17  on speaker, typing on those tiny buttons into the notes

18  function of his phone.  Why?  If this was legitimate, if these

19  were predictions, why not say, Thanks for the heads up, send me

20  the list, I'm on my phone?  Why didn't he do that?

21         You know why, ladies and gentlemen.  It is common

22  sense.  Because he knew it was wrong.  He knew that, once

23  again, once again, after the May 2015 list, the fall 2015 tips

24  about Sumitomo, Credit Suisse, Deutsche Bank, the March 2016

25  list, once again he's getting confidential inside information

1    that he's not allowed to have.  It is wrong, and he knows it,

2    and that's why he put it on his phone.

3           To avoid a paper trail, to avoid another devastating

4    email that he'd have to claim to forget.

5           Your Honor, I understand that someone is in need of a

6    break so this is a logical stopping point.

7           THE COURT:  Sure.  Why don't we take a quick bathroom

8    break, folks.  We'll take about a ten-minute recess.

9           Please leave your notepads on your chairs and we'll

10   continue in ten minutes.

11           (Jury not present)

12           THE COURT:  You may be seated.

13           Anything anybody wanted to address before the break?

14           (Pause)

15           MS. MERMELSTEIN:  No, your Honor.

16           THE COURT:  OK.

17           (Recess)

18           (Continued on next page)

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Ms. Kramer, you may proceed.

3          MS. KRAMER:  Thank you, your Honor.

4          Ladies and gentlemen, we were talking about the

5    January 9th list that Whittle shared with Middendorf on a

6    phonecall in the middle of the day and that Middendorf put down

7    on his phone.  Let's take a look at the list he created that

8    day in the Notes function of his iPhone.  On the left is the

9    list that Sweet took down during his meeting with Cindy Holder

10   on January 9th.  On the right are the notes from Middendorf's

11   phone.  Let's take a look.

12         Valero, Applied Materials, Charter Communications,

13   Macy's, Home Depot, in the same order.  Lakeland, Midland

14   State, National Bank Holdings, Heartland, Northern Trust, with

15   the same break between them.  Then, the notes at the bottom of

16   Brian Sweet's list in Government Exhibit 655 match the notes in

17   the top of Middendorf's list exactly: Citi, Synchrony, Wells,

18   BONY.  There is no mistaking that these are the very same

19   lists.

20         What does this tell you about Middendorf's claim that

21   these were just predictions?  The lists match perfectly.

22   You're looking in Government Exhibit 655 at Sweet's handwritten

23   notes on the top right corner of the manila folder.  If Sweet

24   was making a list of predictions, would he write them in

25   chicken scratch on the corner of a folder?  Of course not.  He

1    put them in a nice-looking spreadsheet and he'd send them by

2    email, as you had seen him do before on more than one occasion.

3           If Sweet got this information from Holder that came

4    from Wada and for some reason, notwithstanding Middendorf's

5    demand for the information in May 2015 and his open arms and

6    continuing request for it that led to the lists in May 2015,

7    the tips in the fall of 2015, the March 2016 list, even if for

8    some reason that I can't even fathom Sweet wanted to claim,

9    falsely, to Whittle and Middendorf that these were predictions,

10   he wouldn't have shared them on the phone; you wouldn't have

11   seen them getting passed from Sweet to Whittle on a phonecall

12   and then from Whittle to Middendorf on a phonecall, and then

13   typed into a phone; you would see an email from Sweet trying to

14   take credit, claiming these were predictions.

15          That's not here either, because no one ever said these

16   were predictions, not a single person.  Sweet didn't tell you

17   that.  Whittle didn't tell you that.  And that is not at all

18   borne out by the actual physical evidence you've seen, the

19   documents.

20          Once again, Middendorf agreed to act on this illegal

21   inside information.  Whittle told you they focused their

22   attention on things they could do on particular engagements,

23   initial procedures, follow-up.

24          And these audits in January 2017, they were live, they

25   were ongoing.  This wasn't after the documentation period.

1   This wasn't in the documentation period.  This was before the

2   audits were even complete, when actual audit work could be done

3   differently, better, with knowledge of an impending inspection

4   down the road, knowledge the PCAOB never wanted its inspection

5   targets to have.

6          Do you know what didn't happen January 9, 2017?

7   Middendorf didn't blow any whistles.  Even if he had his head

8   in the sand, which isn't borne out by the documents, he had

9   another list, another list for Brian Sweet by phone.  He didn't

10   make a single call to Judge Holmes saying you really should

11   look into this.  Of course he didn't, because he was at the

12   heart of the scheme.  This is what he wanted.

13          How did they try to exploit the January 2017

14   preliminary list?  They put additional people, extra resources,

15   on four of the engagements on the list: Valero, Charter

16   Communications, Citi, and Macy's.  They sent extra people to

17   work on Citi.  And Tom Whittle told you they talked about it.

18   Whittle and Middendorf discussed this.  They would not have

19   done it if Citi wasn't on this inside stolen list.

20          Same thing with Macy's.  They sent extra people,

21   additional resources, because of their presence on the list.

22   What is special about Macy's?  How do you know that Middendorf

23   especially wanted to exploit this secret inside edge?  Because

24   he was the SEC reviewing partner on Macy's.  His name was going

25   to be alongside the main engagement partners.  He was on the

1    hook for the success of this inspection.  He had a personal

2    interest in its outcome.

3          If there is any doubt in your mind about whether the

4    participants in this scheme knew full well that what they were

5    doing was wrong, you have another cover-up.  Remember that in

6    November 2016 Sweet sent a prediction list, by email of course,

7    called the bank screening analysis.  That's Government Exhibit

8    1067.  In January 2017 Whittle asked him to add some of the

9    banks on the stolen January 2017 list to this old prediction

10   list, to the bank screening analysis.  Why did he do it?

11         Whittle told you.  He asked Sweet to update the bank

12   screening analysis, to add those additional banks, as a cover

13   so that "if we were ever to do additional procedures," new

14   audit work, after getting this inside information, we would be

15   able to point to an internal analysis.

16         Point who to it, ladies and gentlemen?  "Point the

17   regulator to it, explain why they did it, because explaining to

18   them we had inside information, that was never okay.  To point

19   to an internal analysis as to why we were following up and

20   doing additional procedures, whether it be re-reviews or

21   otherwise."

22         Even if Middendorf wasn't part of this particular

23   cover-up, he was in charge of the whole scheme.  He was the

24   boss.  What does it tell you that a member of this scheme

25   wanted to cover up what they were doing by manipulating

1  documents and creating a fake paper trail?  That they all knew

2  this was wrong, that they all were working not to get caught.

3       After Sweet did this, Whittle sent another cover email

4  to Sweet and their partner in crime David Britt thanking Sweet

5  for the hard work over the past few months that led to that

6  updated prediction list.  He knew full well that they hadn't

7  done a lick of work on it and it was just update with the

8  stolen information.  Another cover-up, another piece from the

9  paper trail.  We are not even to the February 2017 list.

10       I want to pause here for a second.  Everything you

11  have heard about January 2017, everything you have heard about

12  what's happened so far in 2017, that makes Middendorf and Wada

13  guilty of the substantive wire fraud count for 2017, already,

14  and we haven't even gotten to February yet.

15       Let's look at what happened with the February 2017

16  list.  At night on February 2, 2017, Wada texts Holder.  "Okay,

17  I have the grocery list.  All the things you'll need for the

18  year," another grocery list from someone who lives 1500 miles

19  away.  You can see Holder later deleted these texts because,

20  obviously, she too knew this was wrong.

21       The next day, Friday, February 3rd, Wada and Holder

22  speak in three long calls totaling 90 minutes.  It is in one of

23  those calls that Wada discloses PCAOB's complete confidential

24  final inspection list for 2017.  He calls her that afternoon

25  with a correction, a follow-up, a comment about the crime he

1   has already committed that day, more information about the

2   list.  Let's look at what he said.

3          (Audio played)

4          He says he looking at his grocery list.  Again, ladies

5   and gentlemen, that makes no sense.  He was looking at the

6   stolen inspection list and he wanted to talk to her about it,

7   again.

8          Holder got off the phone with Wada and she texted

9   Sweet: "Please call ASAP," as soon as possible.  Then they

10  spoke for more than half an hour.  Sweet took down the list,

11  the full 2017 final list, on that same manila folder on which

12  he had written the January 2017 list.

13         Let's look at how the list that Wada shared that day,

14  that Wada disclosed in breach of his duty, matches up with the

15  PCAOB's real list.  I'm just going to go through a couple of

16  examples, but you can see, ladies and gentlemen, it matches up

17  perfectly.

18         Sweet shares the list.  He tells Whittle and Britt.

19  That following Monday Sweet, Whittle, and Middendorf have a

20  conference call.  Middendorf takes down the whole list once

21  again in his iPhone.  Look at the length of this list, ladies

22  and gentlemen.  Look at the keys.  There is no reason in the

23  world for Middendorf not to have said, email it to me, send it

24  to me.

25         He's on the phone that gets the emails, right?  Why

1    stand there and type dozens and dozens of names?  Why go over

2    it like everyone said they did several times to try to get it

3    right?  He could have said in one second, email this to me.  He

4    could have gotten the email ten seconds later and then looked

5    at this list and talked about it without all that typing.  Why

6    did he do that?

7         You know why.  Because every keystroke as he typed

8    these names in, he knew what he was doing was wrong and he

9    didn't want that paper trail.  He took down all the names, all

10   the details.  Look at how the list in his phone matches up.

11        He took down extra details, too, not just the names.

12   He took down details like the focus areas and the rationale for

13   Macy's, the engagement that he was the SEC reviewing partner

14   on.

15        Next to Macy's in Sweet's list, Government Exhibit

16   655, you see that writing in the brackets.  You can see in a

17   draft of the note on Middendorf's phone that appears deleted

18   that it matches up.  Net sales, pension assets and liabilities,

19   inventory, vendor allowances, store closures.  These were the

20   confidential focus areas and rationale for the very engagement

21   that Middendorf was the SEC reviewing partner on.  He took it

22   down in detail.

23        What does it mean that he took down all these details?

24   He testified that he did it so he could tell his boss what he

25   had learned.  But if he actually knew this was wrong, he didn't

1   need to take down these details.  He didn't need to take down

2   the focus area and the rationale.  And he wouldn't have sat

3   down, like he said he did, and compared this list to the

4   computer system at KPMG and filled in more detail.

5         He did those things, he painstakingly wrote down every

6   single little detail, because he wanted to use the information.

7   He wanted to have it all on his phone so he could act on it, so

8   he could change the outcome, so he could get a better result on

9   the inspection of the engagement that his name was on and on

10   all the others that were going to be inspected that he was

11   ultimately in charge of because he was the head of the national

12   office.

13         He did those things because, just like every other

14   time, he planned to use this information.  But Laurie Mullen

15   and the other whistle-blowers got in his way.

16         Before I talk about how the scheme unraveled, let's

17   make clear Middendorf and Wada are guilty on Count Five for

18   what they did in 2017.  You have overwhelming evidence of the

19   scheme and of their wrongful intent, their intent to defraud.

20   And of course more texts, more voicemails across state lines.

21   Count Five: guilty.

22         After two years of knowingly using stolen PCAOB

23   information to cheat, Middendorf claims that come February 2017

24   he was the knight in shining armor that blew the whistle.

25   That's just not true.  The truth is that he dragged his feet

1    until the very last minute, when everyone around him was

2    freaking out and demanding that this be reported.

3              So why is he now trying to claim that he wanted to

4    blow the whistle?  Why does he want you to believe that in this

5    story of cheating and corruption that he is wearing the white

6    hat?  Because the truth makes crystal clear he is guilty.

7              Let's look at how the scheme was really discovered,

8    how it actually unraveled.  You may recall after the list comes

9    in on February 3rd Brian Sweet told Diana Kunz that her audit

10   was on the list, and she reported it up the chain, her chain of

11   command: John Rodi, Dave Marino, and Laurie Mullen.  The three

12   of them spoke.  They decided that Laurie Mullen would confront

13   Middendorf.

14             On February 8th she did exactly that.  She confronted

15   him by phone.  What did he say on that call?  Everything he

16   could to downplay the information, to try to stop Laurie Mullen

17   from taking any action.  "There were really not a lot of

18   surprises on the list," he said, minimizing its importance.

19   "Most of them were in the monitoring program," nothing to see

20   here, no real news.

21             He said "he couldn't unknow it."  In other words, why

22   bother reporting it?  It's too late, I already have the

23   information in my head.  What about his demeanor?  "Very calm,

24   very affable, regular Dave," playing it cool.

25             When Middendorf was asked about all these details,

details of that call with Laurie Mullen, all those things that
showed that he was trying to keep the genie in the bottle for
as long as he could, you know what he said about that call,
ladies and gentlemen.  Once again, "I don't recall."

What did he do after this call where he was very calm,
very affable, very Dave?  He stormed into Whittle's office.  He
knew the scheme was unraveling.  He knew they were caught.  He
wasn't affable or calm in that conversation.  You heard what he
said: "What the fuck is Brian Sweet doing telling people
they're on the list, telling people they're being inspected?"
Like that, he revealed how he actually felt to his partner in
crime, something he tried to keep from Laurie Mullen.

And he wasn't upset that there was a list.  Of course
he wasn't.  This is now year three of the same scheme.  He was
upset, he was furious, that Sweet was going to get them caught.
Does that sound like a man who is just coming to realize that
this was in the gray area, who was still processing what had
happened?  Not at all.  It's the desperate realization that
they were caught.

Laurie Mullen had to follow up with him a couple of
days later, so they spoke on February 10th.  Middendorf asked
her in that call, you heard her testimony, what if the PCAOB
wants us to have this?  Again trying to minimize what they had
done.  He told her he had passed word to Brian Sweet to just
say no thank you if he's offered this kind of information

1    again.

2          Think about that, ladies and gentlemen.  He didn't

3    tell Laurie Mullen that he had gotten this kind of confidential

4    information before, that he had authorized extensive changes to

5    the workpapers to affect the PCAOB outcome.  He didn't tell

6    Laurie Mullen that he had demanded confidential information

7    from Sweet.  He lied.  He acted like he was putting a stop to

8    something, something that all along, 2015, 2016, and 2017, he

9    had been asking for, he had been receiving, and he had been

10   using, confidential PCAOB information.

11         And what about the idea that the PCAOB may have wanted

12   them to have this list?  It's ridiculous.  Even Middendorf

13   admitted on the stand when he was pressed on cross-examination

14   that having the PCAOB's confidential information is wrong.

15   That claim is also ridiculous, but for a different reason.

16         The PCAOB has a very structured process for notifying

17   firms of inspection.  The legal way, the typical way: an email

18   to a particular point person at KPMG, "We plan to commence the

19   following inspection the week of 8/15."  Then within KPMG there

20   is a typical process, telling the partners and other leaders of

21   the firm, "We have been notified by the PCAOB of the following

22   inspection."

23         That's not what this was.  If the PCAOB wanted them to

24   have this list, this inside information, it wouldn't be passed

25   from a corrupt insider, it would be sent in an email.  But look

1    what happened here.  "Please call ASAP," cell-phone-to-cell-

2    phone call, chicken scratch on a manila folder, notes in an

3    iPhone.  The regulator doesn't want this.  It's preposterous.

4         Laurie Mullen twice, twice, pleaded with Middendorf to

5    report this conduct to the PCAOB.  Two of her partners, Dave

6    Marino and John Rodi, confronted Middendorf's boss.  They made

7    crystal clear: he reports it or they would.  So, under a threat

8    from several KPMG partners that they would report this conduct,

9    Middendorf reported it to Judge Holmes, KPMG's chief legal

10   officer.  This is not Middendorf blowing the whistle.  He was

11   backed into a corner and he had no way out.

12        Again he tried to minimize.  He told Judge Holmes only

13   about the 2017 list in the first call, revealing only what he

14   thought he had to.  It was only later, when everyone was being

15   interviewed, when he knew others were talking, that he told

16   them about his deep involvement with the stolen 2016 list and

17   the re-reviews.

18        Let's turn back to Count Two, the conspiracy to

19   defraud the PCAOB.  That just means an agreement, an agreement

20   in this case to commit wire fraud.  Agreeing is a separate

21   crime.  So, all the evidence you have already seen of the

22   scheme is proof of the conspiracy to commit wire fraud.

23        I expect you will hear from Judge Oetken that

24   conspirators don't have to enter into a spoken agreement.  But

25   that is actually what they did here in 2016.  They literally

1    sat around the conference room table and entered into a

2    criminal agreement.  All the coded language and secrecy, that

3    all tells you they had criminal agreement.  What they called a

4    circle of trust you know is a criminal conspiracy.  It's the

5    same thing.

6           And it doesn't matter that Wada joined the conspiracy

7    in the fall of 2015, after Middendorf had asked for and

8    received the 2015 list.  People don't have to join conspiracies

9    at the same time.  And it also doesn't matter that they played

10   different roles or even that they didn't know each other.  They

11   can be, and they certainly were in this case, part of the same

12   criminal conspiracy.  Wada agreed to pass inside confidential

13   information to Holder, to pass it to KPMG so that it could be

14   used.

15          Let's look at what he said about the so-called grocery

16   list in 2017, the inspection list: "All the things you'll need

17   for the year."  That tells you exactly what Wada knew would be

18   done with this list.  He was sharing it so it could be used,

19   put to use by Holder, Sweet, Middendorf, and everyone else at

20   KPMG who was in the circle of trust.  "All the things you'll

21   need for the year," for the inspection season.

22          Wada knew that Holder wasn't just putting this secret

23   confidential list in a drawer and throwing them away.  He knew

24   she was passing them to Sweet.  Just a couple of examples.

25   "Say hi to Sweet for me," he says in January 2016.  And Sweet

1    relays to Wada through Holder, "Tell Wada we owe him big.  The

2    beers are on me next time he's in New York."  Wada of course

3    knew this was going to be put to use at KPMG because aside from

4    all of this, it's the only reason to share it.  It's the only

5    reason to share it, so that it could be used.

6            That's Count Two, ladies and gentlemen, the conspiracy

7    to commit wire fraud.  Middendorf and Wada are both guilty.

8            Why did they do all of this?  Why did they engage in

9    all of the lies and deceit year after year?  For a criminal

10    purpose: to deceive everyone who received and used the PCAOB

11    inspection reports.  That means not just the PCAOB but also

12    KPMG's main government regulator, the SEC, the same agency that

13    had been monitoring with dismay KPMG's poor inspection

14    performance.

15            That brings us to Count One, the fraud on the SEC.

16    All the proof you have seen in this trial of the core scheme is

17    proof of this crime too, but it has different elements from

18    wire fraud.  I said at the beginning that fraud on the SEC

19    doesn't mean taking property or money.  It means conspiring, or

20    agreeing, to impede, impair, obstruct, or defeat, by fraudulent

21    or dishonest means, the lawful regulatory and enforcement

22    functions of the SEC.

23            You know, and you have seen throughout this trial,

24    that the SEC is the government agency charged with making sure

25    investors get accurate information.  As part of that mission

1    they regulate and bring enforcement actions against auditors.

2    Because auditors are the gatekeepers of the financial markets,

3    regulating them is an important part of protecting investors,

4    an important part of what the SEC does.

5         Wes Bricker, the chief accountant of the SEC,

6    explained this to you too.  He told you that the SEC regulates

7    auditors of public companies directly and indirectly and that

8    the SEC can bring enforcement actions for violations of PCAOB

9    rules.  Even the defense's own witnesses, when pressed on this

10   point on cross-examination, had to acknowledge that the SEC

11   regulates auditors.

12        It is also plain as day, and it was to the defendants,

13   that the PCAOB inspection results matter to the SEC.  You know

14   that's true because the SEC said it publicly.  The chair of the

15   SEC at the time, Mary Jo White, spoke on this topic and it was

16   emailed to Middendorf.  What did she say that Middendorf

17   received in this email, Government Exhibit 925?  "In the

18   worrisome column, we still observe too many instances where

19   companies and their auditors have not discharged their

20   responsibilities.  Recent inspections by the PCAOB have found

21   significant deficiencies."

22        Middendorf knew full well that the SEC cared about

23   PCAOB comments.  That's what "deficiencies" means, ladies and

24   gentlemen, you have heard it throughout this trial: significant

25   comments.  Middendorf knew this mattered,  that this mattered

1    to the SEC.

2         Tom Whittle told you the same thing.  He said it was

3    important to KPMG that the SEC be satisfied with its

4    performance on inspections.  There is just no real dispute that

5    the SEC regulates auditors and uses inspection reports, that

6    they care about the inspection reports.  This basic fact was

7    acknowledged by every single witness who had knowledge on the

8    subject, including those called by the defense.  Even their

9    hired gun, Paul Atkins, told you that, someone who hasn't been

10   at the SEC in 11 years.

11        Wes Bricker explained how the SEC critically relies on

12   PCAOB inspection reports to carry out its job.  He told you

13   they review inspection reports, he said, for a lot of reasons.

14   First, compliance with SEC rules, PCAOB rules, professional

15   standards.  They also use them to evaluate the performance of

16   auditors generally and in considering PCAOB rules as well as

17   their own approval of PCAOB rules and SEC rules.  Those were

18   just examples.

19        You saw how just one group within one office within

20   the entire SEC uses inspection reports, uses those reports to

21   regulate and uses those reports to make referrals to other

22   divisions within the SEC.  You may remember this very long and

23   complicated flowchart.  Wes Bricker told you about it and

24   walked you through it, the path the inspection reports take

25   just for review by the accounting group within the office of

1   the chief accountant within the SEC.  That's Government Exhibit

2   350, ladies and gentlemen.  It shows you just how much use the

3   SEC made of PCAOB inspection reports.

4        Remember all the offices at the SEC that use PCAOB

5   inspection reports to carry out the SEC's regulatory and

6   enforcement functions: two groups within the office of the

7   chief accountant, the accounting group and the professional

8   practice group; the division of enforcement; the division of

9   corporation finance.  They all make use of PCAOB inspection

10  reports.  This was literally undisputed by the defense witness

11  on cross-examination, Paul Atkins, a former SEC commissioner.

12       On top of all that, Middendorf personally met with the

13  SEC.  He personally met with them about inspection results,

14  with the challenges KPMG had and their performance on

15  inspections on the ALL issue all throughout 2015 and 2016.

16  There are lots of calendar entries and there are lots of

17  agendas in evidence, ladies and gentlemen, and you can look at

18  them.  They show you clearly August 2015, October 2015, two

19  times in March, lots of meetings in D.C. at SEC headquarters

20  that Middendorf had to travel to.

21       Remember, we are talking about the head of KPMG's

22  national office when we are talking about Middendorf.  His job

23  was to deal directly with the SEC.  Of course he knew that

24  PCAOB reports mattered to and were used by the SEC.

25       But if there were any doubt in your mind after all

1   that evidence, let's remember the Come to Jesus meeting.  At

2   the SEC in February 2016, the month before he got the 2016

3   confidential inspection list, it doesn't get more serious than

4   being called to the carpet by the chair of the SEC, the person

5   in the highest position of your main government regulator.

6           Of course he intended for the scheme to interfere with

7   the SEC's regulatory and enforcement functions.  He wanted to

8   pull the wool over the SEC's eyes, to get the SEC off of his

9   back, off of KPMG's back, by doing better on inspections, even

10  if that meant cheating.

11          Wada, an inspections leader at the PCAOB, a regulator,

12  also knew exactly what he was doing.  Numerous PCAOB documents

13  make clear that PCAOB inspection reports go to the SEC.  Take a

14  look at M245, the inspections manual.  That basically told Wada

15  how to do his job.  That document made clear that every single

16  inspection report would be transmitted to the SEC.

17          Wada was an inspector.  He worked for a regulator, a

18  regulator that was overseen by the SEC, a regulator that

19  interacted with the SEC regularly.  Of course he knew that the

20  SEC got and used these inspection reports.  He wanted to help

21  himself and get a job in the long run, and that meant helping

22  KPMG do better on inspection reports for everyone who got them,

23  for everyone who used them, including the SEC.

24          How else do you know that Middendorf and Wada intended

25  to defraud the SEC?  Because their partners in crime, other

1   members of this conspiracy who you heard from, told you that

2   they intended to defraud the SEC.  Let's look at an example.

3   Brian Sweet said he intended to defraud the SEC by taking

4   action to manipulate PCAOB's inspection reports because of the

5   advance notice that they received, because the SEC uses those

6   reports in fulfilling their oversight responsibilities.

7        The other members of this conspiracy, including

8   Middendorf, wanted everyone who used the inspection reports,

9   including the SEC, which had been breathing down their neck, to

10  be duped about the firm's quality, to think that it was as good

11  when no one was looking as it was when they acted on illicit,

12  stolen confidential information.

13       You know that by having gotten that early warning, by

14  defeating the design of the PCAOB inspection process, those

15  resulting inspection reports would be useless to the SEC,

16  inherently corrupted.  With that advance notice, those reports

17  couldn't do the very thing they were meant to do: give an

18  accurate assessment of KPMG audit quality that could be relied

19  on by the SEC.

20       Wes Bricker explained that.  The SEC is counting on

21  PCAOB's inspection program to be operating in the way that it

22  was designed to operate.  And that design, that's on the basis

23  of using resources to look at just a few engagements, that 50

24  or so sample of all of KPMG's 700 public company audits.  Then

25  we have the sampling the SEC needs to be able to use that

report, a report that's useful on the basis of that inspection
report.

    The inspection reports that were sent to the SEC, the
inspection reports that KPMG saw, they reiterate that concept.
The reports specifically say, "Inspections are designed and
performed to provide a basis for assessing the degree of
compliance by a firm with applicable requirements related to
auditing issuers."  Through their scheme, the defendants in
this case made this representation to the SEC a lie.  Bricker
explained how the advance notice undermined the design of the
PCAOB inspection process by making the ultimate reports
unreliable as true reflections of KPMG's audit quality.

    It's common sense.  Advance notice lets the firm focus
on just the few.  But the PCAOB is reporting on the firm's
system as a whole.  The SEC is counting on their ability to use
these reports to have a sense of the firm's degree of
compliance overall.

    This is not rocket science, ladies and gentlemen.
Wada, Middendorf, and all their partners in crime corrupted the
inspection process with illegal advance notice that Wada stole
from the PCAOB in breach of his duty.  The fact that this
matters to the SEC and affects its work is also just plain
common sense.

    The harm to the SEC, the interference with its
important regulatory or enforcement functions, that was not

just theoretical in this case.  It came to pass.  Because of

the defendants' scheme, the 2016 report was useless before it

was even issued.

        The PCAOB had to make new selections to replace those

corrupt inspections of banks, the ones that led to the zero

comments because of all the re-review work.  Then the PCAOB had

to perform replacement inspections.  That whole process caused

by the defendants' scheme resulted in a delay of the 2016

report by more than a year.

        This report came out in January of 2019.  You know

from all the testimony in the case and the other inspection

reports that they come out typically in the fall of the year

after they are completed.  Not this one.  This one wasn't

issued until January 2019, more than a year of delay, a long

delay in the SEC obtaining critical data on the audit quality

of one of the biggest auditors in the United States that is

responsible for auditing the financial statements and being the

gatekeeper for over 700 publicly trade companies.  The

defendants intended to and did interfere with the SEC's

important functions.

        That's Count One, ladies and gentlemen, the conspiracy

to defraud the SEC, and both defendants are guilty of it.  They

are guilty of every single charge against them.

        I want to say one word about something called venue.

You will also need to find for each count that something

happened in furtherance of the crime in this district.  That is

not an issue in this case at all.  The Southern District of New

York includes Manhattan.  KPMG's office is here in Manhattan.

And you have seen all the conspirators' meetings, emails sent

and received here, phonecalls to and from here, lunches, all of

that happened in or passed through this district.

I'm almost done.  But before I sit down I want to take

a step back and look at the big picture for just a moment, the

big picture of what the evidence has shown and what the

defenses have been.

The only real issue for you to consider with Jeff Wada

is whether he was the source, the tipster, the corrupt insider.

All of the evidence tells you that he was, that he did this for

personal gain, to try to get a job, that fat payday he texted

about.  His actions were deliberate, devious, and criminal.

His words speak for themselves.  When you are deliberating,

listen again to the voicemails.  You will have a computer with

the voicemails on it.  Listen to those voicemails, ladies and

gentlemen.  They speak volumes about his guilt.

The only real issue for you to consider with

Middendorf is whether his participation in this brazen crime

was knowing and intentional.  You have seen two important

windows into who Middendorf is.  First, Sweet's first week,

when presented with an opportunity to get his hands on a

confidential inspection list stolen from a regulator, to cheat

1    to get ahead, he jumped at it.  Get that list.  A powerful man

2    in a powerful position using powerful words, committing a

3    crime.

4           The second window into who he is you saw when he

5    stormed into Tom Whittle's office after Laurie Mullen blew the

6    whistle.  He played it cool on the call and then he raged on

7    his partner in crime: "What the fuck is Brian Sweet doing?"

8    Those were not the words of someone who didn't realize that

9    what he was doing was wrong.  Those were the words of someone

10   who had been caught red-handed.

11          Look closely, ladies and gentlemen, at his claim of

12   not knowing that what he did was wrong.  First, put in context

13   the number of times that he claimed not to remember a

14   devastating piece of evidence or a damning meeting or a

15   conversation that showed his guilt.  How many times did you

16   hear him say, "I don't recall"?  When faced with incriminating

17   evidence, that's what you heard.  This was no coincidence.

18   This was a strategy.

19          Every other person who learned about the lists

20   understood that this was without a doubt absolutely wrong.

21   Look at who was around David Middendorf when he claimed that he

22   didn't know what he was doing was wrong: Brian Sweet.  He

23   burned the real list in his backyard barbecue to avoid getting

24   caught, ladies and gentlemen.  And he admitted all of his

25   crimes.  He pled guilty to conspiracy to defraud the PCAOB and

1    conspiracy to defraud the SEC.  He knew, as he told you, all

2    along, every step of the way, that what he was doing was wrong.

3           Tom Whittle admitted his crimes, owned up to what he

4    did, pled guilty to conspiracy to commit wire fraud and

5    conspiracy to defraud the SEC, and he told you the same thing:

6    every step of the way he understood this was wrong.  He knew

7    it.

8           Cindy Holder deleted incriminating text messages,

9    talked about getting burner phones when the investigation

10   started.  She knew this was wrong.

11          George Hermann.  You heard testimony that when he

12   found out about this in February 2017, he freaked out.  He knew

13   it was wrong.

14          Diana Kunz, John Rodi, and Laurie Mullen each saw how

15   wrong this was when they first found out.  And remember, they

16   had that reaction when all they understood was that they had

17   one name on the list, before they knew that Middendorf had the

18   whole list of 47.  When they thought it was just one, they knew

19   this was wrong.

20          (Continued on next page)

21          MS. KRAMER:  They insisted it be reported.

22          And Dave Marino, same reaction:  Outrage.

23   Indignation.  Shock.  You heard what he said about it.  He had

24   a deep level of concern for the entire firm.  He said, we

25   cannot have the regulator's selections, period.  We must do the

1   right thing.  There's only one course of action, to

2   self-report.  He said hiding this is unethical and possibly

3   criminal.  It needs to be immediately raised to the Board of

4   Directors, to the CEO, the Chairman of the firm, and the head

5   of Legal.

6           He understood immediately exactly how wrong this was.

7   Every one of these people knew that this was wrong.

8           And they weren't the head of the National Office of

9   one of the four biggest accounting firms in the world.

10  Middendorf is asking you to believe that he was right there in

11  the middle, in the middle of this scheme to obtain and use

12  confidential information -- not once -- many times, 2015, 2016,

13  2017, and he's the only person who didn't think this was wrong?

14          He was probably the smartest man in every room he was

15  in from the beginning to the end of this scheme.  But he's

16  asking you to believe two things that just don't add up:  That

17  he doesn't remember all these key moments in time, when he

18  remembered and testified about everything else from the same

19  time period, in great detail.  And if that doesn't work, he

20  wants you to believe that he was oblivious, oblivious when

21  everyone around him understood exactly how wrong this was.

22          It doesn't add up, ladies and gentlemen.  No matter

23  how much you may want to believe him, it doesn't add up.

24          The evidence in this case has proven to you that this

25  was wrong from day one.

1           The defendants, David Middendorf and Jeffrey Wada,

2    they lied, they schemed, and they cheated.  They committed a

3    brazen fraud.  And they knew, just like you know, that what

4    they were doing was wrong.  Because of that, both of them are

5    guilty.

6           Thank you.

7           THE COURT:  OK.  Can I see counsel at sidebar briefly

8    just to talk scheduling?

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  It is 12:36, and I just wanted to see if

3    it made more sense to break now or if you want to go to 1?

4            MR. BOXER:  I am fine with either of them.  I am fine

5    with going to 1 and getting started.  That is fine, unless

6    somebody else or the jury --

7            THE COURT:  It is really up to you.  If you are fine

8    with starting --

9            MR. BOXER:  We might as well.

10           THE COURT:  OK.  We will go to 1.

11           MR. BOXER:  Thank you, your Honor.

12           (Continued on next page)

1            (In open court)

2            THE COURT:  OK, folks.  We'll go until 1 o'clock, and

3    then we will break for lunch, as is our usual practice.

4            You have heard the closing argument, or summation,

5    from the government.  You will now hear the closing argument,

6    at least until 1, the closing argument of counsel for

7    Mr. Middendorf.

8            Mr. Boxer.

9            MR. BOXER:  Thank you, your Honor.

10           May it please the Court, counsel, ladies and gentlemen

11   of the jury:

12           This is a case that calls for clear, careful,

13   thoughtful consideration.  It is not a case that you should be

14   influenced by tone, by hostility, or by exaggeration.  It

15   requires a careful view of the evidence.

16           Mr. Middendorf, Dave, worked for 30 years at KPMG.

17   When asked to pick up and move his family, he did so four

18   times.  He was chosen to serve on KPMG's Board of Directors,

19   and he was chosen as KPMG's representative on the Special

20   Advisory Group, or the SAG, to the PCAOB.  And in 2014, Dave

21   was promoted to one of the highest leadership position at the

22   firm in the National Office.

23           Dave cared deeply about KPMG.  He loved the firm.  And

24   he championed significant investments in many programs to

25   improve audit quality at KPMG.

 1          Affable Dave.  He was the kind of partner who

 2   regularly met one-on-one with the CO of one of the most

 3   impressive companies in the United States, and impress that

 4   CEO.  And, yet, here we are, Dave sitting at defense counsel

 5   table in this courtroom, charged with serious federal crimes,

 6   facing 85 years in jail.  It is not only improbable and

 7   nonsensical but it is wrong.

 8          Mr. Middendorf did not intend to defraud the SEC or

 9   the PCAOB.  What he intended in 2016 was for a review of

10   workpapers in accordance with auditing rules so KPMG would get

11   the credit or the comment that it deserved.  Period.

12          The government mentioned Mr. Sweet's and Mr. Whittle's

13   guilty pleas to crimes that Mr. Middendorf is also charged

14   with, and mentioned it a lot.  As they told you, neither

15   Mr. Sweet nor Mr. Whittle had understood that what they were

16   doing was a crime.  So, it was no coincidence during the trial

17   that Mr. Sweet and Mr. Whittle were repeatedly asked by the

18   government if they understood what they were doing was wrong.

19          It would be unfair, and it would be improper, to apply

20   Mr. Sweet's and Mr. Whittle's view of what they did to Dave's

21   view of what he did.  In fact, there are numerous instances

22   where Dave has not received and is not even mentioned in

23   critical emails between or involving Mr. Sweet and Mr. Whittle.

24   Emails that may establish Mr. Sweet's and Mr. Whittle's

25   criminal intent.  Emails that may explain why they've pleaded

1    guilty to try to avoid a big jail sentence.  And emails that

2    may explain why they met 10 or 20 times with prosecutors before

3    they testified.  But those emails do not establish

4    Mr. Middendorf's criminal intent.  In fact, they evidence that

5    he was not a member of the charged conspiracy.

6          Looking at all of the evidence demonstrates that

7    Mr. Middendorf acted in good faith and had no intent to

8    defraud.

9          2015, the evidence is clear, Brian Sweet stole

10   information from the PCAOB before he joined KPMG.  He said so

11   himself.  No one at KPMG ever asked him to take these

12   materials.  It wasn't by mistake.  He purposefully downloaded

13   PCAOB confidential information onto his own hard drive while

14   still at the PCAOB so he could use it at KPMG to make himself

15   look better.  This had nothing to do with Dave Middendorf, let

16   alone any pressure Mr. Sweet tried to sell you that

17   Mr. Middendorf applied to Mr. Sweet.

18          Included in that data that he stole was a list, a very

19   hard-to-read list, of the 2015 inspections.  It is Government

20   Exhibit 754A.  Along with the list was some of the reasons why

21   the PCAOB selected those engagements for inspection.  That list

22   was never discussed in Dave's presence, including at the

23   welcome lunch for Mr. Sweet.

24          Mr. Sweet told Mr. Whittle about that list after their

25   welcome lunch, when Mr. Whittle stopped by Mr. Sweet's office

1    to see how he was doing.  Dave was not there.  And notice Mr.

2    Whittle says yes to the banking selection list in Government

3    Exhibit 753, but then Mr. Sweet sends a larger list, the entire

4    list.  He gives more.

5         That becomes Mr. Sweet's MO, his regular course of

6    action, trying to show how important he is to the firm.

7         And then a single one-line forward to Mr. Middendorf,

8    Government Exhibit 754.  No reply by Mr. Middendorf.  No

9    forwarding by Mr. Middendorf.  No emails from or to or with

10   Mr. Middendorf referring to it.  Not a single other document in

11   this case regarding this list and Mr. Middendorf.

12        The government is asking you to conclude that Dave had

13   specific intent to defraud -- that's the legal requirement,

14   "specific" -- because he did not respond to this email, because

15   it could be read to mean that he knew what was coming.  That is

16   not the kind of evidence or argument that supports proof beyond

17   a reasonable doubt.

18        Consider the other equally plausible inference to be

19   drawn from that May 5th email, Government Exhibit 754, that

20   Mr. Middendorf did not give the email much thought at all.  And

21   the government's contention that list gave engagement teams

22   more time to prepare for their first meeting at PCAOB

23   inspections comes out of thin air.  Remember, at the time of

24   this email the audits are over.  The 45-day documentation

25   period is over.  Some of the inspections have already started.

1    And there was not a single email showing an engagement team

2    getting advance notice to prepare as a result of that list.

3           You heard the firm already gets three weeks' notice,

4    which is plenty of time to be prepared, to give a best first

5    answer.  And, by the way, on a conference call, not in a

6    meeting.  The that was exaggerated, the importance of the best

7    first answer.

8           The person who was in charge of the audit for the past

9    year doesn't need more time than three weeks to prepare for a

10   first conference call with the PCAOB.  Enough.  In talking

11   about time preparation, there was an important witness the

12   government left out.  Ms. Kunz, Diana Kunz, the auditor from

13   Chicago who testified.  She said she would be fine with less

14   than three weeks.  Her testimony appears now.

15          "I've always had sufficient time to prep."

16          "You have had in some instances less than two to three

17   weeks to prepare?

18          "Yes.

19          "That was sufficient?

20          "Correct."

21          And ironies of ironies, the notice -- the actual one

22   notice of an inspection that the government put into evidence,

23   Government Exhibit 219, it provides four weeks notice.

24          There is more than enough reason why Dave Middendorf

25   would look at that one-line email and move on with all his

1      other responsibilities.

2              KPMG partners did not need more time to prepare.

3              A few words about Brian Sweet, who comes right at the

4      beginning of his story.  "A superstar."  That was Stephanie

5      Rodriguez's word for him when he was at the PCAOB.

6              And that's how Dave saw him, at first.  It turned out

7      he was something very different.  He testified that he was

8      "pressured" by Mr. Middendorf and by KPMG from day one because

9      of his welcome lunch with Dave.  A very competent, very

10     experienced, not particularly young accountant on his first day

11     on the job, he's pressured, he's cowed; he has to do what they

12     tell him.  And now you know he says that having stolen massive

13     amounts of confidential information from the PCAOB and told

14     nobody.  It's a farce.

15             Mr. Sweet told many, many lies.  And the government,

16     let's be honest, did nothing about it.  It didn't rip up his

17     agreement.  That language in the cooperation agreement that the

18     government likes to point to as the reason why its cooperators

19     do not have a motive to lie, they have a motive to tell the

20     truth -- it is understood that the defendant not commit any

21     further crime -- should the defendant commit any further

22     crimes, he will thereafter be subject to prosecution for any

23     criminal violation of which this office has knowledge -- you've

24     heard of none of that.  His agreement was not ripped up.  His

25     bail was not revoked.  Nothing happened.

1          Another lie:  The location of Mr. Sweet's first day of

2     lunch with Dave at this restaurant Avra.  Now, you may think

3     this was a small lie, and in some respects I admit it is, but

4     in fact when you think about it, it is a very significant one.

5     Government Exhibit 1507 was the picture that was shown to

6     Mr. Sweet right at the beginning of his testimony.  This is the

7     lunch where on the first day everything was set in motion:

8     Dave Middendorf lit the match and was responsible for all that

9     Mr. Sweet did after him, all the pressure he felt.

10          So he described the restaurant.  This is it.  Yes,

11     this is it.  He points out the booth, and he describes exactly

12     where they're sit.  He's right next to Dave.

13          The problem was that wasn't the Avra where the lunch

14     occurred, and that wasn't the booth where they were sitting.

15     Because the government's picture, 1507, was the Avra on

16     60th Street, but the lunch took place at the Avra on

17     48th Street.  And we know that from the calendar invite from

18     April 29th, between Lex and Third and 48th, and from the email

19     from Mr. Mucha about picking up Brian for the lunch.  We also

20     know it from M277, that the two restaurants look very

21     different.

22          Why is this important?  It is important because the

23     government showed Mr. Sweet the photo of 60th Street, and he

24     agreed with it, under oath.  And then he embellished.  Who sat

25     where?  Dave's right in my ear.

1          This proves two things.  Mr. Sweet will say what the
2     government wants him to say.  And he'll embellish, add extra,
3     to the honest facts to make himself valuable, in this case to
4     the government.  He does that when he's at KPMG and he did that
5     during his testimony.

6          Any of those slides you saw in the government's
7     summation that has just a quote from Brian Sweet, you should
8     ignore all of them.  If you don't see a document or an email
9     that proves anything Brian Sweet says, ignore his testimony.
10    You cannot trust or rely on Mr. Sweet for anything, even where
11    he went to lunch.

12         And, by the way, it is astounding that the government
13    is asking you to rely on Brian Sweet for his exact words at
14    that lunch four years ago.  I'll address all the "I don't
15    recalls" in a moment that they flashed on the screen.  But they
16    suggest to you that Brian Sweet remembers, from four years ago,
17    who said what and who sat where at a lunch on May 1st, 2015.
18    And he lied repeatedly on the stand.  He even lied about crimes
19    he hadn't previously admitted to lying about on the stand.  I
20    suggest you can't rely on him for anything.

21         Now, right from the start of his work at KPMG, Brian
22    Sweet unloads a steady flow of inspection predictions.  For
23    Mr. Sweet, he's trying to show his worth to the firm.  In
24    Mr. Middendorf's mind, it's a steady stream of predictions
25    based on gossip and best guesses.

1           Let me just stop there for a moment because this is

2     very important.

3           I can illustrate it with the last few exhibits the

4     government showed about the SEC.  That big flowchart, all the

5     different uses and places that the PCAOB inspection reports go.

6     None of that means anything in this case.  This case is about

7     Mr. Middendorf's intent.  What he knew.  What he didn't know.

8     And what he intended.  There is no evidence that Mr. Middendorf

9     ever saw that fancy flowchart.  The SEC can do all it wants

10    with PCAOB inspection reports, but unless he knows it, and he

11    intends to defraud it, it's irrelevant.

12          As I said, a steady stream of predictions based on

13    gossip and best guesses.  You need to separate from your mind

14    that we all know now that Mr. Sweet had this massive GNF

15    planning document, with all those tabs, stolen in his laptop,

16    and he's conniving with that information to send out these

17    little, little treats of information and gossip.  But

18    Mr. Middendorf doesn't know that.  You have to read those

19    emails from the perspective of someone who's completely

20    ignorant of what Mr. Sweet has done.  Dave had no idea that

21    before he joined KPMG Brian Sweet stole confidential

22    information from the PCAOB.

23          And that's why, in email after email, Mr. Sweet

24    reports gossip or news or his best guesses, as you saw a few

25    already, and not a single person who received the email -- some

1   of whom are senior to Mr. Middendorf, and I'm sure some of

2   whom -- no offense -- are smarter than Mr. Middendorf -- nobody

3   raises her or his hand to say what they just received is wrong.

4   Nobody calls the hotline.  Nobody writes back, hey, maybe we

5   shouldn't have this, or how did you get this, or what should we

6   do.

7          If you were looking for evidence of Mr. Middendorf's

8   criminal intent, these predictions, this gossip, coupled with

9   no concern raised by any recipient, demonstrates the lack of

10  it.  And I could show you a few examples.

11         Government Exhibit 806, towards the beginning.  From

12  Mr. Sweet to Mr. Middendorf and Mr. Whittle:  "I wanted to send

13  you both a list of what I anticipate will be the most likely

14  PCAOB banking inspections for 2016."

15         M57, to a whole host of KPMG people.  Larry Leva, you

16  heard testimony, was the head of the international practice.

17  He oversaw it.  "As I reflect back on our meeting last week, I

18  thought it might be helpful if I followed up with a note

19  outlining some of the most pressing matters that the PCAOB will

20  be focused on during its inspections of our SIFI audits."

21  Systematically important financial institutions.

22         And he gets a whole list of things.  "Hot topics.

23  Will be particularly focused on the following matters."  and

24  Mr. Leva doesn't write back, uh-oh, how does Brian know all

25  this?  He writes back, "Tremendously valuable.  Thanks for

1    taking the time."

2          M298.  "I've spent quite a bit of time with Palantir.

3    What I suspect could be the most likely non-banking targets for

4    potential inspection."

5          How many caveats can you have in one sentence?

6    "Suspect."  Most likely."  "For potential."  This is the steady

7    stream that Mr. Middendorf receives, and this is what informs

8    his understanding of what happens in 2016 and 2017.

9          "I would suggest that these be considered as very good

10   candidates for our internal coaching or pre-issuance review.

11   They would have a higher selection likelihood based on my

12   analysis."  He doesn't say he popped up a GNF form on his

13   computer and did an analysis.  They just hired a very

14   competent, superstar banking auditor from the PCAOB, and

15   they're getting a download, a dump of everything in this guy's

16   head, from all his experience, from all the work he's done.

17   There's nothing wrong with that.  There is no fraud.  There is

18   no criminal intent.  There is nothing stolen about what's

19   indicated.

20         And as far as Palantir, remember Judge Holmes was also

21   aware of the Palantir project, as was the Ethics Committee of

22   KPMG's board.  Mr. Middendorf had a good faith belief that

23   there was nothing wrong with using well-known, risk-based

24   flags, like an audit partner who flies in from out of town or a

25   prior failed inspection, to predict PCAOB inspections even if

 1     it cost the firm $1 million.  It went through the highest

 2     levels of the firm.

 3            Government Exhibit 824.  Again, "I got a call from an

 4     old colleague over the weekend.  I would expect," etc. etc.

 5     Mr. Liddy is Mr. Middendorf's boss.  David Frew is also very

 6     senior in the National Office.  Nobody says, hey, what's the

 7     matter here.

 8            All these people, and we counted them up, 47

 9     recipients of these prediction and gossip emails, receive

10     prediction and gossip emails from Brian Sweet and no one yells

11     fire.  That is because, like Dave, they all understood

12     Mr. Sweet to be sharing predictions based upon his experience

13     at the PCAOB or gossip from a lunch with a former colleague.

14     No one called the hotline or informed Mr. Middendorf that he or

15     she believed it was wrong to have this information.

16            Would this be a convenient time, your Honor?

17            THE COURT:  Yes.  It's just about 1 o'clock, folks.

18            We will break for lunch.  Is 45 minutes enough, for

19     lunch, or do you need an hour?

20            (Jurors indicating)

21            THE COURT:  You want your hour, OK.  All right.  We

22     will compromise.  We'll give you 50 minutes, and we'll try to

23     start a little bit before 2 o'clock, about ten minutes to 2, if

24     we can.

25            All right?  You are not deliberating, of course.  We

 1   still have to finishing the summations and the charge.

 2          Please leave your notepads on your chairs and we'll

 3   start back at 1:50.

 4          (Jury not present)

 5          THE COURT:  You may be seated.

 6          Anybody want to talk about scheduling or anything

 7   else?

 8          MS. KRAMER:  One quick thing, your Honor.

 9          Mr. Boxer made reference to Mr. Middendorf facing 85

10   years in prison.  That is obviously an improper thing to put

11   before the jury.  So, you know, I think before we start again

12   after lunch, we would like an instruction reminding -- I'm

13   sorry, excuse me.

14          (Pause)

15          MS. KRAMER:  I withdraw the request for an instruction

16   upon conferring.

17          THE COURT:  OK.

18          MS. KRAMER:  But wanted to raise it and just make sure

19   it is not going to happen again.

20          MR. BOXER:  Your Honor, the 85 years is evidence

21   through the cooperation agreement of Mr. Whittle, and --

22          THE COURT:  But does that translate into -- is it

23   exactly the same counts?

24          MR. BOXER:  It is.

25          THE COURT:  OK.

1          MS. MERMELSTEIN:  Your Honor, that that is in evidence

2    does not render it a proper argument.  The law could not be

3    more clear that it is irrelevant for the jury to consider the

4    punishment the defendant faces.  There is no way that defense

5    counsel thinks that it is OK to argue to the jury about how

6    much time he is facing.

7          If they want to argue that the cooperators have an

8    incentive to lie because they're facing a lot of time, that's

9    totally fine, but that it is in evidence does not render it

10   permitted for any purpose.

11         And this is black letter law.  It could not be less

12   subject to interpretation that you cannot tell the jury what

13   sentence the defendant is facing.

14         So, the harm has been done.  It has been put out there

15   improperly.  We didn't want to object in realtime and call more

16   attention to it, but it obviously cannot be mentioned again by

17   any defense counsel.

18         THE COURT:  My instructions will be clear on that

19   point.

20         And I assume you are not going to mention it again?

21         MR. BOXER:  I do not intend to, your Honor.  I will

22   double-check over lunch.

23         MR. WEDDLE:  Your Honor, along the same lines, in the

24   prosecutor's summation, the prosecutor talked about not only

25   the cost of planning inspections but also the cost for

1    replanning and additional reviews.  That evidence was offered

2    and admitted for purposes of showing the value of the

3    information taken, to prove that it was property.  It was not

4    offered or admitted for purposes of showing some kind of harm

5    to the PCAOB.  And that's exactly the appeal that the

6    prosecutor made in the prosecutor's argument and it was

7    improper.

8              In addition, your Honor, the prosecutor was talking

9    about Mr. Middendorf, but said that Mr. Middendorf's testimony

10   that he didn't recall certain things puts the lie to the claim

11   that he didn't know what he was doing was wrong.  And then the

12   prosecutor said, "Remember, Tom Whittle and Brian Sweet pled

13   guilty and admitted they knew what they were doing was wrong."

14   That is a completely improper argument that invites the jury to

15   infer the defendant's guilt from the fact of a guilty plea by

16   Tom Whittle and Brian Sweet.  And the juxtaposition of those

17   arguments show exactly the intent of the prosecutor in

18   appealing to that improper inference and the use of the word

19   "remember" to combine those two sentences.

20             MR. BOXER:  I join in that objection, your Honor.

21             MR. WEDDLE:  It is directly contrary to your Honor's

22   instructions, and we'd ask that the Court add to those

23   instructions that the jury should disregard the prosecutor's

24   arguments relating to the guilty pleas of Mr. Whittle and

25   Mr. Sweet.

1          MR. BOXER:  I didn't make a contemporaneous objection,

2     your Honor.  I thought I would just highlight it at that point,

3     but we agree and we looked at the transcript and lodge the same

4     objection.

5          MS. KRAMER:  May I respond, your Honor?

6          THE COURT:  Yes.

7          MS. KRAMER:  First on the value of the property point,

8     it could not have been more clearer that I was talking about

9     the value of the property when I talked about the cost of the

10    list.  In fact, I think the slide title said "Valuable

11    Property," or something along those lines.  So that argument

12    was entirely proper.

13         And with respect to the guilty pleas, there was

14    absolutely nothing improper about my intent, nor what I

15    actually said.  The fact that two co-conspirators in this

16    scheme recognized that what they did was wrong is relevant.  We

17    are allowed to make arguments just like Mr. Boxer did a few

18    moments ago when he put up a list of 47 people and said, look,

19    they didn't know that anything was wrong with this so you can

20    make an inference about what was in Middendorf's mind.

21         Two of his co-conspirators acknowledged that what they

22    did was wrong, and that's totally proper argument.  There was

23    absolutely no suggestion on my part that their guilty pleas

24    show you that Middendorf is guilty of the crime.  It was in the

25    context of discussing the fact that they knew what they were

1   doing was wrong and they had acknowledged it, or to make a

2   proper argument.

3              MR. WEDDLE:  Your Honor, just to add to what I said

4   before.  I agree that in certain parts of the argument the

5   prosecutor used the cooperators for a proper argument, which is

6   the one that the prosecutor just articulated.  The section of

7   the argument that I referred to did not do that.  It did

8   something different, which was to invite an inference of guilt

9   of the charged defendants based on the guilty plea.  So both

10  arguments were in the prosecutor's summation, and the only one

11  that I am making my objection to is the one that I quoted.

12             THE COURT:  I think I understand the argument and I

13  can see how it could be interpreted that way.  However, the

14  instructions are clear that the guilty pleas cannot be used for

15  the jury to infer the ultimate guilt of the defendants here,

16  and I think that that will adequately address that.  I will

17  confirm that it adequately does.

18             MS. KRAMER:  Thank you, your Honor.

19             THE COURT:  OK.  See you soon.

20             (Luncheon recess)

21

22

23

24

25

1           **A F T E R N O O N   S E S S I O N**

2                          1:53 p.m.

3           (Jury not present)

4           THE COURT:  Everyone ready?

5           MS. MERMELSTEIN:  Yes, your Honor.

6           MR. BOXER:  Yes, your Honor.

7           THE COURT:  OK.

8           (Jury present)

9           THE COURT:  Please be seated.

10          MR. BOXER:  Shall I continue?

11          THE COURT:  Yes.

12          MR. BOXER:  Thank you, your Honor.

13          When we broke, I was showing and discussing with you

14   predictions and gossip that had been sent to Mr. Middendorf.

15          When Mr. Whittle comes to Dave in March 2016 and said

16   that Sweet had some predictions and Whittle would like to have

17   Sweet and maybe others review those workpapers, Dave didn't see

18   a problem.  It was after the report release date and before the

19   document completion date.  And when he told his boss, Scott

20   Marcello, about it, he also didn't see a problem.

21          And then a week or so later, Mr. Whittle informed Dave

22   that Mr. Sweet may have information from the PCAOB about some

23   of the inspection selections and he'd like to do the same

24   thing, have a review of the workpapers.  And, again,

25   Mr. Middendorf approved of that taking place and he informed

1     his boss, Mr. Marcello.

2           The fact that Dave does not recall the meeting or the

3     details of who said what, I submit, shows that in fact he is

4     telling the truth.  He heard Whittle and Sweet testify, and he

5     doesn't argue with portions of their testimony about who said

6     what and who was responsible for what.  Is it plausible that

7     you remember each exchange by each person at a meeting four

8     years ago?  I suggest that what has the ring of truth, and what

9     Dave does not excuse or run away from, is the fact that he

10    authorized the review of the workpapers and that he understood

11    the information came from someone at the PCAOB.  That's his

12    takeaway and that's what he remembers.

13          If he was lying about a meeting four years ago, do you

14    think he'd say he did not authorize it, or that he had no idea

15    it was confidential information?  Dave did neither, on direct

16    or on cross.  That has the ring of truth.

17          And why did Dave authorize the rereview?  Because he

18    didn't see any harm to the PCAOB or to anyone else.  Because

19    Dave understood that the audit work was completed, KPMG's audit

20    opinions had been issued, and all that could be done under the

21    PCAOB's auditing rules was cleanup of the audit documentation,

22    the workpapers in the file, which could only help show the

23    audit work that had already occurred.  In fact, the PCAOB very

24    clearly expressed its view that it did not write inspection

25    comments because of poor documentation.

1            For example, if you look at M263, in their own

2     release, they provide that:  "In addressing inspection report

3     criticisms" -- I think this was directed to audit committees --

4     "firms' responses sometimes characterize the deficiency in

5     terms of audit documentation.  That is, firms sometimes assert

6     or imply that the firm performed procedures to obtain the

7     necessary audit evidence and that the criticism arises only

8     because it did not sufficiently document its procedures.  In

9     the board's view, such assertions should be viewed with

10    skepticism."

11           And then there was Stephanie Rodriguez's testimony.

12           "The PCAOB does not consider itself to be giving

13    comments based solely on documentation.  It's looking to

14    whether the underlying work was actually performed?"

15           She said, "Yes."

16           Government Exhibit 152, one of those monthly PCAOB

17    meetings that Mr. Middendorf attend, Paul Bijou, senior

18    inspector at the PCAOB:  "When hearing documentation, far too

19    frequently engagement team hear to put something in the

20    workpapers.  We generally don't write comment forms due to a

21    lack of documentation unless it is egregious.  Most times it is

22    the fact that we did not believe that the information has been

23    utilized in the audit process."

24           And then, again, Ms. Rodriguez:  "So we do not

25    generally write comments for deficiencies that are solely

1  documentation issues."

2          "But ultimately, your assessment as a PCAOB inspector

3  is focused on the underlying work, correct?

4          "It's focused on it, yes, ensuring that the audit work

5  was completed at the report release date."

6          That's what Dave understood when he authorized the

7  rereviews.

8          And after he authorizes rereviews, as you heard, he

9  reached out to a few engagement partners so someone from the

10  National Office can have access to the workpapers.  He doesn't

11  write or send what the government showed you as Government

12  Exhibit 954 in a very cryptic way.

13          If we look at 951, this is an email exchange with Mat

14  Mount, and it looks, since Mount writes the first email, that

15  Dave must have called Mount.  And Mount writes back:  "our

16  audit report date was February 22, so I believe we have until

17  April 7."  He has "audit report date" right in the subject

18  line.

19          And what does Dave do?  Does he delete it?  Does he

20  pick up the phone?  He emails:  "FYI, please send me the name

21  of the individual that should be invited to the eAudIT file."

22          If he had an intent to somehow defraud the PCAOB,

23  that's a confession.  There is no way that was his intent.  He

24  understood that the PCAOB would not make comments -- would not

25  issue comments just because of workpapers.  And he didn't try

1    to speak cryptically or hide what he was writing about the way

2    Mr. Whittle did.

3            If Mr. Middendorf really thought he would be creating

4    evidence of his intent defraud the PCAOB or the SEC, he would

5    never have left a paper trail like that.

6            And if you want a window into Middendorf's --

7    Mr. Middendorf's state of mind about what he thought was

8    permissible and why he thought it was around this time, I

9    suggest you look at Exhibit M57.  It explains why nothing about

10   what Mr. Middendorf did was cheating.

11           He receives an email from Mr. Sweet reporting on an

12   inspection that did not go well.  And he writes:  "Shame on us

13   that an inspection that went bad previously is likely to go bad

14   again.  If we don't learn from our mistakes we deserve to be in

15   Part I."

16           His intent was for the workpapers to be as clear as

17   they could be so they should get the credit they deserve or the

18   comment they deserve.

19           And, finally, as you could see from the markups to the

20   workpapers, some of which came into evidence -- this one's

21   Government Exhibit 1011, page 17 -- and what several witnesses

22   told you, the rereviews complied with AS 3 and AU 390, and

23   provided input to the engagement team for it to make any

24   changes to the workpapers that they thought were appropriate.

25   The rereviewers were not marking up and writing the workpapers

 1   themselves, they were making suggestions, as indicated on the

 2   left side of that exhibit.

 3          And Diana Kunz testified:  "Right.  I had the final

 4   say on what changes we were making."

 5          "And isn't it true that" -- if you can just go back?

 6   Thank you.

 7          "Isn't it true that all of the changes that were made

 8   to the workpapers complied with the auditing standards,

 9   correct?

10          "Yes.

11          "One of those is AS 3?

12          "Correct."

13          And Mr. Lundelius, he told you that he saw no

14   violations of auditing rules in the rereview workpapers that he

15   examined.  And there's his testimony to that effect.  He is not

16   cross-examined on that point.

17          And even Mr. Whittle, he testified that you are

18   permitted to make changes to the workpapers to get credit for

19   the work the engagement team performed during the audit, and

20   that's shown right there.

21          "With respect to AS 3, would you agree with me that

22   you're permitted to make word changes, add descriptions, do

23   other kinds of things to the workpapers?"

24          He says, "That's correct."

25          "It's a way of getting credit for the work that the

 1    team actually did, correct?

 2              "That's correct."

 3              that's what Mr. Middendorf intended.

 4         A few words about Mr. Whittle.  Mr. Sweet reports to

 5    Mr. Whittle and they are closely connected.  And, yes, he

 6    presented differently than Mr. Sweet, although I must say

 7    that's not saying very much, but he did.  Still, some of his

 8    testimony -- some of the little extra he added to the facts are

 9    not credible.  Extra without corroboration.  That does not

10    support a finding of proof beyond a reasonable doubt.

11              When there's no document between Mr. Whittle and

12    Mr. Middendorf and Mr. Whittle just says I told him so, that is

13    not proof beyond a reasonable doubt.

14              For example, he says he implicitly instructed

15    Mr. Sweet to steal PCAOB confidential information.  It is not a

16    document.  It is not in writing.  It wasn't even orally said.

17    He said it was implicit.  That doesn't sound like evidence to

18    me.

19              Mr. Whittle said he didn't view some of what Mr. Sweet

20    wrote as predictions.  But he was closer to Mr. Sweet than

21    Mr. Middendorf.  He had emails with Mr. Sweet that did not

22    include Mr. Middendorf.

23              And, remember, Dave had a lot more responsibilities

24    than Mr. Whittle.  That is part of the big picture, the context

25    that you need to appreciate to assess what Mr. Middendorf did

 1   and did not know.  Dave had many, many other things he was

 2   focused on besides Brian Sweet or Tom Whittle.

 3          I showed you during the trial Exhibit M306, showing

 4   all the audit quality efforts that Mr. Middendorf championed.

 5   You start at the very bottom, the home plate of the baseball

 6   field.  It says, "Higher Audit Quality."  It doesn't say

 7   inspections.  And it continues to move out from different

 8   programs that Mr. Middendorf was involved in when he was

 9   responsible for them.

10          You also saw evidence of his standing meetings and his

11   various direct reports.  And that's in M53, M286, and M287.

12   And all the highlighted names are people he spoke with

13   regularly and reported to him regularly.

14          And then M290 is the org chart we put into evidence.

15   It's not a circle with five or six faces and those are the only

16   relevant people in Dave Middendorf's world.  Far from it.  He

17   had a lot of responsibilities and groups that he oversaw and a

18   lot of things to do.  It is not surprising that he's not as

19   knowledgeable about what Mr. Sweet is doing as Mr. Whittle is.

20          The government said in their summation that Dave

21   didn't care about inspection results.  He didn't say that.  He

22   said, I care.  I would like to have fewer comments from the

23   PCAOB.  I would think anybody would.  But it wasn't his central

24   focus.  It was one of several things he focused on.

25          And also consider this.  If you review any of the

1    inspection reports in your deliberations, notice there's

2    language that makes very clear from the PCAOB that they are not

3    to be considered report cards on audit quality.  Because they

4    are risk-based, they make very clear that they are assessing

5    the riskiest engagements and it is not a fair assessment of the

6    overall audit quality of the firm.  Dave was focused on the

7    overall audit quality.  Inspections was one piece, and a not

8    particularly dominating piece, of what he was focused on.

9         As I said, Dave had a lot going on, a lot more than

10   Tom Whittle's group.  And Mr. Whittle writes plenty of emails

11   to Dave -- they did not sit on the same floor at any time --

12   including about things Whittle told you he said he believed

13   were wrong.  Like the emails about who were the engagement

14   partners for some of the 2016 rereviews.  You should not rely

15   for proof beyond a reasonable doubt on testimony of any of the

16   blue slides that were up there during the government's

17   summation where it's just words.  It is not proof beyond a

18   reasonable doubt.  He knows how to email Dave.  He emails him

19   when he needs him.  And when there is no corroboration, it is

20   not proof.

21        The end of 2016, more predictions arrive from Brian

22   Sweet.  This is the bank screening analysis from November.

23        "Dave - Are there other actions you believe we should

24   take?  For instance, should we discuss the analysis with Kevin

25   and Laurie?"  Kevin O'Hara and Laurie Mullen.  And it goes on

1    to describe as background how they started with the data the

2    firm submitted to the PCAOB at the end of September, looking

3    for anomalies.  There is no indication in there that it is

4    based on something he stole and something confidential.

5         And then additional predictions come from Sweet in

6    January 2017, including about Raymond James Financial, which

7    was in M316.

8         And you heard quite a bit about this in the

9    government's summation.  Dave spoke with Mr. Whittle on

10   January 10th about what he understood were Mr. Sweet's

11   predictions for 2017, and he put them on his phone.  Does that

12   sound like the behavior of a conspirator?

13        As far as Dave knew, nothing was done regarding those

14   predictions.  There was Citi, where Brian Sweet was already

15   embedded there.  There was Charter Communications, where

16   Mr. Whittle said the engagement partner was all set and then

17   later on came back for resources.  As far as Macy*s, Joe Lynch,

18   a former PCAOB employee, had already been sent out there in

19   2016, and Mr. Middendorf understood that he would be back out

20   again.  And for Valero, Cindy Holder had already been contacted

21   by the engagement team.

22        The last exhibit the government introduced during the

23   trial, Government Exhibit 1145, is in fact inconsistent with

24   Mr. Whittle's own testimony about this period of time.  He

25   testified about nothing relating to Scott Henderson.  He didn't

 1    say anything about the subject of this email.  The government

 2    had the opportunity to ask him those questions if it wanted to.

 3    And mentioning Dave in the email, Mr. Whittle also said nothing

 4    about that.

 5         And don't accept this argument that what Mr. Sweet

 6    shared in January of 2017 was more than just predictions.

 7    Remember Mr. Whittle's testimony when he actually got the list

 8    the next month.  He said he was shocked when he received the

 9    full list from Brian Sweet on February 3rd, and that the

10    February 3rd information was totally different from what

11    Mr. Sweet had said on January 10th.  In fact, I think

12    Mr. Whittle testified that he knew the actual list would be

13    different from what he called the preliminary list in January.

14    He's shocked.  His knowledge that it would be different in a

15    month, that's predictions.  That's describing something that

16    happened the month before, that is a prediction, there is

17    uncertainty.  Nobody has shock if they have a preliminary list

18    and then a month later they get the real list.

19         And in the evening on February 6th, 2017, when

20    Mr. Sweet informed Dave that he had all of the audits that the

21    PCAOB was going to inspect later that year, Dave did react

22    differently, he reacted differently than when he had received

23    predictions.  At that time the audits were ongoing, the audit

24    opinions had not yet been issued, and Mr. Sweet had the list of

25    upcoming inspections.  And so Mr. Middendorf, on that call,

1   instructed Mr. Sweet and Mr. Whittle that nothing should be

2   done until he conferred with his boss.  And the next day he

3   did.  The government made no mention of that fact.

4           He also spoke that next day to two of his direct

5   reports about the list, George Hermann, whom Dave understood

6   had not known about it, and Laurie Mullen, who knew about it

7   before Dave did.  Two people who certainly raised their hand to

8   Dave and expressed very clearly their concern and anger about

9   the list.

10          And when Ms. Mullen told Dave that Mr. Sweet had

11  reached out to Ms. Kunz and informed her that her engagement

12  was on the 2017 inspection list, yes, Dave was furious, and

13  instructed Mr. Whittle to tell Mr. Sweet to stop, but not

14  because they were found out, because he had the list and he had

15  instructed that nothing was to be done with it until he heard

16  back from his boss.  It is not a conspiracy that you are angry

17  that somebody is breaking trust when you tell your boss and

18  your two direct reports about the list.  Where does that

19  conspiracy go from that point in time?

20          It's the wrong inference to draw from Dave's anger.

21  Dave was angry because Mr. Sweet didn't listen to him, and he

22  didn't think it was appropriate.

23          Dave spoke to Laurie Mullen again on February 10th,

24  when Ms. Mullen said that she was going to meet with Marcello.

25  On the following Monday, Dave responded, "Fine."  Nothing was

1    being hidden.  And then on February 13th, after his meeting,

2    Mr. Marcello informed Dave that he was going to report the list

3    to Judge Holmes, and Dave agreed.

4          I don't understand what the government is contending,

5    that Mr. Middendorf thought he was a Whittle blower, but I'm

6    telling you now that's not our contention.  He took the

7    information to his boss.  There were conversations during that

8    week.  Without a doubt, the people in Chicago were very upset

9    about it.  They demanded to see Mr. Marcello on that Monday.

10   It's obvious the decision is in the lap of Dave's boss.  And

11   after that meeting Mr. Marcello calls Mr. Middendorf and said

12   we're reporting it to Judge Holmes, and Dave agrees.  It is not

13   a whistleblower, but it's also not somebody that is a part of

14   the conspiracy to use or to make any use of that information.

15         By the way, remember, it was Mr. Marino who had said

16   what Scott Marcello had said about receipt of the 2017 list.

17   Maybe the PCAOB wants us to have it.  That's what Mr. Marcello

18   said, not Mr. Middendorf.

19         And where do you think he got that idea from?  His

20   meetings with Mr. Hanson.  Remember, he handed over an agenda,

21   a draft agenda, at each one of those meetings before the board

22   meetings.  I don't think it indicates anything about a

23   conspiracy that Mr. Marcello had that reaction given those

24   meetings he had with Mr. Hanson, but I'll come to that soon.

25         On February 14th, Mr. Middendorf and Scott Marcello

 1   reported to Judge Holmes.  And the very next day, on

 2   February 15th, Dave was interviewed by a KPMG lawyer, Mark

 3   Rubino.  Mr. Middendorf told Mr. Rubino everything he knew

 4   about the 2017 list.  And he also told him about the

 5   information they had received in 2016.  He didn't hide that.

 6   And he understood from Mr. Rubino's reaction that he was the

 7   first person to mention it to Mr. Rubino.

 8           And he voluntarily turned over his cell phone to

 9   Mr. Rubino.  Mr. Rubino asked Dave to produce the list of

10   companies he received from Mr. Sweet -- and that's Government

11   Exhibit 1144 -- and Dave did so.  And we'll talk about the cell

12   phone in a little more detail.  But recall what Mr. Greenwood

13   said about the content of Mr. Middendorf's cell phone:

14           "That tells you that a note was created in the phone

15   on that date and time, correct?

16           "Yes.

17           "It says nothing at all about what content was in that

18   notes file when it was created, correct?

19           "Yes.

20           "The note could have changed entirely?

21           "Yes, it is possible."

22           There is no way to tell -- a little more.

23           "In your direct examination today, you were asked

24   about the rows on the Cellebrite report.

25           "Those two rows, they have the word 'deleted'

1    appearing in the right-hand column, correct?

2           "Yes.

3           "Therefore, they have no data appearing in the

4    left-hand column where we would see creation or modified data?

5           "Correct.

6           "So we have no idea at all when these notes were

7    created?

8           "Correct.

9           "We have no idea when they were modified or if they

10   were mortified?

11          "Correct.

12          "When they were deleted or if in fact they were even

13   actively deleted by Mr. Middendorf?

14          "Correct."

15          There is no way to tell what appeared in the note when

16   it was created on January 10, 2017.  And there is no way to

17   tell if Dave deleted anything or even overwrote anything

18   previously written.

19          And by the way, Dave was honest about that.  He said

20   he didn't recall if he typed over the initial list from January

21   or if he deleted or replaced the initial list.  He had kept and

22   he turned over the full list of names to Mr. Rubino.

23          Does all of this sound like someone who has an intent

24   to defraud?  Right from the outset, Mr. Sweet lied to

25   Mr. Rubino and KPMG's outside counsel.  He also lied to

 1    Mr. Whittle when he was confronted on February 8th about

 2    reaching out to Diana Kunz.  And Mr. Whittle lied, too, to

 3    KPMG's lawyers.  Mr. Middendorf answered the questions he was

 4    asked, and informed Mr. Rubino right from the start not only

 5    about the list from 2017 but also the information he had in

 6    2016.  As you heard, he told Mr. Rubino about 2016, "That was

 7    probably poor judgment on my part."

 8            I now want to address a few general topics outside the

 9    chronology.

10            The first one is the SEC.

11            And as I mentioned before lunch, the focus is what

12    Dave intended, what's his state of mind?  A fancy internal

13    flowchart doesn't prove it.  The SEC, let alone defeating an

14    SEC lawful function, was not even a consideration of

15    Mr. Middendorf's, and for good reason.  Dave spoke with

16    Mr. Bricker, the SEC Chief Accountant, about particular

17    accounting and auditing issues.  It was a relationship of

18    consultation with and advice by the SEC.  It was completely

19    separate from the PCAOB inspection process.  You saw the

20    meeting invites and agendas, Government Exhibit 300 and 301.

21            300 -- if we could just go back a second.  "I would be

22    happy to give you my views on the allowance for loan losses

23    issues I am observing.  Dave."

24            301.  The agenda.  "KPMG's response to the related

25    audit challenge.  Methodology governance, process level

1      controls, review controls over ALL estimate."

2              These were substantive accounting and auditing issues.

3      Had nothing to do with PCAOB inspection reports or inspection

4      comments.

5              And even assuming that Mr. Middendorf knew the SEC

6      received the PCAOB inspection reports, it was on the agenda for

7      that February 9th meeting with the Chairwoman of the SEC.

8      There was no evidence to support an understanding by

9      Mr. Middendorf that somehow the SEC was using the inspection

10     reports as part of some lawful function.  So, for example, you

11     heard about the Rule 4004 reports.  Those are reports the PCAOB

12     sends to the SEC when it sees something in inspection.  That

13     would be evidence of how the SEC might use PCAOB inspection

14     reports.

15             But the thing about the 4004 reports were, you heard

16     evidence and saw the reports, that those addressed issues about

17     the issuer, about KPMG's clients.  Government -- Defense

18     Exhibit M207, for example, concerning the financial statements

19     of the issuer.  So something comes up in an inspection and the

20     PCAOB sees something related to the issuer's accounting, they

21     could send a 4004 report to the SEC but that's about the

22     issuer.

23             The other topic that comes up in these reports is

24     about auditor independence.  Maybe the auditing firm is

25     representing two people to the same -- related to a transaction

1    or they have subsidiaries and they may not be independent

2    enough to sign an audit opinion.  It has nothing to do with

3    inspection results or comments.

4           And then there was Wes Bricker's testimony on this

5    subject.  I submit to you it was completely incomprehensible.

6    If we look at an example of it on page 346 of the transcript:

7    "So if a firm had improper notice of the fact that the PCAOB

8    was going to inspect a particular audit and they got that

9    notice during the 45-day period and made changes to the

10   workpapers, even if they complied with AS 3" -- so kind of lays

11   out what happened here -- "would you be able to rely on the

12   inspection report's assessment about the quality of the audit?

13          "No.

14          "Why not?

15          "Because the documentation reflects the auditor's

16   judgments and representations about the work that was

17   performed, and so it's the basis for the PCAOB's review of that

18   work and then summarizing whether the firm generally has a

19   system and a set of tools and methodology to do its work on all

20   of its engagements."

21          It means -- to me it is gobbledygook.  It means

22   nothing.  It should be a simple question and a simple answer.

23   What lawful function of the SEC was impeded or defeated by the

24   conduct here?  And we get that, from the Chief Accountant, the

25   one who is supposed to know.

1          And even more importantly, Mr. Bricker's own process

2   manual and the SEC training manual for PCAOB inspectors both

3   make clear that issues about auditors belong to the PCAOB.

4          So first in M206:  "The goal of the review is to

5   identify potential issuer issues, and therefore the SEC review

6   team" -- I inserted the word "SEC", that's who it is speaking

7   to -- "should avoid reporting matters that appear to be solely

8   misapplication by the auditor of PCAOB standards."

9          Then in Government Exhibit 311, from the SEC Division

10   of Corporate Finance, a training program of PCAOB inspectors:

11   "Of course, the PCAOB and the SEC focus in different areas.

12   You are focused on the auditor, while we are focused on the

13   company and the disclosures they provide."

14          The government didn't display those exhibits during

15   their summation, but they show clearly that the SEC is focused

16   on the companies, the clients, the issuers, and there was no

17   reason for Mr. Middendorf, who is sitting down with the Chief

18   Accountant about accounting issues, substantive accounting

19   issues, for him to think that by authorizing the rereview in

20   2016 he's impeding some lawful function of the SEC.  No less

21   when the SEC Chief Accountant can't in plain English describe

22   what that lawful function is.

23          And, finally, you heard the testimony of Paul Atkins,

24   a former commissioner of the SEC, and a commissioner at the

25   time the PCAOB was established.  And he explained how as

1     Commissioner he was not focused on PCAOB reports.

2          "We looked during my first couple of years.  Those

3     were the beginning years of the PCAOB.  And in fact I demanded

4     that we have a public hearing."

5          You heard about that.

6          "In connection with that role, did you ever review a

7     single firm's PCAOB inspection report?

8          "No.

9          "When you were an SEC commissioner, did you ever

10    review a single firm's inspection report in connection with

11    your appointment of board members?

12          "No."

13          Now, the government is saying -- Mr. Atkins was a

14    commissioner until 2008 -- how is a former commissioner of the

15    SEC supposed to know today what functions the SEC does with

16    PCAOB inspection reports?  And my question is if he doesn't

17    know, if he can't know and he's in the industry, how is

18    Mr. Middendorf supposed to know, if it is that secret?  I think

19    the answer is he does know, Mr. Atkins.  He was a commissioner,

20    and he explained to you what use and limited use the SEC had

21    with PCAOB inspection reports.

22          Dave had no reason to think in 2016 that a review of

23    workpapers, after the audits were over and after KPMG had sent

24    out its opinion letters, which accompanied the issuer's

25    financial statement to shareholders, which is what the SEC is

1   principally focused on, would impede or defeat a function of

2   the SEC.

3          Next general topic:  Duty.

4          The Judge will instruct you about the law, and I will

5   not say anything about those instructions other than to say

6   you'll hear an instruction about a duty, a duty that's

7   required, and it must be breached by an action or a failure to

8   act.

9          You will hear instructions from the Judge about

10  embezzlement.

11         Mr. Middendorf did not owe a duty to the PCAOB.  He

12  did not work there.  He wasn't bound by EC9 as far as any

13  information or list of inspections you heard about during the

14  trial, and he did not embezzle anything from the PCAOB.

15         Even the SAG certification Mr. Middendorf signed,

16  Government Exhibit 29, only applied to information he learned

17  in the SAG.  It had nothing to do with PCAOB inspection reports

18  or inspection lists.  Recall that the SAG representatives from

19  all the accounting firms sat.  That certification does not

20  create a duty on the part of Mr. Middendorf with respect to the

21  inspections.

22         And there is the testimony from and about Jay Hanson.

23  Now, the PCAOB is the supposed victim in this case, and we're

24  the only ones who called a board member from the PCAOB.  We did

25  not do so to blame the alleged victim.  That's the way for the

1     government to avoid acknowledging the importance of

2     Mr. Hanson's testimony.  In fact, Mr. Hanson's testimony

3     establishes a critical fact.

4             Starting in December of 2014, Dave is the national

5     managing partner for six months.  Mr. Hanson meets with

6     Mr. Middendorf and Mr. Liddy and later Mr. Marcello -- if you

7     look at M13, it is the very first meeting invitation -- at a

8     hotel in Washington, without Mr. Hanson telling his staff or

9     his fellow board members.  And at those meetings he hands draft

10    agendas to Mr. Middendorf so KPMG will be well prepared at the

11    PCAOB board meetings.  Make no mistake about it, those board

12    meetings are important.  You heard who attends from KPMG, the

13    highest levels of the firm, and the highest levels of the

14    PCAOB, including from the firm the Chairwoman and Judge Holmes,

15    the head of compliance.

16            And KPMG would take that draft agenda, the same people

17    who were attending the board meetings, and they used the

18    information from Mr. Hanson to be better prepared at the board

19    meetings.  I showed you the example, it is M77, for the talking

20    points about HBOS and the Belfast matter.

21            Mr. Hanson hands that to Mr. Middendorf and

22    Mr. Marcello.  They bring it back to senior leadership, and

23    they are advised of the talking points for the meeting that

24    occurs a few days later and they are better prepared to address

25    those issues.

1           Mr. Hanson, and here's why he's critical.  A PCAOB

2    board member told Dave that PCAOB inspections are unfair.  He

3    used the expression "Gotcha."  And he said that the inspections

4    team would pick firms to have a turn in their box, take turns

5    who they would focus on.

6           And, by the way, the facts corroborate that there were

7    peaks and valleys for the Big Four firms.  We have that in

8    M210.  And you can see, as we go across, PwC is the highest,

9    then it becomes Ernst & Young, and then it becomes KPMG.

10          This is critical because it explains Mr. Middendorf's

11   understanding of the PCAOB.  He authorizes the rereviews

12   because, following AS 3, it would make the workpapers clearer,

13   so KPMG would get the credit or comment it deserves.

14          And the government says he's rehearsed that answer.

15   Nonsense.  He has three private meetings and one private

16   telephone call with two PCAOB board members, with his boss,

17   during which the board members tell them that the inspections

18   are unfair, are a game of gotcha.  And that's why Dave, in

19   March of 2016, approved the rereview, to be as well prepared as

20   possible without changing any audit work, so the inspections

21   would be fair.

22          Next I want to point out a few arguments the

23   government has made that I think are unfair.

24          First, the cost to the PCAOB for the 2016

25   reinspections.

1              There was no real cost to the PCAOB for those

2     reinspections.  The data that was used to calculate a cost was

3     for all salaried employees getting paid that money whether they

4     worked on that project or did something else.  There was no

5     overtime.  And it was based on planning hours, which are just

6     that, planning in the future, what they expect will happen.

7     And, of course, always in four- or eight-hour increments.

8     These were estimates for plans, and they weren't additional or

9     extra cost or salary that the PCAOB had to pay.

10             There is no evidence in the record of any work

11    actually performed on those reinspections, let alone the cost

12    of them.

13             (Continued on next page)

 1                The word "cost," as you heard, was put into the table

 2     by the government.

 3                As to this notion that the reinspection in 2016

 4     somehow shows that the re-reviews were successful, Stephanie

 5     Rodriguez showed that you can't compare the initial 11-bank

 6     2016 selections to the 10-bank selections in the reinspection.

 7     The selection process was the same, but in terms of the size of

 8     the issuers, revenue, for example, was there any effort to make

 9     those numbers comparable?  He said, "I don't know if the

10     banking team was involved in that.  I'm not sure."

11                There was also no effort to use the same inspectors.

12     In other words, it's apples and oranges which banks, which

13     inspectors, how big a bank, what issues they might have.  To

14     try to compare from the initial inspection after the re-review

15     to the reinspection I'll call it and that bar graph that went

16     from zero to 6 for the banks, there is no real evidence in the

17     record for you to make that assessment.  You can't know what

18     led to the 2016 results.

19                By the way, Brian Sweet, there is evidence for that

20     reinspection of those 10 banks.  He was the former boss of one

21     of the inspectors, and two of the inspectors on those

22     reinspections -- excuse me.  On the initial inspections, on the

23     2016 one that were rereviewed, Brian Sweet was the boss of one

24     of the inspectors, and two of those inspectors had sent their

25     résumés to Mr. Sweet looking for a job at KPMG, John Lee and

1    Jeff Lutz.  What led to the 10 re-reviewed 2016 results?

2    There's no evidence of it.

3          Delay.  Any delay in the 2016 inspection report was

4    caused by PCAOB.  They took an extra year than ordinary, nicely

5    timed right before the start of this trial.  The government

6    admitted that the 2015 inspections weren't improved by anything

7    it alleged had occurred

8          This Come to Jesus meeting at the SEC where the SEC

9    discussed KPMG's inspection performance apparently.  Today the

10   government said KPMG was chastised by the SEC for its poor

11   inspection reports at this meeting with the chairwoman.  That's

12   an outrageous statement and it should color your view of what

13   they have to say.  There is absolutely no evidence from anybody

14   who attended that meeting other than Mr. Middendorf.

15         Mr. Bricker didn't attend.  They didn't call a single

16   witness from the SEC who was at the meeting.  A 30-minute meet-

17   and-greet Mr. Middendorf described it as, where the SEC

18   insulted the chairwoman for taking her time for an initial

19   meeting.  And the government points to lengthy talking points,

20   a talking point about inspections and says that establishes

21   that it was spoken at this Come to Jesus meeting.  There is no

22   evidence of that.

23         You would learn that KPMG has the least number of

24   restatements among the Big Four.  Our clients really cared

25   about and what the SEC really cared about.  As you heard, the

1    public receives the PCAOB inspection reports anonymously.  The

2    SEC's mission is to protect those shareholders.  Why would they

3    have an intent to defeat an SEC function for a common

4    inspection report that is made public almost two years later

5    and that the shareholders will never know if it concerns his or

6    her shares?

7              Similarly, the comparison chart that the government

8    put in, first they did it with the number of comments which

9    showed KPMG with the most, 2016.  It was their choice to put in

10   six accounting firms, put in the Big Four and the Big Two.

11   That was their choice.  Then, when we had it as a percentage,

12   it showed a different result.  Even for 2016 BDO had more.  In

13   2015 BDO had more, Grant Thornton had more.

14             Circle of trust, you heard that today.  There is no

15   evidence that Dave knew of that term.  Tom Whittle also never

16   heard it.  It shouldn't be applied to Dave's knowledge and

17   intent.

18             Let me say a few words about Dave's testimony.  You

19   heard his testimony.  He was not evasive.  He did not try to

20   dodge questions.  He was clear.  He was straightforward.  I

21   submit that he told the truth.  When asked repeatedly if he

22   knew in 2016 that Mr. Sweet had shared confidential PCAOB

23   information, Dave repeatedly acknowledged that he knew.

24             When asked about his cell phone, he explained how he

25   took down what Mr. Whittle said on January 10 in a Notes file

1    and that he wasn't sure if he overwrote or deleted the note and

2    typed the inspection list on top of it.  The fact is he saved

3    the list and sent it to Mr. Rubino.  Compare that to Brian

4    Sweet, who burned his papers in a barbecue.

5           In one particularly direct moment, Mr. Middendorf

6    discussed his conduct in general.  That was at page 2865, lines

7    9 to 19.  He said, "I don't believe what I did was wrong.  But

8    certainly in hindsight I look back on the fact that we had

9    confidential PCAOB information that we used and should not have

10   done that.  I was focused on what you could do as an auditor,

11   and following the standards did not seem to be wrong.  I was 30

12   years with KPMG.  I dedicated my life to the firm.  My family

13   sacrificed for the firm.  So it was not driven by I thought I

14   was doing something wrong.  I thought it was probably

15   stretching the limits in a gray area, but not something that I

16   did wrong."

17          I suggest, ladies and gentlemen, that that is truthful

18   and does have the ring of truth.  He did not have an intent to

19   commit fraud.  He did not think what he was doing was wrong.

20   He thought he complied with the rules.

21          One other thing.  The government during its

22   questioning of Mr. Middendorf pointed out that six days before

23   he and Mr. Marcello reported their February 6th conversation

24   with Judge Holmes, and they argued that again today.  Those six

25   days are not a basis to conclude that Dave had a specific

1    intent to defraud.

2         The next day, February 7th, Dave reported his

3    conversation with Mr. Sweet and Mr. Whittle to his boss.  That

4    day he also shared the existence of the list with Mr. Hermann,

5    which Dave understood was news to Mr. Hermann.  He also

6    discussed it that day with Laurie Mullen.  Mr. Whittle also

7    acknowledged at the end of the call with Mr. Sweet on February

8    6th Dave made it clear that nothing was to be done with the

9    list until he spoke to his boss.

10        That behavior is not behavior of criminal intent.  You

11   can take issue that he didn't yell fire himself that week, he

12   reported it to his boss and he left it in his boss's lap,

13   that's fine.  But it is not evidence of his intent to commit

14   fraud.

15        A few comments about motive.  I think I mentioned this

16   in my opening statement.  Why would Mr. Middendorf commit the

17   crimes that the government says he committed?  It's very

18   important that when you evaluate the evidence you take Dave's

19   perspective.

20        He worked for 30 years at KPMG, his entire

21   professional career.  He spent his entire career committed to

22   the profession of public accounting and to KPMG.  He did not

23   receive any money for personal benefit.  He was not worried

24   about KPMG losing clients.  And after 30 years he throws it all

25   away for no money, for no profit, all because he wants to avoid

1    a few comments in PCAOB inspection reports?  You heard he said

2    that he used poor judgment.  But there was no motive for him to

3    commit fraud.

4         I want to conclude with two pieces of evidence that I

5    think tell a lot about why the government has not proven Mr.

6    Middendorf's guilt beyond a reasonable doubt.  The first is

7    Government Exhibit 948.  That is the one about the smoke screen

8    re-reviews.

9         As you heard, "David" is not Dave.  That's David

10   Britt.  Apparently Mr. Whittle and Mr. Sweet added four

11   engagements to the re-reviews, so there would be a few that

12   were not later inspected by the PCAOB.  That is a clear intent

13   to deceive.  That's adding four reviews so that if someone

14   finds out about what was done, or to prevent someone from

15   finding out what was done.  So not all of the ones that were

16   reviewed were inspected.  There is not a single document or

17   email connecting Mr. Middendorf to these four smoke screen

18   re-reviews.

19        Similarly, Government Exhibit 1076.  That's the second

20   round of the bank screening risk assessment analysis.  Unlike

21   the one in November I showed you a few minutes ago, this is the

22   one where Mr. Whittle said he added or asked Brian to add a few

23   engagements that really didn't belong on the list but were

24   added in advance in case it turned out many of them were

25   inspected so they didn't score a hundred percent off the bank

1    screening analysis.  Not a single email or document connects

2    this to Mr. Middendorf.

3         These exhibits camouflage making false entries in

4    documents to hide behavior are a window into criminal intent.

5    They are there in writing for Mr. Whittle and Mr. Sweet, but

6    not for Dave.  Maybe Tom Whittle knew in January 2017 that it

7    was a list, but Dave Middendorf didn't know that.  To him they

8    were predictions, like the steady flow the firm had received

9    from Mr. Sweet.  And on Government Exhibit 1076, the real

10   smoking gun of intent to defraud, Dave Middendorf is nowhere on

11   it.  If you find yourself comparing Mr. Whittle's conduct to

12   Mr. Middendorf's conduct, I encourage you to look at Government

13   Exhibits 948 and 1076.

14        Some final thoughts.  Nobody you heard testify thought

15   they were committing a crime.  I said at the outset of the

16   trial a mistake, maybe; poor judgment or even negligence, okay.

17   A mistake and poor judgment has already cost Dave tremendously.

18   But the specific intent, that Dave specifically intended to

19   defeat a function of the SEC and to defraud the PCAOB beyond a

20   reasonable doubt?  No way.

21        Just because they represent the government, just

22   because they say it in a loud voice and use big adjectives and

23   adverbs or sell this to you as the crime of the century doesn't

24   make them right.  It doesn't mean they can't make a mistake by

25   presenting a photo of the wrong restaurant to a cooperator and

1  watching him testify to the exact booth in the wrong photo

2  where his welcome lunch took place.

3          You need to weigh the evidence as you would when

4  making an important decision in your own life, a serious

5  decision, a decision that affected someone you cared about

6  deeply.  That's the mindset you should bring to your

7  deliberations.  As Mr. Middendorf testified, his life is on the

8  line

9          MS. KRAMER:  Objection.

10          THE COURT:  My instructions will be clear.

11          MR. BOXER:  When you look at all of the evidence, all

12  of the context, all of what does and does not get emailed and

13  to whom, by whom, you should conclude that Mr. Middendorf is

14  not guilty of the crimes with which he is charged.

15          Thank you.

16          THE COURT:  Thank you.

17          We will now have the summation on behalf of defendant

18  Wada.  Mr. Cook.

19          MR. COOK:  Your Honor, may we be heard briefly?

20          THE COURT:  Yes.  Why don't we take a 5-minute break.

21  Leave your pads on your chairs, please.

22          (Jury not present)

23          THE COURT:  Mr. Cook.

24          MR. COOK:  Your Honor, I wanted to inquire briefly on

25  scheduling for the remainder of the day.  When we get back, it

1    will be close to 3 o'clock.  I anticipate about two hours.  But

2    I don't want to be in a position where the jury is excused for

3    the day and then hear the rebuttal on a different day.  That

4    would be prejudicial to our case.  I would ask that we stay

5    later to complete at least the summations or make some other

6    arrangements.

7            THE COURT:  I'm pretty sure the jury can't stay past

8    5:00.  There is at least one juror who can't stay past 5:00.

9            MR. COOK:  In that case, I would request the

10   opportunity to deliver my summation on the following court day,

11   the same day as the rebuttal is delivered.  Absent that, we are

12   prejudiced by the government having an overnight opportunity to

13   prepare rebuttal, something that we certainly didn't enjoy in

14   response to the government's summation.

15           THE COURT:  That is just a function of how long the

16   closings are.  Ms. Mermelstein?

17           MS. MERMELSTEIN:  I'm not going to add anything to

18   what your Honor just said.  If the jury is able to stay, I'm

19   very happy to have rebuttal over today.  But I think the notion

20   that there is some unfairness in the schedule -- this always

21   happens in long trials with long summations.  I don't think

22   that we should waste two hours today and delay starting the

23   next summation until tomorrow.  We are happy to go late if the

24   jury is available; otherwise, we should keep moving.

25           MR. BOXER:  My only two cents, your Honor, is do we

 1    know if the jury can sit tomorrow?

 2              THE COURT:  We haven't pressed the issue with the one

 3    juror.

 4              MR. BOXER:  That would heighten the prejudice, if we

 5    went from Thursday to Monday.

 6              MR. COOK:  I would ask that the Court inquire of the

 7    jury if they could stay to complete at least summations.  It

 8    may be that they can't, but if you could inquire.

 9              THE COURT:  If I ask that they stay late, what would

10    be your estimate?  6:00, 6:30?

11              MS. MERMELSTEIN:  It is so hard for me to know because

12    it is not written already and I don't know what Mr. Cook is

13    going to say.  I think that's right.  I don't want to promise

14    that and then be cut off.  But I don't expect to go the length

15    of a regular summation.  I'm happy to do it tonight if the jury

16    is available.  Otherwise, I think we should keep moving.

17              The government agrees that we should sit tomorrow, to

18    be clear.  We don't want to rebut on Monday morning.  We can

19    take that up at the end of the day.  I think we should keep

20    moving today.

21              THE COURT:  They might all be related.  I might need

22    to determine what to do about the juror who says she cannot

23    come tomorrow.  If we determine she cannot come tomorrow, I

24    think I need to hear the parties' positions on where we go from

25    there.

1              MR. COOK:  In that circumstance, at least with regard

2    to summations, I feel even more strongly that we make every

3    effort to conclude them all tonight.

4              THE COURT:  Would we come in and then sit tomorrow?

5              MR. COOK:  If the jury is available to sit tomorrow,

6    yes.

7              THE COURT:  What if the one, Juror No. 7, is not?

8              MR. COOK:  Our preference, assuming we don't complete

9    summations, is that we resume on Monday.

10             MR. BOXER:  Agreed, your Honor.

11             MS. MERMELSTEIN:  Your Honor, we certainly want to

12   give the jury who sat through the trial the opportunity to

13   deliberate.  If she is available or she learns more about her

14   family situation and she can sit tomorrow, that would be great.

15   I think we should sit tomorrow whatever that requires of the

16   composition of the jury though.

17             We have three alternates.  We are very close to the

18   finish line at this point.  It does not make sense to delay and

19   push the whole trial -- they are not even deliberating in week

20   four, which is what we told them it would be -- over the

21   availability of one juror when there are three alternates.

22             Given Juror No. 7's family situation, it is

23   unfortunately the case, of course, that something terrible may

24   happen next week also.  She wants to spend time with them.  If

25   something takes a bad turn, we can't know that she won't also

1    be available on Monday.  I think we should sit tomorrow.  The

2    rest of the jury is available, as they said.  I'm happy for

3    your Honor to ask if they can sit tonight.  Then we can plow

4    forward.  If they can't, Mr. Cook should sum up.  I can start

5    if there is time; if not, we will sum up tomorrow morning.

6          THE COURT:  Is there any problem with my going back

7    and asking them if they can sit on Friday and then if necessary

8    follow up with Juror No. 7?

9          MS. MERMELSTEIN:  I thought they had indicated that

10   they could sit on Friday.  We are happy for your Honor to

11   follow up in any event.

12         MR. BOXER:  No objection.

13         MR. COOK:  No objection.

14         THE COURT:  If I speak separately to Juror No. 7,

15   would you like that on the record?  Should I bring the court

16   reporter back with me?

17         MS. KRAMER:  Yes, your Honor.

18         MR. BOXER:  I think it is a good idea, your Honor.

19         THE COURT:  All right.  We'll be in recess for five

20   minutes.

21         (Recess).

22         (In the robing room, Juror No. 7 present).

23         THE COURT:  You are Juror No. 7, Ms. Lewis, right?

24         JUROR:  Yes.

25         THE COURT:  I'm very sorry to hear about an accident

 1   with someone in your family.  I want to follow up on that.  I

 2   was thinking about having the jury come back tomorrow and, if

 3   necessary, next week to finish the trial and deliberate.  I

 4   wanted to ask what your situation is and if it is a hardship

 5   for you to sit tomorrow.

 6         JUROR:  They told me he only had a few days to live.

 7   That's only determined by God.  He is out in Virginia.  I

 8   wanted to drive down there with my family to go see him because

 9   this will be the last time I'm seeing him.  It is my family

10   member in the hospital.

11         THE COURT:  Is it a close family member?

12         JUROR:  Yes.

13         THE COURT:  You wanted to go down tomorrow?

14         JUROR:  Yes.  I wanted to leave tomorrow.  If you guys

15   can excuse me, I can leave early in the afternoon, if I can

16   leave a little early, only because we have to drive down there.

17   My daughter is taking the day off for work so we all can go

18   down there tomorrow.

19         THE COURT:  Would you be able to sit for part of the

20   day tomorrow?

21         JUROR:  Yes.

22         THE COURT:  How much?  When would you have to leave?

23         JUROR:  About 2 o'clock.

24         THE COURT:  You could sit till 2:00?

25         JUROR:  Yes.

1          THE COURT:  Would you be able to come back in Monday

2     if necessary?

3          JUROR:  Yes, because I'm coming back on Sunday.

4          THE COURT:  In terms of today, when do you have to

5     leave?

6          JUROR:  I'm not leaving today.  I'm leaving tomorrow.

7          THE COURT:  In terms of how late you can sit, could

8     you sit past 5 o'clock today?

9          JUROR:  Yes.

10         THE COURT:  Go till 2:00 tomorrow without a problem?

11         JUROR:  How will I let my job know if you guys are

12    still on Monday?

13         THE COURT:  We will tell them the trial is continuing.

14    If there is any question, we can clarify that with them.

15         JUROR:  No problem.

16         THE COURT:  But you really want to be out by 2:00

17    tomorrow?

18         JUROR:  Yes, if I can.

19         THE COURT:  This is a trip you really want to take?

20         JUROR:  Yes.

21         THE COURT:  Can you tell me any more about the family

22    member?

23         JUROR:  He has a weak heart.

24         THE COURT:  Is it someone like a grandfather or

25    something?

1          JUROR:  No, it's not a grandfather.  It's more like an

2    uncle to me.

3          THE COURT:  You are going to go down with your family

4    members?

5          JUROR:  Yes, my husband and one of my kids.

6          THE COURT:  Thank you.

7          (In open court)

8          THE COURT:  I first spoke with Juror No. 7, Ms. Lewis.

9    Did you see the live feed?

10         MS. MERMELSTEIN:  We didn't realize it was on.  We

11   weren't watching, your Honor.

12         THE COURT:  Basically, I confirmed that she had a

13   situation in her family involving an accident.  It's an uncle

14   or an uncle figure, not clear what, but someone she and her

15   family are very close to, in Virginia.  She wanted to drive

16   down with her family to Virginia tomorrow, she said at the end

17   of the day.  She could leave around 2:00.  She could sit

18   tomorrow until 2:00 without having a problem.

19         I also spoke to the other jurors and first confirmed

20   that they could not stay much past 5:00 today.  There is a

21   juror who works at 5:30 and another juror who had another issue

22   with going much past 5:00.  So we could go to 5:05 or 5:10

23   today, that's it.

24         I confirmed also with all the jurors that they could

25   sit tomorrow until 2:00.  So we can sit tomorrow until 2:00.

 1              I also mentioned to them, by the way, I don't know

 2      when it will go to the jury and how long deliberations will

 3      take, you could very well be coming back on Monday at 9:30, I

 4      want to confirm you are all okay with that, and they said yes.

 5      So they understand that.

 6              MS. KRAMER:  May we proceed, your Honor, for the rest

 7      of the afternoon?

 8              THE COURT:  I think we should.  Do you think you have

 9      about two hours?

10              MR. COOK:  I haven't timed it.  That is my best

11      estimate.

12              THE COURT:  Why don't we go ahead with that.  If we

13      have to stop at 5:00 and you have to finish tomorrow, you will

14      have to do that.  Can we do that?

15              MR. COOK:  Yes.

16              (Jury present)

17              THE COURT:  Good afternoon.  We will now have the

18      summation on behalf of defendant Wada.  Mr. Cook.

19              MR. COOK:  The prosecutor was very direct with her

20      views about why Mr. Wada is sitting in the courtroom today and

21      what she thinks is his defense.  That's fair enough.  Let me be

22      equally direct, without hyperbole or exaggeration, just what

23      the evidence shows.

24              What the evidence shows is the government got suckered

25      by Brian Sweet -- and my words are not evidence -- the

1   documents and the testimony that have been admitted during the

2   trial.  That is the evidence, and we are going to look at it

3   together.  After you look at it, not carefully selected

4   excerpts of text messages and not voicemail messages played

5   without any context or any background, but the evidence in

6   context, no shortcuts and no blinders, you will see that the

7   government got played by Brian Sweet and it's still happening.

8           The prosecutor just said a few minutes ago that Brian

9   Sweet admitted all of his crimes.  I don't know which Brian

10  Sweet we are talking about, but it can't be the person who

11  testified in this courtroom because that Brian Sweet was still

12  admitting his crimes in December two months before this trial

13  started; he was admitting to crimes a month later, right before

14  the trial started; he was admitting to crimes on February 17th,

15  during trial, two days before he would take the stand and

16  testify; and he was still admitting to crimes the evening after

17  he started testifying to you.  In fact, on my cross-examination

18  he was still coming clean with more crimes.

19          You decide, ladies and gentlemen, whether it is

20  reasonable or even rational to conclude that Brian Sweet has

21  admitted all of his crimes.

22          How did the government get it wrong?  Two words you

23  just heard me say: shortcuts and blinders.  Shortcuts can be a

24  good thing if you know where you're going or your destination

25  is fixed and you know that's where you want to be.  They are

1    not good things in a criminal investigation.

2           Blinders, most of you probably know what blinders are.

3    They go on a horse to make sure the horse can't see to the

4    side, it can only see straight ahead, with no distractions.

5    Whatever value they have in a criminal case, they have no value

6    in a criminal investigation.  And when you combine them with

7    shortcuts, the results are disastrous.

8           Like I said, my words aren't evidence.  Let's talk

9    about what the evidence actually was in this case.

10          Brian Sweet's world started to fall apart in February

11   of 2017.  That's when it started to unravel.  He's got the

12   final 2017 inspection list.  He can't help himself but to call

13   people and tell them that he knows that their clients are going

14   to be inspected by PCAOB.

15          Then he calls Diana Kunz.  You heard her testimony.

16   "Q. Mr. Sweet, what did you tell Diana Kunz in sum and

17   substance?

18   "A. I remember when I called Diana, she answered the phone and

19   said like, oh, crap, it's never a good thing when you call me.

20   And I said, yeah, Diana, we just got a heads-up, and it looks

21   like Chemical is going to be inspected by the PCAOB this year."

22          Diana Kunz waits a few days, doesn't call anyone right

23   away.  Eventually this message gets passed along up the chain

24   at KPMG and gets to Mark Rubino.  Brian Sweet was interviewed

25   by Mr. Rubino.  You heard him testify.

1          "You were interviewed on February 14, 2017?

2          "Yes.

3          "Who conducted it?

4          "The call was with Mark Rubino from KPMG's internal

5     counsel."

6          During that interview, Mr. Sweet does not identify

7     Jeffrey Wada as the source of the PCAOB inspections.  It's not

8     until the following month, when he is interviewed by KPMG's

9     outside counsel that he first points the finger at Jeff Wada.

10    Here is his testimony.

11    "Q. Did there come a time when you were interviewed by a law

12    firm in connection with KPMG's internal investigation?

13    "A. Yes.

14    "Q. Were you truthful in those interviews or did you tell lies?

15    "A. I told lies.

16    "Q. What kinds of lies did you tell in those interviews?

17    "A. I lied about not knowing, not knowing who the original

18    source was, that Jeff Wada the person at PCAOB.  Actually, I

19    take that back.  I think at that point I -- no, I'm sorry, at

20    that point -- at that point I had told them that it was Jeff

21    Wada.  Excuse me."

22         So, during the interviews a month after he's caught,

23    with outside counsel he acknowledges, he claims, for the first

24    time that Jeff Wada was Cynthia Holder's source.  Then, about

25    five months after this whole scheme unraveled for Mr. Sweet, he

1    has his first interview with the government

2              pursuant to this proffer agreement you saw in

3    evidence, he had four interviews with the government, the first

4    one on July 25, 2017, and then three very lengthy interviews in

5    August.  You heard him testify that those interviews lasted

6    about 30 hours total, and included in those interviews were

7    specific questions about his background.

8              You heard him testify, and you saw in the proffer

9    agreement, that the reason why they are going through this

10   background is to evaluate whether he would be a viable

11   candidate to be a cooperating witness in their case.  So they

12   listened to what he had to say.  They asked him about his

13   background generally, and then they asked him specifically,

14   very specific questions: tell us about, and then there is a

15   whole list of issues that we talked about, Brian Sweet and I,

16   when he was on cross-examination.

17             He answered those questions.  He lied over and ore

18   again.  He sold himself like he does so well.  He talked to the

19   government.  They listened.  They believed him.  They built

20   their case around what he told them.  He knew what they wanted

21   to hear and he knew what he wanted to say, and he had five

22   months to prepare for that.

23             So he pointed the finger at other people as he had

24   done earlier.  Remember what he had said before.

25   "Q. You lied about the things that could get you into trouble,

1   right?

2   "A. Yes.  I generally tried to point blame at other people and

3   underemphasize my role in this, yes.

4   "Q. Point blame at other people?

5   "A. Yes."

6           That's Brian Sweet.  He is willing to lie and point

7   the finger at other people in order to get out of trouble or

8   avoid getting into trouble.  What is he willing to do to get

9   out of this trouble, 25 years in prison trouble?  Knowing what

10  you know about Brian Sweet, having heard all of his testimony,

11  is there anything that that man would not say to keep the

12  government happy, to ensure that that cooperation agreement

13  stays intact, and that hopefully they are happy enough not to

14  prosecute him for all of the crimes that he confessed to over

15  the months?

16          Let's talk about Sweet's relationship with his former

17  PCAOB colleagues.  If you are willing to point at people in

18  order to get out of trouble, who better to point the finger at

19  if you are Brian Sweet than Jeffrey Wada.

20          What did Brian Sweet know about Jeff Wada?  This is a

21  guy that Brian Sweet knew had been passed over for promotion

22  several times.  He knew that he could be crude.  He was not

23  well liked at PCAOB.  He knew, Sweet knew, he was never going

24  to be hired at KPMG no matter what he said to Brian, to

25  Cynthia, to Jeff.  He was never going to pass his résumé along

1   and get him hired.

2          He knew that Jeff Wada close friends with Cynthia

3   Holder.  Now there was a plausible connection between Jeff and

4   Cynthia so that he could point the finger at Jeff and have a

5   plausible reason why there would be a transmittal of

6   communication between Jeff and Brian.

7          Finally, Brian and Jeff were not friends.  I asked him

8   about that.

9          "Did you ever hang out together?

10         "We didn't.

11         "Did you ever talk on the phone?

12         "No.

13         "Text each other?

14         "No.

15         "Lunch or dinner?

16         "Not that I remember."

17         These were all questions based on activities that he

18   engaged in, Brian did, with lots of other people at the PCAOB.

19   What was clear was that he did not enjoy that kind of

20   relationship with Jeffrey Wada at all.

21         However, contrast that with his relationship with some

22   of his other colleagues.  For example:

23         "Who do you remember maintaining contact with?"  This

24   is Mr. Sweet.

25         "There were quite a few people, but it certainly

1   included Bob Ross, Jung Lee, Grady Peeler, David Nitz, Steve

2   Schindler, and others."

3          I asked him, "Did you ever try to get confidential

4   information from your former colleagues at the PCAOB?

5          "Yes."

6          He didn't just try.  He was successful

7   "Q. And Bob Ross was one of your sources of confidential

8   information, confidential PCAOB information, correct?

9   "A. Bob Ross did provide me with confidential information."

10         Bob Ross was one of his prime targets.  As early as

11  May 2015, just a couple of weeks after he joined the PCAOB, he

12  is telling Tom Whittle, "I'm meeting with Bob Ross the week of

13  June 1, so hopefully we'll see some fruit from that.

14         Jung Lee.  "Two months before he was inspecting KPMG,

15  he was sending you his resume," Jung Lee was.

16         "Yes.

17         "He felt that Mr. Lee was not as objective as he

18  normally would have been on that inspection, right?

19         "Yes."

20         Then Mr. Lee gave confidential information to Brian

21  Sweet about a Spanish bank that the PCAOB was inspecting and

22  that KPMG was pitching as a potential client.

23         "You knew that because when you were at the PCAOB you

24  had access to that information, right?

25         "No.  That was something that Yung Lee told me.

1                 "So you learned it from a former colleague at the

2       PCAOB?

3                 "Yes.

4                 "That was confidential information, right?

5                 "Yes."

6                 He manipulated his contacts, many of whom wanted jobs

7       at KPMG, in order to recruit them to KPMG directly.  All of the

8       résumés that he received over the time he worked at KPMG, some

9       he passed on to recruit, to become employees, others he just

10      maintained contact with so that he could pump them for

11      information.  That is who Brian Sweet is.  That is his nature.

12      You saw that over and over again during his testimony, and you

13      have seen that in the evidence.

14                What were the government's blinders that I talked

15      about?  Ask yourself, whose job is it to provide you with the

16      information in a criminal case that would disprove reasonable

17      alternatives to the explanation that Brian Sweet gave?  The

18      government has the burden here, not Mr. Wada.  It's their job

19      to prove Mr. Wada guilty beyond a reasonable doubt, not the

20      other way around.

21                If the government hadn't take a shortcut with Mr.

22      Sweet, if they hadn't just bought his story, what might you

23      have seen during this trial?  Did you hear from Bob Ross,

24      Sweet's close friend and an acknowledged source of confidential

25      information?  You did not.

1              Did you see any of Bob Ross's text messages,

2     phonecalls, phone records, emails, any of them, from a man that

3     Brian Sweet acknowledged receiving confidential information

4     from, a man that was a close friend of Brian Sweet?  Did you

5     hear from the postal inspectors who sat there for the entire

6     trial?  Did they tell you anything that they did to investigate

7     anybody other than Jeffrey Wada?  Did they do any interviews,

8     collect any emails, read any text messages, anything?  No.

9              The government can choose any way it wants to

10    investigate a case.  That's their prerogative.  They are not on

11    trial.  But they do have the burden of proof.  When reasonable

12    alternatives to the theory that Brian Sweet was proposing

13    present themselves, they have an obligation to disprove those

14    beyond a reasonable doubt.

15             What about Yung Lee, another source of confidential

16    information?  Did we see any of his emails?  Did we hear any of

17    his voicemails?  Did we learn of his relationship with Brian

18    Sweet?  Anything?  What about Jeff Watkins?  What about all the

19    others?  Did they even look?

20             Ladies and gentlemen, that is what reasonable doubt

21    looks like, right there.  As I said, they have no obligation to

22    conduct their investigation in any particular way or to use any

23    particular techniques.  Every witness I just talked about is

24    equally available or unavailable to the government and the

25    defense.  The fundamental difference is we do not have the

1    burden of proof.

2             They have advanced this case.  They have charged the

3    man with a crime.  They have based their evidence on the

4    testimony of a man who is known to receive information,

5    confidential information, from multiple sources.  And, as you

6    will see in just a few minutes, there is substantial evidence

7    to believe that one or more of these other individuals were the

8    sources of the information for which my client has been

9    charged.

10            You are going to hear an instruction tomorrow from the

11   Court.  It is going to be an instruction that explains what

12   circumstantial evidence means.  Much of what you have heard in

13   this case is circumstantial evidence.

14            The definition or the example that the Court is going

15   to use is going to be something like you're in a room, and in

16   walk two people.  There are no windows so you can't see

17   outside.  The first one walks in holding an umbrella and it's

18   wet.  The next person comes in and is wearing a raincoat and

19   it's wet.  You conclude from that circumstantial evidence that

20   it is raining outside.

21            That might be a reasonable conclusion you could reach,

22   not being able to see outside yourself, based on what is in

23   front of you.  That's circumstantial evidence.  That's the

24   difference between direct evidence, it's not something you

25   actually saw.

1          However, when those two people are followed by more

2     people who are wearing shorts and a T-shirt, sunglasses, and a

3     baseball cap and are perfectly dry, all of a sudden that first

4     conclusion that seemed reasonable is no longer reasonable.  Now

5     you've got to ask more questions, you've got to do more

6     investigating.  That's the nature of circumstantial evidence.

7     That's what the government didn't do, in a nutshell.

8          Let's talk about what they actually did, what the

9     actual evidence is, not excerpts, not in isolation, but in

10    context.  Let's start with the 2016 inspection list.  I do

11    agree with what the prosecutors said regarding the nature of

12    the case as to Mr. Wada.  At its core it is was Jeffrey Wada

13    the source of the 2016 inspection list, the 2017 preliminary

14    list, and the 2017 final list.  That is the heart of the case.

15    It is not the only issue, but it is the heart of it.  So let's

16    start with 2016.

17         Here are the core allegations I just described.

18         First of all, let's step back and think about what

19    Brian Sweet actually told you.  He was not a participant in any

20    of the conversations that Cindy Holder had with Jeff Wada.

21    Everything he knows or thinks he knows about Jeff Wada goes

22    like this.

23         Brian Sweet testified to what Cynthia Holder told him

24    as to what Jeff Wada told her were the names on the inspection

25    list.  He is at least two steps removed down the chain.  So, if

1    you accept Brian Sweet's testimony, even if you believe he is

2    telling the truth, you must also believe that Cynthia Holder is

3    telling the truth.  Do you have any way at all to evaluate her

4    credibility, her motivations, and whether or not she might have

5    lied to him?  That's assuming you get past all the problems

6    with Brian Sweet.

7            Much of the evidence you have seen relates to text

8    messages.  We are going to dive into those in just a second.  I

9    just want to pause here and talk about that particular type of

10   evidence.

11           Many of you, maybe most of you, use text communication

12   all the time from family, friends, maybe even with work.  For

13   some people, maybe some of you, it is a primary means of

14   communication.  In some cases it becomes even more common than

15   face-to-face communication.  It is now part of our everyday

16   lives.  So you know what that's like.

17            If you are familiar with it, it is very fast, it is

18   rapid back-and-forths.  It is abbreviated.  There are

19   shortcuts, there is jargon, there is slang, there are inside

20   jokes.  There is a natural familiarity that people have with

21   each other, so they use shortcuts in their speaking manner.

22   Sometimes it barely even resembles English.

23           The people texting typically know exactly what is

24   being communicated back and forth.  But if you are standing on

25   the outside, you may think you know, but you don't always get

1    it right because you don't have that relationship with the

2    other party.

3           For a complete stranger to try and decode the meaning

4    of a text message standing on the outside without knowing the

5    two participants, knowing their relationship to each other,

6    their history with each other, how they talk to each other,

7    their families, the whole gamut of their relationship, is

8    fraught with danger.  It is particularly dangerous in a federal

9    criminal trial where you have to draw conclusions beyond a

10   reasonable doubt.

11          Imagine for a moment, whether it is a text message

12   with a friend or it's a face-to-face conversation, imagine

13   someone is eavesdropping on your conversation.  They don't know

14   you.  They don't know how you speak.  They don't know the

15   nature of your relationship.  They don't know your background,

16   the slang, the jargon, the inside jokes.  They don't know when

17   you are kidding, they don't know when you are serious.  They

18   don't know anything about you and they don't know anything

19   about the relationship you have with the other party.  Somebody

20   completely foreign to your relationship.

21          Could you be confident that that eavesdropper would

22   understand what you are talking about?  Would you feel

23   confident that your meaning will be properly understood by the

24   stranger?  And, to really cut to the heart of it, would you be

25   willing to trust that person without hesitation to make an

1  important decision in your life, in your personal affairs,

2  based on what they understood you to be talking about?

3          I used those words specifically because you are going

4  to hear that to prove a fact beyond a reasonable doubt is to

5  have, as the judge will instruct you, an abiding belief in the

6  truth of that fact, a belief that you would be willing to act

7  upon without hesitation in an important matter in the personal

8  affairs of your own life.  Could you rely on an outside

9  observer to interpret your conversation with that level of

10 accuracy?

11         The government is asking you to be that eavesdropper,

12 not in an improper way, but to read the private conversations

13 between two long-time friends, make assumptions about what is

14 being discussed without talking to either party about what is

15 meant in seriousness, what is meant in jest.  They are also

16 asking you to make assumptions about the meaning of those

17 communications in a way that falls into line with the narrative

18 that Brian Sweet gave them

19         Remember, it is up to you to determine what weight to

20 give these conversations and the interpretations that the

21 government is urging you to make.

22         With that aside with regard to text messages, let's

23 dive into the evidence.  March 28, 2016, is the day the

24 government claims Mr. Wada gave Cindy Holder the 2016 PCAOB

25 inspection list.  What is their evidence?  Let's take a look at

Government Exhibit 1362.  You saw this document towards the end of the trial.

It's a summary chart that the government created based on other documents that are in evidence.  This is their time line of what they contend are the key events surrounding the 2016 inspection list as well as what Brian Sweet did with it afterwards.  The excerpts are carefully chosen.  They are assembled to help guide you to the inescapable conclusion that it must be Jeff Wada, and what he must be talking about here and what he must be doing is giving Cindy Holder the inspection list.

What does he say?  "Cynthia, happy Easter."

She tells Mr. Wada she's going to New York, to let him know when he has time to chat tomorrow, three exclamation marks.  You heard repeatedly about the exclamation marks and some suggestion that we can divine some meaning about Cindy Holder's emotion from her exclamation marks.  I spent a lot of time looking at those and I took the time to count, which you can too because all these will be in evidence, if you want to, the number of times she uses exclamation marks in her text messages.  It's about one in four.

(Continued on next page)

1          MR. COOK:  Of the five exclamation marks, and if it is

2     any gauge at all, getting a vanilla, non-fat latte merits four

3     exclamation marks.

4          So, what's the point of that?  You can't draw any

5     meaning at all from her use of punctuation, just like it is

6     really hard to draw any conclusions at all about the slang and

7     the jargon that people you don't know are using when they are

8     talking with friends.  That is the point of this.  That's what

9     makes this so difficult.

10          Why is Cindy Holder anxious to talk to Jeff?  We have

11     no idea.  Did she get a new car?  Is she going on vacation?

12     Maybe she just likes to use exclamation marks.  We know that.

13     The first vague clue as to what's being discussed in here is

14     "Kristie Zhang is still interested."  Interested in what?

15          The problem here is that the government chose not to

16     include some text messages that give you the context to

17     understand what these people are talking about.  We know from

18     the roster of PCAOB inspectors who went to inspector training

19     that Kristie Zhang was, and may still be, a PCAOB inspector.

20     So now we know that she's someone who works at the PCAOB and

21     she is an inspector.  And if we look at the source documents

22     for these text messages, which the government introduced as

23     part of a separate exhibit, Government Exhibit 1443, we see

24     that the government omitted from this summary timeline these

25     text messages:

1            "Kristie Zhang is still interested."

2            That was there.

3            "OK, call me.  Call me first thing if you can.

4            "OK.  Scott H has halted hiring at the moment.  I'll

5    explain tomorrow.

6            "Really?  Sounds like there is a story behind it."

7            Now, with that context that wasn't there before, now

8    we have a little, as best we can tell from text messages from

9    strangers, what it is that they are going to talk about.

10           And what really this is -- this is really a recruiting

11   discussion.

12           "Scott H has halted hiring at the moment.  I'll

13   explain tomorrow."

14           Kristie Zhang being interested.

15           Can we draw a conclusion that what is being discussed

16   here is a recruiting opportunity?

17           And then Mr. Wada says:  "Sounds like there is a story

18   behind it."

19           It is also clear that those extra facts, when they are

20   added into this exhibit, they don't help prove Mr. Sweet's

21   allegation.  It makes it messy.  It creates doubt about what is

22   being discussed.  Without the context with the blinders on.

23           You might assume that this text message is about an

24   inspection list.  You would be reading it all wrong, or at

25   minimum you would be overlooking other reasonable

1    interpretations.  That is reasonable doubt.

2          That's not all.  It's clear that this conversation was

3    about recruiting because it had been a topic of conversation

4    between Ms. Holder and Mr. Wada for several weeks.

5          You saw this exhibit, the government summary chart of

6    the iMessages from February 5, 2016, the previous month.  The

7    context that is needed to even try and understand what "just

8    talked to Wada about many things" has been omitted from the

9    summary slide, the implication being that something improper or

10   nefarious is going on.  You'd have to piece it together with

11   another defense exhibit that we introduced in order to see what

12   actually they're talking about.  But if you consider this text

13   exchange together with the simultaneous conversation Ms. Holder

14   was having with Mr. Wada, you realize that the government left

15   part of the conversation out.

16         Now, read chronologically and in context:  "Hey, how

17   are you?  You never called me last weekend about your

18   accounting question.  By the way, I had someone in mind for

19   that spot you brought to me, but she was already contacted by

20   one of your colleagues."

21         And then Ms. Holder texts Brian Sweet:  "Call when you

22   can.  I just talked to Wada about many things."

23         Now the suggestion, or the insinuation that "I just

24   talked to Wada about many things" means an inspection list is

25   far less clear because Mr. Wada and Ms. Holder were just

1    texting within 40 minutes of her conversation with Mr. Sweet

2    about an accounting question that she had -- whatever that

3    might be, we have no idea -- and about another recruiting

4    option.

5           This is why it's so important to have the context of

6    the conversation.  But if you put blinders on, and you adopt

7    one person's version of events, like Mr. Sweet's, and you are

8    blind to other possibilities, it can lead you down the wrong

9    path.

10          Now, they go on to try and coordinate a call,

11   presumably to discuss this accounting question, discuss what

12   Mr. Wada had in find for a spot.  "Sounds like somebody already

13   snagged this person at KPMG."  Then they talk on the phone.

14   And Cindy calls Brian Sweet and she says she talked to Wada

15   about many things.  Again, we have absolutely no idea what they

16   talked about.  We can only guess and speculate.  But the

17   context helps -- at least provides some insight into what that

18   conversation was about.

19          What is there not even a hint of in any of this?  That

20   they were talking about confidential inspection lists.  Not

21   even a hint, and in fact the actual evidence suggests something

22   completely different.

23          Remember Brian Sweet's testimony on cross-examination:

24          "Once you started working at KPMG in May 2015, you

25   immediately focused on helping KPMG find additional people to

1  recruit, right?

2  "A  I was asked, even before joining, to identify who else

3  might be good candidates for KPMG to hire.

4  "Q  This was a significant concerted effort by KPMG to bring

5  over PCAOB inspectors, right?

6  "A  Yes."

7       So not only do we have this conversation between Cindy

8  and Jeff about what appears to be recruiting, we learn, with

9  this additional context, that Brian Sweet was actively engaged

10 in recruiting efforts at KPMG in order to bring PCAOB people

11 over, which just lends further support to a different

12 interpretation of that text message, that it had nothing to do

13 with inspection lists.

14       And Mr. Sweet and Mr. Lynch started making lists.

15 They made lists of PCAOB recruiting targets.  You may recall we

16 talked about this quite a bit with Brian Sweet.  He explained

17 that he and Joe Lynch -- Joe being a former PCAOB employee --

18 also got together and they created these three lists.  People

19 who were interested but not that good or good but not that

20 interested.  I don't remember all the details, but there are

21 three categories of people.  And everybody on this list are

22 former -- are PCAOB potential targets for recruitment.  And

23 this was a living document.

24       Cindy Holder, once she joined KPMG enthusiastically

25 participated and she did it with a huge financial incentive.

1   Recall what Mr. Whittle said:

2   "Q  How did that work?

3   "A  It was called a referral bonus."

4          And he goes on:  "I don't recall exactly, but if you

5   referred a friend and they came to join the firm, you got a

6   bonus for doing it.

7   "Q  And it could be thousands of dollars, right?

8   "A  Yes."

9          Now, it didn't apply to partners but Cindy Holder was

10  not a partner.  She was eligible to make thousands of dollars

11  for every recruit.

12         Again, Mr. Whittle:  "Do you remember what Cindy

13  Holder's title was when she came to KPMG?

14         "She was an executive director.

15         "She would have been eligible for a referral bonus if

16  she recruited people, right?

17         "She was not a partner or a managing director so,

18  presumably, yes."

19         Again, with this additional context, it becomes even

20  more not only likely but understandable why Cindy Holder will

21  be talking to Jeff Wada, who was working at the PCAOB, about

22  recruitment targets.  They were friends.

23         And it also has the added bit of emphasis that that

24  interpretation is consistent with the actual words of the text

25  message itself.

1          This was a focused continuing effort to bring over as

2   many people as possible.

3          So what are the lists?  These are them?  You just saw

4   them.  They start putting them together right away.  They

5   understood it was part of Brian Sweet's job to do it, and it

6   was something that Cindy Holder could make money doing.

7          So now let's go back to be January 28, 2016.  This is

8   the day in which the inspection list is supposedly given by

9   Jeff Wada to Cindy Holder, at least according to Brian Sweet --

10  a list that is never mentioned or talked about in any of Cindy

11  or Jeff's text messages.

12         Here's the summary chart again plus the omitted

13  messages so we have some context.

14         And you see the last text message.  It says:  "Sounds

15  like there is a story behind it."

16         So, now I will go to the next page of the government's

17  summary chart, and you see that there is a phone call -- this

18  51-minute phone call that you heard about during the

19  government's closing argument.

20         Now, the government claims that Jeff Wada gave Cindy

21  Holder the 2016 inspection list.  Do we have a recording of

22  that call?  We don't.  Did Cindy Holder tell you that Jeff Wada

23  gave him the list?  No.  How do we know that that actually

24  happened?  Only the testimony of Brian Sweet.  That's it.

25  There is nothing else.  And with the context provided to the

1    text messages, there is not even an insinuation that they were

2    talking about an inspection list.

3         Jeff Wada spoke to Cindy Holder all the time.  It is

4    not unusual that they would talk.  The only indication from the

5    evidence is that they're talking about recruiting.  But the

6    government built its entire case around Brian Sweet's

7    statements to them that Cindy Holder told him that Jeff Wada

8    told her that he had the inspection list.

9         Go back to the summary chart.

10        Mr. Sweet testified that Cindy Holder was anxious to

11   get ahold of him after she spoke Mr. Wada.  Nearly a 24-minute

12   phone call at 1:56 p.m. that afternoon, what did Mr. Sweet say

13   about that call?

14   "Q  What did Cindy Holder tell you during that phone call?

15   "A  That she had received a call from Jeff Wada and that Jeff

16   had provided her with the names of who the PCAOB was going to

17   be inspecting for the banks in 2016."

18        That's it.  That's the government's case against

19   Mr. Wada for the 2016 inspection list.  Out of context,

20   inferences from text messages, and the testimony of Brian

21   Sweet.

22        Now, following this there was a bunch of -- a flurry

23   of activity between Mr. Sweet, Mr. Whittle and Mr. Britt, all

24   of it silent as to Mr. Wada and the inspection list.  The whole

25   weight of the government's case in 2016 -- and we'll get to

1    2017 in a minute, rests on Mr. Sweet's narration of these

2    records.  All of it.

3           I'm going to show you right now with certainty that

4    Mr. Sweet was lying about this.  In order to do that, you need

5    to have some more context.

6           Remember the 2016 inspection list that Mr. Wada is

7    accused of giving to Cindy Holder?  That wasn't the entire

8    inspection list, it was just the banking targets.

9           Here's what Mr. Whittle said about that:

10          "In general, what types of engagements were on the

11    list that Mr. Sweet shared?

12    "A  The majority were banks, smaller banks, and then there were

13    a handful that were non-banking clients."

14          Ladies and gentlemen, regarding the source of the

15    list, here's what Mr. Whittle testified Brian Sweet told him:

16    "Q  Do you have, leaving aside the exact words, a general

17    recollection of what was explained about the nature of the list

18    having mostly banks but not totally banks during that phone

19    call?

20    "A  Generally, that it was someone who had worked in the

21    banking group at the PCAOB."

22          It is undisputed in this case that Mr. Wada never

23    worked in the banking group of the PCAOB.  Mr. Whittle is the

24    government's cooperating witness.  He testified that Brian

25    Sweet said it was someone in the banking group that was the

1    source.  That could not have been Jeff Wada because he was

2    never in the banking group.

3           Stephanie Rodriguez in her testimony confirmed this:

4           "Between 2015 and 2017, was Jeffrey Wada on the KPMG

5    U.S. inspection team at any point in time?

6    "A  Not to my knowledge.

7    "Q  What, if any, connection did he have to the KPMG team?

8    "A  My understanding, he worked on the inspections of the Japan

9    affiliate so he would have been on the international side."

10          Mr. Whittle has no reason to lie in a way that tends

11   to support Mr. Wada's innocence, but his testimony does exactly

12   that.  And it also establishes that Brian Sweet is lying.

13          That's not all.

14          Remember Mr. Sweet was willing to lie about other

15   people's involvement and point the finger elsewhere.  He had

16   more of a motive to do so here than ever before.  In addition

17   to giving the government what he wanted, he could point the

18   finger to someone like Jeff Wada, who was nothing to Brian

19   Sweet.  That would be easy for him.  He could point the finger

20   away from his friends.

21          So if not Mr. Wada, who was the source?  I don't know

22   that.  We don't know that.  But there is evidence in the record

23   that suggests that it's someone other than Mr. Wada.

24          Two names are at the top of the list -- Bob Ross and

25   Jeff Watkins.  I'm not just pulling those names out of thin

1     air.  There is a reason.  Bob Ross was a PCAOB associate

2     directors.  That is a level above Mr. Wada.

3             What do we know about Bob Ross' relationship with

4     Brian Sweet?  First, Brian Sweet, Cindy Holder and Bob Ross all

5     worked together in London.  They were friends.

6             How did Brian Sweet think of Bob Ross?  They were

7     close friends, as he testified.

8             Did Brian Sweet extract confidential information from

9     his close friend Bob Ross?

10            "Bob Ross did provide me with confidential

11    information," he said.

12            Mr. Whittle testified that Sweet told him that the

13    source was someone in the banking group.  Where was Bob Ross

14    assigned in 2015, in 2016?  Stephanie Rodriguez answered that

15    question:

16            "What, if any, role did Bob Ross have?

17    "A  At that time, Bob sat over most of our banking inspections,

18    and he was our banking ATL, or associate team leader."

19            And what about contact between Bob Ross and Brian

20    Sweet leading up to the day that the government contends that

21    inspection list came into Brian Sweet's hands?  Take a look at

22    Bob Ross' -- sorry, Brian Sweet's calendar entries.

23            He was meeting with Bob, who he testified was Bob

24    Ross, on January 6th.  He had lunch with Bob at Bills again in

25    February 2016.  At a minimum, we know that this was a live

1    relationship.  It wasn't an old friend; they had continuing

2    ongoing contact.

3            Bob Ross was working at the PCAOB, and he was working

4    in the Banking Inspection Group.  They were friends, and he had

5    given him confidential information before.

6            Ladies and gentlemen, that is reasonable doubt.

7            Why, knowing all this -- this is all in evidence --

8    knowing all this, did we not see any evidence of any

9    investigation into Bob Ross?  There was a great effort to

10   collect, collate and arrange all of Jeff Wada's text messages

11   in a way that fit the story that Brian Sweet was selling.  Why

12   not look at Bob Ross?  All of this information points to him.

13   They were friends.  He was a source.  And he worked in the

14   group that Whittle said Sweet got the information from.

15           That is what reasonable doubt looks like.

16           Now, what about Jeffrey Watkins?  Where does he fit

17   into this?  Let's look at an email from Brian Sweet to Tom

18   Whittle, May 21, 2015:

19           "Also, FYI, I had dinner with Jeff Watkins and several

20   of the PCAOB inspectors from the BONY" -- that's Bank of New

21   York -- "team last night and it sounds like things are going

22   well."

23           So we know that, first of all, what does Brian Sweet

24   say about Mr. Watkins?  The fact he was very motivated to find

25   a job at KPMG, having been let go.  What does that mean?  This

1   was in February 2016.  Do you remember the government claimed

2   that Sweet obtained the list in March 2016?  And we know from

3   Sweet's text messages with Cindy Holder that Mr. Sweet's

4   understanding of Jeff Watkins' situation is that he had been

5   fired from the PCAOB the previous month.  But he wasn't let go

6   immediately.  According to Mr. Sweet, his understanding was

7   that he was able to finish out the month.  So that brings Jeff

8   Watkins to the end of February as a PCAOB employee, Banking

9   Group employee, getting ready to get fired, and a close friend

10  of Brian Sweet.

11       Actually fired immediately prior to the information

12  disclosure.  He needed a job and was actually asking Brian

13  Sweet for help in getting him a job -- five days before Brian

14  Sweet claims he received the inspection list, from somebody in

15  the Banking Group.

16       Did Mr. Sweet urge Jeff Watkins to steal information

17  the same way he did, in the same way Brian Sweet urged Cynthia

18  Holder to do?  We don't know.  Have no idea.  Who has the

19  greater incentive to steel confidential information from the

20  PCAOB at this point in time?  Jeff Watkins, who was about to be

21  fired, who was friends with Brian Sweet and is asking Brian

22  Sweet for help getting a job?

23       Knowing that the circumstantial evidence of Jeff

24  Wada's implication in this list is outweighed by the

25  circumstantial evidence that Bob Ross was the source or Jeff

1    Watkins was the source, has the government met its burden of

2    proving Jeff Wada guilty beyond a reasonable doubt of being the

3    source of the 2016 inspection list, knowing what we know about

4    these other potential sources for that list?  Do we have any

5    information at all from those other two sources that would

6    prove or disprove their involvement in this scheme?

7         No, the government is not on trial, but they do have

8    the burden of proof.  Then choose what investigative techniques

9    they want, and any party could have called the postal

10   inspectors to ask them what they did, if anything.  But it is

11   not Jeff Wada's burden to prove himself innocent.

12        And when presented with this evidence, this additional

13   context, particularly strong evidence pointing in two different

14   directions, they have an obligation to prove these reasonable

15   options, these reasonable alternatives, or disprove them,

16   beyond a reasonable doubt.  They did not do that.  This is what

17   I meant when I said shortcuts and blinders.  This is what I was

18   talking about.

19        They took Brian Sweet's story as gospel.  They didn't

20   challenge it.  They found ways to make the evidence fit,

21   carefully selecting what they showed you.  Even during

22   summation, the text messages that they claim support their

23   conclusion that Jeff Wada was the source were flashed up in

24   front of you for a few seconds for you to look at without any

25   context, without the background documents to really evaluate.

1    This is tedious stuff.  This is -- it takes tough to unpack

2    Brian Sweet's lies, it takes effort.

3            But given what's at stake, isn't that what's owed to

4    somebody charged with a criminal offense?

5            That didn't happen here.

6            And because the government has failed to meet its

7    burden of proof, because it's failed to disprove these other

8    potential sources of that 2016 list, you must find Mr. Wada not

9    guilty on Count Four, which is the charge focused specifically

10   on the 2016 list.

11           Let's talk about the 2017 preliminary list, and I'll

12   just say at the outset, it suffers from the same defects.

13           In fact, it fails even more spectacularly than the

14   2016 list.

15           As with the 2016 case, it is constructed around Brian

16   Sweet's testimony.  All of which on its face -- well, his

17   testimony about what the text messages and phone records mean,

18   but those records on their face are silent.  They make no

19   mention of an inspection list.

20           Brian Sweet again, as he did in 2016 and he will,

21   you'll see later in the 2017 list, he gets tripped up on his

22   own lies.  Let me be direct about it.  Brian Sweet lied to you

23   on the witness stand about Jeff Wada's involvement in the 2017

24   preliminary list.  That's not speculation or exaggeration.

25   It's a fact.  And I can show you why that's the case.  I'll

1   show you how he did it.  You'll see for yourself how the

2   government tried to blind you from that fact.

3          But like everything else, you have to have the right

4   context to see what's going on.

5          So let's start with the date the government claims

6   Mr. Wada gave Cindy Holder that list, January 9, 2017.

7          Take a look at the summary chart that the government

8   used to support its claim.

9          The government begins its timeline at 2:24 p.m., and

10  that's important.  It's also odd.

11         Their star cooperator, Brian Sweet, testified that the

12  most important event on that day, Mr. Wada's call with

13  Ms. Holder in which he gave her the list, he testified it took

14  place in the morning, not at 2:24 in the afternoon.

15         Let's continue with the government's timeline.

16         The government begins with that 2:24 text message from

17  Cindy Holder to Jeff Wada asking:  Any idea who the ADs will be

18  in the Banking Group yet, or for that matter -- for anyone, for

19  that matter?  LOL.

20         Ms. Holder is referring to the Banking Inspection

21  Group that the PCAOB has not yet announced officially but that

22  you saw during Mr. Whittle's testimony everybody knew about and

23  that multiple people have been talking about it throughout

24  KPMG.  Why did everyone care so much about this group?  Because

25  it meant that the Bob Ross, who had been rotated off of

1    inspecting KPMG, he was assigned to the Banking Inspection

2    Group.  That meant that he could come back and begin inspecting

3    KPMG again.  And that meant that Brian Sweet would have a

4    better source of information from his friend because now he

5    would have had access to KPMG information.

6         About an hour after this time, 3:23 p.m., Jeff Wada

7    leaves a voicemail message in which he tells Cynthia Holder

8    that he has the list, the grocery list, and tells her to give

9    him a call.

10        You've heard the phrase "grocery list" over and over

11   again.  It is a secret code.  You've heard that since the

12   government's opening statement.  You heard it in their

13   summation.  They've been telling you that repeatedly.  It's all

14   based on Brian Sweet.  Brian Sweet is the only person who

15   testified that Cindy Holder told him that "grocery list" really

16   means inspection list.

17        Now, there are three interrelated pieces of evidence

18   on this screen in front of you.

19        Slide 46.

20        First, these two phone calls.  "any idea who the ADs

21   will be in the Banking Group?"

22        OK.  So asking about that Banking Inspection Group.

23        And, second, the 3:23 phone call where he says

24   "grocery list."

25        And then, third, the actual handwritten notes of Cindy

1    Holder, which include the list of the members of the Banking

2    Inspection Group.

3            Let's talk about how these are all connected.

4            These are Cindy Holder's notes.  Three things right

5    off the bat about the notes.  First is that it's a photograph

6    and that the metadata on the photograph shows that the

7    photograph was taken at 7:45 p.m.  We heard testimony that the

8    metadata recovered with this photograph confirms this.  It is

9    not in dispute, both sides agree, that's when the photo was

10   taken.

11           Second, both sides, the government and Mr. Wada,

12   Mr. Wada agree that the document reflects the notes that Cindy

13   Holder took during a conversation she had with Jeff Wada.  We

14   don't dispute that.

15           It's clear as day that that's what they're about

16   because they make specific references to Jeff Wada in the notes

17   themselves.  In fact, if you look closer at the list of

18   inspectors, these little comments that Cindy wrote about, you

19   know, friend of Jeff, or Jeff's sense of humor, it's clear that

20   the information came from Mr. Wada.

21           And by the way, there is no evidence at all that this

22   is confidential.  No one testified to that.  Because that's not

23   an issue.  And he hasn't been charged with giving over the list

24   of inspectors in the Banking Information Group.

25           So, third, this is not the inspection list.  We know

1    that for certain.  Mr. Sweet testified to that:  "This is not

2    -- Government Exhibit 1444, this is not the inspection list,

3    correct?

4    "A  No."

5         So we know three things:  We know that there was a

6    call at 2:23 -- excuse me, 2:24 between Cindy Holder and Jeff

7    Wada.  We know that Jeff Wada gave her the names on the banking

8    Inspection Group, and we know that she wrote those names down

9    in her list.

10        So we're left with this mystery:  If Cindy asked for a

11   list of the people in the Banking Inspection Group at 2:45 and

12   Jeff Wada left her a voicemail saying he has the grocery list

13   about an hour later, at 3:23, if later that same day, at 7:02,

14   they have their first 29-minute phone call, if all those things

15   are true, then what the government's evidence shows is that the

16   "grocery list" could not refer to inspection list.

17        How do we know that?  Brian Sweet said that he had --

18   she had two pages of notes.  She had the list, the inspection

19   list, and she had the notes of the Banking Inspection Group.

20   The other list, he claims, well, he can't remember if he took a

21   picture of it, and we haven't seen it.  So, we don't have any

22   idea if it actually exists other than what Brian Sweet said.

23   The government certainly didn't produce a picture of it or a

24   copy of those notes.

25             And think of the remarkable coincidence that that

1   implies.  Cindy Holder, according to Brian Sweet, has a

2   conversation with Jeff Wada in which he gives her two piece of

3   information.  She writes down the names of the Banking

4   Inspection Group, and supposedly she writes down the names of

5   the inspection targets, but that's the one list that we don't

6   have, the one list we don't have a picture of.  In fact,

7   Mr. Sweet testified he couldn't even remember if he took a

8   picture of it.

9          His explanation for why he didn't take a picture was

10   that he wrote it down himself on the outside of a manila folder

11   so there was no need to take a photo.  According to Mr. Sweet,

12   that manila folder is this exhibit here.  The only notes we

13   have of the 2017 preliminary inspection list are written in Mr.

14   Sweet's own handwriting.

15          And that brings us back to Government Exhibit 1362,

16   that summary chart.

17          I told you that you would see that Brian Sweet was

18   lying to you about this, about Mr. Wada being the source and

19   about the "grocery list" referring to an inspection list.  To

20   see the lie, we need to fill in the gaps on the government's

21   chart.

22          First, the government's first mention of what Brian

23   Sweet was doing that day comes at 7:45 that night when he took

24   a picture of the notes.

25          Oh, we know Brian Sweet was working that day.  In

1    fact, Brian Sweet had lunch with -- you could probably guess --

2    that day Bob Ross.  The same day that Brian Sweet claims that

3    Jeff Wada gave Cindy the inspection list, he's meeting with Bob

4    Ross, his good friend, and the person that he acknowledged

5    receiving confidential information from him in the past.

6           Right here in the emails:  "That would be great, Bob.

7    Let's definitely do it again next month."  Date, January 9,

8    2017.

9           "Brian, it was really good seeing you today."

10          No question that they actually met that day and that

11   that lunch took place at lunchtime.  In fact, there was quite a

12   bit of testimony about when that lunch took place.

13          This was not a spur-of-the-moment get together.  They

14   had arranged it five days earlier.  And while Brian Sweet and

15   Bob Ross were having lunch, Cindy Holder let Brian Sweet know

16   that she wanted to talk with him when he got back from lunch.

17          You see that in her email.  This email is kind of hard

18   to tell because she doesn't put any text in the body of the

19   email, she just writes on the subject line.  But you can see

20   the subject line, "Let me know when you get back from lunch,"

21   two exclamation marks.  Mr. Sweet explained that he actually

22   got back from lunch not at 5:45 in the evening but, because of

23   the UTC Time zone issue, it was actually 12:45, and that he

24   told Cynthia to come by his office.

25          Can we confirm that?  Yes.  Sweet's testimony:

1          "What email did you send Cindy Holder when you were

2    back in your office on January 9th?

3    "A  I responded by saying:  Just got back.  Swing by whenever

4    you are free to catch up (and would you mind if I borrowed your

5    Tide-stick).

6          "What happened after you sent the email?

7          "I remember her coming to my office."

8          This is cryptically important.  12:45, Cindy Holder,

9    Brian Sweet meet in his office after he gets back from lunch

10   with Bob Ross.

11         And we know, to remove any doubt, that this meeting

12   actually took place because Mr. Sweet was bringing Cynthia

13   Holder back a venti, vanilla, non-fat latte.  Confirmed it by

14   emails.  Confirmed it via text message.  Confirmed it via

15   appointment.  There is no question that this meeting between

16   Brian Sweet and Cindy Holder actually took place.

17         Now, what does Mr. Sweet claim happened at this

18   meeting with Cindy Holder?

19         "Lunchtime is your recollection?

20         "Yes, just after I got back from lunch."

21         Holder said she had spoken with Mr. Wada, and that

22   Jeffrey Wada had given her information about PCAOB inspectors,

23   as well as a preliminary listing of who the PCAOB was planning

24   to inspect in 2017.

25         Why is that important?  Because this grocery list

1   voicemail didn't come until hours later.  The "grocery list"

2   term could not refer to an inspection list because, according

3   to Mr. Sweet's sworn testimony, he already received the

4   inspection list from Cindy Holder and she had already received

5   it from Mr. Wada in the morning.

6            It was all a lie.  Demonstrably false.

7            You didn't see this laid out for you in the trial or

8   in summation because of these blinders, the single-minded focus

9   to only show you text messages and emails and phone records

10  that fit Brian Sweet's story that has been adopted by the

11  government, and to ignore everything else.

12           Ladies and gentlemen, this is incontrovertible

13  evidence that Brian Sweet lied to you right there when he said

14  Cynthia Holder told him "grocery list" meant inspection list.

15  It could not have meant that.

16           The first phone call on January 9th in which Cindy

17  Holder speaks with Jeffrey Wada is not until 7:02 p.m. that

18  night.

19           So Brian Sweet's testimony that he got the list from

20  Cindy Holder in his office right after lunch -- false.  The

21  phone records that the government put in front of you, but

22  didn't highlight this, show that they didn't even speak until

23  7 o'clock that night.  Which makes sense because the list, the

24  metadata on this Banking Inspection Group list, is not until

25  7:45.

1          There are no communications -- none -- of any kind on

2     January 9, 2017 between Cindy Holder and Jeffrey Wada until

3     Cindy sends Jeff that text message at 2:24 p.m., after Sweet

4     says he already received the list.

5          Who did Brian Sweet get that list from?  Is it really

6     that big of a leap to conclude that he got the list from Bob

7     Ross?  The guy he had lunch with that day.  He just twisted the

8     facts a little bit to implicate somebody else.  But he got

9     caught up in those lies.  Not even Brian Sweet could keep track

10    of all of his lies and he got caught.

11         That's why the government's summary chart, GX1362,

12    skips over this lunch meeting altogether, even though it was

13    the most important part of Mr. Sweet's testimony about what

14    happened this day.  They realized, I don't know when it

15    happened.  He testified that it happened in the morning.  I

16    don't know, when they were putting the chart together and all

17    of a sudden the dates and the times don't match up and so they

18    just left it off altogether and it starts in the afternoon.

19    They completely omit the fact that Brian Sweet testified in a

20    way absolutely 180 degrees contrary to their theory of the

21    case.

22         Now, even if you set Brian Sweet's perjury aside, his

23    story falls apart in other ways as well.  For example, as you

24    just saw, the only call from Jeff Wada and Cindy Holder was at

25    7:02.  It lasted 28 minutes.  We confirmed that with the actual

1    phone records, not just the government summary chart.

2            You can see it here, adjusted for UTC, 7:02 p.m., 28

3    minutes.

4            What do we know about this 29-minute phone

5    conversation?  Let's look more closely at Cindy Holder's notes,

6    the ones written in red text.

7            There are lots of notes on here that don't relate

8    directly to the members of the Banking Inspection Group.  So,

9    for example, this particular comment, I believe Brian Sweet

10   testified this related to Jeff Wada speaking to this Bob, who

11   may be a former employee of KPMG and maybe getting a referral

12   as part of his effort to get a job possibly at KPMG, so they

13   talked about that.

14           They talked about his not getting promoted.  We see

15   those comments there, which the government highlighted.

16           We also see that -- and we numbered them.  There are

17   35 names on this list.  And they are not just names.  They are

18   full names, but there are also comments about many of them.

19   Like, for example, one of the woman is Wada's friend and

20   another guy is friendly, Wada's sense of humor.  So they

21   actually talked about these people in addition to all the other

22   things that they discussed as reflected in this note.

23           How long was this call?  It was 29 minutes.

24           If you believe Brian Sweet's testimony -- well, let's

25   set his testimony aside.  If you believe the government's new

1       theory, that it was during this call at 7:02 in the evening

2       that Mr. Wada conveyed the inspection list to Cindy Holder,

3       that's a tall order given the volume of information just

4       reflected in these notes alone; that in addition to that, they

5       were also discussing the inspection targets.

6              Now, we don't know for sure.  We weren't on the call.

7       It is not Mr. Wada's job to prove himself innocent.  It is the

8       government's job to prove beyond a reasonable doubt that he was

9       the source.  We've shown that he wasn't.  And we've shown that

10      their cooperator is a liar.

11             What else was going on during this time period that

12      could account for why Jeff Wada would be talking with Cindy

13      Holder?  A woman who, you remember, he considered his friend.

14             Take a look at slide 66.  There are some redacted

15      portions of this document, but you see a couple of dates in the

16      left-hand column, January 9 and January 13.  We don't know what

17      they were talking about, but we do have a stipulation that the

18      parties entered into about certain medical appointments and a

19      medical condition that Mr. Wada had at this time.  We know on

20      January 9, 2017, Mr. Wada had a medical appointment with a

21      cardiologist.  We know on January 13th, he attended a medical

22      appointment with a cardiac surgeon in Fountain Valley, and that

23      eventually these appointments would lead to cardiac surgery in

24      February.

25             So, again, I wasn't on the call.  We don't have a

recording.  None of us were.  None of the participants, you've

heard from none of them.  But to suggest that part of that

conversation also included a conversation about his medical

condition, again, this is not a long phone call, but the idea

that in addition to all of this conversation they also had a

conversation about the inspection list doesn't make any sense.

It is demonstrably false for the reasons we talked about.  But

even if you set that aside, it also doesn't hold up, it doesn't

make sense.

And I would submit to you, ladies and gentlemen, that

medical appointments of this nature, that ultimately led to

heart surgery, is the kind of condition or event or

circumstance that might cause someone to write in a text

message to a friend, "I need to talk."  January 9th is the day

those notes were made.  January 9th is the day Mr. Wada had an

appointment with his cardiologist.  Is it really that big of a

stretch to think that he needed to talk to her because of this

thing that he's experiencing, talk to his friend?  It is not.

When you compound that with all of the other evidence that it

wasn't him and that it was someone else in particular, that is

what reasonable doubt looks like.  That is it.  And that is the

January 2017 preliminary inspection list.

Now, they also showed you a couple of other things.

They showed you Jeff's email to Cindy Holder after

this in which he expresses his frustration, in Jeff Wada's own

1   colorful way, with being passed over for promotion and Jeff

2   wanting a job.  This email comes late in the evening

3   January 9th, if we account for the time change.

4        Is this evidence of a crime?  Is this evidence of a

5   conspiracy or a motive?  The fact that someone who has been

6   passed over repeatedly at PCAOB is obviously unhappy, is going

7   through a significant life event with his health conditions,

8   that he might look at the possibility of getting another job

9   somewhere else where he could make a lot more money?  Is that

10  evidence of a crime?  Or a motive?  When we saw résumé after

11  résumé after résumé that circulated through KPMG, does that

12  provide a motive for all of those people to steal information?

13  Not on its own, no.  And knowing what we now know about the

14  events of January 9th, we know this was not -- this document,

15  his résumé and his rants about his problems at work, was not

16  evidence that he was stealing anything.

17       Is Mr. Wada angry, bitter about his employer?  Maybe.

18  It sounds like it.  He expresses it in his own way.  But what

19  happened after he sent his résumé to Ms. Holder is significant

20  because it leads us to what happens in February.  Cindy Holder

21  forwards Mr. Wada's résumé on.  She forwards it to her KPMG

22  email account, and then she forwards it to Brian Sweet.  There

23  is no content in her email at all.  She just forwards it blank

24  to Mr. Sweet, without any comment.

25       And Brian wrote back to Cindy 20 days later.  First

1  sentence, Brian says, on January 30:  "Cindy, Jeff's résumé

2  looks extremely strong to me.  What a solid background.  I

3  can't wait to get him on board!!!"

4          Three exclamation marks.

5          Was any of that true?

6          Here is what Mr. Sweet said:

7          "Why did you write that?"

8          Speaking of that email.

9          "Because I knew that Cindy would take my feedback on

10  his résumé and whatever I wrote and forward that directly to

11  Jeff Wada.

12          "Did you actually feel positive about the prospect of

13  Jeff Wada leaving the PCAOB and joining KPMG?

14          "No, I did not."

15          That's Brian Sweet.  The guy is running so many cons

16  and so many scams, it's hard to keep track of all of his lies.

17  But even then they begin to unravel, as we've just seen with

18  regard to what happened on January 9th.

19          But if you are willing to take shortcuts and put

20  blinders on to all of the evidence in context, you can see how

21  you can cobble it together to create an impression that he's

22  doing something wrong, or, more specifically, to create the

23  impression that he's stealing the inspection list.  When if you

24  look at everything in context and you are willing to set aside

25  your wholehearted devotion to Brian Sweet, you begin to see

1    that there are a whole host of other even more likely

2    explanations for what's going on.

3            So, here's the other important point about that email

4    that we just looked at, that rant by Jeff Wada where he is

5    complaining about his job.  Brian Sweet saw that.  Right?

6    Because Cindy Holder forwarded it to him.  He knew that

7    Mr. Wada trusted Cindy Holder.  So when Mr. Sweet's world was

8    collapsing around him just a month later, how far do you think

9    it was for him to think about Jeff Wada, his relationship with

10   Cindy, his bitterness at his employer, and how with just a few

11   more lies Jeff would make an easy mark, an easy person to point

12   the finger at?  I'm not going to try to get into the head of a

13   guy like Brian Sweet, but it doesn't take a great stretch of

14   the imagination that he would try and point the finger away

15   from his friend Bob Ross and point the finger at somebody else,

16   and that's exactly what he did.

17           But there is one last piece of evidence or information

18   that the government showed you about this January 9th date.

19   This is an access log for IIS, Inspections Information System.

20   This is computer system or the database where PCAOB inspectors

21   keep all of their inspections-related information.

22           And this, as the parties stipulated -- you can see it

23   right there -- paragraph 3 of the stipulation:  We agree that

24   this is a true and accurate record Mr. Wada's logins to IIS

25   between January 2016 and March 2017.  And we have highlighted

1   here just the January 9th entry because that's what the

2   government is focused on.

3          But continuing on with the stipulation:  The login

4   times represent Mr. Wada's initial logins to IIS on the dates

5   described and do not indicate any particular access to a

6   specific workspace within IIS, such as the KPMG U.S. workspace.

7   IIS does not record a user's access to a specific workspace

8   within IIS or logout times.

9          And then it is the times there are in Central Time.

10         What is the significance of this document?  The

11  government has proven through this document that Mr. Wada

12  logged into his computer system on January 9th.  That's it.

13  Tells us nothing.  Tells us less than nothing.  Since the

14  government, who knew Mr. Sweet was having lunch with Bob Ross,

15  failed to shown us the IIS logins for Mr. Ross for that day, or

16  anyone else, for that matter, or give us any indication that

17  they checked the logins, for whatever they're worth.

18         MS. MERMELSTEIN:  Objection, your Honor.

19         THE COURT:  Sustained.

20         MR. COOK:  Where does this leave us with the 2017

21  preliminary list?  I'm tempted to say that this is what

22  reasonable doubt looks like, but it's more than that.  Brian

23  Sweet's lies have been proven, proven beyond a reasonable

24  doubt.  We've shown that the carefully tailored timeline that

25  you were shown omits the context necessary to evaluate the

1    evidence properly, fully.  The only thing about the 2017

2    preliminary inspection list that has been proven is that it

3    didn't come from Jeff Wada, and that Brian Sweet, again, is

4    lying.

5              Let's turn to the 2017 final inspection list.

6              Count Five of the Indictment alleges that Jeff Wada

7    was the source of the 2017 final inspection list and that

8    according to the government -- really, according to Brian

9    Sweet -- Jeff Wada gave Cindy Holder the list on February 3rd,

10   2017.  Wrong again.

11             Look at slide 72.  For this, to discuss the final

12   inspection list, I am going to break it into two components.  I

13   will talk about the statements of Brian Sweet about what

14   happened, and then everything else -- the phone records, the

15   text messages, the voicemails.

16             And why am I doing that?  I'm doing it to emphasize

17   the point that without Brian Sweet's testimony, the everything

18   else tells you nothing about who the source of the inspection

19   list is.

20             Now, let's take a look at the next slide.  This is the

21   IIS login screen again, which also includes entries in through

22   February.  And as you can see, highlighted are entries from

23   January through February 1.

24             And if you look here, you can see all of the entries

25   just for the month of October 2016.

1        Now, why did I show you October of 2016?  It doesn't

2   really have anything to do with the 2017 list?  To highlight a

3   point.  There are what, 30 or 40 separate logins to IIS in

4   October of 2017 -- 2016 by Jeff Wada.  In January and February

5   there are very, very few.  And in February there is only one,

6   on February 1st.  And the point of that is the government has

7   highlighted the fact that he locked into IIS on February 1st

8   and the fact that there are very few other logins during that

9   time period suggests that there is something significant about

10  that, when there is not.

11       The reason why there are very few, you can infer for

12  yourselves, and that is he was getting ready to have heart

13  surgery in just a couple of days.  February 1 was his last

14  login.  He had heart surgery about a week later.  So the fact

15  that there is only one login on February 1 does not make it any

16  more important than any other particular login.  The only

17  reason there is few of them is because of what was going on in

18  his life.

19       So scroll up to -- we talked about the October

20  entries.  Let's take a look at slide 75.

21       The government showed you this document.  This

22  purports to be a screenshot from Mr. Wada's laptop.  The

23  government claims that during his February 1, 2017 IIS login,

24  the one they showed you from the IIS records, they claim that

25  he logged in and downloaded all of these documents reflected on

1    this screenshot right here.  And the government clams that it's

2    from these documents that Mr. Wada gave -- came up with the

3    final inspection list and gave it to Cindy Holder on

4    February 3, 2017.

5          Now, this is another example of the government taking

6    unrelated normal business activity and converting it into

7    evidence of a crime.  So let's talk about this document itself,

8    the one on the screen.

9          What did we hear about it?  First, there was the

10   testimony of Chris Ren.  Chris Ren was the IT person who

11   supposedly handled this electronic data.  And I don't need to

12   remind you.  Obviously, this is a federal criminal trial, and

13   the evidence in a criminal trial is, to say the least,

14   important.

15         Let's read Mr. Ren's testimony about his background

16   and expertise.  And I want to emphasize here, I'm reading from

17   a transcript.  English is not Mr. Ren's first language, so I am

18   in no means trying to mock his English.  I simply want to

19   identify the credentials of the person that the government

20   used, or the PCAOB used, to extract this data from Mr. Wada's

21   computer.

22         "Did you receive any formal training in criminal

23   investigative techniques?

24         "We received training in computer forensics as part of

25   information security.

1              "How long was your training?

2              "I attended training on various occasions in a

3     security conference.

4              "A conference?

5              "Security conference, you know you have trainings,

6     yes.  Not, you know formal like, you know, year-long training

7     but computer forensics in training for, like, offered by, you

8     know, security conference.

9              "So what conference?

10             "RSA Security.

11             "But it was one conference that you are talking about,

12    correct?

13             "Yes."

14             Now, what about the preservation of evidence?

15             So why are we asking Mr. Ren this?  We're asking

16    Mr. Ren this because he is the one that handled Mr. Wada's

17    computer and that from that computer the government claims this

18    document, that screenshot as well as the documents identified

19    in that screenshot, were extracted.  And they claim that that

20    is evidence supporting Mr. Wada's guilt, that he obtained the

21    inspection list from those documents.  So his manner of

22    handling his computer is very important.

23             Asking about training on preservation of evidence:

24             "Did you learn anything at that conference about the

25    preservation of evidence?

1          "Preservation, I think I know it in general.

2          "Just generally?

3          "I know it.  I don't need to, you know, go to a

4    conference to know that I know preservation of evidence.  It is

5    kind of common sense.

6          "I'm sorry.  What is common sense?

7          "To, you know, preserve evidence through technical

8    means to make sure, you know, that evidence will be intact and

9    it can be, you know, forensically sound in a situation like,

10   you know, this court.

11         "So since it is common sense they didn't teach

12   preserving evidence in a formal way at that conference,

13   correct?

14         "They just nominally mention it because your

15   instructor just mentioned like, you know, common sense, you

16   need to keep evidence, you know, intact."

17         So let's go to slide 79.

18         This is the testimony of Zach Greenwood.

19         I show you the testimony of Zach Greenwood not because

20   he had anything to do with the extraction of data from the

21   laptop computer but just simply to compare the level of

22   expertise of these two individuals.

23         "How many times have you testified in court?

24         "Well over 30 times.  I've lost count.

25         "How many criminal cases?

1              "They have all been criminal.

2              "You received hundreds of hours of forensic training

3     primarily from your prior employers, correct?

4              "Correct.

5              "Dozens upon dozens hours of training from the

6     National White Collar Crime Center in digital forensic

7     acquisition and analysis as well as from" -- and then a list of

8     other places.

9              "Yes, sir."

10             (Continued on next page)

 1               Why was Mr. Wada's laptop handled so sloppily?  Why

 2    didn't it merit the type of attention, the kind of credibility

 3    and care that would come from someone with the expertise and

 4    training of someone like Zach Greenwood, who handled Mr.

 5    Middendorf's phone?

 6               Let's set that aside and go back to the screenshot.

 7    Let's assume what we are looking at here actually came from Mr.

 8    Wada's computer.  Mr. Ren testified that to find documents in

 9    this folder location -- you can tell this is a folder location

10    if you look at the top of the screen.  It is says computer,

11    then local disc J, then users, then WadaJ, my documents, and so

12    on.  You have the file path from where these documents were

13    found.

14               He said he found these documents using search terms.

15    He also testified that he doesn't know what those search terms

16    were.  He did clarify on redirect that all the files found in

17    this particular folder are contained in this screenshot.

18               However, we don't know what other documents may have

19    been on his computer that would be relevant to this case

20    because we don't know what search terms were used to screen

21    those documents.  He couldn't tell us.  Maybe that wouldn't be

22    such a big deal if Zach Greenwood were the person handling this

23    computer and had been the one conducting the analysis.  But it

24    wasn't him, so it's a problem.

25               As of February 1, looking at the document and

 1    accepting it at face value, it indicates that Jeff Wada was

 2    assigned to PWC's planning group.  Look at the file tab:

 3    WadaJ/my documents/inspections/2017/PriceWaterhouseCoopers/

 4    PWC/ -- we know he was assigned to PWC -- admin/planning.  What

 5    is the name of the file in which these documents are found?

 6    "Examples from other firms."

 7           Mr. Wada's résumé confirms that he was doing planning

 8    work at PCAOB.  Mr. Wada was involved in planning for PWC,

 9    which is one of the Big Four accounting firms, we know that as

10    well.  If we believe what is reflected in the documents -- go

11    back -- then according to Ms. Rodriguez's testimony, the very

12    first document there, Copy of EY2017 refers to Ernst & Young,

13    one of the Big Four accounting firms.  Mr. Wada is not accused

14    of leaking information to Ernst & Young.

15           More importantly, when the government put the

16    documents on this page into evidence, it did not provide the

17    copy of the Ernst & Young document.  It didn't fit their theory

18    that the only --

19           MS. KRAMER:  Objection, your Honor.

20           THE COURT:  Overruled.  It's argument.

21           MR. COOK:  It didn't fit their theory that the only

22    reason Jeff Wada was downloading these documents was to get the

23    KPMG inspection list if he is also downloading Ernst & Young

24    documents.  But it's there.

25           Ms. Rodriguez testified "EY" refers to Ernst & Young.

1          If we choose for a moment to apply the presumption of

2     innocence that he is entitled to and assume that Mr. Wada is

3     not engaged in a criminal conspiracy, why, why could he be

4     downloading these documents?  What would explain that?  The

5     answer is plain as day, written right on the document itself:

6     examples from other firms.

7          If you're working on planning for PWC, is it too much

8     of a stretch to think it might be nice to see how the planning

9     documents for the other two firms, E&Y and KPMG, have

10    structured their documents?  Call it a template or a blow-by.

11    We don't know the answer.  We are speculating.  But the

12    government would just have you assume there is a criminal

13    purpose to this.  There are other reasonable alternatives.

14         The fact that Ms. Rodriguez testified that she

15    couldn't think of a reason why in her experience someone from

16    PWC's planning team would have a copy of another firm's

17    planning profile does not turn possession of those documents

18    into a crime.

19         In fact, Ms. Rodriguez was very specific.  She

20    couldn't think of a reason why someone would do that because

21    the information in these documents would be specific to the

22    firm for which they were created.  That has nothing to do with

23    the structure of the document itself, how it is laid out, how

24    it is organized, and how that might help somebody who is

25    creating similar documents for the firm they are responsible

1   for.

2           This is not evidence of a crime.  It's an assumption

3   that the government would have you make that assumes already

4   that he is engaged in criminal activity and then force you to

5   accept this as part of that theory and in support of it.

6   That's backwards.  He is presumed innocent first.  We look for

7   reasonable, noncriminal explanations for what's going on.  If

8   they are ruled out beyond a reasonable doubt and all we are

9   left with is a criminal explanation, then fine, the evidence is

10  what it is.  But that didn't happen here.

11          Let's go to the next day.  This is February 1st.  Keep

12  in mind it is on February 1 that the government believes Mr.

13  Wada has downloaded the final inspection list.  Now February 2.

14  Let's take a look at the time line that the government created

15  for February 2.  That is their document.

16          What is the context of the conversation that is

17  missing here?  Take a look to your left.  This is the

18  government's summary.

19          "Are you flying home tonight?

20          "Yep, on board the plane now.

21          "How are you doing?"  That's Holder.

22          "Landing 8:30.  I'm okay.  Getting close to the day.

23          "If you have a chance to talk tomorrow, I can fill you

24  in."

25          Holder:  "It is.  You got this.

1          "I know, just know, know it.  I remind you I'm a

2     know-it-all.

3          "You got it.  Call when you want.  I'll be up."

4          Is she talking about the top secret final inspection

5     list for 2017 or is she talking about the medical appointments

6     and the surgery that is imminent for Mr. Wada in just a couple

7     of days and the fact that just the day before he had had a

8     diagnostic test in connection with that condition?  Again,

9     without the context, assumptions are easy.  Without the

10    context, you can cram this into whatever theory you want.

11         Cindy Holder appears to provide words of

12    encouragement.  Less than a minute later, Mr. Wada says, "Okay,

13    I have the grocery list and all the things you'll need for the

14    year," immediately followed by "safe travels."

15         Let's talk again about that phrase "grocery list."

16    This is the second we have seen it, the first time being in

17    connection with the list of inspectors in PCAOB's banking

18    group.  What do I mean by that?  Remember, the first time we

19    saw "grocery list" in these text messages was in the context of

20    not the preliminary inspection list but banking inspection

21    group and the list of names in the red text on her notes.  It

22    didn't have anything to do with an inspection list.  But now he

23    is using that phrase again.

24         Here is where I come back to the problem of trying to

25    put yourself in the shoes of two people that you don't know.

1    You don't know how they communicate.  You don't know what they

2    are talking about.  You don't know their inside slang and

3    jargon, their jokes, when they are serious.  You don't know

4    anything about them.

5          It is easy for a prosecutor to come up and say of

6    course "grocery list" means inspection list, what else could it

7    mean.  The answer is it could mean just about anything.  I have

8    no idea, neither do you, neither do they.  The only person to

9    tell you anything at all about what it means is Brian Sweet.

10   That's why I separated him from this discussion about the 2017

11   final list.

12         Set him aside and just look at the other evidence.

13   Does it tell you anything about an inspection list?  Only if

14   you accept the idea that the government has tried to plant in

15   your head from its opening statement, "grocery list" means

16   inspection list, grocery list is a secret code, instead of

17   "grocery list" means just some jargon or slang that gets tossed

18   around loosely.  Or maybe it relates to something related to

19   work.  But there is no evidence that it relates to a top secret

20   inspection list.

21         Let's speculate for just a second.  Let's talk about

22   what else "grocery list" could mean and let's do it in the

23   context of what might make sense given the evidence in this

24   case.  What kind of lists were Cindy Holder and Brian Sweet

25   creating that we have talked about and that we know Jeff Wada

1    was involved in?  Recruiting lists.  They talked about it all

2    the time.  It was important.  Brian Sweet testified it was an

3    important part of his job.

4         We saw those three lists that he created that he said

5    was a living document evolving over time.  We know that Cindy

6    Holder was furthering his efforts and she stood to make a lot

7    of money doing it if she was successful in writing a lot of

8    people on board.  Do we know beyond a reasonable doubt that

9    "grocery list" refers to recruiting?  Of course not, anymore

10   than we know beyond a reasonable doubt that it refers to an

11   inspection list.

12        But let's play that out.  What is a grocery list in a

13   literal sense?  It's a list of items that you want to go shop

14   for.  Does that fit with a recruiting list, people you want to

15   go shop for at the PCAOB?  Yes.  We are way into speculation

16   territory, we are way into reasonable doubt, but it is the same

17   thing the government is asking you to do.

18        I plant that idea in your head that it has to do from

19   recruiting.  Do that from the beginning and reinforce it over

20   and over again and don't give you any other context that it

21   could suggest to you that it has any other meaning, and pretty

22   soon you just assume that that's what it is.  I don't know what

23   it means.  Recruiting list makes as much sense as literally

24   anything else.

25        One thing I would say, I don't think it is as the

1    government suggested.  I don't think it actually referred to

2    groceries, given the relative distance between their two

3    houses.

4            So you've got Brian Sweet and Cindy Holder shopping

5    for PCAOB recruits.  We don't know that's what they are doing

6    here.  They are making list of their top choices, their own

7    grocery lists.  Cindy Holder just a few weeks earlier asked

8    Jeff Wada for a list of PCAOB inspectors which he refers to as

9    a "grocery list," so we actually know that on one prior

10   occasion Jeff Wada referred to a list of PCAOB inspectors as a

11   "grocery list," that big group, the banking inspection group.

12           Again, the term makes sense, the timing makes sense.

13   Beyond a reasonable doubt, definitely not.  The same as the

14   government's attempt to pin "grocery list" on the 2017

15   inspection list: pure speculation.

16           But let's take the government's suggestion at face

17   value for a moment.  Assume Mr. Wada's grocery list was the

18   inspection list.  The time line still doesn't work.  It still

19   falls apart.  We need some context.

20           The inspection list, as you have heard, is supposed to

21   be the most confidential of documents that the PCAOB has.  Ms.

22   Hannigan's testimony, I think you heard it in the summation:

23   "That has the most black-and-white answer you could have

24   because that is such a highly sensitive information, it is

25   clear that you cannot leak that list."

1        According to the government, Jeff Wada downloads the

2   crown jewels of the PCAOB, the 2017 inspection list.  When?  On

3   February 1, 2017.  The IIS log begins, the laptop screenshot

4   that shows the created date of the files all being February 1,

5   while he is getting ready to have heart surgery, as we know.

6        What does he do with this most valuable and I should

7   say time-sensitive information?  Remember, these audits are

8   open right now.  This list has the most value while those

9   audits are open.  What does he do with it on February 1?  He

10   does nothing.

11        Jeff Wada is, according to the government, neck deep

12   in a vast conspiracy to defraud the United States government,

13   the Securities and Exchange Commission, a conspiracy to defraud

14   the PCAOB with a bunch of KPMG strangers.  He's desperate, the

15   government alleges, to make good with the people at KPMG to get

16   a job.  He downloads the single most valuable piece of

17   information that KPMG could possibly want and that PCAOB has.

18        And he sits on it, if you follow the time line, until

19   when?  The following evening, February 2nd.  Even then, the

20   conversation, if you believe "grocery list" means inspection

21   list, is incredibly casual for someone who has the crown jewels

22   in his back pocket and wants to let Cindy Holder know that.  Is

23   she ecstatic?  We know how she likes exclamation marks, and we

24   don't get many here, only two.

25        Surely she called Brian Sweet.  After all, Brian Sweet

1   told you that Cindy Holder told him that "grocery list" meant

2   inspection list back in January.  That was a lie, but let's go

3   with it.

4        So Brian Sweet knows in his mind "grocery list" means

5   inspection list.  Cindy Holder gets the secret code from Jeff

6   Wada: I got the grocery list.  Surely there's a phonecall, a

7   text message, an email, some contact between Cindy Holder and

8   Brian Sweet to say, I got it, it's coming, I got the code,

9   message received, I'll be talking to Wada, I got the list.

10  Nothing.

11       The next day Cindy Holder texts Jeff, says that she is

12  free to chat whenever.  No response for about an hour and a

13  half.  No phonecalls, no are you there, are you able to call

14  me.  Nothing.  No follow-up text.  No calls or texts to Brian

15  Sweet saying, I'm getting the list today, get ready, call

16  Whittle, call Britt to let them know it's coming.  Nothing.  As

17  you have heard, this is the single most important document that

18  could be obtained for KPMG from the PCAOB.

19       They finally talk for 47 minutes.  There are no notes

20  of the call where supposedly all of this information, all

21  information that is on this folder, was conveyed to Cindy

22  Holder, as well as a discussion of Mr. Wada's upcoming heart

23  surgery, which is what prompted the whole text exchange to

24  begin with.

25       I am referring to Mr. Sweet's notes here because it is

1    the only record we have of what purports to be the final

2    inspection list as received from Cindy Holder.  All that

3    information there was conveyed, according to the government and

4    their theory, by Jeff Wada to Cindy Holder in a 47-minute

5    phonecall.  Again, no notes, contemporaneous notes, from Cindy

6    Holder at all.  All we have were Sweet's notes.

7           In another remarkable coincidence, Cindy comes into

8    his office in January in New York.  Remember what happened

9    here.  This is interesting.  In the January incident Cindy goes

10   into Brian Sweet's office after lunch and she says, according

11   to Brian Sweet, I got the list, here it is, the names, and he

12   just grabs a folder that's nearby and that's why it's written

13   on there.  That's in New York.

14          Now Sweet is in California.  He gets another phonecall

15   from Cindy Holder.  And what just happens to be the folder

16   laying around in California?  The same thing.  Seems remarkable

17   to me.  Is it evidence of anything?  Not really, other than

18   there are a lot of coincidences that float around Brian Sweet.

19          Following the government's time line, Ms. Holder

20   conveys all the information that she got from Mr. Wada to Mr.

21   Sweet in a 31-minute call a short time later.  Then, according

22   to Mr. Sweet, he conveyed the information to Mr. Whittle in a

23   7-minute 55-second phonecall.  That's what he said.  This is

24   Mr. Sweet,

25          "So, after you wrote this document on February 3rd, or

1    most of it," that's in evidence as Government Exhibit 655,

2    that's the folder, "what did you do next?

3    "A. I called Tom Whittle.

4    "Q. What did you tell him?

5    "A. I told him that we had received the full list of where the

6    PCAOB was planning to inspect in 2017.

7    "Q. In sum and substance what did he do?

8    A.  He was very glad to have received it.  He asked me for the

9    names, and I, you know, read him down not only the names of the

10   focus area —— I'm sorry, the names of the issuers but then gave

11   him the additional focus areas that had been provided as well,"

12   in the 7-minute 55-second phone conversation.  You decide if

13   that makes sense.

14          Here is the other problem if you accept the

15   government's theory and the testimony that they have offered.

16   Brian Sweet has conveyed the information up the chain of

17   command.  Can we go back to the time line.  Brian Sweet

18   testified that he conveyed the information forward to other

19   KPMG partners at 3:03 p.m. at the latest because that's when he

20   sent the calendar invite to Mr. Middendorf and Mr. Whittle in

21   order to set up a time to discuss the information he had just

22   received.  So we know that at least by 3:03 p.m. he had the

23   full list.

24          What's going on with the 4:31 p.m. voicemail and

25   subsequent calls between Wada and Holder about a grocery list

1   where he says, "Boy, was I wrong"?  It doesn't fit the time

2   line.  Wada had already given the list to Ms. Holder, and Ms.

3   Holder had already given the list to Mr. Sweet, and Mr. Sweet

4   had already given the list on up the chain.  They had already

5   sent out a calendar invite for a meeting to discuss the list.

6   Yet Mr. Wada sends a voicemail saying, "Boy, was I wrong.  I'm

7   looking at the grocery list," as if he hasn't given it to

8   anybody, whatever it is.

9          The idea that the grocery list is the inspection list

10  is pure rank speculation.  It's an assumption based on an

11  assumption that what Brian Sweet told you was truthful.  That's

12  the evidence, physical evidence, in support of their theory

13  that Wada is the source of the final inspection list.

14         Let's talk about Brian Sweet.  This is a photo that

15  the government introduced into evidence of Mr. Sweet.  The

16  person right there in that photo represents the single most

17  important piece of evidence disproving the government's entire

18  case against Jeff Wada.

19         The case rests upon Brian Sweet giving voice to all of

20  the records that are silent about what they really mean, about

21  what they are really talking about.  That's why he is the hub

22  of this.  That's why he is critical to their case.  That's why

23  they were willing to overlook so much from him in order to keep

24  him as a cooperator and get his testimony in front of you.  The

25  case doesn't make it through the doors without Brian Sweet to

1    illustrate and narrate and tell you what all of this stuff

2    means.

3          And he knows it.  There is no question that he knows

4    how badly he is needed, how badly the government wants him.  So

5    I'm going to talk about Brian Sweet for just a couple of

6    minutes.  We have about five minutes.

7          I want to be clear about something that may have not

8    been clear during the cross-examination.  I don't care how many

9    mortgage frauds he committed.  I don't care about his tax

10   fraud.  I don't care about any of the other felonies he

11   committed.  I don't care about any of those crimes, both the

12   ones he disclosed originally, ones he disclosed late, the ones

13   he disclosed during trial, the ones he disclosed on

14   cross-examination.  I don't care about the fact that he engaged

15   in that criminal activity.  I'm not a prosecutor.  It's not my

16   job to prosecute him.

17         What I do care about is his credibility, his bias, and

18   his motive to lie.  That's why that testimony was so important,

19   because it illustrated the problem with relying upon someone

20   like him.  Why did I spend so much time going through all that?

21   And it was tedious, tedious stuff.  Because we have to evaluate

22   whether he can be trusted.  After all, there's a lot at stake.

23   There's a lot riding on the believability of his testimony.  So

24   we care about his biases, his motivations, and his credibility.

25         I fully acknowledge, as the Court will instruct you,

1    that sometimes you've got to make deals with people involved in

2    crime in order to prosecute crime.  That's just the way it is.

3    If there's a bank robbery, you sign up the get-away driver to

4    testify against the other folks.  Happens all the time.

5           You will be told, however, that you should consider

6    their testimony with great care and with particular caution.

7    That's the standard instruction you get with any cooperating

8    witness, including Brian Sweet, because they have a motive to

9    testify falsely because they are getting a benefit from the

10   government.  It is true of any cooperator, certainly of Brian

11   Sweet, also of Mr. Whittle.

12          But when it comes to Brian Sweet, the problem is

13   different and much bigger.  The problem is not just the

14   motivation to lie that comes with any cooperating witness

15   because of what they did before they signed up with the

16   government.  The problem with Brian Sweet is what he did after

17   he signed up with the government and the response to those

18   actions.

19          That's why it's so important, and that's what makes

20   him different from your average cooperator.  It is important,

21   that response from the government to his late disclosures,

22   because that sends a message to Mr. Sweet as to the value of

23   his testimony, how badly he is wanted and to what he has to do

24   to keep the government happy.

25          Let's look at the proffer agreement.  You saw this

1    earlier.  This is the first agreement that Mr. Sweet signed

2    when he met with the government.  As we talked about earlier,

3    there were four meetings initially under the proffer agreement

4    before they even signed him up.  His August meetings were very

5    long.  He went on at length.  He was asked to disclose all of

6    his criminal activity.  We talked about that.  We know that he

7    didn't disclose it all.  He disclosed it piecemeal over time.

8            But we also learned that after these initials

9    meetings, he was formally signed up.  On January 5th of 2018 he

10   signed the cooperation agreement.  That's when the government

11   decided, we want you, we want you to help with this

12   prosecution.  So he makes a good first impression.

13           Think about what it means, though, when in 30 hours of

14   interviews in August 2017 with federal agents, trained law

15   enforcement personnel, that he was able to deceive a roomful of

16   those professionals with his lies.  He lied to them repeatedly.

17   Could they detect those lies?  Obviously not.  Apparently not.

18   If these law enforcement professionals could not detect his

19   lies, how about the rest of us?  We are not trained as they

20   are.

21           Things go quiet for a while after he signs the

22   cooperation agreement in January.  His next meeting is in

23   December 2018.  The trial is approaching.  They need to prepare

24   him to testify.  As we talked about earlier, and I'm not going

25   to go through it again, he begins a series of disclosures.

1           The defense subpoenas documents that signal to him

2   that we are about to discover something, so he makes

3   disclosures to the government.  The defense subpoenas more

4   documents.  He finds out he is about to get caught, he makes

5   more disclosures to the government.  He doles it out piecemeal

6   just the way Cynthia Holder taught him.

7           What do I mean by that?  Cynthia Holder, former FBI

8   special agent, when things were unraveling for them, she got

9   mad at him about not being careful enough with the tracks he

10  was leaving.  She said with regard to his computer, look, don't

11  delete everything.  That's obvious.  Leave some stuff behind so

12  it is not so suspicious.

13          Mr. Sweet didn't disclose everything.  He dribbed it

14  out only as needed, only when he was about to get caught.

15          You recall that we learned while he was testifying

16  that he met with the government the evening he was actually

17  giving testimony to you.  It was during that meeting he

18  disclosed more criminal conduct.  Imagine that circumstance

19  where he has promised and signed a cooperation agreement to

20  disclose everything, and if he doesn't, the agreement says it

21  can be canceled and he can be prosecuted; and every time he

22  makes a new disclosure, they don't tear it up, they go with

23  him, they keep him, they need him, they want him to testify.

24          Pretty soon as the trial is approaching and the trial

25  is in progress, that boulder is rolling down the hill so fast

1    it can't be stopped.  They have no choice but to continue on

2    with their guy.  No matter what he does and no matter what he

3    says, they need him to testify and he testified in front of

4    you.

5         The interesting thing about his direct examination by

6    the government is that they elicited all the testimony they

7    wanted from him about all the supposed criminal activity that

8    Jeff Wada was involved in all before they told you about his

9    own criminal activity.  Only at the end of his testimony did

10   they describe summarily his own criminal disclosures.

11        It's difficult to even put into words the absurdity of

12   that situation, to have someone who has lied so many times to

13   trained professionals who are so desperate to get his testimony

14   that they overlook it.

15        Ladies and gentlemen, you are the judges of the

16   credibility of the witnesses.  You decide how much weight to

17   give Mr. Sweet's testimony.  That is entirely up to you.

18        You may hear in rebuttal after I sit down that not all

19   liars are perfect; if they were, they would never get caught.

20   You heard a hint of that during the government's summation,

21   where they said the fact that he got some of his facts wrong is

22   actually evidence that he is being truthful, which defies

23   logic.  But that brings up an important point about just what

24   kind of a person Brian Sweet is.

25        I'll conclude, your Honor, for the day just after this

1    one.

2        THE COURT:  Okay.

3        MR. COOK:  There is an old fable that you may have

4    heard of the scorpion and the frog that pretty perfectly

5    analogizes the respective relationship between the government

6    and Mr. Sweet.  The story goes that the scorpion approaches the

7    frog on the bank of a river and wants a ride across the river.

8    The frog says, I'm not going to do that, you're going to sting

9    me.  The scorpion says, why would I do that?  If I sting you,

10   we both drown.  The frog says, well, that makes sense.

11       So the scorpion climbs on the frog's back, they begin

12   across the river, the scorpion stings the frog.  As they are

13   both going down, the frog says, why did you do that?  The

14   scorpion says, it's just in my nature, it's who I am.

15       This is who Brian Sweet is.  There is not a single

16   aspect, not one part of his testimony that is not riddled with

17   lies.  Even when it doesn't help him, even when he gets caught,

18   he can't help himself.  Even when he knows his cooperation

19   agreement can be torn up if he doesn't come clean, he still

20   lies.  He doesn't know how not to.  That's the man they put in

21   front of you, the man that they expect you to rely upon to

22   accept his testimony as gospel in convicting another man of

23   four felonies.

24       You are the judges of the credibility of the

25   witnesses.  I submit to you you should give Brian Sweet's

1    testimony no weight whatsoever.

2           THE COURT:  Ladies and gentlemen, we are going to let

3    you go for the evening.  Thanks for your attentiveness once

4    again.  We will be sitting tomorrow.  We will try to start at

5    9:30 tomorrow morning.  We will go until 2 o'clock and then

6    we'll break.

7           There is also, in addition to the defense closing

8    arguments, a government rebuttal, and then I'll be charging the

9    jury in detail as to the law that applies to your

10   deliberations.  That will take a little bit of time, but I

11   think it is likely that we will reach that point where the jury

12   can begin deliberating tomorrow maybe around noon, so there

13   might be a couple of hours of deliberations.

14          However, the jury needs to take as much time as it

15   needs to to go through all the evidence and to reach a

16   unanimous verdict.  Of course, the jury is welcome to come back

17   on Monday morning.  We will be in Monday morning presumably at

18   9:30.  I'm not exactly sure when the jury will get the case,

19   and the jury will take whatever time it needs to reach a

20   unanimous verdict.  You are not deliberating yet, once again,

21   but hopefully you will be tomorrow.

22          Have a good night everybody.  Leave your pads on your

23   chairs.  We will see you tomorrow morning at 9:30.  Good night.

24          (Jury not present)

25          THE COURT:  Mr. Cook, do you have any more or are you

1    finished?

2           MR. COOK:  I do, your Honor.  That seemed to be a

3    convenient stopping point.

4           THE COURT:  Do you know how much longer?

5           MR. COOK:  Less than 45 minutes.

6           THE COURT:  All right.  Then the government's

7    rebuttal, Ms. Mermelstein, are you going to be doing that?

8           MS. MERMELSTEIN:  I am, your Honor.  I don't really

9    know how to predict, to be honest, because I haven't written

10   it.  Perhaps I'll have a better sense in the morning.

11          THE COURT:  Then I'll go directly to the jury

12   instructions.  We'll have the verdict form, which is the same

13   as the draft except that we are switching the words as we

14   discussed.  Otherwise, it will be the same.  It could be 11:30

15   or 12:00 when it goes to the jury.  We will have lunch brought

16   in, then we'll let them go at 2:00 as we discussed.

17          Anything anybody wanted to address?

18          MS. KRAMER:  No, your Honor.

19          MR. BOXER:  No, your Honor.

20          MR. COOK:  No, your Honor.

21          THE COURT:  Have a good night.  We are adjourned.

22          (Adjourned to 9:30 a.m., March 8, 2019)

23

24

25