```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          18 Cr. 0036(JPO)

5   DAVID MIDDENDORF and JEFFREY
    WADA,
6
                   Defendants.
7
    ------------------------------x
8

9                                         March 8, 2019
                                          9:38 a.m.
10

11  Before:

12                      HON. J. PAUL OETKEN,

13                                        District Judge
                                          and a jury
14

15                        APPEARANCES

16  GEOFFREY S. BERMAN
         United States Attorney for the
17       Southern District of New York
    BY:  REBECCA G. MERMELSTEIN
18       AMANDA K. KRAMER
         JORDAN LANCASTER ESTES
19            Assistant United States Attorneys

20  PETRILLO KLEIN & BOXER LLP
         Attorneys for Defendant David Middendorf
21  BY:  NELSON A. BOXER
         AMY R. LESTER
22       ALEXANDRA REBECCA CLARK
              - and -
23  BRUCH HANNA LLP
    BY:  GREGORY S. BRUCH
24

25
```

                          APPEARANCES CONTINUED

BROWN RUDNICK LLP
        Attorneys for Defendant Jeffrey Wada
BY:   STEPHEN COOK
        JUSTIN S. WEDDLE
        SELBIE JASON
              – and –
LATHAM & WATKINS
BY:   JASON MASASHI OHTA


        – also present –

Lyeson Daniel, Postal Inspector
Virginia Faughnan, Postal Inspector
Luke Urbanczyk, Government Paralegal
Nathaniel Cooney, Government Paralegal
Kiezia Girard-Lawrence, Postal Inspector
Stephanie O'Connor, Defendant Middendorf paralegal
Sarah Chojecki, Defendant Wada paralegal



                              oOo

1              (Jury not present)

2              THE COURT:  Good morning.

3              ALL COUNSEL:  Good morning, your Honor.

4              THE COURT:  Before we begin, I received a letter from

5    counsel for Mr. Wada this morning and I wanted to see if the

6    government would like to respond.

7              MS. KRAMER:  Yes, your Honor.  Sorry, I am basically

8    losing my voice from yesterday.

9              So, there is absolutely nothing new that was done in

10   the government's closing argument.  First, I want to just point

11   to some things that the defense has long had in its possession.

12   Jeff Wada's cell phone records were produced very early in

13   discovery.  Brian Sweet's 3500 material, in particular, the

14   August 15, 2017 interview.  In that interview he said that Jeff

15   Wada -- he understood Jeff Wada was the source of the --

16             THE COURT:  Sumitomo.

17             MS. KRAMER:  Of the Sumitomo Credit Suisse tip that

18   the defense is taking issue with from October -- November,

19   2015.

20             THE COURT:  Am I correct that Mr. Sweet testified to

21   that?

22             MS. KRAMER:  Yes, your Honor.

23             So, weeks ago Brian Sweet testified to that.  And that

24   is on pages 830 through -- it kind of goes into 837 of his

25   direct testimony, where he talks about, on page 830, the old

colleague he was referring to was Cindy Holder who had in turn

received a call from Jeff Wada for the October email.  On page

834, about the November email, he had gotten that information,

he said, from Cindy Holder, who had discussed it with Wada and

that she told him the information.

        And then on pages 836 and 837, he went on to testify

that he sent text messages essentially praising Wada, saying

tell Wada we owe him big because of this information.  He was

cross-examined by counsel for Wada about this issue, really

demonstrating that there was absolutely nothing new in the

government's closing, on page -- beginning on page 1184 of the

trial transcript.

        So there is really just nothing new here that was done

and --

        THE COURT:  So I think you have addressed the surprise

issue.  Would you also like to address the argument that there

was a prejudicial variance from the Indictment?

        MS. KRAMER:  Certainly, your Honor.  There just

wasn't.

        Paragraph 58 of the Indictment makes clear that after

leaving the PCAOB for KPMG, Holder remained in frequent contact

from Wada, and on several occasions, between August 2015 and

March 2016, Wada provided Holder with additional confidential

PCAOB information.  There are two examples that are provided,

one of which is another sort of piece of Japan information from

1   November 2015, but those are just examples.  It's crystal clear

2   that the government charged from the beginning that Wada was

3   providing Holder with information throughout the time period of

4   August 2015 and March 2016.

5          And on the face of the emails that are at issue, Sweet

6   says that he got this information from an old colleague.  And

7   he has consistently testified that, you know, that was his way

8   of securing the source and saying, you know, he was referring

9   to Holder, who had gotten the information from Wada.

10          There is no variance of the Indictment.  What the

11   government put into evidence is perfectly consistent with the

12   allegations of Wada's participation in the conspiracy from

13   2015, before these emails, all the way through 2017.

14          THE COURT:  They argue that in paragraph 42 there is a

15   reference to direct communications with PCAOB personnel, and

16   example B is this email.  So I guess the argument is that led

17   them to believe that the Sumitomo email was in that category,

18   as opposed to the paragraph 58 category.

19          MS. KRAMER:  Well, your Honor, there is certainly no

20   variance or prejudicial variance based on a review of the

21   totality of the language in the Indictment and, also, based on

22   the discovery in the case.  So the phone records that the

23   government pointed to in the closing were produced to Wada, I

24   believe -- I have to check -- but I believe in the government's

25   first production of discovery in this case.  And I understand

1    that was just confirmed.  The emails -- the Sumitomo emails

2    were similarly produced in discovery very early in the case.

3           So, there is no variance from the Indictment.  And

4    taken as a totality, and also from a review of the discovery in

5    the case, it's also perfectly consistent with what's been known

6    to the defense based on the discovery but also the production

7    of 3500 material.

8           THE COURT:  All right.  Do you want to add anything?

9           MR. WEDDLE:  Yes, your Honor, briefly.

10          I don't think that it's correct to say when the

11   Indictment specifically quotes the two emails at issue that

12   counsel talked about in summation and specifically says that

13   that is either information that Sweet took himself from his

14   time at the PCAOB or information that Sweet learned through

15   direct communications with PCAOB personnel, that allegation

16   cannot be clearer.  And I don't think you can counteract that

17   by --

18          THE COURT:  Well, the question is is it prejudicial,

19   then?  Given paragraph 58, what prejudice would there be to the

20   defense?

21          MR. WEDDLE:  Because paragraph 58 says there are other

22   examples of communications with Jeff Wada, but paragraph 42

23   says these emails are not.  I mean, I don't think there is any

24   way for the defense to say this generalized description that

25   covers an eight-month period of time, with no specific

examples, trumps the specific, very concrete allegation of the

Indictment that this information came directly to Sweet from

someone at the PCAOB.  That's a very specific, unambiguous

allegation of the Indictment.  And I don't think that there is

any way for the defense to say, well, the Indictment

specifically alleges this but we have phone records and a mass

of other discovery and we should somehow divine that the

government is going to stand up and say the exact opposite of

what the Indictment says.

But, your Honor, let me just -- so that's one point.

A second point is the prosecutor's argument just now is that we

should always have known that the prosecution was going to

contend that these two emails, which are quoted specifically in

the Indictment and attributed to someone else, are going to be

attributed to Jeff Wada because of the discovery in the case.

If that's so, then that just demonstrates what we said in our

letter, which is that to put that evidence in as a rebuttal

case is an example of sandbagging the defense, your Honor.  If

they intended to prove that, they should have proved it as part

of their case.

And, third, your Honor, the main application that

we're making here is simply a ruling from your Honor about the

scope of rebuttal summation.  We haven't talked about 2015 so

far in our summation.  We don't want to talk about 2015 in our

summation.  And if we don't talk about 2015 in our summation,

we would like to have an advance ruling from your Honor that
the government will not talk about 2015 in its rebuttal
summation.  If they're going to want to talk about 2015, then
we're going to have to cover this.

        And I do think that that's prejudicial for the reasons
set forth in our letter, but we think it is outside the scope
given our current plans for our summation, and they shouldn't
be able to sandbag us yet again by covering it in a rebuttal
summation if we don't cover it in our summation.  And if they
are going to cover it in the rebuttal summation, then we will
have to cover it.

        MS. KRAMER:  So there was evidence of this elicited in
our direct case, your Honor.  Brian Sweet testified about it.
There is no sandbagging --

        THE COURT:  I agree.  Under <u>United States v. Dove</u>, 884
F.3d 138, a defendant alleging a variance must establish that
the evidence offered at trial differs materially from the
evidence alleged in the Indictment.

        Viewed as a whole, I don't think this is a material
alteration.  In any event, it is not a prejudicial variance
given that this is information that came out in the
government's case.  This is from Sweet's testimony.  It was in
the discovery materials.  So, I'm going to deny the request to
preclude argument about this in the government's rebuttal.  Can
we bring in the jury?

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, members of the jury.

4          JURORS:  Good morning, your Honor.

5          THE COURT:  We're continuing now with the closing

6   argument on behalf of counsel for Mr. Wada.

7          Mr. Cook, you may proceed.

8          MR. COOK:  Thank you, your Honor.

9          Good morning, ladies and gentlemen.

10          Yesterday I focused on how the government failed to

11   prove that Mr. Wada was the source of the 2016 and 2017

12   inspection lists.  During the prosecutor's summation yesterday,

13   the prosecutor accused Mr. Wada of sharing confidential

14   information in 2015.

15          Now, Count Three of the Indictment is the wire fraud

16   charge relating to 2015.  Mr. Wada is not charged in that

17   count.  However, the prosecutor did allege that Mr. Wada had

18   shared information on two occasions in the fall of 2015 with

19   Cynthia Holder.

20          What did she say?  Well, the government theory as to

21   what happens falls into a similar pattern to what we talked

22   about yesterday:  An accusation by Brian Sweet that Mr. Wada

23   was the source and that he is receiving that information from

24   Cindy Holder and that he relays that information up the chain

25   within KPMG.  Then the government takes that allegation by

1    Mr. Sweet and then takes records, phone records and text

2    messages, and tries to construct a story around that to support

3    the allegation that Mr. Sweet passed along.

4         Now, the theory is for Mr. Wada is that -- well, let's

5    keep in mind that in 2015 there is no evidence that he was

6    upset with his job at PCAOB, and there is no evidence of him

7    having any desire to go work at KPMG.  So the theory, the

8    motive, apparently is that he's joining a criminal conspiracy

9    in 2015 because at some point in the future, years in the

10   future, he might want a job at KPMG.  That's the theory.

11        Now, the prosecutor told you -- well, she showed you

12   Government's Exhibit 824.  Let's take a look at that.

13        From October 20, 2015, this is an email from Brian

14   Sweet to a group of people at KPMG.  And he says, "I got a call

15   from an old colleague over the weekend and they let me know a

16   decision has been made to inspect a 'big Bank' in both

17   Switzerland and Japan next year (so obviously Credit Suisse and

18   Sumitomo)."

19        It is important to remember exactly what Brian Sweet

20   is passing along.  "A decision has been made to inspect a big

21   bank in both Switzerland and Japan next year."  Both

22   Switzerland and Japan, that will become important in just a few

23   minutes and we will come back to that.

24        Who was the old colleague that Mr. Sweet was referring

25   to?  He told us.  "I was referring to Cindy Holder who had, in

1    turn, received a call from Jeff Wada."  And that language

2    probably seems familiar because over and over again during

3    Mr. Sweet's testimony, whenever he was asked about where he

4    received information, it came from Cindy Holder.  He would

5    always add to it he received it from Jeff Wada, as if he were

6    there, as if he had personal knowledge of that, but we know

7    that he didn't, as if almost he had been trained to say that.

8            So Sweet makes the accusation and then the government

9    points to these records to support it.  This is a phone call on

10   October 17th, three days before the email is sent, in which

11   Cindy Holder and Jeff Wada speak for about an hour.  That,

12   ladies and gentlemen, was referred to by the prosecutor as

13   "crushing evidence" that Jeff Wada was the source of that

14   information three days later that Brian Sweet passed along.

15   "Crushing evidence."  Because they spoke for an hour.  And then

16   three days later Brian Sweet shared the information.

17           What is the connection between those two event?  Well,

18   there is no evidence of that -- of any connection between the

19   phone call between Jeff Wada and Cindy Holder and Brian Sweet's

20   email three days later.  But the prosecutor emphasized that it

21   was 63 minutes, an hour-long phone call, that must mean

22   something nefarious was happening.  Well, the information that

23   was supposedly passed along would take no more than 20 seconds

24   to convey.  So the fact that they spoke for an hour is really

25   of no evidence that anything bad or improper was going on.

1              So what did they go to next?  That was it for the

2    October call.  Now we move to November.  And we have another

3    email from Brian Sweet to a group of KPMG employees.  And here

4    he says, "The PCAOB has decided to move up its inspection of

5    KPMG Japan forward to January 2016 (they just notified the

6    firm).  As a result of this timing, I've been told the PCAOB

7    has decided not to look at a bank in Japan.  Instead they are

8    replacing it with a bank in Germany (so it looks like Deutche

9    in lieu of Sumitomo)."

10             What was the support for the accusation by Brian Sweet

11   that that information came from Mr. Wada?

12             "Cindy Holder" -- this is Brian Sweet.

13             "Cindy Holder had discussed that directly with Jeff

14   Wada and then had, in turn, told me that information."

15             That is familiar language that Cindy Holder told me

16   and she got it from Jeff Wada, as if he was party to that

17   conversation.

18             What's the evidence that it came from Jeff Wada

19   besides Mr. Sweet's testimony?  Again, they point to a phone

20   call, 14-minute phone call, on November 9, 2015.  It says

21   nothing about what was discussed.  It says nothing about

22   whether there was any communication between Holder and Sweet

23   afterwards.  It says nothing about who else Sweet was talking

24   to that day or in the preceding days.

25             Now, one thing that the prosecutor didn't show you,

1    that I'm going to tell you about, is a series of text messages

2    between Jeff Wada and Cindy Holder.  And it's Government's

3    Exhibit 1410.  And I imagine the prosecutor in rebuttal will

4    show it to you.  I urge you to read every word of it.  Because

5    what you will see in there is a conversation between Jeff Wada

6    and Cindy Holder in which she makes statements about how nice

7    it would be if she would come join him in Japan during the

8    inspection.  Hopefully Jeff Watkins, an associate director,

9    will be there.  They can have breakfast.  They can have lunch.

10   Then can hang out together, as they had done previously.  And

11   then he says:  No bank -- oops, I said too much.  And that is

12   the incriminating statement.  That somehow pins this all on

13   Jeff Wada.

14            The problem with that assumption is if we can go back

15   to the email, slide E -- I'm sorry, slide D.  D as in David.

16            The problem with that assumption is that nowhere in

17   any records does Jeff Wada say that they're replacing it with a

18   bank in Germany.  Nowhere.

19            The information that Mr. Sweet is conveying is that

20   Japan has been replaced by Germany.  A bank.  Jeff Wada is not

21   on the Banking Team.  He never has been.  We talked about that

22   yesterday.  Who is on the banking team is Bob Ross.  I'm not

23   just pulling that name out of thin air again.  Who did

24   Mr. Sweet have lunch with just a couple of days before he wrote

25   that email?  Bob Ross.  Again, that name just keeps showing up.

1          Is that proof beyond a reasonable doubt that Bob Ross

2     was the source?  Of course not.  Definitely not.  But it's

3     context you need to know as you consider whether the government

4     has disproved any reasonable alternative beyond a reasonable

5     doubt.

6          Now, a couple of other pieces of information that are

7     helpful in evaluating this.

8          You recall that Cindy Holder left the PCAOB in the

9     fall of 2015 also.  What did Brian Sweet suggest that Cindy

10    Holder do?  First he was asked when did she leave.  It says,

11    "Later on at the end of the summer.  I think it was around

12    August of 2015."

13         Sweet said:

14    "Q  Before Cindy Holder left the PCAOB, did there come a time

15    that you spoke with her about the documents that you had taken

16    when you left the PCAOB?

17    "A  Yes.

18         "When did that happen?

19         "While she was still at the PCAOB, so before she

20    joined.

21         "what did she tell you -- what did you tell her?

22         "I told her how before I had left the PCAOB, that I

23    had taken -- transferred the documents that were on my computer

24    onto an external hard drive and that I had taken these

25    documents with me, including the information I got out of the

1   IIS system.

2   "Q   Why did you tell her that?

3           "Well, I knew that this information was helpful for me

4   in my job and I certainly wanted Cindy to be successful in her

5   job, too, so I told her what I had done, fully expecting that

6   she was going to do the same thing.

7           "Did she bring those document with her?

8           "She did."

9           Brian Sweet told us that she did.

10          So at least as to the October email that the

11  government talked about, this would have been shortly after

12  Cindy Holder joined the PCAOB, bringing with her all of the

13  documents that she stole from the PCAOB.

14          Again, was that information contained in the documents

15  that she stole?  We have no idea.  That evidence wasn't put

16  before you.  But is it a reasonable alternative that should at

17  least be considered before we charge and prosecute Jeff Wada

18  for that based on the length of his phone calls?

19          Ladies and gentlemen, I'm not going to go through any

20  more emails and texts with you.  We spent a long time doing it

21  yesterday.  I just want to add one thing.  I can't anticipate

22  everything that the government might show you.  I can't walk

23  through every text message and every email.  You would revolt

24  if I did, and rightfully so.  But I think we've talked about

25  enough and you've seen enough about how this evidence has been

1    presented to you that you know what to look for.  You know what

2    questions to ask and expect to be answered so that you can

3    evaluate anything that's put before you.

4           But before I sit down, I need to talk briefly about

5    the elements of the charges that Jeff Wada -- of the crimes

6    that Jeff Wada has been charged with.

7           These are the four charges.  You'll see the first two

8    are conspiracy charges.  The last two are what we call

9    substantive counts.  And as both the government and I both said

10   yesterday, the core, the heart of the case against Mr. Wada are

11   those three inspection lists that are covered by Counts Four

12   and Five.

13          The first two counts, conspiracy, they encompass the

14   entire period that Brian Sweet was at KPMG, 2015 through 2017.

15   And as the Judge will explain to you after summations are

16   finished today, every charge has elements to it.  One way of

17   thinking about that are ingredients to a recipe.  Think of a

18   cake.  Every recipe has a list of ingredients.  Those

19   ingredients are necessary to make the item.  And if you miss,

20   if you leave something out, you may have something but it's not

21   going to be the cake that you wanted.

22          The same idea in a criminal case.  The government must

23   prove beyond a reasonable doubt each and every element, or

24   ingredient, of each and every charge.  If they don't do that,

25   if any ingredient is left out, they don't prove that, then you

1    must find the defendant not guilty.

2           So before we talk about the elements, let's think

3    about -- think of flour as being the heart of the recipe and

4    the flour in this case being those three inspection lists.

5    Let's talk about the conspiracy charge specifically.

6           The PCAOB is a private company.  That's been

7    established.  It is not an agency of the United States.  Nobody

8    disputes that.  So the government has charged that Mr. Wada did

9    not conspire with the PCAOB but conspired with the Securities

10   and Exchange Commission, which is an agency of the United

11   States.

12          Here's the problem with that allegation.  The

13   government must prove that a conspiracy actually exists, and

14   that Mr. Wada joined that conspiracy, and that he joined in the

15   objectives of that conspiracy, that he voluntarily did that.

16   In other words, whatever conspiracy Mr. Sweet and his circle of

17   trust, or the core group, whichever category you want to call

18   it, whatever conspiracy those folks may have had, the

19   government must prove beyond a reasonable doubt that Mr. Wada

20   intentionally joined that conspiracy and that he joined in the

21   objective of that conspiracy, not just that he gave nonpublic

22   information to Cindy Holder.  That's not enough.  But that he

23   joined -- knowingly joined a conspiracy, and he understood the

24   objective of it was to defraud the SEC.  That's the heart of

25   that conspiracy charge.

1          You did not hear any evidence, at all, that Jeff Wada

2     joined a conspiracy with a group of strangers at KPMG for the

3     purpose of defrauding the SEC.  Nothing.  Not a shred of

4     evidence about it.  He had no contact with the SEC.  There is

5     no evidence that the SEC even entered into his mind as he was

6     going about his job, or, much less, as he was engaging in the

7     supposed criminal activity he is charged with, that he even

8     gave it a passing thought.  Nothing.

9          I won't belabor that point.

10          If you find that he did not join that conspiracy, a

11     conspiracy with that specific objective, then you must find him

12     not guilty of Count One.

13          Count Two is conspiracy to defraud the SEC -- I'm

14     sorry, the PCAOB.  And aside from the issues we talked about

15     yesterday, with there being no evidence that he was the source

16     of the lists, you also must find evidence that he joined this

17     conspiracy as well, and that he voluntarily joined it knowing

18     the objective was to defraud the PCAOB.

19          Tom Whittle, the government's cooperator and so-called

20     member of the conspiracy, you heard him testify he never met

21     Mr. Wada.  He didn't even know who he was.  Brian Sweet barely

22     knows Jeff Wada.  He had no communications with Mr. Wada after

23     he left the PCAOB.  Mr. Middendorf testified the same way.

24     Cindy Holder and Jeff were friends, but that's not evidence of

25     this larger conspiracy.

1          And even if you believe that Ms. Holder and Mr. Wada

2     conspired for the purpose of getting Mr. Wada a job at KPMG,

3     that's not the conspiracy that the government has charged.

4     They've charged a much broader conspiracy involving many more

5     people to do something else entirely -- to defraud the PCAOB.

6          And there's no evidence that Jeff Wada joined in any

7     conspiracy like that.

8          Let's take a look at a couple of the exhibits that

9     sort of evidence the fact that there is no conspiracy here.

10    Remember, Jeff Wada believed at this time that Cindy Holder was

11    a friend.  They had a private relationship, a place where they

12    thought they could speak freely.

13         Take a look at this series of text messages.  And

14    you'll see that interspersed between messages between Jeff Wada

15    and Cindy Holder, Cindy is simultaneously talking to Brian

16    Sweet.  And what's interesting as we read through these is look

17    at the character of the conversation and how it changes when

18    Cindy is talking to Jeff and when Cindy is talking to Brian.

19    So:

20         "Jeff:  "Jung was fired last week.

21         "Cindy:  Wow.

22         "Jeff:  Too bad they haven't fired any ADs.

23         "Jeff:  LOL."

24         "Cindy to Brian:  Wada said Jung was fired last week."

25         Completely different character.  And what's

1   interesting here is Cindy doesn't say I'm going to let Brian --

2   I'm going to let Brian know, or join Brian in the conversation.

3   She turns around and passes the information along directly to

4   Brian Sweet.

5          Take a look at the next slide.

6          Brian Sweet testified that he believed Cindy Holder

7   was manipulative.

8          Next slide.  Can we see 109.

9          Cindy Holder to Jeff Wada:  "Define shortly.  Oh, and

10  we need to chat later this week.  Brian really wants you over

11  here.  So I told him I would take another run at you."

12         110.

13         Cindy to Brian:  "Wada is e-mailing me list.  He just

14  arrived in DC.  He accused me of stalking.  LOL."

15         Cindy to Jeff:  "I was just kidding.  It hurts me when

16  you don't fight.  Haha.

17         Cindy to Brian:  "Promotion announcement sent to

18  personal email."

19         The list they are talking about is a list of

20  promotions, something that there is no evidence of is

21  confidential.

22         The reason why I show you these is to show this

23  character of what's going on here.  There is a game being

24  played.  Cindy is running a game on Jeff.  Brian Sweet trying a

25  game on her.  They are manipulating each other for information.

1    And Jeff the whole time thinks he is talking to a friend.  And

2    as soon as he talks to a friend and talks about something that

3    you would discuss with a friend about what's going on at work,

4    she turns around immediately and passes that on to Brian Sweet.

5              And the reason why this is important is these are

6    supposed to be co-conspirators.  They are all supposed to be in

7    this together -- conspiring to defraud the SEC and the PCAOB.

8    This is not evidence of a conspiracy.  It's evidence of

9    betrayal of trust, of a betrayal of friendship.  This isn't

10   what you see when a group of people have gotten together and

11   decided on this objective of what they're going to accomplish.

12   This is Cindy playing Jeff.  Cindy playing Brian.  Brian

13   playing Cindy.  And that happens over and over again in these

14   emails.  It is not evidence of a conspiracy.

15             Now let's go back to slide 107.

16             This is Brian Sweet to Cindy Holder.  You saw this

17   earlier in the trial:

18             "Wada is the freaking man!  I'd so love to hire him.

19   Do you think he'd be willing to come do this international

20   role?"

21             This is Brian Sweet talking to his co-conspirator

22   Cindy.

23             We know that Brian had no intention of hiring Jeff

24   Wada.  He told us that.  But here he's playing a game on Cindy.

25   "I'd so love to hire him!  Do you think he'd be willing to come

1    do this interactional role?  I can leave Louann out and just

2    gauge interest with Henderson.  It would be awkward for Jeff as

3    he'd have to recuse himself and likely want some time to pass

4    after this inspection.  Either way one day I want to buy that

5    guy a beer!"

6           He had no intention of hiring Jeff Wada.  He never

7    did.  He acknowledged that.  But he's playing Cindy.  He's

8    running his own game on Cindy.  She's running her game on Jeff

9    Wada.  That is not evidence of a conspiracy.

10          Now, remember the circle of trust, the people who are

11   going to decide whether and how to use the information.  Take a

12   look at slide 112.

13          Brian Sweet.

14          "And to your recollection, that's the first time you

15   heard this phrase 'circle of trust' in the context of this

16   confidential information?

17          "Yes.

18          "Do you know if Mr. Wada was in the room?

19          "No.

20          "He was not, was he?

21          "No.  Wasn't on the phone either.

22          "Did you relay the discussion you had with your KPMG

23   partners about your plans for this information to Mr. Wada?"

24          So the reason why this is important is, again,

25   Mr. Wada is supposed to be part of this conspiracy.  And this

1   "circle of trust" group within KPMG that are meeting to decide

2   what to do with this, what is the objective of this conspiracy

3   going to be, how were they going to use it, are they going to

4   use it, what are they going to do with it, Wada has no part of

5   that whatsoever.  Nothing.  He is not involved.  He wasn't

6   there.  The information wasn't conveyed back to him.

7           "That was the purpose of the meeting, right, is to

8   discuss what you were actually going to do with this

9   information now that you had it?

10  "A  Yes.

11          "And Mr. Whittle said that he needed to maintain a

12  circle of trust?

13          "Yes."

14          No Wada.  He's simply not involved in this.

15          Take a look at slide 115.

16          "Jeff Wada was not a part of this circle of trust, was

17  he?

18          "No, he was not."

19          Now, to be clear, you will hear in the Judge's

20  instructions that the government does not need to show that

21  Mr. Wada was in that room, or that he was on the phone, or that

22  he knew every member of the conspiracy.  They don't need to

23  prove that.  But here's the heart of it.  What the government

24  must prove is that there was a mutual understanding, either

25  spoken or unspoken, between two or more persons to cooperate

 1    with each other to accomplish an unlawful act.  There must be a

 2    mutual understanding.  And they must understand what that --

 3    the goal of that conspiracy is.  It may be a lot of things

 4    without that but it's not a conspiracy.

 5           There is no evidence -- whatever you believed about

 6    Jeff Wada and whether he was the source of any of this stuff,

 7    as far as a conspiracy goes, there is no evidence that he

 8    joined in whatever conspiracy these KPMG employees might have

 9    had.

10           So because they have failed to establish that as to

11    either Count One or Count Two, you must find him not guilty.

12           Let's talk about, for just a moment, the final two

13    counts, the wire fraud counts.

14           I am not going to repeat all the reasons why they

15    haven't proved that he was the source of the list.  I just want

16    to note, though, there is a difference between stealing and

17    fraud, a difference between theft and fraud.  They have charged

18    fraud.  And at the heart of that, the government must prove not

19    just that somebody stole something, took something that didn't

20    belong to them, but that, in this case, because it is fraud,

21    that they did it with the specific intent to defraud that

22    person.  They must have had that purpose in their head as the

23    reason why they were doing it, to defraud somebody, not just to

24    steal it.

25           So the government must prove beyond a reasonable doubt

1    that not only was Mr. Wada the source of those three lists but

2    that he took them with the specific intention of defrauding the

3    PCAOB.  And the Court is going to tell you that simply

4    violating a workplace rule, violating the PCAOB's Ethics Code

5    or EC9 that Barbara Hannigan told you about, that alone is not

6    a crime.  He must have had that fraudulent intent, that

7    specific intent to defraud.

8         Because they haven't proven that, aside from all the

9    other reasons why they haven't met the requirement for wire

10   fraud in Counts Four and Five, because they haven't proven his

11   specific intent, you must find him not guilty of those counts

12   as well.

13        Now, at the start of the case, in my opening

14   statement, I told you that the government would try and fill

15   the holes in their case with the testimony of Brian Sweet, that

16   essentially the case would be about that Brian Sweet would tell

17   you what Cindy Holder told him, what Jeff Wada told him, and so

18   on, and that would be the foundation of their case.  And that

19   is exactly what happened here.  And I also told that you Brian

20   Sweet was a liar.  I told you that in the opening statement.

21        This was the last question and answer from my

22   cross-examination of Brian Sweet:

23   "Q  It would be fair to conclude that you were willing to tell

24   a lie, even if it is a criminal lie, if you believe it will

25   advance your own self-interest?

1    "A   I have certainly done that in connection with all of the

2    things I've talked about in this case.  That is true."

3         That was Brian Sweet's last answer to me on

4    cross-examination.  And that is their case.  And because of

5    Brian Sweet's story telling, Jeffrey Wada was charged with

6    these crimes in January of 2018.  And for the past 13 months,

7    Jeff Wada has entrusted himself to me, to Mr. Weddle, Ms. Jason

8    and Mr. Ohta, and we've spent that time trying to unpack the

9    lies, trying to take the blinders off, trying to show you the

10   many reasonable explanations and interpretation of the evidence

11   that the government has failed to disprove in this case beyond

12   a reasonable doubt.

13        When I'm done, the prosecutor is going to have a

14   chance to speak to you again.  It is their burden so they get

15   the last word.  And I won't have an opportunity to point out

16   those blinders.  I won't have an opportunity to point out those

17   errors, or shortcuts.  I won't have an opportunity to test

18   their evidence and argument any more.  That I leave to you.

19        You will have to hold them to their burden.  You will

20   have to reject the arguments that you conclude they have not

21   proven beyond a reasonable doubt.  You must presume him

22   innocent and not assume him guilty.

23        Jeff Wada, he entrusted himself to us, and we entrust

24   him to you.

25        Thank you.

1          THE COURT:  OK.  We are going to have the rebuttal

2     closing on behalf of the government.

3          Ms. Mermelstein.

4          MS. MERMELSTEIN:  Thank you, your Honor.

5          Good morning.

6          The defense lawyers in this case are very good

7     lawyers.  They have worked very hard.  But they are not

8     magicians.  They cannot with a wave of the hand and a clever

9     argument and a misleading slide erase the overwhelming evidence

10    that David Middendorf and Jeffrey Wada are guilty.

11         At the end of the day, I think this case really boils

12    down to two questions, one for each defendant.  And the

13    question for Jeffrey Wada, as you just heard Mr. Cook say for

14    quite some, time is:  Was it him?  Is he the guy, or was there

15    some secret other source that no one has identified?

16         And the answer to that question is a resounding yes.

17    It was Mr. Wada.  The evidence is totally clear.  There is no

18    secret other source that has not been identified.

19         And for Mr. Middendorf, there is also really one

20    question at the end of the day, and that is:  Did he know that

21    what he was doing was wrong?

22         And you know that the answer to that is "Yes."  It is

23    100 percent clear that he knew what he was doing is wrong.  And

24    because the answer to each of those questions for each of these

25    defendants is "yes," these defendants are guilty.

1          I want to spend time addressing those two basic

2     arguments this morning, those two key arguments.

3          Now, Wada's basic argument, as I just said, is:

4     You've got the wrong guy.  It wasn't me.

5          He's not seriously disputing that there were leaks of

6     confidential PCAOB inspection lists in 2016, in January 2017,

7     in February 2017.  He's just saying it wasn't me.

8          That argument is ridiculous.  It is unsupported by any

9     evidence.  It defies common sense.  So I want to walk through

10    each of the ways you know that Jeffrey Wada was definitely the

11    source.

12         Now, the first way is that Brian Sweet told you that.

13    Each and every time Cindy Holder gave Brian Sweet a

14    confidential inspection list, she told him where it came from.

15    She told him how Jeff Wada got it.  And she told him that Jeff

16    Wada was person who gave it to her.

17         So what does counsel say to that?  They say Sweet is a

18    liar.  You can't believe anything he says and he's really

19    covering up for some secret leaker that is a different person.

20    Or they say, well, maybe Holder was lying to Sweet about the

21    source of the information.

22         That doesn't make any sense.  Why would Cindy Holder

23    lie to Brian Sweet -- her co-conspirator, her fellow member of

24    the circle of trust -- about where she was getting the

25    information?  Why would she say it was Jeff Wada if it wasn't?

1    And, most importantly, why would she frame Jeff Wada?  You saw

2    the evidence in this case.  They were friends.  Right?  They

3    were close.  If she was going to point the finger at someone

4    and frame them, wouldn't it be someone she didn't like?  It

5    doesn't make any sense.

6           In fact, you heard that when this whole thing blew up,

7    when the pieces started to fall apart, Holder went to Sweet and

8    she said we have to keep Wada out of this.  Like, we've been

9    identified, but let's hide our source and say it was an

10   anonymous letter.  Holder tried to protect Wada.  She wasn't

11   framing him.

12          So then counsel says, OK, if it wasn't Holder, so then

13   Sweet is framing him.  And this is just a farfetched conspiracy

14   theory.

15          Yesterday, counsel tried to argue that somehow it was

16   at the end of the thing, when it was all falling apart and

17   Sweet knew he needed a fall guy, he said:  Oh, I have an idea.

18   I'm going to point the finger at Jeffrey Wada.  Because I know

19   he's friends with Cindy Holder and I know he wants a job, so

20   that's going to be a good story for us to tell.

21          But that cannot be true.  Sweet had never seen

22   Holder's phone records.  He had never seen her text messages

23   with Wada.  He hadn't heard those voicemails that Wada left for

24   her.  And he had no way to know that, amazingly, all of the

25   evidence would support that the source is Jeffrey Wada.  He had

1    no way to know that every single time -- and I mean every

2    single time -- Holder had a leak that she said was Wada, there

3    are phone records that back that up.  There are voicemails.

4    There are text messages.  There is a communication with Wada

5    every single time.

6           Is that a coincidence?  Sweet randomly picked Wada and

7    then miraculously all of the records support it?  That is not a

8    coincidence, ladies and gentlemen.  That's proof beyond a

9    reasonable doubt.

10           And it didn't just happen one time.  Right?  The

11    pattern that it's each and every time is how you know that

12    there is really no question that the source was Jeffrey Wada.

13           Let me just say one more thing about this preposterous

14    notion that in February of 2017 Sweet first decided I'm going

15    to point this on Wada.  Because in February and March of 2017,

16    the only thing that was going on was an internal KPMG

17    investigation.  Right?  KPMG wanted to know who of our

18    employees has been involved in this.  They don't care who the

19    PCAOB leak is.  That's not really their problem.  But you heard

20    that Brian Sweet told lawyers during that internal

21    investigation, when no one was really worried about who the

22    source was, he admitted it was Jeff Wada months and months

23    before he had any reason to think that prosecutors would want

24    to know who the leak was.

25           And so then defense counsel tried to say, well, you

1   know that Sweet is lying because his testimony about this is

2   inconsistent with the testimony of Tom Whittle.  He said that

3   that was inconsistencies that Sweet told you that Jeff Wada

4   was -- let me start over.

5          He said Whittle says that in March of 2016 on that

6   call, where they came up with this plan, Whittle understood

7   that the person who had been the leak was in banking.  And he

8   says Sweet told him that on the phone.  And so defense counsel

9   says, look, that's inconsistent.  Wada wasn't in banking and

10  Sweet told Whittle the source was in banking, so you know that

11  Sweet is a liar.

12         The problem with that is that's not what Whittle said.

13  That is completely misleading.  You saw a quote from the

14  transcript that references a statement by Whittle that Whittle

15  then clarified, and defense counsel didn't show you the

16  clarification.  So let's look at what Whittle actually said

17  about this.

18         Here's the question:  "Before we move on, on the

19  March 28th call -- the March 28, 2016 call that you said this

20  morning that you understood that the source of the list was

21  someone in banking, was that said on the call or was that just

22  your understanding?

23         "That was my impression given the fact that most of

24  the engagements on the list were banks."

25         Now, that is a perfectly reasonable understanding by

1    Tom Whittle.  The list is banks.  You'd think the person must

2    be in banking.  Sweet didn't tell him that, and he never said

3    that.  And for defense counsel to suggest otherwise to try and

4    make Sweet look like he's lying is totally misleading.

5              Now, before I turn to all of the ways that you

6    affirmatively know that Jeff Wada was the source, let me say a

7    few words about this ridiculous argument that there is some

8    other source, and maybe it is Bob Ross and maybe it is Jeff

9    Watkins.  Defense counsel tried to suggest that the government

10   has blinders in this case, that the government is the frog

11   that's being fooled by the scorpion.  The government is not a

12   frog.  The government has not been fooled by Brian Sweet, and

13   the government did not just rush to judgment.  You heard that

14   the investigation in this case started sometime after the

15   initial reports.  In February of 2017, there was a problem.

16   And you heard when the defendants were arrested --

17   January 2018, almost a year later.

18             This case was investigated thoroughly.

19             Now, as you heard -- and this is very important -- the

20   defendants have no burden.  They don't have to put on any

21   evidence.  They don't have to do anything.  But when they do do

22   something, when they show you evidence, when they make

23   arguments, you have to evaluate those with great scrutiny.

24   Because it's very misleading for the defense to suggest that

25   you didn't see any evidence of an investigation into Bob Ross

1    or Jeff Watkins.

2            First of all, as I expect Judge Oetken will tell you,

3    the evidence is available to both sides.  The witnesses are

4    available to both sides.  And as Mr. Cook himself conceded,

5    they could have called Bob Ross if that was going to be useful.

6    They could have called the agents who ran this investigation to

7    walk through every single investigative step in this entire

8    case.  But you know what that would have shown:  That all roads

9    lead to Jeffrey Wada, that all of the evidence points to

10   Jeffrey Wada.

11           And I don't want to waste too much more time on this,

12   but the evidence is perfectly clear that none of these other

13   people were the source of the key leaked information in this

14   case.  Right?  You know that Jeffrey Wada leaked information

15   about Sumitomo in October 2015, in November 2015, that he

16   leaked part of the inspection list in March of 2016, that he

17   leaked the preliminary list in January 2017, and the final list

18   in February 2017.  And everyone agrees that there are leaks

19   that happened on that date.  So you have to ask yourself who

20   could have been the leaker on each and every one of those

21   dates.

22           Well, Jeff Watkins was fired in February of 2016.  He

23   was gone by the end of the month.  So he can't have been the

24   source of leaked information in March of 2016.  He didn't have

25   access to the PCAOB information at that point.  And he

certainly couldn't have been the source in 2017 in January, or

2017 in February; he had been gone from the job for a year.

So defense counsel says, well, but maybe Jeff Watkins

took information with him when he left the PCAOB and then he

waited a month to share it with Brian Sweet, or he gave it to

Brian Sweet and then Brian Sweet waited a month to act on this

time-sensitive information.  Because, remember, in March of

2016, they're in the 45 days.  The clock is ticking.  That

makes no sense.  There is no way that Jeffrey Watkins is the

source.

And it also cannot have been Bob Ross.  Defense

counsel suggested to you that maybe if you only knew more about

Bob Ross, if only we had more of his documents, that then maybe

it would turn out that he was the leak.  But there was a

suggestion that just the existence of Bob Ross is reasonable

doubt.

But a reasonable doubt has to be "reasonable," and

this is completely outside of reason.  The defense says that

you sort of haven't seen any evidence of Bob Ross' documents.

But that's not true.  Let's look at what you know about Bob

Ross.

OK.  Here is from Brian Sweet's telephone Bob Ross'

contact information.  Two phone numbers, work and mobile.  You

know how many phone calls Bob Ross had with Brian Sweet?  Zero.

Not one.

1            So -- and you heard that Bob Ross and Brian Sweet

2    didn't live in the same place.  Right?  They would meet for

3    lunch if they were in town at the same time.  So they can't

4    have been exchanging the information in person.  It would have

5    had to be on the phone.

6            You know, though, that they didn't communicate in

7    October and November in 2015, right, when that Sumitomo

8    information was leaked.  They weren't having lunch on March 28,

9    2016, when the first list was leaked.  And I'm going to come

10   back to January 9th, by they weren't having lunch in February

11   when that list was leaked.  You saw the calendar invites.  OK?

12   Other than January 9th, which we are going to come back to,

13   here are the times when they are meeting up:  February 3rd of

14   2016, March 9th of 2016.  This is weeks and weeks before the

15   March 28th call.  Brian Sweet didn't get this information from

16   Bob Ross and then sit on it for weeks.  That makes no sense.

17   It cannot be Bob Ross.

18           And one other thing.  The defendants have tried to

19   suggest that -- and we'll come back to this -- there is

20   something really unfair about how KPMG was being treated, and

21   the problem was Bob Ross.  He was out to get KPMG.  He was too

22   harsh.  He was looking for a problem where there wasn't one.

23   And they want you to think that that person is the same person

24   who was feeding KPMG the answers to the test?  It doesn't make

25   any sense.

1          The whole notion that Sweet would frame Wada to try

2     and protect Bob Ross is kind of crazy because Sweet didn't

3     protect Bob Ross when he testified.  Sweet told you that he got

4     confidential PCAOB information from Bob Ross.  He told you they

5     would have lunch, they would go to dinner, and he would try and

6     glean information he shouldn't have.  He told you about how he

7     took notes in the Notes function of his phone to remind himself

8     of some things that Bob Ross had told him.

9          If Sweet is being open with you about the fact that

10    Bob Ross shared confidential PCAOB information, do you think he

11    would lie about, well, yes, he shared this information but not

12    the inspection lists?  He is not protecting Bob Ross.  He is

13    being honest about things Bob Ross did that he shouldn't have.

14    There is no reason for him to then make up that Jeffrey Wada

15    was the source of the inspection lists.  So you know that none

16    of these people is the source of inspection lists.  That is

17    ridiculous.

18         Let's move on and talk about how you know that Jeff

19    Wada absolutely is the one and only source of the inspection

20    lists.  I am going to go through this quickly because Mr. Cook

21    just showed you this this morning.  You will remember that in

22    October of 2015 Brian Sweet emails others -- Middendorf,

23    Whittle -- and says, I got a call from an old colleague over

24    the weekend that this decision has been made.

25         It's not just the fact that lo and behold there is a

1   phonecall from Cindy Holder to Jeff Wada.  It's over the

2   weekend, just like Sweet said.  That email was on October 20th,

3   a Tuesday.  October 17th is Saturday of that weekend.  Those

4   things match up perfectly.  It's not a coincidence.

5          You know what was said on this call because you saw

6   what happened immediately afterwards.  Then it happens again.

7   Remember, there is an update.  It turns out that PCAOB is now

8   not going to look at a bank in Japan, and the exact same thing

9   happens.  It is that same day Cindy Holder calls and tells him.

10  The defense counsel want you to think maybe Bob Ross told him a

11  week before.  This is the same day, breaking news, and Sweet is

12  immediately sharing it.

13         The notion that maybe Cindy Holder brought this

14  information with her and made up that it came from Jeffrey

15  Wada, Cindy Holder left the PCAOB in the summer of 2015.  This

16  is breaking developments.  She didn't have access to this

17  information months before the decision would have been made.

18  It can't be her.

19         Let's look at March 2016 too.  I'm not going to go

20  through this in great detail, but I want you to look at how

21  revealing the time line is, how quickly things happen one after

22  the other.  They start at the top of this.  You will remember

23  there is this call from a number of Cindy Holder at KPMG to

24  Jeff Wada for 51 minutes.  Defense counsel said no, there is no

25  recording of the call, we have no idea what was said on the

1    call.  But that is not true.

2    A.  The first way you know exactly what happened on this call

3    is because you know what Jeffrey Wada was doing during this

4    call.  This is Government Exhibit 1378.  This is the record of

5    Jeffrey Wada's logins to the IIS system.  Here is his login on

6    March 28th of 2016, 11:53 a.m.  You saw it is Central time, so

7    it's 12:53 Eastern.

8            Do you know why that matters?  Because look at when

9    that is happening.  He is on the phone with Cindy Holder when

10   he logs into the IIS system.  You don't know what they were

11   talking about?  He literally logged in to the system while he

12   was talking to her.

13           He didn't log in to the system to get information

14   about Christy Zhang.  He didn't log in to get information about

15   the banking inspections group that was being formed.  That

16   information isn't in IIS.  The only information in IIS is

17   inspection information.  So you know exactly why he was logging

18   in at the very moment in time that he was talking to Cindy

19   Holder: to get the information that he was going to give her.

20           Look how consistent that is with what Brian Sweet told

21   you.  What, if anything, did Holder tell you about where

22   Jeffrey Wada got the information?  "She explained to me that

23   Jeff had gone into the PCAOB's IIS system and had accessed the

24   planning information for the inspection."  That is exactly what

25   happened.  There is proof positive that that is what Jeffrey

1   Wada did, and here is proof positive that when Sweet told you

2   that, he was exactly right.

3        Look at what happens next.  The minute they get off

4   the phone, it's the same minute she is desperately trying to

5   find Sweet on his cell phone, his work phone, she is texting

6   him.  Why?  To talk about a recruiting matter?  That's not

7   desperately important information.  You know exactly why.

8        And in case it is not totally clear, look at what

9   happens next in the chain.  Sweet and Holder speak.  They get

10  off the phone.  It's a 1:56 p.m. call, 23 minutes and 343

11  seconds long.  Immediately after it's over, one minute later,

12  Sweet is calling Whittle.  Do you think that is about

13  recruiting, it is so important that the minute people get the

14  information they immediately have to call their supervisor?

15  That doesn't make sense.

16       What do you know from this time line?  Look at how

17  quickly everything happens, how little time there is between

18  the tipping chain from one person to the next person to the

19  next person.  A minute after Holder has the information, she is

20  trying to find Sweet.  A minute after he has the information,

21  he wants to look for Britt and Whittle.

22       If this was a call about Christy Zhang or Jeff Wada's

23  personal life or recruiting, it wouldn't be this urgent.  They

24  wouldn't be so desperate to find each other.  Hours after Wada

25  has provided this information, they are in that conference room

1    making a plan of how to use this information.

2            There is no real dispute that this information came in

3    on March 28th of 2016, and there is also no real dispute about

4    who provided it, the person at the very beginning of that

5    fast-paced list of telephone calls, and that person is Jeffrey

6    Wada.  That's March of 2016.  It's a hundred percent Wada.

7            Let's turn to January 9th of 2017.  Defense counsel

8    spent a lot of time making it seem like this time line was

9    confusing or somehow misleading.  Not true.  Wada leaked this

10   one just like he leaked the first one.

11           You saw the January 9th time line.  They say the

12   government is trying to mislead you because this is really a

13   call about who the ADs are going to be in the banking group.

14   First of all, this is a government exhibit.  The government has

15   made perfectly clear that what starts this text chain is a text

16   message about that very issue.  But that doesn't mean that

17   that's what every communication in this is about.  You know how

18   conversations go.  People bring up new topics, new things

19   happen.  And you know exactly what happened here because you

20   listened to the voicemail.

21           (Audio played)

22           "I have the list," the grocery list.  That tells you

23   everything you need to know.  That is not the voicemail of

24   someone who's just giving an update on some personnel matters.

25   That is a voicemail of someone who is up to no good.  The tone

1   speaks volumes.  You can hear how excited he is.

2          He is trying not to say exactly what it is he has.

3   Why?  The banking inspection group isn't that big of a deal.

4   You don't need to be really surreptitious about what you are

5   saying.  Christy Zhang is interested in working at KPMG, that

6   is not some great secret.  You know exactly why he is using

7   that tone and those words: because he has the inspection list.

8          Then defense counsel said, well, this is all thrown

9   into question because you saw this email where Holder earlier

10  in the day says she wants to talk to Sweet and Sweet thought

11  that was the email that triggered the conversation.  They say,

12  see, Holder was trying to talk to Sweet before the information

13  came in, so it can't be that this information came in.  But

14  that is silly.  It is perfectly clear that Sweet is just

15  misremembering the exact time of the conversation that happened

16  three years ago.

17         You can tell exactly what that conversation was about

18  based on Wada's logins to IIS.  Let's look at this one.  Here

19  is January 9, 2017.  He logs in at 1:29 Central, 2:29 p.m.

20  Eastern.  What is he doing right after this?  You saw what

21  happens.  It's true, Holder brings up the banking list.  Do you

22  know what he does?  Logs in to ISIS and immediately leaves her

23  a voicemail saying he has the grocery list.  And you know where

24  the grocery list comes from.  It is inspections information

25  that is contained in IIS.  It's not a secret what that call was

1    about.

2              Defense counsel tries to make this whole big deal

3    about it's impossible to know what someone else's text messages

4    mean, we can't understand what other people are saying to each

5    other.  It's just not true.  It's just not true.  You have

6    common sense.  You understand that people don't talk like this

7    when they are doing things that are legitimate.  These are

8    communications that are criminal.

9              Defense counsel also tried to suggest to you that the

10   government hid from you that Sweet misremembered the timing,

11   they tried to hide from you notion that there is some

12   inconsistency and he is misremembering.  He said you didn't see

13   this laid out for you in the summation because of the blinders

14   the government has, the single-minded focus.  That's not true.

15   That's not what happened.  Maybe you remember Ms. Kramer

16   explained this to you in her closing.  Here is what she said.

17             "You may remember that Whittle couldn't remember

18   exactly when that day he got the list from Sweet, and Sweet

19   thought it was right after lunch when Holder emailed him.  But

20   you have the documents to tell you the precise time.  You know

21   that it was later in the day because of the timing of the

22   voicemail, the call, and the photo."

23             The government has been open about this from the

24   beginning.  This is just another example of why this idea that

25   Sweet is just saying whatever he thinks is going to help the

government, he'll make anything up, is ridiculous.  If he was

trying to help the government, he would have lined his story up

to all those documents.  He didn't do that because he

remembered it wrong, and he told you what he remembered

honestly.

Here is another way that you know that Sweet didn't

get this information earlier in the day, he got it later.

First, you saw that when he met with Holder and took a photo of

the page of notes where she had written down who the banking

inspector would be.  She had been asking about the banking

inspectors, and that's one of the things Wada told her on the

call.  The really important information, the inspection list,

Sweet wrote down himself.  He got it all down in that folder.

You know when that conversation about those two things happened

because you have the photo that was taken at 7:45 p.m., after

Jeff Wada had leaked the list.

You also know that from the domino effect of what

happened.  The first thing that Sweet always does is rush to

tell Tom Whittle, and then Tom Whittle tells David Middendorf

because Middendorf is the boss, he's running the whole scheme.

Look at this.  Tom Whittle reached out to David

Middendorf.  It's not until January 10th.  Why is it that it

takes Whittle longer to reach out to Middendorf?  Because he

didn't have this conversation with Brian Sweet until very late

in the day.  If it had been at lunchtime, you'd have seen this

1     email vastly earlier.

2            You know that this email is what triggered that

3     conversation about the list because you saw that when they have

4     that call, Middendorf takes down the list in the notes on his

5     phone, and that happened in the middle of the day on January

6     10th.  The time line speaks for itself.

7            In case there is any doubt, let's look at February 3,

8     2017.  It starts off in basically the same way.  Wada texts

9     Holder: "Okay, I have the grocery list, all the things you'll

10    need for the year.

11           Wada wants you to believe that this is a list about

12    people who work at KPMG or people who are looking for a job.

13    That doesn't make sense.  First of all, you remember that when

14    the scheme all began to unravel, Holder and Sweet got together

15    and said we've got to get rid of the really incriminating

16    evidence, we are going to delete stuff, we are going to burn

17    it, destroy it.

18           Look at this.  Do you know which two text messages

19    Holder deleted?  "Okay, I have the grocery list and all the

20    things you'll need for the year."  She didn't delete, "Hey,

21    flying home tonight."  She didn't delete "Land 8:30 CST."  She

22    didn't delete "Safe travel."

23           Do you want to know why?  Those aren't incriminating.

24    She deleted the ones she knew were evidence of a criminal

25    conspiracy.  If these were nothing, if these were just

1    conversations between friends, why did she choose those two

2    messages to delete?  You know exactly why she did it.

3           And you know that this is not a conversation about

4    Christy Zhang or recruiting or banking inspectors because

5    "grocery list" is the same term Wada uses every time he has an

6    inspection list for Cindy Holder.  It could not be more plain.

7           As was the case every single time Holder got this kind

8    of information from Wada, what she does next is tell you

9    exactly what kind of information it was.  Look at what happens

10   the minute Holder and Wada get off the phone.  One minute later

11   Holder is calling Sweet.  Same pattern every time.  The pattern

12   speaks for itself.

13          Just in case that itself doesn't convince you that

14   Wada is obviously the leak, and really there can be no

15   question, look at what was on his computer.  You saw that on

16   March 28, 2016, and January 9, 2017, Wada accessed IIS

17   literally during his call with Holder or just before at the

18   very place where the PCAOB confidential information resides.

19          In February 2017 he went a little further.  You saw

20   that he took a little more time to make sure he had all the

21   information she wanted.  You saw that on February 21, 2017, he

22   downloaded a whole slew of confidential KPMG inspection

23   information, the very information he needed to feed Holder the

24   entire list.  This is I believe credibly damning evidence.  It

25   proves he had the information that he leaked.  He had no reason

1    to download these documents.  So it proves that he was up to no

2    good.

3         What does defense counsel do?  You have to do

4    something.  He says, well, this evidence is very suspect

5    because the IT security architect from the PCAOB who downloaded

6    these documents, he doesn't have the same qualifications as a

7    member of the Secret Service who looked at Middendorf's phone.

8    That argument is kind of desperate.

9         You heard Chris Ren testify.  Is there any question in

10   your mind that that is a guy who knows a lot about IT?

11   Frankly, how hard is it to copy a file from a computer?  My

12   grandmother could do that.  You don't have to be an IT security

13   professional to be able to download a couple of documents.

14   That argument is ridiculous.

15        Of course a PCAOB IT person is the person who did the

16   search, because the government was not yet involved in this

17   way.  You will recall that Chris Ren conducted the search in

18   April of 2017.  That's way before.  Brian Sweet is not talking

19   to anybody.  This is a completely independent source of

20   information that Jeffrey Wada is the leak.

21        Then counsel says, well, okay, maybe these were on

22   Wada's computer, but the file structure says that he had a

23   legitimate reason because he labeled this folder "Planning

24   documents, examples from other firms."  And just because

25   Stephanie Rodriguez said this is totally unhelpful, it doesn't

1   make any sense, maybe he didn't care about the content, he just

2   wanted to look at how they structured their documents.  That

3   doesn't make any sense either.  One of the documents he copied

4   was the GNF planning profile for KPMG.  Every firm had its own.

5   You don't need to compare your firm to another.  It doesn't

6   make sense.

7        Wada's decision to label the folder this way, that is

8   a cover story.  He knows he's not supposed to have these.  He

9   knows he has no legitimate reason.  He's laying a trail for the

10  defense that is ultimately going to come.

11       One other thing about this.  Defense counsel made a

12  big deal about the government hid from you the fact that there

13  is an E&Y document in this group.  Not true.  This is a

14  government exhibit, Government Exhibit 92.  The document itself

15  makes perfectly clear that that is an E&Y document.

16       We asked Stephanie Rodriguez to explain it to you.

17  She told you she had seen the document and knew what it was.

18  There's no secret there.  This is part of the cover: see, it

19  wasn't just KPMG documents, 95 percent may be KPMG documents,

20  but I was looking at other things too.

21       Just this morning Mr. Cook said to you, I'm going to

22  try and have it both ways.  Wada is not the leaker, you should

23  think it's someone else; but if he was the leaker, he wasn't

24  trying to improve inspection results, he wasn't trying to

25  target the SEC.  That argument doesn't make any sense.

1          That's like a wife who is walking down the street and

2     she looks in the window of a romantic French restaurant and her

3     husband is having dinner with another woman.  When he gets

4     home, she says, I just saw you having dinner, and he says,

5     wasn't me, must have been somebody else, but if it was me, it

6     didn't mean anything.  That doesn't make sense.

7          You can't have it both ways.  The arguments don't hold

8     together.  It doesn't make sense to say that you weren't the

9     source, but if you were the source, you didn't intend to do

10    anything.

11         The argument that Wada didn't intend that the

12    information would be used is ridiculous.  The whole point of

13    the information is to use it.  It doesn't have value to Wada

14    sitting in his house.  The whole point of sharing it with Cindy

15    Holder is so she can use it.  And how do you use it?  You use

16    it to do better on inspection results so that the people who

17    get those results will be fooled, so that they will think that

18    things are better when they are not.  And you know who gets

19    those inspection lists: the SEC and the PCAOB, the targets of

20    the scheme.

21         All of that means that Jeffrey Wada joined this

22    conspiracy.  There is not any other conspiracy.  You are going

23    to hear from Judge Oetken that not all the members of the

24    conspiracy have to know each other.  You don't have to know

25    every detail.  Frankly, it would make no sense for Jeff Wada to

1    be in the meeting at KPMG about how they are going to use the

2    information.  That's not his role.  He gets the information and

3    he gives it to them so they can use it.

4        They are all part of one scheme.  Without each of

5    them, the scheme couldn't exist.  Without Wada, they wouldn't

6    have the information.  And without someone at KPMG to use it,

7    there would be no point in stealing it.  Everyone involved

8    understood that that was exactly true.

9        The idea that somehow Wada was giving it to Holder and

10   he didn't realize she was going to give it to Sweet, that they

11   weren't going to use it more broadly at KPMG, that doesn't make

12   sense.  You saw that Holder was the intermediary.  She is

13   getting information from Wada and she is passing information

14   back to Wada.  Thoughts from Sweet on his résumé: "A thumbs up

15   and a good job.  We're going to buy you a beer."  He knew

16   exactly where the information was going.

17       This goes exactly to Mr. Cook's argument about the

18   intent to defraud.  He said there's a difference between

19   stealing and fraud.  That is true.  But Jeffrey Wada didn't

20   just steal the information and then take it home to use it as

21   scrap paper.  He used it to defraud the PCAOB and the SEC.

22   That was the whole point of giving it to Cindy Holder.  The

23   notion that maybe he was just taking it for some other reason

24   does not make sense.

25       Before I move on to talking about how you know that

1  David Middendorf knew exactly what he was doing was wrong, I

2  want to spend a few minutes talking about just Sweet and

3  Whittle.  Defense counsel spent a lot of time attacking them.

4  And defense counsel have to do that because their testimony is

5  devastating.  If you believe these witnesses, the defendants

6  are both guilty without any other evidence.  So you can

7  understand why defense counsel has to attack them.

8          MR. BOXER:  Objection.

9          THE COURT:  My instructions will clarify the burdens

10  here.

11          MS. MERMELSTEIN:  Let me make that clear.  Defense

12  counsel doesn't have any burden.  They don't have to do

13  anything.  We would never suggest otherwise.  But you can ask

14  yourselves why they are doing what they do do, whether or not

15  those reasons reveal what's going on.  It is clear that this is

16  devastating evidence and they have to attack it.

17          MR. BOXER:  Objection.

18          THE COURT:  Same clarification.  My instructions will

19  make it clear.

20          MS. MERMELSTEIN:  Thank you, your Honor.

21          There is no question that they have to attack this

22  evidence.

23          You heard both of these witnesses testify and you know

24  that they are telling the truth.  First of all, they are

25  corroborated by mountains of other evidence, by the text

1    messages, by the documents, by the IIS logins, by the emails,

2    by the other witnesses who are part of these conversations.

3    Sweet says that Whittle asked him to email the 2015 list.

4    Whittle told you the same thing.  Then you saw the email where

5    that happens.  Total corroboration.

6            Sweet says Wada gave Holder the 2016 list on March

7    28th of 2016.  You saw Holder's phonecall with Wada.  You saw

8    that Wada was in fact logged in to IIS during that very call.

9    And you heard from Whittle that immediately after that Sweet

10   passed him the information.  All of what they are saying is

11   completely corroborated.  It would be impossible for them to

12   make this up and fit it together like this.

13           Defense counsel has suggested that, well, you can't

14   believe them because they have previously lied.  Less so for

15   Whittle, mostly for Sweet.  They said the government is turning

16   a blind eye to Sweet, that we are letting him get away with his

17   crimes because we need him so badly as a witness.  That's not

18   true.

19           First of all, the government doesn't need Sweet.  You

20   could convict both of these defendants if Sweet had never

21   testified.  There is plenty of evidence without him.  But you

22   can believe Sweet because he told you the truth.  This whole

23   idea that Sweet is still committing crimes and still lying

24   about it and still revealing it, that's just not true.  And it

25   is not true that the government has let him get a pass.

1          We are really talking here about two things: a

2     mortgage he got in 2012 where he lied about some of his assets,

3     a mortgage that he has since paid off; and that while he had

4     earlier disclosed that he had improperly used some of his

5     rental properties for tax benefits, that that was also true

6     with respect to this vacation cabin.

7          But he didn't get a pass for that.  You saw 3522-36.

8     After he entered into his cooperation agreement, when

9     government found out about this, we made him take

10    responsibility.  He had to agree that while he is not going to

11    be prosecuted, he is already facing 85 years, this conduct is

12    going to be considered by the judge at his sentencing.  He is

13    taking responsibility.  He is going to face the consequences of

14    that.  And he's got to make it right with the IRS.  He's got to

15    file new tax returns, and no promises about whether or not

16    criminal charges will be brought.  There's no benefit to Brian

17    Sweet.

18          This may, frankly, be the silliest argument from the

19    whole trial.  What is the big gotcha on Brian Sweet, the

20    smoking gun?  It's a photo of a restaurant website.  They want

21    you to think that Brian Sweet can't be believed about anything

22    because he said that the lunch he had was at the location of

23    this restaurant on the right, but really it was at the one on

24    the left.  What does that prove?

25          The photo on the left is of the outside of the

1    restaurant.  This is a restaurant chain.  If you see a photo of

2    an Olive Garden in Philadelphia and an Olive Garden in New York

3    City and you say that looks like where I ate, now you're a

4    liar?  It's the same chain.  It doesn't make any sense.  Again,

5    they have no burden.  But if the restaurants look different

6    inside, don't you think they would have shown you a photo of

7    the inside?

8             MR. BOXER:  Objection.  May we approach, your Honor?

9             MS. MERMELSTEIN:  I don't think that is necessary,

10   your Honor.

11            THE COURT:  I am just going to clarify for the jury

12   that the government has the burden of proof, and any suggestion

13   that the defendants have a burden of presenting evidence to

14   show that they are not guilty, as my instructions will make

15   clear, is not required.

16            MS. MERMELSTEIN:  This argument is ridiculous.  In

17   fact, the whole idea that Whittle or Sweet would lie in this

18   trial is ridiculous.  Their sentencing doesn't depend on the

19   outcome of this trial.  As long as they are truthful, that is

20   the one thing they have to do.  If they are truthful, they get

21   the benefit of cooperation.

22            Frankly, if they were going to lie, wouldn't they have

23   done a better job?  Wouldn't you think that Sweet would have

24   said, oh, yeah, I didn't take that information in 2015 on my

25   own; when I interviewed David Middendorf, he told me to do

that?  But Sweet didn't do that.  He is not trying to make it
worse than it is.  He is trying to tell you the truth.  In 2015
the truth is he did that by himself.

         The defense lawyers also are trying to have it both
ways with Sweet and Whittle.  When they like what they say,
then they want you to believe them.  But when the facts are bad
for them, all of a sudden they are both liars.  There are too
many examples to give you.  Let's talk about just a few.

         Sweet said Holder was manipulating.  That's exactly
they want you to believe.  But when he says Wada was a member
of the conspiracy, now all of a sudden he was lying.  Sweet
says he got confidential PCAOB information from Bob Ross.
Defense counsel says that you should believe.  Sweet says,
right, but not the inspection lists, those I got from Jeff
Wada.  Now it's a lie.

         Sweet says, I took the 2015 GNF planning profile, that
was me, I did it by myself.  That they want you to believe.
Sweet says, my first week Middendorf pressured me for
confidential PCAOB information.  That they say is a lie.
Whittle says he organized a cover story for four additional
engagements, he did that on his own.  That they say is true.
He says he told Middendorf that the 2017 January list was
confidential PCAOB information.  That's at a lie.

         You cannot have it both ways.  It does not make sense
to accept their testimony only when it helps the defense and

1    reject it whenever it hurts them.  It doesn't add up.

2          Let me now turn to the second big question: did

3    Middendorf know that what he was doing was wrong?  The answer

4    is a resounding yes.  David Middendorf was one of KPMG's

5    highest level executives.  He ran an enormous operation,

6    multiple different divisions.  He had enormous

7    responsibilities.  He was ultimately responsible for the

8    relationship between the PCAOB and KPMG and for inspection

9    results.  You don't get to that kind of high-level position by

10   being unsophisticated, by being uninformed, by being unaware.

11         But what David Middendorf wants you to believe is that

12   he just didn't realize it was wrong.  Ladies and gentlemen,

13   that is not credible, it is not believe, and it isn't true.

14   First of all, you don't have to be an expert in the PCAOB or

15   the SEC or in audit firms to understand this is wrong.  A fifth

16   grader could know that this is wrong.

17         You can't cheat on tests.  You can't steal information

18   from your regulator to try and fool them into thinking that you

19   are actually improving.  You can't mislead the PCAOB and the

20   SEC and your clients about whether or not audit quality is

21   getting better.  That's not rocket science.  It's not hard to

22   understand.  It's completely obvious.

23         For people who did work in this industry, that was

24   crystal clear.  You heard a lot about what people at KPMG

25   thought about having and using confidential information.  All

1    of the people that you heard from in this trial had two things

2    in common.  One, they were David Middendorf's subordinates.  He

3    was their boss.  Two, they knew that PCAOB selection

4    information was highly confidential and that it was completely

5    wrong for KPMG to have it.

6            This is obvious, but let's run through how many people

7    knew that.  Diana Kunz, you remember she is not in the national

8    office, she is not a supervisor, she is just a regular

9    engagement partner.  She finds out in 2017 not that they have

10   the whole list, they have her inspection.  She knows something

11   didn't seem right.  The information was very specific, that it

12   was going to be inspected.  There was no ambiguity or

13   uncertainty to it.

14           George Hermann, remember he is in the audit group.  He

15   is not involved in PCAOB inspections like Middendorf is, but he

16   knows that this is not okay.  When he found out, he was very

17   agitated.  He was fired up.  He made derogatory comments about

18   Mr. Sweet and said we should not have this information.

19           To Thomas Whittle, a member of the scheme, someone

20   directly involved in the fraud, it couldn't be more simple: "I

21   thought it was wrong.  It was confidential.  I knew at the time

22   it was not something I was supposed to have."

23           Dave Marino, you will remember how upset he was when

24   he found out this was going on.  "I had a deep level of concern

25   for the firm.  We cannot have the regulator's selections,

1    period.  There was only one course of action, and that course

2    of action was to self-report this matter to the regulators,

3    make them aware that we have the information, and allow them to

4    select new engagements if they so choose.  Hiding this is

5    unethical and possible illegal."

6              Brian Sweet:  Did you know that what you were doing in

7    2015, 2016, and 2017 was wrong?  Yes.

8              Laurie Mullen, same thing:  "We have that information

9    inappropriately, that would have really compromised the

10    integrity of the regulatory process, and the only appropriate

11    action would be to go and self-report to the PCAOB and to allow

12    them to make another selection."

13              Finally, and this one is interesting, Jay Hanson.  Jay

14    Hanson was called by the defendant, and he knew this was wrong.

15    "PCAOB inspection selections are highly confidential."  Here is

16    what we asked him.

17    "Q. An audit firm can't hide from the PCAOB that they've

18    devoted extra resources to certain audits based on the

19    possession of confidential PCAOB information, right?

20    "A. I agree with that statement.

21    "Q. And that's true even if the extra resources devoted to

22    those audits are designed only to improve documents, right?

23    "A. I would agree with that."

24              That is the defense's witness.

25              Literally every person who testified in this trial,

1    every person was one hundred percent sure that it was wrong to

2    have confidential PCAOB information.  Every single person but

3    one.  Amazingly, the one person who somehow didn't realize that

4    this is a huge deal, he wasn't a brand new employee, he wasn't

5    straight out of school.  He was one of the highest executives

6    in all of KPMG.  It is not a coincidence that the one person

7    who is trying to claim that they didn't realize it was wrong is

8    also the one person who is trying to avoid a criminal

9    conviction.

10           Middendorf tried to muddy the waters on it.  He said

11   Sweet sent gossip and predictions to other people, he had a

12   list of 47 people who got emails from Sweet.  He says, look, if

13   they didn't know, then I didn't know.  That is a complete

14   distraction.  Sweet emailed other people.  You saw an email

15   with a lot of people talking about a conference he went to.  He

16   didn't send emails about this fraud to 47 people.  He didn't

17   send inspection lists to 47 people.  Defense counsel's

18   arguments about this were really pretty misleading.

19           Do you remember this email?  It's an email from Brian

20   Sweet just to David Middendorf and Thomas Whittle.  Defense

21   counsel showed this to Mr. Middendorf when he testified and he

22   showed it to you in closing, and he said:

23           "Look at the first sentence.  'I wanted to send you

24   both a list of what I anticipate will be the most likely PCAOB

25   banking inspection.'"  He said, look, it says "anticipate."

1   This is just predictions.

2          Read the second sentence.  "This list represents the

3   PCAOB's view of the higher-risk banking audits based on the

4   attributes it uses to evaluate, and so these were next in line

5   for inspections here."  This is from the PCAOB's own internal

6   list.  It's not subtle that this is confidential information.

7          Here is another way in which defense counsel's

8   arguments on this were misleading.  Defense counsel tried to

9   tell you, well, Jay Hanson gave David Middendorf draft agendas

10  for meetings and somehow that made it okay for them to be

11  stealing confidential PCAOB information about inspections.

12  There are two huge problems to this argument.

13         The first one is easy: that's not what Jay Hanson

14  said.  You heard from Jay Hanson himself.  He was called by the

15  defense as a witness.  He said that he sometimes would schedule

16  a meeting before the agenda went out with the understanding

17  that the firm would get the agenda before the meeting took

18  place.  Here is exactly what he said.

19         "My general practice was meeting with the firm when

20  they had the agenda in their hands, and sometimes, just for

21  pure logistics to get something on the calendar, expecting that

22  by the time I came the firm would have the agenda from the

23  board or the staff, as it transmitted it, as a basis for the

24  discussion."

25         He didn't say David Middendorf drafted agendas every

1    time there was a meeting.  But even if he had, so what?  In

2    what world does getting the agenda for a meeting make you think

3    that you can steal confidential PCAOB information and use it to

4    cheat on inspections?

5            At the end of the day, all of these arguments --

6    everyone else knew it was wrong, that's not what Jay Hanson

7    said -- there is something even more fundamental here.  Despite

8    what defense counsel tried to argue to you, even Mr. Middendorf

9    couldn't hold this lie together.  I'm going to talk in a minute

10   a little more about his testimony.

11           But just think about this point.  On direct

12   examination he said, "I did not know this was wrong, and even

13   today I don't believe it was wrong."  But when he was pressed

14   on that point, even he had to admit that that is not true.

15   Here is what he was asked on cross-examination.

16   "Q. Now, Mr. Middendorf, you testified you didn't recall the

17   2015 list, but if you had the PCAOB inspection list, the

18   complete list, you would understand that was confidential PCAOB

19   information, right?

20   "A. Yes.

21   "Q. That's information you shouldn't have, right?

22   "A. Correct."

23           Here's more.

24   "Q. And I believe you testified that if you had gotten the

25   inspection list from the PCAOB, that would not be okay, right?

1  "A. Correct.

2  "Q. Because that would be confidential information?

3  "A. Correct."

4       Ladies and gentlemen, those are just a different way

5  of saying that it's wrong.  And that is the end of this

6  inquiry.  There is no dispute in this case that David

7  Middendorf got confidential PCAOB information in 2016 and there

8  is no dispute that he authorized its use.  The only dispute is

9  did he know it was wrong, and even he had to admit that he knew

10  it was wrong.  That in and of itself makes him guilty of the

11  conspiracy counts and the 2016 count that is in Count Four.

12       Before I turn to some of the other counts, let's talk

13  about just a few more ways that you know that David Middendorf

14  knew that this was wrong.  The next way you know that is

15  because he lied about it, because he kept it a secret, kept it

16  a secret within KPMG and he kept it a secret from the PCAOB.

17  Let's look at the lies that were told in connection with

18  launching the secret stealth re-reviews.

19       You will remember that in that March 28th call

20  Whittle, Britt, Sweet, and Middendorf all agreed that they were

21  going to use the ALLL monitoring program as a cover.  That is a

22  call Mr. Middendorf says, I don't remember being on.  But lo

23  and behold he is on that email when they actually launched that

24  plan into action.

25       Britt sends out this email to all of the engagement

1   partners for all of the engagements in ALLL.  Why does he copy

2   Middendorf?  Because Middendorf is the boss.  Because

3   Middendorf is the head of this scheme.  He is the one who has

4   authorized this plan.  He signed off on it.

5        Including all the engagements on this email, that's

6   the first lie.  There was never any intention of looking at

7   every single one of these engagements.  The only intention was

8   to look at the ones that were on the list.  It is a cover-up.

9        Look at what the email itself says.  "As part of our

10  wrap-up and reporting of the results of the ALLL monitoring

11  program, we need to gather some additional information."

12  That's not true.  This isn't a part of the wrap-up, and they

13  are not gathering additional information.  That is a lie.  It's

14  a cover story.  The only reason that you need a cover story is

15  because you are committing a crime.

16       Let's fast-forward.  You will recall that all those

17  secret re-reviews, they worked.  KPMG nails it on the ALLL

18  inspections.  They have zero comments.  You saw the talking

19  points for the PCAOB meeting that David Middendorf went to

20  after that.  They are bragging about how good the results are.

21       And the PCAOB wants to know, how did you do it?  What

22  caused the change?  They have a lot of reasons:  "We utilized

23  root cause analysis to identify significant remedial actions.

24  This included substantial training.  Implementation of an

25  invasive risk-based monitoring and support program."

1           Do you know what it doesn't say?  It doesn't say we

2     had secret re-reviews.  It doesn't say we got a list of

3     information, we had an early heads-up.  And why not?  If David

4     Middendorf really thinks this is okay, why is it a secret?  Why

5     don't you want to tell PCAOB what you are really doing?  There

6     is one very clear answer: because he knew it was wrong.

7           One more point about Middendorf's efforts to hide this

8     from the PCAOB.  Yesterday counsel showed you this exhibit,

9     Government Exhibit 940.  Middendorf is not on this, you will

10    remember.  He said, look, this is evidence --

11          MR. BOXER:  Objection.  This is exactly what we

12    argued, your Honor.  It is not evidence, it is not in our

13    argument.

14          MS. MERMELSTEIN:  I am responding to the argument

15    counsel made.

16          THE COURT:  You can respond to the argument.

17          MS. MERMELSTEIN:  Thank you, your Honor.

18          That is the argument defense counsel made.  You know

19    that Whittle and Sweet had an intent to deceive.  Why?  Because

20    they were involved in launching a secret cover-up to look at

21    these four not on the list so that PCAOB wouldn't realize what

22    they were doing.

23          He said this is incredibly strong evidence of Whittle

24    and Britt's specific intent to defraud.  And that is true.

25    Whittle and Britt had a specific intent to defraud, and their

1    involvement in the cover-up is great evidence of that.  But

2    just like this email shows you that Whittle and Britt are

3    guilty, Middendorf's efforts to hide the re-reviews from the

4    PCAOB shows why he is guilty.

5        Let me make two quick asides here.  Middendorf tried

6    to argue that he didn't have a duty to the PCAOB.  That is a

7    completely misleading argument.  As Judge Oetken is going to

8    instruct you, he didn't have to have a duty.  He had to know

9    that someone had a duty.  Jeffrey Wada had a duty.  He signed

10   documents saying he would follow EC9 and then he violated that.

11   That's the duty that was violated.  Middendorf knew that that

12   was happening.  That's what makes him guilty.

13       Let me say one other thing.  There was a lot of talk

14   by Middendorf's counsel that Whittle said they knew this was

15   wrong but they didn't specifically know that it was a crime.

16   That does not matter.  You don't have to be a lawyer to be able

17   to commit a white collar fraud.  You have to know that it was

18   wrong.  Ignorance of the law is not a defense.

19       Let me now turn to Mr. Middendorf's testimony itself.

20   The last way you know that he knew this was wrong is how

21   carefully he crafted his testimony.  He tried very hard to

22   present himself well.  He tried to avoid making it obvious that

23   his story was a lie.  That has some appeal, right?  We want to

24   believe people.  It is very hard to look at someone and say

25   that was a lie.  But that is exactly what happened.

1            Mr. Middendorf is smart and he lied well.  But at

2    bottom it was a lie.  When you think about what he said very

3    carefully, you will see how carefully he had to thread that

4    needle.  He had a very good memory of the facts that were good

5    for him.  But then all of a sudden, when a fact was bad for

6    him, then he had one of three approaches: he tried to avoid

7    answering the question; he just denied remembering anything at

8    all; and in the rare case where he really had no choice, he

9    admitted the bare minimum he could get away with.

10            Let me give you a few examples of where he fought and

11   tried to avoid things that were obvious because they were so

12   bad for him.

13            The first one is that the basic premise of all these

14   re-reviews was to improve inspection results.  Here is what

15   Middendorf said.  He said it again and again and again in

16   exactly these words.  "The purpose was to take credit for the

17   work that had been done prior to the report release date."

18            What does that even mean, the point was to take

19   credit?  The way you get credit with the PCAOB is by not

20   getting comments.  That's the whole ballgame.  There is no such

21   thing as taking credit but not trying to improve inspection

22   results.  He tried so hard not to admit that that was the

23   purpose because he knows that that is how they were defrauding

24   the PCAOB and the SEC.

25            How about this one.  Remember Mr. Middendorf was asked

about that email that goes out to the ALLL monitoring program

and contains all these lies.  He was asked:

"Q. Looking at this email, you testified it's misleading.  In

fact, it really is an outright lie, isn't that fair to say?"

He said, "It is not truthful."

What is the difference between something that is a lie

and something that not truthful?  This is someone who is trying

to wiggle out of trouble.

Think about all the things he didn't remember, all of

the things you would expect him to remember because they were

important, because they were a big deal.  He doesn't remember

that he asked Sweet for information about Wells Fargo at lunch.

He doesn't remember that he asked Whittle to get the 2015 list.

He doesn't remember that Barbara Hannigan had a training where

she explained, among other things, EC9.

He remembers going to the SEC for a meeting, but he

has no recollection that a big focus of that meeting was how

bad the inspection results were.  He doesn't remember being on

the March 28, 2016 conference call.  He doesn't remember

Britt's email to all the ALLL participants.

He doesn't remember knowing that January 9, 2016, was

confidential information.  And he doesn't remember that they

did anything with that information.  He doesn't remember George

Hermann, when he found out, saying this is going to jeopardize

the firm.  He doesn't remember the details of his conversation

1   with Mullen.  And he doesn't remember deleting the January 9th

2   list from his phone.

3         These are major events.  Does it really make sense

4   that Middendorf remembers telling Sweet not to tell him

5   anything he shouldn't at the first lunch?  I say remembers

6   because there is no evidence of that.  The only person who says

7   it is David Middendorf.  But he remembers that and nothing

8   else?  It's totally implausible.  It does not make sense.

9         Everything he claims he doesn't remember, you know it

10  happened because you saw the documents.  You heard from the

11  other people who participated in those conversations.

12        Let me give you two examples of how implausible this

13  lack of memory is.  Let's look at 2015.  You've seen this email

14  a bunch of times.  Whittle emails Mittendorf, "The complete

15  list.  Obviously very sensitive.  We will not be broadcasting

16  this."  Is there any world in which Thomas Whittle sends this

17  to Middendorf out of the blue with zero explanation, this

18  highly confidential information they shouldn't have?  Just

19  sends it, no FYI, no what are we looking at?

20        It's out of the question.  You know that Middendorf

21  asked for this.  When he says he doesn't remember, that's not

22  true.  The idea that I don't read every email I get?  It says

23  "obviously very sensitive."  You would definitely read that

24  email.

25        Let's talk about how he thought that the January 9,

1    2017 list was just a set of predictions, that one he didn't

2    know was confidential.  There is no dispute that Whittle told

3    Middendorf that the March 2016 list was confidential and the

4    February 2017 list was confidential.  So, why was Middendorf

5    saying, oh, January he didn't tell me that?

6            In March he's got this excuse about the documentation.

7    February he's got this story that he was trying to report it.

8    January has no explanation.  They had it, they used it, and he

9    was in on it.  So he says, I thought that was just predictions.

10   That doesn't make any sense.

11           Thomas Whittle told him it was confidential in March

12   of 2016.  He told him it was confidential in February of 2017.

13   In January he hid that from him?  You saw that every single

14   time Whittle had this information, he went directly to

15   Middendorf.  The notion that these prediction lists, you saw

16   them come by email all the time, that this one had to be

17   relayed in a phonecall where Middendorf is typing it into the

18   Notes function of his phone is completely ridiculous.

19           It is also completely clear when Middendorf said he

20   doesn't remember when they did anything with January, that

21   that's not true.  Remember Whittle testified that among the

22   many things he and Middendorf agreed to do was to assign extra

23   resources to Valero.

24           Look at Government Exhibit 1145, January 17, 2017,

25   just after they got the list.  Whittle emails Scott Henderson

1    and he says, we want to utilize your oil and gas background.

2    And he says, Dave -- you will recall "Dave" is always Dave

3    Middendorf, "David" is Britt -- also approved our using our

4    combined resources on this one.  This is a hundred percent

5    proof that they are doing something with the list.

6           Yesterday defense counsel told you, this email is

7    helpful to me because this proves that Thomas Whittle didn't

8    tell you the truth when he testified because Whittle didn't say

9    anything about assigning Scott Henderson to Whittle.  That is

10   completely inaccurate.  Look at what Whittle actually said.

11          "Valero is an oil and gas company, and they had

12   contacted Cindy Holder early in January before the list to get

13   involved in reviewing some of the areas, which I had approved.

14   Around the time the preliminary list came out, there was

15   another request for some additional assistance that came

16   through Cindy Holder, and as a result of that I assigned

17   another partner to step in and look at some oil and gas

18   specific areas that were outside of her expertise."

19          Right.  That's exactly what Whittle said: an oil and

20   gas person.  Scott Henderson is the oil and gas person.  This

21   shows you that Whittle was telling the truth.

22          Last point on Mr. Middendorf's intent.  Counsel has

23   tried to suggest to you that Middendorf was somehow

24   demonstrating good faith when he gave in-house counsel at KPMG

25   a copy of the list from his phone.  But here is what he avoided

1   mentioning: that he deleted relevant information from that list

2   before he turned it in.

3          Let's look at this, 1144.  On the left is the list

4   that went to counsel.  You will see example number 26 is

5   Macy's.  But Middendorf gave a cleaned-up list just listing the

6   engagements.  Do you know what was deleted?  Look at this:

7   Macy's, all of the focus areas, net sales, pension assets and

8   liabilities, inventory, vendor allowance, and store closures.

9          This is not a little point because this itself proves

10  to you that David Middendorf was definitely intending to use

11  this information.  You don't need the focus areas for an

12  engagement that you are involved if you're just not going to do

13  anything with it.  And why do you delete it before you send it

14  to counsel?  To hide the fact that you are intending to do

15  something.

16         This should remind you of someone else.  Look at this.

17  Government Exhibit 650, that's Brian Sweet sending a list to

18  counsel.  It doesn't show your good faith that you send

19  documents when they are demanded by counsel of the company you

20  work for.  That's what Sweet gave them, and it is exactly the

21  same thing.  It's not the real list, it's just the list of

22  engagements.

23         What did Sweet not include?  For Macy's, exactly the

24  same thing, right?  It's hard to read his handwriting, but you

25  have the same exact focus areas written in Sweet's handwriting.

1    These two are behaving exactly the same way, and that is not a

2    coincidence.  They are giving counsel the minimum information

3    they can while trying to cover up what they were really

4    intending to do.

5          There has also been some suggestion at this trial that

6    even if this was a fraud, it doesn't really matter because it

7    didn't really interfere with inspections.  That is ridiculous.

8    Every witness who testified at this trial told you that that

9    first meeting is super important, that a well-prepared team can

10   avoid comments.  You know that's true.

11         This is just one example.  You will recall there was a

12   series of text messages between Sweet and Holder where they are

13   worrying about the fact that a first meeting went poorly and

14   now there may be comments.  It is not in dispute that those

15   first meetings could result in comments.

16         Where they are really trying to mislead you is on this

17   issue of documentation.  You heard a mantra repeated by defense

18   counsel and then by Mr. Middendorf this line from a PCAOB

19   release: we don't issue comments solely for documentation.

20   Solely for documentation.

21         That doesn't mean that the documentation doesn't

22   affect whether or not there are comments.  That means if you

23   forgot to upload a document but you can prove you have it,

24   that's not a comment.  Every single person who testified in

25   this trial told you that the quality of documentation affects

1    comments.  The defense's own witnesses told you that.

2         Jay Hanson, PCAOB board member:  "My personal view is

3    the quality of documentation could affect whether an issue is

4    raised or a comment is written."  There isn't any doubt about

5    that.  You saw that the PCAOB required KPMG to give them a

6    detailed list of every documentation change if they got early

7    notice, because they cared about changes to documentation.

8         You also know that documentation changes mattered

9    because those re-reviews were only focused on documentation,

10   and they were enormously successful.  The improvements to the

11   documentation got comments down to zero.  They didn't go from 5

12   to 4, they went to zero.  Every person involved -- Stephanie

13   Rodriguez, from the PCAOB, Whittle, Sweet -- every person

14   involved understood that this was a result of the cheating.

15        Do you know what the best evidence is that this

16   mattered to the PCAOB?  What they did when they found out about

17   the cheating, they threw out the inspections.  They started

18   over because they knew that there was such a complete taint

19   from changes to documentation that the results could not be

20   trusted.

21        You also heard the argument that it was really unfair,

22   the PCAOB was too harsh, and somehow that makes it okay what

23   happened here.  This is the argument that was made to you

24   yesterday.  This Mr. Hanson's testimony.  "A PCAOB board member

25   told Dave that PCAOB inspections are unfair.  He used the

1   expression 'gotcha,' and he said that the inspections team

2   would pick firms to have a turn in their box, take turns on who

3   they would focus on."

4         Skipping to the last paragraph, "This is critical

5   because it explains Mr. Middendorf's understanding of the

6   PCAOB, and he authorizes the re-reviews because following AS 3

7   it would make the workpapers clearer so KPMG would get the

8   credit or comment it deserves."

9         First of all, that is not what Jay Hanson said.  Jay

10  Hanson said, I don't remember any conversation like that.  Mr.

11  Middendorf claims that conversation happened.  Ask yourselves

12  who you believe: a completely disinterested third party called

13  by the defense or a defendant who is on trial and is trying to

14  justify his actions.

15        Let's say it is actually not true that the PCAOB was

16  treating KPMG unfairly.  You heard from Wes Bricker the SEC

17  looked into that and they confirmed it's false.  But that is

18  really is not the point.

19        Think about what defense counsel is saying here.

20  David Middendorf thought it was okay to cheat because the

21  system was unfair.  That is a shocking argument.  If your child

22  came home from school and you got a call from the teacher they

23  had been caught cheating on a test, and your child's response

24  was, yeah, but the test was really unfair, it was too hard,

25  would you say, oh, well, that makes it okay then?  Of course

1    not.  You can't cheat if the test is too hard.  The rules still

2    apply to you.

3            I expect Judge Oetken is going to tell you exactly

4    this: the fact that the PCAOB was an onerous regulator, if in

5    fact that is true, is completely irrelevant.

6            There has also been a fair amount of talk about, well,

7    look, maybe we tried to defraud the PCAOB but we really didn't

8    intend for it to be the SEC.  First of all, let's not be

9    confused about what the law is, which you are going to hear

10   from Judge Oetken.

11           The fraud on the SEC doesn't have to be the sole

12   purpose.  It doesn't even have to be the primary purpose.  It

13   has to be a purpose.  And the defendants don't have to lie

14   directly to the SEC, they don't have to interact with the SEC

15   directly in order to be guilty.  They have to take an action,

16   cheating on PCAOB inspections, with the aim of interfering with

17   the SEC's lawful function.

18           There is no dispute that the SEC oversees auditors.

19   That is one of its lawful functions.  You heard that from Wes

20   Bricker of the SEC.  You heard it from the defense witness Jay

21   Hanson.  You heard it even from the defendants' hired gun Paul

22   Atkins.  There is no dispute that causing the SEC to get

23   inspection results with fraudulent results is interfering with

24   their ability to, among other things, oversee the auditors.

25           I won't go through of them all, but Wes Bricker

explained to you all the different ways in which the SEC relies

on this.

Paul Atkins, the defense witness who is being paid

almost $1500 an hour -- he has been paid so much in this case

he doesn't remember how much -- even he admitted, yes, the SEC

oversees auditors, the SEC brings enforcement actions against

auditors, these reports came to us, they went to the office of

the chief accountant which is focused on audit quality.

He said, I never read them.  So what?  That doesn't

suggest the SEC is not using them.  These are reports that are

mandated by law to go to the SEC.  People thought that was for

no reason?  They thought it just got dropped in the trash

somewhere?  Of course they were being used by the SEC.

And Middendorf had firsthand knowledge of this because

he went to a meeting at the SEC where everyone was livid about

how bad the inspection results were, although he somehow can't

remember this.  So he had firsthand knowledge that inspection

results were something that the SEC was relying on.

You heard from Brian Sweet and from Thomas Whittle,

the members of this scheme, that they intended to defraud the

SEC.  They told you themselves.  They have taken responsibility

for that.  They have pled guilty to those counts.  It cannot be

disputed.

I want to say just one more thing before I sit down.

You have heard a lot from defense lawyers in closings about

1    reasonable doubt.  That is the standard of proof in this case.

2    It is the government's burden, it is one that we embrace.  But

3    the defense lawyers tried to make that sound like some

4    impossible standard, some standard that could never be met.

5         Reasonable doubt is not a magical thing.  It is not

6    some unattainable thing.  It is the same standard that has been

7    applied in every courtroom in every corner of this country

8    since this country was founded in 1792.

9         Over the last four weeks you have heard from everyone,

10   from the participants in this crime to the whistle-blowers who

11   reported it.  You have seen and heard the defendants' own

12   words, text messages, voicemails, and emails.  You no longer

13   have any reasonable doubts.  So we are have confident that when

14   you return to deliberate, you will return the only verdict that

15   is consistent with the evidence in this case and with the law,

16   that these defendants are guilty.

17        Thank you.

18        MR. BOXER:  Your Honor, may we approach?

19        THE COURT:  Yes.

20        MS. KRAMER:  May we take it up after the break, your

21   Honor?

22        THE COURT:  Can I give them a break?

23        MR. BOXER:  If they need a break, sure.  I prefer to

24   do it now unless they need a break.

25        THE COURT:  Come up now.

1                    (At the sidebar)

2          MR. BOXER:  First let me say for the record I'm

3    raising a relatively minor complaint about what was just said,

4    and by no means do I waive my prior objections and the

5    contemporaneous ones that I made.

6          Two points.  First, I think counsel misstated my

7    argument regarding Mr. Hanson.  In fact, the slide she put up

8    was my argument, and she told the jury that my argument was it

9    was okay to be stealing confidential information.  I didn't

10   make that argument.  I made the one she displayed.

11         I would ask that your Honor instruct the jury that not

12   only does their recollection govern with respect to the

13   evidence, but their recollection also governs with respect to

14   the arguments of counsel.  That is my application.  That's why

15   I asked for them not to be excused.

16         I do have a separate request.  Counsel said that Mr.

17   Hanson was a completely disinterested third party.  Based on

18   that argument to the jury, I would ask that forthwith I receive

19   the ex parte communications submitted by the government and by

20   Mr. Hanson's counsel.  I have no ability to judge that

21   statement.  I made this application the other day.  I don't

22   know why it was ex parte.  But given that representation to the

23   jury, I think we are entitled to receive those forthwith.

24         THE COURT:  On the latter point, I think the reason it

25   was ex parte was because it potentially revealed government

1    strategy, so I don't see any reason to not turn it over.

2              MS. MERMELSTEIN:  Your Honor, I think that is not the

3    full reason.  It relates to confidential things that are both,

4    as I understand it, subject to confidentiality agreements and

5    personal.  So it's not only because it reveals government

6    strategy.  Also, as we said yesterday, there was an ex parte

7    letter filed yesterday by counsel for Mr. Hanson, so it

8    shouldn't be in the absence of his participation.

9              I also think that the argument on the issue of his

10   bias was bias against the government.  The idea that he was not

11   someone who would be interested in helping the defense is

12   generous in that characterization.  I don't think it triggers

13   any need to disclose it.  I don't think it has to be resolved

14   now.

15             With respect to the instruction, it was a rebuttal

16   argument.  There were numerous interruptions and objections

17   because they didn't like the argument.  I think your Honor is

18   going to, as you should, instruct the jury in the normal course

19   about arguments not being sort of anything.  I don't think any

20   specific instruction in an effort to make it seem like the

21   argument was improper is remotely necessary.  That is how the

22   government viewed the argument made by defense counsel.  The

23   actual words were on the screen, so it is really not

24   misleading.

25             MR. BOXER:  I didn't contemporaneously object when

counsel said that, but she said I argued that Hanson showed

that it was okay to be stealing confidential information.  I

didn't make that argument, and the argument she put up on the

screen made clear I didn't make that argument.  I'm not asking

you to highlight it.  I'm not asking you to rebut Ms.

Mermelstein.  I'm just asking for an instruction to the jury

that their your recollection controls.

THE COURT:  I don't have a problem making that general

point.  I don't think it calls anything out.

MS. MERMELSTEIN:  I just don't think it should be made

now.  I think it is fine to be in the general instruction, but

I don't think there is any reason to have a specific

instruction immediately following rebuttal.  There wasn't one

following the closings.

MR. BOXER:  I just gave the basis for it: because she

clearly misstated my argument.

MS. MERMELSTEIN:  There were many things I thought

were misstated in the defense closings.  We didn't ask for a

special instruction then.  That's argument.

THE COURT:  I think I can do it in a way that is

general.

MR. BOXER:  Thank you.

MR. WEDDLE:  Your Honor, there were three ways in

which the rebuttal summation was completely improper.  There

were five examples.

1                    MS. MERMELSTEIN:  Perhaps we should take a break.

2                    MR. WEDDLE:  That was said exactly my suggestion.

3      I'll try to do them quickly because we want the jury to start

4      deliberating.  But there are some pretty severe issues.

5                    MR. BOXER:  I appreciate the instruction.  Thank you.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, yes, I'm going to

3   give you a break now.  Just before I do, I just want to say

4   something about where we are.

5          In terms of scheduling, we are planning to go until

6   2 o'clock today because there are a couple of scheduling

7   issues.  So the next thing in line is for me to give you the

8   instructions on the law, which will govern your deliberations.

9   And I'll do that after the break, I believe.

10         The other thing I am just going to mention is you have

11  heard all the evidence in case, you have heard the closing

12  arguments of the parties.  There are different interpretations,

13  different characterizations of the evidence by their argument.

14  What matters is evidence.  It is not what the lawyers argued

15  but what is the actual evidence in the case.  The documents I

16  admitted and the testimony of the witnesses under oath, that is

17  the evidence in the case and that's what you'll be focusing on

18  when you deliberate.

19         If there is any difference in how you heard an

20  argument from one of the lawyers from your recollection and

21  view of the actual evidence, it's your recollection that

22  controls and your interpretation of the evidence itself.  Also,

23  if there is -- the way one lawyer characterized how one other

24  lawyer made an argument in the closing arguments, it's your

25  recollection of the attorney's actual argument that controls.

1    So if they say something about what the other side said that's

2    different, you recall -- it's your recollection of the argument

3    that controls for each party's summation.

4            But in the end, it's your interpretation of the

5    evidence that will control.  So if there is any difference

6    between that and what one of the lawyers said, then it's your

7    view of the evidence that will determine your verdict.

8            We're going to take a ten-minute break now.  Please

9    leave your pads on your chairs, and we'll start back in ten

10   minutes.

11           (Continued on next page)

1              (Jury not present)

2              MS. MERMELSTEIN:  Your Honor, I respect that counsel

3     wants to raise some issues.  Could we actually take a break

4     first and then deal with the argument?

5              THE COURT:  Sure.  Why don't we take five minutes and

6     then we'll come back.

7              (Recess)

8              THE COURT:  Mr. Weddle.

9              MR. WEDDLE:  Thank you, your Honor.

10             The rebuttal summation was completely improper in

11    three ways.  It improperly impugned defense counsel and defense

12    counsel arguments.  That's one category, and it happened in two

13    examples.  It also injected the prosecutor's personal knowledge

14    into the case.  I have three examples of that.  And, finally,

15    it improperly vouched for the witness, Mr. Sweet.  I have one

16    example of that.

17             I can go through the examples.

18             The relief that I'm requesting is that your Honor

19    strike the improper arguments and add a couple of sentences to

20    your general instruction on arguments by lawyers not being

21    evidence, to instruct the jury to disregard the specific

22    categories that I can go through.

23             So improperly impugning defense counsel and defense

24    arguments, the prosecutor said at one point, referring to

25    defense counsel, "Where they are really trying to mislead you."

1    That's a completely improper thing to say.  And in addition,

2    your Honor, the prosecutor improperly impugned defense counsel

3    by saying that there was some inconsistency in defendant Wada's

4    argument that puts the government to its burden of proof on all

5    the elements.

6              And so I think that both of those things are improper.

7              I think that there was also an improper and

8    imflammatory analogy used by the prosecutor in the context of

9    impugning defense counsel for Mr. Wada.  I think that the

10   prosecutor alluded to a situation of marital infidelity, which

11   I found to be improper, inflammatory, and ironic given some of

12   the sealed briefing that has taken place in this case at the

13   behest of the government.

14             So what I would request in that regard is that the

15   Court instruct the jury:  There is nothing inconsistent in

16   defense counsel holding the government to its burden on all

17   elements.  I specifically instruct you to disregard

18   Ms. Mermelstein's arguments to the contrary.

19             In terms of injecting Ms. Mermelstein's personal

20   knowledge into the case, she did that three times.  She stated

21   that the government thoroughly investigated the case.  She

22   talked about what the agents would say if they were called to

23   testify.  And she talked about when the government became

24   involved, that is, she said the government was not yet

25   involved.  So we would request that the Court instruct the jury

1    to disregard the prosecutor's comments about what happened in

2    the investigation and when the government began its

3    investigation.

4         Finally, your Honor, the prosecutor improperly said

5    the following sentence, which was vouchering for the witness:

6    "You can believe Sweet because he told you the truth."  It is

7    completely improper and it should not have happened.

8         MS. LESTER:  We have just two more issues, your Honor.

9    We join in those arguments made by counsel for Wada.  There

10   were two specific statements that related to points relevant to

11   Mr. Middendorf.  The first, to which Mr. Boxer objected at the

12   time, had to do with the photograph of the restaurant.

13        As Mr. Boxer said in his summation, it is a minor

14   point as to whether Sweet remembered or not.  The broader point

15   is that, of which the government is aware, is that it's likely

16   their mistake that led to him misidentifying the exhibit; that

17   is, they showed him a photograph and he agreed that that was

18   where had lunch.  But in order to -- rather than just

19   letting that go gracefully, the prosecutor said, "Don't you

20   think if defense counsel thought that the inside looked

21   different, they would have shown you the inside?"  that's

22   completely improper.  It's putting the burden back on the

23   defense.  And it's pointing to a situation where we don't know

24   for sure, I'm speculating, but I suspect that it was a mistake

25   by the prosecutors themselves where they put a photograph in

1   front of the witness.  The witness didn't really remember, but

2   he wanted to please them and so he agreed that that was the

3   location.  And no one confirmed that that was in fact the

4   location, the proper photograph of the inside.

5           Secondly, with respect to Mr. Hanson, the prosecutor

6   described him as completely disinterested.  If your Honor

7   recalls, at the sidebar while Mr. Hanson was on the stand, the

8   government alluded to the fact that it might wish to impeach

9   Mr. Hanson on the basis of whatever was in the ex parte

10  submission, or something related to the ex parte submission.

11  And we haven't seen it so we don't know what it is.  But there

12  was an indication that the government thought that there might

13  be some bias there.

14          So for the prosecutor to then state that he's

15  completely disinterested and to characterize it at sidebar as

16  assisting the defense by doing that, it is just unbecoming,

17  when the prosecutor knows full well that they had information

18  that they were threatening to impeach him with.

19          So it is just not fair to make that argument in front

20  of the jury.  We would ask that your Honor strike those

21  arguments.

22          MS. MERMELSTEIN:  Every single thing I've said in

23  rebuttal was 100 percent proper argument.  The notion that some

24  of it should be struck is preposterous.

25          One, no one was impugning counsel personally.  Counsel

1  made arguments to the jury that in the government's view were

2  not accurate, were misleading, and miscited testimony.  And

3  that's what we said.  That is a hundred percent appropriate.

4  The point of rebuttal is to comment on the arguments that were

5  made by defense counsel.  And the suggestion that there is

6  something wrong with doing that is ludicrous.

7          There is nothing inflammatory about marital

8  infidelity.  It is an analogy.  There is nothing in this case

9  that is before the jury that relates to that.  And it was an

10  analogy and a rhetorical point about thinking about why

11  arguments are being made.  It does not burden-shift.

12          I said more times in this rebuttal than I have ever

13  said that the jury should be reminded about the burden, that it

14  never shifts.  But the government has to comment on the way the

15  defendants have presented the evidence and in particular on the

16  defense efforts to point to certain evidence or to suggest that

17  certain evidence would exist if only the government had done

18  something.  It has to be allowed to comment on that.  And that

19  necessarily is going to require, in some instances, that the

20  government suggest why the defense has done something in a

21  particular way, notwithstanding that, as I said many times,

22  they have no obligation to do anything.

23          So there is, for example, nothing improper about

24  suggesting to the jury that a photo of the outside of a

25  restaurant used to suggest what it looks like inside is

misleading.  The restaurants look the same.  They are branches

of the same thing.  And the fact that Sweet thought the photo

of one looked like the inside of the other is completely

consistent.  It doesn't impeach him at all.  I understand the

argument defense counsel wants to make, that he'll say yes to

whatever is put in front of him.  That's just not true.  And

the government was certainly able to argue that the reason the

defense presented evidence a certain way is because of what

sort of doing it a different way would have shown.

That is the same with respect to the argument about

the government investigation.  The defense created this

problem.  They got up and tried to suggest that somehow the

government hadn't looked into things, which it knows is not

true.  They tried to argue about evidence that might exist that

they know does not exist.  And everything I said about the

investigation is based on what is in the record.  It is not

based on my personal knowledge.  One.

The timing of the investigation between when the

conduct happened and when the charges happened, that is in the

record.  There was testimony about when this all was revealed,

and testimony about when Mr. Sweet first proffered, which is

before the sort of charges were brought and when the charges

were brought, and defense counsel argued that Sweet was sort of

the first thing the government learned and everything flowed

from that, and so all of that is completely proper.

 1         To make an argument that there is an absence of

 2    something in the investigation when there is no proof of that,

 3    it is perfectly reasonable for the government to say they have

 4    no burden, but these witnesses were available and there is a

 5    reason that they didn't call them, because you can assume that

 6    it would not have helped them.  That is a perfectly proper

 7    argument.  And so all of that is from the record and perfectly

 8    proper argument.

 9         "You can believe Sweet because he told you the truth"

10    is not vouching.  I never said one word about what I believe,

11    what the government believes, why it is that we are confident

12    that he told the truth in this case, that we would, for

13    example, not have let him testify if we didn't know he was

14    telling the truth.  I said nothing about that.  I said, based

15    on your analysis of what you saw him do, in response to attacks

16    on his credibility, you can believe him because you can tell

17    that what he said was the truth.  That is not remotely

18    approaching anything that comes close to vouching.

19         With respect to the comment about Mr. Hanson, I think

20    it is perfectly appropriate to say that this is a witness

21    called by the defense, so you would expect that they -- I don't

22    think that anything about saying that he was impartial, based

23    on the substance of his testimony, because his testimony was in

24    fact impartial, is in any way improper, undercut by the fact

25    that there are circumstances in which the government, if he had

1    evinced a bias, which we didn't know if he had, would have

2    moved to impeach him.

3         So I think this is all completely appropriate, and I

4    think that efforts by defense counsel to get an instruction

5    from the Court to comment on the rebuttal or to strike portions

6    of it is totally unwarranted and just an effort to suggest to

7    the jury that your Honor has a view, or to try and undermine

8    the fair arguments that were made in rebuttal and so it should

9    be rejected completely.

10        THE COURT:  The only ones -- I think I generally agree

11   with the government.  The only things I think that might have

12   been close to the line would be the suggestion that they could

13   have gone out and gotten evidence about the restaurant.  I

14   mean -- and I think at the time I just said I'll clarify that

15   the government always has the burden of proof.  And I do think

16   that Ms. Mermelstein repeatedly said that the government always

17   bears the burden of proof.  So I think it was essentially

18   harmless.

19        The second thing -- and the second thing is something

20   Mr. Weddle raised, which is this idea of alternative arguments

21   and that somehow his two sort of alternative arguments, I don't

22   think there is anything wrong with the analogy.  I mean, you

23   know, there are scorpions, there are frogs, there are all sorts

24   of analogies.  I don't think that a marital infidelity analogy

25   is necessarily improper per se.  But to suggest that they can't

1   have alternative arguments I think is maybe not fair.

2          Do you want to respond to that?

3          MS. MERMELSTEIN:  Yeah.  Your Honor, I don't think the

4   governments feels that they can't have alternative arguments.

5   I think it absolutely is fair to comment on the reasonableness

6   or consistency of the defendants' arguments.  And I think that

7   your Honor is going to instruct the jury that the government

8   has the burden, it has the burden on every element.  And I

9   don't know if there is anything unclear about that before this

10  jury.

11         So I think that argument was proper.  I think even if

12  your Honor thought that it came close to a line, it is

13  absolutely not warranting of any kind of striking or special

14  instruction.  The general instructions about the government's

15  burden more than adequately inform the jury of who has the

16  burden and what has to be found, and they will evaluate each

17  argument on each element.

18         MR. BOXER:  Briefly, your Honor.

19         The inside of the two restaurant do look different.

20  So, I don't know what Ms. Mermelstein basis that representation

21  on that they are the same, if it is an assumption, if she has

22  seen photographs that are different than ours.  But we didn't

23  put those in because, as Ms. Lester pointed out, we were making

24  a bigger point about what happened between the government and

25  Mr. Sweet regarding the restaurant itself, but the insides look

1    different.

2            And as far as Mr. Hanson, the statement was he was

3    completely disinterested.  That was the argument.  As Ms.

4    Lester pointed out, they alluded to potential impeachment the

5    first time I raised the issue.  I can't respond without seeing

6    both submissions, and so I would just ask that they be provided

7    to us and see if there is anything further to say about

8    completely disinterested.

9            Thank you, your Honor.

10           MR. WEDDLE:  Would you like me to say again my

11   requested instruction?

12           THE COURT:  Well, no, I don't think it is appropriate

13   because I think, insofar as there is anything here that was

14   close to the line, I think it is fully covered by my

15   instructions, particularly my instruction that the closing

16   arguments of the lawyers are not evidence, and it is the

17   evidence that they will be focusing on.  The burden of proof is

18   what it is.  I define the presumption of innocence.  I define

19   everything.  So I think they are all covered by my

20   instructions.

21           MR. WEDDLE:  Well, respectfully, I would request that

22   your Honor reconsider at least giving the single sentence in

23   the part about "arguments by lawyers are not evidence" to say,

24   "There is nothing inconsistent in defense counsel holding the

25   government to its burden on all elements."

1          MS. KRAMER:  Your Honor, the principle behind that,

2     that the government has to prove each element, is already fully

3     covered by your Honor's instructions.  That will add nothing

4     but confusion to what the Court's charge already very clearly

5     sets out.

6          THE COURT:  I agree.

7          MR. WEDDLE:  Your Honor, the prosecutor spent probably

8     five minutes improperly impugning the defense argument, and now

9     for the prosecution to say it is just going to be confusing to

10    talk about it I think doesn't make any sense.  If they thought

11    it was worth spending that much time in rebuttal to make an

12    improper argument, it should be corrected.

13         THE COURT:  I think it is adequately covered by the

14    instructions.

15         Anything else?

16         (Pause)

17         MS. KRAMER:  No, your Honor.

18         THE COURT:  We will bring in the jury.

19         (Pause)

20         MR. WEDDLE:  Does your Honor intend to close the doors

21    for the charge?

22         THE COURT:  Yes, I think so.

23         MR. WEDDLE:  I've seen some judges, I don't know if it

24    is your Honor's practice, warn the spectators that they should

25    either stay until the close of the charge or leave now and not

3415

during the charge.  If that's your Honor's practice, great, but

if not --

          THE COURT:  Not necessarily.  If someone needs to

leave, I don't think it is the end of the world.  But I will

have the doors closed to avoid distraction.

          MS. KRAMER:  Your Honor, there are two binders up on

the ledge there that have the government exhibits that have

been received in evidence.

          (Continued on next page)

1              (Jury present)

2              THE COURT:  You may be seated.

3              Good afternoon, ladies and gentlemen.

4              JURORS:  Good afternoon, your Honor.

5              THE COURT:  Members of the jury, you have now heard

6    all the evidence in the case as well as the final arguments of

7    the parties.  We have reached the point where you are about

8    begin your -- about to undertake your final function as jurors.

9    You have paid careful attention to the evidence, and I am

10   confident that you will act together with fairness and

11   impartiality to reach a just verdict in this case.

12             My duty at this point is to instruct you as to the

13   law.  There are three parts to these instructions.  First, I'm

14   going to give you some general instructions about your role and

15   about how you are to decide the facts of the case.  These

16   instructions really would apply to just about any trial.

17   Second, I'll give you some specific instructions about the

18   legal rules applicable to this particular case.  Third, I'll

19   give you some final instructions about procedure.

20             It is your duty to accept these instructions of law

21   and to apply them to the facts as you determine them.  With

22   respect to legal matters, you must take the law as I give it to

23   you.  If any attorney or witness has stated a legal principle

24   different from any that I state to you in my instructions, it

25   is my instructions that you must follow.  You must not

1   substitute your own notions or opinions of what the law is or

2   ought to be.

3        Listening to these instructions may not be easy.  It

4   is important, however, that you listen carefully and

5   concentrate.  I ask for your patient cooperation and attention.

6   You'll notice that I'm reading these instructions from a

7   prepared text.  It would be more lively, no doubt, if I just

8   improvised.  But it's important that I not do that.  The law is

9   made up of words, and those words are very carefully chosen.

10  So it's critical that I use exactly the right words.

11       You'll have copies of what I'm reading in the jury

12  room to consult, so don't worry if you miss a word or two.  But

13  for now, listen carefully and try to concentrate on what I'm

14  saying.  Remember, you are to consider these instructions

15  together an as whole; you are not to isolate or give undue

16  weight to any single instruction.

17       As members of the jury, you are the sole and exclusive

18  judges of the facts.  You pass upon the evidence.  You

19  determine the credibility of the witnesses.  You resolve such

20  conflicts as there may be in the testimony.  You draw whatever

21  reasonable inferences you decide to draw from the facts as you

22  have determined them, and you determine the weight of the

23  evidence.

24       Do not conclude from any of my questions or any of my

25  rulings on objections or anything else that I have done during

the trial that I have any view as to credibility of the
witnesses or as to how you should decide this case.  Any
opinion I may have regarding the facts is of absolutely no
consequence.  It is your sworn duty, and you have taken your
oath as jurors, to determine the facts.

        Now, just as I have my duties as a judge and you have
your duties as jurors, it has been the duty of each attorney in
this case to object when the other side offered testimony or
other evidence that the attorney believed is not properly
admissible.  It has been my job to rule on those objections.
Therefore, why an objection was made or how I ruled on it is
not your business.  You should draw no inference from the bare
fact that an attorney objects to any evidence.  Nor should you
draw any inference from the fact that I might have sustained or
overruled an objection.

        From time to time, the lawyers and I had conferences
outside your hearing.  These conferences involved procedural
and other matters, and none of the events relating to these
conferences should enter into your deliberations at all.

        To be clear, the personalities and the conduct of
counsel in the courtroom are not in any way at issue.  If you
formed any reaction of any kind to the lawyers in this case,
favorable or unfavorable, whether you approved or disapproved
of their behavior as advocates, those reactions should not
enter into your deliberations.

1          In reaching your verdict, you must remember that all

2   parties stand equal before a jury in the courts of the United

3   States.  The fact that the government is a party and the

4   prosecution is brought in the name of the United States does

5   not entitle the government or its witnesses to any greater

6   consideration than that accorded to any other party.  By the

7   same token, you must give it no less deference.  The government

8   and the defendants stand on equal footing before you.

9          It would be improper for you to consider, in reaching

10  your decision as to whether the government sustained its burden

11  of proof, any personal feelings you may have about the

12  defendants' race, religion, national origin, gender, sexual

13  orientation, or age.  All persons are entitled to the same

14  presumption of innocence, and the government has the same

15  burden of proof with respect to all persons.  Similarly, it

16  would be improper for you to consider any personal feelings you

17  might have about the race, religion, national origin, gender,

18  sexual orientation, or age of any other witness or anyone else

19  involved in this case.  The defendants are entitled to a trial

20  free from prejudice, and our judicial system cannot work unless

21  you reach your evidence through a fair and impartial

22  consideration of the evidence.

23          Now I am going to instruct you on the presumption of

24  innocence.  The law presumes the defendants to be innocent of

25  all charges against them.  In this case, the defendants before

you have pleaded not guilty.  In so doing, they have denied the
charges in the Indictment.  Thus, the government has the burden
of proving the defendants' guilt beyond a reasonable doubt.

        This burden never shifts to the defendants.  In other
words, the defendants do not have to prove their innocence.
They are presumed to be innocent of the charges contained in
the Indictment.  The defendants thus began the trial here with
a clean slate.  The presumption of innocence was in their favor
when the trial began, continued in their favor throughout the
entire trial, remains with them even as I speak to you now, and
persists in their favor during the course of your deliberations
in the jury room.

        This presumption of innocence also requires you to
acquit the defendants unless you as jurors are unanimously
convinced beyond a reasonable doubt of their guilt, after a
careful and impartial consideration of all the evidence in this
case.  It is removed if and only if, as members of the jury,
you are satisfied that the prosecution has sustained its burden
of proving the defendants guilty beyond a reasonable doubt.

        Now, the question naturally arises:  What, exactly, is
a reasonable doubt?  The words almost define themselves.  A
reasonable doubt is a doubt that a reasonable person has after
carefully weighing all the evidence.  It is a doubt founded in
reason and arising out of the evidence in the case -- or the
lack of evidence.  Reasonable doubt is a doubt that appeals to

1   your reason, your judgment, your experience, your common sense.

2   Proof beyond a reasonable doubt must, therefore, be proof of

3   such a convincing character that a reasonable person would not

4   hesitate to rely and act upon it in the most important of his

5   or her affairs.

6         I must emphasize that beyond a "reasonable" doubt does

7   not mean beyond all "possible" doubt.  It is practically

8   impossible for a person to be absolutely and completely

9   convinced of any disputed fact that, by its very nature, cannot

10  be proved with mathematical certainty.  In the criminal law,

11  guilt must be established beyond a "reasonable" doubt, not all

12  "possible" doubt.

13        Further, the government is not required to prove each

14  element of the offense by any particular number of witnesses.

15  The testimony of a single witness may be enough to convince you

16  beyond a reasonable doubt of the existence of the elements of

17  the charged offense -- if you believe that the witnesses

18  testified truthfully and accurately related to what he or she

19  has told you.

20        That all said, if, after a fair and impartial

21  consideration of all the evidence (or the lack of evidence),

22  you have an abiding belief as to the defendants' guilt beyond a

23  reasonable doubt -- a belief that you would be willing to act

24  upon without hesitation in important matters in the personal

25  affairs of your own life -- then it is your sworn duty to

1   convict the defendants.

2          On the other hand, if after a fair and impartial

3   consideration of all the evidence (and lack of evidence), you

4   are not satisfied of the guilt of the defendants with respect

5   to the charges in the Indictment; if you do not have an abiding

6   conviction of the defendants' guilt; in sum, if you have such a

7   doubt as would cause you, as prudent persons, to hesitate

8   before acting in matters of importance to yourselves -- then

9   you have a reasonable doubt, and in that circumstance it is

10  your sworn duty to return a verdict of not guilty.

11         In reaching that determination, your oath as jurors

12  commands that you are not to be swayed by sympathy or

13  prejudice.  You are to be guided solely by the evidence in this

14  case and you are to apply the law as I instruct you.  As you

15  sift through the evidence, you must ask yourselves whether the

16  prosecution has proven the defendants' guilt.  Once you let

17  fear or prejudice or bias or sympathy interfere with your

18  thinking, there is a risk that you will not arrive at a true

19  and just verdict.  Thus, if you have a reasonable doubt as to

20  the defendants' guilt, then you must render a verdict of not

21  guilty.  But if you should find that the prosecution has met

22  its burden of proving the defendants' guilt beyond a reasonable

23  doubt, then you should not hesitate because of sympathy, or for

24  any other reason, to render a verdict of guilty.

25         The question of possible punishment of the defendants

is of no concern to the jury and should not enter into or

influence your deliberations.  The duty of imposing sentence in

the event of a conviction rests exclusively upon the Court.

Your function is to weigh the evidence or the lack of evidence

in the case and to determine whether or not the defendants are

guilty beyond a reasonable doubt, solely upon the basis of such

evidence.  Under your oath as jurors, you cannot allow any

consideration of the punishment that may be imposed upon the

defendants, if they are convicted, to influence your verdict.

Similarly, it would be improper for you to allow any

feelings you might have about the nature of the crimes charged

to interfere with your decision-making process.  Your verdict

must be based exclusively upon the evidence or the lack of

evidence in this case.

Now, I have repeatedly referred to the evidence in the

case, and that raises an important question:  What is evidence?

I instruct you that evidence consists of the sworn testimony of

the witnesses, the exhibits received in evidence, and the

stipulations of the parties.  In determining the facts, you

must rely on your own recollection of the evidence.

What, then, is not evidence?  I want to instruct you

that the following does not constitute evidence:  First,

testimony that I have stricken or excluded is not evidence.

You may not use it in rendering your verdict.  If certain

testimony was received for a limited purpose, you must follow

1      the limiting instructions I have given, and use the evidence

2      only for the limited purpose I indicated.

3              Second, any exhibit that was not received in evidence

4      is not evidence.  Thus, exhibits that were marked for

5      identification but not admitted into evidence are not evidence.

6      Nor are materials that were used only to refresh a witness'

7      recollection.

8              Third, arguments by the lawyers are not evidence.  The

9      reason is simple.  Advocates are not witnesses.  The opening

10     and closing arguments of both sides explained how each side

11     wants you to analyze the evidence, which consists of the

12     testimony of witnesses, the documents and other exhibits that

13     were entered into evidence, and the stipulations of the

14     parties.  What the lawyers have said to you is intended to help

15     you understand the evidence -- or the lack of evidence -- as

16     you deliberate to reach your verdict.  However, it is your

17     recollection of the facts -- I'm sorry.  However, if your

18     recollection of the facts differs from the lawyers' opening

19     statements, questions to witnesses, or summations, closing

20     arguments, it is your recollection that controls, not theirs.

21     For the same reason, you are not to consider a lawyer's or a

22     party's questions as evidence.  Only the witness' answers are

23     to be considered evidence, not the questions.

24             Finally, any statements that I may have made do not

25     constitute evidence.  It is for you alone to decide the weight,

1   if any, to be given to the testimony you've heard and the

2   exhibits you've seen.

3        I will now discuss at slightly greater length some

4   important matters related to evidence.

5        There are two types of evidence that may properly be

6   considered in reaching your verdict.

7        One type of evidence is direct evidence.  Direct

8   evidence is testimony by a witness about something he knows by

9   virtue of his own senses -- something he has seen, felt,

10  touched, or heard.  For example, if a witness testifies that

11  when he left his house this morning, it was raining, that would

12  be direct evidence about the weather.

13       The second type of evidence is called circumstantial

14  evidence.  Circumstantial evidence is evidence that tends to

15  prove a disputed fact indirectly, by proof of other facts.

16  There is a simple example of circumstantial evidence that is

17  often used in this courthouse.

18       Assume that when you came into the courthouse this

19  morning the sun was shining and it was a nice day outside.

20  Assume that the courtroom shades were drawn and that you could

21  not look outside.  Assume further that as you were sitting

22  here, somebody walked in with an umbrella that was dripping wet

23  and then, a few moments later, somebody else walked in with a

24  raincoat that was dripping wet.

25       Now, because you could not look outside the courtroom

1    and you could not see whether it was raining, you would have no

2    direct evidence of that fact.  But, on the combination of facts

3    that I have asked you to assume, it would be reasonable and

4    logical for you to conclude that it was raining.  That is all

5    there is to circumstantial evidence.

6            You infer on the basis of your reason, experience, and

7    common sense from one fact that's established the existence or

8    the nonexistence of some other fact.

9            As you can see, the matter of drawing inferences from

10   facts in evidence is not a matter of guesswork or speculation.

11   An inference is a logical, factual conclusion that you might

12   reasonably draw from other facts that have been proven.

13           Many material facts, such as someone's state of mind,

14   are rarely easily proven by direct evidence.  Usually such

15   facts are established by circumstantial evidence and the

16   reasonable inferences that you draw.  Circumstantial evidence

17   may be given as much weight as direct evidence.  The law makes

18   no distinction between direct and circumstantial evidence, but

19   simply requires that, before convicting a defendant, the jury

20   must be satisfied that the government has proven the

21   defendant's guilt beyond a reasonable doubt, based on all the

22   evidence in the case.

23           There are times when different inferences may be drawn

24   from the evidence.  The government asks you to draw one set of

25   inferences.  The defendants ask you to draw another.  It is for

1    you, and for you alone, to decide what inferences you will

2    draw.

3          You've heard evidence in the form of stipulations.  A

4    stipulation of testimony is an agreement between the parties

5    that, if called, a witness would have given certain testimony.

6    You must accept as true the fact that the witness would have

7    given the testimony.  However, it is for you to decide what

8    effect that testimony should be given.

9          You've also heard in the form of stipulations that

10   certain facts were agreed to be true.  You've also heard

11   evidence in the form of stipulations that certain facts that

12   were agreed -- that were agreed to be true.  In such cases, you

13   must accept those facts as true.  However, it is for you to

14   decide what weight, if any, to give to those facts.

15         Now, some of the exhibits that were admitted into

16   evidence were in the form of charts and summaries.  You should

17   consider them as you would any other evidence.

18         As I have already explained, you should draw no

19   inference or conclusion for or against any party by reason of

20   the lawyers making objections or my rulings on such objections.

21         By the same token, nothing I say is evidence.  If I

22   commented on the evidence at any time, do not accept my

23   statements in place of your recollection or your

24   interpretation.  It is your recollection and interpretation

25   that govern.

1          Further, do not concern yourself with what was said at

2     sidebar conferences or during my discussions with counsel.

3     Those discussions related to rulings of law.

4          At times I may have admonished a witness or directed a

5     witness to be responsive to questions or to keep his or her

6     voice up.  At times I may have asked a question myself.  Any

7     questions that I asked, or instructions that I gave, were

8     intended only to clarify the presentation of evidence and to

9     bring out something that I thought might be unclear.  You

10    should draw no inference or conclusion of any kind, favorable

11    or unfavorable, with respect to any witness or any party in the

12    case by reason of any comment, question, or instruction of

13    mine.  Nor should you infer that I have any views as to the

14    credibility of any witness, as to the weight of the evidence,

15    or as to how you should decide any issue that is before you.

16    That is entirely your role.

17         You have had the opportunity to observe the witnesses.

18    It will now be your job to decide how believable each witness

19    was in his or her testimony.  You are the sole judges of the

20    credibility of each witness and of the importance of his or her

21    testimony.

22         To that end, I'm going to give you a few general

23    instructions on how you may determine whether witnesses are

24    credible and reliable, whether witnesses told the truth at this

25    trial, and whether they knew what they were talking about.  It

1   is really just a matter of using your common sense, your good

2   judgment, and your experience.

3          First, consider how well the witness was able to

4   observe or hear what he or she testified about.  The witness

5   may be honest, but mistaken.  How did the witness' testimony

6   impress you?  Did the witness appear to be testifying honestly

7   and/or candidly?  Were the witness' answers direct, or were

8   they evasive?  Consider the witness' intelligence, demeanor,

9   manner of testifying, and the strength and accuracy of the

10  witness' recollection.  Consider whether any outside factors

11  might have affected a witness' ability to perceive events.

12         Consider the substance of the testimony.  How does the

13  witness' testimony compare with other proof in the case?  Is it

14  corroborated or is it contradicted by other evidence?  If there

15  is a conflict, does any version appear reliable, and, if so,

16  which version seems most reliable?

17         You may consider whether a witness had any possible

18  bias or relationship with a party or any possible interest in

19  the outcome of the case.  Such a bias or relationship does not

20  necessarily make the witness unworthy of belief, but it can.

21  These are simply factors that you may consider.

22         In passing upon the credibility of a witness, you may

23  also take into account any inconsistencies or contradictions as

24  to material matters in his or her testimony.

25         In summary, you should carefully scrutinize all of the

testimony of each witness, the circumstances under which each

witness testified, the impression the witness made when

testifying, the relationship of the witness to the controversy

and the parties, the witness' bias or impartiality, the

reasonableness of the witness' statement, the strength or

weakness of the witness' recollection viewed in the light of

all the other testimony, and any other matter in evidence that

may help you decide the truth and importance of each witness'

testimony.

If you find that a witness has testified falsely as to

any material fact, or if you find that a witness has been

previously untruthful when testifying under oath or otherwise,

you may reject that witness' testimony in its entirety or you

may accept only those parts that you believe to be truthful or

that are corroborated by other independent evidence in the

case.

It is for you, the jury, and you alone -- not the

lawyers, not the witnesses, and not me as the judge -- to

decide the credibility of witnesses who testified and the

weight that their testimony deserves.  The ultimate question

for you to decide in passing upon credibility is:  Did the

witness tell the truth before you?

In a criminal case, the defendant cannot be required

to testify, but if he chooses to testify, he is, of course,

permitted to take the witness stand on his own behalf.  In this

1    case, Mr. Middendorf decided to testify.  You should examine

2    and evaluate his testimony just as you would the testimony of

3    any witness with an interest in the outcome of the case.

4    However, the burden of proof remains on the government at all

5    times, and the defendant is presumed innocent.

6           Mr. Wada did not testify in this case.  Under our

7    Constitution, a defendant has no obligation to testify or to

8    present any evidence, because it is the government's burden to

9    prove the defendant guilty beyond a reasonable doubt.  That

10   burden remains with the government throughout the entire trial

11   and never shifts to the defendant.  A defendant is never

12   required to prove that he or she is innocent.

13          You may not attach any significance to the fact that

14   Mr. Wada did not testify.  No adverse inference against him may

15   be drawn because he did not take the witness stand.  You may

16   not consider this against Mr. Wada in any way in your

17   deliberations in the jury room.

18          You have heard from two witnesses, Brian Sweet and

19   Thomas Whittle, who testified that they pled guilty to criminal

20   charges.  You are instructed that you are to draw no

21   conclusions or inferences of any kind about the guilt of the

22   defendants on trial from the fact that prosecution witnesses

23   have pled guilty to criminal charges.  A witness' decision to

24   plead guilty is a personal decision about his or her own guilt.

25   It may not be used by you in any way as evidence against or

1    unfavorable to the defendants on trial here.

2            Mr. Sweet and Mr. Whittle each testified pursuant to

3    an agreement to cooperate with the government.  The law allows

4    the use of accomplice testimony.  Indeed, it is the law in

5    federal courts that the testimony of an accomplice may be

6    enough in itself for conviction if the jury finds that the

7    testimony establishes guilt beyond a reasonable doubt.  It is

8    also the case, however, that accomplice testimony is of such a

9    nature that it must be scrutinized with great care and viewed

10   with particular caution when you decide how much of that

11   testimony to believe.

12           I have given you several -- I have given you some

13   general considerations on credibility, and I will not repeat

14   them all here.  Nor will I repeat all the arguments made on

15   both sides.  Nevertheless, let me say a few things you might

16   want to consider during your deliberations on the subject of

17   accomplices.  You should ask yourself whether Mr. Sweet and

18   Mr. Whittle would benefit more by lying or by telling the

19   truth.  Was either witness' testimony made up in any way

20   because he believed or hoped that he would somehow receive

21   favorable treatment by testifying falsely?  Or did he believe

22   that his interests would be best served by testifying

23   truthfully?  If you believe that the witness you are

24   considering was motivated by hopes of personal gain, was the

25   motivation one that would cause him to lie, or was it one that

would cause him to tell the truth?  Did this motivation color
his testimony?  In sum, you should look at all of the evidence
in deciding what credence and what weight, if any, to give to
an accomplice witness.

Keep in mind that it does not follow that simply
because a person has admitted to participating in one or more
crimes, that he is incapable of giving a truthful version of
what happened.  Like the testimony of any other witness, the
testimony of someone who has participated in a crime should be
given such weight as it deserves in light of the facts and
circumstances before you, taking into account the witness'
demeanor, candor, the strength and accuracy of a witness'
recollection, his background, and the extent to which his
testimony is or is not corroborated by other evidence in the
case.

One final note in this regard.  It is not concern of
yours why the government made agreements with witnesses.  Your
sole concern is to decide whether the witnesses -- whether the
witness was giving truthful testimony in this case before you.
In sum, you should look at all the evidence in deciding what
credence and what weight, if any, you will give a witness'
testimony.

You have heard testimony from what we call expert
witnesses.  An expert is a witness who, by education or
experience, has acquired learning or experience in a

specialized area of knowledge.  Such witnesses are permitted to

give their opinions as to relevant matters in which they

profess to be an expert and give their reasons for their

opinions.  Expert testimony is presented to you on the theory

that someone who is experienced in the field can assist you in

understanding the evidence or in reaching an independent

decision on the facts.

Now, your role in judging credibility applies to

experts as well as other witnesses.  You should consider the

expert opinions that were received in evidence in this case and

give them as much or as little weight as you think they

deserve.  If you should decide that the opinion of an expert

was not based on sufficient education or experience or on

sufficient data, or if you should conclude that the

trustworthiness or credibility of an expert is questionable for

any reason, or if the opinion of the expert was outweighed in

your judgment by other evidence in the case, then you might

disregard the opinion of the expert entirely or in part.

On the other hand, if you find the opinion of an

expert is based on sufficient data, education and experience,

and the other evidence does not give you reason to doubt his

conclusions, you would be justified in placing reliance on his

testimony.

During the trial, you heard testimony bearing on the

character of Defendant David Middendorf.  Character testimony

should be considered together with all the other evidence in

the case in determining the guilt or innocence of the

defendant.  Evidence of good character may in itself create a

reasonable doubt where, without such evidence, no reasonable

doubt would have existed.

But if, on considering all the evidence, including the

character evidence, you are satisfied beyond a reasonable doubt

that the Defendant is guilty, a showing that he previously

enjoyed a reputation of good character does not justify or

excuse the offense, and you should not acquit Mr. Middendorf

merely because you believe he is a person of good reputation.

The testimony of a character witness is not to be

taken by you as the witness' opinion as to the guilt or

innocence of a defendant.  The guilt or innocence of a

defendant is for you alone to determine, and that should be

based on all the evidence you have heard in the case.

In deciding whether to believe a witness, you should

specifically note any evidence of hostility or affection that

the witness may have toward one of the parties.  Likewise, you

should consider evidence of any other interest or motive that

the witness may have in cooperating with a particular party.

You should also take into account any evidence of any benefit

that a witness may receive from the outcome of the case.

It is your duty to consider whether the witness has

permitted any such bias or interest to color his or her

1    testimony.  In short, if you find that a witness is biased, you

2    should view his or her testimony with caution, weigh it with

3    care, and subject it to close and searching scrutiny.

4         Of course, the mere fact that a witness is interested

5    in the outcome of the case does not mean he or she has not told

6    the truth.  It is for you to decide from your observations and

7    by applying your common sense and experience and all the other

8    considerations mentioned whether the possible interest of any

9    witness has intentionally or otherwise colored or distorted his

10   or her testimony.  You are not required to disbelieve an

11   interested witness.  You may accept as much of his or her

12   testimony as you deem reliable and reject as much as you deem

13   unworthy of acceptance.

14        During the trial, you heard the names of several other

15   individuals mentioned in connection with this case.  Some of

16   those individuals have been mentioned in connection with what

17   the government alleges was illegal activity.

18        I instruct you that you may not draw any inference,

19   favorable or unfavorable, towards the government or the

20   defendants from the fact that any other person is not on trial

21   here.  Further, you may not speculate as to the reasons why

22   those other people are not on trial, or what became of them in

23   the legal system.  Those matters are wholly outside your

24   concern and have no bearing on your duties as jurors in this

25   case.

1        You have heard evidence during the trial that

2   witnesses have discussed the facts of the case and their

3   testimony with the lawyers before the witnesses appeared in

4   court.

5        Although you may consider that fact when you are

6   evaluating the witness' credibility, I should tell you that

7   there is nothing unusual or improper about a witness meeting

8   with lawyers before testifying so that the witness can be aware

9   of the subjects he or she will be questioned about, focus on

10  those subjects, and have the opportunity to review relevant

11  exhibits before being questioned about them.  Such consultation

12  helps conserve your time and the Court's time.  In fact, it

13  would be unusual for a lawyer to call a witness without such

14  consultation.

15       Again, the weight you give to the fact or the nature

16  of the witness' preparation for his or her testimony and what

17  inferences you draw from such preparation are matters

18  completely within your discretion.

19       There are several people whose names you have heard

20  during the course of the trial but who did not appear here to

21  testify.  I instruct you that each party had an equal

22  opportunity, or lack of opportunity, to call any of these

23  witnesses.  Therefore, you should not draw any inferences or

24  reach any conclusions as to what they would have testified to

25  had they been called.

1          You should, however, remember my instruction that the

2     law does not impose on a defendant in a criminal case the

3     burden or duty of calling any witness or producing any

4     evidence.  The burden remains with the government to prove the

5     guilt of the defendants beyond a reasonable doubt.

6          You have heard reference in the arguments and

7     cross-examination of defense counsel in this case to the fact

8     that certain investigative techniques were or were not used by

9     the government.  There is no legal requirement, however, that

10    the government prove its case through any particular means.

11    While you are to carefully consider the evidence adduced by the

12    government, you are not to speculate as to why they used the

13    techniques they did or why they did not use other techniques.

14    The government is not on trial.  Law enforcement techniques are

15    not your concern.  However, you are free to consider a lack of

16    evidence in your determination of whether the government proved

17    the charged crimes beyond a reasonable doubt.  Your concern is

18    to determine whether, on the evidence or lack of evidence, the

19    government has proven the defendants' guilt beyond a reasonable

20    doubt.

21         Defendants David Middendorf and Jeffrey Wada are on

22    trial together.  In reaching your verdict, however, you must

23    bear in mind that innocence or guilt is individual.  Your

24    verdict must be determined separately with respect to each

25    defendant, solely on the evidence or lack of evidence presented

against that defendant, without regard to the guilt or innocence of anyone else.

In this regard, you must be careful not to find any defendant guilty by reason of relationship or association with other persons. The fact that one person may be guilty of an offense does not mean that his or her friends, relatives, or associates were also involved in the crime. You may, of course, consider those associations as part of the evidence in the case, and may draw whatever inferences are reasonable from the fact of the associations taken together with all the other evidence in the case. But you may not draw the inference of guilt merely because of such associations. In short, for each defendant the question of guilt or innocence as to each count of the Indictment must be individually considered and individually answered, and you may not find any defendant guilty unless the evidence proves his guilt beyond a reasonable doubt.

Now I am going to turn to the substantive instructions.

Let me first turn to the charges against the defendants as contained in the Indictment. The Indictment is not evidence. It is an accusation, a statement of the charges made against the defendants. It gives the defendants notice of the charges against them. It informs the Court and the public of the nature of the accusation.

1          A defendant begins trial with an absolutely clean

2     slate and without any evidence against him.  Remember that the

3     charges in the Indictment are merely accusations.  What matters

4     is the evidence or lack of evidence that you heard and saw in

5     this trial.

6          The Indictment in this case consists of five counts,

7     or charges.  I will at times refer to each count by the number

8     assigned to it in the Indictment.  You should know that there

9     is no significance to the order of these numbers or the

10    specific number of counts charged, and indeed my instructions

11    will follow a different order than the order in which the

12    various counts appear in the Indictment.

13         Each count is a separate offense, or crime.  Each

14    count must therefore be considered separately by you as to each

15    defendant named in that count, and you must return a separate

16    verdict of guilty or not guilty on each count as to each

17    defendant.  Whether you find a defendant guilty or not guilty

18    as to one count should not affect your verdict as to any other

19    count charged.

20         In Count One of the Indictment, the defendants are

21    charged with conspiracy to defraud the Securities and Exchange

22    Commission, commonly referred to as the "SEC," which is an

23    agency of the United States.  In Count Two, the defendants are

24    charged with conspiracy to commit wire fraud against the Public

25    Company Accounting Oversight Board, commonly referred to as the

1    "PCAOB."  In Count Three, Mr. Middendorf is charged with wire

2    fraud itself, which is sometimes called a substantive count.

3    Mr. Wada is not charged in Count Three of the Indictment.  In

4    Counts Four and Five, both defendants are charged with

5    substantive counts of wire fraud.

6           In a moment, I will instruct you on each of these

7    charges in more detail.  At the outset, however, let me

8    instruct you that you must consider each individual charge

9    separately, and each defendant separately, and evaluate each on

10   the proof or lack of proof that relates to that charge with

11   respect to each defendant.

12          As I have just described, there are certain counts in

13   the Indictment that are conspiracy counts, while others are

14   what I'll refer to as substantive counts.  Unlike the

15   conspiracy charges, which allege agreements to commit certain

16   offenses, the substantive counts are based on the actual

17   commission of offenses, or aiding others to actually commit the

18   offenses.

19          A conspiracy to commit a crime is an entirely separate

20   and different offense from the substantive crime which may be

21   the object of the conspiracy.  Congress has deemed it

22   appropriate to make conspiracy, standing alone, a separate

23   crime, even if the object of the conspiracy is not achieved.

24   The essence of the crime of conspiracy is an agreement or

25   undertaking to violate other laws.  Thus, if a conspiracy

1   exists, even if it fails, it is still punishable as a crime.

2   Consequently, in a conspiracy charge, there is no need to prove

3   that the crime that was the object of the conspiracy was

4   actually committed.

5        By contrast, the substantive counts require proof that

6   the crime charged was actually committed, but do not require

7   proof of an agreement.  Of course, if a defendant both

8   participates in a conspiracy to commit a crime and then

9   actually commits that crime, that defendant may be guilty of

10  both the conspiracy and the substantive crime, as I will

11  instruct you shortly.

12       We will turn first to the substantive counts, or

13  charges, in the Indictment, which are more convenient to

14  consider before the conspiracy charges.

15       So let's turn first to the three substantive counts,

16  which are listed as Counts Three through Five of the

17  Indictment.  I will turn later to Counts One and Two.

18       Counts Three, Four and Five each charge certain

19  defendants with a substantive count of the crime of wire fraud.

20  Specifically:

21       Count Three charges that from at least in or about

22  April 2015 through at least in or about May 2015,

23  Mr. Middendorf participated in a scheme to defraud the PCAOB by

24  misappropriating, embezzling, obtaining, sharing, and using the

25  PCAOB's property in the form of valuable confidential

information and documents concerning planned PCAOB inspections

in 2015, and by transmitting such information by email, all in

breach of duties of confidentiality owed to the PCAOB by former

and current PCAOB employees.  Mr. Wada is not charged in Count

Three.

          Count Four charges that, from at least in or about

March 2016 through at least in or about May 2016,

Mr. Middendorf and Mr. Wada each participated in a scheme to

defraud the PCAOB by misappropriating, embezzling, sharing,

obtaining -- misappropriating, embezzling, obtaining, sharing,

and using the PCAOB's property in the form of valuable

confidential information and documents concerning planned PCAOB

inspections in 2016, and by transmitting such information by

email and telephone, all in breach of duties of confidentiality

owed to the PCAOB by former and current PCAOB employees.

          Count Five charges that, from at least in or about

January 2017 through at least in or about February of 2017,

Mr. Middendorf and Mr. Wada each participated in a scheme to

defraud the PCAOB by misappropriating, embezzling, obtaining,

sharing, and using the PCAOB's property in the form of valuable

confidential information and documents concerning planned PCAOB

inspections in 2017, and by transmitting such information by

email and telephone, all in breach of duties of confidentiality

owed to the PCAOB by former and current PCAOB employees.

          Counts Three through Five of the Indictment charge

violation of Title 18, United States Code, Section 1343, which

provides in pertinent part:

"Whoever, having devised or intending to devise any

scheme or artifice to defraud, or for obtaining money or

property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be

transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings,

signs, signals, pictures, or sounds for the purpose of

executing such scheme or artifice, shall be [guilty of a

crime]."

(Continued on next page)

1        Turning to the elements of Counts Three through Five,

2   in order to meet its burden of proof, the government must

3   establish beyond a reasonable doubt the following elements of

4   the crime of wire fraud:

5        First, that there was a scheme or artifice to defraud

6   or to obtain money or property by false or fraudulent

7   pretenses, representations, or promises;

8        Second, that the defendant you are considering

9   knowingly and willfully participated in the scheme or artifice

10  to defraud with knowledge of its fraudulent nature and with

11  specific intent to defraud;

12       Third, that in execution of that scheme the defendant

13  you are considering used or caused the use of interstate wires.

14       I will discuss each in turn.

15       As to the first element, a scheme or artifice is

16  merely the plan for the accomplishment of an object.  A scheme

17  to defraud is any plan, device, or action to obtain money or

18  property by means of false or fraudulent pretenses,

19  representations, or promises reasonably calculated to deceive

20  persons of average prudence.

21       "Fraud" is a general term that embraces all the

22  various means that human ingenuity can devise and that are

23  resorted to by an individual to gain advantage over another by

24  false representations, suggestions, or suppression of the truth

25  or deliberate disregard for the truth.  Thus, a scheme to

1  defraud is a plan to deprive another of money or property by

2  trick, deceit, deception, or swindle.

3       The government alleges that there was a scheme to

4  misappropriate, embezzle, obtain, share, and use the PCAOB's

5  confidential information concerning inspections.  The words

6  "misappropriate" and "embezzle" are synonyms for these purposes

7  and mean the fraudulent appropriation of property by a person

8  to whom such property has been entrusted.

9       A person commits embezzlement when he, with the intent

10  to defraud, converts to his own use property belonging to

11  another where the property initially lawfully came within his

12  possession or control.  In the context of a criminal scheme to

13  defraud, the words "obtain," "share," and "use" likewise mean

14  to do those things fraudulently, that is, willfully and with

15  the intent to defraud, which I will define for you in a moment.

16       A scheme to defraud must have money or property as its

17  object.  You are instructed that the definition of "property"

18  for purposes of the wire fraud statute includes an

19  organization's or an entities's confidential information that

20  is of value to that organization or entity.  In this case the

21  indictment alleges that certain PCAOB information and documents

22  concerning planned PCAOB inspections constituted such property.

23       Information is confidential if at the time it was

24  subject to a scheme to defraud, the information was both

25  considered and treated by an entity in a way that maintained

1   the entity's exclusive right to the information.  The entity

2   must both consider the information to be confidential and take

3   affirmative steps to treat the information as confidential and

4   maintain exclusivity.

5          Factors that you may consider in determining whether

6   the PCAOB treated the information at issue as confidential

7   include but are not limited to written policies, employee

8   training, measures taken to guard the information's secrecy,

9   the extent to which the information is known outside the

10  organization, and the ways in which employees may access and

11  use the information.

12         Now I will say a little more about what it means for a

13  person to embezzle confidential information.

14         A person is entrusted with confidential information

15  when he is expected to keep the information confidential or at

16  least that the relationship between the person and the owner of

17  the information implies such a duty.  The person entrusted with

18  the information embezzles information from the owner only if he

19  deceives the owner about his intent to violate his duty of

20  trust and confidentiality by not disclosing to the owner that

21  he intends to use the confidential information for his own

22  personal gain.

23         Whether or not the scheme actually succeeded is really

24  not the question.  You may consider whether it succeeded in

25  determining whether the scheme existed.

1          A scheme to defraud need not be shown by direct

2     evidence but may be established by all of the circumstances and

3     facts in the case.

4          There is one more thing I must tell you about schemes

5     to defraud.  If you find that a scheme to defraud the PCAOB

6     existed, it is irrelevant whether the PCAOB inspection process

7     was onerous or whether the PCAOB was a difficult regulator.

8     However, the actions of the PCAOB as well as defendants'

9     opinions of the organization may be relevant to the respective

10    defendant's state of mind and intent, which the Court now turns

11    to.

12         As to the second element of wire fraud, the government

13    must establish beyond a reasonable doubt that the defendants

14    devised or participate in the fraudulent scheme knowingly,

15    willfully, and with the specific intent to defraud.

16         To devise a scheme to defraud is to concoct or plan

17    it.  To participate in a scheme to defraud means to associate

18    oneself with a scheme while it is ongoing with a view and

19    intent toward making it succeed.  While a mere onlooker is not

20    a participant in a scheme to defraud, it is not necessary that

21    a participant be someone who personally and visibly executes

22    the scheme to defraud.

23         In order to satisfy this element, it is not necessary

24    for the government to establish that the defendant you are

25    considering originated the scheme to defraud.  It is sufficient

if you find that a scheme to defraud existed even if originated by another and that the defendant, while aware of the scheme's existence, knowingly participated in it.

It is also not required that the defendant you are considering participated in or had knowledge of the all of the operations of the scheme.  The guilt of the defendant is not covered by the extent of his participation.

It also is not necessary that the defendant you are considering participated in the illegal scheme from the beginning.  A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter.

Even if the defendant participated in the scheme to a lesser degree than others, he is nevertheless equally guilty so long as that defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.  As I previously noted, before the defendant may be convicted of the fraud charged here, he must also be shown to have acted knowingly and willfully and with a specific intent to defraud.

A person acts knowingly when he acts voluntarily and deliberately and not because of ignorance, mistake, accident,

1    or carelessness.  To act willfully means to act voluntarily and

2    with a wrongful purpose.  "Intent to defraud" means to act

3    knowingly and with the specific intent to deceive for the

4    purpose of causing some financial or property loss to another.

5            The question of whether a person acted knowingly,

6    willfully, and with intent to defraud is a question of fact for

7    you to determine like any other fact question.  This question

8    involves one's state of mind.

9            Direct proof of knowledge and fraudulent intent is

10   almost never available.  It would be a rare case where it could

11   be shown that a person wrote or stated that as of a given time

12   in the past he committed an act with fraudulent intent.  Such

13   direct proof is not required.

14           The ultimate facts of knowledge of criminal intent,

15   though subjective, may be established by circumstantial

16   evidence based upon a person's outward manifestations, his

17   words, his conduct, his acts, and all of the surrounding

18   circumstances disclosed by the evidence and the rational or

19   logical inferences that may be drawn therefrom.

20           Circumstantial evidence, if believed, is of no less

21   value than direct evidence.  In either case, the essential

22   elements of the crime charged must be established beyond a

23   reasonable doubt.

24           Now, evidence has been admitted relating to PCAOB

25   bylaws and ethics rules governing the conduct of PCAOB

1  employees.  Whether a PCAOB employee complied with the PCAOB's

2  bylaws and ethics rules is not determinative of the innocence

3  or guilt of any defendant in this case.  Nor does a purposeful

4  violation of a workplace rule standing alone mean that the

5  defendant acted with the requisite criminal intent.

6          As a practical matter, then, in order to sustain the

7  charges against the defendant you are considering, the

8  government must establish beyond a reasonable doubt that he

9  knew that his conduct as a participant in the scheme was

10  calculated to deceive as opposed to merely transgressing

11  ethical standards and workplace rules and nonetheless that he

12  associated himself with the alleged fraudulent scheme.

13          The third and final element that the government must

14  establish beyond a reasonable doubt is the use of an interstate

15  wire communication in furtherance of the scheme to defraud.

16  Wire communications include telephone calls, emails, and text

17  messages.  The wire communication must pass between two or more

18  states: for example, a telephone call or an email between two

19  states.

20          The use of the wires need not itself be a fraudulent

21  representation.  It must, however, further or assist in the

22  carrying out of the scheme to defraud.  It is not necessary for

23  the defendant you are considering to be directly or personally

24  involved in the wire communication as long as the communication

25  was reasonably foreseeable in the execution of the alleged

1   scheme to defraud in which that defendant is accused of

2   participating.

3        In this regard, it is sufficient to establish this

4   element of the crime if the evidence justifies a finding that

5   the defendant you are considering caused the wires to be used

6   by others.  This does not mean that that defendant must

7   specifically have authorized others to, for example, make a

8   call or send an email.  When one does an act with knowledge

9   that the use of the wires will follow in the ordinary course of

10  business or where such use of the wires can reasonably be

11  foreseen, even though not actually intended, then he causes the

12  wires to be use.

13        The jury must unanimously agree that at least one such

14  wire communication in furtherance of a scheme to defraud was

15  proven by the government beyond a reasonable doubt.

16        With respect to these substantive counts, that is,

17  Counts Three through Five, I have stated what the elements are.

18  Each of those counts also charges the respective defendants

19  with violating 18 U.S.C. section 2, the aiding and abetting

20  statute.  That is, each defendant is charged not only as a

21  principal who committed the crime but also as an aider and

22  abettor.

23        Aiding and abetting is set forth in section 2(a) of

24  the statute.  That section reads in part as follows.  "Whoever

25  commits an offense against the United States or aids or abets

1    or counsels, commands, or induces or procures its commission is

2    punishable as a principal."

3         Under the aiding and abetting statute it is not

4    necessary for the government to show that a defendant himself

5    physically committed the crime with which he is charged in

6    order to for you to find the defendant guilty.  Thus, even if

7    you do not find beyond a reasonable doubt that the defendant

8    you are considering himself committed the crime charged, you

9    may under certain circumstances still find the defendant guilty

10   of that crime as an aider or abettor.

11        A person who aids or abets another person of an

12   offense is just as guilty of that offense as if he committed it

13   himself.  Accordingly, you may find the defendant guilty of the

14   substantive crime if you find beyond a reasonable doubt that

15   the government has proved that another person actually

16   committed the crime and that the defendant aided and abetted

17   that person in the commission of the crime.

18        As you can see, the first requirement is that another

19   person has committed the crime charged.  Obviously, no one can

20   be convicted of aiding and abetting the criminal acts of

21   another if no crime was committed by the other person in the

22   first place.  But if you do find that a crime was committed,

23   then you must consider whether the defendant aided or abetted

24   the commission of that crime.

25        In order to aid or abet another to commit a crime, it

1   is necessary that a defendant act willfully, knowingly, and

2   with the intent to defraud to associate himself in some way

3   with the crime and seek by some act to help make the crime

4   succeed.  Participation in a crime is willful if action is

5   taken voluntarily and intentionally or, in the case of a

6   failure to act, with the specific intent to fail to do

7   something the law requires to be done, that is to say, with an

8   improper purpose.

9        The mere presence of a defendant where a crime is

10  being committed, even coupled with knowledge by the defendant

11  that a crime is being committed, or the mere acquiescence by

12  the defendant in the criminal conduct of others, even with

13  guilty knowledge, is not sufficient to establish aiding and

14  abetting.  An aider and abettor must have some interest in the

15  criminal venture.

16       Furthermore, a person cannot be found guilty of aiding

17  and abetting a crime that has already been committed.  In order

18  to be an aider or abettor, a person must knowingly, willfully,

19  and with intent to defraud associate with the scheme to defraud

20  while the scheme was ongoing.  If the wire fraud scheme you are

21  considering for a particular count was already complete by the

22  time the defendant you are considering was made aware of it,

23  you cannot find that defendant guilty as an aider and abettor

24       To determine whether the defendant aided and abetted

25  the commission of the crime with which he is charged, ask

1    yourself these questions.  Did he participate in the crime

2    charged as something he wished to bring about?  Did he

3    associate himself with the criminal venture knowingly and

4    willfully?  Did he seek by his actions to make the criminal

5    venture succeed?  If he did, then the defendant you are

6    considering is an aider and abettor and is therefore guilty of

7    the offense.  If he did not, then the defendant is not an aider

8    and abettor and is not guilty as an aider and abettor of that

9    offense.

10            Now that we have discussed the three substantive

11    counts in the indictment, let us turn to the conspiracy counts.

12    Count Two of the indictment charges the defendants David

13    Middendorf and Jeffrey Wada with conspiring and agreeing with

14    others to commit wire fraud between in or about April 2015 to

15    in or about February 2017.

16            A conspiracy is a kind of criminal partnership.  It is

17    an agreement of two or more persons to join together to

18    accomplish some unlawful purpose.  As I explained earlier, the

19    crime of conspiracy or agreement to violate a federal law is an

20    independent offense.  It is separate and distinct from the

21    actual violation of any specific federal laws, which the law

22    refers to as substantive crimes.  Indeed, you may find the

23    respective defendants guilty of the crime of conspiracy even if

24    you find that the substantive crimes that were the objects or

25    goals of the charged conspiracy were never actually committed.

1          Count Two.

2          To sustain its burden of proof with respect to Count

3   Two of the indictment, the government must prove beyond a

4   reasonable doubt the following two elements:

5          First, the existence of the conspiracy charged in

6   Count Two of the indictment, that is, the existence of any

7   agreement or understanding to commit the unlawful object of the

8   charged conspiracy;

9          Second, that the defendant you are considering

10  knowingly and willfully became a member of that alleged

11  conspiracy during the applicable time period.

12         The object of a conspiracy is the illegal goal that

13  the co-conspirators seek to achieve.  The object of the

14  conspiracy charged in Count Two is to commit wire fraud.  I

15  have previously explained to you the elements of the

16  substantive offense of wire fraud.

17         Now let us consider the first element of the

18  conspiracy charge.  The first element which the government must

19  prove beyond a reasonable doubt to establish the offense of

20  conspiracy is that two or more persons entered into the

21  unlawful agreement charged in Count Two of the indictment.

22  That count alleges that defendants David Middendorf and Jeffrey

23  Wada conspired with others to commit wire fraud.

24         In order for the government to satisfy this element,

25  you need not find that the alleged members of the conspiracy

met together and entered into any express or formal agreement.

Similarly, you need not find that the alleged conspirators

stated in words or writing what the scheme was, its object or

purpose, or every precise detail of the scheme, or the means by

which its purpose or object was to be accomplished.

What the government must prove is that there was a

mutual understanding, either spoken or unspoken, between two or

more persons to cooperate with each other to accomplish an

unlawful act.  You may, of course, find that the existence of

an agreement to disobey or disregard the law as charged in

Count Two of the indictment has been established by direct

proof.  However, since conspiracy is by its very nature is

characterized by secrecy, you may also infer its existence from

the circumstances of this case and the conduct of the parties

involved.

In a very real sense, then, in the context of

conspiracy cases, actions often speak louder than words.  In

this regard you may, in determining whether an unlawful

agreement existed here, consider the actions and statements of

all of those you find to be participants as proof that a common

design existed on the part of the persons charged to act

together to accomplish an unlawful purpose.

You will recall that I have admitted into evidence

against the defendants the acts and statements of others

because these acts and statements were committed by persons

1    who, the government charges, were also co-conspirators of the

2    defendants on trial.  The reason for allowing this evidence to

3    be received against the defendants has to do with the nature of

4    the crime of conspiracy.

5           A conspiracy is often referred to as a partnership in

6    crime.  Thus, as in other types of partnerships, when people

7    enter into a conspiracy to accomplish an unlawful end, each and

8    every member becomes an agent for the other conspirators in

9    carrying out the conspiracy.

10          Accordingly, the reasonably foreseeable acts,

11   declarations, statements, and omissions of any member of the

12   conspiracy and in furtherance of the common purpose of the

13   conspiracy are deemed under the law to be the acts of all of

14   the members, and all the members are responsible for such acts,

15   declarations, statements, and omissions.

16          If you find beyond a reasonable doubt that the

17   respective defendants were members of the conspiracy charged in

18   the indictment, then any acts done or statements made in

19   furtherance of the conspiracy by persons also found by you to

20   be members of the conspiracy may be considered against that

21   defendant.  This is so even if such acts were done and

22   statements were made in the defendant's absence and without his

23   knowledge.

24          However, before you may consider the statements or

25   acts of a co-conspirator in deciding the issue of a defendant's

1    guilt, you must first determine that the acts and statements

2    were made during the existence and in furtherance of the

3    unlawful scheme.  If the acts were done or the statements made

4    by someone whom you do not find to have been a member of the

5    conspiracy, or if they were not done or said in furtherance of

6    the conspiracy, they may be considered by you as evidence only

7    against the member who did or said them.

8            If you find that the government has proven beyond a

9    reasonable doubt that the conspiracy charged in Count Two of

10   the indictment existed, then you must consider the second

11   element of the crime.  The second element the government must

12   prove beyond a reasonable doubt to establish the offense of

13   conspiracy is that the respective defendants knowingly,

14   willfully, and voluntarily became a member of the alleged

15   conspiracy.

16           I have already instructed you on the definitions of

17   "knowingly" and "willfully," and you should apply those

18   definitions here.

19           In deciding whether the defendant you are considering

20   was in fact a member of the conspiracy, you must consider

21   whether the defendant knowingly and willfully joined the

22   conspiracy intending to advance or achieve its goals.  Did he

23   participate in the conspiracy with knowledge of its unlawful

24   purpose and with the specific intention of furthering its

25   objective?

1            It is important for you to note that the respective

2      defendant's participation in the conspiracy must be established

3      by independent evidence of his own acts or statements as well

4      as those of the other alleged co-conspirators and the

5      reasonable inferences which may be drawn from them.

6            A defendant's knowledge is a matter of inference from

7      the facts proved.  In that connection I instruct you that to

8      become a member of the conspiracy, the defendant you are

9      considering need not have known the identities of each and

10     every other member, nor need he have been apprised of all of

11     their activities.  Moreover, defendant you are considering need

12     not have been fully informed as to all the details or the scope

13     of the conspiracy in order to justify an inference of knowledge

14     on his part.  The defendant must, however, have agreed to

15     participate in the conspiracy charged with knowledge of its

16     object.

17           The extent of a defendant's participation has no

18     bearing on the issue of a defendant's guilt.  A conspirator's

19     liability is not measured by the extent or duration of his

20     participation.  Indeed, each member may perform separate and

21     distinct acts and may perform them at different times.  Some

22     conspirators play major roles while others play minor parts in

23     the scheme.  An equal role is not what the law requires.  In

24     fact, even a single act may be sufficient to draw a defendant

25     within the ambit of the conspiracy.

1          I want to caution you, however, that a defendant's

2    mere presence at the scene of the alleged crime does not by

3    itself make him a member of the alleged conspiracy.  Similarly,

4    mere association with one or more members of the alleged

5    conspiracy does not automatically make any defendant a member.

6    A person may know, supervise, work for or with, or be friendly

7    with a member of a conspiracy without being a conspirator

8    himself.  Mere similarity of conduct or the fact that

9    individuals may have worked together and discussed common aims

10   and interests does not make them members of a conspiracy.

11         I also want to caution you that mere knowledge or

12   acquiescence without participation in the unlawful plan does

13   not make a defendant a member of the conspiracy.  Moreover, the

14   fact that the acts of a defendant without knowledge merely

15   happen to further the purposes or objectives of a conspiracy

16   does not make him a member of the conspiracy.  More is required

17   under the law.  What is necessary is that the defendant must

18   have participated with knowledge of the purpose or objective of

19   the conspiracy and with the specific intention of aiding in the

20   accomplishment of that unlawful end.

21         The government is not required to prove that the

22   members of the alleged conspiracy were successful in achieving

23   the object of the conspiracy.

24         We turn now to the final count in the indictment,

25   Count One.  Count One charges Mr. Middendorf and Mr. Wada with

conspiracy to defraud the United States or an agency thereof.
The relevant statute covering this charge is section 371 of
Title 18 of the United States Code.  That section provides as
follows:

"If two or more persons conspire to defraud the United
States or any agency thereof in any manner or for any purpose
and one or more of such persons do any act to effect the object
of the conspiracy, each is guilty of a crime."

Count One charges the defendants with participating in
a conspiracy with the following object: to defraud an agency of
the United States, the SEC.  The indictment alleges that in or
about April 2015 to in or about February 2017, the defendants
and other individuals conspired and agreed together to defraud
the United States and the SEC.

The indictment charges defendants and their alleged
co-conspirators with employing deceit, craft, trickery, and
dishonest means to impede, impair, defeat, and obstruct a
lawful function of the SEC.  The indictment also alleges in
Count One several overt acts that are alleged to have been
committed in furtherance of the conspiracy, which I will
describe for you later.

As I instructed you earlier, conspiracy is a kind of
criminal partnership, an agreement of two or more persons to
join together to accomplish some unlawful purpose.  The crime
of conspiracy, or agreement, to defraud the United States as

1    charged in this indictment is an independent offense.

2           In order to sustain its burden of proof with respect

3    to conspiracy charged in Count One, the government must prove

4    beyond a reasonable doubt each of the following three elements.

5           First, the government must prove beyond a reasonable

6    doubt the existence of the conspiracy charged in Count One,

7    that is, an agreement or understanding between two or more

8    persons to defraud the SEC.  Therefore, the first question for

9    you in Count One is did the conspiracy alleged in Count One

10   exist.

11          Second, the government must prove beyond a reasonable

12   doubt that the defendant you are considering knowingly and

13   willfully became a member of the conspiracy, that is, that he

14   knowingly associated himself with and participated in the

15   alleged conspiracy with intent to further its unlawful

16   objectives.

17          Third, as to Count One the government must prove

18   beyond a reasonable doubt that at least one of the members of

19   the conspiracy committed at least one overt act in furtherance

20   of the conspiracy.

21          I have already instructed you on the first two

22   elements, and you should apply those instructions here.  As to

23   the third element, the government must prove beyond a

24   reasonable doubt that some member of the conspiracy knowingly

25   and willfully committed at least one overt act in furtherance

of the objective of the conspiracy and that this overt act was

performed during the existence or life of the conspiracy and

was done to somehow further the goal of the conspiracy or

agreement.

The term "overt act" means some type of outward,

objective action performed by one of the members of the

conspiracy that furthers the objectives of the conspiracy.  An

overt act may itself be a lawful act; however, the act must be

a step in achieving the conspiratorial objectives.

The indictment alleges the following overt acts.

A.   In or about May 2015 Thomas Whittle sent an email

from KPMG's Manhattan office soliciting confidential PCAOB

information concerning which of KPMG's engagements would be

subject to inspection by the PCAOB in 2015.

B.   In or about June 2015 David Britt sent an email

from KPMG's Manhattan office soliciting confidential PCAOB

information concerning which of KPMG's engagements would be

subject to inspection by the PCAOB in 2015.

C.   In or about March 2016 Jeffrey Wada called Cynthia

Holder and provided confidential PCAOB information concerning

the identity of certain KPMG engagements that would be subject

to inspection by the PCAOB in 2016.

D.   On or about March 28, 2016, during the

documentation period for most of the engagements at issue,

David Middendorf, Thomas Whittle, David Britt, and others

1    participated in a conference call in KPMG's Manhattan office

2    during which they discussed the utilization of valuable

3    confidential PCAOB information concerning the identity of

4    certain of KPMG's engagements that would be inspected by the

5    PCAOB in 2016.

6          E.   On or about March 28, 2016, David Britt sent an

7    email from KPMG's Manhattan office directing that access be

8    given to various audit files in order to allow secret

9    re-reviews to occur.

10         F.   In or about January 2017 Jeffrey Wada and Cynthia

11   Holder spoke on the telephone, during which conversation Mr.

12   Wada shared valuable confidential PCAOB information concerning

13   the identity of KPMG's engagements that would likely be subject

14   to inspection by the PCAOB in 2017.

15         G.   In or about February 2017 Jeffrey Wada and Cynthia

16   Holder spoke on the telephone, during which conversation Mr.

17   Wada shared valuable confidential PCAOB information concerning

18   the identity of certain of KPMG's engagements that would be

19   subject to inspection by the PCAOB in 2017.

20         H.   In or about February 2017 David Middendorf, Thomas

21   Whittle, and others participated in a conference call in KPMG's

22   Manhattan office during which they acquired and discussed the

23   utilization of valuable confidential PCAOB information

24   concerning the identity of certain of KPMG's engagements that

25   would be subject to inspection by the PCAOB in 2017.

1          In order for the government to satisfy this element,

2     it is not required that all of the overt acts alleged in the

3     indictment or even any of the overt acts contained in the

4     indictment be proven.  However, you must unanimously agree that

5     the same overt act was committed.

6          Similarly, you need not find that Mr. Middendorf or

7     Mr. Wada committed the overt act.  It is sufficient for the

8     government to show that one of the alleged conspirators other

9     than the defendant you are considering knowingly committed an

10    overt act in furtherance of the conspiracy, since such an act

11    becomes in the eyes of the law the act of all of the members of

12    the conspiracy.

13         You are further instructed that the overt act need not

14    have been committed at precisely the time alleged in the

15    indictment.  The sufficient if you are convinced beyond a

16    reasonable doubt that it occurred at or about the time and

17    place stated.

18         Now I will instruct you on the object of the charged

19    conspiracy in Count One.

20         The objects of a conspiracy are the illegal goals the

21    co-conspirators agree or hope to achieve.  The indictment here

22    charges that the conspiracy alleged in Count One had one

23    object: defrauding the SEC.  You must find beyond a reasonable

24    doubt that this object was proven.

25         Specifically, the indictment charges that the

defendants and others, known and unknown, willfully and

knowingly, using deceit, draft, trickery, and dishonest means,

impeded, impaired, defeated, and obstructed a lawful function

of the SEC.

A conspiracy to defraud the United States need not

necessarily involve cheating the government out of money or

property.  The statute also includes conspiracies to interfere

with or obstruct any lawful government function by fraud,

deceit, or any dishonest means.  I instruct you that the SEC is

an agency of the United States government.

The term "conspiracy to defraud the United States" in

this indictment therefore means that the defendants and their

alleged co-conspirators are accused of conspiring to impede,

impair, obstruct, or defeat by fraudulent or dishonest means

the lawful regulatory and enforcement functions of the SEC.

Dishonestly obstructing the lawful function of a

government agency must be a purpose of the conspiracy, not

merely a foreseeable consequence of it.  However, defrauding

the SEC need not be the defendant's sole or even primary

purpose so long as it is a purpose of the scheme.  The intent

to defraud the SEC may be incidental to another primary

motivation or purpose.  All that is required is that an object

of the conspiracy was to interfere with or obstruct one of the

SEC's lawful government functions by deceit, craft, or trickery

or by means that are dishonest.

1          Count One does not require proof that the defendants

2     intended to directly commit the fraud themselves.  Proof that

3     the defendant intended to use a third party as a go-between may

4     be sufficient.  But the government must prove that the United

5     States or one of its agencies or departments was the ultimate

6     target of the conspiracy that the defendants intended to

7     defraud.

8          I have instructed you that the SEC is an agency of the

9     United States.  But I instruct you now that the PCAOB is not an

10    agency of the United States or part of the United States

11    government.

12         With respect to Count One, the government must prove

13    that the defendants intended to defraud the SEC as the ultimate

14    target of the conspiracy.  Fraudulent conduct directed solely

15    at a third party, here the PCAOB, is not a fraud against the

16    United States.  Therefore, if you conclude that the government

17    has proven that the only target of the conspiracy was the PCAOB

18    and not also the SEC, then you must find the defendants not

19    guilty as to Count One.

20         In addition, only conduct that both is intended to

21    impede the lawful functions of a government agency and is

22    fraudulent or dishonest will support a charge of conspiracy to

23    defraud a government agency.

24         A conspiracy to impede the functions of a government

25    agency by fraudulent or dishonest means may include such things

1   as altering documents after they have been demanded by the

2   government agency, creating false documents, destroying

3   records, making false statements, attempting to induce others

4   to make false statements, or engaging in any other fraudulent

5   or deceptive conduct that would have the effect of impairing

6   the ability of the government agency to determine material

7   aspects of a transaction.

8          By citing these examples, I certainly do not mean to

9   suggest that these are the only actions that could impede the

10  SEC by fraudulent or dishonest means, nor do I express any view

11  as to whether conduct similar to these examples took place

12  here.

13         Not all conduct that impedes the lawful functions of a

14  government agency is illegal.  To be unlawful, such conduct

15  must entail fraud, deceit, or other dishonest means.  Thus, it

16  is not illegal simply to make the SEC's job harder.  Only an

17  agreement to engage in conduct that impedes the SEC and also

18  involves fraudulent, deceitful, or dishonest means constitutes

19  an illegal agreement to defraud the United States.

20         It is not necessary that the government or the SEC

21  actually suffer a financial loss from the scheme or that the

22  scheme violated any separate law.  A conspiracy to defraud

23  exists when there is an agreement to impede, impair, obstruct,

24  or defeat in any fraudulent or dishonest manner the lawful

25  functions of the SEC.

1          Where, however, there is an agreement to impede,

2    impair, obstruct, or defeat the lawful functions of the SEC by

3    fraudulent, deceptive, or dishonest means, the first element is

4    satisfied regardless of whether the means of doing so in that

5    particular instance are or are not unlawful in and of

6    themselves.

7          In sum, if you find the government proved beyond a

8    reasonable doubt that the charged conspiracy to defraud the SEC

9    existed, that the defendants you are considering joined it, and

10   that with respect to Count One only at least one overt act was

11   committed in furtherance of the conspiracy, then you should

12   find the defendant you are considering guilty as to that count.

13   On the other hand, if you find that the government has not

14   proved beyond a reasonable doubt any of those essential

15   elements, then you must find the defendant you are considering

16   not guilty.

17         In considering the various charges alleged in this

18   case, you must consider whether Mr. Middendorf and Mr. Wada

19   acted in good faith.  The defendants maintain that they acted

20   in good faith at all times.

21         Good faith is a complete and absolute defense to each

22   of the charges in this case.  If the defendant you are

23   considering believed in good faith that he was acting properly,

24   even if he was mistaken in his belief and even if someone was

25   injured as a result of his conduct, there is no crime.  An

1   honest mistake of judgment or negligence is not unlawful

2   intent, and a defendant who acts on such a basis can still be

3   acting in good faith.

4          The burden of establishing lack of good faith and

5   criminal intent rests on the government.  The defendant is

6   under no burden to prove his good faith.  Rather, the

7   government must prove beyond a reasonable doubt that a

8   defendant acted in bad faith, i.e., knowingly, willfully, and

9   with the unlawful intent for the charge you are considering.

10  If the evidence in this case leaves you with a reasonable doubt

11  as to whether Mr. Middendorf or Mr. Wada acted in bad faith,

12  you must find him not guilty.

13         Mr. Middendorf and Mr. Wada deny the government's

14  allegations.  Mr. Middendorf maintains that he acted in good

15  faith at all times and without the intent alleged in each count

16  in the indictment.  Mr. Wada contends that the government has

17  failed to prove beyond a reasonable doubt that he was the

18  source of the inspection list information obtained by Brian

19  Sweet in 2015, March 2016, January 2017, or February 2017.

20         Mr. Wada further contends that he was not a member of

21  any agreement to embezzle and misuse confidential information

22  to improve KPMG's inspection results, that there was no such

23  scheme to defraud, and that he did not participate in any such

24  scheme to defraud.  As to Count One, Mr. Wada further contends

25  that the government has failed to prove any purpose on his part

1    directed at impairing or impeding the United States in any way.

2            That concludes the substantive instructions.  I have

3    just a few general instructions now, and then you will go to

4    deliberate.

5            In addition to dealing with the elements of each of

6    the offenses, you must also consider the issue of venue as to

7    each offense: namely, whether any act in furtherance of

8    unlawful activity occurred within the Southern District of New

9    York.  The Southern District of New York includes Manhattan as

10   well as the Bronx, Westchester, Rockland, Putnam, Dutchess,

11   Orange, and Sullivan counties.

12           For the conspiracy Counts, Counts One and Two, it is

13   sufficient to satisfy the venue requirement if any act by

14   anyone in furtherance of the crime charged occurred within the

15   Southern District of New York.  The act itself need not be a

16   criminal act, and the act need not have been taken by the

17   defendant you are considering, so long as the act was part of

18   the crime that you find the defendant you are considering

19   committed.

20           For the wire fraud counts, it is sufficient if an

21   interstate wire transmission in furtherance of the scheme

22   originated or terminated in this district.

23           To satisfy this venue requirement only, the government

24   need not meet the burden of proof beyond a reasonable doubt.

25   The government must meet its burden of proof for venue only if

1   it establishes by a preponderance of the evidence that an act

2   in furtherance of the crime occurred within the Southern

3   District of New York.  A preponderance of the evidence means

4   something is more likely than not.

5          As we have proceeded through the indictment, you

6   noticed that it refers to various dates or times.  It does not

7   matter if the indictment provides that specific conduct is

8   alleged to have occurred on or about a certain date, month, or

9   time and the evidence indicates that in fact it was on a

10  different month, date, or time.  As I mentioned earlier, the

11  law only requires a substantial similarity between the dates

12  alleged in the indictment and the date established by testimony

13  and exhibits.

14         You will now retire to decide the case.  Again a few

15  high-level instructions.

16         Your function is to weigh the evidence in the case and

17  to determine the guilt or lack of guilt of the defendants with

18  respect to the charges in the indictment.  You must base your

19  verdict solely on the evidence and these instructions as to the

20  law and your obliged under your oath as jurors to follow the

21  law as I instruct you, whether you agree or disagree with the

22  particular law in question.

23         Your verdict must be unanimous.  This means that each

24  and every one of you must agree upon your verdict.  Each juror

25  is entitled to his or her opinion, but you are required to

exchange views with your fellow jurors.  This is the very

essence of jury deliberations.  It is your duty to consult with

one another and to deliberate with a view to reaching

agreement.

         If you start with one point of view but after

reasoning with other jurors it appears that your own judgment

is open to question, then of course you should not hesitate in

yielding your original point of view if you are convinced that

the opposite point of view is one that truly satisfies your

judgment and conscience.

         But you are not to surrender a view of the case that

you conscientiously believe merely because you are outnumbered

or because other jurors appear firmly committed to their views.

You should vote with the others only if you are convinced on

the evidence, the facts, and the law that it is the correct way

to decide the case.

         In sum, you the jury must deliberate as a body, but

each of you as an individual juror must discuss and weigh your

opinions dispassionately and adopt that conclusion which in

your good conscience appears to be in accordance with the

truth.  No juror should surrender his or her conscientious

beliefs solely for the purpose of returning a unanimous

verdict.

         I instruct you that you are not to discuss the case

unless all jurors are present.  Four or five or ten jurors

1   together are only a gathering of individuals.  Only when all

2   jurors are present do you constitute a jury, and only then may

3   you deliberate.

4          Remember, at all times you are not participants, you

5   are judges, judges of the facts.  Your sole interest is

6   impartially to assess the evidence to determine whether the

7   government has met its burden of proving guilt beyond a

8   reasonable doubt as to each of the charges.

9          If you are divided, do not report how the vote stands.

10  Simply state that you are divided.

11         If you have reached a verdict, do not report what it

12  is until you are asked in open court.  Simply inform me that

13  you have reached a verdict.

14         You are about to go into the jury room and begin your

15  deliberations.  The exhibits that were received in evidence

16  will be provided to you in the jury room.  In addition to paper

17  copies of many of the exhibits, you will be provided with a

18  laptop that contains certain exhibits that could not be

19  presented in hardcopy.  You will be given an exhibit list that

20  will explain which exhibits can be accessed on the laptop.

21         If you want any of the testimony to review, you may

22  also request that.  Please remember that it is not always easy

23  to locate what you might want, so be as specific as you

24  possibly can in requesting portions of the testimony.

25         If you want any further explanation of the law as I

1    have explained it to you, you may also request that.

2         Your requests for testimony, in fact any

3    communications with the Court, should be made to me in writing,

4    signed by your foreperson, and given to the marshal or the

5    deputy clerk.  In any event, do not tell me or anyone else how

6    the jury stands on any issue until there is a unanimous

7    verdict.

8         If you took notes during the trial, those notes are

9    only an aid to recollection.  They are not evidence, nor are

10   they a substitute for your recollection of the evidence in the

11   case.  Your notes are not entitled to any greater weight than

12   your actual recollection or the impression of each juror as to

13   what the evidence actually is.

14        I emphasize that if you took notes, you should not

15   show your notes to any other juror during your deliberations.

16   They are only for yourself.  If you did not take notes during

17   the trial, you should not be influenced by the notes of another

18   juror; instead, you should rely on your own recollection of the

19   evidence.  The fact that a particular juror has taken notes

20   does not entitle that particular juror's views to any greater

21   weight.

22        I have prepared a verdict form for you to use in

23   recording your decision.  Please use that form to report your

24   verdict.  The verdict form does not represent either evidence

25   or instructions on the law.

1          At the beginning of your deliberations you must choose

2   a foreperson.  The foreperson does not have any more power or

3   authority than any other juror, and his or her vote or opinion

4   does not count for any more than any other juror's vote or

5   opinion.  The foreperson is merely a spokesperson to the Court.

6   He or she will send out any notes.  And when the jury has

7   reached a verdict, he or she will notify the marshal that the

8   jury has reached a verdict, and you will come into open court

9   to give the verdict.

10         After you have reached a unanimous verdict, your

11  foreperson will fill in the form that has been given to you,

12  sign and date it, advise the marshal outside the door that you

13  are ready to return to the courtroom.  I will stress that each

14  of you must be in agreement with the verdict that is announced

15  in court.  Once your verdict is announced in open court and

16  officially recorded, I cannot ordinarily be revoked.

17         You are remind that you took an oath to render

18  judgment impartially and fairly, without prejudice or sympathy,

19  solely upon the evidence in the case and the applicable law.

20  I'm sure that if you follow your oath, listen to the views of

21  your fellow jurors, and apply your own common sense, you will

22  reach a fair verdict here.  Remember that your verdict must be

23  rendered without fear, without favor, and without prejudice or

24  sympathy.

25         Members of the jury, this concludes my instructions to

1   you.  I'll ask you to remain seated for a minute while I confer

2   with the attorneys to see if there are any additional

3   instructions they would like to have me given to you or

4   anything I have not covered in my previous statement.

5           (At the sidebar)

6           MS. KRAMER:  We have nothing, your Honor.

7           MR. COOK:  Your Honor page 7, the presumption of

8   innocence instruction, on the first line of the last paragraph

9   of that instruction I believe your Honor read "The presumption

10  of innocence also requires."  It should be "alone requires."

11          THE COURT:  Do you want me to clarify that?

12          MR. COOK:  Yes.

13          THE COURT:  Okay.  Anything else?

14          MR. BOXER:  I just had a question about the index.  Is

15  that the final one that was sitting here?

16          MS. KRAMER:  Is that our final index?

17          MR. BOXER:  Is that the one we intended to send back?

18          MS. MERMELSTEIN:  That's the one the paralegals gave

19  you.

20          MR. BOXER:  We'll look at it a little closer.

21          MS. KRAMER:  If your Honor is giving a clarification,

22  on page 23, the conspiracy instruction that is the second

23  paragraph under the heading B, the sentence in the middle of

24  the paragraph that begins "The essence of the crime of

25  conspiracy is an agreement," I believe your Honor said "or

1    undertaking" instead of "understanding."  If you are giving a

2    clarification, they are going to get the written charge, but we

3    would ask you to include that one.

4         THE COURT:  Okay.  Anything else?

5         MS. KRAMER:  We are going to make sure the index is in

6    order, and we will have a cart coming so we have the computer

7    and we can put the exhibits and the computer on that.

8         MR. WEDDLE:  I want to preserve our prior objections

9    and requests as to the instructions.

10        MR. BOXER:  Same, your Honor.

11        THE COURT:  Okay.

12        (In open court)

13        THE COURT:  As I said earlier, you will have a copy of

14   precisely what I read.  Although, as often happens when I try

15   to read a 50-page document, I screw up a few words.  There are

16   a couple of points that I think I misread the correct form of

17   what you will have.  I am going to highlight and repeat so it

18   is clear what I meant to say and what the correct version is

19   which you will have.

20        When I was talking about the presumption of innocence,

21   at page 7 of the copy of my instructions, I meant to say this.

22   I might have gotten a word wrong.

23        This presumption of innocence alone requires you to

24   acquit the defendants unless you as jurors are unanimously

25   convinced beyond a reasonable doubt of their guilt after a

 1    careful and impartial consideration of all evidence in this

 2    case.  It is removed if and only if as members of the jury you

 3    are satisfied that the prosecution has sustained its burden of

 4    proving the defendants guilty beyond a reasonable doubt.

 5         Then, when I was discussing the conspiracy counts

 6    compared to the substantive counts, which will be on page 23,

 7    in the middle of the page I want to clarify the following

 8    sentence.

 9         The essence of the crime of conspiracy is an agreement

10    or understanding to violate other laws.

11         Everything else that I read you will be getting a copy

12    of.

13         Before you retire into the jury room, I must inform

14    you, and some of you may know this, that the law provides for a

15    jury of 12 people in this case.  Three people, Jurors No. 13,

16    14, and 15, are alternates.  You will be allowed to leave the

17    courthouse during the deliberations, but you are not yet

18    excused as jurors.  In the event that one of the nonalternate

19    jurors can no longer deliberate, you will be recalled to

20    continue your service.

21         So, I am releasing you for now but not excusing you

22    from jury service yet.  You will not be part of the

23    deliberations, but it is possible that you will be called back

24    if something happens during deliberations with one of the other

25    jurors.  We have your contact information.  I believe you have

 1    ours as well.

 2            I am going to now not excuse you from jury service but

 3    let you go.  We will contact you either way, if we need you to

 4    come back or, if we don't need you, we will contact you to let

 5    you know that the trial is complete.  At this time you may

 6    gather your things, the three of you.  I want to thank you for

 7    your attentiveness and service.

 8            I'm sorry.  Can you come back for one second.  I just

 9    wanted to say a couple of more things.  I'm sorry that you in

10    all likelihood will miss the experience of deliberating with

11    the jury, but the law provides for a jury of 12 people in the

12    case.  Before the rest of the jury retires, if you have

13    anything in the jury room, please pick it up and take it out

14    before the deliberations start.

15            Also, please do not discuss the case with anyone over

16    the next few days.  We will let you know when the jury is done

17    deliberating.  At that point you can discuss the case with

18    anyone you want.  But I am going to ask that you continue what

19    I said before about not discussing the case, not doing any

20    research on the case, because it is possible that you will have

21    to come back and deliberate.  Thank you again.

22            (Alternate jurors not present)

23            THE COURT:  Now I am going to send you all back to

24    begin deliberations.  Given what we talked about in terms of

25    scheduling, I believe the plan was to break at 2 o'clock today

1    because of some issues.  I think we got lunch for you today

2    thinking we might finish earlier, so you can grab a quick by

3    the.  We will be sending in all the exhibits.

4            There won't be any significant time to deliberate

5    today.  So, assuming you are in fact breaking at 2 o'clock, you

6    will then come in Monday morning at 9:30 a.m. to begin

7    deliberations.

8            I want to emphasize what I said, that when there are

9    four, five, six, seven of you, even eleven of you, you are not

10   a jury, you should not be talking about the case.  It's just

11   like up until now.  You can talk about other things but not the

12   case.  Only when all 12 of you are in the jury room, only then

13   may you begin deliberations and only then are you the jury.

14           We will be, as I said, sending all the evidence back

15   into the jury room on a cart as well as a laptop.

16           I think that's it.  You can go back to deliberate.

17           JUROR:  Your Honor should we leave the books here?

18           THE COURT:  You can now take the notebooks back to you

19   and you can use them in your deliberations.  You should not

20   take the notebooks home.  Leave them in the jury room.

21           There is also a marshal who will be sitting outside

22   the jury room door.  Is the marshal here to be sworn?  Please

23   swear in the marshal.

24           (Marshal sworn)

25           THE COURT:  Before I send you back to retire, I want

1    to repeat one more time that your deliberations are in the jury

2    room.  When you leave for the weekend and over the weekend,

3    also at night, you should not be doing any research on the

4    case.  You should continue not discussing the case with others.

5    You should discuss the case with each other in the form of

6    deliberations only when all 12 of you are present.

7            You may now retire to the jury room and take your pads

8    with you to begin.  Thank you, folks.

9            (1:40 p.m., the jury commenced deliberations)

10           (Jury not present)

11           THE COURT:  Here is the cart.  Do we have the laptop

12   as well?

13           MS. KRAMER:  Yes, your Honor.

14           THE COURT:  I believe they are going to leave at about

15   2 o'clock.  Mr. Hampton will confirm with everybody when they

16   have left.  Starting on Monday morning, if you would all let

17   Mr. Hampton know if, in case there is a note from the jury, you

18   wander beyond the courtroom and its vicinity.

19           Anything else you wanted to address?

20           MR. BOXER:  No, your Honor.

21           MS. KRAMER:  No, your Honor.

22           MR. COOK:  No, your Honor.

23           MS. KRAMER:  Your Honor, do you want us to stay here

24   until 2 o'clock or are we excused with the understanding that

25   the jury is going to do what they are doing and leave at 2:00?

1          THE COURT:  I think you should probably stay until

2    2:00 just in case there is a note or something.

3          MS. KRAMER:  Certainly, your Honor, thank you.

4          THE COURT:  There is some chance that they say I

5    canceled my trip, I can stay until five.  So stay until 2:00

6    until you get confirmation from Mr. Hampton that they are

7    leaving.

8          (Adjourned to March 11, 2019, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25